1  John W. Dillon (Bar No. 296788)
2  Gatzke Dillon & Ballance LLP
   2762 Gateway Road
3  Carlsbad, California 92009
   Telephone: (760) 431-9501
4  Facsimile: (760) 431-9512
5  E-mail:  jdillon@gdandb.com

6  Attorney for Plaintiffs

7

8           **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | MATTHEW JONES; THOMAS FURRH; | Case No.: 3:19-cv-01226-L-AHG
   | KYLE YAMAMOTO; PWGG, L.P. (d.b.a. |
12 | POWAY WEAPONS AND GEAR and | Hon. M. James Lorenz and Magistrate
   | PWG RANGE); NORTH COUNTY | Judge Allison H. Goddard
13 | SHOOTING CENTER, INC.; BEEBE |
14 | FAMILY ARMS AND MUNITIONS LLC | **DECLARATION OF JOHN W.**
   | (d.b.a. BFAM and BEEBE FAMILY | **DILLON IN SUPPORT OF**
15 | ARMS AND MUNITIONS); FIREARMS | **PLAINTIFFS' MOTION FOR**
   | POLICY COALITION, INC.; FIREARMS | **PRELIMINARY INJUNCTION**
16 | POLICY FOUNDATION; THE CAL |
17 | GUNS RIGHTS FOUNDATION |
   | (formerly, THE CALGUNS | Complaint Filed: July 1, 2019
18 | FOUNDATION); and SECOND | Amended Complaint Filed: July 30, 2019
19 | AMENDMENT FOUNDATION, |
20 |                    Plaintiffs, | Date: Monday, November 18, 2019
21 | v. | Time: 9:00 a.m.
   | | Courtroom: Dept. 5B
22 | XAVIER BECERRA, in his official |
23 | capacity as Attorney General of the |
   | State of California, et al., |
24 |                    Defendants. |

25

26

27

28

---

*DECLARATION OF JOHN W. DILLON IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*

I, John W. Dillon, declare as follows:

1.    I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify to such facts.

2.    I have personally verified the documents described below and used the factual information within each document in the drafting of the Points and Authorities in Support of Plaintiffs' Preliminary Injunction motion.

3.    Attached hereto as **Exhibit 1** is a true and correct copy of the U.S. Department of Justice, Office of Justice Programs, "Bureau of Justice Statistics Special Report: Age Patterns of Victims of Serious Violent Crime" ("BJS Report").

4.    Attached hereto as **Exhibit 2** is a true and correct copy of the United States Secret Service National Threat Assessment Center: *Mass Attacks in Public Space – 2018*, Department of Homeland Security, Published July 2019.

5.    Attached hereto as **Exhibit 3** is a true and correct copy of *School Climate and Safety*, 2015-16 Civil Rights Data Collection, Data Highlights on School Climate and Safety in Our Nation's Public Schools, U.S. Department of Education Office for Civil Rights.

6.    Attached hereto as **Exhibit 4** is a true and correct copy of the digital article, *More than 228,000 students have experienced gun violence at school since Columbine*, The Washington Post's database of school shootings, The Washington Post. Updated May 8, 2019. Available at:

https://www.washingtonpost.com/graphics/2018/local/school-shootings-database/.

*Declaration Of John W. Dillon In Support Of Plaintiffs' Motion For Preliminary Injunction*

7.    Attached hereto as **Exhibit 5** is a true and correct copy of the digital article, *Three Decades of School Shootings: An Analysis* – A comprehensive review of nearly three dozen mass shootings, including Columbine, reveals some notable similarities, Tawnell D. Hobbs, The Wall Street Journal, published April 19, 2019. Available at: https://www.wsj.com/graphics/school-shooters-similarities/.

8.    Attached hereto as **Exhibit 6** is a true and correct copy of the digital article, *Everything We Know About The San Bernardino Terror Attack Investigation So Far,* Los Angeles Times, published December 14, 2015. Available at: https://www.latimes.com/local/california/la-me-san-bernardino-shooting-terror-investigation-htmlstory.html.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on October 4, 2019.

_____

John W. Dillon

**EXHIBITS**
**TABLE OF CONTENTS**

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 1 | U.S. Department of Justice, Office of Justice Programs, "Bureau of Justice Statistics Special Report: Age Patterns of Victims of Serious Violent Crime" | 0001 – 0030 |
| 2 | United States Secret Service National Threat Assessment Center: *Mass Attacks in Public Space – 2018*, Department of Homeland Security, Published July 2019 | 0031 – 0051 |
| 3 | *School Climate and Safety*, 2015-16 Civil Rights Data Collection, Data Highlights on School Climate and Safety in Our Nation's Public Schools, U.S. Department of Education Office for Civil Rights | 0052 – 0070 |
| 4 | *More than 228,000 students have experienced gun violence at school since Columbine*, The Washington Post's database of school shootings, The Washington Post | 0071 – 0078 |
| 5 | *Three Decades of School Shootings: An Analysis –* Tawnell D. Hobbs, The Wall Street Journal, published April 19, 2019 | 0079 - 0089 |
| 6 | *Everything We Know About The San Bernardino Terror Attack Investigation So Far,* Los Angeles Times, published December 14, 2015 | 0090 - 0104 |

*DECLARATION OF JOHN W. DILLON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION*

# EXHIBIT "1"

EXHIBIT 1
0001

U.S. Department of Justice
Office of Justice Programs

# Bureau of Justice Statistics
# Special Report

July 1997, NCJ-162031

# Age Patterns of Victims of Serious Violent Crime

By Craig A. Perkins
BJS Statistician

Vulnerability to violent crime victimization varies across the age spectrum. The victimization rate increases through the teenage years, crests at around age 20, and steadily decreases through the remaining years. This pattern, with some exceptions, exists across all race, sex, and ethnic groups.

For 1992-94, the rate of serious violent crime ranged from 37 per 1,000 persons age 12 to 14, to 50 per 1,000 persons age 18 to 21, to 3 violent crimes per 1,000 persons age 65 or older. Crime rates for individuals age 18 to 21 were 17 times higher than for persons age 65 or older.

This report examines serious violent crime across different age groups, focusing on persons younger than 25 from 1992 through 1994. It highlights key facts about serious violent crime, grouped by age, race, and sex.

Serious violent crimes include rape and sexual assault, robbery, and aggravated assault, as measured by the National Crime Victimization Survey (NCVS), and murders from data reported by law enforcement agencies to the FBI.

## Highlights

- Persons age 12 to 24 comprised:
  - 22% of the population,
  - 35% of murder victims, and
  - 49% of serious violent crime victims.
- Persons age 25 to 49 constituted:
  - 47% of the population,
  - 53% of murder victims, and
  - 44% of serious violent crime victims.
- Persons age 50 or older made up:
  - 30% of the population,
  - 12% of murder victims, and
  - 7% of serious violent crime victims.

- Persons age 18 to 21 were the most likely to experience a serious violent crime, and blacks in that age group were the most vulnerable:
  - 72 victimizations per 1,000 blacks,
  - 50 victimizations per 1,000 Hispanics, and
  - 46 victimizations per 1,000 whites.

- More than 52% of all rape/sexual assault victims were females younger than 25.

- Almost 1 in 10 murder victims age 18 to 21 were black.

### Violent crime rates by age

Adjusted victimization rate per 1,000 persons age 12 and older



Note: Violent crimes included are homicide, rape, robbery, and both simple and aggravated assault. The light gray area indicates that because of changes made to the victimization survey, data prior to 1992 are adjusted to make them comparable to data collected under the redesigned methodology. The adjustment methods are described in *Criminal Victimization 1973-95.*

**EXHIBIT 1**
**0002**

The Bureau of the Census, under the supervision of the Bureau of Justice Statistics (BJS), conducts the NCVS which interviews approximately 50,000 households. Annually the NCVS measures crimes not reported as well as those reported to police.

Each year between 1992 and 1994, U.S. residents age 12 or older experienced about 4.3 million serious violent victimizations on average. Persons age 12 to 24 suffered about 49% (2 million) of the total, although they made up less than a quarter of the U.S. population age 12 or older. Individuals age 40 or older were 47% of the general population but sustained 19% of the serious violent victimizations.

Persons younger than 25 were the most vulnerable to serious violent crime, regardless of how age patterns were analyzed. Rates controlling for population show the young with the highest number of victimizations per 1,000 individuals. Considering only adolescents and adults, the average age of violent crime victims is almost 11 years below the average age of the whole population, because of the over-representation of the young among crime victims.

The *Highlights* graph of trends presents age categories usually used in BJS reports; however, the remaining findings have age groupings identified with stages of life in the United States. This modified grouping is meant to help account for different life styles:
• Persons age 12 to 14 are generally in junior high school.
• Youth age 15 to 17 are in high school.
• Ages 18 to 21 include persons who have left high school and are enrolled in college or technical school or are seeking or starting jobs.
• Young adults age 22 to 24 are those individuals who have left college and are just beginning a career.
• Persons age 65 or older represent residents who have probably retired.

Also, there are too few sampled cases to analyze the age distribution of minority victims of rape or sexual assault (an estimated 1.1 million rapes of white non-Hispanic females, 236,000 rapes of black non-Hispanic females, and 121,000 rapes of Hispanic females for the 3-year period).

Although Hispanics are not a race, they are presented as a separate category within the racial categories.

| ⟨&⟩ | Indicates victimization information other than that about age patterns of victims. |

*2   Age Patterns of Victims of Serious Violent Crime*

**All serious violent crimes: Murder, rape, sexual assault, robbery, and aggravated assault**



Rates of serious violent crime per 1,000 persons

Age of victim

Rates of serious violent crime for 18-21 year olds — 17 times higher than for persons age 65 or older.

Persons between ages 12 and 24 — less than a fourth of the U.S. population age 12 or older, almost half of all serious victimizations.

Persons age 40 or older — almost half of the population age 12 or older, less than a fifth of the serious violent victimizations.



**The average age of U.S. residents age 12 or older was almost 41**

Overall U.S. population

**The average age of victims of serious violent crimes other than murder was 30 or under**

Murder

Rape/sexual assault

Robbery

Aggravated assault

Average age

On average each year, from 1992 to 1994, about 1 in 50 persons fell victim to a serious violent crime; among persons age 12 to 24, 1 in 23.

|  | Number of persons in the population for each victim | | | | |
|---|---|---|---|---|---|
| Age of victim | All serious violent crime | Murder | Rape/ sexual assault | Robbery | Aggravated assault |
| **Total** | **50** | **9,241** | **416** | **164** | **86** |
| 12 to 24 | 23 | 5,945 | 168 | 83 | 39 |
| 25 to 34 | 42 | 6,170 | 378 | 132 | 73 |
| 35 to 49 | 67 | 10,891 | 591 | 219 | 116 |
| 50 or older | 424 | 23,376 | 4,272 | 494 | 424 |

EXHIBIT 1
0003

## Murder



Rates of murder per 1,000 persons
Age of victim

Persons under age 25 —— 22% of the general population —— account for 35% of murder victims.

The youngest and oldest of the population had the lowest rates of murder —— less than 0.05 per 1,000 persons.

The pattern of murder victims resembles that of victims of other serious violent crimes —— rates increasing from the very young, cresting at ages 18 to 21, then decreasing.



**Murder, the least frequent violent crime, victimized fewer than 1 in 1,000 persons, age 12 or older**

Rates per 1,000 persons

Victims of murder, on average, were the oldest of serious violent crime victims. Over half of all murder victims were age 30 or younger (compared with age 25 for victims of other serious violent crimes).

| Serious violent offense | Median age of victim |
|---|---|
| Murder | 29 |
| Rape/sexual assault | 23 |
| Robbery | 26 |
| Aggravated assault | 25 |

## Rape or sexual assault



Rates of rape or sexual assault per 1,000 persons (male and female)
Age of victim

Slightly more than a fifth of all rape/sexual assault victims were age 18 to 21. The average age for victims was 27.

Rates of rape/sexual assault for individuals 18 to 21 were almost 2½ times higher than those for age 25 to 29.

Persons age 50 or older —— almost a third of the general population age 12 or older —— comprised 3% of rape/sexual assault victims.



**Rape or sexual assault (female)**
**1 in 89 females 12-24 were rape/sexual assault victims**

Rates per 1,000 females
Age of victim

Persons under 25 made up almost 50% of everyone suffering a serious violent crime and almost 56% of rape/sexual assault victims.

| Age of victim | Percent of population | Percent of victims | | |
|---|---|---|---|---|
| | | All violent crime | Rape/sexual assault | Robbery |
| Total | 100% | 100% | 100% | 100% |
| 12 to 14 | 5% | 10% | 8% | 11% |
| 15 to 17 | 5 | 12 | 12 | 10 |
| 18 to 21 | 7 | 17 | 21 | 14 |
| 22 to 24 | 5 | 11 | 14 | 9 |
| 25 to 29 | 9 | 13 | 9 | 12 |
| 30 to 34 | 11 | 11 | 13 | 12 |
| 35 to 39 | 10 | 8 | 9 | 8 |
| 40 to 49 | 17 | 12 | 10 | 12 |
| 50 to 64 | 16 | 5 | 2 | 6 |
| 65 or older | 15 | 2 | 1 | 4 |

*Age Patterns of Victims of Serious Violent Crime*  3

**EXHIBIT 1**
**0004**

## Robbery



Rates of robbery per 1,000 persons

Age of victim

*Robbery* is completed or attempted theft, directly
from a person, by force or threat of force,
with or without a weapon, and with or without injury.
Half of all robbery victims were age 26 or younger;
the most vulnerable to robbery were the young.
Persons age 21 or younger —— slightly less than a fifth
of the general population —— suffered close to half
of all robberies.



**Age patterns of robbery victims fall into 5 distinct ranges:
The 12-21 robbery rate is 6 times that of 50 or older.**

Age of victim / Approximate rates per 1,000 persons

1 in every 79 persons age 12 to 21 were robbery victims,
compared to 1 in every 211, age 22 or older.
Between 1992 and 1994, U.S. residents age 12 or older
experienced an annual average of about 1.3 million
robberies.
The average number of robberies each year was ——
457,000 among persons age 12-21
118,000 for age 22-24
319,000 for age 25-34
263,000 for age 35-49, and
130,000 for age 50 or older.

## Aggravated assault



Rates of aggravated assault per 1,000 persons

Age of victim

*Aggravated assault* includes attacks with a weapon, with
or without injury and attacks without a weapon that
result in serious injury such as broken bones, loss
of teeth, internal injuries, or loss of consciousness
—— or an undetermined injury requiring 2 or more
days of hospitalization.

Aggravated assault, the most frequent serious violent
crime, made up over half of all such crimes.
On average between 1992 and 1994, about 1 in every 2
persons who reported an aggravated assault was
younger than 25.
Persons age 50 or older —— almost a third of the
population over age 11 —— were 6% of aggravated
assault victims.
Each year 1992-94, on average, persons age 12 to 24
sustained about 1,200,000 aggravated assaults,
compared to 1,100,000 for persons age 25 to 49,
and 151,000 for those 50 or older.



Annual average number of victimizations, 1992-94

Age of victim

■ Aggravated assault    □ Robbery    ▨ Rape/sexual assault

Murder (not shown): 8,021, 12,129, and 2,743 victims for
each age category.

4    *Age Patterns of Victims of Serious Violent Crime*

**EXHIBIT 1**
**0005**

**Serious violent crime, by race and Hispanic origin**



Rates of serious violent crime per 1,000 persons

Blacks and Hispanics across all age groups were more at risk from violence than whites of comparable age —— 1 in 30 blacks, 1 in 35 Hispanics, and 1 in 58 whites, from 1992 to 1994.

For 18-to-21 year olds, 1 in 14 blacks, 1 in 20 Hispanics, and 1 in 22 whites experienced a serious violent victimization.

**Serious violent crime, by sex of victim**

**1 in 41 males and 1 in 62 females were violent crime victims**



Rates per 1,000 persons

Blacks and to a lesser degree Hispanics were over-represented among victims, relative to their proportion of the general population age 12 or older.

| Racial/ethnic groups | Percent | | Rates per 1,000 |
|---|---|---|---|
| | Population age 12 or older | Victims of serious violence | |
| **Total** | **100%** | **100%** | **20** |
| White | 77% | 65% | 17 |
| Black | 12 | 20 | 34 |
| Other | 3 | 4 | 24 |
| Hispanic | 8 | 12 | 29 |

Note: Whites, blacks, and others exclude Hispanics.



**Murder, by race**



Rates of murder per 1,000 persons

For whites and blacks, persons 18 to 21 were most at risk of becoming a murder victim.

Murder rates for blacks were 8 times higher than for whites —— 1 in every 894 and 1 in every 7,334 persons, respectively.

Blacks, about 12% of general population, comprised 51% of murder victims. Almost 1 in 10 of black murder victims were age 18 to 21.

**Murder, by sex of victim**

**1 in 10 murder victims were males, 18 to 21**



Rates per 1,000 persons

Murder rates for males 18 to 21 were 6 times higher than for their female counterparts. Rates for men 65 or older were 1½ times higher than for their female counterparts.

