John W. Dillon (Bar No. 296788)
Gatzke Dillon & Ballance LLP
2762 Gateway Road
Carlsbad, California 92009
Telephone: (760) 431-9501
Facsimile: (760) 431-9512
E-mail:  jdillon@gdandb.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW JONES; THOMAS FURRH; KYLE YAMAMOTO; PWGG, L.P. (d.b.a. POWAY WEAPONS AND GEAR and PWG RANGE); NORTH COUNTY SHOOTING CENTER, INC.; BEEBE FAMILY ARMS AND MUNITIONS LLC (d.b.a. BFAM and BEEBE FAMILY ARMS AND MUNITIONS); FIREARMS POLICY COALITION, INC.; FIREARMS POLICY FOUNDATION; THE CAL GUN RIGHTS FOUNDATION (formerly, THE CALGUNS FOUNDATION); and SECOND AMENDMENT FOUNDATION<br><br>                                          Plaintiffs,<br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,<br><br>                                          Defendants | Case No.: 19-cv-01226-L-AHG<br><br>Hon. Judge M. James Lorenz and Magistrate Judge Allison H. Goddard<br><br>**DECLARATION OF DAVID T. HARDY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Part 1 of 4)**<br><br>Complaint Filed: July 1, 2019<br>Amended Complaint Filed: July 30, 2019<br><br>Date: November 18, 2019<br>Time: 9:00 a.m.<br>Courtroom: Dept. 5B |

# DECLARATION OF DAVID T. HARDY

I, David T. Hardy, declare as follows:

1.     I am not a party to the captioned action, am over the age of 18, have personal knowledge of the facts stated herein, and am competent to testify as to the matters stated and the opinions rendered below.

2.     I graduated from the University of Arizona with a bachelor's degree (with honors) in 1972. I received my Juris Doctorate degree with honors at the same institution in 1975. In law school, I served as Associate Editor of the Arizona Law Review.

3.     I began my law practice in Tucson, Arizona in 1975. In 1982, I began work as a career attorney with the U.S. Department of Interior in Washington, D.C., ending as a GS-14. In 1992 returned to Tucson and have since practiced law as a sole practitioner. My work has heavily focused on the Second and Fourteenth Amendments.

4.     To date, I have published seven books, including the *Origins and Development of the Second Amendment* and *Dred Scott: The Inside Story*. I have published 27 law review articles, most of which concern the Second or Fourteenth Amendments, or arms laws. Two have been cited by the U.S. Supreme Court. See *McDonald v. City of Chicago*, 561 U.S. 742, 763, n. 10 (2010) (plurality), 561 U.S. at 841 (Thomas, J., concurring). One article has been cited by eleven U.S. Circuit Courts of Appeals. I also submitted amicus briefs in *District of Columbia v. Heller*, *McDonald v. City of Chicago*, and *New York State Rifle and Pistol Ass'n v. New York*.

1

5.      I published my first law review article on the Second Amendment in 1974. In the 45 years since, I have researched arms-related topics in the Library of Congress, the National Archives, and university libraries at William and Mary and the University of Virginia. My photocopy collection on this topic exceeds nine shelf-feet.

6.      Attached hereto as **Exhibit 1** is a true and correct copy of my Curriculum Vitae. It describes my education, employment background, career experience, and publications.

7.      Based on my education, work experience, research background, publications, and review of the research of others, in my opinion, 18-to-20-year-old adults (which I will hereafter refer to as "Young Adults") possess the same protection under the Second Amendment as adults 21 and over.  Further, in my opinion, any firearm ban on Young Adults, based solely on age, significantly infringes on the core Second Amendment rights of Young Adults.

8.      Mirroring the historical inquiry used by the Supreme Court in *Heller,* I conducted a detailed textual and historical review of firearms regulations on Young Adults. As identified in *Heller*, the text, structure, and contemporary drafting documents are the primary historical sources for the Supreme Court's originalist inquiry. I also reviewed pre-Civil War case law and commentators, whose "intellectual foundations were close to those of the founding generation." I also reviewed Post-Civil War sources, although bearing in mind that, as the Court taught in *Heller*, that these "do not provide as much insight into [the Second Amendment's] original meaning as

2

earlier sources." *Heller*, 554 U.S. at 614.

**Colonial and Founding Era Laws**

9.      Based on my review of Colonial and Founding Era firearms regulations, in my opinion, there were *no* age-based restrictions on the acquisition, purchase, or possession of firearms. Although this period did have what is most accurately described as various firearm safety and storage regulations, none of these regulations were in the same category or equivalent to any age-based firearm restriction. My opinion is supported by other historical analyses cited below.

10.      The historical examples of various Founding Era firearms regulations consist mainly of laws that prevented discharging guns at certain times, or using firearms in an especially dangerous manner such as firing guns in public places or in celebration (which also risked causing a false alarm relating to Indian raids), "fire hunting" (*i.e.,* where participants were likely to hurt themselves needlessly). Attached hereto as **Exhibit 2** is a true and correct copy of Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. of Firearms & Pub. Pol'y 1, 30-34 (2004). Other regulations consisted of gunpowder storage laws that only applied when that volatile explosive exceeded a safe amount. (Urban fires were common in the days of candles and fireplaces, and black powder could be ignited by any drifting spark. It thus made sense to store large quantities in public magazines, designed for protection against fire and sparks. These were brick, had wooden floors secured without nails lest a boot nail strike a spark, and had ventilation screened and baffled to keep out drifting embers from building fires).

3

In my opinion, these firearms safety regulations are nothing like broad prohibitions against the purchase, acquisition, and possession of any firearm for an entire class of ordinary law-abiding people based solely on age. *Heller* specifically rejected such examples because any such restrictions were not germane to an outright ban on keeping firearms for self-defense. In other words, these safety regulations did not interfere with the self-defense "core" right of the Second Amendment. *Heller*, 554 U.S. at 634.

11.     Additionally, I reviewed the various firearms regulations that targeted particular groups for public safety reasons, and because they were not seen as members of the body politic. These regulations generally applied to Indians, slaves, sometimes free blacks, Catholics, and (during the Revolution) Loyalists to the Crown. See **Exhibit 2** (Cramer 2004 at 16-23).

12.     In my opinion, these prejudicial restrictions on Indians, slaves, free blacks, and others are hardly relevant precedent to current, under-21 firearm bans. These were directed at persons seen as outside the body politic. Aside from the moral implications of relying on racist and bigoted laws, the 1st and 13th Amendments, applicable to the states through the 14th Amendment, explicitly abrogated any authority or precedent any of these laws once had. In other words, an historical analysis shows that none of these regulations can justify limits on firearms purchase or possession by Young Adults.

13.     The regulations that permitted disarming "Loyalists to the Crown", in my opinion, are also distinct from a categorical age-based firearms prohibition. These

4

"Loyalty Test[s]" were meant to disarm persons above a certain age who refused to swear allegiance to the newly-independent states. Their penalties were imposed based on individual conduct, conduct that placed the person outside the new body politic. Those who refused to swear ("non-jurors) were subjected, not just to disarmament, but to a number of other measures that would be seen as clearly unconstitutional today.

> New Jersey issued fines and threatened non-jurors with confiscation. New York confiscated the property of non-signers and exiled them to the British lines. Pennsylvania non-signers were threatened with the loss of civil rights as well as with fines, punitive taxes, and professional bans in the case of lawyers, apothecaries, doctors, and merchants, was the case in Maryland. Rhode Island and Connecticut deprived non-jurors of their rights to vote and to sue in a court of law…. North Carolina confiscated non-jurors' property and stripped them of their civil rights; they were to leave the state within thirty days.

Holger Hoock, Scars of Independence 452 n. 68 (2017).

14.     Thus, in my opinion, an historical review of Founding Era firearms regulations shows that although various firearms safety regulations existed during the Colonial and Founding Era, they were far from anything remotely similar to a categorical firearms ban based solely on age.

15.     Further review of the Colonial and Founding Era firearm-related regulations, confirms that an historical-based analysis does not support age-based firearms bans. In fact, the state militia laws explicitly reject such bans and even support a core Second Amendment right applicable to Young Adults.

### State Militia Statutes

16.     I conducted a review of the various Colonial and Founding Era militia

5

statutes.  Importantly, at the time of the passage of the Second Amendment, or shortly thereafter, the minimum age for militia service in every state was eighteen. The year the Second Amendment was ratified — 1791 — is "the critical year for determining the amendment's historical meaning." See *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3035 and n. 14; *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). Said state militia laws set around the time of ratification of the Second Amendment and the federal Militia Act of 1792 consist of the following:

a. ***Connecticut***: "…who is, or shall be of the age of eighteen years…" – Connecticut Acts and Laws, October Session (1792) (following a reprint of the federal militia law, Connecticut provided that militia fines imposed on those who had not yet reached the age of twenty-one would be paid by their parents).

b. ***Delaware***: "… who is, or shall be of the age of eighteen years…" – Ch. XXXVI, An Act for Establishing the Militia In This State, Laws of the State of Delaware (1793).

c. ***Georgia***: "…all the male inhabitants…above the age of eighteen…" - An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of the Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States, as contained in Digest of the Laws of Georgia, 460 (1792).

d. ***Maryland***: "…who is, or shall be of the age of eighteen years…" -  Ch.

6

LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793).

e. ***Massachusetts***: "…who is, or shall be of the age of eighteen years…" - Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service, Massachusetts Acts and Laws, May Session (1793).

f. ***New Hampshire***: "…who is, or shall be of the age of eighteen years and under the age of forty years…" - An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, 441 (1792).

g. ***New Jersey***: "…all and every free and able-bodied white male Citizen, between the ages of eighteen and forty-five…" -  Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey (1792).

h. ***New York***: "…who is, or shall be, of the age of eighteen years… shall severally and respectively be enrolled in the militia…" - Ch. 45, An Act to Organize the Militia of This State. Laws of New York (1793).

i. ***North Carolina***: "That all freemen and indented servants within this State,

7

from eighteen to fifty years of age, shall compose the militia thereof…" - Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina — 1786, 813 (amended by An Act to Carry Into Effect an Act of Congress, Entitled, An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States, Also to Amend an Act, Passed at Fayetteville, in the Year One Thousand Seven Hundred and Eighty Six, Entitled, An Act for Establishing the Militia in This State), Acts of the North Carolina General Assembly 1786-1787, North Carolina General Assembly, 1786, Vol. 24, 783-884 (1793).

      j.  ***Pennsylvania***: "…each and every free, able-bodied white male citizen… who is or shall be of the eighteen years of age…" - Ch. MDCXCVI, An Act for Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania (1793).

      k.  ***South Carolina***: "…enroll every citizen who shall, from time to time, arrive at the age of eighteen years…" - An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, Statutes at Large of South Carolina, Vol. 8 (1794-1837) (enrolling citizens turning 18 and evidencing a shift from the former militia age of 16).

      l.  ***Virginia***: "…young men from eighteen to 25 years of age…" - Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, Virginia (1792). For further information regarding each of the above militia statutes, please see **Exhibits 3** through **14**, below.

*DECLARATION OF DAVID T. HARDY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION*

17.    Based on the above review of colony-by-colony militia laws during the Colonial and Founding Era (seventeenth or early eighteenth century through the end of the eighteenth century), I have noted common characteristics of such laws among the colonies and states.  First, the most common age for militia duty was 16 to 50 years old; and the maximum age often went as high as 60. Second, the minimum age was sometimes 18, and never higher (except for one 19-year period in Virginia).

18.    Further, the frequent renewals and revisions of Colonial and early state militia laws reflect the legislatures' continuing determination that persons 18-years-old and over be well-armed. With each revision, Young Adults remained part of the militia, and had the right (indeed, the legal duty) to purchase, acquire, use, and possess firearms.

19.    At first glance, there appears to be two examples of states which chose to enroll only those 21 and older in their militia — New Jersey (in 1779) and Ohio (in 1843). However, neither state set the minimum age to join the militia at 21.

20.    Specifically, New Jersey's 1779 Act was not a general militia act, but rather, a specific purpose act of the type states would enact from time-to-time as supplements to their overall militia structure. See Ch. XIII, An Act for the Regulating, Training, and Arraying of the Militia, and For Providing More Effectually for the Defence and Security of the State, Sec. 10, Acts of the General Assembly of the State of New Jersey, 40 (1781)  (affirming the age group to be enrolled in the state militia as

9

sixteen to fifty and using twenty-one as the cut-off age for a specific purpose act, but not ruling out the use of those between the ages of sixteen and twenty-one *who were still part of the militia*). New Jersey's militia age was 18 in 1792. *See* **Exhibit 9** (enrolling free, white males from eighteen to forty-five in the state militia). Further, the 1779 Act and similar acts addressed a specific need and would sometimes only be in effect for a certain period of time. *See* Ch. XI, An Act to Establish a Company of Artillery, in the City of New-Brunswick, Acts of the General Assembly of the State of New Jersey, 11 (1782). Moreover, the 1779 Act does not state that 21 was the minimum age for militia service; instead, it states the officers would make lists of everyone above 21, not exempted by some other duties. It laid out a specific number of militiamen to be drafted from each county so that an even 1000 was reached. Finally, the 1779 Act states that "nothing herein contained shall be construed to prevent employing Officers, and enlisting non-commissioned Officers and Privates between the Age of sixteen and twenty-one years." Ch. XIII, An Act for the Regulating, Training, and Arraying of the Militia, and For Providing More Effectually for the Defence and Security of the State, Sec. 10, Acts of the General Assembly of the State of New Jersey, 40 (1781)

21.    With regard to the Ohio statute from 1843, it merely exempted persons under 21 from the militia duties *during times of peace*. Ohio's minimum age changed to twenty-one the following year. See An Act To Organize and Discipline the Militia, Sec. 1, Ohio Statutes (1837) and An Act To Regulate the Militia, Sec. 2, Ohio Statutes (1844). However, sixteen year olds were still allowed to volunteer for the militia even

10

after the shift. *Id*. In fact, the militia age in Ohio was eighteen at in 1843. *Id*.

22.    Thus, based on my historical review of the relevant state militia laws, it could not be more clear, at the crucial point of our nation's history — Young Adults were always considered part of the militia and always held the right to keep and bear arms.

### Federal Militia Act

23.    The federal Militia Act of 1792 (1 Stat. 271) required that a male who "is or shall be of the age of 18 years" "shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and 24 rounds of ammunition. Attached hereto as **Exhibit 15** is a true and correct copy of the Uniform Militia Act, 1 Stat. 271-72 (1792). The main consideration in raising the age to 18 was better resistance to disease, which was more dangerous than the enemy on military campaigns. Those who chose to carry a rifle instead of a musket were required to possess the rifle and more than twenty rounds of ammunition. *Id*. The Militia Act of 1792, with amendments, remained law until repealed in 1903. It did allow States to exempt persons from "militia duty." See **Exhibit 15** at p. 272. In the 1830s and 1840s, several States generally exempted citizens from this duty. However, these individuals still remained members of the militia, but were not subject to drill, muster, and being "called forth" by the President or their state Governor. *Id*.

24.    The most encyclopedic treatment of militia statutes as they pertain to the Second Amendment right of 18-to-20-year-olds is found in: (1) David B. Kopel &

11

Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 Southern Illinois University Law Journal 119 (2018) (hereinafter Kopel & Greenlee 2018); and (2) Kopel, David B. and Greenlee, Joseph, *The Second Amendment Rights of Young Adults* (forthcoming in 2019), 43 Southern Illinois Law Journal (2019) (hereinafter Kopel & Greenlee 2019).

25.     Attached hereto as **Exhibit 16** is a true and correct copy of Kopel & Greenlee 2018. Attached hereto as **Exhibit 17** a true and correct copy of Kopel & Greenlee 2019.

26.     Additionally, not only were 18-to-20-year-olds able to freely purchase and acquire firearms, they were also *required* to possess them.  In fact, "over 250 Colonial and state militia statutes through 1799 mandated that persons," usually 16 or 18 (and older) serve in the militia using their own arms.  See **Exhibit 17** at 33-34. For example, during the Founding Era, Colonial militia laws (with the exception of Pennsylvania, due to objections by its Quaker population) required males to own at least one musket, plus a supply of ammunition for it, and to be present annually for inspection and drill. This duty generally commenced at the person's 16th birthday. Anyone who failed in their duty were subject to punishment by court-martial.  See **Exhibit 15** at 271.

27.     Many of the earliest Supreme Court rulings on federal preemption of state laws arose from militia court martials. See, e.g., *Houston v. Moore*, 18 U.S. 1 (1820). On that basis, laws prohibiting 18-to-20-year-olds from purchasing or possessing at least long guns (e.g., rifles and shotguns) would have failed under the Supremacy

12

Clause, prior to the 1903 repeal of the 1792 Militia Act. Federal law *required* 18-year-olds to be armed, and state law could not interfere with that. See *Presser v. Illinois*, 116 U.S. 252, 265-266 (1886) (leaving aside the constitutional issue, the citizenry comprises the militia of the U.S. and States cannot prohibit them from keeping and bearing arms so as to "disable the people from performing their duty to the general government").

**Founding Era Attitudes**

28.     Although the Colonial and Founding Era regulations and militia statutes prove that Young Adults held the core right to keep and bear arms under the Second Amendment, I also reviewed various and more generalized "Founding Era Attitudes" regarding the Second Amendment Rights of Young Adults. In my opinion, Founding Era attitudes do not support the notion that Young Adults could be categorically disarmed due solely to their age. Rather, Founding Era attitudes explicitly support the Second Amendment rights of Young Adults. Indeed, it was common for American children (under the age of 18) to be familiar with firearms, let alone Young Adults.

29.     For example, on July 8, 1775, the Continental Congress warned King George III that America's superiority with arms, due to their training beginning in childhood, would make them a formidable foe: "Men trained to Arms from their Infancy, and animated by the Love of Liberty, will afford neither a cheap or easy Conquest." Attached hereto as **Exhibit 18** is a true and correct copy of *1 Journals of the AM. Congress From 1774-1788*, at 169 (adopted July 8, 1775) (1823). Similarly,

13

David Ramsey, a legislator from South Carolina and delegate to the Continental Congress stated, "Europeans, from their being generally unacquainted with fire arms are less easily taught to use them than Americans, who are from their youth familiar with these instruments of war." Attached hereto as **Exhibit 19** is a true and correct copy of 1 David Ramsey, *The History of the American Revolution* 181 (Liberty Fund 1990) (1789). He also noted that "[f]or the defence of the colonies, the inhabitants had been, from their early years, enrolled in companies, and taught the use of arms." *Id.* at 178.

30.    Writings from Thomas Jefferson provide insight into American attitudes of gun ownership of Young Adults. In explaining the events in America to a Scottish friend, Thomas Jefferson stated, "[w]e are all in arms, exercising and training old and young to the use of the gun." Attached hereto as **Exhibit 20** is a true and correct copy of 3 Am. Archives 4th Ser. (Clark & Force) 621 (1840). Jefferson also opined that during the Revolution, the reasons American battle casualties were so much lower than the British was "our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy." Attached hereto as **Exhibit 21** is a true and correct copy of the letter from Thomas Jefferson to Giovanni Fabbroni (June 8, 1778), in "From Thomas Jefferson to Giovanni Fabbroni, 8 June 1778," Founders Online, National Archives, accessed April 11, 2019, https://founders.archives.gov/documents/Jefferson/01-02-02-0066. [Original source: *The Papers of Thomas* Jefferson, vol. 2, 1777-18 June 1779, ed. Julian P. Boyd. Princeton: Princeton University Press, 1950, pp. 195-198.] In precise legal usage,

"infancy" meant the same as "minority." The word was not used exclusively in the modern sense, in which an "infant" is a child younger than a toddler.

31.    Although the historical attitudes surrounding Young Adults' and gun ownership are more subjective than the general firearms regulations and militia statutes of the time, in my opinion, these general attitudes are clear.  As Tench Coxe said, "the power of the sword are in the hands of the yeomanry of America from 16 to 60…. Their swords… are the birthright of an American." Attached hereto as **Exhibit 22** is a true and correct copy of Tench Coxe, *A Pennsylvanian, No. 3*, *Pennsylvania Gazette*, Feb. 20, 1788.

### Other Arms-Related Statutes and Duties

32.    Other arms-related statutes and duties during this period support the notion that Young Adults held the right to keep and bear arms. These duties required the use of arms and Young Adults were required to take part in them. Specifically, Young Adults (as well as adults over 21) were required to bring their *own arms* to help protect the community in various ways.

33.    First, all able-bodied men from 15 or 16 to 60 were obliged to join in the "hue and cry" to pursue fleeing criminals.  As a part of this duty, deadly force was permitted if necessary to prevent escape. See **Exhibit 17** at 33-34.

34.    Second, there was "watch and ward" guard duty for towns and villages. See **Exhibit 17** at p. 33, fn. 250. Young Adults took party in this duty to provide security for the towns and villages.    Third,   Young   Adults   were   expected   to

15

participate in the *posse comitatus*. This was the power of the sheriff, coroner,

magistrate, or other officials to summon all able-bodied males to assist in keeping the

peace.  Attached hereto as **Exhibit 23** is a true and correct copy of David B. Kopel,

*The Posse Comitatius and the Office of Sheriff: Armed Citizens Summoned to the Aid*

*of Law Enforcement*, 104 J. Crim. L. & Criminology 761, 763, (2015) (Kopel 2015).

The traditional minimum age for posse service was 15 or 16 years; the upper age limit

was 70 by some commentators, while other said there was no limit. *Id.* at 796.  Young

Adults were required to participate in this posse service. Indeed, James Wilson, shortly

before being appointed to the U.S. Supreme Court, stated in 1790, that "No man above

fifteen and under seventy years of age, ecclesiastical or temporal, is exempted from

this service." See James Wilson, *Lectures on Law*, in 2 Collected Works of James

Wilson 1017 (Kermit L. Hall & Mark David Halls eds., 2007) (Ch. VII, "The Subject

Continued. Of Sheriffs and Coroners"). Thus, even at the age of 15 or 16, Americans

were expected to use their own arms to help enforce the law (including by defending

themselves).

**Late 19th-Century Case Law**

35.    I also reviewed the various early to mid-19th century state firearms laws

and regulations to determine if age-based restrictions on firearms were in place. This

review consisted of a diligent search for early age-restricting laws, in session laws, case

law, and academic articles. From 1800 to at least 1850, there were no age-based

firearms regulations. Thus, as in the Colonial period and the Founding Era, there were

16

no age-based arms restrictions in the early Republic or the Jacksonian period.

36.    The first age restrictions on firearms appear in the South shortly before the Civil War.  In 1856, Alabama prohibited giving handguns to male minors. In 1860, Kentucky outlawed providing handguns to minors, free blacks, or slaves. Other than these two laws, age-based restrictions did not appear until the last quarter of the 19th Century. However, as stated above, late nineteenth century laws "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources." *Heller*, 554 U.S. at 614.  Thus, my analysis must take this into account.  Importantly, both of these laws were restrictions on giving handguns to legal "minors" under the age of majority.  No law ever restricted all types of firearms for legal adults (who had reached the age of majority) based on their age up to and through this period.

37.    In my review of the mid-to-late 19th Century, I found only a handful of States that limited firearm purchases based on age. However, these restrictions applied to children or minors who had not reached the age of majority and were not considered legal adults. Further, the age restrictions applied to individuals well under 18; specifically, ages 14, 15, or 16. First, in 1880, Ohio provided that anyone who "sells, barters, or gives away to any minor *under the age of fourteen years*, any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or firearm" would be guilty of a misdemeanor. Rev. Stat. of Ohio §6986 (6th ed. 1895) (emphasis added). Second, in 1881, a Pennsylvania law made it illegal to sell "to any person *under sixteen years of age*, any cannon, revolver, pistol, or other such deadly weapon.' See *McMilleb v.*

17

*Steele*, 275 Pa. 584, 119 A. 721 (1923). In this instance, the term "deadly weapon" does not appear to have applied to long arms (*e.g.,* rifles and shotguns), and at least as quoted by the court, did not forbid possession.  Third, in 1882, New Jersey provided that it would be a misdemeanor for a person to "sell, barter or exchange… any gun, pistol, toy pistol, or fire-arms in this state to any person *under the age of fifteen years*." (emphasis added). This was amended four weeks later to add a section forbidding persons under 15 to "fire or use" a firearm "except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school." See Supplement to the Revision of the Statutes of New Jersey 205-06 (1887).

38.  None of the above-referenced laws applied to legal adults who had reached the age of majority (at that time generally 21) or individuals under the age of majority who were ages 18-to-20.

### Modern Federal Age-Based Firearm Restrictions

39.  In terms of federal law, the National Firearms Act of 1934; which regulated sale and possession of machine guns and other specialized firearms, contained no age restrictions. See 48 Stat. 1236.

40.  The first federal restriction on ordinary firearms purchase came in the Federal Firearms Act of 1938 (52 Stat. 1250), which forbade firearms sales to those convicted of violent crimes and fugitives from justice, but it contained no age restrictions.

41.  The first federal age restriction appears in the Gun Control of 1968. It set

18

the minimum age to purchase rifles and shotguns from licensed dealers at 18 and set the minimum age to purchase handguns from licensed dealers at 21. Handgun transfers between two non-licensed individuals (commonly referred to a "private party transfer") were not prohibited. Thus, those under 21 who wished to purchase handguns were free to acquire them through private party transfers or through their parents

42.     Additional federal age-based restrictions on firearms did not occur until much later in the 20th Century.  The 1993 Youth Handgun Safety Act restricted, but did not ban, juvenile (under 18 years old) handgun possession. See YOUTH HANDGUN SAFETY ACT OF 1993, 1003 Bill Tracking S. 1087. Later, federal law was amended to prohibit juveniles (under 18) from possessing handguns (subject to limited exceptions). 18 U.S.C. 922(x)(2) (2018).

43.     In 2009, the First Circuit upheld the federal ban on juvenile handgun possession in *United States v. Rene E.* 583 F.3d 8 (1st Cir. 2009). However, in my opinion, it provides little support for an age-based firearm ban on the purchase, sale, transfer, and use of any firearm for Young Adults (ages 18-to-20).  The statute at issue related to handgun possession by those aged under 18.

44.     Later, the National Rifle Association challenged the federal law that prohibited federally-licensed firearms dealers from selling handguns to Young Adults under the Second Amendment.  On appeal, the Fifth Circuit upheld the lower court's decision that the prohibition was constitutional under the Second Amendment. The Fifth Circuit applied an "historical analysis" of firearms regulations and determined the

19

conduct at issue was outside the Second Amendment's protection. However, in an abundance of caution, the Fifth Circuit also applied intermediate scrutiny to uphold the challenged law. *NRA of Am. v. Bureau of Alcohol*, 700 F.3d 185, 205-212 (5th Cir. 2012) (*NRA I*).

45.     In my review of *NRA I* and current federal law, the federal handgun law still allows Young Adults to purchase and possess *all types of rifles and shotguns* from licensed dealers, private party transfers, and family transfers. 18 U.S.C.S. § 922(b)(1) and (c)(1). Additionally, Young Adults ages 18 to 20 may still purchase, acquire, transfer, and sell *handguns* through private party transfers and family transfers.  These exceptions were explicitly relied on in upholding the law as constitutional. See *NRA I*, 700 F.3d at 191-92.

46.     In contrast, current California law prevents both dealer and private party sales, transfers, and control or possession of any type of firearm (e.g., handguns, rifles, and shotguns). Penal Code section 27510.

47.     Relatedly, in my opinion and based on other secondary source critiques, the Fifth Circuit's historical analysis of the Second Amendment relative to Young Adults is flawed. See **Exhibit 16** [Kopel & Greenlee 2018] and **Exhibit 17** [Kopel & Greenlee 2019]. My analysis above regarding Colonial and Founding Era firearms regulations and militia statutes, and my analysis of firearms regulations up through 1900 are the base for my criticism.

### Other State Age-Based Firearm Restrictions

*Declaration of David T. Hardy in Support of Plaintiffs' Motion for Preliminary Injunction*

48.    In the 20th Century, it is generally accepted that the earliest relatively strict gun law is New York's 1911 Sullivan Act.  1911 N.Y. Laws ch. 195.  It amended section 1897 of the Penal Law to make it a misdemeanor to sell any "gun, revolver, pistol or other firearm" to a person *under the age of 16*, and prohibited possession by those persons. The history that follows is less than clear. Section 1897 had started as a prohibition against those under 18 possessing brass knuckles or "slung shots," flexible clubs, but did not list firearms. 1908 N.Y. Laws ch. 93. The 1911 law added the "firearms" restriction. A 1913 amendment to section 1897 expanded the list of weapons forbidden to juveniles, but it removed the "firearms" portion of the prohibition. 1913 N.Y. Laws ch. 608. The same list of prohibited weapons, sans firearms, was repeated two years later. 1915 NY Laws ch. 390. This was repeated in 1917.  1917 NY Laws ch. 580. Based on my review, it appears that the ban on firearms possession by those under 16 began in 1911, was repealed in 1913, and went unchanged until at least through 1915. This provision, also evidently lasted throughout most of the 20th century. Justice Scalia has noted that in high school (he graduated in 1953) he carried a rifle through the New York City subways without any problem. See Associated Press, Feb. 27, 2008, online at  https://www.deseretnews.com/article/635187836/Young-Scalia-carried-rifle-while-riding-NY-subway.html.

49. New York's Sullivan Act, which also required a discretionary license to purchase a handgun, did not become popular in other States. To pre-empt its spread, in 1924, the United States Revolver Association published a proposed Uniform Act.

21

Report of the Committee on a Uniform Act to Regulate the Sale and Possession of Firearms (1924). Section 9 of that proposal would have forbidden sales of handguns to those under the age of 18.  It did not restrict handgun sales to Young Adults ages 18 and over. Also, it would not have affected sales of rifles or shotguns, nor did it restrict handgun possession by those under 18; the restrictions on possession were limited to felons and non-citizens.

50. The following year, the National Conference of Commissioners on Uniform Laws produced its own version of a uniform law — the Uniform Firearm Act. *See* Second Report of the Committee on a Uniform Act to Regulate the Sale and Possession of Firearms (1925). The Commissioners followed with further drafts in 1926, 1928, and 1930. Section 8 of each draft tracked the 1924 version, forbidding only dealer sales, of handguns, to those under 18. Private transfers of handguns and all transfers of long guns were not subject to an age limit. Young Adults would not have been affected.

**History of California Age-Based Firearm Restrictions**

51.   As of 1917, California law contained no age restrictions on firearm sales or transfers. 1917 CA Statutes ch. 145. In 1923, California largely adopted the Uniform Acts and imposed a minimum of 18 years of age or older on the sale, delivery, or transfer of "any pistol, revolver or other firearm capable of being concealed upon the person…." 1923 CA Statutes ch. 339, § 10. Even then, there was no California ban on the sale, supply, delivery, possession, or control of any long guns based on age (e.g., rifles and shotguns). *Id.*

22

52.     Prior to the enactment of SB 1100, which amended California Penal Code section 27510, existing California law prohibited the sale or transfer of a handgun, except as exempted, to any person under the age of 21 through federally licensed dealer and private party transfers. However, it expressly allowed a person at least 18 years of age to buy or transfer "long guns" (e.g., rifles and shotguns) through both federally licensed dealer sales, private party transfers, and familial transfers.

53.     Based on my review of age-based firearms restrictions, California Penal Code 27510 is an extreme outlier.  Only five other states have implemented age-restrictions on all types of firearms for Young Adults. Many of these restrictions have only been in place within the last five years.

54.     Attached hereto as **Exhibit 3** is a true and correct copy of Connecticut Acts and Laws, October Session (1792).

55.     Attached hereto as **Exhibit 4** is a true and correct copy of, An Act for Establishing the Militia In This State, Delaware (1793).

56.     Attached hereto as **Exhibit 5** is a true and correct copy of, An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States, as contained in Digest of the Laws of Georgia, 460 (1792).

57.     Attached hereto as **Exhibit 6** is a true and correct copy of, Ch. LIII, An

23

Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793).

58.   Attached hereto as **Exhibit 7** is a true and correct copy of, Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service, Massachusetts Acts and Laws, May Session (1793).

59.   Attached hereto as **Exhibit 8** is a true and correct copy of, An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, New Hampshire, 441 (1792).

60.   Attached hereto as **Exhibit 9** is a true and correct copy of, Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey (1792).

61.   Attached hereto as **Exhibit 10** is a true and correct copy of Ch. 45, An Act to Organize the Militia of This State. Laws of New York (1793).

62.   Attached hereto as **Exhibit 11** is a true and correct copy of, Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina — 1786, 813 (amended by An Act to Carry Into Effect an Act of Congress, Entitled, An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States, Also to Amend an Act, Passed at Fayetteville, in the Year One Thousand Seven Hundred and Eighty Six, Entitled, An Act for Establishing

the Militia in This State), Acts of the North Carolina General Assembly 1786-1787, North Carolina General Assembly, 1786, Vol. 24, 783-884 (1793).

63.     Attached hereto as **Exhibit 12** is a true and correct copy of Ch. MDCXCVI, An Act for Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 454-481 (1793).

64.     Attached hereto as **Exhibit 13** is a true and correct copy of An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, Statutes at Large of South Carolina, Vol. 8 (1794-1837).

65.     Attached hereto as **Exhibit 14** is a true and correct copy of  Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, Virginia (1792).

## CONCLUSIONS

66.     My research leads me to the following conclusions:

67.     Age restrictions on the purchase or possession of firearms were utterly unknown in the Colonial Era, Founding Era, and up through at least 1850. Indeed, state militia laws and other regulations (such as *posse* duties) *required* Young Adults to own, possess, and use firearms. From 1792 until 1903, this same requirement to own, possess, and use firearms was imposed by federal law.

68.     Colonial and Founding Era firearms safety regulations did not contain age restrictions. Many dealt with the then-common fire danger of possessing large quantities of black powder.

69.     Certain racist and bigoted firearm restrictions that prohibited firearms

25

purchases, or disarmed "certain groups" such as Indians, slaves, free blacks, and Catholics, provide no precedent for modern law and are explicitly abrogated by the First, Thirteenth, and Fourteenth Amendments.

70. Firearms restrictions that prohibited firearm purchases or disarmed the non-virtuous or Loyalists were historically rare, found only during wartime, and based upon personal misconduct: refusal to swear allegiance. They were accompanied by penalties that included loss of civil rights, confiscation of property, and exile. Thus, they provide no support for categorical ban on the acquisition or possession of *any* firearm by Young Adults.

71. Overwhelming historical evidence, including state militia laws and federal militia requirements, confirms that Young Adults always have been considered part of the militia.

72. Post-1850, the few age restrictions in place only applied to those under 18 and were narrow in that they usually applied only to handguns (e.g., pistols and revolvers). Later restrictions applied only to individuals who had not reached the age of majority and only applied to handguns.

73. Age restrictions on the purchase or possession of rifles appear to have originated in the 1960s. Prior to that period, even New York, which had the strictest gun laws at the time, did not restrict possession of rifles based on age.

74. Federal age-based handgun restrictions appear for the first time in 1968. However, they were specific to federally-licensed dealer sales, and of handguns. The

26

federal restrictions on long guns (e.g., rifles and shotguns) only applied to those *under* 18.

75.     Federal circuit court cases that have exhausted age-based restrictions have only addressed restrictions on handguns, never rifles and shotguns, and never prohibitions on *all* firearms based on age.

76.     Those relevant federal circuit court cases also rely on a flawed historical analysis and have been heavily criticized.

77.     State prohibitions on all types of firearm purchases are extreme outliers that only have been in place in the last several years. Until the mid-20th Century, with the 1968 Gun Control Act, age restrictions on firearms in general were not common. It is only in recent years that these laws have been implemented at both the federal and state level.

I declare under penalty of perjury that the foregoing is true and correct.  Executed within the United States on October 4, 2019.

_____

David T. Hardy

**EXHIBITS**
**TABLE OF CONTENTS**

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 1 | David T. Hardy, Curriculum Vitae | 0001 – 0007 |
| 2 | Clayton E. Cramer *Colonial Firearm Regulation*, 16 J. on Firearms & Pub. Pol'y (2004) | 0008 – 0056 |
| 3 | Connecticut Acts and Laws, October Session (1792) | 0057 – 0070 |
| 4 | An Act for Establishing the Militia In This State, Delaware (1793) | 0071 – 0085 |
| 5 | An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States, as contained in Digest of the Laws of Georgia, 460 (1792) | 0086 – 0106 |
| 6 | Ch. LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793) | 0107 – 0115 |
| 7 | Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service, Massachusetts Acts and Laws, May Session (1793) | 0116 – 0137 |
| 8 | An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, New Hampshire, | 0138 - 0149 |

28

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| | 441 (1792) | |
| 9 | Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey (1792) | 0150 – 0155 |
| 10 | Ch. 45, An Act to Organize the Militia of This State. Laws of New York (1793) | 0156 – 0168 |
| 11 | Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina — 1786 | 0169 – 0171 |
| 12 | Ch. MDCXCVI, An Act for Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 454-481 (1793) | 0172 – 0204 |
| 13 | An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, Statutes at Large of South Carolina, Vol. 8 (1794-1837) | 0205 – 0326 |
| 14 | Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, Virginia (1792) | 0327 – 0335 |
| 15 | Uniform Militia Act, 1 Stat. 271-72 (1792) | 0336 – 0340 |
| 16 | David B. Kopel & Joseph G.S. Greenlee *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People (2018)* | 0341 – 0379 |
| 17 | Kopel, David B. and Joseph Greenlee *The Second Amendment Rights of Young Adults (2019)* | 0380 – 0480 |
| 18 | *1 Journals of the AM. Congress From 1774-1788* | 0481 – 0496 |
| 19 | 1 David Ramsey, *The History of the American Revolution* 181 (Liberty Fund 1990) (1789) | 0497 – 0752 |

| **Exhibit** | **Description** | **Page(s)** |
|---|---|---|
| 20 | 3 Am. Archives 4th Ser. (Clark & Force) 621 (1840) | 0753 – 0756 |
| 21 | Thomas Jefferson, *Writings 760* (Merrill D. Peterson, ed., 1984) | 0757 – 0760 |
| 22 | Tench Coxe, *A Pennsylvanian, No. 3*, *Pennsylvania Gazette*, Feb. 20, 1788 | 0761 – 0764 |
| 23 | David B. Kopel, *The Posse Comitatius and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761, 763, (2015) | 0765 - 0856 |

30

# EXHIBIT "1"

EXHIBIT 1
0001

# David T. Hardy
## Cirriculum Vitae

8987 E. Tanque Verde, No. 265          (520) 749-0241 (office)
No 265          (520) 490-9460 (cell)
Tucson AZ 85749          dthardy@mindspring.com

### *Education*

J.D., University of Arizona 1975, with honors. Associate editor, Arizona Law
     Review, 1st place moot court 1st & 2nd years, won Regionals 3rd year.
B.A., University of Arizona 1972, with high honors & Honors Program (today the
     Honors College), in 3 years.

### Experience

10 years' governmental service, Interior Department, Washington D.C.; 33 years in private practice. Experience ranged from Endangered Species and Administrative Procedure Acts to a death penalty reversal in the Arizona Supreme Court and a 5-4 in the US Supreme Court. (details below).

26 law review articles authored, two cited by the U.S. Supreme Court, and one by eleven U.S. Circuit Courts of Appeals, and another by Larry Tribe's AMERICAN CONSTITUTIONAL LAW. Author of five books, one a NY Times best-seller.

### Publications

**Legal Periodicals**

*Standards of Review, the Second Amendment, and Doctrinal Chaos*, 42 S. ILL. L. J. 91 (2018).

*Criminology, Gun Control, and the Right to Arms*, 58 HOWARD L. J. 679 (2015).

*The Right to Arms and Standards of Review: A Tale of Three Circuits*, 46 CONN. L. REV. 1435 (2014).

*Dred Scott v. John San(d)ford: The Case for Collusion*, 41 N. KY L. REV. 37 (2014).



**EXHIBIT 1**
**0002**

*McDonald v. Chicago, Fourteenth Amendment Incorporation and Judicial Role Reversals,* 8 N.Y.U. J. OF L. & LIBERTY 15 (2013).

*The Rise and Demise of the "Collective Right" Interpretation of the Second Amendment*, 59 CLEVELAND ST. L. REV. 315 (2011).

*Originalism, Its Tools, and Some Caveats,* 2 AKRON L. REV. STRICT SCRUTINY 1 (2010).

*Ducking the Bullet:* District of Columbia v. Heller *and the Stevens Dissent*, 2010 CARDOZO L. REV. DE NOVO 101 (2010).

*Original Popular Understanding of the 14th Amendment as Reflected in the Print Media of 1866-68,* 30 WHITTIER L. REV. 695 (2009). Cited by the Supreme Court in *McDonald v. City of Chicago*, by the plurality, and by Justice Thomas' concurrence, 561 U.S. 742, 763, n. 10, 841 (2010).

*The Lecture Notes of St. George Tucker: A Framing Era View of the Bill of Rights*, 103 NORTHWESTERN U. L. REV. 1527 (2009).

*Standing to Sue in the Absence of Prosecution: Can a Case Be Too Controversial for "Case or Controversy"?,* 29 THOMAS JEFFERSON L. REV. 53 (2008).

*A Well-Regulated Militia*, 15 WM. & MARY BILL OF RIGHTS JOURNAL 1237 (2007), cited in *Binderup v. Attorney General*, 836 F.3d 336, 371 n. 17 (3rd Cir. 2016).

*The Firearm Owners' Protection Act,* 17 CUMB. L. REV. 585 (1987). Cited in a Supreme Court dissent and by eleven U.S. Circuit Courts of Appeals:
- *Staples v. United States*, 511 U.S. 610, 626 n.4 (1994) (Stevens, J., dissenting);
- *U. S. v. Andrade*, 135 F3d. 104, 109 n. 3 (1st Cir. 1998);
- *Torraco v. Port Authority*, 615 F.3d 129, 143 (2d Cir. 2010);
- *Ass'n of N.J. Rifle and Pistol Clubs v. Port Authority*, 730 F.3d 252, 256-57 (3rd Cir. 2013);
- *U.S. v. Hayden*, 64 F.3d 126, 129 (3d Cir. 1995);
- *U.S. v. Langley,* 62 F.3d 602 (4th Cir. 1995) (*en banc*);
- *United States v. Golding*, 332 F.3d 838 (5th Cir. 2003);
- *U.S. v. Kirk*, 70 F.3d 791, 798 n.1 (5th Cir. 1995), *en banc,* 105 F.3d 997, 1006-07 (1997);
- *U.S. v. McGill*, 74 F.3d 64, 67 (5th Cir. 1996);
- *U.S. v. Knutson*, 113 F.3d 27, 30 (5th Cir. 1997):
- *U.S. v. Rodriguez*, 132 F.3d 208,211 (5th Cir. 1997);
- *U.S. v. Golding*, 332 F.3 838, 841 N. 12 (5th Cir. 2003);
- *U. S. v. Cassidy*, 899 F.3d 543, 546 n.8 (6th Cir. 1990);
- *U.S. v. Choice*, 201 F.3d 837, 841 n. 5 (6th Cir. 2000);

• *U.S. v. Kenney*, 91 F.3d 884, 886 (7th Cir. 1996);
• *U.S. v. Farrell*, 69 F.3d 891, 893 (8th Cir. 1995);
• *U.S. v. Sherbondy*, 865 F.2d 996, 1002 (9th Cir. 1988);
• *U.S. v. Marchant*, 55 F.3d 509, 514 (10th Cir. 1995);
• *U.S. v. Wilkes*, 58 F.3d 1518, 1519 (10th Cir. 1995);
• *U.S. v. Haney*, 264 F.3d 1161, 1169 (10th Cir. 2001);
• *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002);
• *U.S. v. Otiaba*, 862 F. Supp. 251, 253-54 (D.N.D. 1994) (declining to follow
   2d Circuit, since "that court did not have available to it Hardy's analysis....");
• *U.S. v. Hunter*, 843 F. Supp. 235, 246 (E.D. Mich. 1994);
• *Cisewski v. Department of Treasury*, 773 F. Supp.. 148, 150 (E.D. Wis. 1991);
• *In re Two Seized Firearms*, 127 N.J. 84, 602 A.2d 728, 731 (1992);
• 2A Kevin O'Maley, et al., Federal Jury Practice and Instructions §39.09 at 36
(5th Ed. 2000);
• 78 Wisc. Opinions of the Atty'y Gen. 22 (1989).

*The Second Amendment and the Historiography of the Bill of Rights*, 4 J. of Law
& Politics 1 (1987).

*Armed Citizens and Citizen Armies: Origins of the Second Amendment*, 9 Harv.
J. of L. & Pub. Policy 559 (1986). Cited in Laurence Tribe, American
Constitutional Law  897 n. 211 (3d Ed. 2000).

Fields & Hardy, *The Militia and the Constitution*, 136 Military L. Rev. 1
(1992).

*Product Liability and Weapons Manufacture*, 10 J. of Products Liability 61
(1987).

Fields & Hardy, *The Third Amendment and the Issue of the Maintenance of
Standing Armies:*, 35 Amer. J. of Legal History 393 (1991).

*Strict Liability and the Manufacture of Weapons*, 20 Wake Forest L. Rev. 541
(1984).

*Legal Restriction of Firearm Ownership as an Answer to Violent Crime; What
was the Question?*, 6 Hamline L. Rev. 391 (1983).

*Harris v. McRae--The Clash of a Nonenumerated Right with Legislative Control
of the Purse*, 31 Case-Western Res. Univ. L. Rev. 465 (1981).

*Firearms Ownership and Regulation*, 20 Wm & Mary L. Rev. 235 (1978).

*Privacy and Public Funding: Maher v. Roe as the Interaction of Roe v. Wade and Dandridge v. Williams*, 18 ARIZ. L. REV. 903 (1977). Cited in:
- *D.R. v. Mitchell,* 456 F. Supp. 609, 614, 615, 622 (D. Utah 1978);
- *Women's Health Services v. Maher*, 482 F. Supp. 725, 735 (D. Conn. 1980).

Hardy &  Stompoly, *Of Arms and the Law*, 51 CHI-KENT L REV. 62 (1974).

Note, *Informants' Statements as a Basis for Stop and Frisk*, 15 ARIZ. L. REV. 677 (1973).

## Books

DRED SCOTT: THE INSIDE STORY (2019).

MASS KILLINGS: MYTH, REALITY, AND SOLUTIONS (2018)

I'M FROM THE GOVERNMENT, AND I'M HERE TO KILL YOU: THE HUMAN COST OF OFFICIAL NEGLIGENCE (2017). This is actually a treatise calling for reform of the Federal Tort Claims Act and the Federal Rules of Criminal Procedure.

DAVID T. HARDY & JASON CLARKE, MICHAEL MOORE IS A BIG FAT STUPID WHITE MAN (2004) Six weeks on N.Y. Times bestseller list. (The publisher *insisted* on the title, by the way; it was a successful marketing ploy.)

THIS IS NOT AN ASSAULT (2001).

ORIGINS AND DEVELOPMENT OF THE SECOND AMENDMENT (1986).

THE COMPLETE SHORTWAVE LISTENERS' HANDBOOK (3d ed. 1986).

## Monographs and Anthologies

OF MICE AND MEN: SURVIVING ENDANGERED SPECIES ACT LITIGATION (1993).

Chapters dealing with checks and balances, impeachment, bills of attainder, and a biography of James Madison in THE NEW FEDERALIST PAPERS (1989).

## Miscellaneous

Directed a two-hour documentary film on the 2d and 14th Amendments, "In Search of the Second Amendment," nominated for the ABA's Silver Gavel Award.

Creator of four websites and a blog, www.armsandthelaw.com.

President, Tucson Rod and Gun Club.

## PRESENTATIONS

In 2018, I have presented at Southern Illinois University's symposium on "Exploring the Second Amendment: 10 Years after *Heller*," and at the St. Louis Civil War Roundtable on the *Dred Scott* case. In past years I have given Pima County Bar CLEs on Supreme Court watching and on bringing federal test cases. Back when Barbara Atwood taught Civil Procedure, Leighton Rockafellow and I would give an annual presentation on personal jurisdiction. I have often spoken at the National Firearm Law Symposium; in 2010, due to another speaker's emergency I had to give two presentations. The audience evaluations rated them No. 1 and 2 of the symposium, with scores of 3.94 and 3.88, where 4 was the highest rating.

I have appeared on ABC Nightline, Book TV, Court TV (twice), Scarborough Country and over a hundred radio shows.

## EMPLOYMENT HISTORY

**Private Practice, Tucson, Az.** 1992 – present

Primarily civil litigation and appeals. Admitted to U.S. Supreme Court, Arizona Supreme Court, 4th, 6th, and 9th Circuits, U.S. District Courts for Arizona, Colorado, and District of Columbia.

Reported decisions include:

- *Mack v. United States*, consolidated with *Printz v. United States*, 521 U.S. 898 (1997) (10th Amendment, 5-4 win);
- *State v. Detrich*, 178 Ariz. 380, 873 P.2d 1302 (1994) (5-0 reversal of murder conviction and death penalty);
- *Arizona Libertarian Party v. Board of Supervisors of Cochise County*, 205 Ariz. 345, 70 P.3d 1146 (App. 2003) (election statutes);
- *Arizona Libertarian Party v. Schmerl*, 200 Ariz. 486, 28 P.3d 948 (App. 2001) (First Amendment: successful defense of Arizona electoral system);
- *Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277 (9th Cir. 2003) (successful First Amendment attack on State electoral system);
- *NRA v. Magaw*, 132 F.3d 272 (6th Cir. 1997) (standing and ripeness);
- *A. Uberti & C. v. Leonardo* , 181 Ariz. 565, 892 P.2d 1354 (1995) (*In personam* jurisdiction in product liability case).

**Office of the Solicitor, Dep't of the Interior, Wash. DC**, 1982-1992
- Ten years' agency work, mainly representing U.S. Fish and Wildlife Service, occasionally detailed to other federal agencies. GS-14.
- Continuous work under Endangered Species Act, NEPA, etc.
- Chief legal advisor to FWS Law Enforcement Division.
- Litigation: Represented FWS in variety of federal lawsuits, including *US v. Dion*, 476 U.S. 734 (1986) (Eagle Act abrogates Indian hunting rights).
- Mineral, Oil and Gas Rights: Held primary staff responsibility for preparing Interior's legal position on oil, gas and mineral rights underlying Nat'l Wildlife Refuge System (68,000,000 acres) lands.
- Water Rights & Wilderness: Attorney Trish Bangert and I prepared the pivotal Solicitor's Opinion on water rights in designated Wilderness Areas. The position was subsequently adopted by the Attorney General as the position of the entire government.

**Partner, Sharp, Sando, Alfred & Hardy,** Tucson, 1976-1982
- Was assigned individual rating of "b(v)" by Martindale-Hubbell.
- Small firm general practice, torts, contracts, criminal defense.

**Associate, Browning & Wilson-Druke**, Tucson, 1975-76
- Left when partners dissolved the firm.

**EXHIBIT 1**
**0007**

# EXHIBIT "2"

EXHIBIT 2
008

# Journal on Firearms and Public Policy

## VOLUME 16

The Journal on Firearms and Public Policy is the official publication of the Center for the Study of Firearms and Public Policy of the Second Amendment Foundation.

Editor                                    Publisher

David B. Kopel, J.D.            Julianne Versnel Gottlieb
Independence Institute         Women & Guns Magazine

Board of Advisors

Randy E. Barnett, J.D.          Edward F. Leddy, Ph.D.
David Bordua, Ph.D.            Andrew McClurg, J.D.
David I. Caplan, Ph.D., J.D.   Glenn Harlan Reynolds, J.D.
Brendan Furnish, Ph.D.         Joseph P. Tartaro
Alan M. Gottlieb               William Tonso, Ph.D.
Don B. Kates, Jr., J.D.        Eugene Volokh, J.D.
Gary Kleck, Ph.D.              James K. Whisker, Ph.D.

### Journal Policy

The Second Amendment Foundation sponsors this journal to encourage objective research. The Foundation invites submission of research papers of scholarly quality from a variety of disciplines, regardless of whether their conclusions support the Foundation's positions on controversial issues.

Manuscripts should be sent in duplicate to: Center for the Study on Firearms and Public Policy, a division of the Second Amendment Foundation, 12500 N.E. Tenth Place, Bellevue, Washington 98005 or sent via email to www.saf.org

EXHIBIT 2
009

This publication is copyrighted ©2004 by the Second Amendment Foundation. All rights reserved. No part of this publication may be reproduced in any form or by any electronic or mechanical means including information storage and retrieval systems without written permission except in the case of brief quotations embodied in critical articles and reviews.

The Second Amendment Foundation is a non-profit educational foundation dedicated to promoting a better understanding of our Constitutional heritage to privately own and possess firearms. For more information about Foundation activities, write to: Second Amendment Foundation, James Madison Building; 12500 N.E. Tenth Place; Bellevue, Washington 98005. Telephone number is (425) 454-7012. Additional copies of this publication may be ordered for $10.00 each. Please see www.saf.org for more research materials.

This publication is distributed to academia and the book trade by Merril Press, P.O. Box 1682, Bellevue, Washington 98009.

EXHIBIT 2
0010

# Journal on Firearms & Public Policy

## Volume 16                    Fall 2004

THIS PAGE CHANGES
Author One 1

**Article Two**
Author 2 35

**Instrumentality and Wounds in Civilian Homicides in
Savannah: 1896 to 1903 & 1986 to 1993**
Vance McLaughlin 73

**The Highest Possible Generality: The Militia and Moral
Philosophy in Enlightenment Scotland**
J. Norman Heath   93

**Wrongs and Rights: Britain's Firearms
Control Legislation at Work**
Derek Phillips   123

**Christians and Guns**
Carlo Stagnaro  137

**Legal Scholarship 2003**
Joshua Samuel Kirk     165

**Survey of Federal Right to Keep and
Bear Arms Cases since 2000**
William L. McCoskey & Wayne Warf   175

**EXHIBIT 2**
**0011**

EXHIBIT 2
0012

# Colonial Firearm Regulation

## Clayton E. Cramer

*Recently published scholarship concerning the regulation of firearms in Colonial America claims that because Colonial governments distrusted the free population with guns, the laws required guns to be stored centrally, and were not generally allowed in private hands. According to this view, even those guns allowed in private hands were always considered the property of the government. This Article examines the laws of the American colonies and demonstrates that at least for the free population, gun control laws were neither laissez-faire nor restrictive. If Colonial governments evinced any distrust of the free population concerning guns, it was a fear that not enough freemen would own and carry guns. Thus, the governments imposed mandatory gun ownership and carriage laws.*

*Clayton E. Cramer is an independent scholar who took the leading role in exposing the Michael Bellesiles hoax. His website is www.claytoncramer.com.*

## I. THE LEGAL SIGNIFICANCE OF COLONIAL FIREARM REGULATION TODAY

In much the same way that an understanding of the limits of free speech in Colonial America may provide insights into the intent of Congress and the states when they adopted the First Amendment, so an understanding of colonial firearms regulation has the potential to illuminate our understanding of the limits of the right protected by the Second Amendment. What types of firearms laws were common, and might therefore have been considered within the legitimate scope of governmental regulation?

In the last several years, widely publicized scholarship by Michael Bellesiles has asserted that the English colonies strictly regulated the individual possession and use of firearms. While acknowledging that the English government ordered the colonists to own firearms for the public defense as a cost-cutting measure, he asserts:

At the same time, legislators feared that gun-toting

1

EXHIBIT 2
0013

freemen might, under special circumstances, pose a threat to the very polity that they were supposed to defend. Colonial legislatures therefore strictly regulated the storage of firearms, with weapons kept in some central place, to be produced only in emergencies or on muster day, or loaned to individuals living in outlying areas. They were to remain the property of the government. The Duke of York's first laws for New York required that each town have a storehouse for arms and ammunition. Such legislation was on the books of colonies from New Hampshire to South Carolina.[1]

This assertion—that the Colonial governments distrusted their free people with firearms, and closely controlled their possession in governmental hands—has began to appear in court decisions concerning the meaning of the right to keep and bear arms provisions contained in the U.S. Constitution and 46 of the state constitutions.[2]

Then as now, laws were not always obeyed, and were sometimes indifferently or unequally enforced. The evidence from contemporary accounts, from probate records, or even from archaeological digs (which could suggest something about gun ownership levels by recovered artifacts), might provide us with evidence for evaluating how often those laws were followed. Under the best of conditions, however, analysis of this type is complex, and differing interpretative models may come to differing conclusions as to whether those laws were generally obeyed, generally ignored, or perhaps were somewhere in between. By comparison, evaluating the claim that Colonial governments passed laws that restricted firearms ownership and use (regardless of how those laws were actually enforced) is fairly easy.

An examination of the Colonial statutes reveals that, contrary to Bellesiles's claim of distrusted and disarmed freemen, almost all colonies *required* white adult men to possess firearms and ammunition. Some of these statutes were explicit that militiamen were to keep their guns at home; others imply the requirement, by specifying fines for failing to bring guns to musters or church. Colonies that did not explicitly require

2

EXHIBIT 2
0014

firearms ownership passed laws requiring the carrying of guns under circumstances that implied nearly universal ownership.

None of the Colonial militia statutes even *suggest* a requirement for central storage of all guns. None of the Colonial laws in any way limited the possession of firearms by the white non-Catholic population; quite the opposite. Most colonies did, however, pass laws restricting possession of firearms by blacks and Indians. In a few cases, in a few colonies, whites suspected of disloyalty (including Catholics) were also disarmed.

As the statutes demonstrate, colonial governments did not hold that firearms in private hands, "were to remain the property of the government."[3] Indeed, the evidence is largely in the other direction—that colonial governments were often reluctant to seize weapons for public use. When driven by necessity to do so, they compensated owners of those guns.

Colonial regulations that limited the use of firearms were usually for reasons of public safety. These regulations were similar in nature, though generally less restrictive in details, than similar laws today.

## II. FIREARMS AND CIVIC DUTY

The laws regulating firearms ownership adopted by the American colonies bear a strong resemblance to each other. This is not surprising, since by 1740, every colony bore allegiance to the English crown, and the laws reflected the shared heritage. The similarity in laws is especially noticeable with respect to the English duty of nearly all adult men to serve in the militia, and to bear arms in defense of the realm.

### A. Connecticut

Among the Colonial militia statutes, Connecticut's 1650 code contains one of the clearest expressions of the duty to own a gun: "That all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare arms...; and every male person with this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band...." [4] A less elaborate form of the law appeared in 1636, with reiterations in 1637, 1665, 1673, 1696, and 1741.[5] Fines varied between two

EXHIBIT 2
0015

CRAMER                          COLONIAL FIREARM REGULATION

and ten shillings for lacking firearms or for failure to appear with firearms "compleat and well fixt upon the days of training…."[6]

B. Virgina

Virginia provides another example of a militia statute obligating all free men to own a gun. A 1684 statute required free Virginians to "provide and furnish themselves with a sword, musquet and other furniture fitt for a soldier… two pounds of powder, and eight pounds of shott…."[7] A similar 1705 statute required every foot soldier to arm himself "with a firelock, muskett, or fusee well fixed" and gave him eighteen months to comply with the law before he would subject to fine.[8] There are minor modifications to the statute in 1738 that still required all members of the militia to appear at musters with the same list of gun choices, but reduced the ammunition requirement to one pound of powder and four pounds of lead balls.[9] A 1748 revision is also clear that militiamen were obligated to provide themselves with "arms and ammunition."[10] The 1748 statute, however, did acknowledge that all freemen might not be wealthy enough to arm themselves, and provided for issuance of arms "out of his majesty's magazine."[11] By 1755, all cavalry officers were obligated to provide themselves with "holsters and pistols well fixed…."[12]

C. New York

Another typical colonial militia statute is the Duke of York's law for New York (adopted shortly after the colony's transfer from the Dutch), that provided, "Besides the Generall stock of each Town[,] Every Male within this government from Sixteen to Sixty years of age, or not freed by public Allowance, shall[,] if freeholders[,] at their own, if sons or Servants[,] at their Parents and Masters Charge and Cost, be furnished from time to time and so Continue well furnished with Arms and other Suitable Provition hereafter mentioned: under the penalty of five Shillings for the least default therein[:] Namely a good Serviceable Gun, allowed Sufficient by his Military Officer to be kept in Constant fitness for present Service" along with all the other equipment required in the field.[13]

4

EXHIBIT 2
0016

### D. Maryland

Similar to statutes appearing in other colonies, Maryland's "An Act for Military Discipline" enacted in February or March of 1638/9 (O.S.) required "that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes[,] one Serviceable fixed gunne of bastard muskett boare…" along with a pound of gunpowder, four pounds of pistol or musket shot, "match for matchlocks and of flints for firelocks…."[14] A different form of this law, ordering every member of the militia to "appear and bring with him one good serviceable Gun, fixed, with Six Charges of Powder," appears in a 1715 Maryland statute book as well.[15] Cavalrymen were obligated to "find themselves with Swords, Carbines, Pistols, Holsters and Ammunition" with a fine for failure to appear armed at militia muster.[16]

Of course, laws were sometimes passed but not enforced in colonial times, just as happens now. But the provisions for enforcement in Maryland would seem likely to encourage enforcement for purely selfish reasons. The officers of the militia were required to verify compliance with the law by "a Sight or view of the said armes and ammunition" every month. People who failed to possess arms and ammunition were to be fined thirty pounds of tobacco, payable to the militia officer responsible for the inspection. Anyone who lacked arms and ammunition was to be armed by their militia commander, who could force payment at "any price… not extending to above double the value of the said armes and ammunition according to the rate then usual in the Country."[17]

To make sure that householders moving to the new land were adequately armed, it appears that one of the conditions of receiving title to land in Maryland beginning in 1641 was bringing "Armes and Ammunition as are intended & required by the Conditions abovesaid to be provided & carried into the said Province of Maryland for every man betweene the ages of sixteene & fifty years w[hi]ch shalbe transported thether." The arms required included "one musket or bastard musket with a snaphance lock," ten pounds of gunpowder, forty pounds of bullets, pistol, and goose shot.[18]

The Maryland militia law of 1638/9 was revised in 1642

5

EXHIBIT 2
0017

requiring, "That all housekeepers provide fixed gunn and Sufficient powder and Shott for each person able to bear arms."[19] A 1658 revision of the law required "every houseoulder provide himselfe speedily with Armes & Ammunition according to a former Act of Assembly viz 2 [pounds] of powder and 5 [pounds] of shott & one good Gun well fixed for every man able to bear Armes in his house." A householder was subject to fines of 100, 200, or 300 pounds of tobacco, for the first, second, and third failures to keep every man in the house armed.[20]

In 1756, Maryland again made it explicit that " all and every Person and Persons of the Militia of this Province are as aforesaid, not only liable to the Duties and Services required by this Act, but also if able to find, at their own proper Cost and Charge, Suitable Arms…." At the same time, concerned that those exempted from militia duty who were wealthy were getting an unfair advantage, it ordered that exempts were obligated to "each of them find one good and Sufficient Firelock, with a Bayonet, and deliver the Same to the Colonel or Commanding Officer of the County wherein he shall reside, or pay to the Said Colonel or Commanding Officer the Sum of Three Pounds Current Money in lieu thereof…."[21]

At the start of the Revolution, Maryland still assumed that the freemen of the colony were armed as required by law. The Maryland Convention in 1775 threatened that: "if any Minute or Militia-man shall not appear at the time and place of Muster with his Firelock and other accoutrements in good order, … he shall forfeit and pay a sum not exceeding five shillings Common money…."[22]

### E. Massachusetts

Massachusetts adopted a measure March 22, 1630/1 that required all adult men to be armed.[23] Although this measure is not explicit that the arms were *firearms*, it is apparent that guns were not in short supply in Massachusetts, because within 15 years, the Colonial government had made the requirement for guns explicit, and had even become quite demanding as to what type of guns were acceptable for militia duty. An order of October 1, 1645 directed that in the future, the only arms that would be allowed "serviceable, in our trained bands… are ether

6

EXHIBIT 2
0018

JOURNAL ON FIREARMS & PUBLIC POLICY                    VOLUME SIXTEEN

full musket boare, or basterd musket at the least, & that none should be under three foote 9 inches…."[24] Even those exempt from militia duty were not exempt from the requirement to have a gun in their home. A June 18, 1645 order required "all inhabitants" including those exempt from militia duty, "to have armes in their howses fitt for service, with pouder, bullets, match, as other souldiers…."[25]

Massachusetts Bay Colony, like many modern governments, expressed its concern about the nexus of guns and children. A May 14, 1645 order directed that "all youth within this jurisdiction, from ten yeares ould to the age of sixteen yeares, shalbe instructed, by some one of the officers of the band, or some other experienced souldier… upon the usuall training dayes, in the exercise of armes, as small guns, halfe pikes, bowes & arrows….."[26] The duty to be armed meant that even children were required to learn to use a gun.

F. New Haven and Plymouth

Other colonies also required their free adult males to own guns. New Haven Colony passed such laws in 1639, 1643, 1644, and 1646.[27] Plymouth Colony did the same in 1632, 1636, and 1671 (although the last statute is less clear than the earlier two as to requiring private ownership).[28]

G. New Hampshire

A statute in New Hampshire's 1716 compilation ordered "That all Male Persons from Sixteen Years of Age to Sixty, (other than such as are herein after excepted) shall bear Arms … allowing Three Months time to every Son after his coming to Sixteen Years of Age, and every Servant so long, after his time is out, to provide themselves with Arms and Ammunition…. That every Listed Souldier and Housholder, (except Troopers) shall be always provided with a well fix'd, Firelock Musket, of Musket or Bastard-Musket bore,… or other good Fire-Arms, to the satisfaction of the Commission Officers of the Company… on penalty of *Six Shillings* for want of Such Arms, as is hereby required…." [emphasis in original] Similar requirements were imposed on cavalrymen.[29]

H. New Jersey

New Jersey's 1703 militia statute was similar, requiring all

EXHIBIT 2
0019

men "between the Age of Sixteen and Fifty years" with the exception of ministers, physicians, school masters, "Civil Officers of the Government," members of the legislature, and slaves, to be members of the militia. "Every one of which is listed shall be sufficiently armed with one good sufficient Musquet or Fusee well fixed, a Sword or [Bayonet], a Cartouch box or Powder-horn, a pound of Powder, and twelve sizeable Bullets, who shall appear in the Field, so armed, twice every year...."[30]

I. Delaware

In 1742, Delaware required, "That every Freeholder and taxable Person residing in this Government (except such as are hereafter excepted) shall, on or before the First Day of March next, provide himself with the following Arms and Ammunition, viz. One well fixed Musket or Firelock, one Cartouch-Box, with Twelve Charges of Gun-Powder and Ball therein, and Three good Flints, to be approved of by the Commanding Officer of the respective Company to which he belongs, and shall be obliged to keep such Arms and Ammunition by him, during the Continuance of this Act...." There was a fine of forty shillings for those who failed to do so.

While "every Freeholder and taxable Person" in Delaware was obligated to provide himself with a gun, not all were required to enlist in the militia, only "all Male Persons, above Seventeen and under Fifty Years of Age" with a few exceptions. The exemptions from militia duty are quite interesting. Quakers were exempted from the requirement to provide themselves with guns, from militia duty, and from nightly watch duty, in exchange for paying two shillings six pence for every day that "others are obliged to attend the said Muster, Exercise, or Watch...."

Others were exempted from militia musters, but not from the requirement to fight, or the requirement to own a gun. "[A]ll Justices of the Peace, Physicians, Lawyers, and Millers, and Persons incapable through Infirmities of Sickness or Lameness, shall be exempted and excused from appearing to muster, except in Case of an Alarm: They being nevertheless obliged, by this Act, to provide and keep by them Arms and Ammunition as aforesaid, as well as others. And if an Alarm happen, then all

8

EXHIBIT 2
0020

those, who by this Act are obliged to keep Arms as aforesaid... shall join the General Militia...." Ministers appear to have been exempted from all of these requirements.[31]

### J. Rhode Island

There seems to be no explicit Rhode Island law that required every man to own a gun. There is, however, a 1639 statute that ordered "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."[32] While not an explicit order that every man was required to own a gun, widespread gun ownership was clearly assumed. The Rhode Island city of Portsmouth did impose a requirement to own a gun in 1643, and directed militia officers to personally inspect every inhabitant of the town to verify that they had both bullets and powder.[33]

### K. South Carolina

Much like Rhode Island, South Carolina's obligation to own a gun is not explicit, but did require "all, and every person and persons now in this Colony" to "appeare in armes ready fitted in their severall Companies...."[34] "Armes," of course, might include a sword or other non-firearm weapon, but South Carolina's 1743 requirement to bring guns to church (to be discussed later), suggests that "armes" meant guns.

### L. North Carolina

North Carolina passed militia laws in or before 1715 and in 1746 that were similar in form. The earlier statute required every member of the militia (every freeman between 16 and 60) to show up for muster "with a good Gun well-fixed Sword & at least Six Charges of Powder & Ball" or pay a fine.[35] The 1746 statute obligated "all the Freemen and Servants... between the Age of Sixteen Years, and Sixty" to enlist in the militia, and further, required all such persons "be well provided with a Gun, fit for Service,… and at least Twelve Charges of Powder and Ball, or Swan Shot, and Six spare Flints....." Failure to have those when called to militia muster would subject one to a fine of two shillings, eight pence, "for Want of any of the Arms, Accoutrements, or Ammunition...." Interestingly enough, unlike other colonies, the definition of militia member under both

9

EXHIBIT 2
0021

statutes did not exclude free blacks.[36] According to John Hope Franklin, "free Negroes served in the militia of North Carolina with no apparent discrimination against them."[37]

M. Georgia

Georgia's long and poorly written militia law of 1773 at first appears to provide for the government to arm the militia, since it declares that the governor or military commander may "assemble and call together all male Persons in this Province from the Age of Sixteen Years to Sixty Years… at such times, and arm and array them in such manner as is hereafter expressed…."[38] But later the statute directs that, "every Person liable to appear and bear arms at any Exercise Muster or Training… Shall constantly keep and bring with them… one Gun or Musket fit for Service[,] one Catridge [*sic*] Box with at least Nine Catridges filled with Good Gun Powder and Ball that shall fit his Piece[,] a horn or Flask containing at least a Quarter of a Pound of Gun Powder[,] a shot Pouch with half a pound of Bulletts…." This is followed by a *very* complete list of tools required to use a gun in the field.[39]

A member of the militia who was an indentured servant, or otherwise subject to "Government or Command" of another, was not obligated to arm himself, but like New York and other colonies, his master was. He "Shall constantly keep such arms amunition [*sic*] and Furniture for every such Indented Servant…."[40] The militia statute also provided for enlisting male slaves from 16 to 60 "as [their masters] can Recommend as Capable and faithful Slaves." Masters were also supposed to arm such slaves when in actual militia service "with one Sufficient Gun… powder Horn and shot pouch…."[41]

Failure to appear "completely armed and furnished as aforesaid at any General Muster" could result in a fine of twenty shillings. Militia officers were allowed to appear at the residence of any person obligated to militia duty up to six times a year, "and to Demand a Sight of their arms amunition [*sic*] and accoutrements aforesaid…." Failure to possess the arms and ammunition could result in a five shilling fine.[42] Similar provisions applied to those who were cavalry militiamen.[43]

N. Pennsylvania

EXHIBIT 2
0022

Pennsylvania is the only colony that does not appear to have imposed an obligation to own guns on its citizens.[44] It appears that Pennsylvania's exception was because of its Quaker origins and Quaker pacifism.

### O. Indentured Servants

As part of requiring the arming of all freemen, several colonies imposed requirements that masters give guns to indentured servants who had completed their term of service. A 1699 Maryland statute (reiterated in 1715) directed what goods the master was to provide a servant completing his term. Along with clothes and a variety of tools, the master was also directed to give a newly freed male servant, "One Gun of Twenty Shillings Price, not above Four Foot by the barrel, nor less than Three and a Half; which said Gun shall, by the Master or Mistress, in the Presence of the next Justice of the Peace, be delivered to such Free-man, under the Penalty of Five Hundred Pounds of Tobacco on such Master or Mistress omitting so to do…." To encourage the newly freed servant to keep his gun, "And the like Penalty on the said Free-man selling or disposing thereof within the Space of Twelve Months…." Starting in 1705, Virginia imposed a similar requirement that freedom dues include a musket worth at least twenty shillings.[45] A 1715 North Carolina statute gave masters the choice of fulfilling freedom dues with either a suit or "a good well-fixed Gun…."[46]

### P. Gunpowder

Gunpowder import records also provide some clues about firearms ownership and use—and suggest that if guns were kept centrally stored, it was no impediment to colonists using those guns. The British Board of Trade recorded quantities of gunpowder imported through American ports for a brief period just before the Revolution. We have surviving records for the years 1769, 1770, and 1771 that show the American colonies imported a total of 1,030,694 pounds.[47] Of course, this shows only gunpowder imported with knowledge of the Crown; Americans smuggled goods quite regularly during those years, and there was some domestic production of gunpowder as well.[48]

Gunpowder was used not only for civilian small arms, but also for cannon, blasting, and (in extremely small quantities), for

11

EXHIBIT 2
0023

tattooing. It seems likely that at least some of this million pounds of gunpowder was sold to the British military, colonial governments, or the Indians. Nonetheless, the quantity is enormous. Even if only one-quarter of the million pounds of gunpowder was used in civilian small arms, that is enough for eleven to seventeen million shots over those three years—in a nation where, according to some, few Americans owned guns, most guns were stored in central storehouses because of mistrust of the population, and few Americans hunted with guns.[49]

### Q. Summary

Common to nearly every colony was the requirement that members of the militia (nearly all free white men) possess muskets and ammunition; the rest, such as Rhode Island and South Carolina, clearly assume it. Some of these statutes are explicit that militiamen are to keep their guns at home; others imply it, by specifying fines for failure to appear with guns at church or militia musters. If the militiaman's gun was stored in an armory, and was issued "only in emergencies or on muster day," it is strange that the governments fined militiaman for failing to appear with gun and ammunition. None of the Colonial militia statutes even *suggest* a requirement for central storage of all guns. None of these laws in any way regulated the possession of firearms by the white population, except for requiring nearly all white men to own guns.

## III. THE OBLIGATION TO CARRY FIREARMS

Another part of the civic duty to be armed included the duty to bring guns to church and other public meetings, or while traveling.

### A. Guns in Church

The statute that most clearly states the intent of "bring your guns to church" laws is a 1643 Connecticut order, "To prevent or withstand such sudden assaults as may be made by Indeans upon the Sabboth or lecture dayes, It is Ordered, that one person in every several howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, with powder and shott to e[a]ch meeting…." Connecticut found

EXHIBIT 2
0024

within a month that, "Whereas it is obsearved that the late Order for on[e] in a Family to bring his Arms to the meeting house every Sabboth and lecture day, hath not bine attended by divers persons" there was now a fine for failing to do so.[50]

Massachusetts Bay Colony also imposed a requirement to come to church armed, though it was repealed and reinstated several times as fear of Indian attack rose and fell. A March 9, 1636/7 ordinance required individuals to be armed. (Britain and its colonies changed from Julian to Gregorian calendar in 1752; as part of that change, the beginning of the new year changed from March 25 to January 1. What had been January 3, 1751 on the Julian calendar would be January 3, 1752 on the Gregorian calendar. Dates from before March 25, 1752 are typically recorded in a form that shows what year appears in the records—but also what year we would consider that date to have been.)

Because of the danger of Indian attack, and because much of the population neglected to carry their guns, every person above eighteen years of age (except magistrates and elders of the churches) was ordered to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12*d.* for every default...."[51]

The requirement to bring guns to church was repealed November 20, 1637[52] (perhaps because of the Antinomian crisis to be discussed below). A May 10, 1643 order that directed the military officer in each town to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting" suggests that this requirement was again back in force. The motivation for the 1643 law appears to have been preventing theft of arms while the inhabitants were attending church.[53]

Rhode Island's 1639 law ordered that, "none shall come to any public Meeting without his weapon." There was a fine of five shillings for failing to be armed at public meetings.[54] Maryland did likewise in 1642: "Noe man able to bear arms to goe to church or Chappell… without fixed gunn and 1 Charge at least of powder and Shott."[55] The Rhode Island town of Portsmouth passed a similar requirement in 1643,[56] as did New Haven Colony in 1644.[57]

Plymouth's 1641 law is oddly worded, and might at first be

13

EXHIBIT 2
0025

read as referring to a communal obligation of the township: "It is enacted That every Township within this Government do carry a competent number of pieeces fixd and compleate with powder shott and swords every Lord's day to the meetings…." The rest of the sentence clarifies that at least one member of each household was obligated to bring weapons to church during that part of the year when Indian attack was most feared: "one of a house from the first of September to the middle of November, except their be some just & lawfull impedyment."[58] By 1658, Plymouth had reduced the requirement so that only one fourth of the militia was obligated to come to church armed on any particular Sunday.[59] In 1675, apparently in response to a current military crisis, all were again required to come to church armed "with att least six charges of powder and shott" during "the time of publicke danger…."[60]

The earliest mandatory gun carrying law is a 1619 Virginia statute that required everyone to attend church on the Sabbath, "and all suche as beare armes shall bring their pieces, swords, pouder and shotte." Those failing to bring their guns were subject to a three shilling fine.[61] This law was restated in 1632 as: "All men that are fittinge to beare arms, shall bring their pieces to the church…."[62]

While the original motivation in colonies both North and South for bringing guns to church was fear of Indian attack, by the eighteenth century, the Southern colonies' concerns appear to have shifted to fear of slave rebellion. Virginia's 1619 and 1632 statutes were somewhat vague as whether all white men were required to come armed to church or not, because of the qualification "fittinge to beare arms." The requirement was more clearly restated in a November 1738 statute that required all militiamen to come to church armed, if requested by the county's militia commander. Other language in the statute suggests that protection of the white inhabitants from possible slave uprising was now the principal concern.[63]

South Carolina's 1743 confusingly worded statute required "every white male inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who [are] liable to bear arms in the militia of this Province… shall, on any Sunday or Christmas day in the year, go and resort to any church or any other public place of divine worship within this Province,

14

EXHIBIT 2
0026

and shall not carry with him a gun or a pair of horse-pistols…
with at least six charges of gun-powder and ball, and shall not
carry the same into the church or other place of divine worship
as aforesaid" would be fined twenty shillings. Other provisions
required church-wardens, deacons, or elders to check each man
coming in, to make sure that he was armed. The purpose was
"for the better security of this Province against the insurrections
and other wicked attempts of Negroes and other Slaves…."[64] A
very similar statute appears in Georgia in 1770.[65]

### B. Guns for Travelers

Along with the duty to be armed at church, several colonies
required travelers to be armed. A 1623 Virginia law (reissued in
similar form in 1632) required, "That no man go or send abroad
without a sufficient parte will armed…. That go not to worke in
the ground without their arms (and a centinell upon them.)…
That the commander of every plantation take care that there be
sufficient of powder and am[m]unition within the plantation
under his command and their pieces fixt and their arms
compleate…."[66]

Massachusetts imposed a similar requirement in 1631,
ordering that no person was to travel singly between
Massachusetts Bay and Plymouth, "nor without some armes,
though 2 or 3 togeathr." While the law does not specify that
"armes" meant firearms, it would seem likely, considering
Massachusetts's other laws requiring all militiamen to own a
gun.[67] The measure was strengthened in 1636: "And no person
shall travel above one mile from his dwelling house, except in
places wheare other houses are neare together, without some
armes, upon paine of 12d. for every default…."[68]

Rhode Island imposed a similar requirement in 1639: "It is
ordered, that noe man shall go two miles from the Towne
unarmed, eyther with Gunn or Sword…." There was a fine of
five shillings for failing to be armed.[69] Maryland's 1642 law
requiring everyone to come to church armed also dictated, "Noe
man able to bear arms to goe… any considerable distance from
home without fixed gunn and 1 Charge at least of powder and
Shott."[70]

While the requirements varied from colony to colony, and
the motivations changed in the South from fear of Indians to
fear of slaves, common to many of the colonies was the duty to

15

EXHIBIT 2
0027

come to church armed. Somewhat less commonly there was an obligation to be armed (sometimes explicitly with a gun) while traveling away from settled areas.

## IV. RACE, SLAVERY, & REGULATION

Colonial governments imposed a duty to own guns, but otherwise seem to have imposed few restrictions on gun possession—for whites. For Indians and blacks (either free or slave), colonial laws were much more restrictive.

### A. Indians

Colonial concern about Indians acquiring guns is not surprising. Firearms provided a significant advantage to whites because of the novelty of the weapon, because gunfire created fear and confusion, and because a gun could do damage under circumstances where an arrow could not.

William Bradford's account of the Pilgrims' first battle with Indians shows the advantage that guns provided the Europeans. A band of Pilgrims who were exploring the new land in December of 1620 found themselves under attack by Indians armed with bow and arrow. When the Pilgrims began firing muskets, most of the attacking Indians retreated. One brave member of the band, perhaps their leader, stood behind a tree, "within half a musket shot of us," and fired arrows repeatedly at the Pilgrims. He was far enough way, and making sufficiently good use of cover, that Myles Standish, the only professional soldier among the Pilgrim settlers, had little opportunity of hitting him. Finally, Standish, after taking "full aim at him… made the bark or splinters of the tree fly about his ears, after which he gave an extraordinary shriek, and away they went, all of them."[71]

When the Pilgrims arrived in 1620, the Indians of Massachusetts had no guns. Only three years later, John Pory's account reported that those Indians unfriendly to the Pilgrims had been "furnished (in exchange of skins) by some unworthy people of our nation with pieces, shot, [and] powder…."[72] By 1627, the Indians of Massachusetts Bay were believed to have at least sixty guns, largely supplied by Thomas Morton, an Englishman whose trading post, Merrymount, was filled with the

16

EXHIBIT 2
0028

sort of hedonists whom the Pilgrims had hoped to leave behind in England. Morton bartered guns for furs with the Indians, violating a royal proclamation against supplying firearms, powder, or shot to the Indians.[73]

Even after Morton's banishment to England, there were problems with other Europeans selling guns to the Indians. Governor Bradford's history of Plymouth details the arrest of an Englishman named Ashley for illegal sales in 1631, and complained about French traders selling guns and ammunition to the Indians.[74]

Attempts to regulate gun sales to the Indians appear in many colonies, and the severity of the punishments suggests that not all colonists shared their government's concerns. Much like the modern effort to disarm people who are not trusted, the colonial gun control efforts were a series of very strict bans that could not be enforced, and were sometimes replaced with more realistic laws that sought to control rather than prohibit sales.

The prohibitions vary in the severity of punishments and vigorous of enforcement. In 1640, Springfield, Massachusetts tried a woman accused of selling her late husband's gun to an Indian. Her defense was that she did not sell it, but lent it to the Indian, "for it lay [spoiling] in her [cellar]," and she expected to reclaim it shortly. The judge warned her that she should get it home again speedily, "for no commonwealth would allow of such a misdemeanor."[75] At the other extreme, a 1642 Maryland law prohibited providing gunpowder or shot to the Indians, and made execution one of the possible punishments.[76]

Massachusetts Bay Colony, to supplement the royal proclamation against providing guns or ammunition to the Indians, passed its own ordinance on May 17, 1637 prohibiting sale of guns, gunpowder, shot, lead, or shot molds to the Indians, or repair of their guns.[77] In 1642, Massachusetts Bay complained that "some of the English in the eastern parts" who were under no government at all, were supplying gunpowder and ammunition to the Indians. Unsurprisingly, Massachusetts Bay passed laws punishing those sales.[78]

Other evidence of a mistrust based on race can be seen in a pair of orders concerning militia duty. The first, on May 27, 1652, required all "Scotsmen, Negers, & Indians inhabiting with or servants to the English" between 16 and 60 to train with the militia.[79]  In May, 1656, perhaps after the military crisis of the

17

EXHIBIT 2
0029

moment had passed, "no Negroes or Indians… shalbe armed or permitted to trayne…."[80]

Connecticut struggled with unlawful sales of guns to Indians. The very first entry in *Public Records of the Colony of Connecticut* concerns a 1636 complaint that "Henry Stiles or some of the ser[vants] had traded a piece with the Indians for corn."[81] In 1640, Connecticut ordered George Abbott to pay a £5 fine for "selling a pistol & powder to the Indians…."[82] A few years later, Robert Slye, George Hubberd, John West, and Peter Blatchford were each fined £10 for "exchanging a gun with an Indian…."[83]

Connecticut found enforcement of its gun control law prohibiting sales to the Indians[84] frustrated by other colonies. Because merchants in the Dutch and French colonies were selling guns to the Indians, Connecticut next prohibited sale of guns outside the colony. Finally, Connecticut prohibited foreigners from doing business with Indians in Connecticut; the ban was retaliation for continued sales of guns to the Indians by Dutch and French traders elsewhere.[85] Connecticut also repeatedly fined colonists for selling ammunition to the Indians.[86]

By the middle of the seventeenth century, either the original fear of the Indians having guns was receding throughout the New England colonies, or the futility of trying to keep them disarmed was becoming apparent. The laws appear to have changed by the 1660s to less restrictive forms. In 1662, a Springfield, Massachusetts court fined two Indians for drunkenness. Not having the money for the fine, one of them, "Left a gun with the County Treasurer till they make payment."[87] On April 29, 1668, the Massachusetts General Court decided to license the sale of "powder, shot, lead, guns, i.e., hand guns [small arms]" to Indians "not in hostility with us or any of the English in New England…."[88] In 1668-69, an Indian sued Francis West in Plymouth for the theft of a hog and a gun. The court ordered West to pay for the stolen hog and return the gun to the Indian.[89]

A similar progression is visible in Connecticut in this same period. In 1660, Connecticut ordered that "if any Indians shall bring in guns into any of the towns" that the colonists were to seize them. The Indians could redeem their seized guns for 10*s.*

18

EXHIBIT 2
0030

JOURNAL ON FIREARMS & PUBLIC POLICY          VOLUME SIXTEEN

each, with half paid to the Treasury, and the other half paid to the Englishman who seized the gun. Because the Indians could redeem their guns, it seems that the objection was not to the Indians having guns, but bringing them to town.

By the following year, this ban on Indians bringing guns to town was repealed for the Tunxis Indians that lived nearby, who "have free liberty to carry their guns, through the English towns, provided they are not above 10 men in company."[90] The Tunxis Indians were apparently trusted enough to come to town (in small numbers) armed.

Virginia provides perhaps the best example of the shifting views of the colonists about the effectiveness of such laws. A March 1658 Virginia statute provided that "what person or persons so ever shall barter or sell with any Indian or Indians for piece, powder or shot, and being lawfully convicted, shall forfeit his whole estate…." Any Virginian who found an Indian with gun, powder, or shot, was legally entitled to confiscate it.[91]

By the following year, "it is manifest that the neighboring plantations both of English and [foreigners] do plentifully furnish the Indians with guns, powder & shot, and do thereby draw from us the trade of beaver to our great loss and their profit, and besides the Indians being furnished with as much of both guns and ammunition as they are able to purchase, *It is enacted,* That every man may freely trade for guns, powder and shot: It derogating nothing from our safety and adding much to our advantage…."[92] [emphasis in original]

In October 1665, Virginia again prohibited the sale of guns and ammunition to the Indians. The statute admitted that New Amsterdam's sales of guns to the Indians had made the March 1658 law unenforceable. The seizure of New Amsterdam by the Duke of York in 1664 had changed the situation. "[T]hose envious neighbors are now by his majesty's justice and providence removed from us," the ban was again in force.[93]

The ban on gun sales was not obeyed, however. In March 1676, as tensions between whites and Indians escalated into Bacon's Rebellion, Virginia enacted a new statute, complaining "the traders with Indians by their [avarice] have so armed the Indians with powder, shot and guns, that they have been thereby emboldened…." The new statute made it a capital offense to sell guns or ammunition to the Indians, and also declared that any colonist found "within any Indian town or three miles without

19

EXHIBIT 2
0031

the English plantations" with more than one gun and "ten charges of powder and shot for his necessary use" would be considered guilty of selling to the Indians, and punished accordingly.[94]

In times of tension, of course, colonies might again pass restrictions on sale of guns or ammunition to Indians, but Maryland seems to have followed the model of Virginia—severe restrictions followed by more realistic regulations. A 1638/9 Maryland law made it a felony "to sell give or deliver to any Indian or to any other declared or professed enemie of the Province any gunne pistol powder or shott without the knowledge or lycence of the Leiutenant Generall…."[95] A 1649 statute provided that "noe Inhabitant of this Province shall deliver any Gunne or Gunnes or Ammunicon or other kind of martiall Armes, to any Indian borne of Indian Parentage…."[96] A 1763 Maryland law prohibited "any Person or Persons within this Province to Sell or give to any Indian Woman or Child any Gun Powder Shot or lead Whatsoever[,] nor to any Indian Man within this Province more than the Quantitys of one Pound of Gun Powder and six Pounds of Shot or lead at any one Time[,] and not those or lesser Quantitys of Powder or Lead oftener than once in Six Months…."[97]

### B. Blacks

Laws disarming blacks were more common in the southern colonies. A 1680 Virginia statute prohibited "any negroe or other slave to carry or arme himselfe with any club, staffe, gunn, sword or any other weapon of defence or offence…"[98]

By May, 1723, however, there seem to have been enough free blacks and Indians in the militia that the law was changed, "That every free negro, mulatto, or indian, being a house-keeper, or listed in the militia, may be permitted to keep one gun, powder, and shot…." Those blacks and Indians who were "not house-keepers, nor listed in the militia" were required to dispose of their weapons by the end of October, 1723. Blacks and Indians living on frontier plantations were required to obtain a license "to keep and use guns, powder, and shot…."[99] Even the small number of blacks and Indians who were members of the militia were apparently no longer trusted with guns in public by 1738. They were still required to muster, but "shall appear

20

EXHIBIT 2
0032

without arms…."[100]

Other southern colonies showed similar mistrust of blacks with guns. A Maryland statute passed in or before 1715 directed, "That no Negro or other slave, within this Province, shall be permitted to carry any Gun or any other offensive Weapon, from off their Master's Land, without Licence from their said Master...."[101] While less clear, Delaware's 1742 militia statute prohibited all indentured servants and slaves from bearing arms, or mustering in any company of the militia. It is unclear from the statute if this ban applied to free blacks as well.[102]

A Georgia statute of 1768 "for the Establishing and Regulating Patrols" prohibited slaves possessing or carrying "Fire Arms or any Offensive Weapon whatsoever, unless such Slave shall have a Ticket or License in Writing from his Master Mistress or Overseer to Hunt and Kill Game Cattle or Mischievous Birds or Birds of Prey…." Other provisions allowed a slave to possess a gun while in the company of a white person 16 years or older, or while actually protecting crops from birds. Under no conditions was a slave allowed to carry "any Gun Cutlass Pistol or other Offensive Weapon" from Saturday sunset until sunrise Monday morning. The "Patrols" alluded to in the law's title were for the purpose of "Searching and examining any Negroe house for Offensive Weapons Fire Arms and Ammunition."[103]

Unlike the white population, blacks and Indians were not generally trusted with guns, and the laws reflected this. While individual whites might be disarmed as punishment for a crime or suspected disloyalty (as will be discussed next), gun ownership was generally unrestricted, except for blacks or Indians.

## V. DISARMING THE DISLOYAL

Individual whites were sometimes disarmed if they were perceived as disloyal to the polity.

### A. Antinomians

In 1637 Massachusetts, Anne Hutchinson's Antinomian heresy threatened the social order. Hutchinson's beliefs had spread rapidly through Puritan society, and "some persons being

21

EXHIBIT 2
0033

so hot headed for maintaining of these sinfull opinions, that they feared breach of peace, even among the Members of the superiour Court… those in place of government caused certain persons to be disarmed in the severall Townes, as in the Towne of Boston, to the number of 58, in the Towne of Salem 6, in the Towne of Newbery 3, in the Towne of Roxbury 5, in the Towne of Ipswitch 2, and Charles Towne 2."[104]

Today we can look with disfavor on this disarming order for a variety of violations of the Constitution: as a bill of attainder; as a violation of due process; for granting favor to one religious point of view. These concerns, of course, are ahistorical. What the disarming order tells us about Colonial Massachusetts strongly indicates that gun regulation was generally *not* restrictive.

While consistent with the claim that Colonial governments disarmed persons who were not trusted, that there was a need to cause "certain persons to be disarmed" suggests that firearms were *not* stored in central storehouses and were not usually under governmental control. Most freemen were armed, as the laws of all the colonies except Pennsylvania required. Only as punishment for a specific crime—heresy—did Massachusetts disarm Hutchinson's partisans. The number disarmed—77 out of a population then in the thousands—is far less than the percentage legally disarmed in America today.

Virginia's statutes provide a positive variant of this notion. A 1676/7 statute directed, "It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony…."[105] Any loyal subject of the crown was permitted to purchase and own guns.

### B. Catholics

Maryland provides a somewhat different example. Catholics were exempted from militia duty because, like Hutchinson's Antinomians, and blacks almost everywhere in the colonies, they were not completely trusted. In light of the role that Catholics played in the recurring attempts to restore the Stuarts to the throne of England, the distrust is unsurprising.

In exchange for exemption from militia duty, Catholics were doubly taxed on their lands.[106] As part of the same statute, members of the militia were required to swear an oath of

22

EXHIBIT 2
0034

allegiance to King George II. Catholics who refused the oath—thus refusing their legal obligation as British subjects to defend the realm—were not allowed to possess arms or ammunition.[107]

The law of Britain concerning Catholics and arms after the accession of William I to the throne is at first glance quite confusing. A 1689 law prohibited Catholics from possessing "any arms, Weapons, Gunpowder, or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace, at their general Quarter sessions, for the Defence of his House or Person)."[108]  The law both prohibited Catholics from possessing arms, and yet allowed them, under some restrictions, to have at least defensive arms. Joyce Malcolm argues that, "This exception is especially significant, as it demonstrates that even when there were fears of religious war, Catholic Englishmen were permitted the means to defend themselves and their households; they were merely forbidden to stockpile arms."[109]

At least in times of crisis, the English law would appear to have been the justification for disarming Catholics both in Britain and America. In Britain, for example, the death of the queen in 1714 caused orders that, "The Lords Leiutents of the severall Countrys were directed to draw out the Militia to take from Papists & other suspected Persons their Arms & Horses & to be watchfull of the Publick Tranquillity."[110]

Yet there seem to be relatively few incidents that appear in the *Archives of Maryland* that actually involve taking away arms from Catholics, and even these bear careful scrutiny. In 1744, "No Roman Catholick be for the future enrolled or mustered among the Militia of the said County and that if any of the *Publick Arms* be in the Possession of any Roman Catholick, the Colonel of the said County is hereby desired to oblige the Person in whose Custody such Arms are, to deliver the same to him." [emphasis added][111] The law apparently did not order confiscation of privately owned arms owned by Catholics.

By contrast, in 1756, "all Arms Gunpowder and Ammunition of what kind soever any Papist or reputed Papist within this Province hath or shall have in his House or Houses" were ordered seized.[112] That the order was adopted when it was, however, suggests that while the 1689 law *allowed* complete prohibition of Catholic gun ownership at the discretion of the government, in Maryland they were not *usually* prohibited from

23

EXHIBIT 2
0035

possession.

Catholics settled mainly in Maryland. In other colonies, there is no evidence that Catholics in general were disarmed.

Georgia provides an example of selective Catholic disarmament. At the start of the French & Indian War, British forces demanded that the French population of Nova Scotia swear an oath of allegiance to the crown. Persons who refused were forcibly removed to other British colonies. Some of these Acadians (the ancestors of the Cajuns) were bound as indentured servants in Georgia. A 1756 law prohibited indentured Acadians "to have or use any fire Arms or other Offensive Weapons otherwise than in his Masters Plantation or immediately under his Inspection…."[113] There seems to be no general prohibition on Catholic ownership of firearms in Georgia; the Acadians were disarmed because they had refused to be loyal subjects of the British government, and the suspicion of disloyalty followed them to Georgia.

## VI. PRIVATE VS. GOVERNMENT OWNERSHIP

Regarding Bellesiles's claim that guns "were to remain the property of the government,"[114] the evidence suggests quite the opposite.

### A. Guns for the Poor

On any number of occasions, the Colonial governments supplied guns to subjects too poor to purchase them. The laws usually specified that the recipient was to pay for the gun.

For example, a March 22, 1630/1 Massachusetts statute required the entire adult male population to be armed. Every person, including servants, was to own "good & sufficient armes" of a type "allowable by the captain or other officers, those that want & are of abilitie to buy them themselves, others that are unable to have them provided by the town…." Those who were armed by the town under the March 22 statute were to reimburse the town "when they shalbe able."[115] On March 6, 1632/3, the law was amended to require that any single person who had not provided himself with acceptable arms would be compelled to work for a master. The work earned him the cost of the arms provided to him by the government.[116]

24

EXHIBIT 2
0036

Connecticut's Code of 1650 provided that a person who were required to arm themselves, or arm a dependent, but "cannot purchase them by such means as he hath, hee shall bring to the clark so much corne or other merchantable goods" as was necessary to pay for them. The value of the arms was to be appraised by the clerk "and two others of the company, (whereof one to bee chosen by the party, and the other by the clarke,) as shall be judged of a greater value by a fifth parte, then such armes or ammunition is of.…"

Thus, the man who would not purchase a gun and ammunition would have one provided by the government, but at a price as much as twenty percent above the market price. The high price created an incentive to purchase a gun privately.

Another part of the law provided for hiring out any unarmed single men to earn the price of a gun and ammunition.[117] Very similar laws appeared in New York[118] and New Hampshire.[119]

A 1673 Virginia law, while less explicit about the process for determining the value of the arms, directed militia officers to purchase guns on the public account for distribution to those who could not afford them, "for them to dispose of the same as there shalbe occasion; and that those to whome distribution shalbe made doe pay for the same at a reasonable rate.…"[120] The law does not directly disprove that guns were "to remain the property of the government." It does, however, seem a bit strange for the government to provide guns to individual militiamen, and then require them to pay for those guns, if the guns were to remain governmental property.

### B. Public Arms

Not every Virginia militiaman apparently succeeded in arming himself; a 1748 statute provided "it may be necessary in time of danger, to arm part of the militia, not otherwise sufficiently provided, out of his majesty's magazine and other stores within this colony.…" Contrary to the claim that all guns were considered the property of the government, the same statute criminalized embezzlement of "arms or ammunition" that were issued to those who were too poor to arm themselves, and thus drew a distinction between public arms issued from "his majesty's magazine" and other, presumably privately owned firearms.[121]

25

EXHIBIT 2
0037

Similarly, a Maryland statute of 1733 passed "to prevent the Embezzlement of the Public Arms" directed "That all the Public Arms shall be Marked with such Marks… to denote such Arms to belong to the Public; after which Marks so made, no Person or Persons whatsoever, shall presume to Sell or Purchase such Arms so Marked…."[122] If all guns automatically belonged to the government, it seems a bit odd that there was a need to mark them as "Public Arms."

In 1756, Maryland's militia officers were ordered to make a diligent search for arms and ammunition, demanding that everyone show what guns they had. The reason would appear to be, "Whereas on many Occasions Arms Ammunition and military Accoutrements of different Kinds have been delivered out of the public Magazines of this Province and are now dispersed among the Inhabitants and have been Sold or Sent from one to another and it is represented that the Locks have been taken of from many of the Said Arms and put to private Use…."[123] If all guns were "automatically government property," the careful search for publicly owned arms, distinguishing them from private property, would make no sense.

Massachusetts at one point directed that, "The surveyar genrall of the armes of the country shall have power to sell any of the country armes for an equall price, either in corne or other country pay, & to p[ro]vide armes againe therew[i]th so soone as may bee, so hee sell them not out of this jurisdiction."[124] Publicly owned arms were to be sold (not issued or loaned), as long as they were sold in Massachusetts.

A 1765 Virginia statute is also strong evidence that guns were not regarded as automatically government property. It provided for militia commanders in "each of the counties from which the militia has been sent into service in the pay of this colony shall, within the space of three months after the passing this act, sell, for the best price that be had for the same, all arms, ammunition, provisions, and necessaries purchased at the publick expense in the said counties…."[125] Surplus government guns were clearly sold, not loaned out to militiamen.

C. Private Arms

Other evidence establishes that Colonial governments at least sometimes recognized that guns could be private property,

26

EXHIBIT 2
0038

JOURNAL ON FIREARMS & PUBLIC POLICY      VOLUME SIXTEEN

and were *not* regarded as automatically the property of the government. Connecticut's records provide such evidence. In 1639, after the Pequot War, "a musket with 2 letters I W" was found, "conceaved to be Jno. Woods who was killed att the Rivers mouth. It was ordered for the present [that] the musket should be delivered to Jno. Woods friends until other appeare."[126] If the Connecticut government regarded a dead man's musket as "government property," it is odd that they delivered it to his friends.

We also have examples of colonists fined for selling guns to the Indians—and with no suggestion that these were publicly owned arms. A 1636 complaint in the Connecticut records shows that "Henry Stiles or some of the ser[vants] had traded a peece with the Indians for Corne."[127] In 1640, George Abbott is ordered to pay a £5 fine for "selling a pystoll & powder to the Indeans...."[128] Fines are also repeatedly assessed for selling guns to the Indians, with no hint or suggestion that these were government property.[129]

Were guns privately owned or government property? We have evidence such as a Connecticut lawsuit in 1639 by a "Jno. Moody contra Blachford, for a fowling peece he bought and should have payd for it 40s."[130] In 1640, also in Connecticut, a William Hill was fined £4 "for buying a stolen peece of Mr. Plums man."[131] There is nothing in the reports of these cases that suggests that these guns were considered government property.

Similarly, in New Haven Colony, a civil suit of 1645 concerns a gun purchased by Stephen Medcalfe from a Francis Linley. The gun was defective, and when it exploded, Medcalfe lost an eye. There is nothing in the description of the suit that suggests that the gun was "property of the government" and no surprise that one person sold a gun to another.[132]

Bellesiles claims that "the government reserved to itself the right to impress arms on any occasion, either as a defensive measure against possible insurrection or for use by the state. No gun ever belonged unqualifiedly to an individual."[133]

Yet there are a number of examples that directly contradict this claim. An October 13, 1675 statute of Massachusetts Bay provided for assessments on persons exempt from militia training of "so many fire armes, muskets, or carbines, with a proportionable stocke of [powder] & am[m]unition, as the said

27

EXHIBIT 2
0039

committees respectively shall appoint….” It appears that this was an assessment in kind, not of money. Another part of the statute specified “all such persons as shall be assessed, and shall accordingly provide three fire armes, shall be freed from being sent abroad to the warrs, except in extreame & utmost necessity.”[134]

Thus, the government believed that there were enough people who owned at least three guns that the government was prepared to exempt them from the onerous duty to fight overseas if they offered those guns to the government. As much as the government needed the guns, it did not believe that it had the authority to confiscate them. Instead, it needed to make a deal with the owners. Apparently the government did not believe that all guns were its property.

More evidence that militiamen possessed their *own* arms, and that the arms were not always issued from government magazines for militia service, is Massachusetts Governor William Shirley’s 1755 order to the militia to appear for service. “To such of them as shall be provided with sufficient Arms at their first Muster, they shall be allowed a *Dollar* over and above their Wages, and full Recompence for such of their Arms as shall be inevitably lost or spoiled.”[135]

Clearly, Governor Shirley believed that there were some members of the militia who, contrary to law, did not have firearms appropriate to military service. Just as clearly, Governor Shirley believed that some members would show up appropriately armed, and he was prepared to pay them extra to do so. Most importantly from the standpoint of private vs. public ownership, “full Recompence” shows that militiamen would be compensated for the loss of their privately owned guns; the guns were not “property of the government.”

Maryland’s Governor Sharpe similarly directed calling up of the militia, offering to provide government arms in 1759, but also “That for Every One of such Arms as any of Your men shall bring with them, and that may be Spoiled or Lost in actual Service, I will pay at the rate of Twenty five Shillings a Firelock.”[136]

At the start of the Revolution, a number of colonies made arrangements for additional pay for those soldiers who showed up with their own guns. Connecticut, for example, provided

28

EXHIBIT 2
0040

"that each inlisted inhabitant that shall provide arms for himself, well fixed with a good bayonet and cartouch box, shall be paid a premium of ten shillings…."[137] Later measures also suggest that militia men showing up with their own guns, and being paid extra, were the rule, not the exception.[138] Like Governor Shirley's "full Recompense," the Connecticut laws provided for compensation for those whose guns were lost in the war. While Connecticut impressed guns from the population for militiamen who did not have their own, the owners were to be paid four shillings for the use of impressed guns, and "the just value of the such gun" if lost.[139]

At the start of the Revolution, the Provincial Congress of Massachusetts purchased firearms from private parties,[140] and requested private citizens to sell their guns to the government: "[I]t is strongly recommended to such inhabitants…, that they supply the colony with same."[141] A request of June 15, 1775 for individuals to sell their arms is also phrased in terms that seem quite voluntary. "*Resolved*, that any person or persons, who may have such to sell, shall receive so much for them, as the selectmen of the town or district in which or they may dwell, shall appraise such arms at…."[142]

Other colonies also purchased guns from private parties—a strange behavior if guns remained "the property of the government." [143] Similarly, in November of 1775, with the war well under way, the Pennsylvania government issued a very odd statement, if guns were automatically "property of the government":

> The Committee of Safety are of opinion, that it is not improper for Mr. James Innes to purchase any second hand Arms which he may find in the hands of Individuals of this Province, and therefore have no objection to his buying them; But as they have employed, and are endeavouring to employ, all the Artificers that can be procured in making new arms for the public, they apprehend any application by Mr. Innes to such Artificers, will be attended with bad consequences to the general Cause by enhancing the Price of arms….[144]

At the start of the Revolution, the Maryland government confiscated guns from Tories and others suspected of disloyalty

29

EXHIBIT 2
0041

CRAMER                                   COLONIAL FIREARM REGULATION

to the Patriot cause. Yet even then, the owners received compensation for the value of their guns.[145] Even disloyalty was not just cause for confiscation without compensation.

Another piece of evidence that guns were not "property of the government" is a 1776 order of the Continental Congress:

> Whereas in the execution of the resolve of Congress of the 14th of March, respecting the disarming disaffected persons, many fire arms may be taken, which may not be fit for use to arm any of the troops mentioned therein: Therefore, Resolved, That all the fire arms so taken, being appraised according to said resolve, none of them shall be paid for, but those that are fit for the use of such troops, or that may conveniently be so made, and *the remainder shall be safely kept by the said assemblies, conventions, councils or committees of safety, for the owners, to be delivered to them when the Congress shall direct.*[146] [emphasis added]

The owners were to be paid for guns taken for military use. Government ownership of guns was not assumed. Quite the opposite, private ownership was assumed and respected, even for Tories.

In the days after Lexington and Concord, General Gage was understandably nervous about being attacked from the rear by armed rebels. General Gage consequently ordered the people of Boston to turn in their arms. Many Bostonians were also deeply interested in leaving town, both because of the increasing poverty caused by the Boston Port Act of 1774, and the likelihood that the revolutionary army would attack Boston.

As an incentive, General Gage offered passes to leave Boston to all who turned in their weapons. No weapons or ammunition were allowed to leave Boston. The arms were to be "marked with the names of the respective owners…that the arms aforesaid, at a suitable time, would be returned to the owners." The marking of the arms demonstrates that at least of some these were personally owned, not public arms. On April 27th, "the people delivered to the selectman 1778 fire-arms, 634 pistols, 973 bayonets, and 38 blunderbusses…."[147]

30

EXHIBIT 2
0042

## VII. RESTRICTIONS ON PRIVATE USE

There are restrictions on the use of firearms in the Colonial law, and most of these are unsurprising. They are safety and hunting regulations of the same general form, though less restrictive, than current laws.

### A. Restrictions on Discharge

The need for such laws strongly suggests that the claim that guns were kept centrally stored is incorrect. A March 1655/6 Virginia statute, for example, prohibited shooting "any guns at drinkeing (marriages and funerals onely excepted)" because gunshots were the common alarm of Indian attack, "of which no certainty can be had in respect of the frequent shooting of gunns in drinking…."[148] Similarly, a 1642 Maryland statute also ordered that, "No man to discharge 3 guns within the space of ¼ hour… except to give or answer alarm."[149]

There are some regulations that appear to have been temporary measures designed to deal with a particular crisis, and we may only speculate as to the motivations. An example is a 1675 Plymouth statute that prohibited shooting except at an Indian or a wolf. Since this measure immediately followed one requiring everyone to come to church armed "during the time of publicke danger,"[150] it seems likely that the law was an attempt to prevent unnecessary alarm, for the same reasons as the Virginia and Maryland laws.

Shooting was apparently a common enough pastime in 1638 Massachusetts that when an Emanuell Downing had "brought over, at his great charges, all things fitting for takeing wild foule by way of [decoy]," the General Court felt it necessary to order "that it shall not bee lawfull for any person to shoote in any gun within halfe a mile of the pond where such [decoy] shalbee placed…."[151] The need for such a law suggests that guns were not kept locked in a central storehouse.

The laws were passed not only for the economic benefit of the community as a whole, but also because negligent misuse of firearms was not unknown. An incident from a history of Plymouth Colony described how:

31

**EXHIBIT 2**
**0043**

On 1 July 1684 Robert Trayes of Scituate, described as a 'negro,' was indicted for firing a gun at the door of Richard Standlake, thereby wounding and shattering the leg of Daniel Standlake, which occasioned his death. The jury found the death of Daniel Standlake by 'misadventure,' and the defendant, now called 'negro, John Trayes,' was cleared with admonition and fine of £5.[152]

A statute adopted at the Massachusetts 1713-14 legislative session complained, "Whereas by the indiscreet firing of guns laden with shot and ball within the town and harbour of Boston, the lives and limbs of many persons have been lost, and others have been in great danger, as well as other damage has been sustained…" the legislature prohibited firing of any "gun or pistol" in Boston ("the islands thereto belonging excepted").[153]

Perhaps for a similar reason—or just to allow the inhabitants to get some sleep—in 1759, Georgia made it unlawful to fire "any great gun or [small] arm in the town or harbour of Savannah after Sun Set without leave or permission from the Governor…."[154]

B. Restrictions on Hunting

Hunting with firearms was also sufficiently common for Colonial governments to adopt restrictions. A 1632 Virginia statute licensed hunting wild pigs, but "any man be permitted to kill deare or other wild beasts or fowle in the common woods, forests, or rivers…. That thereby the inhabitants may be trained in the use of theire armes, the Indians kept from our plantations, and the wolves and other vermine destroyed."[155] A March 1661/2 statute prohibited "hunting and shooting of diverse men" on land without the owner's permission "whereby many injuryes doe dayly happen to the owners of the said land…." The statute also provided that it was lawful to pursue game shot elsewhere onto private land without permission.[156] A 1699 statute, "prohibiting the unseasonable killing of Deer," complained about how the deer population "is very much destroyed and diminished" by killing "Does bigg with young…."[157]

Laws regulating hunting appear in at least two colonies by

EXHIBIT 2
0044

mid-eighteenth century, and the language in both statutes suggests that hunting was common. A 1722 New Jersey "Act to prevent the Killing of Deer out of Season" prohibited deer hunting from January through June. That same law included a provision prohibiting "Persons carrying of Guns, and presuming to Hunt on other Peoples Land" explaining that it was required because "divers Abuses have been committed, and great Damages and Inconveniencies arisen…." The same act prohibited a slave from hunting or carrying a gun without permission of his master.[158]

A 1738 North Carolina "Act, to Prevent killing Deer, at Unseasonable Times" made it unlawful "to kill or destroy any Deer… by Gun, or other Ways and Means whatsoever" from February 15 to July 15."[159]

Virginia temporarily banned deer hunting in 1772, complaining that "many idle people making a practice, in severe frozen weather, and deep snows, to destroy deer, in great numbers, with dogs, so that the whole breed is likely to be destroyed, in the inhabited parts of the colony…." The government's concern was that, "numbers of disorderly persons… almost destroyed the breed, by which the inhabitants will… be deprived of that wholesome and agreeable food…." Therefore, deer hunting was completely prohibited until August 1, 1776.[160] It is not made explicit that the hunting was with guns, however.

Maryland had a few hunting restrictions as well. A 1648 law complained that because licenses previously issued for "killing of Wild Hoggs [e]mploying Indians to kill deere with Gunnes" both to residents and non-residents of Maryland "hath occasioned some inconvenience & hath given great offence to divers of the Inhabitants of this Province," all existing licenses were repealed. Unfortunately, the statute failed to explain in what manner this hunting had inconvenienced or offended the "Inhabitants."[161]

Two years later, another law prohibited foreigners "either English or Indian" from hunting "in any part of this Province or kill any Venison or other Game" without a license from the governor,[162] again with no explanation of the problem this law was intended to solve.

A 1654 Maryland law sought to prohibit shooting on Sundays: "Noe work shall be done on the Sabboth day but that which is of Necessity and Charity to be done no Inordinate

33

EXHIBIT 2
0045

Recreations as fowling, fishing, hunting or other, no shooting of Gunns be used on that day Except in Case of Necessity[.]" Following immediately upon prohibitions on drunkenness, swearing and gossiping, the statute seems intended to improve morals of the population, and was not specifically directed at guns.[163] In 1678, the law was expanded to prohibit a larger list of amusements, and still prohibited fishing and hunting.[164]

### C. Restrictions on Fire-hunting

One particularly destructive practice of Colonial America was "fire-hunting," well described by a 1760 account explaining why white pines in New York, New England, and New Jersey were protected for the use of the Royal Navy:

> This restriction is absolutely necessary, whether considered as securing a provision for the navy, or as a check upon that very destructive practice, taken from the Indians, of fire-hunting. It used to be the custom for large companies to go into the woods in the winter, and to set fire to the brush and underwood in a circle of several miles. This circle gradually contracting itself, the deer, and other wild animals inclosed, naturally retired from the flames, till at length they got herded together in a very small compass.
>
> Then, blinded and suffocated by the smoke, and scorched by the fire, which every moment came nearer to them, they forced their way, under the greatest trepidation and dismay, through the flames. As soon as they got into the open daylight again, they were shot by the hunters, who stood without and were in readiness to fire upon them.[165]

Fire-hunting was not confined to the Northeast colonies; there are a number of statutes of Colonial Virginia and Maryland that either directly prohibit fire-hunting with reference to guns,[166] or that license hunting on the frontier in an attempt to control fire-hunting.[167] Doubtless other restrictions on firearms use existed—but if so, those who argue that Colonial governments severely restricted firearms use have yet to produce

34

EXHIBIT 2
0046

them.

## CONCLUSION: COLONIAL FIREARMS REGULATIONS WERE NEITHER *LAISSEZ-FAIRE* NOR RESTRICTIVE

As should be clear from the preceding walk through these laws, the Colonial statutes were not *laissez-faire*; there were many obligations concerning the ownership and carrying of guns adopted for the public good. Neither were they restrictive, at least for whites (with the exception of Catholics in Maryland). There were, it is true, some severe restrictions on firearms ownership in Colonial America, but they applied only to people who were not trusted to be loyal members of the community, particularly Indians and blacks. For the vast majority of people, who were considered loyal members of the community, gun ownership was not only allowed, it was an obligation.

## ENDNOTES

1. Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A. Knopf, 2000), 73. Similar text, with a subset of the same footnotes, appears at Michael Bellesiles, "Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794," *Law & History Review*. 16:575 (1998).

Bellesiles also asserts government ownership of all guns at *Arming America*, pp. 79-80. Because individuals failed to take adequate care of guns in private hands, "The eventual solution to the lack of care devoted to firearms was to make all guns into the property of the state, subject to storage in central storehouses where they could be cleaned and repaired by paid government gunsmiths." Similarly, Bellesiles asserts that while "the colonies supported and subsidized the private ownership of firearms, the government reserved to itself the right to impress arms on any occasion, either as a defensive measure against possible insurrection or for use by the state. No gun ever belonged unqualifiedly to an individual."

2. *State v. Hirsch*, 177 Or. App. 441, 34 P.3d 1209 (Or. App. 2001).

3. Bellesiles, *Arming America,* 73.

4. *Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford, Conn.: Silas Andrus, 1822), 72-73; J. Hammond Trumbull (vol. 1-3), Charles J. Hoadly (vol. 4-15), *The*

EXHIBIT 2
0047

*Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony* (Hartford, Conn.: Brown & Parsons, 1850) (hereinafter *Public Records of Connecticut*), 1:542-543.

5. *Public Records of Connecticut*, 1:3-4, 15-16, 2:19-20, 217-18, 4:177, 8:379-80.

6. *Id.*, 2:217-18, 4:177, 8:379-80.

7. William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (New York: R. & W. & G. Bartow, 1823), 3:13.

8. *Id.*, 3:338.

9. *Id.*, 5:17, 21.

10. *Id.*, 6:116.

11. *Id.*, 6:118.

12. *Id.*, 6:537.

13. *The Colonial Laws of New York from the Year 1664 to the Revolution…* (Albany, New York: James B. Lyon, 1894), 1:49-50.

14. William Hand Browne, ed., *Archives of Maryland* (Baltimore: Maryland Historical Society, 1885) (hereinafter *Archives of Maryland*), 1:77.

15. *Id.*, 75:258.

16. *Id.*, 75:259.

17. *Id.*, 1:77.

18. *Id.*, 3:100-1.

19. *Id.*, 3:103.

20. *Id.*, 3:345.

21. *Id.*, 52:469.

22. *Id.*, 11:21. But see *id.,* 11:90 for a complaint that many had failed to conform to the law, though the complaint alleges that that the problem was "would not," not "could not."

23. Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston: William White, 1853), 1:84. In 1752, England switched from the Julian calendar (in which the new year begins on March 25, the date of the Annunciation) to the Gregorian calendar (in which the new year begins on January 1). For some older documents which were published between January 1 and March 25, historians supply both "years" of publication, under the old

36

**EXHIBIT 2**
**0048**

calendar which was in effect at the time, and under the new calendar which we use today.

24. *Id.*, 2:134. This requirement is reiterated on November 11, 1647. *Id.*,2:222.

25. *Id.*, 3:84.

26. *Id.*, 2:99.

27. Charles J. Hoadly, ed., *Records Of The Colony And Plantation Of New Haven, From 1638 To 1649* (Hartford, Conn.: Case, Tiffany, 1857), 25-26, 96-97, 131, 202. Hoadly, 122-3, lists a number of men fined for failure to obey.

28. William Brigham, ed., *The Compact with the Charter and Laws of the Colony of New Plymouth…* (Boston: Dutton and Wentworth, 1836), 31, 44-45, 285-6.

29. *Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England…* (1716), 91-92, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1985.

30. *The Laws and Acts of the General Assembly of Her Majesties Province of Nova Caesarea or New-Jersey* (W. Bradford, 1709), 12-13, in Clifford K. Shipton, ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1412.

31. *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Franklin, 1741), 171-7. While the title page is clearly 1741, this must have been only for the first of annual series, since the law was passed in 1742. See also a 1740 statute, *Id.*, 151, imposing similar requirements on the town of Lewes, which was apparently considered especially exposed to naval attack.

32. John Russell Bartlett, ed., *Records of the Colony of Rhode Island and Providence Plantations, in New England* (Providence, R.I.: A. Crawford Greene and Brother, 1856), 1:94.

33. *Id.*, 1:79-80.

34. Alexander S. Salley, *Journal of the Grand Council of South Carolina* (Columbia, S.C.: Historical Commission of South Carolina, 1907), 1:10-11.

35. *Laws of North Carolina–1715*, ch. 25, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 2:29-31.

36. *A Collection of all the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use...* (Newbern, N.C.: James Davis, 1751), 215-16.

37

EXHIBIT 2
0049

37. John Hope Franklin, *The Free Negro in North Carolina, 1790-1860* (Chapel Hill, N.C.: University of North Carolina Press, 1995), 101-102.

38. Allen D. Candler, comp., *The Colonial Records of the State of Georgia* (Atlanta, Ga.: Chas. P. Byrd, 1911), 19(part 1):291. Nearly identical language appears in the 1755 militia statute. *Id.*, 18:7, 11-12.

39. *Id.*, 19(part 1):296.

40. *Id.*, 19(part 1):303. There are many pages of highly detailed fines and provisions to handle any imaginable contingency in this statute.

41. *Id.*, 19(part 1):324-25.

42. *Id.*, 19(part 1):297-8.

43. *Id.*, 19(part 1):299. See the similar obligation imposed in 1757 on members of the militia to keep and carry "one good Gun or Pistol in Order… and a Cartridge Box with at least Six Cartridges" when on patrol duty. *Id.*, 18:231.

44. A few scattered scraps that give some idea of the conflict between governor and legislature on passage of a mandatory militia law can be found in *Pennsylvania Archives*, 4th series, 1:706-8, 2:441, 548, 555.

45. *Archives of Maryland*, 75:264; Abbot Emerson Smith, *Colonists in Bondage: White Servitude and Convict Labor in America, 1607-1776* (Gloucester, Mass.: Peter Smith, 1965), 239.

46. *Laws of North Carolina*—1715, ch. 46, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 63; Farley Grubb, "The Statutory Regulation of Colonial Servitude: An Incomplete-Contract Approach," *Explorations in Economic History* 37 (January, 2000):69.

47. Public Records Office, Customs 16:85, 109, 171. In 1769: 229,545 pounds; 1770: 410,591; 1771: 390,558 pounds.

48. William J. Novak, "*Salus Populi*: The Roots of Regulation in America, 1787-1873" (Ph.D. diss., Brandeis University, 1992), 188.

49. This calculation is necessarily imprecise, but is based on statutes of the time that assumed four pounds of lead for every pound of gunpowder, and a 0.75 caliber Brown Bess: *Archives of Maryland*, 1:77; Matthew Page Andrews, *Tercentenary History of Maryland* (Chicago and Baltimore: S.J. Clarke Publishing Co., 1925), 1:150; Hening, 5:17, 21. Many firearms in Colonial America were smaller caliber, and consequently used less powder, increasing the number of shots that could have been fired. Concerning the claim of gun ownership, storage requirements, and hunting, see generally Bellesiles, *Arming America*.

50. *Public Records of Connecticut*, 1:95, 96.

EXHIBIT 2
0050

51. Shurtleff, 1:190.

52. *Id.*, 1:210.

53. *Id.*, 2:38.

54. Bartlett, 1:94.

55. *Archives of Maryland*, 3:103.

56. Bartlett, 1:79.

57. Hoadly, 131-32. See *id.*, 122-23, for men fined for failure to bring their guns to church, and Hoadly, 500, for William Paine's request that he be exempted from this requirement, "he lives [far off] and hath three small children, and his wife is lame and cannot help to bring the children."

58. Brigham, 70.

59. *Id.*, 115.

60. *Id.*, 176.

61. August 2, 1619, "Proceedings of the Virginia Assembly, 1619," in Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606-1625* (New York: Charles Scribner's Sons, 1907; reprinted New York: Barnes & Noble, 1959), 273.

62. Hening, 1:198.

63. *Id.*, 5:19.

64. David J. McCord, *Statutes at Large of South Carolina* (Columbia, S.C.: A. S. Johnson, 1840), 7:417-19.

65. Candler, *The Colonial Records of the State of Georgia*, 19(part 1):137-40.

66. Hening, 1:127, 198.

67. Shurtleff, 1:85.

68. *Id.*, 1:190.

69. Bartlett, 1:94.

70. *Archives of Maryland*, 3:103.

71. William Bradford, Samuel Eliot Morison, ed., *Of Plymouth Plantation, 1620-1647* (New York: Alfred A. Knopf, 2001), 70.

72. Sydney V. James, Jr., *Three Visitors to Early Plymouth* (Bedford, Mass.: Applewood Books, 1997), 16.

73. Francis Adams, Jr., ed., *New English Canaan of Thomas Morton* (Boston: The Prince Society, 1883; reprinted New York: Burt Franklin, 1967), 21-28.

74. Bradford, 204, 206-8, 232-3.

EXHIBIT 2
0051

75. Joseph H. Smith, ed., *Colonial Justice in Western Massachusetts (1639-1702): The Pynchon Court Record, An Original Judges' Diary of the Administration of Justice in the Springfield Courts in the Massachusetts Bay Colony* (Cambridge: Harvard University Press, 1961), 208.

76. *Archives of Maryland*, 3:103.

77. Shurtleff, 1:196.

78. *Id.*, 2:24.

79. *Id.*, 3:268.

80. *Id.*, 3:397.

81. *Public Records of Connecticut*, 1:1, 2.

82. *Id.*, 1:49.

83. *Id.*, 1:182.

84. *Id.*, 1:79-80.

85. *Id.*, 1:113-14, 138, 145-6, 197-8.

86. *Id.*, 1:146-7, Richard Lord fined £7 and Thomas Stanton, £5. *Id.*, 1:167, Thomas Lord ordered to appear. *Id.*, 1:242, Captain Sebadoe fined £10.

87. Smith, 263.

88. Shurtleff, 4 (part 2):365.

89. John E. Soule, Milton E. Terry, and Robert S. Wakefield, comp., *George Soule of the Mayflower and His Descendants for Four Generations*, 3rd ed. (Plymouth, Mass.: General Society of Mayflower Descendants, 1999), 6.

90. *Public Records of Connecticut,* 1:351, 375.

91. Hening, 1:441.

92. *Id.*, 1:525.

93. *Id.*, 2:215.

94. *Id.*, 2:336-7.

95. *Archives of Maryland*, 1:71.

96. *Id.*, 1:250.

97. *Id.*, 58:420.

98. Hening, 2:481.

99. *Id.*, 4:131.

100. *Id.*, 5:17. Indians and blacks to appear unarmed for muster reiterated in 1757. *Id.*, 7:95.

40

**EXHIBIT 2**
**0052**

101. *Archives of Maryland*, 75:268.

102. *Laws of the Government of New-Castle, Kent and Sussex Upon Delaware* (Philadelphia: B. Franklin, 1741), 178.

103. Candler, *The Colonial Records of the State of Georgia*, 19(part 1):76-78. Essentially identical language appears in the 1755 slave law, *Ibid.*, 18-117-18.

104. J. Franklin Jameson, ed., *Johnson's Wonder-Working Providence: 1628-1651* (New York: Barnes & Noble, Inc., 1959), 175. Shurtleff, 1:211-12, gives the disarming orders.

105. Hening, 2:403.

106. *Archives of Maryland,* 52:450-1 contains a 1756 militia law that exempts "Papists, the Persons commonly called Neutralls, Servants, and Slaves." See instructions at 52:598 ordering that no soldier be enlisted "Roman Catholic or Deserter, knowing them to be such…." Also discussed at 6:419-20, 9:315-6; 28:315

107. *Id.*, 52:451-2.

108. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (Cambridge, Mass.: Harvard University Press, 1994), 123. Britain and Ireland had different laws concerning the disarming of Catholics, with the Irish law somewhat more restrictive on the possession of arms for self-defense. Compare 1 W. & M., ch. 15 (1689) with the Irish law 7 Will III ch.5 (1695).

109. Joyce Lee Malcolm, "The Right of the People to Keep and Bear Arms: The Common Law Tradition," *Hastings Constitutional. Law Quarterly* 10:310 (1983).

110. *Archives of Maryland*, 25:288-9.

111. *Id.*, 28:315.

112. *Id.*, 52:454.

113. Candler, *The Colonial Records of the State of Georgia*, 18:190-1.

114. Bellesiles, *Arming America,* 73.

115. Shurtleff, 1:84.

116. *Id.*, 1:93.

117. *Code of 1650, Being a Compilation of the Earliest Laws and Orders of the General Court of Connecticut* (Hartford, Conn.: Silas Andrus, 1822), 72-73.

118. *Colonial Laws of New York*, 1:52.

119. *Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England…* (1716), 91-92, in Clifford K. Shipton,

41

EXHIBIT 2
0053

ed., *Early American Imprints, 1639-1800* (Worcester, Mass.: American Antiquarian Society, 1967), imprint 1985, 94.

120. Hening, 2:304.

121. *Id.*, 6:118.

122. *Archives of Maryland*, 75:425.

123. *Id.*, 52:452.

124. Shurtleff, 2:31. Shurtleff, 3:187, includes a May 23, 1650 order that the public arms to be sold not include cannon. An October 14, 1651 order at Shurtleff, 3:248, provides for the gift of five publicly owned muskets to inhabitants of Salem and "our present honored Governor."

125. Hening, 8:125-6.

126. *Public Records of Connecticut,* 1:29.

127. *Id.*, 1:1, 2.

128. *Id.*, 1:49.

129. *Id.*, 1:182, Robert Slye fined £10 for "exchanging a gunn with an Indian" with George Hubberd, John West, and Peter Blatchford "for the same" all fined the same amount.

130. *Id.*, 1:33.

131. *Id.*, 1:50.

132. Hoadly, *Records Of The Colony And Plantation Of New Haven,* 176-77.

133. Bellesiles, *Arming America*, 79.

134. Shurtleff, 5:48-49.

135. Library of Congress, Printed Ephemera Collection; Portfolio 35, Folder 15b.

136. *Archives of Maryland*, 9:565. Similar offers appear at 31:404, in 1760, and at 56:404 in 1761.

137. *Public Records of Connecticut,* 14:417-18. See *id.*, 15:188, for a similar measure in December 1775.

138. *Id.*, 15:97.

139. *Id.*, 14:418-19.

140. Massachusetts Provincial Congress, *The Journals of Each Provincial Congress of Massachusetts in 1774 and 1775* (Boston: Dutton and Wentworth, 1838), 536-37, 584-93. *Id.*, 584 (107 "small arms"); 585 (13 "guns"); 591 (28 "guns, for the use of the colony, collected by order of Congress").

141. *Id.*, 210.

EXHIBIT 2
0054

142. *Id.*, 336-37.

143. February 7, 1776, *Colonial Records of Pennsylvania* (Chicago: Library Resources, 1970), 10:478;    February 9, 1776, 10:481; April 9, 1776. 10:537; April 10, 1776, 10:537; July 30, 1776, 10:471; July 24, 1776, 10:653; August 23, 1776, 10:698; November 29, 1775,   *Minutes of the Supreme Executive Council of Pennsylvania* (Harrisburg, Penn.: Theo. Fenn & Co., 1852), 10:416-67, 10:550-51, 686-67, 700.

144. November 30, 1775, *Min.Sup.Penn.*, 418.

145. See March 8, 1776, *American Archives* 4th series, 5:1509 for Baltimore, Maryland's confiscation and compensation of guns.

146. Worthington C. Ford, *et al,.* ed., *Journals of the Continental Congress, 1774-1789* (Washington, D.C., 1904-37), 4:220-21.

147. Richard Frothingham, *History of the Siege of Boston, and of the Battles of Lexington, Concord, and Bunker Hill,* 6th ed. (Boston: 1903), 94-95.

148. Hening, 1:401-2.

149. *Archives of Maryland,* 3:103.

150. Brigham, 176.

151. September 6, 1638, Shurtleff, 1:236.

152. Eugene Aubrey Stratton, *Plymouth Colony: Its History & People, 1620-1691* (Salt Lake City: Ancestry Publishing, 1986), 188.

153. *Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay…* (Boston: Albert J. Wright, 1878), 3:305-6.

154. Candler, *The State Records of the Colony of Georgia,* 18:294-5.

155. Hening, 1:199.

156. *Id.*, 2:96-97. *Id.*, 3:328, contains a minor revision of this law in 1705.

157. *Id.*, 3:180.

158. *Laws and Acts of the General Assembly Of His Majesties Province of Nova Caesarea or New-Jersey…* (William Bradford, 1722), 143-45.

159. *Laws of North Carolina—1738*, ch. 10, in John D. Cushing, ed., *The Earliest Printed Laws of North Carolina, 1669-1751* (Wilmington, Del.: Michael Glazier, Inc., 1977), 2:128.

160. Hening, 8:592-3.

161. *Archives of Maryland,* 3:255.

162. *Id.*, 1:295-96. Also reiterated in 1654 at 1:351.

163. *Id.*, 1:343-44.

EXHIBIT 2
0055

164. *Id.*, 7:51-52.

165. Andrew Burnaby, "In the Woods" in Albert Bushnell Hart and Mabel Hill, *Camps and Firesides of the Revolution* (New York: Macmillan Co., 1937), 51. See also J. Franklin Jameson, ed., *Johnson's Wonder-Working Providence: 1628-1651* (New York: Barnes & Noble, Inc., 1959), 85, for what *may* be a description of Indian fire-hunting of deer in seventeenth century New England.

166. Hening, 5:62 is a 1738 statute prohibiting fire-hunting by both colonists and Indians. "And if any Indian be found fire-hunting… it shall and may be lawful, for the owner of such land… to take away the gun of such Indian, and the same to keep to his own use." *Id.*, 5:431 again punishes fire-hunting.

*Archives of Maryland,* 28:348-9 is a 1745 statute that prohibits fire-hunting, although it is not explicit that the "hunters" were using guns. *Id.*, 44:21, 36, 39, 173, 180-1, trace the legislative history from the request earlier that year from the backwoods farmers to prohibit fire-hunting and hunting by non-residents to final passage. For reasons not explained, a similar law is debated in 1753 at 50:211 and 251, where it was "referred to the Consideration of next Assembly."

Connecticut's 1733 statute regulating "Firing the Woods" at *Public Records of Connecticut*, 7:456-7, is not explicitly about hunting, nor does it ever mention firearms, but may have been motivated by the same concerns.

167. Hening, 3:69.

44

EXHIBIT 2
0056

# EXHIBIT "3"

EXHIBIT 3
0057



Content downloaded/printed from                    *HeinOnline*

Thu Oct  3 15:38:15 2019

Citations:

Bluebook 20th ed.
1792 423 .

ALWD 6th ed.
1792 423 .

Chicago 7th ed.
, "," Connecticut - October Session : 423-434

OSCOLA 4th ed.
, " 1792 423

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
        *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



**EXHIBIT 3**
**0058**



# ACTS AND LAWS,

Made and paſſed by the General Court or Aſſembly of the State of Connecticut, in America, holden at New-Haven, (in ſaid State) on the ſecond Thurſday of October, Anno Dom. 1792.

An Act for forming and conducting the military force of this ſtate, conformable to the act of Congreſs, paſſed the eight day of May, A. D. 1792, which is as follows :—" An Act more effectually to provide for the national defence, by eſtabliſhing an uniform militia throughout the United States."

"SECTION I. **B**E it enacted by the Senate, and houſe of Repreſentatives, of the United States of America, in Congreſs aſſembled, That each and every free able bodied white male citizen, of the reſpective ſtates, reſident therein, who is, or ſhall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) ſhall ſeverally and reſpectively be enrolled in the militia, by the captain or commanding officer of the company, within whoſe bounds ſuch citizen ſhall reſide ; and that within twelve months after the paſſing this act, it ſhall at all times hereafter be the duty of every ſuch captain, or commanding officer of a company, to enrol every ſuch citizen, as aforeſaid ; and alſo thoſe who ſhall, from time to time, arrive at the age of eighteen years, and under the age of forty-five years (except as before excepted) ſhall come to reſide within his bounds ; and ſhall without delay, notify each citizen of the ſaid enrolment, by a proper non-commiſſioned officer of the company, by whom ſuch notice may be proved. That every ſuch citizen ſo enrolled and notified, ſhall within ſix months thereafter, provide himſelf with a good muſket or firelock, a ſufficient bayonet and belt, two ſpare flints and knapſack, a pouch with a box therein to contain twenty-four cartridges, ſuited to the bore of his muſket or firelock, each cartridge to contain a proper quantity of powder and ball ; or with a good rifle, knapſack, ſhot-pouch and powder-horn, twenty balls ſuited to the bore of his rifle, and a quarter of a pound of powder ; and ſhall appear ſo armed, accoutred and provided, when called out to exerciſe, or into ſervice, except that when called out on company days to exerciſe only, he may appear without a knapſack. That the commiſſion officers ſhall ſeverally be armed with a ſword or hanger, and eſpontoon ; and that from and after five years from the paſſing this act, all muſkets for arming the militia, as herein required, ſhall be of bores ſufficient for balls of the eighteenth part of a pound : And every citizen ſo enrolled, and providing himſelf with the arms, ammunition and accoutrements, required as aforeſaid, ſhall hold the ſame exempt from all ſuits, diſtreſſes, executions, or ſales for debt, or for the payment of taxes."

"SEC. II. *And be it further enacted*, That the vice-preſident of the United States, the officers, judicial and executive, of the United States, the members of both houſes of Congreſs, and the reſpective officers, all cuſtom-houſe officers, with their clerks, all poſt-officers, and ſtage drivers, who are employed in the care and conveyance of the mail of the poſt-office of the United States, all ferrymen employed at any ferry on the poſt-road, all inſpectors of exports, all pilots, all mariners actually employed in the ſea ſervice of any citizen or merchant within the United States, and all perſons who are, or may hereafter be exempted by the laws of the reſpective ſtates, ſhall be, and are hereby exempted from military duty, notwithſtanding their being above eighteen, and under the age of forty-five years."

Y y y

SEC. III.

*[margin notes:]* Militia how & by whom to be enrolled. / How to be armed and accoutred. / Executive officers, &c. exempt.

EXHIBIT 3
0059

**Militia how to be arranged,**

"SEC. III. *And be it further enacted,* That within one year after the passing this act, the militia of the respective states shall be arranged into divisions, brigades, regiments and companies, as the legislature of each state shall direct; and each division, brigade, and regiment, shall be numbered at the formation thereof, and a record made of such numbers in the adjutant general's office in the state; and when in the field, or in service of the state, each division, brigade and regiment, shall respectively take rank according to their numbers, reckoning the first or lowest number highest in rank. That if the same be convenient, each brigade shall consist of four regiments, each regiment of two battalions, each battalion of five companies, each company of sixty-four privates. That the said militia shall be officered by the respective states, as follows, To each division one major-ge-

**by whom officered,**

neral, and two aids-de-camp, with the rank of major; to each brigade, one brigadier-general, with one brigade inspector, to serve also as brigade-major, with the rank of a major; to each regiment one lieutenant-colonel-commandant; and to each battalion one major; to each company one captain, one lieutenant, one ensign, four sergeants, four corporals, one drummer, one fifer or bugler. That there shall be a regimental staff, to consist of one adjutant, one quarter-master to rank as lieutenant, one pay-master, one surgeon and surgeon's-mate, one sergeant-major, one drum-major, and one fife-major."

**Each battalion to have 1 company of grenadiers, &c. and 1 company of artillery.**

"SEC. IV. *And be it further enacted,* That out of the militia enrolled as is herein directed, there shall be formed for each battalion, at least one company of grenadiers, light-infantry, or riflemen; and that to each division, there shall be at least one company of artillery, and one troop of horse. There shall be to each company of artillery, one captain, two lieutenants, four sergeants, four corporals, six gunners, six bombadiers, one drummer, and one fifer; the officers to be

**Officers how to be armed.**

armed with a sword or hanger, fusee, bayonet and belt, with a cartridge box, to contain twelve cartridges, and each private or matross, shall furnish himself with all equipments of a private in the infantry, until proper ordnance and field artillery is provided. There shall be to each troop of horse, one captain, two lieutenants,

**Troops of horse how officered, &c.**

one cornet, four sergeants, four corporals, one saddler, one farrier, and one trumpeter. The commissioned officers to furnish themselves with good horses of at least fourteen hands and a half high, and to be armed with a sword and pair of pistols, the holsters of which to be covered with bearskin caps; each dragoon to furnish himself with a serviceable horse, at least fourteen hands and a half high, a good saddle, bridle, mail pillion and valeise, holsters, and a breastplate and crupper, a pair of boots and spurs, a pair of pistols, a sabre, and a cartridge box to contain 12 cartridges for pistols. That each company of artillery and troop of horse, shall

**Artillery and horse of whom to be formed; to be uniformly clad at their own expence.**

be formed of volunteers from the brigade, at the discretion of the commander in chief of the state, not exceeding one company of each to a regiment, nor more in number than one eleventh part of the infantry; and shall be uniformly clothed in regimentals, to be furnished at their own expence, the colour and fashion to be determined by the brigadier commanding the brigade to which they belong."

**What colours &c. and by whom to be furnished.**

"SEC. V. *And be it further enacted,* That each battalion and regiment, shall be provided with a State and regimental colours by the field officers; and each company with a drum and fife, or bugle horn, by the commissioned officers of the company, in such manner as the legislature of the state shall direct."

"SEC. VI. *And be it further enacted,* That there shall be an adjutant-general appointed in each state, whose duty it shall be to distribute all orders from the commander in Chief of the State, to the several corps; to attend all public reviews when the commander in chief of the state shall review the militia, or any

**Adjutant-general in each state, his duty.**

part thereof; to obey all orders from him relative to carrying into execution, and perfecting the system of military discipline established by this Act; to furnish blank forms of different returns that may be required, and to explain the principles on which they shall be made; to receive from the several officers of the different corps throughout the state, returns of the militia under their command, respecting the actual situation of their arms, accoutrements, and ammunition, their delinquencies, and every other thing which relates to the general advancement of good order and discipline; All which the several officers of the division, of the brigades, regiments, and battalions, are hereby required to make in the usual manner, so that the said adjutant-general may be duly furnished therewith; from all which returns he shall make proper abstracts, and lay the same annually before the commander in chief of the state."

**Rules of discipline.**

"SEC. VII. *And be it further enacted,* That the rules of discipline approved and established by Congress in their resolutions of the 29th of March 1779, shall be the rules of discipline, to be observed by the militia, throughout the United States, except such deviations from the said rules as may be rendered necessary by the requisitions of this act, or by some other unavoidable circumstances. It shall be the duty of the Commanding Officer, at every muster, whether by battalion, regiment, or single company, to cause the militia to be exercised and trained, agreeably to the said rules of discipline."

**Officers how to take rank.**

"SEC. VIII. *And be it further enacted,* That all the commissioned officers shall take rank according to the date of their commissions; and when two of the same grade

**EXHIBIT 3**
**0060**

*ACTS AND LAWS.*

## Militia.

425

grade bear an equal date, then their rank to be determined by lot, to be drawn by them, before the commanding officer of the brigade, regiment, battalion, company, or detachment."

"SEC. IX. *And be it further enacted,* That if any perſon, whether officer or ſoldier, belonging to the militia of any ſtate, and called out into ſervice of the U-nited States, be wounded, or diſabled while in actual ſervice, he ſhall be taken care of and provided for at the public expence." *Poſition incaſe of wounds, &c.*

"SEC. X. *And be it further enacted,* That it ſhall be the duty of the brigade-inſpector, to attend the regimental and battalion meeting of the militia, compo-ſing the ſeveral brigades during the time of their being under arms, to inſpect their arms, ammunition, and accoutrements ; ſuperintend their exerciſe and man-ouvres, and introduce the ſyſtem of military diſcipline before deſcribed, through-out the brigade, agreeable to law ; and ſuch orders as they ſhall from time to time receive from the commander in chief of the ſtate ; to make returns to the adjutant-general of the ſtate, at leaſt once in every year, of the militia of the brigade to which he belongs ; reporting therein the actual ſituation of the arms, accoutre-ments, and ammunition, of the ſeveral corps ; and in every other thing which in his judgment relates to their government, and the general advancement of good order and military diſcipline. And the adjutant-general ſhall make a return of all the militia in the ſtate, to the commander in chief of the ſaid ſtate, and a dupli-cate of the ſame to the Preſident of the United States." *Brigade inſpec-tor's duty.*

" And whereas ſundry corps of artillery, cavalry, and infantry, now exiſt in ſe-veral of the ſaid ſtates, which by the laws, cuſtoms and uſages thereof, have not been incorporated with, or ſubject to the general regulations of the militia ;" *Artillery, &c. now exiſting.*

"SEC. XI. *Be it further enacted,* That ſuch corps retain their accuſtomed privileges, ſubject nevertheleſs to all other duties required by this act, in like man-ner with the other militia." *To retain their privileges.*

JONATHAN TRUMBULL, *Speaker of the Houſe of Repreſentatives.*
RICHARD HENRY LEE, *Preſident pro tempore of the Senate.*

APPROVED MAY THE EIGHTH, 1792.

GEORGE WASHINGTON, *Preſident of the United States.*

In purſuance of which Act, and to carry the ſame into execution agree-ably to the requirements thereof,

BE it enacted by the Governor, Council, and Houſe of Repreſentatives, in General Court aſſembled, That the governor of this ſtate, for the time being, ſhall be captain-general and commander in chief, of all the military force in this ſtate ; and that the lieutenant governor ſhall be lieutenant-general of the ſame. *Capt. General and Lieut. Gen.*

And that all citizens in this ſtate, required by ſaid act of Congreſs, except mem-bers of the council, of the houſe of repreſentatives, for the time being ; the ſtate treaſurer, and ſecretary ; juſtices of the peace ; field, commiſſioned, and ſtaff offi-cers, honorably diſcharged ; miniſters of the goſpel ; the preſident, profeſſors, and tutors of college, and ſtudents, till the time of taking their ſecond degrees ; phyſicians and ſurgeons ; ſelect-men ; conſtant ſchool maſters ; one miller to each griſt-mill, being approved by the ſelect-men, and having a certificate thereof ; the-riffs and conſtables ; conſtant ferrymen ; non-commiſſioned officers, who have re-moved out of the limits of their command and are not re-appointed, or ſuch as have been honorably diſcharged ; and ſuch non-commiſſioned officers and ſoldiers, as inliſted during the war, in the late war, and were honorably diſcharged ; and all ſuch as are exempt by ſpecial act or reſolve of this aſſembly ; ſhall be enrolled in companies as therein directed, and formed into regiments, brigades, and divi-ſions, in the following manner, viz. *Perſons exemp-ted from milita-ry duty.*

Thoſe in the town of Hartford, (the governor's company of horſe guards, and company of cadets excepted, which ſhall be under the immediate command of the captain-general) thoſe in the town of Windſor (excluſive of what lies in the ſociety of Turkey-Hills, in ſaid Windſor,) and thoſe in that part of Farmington lying in the ſociety of Wintonbury, ſhall conſtitute the firſt regiment. *1ſt. Regiment.*

Thoſe in the town of New-Haven, Eaſt-Haven, North-Haven, and Hamden, (ex-cept the governor's guard in New-Haven, who are under the immediate command of the captain-general) ſhall conſtitute the ſecond regiment. *2d. Regiment.*

Thoſe in the towns of New-London and Montville, ſhall conſtitute the third regiment. *3d. Regiment.*

Thoſe in the towns of Fairfield, Weſton, and Reading, ſhall conſtitute the fourth regiment. *4th. Regiment.*

Thoſe in the towns of Windham, Hampton, (excepting the former bounds of Canterbury) Mansfield and Aſhford, ſhall conſtitute the fifth Regiment. *5th Regiment.*

Thoſe in the towns of Wetherſfield and Glaſtenbury, and that part of Berlin for-merly Wetherſfield, ſhall conſtitute the ſixth Regiment. *6th Regiment.*

Thoſe in the towns of Saybrook, Killingworth, and Haddam, ſhall conſtitute the ſeventh regiment. *7th Regiment.*

Thoſe in the towns of Groton and Preſton, (except thoſe in that part of Preſton that was formerly part of Norwich) ſhall conſtitute the eighth regiment. *8th Regiment.*

Thoſe

EXHIBIT 3
0061

# Militia.

**9th Regiment.** Those in the towns of Greenwich and Stamford, (except those in the societies in Canaan, and Middlesex in Stamford) shall constitute the ninth regiment.

**10th Regiment.** Those in the towns of Wallingford, Cheshire, and Durham, shall constitute the tenth regiment.

**11th Regiment.** Those in the towns of Pomfret, Woodstock, Killingly, Thompson, and Brooklin, (excepting the south company and artillery men) shall constitute the eleventh regiment.

**12th Regiment.** Those in the towns of Lebanon, Hebron, and the company in the society of Marlborough in Colchester, and those in the society of Andover, in Coventry, shall constitute the twelfth regiment.

**13th Regiment.** Those in the towns of Woodbury, Southbury, and Bethlehem, (except that part of Southbury included in Oxford company) shall constitute the thirteenth regiment.

**14th Regiment.** Those in the towns of Salisbury, Canaan, and Norfolk, shall constitute the fourteenth regiment.

**15th Regiment.** Those in the towns of Farmington, Berlin, Bristol, and Southington (except the former bounds of Wethersfield and Middletown, in Berlin) shall constitute the fifteenth regiment.

**16th Regiment.** Those in the towns of Danbury, Brookfield, Newtown, New-Fairfield, (except that part which now forms the north company) and Ridgefield, (except that part which now forms the south company) shall constitute the sixteenth regiment.

**17th Regiment.** Those in the towns of Litchfield, Harwinton, and Torrington, shall constitute the seventeenth Regiment.

**18th Regiment.** Those in the towns of Symsbury and Granby, and that part of the town of Windsor lying in the society of Turkey-Hills, and part of Suffield lying West of the mountain, shall constitute the eighteenth regiment.

**19th Regiment.** Those in the towns of East-Hartford, Bolton, East-Windsor, and that part of Ellington lying West of a line running north from the North-west corner of Tolland to Somers, shall constitute the nineteenth regiment.

**20th Regiment.** Those in the towns of Norwich, Bozrah, Franklin, Lisbon, and that part of Preston that was formerly part of Norwich, and that part of Canterbury in Hanover society, shall constitute the twentieth regiment.

**21st Regiment.** Those in the towns of Plainfield, Canterbury, Voluntown, and South Company, with the artillery men in Brooklyn, and that part of Hampton formerly in Canterbury, and the south company in Killingly, (except that part of Canterbury in Hanover society) shall constitute the twenty-first regiment.

**22d. Regiment.** Those in the towns of Tolland, Stafford, Willington, Union, and part of Ellington lying east of a line running north from the north-west corner of Tolland to Somers, and Coventry (except Andover society) shall constitute the twenty-second regiment.

**23d. Regiment.** Those in the towns of Middletown and Chatham, and part of Berlin, formerly Middletown, shall constitute the twenty-third Regiment.

**24th Regiment.** Those in the towns of Colchester and East-Haddam, (except the society of Marlborough in Colchester) shall constitute the twenty-fourth regiment.

**25th Regiment.** Those in the towns of New-Hartford, Hartland, Winchester, Barkhempstead and Colebrook, shall constitute the twenty-fifth Regiment.

**26th Regiment.** Those in the towns of Watertown and Waterbury (except that part of Waterbury included in Oxford company) shall constitute the twenty-sixth regiment.

**27th Regiment.** Those in the towns of Guilford and Branford, shall constitute the twenty-seventh regiment.

**28th Regiment.** Those in the towns of Stratford and Huntington, shall constitute the twenty-eighth regiment.

**29th Regiment.** Those in the towns of Washington, New-Milford, Warren, Kent, and New-Fairfield north society, shall constitute the twenty-ninth regiment.

**30th Regiment.** Those in the town of Stonington shall constitute the thirtieth regiment.

**31st Regiment.** Those in the towns of Suffield, Enfield and Somers, (except that part of Suffield lying west of the mountain) shall constitute the thirty-first regiment.

**32d Regiment.** Those in the towns of Milford, Derby and Woodbridge, and that part of Southbury and Waterbury, in Oxford company, shall constitute the thirty-second regiment.

**33d Regiment.** Those in the town of Lyme, shall constitute the thirty-third regiment.

**34th Regiment.** Those in the towns of Norwalk, and that part, of Ridgefield that now includes the south company, and those in the societies of Canaan, and Middlesex, in Stamford, shall constitute the thirty-fourth regiment.

**35th Regiment.** Those in the towns of Sharon, Cornwall, Goshen, and part of Litchfield, and Kent, now forming a company with Goshen and Cornwall, shall constitute the thirty-fifth regiment.

**Where companies are divided.** And when by the division of companies into regiments, which hath or shall be made, it shall so happen that a company shall be divided, and part put into one regiment and part into another ; in such case the major part of such company, shall belong to the regiment, to which the major part belongs : Any descriptions or division herein before contained notwithstanding.

That

**EXHIBIT 3**
**0062**

That the first, eighteenth, nineteenth, twenty-second, and thirty-first regiments, shall constitute the first brigade. *B'mds of the 1st brigade.*

That the second, seventh, tenth, twenty-seventh, and thirty-second regiments, shall constitute the second brigade. *2d. brigade.*

That the third, eighth, twentieth, thirtieth, and thirty-third regiments, shall constitute the third brigade. *3d. brigade.*

That the fourth, ninth, twenty-eighth, and thirty-fourth regiments, shall constitute the fourth brigade. *4th brigade.*

That the fifth, eleventh, twelveth, and twenty-first regiments, shall constitute the fifth brigade. *5th brigade.*

That the fourteenth, seventeenth, twenty-fifth, and thirty-fifth regiments, shall constitute the sixth brigade. *6th brigade.*

That the sixth, fifteenth, twenty-third and twenty-fourth regiments, shall constitute the seventh brigade. *7th brigade.*

That the thirteenth, sixteenth, twenty-sixth and twenty-ninth regiments, shall constitute the eighth brigade. *8th brigade.*

That the first division shall be composed of the first and seventh brigades. *1st division.*

That the second division shall be composed of the second and fourth brigades. *2d. division.*

That the third division shall be composed of the third and eighth brigades. *3d. division.*

That the fourth division shall be composed of the sixth and eighth brigades. *4th division.*

And that all companies of artillery, grenadiers, and light infantry, that now or shall hereafter be raised, and troops of horse hereafter to be raised, shall be attached and annexed to the regiments, brigades and divisions, from which they were raised. And that the establishment of the companies of light dragoons, shall be forty, exclusive of commission officers ; and that no officer of such company shall recruit his company of dragoons from any company of artillery, or troop of Horse —nor from any company of infantry, unless the same consist of more than sixty-four rank and file ; but may enlist any exempts from military duty. *Artillery, grenadiers, light-infantry & troop of horse to be annexed to the regiments, &c. from which they were raised.*

*And be it further enacted,* That each company of artillery shall consist of thirty matrosses, exclusive of commissioned and non commissioned officers ; that each troop of horse shall consist of forty exclusive of commission officers ; that each barrel of the fire lock, of the infantry shall be at least three feet and a half long, and furnished with a priming wire and brush ; and each sergeant and corporal of the infantry, shall furnish himself with a screw driver and worm, more than is required by said act ; and the sabres of the horsemen shall be four feet long. *Company of artillery to consist of 30 matrosses ; and troop of horse of 40. How furnished.*

*And be it further enacted,* That the general, and field officers, shall be appointed by the legislature, and commissioned by the Governor—That the captains and subalterns, shall be nominated by their several companies, the commanding officer first giving three days notice to the individuals of their companies, that they are about to lead them to the choice of such commissioned officers ; and if approved of by the legislature, shall be commissioned in like manner :—That the non-commissioned officers shall be nominated by their several companies, and shall have a warrant from the commanding officer of the regiment ; which commanding officer of the regiment, has power to reduce to the ranks any non-commissioned officer, upon complaint made, and due notice given, if he finds him guilty of misconduct, or neglect of duty :—That all commissions granted by the governor, or appointments made by the legislature, of officers at one session of the legislature, bear date the same day, (except where two majors are appointed to one regiment) in which case the dates of their commissions shall be according to the priority of their appointments. *Officers by whom appointed & commission'd. Commissions, & appointme.ts, how regulated.*

*And be it further enacted,* That the captain-general of the state, shall appoint the adjutant-general of the state, who shall have the rank of brigadier-general, and be commissioned accordingly :—That the captain-general shall appoint for himself two aids-de-camp, who shall have the rank of lieutenant-colonels ; the lieutenant-general shall appoint for himself two aids-de-camp, who shall have the rank of major ; each major-general shall appoint his two aids-de-camp ; each brigadier-general shall appoint his brigade-inspector, and to serve as brigade-major ; all which appointments, from time to time, as may be necessary of aids-de-camp, and brigade-majors and inspectors, shall be published in general orders :— That each commanding officer of a regiment, shall appoint his regimental staff, and a chaplain, whose appointment shall be published in brigade orders ; and non-commission staff, whose appointments shall be made in regimental orders. *Capt. General to appoint adjutant-gen.& aids. Lieut. gen. and maj. generals to appoint their aids. Regimental staff.*

*And whereas, some regiments now constituted, have more companies than the formation directed by the act of Congress :*

*Be it further enacted,* That the commanding officer of each regiment, constituted by this act, shall form the companies in their regiments as near as may be to an act of congress, for numbers of men and companies ; and that where the field officers of any regiment shall judge best, they may take a company already formed to serve as a light infantry or grenadier company, to each battalion of their regiment ; or enlist such companies from exempts, or others, not reducing any company, by such enlistment, under the number of sixty-four. *Officers commanding regiments to form the companies agreeably to act of Congress.*

*And be it further enacted,* That each non-commissioned officer, horseman, matross, and private of the several companies of horse, artillery, and infantry of the militia *Non commission officers & private*

Z z z

**EXHIBIT 3**
**0063**

**vates to furnish themselves with arms, &c. on penalty of 12s.** tia of this state, shall furnish himself with the arms, ammunition and accoutrements, required by the act of congress, and by this act, upon the penalty of forfeiting and paying a fine of *twelve shillings* lawful money, and the like penalty for every four weeks he shall be unprovided ; to be levied and collected by warrant of distress, as hereafter directed ; and that a horseman, or dragoon, who shall not furnish and provide himself with a horse and furniture, as required by the said act, shall be returned to, enrolled, and do duty in the infantry company in the limits of which he resides :—That the field and commissioned officers in each regiment,

**Officers to be uniformly clothed in regimentals. Field officers to furnish colours.** shall be uniformly cloathed in regimentals, at their own expence, and to be agreed upon by such officers ; that the field officers of each regiment shall furnish state and regimental colours for their regiment and battalions, at the state expence, not exceeding the sum of four pounds ten shillings lawful money, to each regiment.

*And be it further enacted,* That every commanding officer of a company of militia, shall order out his company or troop, three days in each year, and instruct

**Companies to be out three days in each year, to be instructed, &c.** them in the use of arms and discipline of war ; and the days appointed, shall be in the month of March, April, May, September, October or November, and that on the first Monday of May and October annually, such commanding officer shall cause the arms, ammunition and accoutrements, of all under his command, to be review-

**Arms to be inspected.** ed and inspected :—That the commanding officer of each regiment, shall order

**Regiments to be reviewed once in each year.** out his regiment by battalion or company, once in each year for regimental exercise, inspection and review. And if any of the privates belonging to any compa-

**Privates who do not appear equipt to pay 9s.** ny of horse, artillery or infantry, shall neglect to appear compleatly armed and equipped on the place of parade, appointed by the commanding officer of his company, being duly warned, he shall forfeit and pay a fine of *nine shillings* for each day : and if any non-commissioned officer, drummer, fifer, or trumpeter, shall ne-

**and drummers, &c. 12s.** glect to appear as aforesaid, he shall forfeit and pay the fine of *twelve shillings* for each day—unless any such person shall appear before the commanding officer of such company, within twelve days after such day of exercise or review, and make satisfactory excuse for his non appearance on said day ; and the commanding offi-

**Punishment inflicted.** cer of each company, battalion or regiment, shall order the correcting and punishing disorders and contempts, on days of company, battalion, or regimental exercise, inspection or review ; the punishment not being greater than riding a wooden horse, for a time not exceeding one hour, or a fine not exceeding *forty shillings* lawful money :—That each commanding officer of a company, battalion, regiment, brigade or division, shall have power and authority, and full power is here-

**Officers to fix limits & bounds to their parades.** by given to ascertain and fix certain necessary limits and bounds to their respective parades, within which no spectator shall have right to enter, without liberty from said commanding officer ; and in case any person shall so intrude or offend, he shall be subjected to be confined in such way and manner as the commanding officer shall direct, during the continuance of the exercise.

*And be it further enacted,* That all warrants granted by the commanding officer, of any company, battalion or regiment, for any time or times incurred by virtue

**Warrants by whom granted & to whom directed.** of this act, or any breach thereof, shall be directed by the officer commanding a company, to the orderly serjeant of his company ; which orderly serjeant he shall from time to time appoint, from the serjeants of his company ; and the officer commanding a battalion or regiment, to the adjutant or serjeant-major ; and to be by them levied on the goods or chattles of the respective delinquents, if upwards of twenty-one years of age—And for the want of such goods or chattles, a-

**On whom & on what levied.** gainst the body of such delinquent, and against the goods and chattles of the parents, master or guardians, of such delinquents as have not arrived to the age of twenty-one years ; and for want of such goods and chattles, against the body of parent, master or guardian, and them commit and hold in goal, until such fine or fines shall be paid and satisfied, together with lawful fees for service, as in cases of execution for debt ; which fines and forfeitures shall be appropriated for the use of the companies to which such fines and forfeitures respectively belong, for purchasing and

**Fines how appropriated.** maintaining colours, trumpets, drums and fifes ; and should there be any overplus of fines remaining in the hands of the commanding officers of companies, they shall pay it over to the commanding officer of their regiment to which they belong ; which together with the fines collected by virtue of warrants issued by the field officers, shall be applied to keeping colours in repair, and for band-music for the re-

**Officers imposing fines, to give notice to the person fined, who shall have liberty within ten days to apply to, &c. for redress.** giment. That whenever any commanding officer of a company shall impose any fine in any of the cases before mentioned in this act, he shall give notice to the person fined, who shall have liberty within ten days to apply to the commanding officer of the regiment, who on giving notice, and hearing the parties, may abate such fines, or any part thereof ; and if such commanding officer of the regiment, thinks not proper to abate such fine, the officer imposing the same may proceed to a collection thereof.

**Soldiers unable to furnish themselves, &c.** *Provided nevertheless,* That if any soldier shall in the judgment of the select-men of the town to which he belongs, be unable to arm and accoutre himself agreeable to the directions of this act, it shall be the duty of such select-men to certify the same to the commissioned officers of the company to which such soldier belongs, in order

EXHIBIT 3
0064

Case 3:19-cv-01226-L-AHG   Document 12-12   Filed 10/04/19   PageID.500   Page 95 of 168

*ACTS AND LAWS.*

## Militia. 429

order that execution may not iſſue againſt him for deficiency in ſuch arms and accoutrements ; and alſo, at the expence of ſuch town to provide ſuch ſoldier with arms, and the whole or any part of ſuch accoutrements as may be neceſſary, within forty days from the time of granting ſuch certificate, under penalty of the value of ſuch arms and accoutrements, to be recovered of any, or all of ſaid ſelect-men, by warrant from an aſſiſtant or juſtice of the peace, upon proper information, and proof of ſuch neglect, by ſaid commiſſioned officers ; which warrant ſhall be directed to any ſheriff or conſtable proper to ſerve the ſame, returnable in ſixty days, and the fine payable into the treaſury of ſuch town ; and all arms and accoutrements thus provided, ſhall be the property of ſuch town, and ſhall by the commanding officer of the company, be depoſited in ſuch places as he ſhall think proper, to be ready for ſuch ſoldier, as occaſion ſhall require ; and ſuch officer ſhall ſtand accountable for ſuch arms and accoutrements, and ſhall be liable to pay for the ſame, if loſt through his neglect or default. <span style="float:right">*Warrant to whom directed.*<br>*Fines to be paid into the town treaſury.*<br>*Arms, &c, to be depoſited in,&c.*</span>

*Provided alſo,* That any of the people called *Quakers,* who ſhall produce to the commanding officer of the company in which he reſides, a certificate from the clerk of the ſociety of Quakers to which he belongs, certifying that ſuch perſon is a Quaker, he ſhall be exempt from equipping himſelf or doing military duty as required by this act, on his paying the ſum of twenty ſhillings to ſuch officer, at the expiration of each year during ſuch exemption ; and in caſe ſuch Quaker refuſe to pay ſaid ſum of twenty ſhillings, the ſame ſhall be collected and diſpoſed of in the ſame manner as is heretofore provided for fines incurred by a breach of this act. <span style="float:right">*Quakers exempt on paying 20s.*</span>

*And be it further enacted,* That each rank and grade of officers, ſhall furniſh themſelves with the rules of diſcipline approved and eſtabliſhed by Congreſs, in their reſolution of the 29th of March, 1779, and ſhall ſubmit themſelves to the orders and directions of their ſuperior officers, or their ſenior officers, of the ſame grade ; and all officers in the ſtaff and orderly departments, ſhall be vigilant and active in executing and diſpatching orders in their reſpective ſtations. <span style="float:right">*Officers to furniſh themſelves with the rules of diſcipline.*</span>

That general, field, commiſſioned, and ſtaff officers, of all grades and ranks, ſhall be amenable to, and ſubject to trial by courts martial, according to the uſage and practice of war, for all neglects of duty, for contempts or diſreſpects to a ſuperior officer, for diſobedience of orders, and for all un-officer-like conduct ; which court martial ſhall conſiſt of not leſs than nine, or more than thirteen members—the ſenior officer of the higheſt grade to preſide—that another officer of the line or ſtaff, to do the duty of judge advocate to the court—that the members compoſing the court, ſhall take the following oath, before they proceed on the trial of an officer, viz. <span style="float:right">*Officers to be tried by courts martial.*<br>*Who to preſide.*<br>*Judge advocate to be of the ſtaff.*<br>*Form of oath.*</span>

*You ſwear that you will well and truly try and determine according to evidence, the matter depending between the ſtate of Connecticut and the priſoner, or priſoners, now to be tried, that you will not divulge the ſentence of the court until the ſame ſhall be approved, or diſapproved, purſuant to law ; neither will you upon any account at any time whatſoever, diſcloſe or diſcover, the vote or opinion of any particular member of the court martial, unleſs required by a due courſe of law.* So help you GOD.

The preſident of the ſaid court martial, is hereby authorized and required to adminiſter an oath to the officer acting as judge advocate, who is hereby required to take the ſame before he proceeds further on buſineſs, viz.—*You do ſwear that you will not on any account, at any time whatſoever, diſcloſe or diſcover the vote or opinion of any particular member of the court martial, unleſs required in a due courſe of law ; and that you will not divulge the ſentence of this court, till the ſame ſhall be approved or diſapproved according to law ; and that you will well and truly do the duty of judge advocate, in this court, impartially and uprightly, according to the beſt of your abilities.*———So help you GOD. <span style="float:right">*Preſident of c. martial to adminiſter an oath to the judge advocate.*<br>*The form.*</span>

And no other perſon whatever, ſhall be admitted to ſolicit, proſecute or defend the officer arreſted ; which officer arreſted, if under the grade or rank of a field officer, ſhall have twelve days notice of the articles of charge made againſt him, by leaving a true and atteſted copy of the original articles of arreſt, under the hand of a ſuperior officer arreſting him, and the names of the witneſſes to be uſed againſt him minuted thereon, lodged with him at his uſual place of abode by the officer arreſting, or the proper orderly officer ; and of the grade and rank of a field officer twenty days notice ; and of the rank of a general officer thirty days notice in like manner ; which court martial, for the tryal of an officer under the rank and grade of a field officer, ſhall be appointed by the commanding officer of the brigade to which he belongs, and the ſentence approved or diſapproved by the captain-general of the ſtate—for the trial of an officer of the rank and grade of a field officer, by the commanding officer of the diviſion to which he belongs ; and of a general officer by the captain-general of the ſtate, and their ſentence approved or diſapproved by the legiſlature of the ſtate. That no ſentence of a court martial ſhall inflict other puniſhment than a reprimand, ſuſpenſion from office for a certain term of time, caſhiering, and caſhiering with a diſability of holding any military office in this ſtate ; two thirds of the members of any ſuch court agreeing in ſuch ſentence. <span style="float:right">*No perſon admitted to ſolicit &c.*<br>*Officers under the grade of field officers to have 12 days notice, &c.*<br>*Field officer to have 20, & gen. officer 30 days.*<br>*Court martials by whom appointed.*<br>*What puniſhment may be inflicted.*</span>

*And*

**EXHIBIT 3**
**0065**

*Capt.gen. to order out the military force when neceſſary.*

*And be it further enacted,* That the captain-general, or in his abſence the next commanding officer of the ſtate, is hereby authorized and empowered, as he may judge neceſſary upon the occaſion, on an alarm, invaſion, or notice of the appearance of an enemy, either by ſea or land, to order the whole, or any part of the military force of this ſtate, to aſſemble and put the ſame in warlike order; and the ſame to lead, order or employ for the aſſiſtance, or relieving any of the inhabitants of this ſtate, attacked by an enemy, or in danger thereof; and generally to iſſue and publiſh by proper ſtaff or orderly officer, ſuch orders as he ſhall judge expedient to carry into execution the intent and deſign of this act. And all ſubordinate officers are hereby required to yield entire obedience thereto;

*Other officers powers to order out thoſe under their command.*

and the officers ſeverally commanding diviſions, brigades, regiments, battalions and companies, are hereby veſted with the ſame power and authority within the limits of their reſpective commands; provided that when they or any of them find it neceſſary to order out the force under their command, they ſhall forthwith diſpatch intelligence, and the occaſion thereof, together with their movements and operations, to the captain-general of the ſtate, or any other their ſuperior officer, as may be judged moſt conducive to the public ſafety; and the officer receiving ſuch intelligence, ſhall obſerve the ſame line of conduct, in order that it may in the moſt expeditious way, arrive to the captain-general.

*To inform the capt. general.*

*And be it further enacted,* That the diviſions, brigades, and regiments, may be ordered out for inſpection or review, by their commanding officers, at ſuch times as ſhall be thought expedient and neceſſary; and whenever a diviſion is out, they ſhall be reviewed by the captain-general, when a brigade, by a major-general, and when a regiment, by a brigadier-general. And the captain-general ſhall direct a uniform and badges of office, for the general officers, their aids-de-camp, and brigade-major and inſpectors.

*Diviſions,&c. to be ordered out for review, &c. By whom.*

*Capt.gen. to direct uniform,&c*

*And he it further enacted,* That no private ſoldier, matroſs or horſeman, or non-commiſſioned officer, of either of the companies of horſe, artillery or infantry, ſhall be diſcharged from his company and regiment, for inability, after his inliſtment or enrollment in any of the companies, without a certificate from his ſurgeon; and for any other cauſe by applying to his captain, and the conſent of the commanding officer of his regiment. And that no captain or ſubaltern officer, ſhall reſign his commiſſion without permiſſion of the captain-general, or ſuch general officers as he may impower for that purpoſe. And that no field or general officer, ſhall reſign his commiſſion without the acceptance of the legiſlature; and no officer ſhall be allowed to reſign his commiſſion when under an arreſt.

*Surgeon to give certificate for inability to privates.*

*Captain, &c. by whom diſcharged. Gen. and field officers, by legiſlature.*

*And be it further enacted,* That any perſon now holding and ſuſtaining any commiſſion by virtue of any act heretofore made, within any of the brigades, regiments and companies, heretofore, and by this act formed and eſtabliſhed, ſhall continue to hold and exerciſe the ſame, with all the powers and authorities veſted in ſuch office, by virtue of this act, excepting the officers of ſuch companies as ſhall be reduced by virtue of this act.

*Oldcommiſſions continued.*

*Be it further enacted,* That the laws eſtabliſhing the cavalry in this ſtate, be, and continue in force until they ſhall be annexed to the infantry; and that his excellency the governor, be requeſted and empowered to annex them in ſuch proportion as he ſhall judge proper, to the ſeveral brigades within this ſtate, ſubject to the orders and command of the brigadier of that brigade to which they ſhall ſeverally be annexed; and thereafter to be ſubjected to the acts and regulations of Congreſs.

*Cavalry laws continued.*

*To be annexed to the ſeveral brigades, &c.*

*And be it further enacted,* That all the laws heretofore made by this ſtate, for regulating and governing the military force thereof, be, and they are hereby repealed.

*Laws repealed.*

---

An Act for the ſupport of miſſionaries, to preach the goſpel, in the northern and weſtern parts of the United States.

BE it enacted by the Governor, and Council, and houſe of Repreſentatives in General Court aſſembled, and by authority of the ſame, That there be contributions in the ſeveral religious ſocieties and congregations in this ſtate, on the firſt ſabbath in the month of May, annually, for the term of three years; and the miniſter or clerk of ſuch ſocieties or congregations, ſhall receive and pay over ſuch contributions to the Reverend *Ezra Stiles, Nathan Williams* and *Jonathan Edwards,* who ſhall appropriate the ſame to the ſupport of ſuch miſſionaries as the general aſſociation of this ſtate ſhall, from time to time employ in preaching the goſpel, in thoſe ſettlements in the northern and weſtern parts of the United States, where the ordinances of the goſpel are not eſtabliſhed: and ſhall annually exhibit to this aſſembly, and ſaid aſſociation, an account of the receipts, and expenditures of ſuch contributions.

*Contributions.*

*To whom paid.*

*How appropriated.*

An

**EXHIBIT 3**
**0066**

Case 3:19-cv-01226-L-AHG   Document 12-12   Filed 10/04/19   PageID.503   Page 98 of 168

*A C T S  A N D  L A W S.*

Eftates. Perjury. Writs of Error. Equity. N.Haven Bank.   431

### An Act in alteration of an Act, entitled, "An Act for the fettlement of teftate and inteftate eftates."

**B**E it enacted by the Governor and Council and houfe of Reprefentatives, in General Court affembled, That fo much of faid act as is included under the exception, viz. "Except the eldeft fon then furviving, where there is no iffue of the firft born, or of any other elder fon, who fhall have two fhares, or a double portion of the whole," be, and the fame is hereby repealed.

*Provided neverthelefs,* That in the fettlement of the eftate of any perfon heretofore deceafed, or who fhall deceafe before the rifing of the prefent feffion of affembly, the court of probate fhall proceed, and the rights of the heirs of fuch deceafed perfon, fhall veft in the fame manner as if this act had not been paffed.

*(margin: Act repealed,)*
*(margin: after the prefent feffion of affembly.)*

### An Act in addition to, and alteration of an Act, entitled, "An Act for the punifhment of perjury."

**B**E it enacted by the Governor and Council, and houfe of Reprefentatives, in General Court affembled, That It fhall be the duty of all proper informing officers in this ftate, to make prefent of all breaches of faid act, to any court proper to hear and determine the fame.

*And be it further enacted,* That upon conviction for that offence, agreeable to the provifions of this act, the whole fum forfeited by faid act, fhall be to the public treafury of this ftate.

*(margin: Informing officers to make prefentment.)*
*(margin: Sum forfeited how applied.)*

### An Act, in addition to an Act, for regulating trials on writs of error, and for limiting the time for bringing the fame.

**B**E it enacted by the Governor, Council, and Houfe of Reprefentatives, in General Court affembled, That the courts of this ftate, having cognizance of writs of error, upon their affirmance of any judgment or decree, or upon any non-fuit, or withdraw made by the plaintiff in error, may, according to their difcretion, adjudge and decree to the defendant in error, befides his coft, the intereft of the money delayed by fuch writ of error, and grant execution therefor accordingly.

*And be it further enacted,* That the authority figning any writ of error, fhall take good and fufficient bond, with furety, that the plaintiff in error fhall profecute his writ to effect, and anfwer all damages, if he fail to make his plea good.

*(margin: Courts to have cognizance of writs of error.)*
*(margin: Surety to be taken on writs of error.)*

### An Act in addition to an Act, entitled, "An Act for regulating proceedings in equity."

**B**E it enacted by the Governor and Council, and houfe of Reprefentatives, in General Court affembled, That the fuperior court of this ftate be, and they are hereby authorifed as a court of equity, on petition brought before them, to authorife, and direct the taking of depofitions to perpetuate the evidence of facts, where no fuit is depending, agreeably to the rules and ufages in chancery proceedings; which depofitions fo taken, fhall be available in any court of law, or equity in this ftate, in the fame manner as depofitions taken during the pendancy of a fuit.

*(margin: Superior court authorized as a court of equity.)*
*(margin: Depofitions to be valid.)*

### An Act to incorporate the New-Haven Bank.

**B**E it enacted by the Governor, and Council, and Houfe of Reprefentatives, in General Court affembled, That the fubferibers to the New-Haven bank, their fucceffors and affigns, fhall be, and are hereby created and made a corporation, and body politick, by the name and ftyle of The Prefident, Directors and Company, of the New-Haven Bank; and by that name fhall be, and are hereby made capable in law to have, purchafe, receive, poffefs and enjoy, to them and their fucceffors lands, rents, tenements, hereditaments, goods, chattles and effects of what kind or quality foever; and the fame to fell, grant and aline; to fue and be fued, plead and be impleaded, defend and be defended, in all courts of this ftate, or other place whatfoever. And alfo, to have and ufe a common feal, and the fame to break, and afterwards renew at their pleafure. And alfo, to ordain and put in execution fuch bye-laws and regulations, as fhall be deemed neceffary and convenient, for the well ordering and governing faid corporation, not being contrary to this charter, and the laws of this ftate, or of The United ftates; and to do and execute all and fingular acts, matters and things, which to them fhall or may appertain to do, fubject to the rules, reftrictions and provifions, herein after prefcribed.

The capital ftock of faid bank, fhall confift of one hundred thoufand dollars, to be divided into five hundred fhares, of two hundred dollars each: That no perfon, copartnerfhip, or body politick, fhall fubferibe, or at any time hold more than fixty fhares.

*(margin: N.Haven bank named.)*
*(margin: Privileges.)*
*(margin: To have a feal.)*
*(margin: To have by-laws)*
*(margin: Capital ftock,)*

A a a a

That

**EXHIBIT 3**
**0067**

## ACTS AND LAWS.

**432**   New-Haven Bank.

*Nine directors.*

That for the ordering the affairs of said corporation, there shall be nine directors, chosen on the first Thursday of July, annually (after the first election) by the greatest number of votes given by the stockholders of said bank, at a general meeting; and those who shall be duly chosen at any election, shall be capable of serving as directors, until the expiration of the first Thursday of July next ensuing

*To choose a president.*

such election; and the directors, at their first meeting after such election, shall choose one of their number for a president.

*Number of votes each stockholder shall be entitled to.*

The number of votes each stockholder shall be entitled to, in the choice of directors, or any other business respecting the constitution, shall be according to the number of shares he shall hold, in the following proportion, viz.—For one share and not more than two shares, one vote; for every two shares above two shares, and not exceeding ten shares, one vote; for every four shares above ten, and not exceeding thirty shares, one vote; and for every six shares above thirty, one vote; but no person, copartnership, or body politick, shall be entitled to a greater number than fifteen votes.

*Stockholders how to vote.*

All stockholders shall be entitled to vote by themselves, or their agents duly appointed; none but stockholders shall be eligible as directors; and not less than

*None but stockholders to be directors.*

two thirds of the directors shall be actually resident in the city of New-Haven; and public notice shall be given by order of the directors, twenty days previous to holding an election, or general meeting of the stockholders, in a newspaper published in said city, and in such other places as the directors shall judge necessary;

*Three fourths eligible.*

not more than three fourths of the directors in office, exclusive of the president, shall be eligible as directors the next succeeding year; but the director who shall be president at any election, may always be elected a director.

*Directors place may be filled.*

In case of the death or resignation of a director, his place may be filled by a new choice for the remainder of the year, provided a majority of the directors judge it necessary. All elections for directors, shall be by ballot, and the nine persons who shall have at any election, the greatest number of votes, shall be declared to be duly elected.

*Directors to appoint officers, &c.*

The directors for the time being, shall have power to appoint such officers, clerks and servants, as they shall judge necessary, and shall be capable of executing such other powers for the well ordering and governing the affairs of the bank, as shall be determined by the regulations of the stockholders; but no director shall be entitled to any emolument, unless the same shall be ordered by the stockholders at a general meeting, except the president, who shall receive such compensation for his extra attendance at the bank, as the directors shall judge reasonable.

*Not less than 3 directors to constitute a board, &c.*

Not less than three directors shall constitute a board for transacting the business of the bank, of whom the president shall always be one, except in case of sickness or necessary absence, in which case the directors present shall supply his place, by electing one of their number as president for the occasion.

*To determine the manner of doing business.*

The directors, by a majority of votes, shall determine the manner of doing business, and the rules to be prescribed; shall dispose of, and manage the money and credit of the bank, for the interest of the proprietors; and shall at the end of the first year, and once in six months afterwards, make such dividends of the profits as they shall think proper, provided that they shall in no instance do any act contrary to the regulations of the stockholders; and the directors shall once in two

*Statement of debts, &c.*

years lay before the general meeting of the stockholders, for their information, a statement of the debts which shall remain unpaid after the expiration of the original credits, and the surplus of profits, if any after deducting losses and dividends.

*Corporation how to trade.*

The corporation shall not trade in any thing except bills of exchange, gold or silver bullion, or in sale of goods pledged for money lent and not redeemed in due time, or in lands taken for debts previously contracted; nor shall the corporation take more than at the rate of six per cent per annum, for or upon its loans.

*Stock to be assignable, &c.*

The stock of said corporation shall be assignable and transferable according to such rules as shall be instituted by the laws of the same.

*Bills signed by the cashier, &c. binding on the corporation.*

The bills or notes issued by said corporation, signed by the president, and counter-signed by the cashier, or treasurer thereof, promising the payment of money to any person or persons, his, her, or their order, or to their bearer, shall be binding and obligatory on said corporation, and payable on demand; and all such bills and notes shall be assignable and negotiable according to the custom of merchants, and the laws relating to inland bills of exchange; and all notes in writing, which shall be made and signed after the first day of December next, by any

*Bills assignable and negotiable.*

person or persons, his, her, or their servants or agent, who is usually entrusted by him, her, or them to sign such promissory notes, for him, her, or them, said notes being given for the payment of money only, and made payable to any person or persons, his or their order, or to the bearer, and indorsed over to said corporation, shall be assignable or indorsable over in the same manner as inland bills of exchange are, or may be according to the custom of merchants; and said corporation to which the same may be indorsed, shall and may maintain their action thereupon, for the money promised in said notes, against the person, whose agent as aforesaid

**EXHIBIT 3**
**0068**

*A C T S   A N D   L A W S.*

faid, fhall fign the fame ; or any of the perfons who fhall indorfe the fame in like manner as in cafe of inland bills of exchange.

Every cafhier, treafurer or clerk, employed in faid bank, fhall, before he enters on the duties of his office, give bond with two or more furetics, to the fatisfaction of the directors, in a fum not lefs than five thoufand dollars for the cafhier, and not lefs than one thoufand for a clerk, conditioned for the faithful difcharge of his truft. *(Cafhier, treafurer, & clerk to give bond.)*

David Auftin, Ifaac Beers, and Elias Shipman, Efquires, are authorifed to open a fubfcription for the capital of faid bank, at fuch time and place as they fhall think beft, receive the firft depofits ; and after faid fubfcription to call a meeting of the ftockholders to chufe directors. Five per cent on the fums fubfcribed, fhall be paid at the time of fubfcribing ; twenty per cent on each fhare fhall be paid fixty days after faid fubfcription ; twenty-five per cent fix months after the time of the fecond payment ; and the refidue in fix months after the time of the third payment. If there fhall be a failure in the fecond payment of any fum fubfcribed by any perfon, copartnerfhip, or body politick, the party failing, fhall forfeit to the bank the fum by him, her or them, previoufly paid ; and if there fhould be a failure in any fubfequent payment, the party failing fhall forfeit to the bank, his, her, or their fhare of the dividend, during fuch delay—Provided, that in cafe the directors fhall judge it expedient, they are hereby authorifed to fufpend the two laft payments, or either of them for fuch time as they may think proper, giving fixty days notice previous to the time herein fixed for fuch payment. And the fubfcribers fhall be held to make punctual payment, at fuch period or periods, as fhall be determined by the directors, having fixty days notice of the time on which any fuch payment fhall be required, which notice fhall be given in one of the newfpapers of faid city, and fuch other places and manner, as the directors my judge neceffary. *(Perfons authorifed to open a fubfcription. Money when paid in. Forfeiture for delay of payment. Provifo.)*

That a general meeting of the ftockholders fhall be annually held on the firft Thurfday of July, at fuch place as the directors may appoint. That the firft meeting of the ftockholders, being called by the petitioners, and convened, the ftockholders, or a majority of them, fhall elect one of their number to prefide at the election, who fhall be ; and is hereby authorifed to receive and count the votes for directors, and declare what perfons are duly elected according to the provifions of this act. *(General meeting to be held annually on the ift Thurfday of July.)*

---

An Act in addition to an Act, entitled, "An Act, for rebuilding Newgate Prifon in Granby, and for regulating and governing the fame, and for the punifhment of certain atrocious crimes."

BE it enacted by the Governor, and Council, and Houfe of Reprefentatives, in General Court affembled, That if any male perfon of the age of fixteen years or more, fhall wilfully and felonioufly barn, or attempt to burn, by fetting on fire any dwelling houfe, barn, out-houfe, fhop, ftore, fhip or other veffel, and no prejudice or hazard to the life of any perfon happen thereby, fuch perfon fo offending, may at the difcretion of the fuperior court, on conviction thereof, be imprifoned in faid Newgate prifon, and there be kept to labour not exceeding feven years ; and if any male perfon of the age of fixteen years or more, who hath already been, or fhall be hereafter convicted of faid offence, fhall be a fecond time convicted of an offence of the fame kind, he fhall at the difcretion of the faid court, be imprifoned in faid prifon, and there be kept to labour for any limited period, or during his natural life, as the circumftances of the cafe may require. *(Perfons to be confined in Newgate for burning houfes, &c.)*

And be it further enacted, That the imprifonment directed to be inflicted on perfons convicted of the crime of perjury, and fubornation of perjury, in an act, entitled, "An Act for the punifhment of perjury," fhall be an imprifonment in faid Newgate, and keeping to labour, if the perfon fo convicted be a male perfon. *(Perjury how punifhed.)*

And be it further enacted, That if any perfon fhall with force and arms, and actual violence, an affault make on the body of any female, with an intent to commit a rape, the perfon fo offending, on conviction thereof, fhall be imprifoned and kept to labour in faid Newgate prifon, during his natural life, or for fuch other period as the fuperior court fhall determine. *(Rape how punifhed.)*

---

An Act in addition to an Act, entitled, "An Act for encouraging and regulating fifheries."

BE it enacted by the Governor and Council, and houfe of Reprefentatives, in General Court affembled, That no perfon or perfons, fhall draw any fein or other fifhcraft, in Willimantic and Natchaug rivers, except between the fetting of the fun on Tuefday evening, and the funs rifing on Saturday morning in each week, in the months of April, May and June, annually, on penalty of forfeiting ten pounds, for the ufe of him who fhall fue for, and profecute the fame to effect. *(When feins may not be drawn, &c.)*

An

**EXHIBIT 3**
**0069**

An Act in alteration of an Act, entitled, "An Act in addition to an Act for encouraging and regulating fisheries."

**Act repealed.**

BE it enacted by the Governor and Council, and house of Representatives, in General Court assembled; That so much of the said act as relates to the fishery in New-Haven East-River, be, and the same is hereby repealed.

**Seins not to be drawn below Mansfield's bridge, during flood tide, on penalty of 4l.**

Be it further enacted, That no person shall at any time during flood tide, station or draw any sein or other fish-craft, in said river, below Mansfield's-bridge; and that no person shall set or draw any sein or other fish-craft in said river, below said bridge, from the setting of the sun on Wednesday evening, until the setting of the sun on Thursday evening, in each week; and every person that shall be convicted of a breach of this act, shall pay a fine of four pounds, one half to the use of him who shall sue for, and prosecute the same to effect, and the other half to the treasury of the county where such offence shall be committed; and shall also forfeit the sein, ropes, and other implements used for catching fish contrary to this act, to be appropriated as aforesaid.

**EXHIBIT 3**
**0070**

# EXHIBIT "4"

EXHIBIT 4
0071

C H A P.
XXXVI.

1793.

## C H A P.   XXXVI. c.

*An* ACT *for establishing the militia in this state.* (a)

Preanble:,

WHEREAS a well regulated militia is the proper and natural defence of every free state; And as the several laws enacted by the Legislature of this state for the regulation of the militia thereof have been found to require material alterations; in order to which it has been thought more adviseable to revise the whole system, than to amend it by supplementary statutes; therefore,

SECTION 1. *BE it enacted by the Senate and House of Representatives of the state of Delaware in General Assembly met, and it is hereby enacted by the authority of the same,* That each and every free able bodied white male

Who shall be enrolled, and by whom.

citizen of this state, who is or shall be of the age of eighteen years, and under the age of forty-five years, except as herein after excepted, shall severally and respectively be enrolled in the militia, by the Captain or Commanding Officer of the company within whose bounds such citizens shall reside, such bounds to be limited and fixed agreeable to the subdivisions which have been made by the Lieutenants and Sub-lieutenants of the different counties, and that within four months after the passing of this act; (b) and that it shall be at all times hereafter the duty of every such Captain or Commanding Officer of a company to enrol every such citizen as aforesaid, and also those who shall from time to time arrive at the age of eighteen years, or being of the age of eighteen years, and under the age of forty-five years, and not excepted by this act, shall come to reside within his bounds, and

Notification of the enrolment.

shall without delay notify such citizen of the said enrolment, by a proper non-commissioned officer of the company by whom such notice may be proved; and in all cases of doubt respecting the age of any person enrolled, or intended to be enrolled, the party questioned

(a) See a supplement hereto; chap. 95. c. Anno, 1796.

(b) See chap. 95. c. sect. 1, provision made for dividing the counties into regimental and battalion districts, and these into company districts.

EXHIBIT 4
0072

tioned shall prove his age to the satisfaction of the officers of the company within whose bounds he may reside, or a majority of them.

SECT. 2. *And be it further enacted,* That the Vice-President of the United States, officers judicial and executive of the government of the United States, the Members of both Houses of Congress and their respective officers, all Custom-house Officers and their Clerks, Judges of the Supreme Court and of the Court of Common Pleas, Chancellor, Attorney General, Secretary, and Treasurer of the State, Sheriffs, Gaolers and keepers of workhouses, all post-officers and stage-drivers who are employed in the care and conveyance of the mail of the Post-office of the United States, all ferrymen employed at any ferry on the post roads, all inspectors of exports, all pilots, all mariners actually employed in the sea service of any citizen or merchant within the United States, ministers of religion of every denomination, professors and teachers in colleges, academies, Latin schools, and schoolmasters having twenty English scholars, and no other person or persons, shall be excepted from militia duty; but all young men under the age of twenty-one years, and all servants purchased *bona fide,* and for a valuable consideration, though enrolled agreeable to the first section of this law, shall be exempted from furnishing the necessary arms, ammunition and accoutrements as are required by the fourth section thereof, and shall be exempted from militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion of this or any of the neighbouring states.

*Persons exempted from military duty.*

*From furnishing arms, &c.*

SECT. 3. *And be it further enacted,* That the militia of this state be arranged into divisions, brigades, regiments, battalions and companies in manner and form following: The whole state to make one division, and each county to consist of one brigade; each brigade to consist of not less than two, or more than eight regiments; each regiment to consist of two battalions, and each battalion to consist of four companies, in such manner that no company shall consist of more than eighty, or less than forty privates, or as near as may be, having regard to their local situation; there

*Arrangement of the militia.*


C H A P.
XXXVI.
1793.

there fhall be to each regiment at leaft one company
of grenadiers, light infantry, or riflemen; and to each
brigade there fhall be at leaft one company of artil-
lery, and one troop of horfe, which fhall be formed
of volunteers from the refpective regiments, at the
difcretion of the Governor. (c)

How the militia
fhall be armed.

SECT. 4. *And be it further enacted,* That in order
that the militia may be properly armed, equipped and
accoutred, every citizen enrolled, and notified of his
enrolment in manner aforefaid, except as herein
before excepted, fhall, within fix months after re-
ceiving fuch notice, provide himfelf with the arms,
ammunition and accoutrements herein after mention-
ed, *viz.* every non-commiffioned officer and private
of the infantry (including grenadiers and light infan-
try, and of the artillery) fhall have a good mufket or
firelock, a fufficient bayonet and belt, two fpare flints
and a knapfack, a pouch, with a box therein to con-
tain not lefs than twenty-four cartridges fuited to the
bore of his gun, each cartridge to contain a proper
quantity of powder and ball, or with a good rifle,
knapfack, fhot pouch and powder horn, twenty balls
fuited to the bore of his rifle, and a quarter of a pound
of powder; the commiffioned officers of the infantry
fhall be armed with a fword or hanger, and an efpon-
toon, and thofe of artillery with a fword or hanger,
a fuzee, bayonet and belt, and a cartridge box to
contain twelve cartridges; the commiffioned officers
of the troops of horfe fhall furnifh themfelves with
good horfes of at leaft fourteen hands and a half high,
and fhall be armed with a fword and pair of piftols,
the holfters of which fhall be covered with bear fkin
caps; each light-horfeman or dragoon fhall furnifh
himfelf with a ferviceable horfe at leaft fourteen hands
and an half high, a good faddle, bridle, mail pillion
and valife holfters, and a breaft plate and crupper, a
pair of boots and fpurs, a pair of piftols, a fabre, and
cartouch box to contain twelve cartridges for piftols;
the artillery and horfe fhall be uniformly clothed in
regimentals, to be furnifhed at their own expence, the
                                                    colour

(c) See chap. 95. c. fects. 2, 5, further and other arrangement of the militia.

Digitized from Best Available Copy
EXHIBIT 4
0074

colour and fashion to be determined by the Brigadier commanding the brigade to which they shall belong; every militia-man shall appear so armed, accoutred and provided, when called out to exercise, or into service (except that when called out on company days, to exercise only, he may appear without a knapsack;) and every man so enrolled as aforesaid, and providing himself with the arms, accoutrements and ammunition required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales for debt, or payment of taxes; each battalion and regiment shall be provided with the state and regimental colours, by the fieldofficers, and each company with a drum and fife, or bugle horn, by the commissioned officers of the company; the expences of such colours, drums, fifes, or bugle horns to be repaid to the officers out of the fines incurred by this act: *(d) Provided always*, That whenever the field-officers of any regiment shall judge any person enrolled therein unable to equip himself as aforesaid, such person shall not be subject to any fine for not arming, any thing herein contained to the contrary notwithstanding.

*marginal note:* Shall appear armed on days of exercise.

*marginal note:* Arms exempted from distresses.

*marginal note:* Who shall be exempted from fines for not arming.

SECT. 5. *And be it further enacted*, That the militia shall be officered as follows: To a division one Major General, and two Aids de Camp, with the rank of Major; to each brigade one Brigadier General, with one Brigade Inspector, to serve also as Brigade Major, with rank of Major; to each regiment one Lieutenant Colonel Commandant, and to each battalion one Major; to each company of infantry (including light infantry and grenadiers) one Captain, one Lieutenant, one Ensign, four Sergeants, four Corporals, one Clerk, one Drummer, and one Fifer or Bugler; there shall be a regimental staff, to consist of one Adjutant and one Quarter Master, to rank as Lieutenants, one Paymaster, one Surgeon, and one Surgeon's Mate, one Sergeant Major, one Drum Major, and one Fife Major; there shall be to each company of artillery, one

*marginal note:* How the militia shall be officered.

(d) As per sect. 18, hereafter—but see chap. 95. c. sect. 12, the appropriation of fines given to the Commissary of military stores provided for in sect. 9, of that chap.



one Captain, two Lieutenants, four Sergeants, four Corporals, fix Gunners, fix Bombardiers, one Drummer, and one Fifer; and to each troop of horfe there fhall be, one Captain, two Lieutenants, one Cornet, four Sergeants, four Corporals, one Saddler, one Farrier, and one Trumpeter.

*Officers, by whom to be appointed.*

SECT. 6. *And be it further enacted,* That the Governor fhall on or before the firft day of September next, appoint and commiffion the Major General, Brigadiers, Lieutenant Colonels, Majors, Captains, Lieutenants, Enfigns, and Cornets; that the Major General fhall appoint their own Aids de Camp out of the line of Captains or Subalterns; that the Brigadiers fhall appoint their Brigade Majors out of the line of Subalterns; *(e)* that the fieldofficers of each regiment fhall appoint their refpective regimental ftaffs; and that each Captain fhall appoint his Sergeants, one of which fhall be appointed Clerk to the company, Corporals, Drummer and Fifer; that all commiffioned officers fhall be commiffioned for feven

*Of their commiffions and rank.*

years, and fhall take rank according to the date of their commiffions; and when two of the fame grade bear equal date, then their rank fhall be determined by lot, to be drawn by them before the commanding officer of the brigade, regiment, battalion, company or detachment.

*How the companies fhall be claffed.*

SECT. 7. *And be it further enacted,* That on the firft Tuefday in April next enfuing, the Captain or Commanding Officer of each company fhall call the perfons belonging to the fame together, giving due notice, and fhall divide them into eight claffes, as nearly equal in number to each other as conveniently may be, allotting a Sergeant or Corporal to each clafs; and eight flips of paper, numbered refpectively from one to eight, being prepared, every private fhall determine by drawing a ballot, what clafs he is to ferve in; and in cafe any of the perfons belonging to any company fhall neglect to attend, at the time and place appointed for claffing the faid company, or if prefent, fhall refufe to draw as aforefaid, then the
                                                        faid

*(e)* Or " non-commiffioned officers or privates," by fect. 15, of chap. 95. c.

faid Captain or Commanding Officer thereof fhall appoint one difinterefted freeholder to draw for the abfentees, or perfons fo refufing; and when the claffes fhall be fo fettled, the Captain or Commanding Officer of each company fhall form a roll, confifting of the eight claffes, and the names and furnames of the men in each clafs, numbered according to the order of ballotting, which he fhall keep for his own ufe, *(f)* tranfmitting forthwith a copy thereof, with a lift of his commiffioned and non-commiffioned officers prefixed, to the Colonel or Commanding Officer of the regiment, who fhall enter the fame in a book by him to be provided for that purpofe; and the faid Captain or Commanding Officer fhall, on the firft Tuefday in April, in every fucceeding year, add to the faid roll the names and furnames of all fuch male white inhabitants between the ages aforefaid, who, on the next preceding twelve months, have removed to and are then refiding in that fubdivifion, or therein have attained the age of eighteen years, except as herein before are excepted, annexing them refpectively to fuch clafs or claffes as may ftill render all the claffes of a company as nearly equal in number to each other as conveniently may be.

CHAP. XXXVI.
1793.

The Captain fhall form a roll of the claffes, and tranfmit a copy to the Colonel.

SECT. 8. *And be it further enacted,* That to the end the militia when called by claffes fhall be properly officered, the following order is hereby directed and enjoined, *That is to fay,* For the firft draft, the Captain of the firft company, the Lieutenant of the fecond, and the Enfign of the fourth; fecond draft, the Captain of the fecond company, the Lieutenant of the firft, and the Enfign of the third; third draft, the Captain of the third company, the Lieutenant of the fourth, and the Enfign of the fecond; fourth draft, the fourth Captain, the Lieutenant of the third company, and the Enfign of the firft; fifth draft, the fifth Captain, the Lieutenant of the fixth company, and the Enfign of the eighth; fixth draft, the fixth Captain, the Lieutenant of the fifth company; and

Drafts of the militia how officered, and called into fervice by claffes.

VOL. II.          3 X          the

*(f)* See chap. 95. c. fect. 3. further provifion for claffing of companies and declaring what fhall be a fufficient notification of enrolment in fuch clafs lifts.

Digitized from Best Copy Available
EXHIBIT 4
0077

1140

# LAWS OF THE STATE

C H A P.
XXXVI.

1793.

the Enfign of the feventh; feventh draft, the Captain of the feventh company, the Lieutenant of the eighth, and the Enfign of the fixth; the eighth draft, the Captain of the eighth company, the Lieutenant of the feventh, and the Enfign of the fifth; non-commiffioned officers to take tour with the commiffioned officers; and the fieldofficers of regiments, in every divifion and brigade in the ftate, fhall be divided in like manner; and each clafs to be confidered as a detachment from different corps, liable to ferve two months, and no longer, and to be relieved by the clafs next in numerical order, the relief to arrive at leaft two days before the expiration of the term of the clafs to be relieved; but nothing herein contained

*The rule not to be regarded in cafe of emergency.* fhall prevent the Governor from employing and calling out part of any clafs, or any company or companies, regiment or regiments, without refpect to this rule, whenever the exigency is too fudden to allow the affembling of the fcattered militia, which compofe the particular claffes; and the fervice of the perfons fo called out fhall be accounted as part of their

*When pay fhall commence and end.* tour of duty; and the pay of the militia in actual fervice fhall commence two days before marching, and they fhall receive pay and rations at the rate of fifteen miles *per* day on their return home.

*Pay of the militia.* SECT. 9. *And be it further enacted,* That when the militia, or any detachment thereof are called on duty, the pay of a Major General fhall be Sixty Dollars *per* month; of each Brigadier General Fifty Dollars *per* month; of each Lieutenant Colonel Forty Dollars *per* month; of each Major Thirty Dollars *per* month; of each Captain Twenty-five Dollars; of each Lieutenant Twenty Dollars *per* month; of each Enfign Fifteen Dollars *per* month; of each Sergeant Eight Dollars *per* month; of each Corporal Seven Dollars *per* month; and of each private and mufician Six Dol-

*Penalty for neglecting a tour of duty.* lars *per* month; and that every perfon refufing or neglecting to perform his tour of duty, if a commiffioned officer, fhall pay the fum of Twenty-five Dollars, and forfeit fuch his commiffion, and if a non commiffioned officer or private, the fum of Twelve Dollars for every fuch neglect or refufal.

SECT. 10. *And be it further enacted,* That when any clafs

claſs or claſſes of the militia ſhall be called to perform any tour of duty, the Brigade Major ſhall cauſe each and every ſuch perſon ſo called to be notified of ſuch call, by a written or printed notice being delivered to him perſonally, or left at his houſe or uſual place of abode, by ſome officer or other fit perſon to be employed for that purpoſe, at leaſt three days before the time of aſſembling the ſaid militia, unleſs the Governor on a ſudden exigency, ſhall think proper to order any part of the militia into immediate ſervice, and then the notice ſhall be given for immediate attendance. *(g)*

SECT. 11. *And be it further enacted,* That every male white perſon within this ſtate, between the ages of eighteen and forty-five, or who ſhall hereafter attain the age of eighteen years, except as before excepted, ſhall attend at the time and places appointed, in purſuance of this act, for the appearance of the company or regiment to which he belongs; and if any noncommiſſioned officer or private as aforeſaid, required to be armed and accoutred with his firelock and accoutrements aforeſaid in good order, or if any male white perſon between the ages aforeſaid, although not required to be ſo armed and accoutred, ſhall neglect or refuſe to appear on the parade, and anſwer to his name when the roll is called over, which the commanding officer is hereby directed to have done at the diſtance of one hour after the time appointed for meeting, not having a reaſonable excuſe, to be adjudged of by a Court Martial to be appointed by the commanding officer of the company, which ſhall conſiſt of a Subaltern and four privates, the Subaltern to be Preſident thereof, every ſuch perſon ſhall forfeit and pay the ſum of Fifty Cents. *(h)*

SECT. 12. *And be it further enacted,* That every perſon required to attend as aforeſaid, at the time and place

C H A P.
XXXVI.

1793.

How the militia called into ſervice ſhall be notified.

Penalty on privates for non-attendance on days of review and exerciſe;

As in ſect. 4, Ante.

and for neglect of duty.

*(g)* For further and more ſpecial proviſion relating to notification of tour of duty, called for to be performed by claſſes of the militia, and the penalties on privates and officers for non-performance thereof, ſee chap. 95, e. ſects. 12, 13, 14.

*(h)* See chap. 95, e. ſect. 6, alterations in the penalties above in ſects. 11 and 13, diſtin uiſhing between non-attendance on days of exerciſe in company or battalion, and in regiments—and ſee ſect. 18, there penalties for neglect of exerciſe or duty in the troops of horſe—and ſee alſo ſect. 20, for the penalty on perſons enrolled in the militia who ſhall thereafter continue to meet in volunteer companies.

Digitized from Best Copy Available

EXHIBIT 4
0079

CHAP.
XXXVI.
1793.

place of exercise in company or in regiment, who shall then and there appear, and shall neglect or refuse to answer to his name when the roll is called over, or to obey the lawful commands of his commanding officer, or to perform his exercise with the care and attention requisite therein, being convicted of any of the said offences by a Court Martial, to be appointed as aforesaid, shall forfeit and pay for every such offence any sum not exceeding One Dollar and Forty Cents.

Penalty on officers for non-attendance on field days.

SECT. 13. *And be it further enacted*, That every commissioned officer who shall neglect or refuse to appear at the time and place appointed for exercise in battalion or regiment, having no reasonable excuse, to be adjudged of by such of the officers present, as any two of the field officers shall appoint, and there do and perform his duty, according to his office and station, shall forfeit and pay, if a Lieutenant Colonel Commandant Four Dollars, if a Major Three Dollars, if a Captain Two Dollars, and if a Subaltern or Staff Officer One Dollar and Twenty-five Cents; and every commissioned officer, who shall refuse or neglect to appear at the time and place appointed for exercise or

On other muster days.

other muster days, having no reasonable excuse, to be adjudged of by the officers present, or a majority of them, shall forfeit and pay for every such neglect or refusal, if a Captain One Dollar and Twenty-five Cents, and if a Subaltern One Dollar. *(b)*

A Clerk to be appointed for each company.

SECT. 14. *And be it further enacted*, That the commissioned officers of every company shall appoint such Sergeant thereof, as they shall judge best qualified, to be Clerk thereto, who shall keep in a book to be provided by him for that purpose, to be viewed and examined from time to time by the commanding officer thereof, a fair and exact account of all fines and

His duty.

forfeitures incurred by persons belonging to the same, noting therein, at the time and place appointed for meeting in company, battalion or regiment, the names of the persons belonging to his company, and then absent; a transcript of which entries of fines and forfeitures, the said Clerk shall deliver to the Treasurer

And pay.

of his regiment, once in every three months, *(i)* by whom

*(i)* In sect. 7, chap. 95. c. an account of all fines is to be signed by the Captain

whom he shall be paid Four Dollars a year for his services as Clerk aforesaid.

C H A P.
XXXVI.
1793.

SECT. 15. *And be it further enacted,* That it shall and may be lawful for the commissioned officers of each regiment, to meet on the first Tuesday in September annually, and chuse by ballot, to be taken under the inspection of the fieldofficers, or such of them as attend, one reputable freeholder to be Treasurer to such regiment for the year thence next ensuing.

Treasurer for each regiment, to be chosen annually.

SECT. 16. *And be it further enacted,* That the Treasurer of each regiment, before he enters on the duties by this act required of him, shall give bond to the Lieutenant Colonel Commandant of the same, in such sum and with such sureties as he shall approve of, conditioned for the faithful performance of the duties hereby enjoined him, and shall pay over all such sums of money as shall come to his hands, in pursuance of this act, in manner herein directed, and at the expiration of the year for which he was chosen, shall render an account *(k)* to the State Treasurer of all monies that have come into his hands as Treasurer of said regiment, and in what manner he hath disposed of the same; and the balance remaining in his hands, if any, shall be paid over to the State Treasurer, after deducting Twenty Cents in the Pound for his trouble.

To give bond.

Shall account with the State Treasurer.

His compensation.

SECT. 17. *And be it further enacted,* That the Treasurer is hereby impowered and required to sue for and recover all fines and forfeitures incurred by this act, *(l)* and if he shall neglect or refuse to sue for and recover all fines and forfeitures incurred by this act, once in every six months, he shall forfeit and pay for the
first

Shall sue for all fines.

*k* Commanding Officer of each company or troop, and by him transmitted to the Treasurer of the regiment, and a duplicate thereof to the Commissary of military stores, once in three months at the least, under the penalty of Twenty Dollars for every neglect.

*(l)* And pay over to the Military Commissary of his county all sums collected, every four months, deducting twelve Per Cent. for collection, by sect. 8, of said chap. 95. c—and in sect. 11, the said Military Commissary is to account annually with the Auditor of Accounts, retaining four Per Cent.

*(l)* See sect. 7, of said chap. 95, c. a summary mode of collection prescribed, viz. distress and sale under a justices warrant, as in the case of county rates and levies. See also sect. 16, there.

C. H. A. P.
XXXVI.
1793.

Appropriation of
fines and forfei-
tures.

Who shall have
power to call the
militia into ser-
vice.

Militia exempt-
ed from arrests
in civil actions.

first offence the sum of Eight Dollars, and for the second, and every other offence, the sum of Sixteen Dollars.

SECT. 18. *And be it further enacted,* That all fines and forfeitures, that shall be paid into the hands of any Treasurer of a regiment in pursuance of this act, shall be applied for the purpose of purchasing arms, accoutrements and ammunition for the use of the regiment, as the Governor shall order and direct, and for purchasing such drums, colours and fifes for the several companies; and also for paying adjutants, drummers and fifers, and in such manner as the field-officers thereof shall from time to time direct. *(m)*

SECT. 19. *And be it further enacted,* That the Governor shall have full power and authority, in case of an invasion, rebellion, or insurrection within this state, or any of the neighbouring states, to call into service such part of the militia, by classes, as to him shall seem necessary; and in case of the absence of the Governor of this state or any insurrection, rebellion, or invasion, the commanding officer of each brigade is hereby authorised and directed to issue his orders, to call out such part of the militia as he may judge immediately necessary.

SECT. 20. *And be it further enacted,* That no person or persons by this act directed to meet and muster, or perform any military duty, shall be liable to be arrested or taken by any Sheriff, Constable, or other officer, in any civil actions whatsoever, on the day of such meeting, in going to, or returning home from the place of such meeting or muster or other military duty; but every such arrest shall be void, and the officer making the same shall be liable to an action of trespass for false imprisonment at the suit of the party so arrested, and he shall be forthwith set at liberty and discharged from the custody of such officer, by order of any one Judge or Justice of the Peace of the county where such arrest is made, or of the Captain of the company to which such person doth belong.

SECT.

*(m)* See also sect. 10, of ch. 19, 95, &c. the power of appropriation of fines given to the Military Commissary, and the extension of them to a greater number of objects.

SECT. 21. *And be it further enacted*, That the rules of difcipline approved and eftablifhed by Congrefs, in their refolution of the twenty-ninth of March, One Thoufand Seven Hundred and Seventy-nine, fhall be the rules of difcipline to be obferved by the militia of this ftate, except fuch deviations from the faid rules as may be rendered neceffary by the requifitions of an act of Congrefs, intitled, *An act more effectually to provide for the national defence, by eftablifhing an uniform militia throughout the United States*, or by fome other unavoidable circumftances: It fhall be the duty of the commanding officer at every mufter, whether by regiment, battalion, or fingle company, to caufe the militia to be exercifed and trained agreeable to the faid rules of difcipline.

C H A P.
XXXVI.
1793.

What rules of difcipline fhall be obferved by the militia.

SECT. 22. *And be it further enacted*, That if any perfon, whether officer or foldier, belonging to the militia, and called out into fervice, be wounded or difabled while in fervice, he fhall be taken care of, and provided for, at the public expenfe: That the Brigade Infpector, and two reputable freeholders, fhall appraife the horfe of each perfon ferving as light-horfemen, immediately before the time of going into actual fervice, and enter the fame in a book; and in cafe fuch horfe fhall be killed, die, or taken by the enemy, otherwife than by neglect, he fhall be paid the full value of his horfe.

Perfons difabled fhall be fupported at the public expenfe,

Horfes of light-horfemen to be appraifed,

and if killed, the value to be paid.

SECT. 23. *And be it further enacted*, That the militia of this ftate fhall be fubject to fuch articles of war, as may be eftablifhed by the General Affembly; and that they fhall be tried by their own officers only.

Of articles of war, and trial of the militia.

SECT. 24. *And be it further enacted*, That the militia in this ftate fhall be exercifed and inftructed in companies, in the months of April, June and September annually, at fuch time and place as the Captain or Commanding Officer fhall direct, he giving notice thereof by advertifements at three of the moft public places in his diftrict, at leaft five days before the day of mufter; and in regiments as follows: The firft regiment on the fecond Monday in October in every year, the fecond regiment on the Tuefday following, and the third regiment on the Wednefday, and fo on, according to their numerical rank, on

When to be exercifed in companies,

and in regiments.

every

EXHIBIT 4
0083

## LAWS OF THE STATE

C H A P.
XXXVI.

1793.

every day in the week, Saturdays and Sundays ex-
cepted, until the whole number of regiments shall
have muftered and exercifed in the aforefaid man-
ner. (n)

Monies paid in-
to the treafury
by virtue of this
act, how appro-
priated.

SECT. 25. *And be it further enacted,* That all monies
paffing into the treafury, by virtue of this act, fhall
be appropriated as a fund for the
purpofe of fupporting the neceffary officers for carry-
ing this law into effect, and of equipping and fur-
nifhing the militia with every neceffary apparatus for
the defence and fecurity of the ftate, the furplus, if
any, to be appropriated in fuch manner, and to fuch
ufes, as the General Affembly fhall from time to time
direct and appoint; and the State Treafurer fhall keep
all the monies arifing from fines by the militia law, fe-
parate from all other monies, and keep a feparate
book of the fame, and the expenditures thereof pur-
fuant to the directions of this act. (o)

The Governor
fhall appoint an
Adjutant Gene-
ral.

SECT. 26. *And be it further enacted,* That the Go-
vernor fhall appoint an Adjutant General in the ftate,
whofe duty it fhall be to diftribute all orders from the
Commander in Chief of the ftate to the feveral corps,
to attend all public reviews, when the Commander
in Chief fhall review the militia, or any part thereof,

His duty.

to obey all orders from him relative to carrying into
execution and perfecting the fyftems of military difci-
pline eftablifhed by this act, to furnifh blank forms
of different returns that may be required, and to ex-
plain the principles on which they fhould be made,
to receive from the feveral officers of the different
corps throughout the ftate returns of the militia un-
der their command, reporting the actual fituation of
their arms, accoutrements and ammunition, and
every other thing which relates to the general ad-
vancement of good order and difcipline; all which
the feveral officers of brigades, regiments and batta-
lions are hereby required and directed to make in the
ufual

(n) See fect. 5, of chap. 95. c. the foregoing times altered, to wit, of exercife in
companies once in the months of April, Auguft and November—in battalions in the
month of May—and in regiments in the month of June annually.

(o) See alfo fects. 10, 11, of chap. 95. c. fome alterations herein with more fpe-
cific appropriations.

EXHIBIT
0084

ufual manner, fo that the Adjutant General may be duly furnifhed therewith ; from all which returns he fhall make proper extracts, and lay the fame annually before the Governor or Commander in Chief of the ftate, and tranfmit a duplicate of the fame to the Prefident of the United States. (p)

Paffed June 18, 1793.

## C H A P.  XXXVII. c.

*An* ACT *to enable Anna Adams and John Brown of Kent county, to bring from the ftate of Maryland into this ftate, two Negro flaves.*
　Paffed June 18, 1793.——Private act.

## C H A P.  XXXVIII. c.

*An* ACT *to veft the title of a tract of land in Phebe Snow, Jane Wilfon, and Robert Rees.*
　Paffed June 18, 1793.——Private act.

## C H A P.  XXXIX. c.

*An* ACT *for the better regulation of diftreffes for rent, and for other purpofes therein mentioned.*

WHEREAS for want of due regulation of dif- <span>Preamble.</span> treffes for rent much injury hath been fuffered,

SECTION 1. BE it therefore enacted by the Senate and Houfe of Reprefentatives of the ftate of Delaware in General Affembly met, That from and after the publication

VOL. II.　　　　3 Y　　　　of

(p) See fect. 21, of chap. 95. c. a repeal of fo much of this act as is there altered and amended, or otherways provided.

# EXHIBIT "5"

EXHIBIT 5
0086

This is a reproduction of a library book that was digitized by Google as part of an ongoing effort to preserve the information in books and make it universally accessible.

 

https://books.google.com

EXHIBIT 5
0087



**EXHIBIT 5**
**0088**

This edition contains the rare
"Yazoo laws" to be found on

p.304 no. 296

p.397 no. 418

p.557 no. 530

p.577 no. 543



ROBERT WATKINS.

STANFORD UNIVERSITY LIBRARY

G
TAX
D
1800
School of Law

Digitized by Google

EXHIBIT 5
0089

A

# D I G E S T

OF THE

# L  A  W  S

OF THE

# 𝕾𝖙𝖆𝖙𝖊 𝖔𝖋 𝕲𝖊𝖔𝖗𝖌𝖎𝖆.

*FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN
TO THE YEAR 1798, INCLUSIVE,*

AND THE

## PRINCIPAL ACTS OF 1799:

IN WHICH

Is comprehended the declaration of Independence; the State Constitutions of 1777 and 1789, with the
alterations and amendments in 1794.

ALSO THE

## *Constitution of* 1798.

IT CONTAINS

As well all the Laws in force, as those which are deemed useful and necessary, or which are explanatory
of existing Laws: together, with the

### *TITLES OF ALL THE OBSOLETE AND OTHER ACTS.*

AND CONCLUDES

WITH AN APPENDIX containing the original Charters and other Documents, ascertaining and defining the
Limits and Boundary of the State; all the Treaties with the southern tribes of Indians; the articles of
Confederation and perpetual union; the Constitution of the United States, and a few Acts of Congress.

Together with a copious Index to the whole.

BY

### *ROBERT & GEORGE WATKINS.*

Philadelphia:

PRINTED BY *R. AITKEN*, No. 22, MARKET STREET.

••••••••••••••••••••••••

1800.

Digitized by Google

EXHIBIT 5
0090

L15609
OCT 4  1938

Digitized by Google

EXHIBIT 5
0091

ADDRESS

# TO THE PUBLIC.

*THE following work is offered to the public under a conviction of its utility. Not incited to the arduous undertaking, by ambition for literary fame, or with a view of having their names enrolled in the catalogue of contemporary authors, the compilers claim no merit but from their zealous assiduity and labor in the compilation. Having witnessed the numerous advantages resulting from the success of similar exertions, in other States, they determined to pursue the example and collect the whole of the State laws into one view. Such a work had been long called for by the public, and had been contemplated by others at an earlier period; but, either from the difficulty of the undertaking, or the want of legislative sanction, every attempt, in this State, has hitherto failed of success. Notwithstanding these difficulties, the present compilers observing with much concern the great uncertainty in the municipal regulations of the State, and the embarrassments thereby introduced into every department of the government, but particularly in the courts of justice, whither one of them was led by professional duty, they determined though, strange to relate, not without opposition, to encounter the task upon the credit of their own fortunes, and hazard its success on their own individual reputations.*

*In a State whose government has been the theatre of political agitations, in which the reciprocal struggles of jarring and opposing interests, have produced the alternate adoption and abrogation of opposite*

Digitized by Google

EXHIBIT 5
0092

[ iv ]

opposite measures, the civil polity cannot but be subject to frequent and variagated changes: This unfortunately has been too much the case with the State whose legislative acts are here presented to the public; and this too, has added much to the labor and perplexity of the undertaking.   Many of the laws have never been published, some are entirely lost or destroyed, others in a tattered and mutilated condition; and, the mass from whence this collection is made, has hitherto been, almost, as much out of the public reach as the laws of Caligula.   The compilers, however, have exercised their utmost assiduity, in collecting all the laws in force, passed since the first settlement of the State as a British province, together with such of the repealed or obsolete acts as were deemed useful and necessary, as governing the transactions under them, while in force: These they have arranged with the titles of all the other laws to be found, in the order of time in which they were passed, with such marginal notes and references as were deemed necessary to elucidate the objects of succeeding legislatures.   To which is subjoined the fundamental regulations under which they were enacted.   The constitution of the State as revised and amended at different periods, the articles of confederation and perpetual union, and the constitution of the United States.   They have also added, the original charters and other documents, ascertaining and defining the limits and boundary of the State; all the treaties with the southern tribes of Indians, and a few acts of congress.

Whilst the compilers have zealously endeavoured to fulfil their engagements, they have to regret the unexpected delay of the publication.   It is, however, to be hoped the causes will not be overlooked.   Soon after their commencement, measures were taken and pursued for a change in the constitution.   This was too important

not

Digitized by Google

EXHIBIT 5
0093

[ v ]

*not to wait the issue and incorporate the result. They have not on-*
*ly done this, but the delay has enabled them to add the laws of seve-*
*ral years more than originally intended; and the whole code has*
*recently undergone a thorough revision. In strict conformity with*
*those engagements, a guide for justices of the peace should likewise*
*have been annexed: but the new matter already added, it is presumed,*
*will be deemed more than adequate. Indeed it has been considered that*
*the guide will be more useful, by being published in a small portable*
*volume. This will be done as soon as possible. The manuscript has*
*been long prepared, but the many alterations in the constitution and*
*laws have rendered a revision of that too, indispensably necessary. Such*
*of the subscribers, however, as may not have occasion for the present*
*work, without the guide, will be at liberty to withdraw their names.*

*Another cause of delay may justly be ascribed to the agitation*
*of the public mind, during its progress, and to an opposition, which*
*sought to destroy the effects and enjoy the fruits of their labor, by*
*an indelicate interference, and an illiberal competition.**

*Although*

* During the first session of the legislature of 1799, when the digest was in the press, a candid representation was made to them respecting its progress. They took up the subject and referred it to a large and respectable joint committee from the two branches. This committee reported specially, and unanimously recommended an appropriation of fifteen hundred dollars, and added that they were the more induced to recommend the adoption of the measure " from a conviction that the said digest is a work of great labor and merit and will be " of importance in forming a complete digest, agreeably to the 8th sect. of the 3d art. of the constitution; and " that the said Robert and George Watkins are entitled to a generous retribution for their labor and exertions." It was thereupon resolved *unanimously* in the house of representatives, " that the sum of fifteen hundred dollars, " be appropriated" accordingly, to their use. The senate concurred by a large majority. During its progress, however, some opposition arose in the senate. This was at length explained by one of the governor's particular friends, who had the *modesty*, openly, to move that an addition be made to the appropriation act, in the words following : " The sum of two thousand dollars, subject to the order of the governor, for the purpose of enabling " the executive to promulgate the laws of the State, agreeably to the 8th sect. of the 3d art. of the consti- " tution." This was negatived—yeas 4, nays 11. And his excellency was directed, by a second resolution, to pay the first mentioned sum on demand " out of the contingent fund." Still unwilling to submit to the will of the legislature, his excellency has not only been pleased, in the recess of that body, to disapprove of the appropriation, but has also charged the legislature with violating the constitution in making what he calls a " gratuity" of the public money, and withholds the amount.

On these facts, the compilers forbear to comment.

Digitized by Google

EXHIBIT 5
0094

[ vi ]

*Although the authors of this work cannot boast of the patronage of ALL their rulers, they have the consolation to believe, that in offering it to the public, they are sanctioned by the approving voice of the best informed and most impartial characters in the community. To the indulgent eye of a generous public it is, therefore, cheerfully submitted.*

*The want of age and experience in the compilers, engaged in an arduous profession, added to the circumstances already stated, forbid the hope of perfect correctness. Conscious, however, of the best intentions, they venture to flatter themselves that the errors will be found neither numerous or important.*

*Should a greater number of copies be wanted than are now printed, a second edition will be published in octavo, in which all intermediate alterations in the laws, will be duly noticed, and the utmost care taken to correct and improve the former.*

*In a representative government, it is of the utmost consequence to the body of the nation, to be rightly informed of those laws and regulations by which their duties are defined and their rights secured. To promote this desirable object, as far as was in their power, has been the leading motive of the compilers. That it may answer the ends proposed, and advance the public good, is their ardent wish.*

AUGUSTA, 1 JULY, 1799.

Digitized by Google

EXHIBIT 5
0095

HAVING been frequently consulted by Mess. ROBERT and GEORGE WATKINS, during the progress of the following work, we do certify, that in our opinion, it is correct, will be of great utility, and merits the public attention.

GEORGE WALTON,
WILLIAM STITH, Jun.
SEABORN JONES,
GEORGE WALKER.

*Augusta, Nov.* 15, 1798.

## Entered,

IN conformity to the act of the Congress of the UNITED STATES, intitled "An Act for the encouragement of Learning, by securing the Copies of Maps, Charts and Books, to the Authors and Proprietors of such copies during the times therein mentioned."

Digitized by Google

EXHIBIT 5
0096

458                                    DIGEST OF THE

A. D. 1792.    *An Act to revise and amend the militia law of this State, and to adapt*
No. 468.       *the same to the act of the congress of the United States, passed the*
               *eighth day of May, one thousand seven hundred and ninety-two,*
               *entitled " An act more effectually to provide for the national*
               *defence by establishing an uniform militia throughout the United*
               *States."*

In conformity     I. BE it enacted by the senate and house of representatives of the State of Georgia, in
to act of con-       general assembly met, That in order to comply as nearly as may be convenient
gress, the mili-
tia laid off into  with the act of congress of the United States, passed at Philadelphia, on the eighth
divisions, &c.     day of May, in the year of our Lord, one thousand seven hundred and ninety-two,
                   entitled " An act more effectually to provide for the national defence, by establish-
                   ing an uniform militia throughout the United States ;"—the militia of this State shall
                   be laid off and apportioned into divisions, brigades, regiments, battalions and compa-
                   nies, in the manner herein after particularly expressed.

Brigades and di-     II. And be it further enacted, That the counties of Camden, Glynn, Liberty and
visions defined.   Chatham* shall compose a brigade, to be known as the first brigade of the first di-
                   vision ; and the counties of Effingham and Burke† as the second brigade of the said
                   division ; and the said two several brigades shall compose the first division of the
                   militia of this State ; and the counties of Richmond and Columbia shall compose a
                   brigade, to be known as the first brigade of the second division ; and the counties of
                   Washington and Greene as the second brigade of the said division ; and the said two
                   several brigades shall compose the second division of the said militia ; and the county
                   of Wilkes‡ shall compose a brigade, to be known as the first brigade of the third
                   division ; and the counties of Franklin and Elbert§ as the second brigade of the third
                   division, and the said two several brigades shall compose the third division of the said
                   militia.

A major general      III. And be it further enacted, That each division of the said militia shall be under
to command        the direction of, and be commanded by a major general, and each brigade shall be
each division.
A brigadier ge-   under the direction of, and be commanded by a brigadier general ; and there likewise
neral, each bri-  shall be appointed an adjutant general, to have the rank of lieutenant-colonel : All
gade.
Adjutant gene-    which said officers shall be appointed and commissioned by the commander in chief of
ral, rank of      this State, under the regulations and restrictions herein after pointed out.
lieut. col.

Brigades to be       IV. And be it further enacted, That within two months after the passing of this act
subdivided in     the said several brigades shall be sub-divided into regiments, battalions and companies
regiments, bat-
talions and com-  as nearly as may be, in conformity to the aforementioned act of the congress of the
panies.           United States, by the executive department of this State.    Provided, That the respec-
Proviso.          tive counties be kept distinct from, and unblended with any other county in such
                  sub-division, unless alterations in such counties should hereafter by law take place.

                                                                                              V.

---

* Effingham, M'Intosh, and Bryan, added.
† Montgomery, Scriven, Bullock, and Jefferson, added.    } See acts of 1795, No. 334, and 1796, No. 562.
‡ Warren and Lincoln, added.
§ Oglethorpe and Jackson, added.

Google

**EXHIBIT 5**
**0097**

V. *And be it further enacted,* That the officers of companies shall be nominated by election of the citizens liable to bear arms in each company district, and be appointed agreeably to the constitution by the governor of this State, under the following rules and restrictions, that is to say, the free white inhabitants so liable to do militia duty shall, within ten days after such company district shall have been defined by the executive, assemble at a place to be appointed therein by any two or more magistrates within such company district, or if there should not be two residing magistrates within such district, by any two or more magistrates of the county such company may be in, ten days public notice being first given by such magistrates of such meeting and the intention thereof; and the free white inhabitants liable to do duty therein, and so convened, shall proceed to nominate, by ballot, one fit and proper person to fill each respective commission of captain, lieutenant and ensign of such company; the election so held, and the names of the persons so nominated for each commission as aforesaid, shall be certified* under the hands and seals of the said magistrates, and be by them sent, within fifteen days so certified, to his excellency the governor, who shall within five days after the receipt thereof, appoint and commission the persons so nominated for the respective commissions of captain, lieutenant or ensign, as the case may be, and in case of the neglect or refusal of the inhabitants of any company district to meet, and by ballot to nominate the persons aforesaid within the time herein before pointed out for such meeting; the executive department shall proceed to appoint the officers of such company district without any such nomination.

VI. *And be it further enacted,* That the captains and subalterns of companies so nominated and appointed shall, within twenty days after the notification of their appointments by his excellency the governor has taken place, meet and assemble at some convenient place within the battalion or regimental district, as the case may be, to which such officers belong, under the direction of any two or more of the captains so appointed, not being candidates, ten days notice being given of the meeting and its intention by them; and when so met, the said officers shall proceed to nominate, by ballot, one fit and proper person for each commission of lieutenant colonel of the regiment or major commandant of the battalion, as the case may be. *Provided,* That where the lieutenant colonel, when appointed, will command a regiment, consisting of two battalions, the officers of companies of both battalions shall assemble together in like manner at a conevnient place for each battalion, under the direction of two or more captains, one of which at least belonging to each respective battalion; and the captains so assembling, the said officers shall, within ten days after such nomination, certify the same, and the names of the persons so nominated, and send such certificate to the executive department, which shall within five days thereafter, appoint and commission the persons so nominated to fill such appointments of lieutenant colonel or major, as the case may be.

VII. *And be it also enacted,* That where a country will not permit its being formed, into two battalions, the same shall compose a regiment to be commanded by a lieutenant colonel commandant.†

VIII.

* See act of 1793, No. 494, sect. 8, pointing out the manner of certifying and returning such elections.
† To be commanded by a major if a county has not more than 4 companies. See act of 1795, No. 534.

*Margin notes:*
A. D. 1792.
No. 468.
Company officers, how appointed.

Lieut. cols and majors to be appointed by the company officers.

Proviso.

Counties not containing two battalions, how to be commanded.

Digitized by Google

EXHIBIT 5
0098

460                                    DIGEST OF THE

<div style="margin-left:...">

**A. D. 1792.**
**No. 468.**
Officers, how to take rank.

VIII. *And be it further enacted*, That where any officer now in commiſſion ſhall be nominated and appointed to fill the ſame commiſſion he before held, he ſhall take rank† from the date of the commiſſion he ſo before held, any thing herein contained to the contrary notwithſtanding, and the officers in commiſſion at the time of paſſing this act ſhall continue to act until the nomination or appointment of ſome other perſon to fill the ſame.

Enrolments, how to be made, Perſons liable to duty.

IX. *And be it enacted*, That the commanding officer of each company of militia ſhall enroll the names of all the male inhabitants (ſlaves excepted) above the age of eighteen and under the age of forty-five years, who ſhall have reſided therein for the ſpace of ten days; and ſhall cauſe the perſons ſo enroled to be ſummoned and duly noticed by a proper non-commiſſioned officer, to appear at ſuch times and places as he ſhall appoint for company muſters; and the perſons ſo enrolled, ſhall be from thenceforth deemed and held to belong to ſuch company, and liable to appear at all its muſters, whether battalion or company, and on all other neceſſary occaſions, and to perform the whole duty of a militia man without any further notice whatſoever.

Accoutrements.

X. *And be it further enacted*, That every perſon ſo enrolled ſhall provide himſelf, agreeably to the act of congreſs, with a muſket or firelock, a ſufficient bayonet and belt, two ſpare flints, and a knapſack, a pouch with a box therein, to contain not leſs than twenty-four cartridges, ſuited to the bore of his muſket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapſack, ſhot pouch and powder horn, twenty balls ſuited to the bore of his rifle, and a quarter of a pound of powder, and ſhall appear ſo armed, accoutred and provided, when called out to exerciſe or into ſervice; except that when called out to exerciſe only on company days, he may appear without a knapſack. And if any

Fines of privates for deficiencies and non-attendance.

perſon ſo enrolled ſhall neglect to provide himſelf, or ſhall appear at muſters not properly accoutred as before expreſſed, or ſhall neglect or refuſe to appear at ſuch battalion or company muſters, or on any other neceſſary occaſion, at any time within nine months after the paſſing of this act, ſhall be fined in a ſum not exceeding two dollars for every ſuch offence; and for every ſuch neglect after that time, the ſum not exceeding ſix dollars if a battalion muſter, and four dollars if a company muſter.

Field and company officers uniform, ſubject to fine for deficiencies & non-attendance.

XI. *And be it further enacted*, That every commiſſioned officer of the rank of captain and under, ſhall provide himſelf with a ſword or hanger, an eſpontoon, and a complete ſuit of uniform, to be determined on by the officer commanding the brigade he belongs to, and in caſe of any ſuch officer appearing at muſters, or on other neceſſary occaſions, not ſo provided, at any time within nine months after his appointment, every ſuch officer ſo offending, or who ſhall neglect or refuſe to appear at ſuch muſters ſhall be fined, if a captain, in a ſum not exceeding thirty dollars; if a lieutenant, not exceeding twenty dollars; and if an enſign, not exceeding fifteen dollars. And every general and field officer ſhall in like manner appear, when on duty, in a complete uniform, and armed with a ſword or hanger;—the uniform of the general officers to be determined by the commander in chief, and the uniform
                                                                                            of

</div>

† See act of 1793, No. 494, ſect. 6, reſpecting the rank of lieutenant-colonels.

**EXHIBIT 5**
**0099**

of the field officers, by the officer commanding the brigade; and in cafe of their A. D. 1792.
appearing at mufter, or on other neceffary occafions, not fo provided, every fuch   No. 468.
officer fhall forfeit and pay, if a major-general, a fum not exceeding two hundred
and fifty dollars; if a brigadier, a fum not exceeding two hundred dollars; and if
a field officer, a fum not exceeding one hundred dollars.

XII. *And be it further enacted*, That the faid militia fhall exercife in battalion   Battalion or re-
twice in each year, and in companies four times in every year; and in cafe of neg-   gimental : muf-
lect thereof, if a battalion or regimental mufter, the commanding officer of fuch   ters.
regiment or battalion fhall be fined in a fum not exceeding one hundred dollars, to be
impofed by a court martial, to be ordered by the officer commanding the brigade;
and if a company mufter, the officer commanding and fo neglecting fhall be fined
for every fuch neglect in a fum not exceeding thirty dollars, to be impofed by a
court martial, to be ordered by the officer commanding the regiment or battalion to
which fuch company fhall belong, and due notice fhall be given of fuch regimental,
battalion or company mufters, by the officers commanding the fame.

XIII. *And be it further enacted*, That every officer commanding a company fhall,   Company muf-
on the days appointed to exercife his men by company, have the fame formed under   ters.
arms by eleven o'clock in the forenoon, by which hour every perfon liable to militia
duty in fuch company fhall attend, and the faid officer fhall then have his roll called
over, and mark all defaulters, and fhall proceed to inftruct and exercife his men in
the evolutions and manual exercife pointed out and required by the before mentioned
act of congrefs, and in cafe of neglect of fuch inftructing and exercifing, the officer
fo commanding fhall be liable to a penalty not exceeding thirty dollars for every fuch
neglect.

XIV. *And be it further enacted*, That if any perfon liable to bear arms, at any   Officers and pri-
exercife or training, hereby appointed, fhall behave in a contemptuous or unfoldier-   vates to be fined
like manner, at either battalion or company mufters whilft under arms, or fhall infult   court martial,
or threaten his field, company or other officer commanding, after his difcharge, for   for mifbehavior
or on account of fuch officer's performing the duty hereby required of him whilft   or difobedience
fuch perfon was under arms, every fuch perfon fhall for every fuch offence forfeit and   of orders.
pay a fum not exceeding four dollars: And if fuch offender fhall be a commiffioned
officer, and fhall be guilty of contemptuous or unfoldierlike behavior whilft on duty,
or fhall, after his difcharge from fuch duty, threaten or infult his fuperior officer for or
on account of the duty required of fuch officer by this act, every fuch commiffioned
officer fo offending fhall for every fuch offence forfeit and pay a fum not exceeding
twenty dollars or be cafhiered, at the option of a court martial.

XV. *And be it further enacted*, That any perfon interrupting the military exercifes   Perfons inter-
required by this act, may be committed by the officer commanding the body of militia   rupting military
fo interrupted, to the neareft common gaol, for a fpace of time not exceeding five   committed to
days for every fuch offence.   gaol.

XVI. *And be it further enacted*, That every mafter or other perfon who hath the   Mafters of in-
command, government or power over any indented man fervant, liable to do militia   dented fervants
duty by this act, fhall, at his or her own proper cofts and charge furnifh and provide   &c. and fubject
every   to fine for neg-
lect.

Digitized by Google

EXHIBIT 5
00100

A. D. 1792.
No. 468.

every such indented man servant during his servitude, with the arms, ammunition and accoutrements directed by this act, and every such master or other person shall send such indented servant completely armed and furnished as is herein required, to all battalion, regimental or company musters, and on all other necessary occasions, which such indented servant would have been liable to attend were he not a bondsman; and in case such indented servant shall not appear thereat, or on appearance shall be defective in arms or accoutrements hereby required, such master or other person shall be liable to all the fines, penalties and forfeitures imposed in like cases on other persons liable to bear arms by this act.

Fines and forfeitures, how to be imposed by courts martial.

XVII. *And be it further enacted*, That the several fines, penalties and forfeitures to be inflicted by this act on persons liable to attend at company musters, may be imposed by a court consisting of a majority of the commissioned officers of such company; or in case of vacancies of two commissioned officers of the regiment or battalion such companies belong to. *Provided*, one of the said officers be an officer of such company. And the several fines, penalties and forfeitures to be inflicted on persons liable to attend battalion or regimental musters, shall be imposed by a court, to consist of at least seven commissioned officers of such battalion or regiment; and it is hereby made the duty of the officers appointed members of such courts martial, on being duly notified thereof, to attend the same; and in case of neglect or refusal of any such commissioned officer to attend, he shall be liable to the penalties herein pointed out for non-appearance at regimental or battalion orders; and ten days notice at least, in writing, shall be given defaulters and offenders to be tried at such company, battalion or regimental courts martial, under the hand of the commanding officer of the company such offender or defaulter belongs to, who shall be served with the same personally, or be otherwise notified by a non-commissioned officer thereof, by such non-commissioned officer's leaving the same at such defaulter's or offender's usual place of abode, and proof of such service shall be made to such court, on oath, previous to its proceeding to the trial of such offender or defaulter.

Warrant therefor, how to be drawn & served

XVIII. *And be it further enacted*, That all warrants for fines, penalties and forfeitures inflicted by this act shall, if in consequence of the sentence of a company court martial, be under the hand and seal of the commanding officer of the company; and if in consequence of the sentence of a regimental or battalion court martial, under the hand and seal of the commanding officer of such regiment or battalion; and every such warrant shall clearly express the offence, and recite the sentence of the court, and shall be directed to, and executed by a serjeant of the company the offender belongs to, or be directed to, and executed by any lawful constable of such district; and such non-commissioned officer or constable shall make return of such warrant within thirty days after his receiving the same; and if on such return it shall happen that such offender or defaulter has not wherewithal to be levied to satisfy the forfeiture or fine imposed by such court, it shall be the duty of such officer commanding, to renew the warrant, and thereby to commit the offender or defaulter to the common gaol of the county, or the nearest gaol thereto, if there shall be no such county gaol, for the space of one day for each dollar contained in

such

Digitized by Google

EXHIBIT 5
00101

fuch fine or forfeiture ; and it is hereby made the duty of the keeper of fuch gaol to receive fuch offender or defaulter, and to keep him in clofe cuftody for the term in fuch warrant expreffed, without bail or mainprize, and until fuch offender or defaulter fhall have fatisfied fuch keeper for his fees on fuch confinement. *Provided*, That no gaoler fhall detain fuch perfon or perfons more than three days for his fees : *And provided*, That where this act admits of perfons being committed to gaol in the firft inftance, no return or renewal of fuch warrant fhall be neceffary.

*A. D.* 1792.
No. 468.

XIX. *And be it further enacted*, That the non-commiffioned officers of the refpective companies fhall be appointed in the following manner, that is to fay, the names of all perfons liable to bear arms in each company diftrict fhall be placed in a box to be kept in the cuftody of the commanding officer of fuch company and have two partitions, to be known by the numbers one and two, and the names in the firft inftance fhall be put in the petition number one, and within one month after the refpective companies fhall be organized, it fhall be the duty of the commiffioned officers thereof to affemble and draw from the faid partition number one, the names of eight perfons which fhall be thrown into the partition number two, and the eight perfons fo drawn fhall be the non-commiffioned officers of the company and are hereby declared liable to execute and perform all the duties of fuch ftation, and they fhall ferve as fuch for the fpace of twelve months, and fhall not be liable to ferve again in that capacity until all the names fhell be drawn from the partition number one; and in cafe of refufal to act in fuch appointment, or to procure fome fit and proper perfon, to be approved of by the officer commanding the company, to do the duty of a non-commiffioned officer in his ftead, fuch perfon fo drawn and refufing to act or to procure fuch fit and proper perfon, fhall forfeit and pay the fum of ten dollars, to be recovered by warrant of the officer commanding the company fuch perfon fhall belong to, and the faid commiffioned officers fhall proceed to draw another perfon to fill the office of fuch perfon fo refufing until the number of non-commiffioned officers fhall be completed; and the four firft perfons fo drawn as aforefaid, fhall be the ferjeants, and the laft four fo drawn, the corporals of fuch company. *Provided neverthelefs*, That if fit and proper perfons for non-commiffioned officers fhould be procured by the commiffioned officers of fuch company, the mode of drawing in this claufe contained may be difpenfed with; but after fuch fit and proper perfons have accepted fuch offices, they fhall be liable to ferve in fuch ftation, at leaft for the term of twelve months, as is herein before expreffed for perfons drawn to ferve in the fame; and in confideration of the duties in this act affigned to them, one half of the fines of fuch company fhall be fet apart as a fund for defraying the expence of executing fuch duty, and be divided to and among fuch non-commiffioned officers; but if any non-commiffioned officer after accepting fuch office, fhall neglect or refufe to do the duty required by this act, he fhall for every fuch offence, forfeit and pay a fum not exceeding five dollars.

Non-commiffioned officers, in what manner to be appointed—to act twelve months.

Subject to fine in cafe of refufal to act.

Provifo.

XX. *And be it further enacted*, That it fhall be the particular duty of the officers commanding companies, to pay a due attention that the law for eftablifhing and regulating patrols in force in this State, paffed the eighteenth day of November, in the year

The patrol law, how to be enforced by the militia.

Digitized by Google

EXHIBIT 5
00102

464

year of our Lord, one thousand seven hundred and fixty five, under the then province of Georgia, be strictly executed, and in case of neglect or default of such execution, every officer commanding the company defaulting, and not punishing the defaulters agreeable to the said act, shall be subject to a fine not exceeding fifty dollars or be cashiered, at the option of a court martial.

*Returns, to whom and when to be made.*

XXI. *And be it further enacted,* That the officers commanding regiments or battalions, shall once in every year, make proper and complete returns of their regiment or battalion as the case may be, to the officer commanding the brigade to which they respectively belong, and the officers commanding brigades, shall in like manner, make proper and complete returns of their brigades, to the officers commanding the division

*Orders how to be distributed by the officers.*

to which they respectively belong, and the officers commanding divisions, shall receive and distribute all such orders to the brigades of their divisions as may from time to time be issued from the commander in chief, or by his direction, from the adjutant general; and the officers commanding brigades, shall in like manner, receive and distribute to and among the respective regiments and battalions of their respective brigades, all such orders as may from time to time be issued to them by the officers commanding divisions, by the commander in chief, or from his directions by the adjutant general, and the officers commanding regiments or battalions shall cause to be distributed to, and executed by the respective companies under their command all such orders as they may from time to time receive from officers commanding divisions

*Subject to fine or may be cashiered, at different option of court martial.*

and brigades, or from the commander in chief, or the adjutant general; and in case of neglect or refusal to perform such duty, every officer so offending shall, if a major general, be fined in a sum not exceeding five hundred dollars, if a brigadier, in a sum not exceeding three hundred dollars, and if a field officer, in a sum not exceeding two hundred dollars or be cashiered at the option of a court martial to be ordered, if on a major general by the commander in chief, if on a brigadier by the officer commanding the division, and if a field officer by the officer commanding the brigade. *Provided,* That nothing in this clause contained, shall be construed to debar the commander in chief from arresting and ordering courts martial for the trial of any officer of the militia of this State, or to debar any officer commanding a division, brigade, regiment or battalion from arresting and ordering courts martial for the trial of any officer belonging to his division, brigade, regiment or battalion.

*Courts martial for the trial of officers, how constituted.*

XXII. *And be it further enacted,* That a court* martial for the trial of a major-general shall consist of at least one major-general, three brigadier generals and five field officers; and for the trial of a brigadier general the court shall consist of at least two brigadier generals and seven field officers; and for the trial of a field officer it shall consist of at least one brigadier, three field officers, and five captains, or of four field officers, and five captains; and a court martial for the trial of a captain or subaltern shall consist of at least seven commissioned officers, the president

*Their sentence subject to the pleasure of the commander in chief.*

thereof to be of superior rank to the officer tried; and every sentence of a court martial, where the officer shall be cashiered, shall be transmitted by the president of the court through the adjutant-general to the commander in chief, who may approve of, mitigate the sentence or pardon the offender as he may see fit: and in case of sentences

tences

* See act of 1793, No. 494, sect. 3, prescribing the manner of appointing courts martial.

Digitized by Google

EXHIBIT 5
00103

LAWS OF GEORGIA. 465

tences merely pecuniary, the officer ordering the court may approve, difapprove or mitigate the fame.

A. D. 1792. No. 468.

XXIII. *And be it further enacted,* That from and after the organization of the militia as before pointed out, whenever any vacancy fhall happen in any captain's diftrict, battalion, regiment, brigade or divifion, by death, refignation or otherwife, the vacancies fhall be filled up by nominating a perfon or perfons to fill fuch vacancy or vacancies in the fame manner as before pointed out by this act.

Vacancies, how to be filled.

XXIV. *And be it further enacted,* That his excellency the governor be, and he is hereby empowered to affemble and embody fuch part of the militia of the State as he may from time to time think neceffary, to repel any invafion, infurrection or rebellion which may happen within the fame, and to order fuch officers to command the faid militia as he, fhall fee fit. *Provided,* That the officers of one company fhall not be placed to command another company, unlefs where the death, refignation or inability of fuch officer fhall make it neceffary. *And provided,* That nothing in this claufe contained fhall prevent part of fuch company from being detached, or piquet or otherwife under any officer.

The governor may embody the militia.

XXV. *And be it further enacted,* That where volunteer corps of artillery, horfe or infantry fhall be formed in purfuance of the aforementioned act of congrefs; the volunteers compofing the fame fhall not be permitted to leave fuch corps until he or they fhall have given two weeks notice of fuch intention, and fhall have produced a certificate from under the hand of the commanding officer of the company diftrict he belongs to, that his name is enrolled therein; and until the expiration of fuch notice fuch perfon fhall be liable to continue to do duty in fuch volunteer corps; and, in cafe of removal of refidence of any perfon liable to do militia duty from one diftrict to another, five days notice fhall be given to the officer of the company fuch perfon intends to remove from, and fhall produce a certificate from the officer of the company he intends to remove to, that his name is therein enrolled; and until fuch notice and certificate, fuch perfon fhall be liable to do militia duty in fuch company from which he fo intends to remove.

Members of volunteer corps of artillery, horfe &c. infantry, not to. leave the fame without notice and certificate.

Militia men not to remove out of any diftrict without notice. and like certificate.

XXVI. *And be it further enacted,* That any officer acting in an infamous or fcandalous manner unbecoming the officer, and which is likely to bring the militia fervice into difrepute, may be arrefted by order of the commander in chief, or the commanding officer of a divifion or brigade, on fufficient grounds appearing to them of fuch conduct, and on conviction thereof by a court martial, fuch officer may be cafhiered: And all diforders and neglects whilft on duty, or under orders which officers or privates may be guilty of to the prejudice of good order and difcipline, though not herein particularly provided for, may be noticed by a general, regimental or battalion court martial, and be punifhed by fine or forfeiture, not exceeding the penalties herein apportioned for other offences according to the rank of the offender.

All improper conduct of officers, diforders and neglect of duty, to be noticed by courts martial.

XXVII. *And be it further enacted,* That all fines[*] and forfeitures accruing by virtue of this act fhall, if arifing from default at regimental or battalion mufters, be paid into the hands of the major of fuch regiment or battalion for the exprefs purpofe of

Fines and forfeitures, how applied.

N n n                                                                          procuring,

[*] See act of 1795, No. 494, fect. 2, refpecting other fines.

Digitized by Google

EXHIBIT 5
00104

A. D. 1792.
No. 468.

procuring regimental and company colours: and all fines and forfeitures arising from defaults at company musters (except as herein excepted) shall be lodged in the hands of the captain thereof, to be applied in the purchase of drums and fifes; and such captain, after such purpose is attained, shall yearly account with, and pay to the major of such regiment or battalion, the overplus of such fines and forfeitures, who shall, after the expence of colours is deducted therefrom, pay the overplus of such regimental, battalion or company forfeitures into the public treasury, where all fines on general officers shall also be paid.

*Commanding officers of regiments have the sole appointment of the regimental staff.*

XXVIII. *And be it further enacted,* That the commanding officer of regiments shall have the sole appointment of the regimental staff as pointed out by the aforesaid act of congress, and that for the better understanding of this law as it has reference to the said act, the executive be empowered to direct a sufficient number of copies of that act to be struck off with this law, to be distributed one to each company of mi-

*The militia laws to be publicly read to companies, regiments or battalions.*

litia within this State, and one to each field and general officer within the same: And it is declared to be the duty of each company officer to have the said act, together with this law, publicly read over at least twice in each year to his company whilst under arms; and it shall be the duty of the field officers to have the same once in every year, read to the respective regiments or battalions whilst under arms, to which they may respectively belong: And the executive department is also further empowered and required to have a like number of copies of the rules and articles of war, in force with the troops of the United States, to be distributed in like manner, that the militia be not ignorant thereof when called into actual service.

*Major generals, brigadiers and adjutant general, how appointed.*

XXIX. *And be it further enacted,* That the major generals, brigadier generals, and adjutant general created by this act, shall be nominated in the following manner: The senate and house of representatives shall concur in the nomination of one person as major general for the first division; one other person as major general for the second division; and one other person for the major general for the third division of the militia of this State; and shall also concur in the nomination of one other person for the brigadier general of the first brigade of the first division; one other person for the brigadier general for the second brigade of the said division; one other person for the brigadier general of the first brigade of the second division; one other person for the brigadier general for the second brigade of the said last mentioned division; one other person for the brigadier general for the first brigade of the third division; and one other person as a brigadier general for the second brigade for the third and last division; and shall also concur in the nomination of one other fit and proper person as adjutant general; and a list of the names of such persons as shall be nominated as aforesaid, shall be signed by the president of the senate and speaker of the house of representatives, and transmitted to the governor within two days after such nomination, for the purpose of appointing and commissioning each and every of such nominated persons within ten days after he shall receive such lists of names as aforesaid.

*Vacancies by removal.*

XXX. *And be it further enacted,* That in case any officer shall remove out of the district, battalion or regiment for which he shall be appointed, then and in that case his commission shall be void; and all officers of divisions, brigades, regiments, battalions and companies shall be residents of the divisions, brigades, regiments, battalions and companies to which they severally belong. XXXI.

Digitized by Google

EXHIBIT 5
00105

LAWS OF GEORGIA.

XXXI. *And be it further enacted,* That the people called quakers, on producing a certificate from a quaker meeting of their being *bona fide* quakers, shall be exempt from all militia duty required by this act, and shall pay an extra tax of twenty-five *per centum* in addition to their general tax. *Provided,* That this act shall not extend to affect persons nor their estates who are herein exempt either from years, appointments or imbecility.

*A. D. 1792. No. 468. Quakers exempt from militia duty, on payment of additional tax. Proviso.*

XXXII. *And be it further enacted,* That the members of the legislature for the time being, and their officers, all judicial and executive officers, all ministers in orders, practitioners of physic, all public printers, all ferrymen, millers, all tutors and students, all justices of the peace, registers of probates, the treasurers, the surveyor general and county surveyors, the secretary of the State, invalids, post riders, madmen and ideots,† shall be and they are exempted from any of the duties required by this act, in addition to those exempted therefrom by the act of the United States.

*Certain other exemptions in addition to those mentioned in the act of the United States.*

WILLIAM GIBBONS, *Speaker of the House of Representatives.*
BENJAMIN TALIAFERRO, *President of the Senate.*
EDWARD TELFAIR, GOVERNOR.

*December* 14, 1792.

* So much of this sect. as exempts the "several officers" named, and all militia laws prior to this act, repealed by act of 1793, No. 494, sect. 15.

† See other exemptions by acts of 1794, No. 522, and 1795, No. 534.

*An Act for the more effectually preventing and punishing forgery.*

I. BE it enacted by the senate and house of representatives of the State of Georgia in general assembly met, That from and after the passing of this act, if any person or persons shall falsely make, forge, alter or counterfeit, or cause or procure to be falsely made, forged, altered or counterfeited, or willingly act or assist in the falsely making, forging, altering or counterfeiting any audited certificate, issued by the auditor general, or any order or warrant issued by his excellency the governor, or the honorable the president of the senate, or speaker of the house of representatives of this State, on the treasurer thereof, for any money or other thing, or any warrant for land issued by the justices of any land court within this State, or any certificate, draft, warrant or order from any of the public officers of this State, issued under or by virtue of any act or resolve of the general assembly, any deed, will, testament, bond, writing obligatory, bill of exchange, promissory note, or order for money or goods, or acquittance, or receipt for money or goods, or any endorsement or assignment of any bond, writing obligatory, bill of exchange, promissory note, or order for money or goods, with intent to defraud any person or persons whatsoever, or shall utter or publish as true, any false, forged, altered or counterfeited audited certificate, governors, presidents, speakers or other public officer's certificate, draft, warrant or order, so as aforesaid issued under or by virtue of any act, or resolve of the general assembly of this State, or any deed, will, testament bond, writing obligatory, bill of exchange,,

*To forge audited certificates, governors, presidents or speakers warrants, &c. &c.*

*Or to utter or publish the same as true.*

Digitized by Google

EXHIBIT 5
00106

# EXHIBIT "6"

EXHIBIT 6
0107



Content downloaded/printed from          *HeinOnline*

Thu Oct  3 16:12:07 2019

Citations:

Bluebook 20th ed.
1793 [xxix] .

ALWD 6th ed.
1793 [xxix] .

Chicago 7th ed.
, "," Maryland - General Assembly, November Session : [xxix]-[xxxv]

OSCOLA 4th ed.
, " 1793 [xxix]

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
    Conditions of the license agreement available at
        *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



**EXHIBIT 6**
**0108**

THOMAS SIM LEE, Esquire, Governor.    NOVEMBER.  1793.

C H A P.
XLVIII.

aſcertainment of ſuch valuation or damages, and before they ſhall proceed to affect the lands and te-
nements of the perſon or perſons concerned; provided, that the ſaid road ſhall not go through any
houſes, gardens, meadows or orchards, unleſs with the conſent of the owner thereof.

C H A P.    XLIX.

An ACT to authoriſe the regiſter of the land-office to iſſue a patent to Salathiel Fitchett for lot
number ſix in Nanticoke manor.  Lib. JG. No. 2. fol. 55.  A Private Act.

Paſſed 28th of
Dec. 1793.

C H A P.    L.

An ACT to ſettle and pay the civil liſt and other expences of civil government.  Lib. JG. No. 2.
fol. 55.

C H A P.    LI.

## An ACT for the ſupport of Rebecca Fowler.  Lib. JG. No. 2. fol. 56.

WHEREAS Juliana Fowler, of Queen-Anne's county, by her petition to this general aſſembly
hath ſet forth, that ſhe has, amongſt other children, a daughter, who is now a young woman,
who is blind, and alſo much afflicted with convulſion fits, which has in a great meaſure deprived her
of her ſenſes, and that ſhe, the ſaid Juliana Fowler, mother of the ſaid Rebecca, is not able to
maintain her, and prays that an act may paſs to provide for the ſupport of her ſaid daughter, out of
the poor-houſe; and the facts ſtated in the ſaid petition appearing true,

Preamble.

II. BE IT ENACTED, *by the General Aſſembly of Maryland*, That the juſtices of Queen-Anne's coun-
ty ſhall and they are hereby empowered, at their levy courts annually, ſo long as they may ſee cauſe,
to aſſeſs and levy on ſaid county a ſum of money, not exceeding twenty pounds, for the ſupport and
maintenance of the ſaid Rebecca Fowler.

Juſtices to levy
money, &c.

C H A P.    LII.

A Supplement to an act, * entitled, An act to prevent the exportation of flour, ſtaves and ſhingles,
not merchantable, from the town of Baltimore, in Baltimore county, and to regulate the weight
of hay and meaſure of grain, ſalt, flax-ſeed and firewood, within the ſaid town, and to prevent
the exportation of flour, not merchantable, from Fell's Point, in the ſaid county.  Lib. JG.
No. 2. fol. 57.

* 1771, ch. 20.

See the note under the original act.

C H A P.    LIII.

## An ACT to regulate and diſcipline the militia of this ſtate.  Lib. JG. No. 2. fol. 57.

A Supplement 1798, ch. 100.

WHEREAS the congreſs of the United States, by their act, entitled, An act more effectually
to provide for the national defence, by eſtabliſhing an uniform militia throughout the United
States, have enacted as follows, to wit: " Be it enacted, by the ſenate and houſe of repreſentatives
of the United States of America in congreſs aſſembled, That each and every free able bodied white
male citizen of the reſpective ſtates, reſident therein, who is or ſhall be of the age of eighteen years,
and under the age of forty-five years, (except as is herein after excepted,) ſhall ſeverally and re-
ſpectively be enrolled in the militia, by the captain or commanding officer of the company within
whoſe bounds ſuch citizen ſhall reſide, and that within twelve months after the paſſing of this act.
And it ſhall at all times hereafter be the duty of every ſuch captain or commanding officer of a com-
pany, to enrol every ſuch citizen as aforeſaid, and alſo thoſe who ſhall, from time to time, arrive at
the age of eighteen years, or being of the age of eighteen years and under the age of forty-five
years, (except as before excepted,) ſhall come to reſide within his bounds; and ſhall, without delay,
notify ſuch citizen of the ſaid enrolment, by a proper non-commiſſioned officer of the company, by
whom ſuch notice may be proved.  That every citizen ſo enrolled and notified, ſhall, within ſix
months thereafter, provide himſelf with a good muſket or firelock, a ſufficient bayonet and belt, two
ſpare flints, and a knapſack; a pouch with a box therein, to contain not leſs than twenty-four car-
tridges ſuited to the bore of his muſket or firelock, each cartridge to contain a proper quantity of
powder and ball; or with a good rifle, knapſack, ſhot-pouch and powder-horn, twenty balls ſuited
to the bore of his rifle, and a quarter of a pound of powder, and ſhall appear ſo armed, accoutred
and provided, when called out to exerciſe or into ſervice, except that when called out on company
days to exerciſe only, he may appear without a knapſack.  That the commiſſioned officers ſhall ſeve-
rally

Preamble.

EXHIBIT 6
0109

rally be armed with a sword or hanger, and espontoon; and that from and after five years from the passing of this act, all muskets for arming the militia as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound; and every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt, or for the payment of taxes. And be it further enacted, That the vice-president of the United States, the officers, judicial and executive, of the government of the United States, the members of both houses of congress, and their respective officers, all custom-house officers, with their clerks, all post-officers, and stage drivers who are employed in the care and conveyance of the mail of the post-office of the United States, all ferrymen employed at any ferry on the post-road, all inspectors of exports, all pilots, all mariners actually employed in the sea service of any citizen or merchant within the United States, and all persons who now are or may hereafter be exempted by the laws of the respective states, shall be and are hereby exempted from militia duty, notwithstanding their being above the age of eighteen, and under the age of forty-five years. And be it further enacted, That within one year after the passing of this act, the militia of the respective states shall be arranged into divisions, brigades, regiments, battalions and companies, as the legislature of each state shall direct; and each division, brigade and regiment, shall be numbered at the formation thereof, and a record made of such numbers in the adjutant-general's office in the state, and when in the field, or in service in the state, each division, brigade and regiment, shall respectively take rank according to their numbers, reckoning the first or lowest number highest in rank. That if the same be convenient, each brigade shall consist of four regiments, each regiment of two battalions, each battalion of five companies, each company of sixty-four privates. That the said militia shall be officered by the respective states as follows: To each division, one major-general, and two aids-de-camp with the rank of major; to each brigade, one brigadier-general, with one brigade inspector, to serve also as brigade-major, with the rank of a major; to each regiment, one lieutenant-colonel commandant; and to each battalion, one major; to each company, one captain, one lieutenant, one ensign, four serjeants, four corporals, one drummer, and one fifer or bugler. That there shall be a regimental staff, to consist of one adjutant and one quarter-master, to rank as lieutenants; one paymaster, one surgeon, and one surgeon's mate; one serjeant-major, one drum-major, and one fife-major. And be it further enacted, That out of the militia enrolled as is herein directed, there shall be formed for each battalion at least one company of grenadiers, light infantry or riflemen; and that to each division there shall be, at least, one company of artillery, and one troop of horse: There shall be to each company of artillery one captain, two lieutenants, four serjeants, four corporals, six gunners, six bombardiers, one drummer, and one fifer. The officers to be armed with a sword or hanger, a fusee, bayonet and belt, with a cartridge box to contain twelve cartridges; and each private or matross shall furnish himself with all the equipments of a private in the infantry, until proper ordnance and field artillery is provided. There shall be to each troop of horse, one captain, two lieutenants, one cornet, four serjeants, four corporals, one saddler, one farrier, and one trumpeter. The commissioned officers to furnish themselves with good horses, of at least fourteen hands and an half high, and to be armed with a sword and pair of pistols, the holsters of which to be covered with bearskin caps. Each dragoon to furnish himself with a serviceable horse, at least fourteen hands and an half high, a good saddle, bridle, mail pillion and valise, holsters, and a breastplate and crupper, a pair of boots and spurs, a pair of pistols, a sabre, and a cartouch box to contain twelve cartridges for pistols. That each company of artillery and troop of horse shall be formed of volunteers from the brigade, at the discretion of the commander in chief of the state, not exceeding one company of each to a regiment, nor more in number than one eleventh part of the infantry, and shall be uniformly cloathed in regimentals, to be furnished at their own expence; the colour and fashion to be determined by the brigadier commanding the brigade to which they belong. And be it further enacted, That each battalion and regiment shall be provided with the state and regimental colours by the field-officers, and each company with a drum and fife or bugle-horn, by the commissioned officers of the company, in such manner as the legislature of the respective states shall direct. And be it further enacted, That there shall be an adjutant-general appointed in each state, whose duty it shall be to distribute all orders from the commander in chief of the state to the several corps; to attend all public reviews, when the commander in chief of the state shall review the militia, or any part thereof; to obey all orders from him relative to carrying into execution and perfecting the system of military discipline established by this act; to furnish blank forms of different returns that may be required, and to explain the principles on which they should be made; to receive from the several officers of the different corps throughout the state, returns of the militia under their command, reporting the actual situation of their arms, accoutrements and ammunition, their delinquencies, and every other thing which relates to the general advancement of good order and discipline; all which the several officers of the divisions, brigades, regiments and battalions are hereby required to make in the usual manner, so that the said adjutant-general may be
duly

EXHIBIT 6
0110

THOMAS SIM LEE, Esquire, Governor.    November.   1793.

duly furnished therewith; from all which returns he shall make proper abstracts, and lay the same annually before the commander in chief of the state. And be it further enacted, That the rules of discipline approved and established by congress in the resolution of the twenty-ninth of March, one thousand seven hundred and seventy-nine, shall be the rules of discipline to be observed by the militia throughout the United States, except such deviations from the said rules as may be rendered necessary by the requisitions of this act, or by some other unavoidable circumstances. It shall be the duty of the commanding officer at every muster, whether by battalion, regiment or single company, to cause the militia to be exercised and trained agreeably to the said rules of discipline. And be it further enacted, That all commissioned officers shall take rank according to the date of their commissions; and when two of the same grade bear an equal date, then their rank to be determined by lot, to be drawn by them before the commanding officer of the brigade, regiment, battalion, company or detachment. And be it further enacted, That if any person, whether officer or soldier, belonging to the militia of any state, and called out into the service of the United States, be wounded or disabled while in actual service, he shall be taken care of and provided for at the public expence. And be it further enacted, That it shall be the duty of the brigade inspector to attend the regimental and battalion meeting of the militia composing their several brigades, during the time of their being under arms, to inspect their arms, ammunition and accoutrements, superintend their exercise and manœuvres, and introduce the system of military discipline before described throughout the brigade, agreeable to law and such orders as they shall, from time to time, receive from the commander in chief of the state; to make returns to the adjutant-general of the state, at least once in every year, of the militia of the brigade to which he belongs, reporting therein the actual situation of the arms, accoutrements and ammunition, of the several corps, and every other thing which, in his judgment, may relate to their government and the general advancement of good order and military discipline; and the adjutant-general shall make a return of all the militia of the state to the commander in chief of the said state, and a duplicate of the same to the president of the United States. And, whereas sundry corps of artillery, cavalry and infantry, now exist in several of the said states, which, by the laws, customs, or usages thereof, have not been incorporated with or subject to the general regulations of the militia, Be it further enacted, That such corps retain their accustomed privileges, subject, nevertheless, to all other duties required by this act, in like manner with the other militia." Wherefore, and to carry the said act into effect,

II. Be it enacted, *by the General Assembly of Maryland*, That fit and proper persons in each county    Persons to be of this state be appointed by the governor and council to make true and exact lists of the names of all    appointed, &c. able bodied white male citizens between eighteen and forty-five years of age, (except as in the before recited act and as herein after excepted,) distinguishing in the said lists the quakers, menonists and tunkers, and persons conscientiously scrupulous of bearing arms, and the apprentices and their trade, and the name of the master to whom they are apprenticed, and cause the said lists to be completed on or before the tenth day of April next, and shall return the same to the commissioners of the tax of the several and respective counties of this state, on or before the said tenth day of April next.

III. And be it enacted, That every person, so appointed to take the lists of names in the    Who shall be several counties aforesaid, shall be allowed for his trouble at the rate of two dollars and two thirds    allowed, &c. of a dollar for every hundred persons so listed, which sums shall be paid by the treasurer of the shore where they reside, and the governor and the council may, in their discretion, add to the sum to be allowed to the persons to be appointed in Allegany county, and diminish it in cases of appointments in Baltimore-town, as they may think just and necessary, so as to make the compensation equal to the service performed as nearly as may be.

IV. And be it enacted, That if any free male white citizen, of the age of eighteen years and    Penalty for not under the age of forty-five years, when called on by any of the persons so to be appointed by the    giving in governor and the council, shall not give in his name to be listed, if unknown to the person requiring    names, &c. it, he shall forfeit and pay the sum of ten dollars for every such offence.

V. And be it enacted, That if any such person, of the age of eighteen years and upwards,    And for not in when called on as aforesaid, shall not inform the person so to be appointed, that he is of the age of    forming, &c. eighteen years and upwards, and if any such person, under the age of forty-five years, when called on as aforesaid, shall inform the person so to be appointed, that he is of the age of forty-five years or upwards, every such person, so offending, shall forfeit and pay the sum of ten dollars for every such offence.

L l l                                            VI. And

EXHIBIT 6
0111

C H A. P.
LIII.
No free citizen
to be excused,
&c.

VI. AND BE IT ENACTED, That no free white male citizen, of the age of eighteen and under the age of forty-five years, shall be excused from militia duty on account of inability, unless he shall obtain from the surgeon of the regiment to which he shall belong, or some reputable physician in his neighbourhood, a certificate that he is not of sufficient ability to perform militia duty.

Persons appointed, to make returns, &c.

VII. AND BE IT ENACTED, That as soon as may be, and within fifteen days after the aforesaid tenth day of April next, all the persons so to be appointed by the governor and council in each and every county of this state, who shall accept such appointment, shall make true and exact returns of all the free white male citizens by them respectively listed as aforesaid to the governor and council, under the penalty of forty dollars for every neglect; and the governor and council shall forthwith proceed to appoint the proper officers thereto, agreeably to the provisions of the before recited act; that thereupon each and every free white male citizen, who shall be of the age of eighteen years and under the age of forty-five years, (except as before excepted,) shall severally and respectively be enrolled in the militia by the captain or commanding officer of the company within whose bounds such citizen shall reside, under the direction of the brigadier-general of the brigade, and that on or before the twentieth day of June next; and it shall at all times hereafter be the duty of every such captain or commanding officer of a company, to enrol every such citizen as aforesaid, and also those who shall, from time to time, arrive at the age of eighteen years, or being of the age of eighteen years and under the age of forty-five years, (except as before excepted,) shall come to reside within his bounds, and shall, without delay, notify such citizen of the said enrolment, by a proper non-commissioned officer of the company, by whom such notice may be proved.

Governor, &c. to arrange the militia, &c.

VIII. AND BE IT ENACTED, That on or before the twentieth day of June next, the governor and council shall arrange the militia of the state into divisions, brigades, regiments, battalions and companies, and shall number each division, brigade and regiment, at the formation thereof, and a record shall be made of such numbers in the adjutant-general's office; that if the same be convenient, each brigade shall consist of four regiments, each regiment of two battalions, each battalion of five companies, each company of sixty-four privates, four serjeants, four corporals, one drummer and one fifer or bugler.

Grenadiers to be formed, &c.

IX. AND BE IT ENACTED, That out of the militia enrolled as aforesaid, there shall be formed for each battalion at least one company of grenadiers, light infantry or riflemen; that to each division there shall be a company of artillery and one troop of horse, formed and officered according to the directions of the before recited act.

Officers to arm themselves, &c.

X. AND BE IT ENACTED, That all commissioned officers, who shall be appointed as aforesaid by the governor and council, and who shall accept such appointment, shall, on or before the tenth day of July next, arm, accoutre and provide themselves, in the manner by the said before recited act directed, under the penalty of twenty dollars for such neglect; and each non-commissioned (a) officer and matross in the artillery, and each non-commissioned officer and dragoon in the companies of horse, shall, on or before the first day of August next, arm, accoutre and provide himself, in like manner, under the penalty of six dollars current money for such neglect.

(a) By 1798, ch. 100, the captains or commanding officers of companies are to appoint the non-commissioned officers.

Ministers exempt.

XI. AND BE IT ENACTED, That all ministers of the gospel, regularly ordained or licensed by any religious society, shall be and are hereby exempted from militia duty.

Officers to take an oath.

XII. AND BE IT ENACTED, That each and every officer, appointed and commissioned by virtue of this act, shall, previous to their entering on the execution of their respective offices, take the following oath, or affirmation: "I, —— ——, do swear, or affirm, (as the case may be,) that I will "be true and faithful to the state of Maryland."

Colours, &c. to be provided, &c.

XIII. AND BE IT ENACTED, That the state and regimental colours shall be provided by the field-officers, and the drums and fifes, or bugle-horns, by the commissioned officers of companies, who shall contribute to the same in proportion to the pay they would respectively be entitled to receive if now called into actual service; and if the said colours, drums, fifes or bugle-horns, shall not be provided on or before the first day of August next, in the manner herein directed, every officer who shall have neglected to contribute his proportion shall forfeit and pay one third of a month's pay to which such officers respectively are entitled when called into actual service.

XIV. AND

EXHIBIT 6
0112

XIV. And be it enacted, That the whole of the militia, so enrolled as aforesaid, shall, after the first day of June next, be exercised under their respective officers, as followeth; that is to say, in companies on some day in August and November, and in battalion on some day in October, after the tenth day thereof; and after the year seventeen hundred and ninety-four, the said militia shall be exercised as aforesaid, in companies on some day in the months of April and November, in battalion on some day in August, and in regiment on some day in October, after the tenth day thereof; that the captains (a) of companies shall appoint the days and places of meeting in companies, the majors (b) shall appoint the days and places of meeting in battalion, and the lieutenant-colonels shall appoint the days and places of meeting in regiment; on each of which days every militia-man so enrolled shall duly attend with his arms and accoutrements in good order, (c) and the captain or commanding officer of each company is required to appoint a fit and proper person, who shall, at the end of one hour after the time appointed for the meeting of the company, battalion or regiment, call over the muster-roll of the company, noting those who are absent, and on that day shall make return in writing to the captain or commanding officer then present, of such absentees; and all the persons so absent at the time of calling over the roll, or who shall depart from the parade before duly discharged, shall be liable to the fines hereafter mentioned. CHAP. LIII. Militia to be exercised, &c.

(a) By 1798, ch. 100, the captains, &c. are to give notice of every muster day to the non-commissioned officers, who are to give notice to the privates.

(b) By 1798, ch. 100, the brigadier-general is to appoint the days of meeting of each regiment, battalion and extra battalion.

(c) By 1798, ch. 100, non-commissioned officers or privates, who have muskets or guns, and appear without them, are subject to be fined.

XV. And be it enacted, That if any commissioned officer shall refuse or neglect to attend on any of the days which shall be appointed for exercise, accoutred and equipped as aforesaid, (unless prevented by sickness, or some other unavoidable accident,) such commissioned officer shall forfeit and pay a sum not exceeding six dollars per day; (d) and any non-commissioned officer or matross in the artillery, and any non-commissioned officer or dragoon, who shall so refuse or neglect to attend on any of the said days, armed and accoutred as aforesaid, (except as before excepted,) shall forfeit a sum not exceeding two thirds of a dollar per day; and all other non-commissioned officers and privates, who shall so refuse or neglect to attend, armed and accoutred as herein before directed, (except as before excepted,) shall forfeit and pay one cent per day, unless excused for appearing without arms and accoutrements by the commanding officer of their respective companies for the day; and if they shall not attend on the several days of meeting, to be appointed as aforesaid, each and every person so neglecting shall forfeit and pay half a dollar per day, unless prevented by sickness, or other unavoidable accident; the names and surnames of all which persons, so incurring the said fines and penalties, (except such as may have paid the same into the hands of the captain or commanding officer of the company,) shall be duly and forthwith returned by the captain or commanding officer of each company, under his hand, together with such fines as he has received, to the lieutenant-colonel of the regiment to which he shall belong, who shall, immediately after the said returns are made to him, cause the same to be respectively recovered before some justice of the peace living near the place where the delinquents respectively reside, as in the case of small debts; and the said lieutenant-colonel shall, twice in every year, account with the treasurer of his shore for all monies so received, and pay the same over to such treasurer, to be subject to the future application of the general assembly. Penalty on officers, &c. for not attending, &c.

(d) By 1798, ch. 100, officers, non-commissioned officers and privates, may be fined for non-attendance by courts martial, as therein directed.

XVI. And be it enacted, That a duplicate of all returns made to the lieutenant-colonels as aforesaid, and an account of all money paid to them, shall be annually lodged by the respective persons making such returns or payments with the treasurer of their respective shores. A duplicate to be lodged, &c.

XVII. And, whereas the remote and detached situation of that part of the militia of Queen-Anne's county who reside on Kent Island, renders it impracticable for them to meet in battalion or regiment off the said island; therefore, Be it enacted, That the militia residing on Kent island shall not be compelled to meet in battalion or regiment, but that the companies composed of the militia on said island shall nevertheless be subject to be called together to exercise twice a year on said island exclusive of company meetings, at such times and at such place as the commanding officer of the battalion to which they belong shall direct, and shall be subject to the same fines for not appearing at said meetings as others are for not meeting in battalion or regiment, any thing in this act to the contrary notwithstanding. Militia on K. Island not compelled to meet, &c.

**C H A P.**
**LIII.**
**Quakers, &c.**
**excused, &c.**

XVIII. AND BE IT ENACTED, That all thofe perfons called Quakers, Menonifts and Tunkers, and all other perfons confcientioufly fcrupulous of bearing arms, fhall be excufed from militia duty, (except when called into actual fervice,) on the payment of two dollars each on the firft day of September annually, to the lieutenant-colonel of the regiment to which they fhall refpectively belong; which faid fums fhall be collected in manner aforefaid, and be accounted for annually, on or before the firft day of December, and paid to the treafurer of the eaftern and weftern fhores refpectively, fubject to the future difpofition of the general affembly.

This fection is repealed by 1798, ch. 100, which provides that fuch perfons fo refufing fhall pay three dollars annually.

**Mafters, &c.**
**accountable,**
**&c.**

XIX. AND BE IT ENACTED, That the mafter or miftrefs of any apprentice, and the father, or mother or guardian of any minor, not a matrofs or dragoon, who fhall refufe or neglect to attend as aforefaid, being in the fervice of his father, or mother or guardian, mafter or miftrefs, fhall be accountable for the fine or fines fo incurred by fuch minor or apprentice.

**Any perfon**
**draughted may**
**find a fubfti-**
**tute, &c.**

XX. AND BE IT ENACTED, That when any part or parts of the militia fhall be draughted, or called out of the ftate into actual fervice, every perfon enrolled as aforefaid, who is not a commiffioned officer, fhall have it in his choice, either to ferve in perfon, or to find a fufficient perfon for a fubftitute, which faid fubftitute fhall be approved of by the lieutenant-colonel, or commanding officer of the battalion to which he fhall belong; but if any perfon, not being difabled by ficknefs, fhall neglect or refufe to ferve, or find fuch fufficient fubftitute in his place within ten days after notice given to him, the lieutenant-colonel, or commanding officer of the battalion to which fuch delinquent belongs, fhall, and he is hereby required to provide, hire or procure, on as reafonable terms as may be, a fubftitute for fuch perfon fo refufing or neglecting, and to charge fuch fum or fums, together with reafonable expences for procuring the fame, to fuch delinquent, to be recovered by diftrefs, and fale of his goods and chattels, lands or tenements, by warrant under the hands and feals of any two juftices of the peace of the county where fuch perfon refides; and in all cafes where it fhall be neceffary to recover any fine or forfeiture, or other money wherewith any perfon or perfons may become chargeable under and by virtue of this act, by diftrefs and fale, or execution, of the property of fuch perfon or perfons, it is hereby declared to be the duty of the fheriff, or perfon executing for the fame, to take fuch property as fhall be offered or fhewn to fuch fheriff, or perfon executing, amounting to fuch debt and coft, and if no property fhall be fhewn or offered, fuch fheriff, or perfon executing, fhall not take in execution any negro, or other valuable property, to fatisfy a fmall or trifling fine or fum, if property of fmall value can be found, but he fhall take fuch property, if any fuch can be found, as will pay the fum due, with the coft of levying the fame, and no more, as nearly as may be; and any perfon offending herein fhall forfeit and pay treble the fum fo levied, to be recovered by the party grieved by indictment or action of debt in the county where the offence fhall happen; provided, that no lieutenant-colonel, or commanding officer of a battalion, fhall be obliged to provide a fubftitute for any delinquent, unlefs he is of opinion that fuch delinquent has fufficient property to pay the expences of procuring a fubftitute; and if fuch lieutenant-colonel or commanding officer fhall be of opinion, that any delinquent has not fufficient property to pay the expences of procuring a fubftitute, he fhall make application to a juftice of the peace of the county where fuch delinquent refides, who, upon fuch application, fhall iffue his warrant to the fheriff of the county to arreft the delinquent, and imprifon him in the common gaol, there to remain for a certain time, to be fpecified in the warrant, not exceeding twenty days, and the fheriff fhall be obliged to keep fuch delinquent in the common gaol, agreeable to the command of the faid warrant, unlefs he fhall agree to ferve, or find a fufficient fubftitute in his place; provided alfo, that no militia-man, having perfonally or by fubftitute ferved in the militia, fhall be obliged to ferve again until by rotation it comes to his turn.

**Perfons ag-**
**grieved may**
**appeal, &c.**

XXI. AND BE IT ENACTED, That if any perfon or perfons fhall think him, her or themfelves aggrieved in the feizure of his, her or their goods and chattels, lands or tenements, or by the executing his, her or their perfon or perfons, he, fhe or they, may enter an appeal before the juftices of the next county court, and on the party's giving fufficient fecurity within fix days next after any goods or chattels, lands or tenements, fhall be feized or diftrained as aforefaid, or his, her or their perfon or perfons executed as aforefaid, to profecute fuch appeal with effect, the juftices fhall receive the fame, and ftay further procefs; and the faid juftices fhall return every fuch appeal on the fecond day of the next term, and the court fhall direct a trial by jury of the county, as in other cafes of debt, whofe verdict fhall be final and conclufive, and, except in extraordinary cafes, of which the court fhall be judge, all fuch appeals fhall be tried at the term to which fuch returns fhall be made, any law, cuftom or ufage, to the contrary notwithftanding.

XXII. AND

EXHIBIT 6
0114

XXII. AND BE IT ENACTED, That no militia-man shall leave the company to which he belongs, and join any other, under the penalty of ten dollars, unless by consent of the captain, or commanding officer of the company, or in case of removing to some other district within this or any other state, and in such case he shall apply to the commander of such company, who shall give him a certificate of his being discharged, under the penalty of ten dollars, and if the said militia-man had been in actual service, shall also certify the time thereof, and how long he had continued therein, under the like penalty.

**C H A P. LIII.** No militia-man to leave his company, &c.

XXIII. AND BE IT ENACTED, That no person, serving as a substitute for another, shall thereby be excused from serving in his turn.

Substitutes not excused, &c.

XXIV. AND BE IT ENACTED, That no officer or private of the militia shall be subject to any arrest, either on mesne process or execution, or in any other manner, for any civil matter, in his attendance at, going to, or returning from, muster.

Officers, &c. not subject to arrest, &c.

XXV. AND BE IT ENACTED, That if any suit or suits shall be brought or commenced against any person or persons for any thing done in pursuance of this act, the action shall be laid in the county where the cause or causes of such action did arise, and not elsewhere, and the defendant or defendants may plead the general issue, and give this act and the special matter in evidence; and if the jury shall find for the defendant or defendants in such action or actions, or if the plaintiff or plaintiffs shall be nonsuited, or discontinue his or their action or actions, after the defendant or defendants shall have appeared, or if upon demurrer judgment shall be given against the plaintiff or plaintiffs, the defendant or defendants shall have treble costs, and have the like remedy for the same as any defendant or defendants hath or have in other cases to recover costs by law.

Action to be laid in the county, &c.

XXVI. AND, whereas sundry companies of artillery, cavalry and infantry, now exist, or may exist, in the town of Baltimore, previous to the twentieth day of May next, BE IT ENACTED, That all such companies now formed, or that may be formed previous to the said twentieth day of May next, shall be and are hereby continued and confirmed, subject nevertheless to all duties, fines and penalties, to which the rest of the militia are subjected by this act; provided, that the governor, with the advice and consent of the council, shall have the appointment and commissioning of the officers of the said companies.

Companies continued, &c.

XXVII. AND BE IT ENACTED, That this act shall continue and be in force for and during the continuance of the before recited act of congress.

Duration.

The act of congress is not limited in its duration.

## C H A P.   LIV.

**An ACT to open and lay out roads from Denton, the seat of justice in Caroline county, to different parts of said county, and the same, when opened and laid out, to be the public roads of said county. Lib. JG. No. 2. fol. 67.**

Passed 28th of Dec. 1793.

WHEREAS the inhabitants of Caroline county experience considerable inconvenience for the want of public roads leading from Denton, their seat of justice, to different parts of said county, and as it is right and proper they should have the same for their ease and convenience; therefore,

Preamble.

II. BE IT ENACTED, by the General Assembly of Maryland, That Henry Downes, Joseph Richardson, Christopher Driver, William Robinson and Robert Hardcastle, be and they are hereby appointed commissioners to open and lay out the following roads in Caroline county aforesaid, to wit: A road from the west side of Choptank river, opposite to Denton, to intersect the road from Tuckahoe Bridge to Price's Landing; another road from the west side of Choptank river, opposite to Denton, to Tuckahoe Bridge; another road from the west side of Choptank river, opposite to Denton, to intersect the road from Greensborough to Tuckahoe Bridge at or near the Deep Branches; a road from Denton, down Choptank river, to intersect the road leading from Greensborough to Dover ferry between Rhodes's plantation and the mill commonly called and known by the name of Potter's Mill; another road from Denton to intersect the road from Greensborough to Dover ferry between the Old Chapel, and the Three Bridges; and one other road from Denton, up Choptank river, to intersect the road from Greensborough to Dover ferry at or near Matthew Driver's saw mill; and the said commissioners,

Commissioners appointed, &c.

**EXHIBIT 6**
**0115**

# EXHIBIT "7"

EXHIBIT 7
0116



Content downloaded/printed from          *HeinOnline*

Thu Oct  3 17:05:02 2019

Citations:

Bluebook 20th ed.
1793 289 .

ALWD 6th ed.
1793 289 .

Chicago 7th ed.
, "," Massachusetts - Acts & Laws, May Session : 289-308

OSCOLA 4th ed.
, " 1793 289

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
    Conditions of the license agreement available at
        *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



**EXHIBIT 7**
**0117**



# Acts *and* Laws,

## Paſſed by the GENERAL COURT of *Maſſachuſetts* :

Begun and held at Boston, in the County of Suf-
folk, on Wedneſday the Twenty-ninth Day of
May, Anno Domini, 1793.

### C H A P. I.

An Act for regulating and governing the Militia
of the Commonwealth of Maſſachuſetts, and for
repealing all Laws heretofore made for that Pur-
poſe ; excepting an Act, intitled "An Act for
eſtabliſhing Rules and Articles for governing the
Troops ſtationed in Forts and Garriſons, within
this Commonwealth, and alſo the Militia, when
called into actual Service."

*WHEREAS the Laws for regulating and governing the Mili-
tia of this Commonwealth, have become too complicated for*
*practical uſe, by reaſon of the ſeveral alterations which have from*
*time to time been made therein :*     Therefore,    Preamble.

I. *BE it enacted by the* Senate *and* House *of* Represen-
tatives *in General Court aſſembled, and by the authority of the*
*ſame,* That the ſeveral Laws heretofore made for governing and
                                                 regulating    Laws repealed.

**EXHIBIT 7**
**0118**

regulating the Militia, be, and hereby are repealed, except an Act,
intitled " An Act for establishing Rules and Articles for govern-
ing the Troops stationed in Forts and Garrisons within this Com-
monwealth, and also the Militia when called into actual service."

*Proviso.*     *Provided nevertheless,* That all officers actually in commission,
agreeably to the laws which are hereby repealed, and in grades
which are established by this Act, shall continue in commission in
the same manner, and in the same authority they would, in case the
said laws were still in force ; and all actions depending in any Court
by force of said laws, shall, and may be prosecuted to final judg-
ment and execution.

*Persons to be enrolled in the Militia.*     II.  *And be it enacted by the authority aforesaid,* That each and
every free, able-bodied white male citizen, of this, or any other of
the United States, residing within this Commonwealth, who is,
or shall be of the age of eighteen years, and under the age of forty-
five years (except as is herein after excepted) shall severally and
respectively be subject to the requisitions of this Act, and shall be
enrolled in the Militia, by the Captain or Commanding Officer
of the company, within whose bounds such citizens shall reside,
within three months from and after the passing this Act :  And it
shall be at all times hereafter the duty of the Commanding Officer
of every such company; to enroll every such citizen as aforesaid ;
and also those, who shall from time to time arrive at the age of
eighteen years, or being of the age of eighteen years, and under the
age of forty-five years, and not herein after excepted, shall come to
reside within his bounds ; and shall without delay notify such citi-

*To be notified.*     zen of the enrollment, by a non-commissioned officer or other
person, duly authorized for that purpose, by whom such notice may
be proved ;  and in all cases of doubt respecting the age of any per-
son enrolled, or intended to be enrolled, the party questioned, shall
prove his age to the satisfaction of the Commanding Officer of the
company within whose bounds he may reside.

III.  *And be it further enacted by the authority aforesaid,* That
the Vice-President of the United States ; Members of Congress, of
both Houses, with their respective Officers ; Lieutenant-Governor ;

*Persons ex-empted from training.*     Members of the Council, Senate and House of Representatives, with
their Officers ;  Secretary and Treasurer of the Commonwealth ;
Officers, Judicial and Executive, of the Government of the United
States ;  Justices of the Supreme Judicial Court ;  Justices of the
Courts of Common Pleas ;  Judges of Probate ;  Registers of Pro-
bate ;  County Registers ;  Justices of the Peace ;  Sheriffs ;  De-
puty-Sheriffs ;  Coroners ;  Constables ;  Selectmen ;  Ministers of
the Gospel ;  Elders and Deacons of Churches ;  Church War-
dens, and those of the religious denominations of Quakers and Sha-
kers ;  Masters of Arts ;  Officers and Students at any College ;  also
such Physicians, Surgeons, stated School-Masters, Ferrymen and
Millers, as the Selectmen of the towns to which they shall severally
belong, shall by a writing under their hands, signify the expediency
                                                                    of

**EXHIBIT 7**
**0119**

*In the Year of our LORD,* 1793.

of exempting; perfons who have by commiffion under any govern-
ment or Congrefs, or by election in purfuance of the orders of
any Congrefs of the United States, or either of them, held the of-
fice of a Subaltern or office of higher rank ; and all Mariners ac-
tually employed in any fea-fervice of any citizen within the United
States, in any veffel of more than thirty tons burthen ; Cuftom-
Houfe-Officers ; all Poft-Officers, Stage-Drivers, actually em-
ployed in the care and conveyance of the Mail ; and fuch perfons
as did attain to the age of forty years before the eighth day of *May,*
one thoufand feven hundred and ninety-three ; and alfo all fuch
Manufacturers as are by any fpecial law of the Commonwealth
now exempted, fhall be, and hereby are exempted from the faid
enrollment.

IV. *And be it further enacted by the authority aforefaid,* That
the Governor, by and with the advice of the Council, be, and *Arrangement of the Militia.*
hereby is authorized and empowered to form and arrange the Mili-
tia into divifions, brigades, regiments and companies ; and from
time to time to make fuch alterations therein as fhall be neceffary ;
and if the fame be convenient, each brigade fhall confift of four re-
giments, each regiment of ten companies, and each company of
fixty-four effective privates : *Provided notwithftanding,* That the *Provifo.*
prefent arrangement of the Militia fhall continue as it now is, un-
til the Governor, with the advice of Council, fhall otherwife or-
der ; and each new divifion, brigade and regiment fhall be num-
bered at the formation thereof, and a record made of fuch number
in the Adjutant-General's office, and when in the field or in fer-
vice, each divifion, brigade and regiment fhall refpectively take
rank according to its number.

V. *And be it further enacted by the authority aforefaid,* That
the Militia fhall be officered, as follows : To each divifion, one *Manner of officering the Militia.*
Major-General and two Aids-de-Camp, with the rank of Major :
To each brigade, one Brigadier-General, with one Brigade-Infpec-
tor, to ferve alfo as Brigade-Major, with the rank of Major : To
each regiment, one Colonel, one Lieutenant-Colonel, one Major.
*Provided neverthelefs,* where any vacancy of Colonel now is, or
fhall hereafter happen, then the field-officers of each regiment to
confift of a Lieutenant-Colonel-Commandant, and two Majors :
To each company of infantry, one Captain, one Lieutenant, and
one Enfign, four Serjeants, four Corporals, one Drummer, one
Fifer or Bugler : That there fhall be a Regimental Staff, to con-
fift of one Adjutant, one Quarter-Mafter, to rank as Lieutenants,
one Surgeon, and one Surgeon's Mate, to be appointed by the Com-
manding-Officer of the regiment, and commiffioned by the Gover-
nor, one Serjeant-Major one Quarter-Mafter-Serjeant, one Drum-
Major, and one Fife-Major : That each company of artillery
fhall confift of one Captain, two Lieutenants, four Serjeants, four
Corporals, fix Gunners, fix Bombadiers, one Drummer, one Fifer,
and

EXHIBIT 7
0120

*In the Year of our LORD, 1793.*

and thirty-two Privates or Matroffes : And each troop of cavalry fhall confift of one Captain, two Lieutenants, and one Cornet, four Serjeants, four Corporals, one Saddler, one Farrier, one Trumpeter, and thirty-two Privates :. And there fhall be one Adjutant-General and one Quarter-Mafter-General for the whole Militia, to be appointed by the Governor.

VI. *And be it further enacted by the authority aforefaid,* That each and every Major-General be, and hereby is empowered, and **Major-General empowered in election of Officers.** it fhall be his duty, to give all fuch orders, as fhall from time to. time be neceffary, confiftent with the law for electing Brigadier-Generals, Field-Officers, Captains and Subalterns, in brigades, regiments and companies, within his refpective divifion, which have not been already commiffioned, and for filling up vacancies of fuch officers or any of them, where they now are or may hereafter happen. *Provided always,* That whenever a time fhall be appointed for the election of any Officer or Officers, the electors fhall have **Provifo.** ten days notice thereof, at leaft ; and all returns of elections, and neglects, or refufals to make choice of Officers, fhall be made to the Governor by the Major-General, in whofe divifion the election fhall be ordered ; and all commiffions fhall pafs through the hands of the Major-Generals to the officers in their refpective divifions, for whom they fhall be made out ; and every perfon who. fhall be elected to any office in the faid Militia, and fhall not within ten days after he fhall have been notified of his election, (excepting a Major-General, who fhall be allowed thirty days after he fhall be notified by the Secretary of the Commonwealth) fignify his acceptance thereof, fhall be confidered as declining to ferve in fuch office ; and orders fhall be forthwith iffued for a new choice.

**All Officers to fubfcribe the oath.** VII. *And be it further enacted by the authority aforefaid,* That every perfon who fhall be lawfully intitled to be commiffioned to any office in the Militia of this Commonwealth, fhall at the time of receiving his commiffion, take and fubfcribe the oaths and declaration required by the Conftitution, before fome Juftice of the Peace, or fome General or Field-Officer, who fhall have previoufly taken and fubfcribed them himfelf, and who are hereby authorized to adminifter the fame ; and a certificate thereof fhall be made on the back of every commiffion, by the Juftice of the Peace, or General or Field-Officer, before whom the faid oaths and declaration fhall have been taken and fubfcribed.

VIII. *And be it further enacted by the authority aforefaid,* That the Commanding Officer of regiments, fhall appoint the non-com-**Non-commiffioned Officers by whom appointed.** miffioned Staff-Officers of their refpective regiments : The Commanding Officers of Companies fhall appoint the non-commiffioned Officers, including the Clerks, of the refpective companies : All non-commiffioned Staff-Officers and Sergeants fhall receive warrants under the hand of the Commanding Officer of their refpective regiments or corps :—And the Adjutant fhall keep a record in a fuitable

EXHIBIT 7
0121

able book, to be kept for that purpofe, of all warrants which fhall be iffued :—And no non-commiffioned Officer fhall be deemed to have refigned his office, until he fhall have done it in writing to the Commanding Officer of the regiment or corps to which he belonged ; and fhall have obtained his difcharge alfo in writing, from fuch Commanding Officer :—And no non-commiffioned Officer or Private, fhall be difenrolled from the Militia for difability, without a certificate from the regimental Surgeon and Mate *Refignations to be given in writing.*

IX. *And be it further enacted by the authority aforefaid,* That every company fhall have a Clerk, who fhall be alfo one of the Serjeants, and he fhall be fworn to the faithful difcharge of his truft ; and it fhall be his duty always to keep a fair and exact roll of the company, together with the ftate of the arms and equipments belonging to each man, which roll he fhall annually revife and correct in the month of *May,* as is herein after directed ; to regifter all orders and proceedings of the company in an orderly book, which fhall never be alienated from the company ; to keep exact details of all detachments ; to call the roll whenever the company is affembled ; to examine the equipments when thereto required, and to note all delinquencies ; to fue for, recover and receive all fines and forfeitures which are required by this Act to be recovered, one half to his own ufe for his trouble, and the other half to be paid to the Commanding Officer of the company, in truft, for the ufe of the company to which he belongs, excepting fuch cafes wherein other provifion is made by this Act, for the recovery and appropriation of fines and forfeitures. *Clerks to be appointed. — Their duty. — empowered to fue. Appropriations.*

*Provided neverthelefs,* That all commiffioned Officers now in command in the Militia, in any grade not eftablifhed by this Act, fhall be continued in their command; and the Clerks of companies, now in office, fhall be continued in fuch office. *Provifo.*

X. *And be it further enacted by the authority aforefaid,* That whenever a company fhall have neither commiffioned Officers nor non-commiffioned Officers, the Commanding Officer of the regiment or battalion to which fuch company belongs, fhall appoint fuitable perfons within faid company to be non-commiffioned Officers and Clerk of the fame ; and fuch non-commiffioned Officers and Clerk, fo appointed, fhall be authorized in the fame manner, and have the fame power, and authority, as if they had been appointed by a Captain duly qualified to command faid company. *Non-commiffioned Officers appointed in cafe.*

XI. *And be it further enacted by the authority aforefaid,* That no Officer of the Militia fhall be difcharged excepting by the Commander in Chief, on the requeft of fuch Officer, in writing, or by the Commander in Chief on the addrefs of both Houfes of the Legiflature ; or by being difbanded by a law of the Commonwealth, or by a judgment of a Court-Martial, or by actual removal, (the Major-General to be judge whether the diftance is fo great that he cannot conveniently difcharge the duties of his office) or by twelve *Prohibition.*

B                                                            months

**EXHIBIT 7**
**0122**

months abſence, without leave of ſuch Officer, from the diſtrict
of his command : And no Officer ſhall conſider himſelf exempted
from the duties of his ſtation, until he ſhall have been diſcharged
in one or other of the methods aforeſaid : And if by the Comman-
der in Chief, not until he ſhall have received a certificate of ſuch
diſcharge : No Officer ſhall be allowed to reſign his commiſſion
when under arreſt ; and no General or Field-Officer ſhall approve
the reſignation of any other Officer, until ſuch Officer ſhall have
lodged in his hands all ſuchMilitia laws and orderly books as he
ſhall have been furniſhed with by the Government ; and ſuch
General or Field-Officer ſhall deliver the laws and orderly books
which he ſhall thus have received, to the next ſucceeding Officer
who ſhall be commiſſioned in the place of him who ſhall have
reſigned.

XII. *And be it further enacted by the authority aforeſaid,*
That the Governor, with the advice of Council, be and hereby is
authorized to complete the cavalry in each brigade of the Militia,

Cavalry organ-
ized.
to two full companies or troops ; and the cavalry in each brigade,
when completed, ſhall be formed into battalions or ſquadrons;
in thoſe brigades where there are or may be two or three troops,
they ſhall form ſquadrons, and each ſquadron ſhall be commanded
by a Major ; in thoſe brigades where there are already more than
three troops, they ſhall form battalions, and each battalion ſhall
be entitled to a Lieutenant-Colonel, Major, Adjutant and Quarter-
Maſter : *Provided always,* That in thoſe brigades where there are
already two troops raiſed, they ſhall not be augmented ; and in

Proviſo's.
thoſe brigades where there are already more than two troops, they
ſhall not be reduced. *Provided alſo,* That the companies of ca-
valry which are by any former Act, annexed to any regiment, ſhall
continue to be ſo attached to ſuch regiment in which it is raiſed.
The Officers of cavalry ſhall furniſh themſelves with good horſes,
at leaſt fourteen hands and a half high ; and ſhall be armed with

Officers and
men to furniſh
themſelves
complete with
horſes and every
other equip-
ment.
a pair of piſtols, and a good ſword, the holſters of which ſhall be
covered with bearſkin caps : Each horſeman ſhall furniſh himſelf
with a ſerviceable horſe, of at leaſt fourteen hands and a half high ;
a good ſaddle, bridle, mailpillion and valiſe ; holſters, a breaſtplate,
and crupper ; a pair of boots and ſpurs, a pair of piſtols ; a ſabre,
and cartridge-box, to contain twelve cartridges for piſtols. No
man ſhall be enliſted into any troop of cavalry, unleſs he ſhall
own and conſtantly keep a ſuitable horſe, and furniture, for that
ſervice ; and if any man who ſhall belong to any troop of cavalry,
ſhall be deſtitute of a ſuitable horſe and furniture, for more than
three months at one time, he ſhall be diſcharged from ſuch corps,
and enrolled in the ſtanding company in which he reſides. And
whenever any draft or detachment ſhall be made from a troop of
cavalry, for actual ſervice, the men thus drafted or detached, ſhall
march with their own horſes ; and before they march, the horſes
                                                      ſhall

**EXHIBIT 7**
**0123**

Case 3:19-cv-01226-L-AHG   Document 12-12   Filed 10/04/19   PageID.560   Page 155 of 168

shall be appraised, by three indifferent men, to be appointed by the Brigadier of the brigade, from which such detachment shall be made.

XIII. *And be it further enacted by the authority aforesaid,* That the Governor with the advice of Council, be, and hereby is authorized to compleat the artillery in each brigade of the Militia, to two full companies ; and when thus compleated, shall form a battalion in each brigade, and be entitled to a Major, Adjutant and Quarter-Master. *Provided nevertheless,* That in those brigades, where there are already two companies raised, they shall not be augmented ; and in those brigades where there are already more than two companies, they shall not be reduced. And each company of artillery, shall be provided with two good field-pieces, with carriages and apparatus compleat ; an ammunition cart ; forty round shot, and forty rounds of cannister shot.—The Governor shall order to be issued to each company of artillery, annually, a quantity of powder, not exceeding one hundred pounds, which shall be expended on general muster days, and in experimental gunnery. And the Quarter-Master-General shall provide for, and supply the artillery companies with all the carriages, tumbrils, harness apparatus, implements, larboratory and ordnance stores, which may, from time to time be necessary for their equipment. The Officers of artillery shall be armed with a sword or hanger ; a fusee, bayonet and belt, with a cartridge-box to contain twelve cartridges : And each non-commissioned Officer and Private or Matross, of those companies which are unprovided with field-pieces, shall furnish himself with all the equipments of a Private in the infantry, until proper ordnance and field artillery is provided. And the Commanding Officer of each company of artillery, shall be accountable for the careful preservation of the pieces and apparatus, and the proper expenditure of the ammunition supplied by government. Each company of artillery, and troop of cavalry, shall be formed of volunteers from the brigade ; and together, they shall not exceed in number one eleventh part of the infantry of such brigade ; and they shall be uniformly cloathed in regimentals, to be furnished at their own expence.

*Artillery organised.*

*Proviso.*

*— to be provided with compleate apparatus.*

*Quarter-Master to furnish.*

*Commanding Officer to be accountable.*

*Artillery and cavalry to be formed of volunteers.*

XIV. *And be it further enacted by the authority aforesaid,* That at all regimental musters, the companies commanded by the two eldest Captains, shall act as light-infantry companies, except where light-infantry companies have already been raised by voluntary enlistment, and one or more shall be attached to such regiment.

*Light-Infantry companies.*

XV. *And be it further enacted by the authority aforesaid,* That if any non-commissioned Officer or Private of cavalry, artillery, light-infantry, or other corps raised at large, shall neglect for the term of three months, to keep himself provided with an uniform of the company to which he belongs, as is directed by

*Penalty.*

this

**EXHIBIT 7**
**0124**

*In the Year of our LORD, 1793.*

296                Militia.

this Act, he ſhall be diſcharged from ſuch corps, by the Brigadier commanding the brigade, and enrolled in the ſtanding company in which he reſides. And no company of cavalry, artillery, light-infantry, or other corps which it may be lawful to raiſe at large, ſhall be raiſed within this Commonwealth, when any of the ſtanding companies ſhall be reduced thereby, to a leſs number than ſixty-four effective Privates ; and no Officer of any ſuch corps, ſhall enliſt any men belonging to a ſtanding company, for the purpoſe of forming or recruiting ſuch corps raiſed at large, when by means thereof, ſuch ſtanding company would be reduced to a leſs number than ſixty-four effective Privates. And if any ſuch corps, raiſed at large, ſhall at any time be deſtitute of com-miſſioned Officers, and ſhall neglect to fill up ſuch vacancies, for one whole year after being ordered to elect them, or if any ſuch corps ſhall be reduced under twenty privates, and remain in that ſituation for one whole year without doing duty as the law directs ; then in either caſe as aforeſaid, ſuch corps raiſed at large ſhall be deemed diſbanded, and the men which belonged to ſuch delin-quent corps, ſhall be enrolled in the ſtanding company in which the individuals thereof ſhall reſpectively reſide : And no ſuch corps raiſed at large, ſhall at any time bear a greater number of men on their rolls, than the law allows neceſſary to conſtitute them ; and the Commanding Officer of every ſuch corps ſhall annually, in the month of *April*, make out a liſt of all the men's names be-longing to his corps, and deliver the ſame to the Commanding Officer of the regiment or battalion, in whoſe diſtrict ſuch corps is or may be raiſed ; and all ſuch corps raiſed at large, not annexed to any particular regiment, ſhall be ſubject to the orders of the Commanding Officer of the brigade in which they ſhall reſpec-tively be raiſed, and ſhall make their elections and returns in the ſame manner as other corps of the Militia.

And whereas the military company in *Boſton*, commonly called the " *Ancient and Honorable Artillery Company*," being by anci-ent charter, cuſtom and uſage, exempted from the general regula-tions of the Militia : Therefore,

XVI. *Be it further enacted by the authority aforeſaid*, That the ſaid company, called the " *Ancient and Honorable Artillery Com-pany*," ſhall retain its accuſtomed privileges, not being incompa-tible with the Conſtitution, but ſhall be ſubject to all other duties required by this Act, in like manner as other companies of Militia.

XVII. *And be it further enacted by the authority aforeſaid*, That every commiſſioned Officer of infantry, whoſe duty ſhall re-quire him to ſerve on foot, ſhall be armed with a ſword and an eſ-pontoon ; and every Officer whoſe duty requires him to be mounted, ſhall be armed with a ſword and pair of piſtols : And the uniform in every inſtance required by this Act, ſhall be a dark blue cloth coat, of ſuch faſhion, and with ſuch facings, and under-clothes, as the Major-Generals or Brigadiers ſhall direct within their ſeveral commands. *And*

*No corps to be raiſed at large which will re-duce ſtanding companies to a limited num-ber.*

*—— to be deemed diſban-ded in caſe.*

*—— not to conſiſt of a grea-ter number than legal.*

*Ancient and Honorable Ar-tillery Company*

*—— to re-tain privileges.*

*Officers, how to be armed and uniformed.*

EXHIBIT 7

0125

Case 3:19-cv-01226-L-AHG   Document 12-12   Filed 10/04/19   PageID.562   Page 157 of 168

XVIII. *And be it further enacted by the authority aforesaid,* That every non-commissioned Officer and Private of the infantry shall constantly keep himself provided with a good musket, with an iron or steel rod, a sufficient bayonet and belt, two spare flints, a priming wire and brush, and a knapsack; a cartridge-box, or pouch with a box therein, to contain not less than twenty-four cartridges, *Necessary articles of equipments.* suited to the bore of his musket; each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder: And shall appear so armed, accoutred and provided, whenever called out, except that when called out to exercise only, he may appear without a knapsack, and without cartridges loaded with ball. *Provided always,* that whenever a man appears armed with a musket, all his equipments shall *Proviso.* be suited to his musket; and whenever a man appears armed with a rifle, all his equipments shall be suited to his rifle: And that from and after five years from the passing of this Act, all muskets for arming the Militia, as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound: And every citizen enrolled and providing himself with arms ammunition and accou- *Arms &c. to be exempted from suits.* trements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales for debt, or for payment of taxes.

XIX. *And be it further enacted by the authority aforesaid,* That every non-commissioned Officer or Private of the infantry, who shall neglect to keep himself armed and equipped as aforesaid, or who shall on a muster-day, or at any other time of examination, *Fine for neglect.* be destitute of, or appear unprovided with the arms and equip-ments herein directed (except as before excepted) shall pay a fine not exceeding *twenty shillings*,in proportion to the articles of which he shall be deficient, at the discretion of the Justice of the Peace, before whom trial shall be had: And all parents, masters and *Parents and masters to equip their children & servants.* guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipments afore-mentioned, under the like penalties for any neglect: And when-ever the Selectmen of any town shall judge any inhabitant thereof, belonging to the Militia, unable to arm and equip himself in man-ner as aforesaid, they shall at the expence of the town provide for and furnish such inhabitant with the aforesaid arms and equipments, *Persons unable, to be furnished by the town.* which shall remain the property of the town at the expence of which they shall be provided; and if any soldier shall embezzle or destroy the arms and equipments with which he shall be furnish-ed,he shall, upon conviction before some Justice of the Peace, be *Penalty,in case.* adjudged to replace the article or articles, which shall by him be so embezzled or destroyed, and to pay the cost arising from the pro-cess against him: And if he shall not perform the same within fourteen days after such adjudication, it shall be in the power of

C                                                     the

**EXHIBIT 7**
**0126**

Case 3:19-cv-01226-L-AHG   Document 12-12   Filed 10/04/19   PageID.563   Page 158 of 168

*In the Year of our LORD, 1793.*

the Selectmen of the town to which he shall belong, to bind him out to service or labour, for such term of time as shall, at the discretion of the said Justice, be sufficient to procure a sum of money equal to the value of the article or articles so embezzled or destroyed, and pay cost arising as aforesaid.

XX. *And be it further enacted by the authority aforesaid,* That every person liable to do military duty, who being duly warned shall refuse or neglect to appear at the time and place appointed,

*Penalty for not appearing on muster days.* armed and equipped as by this act is directed, for any muster, training, view of arms, or other military duty, shall pay as a fine for such default, the sum of *ten shillings :* And every person who shall appear at any muster with his arms in an unfit condition, shall pay a fine of *three shillings* for each and every such default :

*Proviso.* *Provided nevertheless,* It shall be lawful for the Commanding Officer of a company, at any time within eight days after any muster, training, view of arms or other duty, to excuse any person for non-appearance, on the delinquent's producing to him satisfactory evidence of his inability to appear as aforesaid ; and the Commanding Officer of the company shall certify the same to the Clerk within the time abovementioned, and the Clerk shall not thereafter commence any prosecution against such delinquent for his fine for non-appearance, as aforesaid.

XXI. *And be it further enacted by the authority aforesaid,* That whenever the Commanding Officer shall think proper to call his company together, or shall be ordered by his superior Officer to do it, he shall issue his orders therefor, to one or more of the non-

*Clerk to notify.* commissioned Officers, if there be any, if not to one or more of the privates belonging to his company, directing him or them to notify and warn the said company to appear at such time and place as shall be appointed ; and every such person or persons, who shall receive such orders, shall give notice of the time and place appointed for assembling said company, to each and every person he or they shall be so ordered to warn, either by verbal information, or by leaving a written or printed notification thereof, at the usual

*Manner of notification.* place of abode of the person thus to be notified and warned ; and no notice shall be deemed legal for musters for the purpose of common and ordinary trainings, unless it shall be given four days at least, previous to the time appointed therefor ; but in case of invasion, insurrection or other emergency, any time specified in the orders shall be considered as legal ; and every non-commissioned Officer, or other person, who shall neglect to give the said notice and warning, when ordered thereto by the Commanding Officer of the company to which he belongs, shall for such offence forfeit and pay as a fine, a sum not exceeding *forty shillings,* nor less

*Penalty;* than *twelve shillings,* at the discretion of the Justice of the Peace before whom trial shall be had ; and the testimony of any person under oath, who shall have received orders agreeable to law, for

notifying

**EXHIBIT 7**
**0127**

Case 3:19-cv-01226-L-AHG Document 12-12 Filed 10/04/19 PageID.564 Page 159 of 168

notifying and warning any company, or part thereof, to appear
at a time and place appointed for any mufter, view of arms, or other
military duty, fhall be fufficient to prove due notice was given to
the party againft whom complaint may be made, unlefs fuch tefti-
mony fhall be invalidated by other fufficient evidence : And when-
ever a company fhall be deftitute of commiffioned Officers, and *Companies def-*
the Commanding Officer of the regiment or battalion to which *titute of com-*
fuch company belongs, fhall think proper to call out fuch com- *miffioned Offi-*
pany, he fhall direct his orders to one or more of the non-com- *cers, how warn-*
*ed.*
miffioned Officers of faid company, who fhall have full power and
authority to warn, affemble, lead, order, exercife and govern faid
company, conformably to the orders which he or they fhall thus
receive from their fuperior Officers for that purpofe : *Provided* *Provifo.*
*always,* When in regiment or battalion, it fhall be lawful for the
Commanding Officer prefent, to order a commiffioned Officer to
command fuch company, while acting in conjunction with other
corps.

XXII. *And be it further enacted by the authority aforefaid,* That
every non-commiffioned Officer and Private of the Militia, who *Penalty for dif-*
fhall be diforderly or difobedient, or guilty of unmilitary conduct *orderly beha-*
on a mufter or training day, or at any other time when on duty, *viour.*
fhall be confined during the time of the faid mufter or training, at
the difcretion of his Officers, and fhall pay a fine not exceeding
*forty fhillings,* nor lefs than *twelve fhillings,* at the difcretion of the
Juftice of the Peace to whom complaint fhall be made.

XXIII. *And be it further enacted by the authority aforefaid,*
That whenever any non-commiffioned Officer or Private in the
Militia, fhall forfeit any fum of money, fet and affixed to any
default, or offence, by this Act, of the fum of *four pounds,* or un- *Fines, how re-*
der, the fame fhall be recovered in the manner following ; that *covered.*
is to fay : The Clerk of the company to which the offender be-
longs, fhall, after the expiration of eight days, and within fixty days
after the offence fhall have been committed, make complaint there-
of, and of all matters of fubftance, and material circumftances at-
tending the fame, to fome Juftice of the Peace, in the county where
fuch offender fhall live, who fhall make record thereof, and fhall
iffue a fummons to the party complained of, to be ferved feven days
at leaft, before the time appointed for the trial, in the form follow-
ing, *mutatis mutandis.*

―――――― *ff.*

 *L. S.*   TO the *Sheriff of the faid county, or his Deputy, or*
*either of the Conftables of the town of*               *within*
*the fame county,*         .                GREETING.

*In the name of the Commonwealth of Maffachufetts, you are here-* *Form of the*
*by required to fummon* C. D. *of*        *in the county of* *fummons.*
*to appear before me* E. F. *one of the Juftices of the Peace for the*
*county*

**EXHIBIT 7**
**0128**

Case 3:19-cv-01226-L-AHG   Document 12-12   Filed 10/04/19   PageID.565   Page 160 of 168

*In the Year of our LORD,* 1793.

*county aforefaid, at          in          on          the day of          at          of the clock, in the          noon, then and there to fhew caufe, if any he has, why a warrant of diftrefs fhall not iffue againft him.* [Here infert the complaint.] *Hereof fail not, and make due return of this writ, and of your doings therein, unto myfelf, at, or before the faid          day of          .*
*Dated at          aforefaid, the          day of          in the year of our* LORD

E. F. *Juftice of the Peace.*

And when the faid party fhall by himfelf, or his Attorney appear accordingly, he may plead the general iffue and give any fpecial matter in evidence ; and if the faid party fhall make default, or if judgment fhall be given againft him, and he fhall negleft for four days thereafter, to fatisfy the fame with legal cofts, then the Juftice of the Peace, before whom trial fhall be had, fhall iffue his warrant of diftrefs, under his hand and feal, in the form following :

————— *ff.*

*TO the Sheriff of the faid county, or his Deputy, or* Seal. *any or either of the Conftables of the town of within the fame county,*          GREETING.

Form of the warrant of dif-trefs.

*Whereas* C. D. *of          upon the          day of          being a private Soldier in the Train-Band, (as the cafe may be) of the company of foot, commanded by          in the regiment of Militia, in the faid county of          commanded by          was duly notified to appear upon the          day of          in the town of          in the county aforefaid, with his arms and equipments, as the law of this Commonwealth directs ; and the faid* C. D. *in violation of the faid Law, did unneceffarily negleft to appear, (or did not appear armed and equipped, as the cafe may be) whereby he hath forfeited, and ought to pay the fum of          fhillings, to the ufes directed by law ; and the faid* C. D. *having been duly fummoned to appear before me* E. F. *one of the Juftices of the Peace, for the county aforefaid, to fhew caufe, if any he had, why a warrant of diftrefs fhould not be iffued for the fame fum, did not appear, (or appearing, did not fhew fufficient caufe, why the fame warrant fhould not be iffued, as the cafe may be ;) In the name of the Commonwealth of Maffachufetts, you are therefore commanded forthwith, of the goods or chattles of the faid* C. D. *within your precinft, to levy by diftrefs and fale thereof, the aforefaid fum of          fhillings, with          for charges of fuit, being in the whole, the fum of          and to pay the fame to          Clerk of the aforefaid company ; and alfo of the goods or chattles of the faid* C. D. *to levy          for this writ, together with your own fees ; and for want of fuch goods or chattels of the faid* C. D. *to be by him fhewn to you, or found within your precinft, you are commanded to take          the*

**EXHIBIT 7**
**0129**

*In the Year of our LORD,* 1793.

| Militia. | 301 |
|---|---|

the body of the said C. D. and him commit to the common Gaol in
in the county aforesaid ; and the Keeper thereof is hereby
commanded to receive the said C. D. into the said Gaol, and him
safely keep, until he shall pay the sum aforesaid, together with legal
fees and costs, or until he shall be otherwise discharged by order of law ;
and you are to make return of this warrant with your doings thereon,
unto myself, within twenty days next coming, for which this shall be
your sufficient warrant ; hereof fail not.
  Given under my hand and seal, the    day of
in the year of our LORD

        E. F. *Justice of the Peace.*

XXIV. *And be it further enacted by the authority aforesaid*
That every Captain or Commanding Officer of a company, shall [*Companies to be mustered at stated times for examination.*]
call his company together three days in each year for company
discipline ; and once on the first Tuesday of *May,* annually, for
the express purpose of examining and taking an exact account of
every man's arms and equipments ; at which time every article re-
quired by this act, shall be brought to the place of examination ; and
it shall be the duty of the Clerk, or in his absence, of some other
person to be appointed on the occasion, for the time only, by
the Commanding Officer, for that purpose, to make out an exact
roll of the company, and set against every man's name, the [*Commanding Officers to keep a roll.*]
arms and equipments which shall belong to him : And every Com-
manding Officer of a company, shall constantly keep by him a roll,
with the arms and equipments of every man annexed to his
name, as aforesaid, from which all detachments shall be regu-
larly detailed, and the annual return of the company made : And
the said roll shall be annually revised, corrected, and completed, on
the first Tuesday in *May* as aforesaid : And every person liable to do
duty in the Militia, who shall be absent at the examination or re-
view of arms, in the month of *May*, as aforesaid, and shall not send
his arms and equipments to be examined, at the time and place ap- [*Fines in case of neglect.*]
pointed, he shall be fined for every article required in this act,
not so brought or sent to be examined, as is herein before directed,
besides the sum of *ten shillings*, for non-appearance, as aforesaid.

XXV. *And be it further enacted by the authority aforesaid,* That [*Commanding Officers to make regular returns annually.*]
every Captain or Commanding Officer of a company, shall make
a return of the state of his company, comprehending every man
belonging to said company, with all the arms and equipments be-
longing to them, to the Commanding Officer of the regiment, in
the month of *May*, annually : Every Commanding Officer of a
regiment shall make a return of the state of his regiment, to the
Brigadier, in the month of *June*, annually : And every Com-
manding Officer of a brigade shall make out duplicate returns of
his brigade, one of which he shall transmit to the Major-General
of the division to which he belongs, and the other to the Adjutant-
General of the Commonwealth, in the month of *July*, annually.
    E              *And*

**EXHIBIT 7**
**0130**

*In the Year of our LORD, 1793.*

XXVI. *And be it further enacted by the authority aforesaid,*
That the Adjutant-General shall be commissioned with the rank
of Brigadier-General ; and it shall be his duty to distribute all or-
ders from the Commander in Chief of the Militia, to the several
corps ; to attend all public reviews when the Commander in
Chief shall review the Militia, or any part thereof ; to obey all
orders from him relative to carrying into execution and perfecting
the system of Military Discipline, established by this Act ; to su-
perintend the annual inspection of the Militia ; to furnish blank
forms of the different returns that may be required, and to
explain the principles on which they should be made; to keep such
rosters and records as are proper to be kept in his office ; to receive
from the several Officers of the different corps throughout the
State, returns of the Militia under their command, reporting the
actual situation of their corps, their arms, ammunition and accou-
trements, their delinquencies, and every other thing which relates
to the general advancement of good order and discipline : All
which the several Officers of the divisions, brigades, regiments,
battalions and companies are hereby required to make in the usual
manner, or as the Commander in Chief shall direct, so that the Ad-
jutant-General may be duly furnished therewith : From all which
returns, he shall make proper abstracts, and a general return of the
whole Militia of the Commonwealth, and lay the same before the
Governor or Commander in Chief and to forward a duplicate
thereof to the President of the United States.

*Rank and duty of Adj General.*

XXVII. *And be it further enacted by the authority aforesaid,*
That it shall be the duty of the Brigade-Inspector to attend the
regimental and battalion meetings of the Militia, composing the
several brigades, to which they belong, during the time of their
being under arms ; to inspect their arms and equipments ; to su-
perintend their exercise and manœuvres, and introduce the system
of discipline, established by this Act ; to obey all orders they may
from time to time receive from the Commander in Chief, or
others, their superior Officers ; to make returns to the Adjutant-
General, at least, once in a year, and at such other times as shall
be required, of the Militia of the brigades to which they several-
ly belong, reporting therein the actual situation of the corps, their
arms, ammunition and accoutrements, and every other thing which
they may be required to report ; or which in their judgment may
relate to their government, and the general advancement of good
order and military discipline.

*Duty of Brigade Inspector.*

XXVIII. *And be it further enacted by the authority aforesaid,*
That the rules of discipline approved and established by Congress,
in the resolutions of the twenty-ninth day of *March,* one thousand
seven hundred and seventy-nine, shall be the rules and regulations
of discipline, to be observed by the Militia of this Commonwealth;
except such deviations from said rules, as may be necessary by the
requisitions

*Rules and regu-
lations of disci-
pline for the
Militia.*

EXHIBIT 7
0131

requifitions of this Act, or fome other unavoidable circumftances ; and every Officer receiving a commiffion in the Militia, fhall immediately provide himfelf with a book containing thofe rules.

XXIX. *And be it further enacted by the authority aforefaid,* That every regiment of Militia of this Commonwealth, fhall be affembled in regiment, once in two years, for review, infpection and difcipline, on fuch days as the Commanding Officers of the feveral divifions or brigades fhall order ; (the Commanding Officers of regiments to point out the place.) And the Militia of every town fhall be affembled together once in two years, (the year it is not muftered in regiment) at fuch time and place as the Commanding Officer fhall order, and fhall be inftructed and difciplined under the direction of a Field-officer. *Provided neverthelefs,* in new fettlements, where the difperfed fituation of a regiment may oblige men to march twenty miles or more, to the place of parade, it fhall be at the difcretion of the Commanding Officer of the regiment, to mufter the Militia in fuch fettlements, either by regiment, by towns, or other convenient bodies. And every noncommiffioned Officer and Private fhall come to the place of parade, with neceffary refrefhment for faid day, at his own expence. The cavalry and artillery, and other corps raifed at large, fhall alfo be reviewed and infpected, once in every year, either with the regiments and battalions, or by themfelves, as the Major-Generals, or the Brigadiers fhall order, and at fuch times and places as they fhall direct. And each Commanding Officer of a Corps, when on duty, fhall have full power and authority, to afcertain and fix certain neceffary limits and bounds, to their refpective parades, (no road in which people ufually travel, to be included) within which no fpectator fhall have right to enter without liberty from faid Commanding Officer ; and in cafe any perfon fhall fo intrude within the lines of the parade, after being once forbidden, he fhall be fubject to be confined under guard, during the time of exercife, at the difcretion of the Commanding Officer. And whenever different corps fhall be affembled together, the fenior Officer prefent, fhall command without any regard to corps whatever. And all Officers when on duty, fhall take rank according to the dates of their commiffions ; and when two of the fame grade bear an equal date, and former pretenfions of fome commiffion do not decide, then their rank fhall be determined by lot, to be drawn by them, before the Commanding Officer prefent ; and when on Court-Martial before the Prefident thereof.

XXX. *And be it further enacted by the authority aforefaid,* That every Captain or Commanding Officer of a company, who fhall neglect or refufe to call out his company, as often as the law requires, for difcipline, and on the firft Tuefday of *May,* for a view of arms, as directed by this Act, or at any other time, when thereto required, by his fuperior Officer ; or who fhall at any time excufe
his

*[marginal notes:]* Time and manner of muftering Militia. — Provifo. — Reviews of cavalry and artillery. — Parades to be cleared of fpectators. — Senior Officer to command, in cafe— — Officers to rank from date of commiffions.

**EXHIBIT 7**
**0132**

his men, for unneceſſary abſence, or deficiency, ſhall be tried by a Court-Martial, and if thereof convicted, he ſhall be reprimanded in orders, or removed from office, at the diſcretion of ſaid Court.

**Companies how to rank.** XXXI. *And be it further enacted by the authority aforeſaid,* That at any regimental muſter, the ſeveral companies ſhall form in regiment, according to the rank of the Officers, commanding them ; and the ſame rule ſhall apply whenever different corps are aſſembled together ; excepting ſo far as by cuſtom, uſage and neceſſity, cavalry, artillery and light-troops, may be detached from the battalions.

**Penalty for not marching with detachments, when ordered.** XXXII. *And be it further enacted by the authority aforeſaid,* That whenever in caſe of threatened or actually invaſion, inſurrection, or other public danger or emergency, the Militia, or any part thereof, ſhall be ordered out or detached, if any perſon who ſhall be ordered out or detached, in obedience to ſuch orders, being duly notified thereof, and ordered to march to the place of rendezvous, ſhall neglect or refuſe to obey ſuch orders, or ſhall not within twenty-four hours, after he ſhall have been notified as aforeſaid, pay a fine of *ten pounds*, to the Commanding Officer of the company to which he belongs, or procure an able bodied man, in his ſtead, ſuch perſon ſhall be conſidered as a ſoldier in ſuch detachment, and be dealt with accordingly. **Proviſo.** *Provided always,* That whenever a detachment is made, the Officers, non-commiſſioned Officers and Privates, being able of body, ſhall be detailed from the roſters or rolls which ſhall be kept for that purpoſe ; and any **Puniſhment for abſconding.** perſon who by abſconding after being detached, as aforeſaid, or by deſerting from ſuch detachment, ſhall attempt to evade the puniſhment by law provided for deſertion, he ſhall pay a fine of *twelve pounds*, to be ſued for and recovered by the Clerk of the company, to which ſuch perſon belongs, any time within twelve months after the diſcharge of ſuch detachment ; ſaid fine to be diſpoſed of for the purpoſe of paying ſuch men as ſhall be hired or drafted **Delinquent officers, how puniſhed,** into ſervice : And any Officer holding a commiſſion in the Militia, who ſhall neglect or refuſe to execute any orders he may receive from his ſuperior Officer, to make a detachment of the corps under his command, it ſhall be the duty of the Officer who iſſued ſuch orders, immediately to arreſt ſuch delinquent Officer, bring him to trial therefor, before a Court-Martial, and forthwith give information thereof to the Commander in Chief ; and the Officer who iſſued the order which ſhall not have been executed, as aforeſaid, ſhall immediately after arreſting the delinquent Officer, proceed by himſelf or ſome other Officer, under his command, to make and complete the detachment, ordered as aforeſaid. And when any regiment or company ſhall not be organized, the Officer iſſuing the orders for ſuch detachment, ſhall by himſelf, or ſome other Officer under him, proceed to make and complete the detachment from any part of the Militia, of ſuch unorganized corps.

*And*

**EXHIBIT 7**
**0133**

XXXIII. *And be it further enacted by the authority aforesaid,* That whenever the Militia, or any part thereof, of any town, shall be ordered to march for the immediate defence of this State, each Officer and Soldier shall provide and take with him three days provision, unless otherwise ordered ; and the Selectmen of such town shall cause carriages to attend them with farther supplies of provision and camp utensils, until notice shall be given them to desist, by the Commanding Officer of the Militia detached : And the Selectmen shall prefer their accounts for such supplies to the General Court for allowance and payment : And whenever the Selectmen of any town or district, from which a detachment shall be ordered, shall be notified by any Officer duly authorized thereto, and shall neglect or refuse to furnish such supplies and utensils, the town or districts to which such Selectmen belong, shall pay a fine not exceeding *fifty pounds,* to be sued for and recovered by any person who shall prosecute for the same ; one moiety to the prosecutor, and the other to the use of the Commonwealth ; and the Officer to whom such camp utensils shall be delivered, shall be accountable for the same, unless broken or lost by some unavoidable accident, not in his power to prevent. *(margin: Militia to provide provisions when called out. Selectmen to furnish carriages, &c.)*

*(margin: Penalty in case.)*

XXXIV. *Be it further enacted by the authority aforesaid,* That if any Officer, non-commissioned Officer or Private of the Militia, shall be killed or die of his wounds received in the service of this Commonwealth, his widow, child or children, shall be entitled to similar relief, and under the same regulations and restrictions as is provided by law in such cases for the relief of widows and orphans of persons killed or dying of wounds received in the service of the United States : And if any Officer, non-commissioned Officer or Private of the Militia, shall be wounded or otherwise disabled in the service of this Commonwealth, he shall be entitled to similar relief, and under the same regulations and restrictions, as is provided by law in such cases for the relief of persons wounded or disabled in the service of the United States. *(margin: Widows and children of persons who may be killed or wounded in actual service to receive a pension.)*

XXXV. *And be it further enacted by the authority aforesaid,* That the Governor or Commander in Chief, shall appoint Courts-Martial for the trial of all Officers above the rank of Captain : That the Major-Generals or Commanding-Officers of divisions, each within his own division, shall appoint Courts-Martial for the trial of Captains and all Officers under that rank : And it shall be the duty of every Officer who shall appoint a Court-Martial, as aforesaid, to approve or disapprove of every sentence of such Court-Martial by them appointed : And no Officer who shall appoint a Court-Martial, shall be President thereof, nor shall any sentence be put in execution until it shall have been approved of as aforesaid : No Court-Martial shall consist of a less number than thirteen commissioned Officers, the President of which shall not be under the rank of a Field Officer ; and no Field Officer *(margin: Court-Martial how appointed, and by whom.)*

F                                      ficer

Case 3:19-cv-01226-L-AHG   Document 12-12   Filed 10/04/19   PageID.570   Page 165 of 168

EXHIBIT 7
0134

*In the Year of our LORD,* 1793.

306                Militia.

ficer fhall be tried by any perfon under the degree of a Captain ; and all Officers fhall take rank by feniority of commiffion, without regard to corps : And the Officer who fhall appoint a Court-Martial, fhall at the fame time appoint a fuitable perfon for a Judge-Advocate, whofe duty it fhall be impartially to ftate the evidence, both for and againft the Officer under trial ; to take accurate minutes of the evidence, and all the proceedings of the Court ; all of which he fhall tranfmit, with the judgment of the Court thereon, under feal, to the Officer whofe duty it is to approve or difapprove of fuch judgment. Every Officer to be tried fhall have ten days notice given him of the time and place appointed for trial : And every Officer to be tried fhall be put in arreft, fo as to be fufpended from the exercife of his office, and fhall have a copy of the charges exhibited againft him ten days before the fitting of faid Court ; and in cafe any Officer, for the trial of whom a Court-Martial fhall be appointed, fhall neglect to appear and make defence, he fhall be deemed by faid Court guilty of the charge, and fhall be fentenced accordingly: In every Court-Martial held for the trial of an Officer, not lefs than two-thirds of the members muft agree in the fentence or judgment of faid Court, otherwife the perfon charged fhall be acquitted : All proceedings and trials by Court-Martial fhall be carried on in the day time ; and when the members fhall be required to give their votes on a queftion or decifion, they fhall begin with the youngeft in commiffion, firft : All perfons fhall be holden to appear and give evidence before any Court-Martial, under the fame penalties for neglect, as are by law provided for witneffes in other cafes, when thereunto fummoned by a Juftice of the Peace for fuch fervice : And all witneffes fhall be fworn by the Judge-Advocate before they give their evidence to the Court. Before any Court-Martial fhall proceed to the trial of any Officer, the Judge-Advocate fhall adminifter to the Prefident and each of the members, the following oath, viz.

*YOU A. B. do fwear, that you will well and truly try the caufe now before you between this Commonwealth, and the perfon to be tried ; and you do further fwear that you will not divulge the fentence of this Court-Martial, until it fhall be approved or difapproved of ; and that you will not on any account, at any t me whatever, difcover the vote or opinion of any member, unlefs required to give evidence thereof, as a witnefs by a Court of juftice, in a due courfe of law. So help you* GOD !

And the Prefident fhall adminifter to the Judge-Advocate the following oath, viz.

*YOU A. B. do fwear, that you will not, on any account, at any time whatever, divulge the vote or opinion of any member of this Court-Martial, unlefs required to give evidence thereof, as a witnefs, by a Court of Juftice, in a due courfe of law.
So help you* GOD !

*And*

*Judge-Advocate to be appointed — his duty.*

*Officers to be tried, to have due notice,*

*— to be ar refted.*

*Judgment of Court-Martial, — how deter mined.*

*Perfons to give evidence under penalties.*

*Judge Advocate to adminifter*

*the Oath.*

*Oath adminifter ed to the Judge-Advocate.*

EXHIBIT 7
0135

*In the Year of our LORD, 1793.*

| Militia. | 307 |
|---|---|

XXXVI. *And be it further enacted by the authority aforesaid,* That every Officer holding a commission in the Militia, who shall be accused of any unmilitary conduct, neglect of duty or disobedience of orders ; or who shall when on duty, appear, or behave himself in an un-officer-like manner, or shall wilfully injure those who are under his command, he shall be liable to be tried by a Court-Martial, and if found guilty, to be sentenced by said Court, to be reprimanded in orders, or to be removed from Office : And whenever a Court-Martial shall sentence any Officer to be removed from office, the Court shall therein adjudge such Officer incapable of holding any military commission under this Commonwealth for life, or for years, according to the nature and aggravation of his offence ; and such sentence being duly approved of by the Officer appointing such Court-Martial, shall be published and remain in full force, unless reversed, so far as respects disqualification, by the General Court. *(Officers guilty of unmilitary conduct, to be tried by a Court-Martial ; —and removed from office.)*

XXXVII. *And be it further enacted by the authority aforesaid,* That every town within this Commonwealth, shall be constantly provided with sixty-four pounds of good gun-powder, one hundred pounds of musket-balls, one hundred flints, and three tin or iron camp-kettles, for every sixty-four soldiers in the Militia of such town, enrolled as aforesaid ; and the same proportion of each of the aforesaid articles for a greater or lesser number : And every town which shall neglect to keep constantly provided with the said articles, shall forfeit and pay, for the use of the Commonwealth, for every sixty-four men in such town which shall be unprovided with the said articles, the sum of *six pounds,* to be recovered by presentment in the Court of General Sessions of the Peace, in the county to which such town shall belong : And it shall be the duty of the Brigade-Inspector annually to inspect the magazines of each town, within the brigade to which he belongs, and to make complaint to the Grand Jury of the county against all towns, which shall neglect to keep constantly provided as aforesaid. *(Town to be provided with military articles. Penalty in case of neglect— how recovered. Brigade Inspector to inspect, &c.)*

And whereas the good citizens of this Commonwealth are often injured by the discharge of single guns on a muster-day, Therefore,

XXXVIII. *Be it further enacted by the authority aforesaid,* That no non-commissioned Officer or Private, shall unnecessarily fire a musket or single gun, in any public road, or near any house or near the place of parade, on any day, or evening succeeding the same, on which any troop or company shall be ordered to assemble for military duty, unless embodied under the command of some Officer ; and if any non-commissioned Officer or Private shall fire a musket or gun, except as aforesaid, on the said day or evening succeeding, without being embodied as aforesaid, he shall forfeit and pay a fine of *five shillings,* for each and every offence aforesaid, to be sued for, recovered and disposed of in the same manner as fines for non-appearance on a muster-day, are recovered and disposed of. *(Penalty for firing on a muster day, without orders, and disposed of.)*  *And*

EXHIBIT 7
0136

*In the Year of our LORD,* 1793.

308            *Salisbury* dividing line altered.

Certain officers to receive pay

XXXIX. *And be it further enacted by the authority aforesaid,* That the Adjutant-General, the Quarter-Master-General, Brigade-Inspectors, and Adjutants of regiments, shall receive a reasonable consideration for their services ; to be allowed by the General Court. And all Officers serving on Military Boards, Courts of Inquiry, and Courts-Martial, shall receive pay, while necessarily employed therein, at the same rate as when in actual service : And the Adjutant-General, or Brigade-Majors, as the case

Pay rolls to be laid before the General Court.

may be, shall make up pay-rolls, of such Military Boards, Courts of Inquiry, and Courts-Martial, and lay the same before the General Court, for allowance ; and they shall receive payment at the Treasury, of the sums so allowed, and pay the same over to the Officers who performed the service.

[This Act passed *June* 22, 1793.]

C H A P.   II.

An Act for repealing one Clause, and altering a dividing Line, described in an Act, intitled, " An Act for dividing the Town of *Salisbury*, in the County of *Essex*, into two Parishes."

*B*E *it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same,* That the following clause, viz. " Excepting only that the contract made by the town, with the Minister of that part thereof, which now consti-

Clause in a former act repealed.

tutes the West-Parish, shall, so far as it relates to his future support, be considered as devolving and binding upon the West-Parish only, and not upon the town," contained in an Act passed the last session of the last General Court, intitled, " An Act for dividing the town of *Salisbury*, in the county of *Essex*, into two parishes," be, and the same hereby is repealed.

*And be it further enacted,* That the first dividing line mentioned in said Act, beginning at the oak stump therein mentioned, " and thence running southerly by the western border of said *Titcomb's*

Dividing line altered.

land to *Merrimack River*," be, and hereby is altered, and that said line shall run from said stump southerly by the eastern, instead of the western border of said *Titcomb's* land, to said *Merrimack-River*, so as to include the lands of said *Enoch, Joshua* and *Richard Titcomb*, within the bounds of said Western Parish, any thing in said Act to the contrary notwithstanding.

[This Act passed *June* 6, 1793.]

C H A P.

EXHIBIT 7
0137