1  John W. Dillon (Bar No. 296788)
2  Gatzke Dillon & Ballance LLP
   2762 Gateway Road
3  Carlsbad, California 92009
   Telephone: (760) 431-9501
4  Facsimile: (760) 431-9512
5  E-mail:  jdillon@gdandb.com

6  Attorney for Plaintiffs
7

8              UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10

11 MATTHEW JONES; THOMAS FURRH;        Case No.: 19-cv-01226-L-AHG
   KYLE YAMAMOTO; PWGG, L.P.
12 (d.b.a. POWAY WEAPONS AND GEAR      Hon. Judge M. James Lorenz and
   and PWG RANGE); NORTH COUNTY        Magistrate Judge Allison H. Goddard
13 SHOOTING CENTER, INC.; BEEBE
14 FAMILY ARMS AND MUNITIONS           DECLARATION OF DAVID T.
   LLC (d.b.a. BFAM and BEEBE FAMILY   HARDY IN SUPPORT OF
15 ARMS AND MUNITIONS); FIREARMS       PLAINTIFFS' MOTION FOR
   POLICY COALITION, INC.;             PRELIMINARY
16                                     INJUNCTION (Part 4 of 4)
   FIREARMS POLICY FOUNDATION;
17 CALIFORNIA GUN RIGHTS
18 FOUNDATION (formerly, THE           Complaint Filed: July 1, 2019
   CALGUNS FOUNDATION); and            Second Amended Complaint Filed:
19 SECOND AMENDMENT                     November 8, 2019
20 FOUNDATION            Plaintiffs,
21 v.                                  Date: Monday, December 16, 2019
                                       Time: 10:30 a.m.
22 XAVIER BECERRA, in his official     Courtroom: Dept. 5B  (5th Floor)
   capacity as Attorney General of the
23 State of California, et al.,
24                       Defendants    No oral argument should be heard
                                       unless ordered by the Court
25

26

27

28

# EXHIBIT "17"

EXHIBIT 17
0380

# The Second Amendment Rights of Young Adults

By David B. Kopel[1] & Joseph G.S. Greenlee[2]

## Contents

Introduction ........................................................................................................................ 3

I.   The Supreme Court ......................................................................................................... 4

  A.  District of Columbia v. Heller ................................................................................. 5

  B.  Principles from Other Supreme Court Cases ......................................................... 9

    1.  The militia is protected by the Second Amendment ....................................... 9

    2.  18-to-20-year-olds have historically been understood as part of the militia ................. 10

    3.  Militiamen were required to supply their personal arms, which the government could not deprive them of ........................................................................................ 11

II.  Glossary, and cultural background ................................................................................ 14

  A. Glossary of arms and accoutrements in militia laws ........................................... 14

    1.  Firearms ignition systems .............................................................................. 16

    2.  Types of firearms .......................................................................................... 17

    3.  Edged or bladed weapons and accoutrements ............................................... 20

    4.  Ammunition and related accoutrements ........................................................ 21

    5.  Gun care ......................................................................................................... 23

    6.  Arms carrying and storage ............................................................................ 23

    7.  Pole arms ....................................................................................................... 24

    8.  Horses and tack accoutrements ..................................................................... 25

    9.  Armor ............................................................................................................. 26

    10.   Other field gear ........................................................................................ 26

  B. Types of persons covered by arms mandates ...................................................... 27

  C. "Trained to arms from their infancy" .................................................................. 30

III.   The Colonial and Founding Periods .............................................................................. 33

  A.  New Jersey: "all able-bodied Men, not being Slaves … between the Ages of sixteen and fifty Years" .......................................................................................................... 35

  B.  Maryland: "his her or their house" ....................................................................... 38

---

[1] Adjunct Professor of Constitutional Law, Denver University, Sturm College of Law; Research Director, Independence Institute, Denver, Colorado; Associate Policy Analyst, Cato Institute, Washington, D.C., http://davekopel.org.

[2] Fellow in Constitutional Studies and Firearms Policy, Millennial Policy Center; Steamboat Institute, Emerging Leaders Advisory Council; J.D. 2014, Denver University, Sturm College of Law, http://josephgreenlee.org.

**EXHIBIT 17**
**0381**

Electronic copy available at: https://ssrn.com/abstract=3205664

C. North Carolina: Land grants for properly armed persons "above the age of fourteen years" 42

D. South Carolina: "all male persons in this Province, from the age of sixteen to sixty years" 45

E. New Hampshire: males under seventy ............................................................................... 48

F. Delaware: "every Freeholder and taxable Person" ........................................................... 52

G. Pennsylvania: No service "without the consent of his or their parents or guardians, masters or mistresses" ................................................................................................................. 55

H. New York: "every able bodied male person Indians and slaves excepted" ...................... 59

I. Rhode Island: parents and masters must furnish arms ...................................................... 62

J. Vermont: "the freemen of this Commonwealth, and their sons" ....................................... 64

K. Virginia: "ALL men that are fitting to beare armes, shall bringe their peices to the church" ................................................................................................................................... 67

L. Massachusetts Bay: "from ten yeares ould to the age of sixsteen yeares" ........................ 75

M. Plymouth Colony: "each man servant" ............................................................................. 77

N. Georgia: No going to church without arms ....................................................................... 78

O. Connecticut: "all persons shall beare Armes that are above the age sixteene yeeres" ......... 79

IV. Federal Laws ...................................................................................................................... 80

V. Nineteenth and Early Twentieth Century State Laws and Cases—and Their Role in Modern Litigation ................................................................................................................................ 85

A. State Laws and Cases ........................................................................................................ 85

B. Modern Circuit Cases ....................................................................................................... 89

   1. Rene E. ........................................................................................................................... 90

   2. National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, Explosives ....... 90

   3. National Rifle Association v. McCraw .......................................................................... 92

   4. Horsley v. Trame ........................................................................................................... 92

   5. Ezell v. City of Chicago ................................................................................................ 93

VI. Current State Laws ............................................................................................................ 93

A. State laws with special arms restrictions on young adults ............................................... 94

B. Policy ................................................................................................................................ 98

VII. Conclusion ....................................................................................................................... 100

EXHIBIT 17
0382
Electronic copy available at: https://ssrn.com/abstract=3205664

# Introduction

Since the Supreme Court's 2008 decision in *District of Columbia v. Heller*, lower courts have analyzed diverse Second Amendment issues. One question is whether young adults—that is, persons aged 18-to-20—have Second Amendment rights. This article suggests that they do. Indeed, under *Heller*'s originalist methodology, this is an easy question.

*Heller* provided a methodology for determining whether a person, activity, or arm is protected by the Second Amendment.[3] The Court analyzed founding-era sources, including constitutional text and history, to determine the scope of the Second Amendment at the time of ratification.[4] The Court also looked to 19th century sources, but explained that these "do not provide as much insight into its original meaning as earlier sources."[5] We will take the same approach in this article to determine whether young adults aged 18-to-20 have the right to keep and bear arms.

Part I examines what the Supreme Court has said, explicitly and implicitly, about the Second Amendment rights of young adults.

Parts II and III survey colonial and founding-era sources. Part II begins with a glossary of various terms that were used in militia statutes. These show some of the arms and accoutrements that Americans were required to possess. The various items illustrate that the right to arms does not include only firearms and ammunition. The right also includes, for example, edged weapons and gun-cleaning equipment. Part II also describes the arms culture of early America, where it was a point of national pride that people were trained to arms "from their infancy."

Part III then surveys all the militia statutes from the earliest colonial days through 1800. The survey pays particular attention to two issues. The first is the age for militia service or for other forms of mandatory arms possession. As the statutes demonstrate, arms possession was mandatory for militiamen and for other categories of people. In some colonies, for example, every head of a house, regardless of gender, had to possess arms. So did men who were too old for militia service. The most common ages for mandatory militia service were from 16 to 60. But by the end of the eighteenth century, the militia mandate had been narrowed in most states to 18 until 45 or 50.

The second issue in Part III is the types of arms that militiamen—and the many other people required to possess arms—were supposed to own. Part III tracks the evolution of these laws, as they become more specific about requiring various accoutrements—such as gun cleaning equipment, holsters, and ammunition storage devices—and the laws' attempts to ensure that the public possesses modern arms.

Part IV describes federal laws regarding the ages for arms possession. These include the 1792 statute making 18-year-olds into members of the federal militia (as they are today, by statute), the 1968 Gun Control Act setting age limits on purchases in gun stores, and the 1994 federal law restricting handgun possession by persons under 18.

Part V covers the five leading post-*Heller* federal circuit court cases on age limits for exercising Second Amendment rights. Two of these cases relied heavily on cases and statutes from the nineteenth century; thus, in the course of discussing the cases, we survey the nineteenth century

---

[3] District of Columbia v. Heller, 554 U.S. 570, 595 (2008).

[4] *Id.* at 576 ("In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'") (quoting United States v. Sprague, 282 U.S. 716, 731 (1931)).

[5] *Id.* at 614.

3

**EXHIBIT 17**
**0383**

Electronic copy available at: https://ssrn.com/abstract=3205664

developments. By the end of the century, a substantial minority of states that placed some restrictions on handgun acquisition by persons under 21.

Finally, Part VI describes some of the present-day state laws that limit firearms acquisition or possession by young adults (18 to 20). Part VI also considers various past and present age limits in American law for different activities, such as voting, vices (e.g., alcohol, gambling), marriage, and the right to keep and bear arms.

In conclusion, this article finds that there is some historical precedent for extra regulation for handgun acquisition by young adults, and very little for extra restrictions on long gun acquisition. Pursuant to *Heller*, extra regulations for young adults may be permissible, but prohibitions or quasi-prohibitions are not. The Second Amendment rights of young adults include a core right affirmed in *Heller*: acquiring and keeping a handgun in the home for lawful self-defense.

## I. The Supreme Court

Consider the following syllogism:

1. The militia has the right to keep and bear arms;
2. 18-to-20-year-olds are part of the militia;
3. Therefore, 18-to-20-year-olds have the right to keep and bear arms.

The Supreme Court's precedents have held that items one and two are correct.[6] As will be detailed in Part III, those precedents are correct because colonial and Founding Era militia statutes included young adults.

The *Heller* case affirmed that militiamen have the right to arms and also held that the Second Amendment right is not exclusively for the militia.[7] Further, according to *Heller*, whoever does have the right to arms has that right for all lawful purposes; these include not only militia service, but also self-defense, hunting, target practice, and so on.[8]

---

[6] *See* discussion *infra* Part I.

[7] *Heller*, 554 U.S. at 596; *see also* discussion *infra* Part IA.

[8] *Id.* at 614 ("[T]he right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace.") (quoting Andrews v. State, 50 Tenn. (3 Heisk.) 165, 178-79 (1871)). *Cf.* David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. L.U.L.J. 193, 204-12 (2017) (surveying post-*Heller* federal Circuit Court decisions, which unanimously find that the right to arms includes self-defense, militia, hunting, target shooting, and all other lawful purposes).

4

EXHIBIT 17
0384
Electronic copy available at: https://ssrn.com/abstract=3205664

## A. District of Columbia v. Heller

The *Heller* Court held that the Second Amendment guarantees an individual right, and the right is not dependent on service in a militia. But the Court made clear that the militia is protected. Indeed, all nine Justices agreed that individual militiamen are protected by the Second Amendment. The disagreement between the Justices was whether the right extends beyond the militia, with the majority holding that it does.

The majority stated:

> the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution.[9]

The dissenting opinions similarly recognized that the Second Amendment prevented the militia from being disarmed. Justice Stevens's dissent stated that "the purpose of the Amendment [was] to protect against congressional disarmament, by whatever means, of the States' militias."[10] The Amendment protects "the collective action of individuals having a duty to serve in the militia that the text directly protects,"[11] because the Amendment "was a response to concerns raised during the ratification of the Constitution that the power of Congress to disarm the state militias and create a national standing army posed an intolerable threat to the sovereignty of the several States."[12]

Justice Breyer's dissent noted the "general agreement among the Members of the Court that the principal (if not the only) purpose of the Second Amendment is found in the Amendment's text: the preservation of a 'well regulated Militia.'"[13] After all, the first clause of "[t]he Amendment itself tells us that militia preservation was first and foremost in the Framers' minds."[14]

Although the dissents disagreed with the majority that the right extends beyond the militia, the Court was unanimous that individuals in the militia were fully protected by the Second Amendment, and that the right was codified because the Founders and the public were horrified by the prospect of the government disarming the militia. As explained below, the militias of every colony and state, and the federal militia, included 18-to-20-year-olds. Young adults have been part of the militia from the seventeenth century through the twentyfirst. As Justice Breyer pointed out, the District of Columbia's militia at the time *Heller* was decided included "[e]very able-bodied

---

[9] *Heller*, 554 U.S. at 599. The majority added: "Does the preface fit with an operative clause that creates an individual right to keep and bear arms? It fits perfectly, once one knows the history that the founding generation knew and that we have described above." *Id.* at 598. Because one reason the right was codified was to protect the militia, an interpretation that did not include the entire militia would destroy this "perfect fit."

[10] *Id.* at 660–61 (Stevens, J., dissenting). Justice Stevens's dissent was joined by Justices Souter, Ginsburg, and Breyer.

[11] *Id.* at 645.

[12] *Id.* at 637.

[13] *Id.* at 706 (Breyer, J., dissenting). Justice Breyer's dissent was joined by Justices Souter, Ginsburg, and Stevens.

[14] *Id.* at 715.

**EXHIBIT 17**
**0385**

Electronic copy available at: https://ssrn.com/abstract=3205664

male citizen resident within the District of Columbia, of the age of 18 years and under the age of 45 years."[15]

The *Heller* majority further indicated that 18-to-20-year-olds have Second Amendment rights by explaining:

> the ordinary definition of the militia [i]s all able-bodied men. From that pool, Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." Act of May 8, 1792, 1 Stat. 271. To be sure, Congress need not conscript every able-bodied man into the militia, because nothing in Article I suggests that in exercising its power to organize, discipline, and arm the militia, Congress must focus upon the entire body. Although the militia consists of all able-bodied men, the federally organized militia may consist of a subset of them.[16]

Because the militia consists of "all able-bodied men," because "Congress has plenary power to organize … an effective fighting force" "from that pool" of "able-bodied men," and because "[t]hat is what Congress did in the first Militia Act" by organizing the able-bodied men between eighteen and forty-five, the Court recognized 18-to-20-year-olds as part of the militia; as such, they necessarily have the right to keep and bear arms.

Perhaps, one could argue, that although 18-to-20-year-olds were part of the militia, they were not trusted with arms outside of their militia service. But the *Heller* majority rejects this, since it affirms the right to arms for all lawful purposes.[17] While the English militia of the time was often supplied with centrally-stored arms that were only brought out for practice days, American militiamen were expected to keep their own arms at home, and to be proficient with those arms.[18]

As *Heller* explained, "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty."[19] The Court quoted with approval a previous Supreme Court decision, *United States v. Miller*, discussed *infra*, which stated that

---

[15] D.C. CODE ANN. § 49-401 (West 1889); *Heller*, 554 U.S. at 707 (Breyer, J., dissenting).

[16] *Heller*, 554 U.S. at 596.

[17] *Id.* at 636-37 ("Whether [the Second Amendment] also protects the right to possess and use guns for nonmilitary purposes like hunting and personal self-defense is the question presented by this case. The text of the Amendment, its history, and our decision in *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), provide a clear answer to that question." (citation omitted)). *See also* McDonald v. City of Chicago, 561 U.S. 742, 780 (2010) ("the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."); Caetano v. Massachusetts, 136 S. Ct. 1027, 1028 (2016) (per curiam) ("the [lower] court used 'a contemporary lens' and found 'nothing in the record to suggest that [stun guns] are readily adaptable to use in the military.' But *Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'") (citing *Heller*, 554 U.S. at 624–25) (internal citation omitted).

[18] NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAWS AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 110-11, 136-40, 175-86, 237-40 (2d ed. 2017) (comparing and contrasting English and American militia and arms cultures and laws).

[19] *Heller*, 554 U.S. at 627.

EXHIBIT 17
0386

Electronic copy available at: https://ssrn.com/abstract=3205664

"ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."[20]

The Court also quoted "the most famous" late 19th-century legal scholar: "judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations." Cooley explained that "[t]he alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms."[21] Further, as quoted by the Court, "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use."[22]

Similarly, the Court quoted John Norton Pomeroy, another late-19th-century scholar, stating that the purpose of the Second Amendment is

> to secure a well-armed militia .... But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons. To preserve this privilege, and to secure to the people the ability to oppose themselves in military force against the usurpations of government, as well as against enemies from without, that government is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms.[23]

And the Court quoted Benjamin Vaughan Abbott, another late-19th-century scholar, who said: "Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war."[24]

The *Heller* dissent was of a similar mind, explaining that "the Framers recognized the dangers inherent in relying on inadequately trained militiamen 'as the primary means of providing for the common defense.'"[25] The dissent acknowledged that "during the Revolutionary War, '[t]his force, though armed, was largely untrained, and its deficiencies were the subject of bitter complaint.'"[26] The dissent quoted George Washington stating that, "The firmness requisite for the real business of fighting is only to be attained by a constant course of discipline and service."[27] And Alexander Hamilton, who wrote that "War, like most other things, is a science to be acquired and perfected by diligence, by perseverance, by time, and by practice."[28]

---

[20] *Id.* at 624 (quoting United States v. Miller, 307 U.S. at 179).

[21] *Heller*, 554 U.S. at 616-17.

[22] *Id.* at 617-18 (quoting THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (1880)); *Id.* at 617 ("Cooley understood the right not as connected to militia service, but as securing the militia by ensuring a populace familiar with arms.").

[23] *Id.* at 618 (quoting J.N. POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES § 239 152-53 (1868)).

[24] *Id.* at 619 (citing B. ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880)).

[25] *Id.* at 653 (quoting Perpich v. Dep't of Def., 496 U.S. 334, 340 (1990)).

[26] *Id.* (citing Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 HARV. L. REV. 181, 182 (1940)).

[27] *Id.* at 654.

[28] *Id.* at 653 n.17 (Stevens, J., dissenting) (The Federalist No. 25). While these statements from Washington and Hamilton expressed frustration with the militia, they nonetheless demonstrate that the Founders rejected the idea of disarming a substantial segment of the militia, leaving them largely untrained and unfamiliar with firearms when called to duty. *See also* MARK W. KWASNY, WASHINGTON'S PARTISAN WAR: 1775–1783, at 337-38 (1996) ("Washington learned to recognize both the strengths and the weaknesses of the militia. As regular soldiers,

EXHIBIT 17
0387
Electronic copy available at: https://ssrn.com/abstract=3205664

These sources show that those in the militia were expected not only to provide their own arms, but also to practice with them frequently. All nine Justices shared that understanding.

The majority made clear that the right included, but was not limited to, the militia. "'Keep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*."[29] The Court cited an opinion by the Georgia Supreme Court which "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause…":

> The right of the whole people, *old and young*, men, *women and boys*, and *not militia only*, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.[30]

*Heller*'s most definitive recognition that 18-to-20-year-olds have Second Amendment rights came in the Court's discussion of who "the people" in the Second Amendment are. The operative clause of the Second Amendment states that "the right of *the people* to keep and bear arms, shall not be infringed."[31] As the Court observed, "*the 'militia' in colonial America consisted of a subset of 'the people'*—those who were male, able bodied, and within a certain age range."[32] Thus, because 18-to-20-year-olds were part of the militia, 18-to-20-year-olds were also part of "the people." It is "*the right of the people* to keep and bear arms" that the Second Amendment protects.[33]

---

militiamen were deficient.…He therefore increasingly detached Continentals to support them when operating against the British army.…Militiamen were available everywhere and could respond to sudden attacks and invasions often faster than the army could. Washington therefore used the militia units in the states to provide local defense, to suppress Loyalists, and to rally to the army in case of an invasion.…Washington made full use of the partisan qualities of the militia forces around him. He used them in small parties to harass and raid the army, and to guard all the places he could not send Continentals.…Rather than try to turn the militia into a regular fighting force, he used and exploited its irregular qualities in a partisan war against the British and Tories.").

[29] *Heller*, 554 U.S. at 583 (emphasis in original).

[30] *Id.* at 612–13 (quoting Nunn v. State, 1 Ga. 243, 251 (1846)) (emphasis added).

[31] U.S. CONST., amend. II (emphasis added).

[32] *Heller*, 554 U.S. at 580 (emphasis added). Elsewhere, the majority quoted Thomas Cooley with approval: "The meaning of the provision undoubtedly is, that *the people, from whom the militia must be taken*, shall have the right to keep and bear arms." *Id.* at 617 (emphasis added). The quotation similarly treats the militia as a subset of "the people."

[33] The Court's full discussion on "the people":

> What is more, in all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. As we said in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990):
>
> > "'[T]he people' seems to have been a term of art employed in select parts of the Constitution …. [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

**EXHIBIT 17**
**0388**

Electronic copy available at: https://ssrn.com/abstract=3205664

As *Heller* observed, "Logic demands that there be a link between the stated purpose and the command."[34]   The prefatory clause may assist in interpreting the operative clause.[35]   The Second Amendment's prefatory clause makes it clear that, at a minimum, the main clause protects the entire militia.

The *Heller* Court held that the core of the Second Amendment includes keeping a handgun in the home for lawful defense.[36]   The Supreme Court reiterated that holding in *McDonald v. City of Chicago*.[37]   In the modern United States, some young adults maintain their own homes. Some of them are married. Some of them are raising children in their home. To deprive these householders of the right to possess a handgun in their homes for lawful defense thus infringes on the core of their Second Amendment rights.

The Supreme Court's "first in-depth examination of the Second Amendment"[38] demonstrated that 18-to-20-year-olds have Second Amendment rights, because: 1) the militia is protected by the Second Amendment; 2) 18-to-20-year-olds have historically been understood as part of the militia; and 3) militiamen were required to supply their personal arms, which the government could not deprive them of. But the Court had established this long before *Heller*.

## B.  Principles from Other Supreme Court Cases

### 1.  The militia is protected by the Second Amendment

While the text of the Second Amendment[39] is sufficient to prove that the Founders understood the militia as having the right to keep and bear arms, the Court emphasized the point in *United States v. Miller*:[40]   "With obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view."[41]   While *Miller* has been criticized for its "conceptually flawed concentration on the amendment's militia purpose,"[42] since the case had little to do with the militia, *Miller* correctly affirmed that the Second Amendment prevents the government from rendering militia forces ineffective. Disarming 18-to-20-year-olds would render

---

This contrasts markedly with the phrase "the militia" in the prefatory clause. As we will describe below, the "militia" in colonial America consisted of a subset of "the people"—those who were male, able bodied, and within a certain age range.

*Heller*, 554 U.S. at 580.

[34] *Id.* at 577.

[35] *Id.* at 577-78.

[36] *Id.* at 628, 635 ("the home [is] where the need for defense of self, family, and property is most acute;" "the right of law-abiding, responsible citizens to use arms in defense of hearth and home.").

[37] McDonald v. City of Chicago, 561 U.S. 742, 886 (2010).

[38] *Heller*, 554 U.S. at 635.

[39] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend. II.

[40] United States v. Miller, 307 U.S. 174, 178 (1939).

[41] *Id.* at 178.

[42] Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 259 (1983).

EXHIBIT 17
0389
Electronic copy available at: https://ssrn.com/abstract=3205664

them ineffective militia forces in the Founders' view, especially because militiamen were expected to provide their own arms.

## 2. 18-to-20-year-olds have historically been understood as part of the militia

That 18-to-20-year-olds were included in the federal militia and each state's militia at the time of the founding will be established below, in Parts III and IV. But it is also important to note that the Supreme Court has in every instance understood the militia to include 18-to-20-year-olds.

Citing the constitutional militia, as identified in Article 1, Section 8 of the Constitution, the Court in *Hamilton v. Regents of the University of California*, explained that "[u]ndoubtedly every state has authority to train its able-bodied male citizens of suitable age appropriately to develop fitness, should any such duty be laid upon them, to serve in the United States Army or in state militia (always liable to be called forth by federal authority to execute the laws of the Union, suppress insurrection, or repel invasion…)"[43] The *Hamilton* case involved university students who did not wish to participate in the mandatory militia training required by state law. Then as now, many students at the University of California were ages 18 to 20.

The *Miller* Court recognized that "the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators . . . show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. 'A body of citizens enrolled for military discipline.'"[44] *Miller* then offered examples:

The General Court of Massachusetts in 1784 "provided for the organization and government of the Militia. It directed that the Train Band should 'contain all able bodied men, from sixteen to forty years of age, and the Alarm List, all other men under sixty years of age.'"[45]

The New York Legislature in 1786 "directed: 'That every able-bodied Male Person, being a Citizen of this State, or of any of the United States, and residing in this State, (except such Persons as are herein after excepted) and who are of the Age of Sixteen, and under the Age of Forty-five Years, shall … be enrolled.'"[46]

The General Assembly of Virginia in 1785, the U.S. Supreme Court explained, "directed that 'All free male persons between the ages of eighteen and fifty years,' with certain exceptions, 'shall be inrolled or formed into companies.'"[47]

In *Perpich v. Department of Defense*, the Court acknowledged that "[i]n the early years of the Republic" Congress "command[ed] that every able-bodied male citizen between the ages of 18 and 45 be enrolled" in the militia.[48] *Perpich* also pointed out that at the turn of the twentieth century, the "The Dick Act divided the class of able-bodied male citizens between 18 and 45 years of age into an 'organized militia' to be known as the National Guard of the several States, and the remainder of which was then described as the 'reserve militia,' and which later statutes have

---

[43] Hamilton v. Regents of the Univ. of Cal., 293 U.S. 245, 260 (1934) (citing U.S. CONST., art. 1, § 8, cls. 12, 15 and 16).

[44] *Miller*, 307 U.S. at 179. This language was favorably quoted in *Heller*, 554 U.S. at 595.

[45] *Id.* at 180 (quoting The General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142)).

[46] *Id.* at 180-81 (quoting New York Legislature, an Act passed April 4, 1786 (Laws 1786, c. 25)).

[47] *Id.* at 181 (quoting The General Assembly of Virginia, 1785 (12 Hening's Statutes, c. 1, p. 9 et seq.)).

[48] Perpich v. Dep't of Def., 496 U.S. 334, 341-43 (1990).

10

**EXHIBIT 17**
**0390**

Electronic copy available at: https://ssrn.com/abstract=3205664

termed the 'unorganized militia.'"[49]  As the Court noted, "[i]t is undisputed that Congress was acting pursuant to the Militia Clauses of the Constitution in passing the Dick Act."[50]

In *Presser v. Illinois*, the Court declared:

> It is undoubtedly true that *all citizens capable of bearing arms* constitute the reserved military force or reserve militia of the United States as well as of the states, and, in view of this prerogative of the general government, as well as of its general powers, the states cannot, even laying the constitutional provision in question out of view, prohibit *the people* from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable *the people* from performing their duty to the general government.[51]

Thus, the *Presser* Court, like the *Heller* Court, specified that the militia is part of "the people"— as in "the people" who have the right "to keep and bear arms" protected by the Second Amendment.[52]  The militia identified by the *Presser* Court consists of "all citizens capable of bearing arms," which most certainly includes 18-to-20-year-olds, since the federal militia statute at the time included 18-to-20-year-olds.[53]

## 3. Militiamen were required to supply their personal arms, which the government could not deprive them of

According to the Supreme Court, militiamen were required to provide their own private firearms and were expected to achieve and maintain proficiency with those arms to ensure the effectiveness of the militia.

As *Miller* put it, "the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators . . . show . . . that ordinarily when called for service these men [in the militia] were expected to appear bearing arms *supplied by themselves* and of the kind in common use at the time."[54]  The *Miller* Court provided founding-era examples from Massachusetts, New York, and Virginia: New York required "[t]hat every Citizen so enrolled and notified . . . provide himself, at his own Expense, with a good Musket or Firelock, a sufficient Bayonet and Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges

---

[49] *Id.* at 342.

[50] *Id.*

[51] Presser v. Illinois, 116 U.S. 252, 265-66 (1886) (emphasis added).

[52] *Cf.* Voisine v. United States, 136 S. Ct. 2272, 2291 (2016) (Thomas, J., dissenting) ("To be constitutional, therefore, a law that broadly frustrates an individual's right to keep and bear arms must target individuals who are beyond the scope of the 'People' protected by the Second Amendment.").

[53] *See infra* Part IV.

Following precedent, the Court's opinion in *McDonald* incorporated the Second Amendment on the basis of the Fourteenth Amendment's Due Process Clause, which protects every "person."  Concurring, Justice Thomas preferred to use the Fourteenth Amendment's Privileges or Immunities Clause, which protects "citizens." *McDonald*, 561 U.S. at 850 (Thomas, J., concurring).  Because non-citizens who have declared their intent to naturalize are subject to militia duty, they would have to be within the scope of "the militia" and therefore "the people" who are protected by the Second Amendment. *See* 10 U.S.C. § 246 (2019) (including in the militia all able-bodied males from 17 to 45 "who are, or who have made a declaration of intention to become, citizens of the United States.")

[54] *Miller*, 307 U.S. at 179 (emphasis added).

EXHIBIT 17
0391
Electronic copy available at: https://ssrn.com/abstract=3205664

suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball, two spare Flints, a Blanket and Knapsack."[55]

Massachusetts mandated each militiaman to "equip himself, and be constantly provided with a good fire arm, &c."[56]

Under Virginia law,

> The defense and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty." So "[e]very officer and soldier shall appear . . . armed, equipped, and accoutred, as follows: * * * every non-commissioned officer and private with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, a good knapsack and canteen, and moreover, each non-commissioned officer and private shall have at every muster one pound of good powder, and four pounds of lead, including twenty blind cartridges . . . .And every of the said officers, non-commissioned officers, and privates, *shall constantly keep* the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer.[57]

Recently, in the 2016 *Caetano v. Massachusetts*, the Court reaffirmed that "*Miller* and *Heller* recognized that militiamen traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home.'"[58]

Or as the 1990 Court said in *Perpich*, "in the early years of the Republic, Congress . . . command[ed] that every able-bodied male citizen between the ages of 18 and 45 . . . *equip himself* with appropriate weaponry…."[59] The Court wrote that Congress's "choice of a dual enlistment system [for the militia] is just as permissible as the 1792 choice to have the members of the militia arm themselves."[60]

---

[55] *Id.* at 180–81 (quoting New York Legislature, an Act passed April 4, 1786 (Laws 1786, c. 25)).

[56] *Id.* at 180 (quoting The General Court of Massachusetts, Jan. sess. 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142)).

As in some other states, militiamen "under the control of parents, masters or guardians" were expected to be supplied with arms by their parents, masters, or guardians. General Court of Massachusetts, *supra*, at 142–43. *See also* Part III (listing statutes that required parents, masters, or guardians to supply arms to their dependents). In a militia where duty began at age 16, there would be plenty of militiamen who were not yet living independently, and who could not afford their own arms. As for young people who were already supporting themselves, they typically had to provide their own arms.

Citing seventeenth century laws from the colony of Massachusetts, *Miller* noted that "[c]lauses intended to insure the possession of arms and ammunition by all who were subject to military service appear in all the important enactments concerning military affairs." *Miller*, 307 U.S. at 180 (citing Osgood, 1 The American Colonies In The 17th Century, ch. XIII).

[57] *Miller*, 307 U.S. at 181-82 (The General Assembly of Virginia, October, 1785 (12 Hening's Statutes c. 1, p. 9 et seq.)) (emphasis added).

[58] Caetano v. Massachusetts, 136 S. Ct. 1027, 1032 (2016).

[59] Perpich v. Dep't of Def., 496 U.S. 334, 341-43 (1990) (emphasis added).

[60] *Id.* at 350. Under the modern dual enlistment system, volunteers in the National Guard dually enlist in the National Guard of their state and in the National Guard of the United States. The Guardsmen are state actors unless called into federal service. In either capacity, their arms are supplied by the federal government. The National Guard is the

**EXHIBIT 17**
**0392**

Electronic copy available at: https://ssrn.com/abstract=3205664

The Court said something similar in *Houston v. Moore* in 1820.[61]  The Court stated that the congressional militia statutes were within Congress's enumerated Article I militia power to declare "what arms and accoutrements the officers and privates shall provide themselves with."[62]

In other cases, the Court has confirmed that depriving militiamen of their personal arms would violate their right to keep and bear arms.  As discussed above, the *Presser* Court explained that because the Constitution authorizes Congress to call forth the armed citizenry, "the states cannot . . . prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government."[63]  Since Congress needs to be able to depend on the people being armed, the states cannot disarm them. The *Presser* Court's vision depends on an armed populace.[64]

In *McDonald*, the Court found

> the 39th Congress' response to proposals to disband and disarm the Southern militias is instructive.  Despite recognizing and deploring the abuses of these militias, the 39th Congress balked at a proposal to disarm them.  Disarmament, it was argued, would violate the members' right to bear arms, and it was ultimately decided to disband the militias but not to disarm their members.[65]

Thus, the *McDonald* Court suggested what the *Presser* Court flat out said: individual militiamen could not be deprived of their private firearms.

Nothing the Supreme Court has ever written about the militia can be construed to exclude 18-to-20-year-olds.  The Court has repeatedly confirmed that militiamen were expected to provide their own private firearms, and to be proficient with those arms.  What is more, the Court has twice stated that the militia is a subset of "the people"—the same "people" the Second Amendment

---

"organized" part of the militia. 10 U.S.C. § 246 (2019).  The "unorganized" militia is all other able-bodied males ages 18 to 45, except for ministers and other exempt persons. 10 U.S.C. § 247 (2019).

[61] Houston v. Moore, 18 U.S. (5 Wheat.) 1 (1820).

[62] *Id.* at 14.

[63] Presser v. Illinois, 116 U.S. 252, 265-66 (1886); U.S. CONST., art I, § 8, cl. 16 ("To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions.") (Calling Forth Clause).

The *Presser* point was reiterated with approval in a 1900 case:

> In *Presser* v. *Illinois*, 116 U. S. 252, 29 L. ed. 615, 6 Sup. Ct. Rep. 580, it was held that the Second Amendment to the Constitution, in regard to the right of the people to bear arms, is a limitation only on the power of Congress and the national government, and not of the states.  It was therein said, however, that as all citizens capable of bearing arms constitute the reserved military force of the national government the states could not prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.

Maxwell v. Dow, 176 U.S. 581, 597 (1900), *abrogated on other grounds by* Williams v. Florida, 399 U.S. 78 (1970).  *Presser* had been interpreted to hold that the right to keep and bear arms is not one of the Fourteenth Amendment "privileges or immunities of citizens of the United States" protected from state infringement.  Similar holdings applied to most of the rest of the Bill of Rights.  The work of incorporating items in the Bill of Rights into the Fourteenth Amendment has instead been accomplished by the Due Process of Law clause of the Fourteenth Amendment. *See*, *e.g.*, McDonald v. City of Chicago, 561 U.S. 742 (2010) (plurality opinion by Justice Alito relies on Due Process; concurrence by Justice Thomas relies on Privileges or Immunities).

[64] *See also Houston*, 18 U.S. (5 Wheat.) at 52 (Story, J., dissenting) ("Yet what would the militia be without organization, arms, and discipline?").

[65] *McDonald*, 561 U.S. at 780 (citations omitted).

EXHIBIT 17
0393
Electronic copy available at: https://ssrn.com/abstract=3205664

protects. Finally, the Court has recognized that any law that would disarm "the people"—and especially the militia—would be unlawful.

The Court's unwavering descriptions of the militia and the young adults therein are solidly supported by the historical record. Besides the colonial period and Founding Era sources quoted by the Court above, we will in Part III examine *every* colonial and state militia statute up to 1800. They demonstrate that young adults are part of the militia.

## II. Glossary, and cultural background

Before surveying the early state laws, we provide some background. Part A is a glossary of terms used in colonial and state laws regarding equipment that members of the public were required to possess. As will be detailed in Part III, the requirements often applied beyond militiamen. The arms mandates encompassed the militia, many males not in the militia, and sometimes women.

Previous scholarship has not paid much attention to the particular arms that were required. Because American discussion of the right to keep and bear arms has been so fixated on gun control, scholars have noted that most militiamen needed a long gun, while officers and cavalry needed handguns. This is true as far as it goes, but there was much more. Requirements for a knife, a sword, or both were very common.

Of course ammunition was mandatory Post-*Heller*, courts have readily accepted that ammunition is part of the right to arms and is likewise subject to the arms rights limits that were articulated in *Heller*.[66] In addition to the ammunition that would have to be brought to militia muster, further reserves kept at ammunition were required.[67]

Also mandatory was equipment for the cleaning and carrying of arms and ammunition. Horsemen had to have certain horse tack, and everyone needed various field gear, such as knapsacks and blankets.

Next, in Part B, we explain the American attitude that prevailed during the seventeenth and eighteenth centuries: part of what makes America different from—and better than—Europe, is that Americans start becoming proficient with arms when they are children.

### A. Glossary of arms and accoutrements in militia laws

---

[66] *See, e.g.*, Jackson v. City & Cty. of San Francisco, 746 F.3d 953, 967-68 (9th Cir. 2014) ("the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them") (internal quotations omitted); United States v. Pruess, 703 F.3d 242, 245 (4th Cir. 2012) (treating Supreme Court legal rules about guns as having the same meaning for ammunition); Ezell v. City of Chicago, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); Herrington v. United States, 6 A.3d 1237, 1243 (D.C. 2010) (right to ammunition is coextensive with the right to firearms); Andrews v. State, 50 Tenn. (3 Heisk.) 165, 178 (1871) ("The right to keep arms, necessarily involves the right . . . to purchase and provide ammunition suitable for such arms").

[67] A muster is a periodic assembly of militiamen; the militiamen must prove that they have the certain requisite arms by bringing them the muster. To "pass muster" is to pass the inspection. A muster would not necessarily involve drill or practice. As detailed in Part III, some militia statutes required militiamen (and others) to possess reserves of bullets and gunpowder at home, beyond the quantity that would have to be brought to muster.

**EXHIBIT 17**
**0394**

Electronic copy available at: https://ssrn.com/abstract=3205664

English spelling did not begin to become standardized until the late eighteenth century, so the reader will find that the statutes spell many of the words below in diverse ways.

The militia statutes required possession of arms (e.g., guns, swords), ammunition, and also equipment for arms—including repair, maintenance, carrying, storage, and home manufacture. The most common term for the other items was *accoutrements*: "Generally defined as a soldier's personal equipment excepting clothes and weapons."[68] These would include "cartridge boxes, pouches, belts, scabbards, canteens, knapsacks, powder horns, etc."[69] They are necessarily part of the Second Amendment right, since they are necessary to the use of arms.[70] In the same sense, "the freedom of the press" is not just about owning printing presses, but also includes the relevant accessories, such as printing ink, ink magazines, moveable type, etc., and indeed the entire system of gathering, publishing, and distributing periodicals, pamphlets, and books.[71]

---

[68] GEORGE C. NEUMANN & FRANK J. KRAVIC, COLLECTOR'S ILLUSTRATED ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 8 (1975); *see also Accoutrements Definition,* CHARLES JAMES, AN UNIVERSAL MILITARY DICTIONARY (4th ed. 1816) ("ACCOUTREMENTS, in a military sense, signify habits, equipage, or furniture of a soldier, such as buffs, belts, pouches, cartridge boxes, &c.").

An older, similar term was "furniture," in the sense of furnishing. For example, the first written guarantee of arms rights in Anglo-American law was the 1606 Virginia charter. It gave settlers the perpetual right to import "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3783, 3786 (Francis Newton Thorpe ed., 1909). As of 1606 (and for long after), the word "armor" included arms. The word "apparel" in the Virginia Charter had the narrow meaning of equipment for fighting, including defensive clothing, and the broader meaning of other necessities, such as ordinary clothing.

[69] NEUMANN & KRAVIC, *supra* note 68, at 8.

[70]

> Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. "There comes a point ... at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." Hill v. Colorado, 530 U.S. 703, 745, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (Scalia, J., dissenting). The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," Jackson v. City and County of San Francisco, 746 F.3d 953, 967 (C.A.9 2014) (internal quotation marks omitted), and "to acquire and maintain proficiency in their use," Ezell v. Chicago, 651 F.3d 684, 704 (C.A.7 2011). See District of Columbia v. Heller, 554 U.S. 570, 617-618, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (citing T. Cooley, General Principles of Constitutional Law 271 (2d ed. 1891) (discussing the implicit right to train with weapons)); United States v. Miller, 307 U.S. 174, 180, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (citing 1 H. Osgood, The American Colonies in the 17th Century 499 (1904) (discussing the implicit right to possess ammunition)); Andrews v. State, 50 Tenn. 165, 178 (1871) (discussing both rights). Without protection for these closely related rights, the Second Amendment would be toothless. Likewise, the First Amendment "right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise." McConnell v. Federal Election Comm'n, 540 U.S. 93, 252, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part).
>
> The same goes for the Sixth Amendment and the financial resources required to obtain a lawyer…

Luis v. United States, 136 S. Ct. 1083, 1097-98 (2016) (Thomas, J., concurring).

[71] In the Bill of Rights, "the press" and "arms" are synecdoches. That is, they use a part of a term to refer to the whole—like calling an automobile "my wheels." "The press" refers not only to printing presses, but also to communications that do not involve a printing press, such as handwritten flyers or television broadcasting. Likewise, "arms" includes defensive devices (armor) and devices that raise an alarm (literally, a call to arms). *See* David B. Kopel, *The First Amendment Guide to the Second Amendment*, 81 TENN. L. REV. 417, 448 (2014).

**EXHIBIT 17**
**0395**

Electronic copy available at: https://ssrn.com/abstract=3205664

## 1. Firearms ignition systems

*Matchlock*. When the English settlers began arriving in Virginia in 1607, the predominant ignition system for firearms was the matchlock. When the trigger is pulled, a slow-burning cord is lowered to a small pan (the *priming pan* or *firing pan*). The lit end of the cord ignites a small quantity of gunpowder in the firing pan. The flame from the gunpowder travels along a narrow channel to the touch-hole—a small hole next to the main charge of gunpowder, in the gun's barrel. The flame that enters via the touchhole ignites the main powder charge.

The matchlock was the main type of ignition system in Great Britain during the seventeenth century.[72] Although the first English settlers came to America with matchlocks, Americans upgraded to more sophisticated guns (flintlocks) much earlier than the British did, because the burning cord makes it much more difficult to have a firearm always ready for immediate use. The matchlock's burning cord also impeded concealment in the woods.[73] Matchlocks usually did not work at all in the rain, and only sometimes in the damp.[74] The safety problem of burning rope near gunpowder is apparent.

The slow-burning cord is called the *match* or *match rope*.[75] The cord burns on both ends.[76] When matchlocks were the predominant firearm, militia statutes might also specify the requirement for a sufficient quantity of match, expressed by the total length of match rope.

*Firelock* or *flintlock*.[77] In a flintlock, the gunpowder is ignited by flint striking a piece of steel and producing sparks. The steel is a part of the gun. The flint (which eventually wears out and must be replaced) is held in the jaws of a movable vise that is a part of the gun.

Flintlocks are faster to reload and to fire than matchlocks. And they are much less likely to *misfire* (fail to ignite).[78]

Many militia statutes from the latter eighteenth century specify that the firearm must be a firelock *or* some more specific type of firearm (e.g., musket, rifle). This is a violation of the rule against surplusage, since the other type of firearm would still be a flintlock. The rule against surplusage was not as prominent in eighteenth century drafting as it is today.

---

[72] JOHNSON ET AL., *supra* note 18, at 140–42.

[73] *Id.* at 220.

[74] *Id.*

[75] GEORGE C. NEUMANN, BATTLE WEAPONS OF THE AMERICAN REVOLUTION 6 (2011).

[76] *Id.* at 6-7. The rope was usually made from flax tow or hemp tow. *Id.* "Tow" is defined *infra*, text at note 140. It was soaked in saltpeter (a gunpowder ingredient). The two ends of the cord would be ignited the same way that any other fire was ignited at the time, such as by striking two pieces of metal against each other, or rubbing two sticks to create a spark. What we call "matches" in the twenty-first century are paper or wood sticks with sesquisulfide of phosphorus attached to the tip. As common consumer items, they were preceded in the nineteenth century by matchsticks with white phosphorus tips. The principle was discovered in 1669, but it was not practical to apply due to the difficulty in obtaining phosphorus. *See* Anne Marie Helmenstine, *History of Chemical Matches*, THOUGHTCO. (Jan. 3, 2018), https://www.thoughtco.com/history-of-chemical-matches-606805

[77] RICHARD M. LEDERER, JR., COLONIAL AMERICAN ENGLISH 88 (1985).

[78] A well-trained user could fire up to five shots per minute, depending on the gun. W.W. GREENER, THE GUN AND ITS DEVELOPMENT 66-67 (9th ed. 2010); CHARLES C. CARLTON, THIS SEAT OF MARS: WAR AND THE BRITISH ISLES 1585-1746, at 171-73 (2011). Because ignition time (the interval from when the trigger is pressed until the shot is fired) is shorter for flintlocks, shooting at a moving target became much easier. TOM GRINSLADE, FLINTLOCK FOWLERS: THE FIRST GUNS MADE IN AMERICA 13 (2005).

**EXHIBIT 17**
**0396**
Electronic copy available at: https://ssrn.com/abstract=3205664

*Lock*, *gun lock*.  What we today call the *action* of a firearm.  It is the part of the gun that performs the mechanical work of firing the ammunition.  It has small moving parts that must be carefully fitted to each other.  The distinction between a matchlock and a flintlock was the difference in the lock.

All of the types of guns described in the next section could be either matchlocks or flintlocks (except when specifically noted otherwise).  Matchlocks were the most common in the early seventeenth century, but were subsequently displaced by flintlocks.  As noted above, Americans were much quicker to adopt flintlocks than were their British cousins.  This is one of the many ways that Americans and British arms cultures have diverged since the earliest times.[79]

By the time of the Revolution, the large majority of American and British guns were flintlocks, although presumably there may have been some poorer people whose only gun was an old matchlock.

## 2.  Types of firearms

Guns that can fire more than one shot without reloading are called *repeaters*.  They were invented in the late sixteenth century, but they were much less common than single-shot guns.[80] Until the second quarter of the nineteenth century, repeaters were much more expensive to produce than single-shot guns.  All the guns described below (except for the *blunderbuss*) could be repeaters, but relatively few of them were.

*Musket*.  The musket is a long gun which has a smooth *bore* (the interior of the barrel).  If the bore is not smooth, but instead has grooves, the firearm is a *rifle*, not a classic musket.[81]  Muskets are not highly accurate, but they did not need to be.  The standard European fighting method of the time was massed lines of infantry, so a high rate of fire in the enemy's general direction was sufficient.

*Bastard musket*.  Shorter and lighter than a standard musket.

*Snaphaunce*.  An early version of the flintlock.[82]  "During the 17th century, *snaphaunce*

---

[79] *See* JOHNSON ET AL., *supra* note 18, at 171-74, 239-40 (summarizing divergence of American and British arms cultures, in part because Americans adopted much of Indian arms culture).

[80] *Id.* at 142–44, 223–24; David B. Kopel, *Firearms Technology and the Original Meaning of the Second Amendment*, REASON (Apr. 3, 2017, 9:34 PM), https://reason.com/volokh/2017/04/03/firearms-technology-and-the-or.

[81] Rifled muskets were invented in the latter part of the 18th century but did not see widespread use by Americans in this period.

[82] PATRICK A. MALONE, THE SKULKING WAY OF WAR: TECHNOLOGY AND TACTICS AMONG THE NEW ENGLAND INDIANS 34 (1991) (explaining that "[t]he true snaphaunce, rarely used in New England" differs from the "true" flintlock in how the cover of the firing pan is connected to the rest of the gun lock. American sources often do not use the different terms with precision.).

"Snaphaunce" may derive from the Dutch word for "chicken thief," based on "the occupation of the inventors." GEORGE CAMERON STONE, A GLOSSARY OF THE CONSTRUCTION, DECORATION AND USE OF ARMS AND ARMOR IN ALL COUNTRIES AND IN ALL TIMES 233 (1999).  The mechanical action of a snaphaunce (and of a flintlock), "resembled the pecking motion of a bird."  BILL AHEARN, MUSKETS OF THE REVOLUTION AND THE FRENCH & INDIAN WARS 98 (2005).  The resemblance "appears to be the origin of the term cock which was the English 18th-century word used for this component." *Id.*

The "cock" (sometimes called the "hammer") is the pivoting part of the flintlock that holds the flint in screw-tightened jaws.  When the trigger is pressed, the cock falls forward so that the flint strikes an immobile piece of hardened steel (the *frizzen*, *steel*, or *battery*).  The collision produces a shower of sparks that fall into the firing pan and ignite the gunpowder. NEUMANN, BATTLE WEAPONS, *supra* note 75, at 7.

**EXHIBIT 17**
**0397**
Electronic copy available at: https://ssrn.com/abstract=3205664

commonly referred to any flintlock system."[83]

*Fusee, fuse, fuze, fuzee, fusil*. Often, a synonym for flintlock.[84] More precisely, "a light, smoothbore shoulder arm of smaller size and caliber than the regular infantry weapon."[85]

*Carbine* or *carabine*. In the seventeenth century, a long gun with a smaller bore than a musket. By the eighteenth, also shorter and lighter than a musket. Well-suited for horsemen.[86] The word could "denote almost any small-calibre firearm irrespective of barrel length."[87]

*Caliver*. A matchlock larger than a carbine but smaller than a musket.[88]

The various smaller long guns typically had smaller bores (the empty interior of the barrel). Their smaller bullets were less powerful but were more aerodynamically stable at longer distance. Also, the smaller bore meant that a given quantity of lead could produce more bullets for the particular gun.

*Fowling piece*. A smoothbore long gun well-suited for bird hunting. In contrast to the classic musket, a fowling piece had a lighter barrel and stock, and its muzzle was slightly flared, to increase the velocity of the birdshot.[89] During the Revolution, many fowling pieces were employed as militia arms. Ideally, although not always in practice, they would be retrofitted to allow for the attachment of a bayonet.[90]

*Rifle*. A long gun with interior grooves (*rifling*). The grooves make the bullet spin on its axis, greatly improving aerodynamic stability and thus adding considerable range. Little-used in New England prior to the Revolution, but popular elsewhere, especially in frontier areas.

*Pistol*. Any handgun. (Unlike today, when a semi-automatic pistol is distinct from a revolver.)

---

To cock a gun is to pull the cock (or today, the hammer) backwards so that it is ready fire. JAMES, *supra* note 68. The *sear* is an internal part that holds the cock in its backwards position. The more advanced sears of the eighteenth century had an intermediate position (half-cock) that facilitated loading, without risk of the gun firing. If the sear malfunctioned and released the cock, then the gun "went off half-cocked."

[83] NEUMANN, *supra* note 75, at 8 (italics in original).

[84] STONE, *supra* note 82, at 242; JIM MULLINS, OF SORTS FOR PROVINCIALS: AMERICAN WEAPONS OF THE FRENCH AND INDIAN WAR 53, 65 (2008) (when matchlock muskets, snaphaunces, and true flintlocks were used by European armies, "fusil" or "fire-lock" meant a flintlock musket; by the mid-eighteenth century, "the term 'fusil', 'fuzee' or 'fusee' came to be used by the English to denote a wide variety of light-weight guns."). "Fusil" was also used to mean "carbines."

[85] NEUMANN, *supra* note 75, at 19.

[86] STONE, *supra* note 82, at 163.

[87] STUART REID, THE FLINTLOCK MUSKET: BROWN BESS AND CHARLEVILLE 1715-1865 (2016).

[88] STONE, *supra* note 82 at 158.

[89] J. N. GEORGE, ENGLISH GUNS AND RIFLES 85 (Palladium Press 1999) (1947); GRINSLADE, *supra* note 78, at 5.

[90] GRINSLADE, *supra* note 78, at 5, 54, 63 ("In times of Indian raids or war, the family fowling-piece served the need for a fighting gun."); MULLINS, *supra* note 84, at 49 (The classic fowling piece lacked the musket's swivels for attachment of a sling.).

The first identifiably American-made arms are fowling pieces built in the seventeenth century by Dutch settlers in the Hudson River Valley. AHEARN, *supra* note 82, at 101. As the American fowler evolved, influenced by the English and by immigrant French Huguenot gunsmiths, "The result was the development of a unique variety of American long fowler. These American long guns served as an all-purpose firearm. When loaded with shot, they were suited to hunt birds and small game, and when loaded with a ball, they could provide venison for the table. In times of emergency, they were needed for militia, and more than a few saw service in the early colonial wars as well as the Revolution." *Id.* As a British officer noted after the battles of Lexington and Concord in 1775, ''These fellows were generally good marksmen, and many of them used long guns made for Duck-Shooting.'' FREDERICK MACKENZIE, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON, BEING THE DIARY OF LIEUTENANT FREDERICK MACKENZIE, ADJUTANT OF THE ROYAL WELCH FUSILIERS, JANUARY 5-APRIL 30, 1775, at 67 (Allen French ed., 1926; rprnt. ed. 1969) (quoting an unnamed officer).

**EXHIBIT 17**
**0398**

Electronic copy available at: https://ssrn.com/abstract=3205664

Most handguns of the time were single-shot, although there were some expensive models that could fire multiple shots without reloading.[91] Handguns ranged from large holster pistols to small pocket pistols.[92] They were often carried by officers.[93]

*Blunderbuss.* The name perhaps comes from the Dutch "donder-buse" or "thunder gun."[94] The blunderbuss was notable for its flared muzzle, which made reloading easier while riding on a stagecoach or aboard a water vessel. It could be loaded with a single very large bullet, but the more common load was twenty large pellets, or even up to fifty.[95] It was devastating at close range, but not much use beyond twenty yards.[96] In the Revolution, it was most useful for "street control, sentry duty and as personal officer weapons."[97] A blunderbuss could be a very large handgun.[98] Or it could have a short stock attached and be used as a shoulder arm.

*Horse-pistols.* "[S]o called from being used of horseback, and of a large size."[99]

*Case of pistols.* Handguns were often sold in matched pairs.[100] A "case of pistols" is such a pair. Also called a "brace of pistols."

*Gun.* In the usage of the time, any long gun, but not a handgun.

*Peece, peice.* Today, *piece*. Any firearm.

In the period before the Revolution, most American gunsmiths used imported locks (the moving part of the firearm).[101] The use of recycled parts was also common.[102] So, for example, a damaged fowling piece might be repaired with some lock parts scavenged from a musket. Thus, the above categories of firearms should not be viewed as rigidly divided. There were many hybrids.[103] The variety of American firearms and edged weapons was further increased by the fact that America at all times, including after the Revolution, was a major export market for older, surplus European arms—not only from the United Kingdom, but also from Germany, France, Spain, and the low countries; to these would be added firearms scavenged from the various European armies that fought in colonial wars or the American Revolution.[104]

Whatever the specifics of any state or colony's arms requirements, Americans went to war with a very wide variety of personal arms, not always necessarily in precise compliance with the

---

[91] CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY: 1600 TO 1800, at 194-98, 215-16 (1910) (late eighteenth century American pistols with two to four rounds); NEUMANN, *supra* note 75, at 259 (double-barreled pistols used by many French officers).

[92] LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF NATIONAL DILEMMA 208-11 (1975).

[93] NEUMANN, *supra* note 75, at 231, 275 (explaining that most pistols were smoothbores, but some models had rifling).

[94] D.R. BAXTER, BLUNDERBUSSES 13 (1970); GEORGE, *supra* note 89, at 59.

[95] GEORGE, *supra* note 89, at 92-93.

[96] *See* BAXTER, *supra* note 94; JAMES D. FORMAN, THE BLUNDERBUSS 1560-1900 (1994).

[97] NEUMANN, *supra* note 75, at 20.

[98] *See, e.g., id.*, at 247 ("blunderbuss holster pistol").

[99] JAMES, *supra* note 68, at 638; *see also* NEUMANN, *supra* note 75, at 263 (American horseman pistol).

[100] Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 709, 719 (2008).

[101] GRINSLADE, *supra* note 78, at 1, 5, 15, 23-25.

[102] *Id.*

[103] ERIK GOLDSTEIN & STUART MOWBRAY, THE BROWN BESS 40-41 (2010); GRINSLADE, supra note 78, at 5, 23 ("The distinction between fowlers and muskets in the eighteenth century was not always clear-cut. Those manufactured from existing parts shared a common appearance, often combining aspects of both fowler and musket."). For example, the locks from French muskets that were captured during France's various wars in North America were often recycled into use on American fowlers.

[104] GEORGE G. NEUMANN, SWORDS & BLADES OF THE AMERICAN REVOLUTION 7, 53 (3d ed. 1991).

EXHIBIT 17
0399
Electronic copy available at: https://ssrn.com/abstract=3205664

narrowest definitions of arms that might appear in a militia equipment statute. At Valley Forge in 1777, Baron Von Steuben was encamped with the Continental Army, most of whose members had brought their personal firearms to service. Von Steuben observed that "muskets, carbines, fowling pieces, and rifles were found in the same company."[105]

### 3. Edged or bladed weapons and accoutrements

Most firearms could fire only one shot, after which the user might have to take several seconds to reload. So, at close quarters, a firearm would be good for only one shot. If a person carried a pair of pistols (a *brace*), then he or she could fire two shots. But there would be no time to reload anything more against an adversary who was within arm's reach. So edged weapons were essential to self-defense.[106]

*Bayonet.* A dagger or other straight knife that can be attached to the front of a gun. The word comes from Bayonne, France, the bayonet-manufacturing capital.[107]

The bayonet could be used for all the purposes of any knife. In European-style combat—and much of the combat of the American Revolution—when the two armies met at close quarters, the bayonet would be attached to the end of the long gun, so that the long gun could be used as spear or pole-arm. Compared to muskets, rifles were longer, thinner, and more fragile, and thus poorly suited for use with a bayonet.

Some militiamen who lacked bayonets used daggers for up-close fighting.[108] Typically they had a double-edged blade, about six to ten inches long.[109]

*Knife.* Same meaning as today.

*Jack knife.* As today, a folding pocket knife. Blades could range from three to twelve inches.[110] Primarily for use as a tool, although available as a last-resort weapon.

*Sword.* Same meaning as today. The next four items are types of swords. Some militia statutes required a "sword or hanger" or a "sword or cutlass," or some similar formulation. Again, this is a violation of the rule against surplusage, but that rule was apparently not much in mind when statutes were drafted in the eighteenth century.

*Broad sword.* Has a straight, wide, single-edged blade. "It was the military sword of the 17th century as distinguished from the civil sword, the rapier. It was also the usual weapon of the common people."[111]

---

[105] FRIEDRICH KAPP, THE LIFE OF FREDERICK WILLIAM VON STEUBEN 117 (2d ed. 1859), https://ia802700.us.archive.org/33/items/lifeoffrederickw00kappuoft/lifeoffrederickw00kappuoft.pdf.

[106] HAROLD L. PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 1526-1783, at 69-101 (Dover 2000) (1956).

[107] Bayonne had long been a manufacturing center for cutlery and weapons. While it is generally agreed that bayonets were invented around 1640, there are several stories about how the invention happened. LOGAN THOMPSON, DAGGERS AND BAYONETS: A HISTORY 61-62 (1998). According to one version, "Some peasants of the Basque provinces, whilst on an expedition against a company of bandits, having used all their ammunition, were driven to the desperate necessity of inserting their long knives into the mouths of their arquebuses [an early type of long gun], by which means they routed their adversaries." W.W. GREENER, THE GUN AND ITS DEVELOPMENT 626 (9th ed. 1910).

[108] NEUMANN, *supra* note 104, at 228.

[109] *Id.* at 229-30.

[110] *Id.* at 231. Some jackknives were multitools, also containing forks, saws, heavy needles, or "bleeders" (used to pierce veins in medical treatment). *Id.* at 231, 248.

[111] STONE, *supra* note 82, at 150-51.

**EXHIBIT 17**
**0400**
Electronic copy available at: https://ssrn.com/abstract=3205664

*Hanger.* By one definition, a "short sword (blade averaging twenty-five inches) having at least one cutting edge.[112] Alternatively, a lightweight saber.[113] A classic saber has a curved blade, thick back, and a handguard.[114]

*Cutlass* or *cutlash.* In the seventeenth and early eighteenth century, "used interchangeably with the term 'hanger'."[115]

*Simeter.* Today, *scimitar.* Precisely speaking, a sword with a very curved blade that is narrow and thick. Often associated with Persia or the Middle East.[116] In usage of the time, "a short sword with a convex edge."[117]

*Scabbard* or *bucket.* The former remains in modern usage. A container for carrying or storing the sword. Similar to a holster for pistols.

*Belt*, *girdle*, or *strap.* A sword or bayonet could be carried in a waist belt.[118] A belt could also be used for attaching holsters, scabbards, etc. Some equipment could be held by shoulder belts.[119]

*Swivel.* Rings on a firearm to which a sling can be attached.[120]

*Hatchet.* Same meaning as today. "'Axe', 'hatchet', and 'tomahawk' were used interchangeably in America during most of the 18th century."[121]

*Tomahawk.* In a militia context, similar to a hatchet. Before European contact, Indian tomahawks had a stone attached to the end and were used as clubs, but not as cutting tools. Indian-European trade put steel blades into Indian hands, and led to the development of the bladed tomahawk, familiar to viewers of cinematic Westerns.[122] One popular American innovation was the pipe tomahawk, which could be used for smoking as well as cutting.[123]

## 4. Ammunition and related accoutrements

*Powder.* All of the gunpowder of the seventeenth and eighteenth centuries was what we today call *blackpowder.* It is a mixture of sulfur, charcoal, and saltpeter (which comes from decayed animal waste) and can be produced at home.[124]

*Bullets.* All bullets of the time were spheres. As described above, most of the guns of the seventeenth and eighteenth centuries were smoothbores.[125] They could be loaded with either a single bullet (a *ball*, better for long distances) or several smaller pellets (*shot*, better for bird-

---

[112] NEUMANN, *supra* note 104, at 54.

[113] STONE, *supra* note 82, at 280 (also, a Scotch word for dagger).

[114] In the modern sport of fencing, "saber" has a narrower definition. The saber is one of three types of modern fencing swords, the others being épée and foil.

[115] NEUMANN, *supra* note 104, at 58.

[116] STONE, *supra* note 82, at 544 (cross-referencing "scimiter" to "shamshir"), 550-53.

[117] JAMES, *supra* note 68, at 789.

[118] *Id.* at 51.

[119] *Id.* "Girdle" at the time was the same as "belt." LEDERER, *supra* note 77, at 102.

[120] JAMES, *supra note* 68, at 388.

[121] NEUMANN, *supra* note 104, at 253. The "American axe" was smaller than its European ancestor, and better-suited for carrying in a belt. Redesign of the pole, the attachment mechanism, and the blade shape made the American axe sturdier and better suited for chopping. *Id.* at 255-57.

[122] HAROLD L. PETERSON, AMERICAN INDIAN TOMAHAWKS 8-9 (2d ed. 1971).

[123] NEUMANN, *supra* note 104, at 257.

[124] *See generally* DAVID CRESSY, SALTPETER: THE MOTHER OF GUNPOWDER (2012). Modern gunpowder, invented in the latter part of the nineteenth century, burns more efficiently, and thus produces much less smoke and residue.

[125] JOHNSON ET AL., *supra* note 18, at 220-23.

EXHIBIT 17
0401
Electronic copy available at: https://ssrn.com/abstract=3205664

hunting, and for defense at shorter distances). Many militia statutes required the possession of "sizeable" bullets.[126] At the least, this rules out the tiny pellets that would be used for hunting small birds like partridges or doves.

*Swan shot* and *goose shot*. Multiple large pellets suitable for hunting the aforesaid birds.[127] Today, used in shotguns. In the seventeenth and eighteenth century, usable in all smoothbore handguns or long guns, which is to say all firearms except rifles.

*Buck-shot*. Multiple large pellets for deer hunting. Today, one of the largest types of shotgun pellets.[128]

*Ramrod*. Today, the vast majority of new firearms are breechloaders. They are loaded from the back of the gun, near the firing chamber. Breechloaders were invented in the mid-seventeenth century, but they were very expensive.[129] By far the most common guns at the time were muzzleloaders, which are loaded from the front of the gun, the *muzzle.*

To load a muzzleloader, the user first pours gunpowder down the muzzle. Next, the user uses a pole, the ramrod, to ram the bullet all the way down the barrel.[130]

The ramrod is also used for cleaning a gun and for extracting an unfired bullet, as described below.

*Scour* or *scowerer*. A ramrod.[131]

*Match*. The slow-burning cord used to ignite a matchlock. If quantities are specified, one fathom equals six feet.

*Wadding*. Made of tow, hay, or straw. Rammed into the gun after the powder has been poured, and before the bullet is rammed down, it prevented the powder from scattering.[132]

*Patches*. Often the bullet would be wrapped in linen or some other fabric.[133] This made it easier to ram the bullet down the barrel. The patch also helped to provide a gas seal around the bullet; the seal kept the expanding gas of the gun powder explosion from escaping the barrel before the bullet did. The expanding gas was thus kept behind the bullet, the better to increase the velocity of the traveling bullet.

*Cartouche, Cartridge*. Paper cartridges were in use by the mid-seventeenth century.[134] These were cylinders that contained a premeasured amount of gunpowder, plus the bullet. The user would tear open the cartridge and then pour the powder into the muzzle. Then the user would ram the bullet down the muzzle. Although paper cartridges were common at the time of the Revolution, some gun users, including riflemen and many militiamen, still poured in gunpowder from a flask or horn, rather than from cartridges.[135]

---

[126] *See infra* Parts III.A. (N.J.), B. (Md.), C. (N.C.), E. (N.H.), H. (N.Y.), and J. (Vt.).

[127] *Cf.* R.A. STEINDLER, THE FIREARMS DICTIONARY 250 (1970). "Swan drops" used for hunting swan weigh 29 grains each and are .268 inches in diameter. "Goose drops" were smaller than swan drops. *Id.*

[128] *Id.* at 250 (largest shotgun pellets are "small & large buck shot").

[129] JOHNSON ET AL., *supra* note 18, at 142-44.

[130] STEINDLER, *supra* note 127, at 188 (ramrod is usually wood, but can be metal; also usable as a cleaning tool).

[131] JAMES, *supra* note 68, at 791.

[132] *Id.* at 612.

[133] *See, e.g.*, JOHN G.W. DILLIN, THE KENTUCKY RIFLE 15, 50, 65 (Palladium Press 1998) (1924); William De V. Foulke, Foreword, in *id.* at vi, viii; GREENER, *supra* note 78, at 623-24.

[134] REID, *supra* note 87, at 20 (quoting JOHN VERNON, THE YOUNG HORSEMAN 10 (1644)).

[135] NEUMANN & KRAVIC, *supra* note 68, at 66.

**EXHIBIT 17**
**0402**

Electronic copy available at: https://ssrn.com/abstract=3205664

*Flints.*  For igniting the powder in a flintlock firearm.  Since the flint is softer than the steel that the flint strikes, it will eventually need to be replaced.[136]  So militia laws often mandated possession of certain quantities of flints.

## 5.  Gun care

To reach all the way down the muzzle and to the bottom of the barrel, cleaning tools would often be attached to the *ramrod* or *scour*, described above.[137]

*Worm.*  A corkscrew-shaped device attached to the end of the ramrod.  Used for cleaning and also for extracting an unfired bullet and other ammunition components from a firearm.[138]

*Brush.*  As in modern gun cleaning, a small brush.

*Wire* or *wier.*  Also, *picker.*  The priming wire was for cleaning the flashpan and the touch hole—the small hole where the fire from the priming pan connected with the main powder charge.[139]

*Tow.*  Tow is a loose ball of coarse and unspun waste fibers from hemp or linen production.[140]  It is used for gun cleaning, for wadding, and for tinder.[141]

*Screw driver.*  This has the same meaning as today.  A screw driver is used for cleaning and repairs, especially for the gun lock.[142]  Also, it can be used to loosen or tighten the cock's jaws in order to change the flint.[143]

## 6.  Arms carrying and storage

*Holster.*  This has the same modern definition.  A holster is used for carrying a handgun or a short long gun, usually attached to the body by a belt or can be attached to a horse saddle.[144]  Some later statutes specify that the holsters must have bear skin covers.[145]

*Scabbard* or *bucket.*  Similar to a holster.[146]

---

[136] REID, *supra* note 87, at 33. A properly shaped flint (one that had been well-knapped) would need to be replaced after about ten to fifteen shots. *Id.*

[137] GOLDSTEIN & MOWBRAY, *supra* note 103, at 53.  The tip of the ramrod would be threaded for attachment of cleaning equipment. *Id.*

[138] NEUMANN & KRAVIC, *supra* note 68, at 264; STEINDLER, *supra* note 127, at 278. Also, "wormer." LEDERER, *supra* note 77, at 246.

[139] NEUMANN & KRAVIC, *supra* note 68, at 264.

[140] *Id.* at 269; MULLINS, *supra* note 82, at 48.

[141] MULLINS, *supra* note 84, at 48; NEUMANN & KRAVIC, *supra* note 68, at 161, 262.

[142] MULLINS *supra* note 84, at 48 (explaining that the screwdriver is necessary to remove the lock for cleaning and oiling).

[143] NEUMANN & KRAVIC, *supra* note 68, at 264.

[144] *Holster Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/holster (last visited Jan. 13, 2019).

[145] *See infra* Parts III.E. (N.H.), F. (Del.), and G. (Penn.)

[146] *Scabbard Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/scabbard#other-words (last visited Jan. 13, 2019); *Bucket Definition*, 1 THE NEW SHORTER OXFORD ENGLISH DICTIONARY 293 (4th ed. 1993) ("4. A (usu. leather) socket or rest for a whip, carbine, or lance.").

EXHIBIT 17
0403

Electronic copy available at: https://ssrn.com/abstract=3205664

*Horn*, *powderhorn*, or *flask*. This is used for gunpowder carrying.[147] For most colonists, the most common horn came from cattle, rams or similar animals.[148]

*Charger*, *shot bag* (or *pouch*, *badge*). The charger is a bulb-shaped flask for carrying powder, attached to metal components that release a premeasured quantity of powder. [149] *Shot bag/pouch/badge* may refer to this device.[150] The terms may also refer to bags for carrying bullets.[151]

*Cover for the lock*. As noted above, a *gun lock* (today, it is called the *action*) is the part of the gun that performs the mechanical work of firing the ammunition.[152] A cover protects the gun lock from the elements.[153]

*Wax*. This is used to protect firearms from rain.[154] For example, it can be used to cover the opening of the muzzle and prevent water from entering.[155]

*Cartouche box*. This is what we call a cartridge box today. Its purpose is for storage and carrying of cartridges.[156]

*Bandelero* or *cross belt*. Today, it is referred to as a *bandolier*. A waist or shoulder belt with attachments for carrying units of ammunition or of premeasured powder, usually in the form of a leather strip worn over the chest, containing cartridges in individual loops.[157] The cross belt is a pair of crossing strips, or a single belt "passing obliquely across the breast."[158]

*Mould*. Today, it is called a *mold*. It is used to cast molten lead into ammunition balls.[159] This shows that militiamen, and all the other persons subject to arms mandates, were expected to be able to produce their own ammunition.

## 7. Pole arms

*Pike*. This is a spear with a thrusting or cutting weapon attached to the end.[160] European armies of the seventeenth century were usually a mixture of pikemen and musketmen.[161] The use

---

[147] *Powderhorn Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/powder%20horn (last visited Jan. 13, 2019).

[148] RAY RILING, THE POWDER FLASK BOOK 13 (1953). See *id.* at 171 for instructions on how to make a horn.

[149] STONE, *supra* note 82, at 563.

[150] RILING, *supra* note 145, at 256-57, 430-31.

[151] *See* MULLINS, *supra* note 84, at 43-44.

[152] *Glossary of Firearms Related Terms*, THE FIREARMS GUIDE, http://www.thefirearms.guide/glossary (last visited Jan. 13, 2019).

[153] JAMES, *supra* note 68, at 444 (explaining that a "lock-cover" is "a piece of leather or oil-cloth").

[154] Doug Wicklund, *Caring for Your Collectible Firearms*, NAT'L RIFLE ASS'N, 2-3, http://www.nramuseum.org/media/1007361/caring%20for%20your%20collectible%20firearms%20by%20doug%20wicklund.pdf (last visited Jan. 13, 2019).

[155] *Id.*

[156] RILING, *supra* note 145, at 483. "Cartouche" is the French word for "cartridge." Cartouche boxes were used for carrying paper cartridges; these contained the bullet and a measured quantity of gunpowder, wrapped in paper. *Id.*

[157] STONE, *supra* note 82, at 91-92; NEUMANN, *supra* note 75, at 21.

[158] *Crossbelt Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/crossbelt (last visited Jan. 13, 2019).

[159] NEUMANN, *supra* note 75, at 21. Some molds were for a single bullet, while others could cast multiple bullets. *Id.*

[160] STONE, *supra* note 82, at 501.

[161] RODNEY HILTON BROWN, AMERICAN POLEARMS, 1526-1865: THE LANCE, HALBERD, SPONTOON, PIKE, AND NAVAL BOARDING WEAPONS 17-18 (1967).

**EXHIBIT 17**
**0404**

Electronic copy available at: https://ssrn.com/abstract=3205664

of pikes declined during the eighteenth century, especially in America.[162]  In the first two years of the Revolution, when some soldiers lacked firearms, pikes were re-introduced for infantry, since they were readily made from locally available materials.[163]  The pikes used during the Revolutionary War were usually twelve to sixteen feet long, could be anchored in the ground, and were especially useful for defending entrenched positions.[164]

*Espontoon* or *spontoon.*  This is a six-foot-long pole-arm, similar to a pike but shorter.[165]  It was carried by Revolutionary infantry officers.[166]  "It was an officer's primary weapon, since it allowed him to keep his eyes on the battle at all times … Furthermore, his signals could be seen from a distance in the din and disorder of the battlefield, when voice commands might be indistinguishable."[167]

*Lance.*  It is a horseman's spear, the same meaning as today.[168]

## 8.  Horses and tack accoutrements

*Dragoon* or *trooper.*  This means a horse-mounted soldier.[169]

*Saddle.*  This has the same meaning as today.[170]

*Bridle.*  This also has the same as today.[171]

*Pillion.*  This refers to a rear extension on a saddle allowing for a second rider.[172]

*Valise holsters.*  These are saddle-mounted holsters, similar to modern *saddlebags*, that could be used for carrying large handguns.[173]

*Breastplate.*  Straps that prevent the saddle or harness from sliding.  They attach to the front of the saddle.[174]

---

[162] *Id.* at 18, 34.

[163] NEUMANN, *supra* note 104, at 192-93.

[164] *Id.* at 193.

[165] *Id.* at 191.

[166] *Id.* at 191-92.

[167] Joseph Mussulman, *Espontoon*, DISCOVERING LEWIS & CLARK, http://www.lewis-clark.org/article/2366 (last visited Jan. 13, 2019) ("For Lewis and Clark the espontoon also served as a walking-stick on rough or slippery terrain, as a prop to steady a rifle for a long shot, and as a weapon.  Lewis killed a rattlesnake with his (May 26, 1805), and Clark killed a wolf (May 29, 1805)."); *see also* STONE, *supra* note 82, at 580. *See generally* MERIWETHER LEWIS AND WILLIAM CLARK, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION (Gary Moulton ed. 1983).

[168] STONE, *supra* note 82, at 407-09. *See generally* BROWN, *supra* note 158.

[169] LEDERER, *supra* note 77, at 72 (dragoon).  "Whereas cavalry fought on horseback, dragoons scouted, pursued, and moved on horseback, but dismounted to fight." *Id.*  The militia statutes do not appear to have such a precise meaning.  Some statutes call anyone with a horse a "dragoon," and other statutes call anyone with a horse a "trooper."  The statutes do not distinguish cavalry from dragoons/troopers.

[170] *Saddle Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/saddle (last visited Jan. 13, 2019).

[171] *Bridle Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/bridle (last visited Jan. 13, 2019).

[172] *Pillion Definition*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/pillion (last visited Jan. 13, 2019).

[173] *Valise Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/valise (last visited Jan. 13, 2019).

[174] JANE MYERS, HORSE SAFE: A COMPLETE GUIDE TO EQUINE SAFETY 83 (2005).

EXHIBIT 17
0405
Electronic copy available at: https://ssrn.com/abstract=3205664

*Crupper*.  This has a similar function to a breastplate, except it attaches to the rear of the saddle or harness.[175]  Alternatively, it can be armor for a horse's hind quarters.[176]

*Spurs*.  This definition has remained the same.[177]  Militia statutes might also specify boots suitable for being attached to spurs.

*Hands*.  This is the standard unit of measure for a horse's height.[178]  Today, one hand is equivalent to four inches.[179]  The typical minimum size for a militia horse was 14 or 14 ½ hands (66 or 68 inches).[180]  The measure is from the ground to the horse's withers, the top of its shoulders.[181]

### 9. Armor

In the early decades of American settlement, when Indians with arrows were the principal opponent, many Americans wore armor on at least part of their bodies.[182] For purposes of mobility, leather or quilted jackets became popular; they would not always stop an arrow, but they couldmitigate its damage.[183]  Once the Indians acquired firearms in large quantities, armor was generally abandoned.[184]  By the time of the Revolution, most soldiers did not wear armor; the exceptions were body armor for some specialized engineers, and metal headgear for cavalry.[185]

### 10. Other field gear

*Knapsack, blanket, and canteen*.  These are the same as modern definitions.[186]
*Haversack*.  This bag is like a knapsack but carried over only one shoulder.[187]

---

[175] *Crupper Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/crupper (last visited Jan. 13, 2019).

[176] STONE, *supra* note 82, at 195.

[177] *Spur Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/spur (last visited Jan. 13, 2019).

[178] *Hand*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/science/hand-measurement (last visited Jan. 13, 2019).

[179] *Id.*

[180] *See* 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, BEING THE FIRST SESSION OF THE FIRST CONGRESS-3RD SESSION OF THE 13TH CONGRESS, MARCH 4, 1789–SEPT. 13, 1814, at 814 (1826); Parts III.C. (North Carolina) and III.F. (Delaware) *infra*.

[181] *Hand*, *supra* note 178.

[182] PETERSON, *supra* note 106, at 132-42.

[183] *Id.* at 142-51; *See also id.* at 43 (noting 1645 Massachusetts General Court mandate that every family have "a canvas coat quilted with cotton wool as defense against arrows").

[184] *Id.* at 149.

[185] *Id.* at 307-16.

[186] *Knapsack Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/knapsack (last visited Jan. 13, 2019); *Blanket Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/blanket (last visited Jan. 13, 2019); *Canteen Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/canteen (last visited Jan. 13, 2019).

[187] *Haversack Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/haversack (last visited Jan. 13, 2019).

EXHIBIT 17
0406
Electronic copy available at: https://ssrn.com/abstract=3205664

## B. Types of persons covered by arms mandates

In modern times, when we think about "the militia," we are mainly thinking about males 18 to 45 (or in previous times, 16 to 50 or 60, *infra*). (As used in this article, the ages mean "at least X" and "under Y." In other words, if the militia was males ages 16 to 50, the militia obligation would begin on a person's sixteenth birthday, and end on his fiftieth birthday.) Precisely speaking, these enrolled men were a subset of the whole militia—the whole militia consisting of everyone who was able to fight, as detailed in Part I. The enrolled militiamen had to engage in group drills and might be marched away from home for military service. In the seventeenth and eighteenth centuries, the scope of persons who were required to possess arms was broader than just the enrolled militia.[188]

The arms requirements for other categories of persons were sometimes contained in statutes with the title "militia," and sometimes in other statutes.[189] Likewise, statutes requiring that males 16-60 be armed were often but not always titled as "militia" laws.

The categories below explain the different classes of people who might have to be armed. Examples of the statutory uses of the various terms below will be found in Part III, the survey of seventeenth and eighteenth century militia statutes.

*Trained band.* This was the term in some states or colonies for the enrolled portion of the militia that is required to participate in training (i.e. males 16 or 18 to 45, 50, or 60).[190] It could be sent away from home for military missions, although deployments outside the colony or state were disfavored.[191]

The phrase was copied from Elizabethan England. There, "trained band" referred to a subset of the enrolled militia who received extra training; membership in the English trained band was based on social class. Yeomen—small farmers who owned their own land—could be in the trained band, while lower classes, such as tenants, were not.[192] In American usage, though, "trained band" or "band," usually refer to the entire enrolled militia. One early statute in Maryland did provide extra training for a subset of the enrolled militia. Unlike in England, this subset was chosen by merit—physical fitness and courage—rather than by class.[193]

*Alarm list.* This refers to every other male who was capable of fighting. They were required to possess the same specified arms as members of the trained band (i.e., the enrolled militia) but were not required to participate in training or to serve in ordinary expeditions.[194]

Alarm list duty was limited to emergencies, especially, to join in defense of the town or community when under attack. People on the alarm list were primarily: 1. People with an occupational exemption from trained band service (e.g., physicians in some colonies), or 2. People above the age for trained band service.[195] For example, someone who was fifty-two years old. Alarm list duty would usually have some upper limit, such as age sixty or seventy.

---

[188] *See infra* Part III.
[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] JOHNSON ET AL., *supra* note 18, at 110.
[193] *See infra* Part II.B (1658 statute).
[194] *See infra* Part III.
[195] *Id.*

EXHIBIT 17
0407
Electronic copy available at: https://ssrn.com/abstract=3205664

In practice, when a town was under attack, everyone who could fight would fight, including women and children.[196]

*State armies.*  Although sometimes described as part of the militia, state armies were distinctive in several regards.  State armies were established for temporary periods during wartime.[197]  They fought in Indian Wars, in the numerous wars against the French colonies in America, and the Revolution.[198]

Unlike militia service, state army service was not a universal obligation of every able-bodied male.  State armies were select forces with longer enlistment terms than the ordinary militia.[199]  They were more willing to be deployed to other states or colonies.[200]  To the extent possible, their ranks were filled by volunteers.[201]  To the extent necessary, conscription was used, with each town or other locality having an obligation to supply a certain number of men.[202]  State armies comprised a considerable fraction of American fighters during the Revolution, fighting alongside the Continental Army and the state militias.[203]

*Householder*, *freeholder, taxable person*, *titheable person.*  Many statutes required that these persons possess arms, whether or not they were enrolled in the militia.

A householder is the head of a house, regardless of sex.[204]  For example, a widow, or any other woman living independently could be a householder.

A *freeholder* owns real property.  A single woman could be a freeholder.

The meaning of "taxable" "titheable" (or tithable) person, varied by jurisdiction; some laws exempted government officials, or "immigrants, indigents, and incapacitated persons."[205]  In Virginia, everyone over 16 except for free white women was titheable (that is, taxable under a

---

[196] *See*, *e.g.*, STEVEN C. EAMES, RUSTIC WARRIORS: WARFARE AND THE PROVINCIAL SOLDIERS ON THE NEW ENGLAND FRONTIER, 1689-1748, at 28-29 (2011).

[197] JOHNSON ET AL., *supra* note 18, at 226, 281.

[198] *Id.* at 225, 235, 283.  The wars with the French were the War of the League of Augsburg (1689-97) (known in America as King William's War), the War of the Spanish Succession (1701-13) (Queen Anne's War, in America), and the War of Jenkins' Ear (1741-48) (against France's ally Spain; including an attempted Spanish invasion of Georgia). The latter war blended into the War of the Austrian Succession (1744-48) (King George's War).  Finally, the French & Indian War (1754-63) (known to the British as the Great War for Empire). *Id.* at 245.  For participation by the armies of the various colonies, *see*, *e.g.*, RENÉ CHARTRAND, COLONIAL AMERICAN TROOPS 1610–1774 (2002) (3 vols.).

[199] JOHNSON ET AL., *supra* note 18, at 226, 281.

[200] *Id.* at 226, 281.

[201] *Id.* at 226-27.

[202] *Id.* at 194, 226-228, 230.

[203] *Id.* at 203, 281, 283.

[204] *Householder Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/householder (last visited Jan. 13, 2019).

[205] *See* John Witte, Jr., *Tax Exemption of Church Property: Historical Anomaly or Valid Constitutional Practice?* 64 S. CAL. L. REV. 363, 371-72 (1991).

28

**EXHIBIT 17**
**0408**

Electronic copy available at: https://ssrn.com/abstract=3205664

head or capitation tax).[206]  The revenue could be used for a colony or state's established church[207] or for secular purposes.[208]

A man aged 65 years old might be too old for the enrolled militia, but he could still be taxable or titheable.  Depending on the laws of the particular colony, he might still be required to possess arms.

A fifty-two-year-old widow maintaining her own household would not be in the enrolled militia or the alarm list but would be required to keep arms as a householder.  Depending on her colony's laws, she might also be a taxable or titheable person.

Accordingly, women were sometimes legally required to possess arms in Massachusetts, Maryland, Delaware, New Hampshire, Vermont, and Connecticut.[209]  Although they were never required to serve in the enrolled militia, they were part of the militia in the broadest sense: all able-bodied persons capable of bearing arms.

*Servants*.  The statutes detailed in Part III sometimes have special rules for servants.  For example, a statute requiring people to provide their own arms may include an exception requiring a master provide his or her servant with arms.  Since the servant was, by definition, not living independently, the servant might be not be able to afford all the necessary arms and accoutrements.

Many servants were free laborers.  They were free persons who entered into voluntary contracts to supply services, such as household help or farm work.

*Indentured servants* were free immigrants who had signed contracts entitling the other party to use or sell their labor for a period of years.[210]  For example, a poor Englishman, Irishman, or German who wished to emigrate to America might receive free passage in exchange for an indenture for several years, four years being most common.[211]  The indenture contract was assignable; the master might use the indented laborer for a while, and then sell the indenture to someone else.[212]  Other indentured servants  were convicted criminals who had been given a choice between execution in England, or transportation to America followed by a period of indentured

---

[206] *See* Terri L. Snyder, *Marriage on the Margins: Free Wives, Enslaved Husbands, and the Law in Early Virginia*, 30 L. & HIST. REV. 141, 166 (2012):

> Local courts were especially anxious to establish accurate lists of all taxable persons in any given jurisdiction.  Throughout the colonial period, definitions of which persons were taxable changed, but by 1723, everyone over the age of 16 was taxable, except for free white women.  And it certainly was the case that individuals concealed their dependents in order to reduce their annual tax burden.  In order to prevent them from so doing, Virginia law required households to provide a list of tithables to the tax collector.

*See also* James R. Campbell, *Dispelling the Fog about Direct Taxation*, 1 BRIT. J. AM. LEG. STUD. 109, 163 n. 215 (2012) (Massachusetts "poll taxes were imposed on the same set of tithable persons that Virginia and North Carolina taxed").

[207] *See* Godwin v. Lunan, Jeff. 96, 104, 1771 WL 3, 5 (Va. 1771).

[208] *See* Commonwealth v. Justices of Fairfax Cty. Court, 4 Va. (2 Va. Cas.) 9, 10 (1815) ("to erect the bridges and causeways in the said mandamus mentioned, and to levy the cost of the same on the tithable persons of the said county of Fairfax").

[209] *See* Part III, *infra*.

[210] Mary Sarah Bilder, *The Struggle over Immigration: Indentured Servants, Slaves, and Articles of Commerce*, 61 MO. L. REV. 743, 752-53 (1996).

[211] *Id.* at 754-56.

[212] *Id.* at 758.

EXHIBIT 17
0409
Electronic copy available at: https://ssrn.com/abstract=3205664

servitude, usually seven years.[213]  Like slaves, indentured servants were not legally free; they could not marry, travel, or trade without their master's consent.[214]

At the end of an indenture, the former master was usually required to give the former servant "freedom dues"—land, goods, or money allowing the ex-servant to begin independent life.[215]  In Maryland, Virginia, North Carolina, and South Carolina, freedom dues included a gun for male ex-servants.[216]

*Bought servants.*  An indentured servant was also called a "bought servant."[217]  Some militias statutes excluded "bought" or "indented" servants or allowed militia service only with the master's consent.  Presumably, this was to prevent indentured servants from choosing militia service as a means to evade their indenture contracts.  Textually, the "bought servant" statutes did not apply to free laborers, who were hired servants.

*Slaves* were also called "servants" or sometimes "servants for life."[218]  Imported slaves were Africans sold by Africans to trans-Atlantic slave traders, following capture in war or kidnapping.[219]  Non-imported slaves were Indians captured in war (often by other Indians, and then sold to the English); their slavery/servitude was not necessarily for life.[220]  Although slaves were bought and sold, the term "bought servant" does not seem to encompass them, at least as the term was used in Pennsylvania.[221]

As Part III details, practices varied about whether indentured servants or slave servants were part of the enrolled militia.  In general, the former were usually included, and the latter usually excluded, but there were exceptions in both directions.

## C. "Trained to arms from their infancy"

---

[213] *Id.* at 754, 756-57.

[214] *Id.* at 758.

[215] *Id.* at 759.

[216] JOHNSON ET AL., *supra* note 18, at 185-86.

[217] *See* York Freedom Suits (1685-1715), VIRTUAL JAMESTOWN, http://www.virtualjamestown.org/yorkfreedomsuits1685_1715.html (last visited Jan. 13, 2019) (Mar. 24, 1686/7 judgement that plaintiff, "having truely served her Limited time as a bought Servant" of decedent, should be paid her freedom dues out of decedent's estate) (quoting 7 York County Deeds, Orders, and Wills 292).

[218] *E.g.*, Respublica v. Betsey, 1 U.S. (1 Dall.) 469, 470 (Pa. 1789) ("The words 'freemen and free-women,' seem to have been used in opposition to the word 'slaves,' or 'servants for life'") (interpreting Pennsylvania's gradual abolition statute in favor of Betsey's freedom).

[219] *The Capture and Sale of Enslaved Africans*, INT'L SLAVERY MUSEUM, http://www.liverpoolmuseums.org.uk/ism/slavery/africa/capture_sale.aspx (last visited Jan. 13, 2019) (also noting that some Africans were sold to European traders as criminal punishment or for default on debt); Sheldon M. Stern, *It's Time to Face the Whole Truth About the Atlantic Slave Trade*, HIST. NEWS NETWORK (Aug. 13, 2007), https://historynewsnetwork.org/article/41431.

[220] *See* Robin v. Hardway, Jeff. 109, 1772 WL 11 (Va. 1772) (noting 1670 Virginia statute "that all servants not being Christians, imported into this country by shipping, shall be slaves for their life time," but "Indians taken in war by any other nation, and by that nation that takes them sold to the English…shall serve, if boys and girls, until thirty years of age, if men and women, twelve years and no longer.").

[221] *See* Gary B. Nash, *Slaves and Slave Owners in Colonial Philadelphia*, in AFRICAN AMERICANS IN PENNSYLVANIA: SHIFTING HISTORICAL PERSPECTIVES 43, 46 (Joe Trotter & Eric Ledell Smith eds. 1997) (quoting 1756 message from Pennsylvania Assembly to the Governor, complaining about British recruitment of Pennsylvania indentured servants for the British army in the French & Indian War: "If the Possession of a bought Servant…is… rendered precarious…the People [will be] driven to the Necessity of providing themselves with Negro Slaves…").

**EXHIBIT 17**
**0410**

Electronic copy available at: https://ssrn.com/abstract=3205664

Firearms were a way of life in early America. It was common for American children to be familiar with firearms, a circumstance that gave the Americans confidence leading up to the Revolutionary War. On July 8, 1775, the Continental Congress warned King George III that the Americans' superiority with arms, due to their training beginning in childhood, would make them a formidable foe: "Men trained to Arms from their Infancy, and animated by the Love of Liberty, will afford neither a cheap or easy Conquest."[222]

This same argument was asserted by John Zubly, a Savannah minister and recent immigrant from Switzerland.[223] He warned the British that "In the strong sense of liberty, and the use of firearms almost from the cradle, the Americans have vastly the advantage over men of their rank almost every where else."[224] He added that American children were "shouldering the resemblance of a gun before they are well able to walk."[225]

Similarly, David Ramsay, a legislator from South Carolina and delegate to the Continental Congress, pointed out that, "Europeans, from their being generally unacquainted with fire arms are less easily taught the use of them than Americans, who are from their youth familiar with these instruments of war."[226] He noted that "[f]or the defence of the colonies, the inhabitants had been, from their early years, enrolled in companies, and taught the use of arms."[227]

Thomas Jefferson, explained what was going on in America to his Scottish friend: "[w]e are all in arms, exercising and training old and young to the use of the gun."[228] Once the Revolution began, Jefferson suggested that the reasons American battle casualties were so much lower than British ones was "our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy."[229]

So too was Jefferson. His father, Colonel Peter Jefferson, taught him to use a firearm at a young age.[230] When Thomas was 10 years old, his father was confident enough to send the boy into the wilderness alone with nothing but his firearm, to learn self-reliance.[231] By the time Thomas was 14, his father "had already taught him to sit his horse, fire his gun, boldly stem the Rivanna when the swollen river was 'Rolling red from brae to brae,' and press his way with unflagging foot through the rocky summits of the contiguous hills in pursuit of deer and wild turkeys."[232]

Having valued the firearms training of his childhood, Thomas Jefferson suggested that his 15-year-old cousin, Peter Carr, become similarly acquainted with firearms.[233] Jefferson told Carr that "a strong body makes a strong mind," and recommended two hours of exercise every day. Jefferson

---

[222] 1 JOURNALS OF THE AM. CONGRESS FROM 1774-1788, at 106-11 (adopted July 8, 1775) (1823) (emphasis added).

[223] *Zubly, John Joachim*, BIOGRAPHICAL DIRECTORY OF THE U.S. CONGRESS, http://bioguide.congress.gov/scripts/biodisplay.pl?index=Z000015 (last visited Jan. 13, 2019).

[224] PETER A. DORSEY, COMMON BONDAGE: SLAVERY AS METAPHOR IN REVOLUTIONARY AMERICA 53 (2009).

[225] *Id.*

[226] 1 DAVID RAMSAY, THE HISTORY OF THE AMERICAN REVOLUTION 181 (Liberty Fund 1990) (1789).

[227] *Id.* at 178.

[228] 3 Am. Archives 4th Ser. (Clark & Force) 621 (1840).

[229] Letter from Thomas Jefferson to Giovanni Fabbroni (June 8, 1778), *in* THOMAS JEFFERSON, WRITINGS 760 (Merrill D. Peterson, ed.,1984). In precise legal usage, "infancy" meant the same as "minority." The word was not used exclusively in the modern sense, in which an "infant" is younger than a toddler. As the above quotes indicate, toddler age was when some Americans began learning to use arms.

[230] *Id.*

[231] DUMAS MALONE, JEFFERSON THE VIRGINIAN 46-47 (1948) (Vol. 1 of Dumas Malone, Jefferson and His Time).

[232] HENRY S. RANDALL, 1 THE LIFE OF THOMAS JEFFERSON 14-15 (1865). The "brae to brae" quote is a verse popularized by Sir Walter Scott. 1 MEMOIRS OF THE LIFE OF SIR WALTER SCOTT, part 4, ch. 2, at 52 (1838).

[233] THOMAS JEFFERSON, WRITINGS 816-17 (Merrill D. Peterson ed. 1984).

EXHIBIT 17
0411
Electronic copy available at: https://ssrn.com/abstract=3205664

continued: "[a]s to the species of exercise, I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprise and independence to the mind. . . . Let your gun therefore be the constant companion of your walks."[234] "Another nephew tells us that Jefferson believed every boy should be given a gun at the age of ten, as Jefferson himself had been."[235]

The Adamses felt the same way. "Militiamen on the way to Lexington and Concord stopped at a farm in Braintree, Massachusetts. To their amusement, 8-year-old John Quincy Adams, son of Abigail and John Adams, was executing the manual of arms with a musket taller than he was."[236] When John Adams had been a nine-or ten-year-old schoolboy, he loved to engage in sports, "above all, in shooting, to which diversion I was addicted to a degree of ardor which I know not that I ever felt for any other business, study, or amusement."[237] He would leave his gun by the schoolhouse door, so that he could go hunting as soon as classes ended.[238]

Ordinary people were just as determined to teach the young how to use arms. John Andrews, an aid to British General Thomas Gage, recounted an incident in which Redcoats were unsuccessfully trying to shoot at a target on the Boston Common.[239] When an American mocked them, a British officer dared the American to do better. The American repeatedly hit the target.[240] As Andrews noted, "The officers as well as the soldiers star'd, and tho't the Devil was in the man. Why, says the countryman, I'll tell you *naow*. I have got a *boy* at home that will toss up an apple and shoot out all the seeds as its coming down."[241]

Or in the words of the *Boston Gazette*, "[b]esides the regular trained militia in New-England, all the planters sons and servants are taught to use the fowling piece from their youth, and generally fire balls with great exactness at fowl or beast."[242]

Later, during the debates on ratification of the Constitution, Virginia's Richard Henry Lee emphasized: "to preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, *especially when young*, how to use them."[243]

---

[234] *Id.*

[235] Kates, *supra* note 42, at 229 (1983) (citing T. JEFFERSON RANDOLPH, NOTES ON THE LIFE OF THOMAS JEFFERSON (Edgehill Randolph Collection) (1879)).

[236] DAVID HACKETT FISCHER, PAUL REVERE'S RIDE 289 (1995). A manual of arms is a drill in which the gun user presents the firearm or other arm in a series of positions (e.g., right shoulder arms, left shoulder arms, fix bayonet, unfix bayonet, etc.). *Manual of Arms Definition*, VOCABULARY.COM, https://www.vocabulary.com/dictionary/manual%20of%20arms (last visited Jan. 13, 2019).

[237] 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257-59 (Lyman Henry Butterfield ed., 1961).

[238] *Id.* When the schoolmaster told him to stop, he stored the gun at the nearby home of an old woman. *Id.*

[239] Letter dated Oct. 1, 1774, 1 Am. Archives 4th Ser. (Clark & Force) 58-59 (1840).

[240] *Id.*

[241] *Id.*

[242] BOSTON GAZETTE, Dec. 5, 1774, at 4; *See also* HAROLD F. WILLIAMSON: WINCHESTER: THE GUN THAT WON THE WEST 3 (1952) (quoting English visitor to New England in 1774, "in the cities you scarcely find a Lad of 12 years that does not go a Gunning"); DAVID HARSANYI, FIRST FREEDOM: A RIDE THROUGH AMERICA'S ENDURING HISTORY WITH THE GUN 57-58 (2018) (quoting 1760s visitor to the Valley of Virginia: "A well grown boy at the age of twelve or thirteen years was furnished with a small rifle and a shot-pouch. He then became a fort soldier, and has his port-hole assigned him. Hunting squirrels, turkeys and raccoons soon make him expert in the use of his gun.") (citing Daniel Boorstin, *The Therapy of Distance*, 27 AMERICAN HERITAGE (no. 4 June 1976)).

[243] 17 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 363 (John P. Kaminski & Gaspare J. Saladino eds. 1995) (emphasis added).

EXHIBIT 17
0412
Electronic copy available at: https://ssrn.com/abstract=3205664

# III.   The Colonial and Founding Periods

Before we begin a colony-by-colony survey of militia laws, we can summarize some common characteristics of laws among the colonies and states, from the creation of different colonies in the seventeenth or early eighteenth century, through the end of the eighteenth century.

First, the most common age for militia duty was 16 to 50 years.  The maximum often went as high as 60.  The minimum was sometimes 18, and never higher (except for one 19-year period in Virginia).  In 1792, Congress enacted the Uniform Militia Act (hereinafter UMA), to govern militia when called into federal service.  The federal ages were 18 to 45, and several states revised their laws to make the state militia ages conform to the federal militia ages.[244]

The survey below in this Part III includes over 250 different enactments, as colonies and states revised and updated their militia laws.  They also include many instances in which the colony or state enacted a militia statute that by its terms would expire in one year or a few years.  Then, at the appropriate time, the colony would pass a new militia law, with the same terms as the old law. Because the royal governors, appointed by the king, would control the militia once it was in active service, some colonial legislatures were averse to permanent militia laws, which might give the royal governor too much unilateral power.[245]

The frequent renewals and revisions of colonial and early state militia laws reflect the legislatures' continuing determination that persons over 18-years-old be well-armed.  The *only* militia law that did not have a minimum age of 18 or less was from Virginia in 1738–57.[246]

Before discussing militia laws of the colonies and states one-by-one, we should emphasize that the militia was *not* the only institution in which young adults were required to use arms.  Three related duties also required young adults (like other adults) to bring their arms to help protect the community.  All of these had long-established roots in common law.  Sometimes the colonies enacted relevant statutes, but often they simply relied on the common law tradition.

First, all able-bodied men from 15 or 16 to 60 were obliged to join in the "hue and cry" (*hutesium et clamor*) to pursue fleeing criminals.[247]  Pursuing citizens were allowed to use deadly force if necessary to prevent escape.[248]

Second, there was "watch and ward"—guard duty for towns and villages.  "Ward" was the daytime activity, and "watch" the nighttime activity.[249]  The patrols would be arranged by a sheriff, constable, justice of the peace, or other official.[250]

---

[244] Uniform Militia Act, 1 Stat. 271-72 (1792).

[245] *See*, *e.g.*, Theodore H. Jabbs, The South Carolina Colonial Militia, 1663-1733 (1973) (unpublished Ph.D. dissertation, U. of N.C. Chapel Hill) (available in ProQuest Dissertations & Theses Global).

[246] *See infra* Part III.K.

[247] Statute of Winchester, 13 Edward I, chs. 4-6 (1285) (formalizing hue and cry system; requiring all men aged fifteen to sixty to possess arms and armor according to their wealth; lowest category, having less than "Twenty Marks in Goods," must have swords, knives, bows, and other small arms)

[248] *See* 2 Frederick Pollock & Frederic W. Maitland, The History of English Law Before the Time of Edward I, at 575-81 (1895); 4 William Blackstone, Commentaries *290-91 (describing hue and cry as still in operation); Statute of Winchester, *supra* note 247.

[249] Elizabeth C. Bartels, Volunteer Police in the United States 2 (2014).

[250] Michael Dalton, Officium Vicecomitum: The Office and Authoritie of Sherif 6, 40 (Lawbook Exchange 2009) (1923) (sheriff's oath includes supervising the watch and ward, by reference to his oath specifically to uphold the Statute of Winchester); William Alfred Morris, The Medieval English Sheriff 150, 228-29, 278 (1927); William Lambarde, Eirenarcha 185, 341 (London, Newbery & Bynneman 1581); Ferdinando Pulton, De Pace Regis & Regni 153a-153b (Lawbook Exchange 2007) (1609).

EXHIBIT 17
0413
Electronic copy available at: https://ssrn.com/abstract=3205664

Third, there was the *posse comitatus*. This is the power of the sheriff, coroner, magistrate, or other officials to summon all able-bodied males to assist in keeping the peace.[251] Posse service could include a few men helping a sheriff serve a writ, or it could include many men helping a sheriff suppress a riot.[252] The traditional minimum age for posse service was 15 or 16 years; some commentators said the upper age limit was 70, while others said there was no limit.[253] Shortly before being appointed to the U.S. Supreme Court by President Washington, James Wilson stated in 1790 that "No man above fifteen and under seventy years of age, ecclesiastical or temporal, is exempted from this service."[254]

The *posse* was a vital institution not only in colonial days, but throughout the nineteenth century. As the Supreme Court explained in 1855, a sheriff "may command the *posse comitatus* or power of the country; and this summons, every one over the age of fifteen years is bound to obey, under pain of fine and imprisonment."[255]

The duties of hue and cry, watch and ward, and *posse comitatus* were male only. However, as will be detailed below, some colonies also required arms possession by any householder, regardless of sex. In addition, most of the colonies required arms carrying under certain circumstances, such as when traveling out of town, or when going to public assemblies, especially to church.[256] Usually these laws applied without age limits (i.e., to any able-bodied traveler), or to anyone able to bear arms. Sometimes they applied to militiamen, whose minimum age was 16 or 18.[257]

In short, the age at which Americans were expected to use their own arms to help enforce the law (including by defending themselves) usually was age 15 or 16. These requirements encompassed the vast majority of males, and also included some females. The age at which Americans were expected to bring their own arms to serve in a military capacity, in the militia, usually was 16 or 18.

In the following survey of militia laws, the states are listed in the order that they ratified the Second Amendment.[258]

---

[251] David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 761, 763 (2015).

[252] See *id.* at 796.

[253] CYRUS HARRELD KARRAKER, THE SEVENTEENTH-CENTURY SHERIFF: A COMPARATIVE STUDY OF THE SHERIFF IN ENGLAND AND IN THE CHESAPEAKE COLONIES, 1607−1689, at 176-77 (1930) (reprinting an April 29, 1643, warrant for summoning the *posse comitatus*, applying to persons above the age of sixteen years and "under the age of three score years and able to travel, with such arms or weapons as they have or can provide"); MORDECAI M'KINNEY, THE UNITED STATES CONSTITUTIONAL MANUAL 260 (Harrisburg, Penn., Hickock & Cantine 1845) (all men above the age of fifteen years, "not aged or decrepid"); GEORGE WEBB, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE 252 (Williamsburg, William Parks 1736) ("all Males Persons therein, whether Freemen, or Servants, above the Age of 15 Years, and able to travel") (citing LAMBARDE, *supra* note 250, at 309); EDWARD COKE, 2 INSTITUTES OF THE LAWS OF ENGLAND 194 (Lawbook Exchange 2002) (1628) (ch. 17) ("being above 15 and under 70"); HENRY POTTER, THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE 243 (Raleigh, Joseph Gales 1816); JOHN STEPHEN, SUMMARY OF THE CRIMINAL LAW 46 (Philadelphia, J.S. Littell 1840) (ages fifteen and over, with no upper age limit).

[254] JAMES WILSON, *Lectures on Law*, *in* 2 COLLECTED WORKS OF JAMES WILSON 1017 (Kermit L. Hall & Mark David Hall eds., 2007) (Ch. VII, "The Subject Continued. Of Sheriffs and Coroners").

[255] South v. Maryland *ex rel.* Pottle, 59 U.S. (1 How.) 396, 402 (1856).

[256] NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 183-85 (2d ed. 2017).

[257] *Id.*

[258] The colonial and early state laws are available in the Session Laws Library of Hein Online. Many are also available on Google Books or other public Internet sources, as indicated by the URL in the footnote.

EXHIBIT 17
0414
Electronic copy available at: https://ssrn.com/abstract=3205664

A. New Jersey: "all able-bodied Men, not being Slaves … between the Ages of sixteen and fifty Years"

The English took control of what became New Jersey in 1664, ousting the Dutch from their "New Netherland" colony.[259]  New Jersey's first militia act was passed in 1704. It required "[t]hat every Captain within this Province … make a true and perfect List of all the Men … between the Age of Sixteen and Fifty years … Every one of which so listed shall be sufficiently armed with one good sufficient Musquet or Fuzee well fixed, a Sword or Bagonet, a Cartouch-box or Powder-horn, a pound of Powder, and twelve sizeable Bullets."[260]  The next militia act, passed roughly a decade later, kept the same requirements for the arms and ages of militiamen.[261]

A 1722 statute retained the sixteen to fifty ages, while revising the ammunition requirements.[262]  After the 1722 act expired, it was replaced by a 1730 law with the same ages and arms,[263] which was continued in 1739.[264]

On May 8, 1746, a renewed militia act was necessary because America had been drawn into Great Britain's most recent war with France and Spain.  Like earlier statutes, the 1746 act set the militia age "between the Age of Sixteen and Fifty Years" and required that each militiaman "be sufficiently armed with one good sufficient Musket or Fuzee well fixed, a Sword or Bayonet, a Cartouch-Box or Powder-Horn," plus bullets and powder.[265]  This act was continued in 1749,[266] 1753,[267] 1766,[268] 1770,[269] and 1771.[270]

Also in 1746, New Jersey passed an act to raise 500 troops for a state army expedition against Canada.[271]  This act made it unlawful for an officer "to inlist any young Men under the Age of Twenty One Years, or any Slaves who are so for Term of Life, bought Servants, or Apprentices, without the Express Leave in Writing of their Parents or Guardians, Masters or Mistresses."[272]  Similarly, during the French & Indian War, acts to raise small groups of state army soldiers (one

---

[259] *A Short History of New Jersey*, NJ.GOV, https://www.nj.gov/nj/about/history/short_history.html (last visited Jan. 13, 2019).

[260] 2 BERNARD BUSH, LAWS OF THE ROYAL COLONY OF NEW JERSEY 49 (1980).  The Act provided an exception for "Ministers, Physitians, School-Masters, Civil Officers of the Government, the Representatives of the General assembly, and Slaves."  This act was continued in 1711. *Id.* at 96 (Sixth Assembly, First Session 6 Dec. 1710 – 10 Feb. 1710/11).

[261] *Id.* at 133.  This Act repeated the exemptions of the 1709 Act and added an exception for "Millers." *Id.*

[262] *Id.* at 289 ("three Charges of Powder and three sizeable Bullets").

The exceptions in the 1722 Act were for "the Gentlemen of his Majestys Council and the Representatives of General Assembly, Ministers of the Gospel, the Civil Officers of the Government, and all Field Officers and Captains that here-to-fore bore Commission in the Militia of this Province, and all that now do or shall hereafter bear such Commission, Physitians, School-Masters, Millers, and Slaves." *Id.*

[263] *Id.* at 410 (limited to seven years).

[264] 1738/9 N.J. Laws ch. 165 (limited to seven years).

[265] 3 BERNARD BUSH, LAWS OF THE ROYAL COLONY OF NEW JERSEY 5 (1980).

[266] 1749 N.J. Laws ch. 232.

[267] 1753 N.J. Laws ch. 257.

[268] 1766 N.J. Laws ch. 422.

[269] 1770 N.J. Laws ch. 520.

[270] 1771 N.J. Laws ch. 539.

[271] 3 BUSH, *supra* note 265, at 15.

[272] *Id.*

EXHIBIT 17
0415
Electronic copy available at: https://ssrn.com/abstract=3205664

in 1755[273] and two in 1756[274]) set the minimum age at twenty-one for enlistment for out-of-colony service without consent of a parent, guardian, or master.

Permission from parents or masters was necessary for enlistment in the state army, but not the in-state militia. A 1757 supplement to the militia act kept the age for militia "between the Age of Sixteen and Fifty Years."[275]

Two decades later, in the midst of the Revolutionary War, New Jersey passed a 1777 militia act, "to defeat the Designs of the *British* Court, and to preserve and defend the Freedom and Independence of the United States of *America*."[276] "[A]ll able-bodied Men, not being Slaves … between the Ages of sixteen and fifty Years … and [] capable of bearing Arms" constituted the militia.[277] This act was set to automatically expire after one year.[278] The following year a new act was put in place. Again, the militia was "all effective Men between the Ages of sixteen and fifty Years."[279]

Near the end of the war, in 1781, New Jersey passed its militia law that would be in place when it ratified the Second Amendment on November 20, 1789:[280]

> And Be It Enacted, That the Captain or Commanding Officer of each Company shall keep a true and perfect List or Roll of all effective Men between the Ages of sixteen and fifty Years, residing within the District of such Company . . . And Be It Enacted, That every Person enrolled as aforesaid shall constantly keep himself furnished with a good Musket, well fitted with a Bayonet, a Worm, a Cartridge-Box, twenty-three Rounds of Cartridges sized to his Musket, a Priming Wire, Brush, six Flints, a Knapsack and Canteen, under the Forfeiture of Seven Shillings and Sixpence for Want of a Musket, and One Shilling for Want of any other of the aforesaid Articles, whenever called out to Training or Service . . . Provided always, That if any Person be furnished as aforesaid with a good Rifle-Gun, the Apparatus necessary for the same, and a Tomahawk, it shall be accepted in Lieu of the Musket and the Bayonet and other Articles belonging thereto.[281]

---

[273] *Id.* at 307.

[274] *Id.* at 385, 425.

[275] *Id.* at 502. The Act excepted "the Gentlemen of his Majesty's Council, the Representatives of the General Assembly, Protestant Ministers of the Gospel of every Denomination and Persuasion, Magistrates, Sheriffs, Coroners, Constables, and all Field Officers, and Captains, who heretofore have, now do, or hereafter shall bear such Commissions; Ferry Men, one Miller to each Grist Mill, bought Servants, and Slaves."

[276] 1776 N.J. Laws 26.

[277] *Id.*

[278] *Id.*

[279] 1778 N.J. Laws 44-45. This Act excluded "the Delegates representing this State in the Congress of the United States, the Members of the Legislative-Council and General Assembly, the Judges and Justices of the Supreme and Inferior Courts, the Judge of the Court of Admiralty, the Attorney-General, the Secretary, the Treasurer, the Clerks of the Council and General Assembly, the Clerks of the Courts of Record, the Governor's private Secretary, Ministers of the Gospel of every Denomination, the Presidents, Professors and Tutors of Colleges, Sheriffs and Coroners, one Constable for each Township, to be selected by the Court of Quarter-Sessions of the County, two Ferrymen for each publick Ferry on the *Delaware*, below the Falls at *Trenton*, and one for every other publick Ferry in this State, and Slaves."

[280] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, BEING THE FIRST SESSION OF THE FIRST CONGRESS-3RD SESSION OF THE 13TH CONGRESS, MARCH 4, 1789–SEPT. 13, 1814, at 313-14 (1826).

[281] 1780 N.J. Laws 42-43.

EXHIBIT 17
0416
Electronic copy available at: https://ssrn.com/abstract=3205664

The act further required that "each Person enrolled…also keep at his Place of Abode one Pound of good merchantable Gunpowder and three Pounds of Ball sized to his Musket or Rifle…"[282] At least three times a year, a Sergeant would inspect the home of every man between sixteen and fifty to ensure he had the proper "Arms, Accoutrements, and Ammunition."[283]

In 1792, Congress enacted the UMA, organizing the militia of the United States, pursuant to enumerated powers under Article I, section 8, clause 16.[284] It provided a detailed list of equipment and defined the federal militia as free white males aged 18 to 45.[285] (The Act is discussed in Part IV, *infra*.) Over the next several years, most states revised their militia statutes to bring their state militias into conformity with the federal militia. Since individuals were subject to a militia summons from their state or the federal government, the state governments were making it easier for state militiamen to simultaneously comply with federal requirements.

New Jersey was one of the first states to take account of the federal law, enacting a new militia law in 1792.[286] The minimum age was raised to 18, and maximum age lowered to 45.[287] Copying the federal law, New Jersey required that "every non-commissioned Officer and Private of the Infantry (including Grenadiers, Light Infantry and Artillery) until supplied with Ordnance and Field Artillery, shall have a good Musket or Firelock, a sufficient Bayonet and Belt, two spare Flints and a Knapsack, a Pouch with a Box not less than twenty-four Cartridges suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball; or with a good Rifle, Knapsack, Pouch and Powder-Horn, twenty Balls suited to the Bore of his Rifle, and a Quarter of a Pound of Powder; and shall appear so armed, accoutred and provided, when called out to exercise or into Service."[288]

As for commissioned officers, they had to be "armed with a Sword or Hanger and Espontoon."[289] And for "those of Artillery . . . with a Sword or Hanger, a fuzee, bayonet and belt, and a Cartridge-Box containing twelve Cartridges."[290] Troops of Horse had to provide themselves with "a Sword and Pair of Pistols."[291] Light-Horsemen and Dragoons had to provide themselves with "a Pair of Pistols, a Sabre and Cartouch-Box containing twelve Cartridges for Pistols."[292]

A 1797 supplement required the assessor of each town to compare the list of 18-to-45-year-olds in the community to the list of persons enrolled for military duty, and to ensure that everyone 18 and older who was not exempted was keeping the proper arms and fulfilling his militia duties.[293]

A 1799 revision eliminated non-whites from the militia.[294] Persons who were granted militia exemptions (e.g., physicians, clergy) had to pay a three-dollar annual fee.[295] In case the militia were "called into actual service," exempted persons too would be liable to serve.[296]

---

[282] *Id.*
[283] 1780 N.J. Laws 43.
[284] Uniform Militia Act, 1 Stat. 271 (1792).
[285] *Id.*
[286] 1792 N.J. Laws 850.
[287] *Id.* at 853.
[288] *Id.* at 852.
[289] *Id.*
[290] *Id.*
[291] *Id.*
[292] *Id.* at 852–53.
[293] 1797 N.J. Laws 219-20.
[294] 1799 N.J. Laws 609.
[295] WILLIAM PATERSON, LAWS OF THE STATE OF NEW JERSEY 441 (1800).
[296] *Id.*

EXHIBIT 17
0417

Electronic copy available at: https://ssrn.com/abstract=3205664

As with all militia acts, there was financial punishment for people who neglected their duties to acquire requisite arms, to meet for training, and to serve.[297]  For militiamen who were "minors, living with their parents, and others having the proper care of charge of them, and those of apprentices," the fines were to "be paid by their respective parents, guardians, masters or mistresses, or levied of their respective goods and chattels."[298]

Military forces of the period used music for morale and for signals during the heat of combat. New Jersey provided rules for voluntary enlistment of military musicians: "any youth of the age of twelve years, and not exceeding the age of eighteen years, shall, with the consent of approbation of his parents, attach himself to any company of militia for the purpose of learning to beat the drum, play on the fife or blow the trumpet."[299]

## B. Maryland: "his her or their house"

Maryland's arms mandate extended to every head of a house, regardless of sex or age. A 1638/9 act required

> that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes one Serviceable fixed gunne of bastard muskett boare one pair of bandeleers or shott bagg one pound of good powder foure pound of pistol or muskett shott and Sufficient quantity of match for match locks and of flints for firelocks and before Christmas next shall also find a Sword and Belt for every such person as aforesaid.[300]

Further, "every householder of every hundred haveing in his family three men or more able to beare armes shall Send one man completely armed for every such three men and two men for every five and so proportionately."[301]  The act contemplated many persons within a family, including minors, bearing arms.[302]

A 1654 act mandated "that all persons from 16 yeares of age to Sixty shall be provided with Serviceable Armes & Sufficient Amunition of Powder and Shott ready upon all occasions."[303]

---

[297] *Id.* at 440.

[298] *Id.*

[299] *Id.* at 448.

[300] 1 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8—SEPTEMBER 1664, at 77 (William Hand Browne ed, 1883).  For dates in this article, readers should be aware that in the English-speaking countries, the calendar changed from Old Style (Julian) to New Style (Gregorian) in 1752.  Under the Old Style, the New Year began on March 25 (the traditional date of the Annunciation to the Virgin Mary), not January 1.  So, the people of Maryland considered the above date to be 1638, not 1639.  We have generally rendered dates in New Style. Scholars using Western European date citations between 1582 (when France adopted the New Style calendar) and 1752 should be aware that the days between January 1 and March 24 may be assigned to a different year, depending on the country.  The shift can also move the calendar date as far forward as 11 days; for example, July 1 Old Style can become July 12 New Style.  The shift occurs because New Style remedied the incorrect number of leap year days in Old Style.  New Style omits leap years every 100 years, except for every 400th year.  So, under New Style, there was no leap year day in 1800 or 1900, but there was one in 2000.

[301] *Id.* at 77-78.

[302] *Id.*

[303] *Id.* at 347.

EXHIBIT 17
0418

Electronic copy available at: https://ssrn.com/abstract=3205664

In 1658, the Council of Maryland adopted "Instructions directed by the Governor and Councell to the severall Captaines of the respective Commissions."[304]  Captains had to make "a perfect list" of "all persons able to beare Armes within theyr respective divisions that is of all men betweene 16 and 60 yeares of Age."  From that list, the "fittest" people were to be selected to form the "constant Trayned Band."[305]  In addition, every householder had to provide himself and "every man able to beare Armes in his house" with sufficient ammunition and a well-fixed gun.[306]

Twenty years later, a new militia act kept the ages "between sixteen and sixty yeares of age."[307] Like its predecessors, it required that each "appeare and bring with him one good serviceable fixed Gunn and six shoots of Powder."[308]  Troopers were required to bring their own horses, and "to find themselves with sword Carbine Pistolls Holsters & Amunition."[309]

---

[304] 3 PROCEEDINGS OF THE COUNCIL OF MARYLAND, 1636-1667, at 345 (reprint 1965), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000003/html/am3--345.html (last visited Jan. 13, 2019).
[305] *Id.* (basing fitness on "theyr Ability of Body, Estate, & Courage.")
[306] *Id.*
[307] 7 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, OCTOBER 1678-NOVEMBER 1683, at 53 (1889), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000007/html/am7--53.html (last visited Jan. 13, 2019).
[308] *Id.* at 54.
[309] *Id.* at 55.

**EXHIBIT 17**
**0419**

Electronic copy available at: https://ssrn.com/abstract=3205664

The 1681 militia law retained the age and arms requirements,[310] and was continued in 1682.[311] Ages and arms remained the same in successor acts of 1692,[312] 1695,[313] 1698,[314] 1699,[315] 1704,[316] 1708,[317] 1709,[318] 1711,[319] 1714,[320] 1715,[321] 1719,[322] 1722,[323] and 1733.[324]

In 1756, Maryland passed another militia act, and kept the militia age at 16 to 60.[325] This act changed the ammunition requirement to "nine Charges of Gun-powder and nine Sizeable Bulletts." Troopers needed to provide themselves with "a pair of good Pistols a good Sword or Hanger half a pound of Gun-powder and twelve Sizeable Bulletts and a Carbine --well fixed with a good Belt Swivel and Buckett."[326]

The Conventions of the Province of Maryland that took place in Annapolis in 1775 and 1776 produced two militia laws. Both Conventions determined "[t]hat every able bodied effective freeman within this province, between sixteen and fifty years of age . . . enroll himself in some

---

[310] *Id.* at 188.

[311] *Id.* at 438.

[312] 13 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, APRIL 1684-JUNE 1692, at 554 (1894), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000013/html/am13--554.html (last visited Jan. 13, 2019).

[313] Also, in 1695, Maryland took an additional step to ensure that militiamen maintained the arms they were required to provide themselves, by marking them so they could be identified and so that potential buyers knew not to purchase those arms. 38 ACTS OF THE GENERAL ASSEMBLY HITHERTO UNPUBLISHED 1694-1698, 1711-1729, at 55 (1918), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000038/html/am38--55.html (last visited Jan. 13, 2019).

[314] 1698 Md. Acts 99, https://quod.lib.umich.edu/e/evans/N29557.0001.001/1:9.44?rgn=div2;view=fulltext.

[315] 22 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, MARCH 1697/8-JULY 1699, at 562-63 (1883), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000022/html/am22--562.html (last visited Jan. 13, 2019).

[316] 26 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, SEPTEMBER, 1704-APRIL, 1706, at 269-70 (1906), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000026/html/am26--269.html (last visited Jan. 13, 2019).

[317] 27 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, MARCH, 1707-NOVEMBER, 1710, at 370 (1907), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000027/html/am27--370.html (last visited Jan. 13, 2019).

[318] *Id.* at 483.

[319] 38 ARCHIVES OF MARYLAND, *supra* note 313, at 128.

[320] 29 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, Oct. 25, 1711-Oct. 9, 1714, at 437 (1909).

[321] 30 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, APRIL 26, 1715-AUGUST 10, 1716, at 277 (1910), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000030/html/am30--277.html (last visited Jan. 13, 2019).

[322] 36 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, JULY 1727-AUGUST 1729 WITH AN APPENDIX OF STATUTES PREVIOUSLY UNPUBLISHED ENACTED 1714-1726, at 534 (1916), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000036/html/am36--534.html (last visited Jan. 13, 2019).

[323] 34 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, OCTOBER 1720-1723, at 480 (1914), ARCHIVES MD. ONLINE, https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000034/html/am34--480.html (last visited Jan. 13, 2019).

[324] 39 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, 1733-1736, at 113 (1919), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000039/html/am39--113.html (last visited Jan. 13, 2019).

[325] 52 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, 1755-1756, at 450 (1935), ARCHIVES MD. ONLINE, https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000052/html/am52--450.html (last visited Jan. 13, 2019).

[326] *Id.* at 458.

**EXHIBIT 17**
**0420**
Electronic copy available at: https://ssrn.com/abstract=3205664

company of militia."[327]  The 1777 convention retained the new maximum of 50 years and excluded non-whites.[328]  A 1778 militia act did not change the ages or arms requirements.[329]

Then in 1781, the legislature passed "An Act to raise two battalions of militia for reinforcing the continental army, and to complete the number of select militia." The minimum age remained sixteen.[330]  The new law ordered local governments to draft one or two men to serve the Continental Army.  It allowed lieutenants to play favorites: "to ease the good people, from the draught, every free male idle person, above 16 years of age, who is able bodied, and hath no visible means of an honest livelihood, may be adjudged a vagrant by the lieutenant, and by such adjudication he is to be considered as an enlisted soldier."[331]

When Maryland ratified the Second Amendment on December 19, 1789,[332] every militia it had ever assembled consisted of men sixteen and older, who provided their own firearms.

The first time Maryland increased its militia age was in 1793, when it modified its laws to align with the federal Uniform Militia Act of 1792.  This new militia statute raised the minimum age to eighteen and lowered the maximum age to forty-five.[333]

A 1793 supplement included a provision for a "one complete company of infantry annexed to each regiment within this state, to be furnished with arms and accoutrements at the expense of the state … composed of men between the ages of twenty-one and thirty years."[334]  This provision for select companies of infantry did not change the requirement for all other able bodied males between 18 and 45 to enroll in the general militia, and to provide their own personal arms.[335]  As

---

[327] 78 PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND, 1774-1776, at 20 (1836), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000078/html/am78--20.html (last visited Jan. 13, 2019); *id.* at 74.

[328] An Act to Regulate Militia, 1777 Md. Laws, Ch. XVII, Sec. II (expired in 1785), http://aomol.msa.maryland.gov/megafile/msa/speccol/sc4800/sc4872/003180/html/m3180-0361.html .

[329] 203 HANSON'S LAWS OF MARYLAND 1763-1784, at 192-93 (1787), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000203/html/am203--192.html (last visited Jan. 13, 2019).

[330] MARYLAND HISTORICAL SOCIETY, 18 ARCHIVES OF MARYLAND: MUSTER ROLLS AND OTHER RECORDS OF SERVICE OF MARYLAND TROOPS IN THE AMERICAN REVOLUTION 1775-1783 at 374 (1900).

[331] 203 HANSON'S LAWS OF MARYLAND 1763-1784, at 279 (1787), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000203/html/am203--279.html (last visited Jan. 13, 2019).

[332] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 307-09.

[333] WILLIAM KILTY, THE LAWS OF MARYLAND: 1785-1799, ch. LIII, at 455 (1800), https://play.google.com/books/reader?id=SZxaAAAAYAAJ&hl=en&pg=GBS.PT447. There were exemptions for "quakers, menonists and tunkers, and persons conscientiously scrupulous of bearing arms, and the apprentices of their trade." Excusal on grounds of disability required a certificate from "the surgeon of the regiment to which he shall belong, or some reputable physician in his neighbourhood." *Id.* at 460. Quakers, Mennonites, and Dunkers are pacifist Protestant denominations. The Dunkers are also known as the Church of the Brethren and have Baptist roots.

[334] A Supplement to the Act, Entitled, An Act to Regulate and Discipline the Militia of this State, 1798 Md. Laws, Ch. C, Section XXIII, ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/megafile/msa/speccol/sc4800/sc4872/003181/html/m3181-1319.html (last visited Jan. 13, 2019).  These state-provided arms were to be used only for militia duty.  If used for "hunting, gunning or fowling" or not kept "clean and in neat order," the firearm would be forfeited to the state and the militiaman would be forced to obtain a private firearm, which by comparison, was perfectly legal and expected to be used for non-militia purposes. *Id.* at Ch. C, Section XXX.

[335] Since the supplemental act did not address the arms requirement established in the original act passed earlier that year, the following provision still applied:

> That every citizen so enrolled and notified, shall, within six months thereafter, provide- himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack; a pouch with a box therein, to contain not less than twenty-four cartridges suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and, ball; or with a good rifle,

EXHIBIT 17
0421
Electronic copy available at: https://ssrn.com/abstract=3205664

the Act explained, "the privates and non-commissioned officers of the said company, as they shall respectively arrive at the age of thirty years, shall be dismissed from the company … and shall be subject to militia duty in the same manner as other citizens above the age of thirty years."[336]

In 1799, Maryland's final militia act of the eighteenth century copied federal law by calling for "all able bodied white male citizens between 18 and 45 years of age."[337]

## C. North Carolina: Land grants for properly armed persons "above the age of fourteen years"

In 1663, eight noblemen were granted the Carolina territory—which included what is now North Carolina and South Carolina—as a reward for their support of King Charles II as he was "restored" to the throne. The Charter of Carolina gave these men the authority to "to levy, muster and train all sorts of men, of what condition or wheresoever born … to make war and pursue the enemies."[338]

Pursuant to "Concessions and Agreements" in 1664, "All inhabitants and freemen of Carolina above seventeen years of age and under sixty shall be bound to bear arms and serve as soldiers whenever the grand council shall find it necessary."[339] To encourage settlement and to ensure that the settlers would be able to protect themselves, land grants were given to every properly armed freeman, every freewoman with an armed servant, plus additional land for each armed person produced who was "above the age of fourteen years" and had "a good firelock or matchlock bore, twelve bullets to the pound, ten pounds of powder, and twenty pounds of bullets."[340] The Fundamental Constitutions of Carolina in 1669 repeated the 1664 Concessions and Agreements rules for people 17-60.[341]

A 1712 letter from North Carolina's acting Governor Thomas Pollock to Lord John Carteret recalled that "at the last assembly with much struggling we obtained a law that every person between 16 and 60 years of age able to carry arms that would not go out to the war against the Indians, should forfeit and pay £5."[342]

The minimum militia age of sixteen was maintained in a 1715 act, declaring that "the Militia of this Governmt. shall consist of all the Freemen within the same between the years of Sixteen

---

knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder, and shall appear so armed, accoutred and provided, when called out to exercise or into service.
KILTY, THE LAWS OF MARYLAND: 1785–1799, *supra* note 333, ch. LIII, at 455.

[336] *Id.* at Ch. C, Section XXX.

[337] 1 THOMAS HERTY, A DIGEST OF THE LAWS OF MD. 369 (1799).

[338] CHARTER OF CAROLINA (Mar. 24, 1663), http://avalon.law.yale.edu/17th_century/nc01.asp.

[339] AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL AND REVOLUTIONARY ERA GOVERNANCE 232 (Jon L. Wakelyn ed. 2006) (Concessions and Agreements, Jan. 11, 1664) (available on Google Books).

[340] *Id.* at 210-11.

[341] 1 THE STATE RECORDS OF NORTH CAROLINA 205 (1886).

[342] *Id.* at 877 (letter of Sept. 20, 1712). The war was North Carolina and its Indian allies against the Tuscarora Indians and their Indian allies. *See* DAVID LA VERE, THE TUSCARORA WAR: INDIANS, SETTLERS, AND THE FIGHT FOR THE CAROLINA COLONIES (2016). The Cartaret family were among the proprietors of North Carolina. STEWART E. DUNAWAY, LORD JOHN CARTERET, EARL GRANVILLE: FAMILY HISTORY AND THE GRANVILLE GRANTS IN NORTH CAROLINA 56 (2013).

EXHIBIT 17
0422
Electronic copy available at: https://ssrn.com/abstract=3205664

years & Sixty."[343]  This included free blacks. Each militiaman had to provide himself with "a good Gun well-fixed Sword & at least Six Charges of Powder & Ball."[344]

The enrollment of all freemen of all colors aged 16 to 60 was retained in a 1740 act.[345]  These freemen had to appear with "a good Gun well fixed and a Sword or Cutlass and at least twelve Charges of powder and Ball or Swan Shot"[346]  (Swan shot is large shotgun pellets.)

The next act in 1746 kept the same ages, but included servants in addition to freemen.[347]  It also slightly modified the arms requirement, mandating that each militiaman appear with "a Gun, fit for service, a Cartouch Box, and a Sword, Cutlass, or Hanger [a type of sword], and at least Twelve Charges of Powder and Bail, or Swan Shot, and Six Spare Flints"[348] This act was extended for another five years in 1749,[349] and another three years in 1754.[350]  The 1756 act slightly modified the necessary arms and equipment, specifically requiring tools for gun cleaning.[351]  When this act was amended and continued in 1759, the arms and ages were unchanged.[352]

The 1760 law introduced different arms mandates for mounted militiamen, including a pair of handguns plus a lightweight long gun.  Every trooper (horseman) needed "Holsters, Housing, Breast-Plate and Crupper, a Case of good Pistols, a good Broad Sword, Twelve Charges of Powder, Twelve sizeable Bullets, a Pair of Shoe-Boots, with suitable Spurs, and a Carbine well fixed, with a good Belt, Swivel and Bucket."[353]

The militia act of 1764 had similar age and arms requirements, except that swan shot was now mandatory for infantry.[354]  The act was continued in 1766.[355]  Then in 1768, "sizeable Bullets" were restored as an acceptable alternative to swan shot.[356]

---

[343] 1715 N.C. Sess. Laws 29.

[344] *Id.*

[345] *An Act for the better Regulating the Militia of this Government*, N.C. OFF. ARCHIVES & HIST., http://www.ncpublications.com/Colonial/editions/Acts/militia.htm (last updated Dec. 31, 2000).

[346] *Id.*

[347] An Act for the better Regulating the Militia of this Government, 1746 N.C. Sess. Laws 244, http://docsouth.unc.edu/csr/index.php/document/csr23-0016.

[348] *Id.*

[349] An Act for Altering, Explaining, and Continuing an Act, Intituled, an Act for the better Regulating the Militia in this Government, 1749 N.C. Sess. Laws 330, http://docsouth.unc.edu/csr/index.php/document/csr23-0022.

[350] 1754 N.C. Sess. Laws 266, http://docsouth.unc.edu/csr/index.php/document/csr25-0031.

[351] An Act for the better Regulation of the Militia, and for other Purposes, 1756 N.C. Sess. Laws 334, http://docsouth.unc.edu/csr/index.php/document/csr25-0034 ("a well fixed Gun, and a Cartridge Box, and a Sword, Cutlass or Hanger, and have at least nine Charges of Powder and Ball, or Swan Shot, and three spare Flints, and a Worm and Picker").

[352] An Act to Amend and Continue an Act, Intituled, an Act for the better Regulation of the Militia, and for other Purposes, 1759 N.C. Sess. Laws 393, http://docsouth.unc.edu/csr/index.php/document/csr25-0040.

[353] An Act for Appointing a Militia, 1760 N.C. Sess. Laws 521, http://docsouth.unc.edu/csr/index.php/document/csr23-0040.  This act was continued later that same year, and again in 1762. An Act to amend and continue an Act intitled An Act for appointing a Militia, 1760 N.C. Sess. Laws 535, http://docsouth.unc.edu/csr/index.php/document/csr23-0041; 1762 N.C. Sess. Laws 585, http://docsouth.unc.edu/csr/index.php/document/csr23-0043.

[354] An Act for appointing a Militia, 1764 N.C. Sess. Laws 596, http://docsouth.unc.edu/csr/index.php/document/csr23-0044.

[355] An Act to amend & Continue An Act, Intitled An Act for Appointing a Militia, 1766 N.C. Sess. Laws 496, http://docsouth.unc.edu/csr/index.php/document/csr25-0049.

[356] An Act for establishing a Militia in this Province, 1768 N.C. Sess. Laws 761, http://docsouth.unc.edu/csr/index.php/document/csr23-0049.

EXHIBIT 17
0423
Electronic copy available at: https://ssrn.com/abstract=3205664

The 1770 act eliminated a conscientious objector exemption and ordered "all Male Persons of the people called Quakers, between the age of Sixteen and Sixty" to enlist in the militia.[357] Additionally, the act provided that "the Father or where there is no Father living, the Mother of each and every Person under the age of Twenty One Years, shall be liable to the Payment of the Fines becoming due from their respective sons so under age."[358]

The 1774 militia act retained the age and arm requirements.[359] Perhaps reflecting wartime arms shortages, the 1777 act was less specific about particular firearms, requiring only that "each Militia soldier shall be furnished with a good Gun, shot bag and powder horn, a Cutlass or Tomahawk."[360] The maximum age was reduced: "the Militia of every County shall consist of all the effective men from sixteen to fifty years of age."[361]

With the American Revolution raging, the 1779 act kept the maximum age of 50 and the minimum of 16.[362] Religious exemptions were restored for "Quakers, Menonists, Dunkards, and Moravians."[363] "[E]ach Militia Soldier [had to] be furnished with a Good Gun, Shot bag a Cartouch Box or powder Horn, a Cutlass or Tomahawk."[364]

The 1781 act was more flexible on the requisite arms. Infantry needed "a good gun and shot bag, and powder horn or cartouch box, and havre sack."[365] Cavalry troopers needed "a gun, sword, and cartouch box."[366]

The following year, "An Act for Raising troops to compleat the Continental Battalions of this State, and other purposes" was passed. This was a draft for the Continental Army. Subject to the draft were "all the inhabitants . . . between the ages of sixteen and fifty."[367] To prevent the widespread community practice of filling draft ranks with the most vulnerable and least motivated, the act specified that "no British or Hessian deserter who hath not been a resident of this State twelve months, or orphan or apprentice under eighteen years of age, Indian, sailor or negro slave, shall be received as a substitute for any class volunteer or draft whatever."[368] So a 19-year-old who was drafted could hire an older man to serve as a substitute, but could not hire a 17-year-old orphan.

---

[357] An Act for an Addition to, and Amendment of an Act, entitled, An Act for Appointing a Militia, 1770 N.C. Sess. Laws 787, http://docsouth.unc.edu/csr/index.php/document/csr23-0051.

[358] *Id.* at 788. Similarly, "the master, and where there is no master, the mistress of all such Apprentices and Servants shall be liable to the Payment of Fines becoming Due from their respective Apprentices and Servants." *Id.*

[359] An Act to Establish a Militia for the Security and Defence of this Province, 1774 N.C. Sess. Laws. 940-41, http://docsouth.unc.edu/csr/index.php/document/csr23-0054.

[360] An Act to Establish a Militia in this State, 1777 N.C. Sess. Laws 1, http://docsouth.unc.edu/csr/index.php/document/csr24-0001.

[361] *Id.*

[362] An Act to Regulate and Establish a Militia in this State, 1779 N.C. Sess. Laws 190, https://docsouth.unc.edu/csr/index.php/document/csr24-0005.

[363] *Id.* "Menonists" encompasses several Protestant sects who trace their origin to the Dutch pacifist priest Menno Simons. "Dunkards" derived their name from their practice of full-immersion baptism. Moravians descend from the early fifteenth century Czech Protestant reformer Jan Hus. Mainly from central Europe, they became pacifist after failed uprisings in the seventeenth century.

[364] *Id.* at 191.

[365] An Act to regulate and establish a Militia in this State, 1781 N.C. Sess. Laws 359, http://docsouth.unc.edu/csr/index.php/document/csr24-0010.

[366] *Id.* at 366.

[367] An Act for Raising troops to compleat the Continental Battalions of this State, and other purposes, 1782 N.C. Sess. Laws 413, http://docsouth.unc.edu/csr/index.php/document/csr24-0012.

[368] *Id.* at 414.

EXHIBIT 17
0424
Electronic copy available at: https://ssrn.com/abstract=3205664

After the war was over, the 1785 act raised the minimum militia age to 18. Militiamen included "all freemen and indented servants" (but not servants for life, a/k/a slaves). Militiamen had to arm themselves with "a well fixed gun and cartouch-box, with nine charges of powder made into cartridges and sizeable bullets or swan-shot, and one spare flint, worm and picker."[369]

North Carolina's 1787 militia law[370] was in effect when it ratified the Second Amendment on December 22, 1789.[371] The militia law kept the militia as "all freemen and indented servants within this State, from eighteen to fifty years of age."[372] The required arms and equipment were now more specific and varied by role in the militia.[373]

For commissioned officers in the infantry, "side arms" (handguns) "or a spontoon" (a pole arm). For private and non-commissioned officers, a musket or rifle, plus a cartridge box, powder horn, shot pouch "in good condition," "nine charges of powder made into cartridges with sizeable balls or swan-shot," a spare flint, and one worm and picker.[374] As for artillerymen, they "shall be armed and accoutred with small arms in the same manner of the infantry, except the non-commissioned officers, who shall have swords instead of fire-arms."[375]

Horsemen, whether officers or privates, needed "a strong, serviceable horse, at least fourteen hands high, with a good saddle, bridle, holsters, one pistol, horseman's sword and cap, a pair of shoe boots and spurs," plus "a proper cartouch-box and cartridges all in good order."[376]

North Carolina's next militia bill, passed on December 29, 1792, conformed to the federal Uniform Militia Act of 1792. The minimum age remained 18, while the maximum dropped to 45. The mandatory arms paralleled the federal statute. Each infantryman was required to "provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, a knapsack, a pouch with a box therein to contain not less than 24 cartridges suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball ; or with a good rifle, knapsack, shot-pouch and powder-horn, 20 balls suited to the bore of his rifle, and a quarter of a pound of powder."[377]

The state's final militia act of the eighteenth century was passed in 1796. It improved consistency with federal law and kept the previous age and arms requirements.[378]

### D. South Carolina: "all male persons in this Province, from the age of sixteen to sixty years"

---

[369] An Act for Establishing a Militia in This State, 1785 N.C. Sess. Laws 710, http://docsouth.unc.edu/csr/index.php/document/csr24-0016.

[370] An Act for Establishing a Militia in this State, 1787 N.C. Sess. Laws 813, http://docsouth.unc.edu/csr/index.php/document/csr24-0017.

[371] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 311–12.

[372] An Act for Establishing a Militia in this State, *supra* note 370, at 813.

[373] *Id.* at 814.

[374] *Id.*

[375] *Id.*

[376] *Id.*

[377] 1792 N.C. Sess. Laws 33, https://babel.hathitrust.org/cgi/pt?id=nc01.ark:/13960/t8sb53g1g;view=1up;seq=33.

[378] 1796 N.C. Sess. Laws 57, https://babel.hathitrust.org/cgi/pt?id=nc01.ark:/13960/t6n02562t;view=1up;seq=57.

EXHIBIT 17
0425

Electronic copy available at: https://ssrn.com/abstract=3205664

South Carolina was formally separated from North Carolina in 1729 but began making its own laws before that. Its first militia statute was enacted in 1703.[379] It included "all and every the inhabitants from the age of sixteen years to sixty."[380] It required "each person or soldier" to appear "with a good sufficient gun, well fixed, a good cover for their lock, one good cartridge box, with at least twenty cartridges of good powder and ball, and one good belt or girdle, one ball of wax sticking at the end of the cartridge box, to defend the arms in rain, one worm, one wier and four good spare flints, also a sword, bayonet or hatchet."[381]

The arms and age requirements were retained in the 1707 militia act.[382] This act was revived and continued in 1721.[383] The 1721 act made only minor changes for arms; militiamen now had to bring at least a quarter pound of powder, and only twelve cartridges instead of twenty.[384] Additionally, troops of horse or dragoons had to provide themselves with "holsters and a pair of pistols, a carbine and sword."[385] The next act, in 1734, was identical to 1721.[386]

South Carolina's 1737/8 militia act is lost.[387] A 1739 supplement did make it clear that militia arms were to be kept at home: "all persons who are liable to bear arms, shall constantly keep in their houses such arms, furniture, ammunition and accoutrements."[388]

A 1747 act affirmed that it was "lawful to . . . call together all male persons in this Province, from the age of sixteen to sixty years." It also made "every person liable to appear and bear arms . . . keep in his house, or at his usual place of residence, and bring with him to such muster, exercise or training, one gun or musket, fit for service, a cover for his lock, one cartridge box," twelve cartridges, horn or flask filled with at least a quarter pound of gun powder, a shot pouch with appropriate bullets, "one girdle or belt, one ball of wax . . . to defend his arms in rain, one worm and picker, four spare flints, a bayonet, sword or hatchet."[389]

The next militia act was passed over four decades later, in 1778.[390] It applied to "all male free inhabitants . . . from the age of sixteen to sixty years."[391] Every militiaman had to "constantly keep in good repair, at his place of abode . . . one good musket and bayonet, or a good substantial smooth bore gun and bayonet, a cross belt and cartouch box" that could hold thirty-six rounds, "twelve rounds of good cartridges," plus "half a pound of spare powder and twenty-four spare rounds of leaden bullets or buck-shot," a cover for the gunlock, wax, worm picker, and "one screw driver or substantial knife." Instead of the musket plus bayonet, a militiaman could choose "one good rifle-gun and tomahawk or cutlass."[392]

---

[379] 9 THE STATUTES AT LARGE OF SOUTH CAROLINA: CONTAINING THE ACTS RELATING TO ROADS, BRIDGES AND FERRIES, WITH AN APPENDIX, CONTAINING THE MILITIA ACTS PRIOR TO 1794, at 617 (David J. McCord ed., 1841), https://books.google.com/books/about/The_Statutes_at_Large_of_South_Carolina.html?id=t7Q4AAAAIAAJ.
[380] Id.
[381] Id. at 618.
[382] Id. at 625-26.
[383] Id. at 631.
[384] Id. at 632.
[385] Id. at 639.
[386] Id. at 641.
[387] 3 THE STATUTES AT LARGE OF SOUTH CAROLINA 487 (Thomas Cooper, ed., 1838) ("The original not to be found.").
[388] 9 THE STATUTES AT LARGE OF SOUTH CAROLINA, supra note 367, at 643.
[389] Id. at 645-47. This act was followed in 1760 by an act establishing and regulating the artillery company that was formed out of the Charleston militia. Id. at 664.
[390] Id. at 666.
[391] Id. at 672.
[392] Id. at 672-73.

EXHIBIT 17
0426
Electronic copy available at: https://ssrn.com/abstract=3205664

South Carolina's 1782 militia act kept the minimum age at 16 but lowered the maximum age to 50.[393]  A temporary act in 1783 left the age and arms requirements unchanged.[394]

The minimum age was raised for the first time in South Carolina's history in the militia act of 1784, which defined the militia when the state ratified the Second Amendment on January 19, 1790.[395]  The 1784 act "excused from militia duty, except in times of alarm . . . all persons under the age of eighteen years or above the age of fifty years."[396]  Thus, men under 18 or over 50 could still be forced to serve in an emergency.

The necessary arms were revised in 1791. Firearms were "a good musket and bayonet . . . or other sufficient gun." [397]  Edged arms were "a good and sufficient small sword, broad sword, cutlass or hatchet." [398]  Along with the usual cartouch box, powder horn or flask, shot bag or pouch, spare flint, and ammunition.[399]

Almost exactly one year later, on December 21, 1792, an act[400] was passed that continued the Acts of 1784 and 1791, until the state could "arrange the militia agreeable to the Act of the United States in Congress."[401]  The South Carolina militia expressly included free people of every color within the state: "all free negroes and Indians, (nations of Indians in amity with the State excepted,) Moors, mulattoes and mestizoes,[402] between the ages of eighteen and forty-five, shall be obliged to serve in the said militia."[403]

Finally, in 1794, the state organized its militia "in conformity with the act of Congress."[404]  The South Carolina militia was "every citizen who shall, from time to time, arrive at the age of eighteen years."[405]  It excluded "all persons under the age of eighteen, and above the age of forty-five years."[406]  Additionally, "all free white aliens or transient persons, above the age of eighteen and under the age of forty-five years, who have resided or hereafter shall or may reside in this state for the term of six months [were] subject and liable to do and perform all patrol and militia duty

---

[393] *Id.* at 682.

[394] *Id.* at 688.

[395] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 309–11.

[396] 9 THE STATUTES AT LARGE OF SOUTH CAROLINA, *supra* note 379, at 689–90.

[397] *Id.* at 691.

[398] *Id.*

[399] *Id.*

[400] *Id.* at 347-59.

[401] *Id.* at 358.

[402] Mixed-race descent of whites and Indians.  The Indian amity language meant that an Indian who lived among South Carolinians was subject to militia duty.  Because Indian tribes were legally separate nations, Indians of friendly tribes who lived with the tribe could not be subject to militia duty.

[403] *Id.* at 358.

[404] 8 THE STATUTES AT LARGE OF SOUTH CAROLINA: CONTAINING THE ACTS RELATING TO CORPORATIONS AND THE MILITIA 485 (David J. McCord ed., 1841), https://books.google.com.fj/books?id=4EgUAAAAYAAJ.

[405] *Id.* at 487.

[406] *Id.* at 492.

EXHIBIT 17
0427
Electronic copy available at: https://ssrn.com/abstract=3205664

which shall or may be required by the commanding officer" of the district."[407]  The required arms were the same as the federal Uniform Militia Act.[408]

## E.  New Hampshire: males under seventy

New Hampshire's first militia act was passed in 1687.[409]  It demanded "that no person whatsoever above Sixteene yeares of age remaine unlisted."[410]  Equipment was "a well fixed musket" with a barrel at least three feet.[411]  The caliber was large: "the bore for a bullett of twelve to the pound."[412]  Also necessary were bandoliers and a cartridge box, plus bullets and powder.[413]  Officers had the option of allowing their men to have "a good pike and sword" instead of the musket.[414]

As for horsemen, "every soldier belonging to the horse" had to bring "a good serviceable horse covered with a good saddle with holsters breastplate and crupper a case of good pistolls and sword and halfe a pound of powder and twenty sizable bulletts . . . And every trooper have at his usuall place of abode a well fixed Carabine with belt and swivel."[415]

The next act, in 1692, changed the militia from all "persons" over sixteen to all males over 16.[416]  For arms, everyone had to be "well provided w'th a well fixed gun or fuse," plus "Sword or hatchet."[417]  Along with the typical colonial requirements for gunpowder and bullets, a knapsack, a cartridge box, a powder horn, and flints.[418]

The above had stated how much ammunition the militiaman had to bring when called to muster—the periodic militia inspections for sufficiency of arms.  Besides that, every militiaman had to keep more at home: "every Sooilder Shall have at his habitation & abode one pound of good pouder & twenty Sizable bullets."[419]

---

[407] *Id.* at 493.  The "patrol" was the slave patrol—nighttime patrols to catch slaves who were off their master's land, and to search slave quarters for weapons.  The patrol and the militia had separate origins and were legally distinct.  However, as the text indicates, below the Mason-Dixon line, the patrol and the militia were related. *See generally* SALLY E. HADDEN, SLAVE PATROLS: LAW AND VIOLENCE IN VIRGINIA AND THE CAROLINAS (2001).

[408] 8 THE STATUTES AT LARGE OF SOUTH CAROLINA: CONTAINING THE ACTS RELATING TO CORPORATIONS AND THE MILITIA, *supra* note 404, at 498.  This law was supplemented later in 1794, but the supplement did not affect the age limits nor arms requirements. *Id.* at 501-02.

[409] 1 LAW OF NEW HAMPSHIRE: PROVINCE PERIOD 221 (Albert Stillman Batchellor ed., 1904), https://play.google.com/store/books/details?id=YSgTAAAAYAAJ.

[410] *Id.*

[411] *Id.*

[412] *Id.*  That is, one pound of lead would make twelve bullets.  This was slightly larger than .75 caliber, which is 13 round bullets per pound. RED RIVER BRIGADE, http://www.redriverbrigade.com/lead-ball-per-pound/ (last visited Jan. 13, 2019).

[413] 1 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD, *supra* note 397.

[414] *Id.*

[415] *Id.* at 221-22

[416] *Id.* at 537.

[417] *Id.*

[418] *Id.*

[419] *Id.*

EXHIBIT 17
0428

Electronic copy available at: https://ssrn.com/abstract=3205664

A 1704 act did not change the militia ages or arms.[420]  But the following act did. "An Act for the Regulating of the Militia" in 1718 established New Hampshire's first upper militia age limit, providing that "all Male Persons from Sixteen Years of Age to Sixty [] shall bear Arms."[421]

The primary arms mandate applied to "every Listed Souldier and Housholder (except Troopers)."[422]  In other words, the head of a house was required to have the specified arms, even if the head were not militia-eligible.  These arms were "a well fix'd, Firelock Musket, of Musket or Bastard-Musket bore, the Barrel not less than three foot and a half long; or other good Fire-Arms, to the satisfaction of the Commission Officers of the Company."[423]  Now, the mandatory equipment included gun cleaning tools: "a Worm and Priming Wire fit for his Gun."[424]  Mandatory edged arms were "a good Sword or Cutlash."[425]

As for horsemen, they needed "a Carbine, the Barrel not less than Two Foot and half long, with a Belt and Swivel, a Case of good Pistols with a Sword or Cutlash, a Flask or Cartouch Box, One Pound of good Powder, Three Pound of sizeable Bullets, Twenty Flints, and a good pair of Boots, and Spurs."[426]

Acts passed in 1719[427] and 1739/40[428] did not affect the age limits or arms requirements.  A 1754 revision made the parents over persons under twenty-one liable for fines imposed for their sons' militia delinquency or neglect.[429]

Thus, the social expectation of the time was that parents would ensure that their sons sixteen and older had particular guns, swords, and so on, and that the sons would keep the arms in good condition and practice with them.

In 1773, New Hampshire lowered the maximum militia age from 60 to 50, "it having been found by Experience that persons attending after the Age of Fifty Years was not for the Publick advantage."[430]

After the Revolution began, a comprehensive new militia law was enacted.[431]  It retained the recently established age limits of 16 to 50.[432]

Any "good Fire Arm" was acceptable.  Also mandatory was a "good Ramrod."[433]  The latter was used to ram the bullet down the muzzle, into the firing chamber.  It was essential to the use of a muzzle-loading gun.  While some militia statutes specified a ramrod, many left it to implication.

---

[420] 2 ALBERT STILLMAN BATCHELLOR, LAWS OF NEW HAMPSHIRE, PROVINCE PERIOD 61-62 (1913), https://play.google.com/store/books/details?id=PbxGAQAAIAAJ.
[421] *Id.* at 284.
[422] *Id.* at 285.
[423] *Id.*
[424] *Id.*
[425] *Id.*
[426] *Id.*
[427] *Id.* at 347 ("An Act in Addition to the Act for the Regulating the Militia").
[428] *Id.* at 575 ("An Act in Addition to an Act Entituled, An Act for Regulating the Militia").
[429] 3 LAWS OF NEW HAMPSHIRE, PROVINCE PERIOD 83 (Henry Harrison Metcalf ed., 1915), https://play.google.com/store/books/details?id=n7xGAQAAIAAJ.
[430] *Id.* at 590.
[431] 4 LAWS OF NEW HAMPSHIRE, REVOLUTIONARY PERIOD 39 (Henry Harrison Metcalf ed., 1916) ("An Act for forming and regulating the Militia within the State of New Hampshire in New England, and for repealing all the Laws heretofore made for that purpose"), https://play.google.com/store/books/details?id=P71GAQAAIAAJ.
[432] *Id.*
[433] *Id.* at 42.

**EXHIBIT 17**
**0429**
Electronic copy available at: https://ssrn.com/abstract=3205664

By requiring that a gun be "well fixed" or "good," the less specific statutes implicitly required all appropriate accoutrements, including the ramrod.

For gun cleaning, the worm and priming wire had long been mandated. The new laws had an additional item: a brush.[434]

Two types of edged weapons were needed. First, "a Bayonet fitted to his Gun."[435] In close quarters fighting, an infantryman would attach the bayonet to the front of his gun. Then the gun would be used as a spear. Since there was a bayonet, there had to be "a Scabbard and Belt therefor."[436]

Besides the bayonet, one additional edged weapon was mandatory: "a Cutting Sword, or a Tomahawk or Hatchet."[437]

The ammunition items were: "Pouch containing a Cartridge Box, that will hold fifteen Rounds of Cartridges at least, a Hundred Buck Shot, a Jack Knife and Tow for Wadding, six Flints, one Pound of Powder, forty Leaden Balls fitted to his Gun."[438]

Finally, field supplies: "Knapsack and Blanket, a Canteen or Wooden Bottle sufficient to hold one Quart."[439]

Persons who were self-sufficient had to supply themselves with the required items. As for others, "all Parents, Masters, and Guardians, shall furnish and equip those of the Militia which are under their Care and Command."[440]

In the War of Independence—for national survival—arms duties were expanded even to 65-year-olds. All men "from Sixteen years of Age to Sixty five" who were *not* part of the militia ("the Training Band") were required to provided themselves the same "Arms and Accoutrements." This applied to men "of sufficient Ability" (able-bodied).[441]

Later, four years into the war, in 1780, New Hampshire enacted a new militia law.[442] The militia was ages sixteen and fifty.[443] The militiamen had to attend musters and drills, and sometimes had to march off to fight in distant locations.

Under the 1780 law, all males under 70 who were capable of bearing arms were put on the "alarm list."[444] This meant that they had to have all the same arms and gear as militiamen.[445] If there were an attack on their town, or nearby, they would come forth with their arms.

The New Hampshire statute reflected a common American practice. Whenever a small town was attacked, everybody who was able would fight as needed, including women, children, and the elderly.[446]

---

[434] *Id.*

[435] *Id.*

[436] *Id.*

[437] *Id.*

[438] *Id.*

[439] *Id.*

[440] *Id.*

[441] *Id.* at 46.

[442] *Id.* at 273 ("An Act for Forming & Regulating The Militia within this State, and for Repealing All the Laws heretofore made for that Purpose.").

[443] *Id.* at 274.

[444] *Id.* at 276.

[445] *Id.*

[446] *See, e.g.*, STEVEN C. EAMES, RUSTIC WARRIORS: WARFARE AND THE PROVINCIAL SOLDIERS ON THE NEW ENGLAND FRONTIER, 1689-1748, at 28-29 (2011).

EXHIBIT 17
0430

Electronic copy available at: https://ssrn.com/abstract=3205664

The 1780 firearms requirement was more specific than its 1776 predecessor, requiring "a good Musquet."[447]  The bayonet was still mandatory, but a second edged weapon was not.[448]  Captains and Subalterns were to be "furnished with a half pike or Espontoon" (pole arms) or a "Fusee [lightweight long gun] and Bayonet and also with a Sword or Hanger."[449]

In 1786, New Hampshire repealed all previous militia laws, and enacted a comprehensive new statute.[450]  This was the state's militia law when it ratified the Second Amendment on January 25, 1790.[451]  The minimum age remained at 16—where it had been throughout all of New Hampshire's history.  The maximum age fell to 40, its lowest yet.[452]  Older men were on the alarm list until age 60.[453]

Arms were the same as in 1780.[454]  As before, militiamen "under the care of parents masters or Guardians" were "to be furnished by them with such Arms and accoutrements."[455]

A 1792 militia law introduced a racial element; the militia consisted of "every free, able bodied white male citizen of this State resident therein who is, or shall be of the age of eighteen years and under the age of Forty years."[456]

The 1792 arms requirements were mostly the same as before, with some additional details.  For example, commissioned officers had to have "a pair of Pistols, the holsters of which to be covered with bear-skin Caps."[457]  Commissioned officers might have an espontoon (a pole arm often used for signaling), but field officers would not.[458]  Again, "parents, Masters, or Guardians" had to furnish their charges with "Arms and Accoutrements."[459]  And again they were "liable for the neglect and non appearance of such persons . . . under their care."[460]

In 1795 the starting militia age was lowered back to sixteen, where it had been until recently.[461]  Perhaps the 1792 age-eighteen law was in deference to the federal Uniform Militia Act passed earlier that year.  Later, the people decided that they wanted to keep their traditional lower age.

---

[447] *Id.* at 276-77.

[448] *Id.*

[449] *Id.* at 277.

[450] 5 LAWS OF NEW HAMPSHIRE, FIRST CONSTITUTIONAL PERIOD 177 (Henry Harrison Metcalf ed., 1916), https://play.google.com/store/books/details?id=iKkwAQAAMAAJ.  An addition to this act was passed in September of 1786, but it did not affect the age limits or arms requirements. *Id.* at 197.

[451] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 303-04.

[452] 5 LAWS OF NEW HAMPSHIRE, FIRST CONSTITUTIONAL PERIOD, *supra* note 450, at 177.

[453] *Id.* at 178.

[454] *Id.* at 180.

[455] *Id.* at 179.  Also, as usual, "Parents Masters and Guardians shall be liable for the Neglect and Non Appearance of such persons as are under their Care and are liable by Law to train." *Id.* at 181.

[456] 6 LAWS OF NEW HAMPSHIRE, SECOND CONSTITUTIONAL PERIOD 84-85 (N.H. Sec'y of State ed., 1917) (available on Google Books).

[457] *Id.* at 88.

[458] *Id.* at 89.

[459] *Id.*

[460] *Id.*

[461] *Id.* at 263-64 ("[E]very free, able bodied, white male citizen of this State resident therein who is or shall be of the age of sixteen years, and under forty years of age, under such exceptions as are made in this act, shall be enrolled in the Militia, and shall in all other respects be considered as liable to the duties of the Militia, in the same way and manner, as those of the age of eighteen years and upwards.  And every citizen enrolled and liable as aforesaid; shall, while under the age of twenty one years be exempt from a poll tax.").

Other additions to the 1792 militia law were enacted in 1793. *Id.* at 110 (assigning certain militia units to regiments), 1795 (*id.* at 279), and 1798 (*id.* at 545).

EXHIBIT 17
0431
Electronic copy available at: https://ssrn.com/abstract=3205664

F. Delaware: "every Freeholder and taxable Person"

First a colony of Sweden and then the Netherlands, Delaware was taken by the English in 1664. Initially, New York claimed it. A statute New York passed in 1671 to defend against Indian attacks along the Delaware River became Delaware's first militia act. It required "That every Person that can beare Arms from 16 to 60 years of Age, bee allways provided with a convenient proportion of Powder & Bullett fit for Service, and their mutual Defence."[462]

Eventually, Delaware got its own legislature, but the three compact counties were too small to merit a royal governor. Consequently, the Governor of Pennsylvania was also the Governor of Delaware. Delaware did not enact a militia statute until 1740.[463] It required "all the inhabitants and freemen" aged fifteen to sixty-three to "provide and keep . . . a well-fixed firelock or musket," plus ammunition supplies and cleaning tools.[464]

The next year, a new law required males from 17 to 50 years to enlist. Besides that, everyone else who was living self-sufficiently ("every Freeholder and taxable Person") had to have the same arms as militiamen.[465]

Because "the Subjects of the French King, and their Savage Indian Allies . . . in the most cruel and barbarous Manner, attacked and murdered great Numbers" of colonists, the Assembly of the Counties of New Castle, Kent, and Sussex enacted a militia law in 1756.[466] This militia law for the French & Indian War was for the people to "assert the just Rights, and vindicate the Honour, of His Majesty's Crown, but also to defend themselves and their Lives and Properties, and preserve the many invaluable Rights and Privileges that they enjoy under their present Constitution and Government."[467]

The militia law covered every male "above Seventeen and under Fifty Years of Age (except bought Servants, or Servants adjudged to serve their Creditors)."[468] The gun was to be a musket or rifle.[469] The next year the militia act was extended "so long as the War proclaimed by his Majesty against the French King shall continue and no longer."[470]

After the Revolution began, Delaware enacted several militia statutes in 1778. The foundational act "establishing a Militia within this State" included "each and every able-bodied, effective, Male white Person between the Ages of Eighteen and Fifty."[471] Militiamen had to provide their own "Musket or Firelock with a Bayonet," plus the cartridge box, cartridges, priming

---

[462]   GEORGE H. RYDEN, DELAWARE—THE FIRST STATE IN THE UNION 103-104 (1938), https://archives.delaware.gov/wp-content/uploads/sites/156/2017/05/DE_Terc_Publications.pdf.
[463]   1 LAWS OF THE STATE OF DELAWARE 175 (1797), https://play.google.com/store/books/details?id=GXJKAAAAYAAJ).
[464]   Id. at 175, 178.
[465]   RYDEN, supra note 462, at 117. A "freeholder" owned real property. Single women could be freeholders. A tenant was not a freeholder, but could be a taxable person.
[466]   ARTHUR VOLLMER, MILITARY OBLIGATION: DELAWARE ENACTMENTS 179 (1947).
[467]   Id.
[468]   Id.
[469]   Id. at 180.
[470]   RYDEN supra note 462, at 126.
[471]   AN ACT of the General Assembly of the Delaware State for establishing a militia within the said state, 1778 Del. Acts, March Adjourned Session 3-4. The several acts from the March 1778 session are separately paginated, so each new act begins on its own page 1.

EXHIBIT 17
0432
Electronic copy available at: https://ssrn.com/abstract=3205664

wire, brush, and six flints. For 18-to-20-year-olds who could not afford the mandatory arms, the parents had to provide them, if the parents could afford them.[472]

Another law punished people who bought from militiamen the arms or accoutrements that militiamen were supposed to always keep. If the illicit buyer were a man 18 to 50, the punishment could include six months' service in the militia.[473] The third act in 1778 provided regulations for the militia "whilst under Arms or embodied" (i.e., in active service).[474] A 1779 supplement specified the punishment for persons between 18 and 50 who failed to appear for militia duty with the required arms.[475]

A comprehensive new militia act in 1782 included "every able-bodied effective Male white Inhabitant between the Ages of eighteen and fifty years."[476] Again, parents who could afford to had to provide the required arms to persons aged 18-to-20 who could not afford them.[477] Arms were the same as before.[478]

The act that established the militia when Delaware ratified the Second Amendment on January 28, 1790,[479] was passed in 1785.[480] Each white male 18-50 whose taxes were at least twenty shillings a year had to provide equipment "at his own expence."[481] As for apprentices and persons over 18 and under 21, their parent or guardian would provide the arms—*if* the militiaman's estate were at least eighty pounds, or if the parent paid "six pounds annually towards the public taxes."[482]

Arms were "a musket or firelock, with a bayonet," a cartridge box with twenty-three cartridges, "a priming wire, a brush and six flints, all in good order."[483] Fines for neglect were to be paid by militiamen "of full age or by the parent or guardian of such as are under twenty-one years."[484] The guardian could charge his ward for the expense when the time came for "settling the accounts of his guardianship."[485]

Like most states, Delaware enacted a new militia law after the federal Uniform Militia Act passed in 1792. Delaware's 1793 act included "each and every free able bodied white male citizen of this state, who is or shall be of the age of eighteen years, and under the age of forty-five years."[486] However, "all young men under the age of twenty-one years, and all servants purchased *bona fide*, and for a valuable consideration, [were] exempted from furnishing the necessary arms,

---

[472] *Id.* at 4-5.

[473] An Act against Desertion, and harboring Deserters, or dealing with them in Certain Cases, 1778 Del. Acts Mar. Adjourned Sess. 1-3.

[474] Rules and Articles, for the better regulating of the militia of this State, whilst under Arms or embodied, 1778 Del. Acts Mar. Adjourned Sess. 1.

[475] A Supplement to an Act, intitled, An Act for establishing a Militia within this State, 1778 Del. Acts Oct. Regular Sess. 14.

[476] AN ACT for establishing a Militia within this State, 1, Jan. Adjourned Sess. 1782, http://heinonline.org/HOL/P?h=hein.ssl/ssde0069&i=1.

[477] *Id.* at 3.

[478] *Id.*

[479] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 307.

[480] An Act for Establishing a Militia, 1785 Del. Acts. May Adjourned Sess. 11.

[481] *Id* at 13.

[482] *Id.*

[483] *Id.*

[484] *Id.*

[485] *Id.*

[486] 2 LAWS OF THE STATE OF DELAWARE 1134 (1797), https://babel.hathitrust.org/cgi/pt?num=1134&u=1&seq=641&view=image&size=100&id=njp.32101042903870&q1=twenty-one.

EXHIBIT 17
0433

Electronic copy available at: https://ssrn.com/abstract=3205664

ammunition and accoutrements . . . and [were] exempted from militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion."[487]

In other words, servants and males 18 to 20 would not be fined if they did not participate in drills. Additionally, they would not be fined if they lacked the requisite equipment. Of course, if they wanted to keep arms and train, they could.

Required arms mostly tracked the federal law, with some more detail for horsemen.[488]

A 1796 supplement revised the organization and regulation of the militia, and again included able-bodied white males from 18 to 45.[489] The act also forbade volunteer militias, because there were "a number of free able bodied white men in this state, between the ages of eighteen and forty-five years, who neglect and refuse to muster and do militia duty, in the companies in which they have been enrolled . . . and yet meet together with arms in bodies distinguished and known by the name of Volunteer Companies."[490]

Delaware's hostility to volunteer companies was not the national norm. In fact, the federal Uniform Militia Act expressly recognized independent volunteer companies.[491] The UMA set forth the conditions and regulations for independent militia service in the federal militia.[492]

---

[487] *Id.* at 1135. In other words, hired servants were part of the enrolled militia. Indentured servants were not, except in emergencies. Textually, slaves were "purchased…for a valuable consideration," but we are not certain whether they too would be part of the militia during an emergency. *Cf. supra* note 221 (distinguishing "bought" servants from African slaves).

[488] *Id.* at 1136.

> [E]very non-commissioned officer and private of the infantry (including grenadiers and light infantry, and of the artillery shall have a good musket or firelock, a sufficient bayonet and belt, two spare flints and a knapsack, a pouch, with a box therein to contain not less than twenty-four cartridges suited to the bore of his gun, each cartridge to contain a proper quantity of powder and ball, or with a good rifle, knapsack, shot pouch and powder horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; the commissioned officers of the infantry shall be armed with a sword or hanger, and an espontoon, and those of artillery with a sword or hanger, a fuzee, bayonet and belt, and a cartridge box to contain twelve cartridges; the commissioned officers of the troops of horse shall furnish themselves with good horses of at least fourteen hands and a half high, and shall be armed with a sword and pair of pistols, the holsters of which shall be covered with bear skin caps; each light-horseman or dragoon shall furnish himself with a serviceable horse at least fourteen hands and an half high, a good saddle, bridle, mail pillion and valise holsters, and a breast plate and crupper, a pair of boots and spurs, a pair of pistols, a sabre, and cartouch box to contain twelve cartridges for pistols; the artillery and horse shall be uniformly clothed in regimentals, to be furnished at their own expence.

[489] *Id.* at 1225.

[490] *Id.* at 1234 (noting that besides the concern about the state militia, Delaware also worried about "the assembling of large bodies of armed men, who do not acknowledge, and refuse to submit to, the legal military establishment.").

[491] More effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States (Uniform Militia Act) (UMA), 1 Stat. 271, 274, §§ 10-11.

[492] *Id.* (providing "And whereas sundry corps of artillery, cavalry, and infantry now exist in several of the said states, which by the laws, customs, or usages thereof have not been incorporated with, or subject to the general regulations of the militia: SEC. 11. Be it enacted, That such corps retain their accustomed privileges, subject, nevertheless, to all other duties required by this Act, in like manner with the other militia").

**EXHIBIT 17**
**0434**

Electronic copy available at: https://ssrn.com/abstract=3205664

Delaware passed its final militia act of the eighteenth century in 1799.[493]  The scope of the militia remained the same.[494]  The arms were mostly the same: for the infantryman, "a good musket" plus a bayonet, or "a good rifle." Commissioned officers needed "a sword or hanger, a fusee, bayonet," and troopers had to be "armed with a sabre and pair of pistols." [495]

Men 18 to 20 were again exempted from fines for non-performance of militia duties "during such minority, except in cases of rebellion or any actual invasion of this State."[496]

## G. Pennsylvania: No service "without the consent of his or their parents or guardians, masters or mistresses"

In the days when Pennsylvania was claimed by New York, a 1671 law required "every person that can bear arms from 16 to 60 years of age, be always provided with a convenient proportion of powder and bullet fit for service, and their mutual defence."[497]  This meant "at least one pound of powder and two pounds of bullet."[498]  As backup to insufficient armament by the people, "his Royal Highness' Governor [N.Y. Gov. Francis Lovelace] is willing to furnish them out of the magazine or stores, they being accountable and paying for what they shall receive, to the Governor or his order."[499]

Five years later, it was mandated that:

> Every Male within this Goverment from Sixteen to Sixty years of age, or not freed by public Allowance, shall if freeholders at their own, if sons or Servants at their Parents and Masters Charge and Cost, be furnished from time to time and so Continue well furnished with Armes and other Suitable provition hereafter mentioned . . . Namely a good Serviceable Gun, allowed Sufficient by his Military Officer to be kept in Constant fitness for present Service, with a good sword bandeleers or horne a worme a Scowerer a priming wire Shott Badge and Charger one pound of good powder, four pounds of Pistol bullets or twenty four bullets fitted to the gunne, four fathom of Serviceable Match for match lock gunn four good flints fitted for a fire lock gunn.[500]

As for horsemen, their mandatory arms were "Holsters, Pistolls, or Carbine, and a good Sword."[501]

---

[493] An Act to Establish an Uniform Militia throughout this State, 3 Del. Laws 82 (1798), https://babel.hathitrust.org/cgi/pt?q1=militia;id=njp.32101042904340;view=image;seq=88;start=1;sz=10;page=search;num=82.

[494] *Id.*

[495] *Id.* at 84-85.  Unlike muskets or fowling pieces, rifles of the time were too fragile to use with bayonets.

[496] *Id.* at 84.

[497] *Ordinances for Defence*, in DUKE OF YORKE'S BOOK OF LAWS 450 (1664), https://babel.hathitrust.org/cgi/pt?q1=ARMS;id=hvd.32044022680946;view=image;start=1;sz=10;page=root;size=100;seq=466;num=450.

[498] *Id.*

[499] *Id.*

[500] CHARTER TO WILLIAM PENN, AND LAWS OF THE PROVINCE OF PENNSYLVANIA, PASSED BETWEEN THE YEARS OF 1682 AND 1700, PRECEDED BY DUKE OF YORK'S LAWS IN FORCE FROM THE YEAR 1676 TO THE YEAR 1682, at 39 (1676).

[501] *Id.* at 43.

**EXHIBIT 17**
**0435**
Electronic copy available at: https://ssrn.com/abstract=3205664

Pennsylvania became a separate colony in 1681, following a royal grant to the Quaker aristocrat William Penn.[502]  Early Pennsylvania was the only colony without an organized functional militia.[503]  Political power was in the hands of Quakers, many of whom (not all) were pacifists.[504]  Additionally, the Quakers had generally non-violent relations with Indians, and thus less need for collective self-defense.[505]

However, after the French & Indian War began in 1754, George Washington raised and paid for an army of Virginians to fight the French in the Ohio River Valley, and attitudes began to change.[506]  Because of non-Quaker immigration, Quaker hegemony over Pennsylvania politics had been challenged in the previous decades.[507]  Then in 1755 Pennsylvania passed an act to formalize voluntary militias wanting to defend the colony.[508]  The 1755 militia law explained the assembly was respecting the conscience rights of Quakers (most of whom were unwilling to fight) *and* the conscience rights of people of other faiths, who did want to join in associations for community defense.[509]

Minors and indentured servants could not join the new militia without the consent of their superiors: "no youth under the age of twenty-one years nor any bought servant or indented apprentice shall be admitted to enroll himself or be capable of being enrolled in the said companies or regiments without the consent of his or their parents or guardians, masters or mistresses, in writing under their hands first had and obtained."[510]  Later in 1755, as the pressures of war were growing, the assembly adopted a non-binding resolution "that it be recommended to all male white persons within this province, between the ages of sixteen and fifty years, who have not already associated, and are not conscientiously scrupulous of bearing arms, to join the said [militia] association immediately."[511]

Five months later, Pennsylvania imposed a special tax on "every male white person capable of bearing arms, between the ages of sixteen and fifty years" who had *not* joined a militia.[512]  This

---

[502] *Pennsylvania History 1681-1776: The Quaker Province*, PA. HIST. & MUSEUM COMMISSION, http://www.phmc.state.pa.us/portal/communities/pa-history/1681-1776.html (last visited Jan. 13, 2019).

[503] *Id.*

[504] DAVID B. KOPEL, THE MORALITY OF SELF-DEFENSE AND MILITARY ACTION: THE JUDEO-CHRISTIAN TRADITION 384-89 (2017) (describing diverse Quaker views on defense of self and others, during and before the American Revolution).

[505] PAUL A.W. WALLACE, INDIANS IN PENNSYLVANIA 142-46 (2d ed. 2005); *see also*, Thomas J. Sugrue, *The Peopling and Depeopling of Early Pennsylvania: Indians and Colonists, 1680-1720*, 116 PA. MAG. HIST. & BIO. 3 (Jan. 1992) (explaining the relationship of Penn's settlers with the Indians as, although not typically characterized by war, not always idyllic and generous).

[506] WALLACE, *supra* note 505, at 147-59.

[507] JACK D. MARIETTA, THE REFORMATION OF AMERICAN QUAKERISM, 1748-1783, at 132-22 (2007).

[508] 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682-1801, at 197 (1898), https://babel.hathitrust.org/cgi/pt?view=image;size=125;id=mdp.39015050623548;q1=militia;page=root;seq=203;num=197;orient=0.

[509] *Id.* (The act began: "Whereas this province was first settled by (and a majority of the assemblies ever since been of) the people called Quakers, who, though they do not, as the world is now circumstanced, condemn the use of arms in others, yet are principled against bearing arms themselves." The militia/associator statute was non-compulsory for everyone: "for them by any law to compel others to bear arms and exempt themselves would be inconsistent and partial").

[510] *Id.* at 200.

[511] 8 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 492 (1902).

[512] *Id.* at 539.

EXHIBIT 17
0436
Electronic copy available at: https://ssrn.com/abstract=3205664

penalty was reaffirmed by "Resolutions directing the Mode of Levying Taxes on Non-Associators in Pennsylvania" two months later.[513] Finally, the entire militia act was repealed on July 7, 1756.[514]

In 1755, and the first half of 1756, Quakers had been under pressure.[515] They were willing to pay taxes in general, knowing that some of the revenue would be used for military activity.[516] Most of them were pacifists, and they were not only unwilling to fight, but they were also unwilling to pay a special tax levied on them for not fighting, especially because they knew the tax would be used for the military.[517]

During the eighteenth century, Americans grappled with how to deal with conscientious objectors.[518] Sometimes a mutually acceptable accommodation was found.[519]

Once the Revolutionary War began, Pennsylvania had to create a formidable militia. By this time, non-Quakers held the political power.[520] The new militia law of 1777 was for "every male white person usually inhabiting or residing within his township, borough, ward or district between the ages of eighteen and fifty-three years capable of bearing arms."[521]

For conscientious objectors, Pennsylvania adopted a variant of the practice used in some other colonies: the reluctant man subject to militia service could pay for a substitute to serve in his stead. In some states, this would be simply be a negotiated contract between the conscript and the substitute. In Pennsylvania, the fee or penalty was apparently to be paid to the militia itself, which could then hire a substitute.[522] Pennsylvania allowed for appeals if the objector thought the fee too high.[523] For militiamen 18 to 20, the parents could appeal the fee, as could masters of indentured servants who were 18 to 20.[524]

---

[513] *Id.* at 512.

[514] 5 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 508, at 201, https://babel.hathitrust.org/cgi/pt?view=image;size=125;id=mdp.39015050623548;q1=militia;page=root;seq=207;num=201.

[515] MARIETTA, *supra* note 507, at 141-58.

[516] *Id.* at 136-37.

[517] KOPEL, *supra* note 504, at 388.

[518] *See* LIBERTY AND CONSCIENCE: A DOCUMENTARY HISTORY OF CONSCIENTIOUS OBJECTORS IN AMERICA THROUGH THE CIVIL WAR 3-67 (Peter Brock ed. 2002). For example, the constitutions of Vermont, New Hampshire, Kentucky, and Tennessee included specific protections for conscientious objectors. JOHNSON ET AL., *supra* note 18, at 293, 296, 386. When ratifying the Constitution, the states of Maryland, Virginia, North Carolina, and Rhode Island asked for conscientious objector protections for the federal militia power. *Id.* at 313, 322, 327, 328. James Madison included such a protection in his draft of what became the Second Amendment, but the clause was removed in the Senate, based on the argument that that matter was best left to legislative discretion. *Id.* at 335-37.

[519] *See generally* LIBERTY AND CONSCIENCE, *supra* note 518 (describing examples of persecution and tolerance). Accommodations were easier for the non-Quaker pacifists, who did not object to paying war taxes or special fees for exemptions from military duty. *Id.* at 48.

[520] MARIETTA, *supra* note 507, at 219-20 (noting that from 1774 onward the Pennsylvania Assembly was under control of non-Quakers who advocated vigorous confrontation with Great Britain).

[521] 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 77 (1903); MARIETTA, *supra* note 507, at 225-29.

[522] 9 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 521, at 77.

[523] *Id.*

[524] *Id.* at 87 ("[I]f any parent, guardian, master or mistress of any person between the ages of eighteen and twenty-one years or of any other person made liable to serve in the militia by this act shall think him or herself aggrieved by any of the rates, fines or sum or sums of money agreed for in the procuring of substitutes . . . he, she or they may appeal").

**EXHIBIT 17**
**0437**

Electronic copy available at: https://ssrn.com/abstract=3205664

The 1777 Act was non-specific on equipment, requiring only a militiaman's "arms and accoutrements" be "in good order."[525] This Act was supplemented in 1777, without affecting age limits or arms.[526]

A new Act in 1780, five years into the Revolutionary War, kept the ages at 18 to 53, and reiterated the non-specific mandate for arms and accoutrements "in good order."[527] This Act was Pennsylvania's militia act when it ratified the Second Amendment on March 10, 1790.[528] There was a supplement in 1780,[529] repeal and replacement of that supplement in 1783,[530] more supplements in 1783[531] and 1788,[532] and a repeal of parts of those supplements in 1790.[533] None of these changed the ages or the arms.

During the Revolutionary War, not long after the 1780 Militia Act had been enacted, the assembly established the Pennsylvania Volunteers.[534] The Pennsylvania Volunteers were a state army, similar to the armies raised by other states. Every militia company had to "provide or hire one able-bodied man not less than eighteen or more than forty-five years of age" to serve in the Pennsylvania Volunteers.[535] Notably, the whites-only provision from the militia law was omitted. As was true throughout the seventeenth and eighteenth centuries in America, whatever racial limits existed on militia or other military service tended to be repealed or overlooked under the pressure of wartime exigencies.[536]

After Congress passed the federal UMA in 1792, Pennsylvania enacted conforming legislation in 1793.[537] The Act tracked the federal militia definition: free white males 18 to 45.[538] The mandatory arms and accoutrements within the Act copied the extensive federal list.[539]

Like neighboring Delaware, Pennsylvania relaxed the peacetime requirements for young adults.[540] "[A]ll young men under the age of twenty-one years, and all servants purchased bona fide and for a valuable consideration," had to enroll in the militia.[541] But "during such minority or servitude," they were exempt from training and from fines for not having the requisite

---

[525] *Id.* at 80.
[526] *Id.* at 131.
[527] 10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 144-46 (1904).
[528] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 306-07.
[529] 10 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 527, at 225.
[530] 11 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 91-93 (1906). (The new 1783 supplement stated that it applied to "young men who have arrived to the age of eighteen years.").
[531] *Id.* at 161.
[532] 13 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 41 (1908).
[533] *Id.* at 451, https://books.google.com/books?id=HRxEAAAAYAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q=MILITIA&f=false.
[534] 10 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 527, at 191.
[535] *Id.*
[536] JOHNSON ET AL., *supra* note 18, at 194.
[537] 14 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 454 (1909), https://babel.hathitrust.org/cgi/pt?q1=militia;id=mdp.39015050623514;view=image;start=1;sz=10;page=root;size=100;seq=460;num=454.
[538] *Id.* at 455.
[539] *Id.* at 457-58.
[540] 2 Laws of the State of Delaware 1135 (1797).
[541] 14 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 537, at 456.

EXHIBIT 17
0438
Electronic copy available at: https://ssrn.com/abstract=3205664

equipment.[542]   The exception did not apply "in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states."[543]

Pennsylvania's final militia act of the eighteenth century was passed in 1799.[544]   It kept the previous act's age limits of 18 and 45,[545] as well as the peacetime exemptions.[546]   However, the new act explicitly allowed "sons who are not subject to the militia law may be admitted as substitutes for their fathers."[547]   In other words, if a 42-year-old father were summoned into the militia, the 17-year-old son could choose to serve in his stead.  The arms requirements were slightly modified, with more elaboration of accoutrements for horsemen, and making sure handgunners had "bear skin caps" for their holsters.[548]

## H. New York: "every able bodied male person Indians and slaves excepted"

New York's first militia act came among The Duke of York's Laws in 1665.[549]   It provided that:

> Every Male within this Government from Sixteen to Sixty years of age, or not freed by public Allowance, shall if freeholders at their own, if sons or Servants at their Parents and Masters Charge and Cost, be furnished from time to time and so Continue well furnished with Armes and other Suitable provition hereafter mentioned: under the penalty of five Shillings for the least default therein Namely a good Serviceable Gun, allowed Sufficient by his Military Oficer to be kept in Constant fitness for present Service, with a good sword bandeleers or horne or worme a Scowerer a priming wire Shott Badge and Charger one pound of good powder, four pounds of Pistol bullets or twenty four bullets fitted to the gunne, four fathom of Serviceable Match for match lock gunn four good flints fitted for a fire lock gunn.[550]

Troopers had to "keepe and maintaine a good Horse Fitted with Sadle, bridle, Holsters, Pistolls or Carbine, and a good Sword."[551]

The act additionally provided that: "In defence of himself his wife Father or Mother Children or Servants a man may Lawfully use force to resist any attempt made to that purpose."[552]   Thus, the right of 18-to-20-year-olds to use arms in self-defense was expressly guaranteed.

---

[542] *Id.*

[543] *Id.*

[544]   16 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 276 (1911), https://play.google.com/store/books/details?id=zRtEAAAAYAAJ&rdid=book-zRtEAAAAYAAJ&rdot=1.

[545] *Id.*

[546] *Id.* at 278.

[547] *Id.* at 297.

[548] *Id.* at 281.

[549] 1 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION, INCLUDING THE CHARTERS TO THE DUKE OF YORK, THE COMMISSION AND INSTRUCTIONS TO COLONIAL GOVERNORS, THE DUKES LAWS, THE LAWS OF THE DONAGAN AND LEISLER ASSEMBLIES, THE CHARTERS OF ALBANY AND NEW YORK AND THE ACTS OF THE COLONIAL LEGISLATURES FROM 1691 TO 1775 INCLUSIVE 49-50 (1896).

[550] *Id.*

[551] *Id.* at 54.

[552] *Id.* at 15.

EXHIBIT 17
0439

Electronic copy available at: https://ssrn.com/abstract=3205664

A 1684 law ensured that persons exempted from the militia still kept the militia arms in their homes.[553]

In 1691, New York lowered the minimum militia age, so that "noe person whatsoever from fiftieen to Sixty years of Age remaine unlisted."[554]

The arms were typical of the time: For every foot soldier, "a well fixed muskett or fuzee" for officers, "a good pike or Sword or lance and pistoll."[555] At home, every foot soldier was to have "one pound of good powder and three pound of Sizeable bulletts," and every Trooper (horseman) had to "have at his usuall place of abode a well fixed Carabine with belt and Swivell and two pounds of fine powder with Six pounds of Sizeable bulletts."[556]

The minimum age for militia service was raised back to 16 in 1702.[557] The militia arms remained unchanged.[558] The 1702 act was continued in 1706,[559] 1708,[560] 1709,[561] 1710,[562] 1711,[563] 1712,[564] 1713,[565] 1715,[566] 1716,[567] 1717,[568] 1718,[569] and 1720.[570]

A new act in 1721 applied to every "[p]erson whatsoever from Sixteen to Sixty Years of Age."[571] Foot soldier equipment was nearly the same as before.[572] Many subsequent acts kept the same age limits and arms requirements. There were new acts (all which had interim continuations) in 1724,[573] 1739,[574] 1743,[575] and 1744.[576] The 1746 act told soldiers to appear with nine rounds of ammunition, rather than the previous minimum of six.[577] The requirement was lowered back to

---

[553] *Id.* at 161 ("all persons though freed from Training by the Law yet that they be obliged to Keep Convenient armes and ammunition in Their houses as the Law directs to others").

[554] *Id.* at 231.

[555] *Id.* at 232.

[556] *Id.* "Fine powder" is gunpowder made of very small grains. Small grains burn faster and more uniformly. Hence, "fine powder" propels the bullet faster than does powder with larger grains.

[557] *Id.* at 500.

[558] *Id.* at 500-01.

[559] *Id.* at 591.

[560] *Id.* at 611.

[561] *Id.* at 675.

[562] *Id.* at 706.

[563] *Id.* at 745.

[564] *Id.* at 778.

[565] *Id.* at 781.

[566] *Id.* at 868.

[567] *Id.* at 887.

[568] *Id.* at 917.

[569] *Id.* at 1001.

[570] 2 The Colonial Laws of New York From the Year 1664 to the Revolution 1 (1894).

[571] *Id.* at 84-85.

[572] *Id.*

[573] *Id.* at 187. The act was continued in 1728, *id.* at 421; and in 1730, *id.* at 657; then in 1731, *id.* at 698; again in 1732, *id.* at 734; and in 1733, *id.* at 858; and 1735, *id.* at 905; and 1736, *id.* at 922; and 1737, *id.* at 947.

[574] 3 Colonial Laws of New York From the Year 1664 to the Revolution 3 (1894), https://babel.hathitrust.org/cgi/pt?id=umn.31951002158399;view=1up;seq=11. The act was continued in 1740, *id.* at 69; in 1741, *id.* at 168; and 1742, *id.* at 224.

[575] *Id.* at 296.

[576] *Id.* at 385. This act was continued in 1745. *Id.* at 510.

[577] *Id.* at 511, 513. This act was continued in 1746, *id.* at 621; then again in 1747, *id.* at 648; then in 1753, *id.* at 962; and again in 1754, *id.* at 1016.

EXHIBIT 17
0440
Electronic copy available at: https://ssrn.com/abstract=3205664

six in 1755.[578]  The age and arms requirements remained the same in the acts of 1764[579] and 1772.[580]

On April 1, 1775, less than three weeks before the Revolutionary War would begin, New York enacted a new militia law.[581]  This act retained the same arms requirements as its predecessors, and kept the minimum age at 16, but lowered the maximum age to 50.[582]

The 1775 law was for "every Person."[583]  In the middle of the war, in 1778, the 1775 law was narrowed to "every able bodied male person Indians and slaves excepted."[584]  The new arms requirement was "a good musket or firelock fit for service," plus the bayonet, sixteen rounds of ammunition, and the usual accoutrements.[585]

In 1778, the British, "adopted terror tactics across upstate New York to divert American forces away from more southern battle fields and to inhibit American's ability to produce food and supplies from the large war effort."[586]  A statute that year established "a night watch in the counties of Ulster, Tryon, Charlotte, Dutchess, and Albany."[587]  Service on the watch was required of "every able bodied male inhabitant, Indians and slaves excepted…from sixteen years of age till sixty."[588]

A 1780 act "to raise troops for the defence of the frontiers" required "all the male inhabitants (slaves excepted) of the age of sixteen years and upwards" to provide themselves with "a good musket or firelock" plus seventeen rounds of ammunition.[589]

Militia acts of 1780 and 1782 retained the age limits and arms requirements of 1778.[590]

In 1783, New York passed "AN ACT to authorize his excellency the governor to raise troops for the defence of the frontiers."[591]  It included "all the male inhabitants and sojourners of the age of sixteen years and upwards . . . excepting slaves," and ordered each of them to possess the usual equipment.[592]

---

[578] Id. at 1051.  This act was continued twice in 1756, 4 COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 16, 101 (1894), https://babel.hathitrust.org/cgi/pt?id=mdp.39015011398438;view=1up;seq=22; twice in 1757, id. at 187, 293; then in 1759, id. at 363; in 1760, id. at 475; in 1761, id. at 553; in 1762, id. at 636; and in 1763, id. at 698.

[579] Id. at 767; continued in 1765, id. at 852; in 1766, id. at 915; and in 1767, id. at 952.

[580] 5 COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 342 (1894), https://babel.hathitrust.org/cgi/pt?id=mdp.39015011398420;view=1up;seq=348.

[581] Id. at 732.

[582] Id.

[583] Id. at 342.

[584] LAWS OF THE STATE OF NEW YORK: PASSED AT THE SESSIONS OF THE LEGISLATURE HELD IN THE YEARS 1777, 1778, 1779, 1780, 1781, 1782, 1783, AND 1784, INCLUSIVE, BEING THE FIRST SEVEN SESSIONS 62 (1886), https://books.google.com/books?id=D8GwAAAAMAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=snippet&q=%22every%20able%20bodied%20male%20person%20Indians%20and%20slaves%20excepted%22&f=false.  (Hereinafter LAWS OF THE STATE OF NEW YORK: PASSED AT THE SESSIONS 165-66.)  The act was amended in 1778, id. at 86, and 1779, id. at 157.  The age limits and arms requirements were unaffected.

[585] Id.

[586] Stefan Bielinski, Albany County, in THE OTHER NEW YORK: THE AMERICAN REVOLUTION BEYOND NEW YORK CITY, 1763-1787, at 165-66 (Joseph S. Tiedemann & Edward R. Fingerhut eds. 2006).

[587] LAWS OF THE STATE OF NEW YORK PASSED AT THE SESSIONS, supra note 584, at 94.

[588] Id. at 95.

[589] Id at 232.

[590] Id. at 237, 441.

[591] Id. at 529.

[592] Id.

EXHIBIT 17
0441

Electronic copy available at: https://ssrn.com/abstract=3205664

In 1786, New York passed the law defining its militia.[593] That was the definition in effect when the state ratified the Second Amendment on February 24, 1790.[594] The law defined the New York militia as "every able-bodied male person, being a citizen of this state, or of any of the United States, and residing in this state (except such persons as are herein after excepted) and who are of the age of sixteen, and under the age of forty-five years."[595]

The arms were "a good musket or firelock," 24 bullets, "a sufficient bayonet" and other standard items."[596] In 1787, New York amended the 1786 law without change to ages or arms.[597]

Finally, in 1793 New York aligned with the federal UMA.[598] The minimum age rose to 18, while the maximum remained at 45—both ages the same as for the federal militia.[599] The arms requirement copied the federal statute.[600]

## I. Rhode Island: parents and masters must furnish arms

Rhode Island established a militia in 1673, consisting of persons from 16 to 60 years old.[601] Each militiaman was required to "at all times hereafter have on[e] good gun or muskitt Fitt for Service one pound of good powder & thirty bullits at Least."[602] If a son or servant had no valuable estate of his own, his parents or master would be liable for any fines imposed upon him.[603] A 1677 revision retained the laws for ages and arms.[604]

A 1700 statute specified that persons subject to militia service also had to serve on watch and ward (day and night guard duty in towns).[605] The Act elaborated on the arms requirements, mandating that each militiaman appear with a "Good & Sufficient muskett or Fuze a Sword or

---

[593] 1 LAWS OF THE STATE OF NEW YORK: COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 227 (Thomas Greenleaf 1792), https://books.google.com/books?id=9Hs4AAAAIAAJ&pg=PA26&dq=new+york+state+laws+1779&hl=en&sa=X&ved=0ahUKEwiCvauHn_LZAhVEVWMKHSToDG8Q6AEIKTAA#v=onepage&q=militia&f=false.

[594] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 304-06.

[595] *Id.*

[596] *Id.* at 228.

[597] *Id.* at 454.

[598] 3 LAWS OF THE STATE OF NEW YORK: COMPRISING THE CONSTITUTION AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE TWENTIETH SESSION, INCLUSIVE 58 (1797), https://books.google.com/books?id=Mns4AAAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q=militia&f=false.

[599] *Id.*

[600] *Id.*

[601] LAWS AND ACTS OF HER MAJESTIES COLONY OF RHODE ISLAND, AND PROVIDENCE-PLANTATIONS MADE FROM THE FIRST SETTLEMENT IN 1636 TO 1705, at 23 (1896), https://books.google.com/books?id=VZs0AQAAMAAJ&pg=PA48&lpg=PA48&dq=%22an+act+for+ye+better+regulating+ye+militia%22+%2B+%22rhode+island%22&source=bl&ots=HHzuITQDoD&sig=UB5aPjlcOOwaXouze0Dru3PGdUI&hl=en&sa=X&ved=0ahUKEwiT6a3MpL_aAhVq4oMKHb9jB0oQ6AEIKzAA#v=onepage&q=at%20least&f=false.

[602] *Id.*

[603] *Id.*

[604] *Id.* at 25.

[605] *Id.* at 48. The statute was miswritten: "all persons wthn this Colony Above ye Age of Sixteen Years & Under ye Age of Sixteen Yeares as well housekeepers as others Shall be Obliged to watch or ward." Read literally, no one was required for perform watch and ward, since no one can be "Above" and "Under" the "Age of Sixteen Years." Presumably the intended and understood upper age limit remained 60.

EXHIBIT 17
0442
Electronic copy available at: https://ssrn.com/abstract=3205664

Bayenet, Catooch box or Bandelers wth twelve Bulets fit for his Piece half a Pound of Powder & Six good Flints."[606]

A 1718 law provided that "all male Persons . . . from the Age of Sixteen, to the Age of Sixty Years, shall bear Arms."[607]  Arms were "one good Musket, or Fuzee, the Barrel whereof not to be less than three foot and an half in length," plus a sword or bayonet, a pound of gunpowder, thirty bullets, six flints, and a cartridge box.[608]

The next act appeared in 1755, at the beginning of the French & Indian War.[609]  It did not revise ages or arms.[610]  An addition in 1756 made the parents of militiamen under 21 liable for unpaid fines for neglect of duty.[611]  A 1774 amendment left arms and ages unchanged.[612]

Rhode Island created a state army in 1776, a regiment to serve for three months.[613]  The Rhode Island army was to be "composed of six Men as Soldiers of every Hundred of the male Inhabitants of Sixteen Years of Age, and upwards."[614]  As the quota indicates, at least some of the soldiers were to be raised by conscription, with each town to supply a quota if there were not sufficient volunteers. The soldiers of this regiment had the option of having the town provide their arms, or an enlistment bonus was available for soldiers who furnished their own arms.[615]

This policy of soldiers providing their own arms was typical during the Revolution.[616]  The Continental Army generally refused volunteers who could not supply their own arms.[617]  State armies sometimes accepted unarmed volunteers, while offering bonuses to recruits with their own arms.[618]

A new militia law was enacted in 1779.[619]  The new law would be Rhode Island's militia act when it ratified the Second Amendment on June 7, 1790.[620]  The lower age limit remained at 16, but the upper age limit dropped to 50.[621]  "[E]ach and every effective Man as aforesaid [had to] provide, and at all times be furnished, at his own Expence (excepting such Persons as the Town-Councils of the Towns in which they respectively dwell or reside shall adjudge unable to purchase the same) with one good Musquet, and a Bayonet fitted thereto, with a Sheath and Belt, or Strap, for the same, one Ram-rod, Worm, Priming-wire and Brush, and one Cartouch-Box."[622]

---

[606] *Id.*

[607] THE CHARTER AND THE ACTS AND LAWS OF HIS MAJESTIES COLONY OF RHODE-ISLAND, AND PROVIDENCE-PLANTATIONS IN AMERICA, 1719, at 86 (Sidney S. Rider, ed. 1895), https://archive.org/details/thecharteractsla00rhod/page/86.

[608] *Id.* at 87.

[609] An Act in Addition to the several Acts regulating the Militia in this Colony, 1755 R.I. Laws, Jan. Sess. 71.

[610] *Id.*

[611] An Act in addition to, and Amendment of the several Acts regulating the Militia, 1756 R.I. Laws,  Feb. Sess. 73.

[612] An Act in addition to, and amendment of, an Act entitled "An Act regulating the Militia of this Colony," 1774 R.I. Laws, Dec. Sess. 150.

[613] An Act for raising a Regiment, to serve for Three Months, 1776 R.I. Laws, Nov. Called Sess. 6.

[614] *Id.*

[615] *Id.* at 7.

[616] JOHNSON ET AL., *supra* note 18, at 283.

[617] *Id.*

[618] *Id.*

[619] An Act for the better forming, regulating and conducting the military Force of this State, 1779 R.I. Laws, Oct. Regular Sess. 29.

[620] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 312-13.

[621] An Act for the better forming, regulating and conducting the military Force of this State, *supra* note 619, at 29.

[622] *Id.* at 32.

EXHIBIT 17
0443
Electronic copy available at: https://ssrn.com/abstract=3205664

Then in 1781 Rhode Island passed a law to raise a militia force of 1,200 men, with the statutory guarantee that the term of service would be only one month, and they were "not to be marched out of" the state.[623] The number of men each county raised depended on the number of militia-aged men (16 to 50) within that county.[624] "[E]ach of the non-commissioned Officers and Soldiers" had to "furnish himself with a good Musket, Bayonet, Cartouch-Box, Knapsack, and Blanket."[625] Later that year, a similar law aimed to raise another 500 "able-bodied effective Men."[626] Again, the number of required recruits per county was based on the number of militia-aged men within the county.[627] Arms were the same as before, except that "a good Fire-Arm," was sufficient, rather than only a musket.[628]

Following the 1792 federal UMA, a 1794 law adopted the federal ages and arms.[629] More militia laws were passed in 1795, 1796, 1798, and 1799, none of them altering ages or arms.[630]

## J. Vermont: "the freemen of this Commonwealth, and their sons"

Vermont declared its independence from the competing claims of New York and New Hampshire in January 1777.[631] A constitution was adopted in July.[632] Because New York and New Hampshire still claimed Vermont, Vermont was rebuffed from its attempt to send delegates to Congress. So, starting in 1777, it operated as something of an independent republic. Vermont had its own currency and postal service, and exchanged ambassadors with France and the Netherlands.[633] In 1791, Vermont applied to join the Union, and was admitted.[634]

The 1777 Vermont Constitution drew on Pennsylvania's 1776 Constitution, which was the first state constitution adopted after the Declaration of Independence.[635] Vermont copied

---

[623] An Act for embodying and bringing into the Field Twelve Hundred able-bodied effective Men, of the Militia, to serve within this State for One Month, from the Time of their Rendezvous, and no longer Term, and not to be marched out of the same, 1781 R.I. Laws, Feb. Adjourned Sess. 5.

[624] *Id.*

[625] *Id.* at 8.

[626] An Act for incorporating and bringing into the Field Five Hundred able-bodied effective Men, of the Militia, to serve within this State for one Month, from the Time of their Rendezvous, and no longer, and not to be marched out of the same, 1781 R.I. Laws, May Second Sess. 11.

[627] *Id.*

[628] *Id.* at 15.

[629] An Act to organize the Militia of this State, 1794 R.I. Laws, Mar. Adjourned Sess. 14.

[630] An Act establishing a Company of Horse, by the Name of The Independent Light Dragoons of the Second Regiment of Militia in the County of Newport, 1795 R.I. Laws, Jan. Adjourned Sess. 33; An Act in Addition to, and Amendment of, the Act entitled "An Act to organize the Militia of this State," 1796 R.I. Laws, Feb. Adjourned Sess. 33; An Act for calling out the Militia, 1798 R.I. Laws, June Adjourned Sess. 13; An Act in Addition to an Act, entitled "An Act to organize the Militia of this State," 1799 R.I. Laws, Feb. Sess. 17.

[631] Harvey Strum & Paul G. Pierpaoli, Jr., *Vermont*, in THE ENCYCLOPEDIA OF THE WARS OF THE EARLY AMERICAN REPUBLIC, 1783-1812: A POLITICAL, SOCIAL, AND MILITARY HISTORY 705 (Spencer C. Tucker et al. eds. 2014).

[632] *Id.*; Celise Schnieder, *The Green Mountain Boys Constitute Vermont*, in THE CONSTITUTIONALISM OF AMERICAN STATES 79 (George E. Connor & Christopher W. Hammons eds. 2008); Sanford Levinson, *The 21st Century Rediscovery of Nullification and Secession in American Political Rhetoric: Frivolousness Incarnate, or Serious Arguments to be Wrestled With?* 67 ARK. L. REV. 17, 49 (2014). *See generally* FREDERIC FRANKLYN VAN DE WATER, THE RELUCTANT REPUBLIC: VERMONT, 1724-91 (1941); Peter S. Onuf, *State-Making in Revolutionary America: Independent Vermont as a Case Study*, 67 J. AM. HIST. 797 (1981).

[633] Strum & Pierpaolia, *supra* note 631.

[634] Levinson, *supra* note 631, at 50.

[635] Schnieder, *supra* note 632, at 82.

EXHIBIT 17
0444
Electronic copy available at: https://ssrn.com/abstract=3205664

Pennsylvania's right to hunt: "that the inhabitants of this State, shall have liberty to hunt and fowl, in seasonable times, on the lands they hold, and on other lands (not enclosed)."[636]

Vermont's Declaration of Rights included human rights language, based on models from Pennsylvania, Massachusetts, and Virginia, that would, with variations in wording, become ubiquitous in American state constitutions:

> That all men are born equally free and independent, and have certain natural, inherent and unalienable rights, amongst which are the enjoying and defending life and liberty; acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety.[637]

and

> That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore, is bound to contribute his proportion towards the expense of that protection, and yield his personal service, when necessary, or an equivalent thereto.[638]

This language is irreconcilable with a law that requires a person to contribute his personal service but deprives that person of the right to protect his own life.

The Constitution further provided "[t]hat the people have a right to bear arms for the defence of themselves and the State."[639]  This language is irreconcilable with a law that requires a person to bear arms for the defense of the state but would prohibit that person from bearing arms for defense of himself.

The Vermont Constitution's Declaration of Rights was separate from the Plan or Frame of Government.[640]  The latter provided that "[t]he freemen of this Commonwealth, and their sons, shall be trained and armed for its defence, under such regulations, restrictions and exceptions, as the General Assembly shall, by law, direct."[641]

In 1779, Vermont enacted a statute "for forming and regulating the militia; and for encouragement of military skill, for the better defence of this state."[642]  It provided that "all male persons, from sixteen years of age to fifty, shall bear arms."[643]  The arms mandate was not militia-only; it applied to "every listed soldier and other householder."[644]

The firearm could be "a well fixed firelock, the barrel not less than three feet and a half long, or other good fire-arms."[645]  The edged arm was to be "a good sword, cutlass, tomahawk or

---

[636] VT. CONST. ch. II, art. XXXIX (1777), http://avalon.law.yale.edu/18th_century/vt01.asp.
[637] Id. at ch. II, art. I.
[638] Id. at ch. I, art. IX.
[639] Id. at ch. I, art. XV.
[640] See id. at ch. I-II.
[641] Id. at ch. II, art. 5.
[642] VERMONT STATE PAPERS, BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT; TOGETHER WITH THE JOURNAL OF THE COUNCIL OF SAFETY, THE FIRST CONSTITUTION, THE EARLY JOURNALS OF THE GENERAL ASSEMBLY, AND THE LAWS FROM THE YEAR 1779 TO 1786, INCLUSIVE 305 (1823).
[643] Id. at 307.
[644] Id.
[645] Id.

EXHIBIT 17
0445

Electronic copy available at: https://ssrn.com/abstract=3205664

bayonet."[646]  For cleaning, a soldier or "other householder" needed "a worm, and priming-wire, fit for each gun." Suitable ammunition storage for a solider could be with "a cartouch box, or powder-horn and bullet-pouch."[647]  Adequate supplies were at least a pound of gun powder, four pounds of bullets, "and six good flints."[648]

Militia regulations were changed twice in 1780, and again in 1781,[649] but the age limits and arms requirements were not impacted.[650]

In 1786, Vermont wrote a new constitution.[651]  The convention entertained and rejected a proposal to change the 1777 language of "a right to bear arms for the defence of themselves and the State" into "a right to bear arms for the defence of the community."[652]

The same year, a new militia act kept the minimum militia age at 16, but lowered the maximum age to 45.[653]  The gun mandate was changed to "a good musket or firelock."[654]  The bayonet was now mandatory.[655]  The new law made separate provisions for horsemen; each dragoon had to provide "a case of good pistols, a sword or cutlass not less than three and one half feet in length," plus a pound of gunpowder, "three pounds of sizeable bullets," and eight flints.[656]  Since horsemen would have at least two guns (the pair of handguns) they needed a bigger supply of flints.[657]

Ages and arms were kept the same in the 1787 militia act.[658]  This was the act in effect when Vermont ratified the Second Amendment on November 3, 1791.[659]

In 1793, Vermont revised its constitution again and also passed a militia act in response to the federal UMA. Vermont's 1793 constitution kept the same arms guarantees as before.[660]  The new militia act repealed all previous militia laws.[661]  The new law applied to "each and every free, able-bodied white male citizen . . . who is, or shall be of the age of sixteen years, and under the age of forty-five."[662]  Like New Hampshire, Vermont diverged from the federal act by keeping a minimum militia age of sixteen.[663]

Every non-commissioned officer and private had to "constantly keep himself provided with a good musket, with an iron or steel rod, a sufficient bayonet and belt, two spare flints, a priming wire and brush, and a knapsack ; a cartridge box and pouch, with a box therein, sufficient to contain

[646] *Id.*

[647] *Id.*

[648] *Id.*

[649] 1781 Vt. Acts Feb. Sess. viii.

[650] VERMONT STATE PAPERS, *supra* note 642, at 415; 1780 Vt. Acts Mar. Sess. i.

[651] VERMONT STATE PAPERS, *supra* note 642, at 518; VT. CONST. (1786), http://avalon.law.yale.edu/18th_century/vt02.asp (last visited Jan. 13, 2019).

[652] VERMONT STATE PAPERS, *supra* note 642, at 518.

[653] 1786 Vt. Acts Oct. Sess. 6.

[654] *Id.*

[655] *Id.* at 8.

[656] *Id.* at 7.

[657] *Id.*

[658] 1787 Vt. Acts Feb. & Mar. Sess. 94.

[659] JOURNAL OF THE FIRST SESSION OF THE SENATE OF THE UNITED STATES OF AMERICA, BEGUN AND HELD AT THE CITY OF NEW YORK, MARCH 4, 1789, AND IN THE THIRTEENTH YEAR OF THE INDEPENDENCE OF THE SAID STATES 377-78 (1820).

[660] VT. CONST. (1793).

[661] 1793 Vt. Acts – Oct. Sess. 19.

[662] *Id.* at 20.

[663] 1 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD, 1679-1702, at 221 (Albert Stillman Batchellor ed., 1904).

EXHIBIT 17
0446

Electronic copy available at: https://ssrn.com/abstract=3205664

not less than twenty-four cartridges suited to the bore of his musket."[664]  Horsemen were required to provide themselves with "a pair of pistols, and sabre, and cartridgebox to contain twelve cartridges for pistols."[665]  Cavalry officers needed "a pair of pistols, and sword."[666]

## K. Virginia: "ALL men that are fittinge to beare armes, shall bringe their peices to the church"

Virginia enacted a myriad of laws in the seventeenth century regarding firearms ownership, many of which allowed or required 18-to-20-year-olds to bear arms.  It was not until 1639 that Virginia enacted a statute expressly requiring arms ownership.[667]  Previous statutes simply assumed that everyone already did possess arms, and thus ordered arms-carrying when traveling, going to church, or working in the fields.  The church mandate reflected the general risks of travel, and the more specific risk that when a large number of people are densely gathered indoors, they are easy targets for hostiles intent on mass killing.

- 1623: "That no man go or send abroad without a sufficient partie will armed."[668]

- 1624: "That men go not to worke in the ground without their arms (and a centinell upon them)."[669]

- 1624: "That the commander of every plantation take care that there be sufficient of powder and amunition within the plantation under his command and their pieces fixt and their arms compleate."[670]

- 1632: "NOE man shall goe or send abroade without a sufficient party well armed."[671]

- 1632: "NOE man shall goe to worke in the grounds without theire armes, and a centinell uppon them"[672]

- 1632: "ALL men that are fittinge to beare armes, shall bringe their pieces to the church"[673]

---

[664] 1793 Vt. Acts – Oct. Sess. at 30.

[665] *Id.* at 26.

[666] *Id.*

[667] 1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 226 (1809).

[668] *Id.* at 127.

The above dates are listed by the New Style year, whose new year begins on January 1.  Until 1752, Englishmen used the Old Style calendar, whose new year begins on March 25.  Thus, the above enactment in March is 1624 to the modern reader but was considered 1623 by Virginians of the time.

[669] *Id.*

[670] *Id.*

[671] *Id.* at 173.

[672] *Id.*

[673] *Id.*

EXHIBIT 17
0447
Electronic copy available at: https://ssrn.com/abstract=3205664

- 1632: "NOE man shall goe to worke in the grounds without theire armes, and a centinell uppon them places where the commander shall require it"[674]

- 1632: "ALL men that are fittinge to beare armes, shall bringe their peices to the church"[675]

- 1639: "ALL persons except negroes to be provided with arms and ammunition or be fined at pleasure of the Governor and Council"[676]

- 1643: "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"[677]

- 1645: "all negro men and women, and all other men from the age of 16 to 60" could be drafted to carry on war against the Indians.[678] This indicates that persons over 16 were considered capable of bearing arms.

- 1659: "That every man able to beare armes have in his house a fixt gunn two pounds of powder and eight pound of shott at least"[679]

- 1662: "that every man able to beare armes have in his house a fixed gun, two pound of powder and eight pound of shot at least"[680]

- 1676: "that in goeing to churches and courts in those tymes of danger, all people be enjoyned and required to goe armed for their greate security"[681]

Also in 1676, Virginia enacted a law "for the safeguard and defence of the country against the Indians."[682] The number of militiamen to be supplied by the counties was based on "the number of tytheables of each county."[683] Persons over 16 were considered titheable (required to pay a tax), thus indicating that the minimum age for the militia was 16.[684]

Laws in 1676 expressly authorized persons to carry arms anywhere, but not in large groups. After a short-lived rebellion involving crowds of armed men, the legislature prohibited armed gatherings of more than five people:

> whereas by a branch of an act of assembly made in March last, liberty is granted to
> all persons to carry their armes wheresoever they goe, which liberty hath beene

---

[674] *Id.* at 198.

[675] *Id.*

[676] *Id.* at 226.

[677] *Id.* at 263.

[678] *Id.* at 292.

[679] *Id.* at 525.

[680] 2 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 126 (1823).

[681] *Id.* at 333.

[682] *Id.* at 326.

[683] *Id.* at 350.

[684] *Id.* at 84 (defining what persons are tithable).

68

EXHIBIT 17
0448

Electronic copy available at: https://ssrn.com/abstract=3205664

found to be very prejudiciall to the peace and wellfaire of this colony. Bee it therefore further enacted by this present grand assembly, and the authority thereof, and it is hereby enacted, that if any person or persons shall, from and after publication of this act, presume to assemble together in armes to the number of five or upwards without being legally called together in armes the number of five or upwards, they be held deemed and adjudged as riotous and mutinous, and that they be proceeded against and punished accordingly.[685]

Acts passed in 1679[686] and 1682[687] made no changes to the ages or arms requirements of militiamen. In 1684, arms requirements were made more specific, and separate standards were enacted for mounted militiamen:[688]

every trooper of the respective colonies of this country, shall furnish and supply himself with a good able horse, saddle, and all arms and furniture, fitt and compleat for a trooper, and that every foot soldier, shall furnish himselfe, with a sword, musquet and other furniture fitt for a soldier, and that each trooper and foot soldier, be provided with two pounds of powder, and eight pounds of shott, and shall continually keep their armes well fixt, cleane, and fitt for the king's service.[689]

These more specific arms requirements were complemented by another law establishing troops of horsemen.[690] Horsemen's arms requirements were now more detailed, requiring three guns: "a case of pistolls, a carbine, sword and all other furniture usuall and necessary for horse souldiers or troopers."[691]

Militia-related acts were passed in 1692,[692] 1693,[693] 1695,[694] and 1699,[695] but none of them addressed age limits or arms requirements.

In 1701, "An act for the better strengthening the frontiers and discovering the approaches of an enemy" was passed.[696] It provided 500-acre land grants, with the proviso that the grantee keep "upon the said land one christian man between sixteen and sixty years of age perfect of limb, able and fitt for service."[697] Such men should be "continually provided with a well fixt musquett or fuzee, a good pistoll, sharp simeter, tomahauk and five pounds of good clean pistoll powder and

---

[685] *Id.* at 381. The precipitating event was Bacon's Rebellion, a short-lived uprising of frontiersman who marched on the capital because they were disgruntled with the colonial government's failure to protect them from Indians. *See* JAMES D. RICE, TALES FROM A REVOLUTION: BACON'S REBELLION AND THE TRANSFORMATION OF EARLY AMERICA (2013).

[686] 2 HENING, *supra* note 682, at 433.

[687] *Id.* at 498.

[688] 3 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 13 (1823).

[689] *Id.* at 14.

[690] *Id.* at 17.

[691] *Id.*

[692] *Id.* at 98, 115.

[693] *Id.* at 119.

[694] *Id.* at 126.

[695] *Id.* at 176.

[696] *Id.* at 205.

[697] *Id.*

EXHIBIT 17
0449
Electronic copy available at: https://ssrn.com/abstract=3205664

twenty pounds of sizable leaden bulletts or swan or goose shott to be kept within the fort directed by this act besides the powder and shott for his necessary or usefull shooting at game..."[698] In other words, the frontier guardians would keep at home small quantities of gunpowder for ordinary use, but their larger reserves of gunpowder would be kept in a fort. The gunpowder of the time was blackpowder, which is volatile, so large quantities often were centrally stored, ideally in reinforced brick buildings.[699]

Virginia's first elaborate militia act was passed in 1705.[700] The militia included "all male persons whatsoever, from sixteen to sixty years of age . . . to serve in horse or foot."[701] An infantryman needed "a firelock, muskett or fusee well fixed, a good sword," cartridge box, and ammunition.[702] He had to bring six rounds of ammunition to muster. Additionally, he had to "have at his place of abode two pounds of powder and eight pounds of shott, and bring the same into the field with him when thereunto specially required."[703]

A horseman needed the usual tack and ammunition accoutrements along with a pair of pistols and a sword.[704] He had to bring eight rounds of ammunition to muster.[705] At his usual place of abode, he also had to keep a well fixed carabine, two pounds of powder and eight pounds of shot.[706]

The act made it unlawful for creditors to seize a militiaman's arms as payment for debts.[707] If a creditor nevertheless took someone's militia equipment, the seizure would "be unlawful and void."[708] Any "officer or person that presumes to make or serve the same" (e.g., a sheriff serving a writ of attachment) would "be lyable to the suit of the party grieved, wherein double damages shall be given upon recovery."[709] Later in the century, the federal UMA would likewise make militia equipment immune from seizure for debts.[710]

Subsequent Virginia acts of 1705[711] and 1711[712] kept the age and arms rules. A 1720 act appropriated one thousand pounds to distribute "to each christian titheable [subject to taxation], one firelock, musket, one socket,[713] bayonet fitted thereto, one cartouch box, eight pounds bullet, two pounds powder, until the whole one thousand pounds be laid out."[714]

---

[698] *Id.* at 206-07.

[699] JOHNSON ET AL., *supra* note 18, at 250.

[700] 3 HENING, *supra* note 688, at 335.

[701] *Id.* at 336.

[702] *Id.*

[703] *Id.*

[704] *Id.* at 338.

[705] *Id.*

[706] *Id.*

[707] *Id.* (The required arms and accoutrements were "free and exempted at all times from being impressed upon any account whatsoever, and likewise from being seized or taken by any manner of distress, attachment, or writt of execution.")

[708] *Id.*

[709] *Id.*

[710] 1 Stat. 271, § 1 (1792) ("And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.").

[711] 3 HENING, *supra* note 688, at 362.

[712] 4 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9 (1823).

[713] Located near the muzzle of a gun, the socket was used to attach the bayonet to the gun, so that the gun could be used as a pole-arm at close quarters. J.N. GEORGE, ENGLISH GUNS AND RIFLES 80-81 (1947).

[714] 4 HENNIG, *supra* note 712, at 77-78.

EXHIBIT 17
0450
Electronic copy available at: https://ssrn.com/abstract=3205664

A 1723 act made "the colonel, or chief officer of the militia of every county, have full power and authority to list all free male persons whatsoever, from twenty-one to sixty years of age, within his respective county, to serve in horse or foot."[715]  However, "nothing in this act contained, shall hinder or debar any captain from admitting any able-bodied white person, who shall be above the age of sixteen years, to serve in his troop or company, in the place of any person required by this act to be listed."[716]  In other words, 16-20-year-olds could be hired or could volunteer as substitutes for older men.

The arms requirements were elaborate.  For horsemen, a good serviceable horse, tack accoutrements, "holsters, and a case of pistols, cutting sword, or cutlace, and double cartouch box."[717]  At home, they had to keep a carbine, plus "one pound of powder, and four pounds of shot."[718]

Infantry needed "a firelock, musquet, or fuzee, well fixed, and bayonet fitted to such musquet or fuzee, or a good cutting sword or cutlace," along with the cartridge box.[719]  Reserves to be kept at home were the same powder and shot as for horsemen.[720]

Again, militiamen's arms were immune from creditors.[721]

Acts passed in 1727,[722] 1732,[723] and 1734[724] made no changes to the militia ages or arms.

Virginia's 1738 act "for the settling and better Regulation of the Militia,"[725] appears to be the only militia act in the colonial or founding era that excluded persons aged 18-to-20.  The militia under this act consisted of "all male persons, above the age of one and twenty years."[726]

With the French & Indian War underway, Virginia passed several militia-related acts in 1757. The first act augmented the already-existing forces in the field by allowing officers to add certain men between 18 and 50.[727]  Reflecting a still greater need for additional forces, Virginia's 1757 militia act restored the minimum age to 18 and set the maximum age at 60.[728]  Soldiers had to

---

[715] *Id.* at 118.

[716] *Id.* at 125.

[717] *Id.*

[718] *Id.*

[719] *Id.*

[720] *Id.* at 120.

[721] *Id.* at 121.

> And for an encouragement of every soldier to provide and furnish himself, according to the directions of this act, and his security to keep his horse, arms and ammunition, when provided, *Be it enacted, by the authority aforesaid*, That the horses and furniture, arms and ammunition, provided and kept, in pursuance of this act, be free and exempted at all items from being impressed upon any account whatsoever; and likewise, from being seized or taken by any manner of distress, attachment, or writ of execution. And that every distress, seizure, attachment, or execution, made or served upon any of the premises, be unlawful and void: And that the officer or person that presumes to make or serve the same, be liable to the suit of the party grieved: wherein double damages shall be given upon a recovery.

[722] *Id.* at 197.

[723] *Id.* at 323.

[724] *Id.* at 395.

[725] 5 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 16 (1823).

[726] *Id.*

[727] 7 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 69, 70 (1823).

[728] *Id.* at 93.

EXHIBIT 17
0451

Electronic copy available at: https://ssrn.com/abstract=3205664

furnish themselves with "a firelock well fixed, a bayonet fitted to the same," and keep an extra pound of powder and "four pounds of ball" at home.[729]

Three other acts were passed in 1757; the first preventing mutiny and desertion,[730] the second preventing invasions and insurrections,[731] and the third protecting against Indian attacks.[732] None addressed militia ages.

Acts passed in 1758[733] and 1759[734] made no changes to the militia's age limits or arms requirements.

Like other colonies, Virginia had various exemptions from militia duty. A 1762 amendment ensured that "every person so exempted shall always keep in his house or place of abode such arms, accoutrements, and ammunition, as are by the [1757] act required to be kept by the militia."[735] The 1757 act was continued in 1771.[736]

The American Revolution began on April 19, 1775, when armed Americans resisted British attempts to seize firearms and gunpowder at Lexington and Concord, Massachusetts. In Virginia, A Convention of Delegates for the Counties and Corporations in the Colony of Virginia was held in the summer of 1775. The first enactment of the Convention was "An ordinance for raising and embodying a sufficient force, for the defence and protection of this colony."[737] The ordinance established militia age limits of 16 and 50.[738] Every militiaman had to "furnish himself with a good rifle, if to be had, or otherwise with a tomahawk, common firelock, bayonet, pouch, or cartouch box, three charges of powder and ball, and appear with the same at the place appointed for mustering, and shall constantly keep by him one pound of powder and four pounds of ball."[739]

In 1777, Virginia passed its first militia act as a state, with Patrick Henry as governor.[740] "An Act for regulating and disciplining the Militia" applied to "all free male persons, hired servants [not indentured], and apprentices, between the ages of sixteen and fifty years."[741] "The county lieutenant, colonels, lieutenant colonels, and major" had to appear "with a sword."[742] Every

---

[729] *Id.* at 94. This act was continued in 1759. *Id.* at 274.

[730] *Id.* at 87. This act was continued in 1758, *id.* at 169, and 1759, *id.* at 280.

[731] *Id.* at 106. This act was continued in 1758, *id.* at 237, and 1759, *id.* at 384.

[732] *Id.* at 121.

[733] *Id.* at 171. This act was amended in 1758, but the ages and arms of militiamen remained unchanged. *Id.* at 251.

[734] *Id.* at 279.

[735] *Id.* at 534, 537. The printed volume does not have a page 535 or 536.

[736] 8 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 503 (1823).

[737] 9 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9 (1823). According to the statutory compiler, "In the original, the title of this ordinance is wanting; nor are any of the chapters numbered. The title is here inserted from the Chancellors' Revisal, edi 1785, p. 30, and the late edition of the Ordinances of 1816, p. 29." *Id.*

[738] *Id.* at 16.

[739] *Id.* at 28. A militia ordinance passed at the Convention held the following year did not change the militia ages. *Id.* at 139. Nor did an act passed in October of 1776. *Id.* at 267.

A report from July 28, 1775, mentioned a British major who was killed in action, and had four balls lodged in his body. "The Americans load their rifle-barrel guns with a ball slit almost in four quarters, which when fired out of those guns breaks into four pieces and generally does great execution." Alexander Purdie, VA. GAZETTE (Oct. 20, 1775), http://research.history.org/DigitalLibrary/va-gazettes/VGSinglePage.cfm?IssueIDNo=75.P.74.

[740] 9 HENNIG, *supra* note 737, at 267.

[741] *Id.* This act was amended in 1781, but the amendment did not change the required arms or ages. 10 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 416 (1823).

[742] 9 HENING, *supra* note 737, at 268.

EXHIBIT 17
0452

Electronic copy available at: https://ssrn.com/abstract=3205664

captain and lieutenant needed a "firelock and bayonet, a cartouch box, a sword, and three charges of powder and ball."[743]  Ensigns needed a sword.[744]  Non-commissioned officers and privates had to have

> a rifle and tomahawk, or good fire-lock and bayonet, with a pouch and horn, or a cartouch or cartridge box, and with three charges of powder and ball; and, moreover, each of the said officers and soldiers shall constantly keep one pound of powder and four pounds of ball, to be produced whenever called for by his commanding officer.[745]

Virginia also passed an act in 1777 to raise troops for the Continental Army.[746]  "[A]ble bodied young men above the age of sixteen years" were eligible for enlistment.[747]

Another 1777 act required "all free born male inhabitants of this state, above the age of sixteen years" to "renounce and refuse all allegiance to George the third" and swear to "be faithful and bear true allegiance to the commonwealth of Virginia, as a free and independent state."[748]  Because 16-year-olds were old enough to fight, they were old enough to decide whether their loyalty lay with the king or the commonwealth.

Another statewide law in 1777 left arms and ages unchanged.[749]

The militia laws had educational exemptions, but these were tightened in May 1777, by "An act for regulating and disciplining the militia of the city of Williamsburg and borough of Norfolk."[750]  Its purpose was "FOR forming the citizens of Williamsburg, borough of Norfolk, and the professors and students of William and Mary college, into a militia."  The William & Mary militia included "all male persons between the ages of sixteen and fifty years."[751]

Later that year, an October 1777 "Act for speedily recruiting the Virginia Regiments on the continental establishment and for raising additional troops of Volunteers" called for drafting single men above eighteen and with no children for the Continental Army.[752]

Virginia passed many militia laws in 1778, but none of these changed the militia ages or arms.[753]  Nor did the militia-related acts passed in 1779.[754]

Three acts regarding the militia were passed in 1781.  The first was "to raise two legions for the defence of the state."[755]  Neither this act, nor its amendment added that same year, altered the arms or ages of militiamen.[756]

---

[743] *Id.*

[744] *Id.*

[745] *Id.* at 268-69.

[746] *Id.* at 275.

[747] *Id.*

[748] *Id.* at 281.

[749] *Id.* at 291.

[750] *Id.* at 313.

[751] *Id.*

[752] *Id.* at 337, 339.

[753] *Id.* at 445, 449, 452, 454, 458.

[754] 10 HENING, *supra* note 741, at 18, 23, 28, 32, 83.  One act, entitled "An Act for raising a body of Volunteers for the defence of the commonwealth," allowed two battalions responsible for protecting the western frontiers to furnish themselves "with such clothing, arms, and accoutrements, as are most proper for that service." *Id.* at 20.

[755] *Id.* at 391.

[756] *Id.* at 410.

EXHIBIT 17
0453
Electronic copy available at: https://ssrn.com/abstract=3205664

The second 1781 act was "for ascertaining the number of militia in this state."[757]  It ordered "captains or commanding officers of the respective companies in their several counties," to make "an exact list of each company, distinguishing all such as are under eighteen years of age."[758]

The third 1781 act was "for enlisting soldiers to serve in the continental army."[759]  It made no mention of arms or ages, but it did require that a Continental soldier be at least "five feet four inches tall."[760]

A 1782 act added some equipment detail for cavalry: "horseman's sword and cap, one pistol, and a pair of holsters."[761]

In 1784, Virginia increased its militia's minimum age to 18, and kept the maximum age at 50.[762]  Militiamen were required to appear "armed, equipped, and accoutred" according to rank.[763]  "The county lieutenants, lieutenant colonels commandant, and majors, with a sword; the captains, lieutenants, and ensigns, with a sword and espontoon."[764]  Noncommissioned officers and privates needed to supply themselves "with a good clean musket, carrying an ounce ball,[765] and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto."[766]  Plus also "a cartridge box properly made, to contain and secure twenty cartridges" and "a good knapsack and canteen."[767]

Previously, militiamen had simply been told to keep an extra pound of powder and four pounds of lead at home, and to bring it with them if they were called into action.  Now, to prove that they possessed such quantities, they had to bring to "every muster…twenty blind cartridges."[768]  Further "each sergeant shall have a pair of moulds fit [to] cast balls for their respective companies."[769]

Finally, "the militia of the counties westward of the Blue Ridge, and the counties below adjoining thereto," could forego the muskets, and instead choose "good rifles with proper accoutrements."[770]

The following year, Virginia passed the act[771] that defined its militia when it ratified the Second Amendment on December 15, 1791,[772] making the Amendment part of the Constitution.  Virginia ratified nine other amendments on the same day, enshrining them in the Constitution, and making December 15 the birthday of the Bill of Rights.[773]

---

[757] Id. at 396.

[758] Id.

[759] Id. at 433.

[760] Id.

[761] 11 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 173 (1823).

[762] Id. at 476.

[763] Id. at 478.

[764] Id.

[765] That meant 16 balls to the pound of lead.  This is slightly smaller than .69 caliber, which is 15 balls to the pound. Lead ball, per pound, RED RIVER BRIGADE (Jan. 26, 2014), http://www.redriverbrigade.com/lead-ball-per-pound/.

[766] 11 HENING, supra note 761, at 478-79.

[767] Id. at 479.

[768] Id.  The meaning of "blind cartridge" is obscure.  It may mean a standard paper cartridge.

[769] Id.

[770] Id.

[771] 12 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9 (1823).  This act was amended in 1786, but it did not impact the age limits or arms requirements. Id. at 234.

[772] JOURNAL OF THE FIRST SESSION OF THE SENATE OF THE UNITED STATES OF AMERICA, supra note 659, at 361.

[773] U.S. CONST. amends. I-X.

EXHIBIT 17
0454
Electronic copy available at: https://ssrn.com/abstract=3205664

The 1785 Virginia act included in the general militia "all free male persons between the ages of eighteen and fifty years."[774] Some young men would get extra training in a

> light company to be formed of young men, from eighteen to twenty-five years old, whose activity and domestic circumstances will admit of a frequency of training, and strictness of discipline, not practical for the militia in general, and returning to the main body, on their arrival at the latter period, will be constantly giving thereto a military pride and experience, from which the best of consequences will result.[775]

These light companies were "in all respects [] subject to the same regulations and orders as the rest of the militia."[776] For all the militia, the requisite arms were the same as before.[777]

On December 22, 1792, Virginia passed a new militia law in response to the federal Uniform Militia Act, to "carry the same into effect."[778] The act provided for the continuation of the same "light company" "of young men from eighteen to twenty-five years age" that had been established in Virginia's previous militia act.[779] The 1792 Virginia law made no changes in the age limits. A 1799 amendment did not address ages or arms.[780]

## L. Massachusetts Bay: "from ten yeares ould to the age of sixsteen yeares"

Virginia's ratification of the Second Amendment and of nine other Amendments made the Bill of Rights the supreme law of the land, effective December 15, 1791.[781] The three states that had not yet acted—Massachusetts, Georgia, and Connecticut—therefore had no reason to take up the issue. Yet in all three of these states, ratification of the Second Amendment and the rest of the Bill of Rights was placed on the legislative agenda in early 1939. These 1939 ratifications were apparently enacted to make a statement at a time when right-wing fascists (e.g., Mussolini, Hitler, Franco), and left-wing fascists (e.g., Stalin, Mao) were wantonly murdering disarmed victims. The first state to ratify in 1939 was Massachusetts, on March 2.[782]

In the colonial period and Founding Era, the Bay State had especially strong laws for mass armament. In 1631, Massachusetts Bay enacted a law mandating that all adult males be armed.[783]

---

[774] 12 HENING, *supra* note 771, at 10.

[775] *Id.* at 14-15.

[776] *Id.* at 15.

[777] *Id.* at 12.

[778] 13 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 340 (1823).

[779] *Id.* at 344.

[780] 2 THE STATUTES AT LARGE OF VIRGINIA: FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806 [I.E. 1807], INCLUSIVE, IN THREE VOLUMES, (NEW SERIES,) BEING A CONTINUATION OF HENING 141 (1835).

[781] U.S. CONST. amends. I-X.

[782] JOURNAL OF THE SENATE OF THE COMMONWEALTH OF MASSACHUSETTS 369 (1939). For the essential similarity of the totalitarian "fascist," "communist," or "national socialist" regimes, *see, e.g.*, Arthur M. Schlesinger, Jr., The Vital Center: The Politics of Freedom (1949).

[783] KYLE F. ZELNE, A RABBLE IN ARMS: MASSACHUSETTS TOWNS AND MILITIAMEN DURING KING PHILIP'S WAR 28 (2009).

EXHIBIT 17
0455
Electronic copy available at: https://ssrn.com/abstract=3205664

A 1637 statute required everyone 18 and older to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets."[784]

Young people of both sexes were expected to be proficient with arms. A 1645 statute mandated that "all youth within this jurisdiction, from ten yeares ould to the age of sixsteen yeares, shalbe instructed, by some one of the officers of the band,[785] or some other experienced souldier…upon the usuall training dayes, in the exercise of armes, as small guns, halfe pikes, bowes & arrows."[786] There was an exemption for conscientious objectors; youths would not have to train "against their parents minds."[787]

In the 1770 Boston Massacre, British soldiers fired on a crowd that was pelting them with stones and ice balls. John Adams served as defense attorney.[788] Both sides agreed that the soldiers and the crowd each had the right to carry arms for self-defense. "The court's charge to the jury asserted the traditional duty of private persons to respond to the hue and cry and to carry arms: 'It is the duty of all persons (except women, decrepit persons, and infants under fifteen) to aid and assist the peace officers to suppress riots & c. when called upon to do it. They may take with them such weapons as are necessary to enable them effectually to do it.'"[789]

As political tensions mounted, the British tried to suppress political meetings. They could not do so, for the Redcoats were far outnumbered by armed Americans, including teenagers. When British General sent two companies of Redcoats to dissolve an illegal town meeting in Salem, soldiers backed down when swarms of armed patriots began to appear.[790] Gage's aide John Andrews wrote:

> there was upwards of three thousand men assembled there from the adjacent towns, with full determination to rescue the Committee if they should be sent to prison, even if they were Oblig'd to repel force by force, being sufficiently provided for such a purpose; as indeed they are all through the country—every male above the age of 16 possessing a firelock with double the quantity of powder and ball enjoin'd by law.[791]

At the time Massachusetts ratified the Constitution on February 6, 1788, its militia laws provided for "the train-band to contain all able-bodied men, from sixteen to forty years of age, and the alarm-list all other men under fifty years of age."[792]

Every militiaman "not under the control of parents, masters or guardians, and being of sufficient ability therefore in the judgment of the selectmen of the town in which he shall dwell,"

---

[784] 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (Nathaniel B. Shurtleff ed., 1853).

[785] The "trained band." In American usage, either the militia in general, or an elite militia unit that received extra training. In British usage, only an elite unit.

[786] 2 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 99 (Nathaniel B. Shurtleff ed., 1853).

[787] *Id.*

[788] JOHN ADAMS, 3 LEGAL PAPERS OF JOHN ADAMS 5-6 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965).

[789] *Id.* at 285.

[790] RAY RAPHAEL, A PEOPLE'S HISTORY OF THE AMERICAN REVOLUTION: HOW COMMON PEOPLE SHAPED THE FIGHT FOR INDEPENDENCE 55 (2002).

[791] *Id.*

[792] I. THOMAS & E.T. ANDREWS, THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM THE ESTABLISHMENT OF ITS CONSTITUTION IN THE YEAR 1780 TO THE END OF THE YEAR 1800, at 339 (1801).

EXHIBIT 17
0456
Electronic copy available at: https://ssrn.com/abstract=3205664

had to "equip himself, and be constantly provided with a good fire-arm," plus a ramrod, cleaning tools, a bayonet and scabbard, a cartridge box to hold "fifteen cartridges at least," plus six flints, one pound of powder, forty leaden balls suitable for this firearm, a haversack, blanket, and canteen."[793]  Officers and cavalrymen had to provide themselves with horses plus associated equipment, and a carbine (a shorter, lighter-weight long gun, well-suited for use while mounted).[794]

Militiamen who failed to equip themselves with the required arms could be fined.[795]

Regarding militiamen who *were* "under the control of parents, masters or guardians," the parent, master, or guardian was responsible for providing the equipment, and could be fined for failure to do so.[796]  Both servants and young people who were living at home were, presumably, not yet earning enough income to live independently, so they might not be able to afford their own arms.

For older militiamen who were genuinely unable to afford arms, the town would be responsible for providing them.[797]  The donated arms remained town property and could not be sold by the militiaman.[798]

## M. Plymouth Colony: "each man servant"

By 1939, Plymouth had long ceased to exist as an independent political entity.  Even in the early days, it had been overshadowed by its larger and culturally similar neighbor, the Massachusetts Bay Colony.  In 1691, Plymouth chose assimilation with Massachusetts; it was a defensive measure, since New York was trying to annex Plymouth.[799]  So we cover Plymouth Colony in order with Massachusetts Bay.

Plymouth's first written arms mandate came in 1632.[800]  "[E]very freeman or other inhabitant must provide for himselfe and each under him able to beare arms a musket and other serviceable peece with bandeleroes and other apurtanances," plus two pounds of powder and 10 pounds of bullets.[801]  This was reenacted in 1636, specifying that it included "each man servant."[802]  As in Massachusetts, the master had to provide the arms for the servants, many of whom presumably could not afford their own.[803]

A 1643 update revised the required firearms.[804]  A comprehensive recodification in 1671 specified that the militia is "every man from the age sixteen and upwards."[805]  It also required smiths to repair arms and to charge the same rates they charged for other work.[806]  In 1676, old-

---

[793] *Id.* at 340-41.

[794] *Id.* at 347.

[795] *Id.* at 341.

[796] *Id.*

[797] *Id.*

[798] *Id.*

[799] DAVID S. LOVEJOY, THE GLORIOUS REVOLUTION IN AMERICA 347 (1972).

[800] THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 30-31 (William Brigham ed., 1836).

[801] *Id.* at 31.

[802] *Id.* at 44-45.

[803] *Id.*

[804] *Id.* at 74 (service guns should be matchlocks, snaphaunces [an early version of the flintlock], or flintlocks, not longer than four and a half feet, and of a bore at least the size of a caliver or a bastard musket).

[805] *Id.* at 285-86.

[806] *Id.* at 286.

EXHIBIT 17
0457
Electronic copy available at: https://ssrn.com/abstract=3205664

fashioned matchlocks (ignited by burning cord) were no longer acceptable for the militia; the gun had to be a flintlock or a snaphaunce (ignited by a spark from flint striking steel).[807]   A 1681 revision added the requirement to possess a sword or cutlass.[808]

Like the other colonies, Plymouth had many indentured servants.  After their term of service was completed, they became legally free.  The age of attaining freedom would vary of course, but it could include people in their late teens or early twenties.  Former male servants, or other male single persons, could not set up their own households unless they possessed the requisite arms and ammunition.[809]   If they did not, they had to work for someone who would buy the arms and ammunition for them.[810]

## N. Georgia: No going to church without arms

Georgia did not get around to ratifying the Second Amendment until March 18, 1939.[811]   It was only three days after Hitler had invaded Czechoslovakia.  As was the typical Nazi practice, one of the first acts of the dictatorship was to confiscate arms from the new subjects.[812]

In 1791, when the Second Amendment became part of the Constitution, Georgia required males between 16 and 50 to serve in the militia and provide their own arms.[813]   The arms requirement was "one rifle musket, fowling-piece or fusee fit for action, with a cartridge box or powder-horn answerable for that purpose with six cartridges or powder and lead equal thereto and three flints."[814]

A 1770 Georgia law, copied from South Carolina, imposed fines on those in the militia who came to church unarmed.[815]

---

[807] *Id*. at 184.

[808] *Id*. at 192.

[809] *Id*. at 35.

[810] *Id*.  On top of the individual requirement to possess arms, towns had to have their own: two flintlocks and two swords per 30 men. *Id*. at 84.  These could be available as a reserve in case of breakage during war; they could also be furnished to persons who could not afford their own.

[811] ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA 1414 (1939).

[812] *See*, *e.g.*, THE TIMES (London), Mar. 16, 1939, at 16b.

> Immediately a proclamation, bordered in red and bearing the German eagle and swastika which is now familiar to every Czech town and village, was posted…Under this proclamation no one was allowed in the streets after 8 p.m. . . .; all popular gatherings were forbidden; and weapons, munitions, and wireless sets were ordered to be surrendered immediately.  Disobedience of these orders, the proclamation ended, would be severely punished under military law.

[813] 19 (pt. 2) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 348 (Allen D. Candler ed., 1911), https://books.google.com/books?id=1TMTAAAAYAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

[814] *Id*. at 353.

[815] 19 (pt. 1), *id*. at 137-40.  Georgia continued to mandate the carrying of arms in non-militia contexts in the nineteenth century.  An 1806 law required "All male white inhabitants . . . from the age of eighteen to forty-five years . . . to appear and work upon the several roads, creeks, causeways, water-passages, and bridges" and to "carry with him one good and sufficient gun or pair of pistols, and at least nine cartridges to fit the same, or twelve loads of powder and ball, or buck shot." OLIVER H. PRINCE, DIGEST OF THE LAWS OF THE STATE OF GEORGIA 407, 409 (1822), https://books.google.com/books?id=9tUtYuEuWC0C&pg=PA339&dq=georgia+1786+laws&hl=en&sa=X&ved=0ahUKEwjj9Ym0nafeAhVhpoMKHaLIC0IQ6AEIRzAF#v=onepage&q=%22gun%22&f=false.

EXHIBIT 17
0458
Electronic copy available at: https://ssrn.com/abstract=3205664

## O. Connecticut: "all persons shall beare Armes that are above the age sixteene yeeres"

The Nutmeg State was also slow in its Second Amendment ratification, finally acting on April 19, 1939.[816]  The date was the anniversary of the battles of Lexington and Concord, when the American Revolution had begun in 1775.[817]  On that date, American militia and irregulars had repulsed British efforts to confiscate arms.  But 164 years later, totalitarianism was on the march. Italian tyrant Mussolini had invaded Albania on Good Friday, April 7, 1939, and conquered the small nation in a few days.[818]

When Connecticut was founded in 1636, its government ordered that "every souldier" should have "in his own howse in a readiness" two pounds of gunpowder and twenty lead bullets.[819]  A more detailed law in 1637 ordered "that all persons shall beare Armes that are above the age sixteene yeeres."[820]  Commissioners and church officers were exempt.[821]  "[E]very military man" had to have "continually in his house" half a pound of powder and two pounds of bullets.[822]  Towns were required to have specified reserves of gunpowder and lead bullets.[823]

Central stores of bullets and gunpowder were important in case of extended fighting.  The colonists' personal supplies of ammunition might run out.  During wartime, roads might be captured by the enemy, so a town might not be able to bring in more gunpowder and lead from outside.

In 1650, the colony ordered "[t]hat all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare Armes…; and every male person … aboue the said Age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the Clark of the Band."[824]

New Haven, a separate colony until 1662, required males 16 to 60 to have "a good serviceable gun…to be kept in a constant fitness in all Respects for service."[825]  Also necessary were a "a good sword," bandoleers, a powder horn, worm, scourer, priming wire, shot bag, charger, "and whatsoever else is necessary for such service."[826]  The ammunition minimum was at least "a pound of good powder" plus "four pounds of pistol bullets" or twenty-four long gun bullets, plus match

---

[816]  JOURNAL OF THE SENATE OF THE STATE OF CONNECTICUT, JAN. SESS., 1939: PART 2, at 1403 (1939), https://babel.hathitrust.org/cgi/pt?id=mdp.39015067981400;view=1up;seq=193.

[817]  *See, e.g.*, ALLEN FRENCH, THE DAY OF CONCORD AND LEXINGTON: THE NINETEENTH OF APRIL, 1775 (1984).

[818]  Albania had won its independence from the Ottoman Empire, in a 1908-12 war in which Albanians demanded, inter alia, the right to bear arms.  But in 1928 King Zog, an authoritarian ruler, had banned arms for all tribes but his own. OWEN PEARSON, ALBANIA AND KING ZOG: INDEPENDENCE, REPUBLIC AND MONARCHY 1908-1939, at 21, 26-27, 299, 304 (2005).

[819]  1 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 3 (J. Hammond Trumbull ed., 1850).

[820]  *Id.* at 15.

[821]  *Id.*

[822]  *Id.*

[823]  *Id.* at 15-16.

[824]  *Id.* at 542-43; CODE OF 1650, BEING A COMPILATION OF THE EARLIEST LAWS AND ORDERS OF THE GENERAL COURT OF CONNECTICUT 72-73 (Silas Andrus ed., 1822).

[825]  NEW-HAVEN'S SETTLING IN NEW-ENGLAND AND SOME LAWES FOR GOVERNMENT: PUBLISHED FOR THE USE OF THAT COLONY 60-61 (1656).

[826]  *Id.* at 61.  The worm was a device for cleaning the barrel and for extracting an unfired bullet from a firearm.  The priming wire was for cleaning the touch hole—the small hole where the fire from the priming pan connected with the main powder charge in the barrel.

EXHIBIT 17
0459
Electronic copy available at: https://ssrn.com/abstract=3205664

for a matchlock or flints for a flintlock.[827]

Connecticut ratified the Constitution a week after Georgia on January 9, 1788. Under the state law of the time, "[A]ll male Persons, from sixteen Years of Age to Forty-five, shall constitute the Military Force of this State."[828] Although not part of "the military force," all "Householders under fifty-five Years of Age" had to "be furnished at their own Expence" with the same arms as the militia.[829]

These arms were "a well fixed Musket, the Barrel not less than three Feet and an Half long, and a Bayonet fitted thereto, with a Sheath and Belt or Strap for the same."[830] Militiamen, males under fifty-five, and householders also needed a ramrod, worm, priming-wire, and cartridge box with "fifteen rounds of Cartridges, made with good Musket Powder and Ball, fitting his Gun."[831] Also needed were "six good Flints" and "one Canteen holding not less than three Pints."[832]

Light-Dragoons (horsemen) had to have "a Case of good Pistols…one Pound of good Powder, three Pounds of sizable Bullets, twelve Flints, a good pair of Boots and Spurs."[833]

## IV.    Federal Laws

The Continental Congress, consisting of delegates from the thirteen colonies,[834] began exercising powers of national sovereignty in 1774.[835] Independence was formally declared in 1776. In 1781, the Continental Congress turned into the Confederation Congress, when the Articles of Confederation were ratified.[836] During the Revolution, the Congress did its best to provide for the Continental Army. But management of the wartime militia was far beyond the administrative capacity of the Congress.

Under the Articles of Confederation, every state was obliged to "always keep up a well regulated and disciplined militia, sufficiently armed and accoutered."[837] While the militias were a state responsibility, the Confederation Congress could requisition the states to supply land forces "for the common defense."[838] Also, Congress could appoint militia officers above the rank of colonel when the state militia forces were in national service.[839] Under a federal requisition, the state legislature had the duty to "raise the men and cloath, arm and equip them in a soldier like manner," with the Confederation Congress paying the expense.[840]

The Confederation Congress drew up a militia plan, putting married men and single men in

---

[827] Id.

[828] ACTS AND LAWS OF THE STATE OF CONNECTICUT IN AMERICA 144 (1786).

[829] Id. at 145.

[830] Id. at 150.

[831] Id.

[832] Id.

[833] Id.

[834] Georgia was unrepresented at the 1774 Convention because it was preoccupied by an Indian uprising, and dependent on the British for supplies.

[835] *Documents from the Continental Congress and the Constitutional Convention, 1774 to 1789*, LIBR. CONGRESS, https://www.loc.gov/collections/continental-congress-and-constitutional-convention-from-1774-to-1789/articles-and-essays/timeline/1773-to-1774/ (last visited Jan. 13, 2019).

[836] ARTICLES OF CONFEDERATION OF 1781.

[837] ARTICLES OF CONFEDERATION OF 1781, art. VI.

[838] ARTICLES OF CONFEDERATION OF 1781, art. VII.

[839] Id.

[840] ARTICLES OF CONFEDERATION OF 1781, art. IX.

**EXHIBIT 17**
**0460**

Electronic copy available at: https://ssrn.com/abstract=3205664

different classes. The militia were to be "All the free male inhabitants of each state from 20 to fifty, except such as the laws of the State shall exempt, to be divided into two general classes; one class to consist of married and the other class of single men."[841] Required arms for infantry and dragoons were similar to, although less detailed than, the state laws.[842]

   The Articles of Confederation gave Congress few powers to legislate directly on the people, instead requiring Congress to act through the state governments. As far as we can tell, the 1783 congressional militia plan did not have much influence.

   The United States Constitution, proposed in 1787 and ratified in 1789, was intended to change things. Congress was given a list of enumerated powers, by which it could directly act on the people.[843] Article I, section 8 contained two militia clauses.[844] Clause 15 (the Calling Forth Clause) gave Congress power "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions."[845] Clause 16 (the Arming Clause) gave Congress power:

> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.[846]

   After several years of prodding by President Washington, Congress exercised its power to organize and to provide for arming the federal militia. The Militia Act of 1792 (Uniform Militia Act) was signed into law by President Washington on May 8, 1792.[847] The Act provided:

> That each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively

---

[841] 25 JOURNALS OF THE CONTINENTAL CONGRESS 741 (Oct. 23, 1783), https://memory.loc.gov/cgi-bin/query/r?ammem/hlaw:@field(DOCID+@lit(jc02544)).

[842] Each class to be formed into corps of Infantry and Dragoons, organized in the same manner as proposed for regular troops.

> Those who are willing to be at the expense of equipping themselves for Dragoon service to be permitted to enter into that corps, the residue to be formed into the Infantry; this will consult the convenience and inclinations of different classes of citizens.
>
> Each officer of the Dragoons to provide himself with a horse, saddle &c. pistols and sabre, and each non-commissioned officer and private with the preceding articles and these in addition, a carbine and cartouch box, with twelve rounds of powder and ball for his carbine, and six for each pistol.
>
> Each officer of the Infantry to have a sword, and each non-commissioned officer and private, a musket, bayonet and cartouch box, with twelve-rounds of powder and ball.

*Id.* at 741-42.

[843] U.S. CONST., art. I, § 8.

[844] U.S. CONST., art. I, § 8.

[845] U.S. CONST., art. I, § 8, cl. 15.

[846] U.S. CONST., art. I, § 8, cl. 16.

[847] More effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States,1 Stat. 271 (1792) (Uniform Militia Act) (UMA). The UMA was sometimes called the Second Militia Act, since a statute enacted earlier that year had provided a system for calling forth the militia in times of necessity. To provide for calling forth the Militia to execute the laws of the Union, suppress insurrections and repel invasions, 1 Stat. 264 (1792).

**EXHIBIT 17**
**0461**

Electronic copy available at: https://ssrn.com/abstract=3205664

be enrolled in the militia, by the Captain or Commanding Officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this Act. And it shall at all time hereafter be the duty of every such Captain or Commanding Officer of a company, to enroll every such citizen as aforesaid, and also those who shall, from time to time, arrive at the age of 18 years, or being at the age of 18 years, and under the age of 45 years (except as before excepted) shall come to reside within his bounds; and shall without delay notify such citizen of the said enrollment, by the proper non-commissioned Officer of the company, by whom such notice may be proved. That every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear so armed, accoutred and provided, when called out to exercise or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned Officers shall severally be armed with a sword or hanger, and espontoon; and that from and after five years from the passing of this Act, all muskets from arming the militia as is herein required, shall be of bores sufficient for balls of the eighteenth part of a pound; and every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.[848]

The legislative history of the Militia Act reveals why eighteen was selected as the minimum age. Secretary of War Henry Knox had presented an ambitious militia plan to Congress in 1790.[849] Knox wanted to create a national select militia, founded on intensive training of males aged 18 to 20.[850] Even in a Federalist-dominated Congress, the idea was anathema. As opponents pointed out, the nascent federal government did not have the administrative capability to establish an effective national militia.

For the more realistic 1792 statute, Knox explained that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen."[851] Knox acknowledged that "military age has generally commenced at sixteen," but Knox instead set the bar at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field."[852] Knox also stated that "all men of the legal military age should be armed."[853] Representative Jackson of Georgia agreed "that from eighteen to twenty-one was found to be the best age to make soldiers of."[854]

Knox's first, rejected, plan had implied that the select militia of 18-20 would be armed by the federal government. This brought stern objection:

---

[848] *Id.*
[849] 1 ANNALS OF CONG. app. 2141-61 (Jan. 18, 1790).
[850] *Id.* at 2146.
[851] *Id.*
[852] *Id.* at 2153.
[853] *Id.* at 2145-46.
[854] *Id.* at 1860.

EXHIBIT 17
0462
Electronic copy available at: https://ssrn.com/abstract=3205664

Representative Wadsworth warned that supporters of the federal arming proposal seemed to be suggesting that large segments of the population would be armed by the government, with the attendant dangers: "At first it appeared to be intended for the benefit of poor men who were unable to spare money enough to purchase a firelock: but the gentleman from Delaware (Mr. Vining) had mentioned apprentices and young men in their non-age: he would be glad to know whether there was a man within these walls, who wished to have so large a proportion of the community by the United States, and liable to be disarmed by the government, whenever it should be thought proper." Masters could be expected to furnish arms to their apprentices. As to other young men, "their parents would rather give them guns of their own, than let them take others from the U.S. which were liable to be taken away at the very moment they were most wanted."[855]

The notion that the federal government might be able to take provided arms away from 18-to-20-year-olds set off alarm bells.

The idea that 18-year-olds should be part of the militia was hardly controversial. They had been part of every colonial and state militia from the very beginning, except for a nineteen-year period in Virginia in the middle of the eighteenth century. George Washington believed that 18 was the ideal age for militia enrollment.[856] Nearly a decade before he signed the Militia Act of 1792, he wrote to Alexander Hamilton that, "the Citizens of America … from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency."[857]

Congress made no changes to the 1792 Militia Act until the Civil War, when an 1862 revision removed the word "white" from the definition of the militia.[858]

By the early twentieth century, the 1792 Act was in obvious need of revision. Muskets, powderhorns, and flints were no longer the appropriate equipment for militiamen. President Theodore Roosevelt, a gun enthusiast and National Rifle Association (NRA) member,[859] declared: "Our militia law is obsolete and worthless."[860]

A new law, the Dick Act (named for its sponsor, Charles Dick) repealed the 1792 Act and replaced it with the modern definition of the militia of the United States.[861] This militia consisted of all able-bodied male citizens between 18 and 45 years of age, and also aliens who have declared intent to naturalize.[862] The "organized militia" was the National Guard of the several States.[863]

---

[855] 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS: DEBATES IN THE HOUSE OF REPRESENTATIVES 62 (1992).

[856] 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938).

[857] *Id.*

[858] Militia Act of 1862, 12 Stat. 597 (July 17, 1862).

[859] For information on Roosevelt, guns, and the NRA, *see, e.g.,* THEODORE ROOSEVELT, HUNTING TIPS OF A RANCHMAN (NRA Heritage Library 1999) (1885); THEODORE ROOSEVELT, GOOD HUNTING: IN PURSUIT OF BIG GAME IN THE WEST (1907); Ashley Halsey, Jr., *Theodore Roosevelt, Trailblazer among Hunter-Conservationists,* THE AMERICAN RIFLEMAN, June 1972, at 14, 16.

[860] 14 MESSAGES AND PAPERS OF THE PRESIDENTS 6672 (Bureau of National Literature, 1917).

[861] Dick Act, ch. 196, 32 Stat. 775 (1903).

[862] *Id.*

[863] *Id.*

EXHIBIT 17
0463
Electronic copy available at: https://ssrn.com/abstract=3205664

Everyone else was part of the "reserve militia," which later statutes labeled the "unorganized militia."[864]

There was no mandate for personal possession of arms. Nor, except for the National Guard, was there any provision for the federal government to provide arms.

In the current version of the statute:

> (a) The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.
>
> (b) The classes of the militia are--
> (1) the organized militia, which consists of the National Guard and the Naval Militia; and
> (2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia.[865]

In 1903, Congress created the National Board for the Promotion of Rifle Practice (NBPRR).[866] It did not require citizens to possess arms or to practice with them, but it encouraged them to do so. The NBPRR developed a close relationship with the NRA, which had been founded in 1871, growing from concerns about the poor marksmanship of Union soldiers during the Civil War.[867] By statute, the NBPRR and the NRA were linked.[868] The NRA was the NBPRR's agent for distributing heavily discounted surplus arms to the American public, via NRA gun clubs.[869]

The National Guard Association (an association of state entities), the National Board for the Promotion of Rifle Practice (a federal entity), and the National Rifle Association (a membership organization) developed a close and mutually supportive relationship. Their boards of directors often overlapped.[870]

Through this relationship, over the course of the twentieth century the federal government put millions of military-grade firearms into the hands of private American citizens, including young adults aged 18 to 20. This bore fruit in World War II. With the National Guard federalized and

---

[864] *Id.*

[865] 10 U.S.C. § 246 (2019). There are various occupational exemptions; conscientious objectors may be required to perform noncombat duty. 10 U.S.C. § 247 (2019).

[866] *The National Matches History*, CIVILIAN MARKSMANSHIP PROGRAM http://thecmp.org/competitions/cmp-national-matches/the-national-matches-history/ (last visited Jan. 13, 2019).

[867] *A Brief History of the NRA*, NAT'L RIFLE ASS'N (2018), https://home.nra.org/about-the-nra/.

[868] Act of Mar. 3, 1905, ch. 1416, 33 Stat. 986-87.

[869] *Id.*

[870] JEFFREY A. MARLIN, THE NATIONAL GUARD, THE NATIONAL BOARD FOR THE PROMOTION OF RIFLE PRACTICE, AND THE NATIONAL RIFLE ASSOCIATION: PUBLIC INSTITUTIONS AND THE RISE OF A LOBBY FOR PRIVATE GUN OWNERSHIP 182 (May 10, 2013) (unpublished Ph.D. dissertation, Ga. St. U.), https://scholarworks.gsu.edu/history_diss/33/; RUSSELL S. GILMORE, CRACKSHOTS AND PATRIOTS: THE NATIONAL RIFLE ASSOCIATION AND AMERICA'S MILITARY-SPORTING TRADITION, 1871-1929 (1974) (unpublished Ph.D. dissertation, Univ. of Wisc.) (available in ProQuest Dissertations & Theses Global).

**EXHIBIT 17**
**0464**

Electronic copy available at: https://ssrn.com/abstract=3205664

sent into overseas service, coastal security was provided by the unorganized militia, "whose ages ranged from 16 to 65, served without pay and provided their own arms."[871]

The federal Gun Control Act of 1968 required all persons "engaged in the business" of selling firearms to obtain a Federal Firearms License.[872] ("FFL"; the term is used for both the license and the licensee.) An FFL may not deliver a handgun to a person under 21, or a rifle or shotgun to a person under 18.[873] As the Supreme Court later noted, the 1968 Act aimed to keep guns away from "juveniles, criminals, drug addicts, and mental incompetents."[874]

The FFL rule for handgun deliveries will be discussed in Part V.B., which examines the unsuccessful challenge to the statute in *NRA v. BATF* (5th Cir.).

In 1994, Congress prohibited handgun possession by minors (under 18), with certain exceptions.[875] That law was upheld by the First Circuit in *Rene E.*, which is discussed below in Part V.A.

# V.    Nineteenth and Early Twentieth Century State Laws and Cases—and Their Role in Modern Litigation

Our article in the previous issue of the *Southern Illinois University Law Journal* surveyed nineteenth and early twentieth century state laws and cases about firearms restrictions on young people.[876] We also examined the five leading post-*Heller* federal circuit cases involving challenges to state or federal arms laws aimed at young people. In this Part, we will summarize the findings from that Article. In the interests of concision, many of the footnotes and many details of the discussion from the original article are omitted in this summary.

## A. State Laws and Cases

As in the colonial period and the Founding Era, there were no age-based arms restrictions in the early republic or the Jacksonian period. The first age restrictions appear in the South shortly before the Civil War. In 1856 Alabama prohibited giving handguns to male minors. In 1860 Kentucky outlawed providing handguns to minors, free blacks, or slaves. Other than these two laws, age-based restrictions did not appear until the last quarter of the nineteenth century.

As of 1899, there were forty-six states in the Union. Nineteen of them had some sort of law involving handguns and minors and the other twenty-seven had no such laws. No state criminalized handgun possession by minors. Ten states generally prohibited handgun transfers to

---

[871] Don B. Kates, *Handgun Prohibition*, 82 MICH. L. REV. 204, 272, (1983) (citing Office of the Assistant Secretary of Defense, U.S. Dept. of Defense, *U.S. Home Defense Forces Study*, 58, 62-63 (1981)).

[872] Gun Control Act of 1968, Pub. L. No. 99-308, 100 Stat. 449, 450 (1968); 18 U.S.C. § 923, 27 C.F.R. § 478.41.

[873] 18 U.S.C. § 922(b)(1) (2019).

[874] Huddleston v. United States, 415 U.S. 814, 828 (1974). The federal legislation aimed to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Id.* at 824.

A study of the 1968 law found that it had no impact on the share of 18-to-20-year-olds arrested for homicide, robbery, or aggravated assault. Gary Kleck, *The Impact of the 1968 Gun Control Act's Restrictions on Handgun Purchases by Persons Age 18 to 20* (2011), https://ssrn.com/abstract=1843526.

[875] 18 U.S.C. 922(x)(2) (2019).

[876] David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U.L.J. (2018).

**EXHIBIT 17**
**0465**

Electronic copy available at: https://ssrn.com/abstract=3205664

minors; four of those ten had exceptions for self-defense, hunting, or home possession, and Alabama's law was only for males.  Of these ten statutes, five expressly prohibited loans, while the other five were phrased in terms that could be construed to refer only to permanent dispositions.

Three other states did not restrict transfers in general, but did restrict sales (Delaware, Mississippi) or dealer sales (Wisconsin).  Five states required parental consent for handgun transfers to minors (Illinois, Iowa, Kentucky, Missouri, and Texas).  Nevada simply prohibited concealed carry.

No state restricted long gun purchases by minors, long gun loans to minors, or other long gun transfers to minors, such as gifts.

Modern courts have cited about a dozen cases that involved these statutes.  We examined each of those cases, as well as precedents used in those cases.  The majority of those cases did not involve constitutional issues.  Instead, the decisions were about rules for issues on appeal, the facts of tort liability in a particular situation, and so on.

Four cases did have some substantive analysis of the rights of young people.  Tennessee's *State v. Callicutt* (1878) upheld a statute against giving handguns to minors.[877]  *Callicutt* was explicitly founded on the Tennessee Supreme Court's 1840 *Aymette v. State*.[878]  According to *Aymette*, the Second Amendment right to "bear" arms only means bearing arms while actively serving in a militia.[879]  The *Heller* Court expressly denounced *Aymette*: "This odd reading of the right is, to be sure, not the one we adopt."[880]  Accordingly, *Calicutt* should have little weight as a modern precedent.

The Georgia Supreme Court in 1911 upheld a 1910 statute that prohibited the carrying of firearms without a license and did not make licenses available to persons under 18.[881]  The same statute made it illegal to "knowingly sell, or furnish, any minor with 'any pistol, dirk, bowie knife, or sword cane, except under circumstances justifying their use in defending life, limb, or property.'"[882]

The Georgia court in *Glenn v. State* made numerous errors.  First, it interpreted the statute as a complete prohibition on persons under 18 from possessing pistols.[883]  The interpretation is plainly incorrect, since the statute expressly allowed possession for self-defense.

Second, the Georgia court asserted in dicta that all modern handguns could be banned for everyone.[884]  Of course, that assertion is contrary to *Heller*.[885]  That assertion was also contrary to the Georgia Supreme Court's 1846 decision in *Nunn v. State*, which struck down a state ban on almost all handguns.[886]  The *Nunn* decision is quoted and lauded by *Heller* more than any other

---

[877] State v. Callicutt, 69 Tenn. 714 (1878).
[878] Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).
[879] *Id.* at 158.
[880] District of Columbia v. Heller, 554 U.S. 570, 613 (2008).
[881] Glenn v. State, 72 S.E. 927 (Ga. Ct. App. 1911).
[882] *Id.* at 928.
[883] *Id.* ("We conclude, therefore, that the act of 1910 not only prohibits minors under the age of 18 years from obtaining license to have a pistol or revolver on their persons, but that the clear intendment of said act is to prevent minors from having about their persons at all this character of weapons, and this construction is in harmony with the general legislation of the state on the subject of minors.").
[884] *Id.* at 929.
[885] *Heller*, 554 U.S. 570.
[886] Nunn v. State, 1 Ga. 243 (1846).

EXHIBIT 17
0466
Electronic copy available at: https://ssrn.com/abstract=3205664

precedent.[887]  As of 1846, repeating handguns were already well-established and common in the market.

Most egregiously, the *Glenn* court upheld the statute under the theory that minors have *no* rights that the legislature is bound to respect:

> It is entirely within the province of the Legislature, in the exercise of the police power of the state, to prohibit, on the part of minors, the exercise of any right, constitutional or otherwise, although it might only have the right in the case of adults to regulate and restrict such rights.[888]

*Glenn*'s *ratio decidendi* is contrary to modern precedent.[889]  It is also plainly wrong under the law of the time.  If *Glenn* were correct that minors have no constitutional rights, then the Georgia Constitution of 1877, which was still in effect in 1911, would have been no barrier to the Georgia legislature enacting laws against some or all minors: to take their property without due process of law, to banish them from the state, to inflict cruel and unusual punishments on them, to require Georgia minors to profess belief in an official state religion, to punish their dissent from said religion as heresy, to forbid them from criticizing government officials of Georgia, to search their houses without warrants, to forbid them to petition government, and to punish them with ex post facto laws and bills of attainder.[890]  The absurdity of the proposition is self-evident.

The most thorough analysis of the arms rights of young people came from the Kansas Supreme Court in *Parman v. Lemmon*.[891]  The case was initially decided one way, then reversed following rehearing, so that the original dissent became the opinion of the court.

The issue was whether a 20-gauge Winchester pump-action shotgun was a "dangerous weapon" prohibited by the Kansas statute that made it a misdemeanor to "sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, sling shot, or other dangerous weapons, to any minor, or to any person of notoriously unsound mind."[892]

Applying esjudem generis, the court held that long guns are not covered by the phrase "dangerous weapons."[893]  The shotgun "is such a common implement that, if the lawmakers intended to include it in the prohibited list, it is extremely unlikely they would have failed to mention it."[894]

---

[887] *Heller*, 554 U.S. 570.

[888] *Glenn*, 72 S.E. at 928-29.

[889] *See, e.g.*, Application of Gault, 387 U.S. 1, 13 (1967) (holding that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone" and that juveniles have the right to counsel, right to notice of charges, right to confront and cross-examine witnesses, and right against self-incrimination); Tinker v. Des Moines Indep. Cty. Sch. Dist., 393 U.S. 503, 511 (1969) ("Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect…").

[890] *See* GA. CONST. of 1877, art. I, § 1, parts 3, 7, 12, 15, 16, 24, § 3, part 2 (enumerating prohibitions on aforesaid types of government action, and not limiting the protections to only adults).

[891] Parman v. Lemmon, 244 P. 227 (Kan. 1925).

[892] *Id.* at 228 (citing R. S. 38-701).  R.S. 38–702 made it unlawful for minors to possess these "dangerous weapons." *Id.*

[893] "The rule, 'ejusdem generis' ordinarily limits the meaning of general words to things of the same class as those enumerated under them." *Id.* at 229 (citing 2 Words and Phrases, Second Series, 225).

[894] *Id.* at 232 (Mason, J., dissenting) (later became opinion of the court).

**EXHIBIT 17**
**0467**

Electronic copy available at: https://ssrn.com/abstract=3205664

Moreover, "the right of the people to keep and bear arms … is a basic principle of statecraft of deep concern to all who are clothed with authority and who feel their responsibility to hand on undiminished to future generations those liberties which are our proud American heritage."[895]

The experience from the first days of the Atlantic colonies through the Indian Wars of the late nineteenth century in Kansas had meant that

> the rifle over the fireplace and the shotgun behind the door were imperatively necessary utensils of every rural American household. And it was just as imperative that the members of such household, old and young, should know how to handle them. And it was almost equally true that, unless a man were trained in the use of the rifle and shotgun in his boyhood, he seldom learned to use them.[896]

Announcing the reversal following the petition for rehearing, the Kansas Court explained:

> [I]t is reasonable to conclude that the Legislature did not intend to make law violators of 60 per cent. of the militia of the state, it being estimated that 60 per cent. of the personnel of that body are minors; that it did not intend to prohibit students under 21 years of age in the colleges from taking military training; that it did not intend to prohibit young men under 21 years of age from taking out hunters' licenses and hunting, that it did not intend to prohibit young men who have not yet reached the age of 21, who reside on the farms and ranches, from carrying and using shotguns and rifles when necessity requires.
>
> These suggestions and many others have had the consideration of the court. We do not deem it necessary to discuss the question at length, nor to analyze the cases. We are of the opinion that, if the Legislature of 1883 had intended to include shotguns in the prohibited list of dangerous weapons, it would have specifically mentioned them.
>
> . . .
>
> By a change of view on the part of some of the Justices, the dissenting opinion at the time of the first decision has now become the controlling voice of the court, and further discussion is needless.[897]

None of the Justices in *Parman* seemed to see a problem with the law against giving handguns to minors, which the Justices characterized as being needed occasionally for self-defense; the court's focus was on long guns, which it characterized as the typical arm of rural self-defense, the ordinary arm of the militia, and a daily tool for rural life.

The final case that involved arms and minors was Virginia's *United States v. Blakeney*.[898] It did not involve any law that targeted the arms rights of minors. Instead, the issue was application of the general rule that minors could not enter into enforceable contracts without the consent of their parent or guardian.[899] (In the latter twentieth century, the age of majority for exercise of

---

[895] *Id.* at 231 (Dawson, J., dissenting) (later became opinion of the court).
[896] *Id.*
[897] *Id.* at 233.
[898] United States v. Blakeney, 44 Va. (3 Gratt.) 405 (1847).
[899] *Id.*

88

**EXHIBIT 17**
**0468**

Electronic copy available at: https://ssrn.com/abstract=3205664

contract and property rights without parental consent would be lowered to 18 in most states, the age that continues to prevail as the national norm.)

The Supreme Court of Appeals of Virginia held that 18-to-20-year-old "minors" were to be treated as adults in the context of bearing arms.[900] Blakeney was a 19-year-old who volunteered for military duty, and regretting his decision, argued that a minor could not enter into a valid contract.[901] The court held the contract valid, based in part on the fact that as a 19-year-old, Blakeney had the mental and physical capacity to bear arms.[902]

The court explained that "children" were exempted from military service because they are incapable of handling arms:

> No person is naturally exempt from taking up arms in defence of the State; the obligation of every member of society being the same. They only are excepted who are incapable of handling arms, or supporting the fatigues of war. This is the reason why old men, children, and women are exempted.[903]

By contrast, "We know, as a matter of fact, that at the age of eighteen, a man is capable intellectually and physically of bearing arms."[904] And since 18-year-olds were just as capable as 21-year-olds of both carrying arms and consenting to military service, the court held that 18-to-20-year-olds were bound by military enlistments just as adults over 21 were.[905] The general rule about contracts

> has no application to the subject. The capacity of all citizens or subjects able to bear arms to bind themselves to do so by voluntary enlistment, is in itself a high rule of the public law, to which the artificial and arbitrary rule of the municipal law forms no exception.[906]

In sum, the statutory and case law record on the nineteenth and early twentieth centuries provide no support for age-based restrictions on long guns. There were a minority of states with age-based restrictions on handguns. The largest group in the minority would be those that either banned retail sales or required parental permission for sales. Laws broad enough to prohibit parents from letting minors use handguns existed in five states. Few cases from the period address the arms rights of minors, and of those, hardly any can be considered valid precedents in light of *Heller* and other modern doctrine.

## B. Modern Circuit Cases

---

[900] *Id.* at 414-15.
[901] *Id.* at 406-07.
[902] *Id.* at 425.
[903] *Id.* at 408.
[904] *Id.* at 418.
[905] *Id.* at 416.
[906] *Id.* at 409–10.

EXHIBIT 17
0469
Electronic copy available at: https://ssrn.com/abstract=3205664

Our Article in the previous issue reviewed the nineteenth and early twentieth century history and tradition in the context of their use by the five post-*Heller* Circuit Court of Appeals cases examining the arms rights of young people. We will summarize the analysis of those cases.

1.  Rene E.

In *United States v. Rene E.*, the First Circuit upheld the 1994 federal statute (discussed in Part IV) that prohibits handgun possession by persons under 18.[907] The court emphasized the importance of the statute's exceptions, such as self-defense in the home, ranching, hunting, militia service, and so on.[908]

For historical support, *Rene E.* relied primarily on the state cases discussed above.[909] This is thin support, for reasons that we summarized above, and detailed in the previous Article.

Regarding the Founding, *Rene E.* could not cite any original American source—hardly surprising in light of the many statutes detailed in Part III, *supra*. The colonial and early state governments had repeatedly mandated that persons 16 and older (or sometimes 18, 15, or 10) be armed.

Instead, the First Circuit cited some modern law review articles stating that the Founders believed that unvirtuous persons could be disarmed.[910] The paradigmatic examples in these articles were persons who were disloyal to the government during wartime, as well as slaves and hostile Indians. The point of the article is true enough, but nothing from the colonial or founding periods indicates that young people were considered unvirtuous people who should be disarmed. The statutory evidence is quite the opposite.

2.  National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, Explosives

In this case, the Fifth Circuit upheld the 1968 federal statute that prohibits persons 18-20 from buying handguns in retail stores.[911] The statute does not prohibit young adults from acquiring firearms from persons who are *not* "engaged in the business of selling arms."[912] The statute allows persons 18 and older to buy long guns from stores (and from others).

The strongest part of the court's historical analysis was its list of state statutes. As discussed above, by 1899 there were fifteen states that prohibited minors from buying handguns in stores, and three more that required parental permission. These restrictions were not the majority approach, but neither were they eccentric.

For earlier history, the opinion was weaker. As the court stated (without citation), gun control laws did exist at the time of the Second Amendment and before.[913] This was true, but there were no age restrictions on buying, owning, or carrying firearms.

---

[907] United States v. Rene E., 583 F.3d 8 (1st Cir. 2009).
[908] *Id.* at 13-14.
[909] *Id.* at 14-15.
[910] *Id.* at 15-16.
[911] Nat'l Rifle Ass'n v. Bureau of Alcohol, Firearms, and Explosives, 700 F.3d 185 (5th Cir. 2012); 18 U.S.C. § 922(x)(2) (2019).
[912] *NRA v. BATF, supra* note 911, 700 F.3d at 189.
[913] *Id.* at 200.

EXHIBIT 17
0470
Electronic copy available at: https://ssrn.com/abstract=3205664

There were laws that "targeted particular groups for public safety reasons."[914]  These were laws aimed at slaves, Indians, and, during wartime, "laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation."[915]  The disarmament of persons not considered citizens (slaves and Indians), or who demonstrated disloyalty, should not create precedent for targeting other "particular groups" whose loyalty is unquestioned.[916]  The Fifth Circuit also cited William Rawle, whose 1825 constitutional law treatise was cited with approval in *Heller*.[917]  Rawle, as fully quoted in *Heller*, wrote that persons who "abused" the right to arms could be disarmed.[918]  The Fifth Circuit chopped Rawle to make it appear that he supported disarmament of people who had never abused the right, but whom the government might consider prospectively dangerous.[919]

Like the Georgia Supreme Court in the 1911 *Glenn* case, the Fifth Circuit resorted to the claim that minors lack constitutional rights.[920]  As the court pointed out, the age majority at common law was 21.[921]  Therefore,

> If a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18–to–20–year–olds as 'minors,' then it stands to reason that the citizen would have supported restricting an 18–to–20–year–old's right to keep and bear arms.[922]

The Fifth Circuit's speculation is contrary to all the evidence.  Persons under 21 were certainly minors under the common law of the Founding Era.  Thus, their independent exercise of contract and property rights was limited.  However, there is no evidence "a representative citizen" (or anyone else) in the Founding Era considered all minors "unworthy of the Second Amendment guarantee."[923]  To the contrary, state and federal laws of the Founding Era are unanimous that minors aged 18-to-20 *were* considered worthy of the Second Amendment guarantee.  As had been the case from the earliest colonial days, they were part of the militia and were required to possess their own arms. Massive and uncontradicted evidence from the Founding Era shows that 18-to-20-year-olds *did* have the right to keep and bear arms, and indeed were required by law to exercise that right.

Assuming arguendo that young adults have Second Amendment rights, the Fifth Circuit applied intermediate scrutiny.  The court chose intermediate scrutiny in part because the federal

---

[914] *Id.*
[915] *Id.*
[916] *Id.*
[917] *Id.* at 201.
[918] William Rawle, A View of the Constitution of the United States of America 125-26 (William S. Hein & Co. 2003) (2d ed. 1829), https://books.google.com/books?id=akEbAAAAYAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false; District of Columbia v. Heller, 554 U.S. 570, 607-08 (2008) (quoting Rawle, A View of the Constitution of the United States of America).
[919] *NRA v. BATF*, *supra* note 918, 700 F.3d at 201 (quoting Rawle, *supra* note 913).
[920] *Id.*
[921] *Id.*
[922] *Id.* at 202.
[923] *Id.*

EXHIBIT 17
0471
Electronic copy available at: https://ssrn.com/abstract=3205664

law did not prohibit minors from acquiring handguns for home defense or for other lawful purposes.[924]

The Fifth Circuit found laws against 18-20-year-olds supportable by *Heller*'s emphasis on arms possession by "responsible" citizens.[925]  As the Fifth Circuit accurately stated, persons 18-to-20 commit gun crimes at a higher rate than do older people.[926]  The same can be said of persons 21-to-25, who commit crimes at a higher rate than do people over 25.  The same is true for persons 60-to-65, who commit crimes at a higher rate than do persons over 65.  The same point can also be made based on race.  Americans of some races commit violent crimes at higher rates than persons of other races.  Likewise, males perpetrate violent crimes at a much higher rate than females.

As the Fifth Circuit acknowledged, law-abiding, responsible citizens are at the core of the Second Amendment right.[927]  Their rights should not be forfeited because of irresponsible behavior by other persons of the same age, race, or sex.

### 3. National Rifle Association v. McCraw

Here the Fifth Circuit upheld the Texas statute that prevented 18-to-20-year-olds from applying for a license to carry handguns for lawful protection in public places.[928]  Having recently decided *NRA v. BATF*, the Fifth Circuit did not engage in further historical analysis.[929]  The court reiterated the *BATF* theory that "the conduct burdened by the Texas scheme likely 'falls outside the Second Amendment's protection.'"[930]  Also like the *BATF* court, the *McCraw* court applied intermediate scrutiny in an abundance of caution and upheld the law for similar reasons.[931]

However, the court skipped part of the intermediate scrutiny analysis.  In strict scrutiny, the government must prove that there is no "less restrictive alternative."  Under the more relaxed standard of intermediate scrutiny, the government must prove that there is no "substantially less burdensome alternative."  The plaintiffs had argued that instead of banning licensed carry for young adults, Texas could have a more rigorous licensing system for young adults, compared to applicants over 21.  The *McCraw* court dismissed that alternative and said that "less restrictive alternative" is not part of intermediate scrutiny.[932]  True enough, but "substantially less burdensome alternative" is part of intermediate scrutiny, and the court offered no explanation for refusing to consider it.

### 4. Horsley v. Trame

---

[924] *Id.* at 206-07 (quoting District of Columbia v. Heller, 554 U.S. 570, 628-30, 635 (2008)).
[925] *Id.* at 206.
[926] *Id.* at 206-07.
[927] *Id.*
[928] Nat'l Rifle Ass'n of Am., Inc. v. McCraw, 719 F.3d 338 (5th Cir. 2013).
[929] *Id.*
[930] *Id.* at 347 (quoting Nat'l Rifle Ass'n v. Bureau of Alcohol, Firearms, and Explosives, *supra* note 911, 700 F.3d at 203).
[931] *Id.*
[932] *Id.* at 349.

EXHIBIT 17
0472
Electronic copy available at: https://ssrn.com/abstract=3205664

Illinois requires that residents obtain a firearm owner's identification (FOID) card before acquiring or possessing a firearm.[933]  In *Horsley v. Trame*, the plaintiff challenged the requirement that FOID card applicants between 18 and 21 obtain the consent of a parent or guardian.[934]  The parental permission rule has a safety valve, by which an applicant can instead apply for consent from the Director of the Illinois firearms license office.[935]  If the office denies the permission, the applicant can appeal to a court.[936]

The Seventh Circuit decided that it need not decide whether it agreed with the Illinois Attorney General that the Second Amendment does not apply to persons under 21.[937]  Regardless, the law was valid since it is not prohibitory, since young adults have a higher crime rate, and since the parental permission law has a safety valve similar to what has been allowed for abortion.[938]

### 5. Ezell v. City of Chicago

Ezell challenged a Chicago ordinance that prohibited anyone under 18 from entering a shooting range.[939]  Chicago argued that persons under 18 have no Second Amendment rights.[940]  But the nineteenth century statutes on handgun sales were not much help for a total ban on practice with any firearm.  As the Seventh Circuit observed, "There's zero historical evidence that firearm training for this age group is categorically unprotected.  At least the City hasn't identified any, and we've found none ourselves."[941]

Chicago was "left to rely on generalized assertions about the developmental immaturity of children, the risk of lead poisoning by inhalation or ingestion, and a handful of tort cases involving the negligent supervision of children who were left to their own devices with loaded firearms."[942]  Since the government could address these concerns with "a more closely tailored age restriction— one that does not *completely extinguish* the right of older adolescents and teens in Chicago to learn how to shoot in an appropriately supervised setting at a firing range," the law violated the Second Amendment.[943]

## VI.   Current State Laws

---

[933] 430 ILL. COMP. STAT. 65 (2013).

[934] Horsley v. Trame, 808 F.3d 1126 (7th Cir. 2015).  The law, 430 ILL. COMP. STAT. 65/4(a)(2)(i), requires an applicant to submit evidence that "[h]e or she is 21 years of age or over, or if he or she is under 21 years of age that he or she has the written consent of his or her parent or legal guardian to possess and acquire firearms and firearm ammunition and that he or she has never been convicted of a misdemeanor other than a traffic offense or adjudged delinquent, provided, however, that such parent or legal guardian is not an individual prohibited from having a Firearm Owner's Identification Card…"

[935] 430 ILL. COMP. STAT. 65/10 (2013).

[936] *Id.*

[937] *Horsley*, 808 F.3d at 1130.

[938] *See id.* at 1127, 1130-32.

[939] Ezell v. City of Chicago (*Ezell II*), 846 F.3d 888 (7th Cir. 2017).  The *Ezell I* case held unconstitutional the city's ban on all shooting ranges within city limits. Ezell v. City of Chicago (*Ezell I*), 651 F.3d 684 (7th Cir. 2011).

[940] *Id.* at 896.

[941] *Id.*

[942] *Id.* at 898.

[943] *Id.* (emphasis in original).

EXHIBIT 17
0473

Electronic copy available at: https://ssrn.com/abstract=3205664

Part VI surveys current state laws that impose special limits on arms possession or acquisition by young adults. We do not include state statutes that mimic federal law (such as preventing gun stores from selling handguns to young adults). We do not address state laws that apply only to persons under 18. Nor do we address laws, such as the Texas law discussed in the *McCraw* case above, that set the minimum age for a defensive handgun carry license at 21. The majority of states do set 21 as the carry permit age, while a minority set the age at 18. A few states, such as Texas, which have a general rule of 18, allow carry permits for young adults in certain circumstances, such as a young adult who is currently serving in, or has been honorably discharged from, the armed forces.[944]

As has been true throughout American history, state militia laws include 18-to-20-year-olds. Fifteen state constitutions specify that the starting age for militia service is 18.[945] Two state constitutions, Indiana and Wyoming, specify the starting militia age as 17.[946] Uniquely, the Kansas Constitution makes 21 the starting militia age.[947] The constitutions of Illinois and Montana used to declare that the militia was males 18 to 45; the constitutions were revised to broaden the militia obligation to all able-bodied persons, regardless of age or sex.[948] For many other states, the constitution grants the legislature authority to define the militia, and the legislature has passed laws including 18-to-20-year-olds.

Section A of Part VI describes state laws imposing special limits on firearms acquisition or possession by young adults. Section B discusses the varying age limits for different activities, past and present.

## A. State laws with special arms restrictions on young adults

*California.* "No person, corporation, or firm shall sell, loan, or transfer a firearm to a minor, nor sell a handgun to an individual under 21 years of age."[949] The only circumstance under which a Californian aged 18-20 may purchase a handgun is if the handgun is an antique.[950]

---

[944] TEX. CODE ANN. § 411.172(g).

[945] ARIZ. CONST. art. XVI, § 1; ARK. CONST. art. XI, § 10; COLO. CONST. art. XVII, § 1; IDAHO CONST. art. XIV, § 1; IOWA CONST. art. VI, § 1; KY. CONST. § 219; ME. CONST. art. VII, § 5; MISS. CONST., § 214; N.M. CONST. art. XVIII, § 1; N.D. CONST. art. XI, § 16; OHIO CONST. art. IX, § 1; S.C. CONST. art. XIII, § 1; S.D. CONST. art. XV, § 1; UTAH CONST. art. XV, § 1; WASH. CONST. art. X, § 1.

[946] IND. CONST. art. XII, § 1; WYO. CONST. art. XVII, § 1.

[947] KAN. CONST. art. VIII, § 1.

[948] ILL. CONST. of 1870, art. XII, § 1; MONT. CONST. of 1889, art. XIV, § 1. Illinois now provides that "The State militia consists of all able-bodied persons residing in the State except those exempted by law." ILL. CONST. art. XII, § 1; MONT. CONST. art. VI, § 13(2).1.

In both states, current laws show that the newer provisions still include 18-to-20-year-olds. *See* 20 ILL. COMP. STAT. 1805/1 ("All able-bodied citizens of this State . . . between the ages of 18 and 45 . . . shall be subject to military duty and designated as the Illinois State Militia"); MONT. CODE ANN. § 10-1-103(1) ("the organized militia [] consists of the national guard and the Montana home guard"); 32 U.S.C. § 313 ("To be eligible for original enlistment in the National Guard, a person must be at least 17 years of age and under 45").

[949] CAL. PENAL CODE § 27505(a) (West 2011).

[950] *Id.* (b)(1).

EXHIBIT 17
0474
Electronic copy available at: https://ssrn.com/abstract=3205664

Parents and grandparents (with parental permission) may loan long guns to minors for indefinite periods.[951] Other persons may loan long guns to minors (with parental permission) for up to 30 days.[952]

A parent may loan a handgun to a minor for sporting activities, agriculture, ranching, or theatrical and entertainment events that use firearms props.[953] The loan may last no longer than "the amount of time that is reasonably necessary to engage in" the activity.[954]

Other persons may loan handguns to minors for the same purposes, if written permission from the parent or legal guardian is presented to the lender.[955] The same time limits apply, with the addition proviso that the loan may never exceed ten days.[956]

Thus, a minor may never be transferred a handgun for lawful defense of self and others, even in the parental home, and even in situations of imminent peril.

*Connecticut.* A state certificate is necessary to own a handgun, and only persons at least 21 years old may apply for the certificate.[957]

*Delaware.* No person shall sell to someone under 21 "any pistol or revolver, or stiletto, steel or brass knuckles, or other deadly weapon made especially for the defense of one's person."[958] The prohibition does not apply "to toy pistols, pocket knives or knives used for sporting purposes and in the domestic household, or surgical instruments or tools of any kind."[959]

*District of Columbia.* Persons may only possess firearms that have been registered with the Municipal Police Department.[960] Persons under 18 may not register. Persons 18 to 20 may register if the registrant provides a notarized permission statement from a parent or guardian.[961] In the notarized statement, the parent or guardian must "assume[] civil liability for all damages resulting from the actions of such applicant in the use of the firearm to be registered; provided further, that such registration certificate shall expire on such person's 21st birthday."[962]

*Florida.* "A person younger than 21 years of age may not purchase a firearm. The sale or transfer of a firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer."[963] Thus, persons under 21 may borrow firearms, or receive them as gifts from private persons. The restrictions on persons under 21 do not apply to servicemembers.[964]

*Hawaii.* Permits to acquire firearms may be issued "to citizens of the United States of the age of twenty-one years or more."[965] Permits may also be issued to aliens under certain circumstances,

---

[951] *Id.* (b)(2), (3).
[952] *Id.* (b)(4).
[953] *Id.* (b)(5)(A).
[954] *Id.* (b)(5)(B).
[955] *Id.* (6)(A), (B).
[956] *Id.* (6)(C), (D).
[957] CONN. GEN. STAT. § 29-36f(a).
[958] DEL. CODE ANN. tit. 24, § 901.
[959] *Id.* § 903.
[960] D.C. CODE § 7-2502.01(a).
[961] *Id.* § 7-2502.03(a)(1)(A).
[962] *Id.* § 7-2502.03(a)(1)(B).
[963] FLA. STAT. § 790.065(13) (2018).
[964] *Id.*
[965] HAW. REV. STAT. § 134-2(d) (2017).

EXHIBIT 17
0475
Electronic copy available at: https://ssrn.com/abstract=3205664

including to aliens 18 or older "for use of rifles and shotguns for a period not exceeding sixty days, upon a showing that the alien has first procured a hunting license."[966]

*Illinois.*  To purchase or own a firearm, a person must have a Firearm Owner's Identification (FOID) Card.[967]  Applicants under 21 must have written permission from a parent or guardian.[968] The parent giving permission must not be someone who is prohibited from owning a firearm (e.g., a convicted felon).[969]  The under-21 applicant must, in addition to satisfying generally applicable eligibility requirements, have no misdemeanor convictions other than traffic offenses, and must never have been adjudged delinquent.[970]

As discussed in the section on *Horsely v. Trame*, *supra*, there is a safety valve provision for situations in which parental permission is denied or is unavailable.  Any applicant who is denied can petition the Director of State Police for relief.[971]  The applicant may present evidence, and the State Attorney must be notified and have an opportunity to oppose the petition for relief.  The applicant must prove that "granting relief would not be contrary to the public interest."[972]  A rejected applicant may appeal to state court.[973]

*Iowa.*  In 2017, the legislature repealed a law that had forbidden minors under 14 from temporarily possessing a handgun under any circumstances, even while under direct parental supervision at a target range.[974]

Under current law, anyone who "sells, loans, gives, or makes available a rifle or shotgun or ammunition for a rifle or shotgun to a minor" is guilty of a serious misdemeanor.[975]  Anyone who does the same for a handgun or handgun ammunition is guilty of a serious misdemeanor.[976]

However, a parent, guardian, spouse (if over 18), or anyone else with express permission from such persons may allow a minor to possess rifles, shotguns, and ammunition therefor.[977]

For handguns, the authorizing parent, guardian, or spouse must be over 21, and the person under 21 may possess the handgun only while under direct supervision.[978]  Alternatively, the supervision may be provided by an instructor.[979]  Any supervisor or instructor who is intoxicated at the time is guilty of child endangerment.[980]

If the minor with the handgun is under 14, the parent, guardian, or spouse is strictly liable for any resulting damages.[981]

Persons 18-to-20 may possess firearms and ammunition without need for parental or spousal permission "while on military duty or while a peace officer, security guard or correctional officer"

---

[966] *Id.*
[967] 430 ILL. COMP. STAT. 65/2.
[968] *Id.* 65/4(a)(2)(i).
[969] *Id.*
[970] *Id.*
[971] *Id.* 65/10(c).
[972] *Id.* 65/10(c)(3).
[973] *Id.*
[974] IOWA CODE § 724.22(8); 2017 Iowa Acts 555.
[975] IOWA CODE, *supra* note 975, § 724.22(1).
[976] *Id.* § 724.22(2).  Ammunition in .22 caliber is considered rifle ammunition, not handgun ammunition. *Id.* § 724.22(6).
[977] *Id.* § 724.22(3).
[978] *Id.* § 724.22(5).
[979] *Id.*
[980] *Id.* § 724.22(9).
[981] *Id.* § 724.22(8).

EXHIBIT 17
0476

Electronic copy available at: https://ssrn.com/abstract=3205664

if the job requires it.[982] They may also possess arms while receiving instruction from an instructor who is at least 21.[983]

It is unlawful to store a loaded gun in such a manner that "a minor under the age of fourteen years is likely to gain access to the firearm" without the permission of the minor's parent.[984] Storage is *per se* compliant with the statute if the gun has a trigger lock or is "placed in a securely locked box or container, or placed in some other location which a reasonable person would believe to be secure from a minor under the age of fourteen years."[985] There is no violation of the law unless a minor does actually access the firearm, and then unlawfully exhibits the firearm in a public place or injures someone by using the firearm unlawfully.[986] There is no violation "if the minor obtains the firearm as a result of an unlawful entry by any person."[987]

*Maryland.* Under Maryland law, a "regulated firearm" is a handgun or certain long guns that have been labeled "assault weapons."[988] Of course there are still laws for other guns, namely rifles and shotguns that are not "assault weapons," but these laws are less stringent than the laws for "regulated firearms."

In general, a person under 21 may not possess a regulated firearm.[989] Possession is allowed for temporary transfers if the person under 21 will be "under the supervision of another who is at least 21 years old" and the parents or guardian consent.[990] Possession is also allowed if the person needs the firearm for employment.[991] Temporary transfers are also permitted to participants in marksmanship training who are supervised by an instructor.[992] Also lawful is "the possession of a [regulated] firearm for self-defense or the defense of others against a trespasser into the residence of the person in possession or into a residence in which the person in possession is an invited guest."[993]

*Massachusetts.* A "Class A" license is necessary to possess a handgun or long guns that are dubbed "assault weapons."[994] The Class A license also functions as a license to carry; the issuing law enforcement agency has the discretion to issue the license to allow carrying only for sports and target practice, or to issue as a defensive carry permit.[995] Class A licenses may not be issued to persons under 21.[996]

---

[982] *Id.* § 724.22(4).

[983] *Id.*

[984] *Id.* § 724.22(7).

[985] *Id.*

[986] *Id.*

[987] *Id.*

[988] MD. CODE ANN. PUB. SAFETY § 5-101(r) (2018).

[989] *Id.* § 5-133(d)(1).

[990] *Id.* § 5-133(d)(2)(i).

[991] *Id.* § 5-133(d)(2)(v).

[992] *Id.* § 5-133(d)(2)(iv).

[993] *Id.* § 5-133(d)(2)(vi).

[994] MASS. GEN. LAWS ch. 140, § 131(a).

[995] *Id.* § 131(d).

[996] *Id.* § 131(d)(iv).

EXHIBIT 17
0477
Electronic copy available at: https://ssrn.com/abstract=3205664

*New Jersey*. In general, persons under 18 may not "purchase, barter or otherwise acquire a firearm" and persons under 21 may not do so for handguns.[997] Further, no one under 18 "shall possess, carry, fire or use a firearm."[998] The same is true for handguns for persons under 21.[999]

Exceptions are for gun use "[i]n the actual presence or under the direct supervision of his father, mother or guardian, or some other person" who has the appropriate gun possession permit from the state.[1000] Also allowed is "competition, target practice, instruction, and training" at a firing range.[1001] Finally, persons can possess the guns "during the regularly designated hunting season," if they have a hunting license and have passed a hunter safety course.[1002]

*New York*. A license is necessary to possess a handgun.[1003] Licenses may be issued only to persons who are at least 21.[1004] But if the applicant has been honorably discharged from the armed forces, no age restriction applies.[1005]

*Ohio*. No one shall sell any firearm to a person under 18, or a handgun to a person under 21.[1006] Nor shall anyone "furnish" such guns to such persons, "except for lawful hunting, sporting, or educational purposes, including, but not limited to, instruction in firearms or handgun safety, care, handling, or marksmanship under the supervision or control of a responsible adult."[1007] Persons 18-to-20 may acquire handguns if they are law enforcement officers or active duty members of the armed forces who have received certain training.[1008]

*Rhode Island*. A permit is necessary to purchase or acquire a handgun.[1009] Permits are not issued to persons under 21.[1010]

## B. Policy

In American law, different activities have been subject to different age limits. Under the U.S. and state constitutions, the age for service in elective offices is sometimes 18, but also may be 21, 25, 30, or (for President) 35.[1011] Activities that are considered by some to be vices—such as alcohol, tobacco, recreational marijuana, and gambling—have sometimes been prohibited, sometimes unregulated, and sometimes had age limits of 18 or 21.[1012] The trend of the 1960s and

---

[997] N.J. STAT. ANN. § 2C:58–6.1(a).

[998] *Id.* § 2C:58–6.1(b).

[999] *Id.*

[1000] *Id.* § 2C:58–6.1(b)(1).

[1001] *Id.* § 2C:58–6.1(b)(3). The range must have been approved by a local governing body or by the National Rifle Association. *Id.*

[1002] *Id.* § 2C:58–6.1(b)(4).

[1003] N.Y. PENAL LAW § 400.00(15).

[1004] *Id.* § 400.00(1).

[1005] *Id.*

[1006] OHIO REV. CODE ANN. § 2923.21(A)(1)-(2).

[1007] *Id.* (A)(3).

[1008] *Id.* (B).

[1009] 11 R.I. GEN. LAWS ANN. § 11-47-35.

[1010] *Id.* § 11-47-35(a)(1).

[1011] *See, e.g.*, U.S. CONST. art II, § 1 (35 for President); ILL. CONST. art. V, § 3 (25 for statewide constitutional officers); IOWA CONST. art. III, § 4 (21 for the Iowa House of Representatives).

[1012] *See, e.g.*, Michael Phillip Rosenthal, *The Minimum Drinking Age for Young People: An Observation*, 92 DICK. L. REV. 649 (1988).

EXHIBIT 17
0478
Electronic copy available at: https://ssrn.com/abstract=3205664

the 1970s was for lower age limits for vices, while in recent decades many states have moved to 21.

Perhaps the most important decision a person will ever make is marriage. Certainly, the decision to marry is more momentous than the decision about whether to drink a beer. Today, in every state, the age for marriage *without* parental consent is 16, 17, or 18.[1013] The age is lower (or there is no age limit) when there is parental consent.[1014]

In every state, the age at which a criminal defendant can be prosecuted as an adult is no older than eighteen, and usually younger. Eighteen-year-olds are subject to conscription into the U.S. military, notwithstanding vehement parental objection. With parental consent, persons under 18 may enlist in the U.S. Armed Forces.[1015]

For voting, the usual starting age used to be 21. That was lowered to 18 by the Twenty-Sixth Amendment, ratified in 1971, and applying to all federal and state elections.[1016] That young adults did not have voting rights in the Founding Era is not evidence that young adults lacked arms rights. Some states had property requirements for voting, and higher property requirements for election to the legislature or the governorship.[1017] No one would contend that people who did not own a certain amount of property were excluded from the Second Amendment.

After the Nineteenth Amendment in 1920 guaranteed women the right to vote, Justice Sutherland, writing for the Court, praised "the great—not to say revolutionary—changes which have taken place since that utterance, in the contractual, political, and civil status of women, culminating in the Nineteenth Amendment."[1018] Although laws could still take into account the physical differences between men and women, laws could not treat women like children, by imposing special restrictions on female contract rights that could not constitutionally be imposed on men.[1019]

Although Justice Sutherland's strong defense of the competence and free choices of women was later swept away when the New Deal Supreme Court abandoned nearly all judicial protection of the right of contract, Justice Sutherland turned out to be on the right side of history. Since the 1970s, very few laws that impose special disabilities on account of sex are considered constitutional.

Similar observations can be made about the rights of young adults, and the constitutional guarantee of their voting rights in 1971. The trend over the last half-century has been towards recognizing that people who bear the burdens of adulthood—including military conscription and liability to criminal prosecution as an adult—also have the rights of adulthood. In general, the rights of young adults include the same contract and property rights as of older persons. The only notable exception to the trend of recognizing young adult rights has been re-raising the age for

[1013] *State-by-State Marriage "Age of Consent" Laws*, FINDLAW (2018), https://family.findlaw.com/marriage/state-by-state-marriage-age-of-consent-laws.html.

[1014] *Id.*

[1015] *Are You Eligible to Join the Military?*, MILITARY.COM (2018), https://www.military.com/join-armed-forces/join-the-military-basic-eligibility.html.

[1016] U.S. CONST. amend. XXVI.

[1017] *See* DONALD S. LUTZ, POPULAR CONSENT AND POPULAR CONTROL: WHIG POLITICAL THEORY IN EARLY STATE CONSTITUTIONS 90-91 (1980) (Ga., S.C., Pa., N.C., and N.H. limited voting to taxpayers; Mass. required £60 of property, N.J. £20, and N.Y. £20; Md. required 50 acres, and Del. a freehold).

[1018] *See* Adkins v. Children's Hospital, 261 U.S. 525, 553 (1923), *overruled by* West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937); U.S. CONST. amend. XIX.

[1019] *Adkins*, *supra* note 1018, at 401 ("nor is there ground for distinction between women and men, for, certainly, if women require a minimum wage to preserve their morals men require it to preserve their honesty").

EXHIBIT 17
0479
Electronic copy available at: https://ssrn.com/abstract=3205664

various "vices," such as alcohol. Under American law, none of these vices are constitutionally protected; instead, these vices can be—and sometimes have been—prohibited for the entire population, regardless of age.[1020]

The right to arms is just the opposite. While the Twenty-First Amendment affirms very broad state power over alcohol, up to and including prohibition, the Second Amendment guarantees the right to keep and bear arms.[1021] As has been detailed above, the original meaning of the Second Amendment recognized that young adults have a right and duty to keep and bear arms.

## VII. Conclusion

If the Second Amendment is interpreted according to the original public meaning, as *Heller* says it must be, the Constitution contains a clear rule for the arms rights of young adults. It is beyond dispute that when the Second Amendment was ratified, young adults had the right to keep and bear arms. State and colonial assemblies collectively legislated on the militia hundreds of times, revising many subjects. The militia entry age was 15-18. Sixteen was the most common. The only 21-year-old law existed for two decades in colonial Virginia; that law was repealed long before the Second Amendment was adopted. From the first federal militia laws to the present, the militia of the United States has always included eighteen-year-olds. During the nineteenth and twentieth centuries, the federal government worked to put arms in their hands.

According to *Heller*, the innermost core of the Second Amendment is the right to keep a handgun in the home for lawful self-defense. Laws that prohibit or nearly prohibit young adults from doing so are unconstitutional.

---

[1020] *See* Rosenthal, *supra* note 1012.
[1021] U.S. Const. amends. II, XXI.

**EXHIBIT 17**
**0480**
Electronic copy available at: https://ssrn.com/abstract=3205664

# EXHIBIT "18"

EXHIBIT 18
0481

## SATURDAY JULY 8, 1775

The Congress met according to adjournment.

The Petition to the King being engrossed, was compared, and signed by the several members.[1]

*To the king's most excellent Majesty:*

MOST GRACIOUS SOVEREIGN,

We, your Majesty's faithful subjects of the colonies of new Hampshire, Massachusetts bay, Rhode island and Providence Plantations, Connecticut, New York, New Jersey, Pennsylvania, the counties of New Castle, Kent, and Sussex, on Delaware, Maryland, Virginia, North Carolina, and South Carolina, in behalf of ourselves, and the inhabitants of these colonies, who have deputed us to represent them in general Congress, entreat your Majesty's gracious attention to this our humble petition.

The union between our Mother country and these colonies, and the energy of mild and just government, produced benefits so remarkably important, and afforded such an assurance of their permanency and increase, that the wonder and envy of other Nations were excited, while they beheld Great Britain riseing to a power the most extraordinary the world had ever known.

Her rivals, observing that there was no probability of this happy connexion being broken by civil dissensions, and apprehending its future effects, if left any longer undisturbed, resolved to prevent her receiving such continual and formidable accessions of wealth and strength, by checking the growth of these settlements from which they were to be derived.

In the prosecution of this attempt, events so unfavourable to the design took place, that every friend to the interests of Great Britain and these colonies, entertained pleasing and reasonable expectations of seeing an additional force and extention[2] immediately given to the operations of the union hitherto experienced, by an enlargement of the dominions of the Crown, and the removal of ancient and warlike enemies to a greater distance.

At the conclusion, therefore, of the late war, the most glorious and

---

[1] "Congress gave a signal proof of their indulgence to Mr. Dickinson, and of their great desire not to go too fast for any respectable part of our body, in permitting him to draw their second petition to the King according to his own ideas, and passing it with scarcely any amendment." Jefferson, *Autobiography*, in his *Writings* (Ford), I, 17.

[2] In the printed version this word is *exertion.*

**EXHIBIT 18**
**0482**

Digitized by Google

advantageous that ever had been carried on by British arms, your loyal colonists having contributed to its success, by such repeated and strenuous exertions, as frequently procured them the distinguished approbation of your Majesty, of the late king, and of parliament, doubted not but that they should be permitted, with the rest of the empire, to share in the blessings of peace, and the emoluments of victory and conquest. While these recent and honorable acknowledgments of their merits remained on record in the journals and acts of that august legislature, the Parliament, undefaced by the imputation or even the suspicion of any offence, they were alarmed by a new system of statutes and regulations adopted for the administration of the colonies, that filled their minds with the most painful fears and jealousies; and, to their inexpressible astonishment, perceived the dangers of a foreign quarrel quickly succeeded by domestic dangers, in their judgment, of a more dreadful kind.

Nor were their anxieties alleviated by any tendency in this system to promote the welfare of the Mother country. For tho' its effects were more immediately felt by them, yet its influence appeared to be injurious to the commerce and prosperity of Great Britain.

We shall decline the ungrateful task of describing the irksome variety of artifices, practised by many of your Majesty's Ministers, the delusive pretences, fruitless terrors, and unavailing severities, that have, from time to time, been dealt out by them, in their attempts to execute this impolitic plan, or of traceing, thro' a series of years past, the progress of the unhappy differences between Great Britain and these colonies, which have flowed from this fatal source.

Your Majesty's Ministers, persevering in their measures, and proceeding to open hostilities for enforcing them, have compelled us to arm in our own defence, and have engaged us in a controversy so peculiarly abhorrent to the affections of your still faithful colonists, that when we consider whom we must oppose in this contest, and if it continues, what may be the consequences, our own particular misfortunes are accounted by us only as parts of our distress.

Knowing to what violent resentments and incurable animosities, civil discords are apt to exasperate and inflame the contending parties, we think ourselves required by indispensable obligations to Almighty God, to your Majesty, to our fellow subjects, and to ourselves, immediately to use all the means in our power, not incompatible with our safety, for stopping the further effusion of blood, and for averting the impending calamities that threaten the British Empire.

**EXHIBIT 18**
**0483**

Digitized by Google

Thus called upon to address your Majesty on affairs of such moment to America, and probably to all your dominions, we are earnestly desirous of performing this office, with the utmost deference for your Majesty; and we therefore pray, that your[1] royal magnanimity and benevolence may make the most favourable construction of our expressions on so uncommon an occasion. Could we represent in their full force, the sentiments that agitate the minds of us your dutiful subjects, we are persuaded your Majesty would ascribe any seeming deviation from reverence in our language, and even in our conduct, not to any reprehensible intention, but to the impossibility of reconciling the usual appearances of respect, with a just attention to our own preservation against those artful and cruel enemies, who abuse your royal confidence and authority, for the purpose of effecting our destruction.

Attached to your Majesty's person, family, and government, with all devotion that principle and affection can inspire, connected with Great Britain by the strongest ties that can unite societies, and deploring every event that tends in any degree to weaken them, we solemnly assure your Majesty, that we not only most ardently desire the former harmony between her and these colonies may be restored, but that a concord may be established between them upon so firm a basis as to perpetuate its blessings, uninterrupted by any future dissentions, to succeeding generations in both countries, and to transmit your Majesty's Name to posterity, adorned with that signal and lasting glory, that has attended the memory of those illustrious personages, whose virtues and abilities have extricated states from dangerous convulsions, and, by securing happiness to others, have erected the most noble and durable monuments to their own fame.

We beg leave further to assure your Majesty, that notwithstanding the sufferings of your loyal colonists, during the course of the present controversy, our breasts retain too tender a regard for the kingdom from which we derive our origin, to request such a reconciliation as might in any manner be inconsistent with her dignity or her welfare. These, related as we are to her, honor and duty, as well as inclination, induce us to support and advance; and the apprehensions that now oppress our hearts with unspeakable grief, being once removed, your Majesty will find your faithful subjects on this continent ready and willing at all times, as they ever have been, with their lives and fortunes, to assert and maintain the rights and interests of your Majesty, and of our Mother country.

[1] The word *Majesty's* is here inserted in the printed version.

EXHIBIT 18
0484
Digitized by Google

We, therefore, beseech your Majesty, that your royal authority and influence may be graciously interposed to procure us relief from our afflicting fears and jealousies, occasioned by the system before mentioned, and to settle peace through every part of your dominions, with all humility submitting to your Majesty's wise consideration whether it may not be expedient for facilitating those important purposes, that your Majesty be pleased to direct some mode, by which the united applications of your faithful colonists to the throne, in pursuance of their common councils, may be improved into a happy and permanent reconciliation; and that, in the mean time, measures may be taken for preventing the further destruction of the lives of your Majesty's subjects; and that such statutes as more immediately distress any of your Majesty's colonies may be repealed.

For by such arrangements as your Majesty's wisdom can form, for collecting the united sense of your American people, we are convinced your Majesty would receive such satisfactory proofs of the disposition of the colonists towards their sovereign and parent state, that the wished for opportunity would soon be restored to them, of evincing the sincerity of their professions, by every testimony of devotion becoming the most dutiful subjects, and the most affectionate colonists.

That your Majesty may enjoy a long and prosperous reign, and that your descendants may govern your dominions with honor to themselves and happiness to their subjects, is our sincere and fervent prayer.

JOHN HANCOCK

colony of New hampshire
    John Langdon
colony of Massachusetts bay
    Thomas Cushing
    Sam¹ Adams
    John Adams
    Robᵗ Treat Paine
colony of Rhode island and providence plantations
    Step Hopkins
    Sam: Ward
colony of Connecticut
    Elipht Dyer
    Roger Sherman
    Silas Deane

colony of New York
    Phil. Livingston
    Jaˢ Duane
    John Alsop
    Franˢ Lewis
    John Jay
    Robᵗ R Livingston junʳ
    Lewis Morris
    Wᵐ Floyd
    Henry Wisner
New Jersey
    Wil: Livingston
    John Dᵉ Hart
    Richᵈ Smith

EXHIBIT 18
0485
Digitized by Google

Pennsylvania
  John Dickinson
  B Franklin
  Geo: Ross
  James Wilson
  Chaˢ Humphreys
  Edwᵈ Biddle
counties of New Castle Kent and
  Sussex on delawar
  Cæsar Rodney
  Thoˢ Mᶜ Kean
  Geo: Read
Maryland
  Mat. Tilghman
  Thˢ Johnson Junʳ
  Wᵐ Paca
  Samuel Chase
  Thoˢ Stone

colony of Virginia
  P. Henry Jʳ
  Richard Henry Lee
  Edmund Pendleton
  Benjᵃ Harrison
  Th: Jefferson
North Carolina
  Will Hooper
  Joseph Hewes
South Carolina
  Henry Middleton
  Tho Lynch
  Christ Gadsden
  J. Rutledge
  Edward Rutledge.[1]

The committee appoint[ed] to prepare a Letter to the Lord Mayor, reported the same, which was read.

On motion, *Resolved*, That the above Committee prepare a letter to ~~Mr. Bollan, Mr. Lee and Mr.~~ R[ichard] Penn, Esqʳ and the colony Agents by name in England.[2]

The Congress resumed the Consideration of the address to the Inhabitants of Gt Britain, which being read and debated by paragraphs, was approved and ~~ordered to be printed~~ is as follows:

[here insert it]

[1] Endorsed: "Petition of the Congress to The King. Septʳ 1ˢᵗ 1775—Delivered to the Earl of Dartmouth by Messʳˢ Penn and Lee." The text is taken from the original petition, reproduced in facsimile in Stevens's *Facsimiles of Manuscripts in European Archives relating to America*, No. 454.

[2] Penn sailed for England four days later, and arrived in London August 14. A copy of the petition was not received by Lord Dartmouth until the 26th.

EXHIBIT 18
0486

*The Twelve United Colonies, by their Delegates in Congress, to the
Inhabitants of Great Britain.*[1]

FRIENDS, COUNTRYMEN, AND BRETHREN!

By these, and by every other Appellation that may designate the
Ties, which bind *us* to each other, we entreat your serious Attention
to this our second Attempt to prevent their Dissolution.   Remember-
ance of former Friendships, Pride in the glorious Atchievements of
our common Ancestors, and Affection for the Heirs of their Virtues,
have hitherto preserved our mutual Connexion; but when that Friend-
ship is violated by the grossest Injuries; when the Pride of Ancestry
becomes our Reproach, and we are no otherwise allied than as Tyrants
and Slaves; when reduced to the melancholy Alternative of renounc-
ing your Favour or our Freedom; can we hesitate about the Choice?
Let the Spirit of *Britons* determine.

In a former Address we asserted our Rights, and stated the Injuries
we had then received.   We hoped, that the mention of our Wrongs
would have roused that honest Indignation which has slept too long
for your Honor, or the Welfare of the Empire.   But we have not
been permitted to entertain this pleasing expectation.   Every Day
brought an accumulation of Injuries, and the Invention of the Min-
istry has been constantly exercised, in adding to the Calamities of
your *American* Brethren.

After the most valuable Right of Legislation was infringed; when
the Powers assumed by your Parliament, in which we are not repre-
sented, and from our local and other Circumstances cannot properly
be represented, rendered our Property precarious; after being denied
that mode of Trial, to which we have long been indebted for the safety
of our Persons, and the preservation of our Liberties; after being in
many instances divested of those Laws, which were transmitted to us
by our common Ancestors, and subjected to an arbitrary Code, compiled
under the auspices of *Roman* Tyrants; after those Charters, which
encouraged our Predecessors to brave Death and Danger in every
Shape, on unknown Seas, in Deserts unexplored, amidst barbarous and
inhospitable Nations, were annulled; when, without the form of Trial,
without a public Accusation, whole Colonies were condemned, their
Trade destroyed, their Inhabitants impoverished; when Soldiers were
encouraged to embrue their Hands in the Blood of *Americans*, by offers

[1] The Address is not entered in the MS. Journals, and I have used the text given
in the first printed edition of the Journal.

EXHIBIT 18
0487

Digitized by Google

of Impunity; when new modes of Trial were instituted for the ruin of the accused, where the charge carried with it the horrors of conviction; when a despotic Government was established in a neighbouring Province, and its Limits extended to every of our Frontiers; we little imagined that any thing could be added to this black Catalogue of unprovoked Injuries: but we have unhappily been deceived, and the late Measures of the *British* Ministry fully convince us, that their object is the reduction of these Colonies to Slavery and Ruin.

To confirm this Assertion, let us recal your attention to the Affairs of *America*, since our last Address. Let us combat the Calumnies of our Enemies; and let us warn you of the dangers that threaten you in our destruction. Many of your Fellow-Subjects, whose situation deprived them of other Support, drew their Maintenance from the Sea; but the deprivation of our Liberty being insufficient to satisfy the resentment of our Enemies, the horrors of Famine were superadded, and a *British* Parliament, who, in better times, were the Protectors of Innocence and the Patrons of Humanity, have, without distinction of Age or Sex, robbed thousands of the Food which they were accustomed to draw from that inexhaustible Source, placed in their neighbourhood by the benevolent Creator.

Another Act of your Legislature shuts our Ports, and prohibits our Trade with any but those States from whom the great Law of self-preservation renders it absolutely necessary we should at present withhold our Commerce. But this Act (whatever may have been its design) we consider rather as injurious to your Opulence than our Interest. All our Commerce terminates with you; and the Wealth we procure from other Nations, is soon exchanged for your Superfluities. Our remittances must then cease with our trade; and our refinements with our Affluence. We trust, however, that Laws which deprive us of every Blessing but a Soil that teems with the necessaries of Life, and that Liberty which renders the enjoyment of them secure, will not relax our Vigour in their Defence.

We might here observe on the Cruelty and Inconsistency of those, who, while they publicly Brand us with reproachful and unworthy Epithets, endeavour to deprive us of the means of defence, by their Interposition with foreign Powers, and to deliver us to the lawless Ravages of a merciless Soldiery. But happily we are not without Resources; and though the timid and humiliating Applications of a *British* Ministry should prevail with foreign Nations, yet Industry, prompted by necessity, will not leave us without the necessary Supplies.

EXHIBIT 18
0488
Digitized by Google

We could wish to go no further, and, not to wound the Ear of Humanity, leave untold those rigorous Acts of Oppression, which are daily exercised in the Town of *Boston*, did we not hope, that by disclaiming their Deeds and punishing the Perpetrators, you would shortly vindicate the Honour of the *British* Name, and re-establish the violated Laws of Justice.

That once populous, flourishing and commercial Town is now garrisoned by an Army sent not to protect, but to enslave its Inhabitants. The civil Government is overturned, and a military Despotism erected upon its Ruins. Without Law, without Right, Powers are assumed unknown to the Constitution. Private Property is unjustly invaded. The Inhabitants, daily subjected to the Licentiousness of the Soldiery, are forbid to remove in Defiance of their natural Rights, in Violation of the most solemn Compacts. Or if, after long and wearisome Solicitation, a Pass is procured, their Effects are detained, and even those who are most favoured, have no Alternative but Poverty or Slavery. The Distress of many thousand People, wantonly deprived of the Necessaries of Life, is a Subject, on which we would not wish to enlarge.

Yet, we cannot but observe, that a *British* Fleet (unjustified even by Acts of your Legislature) are daily employed in ruining our Commerce, seizing our Ships, and depriving whole Communities of their daily Bread. Nor will a Regard for your Honour permit us to be silent, while *British* Troops sully your Glory, by Actions, which the most inveterate Enmity will not palliate among civilized Nations, the wanton and unnecessary Destruction of *Charlestown*, a large, ancient, and once populous Town, just before deserted by its Inhabitants, who had fled to avoid the Fury of your Soldiery.

If you still retain those Sentiments of Compassion, by which *Britons* have ever been distinguished, if the Humanity, which tempered the Valour of our common Ancestors, has not degenerated into Cruelty, you will lament the Miseries of their Descendants.

To what are we to attribute this Treatment? If to any secret Principle of the Constitution, let it be mentioned; let us learn, that the Government, we have long revered, is not without its Defects, and that while it gives Freedom to a Part, it necessarily enslaves the Remainder of the Empire. If such a Principle exists, why for Ages has it ceased to operate? Why at this Time is it called into Action? Can no Reason be assigned for this Conduct? Or must it be resolved into the wanton Exercise of arbitrary Power? And shall the Descendants of *Britons* tamely submit to this?—No, Sirs! We never will,

**EXHIBIT 18**
**0489**

Digitized by Google

while we revere the Memory of our gallant and virtuous Ancestors, we never can surrender those glorious Privileges, for which they fought, bled, and conquered. Admit that your Fleets could destroy our Towns, and ravage our Sea-Coasts; these are inconsiderable Objects, Things of no Moment to Men, whose Bosoms glow with the Ardor of Liberty. We can retire beyond the Reach of your Navy, and, without any sensible Diminution of the Necessaries of Life, enjoy a Luxury, which from that Period you will want—the Luxury of being Free.

We know the Force of your Arms, and was it called forth in the Cause of Justice and your Country, we might dread the Exertion: but will *Britons* fight under the Banners of Tyranny? Will they counteract the Labours, and disgrace the Victories of their Ancestors? Will they forge Chains for their Posterity? If they descend to this unworthy Task, will their Swords retain their Edge, their Arms their accustomed Vigour? *Britons* can never become the Instruments of Oppression, till they lose the Spirit of Freedom, by which alone they are invincible.

Our Enemies charge us with Sedition. In what does it consist? In our Refusal to submit to unwarrantable Acts of Injustice and Cruelty? If so, shew us a Period in your History, in which you have not been equally Seditious.

We are accused of aiming at Independence; but how is this Accusation supported? By the Allegations of your Ministers, not by our Actions. Abused, insulted, and contemned, what Steps have we pursued to obtain Redress? We have carried our dutiful Petitions to the Throne. We have applied to your Justice for Relief. We have retrenched our Luxury, and withheld our Trade.

The Advantages of our Commerce were designed as a Compensation for your Protection: When you ceased to protect, for what were we to compensate?

What has been the Success of our Endeavours? The Clemency of our Sovereign is unhappily diverted; our Petitions are treated with Indignity; our Prayers answered by Insults. Our Application to you remains unnoticed, and leaves us the melancholy Apprehension of your wanting either the Will, or the Power, to assist us.

Even under these Circumstances, what Measures have we taken that betray a Desire of Independence? Have we called in the Aid of those foreign Powers, who are the Rivals of your Grandeur? When your Troops were few and defenceless, did we take Advantage of their Distress and expel them our Towns? Or have we permitted them to fortify, to receive new Aid, and to acquire additional Strength?

**EXHIBIT 18**
**0490**

Let not *your* Enemies and *ours* persuade you, that in this we were influenced by Fear or any other unworthy Motive. The Lives of *Britons* are still dear to us. They are the Children of our Parents, and an uninterrupted Intercourse of mutual Benefits had knit the Bonds of Friendship. When Hostilities were commenced, when on a late Occasion we were wantonly attacked by your Troops, though we repelled their Assaults and returned their Blows, yet we lamented the Wounds they obliged us to give; nor have we yet learned to rejoice at a Victory over *Englishmen.*

As we wish not to colour our Actions, or disguise our Thoughts, we shall, in the simple Language of Truth, avow the Measures we have pursued, the Motives upon which we have acted, and our future Designs.

When our late Petition to the Throne produced no other Effect than fresh Injuries, and Votes of your Legislature, calculated to justify every Severity; when your Fleets and your Armies were prepared to wrest from us our Property, to rob us of our Liberties or our Lives; when the hostile Attempts of General *Gage* evinced his Designs, we levied Armies for our Security and Defence. When the Powers vested in the Governor of *Canada,* gave us Reason to apprehend Danger from that Quarter; and we had frequent Intimations, that a cruel and savage Enemy was to be let loose upon the defenceless Inhabitants of our Frontiers; we took such Measures as Prudence dictated, as Necessity will justify. We possessed ourselves of *Crown Point* and *Ticonderoga.* Yet give us leave most solemnly to assure you, that we have not yet lost Sight of the Object we have ever had in View, a Reconciliation with you on constitutional Principles, and a Restoration of that friendly Intercourse, which, to the Advantage of both, we till lately maintained.

The Inhabitants of this Country apply themselves chiefly to Agriculture and Commerce. As their Fashions and Manners are similar to yours, your Markets must afford them the Conveniences and Luxuries, for which they exchange the Produce of their Labours. The Wealth of this extended Continent centres with you; and our Trade is so regulated as to be subservient only to your Interest. You are too reasonable to expect, that by Taxes (in Addition to this) we should contribute to your Expence; to believe, after diverting the Fountain, that the Streams can flow with unabated Force.

It has been said, that we refuse to submit to the Restrictions on our Commerce. From whence is this Inference drawn? Not from our

**EXHIBIT 18**
**0491**

Digitized by Google

Words, we have repeatedly declared the Contrary; and we again profess our Submission to the several Acts of Trade and Navigation, passed before the Year 1763, trusting, nevertheless, in the Equity and Justice of Parliament, that such of them as, upon cool and impartial Consideration, shall appear to have imposed unnecessary or grievous Restrictions, will, at some happier Period, be repealed or altered. And we cheerfully consent to the Operation of such Acts of the *British* Parliament, as shall be restrained to the Regulation of our external Commerce, for the Purpose of securing the commercial Advantages of the whole Empire to the Mother Country, and the commercial Benefits of its respective Members; excluding every Idea of Taxation internal or external, for raising a Revenue on the Subjects in *America*, without their Consent.

It is alledged that we contribute nothing to the common Defence. To this we answer, that the Advantages which *Great Britain* receives from the Monopoly of our Trade, far exceed our Proportion of the Expence necessary for that Purpose. But should these Advantages be inadequate thereto, let the Restrictions on our Trade be removed, and we will cheerfully contribute such Proportion when constitutionally required.

It is a fundamental Principle of the *British* Constitution, that every Man should have at least a Representative Share in the Formation of those Laws, by which he is bound. Were it otherwise, the Regulation of our internal Police by a *British* Parliament, who are and ever will be unacquainted with our local Circumstances, must be always inconvenient, and frequently oppressive, working our wrong, without yielding any possible Advantage to you.

A Plan of Accommodation (as it has been absurdly called) has been proposed by your Ministers to our respective Assemblies. Were this Proposal free from every other Objection, but that which arises from the Time of the Offer, it would not be unexceptionable. Can Men deliberate with the Bayonet at their Breast? Can they treat with Freedom, while their Towns are sacked; when daily Instances of Injustice and Oppression disturb the slower Operations of Reason?

If this Proposal is really such as you would offer and we accept, why was it delayed till the Nation was put to useless expence, and we were reduced to our present melancholy Situation? If it holds forth nothing, why was it proposed? Unless indeed to deceive you into a Belief, that we were unwilling to listen to any Terms of Accommodation. But what is submitted to our Consideration? We contend for

EXHIBIT 18
0492

Digitized by Google

the Disposal of our Property. We are told that our Demand is unreasonable, that our Assemblies may indeed collect our Money, but that they must at the same Time offer, not what your Exigencies or ours may require, but so much as shall be deemed sufficient to satisfy the Desires of a Minister and enable him to provide for Favourites and Dependants. A Recurrence to your own Treasury will convince you how little of the Money already extorted from us has been applied to the Relief of your Burthens. To suppose that we would thus grasp the Shadow and give up the Substance, is adding Insult to Injuries.

We have nevertheless again presented an humble and dutiful Petition to our Sovereign, and to remove every imputation of Obstinacy, have requested his Majesty to direct some Mode, by which the united Applications of his faithful Colonists may be improved into a happy and permanent Reconciliation. We are willing to treat on such Terms as can alone render an accommodation lasting, and we flatter ourselves that our pacific Endeavours will be attended with a removal of ministerial Troops, and a repeal of those Laws, of the Operation of which we complain, on the one part, and a disbanding of our Army, and a dissolution of our commercial Associations, on the other.

Yet conclude not from this that we propose to surrender our Property into the Hands of your Ministry, or vest your Parliament with a Power which may terminate in our Destruction. The great Bulwarks of our Constitution we have desired to maintain by every temperate, by every peaceable Means; but your Ministers (equal Foes to *British* and *American* freedom) have added to their former Oppressions an Attempt to reduce us by the Sword to a base and abject submission. On the Sword, therefore, we are compelled to rely for Protection. Should Victory declare in your Favour, yet Men trained to Arms from their Infancy, and animated by the Love of Liberty, will afford neither a cheap or easy Conquest. Of this at least we are assured, that our Struggle will be glorious, our Success certain; since even in Death we shall find that Freedom which in Life you forbid us to enjoy.

Let us now ask what Advantages are to attend our Reduction? the Trade of a ruined and desolate Country is always inconsiderable, its Revenue trifling; the Expence of subjecting and retaining it in subjection certain and inevitable. What then remains but the gratification of an ill-judged Pride, or the hope of rendering us subservient to designs on your Liberty.

Soldiers who have sheathed their Swords in the Bowels of their *American* Brethren, will not draw them with more reluctance against

**EXHIBIT 18**
**0493**

Digitized by Google

you. When too late you may lament the loss of that freedom, which we exhort you, while still in your Power, to preserve.

On the other hand, should you prove unsuccessful; should that Connexion, which we most ardently wish to maintain, be dissolved; should your Ministers exhaust your Treasures and waste the Blood of your Countrymen in vain Attempts on our Liberty; do they not deliver you, weak and defenceless, to your natural Enemies?

Since then your Liberty must be the price of your Victories; your Ruin, of your Defeat: What blind Fatality can urge you to a pursuit destructive of all that *Britons* hold dear?

If you have no regard to the Connexion that has for Ages subsisted between us; if you have forgot the Wounds we have received fighting by your Side for the extention of the Empire; if our Commerce is not an object below your consideration; if Justice and Humanity have lost their influence on your Hearts; still Motives are not wanting to excite your Indignation at the Measures now pursued; Your Wealth, your Honour, your Liberty are at Stake.

Notwithstanding the Distress to which we are reduced, we sometimes forget our own Afflictions, to anticipate and sympathize in yours. We grieve that rash and inconsiderate Councils should precipitate the destruction of an Empire, which has been the envy and admiration of Ages, and call God to witness! that we would part with our Property, endanger our Lives, and sacrifice every thing but Liberty, to redeem you from ruin.

A Cloud hangs over your Heads and ours; 'ere this reaches you, it may probably burst upon us; let us then (before the remembrance of former Kindness is obliterated) once more repeat those Appellations which are ever grateful in our Ears; let us entreat Heaven to avert our Ruin, and the Destruction that threatens our Friends, Brethren and Countrymen, on the other side of the *Atlantic.*

*Ordered,* That the Address be published and a number of them sent by M.ʳ Penn to England.[1]

The Letter to the Lord Mayor, &c., being read again and debated, was approved, and is as follows:

MY LORD,

Permitt the Delegates of the people of twelve antient colonies, to pay y.ʳ Lordship, and the very respectable body of which you are head,

---

[1] This address was printed as a Postscript to the *Pennsylvania Packet,* 17 July, 1775.

EXHIBIT 18
0494
Digitized by Google

the just tribute of gratitude and thanks, for the virtuous and unsolicited resentment you have shewn to the violated rights of a free people. The city of London, my Lord, having in all ages, approved itself the patron of liberty, and the support of just government, against lawless tyranny and oppression, cannot fail to make us deeply sensible of the powerful aid, our cause must receive from such advocates. A cause, my Lord, worthy the support of the first city in the world, as it involves the fate of a great continent, and threatens to shake the foundations of a flourishing, and, until lately, a happy empire.

North America, my Lord, wishes most ardently for a lasting connection with Great Britain on terms of just and equal liberty; less than which generous minds will not offer, nor brave and free ones be willing to receive.

A cruel war has at length been opened ag^st us, and whilst we prepare to defend ourselves like the descendants of Britons, we still hope that the mediation of wise and good citizens, will at length prevail over despotism, and restore harmony and peace, on permanent principles, to an oppressed and divided empire.

<div style="text-align:center">

We have the honor to be, my Lord,
With great esteem, y^r Lordship's
Faithful friends and fellow-subjects.

</div>

Signed by order of the Congress,

<div style="text-align:right">

JOHN HANCOCK
*President.*[1]

</div>

*Ordered,* That the above Letter be fairly transcribed, and signed by the president, and sent by M^r Penn.

The Committee appointed to prepare a letter to M^r Penn and the Colony Agents, bro^t in the same, which being read was approved:

GENTLEMEN,

The perseverence of the British ministry in their unjust and cruel system of colony administration, has occasioned the meeting of another Congress.

We have again appealed to the justice of our sovereign for protection ag^st the destruction which his Ministers meditate for his American subjects. This Petition to his Majesty you will please, Gentlemen, to present to the King with all convenient expedition, after which we

---

[1] This letter was printed in the *Pennsylvania Packet,* 11 December, 1775.

EXHIBIT 18
0495

desire it may be given to the public.   We likewise send you our second application to the equity and interest of our fellow subjects in G B, and also a Declaration setting forth the causes of our taking up arms: Both which we wish may be immediately put to press, and communicated as universally as possible.

The Congress entertain the highest sense of the wise and worthy interposition of the Lord Mayor and Livery of London, in favour of injured America.   They have expressed this, their sense, in a letter to his Lordship and the livery, which we desire may be presented in the manner most agreeable to that respectable body.

You will oblige us, Gentlemen, by giving the most early information to the Congress, and to the speakers of our respective assemblies, of your proceeding in this business, and such further intelligence as you may judge to be of importance to America in this great contest.

We are, with great regard, gentlemen, y$^r$ most obedient and very humble serv$^{ts}$.

By order of the Congress,

> [JOHN HANCOCK,
>                               *Pres.*]

*Ordered*, That the above be fairly transcribed, and to be signed by the pres$^t$, and then by him sent under cover, with the petition to the King, and address to the Inhabitants of G B, and letter to the L$^d$ Mayor of London to R[ichard] Penn, Esq$^r$ and to request him, in behalf of the Congress, to join with the Colony Agents in presenting the petition to the King.

Order of the day put off, and adjourned till Monday at 9 o'Clock.[1]

### MONDAY, JULY 10, 1775

The Congress met according to adjournment.

It being suggested, that there was a gentleman in town well acquainted with the situation and disposition of the Indians,

---

[1] A letter from General Schuyler, dated June 30, was received by express and read this day.   The letter is in *Papers of the Continental Congress*, No. 153, I, folio 10.

**EXHIBIT 18**
**0496**

Digitized by Google

# EXHIBIT "19"

EXHIBIT 19
0497

# The Online Library of Liberty

A Project Of Liberty Fund, Inc.

David Ramsay, *The History of the American Revolution, vol. 1* [1789]



## The Online Library Of Liberty

This E-Book (PDF format) is published by Liberty Fund, Inc., a private, non-profit, educational foundation established in 1960 to encourage study of the ideal of a society of free and responsible individuals. 2010 was the 50th anniversary year of the founding of Liberty Fund.

It is part of the Online Library of Liberty web site http://oll.libertyfund.org, which was established in 2004 in order to further the educational goals of Liberty Fund, Inc. To find out more about the author or title, to use the site's powerful search engine, to see other titles in other formats (HTML, facsimile PDF), or to make use of the hundreds of essays, educational aids, and study guides, please visit the OLL web site. This title is also part of the Portable Library of Liberty DVD which contains over 1,000 books and quotes about liberty and power, and is available free of charge upon request.

The cuneiform inscription that appears in the logo and serves as a design element in all Liberty Fund books and web sites is the earliest-known written appearance of the word "freedom" (amagi), or "liberty." It is taken from a clay document written about 2300 B.C. in the Sumerian city-state of Lagash, in present day Iraq.

To find out more about Liberty Fund, Inc., or the Online Library of Liberty Project, please contact the Director at oll@libertyfund.org.

LIBERTY FUND, INC.
8335 Allison Pointe Trail, Suite 300
Indianapolis, Indiana 46250-1684

EXHIBIT 19
0498



The
HISTORY
of the
AMERICAN
REVOLUTION
IN TWO VOLUMES
by David Ramsay, M.D.

EDITED BY LESTER H. COHEN

Volume I

Liberty Fund
INDIANAPOLIS

# Edition Used:

*The History of the American Revolution,* Foreword by Lester H. Cohen (Indianapolis: Liberty Fund 1990). Vol. 1.

> Author: [David Ramsay](#)
> Editor: [Lester H. Cohen](#)

# About This Title:

Vol. 1 of a 2 volume work. David Ramsay's *History of the American Revolution* appeared in 1789 during an enthusiastic celebration of nationhood. It is the first American national history written by an American revolutionary and printed in America. Ramsay, a well-known Federalist, was an active participant in many of the events of the period and a member of the Continental Congress from South Carolina. Ramsay discusses the events and ideas of the American Revolution (from the outbreak of turbulence in the 1760s to the onset of Washington's administration) and makes an ardent Federalist defense of the Constitution of 1787. Based on the original and authorized 1789 version, this is the first new modern edition of the work.

EXHIBIT 19
0499

## About Liberty Fund:

Liberty Fund, Inc. is a private, educational foundation established to encourage the study of the ideal of a society of free and responsible individuals.

## Copyright Information:

The copyright to this edition, in both print and electronic forms, is held by Liberty Fund, Inc.

## Fair Use Statement:

This material is put online to further the educational goals of Liberty Fund, Inc. Unless otherwise stated in the Copyright Information section above, this material may be used freely for educational and academic purposes. It may not be used in any way for profit.



Contents

FIRST VOLUME

FOREWORD / xiii
BIBLIOGRAPHY / xxxiii
EDITOR'S NOTE / xxxix
PREFACE TO THE FIRST EDITION / xliii

CHAPTER I

Of the Settlement of the English Colonies, and of the political
Condition of their Inhabitants. / 3

EXHIBIT 19
0500

# Table Of Contents

Foreword
Bibliography
Editor's Note
Acknowledgments
Preface [to the First Edition]
Chapter I: Of the Settlement of the English Colonies, and of the Political Condition of Their Inhabitants.
Chapter II: The Origin of the Disputes Between Great-britain and Her Colonies, In the Year 1764, and Its Progress Till 1773.
Chapter III: Tea Is Sent By the East India Company to America, and Is Refused, Or Destroyed, By the Colonists. Boston Port Act, &c.
Chapter IV: Proceedings of the Colonies In 1774, In Consequence of the Boston Port Act, Viz.
Chapter V: Transactions In Great-britain, In Consequence of the Proceedings of Congress, In 1774.
Appendix No. I: Some Special Transactions of Dr. Franklin In London, In Behalf of America.
Chapter VI: Consequences In America, Resulting From the Preceding Transactions of Parliament; and of the Commencement of Hostilities.
Chapter VII: The Second Congress Meets and Organises a Regular Continental Army—makes Sundry Public Addresses, and Petitions the King, &c. Transactions In Massachusetts.
Chapter VIII: Ticonderoga Taken, and Canada Invaded.
Chapter IX: Transactions In Virginia, the Carolinas, Georgia, and the General State of Public Affairs In the Colonies.
Chapter X: Transactions In Massachusetts, and Evacuation of Boston.
Chapter XI: Transactions In Canada.
Chapter XII: The Proceedings of Parliament, Against the Colonies, 1775–6. Operations In South-carolina, New-york, and New-jersey.
Chapter XIII: Of Independence, State Constitutions, and the Confederation.

EXHIBIT 19
0501

[Back to Table of Contents]

# Foreword

David Ramsay's *The History of the American Revolution* appeared in 1789, during an enthusiastic celebration of American nationhood. "Nationhood," moreover, was beginning to take on new cultural and intellectual connotations. The United States had declared its *political* independence more than a decade earlier, and a rising group of "cultural nationalists" was asserting that it was now time to declare *cultural* independence as well. The American people would never be truly autonomous otherwise. "However they may boast of Independence, and the freedom of their government," wrote Noah Webster, lexicographer, historian, and the nationalists' most brilliant spokesman, "yet their opinions are not sufficiently independent." Instead of liberating themselves from the influences of English culture, as they had from England's arms and government, the Americans were continuing to manifest "an astonishing respect for the arts and literature of their parent country, and a blind imitation of its manners." While such "habitual respect" for England was once understandable, even laudable, it had become an impediment to creating an independent American character and therefore posed dangers for the future.1

Cultural nationalism was almost inevitable in the aftermath of a revolution that seemed to require Americans to define not only their political identity, but their spiritual identity as well. Such nationalism manifested itself in a variety of ways in literature and the arts, science, and education. In its superficial manifestations, it testified to an American inferiority complex, consisting mainly of defensive protests against the notion, common in eighteenth-century Europe, that the New World was a physically and morally debased version of the Old, and of mushy effusions of patriotic sentiment over any product of American literature, art, or science. Thus one commentator gushed over Ramsay's *The History of the Revolution of South-Carolina* (1785), saying that it "reflects honour on this country, and gives room for hope that her literary will in time equal her military reputation," and Rev. James Madison enthused that the work's "Dress is altogether American." Another reviewer, praising *The History of the American Revolution,* observed that it is a "necessity that the history of the American revolution be written in our own country, by a person of suitable abilities, who has witnessed the incidents attendant on that great event."2 Thus did patriotism pass for culture, and Ramsay's work obviously measured up.

On a more sophisticated level, some cultural nationalists—Ramsay among them—developed greater insight into the idea of American cultural identity. These nationalists recognized that, along with the richly deserved celebration and self-congratulation, the new nation needed a strong unifying culture. Without a culture that articulated the fundamental tenets of liberty, constitutionalism, virtue, and simplicity, the principles of the American Revolution would soon become corrupted. Such corruption could come from without, through the people's continued reliance on English cultural values; it could also come from within, through the disintegrating forces already operating to dissolve the new nation into a multitude of disparate fragments. This realization prompted the nationalists anxiously to develop a notion of American identity that rested on two major premises: that politics, culture, and society

EXHIBIT 19
0502

were inextricably intertwined, so that a change in any one would subtly alter the others; and that culture was a significant force in shaping human consciousness, an idea which offered a powerful incentive to use literature as a means of exhortation.

Like all the historians of the Revolutionary era, Ramsay saw historical writing as a vehicle for fostering nationhood, an instrument for promoting the kind of unity, even homogeneity, that the cultural nationalists desired.3 Almost all the leading cultural nationalists were also political nationalists, the surest sign of which was that they saw the Constitution as the great vehicle for both creating and preserving American unity. And, although it was possible to be a nationalist culturally while opposing the Constitution for political reasons (as the historian, poet, and playwright Mercy Otis Warren made clear), Ramsay's reasons for writing a peculiarly consensual or national history were intimately tied to his Federalist political views.

Those reasons were motivated by Ramsay's perception that the new nation faced two sorts of danger: on the one hand, the danger of political divisions between the states and within each state, divisions which had already given rise to factions with competing economic interests; and on the other, the threat of social and cultural divisions among the people of the several states and regions, which could readily lead to insularity and hostility.

Thus, for example, he wrote in political terms about his fellow South Carolinians who put local interests ahead of national unity and opposed ratification of the Constitution. "To write, to speak, or even to think of a separation of the states is political blasphemy," he wrote to Jedidiah Morse. " 'One Indivisible' is my motto."4 He even postponed publication of his history of the Revolution until the fate of the Constitution had been decided, for "The revolution cannot be said to be completed till that or something equivalent is established."5 But Ramsay continued to fear the potential for disunity even after the Constitution had been operating for years. "We should, above all things, study to promote the union and harmony of the different states," he cautioned in 1794. "We should consider the people of this country … as forming one whole, the interest of which should be preferred to that of every part."6

While it is impossible to separate his political from his cultural motives, Ramsay was at his best when he spoke of the importance of historical writing with his cultural concerns in mind. In fact, in his Federalist pamphlet, "An Address to the Freemen of South-Carolina (1788)," he cast one of his strongest political arguments for the Constitution in cultural terms. He called upon his fellow Carolinians to "consider the people of all the thirteen states, as a band of brethren, speaking the same language, professing the same religion, inhabiting one undivided country, and designed by heaven to be one people."7 Ramsay was as sensitive as any intellectual of his era to the kinds of divisions, real and potential, that tended to separate Americans and undermine the unity he sought. Even ratification of the Constitution was less a culmination than a beginning, less a sign of unity than a foundation for it. "We are too widely disseminated over an extensive country & too much diversified by different customs & forms of government to feel as one people[,] which we are," he confided to John Eliot in 1795. But through historical writings, such as Jeremy Belknap's *History of New Hampshire* (1792), "we might become better acquainted with each

6

**EXHIBIT 19**
**0503**

other in that intimate familiar manner which would wear away prejudices—rub off asperities & mould us into a homogenous people." Belknap's achievement was all the more remarkable, for Belknap had written about a single state, yet his work breathed a national spirit.[8] In short, even in ostensibly local history, it was possible—indeed, necessary—to write of the nation and its character, for such writings tended to unify the people. "I long to see Dr. [Hugh] Williamson's history of North Carolina," Ramsay wrote to Belknap in 1795. "Indeed I wish to see a history of every state in the Union written in the stile and manner of yours & Williams's history of Vermont. We do not know half enough of each other. Enthusiastic as I am for the Unity of our republic[,] I wish for every thing that tends to unite us as one people who know[,] esteem & love each other."[9] In 1809, Ramsay's own *The History of South-Carolina* would join the list of nationalistic state histories.

Ramsay's passion for unity and his fear of fragmentation prompted him to invent a national past characterized by consensus. This is not to say that Ramsay was a dissembler or deceiver who created a past out of whole cloth. It is, rather, to emphasize that for Ramsay, as for all the historians of the Revolution, historical writing was not so much an end in itself as it was a means to cultivate the political and moral consciousness of the present and future generations. Sensitive to divisions within America—political, ethnic, racial, religious, economic—Ramsay genuinely feared chaos, and his experience in both state and confederation politics led him to believe that only by generating a constellation of commonly held values and principles could the nation resist the forces that tended to pull it apart. Ramsay did not invent those values and assumptions; he drew them out of the intellectual climate of Revolutionary America and found clues to them in America's past. But he focused upon them and molded them into the story of the new nation, so that his version of the past appeared to be inevitable. Thus, when Ramsay spoke of using history as an instrument of national unity, he meant to incite future generations to commit themselves to the principles of revolutionary republicanism.[10]

Ramsay, even more than his contemporary historians, was experienced in politics, knowledgeable about world affairs, sensitive to the economic and political interests of his compatriots, and had access to a vast number of historical records. He knew that America's past had been marked by tensions that from time to time had erupted into open conflict. Yet he purposefully created an image of the colonial past that diminished the importance of conflicts and portrayed the colonists as revolutionaries—an image of consensus, unity, and an unfaltering commitment to republican principles. In short, he attempted to create a national future by inventing a consensual past—to provide an instant tradition for a revolutionary people.

Ramsay's principal strategy was to establish a republican lineage, an unbroken succession of American generations that were strenuously committed to the principles of revolutionary republicanism from the moment of settlement in the seventeenth century. The colonists' chief characteristic was that they formed an intellectual, even spiritual, consensus on three major principles: they were politically dedicated to an ordered liberty within the context of law and balanced, representative government; they were ethically committed to the obligations of conscience and the public good, so that social life was simple and felicitous and individual conduct marked by industry

EXHIBIT 19
0504

and prudence; and they were convinced philosophically that people are free and efficacious beings who are responsible for their actions and for the consequences their actions bring about. It was this constellation of fundamental principles that constituted the American national character as Ramsay depicted it; and it was to this constellation that he pointed when he exhorted members of his own and future generations to develop cultural unity as a bulwark against division.

Again, Ramsay insisted that these principles were not new to the Revolutionary generation; the conflicts between the Americans and the British during the 1760s and '70s had merely called forth the original settlers' character. The complex coincidence of geography, politics, social arrangements, and values in colonial America had "produced a warm love for liberty, a high sense of the rights of human nature, and a predilection for independence."11

"From their first settlement, the English Provinces received impressions favourable to democratic forms of government." Colonization generally coincided with the struggles in England between Parliament and the crown, so that the issue of popular government based on consent, as contrasted with the divine rights of kings, was a current topic of debate. The colonists who emigrated to the New World consisted mainly of people who were "hostile to the claims of [monarchical] prerogative." They "were from their first settlement in America, devoted to liberty, on English ideas, and English principles." Crucially, these ideas were not mere abstractions. The colonists "not only conceived themselves to inherit the privileges of Englishmen, but though in a colonial situation, actually possessed them."12

By showing that republican principles and practices had been deeply ingrained in the people for generations, Ramsay vivified the image of a revolutionary past so far as to suggest that the colonists had been *independent* from the beginning. "The circumstances under which New-England was planted, would a few centuries ago have entitled them, from their first settlement, to the privileges of independence." The colonists had set out at their own expense, with no prospects other than hard work, to build homes and plant civilization in a wilderness. They purchased their lands from "the native proprietors" and exerted themselves to reap the bounties of nature. One hardly needed John Locke to make the argument that people who expended their own labor, paid for their own lands, and voluntarily formed their own governments owed no obligations to Britain except those that "resulted from their voluntary assent" as revealed in "express or implied compact." And those were manifestly limited. The people knew that government rested upon contracts freely entered; that taxation and representation were indissolubly joined; that they held and alienated their property only by consent; that the end of government was the happiness of the people; that the people were free to assemble and petition the government for redress of grievances; and that, all proximate means failing, the people had the natural right to rebel against tyrannical rule.13 Thus did the colonizing generation consist of proto-revolutionaries.

The colonists were not only republicans in politics, they were also dedicated to personal and social practices that conduced to individual happiness and to the public good. "The state of society in the Colonies favoured a spirit of liberty and independence," Ramsay wrote. Here, the "inhabitants were all of one rank. Kings,

EXHIBIT 19
0505

Nobles, and Bishops, were unknown to them." The people were "unaccustomed to that distinction of ranks" which characterized European society, and they were "strongly impressed with an opinion, that all men are by nature equal." The colonists' religious practices "also nurtured a love for liberty." The majority were Protestants, Ramsay noted, "and all protestantism is founded on a strong claim to natural liberty, and the right of private judgment." There were, of course, numerous sects, but "they all agreed in the communion of liberty, and all reprobated the courtly doctrines of passive obedience, and non-resistance." Nor were the colonists subjected to the pernicious effects of the luxury and opulence indulged in by the courts of Europe. Instead, "inured from their early years to the toils of a country life, they dwelled in the midst of rural plenty."

Colonial American society, in short, was characterized by simplicity of manners, and habits of industry, prudence, and morality. The colonists' experience thus "gave a cast of independence to the manners of the people" and diffused among them "the exalting sentiments" of liberty.[14]

Given the colonists' ingrained political and social values and their commitment to the principles of liberty and democratic government, it was obvious that the American Revolution was not a sudden upsurge of resentment against particular acts of Parliament. Resistance and revolution were the inevitable and justifiable responses of a people long habituated to such values. "The genius of the Americans"—that is, their original "republican habits and sentiments"—had prepared them to resist encroachments on their rights and to form popular governments during the Revolutionary era. This was the final element in Ramsay's message to future generations: confronted with arbitrary power, the colonists had established a tradition of showing the courage of their convictions, resisting inroads against their liberties, and taking responsibility for the future.[15]

But why should Ramsay have presented this manifestly one-dimensional image of the colonists as strenuous republicans, committed to simplicity, industry, prudence, equality, and natural rights? To some extent he actually did see them as American revolutionaries in the making, for so powerful was the "republican synthesis" in his own day that it shaped his ideas and experience and predisposed him to see all of history in its terms.[16] Yet this will not entirely explain Ramsay's over-simplifications, which seem drastic insofar as his history contains little or no intercolonial rivalry, popular uprisings against proprietary governors, political strife among competing interest groups, ethnic tensions, religious intolerances, or class divisions. Even slavery appears in Ramsay's *History* as a mitigated evil, which, while manifestly wrong, at least had produced sentiments of liberty and independence among the masters.[17] If for five or six generations the Americans had held the deeply ingrained political, social, moral, and philosophical principles that Ramsay described and if they had experienced a minimum of conflict, then why did Ramsay have to remind his readers of the American tradition above all else?

The answer contains three parts. First, as noted earlier, there were Ramsay's apprehensions. He feared that disunity would rend the fabric of the new nation—indeed, that without shared assumptions, principles, and values, as well as a

**EXHIBIT 19**
**0506**

federal Constitution, America might even separate into thirteen autonomous states or into two or three regional governments. In either case, it would become prey to the great European powers, even if it did not destroy itself from within.18

Second, Ramsay feared that the great tradition, particularly its powerful moral elements, had been badly damaged by the war. Throughout the war years and into the 1780s, Ramsay expressed his doubts whether the people had sufficient moral courage to make a republican experiment work. Within a year of delivering his stirring vision of an American republican future in his "Oration on the Advantages of American Independence" (1778), he wrote to William Henry Drayton that "A spirit of money-making has eaten up our patriotism." To Benjamin Rush he added: "I most devoutly wish for peace. Our morals are more depreciated than our currency, & that is bad enough." By 1783 he was worried that "This revolution has introduced so much anarchy that it will take half a century to eradicate the licentiousness of the people. I wish for the honor of human nature that in these last ages of the world it may appear that mankind are capable of enjoying the blessings of freedom without the extravagancies that usually accompany it." By 1785 the theme of internal corruption had become more insistent and urgent. "I feel with you the declension of our public virtue," he wrote to John Eliot. "Liberty which ought to produce every generous principle has not in our republics been attended with its usual concomitants. Pride[,] Luxury[,] dissipation & a long train of unsuitable vices have overwhelmed our country." And within a year he expressed the ultimate fear: "We have neither honesty nor knowledge enough for republican governments. … During the war we thought the termination of that would end all our troubles. It is now ended three years & our public situation is as bad as ever."19 ~ ~

The third part of the answer is that historical writings, like Fourth of July orations, sermons, and "all the powers of Eloquence" had the capacity to shape thought, and thus historians, like ministers and politicians, had an *obligation* to use their writings "to counter-act that ruinous propensity we have for foreign superfluities & to excite us to the long neglected virtues of Industry & frugality."20 History, in short, was a moral art. That was why Ramsay praised Belknap's and Williams's histories; that was why he believed that John Eliot's *Biographical Dictionary* "rendered an essential service to the living by holding up so many excellent models for their imitation from the illustrious dead"; and that was why he deliberately omitted conflict and strife in the colonial past.21 Indeed, Ramsay once drew an instructive analogy between history and fiction: "Novelists take fiction & make it a vehicle of their opinions on a variety of subjects," he observed. "I take truth & the facts of history for the same purpose."22 Ramsay was well aware that he was using "art" in the service of history and history in the service of morality and national unity. "Had I a voice that could be heard from New Hampshire to Georgia," he said in 1794, "it should be exerted in urging the necessity of disseminating virtue and knowledge among our citizens." His histories represented that voice.

Ramsay's voice was, in fact, heard all over America and over much of Europe as well.23 Between 1785, when he was thirty-six, and his death in 1815, he published three histories—two on South Carolina and *TheHistory of the American Revolution*—that remain significant after two hundred years. He also wrote numerous

EXHIBIT 19
0507

other works, ranging from an analysis of yellow fever and well water in Charleston, to a eulogy on the death of his friend and mentor, Benjamin Rush, to a memoir of his wife, Martha Laurens Ramsay, to two examples of that distinctively American genre, the Fourth of July oration.

Even in an age dominated by such *philosophes* as Benjamin Franklin and Thomas Jefferson, Ramsay is notable for his fertile and restless intellect. He entered the sophomore class of the College of New Jersey (later renamed Princeton) in 1762 and was graduated three years later at age sixteen. For the next five years he taught school in Maryland and Virginia. Deciding finally to pursue a career in medicine, he enrolled in the newly reorganized medical school of the College of Philadelphia, which boasted an excellent faculty that included the brilliant twenty-four-year-old Rush. Ramsay received his Bachelor of Physic in 1773. On Ramsay's graduation Rush summarized the talents of his young friend, whom he esteemed as "far superior to any person we ever graduated at our college; his abilities are not only good, but great; his talents and knowledge are universal; I never saw so much strength of memory and imagination, united to so fine a judgment."[24]

In 1774, after practicing medicine for a year in Cecil County, Maryland, Ramsay set out for Charleston, where he made his home for the rest of his life. Charleston was then a leading Southern city, with some 12,000 inhabitants, a growing commerce, and a well-defined social hierarchy that divided whites from one another along class lines and whites from blacks along racial lines—clear evidence of the divisions in society to which he was so sensitive and which he deemphasized in his *History.* Yet within a year of his arrival, this outsider from Pennsylvania, the son of immigrants and a Presbyterian in the midst of an Anglican elite, had married Sabina Ellis, daughter of a prominent merchant,[25] and within three years, he was elected to the South Carolina assembly. By 1778 Ramsay had a seat on the state's prestigious privy council. He served in the Continental Congress in 1785, returned to his seat in the state assembly in 1786, served as a delegate to the convention that ratified the South Carolina state constitution in 1788. From 1791 to 1797 Ramsay was president of the state senate. His only disappointment in politics was his resounding defeat by William Loughton Smith for a seat in the first federal congress.[26]

Neither his political nor his medical and scientific careers, however, seemed to satisfy his intellectual curiosity. Ramsay turned to historical writing, he explained to Thomas Jefferson, "when I was in confinement in St. Augustine in the year 1781 and [it] has employed my leisure hours ever since."[27] But Ramsay was drawn to history and to his national vision by his political experience, which convinced him that state government was, by turns, too timid and too wild to solve many of the problems that arose in the post-Revolutionary era. "There is a languor in the States that forebodes ruin," he complained to Rush in 1786. He also noted the "temporising" of the Southern states in particular, and feared the disintegration of the United States if the Constitutional Convention did not produce "an efficient federal government."[28] Politics and government were no better in South Carolina; they may have been worse:

The eight years of war in Carolina were followed by eight years of disorganization, which produced such an amount of civil distress as diminished with some their



respect for liberty and independence. Several apprehended that the same scenes which had taken place in England in the seventeenth century after a long and bloody civil war, would be acted over again in America by a fickle people who had neither the fortitude nor the wisdom to govern themselves. … Peace and liberty were found inadequate to promote public happiness without the aid of energetic government.

The state legislature either languished and did nothing or legislated too much. The best and most courageous act performed by state officials, finally, was to agree to the Constitution that would constrain some of their own power! 29

With first-hand experience of the inefficiencies and vacillations of state government and an urge to cultivate eloquence, Ramsay began writing history. He announced optimistically in his "Oration on the Advantages of American Independence" (1778) that the very presence of free, republican institutions was bound to produce an exalted literature. In an oppressive regime, "ignorance," after all, "was better than knowledge," whereas "Eloquence is the child of a free state." America, he predicted, "will produce poets, orators, criticks, and historians, equal to the most celebrated of the ancient commonwealths of Greece and Italy."30

Despite his optimism about the prospects of culture in the new nation, Ramsay soon faced a grim reality. Although he became known as America's "Tacitus" and "Polybius," he learned all too quickly that "the trade of an author is a very poor one in our new world." Concerning *The History of the Revolution of South-Carolina,* he lamented to fellow historian William Gordon: "My advances will not be replaced till I have sold 500 copies & my debts contracted and yet unpaid will require the sale of 700 more. The edition has cost me 5,000 dollars. The printers bill is 2500 dollars. The engravings 800[,] the binding 4/ 10 a copy. In short I have no brilliant pecuniary prospects before me."31

Yet despite the financial failure of his South Carolina history, Ramsay immersed himself in *TheHistory of the American Revolution* during his tenure in the Continental Congress. Here he had access to people prominent on a national level and to an enormous archive. He predicted to Rush that "I can write the general history of the revolution with more ease than I have wrote a part of it. Indeed, I have got the facts already collected." He had ready to hand, he said, a great many documents: "from my access to papers … and the regularity of records in the offices of Congress[,] I have been enabled to do a great deal in a little time."32 His facts may have been substantially collected, but Ramsay made the effort to pose numerous detailed questions to several people about various aspects of the Revolution. He wrote to Rush on several occasions; to Elias Boudinot (commissary general of prisoners for the Continental Army and a member of Congress for five years); to Gouverneur Morris (member of the New York provincial congress and for four years an assistant minister of finance under Robert Morris); to Charles Thomson (secretary of the Continental Congress from 1774 to 1789); and to John Adams. He also sent his manuscript to Charles Thomson, who read it, made comments on it, and promised to circulate it among other knowledgeable readers.33

**EXHIBIT 19**
**0509**

No doubt these inquiries made for a better history. But Ramsay fared almost as poorly on this work as he had on the previous one. He had problems with his printer, Robert Aitken, whose work, said Ramsay, "offends against every principle of good printing. The printing[,] the spelling[,] the ink[,] the form of the lines are in many cases execrable." In addition, asked the outraged Ramsay, "What think you of his stopping the work on the pretence of want of money[,] though 760 dollars were advanced in the time of the work[,] the whole of which was only to cost 1200 dollars?"[34] He also complained that he had been "cheated by booksellers & printers," who were taking far too much of the proceeds of the sales in advertising. Ramsay was eventually reduced to barter: "If my books that are unsold could be exchanged for a copy of your state laws or of the laws of the neighboring states," he wrote to John Eliot, "I would be most pleased. I would exchange them for any good books rather than [that] they should remain on hand." Finally, Ramsay had to swallow the fact that his *History* had been pirated by John Stockdale in London. It was bad enough that "The errors & blunders of Aitkens edition are many and cannot be corrected," he wrote to John Eliot. Worse yet, "Stockdale has printed one in London without my consent & many of the copies of Aitkens edition are yet on hand." Ramsay had not yet seen the London edition in April 1793, nor had he "any knowledge of it till it was nearly executed." Needless to say, he realized no profit on Stockdale's editions or on the several that were based on it .[35]

Ramsay's reputation as a historian was excellent throughout his life and for decades afterwards. *The History of the American Resolution* has enjoyed a resurgence of interest in the last twenty-five years. The only significant dissenting voice in the last two centuries was that of Orrin Grant Libby, who showed that Ramsay had plagiarized portions of both it and *The History of the Revolution of South-Carolina* from the *Annual Register*.[36] Each issue of the *AnnualRegister,* published continuously from 1758, contained a superb "History of Europe" section which for some years was written by Edmund Burke. This section contained a narrative of the most important events in contemporary English history. Thus, during the years between 1765 and 1783, it was filled with news of American affairs—political, military, economic. Along with the sections known as "State Papers" and "Appendix to the Chronicle," both of which contained the texts of contemporary documents, the "History of Europe" was a comprehensive, beautifully written narrative that had the additional merit of being written from an English Whig (and, therefore, an anti-war or pro-American) standpoint. Each issue of the *Annual Register* went through numerous editions and circulated widely in America.[37]

Ramsay did, in fact, lift passages verbatim from the *Annual Register*, though Libby certainly exaggerated in suggesting that Ramsay "plagiarized a large part" of his book on the American Revolution either from it or from William Gordon's work.[38] But even if all the examples are conceded, they amount to a very small part of the seven hundred pages. More important, the plagiarism has no substantial impact on its value to modern readers; there is no reason for us to agree with Libby's conclusion that, because of the plagiarism, the *History* is "well-nigh worthless."[39]

First, scholarly citation as we know it was not an issue for eighteenth-century writers, who honored the practice, if at all, only in the most irregular and idiosyncratic

EXHIBIT 19
0510

manner. Second, eighteenth-century American histories were performances, not proofs; they more nearly resemble sermons, which inspire by enunciating principles and applying them to human situations, than scientific or legal discourses, which depend for their cogency and persuasiveness on their marshalling of evidence. Finally, and most importantly, Libby's criticism, which spoke to the advocates of "scientific" historicism at the start of the twentieth century, has become largely irrelevant to most modern readers. While we still learn factual information from some of our "ancient" histories—Cotton Mather's *Magnalia ChristiAmericana* (1702), incredibly rich with detail, leaps to mind—we do not similarly value the factual nature of Ramsay's histories with the possible exception of *TheHistory of South-Carolina* (1809*)*. Hence, we are less concerned with having precise information about Ramsay's sources.

Instead, we learn from Ramsay the *interpreter* of his present and his past. We learn about the intellectual predilections of the eighteenth-century historian: the values, assumptions, principles, and expectations of one who lived and wrote amidst the events he narrated. We learn from the ways in which he shaped *history*: his use of language, his sense of the significance of people and events, his narrative style, his use of history as propaganda, as exhortation, and as fiction. We do not, in short, rely on Ramsay to tell us what happened during the Revolution, any more than we rely on him for medical advice, which included Benjamin Rush's recommended practice: bleeding. In most respects we know a great deal more about what happened than he did, particularly since *we* are now the arbiters of what is significant. We rely on Ramsay not for information, but for the ways in which he reveals the sensibility through which the events of his era were filtered.

Lester H. Cohen

> Indianapolis, Indiana

April 1989

Lester H. Cohen received M. Phil. and Ph.D. degrees from Yale University and a J.D. degree from Indiana University School of Law, Indianapolis. He taught intellectual history and American studies for fourteen years at Purdue University. He currently practices law with the firm of Barnes & Thornburg in Indianapolis.

EXHIBIT 19
0511

[Back to Table of Contents]

# Bibliography

## The Writings Of David Ramsay

manuscripts

Ramsay's papers are scattered among almost two dozen repositories. Listed below are institutions with significant holdings:

Library Company of Philadelphia

Historical Society of Pennsylvania

Library of Congress

Massachusetts Historical Society

American Philosophical Society

South Carolina Historical Society

New York Public Library

collections

Robert L. Brunhouse, ed., *David Ramsay, 1749–1815: Selections from His Writings,* American Philosophical Society, *Transactions,* New Series, 55 (1965), Part IV.

publications

"A Sermon on Tea," (Lancaster, Pa., 1774).Reprinted in Brunhouse: 170–182.

"An Oration on the Advantages of American Independence. . ." [July 4, 1778], (Charleston, S.C., 1778).Reprinted in Brunhouse: 182–190.

*The History of the Revolution of South-Carolina, from a Britsh Province to an Independent State* (2 vols.; Trenton, N.J., 1785).French translations: London, 1787; Paris, 1796.

"An Address to the Freemen of South-Carolina, on the Subject of the Federal Constitution, Proposed by the Convention, which met in Philadelphia, May 1787. By Civis,'' (Charleston, S.C., 1788).*American Museum,* 3 (1788): 413–418.

Paul Leicester Ford, ed., *Pamphlets on the Constitution of the United States, Published During Its Discussion by the People, 1787–1788* (Brooklyn, 1888): 371–380.

*The History of the American Revolution* (2 vols.; Philadelphia, 1789).London, 1790, 1791, 1793; Dublin, 1793, 1795; Trenton, N.J., 1811; Lexington, Ky., 1815; Campen, Holland, 4 vols., 1792–1794; Berlin, Germany, 4 vols., 1794–1795.

"Observations on the Decision of the House of Representatives of the United States, on the 22d of May, 1789; Respecting the Eligibility of the Hon. William Smith, of South-Carolina, to a Seat in that House," (New York, 1789).

"A Dissertation on the Means of Preserving Health in Charleston, and the Adjacent Low Country. Read Before the Medical Society of South-Carolina, on the 29th of May, 1790," (Charleston, S.C., 1790).*New-York Magazine,* or *Literary Repository, 6* (1795): 514–519, 585–593.

EXHIBIT 19
0512

[Supposed Author], "Observations on the Impolicy of Recommending the Importation of Slaves, Respectfully Submitted to the Consideration of the Legislature of South-Carolina. By a Citizen of South-Carolina," (Charleston, S.C., 1791 [?]).

"An Oration, Delivered in St. Michael's Church, before the Inhabitants of Charleston, South-Carolina, on the Fourth of July, 1794, in commemoration of American Independence … ," (Charleston, S.C., 1794).Reprinted in Brunhouse: 190–196.

"A Review of the Improvements, Progress and State of Medicine in the XVIIIth Century" [Delivered January 1, 1800], (Charleston, S.C., 1800).Reprinted in Brunhouse: 196–217.

"An Oration on the Death of Lieutenant-General George Washington, Late President of the United States, who Died December 14, 1799. Delivered in Saint Michael's Church, January 15, 1800 … ,'' (Charleston, S. C., 1800).

*The Life of George Washington, Commander in Chief of the Armies of the United States of America, throughout the War which Established their Independence, and First President of the United States* (New York, 1807).London, 1807; Boston, 1811; Baltimore, 1814, 1815, 1818, 1825, 1832.French translation: Paris, 1809.Spanish translations: Paris, 1819, 1825; New York, 1825; Philadelphia, 1826; Barcelona, 1843.

*The History of South-Carolina, from its first Settlement in 1607, to the Year 1808* (2 vols.; Charleston, S.C., 1809).Newberry, South Carolina, 1858.Photo-facsimile of 1858 ed. (Spartanburg, S.C., 1959–60).

*Memoirs of the Life of Martha Laurens Ramsay. . .* (Philadelphia, 1811).Charlestown, Mass., 1812; Boston, 1812, 1814, 1824, 1827; Philadelphia, 1813, 1845, 1895; Glasgow, 1818; Chelmsford, 1827.

*Historical and Biographical Chart of the United States* (n.p., n.d.).

*A Chronological Table of the Principle Events which have taken Place in the English Colonies, now United States, from 1607, til 1810* … (Charleston, S.C., 1811).

"An Eulogium upon Benjamin Rush, M.D. … Delivered … on the 10th of June, 1813 … ," (Philadelphia, 1813).

*History of the United States, from their first Settlement, as English* Colonies, *in1607, to the Year 1808, or the thirty-third of their Sovereignty ... Continued to the Treaty of Ghent, by S.S. Smith ... and other Literary Gentlemen* (3 vols.; Philadelphia, 1818).

*Universal History Americanised; or, an Historical View of the World, from the earliest Records to the Year 1808. With a particular reference to the State of Society, Literature, Religion and Form of Government, in the United States of America . . .* (12 vols.; Philadelphia, 1819).

A list of Ramsay's articles published in the *Medical Repository,* 1801–1808, is in Brunhouse, *Selections,* 230–231.

# SECONDARY SOURCES

The starting point for Ramsay studies is Robert L. Brunhouse, ed., *David Ramsay, 1749–1815: Selections from His Writings,* American Philosophical Society, *Transactions,* New Series, 55 (1965), Part IV. Brunhouse's superb collection includes

EXHIBIT 19
0513

a biography of Ramsay, some three hundred letters, and reprints of "A Sermon on Tea" (1774), "An Oration on the Advantages of American Independence" (1778), "An Oration … on the Fourth of July, 1794," and "A Review of … Medicine in the XVIIIth Century" (1800). Robert Y. Hayne, Ramsay's friend and the executor of Ramsay's estate, published a view of Ramsay's life and work in "Biographical Memoir of David Ramsay, M.D." *Analectic Magazine,* 6 (1815): 204–224.

Studies of historical writing in the Revolutionary Era include Arthur H. Shaffer, *The Politics of History: Writing the History of the American Revolution, 1783–1815* (Chicago, 1975), in which Ramsay figures prominently; William Raymond Smith, *History as Argument: Three Patriot Histories of the American Revolution* (The Hague, 1966), which focuses on Ramsay, John Marshall, and Mercy Otis Warren; and Lester H. Cohen, *TheRevolutionary Histories: Contemporary Narratives of the American Revolution* (Ithaca, N.Y., 1980); "Creating a Useable Future: The Revolutionary Historians and the National Past," in Jack P. Greene, ed., *The American Revolution: Its Character and Limits* (New York, 1987): 309–330; and Mercy Otis Warren's *History of the Rise, Progress and Termination of the American Revolution* (Indianapolis, 1988): xvi-xxxvii. Wesley Frank Craven's *The Legend of the Founding Fathers* (Ithaca, N.Y., n.d.) remains a lively and provocative study of the image of the founding of America in the writings of successive generations of American histories.

The best interpretation of Ramsay's historical writings and political thought include Page Smith, "David Ramsay and the Causes of the American Revolution," *William and Mary Quarterly,* 3d Series, 17 (January 1960): 51–77 (this was reprinted in Page Smith, *The Historian and History* (New York, 1960), which rescued Ramsay and his work from the pall cast over them by Orrin Grant Libby); Lawrence J. Friedman and Arthur H. Shaffer, "David Ramsay and the Quest for an American Historical Identity,'' *Southern Quarterly,* 14 (July 1976): 351–371, and "History, Politics, and Health in Early American Thought: The Case of David Ramsay," *Journal of American Studies,* 13 (April 1979): 37–56; and Arthur H. Shaffer, "Between Two Worlds: David Ramsay and the Politics of Slavery," *Journal of Southern History,* 50 (May 1984): 175–196.

EXHIBIT 19
0514

[Back to Table of Contents]

# Editor'S Note

This edition of Ramsay's *The History of the American Revolution* is the first to reprint the original 1789 edition printed by R. Aitken and Son in Philadelphia. That was the only edition that Ramsay actually authorized. The others, including the popular London edition of 1793, printed by John Stockdale, were pirated before the promulgation of effective copyright laws.

Aitken's and Stockdale's editions vary only minutely. In numbering the pages, Aitken omitted page numbers 321 and 322 of the first volume, so that the text flows directly from page 320 to page 323. Stockdale did not preserve Aitken's error; we did, in order to conform to the pagination of the first edition. Aitken also rendered page 32 of volume I as page "13." We have corrected that error, since it has no bearing on the actual pagination and since preserving it would have no value for modern readers. Stockdale's copy of Aitken's edition, like the one we used here, may have contained a few illegible passages. Stockdale must have interpolated at those points and occasionally misread the text. We have stayed with the wording of the original by comparing it with another printing.

Ramsay was substantially correct about Aitken's "execrable" printing. Aitken's punctuation is wildly irregular and his spelling idiosyncratic. He transposed letters and abbreviated titles inconsistently and, apparently, according to some inner vision. Thus, we were faced with numerous choices. We have tried here to fulfill the ideal of remaining as faithful to the original text as possible while producing a volume that is accessible to modern readers. We have silently corrected the text where errors were obviously the result of the printer—transposed letters, misspelled words—and where to preserve the errors would have no realistic scholarly or aesthetic value. In a number of instances Ramsay's punctuation has been modernized. Most of the time this meant removing dashes erratically placed (by today's standards) and extraneously placed (duplicating a directly preceding or succeeding punctuation mark). In rarer instances, periods and commas were inserted or removed to correct a glaring omission or a usage that strongly clashed with modern conventions of punctuation. As already implied, our policy was to make such alterations in as conservative a manner as possible—and thus a number of the original quirks and errors, which do have the merit of preserving something of the flavor of the first edition, still reside in this one.

We have, in addition, rendered lengthy quotations in block-indented form, rather than run quotation marks down both sides of paragraphs as in the original.

We have preserved the page numbers of the original, which here appear in brackets in the text. We have also preserved Ramsay's and Aitken's marginalia, although we have silently corrected dates appearing in the margins where the originals were clearly erroneous and deleted some of the most redundant of the dates that were repeated. We have added an index for the convenience of modern readers and researchers. Four appendices, interspersed between chapters rather than included together at the end of

EXHIBIT 19
0515

the book, have been kept in the place originally assigned to them by Ramsay and Aitken.

EXHIBIT 19
0516

[Back to Table of Contents]

# Acknowledgments

In addition to sharing with me his knowledge and writings on Ramsay, Arthur H. Shaffer graciously read an early version of the introduction and offered useful suggestions. I am currently reviewing Shaffer's authoritative biography of Ramsay, the manuscript of which arrived unfortunately too late for me to borrow from as liberally as I would have liked. Upon publication, Shaffer's biography will be as indispensable as Brunhouse's excellent collection of sources. Linda Levy Peck proved again the value of her friendship and her keen eye for bad writing. She favored the foreword with several readings, helping me to eliminate the gaffes that no longer appear. Dan McInerney and Bruce Kahler, two former Ph.D. students, also read this material and made numerous valuable suggestions. Bill Dennis, Barbara Reynolds, and Chuck Hamilton of Liberty Fund were, as always, a delight to work with. They took a chance on publishing two early American histories—first Mercy Otis Warren's and then David Ramsay's—and made the experiences gratifying for me.

In preparing Ramsay's *History* for publication, I had the extraordinary experience of coming full circle. At the beginning of my graduate career in 1966, I was blessed by having Page Smith as my mentor and friend; at the end of my teaching career, there was David Ramsay, whom Page introduced to me, along with his passion for the beauty and deceptive simplicity of narrative. I have always identified the two, David Ramsay and Page Smith, no doubt because Page has always exemplified for me the finest spirit of the eighteenth century. If these volumes were mine, rather than Ramsay's, to dedicate, I would dedicate them with admiration and respect to Page Smith.

L.H.C.

EXHIBIT 19
0517

[Back to Table of Contents]

# Preface [To The First Edition]

The materials for the following sheets were collected in the year 1782, 1783, 1785, and 1786; in which years, as a member of Congress, I had access to all the official papers of the United States. Every letter written to Congress by General Washington, from the day he took the command of the American army till he resigned it, was carefully perused, and it's contents noted. The same was done with the letters of other general officers, ministers of Congress, and others in public stations. It was intended to have enlarged the work by the insertion of state papers, as proofs and illustrations of my positions. This I could easily have done, and shall do at a future time, and in a separate work, if the public require it. At present I thought it prudent to publish little more than a simple narrative of events, without introducing my authorities. Several of these are already in my *History of the Revolution of South-Carolina,* and such as are printed may be found in the periodical publications of the day. I have endeavoured to give much original matter at a small expence. As I write about recent events, known to thousands as well as myself, proofs are at present less necessary than they will be in future.

I appeal to the actors in the great scenes which I have described for the substantial truth of my narrative. Intentional misrepresentations, I am sure there are none. If there are any from other sources, I trust they will be found in small circumstances, not affecting the substance.

October 20, 1789

EXHIBIT 19
0518

[Back to Table of Contents]

# CHAPTER I

# Of The Settlement Of The English Colonies, And Of The Political Condition Of Their Inhabitants.

[1] The Extensive Continent which is now called America, was three hundred years ago unknown to three quarters of the globe. The efforts of Europe during the fifteenth century to find a new path to the rich countries of the East, brought on the discovery of a new world in the West.

Christopher Columbus acquired this distinguished honor in the year 1492, but a later navigator Americus Vespucius who had been employed to draw maps of the new discoveries, robbed him of the credit he justly merited of having the country called by his name.

1492

In the following year 1493, Pope Alexander the sixth, with a munificence that cost him nothing, gave the whole Continent to Ferdinand and Isabella of Spain. This grant was not because the country was uninhabited, but because the nations existing there were infidels; and therefore in the opinion of the infallible donor not entitled to the possession of the territory in which their Creator had placed them. This extravagant claim of a right to dispose of the countries of heathen nations, was too absurd to be universally regarded, even in that superstitious age. And in defiance of it, several European sovereigns though devoted to the See of Rome undertook and successfully prosecuted further discoveries in the Western hemisphere.

1493

[2]

Henry the seventh of England, by the exertion of an authority similar to that of Pope Alexander, granted to John Cabot and his three sons a commission, "to navigate all parts of the ocean for the purpose of discovering Islands, Countries, Regions or Provinces, either of Gentiles or Infidels, which have been hitherto unknown to all christian people, with power to set up his standard and to take possession of the same as Vassals of the crown of England."

1496

By virtue of this commission, Sebastian Cabot explored and took possession of a great part of the North American continent, in the name and on behalf of the king of England.

1498

The country thus discovered by Cabot was possessed by numerous tribes or nations of people. As these had been till then unknown to all other Princes or States, they could not possibly have owed either allegiance or subjection to any foreign power on earth; they must have therefore been independent communities, and as such capable of acquiring territorial property, in the same manner as other nations. Of the various principles on which a right to soil has been founded, there is none superior to immemorial occupancy. From what time the Aborigines of America had resided therein, or from what place they migrated thither, were questions of doubtful solution, but it was certain that they had long been sole occupants of the country. In this state no European prince could derive a title to the soil from discovery, because that can

EXHIBIT 19
0519

give a right only to lands and things which either have never been owned or possessed, or which after being owned or possessed have been voluntarily deserted. The right of the Indian nations to the soil in their possession was founded in nature. It was the free and liberal gift of Heaven to them, and such as no foreigner could rightfully annul. The blinded superstition of the times regarded the Deity as the partial God of christians, and not as the common father of saints and savages. The pervading influence of philosophy, reason, and truth, has since that period, given us better notions of the rights of mankind, and of the obligations of morality.

These unquestionably are not confined [3] to particular modes of faith, but extend universally to Jews and Gentiles, to Christians and Infidels.

1496

Unfounded however as the claims of European sovereigns to American territories were, they severally proceeded to act upon them. By tacit consent they adopted as a new law of nations, that the countries which each explored should be the absolute property of the discoverer. While they thus sported with the rights of unoffending nations, they could not agree in their respective shares of the common spoil. The Portuguese and Spaniards, inflamed by the same spirit of national aggrandizement, contended for the exclusive sovereignty of what Columbus had explored. Animated by the rancour of commercial jealousy, the Dutch and Portuguese fought for the Brazils. Contrary to her genuine interests, England commenced a war in order that her contraband traders on the Mexican coast, claimed by the king of Spain might no longer be searched. No farther back than the middle of the present century, a contest concerning boundaries of American territory belonging to neither, occasioned a long and bloody war between, France and England.

Though Queen Elizabeth and James the first denied the authority of the pope of Rome to give away the country of Infidels; yet they so far adopted the fanciful distinction between the rights of heathens and the rights of christians, as to make it the foundation of their respective grants. They freely gave away what did not belong to them with no other proviso, than that "the territories and districts so granted, be not previously occupied and possessed by the subjects of any other christian prince or State."

The first English patent which was given for the purpose of colonising the country discovered by the Cabots, was granted by Queen Elizabeth to Sir Humphry Gilbert, but this proved abortive.

1578

Soon after she licensed Walter Raleigh, "to search for heathen lands not inhabited by christian people," and granted to him in fee all the soil "within 200 leagues of the places where his people should make their dwellings and abidings." [4]

1584

Under his auspices an inconsiderable colony took possession of a part of the American coast, which now forms North-Carolina. In honor of the Virgin Queen his sovereign, he gave to the whole country the name of Virginia. These first settlers and several others who followed them, were either destroyed by the natives, removed by succeeding navigators, or died without leaving any behind to tell their melancholy story, for they were never more heard of. No permanent settlement was effected till the reign of James the first. The national ardor which sprung from the long and vigorous administration of Queen Elizabeth,

1585

EXHIBIT 19
0520

continued to produce its effects for some time after she had ceased to animate the whole. Her successor though of an indolent disposition, possessed a laudable genius for colonisation. Naturally fond of novelty, he was much pleased with a proposal made to him by some of the projectors of that age "for deducing a colony into that part of America commonly called Virginia."

He therefore granted letters patent to Thomas Gates and his associates, by which he conferred on them "all those territories in America, which were not then possessed by other christian princes or people, and which lay between the 34th and 45th degree of north latitude." They were divided into two companies, the first consisting of adventurers of the city of London, was called the London company, the second consisting of merchants of Plymouth and some other Western towns, was called the Plymouth company. The adventurers were empowered to transport thither as many English subjects as should willingly accompany them; and it was declared "that the colonists and their children should enjoy the same liberties as if they had remained, or were born, within the realm."

1606

The month of April 1607, is the epoch of the first permanent settlement on the coast of Virginia, the name then given to all that extent of country which now forms thirteen States. The emigrants took possession of a peninsula on the Northern side of James-river, and erected a town which in honor of their sovereign they called James-Town. They soon experienced the embarrassments [5] which are the usual lot of new settlers. In a few months diseases swept away one half of their number. Those who survived were greatly chagrined by the many vexations incidental to their new and forlorn situation.

1607

In 1609, the Southern or London company surrendered their rights to the crown and obtained a new patent. There were then added to the former adventurers, many of the first nobility and gentry. To them and their successors were granted, in absolute property, the lands extending from Cape Comfort along the sea coast, southward 200 miles, from the same promontory 200 miles northward, and from the Atlantic westward to the South sea. Licence was given to transport to Virginia, all persons willing to go thither. The colonists and their posterity were declared "to be entitled to the rights of subjects, as if they had remained within the realm." The company being thus favoured by their sovereign, were encouraged to proceed with spirit in supporting and extending their settlement, but before this was thoroughly accomplished, a great waste of the human species had taken place. Within 20 years after the foundation of James-Town was laid upwards of 9000 English subjects had, at different times, migrated thither, but diseases, famine, wars with the natives, and the other inconveniences of their new settlement, had made such havoc among these adventurers, that by the end of that period, there remained alive only about 1800 of that large number. The same and other causes continued to operate so forcibly that, notwithstanding frequent accessions from new adventurers, Virginia in 1670, sixty three years after the settlement of James-Town contained no more than 40,000 inhabitants.

1609

Thirteen years elapsed after James-Town began to be built before any permanent establishment was effected in the Northern or second Colony. Various attempts for that purpose had failed, nor was the arduous business accomplished, till it was undertaken by men who were influenced by higher motives than the extension of agriculture or commerce.

1620

EXHIBIT 19
0521

These men had been called Puritans in England, from their earnest desires of farther [6] reformation in the established church, and particularly for their aversion to certain popish habits and ceremonies, which they deemed sinful from their having been abused to idolatry. Such was the intolerance of the times, and so violent the zeal for uniformity, that popular preachers of this sect, though men of learning and piety were suspended, deprived, imprisoned, and ruined, for their not using garments or ceremonies which their adversaries acknowledged to be indifferent. Puritanism nevertheless gained ground. On experiment it was found that no attempts are more fruitless than those which are made with the view of bringing men to think alike on the subject of religion. The leaders both of Church and State were too little acquainted with the genuine principles of policy and christianity, to apply the proper remedy for preserving peace among discording sects. Instead of granting a general liberty of conscience, compulsory methods were adopted for enforcing uniformity.

An act was passed for punishing all who refused to come to church or were present at any conventicle or meeting. The punishment was imprisonment till the convicted agreed to conform, and made a declaration of his conformity. If that was not done in three months, he was to quit the realm, and go into perpetual banishment. In case, he did not depart within the time limited, or returned afterwards without a license, he was to suffer death. Such is the renitency of the human mind to all impositions on conscience, that the more the Puritans were oppressed, the more were they attached to their distinguishing opinions, and the more did their sect prevail. Several of them suffered death, in preference to purchasing an exemption from legal penalties, by doing what, in their opinion, was wrong. It was afterwards resolved to send others, who had equally persevered in their non-conformity, into banishment. Many chose to avoid these evils by voluntarily exiling themselves from their native country.

A congregation of these Puritans, under the pastoral care of Mr. John Robinson, being extremely harassed for their religious opinions, resolved to elude their persecutors by removing to Holland. They continued there [7] ten years, and by hard labor, earned a living. Though they were much esteemed and kindly received by the Hollanders, they were induced by very cogent reasons to think of a second removal. The morals of the Dutch were in their opinion too dissolute; and they were afraid that their offspring would conform to the bad examples daily before them. They had also an ardent desire of propagating religion in foreign lands, and of separating themselves from all the existing establishments in Europe, that they might have an opportunity without interruption of handing down to future ages the model of a pure church, free from the admixture of human additions. America, the colonising of which, then excited a considerable share of public attention, presented a proper theatre for this purpose. After serious and repeated addresses to Heaven for direction, they resolved to cross the Atlantic. An application on their behalf, was made to their native sovereign King James, for full liberty and freedom of conscience, but nothing more could be obtained than a promise, that he would connive at and not molest them. The hope that, when at the distance of 3000 miles, they would be out of the reach of ecclesiastical courts, induced them nevertheless to venture. They sailed 101 in number from Plymouth, in September and arrived at Cape Cod in the November following.

1620

1593

1606

1620

EXHIBIT 19
0522

Before landing they formed themselves into a body politic, under the crown of England, for the purpose of "framing just and equal laws, ordinances, acts, constitutions and offices," to which forty one of their number subscribed their names, and promised all due submission and obedience. After landing they employed themselves in making discoveries till the 20th of December. They then fixed on a place for settlement, which they afterwards called New-Plymouth and purchased the soil from its native proprietors.

1620

These adventurers were now at the commencement of a long and dreary winter, at an immense distance from their former habitations, on the strange coast of an uncultivated country, without a friend to welcome their arrival, or a house to shelter them. In settling down on bare creation they had every [8] obstacle to surmount that could prove their firmness, or try their patience. The climate was unfavourable; the season cold and pinching. The prospect of obtaining a supply of provisions, by cultivating the stubborn soil, required an immensity of previous labor, and was both distant and uncertain. From the disorders occasioned by their tedious voyage, with insufficient accommodations, together with those brought on them by the fatigues and exertions unavoidable in a new settlement, and the rigor of the season, they buried forty four persons, nearly one half of their original number, within six months after their landing. Animated with a high degree of religious fervor, they supported these various hardships with unabated resolution. The prospect of an exemption from the tyranny of ecclesiastical courts, and of an undisturbed liberty to worship their creator in the way that was agreeable to their consciences, was in their estimation a sufficient counterbalance to all that they underwent.

1620

This handful of people laid the foundation of New-England. From them and their subsequent associates have sprung the many thousands that have inhabited Massachusetts, New-Hampshire, Connecticut and Rhode-Island. The Puritans, to which sect these primitive emigrants belonged, were a plain, frugal, industrious people, who were strict observers of moral and social duties. They held, that the Bible was the sole rule both of faith and practice—that every man was bound to study it and to judge of its meaning for himself, and to follow that line of conduct and mode of worship, which he apprehended to be thereby required. They were also of opinion that no churches or church officers had any power over other churches or officers, so as to control them—that all church members had equal rights and privileges—that the imposition of articles of faith, modes of worship, habits or ceremonies, was subversive of natural rights and an usurpation of power, not delegated to any man or body of men. They viewed church hierarchy, and especially the lordly pomp of Bishops, as opposed to the pure[,] simple, and equal spirit, of christianity. Their sufferings for non-conformity disposed them to reflect on the nature [9] and extent of civil authority, and led to a conviction that tyranny, whether in church or state, was contrary to nature, reason and revelation. There was a similarity between their opinions of government, and those which they held on the subject of religion. Each strengthened the other. Both were favourable to liberty, and hostile to all undue exercise of authority.

It is matter of regret, that these noble principles of liberty ceased to operate on these emigrants soon after they got power into their hands.

EXHIBIT 19
0523

In the eleventh year after their settlement in America they resolved, "that no man should be admitted to the freedom of their body politic, but such as were members of some of their churches," and afterwards, "that none but such should share in the administration of civil government, or have a voice in any election." In a few years more, they had so far forgot their own sufferings, as to press for uniformity in religion, and to turn persecutors, in order to accomplish it. No better apology can be made for this inconsistent conduct, than that the true grounds of liberty of conscience were then neither understood, nor practiced by any sect of christians. Nor can any more satisfactory account of so open a dereliction of former principles be offered, than that human nature is the same in all bodies of men, and that those who are in, and those who are out of power, insensibly exchange opinions with each other on a change of their respective situations. These intemperate proceedings were overruled for good. As the intolerance of England peopled Massachusetts, so the intolerance of that Province made many emigrate from it, and gave rise to various distant settlements, which in the course of years were formed into other Provincial establishments. Connecticut, Rhode-Island, and New-Hampshire, were in a great measure shoots from the old venerable trunk Massachusetts, and their early growth was much accelerated by her impolitic zeal for uniformity. The country which was subdivided into these four Provinces had been called New-England ever since the year 1614. The propriety of classing them under one general name became more evident from their being settled by the same kind of people, who were [10] strongly connected with each other by blood, uniformity of manners, and a similarity of religious and political sentiments. The early population of this Northern country was rapid. The Puritans, harrassed for their non-conformity in England, passed over to it in great numbers. In the short space of twenty years from its first settlement 21,200 settlers arrived in 298 vessels. About the year 1640, from a change of affairs, the emigration from Old to New-England in a great measure ceased.

Maryland was the third English colony settled in North America, but the first which from its beginning, was erected into a Province of the empire. The first and second colonies were many years governed by corporations, and in a manner subversive of natural liberty, but the third was from its first settlement ruled by laws enacted in a provincial legislature. The first emigration to Maryland consisting of about two hundred gentlemen, chiefly of the Roman Catholic religion, sailed from England in November, 1632, and landed near the river Potowmack in the beginning of the subsequent year.

Calvert their leader purchased the right of the Aborigines, and with their consent took possession of a town, which he called St. Mary's. He continued carefully to cultivate their friendship, and lived with them on terms of perfect amity. The lands which had been thus ceded were planted with facility, because they had already undergone the discipline of Indian tillage. Food was therefore easily procured. The Roman Catholics, unhappy in their native land, and desirous of a peaceful asylum, went over in great numbers to Maryland. Lord Baltimore, to whom the Province had been granted, laid the foundation of its future prosperity on the broad basis of security to property, and of freedom in religion. The wisdom of these measures converted a dreary wilderness into a prosperous colony, because men exert themselves in their several pursuits in proportion as they are assured of enjoying in safety those blessings which they wish for most. Never did a

1631

1633

EXHIBIT 19
0524

people enjoy more happiness than the inhabitants of Maryland under Cecilius the founder of the Province. While Virginia persecuted the Puritans, her [11] severity compelled many to pass over into this new Province, the Assembly of which had enacted, "that no persons, professing to believe in Christ Jesus should be molested in respect of their religion, or in the free exercise thereof." The prudence of the one colony, acquired what the folly of the other had thrown away. Mankind then beheld a new scene on the theatre of English America. They saw in Massachusetts the Puritans persecuting various sects, and the church of England in Virginia, actuated by the same spirit, harassing those who dissented from the established religion, while the Roman Catholics of Maryland tolerated and protected the professors of all denominations. In consequence of this liberal policy, and the other prudent measures adopted by the rulers of this Province, it rapidly increased in wealth and population.

The distractions which convulsed England for 25 years preceding the restoration in 1660, left no leisure for colonising; but no sooner was Charles the Second restored to the throne of his ancestors, than it was resumed with greater spirit than ever.

Soon after that event the restored monarch granted a charter to Connecticut, which had been previously settled by a voluntary association of persons, who held the soil by an Indian title, without any authority from England. By this charter King Charles established a pure democracy. Every power, legislative, judicial and executive, was invested in the freemen of the corporation, or their delegates, and the colony was under no obligation to communicate its legislative acts to the national sovereign.

| 1662 |

In the year following, a royal charter, with a grant of similar powers, was conferred on Rhode-Island and Providence plantations. These, like Connecticut, had been previously settled by emigrants chiefly from Massachusetts, who as an independent people had seated themselves on land fairly obtained from the native proprietors, without any authority from the parent state. This colony was originally planted on the Catholic principle, "That every man who submits peaceably to the civil authority, may [12] worship God according to the dictates of his own conscience, without molestation," and under all the changes it has undergone, there has been no departure from that broad basis of universal toleration.

| 1663 |

In the same year a patent was granted to Lord Clarendon and others, comprehending that extent of country, which now forms the States of North Carolina, South Carolina, and Georgia. Carolina though settled originally as one government, was about the year 1728 divided into two. Georgia was, in the year 1732, formed by George the Second into a distinct Province.

| 1663 |

In the year 1664, King Charles the Second gave to his brother James Duke of York, a patent which included New-York and New-Jersey. These Provinces had been previously settled by Dutch Colonists, and held as terrirories of the United Netherlands, but they were easily reduced to the obedience of the King of England, who claimed the country by the right of prior discovery.
The Duke of York in the same year, gave a deed of New-Jersey to Lord Berkely and Sir George Carteret.

| 1664 |

EXHIBIT 19
0525

Seventeen years afterwards King Charles gave to William Penn, a patent for Pennsylvania. Mr. Penn some time posterior to this, obtained a farther grant of the land on the Western side of the River Delaware, and South of Pennsylvania, which was formed into a separate Government, and is now the State of Delaware. Notwithstanding these charters Mr. Penn did not think himself invested with the right of the soil, till he had purchased it from the native proprietors. In the charter of Pennsylvania; there was no express stipulation as had been inserted in all other Colonial patents "that the Pennsylvanians and their descendants should be considered as subjects born within the realm." But clauses were inserted, providing that "acts of Parliament concerning trade and navigation, and the customs, should be duly observed." And it was also stipulated, ["]that no custom or other contribution should be laid on the inhabitants or their estates, unless by the consent of the Proprietary, or Governor and Assembly, or *by act of Parliament in England*." The omission of the first clause, the insertion [13] of the second, and the reservation in favor of Parliament, in the last, may have been occasioned by difficulties which had then arisen about the rights of the Colonists and the power of Parliament over them. Massachusetts had before that time questioned the authority of Parliament to tax them and legislate for them. The general clause that the Colonists should retain all the privileges of Englishmen had already been made, the basis of claims against which some in the Mother Country had many objections. Perhaps the ruling powers of England were sensible, that they had previously delegated too much of independence to their Colonies, and intended to be more guarded in future, but their caution was too late. Had it been seriously intended to control the natural order of events, by the feeble force of words and clauses in a charter, the experiment ought to have been tried from the first, and not reserved for that of Pennsylvania, which was one of the last granted to the Colonies. Near a century after, Dr. Franklin, when examined at the Bar of the British House of Commons explained the matter by saying "that the inhabitants from the first settlement of the Province relied, that the Parliament never would or could by virtue of that reservation tax them, till it had qualified itself constitutionally for the exercise of such right, by admitting Representatives from the people to be taxed."

In the rapid manner just related, was the English North American Continent parcelled out into distinct Governments. Little did the wisdom of the two preceding Centuries foresee of the consequences both good and evil, that were to result to the old world from discovering and colonising the new. When we consider the immense floods of gold and silver, which have flowed from it into Europe—the subsequent increase of industry and population, the prodigious extension of commerce, manufactures, and navigation, and the influence of the whole on manners and arts[—]we see such an accumulation of good, as leads us to rank Columbus among the greatest benefactors of the human race: but when we view the injustice done the natives, the extirpation of many of [14] their numerous nations, whose names are no more heard—the havoc made among the first settlers—the slavery of the Africans, to which America has furnished the temptation, and the many long and bloody wars which it has occasioned, we behold such a crowd of woes, as excites an apprehension, that the evil has outweighed the good.

29

**EXHIBIT 19**
**0526**

1681

In vain do we look among ancient nations, for examples of Colonies established on principles of policy, similar to those of the Colonies of Great-Britain. England did not, like the republics of Greece, oblige her sons to form distant communities in the wilds of the earth. Like Rome she did not give lands as a gratuity to soldiers, who became a military force for the defence of her frontiers: She did not, like Carthage, subdue the neighbouring States, in order to acquire an exclusive right to their commerce. No conquest was ever attempted over the Aborigines of America. Their right to the soil was disregarded, and their country looked upon as a waste, which was open to the occupancy and use of other nations. It was considered that settlements might be there formed for the advantage of those who should migrate thither, as well as of the Mother Country. The rights and interests of the native proprietors were, all this time, deemed of no account.

What was the extent of obligations by which Colonies planted under these circumstances, were bound to the Mother Country, is a subject of nice discussion. Whether these arose from nature and the constitution, or from compact, is a question necessarily connected with many others. While the friends of Union contended that the King of England had a property in the soil of America, by virtue of a right derived from prior discovery; and that his subjects by migrating from one part of his dominions to another, did not lessen their obligations to obey the supreme power of the nation, it was inferred, that the emigrants to English America, continued to owe the same obedience to the King and Parliament, as if they had never quitted the land of their nativity. But if as others contended, the Indians were [15] the only lawful proprietors of the country in which their Creator had placed them, and they sold their right to emigrants who, as men, had a right to leave their native country, and as subjects, had obtained chartered permission to do so, it follows from these premises, that the obligations of the Colonists to their parent State, must have resulted more from compact, and the prospect of reciprocal advantage, than from natural obligation. The latter opinions seem to have been adopted by several of the Colonists particularly in New-England. Sundry persons of influence in that country always held, that birth was no necessary cause of subjection, for that the subject of any Prince or State, had a natural right to remove to any other State or quarter of the Globe, especially if deprived of liberty of conscience, and that, upon such removal, his subjection ceased.

The validity of charters about which the emigrants to America were universally anxious, rests upon the same foundation. If the right of the sovereigns of England to the soil of America was ideal, and contrary to natural justice, and if no one can give what is not his own, their charters were on several accounts a nullity. In the eye of reason and philosophy, they could give no right to American territory. The only validity which such grants could have, was that the grantees had from their sovereign, a permission to depart from their native country, and negotiate with the proprietors for the purchase of the soil, and thereupon to acquire a power of jurisdiction subject to his crown. These were the opinions of many of the settlers in New-England. They looked upon their charters as a voluntary compact between their sovereign and themselves, by which they were bound neither to be subject to, nor seek protection from any other Prince, nor to make any laws repugnant to those of England: but did not consider them as inferring an obligation of obedience to a Parliament, in which they were unrepresented. The prospects of advantage which the emigrants to America expected

EXHIBIT 19
0527

from the protection of their native sovereign, and the prospect of aggrandizement which their native sovereign expected from [16] the extension of his empire, made the former very solicitous for charters, and the latter very ready to grant them. Neither reasoned clearly on their nature nor well understood their extent. In less than eight years 1500 miles of the sea coast were granted away, and so little did they who gave, or they who accepted of charters, understand their own transactions, that in several cases the same ground was covered by contradictory grants, and with an absurdity that can only be palliated by the ignorance of the parties, some of the grants extended to the South Sea, over a country whose breadth is yet unknown, and which to this day is unexplored.

Ideal as these charters were, they answered a temporary purpose. The colonists reposed confidence in them, and were excited to industry on their credit. They also deterred foreign European powers from disturbing them, because agreeably to the late law of nations, relative to the appropriation of newly discovered heathen countries, they inferred the protection of the sovereign who gave them. They also opposed a barrier to open and gross encroachments of the mother country on the rights of the colonists; a particular detail of these is not now necessary; some general remarks may, nevertheless, be made on the early periods of colonial history, as they cast light on the late revolution. Long before the declaration of independence, several of the colonies on different occasions, declared, that they ought not to be taxed but by their own provincial assemblies, and that they considered subjection to acts of a British parliament, in which they had no representation, as a grievance. It is also worthy of being noted, that of the 13 colonies, which have been lately formed into States, no one (Georgia excepted) was settled at the expence of government. Towards the settlement of that Southern frontier, considerable sums have at different times been granted by parliament, but the twelve more Northern provinces, have been wholly settled by private adventurers, without any advances from the national treasury. It does not appear, from existing records, that any compensation for their lands was ever made to the [17] Aborigines of America, by the crown or Parliament of England; but policy as well as justice led the colonists to purchase and pay for what they occupied. This was done in almost every settlement, and they prospered most, who by justice and kindness took the greatest pains to conciliate the good will of the natives.

It is in vain to look for well balanced constitutions in the early periods of colonial history. Till the revolution in the year 1688, a period subsequent to the settlement of the colonies, England herself can scarcely be said to have had a fixed constitution. At that eventful era the line was first drawn between the privileges of subjects, and the prerogatives of sovereigns. The legal and constitutional history of the colonies, in their early periods, therefore, affords but little instruction. It is sufficient in general to observe, that in less than eighty years from the first permanent English settlement in North America; the two original patents granted to the Plymouth and London companies were divided, and subdivided, into twelve distinct and unconnected provinces, and in fifty years more a thirteenth, by the name of Georgia, was added to the Southern extreme of previous establishments.

To each of these, after various changes, there was ultimately granted a form of government resembling, in its most essential parts, as far as local circumstances

EXHIBIT 19
0528

would permit, that which was established in the parent state. A minute description of constitutions, which no longer exist, would be both tedious and unprofitable. In general, it may be observed, that agreeably to the spirit of the British constitution, ample provision was made for the liberties of the inhabitants. The prerogatives of royalty and dependence on the Mother Country, were but feebly impressed, on the colonial forms of government. In some of the provinces the inhabitants chose their governors, and all other public officers, and their legislatures were under little or no controul. In others the crown delegated most of its power to particular persons, who were also invested with the property of the soil. In those which were most immediately dependent on the King, he exercised no higher prerogatives over the colonists than over their fellow [18] subjects in England, and his power over the provincial legislative assemblies, was not greater than what he was constitutionally vested with, over the house of commons in the Mother Country. From the acquiescence of the parent state, the spirit of her constitution and daily experience, the colonists grew up in a belief, that their local assemblies stood in the same relation to them, as the parliament of Great Britain, to the inhabitants of that island. The benefits of legislation were conferred on both, only through these constitutional channels.

It is remarkable, that though the English possessions in America were far inferior in natural riches to those which fell to the lot of other Europeans, yet the security of property and of liberty, derived from the English constitution, gave them a consequence to which the colonies of other powers, though settled at an earlier day, have not yet attained. The wise and liberal policy of England towards her colonies, during the first century and [a] half after their settlement, had a considerable influence in exalting them to this pre-eminence. She gave them full liberty to govern themselves, by such laws as their local legislatures thought necessary, and left their trade open to every individual in her dominions. She also gave them the amplest permission to pursue their respective interests in such manner, as they thought proper, and reserved little for herself, but the benefit of their trade, and that of a political union under the same head. The colonies, founded by other powers, experienced no such indulgences. Portugal and Spain burdened theirs with many vexatious regulations, gave encouragement only to what was for their own interest, and punished whatever had a contrary tendency. France and Holland did not adopt such oppressive maxims, but were in fact not much less rigorous and coercive. They parted, as it were, with the propriety of their colonies to mercantile associations, which sold to the colonists the commodities of Europe, at an enormous advance, and took the produce of their lands, at a low price, and, at the same time, discouraged the growth of any more than they could dispose of, at excessive profits. These oppressive regulations were followed [19] with their natural consequences: The settlements thus restricted advanced but slowly in population and in wealth.

The English colonies participated in that excellent form of government, with which their parent isle was blessed, and which had raised it to an admirable height of agriculture, commerce, and manufactures. After many struggles, it had been acknowledged to be essential to the constitution of Great-Britain, that the people could not be compelled to pay any taxes, nor be bound by any laws, but such as had been granted, or enacted, with the consent of themselves, or of their representatives. It was also one of their privileges, that they could not be affected either in their

EXHIBIT 19
0529

property, their liberties or their persons, but by the unanimous consent of twelve of their peers.

From the operation of these general principles of liberty, and the wise policy of Great Britain, her American settlements increased in number, wealth, and resources, with a rapidity which surpassed all previous calculations. Neither antient nor modern history can produce an example of colonies governed with equal wisdom, or flourishing with equal rapidity. In the short space of 150 years their numbers increased to three millions, and their commerce to such a degree, as to be more than a third of that of Great Britain. They also extended their settlements 1500 miles on the sea coast, and 300 miles to the westward. Their rapid population, though partly accelerated by the influx of strangers, was principally owing to internal causes. In consequence of the equality of fortune and simplicity of manners, which prevailed among them, their inhabitants multiplied far beyond the proportion of old nations, corrupted and weakened by the vices of wealth, and above all, of vanity, than which, perhaps, there is no greater enemy to the increase of the human species.

The good effects of a wise policy and equal government, were not only discernible in raising the colonies of England to a pre-eminence over those of other European powers, but in raising some among themselves to greater importance than others. Their relative population and wealth, were by no means correspondent to their respective [20] advantages of soil and climate. From the common disproportion between the natural and artificial wealth of different countries, it seems to be a general rule, that the more nature does for any body of men, the less they are disposed to do for themselves.

The New-England Provinces, though possessed of comparatively a barren country, were improved much faster than others, which were blessed with a superior soil and milder climate. Their first settlers were animated with a high degree of that religious fervor which excites to great undertakings. They also settled their vacant lands on principles of the wisest policy. Instead of granting large tracts to individuals, they sold the soil in small farms, to those who personally cultivated the same. Instead of disseminating their inhabitants over an extensive country, they formed successive settlements, in townships of six miles square. They also made such arrangements, in these townships, as co-extended the blessings of education and of religious instruction, with their settlements. By these means industry and morality were propagated, and knowledge was generally diffused.

In proportion to their respective numbers, it is probable that no other country in the world contained more sober orderly citizens, and fewer who were profligate and abandoned. Those high crimes which are usually punished with death, were so rare in New-England, that many years have elapsed, in large populous settlements, without a single execution. Their less fertile soil disposed them to a spirit of adventure, and their victorious industry rose superior to every obstacle. In carrying on the whale fishery, they not only penetrated the deepest frozen recesses of Hudson's Bay, and Davis' straits: But pierced into the opposite regions of polar cold. While some of them were striking the harpoon on the coast of Africa, others pursued their gigantic game, near the shores of Brazil. While they were yet in their infancy as a political society, they

EXHIBIT 19
0530

carried on this perilous business to an extent exceeding all that the perseverance of Holland, the activity of France, or the vigor of English enterprize, had ever accomplished. A spirit of liberty prompted their [21] industry, and a free constitution guarded their civil rights. The country was settled with yeomanry, who were both proprietors, and cultivators, of the soil. Luxury was estranged from their borders. Enervating wealth and pinching poverty, were both equally rare. Early marriages, and a numerous offspring, were common—thence population was rapid, and the inhabitants generally possessed that happy state of mediocrity, which favors the improvement both of mind and body.

New-York adjoined New-England, but did not encrease with equal rapidity. A few by monopolizing large tracts of land, reduced many to the necessity of being tenants, or of removing to other Provinces, where land could be obtained on more favourable terms. The encrease of population, in this Province, was nevertheless great, when compared with that of old countries. This appears from the following statement of their numbers at different periods. In 1756, the Province of New-York contained 83,233 whites, and in 1771, 148,124, an increase of nearly two for one, in the space of fifteen years.

Pennsylvania was at first settled under the auspices of the celebrated William Penn, who introduced a number of industrious inhabitants, chiefly of the sect of Quakers. The population of this country advanced, equally, with that, of the New-England Provinces. Among the inducements operating on foreigners to settle in Pennsylvania, was a most excellent form of provincial government, which secured the religious as well as the civil rights of its inhabitants. While the Mother Country laboured under an oppressive ecclesiastical establishment, and while partialities of the same kind, were sanctioned by law, in some of the American Provinces, perfect liberty of conscience, and an exact equality of all sects was, in every period, a part of the Constitution of Pennsylvania.

Quaker simplicity, industry, and frugality, contributed, in like manner, to the flourishing of that Province. The habits of that plain people correspond, admirably, with a new country, and with republican constitutions. Opposed to idleness and extravagance, they combined the whole [22] force of religion, with customs and laws, to exile these vices, from their society. The first Quaker settlers were soon followed by Germans, whose industry was not inferior to their own. The emigrants from other countries who settled in Pennsylvania, followed these good examples, and industry and frugality became predominant virtues, over the whole Province.

The policy of a Loan-Office was also eminently beneficial. The Proprietaries of Pennsylvania, sold their lands in small tracts, and on long credit. The purchasers were indulged with the liberty of borrowing, on interest, paper bills of credit, out of the Loan-Office, on the mortgage of their lands. Perhaps there never was an institution which contributed more to the happiness of the people, or to the flourishing of a new country, than this land Loan-Office scheme. The Province being enriched by the clear interest of its loaned paper, was thereby enabled to defray the expences of government, with moderate taxes. The industrious farmer was furnished with the means of cultivating and stocking his farm. These improvements, by increasing the

EXHIBIT 19
0531

value of the land, not only established the credit of the paper, but enabled the borrower, in a few years, to pay off the original loan with the productions of the soil. The progressive improvements of Pennsylvania may be estimated from the increase of its trade. In the year 1704, that Province imported goods from the Mother Country, amounting in value only to £11,499 sterling, but in 1772, to the value of £507,909, an encrease of nearly fifty for one, in little more than half a century.

In Maryland and Virginia, a policy less favourable to population, and somewhat different from that of Pennsylvania, took place. The Church of England was incorporated with the first settlement of Virginia, and in the lapse of time, it also became the established religion of Maryland. In both these Provinces, long before the American Revolution, that church possessed a legal preeminence, and was maintained at the expence, not only of its own members, but of all other denominations. These deterred great numbers, especially of the Presbyterian [23] denomination, who had emigrated from Ireland from settling within the limits of these governments, and fomented [a] spirit of discord between those who belonged to, and those who dissented from, the established church.

In these and the other Southern Provinces, domestic slavery was common. Though it was not by law forbidden any where, yet there were comparatively few slaves any where, to the Northward of Maryland. The peaceable and benevolent religion of the Quakers, induced their united opposition to all traffic of the human race. Many individuals of other denominations, in like manner discountenanced it, but the principal ground of difference on this head between the Northern and Southern Provinces, arose, less, from religious principles, than from climate, and local circumstances. In the former, they found it to be for their interest to cultivate their lands with white men, in the latter with those of an opposite colour. The stagnant waters, and low lands, which are so frequent on the shores of Maryland and Virginia, and on the coasts, and near the rivers in the Southern Provinces, generate diseases, which are more fatal to whites than blacks. There is a physical difference in the constitution of these varieties of the human species. The latter secrete less by the kidnies, and more by the glands of the skin than the former. This greater degree of transpiration renders the blacks more tolerant of heat, than the whites. The perspirable matter, thrown off by the former, is more foetid than that of the latter. It is perhaps owing to these circumstances, that blacks enjoy better health, in warm and marshy countries, than whites.

It is certain, that a great part of the low country in several of the provinces must have remained without cultivation, if it had not been cultivated by black men. From imagined necessity, founded on the natural state of the country, domestic slavery seemed to be forced on the Southern provinces. It favored cultivation, but produced many baneful consequences. It was particularly hostile to the proper education of youth. Industry, temperance, and abstinence, virtues essential to the health and vigor of both mind and body, were with difficulty [24] practised, where the labour of slaves procured an abundance, not only of the necessaries, but of the delicacies of life, and where daily opportunities and facilities were offered, for early, excessive, and enervating indulgences. Slavery also led to the engrossing of land, in the hands of a few. It impeded the introduction of labouring freemen, and of course diminished the

EXHIBIT 19
0532

capacity of the country for active defence, and at the same time endangered internal tranquility, by multiplying a species of inhabitants, who had no interest in the soil. For if a slave can have a country in the world, it must be any other in preference to that, in which he is compelled to labour for a master. Such is the force of habit, and the pliancy of human nature, that though degrading freemen to the condition of slaves, would, to many, be more intolerable than death, yet Negroes who have been born and bred in habits of slavery, are so well satisfied with their condition, that several have been known to reject proffered freedom, and as far as circumstances authorize us to judge, emancipation does not appear to be the wish of the generality of them. The peasantry of few countries enjoy as much of the comforts of life, as the slaves, who belong to good masters. Interest concurs with the finer feelings of human nature, to induce slave-holders to treat with humanity and kindness, those who are subjected to their will and power. There is frequently more happiness in kitchens than parlours, and life is often more pleasantly enjoyed by the slave, than his master. The political evils of slavery do not so much arise from the distresses it occasions to slaves, as from its diminishing the incitements to industry, and from its unhappy influence on the general state of society. Where it is common, a few grow rich, and live in ease and luxury, but the community is deprived of many of its resources for independent happiness, and depressed to a low station on the scale of national greatness. The aggregate industry of a country, in which slaves and freemen are intermixed, will always be less than where there is a number of freemen equal to both. Nothing stimulates to industry so much as interest. The man who works for another, will contrive many artifices to make [25] that work as little as possible, but he who has an immediate profit from his labor, will disregard tasks, times and seasons. In settlements where the soil is cultivated by slaves, it soon becomes unfashionable for freemen to labor, than which no greater curse can befal a country. The individuals, who by the industry of their slaves are released from the necessity of personal exertions, will be strongly tempted to many practices injurious to themselves and others. Idleness is the parent of every vice, while labor of all kinds, favours and facilitates the practice of virtue. Unhappy is that country, where necessity compels the use of slaves, and unhappy are the people, where the original decree of heaven "that man should eat his bread in the sweat of his face" is by any means whatever generally eluded.

The influence of these causes was so extensive, that though the Southern Provinces possessed the most fruitful soil and the mildest climate, yet they were far inferior to their neighbours in strength, population, industry, and aggregate wealth. This inferiority, increased or diminished, with the number of Slaves in each Province, contrasted with the number of freemen. The same observation held good between different parts of the same Province. The sea coast which, from necessity, could be cultivated only by black men, was deficient in many of the enjoyments of life, and lay at the mercy of every bold invader, while the Western Country, where cultivation was more generally carried on by freemen, though settled at a later period, sooner attained the means of self defence, and, relatively, a greater proportion of those comforts with which a cultivated country rewards its industrious inhabitants.

In the Southern Provinces, the long credit given by British merchants, was a principal source of their flourishing. The immense capitals of the merchants trading to the

EXHIBIT 19
0533

North American Continent, enabled them to extend credit to the term of several years. They received a profit on their goods, and an annual interest of five per cent on the sums for which they were sold. This enabled the American merchant to extend credit to the [26] planter, from whom he received a higher interest than he paid in Great-Britain. The planters being furnished, on credit, with slaves and every thing necessary for the cultivation of their lands, when careful and industrious, cleared so much more than the legal interest with which they were charged, that in a few years of successful planting, the difference enabled them to pay their debts and clear their capital. By the help of credit, a beneficial intercourse was established, which redounded to the benefit of both parties.

These causes eminently contributed to the prosperity of the English Provinces. Others, besides co-operating, to the same end, produced a warm love for liberty, a high sense of the rights of human nature, and a predilection for independence.

The first emigrants from England for colonising America, left the Mother Country at a time when the dread of arbitrary power was the predominant passion of the nation. Except the very modern charter of Georgia, in the year 1732, all the English Colonies obtained their charters and their greatest number of European settlers, between the years 1603 and 1688. In this period a remarkable struggle between prerogative and privilege commenced, and was carried on till it terminated in a revolution highly favourable to the liberties of the people. In the year 1621, when the English House of Commons claimed freedom of speech, "as their ancient and undoubted right, and an inheritance transmitted to them from their ancestors;" King James the First replied, "that he could not allow of their style, in mentioning their ancient and undoubted rights, but would rather have wished they had said, that their privileges were derived from the grace and permission of their sovereign." This was the opening of a dispute which occupied the tongues, pens and swords, of the most active men in the nation, for a period of seventy years. It is remarkable that the same period is exactly co-incident with the settlement of the English Colonies. James, educated in the arbitrary sentiments of the divine right of Kings, conceived his subjects to be his property, and that their privileges were [27] matters of grace and favour flowing, from his generosity. This high claim of prerogative excited opposition in support of the rights of the people. In the progress of the dispute, Charles the First, son of King James, in attempting to levy ship-money, and other revenues without consent of Parliament, involved himself in a war with his subjects, in which, after various conflicts, he was brought to the block and suffered death as an enemy to the constitution of his country. Though the monarchy was restored under Charles the Second, and transmitted to James the Second, yet the same arbitrary maxims being pursued, the nation, tenacious of its rights, invited the Prince of Orange to the sovereignty of the island, and expelled the reigning family from the throne. While these spirited exertions were made, in support of the liberties of the parent isle, the English Colonies were settled, and chiefly with inhabitants of that class of people, which was most hostile to the claims of prerogative. Every transaction in that period of English history, supported the position that the people have a right to resist their sovereign, when he invades their liberties, and to transfer the crown from one to another, when the good of the community requires it.

EXHIBIT 19
0534

The English Colonists were from their first settlement in America, devoted to liberty, on English ideas, and English principles. They not only conceived themselves to inherit the privileges of Englishmen, but though in a colonial situation, actually possessed them.

After a long war between King and Parliament, and a Revolution—these were settled on the following fundamental principles.

That it was the undoubted right of English subjects, being freemen or freeholders, to give their property, only by their own consent. That the House of Commons exercised the sole right of granting the money of the people of England, because that house alone, represented them. That taxes were the free gifts of the people to their rulers. That the authority of sovereigns was to be exercised only for the good of their subjects. That it was the right of the people to meet together, and peaceably to consider of their grievances—[28] to petition for a redress of them, and finally, when intolerable grievances were unredressed, to seek relief, on the failure of petitions and remonstrances, by forcible means.

Opinions of this kind generally prevailing, produced, among the colonists, a more determined spirit of opposition to all encroachments on their rights, than would probably have taken place, had they emigrated from the Mother Country in the preceding century, when the doctrines of passive obedience, non resistance, and the divine right of kings, were generally received.

That attachment to their sovereign, which was diminished in the first emigrants to America, by being removed to a great distance from his influence was still farther diminished, in their descendants. When the American revolution commenced, the inhabitants of the colonies were for the most part, the third and fourth, and sometimes the fifth or sixth generation, from the original emigrants. In the same degree as they were removed from that parent stock, they were weaned from the partial attachment, which bound their forefathers to the place of their nativity. The affection for the Mother Country, as far as it was a natural passion, wore away in successive generations, till at last it had scarcely any existence.

That mercantile intercourse, which connects different countries, was in the early periods of the English Colonies, far short of that degree, which is necessary to perpetuate a friendly union. Had the first great colonial establishments been made in the Southern Provinces, where the suitableness of native commodities would have maintained a brisk and direct trade with England—the constant exchange of good offices between the two countries, would have been more likely to perpetuate their friendship. But as the Eastern Provinces were the first, which were thickly settled, and they did not for a long time cultivate an extensive trade with England, their descendants speedily lost the fond attachment, which their forefathers felt to their Parent State. The bulk of the people in New England knew little of the Mother Country, having only heard of her as a distant kingdom, the rulers [29] of which, had in the preceding century, persecuted and banished their ancestors to the woods of America.

EXHIBIT 19
0535

The distance of America from Great Britain generated ideas, in the minds of the colonists, favourable to liberty. Three thousand miles of ocean separated them from the Mother Country. Seas rolled, and months passed, between orders, and their execution. In large governments the circulation of power is enfeebled at the extremities. This results from the nature of things, and is the eternal law of extensive or detached empire. Colonists, growing up to maturity, at such an immense distance from the seat of government, perceived the obligation of dependence much more feebly, than the inhabitants of the parent isle, who not only saw, but daily felt, the fangs of power. The wide extent and nature of the country contributed to the same effect. The natural seat of freedom is among high mountains, and pathless deserts, such as abound in the wilds of America.

The religion of the colonists also nurtured a love for liberty. They were chiefly protestants, and all protestantism is founded on a strong claim to natural liberty, and the right of private judgement. A majority of them were of that class of men, who, in England, are called Dissenters. Their tenets, being the protestantism of the protestant religion, are hostile to all interference of authority, in matters of opinion, and predispose to a jealousy for civil liberty. They who belonged to the Church of England were for the most part independents, as far as church government and hierarchy, were concerned. They used the liturgy of that church, but were without Bishops, and were strangers to those systems, which make religion an engine of state. That policy, which unites the lowest curate with the greatest metropolitan, and connects both with the sovereign, was unknown among the colonists. Their religion was their own, and neither imposed by authority, nor made subservient to political purposes. Though there was a variety of sects, they all agreed in the communion of liberty, and all reprobated the courtly doctrines of passive obedience, and non-resistance. The same dispositions were fostered by the usual [30] modes of education in the colonies. The study of law was common and fashionable. The infinity of disputes, in a new and free country, made it lucrative, and multiplied its followers. No order of men has, in all ages, been more favourable to liberty, than lawyers. Where they are not won over to the service of government, they are formidable adversaries to it. Professionally taught the rights of human nature, they keenly and quickly perceive every attack made on them. While others judge of bad principles by the actual grievances they occasion, lawyers discover them at a distance, and trace future mischiefs from gilded innovations.

The reading of those colonists who were inclined to books, generally favoured the cause of liberty. Large libraries were uncommon in the New World. Disquisitions on abstruse subjects, and curious researches into antiquity, did not accord with the genius of a people, settled in an uncultivated country, where every surrounding object impelled to action, and little leisure was left for speculation. Their books were generally small in size, and few in number: A great part of them consisted of those fashionable authors, who have defended the cause of liberty. Catos' letters, the Independent Whig, and such productions, were common in one extreme of the colonies, while in the other, histories of the Puritans, kept alive the remembrance of the sufferings of their forefathers, and inspired a warm attachment, both to the civil and the religious rights of human nature.

EXHIBIT 19
0536

In the Southern Colonies, slavery nurtured a spirit of liberty, among the free inhabitants. All masters of slaves who enjoy personal liberty will be both proud and jealous of their freedom. It is, in their opinion, not only an enjoyment, but a kind of rank and privilege. In them, the haughtiness of domination, combines with the spirit of liberty. Nothing could more effectually animate the opposition of a planter to the claims of Great-Britain, than a conviction that those claims in their extent, degraded him to a degree of dependence on his fellow subjects, equally humiliating with that which existed between his slaves and himself.

[31] The state of society in the Colonies favoured a spirit of liberty and independence. Their inhabitants were all of one rank. Kings, Nobles and Bishops, were unknown among them. From their first settlement, the English Provinces received impressions favourable to democratic forms of government. Their dependent situation forbad any inordinate ambition among their native sons, and the humility of their society, abstracted as they were from the splendor and amusements of the Old World, held forth few allurements to invite the residence of such from the Mother Country as aspired to hereditary honors. In modern Europe, the remains of the feudal system have occasioned an order of men superior to that of the commonality, but, as few of that class migrated to the Colonies, they were settled with the yeomanry. Their inhabitants, unaccustomed to that distinction of ranks, which the policy of Europe has established, were strongly impressed with an opinion, that all men are by nature equal. They could not easily be persuaded that their grants of land, or their civil rights, flowed from the munificence of Princes. Many of them had never heard of Magna Charta, and those who knew the circumstances of the remarkable period of English history, when that was obtained, did not rest their claims to liberty and property on the transactions of that important day. They looked up to Heaven as the source of their rights, and claimed, not from the promises of Kings but, from the parent of the universe. The political creed of an American Colonist was short but substantial. He believed that God made all mankind originally equal: That he endowed them with the rights of life, property, and as much liberty as was consistent with the rights of others. That he had bestowed on his vast family of the human race, the earth for their support, and that all government was a political institution between men naturally equal, not for the aggrandizement of one, or a few, but for the general happiness of the whole community. Impressed with sentiments of this kind, they grew up, from their earliest infancy, with that confidence which is well calculated to inspire a love for liberty, and a prepossession in favour of independence.

[32] In consequence of the vast extent of vacant country, every colonist was, or easily might be, a freeholder. Settled on lands of his own, he was both farmer and landlord—producing all the necessaries of life from his own grounds, he felt himself both free and independent. Each individual might hunt, fish, or fowl, without injury to his neighbours. These immunities which, in old countries, are guarded by the sanction of penal laws, and monopolized by a few, are the common privileges of all, in America. Colonists, growing up in the enjoyment of such rights, felt the restraint of law more feebly than they, who are educated in countries, where long habits have made submission familiar. The mind of man naturally relishes liberty—where from the extent of a new and unsettled country, some abridgements thereof are useless, and

EXHIBIT 19
0537

others impracticable, the natural desire of freedom is strengthened, and the independent mind revolts at the idea of subjection.

The Colonists were also preserved from the contagion of ministerial influence by their distance from the metropolis. Remote from the seat of power and corruption, they were not over-awed by the one, nor debauched by the other. Few were the means of detaching individuals from the interest of the public. High offices, were neither sufficiently numerous nor lucrative to purchase many adherents, and the most valuable of these were conferred on natives of Britain. Every man occupied that rank only, which his own industry, or that of his near ancestors, had procured him. Each individual being cut off from all means of rising to importance, but by his personal talents, was encouraged to make the most of those with which he was endowed. Prospects of this kind excited emulation, and produced an enterprising laborious set of men, not easily overcome by difficulties, and full of projects for bettering their condition.

The enervating opulence of Europe had not yet reached the colonists. They were destitute of gold and silver, but abounded in the riches of nature. A sameness of circumstances and occupations created a great sense of equality, and disposed them to union in any common cause, [33] from the success of which, they might expect to partake of equal advantages.

The colonies were communities of separate independent individuals, under no general influence, but that of their personal feelings and opinions. They were not led by powerful families, nor by great officers, in church or state. Residing chiefly on lands of their own, and employed in the wholesome labours of the field, they were in a great measure strangers to luxury. Their wants were few, and among the great bulk of the people, for the most part, supplied from their own grounds. Their enjoyments were neither far-fetched, nor dearly purchased, and were so moderate in their kind, as to leave both mind and body unimpaired. Inured from their early years to the toils of a country life, they dwelled in the midst of rural plenty. Unacquainted with ideal wants, they delighted in personal independence. Removed from the pressures of indigence, and the indulgence of affluence, their bodies were strong, and their minds vigorous.

The great bulk of the British colonists were farmers, or planters, who were also proprietors of the soil. The merchants, mechanics and manufacturers, taken collectively, did not amount to one fifteenth of the whole number of inhabitants. While the cultivators of the soil depend on nothing but heaven and their own industry, other classes of men contract more or less of servility, from depending on the caprice of their customers. The excess of the farmers over the collective numbers of all the other inhabitants, gave a cast of independence to the manners of the people, and diffused the exalting sentiments, which have always predominated among those, who are cultivators of their own grounds. These were farther promoted by their moderate circumstances, which deprived them of all superfluity for idleness, or effeminate indulgence.

The provincial constitutions of the English colonies nurtured a spirit of liberty. The King and government of Great-Britain held no patronage in America, which could

EXHIBIT 19
0538

create a portion of attachment and influence, sufficient to counteract that spirit in popular assemblies, which, when left to itself, illy brooks any authority, that interferes with its own.

[34] The inhabitants of the colonies from the beginning, especially in New-England, enjoyed a government, which was but little short of being independent. They had not only the image, but the substance of the English constitution. They chose most of their magistrates, and paid them all. They had in effect the sole direction of their internal government. The chief mark of their subordination consisted in their making no laws repugnant to the laws of their Mother Country—their submitting such laws as they made to be repealed by the King, and their obeying such restrictions, as were laid on their trade, by parliament. The latter were often evaded, and with impunity. The other small checks were scarcely felt, and for a long time were in no respects injurious to their interests.

Under these favourable circumstances, colonies in the new world had advanced nearly to the magnitude of a nation, while the greatest part of Europe was almost wholly ignorant of their progress. Some arbitrary proceedings of governors, proprietary partialities, or democratical jealousies, now and then, interrupted the political calm, which generally prevailed among them, but these and other occasional impediments of their prosperity, for the most part, soon subsided. The circumstances of the country afforded but little scope for the intrigues of politicians, or the turbulence of demagogues. The colonists being but remotely affected by the bustlings of the old world, and having but few objects of ambition or contention among themselves, were absorbed in the ordinary cares of domestic life, and for a long time exempted from a great proportion of those evils, which the governed too often experience, from the passions and follies of statesmen. But all this time they were rising higher, and though not sensible of it, growing to a greater degree of political consequence.

One of the first events, which as an evidence of their increasing importance, drew on the colonies a share of public attention, was the taking of Louisbourg from France, while that country was at war with Great-Britain. This enterprize was projected by Governor Shirley, of Massachusetts, and undertaken by the sole authority of [35] the legislature of that Colony. It was carried by only a single vote to make the attempt, but after the adoption of the measure, there was an immediate union of all parties, and all were equally zealous in carrying it into execution. The expedition was committed to General Pepperell, and upwards of 5000 men were speedily raised for the service, and put under his command. This force arrived at Canso, on the 4th of April: A British marine force from the West-Indies, commanded by Commodore Warren, which arrived in the same month, acted in concert with these land forces. Their combined operations were carried on with so much judgment, that on the 17th of June the fortress capitulated.

1745

The war in which Louisbourg was taken, was scarcely ended when another began, in which the colonies were distinguished parties. The reduction of that fortress, by colonial troops, must have given both to France and England, enlarged ideas of the value of American territory, and might have given rise to that eagerness for extending the boundaries of their respective colonies, which soon after, by a collision of claims

EXHIBIT 19
0539

to the same ground, laid the foundation of a bloody war between the two nations. It is neither possible nor necessary to decide on the rights of either to the lands about which this contest began. It is certain that the prospects of convenience and future advantage, had much more influence on both, than the considerations of equity. As the contending powers considered the rights of the native inhabitants of no account, it is not wonderful that they should not agree in settling their own. The war was brought on in the following manner. About the year 1749, a grant of 600,000 acres of land in the neighbourhood of the Ohio, was made out in favour of certain persons in Westminster, London, and Virginia, who had associated under the title of the Ohio company. At this time France was in possession of the country, on both sides of the mouth of the Mississippi, as well as of Canada, and wished to form a communication between these two extremities of her territories in North-America. She was therefore alarmed at the scheme in agitation by the Ohio company [36] in as much as the land granted to them, lay between her Northern and Southern settlements.

Remonstrances against British encroachments, as they were called, having been made in vain by the Governor of Canada, the French, at length, seized some British subjects who were trading among the Twightwees, a nation of Indians near the Ohio, as intruders on the land of his most Christian Majesty, and sent them to a fort on the South side of Lake Erie. The Twightwees, by way of retaliation for capturing British traders, whom they deemed their allies, seized three French traders and sent them to Pennsylvania. The French persisting in their claims to the country on the Ohio, as part of Canada, strengthened themselves by erecting new forts in its vicinity, and at length began to seize and plunder every British trader, found on any part of that river. Repeated complaints of those violences being made to the Governor of Virginia, it was at length determined to send a suitable person to the French commandant near the Ohio, to demand the reason of his hostile proceedings, and to insist on his evacuating a fort he had lately built. Major Washington, being then but little more than 21 years of age, offered his service, which was thankfully accepted. The distance to the French settlement was more than 400 miles, and one half of the rout led through a wilderness, inhabited only by Indians. He nevertheless set out in an uncommonly severe season, attended only by one companion. From Winchester, he proceeded on foot, with his provisions on his back. When he arrived and delivered his message, the French commandant refused to comply, and claimed the country as belonging to the King his master, and declared that he should continue to seize and send as prisoners to Canada, every Englishman that should attempt to trade on the Ohio, or any of its branches. Before Major Washington returned, the Virginians had sent out workmen and materials, to erect a fort at the conflux of the Ohio, and the Monongahela. While they were engaged in this work, the French came upon them—drove them out of the country, and erected a regular fortification on the same spot. These spirited [37] proceedings overset the schemes of the Ohio company, but its members both in England and America, were too powerful to brook the disappointment. It was therefore resolved to instruct the colonies to oppose with arms, the encroachments of the French on the British territories, as these Western lands were called. In obedience to these instructions, Virginia raised three hundred men, put them under the command of Colonel Washington, and sent them on towards the Ohio.

An engagement between them and a party of French, took place, in which the latter were defeated. On this Mr. de Villier, the

**1753**

**May 28, 1754**



**EXHIBIT 19
0540**

French commandant marched down with 900 men, besides Indians, and attacked the Virginians. Colonel Washington made a brave defence, behind a small unfinished intrenchment; called Fort Necessity; but at length accepted of honorable terms of capitulation.

From the eagerness discovered by both nations for these lands, it occurred to all, that a rupture between France and England, could not be far distant. It was also evident to the rulers of the latter, that the colonies would be the most convenient centre of operation, for repressing French encroachments. To draw forth their colonial resources, in an uniform system of operations, then, for the first time, became an object of public attention.

To digest a plan for this purpose, a general meeting of the Governors, and most influential members of the Provincial Assemblies, was held at Albany. The commissioners, at this Congress, were unanimously of opinion, that an union of the colonies was necessary, and they proposed a plan to the following effect, "that a grand Council should be formed of members, to be chosen by the Provincial Assemblies, which Council, together with a Governor, to be appointed by the Crown, should be authorised to make general laws, and also to raise money from all the colonies for their common defence.["] The leading members of the Provincial Assemblies, were of opinion, that if this plan was adopted, they could defend themselves from the French, without any assistance from Great-Britain. This plan, when sent to England, was not acceptable to the Ministry, and in lieu thereof, they [38] proposed "that the Governors of all the colonies, attended by one or two members of their respective Councils," which were for the most part of royal appointment, "should from time to time concert measures for the whole colonies—erect forts, and raise troops with a power to draw upon the British treasury in the first instance: but to be ultimately re-imbursed by a tax to be laid on the colonies by act of Parliament." This was as much disrelished by the colonists, as the former plan had been by the British Ministry. The principle of some general power, operating on the whole of the colonies, was still kept in mind, though dropped for the present.

1754

The ministerial plan laid down above, was transmitted to Governor Shirley; and by him communicated to Dr. Franklin, and his opinion thereon requested. That sagacious patriot, sent to the Governor an answer in writing, with remarks upon the proposed plan, in which by his strong reasoning powers, on the first view of the new subject, he anticipated the substance of a controversy, which for twenty years employed the tongues, pens and swords, of both countries.

The policy of repressing the encroachments of the French on the British colonies, was generally approved, both in England and America. It was therefore resolved to take effectual measures for driving them from the Ohio, and also for reducing Niagara, Crown-Point, and the other posts, which they held within the limit claimed by the King of Great-Britain.

To effect the first purpose, General Braddock was sent from Ireland to Virginia, with two regiments, and was there joined by as many more, as amounted, in the whole, to 2200 men. He was a brave man, but destitute of the other qualifications of a great

EXHIBIT 19
0541

officer. His haughtiness disgusted the Americans, and his severity made him disagreeable to the regular troops. He particularly slighted the country militia, and the Virginia officers. Colonel Washington begged his permission to go before him, and scour the woods with his provincial troops, who were well acquainted with that service, but this was refused.

The General with 1400 men pushed on incautiously, till he [39] fell into an ambuscade of French and Indians, by whom he was


1755 June 9

defeated, and mortally wounded. The regulars, as the British Troops at that time were called, were thrown into confusion, but the Provincials more used to Indian fighting, were not so much disconcerted. They continued in an unbroken body under, Colonel Washington, and by covering the retreat of the regulars, prevented their entirely being cut off.

Notwithstanding these hostilities, war had not yet been formally declared. Previous to the adoption of that measure, Great-Britain, contrary to the usages of nations, made prisoners of 8000 French sailors. This heavy blow for a long time, crippled the naval operations of France, but at the same time, inspired her with a desire, to retaliate, whenever a proper opportunity should present itself. For two or three years, after Braddock's defeat, the war was carried on against France, without vigor or success, but when Mr. Pitt was placed at the head of the ministry, public affairs assumed a new aspect.

Victory, every where, crowned the British arms, and, in a short time, the French were dispossessed, not only of all the British


1759

territories, on which they had encroached, but also of Quebec, the capital of their ancient Province, Canada.

In the course of this war, some of the colonies made exertions so far beyond their reasonable quota, as to merit a re-imbursement from the national treasury; but this was not universally the case. In consequence of internal disputes, together with their greater domestic security, the necessary supplies had not been raised in due time, by others, of the Provincial Assemblies. That a British Minister should depend on colony legislatures, for the execution of his plans, did not well accord with the vigorous and decisive genius of Mr. Pitt, but it was not prudent, by any innovation, to irritate the colonies, during a war, in which, from local circumstances, their exertions were peculiarly beneficial. The advantages that would result from an ability, to draw forth the resources of the colonies, by the same authority, which commanded the wealth of the Mother Country, might in these circumstances [40] have suggested the idea of taxing the colonies by authority of the British Parliament. Mr. Pitt is said to have told Mr. Franklin, "that when the war closed, if he should be in the ministry, he would take measures to prevent the colonies from having a power to refuse or delay the supplies that might be wanted for national purposes," but did not mention what those measures should be. As often as money or men were wanted from the colonies, a requisition was made to their legislatures. These were generally and cheerfully complied with. Their exertions with a few exceptions were great, and manifested a serious desire to carry into effect the plans of Great-Britain, for reducing the power of France.

In the prosecution of this war, the advantages which Great-Britain derived from the colonies, were severely felt by her enemies. Upwards of 400 privateers which were

EXHIBIT 19
0542

fitted out of the ports of the British colonies, successfully cruised on French property. These not only ravaged the West-India islands, belonging to his most Christian Majesty, but made many captures on the coast of France. Besides distressing the French nation by privateering, the colonies furnished 23,800 men, to co-operate with the British regular forces, in North-America. They also sent powerful aids, both in men and provisions, out of their own limits, which facilitated the reduction of Martinique, and of the Havannah. The success of their privateers—the cooperation of their land forces—the convenience of their harbours, and their contiguity to the West-India islands, made the colonies great acquisitions to Britain, and formidable adversaries to France. From their growing importance, the latter had much to fear. Their continued union with Great-Britain, threatened the subversion of the commerce, and American possessions, of France.

After hostilities had raged nearly eight years—a general peace was concluded, on terms, by which France ceded Canada to Great-Britain. The Spaniards having also taken part in the war, were, at the termination of it, induced to relinquish to the same power, both East and West-Florida. This peace gave Great-Britain possession [41] of an extent of country equal in dimensions to several of the kingdoms of Europe. The possession of Canada in the North, and of the two Floridas in the South, made her almost sole mistress of the North-American Continent.

> 1763

This laid a foundation for future greatness, which excited the envy and the fears of Europe. Her navy, her commerce, and her manufactures had greatly increased, when she held but a part of the Continent; and when she was bounded by the formidable powers of France and Spain. Her probable future greatness, when without a rival, and with a growing vent for her manufactures, and increasing employment for her marine, threatened to destroy that balance of power, which European sovereigns have for a long time endeavored to preserve. Kings are republicans with respect to each other, and behold with democratic jealousy, any one of their order towering above the rest. The aggrandizement of one, tends to excite the combination, or at least the wishes of many, to reduce him to the common level. From motives of this kind, a great part of Europe not long since combined against Venice; and soon after against Louis the XIVth of France. With the same suspicious eye, was the naval superiority of Great-Britain, viewed by her neighbours. They were, in general, disposed to favour any convulsion which promised a diminution of her overgrown power.

The addition to the British empire of new provinces, equal in extent to old kingdoms, not only excited the jealousy of European powers, but occasioned doubts in the minds of enlightened British politicians, whether or not, such immense acquisitions of territory would contribute to the felicity of the parent State. They saw, or thought they saw, the seeds of disunion, planted in the too widely extended empire. Power like all things human, has its limits, and there is a point beyond which the longest and sharpest sword fails of doing execution. To combine in one uniform system of Government, the extensive territory then subjected to the British sway appeared to men of reflection, a work of doubtful practicability: [42] Nor were they mistaken in their conjectures.

EXHIBIT 19
0543

The seeds of discord were soon planted, and speedily grew up to the rending of the empire. The high notions of liberty and independence, which were nurtured in the colonies, by their local situation, and the state of society in the new world, were increased by the removal of hostile neighbours. The events of the war, had also given them some experience in military operations, and some confidence in their own ability. Foreseeing their future importance, from the rapid increase of their numbers, and extension of their commerce; and being extremely jealous of their rights, they readily admitted, and with pleasure indulged, ideas and sentiments which were favourable to independence. While combustible materials were daily collecting, in the new world, a spark to kindle the whole was produced in the old. Nor were there wanting those who, from a jealousy of Great-Britain, helped to fan the flame.

EXHIBIT 19
0544

[Back to Table of Contents]

## CHAPTER II

## The Origin Of The Disputes Between Great-Britain And Her Colonies, In The Year 1764, And Its Progress Till 1773.

From the first settlement of English America, till the close of the war of 1755, the conduct of Great-Britain towards her colonies, affords an useful lesson to those who are disposed to colonisation. From that era, it is equally worthy of the attention of those who wish for the reduction of great empires to small ones. In the first period, Great-Britain regarded the provinces as instruments of commerce. Without charging herself with the care of their internal police, or seeking a revenue from them; she contented herself with a monopoly of their trade. She treated them as a judicious mother does her dutiful children.

They shared in every privilege belonging to her native sons, and but slightly felt the inconveniences of subordination. Small was the catalogue of grievances, with which even democratical jealousy charged the parent state, antecedent to the period before [43] mentioned. The following appear to have been the chief. An act of the British parliament for prohibiting the cutting down pitch and tar trees, not being within a fence or enclosure, and sundry acts which operated against colonial manufactures. By one of these, it was made illegal after the 24th of June, 1750, to erect in the colonies, any mill or other engine for slitting or rolling of iron, or any plating forge, to work with a tilt-hammer, or any furnace for making steel. By another, hatters were restrained from taking more than two apprentices at a time, or any for less than seven years, and from employing negroes in the business. The colonists were also prohibited from transporting hats, and home manufactured woolens, from one province to another. These regulations were for the most part evaded, but if carried into execution, would have been slightly inconvenient, and only to a few. The articles, the manufacturing of which, were thus prohibited, could be purchased, at a cheaper rate, from England, and the hands who made them, could be as well employed in agriculture.

<div style="text-align:right">1750</div>

Though these restrictions were a species of affront, by their implying, that the colonists had not sense enough to discover their own interest, and though they seemed calculated to crush their native talents, and to keep them in a constant state of inferiority, without any hope of arriving at those advantages, to which, by the native riches of their country, they were prompted to aspire, yet if no other grievances had been superadded, to what existed in 1763, these would have been soon forgotten, for their pressure was neither great, nor universal. The good resulting to the colonies, from their connection with Great-Britain, infinitely outweighed the evil.

<div style="text-align:right">1763</div>

Till the year 1764, the colonial regulations seemed to have no other object, but the common good of the whole empire. Exceptions, to the contrary, were few, and had no appearance of system. When the approach of the colonies to manhood, made them more capable of resisting

<div style="text-align:right">1764</div>


EXHIBIT 19
0545

impositions, Great-Britain changed the ancient system, under which her colonies had long flourished. When policy would rather have dictated a relaxation of authority, she rose in her demands, and multiplied her restraints.

[44] From the conquest of Canada, in 1759, some have supposed, that France began secretly to lay schemes, for wresting those colonies from Great-Britain, which she was not able to conquer. Others alledge, that from that period, the colonists, released from all fears of dangerous neighbours, fixed their eyes on independence, and took sundry steps, preparatory to the adoption of the measure. Without recurring to either of these opinions, the known selfishness of human nature is sufficient to account for that demand on the one side, and that refusal on the other, which occasioned the revolution. It was natural for Great-Britain, to wish for an extension of her authority over the colonies, and equally so for them, on their approach to maturity, to be more impatient of subordination, and to resist every innovation, for increasing the degree of their dependence.

The sad story of colonial oppression commenced in the year 1764. Great-Britain, then, adopted new regulations, respecting her colonies, which, after disturbing the ancient harmony of the two countries, for about twelve years, terminated in a dismemberment of the empire.

These consisted in restricting their former commerce, but more especially in subjecting them to taxation, by the British Parliament. By adhering to the spirit of her navigation act, in the course of a century, the trade of Great-Britain had encreased far beyond the expectation of her most sanguine sons, but by rigidly enforcing the strict letter of the same, in a different situation of public affairs, effects, directly the reverse, were produced.

> 1764

From the enterprising, commercial spirit of the colonists, the trade of America, after filling all its proper channels to the brim, swelled out on every side, overflowed its proper banks, with a rich redundance. In the cure of evils, which are closely connected with the causes of national prosperity, vulgar precaution ought not to be employed. In severely checking a contraband trade, which was only the overflowing of an extensive fair trade, the remedy was worse then the disease.

For some time before and after the termination of the war of 1755, a considerable intercourse had been carried [45] on between the British and Spanish colonies, consisting of the manufactures of Great Britain, imported by the former, and sold to the latter, by which the British colonies acquired gold and silver, and were enabled to make remittances to the Mother Country. This trade, though it did not clash with the spirit of the British navigation laws, was forbidden by their letter. On account of the advantages, which all parties, and particularly Great-Britain, reaped from this intercourse, it had long been winked at, by persons in power, but at the period beforementioned, some new regulations were adopted, by which it was almost destroyed. This was effected by armed cutters, whose commanders were enjoined to take the usual custom-house oaths, and to act in the capacity of revenue officers. So sudden a stoppage of an accustomed and beneficial commerce, by an unusually rigid execution of old laws, was a serious blow to the Northern colonies. It was their

EXHIBIT 19
0546

misfortune, that though they stood in need of vast quantities of British manufactures, their country produced very little, that afforded a direct remittance, to pay for them. They were, therefore, under a necessity of seeking elsewhere, a market for their produce, and by a circuitous route, acquiring the means of supporting their credit, with the Mother Country. This they found, by trading with the Spanish and French colonies, in their neighbourhood. From them they acquired gold, silver, and valuable commodities, the ultimate profits of which, centered in Great-Britain. This intercourse gave life to business of every denomination, and established a reciprocal circulation of money and merchandize, to the benefit of all parties concerned. Why a trade, essential to the colonies, and which, so far from being detrimental, was indirectly advantageous to Great-Britain, should be so narrowly watched, and so severely restrained, could not be accounted for by the Americans, without supposing, that the rulers of Great-Britain were jealous of their adventurous commercial spirit, and of their increasing number of seamen. Their actual sufferings were great, but their apprehensions were greater.

Instead of viewing the parent state, as formerly, in the light of an affectionate [46] mother, they conceived her, as beginning to be influenced by the narrow views of an illiberal stepdame.

1764

After the 29th of September, 1764, the trade between the British, and the French, and Spanish colonies, was in some degree legalised, but under circumstances, that brought no relief to the colonists, for it was loaded with such enormous duties, as were equivalent to a prohibition. The preamble to the act, for this purpose, was alarming. "Whereas it is just and necessary, that a revenue be raised in America, for defraying the expences, of defending, protecting, and securing the same, We, the commons, &c. towards raising the same, give, and grant unto your Majesty, the sum of'' (here followed a specification of duties upon foreign clayed sugar, indigo, and coffee, of foreign produce, upon all wines, except French, upon all wrought silk, and all calicoes, and upon every gallon of melasses, and syrups, being the produce of a colony, not under the dominion of his Majesty). It was also enacted, that the monies, arising from the importation of these articles, into the colonies, should be paid into the receipt of his Majesty's exchequer, there to entered separate, and reserved, to be disposed of by Parliament, toward defraying the necessary expences, of defending, protecting, and securing America. Till that act passed, no act avowedly for the purpose of revenue, and with the ordinary title and recital of such, was to be found in the parliamentary statute book. The wording of it made the colonists fear, that the Parliament would go on, in charging them with such taxes, as they pleased, and for the support of such military force, as they should think proper. The act was the more disgusting, because the monies, arising from it, were ordered to be paid in specie, and regulations were adopted, against colonial paper money. To obstruct the avenues of acquiring gold and silver, and at the same time to interdict the use of paper money, appeared to the colonists as a farther evidence, that their interests were either misunderstood, or disregarded. The imposition of duties, for the purpose of raising a revenue, in America, was considered as a dangerous innovation, but the methods adopted, for securing their collection, [47] were resented as arbitrary and unconstitutional. It was enacted by Parliament, that whenever offences should be committed against the acts, which imposed them, the prosecutor might bring his action for the penalty, in the courts of admiralty, by which means the defendant lost

EXHIBIT 19
0547

the advantage of being tried by a jury, and was subjected to the necessity of having his case decided upon, by a single man, a creature of the crown, whose salary was to be paid out of forfeitures, adjudged by himself; and also according to a course of law, which exempted the prosecutor from the trouble of proving his accusation, and obliged the defendant, either to evince his innocence, or to suffer. By these regulations, the guards, which the constitution had placed round property, and the fences, which the ancestors of both countries had erected, against arbitrary power, were thrown down, as far as they concerned the colonists, charged with violating the laws, for raising a revenue in America.

They who directed public affairs in Great-Britain feared, that if the collection of these duties was enforced, only in the customary way, payment would be often eluded. To obviate that disposition which the colonists discovered to screen one another, in disobeying offensive acts of parliament, regulations were adopted, bearing hard on their constitutional rights. Unwilling as the colonists were to be excluded by the imposition of enormous duties, from an accustomed and beneficial line of business; it is not wonderful that they were disposed to represent these innovations of the Mother Country, in the most unfavourable point of view. The heavy losses to which many individuals were subjected, and the general distress of the mercantile interest, in several of the oldest colonies, soured the minds of many. That the Mother Country should infringe her own constitution, to cramp the commerce of her colonies, was a fruitful subject of declamation: but these murmurings would have evaporated in words, had Great-Britain proceeded to no farther innovations. Instead of this, she adopted the novel idea of raising from the colonies, an efficient revenue, by direct internal taxes, laid by authority of her parliament.

[48] Though all the colonists disrelished, and many, from the pressure of actual sufferings, complained of the British restrictions on their manufactures and commerce, yet a great majority was disposed to submit to both. Most of them acknowledged that the exercise of these powers was incident to the sovereignty of the Mother Country, especially when guarded by an implied contract, that they were to be only used for the common benefit of the empire. It was generally allowed, that as the planting of colonies was not designed to erect an independent government, but to extend an old one, the Parent State had a right to restrain their trade in every way, which conduced to the common emolument.

They for the most part considered the Mother Country as authorised to name ports and nations, to which alone their merchandize should be carried, and with which alone they should trade: but the novel claim of taxing them without their consent, was universally reprobated, as contrary to their natural, chartered, and constitutional rights. In opposition to it, they not only alledged the general principles of liberty, but ancient usage. During the first 150 years of their existence, they had been left to tax themselves and in their own way. If there were any exceptions to this general rule, they were too inconsiderable to merit notice. In the war of 1755, the events of which were fresh in the recollection of every one, the parliament had in no instance attempted to raise either men or money in the colonies, by its own authority. As the claim of taxation on one side, and the refusal of it on the other, was the very hinge on which the revolution turned, it merits a particular discussion.

EXHIBIT 19
0548

Colonies were formerly planted by warlike nations, to keep their enemies in awe, to give vent to a surplus of inhabitants, or to discharge a number of discontented and troublesome citizens. But in modern ages, the spirit of violence, being in some measure sheathed in commerce, colonies have been settled, by the nations of Europe, for the purposes of trade. These were to be attained by their raising, for the Mother Country, such [49] commodities as she did not produce, and supplying themselves from her with such things as they wanted. In subserviency to these views, Great-Britain planted colonies, and made laws, obliging them to carry to her, all their products which she wanted, and all their raw materials which she chose to work up. Besides this restriction, she forbad them to procure manufactures from any other part of the globe, or even the products of European countries, which could rival her, without being first brought to her ports. By a variety of laws, she regulated their trade, in such a manner, as was thought most conducive to their mutual advantage, and her own particular welfare. This principle of commercial monopoly, ran through no less than 29 acts of parliament from 1660, to 1764. In all these acts, the system of commerce was established, as that, from which alone, their contributions to the strength of the empire, were expected. During this whole period, a parliamentary revenue was no part of the object of colonisation. Accordingly, in all the laws which regarded them, the technical words of revenue laws, were avoided. Such have usually a title purporting their being "grants," and the words "give and grant," usually precede their enacting clauses. Although duties were imposed on America, by previous acts of parliament, no one title of "giving an aid to his majesty," or any other of the usual titles to revenue acts, was to be found in any of them. They were intended as regulations of trade, and not as sources of national supplies. Till the year 1764, all stood on commercial regulation, and restraint.

While Great-Britain attended to this first system of colonisation, her American settlements, though exposed in unknown climates, and unexplored wildernesses, grew and flourished, and in the same proportion; the trade and riches of the Mother Country encreased. Some estimate may be made of this increase, from the following statement. The whole export trade of England, including that to the colonies, in the year 1704, amounted to £6,509,000 sterling: but so immensely had the colonies increased, that the exports to them alone [50] in the year 1772, amounted to £6,022,132 sterling, and they were yearly increasing. In the short space of 68 years, the colonies added nearly as much to the export commerce of Great-Britain, as she had grown to by a progressive increase of improvement in 1700 years. And this increase of colonial trade, was not at the expence of the general trade of the kingdom, for that increased in the same time, from six millions, to sixteen millions.

In this auspicious period, the Mother Country contented herself with exercising her supremacy in superintending the general concerns of the colonies, and in harmonising the commercial interest of the whole empire. To this the most of them bowed down with such a filial submission as demonstrated that they, though not subjected to parliamentary taxes, could be kept in due subordination, and in perfect subserviency to the grand views of colonisation.

Immediately after the peace of Paris, 1763, a new scene was opened. The national debt of Great-Britain, then amounted to 148 millions, for which an interest of nearly 5

EXHIBIT 19
0549

millions, was annually paid. While the British minister was digesting plans for diminishing this amazing load of debt, he conceived the idea of raising a substantial revenue in the British colonies, from taxes laid by the parliament of the parent state. On the one hand it was urged that the late war originated on account of the colonies—that it was reasonable, more especially as it had terminated in a manner so favourable to their interest, that they should contribute to the defraying of the expences it had occasioned. Thus far both parties were agreed, but Great-Britain contended, that her parliament as the supreme power, was constitutionally vested with an authority to lay them on every part of the empire. This doctrine, plausible in itself, and conformable to the letter of the British constitution, when the whole dominions were represented in one assembly, was reprobated in the colonies, as contrary to the spirit of the same government, when the empire became so far extended, as to have many distinct representative assemblies. The colonists believed that the chief excellence of the [51] British constitution consisted in the right of subjects to grant, or withhold taxes, and in their having a share in enacting the laws, by which they were to be bound.

They conceived, that the superiority of the British constitution, to other forms of government was, not because their supreme council was called Parliament, but because, the people had a share in it, by appointing members, who constituted one of its constituent branches, and without whose concurrence, no law, binding on them, could be enacted. In the Mother Country, it was asserted to be essential to the unity of the empire, that the British Parliament should have a right of taxation, over every part of the royal dominions. In the colonies, it was believed, that taxation and representation were inseparable, and that they could neither be free, nor happy, if their property could be taken from them, without their consent. The common people in America reasoned on this subject, in a summary way: "If a British Parliament," said they, "in which we are unrepresented, and over which we have no control, can take from us any part of our property, by direct taxation, they may take as much as they please, and we have no security for any thing, that remains, but a forbearance on their part, less likely to be exercised in our favour, as they lighten themselves of the burthens of government, in the same proportion, that they impose them on us." They well knew, that communities of mankind, as well as individuals, have a strong propensity to impose on others, when they can do it with impunity, and, especially, when there is a prospect, that the imposition will be attended with advantage to themselves. The Americans, from that jealousy of their liberties, which their local situation nurtured, and which they inherited from their forefathers, viewed the exclusive right of laying taxes on themselves, free from extraneous influence, in the same light, as the British Parliament views its peculiar privilege of raising money, independent of the crown. The parent state appeared to the colonists to stand in the same relation to their local legislatures, as the monarch of Great-Britain, to the British [52] Parliament. His prerogative is limited by that palladium of the people's liberty, the exclusive privilege of granting their own money. While this right rests in the hands of the people, their liberties are secured. In the same manner reasoned the colonists "in order to be stiled freemen, our local assemblies, elected by ourselves, must enjoy the exclusive privilege of imposing taxes upon us." They contended, that men settled in foreign parts to better their condition, and not to submit their liberties—to continue the equals, not to become the slave of their less adventurous

EXHIBIT 19
0550

fellow-citizens, and that by the novel doctrine of parliamentary power, they were degraded from being the subjects of a King, to the low condition of being subjects of subjects. They argued, that it was essentially involved in the idea of property, that the possessor had such a right therein, that it was a contradiction to suppose any other man, or body of men, possessed a right to take it from him, without his consent. Precedents, in the history of England, justified this mode of reasoning. The love of property strengthened it, and it had a peculiar force on the minds of colonists, 3000 miles removed from the seat of government, and growing up to maturity, in a new world, where, from the extent of country, and the state of society, even the necessary restraints of civil government, were impatiently born. On the other hand, the people of Great-Britain revolted against the claims of the colonists. Educated in habits of submission to parliamentary taxation, they conceived it to be the height of contumacy for their colonists to refuse obedience to the power, which they had been taught to revere. Not adverting to the common interest, which existed between the people of Great-Britain, and their representatives, they believed, that the same right existed, although the same community of interests was wanting. The pride of an opulent, conquering nation, aided this mode of reasoning. "What," said they, "shall we, who have so lately humbled France and Spain, be dictated to by our own colonists? Shall our subjects, educated by our care, and defended by our arms, presume to question the rights of Parliament, to which we are obliged to submit." [53] Reflections of this kind, congenial to the natural vanity of the human heart, operated so extensively, that the people of Great-Britain spoke of their colonies and of their colonists, as of a kind of possession, annexed to their persons. The love of power, and of property, on the one side of the Atlantic, were opposed by the same powerful passions on the other.

The disposition to tax the colonies, was also strengthened by exaggerated accounts of their wealth. It was said, "that the American planters lived in affluence, and with inconsiderable taxes, while the inhabitants of Great-Britain were born down, by such oppressive burdens, as to make a bare subsistence, a matter of extreme difficulty." The officers who have served in America, during the late war, contributed to this delusion. Their observations were founded on what they had seen in cities, and at a time, when large sums were spent by government, in support of fleets and armies, and when American commodities were in great demand. To treat with attention those, who came to fight for them, and also to gratify their own pride, the colonists had made a parade of their riches, by frequently and sumptuously entertaining the gentlemen of the British army. These, judging from what they saw, without considering the general state of the country, concurred in representing the colonists, as very able to contribute, largely, towards defraying the common expences of the empire.

The charters, which were supposed to contain the principles on which the colonies were founded, became the subject of serious investigation on both sides. One clause was found to run through the whole of them, except that which had been granted to Mr. Penn. This was a declaration, "that the emigrants to America should enjoy the same privileges, as if they had remained, or had been born within the realm;" but such was the subtilty of disputants, that both parties construed this general principle, so as to favour their respective opinions. The American patriots contended, that as English freeholders could not be taxed, but by representatives, in chusing whom they had a

EXHIBIT 19
0551

vote, neither could the colonists: But [54] it was replied, that if the colonists had remained in England, they must have been bound to pay the taxes, imposed by parliament. It was therefore inferred, that, though taxed by that authority, they lost none of the rights of native Englishmen, residing at home. The partizans of the Mother Country could see nothing in charters, but security against taxes, by royal authority. The Americans, adhering to the spirit more than to the letter, viewed their charters, as a shield, against all taxes, not imposed by representatives of their own choice. This construction they contended to be expressly recognized by the charter of Maryland. In that, King Charles bound, both himself and his successors, not to assent to any bill, subjecting the inhabitants to internal taxation, by external legislation.

The nature and extent of the connection between Great-Britain and America, was a great constitutional question, involving many interests, and the general principles of civil liberty. To decide this, recourse was in vain had to parchment authorities, made at a distant time, when neither the grantor, nor grantees, of American territory, had in contemplation, any thing like the present state of the two countries.

Great and flourishing colonies, daily increasing in numbers, and already grown to the magnitude of a nation, planted at an immense distance, and governed by constitutions, resembling that of the country, from which they sprung, were novelties in the history of the world. To combine colonies, so circumstanced, in one uniform system of government, with the parent state, required a great knowledge of mankind, and an extensive comprehension of things. It was an arduous business, far beyond the grasp of ordinary statesmen, whose minds were narrowed by the formalities of law, or the trammels of office. An original genius, unfettered with precedents, and exalted with just ideas of the rights of human nature, and the obligations of universal benevolence, might have struck out a middle line, which would have secured as much liberty to the colonies, and as great a degree of supremacy to the parent state, as their common good required: But [55] the helm of Great-Britain was not in such hands. The spirit of the British constitution on the one hand, revolted at the idea, that the British parliament should exercise the same unlimited authority over the unrepresented colonies, which it exercised over the inhabitants of Great-Britain. The colonists on the other hand did not claim a total exemption from its authority. They in general allowed the Mother Country a certain undefined prerogative over them, and acquiesced in the right of Parliament, to make many acts, binding them in many subjects of internal policy, and regulating their trade. Where parliamentary supremacy ended, and at what point colonial independency began, was not ascertained. Happy would it have been, had the question never been agitated, but much more so, had it been compromised by an amicable compact, without the horrors of a civil war.

The English colonies were originally established, not for the sake of revenue, but on the principles of a commercial monopoly. While England pursued trade and forgot revenue, her commerce increased at least fourfold. The colonies took off the manufactures of Great-Britain, and paid for them with provisions, or raw materials. They united their arms in war, their commerce and their councils in peace, without nicely investigating the terms on which the connection of the two countries depended.

EXHIBIT 19
0552

A perfect calm in the political world is not long to be expected. The reciprocal happiness, both of Great-Britain and of the colonies, was too great to be of long duration. The calamities of the war of 1755, had scarcely ended, when the germ of another war was planted, which soon grew up and produced deadly fruit.

At that time sundry resolutions passed the British parliament, relative to the imposition of a stamp duty in America, which gave a general alarm. By them the right, the equity, the policy, and even the necessity of taxing the colonies was formally avowed. These resolutions being considered as the preface of a system of American revenue, were deemed an introduction of evils of much greater magnitude. They opened a prospect of oppression, [56] boundless in extent, and endless in duration. They were nevertheless not immediately followed by any legislative act. Time, and an invitation, were given to the Americans, to suggest any other mode of taxation, that might be equivalent in its produce to the stamp act: But they objected, not only to the mode, but the principle, and several of their assemblies, though in vain, petitioned against it. An American revenue was in England, a very popular measure. The cry in favour of it was so strong, as to confound and silence the voice of petitions to the contrary. The equity of compelling the Americans to contribute to the common expences of the empire, satisfied many, who, without enquiring into the policy or justice of taxing their unrepresented fellow subjects, readily assented to the measures adopted by the parliament, for this purpose. The prospect of easing their own burdens, at the expence of the colonists, dazzled the eyes of gentlemen of landed interest, so as to keep out of their view, the probable consequences of the innovation.

| | |
|---|---|
| | 1764 |

The omnipotence of parliament was so familiar a phrase on both sides of the Atlantic, that few in America, and still fewer in Great-Britain, were impressed in the first instance, with any idea of the illegality of taxing the colonists.

The illumination on that subject was gradual. The resolutions in favour of an American stamp act, which passed in March, 1764, met with no opposition. In the course of the year, which intervened between these resolutions, and the passing of a law grounded upon them, the subject was better understood and constitutional objections against the measure, were urged by several, both in Great-Britain and America. This astonished and chagrined the British ministry: But as the principle of taxing America, had been for some time determined upon, they were unwilling to give it up.

Impelled by partiality for a long cherished idea, Mr. Grenville brought into the house of commons his long expected bill, for laying a stamp duty in America. By this after passing through the usual forms, it was enacted, that the instruments [57] of writing which are in daily use among a commercial people, should be null and void, unless they were executed on stamped paper or parchment, charged with a duty imposed by the British parliament.

| | |
|---|---|
| | March, 1765 |

When the bill was brought in, Mr. Charles Townsend concluded a speech in its favour, with words to the following effect, "And now will these Americans, children planted by our care, nourished up by our indulgence, till they are grown to a degree of strength and opulence, and protected by our arms, will they grudge to contribute their

EXHIBIT 19
0553

mite to relieve us from the heavy weight of that burden which we lie under." To which Colonel Barré replied,

They planted by your care? No, your oppressions planted them in America. They fled from tyranny to a then uncultivated and inhospitable country, where they exposed themselves to almost all the hardships to which human nature is liable; and among others to the cruelty of a savage foe the most subtle, and I will take upon me to say, the most formidable of any people upon the face of God's earth; and yet, actuated by principles of true English liberty, they met all hardships with pleasure compared with those they suffered in their own country, from the hands of those that should have been their friends. They nourished up by your indulgence? They grew by your neglect of them. As soon as you began to care about them, that care was exercised in sending persons to rule them in one department and another, who were perhaps the deputies of deputies to some members of this house, sent to spy out their liberties, to misrepresent their actions and to prey upon them. Men, whose behaviour on many occasions, has caused the blood of those sons of liberty to recoil within them. Men promoted to the highest seats of justice, some who to my knowledge were glad by going to a foreign country, to escape being brought to the bar of a court of justice in their own. They protected by your arms? They have nobly taken up arms in your defence, have exerted a valour amidst their constant and laborious industry, for the defence of a country whose frontier was drenched in blood, while its interior parts yielded all its little savings to your emolument. And believe [58] me, remember I this day told you so, that same spirit of freedom which actuated that people at first will accompany them still: but prudence forbids me to explain myself farther. God knows, I do not at this time speak from any motives of party heat, what I deliver are the genuine sentiments of my heart. However superior to me in general knowledge and experience, the respectable body of this house may be, yet I claim to know more of America than most of you, having seen and been conversant in that country. The people I believe are as truly loyal as any subjects the King has, but a people jealous of their liberties, and who will vindicate them, if ever they should be violated: but the subject is too delicate—I will say no more.

During the debate on the bill, the supporters of it insisted much on the colonies being virtually represented in the same manner as Leeds, Halifax, and some other towns were. A recurrence to this plea was a virtual acknowledgment, that there ought not to be taxation without representation. It was replied, that the connexion between the electors and non-electors of parliament in Great-Britain, was so interwoven, from both being equally liable to pay the same common tax, as to give some security of property to the latter: but with respect to taxes laid by the British parliament, and paid by the Americans, the situation of the parties was reversed. Instead of both parties bearing a proportionable share of the same common burden, what was laid on the one, was exactly so much taken off from the other.

The bill met with no opposition in the house of Lords, and on the 22d of March, it received the royal assent.
The night after it passed, Dr. Franklin wrote to Mr. Charles Thomson. "The sun of liberty is set, you must light up the candles of industry and economy." Mr. Thomson answered, "he was apprehensive

1765

EXHIBIT 19
0554

that other lights would be the consequence," and foretold the opposition that shortly took place. On its being suggested from authority, that the stamp officers would not be sent from Great-Britain: but selected from among the Americans, the colony agents were desired to point out proper persons [59] for the purpose. They generally nominated their friends which affords a presumptive proof, that they supposed the act would have gone down. In this opinion they were far from being singular. That the colonists would be ultimately obliged to submit to the stamp act, was at first commonly believed, both in England and America. The framers of it, in particular, flattered themselves that the confusion which would arise upon the disuse of writings, and the insecurity of property, which would result from using any other than that required by law, would compel the colonies, however reluctant, to use the stamp paper, and consequently to pay the taxes imposed thereon. They therefore boasted that it was a law which would execute itself.

By the terms of the stamp act, it was not to take effect till the first day of November, a period of more than seven months after | 1765

its passing. This give the colonists an opportunity for leisurely canvassing the new subject, and examining it fully on every side. In the first part of this interval, struck with astonishment, they lay in silent consternation, and could not determine what course to pursue. By degrees they recovered their recollection.

Virginia led the way in opposition to the stamp act. Mr. Patrick Henry brought into the house of burgesses of that colony, the following resolutions which were substantially adopted. | May 28, 1765

Resolved, That the first adventurers, settlers of this his Majesty's colony and dominion of Virginia, brought with them and transmitted to their posterity, and all other, his Majesty's subjects, since inhabiting in this, his Majesty's said colony, all the liberties, privileges and immunities, that have at any time been held, enjoyed and possessed by the people of Great-Britain.

Resolved, That by two royal charters, granted by King James the first, the colonies aforesaid are declared, and entitled to all liberties, privileges, and immunities of denizens, and natural subjects, to all intents and purposes, as if they had been abiding, and born within the realm of England,

Resolved, That his Majesty's liege people, of this, his ancient colony, have enjoyed the rights of being thus governed [60] by | 1765

their own assembly, in the article of taxes, and internal police, and that the same have never been forfeited, or yielded up, but have been constantly recognized by the King and people of Britain.

Resolved, therefore, That the general assembly of this colony, together with his Majesty, or his substitutes, have, in their representative capacity, the only exclusive right and power, to lay taxes and imposts, upon the inhabitants of this colony, and that every attempt to vest such power in any other person or persons, whatsoever, than the general assembly aforesaid, is illegal, unconstitutional, and unjust, and hath a manifest tendency to destroy British, as well as American Liberty.

**EXHIBIT 19**
**0555**

Resolved, That his Majesty's liege people, the inhabitants of this colony, are not bound to yield obedience to any law, or ordinance whatever, designed to impose any taxation whatever upon them, other, than the laws or ordinances of the general assembly aforesaid.

Resolved, That any person, who shall, by speaking, or writing, assert, or maintain, that any person, or persons, other than the general assembly of this colony, have any right or power, to impose, or lay any taxation on the people here, shall be deemed an enemy to this, his Majesty's colony.

Upon reading these resolutions, the boldness and novelty of them affected one of the members to such a degree, that he cried out, "Treason! Treason!" They were, nevertheless, well received by the people, and immediately forwarded to the other provinces. They circulated extensively, and gave a spring to all the discontented. Till they appeared, most were of opinion, that the act would be quietly adopted. Murmurs, indeed, were common, but they seemed to be such, as would soon die away. The countenance of so respectable a colony, as Virginia, confirmed the wavering, and emboldened the timid. Opposition to the stamp act, from that period, assumed a bolder face. The fire of liberty blazed forth from the press; some well judged publications set the rights of the colonists, in a plain, but strong point of view. The tongues and the pens of the well informed [61] citizens laboured in kindling the latent sparks of patriotism. The flame spread from breast to breast, till the conflagration, became general. In this business, New-England had a principal share. The inhabitants of that part of America, in particular, considered their obligations to the Mother Country for past favours, to be very inconsiderable. They were fully informed, that their forefathers were driven, by persecution, to the woods of America, and had there, without any expence to the parent state, effected a settlement on bare creation. Their resentment, for the invasion of their accustomed right of taxation, was not so much mitigated, by the recollection of late favours, as it was heightened by the tradition of grievous sufferings, to which their ancestors, by the rulers of England, had been subjected. The descendants of the exiled, persecuted, Puritans, of the last century, opposed the stamp act with the same spirit, with which their forefathers were actuated, when they set themselves against the arbitrary impositions of the House of Stuart.

The heavy burdens, which the operation of the stamp-act would have imposed on the colonists, together with the precedent it would establish of future exactions, furnished the American patriots with arguments, calculated as well to move the passions, as to convince the judgments of their fellow colonists. In great warmth they exclaimed, "If the parliament has a right to levy the stamp duties, they may, by the same authority, lay on us imposts, excises, and other taxes, without end, till their rapacity is satisfied, or our abilities are exhausted. We cannot, at future elections, displace these men, who so lavishly grant away our property. Their seats and their power are independent of us, and it will rest with their generosity, where to stop, in transferring the expences of government, from their own, to our shoulders."

It was fortunate for the liberties of America, that News-papers were the subject of a heavy stamp duty. Printers, when uninfluenced by government, have generally

**EXHIBIT 19**
**0556**

arranged themselves on the side of liberty, nor are they less remarkable for attention to the profits of their profession.

A stamp duty, which openly invaded the first, [62] and threatened a great diminution of the last, provoked their united zealous opposition. They daily presented to the public, original dissertations, tending to prove, that if the stamp-act was suffered to operate, the liberties of America, were at end, and their property virtually transferred, to their Trans-Atlantic fellow-subjects. The writers among the Americans, seriously alarmed for the fate of their country, came forward, with essays, to prove, that agreeably to the British constitution, taxation and representation were inseparable, that the only constitutional mode of raising money from the colonists, was by acts of their own legislatures, that the Crown possessed no farther power, than that of requisition, and that the parliamentary right of taxation was confined to the Mother Country, and there originated, from the natural right of man, to do what he pleased with his own, transferred by consent from the electors of Great-Britain, to those whom they chose to represent them in Parliament. They also insisted much on the mis-application of public money by the British ministry. Great pains were taken, to inform the colonists, of the large sums, annually bestowed on pensioned favorites, and for the various purposes of bribery. Their passions were inflamed, by high coloured representations of the hardship of being obliged to pay the earnings of their industry, into a British treasury, well known to be a fund for corruption.

1765

The writers on the American side were opposed by arguments, drawn from the unity of the empire. The necessity of one supreme head, the unlimited power of Parliament, and the great numbers in the Mother Country, who, though legally disqualified, from voting at elections, were nevertheless bound to pay the taxes, imposed by the representatives of the nation. To these objections it was replied, that the very idea of subordination of parts, excluded the notion of simple undivided unity.

That as England was the head, she could not be the head and the members too—that in all extensive empires, where the dead uniformity of servitude did not prevent, the subordinate parts had many local privileges and immunities—that between these privileges and the supreme [63] common authority, the line was extremely nice; but nevertheless, the supremacy of the head had an ample field of exercise, without arrogating to itself the disposal of the property of the unrepresented subordinate parts. To the assertion, that the power of Parliament was unlimited, the colonists replied, that before it could constitutionally exercise that power, it must be constitutionally formed, and that, therefore, it must at least, in one of its branches, be constituted by the people, over whom it exercised unlimited power. That with respect to Great-Britain, it was so constituted—with respect to America, it was not. They therefore inferred, that its power ought not to be the same over both countries. They argued also, that the delegation of the people was the source of power, in regard to taxation, and as that delegation was wanting in America, they concluded the right of Parliament, to grant away their property, could not exist. That the defective representation in Great-Britain, should be urged as an argument for taxing the Americans, without any representation at all, proved the encroaching nature of power. Instead of convincing the colonists of the propriety of their submission, it demonstrated the wisdom of their resistance; for, said they, "one

1765

EXHIBIT 19
0557

invasion of natural right is made the justification of another, much more injurious and oppressive."

The advocates for parliamentary taxation laid great stress on the rights, supposed to accrue to Great-Britain, on the score of her having reared up and protected the English settlements, in America, at great expence. It was, on the other hand, contended by the colonists, that in all the wars which were common to both countries, they had taken their full share, but in all their own dangers, in all the difficulties belonging separately to their situation, which did not immediately concern Great-Britain, they were left to themselves, and had to struggle through a hard infancy; and in particular, to defend themselves without any aid from the Parent State, against the numerous savages in their vicinity. That when France had made war upon them, it was not on their own account, but as appendages to Great-Britain.

That confining their trade [64] for the exclusive benefit of the Parent State, was an ample compensation for her protection, and a sufficient equivalent for their exemption from parliamentary taxation. That the taxes imposed on the inhabitants of Great-Britain, were incorporated with their manufactures, and ultimately fell on the colonists, who were the consumers.

> 1765

The advocates for the stamp act, also contended that as the parliament was charged with the defence of the colonies, it ought to possess the means of defraying the expences incurred thereby. The same argument had been used by King Charles the 1st, in support of ship money; and it was now answered in the same manner, as it was by the patriots of that day. "That the people who were defended or protected, were the first to judge of and to provide the means of defraying the expences incurred on that account." In the mean time, the minds of the Americans underwent a total transformation. Instead of their late peaceable and steady attachment to the British nation, they were dayly advancing to the opposite extreme. A new mode of displaying resentment against the friends of the stamp act, began in Massachusetts, and was followed by the other colonies.

A few gentlemen hung out, early in the morning, on the limb of a large tree, towards the enterance of Boston, two effigies, one designed for the stamp master, the other for a jack boot, with a head and horns peeping out at the top. Great numbers both from town and country came to see them. A spirit of enthusiasm was diffused among the spectators. In the evening the whole was cut down and carried in procession by the populace shouting "liberty and property forever, no stamps." They next pulled down a new building, lately erected by Mr. Oliver, the stamp master. They then went to his house, before which they beheaded his effigy, and at the same time broke his windows. Eleven days after similar violences were repeated. The mob attacked the house of Mr. William Story, deputy register of the court of admiralty—broke his windows—forced into his dwelling house, and destroyed the books and files belonging to the said court, and ruined a great part of his furniture. They [65] next proceeded to the house of Benjamin Hallowell, comptroller of the customs, and repeated similar excesses, and drank and destroyed his liquors. They afterwards proceeded to the house of Mr. Hutchinson, and soon demolished it. They carried off his plate, furniture and apparel, and scattered or destroyed manuscripts and other curious and useful papers, which for thirty years he had been collecting. About half a dozen of the meanest of the mob

> 1765 Aug. 14

EXHIBIT 19
0558

were soon after taken up and committed, but they either broke jail, or otherwise escaped all punishment. The town of Boston condemned the whole proceeding, and for some time, private gentlemen kept watch at night, to prevent further violences.

Similar disturbances broke out in the adjacent colonies, nearly about the same time. On the 27th August, the people of New-Port in Rhode-Island, exhibited three effigies intended for Messieurs Howard, Moffatt, and Johnson, in a cart with halters about their necks, and after hanging them on a gallows for some time, cut them down and burnt them, amidst the acclamations of thousands. On the day following, the people collected at the house of Mr. Martin Howard, a lawyer, who had written in defence of the right of Parliament to tax the Americans, and demolished every thing, that belonged to it. They proceeded to Dr. Moffatt's, who, in conversation, had supported the same right, and made a similar devastation of his property.

`1765`

In Connecticut they exhibited effigies in sundry places, and afterwards committed them to the flames.

In New-York, the stamp master having resigned, the stamp papers were taken into Fort George, by Lieutenant Governor Colden. The people, disliking his political sentiments, broke open his stable, took out his coach, and carried it in triumph, through the principal streets, to the gallows. On one end of this they suspended the effigy of the Lieut. Governor, having in his right hand a stamped bill of lading, and in the other a figure of the devil. After some time, they carried the apparatus to the gate of the fort, and from thence to the bowling green, under the muzzles of the guns, and burned the [66] whole amid the acclamations of many thousands. They went thence to Major James' house, stripped it of every article, and consumed the whole, because he was a friend to the stamp act.

`Nov. 1, 1765`

The next evening the mob re-assembled, and insisted upon the Lieutenant Governor delivering the stamped papers into their hands, and threatened, in case of a refusal, to take them by force. After some negotiation, it was agreed that they should be delivered to the corporation, and they were deposited in the city hall. Ten boxes of the same, which came by another conveyance, were burned.

The stamp-act was not less odious to many of the inhabitants of the British West-India islands, than to those on the continent of North America. The people of St. Kitts obliged the stamp officer, and his deputy, to resign. Barbadoes, Canada, and Halifax, submitted to the act.

When the ship, which brought the stamp papers to Philadelphia, first appeared round Gloucester point, all the vessels in the harbour hoisted their colours half mast high. The bells were rung muffled till evening, and every countenance added to the appearance of sincere mourning. A large number of people assembled, and endeavoured to procure the resignation of Mr. Hughes, the stamp distributor. He held out long, but at length found it necessary to comply.

EXHIBIT 19
0559

As opportunities offered, the assemblies generally passed resolutions, asserting their exclusive right, to lay taxes on their constituents. The people, in their town meetings, instructed their representatives to oppose the stamp act. As a specimen of these, the instructions given to Thomas Forster, their representative, by the freeholders and other inhabitants of the town of Plymouth, are subjoined. In these the yeomanry of the country spoke the determined language of freemen.

After expressing the highest esteem for the British constitution, and setting forth their grievances, they proceeded as follows:

October, 1765

You, Sir, represent a people, who are not only descended from the first settlers of this country, but inhabit the very spot they first possessed. Here was first laid [67] the foundation of the British empire, in this part of America, which, from a very small beginning, has increased and spread, in a manner very surprising, and almost incredible, especially, when we consider, that all this has been effected, without the aid or assistance of any power on earth; that we have defended, protected and secured ourselves against the invasions and cruelty of savages, and the subtlety and inhumanity of our inveterate and natural enemies, the French; and all this without the appropriation of any tax by stamps, or stamp acts, laid upon our fellow subjects, in any part of the King's dominions, for defraying the expence thereof. This place, Sir, was at first the asylum of liberty, and we hope, will ever be preserved sacred to it, though it was then no more than a barren wilderness, inhabited only by savage men and beasts. To this place our Fathers (whose memories be revered) possessed of the principles of liberty in their purity, disdaining slavery, fled to enjoy those privileges, which they had an undoubted right to, but were deprived of, by the hands of violence and oppression, in their native country. We, Sir, their posterity, the freeholders, and other inhabitants of this town, legally assembled for that purpose, possessed of the same sentiments, and retaining the same ardour for liberty, think it our indispensable duty, on this occasion, to express to you these our sentiments of the stamp-act, and its fatal consequences to this country, and to enjoin upon you, as you regard not only the welfare, but the very being of this people, that you (consistent with our allegiance to the King, and relation to the government of Great Britain) disregarding all proposals for that purpose, exert all your power and influence in opposition to the stamp act, at least till we hear the success of our petitions for relief. We likewise, to avoid disgracing the memories of our ancestors, as well as the reproaches of our own consciences, and the curses of posterity, recommend it to you, to obtain, if possible, in the honorable house of representatives of this province, a full and explicit assertion of our rights, and to have the same entered on their public records, that all generations yet to come, may be convinced, that we have [68] not only a just sense of our rights and liberties, but that we never, with submission to Divine Providence, will be slaves to any power on earth.

The expediency of calling a continental Congress to be composed of deputies from each of the provinces, had early occurred to the people of Massachusetts.

The assembly of that province passed a resolution in favour of that measure, and fixed on New-York as the place, and the second Tuesday of October, as the time, for holding the same. Soon after, they sent circular letters to the speakers of the several assemblies, requesting their concurrence. This first advance towards continental union was seconded in South-Carolina, before

1765 June 6


EXHIBIT 19
0560

it had been agreed to by any colony to the southward of New England. The example of this province had a considerable influence in recommending the measure to others, who were divided in their opinions, on the propriety of it.

The assemblies of Virginia, North-Carolina, and Georgia, were prevented, by their governors, from sending a deputation to this Congress. Twenty eight deputies from Massachusetts, Rhode-Island, Connecticut, New-York, New-Jersey, Pennsylvania, Delaware, Maryland, and South-Carolina met at New-York; and after mature deliberation agreed on a declaration of their rights, and on a statement of their grievances. They asserted in strong terms, their exemption from all taxes, not imposed by their own representatives. They also concurred in a petition to the King, and memorial to the House of Lords, and a petition to the House of Commons. The colonies that were prevented from sending their representatives to this Congress, forwarded petitions, similar to those which were adopted by the deputies which attended.

While a variety of legal and illegal methods were adopted to oppose the stamp act, the first of November, on which it was to commence its operation, approached. This in Boston was ushered in by a funeral tolling of bells. Many shops and stores were shut. The effigies of the planners and friends of the stamp act, were carried [69] about the streets in public derision, and then torn in pieces, by the enraged populace. It was remarkable that though a large crowd was assembled, there was not the least violence, or disorder.

At Portsmouth in New-Hampshire, the morning was ushered in, with tolling all the bells in town. In the course of the day, notice was given to the friends of liberty, to attend her funeral. A coffin, neatly ornamented inscribed with the word *Liberty* in large letters, was carried to the grave. The funeral procession began from the state house, attended with two unbraced drums. While the inhabitants who followed the coffin were in motion, minute guns were fired, and continued till the corpse arrived at the place of interment. Then an oration in favour of the deceased was pronounced. It was scarcely ended before the corpse was taken up, it having been perceived that some remains of life were left, at which the inscription was immediately altered to "Liberty revived." The bells immediately exchanged their melancholy, for a more joyful sound, and satisfaction appeared in every countenance. The whole was conducted with decency, and without injury or insult, to any man's person or property.

Nov. 1

In Maryland, the effigy of the stamp master, on one side of which was written, "Tyranny" on the other "Oppression," and across the breast, "Damn my country I'll get money," was carried through the streets, from the place of confinement, to the whipping post, and from thence to the pillory. After suffering many indignities, it was first hanged and than burnt.

The general aversion to the stamp act, was, by similar methods, in a variety of places, demonstrated. It is remarkable that the proceedings of the populace, on these occasions, were earned on with decorum, and regularity. They were not ebullitions of a thoughtless mob, but for the most part, planned by leading men of character and

EXHIBIT 19
0561

influence, who were friends to peace and order. These, knowing well that the bulk of mankind, are more led by their senses, than by their reason, conducted the public [70] exhibitions on that principle, with a view of making the stamp act, and its friends, both ridiculous, and odious.

Though the stamp act was to have operated from the first of November; yet legal proceedings in the courts, were carried on as before. Vessels entered and departed without stamped papers. The printers boldly printed and circulated their news-papers, and found a sufficient number of readers, though they used common paper, in defiance of the act of parliament. In most departments, by common consent, business was carried on, as though no stamp act had existed. This was accompanied by spirited resolutions to risque all consequences, rather than submit to use the paper required by law. While these matters were in agitation, the colonists entered into associations against importing British manufactures, till the stamp act should be repealed. In this manner British liberty was made to operate against British tyranny. Agreeably to the free constitution of Great Britain, the subject was at liberty to buy, or not to buy, as he pleased. By suspending their future purchases on the repeal of the stamp act, the colonists made it the interest of merchants, and manufacturers, to solicit for that repeal. They had usually taken off so great a proportion of British manufactures, that the sudden stoppage of all their orders, amounting, annually, to several millions sterling, threw some thousands in the Mother Country out of employment, and induced them, from a regard to their own interest, to advocate the measures wished for by America. The petitions from the colonies were seconded by petitions from the merchants and manufacturers of Great-Britain. What the former prayed for as a matter of right, and connected with their liberties, the latter also solicited from motives of immediate advantage. In order to remedy the deficiency of British goods, the colonists betook themselves to a variety of necessary domestic manufactures. In a little time, large quantities of course and common clothes were brought to market, and these though dearer, and of a worse quality, were cheerfully preferred to similar articles, imported from Britain. That wool might not be wanting, they entered into resolutions [71] to abstain from eating lambs. Foreign elegancies were generally laid aside. The women were as exemplary as the men, in various instances of self denial. With great readiness, they refused every article of decoration for their persons, and of luxury for their tables. These restrictions, which the colonists had voluntarily imposed on themselves, were so well observed, that multitudes of artificers in England, were reduced to great distress, and some of their most flourishing manufactories, were, in a great measure, at a stand. An association was entered into by many of the sons of liberty, the name given to those who were opposed to the stamp act, by which they agreed "to march with the utmost expedition at their own proper costs and expence, with their whole force to the relief of those that should be in danger from the stamp act, or its promoters and abettors, or any thing relative to it, on account of any thing that may have been done, in opposition to its obtaining." This was subscribed by so many in New-York and New-England, that nothing but a repeal could have prevented the immediate commencement of a civil war.

From the decided opposition to the stamp act, which had been by the colonies adopted, it became necessary for Great Britain to enforce, or to repeal it. Both


EXHIBIT 19
0562

methods of proceeding had supporters. The opposers of a repeal urged arguments, drawn from the dignity of the nation, the danger of giving way to the clamours of the Americans, and the consequences of weakening parliamentary authority over the colonies. On the other hand it was evident, from the determined opposition of the colonies, that it could not be enforced without a civil war, by which, in every event, the nation must be a loser. In the course of these discussions, Dr. Franklin was examined at the bar of the House of Commons, and gave extensive information on the state of American affairs, and the impolicy of the stamp act, which contributed much to remove prejudices, and to produce a disposition that was friendly to a repeal.

Some speakers of great weight, in both houses of parliament, denied their right of taxing the colonies. The [72] most distinguished supporters of this opinion were Lord Camden, in the House of Peers, and Mr. Pitt, in the House of Commons. The former, in strong language, said, "My position is this, I repeat it, I will maintain it to my last hour. Taxation and representation are inseparable. This position is founded on the laws of nature. It is more, it is itself an eternal law of nature. For whatever is a man's own, is absolutely his own. No man has a right to take it from him without his consent. Whoever attempts to do it, attempts an injury, whoever does it, commits a robbery." Mr. Pitt, with an original boldness of expression, justified the colonists, in opposing the stamp-act. "You have no right," said he, "to tax America. I rejoice, that America has resisted. Three millions of our fellow subjects so lost to every sense of virtue, as tamely to give up their liberties, would be fit instruments to make slaves of the rest." He concluded with giving his advice, that the stamp-act be repealed absolutely, totally, and immediately, that the reason for the repeal be assigned, that it was founded on an erroneous principle. "At the same time," said he, "let the sovereign authority of this country, over the colonies, be asserted in as strong terms as can be devised, and be made to extend to every point of legislation whatsoever; that we may bind their trade, confine their manufactures, and exercise every power, except that of taking their money out of their pockets, without their consent." The approbation of this illustrious statesman, whose distinguished abilities had raised Great Britain to the highest pitch of renown, inspired the Americans with additional confidence, in the rectitude of their claims of exemption from parliamentary taxation, and emboldened them to farther opposition, when at a future day, as shall be hereafter related, the project of an American revenue was resumed. After much debating, and two protests in the House of Lords, and passing an act "for securing the dependence of America on Great Britain" the repeal of the stamp act was finally carried.

This event gave great joy in London. Ships in the river Thames displayed their colours, and houses were illuminated all [73] over

> March 18

the city. It was no sooner known in America, than the colonists rescinded their resolutions, and recommenced their mercantile intercourse with the Mother Country. They presented their homespun clothes to the poor, and imported more largely than ever. The churches resounded with thanksgivings, and their public and private rejoicings knew no bounds. By letters, addresses, and other means, almost all the colonies shewed unequivocal marks of acknowledgment, and gratitude. So sudden a calm recovered after so violent a storm, is without a parallel in history. By the judicious sacrifice of one law, the parliament of Great Britain procured an acquiescence, in all that remained.

EXHIBIT 19
0563

There were enlightened patriots, fully impressed with an idea, that the immoderate joy of the colonists was disproportioned to the advantage they had gained.

The stamp act, though repealed, was not repealed on American principles. The preamble assigned as the reason thereof, "That the collecting the several duties and revenues, as by the said act was directed, would be attended with many inconveniencies, and productive of consequences, dangerous to the commercial interests of these kingdoms." Though this reason was a good one in England, it was by no means satisfactory in America. At the same time that the stamp act was repealed, the absolute, unlimited supremacy of parliament was, in words, asserted. The opposers of the repeal contended for this as essential, the friends of that measure acquiesced in it to strengthen their party, and make sure of their object. Many of both sides thought, that the dignity of Great Britain required something of the kind to counterbalance the loss of authority, that might result from her yielding to the clamours of the colonists. The act for this purpose was called the declaratory act, and was in principle more hostile to American rights, than the stamp act; for it annulled those resolutions and acts of the provincial assemblies, in which they had asserted their right to exemption from all taxes, not imposed by their own representatives; and also enacted, "That the parliament [74] had, and of right ought to have, power to bind the colonies, in all cases whatsoever. "

The bulk of the Americans, intoxicated with the advantage they had gained, overlooked this statute, which in one comprehensive sentence, not only deprived them of liberty and property, but of every right, incident to humanity. They considered it as a salvo for the honor of parliament, in repealing an act, which had so lately received their sanction, and flattered themselves it would remain a dead letter, and that although the right of taxation was in words retained, it would never be exercised. Unwilling to contend about paper claims of ideal supremacy, they returned to their habits of good humour, with the parent state.

The repeal of the stamp act, in a relative connexion with all its circumstances and consequences, was the first direct step to American independency. The claims of the two countries were not only left undecided, but a foundation was laid for their extending at a future period, to the impossibility of a compromise. Though for the present Great-Britain receded from enforcing her claim of American revenue, a numerous party, adhering to that system, reserved themselves for more favourable circumstances to enforce it; and at the same time the colonists, more enlightened on the subject, and more fully convinced of the rectitude of their claims, were encouraged to oppose it, under whatsoever form it should appear, or under whatsoever disguise it should cover itself.

Elevated with the advantage they had gained, from that day forward, instead of feeling themselves dependent on Great-Britain, they conceived that, in respect to commerce, she was dependent on them. It inspired them with such high ideas of the importance of their trade, that they considered the Mother Country to be brought under greater obligations to them, for purchasing her manufactures, than they were to her for protection and the administration of civil government. The freemen of British America, impressed with the exalting sentiments of patriotism and of liberty,

EXHIBIT 19
0564

conceived it to be within their power, by future combinations, at any time to [75] convulse, if not to bankrupt the nation, from which they sprung.

Opinions of this kind were strengthened by their local situation, favouring ideas, as extensive as the unexplored continent of which they were inhabitants. While the pride of Britons revolted at the thought of their colonies refusing subjection to that parliament which they obeyed, the Americans with equal haughtiness exclaimed, "shall the petty island of Great-Britain, scarce a speck on the map of the world, controul the free citizens of the great continent of America?"

These high sounding pretensions would have been harmless, or at most, spent themselves in words, had not a ruinous policy, untaught by recent experience, called them into serious action. Though the stamp act was repealed, an American revenue was still a favourite object with many in Great-Britain. The equity and the advantage of taxing the colonists by parliamentary authority were very apparent to their understandings, but the mode of effecting it, without hazarding the public tranquility, was not so obvious. Mr. Charles Townsend, afterwards chancellor of the exchequer, pawned his credit to accomplish what many so earnestly desired.

He accordingly brought into parliament a bill for granting duties in the British colonies on glass, paper, painters colours, and tea,

1767

which was afterwards enacted into a law. If the small duties imposed on these articles, had preceded the stamp act, they might have passed unobserved: but the late discussions occasioned by that act, had produced among the colonists, not only an animated conviction of their exemption from parliamentary taxation, but a jealousy of the designs of Great-Britain. The sentiments of the Americans on this subject, bore a great resemblance to those of their British countrymen of the preceding century, in the case of ship money. The amount of that tax was very moderate, little exceeding twenty thousand pounds. It was distributed upon the people with equality, and expended for the honour and advantage of the kingdom, yet all these circumstances could not reconcile the people of England to the imposition. [76] It was entirely arbitrary. "By the same right," said they, "any other tax may be imposed." In like manner the Americans considered these small duties, in the nature of an entering wedge, designed to make way for others, which would be greater and heavier. In a relative connection with late acts of parliament, respecting domestic manufactures and foreign commerce, laws for imposing taxes on British commodities exported to the colonies, formed a complete circle of oppression, from which there was no possibility of escaping. The colonists had been, previously, restrained from manufacturing certain articles, for their own consumption. Other acts confined them to the exclusive use of British merchandize. The addition of duties, put them wholly in the power and discretion of Great-Britain "We are not" said they,

permitted to import from any nation, other than our own parent state, and have been in some cases by her restrained from manufacturing for ourselves, and she claims a right to do so in every instance which is incompatible with her interest. To these restrictions we have hitherto submitted, but she now rises in her demands, and imposes duties on those commodities, the purchasing of which, elsewhere than at her market, her laws forbid, and the manufacturing of which for our own use, she may any moment she pleases restrain. If her right is valid to lay a small tax, it is equally so

EXHIBIT 19
0565

to lay a large one, for from the nature of the case, she must be guided exclusively by her own opinions of our ability, and of the propriety of the duties she may impose. Nothing is left for us but to complain, and, pay.

They contended that there was no real difference between the principle of these new duties and the stamp act, they were both designed to raise a revenue in America, and in the same manner. The payment of the duties, imposed by the stamp act, might have been eluded by the total disuse of stamped paper, and so might the payment of these duties, by the total disuse of those articles on which they were laid, but in neither case, without great difficulty. The colonists were therefore reduced to the hard alternative of being obliged totally to disuse articles of the greatest necessity in human [77] life, or to pay a tax without their consent. The fire of opposition, which had been smothered by the repeal of the stamp act, burned afresh against the same principle of taxation, exhibited in its new form. Mr. Dickenson, of Pennsylvania, on this occasion presented to the public a series of letters signed a Farmer, proving the extreme danger which threatened the liberties of America, from their acquiescence in a precedent which might establish the claim of parliamentary taxation. They were written with great animation, and were read with uncommon avidity. Their reasoning was so convincing, that many of the candid and disinterested citizens of Great-Britain, acknowledged that the American opposition to parliamentary taxation was justifiable. The enormous sums which the stamp act would have collected, had thoroughly alarmed the colonists for their property. It was now demonstrated by several writers, especially by the Pennsylvania Farmer, that a small tax, though more specious, was equally dangerous, as it established a precedent which eventually annihilated American property. The declaratory act which at first was the subject of but a few comments, was now dilated upon, as a foundation for every species of oppression; and the small duties, lately imposed, were considered as the beginning of a train of much greater evils.

Had the colonists admitted the propriety of raising a parliamentary revenue among them, the erection of an American board of commissioners for managing it, which was about this time instituted at Boston, would have been a convenience, rather than an injury; but united as they were in sentiments, of the contrariety of that measure to their natural and constitutional rights, they illy brooked the innovation. As it was coeval with the new duties, they considered it as a certain evidence that the project of an extensive American revenue, notwithstanding the repeal of the stamp act, was still in contemplation. A dislike to British taxation naturally produced a dislike to a board which was to be instrumental in that business, and occasioned many insults to its commissioners.

[78] The revenue act of 1767 produced resolves, petitions, addresses, and remonstrances, similar to those, with which the colonists opposed the stamp act. It also gave rise to a second association for suspending farther importations of British manufactures, till these offensive duties should be taken off. Uniformity, in these measures, was promoted by a circular letter from the assembly of Massachusetts to the speakers of the other assemblies.

This stated the petitions, and representations, which they had forwarded against the late duties, and strongly pointed out the

1768

69

EXHIBIT 19
0566

great difficulties, that must arise to themselves and their constituents, from the operation of acts of parliament, imposing duties on the unrepresented American colonies, and requesting a reciprocal free communication, on public affairs. Most of the provincial assemblies, as they had opportunities of deliberating on the subject, approved of the proceedings of the Massachusetts assembly, and harmonised with them in the measures, which they had adopted. In resolves, they stated their rights, in firm but decent language, and, in petitions, they prayed for a repeal of the late acts, which they considered as infringements on their liberties.

It is not unreasonable to suppose, that the minister, who planned these duties, hoped, that they would be regarded as regulations of trade. He might also presume, that as they amounted only to an inconsiderable sum, they would not give any alarm. The circular letter of the Massachusetts assembly, which laid the foundation for united petitions against them, gave therefore great offence. Lord Hillsborough, who had lately been appointed Secretary of State, for the American department, wrote letters to the governors of the respective provinces, urging them to exert their influence, to prevent the assemblies from taking any notice of it, and he called on the Massachusetts assembly, to rescind their proceedings on that subject. This measure was both injudicious and irritating. To require a public body to rescind a resolution, for sending a letter, which was already sent, answered, and acted upon, was a bad specimen of the wisdom of the new minister. To call a vote, for sending a circular [79] letter to invite the assemblies of the neighbouring colonies to communicate together in the pursuit of legal measures to obtain a redress of grievances, "a flagitious attempt to disturb the public peace," appeared to the colonists a very injudicious application of harsh epithets to their constitutional right of petitioning. To threaten a new house of Assembly with dissolution, in case of their not agreeing to rescind an act of a former assembly, which was not executory, but executed, clashed no less with the dictates of common sense, than the constitutional rights of British colonists. The proposition for rescinding was negatived, by a majority of 97 to 17. The assembly was immediately dissolved, as had been threatened. This procedure of the new secretary was considered, by the colonists, as an attempt to suppress all communication of sentiments between them, and to prevent their united supplications, from reaching the royal ear. It answered no one valuable purpose, but naturally tended to mischief.

The bad humour, which from successive irritation already too much prevailed, was about this time wrought up to a high pitch of resentment and violence, on occasion of the seizure of Mr. Hancock's sloop Liberty, for not having entered all the wines she had brought from Madeira.
The popularity of her owner, the name of the sloop, and the general aversion to the board of commissioners, and

1768 June 10

parliamentary taxation, concurred to inflame the minds of the people. They resented the removal of the sloop from the wharf, as implying an apprehension of a rescue. They used every means in their power to interrupt the officers, in the execution of their business; and numbers swore that they would be revenged. Mr. Harrison the collector, Mr. Hallowell the comptroller, and Mr. Irwine the inspector of imports and exports, were so roughly handled, as to bring their lives in danger. The windows of some of their houses were broken, and the boat of the collector was dragged through

EXHIBIT 19
0567

the town, and burned on the common. Such was the temper and disposition of many of the inhabitants, that the commissioners of the customs thought [80] proper to retire on board the Romney man of war; and afterwards to Castle William. The commissioners, from the first moment of their institution, had been an eye sore to the people of Boston. This, though partly owing to their active zeal in detecting smugglers, principally arose from the association which existed in the minds of the inhabitants, between that board and an American revenue. The declaratory act of 1766, the revenue act of 1767; together with the pomp and expence of this board, so disproportionate to the small income of the present duties, conspired to convince not only the few who were benefited by smuggling, but the great body of enlightened freemen, that farther and greater impositions of parliamentary taxes were intended. In proportion as this opinion gained ground, the inhabitants became more disrespectful to the executive officers of the revenue, and more disposed, in the frenzy of patriotism, to commit outrages on their persons and property. The constant bickering that existed between them and the inhabitants, together with the steady opposition given by the latter, to the discharge of the official duties of the former, induced the commissioners and friends of an American revenue, to solicit the protection of a regular force, to be stationed at Boston. In compliance with their wishes, his Majesty ordered two regiments and some armed vessels to repair thither, for supporting and assisting the officers of the customs in the execution of their duty. This restrained the active exertion of that turbulent spirit, which since the passing of the late revenue laws had revived, but it added to the pre-existing causes thereof.

When it was reported in Boston, that one or more regiments were ordered there, a meeting of the inhabitants was called, and a committee appointed, to request the governor, to issue precepts, for convening a general assembly. He replied, "that he could not comply with their request, till he had received his Majesty's commands for that purpose." This answer being reported, some spirited resolutions were adopted. In particular it was voted, that the select men of Boston should write [81] to the select men of other towns, to propose, that a convention be held, of deputies from each, to meet at Faneuil hall, in Boston, on the 22d instant.

Sept. 13

It was afterwards voted, "That as there is apprehension in the minds of many, of an approaching war with France, those inhabitants, who are not provided, be requested to furnish themselves forthwith with arms."

Sept. 22

Ninety six towns, and eight districts, agreed to the proposal made by the inhabitants of Boston, and appointed deputies, to attend a convention, but the town of Hatfield refused its concurrence. When the deputies met, they conducted with moderation, disclaimed all legislative authority, advised the people to pay the greatest deference to government, and to wait patiently for a redress of their grievances, from his Majesty's wisdom and moderation. After stating to the world the causes of their meeting, and an account of their proceedings, they dissolved themselves, after a short session, and went home.

Within a day after the convention broke up, the expected regiments arrived, and were peaceably received. Hints had been thrown out by some idle people, that they should

**EXHIBIT 19**
**0568**

not be permitted to come on shore. Preparations were made by the captains of the men of war in the harbour, to fire on the town, in case opposition had been made to their landing, but the crisis for an appeal to arms was not yet arrived. It was hoped by some, that the folly and rage of the Bostonians would have led them to this rash measure, and thereby have afforded an opportunity for giving them some naval and military correction, but both prudence and policy induced them to adopt a more temperate line of conduct.

While the contention was kept alive, by the successive irritations, which have been mentioned, there was, particularly in Massachusetts, a species of warfare carried on between the royal governors, and the provincial assemblies. Each watched the other with all the jealousy, which strong distrust could inspire. The latter regarded the former as instruments of power, wishing to pay their court to the Mother Country, by curbing the spirit of [82] American freedom, and the former kept a strict eye on the latter, lest they might smooth the way to independence, at which they were charged with aiming. Lieut. Governor Hutchinson, of Massachusetts, virtually challenged the assembly to a dispute, on the ground of the controversy between the two countries. This was accepted by the latter, and the subject, discussed with all the subtilty of argument, which the ingenuity of either party could suggest.

The war of words was not confined to the colonies. While the American assemblies passed resolutions, asserting their exclusive right to tax their constituents, the parliament by resolves, asserted their unlimited supremacy in and over the colonies. While the former, in their public acts, disclaimed all views of independence, they were successively represented in parliamentary resolves, royal speeches, and addresses from Lords and commons, as being in a state of disobedience to law and government, and as having proceeded to measures subversive of the constitution, and manifesting a disposition to throw off all subordination to Great Britain.

In February 1769, both houses of parliament went one step beyond all that had preceded. They then concurred in a joint address to his majesty, in which they expressed their satisfaction in the measures his majesty had pursued—gave the strongest assurances, that they would effectually support him in such farther measures as might be found necessary, to maintain the civil magistrates in a due execution of the laws, in Massachusett's Bay, and beseeched him

1769

to direct the governor to take the most effectual methods of procuring the fullest information, touching all treasons or misprisions of treason, committed within the government, since the 30th day of December, 1767; and to transmit the same together with the names of the persons who were most active in the commission of such offences, to one of the secretaries of state, in order that his majesty might issue a special commission for enquiring of, hearing, and determining, the said offences, within the realm of Great-Britain, pursuant to the provision of the statute of the 35th [83] of King Henry the 8th.

EXHIBIT 19
0569

The latter part of this address, which proposed the bringing of delinquents from Massachusetts, to be tried at a tribunal in Great-Britain, for crimes committed in America, underwent many severe animadversions.

It was asserted to be totally inconsistent with the spirit of the constitution, for in England a man charged with a crime, had a right to be tried in the county in which his offence was supposed to have been committed. "Justice is regularly and impartially administered in our courts," said the colonists "and yet by direction of parliament, offenders are to be taken by force, together with all such persons as may be pointed out as witnesses and carried to England, there to be tried in a distant land, by a jury of strangers, and subject to all the disadvantages which result from want of friends, want of witnesses and want of money."

The house of burgesses of Virginia met, soon after official accounts of the joint address of lords and commons on this subject reached America; and in a few days after their meeting, passed resolutions expressing

their exclusive right to tax their constituents, and their right to petition their sovereign for redress of grievances, and the lawfulness of procuring the concurrence of the other colonies in praying for the royal interposition, in favour of the violated rights of America: and that all trials for treason, or for any crime whatsoever, committed in that colony, ought to be before his majesty's courts, within the said colony; and that the seizing any person residing in the said colony, suspected of any crime whatsoever, committed therein, and sending such person to places beyond the sea to be tried, was highly derogatory of the rights of British subjects.

The next day lord Botetourt the governour of Virginia, sent for the house of burgesses and addressed them as follows. "Mr. Speaker and gentlemen of the house of burgesses. I have heard of your resolves, and augur ill of their effects. You have made it my duty to dissolve you, and you are dissolved accordingly."

[84] The assembly of North-Carolina adopted resolutions, similar to those of Virginia, for which Tryon their governour dissolved them. The members of the house of burgesses in Virginia, and of the assembly of North-Carolina, after their dissolution, met as private gentlemen, chose their late speakers moderators, and adopted resolutions against importing British goods. The non-importation agreement, was in this manner forwarded by the very measures which were intended to curb the spirit of American freedom, from which it sprung. Meetings of the associators were regularly held in the various provinces. Committees were appointed to examine all vessels arriving from Britain. Censures were freely passed on such as refused to concur in these associations, and their names published in the news-papers as enemies to their country. The regular acts of the provincial assemblies were not so much respected and obeyed as the decrees of these committees, the associations were in general, as well observed as could be expected; but nevertheless there were some collusions. The fear of mobs, of public resentment and contempt, co-operating with patriotism, preponderated over private interest and convenience. One of the importing merchants of Boston, who hesitated in his compliance with the determination of the inhabitants, was waited upon by a committee of tradesmen, with an axeman and a carpenter at

EXHIBIT 19
0570

their head, who informed him, "that 1000 men were waiting for his answer, and that if he refused to comply, they could not tell what might be the consequence. " He complied, and the newspapers soon after published, that he did it voluntarily.

In Boston, Lieut. Governor Hutchinson endeavoured to promote a counter association, but without effect. The friends of importation objected, that till parliament made provision for the punishment of the confederacies against importation, a counter association would answer no other purpose, than to expose the associators to popular rage.

The Bostonians, about this time, went one step farther. They reshipped goods to Great Britain, instead of [85] storing them as formerly. This was resolved upon in a town meeting, on the information of an inhabitant, who communicated a letter he had lately received from a member of parliament, in which it was said, "that shipping back ten thousand pounds worth of goods would do more, than storing a hundred thousand." This turned the scale, and procured a majority of votes for reshipping. Not only in this, but in many other instances, the violences of the colonists were fostered by individuals in Great Britain. A number of these were in principle with the Americans, in denying the right of parliament, to tax them, but others were more influenced by a spirit of opposition to the ministerial majority, than by a regard to the constitutional liberties of either country.

The non-importation agreement had now lasted some time, and by degrees had become general. Several of the colonial assemblies had been dissolved, or prorogued, for asserting the rights of their constituents. The royal governours, and other friends to an American revenue, were chagrined. The colonists were irritated. Good men, both in England and America, deplored these untoward events, and beheld with concern an increasing ill humour between those, who were bound by interest and affection, to be friends to each other.

In consequence of the American non-importation agreement, founded in opposition to the duties of 1767, the manufacturers of Great Britain experienced a renewal of the distresses, which followed the adoption of similar resolutions, in the year 1765, the repeal of these duties was therefore solicited by the same influence, which had procured the repeal of the stamp act. The rulers of Great Britain acted without decision. Instead of persevering in their own system of coercion or indeed in any one uniform system of colonial government, they struck out a middle line, embarrassed with the consequences, both of severity and of lenity, and which was without the complete benefits of either.

Soon after the spirited address to his Majesty, last mentioned, | 1769
had passed both houses of parliament, assurances were given for
[86] repealing all the duties, imposed in 1767, excepting that of three-pence per pound on tea.

Anxious on the one hand to establish parliamentary supremacy, and on the other, afraid to stem the torrent of opposition, they conceded enough to weaken the former, and yet not enough to satisfy the latter. Had Great Britain generously repealed the whole, and for ever relinquished all claim to the right, or even the exercise of the right

EXHIBIT 19
0571

of taxation, the union of the two countries, might have lasted for ages. Had she seriously determined to compel the submission of the colonies, nothing could have been more unfriendly to this design, than her repeated concessions to their reiterated associations. The declaratory act, and the reservation of the duty on tea, left the cause of contention between the two countries, in full force, but the former was only a claim on paper, and the latter might be evaded, by refusing to purchase any tea, on which the parliamentary tax was imposed. The colonists, therefore, conceiving that their commerce might be renewed, without establishing any precedent, injurious to their liberties, relaxed in their associations, in every particular, except tea, and immediately recommenced the importation of all other articles of merchandise. A political calm once more took place. The parent state might now have closed the dispute for ever, and honorably receded, without a formal relinquishment of her claims. Neither the reservation of the duty on tea, by the British parliament, nor the exceptions made by the colonists, of importing no tea, on which a duty was imposed, would, if they had been left to their own operation, have disturbed the returning harmony of the two countries. Without fresh irritation, their wounds might have healed, and not a scar been left behind.

Unfortunately for the friends of union, so paltry a sum as 3 [pence for] so insignificant an article as tea, in consequence of a combination between the British ministry and East-India company, revived the dispute to the rending of the empire.

[87] These two abortive attempts to raise a parliamentary revenue in America, caused a fermentation in the minds of the colonists, and gave birth to many enquiries respecting their natural rights. Reflections and reasonings on this subject produced a high sense of liberty, and a general conviction that there could be no security for their property, if they were to be taxed at the discretion of a British parliament, in which they were unrepresented, and over which they had no controul. A determination not only to oppose this new claim of taxation, but to keep a strict watch, least it might be established in some disguised form, took possession of their minds.

It commonly happens in the discussion of doubtful claims between States, that the ground of the original dispute insensibly changes. When the mind is employed in investigating one subject, others associated with it, naturally present themselves. In the course of enquiries on the subject of parliamentary taxation, the restriction on the trade of the colonists—the necessity that was imposed on them to purchase British and other manufactures, loaded with their full proportion of all taxes paid by those who made or sold them, became more generally known. While American writers were vindicating their country from the charge of contributing nothing to the common expences of the empire, they were led to set off to their credit, the disadvantage of their being confined exclusively to purchase such manufactures in Britain. They instituted calculations by which they demonstrated that the monopoly of their trade, drew from them greater sums for the support of government, than were usually paid by an equal number of their fellow citizens of Great-Britain; and that taxation, superadded to such a monopoly, would leave them in a state of perfect uncompensated slavery. The investigation of these subjects brought matters into view which the friends of union ought to have kept out of sight. These circumstances, together with the extensive population of the Eastern States, and their adventurous

EXHIBIT 19
0572

spirit of commerce, suggested to some bold spirits that not only British taxation, but British navigation laws were unfriendly to the interests of [88] America. Speculations of this magnitude suited well with the extensive views of some capital merchants, but never would have roused the bulk of the people, had not new matter brought the dispute between the two countries to a point, in which every individual was interested.

On reviewing the conduct of the British ministry, respecting the colonies, much weakness as well as folly appears. For a succession of years there was a steady pursuit of American revenue, but great inconsistence in the projects for obtaining it. In one moment the parliament was for enforcing their laws, the next for repealing them. Doing and undoing, menacing and submitting, straining and relaxing, followed each other, in alternate succession. The object of administration, though twice relinquished as to any present efficiency, was invariably pursued, but without any unity of system.

On the 9th of May, 1769, the King in his speech to parliament, highly applauded their hearty concurrence, in maintaining the execution of the laws, in every part of his dominions. Five days after this speech, lord Hillsborough, secretary of state for the colonies, wrote to lord Botetourt, governor of Virginia:

I can take upon me to assure you, notwithstanding information to the contrary, from men, with factious and seditious views, that his Majesty's present administration have at no time entertained a design to propose to parliament, to lay any farther taxes upon America, for the purpose of raising a revenue, and that it is at present their intention to propose the next session of parliament, to take off the duties upon glass, paper, and colours, upon consideration of such duties having been laid contrary to the true principles of commerce.

The governor was also informed, that "his Majesty relied upon his prudence and fidelity, to make such an explanation of his Majesty's measures, as would tend to remove prejudices, and to re-establish mutual confidence and affection between the Mother Country and the colonies." In the exact spirit of his instructions, lord Botetourt addressed the Virginia assembly as follows:

It may possibly be objected, that as his [89] Majesty's present administration are not immortal, their successors may be inclined to attempt to undo what the present ministers shall have attempted to perform, and to that objection I can give but this answer, that it is my firm opinion, that the plan I have stated to you, will certainly take place, and that it will never be departed from; and so determined am I forever to abide by it, that I will be content to be declared infamous, if I do not to the last hour of my life, at all times, in all places, and upon all occasions, exert every power, with which I either am, or ever shall be, legally invested, in order to obtain and maintain for the continent of America, that satisfaction, which I have been authorised to promise this day, by the confidential servants of our gracious sovereign, who, to my certain knowledge, rates his honor so high, that he would rather part with his crown, than preserve it by deceit.

These assurances were received with transports of joy by the Virginians. They viewed them as pledging his Majesty for security, that the late design for raising a revenue in

**EXHIBIT 19**
**0573**

America was abandoned, and never more to be resumed. The Assembly of Virginia, in answer to lord Botetourt, expressed themselves thus:

We are sure our most gracious sovereign, under whatever changes may happen in his confidential servants, will remain immutable in the ways of truth and justice, and that he is incapable of deceiving his faithful subjects; and we esteem your lordship's information not only as warranted, but even sanctified by the royal word.

How far these solemn engagements with the Americans were observed, subsequent events will demonstrate. In a perfect reliance on them, most of the colonists returned to their ancient habits of good humour, and flattered themselves that no future parliament would undertake to give, or grant away their property.

From the royal and ministerial assurances given in favour of America, in the year 1769, and the subsequent repeal in 1770, of five sixths of the duties which had been imposed in 1767; together with the consequent renewal of the mercantile intercourse between Great-Britain [90] and the colonies: Many hoped that the contention between the two countries was finally closed. In all the provinces, excepting Massachusetts, appearances seemed to favour that opinion. Many incidents operated there to the prejudice of that harmony, which had begun, elsewhere, to return. The stationing a military force among them, was a fruitful source of uneasiness. The royal army had been brought thither, with the avowed design of enforcing submission to the Mother Country. Speeches from the throne, and addresses from both houses of parliament, had taught them to look upon the inhabitants as a factious turbulent people, who aimed at throwing off all subordination to Great-Britain.
They, on the other hand were accustomed to look upon the soldiery as instruments of tyranny, sent on purpose to dragoon them out of their liberties.

1770

Reciprocal insults soured the tempers, and mutual injuries embittered the passions, of the opposite parties: besides, some fiery spirits who thought it an indignity to have troops quartered among them, were constantly exciting the towns-people to quarrel with the soldiers.

On the second of March, a fray took place near Mr. Gray's ropewalk, between a private soldier of the 29th regiment, and an inhabitant. The former was supported by his comrades, the latter by the rope makers, till several on both sides were involved in the consequences. On the 5th a more dreadful scene was presented. The soldiers, when under arms, were pressed upon, insulted and pelted by a mob armed with clubs, sticks, and snowballs covering stones. They were also dared to fire. In this situation, one of the soldiers who had received a blow, in resentment fired at the supposed aggressor. This was followed by a single discharge from six others. Three of the inhabitants were killed, and five were dangerously wounded. The town was immediately in commotion. Such was the temper, force, and number of the inhabitants, that nothing but an engagement to remove the troops out of the town; together with the advice of moderate men, prevented the townsmen from falling on the soldiers. The killed were buried in one vault, and in a most respectful, [91] manner to express the indignation of the inhabitants at the slaughter of their brethren, by

EXHIBIT 19
0574

soldiers quartered among them, in violation of their civil liberties. Preston the captain who commanded the party, which fired on the inhabitants [was] committed to jail, and afterwards tried. The captain, and six of the men, were acquitted. Two were brought in guilty of man-slaughter. It appeared on the trial, that the soldiers were abused, insulted, threatened, and pelted, before they fired. It was also proved, that only seven guns were fired by the eight prisoners. These circumstances induced the jury to make a favourable verdict. The result of the trial reflected great honour on John Adams, and Josiah Quincy, the council for the prisoners, and also on the integrity of the jury, who ventured to give an upright verdict, in defiance of popular opinions.

The events of this tragical night, sunk deep in the minds of the people, and were made subservient to important purposes. The anniversary of it was observed with great solemnity. Eloquent orators, were successively employed to deliver an annual oration, to preserve the remembrance of it fresh in their minds. On these occasions the blessings of liberty—the horrors of slavery—the dangers of a standing army—the rights of the colonies, and a variety of such topics were presented to the public view, under their most pleasing and alarming forms. These annual orations administered fuel to the fire of liberty, and kept it burning, with an incessant flame.

The obstacles to returning harmony, which have already been mentioned, were increased, by making the governor and judges in Massachusetts, independent of the province. Formerly, they had been paid by yearly grants from the assembly, but about this time provision was made for paying their salaries by the crown. This was resented as a dangerous innovation, as an infraction of their charter, and as destroying that balance of power, which is essential to free governments. That the crown should pay the salary of the chief justice, was represented by the assembly, as a species of bribery, tending to bias his judicial determinations. They made it the foundation for [92] impeaching Mr. Justice Oliver, before the governor, but he excepted to their proceedings, as unconstitutional. The assembly, nevertheless, gained two points. They tendered the governor more odious to the inhabitants, and increased the public respect for themselves, as the counterpart of the British house of commons, and as guardians of the rights of the people.

A personal animosity, between Lieut. Governor Hutchinson, and some distinguished patriots, in Massachusetts, contributed to perpetuate a flame of discontent in that province, after it had elsewhere visibly abated. This was worked up, in the year 1773, to a high pitch, by a singular combination of circumstances. Some letters had been written, in the course of the dispute, by governor Hutchinson, lieut. governor Oliver, and others, in Boston, to persons in power and office, in England, which contained a very unfavourable representation of the state of public affairs, and tended to shew the necessity of coercive measures, and of changing the chartered system of government, to secure the obedience of the province. These letters fell into the hands of Dr. Franklin, agent of the province, who transmitted them to Boston. The indignation and animosity, which was excited on the receipt of them, knew no bounds. The house of assembly agreed on a petition and remonstrance to his Majesty, in which they charged their governor and lieut. governor with being betrayers of their trusts, and of the people they governed, and of giving private, partial, and false information. They also

declared them enemies to the colonies, and prayed for justice against them, and for their speedy removal from their places.

These charges were carried through by a majority of 82 to 12.

Jan. 29, 1774

This petition and remonstrance being transmitted to England, the merits of it were discussed before his Majesty's privy council. After a hearing before that board, in which Dr. Franklin represented the province of Massachusetts, the governor and lieut. governor were acquitted. Mr. Wedderburne, who defended the accused royal servants, in the course of his pleadings, inveighed against Dr. Franklin, in the severest language, as the fomenter of the disputes between the two countries. It [93] was no protection to this venerable sage, that being the agent of Massachusetts, he conceived it his duty to inform his constituents, of letters, written on public affairs, calculated to overturn their chartered constitution. The age, respectability, and high literary character of the subject of Mr. Wedderburne's philippic, turned the attention of the public, on the transaction. The insult offered to one of their public agents, and especially to one, who was both the idol and ornament of his native country, sunk deep in the minds of the Americans. That a faithful servant, whom they loved, and almost adored, should be insulted, for discharging his official duty, rankled in their hearts. Dr. Franklin was also immediately dismissed from the office of deputy postmaster general, which he held under the crown. It was not only by his transmission of these letters, that he had given offence to the British ministry, but by his popular writings, in favor of America. Two pieces of his, in particular, had lately attracted a large share of public attention, and had an extensive influence on both sides of the Atlantic. The one purported to be an edict from the King of Prussia, for taxing the inhabitants of Great-Britain, as descendants of emigrants from his dominions. The other was entitled, "Rules for reducing a great empire to a small one." In both of which he had exposed the claims of the Mother Country, and the proceedings of the British ministry, with the severity of poignant satire.

For ten years, there had now been but little intermission to the disputes between Great-Britain and her colonies. Their respective claims had never been compromised on middle ground. The calm which followed the repeal of the stamp act, was in a few months disturbed, by the revenue act of the year 1767. The tranquility which followed the repeal of five sixths of that act in the year 1770, was nothing more than a truce. The reservation of the duty on tea, made as an avowed evidence of the claims of Great-Britain to tax her colonies, kept alive the jealousy of the colonists, while at the same time the stationing of a standing army in Massachusetts—the continuance of a board of commissioners in Boston—the constituting the governors and judges of that province [94] independent of the people, were constant sources of irritation. The altercations which, at this period, were common between the royal governors and the provincial assemblies, together with numerous vindications of the claims of America, made the subject familiar to the colonists. The ground of the controversy was canvassed in every company. The more the Americans read, reasoned, and conversed on the subject, the more were they convinced of their right to the exclusive disposal of their property. This was followed by a determination to resist all encroachments on that palladium of British liberty. They were as strongly convinced of their right to refuse and resist parliamentary taxation, as the ruling powers of Great-Britain, of their right to demand and enforce their submission to it.

EXHIBIT 19
0576

The claims of the two countries, being thus irreconcilably opposed to each other, the partial calm which followed the concession of parliament in 1770, was liable to disturbance, from every incident. Under such circumstances, nothing less than the most guarded conduct on both sides could prevent a renewal of the controversy. Instead of following those prudential measures which would have kept the ground of the dispute out of sight, an impolitic scheme was concerted, between the British ministry and the East-India company, which placed the claims of Great-Britain and of her colonies in hostile array against each other.

EXHIBIT 19
0577

[Back to Table of Contents]

# CHAPTER III

# Tea Is Sent By The East India Company To America, And Is Refused, Or Destroyed, By The Colonists. Boston Port Act, &C.

In the year 1773, commenced a new era of the American controversy. To understand this in its origin, it is necessary to recur to the period, when the solitary duty on tea, was excepted from the partial repeal of the revenue act of 1767. When the duties which had been laid on glass, paper and painters colours, were taken off, a [95] respectable minority in parliament contended, that the duty on tea should also be removed. To this it was replied, "That as the Americans denied the legality of taxing them, a total repeal would be a virtual acquiescence in their claims; and that in order to preserve the rights of the Mother Country, it was necessary to retain the preamble, and at least one of the taxed articles." It was answered, that a partial repeal would be a source of endless discontent—that the tax on tea would not defray the expences of collecting it. The motion in favour of a total repeal, was thrown out by a great majority. As the parliament thought fit to retain the tax on tea for an evidence of their right of taxation, the Americans in like manner, to be consistent with themselves, in denying that right, discontinued the importation of that commodity. While there was no attempt to introduce tea into the colonies against this declared sense of the inhabitants, these opposing claims were in no danger of collision. In that case the Mother Country might have solaced herself, with her ideal rights, and the colonies, with their favorite opinion of a total exemption from parliamentary taxes, without disturbing the public peace. This mode of compromising the dispute, which seemed at first designed as a salvo for the honor and consistency of both parties, was, by the interference of the East-India Company, in combination with the British ministry, completely overset.

The expected revenue from tea failed, in consequence of the American association to import none, on which a duty was charged. This, though partially violated in some of the colonies, was well observed in others, and particularly in Pennsylvania, where the duty was never paid on more than one chest of that commodity. This proceeded as much from the spirit of gain as of patriotism. The merchants found means of supplying their countrymen with tea, smuggled from countries to which the power of Britain did not extend. They doubtless conceived themselves to be supporting the rights of their country, by refusing to purchase tea from Britain, but they also reflected that if they could bring the same commodity to market, free of duty, their profits would be proportionably greater.

[96] The love of gain was not peculiar to the American merchants. From the diminished exportation to the colonies, the ware-houses of the British East-India company had in them about seventeen millions of pounds of tea, for which a market could not readily be procured. The ministry and East-India company unwilling to lose, the one the expected revenue from the sale of tea in America—the other, their usual

81 **EXHIBIT 19
0578**

commercial profits, agreed on a measure by which they supposed both would be secured.

The East-India company were by law authorized to export their tea free of duties to all places whatsoever. By this regulation, tea, though loaded with an exceptionable duty, would come cheaper to the colonies, than before it had been made a source of revenue: For the duty when taken off it, when exported from Great-Britain, was greater than what was to be paid on its importation into the colonies. Confident of success in finding a market for their tea, thus reduced in its price, and also of collecting a duty on its importation and sale in the colonies, the East-India company freighted several ships, with teas for the different colonies, and appointed agents for the disposal thereof. This measure united several interests in opposition to its execution. The patriotism of the Americans was corroborated by several auxiliary aids, no ways connected with the cause of liberty.

The merchants in England were alarmed at the losses that must accrue to themselves, from the exportations of the East-India company, and from the sales going through the hands of consignees. Letters were written from that country, to colonial patriots, urging that opposition to which they of themselves were prone.

The smugglers who were both numerous and powerful, could not relish a scheme which by underselling them, and taking a profitable branch of business, out of their hands, threatened a diminution of their gains. The colonists were too suspicious of the designs of Great-Britain to be imposed upon.

The cry of endangered liberty once more excited an alarm from New-Hampshire to Georgia. The first opposition [97] to the execution of the scheme adopted by the East-India company began with the American merchants. They saw a profitable branch of their trade likely to be lost, and the benefits of it to be transferred to people in Great-Britain. They felt for the wound that would be inflicted on their country's claim of exemption from parliamentary taxation, but they felt with equal sensibility for the losses they would sustain by the diversion of the streams of commerce, into unusual channels. Though the opposition originated in the selfishness of the merchants, it did not end there. The great body of the people, from principles of the purest patriotism, were brought over to second their wishes. They considered the whole scheme, as calculated to seduce them into an acquiescence with the views of parliament, for raising an American revenue. Much pains were taken to enlighten the colonists on this subject, and to convince them of the eminent hazard to which their liberties were exposed.

The provincial patriots insisted largely on the persevering determination of the parent state to establish her claim of taxation, by compelling the sale of tea in the colonies against the solemn resolutions and declared sense of the inhabitants, and that at a time when the commercial intercourse of the two countries was renewed, and their ancient harmony fast returning. The proposed venders of the tea were represented as revenue officers, employed in the collection of an unconstitutional tax, imposed by Great-Britain. The colonists reasoned with themselves, that as the duty and the price of the commodity were inseparably blended, if the tea was sold, every purchaser would pay

EXHIBIT 19
0579

a tax imposed by the British parliament, as part of the purchase money. To obviate this evil, and to prevent the liberties of a great country from being sacrificed by inconsiderate purchasers, sundry town meetings were held in the capitals of the different provinces, and combinations were formed to obstruct the sales of the tea, sent by the East-India company.

[98] The resolutions entered into by the inhabitants of Philadelphia, on October the 18th 1773, afford a good specimen of the whole—these were as follows:

> 1. That the disposal of their own property is the inherent right of freemen; that there can be no property in that which another can, of right, take from us without our consent; that the claim of parliament to tax America, is in other words, a claim of right to levy contributions on us at pleasure.
> 2. That the duty imposed by parliament upon tea landed in America, is a tax on the Americans, or levying contributions on them without their consent.
> 3. That the express purpose for which the tax is levied on the Americans—namely, for the support of government, administration of justice, and defence of his Majesty's dominions in America, has a direct tendency to render assemblies useless, and to introduce arbitrary government and slavery.
> 4. That a virtuous and steady opposition to this ministerial plan of governing America, is absolutely necessary to preserve even the shadow of liberty, and is a duty which every freeman in America owes to his country, to himself, and to his posterity.
> 5. That the resolution lately entered into by the East-India company, to send out their tea to America, subject to the payment of duties on its being landed here, is an open attempt to enforce this ministerial plan, and a violent attack upon the liberties of America.
> 6. That it is the duty of every American to oppose this attempt.
> 7. That whoever shall directly or indirectly, countenance this attempt, or in any wise aid or abet in unloading, receiving, or vending the tea sent, or to be sent out by the East-India company, while it remains subject to the payment of a duty here, is an enemy to his country.
> 8. That a committee be immediately chosen to wait on those gentlemen, who, it is reported, are appointed by the East-India company, to receive and sell said tea, and request them, from a regard to their own character [99] and the peace and good order of the city and province, immediately to resign their appointment.

As the time approached when the arrival of the tea ships might be soon expected, such measures were adopted as seemed most likely to prevent the landing of their cargoes. The tea consignees, appointed by the East-India company, were in several places compelled to relinquish their appointments, and no others could be found hardy enough to act in their stead. The pilots in the river Delaware, were warned not to conduct any of the tea ships into their harbour. In New-York, popular vengeance was denounced against all who would contribute, in any measure, to forward the views of the East-India company. The captains of the New-York and Philadelphia ships, being apprized of the resolution of the people, and fearing the consequences of landing a commodity, charged with an odious duty, in violation of their declared public

EXHIBIT 19
0580

sentiments, concluded to return directly to Great-Britain, without making any entry at the custom house.

It was otherwise in Massachusetts. The tea ships designed for the supply of Boston, were consigned to the sons, cousins, and particular friends, of governor Hutchinson. When they were called upon to resign, they answered, "That it was out of their power." The collector refused to give a clearance, unless the vessels were discharged of dutiable articles. The governor refused to give a pass for the vessels, unless properly qualified from the custom-house. The governor likewise requested Admiral Montague to guard the passages out of the harbour, and gave orders to suffer no vessels, coasters excepted, to pass the fortress from the town, without a pass signed by himself. From a combination of these circumstances, the return of the tea vessels from Boston, was rendered impossible. The inhabitants then, had no option, but to prevent the landing of the tea, or to suffer it to be landed, and depend on the unanimity of the people not to purchase it, or to destroy the tea, or to suffer a deep laid scheme against their sacred liberties to take effect. The first would have required incessant [100] watching by night, as well as by day, for a period of time, the duration of which no one could compute. The second would have been visionary to childishness, by suspending the liberties of a growing country, on the self denial and discretion of every tea drinker in the province. They viewed the tea as the vehicle of an unconstitutional tax, and as inseparably associated with it. To avoid the one, they resolved to destroy the other. About seventeen persons, dressed as Indians, repaired to the tea ships, broke open 342 chests of tea, and without doing any other damage, discharged their contents into the water.

Thus by the inflexibility of the governor, the issue of this business was different, at Boston, from what it was elsewhere. The whole cargoes of tea were returned from New-York and Philadelphia. That which was sent to Charleston was landed and stored, but not offered for sale. Mr. Hutchinson had repeatedly urged government, at home, to be firm and persevering, he could not therefore consistent with his honour depart from a line of conduct, he had so often and so strongly recommended to his superiors. He also believed that the inhabitants would not dare to perfect their engagements, and flattered himself that they would desist, when the critical moment arrived.

Admitting the rectitude of the American claims of exemption, from parliamentary taxation, the destruction of the tea by the Bostonians, was warranted by the great law of self preservation, for it was not possible for them, by any other means, within the compass of probability, to discharge the duty they owed to their country.

The event of this business was very different from what had been expected in England. The colonists acted with so much union and system, that there was not a single chest of any of the cargoes sent out by the East-India company, on this occasion, sold for their benefit.

Intelligence of these proceedings was, on the 7th of March 1774, communicated, in a message from the throne, to both houses of parliament. In this communication the conduct of the colonists was represented as [101] not only obstructing the commerce

EXHIBIT 19
0581

of Great-Britain, but as subversive of its constitution. The message was accompanied with a number of papers, containing copies and extracts of letters, from the several royal governors and others, from which it appeared that the opposition to the sale of the tea was not peculiar to Massachusetts, but common to all the colonies. These papers were accompanied with accounts setting forth, that nothing short of parliamentary interference was capable of re-establishing order among the turbulent colonists, and that therefore decisive measures should be immediately adopted for securing the dependence of the colonies. If the right of levying taxes on the Americans was vested in the parent state, these inferences were well founded; but if it was not, their conduct in resisting an invasion of their rights was justified, not only by many examples in the history of Britain, but by the spirit of the constitution of that country which they were opposing.

By the destruction of the tea, the people of Boston had incurred the sanction of penal laws. Those in Great-Britain who wished for an opportunity to take vengeance on that town, commonly supposed by them to be the mother of sedition and rebellion, rejoiced that her inhabitants had laid themselves open to castigation.

It was well known that the throwing of the tea into the river, did not originate with the persons who were the immediate instruments of that act of violence. That the whole had been concerted at a public meeting, and was, in a qualified sense, the act of the town. The universal indignation which in Great-Britain was excited against the people of Boston, pointed out to the ministry the suitableness of the present moment for humbling them. Though the ostensible ground of complaint was nothing more than a trespass on private property, committed by private persons, yet it was well known to be part of a long digested plan of resistance to parliamentary taxation. Every measure that might be pursued on the occasion seemed to be big with the fate of the empire. To proceed in the usual forms of law, appeared to the rulers in Great-Britain to be a departure from their [102] dignity. It was urged by the ministry that parliament, and parliament only, was capable of re-establishing tranquility among these turbulent people, and of bringing order out of confusion. To stifle all opposition from the merchants, the public papers were filled with writings which stated the impossibility of carrying on a future trade to America, if this flagrant outrage on commerce should go unpunished.

It was in vain urged by the minority that no good could arise from coercion, unless the minds of the Americans were made easy on the subject of taxation. Equally vain was a motion for a retrospect into the conduct of the ministry, which had provoked their resistance.

The parliament discovered an aversion from looking back to the original ground of the dispute, and confined themselves solely to the late misbehavior of the Americans, without any enquiry into the provoking causes thereof.

The violence of the Bostonians in destroying an article of commerce, was largely insisted upon, without any indulgence for the jealous spirit of liberty, in the descendants of Englishmen. The connexion between the tea and the unconstitutional duty imposed thereon, was overlooked, and the public mind of Great-Britain solely

EXHIBIT 19
0582

fixed on the obstruction given to commerce, by the turbulent colonists. The spirit raised against the Americans became as high, and as strong, as their most inveterate enemies could desire. This was not confined to the common people, but took possession of legislators, whose unclouded minds ought to be exalted above the mists of prejudice or partiality. Such, when they consult on public affairs, should be free from the impulses of passion, for it rarely happens that resolutions adopted in anger, are founded in wisdom. The parliament in Great-Britain, transported with indignation against the people of Boston, in a fit of rage resolved to take legislative vengeance, on that devoted town.

Disregarding the forms of her own constitution by which none are to be condemned unheard, or punished without a trial, a bill was finally passed, on the 17th day [103] after it was first moved for, by which the port of Boston was virtually blocked up, for it was legally precluded from the privilege of landing and discharging, or of lading and shipping of goods, wares and merchandise. The minister who proposed this measure, stated in support of it, that the opposition to the authority of parliament, had always originated in that colony, and had always been instigated by the seditious proceedings of the town of Boston: that it was therefore necessary to make an example of that town, which by an unparalleled outrage had violated the freedom of commerce; that Great-Britain would be wanting in the protection she owed to her peaceable subjects, if she did not punish such an insult, in an exemplary manner. He therefore proposed, that the town of Boston should be obliged to pay for the tea which had been destroyed. He was farther of opinion, that making a pecuniary satisfaction for the injury committed, would not alone be sufficient, but that in addition thereto, security must be given in future, that trade may be safely carried on—property protected—laws obeyed—and duties paid. He urged, therefore that it would be proper to take away from Boston the privilege of a port, until his Majesty should be satisfied in these particulars, and publicly declare in council, on a proper certificate, of the good behaviour of the town, that he was so satisfied. Until this should happen he proposed that the custom house officers should be removed to Salem. The minister hoped that this act would execute itself, or at most, that a few frigates would secure its execution. He also hoped, that the prospect of advantage to the town of Salem, from its being made the seat of the custom house, and from the occlusion of the port of Boston, would detach them from the interest of the latter, and dispose them to support a measure, from which they had so much to expect. It was also presumed that the other colonies would leave Boston to suffer the punishment due to her demerits. The abettors of parliamentary supremacy flattered themselves that this decided conduct of Great-Britain would, forever, extinguish all opposition from the refractory colonists to the claims of [104] the Mother Country; and the apparent equity of obliging a delinquent town to make reparation for an injury occasioned by the factious spirit of its inhabitants, silenced many of the friends of America. The consequences resulting from this measure, were the reverse of what were wished for by the first, and dreaded by the last.

By the operation of the Boston port act, the preceding situation of its inhabitants, and that of the East-India company was reversed. The former had more reason to complain of the disproportionate penalty to which they were indiscriminately subjected, than the latter of that outrage on their property, for which punishment had

86

EXHIBIT 19
0583

been inflicted. Hitherto the East-India company were the injured party, but from the passing of this act, the balance of injury was on the opposite side. If wrongs received entitled the former to reparation, the latter had a much stronger title on the same ground. For the act of seventeen or eighteen individuals, twice as many thousands were involved in one general calamity.

Both parties viewed the case on a much larger scale than that of municipal law. The people of Boston alledged, in vindication of their conduct, that the tea was a weapon aimed at their liberties, and that the same principles of self preservation which justify the breaking of the assassins sword uplifted for destruction, equally authorised the destruction of that tea which was the vehicle of an unconstitutional tax subversive of their liberties. The parliament of Great-Britain considered the act of the people of Boston, in destroying the tea, as an open defiance of that country. The demerit of the action as an offence against property, was lost, in the supposed superior demerit of treasonable intention to emancipate themselves from a state of colonial dependence. The Americans conceived the case to be intimately connected with their liberties; the inhabitants of Great-Britain with their supremacy, the former considered it as a duty they owed their country, to make a common cause with the people of Boston, the latter thought themselves under equal obligations to support the privileges of parliament.

[105] On the third reading of the Boston port bill, a petition was presented by the lord mayor, in the name of several natives and inhabitants of North America, then residing in London. It was drawn with great force of language, and stated that "the proceedings of parliament against Boston were repugnant to every principle of law and justice, and established a precedent by which no man in America could enjoy a moment's security." The friends of parliamentary supremacy had long regretted the democratic constitutions of the provinces as adverse to their schemes. They saw with concern the steady opposition that was given to their measures by the American legislatures. These constitutions were planned when Great-Britain neither feared nor cared for her colonies. Not suspecting that she was laying the foundation of future states, she granted charters that gave to the people so much of the powers of government as enabled them to make not only a formidable, but a regular, constitutional, opposition, to the country from which they sprung.

Long had her rulers wished for an opportunity to revoke these charters, and to new model these governments. The present moment seemed favourable to this design. The temper of the nation was high, and the resentment against the province of Massachusetts general and violent. The late outrages in Boston furnished a tolerable pretence for the attempt. An act of the British parliament speedily followed the one for shutting up the port of Boston, entitled, an act for the better regulating the government of Massachusetts. The object of this was to alter the charter of the province in the following particulars: The council or second branch of the legislature heretofore elected by the general court, was to be from the first of August 1774, appointed by the crown. The royal governor was also by the same act, invested with the power of appointing and removing all judges of the inferior courts of common pleas—commissioners of oyer and terminer—the attorney general—provost marshal—justices—sheriffs, &c. The town meetings which were sanctioned by the

EXHIBIT 19
0584

charter, were with a few exceptions [106] expressly forbidden to be held, without the leave of the governor or lieutenant governor in writing, expressing the special business of said meeting, first had and obtained; and with a farther restriction, that no matter should be treated of at these meetings, excepting the election of public officers, and the business expressed in the leave given by the governor or lieutenant governor. Jurymen which had been before elected by the freeholders and inhabitants of the several towns, were to be, by this new act, all summoned and returned, by the sheriffs of the respective counties. The whole executive government was taken out of the hands of the people, and the nomination of all important officers vested in the king or his governor.

This act excited a greater alarm than the port act. The one effected only the metropolis, the other the whole province. The one had the appearance of being merited, as it was well known that an act of violence had been committed by its inhabitants, under the sanction of a town meeting; but the other had no stronger justifying reason than that the proposed alterations were, in the opinion of the parliament, become absolutely necessary, in order to the preservation of the peace and good order of the said province. In support of this bill, the minister who brought it in alledged, that an executive power was wanting in the country. The very people, said he, who commit the riots are the posse comitatus in which the force of the civil power consists. He farther urged the futility of making laws, the execution of which, under the present form of government in Massachusetts, might be so easily evaded, and therefore contended for a necessity to alter the whole frame of their constitution, as far as related to its executive and judicial powers. In opposition it was urged, that the taking away the civil constitution of a whole people, secured by a solemn charter, upon general charges of delinquencies and defects, was a stretch of power of the most arbitrary and dangerous nature.

By the English constitution charters were sacred, and only revokable by a due course of law, and on a conviction [107] of misconduct. They were solemn compacts between the prince and the people, and without the constitutional power of either party. The abettors of the British schemes reasoned in a summary way. Said they,

the colonies, particularly Massachusetts, by their circular letters; associations and town meetings, have for years past thwarted all the measures of government, and are meditating independency. This turbulent spirit of theirs is fostered by their constitution, which invests them with too much power to be consistent with their state of subordination. Let us therefore lay the axe at the root—new model their charter, and lop off those privileges which they have abused.

When the human mind is agitated with passion it rarely discerns its own interest, and but faintly foresees consequences. Had the parliament stopped short with the Boston port act, the motives to union and to make a common cause with that metropolis, would have been feeble, perhaps ineffectual to have roused the other provinces; but the arbitrary mutilation of the important privileges contained in a solemn charter, without a trial—without a hearing, by the will of parliament, convinced the most moderate that the cause of Massachusetts was the cause of all the provinces.

88
EXHIBIT 19
0585

It readily occurred to those who guided the helm of Great-Britain, that riots would probably take place, in attempting the execution of the acts just mentioned. They also discerned that such was the temper of the people, that trials for murders committed in suppressing riots, if held in Massachusetts, would seldom terminate in favour of the parties, who were engaged on the side of government. To make their system compleat, it was necessary to go one step farther, and to screen their active friends from the apprehended partiality of such trials. It was therefore provided by law, that if any person was indicted for murder, or for any capital offence committed in aiding magistracy, that the governor might send the person so indicted to another colony, or to Great-Britain to be tried. This law was the subject of severe comments. It was considered as an act of indemnity to those who should [108] embrue their hands in the blood of their fellow citizens. It was asked how the relations of a murdered man could effectually prosecute, if they must go three thousand miles to attend that business. It was contended that the act by stopping the usual course of justice, would probably give rise to assassinations and dark revenge among individuals, and encourage all kinds of lawless violence. The charge of partiality was retorted. For said they, "If a party spirit against the authority of Great-Britain would condemn an active officer in Massachusetts as a murderer, the same party spirit for preserving the authority of Great-Britain, would, in that country, acquit a murderer as a spirited performer of his duty.["] The case of captain Preston was also quoted as a proof of the impartial administration of justice in Massachusetts.

The same Natives of America who had petitioned against the Boston port bill, presented a second one against these two bills. With uncommon energy of language, they pointed out many constitutional objections against them, and concluded with fervently beseeching, "that the parliament would not, by passing them, reduce their countrymen to an abject state of misery and humiliation, or drive them to the last resource of despair." The lords of the minority entered also a protest against the passing of each of these bills.

It was fortunate for the people of Boston, and those who wished to promote a combination of the colonies against Great-Britain, that these three several laws passed nearly at the same time. They were presented in quick progression, either in the form of bills or of acts, to the consideration of the inflamed Americans, and produced effects on their minds, infinitely greater than could have been expected from either, especially from the Boston port act alone.

When the fire of indignation, excited by the first, was burning, intelligence of these other acts, operated like fuel, and made it flame out with increasing vehemence. The three laws were considered as forming a complete system of tyranny, from the operation of which, there was no chance of making a peaceable escape.

[109] "By the first," said they, "the property of unoffending thousands is arbitrarily taken away, for the act of a few individuals; by the second our chartered liberties are annihilated; and by the third, our lives may be destroyed with impunity. Property, liberty, and life, are all sacrificed on the altar of ministerial vengeance." This mode of reasoning was not peculiar to Massachusetts. These three acts of parliament, contrary to the expectation of those who planned them, became a cement of a firm union

EXHIBIT 19
0586

among the colonies, from New-Hampshire to Georgia. They now openly said, "our charters and other rights and immunities must depend on the pleasure of parliament." They were sensible that they had all concurred, more or less, in the same line of opposition which had provoked these severe statutes against Massachusetts; and they believed that vengeance, though delayed, was not remitted, and that the only favour the least culpable could expect, was to be the last that would be devoured. The friends of the colonies contended, that these laws were in direct contradiction to the letter, and the spirit of the British constitution. Their opposers could support them on no stronger grounds than those of political necessity and expedience. They acknowledged them to be contrary to the established mode of proceeding, but defended them as tending ultimately to preserve the constitution, from the meditated independency of the colonies.

Such was the temper of the people in England, that the acts hitherto passed were popular. A general opinion had gone forth in the Mother Country, that the people of Massachusetts, by their violent opposition to government, had drawn on themselves merited correction.

The parliament did not stop here, but proceeded one step farther, which inflamed their enemies in America, and lost them friends in Great-Britain. The general clamor in the provinces was, that the proceedings in the parliament were arbitrary, and unconstitutional. Before they completed their memorable session in the beginning of the year 1774, they passed an act respecting the government of Quebec, which in the opinion of their friends merited these appellations. By this act the government of that [110] province was made to extend southward to the Ohio, and westward to the banks of the Mississippi, and northward, to the boundary of the Hudson's Bay company. The principal objects of the act were to form a legislative council, for all the affairs of the province, except taxation, which council should be appointed by the crown; the office to be held during pleasure, and his Majesty's Roman Catholic subjects to be entitled to a place therein—to establish the French laws, and a trial without jury, in civil cases, and the English laws, with a trial by jury, in criminal—to secure to the Roman Catholic clergy, except the regulars, the legal enjoyment of their estates, and their tythes, from all who were of their own religion. Not only the spirit but the letter of this act were so contrary to the English constitution, that it diminished the popularity of the measures which had been formed against the Americans.

Among the more southern colonists, it was conceived that its evident object was to make the inhabitants of Canada fit instruments, in the hands of power, to reduce them to a state of slavery.

They well remembered the embarrassments occasioned to them in the late war between France and England, by the French inhabitants of Canada—they supposed that the British administration meant, at this time, to use these people in the same line of attack, for their subjugation. As Great-Britain had new modelled the chartered government of Massachusetts, and claimed an authority so to do in every province, the colonists were apprehensive, that in the plenitude of her power, she would impose on each of them, in their turns, a constitution similar to what she had projected, for the province of Canada.

EXHIBIT 19
0587

They foresaw, or thought they foresaw, the annihilation of their ancient assemblies, and their whole legislative business transferred to creatures of the crown. The legal parliamentary right to a maintenance conferred on the clergy of the Roman Catholic religion, gave great offence to many in England, but the political consequences expected to result from it, were most dreaded by the colonists.

[111] They viewed the whole act as an evidence that hostilities were intended against them, and that part of it which respected religion, as calculated to make Roman Catholicks subservient to the purposes of military coercion.

The session of parliament which passed these memorable acts, had stretched far into summer. As it drew near a close, the most sanguine expectations were indulged, that from the resolution and great unanimity of parliament on all American questions, the submission of the colonies would be immediate, and their future obedience and tranquility effectually secured. The triumphs and congratulations of the friends of the ministry, were unusually great.

In passing the acts which have been just mentioned, dissentients in favour of America, were unusually few. The ministerial majority, believing that the refractory colonists depended chiefly on the countenance of their English abettors, were of opinion, that as soon as they received intelligence of the decrease of their friends, and of the decisive conduct of parliament, they would acquiesce in the will of Great-Britain—the fame and grandeur of the nation was such, that it was never imagined they would seriously dare to contend with so formidable a people. The late triumphs of Great-Britain had made such an impression on her rulers, that they believed the Americans, on seeing the ancient spirit of the nation revive, would not risque a trial of prowess with those fleets and armies, which the combined force of France and Spain, were unable to resist. By an impious confidence in their superior strength, they precipitated the nation into rash measures, from the dire effects of which, the world may learn a useful lesson.

EXHIBIT 19
0588

[Back to Table of Contents]

# CHAPTER IV

## Proceedings Of The Colonies In 1774, In Consequence Of The Boston Port Act, Viz.

The winter which followed the destruction of the tea in Boston, was an anxious one to those of the [112] colonists who were given to reflection. Many conjectures were formed about the line of conduct, Great-Britain would probably adopt, for the support of her dignity. The fears of the most timid were more than realized by the news of the Boston port bill.

This arrived on the 10th of May, and its operation was to commence the first of the next month. Various town meetings were called to deliberate on the state of public affairs. On the 13th of May, the town of Boston passed the following vote.

1774

That it is the opinion of this town, that if the other colonies come into a joint resolution to stop all importation from Great-Britain and the West-Indies, till the act for blocking up this harbour be repealed, the same will prove the salvation of North-America, and her liberties. On the other hand if they continue their exports and imports, there is high reason to fear that fraud, power, and the most odious oppression, will rise triumphant over justice, right, social happiness, and freedom. And moreover that this vote, be transmitted by the moderator, to all our sister colonies, in the name and behalf of this town.

Copies of this vote were transmitted to each of the colonies. The opposition to Great-Britain, had hitherto called forth the pens of the ingenious, and in some instances imposed the self denial of non-importation agreements: but the bulk of the people, had little to do with the dispute. The spirited conduct of the people of Boston, in destroying the tea, and the alarming precedents set by Great-Britain, in consequence thereof, brought subjects into discussion, with which every peasant and day labourer was concerned.

The patriots who had hitherto guided the helm, knew well, that if the other colonies did not support the people of Boston, they must be crushed, and it was equally obvious, that in their coercion a precedent, injurious to liberty, would be established. It was therefore the interest of Boston to draw in the other colonies. It was also the interest of the patriots in all the colonies, to bring over the bulk of the people, to adopt such efficient measures as were likely to extricate the inhabitants of [113] Boston from the unhappy situation in which they were involved. To effect these purposes much prudence as well as patriotism was necessary. The other provinces were but remotely affected by the fate of Massachusetts. They were happy, and had no cause, on their own account, to oppose the government of Great-Britain. That a people so circumstanced, should take part with a distressed neighbour, at the risque of incurring the resentment of the Mother Country, did not accord with the selfish maxims by which states, as well as individuals, are usually governed. The ruled are, for the most

EXHIBIT 19
0589

part, prone to suffer as long as evils are tolerable, and in general they must feel before they are roused to contend with their oppressors; but the Americans acted on a contrary principle.

They commenced an opposition to Great-Britain, and ultimately engaged in a defensive war, on speculation. They were not so much moved by oppression actually felt, as by a conviction that a foundation was laid, and a precedent about to be established for future oppressions. To convince the bulk of the people, that they had an interest in foregoing a present good, and submitting to a present evil, in order to obtain a future greater good, and to avoid a future greater evil, was the task assigned to the colonial patriots. But it called for the exertion of their utmost abilities. They effected it in a great measure, by means of the press. Pamphlets, essays, addresses and news paper dissertations were daily presented to the public, proving that Massachusetts was suffering in the common cause, and that interest and policy, as well as good neighbourhood, required the united exertions of all the colonies, in support of that much injured province. It was inculcated on the people, that if the ministerial schemes were suffered to take effect in Massachusetts, the other colonies must expect the loss of their charters, and that a new government would be imposed upon them, like that projected for Quebec. The king and parliament held no patronage in America, sufficient to oppose this torrent. The few who ventured to write in their favour found a difficulty in communicating their sentiments to the public. [114] No pensions or preferments awaited their exertions. Neglect and contempt were their usual portion, but popularity, consequence, and fame, were the rewards of those who stepped forward in the cause of liberty. In order to interest the great body of people, the few who were at the helm, disclaimed any thing more decisive, than convening the inhabitants, and taking their sense on what was proper to be done. In the mean time great pains were taken to prepare them for the adoption of vigorous measures.

The words whigs and tories, for want of better, were now introduced, as the distinguishing names of parties. By the former, were meant those who were for making a common cause with Boston, and supporting the colonies in their opposition to the claims of parliament. By the latter those who were at least so far favourers of Great-Britain, that they wished, either that no measures, or only palliative measures, should be adopted in opposition to her schemes.

These parties were so nearly balanced in New-York, that nothing more was agreed to at the first meeting of the inhabitants, than a recommendation to call a Congress.

At Philadelphia the patriots had a delicate part to act. The government of the colony being proprietary, a multitude of officers connected with that interest, had much to fear from convulsions, and nothing to expect from a revolution. A still greater body of people called Quakers, denied the lawfulness of war, and therefore could not adopt such measures for the support of Boston, as naturally tended to produce an event so adverse to their system of religion.

The citizens of Boston, not only sent forward their public letter, to the citizens of Philadelphia; but accompanied it with private communications to individuals of known patriotism and influence, in which they stated the impossibility of their

EXHIBIT 19
0590

standing alone, against the torrent of ministerial vengeance, and the indispensable necessity, that the leading colony of Pennsylvania, should afford them its support and countenance. The advocates in Philadelphia, for making a common cause [115] with Boston, were fully sensible of the state of parties in Pennsylvania. They saw the dispute with Great-Britain, brought to a crisis, and a new scene opening, which required exertions different from any heretofore made. The success of these they well knew, depended on the wisdom with which they were planned, and the union of the whole people, in carrying them into execution.

They saw the propriety of proceeding with the greatest circumspection; and therefore resolved at their first meeting, on nothing more than to call a general meeting of the inhabitants, on the next evening.

May 20

At this second meeting the patriots had so much moderation and policy, as to urge nothing decisive, contenting themselves with taking the sense of the inhabitants, simply on the propriety of sending an answer to the public letter from Boston. This was universally approved. The letter agreed upon was firm but temperate.

21

They acknowledged the difficulty of offering advice on the present occasion, sympathized with the people of Boston in their distress, and observed that all lenient measures, for their relief, should be first tried. That if the making restitution for the tea destroyed, would put an end to the unhappy controversy, and leave the people of Boston upon their ancient footing of constitutional liberty, it could not admit of a doubt what part they should act. But that it was not the value of the tea, it was the indefeasible right of giving and granting their own money, which was the matter in consideration. That it was the common cause of America; and therefore necessary in their opinion, that a congress of deputies from the several colonies should be convened to devise means for restoring harmony between Great-Britain and the colonies, and preventing matters from coming to extremities. Till this could be brought about, they recommended firmness, prudence, and moderation to the immediate sufferers, assuring them, that the people of Pennsylvania would continue to evince a firm adherence to the cause of American liberty.

In order to awaken the attention of the people, a series of letters was published well calculated to rouse [116] them to a sense of their danger, and point out the fatal consequences of the late acts of parliament. Every newspaper teemed with dissertations in favour of liberty—with debates of the members of parliament, especially with the speeches of the favourers of America, and the protests of the dissenting lords. The latter had a particular effect on the colonists, and were considered by them as irrefragable proofs, that the late acts against Massachusetts were unconstitutional and arbitrary.

The minds of the people being thus prepared, the friends of liberty promoted a petition to the governor, for convening the assembly. This they knew would not be granted, and that the refusal of it, would smooth the way for calling the inhabitants together.

The governor having refused to call the assembly, a general meeting of the inhabitants was requested. About 8000 met and adopted sundry spirited resolutions. In these they declared, that the Boston port act

Jun. 18

EXHIBIT 19
0591

was unconstitutional—that it was expedient to convene a continental congress—to appoint a committee for the city and county of Philadelphia, to correspond with their sister colonies and the several counties of Pennsylvania, and to invest that committee with power, to determine on the best mode for collecting the sense of the province, and appointing deputies to attend a general congress.

Under the sanction of this last resolve, the committee appointed for that purpose, wrote a circular letter to all the counties of the Province, requesting them to appoint deputies to a general meeting, proposed to be held on the 15th of July, part of this letter was in the following words:

28

We would not offer such an affront to the well known public spirit of Pennsylvanians, as to question your zeal on the present occasion. Our very existence in the rank of freemen, and the security of all that ought to be dear to us, evidently depends on our conducting this great cause to its proper issue, by firmness, wisdom, and magnanimity. It is with pleasure we assure you, that all the colonies from South-Carolina to New-Hampshire, are animated with one spirit, in the common cause, and consider that as the proper crisis for having our differences with the Mother Country [117] brought to some certain issue, and our liberties fixed upon a permanent foundation, this desirable end can only be accomplished by a free communication of sentiments, and a sincere and fervent regard for the interests of our common country.

The several counties readily complied with the request of the inhabitants of Philadelphia, and appointed deputies, who met at the time appointed, and passed sundry resolves, in which they reprobated the late acts of parliament—expressed their sympathy with Boston, as suffering in the common cause—approved of holding a congress, and declared their willingness to make any sacrifices that might be recommended by a congress, for securing their liberties.

Thus, without tumult, disorder, or divided counsels, the whole province of Pennsylvania was, by prudent management and temperate proceedings, brought into the opposition with its whole weight and influence. This is the more remarkable as it is probable, that if the sentiments of individuals had been separately taken, there would have been a majority against involving themselves in the consequences of taking part with the destroyers of the tea, at Boston.

While these proceedings were carrying on in Pennsylvania, three of the most distinguished patriots of Philadelphia, under color of an excursion of pleasure, made a tour throughout the province, in order to discover the real sentiments of the common people. They were well apprized of the consequences of taking the lead in a dispute which every day became more serious, unless they could depend on being supported by the yeomanry of the country. By freely associating and conversing with many of every class and denomination; they found them unanimous in that fundamental principle of the American controversy, "That the parliament of Great-Britain had no right to tax them." From their general determination on this subject, a favourable prognostic was formed, of a successful opposition to the claims of Great-Britain.

In Virginia the house of burgesses on the 26th of May, 1774, resolved, that the first of June, the day on which [118] the operation of the Boston port bill was to commence,

EXHIBIT 19
0592

should be set apart by the members as a day of fasting, humiliation and prayer, "devoutly to implore the divine interposition, for averting the heavy calamities which threatened destruction to their civil rights, and the evils of a civil war—to give them one heart and one mind, to oppose by all just and proper means, every injury to American rights." On the publication of this resolution, the royal governor, the Earl of Dunmore dissolved them. The members notwithstanding their dissolution, met in their private capacities, and signed an agreement, in which, among other things, they declared, "that an attack made on one of their sister colonies, to compel submission to arbitrary taxes, was an attack made on all British America, and threatened ruin to the rights of all, unless the united wisdom of the whole be applied."

In South-Carolina the vote of the town of Boston of the 13th of May, being presented to a number of the leading citizens in Charleston, it was unanimously agreed to call a meeting of the inhabitants.

That this might be as general as possible, letters were sent to every parish and district in the province, and the people were invited to attend, either personally, or by their representatives at a general meeting of the inhabitants. A large number assembled, in which were some, from almost every part of the province. The proceedings of the parliament against the province of Massachusetts were distinctly related to this convention.

July 18, 1774

Without one dissenting voice, they passed sundry resolutions, expressive of their rights, and of their sympathy with the people of Boston. They also chose five delegates to represent them in a continental Congress, and invested them "with full powers, and authority, in behalf of them and their constituents, to concert, agree to, and effectually to prosecute such legal measures as in their opinion, and the opinion of the other members, would be most likely to obtain a redress of American grievances."

The events of this time may be transmitted to posterity, but the agitation of the public mind can never be fully comprehended, but by those who were witnesses of it.

[119] In the counties and towns of the several provinces, as well as in the cities, the people assembled and passed resolutions, expressive of their rights, and of their detestation of the late American acts of parliament. These had an instantaneous effect on the minds of thousands. Not only the young and impetuous, but the aged and temperate, joined in pronouncing them to be unconstitutional and oppressive. They viewed them as deadly weapons aimed at the vitals of that liberty, which they adored; as rendering abortive the generous pains taken by their forefathers, to procure for them in a new world, the quiet enjoyment of their rights. They were the subjects of their meditation when alone, and of their conversation when in company.

Within little more than a month, after the news of the Boston port bill reached America, it was communicated from state to state, and a flame was kindled, in almost every breast, through the widely extended provinces.

In order to understand the mode by which this flame was spread with such rapidity over so great an extent of country, it is necessary to observe, that the several colonies

EXHIBIT 19
0593

were divided into counties, and these again subdivided into districts, distinguished by the names of towns, townships, precincts, hundreds or parishes. In New-England the subdivisions which are called towns, were by law, bodies corporate—had their regular meetings, and might be occasionally convened by their proper officers. The advantages derived from these meetings, by uniting the whole body of the people in the measures taken to oppose the stamp act, induced other provinces to follow the example. Accordingly under the association which was formed to oppose the revenue act of 1767, committees were established not only in the capitals of every province, but also in most of the subordinate districts. Great-Britain, without designing it, had by her two preceding attempts at American revenue, taught her colonies not only the advantages, but the means of union. The system of committees, which prevailed in 1765, and also in 1767, was revived in 1774. By them there was a quick transmission of intelligence from the capital towns through [120] the subordinate districts to the whole body of the people, and a union of counsels and measures was effected among widely disseminated inhabitants.

It is perhaps impossible for human wisdom, to contrive any system more subservient to these purposes, than such a reciprocal exchange of intelligence, by committees. From the want of such a communication with each other, and consequently of union among themselves, many states have lost their liberties, and more have been unsuccessful in their attempts to regain them, after they have been lost.

What the eloquence and talents of Demosthenes could not effect among the states of Greece, might have been effected by the simple device of committees of correspondence. The few have been enabled to keep the many in subjection in every age, from the want of union among the latter. Several of the provinces of Spain complained of oppression under Charles the 5th, and in transports of rage took arms against him; but they never consulted or communicated with each other. They resisted separately, and were therefore separately subdued.

The colonists sympathizing with their distressed brethren in Massachusetts, felt themselves called upon, to do something for their relief; but to determine on what was proper to be done, did not so obviously occur. It was a natural idea, that for harmonising their measures, a Congress of deputies from each province should be convened. This early occurred to all, and being agreed to by all, was the means of procuring union and concert among inhabitants, removed several hundred miles from each other. In times less animated, various questions about the place and legality of their meeting, and about the extent of their power, would have produced a great diversity of sentiments; but on this occasion, by the special agency of providence, there was the same universal bent of inclination in the great body of the people. A sense of common danger, extinguished selfish passions. The public attention was fixed on the great cause of liberty. Local attachments and partialities, were sacrificed on the altar of patriotism.

There were not wanting moderate men, who would [121] have been willing to pay for the tea destroyed, if that would have put an end to the controversy, for it was not the value of the tea nor of the tax, but the indefeasible right of giving and granting their money, for which the colonists contended. The act of parliament was so cautiously

EXHIBIT 19
0594

worded, as to prevent the opening of the port of Boston, even though the East-India company had been reimbursed for all damages, "until it was made [to] appear to his majesty in council, that peace and obedience to the laws were so far restored in the town of Boston, that the trade of Great-Britain might be safely carried on there and his majesty's customs duly collected." The latter part of this limitation, "the due collection of his majesty's customs," was understood to comprehend submission to the late revenue laws. It was therefore inferred, that payment for the tea destroyed, would produce no certain relief, unless they were willing to give operation to the law, for raising a revenue on future importations of that commodity, and also to acquiesce in the late mutilation of their charter. As it was deliberately resolved, never to submit to either the most lukewarm of well informed patriots, possessing the public confidence, neither advised nor wished for the adoption of that measure. A few in Boston, who were known to be in the royal interest, proposed a resolution for that purpose, but they met with no support. Of the many who joined the British in the course of the war, there was scarcely an individual to be found in this early stage of the contriversy, who advocated the right of parliamentary taxation. There were doubtless many timid persons, who fearing the power of Britain, would rather have submitted to her encroachments, than risque the vengeance of her arms, but such for the most part suppressed their sentiments. Zeal for liberty, being immediately rewarded with applause, the patriots had every inducement to come forward, and avow their principles; but there was something so unpopular in appearing to be influenced by timidity, interest or excessive caution, when essential interests were attacked, that such persons shunned public notice, and sought the shade of retirement.

[122 ] In the three first months, which followed the shutting up of the port of Boston, the inhabitants of the colonies in hundreds of small circles, as well as in their provincial assemblies and congresses, expressed their abhorrence of the late proceedings of the British parliament against Massachusetts—their concurrence in the proposed measure of appointing deputies for a general congress, and their willingness to do and suffer whatever should be judged conducive to the establishment of their liberties.

A patriotic flame, created and diffused by the contagion of sympathy, was communicated to so many breasts, and reflected from such a variety of objects, as to become too intense to be resisted.

While the combination of the other colonies to support Boston, was gaining strength, new matter of dissention daily took place in Massachusetts. The resolution for shutting the port of Boston, was no sooner taken, than it was determined to order a military force to that town. General Gage, the commander in chief of the royal forces in North-America, was also sent thither, in the additional capacity of Governor of Massachusetts. He arrived in Boston on the third day after the inhabitants received the first intelligence of the Boston port bill. Though the people were irritated by that measure, and though their republican jealousy was hurt by the combination of the civil and military character in one person, yet the general was received with all the honours which had been usually paid to his predecessors. Soon after his arrival, two regiments of foot, with a detachment of artillery and some cannon, were landed in

 **EXHIBIT 19**
0595

Boston. These troops were by degrees re-inforced, with others from Ireland, New-York, Halifax and Quebec.

The governor announced that he had the king's particular command, for holding the general court at Salem, after the first of June. When that eventful day arrived, the act for shutting up the port of Boston commenced its operation. It was devoutly kept at Williamsburgh, as a day of fasting and humiliation. In Philadelphia it was solemnized with every manifestation of public calamity and grief. The inhabitants shut up their houses. After [123] divine service a stillness reigned over the city, which exhibited an appearance of the deepest distress.

In Boston a new scene opened on the inhabitants. Hitherto, that town had been the seat of commerce and of plenty. The immense business carried on therein, afforded a comfortable subsistence to many thousands. The necessary—the useful, and even some of the elegant arts were cultivated among them. The citizens were polite and hospitable. In this happy state they were sentenced on the short notice of twenty one days, to a total deprivation of all means of subsisting. The blow reached every person. The rents of the landholders, either ceased or were greatly diminished. The immense property in stores and wharfs, was rendered comparatively useless. Labourers, artifices and others, employed in the numerous occupations created by an extensive trade, partook in the general calamity. They who depended on a regular income, flowing from previous acquisitions of property, as well as they who with the sweat of their brow, earned their daily subsistence, were equally deprived of the means of support; and the chief difference between them, was that the distresses of the former were rendered more intolerable by the recollection of past enjoyments. All these inconveniences and hardships, were born with a passive, but inflexible fortitude. Their determination to persist in the same line of conduct, which had been the occasion of their suffering was unabated.

The authors and advisers of the resolution for destroying the tea, were in the town, and still retained their popularity and influence. The execrations of the inhabitants fell not on them, but on the British parliament. Their countrymen acquitted them of all selfish designs, and believed that in their opposition to the measures of Great-Britain, they were actuated by an honest zeal for constitutional liberty. The sufferers in Boston had the consolation of sympathy from the other colonists. Contributions were raised in all quarters for their relief. Letters and addresses came to them from corporate bodies, town meetings and provincial conventions, applauding their conduct, and exhorting them to perseverance.

[124] The people of Marblehead, who by their proximity were likely to reap advantage from the distresses of Boston, generously offered the merchants thereof, the use of their harbour, wharfs, warehouses, and also their personal attendance on the lading or unlading of their goods free of all expence.

The inhabitants of Salem in an address to governor Gage, concluded with these remarkable words,

99
EXHIBIT 19
0596

By shutting up the port of Boston, some imagine that the course of trade might be turned hither, and to our benefit: But nature in the formation of our harbour, forbid, our becoming rivals in commerce with that convenient mart; and were it otherwise, we must be dead to every idea of justice, lost to all feelings of humanity, could we indulge one thought to seize on wealth, and raise our fortunes on the ruins of our suffering neighbours.

The Massachusetts general court met at Salem, according to adjournment, on the 7th of June. Several of the popular leaders took, in a private way, the sense of the members on what was proper to be done. Finding they were able to carry such measures as the public exigencies required, they prepared resolves and moved for their adoption. But before they went on the latter business, their door was shut.

One member nevertheless contrived means of sending information to governor Gage of what was doing. His secretary was sent off to dissolve the general court, but was refused admission. As he could obtain no entrance, he read the proclamation at the door, and immediately after in council, and thus dissolved the general court. The house while sitting with their doors shut, appointed five of the most respectable inhabitants as their committee, to meet committees from other provinces, that might be convened the first of September at Philadelphia—voted them 75 pounds sterling each, and recommended to the several towns and districts to raise the said sum by equitable proportions. By these means the designs of the governor were disappointed. His situation in every respect was truly disageeable. It was his duty to forward the execution of laws which were universally execrated. Zeal for [125] his master's service, prompted him to endeavour that they should be earned into full effect, but his progress was retarded by obstacles from every quarter. He had to transact his official business with a people who possessed a high sense of liberty, and were uncommonly ingenious in evading disagreeable acts of parliament. It was a part of his duty to prevent the calling of the town meetings after the first of August, 1774. These meetings were nevertheless held. On his proposing to exert authority for the dispersion of the people, he was told by the select men, that they had not offended against the act of parliament, for that only prohibited the calling of town meetings, and that no such call had been made: A former constitutional meeting before the first of August, having only adjourned themselves from time to time. Other evasions, equally founded on the letter, of even the late obnoxious laws, were practised.

As the summer advanced, the people of Massachusetts received stronger proofs of support from the neighbouring provinces. They were therefore encouraged to farther opposition. The inhabitants of the colonies, at this time, with regard to political opinions, might be divided into three classes; of these, one was for rushing precipitately into extremities. They were for immediately stopping all trade, and could not even brook the delay of waiting till the proposed continental congress should meet. Another party, equally respectable, both as to character, property, and patriotism, was more moderate, but not less firm. These were averse to the adoption of any violent resolutions, till all others were ineffectually tried. They wished that a clear statement of their rights, claims, and grievances, should precede every other measure. A third class disapproved of what was generally going on. A few from principle, and a persuasion that they ought to submit to the Mother Country; some

100

EXHIBIT 19
0597

from the love of ease, others from self-interest, but the bulk from fear of the mischievous consequences likely to follow: All these latter classes, for the most part, lay still, while the friends of liberty acted with spirit. If they, or any of them, ventured to oppose popular measures, they [126] were not supported, and therefore declined farther efforts. The resentment of the people was so strong against them, that they sought for peace by remaining quiet. The same indecision that made them willing to submit to Great-Britain, made them apparently acquiesce in popular measures which they disapproved. The spirited part of the community, being on the side of liberty, the patriots had the appearance of unanimity; though many either kept at a distance from public meetings, or voted against their own opinion, to secure themselves from resentment, and promote their present ease and interest.

Under the influence of those who were for the immediate adoption of efficacious measures, an agreement by the name of the solemn league and covenant, was adopted by numbers. The subscribers of this, bound themselves to suspend all commercial intercourse with Great-Britain, until the late obnoxious laws were repealed, and the colony of Massachusetts restored to its chartered rights.

General Gage published a proclamation, in which he stiled this solemn league and covenant, "An unlawful, hostile, and traitorous combination." And all magistrates were charged, to apprehend and secure for trial, such as should have any agency in publishing or subscribing the same, or any similar covenant. This proclamation had no other effect, than to exercise the pens of the lawyers, in shewing that the association did not come within the description of legal treason, and that therefore the governor's proclamation was not warranted by the principles of the constitution.

June 29

The late law, for regulating the government of the provinces, arrived near the beginning of August, and was accompanied with a list of 36 new counsellors, appointed by the crown, and in a mode, variant from that prescribed by the charter. Several of these in the first instance, declined an acceptance of the appointment. Those, who accepted of it, were every where declared to be enemies to their country. The new judges were rendered incapable of proceeding in their official duty. Upon opening the courts, the juries refused to be sworn, or to act in any manner, either under them, or in conformity to the late [127] regulations.
In some places, the people assembled, and filled the court-houses and avenues to them in such a manner, that neither the judges, nor their officers could obtain entrance; and upon the sheriff's commanding them, to make way for the court, they answered, "That they knew no court independent of the ancient laws of their country, and to none other would they submit."

Aug. 4

In imitation of his royal master, governor Gage issued a proclamation "for the encouragement of piety and virtue, and for the prevention and punishing vice, prophaneness and immorality." In this proclamation, hypocrisy was inserted as one of the immoralities against which the people were warned. This was considered by the inhabitants, who had often been ridiculed for their strict attention to the forms of religion, to be a studied insult, and as such was more resented than an actual injury. It greatly added to the inflammation which had already taken place in their minds.

**EXHIBIT 19
0598**

The proceedings and apparent dispositions of the people, together with the military preparations which were daily made through the province, induced general Gage to fortify that neck of land which joins Boston to the continent.

He also seized upon the powder which was lodged in the arsenal at Charlestown.

This excited a most violent and universal ferment. Several thousands of the people assembled at Cambridge, and it was with difficulty they were restrained from marching directly to Boston, to demand a delivery of the powder, with a resolution in case of refusal to attack the troops.

Sept. 1

The people thus assembled, proceeded to lieutenant governor Oliver's house, and to the houses of several of the new counsellors, and obliged them to resign, and to declare that they would no more act under the laws lately enacted. In the confusion of these transactions a rumor went abroad, that the royal fleet and troops were firing upon the town of Boston. This was probably designed by the popular leaders, on purpose to ascertain what aid they might expect from the country in case of extremities. The result exceeded their most sanguine expectations. [128] In less than twenty four hours, there were upwards of 30,000 men in arms, and marching towards the capital. Other risings of the people took place in different parts of the colony, and their violence was such, that in a short time the new counsellors, the commissioners of the customs, and all who had taken an active part in favour of Great-Britain, were obliged to skreen themselves in Boston. The new seat of government at Salem was abandoned, and all the officers connected with the revenue were obliged to consult their safety, by taking up their residence in a place which an act of parliament had proscribed from all trade.

About this time, delegates from every town and district in the county of Suffolk, of which Boston is the county town, had a meeting, at which they prefaced a number of spirited resolutions, containing a detail of the particulars of their intended opposition to the late acts of parliament, with a general declaration, "That no obedience was due from the province to either, or any part of the said acts, but that they should be rejected as the attempts of a wicked administration to enslave America." The resolves of this meeting were sent on to Philadelphia, for the information and opinion of the Congress, which, as shall be hereafter related, had met there about this time.

The people of Massachusetts rightly judged, that from the decision of congress on these resolutions, they would be enabled to determine what support they might expect. Notwithstanding present appearances they feared that the other colonies, who were no more than remotely concerned, would not hazard the consequences of making a common cause with them, should subsequent events make it necessary to repel force by force. The decision of Congress exceeded their expectations. They "most thoroughly approved the wisdom and fortitude with which opposition to wicked ministerial measures had been hitherto conducted in Massachusetts, and recommended to them perseverance in the same firm and temperate conduct as expressed in the resolutions of the delegates from the county of Suffolk."
By this approbation and advice, the [129] people of Massachusetts were encouraged to resistance, and the other

1774

EXHIBIT 19
0599

colonies became bound to support them. The former, more in need of a bridle than a spur, proceeded as they had begun, but with additional confidence.

Governor Gage had issued writs for holding a general assembly at Salem; but subsequent events, and the heat and violence which every where prevailed, made him think it expedient to counteract the writs by a proclamation for suspending the meeting of the members. The legality of a proclamation for that purpose was denied, and in defiance thereof 90 of the newly elected members met at the time and place appointed. They soon after resolved themselves into a provincial congress, and adjourned to Concord, about 20 miles from Charlestown. On their meeting there, they chose Mr. Hancock president, and proceeded to business. One of their first acts was to appoint a committee to wait on the governor, with a remonstrance, in which they apologized for their meeting, from the distressed state of the colony; complained of their grievances, and, after stating their apprehensions, from the hostile preparations on Boston neck, concluded with an earnest request, "That he would desist from the construction of the fortress at the entrance into Boston, and restore that pass to its natural state." The governor found some difficulty in giving them an answer, as they were not, in his opinion, a legal body, but the necessity of the times over-ruled his scruples. He replied, by expressing his indignation at the supposition, "That the lives, liberties or property of any people, except enemies, could be in danger, from English troops." He reminded them, that while they complained of alterations made in their charter, by acts of parliament, they were by their own acts subverting it altogether. He therefore warned them of the rocks they were upon; and to desist from such illegal and unconstitutional proceedings. The governor's admonitions were unavailing. The provincial congress appointed a committee to draw up a plan for the immediate defence of the province. It was resolved to inlist a number of the inhabitants under the name of minute men, who were to be under obligations to turn out at a [130] minute's warning. Jedediah Pribble, Artemas Ward and Seth Pomeroy, were elected general officers to command those minute men and the militia, in case they should be called out to action. A committee of safety, and a committee of supplies were appointed. These consisted of different persons and were intended for different purposes. The first were invested with an authority to assemble the militia when they thought proper, and were to recommend to the committee of supplies the purchase of such articles as the public exigencies required; the last were limited to the small sum of £15,627.15s. sterl. which was all the money at first voted to oppose the power and riches of Great Britain. Under this authority, and with these means, the committees of safety and of supplies, acting in concert, laid in a quantity of stores, partly at Worcester and partly at Concord.

The same congress met again, and soon after resolved to get in readiness twelve thousand men to act on any given emergency; and that a fourth part of the militia should be inlisted as minute men, and receive pay. John Thomas and William Heath were appointed general officers. They also sent persons to New-Hampshire, Rhode-Island and Connecticut, to inform them of the steps they had taken and to request their co-operation in making up an army of 20,000 men. Committees from these several colonies met with a committee from the provincial congress of Massachusetts, and settled their plans. The proper period of commencing opposition to general Gage's troops, was determined to be whenever they marched out with their baggage, ammunition and artillery. The aid of the clergy

| Oct. 4 |

| Nov. 23 |

EXHIBIT 19
0600

was called in upon this occasion, and a circular letter was addressed to each of the several ministers in the province, requesting their assistance "in avoiding the dreadful slavery with which they were threatened."

As the winter approached, general Gage ordered barracks for his troops to be erected, but such was the superior influence of the popular leaders, that on their recommendation the workmen desisted from fulfilling the general's wishes, though the money for their labour would have been paid by the crown.

An application to New-York was equally unsuccessful, [131] and it was with difficulty that the troops could be furnished with winter lodgings. Similar obstructions were thrown in the way of getting winter covering for the soldiery. The merchants of New-York on being applied to, answered, "That they would never supply any article for the benefit of men who were sent as enemies to the country." The inhabitants of Massachusetts encouraged the desertion of the soldiers; and acted systematically in preventing their obtaining any other supplies but necessary provisions. The farmers were discouraged from selling them straw, timber, boards and such like articles of convenience. Straw, when purchased for their service, was frequently burnt. Vessels, with bricks intended for their use, were sunk, and carts with wood were overturned, and the king's property by one contrivance or other, was daily destroyed.

`1774`

A proclamation had been issued by the king, prohibiting the exportation of military stores from Britain, which reached America in the latter end of the year 1774. On receiving intelligence thereof, in Rhode-Island, the people seized upon and removed from the public battery about 40 pieces of cannon; and the assembly passed resolutions for obtaining arms and military stores by every means, and also for raising and arming the inhabitants: soon after 400 men beset his majesty's castle at Portsmouth. They sustained a fire from three four-pounders and small arms, but before they could be ready for a second fire, the assailants stormed the fort, and secured and confined the garrison till they broke open the powder house, and took the powder away. The powder being secured, the garrison was released from confinement.

`Dec. 14`

Throughout this whole season, civil government, legislation, judicial proceedings and commercial regulations were in Massachusetts, to all appearance, annihilated. The provincial Congress exercised all the semblance of government which existed. From their coincidence, with the prevailing disposition, of the people, their resolutions had the weight and efficacy of laws. Under the simple stile of recommendation, they organized the militia, made ordinances respecting public monies and such farther regulations [132] as were necessary for preserving order, and for defending themselves against the British troops.

`1774`

In this crisis it seemed to be the sense of the inhabitants of Massachusetts to wait events. They dreaded every evil that could flow from resistance, less than the operation of the late acts of parliament, but at the same time were averse to be the aggressors in bringing on a civil war. They chose to submit to a suspension of regular

EXHIBIT 19
0601

government, in preference to permitting the streams of justice to flow in the channel prescribed by the late acts of parliament, or to conducting them forcibly in the old one, sanctioned by their charter. From the extinction of the old, and the rejection of the new constitution, all regular government was for several months abolished. Some hundred thousands of people, were in a state of nature without legislation, magistrates or executive officers: there was nevertheless a surprising degree of order. Men of the purest morals were among the most active opposers of Great-Britain. While municipal laws ceased to operate, the laws of reason, morality and religion, bound the people to each other as a social band, and preserved as great a degree of a decorum as had at any time prevailed. Even those who were opposed to the proceedings of the populace when they were prudent and moderate, for the most part enjoyed safety both at home and abroad.

Though there were no civil officers, there was an abundance of military ones. These were chosen by the people, but exercised more authority than any who had been honoured with commissions from the governor. The inhabitants in every place devoted themselves to arms. Handling the musket, and training, were the fashionable amusements of the men, while the women by their presence, encouraged them to proceed. The sound of drums and fifes was to be heard in all directions. The young and the old were fired with a martial spirit. On experiment it was found, that to force on the inhabitants, a form of government, to which they were totally averse, was not within the fancied omnipotence of parliament.

During these transactions in Massachusetts effectual [133] measures had been taken by the colonies for convening a continental Congress, though there was no one entitled to lead in this business, yet in consequence of the general impulse on the public mind, from a sense of common danger, not only the measure itself, but the time and place of meeting, were with surprising unanimity agreed upon. The colonies though formerly agitated with local prejudices, jealousies and aversions, were led to assemble together in a general diet, and to feel their weight and importance in a common union. Within four months from the day on which the first intelligence of the Boston port bill reached America, the deputies of eleven provinces had convened in Philadelphia, and in four days more, by the arrival of delegates from North-Carolina, there was a complete representation of twelve colonies, containing three millions of people, disseminated over 260,000 square miles of territory. Some of the delegates were appointed by the constitutional assemblies[;] in other provinces, where they were embarrassed by royal governors, the appointments were made in voluntary meetings of the people. Perhaps there never was a body of delegates more faithful to the interest of their constituents than the Congress of 1774. The public voice elevated none to a seat in that august assembly, but such as in addition to considerable abilities, possessed that ascendancy over the minds of their fellow citizens, which can neither be acquired by birth nor purchased by wealth. The instructions given to these deputies were various, but in general they contained strong professions of loyalty, and of constitutional dependence on the Mother Country: the framers of them acknowledged the prerogatives of the crown, and disclaimed every wish of separation from the Parent State. On the other hand, they were firm in declaring that they were entitled to all the rights of British born

> 1774

EXHIBIT 19
0602

subjects, and that the late acts respecting Massachusetts were unconstitutional and oppressive.

They particularly stated their grievances, and for the most part concurred in authorising their deputies to concert and agree to

1774

such measures in behalf of their constituents [134], as in their joint opinion would be most likely to obtain a redress of American grievances, ascertain American rights, on constitutional principles, and establish union and harmony between Great-Britain and the colonies. Of the various instructions, on this occasion, those which were drawn up by a convention of delegates, from every county in the province of Pennsylvania, and presented by them in a body to the constitutional assembly, were the most precise and determinate. By these it appears, that the Pennsylvanians were disposed to submit to the acts of navigation, as they then stood, and also to settle a certain annual revenue on his majesty, his heirs and successors, subject to the control of parliament, and to satisfy all damages done to the East-India company, provided their grievances were redressed, and an amicable compact was settled, which, by establishing American rights in the manner of a new Magna Charta, would have precluded future disputes.

Of the whole number of deputies, which formed the Continental Congress, of 1774, one half were lawyers. Gentlemen of that profession had acquired the confidence of the inhabitants by their exertions in the common cause. The previous measures in the respective provinces had been planned and carried into effect, more by lawyers than by any other order of men. Professionally taught the rights of the people, they were among the foremost to decry every attack made on their liberties. Bred in the habits of public speaking, they made a distinguished figure in the meetings of the people, and were particularly able to explain to them the tendency of the late acts of parliament. Exerting their abilities and influence in the cause of their country, they were rewarded with its confidence.

On the meeting of Congress, they chose Peyton Randolph their president, and Charles Thomson their secretary. They agreed as one of the rules of their doing business, that no entry should be made on their journals of any propositions discussed before them, to which they did not finally assent.

This august body, to which all the colonies looked up [135] for wisdom and direction, had scarcely convened, when a dispute

1774

arose about the mode of conducting business, which alarmed the friends of union. It was contended by some, that the votes of the small provinces should not count as much as those of the larger ones. This was argued with some warmth and invidious comparisons were made between the extensive dominion of Virginia, and the small colonies of Delaware and Rhode-Island. The impossibility of fixing the comparative weight of each province, from the want of proper materials, induced Congress to resolve, that each should have one equal vote. The mode of conducting business being settled, two committees were appointed. One, to state the rights of the colonies, the several instances in which these rights had been violated, and the means most proper to be pursued for obtaining a restoration of them; the other, to examine and report the several statutes which affected the trade and manufactures of the colonies. The first

EXHIBIT 19
0603

committee were farther instructed to confine themselves to the consideration of such rights as had been infringed since the year 1763.

Congress soon after their meeting, agreed upon a declaration of their rights, by which it was among other things declared, that the inhabitants of the English colonies in North-America, by the immutable laws of nature, the principles of the English constitution, and the several charters or compacts, were entitled to life, liberty and property; and that they had never ceded to any sovereign power whatever, a right to dispose of either, without their consent.

That their ancestors, who first settled the colonies were entitled to all the rights, liberties and immunities of free and natural born subjects within the realm of England, and that by their migrating to America, they by no means forfeited, surrendered or lost any of those rights; that the foundation of English liberty, and of all free government was, a right in the people to participate in their legislative council, and that as the English colonists were not, and could not be properly represented in the British parliament, they were entitled to a free and exclusive power of legislation in their [136] several provincial legislatures, in all cases of taxation and internal polity, subject only to the negative of their sovereign. They then run the line, between the supremacy of parliament, and the independency of the colonial legislatures by provisoes and restrictions, expressed in the following words.

1774

But from the necessity of the case, and a regard to the mutual interests of both countries, we cheerfully consent to the operation of such acts of the British parliament, as are *bona fide*, restrained to the regulation of our external commerce, for the purpose of securing the commercial advantages of the whole empire to the Mother Country, and the commercial benefits of its respective members, excluding every idea of taxation; internal and external for raising a revenue on the subjects in America without their consent.

This was the very hinge of the controversy. The absolute unlimited supremacy of the British parliament, both in legislation and taxation, was contended for on one side; while on the other, no farther authority was conceded than such a limited legislation, with regard to external commerce, as would combine the interest of the whole empire. In government, as well as in religion, there are mysteries from the close investigation of which little advantage can be expected. From the unity of the empire it was necessary, that some acts should extend over the whole. From the local situation of the colonies it was equally reasonable that their legislatures should at least in some matters be independent. Where the supremacy of the first ended and the independency of the last began, was to the best informed a puzzling question. Happy would it have been for both countries, had the discussion of this doubtful point never been attempted.

Congress also resolved, that the colonists were entitled to the common law of England, and more especially to the privilege of being tried by their peers of the vicinage. That they were entitled to the benefit of such of the English statutes as existed at the time of their colonization, and which they had found to be applicable to

EXHIBIT 19
0604

their local circumstances, and also to the immunities and privileges granted and confirmed to them by royal charters or secured [137] by provincial laws.

That they had a right peaceably to assemble, consider of their grievances, and petition the king; that the keeping a standing army in the colonies, without the consent of the legislature of the colony where the army was kept, was against law. That it was indispensibly necessary to good government, and rendered essential by the English constitution, that the constituent branches of the legislature be independent of each other, and that therefore, the exercise of legislative power, in several colonies by a council, appointed during pleasure by the crown, was unconstitutional, dangerous and destructive to the freedom of American legislation. All of these liberties, Congress in behalf of themselves and their constituents, claimed, demanded and insisted upon as their indubitable rights, which could not be legally taken from them, altered or abridged by any power whatever, without their consent. Congress then resolved, that sundry acts, which had been passed in the reign of George the Third, were infringements and violations of the rights of the colonists, and that the repeal of them was essentially necessary, in order to restore harmony between Great-Britain and the colonies. The acts complained of, were as follow: The several acts of 4 George III. ch. 15 and ch. 34; 5 Geo. III. ch. 25; 6 Geo. III. ch. 52; 7 Geo. III. ch. 41 and ch. 46; 8 Geo. III. ch. 22 which imposed duties for the purpose of raising a revenue in America, extended the power of the admiralty courts beyond their ancient limits, deprived the American subject of trial by jury, authorized the judges certificate to indemnify the prosecutor from damages, that he might otherwise be liable to requiring oppressive security from a claimant of ships and goods seized before he was allowed to defend his property.

1774

Also 12 Geo. III. ch. 24 entitled, "An act for the better securing his majesty's dock yards, magazines, ships, ammunition and stores," which declares a new offence in America, and deprives the American subject of a constitutional trial by jury of the vicinage, by authorizing the trial of any person charged with the committing any offence described in the said act out of the realm, to be indicted [138] and tried for the same in any shire or county within the realm.

1774

Also the three acts passed in the last session of parliament for stopping the port and blocking up the harbour of Boston, for altering the charter and government of Massachusetts Bay, and that which is entitled, "An act for the better administration of justice, &c."

Also the act passed in the same session, for establishing the Roman Catholic religion in the province of Quebec, abolishing the equitable system of English laws, and erecting a tyranny there to the great danger (from so total a dissimilarity of religion, law and government) of the neighbouring British colonies, by the assistance of whose blood and treasure the said country had been conquered from France.

Also the act passed in the same session, for the better providing suitable quarters for officers and soldiers in his majesty's service in North-America.

EXHIBIT 19
0605

Also that the keeping a standing army in several of these colonies in time of peace, without the consent of the legislature of that colony in which such army was kept, was against law.

Congress declared, that they could not submit to these grievous acts and measures. In hopes that their fellow subjects in Great-Britain would restore the colonies to that state in which both countries found happiness and prosperity, they resolved for the present only to pursue the following peaceable measures: 1st, To enter into a non-importation, non-consumption and non-exportation agreement or association; 2d, To prepare an address to the people of Great-Britain, and a memorial to the inhabitants of British America; and 3dly, to prepare a loyal address to his majesty.

By the association they bound themselves and their constituents, 1774

from and after the 1st day of December next, not to import into British America, from Great-Britain or Ireland, any goods, wares or merchandize, whatsoever; not to purchase any slave, imported after the said first day of December; not to purchase or use any tea, imported on account of the East-India company, or [139] any on which a duty hath been or shall be paid; and from and after the first day of the next ensuing March, neither to purchase or use any East-India tea whatever. That they would not after the tenth day of the next September, if their grievances were not previously redressed, export any commodity whatsoever, to Great-Britain, Ireland or the West-Indies, except rice to Europe. That the merchants should, as soon as possible, write to their correspondents in Great-Britain and Ireland, not to ship any goods to them on any pretence whatever; and if any merchant there, should ship any goods for America, in order to contravene the non-importation agreement, they would not afterwards have any commercial connexion with such merchant; that such as were owners of vessels, should give positive orders to their captains and masters, not to receive on board their vessels, any goods prohibited by the said non-importation agreement; that they would use their endeavors to improve the breed of sheep and increase their numbers to the greatest extent; that they would encourage frugality, oeconomy and industry, and promote agriculture, arts and American manufactures; that they would discountenance and discourage every species of extravagance and dissipation, and that on the death of relations or friends, they would wear no other mourning than a small piece of black crape or ribbon; that such as were venders of goods, should not take any advantage of the scarcity so as to raise their prices; that if any person should import goods after the first day of December, and before the first day of February, then next ensuing, the same ought to be immediately reshipped or delivered up to a committee to be stored or sold: in the last case, all the clear profits to be applied towards the relief of the inhabitants of Boston; and that if any goods should be imported after the first day of February, then next ensuing, they should be sent back without breaking any of the packages; that committees be chosen in every county, city and town, to observe the conduct of all persons touching the association, and to publish in gazettes, the names of the violaters of it, as foes to the rights of British America; that the committees of correspondence [140] in the respective colonies frequently inspect the entries of their custom houses, and inform each other from time to time of the true state thereof; that all manufactures of America should be sold at reasonable prices; and no advantages be taken of a future scarcity of goods; and lastly, that they would have no dealings or

EXHIBIT 19
0606

intercourse whatever, with any province or colony of North-America, which should not accede to, or should violate the aforesaid associations.

These several resolutions, they bound themselves and their constituents, by the sacred ties of virtue, honour and love of their country, to observe till their grievances were redressed.

In their address to the people of Great-Britain they complimented them for having at every hazard maintained their independence, and transmitted the rights of man and the blessings of liberty to their posterity, and requested them not to be surprised, that they who were descended from the same common ancestors, should refuse to surrender their rights, liberties and constitution. They proceeded to state their rights and their grievances, and to vindicate themselves from the charges of being seditious, impatient of government and desirous of independency. They summed up their wishes in the following words, "Place us in the same situation that we were, at the close of the last war, and our former harmony will be restored."

In the memorial of Congress to the inhabitants of the British colonies, they recapitulated the proceedings of Great-Britain against them, since the year 1763, in order to impress them with a belief, that a deliberate system was formed for abridging their liberties. They then proceeded to state the measures they had adopted to counteract this system, and gave the reasons which induced them to adopt the same. They encouraged them to submit to the inconveniences of non-importation and non-exportation by desiring them "to weigh in the opposite balance the endless miseries, they and their descendants must endure from an established arbitrary power." They concluded with informing them "that the schemes agitated against the colonies, had been so conducted as to render it 1774 prudent [141] to extend their views to mournful events, and to be in all respects prepared for every contingency."

In the petition of Congress to the king, they begged leave to lay their grievances before the throne. After a particular enumeration of these, they observed that they wholly arose from a destructive system of colony administration, adopted since the conclusion of the last war. They assured his majesty that they had made such provision for defraying the charges of the administration of justice, and the support of civil government, as had been judged just and suitable to their respective circumstances, and that for the defence, protection and security of the colonies, their militia would be fully sufficient in time of peace, and in case of war they were ready and willing, when constitutionally required, to exert their most strenuous efforts in granting supplies and raising forces. They said, "we ask but for peace, liberty and safety. We wish not a diminution of the prerogative, nor do we solicit the grant of any new right in our favour. Your royal authority over us, and our connexion with Great-Britain, we shall always carefully and zealously endeavour to support and maintain." They then solicited for a redress of their grievances, which they had enumerated, and appealing to that Being, who searches thoroughly the hearts of his creatures, they solemnly professed, "that their counsels had been influenced by no other motives, than a dread of impending destruction." They concluded with imploring his majesty, "for the honor of Almighty God, for his own glory, for the interests of his family, for

EXHIBIT 19
0607

the safety of his kingdoms and dominions, that as the loving father of his whole people, connected by the same bonds of law, loyalty, faith and blood, though dwelling in various countries, he would not suffer the transcendent relation formed by these ties, to be farther violated by uncertain expectation of effects, that if attained never could compensate for the calamities through which they must be gained."

The Congress also addressed the French inhabitants of Canada. In this they stated the right they had on becoming English subjects, to the benefits of the English [142] constitution.

They explained what these rights were, and pointed out the difference between the constitution imposed on them by act of parliament, and that to which as British subjects they were entitled. They introduced their countryman Montesquieu, as reprobating their parliamentary constitution, and exhorting them to join their fellow colonists in support of their common rights. They earnestly invited them to join with the other colonies in one social compact, formed on the generous principles of equal liberty, and to this end recommended, that they would chuse delegates to represent them in Congress.

1774

All these addresses were written with uncommon ability. Coming from the heart, they were calculated to move it. Inspired by a love of liberty, and roused by a sense of common danger, the patriots of that day spoke, wrote and acted, with an animation unknown in times of public tranquility; but it was not so much on the probable effect of these addresses, that Congress founded their hopes of obtaining a redress of their grievances, as on the consequences which they expected from the operation of their non-importation, and non-exportation agreement. The success that had followed the adoption of a measure similar to the former, in two preceding instances, had encouraged the colonists to expect much from a repetition of it. They indulged, in extravagant opinions of the importance of their trade to Great-Britain. The measure of a non-exportation of their commodities was a new expedient, and from that, even more was expected than from the non-importation agreement. They supposed that it would produce such extensive distress among the merchants and manufacturers of Great-Britain, and especially among the inhabitants of the British West-India islands, as would induce their general co-operation in procuring a redress of American grievances. Events proved that young nations, like young people, are prone to over rate their own importance.

Congress having finished all this important business, in less than eight weeks, dissolved themselves, after giving their opinion, "that another Congress should be held on the 10th of May next ensuing at Philadelphia, unless [143] the redress of their grievances should be previously obtained," and recommended "to all the colonies to chuse deputies as soon as possible, to be ready to attend at that time and place, should events make their meeting necessary."

October 26

1774

On the publication of the proceedings of Congress, the people obtained that information which they desired. Zealous to do something for their country, they patiently waited for the decision of that body, to whose direction they had resigned

 **EXHIBIT 19 0608**

themselves. Their determinations were no sooner known, than they were cheerfully obeyed. Though their power was only advisory, yet their recommendations were more generally and more effectually carried into execution, than the laws of the best regulated states. Every individual felt his liberties endangered, and was impressed with an idea, that his safety consisted in union. A common interest in warding off a common danger, proved a powerful incentive to the most implicit submission; provincial congresses and subordinate, committees were every where instituted. The resolutions of the Continental Congress, were sanctioned with the universal approbation of these new representative bodies, and institutions were formed under their direction to carry them into effect.

The regular constitutional assemblies also gave their assent to the measures recommended. The assembly of New-York, was the only legislature which withheld its approbation. Their metropolis had long been head quarters of the British army in the colonies, and many of their best families were connected with people of influence in Great-Britain. The unequal distribution of their land, fostered an aristocratic spirit. From the operation of these and other causes, the party for royal government, was both more numerous and respectable in New-York, than in any of the other colonies.

The assembly of Pennsylvania, though composed of a majority of Quakers, or of those who were friendly to their interests, was the first legal body of representatives that ratified unanimously the acts of the general Congress. They not only voted their approbation of what that [144] body had done, but appointed members to represent them in the new Congress, proposed to be held on the 10th day of May next ensuing, and took sundry steps to put the province in a posture of defence.

1774

To relieve the distresses of the people of Boston, liberal collections were made throughout the colonies, and forwarded for the supply of their immediate necessities. Domestic manufactures were encouraged, that the wants of the inhabitants from the non-importation agreement might be diminished, and the greatest zeal was discovered by a large majority of the people, to comply with the determinations of these new made representative bodies. In this manner, while the forms of the old government subsisted, a new and independent authority was virtually established. It was so universally the sense of the people, that the public good required a compliance with the recommendations of Congress, that any man who discovered an anxiety about the continuance of trade and business, was considered as a selfish individual, preferring private interest to the good of his country. Under the influence of these principles, the intemperate zeal of the populace, transported them frequently so far beyond the limits of moderation, as to apply singular punishments to particular persons, who contravened the general sense of the community.

The British ministry were not less disappointed than mortified at this unexpected combination of the colonies. They had flattered themselves with a belief, that the malcontents in Boston were a small party headed by a few factious men, and that the majority of the inhabitants would arrange themselves on the side of government, as soon as they found Great-Britain determined to support her authority, and should even Massachusetts take part with its offending capital, they could not believe that the

EXHIBIT 19
0609

other colonies would make a common cause in supporting so intemperate a colony: but should even that expectation fail, they conceived that their association must be founded on principles so adverse to the interests and feelings of individuals, that it could not be of long duration.

They were encouraged in these ill founded opinions by [145] the recollection that the colonies were frequently quarrelling about boundaries, clashing in interest, differing in policy, manners, customs, forms of government and religion, and under the influence of a variety of local prejudices, jealousies and aversions. They also remembered the obstacles which prevented the colonies from acting together, in the execution of schemes, planned for their own defence, in the late war against the French and Indians. The failure of the expected co-operation of the colonies in one uniform system at that time, was not only urged by the British ministry, as a reason for parliamentary control over the whole, but flattered them with a delusive hope, that they never could be brought to combine their counsels and their arms. Perhaps the colonists apprehended more danger from British encroachments on their liberties, than from French encroachment on Indian territories, in their neighbourhood: or more probably the time to part being come, the Governor of the Universe, by a secret influence on their minds, disposed them to union. From whatever cause it proceeded, it is certain, that a disposition to do, to suffer, and to accommodate, spread from breast to breast, and from colony to colony, beyond the reach of human calculation. It seemed as though one mind inspired the whole. The merchants put far behind them the gains of trade, and cheerfully submitted to a total stoppage of business, in obedience to the recommendations of men, invested with no legislative powers. The cultivators of the soil, with great unanimity assented to the determination, that the hard earned produce of their farms, should remain unshipped, although in case of a free exportation, many would have been eager to have purchased it from them, at advanced prices. The sons and daughters of ease, renounced imported conveniences, and voluntarily engaged to eat, drink, and wear, only such articles as their country afforded. These sacrifices were made, not from the pressure of present distress, but on the generous principle of sympathy, with an invaded sister colony, and the prudent policy of guarding against a precedent which might, in a future day, operate against their liberties.

[146]

This season of universal distress, exhibited a striking proof, how practicable it is for mankind to sacrifice ease, pleasure, and interest, when the mind is strongly excited by its passions. In the midst of their sufferings, cheerfulness appeared in the face of all the people. They counted every thing cheap in comparison with liberty, and readily gave up whatever tended to endanger it. A noble strain of generosity and mutual support was generally excited. A great and powerful diffusion of public spirit took place. The animation of the times, raised the actors in these scenes above themselves, and excited them to deeds of self denial, which the interested prudence of calmer seasons can scarcely credit.

EXHIBIT 19
0610

[Back to Table of Contents]

# CHAPTER V

## Transactions In Great-Britain, In Consequence Of The Proceedings Of Congress, In 1774.

Some time before the proceedings of Congress reached England, it was justly apprehended that a non-importation agreement would be one of the measures they would adopt. The ministry apprehending that this event, by distressing the trading and manufacturing towns, might influence votes against the court, in the election of a new parliament, which was of course to come on in the succeeding year, suddenly dissolved the parliament, and immediately ordered a new one to be chosen. It was their design to have the whole business of elections over, before the inconveniences of a non-importation agreement could be felt. The nation was thus surprised into an election without knowing that the late American acts, had driven the colonies into a firm combination, to support, and make a common cause, with the people of Massachusetts. A new parliament was returned, which met in thirty-four days after the proceedings of Congress were first published in Philadelphia, and before they were known in Great-Britain.

This, for the most part consisted, either of the former members, or of those who held similar sentiments.

1774

[147] On the 30th of November, the king in his speech to his new parliament informed them,

that a most daring spirit of resistance and disobedience to the laws, unhappily prevailed in the province of Massachusetts, and had broke forth in fresh violences of a very criminal nature, and that these proceedings had been countenanced and encouraged in his other colonies, and unwarrantable attempts had been made to obstruct the commerce of his kingdoms by unlawful combinations, and that he had taken such measures, and given such orders as he judged most proper and effectual, for carrying into execution the laws which were passed in the last session of the late parliament, relative to the province of Massachusetts.

An address which was proposed in the house of commons in answer to this speech, produced a warm debate. The minister was reminded of the great effects he had predicted from the late American acts. "They were to humble that whole continent, without further trouble, and the punishment of Boston, was to strike so universal a panic on all the colonies, that it would be totally abandoned, and instead of obtaining relief, a dread of the same fate would awe the other provinces to a most respectful submission." An address re-echoing the royal speech, was nevertheless carried by a great majority. A similar address was carried, after a spirited debate, in the upper house, but the lords Richmond, Portland, Rockingham, Stamford, Stanhope, Torrington, Ponsonby, Wycombe and Camden, entered a protest against it, which concluded with these remarkable words.

EXHIBIT 19
0611

Whatever may be the mischievous designs, or the inconsiderate temerity which leads others to this desperate course, we wish to be known as persons who have disapproved of measures so injurious in their past effects, and future tendency, and who are not in haste, without enquiry or information, to commit ourselves in declarations, which may precipitate our country into all the calamities of a civil war.

Soon after the meeting of the new parliament, the proceedings of the Congress reached Great-Britain.

The first impression made by them, was in favour of [148] America. Administration seemed to be staggered, and their opposers triumphed, in the eventual truth of their prediction, that an universal confederacy to resist Great-Britain, would be the consequence of the late American acts. The secretary of state, after a days perusal, during which a council was held, said that the petition of Congress to the King, was a decent and proper one. He also cheerfully undertook to present it, and afterwards reported, that his majesty was pleased very graciously to receive it, and to promise to lay it before his two houses of parliament. From these favourable circumstances, the sanguine friends of America, concluded that it was intended to make the petition, the foundation of a change of measures, but these hopes were of short duration.

| 1774 |

The warmer partisans of administration, placed so much confidence in the efficacy of the measures, they had lately taken to bring the Americans to obedience, that they regarded the boldest resolutions of Congress, as the idle clamors of an unruly multitude, which proper exertions on the part of Great-Britain would speedily silence. So much had been asserted and contradicted by both parties, that the bulk of the people could form no certain opinion, on the subject.

The parliament adjourned for the christmas holidays, without coming to any decision on American affairs.

As soon as they met in January, a number of papers, containing information, were laid before them. These were mostly letters from governors, and other servants of his majesty, which detailed the opposition of the colonists, in language calculated to give a bad impression of their past conduct, and an alarming one of their future intentions.

| 1775 |

It was a circumstance unfavourable to the lovers of peace, that the rulers of Great-Britain received almost the whole of their American intelligence from those, who had an interest in deceiving them. Governors, judges, revenue-officers, and other royal servants, being both appointed and paid by Great-Britain, fancied that zeal for the interest of that country, would be the most likely way to ensure their farther promotion. They were therefore, [149] in their official dispatches, to government, often tempted to abuse the colonists, with a view of magnifying their own watchfulness and recommending themselves to Great-Britain. The plain, simple language of truth, was not acceptable to courtly ears. Ministers received and caressed those, and those only, whose representations coincided with their own views and wishes. They who contended that by the spirit of the English constitution British subjects, residing on one side of the Atlantic, were entitled to equal privileges with

EXHIBIT 19
0612

those who resided on the other, were unnoticed, while the abettors of ministerial measures were heard with attention.

In this hour of national infatuation lord Chatham, after a long retirement, resumed his seat in the house of lords, and exerted his unrivalled eloquence, in sundry attempts to dissuade his countrymen from attempting to subdue the Americans by force of arms. The native dignity of his superior genius, and the recollection of his important services, entitled him to distinguished notice. His language, voice, and gesture, were calculated to force conviction on his hearers. Though venerable for his age, he spoke with the fire of youth. He introduced himself with some general observations on the importance of the American quarrel. He enlarged on the dangerous events that were coming on the nation, in consequence of the present dispute. He arraigned the conduct of ministers with great severity, and reprobated their whole system of American politics, and moved that an humble address, be presented to his majesty, most humbly to advise and beseech him to dispatch orders to general Gage, to remove his majesty's forces from the town of Boston. His lordship supported this motion in a pathetic animated speech, but it was rejected by a great majority. From this and other circumstances it soon became evident, that the Americans could expect no more favour from the new parliament, than they had experienced from the late one.

Jan. 20

A majority in both houses was against them, and resolved to compel them to obedience; but a respectable minority in their favour was strongly seconded by petitions from the merchants and manufacturers, [150] throughout the kingdom, and particularly by those of London and Bristol. As these were well apprised of the consequences that must follow from a prosecution of coercive measures, and deeply interested in the event, they made uncommon exertions to prevent their adoption. They circumstantially pointed out the various evils that would result from them, and faithfully warned their countrymen of the danger, to which their commercial interests were exposed.

1775

When the petition from the merchants of London was read in the house of commons, it was moved to refer it to the committee appointed to take into consideration the American papers; but it was moved by way of amendment on the ministerial side, that it should be referred to a separate committee, to meet on the 27th, the day succeeding that appointed for the consideration of American papers. This, though a dishonorable evasion, was carried by a majority of more than two to one.

A similar fate attended the petitions from Bristol, Glasgow, Norwich, Liverpool, Manchester, Birmingham, Woolverhampton, Dudley, and some other places. These on their being presented, were in like manner consigned to what the opposition humorously termed, the committee of oblivion.

About the same time a petition was offered from Mr. Bollan, Dr. Franklin, and Mr. Lee, stating that they were authorized by Congress to present their petition to the king, which his majesty had referred to that house, and that they were enabled to throw great light on the subject, and praying to be heard at the bar, in support of the said petition. The friends of the ministry alledged, that as Congress was not a legal body, nothing could be received from them. It was in vain replied, that the Congress,

EXHIBIT 19
0613

however illegal as to other purposes, was sufficiently legal for presenting a petition, and that as it was signed by the individual members of Congress, it might be received as a petition from individuals. That the signers of it were persons of great influence in America, and it was the right of all subjects to have their petitions heard.

[151]
In the course of the debate on Lord Chatham's motion for addressing his majesty to withdraw his troops from Boston, it had been observed by some lords in administration, that it was common and easy to censure their measures, but those who did so, proposed nothing better.

> 1775

Lord Chatham answered, that he should not be one of those idle censurers, that he had thought long and closely upon the subject, and purposed soon to lay before their lordships the result of his meditations, in a plan for healing the differences between Great-Britain and the colonies, and for restoring peace to the empire. When he had matured his plan, he introduced it into the house, in the form of a bill for settling the troubles in America. In this he proposed that the colonists should make a full acknowledgement of the supremacy of the legislature, and the superintending power of the British parliament. The bill did not absolutely decide on the right of taxation, but partly as a matter of grace, and partly as a compromise, declared and enacted, "that no tollage tax, or other charge, should be levied in America, except by common consent in their provincial assemblies." It asserted the right of the king to send a legal army to any part of his dominions at all times, but declared, "that no military force could ever be lawfully employed to violate or destroy the just rights of the people." It also legalised the holding a Congress in the ensuing May for the double purpose "of recognising the supreme legislative authority, and superintending power of parliament over the colonies, and for making a free grant to the king, his heirs and successors, of a certain and perpetual revenue, subject to the disposition of parliament, and applicable to the alleviation of the national debt." On these conditions the bill proposed, "to restrain the powers of the admiralty courts to their ancient limits, and suspended for a limited time, those acts which had been complained of by Congress." It proposed to place the judges in America on the same footing, as to the holding of their salaries and offices, with those in England, and secured to the colonies all the privileges, franchises, and immunities, granted by their several charters and constitutions.

> Feb. 1st

His lordship introduced this [152] plan with a speech, in which he explained and supported every part of it. When he sat down, lord Dartmouth rose and said, "it contained matter of such magnitude as to require consideration, and therefore hoped, that the noble Earl did not expect their lordships to decide upon it by an immediate vote, but would be willing it should lie on the table for consideration." Lord Chatham answered, "that he expected no more," but lord Sandwich rose, and in a petulant speech opposed its being received at all, and gave his opinion, "that it ought immediately to be rejected with the contempt it deserved. That he could not believe it to be the production of any British peer—that it appeared to him rather the work of some American," and turning his face towards Dr. Franklin, who was leaning on the bar, said, "he fancied he had in his eye the person who drew it up, one of the bitterest and most mischievous enemies this country had ever known." This turned the eyes of many lords on the insulted American, who, with that self command, which is peculiar to great minds, kept his countenance unmoved. Several

> 1775

EXHIBIT 19
0614

other lords of the administration gave their sentiments also, for rejecting lord Chatham's conciliatory bill, urging that it not only gave a sanction to the traiterous proceedings of the Congress already held, but legalised their future meeting. They enlarged on the rebellious temper and hostile disposition of the Americans, and said, "that, though the duty on tea was the pretence, the restrictions on their commerce, and the hopes of throwing them off, were the real motives of their disobedience, and that to concede now, would be to give up the point forever."

The Dukes of Richmond and Manchester, lord Camden, lord Lyttleton and others, were for receiving lord Chatham's conciliatory bill—some from approbation of its principles, but others only from a regard to the character and dignity of the house.

Lord Dartmouth who, from indecision rarely had any will or judgment of his own, and who with dispositions for the best

1775

measures, could be easily prevailed upon to join in support of the worst, finding the opposition from [153] his coadjutors in administration unexpectedly strong, turned round and gave his voice with them for immediately rejecting the plan; lord Chatham, in reply to lord Sandwich, declared,

the bill proposed by him to be entirely his own, but he made no scruple to declare, that if he were the first minister of the country, and had the care of settling this momentous business, he should not be ashamed of publicly calling to his assistance a person so perfectly acquainted with the whole of the American affairs as the gentleman alluded to, and so injuriously reflected upon [(]Dr. Franklin). One whom all Europe held in high estimation for his knowledge and wisdom, and ranked with her Boyles and her Newtons—who was an honour, not only to the English nation, but to human nature.

The plan proposed by lord Chatham was rejected, by a majority of 64 to 32, and without being admitted to lie on the table. That a bill on so important a subject, offered by one of the first men of the age, and who, as prime minister of the nation, had but a few years before taken up Great-Britain when in the lowest despondency, and conducted her to victory and glory, through a war with two of the most powerful kingdoms of Europe, should be rejected without any consideration, or even a second reading, was not only a breach of decency, but a departure from that propriety of conduct which should mark the proceedings of a branch of the national legislature. It could not but strike every thinking American, that such legislators, influenced by passion, prejudice, and party spirit, many of whom were totally ignorant of the subject, and who would not give themselves an opportunity by a second reading, or farther consideration, to inform themselves better, were very unfit to exercise unlimited supremacy over three millions of virtuous, sensible people, inhabiting the other side of the globe.

On the day after the rejection of lord Chatham's bill, a petition was presented to the house of commons, from the planters of the sugar colonies residing in Great-Britain, and the merchants of London trading to the colonies.

In this they stated, that the British property in [154] the West-India islands amounted to upwards of 30 millions, and that a

1775

EXHIBIT 19
0615

further property of many millions was employed in the commerce created by the said islands, and that the profits and produce of these immense capitals which ultimately centered in Great-Britain, would be deranged and endangered by the continuance of the American troubles. The petitioners were on the 16th of the next month admitted to a hearing, when Mr. Glover, as their agent, ably demonstrated the folly and danger of persevering in the contest, but without any effect. The immediate coercion of the colonies was resolved upon, and the ministry would not suffer themselves to be diverted from its execution. They were confident of success, if they could once bring the controversy to the decision of arms. They expected more from conquest than they could promise themselves by negotiation or compromise. The free constitutions of the colonies and their rapid progress in population, were beheld with a jealous eye, as the natural means of independence. They conceived the most effectual method of retaining them long, would be to reduce them soon. They hoped to be able to extinguish remonstrance and debate by such a speedy and decisive conquest, as would give them an opportunity to new model the colonial constitutions, on such principles as would have prevented future altercations on the subject of their chartered rights. Every representation that tended to retard or obstruct the coercion of the colonies, was therefore considered as tending only to prolong the controversy. Confident of victory, and believing that nothing short of it would restore the peace of the empire, the ministry turned a deaf ear to all petitions and representations. They even presumed that the petitioners, when they found Great-Britain determined on war, would assist in carrying it on with vigour, in order to expedite the settlement of the dispute. They took it for granted, that when the petitioning towns were convinced that a renewal of the commercial intercourse between the two countries would be sooner obtained by going on, than turning back, that the same interest which led them at first to petition, would lead them afterwards to support coercive [155] measures, as the most effectual and shortest way of securing commerce from all future interruptions.

1775

The determination of ministers to persevere was also forwarded by hopes of the defection of New-York from her sister colonies. They flattered themselves, that when one link of the continental chain gave way, it would be easy to make an impression on the disjointed extremities.

Every attempt to close the breach which had been opened by the former parliament, having failed, and the ministry having made up their minds on the mode of proceeding with the colonists, their proposed plan was briefly unfolded. This was to send a greater force to America, and to bring in a temporary act to put a stop to all the foreign trade of the New England colonies, till they should make proper submissions and acknowledgments. An address to his majesty was at the same time moved for, to "beseech him to take the most effectual measures, to enforce due obedience to the laws and authority of the supreme legislature."

Truly critical was that moment to the union of the empire. A new parliament might, without the charge of inconsistency, have repealed acts, passed by a former one, which had been found inconvenient on experiment; but pride and passion, under the specious names of national dignity and zeal for the supremacy of parliament, induced the adoption of measures, for immediately compelling the submission of the colonies.

EXHIBIT 19
0616

The repeal of a few acts of parliament would, at this time, have satisfied America. Though she had been extending her claims, yet she was still willing that Great-Britain should monopolize her trade, and that the parliament should regulate it for the common benefit of the empire; nor was she disposed to abridge his majesty of any of his usual prerogatives. This authority was sufficient for the Mother Country to retain the colonists in a profitable state of subordination, and yet not so much as to be inconsistent with their claims, or the security of their most important interests. Britain viewed the matter in a different light.

To recede at this time, would be to acknowledge, that the ministry had hitherto been in the [156] wrong, a concession

1775

rarely made by private persons, but more rarely still by men in public stations. The leading members in parliament, not distinguishing the opposition of freemen to unconstitutional innovations, from the turbulence of licentious mobs breaking over the bounds of law and constitution, supposed that to redress grievances, was to renounce sovereignty. This inference, in some degree, resulted from the broad basis which they had assigned to the claims of the Mother Country. If, as was contended, on the part of Great-Britain, they had a right to bind the colonies in all cases whatsoever, and the power of parliament over them was absolute and unlimited, they were precluded from rescinding any act of theirs, however oppressive, when demanded as a matter of right. They were too highly impressed with ideas of their unlimited authority to repeal any of their laws, on the principle, that they had not a constitutional power to enact them, and too unwise to adopt the same measure on the ground of political expediency. Unfortunately for both countries, two opinions were generally believed, neither of which was perhaps true in its utmost extent, and one of which was most assuredly false. The ministry and parliament of England proceeded on the idea, that the claims of the colonists amounted to absolute independence, and that a fixed resolution to renounce the sovereignty of Great-Britain was concealed, under the specious pretext of a redress of grievances. The Americans on the other hand, were equally confident that the Mother Country not only harboured designs unfriendly to their interests, but seriously intended to introduce arbitrary government. Jealousies of each other were reciprocally indulged to the destruction of all confidence, and to the final dismemberment of the empire.

In discussing the measures proposed by the minister for the coercion of the colonies, the whole ground of the American controversy was traversed.

The comparative merits of concession and coercion were placed in every point of view. Some of the minority in both houses of

1775

parliament, pointed out the dangers that would attend a war with America—the likelihood of the interference of [157] other powers—the probability of losing, and the impossibility of gaining any thing more than was already possessed. On the other hand, the friends of the ministry asserted that the Americans had been long aiming at independence—that they were magnifying pretended grievances to cover a premeditated revolt—that it was the business and duty of Englishmen, at every hazard to prevent its completion, and to bring them back to a remembrance that their present greatness was owing to the Mother Country; and that even their existence had been purchased at an immense expence of British blood and treasure. They acknowledged the danger to be great, but said "it must be encountered; that every day's delay increased the evil, and that it would be base and cowardly to shift off for the present

EXHIBIT 19
0617

an unavoidable contest, which must fall with accumulated weight on the heads of their posterity." The danger of foreign interference was denied, and it was contended that an appearance of vigorous measures, with a farther reinforcement of troops at Boston, would be sufficient to quell the disturbances; and it was urged, that the friends of government were both strong and numerous, and only waited for proper support, and favourable circumstances, to declare themselves.

After long and warm debates, and one or two protests, the ministerial plans were carried by great majorities. In consequence thereof, on the 9th of February, 1775, a joint address, from both lords and commons, was presented to his majesty, in which

they returned thanks for the communication of the papers relative to the state of the British colonies in America, and gave it as their opinion, that a rebellion actually existed in the province of Massachusetts, and beseeched his majesty that he would take the most effectual measures to enforce due obedience to the laws and authority of the supreme legislature, and begged in the most solemn manner to assure his majesty that it was their fixed resolution, at the hazard of their lives and properties, to stand by his majesty against all rebellious attempts, in the maintenance of the just rights of his majesty, and the two houses of parliament.

[158]
The lords, Richmond, Craven, Archer, Abergaveny, Rockingham, Wycombe, Courtenay, Torrington, Ponsonby, Cholmondeley, Abingdon, Rutland, Camden, Effingham, Stanhope, Scarborough, Fitzwilliam and Tankerville, protested against this address,

1775

as founded on no proper parliamentary information, being introduced by refusing to suffer the presentation of petitions against it (though it be the undoubted right of the subject to present the same)—as following the rejection of every mode of conciliation—as holding out no substantial offer of redress of grievances, and as promising support to those ministers who had inflamed America, and grossly misconducted the affairs of Great-Britain.

By the address, against which this protest was entered, the parliament of Great-Britain passed the Rubicon. In former periods, it might be alledged that the claims of the colonies were undefined, and that their unanimous resolution to defend them was unknown; but after a free representation from twelve provinces had stated their rights, and pledged themselves to each other to support them, and their determinations were known, a resolution that a rebellion actually existed, and that at the hazard of their lives and properties, they would stand by his majesty against all rebellious attempts, was a virtual declaration of war. Both parties were now bound in consequence of their own acts, to submit their controversy to the decision of arms. Issue was joined by the approbation Congress had given to the Suffolk resolves, and by this subsequent joint address of both houses of parliament to his majesty. It is probable that neither party, in the beginning, intended to go thus far, but by the inscrutable operations of providence, each was permitted to adopt such measures as not only rent the empire, but involved them both, with their own consent, in all the calamities of a long and bloody war. The answer from the throne to the joint address of parliament, contained

EXHIBIT 19
0618

assurances of taking the most speedy and effectual measures for enforcing due obedience to the laws, and authority of the supreme legislature.

This answer was accompanied with a message to the commons, in [159] which they were informed that some augmentation to the forces by sea and land would be necessary. An augmentation of 4383 men to the land forces, and of 2000 seamen, to be employed for the ensuing year, was accordingly asked for, and carried without difficulty. By the first it was stated, that the force at Boston would be ten thousand men, a number supposed to be sufficient for enforcing the laws. Other schemes, in addition to a military force, were thought advisable for promoting the projected coercion of the colonies.

1775

With this view a punishment was proposed, so universal in its operation, that it was expected the inhabitants of the New-England colonies, to obtain a riddance of its heavy pressure, would interest themselves in procuring a general submission to parliament. Lord North moved for leave to bring in a bill to restrain the trade and commerce of the provinces of Massachusetts Bay, and New-Hampshire, the colonies of Connecticut and Rhode-Island, and Providence Plantations in North-America, to Great-Britain, Ireland, and the British islands in the West-Indies, and to prohibit such provinces and colonies from carrying on any fishery on the banks of Newfoundland, or other places therein to be mentioned, under certain conditions, and for a limited time. The motion for this bill was supported, by declaring that as the Americans had refused to trade with the Mother Country, they ought not to be permitted to trade with any other. It was known that the New-England colonies earned on a circuitous trade and fishing, on the banks of Newfoundland, to a great extent. To cut them off from this resource, they were legislatively forbidden to fish, or to carry on foreign trade. It was presumed that the wants of a large body of people, deprived of employment, would create a clamor in favour of reconciliation.

Feb. 10

The British ministry expected to excite the same temper in the unemployed New-England men, that Congress meant to raise by the non-importation agreement, among the British merchants and manufacturers. The motion for this bill brought into view, the whole of the American controversy.

The opposers of it said, that its cruelty [160] exceeded the examples of hostile rigour with avowed enemies; for that in the most dangerous wars, the fishing craft was universally spared—they desired the proposer of the bill to recollect, that he had often spoken of the multitude of friends he had in those provinces, and that now he confounded the innocent with the guilty—friends with enemies, and involved his own partizans in one common ruin with his opposers. They alledged farther, that the bill would operate against the people of Great-Britain, as the people of New England were in debt to them, and had no other means of paying that debt, but through the fishery, and the circuitous trade dependent on it. It was observed, that the fishermen being cut off from employment must turn soldiers, and that therefore while they were provoking the Americans to resistance by one set of acts, they were furnishing them with the means of recruiting an army by another. The favourers of the bill denied the charge of severity, alledging that the colonists could not complain of any distress the bill might bring on them, as they not only deserved it, but had set the example, that they had entered into lawful combinations to ruin the merchants and manufacturers of Great-Britain. It was said,

1775

122

**EXHIBIT 19**
**0619**

that if any foreign power had offered a similar insult or injury, the whole nation would have demanded satisfaction. They contended that it was a bill of humanity and mercy; for, said they, the colonists have incurred all the penalties of rebellion, and are liable to the severest military execution. Instead of inflicting the extent of what they deserved, the bill only proposes to bring them to their senses, by restricting their trade. They urged farther that the measure was necessary, for said they, "the Americans have frequently imposed on us, by threatening to withdraw their trade, hoping through mercantile influence to bend the legislature to their demands—that this was the third time they had thrown the commerce of Great-Britain into a state of confusion. That both colonies and commerce were better lost than preserved on such terms.["] They added farther, that they must either relinquish their connexion with America, or fix it on such a basis as would prevent [161] a return of these evils. They admitted the bill to be coercive, but said, "That the coercion which put the speediest end to the dispute, was eventually the most merciful."

1775

In the progress of the bill, a petition from the merchants and traders of London, who were interested in the American commerce, was presented against it. They were heard by their agent, Mr. David Barclay, and a variety of witnesses were examined before the house. In the course of their evidence it appeared that in the year 1764, the four provinces of New-England employed in their several fisheries no less than 45,880 ton of shipping, and 6002 men; and that the produce of their fisheries that year, in foreign markets, amounted to 322,220£. 16s. sterling. It also appeared that the fisheries had very much increased since that time—that all the materials used in them, except salt, and the timber of which the vessels were built, were purchased from Great-Britain; and that the net proceeds of the whole were remitted thither. All this information was disregarded.

After much opposition in both houses, and a protest in the house of lords, the bill was, by a great majority, finally ratified. So intent was the ministry and parliament on the coercion of the colonists, that every other interest was sacrificed to its accomplishment. They conceived the question between the two countries to be simply whether they should abandon their claims, and at once give up all the advantages arising from sovereignty and commerce, or resort to violent measures for their security.

March 30

Since the year 1769, when a secretary of state officially disclaimed all views of an American revenue, little mention had been made of that subject, but the decided majority which voted with the ministry on this occasion, emboldened lord North once more to present it to the view of his countrymen; he therefore brought into parliament a scheme which had the double recommendation of holding forth the semblance of conciliation, and the prospect of an easement of British taxes, by a productive revenue from the colonies. This was a resolution which passed on the 20th of February.

[162]
Resolved, That when the governor, council, and assembly, or general court, of any of his majesty's provinces or colonies in America, shall propose to make provision according to the condition, circumstances, and situations of such province or colony, for contributing their proportion for the

1775

EXHIBIT 19
0620

common defence, (such proportion to be raised under the authority of the general court or general assembly of such province or colony, and disposable by parliament) and shall engage to make provision also for the support of the civil government, and the administration of justice in such province or colony, it will be proper, if such proposal shall be approved by his majesty and the two houses of parliament, and for so long as such provision shall be made accordingly, to forbear, in respect of such province or colony, to levy any duty, tax, or assessment, except only such duties as it may be expedient to continue to levy or to impose for the regulation of commerce, the net produce of the duties last mentioned, to be carried to the account of such province or colony respectively.

This was introduced by the minister in a long speech, in which he asserted that it would be an infallible touch stone to try the Americans; "if" said he, "their opposition is only founded on the principles which they pretend, they must agree with this proposition, but if they have designs in contemplation different from those they avow, their refusal will convict them of duplicity." The oppositions to the minister's motion originated among those who had supported him in previous questions. They objected to the proposal that in effect it was an acknowledgment of something grievous in the idea of taxing America by parliament, and that it was therefore a departure from their own principles. They contended that it was improper to make concessions to rebels with arms in their hands, or to enter into any measures for a settlement with the Americans, in which they did not, as a preliminary, acknowledge the supremacy of parliament.

The minister was likely to be deserted by some of his partizans, till others explained the consistency of the scheme with their former declarations. [163] It was asked, "what shall parliament lose by acceding to this resolution? Not the right of taxing America, for this is most expressly reserved. Not the profitable exercise of this right, for it proposed to enforce the only essential part of taxation, by compelling the Americans to raise not only what they, but what we, think reasonable. We are not going to war for trifles and a vain point of honor, but for substantial revenue." The minister farther declared, that he did not expect his proposition to be generally relished by the Americans. But said he, if it does no good in the colonies, it will do good here, it will unite the people of England, by holding out to them a distinct object of revenue. He added farther, as it tends to unite England, it is likely to disunite America, for if only one province accepts the offer, their confederacy, which only makes them formidable, will be broken.

1775

The opposers of ministry attacked the proposition with the combined force of wit and argument. They animadverted on the inconsistency of holding forth the same resolution as a measure of concession, and as an assertion of authority. They remarked that hitherto it had been constantly denied that they had any contest about an American revenue—that the whole had been a dispute about obedience to trade-laws, and the general legislative authority of parliament, but now ministers suddenly changed their language, and proposed to interest the nation—console the manufacturers and animate the soldiery, by persuading them that it is not a contest for empty honour, but for the acquisition of a substantial revenue. It was said that the Americans would be as effectually taxed, without their consent, by being compelled to pay a gross sum, as by an aggregate of small duties to the same amount. That this

EXHIBIT 19
0621

scheme of taxation exceeded in oppression any that the rapacity of mankind had hitherto devised. In other cases a specific sum was demanded, and the people might reasonably presume that the remainder was their own; but here they were wholly in the dark as to the extent of the demand.

This proposition, however for conciliation, though illy [164] relished by many of the friends of ministry, was carried on a division of 274 to 88. On its transmission to the colonies, it did not produce the effects of disunion expected from it. It was unanimously rejected. The reason for this cannot be expressed better than in the act of Congress on that subject, which after a recital of the said conciliatory motion, proceeded in the following words,

1775

The Congress took the said resolution into consideration, and are thereupon of opinion,

That the colonies of America are entitled to the sole and exclusive privilege of giving and granting their own money. That this involves a right of deliberating whether they will make any gift, for what purposes it shall be made, and what shall be its amount; and that it is a high breach of this privilege for any body of men, extraneous to their Constitutions, to prescribe the purposes for which money shall be levied on them, to take to themselves the authority of judging of their conditions, circumstances, and situations, and of determining the amount of the contribution to be levied.

That as the colonies possess a right of appropriating their gifts, so are they entitled at all times to enquire into their application, to see that they be not wasted among the venal and corrupt for the purpose of undermining the civil rights of the givers, nor yet be diverted to the support of standing armies, inconsistent with their freedom and subversive of their quiet. To propose therefore, as this resolution does, that the monies given by the colonies shall be subject to the disposal of parliament alone, is to propose that they shall relinquish this right of enquiry, and put it in the power of others to render their gifts ruinous, in proportion as they are liberal.

That this privilege of giving, or of withholding our monies, is an important barrier against the undue exertion of prerogative, which, if left altogether without controul, may be exercised to our great oppression; and all history shews how efficacious is its intercession for redress of grievances, and re-establishment of rights, and how improvident it would be to part with so powerful a mediator.

We are of opinion that the proposition contained in [165] this resolution is unreasonable and insidious: Unreasonable, because, if we declare we accede to it, we declare without reservation, we will purchase the favour of parliament, not knowing at the same time at what price they will please to estimate their favour; it is insidious, because, individual colonies, having bid and bidden again, till they find the avidity of the seller too great for all their powers to satisfy, are then to return into opposition, divided from their sister colonies whom the minister will have previously detached by a grant of easier terms, or by an artful procrastination of a definitive answer.

1775

EXHIBIT 19
0622

That the suspension of the exercise of their pretended power of taxation being expressly made commensurate with the continuance of our gifts, these must be perpetual to make that so. Whereas no experience has shewn that a gift of perpetual revenue secures a perpetual return of duty or of kind disposition. On the contrary, the parliament itself, wisely attentive to this observation, are in the established practice of granting their supplies from year to year only.

Desirous, and determined as we are to consider, in the most dispassionate view, every seeming advance towards a reconciliation made by the British parliament, let our brethren of Britain reflect what would have been the sacrifice to men of free spirits had even fair terms been proffered, as these insidious proposals were, with circumstances of insult and defiance. A proposition to give our money; accompanied with large fleets and armies, seems addressed to our fears rather than to our freedom. With what patience would Britons have received articles of treaty from any power on earth when born on the point of a bayonet by military Plenipotentiaries?

We think the attempt unnecessary to raise upon us by force or by threats our proportional contributions to the common defence, when all know, and themselves acknowledge, we have fully contributed, whenever called upon to do so in the character of freemen.

We are of opinion it is not just that the colonies should be required to oblige themselves to other contributions, while Great-Britain possesses a Monopoly of their trade. [166] This of itself lays them under heavy contribution. To demand, therefore, additional aids in the form of a tax, is to demand the

<span style="background-color: yellow;">1775</span>

double of their equal proportion, if we are to contribute equally with the other parts of the empire, let us equally with them, enjoy free commerce with the whole world. But while the restrictions on our trade shut to us the resources of wealth, is it just we should bear all other burthens, equally with those to whom every resource is open?

We conceive that the British parliament has no right to intermeddle with our provisions for the support of civil government, or administration of justice. The provisions we have made are such as please ourselves, and are agreeable to our own circumstances: They answer the substantial purposes of government and of justice, and other purposes than these should not be answered. We do not mean that our people shall be burthened with oppressive taxes, to provide sinecures for the idle or the wicked, under colour of providing for a civil list. While parliament pursue their plan of civil government within their own jurisdiction, we also hope to pursue ours without molestation.

We are of opinion the proposition is altogether unsatisfactory; because it imports only a suspension of the mode, not a renunciation of the pretended right to tax us: Because too it does not propose to repeal the several acts of parliament, passed for the purposes of restraining the trade, and altering the form of government of one of our colonies; extending the boundaries and changing the government of Quebec; enlarging the jurisdiction of the courts of admiralty and vice-admiralty; taking from us the rights of a trial by jury of the vicinage, in cases affecting both life and property;

EXHIBIT 19
0623

transporting us into other countries to be tried for criminal offences; exempting by mock-trial the murderers of colonists from punishment; and quartering soldiers on us in times of profound peace. Nor do they renounce the power of suspending our own legislatures, and for legislating for us themselves, in all cases whatsoever. On the contrary, to shew they mean no discontinuance of injury, they pass acts, at the very [167] time of holding out this proposition, for restraining the commerce and fisheries of the provinces of New-England, and for interdicting the trade of other colonies with all foreign nations, and with each other. This proves unequivocally they mean not to relinquish the exercise of indiscriminate legislation over us.

Upon the whole, this proposition seems to have been held up to the world, to deceive it into a belief that there was nothing in dispute between us but the mode of levying taxes; and that the parliament having now been so good as to give up this, the colonies are unreasonable if not perfectly satisfied: whereas, in truth, our adversaries still claim a right of demanding *adlibitum*, and of taxing us themselves to the full amount of their demand, if we do comply with it. This leaves us without any thing we can call property. But, what is of more importance, and what in this proposal they keep out of sight, as if no such point was now in contest between us, they claim a right to alter our charters and establish laws, and leave us without any security for our lives or liberties. The proposition seems also to have been calculated more particularly to lull into fatal security, our well affected fellow subjects on the other side of the water, till time should be given for the operation of those arms, which a British minister pronounced would instantaneously reduce the "cowardly" sons of America to unreserved submission. But when the world reflects, how inadequate to justice are these vaunted terms; when it attends to the rapid and bold succession of injuries, which, during a course of eleven years, have been aimed at these colonies; when it reviews the pacific and respectful expostulations, which, during that whole time, were the sole arms we opposed to them; when it observes that our complaints were either not heard at all, or were answered with new and accumulated injuries; when it recollects that the minister himself on an early occasion declared, "that he would never treat with America, till he had brought her to his feet," and that an avowed partisan of ministry has more lately denounced against us the dreadful sentence "*delenda est Carthago*," that this was done [168] in presence of a British senate, and being unreproved by them, must be taken to be their own sentiment, (especially as the purpose has already in part been carried into execution, by their treatment of Boston and burning of Charlestown); when it considers the great Armaments with which they have invaded us, and the circumstances of cruelty with which these have commenced and prosecuted hostilities; when these things, we say, are laid together and attentively considered, can the world be deceived into an opinion that we are unreasonable, or can it hesitate to believe with us, that nothing but our own exertions may defeat the ministerial sentence of death or abject submission.

`1775`

Other plans for conciliation with the colonies, founded on principles very different from those which were the basis of lord North's conciliatory motion, were brought forward in the house of commons, but without receiving its approbation. The most remarkable of these was proposed by Mr. Edmund Burke, in a speech which for strength of argument, extent of information, and sublimity of language, would bear a comparison with the most

`March 22`

EXHIBIT 19
0624

finished performance that ancient or modern times have produced. In his introduction to this admirable speech, he examined and explained the natural and accidental circumstances of the colonies, with respect to situation, resources, number, population, commerce, fisheries and agriculture, and from those considerations shewed their importance. He then enquired into their unconquerable spirit of freedom; and he traced it to its original sources; from these circumstances he inferred the line of policy which should be pursued with regard to America—he shewed that all proper plans of government must be adapted to the feelings, established habits, and received opinions of the people. On these principles he reprobated all plans of governing the colonies by force; and proposed as the ground work of his plan, that the colonists should be admitted to an interest in the constitution.

He then went into an historical detail of the manner in which British privileges had been extended to Ireland, Wales, and the

1775

counties palatine of Chester and Durham—the [169] state of confusion previously to that event—and the happy consequences which followed it. He contended that a communication to the members of an interest in the constitution, was the great ruling principle of British government. He therefore proposed to go back to the old policy for governing the colonies. He was for a parliamentary acknowledgment of the legal competency of the colony assemblies for the support of their government in peace, and for public aids in time of war—and of the futility of parliamentary taxation as a method of supply. He stated that much had been given in the old way of colonial grant, that from the year 1748 to 1763, the journals of the house of commons repeatedly acknowledged that the colonies not only gave, but gave to satiety; and that from the time in which parliamentary imposition had superseded the free gifts of the provinces, there was much discontent, but little revenue. He therefore moved six resolutions affirmatory of these facts, and grounded on them resolutions for repealing the acts complained of by the Americans, trusting to the liberality of their future voluntary contributions. This plan of conciliation, which promised immediate peace to the whole empire, and a lasting obedience of the colonies, though recommended by the charms of the most persuasive eloquence, and supported by the most convincing arguments, was by a great majority rejected.

Mr. D. Hartley, not discouraged by the negative which had been given to Mr. Burke's scheme, came forward with another for the

March 27

same purpose. This proposed that a letter of requisition should be sent to the colonies by a secretary of state, on a motion from the house for a contribution to the expences of the whole empire. He meant to leave to the provincial assemblies the right to judge of the expedience of the grant—its amount and application. In confidence that the colonies would give freely when called on in this constitutional way, he moved to suspend the acts complained of by the Americans. This was also rejected. Another plan which shall be more particularly explained was digested in private by Dr. Franklin, on the part of the Americans, and Dr. Fothergill and David [170] Barclay on behalf of the British ministry.

There appeared a disposition to concede some thing considerable on both sides, but the whole came to nothing, in consequence of

1775

an inflexible determination to refuse a repeal of the act of parliament for altering the chartered government of Massachusetts; Dr. Franklin agreed, that the tea destroyed should be paid for—the British ministers, that the Boston port act should be repealed,

EXHIBIT 19
0625

but the latter contended, "that the late Massachusetts acts being real amendments of their constitution, must for that reason be continued as well as to be a standing example of the power of parliament." On the other hand it was declared by Dr. Franklin, "that while the parliament claimed and exercised a power of internal legislation for the colonies, and of altering American constitutions at pleasure, there could be no agreement, as that would render the Americans unsafe in every privilege they enjoyed, and would leave them nothing in which they could be secure."

This obstinate adherence to support parliament in a power of altering the laws and charters of the provinces, particularly to enforce their late laws for new modelling the chartered constitution of Massachusetts, was the fatal rock by dashing on which the empire broke in twain; for every other point, in dispute between the two countries, seemed in a fair way for an amicable compromise.

The fishery bill was speedily followed by another, for restraining the trade and commerce of the colonies and provinces of New-Jersey, Pennsylvania, Maryland, Virginia and South-Carolina: The reasons assigned for this were the same with those offered for the other. These provinces had adopted the continental association. The British minister thought it proper, that as they had voluntarily interdicted themselves from trade with Great-Britain, Ireland, and the West-Indies, they should be restrained from it with all other parts of the world. He contended that the inhabitants of the colonies might render this act a dead letter, by relinquishing their own resolutions, as then they would meet with no restraint in carrying on trade in its ancient legal channel.

It is remarkable, that three of the associated colonies, viz. New-York, [171] Delaware and North-Carolina, were omitted in this restraining bill. Whatever might be the view of the British ministry for this discrimination, it was considered in the colonies as calculated to promote disunion among them. It is certain, that the colonies which were exempted from its operation, might have reaped a golden harvest from the exemption in their favour, had they been disposed to avail themselves of it. But such was the temper of the times, that a renunciation of immediate advantage in favour of the public was fashionable. The selfish passions which in seasons of peace are too often the cause of quarrels, were hushed by the pressure of common danger. The exempted colonies spurned the proffered favour, and submitted to the restraints imposed on their less favoured neighbours, so as to be equal sharers of their fate. The indulgence granted to New-York, in being kept out of this restraining bill, was considered by some as a premium for her superior loyalty. Her assembly had refused to approve the proceedings of the Congress, and had, in some other instances, discovered less warmth than the neighbouring legislatures. Much was expected from her moderation. At the very time the British parliament was framing the restraining acts just mentioned, the constitutional assembly of New-York petitioned the British parliament for a redress of their grievances. Great stress had been laid on the circumstance that Congress was not a legal assembly, and the want of constitutional sanction had been assigned as a reason for the neglect with which their petition had been treated. Much praise had been lavished on the colony of New-York for its moderation, and occasion had been taken, from their refusing to approve the proceedings of the Congress to represent the

1775

EXHIBIT 19
0626

resolutions and claims of that body to be more the ebullitions of incendiaries, than the sober sentiments of the temperate citizens.

It was both unexpected and confounding to those who supported these opinions, that the representation and remonstrance of the very loyal assembly of New-York stated, "that an exemption from internal taxation, and the exclusive right of providing for their own civil government, and the administration of justice in [172] the colony, were esteemed by them as their undoubted and unalienable rights."

1775

A motion being made in the house of commons for bringing up this representation and remonstrance of the assembly of New-York, it was amended on the suggestion of lord North, by adding, "in which the assembly claim to themselves rights derogatory to, and inconsistent with the legislative authority of parliament, as declared by the declaratory act." The question, so amended, being put, it passed in the negative. The fate of this representation extinguished the hopes of those moderate persons, both in the parent state and the colonies, who flattered themselves that the disputes subsisting between the two countries might be accommodated by the mediation of the constitutional assemblies. Two conclusions were drawn from this transaction, both of which were unfriendly to a reconciliation. The decided language with which the loyal assembly of New-York claimed exemption from parliamentary taxation, proved to the people of Great-Britain that the colonists, however they might differ in modes of opposition, or in degrees of warmth, were nevertheless, united in that fundamental principle. The rejection of their representation proved that nothing more was to be expected from proceeding in the constitutional channel of the legal assemblies, than from the new system of a continental Congress. Solid revenue and unlimited supremacy were the objects of Great-Britain, and exemption from parliamentary taxation that of the most moderate of the colonies. So wide were the claims of the two countries from each other, that to reconcile them on any middle ground seemed to be impossible.

EXHIBIT 19
0627

[Back to Table of Contents]

# APPENDIX NO. I

## Some Special Transactions Of Dr. Franklin In London, In Behalf Of America.

[173]

While the breach between Great-Britain and the colonies, was daily increasing, the enlightened and liberal, who loved peace, and the extension of human happiness, saw with regret the approaching horrors of a civil war, and wished to avert them. With these views Dr. Fothergill, Mr. David Barclay and Dr. Franklin, held sundry conferences in London on American affairs. The two former were English gentlemen of most amiable characters, and highly esteemed by the British ministry. The last was by birth an American, but a citizen of the world, who loved and was beloved by all good men. He was also agent for several of the colonies. At one of their conferences held at the house of Dr. Fothergill on the 4th December, 1774, before the proceedings of Congress had reached England—a paper drawn up by the last, at the request of the two first, was submitted to their joint consideration, which with a few additions proposed and agreed to by common consent was as follows.

Hints for conversation upon the subjects of terms, that might probably produce a durable union between Britain and the colonies.

1st. The tea destroyed to be paid for.

2d. The tea duty act to be repealed, and all the duties that have been received upon it to be repaid into the treasuries of the several provinces from which they have been collected.

3d. The acts of navigation to be all re-enacted in the colonies.

4th. A naval officer to be appointed by the crown to see that these acts are observed.

5th. All the acts restraining manufactories in the colonies to be reconsidered.

6th. All duties arising on the acts for regulating trade with the colonies to be for the public use of the respective colonies and paid into their treasuries.

[174]

The collectors and custom house officers to be appointed by each governor and not sent from England.

7th. In consideration of the Americans maintaining their own peace establishment, and the monopoly Britain is to have of their commerce, no requisition is to be made from them in time of peace.

1775

1775

EXHIBIT 19
0628

8th. No troops to enter and quarter in any colony, but with the consent of its legislature.

9th. In time of war on requisition by the king with consent of parliament, every colony shall raise money by the following rules in proportion, viz. If Britain on account of the war, raises three shillings in the pound to its land tax, then the colonies to add to their last general provincial peace tax, a sum equal to one fourth part thereof, and if Britain on the same account pays four shillings in the pound, then the colonies to add to their last peace tax, a sum equal to the half thereof, which additional tax is to be granted to his majesty, and to be employed in raising and paying men for land or sea service, and furnishing provisions, transports, or for such other purposes as the king shall require and direct, and though no colony may contribute less, each may add as much by voluntary grant as it shall think proper.

10th. Castle William to be restored to the province of Massachusetts Bay, and no fortress to be built by the crown in any province, but with the consent of its legislature.

11th. The late Massachusetts and Quebec acts to be repealed, and a free government granted to Canada.

12th. All judges to be appointed during good behavior, with equally permanent salaries to be paid out of the province revenues by appointment of the assemblies, or if the judges are to be appointed during the pleasure of the crown, let the salaries be during the pleasure of the assemblies as heretofore.

13th. Governors to be supported by the assemblies of each province.

14th. If Britain will give up her monopoly of the American commerce, then the aid above mentioned to be given in time of peace, as well as in time of war.

[175]

15th. The extension of the act of Henry the 8th, concerning treasons to the colonies to be formally disowned by parliament.

1775

16th. The American admiralty courts to be reduced to the same powers they have in England, and the acts establishing them to be re-enacted in America.

17th. All power of internal legislation in the colonies to be disclaimed by parliament.

On reading this paper a second time, Dr. Franklin gave his reasons at length for each article. Some of his reasons were as follows.

On the first article he observed, that when the tea was destroyed at Boston, Great-Britain had a right to reparation, and would certainly have had it on demand, as was the case when injuries were done by mobs in the time of the stamp act, or she might have a right to return an equal injury if she rather chose to do that; but Great-Britain could not have a right both to reparation and to return an equal injury, much less had she a right to return the injury ten or twenty fold, as she had done by blocking up the

EXHIBIT 19
0629

port of Boston. All which extra injury ought to be repaired by Great-Britain. That therefore if paying for the tea was agreed to, as an article fit to be proposed, it was merely from a desire of peace, and in compliance with the opinions of Dr. Fothergill and David Barclay, expressed at their first meeting; that this was indispensible, that the dignity of Great-Britain required it, and that if this was agreed to, every thing else would be easy.

On the second, it was observed that the tea duty act should be repealed as having never answered any good purpose, as having been the cause of the present mischief, and never likely to be executed. That the act being considered as unconstitutional by the Americans, and what parliament had no right to enact they must consider all the money extorted by it as so much wrongfully taken, and of which therefore restitution ought to be made, and the rather as it would furnish a fund out of which the tea destroyed would be best defrayed.

On the third and fourth articles it was observed, that the Americans were frequently charged with views of abolishing [176] the navigation act, but that in truth those parts of it, which were of most importance to Britain, as tending to increase its naval strength, were as acceptable to the colonists as they could be to the inhabitants of the Parent State, since they wished to employ their own ships in preference to those of foreigners, and they had no desire to see foreign ships enter their ports. That it would prevent disputes if they were re-enacted in the colonies, as that would demonstrate their consent to them, and then if all the duties arising on them were to be collected by officers appointed and paid in the respective governments, and the produce paid into their treasuries, the acts would be better and more faithfully executed, and at much less expence, and a great source of misunderstanding between the two countries removed—that the extension of the admiralty jurisdiction so much complained of would then no longer be necessary.

1775

In support of the 7th article it was observed, that if every distinct part of the king's dominions supported its own government in time of peace, it was all that could justly be required of it. That all the other confederated colonies had done so from their beginning, that their taxes for that purpose were very considerable, that new countries had many expences which old ones were free from, the work being done to their land by their ancestors, such as making roads and bridges, erecting churches, courthouses, forts, quays and other public buildings, founding schools and places of education, hospitals and almshouses—that the voluntary subscriptions and legal taxes for such purposes taken together amounted to more than was paid by equal estates in Great-Britain; that it would be best not to take money from the Americans as a contribution to its public expence in time of peace, first for that just so much less would be got from them in commerce, and secondly, that coming into the hands of British ministers accustomed to prodigality of public money, it would be squandered and dissipated without answering any general good purposes.

That on the whole it would be best for both countries, that no aids should be asked from the colonies in time of peace, [177] that it would then be their interest to grant bountifully, and exert themselves, in time of war, the sooner to put an end to it.

1775

EXHIBIT 19
0630

In support of the 8th article, it was said, that if the king could bring into any one part of his dominions troops raised in any other part of them, without the consent of the legislature of the part to which they were brought, he might bring armies raised in America to England without the consent of parliament.

The 9th article was drawn in compliance with an idea of Dr. Fothergill, that the British government would probably not be satisfied with the promise of voluntary grants in time of war from the American assemblies, of which the quantity must be uncertain, that therefore it would be best to proportion them in some way to the shilling in the pound raised in England.

In support of the 10th article, was urged the injustice of seizing that fortress which had been built at an immense charge by the province, for the defence of their port against national enemies, and turning it into a citadel for awing the town, restraining their trade, blocking up their port, and depriving them of their privileges. That a great deal had been said of their injustice in destroying the tea, but here was a much greater injustice uncompensated, that castle having cost the province £300,000.

In support of the 11th article, it was said, that as the Americans had assisted in the conquest of Canada, at a great expence of blood and treasure, they had some right to be considered in the settlement of it; that the establishing an arbitrary government on the bank of their settlements would be dangerous to them all. That as to amending the Massachusetts government, though it might be shewn that every one of these pretended amendments were real mischiefs, yet, that as charters were compacts between two parties, the king and the people, no alteration could be made in them even for the better, but by the consent of both parties; that the parliamentary claim and exercise of power to alter American charters, had rendered all their constitutions uncertain and set them [178] quite afloat.

That by this claim of altering laws and charters at will they deprived the colonists of all rights and privileges whatever, but what they should hold at their pleasure. That this was a situation they could not be in and must risque life and every thing rather than submit to it.

1775

The 12th article was explained by stating the former situation of the judges in most of the colonies, viz. that they were appointed by the crown and paid by the assemblies, that the appointment being during the pleasure of the crown, the salary had been during the pleasure of the assembly; that when it was urged against the assemblies that their making judges dependent on them for their salaries, was aiming at an undue influence over the courts of justice, the assemblies usually replied, that making them dependent on the crown for continuance in their places was also retaining an undue influence over those courts, and that one undue influence was a proper balance for another; but that whenever the crown would consent to the appointment of judges only during good behaviour, the assemblies would at the same time grant their salaries to be permanent during their continuance in office; that instead of agreeing to this equitable offer the crown now claimed to make the judges in the colonies dependant on its favour for place, as well as salary, and both to be continued at its pleasure. This the colonies must oppose as inequitable, as putting both the weights into one of the scales of justice.

EXHIBIT 19
0631

In favour of the 123th it was urged that the governors sent to the colonies were often men of no estate or principle, who came merely to make fortunes, and had no natural regard for the country they were to govern. That to make them quite independent of the people, was to make them careless of their conduct, and giving a loose to their rapacious and oppressive dispositions. That the dependence of the governors on the people for their salaries could never operate to the prejudice of the king's service, or to the disadvantage of Britain, since each governor was bound by a particular set of instructions which he had given surety to observe, and all the laws he assented [179] to were subject to be repealed by the crown.

That the payment of the salaries by the people was more satisfactory to them, and was productive of a good understanding between governors and governed, and that therefore the innovations lately made at Boston and New-York, should be laid aside.

1775

The 14th article was expunged on the representation of Dr. Fothergill and David Barclay, that the monopoly of the American commerce would never be given up, and that the proposing of it would only give offence, without answering any good purpose.

The 15th article was readily agreed to.

The 16th was thought to be of little consequence, if the duties were given to the colony treasuries.

The 17th it was thought could hardly be obtained, but it was supported by Dr. Franklin, alleging that without it, any compact made with the Americans, might be evaded by acts of the British parliament, restraining the intermediate proceedings, which were necessary for carrying it into effect.

This paper of hints was communicated to lord Dartmouth by Dr. Fothergill, who also stated the arguments which in conversation had been offered in support of them. When objections were made to them, as being humiliating to Great-Britain Dr. Fothergill replied "that she had been unjust, and ought to bear the consequences, and alter her conduct—that the pill might be bitter, but it would be salutary and must be swallowed; that sooner or later these or similar measures must be followed, or the empire would be divided and ruined."

These hints were handed about amongst ministers, and conferences were held on them. The result was on the 4th of February 1775 communicated to Dr. Franklin, in the presence of Dr. Fothergill and David Barclay, which as far as concerned the leading articles, was as follows:

1. The first article was approved.

2. The second agreed to so far as related to the tea act, but repayment of the duties that had been collected, was refused.

3. The third not approved, as it implied a deficiency of power in the parliament that made the acts. [180]

EXHIBIT 19
0632

4. The fourth approved.

5. The fifth agreed to, but with a reserve that no change prejudicial to Britain was to be expected.

6. The sixth agreed to, so far as related to the appropriation of the duties, but the appointment of the officers and of their salaries to remain as at present.

7. The seventh relating to aids in time of war, agreed to.

8. The eighth relating to troops, was inadmissible.

9. The ninth could be agreed to with this difference, that no proportion should be observed with regard to preceding taxes, but each colony should give at pleasure.

10. The tenth agreed to as to the restitution of Castle William, but the restriction on the crown in building fortresses refused.

11. The eleventh refused absolutely, except as to the Boston port bill which would be repealed, and the Quebec act might be so far amended, as to reduce that province to its ancient limits. The other massachusetts acts being real amendments of their constitution, must for that reason be continued, as well as to be a standing example of the power of parliament.

12. The twelfth agreed to, that the judges should be appointed during good behaviour, on the assemblies providing permanent salaries, such as the Crown should approve of.

13. The thirteenth agreed to, provided the assemblies make provision, as in the preceding article.

15. The fifteenth agreed to.

16. The sixteenth agreed to, supposing the duties paid to the colony treasuries.

17. The seventeenth inadmissible.

At this interview the conversation was shortened by Dr. Franklin's observing, that while the parliament claimed and exercised a power of internal legislation for the colonies, and of altering American constitutions, at pleasure, there could be no agreement, as that would render the Americans unsafe in every privilege they enjoyed, [181] and would leave them nothing, in which they could be secure. It being hinted how necessary an agreement was for America, since it was so easy for Britain to burn all her seaport towns, Dr. Franklin replied,

1775

that the chief part of his little property consisted of houses in such towns, that they might make bonfires of them whenever they pleased. That the fear of losing them would never alter his resolution of resisting to the last extremity, that claim of parliament, and that it behoved Great-Britain to take care what mischief she did to

EXHIBIT 19
0633

America, for that sooner or later she would certainly be obliged to make good all damages with interest.

On the 16th of February, 1775, the three before mentioned gentlemen met, when a paper was produced by David Barclay entitled, "A plan which it is believed would produce a permanent union between Great-Britain and her colonies.["] This, in the first article, proposed a repeal of the tea act, on payment being made for the tea destroyed. Dr. Franklin agreed to the first part, but contended that all the other Massachusetts acts should also be repealed, but this was deemed inadmissible. Dr. Franklin declared that the people of Massachusetts would suffer all the hazards and mischiefs of war, rather than admit the alteration of their charters and laws, by parliament. He was for securing the unity of the empire, by recognising the sanctity of charters, and by leaving the provinces to govern themselves, in their internal concerns, but the British ministry could not brook the idea of relinquishing their claim to internal legislation for the colonies, and especially to alter and amend their charters. The first was for communicating the vital principles of liberty to the provinces, but the latter though disposed to redress a few of their existing grievances, would by no means consent to a repeal of the late act of parliament, for altering the chartered government of Massachusetts, and least of all to renounce all claim to future amendments of charters, or of internal legislation for the colonies.

Dr. Franklin laboured hard to prevent the breach from becoming irreparable, and candidly stated the outlines [182] of a compact which he supposed would procure a durable union of the two countries, but his well meant endeavors proved abortive, and in the mean time he was abused as the fomenter of those disturbances which he was anxiously endeavouring to prevent. That the ministry might have some opening to proceed upon, and some salvo for their personal honor, he was disposed to engage, that pecuniary compensation should be made for the tea destroyed, but he would not give up essential liberty, for the purpose of procuring temporary safety. Finding the ministry bent on war, unless the colonists would consent to hold their rights, liberties and charters at the discretion of a British parliament, and well knowing that his countrymen would hazard every thing, rather than consent to terms so degrading as well as inconsistent with the spirit of the British constitution, he quitted Great-Britain in March 1775, and returned to Philadelphia. Dr. Fothergill, his worthy coadjutor in the great business of peace, wrote to him on the evening before he left London. "That whatever specious pretences were offered, they were all hollow, and that to get a larger field on which to fatten a herd of worthless parasites, was all that was intended." With this conviction founded on personal observations, as well as the testimony of his esteemed friend, who in the course of his daily visits among the great, in the practice of his profession, had an opportunity of knowing their undisguised sentiments, Dr. Franklin joined his countrymen, and exerted his great abilities in conducting them through a war he had in vain laboured to prevent.

1775

EXHIBIT 19
0634

[Back to Table of Contents]

# CHAPTER VI

## Consequences In America, Resulting From The Preceding Transactions Of Parliament; And Of The Commencement Of Hostilities.

The year 1774 terminated in america, with an expectation that a few months would bring them a redress of their grievances; but the probability of that event [183] daily diminished.

The colonists had indulged themselves in an expectation that the people of Great-Britain, from a consideration of the dangers and

1775

difficulties of a war with their colonies, would in their election have preferred those who were friends to peace and a reconciliation; but when they were convinced of the fallacy of these hopes, they turned their attention to the means of self defence. It had been the resolution of many never to submit to the operation of the late acts of parliament. Their number daily increased, and in the same proportion that Great-Britain determined to enforce, did they determine to oppose. Intelligence of the rejection of lord Chatham's bill, of the address of both houses of parliament to the king of the 9th of February, and of the fishery bill, all arrived among the colonists, about the same time, and diminished what remained of their first hopes of a speedy accommodation. The fishery bill excited a variety of emotions. The obvious tendency of it was to starve thousands. The severity of it did not strike an Englishman, for he viewed it as a merited correction for great provincial offences; but it appeared in the blackest colours to an American, who felt no consciousness of guilt, and who fancied that heaven approved his zeal in defence of liberty. It alienated the affections of the colonists, and produced in the breasts of thousands, a hatred of Great-Britain.

The penal acts of parliament in 1774, were all levelled against Massachusetts, but the fishery bill extended to New-Hampshire, Connecticut and Rhode-Island. The reasons assigned for this by lord North were, that they had aided and abetted their offending neighbours, and were so near to them that the intentions of parliament would be frustrated, unless they were in like manner comprehended in the proposed restraints. The extension of this penal statute to three additional provinces, operated powerfully in favour of union, and convinced the most moderate, of the increasing necessity for all the provinces to make a common cause of their opposition. Whatever might be the designs of parliament, their acts had a natural tendency to enlarge the demands of the Americans, [184] and to cement their confederacy, by firm principles of union.

At first they only claimed exemption from internal taxation, but by the combination of the East-India company and the British

1775

ministry, an external tax was made to answer all the purposes of a direct internal tax. They therefore in consistence with their own principles, were constrained to deny the right of taxing in any form for a supply. Nothing could more contribute to make the colonists deny the parliamentary claim of internal legislation, than the manner in which it was exercised, in depriving them of their charters, and passing an act relative

EXHIBIT 19
0635

to trials, which promised indemnity to murderers. This convinced them that an opposition to so injurious a claim was essentially necessary to their security. But they still admitted the power of parliament to bind their trade. This was conceded by Congress but a few months before an act passed that they should have no foreign trade, nor be allowed to fish on their own coasts. The British ministry by their successive acts, impelled the colonists to believe, that while the Mother Country retained any authority over them, that authority would, in some shape or other, be exerted so as to answer all the purposes of a power to tax. While Great-Britain stretched that portion of controlling supremacy which the colonists were disposed to allow her, to such an extent as covered oppression equally grievous with that which they would not allow, the way was fast opening for a total renunciation of her sovereignty. The coercive measures adopted by the Parent State, produced a disposition in the colonies to extend their claims, and the extension of their claims produced an increasing disposition in Great-Britain to coerce them still more. The jealousy of liberty on one side, and the desire of supremacy on the other, were reciprocally cause and effect; and urged both parties, the one to rise in their demands, and the other to enforce submission. In the contest between Great-Britain and her colonies, there had been a fatal progression from small to greater grounds of dissention. The trifling tax of 3d per pound on tea, roused the jealous inhabitants of Boston to throw 340 chests of it into the ocean. [185]

This provoked the British parliament to shut up their port, and to new model their charter. Statutes so unconstitutional and alarming, excited a combination in twelve of the colonies, to stop all trade with Great-Britain, Ireland, and the West-Indies. Their combination gave birth to the restraining acts of parliament, by which nine of the colonies were interdicted all other trade but that from which they had voluntarily excluded themselves; and four of these nine were farther devoted to famine, by being forbidden to fish on their coasts. Each new resolution on the one side, and new act on the other, reciprocally gave birth to something from the opposite party, that was more irritating or oppressive, than what had preceded.

1775

The beginning of strife between the Parent State and her colonies, was like the letting out of waters. From inconsiderable causes love was changed into suspicion that gradually ripened into ill will, and soon ended in hostility. Prudence, policy, and reciprocal interest, urged the expediency of concession; but pride, false honour, and misconceived dignity, drew in an opposite direction. Undecided claims and doubtful rights, which under the influence of wisdom and humility might have been easily compromised, imperceptibly widened into an irreconcileable breach. Hatred at length took the place of kind affections, and the calamities of war were substituted, in lieu of the benefits of commerce.

From the year 1768, in which a military force had been stationed in Boston, there was a constant succession of insulting words, looks, and gestures. The inhabitants were exasperated against the soldiers, and they against the inhabitants. The former looked on the latter as the instruments of tyranny, and the latter on the former as seditious rioters, or fraudulent smugglers. In this irritable state, every incident however trifling, made a sensible impression. The citizens apprehended constant danger from an armed force, in whose power they were; the soldiers on the other hand, considered

EXHIBIT 19
0636

themselves as in the midst of enemies, and exposed to attacks from within and from without.

In proportion [186] as the breach between Great-Britain and her colonies widened, the distrust and animosity between the people

1775

and the army increased. From the latter end of 1774, hostile appearances daily threatened that the flames of war would be kindled from the collision of such inflammable materials. Whatsoever was done by either party by way of precaution, for the purposes of self defence, was construed by the other as preparatory to an intended attack. Each disclaimed all intentions of commencing hostilities, but reciprocally manifested suspicion of the others sincerity. As far as was practicable without an open rupture, the plans of the one were respectively thwarted by the other. From every appearance it became daily more evident that arms must ultimately decide the contest. To suffer an army that was soon expected to be an enemy, quietly to fortify themselves, when the inhabitants were both able and willing to cut them off, appeared to some warm spirits the height of folly; but the prudence and moderation of others, and especially the advice and recommendation of Congress, restrained their impetuosity. It was a fortunate circumstance for the colonies that the royal army was posted in New-England. The people of that northern country have their passions more under the command of reason and interest, than in the southern latitudes, where a warmer sun excites a greater degree of irascibility. One rash offensive action against the royal forces at this early period, though successful, might have done great mischief to the cause of America. It would have lost them European friends, and weakened the disposition of the other colonies to assist them. The patient and the politic New-England men, fully sensible of their situation, submitted to many insults, and bridled their resentment. In civil wars or revolutions it is a matter of much consequence who strikes the first blow. The compassion of the world is in favour of the attacked, and the displeasure of good men on those who are the first to imbrue their hands in human blood. For the space of nine months after the arrival of general Gage, the behaviour of the people of Boston is particularly worthy of imitation, by those who wish to [187] overturn established governments.

They conducted their opposition with exquisite address. They avoided every kind of outrage and violence, preserved peace and

1775

good order among themselves, successfully engaged the other colonies to make a common cause with them, and counteracted general Gage so effectually as to prevent his doing any thing for his royal master, while by patience and moderation they skreened themselves from censure. Though resolved to bear as long as prudence and policy dictated, they were all the time preparing for the last extremity. They were furnishing themselves with arms and ammunition, and training their militia.

Provisions were also collected and stored in different places, particularly at Concord, about 20 miles from Boston. General Gage, though zealous for his royal master's interest, discovered a prevailing desire after a peaceable accommodation. He wished to prevent hostilities by depriving the inhabitants of the means necessary for carrying them on. With this view he determined to destroy the stores which he knew were collected for the support of a provincial army. Wishing to accomplish this without bloodshed, he took every precaution to effect it by surprise, and without alarming the country.

EXHIBIT 19
0637

At eleven o'clock at night 800 grenadiers and light infantry, the flower of the royal army, embarked at the Common, landed at Phipps's farm, and marched for Concord, under the command of lieutenant colonel Smith. Neither the secrecy with which this expedition was planned—the privacy with which the troops marched out, nor an order that no one inhabitant should leave Boston, were sufficient to prevent intelligence from being sent to the country militia, of what was going on. About two in the morning 130 of the Lexington militia had assembled to oppose them, but the air being chilly and intelligence respecting the regulars uncertain, they were dismissed, with orders to appear again at beat of drum. They collected a second time to the number of 70, between 4 and 5 o'clock in the morning, and the British regulars soon after made their appearance. Major Pitcairn, who led the advanced corps, rode up to them and called out, "Disperse you [188] rebels, throw down your arms and disperse." They still continued in a body, on which he advanced nearer—discharged his pistol—and ordered his soldiers to fire.

April 18

19th

1775

This was done with a huzza. A dispersion of the militia was the consequence, but the firing of the regulars was nevertheless continued. Individuals finding they were fired upon, though dispersing, returned the fire. Three or four of the militia were killed on the green. A few more were shot after they had begun to disperse. The royal detachment proceeded on to Concord, and executed their commission. They disabled two 24 pounders—threw 500 lb. of ball into rivers and wells, and broke in pieces about 60 barrels of flour. Mr. John Butterick of Concord, major of a minute regiment, not knowing what had passed at Lexington, ordered his men not to give the first fire, that they might not be the aggressors. Upon his approaching near the regulars, they fired, and killed captain Isaac Davis, and one private of the provincial minute men. The fire was returned, and a skirmish ensued. The king's troops having done their business, began their retreat towards Boston. This was conducted with expedition, for the adjacent inhabitants had assembled in arms, and began to attack them in every direction. In their return to Lexington they were exceedingly annoyed, both by those who pressed on their rear, and others who pouring in from all sides, fired from behind stone walls, and such like coverts, which supplied the place of lines and redoubts. At Lexington the regulars were joined by a detachment of 900 men, under lord Piercy, which had been sent out by general Gage to support lieutenant colonel Smith. This reinforcement having two pieces of cannon awed the provincials, and kept them at a greater distance, but they continued a constant, though irregular and scattering fire, which did great execution. The close firing from behind the walls by good marksmen, put the regular troops in no small confusion, but they nevertheless kept up a brisk retreating fire on the militia and minute men.

A little after sunset the regulars reached Bunkers-hill, worn down with excessive fatigue, having marched that day between thirty and forty miles. On [189] the next day they crossed Charlestown ferry, and returned to Boston.

1775

There never were more than 400 provincials engaged at one time, and often not so many. As some tired and gave out, others came up and took their places. There was scarcely any discipline observed among them. Officers and privates fired when they were ready, and saw a royal uniform without waiting for the word of command. Their knowledge of the country enabled them to gain opportunities by crossing fields and

EXHIBIT 19
0638

fences, and to act as flanking parties against the king's troops who kept to the main road.

The regulars had 65 killed, 180 wounded, and 28 made prisoners. Of the provincials 50 were killed, and 38 wounded and missing.

As arms were to decide the controversy, it was fortunate for the Americans that the first blood was drawn in New-England. The inhabitants of that country are so connected with each other by descent, manners, religion, politics, and a general equality, that the killing of a single individual interested the whole, and made them consider it as a common cause. The blood of those who were killed at Lexington and Concord proved the firm cement of an extensive union.

To prevent the people within Boston from co-operating with their countrymen without in case of an assault which was now daily expected, General Gage agreed with a committee of the town, that upon the inhabitants lodging their arms in Faneuil-hall or any other convenient place, under the care of the selectmen, all such inhabitants as were inclined, might depart from the town, with their families and effects. In five days after the ratification of this agreement, the inhabitants had lodged 1778 fire arms, 634 pistols, 273 bayonets and 38 blunderbusses. The agreement was well observed in the beginning, but after a short time obstructions were thrown in the way of its final completion, on the plea that persons who went from Boston to bring in the goods of those who chose to continue within the town, were not properly treated. Congress remonstrated on the infraction of [190] the agreement, but without effect. The general, on a farther consideration of the consequences of moving the whigs out of Boston, evaded it in a manner not consistent with good faith. He was in some measure compelled to adopt this dishonourable measure, from the clamor of the tories, who alleged that none but enemies to the British government were disposed to remove, and that when they were all safe with their families and effects, the town would be set on fire. To prevent the provincials from obtaining supplies which they much wanted, a quibble was made on the meaning of the word effects, which was construed by the general as not including merchandize. By this construction, unwarranted by every rule of genuine interpretation, many who quitted the town were deprived of their usual resources for a support. Passports were not universally refused, but were given out very slowly, and the business was so conducted that families were divided—wives were separated from their husbands, children from their parents, and the aged and infirm from their relations and friends. The general discovered a disinclination to part with the women and children, thinking that, on their account, the provincials would be restrained from making an assault on the town. The select-men gave repeated assurances that the inhabitants had delivered up their arms, but as a cover for violating the agreement, general Gage issued a proclamation, in which he asserted that he had full proof to the contrary. A few might have secreted some favourite arms, but nearly all the training arms were delivered up. On this flimsy pretence the general sacrificed his honour, to policy and the clamors of the tories. Contrary to good faith he detained many, though fairly entitled by agreement to go out, and when he admitted the departure of others he would not allow them to remove their families and effects.

April 22

EXHIBIT 19
0639

The provincial congress of Massachusetts, which was in session at the time of the Lexington battle, dispatched an account of it to Great-Britain, accompanied with many depositions, to prove that the British troops were the aggressors. They also made an address to the inhabitants [191] of Great-Britain, in which, after complaining of their sufferings, they say, "these have not yet detached us from our royal sovereign; we profess to be his loyal and dutiful subjects, and though hardly dealt with, as we have been, are still ready with our lives and fortunes, to defend his person, crown, and dignity. Nevertheless, to the persecution and tyranny of his evil ministry, we will not tamely submit. Appealing to heaven for the justice of our cause, we determine to die or be free." From the commencement of hostilities, the dispute between Great-Britain and the colonies took a new direction.

1775

Intelligence that the British troops had marched out of Boston into the country on some hostile purpose, being forwarded by expresses from one committee to another, great bodies of the militia, not only from Massachusetts but the adjacent colonies, grasped their arms and marched to oppose them. The colonies were in such a state of irritability, that the least shock in any part was, by a powerful and sympathetic affection, instantaneously felt throughout the whole. The Americans who fell were revered by their countrymen, as martyrs who had died in the cause of liberty. Resentment against the British burned more strongly than ever. Martial rage took possession of the breasts of thousands. Combinations were formed and associations subscribed, binding the inhabitants to one another by the sacred ties of honour, religion, and love of country, to do whatever their public bodies directed for the preservation of their liberties. Hitherto the Americans had no regular army. From principles of policy they cautiously avoided that measure, least they might subject themselves to the charge of being aggressors. All their military regulations were carried on by their militia, and under the old established laws of the land. For the defence of the colonies, the inhabitants had been, from their early years, enrolled in companies, and taught the use of arms. The laws for this purpose had never been better observed than for some months previous to the Lexington battle. These military arrangements, which had been previously adopted for defending the colonies from hostile French and Indians, [192] were on this occasion turned against the troops of the Parent State. Forts, magazines, and arsenals, by the constitution of the country, were in the keeping of his majesty. Immediately after the Lexington battle, these were for the most part taken possession of throughout the colonies, by parties of the provincial militia. Ticonderoga, in which was a small royal garrison, was surprised and taken by adventurers from different states. Public money which had been collected in consequence of previous grants, was also seized for common services. Before the commencement of hostilities these measures would have been condemned by the moderate even among the Americans, but that event justified a bolder line of opposition than had been adopted. Sundry citizens having been put to death by British troops, self preservation dictated measures which, if adopted under other circumstances, would have disunited the colonists. One of the most important of this kind was the raising an army. Men of warm tempers, whose courage exceeded their prudence, had for months urged the necessity of raising troops; but they were restrained by the more moderate, who wished that the colonies might avoid extremities, or at least that they might not lead in

1775

EXHIBIT 19
0640

bringing them on. The provincial congress of Massachusetts being in session at the time the battle of Lexington was fought, voted that "an army of 30,000 men be immediately raised, that 13,600 be of their own province, and that a letter and delegate be sent to the several colonies of New-Hampshire, Connecticut and Rhode Island." In consequence of this vote, the business of recruiting was begun, and in a short time a provincial army was paraded in the vicinity of Boston, which though far below what had been voted by the provincial congress, was much superior in numbers to the royal army. The command of this force was given to general Ward.

Had the British troops confined themselves to Boston, as before the 18th of April, the assembling an American army, though only for the purpose of observation and defence, would have appeared in the nature of a challenge, and would have made many less willing to support [193] the people of Massachusetts, but after the British had commenced hostilities the same measure was adopted without subjecting the authors of it to censure, and without giving offence or hazarding the union. The Lexington battle not only furnished the Americans with a justifying apology for raising an army, but inspired them with ideas of their own prowess. Amidst the most animated declarations of sacrificing fortune, and risquing life itself for the security of American rights, a secret sigh would frequently escape from the breasts of her most determined friends, for fear that they could not stand before the bravery and discipline of British troops. Hoary sages would shake their heads and say, "Your cause is good and I wish you success, but I fear that your undisciplined valour must be overcome, in the unequal contest. After a few thousands of you have fallen, the provinces must ultimately bow to that power which has so repeatedly humbled France and Spain." So confident were the British of their superiority in arms, that they seemed desirous that the contest might be brought to a military decision. Some of the distinguished speakers in parliament had publicly asserted that the natives of America had nothing of the soldier in them, and that they were in no respect qualified to face a British army. European philosophers had published theories, setting forth that not only vegetables and beasts, but that even men degenerated in the western hemisphere. Departing from the spirit of true philosophy, they overlooked the state of society in a new world, and charged a comparative inferiority, on every production that was American. The colonists themselves had imbibed opinions from their forefathers, that no people on earth were equal to those with whom they were about to contend. Impressed with high ideas of British superiority, and dissident of themselves, their best informed citizens, though willing to run all risques, feared the consequence of an appeal to arms. The success that attended their first military enterprize, in some degree banished these suggestions. Perhaps in no subsequent battle did the Americans appear to greater advantage than in their first essay at Lexington.

It is almost without parallel [194] in military history, for the yeomanry of the country to come forward in a single disjointed manner, without order, and for the most part without officers, and by an irregular fire to put to flight troops equal in discipline to any in the world. In opposition to the bold assertions, of some, and the desponding fears of others, experience proved that Americans might effectually resist British troops. The dissident grew bold in their country's cause, and indulged in chearful hopes that heaven would finally crown their labours with success.

EXHIBIT 19
0641

Soon after the Lexington battle, and in consequence of that event, not only the arms, ammunition, forts and fortifications in the colonies were secured for the use of the provincials, but regular forces were raised, and money struck for their support. These military arrangements were not confined to the New-England states, but were general throughout the colonies. The determination of the king and parliament to enforce submission to their acts, and the news of the Lexington battle, came to the distant provinces nearly about the same time. It was supposed by many that the latter was in consequence of the former, and that general Gage had recent orders to proceed immediately to subdue the refractory colonists.

From a variety of circumstances the Americans had good reason to conclude that hostilities would soon be carried on vigorously in Massachusetts, and also to apprehend that, sooner or later, each province would be the theatre of war. "The more speedily therefore said they, we are prepared for that event, the better chance we have for defending ourselves." Previous to this period, or rather to the 19th of April 1775, the dispute had been carried on by the pen, or at most by associations and legislative acts; but from this time forward it was conducted by the sword. The crisis was arrived when the colonies had no alternative, but either to submit to the mercy, or to resist the power of Great-Britain. An unconquerable love of liberty could not brook the idea of submission, while reason more temperate in her decisions, suggested to the people their insufficiency to make effectual opposition.

They were fully apprized of the power [195] of Britain—they knew that her fleets covered the ocean, and that her flag had

1775

waved in triumph through the four quarters of the globe; but the animated language of the time was, "It is better to die freemen, than to live slaves." Though the justice of their cause, and the inspiration of liberty gave, in the opinion of disinterested judges a superiority to the writings of Americans, yet in the latter mode of conducting their opposition, the candid among themselves acknowledged an inferiority. Their form of government was deficient in that decision, dispatch, and coercion, which are necessary to military operations.

Europeans, from their being generally unacquainted with fire arms are less easily taught the use of them than Americans, who are from their youth familiar with these instruments of war; yet on other accounts they are more susceptible of military habits. The proportion of necessitous men in the new world is small to that in the old.

To procure subsistence is a powerful motive with an European to enlist, and the prospect of losing it makes him afraid to neglect his duty; but these incitements to the punctual discharge of military services, are wanting in America. In old countries the distinction of ranks and the submission of inferiors to superiors, generally takes place, but in the new world an extreme sense of liberty and equality indisposes to that implicit obedience which is the soul of an army. The same causes which nurtured a spirit of independence in the colonies, were hostile to their military arrangements. It was not only from the different state of society in the two countries, but from a variety of local causes, that the Americans were not able to contend in arms, on equal terms, with their Parent State. From the first settlement of the British colonies, agriculture and commerce, but especially the former, had been the favourite pursuits of their inhabitants. War was a business abhorrent from their usual habits of life. They had

EXHIBIT 19
0642

never engaged in it from their own motion, nor in any other mode than as appendages to British troops, and under British establishments. By these means the military spirit of the colonies had no opportunity of expanding itself.

At the commencement of hostilities, the British [196] troops possessed a knowledge of the science and discipline of war,

1775

which could be acquired only by a long series of application, and substantial establishments. Their equipments, their artillery, and every other part of their apparatus for war approached perfection. To these important circumstances was added a high national spirit of pride, which had been greatly augmented by their successes in their last contest with France and Spain. On the other hand the Americans were undisciplined, without experienced officers, and without the shadow of military establishments. In the wars which had been previously carried on, in or near the colonies, the provincials had been, by their respective legislatures, frequently added to the British troops, but the pride of the latter would not consider the former, who were without uniformity of dress, or the pertness of military airs, to be their equals. The provincial troops were therefore for the most part, assigned to services which, though laborious, were not honourable.

The ignorance of British generals commanding in the woods of America, sometimes involved them in difficulties from which they had been more than once relieved by the superior local knowledge of the colonial troops. These services were soon forgotten, and the moment the troops who performed them could be spared, they were disbanded. Such like obstacles had hitherto depressed military talents in America, but they were now overcome by the ardor of the people.

In the year 1775, a martial spirit pervaded all ranks of men in the colonies. They believed their liberties to be in danger, and were generally disposed to risque their lives for their establishment. Their ignorance of the military art, prevented their weighing the chances of war with that exactness of calculation which, if indulged, might have damped their hopes. They conceived that there was little more to do than fight manfully for their country. They consoled themselves with the idea, that though their first attempt might be unsuccessful; their numbers would admit of a repetition of the experiment, till the invaders were finally exterminated.

Not considering [197] that in modern war the longest purse decides oftener than the longest sword, they feared not the

1775

wealth of Britain. They both expected and wished that the whole dispute would be speedily settled in a few decisive engagements. Elevated with the love of liberty, and buoyed above the fear of consequences, by an ardent military enthusiasm, unabated by calculations about the extent, duration, or probable issue of the war, the people of America seconded the voice of their rulers, in an appeal to heaven for the vindication of their rights. At the time the colonies adopted these spirited resolutions, they possessed not a single ship of war, nor so much as an armed vessel of any kind. It had often been suggested that their seaport towns lay at the mercy of the navy of Great-Britain; this was both known and believed, but disregarded. The love of property was absorbed in the love of liberty. The animated votaries of the equal rights of human nature, consoled themselves with the idea that though their whole sea coast should be laid in ashes, they could retire to the western wilderness, and enjoy the luxury of being free; on this occasion it was observed in Congress by Christopher Gadsden, one

EXHIBIT 19
0643

of the South-Carolina delegates, "Our houses being constructed of brick, stone, and wood, though destroyed may be rebuilt, but liberty once gone is lost forever."

The sober discretion of the present age will more readily censure than admire, but can more easily admire than imitate the fervid zeal of the patriots of 1775, who in idea sacrificed property in the cause of liberty, with the ease that they now sacrifice almost every other consideration for the acquisition of property.

The revenues of Britain were immense, and her people were habituated to the payment of large sums in every form which contributions to government have assumed; but the American colonies possess neither money nor funds, nor were their people accustomed to taxes equal to the exigences of war. The contest having begun about taxation, to have raised money by taxes for carrying it on, would have been impolitic.

The temper of the times precluded the necessity of attempting the dangerous [198] expedient, for such was the enthusiasm of the day, that the colonists gave up both their personal services and their property to the public, on the vague promises that they should at a future time be reimbursed. Without enquiring into the solidity of funds, or the precise period of payment, the resources of the country were commanded on general assurances, that all expences of the war should ultimately be equalised. The Parent State abounded with experienced statesmen and officers, but the dependent form of government exercised in the colonies, precluded their citizens from gaining that practical knowledge which is acquired from being at the head of public departments. There were very few in the colonies who understood the business of providing for an army, and still fewer who had experience and knowledge to direct its operations. The disposition of the finances of the country, and the most effectual mode of drawing forth its resources, were subjects with which scarce any of the inhabitants were acquainted. Arms and ammunition were almost wholly deficient; and though the country abounded with the materials of which they are manufactured, yet there was neither time nor artists enough to supply an army with the means of defence. The country was destitute both of fortifications and engineers. Amidst so many discouragements there were some flattering circumstances. The war could not be carried on by Great-Britain, but to a great disadvantage, and at an immense expence. It was easy for ministers at St. James's to plan campaigns, but hard was the fate of the officer from whom the execution of them in the woods of America was expected. The country was so extensive, and abounded so much with defiles; that by evacuating and retreating, the Americans though they could not conquer, yet might save themselves from being conquered. The authors of the acts of parliament for restraining the trade of the colonies, were most excellent recruiting officers for the Congress. They imposed a necessity on thousands to become soldiers. All other business being suspended, the whole resources of the country were applied in supporting an army.

Though [199] the colonists were without discipline, they possessed native valour. Though they had neither gold nor silver, they possessed a mine in the enthusiasm of their people. Paper for upwards of two years produced to them more solid advantages than Spain derived from her superabounding precious metals. Though they had no ships to protect their trade or their towns, they had simplicity enough to live without the former, and enthusiasm

EXHIBIT 19
0644

enough to risque the latter, rather than submit to the power of Britain. They believed their cause to be just, and that heaven approved their exertions in defence of their rights. Zeal originating from such motives, supplied the place of discipline, and inspired a confidence and military ardor which overleaped all difficulties.

Resistance being resolved upon by Americans—the pulpit—the press—the bench and the bar, severally laboured to unite and encourage them. The clergy of New-England were a numerous, learned and respectable body, who had a great ascendancy over the minds of their hearers. They connected religion and patriotism, and in their sermons and prayers, represented the cause of America as the cause of heaven. The synod of New-York and Philadelphia, also sent forth a pastoral letter, which was publicly read in their churches. This earnestly recommended such sentiments and conduct as were suitable to their situation. Writers and printers followed in the rear of the preachers, and next to them had the greatest hand in animating their countrymen. Gentlemen of the bench and of the bar denied the charge of rebellion, and justified the resistance of the colonists. A destinction founded on law, between the king and his ministry, was introduced. The former, it was contended, could do no wrong. The crime of treason was charged on the latter, for using the royal name to varnish their own unconstitutional measures. The phrase of a ministerial war became common, and was used as a medium for reconciling resistance with allegiance.

Coeval with the resolutions for organizing an army, was one appointing the 20th day of July, 1775, a day of public humiliation, fasting and prayer to Almighty God, [200] ["]to bless their rightful sovereign king George, and to inspire him with wisdom to discern and pursue the true interest of his subjects; and that the British nation might be influenced to regard the things that belonged to her peace, before they were hid from her eyes—that the colonies might be ever under the care and protection of a kind providence, and be prospered in all their interests—that America might soon behold a gracious interposition of heaven, for the redress of her many grievances; the restoration of her invaded rights, a reconciliation with the Parent State, on terms constitutional and honourable to both." The forces which had been collected in Massachusetts, were stationed in convenient places for guarding the country from farther excursions of the regulars from Boston. Breast works were also erected in different places for the same purpose. While both parties were attempting to carry off stock from the several islands with which the bay of Boston is agreeably diversified, sundry skirmishes took place. These were of real service to the Americans. They habituated them to danger, and perhaps much of the courage of old soldiers, is derived from an experimental conviction, that the chance of escaping unhurt from engagements is much greater than young recruits suppose.

About the latter end of May a great part of the reinforcements ordered from Great-Britain, arrived at Boston.

Three British generals, Howe, Burgoyne and Clinton, whose behaviour in the preceding war had gained them great reputation, | May 25 |

also arrived about the same time. General Gage, thus reinforced, prepared for acting with more decision, but before he proceeded to extremities he conceived it due to ancient forms to issue a proclamation, holding forth to the inhabitants the alternative of peace or war.

EXHIBIT 19
0645

He therefore offered pardon in the king's name to all who should forthwith lay down their arms, and return to their respective

June 12

occupations and peaceable duties, excepting only from the benefit of that pardon "Samuel Adams, and John Hancock, whose offences were said to be of too flagitious a nature to admit of any other consideration than that of condign punishment."

He also [201] proclaimed that not only the persons above named and excepted, but also their adherents, associates, and

1775

correspondents, should be deemed guilty of treason and rebellion, and treated accordingly. By this proclamation it was also declared "that as the courts of judicature were shut, martial law should take place, till a due course of justice should be re-established." It was supposed that this proclamation was a prelude to hostilities, and preparations were accordingly made by the Americans. A considerable height, by the name of Bunkers-hill, just at the entrance of the peninsula of Charlestown, was so situated as to make the possession of it a matter of great consequence, to either of the contending parties.

Orders were therefore issued by the provincial commanders that a detachment of a thousand men should intrench upon this

June 16

height. By some mistake Breed's-hill, high and large like the other, but situated nearer Boston, was marked out for the intrenchments, instead of Bunkers-hill. The provincials proceeded to Breed's-hill and worked with so much diligence, that between midnight and the dawn of the morning, they had thrown up a small redoubt about 8 rods square. They kept such a profound silence that they were not heard by the British, on board their vessels, though very near. These having derived their first information of what was going on from the sight of the work near completion, began an incessant firing upon them. The provincials bore this with firmness, and though they were only young soldiers continued to labour till they had thrown up a small breastwork, extending from the east side of the redoubt to the bottom of the hill. As this eminence overlooked Boston general Gage thought it necessary to drive the provincials from it.

About noon therefore he detached major general Howe and brig. general Pigot, with the flower of his army, consisting of four

June 17

battalions, ten companies of the grenadiers and ten of light infantry, with a proportion of field artillery, to effect this business. These troops landed at Moreton's point, and formed after landing, but remained in that position till they were reinforced by a second detachment of light infantry and grenadier companies, a battalion of land forces and a battalion of marines, [202] making in the whole nearly 3000 men.

While the troops who first landed were waiting for this reinforcement, the provincials for their farther security, pulled up

1775

some adjoining post and rail fences, and set them down in two parallel lines at a small distance from each other, and filled the space between with hay, which having been lately mowed, remained on the adjacent ground.

The king's troops formed in two lines, and advanced slowly, to give their artillery time to demolish the American works. While the British were advancing to the attack, they received orders to burn Charlestown. This was not done because they were fired upon from the houses in that town, but from the military policy of depriving enemies of a cover in their approaches. In a short time this ancient town, consisting of about 500 buildings, chiefly of wood, was in one great blaze. The lofty steeple of the

EXHIBIT 19
0646

meeting house formed a pyramid of fire above the rest, and struck the astonished eyes of numerous beholders with a magnificent but awful spectacle. In Boston the heights of every kind were covered with the citizens, and such of the king's troops as were not on duty. The hills around the adjacent country which afforded a safe and distinct view, were occupied by the inhabitants of the country.

Thousands, both within and without Boston, were anxious spectators of the bloody scene. The honour of British troops beat high in the breasts of many, while others with a keener sensibility, felt for the liberties of a great and growing country. The British moved on but slowly, which gave the provincials a better opportunity for taking aim. The latter in general reserved themselves till their adversaries were within ten or twelve rods, but then began a furious discharge of small arms. The stream of the American fire was so incessant, and did so great execution that the king's troops retreated in disorder and precipitation. Their officers rallied them and pushed them forward with their swords, but they returned to the attack with great reluctance. The Americans again reserved their fire till their adversaries were near, and then put them a second time to flight.

General Howe and the officers redoubled their exertions, and were again [203] successful, though the soldiers discovered a

1775

great aversion to going on. By this time the powder of the Americans began so far to fail that they were not able to keep up the same brisk fire as before. The British also brought some cannon to bear which raked the inside of the breast work from end to end. The fire from the ships, batteries, and field artillery was redoubled—the soldiers in the rear were goaded on by their officers. The redoubt was attacked on three sides at once. Under these circumstances a retreat from it was ordered, but the provincials delayed, and made resistance with their discharged muskets as if they had been clubs, so long that the king's troops who easily mounted the works had half filled the redoubt before it was given up to them.

While these operations were going on at the breast work and redoubt, the British light infantry were attempting to force the left point of the former, that they might take the American line in flank. Though they exhibited the most undaunted courage, they met with an opposition which called for its greatest exertions. The provincials here, in like manner, reserved their fire till their adversaries were near, and then poured it upon the light infantry, with such an incessant stream, and in so true a direction as mowed down their ranks. The engagement was kept up on both sides with great resolution. The persevering exertions of the king's troops could not compel the Americans to retreat, till they observed that their main body had left the hill. This, when begun, exposed them to new danger, for it could not be effected but by marching over Charlestown neck, every part of which was raked by the shot of the Glasgow man of war, and of two floating batteries. The incessant fire kept up across this neck prevented any considerable reinforcement from joining their countrymen who were engaged; but the few who fell on their retreat, over the same ground proved, that the apprehensions of those provincial officers who declined passing over to succour their companions, were without any solid foundation.

The number of Americans engaged, amounted only to 1500.

EXHIBIT 19
0647

It was apprehended that the conquerors would [204] push the advantage they had gained, and march immediately to American

1775

head quarters at Cambridge, but they advanced no farther than Bunker's-hill. There they threw up works for their own security. The provincials did the same on Prospect-hill in front of them. Both were guarding against an attack, and both were in a bad condition to receive one. The loss of the peninsula depressed the spirits of the Americans, and their great loss of men produced the same effect on the British. There have been few battles in modern wars, in which all circumstances considered, there was a greater destruction of men than in this short engagement. The loss of the British, as acknowledged by general Gage, amounted to 1054. Nineteen commissioned officers were killed, and 70 more were wounded. The battle of Quebec in 1759, which gave Great-Britain the province of Canada, was not so destructive to British officers as this affair of a slight intrenchment, the work only of a few hours. That the officers suffered so much, must be imputed to their being aimed at. None of the provincials in this engagement were riflemen, but they were all good marksmen. The whole of their previous military knowledge had been derived, from hunting, and the ordinary amusements of sportsmen. The dexterity which by long habit they had acquired in hitting beasts, birds, and marks, was fatally applied to the destruction of British officers. From their fall much confusion was expected. They were therefore particularly singled out. Most of those who were near the person of general Howe were either killed or wounded, but the general, though he greatly exposed himself, was unhurt. The light infantry and grenadiers lost three-fourths of their men. Of one company not more than five, and of another, not more than fourteen escaped. The unexpected resistance of the Americans was such as wiped away the reproaches of cowardice, which had been cast on them by their enemies in Britain. The spirited conduct of the British officers merited and obtained great applause, but the provincials were justly entitled to a large

1775

portion of the same, for having made the utmost exertions of their adversaries necessary to dislodge them [205] from lines, which were the work only of a single night.

The Americans lost five pieces of cannon. Their killed amounted to 139. Their wounded and missing to 314. Thirty of the former fell into the hands of the conquerors. They particularly regretted the death of general Warren. To the purest patriotism and most undaunted bravery, he added the virtues of domestic life, the eloquence of an accomplished orator, and the wisdom of an able statesman. Nothing but a regard to the liberty of his country induced him to oppose the measures of government. He aimed not at a separation from, but a coalition with the Mother Country. He took an active part in defence of his country, not that he might be applauded and rewarded for a patriotic spirit, but because he was, in the best sense of the word, a real patriot. Having no interested or personal views to answer the friends of liberty, confided in his integrity. The soundness of his judgment, and his abilities as a public speaker, enabled him to make a distinguished figure in public councils, but his intrepidity and active zeal, induced his countrymen to place him in the military line. Within four days after he was appointed a major general, he fell a noble sacrifice to a cause which he had espoused from the purest principles. Like Hambden he lived and like Hambden he died, universally beloved and universally regretted. His many virtues were celebrated in an elegant eulogium written by Dr. Rush, in language equal

EXHIBIT 19
0648

to the illustrious subject. The burning of Charlestown, though a place of great trade did not discourage the provincials. It excited resentment and execration, but not any disposition to submit. Such was the high toned state of the public mind, and so great the indifference for property when put in competition with liberty, that military conflagrations, though they distressed and impoverished, had no tendency to subdue the colonists. They might answer in the old world, but were not calculated for the new, where the war was undertaken, not for a change of masters, but for securing essential rights. The action at Breed's-hill, or Bunker's-hill, as it has been commonly called, produced many and very important [206] consequences.

It taught the British so much respect for Americans intrenched behind works, that their subsequent operations were retarded

<div style="border:1px solid; background:yellow; display:inline-block">1775</div>

with a caution that wasted away a whole campaign, to very little purpose. It added to the confidence the Americans began to have in their own abilities, but inferences, very injurious to the future interests of America, were drawn from the good conduct of the new troops on that memorable day. It inspired some of the leading members of Congress, with such high ideas of what might be done by militia, or men engaged for a short term of enlistment, that it was long before they assented to the establishment of a permanent army. Not distinguishing the continued exertions of an army through a series of years, from the gallant efforts of the yeomanry of the country, led directly to action, they were slow in admitting the necessity of permanent troops. They conceived the country might be defended by the occasional exertions of her sons, without the expence and danger of an army engaged for the war. In the progress of hostilities, as will appear in the sequel, the militia lost much of their first ardor, while leading men in the councils of America, trusting to its continuance, neglected the proper time of recruiting for a series of years. From the want of perseverance in the militia, and the want of a disciplined standing army, the cause for which arms were at first taken up, was more than once brought to the brink of destruction.

EXHIBIT 19
0649

[Back to Table of Contents]

# CHAPTER VII

## The Second Congress Meets And Organises A Regular Continental Army—Makes Sundry Public Addresses, And Petitions The King, &C. Transactions In Massachusetts.

It has already been mentioned, that Congress previous to its dissolution, on the 26th of October, 1774, recommended to the colonies, to chuse members for another to meet on the tenth of May 1775, unless the redress of their grievances was previously obtained. A circular letter had been addressed by lord Dartmouth, to the [207] several colonial governors, requesting their interference to prevent the meeting of this second Congress: but ministerial requisitions had lost their influence, delegates were elected not only for the twelve colonies that were before represented, but also for the parish of St. John's in Georgia, and in July following, for the whole province. The time of the meeting of this second Congress was fixed at so distant a day, that an opportunity might be afforded for obtaining information of the plans adopted by the British parliament in the winter of 1774, 1775. Had these been favourable, the delegates would either not have met, or dispersed after a short session, but as the resolution was then fixed to compel the submission of the colonies, and hostilities had already commenced, the meeting of Congress on the tenth of May, which was at first eventual, became fixed.

| 1775 |

On their meeting, they chose Peyton Randolph for their President, and Charles Thomson for their secretary. On the next day Mr. Hancock laid before them a variety of depositions, proving that the king's troops were the aggressors in the late battle at Lexington, together with sundry papers relative to the great events which had lately taken place in Massachusetts: Whereupon Congress resolved itself into a committee of the whole, to take into consideration the state of America. They proceeded in the same line of moderation and firmness, which marked the acts of their predecessors in the past year.

| May 10 |

The city and county of New-York having applied to Congress for advice, how they should conduct themselves with regard to the troops expected to land there, they were advised "to act on the defensive so long as might be consistent with their safety—to permit the troops to remain in the barracks, so long as they behaved peaceably, but not to suffer fortifications to be erected, or any steps to be taken for cutting off the communication between the town and country." Congress also resolved, "That exportation to all parts of British America, which had not adopted their association, should immediately cease;" and that, "no provision of any kind, or other necessaries be furnished to the British fisheries on the American [208] coasts." And

| May 15 |

| May 17 |

| 1775 |

that no bill of exchange, draught, or order, of any officer in the British army or navy, their agents or contractors, be received or

| June 2 |

153

EXHIBIT 19
0650

negociated, or any money supplied them, by any person in America—that no provisions or necessaries of any kind, be furnished or supplied, to or for the use of the British army or navy, in the colony of Massachusetts Bay—that no vessel employed in transporting British troops to America, or from one part of North-America to another, or warlike stores or provisions for said troops, be freighted or furnished with provisions or any necessaries.

These resolutions may be considered as the counterpart of the British acts for restraining the commerce, and prohibiting the fisheries of the colonies. They were calculated to bring distress on the British islands in the West-Indies, whose chief dependence for subsistance, was on the importation of provision from the American continent. They also occasioned new difficulties in the support of the British army and fisheries. The colonists were so much indebted to Great-Britain, that government bills for the most part found among them a ready market. A war in the colonies was therefore made subservient to commerce, by increasing the sources of remittance. This enabled the Mother Country, in a great degree, to supply her troops without shipping money out of the kingdom. From the operation of these resolutions, advantages of this nature were not only cut off, but the supply of the British army rendered both precarious and expensive. In consequence of the interdiction of the American fisheries, great profits were expected by British adventurers in that line. Such frequently found it most convenient to obtain supplies in America for carrying on their fisheries; but as Great-Britain had deprived the colonists of all benefits from that quarter, they now in their turn, interdicted all supplies from being furnished to British fishermen. To obviate this unexpected embarrassment, several of the vessels employed in this business, were obliged to return home, to bring out provisions for their associates. These restrictive resolutions, were not so much the effect of resentment as of policy.

The colonists conceived, that [209] by distressing the British commerce, they would encrease the number of those who would interest themselves in their behalf.

1775

The new Congress had convened but a few days when their venerable president Peyton Randolph, was under a necessity of returning home. On his departure John Hancock was unanimously chosen his successor. The objects of deliberation presented to this new Congress were, if possible, more important than those which in the preceding year, had engaged the attention of their predecessors. The colonists had now experienced the inefficacy of those measures, from which relief had been formerly obtained. They found a new parliament disposed to run all risques in inforcing their submission. They also understood that administration was united against them, and its members firmly established in their places. Hostilities were commenced. Reinforcements had arrived, and more were daily expected. Added to this, they had information that their adversaries had taken measures to secure the friendship and co-operation of the Indians; and also of the Canadians.

The coercion of the colonies being resolved upon, and their conquest supposed to be inevitable, the British ministry judged that it would be for the interest of both countries to proceed in that vigorous course, which bid fairest for the speediest

EXHIBIT 19
0651

attainment of their object. They hoped by pressing the colonists on all quarters, to intimidate opposition, and ultimately to lessen the effusion of human blood.

In this awful crisis Congress had but a choice of difficulties. The New-England states had already organized an army and blockaded general Gage. To desert them would have been contrary to plighted faith and to sound policy. To support them would make the war general, and involve all the provinces in one general promiscuous state of hostility. The resolution of the people in favour of the latter was fixed, and only wanted public sanction for its operation.

Congress therefore resolved, "that for the express purpose of defending and securing the colonies, and preserving them in safety, against [210] all attempts to carry the late acts of a parliament into execution, by force of arms,

May 26

they be immediately put in a state of defence; but as they wished for a restoration of the harmony formerly subsisting between the Mother Country and the colonies, to the promotion of this most desirable reconciliation, an humble and dutiful petition be presented to his majesty." To resist and to petition were coeval resolutions. As freemen they could not tamely submit, but as loyal subjects, wishing for peace as far as was compatible with their rights, they once more, in the character of petitioners, humbly stated their grievances to the common father of the empire. To dissuade the Canadians from co-operating with the British, they again addressed them, representing the pernicious tendency of the Quebec act, and apologizing for their taking Ticonderoga and Crown-Point, as measures which were dictated by the great law of self preservation. About the same time Congress took measures for warding off the danger that threatened their frontier inhabitants from Indians. Commissioners to treat with them were appointed, and a supply of goods for their use was ordered. A talk was also prepared by Congress, and transmitted to them, in which the controversy between Great-Britain and her colonies was explained, in a familiar Indian style. They were told that they had no concern in the family quarrel, and were urged by the ties of ancient friendship and a common birth place, to remain at home, keep their hatchet buried deep, and to join neither side.

1775

The novel situation of Massachusetts made it necessary for the ruling powers of that province to ask the advice of Congress on a very interesting subject, "The taking up and exercising the powers of civil government." For many months they had been kept together in tolerable peace and order by the force of ancient habits, under the simple style of recommendation and advice from popular bodies, invested with no legislative authority. But as war now raged in their borders, and a numerous army was actually raised, some more efficient form of government became necessary.

At this early day it neither [211] comported with the wishes nor the designs of the colonists to erect forms of government independent of Great-Britain, Congress therefore recommended only such regulations as were immediately necessary, and these were conformed as near as possible to the spirit and substance of the charter, and were only to last till a governor of his majesty's appointment would consent to govern the colony according to its charter.

1775

On the same principles of necessity, another assumption of new powers became unavoidable. The great intercourse that daily took place throughout the colonies,

EXHIBIT 19
0652

pointed out the propriety of establishing a general post-office. This was accordingly done, and Dr. Franklin, who had by royal authority been dismissed from a similar employment about three years before, was appointed by his country, the head of the new department.

While Congress was making arrangements for their proposed continental army, it was thought expedient once more to address the inhabitants of Great-Britain, and to publish to the world a declaration setting forth their reasons for taking up arms—to address the speaker and gentlemen of the assembly of Jamaica, and the inhabitants of Ireland, and also to prefer a second humble petition to the king. In their address to the inhabitants of Great-Britain, they again vindicated themselves from the charge of aiming at independency, professed their willingness to submit to the several acts of trade and navigation which were passed before the year 1763, recapitulated their reasons for rejecting lord North's conciliatory motion—stated the hardships they suffered from the operations of the royal army in Boston, and insinuated the danger the inhabitants of Britain would be in of losing their freedom, in case their American brethren were subdued.

In their declaration, setting forth the causes and necessity of their taking up arms, they enumerated the injuries they had received, and the methods taken by the British ministry to compel their submission, and then said,
"We are reduced to the alternative of choosing an unconditional submission to the tyranny of irritated ministers, or [212] resistance by force. The latter is our choice. We have counted the cost of this contest, and find nothing so dreadful as voluntary slavery." They asserted "that foreign assistance was undoubtedly attainable." This was not founded on any private information, but was an opinion derived from their knowledge of the principles of policy, by which states usually regulate their conduct towards each other.

1775

In their address to the speaker and gentlemen of the assembly of Jamaica, they dilated on the arbitrary systems of the British ministry, and informed them that in order to obtain a redress of their grievances, they had appealed to the justice, humanity, and interest of Great-Britain. They stated, that to make their schemes of non-importation and non-exportation produce the desired effects, they were obliged to extend them to the islands. "From that necessity, and from that alone, said they, our conduct has proceeded." They concluded with saying, "the peculiar situation of your island forbids your assistance, but we have your good wishes—from the good wishes of the friends of liberty and mankind we shall always derive consolation."

In their address to the people of Ireland they recapitulated their grievances, stated their humble petitions, and the neglect with which they had been treated. "In defence of our persons and properties under actual violations, said they, we have taken up arms. When that violence shall be removed, and hostilities cease on the part of the aggressors, they shall cease on our part also."

These several addresses were executed in a masterly manner, and were well calculated to make friends to the colonies. But their petition to the king, which was drawn up at the same time, produced more solid advantages in favour of the American

EXHIBIT 19
0653

cause, than any other of their productions. This was in a great measure carried through Congress by Mr. Dickinson.

Several members, judging from the violence with which parliament proceeded against the colonies, were of opinion that

1775

farther petitions were nugatory; but this worthy citizen, a friend to both countries, and devoted to a reconciliation on [213] constitutional principles, urged the expediency and policy of trying once more the effect of an humble, decent, and firm petition, to the common head of the empire. The high opinion that was conceived of his patriotism and abilities, induced the members to assent to the measure, though they generally conceived it to be labour lost. The petition agreed upon was the work of Mr. Dickinson's pen. In this, among other things, it was stated,

that notwithstanding their sufferings, they had retained too high a regard for the kingdom from which they derived their origin, to

July 8

request such a reconciliation as might in any manner be inconsistent with her dignity and welfare. Attached to his majesty's person, family, and government, with all the devotion that principle and affection can inspire, connected with Great-Britain by the strongest ties that can unite society, and deploring every event that tended in any degree to weaken them, they not only most fervently desired the former harmony between her and the colonies to be restored, but that a concord might be established between them, upon so firm a basis as to perpetuate its blessings, uninterrupted by any future dissentions, to succeeding generations, in both countries. They therefore beseeched that his majesty would be pleased to direct some mode by which the united applications of his faithful colonists to the throne, in pursuance of their common councils, might be improved into a happy and permanent reconciliation.

By this last clause Congress meant that the Mother Country should propose a plan for establishing by compact, something like Magna Charta for the colonies. They did not aim at a total exemption from the controul of parliament, nor were they unwilling to contribute in their own way, to the expences of government; but they feared the horrors of war less than submission to unlimited parliamentary supremacy. They wished for an amicable compact, in which doubtful, undefined points, should be ascertained so as to secure that proportion of authority and liberty which would be for the general good of the whole empire. They fancied themselves in the condition of the barons at Runnymede; but with this difference, that in [214] addition to opposing the king, they had also to oppose the parliament.

This difference was more nominal than real, for in the latter case the king and parliament stood precisely in the same relation to

1775

the people of America, which subsisted in the former between the king and people of England. In both, popular leaders were contending with the sovereign for the privileges of subjects. This well meant petition was presented on September 1st, 1775, by Mr. Penn and Mr. Lee, and on the 4th lord Dartmouth informed them, "that to it no answer would be given." This slight contributed not a little to the union and perseverance of the colonists. When pressed by the calamities of war, a doubt would sometimes arise in the minds of scrupulous persons, that they had been too hasty in their opposition to their protecting Parent State. To such it was usual to present the second petition of Congress to the king, observing thereon, that all the blood and all the guilt of the war, must be charged on British, and not on American counsels.

EXHIBIT 19
0654

Though the colonists were accused in a speech from the throne, as meaning only, "to amuse by vague expressions of attachment to the Parent State, and the strongest protestations of loyalty to their king, while they were preparing for a general revolt, and that their rebellious war was manifestly carried on for the purpose of establishing an independent empire." Yet at that time, and for months after, a redress of grievances was their ultimate aim. Conscious of this intention, and assenting in the sincerity of their souls to the submissive language of their petition, they illy brooked the contempt with which their joint supplication was treated, and still worse, that they should be charged from the throne with studied duplicity. Nothing contributes more to the success of revolutions than moderation. Intemperate zealots overshoot themselves, and soon spend their force, while the calm and dispassionate persevere to the end. The bulk of the people in civil commotions are influenced to a choice of sides, by the general complexion of the measures adopted by the respective parties. When these appear to be dictated by justice and prudence, and to be [215] uninfluenced by passion, ambition or avarice, they are disposed to favour them. Such was the effect of this second petition, through a long and trying war, in which men of serious reflection were often called upon to examine the rectitude of their conduct.

Oct. 26

Though the refusal of an answer to this renewed application of Congress to the king, was censured by numbers in Great-Britain, as well as in the colonies, yet the partisans of ministry varnished the measure as proper and expedient. They contended that the petition, as it contained no offers of submission, was unavailing, as a ground work of negociation. Nothing was farther from the thoughts of Congress than such concessions as were expected in Great-Britain. They conceived themselves to be more sinned against than sinning. They claimed a redress of grievances as a matter of right, but were persuaded that concessions for this purpose were acts of justice and not of humiliation, and therefore could not be disgraceful to those by whom they were made. To prevent future altercations they wished for an amicable compact to ascertain the extent of parliamentary supremacy. The Mother Country wished for absolute submission to her authority, the colonists for a repeal of every act that imposed taxes, or that interfered in their internal legislation. The ministry of England being determined not to repeal these acts, and the Congress equally determined not to submit to them, the claims of the two countries were so wide of each other as to afford no reasonable ground to expect a compromise. It was therefore concluded, that any notice taken of the petition would only afford an opportunity for the colonies to prepare themselves for the last extremity.

A military opposition to the armies of Great-Britain being resolved upon by the colonies, it became an object of consequence to fix on a proper person to conduct that opposition.

Many of the colonists had titles of high rank in the militia, and several had seen something of real service, in the late war between France and England; but there was no individual of such superior military experience as to entitle him to a decided pre-eminence, or even [216] to qualify him, on that ground, to contend on equal terms with the British masters of the art of war. In elevating one man, by the free voice of an invaded country, to the command of thousands of his equal fellow citizens, no consideration was regarded but the interest

1775

EXHIBIT 19
0655

of the community. To bind the uninvaded provinces more closely to the common cause, policy directed the views of Congress to the south.

Among the southern colonies Virginia, for numbers, wealth, and influence, stood pre-eminent. To attach so respectable a colony to the aid of Massachusetts, by selecting a commander in chief from that quarter, was not less warranted by the great military genius of one of her distinguished citizens, than dictated by sound policy. George Washington was, by an unanimous vote appointed, commander in chief of all the forces raised, or to be raised, for the defence of the colonies. It was a fortunate circumstance attending his election, that it was accompanied with no competition, and followed by no envy. That same general impulse on the public mind, which led the colonists to agree in many other particulars, pointed to as the most proper person for presiding over the military arrangements of America. Not only Congress but the inhabitants in the east and the west, in the north and, the south, as well before as at the time of embodying a continental army were in a great degree unanimous in his favour. An attempt to draw the character of this truly great man would look like flattery. Posterity will doubtless do it justice. His actions, especially now, while fresh in remembrance, are his amplest panegyric. Suffice it, in his life time, only to particularise those qualities, which being more common, may be mentioned without offending the delicate sensibility of the most modest of men.

> June 15

General Washington was born on the 11th of February 1732. His education was such as favoured the production of a solid mind and a vigorous body. Mountain air, abundant exercise in the open country—the wholesome toils of the chace, and the delightful scenes of rural life, expanded his limbs to an unusual but graceful [217] and well proportioned size. His youth was spent in the acquisition of useful knowledge, and in pursuits, tending to the improvement of his fortune, or the benefit of his country. Fitted more for active, than for speculative life, he devoted the greater proportion of his time to the latter, but this was amply compensated by his being frequently in such situations, as called forth the powers of his mind, and strengthened them by repeated exercise. Early in life, in obedience to his country's call, he entered the military line, and began his career of fame in opposing that power in concert with whose troops, he acquired his last and most distinguished honours. He was with general Braddock in 1755, when that unfortunate officer from an excess of bravery, chose rather to sacrifice his army than retreat from an unseen foe. The remains of that unfortunate corpse were brought off the field of battle chiefly by the address and good conduct of colonel Washington. After the peace of Paris 1763, he retired to his estate, and with great industry and success pursued the arts of peaceful life. When the proceedings of the British parliament alarmed the colonists with apprehensions that a blow was levelled at their liberties, he again came forward into public view, and was appointed a delegate to the Congress, which met in September 1774. Possessed of a large proportion of common sense directed by a sound judgment, he was better fitted for the exalted station to which he was called, than many others who to a greater brilliancy of parts frequently add the eccentricity of original genius. Engaged in the busy scenes of life, he knew human nature, and the most proper method of accomplishing proposed objects. His passions were subdued and kept in subjection to reason. His soul superior to party spirit, to prejudice and illiberal views,

> 1775

EXHIBIT 19
0656

moved according to the impulses it received from an honest heart, a good understanding, common sense, and a sound judgment. He was habituated to view things on every side, to consider them in all relations, and to trace the possible and probable consequences of proposed measures. Much addicted to close thinking, his mind was constantly employed.

By frequent exercise, [218] his understanding and judgment expanded so as to be able to discern truth, and to know what was proper to be done in the most difficult conjunctures.

1775

Soon after general Washington was appointed commander in chief of the American army. Four major generals, one adjutant general, with the rank of a brigadier, and eight brigadiers general were appointed in subordination to him which were as follows.

lst. Major General Artemas Ward
2d.               Charles Lee
3d.               Philip Schuyler
4th.              Israel Putnam
Adjutant General  Horatio Gates

The 8 Brigadiers were

1st. Seth Pomeroy
2d.  Richard Montgomery
3d.  David Wooster
4th. William Heath
5th. Joseph Spencer
6th. John Thomas
7th. John Sullivan
8th. Nathaniel Greene

General Washington replied to the president of Congress, announcing his appointment in the following words.

Mr. President,

Though I am truly sensible of the high honour done me in this appointment, yet, I feel great distress from a consciousness, that my abilities and military experience may not be equal to the extensive and important trust: however as the Congress desire it, I will enter upon the momentous duty, and exert every power I possess in their service, and for support of the glorious cause. I beg they will accept my most cordial thanks for this distinguished testimony of their approbation.

But, lest some unlucky event should happen unfavourable to my reputation, I beg it may be remembered by every gentleman in the room, that I this day declare with the utmost sincerity, I do not think myself equal to the command I am honoured with.

**EXHIBIT 19**
**0657**

[219]

As to pay sir, I beg leave to assure the Congress, that as no pecuniary consideration could have tempted me to accept this arduous employment, at the expence of my domestic ease and happiness, I do not wish to make any profit from it. I will keep an exact account of my expences. Those I doubt not they will discharge, and that is all I desire.

1775

A special commission was drawn up and presented to him, and at the same time an unanimous resolution was adopted by Congress, "That they would maintain and assist him, and adhere to him with their lives and fortunes in the cause of American liberty." Instructions were also given him for his government, by which after reciting various particulars he was directed, "to destroy or make prisoners of all persons who now are, or who hereafter shall appear in arms against the good people of the colonies:" but the whole was summed up in authorizing him "to order and dispose of the army under his command as might be most advantageous for obtaining the end for which it had been raised, making it his special care in discharge of the great trust committed to him, that the liberties of America received no detriment."

About the same time twelve companies of riflemen were ordered to be raised in Pennsylvania, Maryland and Virginia. The men to the amount of 1430 were procured and forwarded with great expedition. They had to march from 4 to 700 miles, and yet the whole business was compleated and they joined the American army at Cambridge, in less than two months from the day on which the first resolution for raising them was agreed to.

June 14–22

Coeval with the resolution for raising an army, was another for emitting a sum not exceeding two millions of Spanish milled dollars in bills of credit for the defence of America, and the colonies were pledged for the redemption of them. This sum was increased from time to time by farther emissions. The colonies having neither money nor revenues at their command, were forced to adopt this expedient, the only one which was in their power for supporting an army.

June 22

No one delegate [220] opposed the measure. So great had been the credit of the former emissions of paper in the greater part of the colonies, that very few at that time foresaw or apprehended the consequences of unfunded paper emissions, but had all the consequences which resulted from this measure in the course of the war been forseen, it must notwithstanding have been adopted, for it was a less evil, that there should be a general wreck of property, than that the essential rights and liberties of a growing country should be lost. A happy ignorance of future events combined with the ardor of the times, prevented many reflections on this subject, and gave credit and circulation to these bills of credit.

1775

General Washington soon after his appointment to the command of the American army set out for the camp at Cambridge. On his way thither, he received an address from the provincial congress of New-York, in which they expressed their joy at his appointment. They also said, "we have the fullest assurances that whenever this important contest shall be decided by that fondest wish of each American soul, an accommodation with our Mother Country, you will chearfully resign the important

EXHIBIT 19
0658

deposit committed into your hands, and re-assume the character of our worthiest citizen.["] The general after declaring his gratitude for the regard shewn him, added,

Be assured that every exertion of my worthy colleagues and myself, will be extended to the re-establishment of peace and harmony between the Mother Country and these colonies. As to the fatal but necessary operations of war, when we assumed the soldier, we did not lay aside the citizen, and we shall most sincerely rejoice with you in that happy hour, when the re-establishment of American liberty, on the most firm and solid foundations shall enable us to return to our private stations, in the bosom of a free, peaceful, and happy country.

The general on his way to camp was treated with the highest honours in every place through which he passed. Large detachments of volunteers composed of private gentlemen turned out to escort him.
A committee from the Massachusetts Congress received him about 100 miles [221] from Boston, and conducted him to the army. He was soon after addressed by the Congress of that colony in the most affectionate manner, in his answer he said,

<div style="float:right">1775</div>

Gentlemen, your kind congratulations on my appointment and arrival, demand my warmest ackowledgements, and will ever be retained in grateful remembrance. In exchanging the enjoyments of domestic life for the duties of my present honourable but arduous station, I only emulate the virtue and public spirit of the whole province of Massachusetts, which, with a firmness and patriotism without example, has sacrificed all the comforts of social and political life, in support of the rights of mankind and the welfare of our common country. My highest ambition is to be the happy instrument of vindicating these rights, and to see this devoted province again restored to peace, liberty and safety.

When general Washington arrived at Cambridge, he was received with the joyful acclamations of the American army. At the head of his troops he published a declaration, previously drawn up by Congress, in the nature of a manifesto, setting forth the reasons for taking up arms. In this, after enumerating various grievances of the colonies, and vindicating them from a premeditated design of establishing independent states, it was added,

<div style="float:right">July 3</div>

In our own native land, in defence of the freedom which is our birthright, and which we ever enjoyed till the late violation of it—for the protection of our property, acquired solely by the industry of our forefathers and ourselves, against violence actually offered, we have taken up arms, we shall lay them down when hostilities shall cease on the part of the aggressors, and all danger of their being renewed shall be removed, and not before.

When general Washington joined the American army, he found the British intrenched on Bunker's-hill, having also three floating batteries in Mystic river, and a twenty gun ship below the ferry, between Boston and Charlestown. They had also a battery on Copse's hill, and were strongly fortified on the neck.

<div style="float:right">1775</div>


EXHIBIT 19
0659

The Americans were intrenched at Winter-hill, Prospect-hill, and Roxbury, communicating with one another by small posts, [222] over a distance of ten miles. There were also parties stationed in several towns along the sea coast. They had neither engineers to plan suitable works, nor sufficient tools for their erection.

In the American camp was collected a large body of men, but without those conveniencies which ancient establishments have introduced for the comfort of regular armies. Instead of tents, sails now rendered useless by the obstructions of commerce, were applied for their covering; but even of them, there was not a sufficiency. The American soldiers having joined the camp in all that variety of clothing which they used in their daily labour, were without uniformity of dress. To abolish provincial distinctions, the hunting shirt was introduced. They were also without those heads of departments in the line of commissaries or quarter masters, which are necessary for the regular and economical supply of armies. The troops from Connecticut had proper officers appointed to procure them supplies, but they who came from the other colonies were not so well furnished. Individuals brought to camp their own provisions on their own horses. In some parts committees of supplies were appointed, who purchased necessaries at public expence, sent them on to camp, and distributed them to such as were in want, without any regularity or system; the country afforded provisions, and nothing more was wanting to supply the army than proper systems for their collection and distribution. Other articles, though equally necessary, were almost wholly deficient, and could not be procured but with difficulty. On the 4th of August the whole stock of powder in the American camp, and in the public magazines of the four New-England provinces, would make but little more than nine rounds a man. The continental army remained in this destitute condition for a fortnight or more. This was generally known among themselves, and was also communicated to the British, by a deserter, but they suspecting a plot would not believe it. A supply of a few tons was sent on to them from the committee of Elizabeth-town, but this was done privately, lest the adjacent inhabitants, who were equally destitute [223] should stop it for their own use.

The public rulers in Massachusetts issued a recommendation to the inhabitants, not to fire a gun at beast, bird or mark, in order 

1775

that they might husband their little stock for the more necessary purpose of shooting men. A supply of several thousand pounds weight of powder, was soon after obtained from Africa in exchange for New-England rum. This was managed with so much address, that every ounce for sale in the British forts on the African coasts, was purchased up and brought off for the use of the Americans.

Embarrassments from various quarters occurred in the formation of a continental army. The appointment of general officers made by Congress, was not satisfactory. Enterprising leaders had come forward with their followers on the commencement of hostilities, without scrupulous attention to rank. When these were all blended together, it was impossible to assign to every officer the station which his services merited, or his vanity demanded. Materials for a good army were collected. The husbandmen who flew to arms were active, zealous, and of unquestionable courage, but to introduce discipline and subordination, among free men who were habituated to think for themselves, was an arduous labour.

EXHIBIT 19
0660

The want of system and of union, under proper heads, pervaded every department. From the circumstance that the persons employed in providing necessaries for the army were unconnected with each other, much waste and unnecessary delays were occasioned. The troops of the different colonies came into service under variant establishments—some were enlisted with the express condition of choosing their officers. The rations promised by the local legislatures varied both as to quantity, quality and price. To form one uniform mass of these discordant materials, and to subject the licentiousness of independent freemen to the controul of military discipline, was a delicate and difficult business.

The continental army put under the command of general Washington, amounted to about 14,500 men.

These had been so judiciously stationed round Boston, as [224] to confine the British to the town, and to exclude them from the forage and provisions which the adjacent country and islands in Boston-bay afforded. This force was thrown into three grand divisions. General Ward commanded the right wing at Roxbury. General Lee the left at Prospect-hill, and the centre was commanded by general Washington. In arranging the army, the military skill of adjutant-general Gates was of great service. Method and punctuality were introduced. The officers and privates were taught to know their respective places, and to have the mechanism and movements as well as the name of an army.

| 1775 |

When some effectual pains had been taken to discipline the army, it was found that the term for which enlistments had taken place, was on the point of expiring. The troops from Connecticut and Rhode-Island were only engaged till the 1st day of December 1775, and no part of the army longer than the first day of January 1776. Such mistaken apprehensions respecting the future conduct of Great-Britain prevailed, that many thought the assumption of a determined spirit of resistance would lead to a redress of all their grievances.

Towards the close of the year, general Gage sailed for England, and the command devolved on general Howe.

| Oct. 10 |

The Massachusetts assembly and continental Congress both resolved, to fit out armed vessels to cruise on the American coast, for the purpose of interrupting warlike stores and supplies designed for the use of the British army. The object was at first limited, but as the prospect of accommodation vanished, it was extended to all British property afloat on the high seas. The Americans were diffident of their ability to do any thing on water in opposition to the greatest naval power in the world, but from a combination of circumstances, their first attempts were successful.

| Nov. |

The Lee privateer, captain Manly, took the brig Nancy, an ordnance ship from Woolwich, containing a large brass mortar, several pieces of brass cannon, a large quantity of arms and ammunition, with all manner of tools, [225] utensils and machines, necessary for camps and artillery. Had Congress sent an order for supplies, they could not have made

| Nov. 29 |

| 1775 |

EXHIBIT 19
0661

out a list of articles more suitable to their situation, than what was thus providentially thrown into their hands.

In about 9 days after three ships, with various stores for the British army, and a brig from Antigua with rum, were taken by capt. Manly. Before five days more had elapsed, several other store ships were captured. By these means the distresses of the British troops, in Boston, were increased, and supplies for the continental army were procured. Naval captures, being unexpected, were matter of triumph to the Americans, and of surprize to the British. The latter scarcely believed that the former would oppose them by land with a regular army, but never suspected that a people, so unfurnished as they were with many things necessary for arming vessels, would presume to attempt any thing on water. A spirit of enterprize, invigorated by patriotic zeal, prompted the hardy New Englandmen to undertake the hazardous business, and their success encouraged them to proceed.

| Dec. 8 |

Before the close of the year, Congress determined to build 5 vessels of 32 guns, 5 of 28, and 3 of 24. While the Americans were fitting out armed vessels, and before they had made any captures, an event took place which would have disposed a less determined people to desist from provoking the vengeance of the British navy. This was the burning of Falmouth in the northern parts of Massachusetts.

| Dec. 13 |

Captain Mowat, in the Canceaux of sixteen guns, destroyed 139 houses and 278 stores, and other buildings in that town.

| Oct. 18 |

This spread an alarm on the coast, but produced no disposition to submit, many moved from the sea ports with their families and effects, but no solicitations were preferred for the obtaining of British protection.

In a few days after the burning of Falmouth, the old south meeting house in Boston, was taken into possession by the British, and destined for a riding school, and the service of the light dragoons. These proceedings produced, in the minds of the colonists, a more determined spirit of resistance, and a more general aversion to Great-Britain.

EXHIBIT 19
0662

[Back to Table of Contents]

# CHAPTER VIII

## Ticonderoga Taken, And Canada Invaded.

[226]

It early occurred to many, that if the sword decided the controversy between Great-Britain and her colonies, the possession of Ticonderoga would be essential to the security of the latter. Situated on a promontory, formed at the junction of the waters of lake George and lake Champlain, it is the key of all communication between New-York and Canada. Messrs. Deane, Wooster, Parsons, Stevens, and others of Connecticut, planned a scheme for obtaining possession of this valuable post. Having procured a loan of 1800 dollars of public money, and provided a sufficient quantity of powder and ball, they set off for Bennington, to obtain the co-operation of colonel Allen of that place. Two hundred and seventy men, mostly of that brave and hardy people, who are called green mountain boys, were speedily collected at Castleton, which was fixed on as the place of rendezvous. At this place colonel Arnold, who, though attended only with a servant, was prosecuting the same object, unexpectedly joined them. He had been early chosen a captain of a volunteer company, by the inhabitants of New-Haven, among whom he resided. As soon as he recieved news of the Lexington battle, he marched off with his company for the vicinity of Boston, and arrived there, though 150 miles distant, in a few days. Immediately after his arrival he waited on the Massachusetts committee of safety, and informed them, that there were at Ticonderoga many pieces of cannon and a great quantity of valuable stores, and that the fort was in a ruinous condition, and garrisoned only by about 40 men. They appointed him a colonel, and commissioned him to raise 400 men, and to take Ticonderoga. The leaders of the party which had previously rendezvoused at Castleton, admitted colonel Arnold to join them, and it was agreed that colonel Allen should be the commander in chief of the expedition, and that colonel Arnold should be his assistant. They proceeded without delay, and arrived in the night at lake Champlain, opposite to Ticonderoga. [227] Allen and Arnold crossed over with 83 men, and landed near the garrison. They contended who should go in first, but it was at last agreed that they should both go in together.

They advanced abreast, and entered the fort at the dawning of day.

A sentry snapped his piece at one of them, and then retreated through the covered way to the parade. The Americans followed and immediately drew up. The commander surprised in his bed, was called upon to surrender the fort. He asked, by what authority? Colonel Allen replied, "I demand it in the name of the great Jehovah, and the Continental Congress." No resistance was made, and the fort with its valuable stores, and forty-eight prisoners, fell into the hands of the Americans. The boats had been sent back for the remainder of the men, but the business was done before they got over. Colonel Seth Warner was sent off with a party to take possession of Crown-point, where a serjeant and 12 men performed garrison duty. This was speedily effected. The next object, calling for the

| 1775 |

| May 9 |

| May 10 |

EXHIBIT 19
0663

attention of the Americans, was to obtain the command of lake Champlain, but to accomplish this, it was necessary for them to get possession of a sloop of war, lying at St. John's, at the northern extremity of the lake. With the view of capturing this sloop it was agreed to man and arm a schooner lying at South Bay, and that Arnold should command her, and that Allen should command some batteaux on the same expedition. A favourable wind carried the schooner a-head of the batteaux, and colonel Arnold got immediate possession of the sloop by surprise. The wind again favouring him, he returned with his prize to Ticonderoga, and rejoined colonel Allen. The latter soon went home, and the former with a number of men agreed to remain there in garrison. In this rapid manner the possession of Ticonderoga, and the command of lake Champlain was obtained, without any loss, by a few determined men. Intelligence of these events was in a few days communicated to Congress, which met for the first time, at 10 o'clock of the same day, in the morning of which, Ticonderoga was taken. They rejoiced in the spirit of enterprise, displayed by their [228] countrymen, but feared the charge of being aggressors, or of doing any thing to widen the breach between Great-Britain and the colonies; for an accommodation was at that time, nearly their unanimous wish. They therefore recommended to the committees of the cities and counties of New-York and Albany, to cause the cannon and stores to be removed from Ticonderoga to the south end of lake George, and to take an exact inventory of them, "in order that they might be safely returned when the restoration of the former harmony between Great-Britain and the colonies, so ardently wished for by the latter, should render it prudent and consistent with the overruling law of self-preservation. "

1775

Colonel Arnold having begun his military career with a series of successes, was urged by his native impetuosity to project more extensive operations. He wrote a letter to Congress, strongly urging an expedition into Canada, and offering with 2000 men to reduce the whole province. In his ardent zeal to oppose Great-Britain, he had advised the adoption of offensive war, even before Congress had organised an army or appointed a single military officer. His importunity was at last successful, as shall hereafter be related, but not till two months had elapsed, subsequent to his first proposition of conducting an expedition against Canada. Such was the increasing fervor of the public mind in 1775, that what, in the early part of the year, was deemed violent and dangerous, was in its progress pronounced both moderate and expedient.

June 13

Sir Guy Carleton, the king's governor in Canada no sooner heard that the Americans had surprised Ticonderoga and Crown-point, and obtained the command of lake Champlain, than he planned a scheme for their recovery. Having only a few regular troops under his command, he endeavored to induce the Canadians and Indians to co-operate with him, but they both declined. He established martial law that he might compel the inhabitants to take arms. They declared themselves ready to defend the province, but refused to march out of it, or to commence hostilities on their neighbors. Colonel Johnston had, on the same occasion, repeated conferences with the [229] Indians, and endeavored to influence them to take up the hatchet, but they steadily refused. In order to gain their co-operation he invited them to feast on a Bostonian, and to drink his blood. This, in the Indian style, meant no more than to partake of a roasted ox and a pipe of wine, at a

1775

EXHIBIT 19
0664

public entertainment, which was given on design to influence them to co-operate with the British troops. The colonial patriots, affected to understand it in its literal sense. It furnished, in their mode of explication, a convenient handle for operating on the passions of the people.

These exertions in Canada, which were principally made with a view to recover Ticonderoga, Crown-point, and the command of lake Champlain, induced Congress to believe that a formidable invasion of their northwestern frontier was intended, from that quarter. The evident tendency of the Quebec act favoured this opinion. Believing it to be the fixed purpose of the British ministry to attack the united colonies on that side, they conceived that they would be inexcusable if they neglected the proper means for warding off so terrible a blow. They were also sensible that the only practicable plan to effect this purpose, was to make a vigorous attack upon Canada, while it was unable to resist the unexpected impression. Their success at Ticonderoga and Crown-point, had already paved the way for this bold enterprize, and had broken down the fences which guarded the entrance into that province. On the other hand, they were sensible that by taking this step, they changed at once the whole nature of the war. From defensive it became offensive, and subjected them to the imputation of being the aggressors. They were well aware that several who had espoused their cause in Britain, would probably be offended at this measure, and charge them with heightening the mischiefs occasioned by the dispute. They knew that the principles of resistance, as far as they had hitherto acted upon them, were abetted by a considerable party even in Great-Britain; and that to forfeit their good opinion, might be of great disservice. Considerations of this kind made them weigh well the important step before [230] they ventured upon it.

They on the other hand reflected that the eloquence of the minority in parliament, and the petitions and remonstrances of the merchants in Great-Britain, had produced no solid advantages in their favour; and that they had no chance of relief, but from the smiles of heaven on their own endeavors. The danger was pressing. War was not only inevitable, but already begun. To wait till they were attacked by a formidable force at their backs, in the very instant when their utmost exertions would be requisite, perhaps insufficient, to protect their cities and sea coast against an invasion from Britain, would be the summit of folly. The laws of war and of nations justified the forestalling of an enemy. The colonists argued that to prevent known hostile intentions, was a matter of self defence; they were also sensible that they had already gone such lengths as could only be vindicated by arms; and that if a certain degree of success did not attend their resistance, they would be at the mercy of an irritated government, and their moderation in the single instance of Canada, would be an unavailing plea for indulgence. They were also encouraged to proceed, by certain information that the French inhabitants of Canada, except the noblesse and the clergy, were as much discontented with their present system of government as even the British settlers. It seemed therefore probable, that they would consider the provincials, rather as friends than as enemies. The invasion of that province was therefore determined upon, if found practicable, and not disagreeable to the Canadians.

Congress had committed the management of their military arrangements, in this northern department, to general Schuyler and general Montgomery. While the former

| 1775 |
| --- |

EXHIBIT 19
0665

remained at Albany, to attend an Indian treaty, the latter was sent forward to Ticonderoga, with a body of troops from New-York and New-England. Soon after reaching Ticonderoga, he made a movement down Lake Champlain. General Schuyler overtook him at Cape le Motte; from thence they moved on to Isle aux Noix. About this time general Schuyler addressed the inhabitants informing them, "that the only views of [231] Congress were to restore to them those rights which every subject of the British empire, of whatever religious sentiments he may be, is entitled to; and that in the execution of these truths he had received the most positive orders to cherish every Canadian, and every friend to the cause of liberty, and sacredly to guard their property."

1775

The Americans, about 1000 in number, effected a landing at St. John's, which being the first British post in Canada, lies only 115 miles to the northward of Ticonderoga. The British piquets were driven into the fort. The environs were then reconnoitered, and the fortifications were found to be much stronger than had been suspected. This induced the calling of a council of war, which recommended a retreat to Isle aux Noix, twelve miles south of St. John's, to throw a boom across the channel, and to erect works for its defence. Soon after this event, an extreme bad state of health induced general Schuyler to retire to Ticonderoga, and the command devolved on general Montgomery.

Sep. 10

This enterprising officer in a few days returned to the vicinity of St. John's, and opened a battery against it. Ammunition was so scarce, that the siege could not be carried on with any prospect of speedy success. The general detached a small body of troops, to attempt the reduction of fort Chamblee, only six miles distant. Success attended this enterprize. By its surrender six tons of gun powder were obtained, which enabled the general to prosecute the siege of St. John's with vigor. The garrison, though straitened for provisions, persevered in defending themselves with unabating fortitude. While general Montgomery was prosecuting this siege, the governor of the province collected, at Montreal, about 800 men chiefly militia and Indians. He endeavored to cross the river St. Lawrence, with this force, and to land at Lonqueil, intending to proceed thence to attack the besiegers, but colonel Warner with 300 green mountain boys, and a four pounder, prevented the execution of the design. The governor's party was suffered to come near the shore, but was then fired upon with such effect as to make them retire after sustaining great loss.

[232] An account of this affair being communicated to the garrison in St. John's, major Preston, the commanding officer surrendered, on receiving honorable terms of capitulation. By these it was agreed, that the garrison should march out with the honors of war, that the officers and privates should ground their arms on the plain—the oficers keep their side arms and their fire arms, be reserved for them, and that the people of the garrison should retain their effects. About 500 regulars and 100 Canadians became prisoners to the provincials. They also acquired 39 pieces of cannon, seven mortars, and two howitzers, and about 800 stand of arms. Among the cannon were many brass field pieces, an article of which the Americans were nearly destitute.

While the siege of St. John's was pending, colonel Allen, who was returning with about 80 men from a tour on which he had been sent by his general, was captured by

EXHIBIT 19
0666

the British near Montreal, loaded with irons, and in that condition sent to England. Major Brown proposed that colonel Allen should return to Lonqueil, procure canoes, and cross the river St. Lawrence, a little to the north of Montreal, while he with a force of about 200 men crossed a little to the south of it. The former crossed in the night, but the latter by some means failed on his part. Colonel Allen found himself the next morning unsupported, and exposed to immediate danger, but nevertheless concluded on maintaining his ground. General Carleton, knowing his weakness, marched out against him with a superior force. The colonel defended himself with his wonted bravery, but being deserted by several of his party, and having lost fifteen of his men, he was compelled to surrender with the remainder amounting to 38.

After the reduction of St. John's, general Montgomery proceeded towards Montreal. The few British forces there, unable to stand their ground, repaired for safety on board the shipping in hopes of escaping down the river, but they were prevented by colonel Easton, who was stationed at the point of Sorel river, with a number of continental troops, some cannon, and an armed gondola. [233] General Prescot, who was on board with several officers, and about 120 privates, having no chance of escape, submitted to be `1775` prisoners on terms of capitulation. Eleven sail of vessels, with all their contents, consisting of ammunition, provision, and entrenching tools, became the property of the provincials. Governor Carleton, was about this time conveyed in a boat with muffled paddles, by a secret way to the Three Rivers, and from thence to Quebec in a few days.

When Montreal was evacuated by the troops, the inhabitants applied to general Montgomery for capitulation. He informed them, that as they were defenseless, they could not expect such a concession, but he engaged upon his honour to maintain the individuals and religious communities of the city, in the peaceable enjoyment of their property, and the free exercise of their religion. In all his transactions, he spoke, wrote, and acted, with dignity and propriety, and in particular treated the inhabitants with liberality and politeness.

Montreal which at this time surrendered to the provincials carried on an extensive trade, and contained many of those articles, which from the operation of the resolutions of Congress, could not be imported into any of the united colonies. From these stores the American soldiers, who had hitherto suffered from the want of suitable clothing, obtained a plentiful supply.

General Montgomery, after leaving some troops in Montreal, and sending detachments into different parts of the province to encourage the Canadians, and to forward provisions, advanced towards the capital. His little army arrived with expedition before Quebec. Success had hitherto crowned every attempt of general Montgomery, but notwithstanding, his situation was very embarrassing. Much to be pitied is the officer, who having been bred to arms, in the strict discipline of regular armies, is afterwards called to command men who carry with them the spirit of freedom into the field.
The greater part of the Americans, officers as well as soldiers, having never seen any service, were ignorant of their duty, and `1775`

EXHIBIT 19
0667

but feebly impressed with the military ideas of union, subordination [234] and discipline. The army was continental in name and pay, but in no other respect. Not only the troops of different colonies conceived themselves independent of each other, but in some instances the different regiments of the same colony, were backward to submit to the orders of officers in a higher grade of another line. They were also soon tired of a military life. Novelty and the first impulse of passion had led them to camp; but the approaching cold season, together with the fatigues and dangers incident to war, induced a general wish to relinquish the service. Though by the terms of their enlistment, they were to be discharged in a few weeks, they could not brook an absence from their homes for that short space of time. The ideas of liberty and independence, which roused the colonists to oppose the claims of Great-Britain, operated against that implicit obedience which is necessary to a well regulated army.

Even in European states, where long habits have established submission to superiors as a primary duty of the common people, the difficulty of governing recruits, when first led to the field from civil occupations, is great; but to exercise discipline over freemen, accustomed to act only from the impulse of their own minds, required not only a knowledge of human nature, but an accommodating spirit, and a degree of patience which is rarely found among officers of regular armies. The troops under the immediate command of general Montgomery, were from their usual habits, averse to the ideas of subordination, and had suddenly passed from domestic ease, to the numberless wants and distresses which are incident to marches through strange and desert countries. Every difficulty was increased by the short term for which they were enlisted. To secure the affections of the Canadians, it was necessary for the American general to restrain the appetites, and control the licentiousness of his soldiery, while the appearance of military harshness was dangerous, lest their good will might be forfeited. In this choice of difficulties, the genius of Montgomery surmounted many obstacles.

During his short but glorious [235 ] career, he conducted with so much prudence, as to make it doubtful whether we ought to admire most the goodness of the man, or the address of the general.

> 1775

About the same time that Canada was invaded, in the usual route from New-York, a considerable detachment from the American army at Cambridge, was conducted into that royal province by a new and unexpected passage.

Colonel Arnold, who successfully conducted this bold undertaking, thereby acquired the name of the American Hannibal. He was detached with a thousand men, from Cambridge to penetrate into Canada, by ascending the river Kennebeck, and descending by the Chaundiere to the river St. Lawrence. Great were the difficulties these troops had to encounter in marching by an unexplored route, 300 miles through an uninhabited country. In ascending the Kennebeck, they were constantly obliged to work upwards against an impetuous current. They were often compelled by cataracts or other impediments, to land and to haul their batteaux up rapid streams, and over falls of rivers. Nor was their march by land more eligible than this passage by water. They had deep swamps, thick woods, difficult mountains, and craggy precipices alternatively to encounter. At some places they had to cut their way for miles together through forests so embarrassed, that their progress was only four or five miles a day. The constant fatigue caused

> Sep. 13

EXHIBIT 19
0668

many men to fall sick. One third of the number which set out, were from want of necessaries obliged to return; the others proceeded with unabated fortitude and constancy. Provisions grew at length so scarce, that some of the men ate their dogs, cartouch boxes, breeches and shoes. When they were an hundred miles from any habitation or prospect of a supply their whole store was divided, which yielded four pints of flour for each man. After they had baked and eaten their last morsel, they had thirty miles to travel before they could expect any farther supply. The men bore up under these complicated distresses with the greatest fortitude. They gloried in the hope of completing a march which would rival the fame of similar expeditions undertaken by the heroes of antiquity. [236]

Having spent thirty one days in traversing a hideous wilderness, without ever seeing anything human, they at length reached the

1775

inhabited parts of Canada. They were there well received, and supplied with every thing necessary for their comfort. The Canadians were struck with amazement when they saw this armed force emerging from the wilderness. It had never entered their conceptions that it was possible for human beings to traverse such immense wilds. The most pointed instructions had been given to this corps, to conciliate the affections of the Canadians. It was particularly enjoined upon them, if the son of lord Chatham, then an officer in one of the British regiments in that province, should fall into their hands, to treat him with all possible attention, in return for the great exertions of his father in behalf of American liberty. A manifesto subscribed by general Washington, which had been sent from Cambridge with this detachment, was circulated among the inhabitants of Canada. In this they were invited to arrange themselves under the standard of general liberty; and they were informed that the American army was sent into the province, not to plunder but to protect them.

While general Montgomery lay at Montreal, colonel Arnold arrived at Point Levy, opposite to Quebec. Such was the

Nov. 8

consternation of the garrison and inhabitants at his unexpected appearance, that had not the river intervened, an immediate attack in the first surprize and confusion, might have been successful. The bold enterprise of one American army marching through the wilderness, at a time when success was crowning every undertaking of another invading in a different direction, struck terror into the breasts of those Canadians who were unfriendly to the designs of Congress. The embarrassments of the garrison were increased by the absence of sir Guy Carleton. That gallant officer, on hearing of Montgomery's invasion, prepared to oppose him in the extremes of the province. While he was collecting a force to attack invaders in one direction, a different corps, emerging out of the depths of an unexplored wilderness, suddenly appeared from another.

In a few days after colonel Arnold [237] had arrived at Point Levy, he crossed the river St. Lawrence, but his chance of

1775

succeeding by a coup de main was in that short space greatly diminished. The critical moment was past. The panic occasioned by his first appearance had abated, and solid preparations for the defence of the town were adopted. The inhabitants, both English and Canadians as soon as danger pressed, united for their common defence. Alarmed for their property, they were, at their own request, embodied for its security. The sailors were taken from the shipping in the harbour, and put to the batteries on shore. As colonel Arnold had no artillery, after parading some days on the heights near

EXHIBIT 19
0669

Quebec, he drew off his troops, intending nothing more until the arrival of Montgomery, than to cut off supplies from entering the garrison.

So favourable were the prospects of the united colonies at this period, that general Montgomery set on foot a regiment of Canadians, to be in the pay of Congress. James Livingston, a native of New-York, who had long resided in Canada, was appointed to the command thereof, and several recruits were engaged for the term of twelve months. The inhabitants on both sides of the river St. Laurence, were very friendly. Expresses in the employ of the Americans, went without molestation, backwards and forwards, between Montreal and Quebec. Many individuals performed signal services in favour of the invading army. Among a considerable number Mr. Price stands conspicuous, who advanced 5000£. in specie, for their use.

Various causes had contributed to attach the inhabitants of Canada, especially those of the inferior classes, to the interest of Congress, and to alienate their affections from the government of Great-Britain. The contest was for liberty, and there is something in that sound, captivating to the mind of man in a state of original simplicity. It was for the colonies, and Canada was also a colony. The objects of the war were therefore supposed to be for their common advantage. The form of government lately imposed on them by act of parliament, was far from being so free as the constitutions of the other [238] colonies, and was in many respects particularly oppressive. The common people had no representative share in enacting the laws by which they were to be governed, and were subjected to the arbitrary will of persons, over whom they had no constitutional control. Distinctions so degrading were not unobserved by the native Canadians, but were more obvious to those who had known the privileges enjoyed in the neighbouring provinces. Several individuals educated in New-England and New-York, with the high ideas of liberty inspired by their free constitutions, had in the interval between the peace of Paris 1763, and the commencement of the American war, migrated into Canada. Such, sensibly felt the difference between the governments they had left, and the arbitrary constitution imposed on them, and both from principle and affection, earnestly persuaded the Canadians to make a common cause with the United Colonies.

1775

Though motives of this kind induced the peasantry of the country to espouse the interest of Congress, yet sundry individuals, and some whole orders of men, threw the weight of their influence into the opposite scale. The legal privileges which the Roman Catholic clergy enjoyed, made them averse to a change, lest they should be endangered by a more intimate connection with their protestant neighbours. They used their influence in the next world, as an engine to operate on the movements of the present. They refused absolution to such of their flocks as abetted the Americans. This interdiction of the joys of heaven, by those who were supposed to hold the keys of it, operated powerfully on the opinions and practices of the superstitious multitude. The seigneurs had also immunities unknown in the other colonies. Such is the fondness for power in every human breast, that revolutions are rarely favoured by any order of men who have reason to apprehend that their future situation will, in case of a change, be less pre-eminent than before. The sagacious general Montgomery, no less

EXHIBIT 19
0670

a man of the world than an officer, discovered great address in accommodating himself to these clashing interests.

Though he knew the part the popish clergy had acted in opposition [239] to him, yet he conducted towards them as if totally ignorant of the matter; and treated them and their religion with great respect and attention. As far as he was authorised to promise, he engaged that their ecclesiastical property should be secured, and the free exercise of their religion continued. To all he held forth the flattering idea of calling a convention of representatives, freely chosen, to institute by its own will, such a form of government as they approved. While the great mind of this illustrious man, was meditating schemes of liberty and happiness, a military force was collecting and training to oppose him, which in a short time put a period to his valuable life.

<div style="float:right; border:1px solid; padding:4px;">1775</div>

At the time the Americans were before Montreal, general Carleton, as has been related, escaped through their hands, and got safe to Quebec. His presence was itself a garrison. The confidence reposed in his talents, inspired the men under his command to make the most determined resistance. Soon after his arrival he issued a proclamation, setting forth, "That all persons liable to do militia duty, and residing in Quebec, who refused to arm in conjunction with the royal army, should in four days quit Quebec with their families, and withdraw themselves from the limits of the district by the first of December, on pain of being treated afterwards as spies or rebels." All who were unwilling to co-operate with the British army, being thus disposed of, the remaining inhabitants, though unused to arms, became in a little time so far acquainted with them as to be very useful in defending the town. They supported fatigues and submitted to command with a patience and chearfulness, that could not be exceeded by men familiarized to the hardships and subordination of a military life.

General Montgomery having effected at Point aux Trembles, a junction with colonel Arnold, commenced the siege of Quebec. Upon his arrival before the town, he wrote a letter to the British governor, recommending an immediate surrender, to prevent the dreadful consequences of a storm.

<div style="float:right; border:1px solid; padding:4px;">Dec. 1</div>

Though the flag which conveyed this letter was fired upon, and all communication refused, [240] general Montgomery found other means to convey a letter of the same tenor into the garrison, but the inflexible firmness of the governor could not be moved either by threats or dangers. The Americans soon after commenced a bombardment with five small mortars, but with very little effect. In a few days general Montgomery opened a six gun battery, at the distance of seven hundred yards from the walls, but his metal was too light to make any impression.

<div style="float:right; border:1px solid; padding:4px;">1775</div>

The news of general Montgomery's success in Canada had filled the colonies with expectations, that the conquest of Quebec would soon add fresh lustre to his already brilliant fame. He knew well the consequences of popular disappointment, and was besides of opinion that unless something decisive was immediately done, the benefit of his previous acquisitions would in a great degree be lost to the American cause. On both accounts, he was strongly impelled to make every exertion for satisfying the

EXHIBIT 19
0671

expectations and promoting the interest of a people, who had honoured him with so great a share of their confidence. The government of Great-Britain, in the extensive province of Canada, was at that time reduced to the single town of Quebec. The astonished world saw peaceable colonists suddenly transformed into soldiers, and these marching through unexplored wildernesses, and extending themselves by conquests, in the first moment after they had assumed the profession of arms. Towards the end of the year, the tide of fortune began to turn. Dissentions broke out between colonel Arnold and some of his officers, threatening the annihilation of discipline. The continental currency had no circulation in Canada, and all the hard money furnished for the expedition, was nearly expended. Difficulties of every kind were daily increasing. The extremities of fatigue were constantly to be encountered. The American general had not a sufficient number of men to make the proper reliefs in the daily labours they underwent; and that inconsiderable number, worn down with toil, was constantly exposed to the severities of a Canada winter.

The period for which a great part of his men had enlisted, being on the point of expiration, [241] he apprehended that they who were entitled to it, would insist on their discharge. On the other hand, he saw no prospect of staggering the resolution of the garrison. They were well supplied with every thing necessary for their defence, and were daily acquiring additional firmness. The extremity of winter was fast approaching. From these combined circumstances, general Montgomery was impressed with a conviction, that the siege should either be raised, or brought to a summary termination. To storm the place was the only feasible method of effecting the latter purpose. But this was an undertaking, in which success was but barely possible. Great minds are seldom exact calculators of danger. Nor do they minutely attend to the difficulties which obstruct the attainment of their objects. Fortune, in contempt of the pride of man, has ever had an influence in the success or failure of military enterprises. Some of the greatest achievements, of that kind, have owed their success to a noble contempt of common forms.

The upper part of Quebec was surrounded with very strong works, and the access from the lower town was excessively difficult, from its almost perpendicular steepness. General Montgomery, from a native intrepidity, and an ardent thirst for glory, overlooked all these dangers, and resolved at once either to carry the place or perish in the attempt. Trusting much to his good fortune—confiding in the bravery of his troops, and their readiness to follow whithersoever he should lead; and depending somewhat on the extensiveness of the works, he determined to attempt the town by escalade.

The garrison of Quebec at this time consisted of about 1520 men, of which 800 were militia, and 450 were seamen, belonging to the king's frigates, or merchant ships in the harbour. The rest were marines, regulars, or colonel Maclean's new raised emigrants. The American army consisted of about 800 men. Some had been left at Montreal, and near a third of Arnold's detachment, as has been related, had returned to Cambridge.

General Montgomery having divided this little force into four detachments, ordered two feints to be made [242] against the upper town, one by colonel Livingston, at the head of the Canadians against St. John's gate; and the other by major Brown, against

EXHIBIT 19
0672

cape Diamond, reserving to himself and colonel Arnold the two principal attacks, against the lower town.

At five o'clock in the morning general Montgomery advanced against the lower town. He passed the first barrier, and was just

Dec. 31

opening to attack the second, when he was killed, together with his aid de camp, captain John M'Pherson, captain Cheesman, and some others. This so dispirited the men that colonel Campbell, on whom the command devolved, thought proper to draw them off. In the mean time colonel Arnold, at the head of about 350 men, passed through St. Roques, and approached near a two gun battery, without being discovered. This he attacked, and though it was well defended, carried it, but with considerable loss. In this attack colonel Arnold received a wound, which made it necessary to carry him off the field of battle. His party nevertheless continued the assault, and pushing on, made themselves masters of a second barrier. These brave men sustained the force of the whole garrison for three hours, but finding themselves hemmed in, and without hopes either of success, relief or retreat, they yielded to numbers, and the advantageous situation of their adversaries. The loss of the Americans in killed and wounded, was about 100, and 300 were taken prisoners. Among the slain were captain Kendricks, lieutenant Humphries, and lieutenant Cooper. The behaviour of the provincial troops was such as might have silenced those who had reproached them for being deficient in courage. The most experienced veterans could not have exceeded the firmness they displayed in their last attack. The issue of this assault relieved the garrison of Quebec from all apprehensions for its safety. The provincials were so much weakened, as to be scarcely equal to their own defence. However, colonel Arnold had the boldness to encamp within three miles of the town, and had the address, even with his reduced numbers, to impede the conveyance of refreshments and provisions into the garrison. His situation was extremely difficult.

He was [243] at an immense distance from those parts where effectual assistance could be expected. On his first entrance into

1775

the province, he had experienced much kind treatment from the inhabitants. The Canadians, besides being fickle in their resolutions, are apt to be biassed by success. Their disposition to aid the Americans, became therefore daily more precarious. It was even difficult to keep the provincial troops from returning to their respective homes. Their sufferings were great. While their adversaries were comfortably housed in Quebec, they were exposed in the open air to the extreme rigour of the season. The severity of a Canada winter was far beyond any thing with which they were acquainted. The snow lay above four feet deep on a level.

This deliverance of Quebec may be considered as a proof how much may be done by one man for the preservation of a country. It also proves that soldiers may in a short time be formed out of the mass of citizens.

The conflict being over, the ill will which had subsisted, during the siege, between the royal and provincial troops gave way to sentiments of humanity. The Americans, who surrendered, were treated with kindness. Ample provisions were made for their wounded, and no unnecessary severity shewn to any. Few men have ever fallen in battle, so much regretted by both sides, as general Montgomery. His many amiable qualities had procured him an uncommon share of private affection, and his great abilities an equal proportion of public esteem. Being a sincere lover of liberty, he had

EXHIBIT 19
0673

engaged in the American cause from principle, and quitted the enjoyment of an easy fortune, and the highest domestic felicity, to take an active share in the fatigues and dangers of a war, instituted for the defence of the community of which he was an adopted member. His well known character was almost equally esteemed by the friends and foes of the side which he had espoused. In America he was celebrated as a martyr to the liberties of mankind; in Great-Britain as a misguided, good man, sacrificing to what he supposed to be the rights of his country. His name was mentioned in parliament with singular respect.

Some of the most [244] powerful speakers in that illustrious assembly, displayed their eloquence in sounding his praise and lamenting his fate. Those in particular who had been his fellow soldiers in the late war, expatiated on his many virtues. The minister himself acknowledged his worth, while he reprobated the cause for which he fell. He concluded an involuntary panegyric, by saying, "Curse on his virtues, they have undone his country."

1775

Though the invasion of Canada was finally unsuccessful, yet the advantages which the Americans gained in the months of September and October, gave fresh spirits to their army and people. The boldness of the enterprise, might have taught Great-Britain the folly of persisting in the design of subjugating America. But instead of preserving the union, and restoring the peace of the empire by repealing a few of her laws, she from mistaken dignity, resolved on a more vigorous prosecution of the war.

EXHIBIT 19
0674

[Back to Table of Contents]

# CHAPTER IX

## Transactions In Virginia, The Carolinas, Georgia, And The General State Of Public Affairs In The Colonies.

It has already been mentioned, that the colonists from the rising of Congress in October 1774, and particularly after the Lexington battle, were attentive to the training their militia, and making the necessary preparations for their defence.

The effects of their arrangements, for this purpose, varied with circumstances.

Where there were no royal troops, and where ordinary prudence was observed, the public peace was undisturbed. In other cases, the intemperate zeal of governors, and the imprudent warmth of the people, anticipated the calamities of war before its proper time. Virginia, though there was not a single British soldier within its limits, was, by the indiscretion of its governor, lord Dunmore, involved, for several months, in difficulties, but little short of those to which the inhabitants of Massachusetts were [245] subjected.

His lordship was but illy fitted to be at the helm in this tempestuous season. His passions predominated over his understanding, and precipitated him into measures injurious both to the people whom he governed, and to the interest of his royal master. The Virginians from the earliest stages of the controversy, had been in the foremost line of opposition to the claims of Great-Britain, but at the same time treated lord Dunmore with the attention that was due to his station. In common with the other provinces they had taken effectual measures to prepare their militia for the purposes of defence.

1775

While they were pursuing this object, his lordship engaged a party belonging to a royal vessel in James' river, to convey some public powder from a magazine in Williamsburg on board their ship. The value or quantity of the powder was inconsiderable, but the circumstances attending its removal begat suspicions that lord Dunmore meant to deprive the inhabitants of the means of defence. They were therefore alarmed, and assembled with arms to demand its restitution. By the interposition of the mayor and corporation of Williamsburg, extremities were prevented. Reports were soon after spread that a second attempt to rob the magazine was intended. The inhabitants again took arms, and instituted nightly patroles, with a determined resolution to protect it. The governor was irritated at these commotions, and in the warmth of his temper threatened to set up the royal standard–franchise the negroes, and arm them against their masters. This irritated, but did not intimidate. Several public meetings were held in the different counties, in all of which the removal of the powder from the magazine, and the governor's threats, were severely condemned. Some of the gentlemen of Hanover and the neighbouring counties assembled in arms, under the conduct of Mr. Patrick Henry, and marched towards Williamsburg, with an avowed design to obtain restitution of the powder, and to take measures for securing the public treasury. This ended in a negotiation, by

Apr. 20

EXHIBIT 19
0675

which it was agreed that payment for the powder, by [246] the receiver general of the colony, should be accepted in lieu of restitution; and that upon the engagement of the inhabitants of Williamsburg to guard both the treasury and the magazine, the armed parties should return to their habitations.

The alarm of this affair induced lord Dunmore to send his lady and family on board the Fowey man of war in James' river. About the same time his lordship, with the assistance of a detachment of marines, fortified his palace and surrounded it with artillery. He soon after issued a proclamation, in which Mr. Henry and his associates were charged with rebellious practices, and the present commotions were attributed to a desire in the people of changing the established form of government. Several meetings were held in the neighbouring counties, in which the conduct of Mr. Henry and of his associates was applauded, and resolutions were adopted, that at every risque he and they should be indemnified. About this time copies of some letters from governor Dunmore to the minister of the American department were made public. These in the opinion of the Virginians contained unfair and unjust representations of facts, and also of their temper and disposition. Many severe things were said on both sides, and fame as usual, magnified or misrepresented whatever was said or done. One distrust begat another. Every thing tended to produce a spirit of discontent, and the fever of the public mind daily increased.

In this state of disorder the governor convened the general assembly. The leading motive for this unexpected measure, was to procure their approbation and acceptance of the terms of the conciliatory motion agreed to in parliament, on the 20th of the preceding February. His lordship introduced this to their consideration, in a long and plausible speech. In a few days they presented their address in answer, in which, among other grounds of rejection they stated that, "the proposed plan only changed the form of oppression, without lessening its burthen;" but they referred the papers for a final determination, to Congress. For themselves they declared,

[247]
We have exhausted every mode of application which our invention could suggest, as proper and promising. We have

1775

decently remonstrated with parliament. They have added new injuries to the old. We have wearied our king with supplications; he has not deigned to answer us. We have appealed to the native honour and justice of the British nation. Their efforts in our favour have been hitherto ineffectual.

The assembly, among their first acts, appointed a committee to enquire into the causes of the late disturbances, and particularly to examine the state of the magazine. They found most of the remaining powder buried; the muskets deprived of their locks, and spring guns planted in the magazine. These discoveries irritated the people, and occasioned intemperate expressions of resentment.

Lord Dunmore quitted the palace privately, and retired on board the Fowey man of war, which then lay near York-town. He left a message for the house of burgesses, acquainting them

May 8

EXHIBIT 19
0676

that he thought it prudent to retire to a place of safety, having reason to believe that he was in constant danger of falling a sacrifice to popular fury; he nevertheless, hoped they would proceed in the great business before them; and he engaged to render the communication between him and the house as easy and as safe as possible. He assured them that he would attend as heretofore, to the duties of his office, and that he was well disposed to restore that harmony which had been unhappily interrupted.

This message produced a joint address from the council and house of burgesses, in which they represented his lordship's fears to be groundless, and declared their willingness to concur in any measure he would propose for the security of himself and family; and concluded by entreating his return to the palace. Lord Dunmore in a reply, justified his apprehensions of danger from the threats which had been repeatedly thrown out. He charged the house of burgesses with countenancing the violent proceedings of the people, and with a design to usurp the executive power, and subvert the constitution. This produced a reply fraught with recrimination and defensive [248] arguments. Every incident afforded fresh room for altercation. There was a continued intercourse by addresses, messages and answers, between the house of burgesses and the Fowey, but little of the public business was completed. His lordship was still acknowledged as the lawful governor of the province, but did not think proper to set his foot on shore, in the country over which his functions were to be exercised.

> 1775

At length, when the necessary bills were ready for ratification, the council and burgesses jointly intreated the governor's presence, to give his assent to them and finish the session. After several messages and answers, lord Dunmore peremptorily refused to meet the assembly at the capital, their usual place of deliberation; but said he would be ready to receive them on the next Monday, at his present residence on board the Fowey, for the purpose of giving his assent to such bills as he should approve of. Upon receiving this answer, the house of burgesses passed resolutions in which they declared, that the message requiring them to attend the governor on board a ship of war, was a high breach of their rights and privileges—that they had reason to fear a dangerous attack was meditated against the colony, and it was therefore their opinion, that they should prepare for the preservation of their rights and liberties. After strongly professing loyalty to the king, and amity to the Mother Country, they broke up their session.

The royal government in Virginia, from that day ceased. Soon after, a convention of delegates was appointed, to supply the place of the assembly. As these had an unlimited confidence reposed in them, they became at once possessed of undefined discretionary powers, both legislative and executive. They exercised this authority for the security of their constituents. They raised and embodied an armed force, and took other measures for putting the colony in a state of defence. They published a justification of their conduct, and set forth the necessity of the measures they had adopted.

> July 18

They concluded with professions of loyalty, and declared that though they were determined at every hazard, to maintain their rights and privileges, [249] it was also their fixed resolution to disband such forces as were raised for the defence of the colony, whenever their dangers were removed. The headstrong passions of lord Dunmore precipitated him into farther follies. With the

> 1775

EXHIBIT 19
0677

aid of the loyalists, run away negroes, and some frigates that were on the station, he established a marine force. By degrees, he equipped and armed a number of vessels of different kinds and sizes, in one of which he constantly resided, except when he went on shore in a hostile manner. This force was calculated only for depredation, and never became equal to any essential service. Obnoxious persons were seized and taken on board. Negroes were carried off—plantations ravaged—and houses burnt. These proceedings occasioned the sending of some detachments of the new raised provincial forces to protect the coasts. This produced a predatory war, from which neither honour nor benefit could be acquired, and in which every necessary from on shore was purchased at the risque of blood.

The forces under his lordship attempted to burn Hampton; but the crews of the royal vessels employed in that business, though | Oct. 25 |
they had begun to cannonade it, were so annoyed by riflemen from on shore, that they were obliged to quit their station.

In a few days after this repulse, a proclamation was issued by the governor, dated on board the ship William, off Norfolk, | Nov. 7 |
declaring, that as the civil law was at present insufficient to punish treason and traitors, martial law should take place and be executed throughout the colony; and requiring all persons capable of bearing arms, to repair to his majesty's standard, or to be considered as traitors. He also declared all indented servants, negroes and others, appertaining to rebels, who were able and willing to bear arms, and who joined his majesty's forces, to be free.

Among the circumstances which induced the rulers of Great-Britain to count on an easy conquest of America, the great number of slaves had a considerable weight. On the sea coast of five of the most southern provinces, the number of slaves exceeded that of freemen.

It was supposed that the proffer of freedom would detach them [250] from their master's interest, and bind them by strong ties to | 1775 |
support the royal standard. Perhaps, under favourable circumstances, these expectations would in some degree have been realised; but lord Dunmore's indiscretion deprived his royal master of this resource. Six months had elapsed since his lordship first threatened its adoption. The negroes had in a great measure ceased to believe, and the inhabitants to fear. It excited less surprize, and produced less effect, than if it had been more immediate and unexpected. The country was now in a tolerable state of defence, and the force for protecting the negroes, in case they had closed with his lordship's offer, was far short of what would have been necessary for their security. The injury done the royal cause by the bare proposal of the scheme, far outweighed any advantage that resulted from it. The colonists were struck with horror, and filled with detestation of a government which was exercised in loosening the bands of society, and destroying domestic security. The union and vigor which was given to their opposition, was great, while the additional force, acquired by his lordship, was inconsiderable. It nevertheless produced some effect in Norfolk and the adjoining country, where his lordship was joined by several hundreds, both whites and blacks. The governor having once more got footing on the main, amused himself with hopes of acquiring the glory of reducing one part of the province by means of the other. The provincials had now an object against which they might direct their arms. An expedition was therefore concerted against the force which had taken post at

EXHIBIT 19
0678

Norfolk. To protect his adherents lord Dunmore constructed a fort at the great bridge, on the Norfolk side, and furnished it with artillery. The provincials also fortified themselves near to the same place, with a narrow causeway in their front. In this state both parties continued quiet for some days.

The royalists commenced an attack. Captain Fordyce, at the head of about 60 British grenadiers, passed the causeway, and boldly marched up to the provincial entrenchments with fixed bayonets.

<div style="border:1px solid">Dec. 9</div>

They were exposed without cover to the fire of the provincials [251] in front, and enfiladed by another part of their works. The

<div style="border:1px solid">1775</div>

brave captain and several of his men fell. The lieutenant, with others, were taken, and all who survived were wounded. The slaves in this engagement were more prejudicial to their British employers than to the provincials. Captain Fordyce was interred by the victors, with military honors. The English prisoners were treated with kindness, but the Americans who had joined the king's standard, experienced the resentment of their countrymen.

The royal forces, on the ensuing night, evacuated their post at the great bridge, and lord Dunmore shortly after abandoned Norfolk, and retired with his people on board his ships. Many of the tories, a name which was given to those who adhered to the royal interest, sought the same asylum, for themselves and moveable effects. The provincials took possession of Norfolk, and the fleet, with its new incumberances, moved to a greater distance. The people on board, cut off from all peaceable intercourse with the shore, were distressed for provisions and necessaries of every kind. This occasioned sundry unimportant contests between the provincial forces and the armed ships and boats. At length, on the arrival of the Liverpool man of war from England, a flag was sent on shore to put the question, whether they would supply his majesty's ships with provisions. An answer was returned in the negative. It was then determined to destroy the town.

This was carried into effect, and Norfolk was reduced to ashes. The whole loss was estimated at 300,000£. sterling. The

<div style="border:1px solid">Jan. 1, 1776</div>

provincials, to deprive the ships of every resource of supply, destroyed the houses and plantations that were near the water, and obliged the people to move their cattle, provisions, and effects, farther into the country. Lord Dunmore, with his fleet, continued for several months on the coast and in the rivers of Virginia. His unhappy followers suffered a complication of distresses. The scarcity of water and provisions, the closeness and filth of the small vessels, produced diseases which were fatal to many, especially to the negroes. Though his whole force was trifling when compared with [252] the resources of Virginia, yet the want of suitable armed vessels made its expulsion impracticable. The experience of that day evinced the inadequacy of land forces for the defence of a maritime country; and the extensive mischief which may be done, by even an inconsiderable marine, when unopposed in its own way. The want of a navy was both seen and felt. Some arrangements to procure one, were therefore made. Either the expectation of an attack from this quarter, or the sufferings of the crews on board, induced his lordship in the summer 1776 to burn the least valuable of his vessels, and to send the remainder, amounting to 30 or 40 sail, to Florida, Bermuda, and the West-Indies. The hopes which lord Dunmore had entertained of subduing Virginia by the cooperation of the negroes, terminated with

EXHIBIT 19
0679

this movement. The unhappy Africans who had engaged in it, are said to have almost universally perished.

While these transactions were carrying on, another scheme, in which lord Dunmore was a party, in like manner miscarried. It was in contemplation to raise a considerable force at the back of the colonies, particularly in Virginia and the Carolinas. One Connelly, a native of Pennsylvania, was the framer of the design. He had gained the approbation of lord Dunmore, and had been sent by him to general Gage at Boston, and from him he received a commission to act as colonel commandant. It was intended that the British garrisons at Detroit, and some other remote posts, with their artillery and ammunition, should be subservient to this design. Connelly also hoped for the aid of the Canadians and Indians. He was authorised to grant commissions, and to have the supreme direction of the new forces. As soon as they were in readiness he was to penetrate through Virginia, and to meet lord Dunmore near Alexandria, on the river Potowmac. Connelly was taken up on suspicion, by one of the committees in Maryland, while on his way to the scene of action. The papers found in his possession betrayed the whole. Among these was a general sketch of the plan, and a letter from lord Dunmore to one of the Indian chiefs.

He was imprisoned, [253] and the papers published. So many fortunate escapes induced a belief among serious Americans, that their cause was favoured by heaven. The various projects which were devised and put in operation against them, pointed out the increasing necessity of union, while the havock made on their coasts—the proffer of freedom to their slaves, and the encouragement proposed to Indians for making war on their frontier inhabitants, quickened their resentment against Great-Britain.

1776

North-Carolina was more fortunate than Virginia. The governors of both were perhaps equally zealous for the royal interest, and the people of both equally attached to the cause of America, but the former escaped with a smaller portion of public calamity. Several regulations were at this time adopted by most of the provinces. Councils of safety, committees, and conventions, were common substitutes for regular government. Similar plans for raising, arming and supporting troops, and for training the militia, were from north to south generally adopted. In like manner royal governors throughout the provinces, were exerting themselves in attaching the people to the schemes of Great-Britain. Governor Martin, of North-Carolina, was particularly zealous in this business. He fortified and armed his palace at Newbern, that it might answer the double purpose of a garrison and magazine. While he was thus employed, such commotions were excited among the people, that he thought it expedient to retire on board a sloop of war in Cape Fear river. The people on examining, found powder and various military stores which had been buried in his garden and yard. Governor Martin, though he had abandoned his usual place of residence, continued his exertions for reducing North-Carolina to obedience. He particularly addressed himself to the regulators and Highland emigrants. The former had acquired this name from their attempting to regulate the administration of justice in the remote settlements, in a summary manner subversive of the public peace.

They had suffered the consequences of opposing royal government, and from obvious principles of human nature, were disposed to [254] support the authority whose power to punish they had recently

1776

EXHIBIT 19
0680

experienced. The Highland emigrants had been but a short time in America, and were yet more under the influence of European ideas than those which their new situation was calculated to inspire. Governor Martin sent commissions among these people for raising and commanding regiments; and he granted one to Mr. M'Donald to act as their general. He also sent them a proclamation commanding all persons, on their allegiance, to repair to the royal standard. This was erected by general M'Donald, about the middle of February. Upon the first intelligence of their assembling brigadier general Moore, with some provincial troops and militia, and some pieces of cannon, marched to oppose them. He took possession of Rock fish bridge and threw up some works. He had not been there many days when M'Donald approached, and sent a letter to Moore, enclosing the governor's proclamation, and advising him and his party to join the king's standard; and adding, that in case of refusal they must be treated as enemies. To this Moore replied, that he and his officers considered themselves as engaged in a cause the most glorious and honourable in the world, the defence of mankind; and in his turn offered, that if M'Donald's party laid down their arms they should be received as friends, but, otherwise they must expect consequences similar to those which they threatened. Soon after this, general M'Donald with his adherents pushed on to join governor Martin, but colonels Lillington and Caswell, with about 1000 militia men, took possession of Moore's creek bridge, which lay in their way, and raised a small breast work to secure themselves.

On the next morning the Highland emigrants attacked the militia posted at the bridge, but M'Cleod, the second in command, and some more of their officers being killed at the first onset, they fled with precipitation. General M'Donald was taken prisoner, and the whole of his party broken and dispersed. This overthrow produced consequences very injurious to the British interest. A royal fleet and army was expected on the coast. A [255] junction formed between them and the Highland emigrants in the interior country, might have made a sensible impression on the province. From an eagerness to do something, the insurgents prematurely took arms, and being crushed before the arrival of proper support, their spirits were so entirely broken, that no future effort could be expected from them.

1776 Feb. 27

While the war raged only in Massachusetts, each province conducted as under the expectation of being next attacked. Georgia, though a majority of its inhabitants were at first against the measures, yet about the middle of this year, joined the other colonies. Having not concurred in the petitions from Congress to the king, they petitioned by themselves, and stated their rights and grievances, in firm and decided language. They also adopted the continental association, and sent on their deputies to Congress.

In South-Carolina there was an eagerness to be prepared for defence, which was not surpassed in any of the provinces. Regiments were raised—forts were built—the militia trained, and every necessary preparation made for that purpose. Lord William Campbell, the royal governor, endeavoured to form a party for the support of government, and was in some degree successful. Distrusting his personal safety on

EXHIBIT 19
0681

shore, about the middle of September, he took up his residence on board an armed vessel, then in the harbour.

The royal government still existed in name and form; but the real power which the people obeyed, was exercised by a provincial congress, a council of safety, and subordinate committees. To conciliate the friendship of the Indians, the popular leaders sent a small supply of powder into their country. They who were opposed to Congress embodied, and robbed the waggons which were employed in its transportation. To inflame the minds of their adherents, they propagated a report that the powder was intended to be given to the Indians, for the purpose of massacring the friends of royal government. The inhabitants took arms, some to support royal government, but others to support the American measures.

The royalists [256] acted feebly and were easily overpowered. They were disheartened by the superior numbers that opposed

1776

them. They every where gave way and were obliged either to fly or feign submission. Solicitations had been made about this time for royal forces to awe the southern provinces, but without effect till the proper season was over. One scheme for this purpose was frustrated by a singular device. Private intelligence had been received of an express being sent from Sir James Wright, governor of Georgia, to general Gage. By him the necessity of ordering a part of the royal army to the southward was fully stated. The express was waylaid, and compelled by two gentle men to deliver his letters. One to general Gage was kept back, and another one forwarded in its room. The seal and hand writing were so exactly imitated that the deception was not suspected. The forged letter was received and acted upon. It stated such a degree of peace and tranquility as induced an opinion that there was no necessity of sending royal troops to the southward. While these states were thus left to themselves, they had time and opportunity to prepare for extremities, and in the mean time the friends of royal government were severally crushed. A series of disasters followed the royal cause in the year 1775. General Gage's army was cooped up in Boston, and rendered useless. In the southern states, where a small force would have made an impression, the royal governors were unsupported. Much was done to irritate the colonists and to cement their union, but very little, either in the way of conquest or concession, to subdue their spirits or conciliate their affections.

In this year the people of America generally took their side. Every art was made use of by the popular leaders to attach the inhabitants to their royal cause; nor were the votaries of the royal interest inactive. But little impression was made by the latter, except among the uninformed. The great mass of the wealth, learning, and influence, in all the southern colonies, and in most of the northern, was in favour of the American cause. Some aged persons were exceptions to the contrary.

Attached to ancient habits, and enjoying the fruits of their industry, [257] they were slow in approving new measures

1776

subversive of the former, and endangering the latter. A few who had basked in the sunshine of court favour, were restrained by honour, principle and interest, from forsaking the fountain of their enjoyments. Some feared the power of Britain, and others doubted the perseverance of America; but a great majority resolved to hazard every thing in preference to a tame submission. In the beginning of the year, the colonists were farmers, merchants and mechanics; but in its close they had assumed

EXHIBIT 19
0682

the profession of soldiers. So sudden a transformation of so numerous, and so dispersed a people, is without a parallel.

This year was also remarkable for the general termination of royal government. This was effected without any violence to its executive officers. The new system was not so much forcibly imposed or designedly adopted, as introduced through necessity, and the imperceptible agency of a common danger, operating uniformly on the mind of the public. The royal governors, for the most part, voluntarily abdicated their governments, and retired on board ships of war. They assigned for reason, that they apprehended personal danger, but this, in every instance, was unfounded. Perhaps these representatives of royalty thought, that as they were constitutionally necessary to the administration of justice, the horrors of anarchy would deter the people from prosecuting their opposition. If they acted from this principle, they were mistaken. Their withdrawing from the exercise of their official duties, both furnished an apology, and induced a necessity, for organising a system of government independent of royal authority. By encouraging opposition to the popular measures, they involved their friends in great distress. The unsuccessful insurrections which they fomented, being improperly timed, and unsupported, were easily overthrown, and actually strengthened the popular government, which they meant to destroy.

EXHIBIT 19
0683

[Back to Table of Contents]

# CHAPTER X

## Transactions In Massachusetts, And Evacuation Of Boston.

[258]

As the year 1775 drew near to a close, the friends of Congress were embarrassed with a new difficulty. Their army was temporary, and only engaged to serve out the year. The object for which they had taken up arms was not yet obtained. Every reason which had previously induced the provinces to embody a military force still existed, and with increasing weight. It was therefore resolved to form a new army. The same flattering hopes were indulged, that an army for the ensuing year would answer every purpose. A committee of Congress, consisting of Dr. Franklin, Mr. Lynch, and Mr. Harrison, repaired to head quarters at Cambridge, and there in conjunction with general Washington made arrangements for organizing an army for the year 1776. It was presumed that the spirit which had hitherto operated on the yeomanry of the country, would induce most of the same individuals to engage for another twelve-month, but on experiment it was found that much of their military ardor had already evaporated. The first impulse of passion, and the novelty of the scene, had brought many to the field, who had great objections against continuing in the military line. They found, that to be soldiers required sacrifices of which, when they assumed that character, they had no idea. So unacquainted were the bulk of the people with the mode of carrying on modern war, that many of them flew to arms with the delusive expectation of settling the whole dispute by a few decisive and immediate engagements. Experience soon taught them to risque life in open fighting, was but a part of the soldier's duty. Several of the inferior officers retired—the men frequently refused to enlist, unless they were allowed to chuse their officers. Others would not engage unless they were indulged with furloughs. Fifty would apply together for leave of absence; indulgence threatened less ruinous consequences than a refusal would probably have produced. On the whole enlistments went on slowly.

Though the recruits [259] for the new army had not arrived, yet the Connecticut troops, whose time expired on the first of December, could not be persuaded to continue in service. On their way home several of them were stopped by the country people and compelled to return. When every thing seemed to be exposed, by the departure of so great a part of the late army, the militia was called on for a temporary aid. A new difficulty obstructed, as well the recruiting of the army, as the coming in of the militia. Sundry persons infected with the small pox, were sent out of Boston and landed at Point Shirley. Such was the dread of that disease, that the British army scarcely excited equal terror. So many difficulties retarded the recruiting service, that on the last day of the year 1775, the whole American army amounted to no more than 9650 men. Of the remarkable events with which this important year was replete, it was not the least, that within musket shot of twenty British regiments, one army was disbanded and another enlisted.

1776

1776

EXHIBIT 19
0684

All this time the British troops at Boston were suffering the inconvenience of a blockade. From the 19th of April they were cut off from those refreshments which their situation required. Their supplies from Britain did not reach the coast for a long time after they were expected. Several were taken by the American cruisers, and others were lost at sea. This was in particular the fate of many of their coal ships. The want of fuel was peculiarly felt in a climate where the winter is both severe and tedious. They relieved themselves in part from their sufferings on this account, by the timber of houses which they pulled down and burnt. Vessels were dispatched to the West-Indies to procure provisions; but the islands were so straitened, that they could afford but little assistance. Armed ships and transports were ordered to Georgia with an intent to procure rice, but the people of that province, with the aid of a party from South-Carolina, so effectually opposed them, that of eleven vessels, only two got off safe with their cargoes.

It was not till the stock of the garrison was nearly exhausted that the transports from England entered the port of [260] Boston, and relieved the distresses of the garrison.

1776

While the troops within the lines were apprehensive of suffering from want of provisions, the troops without were equally uneasy for want of employment. Used to labour and motion on their farms, they but illy relished the inactivity and confinement of a camp life. Fiery spirits declaimed in favour of an assault. They preferred a bold spirit of enterprize, to that passive fortitude which bears up under present evils, while it waits for favorable junctures. To be in readiness for an attempt of this kind, a council of war recommended to call in 7280 militia men, from New-Hampshire or Connecticut.

This number added to the regular army before Boston, would have made an operating force of about 17,000 men.

January 17–18

The provincials laboured under great inconveniences from the want of arms and ammunition. Very early in the contest, the king of Great-Britain, by proclamation, forbad the exportation of warlike forces to the colonies. Great exertions had been made to manufacture salt petre and gun powder, but the supply was slow and inadequate. A secret committee of Congress had been appointed, with ample powers to lay in a stock of this necessary article. Some swift sailing vessels had been dispatched to the coast of Africa to purchase what could be procured in that distant region. A party from Charleston forcibly took about 17000 lbs. of powder from a vessel near the bar of St. Augustine. Some time after, commodore Hopkins stripped Providence, one of the Bahama islands of a quantity of artillery and stores; but the whole, procured from all these quarters, was far short of a sufficiency. In order to supply the new army before Boston with the necessary means of defence, an application was made to Massachusetts for arms, but on examination it was found that their public stores afforded only 200. Orders were issued to purchase firelocks from private persons, but few had any to sell, and fewer would part with them. In the month of February, there were 2000 of the American infantry, who were destitute of arms. Powder was equally scarce, and yet daily applications were made for dividends of the small quantity [261] which was on hand, for the defence of various parts threatened with invasion. The eastern colonies presented an unusual sight. A powerful enemy safely intrenched in their first city, while a fleet

1776

EXHIBIT 19
0685

was ready to transport them to any part of the coast. A numerous body of husbandmen was resolutely bent on opposition, but without the necessary arms and ammunition for self defence. The eyes of all were fixed on general Washington, and from him it was unreasonably expected that he would by a bold exertion, free the town of Boston from the British troops. The dangerous situation of public affairs led him to conceal the real scarcity of arms and ammunition, and with that magnanimity which is characteristic of great minds, to suffer his character to be assailed, rather than vindicate himself by exposing his many wants. There were not wanting persons, who judging from the superior numbers of men in the American army, boldly asserted, that if the commander in chief was not desirous of prolonging his importance at the head of an army, he might by a vigorous exertion gain possession of Boston. Such suggestions were reported and believed by several, while they were uncontradicted by the general, who chose to risque his fame, rather than expose his army and his country.

Agreeably to the request of the council of war, about 7000 of the militia had rendezvoused in February. General Washington stated to his officers that the troops in camp, together with the reinforcements which had been called for, and were daily coming in, would amount nearly to 17,000 men—that he had not powder sufficient for a bombardment, and asked their advice whether, as reinforcements might be daily expected to the enemy, it would not be prudent before that event took place, to make an assault on the British lines. The proposition was negatived; but it was recommended to take possession of Dorchester heights. To conceal this design, and to divert the attention of the garrison, a bombardment of the town from other directions commenced, and was carried on for three days with as much briskness as a deficient stock of powder would admit.

In this first essay, [262 ] three of the mortars were broken, either from a defect in their construction, or more probably from ignorance of the proper mode of using them.

1776

The night of the 4th of March was fixed upon for taking possession of Dorchester heights. A covering party of about 800 men led the way. These were followed by the carts with the intrenching tools, and 1200 of a working party, commanded by general Thomas. In the rear there were more than 200 carts, loaded with fascines, and hay in bundles. While the cannon were playing in other parts, the greatest silence was kept by this working party. The active zeal of the industrious provincials completed lines of defence by the morning, which astonished the garrison. The difference between Dorchester heights on the evening of the 4th, and the morning of the 5th, seemed to realise the tales of romance. The admiral informed general Howe, that if the Americans kept possession of these heights, he would not be able to keep one of his majesty's ships in the harbour. It was therefore determined in a council of war, to attempt to dislodge them. An engagement was hourly expected. It was intended by general Washington, in that case, to force his way into Boston with 4000 men, who were to have embarked at the mouth of Cambridge river. The militia had come forward with great alertness, each bringing three days provision, in expectation of an immediate assault. The men were in high spirits, and impatiently waiting for the appeal.

EXHIBIT 19
0686

They were reminded that it was the 5th of March, and were called upon to avenge the death of their countrymen killed on that day. The many eminences in and near Boston, which overlooked the ground on which it was expected that the contending parties would engage, were crouded with numerous spectators. But general Howe did not intend to attack till the next day. In order to be ready for it, the transports went down in the evening towards the castle. In the night a most violent storm, and towards morning a heavy flood of rain, came on.

A carnage was thus providentially prevented, that would probably have equalled, if not exceeded, the fatal [263] 17th of June, at Bunker's-hill. In this situation it was agreed by the British, in a council of war, to evacuate the town as soon as possible.

| 1776 |
| --- |

In a few days after, a flag came out of Boston, with a paper signed by four select men, informing, "that they had applied to general Robertson, who, on application to general Howe, was authorised to assure them, that he had no intention of burning the town, unless the troops under his command were molested, during their embarkation, or at their departure, by the armed force without." When this paper was presented to general Washington, he replied, "that as it was an unauthenticated paper, and without an address, and not obligatory on general Howe, he could take no notice of it;" but at the same time intimated his good wishes for the security of the town.

A proclamation was issued by general Howe, ordering all woollen and linen goods to be delivered to Crean Brush, Esq. Shops were opened and stripped of their goods. A licentious plundering took place. Much was carried off, and more was wantonly destroyed. These irregularities were forbidden in orders, and the guilty threatened with death, but nevertheless every mischief which disappointed malice could suggest, was committed.

The British amounting to more than 7000 men, evacuated Boston, leaving their barracks standing, and also a number of pieces of cannon spiked, four large iron sea mortars, and stores, to the value of £ 30,000. They demolished the castle, and knocked off the trunnions of the cannon. Various incidents caused a delay of nine days after the evacuation, before they left Nantasket road.

| March 17 |
| --- |

This embarkation was attended with many circumstances of distress and embarrassment. On the departure of the royal army from Boston, a great number of the inhabitants attached to their sovereign, and afraid of public resentment, chose to abandon their country. From the great multitude about to depart, there was no possibility of procuring purchasers for their furniture, neither was there a sufficiency of vessels for its convenient transportation. Mutual jealousy subsisted between the [264] army and navy; each charging the other as the cause of some part of their common distress. The army was full of discontent. Reinforcements though long promised, had not arrived. Both officers and soldiers thought themselves neglected. Five months had elapsed since they had received any advice of their destination. Wants and inconveniencies increased their ill humour. Their intended voyage to Halifax subjected them to great dangers. The coast at all times hazardous, was eminently so at that tempestuous equinoctial season. They had reason to fear they

EXHIBIT 19
0687

would be blown off to the West-Indies, and without a sufficient stock of provisions. They were also going to a barren country. To add to their difficulties, this dangerous voyage when completed, was directly so much out of their way. Their business lay to the southward, and they were going northward. Under all these difficulties, and with all these gloomy prospects, the fleet steered for Halifax. Contrary to appearances, the voyage thither was both short and prosperous. They remained there for some time, waiting for reinforcements and instructions from England. When the royal fleet and army departed from Boston, several ships were left behind for the protection of vessels coming from England, but the American privateers were so alert that they nevertheless made many prizes. Some of the vessels which they captured, were laden with arms and warlike stores. Some transports, with troops on board, were also taken. These had run into the harbour, not knowing that the place was evacuated. The boats employed in the embarkation of the British troops, had scarcely completed their business when general Washington, with his army, marched into Boston. He was received with marks of approbation more flattering than the pomps of a triumph. The inhabitants released from the severities of a garrison life, and from the various indignities to which they were subjected, hailed him as their deliverer. Reciprocal congratulations between those who had been confined within the British lines, and those [who] were excluded from entering them, were exchanged with an ardor which cannot be discribed.

General Washington [265] was honoured by Congress with a vote of thanks. They also ordered a medal to be struck, with suitable devices to perpetuate the remembrance of the great event. The Massachusetts council and house of representatives complimented him in a joint address, in which they expressed their good wishes in the following words, "May you still go on approved by heaven—revered by all good men, and dreaded by those tyrants, who claim their fellow men as their property." His answer was modest and proper.

1776

The evacuation of Boston had been previously determined upon by the British ministry, from principles of political expedience. Being resolved to carry on the war for purposes affecting all the colonies, they conceived a central position to be preferable to Boston. Reasoning of this kind had induced the adoption of the measure, but the American works on Roxbury expedited its execution. The abandonment of their friends, and the withdrawing their forces from Boston, was the first act of a tragedy in which evacuations and retreats were the scenes which most frequently occurred, and the epilogue of which was a total evacuation of the United States.

EXHIBIT 19
0688

[Back to Table of Contents]

# CHAPTER XI

# Transactions In Canada.

The tide of good fortune which in the autumn of 1775 flowed in upon general Montgomery, induced Congress to reinforce the army under his command. Chamblee, St. Johns, and Montreal having surrendered to the Americans, a fair prospect opened of expelling the British from Canada, and of annexing that province to the united colonies. While they were in imagination anticipating these events, the army in which they confided was defeated, and the general whom they adored was killed.

The intelligence transmitted from general Montgomery, previous to his assault on Quebec, encouraged Congress to resolve that nine battalions should be kept up and maintained in Canada. The repulse of their army, [266] though discouraging, did not extinguish the ardor of the Americans. It was no sooner known, at headquarters in Cambridge, than general Washington convened a council of war by which it was resolved, "That as no troops could be spared from Cambridge, the colonies of Massachusetts, Connecticut and New-Hampshire, should be requested to raise three regiments and forward them to Canada.["]

| Jan. 8, 1776 |

Congress also resolved to forward the reinforcements previously voted, and to raise four battalions in New-York, for the defence of that colony, and to garrison Crown-Point, and the several posts to the southward of that fortress. That the army might be supplied with blankets for this winter expedition, a committee was appointed to procure from householders, such as could be spared from their families. To obtain a supply of hard money for the use of the army in Canada, proper persons were employed to exchange paper money for specie. Such was the enthusiasm of the times that many thousand Mexican dollars were freely exchanged at par, by individuals for the paper bills of Congress. It was also resolved, to raise a corps of artillery for this service, and to take into the pay of the colonies one thousand Canadians, in addition to colonel Livingston's regiment. Moses Hazen, a native of Massachusetts, who had resided many years in Canada, was appointed to the command of this new corps.

| Jan. 19 |

Congress addressed a letter to the Canadians in which they observed, "Such is the lot of human nature, that the best of causes are subject to vicissitudes; but generous souls, enlightened and warmed with the fire of liberty, become more resolute as difficulties increase.["] They stated to them, "that eight battalions were raising to proceed to their province, and that if more force was necessary it should be sent." They requested them to seize with eagerness the favourable opportunity then offered to co-operate in the present glorious enterprise, and they advised them to establish associations in their different parishes—to elect deputies for forming a provincial assembly, and for representing them in Congress.

| Jan. 24 |

EXHIBIT 19
0689

The cause of the Americans had received such powerful aid from many patriotic publications in their gazettes, [267] and from the fervent exhortations of popular preachers, connecting the cause of liberty with the animating principles of religion, that it was determined to employ these two powerful instruments 1776 of revolutions—printing and preaching, to operate on the minds of the Canadians. A complete apparatus for printing, together with a printer and a clergyman, were therefore sent into Canada.

Congress also appointed Dr. Franklin, Mr. Chase and Mr. Carrol, the two first of whom were members of their body, and the last a respectable gentleman of the Roman catholic persuasion to proceed to Canada with the view of gaining over the people of that colony to the cause of America, and authorised them to promise on behalf of the united colonies, that Canada should be received into their association on equal terms, and also that the inhabitants thereof should enjoy the free exercise of their religion, and the peaceable possession of all their ecclesiastical property.

The desire of effecting something decisive in Canada before the approaching spring, would permit relief to ascend the river St. Lawrence, added to the enthusiasm of the day, encountered difficulties which, in less animated times, would be reckoned unsurmountable. Arthur St. Clair who was appointed colonel of one of the Pennsylvania regiments received his recruiting orders on the 10th of January, and notwithstanding the shortness of the period, his regiment was not only raised, but six companies of it had, in this extreme cold season, completed their march from Pennsylvania to Canada, a distance of several hundred miles, and on the eleventh of April following, joined the American army before Quebec.

Though Congress and the states made great exertions to support the war in Canada, yet from the fall of Montgomery their interest in that colony daily declined. The reduction of Quebec was an object to which their resources were inadequate. Their unsuccessful assault on Quebec made an impression both on the Canadians and Indians unfavorable to their views.
A woman infected with the small-pox had either been sent out, or 1776 voluntarily came out of Quebec, and by mixing with the American soldiers [268] propagated that scourge of the new world to the great diminution of the effective force of their army. The soldiers inoculated themselves, though their officers issued positive orders to the contrary. By the first of May so many new troops had arrived that the American army, in name, amounted to 3000, but from the prevalence of the small-pox there were only 900 fit for duty. The increasing number of invalids retarded their military operations, and discouraged their friends, while the opposite party was buoyed up with the expectation that the advancing season would soon bring them relief. To these causes of the declining interest of Congress, it must be added that the affections of the Canadians were alienated. They had many and well founded complaints against the American soldiers. Unrestrained by the terror of civil law and refusing obedience to a military code, the hope of impunity and the love of plunder, led many of the invading army to practices not less disgraceful to themselves, than injurious to the cause in which they had taken arms. Not only the common soldiers but the officers of the American army deviated, in their intercourse with the Canadians, from the maxims of sound policy. Several of them

EXHIBIT 19
0690

having been lately taken from obscure life were giddy with their exaltation. Far from home they were unawed by those checks which commonly restrain the ferocity of man.

The reduction of Chamblee, St. Johns', and Montreal, together with the exposed situation of Quebec, being known in England, measures were without delay adopted by the British ministry to introduce into Canada, as soon as possible, a force sufficient for the double purpose of recovering what they had lost, and of prosecuting offensive operations from that quarter against the revolted colonies.

The van of this force made good its passage, very early in the spring, through the ice up the river St. Lawrence. The expectation of their coming had for some time damped the hopes of the besiegers, and had induced them to think of a retreat. The day before the first of the British reinforcements arrived, that measure was resolved upon by a council of war, and arrangements were made for carrying it into execution.

May 5

[269]

Governor Carleton was too great a proficient in the art of war, to delay seizing the advantages which the consternation of the besiegers, and the arrival of a reinforcement, afforded. A small detachment of soldiers and marines from the ships which had just ascended the river St. Lawrence, being landed and joined to the garrison in Quebec, he marched out at their head to attack the Americans. On his approach, he found every thing in confusion. The late besiegers abandoning their artillery and military stores, had in great precipitation retreated. In this manner at the expiration of five months, the mixed siege and blockade of Quebec was raised. The fortitude and perseverance of the garrison reflected honour on both officers and privates.

1776

The reputation acquired by general Carleton in his military char acter, for bravely and judiciously defending the province committed to his care, was exceeded by the superior applause, merited from his exercise of the virtues of humanity and generosity. Among the numerous sick in the American hospitals, several incapable of being moved were left behind.

The victorious general proved himself worthy of success by his treatment of these unfortunate men, he not only fed and cloathed them, but permitted them when recovered to return home, apprehending that fear might make some conceal themselves in the woods, rather than by applying for relief, make themselves known, he removed their doubts by a proclamation, in which he engaged, "that as soon as their health was restored, they should have free liberty of returning to the respective provinces." This humane line of conduct was more injurious to the view of the leaders in the American councils, than the severity practised by other British commanders. The truly politic, as well as humane general Carleton, dismissed these prisoners after liberally supplying their wants with a recommendation, "to go home, mind their farms, and keep themselves and their neighbours from all participation in the unhappy war."

May 10

The small force which arrived at Quebec early in May, was followed by several British regiments; together with [270] the

1776

EXHIBIT 19
0691

Brunswic troops in such a rapid succession, that in a few weeks the whole was estimated at 13,000 men.

The Americans retreated forty five miles before they stopped. After a short halt, they proceeded to the Sorel, at which place they threw up some slight works for their safety. They were there joined by some battalions coming to reinforce them. About this time general Thomas, the commander in chief in Canada was seized with the small pox and died, having forbidden his men to inoculate, he conformed to his rule, and refused to avail himself of that precaution. On his death, the command devolved at first on general Arnold, and afterwards on general Sullivan. It soon became evident, that the Americans must abandon the whole province of Canada.

From a desire to do something which might counterbalance in the minds of the Canadians, the unfavorable impression which this farther retreat would communicate, General Thomson projected an attack on the British post at the Three Rivers. This lies about half way between Quebec and Montreal, and is so called from the vicinity of one of the branches of a large river, whose waters are discharged through three mouths into the St. Lawrence. With this view a detachment of six hundred men was put under the command of colonel St. Clair. At their head he advanced to the village of Nicolette. When every thing was ready for the enterprise, intelligence was received that six transports escorted by two frigates from Quebec, had arrived and brought a large addition to the late force at the Three Rivers. This caused some new movements, and a delay till more troops could be brought forward. General Thomson then came on with a reinforcement and took the command of the whole. It was determined to make the proposed attack in four different places at the same time. One division commanded by colonel Wayne was to gain the eastern extremity of the town. One commanded by colonel Maxwell was to enter from the northward about the center, and the other two divisions commanded by colonels Sinclair and Irvine were to enter from the westward.

The whole [271] having embarked at midnight, landed at the Point du Lac, about three hours before day. At some distance ⟨1776⟩ from this point, there are two ways of approaching Three Rivers, one by a road that leads along the banks of the St. Lawrence, the other by a road almost parallel, but at a considerable distance. It had been determined to advance on the last. Intelligence was brought to general Thomson, soon after his landing that a party of 3 or 400 men were posted at three miles distance. The troops were instantly put in motion to dislodge them. The intelligence proved to be false but it had carried the detachment, some distance beyond the point, where the roads separated. To have returned, would have consumed time that could not be spared as the day was fast approaching. It was therefore resolved to proceed in a diagonal direction towards the road they had left. After being much retarded by very difficult grounds, they arrived at a morass which seemed impassable. Here the day broke, when they were six miles from the object. General Thomson suspecting the fidelity of his guides, put them under arrest—reversed the order of his march, and again reached the road by the river. He had advanced but a small distance before he was fired upon by two armed vessels. All expectation of succeeding by surprise, was now at an end. It was therefore instantly determined to make an open attack. The sun was rising. The drums were ordered to beat, and the troops moved on with the greatest alacrity. Having advanced three miles

EXHIBIT 19
0692

farther, the ships of war began to fire on them. The American officer who led the advance, struck into a road on the left, which also led to the town, and was covered from the fire of the ships. This last road was circuitous and led through a vast tract of woodland at that season almost impassable. He nevertheless entered the wood, and the rest of the detachment followed. After incredible labour, and wading a rivulet breast deep, they gained the open country north of the village. A party of the British were soon discovered about a mile to the left of the Americans, and between them and the town. Colonel Wayne, ardent for action immediately attacked them. The onset was gallant [272] and vigorous, but the contest was unequal.

The Americans were soon repulsed and forced to retreat. In the beginning of the action general Thomson left the main body of

1776

his corps to join that which was engaged. The woods were so thick, that it was difficult for any person in motion, after losing sight of an object to recover it. The general therefore never found his way back. The situation of colonel St. Clair, the next in command became embarrassing. In his opinion a retreat was necessary, but not knowing the precise situation of his superior officer, and every moment expecting his return, he declined giving orders for that purpose. At last when the British were discovered on the river road, advancing in a direction to gain the rear of the Americans, colonel St. Clair in the absence of gen. Thomson, ordered a retreat. This was made by treading back their steps through the same dismal swamp by which they had advanced. The British marched directly for the point du Lac with the expectation of securing the American batteaux. On their approach major Wood, in whose care they had been left, retired with them to the Sorel. At the point du Lac, the British halted and took a very advantageous position. As soon as it was discovered that the Americans had retired, a party of the British pursued them. When the former arrived near the place of their embarkation, they found a large party of their enemies posted in their front, at the same time that another was only three quarters of a mile in their rear. Here was a new and trying dilemma, and but little time left for consideration. There was an immediate necessity, either to lay down their arms or attempt by a sudden March to turn the party in front and get into the country beyond it. The last was thought practicable. Colonel St. Clair having some knowledge of the country from his having served in it in the preceding war, gave them a route by the Acadian village where the river de Loups is fordable. They had not advanced far when colonel St. Clair found himself unable to proceed from a wound, occasioned by a root which had penetrated through his shoe.

His men offered to carry him, but this generous proposal was declined. [273] He and two or three officers, who having been

1776

worn down with fatigue, remained behind with him, found an asylum under cover of a large tree which had been blown up by the roots. They had not been long in this situation when they heard a firing from the British in almost all directions. They nevertheless lay still, and in the night stole off from the midst of surrounding foes. They were now pressed with the importunate cravings of hunger, for they were entering on the third day without food. After wandering for some time, they accidentally found some peasants, who entertained them with great hospitality. In a few days they joined the army at Sorel, and had the satisfaction to find that the greatest part of the detachment had arrived safe before them. In their way through the country, although they might in almost every step of it have been made prisoners, and had reason to fear that the inhabitants from the prospect of reward, would have been

EXHIBIT 19
0693

tempted to take them, yet they met with neither injury nor insult. General Thomson was not so fortunate. After having lost the troops and falling in with colonel Irwine, and some other officers, they wandered the whole night in thick swamps, without being able to find their way out. Failing in their attempts to gain the river, they had taken refuge in a house, and were there made prisoners.

The British forces having arrived, and a considerable body of them having rendezvoused at the Three Rivers, a serious pursuit of the American army commenced. Had Sir Guy Carleton taken no pains to cut off their retreat, and at once attacked their post, or rather their fortified camp at Sorel, it would probably have fallen into his hands; but either the bold, though unsuccessful attack, at the Three rivers had taught him to respect them, or he wished to reduce them without bloodshed. In the pursuit he made three divisions of his army, and arranged them so as to embrace the whole American encampment, and to command it in every part. The retreat was delayed so long that the Americans evacuated Sorel, only about two hours before one division of the British made its appearance.

[274]

While the Americans were retreating, they were daily assailed by the remonstrances of the inhabitants of Canada, who had either joined or befriended them. Great numbers of Canadians had taken a decided part in their favour, rendered them essential services, and thereby incurred the heavy penalties annexed to the crime of supporting rebellion. These, though Congress had assured them but a few months before "that they would never abandon them to the fury of their common enemies" were from the necessity of the case left exposed to the resentment of their provincial rulers. Several of them with tears in their eyes, expostulated with the retreating army, and bewailing their hard fate prayed for support. The only relief the Americans could offer was an assurance of continued protection, if they retreated with them, but this was a hard alternative to men who had wives, children and immovable effects. They generally concluded, that it was the least of two evils to cast themselves on the mercy of that government, against which they had offended.

The distresses of the retreating army were great. The British were close on their rear and threatening them with destruction. The unfurnished state of the colonies in point of ordnance, imposed a necessity of preserving their cannon. The men were obliged to drag their loaded batteaus up the rapids by mere strength, and when they were to the middle in water. The retreating army was also incumbered with great numbers labouring under the small-pox, and other diseases. Two regiments, at one time, had not a single man in health. Another had only six, and a fourth only forty, and two more were in nearly the same condition.

To retreat in face of an enemy is at all times hazardous; but on this occasion it was attended with an unusual proportion of embarrassments. General Sullivan, who conducted the retreat, nevertheless acted with so much judgment and propriety, that the baggage and public stores were saved, and the numerous sick brought off. The American army reached Crown-Point on the first of July, and at that place made their first stand.

EXHIBIT 19
0694

[275]

A short time before the Americans evacuated the province of Canada, General Arnold convened the merchants of Montreal, and proposed to them to furnish a quantity of specified articles, for the use of the army in the service of Congress. While they were deliberating on the subject, he placed centinels at their shop doors, and made such arrangements, that what was at first only a request, operated as a command. A great quantity of goods were taken on pretence that they were wanted for the use of the American army, but in their number were many articles only serviceable to women, and to persons in civil life. His nephew soon after opened a store in Albany, and publicly disposed of goods which had been procured at Montreal.

1776

The possession of Canada so eminently favoured the plans of defence adopted by Congress, that the province was evacuated with great reluctance. The Americans were not only mortified at the disappointment of their favourite scheme, of annexing it as a fourteenth link in the chain of their confederacy, but apprehended the most serious consequences from the ascending of the British power in that quarter. Anxious to preserve a footing there, they had persevered for a long time in stemming the tide of unfavorable events.

General Gates was about this time appointed to command in Canada, but on coming to the knowledge of the late events in that province, he concluded to stop short within the limits of New-York. The scene was henceforth reversed. Instead of meditating the recommencement of offensive operations, that army which had lately excited so much terror in Canada, was called upon to be prepared for repelling an invasion threatened from that province.

Jun. 17

The attention of the Americans being exclusively fixed on plans of defence, their general officers commanding in the northern department, were convened to deliberate on the place and means most suitable for that purpose. To form a judgment on this subject, a recollection of the events of the late war, between France and England, was of advantage. The same ground was to be fought over, [276] and the same posts to be again contended for. On the confines of Lake George and Lake Champlain two inland seas, which stretch almost from the sources of Hudson's river to the St. Lawrence, are situated the famous posts of Ticonderoga and Crown-Point. These are of primary necessity to any power which contends for the possession of the adjacent country, for they afford the most convenient stand either for its annoyance or defence. In the opinion of some American officers, Crown-Point to which the army on the evacuation of Canada had retreated, was the most proper place for erecting works of defence, but it was otherwise determined, by the council convened, on this occasion. It was also by their advice resolved, to move lower down, and to make the principal work on the strong ground east of Ticonderoga, and especially by every means to endeavour to maintain a naval superiority in Lake Champlain. In conformity to these resolutions general Gates with about 12,000 men, which collected in the course of the summer, was fixed in command of Ticonderoga, and a fleet was constructed at Skenesborough. This was carried on with so much rapidity, that in a short time there were afloat, in Lake Champlain, one sloop, three schooners, and six gondolas, carrying in the whole 58 guns, 86 swivels, and 440 men.

August 22

**EXHIBIT 19
0695**

Six other vessels were also nearly ready for launching at the same time. The fleet was put under the command of general Arnold, and he was instructed by general Gates, to proceed beyond Crown-Point, down Lake Champlain, to the Split Rock; but most peremptorily restrained from advancing any farther, as security against an apprehended invasion was the ultimate end of the armament.

The expulsion of the American invaders from Canada, was but a part of the British designs in that quarter. They urged the pursuit no farther than St. John's, but indulged the hope of being soon in a condition for passing the lakes, and penetrating through the country to Albany, so as to form a communication with New-York. The objects they had in view were great, and the obstacles in the way of their accomplishment equally so. [277]

Before they could advance with any prospect of success, a fleet superior to that of the Americans on the lakes, was to be constructed. The materials of some large vessels were, for this purpose, brought from England, but their transportation, and the labour necessary to put them together required both time and patience. The spirit of the British commanders rose in proportion to the difficulties which were to be encountered. Nevertheless it was so late as the month of October, before their fleet was prepared to face the American naval force, on Lake Champlain. The former consisted of the ship Inflexible, mounting 18 twelve pounders, which was so expeditiously constructed, that she sailed from St. John's 28 days after laying her keel. One schooner mounting 14 and another 12 six pounders. A flat bottomed radeau carrying six 24 and six 12 pounders, besides howitzers, and a gondola with seven nine pounders. There were also twenty smaller vessels with brass field pieces, from 9 to 24 pounders, or with howitzers. Some long boats were furnished in the same manner. An equal number of large boats acted as tenders. Besides these vessels of war, there was a vast number destined for the transportation of the army, its stores, artillery, baggage and provisions. The whole was put under the command of captain Pringle. The naval force of the Americans, from the deficiency of means, was far short of what was brought against them. Their principal armed vessel was a schooner, which mounted only 12 six and four pounders, and their whole fleet in addition to this, consisted of only fifteen vessels of inferior force.

> 1776

No one step could be taken towards accomplishing the designs of the British, on the northern frontiers of New-York, till they had the command of Lake Champlain. With this view their fleet proceeded up the lake, and engaged the Americans. The wind was so unfavorable to the British, that their ship Inflexible, and some other vessel of force, could not be brought to action. This lessened the inequality between the contending fleets so much, that the principal damage sustained by the Americans, was the loss of a schooner and gondola.

> Oct. 11

At the [278] approach of night the action was discontinued. The vanquished took the advantage, which the darkness afforded to make their escape. This was effected by general Arnold, with great judgment and ability. By the next morning the whole fleet under his command was out of sight. The British pursued with all the sail they could croud. The wind having become more favorable, they overtook the Americans, and brought them to action near Crown-Point.

> 1776

EXHIBIT 19
0696

A smart engagement ensued and was well supported on both
sides for about two hours. Some of the American vessels which

Oct. 13

were most ahead escaped to Ticonderoga. Two gallies and five gondolas remained
and resisted an unequal force, with a spirit approaching to desperation. One of the
gallies struck and was taken. General Arnold, though he knew that to escape was
impossible, and to resist unavailing, yet instead of surrendering, determined that his
people should not become prisoners, nor his vessels a re-inforcement to the British.
This spirited resolution was executed with a judgment, equal to the boldness, with
which it had been adopted. He ran the Congress galley, on board of which he was,
together with the five gondolas on shore, in such a position, as enabled him to land his
men and blow up the vessels. In the execution of this perilous enterprise, he paid a
romantic attention to a point of honour. He did not quit his own galley till she was in
flames, lest the British should board her, and strike his flag. The result of this action,
though unfavorable to the Americans, raised the reputation of general Arnold, higher
than ever. In addition to the fame of a brave soldier, he acquired that of an able sea
officer.

The American naval force being nearly destroyed, the British had undisputed
possession of Lake Champlain. On this event a few continental troops which had been
at Crown-Point, retired to their main body at Ticonderoga. General Carleton took
possession of the ground from which they had retreated, and was there soon joined by
his army. He sent out several reconnoitering parties, and at one time pushed forward a
strong detachment on both sides of the lake, which approached near [279] to
Ticonderoga.

Some British vessels appeared at the same time, within cannon
shot of the American works, at that place. It is probable he had it

1776

in contemplation, if circumstances favoured to reduce the post, and that the apparent
strength of the works, restrained him from making the attempt, and induced his return
to Canada.

Such was the termination of the northern campaign in 1776. Though after the
surrender of Montreal evacuations, defeats, and retreats, had almost uninterruptedly
been the portion of the Americans, yet with respect to the great object of defence on
the one side, and of conquest on the other, a whole campaign was gained to them, and
lost to their adversaries.

The British had cleared Canada of its invaders, and destroyed the American fleet on
the lakes, yet from impediments thrown in their way, they failed in their ulterior
designs. The delays contrived by general Gates, retarded the British for so great a part
of the summer, that by the time they had reached Ticonderoga, their retreat on account
of the approaching winter, became immediately necessary. On the part of the
Americans, some men, and a few armed vessels were lost, but time was gained, their
army saved, and the frontier of the adjacent states secured from a projected invasion.
On the part of the British, the object of a campaign, in which 13,000 men were
employed, and near a million of money expended, was rendered in a great measure
abortive.

EXHIBIT 19
0697

[Back to Table of Contents]

# CHAPTER XII

## The Proceedings Of Parliament, Against The Colonies, 1775–6. Operations In South-Carolina, New-York, And New-Jersey.

The operations carried on against the united colonies, in the year 1775, were adapted to cases of criminal combination among subjects not in arms. The military arrangements for that year, were therefore made on the idea of a trifling addition to a peace establishment. [280]

It was either not known, that a majority of the Americans had determined to resist the power of Great-Britain, rather than submit to the late coercive laws, or it was not believed that they had spirit sufficient to act in conformity to that determination. The propensity in human nature, to believe that to be true, which is wished to be so, had deceived the royal servants in America, and the British ministry in England, so far as to induce their general belief, that a determined spirit on the part of government, and a few thousand troops to support that determination, would easily compose the troubles in America. Their military operations in the year 1775, were therefore calculated on the small scale of strengthening the civil power, and not on the large one of resisting an organised army. Though it had been declared by parliament in February, 1775, that a rebellion existed in Massachusetts, yet it was not believed that the colonists would dare to abet their opposition by an armed force. The resistance made by the militia at Lexington, the consequent military arrangements adopted, first by Massachusetts, and afterwards by Congress, together with the defence of Bunker's-hill, all conspired to prove that the Americans were far from being contemptible adversaries. The nation finding itself, by a fatal progression of the unhappy dispute, involved in a civil war, was roused to recollection. Though several corporate bodies, and sundry distinguished individuals in Great-Britain, were opposed to coercive measures, yet there was a majority for proceeding. The pride of the nation was interested in humbling the colonists, who had dared to resist the power which had lately triumphed over the combined force of France and Spain. The prospect of freeing their own estates from a part of the heavy taxes charged thereon, induced numbers of the landed gentlemen in Great-Britain to support the same measures. They conceived the coercion of the colonies to be the most direct mode of securing their contribution towards sinking the national debt. Influenced by these opinions, such not only justified the adoption of rigorous measures, but chearfully consented to present additional taxes with the same spirit [281] which induces litigants in private life to advance money for forwarding a lawsuit, from the termination of which great profits are expected. Lord North, the prime minister of England, finding himself supported by so many powerful interests, was encouraged to proceed. He had already subdued a powerful party in the city of London, and triumphed over the East-India company. The submission of the colonies was only wanting to complete the glory of his administration. Previous success emboldened him to attempt the arduous business. He flattered himself that the accomplishment of it would, not only restore peace to the

201

EXHIBIT 19
0698

empire, but give a brilliancy to his name, far exceeding that of any of his predecessors.

Such was the temper of a great part of the nation, and such the ambitious views of its prime minister, when the parliament was convened, on the 24th of October 1775. In the speech from the throne great complaints were made of the leaders in the colonies, who were said by their misrepresentatives to have infused into the minds of the deluded multitude opinions, repugnant to their constitutional subordination, and afterwards to have proceeded to the commencement of hostilities, and the usurpation of the whole powers of government. His majesty also charged his subjects in America with "meaning only to amuse by vague expressions of attachment to the Parent State, while they were preparing for a general revolt." And he farther asserted "that the rebellious war now levied by them was become more general, and manifestly carried on for the purpose of establishing an independent empire, and that it was become the art of wisdom, and in its effects, of clemency to put a speedy end to these disorders, by the most decisive exertions."

Information was also given, that "the most friendly offers of foreign assistance had been received, and that his majesty's electoral troops were sent to the garrison of Gibraltar and Port Mahon, in order that a large number of the established forces of the kingdom might be applied to the maintenance of its authority."
The severity of these assertions was mitigated by a declaration, | 1775
"that when the unhappy and deluded multitude against [282]
whom this force should be directed, would become sensible of their error, his majesty would be ready to receive the misled with tenderness and mercy," "and that to prevent inconveniences, he should give authority to certain persons on the spot, to grant general or particular pardons and indemnities to such as should be disposed to return to their allegiance." The sentiments expressed in this speech and the heavy charges therein laid against the colonists, were re-echoed in addresses to the king from both houses of parliament, but not without a spirited protest in the house of lords. In this, nineteen dissenting members asserted the American war to be "unjust and impolitic in its principles, and fatal in its consequences." They also declared, that they could not consent to an address, "which might deceive his majesty and the public into a belief of the confidence of their house in the present ministers, who had disgraced parliament, deceived the nation—lost the colonies, and involved them in a civil war against their clearest interests, and upon the most unjustifiable grounds wantonly spilling the blood of thousands of their fellow subjects."

The sanction of parliament being obtained for a vigorous prosecution of the American war, estimates for the public service, were agreed to on the idea of operating against the colonies as an hostile armed foreign power. To this end it was voted to employ 28,000 sea-men, and 55,900 land forces, and the sanction of authority was not long after given to measures for engaging foreign mercenaries. No ministry had in any preceding war exerted themselves more to prosecute military operations against alien enemies, than the present to make the ensuing campaign decisive of the dispute between the Mother Country and the colonies.
One legislative act was still wanting to give full efficacy to the | Nov. 20, 1775
intended prosecution of hostilities. This was brought into

EXHIBIT 19
0699

parliament in a bill interdicting all trade and intercourse with the thirteen united colonies. By it all property of Americans, whether of ships or goods, on the high seas, or in harbour, was declared "to be forfeited to the captors, being the officers and crews of his majesty's ships of war." It farther enacted [283] "that the masters, crews and other persons found on board captured American vessels, should be entered on board his majesty's vessels of war, and there considered to be in his majesty's service to all intents and purposes, as if they had entered of their own accord." This bill also authorised the crown to appoint commissioners, who over and above granting pardons to individuals were empowered to "enquire into general and particular grievances, and to determine whether any colony or part of a colony was returned to that state of obedience, which might entitle it to be received within the king's peace and protection." In that case upon a declaration from the commissioners "the restrictions of the proposed law were to cease."

It was said in favour of this bill,

that as the Americans were already in a state of war, it became necessary that hostilities should be carried on against them, as was usual against alien enemies. That the more vigorously and extensively military operations were prosecuted, the sooner would peace and order be restored. That as the commissioners went out with the sword in one hand, and terms of conciliation in the other, it was in the power of the colonists to prevent the infliction of any real or apparent severities, in the proposed statute.

In opposition to it, it was said, "that treating the Americans as a foreign nation, was chalking out the way for their independence." One member observed, that as the indiscriminate rapine of property authorised by the bill, would oblige the colonists to coalesce as one man, its title ought to be "A bill for carrying more effectually into execution the resolves of Congress." The clause for vesting the property of the seizures in the captors, was reprobated as tending to extinguish in the breasts of seamen the principles of patriotism—of national pride and glory, and to substitute in their room habits of cruelty, of piracy and robbery. But of all parts of this bill none was so severely condemned as that clause by which persons taken on board the American vessels, were indiscriminately compelled to serve as common sailors in British ships of war. This was said to be "a refinement of [284] tyranny worse than death."

It was also said, "That no man could be despoiled of his goods as a foreign enemy, and at the same time obliged to serve as a citizen, and that compelling captives to bear arms against their families, kindred, friends and country—and after being plundered themselves to become accomplices in plundering their brethren, was unexampled, except among pirates, the outlaws and enemies of human society." To all these high charges the ministry replied, "that the measure was an act of grace and favour, for" said they, "the crews of American vessels, instead of being put to death, the legal punishment of their demerits, as traitors and rebels, are by this law to be rated on the king's books, and treated as if they were on the same footing with a great body of his most useful and faithful subjects." It was also said, "that their pay and emoluments in the service of their

1776

EXHIBIT 19
0700

lawful sovereign would be a compensation for all scruples that might arise from the supposed violation of their principles."

In the progress of the debates on this bill, lord Mansfield declared, "that the questions of original right and wrong were no longer to be considered—that they were engaged in a war, and must use their utmost efforts to obtain the ends proposed by it, that they must either fight or be pursued, and that the justice of the cause must give way to their present situation." Perhaps no speech in or out of parliament operated more extensively on the irritated minds of the colonists than this one.

The great abilities and profound legal knowledge of lord Mansfield were both known and admired in America. That this illustrious oracle of law should declare from the seat of legislation, that the justice of the cause was no longer to be regarded, excited the astonishment, and cemented the union of the colonists. "Great-Britain, said they, has commenced war against us for maintaining our constitutional liberties, and her lawgivers now declare they must proceed without any retrospect to the merits of the original ground of dispute. Our peace and happiness must be sacrificed to British honour and consistency, in their continuing to prosecute [285] an unjust invasion of our rights."

A number of lords, as usual, entered a spirited protest against the bill, but it was carried by a great majority in both houses of parliament, and soon after received the royal assent.

Dec. 21, 1775

This law arrived in the colonies in March 1776. The effects resulting from it were such as had been predicted by its opposers. It not only united the colonies in resisting Great-Britain, but produced a favorable opinion of independence in the minds of thousands, who previously reprobated that measure. It was considered from New-Hampshire to Georgia, as a legal discharge from allegiance to their native sovereign. What was wanting to produce a decided majority of the party for breaking off all connexion with Great-Britain, was speedily obtained from the irritation excited by the hiring of foreign troops to fight against the colonists. This measure was nearly coincident with the ratification of the prohibitory law just mentioned, and intelligence of both arrived in the colonies about the same time.

The treaties which had been lately concluded with the Landgrave of Hesse Cassel, the duke of Brunswic, and the hereditary prince of Hesse Cassel for hiring their troops to the king of Great-Britain, to be employed in the American service being laid before the house of commons, a motion was made thereon for referring them to the committee of supply.

This occasioned a very interesting debate on the propriety of employing foreign troops against the Americans. The measure was supported on the necessity of prosecuting the war, and the impracticability of raising a sufficient number of domestic levies. It was also urged "that foreign troops inspired with the military maxims, and ideas of implicit submission, would be less apt to be biassed by that false lenity, which native soldiers might indulge, at the expence of national interest." It was said,

Feb. 29, 1776

EXHIBIT 19
0701

Are we to sit still and suffer an unprovoked rebellion to terminate in the formation of an independent hostile empire? Are we to suffer our colonies, the object of the great national expence, and of two bloody wars to be lost forever to us, and given away to strangers from a scruple of [286] employing foreign troops to preserve our just rights, over colonies for which we have paid so dear a purchase? As the Americans by refusing the obedience and taxes of subjects, deny themselves to be a part of the British empire, and make themselves foreigners, they cannot complain that foreigners are employed against them.

1775

On the other side the measure was severely condemned. The necessity of the war was denied, and the nation was represented as disgraced by applying to the petty princes of Germany, for succours against her own rebellious subjects. The tendency of the example to induce the Americans to form alliances with foreign powers, was strongly urged. It was said,

hitherto the colonists have ventured to commit themselves singly in this arduous contest, without having recourse to foreign aid, but it is not to be doubted, that in future they will think themselves fully justified both by our example, and the laws of self preservation, to engage foreigners to assist them in opposing those mercenaries, whom we are about to transport for their destruction. Nor is it doubtful that in case of their application, European powers of a rank far superior to that of those petty princes, to whom we have so abjectly sued for aid, will consider themselves to be equally entitled to interfere in the quarrel between us and our colonies.

The supposition of the Americans receiving aid from France or Spain, was on this and several other occasions ridiculed, on the idea that these powers would not dare to set to their own colonies the dangerous example of encouraging those of Great-Britain, in opposing their sovereign. It was also supposed, that they would be influenced by considerations of future danger to their American possessions, from the establishment of an independent empire in their vicinity.

In this session of parliament between the 26th of October, 1775, and the 23d, of May 1776, the ultimate plan for reducing the colonies was completely fixed. The Americans were declared out of the royal protection, and 16,000 foreign mercenaries, employed by national authority, to effect their subjugation. These measures [287] induced Congress in the following summer to declare themselves independent, and to seek for foreign aid: Events which shall be hereafter more fully explained.

1776

Parliamentary sanction for carrying on the war against the colonists, as against alien enemies being obtained, it became necessary to fix on a commander of the royal forces to be employed on this occasion. This as a matter of right was, in the first instance, offered to general Oglethorpe, as being the first on the list of general officers. To the surprise of the minister that respectable veteran, readily accepted the command, on condition of his being properly supported. A numerous well appointed army and a powerful fleet were promised him, to which he replied, "I will undertake the business without a man or a ship of war, provided you will authorise me to assure

EXHIBIT 19
0702

the colonists on my arrival among them, that you will do them justice." He added farther, "I know the people of America well, and am satisfied, that his majesty has not in any part of his dominions, more obedient, or more loyal subjects. You may secure their obedience by doing them justice, but you will never subdue them by force of arms." These opinions so favourable to the Americans, proved general Oglethorpe to be an improper person for the purpose intended by the British ministry. He was therefore passed over, and the command given to Sir William Howe.

It was resolved to open the campaign, with such a powerful force as "would look down all opposition, and effectuate submission without bloodshed," and to direct its operations to the accomplishment of three objects. The first was the relief of Quebec, and the recovery of Canada, which also included a subsequent invasion of the northwestern frontiers of the adjacent provinces. The second was a strong impression on some of the southern colonies. The third and principal, was to take possession of New-York, with a force sufficiently powerful to keep possession of Hudson's-River, and form a line of communication with the royal army in Canada, or to over-run the adjacent country.

The partial success of the first part of this plan, has been in the preceding chapter explained. The execution [288] of the second part was committed to general Clinton, and Sir Peter Parker. The former with a small force having called at New-York, and also visited in Virginia lord Dunmore, the late royal governor of that colony, and finding that nothing could be done at either place, proceeded to Cape-Fear-River. At that place he issued a proclamation from on board the Pallas transport, offering free pardon to all such as should lay down their arms, excepting Cornelius Hasnett, and Robert Howe, but the recent defeat of the regulators and Highlanders, restrained even their friends from paying any attention to this act of grace.

At Cape-Fear a junction was formed between Sir Henry Clinton, and Sir Peter Parker, the latter of whom had sailed with his squadron directly from Europe. They concluded to attempt the reduction of Charleston as being, of all places within the line of their instructions, the object at which they could strike with the greatest prospect of advantage. They had 2,800 land forces, which they hoped, with the co-operation of their shipping, would be fully sufficient.

For some months past every exertion had been made to put the colony of South-Carolina, and especially its capital Charleston, in a respectable posture of defence. In subserviency to this view, works had been erected on Sullivan's island, which is situated so near the channel leading up to the town, as to be a convenient post for annoying vessels approaching it.

Sir Peter Parker attacked the fort on that island, with two fifty gun ships, the Bristol and Experiment, four frigates, the Active, Acteon, Solebay and Syron, each of 28 guns. The Sphynx of 20 guns, the Friendship armed vessel of 22 guns, Ranger sloop, and Thunder bomb, each of 8 guns. On the fort were mounted 26 cannon, 26, 18 and 9 pounders. The attack commenced between ten and eleven in the forenoon, and was continued for upwards of ten hours. The garrison consisting of 375 regulars and a few

EXHIBIT 19
0703

militia, under the command of colonel Moultrie, made a most gallant defence. They fired deliberately, for the most part took [289] aim and seldom missed their object. The ships were torn almost to pieces, and the killed and wounded on board exceeded 200 men. The loss of the garrison was only ten men killed, and 22 wounded. The fort being built of palmetto, was little damaged. The shot which struck it were ineffectually buried in its soft wood. General Clinton had some time before the engagement, landed with a number of troops on Long-Island, and it was expected that he would have co-operated with Sir Peter Parker, by crossing over the narrow passage, which divides the two islands, and attacking the fort in its unfinished rear; but the extreme danger to which he must unavoidably have exposed his men, induced him to decline the perilous attempt. Colonel Thomson with 7 or 800 men was stationed at the east end of Sullivan's island, to oppose their crossing. No serious attempt was made to land either from the fleet, or the detachment commanded by Sir Henry Clinton. The firing ceased in the evening, and soon after the ships slipped their cables. Before morning they had retired about two miles from the island. Within a few days more the troops re-embarked and the whole sailed from New-York. The thanks of Congress were given to general Lee, who had been sent on by Congress to take the command in Carolina, and also to colonels Moultrie and Thomson, for their good conduct on this memorable day. In compliment to the commanding officer the fort from that time was called Fort Moultrie.

During the engagement the inhabitants stood with arms in their hands at their respective posts, prepared to receive the enemy wherever they might land. Impressed with high ideas of British power and bravery, they were apprehensive that the fort would be either silenced or passed, and that they should be called to immediate action. They were cantoned in the various landing places near Charleston, and their resolution was fixed to meet the invaders at the water's edge, and dispute every inch of ground, trusting the event to heaven.

By the repulse of this armament the southern states obtained a respite from the calamities of war for two years and a half. The defeat the British met with at Charleston, [290] seemed in some measure to counterbalance the unfavourable impression made, by their subsequent successes, to the northward. Throughout the whole summer, and till the close of the year, Congress had little else than the victory on Sullivan's island, to console them under the various evacuations, retreats, and defeats, to which, as shall hereafter be related, their armies were obliged to submit in every other part of the union. The event of the expedition contributed greatly to establish the cause which it was intended to overset. In opposition to the bold assertions of some, and the desponding fears of others, experience proved that America might effectually resist a British fleet and army. Those, who from interested motives had abetted the royal government, ashamed of their opposition to the struggles of an infant people for their dearest rights, retired into obscurity.

The effects of this victory, in animating the Americans, were much greater than could be warranted, by the circumstances of the action. As it was the first attack made by the British navy, its unsuccessful issue inspired a confidence which a more exact knowledge of military calculations would have corrected. The circumstance of its

EXHIBIT 19
0704

happening in the early part of the war, and in one of the weaker provinces, were happily instrumental in dispelling the gloom which overshadowed the minds of many of the colonists, on hearing of the powerful fleets and numerous armies which were coming against them.

The command of the force which was designed to operate against New-York in this campaign, was given to admiral lord Howe, and his brother Sir William, officers who, as well from their personal characters, as the known bravery of their family, stood high in the confidence of the British nation. To this service was allotted a very powerful army, consisting of about 30,000 men. This force was far superior to any thing that America had heretofore seen. The troops were amply provided with artillery, military stores, and warlike materials of every kind, and were supported by a numerous fleet. The admiral and general, in addition to their military powers, were appointed commissioners for restoring peace to the colonies.

[291]

General Howe having in vain waited two months at Halifax for his brother, and the expected re-inforcements from England, | 1776

impatient of farther delays, sailed from that harbour, with the force which he had previously commanded in Boston,

and directing his course towards New-York, arrived in the latter end of June, off Sandy-Hook. Admiral lord Howe, with part of | Jun. 10

the re-inforcement from England, arrived at Halifax, soon after his brother's departure.

Without dropping anchor he followed, and soon after joined him near Staten-Island. The British general, on his approach, found | Jun. 12

every part of New-York island, and the most exposed parts of Long-Island fortified and well defended by artillery. About fifty British transports anchored near Staten-Island, which had not been so much the object of attention. The inhabitants thereof, either from fear, policy, or affection, expressed great joy on the arrival of the royal forces. General Howe was there met by Tryon, late governor of the province, and by several of the loyalists, who had taken refuge with him in an armed vessel. He was also joined by about sixty persons from New-Jersey, and 200 of the inhabitants of Staten-Island were embodied, as a royal militia. From these appearances, great hopes were indulged that as soon as the army was in a condition to penetrate into the country, and protect the loyalists, such numbers would flock to their standard as would facilitate the attainment of the objects of the campaign.

On the fourth day after the British transports appeared off Sandy-Hook. Congress, though fully informed of the numbers and appointment of the force about to be employed against the colonies, ratified their famous declaration of independence. This was publicly read to the American army, and received by them with unfeigned acclamations of joy. Though it was well known, that Great-Britain had employed a force of 55,000 men, to war upon the new-formed states, and that the continental army was not near equal to half that number, and only engaged for a few months, and that Congress was without any assurance of foreign aid, yet both the American [292] officers and privates gave every evidence

EXHIBIT 19
0705

of their hearty approbation of the decree which severed the colonies from Great-Britain, and submitted to the decision of the sword, whether they should be free states, or conquered provinces. Now, said they, "we know the ground on which we stand. Now we are a nation. No more shall the opprobrious term of rebel, with any appearance of justice, be applied to us. Should the fortune of war throw us into the hands of our enemies, we may expect the treatment of prisoners, and not the punishment of rebels. The prize for which we contend is of such magnitude that we may freely risque our lives to obtain it."

1776

It had early occurred to general Washington, that the possession of New-York, would be with the British a favourite object. Its central situation and contiguity to the ocean, enabled them to carry with facility the war to any part of the sea coast. The possession of it was rendered still more valuable by the ease with which it could be maintained. Surrounded on all sides by water, it was defensible by a small number of British ships, against adversaries whose whole navy consisted only of a few frigates. Hudson's river, being navigable for ships of the largest size to a great distance, afforded an opportunity of severing the eastern from the more southern states, and of preventing almost any communication between them.

From these well known advantages, it was presumed by the Americans, that the British would make great exertions to effect the reduction of New-York. General Lee, while the British were yet in possession of the capital of Massachusetts had been detached from Cambridge, to put Long-Island and New-York into a posture of defence. As the departure of the British from Boston became more certain, the probability of their instantly going to New-York, increased the necessity of collecting a force for its safety.

It had been therefore agreed in a council of war, that five regiments, together with a rifle battalion should march without delay to New-York, and that the states of New-York and New-Jersey should be requested to furnish the former two thousand, and the [293] latter one thousand men for its immediate defence.

March 13

General Washington soon followed, and early in April fixed his head quarters in that city. A new distribution of the American army took place. Part was left in Massachusetts. Between two and three thousand were ordered to Canada: But the greater part rendezvoused at New-York.

1776

Experience had taught the Americans the difficulty of attacking an army, after it had effected a lodgment. They therefore made strenuous exertions to prevent the British from enjoying the advantages in New-York, which had resulted from their having been permitted to land and fortify themselves in Boston. The sudden commencement of hostilities in Massachusetts, together with the previous undisturbed landing of the royal army, allowed no time for deliberating on a system of war. A change of circumstances indicated the propriety of fixing on a plan for conducting the defence of the new formed states. On this occasion general Washington, after much thought, determined on a war of posts. This mode of conducting military operations gave confidence to the Americans, and besides, it both retarded and alarmed their adversaries. The soldiers in the American army were new levies, and had not yet learned to stand uncovered, before the instruments of death. Habituating them to the

EXHIBIT 19
0706

sound of fire arms, while they were sheltered from danger, was one step towards inspiring them with a portion of mechanical courage. The British remembered Bunker's-hill, and had no small reverence for even slight fortifications, when defended by freemen. From views of this kind, works were erected in and about New-York, on Long Island, and the heights of Haerlem. These, besides batteries, were field redoubts, formed of earth with a parapet and ditch. The former were sometimes fraised, and the latter palisadoed, but they were in no instance formed to sustain a siege. Slight as they were, the campaign was nearly wasted away before they were so far reduced, as to permit the royal army to penetrate into the country.

[294]

The war having taken a more important turn than in the preceding year had been foreseen, Congress at the opening of the campaign, found themselves distitute of a force sufficient for their defence. They therefore in June determined on a plan to reinforce their continental army by bringing into the field, a new species of troops, that would be more permanent than the common militia, and yet more easily raised than regulars. With this view they instituted a flying camp, to consist of an intermediate corps, between regular soldiers and militia.

| 1776 |

Ten thousand men were called for from the states of Pennsylvania, Maryland, and Delaware, to be in constant service to the first day of the ensuing December. Congress at the same time called for 13,800 of the common militia from Massachusetts, Connecticut, New-York, and New-Jersey. The men for forming the flying camp were generally procured, but there were great deficiencies of the militia, and many of those who obeyed their country's call, so far as to turn out, manifested a reluctance to submit to the necessary discipline of camps.

| June 3 |

The difficulty of providing the troops with arms while before Boston, was exceeded by the superior difficulty of supplying them, in their new position. By the returns of the garrison at fort Montgomery, in the Highlands in April, it appeared that there were 208 privates, and only forty one guns fit for use. In the garrison at fort Constitution, there were 136 men, and only 68 guns fit for use. Flints were also much wanted. Lead would have been equally deficient, had not a supply for the musquetry been obtained by stripping dwelling houses.

The uncertainty of the place, where the British would commence their operations, added much to the imbarrassment of general Washington. Not only each colony, but each seaport town, supposed itself to be the object of the British, and was ardent in its supplications, to the commander in chief for his puculiar attention. The people of Massachusetts were strongly impressed with an idea, that the evacuation of Boston was only a feint, and that the British army would soon return. They were for that reason very desirous, that the continental troops should not be withdrawn [295] from their state. The inhabitants of Rhode-Island urged in a long petition, that their maritime situation exposed them to uncommon danger, while their great exertions in fitting out armed vessels, had deprived them of many of their citizens. They therefore prayed for a body of continental soldiers, to be stationed for their constant and peculiar defence. So various were the applications for troops, so numerous the calls for arms, that a

| 1776 |

210

EXHIBIT 19
0707

decided conduct became necessary to prevent the feeble American force, and the deficient stock of public arms from being divided and subdivided, so as to be unequal to the proper defence of any one place.

In this crisis of particular danger, the people of New-York acted with spirit. Though they knew they were to receive the first impression of the British army, yet their convention resolved, "that all persons residing within the state of New-York, and claiming protection from its laws, owed it allegiance, and that any person owing it allegiance and levying war against the state, or being an adherent to the king of Great-Britain, should be deemed guilty of treason and suffer death." They also resolved ["]that one fourth of the militia of West-Chester, Dutchess and Orange counties, should be forthwith drawn out for the defence of the liberties, property, wives and children, of the good people of the state, to be continued in service till the last day of December," and, "that as the inhabitants of King's county, had determined not to oppose the enemy, a committee should be appointed to enquire into the authenticity of these reports, and to disarm and secure the disaffected. To remove or destroy the stock of grain, and if necessary to lay the whole country waste."

The two royal commissioners, admiral and general Howe, thought proper, before they commenced their military operations, to try what might be done in their civil capacity, towards effecting a re-union between Great-Britain and the colonies. It was one of the first acts of lord Howe, to send on shore a circular letter to several of the royal governors in America, informing them of the late act of parliament, "for restoring peace to the colonies, [296] and granting pardon to such as should deserve mercy," and desiring them to publish a declaration which accompanied the same. In this he informed the colonists of the power with which his brother and he were intrusted "of granting general or particular pardons to all those who though they had deviated from their allegiance, were willing to return to their duty," and of declaring "any colony, province, county or town, port, district or place to be at the peace of his majesty." Congress, impressed with a belief, that the proposals of the commissioners, instead of disuniting the people, would have a contrary effect, ordered them to be speedily published in the several American news-papers. Had a redress of grievances been at this late hour offered, though the honour of the states was involved in supporting their late declaration of independence, yet the love of peace, and the bias of great numbers to their Parent State, would in all probability have made a powerful party for rescinding the act of separation, and for re-uniting with Great-Britain. But when it appeared that the power of the royal commissioners was little more than to grant pardons, Congress appealed to the good sense of the people, for the necessity of adhering to the act of independence. The resolution for publishing the circular letter, and the declaration of the royal commissioners, assigned as a reason thereof,

that the good people of the United States may be informed of what nature are the commissioners, and what the terms, with expectation of which the insidious court of Great-Britain had endeavoured to amuse and disarm them, and that the few who still remain suspended by a hope, founded either in the justice or moderation of their late king, may now at length be convinced that the valour alone of their country is to save its liberties.

EXHIBIT 19
0708

About the same time flags were sent ashore by lord Howe, with a letter directed to George Washington, Esq. which he refused to receive as not being addressed to him with the title due to his rank.

In his letter to Congress on this subject, he wrote as follows, "I would not on any occasion sacrifice essentials to punctilio, but in this instance I deemed it a duty to my country and appointment, to insist [297] on that respect, which in any other than a public view, I would willingly have waved.

1776

"Congress applauded his conduct in a public resolution, and at the same time directed ["]that no letter or message should be received on any occasion whatever, from the enemy, by the commander in chief, or others the commanders of the American army, but such as were directed to them in the characters they severally sustained."

Some time after, adjutant general Patterson was sent to New-York, by general Howe, with a letter addressed to George Washington, &c. &c. &c. On an interview the adjutant general, after expressing his high esteem for the person and character of the American general, and declaring, that it was not intended to derogate from the respect due to his rank, expressed his hopes, that the *et ceteras* would remove the impediments to their correspondence. General Washington replied, "That a letter directed to any person in a public character, should have some description of it, otherwise it would appear a mere private letter. That it was true the *et ceteras* implied every thing, but they also implied any thing, and that he should therefore decline the receiving any letter directed to him as a private person, when it related to his public station.["] A long conference ensued, in which the adjutant general observed, that "the commissioners were armed with great powers, and would be very happy in effecting an accommodation." He received for answer, "that from what appeared, their powers were only to grant pardon, that they who had committed no fault, wanted no pardon." Soon after this interview, a letter from Howe, respecting prisoners, which was properly addressed to Washington was received.

While the British, by their manifestoes and declarations, were endeavouring to separate those who preferred a reconciliation with Great-Britain from those who were the friends of independence, Congress, by a similiar policy, was attempting to detach the foreigners, who had come with the royal troops from the service of his Britannic majesty. Before hostilities had commenced, the following resolution was adopted and circulated among those [298] on whom it was intended to operate.

Resolved, that these states will receive all such foreigners who shall leave the armies of his Britannic majesty in America, and shall chuse to become members of any of these states, and they shall be protected in the free exercise of their respective religions, and be invested with the rights, privileges and immunities of natives, as established by the laws of these states, and moreover, that this congress will provide for every such person, fifty acres of unappropriated lands in some of these states, to be held by him and his heirs, as absolute property.

August 14

The numbers which were prepared to oppose the British, when they should disembark, made them for some time cautious of proceeding to their projected land

EXHIBIT 19
0709

operations, but the superiority of their navy enabled them to go by water, whithersoever they pleased.

A British forty gun ship, with some smaller vessels, sailed up North-River, without receiving any damage of consequence,

July 12

though fired upon from the batteries of New-York, Paules-Hook, Red-Bank, and Governor's Island. An attempt was made, not long after, with two fire ships, to destroy the British vessels in the North-River, but without effecting any thing more than the burning of a tender. They were also attacked with row gallies, but to little purpose. After some time the Phoenix and Rose men of war, came down the river, and joined the fleet. Every effort of the Americans from their batteries on land, as well as their exertions on the water, proved ineffectual. The British ships passed with less loss than was generally expected, but nevertheless the damage they received was such as deterred them from frequently repeating the experiment. In two or three instances they ascended the North-River, and in one or two the East-River, but those which sailed up the former, speedily returned, and by their return, a free communication was opened through the upper part of the state.

The American army in and near New-York amounted to 17,225 men. These were mostly new troops, and were divided in many small and unconnected posts, some of which were fifteen miles removed from others.
The [299] British force before New-York was increasing by frequent successive arrivals from Halifax, South-Carolina,

1776

Florida, the West-Indies and Europe. But so many unforeseen delays had taken place, that the month of August was far advanced, before they were in a condition to open the campaign.

When all things were ready, the British commanders resolved to make their first attempt on Long-Island. This was preferred to New-York, as it abounded with those supplies which their forces required.

The British landed without opposition, between two small towns, Utrecht and Gravesend. The American works protected a small peninsula having Wallabout-Bay to the left, and stretching over to Red-Hook on the right, and the East-River being in their rear. General Sullivan, with a strong force, was encamped within these works at Brooklyne. From the east-side of the narrows runs a ridge of hills covered with thick wood, about five or six miles in length, which terminates near Jamaica. There were three passes through these hills, one near the narrows, a second on the Flatbush road, and a third on the Bedford road, and they are all defensible. These were the only roads which could be passed from the southside of the hills to the American lines, except a road which led round the easterly end of the hills to Jamaica. The Americans had 800 men on each of these roads, and colonel Miles was placed with his battalion of riflemen, to guard the road from the south of the hills to Jamaica, and to watch the motions of the British.

General de Heister, with his Hessians, took post at Flatbush, in the evening. In the following night the greater part of the British army, commanded by general Clinton, marched to gain the road leading round the

August 26

EXHIBIT 19
0710

easterly end of the hills to Jamaica, and to turn the left of the Americans. He arrived about two hours before day, within half a mile of this road. One of his parties fell in with a patrol of American officers, and took them all prisoners, which prevented the early transmission of intelligence.

Upon the first appearance of day general Clinton advanced, and took possession of the heights over [300] which the road passed.

1776

General Grant, with the left wing, advanced along the coast by the west road, near the narrows; but this was intended chiefly as a feint.

The guard which was stationed at this road, fled without making any resistance. A few of them were afterwards rallied, and lord Stirling advanced with 1500 men, and took possession of a hill, about two miles from the American camp, and in front of general Grant.

An attack was made very early in the morning by the Hessians from Flatbush, under general de Heister, and by general Grant on

Aug. 27

the coast, and was well supported for a considerable time by both sides. The Americans who opposed general de Heister were first informed of the approach of general Clinton, who had come round on their left. They immediately began to retreat to their camp, but were intercepted by the right wing under general Clinton, who got into the rear of their left, and attacked them with his light infantry and dragoons, while returning to their lines. They were driven back till they were met by the Hessians. They were thus alternately chased and intercepted, between general de Heister and general Clinton. Some of their regiments nevertheless found their way to the camp. The Americans under lord Stirling, consisting of colonel Miles' two battalions, colonel Atlee's, colonel Smallwood's, and colonel Hatche's, regiments, who were engaged with general Grant, fought with great resolution for about six hours. They were uninformed of the movements made by general Clinton, till some of the troops under his command, had traversed the whole extent of country in their rear. Their retreat was thus intercepted, but several notwithstanding, broke through and got into the woods. Many threw themselves into the marsh, some were drowned, and others perished in the mud, but a considerable number escaped by this way to their lines.

The king's troops displayed great valour throughout the whole day. The variety of the ground occasioned a succession of small engagements, pursuits and slaughter, which lasted for many hours.

British discipline in every instance, triumphed over the native valour of raw troops, [301] who had never been in action, and whose officers were unacquainted with the stratagems of war.

1776

The loss of the British and Hessians was about 450. The killed, wounded and prisoners of the Americans, including those who were drowned or perished in the woods or mud, considerably exceeded a thousand. Among the prisoners of the latter were two of their general officers, Sullivan and lord Stirling. Three Colonels, 4 lieutenant colonels, 3 majors, 18 captains, 43 lieutenants, and 11 ensigns. Smallwood's regiment, the officers of which were young men of the best families in the state of Maryland, sustained a loss of 259 men. The British after their victory were

EXHIBIT 19
0711

so impetuous, that it was with difficulty, they could be restrained from attacking the American lines.

In the time of, and subsequent to the engagement, General Washington drew over to Long-Island, the greatest part of his army. After he had collected his principal force there, it was his wish and hope, that Sir William Howe, would attempt to storm the works on the island. These though insufficient to stand a regular siege, were strong enough to resist a coup de main. The rememberance of Bunker's-hill, and a desire to spare his men, restrained the British general from making an assault. On the contrary he made demonstrations of proceeding by siege, and broke ground within three hundred yards to the left at Putnam's redoubt.

Though general Washington wished for an assault, yet being certain that his works would be untenable, when the British

> Aug. 30

batteries should be fully opened, he called a council of war, to consult on the measures proper to be taken. It was then determined that the objects in view were in no degree proportioned to the dangers to which, by a continuation on the island, they would be exposed. Conformably to this opinion, dispositions were made for an immediate retreat. This commenced soon after it was dark from two points, the upper and lower ferries, on East river. General M'Dougal, regulated the embarkation at one, and colonel Knox at the other.

The intention of evacuating the island, had been so prudently concealed [302] from the Americans, that they knew not whither

> 1776

they were going, but supposed to attack the enemy. The field artillery, tents, baggage, and about 9000 men were conveyed to the city of New-York over East River, more than a mile wide, in less than 13 hours, and without the knowledge of the British, though not six hundred yards distant. Providence, in a remarkable manner favoured the retreating army. For some time after the Americans began to cross the state of the tide, and a strong north-east wind made it impossible for them to make use of their sail boats, and their whole number of row boats was insufficient for completing the business, in the course of the night. But about eleven o'clock, the wind died away, and soon after sprung up at south-east, and blew fresh, which rendered the sail boats of use, and at the same time made the passage from the island to the city, direct, easy and expeditious. Towards morning an extreme thick fog came up, which hovered over Long-Island, and by concealing the Americans, enabled them to complete their retreat without interruption, though the day had begun to dawn some time before it was finished. By a mistake in the transmission of orders, the American lines were evacuated for about three quarters of an hour, before the last embarkation took place, but the British though so near, that their working parties could be distinctly heard, being enveloped in the fog knew nothing of the matter. The lines were repossessed and held till six o'clock in the morning, when every thing except some heavy cannon was removed. General Mifflin, who commanded the rear guard left the lines, and under the cover of the fog got off safe. In about half an hour the fog cleared away, and the British entered the works which had been just relinquished. Had the wind not shifted, the half of the American army could not have crossed, and even as it was, if the fog had not concealed their rear, it must have been discovered, and could hardly have escaped. General Sullivan, who was taken prisoner on Long-Island, was immediately sent on parole, with the following verbal message from lord Howe to Congress,

EXHIBIT 19
0712

that though he could not at present treat [303] with them in that character, yet he was very desirous of having a conference with

1776

some of the members, whom he would consider as private gentlemen; that he with his brother the general, had full powers to compromise the dispute between Great-Britain and America, upon terms advantageous to both—that he wished a compact might be settled, at a time when no decisive blow was struck, and neither party could say it was compelled to enter into such agreement. That were they disposed to treat, many things which they had not yet asked, might and ought to be granted, and that if upon conference they found any probable ground of accommodation, the authority of Congress would be afterwards acknowledged to render the treaty complete.

Three days after this message was received, general Sullivan was requested to inform lord Howe,

that Congress being the representatives of the free and independent states of America, they cannot with propriety send any of their members to confer with his lordship in their private characters, but that ever desirous of establishing peace on reasonable terms, they will send a committee of their body, to know whether he has any authority to treat with persons authorised by Congress, for that purpose, on behalf of America, and what that authority is; and to hear such propositions as he shall think fit to make respecting the same.

They elected Dr. Franklin, John Adams, and Edward Rutledge their committee, for this purpose. In a few days they met lord Howe on Staten-Island, and were received with great politeness. On their return they made a report of their conference, which they summed up by saying,

It did not appear to your committee that his lordship's commission contained any other authority than that expressed in the act of parliament—namely, that of granting pardons, with such exceptions as the commissioners shall think proper to make, and of declaring America, or any part of it, to be in the king's peace, on submission: For as to the power of enquiring into the state of America, which his lordship mentioned to us, and of conferring and consulting with any persons the commissioners might think proper,

and representing the result [304] of such conversation to the ministry, who, provided the colonies would subject themselves,

1776

might after all, or might not, at their pleasure, make any alterations in the former instructions to governors, or propose in parliament, any amendment of the acts complained of, we apprehended any expectation from the effect of such a power, would have been too uncertain and precarious, to be relied on by America, had she still continued in her state of dependence.

Lord Howe, had ended the conference on his part, by expressing his regard for America, and the extreme pain he would suffer in being obliged to distress those whom he so much regarded. Dr. Franklin, thanked him for his regards, and assured him, ["]that the Americans would shew their gratitude, by endeavouring to lessen as much as possible, all pain he might feel on their account, by exerting their utmost abilities, in taking good care of themselves."

EXHIBIT 19
0713

The committee in every respect maintained the dignity of Congress. Their conduct and sentiments were such as became their character. The friends to independence rejoiced that nothing resulted from this interview, that might disunite the people. Congress, trusting to the good sense of their countrymen, ordered the whole to be printed for their information. All the states would have then rejoiced at less beneficial terms than they obtained about seven years later. But Great-Britain counted on the certainty of their absolute conquest, or unconditional submission. Her offers therefore comported so little with the feelings of America, that they neither caused demur nor disunion, among the new formed states.

The unsuccessful termination of the action on the 27th, led to consequences more seriously alarming to the Americans, than the loss of their men. Their army was universally dispirited. The militia ran off by companies. Their example infected the regular regiments. The loose footing on which the militia came to camp, made it hazardous to exercise over them that discipline, without which, an army is a mob. To restrain one part of an army, while another claimed and exercised the right of doing as they pleased, was no less impracticable than absurd.

[305]

A council of war, recommended to act on the defensive, and not to risque the army for the sake of New-York.

1776

To retreat, subjected the commander in chief to reflections painful to bear, and yet impolitic to refute. To stand his ground, and by suffering himself to be surrounded, to hazard the fate of America on one decisive engagement, was contrary to every rational plan of defending the wide extended states committed to his care. A middle line between abandoning and defending was therefore for a short time adopted. The public stores were moved to Dobbs' ferry, about 26 miles from New-York. 12,000 men were ordered to the northern extremity of New-York island, and 4500 to remain for the defence of the city, while the remainder occupied the intermediate space, with orders, either to support the city or Kingsbridge, as exigencies might require. Before the British landed, it was impossible to tell what place would be first attacked. This made it necessary to erect works for the defence of a variety of places, as well as of New-York. Though every thing was abandoned when the crisis came that either the city must be relinquished, or the army risqued for its defence, yet from the delays, occasioned by the redoubts and other works, which had been erected on the idea of making the defence of the states a war of posts, a whole campaign was lost to the British, and saved to the Americans. The year began with hopes, that Great-Britain would recede from her demands, and therefore every plan of defence was on a temporary system. The declaration of independence, which the violence of Great-Britain forced the colonies to adopt in July, though neither foreseen nor intended at the commencement of the year, pointed out the necessity of organising an army, on new terms, correspondent to the enlarged objects for which they had resolved to contend.

Sept. 7

Congress accordingly determined to raise 88 battalions, to serve during the war. Under these circumstances to wear away the campaign, with as little misfortune as possible, and thereby to gain time for raising a

Sep. 16

EXHIBIT 19
0714

permanent army against the next year, was to the Americans a matter of the last importance.

Though the commander in chief abandoned those works, [306] which had engrossed much time and attention yet the advantage resulting from the delays they occasioned, far overbalanced the expence incurred by their erection.

1776

The same shortsighted politicians, who had before censured general Washington, for his cautious conduct, in not storming the British lines at Boston, renewed their clamors against him, for adopting this evacuating and retreating system. Supported by a consciousness of his own integrity, and by a full conviction that these measures were best calculated for securing the independence of America, he for the good of his country, voluntarily subjected his fame to be overshadowed by a temporary cloud.

General Howe having prepared every thing for a descent on New-York island, began to land his men under cover of ships of war, between Kepps'-bay and Turtle bay. A breast work had been erected in the vicinity, and a party stationed in it to oppose the British, in case of their attempting to land. But on the first appearance of danger, they ran off in confusion. The commander in chief came up, and in vain attempted to rally them. Though the British in sight, did not exceed sixty, he could not either by example, intreaty, or authority, prevail on a superior force to stand their ground, and face that inconsiderable number. Such dastardly conduct raised a tempest in the usually tranquil mind of general Washington. Having embarked in the American cause from the purest principles, he viewed with infinite concern this shameful behaviour, as threatening ruin to his country. He recollected the many declarations of Congress, of the army, and of the inhabitants, preferring liberty to life, and death to dishonour, and contrasted them with their present scandalous flight. His soul was harrowed up with apprehensions that his country would be conquered—her army disgraced, and her liberties destroyed. He anticipated, in imagination, that the Americans would appear to posterity in the light of high sounding boasters, who blustered when danger was at a distance, but shrunk at the shadow of opposition. Extensive confiscations and numerous attainders presented, themselves in full view to his agitated mind.

Sep. 15

He saw, in imagination, new formed states, with [307] the means of defence in their hands, and the glorious prospects of liberty before them, levelled to the dust, and such constitutions imposed on them as were likely to crush the vigour of the human mind, while the unsuccessful issue of the present struggle would for ages to come, deter posterity from the bold design of asserting their rights. Impressed with these ideas he hazarded his person for some considerable time in rear of his own men, and in front of the enemy with his horse's head towards the latter, as if in expectation, that by an honourable death he might escape the infamy he dreaded from the dastardly conduct of troops on whom he could place no dependance. His aids and the confidential friends around his person, by indirect violence, compelled him to retire. In consequence of their address and importunity, a life was saved for public service, which otherwise from a sense of honour, and a gust of passion, seemed to be devoted to almost certain destruction.

1776

EXHIBIT 19
0715

On the day after this shameful flight of part of the American army, a skirmish took place between two battalions of light infantry and highlanders commanded by brigadier Leslie, and some detachments from the American army, under the command of lieutenant colonel Knowlton of Connecticut, and major Leitch of Virginia. The colonel was killed and the major badly wounded. Their men behaved with great bravery, and fairly beat their adversaries from the field. Most of these were the same men, who had disgraced themselves the day before, by running away[;] struck with a sense of shame for their late misbehaviour, they had offered themselves as volunteers, and requested the commander in chief to give them an opportunity to retrieve their honour. Their good conduct, at this second engagement, proved an antidote to the poison of their example on the preceding day. It demonstrated that the Americans only wanted resolution and good officers to be on a footing with the British, and inspired them with hopes that a little more experience would enable them to assume, not only the name and garb, but the spirit and firmness of soldiers.

The Americans having evacuated the city of New-York, [308] a brigade of the British army marched into it.

They had been but a few days in possession, when a dreadful fire, most probably occasioned by the disorderly conduct of some | 1776 |
British sailors, who had been permitted to regale themselves on shore, broke out, and consumed about a thousand houses. Dry weather, and a brisk wind, spread the flames to such an extent, that had it not been for great exertions of the troops and sailors, the whole city must have shared the same fate. After the Americans had evacuated New-York, they retired to the north end of the island, on which that city is erected. In about four weeks general Howe began to execute a plan for cutting off general Washington's communication with the eastern states, and enclosing him so as to compel a general engagement on the island. With this view, the greater part of the royal army passed through Hellgate, entered the sound, and landed on Frog's neck, in West-Chester county.

Two days after they made this movement, general Lee arrived from his late successful command to the southward. | Oct. 12 |

He found that there was a prevailing disposition among the officers in the American army for remaining on New-York island. | Oct. 14 |

A council of war was called, in which general Lee gave such convincing reasons for quitting it, that they resolved immediately | Oct. 16 |
to withdraw the bulk of the army. He also pressed the expediency of evacuating Fort Washington, but in this he was opposed by general Greene, who argued that the possession of that post would divert a large body of the enemy, from joining their main force, and in conjunction with Fort Lee, would be of great use in covering the transportation of provisions and stores up the North-River, for the service of the American troops. He added farther, that the garrison could be brought off at any time, by boats from the Jersey side of the river. His opinion prevailed. Though the system of evacuating and retreating was in general adopted, an exception was made in favour of Fort Washington, and near 3000 men were assigned for its defence.

| Oct. 18 |

EXHIBIT 19
0716

The royal army, after a halt of six days, at Frog's neck, advanced near to New-Rochelle. On their march they [309] sustained a considerable loss by a party of Americans, whom general Lee posted behind a wall. After three days, general Howe moved the right and centre of his army two miles to the northward of New Rochelle, on the road to the White Plains, and there he received a large reinforcement.

1776

Oct. 21

General Washington, while retreating from New-York island, was careful to make a front towards the British, from East-Chester, almost to White Plains, in order to secure the march of those who were behind, and to defend the removal of the sick, the cannon and stores of his army. In this manner his troops made a line of small detached and intrenched camps, on the several heights and strong grounds, from Valentine's hill, on the right, to the vicinity of the White Plains, on the left.

The royal army moved in two columns, and took a position with the Brunx in front, upon which the Americans assembled their main force at White Plains, behind entrenchments. A general action was hourly expected, and a considerable one took place, in which several hundreds fell. The Americans were commanded by general M'Dougal, and the British by general Leslie. While they were engaged, the American baggage was moved off, in full view of the British army. Soon after this, general Washington changed his front, his left wing stood fast, and his right fell back to some hills. In this position, which was an admirable one in a military point of view, he both desired and expected an action; but general Howe declined it, and drew off his forces towards Dobbs' ferry. The Americans afterwards retired to North-Castle.

Oct. 25

Oct. 28

General Washington, with part of his army, crossed the North-River, and took post in the neighborhood of Fort-Lee. A force of about 7500 men was left at North-Castle, under general Lee.

The Americans having retired, Sir William Howe determined to improve the opportunity of their absence, for the reduction of Fort Washington. This, the only post the Americans then held on New-York island, was under the command of colonel Magaw. The royal army made four attacks upon it. The first on the north [310] side, was led on by general Kniphausen. The second on the east by general Mathews, supported by lord Cornwallis. The third was under the direction of lieutenant colonel Stirling, and the fourth was commanded by lord Piercy. The troops under Kniphausen, when advancing to the fort, had to pass through a thick wood, which was occupied by colonel Rawling's regiment of riflemen, and suffered very much from their well directed fire. During this attack, a body of the British light infantry advanced against a party of the Americans, who were annoying them from behind rocks and trees, and obliged them to disperse. Lord Piercy, carried an advance work on his side, and lieutenant colonel Stirling, forced his way up a steep height, and took 170 prisoners. Their outworks being carried, the Americans left their lines, and crouded into the fort. Colonel Rahl, who led the right column of Kniphausen's attack, pushed forward, and lodged his column within a hundred yards of the fort, and was there soon joined by the left column—the garrison surrendered on terms of

Nov. 12

Nov. 16

EXHIBIT 19
0717

capitulation, by which the men were to be considered as prisoners of war, and the officers to keep their baggage and side arms. The number of prisoners amounted to 2700. The loss of the British, inclusive of killed and wounded, was about 1200. Shortly after Fort Washington had surrendered.

Lord Cornwallis, with a considerable force passed over to attack Fort Lee, on the opposite Jersey shore.

<div style="text-align:right">Nov. 18</div>

The garrison was saved by an immediate evacuation, but at the expense of their artillery and stores. General Washington, about this time retreated to New-Ark. Having abundant reason from the posture of affairs, to count on the necessity of a farther retreat he asked colonel Reed—"Should we retreat to the back parts of Pennsylvania, will the Pennsylvanians support us?" The colonel replied, if the lower counties are subdued and give up, the back counties will do the same. The general replied, ["]we must retire to Augusta county, in Virginia. Numbers will be obliged to repair to us for safety, and we must try what we can do in carrying on a predatory war, and if overpowered, we must cross the Allegany mountains."

[311]

While a tide of success, was flowing in upon general Howe, he and his brother, as royal commissioners, issued a proclamation, in which they commanded, "All persons assembled in arms against his majesty's government to disband, and all general or provincial congresses to desist from their treasonable actings, and to relinquish their usurped power." They also declared "that every person who within sixty days should appear before the governor, lieutenant governor, or commander in chief of any of his majesty's colonies, or before the general, or commanding officer of his majesty's forces, and claim the benefit of the proclamation; and testify his obedience to the laws, by subscribing a certain declaration, should obtain a full and free pardon of all treasons by him committed, and of all forfeitures, and penalties for the same." Many who had been in office, and taken an active part in support of the new government, accepted of these offers, and made their peace by submission. Some who had been the greatest blusterers in favour of independence, veered round to the strongest side. Men of fortune generally gave way. The few who stood firm, were mostly to be found in the middle ranks of the people.

<div style="text-align:right">1776</div>

The term of time for which the American soldiers had engaged to serve, ended in November or December, with no other exception, than that of two companies of artillery, belonging to the state of New-York, which were engaged for the war. The army had been organized at the close of the preceding year, on the fallacious idea, that an accommodation would take place, within a twelve month. Even the flying camp, though instituted after the prospect of that event had vanished, was enlisted only till the first of December, from a presumption that the campaign would terminate by that time.

When it was expected that the conquerors would retire to winter quarters, they commenced a new plan of operations more alarming, than all their previous conquests. The reduction of Fort Washington, the evacuation of Fort Lee, and the diminution of the American army, by the departure of those whose time of service had expired, encouraged the British,

EXHIBIT 19
0718

notwithstanding the [312] severity of the winter, and the badness of the roads, to pursue the remaining inconsiderable continental force, with the prospect of annihilating it. By this turn of affairs, the interior country was surprised into confusion, and found an enemy within its bowels, without a sufficient army to oppose it. To retreat, was the only expedient left. This having commenced, lord Cornwallis followed, and was close in the rear of general Washington, as he retreated successively to New-Ark, to Brunswick, to Princeton, to Trenton, and to the Pennsylvania side of the Delaware. The pursuit was urged with so much rapidity, that the rear of the one army, pulling down bridges was often within sight, and shot off the van of the other, building them up.

This retreat into, and through New-Jersey, was attended with almost every circumstance that could occasion embarrassment, and depression of spirits. It commenced in a few days, after the Americans had lost 2700 men in Fort Washington. In fourteen days after that event, the whole flying camp claimed their discharge. This was followed by the almost daily departure of others, whose engagements terminated nearly about the same time. A farther disappointment happened to general Washington at this time. Gates had been ordered by Congress to send two regiments from Ticonderoga, to reinforce his army. Two Jersey regiments were put under the command of general St. Clair, and forwarded in obedience to this order, but the period for which they were enlisted was expired, and the moment they entered their own state, they went off to a man. A few officers without a single private, were all that general St. Clair brought off these two regiments, to the aid of the retreating American army. The few who remained with general Washington were in a most forlorn condition. They consisted mostly of the troops which had garrisoned Fort Lee, and had been compelled to abandon that post so suddenly, that they commenced their retreat without tents or blankets, and without any utensils to dress their provisions. In this situation they performed a march of about ninety miles, and had the address to prolong it to [313] the space of nineteen days.

As the retreating Americans marched through the country, scarcely one of the inhabitants joined them, while numbers were daily flocking to the royal army, to make their peace and obtain protection. They saw on the one side a numerous well appointed and full clad army, dazzling their eyes with the elegance of uniformity; on the other a few poor fellows, who from their shabby cloathing were called ragamuffins, fleeing for their safety. Not only the common people changed sides in this gloomy state of public affairs, but some of the leading men in New-Jersey and Pennsylvania adopted the same expedient. Among these Mr. Galloway, and the family of the Allens of Philadelphia, were most distinguished. The former, and one of the latter, had been members of Congress. In this hour of adversity they came within the British lines, and surrendered themselves to the conquerors, alledging in justification of their conduct, that though they had joined with their countrymen, in seeking for a redress of grievances in a constitutional way, they had never approved of the measures lately adopted, and were in particular, at all times, averse to independence.

On the day general Washington retreated over the Delaware, the British took possession of Rhode-Island without any loss, and at the same time blocked up commodore Hopkins' squadron, and a number of privateers at Providence.

EXHIBIT 19
0719

In this period, when the American army was relinquishing its general—the people giving up the cause, some of their leaders going over to the enemy, and the British commanders succeeding in every enterprise, general Lee was taken prisoner at Baskenridge, by lieutenant colonel Harcourt. This caused a depression of spirits among the Americans, far exceeding any real injury done to their essential interests. He had been repeatedly ordered to come forward with his division and join general Washington, but these orders were not obeyed.

This circumstance, and the dangerous crisis of public affairs, together with his being alone at some distance, from the troops | 1776 |

which he commanded, begat suspicions that he chose to [314] fall into the hands of the British. Though these apprehensions were without foundation, they produced the same extensive mischief, as if they had been realities. The Americans had reposed extravagant confidence in his military talents, and experience of regular European war. Merely to have lost such an idol of the states at any time, would have been distressful, but losing him under circumstances, which favoured an opinion that, despairing of the American cause, he chose to be taken a prisoner, was to many an extinguishment of every hope.

By the advance of the British into New-Jersey, the neighbourhood of Philadelphia became the seat of war. This prevented that undisturbed attention to public business which the deliberations of Congress required.

They therefore adjourned themselves to meet in eight days at Baltimore, resolving at the same time, "that general Washington | Dec. 12 20 |

should be possessed of full powers to order and direct all things relative to the department, and the operations of war."

The activity of the British in the close of the campaign, seemed in some measure to compensate for their tardiness, in the beginning of it.

Hitherto they had succeeded in every scheme. They marched up and down the Jersey side of the river Delaware, and through the country, without any molestation. All opposition to the re-establishment of royal government, seemed to be on the point of expiring. The Americans had thus far acted without system, or rather feebly executed what had been tardily adopted. Though the war was changed from its first ground, a redress of grievances to a struggle for sovereignty, yet some considerable time elapsed, before arrangements, conformable to this new system were adopted, and a much longer before they were carried into execution.

With the year 1776, a retreating, half naked army, was to be dismissed, and the prospect of a new one was both distant and uncertain. The recently assumed independence of the States, was apparently on the verge of dissolution. It was supposed by many, that the record of their existence would have been no more than that

a fickle people, impatient of the restraints of regular government, | 1776 |
[315] had in a fit of passion abolished that of Great-Britain, and

established in its room free constitutions of their own, but these new establishments, from want of wisdom in their rulers, or of spirit in their people, were no sooner

EXHIBIT 19
0720

formed than annihilated. The leading men, in their respective governments, and the principal members of Congress, (for by this name the insurgents distinguished their supreme council) were hanged, and their estates confiscated. Washington, the gallant leader of their military establishments—worthy of a better fate—deserted by his army—abandoned by his country—rushing on the thickest battalions of the foe, provoked a friendly British bayonet to deliver him from an ignominious death.

To human wisdom it appeared probable, that such a paragraph would have closed some small section in the history of England, treating of the American troubles, but there is in human affairs an ultimate point of elevation or depression, beyond which they neither grow better nor worse, but turn back in a contrary course.

In proportion as difficulties increased, Congress redoubled their exertions to oppose them.
They addressed the states in animated language, calculated to remove their despondency—renew their hopes—and confirm their resolutions.

| Dec. 10 |

They at the same time dispatched gentlemen of character and influence, to excite the militia to take the field. General Mifflin was, on this occasion, particularly useful. He exerted his great abilities in rousing his fellow citizens, by animated and affectionate addresses, to turn out in defence of their endangered liberties.

Congress also recommended to each of the United States "to appoint a day of solemn fasting and humiliation, to implore of Almighty God the forgiveness of their many sins, and to beg the countenance and assistance of his providence, in the prosecution of the present just and necessary war."

| 11 |

In the dangerous situation to which every thing dear to the friends of independence was reduced, Congress transferred extraordinary powers to general Washington, by a resolution, expressed in the following words:

[316]
The unjust, but determined purposes of the British court to enslave these free states, obvious through every delusive insinuation to the contrary,
having placed things in such a situation that the very existence of civil liberty now depends on the right execution of military powers, and the vigorous decisive conduct of these being impossible to distant, numerous, and deliberative bodies. This Congress, having maturely considered the present crisis; and having perfect reliance on the wisdom, vigour, and uprightness of general Washington, do hereby,

| 1776 |

| Dec. 27 |

Resolve, That general Washington shall be, and he is hereby vested with full, ample, and complete powers, to raise and collect together, in the most speedy and effectual manner, from any or all of these United States, sixteen battalions of infantry, in addition to those already voted by Congress; to appoint officers for the said battalions of infantry; to raise, officer, and equip 3000 light-horse; three regiments of artillery,

EXHIBIT 19
0721

and a corps of engineers, and to establish their pay; to apply to any of the states for such aid of the militia as he shall judge necessary; to form such magazines of provisions, and in such places as he shall think proper; to displace and appoint all officers under the rank of brigadier general, and to fill up all vacancies in every other department in the American armies; to take, wherever he may be, whatever he may want, for the use of the army, if the inhabitants will not sell it, allowing a reasonable price for the same; to arrest and confine persons who refuse to take the continental currency, or are otherwise disaffected to the American cause; and return to the states, of which they are citizens, their names, and the nature of their offences, together with the witnesses to prove them: That the foregoing powers be vested in general Washington for and during the term of six months, from the date hereof, unless sooner determined by Congress.

In this hour of extremity, the attention of the Congress was employed, in devising plans to save the states from sinking under the heavy calamities which were bearing them down.

It is remarkable, that, neither in the present condition, though trying and severe, nor in any other [317] since the declaration of independence, was Congress influenced either by force, distress, artifice, or persuasion, to entertain the most distant idea of purchasing peace, by returning to the condition of British subjects. So low were they reduced in the latter end of 1776, that some members, distrustful of their ability to resist the power of Great-Britain, proposed to authorise their commissioners at the court of France (whose appointment shall be hereafter explained) to transfer to that country the same monopoly of their trade, which Great-Britain had hitherto enjoyed. On examination it was found, that concessions of this kind would destroy the force of many arguments heretofore used in favour of independence, and probably disunite their citizens. It was next proposed to offer a monopoly of certain enumerated articles of produce. To this the variant interests of the different states were so directly opposed, as to occasion a speedy and decided negative. Some proposed offering to France, a league offensive and defensive, in case she would heartily support American independence; but this was also rejected. The more enlightened members of Congress argued, "Though the friendship of small states might be purchased, that of France could not." They alledged, that if she would risque a war with Great-Britain, by openly espousing their cause, it would not be so much from the prospect of direct advantages, as from a natural desire to lessen the overgrown power of a dangerous rival. It was therefore supposed, that the only inducement, likely to influence France to an interference, was an assurance that the United States were determined to persevere in refusing a return to their former allegiance. Instead of listening to the terms of the royal commissioners, or to any founded on the idea of their resuming their character of British subjects, it was therefore again resolved, to abide by their declared independence, and proffered freedom of trade to every foreign nation, trusting the event to Providence, and risquing all consequences. Copies of these resolutions were sent to the principal courts of Europe, and proper persons were appointed to solicit their friendship to the new formed states.

These despatches fell into the hands of the British, [318] and were by them published. This was the very thing wished for by Congress. They well knew, that an apprehension of their making up all differences

EXHIBIT 19
0722

with Great-Britain was the principal objection to the interference of foreign courts, in what was represented to be no more than a domestic quarrel. A resolution adopted in the deepest distress, and the worst of times that Congress would listen to no terms of reunion with their Parent State, convinced those, who wished for the dismemberment of the British empire, that it was sound policy to interfere, so far as would prevent the conquest of the United States.

These judicious determinations in the cabinet, were accompanied with vigorous exertions in the field. In this crisis of danger 1500 of the Pennsylvania militia, embodied to re-inforce the continental army. The merchant, the farmer, the tradesman and the labourer, cheerfully relinquished the conveniences of home, to perform the duties of private soldiers, in the severity of a winter campaign. Though most of them were accustomed to the habits of a city life, they slept in tents, barns, and sometimes in the open air, during the cold months of December and January. There were, nevertheless, only two instances of sickness, and only one of death in that large body of men in the course if six weeks. The delay so judiciously contrived on the retreat through Jersey, afforded time for these volunteer reinforcements to join general Washington. The number of troops under his command at that time, fluctuated between two and three thousand men. To turn round and face a victorious and numerous foe, with this inconsiderable force was risquing much; but the urgency of the case required that something should be attempted. The recruiting business for the proposed new continental army was at a stand, while the British were driving the Americans before them. The present regular soldiers could, as a matter of right, in less than a week claim their discharge, and scarce a single recruit offered to supply their place. Under these circumstances, the bold resolution was formed of recrossing into the state of Jersey, and attacking that part of the enemy, which was posted at Trenton.

[319]
When the Americans retreated over the Delaware, the boats in the vicinity were removed out of the way of their pursuers—this arrested their progress: But the British commanders in the security of conquest cantoned their army in Burlington, Bordenton, Trenton, and other towns of New-Jersey, in daily expectation of being enabled to cross into Pennsylvania, by means of ice, which is generally formed about that time.

1776

Of all events, none seemed to them more improbable, than that their late retreating half naked enemies, should in this extreme cold season, face about and commence offensive operations. They indulged themselves in a degree of careless inattention to the possibility of a surprise, which in the vicinity of an enemy, however contemptible, can never be justified. It has been said that colonel Rahl, the commanding officer in Trenton, being under some apprehension for that frontier post, applied to general Grant for a reinforcement, and that the general returned for answer. "Tell the colonel, he is very safe, I will undertake to keep the peace in New-Jersey with a corporal's guard."

In the evening of Christmas day, general Washington, made arrangements for recrossing the Delaware in three divisions; at M. Konkey's ferry, at Trenton ferry, and at or near Bordenton. The troops which were to have crossed at the two last places,

EXHIBIT 19
0723

were commanded by generals Ewing, and Cadwallader, they made every exertion to get over, but the quantity of ice was so great, that they could not effect their purpose. The main body which was commanded by general Washington crossed at M. Konkey's ferry, but the ice in the river retarded their passage so long, that it was three o'clock in the morning, before the artillery could be got over. On their landing in Jersey, they were formed into two divisions, commanded by general Sullivan, and Greene, who had under their command brigadiers, lord Stirling, Mercer and St. Clair: one of these divisions was ordered to proceed on the lower, or river road, the other on the upper or Pennington road. Col. Stark, with some light troops, was also directed to advance near to the river, and to possess himself [320] of that part of the town, which is beyond the bridge. The divisions having nearly the same distance to march, were ordered immediately on forcing the out guards, to push directly into Trenton, that they might charge the enemy before they had time to form. Though they marched different roads, yet they arrived at the enemy's advanced post, within three minutes of each other. The out guards of the Hessian troops at Trenton soon fell back, but kept up a constant retreating fire. Their main body being hard pressed by the Americans, who had already got possession of half their artillery, attempted to file off by a road leading towards Princeton, but were checked by a body of troops thrown in their way. Finding they were surrounded, they laid down their arms. The number which submitted, was 23 officers, and 885 men. Between 30 and 40 of the Hessians were killed and wounded. Colonel Rahl, was among the former, and seven of his officers among the latter. Captain Washington of the Virginia troops, and five or six of the Americans were wounded. Two were killed, and two or three were frozen to death. The detachment in Trenton consisted of the regiments of Rahl, Losberg, and Kniphausen, amounting in the whole to about 1500 men, and a troop of British light horse. All these were killed or captured, except about 600, who escaped by the road leading to Bordenton.

The British had a strong battalion of light infantry at Princeton, and a force yet remaining near the Delaware, superior to the American army. General Washington, therefore in the evening of the same day, thought it most prudent to recross into Pennsylvania, with his prisoners.

The effects of this successful enterprize were speedily felt in recruiting the American army. About 1400 regular soldiers whose time of service was on the point of expiring, agreed to serve six weeks longer, on a promised gratuity of ten paper dollars to each. Men of influence were sent to different parts of the country to rouse the militia. The rapine, and impolitic conduct of the British, operated more forcibly on the inhabitants, to expel them [323 (the original paging errs, skipping over 321–22)] from the state, than either patriotism or persuasion to prevent their overrunning it.

1776

The Hessian prisoners taken on the 26th being secured, general Washington re-crossed the Delaware, and took possession of Trenton. The detachments which had been distributed over New-Jersey, previous to the capture of the Hessians, immediately, after that event, assembled at Princeton, and were joined by the army from Brunswick under lord Cornwallis.

Dec. 28

EXHIBIT 19
0724

From this position they came forward towards Trenton in great force, hoping by a vigorous onset to repair the injury their cause had sustained by the late defeat.

1777

Truly delicate was the situation of the feeble American army. To retreat was to hazard the city of Philadelphia, and to destroy every ray of hope which had begun to dawn from their late success. To risque an action with a superior force in front, and a river in rear, was dangerous in the extreme. To get round the advanced party of the British, and by pushing forwards to attack in their rear, was deemed preferable to either.

Jan. 2d

The British on their advance from Princeton, about 4 P.M. attacked a body of Americans which were posted with four field pieces, a little to the northward of Trenton, and compelled them to retreat. The pursuing British, being checked at the bridge over Sanpink creek, which runs through that town, by some field pieces, which were posted on the opposite banks of that rivulet, fell back so far as to be out of reach of the cannon, and kindled their fires. The Americans were drawn up on the other side of the creek, and in that position remained till night, cannonading the enemy and receiving their fire. In this critical hour, two armies on which the success or failure of the American revolution, materially depended, were crouded into the small village of Trenton, and only separated by a creek in many places fordable. The British believing they had all the advantages they could wish for, and that they could use them when they pleased, discontinued all further operations, and kept themselves in readiness to make the attack next morning. Sir William Erskine is reported to have advised an immediate attack, or at least to place a strong [324] guard at a bridge over Sanpink creek, which lay in the route the Americans took to Princeton, giving for reason that, otherwise, Washington if a good general, would make a move to the left of the royal army, and attack the post at Princeton in their rear. The next morning presented a scene as brilliant on the one side, as it was unexpected on the other. Soon after it became dark, gen. Washington ordered all his baggage to be silently removed, and having left guards for the purpose of deception, marched with his whole force, by a circuitous route to Princeton. This manoeuvre was determined upon in a council of war, from a conviction that it would avoid the appearance of a retreat, and at the same time the hazard of an action in a bad position, and that it was the most likely way to preserve the city of Philadelphia, from falling into the hands of the British. General Washington also presumed, that from an eagerness to efface the impressions, made by the late capture of Hessians at Trenton, the British commanders had pushed forward their principal force, and that of course the remainder in the rear at Princeton was not more than equal to his own. The event verified this conjecture. The more effectually to disguise the departure of the Americans from Trenton, fires were lighted up in front of their camp. These not only gave an appearance of going to rest, but as flame cannot be seen through, concealed from the British, what was transacting behind them. In this relative position they were a pillar of fire to the one army, and a pillar of a cloud to the other. Providence favoured this movement of the Americans. The weather had been for some time so warm and moist, that the ground was soft and the roads so deep as to be scarcely passable: but the wind suddenly changed to the northwest, and the ground in a short time was frozen so hard, that when the Americans took up their line of march, they were no more retarded, than if they had been upon a solid pavement.

EXHIBIT 19
0725

General Washington reached Princeton, early in the morning, and would have completely surprised the British, had not a party, which was on their way to Trenton, [325] descried his troops, when they were about two miles distant, and sent back couriers to alarm their unsuspecting fellow soldiers in their rear. These consisted of the 17th, the 40th, & 55th regiments of British infantry and some of the royal artillery with two field pieces, and three troops of light dragoons. The center of the Americans, consisting of the Philadelphia militia, while on their line of march, was briskly charged by a party of the British, and gave way in disorder. The moment was critical. General Washington pushed forward, and placed himself between his own men, and the British, with his horse's head fronting the latter. The Americans encouraged by his example, and exhortations, made a stand, and returned the British fire. The general, though between both parties, was providentially uninjured by either. A party of the British fled into the college and were there attacked with field pieces which were fired into it. The seat of the muses became for some time the scene of action. The party which had taken refuge in the college, after receiving a few discharges from the American field pieces came out and surrendered themselves prisoners of war. In the course of the engagement, sixty of the British were killed, and a greater number wounded, and about 300 of them were taken prisoners. The rest made their escape, some by pushing on towards Trenton, others by returning towards Brunswick. The Americans lost only a few, but colonels Haslet and Potter, and capt. Neal of the artillery, were among the slain. General Mercer received three bayonet wounds of which he died in a short time. He was a Scotchman by birth, but from principle and affection had engaged to support the liberties of his adopted country, with a zeal equal to that of any of its native sons. In private life he was amiable, and his character as an officer stood high in the public esteem.

Jan. 3

1776

While they were fighting in Princeton, the British in Trenton were under arms, and on the point of making an assault on the evacuated camp of the Americans. With so much address had the movement to Princeton been conducted, that though from the critical situation of the two armies, every ear may be supposed to have been [326] open, and every watchfulness to have been employed, yet General Washington moved completely off the ground, with his whole force, stores, baggage and artillery unknown to, and unsuspected by his adversaries. The British in Trenton, were so entirely deceived, that when they heard the report of the artillery at Princeton, though it was in the depth of winter, they supposed it to be thunder.

1776

That part of the royal army, which having escaped from Princeton, retreated towards New-Brunswick, was pursued for three or four miles. Another party which had advanced as far as Maidenhead, on their way to Trenton, hearing the frequent discharge of fire arms in their rear, wheeled round and marched to the aid of their companions. The Americans by destroying bridges, retarded these, though close in their rear, so long as to gain time for themselves, to move off, in good order, to Pluckemin.

So great was the consternation of the British at these unexpected movements, that they instantly evacuated both Trenton and Princeton, and retreated with their whole

EXHIBIT 19
0726

force to New-Brunswick. The American militia, collected and forming themselves into parties, waylaid their enemies, and cut them off whensoever an opportunity presented. In a few days they over-ran the Jerseys. General Maxwell surprised Elisabeth-town, and took near 100 prisoners. Newark was abandoned, and the late conquerors were forced to leave Woodbridge. The royal troops were confined to Amboy and Brunswick, which held a water communication with New-York. Thus, in the short space of a month, that part of Jersey, which lies between New-Brunswick and Delaware, was both overrun by the British, and recovered by the Americans. The retreat of the continental army, the timid policy of the Jersey farmers, who chose rather to secure their property by submission, than defend it by resistance, made the British believe their work was done, and that little else remained, but to reap a harvest of plunder as the reward of their labours.

Unrestrained by the terrors of civil law, uncontrolled by the severity of discipline, and elated with their success, the soldiers | 1776 |
of the royal army, and particularly [327] the Hessians, gave full scope to the selfish and ferocious passions of human nature. A conquered country, and submitting inhabitants presented easy plunder, equal to their unbounded rapacity. Infants, children, old men and women were stripped of their blankets and cloathing. Furniture was burnt or otherwise destroyed. Domestic animals were carried off, and the people robbed of their necessary household provisions. The rapes and brutalities committed on women, and even on very young girls, would shock the ears of modesty, if particularly recited. These violences were perpetrated on inhabitants who had remained in their houses, and received printed protections, signed by order of the commander in chief. It was in vain, that they produced these protections as a safeguard. The Hessians could not read them, and the British soldiers thought they were entitled to a share of the booty, equally with their foreign associates.

Such, in all ages, has been the complexion of the bulk of armies, that immediate and severe punishments are indispensably necessary, to keep them from flagrant enormities. That discipline, without which an army is a band of armed plunderers, was as far, as respected the inhabitants, either neglected, or but feebly administered in the royal army. The soldiers finding, they might take with impunity what they pleased, were more strongly urged by avarice, than checked by policy or fear. Had every citizen been secured in his rights, protected in his property, and paid for his supplies, the consequences might have been fatal to the hopes of those who were attached to independence. What the warm recommendations of Congress, and the ardent supplications of general Washington could not effect, took place of its own accord, in consequence of the plundering and devastations of the royal army.

The whole country became instantly hostile to the invaders. Sufferers of all parties rose as one man, to revenge their personal injuries. Those, who from age, or infirmities, were incapable of bearing arms, kept a strict watch on the movements of the royal army, and from time to time, communicated information to their countrymen [328] in arms.

Those who lately declined all military opposition, though called | 1777 |
upon by the sacred tie of honour pledged to each other on the
declaration of independence, chearfully embodied, when they found submission to be unavailing for the security of their estates. This was not done originally in

**EXHIBIT 19**
**0727**

consequence of the victories of Trenton and Princeton. In the very moment of these actions, or before the news of them had circulated, sundry individuals unknowing of general Washington's movements, were concerting private insurrections, to revenge themselves on the plunderers. The dispute originated about property, or in other words, about the right of taxation. From the same source at this time, it received a new and forcible impulse. The farmer, who could not trace the consequences of British taxation, nor of American independence, felt the injuries he sustained from the depredation of licentious troops. The militia of New-Jersey, who had hitherto behaved most shamefully, from this time forward redeemed their character, and throughout a tedious war, performed services with a spirit and discipline in many respects, equal to that of regular soldiers.

The victories of Trenton and Princeton, seemed to be like a resurrection from the dead, to the desponding friends of independence. A melancholy gloom, had in the first 25 days of December overspread the United States; but from the memorable era of the 26th of same month, their prospects began to brighten. The recruiting service, which for some time had been at a stand, was successfully renewed, and hopes were soon indulged, that the commander in chief would be enabled to take the field in the spring, with a permanent regular force. General Washington retired to Morristown, that he might afford shelter to his suffering army. The American militia had sundry successful skirmishes with detachments of their adversaries. Within four days after the affair at Princeton, between forty and fifty Waldeckers were killed, wounded, or taken at Springfield, by an equal number of the same New-Jersey militia, which but a month before, suffered the British to overrun their country [329] without opposition. This enterprise was conducted by colonel Spencer, whose gallantry, on the occasion, was rewarded with the command of a regiment.

1777

During the winter movements, which have been just related, the soldiers of both armies underwent great hardships, but the Americans suffered by far the greater. Many of them were without shoes, though marching over frozen ground, which so gashed their naked feet, that each step was marked with blood. There was scarcely a tent in their whole army. The city of Philadelphia had been twice laid under contribution, to provide them with blankets. Officers had been appointed, to examine every house, and, after leaving a scanty covering for the family to bring off the rest, for the use of the troops in the field; but notwithstanding these exertions, the quantity procured was far short of decency, much less of comfort.

The officers and soldiers of the American army were about this time inoculated in their cantonment at Morristown. As very few of them had ever had the small pox, the inoculation was nearly universal. The disorder had previously spread among them in the natural way, and proved mortal to many: but after inoculation was introduced though whole regiments were inoculated, in a day, there was little or no mortality from the small pox, and the disorder was so slight, that from the beginning to the end of it, there was not a single day in which they could not, and if called upon, would not have turned out and fought the British. To induce the inhabitants to accommodate officers and soldiers in their houses, while under the small pox, they and their families were inoculated gratis by the military surgeons. Thus in a short time, the whole army

EXHIBIT 19
0728

and the inhabitants in and near Morristown were subjected to the small pox, and with very little inconvenience to either.

Three months, which followed the actions of Trenton and Princeton, passed away without any important military enterprise on either side. Major general Putnam was directed to take post at Princeton, and cover the country in the vicinity. He had only a few hundred troops, though he was no more than eighteen miles distant from [330] the strong garrison of the British at Brunswick.

At one period he had fewer men for duty than he had miles of frontier to guard. The situation of general Washington at

`1777`

Morristown was not more eligible. His force was trifling, when compared with that of the British, but the enemy, and his own countrymen, believed the contrary. Their deception was cherished, and artfully continued by the specious parade of a considerable army. The American officers took their station in positions of difficult access, and kept up a constant communication with each other. This secured them from insult and surprise. While they covered the country, they harassed the foraging parties of the British, and often attacked them with success. Of a variety of these, the two following are selected as most worthy of notice.

General Dickenson, with four hundred Jersey militia, and fifty of the Pennsylvania riflemen, crossed Millstone-river, near

`Jan. 20`

Somerset courthouse, and attacked a large foraging party of the British, with so much spirit that they abandoned their convoy, and fled. Nine of them were taken prisoners. Forty waggons, and upwards of one hundred horses, with a considerable booty, fell into the hands of the general. While the British were loading their waggons, a single man began to fire on them from the woods. He was soon joined by more of his neighbors, who could not patiently see their propertys carried away. After the foragers had been annoyed for some time by these unseen marksmen, they fancied on the appearance of general Dickenson, that they were attacked by a superior force, and began a precipitate flight.

In about a month after the affair of Somerset courthouse, colonel. Nelson, of Brunswick, with a detachment of 150 militiamen,

`Feb. 18`

surprised and captured at Lawrence's Neck, a major, and fifty-nine privates, of the refugees, who were in British pay.

Throughout the campaign of 1776, an uncommon degree of sickness raged in the American army. Husbandmen, transferred at once from the conveniences of domestic life, to the hardships of a field encampment, could not accommodate themselves to the sudden change.

The southern troops, sickened from the [331] want of salt provisions. Linen shirts were too generally worn, in contact with

`1777`

the skin. The salutary influence of flannel, in preventing the diseases of camps, was either unknown or disregarded. The discipline of the army was too feeble to enforce those regulations which experience has proved to be indispensably necessary, for preserving the health of large bodies of men collected together. Cleanliness was also too much neglected. On the 8th of August the whole American army before New-York, consisted of 17,225 men, but of that number only 10,514 were fit for duty. These numerous sick suffered much, from the want of necessaries. Hurry and

EXHIBIT 19
0729

confusion added much to their distresses. There was besides a real want of the requisites for their relief.

A proper hospital establishment was beyond the abilities of Congress, especially as the previous arrangements were not entered upon till the campaign had begun. Many, perhaps some thousands in the American army, were swept off in a few months by sickness. The country every where presented the melancholy sight of soldiers suffering poverty and disease, without the aid of medicine or attendance. Those who survived gave such accounts of the sufferings of the sick, as greatly discouraged the recruiting service. A rage for plundering, under the pretence of taking tory property, infected many of the common soldiery, and even some of the officers. The army had been formed on such principles, in some of the states, that commissions were, in several instances, bestowed on persons who had no pretensions to the character of gentlemen. Several of the officers were chosen by their own men, and they often preferred those from whom they expected the greatest indulgences. In other cases, the choice of the men was in favour of those who had consented to throw their pay into a joint stock with the privates, from which officers and men drew equal shares.

The army, consisting mostly of new recruits and unexperienced officers, and being only engaged for a twelve month, was very deficient in that mechanism and discipline which time and experience bestow on veteran troops. General Washington was unremitting in his [332] representations to Congress, favouring such alterations as promised permanency, order and discipline, in the army, but his judicious opinions on these subjects were slowly adopted. The sentiments of liberty, which then generally prevailed, made some distinguished members of Congress so distrustful of the future power and probable designs of a permanent domestic army, that they had well nigh sacrificed their country to their jealousies.

The unbounded freedom of the savage who roams the woods must be restrained when he becomes a citizen of orderly government, and from the necessity of the case must be much more so, when he submits to be a soldier. The individuals composing the army of America, could not at once pass over from the full enjoyment of civil liberty to the discipline of a camp, nor could the leading men in Congress for some time be persuaded, to adopt energetic establishments. "God forbid, would such say, that the citizen should be so far lost in the soldiers of our army, that they should give over longing for the enjoyments of domestic happiness. Let frequent furloughs be granted, rather than the endearments of wives and children should cease to allure the individuals of our army from camps to farms. " The amiableness of this principle, veiled the error of the sentiment. The minds of the civil leaders in the councils of America were daily occupied in contemplating the rights of human nature, and investigating arguments on the principles of general liberty, to justify their own opposition to Great-Britain. Warmed with these ideas, they trusted too much to the virtue of their countrymen, and were backward to enforce that subordination and order in their army, which, though it intrenches on civil liberty, produces effects in the military line unequaled by the effusions of patriotism, or the exertions of undisciplined valor.

EXHIBIT 19
0730

The experience of two campaigns evinced the folly of trusting the defence of the country to militia, or to levies raised only for a few months, and had induced a resolution for recruiting an army for the war. The good effects of this measure will appear in the sequel.

The campaign of 1776 did not end, till it had been [333] protracted into the first month of the year 1777.

The British had counted on the complete and speedy reduction of their late colonies, but they found the work more difficult of execution, than was supposed. They wholly failed in their designs on the southern states. In Canada they recovered what, in the preceding year, they had lost—drove the Americans out of their borders, and destroyed their fleet on the lakes, but they failed in making their intended impression on the northwestern frontier of the states. They obtained possession of Rhode-Island, but the acquisition was of little service—perhaps was of detriment. For near three years several thousand men stationed thereon for its security, were lost to every purpose of active cooperation with the royal forces in the field, and the possession of it secured no equivalent advantages. The British completely succeeded against the city of New-York, and the adjacent country, but when they pursued their victories into New-Jersey, and subdivided their army, the recoiling Americans soon recovered the greatest part of what they had lost.

1777

Sir William Howe, after having nearly reached Philadelphia, was confined to limits so narrow, that the fee simple of all he commanded would not reimburse the expence incurred by its conquest.

The war, on the part of the Americans, was but barely begun. Hitherto they had engaged with temporary forces, for a redress of grievances, but towards the close of this year they made arrangements for raising a permanent army to contend with Great-Britain, for the sovereignty of the country. To have thus far stood their ground, with their new levies, was a matter of great importance, because of them, delay was victory, and not to be conquered was to conquer.

EXHIBIT 19
0731

[Back to Table of Contents]

# CHAPTER XIII

# Of Independence, State Constitutions, And The Confederation.

[334]

In former ages it was common for a part of a community to migrate, and erect themselves into an independent society. Since the earth has been more fully peopled, and especially since the principles of Union have been better understood, a different policy has prevailed. A fondness for planting colonies has, for three preceding centuries, given full scope to a disposition for emigration, and at the same time the emigrants have been retained in a connexion with their Parent State. By these means Europeans have made the riches both of the east and west, subservient to their avarice and ambition. Though they occupy the smallest portion of the four quarters of the globe, they have contrived to subject the other three to their influence or command.

`1777`

The circumstances under which New-England was planted, would a few centuries ago have entitled them from their first settlement, to the privileges of independence. They were virtually exiled from their native country, by being denied the rights of men—they set out on their own expence, and after purchasing the consent of the native proprietors, improved an uncultivated country, to which, in the eye of reason and philosophy, the king of England had no title.

If it is lawful for individuals to relinquish their native soil, and pursue their own happiness in other regions and under other political associations, the settlers of New-England were always so far independent, as to owe no obedience to their Parent State, but such as resulted from their voluntary assent. The slavish doctrine of the divine right of kings, and the corruptions of christianity, by undervaluing heathen titles, favoured an opposite system. What for several centuries after the christian era would have been called the institution of a new government, was by modern refinement denominated only an extension of the old, in the form of a dependent colony. Though the prevailing ecclesiastical and political creeds [335] tended to degrade the condition of the settlers in New-England, yet there was always a party there which believed in their natural right to independence. They recurred to first principles, and argued, that as they received from government nothing more than a charter, founded on ideal claims of sovereignty, they owed it no other obedience than what was derived from express, or implied compact. It was not till the present century had more than half elapsed, that it occurred to any number of the colonists, that they had an interest in being detached from Great-Britain. Their attention was first turned to this subject, by the British claim of taxation. This opened a melancholy prospect, boundless in extent, and endless in duration. The Boston port act, and the other acts, passed in 1774, and 1775, which have been already the subject of comment, progressively weakened the attachment of the colonists to the birth place of their forefathers. The commencement of hostilities on the 19th of April, 1775, exhibited the Parent State in an odious point of view, and

`1777`

EXHIBIT 19
0732

abated the original dread of separating from it. But nevertheless at that time, and for a twelve month after, a majority of the colonists wished for no more than to be re-established as subjects in their antient rights. Had independence been their object even at the commencement of hostilities, they would have rescinded these associations, which have been already mentioned and imported more largely than ever. Common sense revolts at the idea, that colonists unfurnished with military stores, and wanting manufactures of every kind, should at the time of their intending a serious struggle for independence, by a voluntary agreement, deprive themselves of the obvious means of procuring such foreign supplies as their circumstances might make necessary. Instead of pursuing a line of conduct, which might have been dictated by a wish for independence, they continued their exports for nearly a year after they ceased to import. This not only lessened the debts they owed to Great-Britain, but furnished additional means for carrying on the war against themselves.

To aim at independence, and at the same time to transfer their resources to their enemies, could not have been [336] the policy `1777` of an enlightened people. It was not till some time in 1776, that the colonists began to take other ground, and contend that it was for their interest to be forever separated from Great-Britain. In favour of this opinion it was said, that in case of their continuing subjects, the Mother country, though she redressed their present grievances, might at pleasure repeat similar oppressions. That she ought not to be trusted, having twice resumed the exercise of taxation, after it had been apparently relinquished. The favourers of separation also urged, that Great-Britain was jealous of their increasing numbers, and rising greatness—that she would not exercise government for their benefit, but for her own. That the only permanent security for American happiness, was to deny her the power of interfering with their government or commerce. To effect this purpose they were of opinion, that it was necessary to cut the knot, which connected the two countries, by a public renunciation of all political connections between them.

The Americans about this time began to be influenced by new views. The military arrangements of the preceding year—their unexpected union, and prevailing enthusiasm, expanded the minds of their leaders, and elevated the sentiments of the great body of their people. Decisive measures which would have been lately reprobated, now met with approbation.

The favourers of subordination under the former constitution urged the advantages of a supreme head, to control the disputes of interfering colonies, and also the benefits which flowed from union. That independence was untried ground, and should not be entered upon, but in the last extremity.

They flattered themselves that Great-Britain was so fully convinced of the determined spirit of America, that if the present controversy was compromised, she would not at any future period, resume an injurious exercise of her supremacy. They were therefore for proceeding no farther than to defend themselves in the character of subjects, trusting that ere long the present hostile measures would be relinquished, and the harmony [337] of the two countries reestablished. The `1777` favourers of this system were embarrassed, and all their arguments weakened, by the perseverance of Great-Britain in her schemes of

EXHIBIT 19
0733

coercion. A probable hope of a speedy repeal of a few acts of parliament, would have greatly increased the number of those who were advocates for reconciliation. But the certainty of intelligence to the contrary gave additional force to the arguments of the opposite party. Though new weight was daily thrown into the scale, in which the advantages of independence were weighed, yet it did not preponderate till about that time in 1776, when intelligence reached the colonists of the act of parliament passed in December 1775, for throwing them out of British protection, and of hiring foreign troops to assist in effecting their conquest. Respecting the first it was said, "that protection and allegiance were reciprocal, and that the refusal of the first was a legal ground of justification for withholding the last." They considered themselves to be thereby discharged from their allegiance, and that to declare themselves independent, was no more than to announce to the world the real political state, in which Great-Britain had placed them. This act proved that the colonists might constitutionally declare themselves independent, but the hiring of foreign troops to make war upon them, demonstrated the necessity of their doing it immediately. They reasoned that if Great-Britain called in the aid of strangers to crush them, they must seek similar relief for their own preservation. But they well knew this could not be expected, while they were in arms against their acknowledged sovereign. They had therefore only a choice of difficulties, and must either seek foreign aid as independent states, or continue in the awkward and hazardous situation of subjects, carrying on war from their own resources both against their king, and such mercenaries as he chose to employ for their subjugation. Necessity not choice forced them on the decision. Submission without obtaining a redress of their grievances was advocated by none who possessed the public confidence.

Some of the popular leaders may have [338] secretly wished for independence from the beginning of the controversy, but their number was small and their sentiments were not generally known.

1777

While the public mind was balancing on this eventful subject, several writers placed the advantages of independence in various points of view. Among these Thomas Paine in a pamphlet, under the signature of Common Sense, held the most distinguished rank. The stile, manner, and language of this performance were calculated to interest the passions, and to rouse all the active powers of human nature. With the view of operating on the sentiments of a religious people, scripture was pressed into his service, and the powers, and even the name of a king was rendered odious in the eyes of the numerous colonists who had read and studied the history of the Jews, as recorded in the Old Testament. The folly of that people in revolting from a government, instituted by Heaven itself, and the oppressions to which they were subjected in consequence of their lusting after kings to rule over them, afforded an excellent handle for prepossessing the colonists in favour of republican institutions, and prejudicing them against kingly government. Hereditary succession was turned into ridicule. The absurdity of subjecting a great continent to a small island on the other side of the globe, was represented in such striking language, as to interest the honor and pride of the colonists in renouncing the government of Great-Britain. The necessity, the advantages, and practicability of independence, were forcibly demonstrated. Nothing could be better timed than this performance. It was addressed to freemen, who had just received convincing proof, that Great-Britain had thrown them out of her protection, had engaged foreign mercenaries to make war upon them,

EXHIBIT 19
0734

and seriously designed to compel their unconditional submission to her unlimited power. It found the colonists most thoroughly alarmed for their liberties, and disposed to do and suffer any thing that promised their establishment. In union with the feelings and sentiments of the people, it produced surprising effects.

Many thousands were convinced, and were led to approve [339] 1777 and long for a separation from the Mother Country. Though that measure, a few months before, was not only foreign from their wishes, but the object of their abhorrence, the current suddenly became so strong in its favour, that it bore down all opposition. The multitude was hurried down the stream, but some worthy men could not easily reconcile themselves to the idea of an eternal separation from a country, to which they had been long bound by the most endearing ties. They saw the sword drawn, but could not tell when it would be sheathed. They feared that the dispersed individuals of the several colonies would not be brought to coalesce under an efficient government, and that after much anarchy some future Caesar would grasp their liberties, and confirm himself in a throne of despotism. They doubted the perseverance of their countrymen in effecting their independence, and were also apprehensive that in case of success, their future condition would be less happy than their past. Some respectable individuals whose principles were pure, but whose souls were not of that firm texture which revolutions require, shrunk back from the bold measures proposed by their more adventurous countrymen. To submit without an appeal to Heaven, though secretly wished for by some, was not the avowed sentiment of any. But to persevere in petitioning and resisting was the system of some misguided honest men. The favourers of this opinion were generally wanting in that decision which grasps at great objects, and influenced by that timid policy, which does its work by halves. Most of them dreaded the power of Britain. A few, on the score of interest or an expectancy of favours from royal government, refused to concur with the general voice. Some of the natives of the Parent State who, having lately settled in the colonies, had not yet exchanged European for American ideas, together with a few others, conscientiously opposed the measures of Congress: but the great bulk of the people, and especially of the spirited and independent part of the community, came with surprising unanimity into the project of independence.

[340]

The eagerness for independence resulted more from feeling than 1776 reasoning. The advantages of an unfettered trade, the prospect of honours and emoluments in administering a new government, were of themselves insufficient motives for adopting this bold measure. But what was wanting from considerations of this kind, was made up by the perseverance of Great-Britain, in her schemes of coercion and conquest. The determined resolution of the Mother Country to subdue the colonists, together with the plans she adopted for accomplishing that purpose, and their equally determined resolution to appeal to Heaven rather than submit, made a declaration of independence as necessary in 1776, as was the non-importation agreement of 1774, or the assumption of arms in 1775. The last naturally resulted from the first. The revolution was not forced on the people by ambitious leaders grasping at supreme power, but every measure of it was forced on Congress, by the necessity of the case, and the voice of the people. The change of the public mind of America respecting connexion with Great-Britain, is without a parallel. In the

EXHIBIT 19
0735

short space of two years, nearly three millions of people passed over from the love and duty of loyal subjects, to the hatred and resentment of enemies.

The motion for declaring the colonies free and independent, was first made in Congress, by Richard Henry Lee of Virginia. He

June 7

was warranted in making this motion by the particular instructions of his immediate constituents, and also by the general voice of the people of all the states. When the time for taking the subject under consideration arrived, much knowledge, ingenuity and eloquence were displayed on both sides of the question. The debates were continued for some time, and with great animation. In these John Adams, and John Dickinson, took leading and opposite parts. The former began one of his speeches, by an invocation of the god of eloquence, to assist him in defending the claims, and in enforcing the duty of his countrymen. He strongly urged the immediate dissolution of all political connexion of the colonies with Great-Britain, from the voice of the [341] people,

from the necessity of the measure in order to obtain foreign assistance, from a regard to consistency, and from the prospects

1776

of glory and happiness, which opened beyond the war, to a free and independent people. Mr. Dickinson replied to this speech. He began by observing that the member from Massachusetts (Mr. Adams) had introduced his defence of the declaration of independence by invoking an heathen god, but that he should begin his objections to it, by solemnly invoking the Governor of the Universe, so to influence the minds of the members of Congress, that if the proposed measure was for the benefit of America, nothing which he should say against it, might make the least impression. He then urged that the present time was improper for the declaration of independence, that the war might be conducted with equal vigor without it, that it would divide the Americans, and unite the people of Great-Britain against them. He then proposed that some assurance should be obtained of assistance from a foreign power, before they renounced their connexion with Great-Britain, and that the declaration of independence should be the condition to be offered for this assistance. He likewise stated the disputes that existed between several of the colonies, and proposed that some measures for the settlement of them should be determined upon, before they lost sight of that tribunal, which had hitherto been the umpire of all their differences.

After a full discussion, the measure of declaring the colonies free and independent was approved, by nearly an unanimous vote. The anniversary of the day on which this great event took place, has ever since been consecrated by the Americans to religious gratitude, and social pleasures. It is considered by them as the birth day of their freedom.

The act of the united colonies for separating themselves from the government of Great-Britain, and declaring their independence, was expressed in the following words:

When, in the course of human events, it becomes necessary for one people to dissolve the political bands [342] which have

1776

connected them with another, and to assume among the powers of the earth, the separate and equal station to which the laws of nature and of nature's God entitle

EXHIBIT 19
0736

them, a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.

We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty, and the pursuit of happiness—That to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed; that whenever any form of government becomes destructive of these ends, it is the right of the people to alter or to abolish it, and to institute new government, laying its foundation on such principles, and organizing its power in such form, as to them shall seem most likely to effect their safety and happiness. Prudence, indeed, will dictate that governments long established should not be changed for light and transient causes; and accordingly all experience hath shewn, that mankind are more disposed to suffer, while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed. But when a long train of abuses and usurpations, pursuing invariably the same object, evinces a design to reduce them under absolute despotism, it is their right, it is their duty, to throw off such government, and to provide new guards for their future security. Such has been the patient sufferance of these colonies, and such is now the necessity which constrains them to alter their former systems of government. The history of the present king of Great-Britain is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute tyranny over these states. To prove this, let facts be submitted to a candid world.

He has refused his assent to laws, the most wholesome and necessary for the public good.

He has forbidden his governors to pass laws of immediate and pressing importance, unless suspended in their [343] operation till his assent should be obtained; and when so suspended he has utterly neglected to attend to them.

<div style="float:right">1776</div>

He has refused to pass other laws for the accommodation of large districts of people, unless those people would relinquish the right of representation in the legislature, a right inestimable to them, and formidable to tyrants only.

He has called together legislative bodies at places unusual, uncomfortable, and distant from the depository of their public records, for the sole purpose of fatiguing them into compliance with his measures.

He has dissolved representative houses repeatedly, for opposing, with manly firmness, his invasions on the rights of the people.

He has refused, for a long time after such dissolutions, to cause others to be elected; whereby the legislative powers, incapable of annihilation, have returned to the people at large for their exercise; the state remaining in the mean-time exposed to all the danger of invasion from without, and convulsions within.

EXHIBIT 19
0737

He has endeavored to prevent the population of these states; for that purpose obstructing the laws for naturalization of foreigners; refusing to pass others to encourage their migration hither, and raising the conditions of new appropriations of lands.

He has obstructed the administration of justice, by refusing his assent to laws for establishing judiciary powers.

He has made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries.

He has erected a multitude of new offices, and sent hither swarms of officers to harass our people, and eat out their substance.

He has kept among us, in times of peace, standing armies, without the consent of our legislatures.

He has affected to render the military independent of, and superior to, the civil power.

He has combined with others to subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his assent to their acts of pretended legislation:

[344]

For quartering large bodies of armed troops among us:

1776

For protecting them, by a mock trial, from punishment for any murders which they should commit on the inhabitants of these states:

For cutting off our trade with all parts of the world:

For imposing taxes on us without our consent:

For depriving us, in many cases, of the benefits of trial by jury:

For transporting us beyond seas to be tried for pretended offences:

For abolishing the free system of English laws in a neighbouring province, establishing therein an arbitrary government, and enlarging its boundaries, so as to render it at once an example and fit instrument for introducing the same absolute rule into these colonies:

For taking away our charters, abolishing our most valuable laws, and altering fundamentally the forms of our governments:

For suspending our own legislatures, and declaring themselves invested with power to legislate for us in all cases whatsoever.


EXHIBIT 19
0738

He has abdicated government here, by declaring us out of his protection, and waging war against us.

He has plundered our seas, ravaged our coasts, burnt our towns, and destroyed the lives of our people.

He is, at this time, transporting large armies of foreign mercenaries to complete the works of death, desolation and tyranny, already begun with circumstances of cruelty and perfidy, scarcely paralleled in the most barbarous ages, and totally unworthy the head of a civilized nation.

He has constrained our fellow-citizens, taken captive on the high seas, to bear arms against their country, to become the executioners of their friends and brethren, or to fall themselves by their hands.

He has excited domestic insurrections amongst us, and has endeavoured to bring on the inhabitants of our frontiers the merciless Indian savages, whose known rule of warfare is an undistinguished destruction of all ages, sexes and conditions.

In every stage of these oppressions we have petitioned [345] for redress in the most humble terms: our repeated petitions have been answered only by repeated injury. A prince, whose character is thus marked by every act which may define a tyrant, is unfit to be the ruler of a free people.

1776

Nor have we been wanting in attention to our British brethren. We have warned them from time to time of attempts made by their legislature, to extend an unwarrantable jurisdiction over us. We have reminded them of the circumstances of our emigration and settlement here. We have appealed to their native justice and magnanimity, and we have conjured them, by the ties of our common kindred, to disavow these usurpations, which would inevitably interrupt our connections and correspondence. They too have been deaf to the voice of justice and of consanguinity. We must, therefore, acquiesce in the necessity, which denounces our separation, and hold them, as we hold the rest of mankind, enemies in war, in peace, friends.

We, therefore, the representatives of the United States of America, in General Congress assembled, appealing to the Supreme Judge of the world for the rectitude of our intentions, do, in the name, and by authority of the good people of these colonies, solemnly publish and declare, that these United Colonies are, and of right ought to be, free and independent states; that they are absolved from all allegiance to the British crown; and that all political connection between them and the state of Great-Britain is and ought to be totally dissolved; and that as free and independent states, they have full power to levy war, conclude peace, contract alliances, establish commerce, and to do all other acts and things which independent states may of right do. And for the support of this declaration, with a firm reliance on the protection of Divine Providence, we mutually pledge to each other our lives, our fortunes, and our sacred honour.

John Hancock, President

EXHIBIT 19
0739

*New-Hampshire,* Josiah Bartlett, William Whipple, Matthew Thornton. *Massachusetts-Bay,* Samuel Adams, John Adams, Robert-Treat Paine, Elbridge [346] Gerry. *Rhode-Island,* &c. Stephen Hopkins, William Ellery. *Connecticut,* Roger Sherman, Samuel Huntington, William Williams, Oliver Wolcott. *New-York,* William Floyd, Philip Livingston, Francis Lewis, Lewis Morris. *New-Jersey,* Richard Stockton, John Witherspoon, Francis Hopkinson, John Hart, Abraham Clark. *Pennsylvania,* Robert Morris, Benjamin Rush, Benjamin Franklin, John Morton, George Clymer, James Smith, George Taylor, James Wilson, George Ross. *Delaware,* Caesar Rodney, George Read. *Maryland,* Samuel Chase, William Paca, Thomas Stone, Charles Carroll, of Carrollton. *Virginia,* George Wythe, Richard Henry-Lee, Thomas Jefferson, Benjamin Harrison, Thomas Nelson, jun. Francis Lightfoot Lee, Carter Braxton. *North-Carolina,* William Hooper, Joseph Hewes, John Penn. *South-Carolina,* Edward Rutledge, Thomas Heyward, jun. Thomas Lynch, jun. Arthur Middleton. *Georgia,* Button Gwinnett, Lyman Hall, George Walton.

From the promulgation of this declaration, every thing assumed a new form. The Americans no longer appeared in the character of subjects in arms against their sovereign, but as an independent people, repelling the attacks of an invading foe. The propositions and supplications for reconciliation were done away. The dispute was brought to a single point, whether the late British colonies should be conquered provinces, or free and independent states.

The declaration of independence was read publicly in all the states, and was welcomed with many demonstrations of joy. The people were encouraged by it to bear up under the calamities of war, and viewed the evils they suffered, only as the thorn that ever accompanies the rose. The army received it with particular satisfaction. As far as it had validity, so far it secured them from suffering as rebels, and held out to their view an object, the attainment of which would be an adequate recompense for the [347] toils and dangers of war. They were animated by 1776 the consideration that they were no longer to risque their lives for the trifling purpose of procuring a repeal of a few oppressive acts of parliament, but for a new organization of government, that would forever put it out of the power of Great-Britain to oppress them. The flattering prospects of an extensive commerce, freed from British restrictions, and the honours and emoluments of office in independent states now began to glitter before the eyes of the colonists, and reconciled them to the difficulties of their situation. What was supposed in Great-Britain to be their primary object, had only a secondary influence. While they were charged with aiming at independence from the impulse of avarice and ambition, they were ardently wishing for a reconciliation. But, after they had been compelled to adopt that measure, these powerful principles of human actions opposed its retraction, and stimulated to its support. That separation which the colonists at first dreaded as an evil, they soon gloried in as a national blessing. While the rulers of Great-Britain urged their people to a vigorous prosecution of the American war, on the idea that the colonists were aiming at independence, they imposed on them a necessity of adopting that very measure, and actually effected its accomplishment. By repeatedly charging the Americans with aiming at the erection of a new government, and by proceeding on that idea to subdue them, predictions which were originally false, eventually became true. When the declaration of independence reached Great-Britain the

EXHIBIT 19
0740

partisans of ministry triumphed in their sagacity. "The measure, said they, we have long foreseen, is now come to pass." They inverted the natural order of things. Without reflecting that their own policy had forced a revolution contrary to the original design of the colonists, the declaration of independence was held out to the people of Great-Britain as a justification of those previous violences, which were its efficient cause.

The act of Congress for dissevering the colonies from their Parent State, was the subject of many animadversions.

[348]

The colonists were said to have been precipitate in adopting a measure, from which there was no honourable ground of retreating. They replied that for eleven years they had been incessantly petitioning the throne for a redress of their grievances. Since the year 1765, a continental Congress had at three sundry times stated their claims, and prayed for their constitutional rights. That each assembly of the thirteen colonies had also, in its separate capacity, concurred in the same measure. That from the perseverance of Great-Britain in her schemes for their coercion, they had no alternative, but a mean submission, or a vigorous resistance; and that as she was about to invade their coasts with a large body of mercenaries, they were compelled to declare themselves independent, that they might be put into an immediate capacity for soliciting foreign aid.

> 1776

The virulence of those who had been in opposition to the claims of the colonists, was increased by their bold act in breaking off all subordination to the Parent State. "Great-Britain, said they, has founded colonies at great expence—has incurred a load of debt by wars on their account—has protected their commerce, and raised them to all the consequence they possess, and now in the insolence of adult years, rather than pay their proportion of the common expences of government, they ungratefully renounce all connexion with the nurse of their youth, and the protectress of their riper years.'' The Americans acknowledged that much was due to Great-Britain, for the protection which her navy procured to the coasts, and the commerce of the colonies, but contended that much was paid by the latter, in consequence of the restrictions imposed on their commerce by the former. "The charge of ingratitude would have been just," said they, "had allegiance been renounced while protection was given, but when the navy, which formerly secured the commerce and seaport towns of America, began to distress the former, and to burn the latter, the previous obligations to obey or be grateful, were no longer in force."

That the colonists paid nothing, and would not pay to the support of government, was confidently asserted, and [349] no credit was given for the sums indirectly levied upon them, in consequence of their being confined to the consumption of British manufactures. By such illfounded observations were the people of Great-Britain inflamed against their fellow subjects in America. The latter were represented as an ungrateful people, refusing to bear any part of the expences of a protecting government, or to pay their proportion of a heavy debt, said to be incurred on their account. Many of the inhabitants of Great-Britain deceived in matters of fact, considered their American brethren as deserving the severity of

> 1776

EXHIBIT 19
0741

military coercion. So strongly were the two countries rivetted together, that if the whole truth had been known to the people of both, their separation would have been scarcely possible. Any feasible plan by which subjection to Great-Britain could have been reconciled with American safety, would at any time, previous to 1776, have met the approbation of the colonists. But while the lust of power and of gain, blinded the rulers of Great-Britain, mistated facts and uncandid representations brought over their people to second the infatuation. A few honest men properly authorised, might have devised measures of compromise, which under the influence of truth, humility and moderation, would have prevented a dismemberment of the empire; but these virtues ceased to influence, and falsehood, haughtiness and blind zeal usurped their places. Had Great-Britain, even after the declaration of independence, adopted the magnanimous resolution of declaring her colonies free and independent states, interest would have prompted them to form such a connexion as would have secured to the Mother Country the advantages of their commerce, without the expence or trouble of their governments. But misguided politics continued the fatal system of coercion and conquest. Several on both sides of the Atlantic, have called the declaration of independence, "a bold, and accidentally, a lucky speculation," but subsequent events proved, that it was a wise measure. It is acknowledged, that it detatched some timid friends from supporting the Americans in their opposition to Great-Britain, but it increased the [350] vigour and union of those, who possessed more fortitude and perseverance. Without it, the colonists would have had no object adequate to the dangers to which they exposed themselves, in continuing to contend with Great-Britain. If the interference of France was necessary to give success to the resistance of the Americans, the declaration of independence was also necessary, for the French expressly founded the propriety of their treaty with Congress on the circumstance, "that they found the United States in possession of independence."

1776

All political connexion between Great-Britain and her colonies being dissolved, the institution of new forms of government became unavoidable. The necessity of this was so urgent that Congress, before the declaration of independence, had recommended to the respective assemblies and conventions of the United States, to adopt such governments as should, in their opinion, best conduce to the happiness and safety of their constituents. During more than twelve months the colonists had been held together by the force of antient habits, and by laws under the simple stile of recommendations. The impropriety of proceeding in courts of justice by the authority of a sovereign, against whom the colonies were in arms, was self-evident. The impossibility of governing, for any length of time, three millions of people, by the ties of honour, without the authority of law, was equally apparent. The rejection of British sovereignty therefore drew after it the necessity of fixing on some other principle of government. The genius of the Americans, their republican habits and sentiments, naturally led them to substitute the majesty of the people, in lieu of discarded royalty. The kingly office was dropped, but in most of the subordinate departments of government, antient forms and names were retained. Such a portion of power had at all times been exercised by the people and their representatives, that the change of sovereignty was hardly perceptible, and the revolution took place without violence or

May 15

EXHIBIT 19
0742

convulsion. Popular elections elevated private citizens to the same offices, which formerly had been conferred by royal appointment.

The people felt an uninterrupted continuation of the blessings [351] of law and government under old names, though derived

1776

from a new sovereignty, and were scarcely sensible of any change in their political constitution. The checks and balances which restrained the popular assemblies under the royal government, were partly dropped, and partly retained, by substituting something of the same kind. The temper of the people would not permit that any one man, however exalted by office, or distinguished by abilities, should have a negative on the declared sense of a majority of their representatives, but the experience of all ages had taught them the danger of lodging all power in one body of men. A second branch of legislature, consisting of a few select persons, under the name of senate, or council, was therefore constituted in eleven of the thirteen states, and their concurrence made necessary to give the validity of law to the acts of a more numerous branch of popular representatives. New-York and Massachusetts went one step farther. The former constituted a council of revision, consisting of the governor and the heads of judicial departments, on whose objecting to any proposed law, a reconsideration became necessary, and unless it was confirmed by two thirds of both houses, it could have no operation. A similar power was given to the governor of Massachusetts. Georgia and Pennsylvania were the only states whose legislature consisted of only one branch. Though many in these states, and a majority in all the others, saw and acknowledged the propriety of a compounded legislature, yet the mode of creating two branches out of a homogeneous mass of people, was a matter of difficulty. No distinction of ranks existed in the colonies, and none were entitled to any rights, but such as were common to all. Some possessed more wealth than others, but riches and ability were not always associated. Ten of the eleven states, whose legislatures consisted of two branches, ordained that the members of both should be elected by the people. This rather made two co-ordinate houses of representatives than a check on a single one, by the moderation of a select few. Maryland adopted a singular plan for constituting an independent senate.

By her constitution the members of that body [352] were elected for five years, while the members of the house of delegates held

1776

their seats only for one. The number of senators was only fifteen, and they were all elected indiscriminately from the inhabitants of any part of the state, excepting that nine of them were to be resident on the west, and six on the east side of the Chesapeak Bay. They were elected not immediately by the people, but by electors, two from each county, appointed by the inhabitants for that sole purpose. By these regulations the senate of Maryland consisted of men of influence, integrity and abilities, and such as were a real and beneficial check on the hasty proceedings of a more numerous branch of popular representatives. The laws of that state were well digested, and its interest steadily pursued with a peculiar unity of system; while elsewhere it too often happened in the fluctuation of public assemblies; and where the legislative department was not sufficiently checked, that passion and party predominated over principle and public good.

Pennsylvania instead of a legislative council or senate, adopted the expedient of publishing bills after the second reading, for the information of the inhabitants. This had its advantages and disadvantages. It prevented the precipitate adoption of new

EXHIBIT 19
0743

regulations, and gave an opportunity of ascertaining the sense of the people on those laws by which they were to be bound; but it carried the spirit of discussion into every comer, and disturbed the peace and harmony of neighbourhoods. By making the business of government the duty of every man, it drew off the attention of many from the steady pursuit of their respective businesses.

The state of Pennsylvania also adopted another institution peculiar to itself, under the denomination of a council of censors. These were to be chosen once every seven years, and were authorised to enquire whether the constitution had been preserved—whether the legislative and executive branch of government, had performed their duty, or assumed to themselves, or exercised other or greater powers, than those to which they were constitutionally entitled.

To enquire whether the public taxes had [353] been justly laid and collected, and in what manner the public monies had been disposed of, and whether the laws had been duly executed. However excellent this institution may appear in theory, it is doubtful whether in practice it will answer any valuable end. It most certainly opens a door for discord, and furnishes abundant matter for periodical altercation. Either from the disposition of its inhabitants, its form of government, or some other cause, the people of Pennsylvania have constantly been in a state of fermentation. The end of one public controversy, has been the beginning of another. From the collision of parties, the minds of the citizens were sharpened, and their active powers improved, but internal harmony has been unknown. They who were out of place, so narrowly watched those who were in, that nothing injurious to the public could be easily effected, but from the fluctuation of power, and the total want of permanent system, nothing great or lasting could with safety be undertaken, or prosecuted to effect. Under all these disadvantages, the state flourished, and from the industry and ingenuity of its inhabitants acquired an unrivalled ascendancy in arts and manufactures. This must in a great measure be ascribed to the influence of habits, of order and industry, that had long prevailed.

| 1776 |
| --- |

The Americans agreed in appointing a supreme executive head to each state, with the title either of governor or president. They also agreed in deriving the whole powers of government, either mediately or immediately from the people. In the eastern states, and in New York, their governors were elected by the inhabitants, in their respective towns or counties, and in the other states by the legislatures: but in no case was the smallest title of power exercised from hereditary right. New-York was the only state which invested its governor with executive authority without a council. Such was the extreme jealousy of power which pervaded the American states, that they did not think proper to trust the man of their choice with the power of executing their own determinations, without obliging him in many cases to take the advice of such counsellors as they thought proper to nominate. [354] The disadvantages of this institution far outweighed its advantages. Had the governors succeeded by hereditary right, a council would have been often necessary to supply the real want of abilities, but when an individual had been selected by the people as the fittest person for discharging the duties of this high department, to fetter him with a council was either to lessen his capacity of doing good, or to furnish him with a skreen for doing evil. It destroyed the secrecy, vigor and dispatch, which the executive power ought to possess, and by making governmental acts the acts of a body, diminished individual

EXHIBIT 19
0744

responsibility. In some states it greatly enhanced the expences of government, and in all retarded its operations, without any equivalent advantages.

New-York in another particular, displayed political sagacity superior to her neighbors. This was in her council of appointment, consisting of one senator from each of her four great election districts, authorised to designate proper persons for filling vacancies in the executive departments of government. Large bodies are far from being the most proper depositaries of the power of appointing to offices. The assiduous attention of candidates is too apt to biass the voice of individuals in popular assemblies. Besides in such appointments, the responsibility for the conduct of the officer, is in a great measure annihilated. The concurrence of a select few on the nomination of one, seems a more eligible mode for securing a proper choice, than appointments made either by one, or by a numerous body. In the former case there would be danger of favoritism, in the latter that modest unassuming merit would be overlooked, in favour of the forward and obsequious.

A rotation of public officers made a part of most of the American constitutions. Frequent elections were required by all, but several still farther, and deprived the electors of the power of continuing the same office in the same hands, after a specified length of time. Young politicians suddenly called from the ordinary walks of life, to make laws and institute forms of government, turned their attention to the histories of ancient republics [355] and the writings of speculative men on the subject of government.

This led them into many errors and occasioned them to adopt sundry opinions, unsuitable to the state of society in America, and contrary to the genius of real republicanism.

1776

The principle of rotation was carried so far, that in some of the states, public officers in several departments scarcely knew their official duty, till they were obliged to retire and give place to others, as ignorant as they had been on their first appointment. If offices had been instituted for the benefit of the holders, the policy of diffusing these benefits would have been proper, but instituted as they were for the convenience of the public, the end was marred by such frequent changes. By confining the objects of choice, it diminished the privileges of electors, and frequently deprived them of the liberty of choosing the man who, from previous experience, was of all men the most suitable. The favourers of this system of rotation contended for it, as likely to prevent a perpetuity of office and power in the same individual or family, and as a security against hereditary honours. To this it was replied, that free, fair and frequent elections were the most natural and proper securities, for the liberties of the people. It produced a more general diffusion of political knowledge, but made more smatterers than adepts in the science of government.

As a farther security for the continuance of republican principles in the American constitutions, they agreed in prohibiting all hereditary honours and distinction of ranks.

It was one of the peculiarities of these new forms of government, that all religious establishments were abolished. Some retained a constitutional distinction between

EXHIBIT 19
0745

Christians and others, with respect to eligibility to office, but the idea of supporting one denomination at the expence of others, or of raising any one sect of protestants to a legal pre-eminence, was universally reprobated. The alliance between church and state was completely broken, and each was left to support itself, independent of the other.

The far famed social compact between the people and their rulers, did not apply to the United States. The [356] sovereignty

1776

was in the people. In their sovereign capacity by their representatives, they agreed on forms of government for their own security, and deputed certain individuals as their agents to serve them in public stations agreeably to constitutions, which they prescribed for their conduct.

The world has not hitherto exhibited so fair an opportunity for promoting social happiness. It is hoped for the honor of human nature, that the result will prove the fallacy of those theories, which suppose that mankind are incapable of self government. The ancients, not knowing the doctrine of representation, were apt in their public meetings to run into confusion, but in America this mode of taking the sense of the people, is so well understood, and so completely reduced to system, that its most populous states are often peaceably convened in an assembly of deputies, not too large for orderly deliberation, and yet representing the whole in equal proportions. These popular branches of legislature are miniature pictures of the community, and from the mode of their election are likely to be influenced by the same interests and feelings with the people whom they represent. As a farther security for their fidelity, they are bound by every law they make for their constituents. The assemblage of these circumstances gives as great a security that laws will be made, and government administered for the good of the people, as can be expected from the imperfection of human institutions.

In this short view of the formation and establishment of the American constitutions, we behold our species in a new situation. In no age before, and in no other country, did man ever possess an election of the kind of government, under which he would choose to live. The constituent parts of the antient free governments were thrown together by accident. The freedom of modern European governments was, for the most part, obtained by the concessions, or liberality of monarchs, or military leaders. In America alone, reason and liberty concurred in the formation of constitutions. It is true, from the infancy of political knowledge in the United States, there were [357] many defects in their forms of

1776

government. But in one thing they were all perfect. They left the people in the power of altering and amending them, whenever they pleased. In this happy peculiarity they placed the science of politics on a footing with the other sciences, by opening it to improvements from experience, and the discoveries of future ages. By means of this power of amending American constitutions, the friends of mankind have fondly hoped that oppression will one day be no more, and that political evil will at least be prevented or restrained with as much certainty, by a proper combination or separation of power, as natural evil is lessened or prevented by the application of the knowledge or ingenuity of man to domestic purposes. No part of the history of antient or modern Europe, can furnish a single fact that militates against this opinion, since in none of its

EXHIBIT 19
0746

governments have the principles of equal representation and checks been applied, for the preservation of freedom. On these two pivots are suspended the liberties of most of the states. Where they are wanting, there can be no security for liberty, where they exist they render any farther security unnecessary.

The rejection of British sovereignty not only involved a necessity of erecting independent constitutions, but of cementing the whole United States by some common bond of union. The act of independence did not hold out to the world thirteen sovereign states, but a common sovereignty of the whole in their united capacity. It therefore became necessary to run the line of distinction, between the local legislatures, and the assembly of the states in Congress. A committee was appointed for digesting articles of confederation between the states or united colonies, as they were then called, at the time the propriety of declaring independence was under debate, and some weeks previously to the adoption of that measure, but the plan was not for sixteen months after so far digested, as to be ready for communication to the states. Nor was it finally ratified by the accession of all the states, till nearly three years more had elapsed.

In discussing its articles, many difficult questions occurred. One was to ascertain the ratio of [358] contributions from each state. Two principles presented themselves, numbers of people, and the value of lands. The last was preferred as being the truest barometer of the wealth of nations, but from an apprehended impracticability of carrying it into effect, it was soon relinquished, and recurrence had to the former. That the states should be represented in proportion to their importance, was contended for by those who had extensive territory, but they who were confined to small dimensions, replied, that the states confederated as individuals, in a state of nature, and should therefore have equal votes. From fear of weakening their exertions against the common enemy, the large states for the present yielded the point, and consented that each state should have an equal suffrage.

It was not easy to define the power of the state legislatures, so as to prevent a clashing between their jurisdiction, and that of the general government. On mature deliberation it was thought proper, that the former should be abridged of the power of forming any other confederation or alliance—of laying on any imposts or duties that might interfere with treaties made by Congress—or keeping up any vessels of war, or granting letters of marque or reprisal. The powers of Congress were also defined. Of these the principle were as follows: To have the sole and exclusive right of determining on peace and war—of sending and receiving ambassadors—of entering into treaties and alliances,—of granting letters of marque and reprisal in times of peace.—To be the last resort on appeal, in all disputes between two or more states—to have the sole and exclusive right of regulating the alloy and value of coin, of fixing the standard of weights and measures—regulating the trade and managing all affairs with the Indians—establishing and regulating post offices—to borrow money or emit bills on the credit of the United States—to build and equip a navy—to agree upon the number of land forces, and to make requisitions from each state for its quota of men, in proportion to the number of its white inhabitants.

No coercive power was given to the general government, nor was it invested with any legislative power over [359] individuals,

1776

1776

EXHIBIT 19
0747

but only over states in their corporate capacity. As at the time the articles of confederation were proposed for ratification, the Americans had little or no regular commercial intercourse with foreign nations, a power to regulate trade or to raise a revenue from it, though both were essential to the welfare of the union, made no part of the federal system. To remedy this and all other defects, a door was left open for introducing farther provisions, suited to future circumstances.

The articles of confederation were proposed at a time when the citizens of America were young in the science of politics, and when a commanding sense of duty, enforced by the pressure of a common danger, precluded the necessity of a power of compulsion. The enthusiasm of the day gave such credit and currency to paper emissions, as made the raising of supplies an easy matter. The system of federal government was therefore more calculated for what men then were, under these circumstances, than for the languid years of peace, when selfishness usurped the place of public spirit, and when credit no longer assisted, in providing for the exigencies of government.

The experience of a few years after the termination of the war, proved, as will appear in its proper place, that a radical change of the whole system was necessary, to the good government of the United States.

the end of the first volume

[1.]Noah Webster, *Dissertations on the English Language* (Boston, 1789), pp. 397–398. See Lawrence J. Friedman, *Inventors of the Promised Land* (New York, 1975) and Richard M. Rollins, *The Long Journey of Noah Webster* (Philadelphia, 1980).

[2.]*Columbian Magazine, or Monthly Miscellany*, 1 (1786): 22–25; Rev. James Madison to Thomas Jefferson, March 27, 1786, in Robert H. Brunhouse, ed., *David Ramsay, 1749–1815: Selections from His Writings,* American Philosophical Society, *Transactions,* New Series, 55 (1965), Part IV, p. 226; *Columbian Magazine,* 4 (1790): 373–377.

[3.]See Arthur H. Shaffer, *The Politics of History: Writing the History of the American Revolution, 1783–1815* (Chicago, 1975); Lester H. Cohen, *The Revolutionary Histories: Contemporary Narratives of the American Revolution* (Ithaca, 1980), Chapter 6.

[4.]Ramsay to Jedidiah Morse, May 5, 1813, in Brunhouse, pp. 118–119, 174. See Ramsay to Benjamin Lincoln, January 29, 1788.

[5.]Ramsay to Benjamin Rush, February 17, 1788, in Brunhouse, p. 119. Ramsay was a staunch Federalist delegate to his state's constitution-ratifying convention; he wrote to Rush, April 21, 1788, exulting: "I hope in my next [letter] to congratulate you on South Carolina being the 7th pillar of the new Government." Ibid., p. 120.

[6.]Ramsay's "An Oration," for July 4, 1794. Ibid., p. 195. However, Ramsay's was not a naive vision of homogeneity, for he also thought that "Even the prejudices,

EXHIBIT 19
0748

peculiarities, and local habits of the different states, should be respected and tenderly dealt with." Ibid. He emphasized unity of vision—an intellectual consensus—rather than a bland uniformity of customs or conduct.

[7.]"An Address to the Freemen of South-Carolina, on the Subject of the Federal Constitution," (Charleston, S.C., 1788), p. 13; rpt. Paul Leicester Ford, ed., *Pamphlets on the Constitution of the United States, Published During Its Discussion by the People, 1787–1788* (Brooklyn, 1888), p. 379.

[8.]Ramsay to Eliot, March 11, 1795, in Brunhouse, p. 139.

[9.]Ramsay to Belknap, March 11, 1795, in Brunhouse, pp. 139–140.

[10.]See Lester H. Cohen, "Creating a Useable Future: The Revolutionary Historians and the National Past," in Jack P. Greene, ed., *The American Revolution: Its Character and Limits* (New York, 1987), pp. 309–330.

[11.]David Ramsay, *The History of the American Revolution* (hereafter *HAR),* I, p. *26.*

[12.]*HAR,* I, pp. 31, 27.

[13.]*HAR,* I, pp. 334–337, 27–33.

[14.]*HAR,* I, pp. 29–33. Even the colonists' readings, though few in number, "generally favoured the cause of liberty." They included *Cato's Letters,* the *Independent Whig,* and, in New England, histories of the Puritans, which "kept alive the remembrance of the sufferings of their forefathers, and inspired a warm attachment, both to the civil and the religious rights of human nature." Ibid., p. 30. Ramsay, who wrote of the powerful unifying force exerted by New England histories, was no doubt influenced by them in his own writings.

[15.]*HAR,* I, p. 350.

[16.]The major sources are Bernard Bailyn, *The Ideological Origins ofthe American Revolution* (Cambridge, Mass., 1967) and *The Originsof American Politics* (New York, 1971); Gordon S. Wood, *The Creation of the American Republic, 1776–1787* (Chapel Hill, N.C., 1969); and J.G.A. Pocock, *The Machiavellian Moment: Florentine Political Thought and the Atlantic Republican Tradition* (Princeton, N.J., 1975). Three excellent historiographical essays are Robert Shalhope, "Toward a Republican Synthesis: The Emergence of an Understanding of Republicanism in American Historiography," *William and Mary Quarterly,* 3d Series, 29 (1972): 49–80, and "Republicanism and Early American Historiography," ibid., 39 (1982): 334–356; and Linda K. Kerber, "The Republican Ideology of the Revolutionary Generation," *American Quarterly,* 37 (1985): 474–495. I have discussed the impact of republicanism on one historian in "Mercy Otis Warren: The Politics of Language and the Aesthetics of Self," *American Quarterly,* 35 (1983): 481–498.

[17.]In fact, Ramsay publicly opposed slavery and branded the slave trade an "infamous traffic." [See Ramsay to Rush, August 22, 1783, September 9, 1783,

EXHIBIT 19
0749

January 31, 1785, December 14, 1785, April 12, 1786, in Brunhouse, pp. 76, 77, 86–87, 94, 99.] According to Winthrop Jordan, moreover, Ramsay was the only Southerner who, upon receipt of a copy of Thomas Jefferson's *Notes on the State of Virginia,* wrote that he thought Jefferson had "depressed the negroes too low." Ramsay was as strong a proponent of the Lockean principle that environment shapes human nature as one could find in eighteenth-century America. He believed that "all mankind [is] originally the same & only diversified by accidental circumstances." [Ramsay to Jefferson, May 3, 1786, in Brunhouse, p. 101. Jordan, *White Over Black: American Attitudes Toward the Negro, 1550–1812* (Chapel Hill, N.C., 1968), p. 456.] While Ramsay's attitudes toward slavery are beyond the scope of this essay, it is useful to note that his failure to condemn slavery more vehemently in his *History* was integral to his strategy of diminishing the importance of the forces that could tear the nation apart. For a fine discussion of Ramsay and slavery, see Arthur H. Shaffer, "Between Two Worlds: David Ramsay and the Politics of Slavery," *Journal of Southern History,* 50 (1984): 175–196.

[18.]See Ramsay to Jefferson, April 7, 1787, in Brunhouse, p. 110; "An Oration" for July 4, 1794, Ibid., p. 195.

[19.]Ramsay to Drayton, September 1, 1779; to Rush, July 18, 1779; to Rush, July 11, 1783; to Eliot, August 6, 1785; to Rush, August 6, 1786; in Brunhouse, pp. 64, 62, 75, 90, 105.

[20.]Ramsay to Eliot, August 6, 1785, in Brunhouse, pp. 90–91.

[21.]Ramsay to Eliot, April 7, 1810, in Brunhouse, p. 166.

[22.]Ramsay to John Coakley Lettsom, October 29, 1808, in Brunhouse, p. 163. This analogy raises the issue of "truth" in historical writing, which I have addressed in "Creating a Useable Future," and *The Revolutionary Histories,* particularly chapters 6 and 8.

[23.]*The History of the Revolution of South-Carolina* was, thanks to Jefferson's brokering, translated into French. The fascinating story of Jefferson's efforts is contained in several letters: Ramsay to Jefferson, June 15, 1785; Ramsay to Jefferson, July 13, 1785; Ramsay to Jefferson, August 8, 1785; Jefferson to Ramsay, August 31, 1785; Jefferson to Ramsay, October 12, 1785; Ramsay to Jefferson, December 10, 1785; Jefferson to Ramsay, January 26, 1786; Jefferson to Ramsay, January 27, 1786; Ramsay to Jefferson, May 3, 1786; Jefferson to Ramsay, July 10, 1786; Ramsay to Jefferson, November 8, 1786; Jefferson to Ramsay, August 4, 1786; Jefferson to Ramsay, May 7, 1788; Ramsay to Jefferson, October 8, 1788, in Brunhouse, pp. 88–94, 97, 101, 104, 107, 112–113, 121, 123. *The History of the American Revolution* was translated into Dutch and German, and *The Life of George Washington* was translated into French and Spanish.

[24.]Rush quoted in Robert Y. Hayne, "Biographical Memoir of David Ramsay, M.D.," *Analectic Magazine,* 6 (1815): 206. I have relied on Brunhouse, pp. 12–48 for biographical material.

EXHIBIT 19
0750

[25.]Ramsay was married three times: first, in February 1775, to Sabina Ellis, who died in June 1776; then in March 1783 to Frances Witherspoon—daughter of John Witherspoon, president of the College of New Jersey (Princeton)—who died while delivering their child December 9, 1784; and finally in January 1787 to Martha Laurens—daughter of Henry Laurens, one of the giants of South Carolina politics and commerce; this marriage lasted some twenty-five years.

[26.]Ramsay's loss to Smith was almost certainly related to his anti-slavery sentiments. See Shaffer, "Between Two Worlds"; George C. Rogers, Jr., *Evolution of a Federalist: William Loughton Smith of Charleston (1758–1812)* (Columbia, S.C., 1962), especially pp. 162–171.

[27.]Ramsay to Jefferson, June 15, 1785, in Brunhouse, p. 88. Ramsay, along with other prominent Charlestonians, was arrested by the British on May 12, 1780, upon the capitulation of the city. On August 27 he was exiled to St. Augustine; a year later he was released.

[28.]Ramsay to Rush, February 11, 1786 and Ramsay to Jefferson, April 7, 1787, in Brunhouse, pp. 98, 110.

[29.]David Ramsay, *The History of South-Carolina,* II, pp. 238–240, 83–84.

[30.]"An Oration on the Advantages of American Independence … ," in Brunhouse, pp. 184–185.

[31.]Ramsay was referred to as the "Tacitus" of America by J. Kingston, in *The New American Biographic Dictionary* (Baltimore, 1810), and as America's "Polybius" in *Niles' Weekly Register,* 11 (October 5, 1816), both quoted in Brunhouse, p. 220; Ramsay to Gordon, January 18, 1786, in Brunhouse, p. 96.

[32.]Ramsay to Rush, May 3, 1786, in Brunhouse, pp. 101–102. He added: "For some months past I have spent from five to 8 hours every day at this work. The drudery is nearly done. I have got my facts & I shall put them together in Carolina."

[33.]Ramsay to Rush, April 13, 1786, September 26, 1786, May 1, 1787, and August 18, 1787, in Brunhouse, pp. 99–100, 105–106, 112, 113–114; Ramsay to Boudinot, April 13, 1786, to Morris, May 12, 1786, to Thomson, November 4, 1786, to Adams, September 20, 1787, in Brunhouse, pp. 100, 102, 107, 114. Thomson's lengthy letter responding to Ramsay's manuscript has been reprinted by Paul H. Smith, *Quarterly Journal of the Library of Congress,* 28 (1971): 158–172.

[34.]Ramsay to Ashbel Green, October 4, 1791, in Brunhouse, p. 130. Aitken had a very good reputation, and he attempted to explain his procedures to the irate author. See Brunhouse's index for several references to Aitken; Isaiah Thomas, *The History of Printing in America* (1810), rev. ed., by Marcus A. McCorison (New York, 1970).~ ~~~~~~

[35.]Ramsay to Eliot, October 19, 1789, April 13, 1792, April 7, 1810, and April 12, 1793, in Brunhouse, pp. 126, 131, 166, 135.

**EXHIBIT 19**
**0751**

[36.]Orrin Grant Libby, "Ramsay as a Plagiarist," *American Historical Review* 7 (1901–02): 697–703. Libby also demonstrated that William Gordon had plagiarized from the same source in "A Critical Examination of William Gordon's History of the American Revolution," American Historical Association, *Annual Report* (1899), I: 367–388. Brunhouse has pointed out that two other historians followed Libby's lead: Josephine Fitts, "David Ramsay . . ." (Unpub. M.A. thesis, Columbia University, 1936); and Elmer D. Johnson, "David Ramsay: Historian or Plagiarist?" *South Carolina Historical Magazine,* 57 (1956).

[37.]Burke's role on the *Annual Register* is still, apparently, a matter of controversy. See Thomas W. Copeland, "Burke and Dodsley's Annual Register," *PMLA*, 54 (1939): 223–245; Bertram D. Sarason, "Edmund Burke and the Two Annual Registers," *PMLA,* 68 (1953): 496–508.

[38.]Libby adduced eight examples of plagiarism in Ramsay's *The History of the American Revolution.* Fitts added ten more, Brunhouse six. Ironically, Libby searched only the *Annual Register,* whereas Ramsay himself mentioned that the *Remembrancer,* another English periodical, also was available to him. See Ramsay to Rush, May 3, 1786, in Brunhouse, p. 102. Brunhouse lists the examples of plagiarism at p. 219.

[39.]Libby, "Ramsay as a Plagiarist," p. 703.

EXHIBIT 19
0752

# EXHIBIT "20"

EXHIBIT 20
0753

| | | |
|---|---|---|
| Isaac Lytle, | John McNeale, | John White, |
| David Getty, | Jonathan Baker, | John Reed, |
| Robert Getty, | George Fowler | John McKinsey, |
| Isaac Hopkins, | John Duncan, | James Burns, |
| James Gamel, | Jonathan Barber, | John McMullen, |
| George McKnight, | Daniel McCloud, | Peter Garoy, |
| Adam Getty, | John Munson, | Ananias Cormac, |
| Samuel Gamel, | John McDonal, | Josiah Parrish, Jr., |
| David Wheden, | Oliver Fowler, | Nathaniel Munson, |
| Solomon Weode, | Alexander Gamel, | John Peek, |
| David Wilson, | Norman McCloud, | John Gary, |
| Josiah Parrish, | Alexander Simpson, | Duncan McCloud. |

### SIGNERS IN SPRINGFIELD, CUMBERLAND COUNTY.

| | | |
|---|---|---|
| Simon Stevens, | John Nott, | John Barrett, |
| George Hall, | Noah Porter, | Daniel Sartwell, |
| Samuel Scott, | Emanuel Case, | Robert Millard, |
| Abner Bisbee, | Anthony Sheldon, | Jerahmeel Powers, |
| Josiah Johnson, | John Hammond, | Platt Parker, |
| Asahel Mighell, | William Kellog, | Nicholas Bragg, |
| Timothy Spencer, | Joseph Little, | Jacob Sartwell, |
| Hezakiah Holmes, | Nicholas Bragg, | Counos House, |
| Simon Spencer, | Jacob Lockwood, | William McClellan, |
| James Martin, Jr., | John Griswold, | Thomas Corten, |
| James Martin, | Daus Goodwin, | Simeon Bradford, |
| Nathaniel Weston, | John M. Roberts, | John Weeams, |
| Taylor Spencer, | Isaac Lockwood, | Robert Tavers, |
| Ichabod Woddams, | Jesse Richardson, | Ebenezer Hildrith, |
| Joseph Lockwood, | Oliver Sartwell, | George Hall, Jr., |
| Abraham Lockwood, | Joseph Webb, | James Dunghy, |
| Nathaniel Sheldon, | Thomas Edwards, | John Barrett. |

Signed by order of the Committee of Safety in *Springfield.*

*December 21, 1775.*

JOHN BARRETT.

*Province of New-York, Cumberland County,*
*Townshend, July 13, 1775.*

We, the subscribers, heartily and sincerely adhere to the proceedings of the Continental Congress, held at *Philadelphia* on the 5th day of *September,* 1775, more especially the Association Agreement; as witness our hands:

| | | |
|---|---|---|
| John Hazeltine, | Amos Holbrook, | John Burt, |
| Timothy Holbrook, | John Wright, | Paul Hazeltine, |
| William Hayward, | John How, | John Hazeltine, Jr., |
| Silas Hayward, | John How, Jr., | Thomas Walker, |
| Caleb Hayward, | James Watkins, | Jesman Walker, |
| Peter Hazeltine, | Jonathan Claton, | Samuel Wisell, |
| Paul Hayward, | William Christopher, | John Dyer, |
| Joseph How, | Ezra Holbrook, | Benjamin Dyer, |
| Benjamin How, | William Johnson, | Isaac Harhart, |
| Daniel Blanchard, | Joseph Tyler, | John Barns, |
| Benjamin Hayward, | Ebenezer Ober, | Epherim Barns, |
| Amariah Tost, | Matthew Martin, | Lemuel Robings, |
| Calvin Hayward, | Abraham Martin, | William Robings, |
| Eli Hayward, | David Linsey, | Benjamin Fletcher, |
| Josiah Fish, | James Linsey, | Thomas Reed, |
| John Wood, | Mike Johnson, | Benjamin Bugg, |
| Moses Holbrook, | Caleb Darling, | Asa Ober. |

The above subscribers are all the men now in *Townshend ;* those out of Town are : *Samuel Fletcher, Benjamin Moredock, Oliver Moredock, Aaron Johnson, Samuel Parkis, Thomas Barns, Ebenezer Burt.*

These are in the service at *Roxbury,* under Gen. *Washington.* The above completed *July* 12, 1775, but no safe opportunity till now, the 6th day of *December,* 1775.

This from a real friend to liberty.

JOHN HAZELTINE.

---

*Whitehall, September 1, 1775.*

The House of Representatives of the Province of *Nova-Scotia,* in *North-America,* having unanimously agreed to a loyal and dutiful address, petition, and memorial, to the King's most excellent Majesty, the Lords spiritual and temporal, and the Commons of *Great Britain,* in Parliament assembled, containing declarations of their obedience and submission to the authority of the Parliament of *Great Britain,* as the supreme legislature of that Province, and of all the *British* Dominions, and of their readiness, as an indispensable duty, to submit to the payment of such taxes, to be raised upon a permanent plan, and at the disposal of Parliament, as shall be their due proportion of the expenses of the Empire ; and *William Nesbitt,* Esq., Speaker of the said House of Representatives, having transmitted a transcript of the said loyal and dutiful address, petition, and memorial, to the Earl of *Dartmouth,* one of His Majesty's principal Secretaries of State, it was this day presented to His Majesty, and most graciously received.

EXTRACT OF A LETTER FROM IRELAND TO AN ACQUAINTANCE IN NEW-YORK, DATED SEPTEMBER 1, 1775.

Though most of the people here wish well to the cause in which you are engaged, and would rejoice to find you continue firm and steadfast, yet it is the prevailing opinion, especially among the friends to Government, (so called,) that you will be at last frightened into submission to ministerial measures. They are raising recruits throughout this Kingdom. The men are told they are only going to *Edinburgh* to learn military discipline, and are then to return. The common people are industriously kept from the knowledge of publick affairs. They know nothing but what the great people please to let them. Newspapers, since the Stamp Act, are so high, the poor and middling people cannot purchase them, nor even an almanack ; not one of which is to be found within sixty miles, except among the great folks ; however, so few are sold, that it is thought there will be no more printed, unless the act is repealed, which is expected next session.

It is most grievous to bear the innumerable burdens they have imposed upon the people here. It is intended to send several Bishops to *America,* (one at least to every city,) with salaries of four hundred Pounds sterling each, to be paid by the people where they are stationed. It is expected that *New-York* will be the first to submit to any terms that shall be offered ; and great pains have been taken to spread a general belief that the people in all the Colonies are mere cowards, ready to run at the sight of an army. The newspapers that are most circulated are filled with such stuff,

but not a word of any thing spirited on your part, so that our people are altogether ignorant of the true state of affairs with you.

Dear countrymen and fellow-sufferers, who have been so happy as to have your lot in a land of liberty, though now persecuted and your rights invaded, suffer not your most precious inheritance, your liberty and property, your noble Constitution, to be torn from you. You are contending for what is of more value than life ; fear not to risk your lives freely in defence of it. Keep your presses free, that the people may know all that concerns them and all that is doing against them. By every means in your power keep corruption from influencing any of your offices of publick trust ; you cannot possibly be too much guarded against this terrible evil, which has almost undone us here. Let not arbitrary power and despotism have any footing among you. Many in this Country, who groan under it, would be glad to give their utmost assistance, and hope to be over with you before the contest is ended.

It is my opinion that if you continue firm, you will, without doubt, succeed in your glorious struggle ; justice will give strength to your arms, and weaken those of your enemies. *God* himself is on your side, and will cause them to fall before you. Meanwhile, let me caution you against the least appearance of submission. You can hardly conceive the ill effects of every thing that may feed the hopes of your enemies ; even base complaisance in this case is criminal, for like drowning men they are ready to catch at straws, and, if possible, interpret every thing you say or do in favour of their own designs, whereby they are encouraged to continue their efforts to subdue you. It behooves you, therefore, to be resolute, plain, and absolute, in your refusal of every proposal that implies giving up one tittle of your rights and liberties, or might bring them into the least danger, and resist every attempt against them with all your might. The least slackness or compliance on your part will embolden them to proceed in their endeavours to enforce their laws, to tax and enslave you. May *God* guide and protect you. *Amen.*

I am a sincere friend to the natural rights and liberty of mankind, and yours, &c.      M. W.

P. S. It is reported that *Charles Stuart* is preparing to make an attempt to obtain the Crown of *Scotland.* I wait for further intelligence.

EXTRACT OF A LETTER FROM A GENTLEMAN IN VIRGINIA TO HIS FRIEND IN EDINBURGH, SCOTLAND, DATED MIDDLESEX, SEPTEMBER 1, 1775.

DEAR SIR : I embrace this favourable opportunity of writing you by a gentleman who intends to reside in *Scot-*

EXHIBIT 20

0754

*land* with his lady and family. As to the present state of *Virginia*, I refer you to them. Tears stand in my eyes when I think or write of this once happy, thrice happy land of liberty.

All is anarchy and confusion. A brave people struggling in opposition to the acts of the *British* Parliament. We are all in arms, exercising and training old and young to the use of the gun. No person goes abroad without his sword, or gun, or pistols. The sound of war echoes from north to south. Every plain is full of armed men, who all wear a hunting shirt, on the left breast of which are sewed, in very legible letters, "*Liberty or Death.*" May *God* put a speedy and happy end to this grand and important contest between the mother and her children. The Colonies do not wish to be independent; they only deny the right of taxation in the Parliament. They would freely grant the King whatever he pleases to request of their own Assemblies, provided the Parliament has no hand in the disposing of it.

This dispute has put an end to all trade and commerce. The Country is on the brink of destruction. The rising glory of *America* is totally eclipsed, and, unless some prudent means be fallen on to bring about a reconciliation, I tremble for the consequences. The troubles of the year 1745 were but like a flea-bite to the present commotions. Never was there heard of such an unanimity as prevails through this extensive Empire in the glorious cause of liberty. All ranks and conditions of men have laid aside all sorts of extravagance in living and dressing, vieing with one another who shall wear most of their own manufactory. You would hardly believe the quantity of cotton cloth that is annually manufactured here could be made. I do assure you no women in any part of the world can be more industrious than those in *Virginia*. They labour under one great disadvantage; which is, their being entirely ignorant of the ways of making of linen, which they will severely feel next year, this warm climate requiring more of that article than any other.

WILLIAM TENNENT TO THE COUNCIL OF SAFETY FOR SOUTH-CAROLINA.

Long Cane, September 1, 1775.

This comes by Captain *George Reid's* wagon from the *Long Canes*, where I am at present. I parted from Mr. *Drayton* on *Monday* morning; he steered his course to *Augusta*, and thence designed for the camp at *Amelia*. I thought it necessary to visit the settlements on this side of *Saluda*. Met a large congregation yesterday, and found the people divided in their sentiments. Spoke at least two hours to them, to good effect. The prevailing party here is for *American* measures, by the agency of some of our worthy members; but they need confirmation. I have therefore appointed three meetings, at which I expect to see the greater number of the disaffected. I shall then cross over into *Fletchall's* Regiment once more, to be at an election appointed at *Ford's*, on *Enoree*, where we expect great opposition, if not violence, from *Cunningham's* party. *Brown* will bring them to blood if he can, but I still hope it may be prevented. I consider myself as running great risks, but think it my duty.

Our visit has given their party a great shock, divided their friends, and strengthened our interest much. One of their chiefs confessed to me, at *Little River*, that he brought up the thanks of the Governour to Mr. *Cunningham*, for what he had done and is doing. The Governour's intrigue here is as evident as the light of the sun. The evidences of their design, by the *Indians*, is no doubt clear to the Council, from the papers sent down already.

The inhabitants here are in great terrour, as far as they have heard of their danger, and that because they have no ammunition. The leaders have frequently dropped in company that they intend to form a camp. I am sure they will find a smaller number ready to befriend them than they imagine. But their dependance is upon the savages to join their army, and that the rest of the inhabitants will be forced to join them, to save their families from a massacre. I am taking proper measures, in this District, to prevent the horrible conspiracy. Three volunteer companies are formed; one under Major *Terry*, who now seems animated in the cause; another under Captain *Pickins;* a third under Captain *James McCall.* More of the like kind is going on

as fast as may be. The great difficulty is the want of ammunition. They evidently have a design upon *Fort Charlotte*, and our friends cannot collect to defend it, unless they are supplied; I have therefore promised them a supply. If you, therefore, gentlemen, think it proper, it will be of the greatest utility to send up one hundred or one hundred and fifty pounds weight of powder, and some lead, by the bearer, *Samuel Reid*, who will effectually secrete it until delivered safe into the hands of the volunteer Companies, to be subject to the order of the Council in case it is not used for the defence of the Colony. It will be effectually secured, and a small delay may be greatly dangerous. The same measure will be necessary on the other side of *Broad* River.

I could wish that *Virginia* might be alarmed and ready, and that a categorical answer might be demanded of the *Cherokees* before the time of danger. The *Creeks* are in some danger from one *Thompson*, an emissary, now among them. I shall visit *Fort Charlotte* before I return, and hope to let you hear more particularly on these subjects next week.

PHILADELPHIA COUNTY COMMITTEE.

Philadelphia County, September 1, 1775.

In Committee, *Resolved*, That it be recommended to the Township Committees and the Captains of the different Companies, and they are hereby enjoined to make returns to this Committee of the Associators, Non-Associators, &c., in their respective Districts, agreeable to the directions of the Committee of Safety, on *Friday*, the 22d instant; and that the Colonels of each Battalion in this County do, at the same time, return the names of the Officers of their respective Battalions, with their ranks and seniority in Battalion.

The Committee adjourned to *Friday*, the 22d instant, to meet at the house of *Jacob Neaff*, at ten o'clock in the forenoon.

NEW-YORK COMMITTEE.

The Committee met *Friday*, *September* 1, 1775. Present: *Henry Remsen*, Chairman, and thirty-five Members.

The Deposition of *George Van Schamp*, relative to Sergeant *Graham's* conduct in *Boston*, received and read.

The Memorial of *Stephen Skinner*, Esq., received and read, praying leave to land some Trunks and Bedding, the property of Miss *Johnson*, Miss *Kemble*, and Mrs. *Lee*.

*Ordered*, That leave be given accordingly, and that Mr. *O. Templeton* and Mr. *John Broome* be a Sub-Committee to examine the same.

*Ordered*, That the Chairman be requested to write a letter of thanks to the different Committees in *New-Jersey* and *Orangetown*, for their polite behaviour to Captain *Dobbs*.

New-York Committee Chamber, September 1, 1775.

Whereas this Committee, by their Resolution of the 1st of *May* last, and the Continental Congress, by their Resolve of the 27th of said month, ordered, that no Provisions should be exported to *Quebeck*, *Nova-Scotia*, *Georgia*, *Newfoundland*, or any part of the fishing coast or fishing islands to the eastward of *Nantucket:* And whereas it appears to this Committee, by the Depositions of *Charles De Kay*, master, and *Thomas Millroy*, mate of the Sloop *Sally*, whereof *John Christian Drewidts* and *Moses Delis Dernier* are owners, that they, the said *John Christian Drewidts* and *Moses Delis Dernier*, did load the said sloop with Provisions; and the said *Moses Delis Dernier* did proceed with her, so loaded, to *Nova-Scotia*, and there disposed of the same, in violation of the Resolve of the said Continental Congress: And whereas it further appears, by the Deposition of Captain *Jenking*, late master of the Sloop *Elizabeth*, whereof *Thomas Ludlow* was owner, that the said *Thomas Ludlow* did load the said sloop in the Port of *New-York*, with Provisions; and with her so loaded, did proceed to the Island of *Newfoundland*, and there disposed of the same, in violation of the aforesaid Resolve:

*Resolved*, 1st, That the Depositions of the said *Charles De Kay*, *Thomas Millroy*, and *Richard Jenking*, be published in the newspapers in this City.

EXHIBIT 20
0755

· *Resolved.* 2d. That the said *John Christian Drewidts.*
*Moses Delis Dernier, Charles De Kay,* and *Thomas Lud-*
*low,* have knowingly violated the beforementioned Resolve
of the Continental Congress, and the General Association
entered into by the inhabitants of this City and County;
and that the said *John Christian Drewidts, Moses Delis*
*Dernier. Charles De Kav.* and *Thomas Ludlow,* have
severally acted inimically to, and have been guilty of a
high infringement of a Resolve of the associated *American*
Colonies.

By order of the Committee:

HENRY REMSEN, *Dep'y Chairman.*

*City of* NEW-YORK, *ss.*

*Charles De Kav.* of the City of *New-York,* Mariner,
and commander of the Sloop *Sally,* now lying in the Port
of *New-York.* being duly sworn, makes oath, that on or
about the beginning of *June* last, he sailed from the said
Port of *New-York.* on board of the said sloop, as master
and commander thereof. with a cargo consisting of flour,
rye meal, bread, pork, *Indian* corn, rum, and some boards,
to the river called *Pettiquit Jack,* in *Nova-Scotia,* where
Mr. *Moses Delis Dernier,* supercargo and part owner of
the said sloop and cargo. disposed of a small part of the
said cargo, to wit: of some of the flour and some of the
bread; that from thence he proceeded with the remainder
of the said cargo on board of the said sloop, to the Town-
ship of *Shippody,* in the Province of *Nova-Scotia* afore-
said. and there discharged some part of the said cargo, by
the direction of the said *Moses Delis Dernier;* that from
the Township of *Shippody* he proceeded with the said sloop
and the residue of the said cargo to the Town of *Cumber-*
*land,* in the Province aforesaid, where the said sloop was
discharged of her said cargo, and the same was disposed of
in the manner following, to wit: part to Mr. *John Avary,*
of *Windsor.* then at *Cumberland* aforesaid, who loaded or
put the part so purchased by him on board of a schooner,
to go to *Windsor* aforesaid, part consisting of flour, bread,
iron, and steel, amounting to about the sum of two hun-
dred and ninety odd Pounds sterling in value, to Mr.
*Thomas Clough,* of the Town of *Boston,* (which he told
the deponent he intended to carry or convey to *Windsor*
aforesaid, or *Machias,* in order therewith to purchase a
cargo for the *West-Indies,* which the deponent believed to
be true.) and the rest in small parcels to the inhabitants of
the said Town of *Cumberland;* that that part of the said
cargo sold to the said *Thomas Clough,* as aforesaid, was sold
for the same price that the said *John Avary* purchased at;
that the deponent had no knowledge or expectation, or
belief, at the time of the sale of part of the said cargo to
the said *Thomas Clough,* that he intended to convey any
part thereof so purchased by him to any other place than
*Windsor* or *Machias* aforesaid, for the purposes aforesaid;
and that he, the deponent, verily believes, and is well as-
sured, that the said *Thomas Clough* did not convey any part
of the said cargo, so purchased by him as aforesaid, to the
Town of *Boston;* and this deponent further saith, that the
said sloop's cargo being discharged and disposed of as afore-
said, he proceeded from *Cumberland* aforesaid, on board of
the said sloop, in ballast, to this City, where he arrived
about the 23d instant; and this deponent further saith, that
besides the sloop's cargo beforementioned, he had an adven-
ture belonging to him, the deponent, on board, of two hun-
dred and fifty weight of hams, and one hundred and fifty
gallons of rum, which were disposed of at *Cumberland* afore-
said, in small parcels, to the inhabitants; and further the
deponent saith, that before he left *New-York,* in the said
voyage, he, the deponent, was informed by *Moses Delis*
*Dernier.* one of the owners of the said vessel, that she
was bound for the Bay of *Fundy;* and the said *Moses* told
him, that he would have applied to the Committee, to
have got leave to have gone there, but that he was afraid
that the port would have been shut; and further the de-
ponent saith not.                    CHARLES DE KAY.

Sworn the 31st *August,* 1775, before me.

WHITEHEAD HICKS. *Mayor.*

*City of* NEW-YORK, *ss.*

*Thomas Millroy,* of the *Isle-of-Man,* Mariner, and mate
of the Sloop *Sally,* now lying in the Port of *New-York,*
being duly sworn, maketh oath, that on or about the begin-
ning of *June* last, he sailed from the said Port of *New-*

*York,* on board the said sloop, as mate thereof, with a
cargo consisting of flour, rye meal, bread, pork, *Indian*
corn, rum, and some boards, bound for the *West-Indies,* as
he was informed by the master of the said sloop. When
they had got out at sea about eighteen hours' sail, Captain
*Charles De Kay* told the deponent they were bound for
the Bay of *Fundy.* At their arrival in the Bay of *Fundy,*
at a place called *Pettiquit Jack,* where our supercargo,
Mr. *Moses Delis Dernier,* sold some of the cargo; from
thence we went to the Township of *Shippody* River, and
there we discharged part of the cargo, by the directions of
said *Moses Delis Dernier;* from thence we went to *Cumber-*
*land,* in the Province aforesaid, and there we discharged
the whole of the cargo we had left, by the order of our super-
cargo; and then took in ballast, and filled our casks with
water, and sailed from thence to *New-York,* where we
arrived the 25th of *August,* 1775, at *Sandy-Hook,* or near
the *Narrows,* where the Captain left the sloop and went
up to *New-York.* Before he left the sloop he desired me,
if any person inquired where they came from, should say
from *St. Eustatia;* and also desired me to give the peo-
ple a caution; which I accordingly did.

THOMAS MILLROY.

Sworn this 31st day of *August,* 1775, before me,

WILLIAM WADDELL, *Alderman.*

I, *Richard Jenking,* sailed from *New-York* on the 28th
of *May* last, as master of the Sloop *Elizabeth,* belonging
to Mr. *Thomas Ludlow,* laden with provisions, to wit: bread,
flour, pork, *Indian* corn, and a small parcel of iron; that
the said *Thomas Ludlow* went with me, as owner and super-
cargo, and took with him four negroes, three of which I
understood were his own. We came to an anchor that day
within *Sandy-Hook* light-house; next day about noon got
under way, and put to sea. I took the log-book and marked
it towards *Bermuda;* and that he then told me not to be
surprised, that he intended to go to *Newfoundland.* I found
myself obliged to follow his orders, and shaped a course for
*Cape Race.* The 14th of *June,* arrived at the harbour of
*Trespass,* in *Newfoundland,* and there landed the cargo,
which he sold to *Jackson & Hallet,* merchants, of *Topsham,*
for sixteen and sixpence sterling, round, as he informed me.
I differed with him there, for deceiving me, and would have
left him, could I have got a passage home. He took a pas-
sage in a small vessel belonging to Mr. *Jackson,* for *Quebeck,*
and gave me my sailing orders to follow him, which I did:
he arrived at *Quebeck* some days before me. At my arrival,
he ordered me to haul the vessel close into the Town in the
mud. In a few days he informed me that he was going to
take on board cattle for the *West-Indies.* I demanded my
discharge, and told him I would not proceed any further
with him. He insisted I should; on which high words
arose between us. I still persisted in my resolution to
leave him. In a few days he provided another master,
and discharged me. I procured a passage to *Saybrook,* in
the Sloop *Betsey, Norman Morrison,* master, and arrived at
*Saybrook* the 20th instant; from thence I proceeded here,
and arrived the 27th.                    RICHARD JENKING.

Sworn the 30th *August,* 1775, before me,

WHITEHEAD HICKS, *Mayor.*

### DAVID BURGER TO NEW-YORK CONGRESS.

New-York, September 1, 1775.

GENTLEMEN: I take this opportunity, from the regard
that I have for the cause of *American* freedom, to acquaint
you that there is a set of judicious people that live on *Sta-*
*ten-Island,* who, for the sake of a little gain, would sell
their and the Country's privileges, as appears by their sell-
ing to the Troops, which they have done last *Tuesday,*
such as hogs, sheep, geese, ducks, and fowls, to go on
board the ship that lies now in the *North* River, to go
to *Boston,* and are determined to continue thus in letting
them have such stock as they want, as far as they are able
to supply them, and will spare no pains to provide for
them. Mr. *Cubberly* is to let them have some stock. As
he is not willing to bring them up himself, for fear of being
discovered in so doing, so that they are to call for them,
and he will let them have as far as he can spare. Last
*Tuesday* they had the abovementioned stock from *John*
*Van Pelt, Cornelius Martin, Benjamin Martin, John*
*Keteltas, Jacob Barregar,* and *Mary Barregar.* The

EXHIBIT 20
0756

# EXHIBIT "21"

EXHIBIT 21
0757

# Founders Online

[Back to normal view]

# From Thomas Jefferson to Giovanni Fabbroni, 8 June 1778

**To Giovanni Fabbroni**

SIR                                                                Williamsburg in Virginia June. 8. 1778

Your letter of Sep. 15. 1776 from Paris came safe to hand. We have not however had the pleasure of seeing Mr. De Crenis, the bearer of it in this country, as he joined the army in Pennsylvania as soon as he arrived. I should have taken particular pleasure in serving him on your recommendation. From the kind anxiety expressed in your letters as well as from other sources of information we discover that our enemies have filled Europe with Thrasonic accounts of victories they had never won and conquests they were fated never to make. While these accounts alarmed our friends in Europe they afforded us diversion. We have long been out of all fear for the event of the war.[1] I inclose you a list of the killed, wounded, and captives of the enemy from the Commencement of hostilities at Lexington in April 1775, till November 1777. since which there has been no event of any consequence. This is the best history of the war which can be brought within the compass of a letter. I believe the account to be near the truth, tho' it is difficult to get at the numbers lost by an enemy with absolute precision. Many of the articles have been communicated to us from England as taken from the official returns made by their General. I wish it were in my power to send you as just an account of our [losses] but this cannot be done without an application to the war office which being in another country is at this time out of my reach. I think that upon the whole it has been about one half the number lost by them. In some instances more, but in others less. This difference is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy. If there could have been a doubt before as to the event of the war, it is now totally removed by the interposition of France; and the generous alliance she has entered into with us.

Tho' much of my time is employed in the councils of America I have yet a little leisure to indulge my fondness for philosophical studies. I could wish to correspond with you on subjects of that kind. It might not be unacceptable to you to be informed for instance of the true power of our climate as discoverable from the Thermometer, from the force and direction of the winds, the quantity of rain, the plants which grow without shelter in the winter &c. On the other hand we should be much pleased with cotemporary observations on the same particulars in your country, which will give us a comparative view of the two climates.[2] Farenheit's thermometer is the only one in use with us. I make my daily observations as early as possible in the morning and again about 4. o'clock in the afternoon, these generally showing the maxima of cold and heat in the course of 24 hours. I wish I could gratify your Botanical taste; but I am acquainted with nothing more than the first principles of that science, yet myself and my friends may furnish you with any Botanical subjects which this country affords, and are not to be had with you: and I shall take pleasure in procuring them when pointed out by you. The greatest difficulty will be the means of conveyance during the continuance of the war.

If there is a gratification which I envy any people in this world it is to your country its music. This is the favorite passion of my soul, and fortune has cast my lot in a country where it is in a state of deplorable barbarism. From the [line] of life in which we conjecture you to be, I have for some time lost the hope of seeing you here. Should the event prove so, I shall ask your assistance in procuring a substitute who may be a proficient in singing and on the harpsichord. I should be contented to receive such an one two or three years hence, when it is hoped he may come more safely, and find here a greater plenty of those useful things which commerce alone can furnish. The bounds of an American fortune will not admit the indulgence of a domestic band of musicians. Yet I have thought that a passion for music might be reconciled with that oeconomy which we are obliged to observe. I retain for instance among my domestic servants a gardener (Ortolano), weaver (Tessitore di lino e lan[a],] a cabinet maker (Stipettaio) and a stonecutter (scalpellino lavorante in piano) to which I would add a Vigneron. In a country where, like yours, music is cultivated and practised by every class of men I suppose there might be found persons of those trades who could perform on the French horn, clarinet or hautboy and bassoon, so that one might have a band of two French horns, two clarinets and hautboys and a bassoon, without enlarging their domest[ic] expences. A certainty of employment for a half dozen years, and at [the] end of that time to find them if they chose it a conveyance to their own country might induce [them] to come here on reasonable wages. Without meaning to give you trouble, perhaps it mig[ht] be practicable for you in your ordinary intercourse with your pe[ople] to find out such men disposed to come to America. Sobriety and good nature would be desireable parts of their characters. If you think such a plan practicable, and will be so kind[3] as to inform me what will be necessary to be done on my part, I will take care that it shall be done. The necessary expences, when informed of them, I can remit before they are wanting, to any port in France with which country alone we have safe correspondence.

I am Sir with much esteem your humble servt., T. J.[4]

<div align="center">ENCLOSURE</div>

Number of the Killed, Wounded, and Captives of the British Army in the Course of the American War.

| 1775 | KILLED | WOUNDED | PRISONERS |
|---|---|---|---|
| At Lexington & Concord | 43 | 70 | |
| Bunker's hill | 746 | 1,150 | |

<div align="center">EXHIBIT 21<br>0758</div>

| | | | |
|---|---:|---:|---:|
| Ticonderoga, St. John, & Quebeck | 81 | 110 | 340 |
| **1776** | | | |
| on the Lakes by general Arnold | 53 | 64 | |
| at Fort Sulivan in South Carolina | 197 | 260 | |
| at the Cedars in Canada | 40 | 70 | |
| at Norfolk, & the great bridge in Virginia | 129 | 175 | 40 |
| in Long Island | 840 | 1600 | 65 |
| at Harlem & Hellgate near New York | 136 | 157 | 49 |
| at New York on Landing | 57 | 100 | |
| at Fort Washington near New York | 900 | 1,500 | |
| at Fort Lee | 20 | 35 | |
| at Trenton the 26 of Decber. | 35 | 60 | 948 |
| at Princeton in New Jersey | 74 | 100 | |
| **1777** | | | |
| in Boston road by Commodore Harding | 52 | 90 | 750 |
| in Sundry transports | | | 390 |
| at Danbury | 260 | 350 | |
| at Iron hill in Delaware State | 59 | 80 | 20 |
| at Brandwine in Pensylvania the 11th. Sepber. | 800 | 1,176 | |
| on Reading road by Genal. Maxwell | 40 | 60 | |
| at german Town near Philadelphia the 4th. Octber. | 180 | 975 | 20 |
| on Staten Island by Genal. Sulivan | 94 | 150 | 278 |
| at Bennington near the Lakes the 4th. Octber. | 900 | 1,300 | 30 |
| at Forts Montgomery & Clinton Hudsons River | 580 | 700 | |
| at Forts Mifflin & Red-Bank near Philada. | 328 | 70 | 84 |
| Genal. Burgoin's Army at Saratoga | 2,100 | 1,126 | 5,752 |
| Prisoners, & deserters before the Surrender | | | 1,100 |
| Total | 8,844 | 11,528 | 9,866. |

In all Wounded, Killed, and Prisoners,      30,238

Men already Lost to England      18,710

---

Dft (DLC); heavily corrected; the more important excisions are given in the textual notes. Tr (MiU-C) of the recipient's copy, which was evidently intercepted and is now missing; endorsed: "Copy of a private Letter from Williamsburgh in Virginia dated June 8-1778. Sent by the way of Spain, to a foreign gentleman abroad." Tr is incomplete, omitting more than half the text. It includes, however, the table of British losses which was enclosed by TJ and which is not found with the draft. That table is therefore printed here from the transcript.

**YOUR LETTER OF SEP. 15 1776**: TJ corrected the year, apparently from 1777 to 1776, for Tr reads 1776; see Fabbroni's letter of that date. On the cover of Fabbroni's letter TJ made memoranda for his reply. These read as follows:

"state of killed & [ . . . . ]

alliance

lies in Engld. diversion

musician harpsichd. singer. organ.

band. viz



2 horns &c     Cab. makr.

<clarinet> &c     Gardener.

bassoon.     Stone cutter

        weaver

        vigneron

wines. Vendée

Thermometer &c

a gardener. Ortolano

a stone-cutter. Scalpellino lavorante in piano.

a cabinet-maker. Stipettaio.

weaver. Tessitore di lino e lana."

**EXHIBIT 21**
**0759**

Intercepted with TJ's letter was a letter from his friend Charles (Carlo) Bellini to Fabbroni; an undated translation of it is also in MiU-C. It provides an illuminating account of Bellini's life in Virginia: he describes himself as "Secretary to the State of Virginia for foreign affairs [he was actually a translator, see notes to Bill Establishing a Clerkship of Foreign Correspondence, 18 May 1778], and Professor of Modern Languages in this University [College of William and Mary]." The substance of his letter is repeated in one he afterward addressed to Mazzei, 12 Aug. 1778, printed in two Florentine journals later that year and reprinted in English by A. Pace, WMQ, 3d ser., IV (1947), 350–5.

1. Deleted in draft: "since the battle of Bunker's hill, which proved to us experimentally that the want of discipline might be supplied by native courage and a cordial tho' governable animation in the cause for which we are contending. Our enemies indeed obtained the feild on that day by superiority of numbers, but their loss was five times greater than ours."

2. Text of transcript of the intercepted letter (except for complimentary close and signature) ends at this point. The British high command was not interested in TJ's musical plans.

3. Deleted in draft: "as to write me a line, with advice what money may be necessary to remit, I will take care to do it for their transportation hither; I would remit it according to your advice to any port of France, with which country only we have safe correspondence. I shall always be glad to receive your letters and to do any friendly offices which you or your friends may require hence."

4. Supplied from transcript. Draft is unsigned.

PERMALINK https://founders.archives.gov/documents/Jefferson/01-02-02-0066
 What's this?

*Note:* The annotations to this document, and any other modern editorial content, are copyright © Princeton University Press. All rights reserved.

| SOURCE PROJECT | Jefferson Papers |
| --- | --- |
| TITLE | From Thomas Jefferson to Giovanni Fabbroni, 8 June 1778 |
| AUTHOR | Jefferson, Thomas |
| RECIPIENT | Fabbroni, Giovanni |
| DATE | 8 June 1778 |
| CITE AS | "From Thomas Jefferson to Giovanni Fabbroni, 8 June 1778," *Founders Online*, National Archives, accessed April 11, 2019, https://founders.archives.gov/documents/Jefferson/01-02-02-0066. [Original source: *The Papers of Thomas Jefferson*, vol. 2, *1777–18 June 1779*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1950, pp. 195–198.] |

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

**EXHIBIT 21**
**0760**

# EXHIBIT "22"

EXHIBIT 22
0761



Copyright © 2019 Newspapers.com. All Rights Reserved.



Copyright © 2019 Newspapers.com. All Rights Reserved.

is very conſiderable, the ſtates have in their own hands, to the absolute *excluſion* of Congreſs.

The power of the ſword, ſay the minority of Pennſylvania, is in the hands of Congreſs. My friends and countrymen, it is not ſo, for THE POWERS OF THE SWORD ARE IN THE HANDS OF THE YEOMANRY OF AMERICA FROM SIXTEEN TO SIXTY. The militia of theſe free commonwealths, entitled and accuſtomed to their arms, when compared with any poſſible army, muſt be *tremendous and irreſiſtable.* Who are theſe militia? *are they not ourſelves.* Is it feared, then, that we ſhall turn our arms *each man againſt his own boſom.* Congreſs have no power to diſarm the militia. Their ſwords, and every other terrible implement of the ſoldier, are *the birth-right of an American.* What clauſe in the ſtate or fœderal conſtitutions hath *given away* that important right. It is ſaid, Congreſs can order the militia of Georgia to New-Hampſhire! The gentlemen might have gone further, and ſaid, they might order the militia of Maryland TO MARCH OVER THE SURFACE OF THE CHESAPEAK. The latter would be obeyed as ſoon as the former. Theſe extravagancies operate againſt all power. The legiſlature of Pennſylvania may conſtitutionally order their citizens to pay in taxes one half, or even *the whole, value* of their eſtates, by the very clauſe which veſts them with the power of providing for the real and evident exigences of the ſtate government. Further, the power of the ſword, even ſo far as it is placed in the hands of Congreſs, is ſubject to *the controul* of the ſtate legiſlatures, for they name one branch of the fœderal government (the Senate) without whom no military officers can be appointed, no monies granted, no armies raiſed, no navies provided. The ſtate governments alſo have " *the authority* of training the militia, and *appointing all the officers.* The conſtitution, inſtead of providing a ſtanding (or permanent) army, takes care that *it ſhall not be ſtanding,* ſhall not *continue,* for it declares it ſhall find itſelf *abſolutely unprovided* at the end of every two years. If the people ſee the leaſt reaſon to apprehend a breach in the conſtitution by the grant of money for more than two years, they can elect new

Copyright © 2019 Newspapers.com. All Rights Reserved.

# EXHIBIT "23"

EXHIBIT 23
0765

## Journal of Criminal Law and Criminology

Volume 104
Issue 4 *Symposium On Guns In America*

Article 3

Fall 2015

# The Posse Comitatus And The Office Of Sheriff: Armed Citizens Summoned To The Aid Of Law Enforcement

David B. Kopel

Follow this and additional works at: https://scholarlycommons.law.northwestern.edu/jclc

 Part of the Criminal Law Commons

## Recommended Citation

David B. Kopel, *The Posse Comitatus And The Office Of Sheriff: Armed Citizens Summoned To The Aid Of Law Enforcement*, 104 J. Crim. L. & Criminology 761 (2015).
https://scholarlycommons.law.northwestern.edu/jclc/vol104/iss4/3

This Criminal Law is brought to you for free and open access by Northwestern University School of Law Scholarly Commons. It has been accepted for inclusion in Journal of Criminal Law and Criminology by an authorized editor of Northwestern University School of Law Scholarly Commons.

**EXHIBIT 23**
**0766**

0091-4169/15/10404-0761
THE JOURNAL OF CRIMINAL LAW & CRIMINOLOGY
Copyright © 2015 by Northwestern University School of Law

Vol. 104, No. 4
Printed in U.S.A.

# THE *POSSE COMITATUS* AND THE OFFICE OF SHERIFF: ARMED CITIZENS SUMMONED TO THE AID OF LAW ENFORCEMENT

## DAVID B. KOPEL*

Posse comitatus *is the legal power of sheriffs and other officials to summon armed citizens to aid in keeping the peace. The* posse comitatus *can be traced back at least as far as the reign of Alfred the Great in ninth-century England. The institution thrives today in the United States; a study of Colorado finds many county sheriffs have active posses. Like the law of the* posse comitatus, *the law of the office of sheriff has been remarkably stable for over a millennium. This Article presents the history and law of the* posse comitatus *and the office of sheriff from their earliest days to the present. This Article also describes how the past and present of the* posse comitatus *can be used in interpretation of the Second Amendment.*

---

* Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law. Research Director, Independence Institute, Denver, Colorado. Associate Policy Analyst, Cato Institute, Washington, D.C. Professor Kopel is the author of ninety scholarly journal articles and fifteen books, including the first law school textbook on the Second Amendment: NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT (2012). Kopel's website is http://www.davekopel.org. The author would like to thank Christopher Lee Runyan, Justin Miller, Alycia Wilson, and Sean O'Connor for research assistance. All errors in this Article are Felix Frankfurter's fault. *See* Orin Kerr, *Because We Thought the Errors in Your Article Were Cass Sunstein's Fault*, VOLOKH CONSPIRACY (Sept. 6, 2010, 10:18 PM), http://www.volokh.com/2010/09/06/because-we-thought-the-errors-in-your-article-were-cass-sunsteins-fault/ (last visited Dec. 26, 2013), *archived at* http://perma.cc/FDY4-D7A3; *Others' Mistakes, Maybe*, 17 GREEN BAG 2D 128 (2014) (discussing Kopel's use of footnote * to identify responsibility for errors).

EXHIBIT 23
0767

T<small>ABLE OF</small> C<small>ONTENTS</small>

I<small>NTRODUCTION</small>..................................................................763
I. T<small>HE</small> C<small>ONSTITUTIONAL</small> O<small>FFICE OF</small> S<small>HERIFF</small> ...........................765
    A. Anglo-Saxon Liberties ..............................................765
    B. The Anglo-Saxon Sheriff ..........................................769
    C. The Sheriff's Office from the Norman Conquest to the
        Fourteenth Century ...............................................774
        1. Sheriffs' Courts.................................................775
        2. Election of Sheriffs ...........................................776
        3. Sheriff's Oath of Office and Bond.......................781
    D. The English Office of Sheriff in the Seventeenth Century and
        Thereafter.............................................................781
        1. Autonomous and Indivisible .............................782
        2. Modern Role in the United Kingdom ................783
    E. The Sheriff in America .............................................784
II. T<small>HE</small> *P<small>OSSE</small> C<small>OMITATUS</small>* <small>FOR THE</small> K<small>EEPER OF THE</small> P<small>EACE</small>.....................787
    A. *Posse Comitatus* in England.....................................789
    B. *Posse Comitatus* in Colonial America and the Revolution .......792
    C. After Independence .................................................793
    D. *Posse Comitatus* and the Civil War.........................798
        1. Before the War ................................................798
        2. After the War ..................................................800
    E. *Posse Comitatus* in Late Nineteenth Century America to the
        Present..................................................................802
    F. Who Is Subject to *Posse Comitatus* Duty? ...............804
    G. Arms of the *Posse Comitatus* .................................806
III. C<small>OLORADO</small> S<small>HERIFFS AND</small> T<small>HEIR</small> P<small>OSSES</small> .........................808
    A. *Posse Comitatus* in Crime Emergencies ..................812
        1. Pitkin Sheriff's Office......................................812
        2. Hinsdale Sheriff's Office .................................813
        3. Rio Blanco Sheriff's Office .............................815
        4. Jackson Sheriff's Office...................................816
        5. Larimer Sheriff's Office ..................................816
        6. Morgan Sheriff's Office...................................817
    B. *Posse Comitatus* in Low-Risk Situations .................817
    C. Trained *Posse Comitatus* in Forcible Law Enforcement
        Situations .............................................................818
        1. Alamosa County Sheriff's Office ......................818
        2. Baca County Sheriff's Office............................818
        3. Custer County Sheriff's Office .........................819
        4. Delta County Sheriff's Office...........................819

**EXHIBIT 23**
**0768**

        5. Douglas County Sheriff's Office ........................................ 819
        6. Elbert County Sheriff's Office ............................................ 819
        7. Hinsdale County Sheriff's Office ...................................... 820
        8. Kiowa County Sheriff's Office .......................................... 820
        9. Lincoln County Sheriff's Office ........................................ 820
        10. Logan County Sheriff's Office ........................................ 821
        11. Montezuma County Sheriff's Office................................ 821
        12. Morgan County Sheriff's Office...................................... 821
        13. Prowers County Sheriff's Office...................................... 821
    D. The Colorado Mounted Rangers ............................................ 821
IV. POSSE COMITATUS:
        THE RIGHT—AND DUTY—TO KEEP AND BEAR ARMS ................. 823
CONCLUSION .......................................................................... 828
APPENDIX ............................................................................... 830

## INTRODUCTION

Most people know that in the American frontier West, sheriffs sometimes summoned "the posse" to assist in keeping the peace. The sheriff's *posse comitatus* authority to call forth armed citizens to aid law enforcement is deeply rooted in the Anglo-American legal system, originating no later than the ninth century. The *posse comitatus* power thrives in the twenty-first century United States. Sheriffs today use their *posse comitatus* power frequently, sometimes daily. This Article describes the historical roots, the modern uses, and the Second Amendment implications of *posse comitatus*.

The *posse comitatus* power does not belong exclusively to sheriffs, but the power was originally created for them, and they remain its most frequent users. Accordingly, Part I of this Article describes the origins and history of the office of sheriff. This Part explains how the nature of the Anglo-Saxon office provided the foundation for the American sheriff's role as a constitutional officer who is elected directly by the people and enjoys great independence in the performance of his duties. While police chiefs are appointed to their place within (and not at the top of) the chain of command of a city government, sheriffs are autonomous.

Part II explicates the law and history of the *posse comitatus* from Anglo-Saxon times to the present. The *posse comitatus* law of the twenty-first century United States is essentially the same as the *posse comitatus* law of England during the ninth century. The sheriff in carrying out his peacekeeping duty may summon to his aid the able-bodied adults of the

EXHIBIT 23
0769

county. He has complete discretion about whom to summon and how the persons summoned shall be armed.

Part III provides a case study of the *posse comitatus* in modern Colorado. Posses play numerous roles in Colorado. They have thwarted the escapes of criminals, including serial killer Ted Bundy. They also function as a citizen volunteer corps on a regular, structured basis; they assist sheriffs during county fairs, weather emergencies, and hostage situations, among many other duties. The most highly trained posse in Colorado is the Colorado Mounted Rangers, which provides armed assistance to many sheriffs' offices and police departments as needed.

Finally, Part IV considers the relationship between the *posse comitatus* and the Second Amendment. The Second Amendment aims to foster a "well-regulated militia," and, in furtherance of this purpose, the right of the people to keep and bear arms is safeguarded. The *posse comitatus* and the militia are not identical, but they overlap and are intertwined to such a degree that the disarmament of one would inevitably destroy the other. The Second Amendment's protection of the arms rights of citizens has the necessary effect of ensuring that there can be an effective *posse comitatus*. Accordingly, sheriffs and other officials who have the authority to summon the *posse comitatus* are intended third-party beneficiaries of the individual right to keep and bear arms. Sheriffs thus have proper third party standing to defend and advocate for the Second Amendment rights of citizens in their jurisdictions.

Following this Article, a lengthy Appendix summarizes state statutes related to the *posse comitatus*; almost all states continue the longstanding legal tradition that armed citizens may be summoned to aid of law enforcement.

The founding father of the *posse comitatus* was the first true King of England: Alfred the Great, who ruled from A.D. 871–899. One reason he is the only English king called "the Great" is that he recognized that he could not fulfill his own duties solely through his own appointees. To keep "the King's peace," the government needed the active participation of the people. Routine suppression of violent crime and emergency community defense against riots, insurrections, and invasions all require that the armed people actively defend the authority of the government. This is a moral point of the Second Amendment and of its counterparts in state constitutions. This is the "active liberty" extolled by Justice Breyer.[1]

---

[1] STEPHEN BREYER, ACTIVE LIBERTY (2005) (defining "active liberty" to mean citizen participation in collective governance, as opposed to the "negative liberty" of an individual not being restrained by government).

**EXHIBIT 23**
**0770**

Armed citizens, under the guidance of the leaders chosen by the citizens, can embody and effectuate law and order.

## I. THE CONSTITUTIONAL OFFICE OF SHERIFF

This Part explains the history of the office of sheriff, from its Anglo-Saxon origins through its present role in the United States. Section A explores why the Anglo-Saxon model was so revered by the American Founders. Section B then describes the origins and features of the office of sheriff in Anglo-Saxon England. Section C shows the continuity and changes in the office in the three centuries following the Norman Conquest of 1066. The most important development was the demise of the custom of electing sheriffs. Section D describes the long, slow decline of the office of sheriff in England from the seventeenth century to the present. Finally, Section E shows how the office of sheriff has thrived in America, from colonial days to the present. On both sides of the Atlantic, the sheriff was legally autonomous, but in America, the practical autonomy, responsibility, influence, and power of the sheriff were much greater. In addition, the custom of electing sheriffs was restored in America after centuries of disuse. Popular elections became an explicit requirement of most state constitutions.

### A. ANGLO-SAXON LIBERTIES

To the American Founders, England before the Norman Conquest of 1066 was a land of liberty.[2] The American Revolution began because of violations of "the rights of Englishmen" (including the right to bear arms) as those rights existed in the late eighteenth century.[3] However, as with many revolutions, the ambitions for reform grew as the war continued.[4]

The importance of the people's right to bear arms was clear from the start of the Revolution. The war began on April 19, 1775, when Americans used their firearms to fight British soldiers who confiscated firearms and

---

[2] *See, e.g.*, Letter from John Adams to Abigail Adams (Aug. 14, 1776), *in* 2 ADAMS FAMILY CORRESPONDENCE 96 (L.H. Butterfield ed., 1963); MERRILL D. PETERSON, THOMAS JEFFERSON AND THE NEW NATION 57 (1970).

[3] David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 291–92 (2012); William F. Swindler, *"Rights of Englishmen" Since 1776: Some Anglo-American Notes*, 124 U. PA. L. REV. 1083, 1089–91 (1976).

[4] GORDON S. WOOD, THE RADICALISM OF THE AMERICAN REVOLUTION (1992) (while the Revolution began because of specific grievances related to the British government's violations of the traditional rights of Englishmen, its length and ultimate success led many Americans to aim to create a new political system, rather than simply an improved version of the British one).

EXHIBIT 23
0771

gunpowder by conducting house-to-house searches in Lexington and Concord.[5] The Americans chased and harried the Redcoats back to Boston, besieged them there, and fought several battles.[6] On March 17, 1776, the British departed Boston by ship.[7]

The revolutionaries valued Anglo-Saxon traditions. After the Declaration of Independence was announced, the Continental Congress had to decide on the public symbols of the new nation, so on July 6, 1776, a committee discussed the design of the Great Seal of the United States. Thomas Jefferson urged that the reverse of the seal depict "Hengist and Horsa, the Saxon Chiefs, from whom We claim the Honour of being descended and whose Political Principles and Form of Government We have assumed."[8] Hengist and Horsa were the first Anglo-Saxon rulers in England, from the fifth century A.D.[9]

The American Revolutionaries and their European intellectual ancestors believed that societies of liberty had existed in ancient times, and that one purpose of political activity was to recover that lost liberty—especially to ensure that the government ruled under The Law, and not above it.[10]

The eighteenth century Americans who (like many Englishmen of the time) viewed Anglo-Saxon England as a historical model of freedom were part of a longstanding tradition of idealizing the ancient free Germanic tribes, who seemed so different from the despotic Roman Empire and the European governments of the second millennium A.D. The idealization of Germanic liberty can be traced back as far as the first-century Roman historian Tacitus. He extolled the liberties and democracy of the German

---

[5] Kopel, *supra* note 3, at 291–92.

[6] *Id.* at 309–10.

[7] NATHANIEL PHILBRICK, BUNKER HILL: A CITY, A SIEGE, A REVOLUTION 285 (2013).

[8] Letter from John Adams to Abigail Adams, *supra* note 2, at 96.

[9] It is not clear whether Hengist and Horsa were historical figures, or legendary. Allegedly, they were brothers who founded the Anglo-Saxon kingdom of Kent, the first such kingdom in England. *See* BEDE, 1 ECCLESIASTICAL HISTORY OF THE ENGLISH PEOPLE ch. 15 (circa 731); GEOFFREY OF MONMOUTH, THE HISTORY OF THE KINGS OF BRITAIN 155−66, 186−93 (Lewis Thorpe trans., Penguin 1966) (c. 1136).

[10] For example, in 1644, the Scottish Presbyterian Samuel Rutherford published *Lex, Rex, or the Law and the Prince*. The point of the title was that the law precedes the king, and so the monarch is bound to obey the law. The great Anglo-American ideal of "the rule of law" embodies Rutherford's principle. The law, not the individual who heads the government, is the supreme ruler. Further, the true source of law is not the King's will, but God's will. Accordingly, king-made "law" which is inconsistent with God's law of natural justice and goodness is merely a pretended law, not true law. SAMUEL RUTHERFORD, LEX, REX, OR THE LAW AND THE PRINCE 113–19, 125–39 (Sprinkle Pubs., 1982) (1644) (consisting of Questions XXIV, XXVI, and XXVII).

**EXHIBIT 23**
**0772**

tribes, whom the Romans attempted to conquer but failed.[11]  These German tribes later became the ancestors of the English (the Anglo-Saxons) and, to at least some degree, of the French.[12]   The French author François Hotman's *Francogallia* lauded the ancient liberties of the era of Charlemagne (ruled A.D. 768–814), implicitly contrasting France's ancient, primitive freedom with the contemporary centralized despotism of the Bourbon kings.[13]   In the Anglosphere, and especially in America, many believed that the liberties of the Anglo-Saxons had been destroyed by the Norman Conquest in 1066.[14]

---

[11] TACITUS, DE ORIGINE ET SITU GERMANORUM §§ 11–12 (c. A.D. 98).  The book is commonly known as *Germania*.  *See* CHRISTOPHER B. KREBS, A MOST DANGEROUS BOOK: TACITUS'S *GERMANIA* FROM THE ROMAN EMPIRE TO THE THIRD REICH 17 (2011).  It was published during the reign of Trajan, one of the "five good emperors."  Trajan regarded himself as bound by the law, not above it.  *See* Robert G. Natelson, *The Government as Fiduciary: A Practical Demonstration from the Reign of Trajan*, 35 U. RICH. L. REV. 191, 211 (2001).

Germania was lost during the Dark Ages and rediscovered in 1425.  KREBS, *supra*, at 56. It remained influential for centuries afterward.  For example, English opponents of the absolutist Stuart monarchs in the seventeenth century relied on Tacitus as part of their account of ancient Anglo-Saxon liberty.  Ralph E. Giesey & J.H.M. Salmon, *Introduction* to FRANÇOIS HOTMAN, FRANCOGALLIA 120–21 (Ralph E. Giesey & J.H.M. Salmon eds., Cambridge Univ. Press, 2010) (1586).  Montesquieu's 1748 *The Spirit of Laws* attributed the admirable features of the English system of government (such as a limited rather than absolute monarchy and an independent legislature) to the ancient Germanic liberty, as described by Tacitus.  KREBS, *supra*, at 157–62.

[12] WILLIAM STUBBS, SELECT CHARTERS AND OTHER ILLUSTRATIONS OF ENGLISH CONSTITUTIONAL HISTORY 1–7 (H.W.C. Davis ed., 9th ed. 1913); KREBS, *supra* note 11, at 158–59.

[13] HOTMAN, *supra* note 11.  The English radical Whig Algernon Sidney adopted and cited Hotman's argument.  ALGERNON SIDNEY, DISCOURSES CONCERNING GOVERNMENT 237 (London, Booksellers of London and Westminster 1698).  (Sidney was revered by the American founders; his *Discourses* synthesized and advanced a vast sweep of prior Western authors, from the Bible to his own time, which supported the legitimacy of armed resistance to tyranny); Giesey & Salmon, *supra* note 11, at 121–22.  Thomas Jefferson credited Sidney as one of four key intellectual sources for the Declaration of Independence.  Letter from Thomas Jefferson to Henry Lee (May 8, 1825), *in* THOMAS JEFFERSON, WRITINGS 1500, 1500–01 (Merrill D. Peterson ed., 1984).

The first English translations of *Francogallia* were published in the eighteenth century, with an introduction in which the prominent and influential Whig Robert Molesworth traced contemporary Whig principles to the ancient Franks and Saxons.  Giesey & Salmon, *supra* note 11, at 123–25.  A 1775 reprint was published and read by Englishmen who were sympathetic to the armed resistance of the Americans.  Justin Champion, *Introduction* to ROBERT MOLESWORTH, AN ACCOUNT OF DENMARK, at ix, xxxii–xxxiii (Justin Champion ed., 2011).

[14] *See, e.g.*, DAVID HUME, 1 HISTORY OF ENGLAND 160–85, 194–98, 208, 226–27 (Liberty Fund 1983) (1778); *id.* at 226–27 ("[I]t would be difficult to find in all history a revolution more destructive, or attended with a more complete subjection of the antient inhabitants."); *id.* at 437 (the majority of Anglo-Saxons were reduced "to a state of real

**EXHIBIT 23**
**0773**

The ideal of ancient Anglo-Saxon England became a powerful influence upon the new American nation, which was striving to create what Jefferson called "an Empire of liberty."[15]

The American view of Anglo-Saxon England as a land of liberty has influenced American law; the view is one of the sources of the Confrontation Clause in the Bill of Rights.[16]  Anglo-Saxon history would also help to shape the office of sheriff in the United States.  To Jefferson, "the office of sheriff" was "the most important of all the executive officers of the county."[17]  As the United States in the nineteenth century grew from a thinly populated nation on the Atlantic seaboard into a nation stretching from ocean to ocean, there was a nearly constant process of forming new territories and states, both of them composed of counties.  In creating the "most important" of all the county offices, the American people modeled the office on the best features of the Anglo-Saxon office of sheriff.  The Americans also included what they considered to be improvements that had taken place in the centuries after the Norman Conquest.[18]  As one historian would observe in 1930, "in America today . . . the sheriff retains many of his Anglo-Saxon and Norman characteristics."[19]  The same is true today: the fundamental structure of the American office of sheriff is as it was in the nineteenth century and is similar in many ways to its structure in the ninth century.

---

slavery"); FORREST MCDONALD, NOVUS ORDO SECLORUM: THE INTELLECTUAL ORIGINS OF THE CONSTITUTION 76–77 (1985) (noting influence of "the Norman yoke" in American Revolution ideology); CHARLES WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 6342, at n. 80–107 (summarizing the common view of Americans and of English Whigs about the imposition of "the Norman yoke" in 1066).

[15] *See* Letter from Thomas Jefferson to George Rogers Clark (Dec. 25, 1780), in 4 THE PAPERS OF THOMAS JEFFERSON 237, 237–38 (Julian P. Boyd ed., 1951) ("[W]e shall form to the American union a barrier against the dangerous extension of the British Province of Canada and add to the Empire of liberty an extensive and fertile Country thereby converting dangerous Enemies into valuable friends."); Letter from Thomas Jefferson to James Madison (Apr. 27, 1809), *in* 1 THE PAPERS OF THOMAS JEFFERSON: RETIREMENT SERIES 168, 169 (J. Jefferson Looney ed., 2004) ("[W]e should have such an empire for liberty as she has never surveyed since the creation: & I am persuaded no constitution was ever before so well calculated as ours for extensive empire & self government.").

[16] WRIGHT & GRAHAM, *supra* note 14, § 6342.

[17] Letter from Thomas Jefferson to Samuel Kercheval (July 12, 1816), *in* 12 THE WORKS OF THOMAS JEFFERSON 3, 6 (Paul Leicester Ford ed., 1905).

[18] *See infra* text accompanying notes 60–146.

[19] CYRUS HARRELD KARRAKER, THE SEVENTEENTH-CENTURY SHERIFF: A COMPARATIVE STUDY OF THE SHERIFF IN ENGLAND AND IN THE CHESAPEAKE COLONIES, 1607−1689, at 159 (1930).

EXHIBIT 23
0774

B. THE ANGLO-SAXON SHERIFF

This Section describes the origins and early characteristics of the office of sheriff. The formalization of that office into what is essentially the same office in modern America was one consequence of King Alfred the Great's victories against Danish invaders. Therefore, this Section proceeds chronologically from ancient times until 1066, describing developments in the office of sheriff in the context of contemporary political events.

After Roman rule receded from England, Germanic tribes—specifically, the Angles and the Saxons[20]—repeatedly invaded Britain. The tribes settled in England, which became a heptarchy (seven distinct kingdoms).[21] The Anglo-Saxons needed an official who would directly enforce the king's laws and look out for the king's interests. Thus was born "the king's reeve"—a man of the shire directly appointed by the king, whose duty was to carry out the king's commands.[22]

In the English system of government, the second oldest title of office is "sheriff."[23] The Anglo-Saxon word for what we today call a "county" was "shire."[24] The word "sheriff" is a compound of "seyre" (meaning "shire") and "reve" (meaning "bailiff" or "guardian").[25] The sheriff is therefore the

---

[20] THE ANGLO-SAXON CHRONICLE 25–32 (James H. Ford ed., James Ingram trans., El Paso Norte Press 2005) (describing events of years A.D. 449–607); STUBBS, *supra* note 12, at 1.

[21] The seven kingdoms were Wessex, Mercia, Northumbria, East Anglia, Essex, Kent, and Sussex. The first four of these were usually the most powerful. These kingdoms later consolidated into larger states. HUME, *supra* note 14, at 23–54; STUBBS, *supra* note 12, at 10–11.

[22] The king also had great landowners, "ealdormen" (who outranked the reeves), but on a practical basis, the reeves did more of the day-to-day work. RICHARD ABELS, ALFRED THE GREAT 270–74 (1998).

[23] Thomas Garden Barnes, *Introduction* to MICHAEL DALTON, OFFICIUM VICECOMITUM: THE OFFICE AND AUTHORITIE OF SHERIFS iii (The Lawbook Exchange 2009) (1623) ("Older than the great officers of state, older than Parliament, older than the courts of law."). The oldest title is "king." WILLIAM ALFRED MORRIS, THE MEDIEVAL ENGLISH SHERIFF 1 (1927) ("With the single exception of kingship, no secular dignity now known to English-speaking people is older.").

[24] Consistent with the original title of "shire-reeve," the Colorado sheriffs who have filed suit against gun control laws enacted in 2013 (see Part III, *infra*) see themselves as protecting their counties against oppressive intrusions.

[25] WILLIAM HENRY WATSON, A PRACTICAL TREATISE ON THE OFFICE OF SHERIFF 1 (London, S. Sweet 1848); EDWARD COKE, 2 THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND; OR, A COMMENTARY UPON LITTLETON 168(a) (London 1823) (1628) ("'*Sherife.*' *Shireve* is a word compounded of two Saxon words, viz. *shire*, and *reve*. *Shire, satrapia*, or *comitatus*, commeth of the Saxon verbe *shiram, i.e. partiri*, for that the whole realme is parted and divided into shires; and *reve* is *praefectus*, or *praepositus*; so as *shireve* is the *reve* of the shire, *praefectus satrapiae, provinciae*, or *comitatûs*."). *Coke upon Littleton* is the first volume of Coke's *Institutes of the Laws of England*. Prior to Blackstone,

EXHIBIT 23
0775

guardian of the county. One can find some references to "sheriffs" in Anglo-Saxon texts preceding Alfred the Great.[26] Nevertheless, we can trace the regularization of the office of sheriff and its *posse comitatus* power, as well as the militia that was later recognized by the Second Amendment, to Alfred's reign.

Of all English monarchs from post-Roman times to Queen Elizabeth II, only one is called "the Great." He is Alfred. As a second son, Alfred was not expected to become king. Well-educated, multilingual, and deeply religious, he studied for a while in Rome.[27] He ascended to the throne during a war with the Danes in which his older brother was killed.[28] The English lived in near-constant fear of Danish invasion and pillage; they were frequently oppressed by the Danes who had conquered parts of England.[29]

In A.D. 878, as *The Anglo-Saxon Chronicle* (a historical work begun during Alfred's time) explains, the Danes triumphed completely, and all the people of England were "subdued to their will;—ALL BUT ALFRED THE KING. He, with a little band, uneasily sought the woods and fastnesses of the moors."[30] With nothing but a guerilla band hiding in the swamps, Alfred kept alive the principle of English sovereignty and led the English back from the brink of annihilation. The bookish man became one of the greatest military strategists of his century. Once, he disguised himself as a harper, and entered the Danish camp—entertaining the Danes with song and story, meeting with the Danish prince Guthrum in his tent—and acquiring military intelligence.[31] His growing army finally expelled the most recent Danish invaders.[32] The Danish settlements in England were brought under

---

*Institutes* was the foundational text for Anglo-American courts, lawyers, and law students. "Littleton" was Thomas Littleton's *Treatise on Tenures*, first published in 1481 or 1482, although Coke's commentaries go far beyond the subjects covered by Littleton.

[26] *See* EDWARD COKE, 1 THE SELECTED WRITINGS OF SIR EDWARD COKE 61 (Steve Sheppard ed., Liberty Fund 2003) (1602) ("[T]he learned know that Sheriffes were great officers and ministers of justice, as now they are, long before the Conquest . . . ."); *id.* at 302 ("[A]s far as the Reign of the often named King *Arthur* . . . the Offices of the Keepers or Senators of the Shires or Counties, *Custodes seu Praepositi Comitatus*, of later times called Shrieves . . . ."); COKE, *supra* note 25, at 168(a).

[27] HUME, *supra* note 14, at 64.

[28] *Id.* at 63–64. Their father had died earlier.

[29] *Id.* at 57–59, 62–63.

[30] THE ANGLO-SAXON CHRONICLE, *supra* note 20, at 67 (discussing the events of A.D. 878). *See also* HUME, *supra* note 14, at 66–68 (explaining that for a while, Alfred disguised himself as a peasant and found refuge working as an assistant to a cowherd, then later assembled guerilas on two acres of firm ground in a bog in Somersetshire from whence he led raids for a year).

[31] HUME, *supra* note 14, at 68.

[32] *Id.* at 69.

**EXHIBIT 23**
**0776**

his sovereignty and were no longer able to plunder the English at will.  He was the first King of England.[33]

King Alfred recognized that another wave of Danish invasion was inevitable, so he began building England's capacity for self-defense.  This capacity was founded on the idea that all the freemen were to be armed, trained, and ready to fight to defend their local and national communities.  He created the English militia, which consisted of all armed people.[34]  In the 1939 case *United States v. Miller*, the Supreme Court unanimously acknowledged the militia of the Second Amendment to be the institution founded by Alfred.[35]

Among Alfred's most important ideas was dividing the militia in each shire into two parts, only one of which would be required to serve at a given time.[36]  The practical benefit was enormous.  The men who were not serving in a particular campaign could work the farms, keep the economy functioning, and take care of the women and children.  Meanwhile, the men who were actively serving in the militia were willing to go on longer campaigns because they did not feel compelled to return home as fast as possible in order to plant, cultivate, or harvest the crops.[37]  When the Danes tried invading again, they were routed.[38]

During the American Revolution nearly a millennium later, the militia system would again be a foundation of victory.  Soldiers in the Continental Army might be away from home for years, but the majority of American fighters came from the militia.  Because they were not full-time soldiers, they could return home to take care of their farms and keep the American economy functioning.[39]

A second security reform of Alfred the Great was reformation of the office of sheriff.[40]  After the period of Danish oppression, the English had

---

[33] *Id.* at 70.  Alfred's grandfather, Egbert, was the first to style himself King of England, but Egbert never ruled the large inland kingdom of Mercia.  *Id.*

[34] *Id.* at 70−72.

[35] United States v. Miller, 307 U.S. 174, 179 (1939) ("Blackstone's Commentaries, Vol. 2, Ch. 13, p. 409 points out 'that king Alfred first settled a national militia in this kingdom' and traces the subsequent development and use of such forces.").

[36] ABELS, *supra* note 22, at 196–98; HUME, *supra* note 14, at 70−71; THE ANGLO-SAXON CHRONICLE, *supra* note 20, at 71 ("A.D. 894 . . . The king had divided his army into two parts; so that they were always half at home, half out; besides the men that should maintain the towns.").  Alfred may have copied the example of the legendary female warrior kingdom of the Amazons, which divided its military in half.  ABELS, *supra* note 22, at 197–98.

[37] *See* HUME, *supra* note 14, at 70–71.

[38] *Id.* at 71−74.

[39] NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT 164−67 (2012).

[40] HUME, *supra* note 14, at 78.  Hume here cites "Ingulf p. 870."  This cite is to HISTORIA

EXHIBIT 23
0777

devolved into lawlessness and robbery.[41]  Alfred fixed England's county boundaries with greater precision and used the counties to organize national and community self-defense.[42]  The sheriff was the pillar of this self-defense system and often the leader of the county militia.[43]  As will be detailed in Part II, the sheriff exercised the authority to summon and command the armed body of the people not only in the militia, but also in several related forms: *posse comitatus*, "hue and cry," and "watch and ward."[44]

Thus, according to medieval historian Frank Barlow, "[i]t is not unlikely that every freeman had the duty, and right, to bear arms" in Anglo-Saxon times.[45]  When carrying out the duty to bear arms, the freeman would most commonly be under the leadership of the sheriff.  The Second Amendment also recognizes the individual right to keep and bear arms for all lawful purposes and the duty to bear arms when summoned to the defense of community, as in the militia or the *posse comitatus*; the legal implications will be explored in Part IV.[46]

As the county leader of the armed people, "the reeve became the guarantor of the survival of the group."[47]  "[T]he people maintained law and order among themselves" because the central government of the king had no practical ability to do so.[48]

---

CROYLANDENSIS (Chronicle of the Abbey of Croyland), which covers A.D 655–1486, and whose first named author is claimed to be "Ingulf" (or "Ingulph").  The document was probably written around the thirteenth or fourteenth centuries, but purported to be older, probably in order to support some of the Abbey's land claims.  W.G. SEARLE, INGULF AND THE HISTORIA CROYLANDENSIS (1894).  On the issue of sheriffs, *Historia* is a credible source, in that it likely reflects an oral tradition that was well established and widely known.

[41] HUME, *supra* note 14, at 75–76.

[42] COKE, *supra* note 26, at 303; JUDITH A. GREEN, ENGLISH SHERIFFS TO 1154, at 9 (1990); THE ANGLO-SAXON CHRONICLE, *supra* note 20, at 65–75.

[43] COKE, *supra* note 26, at 303; WATSON, *supra* note 25, at 1–2.  Shire boundaries were stabilized in the south earlier than elsewhere; they did not take their final shape until well after the Norman Conquest.  GREEN, *supra* note 42, at 9.  *The Anglo-Saxon Chronicle*'s first mention of sheriffs is for the year A.D. 778, which is a century before Alfred's reign.  THE ANGLO-SAXON CHRONICLE, *supra* note 20, at 54.  For more on Anglo-Saxon sheriffs and the historical uncertainties surrounding them, see GREEN, *supra* note 42, at 9–11.  Another of Alfred's reforms was the division of counties into smaller districts for maintenance of law and order; the armed community assemblies with twelve freeholders to resolve disputes were a foundation of the jury system.  HUME, *supra* note 14, at 76–77.  Alfred's law code became a basis of the common law.  *Id.* at 78.

[44] *See* discussion *infra* Part II.

[45] FRANK BARLOW, EDWARD THE CONFESSOR 172 (1970).  Barlow is the head of the History Department at the University of Exeter.

[46] *See* discussion *infra* Part IV.

[47] DAVID R. STRUCKHOFF, THE AMERICAN SHERIFF 3 (1994).

[48] *Id.* at 4.

**EXHIBIT 23**
**0778**

A millennium later, Alfred the Great was still revered by Englishmen and Americans of all political persuasions.[49] He had brought peace and security to England, while, in the words of the English political philosopher David Hume, "[he] preserved the most sacred regard to the liberty of his people; and it is a memorable sentiment preserved in his will, that it was just the English should for ever remain as free as their own thoughts."[50]

Government records from Anglo-Saxon England are hardly universal, but there are records of sheriffs present in all English counties by A.D. 992.[51] The duties of sheriffs were numerous:

> [T]he original role of the sheriff was to act as the personal representative of the King in each county. Mediaeval government was not based on any concept of separation of powers and the duties of sheriffs were therefore both executive and judicial. They were responsible for commanding the local military [the militia] in cases of invasion or rebellion, they collected local taxes, investigated suspicious deaths, executed Royal Writs and generally maintained law and order. In their law enforcement role they could call upon the local freemen to form a posse comitatus to hunt for outlaws and, in their judicial role, they presided over the shire court, exercising both civil and criminal jurisdiction.[52]

The sheriff's responsibilities included mobilizing the people to resist invasion or for other military purposes, as leaders of the county militias.[53] So when William the Conqueror invaded in 1066, "[h]is primary adversaries were King Harold's Sheriffs."[54] Sheriff Esgar defended London

---

[49] *See, e.g.*, Daniel Webster, Oration at the Dedication of the Bunker Hill Monument, (June 17, 1825) (concluding paragraph extols "our fathers" as men like "Alfred, and other founders of states"), *in* WEBSTER'S FIRST BUNKER HILL ORATION 42 (Boston, Leach, Shewell, and Sanborn 1889); Barbara Yorke, *The Most Perfect Man in History?*, HIST. TODAY 49 (October 1999).

[50] HUME, *supra* note 14, at 79.

[51] Steve Gullion, *Sheriffs in Search of a Role*, 142 NEW L.J. 1156, 1156 (1992). There are also records of "shire-reeves" during the reign of King Edgar (950–75). *Id.*

[52] *Id.*

[53] MORRIS, *supra* note 23, at 27; *see also* ANGLO-SAXON CHRONICLE, *supra* note 20, at 147 (A.D. 1056, "Elnoth the Sheriff" slain during war against the Welsh king); BARLOW, *supra* note 45, at 173 (in Anglo-Saxon times, "[w]hereas the earl and the sheriffs would normally lead the troops on campaign, it would often fall to the bishop to see to the defence of his diocese, particularly at times when it was denuded of its best fighting men."). *See also* ABELS, *supra* note 22, at 273 (ealdormen were responsible for levying men for the king's army; sheriffs were responsible for the defense of the village-based fortifications). Sheriffs also occasionally summoned the militia (or "fyrd"). C. WARREN HOLLISTER, ANGLO-SAXON MILITARY INSTITUTIONS ON THE EVE OF THE NORMAN CONQUEST 68 (1962). However, by late Saxon times, earls were probably higher ranked as military leaders than sheriffs. *Id.* at 94–95.

[54] STRUCKHOFF, *supra* note 47, at 8.

**EXHIBIT 23**
**0779**

against William's army.[55]  At the Battle of Hastings, "King Harold's last battle was led by his sheriffs."[56]

Sheriffs tended to be from the lesser nobility.[57]  A baron might be a great landholder with real property in several counties (and, later, as a Member of Parliament, a player on the national political stage).  In contrast, the sheriff would usually be man of the shire.  His interests and property were within a single county.[58]  The sheriff needed to be man of independent means, because the national government provided him with no support, not even a salary.  He was responsible for paying all the expenses of his office (e.g., the salaries of the undersheriff and the deputies), and he would keep whatever revenues he earned from his services (e.g., fees for serving writs).[59]

## C. THE SHERIFF'S OFFICE FROM THE NORMAN CONQUEST TO THE FOURTEENTH CENTURY

Although the office of sheriff in tenth century England has much in common with the office in twenty-first century America, there were some important changes in the centuries following the Norman Conquest of 1066.  Two of these changes would later be incorporated by Americans: the elimination of the sheriff's judicial role[60] and the requirement that sheriffs take an oath and post a bond.[61]  Another Norman innovation—making the sheriff's office appointive rather than elective—was eventually accepted in England.[62]  But it would later be rejected in the United States.[63]

---

[55] MORRIS, *supra* note 23, at 27.

[56] STRUCKHOFF, *supra* note 47, at 8.

[57] *See* GREEN, *supra* note 42, at 15 (stating that on the eve of the Norman Conquest, sheriffs were "men of substance in their own shires, but their landed wealth was not on the same scale as that of the earls or the stallers . . .").

[58] The custom of local sheriffs did not always prevail.  In the fourteenth century, several Sheriffs served successively in multiple counties.  RICHARD GORSKI, THE FOURTEENTH-CENTURY SHERIFF 59, 159, 162–70 (2003).  During the thirteenth century, the issue was often contested, with locally-oriented sheriffs gaining temporary ascendency by the latter part of the century.  J.R. Madicott, *Edward I and the Lessons of Baronial Reform: Local Government, 1258–80, in* 1 THIRTEENTH CENTURY ENGLAND 27 (P.R. Coss & S.D. Lloyd eds., 1986).

[59] Although for concision I usually refer to pre-modern sheriffs as "he," there were some female sheriffs, such as the Countess of Salisbury, who was Sheriff of Whiltshire during Henry III (reigned 1227–1272).  J. H. BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 530 n.4 (3d ed. 1990).  Also, "Ann Countess of Pembroke . . . had the office of hereditary sheriff of Westmoreland, and exercised it in person."  COKE, *supra* note 25, at 326(a) n.2.

[60] Discussed *infra* at Part I(C)(1).

[61] Discussed *infra* at Part I(C)(3).

[62] Discussed *infra* at Part I(C)(2).

[63] Discussed *infra* at Part I(E).

EXHIBIT 23
0780

## *1. Sheriffs' Courts*

The most important step towards the end of the sheriffs' judicial function came with Magna Carta in 1215, although Magna Carta confirmed a trend that had been going on for a while.

The Norman Conquest had been disastrous for many of the English people, as they were subjugated to tyranny and poverty.[64] The problem was exacerbated by the conduct of King John (reigned 1199–1216).[65] According to David Hume's *The History of England*, "[t]he only happiness was, that arms were never yet ravished from the hands of the barons and people: The nation, by a great confederacy, might still vindicate its liberties."[66]

An armed revolt forced King John to agree to Magna Carta on June 12, 1215. Later monarchs were repeatedly compelled to declare that they too were bound by the Great Charter and would rule in accordance with it.[67] Magna Carta was created by the barons and contained great universal principles of ordered liberty, as well as items involving the narrower concerns of the barons of the time.

One broad principle of liberty contained in Magna Carta was the "law of the land" article, which is an ancestor of the U.S. Constitution's guarantees that no persons shall be deprived of life, liberty, or property without due process of law.[68] The Magna Carta of 1215 (although not its subsequent reissues by other monarchs) even included a provision authorizing the use of force against the king if he violated Magna Carta.[69]

One clause of Magna Carta required the discontinuance of the sheriffs' courts for holding pleas of the crown.[70] At the time, "pleas of the crown" was a legal term of art for certain cases involving issues where a royal interest was involved.[71] Efforts to restrict sheriffs' judicial role had been

---

[64] See HUME, *supra* note 14, at 437.

[65] *Id.* at 436–38.

[66] *Id.* at 437.

[67] WILLIAM SHARP MCKECHNIE, MAGNA CARTA 36–40, 139–59 (1914).

[68] U.S. CONST. amends. V, XIV:

No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any other way, nor will we proceed with force against him, or send others to do so, except by the lawful judgement of his equals or by the law of the land.

Magna Carta of 1215, *reprinted in* G.R.C. DAVIS, MAGNA CARTA 21 (1963).

[69] Magna Carta of 1215, *reprinted in* J.C. HOLT, MAGNA CARTA app. at 469–73 (2d ed. 1992) (quoting art. 61); David I. Caplan & Sue Wimmershoff-Caplan, *Magna Carta*, *in* 2 GUNS IN AMERICAN SOCIETY 371 (Gregg Lee Carter ed., 2d ed., 2007); David B. Kopel, *The Catholic Second Amendment*, 29 HAMLINE L. REV. 519, 540–41 (2006).

[70] Magna Carta of 1215 § 24, *supra* note 69, at 457 ("No sheriff, constable, coroners or other of our bailiffs may hold pleas of our Crown."); HUME, *supra* note 14, at 445.

[71] *See* MCKECHNIE, *supra* note 67, at 305–06.

EXHIBIT 23
0781

going on for the last century.[72]  The standard view of historians has been that the sheriffs and their courts were oppressive,[73] although a modern commentator suggests that the upper nobility's actions against the sheriffs' courts came about "not because of general dissatisfaction with their conduct, but because the earls and barons were displeased at the local feudal courts' loss of 'business' (from which they derived revenue) to the increasingly popular sheriffs' courts."[74]

Regardless, Magna Carta was a major step in sheriffs losing their judicial role.  Magna Carta did not by its terms apply in Scotland, so sheriffs continued to preside over the sheriffs' courts there, and these courts are the heart of the Scottish judicial system today.[75]  The Scottish sheriffs also had the same law enforcement powers and duties as their English counterparts, such as raising the hue and cry.[76]  In the United States, sheriffs retain many traditional duties to the courts, such as providing court security and serving warrants, but they have no judicial role in presiding over courts or deciding cases.

### 2. Election of Sheriffs

In the United States, it is axiomatic that the sheriff is elected by the people.[77]  The American principle is based on the Anglo-Saxon custom of electing sheriffs, although precisely how many sheriffs were elected in either Anglo-Saxon or Norman times is difficult to say.

There is some debate about whether sheriffs were elected or appointed during the Anglo-Saxon era.  According to Blackstone, in Anglo-Saxon times, "sheriffs were elected: following still that old fundamental maxim of the Saxon constitution, that where any officer was entrusted with such

---

[72] *See, e.g.*, STUBBS, *supra* note 12, at 121–22 (stating that Henry I (reigned 1100–1135) forbade sheriffs to hold sheriffs' courts more frequently than at customary times).

[73] *See e.g.*, GREEN, *supra* note 42, at 17; MCKECHNIE, *supra* note 67, at 311.

[74] MCKECHNIE, *supra* note 67, at 311; Tamara Buckwold, *From Sherwood Forest to Saskatchewan: The Role of the Sheriff in a Redesigned Judgment Enforcement System*, 66 SASK. L. REV. 219, 227 n.40 (2003); Gullion, *supra* note 51, at 1156.  It should be noted that at least some sheriffs had supported the Magna Carta movement.  Once King John regained his political power, these sheriffs were promptly dismissed from office. MORRIS, *supra* note 23, at 161.  "The spirit of the sheriff and his office permeated Magna Carta from start to finish and considered in this aspect alone it is the finest example we possess to prove the importance of the sheriff's role in the governance of medieval England." IRENE GLADWIN, THE SHERIFF 124 (1974).  Five clauses in Magna Carta directly dealt with the operation of sheriffs' offices; another clause removed certain named sheriffs; and nineteen others involved administrative reforms which the sheriffs would help to effectuate. *Id.* at 123–24.

[75] Gullion, *supra* note 51, at 1157.

[76] WILLIAM C. DICKINSON, THE SHERIFF COURT BOOK OF FIFE 1515–1522, at xxxix (1928), *cited in* STRUCKHOFF, *supra* note 47, at 18.  "Hue and cry" is discussed *infra* Part II.

[77] *See infra* text accompanying notes 136–146.

EXHIBIT 23
0782

power, as if abused might tend to the oppression of the people, that power was delegated to him by the vote of the people themselves."[78]

While the sheriffs of nineteenth century England were appointed and not elected, the author of an 1848 treatise on sheriff law explained that "[s]heriffs were formerly chosen by the inhabitants of their respective counties; in confirmation of which it was ordained by the statute of 28 Edw. 1, c. 8 and 13, that 'the people should have the election of sheriffs in every shire, when the shrievalty is not of inheritance.'"[79] It was not surprising that Americans embraced the principle of election of sheriffs or that most states have constitutionalized this principle.[80] In the twentieth century, however, legal historians suggested that earlier writers had overstated the extent to which English sheriffs were elected.[81] Modern historians have shown that from the time of the Norman Conquest onward, most sheriffs

---

[78] 1 WILLIAM BLACKSTONE, COMMENTARIES *409. *See also* HUME, *supra* note 14, at 163 (citing § 35 of the laws of Edward the Confessor). What Hume did not know is that the document known as "The Laws of Edward the Confessor" (Leges Edwardi Confessoris) is not original to the reign of Edward the Confessor (an Anglo-Saxon king who reigned 1042–66). Rather, the document likely dates to the early 1100s, after the Norman Conquest, and is regarded as a reasonably accurate description of English law at the time it was actually written. BRUCE R. O'BRIEN, GOD'S PEACE AND KING'S PEACE: THE LAWS OF EDWARD THE CONFESSOR 3–6 (1999). As for sheriffs, election was certainly not standard in the early twelfth century. It might be inferred that the document's assertions about Anglo-Saxon sheriff elections reflected a popular understanding or national memory that was credible to the document's twelfth century readers.

To make matters all the more complicated, the provision in *The Laws of Edward the Confessor* about the election of sheriffs was probably not in the original version. Rather, it may be an interpolation that was added as some later unknown date. At least that appears to be the conclusion of Benjamin Thorpe, whose 1840 compilation of Anglo-Saxon laws relegates to a footnote the material about sheriff elections. *See Leges Regis Edwardi Confessoris in* BENJAMIN THORPE, ANCIENT LAWS AND INSTITUTES OF ENGLAND 197 (London, 1840) (note to § 32 explains that Thorpe is using Lambard's edition of *The Laws of Edward the Confessor* and that the language appears to be an interpolation; the sheriff language is part of a long paragraph which states in relevant part: "sicut et vicecomites provinciarum et comitatum eligi debent." In English: "and also the sheriffs [vicecomites] of the provinces and counties ought to be elected.").

[79] WATSON, *supra* note 25, at 9. The statutory citation is to the twenty-eighth year of the reign of King Edward I, which would have been 1300.

[80] *See infra* text accompanying notes 136–146.

[81] GORSKI, *supra* note 58, at 34–35; GREEN, *supra* note 42, at 13–14 (describing appointment of sheriffs in the century following the Norman Conquest); MORRIS, *supra* note 23, at 17.

EXHIBIT 23
0783

were appointed.  As far as we know, they were elected only in London[82] and in some southwestern counties.[83]

We may never have a full sense of how the office of sheriff functioned in Anglo-Saxon times.  But we can be certain that when King Edward I and Parliament in 1300 promulgated the election statute (*Articuli supra Cartas*), the election of sheriffs was a change, rather than a "confirmation" of a then-current general practice.[84]  Edward Coke, an enormously influential legal writer, described Edward I as having "restored to his people the ancient election of sheriffes . . . ."[85]  But even after Edward I's statute of 1300, we have only one record from the following decade for a sheriff election taking place.[86]

The next king, Edward II, was unpopular during his reign, and most historians have regarded him as mediocre or worse.[87]  Among the problems was his very close relationship with his best friend, Piers Gaveston, whom much of the rest of the nobility believed unhinged Edward's judgment.[88] There was also Edward's propensity for seizing whatever property he

---

[82] HUME, *supra* note 14, at 278 (indicating that Henry I, upon his coronation in 1100, issued a charter to London granting the city the right to elect its own sheriff); *id.* at 453–54 (noting that, later, King John granted to London the "power to elect and remove its sheriffs at pleasure").

[83] MORRIS, *supra* note 23, at 182–83 (noting that men of these counties paid a fee to the king for the privilege of electing the sheriff); WILLIAM STUBBS, 2 THE CONSTITUTIONAL HISTORY OF ENGLAND 217 (4th ed. 1896) ("[T]he freeholders of Cornwall and Devon had purchased the like privilege from John and Henry III.").

[84] GORSKI, *supra* note 58, at 12, 34–37; JOHN M. KEMBLE, ANGLO-SAXON LAWS AND INSTITUTES 60 (London, Richard & John E. Taylor 1841) (explaining that during the Anglo-Saxon period, elective sheriffs were replaced by appointed ones as kings gained more power); STUBBS, *supra* note 83, at 217–18 (Section 8 of the *Articuli Super Cartas* provided for election of sheriffs, except in counties where the office is hereditable or held in fee); *cf.* GORSKI, *supra* note 58, at 51 (King's rejection of 1361 petition from the people of Cumberland to elect their sheriff).

In 1258, the Provisions of Oxford required that sheriffs should live in their county, and should serve for only one year.  STUBBS, *supra* note 83, at 216–17.  The next year, it was provided that the king's discretion on appointments would be limited; he would have to appoint one of four men nominated by the county court.  *Id.* at 217.

[85] EDWARD COKE, 2 INSTITUTES OF THE LAWS OF ENGLAND 175 (The Lawbook Exchange 2002) (1628); *id.* at 558 ("Of ancient time," sheriffs were "in every severall county chosen in full or open county by the freeholders of that county . . . .")  Coke served as Attorney General, Speaker of the House of Commons, and Chief Justice in the early seventeenth century.  Payton v. New York, 445 U.S. 573, 594 n.36 (1980) (citing A. E. DICK HOWARD, THE ROAD FROM RUNNYMEDE 118–119 (1968)).

[86] MORRIS, *supra* note 23, at 184–85.

[87] *E.g.*, SEYMOUR PHILLIPS, EDWARD II 5 (2012) ("The general opinion of Edward II from his own day to the present has been that he was a failure."); STUBBS, *supra* note 83, at 323–25.

[88] STUBBS, *supra* note 83, at 319–32.  *See, e.g.* PHILLIPS, *supra* note 87, at 161–62.

**EXHIBIT 23**
**0784**

wanted.  These seizures were to support either his military adventures or the extravagant lifestyle that he and the Gaveston family led during the periods when the Gavestons had not been forced into temporary exile by Parliament.[89]

Rising tensions led an ad hoc assembly of barons to proclaim the Ordinances of 1311.[90]  Like Magna Carta, the Ordinances of 1311 contained provisions regarding civil liberty (e.g., a provision against uncompensated seizure of property) and provisions relating to the barons' narrow self-interests.  Item 17 demanded an end to the election of sheriffs.  The varying political balance of power affected how much heed Edward II was willing to pay to the Ordinances of 1311, but he did eventually accede to the demand about sheriffs by promulgating the Sheriff's Act of 1315.[91]  He thus gave statutory force to Item 17 of the Ordinances of 1311.[92]

Two other portions of the Ordinances, Items 10 and 39, perhaps provide some context for Item 17.  Many of the Ordinances attempted to end the King's habit of helping himself to other people's property; the formal term for such monarchical theft was "prises."  Item 10 of the Ordinances of 1311 stated, "[a]nd because it is to be feared that the people of the land will arise on account of the prises and divers oppressions inflicted before this time . . . ."  Given the continuing role of sheriffs as military leaders,[93] and given their continuing role in leading bodies of

---

[89] PHILLIPS, *supra* note 87, at 156–71.

[90] *Edward II*, 4 ENCYLOPAEDIA BRITANNICA 375 (15th ed., 2002); THE NEW ORDINANCES, 1311 (1311), *reprinted in* 3 ENGLISH HISTORICAL DOCUMENTS 527–39 (Harry Rothwell ed., 1975).

[91] "That the Sheriffs from henceforth shall be assigned by the Chancellor, Treasurer, Barons of the Exchequer, and by the Justices . . . ." Statute of Lincoln, 1315, 9 Edw. 2 stat. 2; WATSON, *supra* note 25, at 9 (noting that appointment is "on the morrow of All Souls"); *see also* 14 Edw. 3, ch. 7 1 STATUTES OF THE REALM 283 (1340) (sheriffs to be appointed by the Exchequer).  The process for appointment was that on November 1 (All Souls Day), high government officials would meet at the Exchequer in London.  They would choose three persons per county, and the king would from each list of three appoint a sheriff to a one-year term.  KARRAKER, *supra* note 19, at 7.  "The Exchequer was a court of audit meeting twice each year at Easter and Michaelmas in the treasury, to scrutinize the accounts presented by sheriffs and other financial agents. Its name was taken from the checked cloth on a table round which sat leading members of the royal household." GREEN, *supra* note 42, at 12.  In Anglo-Saxon times, the king's revenue was kept in boxes or barrels in the king's bedroom. BARLOW, *supra* note 45, at 186.

[92] "In addition, we ordain that sheriffs be appointed henceforth by the chancellor, treasurer and the others of the council that are present . . . ." THE NEW ORDINANCES, 1311, *supra* note 90, at 530.

[93] *See* GORSKI, *supra* note 58, at 52 (explaining the fourteenth century role of sheriffs in the northern counties bordering Scotland as military leaders); MORRIS, *supra* note 23, at 58, 117, 151–53; MICHAEL POWICKE, MILITARY OBLIGATION IN MEDIEVAL ENGLAND 157 (1962) (in 1319, Sheriff of York ordered to lead a fifteen day expedition against the Scots); STUBBS,

EXHIBIT 23
0785

armed men in the *posse comitatus* and other law enforcement activities (discussed *infra*), the possibility could arise that elected sheriffs would serve as the leaders of a discontented populace which might revolt against an oppressive, kleptocratic king.

Greater context for the abolition of sheriff elections comes from Item 39, which required that various officials, including sheriffs, "shall be sworn . . . to keep and hold all the ordinances made by the prelates, earls, and barons . . . without contravening any point of them."[94]  The motive for this clause appears to be that sheriffs (and some other officials) were not enforcing various decrees issued by the upper nobility.  In situations where the great baron of a county issued a decree the electorate did not like, perhaps some elected sheriffs had been reluctant to enforce such decrees.

In 1338, King Edward III ordered that the counties elect their sheriffs, but this was abandoned in 1340, replaced by appointment by the Exchequer, the treasury office of the monarchy.[95]  The "Good Parliament" of 1376 unsuccessfully demanded that sheriffs be elected.[96]  Still, kings continued to

---

supra note 83, at 220 (noting that, militarily, the sheriff was "the proper leader" for "minor tenants-in-chief" and for "the body of freemen sworn under the assize of arms"; furthermore, the leading tenants of the king directly commanded their own vassals, but sometimes the sheriffs were put in charge of them, too); *id.* at 230, 288 (noting that sheriff was responsible for enforcing the Assize of Arms, which required all free men to own various arms and armor).

[94]  THE NEW ORDINANCES, 1311, *supra* note 90, at 539.  The barons were plainly not opposed to the principle of using armed force against a monarch.  They had a long history of doing so, against Edward II and several of his predecessors.  However, it would be understandable for the great barons and earls to try to ensure that only they would have the ability to make the decision to use force.

[95]  STUBBS, *supra* note 83, at 281, 401–02.

[96]  THE PARLIAMENT ROLLS OF MEDIEVAL ENGLAND 1275–1504, vol. 5, EDWARDS III 1351–1377, at 373 (item 186, no. CXXVIII in petitions from the commons):

> [T]he sheriffs of the counties of the realm should be chosen in the same manner ["by election from the best men of said counties"] from year to year, and not appointed by bribery in the king's court, as they used to do, for their own profit and by procurement of the maintainers of the region, to sustain their deceits and evils and their false quarrels, as they have commonly done before this time, in destruction of the people.

King Edward III brushed off the petition, responding "there is a bill which has been answered." *Id.* Presumably he was referring to the legislation described above, providing for appointment of sheriffs in most counties. *See also* STUBBS, *supra* note 83, at 453–54. The "Good Parliament" was a widely supported effort to tame the massive corruption, military incompetence, and other abuses of the latter part of the reign of Edward III. *See* GEORGE HOLMES, THE GOOD PARLIAMENT (1975). To present the Parliament's position to the King, the Parliament chose Sheriff Peter de la Mare; he is today regarded as the first Speaker of the House of Commons. *Id.* at 101–110, 134–38. Sheriff de la Mare was later imprisoned after Edward III regained his political footing and then pardoned after Edward III was close to death. *Id.* at 192.

EXHIBIT 23
0786

need money, and for the right price, they would grant a locality the right of electing its own sheriff; by the eighteenth century, twenty-one cities or boroughs enjoyed the right of election.[97]

However the sheriff was chosen, he was supposed to be a defender of liberty. As historian William Morris puts it, "[i]n the time of Henry III,[98] he was still regarded by the king and council as their agent in the maintenance of popular liberties and private rights."[99]

### 3. Sheriff's Oath of Office and Bond

Item 39 of the Ordinances of 1311 had also said that sheriffs should take an oath of office. This had been a longstanding baronial demand.[100] The oath requirement became a well-established and uncontroversial part of the common law.[101] Thus, almost every American state constitution that provides for an office of sheriff requires that the sheriff take an oath, as must all other constitutional officers. In England, the sheriff's oath was to the supreme ruler, the monarch; in the United States, the sheriff's oath is also to the supreme ruler, the law itself—an oath to uphold the U.S. Constitution and the constitution of the sheriff's state.[102]

In the sixteenth century, a statute mandated that before taking office, a sheriff must post a bond as a surety against any malfeasance for which he or his deputies might be found liable.[103] This requirement is still standard for American sheriffs, although the sheriff may now choose to instead purchase liability insurance.

### D. THE ENGLISH OFFICE OF SHERIFF IN THE SEVENTEENTH CENTURY AND THEREAFTER

By the time that emigrants from Great Britain were establishing colonies in America, the duties and scope of the office of sheriff were well understood and noncontroversial. In legal treatises, the laws concerning sheriffs tended to be addressed in larger treatises on other subjects, such as criminal law. The treatise entirely devoted to sheriffs was Michael Dalton's

---

[97] GLADWIN, *supra* note 74, at 357–58.

[98] Reigned 1216–1272. *Henry III*, 5 ENCYCLOPAEDIA BRITANNICA 837 (15th ed., 2002).

[99] MORRIS, *supra* note 23, at 213. For example, King Henry III instructed various sheriffs "to preserve the liberties of the church" and to enforce Magna Carta. *Id.* at 213 n.44.

[100] STRUCKHOFF, *supra* note 47, at 13.

[101] MORRIS, *supra* note 23, at 170–71 (discussing original oath from 1258); *see also* The Oath of the Sheriffs, 1 STATS. OF THE REALM 247 (Dawson's of Pall Mall 1963) (1810).

[102] WATSON, *supra* note 25, at 17–21 (oath in nineteenth century). Previously, the oath was much more detailed. DALTON, *supra* note 23, at 4b–6a (reprinting seventeenth century oath in full).

[103] DALTON, *supra* note 23, at 3a (citing 2 & 3 Edw. 6, ch. 34).

EXHIBIT 23
0787

*The Office and Authoritie of Sherifs*.[104]  Dalton was also the author of a very popular treatise on justices of the peace, which contained much content about sheriffs since both offices had similar powers and duties, such as summoning the *posse comitatus*.[105]

### 1. Autonomous and Indivisible

By the seventeenth century, two other important principles of the office of sheriff had been established: the office is *autonomous* and the office is *indivisible*.  An early twentieth century case from Alberta, Canada, explained autonomy in terms that were no different than what had been said by Dalton and other commentators from centuries before:

> [T]he connection between the State and the sheriff after his appointment or election is of a very casual character.  He is practically placed in the sole and undisturbed discharge of the duties of the shrievalty.  He takes to his own use the emoluments of the office and out of them meets the expenditures of it.  He employs under sheriffs or deputy sheriffs and bailiffs of his own selection.  He assigns to them the work that they are to do, pays them their salaries and dismisses them at his pleasure.  His office is in its management entirely free from outside dictatorship or control.  He runs it as an institution for which he and he alone is responsible to those whose business passes through it.  And so in those jurisdictions he is held liable for the misconduct of those whom he employs in his office.[106]

The monarch could choose the sheriff, but could in no way limit the office of sheriff: "neither can she [the queen] abridge the sheriff of any thing incident or belonging to his office, for the office is entire and indivisible."[107]

The autonomy of sheriffs and of justices of the peace may have been one reason for slack enforcement of the arms control laws that were introduced in the Tudor period (1485–1603).  In general, the Tudor monarchs were trying to keep handguns and crossbows out of the hands of everyone except the gentry.[108]  A 1526 proclamation by King Henry VIII told the sheriffs and mayor of London to stop being "negligent, slack, or

---

[104]  DALTON, *supra* note 23.

[105]  THOMAS GARDEN BARNES, SHAPING THE COMMON LAW 136–51 (Allen D. Boyer ed., 2008); MICHAEL DALTON, THE COUNTREY JUSTICE (London, William Rollins & Samuel Roycroft 1622).

[106]  Great N. Ins. Co. v. Young (1916), [1917] 32 D.L.R. 238, 241 (Can. Alta.).  *Cf.* MORRIS, *supra* note 23, at 167 (stating that the development of the sheriff's independence from the king began in the period 1206–1307, under Henry III and Edward I).

[107]  Mitton's Case, (1584) 76 Eng. Rep. 965 (K.B.); 4 Co. Rep. 32 b ; DALTON, *supra* note 23, at 6b; WATSON, *supra* note 25, at 8.  *Mitton's Case* is cited in *State v. Cummins*, 99 Tenn. 667, 42 S.W. 880, 882 (1897) (sheriff may not be deprived of exclusive supervision of the county jails).

[108]  JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 39, at 82–85.

EXHIBIT 23
0788

remiss" in enforcing the arms restrictions.[109]  In 1537, the King expressed his "displeasure and indignation" about the unenforcement of arms bans.[110] In 1600, a proclamation of Queen Elizabeth I complained about the "slack execution" of the arms control laws, and "the common carrying and use of guns contrary to the said statutes" by "common and ordinary persons traveling the highways to carry pistols and other kind of pieces," and by "ruffians and other lewd and dissolute men."[111]

Another innovation was that a sheriff may not practice as an attorney during his term of office.[112]  Given the sheriff's intimate involvement with the judicial system, the prohibition is a sensible prevention of conflicts of interest.  The prohibition was carried forward into America[113] and today is often expressly stated in state statutes.[114]

### 2. Modern Role in the United Kingdom

The office of justice of the peace had been formally created in the fourteenth century, with roots from the previous century.[115]  By the time Michael Dalton was writing in the early seventeenth century, the justices of the peace were supplanting the sheriffs as having the greatest practical role in keeping the peace.  Other traditional sheriff duties, such as serving and enforcing writs, including by executing judgments, remained primarily the responsibility of sheriffs.[116]

Sheriffs in the seventeenth century continued to have a military role: "The sheriff was often appointed one of the commissioners of musters"[117]— the periodic assemblies of the militia to ensure that every militiaman had provided himself with appropriate equipment.  Likewise, the sheriff sometimes received assistance from the "trained bands,"[118] militia units that

---

[109] 1 TUDOR ROYAL PROCLAMATIONS 151–52 (Paul L. Hughes & James F. Larkin eds., 1964).

[110] *Id.* at 249–50.

[111] 3 TUDOR ROYAL PROCLAMATIONS 218–19 (Paul L. Hughes & James F. Larkin eds., 1969).

[112] DALTON, *supra* note 23, at 175–76.

[113] *See* GEORGE WEBB, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE 306 (Williamsburg, William Parks 1736).

[114] *E.g.*, COLO. REV. STAT. § 30-10-520 (2013) ("No sheriff, undersheriff, or deputy shall appear or advise as attorney or counselor in any case in any court.").

[115] MCKECHNIE, *supra* note 67, at 16.

[116] Barnes, *supra* note 23, at iv (describing sheriffs' other duties as services to the common law courts, including maintaining the jail; collection of crown revenues; ministerial services to various local government bodies, such as commissions; and keeping a limited "court" which heard replevin cases and which supervised elections to Parliament).

[117] KARRAKER, *supra* note 19, at 22.

[118] *Id.*

**EXHIBIT 23**
**0789**

engaged in extra practice to maintain high proficiency. During the English Civil War (1642–1651), both sides attempted to order sheriffs "to rally the counties to their support as though the military command were still theirs, *ex officio.*"[119]

Everyone may have agreed the office of sheriff is indivisible, but in a constitutional system based on shared understandings, and lacking an authoritative text which supersedes all else, things that were once plainly illegal may become accepted innovations. So in England, the sheriffs were over the centuries stripped of all responsibilities.[120] Today the English office of sheriff is barely even ceremonial, consisting of holding an annual dinner for local judges and other important persons.[121]

### E. THE SHERIFF IN AMERICA

Colonial Americans took the office of sheriff as they had inherited it from England, with one important exception: they restored the right of electing sheriffs, a task that was completed in the nineteenth century. While the office of sheriff was waning in England, the office became increasingly important in America.

Magna Carta applied in the American colonies, so sheriffs never served as judges.[122] In the colonies, the sheriffs used all the traditional powers of the office to the fullest. American sheriffs were more active than their English counterparts at finding criminals and delivering them to court, taking "an active law enforcement role."[123]

By all indications, the formal seventeenth century American understanding of the office was mostly the same as the English. A study of Maryland and Virginia in the seventeenth century "proves the similarities in the office of sheriff in England and in her colonies to have been decidedly more numerous than the differences."[124] Michael Dalton's English treatise

---

[119] *Id.* at 22–23. *See generally* DALTON, *supra* note 23, at 13a ("[W]hen any of the kings enemies shall come into the land, the Sherife in defence of the realme, may commaund all the people of his countie to attend him; and he and they are to attend the king and defend the land."); *id.* at 136b ("Also the Sherife may take Posse Comitatus, in defence of the realme, when any of the kings enemies shall invade the land &c."). But in practice, the military role of sheriffs had declined to an auxiliary role, beginning in the latter thirteenth century, under Henry III. MORRIS, *supra* note 23, at 167, 234–38.

[120] Barnes, *supra* note 23, at iii; Gullion, *supra* note 51, at 1156.

[121] Barnes, *supra* note 23, at iii (explaining that sheriffs are almost entirely ceremonial, but professional undersheriffs oversee the execution of judicial writs); Gullion, *supra* note 51, at 1156.

[122] BARNES, *supra* note 105, at 30–31.

[123] Gullion, *supra* note 51, at 1157.

[124] KARRAKER, *supra* note 19, at 151.

**EXHIBIT 23**
**0790**

*Office of the Sheriffs* is known to have been used as a guide in Maryland.[125] Dalton's *Country Justice* treatise (about the justice of the peace, and also containing much information about sheriffs and their posse powers) was also influential in America.[126] Virginian George Webb's 1736 treatise on sheriffs and other local officials was conventional in its treatment of sheriffs, the *posse comitatus*, and so on, relying on mainstream English sources such as Dalton.[127]

However, while the office looked the same on paper on both sides of the Atlantic, there were very significant practical differences, all of which had the effect of elevating the sheriff in America. To begin with, the American colonial sheriff was even more independent of central authority. In the American colonies, sheriffs were formally appointed by the crown, as they were in England and Scotland.[128] The royal governor typically made appointments taking into account the advice of the county justices.[129] The governor rarely questioned the county's nominees of individuals to become sheriff.[130]

Although nominally appointed by the royal governor, the American sheriff "was more of a county than a colonial official . . . ."[131] Unlike the English counties, the American counties were self-governing.[132] "[A]s a member of the ruling group in the county, the sheriff shared its independence."[133]

The colonial sheriff enjoyed "little of the social functions and prestige of the English official, but economic and political forces more than compensated for this loss . . . restoring to him some of the importance his ancestor early had in England as conservator of the peace . . . ." In sum, "[t]he office was taking on new strength in the colonies while continuing to decline in England."[134]

An important American innovation was that the sheriff either had a salary or could only charge fees (e.g., for executing a civil judgment) that were fixed by law. This reform recognized the problem of some of the

---

[125] *Id.* at 111.
[126] BARNES, *supra* note 105, at 137–51.
[127] WEBB, *supra* note 113, at 292–306.
[128] STRUCKHOFF, *supra* note 47, at 23.
[129] *Id.* at 24.
[130] KARRAKER, *supra* note 19, at 157.
[131] *Id.* at 156.
[132] *Id.* at 156–57.
[133] *Id.* at 157.
[134] *Id.* at 158–59.

EXHIBIT 23
0791

unsalaried English sheriffs who had used their office for personal enrichment.[135]

The return of the long-lost practice of electing sheriffs began in 1652,[136] when the Royal Governor of Virginia told each county to choose its own sheriffs. The commissioners of Northampton County asked the people of the county to elect the sheriff. William Waters became the first sheriff elected in America.[137] It was not surprising that the reestablishment of popular election of sheriffs came from a county government; other than the New England town meetings, the first democratic governments in the American colonies were county governments.[138] New England already had the tradition of electing constables—low-level officers responsible for suppression of minor crimes; this was in contrast to the English custom of constables being appointed by the justices of the peace.[139]

The restoration of direct election of sheriffs "encouraged them to adopt an active role, whilst the fact that they were officials of county government helped to give them the opportunity to do so."[140] Election "meant that sheriffs were amongst the first public officials to be elected in any newly settled area and were therefore able to develop their role with little opposition from competing organisations or officials."[141] Americans came to understand the election of the sheriff as a right of the people.[142] The 1802 Ohio Constitution was the first state constitution to formally specify that sheriffs must be elected.[143] Today, the large majority of American state constitutions require that sheriffs be elected by the people of the county.[144]

---

[135] BRADLEY CHAPIN, CRIMINAL JUSTICE IN COLONIAL AMERICA 1600–1660, at 95–96 (1983).

[136] The year was 1652 by the modern calendar, which begins the new year on January 1. The year was 1651 by the "Old Style" calendar then in use, which began the year on March 25, the date on which Jesus was said to have been conceived by the Virgin Mary. 1751, 24 Geo. II ch. 23; ROBERT POOLE, TIME'S ALTERATION: CALENDAR REFORM IN EARLY MODERN ENGLAND 118–23 (1998).

[137] KARRAKER, *supra* note 19, at 74. The surviving records from Virginia and Maryland, through 1689, do not specifically demonstrate the election of other sheriffs in those colonies during that period. *Id.*

[138] Gullion, *supra* note 51, at 1157.

[139] CHAPIN, *supra* note 135, at 96.

[140] Gullion, *supra* note 51, at 1157.

[141] *Id.*

[142] STRUCKHOFF, *supra* note 47, at 23.

[143] *Id.* at 27; OHIO CONST. of 1802, art. VI § 1. The 1836 Constitution of the independent Republic of Texas likewise required election of sheriffs. TEX. CONST. of 1836, art. IV, § 12.

[144] ALA. CONST. art. V, § 138; ARIZ. CONST. art. XII, § 3; ARK. CONST. art. VII, § 46; CAL. CONST. art. XI, §§ 1(b), 4(c); COLO. CONST. art. XIV, § 8; DEL. CONST. art. III, § 22; FLA. CONST. art. VIII, § 1; GA. CONST. art. IX, § 1, para. III; IDAHO CONST. art. XVIII, § 6; ILL. CONST. art. VII, § 4; IND. CONST. art. VI, § 2; KY. CONST. § 99; LA. CONST. art. V, § 27;

EXHIBIT 23
0792

Developments in the United States confirmed the importance and independence of sheriffs, whose power came directly from the people. The classic American treatise on sheriff law, written in 1884 by William L. Murfee, observed,

> the sheriff is, in each of the United States, a constitutional officer, recognized *eo nomine* as part of the machinery of the state government, and therefore, although it is competent for legislatures to add to his powers or exact from him the performance of additional duties, it is, upon well established legal principles, beyond their powers to circumscribe his common-law functions or to transfer them to other officers.[145]

Today, American sheriffs are elected in all states except Alaska (which has no counties), Hawaii, Rhode Island, and Connecticut (where the office of sheriff was abolished in 2000).[146]

## II. THE *POSSE COMITATUS* FOR THE KEEPER OF THE PEACE

The traditional American view is that the legislature may add new duties or powers to the office of sheriff, but may not remove any of the sheriff's inherent common law powers or duties.[147] An example of a new duty, not traceable to the common law, is that by Colorado statute, the sheriff is the chief fire warden in his or her county.[148]

In America, the most important traditional responsibility of the sheriff has been keeping the peace. This is the third item of what Edward Coke described as the "three-fold custody" of the sheriff. First, the sheriff has custody of justice, because no suit begins without a sheriff serving process,

---

ME. CONST. art. IX, § 10; MD. CONST. art. IV, § 44; MASS. CONST. art. XIX; MICH. CONST. art. VII, § 4; MISS. CONST. art. V, § 138; NEV. CONST. art. IV, § 32; N.H. CONST. pt. 2, art. 71; N.J. CONST. art. VII, § 2, para. 2; N.M. CONST. art. X, § 2; N.Y. CONST. art. XIII, § 13; N.C. CONST. art. VII, § 2; N.D. CONST. art. VII, § 8; OR. CONST. art. VI, § 6; PA. CONST. art. IX, § 4; S.C. CONST. art. V, § 24; TENN. CONST. art. VII, § 1; TEX. CONST. art. V, § 23; VT. CONST. ch. II, §§ 43, 50; VA. CONST. art. VII, § 4; WASH. CONST. art. XI, § 5; W. VA. CONST. art. IX, § 1; WIS. CONST. art. VI, § 4.

[145] WILLIAM L. MURFEE, A TREATISE ON THE LAW OF THE SHERIFFS AND OTHER MINISTERIAL OFFICERS, at v (St. Louis, F.H. Thomas & Co., 1884); *see also id.* at 22 ("It is competent for the state legislature to impose upon him new duties growing out of public policy and convenience, but it cannot strip him of his time-honored and common-law functions and devolve them upon the incumbents of other offices created by legislative authority."); CLYDE F. SNYDER & IRVING HOWARDS, COUNTY GOVERNMENT IN ILLINOIS 78 (Carbondale: U. of Ill. Pr. 1960) ("[T]he sheriff . . . possesses certain common-law powers and duties of which he cannot be deprived by legislative enactment . . . ." The "common-law powers" are "vested in the sheriff by constitutional implication.") (citing People v. Clampitt, 200 N.E. 332 (Ill. 1936); Cnty. of Edgar v. Middleton, 86 Ill. App. 3d 502 (1899); Cnty. of McDonough v. Thomas, 84 Ill. App. 3d 408 (1899)).

[146] STRUCKHOFF, *supra* note 47, at 47; *Connecticut Sheriffs Ride into Sunset*, WORCESTER TEL. & GAZETTE, Nov. 9, 2000, at B3.

[147] MURFEE, *supra* note 145, at 22.

[148] COLO. REV. STAT. § 30-10-512 (2013).

EXHIBIT 23
0793

and because sheriffs are responsible for returning jurors to hear a trial. Second, the sheriff has custody of the law, since the sheriff executes the decisions in civil and criminal cases.[149] And third, the sheriff has custody of the commonwealth, for "he is [principal Conservator of the Peace], within the countie, which is the life of the common wealth . . . ."[150]

This Article is principally concerned with the sheriff's duty of keeping the peace. For various aspects of that duty, the sheriff has traditionally had the authority to summon assistance from armed citizens. Formally, there are four separate prongs to this common law authority, although in practice they can easily overlap. The first prong stems from the English sheriff's specific duty of keeping "watch and ward," to guard towns, which was given statutory expression during the reign of King Richard I (1189–1199).[151] This is the power to arrange watches and patrols, and to require townsfolk to take turns on guard duty.[152] "Ward" was the daytime activity, and "watch" the nighttime activity.[153] Closely related to "watch and ward" was "hue and cry," the second traditional power. Under English law originating long before the Norman Conquest of 1066, all able-bodied men were obliged to join in the *hutesium et clamor* (hue and cry) to pursue fleeing criminals. Pursuing citizens were allowed to use deadly force if

---

[149] COKE, *supra* note 25, at 168(a) (BOOK 3, CH.1, § 248) (noting that the sheriff is custodian of "*vitae republicae*; he is *principalis conservator pacis*, within the countie, which is the life of common wealth, *vita republicae pax.*").

[150] *Id.* Other commentators took the same view. *See, e.g*, GEORGE ATKINSON, A PRACTICAL TREATISE ON SHERIFF LAW 424 (London, William Crofts 1839); DALTON, *supra* note 23, at 12b–13a; DALTON, *supra* note 105, at 3; ISAAC GOODWIN, NEW ENGLAND SHERIFF 13 (Worcestor, Dorr & Howland 1830) ("He is the principal conservator of the peace for his jurisdiction, and has power to call to his aid the *posse comitatus* or physical force of the county."); CHARLES W. HARTSHORN, NEW ENGLAND SHERIFF 13 (Worcester, Warren Lazell 1844) (same quotation); WILLIAM HAWKINS, 2 A TREATISE OF THE PLEAS OF THE CROWN 33 (2nd ed., London, Nutt & Gosling 1724) (ch. 8 § 4); WEBB, *supra* note 113, at 292 (noting that the sheriff was "Chief Conservator of the Peace of his County, almost 300 Years before Justices of Peace were instituted"). The role of the sheriff as keeper of "the king's peace"—and of "the sheriff's peace"—was well established in Anglo-Saxon and Norman times. MORRIS, *supra* note 23, at 149, 196.

[151] DALTON, *supra* note 23, at 6a–6b (sheriff's oath included supervising the watch and ward, by reference to his oath specifically to uphold the Statute of Winchester); MORRIS, *supra* note 23, at 150, 228–29, 278. The Statute of Winchester was enacted by Edward I. It required all free men to possess arms on a sliding scale based on their wealth: the wealthier the individual, the more extensive the required arms and armor. Statute of Winchester, 1285, 13 Edw. 1, stat. 2.

[152] WILLIAM LAMBARDE, EIRENARCHA 185, 341 (London, Newbery & Bynneman 1581); FERDINANDO PULTON, DE PACE REGIS & REGNI 153a–153b (Lawbook Exchange 2007) (1609). *See also* GOODWIN, *supra* note 150, at 234–35 (noting that justices of the peace may order constables to organize the watch and ward).

[153] ELIZABETH C. BARTELS, VOLUNTEER POLICE IN THE UNITED STATES 2 (2014).

EXHIBIT 23
0794

necessary to prevent escape.[154]  The third power of the sheriffs, to summon the *posse comitatus*, is described in the remainder of Part II.  The fourth power is to summon the militia.  The use of this military force is supposed to be rare and only for situations that the *posse comitatus* is incapable of resolving.

A. *POSSE COMITATUS* IN ENGLAND

Richard Abels, a modern historian of the Anglo-Saxon period, reports that "[t]he reeves of the late ninth and the early tenth century also led posses in pursuit of thieves . . . ."[155]  The Latin phrase which was applied to this popular use of armed force for keeping the peace is *posse comitatus*, literally "[t]he power or force of the county."[156]  Historian Richard Kemble wrote that from the early days of the heptarchy and throughout the Anglo-Saxon period, the sheriff was "leader of the constitutional force, the *posse*

---

[154] For details about the hue and cry, *see* Statute of Winchester, 1285, 13 Edw.  I, stat.  2, chs.  4–6 (formalizing hue and cry system; requiring all men aged fifteen to sixty to possess arms and armor according to their wealth; lowest category, having less than "Twenty Marks in Goods," must have swords, knives, bows, and other small arms); 4 WILLIAM BLACKSTONE, COMMENTARIES *293–94 (describing hue and cry system as still in effect); EDWARD COKE, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND; CONCERNING HIGH TREASON, AND OTHER PLEAS OF THE CROWN AND CRIMINAL CAUSES 116–18 (William S. Hein & Co. 2008 (1628); COKE, *supra* note 85, at 171–73 (ch. 9); DALTON, *supra* note 23, at 6a–6b (noting that the sheriff's oath included the hue and cry, by reference to his oath specifically to uphold the Statute of Winchester); *id.* at 14a (all men must "be ready at the commandement of the sherife (& at the cry of the countrey) to pursue and arrest all felons"); LAMBARDE, *supra* note 152, at 185, 233 (Book I, ch. 22), 341 (Book II, ch. 4); MORRIS, *supra* note 23, at 221–22, 227; FREDERICK POLLOCK & FREDERIC W. MAITLAND, 2 THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I 576–81 (Liberty Fund 2010) (1895); PULTON, *supra* note 152, at 152b § 1 ("That all men generally shall be readie at the commandement and summons of the Sherifes, and at the crie of the Countrie to pursue and arrest felons when neede shall be."); STUBBS, *supra* note 83, at 123 (Statute of Winchester "carries us back to the earliest institutions of the race; it revises and refines the action of the hundred, hue and cry, watch and ward, the fyrd and the assize of arms."  It "shows the permanence and adaptability of ancient popular law."  The statute is "the culminating point" of Edward I's "legislative activity," being of "great constructive power"); WEBB, *supra* note 113, at 294 ("If a Felony is committed, the Sheriff may raise Hue and Cry, without other Warrant, to pursue and apprehend the Felon; and if he resists, or will not surrender himself, so that he cannot otherwise be taken, he may be kill'd by any Officer, or his Assistants.").

[155] ABELS, *supra* note 22, at 274; *see also* MORRIS, *supra* note 23, at 18 (stating that records show the Reeve of London led Londoners in pursuit of thieves during the reign of King Aethelstan in the early tenth century).

[156] BLACK'S LAW DICTIONARY 1046 (5th ed. 1979) ("The power or force of the county.  The entire population of the county above the age of fifteen, which a sheriff may summon to his assistance, in certain cases, as to aid him in keeping the peace, in pursuing and arresting felons, etc.  Williams v. State, 253 Ark. 973, 490 S.W.2d 117, 121."); *see also* BLACK'S LAW DICTIONARY 1281 (9th ed. 2009) ("A group of citizens who are called together to help the sheriff keep the peace or conduct rescue operations. — Often shortened to *posse*.").

EXHIBIT 23
0795

*comitatus* or *levée en masse* of the free men."[157]  Kemble used this fact in support of his argument that in the early Anglo-Saxon period:

> The *graviones*, *gerêfan*, or *shire-reeves* (by whatever name they may then have been called), were the essentially the people's officers; whether they were hereditary or not, these offices depended upon the popular will; and in a vast majority of cases, it is obvious that they must have been immediately dependent upon it,—that is to say, elective, and not hereditary.[158]

So it may well be that Alfred the Great did not invent the *posse comitatus*; it may also be that King Alfred's better organization of the shires, the shire-reeves, and the shire-based militias may have helped make the *posse comitatus* more effective.

William Henry Watson's 1848 treatise on the English sheriff explained that the *posse comitatus* power of the nineteenth century was formally the same as it had been in the ninth century.

> He may, and is bound, *ex officio*, to pursue and take all traitors, murderers, felons, and rioters; he hath also the custody and safe-keeping of the county gaol; he is to defend the same against rioters, and for this purpose, as well as for taking rioters and others breaking the peace, and also for attending the queen to the war when enemies come; he may command all the people of his county to attend him, which is called the *posse comitatus*, or power of the county, and this summons every person above fifteen years old, and under the degree of a peer, is bound to attend upon warning, under pain of fine and imprisonment.[159]

*Posse comitatus* was available whenever the sheriff needed a citizen armed force to enforce the law.[160]  The sheriff could use *posse comitatus* to suppress riots and also to enforce civil process—if and only if there was resistance to the civil process.[161]  Examples for use of *posse comitatus* in

---

[157] KEMBLE, *supra* note 84, at 60.

[158] *Id.*

[159] WATSON, *supra* note 25, at 2 (citing 1414, 2 Hen. 5, stat. 1 c. 8); *see also* Statute of Winchester, 1285, 13 Edw. 1, stat. 2, c. 39; DALTON, *supra* note 105, at 314 (seventeenth century); KARRAKER, *supra* note 19, at 22 (seventeenth century).

[160] COKE, *supra* note 85, at 192–94; *cf.* STUBBS, *supra* note 83, at 289 (describing instances in 1220, 1224, 1231, 1264, and 1267 when posses fought for or against the monarchy during the times when barons were resisting the king).

[161] RICHARD CROMPTON, L'OFFICE ET AUCTHORITIE DE IUSTICES DE PEACE 123 (2014) (1584) (print-on-demand reprint of 1584 edition; *posse comitatus* is in section on "Vicountes," a Norman French term for "Sheriff"; the page numbers of this edition disappear after 74, but the table of contents lists "posse comitatus" as 123); DALTON, *supra* note 23, at 13a–15b, 136a–137a; WILLIAM HAWKINS, 1 A TREATISE OF THE PLEAS OF THE CROWN 156, 158–61 (2nd ed., London, Nutt & Gosling 1724); *id.* at 159 (noting also that even without the direction of a sheriff, "private Persons may arm themselves in order to suppress a Riot; from whence it seems clearly to follow, that they may make use of Arms in the suppressing of it . . ."); LAMBARDE, *supra* note 152, at 233 (riot suppression); PULTON *supra* note 152, at 29a (in case of a riot, "the Justices of peace, the Shirife or undershirife shall come with the power of the Countie, if neede be, to arrest them"); JOHN STEPHEN, SUMMARY OF THE

EXHIBIT 23
0796

cases of resistance of civil process included a Precept of Restitution,[162] and Writs of Execution, Replevin, Estrepement, Capias, "or other Writ."[163] The *posse comitatus* could be used to "to apprehend Felons, &c. Or disturbers of the peace."[164] In other words, the posse could be used for the arrest of all types of criminals. This included the power to arrest even "a great Lord."[165]

By the eighteenth century, the government of Great Britain was moving towards reduced use of the *posse comitatus* and sheriffs, notwithstanding protests from political writers who argued that the sheriffs and the *posse comitatus* were the law enforcement system that complied with England's unwritten constitutional tradition.[166] The *posse comitatus* was still used in the early nineteenth century,[167] but, by the late nineteenth century, it, like many other formal powers of the sheriff, had fallen into disuse in England.[168] America was different.

---

CRIMINAL LAW 46 (Philadelphia: J.S. Littell, 1840) (suppressing of unlawful riots, routs, and assemblies).

[162] HAWKINS, *supra* note 150, at 152. A precept of restitution is used to restore the rightful owner to real property that is wrongly possessed by another. "Precept" in this context is an order from an authority to compel an officer to perform some act. BLACK'S LAW DICTIONARY 1059 (5th ed. 1979).

[163] DALTON, *supra* note 105, at 314. A writ of replevin is for the return of personal property wrongly held by another. A writ of execution is to satisfy the judgment of a court, such as by selling a defendant's property to pay his creditors. FED. R. CIV. P. 69; BLACK'S LAW DICTIONARY 510 (5th ed. 1979). A writ of estrepement compels a party not to commit waste on real property. BLACK'S LAW DICTIONARY 496 (5th ed. 1979). A writ of capias is for the sheriff to arrest a defendant in a civil case who has refused to appear in court. Edmund M. Morgan, *The Court of Common Pleas in Fifteenth Century England*, 61 HARV. L. REV. 914, 915–16 (1948) (book review).

[164] DALTON, *supra* note 105, at 315.

[165] *Id.* at 314.

[166] WILLIAM JONES, AN INQUIRY INTO THE LEGAL MODE OF SUPPRESSING RIOTS, WITH A CONSTITUTIONAL PLAN OF FUTURE DEFENCE (2d ed., London, C. Dilly 1782) (calling for an organized and thorough plan for training the *posse comitatus* and ensuring that it was armed; arguing that law enforcement by *posse comitatus* was much safer for civil liberty than law enforcement by a standing army); LEON RADZINOWICZ, 2 A HISTORY OF ENGLISH CRIMINAL LAW AND ITS ADMINISTRATION FROM 1750, at 28–29 (1956) [hereinafter 2 RADZINOWICZ]; LEON RADZINOWICZ, 3 A HISTORY OF ENGLISH CRIMINAL LAW AND ITS ADMINISTRATION FROM 1750, at 93–96, 375–77 (1956); ANONYMOUS, REGULATIONS OF PAROCHIAL POLICE 24–42 (4th ed., London, J. Hatchard 1803) (also proposing a plan to train the population in posse service).

[167] 2 RADZINOWICZ, *supra* note 166, at 221 n.89 (citing 1816 use of posse to guard the Gas Light Company). The last known use of the *posse comitatus* in England was in 1830 by the Sheriff of Oxfordshire to suppress riots. GLADWIN, *supra* note 74, at 375. During World War I and World War II, the power of sheriffs to raise the *posse comitatus* in case of invasion was reaffirmed. *Id.* But there being no invasion during either war, the power was apparently not exercised. *Id.*

[168] In 1885, the legal historian Frederic Maitland wrote: "Now the whole history of English Justice and Police might be brought under this rubric, *The Decline and Fall of*

EXHIBIT 23
0797

## B. *POSSE COMITATUS* IN COLONIAL AMERICA AND THE REVOLUTION

The sheriff's role as conservator of the peace—with the authority to summon the *posse comitatus*, raise the hue and cry, and administer watch and ward—was straightforwardly recognized in the American colonies.[169] But the changes in the posse began to reflect—and intensify—the ways in which the Americans were reshaping their English legal heritage towards greater self-government and liberty.

Gautham Rao's article *The Federal* Posse Comitatus *Doctrine* explains: "In its migration to America, however, colonists transformed the *posse comitatus* from an instrument of royal prerogative to an institution of local self-governance."[170] The posse "functioned through, rather than upon, the local popular will."[171] In other words, the Americans brought the posse back to its traditional Anglo-Saxon role, shaking off six centuries of how the Norman Conquest and succeeding monarchs had partially undemocratized the posse and the sheriff.

According to Rao, "[t]he colonists' control of the *posse comitatus*—of the legal means of coercion—all but precipitated the American Revolution."[172] The policies of the government in London had so alienated the Americans that they were no longer willing to enforce what London wanted. The Prime Minister, Lord North, recognized the problem: the posse had switched sides; rather than providing the manpower to enforce Parliament's will, the posse was now actively resisting that will: "[O]ur regulations here are of no import, if you have nobody in that country to give

---

*Sheriff.*" FREDERIC WILLIAM MAITLAND, JUSTICE AND POLICE 69 (London, MacMillan & Co. 1885). Maitland traced the beginning of the decline to "the Norman reigns." *Id.* So "there are many things which according to law books he might do, but which he never does. He might call out the power of the county (*posse comitatus*) to apprehend a criminal with hue and cry, but justices of the peace and police constables have long rendered needless this rusty machinery." *Id.* at 70.

[169] CHAPIN, *supra* note 135, at 31; KARRAKER, *supra* note 19, at 147 (Virginia); JOHN MILTON NILES, THE CONNECTICUT CIVIL OFFICER 188–89, 214 (Hartford, Huntington & Hopkins 1823); *cf.* BARTELS, *supra* note 153, at 2 (night watches created in Boston in 1636 and New York City in 1686). In Delaware, the role is affirmed in the state constitution. "Sheriffs shall be conservators of the peace within the counties respectively in which they reside." DEL. CONST. art. XV, § 1; *see also* sources in note 144 *supra* (describing constitutional office of sheriff).

[170] Gautham Rao, *The Federal* Posse Comitatus *Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America*, 26 LAW & HIST. REV. 1, 10 (2008); *see also* PAULINE MAIER, FROM RESISTANCE TO REVOLUTION 16–20 (1991) (noting, *inter alia*, use of *posse comitatus* to prevent impressment of Americans into the British navy).

[171] Rao, *supra* note 170, at 10.

[172] *Id.*

**EXHIBIT 23**
**0798**

them force.”[173]  The problem was exacerbated by the fact that most sheriffs leaned Whig (towards citizen rights) rather than Tory (towards the authority of the monarch).[174]

So at the advice of Lord North and his party, the British government attempted to resort to military coercion of the Americans, and, starting in the fall of 1774, a gun control program designed to disarm them.  Forcible disarmament with house-to-house searches by the British redcoats was attempted at Lexington and Concord on the morning of April 19, 1775.  The Americans resisted with their personal arms, and the Revolutionary War began.[175]

## C. AFTER INDEPENDENCE

In the Early Republic, the *posse comitatus* was an accepted and uncontroversial institution; the federal government only rarely used its *posse comitatus* powers.

One of the first legal treatises of the new United States of America was produced by James Wilson, the preeminent lawyer of his day, soon to be appointed to the Supreme Court by President Washington.[176]  Quite conventionally, Wilson described *posse comitatus* as “the high power of ordering to [the sheriff’s] assistance the whole strength of the county over which he presides” in order “to suppress . . . unlawful force and resistance.”[177]

Joel Barlow’s essay *Advice to the Privileged Orders* argued that if the state represented the people as a whole, not just one class, society would be more stable.[178]  Barlow noted that in Europe, an armed populace would be regarded “as a mark of an uncivilized people, extremely dangerous to a well

---

[173] House of Commons Debate, Mar. 28, 1774, 17 PARL. HIST. ENG. 1192–93, in JOHN PHILLIP REID, IN DEFIANCE OF THE LAW 230–33 (1981); Rao, *supra* note 170, at 10–11.

[174] REID, *supra* note 173, at 203.

[175] Kopel, *supra* note 3, at 308.

[176] OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1092 (2d ed. 2005).

[177] JAMES WILSON, *Of Government*, in 2 COLLECTED WORKS OF JAMES WILSON 1016 (Kermit L. Hall & Mark David Hall eds., 2007).  The treatise is based on series of lectures that Wilson delivered in 1790 and 1791 at the College of Philadelphia, which he revised for publication.  He was aiming to become the American Blackstone.  Mark David Hall, *Bibliographical Essay: History of James Wilson’s Law Lectures in id.* at 401.

[178] JOEL BARLOW, ADVICE TO THE PRIVILEGED ORDERS IN THE SEVERAL STATES OF EUROPE (Cornell University Press, 1956) (1792).  Barlow was a leading diplomat and writer during the 1780s and 1790s.  He was one of the “Connecticut wits,” a group of writers centered around Yale.  *Joel Barlow: A Biographical Note, in id.* at ix.  He challenged the typical European belief that Europeans were more civilized than Americans.

EXHIBIT 23
0799

ordered society."[179]   But unlike the European rabble, which had no experience with self-government, Americans were their own sovereigns, and self-government brought out the best in man's character.   Thus, the American people could be trusted with guns: "It is *because the people are civilized, that they are with safety armed*."[180]   Barlow praised the "very important" "discoveries" which "had been made in modern nations, especially in England, and carried into successful practice, for the security of citizens against an undue exercise of the governing power; and some that were equally original for the regular assistance of the governing power against the turbulence of citizens."[181]   These were the *posse comitatus*, habeas corpus, the jury, and the rule that "parliament holds the purse."[182]

When the proposed Constitution was put before the American people, one of the objections of Anti-Federalists was that the new federal government did not have an enumerated *posse comitatus* power, but did have an enumerated militia power.   The Anti-Federalists argued that therefore the federal government would use the militia (that is, military force) to carry out its powers on a routine basis.[183]   In Federalist Number 29, Alexander Hamilton responded that the federal government did have *posse comitatus* power, by virtue of the Necessary and Proper Clause.[184]

---

[179] *Id.* at 16.

[180] *Id.*

[181] JOEL BARLOW, THE MARCH OF THIS GOVERNMENT, *quoted in* Christine M. Lizanich, *"The March of This Government": Joel Barlow's Unwritten History of the United States*, 33 WM. & MARY Q. 315, 325–26 (1976).   Barlow's appointment as Ambassador to France interrupted his work on the book, and he died before completing it.   *Id.* at 320.

[182] *Id.* at 325 n.24.

[183] *Letter from the Federal Farmer III* (Oct. 10, 1787), *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST 234–45 (Herbert J. Storing ed., 1981); Brutus, *Essay IV*, *reprinted in id.* at 382–87 (claiming that the power to use the militia for law enforcement "is a novel one, in free governments—these have depended for the execution of the laws on the Posse Comitatus, and never raised an idea, that the people would refuse to aid the civil magistrate in executing those laws they themselves had made").

[184] THE FEDERALIST No. 29 (Alexander Hamilton):

> In order to cast an odium upon the power of calling forth the militia to execute the laws of the Union, it has been remarked that there is nowhere any provision in the proposed Constitution for calling out the POSSE COMITATUS, to assist the magistrate in the execution of his duty, whence it has been inferred, that military force was intended to be his only auxiliary . . . .   The same persons who tell us in one breath, that the powers of the federal government will be despotic and unlimited, inform us in the next, that it has not authority sufficient even to call out the POSSE COMITATUS.   The latter, fortunately, is as much short of the truth as the former exceeds it.   It would be as absurd to doubt, that a right to pass all laws *necessary* and *proper* to execute its declared powers, would include that of requiring the assistance of the citizens to the officers who may be intrusted with the execution of those laws, as it would be to believe, that a right to enact laws necessary and proper for the imposition and collection of taxes would involve that of varying the rules of descent and of the

**EXHIBIT 23**
**0800**

After ratification of the Constitution, Hamilton's necessary and proper view of the federal *posse comitatus* power was uncontroversial.  In addition, the federal government has all the normal powers of local government in areas, such as territories, where the federal government has the authority to exercise local government.[185]  Thus, during the Jefferson administration, Secretary of State James Madison sent a written order that a French official "call for the assistance of the good citizens of the district, as the *posse comitatus*" to enforce the terms of the Louisiana Purchase.[186]  In an 1833 treatise on American constitutional law, Supreme Court Justice Joseph Story explained that while the *posse comitatus* would suffice for maintaining law and order in most situations, there were some circumstances in which either a militia or a standing army would be necessary.[187]

For local law enforcement, *posse comitatus* in the decades before 1850 thrived as a well-developed and popular institution.  Edward Livingston extolled the posse because "the same ties of property, of family, of love of country and of liberty" which make possemen "effective instruments for the suppression of disorder" also make them "unfit . . . to promote any scheme of usurpation.  The people can apprehend no danger to their liberties from

---

alienation of landed property, or of abolishing the trial by jury in cases relating to it.  It being therefore evident that the supposition of a want of power to require the aid of the POSSE COMITATUS is entirely destitute of color, it will follow, that the conclusion which has been drawn from it, in its application to the authority of the federal government over the militia, is as uncandid as it is illogical.  What reason could there be to infer, that force was intended to be the sole instrument of authority, merely because there is a power to make use of it when necessary?

*Id.*

[185] *See* U.S. CONST., art. IV § 3, cl. 2; Block v. Hirsh, 256 U.S. 135, 156 (1921); Shively v. Bowlby, 152 U.S. 1 (1894); Am. Ins. Co. v. 356 Bales of Cotton, 26 U.S. 511, 542 (1828).

[186] Madison's instruction was quoted in a Supreme Court case a few years later.  Livingston v. Dorgenois, 11 U.S. 577, 578–79 (1813).

[187] JOSEPH STORY, 3 COMMENTARIES ON THE CONSTITUTION 81–82 (Boston, Hilliard, Gray, & Co. 1833) (§ 1196):

In ordinary cases, indeed, the resistance to the laws may be put down by the *posse comitatus*, or the assistance of the common magistracy . . . .  The general power of the government to pass all laws necessary and proper to execute its declared powers, would doubtless authorize laws to call forth the *posse comitatus*, and employ the common magistracy, in cases, where such measures would suit the emergency.  But if the militia could not be called in aid, it would be absolutely indispensable to the common safety to keep up a strong regular force in time of peace.

*See also* Luther v. Borden, 48 U.S. 1, 76 (1849) (Woodbury, J., dissenting) ("The State courts, with the aid of the militia, as in Shays's rebellion and the Western insurrection, could, for aught which appears, by help of the *posse comitatus*, or at least by that militia, have in this case dispersed all opposition.").

**EXHIBIT 23**
**0801**

such a force . . . ."[188]  Citizens served in the posse readily and with pride.[189] It was used for a wide variety of local enforcement, ranging from stopping illegal fishing up to riots.[190]  Like jury service, posse service was a mandatory duty of a citizen, one that should be performed with pride as part of free citizen's rights and duties in a self-governing republic.[191]

In the early decades of the republic, before slavery became a major conflict, federal use of *posse comitatus* in the states was rare and sporadic. The Judiciary Act of 1789 gave U.S. Marshals authority to summon the *posse comitatus*.[192]

---

[188] EDWARD LIVINGSTON, A SYSTEM OF PENAL LAW FOR THE STATE OF LOUISIANA 209–10 (Lawbook Exchange 2010) (1833).  Livingston was one of the parties in *Livingston v. Dorgenois*, *supra* note 186.  He also served as Secretary of State for Andrew Jackson, and also as a United States Senator for Louisiana and United States Representative for two states, New York and Louisiana.  Roger J. Champagne, *Livingston, Edward*, *in* 17 ENCYCLOPEDIA AMERICANA 615 (1980).

[189] Rao, *supra* note 170, at 11–12.

[190] *Id.  See also* Reed v. Bias, 8 Watts & Serg. 189, 191  (Pa. 1844) ("The sheriff, to prevent personal damage to himself and his ordinary assistants from a mob assembled in extraordinary numbers, and with a show of force to overawe the civil power, may call in the assistance of the military.  He has the right, and it is his duty to use the proper and necessary force to suppress all mobs and disturbers of the peace.  Without this power our liberty would be but a name, and our lives and property insecure."); GOODWIN, *supra* note 150, at 13, 76, 149–50, 155 (conservation of the peace, recapture of escaped prisoners, suppression of riots, arrest warrants); HARTSHORN, *supra* note 150, at 13, 123, 230–31 (any criminal case, preservation of the peace, recapture of prisoners); JOHN H.B. LATROBE, THE JUSTICES' PRACTICE UNDER THE LAWS OF MARYLAND 22 (Baltimore, Fielding Lucas, Jr. 1826) (constable may order any person to assist him in making an arrest); MORDECAI M'KINNEY, THE UNITED STATES CONSTITUTIONAL MANUAL 151, 160, 260 (Harrisburg, Penn.: Hickock & Cantine, 1845) (sheriffs may raise the *posse comitatus* to suppress riots or affrays and to arrest criminals); NILES, *supra* note 169, at 17, 190, 214, 270, 275–76 (suppression of riots, execution of arrests; final item is form for a constable's return after having summoned assistance and suppressed a riot); WILLIAM J. NOVAK, THE PEOPLE'S WELFARE 212 (1996) (quarantine enforcement in Albany in 1832); HENRY POTTER, THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE 243–44 (Raleigh, Joseph Gales 1816) (noting posse use for riots and affrays, forcible entry and detainer, pursuit and apprehension of all felons and all breakers or disturbers of the pace; execution of any lawful writ, process, or warrant; preservation of the peace).

[191] Avery v. Seely, 3 Watts & Serg. 494, 498 (Pa. 1841) (stating that sheriff may not take his posse out of his own county); Comfort v. Commonwealth, 5 Whart. 437, 440 (Pa. 1840) (holding that the constable has the same power as the sheriff to summon posse, including for assistance in execution of a writ on a debt); Coyles v. Hurtin, 10 Johns. 85, 88 (N.Y. Sup. Ct. 1813) (holding that sheriff can order a person to perform a posse task, and can then leave the person's presence; persons in posse service have the same civil immunities as the sheriff); STEPHEN, *supra* note 161, at 29.

[192] 1 Stat. 73, 87 (1789) (creating, in § 27, office of U.S. Marshal in each federal judicial district, who "shall have power to command all necessary assistance in the execution of his duty").

EXHIBIT 23
0802

A modern scholar, Wesley Campbell, uses ratification history to argue against the Supreme Court decisions such as *Printz v. United States*, which forbid federal commandeering of state officials.[193]  Campbell infers from the ratification history not only a federal *posse comitatus* power, but also a federal power to commandeer county sheriffs to lead the *posse comitatus* in federal service.[194]  This is problematic because of the nature of the posse.  The posse is an ad hoc organization.  It has no organization until it enters into the service of whoever lawfully summoned it.  As in England, the American common law recognized that many officials, not just the sheriffs, had the authority to summon a posse.  These officials were a "Judge of Record, Sheriff, Coroner,[195] Constable, or other Officer to whose Office belongs the Conservation of the Peace . . . ."[196]  The Appendix to this Article sets forth the modern state *posse comitatus* statutes; they follow the common law in providing that a variety of state or local officials, not just sheriffs, may summon a *posse comitatus.*

If a coroner summons the posse on Tuesday, then he is the posse commander that day.  If a judge summons the posse on Friday, then she is the posse commander for that day.  Accordingly, the power of a federal officer to summon a posse for his own use does not necessarily imply that the federal officer also has the power to summon any of the state officials—such as sheriffs, judges, and coroners—who also has posse-summoning power.

It is useful to contrast the posse with the state militia.  There are a variety of possible posse commanders, depending on the exigencies of law enforcement need.  There is no process for compulsory training of persons who might be summoned to posse service.  In contrast, the state militia is a regular body.  It is subject to periodic training and to musters (where militia members show that they possess the requisite arms for militia duty).[197]

---

[193] Wesley J. Campbell, *Commandeering and Constitutional Change*, 122 YALE L.J. 1104 (2013).

[194] *Id.* at 1139–44.

[195] The Office of Coroner in England was created in 1194.  Articles of the Eyre, 1 Stats. of the Realm 233 (art. 20).  The office was originally much broader than today, when forensic autopsies are the office's only routine law enforcement role.  Coroners presided at some judicial hearings and had arrest powers.  *See, e.g.*, WEBB, *supra* note 113, at 97–104.

[196] WEBB, *supra* note 113, at 253.

[197] *See, e.g.*, District of Columbia v. Heller, 554 U.S. 570, 650 n.12 (Stevens, J., dissenting)  (quoting an Act for Establishing a Militia, 1785 Del. Laws § 7) ("And be it enacted, That every person between the ages of eighteen and fifty . . . shall at his own expense, provide himself . . . with a musket or firelock, with a bayonet, a cartouch box to contain twenty three cartridges, a priming wire, a brush and six flints, all in good order, on or before the first day of April next, under the penalty of forty shillings, and shall keep the same by him at all times, ready and fit for service, under the penalty of two shillings and six

**EXHIBIT 23**
**0803**

Unlike the posse, the militia is led by a regular set of officers.[198]  The man who is the militia captain on Monday will still be the militia captain on Friday.  The U.S. Constitution expressly grants Congress the power to summon the state militias, including their state officers, into federal service.[199]  When the Constitution means to grant to the federal government the extraordinary power of commandeering state officers, the Constitution says so expressly.

Early practice shows that the federal *posse comitatus* power was not exercised as a power to commandeer state officers.  The Judiciary Act of 1789 authorized federal marshals to summon posses.  There appears to be no evidence indicating that from 1789 to the present, the federal posse power has ever been used by a federal marshal, or anyone else, to commandeer a state official in his official capacity (e.g., a sheriff or a state judge) into serving as posse commander in federal service.

In *Prigg v. Pennsylvania*, the Supreme Court ruled that the 1793 federal Fugitive Slave Act was constitutional.  Even though Article I had not given Congress an enumerated power over fugitive slaves, the fugitive slave provisions in Article IV created an implied power, according to the Court.[200]  At the same time, state and local officials had absolutely no obligation to assist in the recapture of fugitives, according to the *Prigg* Court.[201]

## D. *POSSE COMITATUS* AND THE CIVIL WAR

### 1. Before the War

Everything changed with the congressional enactment of the Compromise of 1850.  In exchange for admission of California to the Union as a free state, northern legislators accepted a massive new federal Fugitive Slave Act.[202]  This time, the Act explicitly declared that citizens were required to serve when summoned in a federal *posse comitatus* hunting for

---

pence for each neglect or default thereof on every muster day").

[198] *See, e.g.*, S.D. CONST. art. 15, § 4.

[199] U.S. CONST. art. I, § 8, cl. 15–16: "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"; "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress . . . ."

[200] Prigg v. Pennsylvania, 41 U.S. 539 (1842).

[201] *Id.* at 615.

[202] FERGUS M. BORDEWICH, AMERICA'S GREAT DEBATE: HENRY CLAY, STEPHEN A. DOUGLAS, AND THE COMPROMISE THAT PRESERVED THE UNION (2012).

EXHIBIT 23
0804

fugitive slaves.[203]  The federal *posse comitatus* had been transformed, as Rao puts it, "from emergency to routine . . . from sporadic to ubiquitous."[204] The *posse comitatus* provisions of the Fugitive Slave Act of 1850 forced the North to become complicit in enforcing slavery, and thus to become part of the slave system.[205]  To many northerners, forced service to recapture slaves felt little different from slavery itself.[206]  The *posse comitatus* was supposed to be the people of the county participating in self-government by enforcing their own laws.  Now, federal *posse comitatus* had been perverted into a weapon that transformed free citizens into the minions of distant slave owners.

Making things even worse, the federal government began using federal soldiers on slave hunts and claimed that these men were merely acting as *posse comitatus*.[207]  To call the federal standing army a "*posse comitatus*" was as Orwellian as calling the federal army "the Massachusetts State Militia."  The posse and the militia were supposed to be the institutions that minimized the need for domestic use of a standing army.  The posse was not supposed to be used as a legal fiction to justify use of the military for ordinary law enforcement in a state that was not under martial law.

An 1854 poem by Walt Whitman, "A Boston Ballad," denounced the sight of federal troops—"the Federal foot and dragoons"—marching through Boston to transport a fugitive slave.[208]  King George's despotic principles had triumphed: "You have got your revenge, old buster!  The crown is come to its own, and more than its own."[209]

The innovative use of *posse comitatus* to enforce the Fugitive Slave Act brought slavery home to the North.  Indifference as to slavery as a far-away institution was no longer possible.  According to the abolitionists, there were now only two choices for a free northern man: one option was to himself become a servant of the slave power in the federal *posse comitatus*. The only other choice was to put slavery everywhere in America on the

---

[203] Fugitive Slave Act of 1850, 9 Stat. 462, 462–63 (explaining that U.S. Marshals are authorized "to summon and call to their aid the bystanders, or *posse comitatus* of the proper county, when necessary to ensure a faithful observance of the clause of the Constitution referred to, in conformity with the provisions of this act; and all good citizens are hereby commanded to aid and assist in the prompt and efficient execution of this law, whenever their services may be required, as aforesaid, for that purpose . . . "); *see also* Extradition of Fugitives from Service, 6 Op. Att'y Gen. 466 (1854).

[204] Rao, *supra* note 170, at 25–26.

[205] *Id.* at 5, 20, 26–31.

[206] *Id.* at 27–28.

[207] *Id.* at 29.

[208] WALT WHITMAN, THE COMPLETE POEMS 292–03 (Penguin Classics 2005).

[209] *Id.* at 204.

EXHIBIT 23
0805

road to destruction.[210]  All sides agreed that Abraham Lincoln's plan to block any expansion of slavery into federal territories would eventually lead to the economic collapse of slavery in all the slave states.[211]  Ascendant in Congress, the South had nationalized the issue of slavery, and thereby radicalized much of the North.  The locally controlled *posse comitatus* of ordered liberty had helped bring about the American Revolution.  The federally controlled *posse comitatus* of slavery would help cause the Civil War.

### 2. After the War

Victorious after four years of the bloodiest war in American history, the Radical Republicans and their political allies embarked upon a Reconstruction plan to demolish the slave power root and branch.[212]  The Thirteenth Amendment and the abolition of *de jure* slavery was just the first step.

*Prigg v. Pennsylvania* had found an implicit pro-slavery federal power in the Fugitive Slave Clause of the Constitution.[213]  So Congress looked to the other clauses of Article IV and found the guarantee that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[214]  To the most ardent reconstructionists, this was enough to imply a congressional power to enact civil rights legislation— especially in conjunction with the enforcement power granted by Section Two of the Thirteenth Amendment.[215]  Such legislation was enacted,[216] but Congress decided to put it on a more solid constitutional footing by proposing the Fourteenth Amendment for ratification, Section One of which provided that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ."[217] Section Five gave Congress the power to enforce the Amendment by appropriate legislation.[218]

Likewise, federal slavery powers were later used for civil rights ends: the Civil Rights Act of 1866, the Enforcement Acts of 1870 and 1871, and

---

[210] Rao, *supra* note 170, at 26–31.

[211] DOUGLAS R. EGERTON, YEAR OF METEORS: STEPHEN DOUGLAS, ABRAHAM LINCOLN, AND THE ELECTION THAT BROUGHT ON THE CIVIL WAR 28, 35 (2010).

[212] *See* GARRETT EPPS, DEMOCRACY REBORN: THE FOURTEENTH AMENDMENT AND THE FIGHT FOR EQUAL RIGHTS IN POST-CIVIL WAR AMERICA (2006).

[213] U.S. CONST. art. IV, § 2, cl. 3.

[214] U.S. CONST. art. IV, § 2, cl. 1.

[215] MICHAEL KENT CURTIS, NO STATE SHALL ABRIDGE 42–43 (1986).

[216] Civil Rights Act of 1866, 14. Stat. 27–30.

[217] U.S. CONST. amend. XIV. CURTIS, *supra* note 215, at 42–43.

[218] *Id.*

EXHIBIT 23
0806

the Ku Klux Klan Act of 1871 all gave federal marshals authority to summon the *posse comitatus*.[219]   Anti-slavery Senator Lyman Trumbull noted that the *posse comitatus* provision of the 1866 Civil Rights Act was "copied from the late fugitive slave act, adopted in 1850 . . . ."[220]  But in the South in 1872 as in the North in 1852, there was resistance to serving in a federal *posse comitatus* for routine enforcement of federal laws which many local people did not accept.[221]   Again, the federal military was sometimes used as *posse comitatus*, under the pretext that the men were merely acting as citizens, rather than as soldiers.[222]  Finally in 1878, Congress passed the Posse Comitatus Act to forbid use of the army in law enforcement, except when expressly authorized by Congress.[223]

Today, the modern version of the civil rights statute provides that United States Magistrate Judges may appoint persons to serve warrants and process:

> [These] persons so appointed shall have authority to summon and call to their aid the bystanders or *posse comitatus* of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty with which they are charged . . . .[224]

The statutory authority of federal judges to raise the *posse comitatus*, as described above, is consistent with the American common law understanding of who may invoke the power.[225]  As U.S. Attorney General Edward Bates wrote, "[t]he right of the courts to call out the whole power of the county to enforce their judgments, is as old as the common law . . . ."[226]

---

[219] 14 Stat. 27, 28 (1866) (Civil Rights Act) (Empowering federal civil rights commissioners to appoint "suitable persons . . . to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty . . ."); 16 Stat. 140, 142 (1870) (Enforcement Act); 16 Stat. 433, 437 (1871) (voting rights).

[220] CONG. GLOBE, 39th Cong., 1st Sess. 475 (1866).

[221] Rao, *supra* note 170, at 50.

[222] *Id.* at 50–51.

[223] 20 STAT. 145, 152 (1878).  The law remains in effect today, albeit with major loopholes created for the "War on Drugs." *See* David B. Kopel, *Smash-up Policing: When Law Enforcement Goes Military, in* BUSTED: STONE COWBOYS, NARCO-LORDS AND WASHINGTON'S WAR ON DRUGS 155–58 (Mike Gray ed., 2002).

[224] 42 U.S.C. § 1989 (2006).

[225] WEBB, *supra* note 113, at 253 ("By the Common Law, every Judge of Record, Sheriffs, Coroner, Constable, or other Office to whose office belongs the Conservation of the Peace, may command and take the Aid and Force of Others to pacify Riots, or Affrays . . . .") (citing 28 Edw. 3, c. 8).

[226] Suspension of the Privilege of the Writ of Habeas Corpus, 10 Op. Att'y Gen. 74, 80 (1861).

EXHIBIT 23
0807

## E. *POSSE COMITATUS* IN LATE NINETEENTH CENTURY AMERICA TO THE PRESENT

With the federal *posse comitatus* crisis of 1850–1878 finally resolved, the *posse comitatus* returned to its traditional American role, with the power of the county to be used in support of popularly-supported laws.[227]

This is the period about which most people today have their greatest familiarity with the *posse comitatus*—of the western sheriff summoning the posse to pursue an escaped outlaw or to confront a violent gang. Frank Richard Prassel's *The Western Peace Officer* is the leading study of the office of sheriff in the western United States during the late nineteenth and early twentieth centuries. As Prassel observes, the original legal structure of the office of sheriff in the western territories and states is nearly identical to the modern structure of the office.[228]

The *posse comitatus* power continued to be a core, essential power of the county sheriff.[229] To this day, in almost every American state, the sheriff's common law *posse comitatus* power[230] is given expression by a statute on the subject.[231] As noted above, the power to raise the hue and cry

---

[227] The federal *posse comitatus* power never went away. The Supreme Court in 1890 and 1895 affirmed the responsibility of every U.S. citizen to assist the federal government when needed in the *posse comitatus*. Cunningham v. Neagle, 135 U.S. 1, 65 (1890) ("marshals of the United States, with a *posse comitatus* properly armed and equipped . . ."); *In re* Quarles, 158 U.S. 532, 535 (1895) :

It is the duty and the right, not only of every peace officer of the United States, but of every citizen, to assist in prosecuting, and in securing the punishment of, any breach of the peace of the United States. It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the *posse comitatus* in upholding the laws of his country.

*Cf.* Wright v. United States, 158 U.S. 232, 239 (1895) (enforcing federal statute protecting federal officers, including *posse comitatus*, on Indian lands when in performance of their official duties, or after they have performed such duties). The actual use of the federal *posse comitatus* had returned to its pre-1850 norm of being rare and uncontroversial.

[228] "Virtually no significant changes have occurred in the American system of county law enforcement during the past century. Most sheriffs and constables operate under the same basic laws and customs as existed at the creation of their posts." FRANK RICHARD PRASSEL, THE WESTERN PEACE OFFICER 119 (1972).

[229] MURFEE, *supra* note 145, at 21 ("For a thousand years the sheriff has been the principal conservator of the peace in his county, with full power to command, whenever necessary, the power of the county.").

[230] "He is also required, in his capacity as conservator of the peace, to suppress riots, mobs, and insurrections, and, in the discharge of his duty, to employ the whole power of the county, including any military force that may be necessary and available for that purpose." MURFEE, *supra* note 145, at 629; *see also* WEBB, *supra* note 113, at 252–53, 293–94.

[231] For example, in Colorado,

It is the duty of the sheriffs, undersheriffs, and deputies to keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots, and unlawful

**EXHIBIT 23**
**0808**

is closely related to the *posse comitatus* power.   American sheriffs continued to have the power of hue and cry.[232]

One of the longstanding rules of the English law of sheriffs was that the sheriff is civilly liable for the acts performed by his undersheriff, his deputies, or anyone else in his service.  This principle applies to the *posse comitatus*.[233]  Concomitantly, persons serving in the sheriff's posse have the same legal immunities as does the sheriff herself.[234]  Once workman's compensation was established, it was straightforwardly applied so that a person who is injured while serving in the posse is entitled to workman's compensation just as are full-time deputies.[235]

The *posse comitatus* is familiar enough to the Supreme Court that it figured in part of the questioning during oral argument in *Plyer v. Doe* in

> assemblies and insurrections.  For that purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony or breach of the peace, they, and every coroner, may call to their aid such person of their county as they may deem necessary.

COLO. REV. STAT. § 30-10-516.  A list of all state *posse comitatus* statutes is contained in the Appendix to this Article.

[232] For example, the first statutes of the Colorado Territory, created in 1861, stated:

> When any felonious offense shall be committed, public notice thereof shall be immediately given in all public places near where the same was committed, and fresh pursuit shall forthwith be made after every person guilty thereof by sheriffs, coroners, constables, and all other persons who shall be by any of them commanded or summoned for that purpose.

1861 Colo. Sess. Laws 326; *see also* KARRAKER *supra* note 19, at 147–48 (explaining that colonial Virginia sheriffs could raise hue and cry, but "[i]t was probably little resorted to in Virginia because of the wide scattering of the population."); *cf.* NILES, *supra* note 169, at 188–89 (constables' hue and cry).

The New Mexico Territory specifically authorized the sheriff to cross county lines in order to perform an arrest and to take the *posse comitatus* with him for that purpose.  N.M. STAT. § 15-40-14 (West 1953) (referencing historical law of 1868–69).

[233] Scott v. Vandiver, 476 F.2d 238, 242–43 (4th Cir. 1973).  Conversely, when persons with no connection to a sheriff's office falsely call themselves "*posse comitatus*," the sheriff has no liability for the acts of these unauthorized imposters.  *See* Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711, 717 (9th Cir. 1981).  A particularly pernicious set of fraudsters was a private extremist organization of tax evaders in the latter twentieth century which wrongly called itself "*Posse Comitatus*."  *See generally* JAMES CORCORAN, BITTER HARVEST: GORDON KAHL AND THE *POSSE COMITATUS* (1990) (describing the history of Kahl and his misguided followers).

[234] Filarsky v. Delia, 132 S. Ct. 1657, 1665 (2012) (citing numerous precedents and MURFEE, *supra* note 145); State v. Parker, 199 S.W.2d 338, 339–40 (Mo. 1947); Monterey Cnty. v. Rader, 248 P. 912, 914 (Cal. 1926); Robinson v. State, 18 S.E. 1018, 1019 (Ga. 1893).

[235] CAL. LAB. CODE § 3366 (2011); COLO. REV. STAT. § 8-40-202 (2013); Eaton v. Bernalillo Cnty., 128 P.2d 738 (N.M. 1942); *Monterey Cnty.*, 248 P. at 916; Annotation, *One Temporarily Impressed into Public Service in Emergency, as Within Workmen's Compensation Act*, 142 A.L.R. 657 (1943).

EXHIBIT 23
0809

1982.[236]  The case involved whether illegal aliens were entitled to attend American public schools; one hypothetical raised by a Justice involved the judicial authority to summon *posse comitatus*.[237]  More recently, the 2012 Supreme Court case *Filarsky v. Delia* featured a mini-treatise on *posse comitatus*, recapitulating some of the leading precedents on the subject.[238]

### F. WHO IS SUBJECT TO *POSSE COMITATUS* DUTY?

*Posse comitatus* is like the jury: it is a law enforcement duty of the citizen, and a person who fails to perform either duty may be criminally punished.[239]  This principle is not in desuetude, but has been affirmed by state court cases from the late twentieth century.[240]  The posse duty inheres in the inhabitants of the county; that is, the Sheriff of Hinsdale County can command posse service only from the inhabitants of Hinsdale County.[241]

Exemptions of able-bodied males from posse duty are rare.[242]  One 1848 English treatise[243] said that nobles did not have to serve in the *posse*

---

[236] 457 U.S. 202 (1982).

[237] Q. What about a *posse comitatus*, where a judge is theoretically, he may have difficulty doing it, but he is entitled to call upon bystanders to enforce an order of a court.  Wouldn't the people escorting these people to the border be much like a *posse comitatus*?  They are not officially endowed with status, but they are helping to enforce a federal statute?

Quoted in E. Barrett Prettyman, Jr., *The Supreme Court's Use of Hypothetical Questions at Oral Argument*, 33 CATH. U. REV. 555, 585–86 (1984).  The correct answer to the question, by the way, is "no."  If you are not summoned by a government officer, then you are not acting as *posse comitatus*.  *Posse comitatus* is a status, which confers, *inter alia*, the same civil immunities as enjoyed by other law enforcement officers, as well the same liabilities for supervisors for an agent's misconduct.  *See supra* text accompanying note 233.

[238] *Filarsky*, 132 S.Ct. at 1664.  As the Court explained, Sheriffs executing a warrant were empowered by the common law to enlist the aid of the able-bodied men of the community in doing so (citing 1 WILLIAM BLACKSTONE, COMMENTARIES *343); while serving as part of this "*posse comitatus*," a private individual had the same authority as the sheriff and was protected to the same extent.  See, e.g., *Robinson*, 18 S.E. at 1019.

[239] Sutton v. Allison, 47 N.C. 339 (1855); Houser v. Hampton, 29 N.C. 333 (1847); MURFEE, *supra* note 145, at 78 (citing Coyles v. Hurtin, 10 Johns. 85 (N.Y. Sup. Ct. 1813)).

[240] State v. Floyd, 584 A.2d 1157, 1159 (Conn. 1991); Williams v. State, 490 S.W.2d 117, 119 (Ark. 1973).

[241] State *ex rel.* Att'y Gen. v. McLain, 50 N.E. 907, 908 (Ohio 1898) ("[H]e may command the inhabitants of the county to assist him.").  *But see* OKLA. STAT. ANN. tit. 22, § 94 (West 2003) (under extraordinary circumstances, governor must summon posses of other counties to assist in a county where county's *posse comitatus* cannot solve the problem); MORRIS *supra* note 23, at 227 n. 178 (noting one thirteenth century example of the king ordering a sheriff to summon men from two counties, if necessary).

[242] LAMBARDE, *supra* note 152, at 233 (Book I, ch. 22) (ministers, the infirm or decrepit); PULTON, *supra* note 152, at 29a ("which be not of the Clergie"); STEPHEN, *supra* note 161, at 46 (citing Blackstone, "except women, clergymen, persons, decrepit and infants under the age of fifteen"); WEBB, *supra* note 113, at 252 ("But Clergy-men, and sick, lame, or

**EXHIBIT 23**
**0810**

*comitatus*, but many other prominent English commentators have viewed posse duty as encompassing everyone regardless of rank.[244] As with militia service, persons who are not able-bodied are exempt; some but not all commentators state that clergymen are exempt.[245]

Unlike with militia service, there is not necessarily an upper age limit for *posse comitatus*. In the view of some commentators, if you are sixty-five years old and able-bodied, you may be exempt from the militia, but not from *posse comitatus*.[246] James Wilson stated in 1790 that "[n]o man above fifteen and under seventy years of age, ecclesiastical or temporal, is exempted from this service."[247] The traditional lower age limit for *posse comitatus* duty was fifteen years old, which was six years below the age of majority in England and the United States.[248] One might argue that changing views about the legal responsibilities of minors might militate for eighteen years as the limit in the United States today.

Women were traditionally exempt.[249] Arguably, the exemption has continuing legal validity by analogy to women still being exempt from

---

impotent Persons are excepted.").

[243] WATSON, *supra* note 25, at 2.

[244] COKE, *supra* note 85, at 193 (ch. 17) ("no man ecclesiasticall or temporall is exempted from this service"); DALTON, *supra* note 105, at 313; HAWKINS, *supra* note 150, at ch. 28 § 201 ("all Persons whatsoever, and even noblemen, and all others of what condition or degree soever they may be, except women, clergymen, persons decrepit, and infants under the age of fifteen years"); *see also* DALTON, *supra* note 23, at 136b (similar list to Pulton, except "villaines" omitted); LAMBARDE, *supra* note 152, at 233 (Book I, ch. 22) ("all manner of Gentlemen, Yeomen . . ."); PULTON, *supra* note 152, at 29a ("Al Lords and other liege people of the Realme, as KNIGHTS, Esquires, gentlemen, yeomen, laborers, servants, apprentices, villaines [serfs], and all other of the age of 15 years or above.") (citing 13 Henry IV, ch. 7).

[245] LAMBARDE, *supra* note 152, at 233 (Book I, ch. 22) (ministers, the infirm or decrepit); PULTON, *supra* note 152, at 29a ("which be not of the Clergie"); STEPHEN, *supra* note 161, at 46 ("except women, clergymen, persons decrepit and infants under fifteen"); WEBB, *supra* note 113, at 252 ("But Clergy-men, and sick, lame, or impotent Persons are excepted.").

[246] KARRAKER, *supra* note 19, at 176–77 (reprinting an April 29, 1643, warrant for summoning the *posse comitatus*, applying to persons above the age of sixteen years and "under the age of three score years and able to travel, with such arms or weapons as they have or can provide"); M'KINNEY, *supra* note 190, at 260 (requiring all men above the age of fifteen years, "not aged or decrepid"); WEBB, *supra* note 113, at 252 ("all Males Persons therein, whether Freemen, or Servants, above the Age of 15 Years, and able to travel") (citing LAMBARDE, *supra* note 152, at 309). *But see* COKE, *supra* note 85, at 193 (ch. 17) ("being above 15 and under 70").

[247] WILSON, *supra* note 177, at 1017. *Cf.* STEPHEN, *supra* note 161, at 46 (citing ages fifteen and over, with no upper age limit).

[248] South v. Maryland *ex rel.* Pottle, 59 U.S. 396, 402 (1855); POTTER, *supra* note 190, at 243.

[249] *See e.g.*, PULTON, *supra* note 152, at 29a.

EXHIBIT 23
0811

conscription into the U.S. military[250] and into the statutory militia of the United States.[251]   On the other hand, the *Virginia Military Institute* case forbids women being excluded from state military service and training unless the exclusion has an "exceedingly persuasive justification."[252] Moreover, posse members will be assisting state or federal law enforcement officers, and these days, many such officers are female.  Given that women are universally recognized as capable of serving as sworn law enforcement officers, it seems difficult to argue that any inherent characteristics of women in general disable them from being able to participate in a posse.  At the least, the authority of a twenty-first century American sheriff to choose to accept female volunteers in the *posse comitatus* seems incontestable.  As for the number of persons which a sheriff or other authorized official may summon, the decision is entirely up to that officer.[253]

## G. ARMS OF THE *POSSE COMITATUS*

Because the sheriff must keep the peace, it is axiomatic that he "may lawfully beare armour or weapons."[254]  Because the sheriff and his officers may lawfully bear armour or weapons, so may his *posse comitatus*.[255] Thus, persons summoned to the *posse comitatus* "may take with them such Weapons as shall be necessary to enable them effectually to do it . . . ."[256] The posse member must bring not only arms, but also whatever other instruments, such as automobiles, are necessary for service, as Justice

---

[250] *See generally* Rostker v. Goldberg, 453 U.S. 57 (1981) (upholding men-only draft registration as not violating the Equal Protection standards of the Fifth Amendment's Due Process Clause).

[251] 10 U.S.C §§ 310–311 (2012).

[252] United States v. Virginia, 518 U.S. 515, 524 (1996) (citing Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)).

[253] DALTON, *supra* note 23, at 136a–136b; LAMBARDE, *supra* note 152, at 233 (Book I, ch. 22) ("And it resteth in the discretion of the Justices [of the Peace] and Shirife or Undershirife how many, or, how fewe, they will have assist them . . . ."); PULTON, *supra* note 152, at 29a ("[S]aid Justices [of the Peace] and Shirife may take so many to assist them as they thinke good to arrest the offenders, and to cary them to the Gaole."); WEBB, *supra* note 113, at 252 ("of such a Number in his Discretion shall appear necessary").  Dalton noted a case in which a sheriff's bailiff in order to execute a replevy "tooke with him three hundred men armed (*modo guerino*) with Brigandines, Jacks, and Gunness, and it was holden lawfull." DALTON, *supra* note 23, at 136b; DALTON, *supra* note 105, at 314.  The case was cited by many subsequent commentators.

[254] Statute of Winchester, 1285, 13 Edw. 1, stat. 2; Patton v. State, 86 S.W.2d 774 (Tex. Crim. App. 1935); DALTON, *supra* note 105, at 31; *see also* WEBB, *supra* note 113, at 294 ("In the Execution of his Office he may arm himself, and his Assistants, with Arms offensive and defensive . . . .").

[255] DALTON, *supra* note 23, at 14b.

[256] *Id.* at 136b; HAWKINS, *supra* note 150, at 161; *see also* CROMPTON, *supra* note 161, at 62.

**EXHIBIT 23**
**0812**

Benjamin Cardozo explained in 1928.[257]   However, the person who is summoning the posse has "discretion" as to "how many, or few, they have to attend them in their business, and in what form they shall be armed, weaponed, or otherwise furnished for it."[258]

As will be detailed below, Colorado sheriffs' policies for posse armament vary depending on the circumstances and the exigencies of the situation.   Usually, Colorado posses are used in situations where advance planning and training are possible.   Sometimes, the sheriff prefers that they not be armed, as when providing gate security at a county fair.   Other sheriffs might allow posse members in such a situation to carry a handgun if the person has a concealed handgun carry permit; the posse member would simply carry whatever handgun he or she usually carries for lawful protection.   At other times, posses are deployed in higher-risk environments.   These trained members may be called upon, for example, to assist in the service of high-risk warrants, or in a hostage siege.   For such posse members, the sheriffs' policies may be prescriptive about particular arms to be carried.   Finally, there are situations in which the citizens of a county may need to provide assistance on an ad hoc basis in an emergency, such as the manhunts for the escaped serial killer Ted Bundy or for the murderers of the Hinsdale County Sheriff.[259]   Then, the citizens simply bring whatever arms they happen to own.

As a general policy, it is often best when posse members have the same types of firearms as those carried by a full-time certified sheriff's deputy.   Having similar arms means that in an emergency, the firearms, magazines, and ammunition are interchangeable.   For example, if a deputy runs out of ammunition, a posse member can quickly provide a fresh magazine that will fit the deputy's gun.

Broadly speaking, compatibility with American law enforcement firearms would mean the following:

- For handguns, a full-size (not compact or subcompact)[260] semiautomatic pistol in the calibers of 9mm, .40, or .45, made by a reputable manufacturer

---

[257] "A person, who, after having been lawfully commanded to aid an officer in arresting any person, or in re-taking any person who has escaped from legal custody, or in executing any legal process, willfully neglects or refuses to aid such officer is guilty of a misdemeanor."   Babington v. Yellow Taxi Corp., 164 N.E. 726, 727 (N.Y. 1928) (citing Penal Law (Consol. Laws, c. 40) § 1848.).

[258] DALTON, *supra* note 23, at 136b; DALTON, *supra* note 105, at 101, 313.

[259] *See infra* Parts III.A.1 and III.A.2.

[260] For modern semiautomatic handguns, typical barrel lengths are about three inches up to five or six inches. Some grips can accommodate all four fingers, while some can only fit three fingers. The longer barrels and a full-hand grip would characterize a full-size handgun. A three-inch barrel for a three-finger grip would be a subcompact. The dividing lines between full, compact, and subcompact do not have formal definitions.

EXHIBIT 23
0813

such as Smith & Wesson, Glock, or Ruger.  Some sheriffs' offices may use a standardized .40 caliber only.

- The magazines for such firearms generally hold up to twenty or twenty-one rounds in 9mm, up to sixteen rounds in .40, and up to thirteen in .45 caliber. A sheriff's office may or may not allow the use of extenders to add one to three rounds of ammunition capacity.

- A person should carry at least two spare magazines.[261]  For rifles, an AR-15 platform semiautomatic rifle in .223 or .308 caliber.

- For the rifle, a magazine of twenty or thirty rounds, although a few allow the choice of ten.

- For shotguns, a pump-action shotgun, most commonly the Remington 8700, at least two spare magazines of the same size.[262]

The above are not the firearms of tactical officers such as "SWAT" or "emergency services."  These special teams often use machine guns, stun grenades, and the like.  Rather, the aforesaid arms such as the 9mm handgun or the AR-15 rifle are the typical firearms of an ordinary deputy on road patrol, ready to face a wide variety of possible situations.

### III. COLORADO SHERIFFS AND THEIR POSSES

This Part describes the use of *posse comitatus* in modern Colorado. Most of the materials presented are based on interrogatory and document production discovery responses from sheriffs' offices in the case of *Colorado Outfitters Association et al. v. Hickenlooper*.[263]  In that case, fifty-five of Colorado's sixty-two elected county sheriffs, as well as other plaintiffs, have filed a federal civil rights lawsuit against two gun bills passed by the Colorado legislature in March 2013.  The plaintiffs contend

---

[261] Nationally, 100% of sheriffs' offices authorize sworn personnel to use a semiautomatic handgun as the primary duty sidearm; 22% allow the choice to use a revolver instead.  For a backup weapon, the semiautomatic pistol is authorized by eighty percent, and the revolver by 52%.  ANDREA M. BURCH, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, NO. NCJ 238558, SHERIFFS' OFFICES, 2007—STATISTICAL TABLES, 13 (2012) (Table 28).

[262] The above is based on the author's experience based on representing law enforcement and law enforcement training organizations in numerous cases, including as amici in *District of Columbia v. Heller* and *McDonald v. Chicago*, and on the author's participation as an instructor at the annual meetings of the International Law Enforcement Educators and Trainers Association (ILEETA).  Information about modern American law enforcement choices for firearms can be found at the ILEETA website, http://www.ileeta.org, the website of the International Association of Law Enforcement Firearms Instructors, http://www. ielefia.com, the websites of the many state associations of law enforcement firearms instructors, and the products page of the law enforcement news website PoliceOne.com, http://www.policeone.com/police-products/firearms/.

[263] *See* text accompanying notes 284–318.

**EXHIBIT 23**
**0814**

that the bills violate the Second Amendment, the Fourteenth Amendment, and the Americans with Disabilities Act.[264]  I am the attorney for the fifty-five sheriff plaintiffs and for one retired police officer.[265]

This Part first provides the definitions and legal standards for various types of peace officers in Colorado.  Section A then details some modern uses of the *posse comitatus* in Colorado during crime emergencies.  The remainder of Part III describes a relatively new development in the *posse comitatus*: sheriffs using a posse of trained volunteers on a regular basis.  Section B briefly describes volunteer posse use for routine non-crime situations, such as providing security at a parade or fair.  Section C summarizes how Colorado sheriffs use their trained posses for violent crime control.  Finally, Section D describes a civic organization called the Colorado Mounted Rangers, whose members train to high standards, and who make themselves available as *posse comitatus* to the twenty-eight law enforcement agencies with whom they have memoranda of understanding.  Sheriffs and other chief law enforcement officers call out the Colorado Mounted Rangers during fire emergencies and in many other situations.

Let us begin by describing some terms for persons who serve Colorado in law enforcement.  Most states have analogous statutes or rules.  A "certified" or "sworn" officer is a person who has completed a certain number of hours of training pursuant to the statewide standards for Peace Officer Standards and Training (POST).  The training may be provided by law enforcement offices themselves, by community colleges, or by some other institution.  A person who has completed the course of instruction and passed a test thereon is eligible to be hired as a full-time certified peace officer.  A person who completes a shorter course of training is eligible to be a "reserve" officer.  Reserve officers typically serve as volunteers for a local law enforcement agency and are called to duty as necessary.  Reserve officers are "peace officers" for all legal purposes in Colorado.[266]

---

[264] Plaintiff's Trial Brief at Civil Action No. 13-CV-1300-MSK-MJW, *Colorado Outfitters Ass'n. v. Hickenlooper*, (D. Colo. Mar. 14, 2014), *available at* http://coloradoguncase.org/Colorado-Outfitters-plaintiffs-pretrial-brief.pdf, *archived at* http://perma.cc/7U7E-HBT7.

[265] The major filings in the case are available at http://www.ColoradoGunCase.org.  A nine day trial in the case concluded on April 9, 2013, and District Judge Marcia S. Krieger ruled against the plaintiffs on June 26, 2014.  In November 2012, the District Court had ruled that the "political subdivision doctrine" precludes standing for the sheriffs in their official capacities.  The court allowed eleven sheriffs who will be retiring in January 2015 to join the suit in their individual capacities as American citizens.  The case is presently on appeal to the Tenth Circuit, including on the sheriff standing issues.

[266] COLO. REV. STAT. §§ 24-31-301, 24-31-305 (2013).  The minimum number of required hours for full Peace Officer Standards and Training certification in Colorado is 540; however, all the programs include many more hours than that. For the reserves, a minimum

EXHIBIT 23
0815

By the practices of all Colorado sheriffs' offices, every full-time deputy who is engaged in dealing with the general public (e.g., road patrol, detective work, undercover) will be a POST-certified officer who has passed a 1,500-hour course. These full-time employees may sometimes be supplemented by volunteer reserve officers. By Colorado statute (and by common law), sheriffs have the authority to hire and fire whomever they like, and to summon posses.[267] Unlike in a municipal police department, sheriffs' deputies are not part of the civil service and do not engage in collective bargaining.

Based on available manpower, sometime sheriffs hire "noncertified" full-time deputies for more limited roles. The most common such role is being a jail deputy ("detention deputy").[268] Other duties include providing security at courts and for the transport of prisoners, and in special situations, such as guarding a trial witness or a victim who has received death threats.

Not all jail deputies carry firearms, while deputies in these other roles typically do. Any deputy (whether certified or noncertified) who carries a firearm must periodically "qualify" with the firearm. That is, the deputy must pass a firearms shooting proficiency test. All offices require qualification before first using a gun; some offices require requalification annually and others require it several times a year. The particular form of the shooting qualification test and the required score are determined by the sheriff or by a deputy to whom he or she delegates the standard-setting. Some offices provide noncertified deputies with firearms; some offices allow or require deputies to provide their own firearms. Some offices have rules that allow noncertified deputies to carry guns depending on the deputy's experience or other factors.

At least seventeen county sheriffs' offices have organized posses, composed of citizen volunteers.[269] Some posse members are certified reserve peace officers, but most are not. All posse members are trained by

---

of 253 hours of training is required. Telephone conversation with Sarah J. Bouma, Operations Assistant, Independence Institute, and Lori Jencks, Administrative Assistant for Colorado POST (June 11, 2014).

[267] COLO. REV. STAT. §§ 16-2.5-103(2), 30-10-506 (2013).

[268] *See, e.g.*, Pl.'s Resp. to Def.'s Interrog. No. 4 (James L. Beicker, Sheriff of Fremont County).

[269] Counties with posses include Adams, Alamosa, Baca, Custer, Grand, Hinsdale, Larimer, Lincoln, Logan, Mesa, Montezuma, Montrose, Morgan, Prowers, Rio Blanco, Teller, and Weld. *See* Section A, *infra*. Of these, the most populous are Adams County (460,000), Larimer County (310,000), Weld County (264,000), and Mesa County (148,000). These four counties comprise over one-fifth of the Colorado population. *State & County Quick Facts, Colorado*, U.S. CENSUS BUREAU (Mar. 27, 2014), http://quickfacts.census.gov/qfd/states/08000.html, *archived at http://perma.cc/B7XJ-Q8J9*.

EXHIBIT 23

0816

the sheriff's office and are required to follow regulations promulgated by the sheriff. Posses perform a wide range of duties based on the determination of the sheriff. For posse members who are allowed to carry firearms, they are almost always required to pass the same firearms qualification as full-time deputies, and they have usually been given firearms training by the sheriff's office.

The organized and trained posse is an important development in the story of the *posse comitatus*. A sheriff's *posse comitatus* authority, from Anglo-Saxon England to the modern United States, includes the authority to summon all able-bodied men. In modern Colorado, sheriffs have used only volunteers for their posses. Further, while there have sometimes been emergencies when a brand new posse is assembled (e.g., the incidents in Pitkin County, Hinsdale County, and Rio Blanco County[270]), the more common practice is that the posse volunteers are a particular group of individuals who have volunteered and undergone training and now assist the sheriff's office in a wide variety of ways. The need for assistance is sometimes known in advance (e.g., gate security at the county fair), or it may arise suddenly (e.g., a hostage situation or a wildfire). Regardless, the possemen and possewomen who assist in such situations are people who have previously come forward to volunteer for long-term service in the posse and who have received training appropriate for their duties.

Universally, the only rifle or handgun ammunition allowed is jacketed hollowpoint cartridges. The copper jacket surrounding a lead bullet reduces lead fouling in the firearm, and thereby reduces the risk of misfeeds or malfunctions. Hollowpoint bullets are designed to open up when they impact the target. This substantially reduces the risk that the bullet might overpenetrate (exit the target) and thereby endanger an innocent bystander. Because hollowpoints do not exit the target, all their kinetic energy is expended in the target. This significantly increase the possibility of delivering a "fight-stopping hit" that makes the target unable to inflict injury on whomever is being threatened.[271]

As will be described below, in addition to the posses organized by a particular sheriff's office, there is a statewide civic organization called the Colorado Mounted Rangers. The Rangers are ordinary citizens who train themselves to very high standards (in accordance with the POST curriculum). They have memoranda of understanding to provide aid to local law enforcement agencies upon request; that aid may include

---

[270] *See infra* text accompanying notes 272–86.

[271] Joshua F. Berry, *Hollow Point Bullets: How History Has Hijacked Their Use in Combat and Why It Is Time to Reexamine the 1899 Hague Declaration Concerning Expanding Bullets*, 206 MIL. L. REV. 88, 137–42 (2010).

EXHIBIT 23
0817

everything from crowd management at a parade to backcountry search and rescue. Many but not all of the Rangers are armed. They carry the same handguns and rifles as described in the preceding paragraphs.

Finally, there are sometimes situations in which the sheriffs need to call upon the armed assistance of whatever armed citizens may be available in an emergency. Such situations range from manhunts to securing a burglarized building to deterring looting after a natural disaster. Specific details of all the above situations are described in the next Section.

## A. *POSSE COMITATUS* IN CRIME EMERGENCIES

### *1. Pitkin Sheriff's Office*

Ted Bundy was perhaps the most notorious serial killer in American history. Before his execution in 1989, he confessed to thirty murders, which were often accompanied by rape and torture of the victims.[272] On June 6, 1977, Bundy jumped out a courthouse window during a break in a preliminary hearing at a state court in Aspen, Colorado.[273] A posse was immediately assembled. As one author observed, "[t]he men who tracked Ted Bundy looked like something out of a Charles Russell or Frederick Remington painting, garbed in Stetsons, deer-skin vests, jeans, cowboy boots, and carrying sidearms. They could have been possemen of a century earlier, looking for Billy the Kid or the James boys."[274] Some "[p]ossemen in high-country rigs and on horseback started up the mountain roads around Aspen that afternoon . . . ."[275] Other "deputies and volunteers made a house-by-house search" through Aspen.[276] By June 10, the FBI had joined the manhunt. The number of other searchers (certified law enforcement plus the posse) had declined from 150 to 70, given the feeling that Bundy was by then long gone from Pitkin County.[277]

Bundy, in the meantime, had broken into a mountain cabin in Castle Creek (just south of Aspen), and stolen some clothing and provisions.[278] His effort to head south to get to U.S. Highway 50 was cut off by the snowpack that remained in the high mountains even in the late spring. On June 10, he headed back to the Castle Creek cabin, but saw that the posse

---

[272] This is the one incident in Part III for which the information was not produced as a result of sheriff responses to discovery in the Colorado sheriffs' case. The Pitkin County Sheriff is one of seven elected Colorado sheriffs who did not file suit as a plaintiff.

[273] RICHARD W. LARSEN, BUNDY: THE DELIBERATE STRANGER 179–82 (1980).

[274] ANN RULE, THE STRANGER BESIDE ME 219 (2000).

[275] LARSEN, *supra* note 273, at 182.

[276] RULE, *supra* note 274, at 219.

[277] *Id.* at 220.

[278] *Id.* at 221.

**EXHIBIT 23**
**0818**

was already there.[279]  He snuck away, hungry and exhausted, suffering from the broken ankle that had resulted from his jump out of the courthouse window.[280]  After a night in the cold wilderness, Bundy found a Cadillac with the keys in the ignition.  By 2 A.M. on June 13, he was driving down Colorado Highway 82 on his way to Interstate 70, and from there, to a completed escape.[281]  But he was so exhausted he drove poorly, weaving around the road.  Some deputies on road patrol stopped the apparently drunk driver and immediately recognized that they had just apprehended Ted Bundy.[282]

A return to the Castle Creek cabin with its food and shelter would have restored some of Bundy's energy, perhaps sufficiently so that he would have been able to drive the stolen car without attracting attention to himself. Had he made good on the final step of his escape, more young women would very likely have been the next victims of the serial killer.  Bundy escaped again on December 30, 1977, and he was not recaptured until February 12, 1978, in Pensacola, Florida.  In the interim, he had murdered three women.  Thus, the posse's success in thwarting his June 1977 escape very likely saved innocent lives.

### 2. Hinsdale Sheriff's Office

Hinsdale County is the most remote county in the lower forty-eight states and "contains some of the most rugged mountains in Colorado."[283] As detailed *infra*, the Hinsdale County Sheriff's Office has a regular posse with trained volunteers.  But on one occasion, a much larger posse was needed.  Hinsdale Sheriff Ron Bruce described the events in that county of November 1994 in a series of answers to interrogatories.[284]

In 1994, Hinsdale Sheriff Roger Coursey was short-staffed.  In fact, he was the office's only law enforcement officer.  Not long before, there had been much upheaval in the Sheriff's Office, with the former sheriff and undersheriff having been indicted by the U.S. Attorney for illegal electronic surveillance.  The Board of County Commissioners appointed Deputy Roger Coursey Sheriff in August 1994.  He was elected to a four-year term that November.

---

[279] *Id.*

[280] *Id.*

[281] *Id.*

[282] *Id.* at 221–22.

[283] John Duer Irving & Howard Bancroft, *Geology and Ore Deposits near Lake City, Colo.*, U.S. GEOLOGICAL SURVEY BULLETIN 478, at 10 (D.C.: G.P.O. 1911).

[284] All information in Subsection 2 is taken from Pl.'s Resp. to Def.'s Interrog. (Ron Bruce, Sheriff of Hinsdale County).

EXHIBIT 23
0819

Sheriff Coursey reached out for the best help he could find in the most thinly populated county in Colorado. Ray Blaum was a retired Air Force Lieutenant Colonel and was willing to serve. Mr. Blaum was appointed Undersheriff and became a salaried employee of the Hinsdale County Sheriff's Office. Mr. Blaum was not POST-certified. For a duty sidearm, Mr. Blaum used a Beretta semiautomatic pistol, which he already personally owned.

At about 5:35 A.M. on the morning of November 18, 1994, the Sheriff's Office received a phone call from the Mineral County Sheriff's Office: there had been an attempt to break into a bank in Creede. The bank manager had observed a light colored pick-up truck with a camper shell fleeing north on Highway 149, towards Lake City, the only incorporated municipality in Hinsdale County. Sheriff Coursey and Undersheriff Blaum got into their respective patrol cars and drove to Highway 149. The robbers' vehicle was stopped shortly before 5:50 A.M. near Highway 149, in the driveway of the Alferd Packer Massacre Site.

Sheriff Coursey and Undersheriff Blaum took positions outside the robbers' vehicle. They ordered the suspects (one male and one female) to exit the vehicle. The male suspect fired one shot with a .44 revolver, killing Sheriff Coursey nearly instantly. As the vehicle fled, Undersheriff Blaum emptied the thirteen rounds of his Beretta semiautomatic towards the vehicle. Apparently he had loaded the Beretta with a short stack. Instead of having the full capacity of seventeen rounds in the magazine, plus one in the firing chamber, the gun had only twelve rounds in the magazine plus one in the chamber.

In a report immediately thereafter, Undersheriff Blaum described his shots as having "no apparent effect." In fact, all thirteen shots hit the truck. Most of the shots were absorbed by the camper shell, protecting the suspects inside the cab. But at least one shot hit a tire. The truck was abandoned within a couple miles of the scene of the crime.

The trail of the suspects' footprints in the snow, leading away from the truck, ran out after four and one-half miles when it intersected a dirt road. Bloodhounds attempted to follow the scent, but never succeeded. During the manhunt for two suspects, over one hundred local citizens were sworn in to assist the approximately two hundred law enforcement officers in conducting the search. Regarding the latter, Gunnison County Sheriff Rick Murdie and Gunnison Chief of Police Stu Ferguson were a significant help.

During this time, almost everyone in Lake City was carrying one kind of gun or another and usually more than one. Several hundred buildings and the surrounding land mass was searched without any report of a single shot being fired. There is no information on the firearms and magazines since they ran the gamut of nearly everything available at the time.

**EXHIBIT 23**
**0820**

After the manhunt had gone on for a month, on December 17, 1994, the suspects were both found dead not far from their abandoned truck. They had killed themselves not long after the crime, when they failed their attempt to climb the treacherously steep mountain. Their bodies were concealed underneath the low branches of a tree. Given the location of the bodies, the suspects had likely seen that the manhunt was in progress. Undersheriff Blaum's shot to the tire had ended the suspects' multistate crime spree, which had begun in Provo, Utah, on June 21. The murderer, Mark Allen Vredenburg, had been a career criminal; his accomplice, Ruth Slater, an extreme alcoholic and abuser of prescription drugs. Vredenburg had used the revolver to kill Ruth Slater and then himself.[285]

The large citizens' posse aided in preventing the murderers from escaping. Given that there were two people at large who were apparently ready to kill, it would have been foolish for individuals to go out on a manhunt alone or even in pairs. The searchers had to operate in groups, so the armed citizen volunteers significantly increased the number of groups that could be in the field.

We will never know exactly how the killers perceived their tactical situation at the end, but it is reasonable to infer that the presence of so many groups of armed searchers in the field made it clear to the killers that there was no possibility of sneaking out through any accessible path, and no possibility of shooting their way past so many armed people. Accordingly, the killers determined that their only possibility of escape was to climb a very steep mountain under difficult winter conditions. When this proved impossible, the killers committed suicide.

### 3. Rio Blanco Sheriff's Office

Sheriff Si Woodruff recounted Rio Blanco County's experience with posse use.[286] On September 8, 2003, two men in a stolen car fled on foot from a traffic stop. The Sheriff deputized two individuals to assist the nighttime manhunt, allowing the deputies to get some rest. The posse members were previously known to the Sheriff's Office as very experienced

---

[285] Newspaper articles about the events include: Michael Booth, *Sheriff's Killers Left Note*, DENVER POST, Dec. 23, 1994, at 1B; Charlie Brennan, *Pair Sought in Slaying of Sheriff*, ROCKY MOUNTAIN NEWS, Nov. 19, 1994, at 6A; *Colorado Sheriff Killed in Pursuit*, FRESNO BEE, Nov. 20, 1994; Fawn Germer, *Grisly Discovery Lifts Burden*, ROCKY MOUNTAIN NEWS, Dec. 19, 1994, at 5A; Greg Lopez, *The New Sheriff*, ROCKY MOUNTAIN NEWS, Dec. 11, 1994, at 16A; *Mountain Avenges Sheriff*, NEW ORLEANS TIMES PICAYUNE, Dec. 20, 1994; Marilyn Robinson et al., *Sheriff's Killers Hunted*, DENVER POST, Nov. 19, 1994, at 1A; Tracy Seipel, *Dogs Sniffed out Suspects*, DENVER POST, Dec. 19, 1994, at 1A.

[286] All information in Subsection 3 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Si Woodruff, Sheriff of Rio Blanco County).

EXHIBIT 23
0821

pistol and rifle shooters.  They had had Glock .40 handguns, AR-15 rifles, shotguns, and perhaps other arms.  They joined the Sheriff's Office in an Office vehicle, assisting with patrol of the highway and operating the thermal vision camera.  Both suspects were apprehended with no shots fired.

### 4. Jackson Sheriff's Office

Sheriff Scott Fischer reported that an armed posse was used after a jailbreak in September of 2003 or 2004, where the inmate fled to the town limits of Walden.[287]

### 5. Larimer Sheriff's Office

Erik Nilsson, presently an employee of the Sheriff's Office, recalled being deputized for *posse comitatus* service following the July 31, 1976, Big Thompson River flood.[288]  At the time, Mr. Nilsson was a civilian member of the Larimer County Mountain Rescue Team.  On August 4, 1976, he was transported by helicopter to the small town of Drake, which is located in a canyon.  He acted as a visible law enforcement presence to maintain order and deter looting, and carried a loaded firearm.

In late June and early July 2012, during the High Park fire, Sheriff Justin Smith was prepared to use *posse comitatus* to provide armed security in evacuated areas, because the Colorado National Guard had to demobilize before the fire was fully contained.  However, the weather changed quickly and the fire was contained before armed citizens were necessary.

During the September 2013 floods and aftermath, Sheriff Smith exercised *posse comitatus* authority on three occasions.  On September 14, he deputized members of the Glenhaven Volunteer Fire Department to provide protection to the firefighters or the citizens of that community.  On September 18, he deputized fire department personnel present in the Storm Mountain community above Drake.  Later that day, he deputized a citizen who was assisting a Colorado State Trooper (who was a trapped resident of the neighborhood).

The *posse comitatus* deputizations were used because of concerns about the risk of looting and other disorder.  The *posse comitatus* members had full authority to carry firearms in the performance of those duties as they saw necessary.

---

[287]  Pl.'s Resp. to Def.'s Interrog. (Scott Fisher, Sheriff of Jackson County).
[288]  All information in Subsection 5 is taken from Pl.'s Resp. to Def.'s Interrog. (Justin Smith, Sheriff of Larimer County).

**EXHIBIT 23**
**0822**

*6. Morgan Sheriff's Office*

Sheriff Jim Crone recalled that when he was a deputy:

I was involved in a specific incident in March of 1985 where I was in pursuit of a stolen vehicle from Texas. The vehicle left the roadway and went cross-county into Adams County, and we were unable to pursue due to having no four-wheel drive vehicles. A local rancher offered himself and his pickup so he and I could follow the vehicle's tracks through the snow (in the middle of a blizzard at night). Locating the pickup, the rancher pursued it back into Morgan County.

We went across country for several minutes and went back into Adams County. After the stolen pickup rammed us and I fired a shot into the front of the pickup, it stopped shortly thereafter. I gave the rancher my shotgun and had him cover me while I arrested both occupants of the pickup. The rancher fired no shots but stood armed, in view of the suspects, as my backup. I made the arrests alone in a remote area in which road signs were covered with snow and my radio could not reach out to the other cars looking for us.[289]

While citizen assistance in chases of suspects is rare, Sheriff Crone also noted the more common scenarios in which armed citizens,

usually local farmers or ranchers, back us [sheriffs] up when involved with a combative suspect, a felony stop, or a crime in progress. In these instances, the citizens had told us they had ready access to a firearm (inside the house, vehicle, or on their person), if so needed.

When searching a private residence or a business where a burglar alarm has gone off, I have had instances where an armed home/business/property owner has accompanied me while armed with a handgun, when I had no backup close at hand.

So when Sheriff Crone is the only law enforcement officer at crime scenes and has to clear a building, not knowing whether he will encounter violent criminals waiting to ambush him, he has been backed up by citizens armed with their personal handguns.

B. *POSSE COMITATUS* IN LOW-RISK SITUATIONS

The posse of the Weld County Sheriff's Office is divided into various classes, depending on whether the posse member is a POST-certified Reserve officer, and on whether the posse member can provide his or her own horse.[290]

The large majority of posse members who are not POST-certified do not carry firearms while on duty, although there is a "Special Deputy"

---

[289] All information in Subsection 6 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Jim Crone, Sheriff of Morgan County).

[290] Pl.'s Resp. to Def.'s Interrog. No. 3 (John Cooke, Sheriff of Weld County).

EXHIBIT 23
0823

program to allow a few of them to do so.[291]  The situations in which the unarmed posse members assist the sheriff's office include:

> The Greeley Independence Stampede, The Farm Show, The County Fair, and The Cattle Baron's Ball.  Other miscellaneous events they assist with include United Way events, Pheasants Forever, sporting events, UNC Graduation, Rocky Mountain Senior Games, community celebrations, assisting other agencies when needed, Ducks Unlimited, election security, school events, Law Enforcement and Military memorial ceremonies, National Drug Take Back day, children's safety events, and Santa Cops.[292]

These events are typical of the event security provided by posse members throughout Colorado.

## C. TRAINED *POSSE COMITATUS* IN FORCIBLE LAW ENFORCEMENT SITUATIONS

Below are descriptions of how some sheriffs' offices have used or considered using armed posses on a regular basis.

### *1. Alamosa County Sheriff's Office*

Posse members assist the day-to-day operation of the Alamosa County Sheriff's Office.[293]  After training provided by the office and after passing a qualification test, posse members are required to carry firearms.  Posse members provide their own firearms.

### *2. Baca County Sheriff's Office*

The posse is typically comprised of twelve-to-twenty volunteer members, and, at the time of answering the interrogatories, had fifteen members.[294]

> The Baca County Sheriff's Posse's primary purpose is to support the Baca County Sheriff's Office during large public events, natural disasters, and incidents where the Baca County Sheriff's Office alone may be unable to provide the level of security or safety the public requires.  The Baca County Posse most frequently assists in yearly road closures for winter storms requiring manned road closures and during road closures due to large-scale fires.  During these events, their goal is to keep the public out of the area and provide scene security . . . .  Posse members are required to be armed, and they provide their own firearms.

---

[291] *Id.*; Cooke's Dep. 218:20–220:5, Oct. 23, 2013.

[292] Pl.'s Resp. to Def.'s Interrog. No. 3 (John Cooke, Sheriff of Weld County).

[293] All information in Subsection 1 is taken from Pl.'s Resp. to Def.'s Interrog. No. 4 (Dave Stong, Sheriff of Alamosa County).

[294] All information in Subsection 2 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Dave Campbell, Sheriff of Baca County).

**EXHIBIT 23**
**0824**

### 3. Custer County Sheriff's Office

The Custer County Sheriff's Office posse was established April 2, 2003. "The posse assists with parades, traffic control, crowd control, road closures, searches, inmate transfers and detention detail."[295] It has also assisted with searches for escaped inmates, fugitives, or missing persons; with watching inmates; in searches and in the service of search warrants; in a hostage situation; in drug surveillance of a house; and in guarding the home of a teacher who had received death threats. There is a limit of forty members, and currently twenty-five are certified to carry handguns, while sixteen are additionally certified to carry shotguns. Posse members receive firearms training from the Custer County Sheriff's Office; they are not required to be POST-certified.

### 4. Delta County Sheriff's Office

"After the 9-11 terrorist attacks [the Delta County Sheriff's Office] considered deputizing non certified personnel to provide security for infrastructure in our county, mines, railroad, dams, etc." This was not acted upon.[296]

### 5. Douglas County Sheriff's Office

As of 1975, the office had a posse and a special deputies program.[297] Members would provide backup on a call when needed (especially at night); assist with search and rescue (notably, on horseback in the mountains); or provide security at events. They provided their own firearms, vehicles, horses, and so on. The most common firearms were .38 or .357 revolvers. The programs were dissolved during the administration of Sheriff Zotos (1983–2002).

### 6. Elbert County Sheriff's Office

The posse was removed by the previous Sheriff of Elbert County and has been restored by the current Sheriff.[298] Posse members serve as a force multiplier for the Office.[299] For example, they have guarded the scenes of the small plane crashes.[300] At present, the posse has been trained and

---

[295] All information in Subsection 3 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Fred Jobe, Sheriff of Custer County).

[296] Pl.'s Resp. to Def.'s Interrog. No. 4 (Fred McKee, Sheriff of Delta County).

[297] All information in Subsection 5 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (David Weaver, Sheriff of Douglas County).

[298] Heap Dep. 99:2–6, Oct. 16, 2013 (Shayne Heap, Sheriff of Elbert County).

[299] *Id.* at 99:12.

[300] *Id.* at 102:6–16.

EXHIBIT 23
0825

qualified in the Office's use of force practices for everything except firearms. The Sheriff expects to issue new policies providing for the training, qualification, and use of firearms by the posse.[301]

### 7. Hinsdale County Sheriff's Office

Currently, the Hinsdale County Sheriff's Office receives armed volunteer services from six men who are not POST-certified. Two of them are retired Air Force Colonels.[302] The volunteers get the same in-house training as do the sworn office staff. All of the Hinsdale County Sheriff's Office volunteers are encouraged to carry a firearm when in the field; they are required to have completed a concealed handgun permit class and qualification. Some Hinsdale volunteers have been issued patrol carbines with either a thirty or sixty round magazine; sometimes "they have provided their own carbine with the same capacity magazines." The Office trains "with standard capacity magazines for our carbines and select-fire firearms, up to and including sixty-round magazines." "Most [non-sworn staff] also personally own such firearms, including select-fire firearms (BATFE licensed)."

### 8. Kiowa County Sheriff's Office

The Kiowa County Sheriff's posse is used for search and rescue, traffic control, and to man road closure sites.[303]

### 9. Lincoln County Sheriff's Office

The Lincoln County Sheriff started a posse in 2007 for events, evidence searches, and missing person searches.[304] There are currently twenty members. The posse has also been deployed for gate security at the annual Lincoln County Fair. Posse members are authorized for ride-alongs with certified deputies. Posse members are allowed, but not required, to carry a handgun (of the same types authorized for sworn deputies) if the posse member has been through concealed carry training. Additional training for them is available through a simulator.

---

[301] *Id.* at 97:8–101:22

[302] All information in Subsection 7 is taken from Pl.'s Resp. to Def.'s Interrog. No. 4 (Ron Bruce, Sheriff of Hinsdale County).

[303] Pl.'s Resp. to Def.'s Interrog. No. 3 (Forest Frazee, Sheriff of Kiowa County).

[304] All information in Subsection 9 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Tom Nestor, Sheriff of Lincoln County).

**EXHIBIT 23**
**0826**

### 10. Logan County Sheriff's Office

Created in approximately 1960, the Logan County Sheriff's posse currently has fifteen members.[305]   The posse's duties are to perform "security for local sports activities, county fair, occasional medical security on an inmate, or any other duties assigned to them by the sheriff.  They are required to go through firearms training and qualify quarterly."  The current captain is a certified peace officer who is not an employee of the county.

### 11. Montezuma County Sheriff's Office

Created in 1968, the Montezuma Sheriff's posse currently has twenty-nine members and assists the office with law enforcement and search and rescue missions.[306] They also provide security for community events, guard crime scenes, and have also assisted with court security and the transportation of inmates.  Posse members may carry a firearm as permitted or required by the sheriff.  Each posse member must complete a mandatory basic firearms training course and a qualification test.  They furnish their own firearms in accordance with office standards.[307]

### 12. Morgan County Sheriff's Office

At present, the posse has one member, who does not carry a firearm.  He assists deputies directing traffic at accident scenes, handcuffing a suspect when ordered by a deputy, and so on.  The Sheriff is in the early stages of a creating a new policy which would enlarge the posse and would allow posse members to carry arms.[308]

### 13. Prowers County Sheriff's Office

The posse has fifteen members, four of whom are certified reserve peace officers, and eleven of whom are noncertified members.[309]  Posse members may be issued a Glock .40 handgun.[310]

### D. THE COLORADO MOUNTED RANGERS

Some armed citizens have long-running close relationships with the sheriffs to provide aid.  One such group is the Colorado Mounted Rangers

---

[305]  All information in Subsection 10 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Brett L.  Powell, Sheriff of Logan County).

[306]  All information in Subsection 11 is taken from Pl.'s Resp. to Def.'s Interrog. Nos. 3, 6 (Dennis Spruell, Sheriff of Montezuma County).

[307]  Pl.'s Resp. to Def.'s Interrog. No. 3 (Dennis Spruell, Sheriff of Montezuma County).

[308]  Pl.'s Resp. to Def.'s Interrog. No. 4 (Jim Crone, Sheriff of Morgan County).

[309]  Pl.'s Resp. to Def.'s Interrog. No. 4 (Jim Faull, Sheriff of Prowers County).

[310]  *Id.*

**EXHIBIT 23**
**0827**

(also known as the Colorado Rangers).[311]  The Colorado Mounted Rangers were founded in 1861 and for many decades were the only statewide law enforcement organization.[312]  They were recently recognized by state statute.[313]

The Colorado Mounted Rangers provide approximately 50,000 hours of community service during a typical year.  This amounts to a contribution of over $2 million of law enforcement resources, at no cost to the taxpayer.  They are an unpaid, volunteer organization.[314]  The Colorado Mounted Rangers currently have Memoranda of Understanding to provide support to numerous law enforcement agencies in Colorado.[315]

One of the important posse roles of the Colorado Mounted Rangers is aiding law enforcement officers during forest wildfires.  For example, in the summer of 2013, the Colorado Mounted Rangers provided forest roadblock support for the Douglas and Jefferson County Sheriffs' Offices during the Lime Gulch Fire.[316]  Likewise, in Fremont County, the Rangers have been used during four wildfires in the last decade to close roads and maintain roadblocks.[317]

---

[311] This Section is based on the deposition of Major Ronald Abramson, who is head of Training for the Colorado Mounted Rangers, and on documents produced by the Colorado Mounted Rangers.  Abramson Dep., Oct. 23, 2013.

[312] *Id.* at 7:19–23.

[313] COLO. REV. STAT. § 24-33.5-822 (2013) (specifically authorizing law enforcement agencies to enter into memoranda of understanding with the Colorado Mounted Rangers).

[314] *Colorado Mounted Rangers*, COLORADO MOUNTED RANGERS, https://www.coloradoranger.org/index.php/organization, (last visited May 26, 2014), *archived at* https://perma.cc/Z2XE-BA5V.

[315] *Id.*  **Sheriff's Offices** (SOs): Archuleta County SO, Crowley County SO, Douglas County SO, Fremont County SO, Kiowa County SO, La Plata County SO, Weld County SO; **Police Departments** (PDs): Ault PD, Durango PD, Elizabeth PD, Fairplay PD, Fort Lupton PD, Fowler PD, Green Mountain Falls Marshal, Manitou Springs PD, Rocky Ford PD, Salida PD, Windsor PD; **County Governments**: Adams County Office of Emergency Management, Teller County; **Municipal Governments**: Town of Bayfield, Town of Monument, Town of Ordway, Town of Palmer Lake; **Fire Protection and Other**: Canon City Area Fire Protection District, Community College of Aurora.  *Id.*

[316] Pl.'s Resp. to Def.'s Interrog. No. 6 (David Weaver, Sheriff of Douglas County).

[317] Fremont County Sheriff James L. Beicker stated:

Since January 1, 2004 I have requested the assistance of the Colorado Mounted Rangers "J Troop."  The majority of these individuals are not POST certified peace officers, but my understanding is that a few members of their organization are.

I have used their assistance on four wildfires in my county: Duckett Fire/ Park Fire/ Wetmore Fire/ Royal Gorge Fire.  On these incidents they were assigned to road closures, manning road blocks for evacuated areas.

They were allowed, but not required to carry firearms for this duty.  I have no documented evidence of who did carry or did not carry during these events.

The Fremont County Sheriff's Office has also utilized the J Troop Rangers for some

**EXHIBIT 23**
**0828**

The Rangers go deep into Colorado's twenty-four million acres of forest for fires, for search and rescue, and for other law enforcement tasks, where they are at risk of bear, mountain lion, and coyote attacks, and other extremely dangerous conditions.  Often, the Rangers are beyond any radio communication; their patrol rifle is their only protection.

The Rangers' firearm training is a modified version of the Colorado State Patrol Academy course.  Many of the Colorado Mounted Rangers, and especially the female Rangers, carry the Glock 17 or Springfield Armory XD 9mm pistols.[318]  As in most sheriffs' offices, the AR-15 type carbine with several magazines of thirty rounds is the standard patrol rifle for the Colorado Mounted Rangers.

## IV. *POSSE COMITATUS:* THE RIGHT—AND DUTY—TO KEEP AND BEAR ARMS

*Posse comitatus* is expressly part of the Constitution of Puerto Rico,[319] and understanding the *posse comitatus* aids in understanding the constitutions of the fifty states and of the federal government.  To most Americans of the nineteenth century, the Second Amendment had been easy to understand: a right of everyone to possess and carry arms, including firearms.[320]  The protection of that right ensured that there would be an

---

annual community events . . . .
Pl.'s Resp. to Def.'s Interrog. No. 6 (James L. Beicker, Sheriff of Fremont County).

[318] The Glock and Springfield 9mm handguns are very controllable for persons with smaller bodies.  Most female Rangers strongly prefer these handguns.  They have less recoil than larger-caliber handguns, and are thus easier for them to shoot accurately.  Because the 9mm cartridge is less powerful than larger calibers, greater magazine capacity is particularly important.  The Glock 17 has a standard seventeen-round magazine, while Springfields have standard magazines of sixteen or more rounds.

Many certified law enforcement officers, including certified deputies, also carry the Glock 17 9mm pistol.  Commonality of arms among full-time law enforcement officers and posse volunteers makes everyone safer, allowing interchangeability of magazines in a critical incident.  Transcript of Record at 861–64, Colo. Outfitters Ass'n v. Hickenlooper, No. 13-CV-1300-MSK-MJW (D. Colo. argued Apr. 3, 2014); Plaintiff's Response Brief to Defendant's Motion to Dismiss at 33–34, Cooke v. Hickenlooper (D. Colo. filed Aug. 22, 2013).

[319] CONST. P.R. art. IV, § 4 (explaining that governor may "call out the militia and summon the posse comitatus in order to prevent or suppress rebellion, invasion or any serious disturbance of the public peace"); *see also* HAWAIIAN ORGANIC ACT OF 1900, § 67 (Among the powers of the Territorial Governor are that "whenever it becomes necessary he may call upon the commanders of the military and naval forces of the United States in the Territory of Hawaii, or summon the posse comitatus, or call out the militia of the Territory to prevent or suppress lawless violence, invasion, insurrection, or rebellion in said Territory . . ."). 31 STAT. 153 (1900), 48 U. S. C. § 532 (1940).

[320] *See* David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359.

EXHIBIT 23
0829

armed people from whom a well-regulated militia could be drawn when necessary.[321] The Supreme Court's decision in *District of Columbia v. Heller*[322] accurately followed that understanding.

However, for several decades in the latter twentieth century, and a few years in the early twenty-first century, there was confusion about the meaning of the Second Amendment. Various theories were invented for the purpose of negating the individual right. A 1905 decision by the Kansas Supreme Court interpreted the right to arms in the Kansas State Constitution Bill of Rights as merely affirming the state government's own power over the militia.[323] In dicta, the Kansas court said that the Second Amendment meant the same thing.[324] This was the beginning of the "states' right" theory of the Second Amendment.[325] In 1968, the New Jersey Supreme Court announced that the Second Amendment was a "collective right."[326] The right belonged to all the people collectively, but could never be asserted by any individual.

In 1989, Dennis Henigan, an attorney for Handgun Control, Inc., invented the "narrow individual right" theory of the Second Amendment.[327] Historian Saul Cornell later elaborated on the theory.[328] Under the "narrow individual right," the Second Amendment is an individual right, but solely for the purpose of militia service. If a person is not the militia, the person has no right to arms.

The *Heller* Court unanimously rejected the "states' right" and "collective right" theories which had been dominant in the lower federal courts in the latter part of the twentieth century. The Court split five-to-four between the standard model of the Second Amendment (the Scalia majority) and the Henigan–Cornell narrow individual right (the Stevens dissent).[329] The *Heller* Court correctly viewed the Second Amendment in

---

[321] *Id.*

[322] District of Columbia v. Heller, 554 U.S. 570 (2008).

[323] City of Salina v. Blaksley, 83 P. 619, 620 (Kan. 1905).

[324] *Id.*

[325] *See* Kopel, *supra* note 320, at 1510–12.

[326] Burton v. Sills, 248 A.2d 521, 526 (N.J. 1968). Thus, like "collective property" in a communist country, the right nominally belonged to the people, but really belonged to the government.

[327] Keith A. Ehrman & Dennis A. Henigan, *The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?*, 15 U. DAYTON L. REV. 5, 47–48 (1989) ("It may well be that the right to keep and bear arms is individual in the sense that it may be asserted by an individual. But it is a narrow right indeed, for it is violated only by laws that, by regulating the individual's access to firearms, adversely affect the state's interest in a strong militia.").

[328] SAUL CORNELL, A WELL-REGULATED MILITIA (2008).

[329] District of Columbia v. Heller, 554 U.S. 570 (2008); *id.* at 636 (Stevens, J.,

**EXHIBIT 23**
**0830**

the context of Anglo-American common law and of American state constitutions. As *Heller* recognized, keeping and bearing arms is a right (as protected by the Second Amendment, and its state and common law analogues), *and* it can be a duty (as in Congress's powers in Article I, Section 8, cl. 15–16 to call forth the militia, and to provide for militia training and armament, and in the militia powers of state governments).[330]

The story of the *posse comitatus* in this Article provides additional perspective on the dual nature of the right/duty to keep and bear arms. Arguments about the duty side of original meaning of the body of the Constitution and its Amendments have focused exclusively on arms bearing in the militia. This is incomplete. As detailed in Part II, the Constitution *also* gave the new federal government *posse comitatus* power.

Historically, the *posse comitatus* is broader than the militia in membership. When the state carries out its duties of training the militia, the militia is an organized body. The *posse comitatus*, however, is often ad hoc. The sheriff or other proper official can call out the posse when needed and compel service of the posse, but there is no legal theory, or historical practice, for a government official to *require* unwilling persons to undergo posse training. Of course, since the sheriff has complete discretion about who may join the posse, a sheriff can require that volunteers undergo training, and that is what all Colorado sheriffs with regular posses do.

A common phrase in early state constitutions was that the people had the right to arms "for the defence of themselves and the state."[331] Later in the nineteenth century, the phrasing changed, but the principles remained the same. For example, in Missouri and Colorado: "[T]o keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned . . . ."[332] Modern commentators have sometimes broken the phrases into a dichotomy: "themselves" means personal self-defense, and "the state" means militia service.[333] It is true that

---

dissenting) ("a right that can be enforced by individuals").

[330] *Heller*, 554 U.S. at 596, 600 n.17 (2008).

[331] *E.g.* PA. CONST. art. XIII (1776).

[332] COLO. CONST. art II, § 13.

[333] *But see* Nathan Kozuskanich, *Defending Themselves: The Original Understanding of the Right to Bear Arms*, 38 RUTGERS L.J. 1041 (2007) (arguing that "themselves" and "the State" both refer exclusively to militia service). For a pro/con discussion, see David B. Kopel & Clayton E. Cramer, *The Keystone of the Second Amendment: The Quakers, the Pennsylvania Constitution, and the Flawed Scholarship of Nathan Kozuskanich*, 19 WIDENER L.J. 277 (2010); Nathan Kozuskanich, *History or Ideology? A Response to David B. Kopel and Clayton E. Cramer*, 19 WIDENER L.J. 321 (2010) (reply article); David B. Kopel & Clayton E. Cramer, *Credentials Are No Substitute for Accuracy: Nathan Kozuskanich, Stephen Halbrook, and the Role of the Historian*, 19 WIDENER L.J. 343 (2010) (sur-reply).

EXHIBIT 23
0831

the phrase includes self-defense and the militia, but it is inaccurate to divide the phrase into two totally separate categories. The duty to keep and bear arms was not solely for the militia. It was also for all the other common law practices by which armed citizens aided in the protection of their communities: hue and cry, watch and ward, and, especially, *posse comitatus*. When individuals are helping local law enforcement search for an escaped serial killer, or for the people who just murdered the sheriff, or who just perpetrated some other violent felony, they are certainly helping to defend the state. But they are also defending themselves. Apprehending murderers, robbers, and rapists who have harmed a third party is one way that the individual protects himself from surprise attack by these criminals. Moreover, the reason for the creation of the state in the first place was the protection of the rights and personal security of individuals. In the American theory of government, the state has no autonomous existence prior to the individuals; the state is an artificial entity created by the people, and the state's purpose is to serve as the agent of the people in safeguarding their lives, liberty, and property. Thus, the "defense of the state" is really a form of self-defense. When you aid the state in keeping the peace, you are protecting yourself. Inseparable from the "defense of the state" (in state constitutions) or "the security of a free state" (in the Second Amendment) is preventing tyranny. Tyranny could come from a hostile foreign invader, and the people must be armed so that they can resist such an invasion, just as Alfred the Great's militia was armed for that same purpose.

Alternatively, tyranny could come from within. As James Madison wrote in *The Federalist No. 46*, armed resistance by the state militias is the emergency, last resort against central government tyranny, although tyranny might at present appear very unlikely.[334] Senator and later Vice President Hubert Humphrey, the avatar of post–World War II American liberalism, agreed.[335]

The widespread armament of the people is itself a deterrent to any attempt to impose tyranny. As John Mitchell Kemble observed in his legal history of Anglo-Saxon England, "[t]he strength of the popular power was felt in a negative, not positive, action upon the governing body; the people

---

[334] THE FEDERALIST NO. 46 (James Madison).

[335] "Certainly one of the chief guarantees of freedom under any government, no matter how popular and respected, is the right of citizens to keep and bear arms . . . . [T]he right of citizens to bear arms is just one more guarantee against arbitrary government, one more safeguard against a tyranny which now appears remote in America, but which historically has proved to be always possible." Hubert H. Humphrey, *Know Your Lawmakers*, GUNS, Feb. 1960, at 4 (letter by then-Senator Humphrey to the magazine in response to a question about his views on the Second Amendment).

**EXHIBIT 23**
**0832**

were by far the strongest armed force, and the conviction of this, even if not worthier motives, kept the ruling body from enacting oppressive laws."[336]

Like the state constitutions, the Second Amendment intertwines the purposes of personal defense and defense of civil order in a republic. As explained in *Heller*, "[t]he phrase 'security of a free State' meant 'security of a free polity,' not security of each of the several States . . . ."[337] That is why the Second Amendment applies in the District of Columbia and other federal areas and not just in the fifty states. The principle is that *all* of the polities in the United States are supposed to be secure in their freedom. Secure freedom includes a polity's ability to repel invasion or suppress insurrection.[338] Secure freedom includes sheriffs' ability to call on law-abiding armed citizens to "suppress all affrays, riots, and unlawful assemblies and insurrections."[339]

The Second Amendment right to keep and bear arms is an individual right belonging to all Americans for all lawful purposes, like the First Amendment freedom of speech and other fundamental rights.[340] Thus, individual citizens have standing to raise Second Amendment claims.[341]

In addition, the Second Amendment formally announces an intended third-party beneficiary: the state militias. Before *Heller*, some lower courts misread the Second Amendment and thought that the individual Second Amendment right exists *only* when it is in direct service of state militias.[342] *Heller* corrects this error and affirms the traditional American understanding that the Second Amendment right to keep and bear arms is for all law-abiding citizens, *and* that an intended beneficiary of that right is the state militia system. Article I of the Constitution makes it clear that the militias exist for the benefit of both the states and the federal government, and are subject to the overlapping control of both.[343] Thus the Second Amendment is partly a structural right enacted for the benefit of state and local governments. Accordingly, state militia officers, including governors,

---

[336] KEMBLE, *supra* note 84, at 88.

[337] District of Columbia v. Heller, 554 U.S. 570, 597 (2008).

[338] *Id.*

[339] COLO. REV. STAT. § 30-10-516 (2013).

[340] McDonald v. City of Chicago, 130 S. Ct. 3020, 3031, 3036, 3044 (2010); *id.* at 3054–56 (Scalia, J., concurring); *Heller*, 554 U.S. at 578–89, 582, 591, 595, 606, 625–30. *See also* David B. Kopel, *The First Amendment Guide to the Second Amendment*, 81 TENN. L. REV. 419 (2014).

[341] On this point, the nine Justices in *Heller* were unanimous. *See Heller*, 554 U.S. at 592 (The provisions of the Second Amendment "guarantee the individual right to possess and carry weapons in case of confrontation"); *id.* at 636 (Stevens, J., dissenting) ("Surely it protects a right that can be enforced by individuals.").

[342] *See, e.g.*, cases cited in *Heller*, *supra* note 337, at 638 n.2 (Stevens, J., dissenting).

[343] U.S. CONST. art. I, § 8, cl. 15–16.

EXHIBIT 23
0833

should have standing to raise Second Amendment claims regarding laws or actions that interfere with the militia of their state.[344]

Besides the militia, there is another beneficiary of the Second Amendment and its state analogues: the *posse comitatus*. Creating the conditions for a well-regulated, functional militia also has the obvious and inescapable benefit of ensuring a strong and vigorous *posse comitatus*. A well-armed population fosters both. The original meaning of the Constitution was that the militia *and* the posse could be used to assist the federal government. The militia and the posse are complementary institutions, each of them requiring that the people as a whole be armed. The U.S. Constitution follows the model set down by Alfred the Great: the security of a free state requires that the entire people be armed, so that they may defend themselves and the state, in the militia, in the *posse comitatus*, and in whatever other capacity (e.g., hue and cry) the government needs the aid of the armed people.

The power to employ the *posse comitatus* was originally a power that belonged only to sheriffs.[345] Today, they remain the most frequent users of that power. Accordingly, sheriffs should be recognized as having standing under the Second Amendment and its state analogues to challenge laws or practices that interfere with the *posse comitatus*.

CONCLUSION

Historian Frank Richard Prassel observes: "An unwritten but basic tenet of democracy places enforcement of the law within the domain of ordinary citizens."[346] This was true, he writes, in early England, when "the task of upholding order fell to the over-all community."[347] Later, sophisticated law enforcement agencies were created, "but under principles of common law any man still possesses wide authority to protect himself, his family, and to some extent the general peace of the land."[348] This is one application of a fundamental principle of American law: "the people, not the government, possess the sovereignty."[349]

---

[344] In *Perpich v. Department of Defense*, 496 U.S. 334, 338 (1990), the Court recognized that a state governor had standing to sue over federal interference with his state's National Guard. However, the governor in that case did not assert Second Amendment claims, and the issue (federal deployment, without gubernatorial consent or declaration of a national emergency, of the Minnesota National Guard into Honduras for training exercises) did not involve any interference with anyone's possession of arms. *Id.*

[345] *See supra* text accompanying notes 155–157.

[346] PRASSEL, *supra* note 228, at 126.

[347] *Id.*

[348] *Id.*

[349] Mandel v. Mitchell, 325 F. Supp. 620, 629 (E.D.N.Y. 1971), *overruled by* Kleindienst

EXHIBIT 23
0834

A modern historian of sheriffs urges that their contemporary role should be recognized as one of "tribune of the people" who champions their rights.[350] This description is consistent with the most admirable aspects of the role of sheriffs, from Anglo-Saxon times to the present. The people elect a sheriff to be the guardian to their county: to lead the people in keeping the peace, in maintaining civil order, and in defending themselves against threats to their lives and liberties.

The *posse comitatus* has always been a vital part of this system. It was important well over a thousand years ago, and it remains important today. Whether in manhunts for escaped murderers or in augmenting the daily operations of a sheriff's office, the *posse comitatus* is one example of how in the American system of government, elected officials and armed citizens work together successfully to keep the peace.

---

v. Mandel, 408 U.S. 753 (1972).

[350] Johannes F. Spreen, *The Future Shire Reeve—Tribune of the People*, *in* CRIME AND JUSTICE IN AMERICA 43, 45 (John T. O'Brien & Marvin Marcus eds., 1979).

EXHIBIT 23
0835

# APPENDIX

*This Appendix compiles* posse comitatus *statutes from across the United States.  For each state, this Appendix lists the statutory citation, the person or persons authorized to summon the* posse comitatus*, and the language of each relevant statute.*

## ALABAMA

| | | |
|---|---|---|
| ALA. CODE § 9-12-2 (LexisNexis 2001) | Sheriff | If resistance is apprehended by the sheriff in the execution of this chapter, he may summon to his aid the posse comitatus of his county, armed and equipped as the occasion may require, and may press into his service any steamboat or other vessel not actually engaged in carrying the public mail at the risk and expense of the state; and, if resistance is made by the boatmen of the boat or vessel attempted to be seized, such resistance is punishable in the same manner as is now provided by law for resistance to process. |
| ALA. CODE §§ 16-47-10, 16-48-12, 16-50-4, 16-51-12, 16-52-12, 16-54-13.1, 16-56-12, 16-59A-1, 22-50-21 (LexisNexis 2001) | Campus Police and State Health Facility Officers | [*Safety officials appointed by heads of educational and health institutions "shall have authority to summon a posse comitatus."  Institutions authorized include:*<br>    *Auburn University (§ 16-48-12)*<br>    *Alabama State University (§ 16-50-4)*<br>    *University of Northern Alabama (§ 16-51-12)*<br>    *Jacksonville State University (§ 16-52-12)*<br>    *University of Montevallo (§ 16-54-13.1)*<br>    *Troy University (§ 16-56-12)*<br>    *Oakwood University (§ 16-59A-1)*<br>    *State mental health facilities (§ 22-50-21)*] |

## ALASKA

| | | |
|---|---|---|
| ALASKA STAT. § 12.25.090 (2012) | Peace Officer | A peace officer making an arrest may orally summon as many persons as the officer considers necessary to aid in making the arrest.  A person when required by an officer shall aid in making the arrest. |

**EXHIBIT 23**
**0836**

## ARIZONA

| | | |
|---|---|---|
| ARIZ. REV. STAT. ANN. § 13-3801 (2010) | Peace Officer | A. Public offenses may be prevented by intervention of peace officers as follows: <br> 1. By requiring security to keep the peace. <br> 2. Forming a police detail in cities and towns and requiring their attendance in exposed places. <br> 3. Suppressing riots. <br> B. When peace officers are authorized to act in preventing public offenses, other persons, who, by their command, act in their aid, are justified in so doing. |
| ARIZ. REV. STAT. ANN. § 13-3802 (2010) | Sheriff or Other Public Officer | A. When a sheriff or other public officer authorized to execute process finds, or has reason to believe that resistance will be made to execution of the process, such officer may command as many inhabitants of the county as the officer deems proper to assist in overcoming such resistance. <br> B. The officer shall certify to the court from which the process issued the names of those persons resisting, and they may be proceeded against for contempt of court. |
| ARIZ. REV. STAT. ANN. § 13-2403 (2010) | Peace Officer | A. A person commits refusing to aid a peace officer if, upon a reasonable command by a person reasonably known to be a peace officer, such person knowingly refuses or fails to aid such peace officer in: <br> 1. Effectuating or securing an arrest; or <br> 2. Preventing the commission by another of any offense. <br> B. A person who complies with this section by aiding a peace officer shall not be held liable to any person for damages resulting therefrom, provided such person acted reasonably under the circumstances known to him at the time. <br> C. Refusing to aid a peace officer is a class 1 misdemeanor. |

**EXHIBIT 23**
**0837**

## <u>ARKANSAS</u>

| | | |
|---|---|---|
| ARK. CODE ANN. § 12-63-203(b)(3) (2003) | Police Officers | The police officer may summon a posse comitatus, if necessary. |
| ARK. CODE ANN. § 25-17-305(b) (2009) | Institutional Law Enforcement Officer | [An institutional law enforcement officer] shall have the authority to summon a posse comitatus if necessary. |
| ARK. CODE ANN. § 12-11-103 (2009) | Judge, Justice of the Peace, Sheriff, Coroner or Constable. | (a) When three (3) or more persons shall be riotously, unlawfully, or tumultuously assembled, it shall be the duty of any judge, justice of the peace, county sheriff, county coroner, or constable . . . to make a proclamation . . . , charging and commanding them immediately to disperse themselves and peaceably to depart to their habitations or lawful business.<br><br>(b) If upon the proclamation being made, the persons so assembled shall not immediately disperse and depart as commanded or if they shall resist the officer or prevent the making of the proclamation, then the officer shall command those present, and the power of the county if necessary, and shall disperse the unlawful assembly, arrest the offenders, and take them before some judicial officer, to be dealt with according to law. |

## <u>CALIFORNIA</u>

| | | |
|---|---|---|
| CAL. GOV'T CODE § 26604 (West 2008) | Sheriff | The sheriff shall command the aid of as many inhabitants of the sheriff's county as he or she thinks necessary in the execution of his or her duties.<br><br>If any person, under any pretense of any claim inconsistent with the sovereignty and jurisdiction of the State, intrudes upon any of the waste or ungranted lands of the State . . . the Governor . . . shall direct the sheriff of the county to remove the intruder . . . the sheriff may call to his aid the power of the county, as in cases of resistance to the writs of the people. |

**EXHIBIT 23**
**0838**

| | | |
|---|---|---|
| CAL. GOV'T CODE § 41602 (West 2012) | Chief of Police | His lawful orders shall be promptly executed by deputies, police officers, and watchmen in the city. Every citizen shall also lend his aid when required for the arrest of offenders and maintenance of public order. |
| CAL. PENAL CODE § 839 (West 2008) | | Persons making arrest may summon assistance. Any person making an arrest may orally summon as many persons as he deems necessary to aid him therein. |

### COLORADO

| | | |
|---|---|---|
| COLO. REV. STAT. § 30-1-104 (2013) | Sheriff | (1) Fees collected by sheriffs shall be as follows: (o) For serving writ with aid of posse comitatus with actual expenses necessarily incurred in executing said writ, in counties of every class, actual expenses, but not more than sixty dollars; for serving same without aid in counties of every class, actual expenses, but not more than four dollars . . . . |
| Colo. R. Civ. P. Form 24 | | *WRIT OF ASSISTANCE—PETITION FOR* COMES NOW the Plaintiff, above-named, by and through its attorneys of record, and moves this Honorable Court issue a Writ of Assistance to the Sheriff of the County of _____, State of Colorado, enabling the Sheriff to call to his aid the powers of his County, in accordance with Rule 104(h), in order that the Sheriff may execute the Writ of Replevin heretofore entered in the premises . . . . |
| Colo. R. Civ. P. 104 & CO ST CTY CT RCP Rule 404 | | (i) Sheriff May Break Building; When. If the property or any part thereof is in a building or enclosure, the sheriff shall demand its delivery, announcing his identity, purpose, and the authority under which he acts. If it is not voluntarily delivered, he shall cause the building or enclosure to be broken open in such manner as he reasonably believes will cause the least damage to the building or enclosure, and take the property into his possession. He may call upon the power of the county to aid and protect him . . . . |

**EXHIBIT 23**
**0839**

### CONNECTICUT

| | | |
|---|---|---|
| CONN. GEN. STAT. ANN. § 6-31 (West 2008) (repealed 2000) | County Sheriffs Eliminated | [§ 6-31. Repealed. (2000, P.A. 00-99, § 153, eff. Dec. 1, 2000.)[351] |
| CONN. GEN. STAT. ANN. § 52-53 (West 2013) | State Marshals May "Depute" | A state marshal may, on any special occasion, depute, in writing on the back of the process, any proper person to serve it. After serving the process, such person shall make oath before a justice of the peace that he or she faithfully served the process according to such person's endorsement thereon and did not fill out the process or direct any person to fill it out; and, if such justice of the peace certifies on the process that such justice of the peace administered such oath, the service shall be valid. |
| CONN. GEN. STAT. ANN. § 53a-167b (West 2012) | Peace Officer, Special Policeman, Motor Vehicle Inspector or Firefighter May "Command Assistance" | (a) A person is guilty of failure to assist a peace officer, special policeman, motor vehicle inspector or firefighter when, commanded by a peace officer, special policeman appointed under § 29-18b, motor vehicle inspector designated under § 14-8 and certified pursuant to § 7-294d or firefighter authorized to command assistance, such person refuses to assist such peace officer, special policeman, motor vehicle inspector or firefighter in the execution of such peace officer's, special policeman's, motor vehicle inspector's or firefighter's duties.<br><br>(b) Failure to assist a peace officer, special policeman, motor vehicle inspector or firefighter is a class A misdemeanor. |

---

[351] For more information about Connecticut's repeal, see sources *supra* note 146.

**EXHIBIT 23**
**0840**

## Delaware

| Del. Code Ann. tit. 11, § 1241 (2007) | Police Officer | A person is guilty of refusing to aid a police officer when, upon command by a police officer identifiable or identified by the officer as such, the person unreasonably fails or refuses to aid the police officer in effecting an arrest, or in preventing the commission by another person of any offense. Refusing to aid a police officer is a class B misdemeanor. |

## Florida

| Fla. Stat. Ann. § 30.15(1)(h) (West 2010) | Sheriff | (1) Sheriffs, in their respective counties, in person or by deputy, shall: (h) Have authority to raise the power of the county and command any person to assist them, when necessary, in the execution of the duties of their office; and, whoever, not being physically incompetent, refuses or neglects to render such assistance, shall be punished by imprisonment in jail not exceeding 1 year, or by fine not exceeding $500. |
| Fla. Stat. Ann. § 78.10 (West 2004) | Sheriff | In executing the writ of replevin, if the sheriff has reasonable grounds to believe that the property or any part thereof is secreted or concealed in any dwelling house or other building or enclosure, the sheriff shall publicly demand delivery thereof; and, if it is not delivered by the defendant or some other person, the sheriff shall cause such house, building, or enclosure to be broken open and shall make replevin according to the writ; and, if necessary, the sheriff shall take to his or her assistance the power of the county. |

**EXHIBIT 23**
**0841**

## G<span>EORGIA</span>

G<span>A</span>. C<span>ODE</span>
A<span>NN</span>.
§ 16-3-22(a)
(West 2003)

Any person who renders assistance reasonably and in good faith to any law enforcement officer who is being hindered in the performance of his official duties or whose life is being endangered by the conduct of any other person or persons while performing his official duties shall be immune to the same extent as the law enforcement officer from any criminal liability that might otherwise be incurred or imposed as a result of rendering assistance to the law enforcement officer.

## H<span>AWAII</span>

H<span>AW</span>. R<span>EV</span>.
S<span>TAT</span>. A<span>NN</span>.
§ 710-1011
(LexisNexis
2007)

Law
Enforcement
Officer

(1) A person commits the offense of refusing to aid a law enforcement officer when, upon a reasonable command by a person known to him to be a law enforcement officer, he intentionally refuses or fails to aid such law enforcement officer, in:
(a) Effectuating or securing an arrest; or
(b) Preventing the commission by another of any offense.
(2) Refusing to aid a law enforcement officer is a petty misdemeanor.
(3) A person who complies with this section by aiding a law enforcement officer shall not be held liable to any person for damages resulting therefrom, provided he acted reasonably under the circumstances known to him at the time.

**EXHIBIT 23**
**0842**

## IDAHO

| | | |
|---|---|---|
| IDAHO CODE ANN. § 8-305 (2010) | Sheriff | The sheriff shall forthwith take the property, if it be in the possession of the defendant or his agent, and retain it in his custody, either by removing the property to a place of safekeeping or, upon good cause shown, by installing a keeper.<br><br>If the property or any part thereof is in a building or inclosure, the sheriff shall demand its delivery, announcing his identity, purpose, and the authority under which he acts.  If it is not voluntarily delivered, he shall cause the building or inclosure to be broken open in such manner as he reasonably believes will cause the least damage to the building or inclosure, and take the property into his possession.  He may call upon the power of the county to aid and protect him . . . . |
| IDAHO CODE ANN. § 18-707 (2004) | Sheriff, Deputy Sheriff, Coroner, Constable, Judge or Other Officer Concerned in the Administration of Justice. | Every male person above eighteen (18) years of age who neglects or refuses to join the posse comitatus or power of the county . . . being thereto lawfully required by any sheriff, deputy sheriff, coroner, constable, judge or other officer concerned in the administration of justice, is punishable by fine of not less than fifty dollars ($50.00) nor more than $1,000. |

## ILLINOIS

| | | |
|---|---|---|
| 55 ILL. COMP. STAT. ANN. 5/3-6022 (West 2005) | Sheriff | To keep the peace, prevent crime, or to execute any warrant, process, order or judgment he or she may call to his or her aid, when necessary, any person or the power of the county. |

**EXHIBIT 23**
**0843**

## INDIANA

| | | |
|---|---|---|
| IND. CODE ANN. § 36-2-13-5 (West 2006) | Sheriff & Members of Sheriff's Department | The sheriff shall: suppress breaches of the peace, calling the power of the county to the sheriff's aid if necessary . . . . |
| IND. CODE ANN. § 36-8-10-9 (West 2006) | | (a) Each member of the department: shall suppress all breaches of the peace within his knowledge, with authority to call to his aid the power of the county . . . . |

## IOWA

| | | |
|---|---|---|
| IOWA CODE ANN. § 331.652(2) (West 2013) | Sheriff | The sheriff, when necessary, may summon the power of the county to carry out the responsibilities of office. |

## KANSAS

| | | |
|---|---|---|
| KAN. STAT. ANN. § 22-2407 (2007) | Law Enforcement Officer | (1) A law enforcement officer making an arrest may command the assistance of any person who may be in the vicinity. (2) A person commanded to assist a law enforcement officer shall have the same authority to arrest as the officer who commands his assistance. (3) A person commanded to assist a law enforcement officer in making an arrest shall not be civilly or criminally liable for any reasonable conduct in aid of the officer or any acts expressly directed by the officer. |

**EXHIBIT 23**
**0844**

## KENTUCKY

| | | |
|---|---|---|
| KY. REV. STAT. ANN. § 70.060 (LexisNexis 2004) | Sheriff, Deputy Sheriff or Other Like Officer | Any sheriff, deputy sheriff or other like officer may command and take with him the power of the county, or a part thereof, to aid him in the execution of the duties of his office, and may summon as many persons as he deems necessary to aid him in the performance thereof. |
| KY. REV. STAT. ANN. § 432.550 (West 2006) | No Foreign Posses Allowed | No person shall, except with the consent of the General Assembly or of the Governor when the General Assembly is not in session, bring or cause to be brought into this state any armed person, not a citizen of this state, to preserve the peace, suppress domestic violence or to serve as a deputy of any officer or as a member of a posse comitatus, nor shall any officer knowingly summon any such person or any other person who has come into the state for that purpose to aid in suppressing violence . . . . |

## LOUISIANA

| | | |
|---|---|---|
| LA. CODE CIV. PROC. ANN. art. 325 (1999) | Peace Officer | In the execution of a writ, mandate, order, or judgment of a court, the sheriff may enter on the lands, and into the residence or other building, owned or occupied by the judgment debtor or defendant. If necessary to effect entry, he may break open any door or window. If resistance is offered or threatened, he may require the assistance of the police, of neighbors, and of persons present or passing by. |
| LA. CODE CRIM. PROC. ANN. art. 219 (2003) | | A peace officer making a lawful arrest may call upon as many persons as he considers necessary to aid him in making the arrest. A person thus called upon shall be considered a peace officer for such purposes. |

**EXHIBIT 23**
**0845**

## MAINE

| | | |
|---|---|---|
| ME. REV. STAT. tit. 30-A, § 402 (2011) | Law Enforcement Officer | 1. Officer may require aid. Any law enforcement officer may require suitable aid in the execution of official duties in criminal and traffic infraction cases for the following reasons:<br>A. For the preservation of the peace; or<br>B. For apprehending or securing any person for the breach of the peace or in case of the escape or rescue of persons arrested on civil process.<br>2. Violation and penalty. Any person required to aid a law enforcement officer under this section who neglects or refuses to do so commits a civil violation for which a forfeiture of not less than $3 nor more than $50 to be paid to the county may be adjudged. |

## MARYLAND

| | | |
|---|---|---|
| | Any Government Official Who Is a Conservator of the Peace | [*Not presently in statute. Common law power to summon a* posse comitatus *remains valid.* City of Baltimore v. Siler, *263 Md. 439 (1971) (Mayor of Baltimore could have raised a posse to attempt to suppress riots in April 1968).*] |

## MASSACHUSETTS

| | | |
|---|---|---|
| MASS. ANN. LAWS ch. 37, § 13 (LexisNexis 2006) | Sheriff | They may require suitable aid in the execution of their office in a criminal case, in the preservation of the peace, in the apprehending or securing of a person for a breach of the peace and in cases of escape or rescue of persons arrested upon civil process. |

## MICHIGAN

| | | |
|---|---|---|
| MICH. COMP. LAWS ANN. § 600.4331(5) (West 2013) | Sheriff (Other Person When Court Orders Sheriff's Arrest) | In making the arrest the sheriff or other person so directed may call to his aid the power of the county as in other cases. |

**EXHIBIT 23**
**0846**

## MINNESOTA

| | | |
|---|---|---|
| MINN. STAT. ANN. § 387.03 (West 1997) | Sheriff | The sheriff shall keep and preserve the peace of the county, for which purpose the sheriff may require the aid of such persons or power of the county as the sheriff deems necessary . . . . |
| MINN. STAT. ANN. § 491A.01 Subd. 5 (West 2014) | | The sheriff is authorized to effect repossession of the property according to law, including, but not limited to: (1) entry upon the premises for the purposes of demanding the property and ascertaining whether the property is present and taking possession of it; and (2) causing the building or enclosure where the property is located to be broken open and the property taken out of the building and if necessary to that end, the sheriff may call the power of the county to the sheriff's aid . . . . |

## MISSISSIPPI

| | | |
|---|---|---|
| MISS. CODE ANN. § 19-25-39 (2012) | Sheriff | If the sheriff finds that resistance will be made against the execution of any process, he shall forthwith go in his proper person, taking the power of the county if necessary, and execute the same. He shall certify to the court the names of the persons making resistance, their aiders, assistants, favorers, and procurers. |

## MISSOURI

| | | |
|---|---|---|
| MO. ANN. STAT. § 105.210 (West 1997) | Officer | In all cases where, by the common law or a statute of this state, any officer is authorized to execute any process, he may call to his aid all male inhabitants above the age of twenty-one years in the county in which the officer is authorized to act. |
| MO. ANN. STAT. § 532.600 (West 1953) | | In the execution of such writs of attachment and precept, or either of them, the sheriff or other person to whom they shall be directed may call to his aid the power of the county, as is provided by law in the execution of writs and process by any officer. |

**EXHIBIT 23**
**0847**

### Montana

| | | |
|---|---|---|
| Mont. Code Ann. § 27-17-206 (2013) | Sheriff | If the property or any part of the property is concealed in a building or enclosure, the sheriff shall publicly demand its delivery. If the property is not delivered, the sheriff shall cause the building or enclosure to be broken open and take the property into the sheriff's possession and, if necessary, the sheriff may call to the sheriff's aid the power of the county. |

### Nebraska

| | | |
|---|---|---|
| Neb. Rev. Stat. § 23-1704 (2012) | Sheriff & Deputies | The sheriff and his deputies are conservators of the peace, and to keep the same, to prevent crime, to arrest any person liable thereto, or to execute process of law, they may call any person to their aid; and, when necessary, the sheriff may summon the power of the county. |

### Nevada

| | | |
|---|---|---|
| Nev. Rev. Stat. Ann. § 248.090 (LexisNexis 2011) | Sheriff & Deputies | Sheriffs and their deputies shall keep and preserve the peace in their respective counties, and quiet and suppress all affrays, riots and insurrections, for which purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony, or breach of the peace, they may call upon the power of their county to aid in such arrest or in preserving the peace. |

### New Hampshire

| | | |
|---|---|---|
| N.H. Rev. Stat. Ann. § 104:12 (LexisNexis 2012) | Officer | An officer having authority to serve process or make an arrest may require suitable aid in the execution of his office. Any person who neglects or refuses to give such aid when so required shall be fined not more than $20. |

**EXHIBIT 23**
**0848**

### NEW JERSEY

[*Recognized in common law.* Snyder v. Van Natta, *7 N.J.L. 25, 1823 WL 1309 (1823);* Patten v. Halsted, *1 N.J.L. 277 (1795). A 1941 statute exempted the New Jersey Guard from* posse comitatus *duty. L.1941, c. 109, p. 249, § 16. The exemption statute, N.J. Stat. Ann. 38:5-4.1 was repealed in 1963, as part of a general revision of the militia statutes. L.1963, c. 109.*]

### NEW MEXICO

| | | |
|---|---|---|
| N.M. STAT. ANN. § 4-41-10 (2013) | Local Sheriff and Sheriffs of Other Counties | Any sheriff is hereby authorized at any time to appoint respectable and orderly persons as special deputies to serve any particular order, writ or process or when in the opinion of any sheriff the appointment of special deputies is necessary and required for the purpose of preserving the peace, and it shall not be necessary to give or file any notice of such special appointment; however, the provision authorizing the carrying of concealed arms shall not apply to such persons. Provided, no person shall be eligible to appointment as a deputy sheriff unless he is a legally qualified voter of the state of New Mexico, and further provided that there shall be no additional fees or per diem paid by the counties for any additional deputies other than as provided by law. |
| N.M. STAT. ANN. § 4-41-12 (2013) | Sheriff | The various sheriffs of the several counties of this state shall have the right to enter any county of this state, or any part of this state, for the purpose of arresting any person charged with crime . . . and any sheriff entering any county as above mentioned, shall have the same power to call out the power of said county to aid him, as is conferred on sheriffs in their own counties. |

**EXHIBIT 23**
**0849**

## NEW YORK

| | | |
|---|---|---|
| N.Y. JUDICIARY LAW § 400 (West 2005) | Sheriff | If a sheriff, to whom a mandate is directed and delivered, finds, or has reason to apprehend, that resistance will be made to the execution thereof, he may command all persons in his county, or as many as he thinks proper, and with such arms as he directs, to assist him in overcoming the resistance and, if necessary, in arresting and confining the resisters, their aiders and abettors, to be dealt with according to law. |

## NORTH CAROLINA

| | | |
|---|---|---|
| N.C. GEN. STAT. ANN. § 1-415 (West 2013) | Sheriff & Law Enforcement Officer | The sheriff shall execute the order by arresting the defendant and keeping him in custody until discharged by law. The sheriff may call the power of the county to his aid in the execution of the arrest. |

## NORTH DAKOTA

| | | |
|---|---|---|
| N.D. CENT. CODE § 29-06-03 (2006) | Officer | Any officer making an arrest may summon as many persons orally as the officer deems necessary to aid the officer therein. |

## OHIO

| | | |
|---|---|---|
| OHIO REV. CODE ANN. § 311.07(A) (West 2005) | Sheriff | In the execution of official duties of the sheriff, the sheriff may call to the sheriff's aid such persons or power of the county as is necessary. |
| OHIO REV. CODE ANN. § 2921.23(B) (West 2014) | | . . . [F]ailure to aid a law enforcement officer [is] a minor misdemeanor. |

**EXHIBIT 23**
**0850**

## **OKLAHOMA**

| | | |
|---|---|---|
| OKLA. STAT. ANN. tit. 19, § 516(A) (West 2000) | Sheriff, Under-sheriffs and Deputies | It shall be the duty of the sheriff, under-sheriffs and deputies to keep and preserve the peace of their respective counties, and to quiet and suppress all affrays, riots and unlawful assemblies and insurrections, for which purpose and for the service of process in civil and criminal cases, and in apprehending or securing any person for felony or breach of the peace, they and every constable may call to their aid such person or persons of their county as they may deem necessary. |
| OKLA. STAT. ANN. tit. 22, § 94 (West 2003) | | If it appears to the Governor that the power of the county is not sufficient to enable the sheriff to execute process delivered to him, or to suppress riots and to preserve the peace, he must, on the application of the sheriff, or the judge, of any court of record of such county, order such a force from any other county or counties as is necessary, and all persons so ordered or summoned by the Governor or acting Governor, are required to attend and act; and any such persons who, without lawful cause, refuse or neglect to obey the command, are guilty of a misdemeanor. |

## **OREGON**

| | | |
|---|---|---|
| OR. REV. STAT. § 206.050(1) (2013) | Police Officer | When an officer finds, or has reason to apprehend, that resistance will be made to the execution or service of any process, order or paper delivered to the officer for execution or service, and authorized by law, the officer may command as many adult inhabitants of the county of the officer as the officer may think proper and necessary to assist the officer in overcoming the resistance, and if necessary, in seizing, arresting and confining the resisters and their aiders and abettors, to be punished according to law. |

**EXHIBIT 23**
**0851**

## Pennsylvania

| | | |
|---|---|---|
| 42 Pa. Cons. Stat. Ann. § 21115(a) (West 1982) | Sheriff & Mayors[352] | For the services performed in the capacity as a conservator of the peace or police officer in suppressing riots, mobs or insurrections, and when discharging any duty requiring the summoning of a posse, comitatus or special deputy sheriffs, the sheriff shall receive per diem compensation at the rate of $50 in a county for eight hours service, together with the mileage and necessary expenses, including subsistence for the sheriff and those under him, all to be paid by the county. |

## Rhode Island

| | | |
|---|---|---|
| R.I. Gen. Laws § 11-47-43 (2002) | | The provisions of § 11-47-42 [prohibiting the carrying of certain weapons], . . . so far as they relate to the possession or carrying of any billy, apply to sheriffs, constables, police, or other officers or guards whose duties require them to arrest or to keep and guard prisoners or property, nor to any person summoned by those officers to aid them in the discharge of their duties while actually engaged in their duties. |

## South Carolina

| | | |
|---|---|---|
| S.C. Code Ann. § 15-17-90 (1977) | Sheriff, Deputy, Constable, or Other Officer | The sheriff or constable shall execute the order by arresting the defendant and keeping him in custody until discharged by law and may call the power of the county to his aid in the execution of the arrest, as in case of process. |

---

[352] "The power to summon a *posse comitatus* is 'the power which is devolved upon a sheriff to suppress riots . . . ,' which, in turn, was conferred by Third Class City Code upon the mayor." *Jenkins Sportswear v. City of Pittston*, 22 Pa. D. & C.2d 566, 575 (Pa. Com. Pl. 1961).

**EXHIBIT 23**
**0852**

| | | |
|---|---|---|
| S.C. CODE ANN. § 23-15-70 (1989) | Sheriff, Deputy, Constable, or Other Officer | Any sheriff, deputy sheriff, constable or other officer specially empowered may call out the bystanders or posse comitatus of the proper county to his assistance whenever he is resisted or has reasonable grounds to suspect and believe that such assistance will be necessary in the service or execution of process in any criminal case and any deputy sheriff may call out such posse comitatus to assist in enforcing the laws and in arresting violators or suspected violators thereof. Any person refusing to assist as one of the posse . . . shall be guilty of a misdemeanor and, upon conviction shall be fined not less than thirty nor more than one hundred dollars or imprisoned for thirty days. |

### SOUTH DAKOTA

| | | |
|---|---|---|
| S.D. CODIFIED LAWS § 21-15-7 (2004). | Sheriff | If the property, or any part thereof, be concealed in a building or enclosure, the sheriff shall publicly demand its delivery. If it be not forthwith delivered, he shall cause the building or enclosure to be broken open, and take the property into his possession and if necessary he may call to his aid the power of his county. |
| S.D. CODIFIED LAWS § 7-12-1 (2004) | Sheriff | The sheriff shall keep and preserve the peace within his county, for which purpose he is empowered to call to his aid such persons or power of his county as he may deem necessary. |

### TENNESSEE

| | | |
|---|---|---|
| TENN. CODE ANN. § 38-3-112 (West 2013) | Governor | If it appears to the governor that the power of any county is not sufficient to enable the sheriff to execute process delivered to that sheriff, the governor may, on the application of the sheriff, order a posse or military force as is necessary from any other county or counties. |
| TENN. CODE ANN. § 8-8-213(b) (West 2013) | Sheriff | The sheriff shall furnish the necessary deputies to carry out the duties . . . and, if necessary, may summon to the sheriff's aid as many of the inhabitants of the county as the sheriff thinks proper. |

**EXHIBIT 23**
**0853**

## <u>TEXAS</u>

| | | |
|---|---|---|
| TEX. CODE CRIM. PROC. ANN. art. 8.01 (West 2005) | Officer | When any officer authorized to execute process is resisted, or when he has sufficient reason to believe that he will meet with resistance in executing the same, he may command as many of the citizens of his county as he may think proper; and the sheriff may call any military company in the county to aid him in overcoming the resistance, and if necessary, in seizing and arresting the persons engaged in such resistance. |
| TEX. CODE CRIM. PROC. ANN. art. 8.05 (West 2005) | Peace Officer | In order to enable the officer to disperse a riot, he may call to his aid the power of the county in the same manner as is provided where it is necessary for the execution of process. |
| TEX. CODE CRIM. PROC. ANN. art. 2.14 (West 2005) | Peace Officer | Whenever a peace officer meets with resistance in discharging any duty imposed upon him by law, he shall summon a sufficient number of citizens of his county to overcome the resistance; and all persons summoned are bound to obey. |

## <u>UTAH</u>

| | | |
|---|---|---|
| UTAH CODE ANN. § 76-8-307 (LexisNexis 2012) | Peace Officer | A person is guilty of a class B misdemeanor if, upon command by a peace officer identifiable or identified by him as such, he unreasonably fails or refuses to aid the peace officer in effecting an arrest or in preventing the commission of any offense by another person. |

## <u>VERMONT</u>

| | | |
|---|---|---|
| VT. STAT. ANN. tit. 24, § 300 (2005) | Sheriff or Other Officer | A sheriff or other officer in the discharge of the duties of his office, for the preservation of the peace, or the suppression or prevention of any criminal matter or cause, may require suitable assistance. |

**EXHIBIT 23**
**0854**

## VIRGINIA

| | | |
|---|---|---|
| Va. Code Ann. § 18.2-463 (2009) | Law Enforcement Officer | If any person on being required by any sheriff or other officer refuse or neglect to assist him: (1) in the execution of his office in a criminal case, (2) in the preservation of the peace, (3) in the apprehending or securing of any person for a breach of the peace, or (4) in any case of escape or rescue, he shall be guilty of a Class 2 misdemeanor. |

## WASHINGTON

| | | |
|---|---|---|
| Wash. Rev. Code Ann. § 36.28.010 (West 2003) | Sheriff | The sheriff is the chief executive officer and conservator of the peace of the county. In the execution of his or her office, he or she and his or her deputies: (6) Shall keep and preserve the peace in their respective counties, and quiet and suppress all affrays, riots, unlawful assemblies and insurrections, for which purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony or breach of the peace, they may call to their aid such persons, or power of their county as they may deem necessary. |

## WEST VIRGINIA

| | | |
|---|---|---|
| W. Va. Code Ann. § 61-5-14 (LexisNexis 2010) | Sheriff or Other Officer | If any person shall, on being required by any sheriff or other officer, refuse or neglect to assist him in the execution of his office in a criminal case, or in the preservation of the peace, or the apprehending or securing of any person for a breach of the peace, or in any case of escape or rescue, he shall be guilty of a misdemeanor, and, upon conviction, shall be confined in jail not more than six months and be fined not exceeding one hundred dollars. |

**EXHIBIT 23**
**0855**

## WISCONSIN

| WIS. STAT. ANN. § 59.28(1) (West 2013) | Sheriff, Undersheriff & Deputies | Sheriffs and their undersheriffs and deputies shall keep and preserve the peace in their respective counties and quiet and suppress all affrays, routs, riots, unlawful assemblies and insurrections; for which purpose, and for the service of processes in civil or criminal cases and in the apprehending or securing any person for felony or breach of the peace they and every coroner and constable may call to their aid such persons or power of their county as they consider necessary. |

## WYOMING

| WYO. STAT. ANN. § 18-3-606 (2013) | Sheriff & Deputies | Each county sheriff and deputy shall preserve the peace in the respective counties and suppress all affrays, riots, unlawful assemblies and insurrections. Each sheriff or deputy sheriff may call upon any person to assist in performing these duties or for the service of process in civil and criminal cases or for the apprehension or securing of any person for felony or breach of peace. |

**EXHIBIT 23**
**0856**