The average age for male murder victims was 32, compared to the female murder victim's average age of 37.

White murder victims had an average age of 35, while black murder victims had an average age of 30.

Over half of black murder victims were 29 or younger, compared to over half of white victims, 32 or older.

*Age Patterns of Victims of Serious Violent Crime* 5

**EXHIBIT 1**
**0006**

### Robbery, by race and Hispanic origin



Blacks and Hispanics under age 22 had robbery rates approximately twice those for whites — 1 in 48, 1 in 57, and 1 in 101 respectively, from 1992 to 1994.

Robbery rates for blacks peaked twice, for ages 18 to 21 and 30 to 34, at 24 robberies per 1,000 blacks — at 5 times the rate for age 50 or older, 5 per 1,000.

The average age for robbery victims was about 30 for whites and blacks, and 28 for Hispanics.

### Robbery, by sex of victim

**Almost 1 in 10 robbery victims were males 18 to 21**



Boys 12 to 14 and young women 18 to 21 reported the highest rates for robbery.

About 1 in every 54 boys age 12 to 14 was a robbery victim, compared to 1 in every 473 men age 65 or older.

The average ages for male and female robbery victims were at least 10 years younger than the average age of males and females in the general population.

|  | Average age | |
| --- | --- | --- |
|  | Male | Female |
| General population 12 or older | 40 yrs | 42 yrs |
| Robbery victims | 30 | 31 |

### Aggravated assault, by race and Hispanic origin



Slightly more than 1 in every 60 blacks, 1 in every 63 Hispanics, and 1 in every 96 whites were aggravated assault victims.

Blacks and Hispanics — 20% of the general population — were about 28% of aggravated assault victims .

The average age of aggravated assault victims was 25 for Hispanics, 26 for blacks, and 29 for whites.

### Aggravated assault, by sex of victim

**For 18 to 21, men twice as likely as women to be victimized**



Minority victims of aggravated assault were relatively younger than white victims.

| Aggravated assault victims' race and age | Percent of population | | Rates per 1,000 |
| --- | --- | --- | --- |
|  | General | Victim |  |
| **White** | **100%** | **100%** | **10** |
| 12 to 24 | 20 | 47 | 24 |
| 25 to 34 | 19 | 25 | 14 |
| 35 to 49 | 27 | 21 | 8 |
| 50 or older | 33 | 7 | 2 |
| **Black** | **100%** | **100%** | **17** |
| 12 to 24 | 28 | 53 | 31 |
| 25 to 34 | 22 | 23 | 17 |
| 35 to 49 | 27 | 20 | 13 |
| 50 or older | 23 | 5 | 3 |
| **Hispanic** | **100%** | **100%** | **16** |
| 12 to 24 | 33 | 61 | 29 |
| 25 to 34 | 26 | 19 | 12 |
| 35 to 49 | 24 | 17 | 11 |
| 50 or older | 17 | 4 | 3 |

**EXHIBIT 1**
**0007**

## Methodology

Except for homicide data provided by the Uniform Crime Reports, the tables in this report include data from the re-designed National Crime Victimization Survey (NCVS) for 1992, 1993, and 1994. The NCVS obtains information about crimes, including incidents not reported to police, from a continuous, nationally representative sample of households in the United States. Approximately 50,000 individuals age 12 or older are interviewed for the survey annually.

*Calculations of NCVS rates*

The rates in this report were annual average rates for 1992-94. The numerator of a given rate was the sum of the estimated victimizations that occurred for all three years for each respective demographic group; the denominator was the sum of the annual population totals for these same years and demographic groups.

*Calculations of NCVS ratios*

The ratios in this report were annual average ratios. The numerator of the given ratio was the sum of the annual population totals for all 3 years for each respective demo-graphic group; the denominator was the sum of the esti-mated victimizations that occurred for all 3 years for each demographic group.

*Application of standard errors*

The results presented in this report were tested to deter-mine whether the observed difference between groups was statistically significant. Comparisons mentioned in the re-port passed a hypothesis test at the .05 level of statistical significance (or the 95-percent confidence level), meaning that the estimated difference between comparisons was greater than twice the standard error of the difference.

Although the data in this report were collected over 3 years, some estimates were based on a relatively small number of sample cases, particularly for certain demographic groups.

Caution should be used when comparing estimates not dis-cussed in the text because since seemingly large differ-ences may not be statistically significant.

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Jan M. Chaiken, Ph.D., is director.

BJS Special Reports address a specific topic in depth from one or more datasets that cover many topics.

Craig A. Perkins wrote this report. Patsy Klaus provided analytical and programming assistance; Cathy Maston provided statistical review; and Diane Craven reviewed the computer programs. Rhonda Keith produced and edited the report, supervised by Tom Hester. Marilyn Marbrook, assisted by Jayne Robinson and Yvonne Boston, administered final production.

July 1997, NCJ-162031

Links to the data for the graphics of this report can be immediately accessed and viewed on the Internet. This report and many of its data, as well as other reports and statistics, are found at the Bureau of Justice Statistics Internet World Wide Web site: http://www.ojp.usdoj.gov/bjs/

**EXHIBIT 1**
**0008**

**Violent crime rates by age**

Adjusted victimization rate per 1,000 persons, age 12 and older

| Year | Age of victim | | | | | | |
|------|------|------|------|------|------|------|------|
|      | 12-15 | 16-19 | 20-24 | 25-34 | 35-49 | 50-64 | 65+ |
| 1973 | 81.8 | 81.7 | 87.6 | 52.4 | 38.8 | 17.2 | 9.1 |
| 1974 | 77.5 | 90.6 | 83.5 | 58.6 | 37.5 | 15.5 | 9.5 |
| 1975 | 80.3 | 85.7 | 80.9 | 59.5 | 36.9 | 17.8 | 8.3 |
| 1976 | 76.4 | 88.8 | 79.7 | 61.5 | 35.9 | 16.1 | 8.1 |
| 1977 | 83.0 | 90.2 | 86.2 | 63.5 | 35.8 | 16.8 | 8.0 |
| 1978 | 83.7 | 91.7 | 91.1 | 60.5 | 35.8 | 15.0 | 8.4 |
| 1979 | 78.5 | 93.4 | 98.4 | 66.3 | 38.2 | 13.6 | 6.2 |
| 1980 | 72.5 | 91.3 | 94.1 | 60.0 | 37.4 | 15.6 | 7.2 |
| 1981 | 86.0 | 90.7 | 93.7 | 65.8 | 41.6 | 17.3 | 8.3 |
| 1982 | 75.6 | 94.4 | 93.8 | 69.6 | 38.6 | 13.8 | 6.1 |
| 1983 | 75.4 | 86.3 | 82.0 | 62.2 | 36.5 | 11.9 | 5.9 |
| 1984 | 78.2 | 90.0 | 87.5 | 56.6 | 37.9 | 13.2 | 5.2 |
| 1985 | 79.6 | 89.4 | 82.0 | 56.5 | 35.6 | 13.0 | 4.8 |
| 1986 | 77.1 | 80.8 | 80.1 | 52.0 | 36.0 | 10.8 | 4.8 |
| 1987 | 87.2 | 92.4 | 85.5 | 51.9 | 34.7 | 11.4 | 5.2 |
| 1988 | 83.7 | 95.9 | 80.2 | 53.2 | 39.1 | 13.4 | 4.4 |
| 1989 | 92.5 | 98.2 | 78.8 | 52.8 | 37.3 | 10.5 | 4.2 |
| 1990 | 101.1 | 99.1 | 86.1 | 55.2 | 34.4 | 9.9 | 3.7 |
| 1991 | 94.5 | 122.6 | 103.6 | 54.3 | 37.2 | 12.5 | 4.0 |
| 1992 | 111.0 | 103.7 | 95.2 | 56.8 | 38.1 | 13.2 | 5.2 |
| 1993 | 118.4 | 114.2 | 91.2 | 57.9 | 42.1 | 17.0 | 5.6 |
| 1994 | 113.0 | 120.5 | 97.7 | 60.4 | 39.1 | 15.1 | 5.1 |

Note: Violent crimes included are homicide, rape, robbery, and both simple and aggravated assault. The light gray area indicates that because of changes made to the victimization survey, data prior to 1992 are adjusted to make them comparable to data collected under the redesigned methodology. The adjustment methods are described in Criminal Victimization 1973-95.

**EXHIBIT 1**
**0009**

**All serious violent crimes: Murder, rape, sexual assault, robbery, and aggravated assault**

Rates of serious violent crime per 1,000 persons

| Victims' age | Rate |
|---|---|
| 12 to 14 | 37 |
| 15 to 17 | 47 |
| 18 to 21 | 50 |
| 22 to 24 | 40 |
| 25 to 29 | 27 |
| 30 to 34 | 21 |
| 35 to 39 | 16 |
| 40 to 49 | 14 |
| 50 to 64 | 6 |
| 65 or older | 3 |

**EXHIBIT 1**
**00010**

- **The average age of U.S. residents age 12 or older was almost 41.**
- **The average age of victims of serious violent crimes other than murder was 30 or under.**

|  | Mean | Median |
|---|---|---|
| Overall U.S. population | 40.9 | 39 |
| Murder | 34.6 | 30 |
| Rape/sexual assault | 26.6 | 23 |
| Robbery | 29.9 | 26 |
| Aggravated assault | 27.8 | 25 |

**EXHIBIT 1**
**00011**

**Murder**

Rates of murder per 1,000 persons

| Victims' age | Rate |
|---|---|
| 12 to 14 | 0.03 |
| 15 to 17 | 0.13 |
| 18 to 21 | 0.26 |
| 22 to 24 | 0.23 |
| 25 to 29 | 0.18 |
| 30 to 34 | 0.14 |
| 35 to 39 | 0.11 |
| 40 to 49 | 0.08 |
| 50 to 64 | 0.05 |
| 65 or older | 0.04 |

**EXHIBIT 1**
**00012**

**Murder, the least frequent violent crime, victimized fewer than 1 in 1,000 persons, age 12 or older.**

| Violent crime | Total |
|---|---|
| Murder | 0.11 |
| Rape/sexual assault | 2.4 |
| Robbery | 6.1 |
| Aggravated assault | 11.6 |

**EXHIBIT 1**
**00013**

**Rape or sexual assault**

Rates of rape or sexual assault
per 1,000 persons

| Victims' age | Rate |
|---|---|
| 12 to 14 | 3.6 |
| 15 to 17 | 5.9 |
| 18 to 21 | 7.6 |
| 22 to 24 | 6.4 |
| 25 to 29 | 2.2 |
| 30 to 34 | 3.0 |
| 35 to 39 | 2.1 |
| 40 to 49 | 1.5 |
| 50 to 64 | 0.3 |
| 65 or older | 0.1 |

**EXHIBIT 1**
**00014**

**Rape or sexual assault**

**1 in 89 females 12-24 were
rape/sexual assault victims**

Rates per 1,000 females

| Victims' age | Rates |
|---|---|
| 12 to 14 | 6.7 |
| 15 to 17 | 12 |
| 18 to 21 | 13.8 |
| 22 to 24 | 11.8 |
| 25 to 29 | 3.7 |
| 30 to 34 | 5.4 |
| 35 to 39 | 4.0 |
| 40 to 49 | 2.6 |
| 50 to 64 | 0.6 |
| 65 or older | 0.3 |

**EXHIBIT 1
00015**

**Robbery**

Rates of robbery per 1,000 persons

| Victims' age | Rate |
|---|---|
| 12 to 14 | 12.6 |
| 15 to 17 | 12.4 |
| 18 to 21 | 12.8 |
| 22 to 24 | 10.3 |
| 25 to 29 | 7.9 |
| 30 to 34 | 7.2 |
| 35 to 39 | 4.9 |
| 40 to 49 | 4.4 |
| 50 to 64 | 2.5 |
| 65 or older | 1.5 |

**EXHIBIT 1**
**00016**

**Age patterns of robbery victims fall into
5 distinct ranges:  The 12-21 robbery
rate is 6 times that of 50 or older.**

Approximate robbery rates
per 1,000 persons

| Victim's age | Rate |
|---|---|
| 12 to 21 | 13 |
| 22 to 24 | 10 |
| 25 to 34 | 8 |
| 35 to 49 | 5 |
| 50 or older | 2 |

**EXHIBIT 1
00017**

**Aggravated asault**

Rates of aggravated assault
per 1,000 persons

| Victims' age | Rate |
|---|---|
| 12 to 14 | 21.1 |
| 15 to 17 | 28.9 |
| 18 to 21 | 29.3 |
| 22 to 24 | 22.9 |
| 25 to 29 | 16.7 |
| 30 to 34 | 11.0 |
| 35 to 39 | 9.2 |
| 40 to 49 | 8.3 |
| 50 to 64 | 3.4 |
| 65 or older | 1.2 |

**EXHIBIT 1**
**00018**

Annual average number of victimizations, 1992-94

| Age | Aggravated assault | Robbery | Rape/sexual assault | Murder |
|---|---|---|---|---|
| 12 to 24 | 1,225,517 | 575,131 | 284,402 | 8,021 |
| 25 to 49 | 1,075,742 | 582,215 | 209,027 | 12,129 |
| 50+ | 151,236 | 129,798 | 15,006 | 2,743 |

**EXHIBIT 1**
**00019**

**Serious violent crime, by race and Hispanic origin**

| Victims' age | Rates of serious violent crime per 1,000 persons | | |
|---|---|---|---|
| | White | Black | Hispanic |
| 12 to 14 | 31.0 | 58.6 | 51.2 |
| 15 to 17 | 42.9 | 56.7 | 57.0 |
| 18 to 21 | 46.4 | 71.5 | 50.3 |
| 22 to 24 | 38.6 | 50.0 | 36.5 |
| 25 to 29 | 25.3 | 33.8 | 31.7 |
| 30 to 34 | 19.0 | 40.0 | 17.0 |
| 35 to 39 | 13.6 | 27.2 | 23.3 |
| 40 to 49 | 12.7 | 23.7 | 18.8 |
| 50 to 64 | 5.5 | 10.9 | 10.5 |
| 65 or older | 2.3 | 6.2 | 8.2 |

**EXHIBIT 1**
**00020**

**Serious violent crime, by sex of victim**

**1 in 41 males and 1 in 62 females were
violent crime victims**

| Victims' age | Rates per 1,000 persons | |
|---|---|---|
| | Male | Female |
| 12 to 14 | 45.4 | 28.7 |
| 15 to 17 | 55.8 | 38.4 |
| 18 to 21 | 58.0 | 41.9 |
| 22 to 24 | 44.7 | 35.0 |
| 25 to 29 | 31.1 | 23.0 |
| 30 to 34 | 23.2 | 19.5 |
| 35 to 39 | 19.6 | 13.0 |
| 40 to 49 | 17.9 | 10.7 |
| 50 to 64 | 7.9 | 4.8 |
| 65 or older | 4.1 | 2.1 |

**EXHIBIT 1**
**00021**

**Murder, by race**

| Victims' age | Rates of murder per 1,000 persons | |
| --- | --- | --- |
| | White | Black |
| 12 to 14 | 0.02 | 0.09 |
| 15 to 17 | 0.07 | 0.47 |
| 18 to 21 | 0.11 | 1.08 |
| 22 to 24 | 0.10 | 0.97 |
| 25 to 29 | 0.09 | 0.73 |
| 30 to 34 | 0.08 | 0.57 |
| 35 to 39 | 0.07 | 0.42 |
| 40 to 49 | 0.05 | 0.30 |
| 50 to 64 | 0.04 | 0.16 |
| 65 or older | 0.03 | 0.14 |

**EXHIBIT 1**
**00022**

**Murder, by sex of victim**

**1 in 10 murder victims were males, 18 to 21**

| Victims' age | Rates per 1,000 persons | |
|---|---|---|
| | Male | Female |
| 12 to 14 | 0.04 | 0.02 |
| 15 to 17 | 0.22 | 0.04 |
| 18 to 21 | 0.45 | 0.07 |
| 22 to 24 | 0.37 | 0.07 |
| 25 to 29 | 0.29 | 0.07 |
| 30 to 34 | 0.22 | 0.07 |
| 35 to 39 | 0.17 | 0.05 |
| 40 to 49 | 0.12 | 0.04 |
| 50 to 64 | 0.08 | 0.02 |
| 65 or older | 0.05 | 0.03 |

**EXHIBIT 1**
**00023**

**Robbery, by race and Hispanic origin**

| Victims' age | Rates of robbery per 1,000 persons | | |
|---|---|---|---|
| | White | Black | Hispanic |
| 12 to 14 | 9.9 | 20.5 | 18.4 |
| 15 to 17 | 9.0 | 17.2 | 20.0 |
| 18 to 21 | 10.4 | 24.3 | 15.2 |
| 22 to 24 | 9.2 | 16.7 | 10.1 |
| 25 to 29 | 6.1 | 10.4 | 13.5 |
| 30 to 34 | 4.6 | 23.8 | 5.3 |
| 35 to 39 | 3.4 | 11.2 | 8.3 |
| 40 to 49 | 3.3 | 9.9 | 8.1 |
| 50 to 64 | 1.9 | 5.3 | 6.9 |
| 65 or older | 1.0 | 4.6 | 4.7 |

**EXHIBIT 1**
**00024**

**Robbery, by sex of victim**

**Almost 1 in 10 robbery victims were males 18 to 21**

| Victims' age | Rates per 1,000 persons | |
|---|---|---|
| | Male | Female |
| 12 to 14 | 18.4 | 6.5 |
| 15 to 17 | 16.5 | 8.2 |
| 18 to 21 | 16.6 | 9.0 |
| 22 to 24 | 12.1 | 8.5 |
| 25 to 29 | 8.9 | 7.0 |
| 30 to 34 | 10.1 | 4.4 |
| 35 to 39 | 6.5 | 3.4 |
| 40 to 49 | 5.9 | 2.9 |
| 50 to 64 | 3.5 | 1.6 |
| 65 or older | 2.1 | 1.1 |

**EXHIBIT 1**
**00025**

**Aggravated assault, by race and Hispanic origin**

| Victims' age | Rates of aggravated assault per 1,000 persons | | |
|---|---|---|---|
| | White | Black | Hispanic |
| 12 to 14 | 18.0 | 31.4 | 29.1 |
| 15 to 17 | 27.2 | 35.3 | 32.9 |
| 18 to 21 | 28.2 | 33.5 | 30.8 |
| 22 to 24 | 22.6 | 23.6 | 25.2 |
| 25 to 29 | 16.5 | 21.8 | 16.4 |
| 30 to 34 | 11.5 | 13.3 | 7.2 |
| 35 to 39 | 8.0 | 12.5 | 13.4 |
| 40 to 49 | 7.7 | 12.6 | 9.4 |
| 50 to 64 | 3.3 | 4.7 | 3.2 |
| 65 or older | 1.1 | 1.5 | 3.5 |

**EXHIBIT 1**
**00026**

**Aggravated assault, by sex of victim**

**For 18 to 21, men twice as likely as women to be victimized**

| Victims' age | Rates per 1,000 persons | |
| --- | --- | --- |
| | Male | Female |
| 12 to 14 | 26.4 | 15.5 |
| 15 to 17 | 39.1 | 18.2 |
| 18 to 21 | 39.5 | 19.1 |
| 22 to 24 | 31.2 | 14.6 |
| 25 to 29 | 21.1 | 12.3 |
| 30 to 34 | 12.3 | 9.7 |
| 35 to 39 | 12.8 | 5.5 |
| 40 to 49 | 11.6 | 5.1 |
| 50 to 64 | 4.4 | 2.5 |
| 65 or older | 1.9 | 0.7 |

**EXHIBIT 1**
**00027**

ll serious violent crimes:  Murder, rape, sexual assault,
obbery, and aggravated assault

ates of serious violent crime per 1,000 persons

| ictims' age | Rate |
|---|---|
| 2 to 14 | 37 |
| 5 to 17 | 47 |
| 8 to 21 | 50 |
| 2 to 24 | 40 |
| 5 to 29 | 27 |
| 0 to 34 | 21 |
| 5 to 39 | 16 |
| 0 to 49 | 14 |
| 0 to 64 | 6 |
| 5 or older | 3 |

**EXHIBIT 1**
**00028**

Bureau of Justice Statistics
Age Patterns of Victims of Serious Violent Crime
July 1997, NCJ-162031

Violent crime rates by age

Adjusted victimization rate per 1,000 persons, age 12 and older

| Year | Age of victim | | | | | | |
|---|---|---|---|---|---|---|---|
| | 12-15 | 16-19 | 20-24 | 25-34 | 35-49 | 50-64 | 65+ |
| 1973 | 81.8 | 81.7 | 87.6 | 52.4 | 38.8 | 17.2 | 9.1 |
| 1974 | 77.5 | 90.6 | 83.5 | 58.6 | 37.5 | 15.5 | 9.5 |
| 1975 | 80.3 | 85.7 | 80.9 | 59.5 | 36.9 | 17.8 | 8.3 |
| 1976 | 76.4 | 88.8 | 79.7 | 61.5 | 35.9 | 16.1 | 8.1 |
| 1977 | 83.0 | 90.2 | 86.2 | 63.5 | 35.8 | 16.8 | 8.0 |
| 1978 | 83.7 | 91.7 | 91.1 | 60.5 | 35.8 | 15.0 | 8.4 |
| 1979 | 78.5 | 93.4 | 98.4 | 66.3 | 38.2 | 13.6 | 6.2 |
| 1980 | 72.5 | 91.3 | 94.1 | 60.0 | 37.4 | 15.6 | 7.2 |
| 1981 | 86.0 | 90.7 | 93.7 | 65.8 | 41.6 | 17.3 | 8.3 |
| 1982 | 75.6 | 94.4 | 93.8 | 69.6 | 38.6 | 13.8 | 6.1 |
| 1983 | 75.4 | 86.3 | 82.0 | 62.2 | 36.5 | 11.9 | 5.9 |
| 1984 | 78.2 | 90.0 | 87.5 | 56.6 | 37.9 | 13.2 | 5.2 |
| 1985 | 79.6 | 89.4 | 82.0 | 56.5 | 35.6 | 13.0 | 4.8 |
| 1986 | 77.1 | 80.8 | 80.1 | 52.0 | 36.0 | 10.8 | 4.8 |
| 1987 | 87.2 | 92.4 | 85.5 | 51.9 | 34.7 | 11.4 | 5.2 |
| 1988 | 83.7 | 95.9 | 80.2 | 53.2 | 39.1 | 13.4 | 4.4 |
| 1989 | 92.5 | 98.2 | 78.8 | 52.8 | 37.3 | 10.5 | 4.2 |
| 1990 | 101.1 | 99.1 | 86.1 | 55.2 | 34.4 | 9.9 | 3.7 |
| 1991 | 94.5 | 122.6 | 103.6 | 54.3 | 37.2 | 12.5 | 4.0 |
| 1992 | 111.0 | 103.7 | 95.2 | 56.8 | 38.1 | 13.2 | 5.2 |
| 1993 | 118.4 | 114.2 | 91.2 | 57.9 | 42.1 | 17.0 | 5.6 |
| 1994 | 113.0 | 120.5 | 97.7 | 60.4 | 39.1 | 15.1 | 5.1 |

http://www.ojp.usdoj.gov/bjs/pub/sheets/apvsvc01.txt (1 of 2) [10/18/2001 8:41:14 AM]

**EXHIBIT 1**
**00029**

Note: Violent crimes included are homicide, rape, robbery, and
both simple and aggravated assault. The light gray area
indicates that because of changes made to the victimization
survey, data prior to 1992 are adjusted to make them comparable
to data collected under the redesigned methodology.  The
adjustment methods are described in Criminal Victimization
1973-95.

**EXHIBIT 1**
**00030**

# EXHIBIT "2"

EXHIBIT 2
0031



JULY
2019

United States Secret Service
NATIONAL THREAT ASSESSMENT CENTER

# MASS ATTACKS IN PUBLIC SPACES – 2018

U.S. Department of Homeland Security

EXHIBIT 2
0032

This report was prepared by the staff of the
U.S. Secret Service National Threat Assessment Center (NTAC)

Lina Alathari, Ph.D.
Chief

Ashley Blair, M.A.
Social Science Research Specialist

Arna Carlock, Ph.D.
Social Science Research Specialist

Steven Driscoll, M.Ed.
Lead Social Science Research Specialist

Diana Drysdale, M.A.
Supervisory Social Science Research Specialist

Jeffrey McGarry, M.A.
Social Science Research Specialist

National Threat Assessment Center
U.S. Secret Service
U.S. Department of Homeland Security

July 2019

This publication is in the public domain. Authorization to copy and distribute this publication in whole or in part is granted. However, the U.S. Secret Service star insignia may not be used in any other manner without advance written permission from the agency. While permission to reprint this publication is not necessary, when quoting, paraphrasing, or otherwise referring to this report, the citation should be: National Threat Assessment Center (2019). *Mass Attacks in Public Spaces - 2018*. U.S. Secret Service, Department of Homeland Security.

Mass Attacks in Public Spaces – 2018        LIMITED TO OPEN SOURCE INFORMATION

EXHIBIT 2
0033

## MESSAGE FROM THE DIRECTOR

In response to the acts of targeted violence occurring in this Nation, the U.S. Secret Service National Threat Assessment Center (NTAC) has published this research report titled, **Mass Attacks in Public Spaces – 2018**. The study was conducted for the specific purpose of identifying key information that will enhance efforts to prevent these types of attacks. The report is NTAC's second analysis of mass attacks carried out in public spaces, building upon the findings identified in its 2017 report.

These acts have impacted the safety and security of the places where we work, learn, dine, and conduct our daily activities. Each new tragedy, including the attack on a bank in Sebring, FL; a synagogue in Poway, CA; a university in Charlotte, NC; and the municipal center in Virginia Beach, VA; serves as a reminder that we must continue to research and provide robust training and awareness to help prevent these tragic outcomes.

NTAC's research and publications directly support our agency's protective mission, as well as the missions of those responsible for keeping our communities safe. Through this report, NTAC aims to assist law enforcement, schools, public agencies, private organizations, and others in understanding the motives, behavioral indicators, and situational factors of those who carry out mass attacks.

Empowering public safety professionals to combat this ever-evolving threat is a priority for our agency. I commend our community partners for their continued efforts, commitment, and determination to prevent targeted violence within the Homeland.

James M. Murray
Director

*The U.S. Secret Service's National Threat Assessment Center (NTAC) was created in 1998 to provide guidance on threat assessment both within the U.S. Secret Service and to others with criminal justice and public safety responsibilities. Through the Presidential Threat Protection Act of 2000, Congress formally authorized NTAC to conduct research on threat assessment and various types of targeted violence; provide training on threat assessment and targeted violence; facilitate information-sharing among agencies with protective and/or public safety responsibilities; provide case consultation on individual threat assessment investigations and for agencies building threat assessment units; and, develop programs to promote the standardization of federal, state, and local threat assessment processes and investigations.*

**EXHIBIT 2**
**0034**



## United States Secret Service
## NATIONAL THREAT ASSESSMENT CENTER

### INTRODUCTION

On May 31, 2019, 12 innocent people were killed at the Virginia Beach Municipal Center in Virginia Beach, VA by an attacker who had reportedly resigned from his position at the municipal center earlier that day. While little else is yet known publicly about the attacker or his motive, this act of mass violence is the most recent example of targeted violence affecting a public space in the United States. Mitigating the risk of mass casualties from such an event requires the efforts of everyone with a role in public safety, a responsibility that is not limited to law enforcement. Other community stakeholders may also be in a position to intervene, including workplace managers, school administrators, local officials, and the mental health community, each of whom has a unique role to play in keeping communities safe.

To support these prevention efforts, the Secret Service National Threat Assessment Center (NTAC) is tasked with delivering research, training, consultation, and information sharing on threat assessment and the prevention of targeted violence, including targeted attacks directed at workplaces, houses of worship, schools, and other public spaces. The research and information produced by NTAC guides not only the Secret Service's approach to preventing assassinations, called *threat assessment*, but also informs the communitywide approach needed to prevent incidents of targeted violence.[i]

This report is NTAC's second analysis of mass attacks that were carried out in public spaces, and it builds upon *Mass Attacks in Public Spaces – 2017* (MAPS-2017). In MAPS-2017, NTAC found that attackers from that year were most frequently motivated by grievances related to their workplace or a domestic issue. All of the attackers had recently experienced at least one significant stressor, and most had experienced financial instability. Over three-quarters of the attackers had made threatening or concerning communications, and a similar number had elicited concern from others. Further, most had histories of criminal charges, mental health symptoms, and/or illicit substance use or abuse.

With this latest report, *Mass Attacks in Public Spaces – 2018* (MAPS-2018), the Secret Service offers further analysis and operational considerations to our partners in public safety.[2] Between January and December 2018, 27 incidents of mass attacks – in which three or more persons were harmed – were carried out in public spaces within the United States.[3] In total, 91 people were killed and 107 more were injured in locations where people should feel safe, including workplaces, schools, and other public areas.[4] The loss of life and traumatic nature of these attacks had a devastating impact on the victims and their families, local communities, and the entire nation.

> #### *What is Threat Assessment?*
>
> In the 1990s, the U.S. Secret Service pioneered the field of threat assessment by conducting research on the targeting of public officials and public figures. The agency's Threat Assessment Model offered law enforcement and others with public safety responsibilities a systematic investigative approach to identify individuals who exhibit threatening or concerning behavior, gather information to assess whether they pose a risk of harm, and identify the appropriate interventions, resources, and supports to manage that risk.

**EXHIBIT 2**
**0035**



## United States Secret Service
### NATIONAL THREAT ASSESSMENT CENTER

Regardless of whether these attacks were acts of workplace violence, domestic violence, school-based violence, or inspired by an ideology, similar themes were observed in the behaviors and circumstances of the perpetrators,[§] including:

- Most of the attackers utilized *firearms*, and half *departed the site on their own* or *committed suicide*.
- Half were motivated by a *grievance* related to a domestic situation, workplace, or other personal issue.
- Two-thirds had histories of *mental health symptoms*, including *depressive, suicidal, and psychotic symptoms*.
- Nearly all had at least one *significant stressor* within the last five years, and over half had indications of *financial instability* in that timeframe.
- Nearly all made *threatening or concerning communications* and more than three-quarters *elicited concern* from others prior to carrying out their attacks.

The violence described in this report is not the result of a single cause or motive. The findings emphasize, however, that we can identify warning signs prior to an act of violence. While not every act of violence will be prevented, this report indicates that targeted violence may be *preventable*, if appropriate systems are in place to identify concerning behaviors, gather information to assess the risk of violence, and utilize community resources to mitigate the risk.



**EXHIBIT 2**
**0036**



## United States Secret Service
### NATIONAL THREAT ASSESSMENT CENTER

## THE INCIDENTS

**THE WEAPONS:** Though most of the attacks were carried out using a firearm ($n = 24$, 89%), three attackers used vehicles to cause harm (11%).[6] Of the 24 who used firearms, at least 10 possessed their weapon illegally at the time of the incident. Two of those ten were minors. The remaining eight had felony convictions, were the subjects of protective orders, or had some other factor present that would have prohibited them from purchasing or possessing a firearm based on federal or state laws.[7]

**THE PUBLIC SITES:** The 27 incidents were carried out in 18 states, at 28 different sites, with most ($n = 20$, 70%) occurring at places of business (see Figure 1). Those that took place in open spaces ($n = 4$) represented 14% and included such locations as a public sidewalk, street, and parking lot. Three attacks (11%) were carried out at high schools. One attack (4%) took place in a house of worship.

*Figure 1.*



**EXHIBIT 2**
**0037**



**United States Secret Service**
**NATIONAL THREAT ASSESSMENT CENTER**

**THE TIMING:** The attacks took place in every month except December and occurred on every day of the week (see Figure 2). Over half ($n = 16$, 59%) took place between the hours of 7:00 a.m. and 3:00 p.m. More than half ($n = 17$, 63%) of the attacks ended within 5 minutes from when the incident was initiated (see Figure 3).

**END OF THE ATTACKS:** The most common ways the attacks ended were either by the attacker committing suicide at the scene ($n = 7$, 26%) or departing on their own ($n = 7$, 26%). Three of those who departed the scene on their own committed suicide soon after. Law enforcement intervention at the site brought six attacks to an end (22%). In four of these incidents, the attacker was killed. Other attacks ended when the weapon used became inoperable ($n = 4$, 15%) or due to bystander intervention ($n = 2$, 7%).

Figure 2.



| Day of the Week | | | | |
|---|---|---|---|---|
| **Mon** | **Tues** | **Wed** | **Thurs** | **Fri** |
| | | **Sat** | **Sun** | |

Figure 3.



**Duration of the Attacks**

Less than 5 min. 63%

5-14 min. 22%

15 min. or more 15%

**Attacks Perpetrated By Current Employees**

On September 12, 2018, an employee shot and killed his ex-wife and two co-workers near his workplace. Though divorced that April, the ex-wife had recently filed for additional support. The attacker fled the scene and later committed suicide when confronted by police.

On September 19, 2018, an employee opened fire inside his employer's offices, injuring four before being fatally shot by police. The attacker's targets appeared to be random, and his motive is unknown.

On September 20, 2018, a temporary employee opened fire at a distribution center, killing three people and injuring three others before committing suicide. The attacker's motive may have been related to a grievance with co-workers.

On November 12, 2018, an employee shot and injured three individuals at a food distribution warehouse. After fleeing the scene, the attacker called police and reported that his actions were motivated by mental illness. He later committed suicide.

**EXHIBIT 2**
**0038**



United States Secret Service
NATIONAL THREAT ASSESSMENT CENTER

## THE ATTACKERS

**GENDER AND AGE:** While most of the attackers were male ($n$ = 25, 93%), there was one female and one individual in the process of gender reassignment. Their ages ranged from 15 to 64, and the average age was 37 (see Figure 4).

> *YOUNGEST: On January 23, 2018, a 15-year-old sophomore began shooting students randomly in a common area at his high school, killing two and injuring ten. When the attacker ran out of bullets, he abandoned his gun and joined other students who had been hiding. After the students were moved to another room, police identified the attacker and arrested him. The student had planned the attack for about a week, and he did not target any particular students, describing his attack as "an experiment."*

> *OLDEST: On March 7, 2018, a 64-year-old male walked into a local cafe and asked to see the owner, with whom he had a disagreement weeks prior. When the owner appeared, the attacker shot him several times with a rifle, killing him. He then proceeded to shoot cafe patrons, injuring two and killing one. After the attacker ran out of bullets, he fled to his nearby home and barricaded himself inside. He eventually surrendered to police.*

**SUBSTANCE USE:** Nearly one quarter of the attackers ($n$ = 6, 22%) were found to have a history of illicit drug use and/or substance abuse.

**CRIMINAL CHARGES AND DOMESTIC VIOLENCE:** Approximately half of the attackers ($n$ = 13, 48%) had histories of criminal charges beyond minor traffic violations. Those charges included both non-violent ($n$ = 10, 37%) and violent ($n$ = 6, 22%) offenses.

Figure 4.



*Ages of the Attackers*

| Age | 2018 | 2017 |
|-----|------|------|
| 15-24 | 5 | 5 |
| 25-34 | 9 | 6 |
| 35-44 | 6 | 8 |
| 45-54 | 2 | 7 |
| 55+ | 5 | 2 |

Looking specifically at the issue of domestic violence, eight attackers (30%) were found to have had such histories, with only some of those instances resulting in criminal charges or arrests.*

> *On September 19, 2018, a man shot and injured his wife, two bystanders, and a police officer in a municipal building. At the time of the attack, he was subject to a protective order resulting from incidents in which he assaulted and threatened to kill his wife because she wanted a divorce. About a month prior to his attack, he was arrested after he threatened to kill his wife and choked her with a belt. A judge agreed to issue a protective order; however, he denied the wife's request that her husband be ordered to relinquish his firearms.*

**EXHIBIT 2**
**0039**



**United States Secret Service**
NATIONAL THREAT ASSESSMENT CENTER

---

*MENTAL HEALTH:* Two-thirds of the attackers ($n = 18$, 67%) experienced mental health symptoms prior to their attacks. The most common symptoms observed were related to depression and psychotic symptoms, such as paranoia, hallucinations, or delusions. Suicidal thoughts were also observed (see Table 1). Nearly half of the attackers ($n = 12$, 44%) had been diagnosed with, or treated for, a mental illness prior to their attacks.

> *On May 24, 2018, a man opened fire on the patrons of a restaurant, injuring one adult and two children. His motive for the attack is not known, but he was demonstrating symptoms of a mental illness, including suicidal thoughts and paranoid delusions about being taunted by demons and watched by a drone. In videos posted online shortly before the attack, the man said that everyone was against him and he felt tortured and alone. He said, "My life is in danger...Satan is after me."*

Table 1.

| Mental Health Symptoms | 2017 | 2018 |
|---|---|---|
| | n | n |
| Depression | 4 | 10 |
| Psychotic Symptoms | 9 | 10 |
| Paranoia | 6 | 9 |
| Delusions | 2 | 5 |
| Hallucinations | 6 | 1 |
| Suicidal Thoughts | 6 | 8 |



Mass Attacks in Public Spaces - 2018          LIMITED TO OPEN SOURCE INFORMATION                    6

**EXHIBIT 2**
**0040**



**United States Secret Service**
NATIONAL THREAT ASSESSMENT CENTER

## MOTIVES, BELIEFS, & TARGETING

**MOTIVES:** The violence in this study resulted from a range of motives, with some attackers having multiple motives. In half of the incidents ($n = 14$, 52%), grievances appeared to be the main motivating factor. In these cases, the attackers were retaliating for perceived wrongs related to their domestic situations ($n = 6$, 22%), workplaces ($n = 3$, 11%), or other personal issues ($n = 6$, 22%), for example, losing a video game competition or having an argument with an owner of a retail establishment (see Table 2).[9]

Beyond grievances, some motives were related to the attackers' mental health symptoms ($n = 5$, 19%), while others were connected to ideological beliefs ($n = 2$, 7%). Of the two perpetrators motivated by an ideology, one was motivated by anti-abortion beliefs while the other was motivated by anti-Semitic beliefs. Additionally, one attacker appeared to have been motivated by the desire for fame or notoriety. For the remaining incidents ($n = 6$, 22%), a motive was not identifiable given information that was publicly available.

Table 2.

| Components to Motive | 2017 | 2018 |
|---|---|---|
| **Grievances** | 46% | 52% |
| _Domestic_ | 18% | 22% |
| _Personal_ | 7% | 22% |
| _Workplace_ | 21% | 11% |
| **Mental Health/Psychosis** | 14% | 19% |
| **Ideological** | 21% | 7% |
| **Fame** | 4% | 4% |
| **Political** | 4% | 0% |
| **Unknown** | 14% | 22% |
| *Percentages exceed 100 as some attackers had more than one motive. | | |

**BELIEFS:** While only two of the attacks were primarily motivated by an ideology, nearly one-third of the attackers ($n = 8$, 30%) appeared to have subscribed to a belief system that has previously been associated with violence. Often the attackers' beliefs were multifaceted and touched on a range of issues, including white supremacy, anti-Semitism, conspiracy theories, sovereign citizens, animal rights, and the "incel" movement. Incels, or involuntarily celibates, are members of an Internet-based subculture of heterosexual males who view themselves as undesirable to females and therefore unable to establish romantic or sexual relationships to which they feel entitled.



**EXHIBIT 2**
**0041**



United States Secret Service
## NATIONAL THREAT ASSESSMENT CENTER



**FIXATIONS:** Two-fifths of the attackers ($n = 11$, 41%) exhibited a fixation, defined as an intense or obsessive preoccupation with a person, activity, or belief to the point that it negatively impacted aspects of their lives. The focuses of these fixations included an ex-girlfriend, wife, or other females in the subjects' lives; perceived injustices; delusions; sociopolitical ideologies; and video games. The behaviors that demonstrated these fixations included, but were not limited to, posting written material or videos online, stalking or harassing others, and filing lawsuits or complaints to police.

> *On June 28, 2018, a man shot and killed five employees in a newspaper office. Six years prior, he had sued the newspaper and some of its employees for alleged defamation. He became fixated on the case, stating in 2013 that it had "become [his] life." He created social media profiles to impersonate people involved in the court proceedings. After the lawsuit was dismissed, he continued to file related court documents.*

**TARGETING:** In 11 cases (41%), the attacker appeared to have pre-selected targets in mind. Seven of those attacks resulted in harm to both the targeted person and random bystanders, and in three cases the harm was restricted to just those specifically targeted. In the remaining case, when the attacker could not find his intended targets at their workplaces, he randomly fired at other people associated with the office. In nearly two-thirds of the attacks ($n = 16$, 59%) harm was directed at persons indiscriminately.

> *On October 27, 2018, a man opened fire indiscriminately inside a synagogue. Eleven people were killed and six more were wounded before he was shot and apprehended by police. The attacker had previously accused a Jewish-founded refugee advocacy group of helping to transport refugees, whom he referred to as "invaders," from Central America into the United States. When he later attacked the synagogue, he reportedly targeted a specific Jewish congregation in the building that had previously partnered with that refugee aid group.*

**EXHIBIT 2**
**0042**



**United States Secret Service**
NATIONAL THREAT ASSESSMENT CENTER

## KEY INVESTIGATIVE THEMES

***SIGNIFICANT STRESSORS WITHIN FIVE YEARS:*** Most ($n$ = 23, 85%) attackers had at least one significant stressor occur in their lives in the five years preceding the attack. For three-quarters of the attackers ($n$ = 20, 74%), the stressors they experienced occurred within one year of the attack. Beyond the criminal charges described earlier, the stressors most often faced by the attackers were related to:

*LIFE STRESSORS*



- *Family/romantic relationships*, such as the death of a loved one, divorce, a broken engagement, or physical or emotional abuse.
- *Work or school*, such as being denied a promotion, losing a job, or being forced to withdraw from school.
- *Contact with law enforcement that did not result in arrests or charges*, including law enforcement responding to reports of inappropriately touching women, domestic violence, or engaging in other violent acts towards others.
- *Personal issues*, such as homelessness or losing a competition.

Over half of the attackers ($n$ = 15, 56%) experienced stressors related to *financial instability* in the five-year period prior to their attacks. These financial stressors were evidenced through the inability to sustain employment, losing civil judgements in court, filing for bankruptcy, loss of income, or having to rely on others for income.

> *On April 3, 2018, a female opened fire at the headquarters of a video sharing website, injuring three people. The attacker had supported herself financially using the ad revenue generated by videos that she posted to the company's website, some of which had received hundreds of thousands of views. Prior to the attack, the woman had expressed her anger at the company over recent policy changes that resulted in a loss of income. Following the attack, her father reported that she had been angry for weeks and complaining that the company had ruined her life.*

***THREATS AND OTHER CONCERNING COMMUNICATIONS:*** Nearly all of the attackers ($n$ = 25, 93%) engaged in prior threatening or concerning communications. One-third had threatened someone ($n$ = 10, 37%), including threats against the target in six cases (22%). Most of those who made threats against the target had a direct relationship with them, as a co-worker, domestic partner, classmate, member of the same treatment facility, or peer in a competition. Though the presence of prior threats to the target is unusual for some forms of targeted violence (e.g., assassination), threats are often seen in cases motivated by domestic or workplace issues, which together represent one-third of these mass attacks ($n$ = 9, 33%).

All but four attackers ($n$ = 23, 85%) made some type of communication that did not constitute a direct threat, but should have elicited concern. Some of these concerning communications included expressing interest in previous attackers, racist and misogynistic comments, referencing a desire to purchase a gun, and comments that suggest an aspiration to commit future violence.

> *On February 14, 2018, a former student opened fire at his prior high school, killing 14 students and 3 staff, and wounding an additional 17. The attacker had a long history of behavioral problems and concerning communications. While enrolled at the targeted high school, he was known by classmates to make racist and anti-Semitic comments and to speak openly about*

**EXHIBIT 2**
**0043**



# United States Secret Service
## NATIONAL THREAT ASSESSMENT CENTER

*his guns. A year prior to the attack, someone who knew the attacker contacted local law enforcement to report that the attacker had posted on Instagram a photo of himself holding a gun and a statement similar to, "I am going to get this gun when I turn 18 and shoot up the school." Another concerned individual notified law enforcement of the attacker's concerning social media posts about a month before the shooting.*

**HISTORY OF ELICITING CONCERN:** Most of the attackers ($n = 21$, 78%) in this report exhibited behaviors that caused concern in others. Those who were concerned had various degrees of association with the attackers, from those who were close to them, to strangers in the community who may have never met the attacker before.

### The Behaviors that Elicited Concern

- Social media posts with alarming content
- Escalating anger or aggressive behavior
- Changes in behavior and appearance
- Expressions of suicidal ideations
- Writing about violence or weapons
- Cutting off communications
- Inappropriate behavior toward females
- Stalking and harassing behaviors
- Increased depression
- Increased drug use
- Erratic behavior
- Purchasing weapons
- Threats of domestic violence
- Acting paranoid

The responses from others to these behaviors varied from more passive activities like avoiding the attacker, to more active efforts like transporting the person for a mental health evaluation. The ways in which people responded to their concerns included:

- Mothers and fathers seeking therapy for the attacker, calling police, confiscating weapons, or searching for the person when they could not be reached.
- Family and friends making efforts to spend more time with the attacker.
- Online community members calling police.
- Fellow students telling school staff about their concerns.
- Law enforcement getting the attacker to undergo a mental health evaluation, revoking firearms licenses, or asking family to consensually restrict access to weapons.
- Employers firing them or calling their family members to express concern.
- Co-workers checking on them or suggesting counseling.
- Members of the community asking them to leave business establishments or treatment programs, sometimes resorting to calling law enforcement.

### Who Was Concerned

Mothers & Fathers
Romantic Partners
Siblings & Children

•

Friends & Neighbors

•

School Staff & Classmates

•

Supervisors & Coworkers

•

Mental Health Professionals

•

Law Enforcement
Judges & Attorneys
Community Services

•

Community Members
Religious Leaders

•

Online Community

**EXHIBIT 2**
**0044**



**United States Secret Service**
NATIONAL THREAT ASSESSMENT CENTER

For the majority of the attackers ($n$ = 19, 70%), the concern others felt was so severe that they feared specifically for the safety of the individual, themselves, or others. Some of those concerned for their own safety acted on that fear by filing for divorce, ceasing communications, filing for restraining or protection orders, asking loved ones to stay with them out of fear, changing their daily routines, moving, or warning their own family and friends about their concerns. In one case, a person shared photos of the attacker so that others could remain alert and call the police if needed.

*On November 2, 2018, a man opened fire inside a yoga studio, killing two and injuring five. From adolescence, others had expressed concerns about his behavior around women and girls. According to police investigative records and other sources, his conduct had resulted in the man being discharged from the Army, fired from two teaching jobs, reported to law enforcement, arrested and investigated by police on multiple occasions, banned from a university campus, asked to leave a child's party, and avoided by acquaintances and former friends.*



Mass Attacks in Public Spaces - 2018              LIMITED TO OPEN SOURCE INFORMATION                                11

**EXHIBIT 2**
**0045**



**United States Secret Service**
**NATIONAL THREAT ASSESSMENT CENTER**

## MASS ATTACKS IN PUBLIC SPACES
### 2017 & 2018

Many of the key findings in both the 2017 and 2018 reports reflect similarities among the incidents and the attackers. For example, attacks occurred across the country and attackers predominantly used firearms. The majority of attackers elicited concern in others and two-thirds had histories of mental health symptoms or treatment. A majority of the attackers had recently experienced significant stressors, with just over half of the attackers experiencing financial instability in that same timeframe.

*Table 3.*

| General Backgrounds | 2017 | 2018 |
|---|---|---|
| *Gender - Male* | 100% | 93% |
| *Age: Range* | 15-66 | 15-64 |
| Average | 37 | 37 |
| *Illicit drug use or substance abuse* | 54% | 22% |
| *History of criminal charge(s)* | 71% | 48% |
| Non-violent | 57% | 37% |
| Violent | 54% | 22% |
| *History of domestic violence* | 32% | 30% |
| *Overall history of violence* | 64% | 44% |
| *Mental health symptoms* | 64% | 67% |
| Known treatment or diagnosis | 25% | 44% |
| **Investigative Themes** | 2017 | 2018 |
| *Beliefs* | 25% | 30% |
| *Fixation* | 39% | 41% |
| *Stressors* | 100% | 85% |
| Financial instability | 57% | 56% |
| *Threatening or concerning communications* | 86% | 93% |
| History of making threats | 50% | 37% |
| Threats specific to the target | 36% | 22% |
| Concerning communications | 82% | 85% |
| *Elicited concern* | 79% | 78% |
| Concern about safety | 46% | 70% |

**EXHIBIT 2**
**0046**



**United States Secret Service**
NATIONAL THREAT ASSESSMENT CENTER

## CONSIDERATIONS

Like the year before, 2018 saw incidents of mass violence impact the places where we work, learn, worship, or otherwise conduct our daily activities. Consistent with previous research from the Secret Service, these attacks were found to be motivated by a variety of goals, grievances, and ideologies. The attackers varied widely on demographic factors, and while there is no single profile that can be used to predict who will engage in targeted violence, focusing on a range of concerning behaviors while assessing threats can help promote early intervention with those rare individuals that pose such a risk.

- **Mental health and mental wellness** – Mental illness, alone, is not a risk factor for violence, and most violence is committed by individuals who are not mentally ill. Two-thirds of the attackers in this study, however, had previously displayed symptoms indicative of mental health issues, including depression, paranoia, and delusions. Other attackers displayed behaviors that do not indicate the presence of a mental illness, but do show that the person was experiencing some sort of distress or an emotional struggle. These behaviors included displays of persistent anger, an inability to cope with stressful events, or increased isolation. A multidisciplinary approach that promotes emotional and mental wellness is an important component of any community violence prevention model. For example, a robust employee assistance program (EAP) can help to promote mental wellness in the workplace, whether that involves facilitating mental health treatment or assisting with other personal problems, like substance abuse, financial struggles, or problems in a personal relationship.

- **The importance of reporting** – Since three-quarters of the attackers had concerned the people around them, with most of them specifically eliciting concerns for safety, the public is encouraged to share concerns they may have regarding coworkers, classmates, family members, or neighbors. Such reports could be made to workplace managers, school administrators, or law enforcement, as appropriate. While over-reporting is not the goal, a reasonable awareness of the warning signs that can precede an act of violence may prompt community members to share their concerns with someone who can help. Systems can be developed to promote and facilitate such reporting, and people should be encouraged to trust their instincts, especially if they have concerns for someone's safety. For example, several states have recently developed statewide reporting infrastructures that allow students and others to utilize a smartphone app to submit anonymous tips to a call center staffed by law enforcement. This type of program can facilitate not only a law enforcement response to reported threats, but also a community-level response to reports of bullying, suicidal ideation, self-harm, or depression.

- **"…Do Something"** – Since 2010, the Department of Homeland Security has effectively promoted the "If You See Something, Say Something"™ national campaign, originally developed by New York City's Metropolitan Transportation Authority, which encourages the reporting of suspicious activity. In many of these cases from 2018, members of the general public successfully performed their role in the "See Something, Say Something" process, by reporting their concerns to someone with a role in public safety. At that point, the responsibility is on the public safety professionals to "Do Something," namely assessing the situation and managing as needed. By adopting a multidisciplinary threat assessment approach, that standardizes the process for identifying, assessing, and managing individuals who may pose a risk of violence, law enforcement and others are taking steps to ensure that those individuals who have elicited concern do not "fall through the cracks."

**EXHIBIT 2**
**0047**

**United States Secret Service**
## NATIONAL THREAT ASSESSMENT CENTER

- **Law enforcement partnerships** – While law enforcement has a key role to play in the prevention of community violence, intervening with individuals who may pose a risk is not the responsibility of law enforcement alone. Particularly in those instances where a concerning individual has not broken a law, the relationships between law enforcement and other community resources become paramount. Law enforcement personnel are encouraged to continue developing close partnerships with the mental health community, local schools and school districts, houses of worship, social services, and other private and public community organizations. The mission of law enforcement in the United States is public service oriented, and that mission will be most effectively executed through multidisciplinary and collaborative community efforts.

Targeted violence has a profound and devastating impact on those directly involved and a far reaching emotional impact to those beyond. Because these acts are usually planned over a period of time, and the attackers often elicit concern from the people around them, there exists an opportunity to stop these incidents before they occur. *Threat assessment* is one of the most effective practices for prevention. Many of the resources to support this process are already in place at the community level, but require leadership, collaboration, and information sharing to facilitate their effectiveness at preventing violence.

### The Importance of Threat Assessment

"Threat assessment" refers to a proactive approach to violence prevention. It is an investigative model originally developed by the U.S. Secret Service to prevent assassinations, but has since been adapted to prevent all forms of targeted violence, regardless of motivation. This includes K-12 school shootings and acts of workplace violence. When implemented effectively, a threat assessment generally involves three key components:

### Identify → Assess → Manage

Research indicates that the majority of perpetrators of targeted violence elicit concern in others prior to the attack. We rely on those people who observe such concerns to *identify* the individual to law enforcement or to someone else with a public safety responsibility. In educational settings or workplaces, concerns may be reported to a multidisciplinary threat assessment team that works in conjunction with law enforcement when needed. The responsible public safety entity is then tasked to *assess* the situation to determine how they can *manage* any risk of violence posed by the individual. With a focus on early intervention, this systematic approach is an important component of any safety plan. It allows communities to respond appropriately to a broad range of situations, from those individuals who are displaying a low-level concerning behavior to those who may pose an immediate and imminent risk of violence.

**EXHIBIT 2**
**0048**



## United States Secret Service
## NATIONAL THREAT ASSESSMENT CENTER

### THE INCIDENTS

1) On January 23, a student fatally shot two and injured ten at a high school in Benton, KY.

2) On January 28, a gunman fatally shot four in a parking lot in Melcroft, PA.

3) On February 14, a former student fatally shot 17 and injured another 17 at a high school in Parkland, FL.

4) On February 14, a man drove a truck into a clinic, injuring three in East Orange, NJ.

5) On March 7, a gunman fatally shot two and injured two inside a restaurant in Hurtsboro, AL.

6) On March 9, a gunman fatally shot three at a treatment facility in Yountville, CA.

7) On April 3, a woman shot and injured three at the headquarters of a video sharing website in San Bruno, CA.

8) On April 22, a gunman fatally shot four and injured four others in a restaurant in Antioch, TN.

9) On May 18, a student fatally shot 10 and injured 13 at a high school in Santa Fe, TX.

10) On May 20, a man drove a vehicle into a restaurant, killing two and injuring three in Bessemer City, NC.

11) On May 24, a gunman injured three in a restaurant in Oklahoma City, OK.

12) On May 25, a man drove a vehicle onto a sidewalk, injuring three in Portland, OR.

13) On June 1, a gunman killed two at a law firm, followed by one at a psychologist's office, in Scottsdale, AZ.

14) On June 28, a gunman killed five in a newsroom in Annapolis, MD.

15) On July 5, a gunman injured six in the street near the oceanfront in Virginia Beach, VA.

16) On August 26, a gunman fatally shot two and injured nine at a video game competition in Jacksonville, FL.

17) On September 6, a gunman fatally shot three and injured two at a bank in Cincinnati, OH.

18) On September 12, a gunman fatally shot three in front of a trucking company in Bakersfield, CA.

19) On September 19, a gunman injured four at a municipal center in Masontown, PA.

20) On September 19, a gunman injured four in an office building in Middleton, WI.

21) On September 20, a gunman fatally shot three and injured three at a warehouse in Aberdeen, MD.

22) On October 27, a gunman fatally shot 11 in a synagogue in Pittsburgh, PA.

23) On November 2, a gunman fatally shot two and injured five in a yoga studio in Tallahassee, FL.

24) On November 5, a gunman fatally shot one and injured two at a drug treatment center in San Rafael, CA.

25) On November 7, a gunman fatally shot 11 and injured at least two at a bar in Thousand Oaks, CA.

26) On November 12, a gunman injured three at a food distribution warehouse in Albuquerque, NM.

27) On November 19, a gunman fatally shot three at a hospital in Chicago, IL.

---

[1] Additional threat assessment resources and publications from the National Threat Assessment Center are available on the U.S. Secret Service website, located at https://www.secretservice.gov/protection/ntac/.

[2] The limitations of open source information should be considered when reviewing the findings contained in this report. Since information for a few of the offenders was limited, it is likely that a larger number than reported here may have displayed the behaviors, symptoms, and other background elements described here.

[3] The incidents included in this report were identified and researched through open source reporting (e.g., media sources and released law enforcement records); therefore, it is possible that more incidents took place than were discovered at the time of this writing. Though there is much debate as to what defines a *mass attack*, for the purpose of this report we included acts of intentional violence in public spaces (e.g., parks, community events, retail establishments) or semi-public places (e.g., workplaces, schools, religious establishments) during which significant harm was caused to three or more persons. We excluded violence related to criminal acts (e.g., gang or drug activity), failed attempts at a mass attack, and spontaneous violence.

[4] In two incidents, the attackers harmed additional persons that were not included in the total number killed and injured, based on the criteria for this report. In one case, the attacker killed two individuals at a private residence following his attack in a public space. In another case, the attacker had killed one person the day prior to the mass attack. Further, the total of those harmed only included individuals that were harmed as a direct result of the subject's actions. Injuries sustained while fleeing the scene, for example, were not included.

[5] This report was prepared for educational and research purposes. The background and behaviors reported herein are of those individuals who: 1) were arrested for the act; 2) died at the scene; or 3) died immediately following the attack. Actions attributed to individuals who have been arrested, indicted, or charged in these incidents are merely allegations, and all are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.

[6] In one attack, the attacker used a combination of a firearm and smoke/flash-bang grenades. In another attack, the subject brought explosives to the school, but they were not used in the attack and were determined to be inoperable.

[7] Though illegal drug use within the previous year is one of the disqualifying factors for possessing a firearm under federal law, it was not considered in this review as information was not available to confirm active use within one year of the incident.

[8] For the purpose of this report, *domestic violence* was defined as physical force or the threat of imminent bodily harm inflicted on a romantic partner, parent/guardian, or child (of the assailant or romantic partner). If an attacker was classified as having a history of domestic violence against a parent or child, the perpetrator and the victim must have resided at the same location.

[9] One subject had both domestic and personal grievances as part of his motive for the attack.

**EXHIBIT 2**
**0049**

**EXHIBIT 2**
**0050**

United States Secret Service
NATIONAL THREAT ASSESSMENT CENTER
Mass Attacks in Public Spaces - 2018

EXHIBIT 2
0051

# EXHIBIT "3"

EXHIBIT 3
052



**2015–16 CIVIL RIGHTS DATA COLLECTION**

U.S. Department of Education
Office for Civil Rights

# SCHOOL CLIMATE AND SAFETY

## DATA HIGHLIGHTS ON SCHOOL CLIMATE AND SAFETY IN OUR NATION'S PUBLIC SCHOOLS

## What's the 2015–16 Civil Rights Data Collection?

The 2015–16 Civil Rights Data Collection (CRDC) is a survey of public schools and school districts in the United States. The CRDC measures student access to courses, programs, staff, and resources that impact education equity and opportunity for students. The CRDC has long provided critical information used by the Department of Education's Office for Civil Rights in its enforcement and monitoring activities.

In addition, the CRDC is a valuable resource for other federal agencies, policymakers, researchers, educators, school officials, parents, students, and other members of the public who seek data on student equity and opportunity. To further explore the CRDC data through the use of data tools, please visit the CRDC Reporting Website at *ocrdata.ed.gov*. To download the CRDC data, visit *crdc.ed.gov*.

## Who's in the 2015–16 CRDC?

**Number of school districts:** 17,337
**Number of schools:** 96,360
**Total number of students:** 50.6 Million

**Nationwide Student Demographics:**

**Race/Ethnicity:**[1]
Asian 5%
American Indian or Alaska Native 1%
Two or more races 3%
Native Hawaiian or Other Pacific Islander 0.4%



Hispanic or Latino of any race 26%
Black or African American 15%
White 49%

**Boys:** 51%   **Girls:** 49%

**English Learners:** 10%

**Students with Disabilities:** 14%
- Students with disabilities served under the Individuals with Disabilities Education Act (IDEA): 12%
- Students with disabilities served only under Section 504 of the Rehabilitation Act, as amended: 2%

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

### WHAT'S INSIDE

| | |
|---|---|
| Serious Offenses | 2 |
| Law Enforcement Referrals and School-Related Arrests | 3 |
| Harassment or Bullying | 5 |
| Restraint and Seclusion | 11 |
| School Discipline | 13 |
| Data Highlights and CRDC Endnotes | 17 |
| More About the CRDC | 18 |
| *Data Collected for the First Time* | |
| Serious Offenses | 2 |
| Firearm Use | 2 |
| School Homicides | 2 |

U.S. Department of Education | Office for Civil Rights | April 2018 - revised May 2019      **1**

**EXHIBIT 3**
**053**

# SCHOOL CLIMATE AND SAFETY†

School climate generally refers to interrelated aspects of the quality and character of school life. This issue brief focuses on one element of school climate: safety. To evaluate how safe students are at school, the CRDC collects data on serious offenses, law enforcement referrals and school-related arrests, harassment or bullying, restraint and seclusion, and school discipline.

## Serious Offenses

**Figure 1** shows the number of incidents of serious offenses.[2] During the 2015–16 school year, nearly 1.1 million incidents of serious offenses were reported in public schools across the nation.[3]

The categories of (a) physical attack or fight *without* a weapon, and (b) threats of physical attack *without* a weapon, accounted for 94 percent of all reported incidents of serious offenses. About 787,200 (75 percent) incidents of physical attack or fight *without* a weapon, and about 197,900 (19 percent) incidents involving a threat of physical attack *without* a weapon were reported.

School districts also reported approximately 22,600 (2 percent) incidents of robbery *without* a weapon, and 11,700 (1 percent) incidents of a physical attack or fight *with* a weapon. Each of the other offenses accounted for less than 1 percent of the total.

### FIGURE 1: Number of incidents of serious offenses

| Type of incident | Number |
|---|---|
| Physical attack or fight *without* a weapon | 787,200 |
| Threats of physical attack *without* a weapon | 197,900 |
| Robbery *without* a weapon | 22,600 |
| Physical attack or fight *with* a weapon | 11,700 |
| Threats of physical attack *with* a weapon | 10,400 |
| Sexual assault (other than rape) | 9,300 |
| Possession of a firearm or explosive device | 5,900 |
| Threats of physical attack *with* a firearm or explosive device | 3,400 |
| Physical attack or fight *with* a firearm or explosive device | 2,800 |
| Rape or attempted rape | 400 |
| Robbery *with* a weapon | 620 |
| Robbery *with* a firearm or explosive device | 250 |

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

In addition to the foregoing incidents of serious offenses, for the first time, the CRDC required schools to report on school-related shootings and school-related homicides. Nearly 230 schools (0.2 percent of all schools) reported at least 1 incident involving a school-related shooting, and over 100 schools (0.1 percent of all schools) reported a school-related homicide involving a student, faculty member, or staff member. About 1 out of every 100,000 students was enrolled in a school that reported a school-related shooting or school-related homicide during the 2015–16 school year.

Note: The total number of school-related shootings or the total number of school-related homicides are not reported. The data reflect the number of schools that had at least one incident of a school-related shooting or school-related homicide.

**EXHIBIT 3**
**054**

# Law Enforcement Referrals and School-Related Arrests

Referral to law enforcement is an action by which a student is reported to any law enforcement agency or official, including a school police unit, for an incident that occurs on school grounds, during school-related events, or while taking school transportation. School-related arrest refers to an arrest of a student for any activity conducted on school grounds, during off-campus school activities (including while taking school transportation), or due to a referral by any school official.[4] All arrests are considered referrals to law enforcement. During the 2015-16 school year, over 290,600 students were referred to law enforcement agencies or arrested.

## REFERRALS TO LAW ENFORCEMENT AND ARRESTS BY RACE AND SEX

**Figure 2** presents the percentage distribution of students referred to law enforcement or subjected to school-related arrests, by race. During the 2015-16 school year, black students represented 15 percent of the total student enrollment, and 31 percent of students who were referred to law enforcement or arrested – a 16 percentage point disparity.[5] During the 2013-14 school year, black students had an 11 percentage point disparity (black students were 16 percent of the student enrollment and 27 percent of students referred to law enforcement or arrested). During the 2015-16 school year, white students represented 49 percent of the total student enrollment, and accounted for 36 percent of those referred to law enforcement or arrested. During the 2013-14 school year, white students were 50 percent of the student enrollment and 38 percent of students who were referred to law enforcement or arrested.

During the 2015-16 school year, American Indian or Alaska Native students, Native Hawaiian or Other Pacific Islander students, and students of two or more races were referred to law enforcement or arrested at rates approaching their overall student enrollment. Together, these students represented almost 5 percent of the total student enrollment, and accounted for 8 percent of students who received a referral to law enforcement or were arrested. During the 2013-14 school year, American Indian or Alaska Native students, Native Hawaiian or Other



**FIGURE 2: Percentage distribution of students referred to law enforcement or subjected to school-related arrests, by race**

Legend:
- American Indian or Alaska Native
- Hispanic or Latino of any race
- Asian
- Black or African American
- Native Hawaiian or Other Pacific Islander
- White
- Two or more races

NOTE: Data may not add up to 100 percent due to rounding.
SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015-16.

Pacific Islander students, and students of two or more races had a collective enrollment of 5 percent and were 10 percent of students referred to law enforcement or arrested.

Latino, Asian, and white students were not referred to law enforcement or arrested at a percentage higher than their overall student enrollment during the 2015-16 school year.[6] This is consistent with the 2013-14 school year, where these students were not referred to law enforcement or arrested at a percentage higher than their overall enrollment.

Male students were referred to law enforcement or arrested more than female students. Males represented 51 percent of all enrolled students, and 69 percent of those who received a referral to law enforcement or were arrested during the 2015-16 school year. Males were 51 percent of the student enrollment and 71 percent of students referred to law enforcement or arrested during the 2013-14 school year.

**EXHIBIT 3**
**055**



FIGURE 3: Percentage distribution of students referred to law enforcement or subjected to school-related arrests, by disability (IDEA)

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

## REFERRALS TO LAW ENFORCEMENT AND ARRESTS BY DISABILITY (IDEA)

Approximately 82,500 of the 290,600 total students referred to law enforcement or arrested were students with disabilities (IDEA).[7] **Figure 3** shows the percentage distribution of students referred to law enforcement or subjected to school-related arrests, by disability (IDEA). Students with disabilities (IDEA) represented 12 percent of the overall student enrollment and 28 percent of students referred to law enforcement or arrested.

**EXHIBIT 3**
**056**

# Harassment or Bullying

Harassment or bullying is intimidation or abusive behavior toward a student from another student, school employee, or non-school employee third party. It can take many forms, including verbal name-calling, insults, or intimidation, as well as non-verbal acts or behavior such as graphic or written statements, or conduct that is physically threatening, harmful, or humiliating. The CRDC collects data on allegations of harassment or bullying on the basis of sex; race, color, or national origin;[a] disability; sexual orientation; and religion. In addition, the CRDC includes data on students reported as harassed or bullied and students disciplined for harassment or bullying on the basis of sex, race, and disability.



FIGURE 4: Percentage distribution of allegations of harassment or bullying, by basis

NOTE: Data may not add up to 100 percent due to rounding.
SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

Overall, approximately 135,200 individual allegations of harassment or bullying on the basis of sex, race, sexual orientation, disability, or religion were reported during the 2015–16 school year. **Figure 4** presents the percentage distribution of allegations of harassment or bullying, by basis. Forty-one percent of these allegations involved harassment or bullying on the basis of sex – which includes sexual and other sex-based harassment or bullying. Twenty-three percent of these allegations involved harassment or bullying on the basis of race; 16 percent involved allegations on the basis of sexual orientation; 11 percent involved allegations on the basis of disability; and 8 percent involved allegations on the basis of religion.

**EXHIBIT 3**
**057**



FIGURE 5: Percentage distribution of students reported as harassed or bullied, by race

NOTE: Data may not add up to 100 percent due to rounding.
SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

## HARASSMENT OR BULLYING REPORTS BY RACE

In addition to allegations of harassment or bullying, the CRDC collects data on which students were reported as harassed or bullied. During the 2015–16 school year, about 102,300 students (approximately 0.2 percent of all enrolled students) were reported to have been harassed or bullied on the basis of sex, race, or disability.

**Figure 5** presents the percentage distribution of students reported as harassed or bullied, by race. Black students were 15 percent of overall student enrollment and 19 percent of students harassed or bullied on the basis of sex, 35 percent on the basis of race, and 17 percent on the basis of disability. American Indian or Alaska Native students were 1 percent of student enrollment and 2 percent of students harassed or bullied on each basis. Students of two or more races were 3 percent of the overall student enrollment, 5 percent of students harassed or bullied on the basis of sex, 6 percent on the basis of race, and 4 percent on the basis of disability.

White students were 49 percent of the student enrollment, 50 percent of students harassed or bullied on the basis of sex, 29 percent of students harassed or bullied on the basis of race, and 59 percent of students reported as harassed or bullied on the basis of disability. Asian students were 5 percent of the student enrollment, 2 percent of students harassed or bullied on the basis of sex, 6 percent of the students who were reported as harassed or bullied on the basis of race, and 3 percent of students harassed or bullied on the basis of disability.

Native Hawaiian or Other Pacific Islander students were reported as harassed or bullied on the basis of sex, race, and disability at rates comparable to their student enrollment rate.

**EXHIBIT 3**
**058**



FIGURE 6: Percentage distribution of students reported as harassed or bullied, by sex

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

## THE TYPE OF BULLYING OR HARASSMENT REPORTED BY MALE AND FEMALE STUDENTS DIFFERS

CRDC data indicate differences in the most common bases for which female students and male students were reported as harassed or bullied. **Figure 6** shows the percentage distribution of students reported as harassed or bullied, by sex. Female students (49 percent of total enrollment) accounted for 63 percent of students reported as harassed or bullied on the basis of sex, 38 percent of students harassed or bullied on the basis of race, and 34 percent of students reported as harassed or bullied on the basis of disability.

Male students (51 percent of total enrollment) accounted for 37 percent of students reported as harassed or bullied on the basis of sex, 62 percent of students reported as harassed or bullied on the basis of race, and 66 percent of students reported as harassed or bullied on the basis of disability.

**EXHIBIT 3**
**059**



**FIGURE 7: Percentage distribution of students reported as harassed or bullied, by disability**

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

## HARASSMENT OR BULLYING REPORTS BY DISABILITY

As used in this report, the term "students with disabilities," in regards to harassment or bullying, includes both students with disabilities (IDEA) and Section 504-only students.[9] **Figure 7** illustrates the percentage distribution of students reported as harassed or bullied, by disability. Students with disabilities were harassed or bullied based on sex, race, and disability at rates higher than their representation in the total school enrollment. Students with disabilities comprised 14 percent of the total student enrollment, but were 18 percent of students harassed or bullied on the basis of sex, 16 percent of the students harassed or bullied on the basis of race, and 51 percent of the students harassed or bullied on the basis of disability.

In comparison, students without disabilities represented 86 percent of the total student enrollment, but were 82 percent of students harassed or bullied on the basis of sex, 84 percent on the basis of race, and 49 percent of the students harassed or bullied on the basis of disability.[10] The basis of disability includes disabilities under IDEA, disabilities under section 504, perceived disabilities, and any other disabilities.

**EXHIBIT 3**
**060**



FIGURE 8: Percentage distribution of students disciplined for harassment or bullying, by race

NOTE: Data may not add up to 100 percent due to rounding.
SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

## STUDENTS DISCIPLINED FOR HARASSMENT OR BULLYING BY RACE, SEX, AND DISABILITY

Nearly 114,600 students (approximately 0.2 percent of the total number of enrolled students) were disciplined for incidents of harassment or bullying on the basis of sex, race, or disability during the 2015–16 school year.

**Figure 8** illustrates the percentage distribution of students disciplined for harassment or bullying, by race. Black students represented 15 percent of all students enrolled, and accounted for 22 percent of those disciplined for harassment or bullying; white students represented 49 percent of students enrolled and 45 percent of those disciplined; Latino students represented 26 percent of students enrolled and 22 percent of those disciplined; Asian students represented 5 percent of students enrolled and 2 percent of those disciplined; Native Hawaiian or Other Pacific Islander students represented 0.4 percent of students enrolled and 1 percent of those disciplined; and students of two or more races represented 3 percent of students enrolled and 5 percent of those disciplined.

**EXHIBIT 3**
**061**



**FIGURE 9: Percentage distribution of students disciplined for harassment or bullying, by sex**

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.



**FIGURE 10: Percentage distribution of students disciplined for harassment or bullying, by disability**

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

**Figure 9** presents the percentage distribution of students disciplined for harassment or bullying, by sex. Male students were 51 percent of students enrolled and 76 percent of students disciplined for harassment or bullying. Female students were 49 percent of students enrolled and 24 percent of students disciplined.

**Figure 10** shows the percentage distribution of students disciplined for harassment or bullying, by disability. Students with disabilities comprised 14 percent of student enrollment and 25 percent of the students disciplined for harassment or bullying.

**EXHIBIT 3**
**062**

## Restraint and Seclusion

The CRDC collects data on the physical and mechanical restraint of students and seclusion of students. Generally, physical restraint refers to restricting the student's ability to freely move his or her torso, arms, legs, or head. Mechanical restraint refers to the use of any device or equipment to restrict a student's freedom of movement. Seclusion refers to involuntarily confining a student alone in a room or area from which he or she cannot physically leave.

During the 2015–16 school year, 124,500 students (approximately 0.2 percent of all students enrolled) across the nation were physically restrained, mechanically restrained, or secluded. Nearly 87,000 of those students were subjected to physical or mechanical restraint, and over 37,500 were subjected to seclusion.



FIGURE 11: Percentage distribution of students subjected to restraint or seclusion, by race

NOTE: Data may not add up to 100 percent due to rounding.
SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

**Figure 11** displays the percentage distribution of students subjected to restraint or seclusion, by race. Black students were 15 percent of all students enrolled, 27 percent of students restrained, and 23 percent of students secluded. White students were 49 percent of all students enrolled, 48 percent of students restrained, and 55 percent of students secluded. American Indian or Alaska Native students were 1 percent of students enrolled, 1 percent of students restrained, and 3 percent of students secluded.

Asian students (5 percent of enrolled students) comprised 1 percent of students restrained and secluded. Latino students (26 percent of enrolled students) comprised 17 percent of students restrained and 11 percent of students secluded. Native Hawaiian or Other Pacific Islander students (0.4 percent of enrolled students) comprised 0.1 percent of students restrained and 0.2 percent of students secluded.

**EXHIBIT 3**
**063**



FIGURE 12: Percentage distribution of students subjected to restraint or seclusion, by disability (IDEA)

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

Most students restrained and secluded were students with disabilities (IDEA), who comprised 12 percent of all students enrolled. **Figure 12** illustrates the percentage distribution of students subjected to restraint or seclusion, by disability (IDEA). Students with disabilities (IDEA) represented 71 percent of all students restrained and 66 percent of all students secluded.

**EXHIBIT 3**
**064**

# School Discipline

The CRDC collects information about exclusionary discipline practices including out-of-school suspensions and expulsions. Out-of-school suspension is an instance in which a child is temporarily removed from his or her regular school for at least half a school day for disciplinary purposes. Expulsion refers to removing a child from his or her regular school for disciplinary purposes. An expulsion can occur with or without educational services provided to the student.



FIGURE 13: Percentage distribution of students receiving one or more out-of-school suspensions, by race and sex

Legend: American Indian or Alaska Native; Asian; Native Hawaiian or Other Pacific Islander; Two or more races; Hispanic or Latino of any race; Black or African American; White

NOTE: Data may not add up to 100 percent due to rounding.
SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

## SUSPENSIONS BY RACE AND SEX

About 2.7 million (between 5 and 6 percent) of all K-12 students received one or more out-of-school suspensions during the 2015–16 school year. **Figure 13** shows the percentage distribution of students receiving one or more out-of-school suspensions, by race and sex.

Black male students represented 8 percent of enrolled students and accounted for 25 percent of students who received an out-of-school suspension. Black female students represented 8 percent of the student enrollment and accounted for 14 percent of students who received an out-of-school suspension. Latino male students represented 13 percent of student enrollment and 15 percent of students who received an out-of-school suspension. Latina female students represented 13 percent of student enrollment and 6 percent of students who received an out-of-school suspension.

American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and male students of two or more races collectively represented 3 percent of students enrolled, and 4 percent of students who received an out-of-school suspension. In comparison, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and female students of two or more races accounted for 3 percent of students enrolled and 2 percent of students who received an out-of-school suspension.

EXHIBIT 3
065

Asian male students accounted for 3 percent of students enrolled and 1 percent of students who received an out-of-school suspension. Asian female students constituted 2 percent of student enrollment and less than 1 percent of students who received an out-of-school suspension. White male students represented 25 percent of students enrolled and 24 percent of students who received an out-of-school suspension. White female students represented 24 percent of students enrolled and 8 percent of students who received an out-of-school suspension.



FIGURE 14: Percentage distribution of students receiving one or more out-of-school suspensions, by disability (IDEA)

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

**Figure 14** illustrates the percentage distribution of students receiving one or more out-of-school suspensions, by disability (IDEA). Students with disabilities (IDEA) represented 12 percent of students enrolled and 26 percent of students who received an out-of-school suspension.

**EXHIBIT 3**
**066**



**FIGURE 15: Percentage distribution of students receiving expulsions, by race and sex**

NOTE: Data may not add up to 100 percent due to rounding.
SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

## EXPULSIONS BY RACE AND SEX

During the 2015–16 school year, approximately 120,800 students (about 0.2 percent of the total number of students enrolled) received an expulsion with or without educational services. **Figure 15** shows the percentage distribution of students receiving expulsions, by race and sex.

White male students represented 25 percent of students enrolled and 27 percent of students who were expelled. White female students represented 24 percent of students enrolled and 10 percent of students who were expelled. Asian male students accounted for 3 percent of students enrolled and 1 percent of the students who were expelled. Asian female students constituted 2 percent of the student enrollment and less than 1 percent of the students who were expelled.

Black male students represented 8 percent of enrolled students and accounted for 23 percent of students expelled. Black female students represented 8 percent of the student enrollment and accounted for 10 percent of students who were expelled. Latino male students accounted for 13 percent of students enrolled and 16 percent of students who were expelled. Latina female students accounted for 13 percent of student enrollment and 6 percent of students who were expelled.

American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and male students of two or more races collectively represented 3 percent of students enrolled, and 4 percent of students who were expelled. In comparison, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander, and female students of two or more races accounted for 3 percent of students enrolled and 2 percent of students who were expelled.

U.S. Department of Education  |  Office for Civil Rights  |  *ocrdata.ed.gov*    **15**

EXHIBIT 3
067



FIGURE 16: Percentage distribution of students receiving an expulsion, by disability (IDEA)

SOURCE: U.S. Department of Education, Office for Civil Rights, Civil Rights Data Collection, 2015–16.

**Figure 16** displays the percentage distribution of students receiving expulsions, by disability (IDEA). Students with disabilities (IDEA) represented 12 percent of the total students enrolled, and 24 percent of those students who were expelled.

**EXHIBIT 3**
**068**

## Data Highlights

† Note: Except where the percentage is below 1 percent, the percentages listed in these data highlights are rounded to the nearest whole number. Counts of 1,000,000 or greater are rounded to the nearest hundred thousand. Counts of 1,000 or greater are rounded to the nearest hundred. Counts of less than 1,000 are rounded to the nearest ten. For the survey form and full definitions of all terms mentioned in the report, visit *ocrdata.ed.gov/SurveyDocuments*.

## CRDC Endnotes

[1] CRDC data report students using the seven racial/ethnic categories found in the U.S. Department of Education's Final Guidance on Collecting, Maintaining and Reporting Data on Race and Ethnicity. The Final Guidance can be found at *http://nces.ed.gov/pubs2008/rediguide/pdf/appendixA.pdf*. For brevity in this report, the racial/ethnic categories are referred to as "race." Furthermore, for brevity in this report, race, color, or national origin – as referenced in Title VI of the Civil Rights Act of 1964 – is referred to as "race."

[2] Data on offenses reported by the National Center for Educational Statistics (NCES) may differ from the data on offenses reported by the CRDC due to differences in the populations or samples used in the two different data collections.

[3] For consistency with how questions were asked of school districts completing the survey, "offenses" are referred to as incidents and "harassment or bullying" are referred to as allegations.

[4] For brevity in this report, school-related arrests are referred to as arrests.

[5] The term "black" refers to persons who are black or African American.

[6] The terms "Latino/a" refer to persons who are Hispanic or Latino/a of any race.

[7] As used in this report, the term "students with disabilities (IDEA)" is used to refer to students who receive special education and related services under the Individuals with Disabilities Education Act according to an Individualized Education Program, Individualized Family Service Plan, or service plan. These students may or may not receive related aids and services under Section 504 of the Rehabilitation Act of 1973, amended. 20 U.S.C. §§ 1400-1419; 34 C.F.R. pt. 300. Part B of the IDEA addresses the obligations of States and school districts to provide special education and related services to eligible children with disabilities. The Office of Special Education Programs (OSEP) in the Department's Office of Special Education and Rehabilitative Services (OSERS) administers the IDEA. The national percentages reported by OSEP may differ from those reported by OCR due to differences in the population of students included in the collection. For information about the IDEA, please see *osep.grads360.org* and *www.ed.gov/osers/osep/index.html*.

[8] See note 1 above.

[9] The term "Section 504-only" refers to a student who receives related aids and services under Section 504 of the Rehabilitation Act of 1973, as amended, and does not receive special education and related services under IDEA according to an Individualized Education Program, Individualized Family Service Plan, or service plan.

[10] Harassment or bullying on the basis of disability includes perceived disability. A student may have a disability and not receive services under IDEA or Section 504. Furthermore, a student may have a disability and not be counted under "students with disabilities" for CRDC purposes.

**EXHIBIT 3**
**069**

## More About the CRDC

### What is the purpose of the CRDC?

Since 1968, the U.S. Department of Education (ED) Office for Civil Rights (OCR), or its predecessor agency, has conducted the Civil Rights Data Collection (CRDC) to collect data on key education and civil rights issues in our nation's public schools.

The CRDC collects a variety of information, including student enrollment and educational programs and services, most of which is disaggregated by race, sex, English learners, and disability.

The CRDC is a longstanding and critical aspect of the overall enforcement and monitoring strategy used by OCR to ensure that recipients of the Department's Federal financial assistance do not discriminate on the basis of race, color, national origin, sex, and disability.

OCR relies on CRDC data from public school districts as it investigates complaints alleging discrimination, initiates proactive compliance reviews to focus on particularly acute or nationwide civil rights compliance problems, and provides policy guidance and technical assistance to educational institutions, parents, students, and others.

In addition, the CRDC is a valuable resource for other Department offices and federal agencies, policymakers and researchers, educators and school officials, parents and students, and other members of the public who seek data on student equity and opportunity.

### Under what authority does OCR conduct the CRDC?

Section 203(c)(1) of the 1979 Department of Education Organization Act conveys to the Assistant Secretary for Civil Rights the authority to "collect or coordinate the collection of data necessary to ensure compliance with civil rights laws within the jurisdiction of the Office for Civil Rights." The civil rights laws enforced by OCR include:

- Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, and national origin;
- Title IX of the Education Amendments of 1972, which prohibits discrimination based on sex; and
- Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination on the basis of disability.

OCR's implementing regulations for each of these statutes require recipients of the Department's federal financial assistance to submit to OCR "complete and accurate compliance reports at such times, and in such form and containing such information" as OCR "may determine to be necessary to enable [OCR] to ascertain whether the recipient has complied or is complying" with these laws and implementing regulations (34 CFR § 100.6(b), 34 CFR § 106.71, and 34 CFR § 104.61). Any data collection that OCR determines is necessary to ascertain or ensure compliance with these laws is mandatory.

For further general information about the CRDC, visit the *CRDC FAQ* page.

**Availability of Alternate Format**

Requests for documents in alternate formats such as Braille or large print should be submitted to the Alternate Format Center by calling 202.260.0852 or emailing the Section 508 Coordinator at *om_eeos@ed.gov*.

**Notice to Persons with Limited English Proficiency**

If you have difficulty understanding English, you can request free interpretation or translation assistance for Department information that is available to the public. To find out more about these services, please call 1-800-USA-LEARN (1.800.872.5327)
(TTY: 1.800.877.8339) or email us at
*ED.Language.Assistance@ed.gov*.

You also can write to U.S. Department of Education, Information Resource Center, LBJ Education Building, 400 Maryland Avenue SW, Washington, DC, 20202.

**Document History**

This document was originally issued in April 2018. In April 2019, the document was updated to incorporate data corrections submitted by districts. The corrected data resulted in changes to some of the national totals reported for offenses (page 2), referrals to law enforcement and school-related arrests (pages 3 - 4), allegations of harassment or bullying (page 5), students disciplined for harassment or bullying (page 9), restraint and seclusion (page 11) and expulsion (page 15). To learn more about the data corrections, please see the 2015-16 Data Notes
*https://ocrdata.ed.gov/Downloads/Data-Notes-2015-16-CRDC.pdf*.

**How to Contact the Department of Education and Office for Civil Rights**

**United States Department of Education**
*Betsy DeVos*, Secretary
*Kenneth Marcus*, Assistant Secretary for Civil Rights
Lyndon Baines Johnson Building
Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-1100
Telephone: 800-421-3481
FAX: 202-453-6012
TDD: 877-521-2172
Email: *OCR@ed.gov* | *www.ed.gov/ocr*



U.S. Department of Education
Office for Civil Rights

**EXHIBIT 3**
**070**

# EXHIBIT "4"

EXHIBIT 4
0071

The Washington Post

More than

# 228,000

## students have experienced gun violence at school since Columbine

One dot • represents 10 children exposed to gun violence



**Columbine High School**
APRIL 20, 1999 – 1,820
CHILDREN IN SCHOOL

**Marjory Stoneman Douglas High School**
FEB. 14, 2018 – 2,930
CHILDREN IN SCHOOL

**West Nickel Mines Amish School**
OCT. 2, 2006 – 20
CHILDREN IN SCHOOL

**Sandy Hook Elementary School**
DEC. 14, 2012 – 420
CHILDREN IN SCHOOL

Explore The Washington Post's database of school shootings

By **John Woodrow Cox**, **Steven Rich**, **Allyson Chiu**,
**John Muyskens** and **Monica Ulmanu**

Updated May 8 at 10:02 a.m.

**EXHIBIT 4**
**0073**

The Washington Post has spent the past year determining how many children have been exposed to gun violence during school hours since the Columbine High massacre in 1999.

Beyond the dead and wounded, children who witness the violence or cower behind locked doors to hide from it can be profoundly traumatized.

The federal government does not track school shootings, so The Post pieced together its numbers from news articles, open-source databases, law enforcement reports and calls to schools and police departments.

The children impacted grew with each round of reporting: from 135,000 students in at least 164 primary and secondary schools to more than 187,000 on 193 campuses.

Since March, The Post has taken a closer look at states with fewer local news sources and searched more deeply for less visible public suicides and accidents that led to injury.

The count now stands at more than 228,000 children at 234 schools.

The Post has found that at least 144 children, educators and other people have been killed in assaults, and another 302 have been injured.

In 2018 alone, there have already been 25 shootings — the highest number during any year since at least 1999. Still, school shootings remain rare, and only a tiny percentage of the tens of millions of students in America ever experience them.

The most recent school shooting was 150 days ago.

Show shootings in **all schools**          from **all years**

in **the U.S.**

1 of 239

May 7, 2019

**EXHIBIT 4**
**0074**

## STEM School Highlands Ranch in Highlands Ranch, Colorado

**1** dead • **8** injured • **1,720** children present in school

Two armed students killed one person and wounded at least eight other peo, will be updated.)

Source: The Washington Post

Injuries and death tolls do not include the shooters

Download the data ⟶  Read the methodology ↓  Send information ✉

The Post's search for more shootings will continue, and it's possible reporters will locate additional incidents from previous years.

Hundreds of outlets cover the deadliest attacks, such as the Feb. 14 rampage at Marjory Stoneman Douglas High in Parkland, Fla., where a 19-year-old man with an AR-15 rifle killed 17 people.

Others are covered by a single newspaper, such as a 2001 shooting at Pearl C. Anderson Middle School in Dallas, where a 14-year-old boy held a revolver to a girl's chest and asked her whether she was "ready to die" before a bullet fired, grazing her hand.

Even as the list of incidents has expanded, however, the trend lines have remained consistent.

Among The Post's most important findings: the disproportionate impact of school shootings on children of color.

**Black students make up 16.6% of the school population...**

**...but they experience school shootings at twice that rate.**

**EXHIBIT 4**

**0075**



In cases where the source of the gun could be determined, more than 85 percent of shooters brought them from their own homes or obtained them from friends or relatives, according to The Post's analysis.

The ranks of school shooters include a 6-year-old boy, who killed a classmate after saying he didn't like her, and a 15-year-old girl, who did the same to a friend for rejecting her romantic overtures.

Seven in 10 of them, however, were under the age of 18, which means that — often because of an adult's negligence — dozens of children had access to deadly weapons.

**The median age of school shooters is 16.**



45 shooters with unknown age not included

**Read our stories about children and gun violence**

**EXHIBIT 4**
**0076**

Scarred by school shootings

How Parkland student journalists covered the shooting they survived and friends they lost

Twelve seconds of gunfire: First-graders are haunted by what they survived — and lost — on a school playground

The wounds they carry: For six teens at a Las Vegas high school, homecoming week started with a country music concert

'Did your father die?' A second-grader grows up surrounded by gunfire

*Alex Horton contributed to this report.*

### About the methodology

The Washington Post spent a year determining how many children have been affected by school shootings, beyond just those killed or injured. To do that, reporters attempted to identify every act of gunfire at a primary or secondary school during school hours since the Columbine High massacre on April 20, 1999. Using Nexis, news articles, open-source databases, law enforcement reports, information from school websites and calls to schools and police departments, The Post reviewed more than 1,000 alleged incidents but counted only those that happened on campuses immediately before, during or just after classes.

Shootings at after-hours events, accidental discharges that caused no injuries to anyone other than the person handling the gun, and suicides that occurred privately or posed no threat to other children were excluded. Gunfire at colleges and universities, which affects young adults rather than kids, also was not counted.

After finding more than 200 incidents of gun violence that met The Post's criteria, reporters organized them in a database for analysis. Because the federal government does not track school shootings, it's possible that the database does not contain every incident that would qualify.

To calculate how many children were exposed to gunfire in each school shooting, The Post relied on enrollment figures and demographic information from the U.S. Education Department, including the Common Core of Data and the Private School Universe Survey. The analysis used attendance figures from the year of the shooting for the vast majority of the schools. Then The Post deducted 7 percent from the enrollment total because that is, on average, how many students miss school each day, according to the National Center for Education Statistics. Reporters subtracted 50 percent from a school's enrollment if the act of gun violence occurred just before or after the school day. To provide information about school shootings since Columbine that fit The Post's definition, send us an email at schoolshootings@washpost.com.

Originally published April 20, 2018.

       **Comments**

**EXHIBIT 4**
**0077**

Get unlimited digital access to The Post

## Basic Digital

$10 every month
Or just $130 $100 every year

Try 1 month for $1

## Premium Digital

$15 every month
Or just $195 $150 every year

Try 1 month for $1

👤 *Includes additional subscription*

**View more offers** | Already a subscriber? **Sign in**

**More stories**

## Fatal Force: 2018 police shootings database

The Washington Post database contains records of every fatal shooting in the United States by a police officer in the line of duty since Jan. 1, 2015.

## Mass shootings: How U.S. gun culture compares with the rest of the world

After mass shootings, much debate centers on Americans' relatively easy access to guns. As of 2015, there are more guns than people in the United States, a rate that's far higher than in other developed nations.

## The terrible numbers that grow with each mass shooting

The death tolls change, the places change. But the weapons are the common denominator.

**Most Read**

**Follow Post Graphics**

 Twitter           Facebook          t Tumblr

# EXHIBIT "5"

EXHIBIT 5
0079

# Three Decades of School Shootings: an Analysis

A comprehensive review of nearly three dozen mass shootings, including Columbine, reveals some notable similarities

*By Tawnell D. Hobbs*

Published April 19, 2019, at 10:30 a.m. ET

School shooters typically plan their attacks weeks or months in advance, usually telling someone or hinting at coming violence. Most feel bullied or left out and are seeking revenge. Many have easy access to guns and are fascinated by mass shooters. Many are suicidal or ready to die during their attacks.

Those are the findings of a Wall Street Journal analysis of information about nearly three dozen mass shootings that have taken place at schools since 1990. The deadly shooting at Columbine High School in Colorado, which occurred 20 years ago Saturday, was one of them.

### School Shooters Exhibit Similar Behavior

Displayed trait
◯ Did not display trait

Columns: PLANNED IN ADVANCE · BULLIED · SOUGHT REVENGE · EASY ACCESS TO GUNS · TOLD SOMEONE · SUICIDAL

**SHARED 5 TRAITS**

| | | | | | |
|---|---|---|---|---|---|
| Eric Harris | | | | | |
| Dylan Klebold | | | | | |
| Caleb Sharpe | | | | | |
| James Rouse | | | | | |
| Jesse Osborne | | | | | |
| Thomas Solomon Jr. | | | | | |
| Eric Houston | | | | | |
| Evan Ramsey | | | | | |
| Charles Williams | | | | | |
| Jaylen Fryberg | | | | | |

**SHARED 4 TRAITS**

| | | | | | |
|---|---|---|---|---|---|
| Mitchell Johnson | | | | ◯ | |
| Andrew Golden | | | | ◯ | |

**EXHIBIT 5**
**0080**

| Name | | | | |
|------|---|---|---|---|
| Barry Loukaitis | | | | ○ |
| Luke Woodham | | | | ○ |
| Jose Reyes | | | | |
| Asa Coon | | | | |
| Charles Roberts | | | | |
| Kipland Kinkel | | ○ | | |
| Jeffrey Weise | | | | |

**SHARED 3 TRAITS**

| Name | | | | |
|------|---|---|---|---|
| Gabriel Parker | | | | ○ |
| Jason Hoffman | | | | |
| Adam Lanza | | | | |
| Nikolas Cruz | | | | |
| Dimitrios Pagourtzis | | | | |
| Kenneth Bartley Jr. | | | ○ | |
| Kevin Janson Neal | | | | |
| Keith A. Ledeger | | | | |

**SHARED 2 TRAITS**

| Name | | | | |
|------|---|---|---|---|
| Thomas Lane III | | ○ ○ | | |
| Michael Carneal | | | ○ | |
| Steven Williams | | | | ○ |
| James Tate | | | | ○ |
| Cedric Anderson | | | | |
| Kevin Newman | | | | |

**SHARED 1 TRAIT**

| Name |
|------|
| Kenneth Wolford |
| unnamed 15-year-old |
| unnamed 16-year-old |

**NO DATA AVAILABLE**

| Name |
|------|
| unnamed 12-year-old |
| Dedrick Dashaun Nelson |
| Rakish Jenkins |

Note: Empty cells are left blank because of lack of data.

The Journal reviewed information made public by courts or law-enforcement agencies about school shootings that left three or more victims killed or injured. The material included 22 hours of video, 108 minutes of audio and about 10,000 pages of documents—text messages, journals, court records and transcripts of police interviews.

The shooters, 39 in all, left 116 dead and 229 injured. Last year, 77 people in the U.S. died or were injured in mass school shootings that left three or more victims, more than in any other year in the Center for Homeland Defense and Security's statistics, which go back to 1970.

**EXHIBIT 5**
**0081**

The Journal's analysis of information about the 39 shooters revealed many common elements.

# At least 34 of 39
## planned the attack in advance

○○○○○○○○○○○○○
○○○○○○○○○○○○○
○○○○○○○○○○○○○○

In the days before 15-year-old Jaylen Fryberg killed four students at Marysville Pilchuck High School in Marysville, Wash., on Oct. 24, 2014, he engaged in ominous text-message exchanges with an ex-girlfriend.

### Text messages between Jaylen Fryberg and his ex-girlfriend

Just please talk me out of this...

The guns in my hand..

Please....

Jaylen

Jay

Jaylen's ex-girlfriend

What.

Jaylen

Source: Snohomish County Multiple Agency Response Team

Two days before the rampage, he texted her: "I set the date."

Moments before the first shot, he sent a message to members of his family with details for his funeral and an apology to some parents of students he planned to kill. "I want to be fully dressed in Camo in my casket," it said in part.

Within two minutes, the first 911 calls come from the school. Fryberg had invited three friends and two of his cousins to sit with him at a table in the lunchroom. He shot each of them in the head. Four of them died. Then he killed himself.

**EXHIBIT 5**
**0082**

There is considerable evidence that Nikolas Cruz, too, did a lot of planning before the school shooting on Feb. 14, 2018, that left 17 dead in Parkland, Fla.

"Hello. My name is Nick and I'm gonna be the next school shooter of 2018," he said in a cellphone video three days before the attack. "My goal is at least 20 people with an AR-15 and a couple tracer rounds."

## "It's gonna be a *big* event. You're all going to die."

—Nikolas Cruz

Source: 17th Judicial Circuit Court, Broward County, Fla.

Cruz's cellphone content and search history indicate he researched shooting people months before the attack at Marjory Stoneman Douglas High. The month before the shooting, he made a cellphone note to himself about a "basketball court full of targets." One day later, he said in another note, "Everything and everyone is happy except for me I want to kill people but I don't know how I can do it." The day of the shooting, his internet activity included a search on "school shooter."

More than a month before the shooting, an unidentified woman had called an FBI tip line to warn about Cruz's professed desire to kill people and his disturbing social-media posts, saying she worried he would shoot up a school. The FBI didn't follow up on the tip.

## "I just want to, you know, get it off my chest in case something does happen and I do believe something's going to happen, but...

—unidentified woman tipping off the FBI about Nikolas Cruz

Source: Federal Bureau of Investigation

A state safety commission later found that at least 30 people knew of Cruz's troubling behavior before the shooting, and they either didn't report it or their reports weren't acted upon.

Writings by school shooters recovered by law-enforcement officials.
Source: Courts, law enforcement agencies

## At least 21 of 39

# felt bullied, sought revenge

Twelve-year-old Jose Reyes left behind two letters in his backpack after a 2013 attack at Sparks Middle School in Sparks, Nev., that left two students injured and a teacher dead. He also killed himself.

In a letter to teachers and students, he said he was seeking revenge for the mean things they had said, and that "today is the day when I kill you."



Dear teachers and students today is the day when I kill you because its for the embarrasment that you did. You say mean things in school. That I'm gay, that I'm lazy, stupid, idiot, and also say that I pee my pants and that steeling my money. Well, that all ends. Today I will get revenge on the students and teachers for rueining my life. Today I will bring a god damn pistol and rifle to shoot you and see how you like it when someone making fun of you. Once I kill you your life will be noting but nightmare and bad dreams, I don't care if I have lots of bullets to shoot all of you, cause I'm going die tring on my last stand. And right now this school will now come to an end and your death will be rising when I shoot you. Have a great death at school.

Sparks middle school 1965 – 2013

Source: Sparks Police Department, Sparks, Nev.

Dear teachers and students today is the day
when I kill you bastards for the embarressment
that you did. You say mean things in school.
That I'm gay, that I'm lazy. Stupid, idiot,
and also say that I pee my pants and also
stealing my money. Well that all ends.
Today I will get revenge on the students and
teachers for ruinning my life. Today I will
bring a god damn pistol and rifle to shoot you
and see how you like it when someone making
fun of you. Once I kill you your life will
be noting but nightmare and bad dreams.
I don't care if I have alots of bullets to
shoot all of you cause I'm going to die tring on
my last stand. And right now this school will
now come to an end and your death will
be rising when I shoot you. Have a great
death at school.

https://www.wsj.com/graphics/school-shooters-similarities/

**EXHIBIT 5**
**0085**

In 1997, 16-year-old Evan Ramsey entered Bethel Regional High School in Bethel, Alaska, with a shotgun hidden under his jacket. He walked into a common area and opened fire, killing one student and injuring two others. He continued on to the main office, where he shot the principal, Ronald Edwards, who died in his office.

A note found in his bedroom after the attack indicated he was seeking revenge against the principal and others. It said he believed he would die after the attack. He lived.

A note found in school shooter Evan Ramsey's bedroom.
Source: Court of Appeals, State of Alaska

## At least 22 of 39
### told someone or hinted at plans

○○○○○○○○○○○○○
○○○○○○○○○○○○○
○○○○○○○○○○○○○

Many of the shooters told someone or hinted at their plans, either in conversations with friends or in online communications, in some cases in an effort to keep friends safe. In 1998, 13-year-old Mitchell Johnson and 11-year-old Andrew Golden killed five and injured 10 at Westside Middle School in Jonesboro, Ark. In a later deposition, Johnson said he had warned a couple of people the day before the shooting "please don't come to school" the next day.

In 2016, 14-year-old home-schooler Jesse Osborne took a gun from his father's nightstand and shot him dead. Then, after kissing his pets, he drove his father's truck to Townville Elementary School in Townville, S.C., where he killed one person and injured three.

He told the police that a group of people from various countries had encouraged his plan in Instagram exchanges.

Instagram exchange between school shooter Jesse Osborne
and an unnamed person.

EXHIBIT 5
0086

Should i shoot up my
elementary school or my
middle school

The middle school has tons of
cops

The elementry doesnt

And the elementry school is 4
mins away from my house

The middle schools 1 hr away

Elementary those **** are just
disgusting little kids who
grow up to be little **** when
they're older

Yep thats what i was thinking

And yeah it's easier to go to
the closest

Source: WYFF-TV, Greenville, S.C.

# At least 26 of 39
## had easy access to guns

○○○○○○○○○○○○○
○○○○○○○○○○○○○
○○○○○○○○○○○○○

The Journal analysis found school shooters mostly used guns owned by family members.

Police found a large number of firearms in the home that Adam Lanza shared with his mother, whom he killed before killing 26 at Sandy Hook Elementary School in Newtown, Conn., in 2012. The socially isolated 20-year-old, who had

**EXHIBIT 5**
**0087**

been diagnosed with mental illness, had spent time online researching school shootings, including downloading the investigation of the Columbine attack. He kept a detailed spreadsheet on killers, sorted in order of the number killed.

School shooter Adam Lanza kept a spreadsheet of mass killers.
Source: Connecticut State Department of Emergency Services and Public Protection

In the home where Kipland Kinkel lived with his parents, police found a large collection of guns and knives, and ingredients for making explosive devices. The 15-year-old, who was diagnosed with mental-health problems, first killed his parents, then killed two people and injured 26 in a rampage at Thurston High School in Springfield, Ore., in May 1998.

In an interview with a police detective after the shooting, he said that he got his weapons from home.

### Kipland Kinkel's Confession to Police

Okay….So your dad has guns, right?

Yes.

And where does he keep his guns?

He usually keeps them in his tennis locker at the swim and tennis club. But we could always shoot it once in awhile and so they were home

Source: Springfield Police Department, Springfield, Ore.

# At least 22 of 39
## felt suicidal

○○○○○○○○○○○○○
○○○○○○○○○○○○○
○○○○○○○○○○○○○○

Eric Houston knew it was possible he would die in a 1992 attack on his former school, Lindhurst High School in Olivehurst, Calif. A note was found in the 20-year-old's bedroom after he stormed the school, killing four and wounding

**EXHIBIT 5**
**0088**

several others. "If I die today please bury me somewhere beautiful," he wrote. He lived, as did 72% of shooters in the incidents reviewed by the Journal.

In February 2012, Thomas Lane, then 17, went on a shooting rampage in the cafeteria of Chardon High School in Chardon, Ohio, killing three students and injuring three others. Afterward, he sat in a ditch about a mile away and loaded a gun to kill himself. He didn't do it.

Nick Walczak had limped from the cafeteria with three gunshot wounds, only to be chased down by Lane and shot in the back. The last shot left him paralyzed.

"None of us were ever mean to him," Mr. Walczak says of the shooter. "If you had asked me a day before, I would have told you that he's a good kid."

**Methodology: Planned in advance** indicates the shooter planned the attack well in advance, including plotting to get weapons, researching other shooters, setting a date for the attack or writing a letter explaining the motive for the attack. **Bullied, sought revenge** indicates the shooter felt bullied or sought revenge for a perceived wrong. **Easy access to guns** indicates the shooter knew where unsecured guns were in the house, had access to home gun safes or purchased the guns themselves. **Told someone** indicates the shooter told at least one person about the coming attack, or alluded to it, verbally or in writings, text messages, video recordings or on social media. **Suicidal** indicates the shooter planned to commit suicide after the attack or be killed by police.

**Credits:** Design and development by Tyler Paige and Elbert Wang.

---

### Share this story

---

**Follow WSJ Visuals** @WSJGraphics  /  @WSJPhotos  /  More Graphics

Customer Service    Subscriber Agreement    Privacy Policy    Cookie Policy
© 2019 Dow Jones & Company, Inc. All Rights Reserved.

**EXHIBIT 5
0089**

# EXHIBIT "6"

EXHIBIT 6
0090

☰      **Los Angeles Times**      LOG IN   🔍

CALIFORNIA

# Everything we know about the San Bernardino terror attack investigation so far



Syed Rizwan Farook, left, and a photo of Tashfeen Malik. (FBI)

DEC. 14, 2015
4:03 PM



Here's the latest updates on the investigation into Syed Rizwan Farook and Tashfeen Malik, the shooters who attacked Farook's office holiday party, killing 14 and wounding 22, in what officials believe was an act of terrorism. They were killed in a shootout with police shortly after. Since the Dec. 2 attack, investigators have been piecing together evidence in an effort to pinpoint exactly what motivated the couple, and how their plan went undetected.

**Latest in the investigation** Farook's friend, Enrique Marquez Jr. was arrested Thursday and charged with conspiring to give material support to terrorists, according to federal documents that allege the two men had talked of attacking Riverside City College and a busy freeway during rush hour. **READ MORE**

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

**TRIAL OFFER**    SUPPORT QUALITY   4 weeks for $1      SAVE NOW

**EXHIBIT 6**
**0091**

## Enrique Marquez, the neighbor



Home in Riverside where Marquez lived next door to Farook. (Los Angeles Times)

Enrique Marquez Jr., a 24-year-old Riverside man who worked as a Wal-Mart security guard, is a central figure in the investigation.

He checked into a mental health facility on the day of the shooting and police searched his Riverside home -- next door to Farook's old residence -- shortly after the shootings. He was said to be good friends with Farook and cemented his connection to his next-door neighbor by marrying the sister of Farook's sister-in-law in 2014. In 2011 or 2012, Marquez bought two of the rifles Farook and Malik used in the attack. A law enforcement source said he converted to Islam at some point, but when is unclear.

Marquez has waived his right to an attorney and been cooperative throughout marathon interviews with federal investigators, a law enforcement source said.

According to a law enforcement source, Marquez told investigators Farook wanted him to buy the guns because he feared he "wouldn't pass a background check" if he attempted to acquire the weapons on his own.

Marquez also told FBI agents Farook had made an earlier attack plan he didn't follow through on, according to a source.

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

TRIAL OFFER

SUPPORT QUALITY
4 weeks for $1

SAVE NOW

**EXHIBIT 6**
0092

## An even bigger attack was planned

Two federal sources told The Times that before the shooting and their subsequent deaths, the couple was in the final planning stages for an assault on a separate building or location "with a lot more people inside," possibly at a nearby school or college. They based that assessment on data from digital equipment recovered from the couple's Redlands home, all of which was smashed in an attempt to hide their activities.

## The weapons



**M&P15 rifle**
Smith & Wesson

**9mm**
Llama

**9mm**
Springfield Armory

**DPMS Model A-15 (.223-caliber)**

**Model 64 F* (.22-caliber rifle)**
Savage Arms

*Not scaled in relationship to
the other weapons

Farook and Malik used five firearms during the attack, and left behind three pipe bombs wired to a remote control. They did not detonate.

The shooters fire over 150 rounds during the initial attack and during a gun battle with police afterwards. They had more than 1,400 .223 caliber rounds and more than 200 9-millimeter rounds with them.

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

TRIAL OFFER   SUPPORT QUALITY
4 weeks for $1

**EXHIBIT 6**
**0093**

Three of the guns were purchased legally by Farook between 2007 and 2012. He bought the handguns at Annie's Get Your Gun in Corona. Two of the rifles were purchased by Farook's friend and former neighbor, Enrique Marquez Jr., in 2011 or 2012.

## What we know about the previous attack plan

Farook and possibly others may have planned a terrorist act as early as 2011 or 2012 but dropped it after four men were arrested — three of them in Chino — and ultimately convicted in a plot to kill Americans in Afghanistan , according to a government official.

The official said Farook may have told at least one associate in 2011 or 2012 that he was considering a terrorist plot. It's not clear who the associate was, but Farook friend Enrique Marquez Jr. told investigators about what Farook said, according to the official.

FBI agents believe Farook abandoned his plans to launch the earlier attack after a law enforcement task force arrested the three men in November 2012. The men were later convicted of charges related to providing material support to terrorists and plotting to kill Americans in Afghanistan. Investigators are looking into whether the men had ties to Farook.

They were talking generally about something, but I don't think it made it to anything specific. I don't think it got to a time or a place.
Law enforcement official, on the previous plot

## The shooters' online communications

The investigation is in part focused on Malik and Farook's digital lives, including how they communicated early in their relationship, and with terror groups.

The couple jointly pledged allegiance to Islamic State on social media shortly before they were killed in a shootout with police, the FBI has said.

Malik sent at least two private messages on Facebook to a small group of Pakistani friends in 2012 and 2014 pledging her support for Islamic jihad and sayi

By continuing to use our site, you agree to our **Terms of Service** and **Privacy Policy**. You can learn more about how we use cookies by reviewing our **Privacy Policy**. Close

**TRIAL OFFER**    SUPPORT QUALITY   4 weeks for $1

Farook used several dating and matrimonial websites, including BestMuslim.com, where he wrote he wanted "Someone who takes her religion very seriously and is always trying to improve her religion and encouraging others to do the same using hikmah (wisdom) and not harshness."

FBI officials said that after the couple began dating online as early as 2013, they spoke to each other about jihad and martyrdom.

Farook had some kind of digital contact with people from at least two terrorist organizations overseas, including the Al Qaeda-affiliated Nusra Front in Syria, a federal law enforcement official said.

## The K-1 'fiancee' visa



By continuing to use our site, you agree to our **Terms of Service** and **Privacy Policy**. You can learn more about how we use cookies by reviewing our **Privacy Policy**. Close

TRIAL OFFER       SUPPORT QUALITY
4 weeks for $1

**EXHIBIT 6**
**0095**

Two government sources told The Times Malik used the name of a neighborhood or street near her home in Pakistan, rather than her family's home address, on her application. Investigators have speculated that she did so to deflect any investigation of her family's reputed ties to Islamic militants in Punjab.

K-1 applicants, like other visa applicants, undergo extensive counter-terrorism screening that includes checks based on fingerprints and facial recognition software. Questions for the partner seeking to come to the U.S. include: "Do you seek to engage in terrorist activities while in the United States or have you ever engaged in terrorist activities?" and "Have you ever or do you intend to provide financial assistance or other support to terrorists or terrorist organizations?"

[Read more](#)

## The marriage



Malik and Farook's marriage license

The couple met online, and Farook traveled to Saudi Arabia in 2013 to meet Malik in person. The two married last year in Islam's holy city of Mecca in Saudi .

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

TRIAL OFFER    SUPPORT QUALITY
4 weeks for $1

**EXHIBIT 6
0096**

Asked whether the marriage might have been purposely arranged by a foreign terrorist organization to sneak them into the United States to conduct an attack, the FBI's director said he didn't know yet.

## Where the investigation is happening



Al-Huda, the Islamic seminary Malik attended (Getty Images)

**Pakistan** Where Tashfeen Malik was born, went to college and attended a women's Islamic seminary. Members of Malik's extended family live in Pakistan.

**Saudi Arabia** Where Tashfeen Malik spent much of her childhood, and where Malik met Farook in person for the first time in 2013. The two met again in 2014, where they were married in Islam's holy city of Mecca in Saudi Arabia, before Farook brought Malik to the United States. Members of Malik's immediate family live in Saudi Arabia.

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

**TRIAL OFFER**   SUPPORT QUALITY
4 weeks for $1   SAVE NOW

**EXHIBIT 6**
**0097**

Marquez were neighbors until a few months ago. Farook practiced shooting with an AR-15 at the Riverside
Magnum Range and attended a mosque there.



Farook's father in Corona (Marcus Yam / Los Angeles Times)

**Corona** Where Farook's brother, Syed Raheel Farook, has lived with his wife, Tatiana A. Farook, since
February. Farook's father also lives there.

**Redlands** Where Farook and Malik moved in May, the month their daughter was born.

**San Bernardino** Where Farook and Malik began their shooting rampage and where the final shootout
occurred between them and police. Also the location of Seccombe Lake, where FBI divers searched for
electronics that may have been dumped by the shooters and removed several items. Farook also attended a
mosque in the city shortly before the massacre.

## How they funded their attack

By continuing to use our site, you agree to our **Terms of Service** and **Privacy Policy**. You
can learn more about how we use cookies by reviewing our **Privacy Policy**. Close

**TRIAL OFFER**          SUPPORT QUALITY
                         4 weeks for $1

**EXHIBIT 6**

(Screenshot via Prosper.com)

Farook worked for the county as a health inspector, and many of the details of the couple's finances are not yet known. But in the weeks before the San Bernardino massacre, the husband-and-wife assailants got a $28,500 loan, which authorities believe may have helped them acquire last-minute firearms, ammunition and components to build explosives.

The couple received the loan from San Francisco online lender Prosper Marketplace, according to Fortune and Bloomberg News.

Prosper is a leading player in the burgeoning world of online, peer-to-peer lending, acting as a middleman matching borrowers and investors who fund their loans.

## Why their plot wasn't detected

Farook and Malik were unknown to law enforce~

By continuing to use our site, you agree to our **Terms of Service** and **Privacy Policy**. You
can learn more about how we use cookies by reviewing our **Privacy Policy**. Close

**TRIAL OFFER**        SUPPORT QUALITY
                       4 weeks for $1

**EXHIBIT 6**
**0099**

## How they were radicalized



Al-Huda, the Islamic seminary Malik attended (Getty Images)

Investigators believe the couple self-radicalized separately before meeting each other. Possible sources of radicalization investigators are looking into include:

### Malik

• Her family. Pakistani officials say they have questioned members of Malik's extended family in the Pakistani province of Punjab, an area that is considered a stronghold of Islamic militant organizations. Residents said the Aulakh family is known to have connections to militant Islam.

• The Islamic seminary Malik attended in 2013. Pakistani security officials have questioned teachers and students there.

By continuing to use our site, you agree to our **Terms of Service** and **Privacy Policy**. You can learn more about how we use cookies by reviewing our **Privacy Policy**. Close

TRIAL OFFER     SUPPORT QUALITY
4 weeks for $1



By continuing to use our site, you agree to our **Terms of Service** and **Privacy Policy**. You can learn more about how we use cookies by reviewing our **Privacy Policy**. Close

**TRIAL OFFER**

SUPPORT QUALITY
4 weeks for $1

SAVE NOW

Mohamed Abdullahi Hassan (FBI via AP)

## Farook

- Overseas terrorist organizations. Officials are looking into contact Farook had contact with people from at least two terrorist organizations overseas, including the Al Qaeda-affiliated Nusra Front in Syria and Shabab in Somalia.
- Mohamed Abdullahi Hassan, a former Minneapolis resident known as "Mujahid Miski" who became a recruiter for Islamic State and is alleged to have encouraged the attempted attack on a cartoon contest in Garland, Texas, earlier this year. Federal investigators are trying to determine if Farook was influenced by him.

CALIFORNIA

NEWSLETTER

**Get our Essential California newsletter**

Please enter your email address

Subscribe

MORE FROM THE LOS ANGELES TIMES

CALIFORNIA

**LAX ban on taxi, Uber and Lyft curbside pickups irks passengers: 'It's inconvenient'**

1 hour ago

CALIFORNIA

**Retrial in Ghost Ship warehouse fire that killed 36 set for March 2020**

2 hours ago

CALIFORNIA

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

**TRIAL OFFER**

SUPPORT QUALITY
4 weeks for $1

**EXHIBIT 6**
**00102**

CALIFORNIA

**Credible threat targeting 'Joker' screening forces Huntington Beach theater to close**

Oct. 4, 2019

## Around the Web


Ads by Revcontent



**Oncologists Are Freaking Out After Officials Announce True Cause of Cancer**

Natural Health Solutions



**The Amazon Discount Trick Most People Don't Even Know of**

Honey



**Affordable SUVs Made For Seniors**

SUV | Sponsored Links

---

**LATEST CALIFORNIA** >

LIFESTYLE

It's fall, which means it's prime plant sale time in Southern California

Oct. 4, 2019

CLIMATE & ENVIRONMENT

The next big California vs. Trump fight is over water and endangered species

Oct. 4, 2019

CALIFORNIA

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

**TRIAL OFFER**   SUPPORT QUALITY
4 weeks for $1

**EXHIBIT 6**
00103

CALIFORNIA

Students want Chanel Miller's words on a plaque. Stanford says they'll be triggering

47 minutes ago

Subscribe for unlimited access

Follow Us

Copyright © 2019 Los Angeles Times · Terms of Service | Privacy Policy

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You

can learn more about how we use cookies by reviewing our Privacy Policy. Close

TRIAL OFFER    SUPPORT QUALITY

4 weeks for $1

SAVE NOW

**EXHIBIT 6**

00104