1  John W. Dillon (Bar No. 296788)
2  Gatzke Dillon & Ballance LLP
3  2762 Gateway Road
   Carlsbad, California 92009
4  Telephone: (760) 431-9501
   Facsimile: (760) 431-9512
5  E-mail:  jdillon@gdandb.com

6  Attorney for Plaintiffs

7

8            **UNITED STATES DISTRICT COURT**

9           **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | MATTHEW JONES; THOMAS FURRH;        | Case No.: 19-cv-01226-L-AHG
12 | KYLE YAMAMOTO; PWGG, L.P.           | Hon. Judge M. James Lorenz and
   | (d.b.a. POWAY WEAPONS AND GEAR      | Magistrate Judge Allison H. Goddard
13 | and PWG RANGE); NORTH COUNTY        |
   | SHOOTING CENTER, INC.; BEEBE        |
14 | FAMILY ARMS AND MUNITIONS           | **DECLARATION OF THOMAS B.**
15 | LLC (d.b.a. BFAM and BEEBE FAMILY   | **MARVELL IN SUPPORT OF**
   | ARMS AND MUNITIONS); FIREARMS       | **PLAINTIFFS' MOTION FOR**
16 | POLICY COALITION, INC.;             | **PRELIMINARY INJUNCTION**
17 | FIREARMS POLICY FOUNDATION;         | **(Part 1 of 2)**
   | CALIFORNIA GUN RIGHTS               |
18 | FOUNDATION (formerly, THE           |
19 | CALGUNS FOUNDATION); and            | Complaint Filed: July 1, 2019
   | SECOND AMENDMENT                    | Second Amended Complaint Filed:
20 | FOUNDATION          Plaintiffs,     | November 8, 2019
21 |                                     |
   | v.                                  |
22 |                                     | Date: Monday, December 16, 2019
   | XAVIER BECERRA, et al.,             | Time: 10:30 a.m.
23 |                     Defendants      | Courtroom: Dept. 5B (5th Floor)
24 |                                     |
   |                                     | No oral argument should be heard
25 |                                     | unless ordered by the Court

26

27

28

## DECLARATION OF THOMAS B. MARVELL

I, Thomas B. Marvell, declare as follows:

I am not a party to the captioned action, am over the age of 18, have personal knowledge of the facts stated herein, and am competent to testify as to the matters stated and the opinions rendered below.

1.     I reside in Williamsburg, Virginia, and am currently retired as a sociologist and lawyer, though I continue to conduct research.  I graduated from Harvard University, with a LLB degree in 1961. I obtained my Juris Doctorate degree from the University of Michigan Law School in 1964 and my PhD in sociology from the University of Michigan in 1978.

2.     I worked for the National Center for State Courts (NCSC) from 1977 to 1985.  The NCSC is an independent, non-profit organization founded at the urging of Supreme Court Chief Justice Warren E. Burger to provide research, information, and data to help courts plan, make decisions, and implement improvements in judicial administration of the court system.   From 1985 to 2010, I worked for Justec Research, and the research at Justec was financed by six grants from the U.S. Department of Justice.

3.     I have authored or co-authored more than 30 publications concerning criminology, 11 of which pertain to gun laws. One is "The Impact of Banning Juvenile Gun Possession," published in the *Journal of Law and Economics*, Vol. 44, Oct. 2001, pp. 691-713.

4.     Attached hereto as **Exhibit 1** is a true and correct copy of my Curriculum Vitae. It describes my education, employment background, career experience, and publications.

**Minimum Age Laws and Crime-Reduction Impacts**

5.     Based on my education, work experience, research background, publications, and review of the research of others, in my opinion, there is no evidence that gun laws banning the purchase or possession of firearms based on age restrictions have the intended effect of reducing gun homicides and suicides; I have found no discernable crime-reduction impact.

6.     I have conducted an extensive literature review, and have summarized the results of my research of pertinent publications. I know of no other pertinent publications but would consider them upon presentation.  All such publications, except for those by Gary Kleck, use a time-series-cross-section (TSCS) design or methodology, with data over many years and covering all states.  I specialize in that methodology, having published more than 25 studies using it.

7.     This methodology is the most common statistical procedure for determining whether a law affects crime.  It controls for overall differences in crime levels between states (state effects) and for overall differences between years (year effects).  When studying the impact of a law, the researcher typically constructs a "dummy variable," which is "0" when the state does not have the law and "1" when the law is in effect.  The TSCS methodology in effect compares trends in states with

2

the law and states without the law (or with laws passed in earlier or later years).  The law is deemed to have an effect if the regression coefficient on the dummy is statistically significant (*i.e.*, the law is found to have an impact after controlling for state and year effects and other control variables).  It is negative when the law reduces crime and positive when it increases crime.  The term "statistical significance," as used in these studies, means that there is less than a five (5) percent chance that the law has no impact given the size of the regression coefficient on the dummy variable.  As a practical matter, lack of significance is usually accompanied by a negligible coefficient on the dummy variable.

Determining significance using the TSCS methodology is greatly affected by autocorrelation, which here involves the correlation between current-year crime and crime in the prior and earlier years.  Unless proper corrections are made for autocorrelation, the regression often produces significant results, even though the results in fact are not significant.

8.     The impact of increasing minimum age to purchase a firearm from 18 to 21 is difficult to determine because very few states have made such a change.  However, based on my and others' research on age-based firearm restrictions and their effects, I have no reason to believe that increasing the minimum age to purchase firearms from 18 to 21 has any more effect than other minimum age requirements currently in place.

9.  Kleck, Gary. 2019.*"Regulating guns among young adults,"* American *Journal of Criminal Justice*, https://doi.org/10.1007/s12103-019-09476-6. The publication reports the results of two studies of the impact of gun control measures on violent crimes.  The first study assessed the impact of state bans on concealed carry permits among persons age 18 to 20 on rates of violent crime (homicide, robbery, and aggravated assault) committed by persons in that age group.  The results indicate that states limiting concealed carry permits to those 21 and older did not have less violent crime in that age group than states granting permits to those 19 and older.  The second study evaluated a Federal 1968 law prohibiting gun dealers from selling handguns to persons under 21.  The analysis tested whether the share of arrests for three violent crimes (homicide, robbery, aggravated assault) trended downward or upward, after the law went into effect.  Results indicated that the federal law had no impact on the 18-to-20-year old share of arrests for violent crime.  Attached hereto as **Exhibit 2** is a true and correct copy of Kleck (2019) (see specifically, pages 0006-7, 12, 16-17).

10.  Kleck, Gary, Thomislav Kavandzic, and Jon Bellows. 2016. "Does Gun Control Reduce Violent Crime?" *Criminal Justice Review*, 41:488-513.  In a cross-section study of 1,078 cities the authors found no significant reduction in total homicides, gun-homicides, non-gun homicides, robberies or assaults associated with laws limiting gun sales to, or gun possession by, minors.  Attached hereto as

4

**Exhibit 3** is a true and correct copy of Kleck et al (2016) (see specifically, pages 23-24, 36-37, 39, 42).

11.     Gius, Mark. 2015. "The impact of minimum age and child access prevention laws on firearms related youth suicides and unintentional deaths," *Social Science Journal*, 52: 168-175. The study evaluated, among other things, state minimum age laws and the association, if any, with firearms-related youth suicide and unintentional deaths.  The study found that state minimum age laws do not have a significant impact on gun suicides or unintentional deaths for those under 20 years old.  Gius (2015) found a significant impact for the 1994 federal minimum age law, but this is a spurious finding due to a statistical mistake.  The federal law applied to every state, so the federal law dummy variable captured the impact of everything that affected suicides in 1994 and that were not controlled by other variables. Technically, the federal law dummy is the fixed effect year dummy for 1994, and the 1994 fixed effect dummy drops out of the regression results.  If the federal law dummy had been entered into the equation after the year fixed effects, the regression program would have dropped it.  Another way of putting it is that there is no comparison group of states – states exempt from the federal law – meaning that the TSCS results are meaningless. Attached hereto as **Exhibit 4** is a true and correct copy of Guis (2015) (see specifically, pages 50-51, 54-56).

12.     Rodríguez-Andrésa, Antonio, and Katherine Hempstead. 2011.  "Gun control and suicide: impact of state firearm regulations in the United States,"

5

1995-2004. *Health Policy*, 101: 95-103. The article studied the impact of state laws banning handgun purchases on male suicide rates for age groups, 15-24, 25-44, 45-64, and 65 and over. The article found no significant impact except that the laws are associated with a significant reduction in suicides for males, ages 25-44. The latter finding, however, is not credible for several reasons. First, only one state (New York) enacted a new minimum age law during the period of the study (1995-2004), far from enough to produce useful results. Second, the study uses only ten years of data, which is unusual and in my experience leads to erratic results. Third, there is no correction for autocorrelation, so the significance levels are overstated. Attached hereto as **Exhibit 5** is a true and correct copy of Rodríguez, et al. (2011) (see specifically, pages 59, 63-66).

13.     Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Riveria. 2005. "An evaluation of state firearms regulations and homicide and suicide death rates," *Injury Prevention*, 11: 77-83. This study evaluated laws banning the purchase or possession of handguns by persons under the age of 21. The study found that such laws produced no significant reduction of a variety of measures of gun and non-gun homicides and suicides, but the findings are based on only a few law changes. This research, in effect, evaluated what happens when states move from under-18 laws to under-21 laws, which is comparable to California. Attached hereto as **Exhibit 6** is a true and correct copy of Rosengart, et al. (2005) (see specifically, pages 69, 71-75).

14.    Webster, Daniel, Jon S. Vernick, April M. Zeoli, and Jennifer A. Manganello. 2004.   "Association between youth-focused firearm laws and youth suicides," *Journal of the American Medical Association*, 292:592-602.   The study estimates the impact of laws establishing minimum age requirements for the purchase or possession of firearms on suicides by those 14-17 years and 18-20 years.   The study found no significant impact, except a significant decline in suicides in the 18-20 age group following an increase in the legal purchase age from 18 to 21.   This finding, in my opinion, is highly unlikely to be correct.   The study itself identifies several reasons to doubt the validity of the finding, including the fact that the finding is based on only 3 states making the change, 2 of which adopted the change in the final 2 years of the study.   The finding is barely significant (at the .04 level, just below the .05 level that indicates significance).   Most important, the authors attempt to address autocorrelation through the "cluster" method, which causes the significance levels to drastically increase with such a small number of law changes. Attached hereto as **Exhibit 7** is a true and correct copy of Webster, et al. (2004) (see specifically, pages 77-79, 81-83).

15.    Marvell, Thomas B. 2001.   "The impact of banning juvenile gun possession," *Journal of Law and Economics*.   44:691-714.   I posited theories were that juvenile gun bans either increase or decrease homicides.   If the bans reduce juvenile gun access, they would probably reduce the use of guns by juveniles in crimes.   If the bans lead others to believe that juveniles are more vulnerable targets,

7

the result is likely to be more crime, especially violent crimes against juveniles.  My research, however, found that state laws banning juvenile handgun possession (under the age of 18) had no significant effect on reducing gun homicides and suicides. Attached hereto as **Exhibit 8** is a true and correct copy of Marvell (2001).

16.    Kleck, Gary, and E. Brit Patterson. 1993.  "The impact of gun control and gun ownership levels on violence rates," *Journal of Quantitative Criminology*. 9:249-287.  In a cross-section state-level study, the authors found no significant relationship between gun or non-gun homicide and state restrictions on handgun purchases by minors.  Attached hereto as **Exhibit 9** is a true and correct copy of Kleck, et al. (1993).

17.    Rand Corporation recently published a lengthy review of the research on the impact of gun laws. [1] It found "inconclusive" evidence that minimum age laws have a crime-reducing impact.  It did find "limited" evidence that laws barring purchase by 18-20 year olds reduced suicide, based on the findings by Webster, et al. (2004), described above.  However, it failed to note that the Webster, et al. (2004) calculation of significance levels is erroneous (see above).  Attached hereto as **Exhibit 10** is a true and correct copy of relevant excerpts from Morral, et al. 2018.

---

[1] Andrew R. Morral, et al., 2018 *The Science of Gun Policy:A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States*. https://www.rand.org/pubs/research_reports/RR2088.html (accessed August 5, 2019).

8

**Mass Shootings**

18.     Mass shootings are an important and timely topic, but the shootings are not common enough, in my opinion, to obtain useful research results concerning whether they are affected by age limits.  My opinion is supported by the following article authored by M. Luca, L. Deepak, and C. Poliquin, 2019.  "The Impact of Mass Shootings on Gun Policy," Working Paper 16-126.  Harvard Business School, Cambridge, Massachusetts.  In that article, Luca, et al. (2019) also opine that mass shootings are not frequent enough to estimate the effects of gun policy on gun deaths. (*Id*. at 22.)  Attached hereto as **Exhibit 11** is a true and correct copy of Luca, et al. (2019).

19.     As described in Luca, et al. (2019), roughly 30,000 annual gun deaths occur in the United States, with fewer than 100 occurring in connection with mass shootings.  (*Id*. at 5.)  For clarity, I'm using the same definition of "mass shooting" as used in Luca, et al. (2019), which also closely matches the one used by the Federal Bureau of Investigation.  (*Ibid*.)  "Mass shootings" means an incident in which four or more people, other than the perpetrator(s), are unlawfully killed with a firearm in a single, continuous incident that is not related to gangs, drugs, or other criminal activity.  (*Ibid*.)

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on September 30, 2019.

_____

Thomas B. Marvell

*DECLARATION OF THOMAS MARVELL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION*

1
2

**EXHIBITS**
**TABLE OF CONTENTS**

3

**Exhibit**      **Description**                                      **Page(s)**

4
5

1      Thomas Marvell                                       0001 - 0004
       Curriculum Vitae

6
7
8

2      Kleck, Gary                                          0005 - 0021
       *"Regulating guns among young adults,"*
       American Journal of Criminal Justice (2019)

9
10

3      Kleck, Gary, et al.                                  0022 - 0048
       "Does Gun Control Reduce Violent Crime?"
       *Criminal Justice Review* (2016)

11
12
13
14

4      Gius, Mark                                           0049 - 0057
       "The impact of minimum age and child access
       prevention laws on firearms related youth suicides
       and unintentional deaths,"
       *Social Science Journal* (2015)

15
16
17

5      Rodríguez et al.                                     0058 - 0067
       "Gun control and suicide: impact of state firearm
       regulations in the United States," 1995-2004.
       *Health Policy* (2011)

18
19
20

6      Rosengart et al.                                     0068 - 0075
       "An evaluation of state firearms regulations and
       homicide and suicide death rates,"
       *Injury Prevention* (2005)

21
22
23
24

7      Webster et al.                                       0076 - 0085
       "Association between youth-focused firearm laws
       and youth suicides,"
       *Journal of the American Medical Association* (2004)

25
26
27
28

1

2

3

**EXHIBITS**
**TABLE OF CONTENTS**

4

| <u>Exhibit</u> | <u>Description</u> | <u>Page(s)</u> |
|---|---|---|
| 8 | Marvell, Thomas<br>"The impact of banning juvenile gun possession,"<br>*Journal of Law and Economics* (2001*)* | 0086 - 0109 |
| 9 | Kleck, Gary et al.<br>"The impact of gun control and gun ownership levels on violence rates,"<br>*Journal of Quantitative Criminology* (1993) | 0110 - 0150 |
| 10 | Morral, et al.<br>*The Science of Gun Policy:A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* (2018) | 0151 - 0329 |
| 11 | Luca et al.<br>*"The Impact of Mass Shootings on Gun Policy,"*<br>Working Paper (2019) | 0330 - 0389 |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Declaration of Thomas Marvell in Support of Plaintiffs' Motion for Preliminary Injunction*

# EXHIBIT "1"

Exhibit 1
0001

Thomas B. Marvell

155 Ridings Cove
Williamsburg, VA 23185
Email: marvell@cox.net
Phone: (757) 229 3531

Education

B.A., Harvard University 1961
J.D., University of Michigan 1964
Ph.D., University of Michigan 1976, Sociology

Experience

Attorney, Federal Home Loan Bank Board 1965-1968
Attorney, National Center for State Courts 1976-1985
Director, Justec Research 1985-2010

Selected Publications

"Indirect Simultaneity," *Criminology and Public Policy*, forthcoming.

"Clustering and Standard Error Bias in Fixed Effects Panel Data Regressions," (with C.E. Moody) *Journal of Quantitative Criminology*, 2018. https://doi.org/10.1007/s10940-018-9383-z

"The Impact of Right-to-Carry Laws: Critique of the 2014 version of Aneja, Donohue, and Zhang," (with C.E. Moody) *Econ Journal Watch*, 2018.

"The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," (with C.E. Moody, P.R. Zimmerman and Fisal Alemante) *Review of Economics and Finance*, 4(1) 2014, 33-43.

"Did John Lott Provide Bad Data to the NRC? A Note on Aneja, Donohue, and Zhang," (with J.R. Lott and C.E. Moody) *Econ Journal Watch,* 10, 2013, 25-31.

"On the Choice of Control Variables in the Crime Equation," (with C.E. Moody) *Oxford Bulletin of Economics and Statistics*, 72(5) 2010, 696-715

"Prison Population and Crime" in B. Benson and P. Zimmerman (eds.), *Handbook on the Economics of Crime*, Edward Elgar, Northampton, MA 2010, 145-183.

"The Debate on Shall-Issue Laws, Continued," (with C.E. Moody) *Econ Journal Watch*, 6(2) 2009, 203-217.

"The Debate on Shall-Issue Laws," (with C.E. Moody) *Econ Journal Watch*, 5(3) 2008, 269-293.

**Exhibit 1**
**0002**

"Can and Should Criminology Research Influence Policy? Suggestions for Time-Series Cross-Section Studies" (with C.E. Moody) *Criminology and Public Policy* 7(1) August, 2008, 401-407.

"The Criminogenic Effects of Imprisonment: Evidence from State Panel Data, 1974-2002," (with L.M. Vieraitis and T.V. Kovandzic). *Criminology and Public Policy,* 6, 2007, 589-562.

"Guns and Crime," (with C.E. Moody), *Southern Economic Journal,* 71(4), April, 2005, 720-736.

"The Impact of "Shall-Issue" Concealed Handgun Laws on Violent Crime Rates: Evidence from Panel Data for Large Urban Cities," (with T.V. Kovandzic and L.M. Vieraitis), *Homicide Studies,* 9, 2005, 292-323.

"When Prisoners Get Out: The Impact of Prison Releases on Homicide Rates, 1975-1999," (with T.V. Kovandzic, C.E Moody and L.M.Vieraitis), *Criminal Justice Policy Review,* 15, 2004, 212-228.

"Right-to-Carry Concealed Handguns and Violent Crime: Crime Control Through Gun Decontrol?" (with T.V Kovandzic), *Criminology and Public Policy* 2, 2003, 363-396.

"A Comparison of Changes in Police and General Homicides: 1930-1998," (with K.J. Kaminski). *Criminology,* 40, 2002, 171-183.

"The Impact of Lambda Skewness on Criminology: A Contingent Analysis" in A.R. Piquero and S.G. Tibbits, eds, Rational Choice and Criminal Behavior: Recent Research and Future Challenges. 2002. Routledge, NY

"The Impact of Banning Juvenile Gun Possession," *Journal of Law and Economics,* 44, 2001, 691-714.

"The Lethal Effects of Three-Strikes Laws," (with C.E. Moody), *Journal of Legal Studies*, 30, 2001, 89-106.

"Female and Male Homicide Victimization Rates: Comparing Trends and Regressors," (with C.E Moody), *Criminology*, 37, 1999, 879-902.

"The Impact of Out-of-State Prison Population on State Homicide Rates: Displacement and Free-Rider Effects," (with C.E. Moody), *Criminology*, 30, 1998, 513-535.

"The Impact of Prison Growth on Homicide," (with C.E. Moody) *Homicide Studies,* 1, 1997, 205-233.

"Age Structure Trends and Prison Populations," (with C.E. Moody) *Journal of Criminal Justice*, 25, 1997, 114-124.

**Exhibit 1**
**0003**

"Specification Problems, Police Levels, and Crime Rates," (with C.E. Moody) *Criminology,* 24, 1996, 609-646.

"The Uncertain Timing of Innovations in Time Series: Minnesota Sentencing Guidelines and Jail Sentences – A Comment," (with C.E. Moody) *Criminology*, 34, May, 1996.

"Determinant Sentencing and Abolishing Parole: the Long Term Impacts on Prisons and Crime," (with C.E. Moody), *Criminology,* 34, 1996, 107-128.

"Sentencing Guidelines and Prison Population Growth," *The Journal of Criminal Law and Criminology*, 8 (1995) 696-709.

"The Impact of Enhanced Prison Terms for Felonies Committed with Guns" (with C.E. Moody) *Criminology*,  33, 1995, 247-281.

"Prison Population Growth and Crime Reduction." (with C.E. Moody) *Journal of Quantitative Criminology,* 10, 1994, 109-140.

"Age Structure and Crime Rates: the Conflicting Evidence." (with C.E. Moody) *Journal of Quantitative Criminology*, 7, 1991, 237-273.

"Divorce Rates and the Fault Requirement, *Law and Society Review*, 1989, 23, 543-567.

"The Effectiveness of Measures to Increase Appellate Court Efficiency and Decision Output." (with C.E. Moody) Michigan Journal of Law Reform, 21, 1988, 415- 442.

"Appellate and Trial Caseload Growth: A Pooled Time Series Cross Section Approach." (with C.E. Moody) *Journal of Quantitative Criminology,*  3, 1987.

The Rationales for Federal Question Jurisdiction: An Empirical Examination of Student Rights Litigation, *Wisconsin Law Review* 1984, 1315-1342.

**Exhibit 1**
**0004**

# EXHIBIT "2"

Exhibit 2
0005

American Journal of Criminal Justice
https://doi.org/10.1007/s12103-019-09476-6

# Regulating Guns among Young Adults



Check for
updates

## Gary Kleck[1]

Received: 19 January 2019 / Accepted: 1 April 2019 / Published online: 29 April 2019
© Southern Criminal Justice Association 2019

## Abstract

This paper reports the results of two studies of the impact of gun control measures on violent criminal behavior among persons age 18 to 20. The first study assessed the impact of state bans on gun carrying among persons age 18 to 20 on rates of violent crime committed by persons in that age group. The research used a state-level cross-sectional weighted least squares analysis of murder, robbery, and aggravated assault rates in 2000, controlling for possible confounding variables. The results indicate no significant effect of these carry bans on any of the three violent crime rates. The second study was a longitudinal analysis performed to evaluate the impact of a single previously unstudied element of the federal Gun Control Act of 1968 – its ban on the purchase of handguns by persons aged 18 to 20. The analysis tested whether the share of arrests for three violent crime types trended downward, or less strongly upward, after the law went into effect, controlling for trends in the share of the population in this age group. Results indicate that there was no impact of this ban on the 18-to-20 year-old share of arrests for homicide, robbery, or aggravated assault.

**Keywords** Gun control · Young adults · Violent crime · Gun Control Act of 1968

## Introduction

This paper performs two tests of the general hypothesis that gun control measures specific to young adults reduce violent crime within that group. This focus is especially important because criminal violence in America is at its highest in the young adult ages. For example, national arrest data for 2017 indicate that the single ages with the highest rates of arrest for murder were 18, 19, and 20 years old (U.S. FBI, 2019, Table 38). Society therefore has an especially strong interest in reducing violence among young

✉  Gary Kleck
    gkleck@fsu.edu

[1]   College of Criminology and Criminal Justice, Florida State University, Tallahassee,
      FL 32306-1127, USA

🖄 Springer

Exhibit 2
0006

American Journal of Criminal Justice

adults, and it would seem reasonable to focus violence-prevention efforts especially heavily on this group.

There are also good reasons to believe that gun control measures would be especially likely to be effective if they focused on young adults. First, precisely because violent criminal behavior is more common within this group, any one instance of denying a gun to such a person is more likely to prevent a violent crime with a gun. Second, young adults are more likely to use firearms when they commit violence crimes (Department of the Treasury and Department of Justice, 1999, pp. 7, 9). Consistent with this fact, there is some macro-level evidence that gun prevalence increases homicide rates among persons age 18 to 24 (Parker et al., 2011, p. 510), even though the technically strongest evidence does not show a net positive effect of gun prevalence on the *overall* (all-ages) homicide rate (Kovandzic, Schaffer, & Kleck, 2013). (Parker et al., however, failed to model the possible two-way relationship between gun prevalence and homicide, so the positive association they observed may reflect the effect of homicide on gun prevalence, rather than the reverse - Kovandzic et al., 2013). Third, it seems likely that, compared to older offenders, younger criminals are less likely to have acquired the personal contacts and knowledge that would enable them to evade restrictions on guns. Further, their higher rate of involvement in violence may make it especially easy to detect any crime-reducing effects of gun controls in this group. In contrast, among children and older people, there is little violent crime to be prevented, so even a large percentage decrease might be too small in absolute terms to be reliably detected.

There is little variation across jurisdictions in the regulation of firearms among persons *under* the age of 18. They have been categorically forbidden from purchasing firearms of any kind from licensed gun dealers under federal law since the Gun Control Act of 1968 (GCA) (18 USC Section 922(b)(1)), and are ineligible everywhere except in Vermont to get the state carry permits that are required in most states to lawfully carry a concealed firearm off of the possessor's property (Giffords Law Center, 2019). This lack of variation makes it difficult to detect any effects of gun control measures applying to those under age 18. In contrast, the strictness of gun control laws pertaining to young adults age 18–20 has shown considerably more variation, both over time and across states. People in this age group can legally carry guns in public places in some states but not in others. This variation provides opportunities for researchers to estimate the effect of gun regulations on violence within this specific high-violence subpopulation.

The research reported here therefore focuses specifically on controls applying to this age group. In particular, it is aimed at two kinds of gun control measures: (1) state laws that forbid concealed carrying of firearms among 18–20 year-olds, and (2) a federal ban on the purchase of handguns by persons age 18–20, enacted as part of the 1968 GCA. We evaluate the first measure using a state-level cross-sectional design, and evaluate the second measure using a national-level longitudinal design.

## Study 1 – The Effect of State Bans on Concealed Gun Carrying by Persons Age 18–20

Each of the 50 states has different regulations on the carrying of concealed weapons, and in particular the states differ regarding the minimum age at which persons become eligible to lawfully carry concealed weapons. Variation was especially high prior to the


Springer

Exhibit 2
0007

American Journal of Criminal Justice

Supreme Court's 2008 Heller and 2010 McDonald decisions, and subsequent court decisions interpreting them, which had the effect of striking down state laws that categorically forbade all concealed carrying. Prior to 2000, seven states forbade concealed carrying of firearms altogether, for all ages (see the Appendix for a listing of states and supporting statutory citations) a number of courts banned nearly all gun carrying among civilians. One state (Vermont) set 16 as the minimum age to carry concealed guns in public places, 14 states required a minimum age of 18, another 21 states set 21 as the minimum age, and one state (Oklahoma) set the minimum age at 23.

The states also differ in how they implement age restrictions. Some require permits for concealed carrying, and specify a minimum age to get the permit, while others require no permit but nevertheless specify a minimum age for carrying. Still others do not specify an explicit age minimum, but rather grant discretion to authorities such as county sheriffs to assess the degree to which a prospective carrier is a "suitable person." As of 1999, 29 states forbade the carrying of concealed weapons by 18-to-20 year olds (including those that banned carrying by persons of any age) while the remaining 21 allowed it, either because (1) people this age could get a carry permit, or (2) the state neither required a carry permit nor stated a minimum age to carry (Appendix).

## Study 1 Methods

Our strategy for testing for an effect of state carry laws on violent crime takes advantage of the age-related element of these laws. The provisions concerning minimum age either prohibit or allow carrying specifically among 18-to-20 year olds, so if they affect the frequency of violent crime, they should do so primarily by affecting violent crime rates among 18-to-20 year olds. There are no available data that directly measure the violent criminal behavior of Americans of specific age groups, but an approximation can be derived from data on persons *arrested* for crimes. Arrest data by age are available from the Uniform Crime Reporting (UCR) program of the Federal Bureau of Investigation (FBI) are specific enough to establish national totals of arrests of 18-to-20 year olds. We analyzed three specific violent crimes that are the only crime types committed in significant numbers with firearms: (1) murder and nonnegligent manslaughter (hereafter denoted "homicide" for brevity's sake), (2) robbery, and (3) aggravated assault. About 73% of homicides, 41% of robberies, and 28% of aggravated assaults in 2017 were committed with firearms (U. S. Federal Bureau of Investigation, 2019).

We therefore estimated state rates of violent crime among 18-to-20 year olds by multiplying state crime rates concerning offenses by all ages by the fraction of persons arrested for a given crime type who were 18-to-20 years old. For example, we estimated the Alabama homicide rate among 18-to-20 year olds by multiplying the Alabama homicide rate in 2000 (7.4 homicides per 100,000 population) by the fraction of homicide arrests that 18-to-20 year olds accounted for in Alabama in 2000–2002 (0.1916), which yields an estimated homicide rate of 1.42 homicides committed by 18-to-20 year-olds per 100,000 resident population of all ages. Three years of arrest data, covering 2000–2002, were used to estimate the fraction of crimes committed by persons 18 to 20 because in smaller states there are too few arrests in any 1 year for any one type of violent crime (especially homicide) to provide a stable estimate of the 18-to-20 year old share of arrests.

 Springer

Exhibit 2
0008

American Journal of Criminal Justice

In the following regression analyses, three types of age-specific violent crime rates were analyzed: (1) the rate of homicide committed by 18-to-20 year-olds, (2) the rate of robbery committed by 18-to-20 year-olds, and (3) the rate of aggravated assault committed by 18-to-20 year-olds. The analysis focused on the year 2000 rather than more recent years because there was far more variation in the strictness of state controls on carrying firearms than in later years. In more recent times there has been little meaningful variation in the strictness of carry laws. For example, in 1999 there were seven states that completely banned carrying guns in public (see Appendix), but by 2010, there were none (Gifford Law Center, 2019). State controls over gun carrying became lenient in all but a handful of states. By 2018, at least 30 states had adopted lenient shall-issue carry laws, which make it easy for noncriminal adults to get carry permits, while another 12 states had eliminated the requirement for a permit to carry concealed firearms altogether (Gifford Law Center, 2019). One might speculate that results pertaining to 2000 do not apply to more recent years. Certainly, the *levels* of the variables in our models, and which states have which laws, changes over time, but we are not aware of any evidence that the causal *effects* of gun laws have changed since 2000.

The present study focused on 2000 rather than any intercensal year (e.g., 2001–2009) because the Census provides, for years when the diennial Census is conducted, data on a wealth of crime-related variables that should be statistically controlled in order to isolate the effect of carry law provisions. A list of these other variables appears in Table 1, and the sources of data for the analysis are reported in the Appendix.

States were coded according to their carry laws as of 1999, rather than 2000, to make sure that they pertained to a time point prior to 2000–2002, the period to which the crime rates pertained. This makes it less likely that any relationship found between carry law provisions and crime rates is due to an effect of crime rates on the enactment or amending of carry law provisions, and more likely that the relationship reflects an effect of the carry law provisions on crime rates.

The statistical procedure used to estimate the relationship between carry law age provisions and crime rates was weighted least squares (WLS) regression. This procedure gives differing weights to each of the states, such that states with larger populations are given greater weight. This has the effect of reducing heteroscedasticity. The weight used in these analyses was the square root of the state's resident population in 2000.

Only 48 of the 50 states could be included in the analysis because FBI arrest data by age were not available for all of the years from 2000 to 2002 for Florida or Wisconsin (they were missing for 2000 for Wisconsin and for all 3 years for Florida). It should be noted that it is not essential for present purposes that all arrests be reported to the FBI, since we make no use of the absolute frequency of arrests. Rather, it is only necessary that the 18-to-20 year old share of those arrests reported to the FBI be approximately the same as the 18-to-20 year old share of *all* arrests for a given type of violent crime, whether reported to the FBI or not.

## Study 1 Findings

Table 2 displays the WLS estimates. Each column of numbers shows the estimated coefficients of a regression equation pertaining to one of the three dependent variables, and each row pertains to a particular independent variable that might affect these outcome variables. Each cell of the table shows three numbers. The topmost number is the WLS



**Exhibit 2**
**0009**

American Journal of Criminal Justice

**Table 1**   Variables in the analysis (as of 2000 unless otherwise indicated)*

| Variable name | Variable description | Mean | Standard deviation |
|---|---|---|---|
| MURD1820 | Murder, nonnegligent manslaughters among 18-to-20 year olds per 100,000 population | 1.02 | 0.51 |
| ROB1820 | Robberies among 18-to-20 year olds per 100,000 population | 117.66 | 61.76 |
| ASLT1820 | Aggravated assaults among 18-to-20 year olds per 100,000 population | 35.84 | 14.27 |
| CARRY1820 | State law allows 18–20 carry, as of 1999 (1 = yes, 0 = no) | 0.41 | 0.50 |
| %POP18–20 | % of resident population age 18–20 | 4.41 | 0.40 |
| POVERTY | % families under the poverty line, 1999 | 12.17 | 3.03 |
| BLACK | % African-American | 11.55 | 9.19 |
| HISPANIC | % Hispanic | | |
| PRISONRS | State, federal prisoners per 100,000 resident population | 423.26 | 167.19 |
| DIVORCE | Divorces per 100,000 resident population | 4.22 | 1.17 |
| URBAN | % population residing in urban areas | 74.93 | 13.96 |
| DENSITY | Persons per square mile | 0.21 | 0.25 |
| FOREIGN | % foreign-born | 8.60 | 6.82 |
| INSTATE | % population born in same state | 61.02 | 12.05 |
| LIVLONE | % of population that lives alone | 9.73 | 1.04 |
| MARRIED | % of population married, living with spouse | 51.81 | 2.60 |
| MOVERS | % of population age 5+ that changed residence, 1995–2000 | 45.61 | 5.16 |
| OLDPCT | % population age 65 or older | 12.29 | 1.72 |
| POLICE | Sworn full-time police officers per 10,000 population | 20.20 | 4.33 |
| SOUTH | State is in the South (former slave-owning state) | 0.32 | 0.47 |
| WEST | State is in the West Census region | 0.24 | 0.43 |
| UNEMPLOY | % civilian labor force unemployed | 5.66 | 1.01 |
| VETERAN | Military veterans per 1000 population, 1999 | 89.16 | 9.76 |

* Means and standard deviations are based on weighted data, and cover the 48 nonmissing states used in the regression analyses – that is, they exclude Florida and Wisconsin

coefficient. The middle number is the ratio of the coefficient over its standard error, sometimes called a t-ratio, used to test whether the regression coefficient is significantly different from zero. The bottom number is the one-tailed statistical significance of the coefficient. A significance under .05 (5%) is generally considered to be statistically significant, i.e. not likely to be the product of random chance. Thus, if the bottom number in a given cell is lower than .05, it means that the associated independent variable shown in the row heading has a statistically significant association with the dependent or outcome variable shown in the column heading. Our primary interest is in the estimates shown in the first row of the table, those pertaining to the association of the 1999 state carry laws' provisions regarding minimum age for concealed carrying with crime rates among 18–20 year olds on the estimated rate of violent crime among 18–20 year-olds. Note that CARRY1820 reflects whether persons age 18 to 20 are *allowed* to legally carry guns, so a positive coefficient for this variable means that violent crime rates are higher where these young adults may legally carry firearms.

Exhibit 2
0010

American Journal of Criminal Justice

**Table 2** Weighted least-squares estimates – the effect of state bans on gun carrying by 18-to-20 year-olds on rates of violence crime by that age group

Coefficient/ratio of coefficient over standard error/1-tailed significance

| Independent variable | Dependent variable | | |
|---|---|---|---|
| | MURD1820 | ROB1820 | ASLT1820 |
| CARRY1820 | −0.116 | 1.006 | −1.624 |
| | −1.112 | 0.342 | −0.453 |
| | .136 | .367 | .326 |
| %POP18–20 | −0.052 | −5.405 | −0.496 |
| | −0.363 | −1.361 | −0.102 |
| | .360 | .090 | .460 |
| POVERTY | 0.044 | 1.269 | 1.434 |
| | 2.301 | 2.366 | 2.191 |
| | .014 | .012 | .034 |
| BLACK | 0.033 | 0.611 | 0.665 |
| | 5.542 | 3.699 | 3.298 |
| | .000 | .000 | .002 |
| URBAN | 0.006 | 0.427 | 0.357 |
| | 1.561 | 3.987 | 2.715 |
| | .063 | .000 | .004 |
| OLDPCT | −0.069 | | |
| | −2.252 | | |
| | .015 | | |
| Constant | 0.767 | −4.992 | −13.158 |
| Adjusted $R^2$ | .575 | .447 | .341 |

All variables shown in Table 1 that do not appear in Table 2 were found to have no significant ($p < .20$) association with any of the three violent crime rates studied and were therefore omitted from the crime rate models

Each regression equation also controlled for additional variables that affect crime rates and that might also be associated with carry law age provisions. Every equation controlled for the share of the state population that was in the 18–20 age range, regardless of whether this variable was significantly related to the dependent variable, because it was thought to be self-evident that the number of people in this age range would affect the number of crimes committed by persons in this age range. It turned out to make no difference to the key results whether or not this variable was included in the equations. The rest of the control variables were included in the equation only if they showed a significant relationship with the dependent variable. A generous standard of significance, 20%, was used in deciding whether to retain variables in the equation, to reduce the chances that a potentially important control variable was omitted. A much larger set of potential control variables were tested but found to have no significant association (even at a generous 20% level of significance) with any of the crime rates. All the variables shown in Table 1 that do not appear in Table 2 fall into this category.

Exhibit 2
0011

American Journal of Criminal Justice

Collinearity among the independent variables was not a problem – all tolerances were over 0.7 in all equations.

The estimates shown in the first row (labeled CARRY1820) of the first three columns of Table 2 estimate the effect of allowing 18–20 year olds to legally carry concealed weapons. The estimates indicate that this policy is not significantly related to rates of any of the three violent crimes that are often committed with guns (homicide, robbery, aggravated assault) among persons age 18 to 20. Indeed, the associations were negative for two of the three violent crime types, indicating that, other things being equal, states allowing 18–20 year old carry have less homicide and aggravated assault among 18–20 year olds than states forbidding it, though not to a statistically significant degree. The homicide finding is consistent with the results of a recent study of the effect of state gun laws on homicide rates, which found no significant effect of a requirement that people be at least 21 years old to legally possess a firearm (Siegel, Pahn, Xuan, Fleegler, & Hemenway, 2019).

### Study 1 Discussion and Conclusions

The analysis of state crime and arrest data indicates that provisions in state law prevailing in 1999 that allowed lawful concealed carrying of weapons among 18–20 year olds did not increase rates of murder, robbery, or aggravated assault within that age group. One partial explanation may be that states granting carry permits to persons under age 21 do so only for persons without criminal convictions or other predictors of violent crime, so legal carrying increased only among persons unlikely to commit violent crimes – even within a relatively high-violence age segment of the population. Another explanation, consistent with research on the frequency and prevalence of defensive gun use (Kleck, 2001a, b), is that the deterrent and defensive effects of gun carrying and defensive use among crime victims and prospective victims had crime-reducing effects that counterbalanced any crime-increasing effects of young adults carrying concealed guns. Alternatively, these restrictions may have failed to even achieve their proximate goal of reducing gun carrying in the target age group, because young adults carried guns illegally. In any case, the evidence indicates that allowing lawful concealed carrying of weapons among 18–20 year olds appears to have no net effect on rates of murder, robbery, or aggravated assault committed by people in this age group.

This finding fits well with complementary research done by Thomas Marvell (2001). Although he did not analyze age-specific crime rates as is done in the present paper, his fixed-effects panel analysis of state crime rates in the period 1968–1999 indicated that neither state laws banning juvenile gun possession nor a 1994 federal ban had any measurable net effect on violent crime rates (for all ages), including rates of homicide, robbery, and aggravated assault. This combination of studies suggests that banning juvenile gun possession or carrying does not, on net, reduce violent crime, and, conversely, that allowing lawful gun carrying does not, on net, increase violent crime.

### Study 2 – The Effect of the 1968 Federal Ban on Handgun Purchases by Persons Age 18–20

The Gun Control Act of 1968 (hereafter GCA) was a major piece of federal gun control legislation that had many elements, one of which imposed a new restriction specifically

✷ Springer

Exhibit 2
0012

applying to persons age 18 to 20. It provided that, while such persons could, like persons age 21 or over, lawfully purchase *long guns* (rifles and shotguns) from licensed gun dealers, those 18–20 were legally forbidden from buying handguns. Prior to this law, many states imposed age-based restrictions. We are not aware of any compilations of gun laws detailed enough to indicate how many states allowed handgun purchases by persons age 18–20 before 1968, but we do know that as of 2018, only 17 states and the District of Columbia required a minimum age of 21 to purchase handguns (Giffords Law Center, 2019). That is, as far of 2018 state law is concerned, people age 18 to 20 can lawfully buy handguns in 33 states. We assume that many states also allowed handgun purchases by 18–20 year-olds before 1968. Further, until 1968 no federal law prohibited handgun purchases by 18-to-20 year olds. Thus, the GCA introduced a new restriction on handgun buying by young adults.

The intent of the GCA was to reduce gun violence, partly by helping to restrict access to firearms among some subsets of the population. The introduction of this new restriction, applying specifically to 18-to-20 year olds, should directly affect only this age group, and should therefore have its largest effect on violent crime committed by persons age 18 to 20.

## Study 2 Methods

The logic of the following analysis is simple. If the new handgun purchase restrictions of the GCA applying to 18-to-20 year olds was effective, the fraction of arrests for violent crimes that 18-to-20 year olds accounted for should have declined after the GCA went into effect late in 1968, since only this age group was newly subject to the age-based handgun purchase ban. Therefore, we analyzed arrest data for the United States for each year from 1963 (5 years before the GCA went into effect) to 1973 (5 years after the GCA), for trends in three measures: (1) the percent of arrests for murders and nonnegligent manslaughters (hereafter "homicides") that 18-to-20 year olds accounted for, (2) the percent of arrests for robbery that 18-to-20 year olds accounted for, and (3) the percent of arrests for aggravated assault that 18-to-20 year olds accounted for. As with Study 1, these three offense types were studied because they are the only types of violent crime that involve handguns to any significant degree. Arrest data do not allow analysts to determine if the crime for which the person was arrested involved a gun, or more specifically a handgun, so it is not possible to directly measure trends in age patterns of persons committing, or arrested for, crimes in which handguns were used.

It should be emphasized that, unlike in Study 1, we did not analyze estimated per capita rates of crime by 18-to-20 year olds in Study 2. Instead, we analyzed the estimated *share* of violent crimes (regardless of their number) committed by this subpopulation. This strategy strengthens our ability to isolate the effect of changes in age-specific gun control measures by reducing the need to control for numerous possible confounders. The alternative of analyzing per capita rates of violent crime in this age group would be afflicted by a far more severe need to control for possible confounding variables, since virtually any variable that could affect violent criminal behavior in the population as a whole could also affect violent criminal behavior among those age 18-to-20. Isolating the impact of the GCA's new ban would require controlling for all the other variables having causal effects among people of all ages. In

Exhibit 2
0013

American Journal of Criminal Justice

contrast, only factors specific to persons 18–20 are likely to affect the *percent* of crimes committed by those age 18–20.

Violent crime (and arrests for violent crime) increased after 1968 but by itself this says nothing definitive about the impact of the GCA as a whole or of its new restrictions concerning 18-to-20 year olds, since violence increased in all age groups, and had already been increasing well before the GCA went into effect. Thus, we need to introduce a feature into the research design that takes account of preexisting trends in violent crime, and thus in arrests for violent crime. We do this by measuring the average trend in the 18-to-20 year old share of arrests in the years immediately before the GCA went into effect in late 1968 (i.e., in 1963–1968) and comparing this with the average trend in the years immediately *after* the GCA (i.e., 1969–1973), excluding 1968 because part of it was before the GCA went into effect and part was after. If the relevant provisions of the GCA were effective, the post-1968 trends should be either downward or at least be less steeply upward than they had been before the GCA. Thus, the preexisting upward trend in the 18-to-20 year old share of violent crime arrests should have at least slowed, and possibly even reversed itself after 1968.

One other methodological feature was also essential to the analysis. The 18-to-20 year old share of arrests could change even if the GCA's relevant provisions had no effects, merely because the 18-to-20 year old share of the *population* changed. More specifically, the previously increasing 18-to-20 year old share of *arrests* could slow in its rate of increase if the previously increasing 18-to-20 year old share of the *population* slowed in its rate of increase. This is not a mere hypothetical – this is precisely what happened around 1968. Figure 1 shows that the 18-to-20 year-old share of the population (represented by the height of the line) was sharply increasing up until 1968, but then decreased in 1968 and thereafter increased much more slowly than it had before 1968. This means that if an analyst did not control for trends in the 18-to-



**Fig. 1** Trends in the percent of the U. S. population that was age 18 to 20, 1963–1973

Springer

Exhibit 2
0014

American Journal of Criminal Justice

20 year old share of the population, the effect of this shift in the age structure of the population would be confused with the effect of the GCA.

We therefore performed a linear regression analysis for each of our arrest outcome measures, in which the dependent variable was the 18-to-20 year old share of arrests for a given type of violent crime (murder, robbery, or aggravated assault), the year was the main independent variable, and the 18-to-20 year old share of the population was a control variable. The analysis was performed twice for each violent crime type, once for the years 1963–1968 (pre-GCA years) and once for the years 1969–1973 (post-GCA years). The coefficient for the YEAR variable represents the average annual change in the 18-to-20 year old share of arrests over the time period studied. If it is positive, it means that the 18-to-20 year old share of arrests for the target violent crime was increasing during that period, and if it is negative, it indicates that the share was decreasing. The larger the coefficient, the stronger the trend was. Thus, if the GCA was effective, the coefficient for YEAR in the post-GCA period should be either a smaller positive number than the same coefficient for the pre-GCA period (indicating a weakening of the pre-GCA upward trend), or the post-GCA coefficient might even be negative, indicating that the trend had reversed itself from an upward trend to a downward trend.

### Study 2 Findings on the Impact of the GCA

Table 3 displays the key results from the regression analyses, showing the YEAR coefficients for the pre-GCA period and the post-GCA period, for each of the three arrest outcome measures. The upper panel (Panel A) shows the potentially misleading results obtained when there are no controls for the 18-to-20 year old share of the population, and the lower panel (Panel B) shows the corresponding results when a control for this variable was introduced.

**Table 3** Changes in the trend in the 18-to-20 year old share of violent crime arrests, from the 1963–1967 (pre-GCA) period to the 1969–1973 (post-GCA) period

| Panel A. No control for percent of the population age 18–20 | | | |
|---|---|---|---|
| Dependent variable | | | |
| 18-to-20 year-old share | Coefficient for year | | Change from 1963 to 1968 |
| of arrests for … | 1963–1968 | 1969–1973 | to 1969–1973 |
| Murder | .654 | −.060 | −0.714 |
| Robbery | .834 | −.290 | −1.124 |
| Aggravated Assault | .580 | −.020 | −0.600 |
| Panel B. Percent of the population age 18–20 controlled | | | |
| Dependent variable | | | |
| 18-to-20 year-old share | Coefficient for year | | Change from 1963 to 1968 |
| of arrests for … | 1963–1968 | 1969–1973 | to 1969–1973 |
| Murder | .410 | 3.417 | +3.007 |
| Robbery | .840 | 2.651 | +1.811 |
| Aggravated Assault | .525 | 1.649 | +1.124 |

Exhibit 2
0015

American Journal of Criminal Justice

The Panel A results initially indicated that trends in the 18-to-20 year old share of violent crime arrests moved in a desirable direction after 1968 – the previous upward trend prevailing prior to 1968 leveled off or even declined slightly after 1968. The Panel B results, however, indicate that this change in trends was at least partly due to the changing trends in the 18-to-20 year old share of the population documented in Fig. 1. Once that factor was statistically controlled, the positive coefficients for the YEAR variable for the pre-GCA period, which indicated an upward trend in the 18-to-20 year old share of violent crime arrests before 1968, became an even *larger* positive coefficient in the post-GCA period, indicating that the upward trend in the 18-to-20 year old share of violent crime arrests became even stronger after 1968, despite the new federal ban on handgun purchases by persons age 18 to 20. That is, once one takes account of trends in the percent of the population age 18 to 20, it becomes apparent that upward trend in the share of arrests claimed by 18-to-20 year olds became stronger after 1968.

## Study 2 Discussion and Conclusions

The federal ban on 18-to-20 year olds purchasing handguns from licensed dealers introduced in 1969 does not appear to have reduced the 18-to-20 year old share of violent crime. It is this specific age group whose violent behavior should have been most influenced if the purchase ban was effective, so the ban was apparently ineffective in reducing criminal violence. These results specific to young adults comport with research on the impact of the GCA on violent crime in the population as a whole. Magaddino and Medoff (1984) found no significant effect of the GCA on the U.S. homicide rate as a whole, i.e. for all ages. Zimring (1975) did not test the effect of the GCA on national crime rates, but did find that it failed to achieve the intermediate goals of reducing interstate movement of guns (pp. 181, 191) or decreasing the share of violent crimes committed with handguns (p. 172).

The focus on national-level data leaves open the possibility that the handgun purchase ban reduced young adult involvement in violence in some parts of the country, but not others. Since our results indicated no net effect for the nation as a whole, however, violence-reducing effects in some places could exist only if banning handgun purchases had violence-*increasing* effects in other places.

The apparent lack of impact of the handgun purchase ban on young adult involvement in violent crime does not mean that other elements of the GCA could not have had any beneficial effects. Nevertheless, the evidence indicates that the law as a whole apparently did not have any net effect on the homicide rate and did not reduce the share of the nation's violent crimes committed with guns (Magaddino and Medoff 1984; Zimring 1975).

Why did the new ban on handgun buying not reduce violent crime among the young adults who should have been affected? One obvious explanation would be that they bought handguns from other sources besides licensed dealers, such as friends or relatives. They could have acquired handguns illegally, e.g., by stealing them or by using persons age 21 or older to act as "straw purchasers" on their behalf (Wright & Rossi, 1986). Youth could also gain possession of handguns by borrowing their parents' firearms, with or without their knowledge. It is even possible that the ban *did* reduce handgun acquisition in this group, but that this did not reduce the youths'

Springer

Exhibit 2
0016

American Journal of Criminal Justice

involvement in violent crime. Criminally inclined young adults could substitute long guns like shotguns or rifles, or weapons other than firearms, to use in crimes, or commit offenses without using weapons of any kind - unsurprising possibilities given that most rapes, aggravated assaults, and robberies are in fact committed without firearms (U.S. Federal Bureau of Investigation, 2019, Table 19; U.S. Bureau of Justice Statistics., 2010, Table 66).

## Overall Conclusions and Policy Implications

Neither study reported herein found any violent crime-reducing effects of gun control measures aimed specifically at young adults, notwithstanding the strong a priori reasons to expect that such effects would be strongest and easiest to detect within this population. These findings reduce any optimism one might have about the benefits of gun control restrictions directly specifically at young adults. Recent reviews of research on the impact of gun control laws as a whole likewise indicate that, with few exceptions, existing gun laws have no detectable net reducing effect on violent crime (Kleck, Kovandzic, & Bellows, 2016; Rand Corporation, 2018). For example, Rand searched for evidence bearing on the effects of 14 types of gun policies (excluding Stand-Your-Ground laws, which are not gun policies) with reference to eight violent crime outcomes, and found evidence bearing on 26 of the possible effects of policies on crime. Among these 26, the authors failed to find either "strong" or "moderate" support for a violence-reducing effect of any gun policy on any violent crime outcome, with a single exception – moderate support for the effect of prohibitions associated with mental illness. (The review also found moderate support for background checks on *firearms* homicides, but only "limited" support for an effect on *total* homicides - p. 304). For all the other possible effects, the authors rated the evidence as "inconclusive."

Particularly relevant to the present report, the Rand authors found no strong or moderate support for an impact of age restrictions on purchasing or possessing guns - evidence regarding effects on homicide was rated as "inconclusive." Similarly, Kleck et al. (2016) failed to find even weak support for violence-reducing effects of bans on possession or purchase of guns by minors. Thus, in this research context, the present report's null findings concerning restrictions on purchase or carrying of guns among persons age 18 to 20 are unsurprising.

This does not mean that no gun control measures can reduce violent crime. Even the generally unsupportive Rand review found some evidence that background checks and prohibitions associated with mental illness may reduce homicide. Likewise, Kleck et al. (2016, p. 508) found strong support for an effect of gun owner licensing (whose central element is background checks) on homicide, and weaker support for an assault-reducing effect of prohibition of gun possession by mentally ill persons. Further, there could be gun regulations that have never been implemented, or implemented but not evaluated, that might prove effective. Nevertheless, the full body of empirical evidence accumulated so far largely indicates that most gun control policies heretofore implemented, whether directed at young adults or the population as a whole, do not have any measurable net effect on violent crime.

Exhibit 2
0017

American Journal of Criminal Justice

## Appendix

### Data Sources

### State crime rate data

U.S. Dept. of Justice, Federal Bureau of Investigation. Crime in the United States - Uniform Crime Reports, 2000. Washington, D. C.: U. S. Government Printing Office.

*State arrest data by age, 2000–2002* (available from ICPSR website at http://www.icpsr.umich.edu/icpsrweb/ICPSR/access/index.jsp):

U.S. Dept. of Justice, Federal Bureau of Investigation. Uniform Crime Reporting Program Data [United States]: Arrests By Age, Sex, And Race, 2000 [Computer file]. ICPSR03443-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 2006-10-27.

U.S. Dept. of Justice, Federal Bureau of Investigation. Uniform Crime Reporting Program Data [United States]: Arrests By Age, Sex, And Race, 2001 [Computer file]. Compiled by the U.S. Dept. of Justice, Federal Bureau of Investigation. ICPSR03760-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 2006-09-21.

U.S. Dept. of Justice, Federal Bureau of Investigation. Uniform Crime Reporting Program Data [United States]: Arrests By Age, Sex, And Race, 2002 [Computer file]. ICPSR04443-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 2007-03-21.

### State and Federal Prisoners

U.S. Bureau of Justice Statistics. 2001. Prisoners in 2000. BJS Bulletin NCJ 118207 at: http://bjs.ojp.usdoj.gov/content/pub/pdf/p00.pdf

### Sworn police full-time employment

U.S. Department of Justice, Bureau of Justice Statistics. (1998). *Directory of Law Enforcement Agencies*, 1996: [UNITED STATES] [Computer file]. Conducted by U.S. Dept. of Commerce, Bureau of the Census. ICPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 1998.

### Divorces

U.S. National Center for Health Statistics. "Provisional Tables on Births, Marriages, Divorces, and Deaths 1998-2000". National Vital Statistics Reports, Volume 49, number 6, available at http://www.cdc.gov/nchs/data/nvsr/nvsr49/49_06_02_03.pdf.

*Population estimates by age*: U.S. Bureau of the Census website at http://www.census.gov/popest/archives/pre-1980/.

http://www.census.gov/popest/states/asrh/files/SC-EST2009-AGESEX-RES.csv

 Springer

Exhibit 2
0018

American Journal of Criminal Justice

**All other variables**

U. S. Bureau of the Census. "Census 2000 Briefs and Special Reports" website at http://www.census.gov/population/www/cen2000/briefs.html.

**Classification of the States as to Minimum Age for Lawful Carrying of Concealed Weapons, as of 1999.**

*No Concealed Carrying Allowed*: IL, KS, MO, NE, NM, OH, WI.

*Minimum Age 23*: OK.

*Minimum Age 21*: AK, AZ, AR, FL, GA, HA, KY, LA, MA, MI, NV, NC, OR, PA, RI, SC, TN, TX, UT, VA, WA.

*No express minimum age*: AL, CA, CO, CT, NH, NY.

*Minimum age 18*: DE, ID, IN, IA, ME, MD, MI, MN, MT, NJ, ND, SD, WV, WY.

*Minimum Age 16*: VT.

*State Law Provisions on Minimum Age for Concealed Weapons Carry as of 1999*:

1. Alabama. Code of Ala. § 13A-11-75 (1999)
2. Alaska. Alaska Stat. § 18.65.705(1) (1999)
3. Arizona. Ariz. Rev. Stat. § 13–3112(E)(2) (1999)
4. Arkansas. Ark. Stat. Ann. § 5–73-309(1)(B) (1999)
5. California. Cal. Pen. Code § 12,050 (1999)
6. Colorado. Col. Rev. Stat. § 18–12-105.1 (1999)
7. Connecticut. Conn. Gen. Stat. § 29–28 (2000)
8. Delaware. 1 Del. Code § 701; 11 Del. Code § 1441(a) (1999)
9. Florida. Fla. Stat. § 790.06(2)(b) (1999)
10. Georgia. Official Code Ga. Ann. § 16–11-129(b)(1) (1999)
11. Hawaii. Haw. Rev. State § 134–9(a) (1999)
12. Idaho. Idaho Code §§ 3302(1)(l), (11) (1999)
13. Illinois. 720 Ill. Compiled Stat. Ann. § 5/24–1(4) (1999)
14. Indiana. Burns Ind. Code Ann. § 35–47-2-3(f)(2) (1999)
15. Iowa. Iowa Code § 724.8(1) (1999)
16. Kansas. Kansas Stat. Ann. § 21–4201(a)(4) (1999)
17. Kentucky. Kentucky Rev. Stat. § 237.110(2)(b) (2000)
18. Louisiana. La. Rev. Stat. § 40:1379.3(C)(4) (1999)
19. Maine. 25 Maine Rev. Stat. § 2003(1)(A) (1999)
20. Maryland. Md. Ann. Code art. 27, § 36E(a)(1) (1999)
21. Massachusetts. Mass. Ann. Laws ch. 140, § 131(d)(iv) (1999)
22. Michigan. Mich. Code Laws § 28.426 (1999)
23. Minnesota. Minn. Stat. §§ 624.713(1)(a), 624.714(5)(a) (1999)
24. Mississippi. Miss. Code Ann. § 45–9-101(2)(b) (1999)
25. Missouri. Rev. Stat. Mo. § 571.030 (1999)
26. Montana. Mont. Code Ann. § 45–8-321(1) (1999)
27. Nebraska. Rev. Stat. Neb. § 28–1202 (1999)
28. Nevada. Nev. Rev. Stat. Ann. § 202.3657(2)(b) (1999)
29. New Hampshire. N.H. Rev. Stat. Ann. § 159:6 (1999)
30. New Jersey. N.J. Stat. §§ 2C:58–3(c)(4), 2C:58–4(c) (1999)
31. New Mexico. N.M. Stat. § 30–7-2 (1999)
32. New York. N.Y. CLS Penal § 400.00(1) (1999)

Exhibit 2
0019

American Journal of Criminal Justice

33. North Carolina. N.C. Gen. Stat. § 14–415.12(a)(2) (1999)
34. North Dakota. N.D. Cent. Code §§ 62.1–02-01(4), 62.1–04-03 (1999)
35. Ohio. Ohio Rev. Code Ann. § 2923.12(A) (1999)
36. Oklahoma. 21 Okl. St. § 1290.9(3) (1999)
37. Oregon. Oregon Rev. Stat. § 166.291(1)(b) (1999)
38. Pennsylvania. 18 Pa. C.S. § 6109(B) (1999)
39. Rhode Island. R.I. Gen. Laws § 11–47-11(a) (1999)
40. South Carolina. S.C. Code Ann. § 23–31-215(A) (1999)
41. South Dakota. S.D. Codified Laws § 23–7-7.1(1) (1999)
42. Tennessee. Tenn. Code Ann. § 39-17-1351(b) (1999)
43. Texas. Tex. Gov't Code 411.172(a)(2) (1999)
44. Utah. Utah Code Ann. § 53–5-704(1) (1999)
45. Vermont. 13 Vermont Stat. Ann. § 4008 (1999)
46. Virginia. Va. Code Ann. § 18.2–308(D) (1999)
47. Washington. Rev. Code Wash. § 9.41.070(1)(c) (1999)
48. West Virginia. W. Va. Code § 61–7-4(a)(3) (1999)
49. Wisconsin. Wis. Stat. § 941.23 (1999)
50. Wyoming. Wyo. State. § 6–8-104(j) (1999)

## References

Department of the Treasury and Department of Justice. 1999. Gun Crime in the Age Group 18–20. https://permanent-access-gpo-gov.proxy.lib.fsu.edu/lps20136/report.pdf. Accessed 1-9-19.

Giffords Law Center. 2019. "Concealed carry". https://lawcenter.giffords.org/ gun-laws/policy-areas/guns-in-public/concealed-carry/. Accessed 10 Jan 2019.

Kleck, G. (2001a). The frequency of defensive gun use. In G. Kleck & D. B. Kates (Eds.), Armed (pp. 213–283). Amherst, NY: Prometheus Books.

Kleck, G. (2001b). The nature and effectiveness of owning, carrying, and using guns for self-protection. In G. Kleck & D. B. Kates (Eds.), Armed (pp. 285–342). Amherst, NY: Prometheus Books.

Kleck, G., Kovandzic, T., & Bellows, J. (2016). Does gun control reduce violent crime? Criminal Justice Review, 41, 488–513.

Kovandzic, T., Schaffer, M. E., & Kleck, G. (2013). Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach. Journal of Quantitative Criminology, 28(4), 477–541.

Magaddino, J. P., & Medoff, M. H. (1984). An empirical analysis of federal and state firearm control laws. In D. B. Kates, Jr., (Ed.), Firearms and violence: issues of public policy (pp.225–258). Cambridge, Mass.: Ballinger.

Marvell, T. (2001). The impact of banning juvenile gun possession. Journal of Law and Economics, 44, 691–713.

Parker, R. N., Williams, K. R., McCaffree, K. J., Acensio, E. K., Browne, A., Strom, K. J., & Barrick, K. (2011). Alcohol availability and youth homicide in the 91 largest US cities, 1984-2006. Drug and Alcohol Review, 30, 505–514.

Rand Corporation. 2018. The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States. https://www.rand.org/pubs/research_reports/RR2088.html. Accessed 10 Jan 2019.

Siegel, M., Pahn, M., Xuan, Z., Fleegler, E., and Hemenway, D. 2019. The impact of state firearm laws on homicide and suicide deaths in the USA, 1991-2016: A panel study. Journal of General Internal Medicine, Online First article.

U. S. Federal Bureau of Investigation. 2019. Uniform Crime Reports, 2017. Available online at https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/topic-pages/tables/table-38. Accessed 1-9-19.

 Springer

Exhibit 2
0020

U.S. Bureau of Justice Statistics. 2010. *Criminal Victimization in the United States, 2008 – Statistical Tables*, table 66. At https://www.bjs.gov/content/pub/pdf/cvus08.pdf. Accessed 10 Jan 2019.

Wright, J., & Rossi, P. (1986). *Armed and Considered Dangerous*. New York: Aldine de Gruyter.

Zimring, F. E. (1975). Firearms and federal law: the Gun Control Act of 1968. *Journal of Legal Studies, 4*, 133–198.

**Publisher's Note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Gary Kleck** is the Emeritus David J. Bordua Professor of Criminology and Criminal Justice at Florida State University. His research has focused on the topics of the impact of firearms and gun control on violence, deterrence, crime control, and violence. He is the author of Point Blank: Guns and Violence in America, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology. He also wrote Targeting Guns (1997) and, with Don B. Kates, Jr., The Great American Gun Debate (1997) and Armed (2001), and, with Brion Sever, Punishment and Crime (2017). His articles have been published in the American Sociological Review, American Journal of Sociology, Social Forces, Criminology, Journal of Criminal Law and Criminology, Law & Society Review, Journal of Research in Crime and Delinquency, and many other journals. He has testified before Congress and state legislatures on gun control issues and his work has been cited by the U.S. Supreme Court. He has served as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a member of the U.S. Sentencing Commission's Drugs-Violence Task Force, and a member of the National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-related Violence. His most recent book is Punishment and Crime, with Brion Sever, and was published in October 2016.

Exhibit 2
0021

# EXHIBIT "3"

Exhibit 3
0022

*Article*

# Does Gun Control Reduce Violent Crime?

Criminal Justice Review
2016, Vol. 41(4) 488-513
© 2016 Georgia State University
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0734016816670457
cjr.sagepub.com



## Gary Kleck[1], Tomislav Kovandzic[2], and Jon Bellows[3]

## Abstract

Do gun control laws reduce violence? To answer this question, a city-level cross-sectional analysis was performed on data pertaining to every U.S. city with a population of at least 25,000 in 1990 ($n = 1,078$), assessing the impact of 19 major types of gun control laws, and controlling for gun ownership levels and numerous other possible confounders. Models were estimated using instrumental variables (IVs) regression to address endogeneity of gun levels due to reverse causality. Results indicate that gun control laws generally show no evidence of effects on crime rates, possibly because gun levels do not have a net positive effect on violence rates. Although a minority of laws seem to show effects, they are as likely to imply violence-increasing effects as violence-decreasing effects. There were, however, a few noteworthy exceptions: requiring a license to possess a gun and bans on purchases of guns by alcoholics appear to reduce rates of both homicide and robbery. Weaker evidence suggests that bans on gun purchases by criminals and on possession by mentally ill persons may reduce assault rates, and that bans on gun purchase by criminals may also reduce robbery rates.

## Keywords

gun control, violence, gun ownership

The United States has higher rates of violent crime, both fatal and nonfatal, than all but a handful of the industrialized nations of the world (Killias, van Kesteren, & Rindlisbacher, 2001). Many of these crimes are committed by offenders armed with guns. In 2014, 67.9% of homicides, 40.3% of robberies, and 22.5% of aggravated assaults known to police were committed by criminals with guns (U.S. Federal Bureau of Investigation [FBI], 2015). The United States also has a higher rate of private gun ownership than any other industrialized nation (Killias et al., 2001). This combination of facts has led many to conclude that America's high rate of gun ownership must be at least partially responsible for the nation's high rates of violence, or at least its high rate of homicide. This in turn has led many to conclude that stricter gun laws can reduce violent crime, especially the homicide rate (e.g., Cook & Ludwig, 2000).

---

[1] College of Criminology and Criminal Justice, Florida State University, Tallahassee, FL, USA
[2] Program in Criminology, University of Texas at Dallas, Richardson, TX, USA
[3] Wisconsin Supreme Court, Oshkosh, WI, USA

**Corresponding Author:**
Gary Kleck, College of Criminology and Criminal Justice, Florida State University, Tallahassee, FL 32306, USA.
Email: gkleck@fsu.edu

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0023**

## Theory

Why should gun levels influence rates of crime or violence? And if gun levels do have effects, how might gun control laws decrease crime rates? If a gun is available to a prospective aggressor, it can encourage attacks, especially by weaker attackers on stronger or more numerous victims, and can facilitate attacks from a distance or attacks by persons too squeamish to attack with messier weapons like knives or too timid to attack at close quarters. Similarly, guns may enable some people to attempt robberies they could not complete unarmed (Cook, 1976; Kleck, 1997, pp. 215–240; Newton & Zimring, 1969). The sight of a gun also might trigger attacks by angered persons, due to the learned association between guns and violence. On the other hand, research on real-world crime incidents indicates that aggressor possession of guns is generally associated with a *lower* likelihood of attack and injury to the victim (Kleck & McElrath, 1991). Once an injury is inflicted, however, it is more likely to result in death if a gun was used, due to the weapon's greater lethality (Block, 1977; Kleck & McElrath, 1991; Newton & Zimring, 1969). Part of the higher fatality rates of gun attacks, however, is probably due to greater deadliness of intent among attackers using guns, rather than just the deadliness of the weapon itself (Cook, 1982, pp. 247–248; Wright, Rossi, & Daly, 1983, pp. 189–212).

Gun control laws, in turn, are intended to reduce crime and violence rates by restricting the availability of firearms among persons believed to be at higher risk of committing acts of violence. Although some laws hypothetically might do this by reducing gun levels in the general population, neither the federal government nor any state has ever banned the ownership of guns or even any large subset of guns, such as handguns. Further, prior research indicates that existing laws have no measurable effect on overall gun ownership levels in the population as a whole (Kleck & Patterson, 1993). Instead, gun laws are intended to block acquisition, possession, and criminal use of guns by members of high-risk subsets of the population, such as convicted criminals, mentally ill persons, alcoholics, or drug addicts.

Further, some gun laws are designed to reduce violence in ways that do not require reducing gun ownership in any subset of the population. For example, some controls aim to reduce unlicensed carrying of concealed guns through public spaces, reducing gun possession in situations likely to erupt in violence. Other controls try to deter criminal use of firearms by imposing enhanced (add-on) penalties for gun use in crimes, above and beyond the baseline penalties provided for the underlying crimes.

On the other hand, critics argue that gun control laws could increase crime, by disarming prospective victims, reducing their ability to effectively defend themselves, and possibly reducing any deterrent effect that victim gun possession might have on offenders (Kovandzic & Marvell, 2003; Lott & Mustard, 1997; Moody & Marvell, 2005). This could happen even with laws narrowly aimed at disarming subsets of the population at high risk of offending, since such groups are also at high risk of victimization (Kleck, 1997, Chapter 5; Tark & Kleck, 2004). For example, few mentally ill people commit violent acts, but they are at higher risk of victimization (Friedman, 2006), so banning sales of guns to this group could reduce defensive and deterrent effects of their gun ownership more than it reduced its violence-elevating effects. If this happened, the net effect on violence rates could be positive.

The purpose of the present study is to provide a methodologically sound evaluation of the impact of gun control laws on violent crime rates.

## Prior Research on the Impact of Gun Control Laws on Crime

There are many macro-level studies of the impact of gun control laws on violent crime rates. Most report no significant negative association between violent crime rates and the gun control law under

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0024**

study (see reviews by National Research Council, 2004; Hahn et al., 2005; Kleck, 2013), though a few (e.g., Koper & Roth, 2001; Loftin, McDowall, Wiersema, & Cottey, 1991) find evidence of crime-reducing effects of some gun control laws. Regardless of their findings, all these studies can be criticized on methodological grounds. The central problems have been (1) the failure of analysts to properly account for other factors that affect violence (omitted variable bias), (2) studying heterogeneous states rather than more homogeneous cities or counties, (3) a failure to control for gun ownership levels, (4) a failure to take account of local gun ordinances, (5) the use of unreliable secondary sources of information on gun laws, (6) the use of uninformative "gun control strictness" indexes that lump together heterogeneous mixtures of gun laws, and (7) the opposite problem of studying a single arbitrarily chosen instance of a given type of gun control, which precludes generalization of findings and risks confusing the effects of a gun law with the effects of other crime-control measures likely to accompany it.

One research design commonly used to assess the impact of gun control laws on violence rates has been the interrupted time-series design (ITSD). In the typical ITSD study, monthly violence rates for a single jurisdiction are analyzed to see if there is a significant downward shift in violent crime rates around the time a new gun law went into effect. The ITSD design requires that the researcher convincingly rule out changes in other crime-related factors (other than the legal change under study) as alternative explanations for observed shifts in crime trends (Campbell & Stanley, 1963). This problem is especially acute in time-series studies of gun laws due to the fact that state legislatures are almost continuously making large numbers of changes in the criminal law, often for the express purpose of reducing crime. For example, over the period 1973–1992, the Florida legislature passed an annual average of 381 general bills (this total excludes resolutions), including an average of 2.45 gun control bills per year (Etten, 2002). Almost every enactment of a new gun law is accompanied by dozens or hundreds of other changes in criminal law passed during the same legislative session, making it virtually impossible to separate the effects of one new law from those of others, enacted at the same time, and also intended to reduce crime. Since the ITSD approach is univariate, it cannot explicitly rule out any specific changes that might account for observed shifts in violent crime rates.

## Panel/Multiple Time-Series Designs

After 1997, ITSDs of individual laws in single jurisdictions were largely replaced by panel designs in which violent crime rates in large numbers of areas with and without the law under study were tracked over time. For example, at least two dozen panel studies have assessed the impact of "right to carry" (RTC) laws, using a county-level panel data set first compiled by Lott and Mustard (1997). They are a highly overlapping set of analyses of the same fatally flawed body of data (see Kovandzic, Marvell, & Vieraitis, 2005, pp. 294–302, for a summary; the review by Moody & Marvell, 2008).[1] The results of both the original Lott–Mustard study and two dozen reanalyzes of their data set are all essentially uninterpretable because they are, regardless of methodological variations, based on analyses of a meaningless set of county-level "crime rates." Better empirical evidence on the impact of these laws was provided by researchers who gathered their own crime data rather than merely reanalyzing the flawed Lott–Mustard county data set. The best evidence was produced by Kovandzic, Marvell, and Vieraitis (2005), whose panel data set pertained to 189 large cities (covering the period 1980–2000) using city-level crime data that did not have the problems associated with the attempt to aggregate crime counts of multiple local jurisdictions to create county violent crime rates. They found that RTC laws have no measurable effect on violent crime rates. Kovandzic and Marvell (2003) likewise found no impact of RTC laws on violence levels when using more complete county-level crime data for Florida counties and a more refined measure of the laws' "treatment" effects—the number of valid concealed carry permits in each county in each year.

Downloaded from cjr.sagepub.com by guest on November 7, 2016

Exhibit 3
0025

Panel studies (also referred to as multiple time-series studies) were a substantial improvement over ITSD studies because they exploit evidence concerning numerous instances of new gun laws in multiple jurisdictions, but they also suffer, albeit it to a lesser degree, from potential bias due to omitted variables. The omitted variable bias problem occurs here because analysts fail to or are unable to control for more than a few genuinely crime-related, time-varying factors (including other gun laws) that affect violence rates.

It is important to note that the issue here is the lack of needed controls for time-varying factors likely to influence violent crime rates (such as the passage of other gun laws), because the typical panel study uses a "fixed effects model" that is based *solely* on the cross-temporal relationship between the gun law under study and violence rates. Panel studies typically include dummy variables that represent each year and each state, in an attempt to indirectly control for the effects of variables that differ across years and states, but that are not explicitly measured—these are called "fixed effects" variables. There is a common misperception among some scholars that the inclusion of these fixed effects variables minimizes the need to explicitly control for potential confounding time-varying factors. Although fixed effects help in creating ceteris paribus conditions by capturing all unobserved, time-invariant factors that affect violent crime rates and are correlated with the policy variable under study, they can still produce inaccurate estimates of the effect of the policy variable if other omitted variables are correlated with *changes* in the policy variable (Wooldridge, 2000).

How consequential can omitted variable bias be in panel studies with respect to conclusions about the effect of gun laws on violence rates? A recent state panel study of 13 gun laws enacted between 1977 and 2000 by Moody and Marvell (2006) found that researchers analyzing any of the laws in isolation would have got their conclusions wrong for 5 of the 13 laws (see their table 7).

Pioneers in the use of panel data for crime policy studies, Moody and Marvell conclude that "policy analysts must be careful to properly identify the coefficients in any policy analysis equation and to avoid omitted variable bias due to omitting other relevant laws which can lead to spurious results" (p. 14). Lott and Mustard (1997, p. 38) controlled for just two other types of gun laws in their assessment of "shall issue" carry laws, whereas Ludwig and Cook (2000) controlled for none in their evaluation of the federal Brady law. In contrast, Kleck and Patterson (1993, pp. 259–260) controlled for up to 19 types of gun laws in their cross-sectional (CX) analysis of gun laws.

Given the importance of controlling for potential confounding time-varying factors, why have researchers chosen to include so few in their violence models? The answer is quite simple—the data simply do not exist or would be difficult to collect. For example, the U.S. Census Bureau and other federal/state government agencies only compute intercensal estimates for a handful of potential crime-related variables (e.g., poverty), and even those estimates are only available for larger areas such as states.

The problem with using larger aggregates such as states as a unit of analysis in a study of gun laws is that states are more heterogeneous than cities and counties, which aggravates the problem of aggregation bias. For example, a state as a whole might be high on both gun ownership and violence rates, even though the parts of the state that have high gun ownership have low violence rates. Unwary analysts who used state-level data might only find that states with more guns had more violence, failing to realize the specific places with higher gun ownership were not the places with higher violence rates.

Further, the use of state-level data can lead to mismeasurement of the strictness of gun controls to which residents of a given city are subject, as it precludes taking into account local gun control laws, the most restrictive in the nation. Thus, cities or counties are better units of analysis for a study of gun laws, both because they are more homogenous and because they allow analysts to control for both local and state gun controls. Unfortunately, if one wanted to do any kind of longitudinal research, such as a panel study, and needed to gather data describing cities or counties in the years

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0026**

between censuses (e.g., 1994, 1995, etc.), one would find that intercensal data on crime-related variables for cities or counties are virtually nonexistent.

## CX Designs

CX designs compare legal jurisdictions, such as states, with each other to see if those with a gun law have lower levels of violence, other things being equal, than those lacking the law. CX designs are often judged by scholars to be weaker than panel designs because it is inherently harder for researchers to establish ceteris paribus conditions with a CX design. If, for example, there are factors unobserved by the researcher that affect violent crime rates and are likely to be correlated with the gun law under study, then one is likely to get a biased estimate of the causal effect of the gun law on crime. The solution is for the analyst to control as many potentially confounding factors as possible before attributing crime reduction effects to gun regulation. Of course, it is not possible to literally hold all else equal because there is no way to know exactly which variables might generate spurious associations or suppress or distort genuine causal effects. Thus, the most sensible procedure is to control for as many relevant factors as available data allow. Unlike ITSD or panel studies, however, CX studies can take advantage of the very large volume of data that is available in census years for cities, counties, or states on possible determinants of violent crime rates.

Likewise, in CX studies, it is easier for researchers to control for other types of gun laws by using, for example, the Bureau of Alcohol, Tobacco, and Firearms (BATF) report on state and local firearm ordinances. Controlling for the presence or absence of other preexisting gun laws is especially important for CX studies because it is likely that places whose residents favor one type of gun control are likely to favor others as well. Thus, failing to control for existing gun laws could lead to ordinary least squares (OLS) estimates for gun laws under study being biased in the negative direction (i.e., implying more of a crime-reducing effect) due to the omission of other gun laws and lead one to conclude that certain gun laws are effective when it is actually other gun laws that reduce violence.

Panel designs are generally preferred to CX designs for purposes of establishing ceteris paribus conditions, but unfortunately panel approaches are simply not feasible in some situations, and this happens to be one of them. This is because (1) it is essential to control for gun ownership levels to avoid biasing gun control law coefficients in a negative direction, but (2) there are no known valid indicators of cross-temporal variation in gun levels, making it impossible to control for gun levels in any kind of cross-temporal analysis (Kleck, 2004). The spurious association problem derives from the simple political fact that larger numbers of gun-owning voters in high gun ownership areas make it politically more risky for legislators to vote in favor of additional gun control measures. Thus, although higher gun ownership might contribute to higher violence rates, it also reduces the likelihood that a given area will have any given gun control law. If gun ownership increases violence but reduces the strictness of gun control, it will generate a spurious negative association between gun laws and violence rates, giving an erroneous impression that weaker gun laws caused higher violence rates, when in fact it was the higher gun levels that caused the higher violence rates. Consequently, any analysis of gun law impact that fails to control for gun ownership levels will yield misleading results.

It is, however, currently impossible to control for changes over time in gun levels because there are *no* valid measures of such changes. Even proxy measures that are excellent indicators of cross-area variation in gun levels, such as the percentage of suicides that are committed with guns (PSG), show no validity for measuring changes over time (Kleck, 2004, pp. 19–25). Although a few scholars have claimed that their validity checks indicated validity of PSG for use in panel studies (Cook & Ludwig, 2003; Duggan, 2001, p. 1093; Moody & Marvell, 2005), in fact the associations they observed between PSG and direct survey measures of gun ownership (used as criterion measures)

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0027**

were almost entirely attributable to cross-area covariation (Kovandzic, Schaffer, & Kleck, 2013). As we demonstrate later, there is virtually *no* correlation over time between PSG and direct survey measures of gun prevalence.

We believe CX data can also be used to approximate ceteris paribus conditions, given the immense amount of macro-level data available to researchers for census years. In fact, one might argue that in the context of policy studies of violent crime that CX data might actually be preferred to panel data sets as few macro-level determinants of violent crime are measured at regular intervals between census years, making it difficult for panel researchers to rule out omitted variables bias. In the next section, we discuss the inability to control for perhaps the most important time-varying factor related to the passage of gun laws, gun ownership levels.

### The Need to Control for Gun Ownership Levels

Low or declining gun ownership may be part of what makes it politically feasible to pass new restrictions on guns, but declines in gun levels could also independently reduce violence rates, even if gun laws had no effect of their own on either gun levels or crime. Likewise, in CX analyses, the strictness of gun controls is likely to be negatively correlated with gun ownership levels for the aforementioned political reasons. In our sample of over a thousand U.S. cities, a principle components factor of gun laws was correlated $-.52$ with our measure of gun ownership—that is, where gun ownership was higher in the general population, gun control was weaker. One of the main arguments for gun control is that gun levels, at least within some high-risk subsets of the population, affect at least some kinds of violent crime. If this were not true, it would be harder to argue that laws restricting guns could affect violence rates. On the other hand, if gun levels do affect crime, and also affect whether gun controls are implemented, then gun ownership levels are an important confounding factor, which must be controlled to avoid spurious negative associations between gun law variables and violence rates. It should be stressed that virtually all gun control laws in the United States are not designed to have their effects by reducing the level of gun ownership in the general population. Confirming this, past research indicates that gun laws in fact do not affect gun ownership levels in the general population (Kleck & Patterson, 1993). Rather, gun control laws are intended to reduce violence either by reducing gun levels within small high-risk subsets of the population or by other means that do not entail reducing gun levels within any part of the population, such as discouraging the unlicensed carrying of guns in public places or their use in crimes. Thus, gun laws do not have their effects on violence by reducing gun levels in the general public; indeed, it is unlikely that it would be politically feasible in America to pass any gun control measures that were likely to significantly reduce gun ownership among the noncriminal majority.

Consequently, general gun levels do not mediate the relationship between gun laws and violence rates. Therefore, we do not include gun ownership levels in our models for the purpose of testing for their indirect effects of gun laws on violence via their effects on general gun ownership levels. The measure of gun levels that we use, the PSG, is a measure of gun prevalence in the general population and has been validated against estimates drawn from surveys of the general population. Instead, we control for general gun levels because the gun ownership level of the general population is a confounding factor that may affect violence rates but is also likely to influence the degree of gun control strictness in a given jurisdiction, thereby generating a spurious negative association between gun laws and violence rates.

An evaluation of the validity of 21 previously used proxies for gun levels shows that although some are valid for purposes of CX comparisons, none show even minimal evidence of validity as a cross-temporal proxies for gun ownership. The CX correlation between the PSG and General Social Survey measures of household gun prevalence at the state-level was .92, whereas the correlation was .95 with similar CX survey estimates for nations. On the other hand, when evaluated for the United

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0028**

States across years, the correlations for this proxy were exactly .00 with the survey-measured prevalence of handgun ownership, and actually *negative* with survey-based measures of ownership of all guns (Kleck, 2004).

Some authors have nevertheless insisted that PSG is valid for intertemporal purposes, based on the fact that PSG is correlated with General Social Surveys (GSS) gun prevalence estimates in their panel analyses (Cook & Ludwig, 2000; Moody & Marvell, 2005). What these authors all failed to note was that this correlation is driven entirely by the CX correlation between PSG and the GSS gun measures. The cross-temporal correlations are negligible (Kovandzic et al., 2013). Thus, these tests actually indicated that PSG has *no* validity for measuring changes in gun levels.

The exact same problems afflict the effort of Duggan (2001) to establish that the rate of subscriptions to *Guns & Ammo* magazine (GAR) is a valid proxy for changes in gun levels. As shown in Kovandzic, Schaffer, and Kleck (2013), the association he documented between state-level survey estimates of household gun prevalence and GAR was entirely attributable to CX covariation. Across years, there is no significant correlation between GAR and the survey-based criterion measure ($R^2 = .002$).

Because there are no known valid cross-temporal proxies for gun ownership available, it is, at present, impossible to control for gun levels using *any* kind of longitudinal design, including the otherwise preferable panel design. In the absence of valid time-series proxies for gun levels, researchers who want to isolate the effect of gun laws from the effects of gun ownership levels presently have no choice but to rely on CX data. For this and other reasons already discussed above, we use a CX approach in this article.

## Method

Our study assesses the impact of gun control laws on violent crime rates using CX data from all U.S. cities with a 1990 population of 25,000 or more ($n = 1,078$). These cities accounted for roughly three quarters of the violent crime in the United States in 1990 (U.S. FBI, 1991, pp. 150–151). We use data for 1990 rather than 2000 or 2010 because the city-level suicide data needed to measure the proxy for gun levels were no longer publicly available and there are no feasible and valid alternative measures of gun levels (Kleck, 2004). We are not aware of any evidence that the effects of gun laws of the type that were present in 1990 would have different effects in other time periods, and it has been empirically demonstrated that the effect of gun prevalence on violence has not changed over time (Kovandzic et al., 2013, pp. 528–539). We cannot, of course, say anything about types of gun control that did not exist circa 1990, but note that newer measures have generally been weak controls, due to the unfavorable political climate for passing stronger controls in recent years, and that research has generally found no impact on crime rates for these measures, such as child access protection laws and one-gun-a-month laws (Kleck, 2013, pp. 1405–1406, 1409–1410).

We use a double-log model in which both dependent and independent variables (except for gun law dummy variables) are expressed in their natural logs.[2] Because the dependent variables are logged, the coefficients for the gun law dummy variables can be interpreted as elasticities. The coefficient, when multiplied by 100, is the percentage difference in rates of violent crime in cities with a particular gun law versus those without the law, holding all other factors fixed. Thus, a coefficient of $-.16$ for a particular type of gun law in a robbery analysis means that cities with the gun law in effect have 16% lower robbery rates than cities without the law. Heteroscedasticity was detected using the Pagan–Hall (Pagan & Hall, 1983) statistic and was handled by using the Huber–White robust estimator of standard errors, which is valid in the presence of heteroscedasticity of unknown form (Wooldridge, 2006).

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0029**

## Violent Crime Rate Variables

The dependent variables are the rates per 100,000 population of total homicide, gun homicide, nongun homicide, total robbery, and total aggravated assaults.[3,4] Data on the total number of homicides, robberies, and aggravated assaults for each city were taken from the FBI Uniform Crime Reports (UCR) for 1989 to 1991 (U.S. Federal Bureau of Identification 1990–1992). Gun and nongun homicide data were taken from the FBI Supplementary Homicide Reports (SHR) computer data set (Fox, 2001; see Note 4). To estimate the number of gun homicides for each city in each year, we multiplied the total number of homicides in the published UCR reports for that year by the ratio of the number of SHR-recorded gun homicides to the total number of SHR-recorded homicides for the corresponding year. Nongun homicides were estimated using the same procedure.

Following convention for CX studies, violence rates were averaged over 3 years, 1989–1991, to reduce the influence of random year-to-year aberrations. For cities missing crime count data for a given year, we estimated missing values by computing the average crime rate for that year in cities in the same census region and same population group (e.g., 25,000–99,999), among cities with valid crime data.

## Gun Law Variables

Cities were coded for the presence of 19 major forms of gun control restrictions that were in existence as of 1989 at either the state or city level. Descriptions of the laws, variable names, means, and standard deviations are provided in Table 1. Gun law coding for most laws was based on *State Laws and Published Ordinances—Firearms—1989*, an authoritative and comprehensive verbatim collection of state statutes and local ordinances compiled by the U.S. BATF (1989).

The coding for most gun laws was 1 if the law was present at either the state or city level, regardless of whether the law applied to all types of guns or, as was often the case, only to handguns, and 0 if it was absent. Most of the gun laws fall into one of the six categories: (1) bans on gun possession by members of "high-risk" groups such as criminals and minors, (2) restrictions on sale/transfer/purchase of guns to or by members of these groups, (3) restrictions on the carrying of guns in public places, (4) laws requiring the licensing of gun owners or registration of guns in order for a gun to be legally owned or possessed, (5) restrictions or bans on special gun types such as handguns, and (6) laws requiring a state or local license to be in the business of selling guns, in addition to the license required by the federal government.[5] Gun laws that were too minor or technical to be likely to have any detectable effect on violence rates were not coded, nor were laws that were either universal (or nearly so) across states (e.g., federal laws or bans on machinegun possession) or that were unique to a single jurisdiction. In either of the latter two situations, there was too little variation across cities to reliably detect effects of the laws. The complete gun law coding protocol may be obtained from the senior author.

These state and local laws do not merely duplicate or overlap similar controls at the federal law. The scope of state controls is often considerably broader than seemingly similar federal controls. For example, a state ban on acquisition or possession of guns by convicted criminal may apply to certain misdemeanants as well as felons, whereas the federal ban generally applies only to felons. Likewise, some state restrictions on juvenile acquisition or possession of long guns apply to 18- to 20-year-olds as well as those under 18, while federal law prohibits acquisition only by those under 18. Further, state and local capacity to effectively administer their controls is often considerably greater than that of the federal government. Even after the Brady Act was passed in 1994 (after our study period), background checks in connection with the federal Brady law could not make any significant use of records concerning mental illness—in 2005, over 4.9 million people applied to buy a gun from a federally licensed dealer, 66,705 were rejected via an FBI records check, but only one half of 1% of

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0030**

**Table 1.** Variables Used in the Analysis and Descriptive Statistics.[a]

| Variables | Mean | SD | Source[b] |
|---|---|---|---|
| Crime rates (1989–1991 average, rates per 100,000 residents) | | | |
|   CRMUR, total homicides | 8.02 | 10.30 | A |
|   CRGUNMR, gun homicides | 4.80 | 7.64 | B |
|   CRNGUNMR, nongun homicides | 3.19 | 3.31 | B |
|   CRROB, total robberies | 242.85 | 282.17 | A |
|   CRASLT, total aggravated assaults | 454.61 | 405.73 | A |
| Gun ownership proxy | | | |
|   PSG, % of suicides with guns, 1987–1993, county | 55.67 | 12.96 | C |
| Excluded instrumental variables (used to instrument for gun ownership) | | | |
|   PCTREP92, % vote cast for Republican presidential candidate, 1992, County | 36.87 | 7.87 | D |
|   VIETNAM, Vietnam veterans per 100,000 population, county | 3,343.2 | 889.91 | D |
| Gun law variables | | | |
|   Bans on Possession of guns | | | |
|     CRIMPOS, prohibit possession, criminals | 0.80 | 0.40 | E |
|     MINORPOS, prohibit possession, minors | 0.50 | 0.50 | E |
|     DRUGPOS, prohibit possession, drug addicts | 0.66 | 0.47 | E |
|     ALCPOS, prohibit possession, alcoholics | 0.51 | 0.50 | E |
|     MENTPOS, prohibit possession, mentally ill | 0.63 | 0.48 | E |
|   Restrictions on transfer of guns | | | |
|     CRIMBUY, ban on gun purchase by criminals | 0.78 | 0.42 | E |
|     MINORBUY, ban on gun purchase by minors | 0.95 | 0.22 | E |
|     DRUGBUY, ban on gun purchase by drug addicts | 0.74 | 0.44 | E |
|     ALCBUY, ban on gun purchase by alcoholics | 0.61 | 0.48 | E |
|     MENTBUY, ban on gun purchase by mentally ill | 0.71 | 0.46 | E |
|     BYPERMIT, permit required to purchase gun | 0.19 | 0.39 | E |
|     BYAPLIC, application required to purchase gun | 0.42 | 0.49 | E |
|     WAITPERH, waiting period to receive handgun | 0.50 | 0.50 | E |
|     REGISTER, transfer/sale of guns must be registered with a governmental agency | 0.43 | 0.50 | E |
|     CARYHIDN, concealed carrying of loaded handgun prohibited or permit hard to get | 0.82 | 0.39 | F |
|   Restrictions on ownership/home possession | | | |
|     LICENSE, license required to possess gun in home | 0.13 | 0.34 | E |
|   Restrictions on special gun types | | | |
|     HGBYBAN, handgun sales ban | 0.00 | 0.06 | E |
|     SNSBAN, ban on sale of cheap handguns | 0.12 | 0.32 | E |
|   Regulation of dealing in firearms | | | E |
|     DEALER, state or city license required for gun dealers | 0.53 | 0.50 | E |
| Control variables | | | |
|   PCTBLACK, % resident population Black | 11.66 | 15.60 | D |
|   LIVLONE, % persons living alone | 25.92 | 6.77 | D |
|   PCTHISP, % resident pop. Hispanic origin | 10.59 | 15.55 | D |
|   DENSITY, persons per square mile | 3,783.2 | 3,440.8 | D |
|   PCTDIV, % resident population 15 and older divorced | 9.23 | 2.27 | D |
|   PCT18T24, % resident population age 18–24 | 12.32 | 6.60 | D |
|   PCT25T34, % resident population age 25–34 | 18.12 | 2.91 | D |
|   PCTPOOR, % resident population < poverty line, 1989 | 13.21 | 8.14 | D |
|   OWNEROCC, % housing units owner occupied | 58.23 | 12.79 | D |
|   PCTVACAT, % housing units vacant | 7.16 | 3.99 | D |
|   PCTHIGH, % persons 25 and up with high school degree | 77.54 | 10.65 | D |

*Note.* B = Fox (2001); C = U.S. National Center for Health Statistics (1997); D = U.S. Bureau of the Census (1994); E = U.S. Bureau of Alcohol, Tobacco, and Firearms (1989); F = Thomas Marvell, personal communication (2001).
[a]Unless otherwise noted, each variable refers to a city, as of 1990. In variable descriptions, "county" indicates variable refers to county in which city is located. [b]A = U.S. Federal Bureau of Investigation (1990–1992).

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0031**

these FBI rejections were for reasons of mental illness. In contrast, some states like Illinois have registries of all persons admitted to psychiatric hospitals in the state, while local enforcement agencies have access to local mental health sources. Consequently, much higher shares of the rejections by state and local agencies were for reasons of mental illness (Bordua, Lizotte, & Kleck, 1979; U.S. Bureau of Justice Statistics, 2006, pp. 2, 5). Likewise, the requirements for state and local dealer licenses are stricter than those imposed by the federal government for issuance of its license. For example, although many states and localities required a criminal background check to become a licensed gun dealer, the federal government, as of 1989, did not do so (U.S. BATF, 1989).

## Gun Ownership Levels

Gun levels were measured using the PSG, which research has shown to be the best proxy to use in CX research (Kleck, 2004). This measure has a near-perfect correlation with direct survey measures of household gun prevalence, that is, the percentage of households with one or more guns, so we interpret our measure of gun levels as a measure of household gun prevalence. Vital statistics data for 1987–1993 do not identify locations of deaths for cities with populations smaller than 100,000, so it was not possible to compute city-level measures of PSG for most of our cities. Therefore, we used PSG for the *county* in which the city was located as a proxy for city-level gun availability. Some of the smaller counties had few suicides per year, so misclassification of a few suicides as homicides or accidents in small counties could produce substantial measurement error in a single year's count. Therefore, PSG was computed using data covering the 7-year period from 1987 to 1993, bracketing the census year of 1990. Data were derived from special Part III Mortality Detail File computer tapes (not the general public use tapes) made available to the senior author by the National Center for Health Statistics (U.S. National Center for Health Statistics, 1997). Unfortunately, data access restrictions adopted later by the Centers for Disease Control and Prevention made it virtually impossible to acquire similar data for the years bracketing 2000 or 2010.

## Control Variables

In addition to the gun levels measure and gun law dummies, we included 11 city-level control variables that prior macro-level crime research have shown to be reliable predictors of crime. Decisions as to which control variables were included in the violent crime models were based on a review of previous macro-level studies linking violent crime to structural characteristics of macro-level units like cities and states. Most of these control variables account for the causal effects emphasized by motivational, opportunity, and compositional theories of criminal behavior (see Kovandzic, Vieraitis, & Yeisley, 1998; Sampson, 1986; Vieraitis, 2000; the studies reviewed therein). Thus for each gun control law, we control for 18 other gun laws and 11 of the most important structural covariates of violent crime as determined by theory and prior research. Although it is impossible to know for sure if any important time-invariant confounding factors have been omitted, we suggest by holding constant 29 potential relevant factors that we can satisfactorily test the gun law efficacy hypothesis. Table 1 lists and provides a brief description of each control variable along with their means, standard deviations, and data sources.

Fortunately, correlations between the gun law variables and the control variables were generally weak in almost all cases. Of the 209 bivariate correlations between the gun law variables and control variables (19 Gun Laws × 11 Control Variables), none exceeded .5, and only one reached .4. Thus, there was no serious collinearity between gun law variables and control variables. This was confirmed by examination of condition indices and variance-decomposition proportions (Belsley, Kuh, & Welsch, 1980).

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0032**

## Analytic Procedures

As discussed above, it is important to control for gun levels to isolate the effect of gun laws, but this introduces a complication in estimation of the models. There is a strong theoretical basis, and a large body of empirical support, for the belief that higher violence rates drive up gun ownership levels, as more people acquire guns for self-protection (Bice & Hemley, 2002; Bordua, 1986; Clotfelter, 1981; Kleck, 1979, 1984; Kleck & Kovandzic, 2009; Kleck & Patterson, 1993; Kovandzic, Schaffer, & Kleck, 2012, 2013; McDowall, 1986; Rosenfeld, Baumer, & Messner, 2007; Southwick, 1997). Cities with higher violence rates, therefore, may tend to have higher gun ownership levels, even if gun availability reduced or had no effect on violence rates. When explanatory variables such as gun ownership are endogenous (affected by other variables in the analysis), the OLS estimator is biased and inconsistent (Wooldridge, 2000).

The most common estimation procedure used to address potential endogeneity bias, and the procedure used here, is IVs regression. The key challenge in using IV methods is finding a source of identifying variation: here, variables that are correlated with gun ownership (instrument relevance), that are exogenous with respect to violent crime (i.e., not affected by violent crime—"instrument validity"), and that a priori reasoning and evidence suggest should be excluded from the violent crime equations, that is, do not directly affect violent crime. In the terminology of IV estimation, the instruments used for gun levels are "excluded instruments," and the control variables are "included instruments." If appropriate IVs can be found for gun levels, the method of IVs will produce consistent estimates of the effect of gun levels on violent crime (Wooldridge, 2000).

The excluded IVs used in this article to instrument gun levels are the percentage of the 1992 Presidential vote for the Republican candidate (PCTREP92) and the 1990 county rate of Vietnam-era veterans per 100,000 population (VIETNAM). Both excluded IVs are theoretically important determinants of gun ownership that are plausibly otherwise unrelated to levels of violence. VIETNAM serves as a measure of military training or service, while PCTREP92 serves as a measure of political conservatism. Prior research suggests that variables are significant predictors of gun ownership (Cook & Ludwig, 1997, p. 35; Kleck, 1997, pp. 70–72; Lizotte & Bordua, 1980). In contrast to past research, we carried out extensive specification testing to demonstrate that our excluded IVs VIETNAM and PCTREP92 are relevant and valid.

### Tests of the Relevance and Validity of the Instruments

We test for instrument relevance using a heteroscedasticity-robust $F$-test of the joint significance of the excluded instruments VIETNAM and PCTREP92 in an OLS estimation of the first-stage equation of gun levels (PSG), and we also examine the significance of VIETNAM and PCTREP92 separately using conventional $t$-statistics. Research by Bound, Jaeger, and Baker (1995) and Staiger and Stock (1997) indicates that an $F$-test is useful for examining the explanatory power of the excluded IVs, and that $F$-statistics below 10 indicate weak instruments (Staiger & Stock, 1997, p. 557). The results of the $F$-test for VIETNAM and PCTREP92 are reported at the bottom of column 2 in Table 2. The second column in Table 2 also reports the estimated coefficients of the excluded IVs and the remaining exogenous regressors in the first-stage equation of gun levels. The first-stage $F$-statistic reported in column 2 is 38.9, well above the Staiger–Stock rule-of-thumb value of 10. Both of the excluded instruments are correlated with gun levels in the expected directions and at the 0.1% significance level: cities in counties with a greater proportion of Vietnam veterans and persons voting for the Republican candidate in the 1992 Presidential election have higher gun ownership levels. We conclude that our excluded instruments in this estimation are relevant and not "weak."

The second requirement for excluded IVs is that they be uncorrelated with the error process in the violent crime equations. Because the violence equations are overidentified, we are able to assess the

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0033**

**Table 2.** The Estimated Impact of Gun Availability and Gun Laws on City-Level Violence Rates: Instrumental Variables Estimates, Gun Ownership Treated as Endogenous.

| Predictor Variables | First-Stage Regression | IV Estimation: Dependent Variables: Natural Log of the Violent Crime Rate per 100,000 Persons | | | | |
|---|---|---|---|---|---|---|
| | Gun Ownership | Total Homicide | Gun Homicide | Nongun Homicide | Total Robbery | Total Assault |
| PSG | — | -0.57 (1.17) | -0.39 (0.72) | -0.14 (0.35) | -0.92 (1.69) | 0.55 (1.10) |
| CRIMINAL | 0.02 (1.25) | -0.05 (0.64) | -0.06 (0.76) | -0.04 (0.66) | 0.09 (1.29) | 0.10 (1.27) |
| CRIMBUY | -0.08 (3.22)** | -0.03 (0.31) | -0.15 (1.25) | 0.10 (1.08) | -0.32 (2.83)** | -0.30 (2.54)* |
| MINORPOS | -0.08 (4.20)** | -0.06 (0.73) | -0.11 (1.25) | 0.04 (0.60) | -0.04 (0.46) | 0.01 (0.06) |
| MINORBUY | 0.02 (0.66) | 0.13 (1.25) | 0.09 (0.78) | 0.15 (1.58) | 0.30 (2.61)** | -0.09 (0.77) |
| DRUGPOS | -0.19 (5.89)** | -0.14 (1.00) | -0.11 (0.70) | 0.01 (0.08) | -0.05 (0.29) | -0.11 (0.79) |
| DRUGBUY | 0.27 (9.26)** | 0.59 (3.45)** | 0.54 (3.00)** | 0.29 (2.02)* | 0.53 (2.92)** | 0.13 (0.73) |
| ALCPOS | 0.17 (5.41)** | 0.26 (2.00)* | 0.26 (1.86) | 0.03 (0.27) | 0.16 (1.10) | 0.46 (3.46)** |
| ALCBUY | -0.27 (10.11)** | -0.61 (3.63)** | -0.57 (3.11)** | -0.30 (2.13)* | -0.56 (3.13)** | -0.19 (1.13) |
| MENTALPOS | -0.02 (1.26) | -0.05 (0.57) | -0.06 (0.67) | -0.02 (0.34) | -0.00 (0.03) | -0.19 (2.22)* |
| MENTBUY | 0.02 (0.84) | -0.20 (2.04)* | -0.11 (1.05) | -0.16 (1.90) | 0.12 (1.11) | 0.20 (2.00)* |
| BYPERMIT | -0.14 (5.86)** | -0.15 (1.29) | -0.12 (0.95) | -0.05 (0.53) | -0.19 (1.50) | 0.32 (2.48)* |
| BYAPLIC | 0.10 (3.51)** | -0.13 (1.17) | -0.02 (0.20) | -0.24 (2.42)* | -0.13 (1.04) | 0.15 (1.21) |
| REGISTER | 0.05 (1.96) | 0.15 (1.74) | 0.12 (1.38) | 0.08 (1.11) | 0.26 (3.10)** | 0.06 (0.70) |
| WAITPERH | -0.05 (1.59) | 0.05 (0.46) | 0.07 (0.63) | 0.02 (0.21) | -0.16 (1.23) | 0.13 (1.09) |
| CARYHIDN | 0.08 (4.64)** | 0.25 (2.91)** | 0.23 (2.50)* | 0.12 (1.66) | -0.02 (0.28) | 0.03 (0.38) |
| LICENSE | -0.18 (7.45)** | -0.31 (2.25)* | -0.34 (2.32)* | -0.11 (0.96) | -0.52 (3.37)** | 0.11 (0.78) |
| HGBYBAN | 0.13 (1.59) | 0.52 (1.40) | 0.69 (1.43) | 0.19 (0.92) | 0.54 (3.69)** | 0.30 (1.64) |
| SNSBAN | -0.07 (2.21)* | 0.03 (0.31) | 0.02 (0.15) | 0.12 (1.32) | 0.01 (0.08) | 0.01 (0.05) |
| DEALER | -0.04 (1.78) | 0.24 (3.15)** | 0.16 (2.19)* | 0.24 (3.64)** | 0.24 (3.22)** | 0.04 (0.55) |
| PCTBLACK | -0.00 (0.92) | 0.25 (14.89)** | 0.27 (14.31)** | 0.16 (10.51)** | 0.38 (21.27)** | 0.20 (9.55)** |
| PCTHISP | -0.03 (6.46)** | 0.00 (0.13) | 0.02 (0.59) | 0.02 (0.66) | 0.11 (3.72)** | 0.13 (4.13)** |
| PCT18T24 | 0.02 (0.95) | -0.22 (2.19)* | -0.12 (1.16) | -0.32 (3.41)** | -0.16 (1.42) | -0.26 (2.52)* |
| PCT25T34 | -0.11 (2.98)** | -0.13 (0.73) | -0.21 (1.18) | -0.02 (0.13) | -0.34 (1.91) | 0.14 (0.82) |
| PCTPOOR | 0.13 (8.44)** | 0.35 (3.79)** | 0.27 (2.71)** | 0.30 (3.73)** | 0.20 (1.97)* | 0.38 (4.10)** |
| OWNER | 0.10 (2.47)* | 0.00 (0.01) | 0.05 (0.26) | -0.23 (1.53) | 0.05 (0.26) | 0.03 (0.21) |
| PCTVACAT | 0.02 (1.73) | 0.22 (3.43)** | 0.11 (1.63) | 0.15 (2.67)** | 0.02 (0.27) | 0.21 (3.01)** |
| LIVLONE | -0.16 (5.70)** | -0.31 (2.01)* | -0.39 (2.35)* | -0.06 (0.41) | 0.04 (0.26) | -0.04 (0.31) |
| PCTHIGH | 0.03 (0.64) | -1.39 (6.83)** | -1.31 (6.09)** | -0.66 (3.21)** | -1.45 (6.42)** | -0.84 (3.75)** |
| DENSITY | -0.05 (5.89)** | 0.04 (0.77) | 0.05 (0.98) | -0.00 (0.03) | 0.28 (4.40)** | 0.07 (1.31) |

*(continued)*

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0034**

Table 2. (continued)

| Predictor Variables | First-Stage Regression | IV Estimation: Dependent Variables: Natural Log of the Violent Crime Rate per 100,000 Persons | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Gun Ownership | Total Homicide | Gun Homicide | Nongun Homicide | Total Robbery | Total Assault |
| PCTDIV | 0.13 (4.45)** | 0.49 (3.05)** | 0.47 (2.92)** | 0.25 (1.85) | 0.73 (4.31)** | 0.15 (1.04) |
| First-stage regression | | | | | | |
| F-statistic | 39.76*** | | | | | |
| VIETNAM | 0.18 (7.62)** | | | | | |
| PCTREP92 | 0.07 (3.02)** | | | | | |
| Overidentification test | | | | | | |
| J-statistic | — | $\chi^2(1) = 0.02$ | $\chi^2(1) = 0.16$ | $\chi^2(1) = 1.47$ | $\chi^2(1) = 0.32$ | $\chi^2(1) = 0.16$ |
| p value | | .88 | .69 | .22 | .57 | .69 |
| $R^2$ | .709 | .605 | .840 | .852 | .705 | .550 |
| N | 1,078 | 1,078 | 1,078 | 1,078 | 1,078 | 1,078 |

*Note.* Standard errors are computed using Huber–White robust estimate of variance. Robust t-statistics in parentheses. Excluded instruments are VIETNAM and PCTREP92.
*Significant at 5%. **Significant at 1%.

Downloaded from cjr.sagepub.com by guest on November 7, 2016

Exhibit 3

0035

validity of the excluded instruments with an overidentification test.[6] Although several such tests exist, we use the *J*-statistic of Hansen (1982) because it is robust in the presence of heteroscedasticity.[7] Hansen's *J*-statistic tests the null hypothesis that the excluded instruments and/or control variables (i.e., included instruments) are exogenous (Baum, Schaffer, & Stillman, 2003). For our IVs to be valid, we should fail to reject the null hypothesis. This test is especially valuable because it fails to have power only if *all* excluded IVs are invalid, that is, are not exogenous. As long as even one of our excluded instruments is valid, the *J*-test is effective in detecting the invalidity of the instruments.[8]

The results of the *J*-test for each violent crime model are reported at the bottom of Table 2. The *J*-statistics are all both small and statistically insignificant. We therefore cannot reject the null that VIETNAM and PCTREP92 and the control variables are exogenous. Thus, the evidence suggests that both of our excluded IVs are exogenous and are correctly excluded from the violent crime equations. To summarize, VIETNAM and PCTREP92 easily pass the relevance (*F*-test) and validity requirements (*J*-test) for instruments.

It might be argued that gun control laws should also be treated as endogenous because the passage of laws intended to reduce violent crime is affected by violent crime. That is, coefficients on the gun law variables might be biased upwards due to another form of endogeneity bias—simultaneity bias attributable to higher violent crime rates leading to passage of gun laws. We consider this to be unlikely, for several reasons. First, most major gun laws in effect in 1989 were originally enacted decades earlier (compare Newton & Zimring, 1969, appendix G with U.S. Bureau of Justice Statistics, 1996), so their enactment could not have been influenced by violent crime rates in 1989–1991, or indeed in any recent years. Second, prior research directly testing for an impact of violent crime rates on gun control strictness has found no effect (Bruce & Wilcox, 1998).

The probable source of the belief that crime affects passage of gun laws is the fact that highly publicized individual acts of violence, such as mass shootings, sometimes trigger the enactment of new gun control laws. Strictly speaking, the effect of news coverage of crime is irrelevant to whether *crime rates* affect the enactment of gun laws unless one assumes a significant correlation between crime rates and *news coverage* of crime. Past research, however, indicates that there is virtually no correlation between crime and the amount of news coverage of crime (Dorfman & Schiraldi, 2001; Garofalo, 1981; Marsh, 1989). In sum, crime news affects passage of gun laws, but crime rates do not.

Finally, there is little reason to believe that higher violent crime rates increase public support for gun control, since survey research shows that public support for gun control is not affected by higher crime rates in the area where a person resides, prior victimization, or fear of crime but instead derives from more stable cultural determinants not directly related to crime (Kleck, 1996; Kleck & Kovandzic, 2009). If higher crime rates do not increase the likelihood that people support more gun laws, there is little reason to expect that higher crime rates, in the past or the present, would increase the level of gun control strictness (Kleck, 1997; Wright et al., 1983). In sum, there is no sound basis for regarding gun control laws as endogenous or influenced by violent crime rates.

## Results

### Effects of Gun Ownership Levels on Crime

Estimates of the impact of gun ownership levels (as proxied by PSG) on crime can be found in Table 2, in the first row of each column referring to a crime. For example, the coefficient on PSG in the total homicide equation using IV methods is −.57 and it is not statistically significant at the 5% level. The basic finding in Table 2 is that when gun levels are treated as endogenous and instrumented with VIETNAM and PCTREP92, gun levels show no net significant positive (violence-

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0036**

increasing) effect on homicide, robbery, or aggravated assault rates. As discussed in Kovandzic et al. 2013, this IVs strategy would probably overstate a violence-elevating effects of gun levels on violent crime, if there were any. Yet, it still produces estimates suggesting net negative (albeit not significant) or null effects. Thus, our findings of a null or negative impact of guns on homicide are strengthened because the potential bias in estimation is likely to be positive, which would work against our interpretation. The implication is that our coefficient estimate is an upper bound on the estimated effect of gun levels on violence rates.

One problem with using city-level data is that cities in the same state may share unobservable characteristics that could lead to intrastate correlation of errors. In such a situation, standard errors are underestimated, leading to inflated $t$-ratios on PSG and the gun law variables. Therefore, we reestimated the regressions in Table 3 using robust standard errors corrected for clustering by state (which allow for arbitrary within-state correlation), and the $t$-ratios for PSG and the gun law variables became much smaller. Nevertheless, when we reestimated regressions analogous to those in Table 2 using the two-step efficient generalized method of moments (GMM) estimator instead of the IV estimator, we obtained results similar to those reported in Table 2. The benefit of the GMM estimator relative to the traditional IV estimator is that it produces parameter estimates that are both consistent and efficient in the presence of heteroscedasticity of unknown form, whereas the IV estimator is consistent but inefficient (Wooldridge, 2000). The coefficients obtained for PSG using the GMM estimator were as follows ($t$-ratios in parentheses): $-.56$ (1.16) for total homicide, $.42$ (0.79) for gun homicide, $-.14$ (0.33) for nongun homicide, $-.91$ ($-1.68$) for robbery, and $.54$ (1.09) for assault. Thus, the results once again indicate no significant positive (violence-elevating) effect of gun ownership on crime rates.

To summarize, we have strong evidence that higher gun levels do not cause more crime. One implication of these findings is that general gun ownership could not mediate the effect of gun control laws on crime. Consequently, if gun laws were passed that were intended to reduce violent crime by reducing general gun ownership levels, they would be likely to fail because even if they did succeed in reducing general gun levels, this would not lead to a reduction in violent crime. Gun ownership levels among criminals, however, may have violence-increasing effects that are canceled out by violence-decreasing effects of gun ownership among noncriminals. Thus, our results do not allow us to rule out the possibility of violence-increasing effects of criminal gun possession.

### Effects of Gun Control Laws on Gun Ownership Levels

We then estimate a model testing the effects on gun laws on gun ownership levels, as measured by PSG. Results of the first-stage estimation for this PSG model are presented in column 2 of Table 2. In all, 7 of the 19 gun laws showed an apparent negative effect on gun ownership levels, while 4 others showed an apparent positive effect. This mix of signs on the coefficients suggest the operation of random chance in generating the estimates, in the absence of any compelling reasons to expect some gun laws to increase gun ownership and others to reduce it. Significant negative estimates should in any case be viewed with caution, as they may reflect negative effects of gun levels on the passage of gun control laws, due to the fact that larger numbers of gun-owning voters discourage legislators from supporting new gun controls.

### Effects of Gun Control Laws on Violence Rates

The estimates displayed in Table 2 also indicate that most gun control measures appear to have no significant negative direct effect on total (gun plus nongun) violence rates—total homicide, total robbery, and total aggravated assault. Indeed, if the statistical results are taken at face value, some laws appear to increase violence rates. Of the 57 possible effects examined (19 laws, paired with

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0037**

**Table 3.** The Estimated Impact of Gun Levels and Gun Laws on City-Level Violence Rates: Ordinary Least Squares (OLS) Estimates, Gun Ownership Treated as Exogenous.

| Predictor Variables | OLS Estimation: Dependent Variables: Natural Log of the Violent Crime Rate per 100,000 Persons | | | | |
|---|---|---|---|---|---|
| | Total Homicide | Gun Homicide | Nongun Homicide | Total Robbery | Total Assault |
| PSG | 0.23 (1.77) | 0.39 (2.98)** | −0.00 (0.00) | −0.06 (0.41) | −0.17 (1.15) |
| CRIMINAL | −0.06 (0.83) | −0.07 (0.95) | −0.04 (0.70) | 0.08 (1.12) | 0.12 (1.39) |
| CRIMBUY | 0.03 (0.29) | −0.09 (0.82) | 0.11 (1.30) | −0.26 (2.52)* | −0.35 (3.13)** |
| MINORPOS | −0.00 (0.06) | −0.05 (0.70) | 0.05 (0.86) | 0.02 (0.31) | −0.05 (0.60) |
| MINORBUY | 0.12 (1.14) | 0.08 (0.67) | 0.15 (1.56) | 0.28 (2.43)* | −0.07 (0.67) |
| DRUGPOS | 0.00 (0.04) | 0.04 (0.33) | 0.04 (0.35) | 0.11 (0.94) | −0.24 (2.22)* |
| DRUGBUY | 0.38 (3.50)** | 0.34 (3.02)** | 0.25 (2.55)* | 0.31 (2.64)** | 0.31 (2.71)** |
| ALCPOS | 0.14 (1.36) | 0.14 (1.28) | 0.01 (0.08) | 0.02 (0.22) | 0.57 (5.43)** |
| ALCBUY | −0.39 (4.00)** | −0.35 (3.36)** | −0.26 (2.94)** | −0.32 (3.07)** | −0.38 (3.75)** |
| MENTALPOS | −0.02 (0.20) | −0.03 (0.33) | −0.02 (0.26) | 0.03 (0.40) | −0.22 (2.60)** |
| MENTBUY | −0.23 (2.40)* | −0.14 (1.35) | −0.16 (1.99)* | 0.09 (0.83) | 0.23 (2.35)* |
| BYPERMIT | −0.03 (0.29) | 0.00 (0.03) | −0.03 (0.38) | −0.05 (0.58) | 0.21 (2.14)* |
| BYAPLIC | −0.20 (1.96)* | −0.10 (0.95) | −0.25 (2.66)** | −0.21 (1.86) | 0.21 (2.02)* |
| REGISTER | 0.12 (1.50) | 0.10 (1.17) | 0.07 (1.07) | 0.23 (3.00)** | 0.08 (1.00) |
| WAITPERH | 0.10 (0.89) | 0.12 (1.07) | 0.03 (0.30) | −0.11 (0.89) | 0.09 (0.81) |
| CARYHIDN | 0.18 (2.54)* | 0.17 (2.12)* | 0.11 (1.68) | −0.09 (1.24) | 0.09 (1.14) |
| LICENSE | −0.15 (1.54) | −0.18 (1.83) | −0.08 (0.99) | −0.34 (3.34)** | −0.04 (0.36) |
| HGBYBAN | 0.46 (1.36) | 0.63 (1.42) | 0.17 (0.91) | 0.48 (3.10)** | 0.36 (2.32)* |
| SNSBAN | 0.08(0.69) | 0.06 (0.55) | 0.13 (1.41) | 0.05 (0.50) | −0.03 (0.27) |
| DEALER | 0.26 (3.45)** | 0.19 (2.53)* | 0.24 (3.68)** | 0.26 (3.58)** | 0.03 (0.33) |
| PCTBLACK | 0.25 (15.66)** | 0.27 (14.93)** | 0.16 (10.60)** | 0.39 (22.22)** | 0.20 (9.44)** |
| PCTHISP | 0.04 (1.67) | 0.05 (2.07)* | 0.02 (1.16) | 0.15 (6.45)** | 0.10 (4.18)** |
| PCT18T24 | −0.25 (2.51)* | −0.14 (1.43) | −0.32 (3.49)** | −0.19 (1.71) | −0.24 (2.30)* |
| PCT25T34 | −0.05 (0.30) | −0.13 (0.79) | −0.01 (0.04) | −0.25 (1.49) | 0.07 (0.43) |
| PCTPOOR | 0.25 (3.71)** | 0.17 (2.44)* | 0.28 (4.52)** | 0.09 (1.23) | 0.48 (7.01)** |
| OWNER | −0.08 (0.47) | −0.03 (0.17) | −0.25 (1.65) | −0.04 (0.21) | 0.10 (0.63) |
| PCTVACAT | 0.19 (3.12)** | 0.08 (1.28) | 0.15 (2.67)** | −0.02 (0.26) | 0.24 (3.41)** |
| LIVLONE | −0.15 (1.25) | −0.23 (1.83) | −0.03 (0.25) | 0.21 (1.73) | −0.19 (1.65) |
| PCTHIGH | −1.44 (7.31)** | −1.36 (6.61)** | −0.67 (3.27)** | −1.51 (6.87)** | −0.79 (3.68)** |
| DENSITY | 0.09 (2.23)* | 0.10 (2.47)* | 0.01 (0.24) | 0.34 (7.08)** | 0.02 (0.56) |
| PCTDIV | 0.36 (2.56)* | 0.34 (2.48)* | 0.23 (1.91) | 0.59 (3.98)** | 0.27 (2.08)* |
| Endogeneity test | | | | | |
| C-statistic | 2.86 | 2.58 | 0.09 | 2.82 | 2.29 |
| p value | .09 | .11 | .76 | .09 | .13 |
| $R^2$ | .619 | .555 | .497 | .716 | .562 |
| N | 1,078 | 1,078 | 1,078 | 1,078 | 1,078 |

*Note.* Standard errors are computed using Huber–White robust estimate of variance. Robust *t*-statistics in parentheses.
*Significant at 5%. **Significant at 1%.

each of 3 violent crime types), results for 2 effects were strongly supportive of gun control effectiveness, whereas 5 others were at least weakly supportive. There were 20 gun law coefficients significant at the .05 level (counting total homicide results, but not counting those for gun homicide and nongun homicide). Given that we had a sample size exceeding a thousand, it is not surprising that many associations were statistically significant, as even weak associations can be statistically significant when analyzing so large a macro-level sample. The 8 negative coefficients, however, were outnumbered by 12 positive ones. There is no clear pattern of these "effects" by either type of

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0038**

gun control or type of violent crime affected. Thus, while it is possible that some gun laws really do increase violent crime while others reduce it, some of these significant coefficients may reflect nothing more than random chance operating with a large number (57) of hypothesis tests, each of them based on a large sample.

There was nevertheless solid support for two beneficial effects of gun control laws on violent crime. First, we found that state laws forbidding the purchase of guns by, or sale of guns to, alcoholics or persons under the influence (ALCBUY) reduced homicide. This is a relatively strong finding because the law not only showed significant negative effects on total (gun plus nongun) homicide but also showed a significant negative effect on gun homicide and a weaker effect on nongun homicide.

Second, the results provide relatively strong evidence that laws requiring a license to possess a gun in the home (LICENSE) reduce homicide. This impact may reflect the consequences of more extensive state-level background checks conducted in connection with licensing. Like the results for laws restricting gun sales to alcoholics, these results showed a strongly supportive pattern of results by gun involvement—a significant negative effect on gun homicide, combined with no significant effect on nongun homicide.

Only weaker evidence is available for gun law effects on robbery and assault, since flaws in available data made it impossible to reliably compare gun law effects on gun violence with their effects on nongun violence (e.g., gun robbery vs. nongun robbery). These weaker findings suggest that robbery may be reduced via state bans on purchases of guns by convicted criminals (CRIM-BUY), bans on gun purchases by alcoholics (ALCBUY), and requiring a license to possess a gun (LICENSE). Confidence is increased in the results concerning the latter two laws because our evidence indicated these laws also may reduce gun ownership (some portion of which is ownership by criminals) and appear to reduce homicide, suggesting some capacity to deny guns to criminals.

Two types of gun control laws appear to reduce aggravated assault, though again the findings should be viewed as tentative, for the same reasons stated with connection with findings bearing on robbery. First, state or local bans on the purchase of guns by criminals (CRIMBUY) may reduce aggravated assaults. Second, the results suggest that bans on possession of guns by mentally ill persons may reduce aggravated assault. This latter interpretation, however, is questionable in light of the finding of a significant *positive* association between bans on *purchase* of guns by mentally ill persons and aggravated assault. There is no obvious explanation why banning gun purchases by mentally ill persons would increase assaults, while banning gun *possession* by such people would decrease them.

## Using a More Limited Set of Gun Laws

Because we could not know in advance which of the 19 gun law measures affected violent crime, we initially specified all 19 gun control variables to be included in each violent crime equation. As discussed above, close examination of collinearity diagnostics did not reveal a harmful degree of collinearity among the gun law variables. Nevertheless, there is *some* collinearity among the gun law variables that could inflate standard errors somewhat and thereby bias hypothesis tests in favor of the null (no effect) hypothesis. Therefore, each violent crime equation was reestimated so as to test the effects of just nine stronger gun laws thought to be especially likely to show effects on crime—bans on the possession of guns by criminals and minors (CRIMPOS, MINORPOS), bans on sale/transfer of guns to criminals and minors (CRIMBUY, MINORBUY), laws requiring a permit and/or license to purchase a gun (BYPERMIT, BYAPLIC), laws requiring a license to possess a gun in a home (LICENSE), laws controlling the concealed carrying of loaded handguns in public places (CAR-YHIDN), and bans on the sale of "Saturday Night Specials" (SNSBAN). We obtained results virtually identical to those obtained using the full set of 19 gun law variables except that the

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0039**

coefficient for CRIMBUY was no longer significant and negative in the assault equation. Gun levels still showed no positive effect on violence rates (estimates are available from the senior author).

## Using Lagged Violent Crime as a Proxy Variable for Omitted Historical Variables

As noted above, it is impossible to control for literally all potential confounding factors, even though CX data are widely available for a rich variety of variables for census years. Despite our best attempts to control for the most likely confounding factors, we cannot rule out the possibility that the gun law variables are correlated with one or more omitted variables that affect violent crime rates. One way to address potential bias due to omitted historical variables in the context of CX data is to control for the value of the dependent variable from a previous time period. As Wooldridge (2000) notes

> using a lagged dependent variable in a CX equation increases the data requirements, but it also provides a simple way to account for historical factors that cause current differences in the dependent variable that are difficult to account for in other ways." (p. 289)

If, for example, cities with historically high violent crime rates were also more likely to have stricter gun laws, we would fail to get an unbiased estimator of the causal effect of gun laws on violent crime rates. Therefore, we reestimated the violence equations in Table 2 but also included the natural log of the violent crime rate for 1980 as an additional independent variable in an attempt to control for city unobservables that affect violent crime and may be correlated with the gun law variables. By including the violent crime rate for 1980 in the violence equations, we are examining whether cities with similar previous violent crime rates in 1980 and 1990 values for the socio-demographic control variables had lower violent crime rates in 1990 due to the presence of any of the 19 gun laws studied here. To conserve space, the results of these analyses are not shown but are available upon request from the senior author. Not surprisingly, the homicide, robbery, and assault rates for 1990 were strongly related to the past violent crime rate. With respect to the gun law variables, the results were almost identical to those reported in Table 2. The only exception pertained to the robbery equation—the coefficient for the gun law banning the sale of handguns (HGBYBAN) was positive but no longer statistically significant. Thus, the evidence does not support the suspicion that estimates for the gun law variables were biased upwards due to the omission of historical factors responsible for differences in violent crime rates across cities in 1990.

## OLS Estimates With Gun Ownership Treated as Exogenous

Although prior research indicates that OLS estimates of the effect of gun ownership levels on homicide rates are likely to be biased, the possibility that these biases are small or negligible cannot be ruled out. If this were indeed the case, then gun ownership could be treated as an exogenous regressor, and estimation by OLS would be preferred to IV because it is the more efficient (lower variance) estimator. The standard approach to this question is to conduct a test of the endogeneity of gun ownership. Such a test relies implicitly on a comparison of an estimation in which gun ownership is treated as exogenous and one in which it is treated as endogenous. For the test to have any meaning, it is therefore essential that the OLS estimation be contrasted with a well-specified IV estimation, that is, one that uses instruments for gun ownership that are both relevant and valid. Testing for the endogeneity of gun ownership by comparing OLS to a misspecified IV estimation cannot provide evidence that OLS is acceptable. Having shown that our instruments satisfy the requirements of both validity and reliability, we turn to the issue of whether gun ownership (again proxied by PSG) is endogenous.

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0040**

We tested for the endogeneity of gun ownership using the *C*-test, which detects the impact of adding a restriction, in this case assuming that violence rates have zero immediate effect on gun ownership (thus treating gun levels as exogenous; Baum et al., 2003). The impact should be small if both equations (with and without the restriction) are valid. On the other hand, if there is a large change in the estimates of parameters, it suggests that the equation with the extra restriction (assuming gun ownership to be exogenous) is wrong.

The results of the *C*-test for the endogeneity of PSG are presented in the bottom half of Table 3. The *C*-statistic suggests gun ownership may be endogenous in the total homicide and robbery equations, although it is only significant at the .10 level. Additionally, the results indicate that although gun ownership may also be endogenous to gun homicide and assault, the *C*-statistic in these equations is not significant at conventional significance levels. In light of the mixed *C*-test results, we reestimated the violence rate equations presented in Table 3 but treated gun ownership as exogenous to rates of violence and estimated models with OLS. These results are shown in Table 3.

The OLS estimates indicate that gun ownership has a positive association with total homicide that is barely significant at the 5% (one-tailed) level ($t = 1.77$) but is still not significantly related to robbery or assault rates. Thus, we have consistent findings regarding robbery and assault—gun ownership has no significant positive effect. But we have mildly contradictory findings regarding the impact of gun ownership on the homicide rate. The IV results, which are appropriate if homicide rates affect gun acquisition, indicate that gun ownership has no significant net effect on homicide rates, while the OLS results, which are appropriate only if homicide rates have no effect on gun acquisition, indicate a marginally significant positive effect of gun ownership on homicide rates.

We doubt that gun ownership can be treated as exogenous, given the prior evidence of individual-level survey studies indicating that violent crime rates affect gun ownership. These studies are critical for breaking the deadlock concerning causal order because they are not subject to the same uncertainties concerning exogeneity and model identification that may afflict the numerous aggregate-level studies that have found an effect of violent crime rates on gun ownership. The survey studies relate the gun ownership of individual persons or households to the violent crime rates of the areas in which the individuals reside (Kleck & Kovandzic, 2009). Because it is highly unlikely that the gun ownership of any one person or household could materially affect the violent crime rates of an entire city or county, it is reasonable to conclude that the violent crime/gun ownership relationship in such studies is unidirectional, and that estimates of the effect of crime rates on gun ownership are not distorted by two-way causation.

These studies find that violent crime rates of surrounding areas increase, directly or indirectly, the likelihood that a person or household owns a gun (Kleck & Kovandzic, 2009; Lizotte, Bordua, & White, 1981, p. 501; Smith & Uchida, 1988). Therefore, we think it is advisable, in macro-level studies, to treat gun ownership as endogenous, based on strong and consistent evidence that violent crime rates affect levels of gun ownership, especially handgun ownership. Thus, on the basis of prior information, the IV estimates of models assuming gun levels to be endogenous should be regarded as more reliable than OLS estimates that require the strong assumption that violent crime rates have no effect on gun levels.

When gun levels were treated as exogenous (Table 3), nine effects of gun laws on violence rates substantially changed (i.e., coefficients changed from significant to nonsignificant, or the reverse). Five changes were in a direction favorable to the hypothesis that gun control either reduces violent crime or has no effect: the previously significant positive (counterproductive) effects of bans on gun possession among alcoholics (ALCPOS) became nonsignificant, while four previously nonsignificant negative effects became significant (BYAPLIC → HOMICIDE, BYAPLIC → ROBBERY, DRUGPOS → ASSAULT, ALCBUY → ASSAULT). The remaining four changes were unfavorable to the gun control efficacy hypothesis: the previously significant negative effect of gun owner

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0041**

licensing became nonsignificant, while three previously nonsignificant positive (counterproductive) effects became significant.

For the rest of the potential effects, resolution of the exogeneity issue turned out not to materially affect the results of primary interest, the impact of gun laws on violence rates—the OLS results were qualitatively identical to those obtained using IV methods. On net, results were no more supportive of gun control than those obtained when gun ownership was treated as endogenous. Considering the OLS estimates as a whole, the 10 significant negative associations were counterbalanced by 14 significant positive coefficients. This pattern suggests, as did the IV results, that if one interprets these associations as causal effects, gun control laws are more likely to increase violent crime than to decrease it. We also estimated models with gun ownership omitted altogether, and results for gun law variables were essentially identical to those produced when gun ownership was included, but as an exogenous variable.

Given the inevitable uncertainties of even the most careful nonexperimental research, it cannot be stated with certainty that gun ownership levels have no effect on violent crime rates. If they do not, gun ownership is not a confounder that needs to be controlled to isolate the effects of gun laws, but one of the most important underlying premises of gun control is undercut. On the other hand, if the level of gun ownership does affect violence rates, then it is a confounder that must be controlled if estimates of gun control effects are to be given much credence. Our results are therefore stronger than those of past research because we could rule out the possibility of a spurious negative association between gun laws and violent crime rates attributable to the negative association of gun control strictness with gun ownership levels.

## Discussion and Conclusion

For the most part, the evidence fails to support the hypothesis that gun control laws reduce violent crime. The absence of any apparent impact may be partly because most laws do not disarm significant numbers of violence-prone persons in the first place. It is also possible that gun laws have both violence-reducing and violence-increasing effects, the latter due to disarming of prospective victims. Opposite-sign effects may counterbalance each other, yielding no net effect.

There were nevertheless some findings that point to possible gun law effects on violent crime rates, both desirable and undesirable (summarized in Table 4). Of 57 possible effects of a type of gun law on a type of violent crime, 20 were significantly different from zero—8 negative, 12 positive. Some of these findings may be the product of chance, operating in combination with the very large number of tests for effects that were performed, though this would probably produce no more than around three coefficients significant at the 5% level ($.05 \times 57 = 3$). Taken at face value as causal effects, these findings indicate that gun control laws are at least as likely to increase violent crime as to decrease it, though on net gun control laws as a whole do not affect violent crime rates.

Along with the two strong findings (the effect of bans on purchase by alcoholics and the impact of requiring a gun license on homicide rates) and five moderate-to-weak findings supportive of gun control efficacy, Table 4 also shows 12 possible *positive* effects of gun laws on violent crime rates. Unlike our tests of violence-reducing effects of gun laws on homicide, no sharp tests of violence-increasing effects are possible because reduction of gun levels among prospective victims could increase either crime committed with guns or crime committed without guns. Thus, findings pointing to violence-elevating effects are necessarily weaker than findings pointing to violence-reducing effects on homicide. If interpreted as causal effects, the positive associations would indicate violence-increasing effects of gun control measures, perhaps due to potential victims (many within high-risk prohibited groups) being disarmed, making crime less risky for offenders. Among the more intriguing apparent counterproductive effects was that of laws restricting the concealed carrying of

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0042**

**Table 4.** Summary of Effects of Gun Control Laws on Crime Rates.

| Type of Gun Control Law | Types of Violent Crime Affected |
| --- | --- |
| Violence-reducing effects | |
|   Strongly supported | |
|     Ban on gun purchase by alcoholics | Homicide |
|     License required to possess gun in home | Homicide |
|   Moderately supported | |
|     Ban on gun purchase by alcoholics | Robbery |
|     License required to possess gun in home | Robbery |
|   Weakly supported | |
|     Ban on gun purchase by criminals | Robbery, assault |
|     Prohibit possession, mentally ill | Assault |
| Violence-increasing effects | |
| (All weakly supported) | |
|     Ban on gun purchase by minors | Robbery |
|     Ban on gun purchase by drug addicts | Homicide, robbery |
|     Prohibit possession, alcoholics | Homicide, assault |
|     Ban on gun purchase by mentally ill | Assault |
|     Permit required to purchase gun | Assault |
|     Transfer/sale of guns must be registered with a governmental agency | Robbery |
|     Concealed carrying of loaded handgun prohibited or permit hard to get | Homicide |
|     Handgun sales ban | Robbery |
|     State or city license required for gun dealers | Homicide, robbery |

guns on homicide. To the extent that these laws reduce gun carrying by prospective victims more than by offenders, the laws could increase violent crime by reducing any deterrent effects generated by victim gun carrying. The strongest prior research on this question, however, indicates that replacing restrictive carry laws with more lenient "shall issue" licensing has no net impact on violent crime rates (Kovandzic et al., 2005). Further, laws reducing the carrying of guns outside the home should have their strongest influence on crimes typically committed in nonresidential locations, such as robberies, but our results indicated no effect on the robbery law.

It is possible that still other laws, implemented since 1989 or not yet implemented, might have effects not produced by the older laws. Perhaps gun control strictness has not yet reached some unknown threshold level, below which no measurable crime reductions can be achieved. The laws enacted since 1989, however, are generally weaker than those passed earlier. The single possible exception is the federal Brady Act, but preliminary evaluation indicates that this law, at least in the first few years after its passage, was ineffective (Ludwig & Cook, 2000). In any case, this sort of speculation is nonfalsifiable, as one could continue to entertain it no matter how strict controls became in the future, and no matter how negative the results of research continued to be. It is also possible that some laws have effects, but they are too small to be statistically detectable using our models and data, even with a sample size exceeding a thousand.

The main policy implication of this research is that the past performance of existing gun laws does not justify much optimism that new gun laws will reduce violent crime. Support for even the least promising strategy can be sustained by ultimately nonfalsifiable speculations about what might be achieved by the next, heretofore untried, variant of the strategy, but this is not a very practical way to set priorities for the allocation of limited resources for reducing social problems. This does not imply that we should not explore new variants of gun control, but it does imply that such efforts have

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0043**

less a priori potential for measurable impact on crime rates than alternatives such as well-evaluated programs to reduce poverty or rehabilitate criminals (Walker, 2011).

On a more positive note, the minority of gun control measures that show evidence of effectiveness share an important element in common—background checks on persons attempting to acquire firearms. Both licenses authorizing gun possession and permits for purchasing guns are implemented using background checks to screen out persons in prohibited categories, such as criminals, alcoholics, and mentally ill persons. Likewise, bans on gun purchases by criminals or alcoholics are little more than hollow recommendations if not backed up by a system for identifying whether persons fall into these prohibited categories. Currently, persons attempting to acquire guns from licensed gun dealers are required to pass a background check under federal law, but those trying to get guns from private (nondealer) sources are not required to do so, under either federal law or the laws of most states. Consequently, some reduction in violent crime could be produced by a federal law requiring background checks on all persons seeking to obtain a firearm, regardless of the source.

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## Notes

1. Although Lott and Mustard (1997) represented their key data as county rates of crimes known to the police, their data in fact reflected only crimes within subsets of local police jurisdictions within each county that reported crime to state UCR agencies—subsets of jurisdictions that frequently changed from year to year. Their ''crime rates'' for a given county changed in this data set merely because different sets of areas contributed crime statistics in 1 year compared to the previous year, rather than because rates of crime (or even crimes known to police) changed (Maltz & Targonski, 2002; see also Martin and Legault, 2005, regarding similar problems in state-level crime data analyzed by Lott and Mustard). It is exactly as if a different set of counties were included in each wave of the panel. Lott and Mustard did nothing to correct this critical problem, nor did critics who reanalyzed their unmodified data set.
2. A few low population cities reported zero homicides for the 1989–1991 study period. Because the logarithm of zero is undefined, 1 was added to the average annual number of total, gun, and nongun homicides before we computed the rates and then took the natural logs of those rates. The procedure was applied to all cities, not just those with zero homicides, to maintain relative homicide levels.
3. We did not study the effects of gun ownership and gun laws on rape rates. Because less than 3% of rapes involve offenders armed with guns (U.S. Bureau of Justice Statistics, 2006), it is unlikely that gun ownership or gun laws could exert a detectable effect on the rape rate.
4. It would have been desirable to separately assess rates of all types of violent crime with and without guns, to provide sharper tests of the hypotheses that gun levels and gun laws affect violence rates. Unfortunately, close examination of UCR data on gun versus nongun varieties of robbery and aggravated assault revealed that the data often covered less than 12 months of the year, were often coded incorrectly (e.g., *all* robberies were coded as gun robberies), or there were implausibly large or small numbers of crimes reported as involving guns. Consequently, we could reliably distinguish gun and nongun crimes only for homicide, by using SHR data.
5. For the gun carrying law variable (CARYHIDN), 1 indicated that gun carrying was either completely unlawful or required a license that was rarely issued, and 0 indicated that either the city was located in a

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0044**

nondiscretionary "shall-issue" state where authorities were required to issue carry permits to applicants meeting certain objective criteria, or no license was required at all to carry guns.

6. That is, the number of excluded instruments exceeds the number of endogenous regressors.

7. The *J*-statistic for the instrumental variable estimator is numerically equivalent to Sargan's (1958) NR2 overidentification statistic.

8. Where the test will lack power is if all the instruments fail the requirement of exogeneity and, in addition, they all imply the same bias in the estimate of gun levels.

## References

Baum, C. F., Schaffer, M. E., & Stillman, S. (2003). Instrumental variables and GMM: Estimation and testing. *Stata Journal*, *3*, 1–31.

Belsley, D. A., Kuh, E., & Welsch, R. E. (1980). *Regression diagnostics*. New York, NY: John Wiley.

Bice, D. C., & Hemley, D. D. (2002). The market for new handguns. *Journal of Law and Economics*, *45*, 251–265.

Block, R. (1977). *Violent crime*. Lexington, MA: Lexington Books.

Bordua, D. J. (1986). Firearms ownership and violent crime: A comparison of Illinois counties. In J. M. Byrne & R. J. Sampson (Eds.), *The social ecology of crime* (pp. 156–188). New York, NY: Springer-Verlag.

Bordua, D. J., Lizotte, A. J., & Kleck, G. (1979). *Patterns of firearms ownership, regulation, and use in Illinois. A report to the Illinois Law Enforcement Commission*. Springfield, IL: Illinois Law Enforcement Commission.

Bound, J., Jaeger, D. A., & Baker, R. M. (1995). Problems with instrumental variables estimation when the correlation between the instruments and the endogenous explanatory variable is weak. *Journal of the American Statistical Association*, *90*, 443–450.

Bruce, J. M., & Wilcox, C. (1998). Gun control laws in the states: Political and apolitical influences. In J. M. Bruce & C. Wilcox (Eds.), *The changing politics of gun control* (pp. 139–154). New York, NY: Rowman & Littlefield.

Campbell, D. T., & Stanley, J. (1963). *Experimental and quasi-experimental designs for research*. Boston, MA: Houghton Mifflin Company.

Clotfelter, C. T. (1981). Crime, disorders, and the demand for handguns. *Law & Policy Quarterly*, *3*, 425–446.

Cook, P. J. (1976). A strategic choice analysis of robbery. In W. Skogan (Ed.), *Sample surveys of the victims of crime* (pp. 173–187). Cambridge, MA: Ballinger.

Cook, P. J. (1982). The role of firearms in violent crime. In M. E. Wolfgang & N. A. Weiner (Eds.), *Criminal violence* (pp. 236–291). Beverly Hills, CA: Sage.

Cook, P. J., & Ludwig, J. (1997). *Guns in America*. Washington, DC: Police Foundation.

Cook, P. J., & Ludwig, J. (2000). *Gun violence: The real costs*. New York, NY: Oxford University Press.

Cook, P. J., & Ludwig, J. (2003). Guns and burglary. In J. Ludwig & P. J. Cook (Eds.), *Evaluating gun policy* (pp. 74–107). Washington, DC: Brookings Institution.

Dorfman, L., & Schiraldi, V. (2001). *Off balance: Youth, race & crime in the news*. Building Blocks for Youth website at www.buildingblocksforyouth.org

Duggan, M. (2001). More guns, more crime. *Journal of Political Economy*, *109*, 1086–1114.

Etten, T. (2002). *Gun control in Florida*. Unpublished doctoral dissertation draft, School of Criminal Justice, Rutgers University, New Brunswick, NJ.

Fox, J. A. (2001). *Uniform Crime Reports [United States]: Supplementary Homicide Reports 1976–1999 [Computer file]* (ICPSR Version). Boston, MA: Northeastern University, College of Criminal Justice [producer]. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor].

Friedman, R. A. (2006). Violence and mental illness—How strong is the link? *New England Journal of Medicine*, *355*, 2064–2066.

Garofalo, J. (1981). Crime and the mass media. *Journal of Research in Crime and Delinquency*, *18*, 319–350.

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0045**

Hahn, R. A., Bilukha, O., Crosby, A. M., Fullilove, T., Liberman, A., Moscicki, E., . . . Briss, P. A. (2005). Firearms laws and the reduction of violence: A systematic review. *American Journal of Preventive Medicine*, *28*, 40–70.

Hansen, L. P. (1982). Large sample properties of generalized method of moments estimators. *Econometrica*, *50*, 1029–1054.

Killias, M., van Kesteren, J., & Rindlisbacher, M. (2001). Guns, violent crime, and suicide in 21 countries. *Canadian Journal of Criminology*, *43*, 429–448.

Kleck, G. (1979). Capital punishment, gun ownership, and homicide. *American Journal of Sociology*, *84*, 882–910.

Kleck, G. (1984). The relationship between gun ownership levels and rates of violence in the United States. In D. B. Kates, Jr. (Ed.), *Firearms and violence: Issues of public policy* (pp. 99–135). Cambridge, MA: Ballinger.

Kleck, G. (1996). Crime, culture conflict and the sources of support for gun control. *American Behavioral Scientist*, *39*, 387–404.

Kleck, G. (1997). *Targeting guns: Firearms and their control*. New York, NY: Aldine.

Kleck, G. (2004). Measures of gun ownership levels for macro-level crime and violence research. *Journal of Research in Crime and Delinquency*, *41*, 1–34.

Kleck, G. (2013). Gun control after *Heller* and *McDonald*: What cannot be done and what ought to be done. *Fordham Urban Law Journal*, *39*, 1383–1420.

Kleck, G., & Kovandzic, T. (2009). City-level characteristics and individual handgun ownership: Effects of collective security and homicide. *Journal of Contemporary Criminal Justice*, *25*, 45–66.

Kleck, G., & McElrath, K. (1991). The effects of weaponry on human violence. *Social Forces*, *69*, 669–692.

Kleck, G., & Patterson, E. B. (1993). The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology*, *9*, 249–288.

Koper, C. S., & Roth, J. A. (2001). The impact of the 1994 federal assault weapon ban on gun violence outcomes. *Journal of Quantitative Criminology*, *17*, 33–74.

Kovandzic, T. V., & Marvell, T. B. (2003). Right-to-carry concealed handguns and violent crime. *Criminology and Public Policy*, *2*, 363–396.

Kovandzic, T. V., Marvell, T. B., & Vieraitis, L. M. (2005). The impact of 'shall-issue' concealed handgun laws on violent crime rates. *Homicide Studies*, *9*, 292–323.

Kovandzic, T., Schaffer, M. E., & Kleck, G. (2012). Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias. In D. Gadd, S. Karstedt, & S. F. Messner (Eds.), *The Sage handbook of criminological research methods* (pp. 76–92). Thousand Oaks, CA: Sage.

Kovandzic, T., Schaffer, M., & Kleck, G. (2013). Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach. *Journal of Quantitative Criminology*, *28*, 477–541.

Kovandzic, T., Vieraitis, L. M., & Yeisley, M. R. (1998). "The structural covariates of urban homicide." *Criminology*, *36*, 569–600.

Lizotte, A. J., & Bordua, D. J. (1980). Military socialization, childhood socialization, and current situations: Veterans' firearms ownership. *Journal of Political and Military Sociology*, *8*, 243–256.

Lizotte, A. J., Bordua, D. J., & White, C. S. (1981). Firearms ownership for sport and protection: Two not so divergent models. *American Sociological Review*, *46*, 499–503.

Loftin, C., McDowall, D., Wiersema, B., & Cottey, T. J. (1991). Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *New England Journal of Medicine*, *325*, 1615–1621.

Lott, J. R., Jr., & Mustard, D. B. M. (1997). Crime, deterrence and right-to-carry concealed handguns. *Journal of Legal Studies*, *26*, 1–68.

Ludwig, J., & Cook, P. (2000). Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *Journal of the American Medical Association*, *284*, 585–591.

Maltz, M. D., & Targonski, J. (2002). A note on the use of county-level UCR data. *Journal of Quantitative Criminology*, *18*, 297–318.

Marsh, H. L. (1989). Newspaper crime coverage in the U.S., 1983–1988. *Criminal Justice Abstracts*, *21*, 506–514.

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**
**0046**

Martin, R. A., Jr., & Legault, R. L. (2005). Systematic measurement error with state-level crime data. *Journal of Research in Crime and Delinquency*, *42*, 187–210.

McDowall, D. (1986). Gun availability and robbery rates: A panel study of large U.S. cities, 1974-1978. *Law & Policy*, *8*, 135–148.

Moody, C. E., & Marvell, T. B. (2005). Guns and crime. *Southern Economic Journal*, *71*, 720–736.

Moody, C. E., & Marvell, T. B. (2006). *Gun control, homicide, and collinearity*. Unpublished manuscript.

Moody, C. E., & Marvell, T. B. (2008). The debate on shall-issue laws. *Econ Journal Watch*, *5*, 269–293.

National Research Council. (2004). *Firearms and violence: A critical review*. Washington, DC: The National Academies Press.

Newton, G. D., & Zimring, F. (1969). *Firearms and violence in American Life. A Staff Report to the National Commission on the Causes & Prevention of Violence*. Washington, DC: U.S. Government Printing Office.

Pagan, A. R., & Hall, D. (1983). Diagnostic tests as residual analysis. *Econometric Reviews*, *29*, 229–256.

Rosenfeld, R., Baumer, E., & Messner, S. F. (2007). Social trust, firearm prevalence, and homicide. *Annals of Epidemiology*, *17*, 119–125.

Sampson, R. J. (1986). Crime in cities. In A. J. Reiss Jr. & M. Tonry (Eds.), *Communities and crime* (pp. 271–311). Chicago, IL: University of Chicago Press.

Sargan, D. (1958). The estimation of econometric relationships using instrumental variables. *Econometrica*, *26*, 393–415.

Smith, D. A., & Uchida, C. D. (1988). The social organization of self-help. *American Sociological Review*, *53*, 94–102.

Southwick, L., Jr. (1997). Do guns cause crime? Does crime cause guns?: A Granger test. *Atlantic Economic Journal*, *25*, 256–273.

Staiger, D., & Stock, J. H. (1997). Instrumental variables regression with weak instruments. *Econometrica*, *65*, 557–586.

Tark, J., & Kleck, G. (2004). Resisting crime. *Criminology*, *42*, 861–909.

U.S. Bureau of Alcohol, Tobacco and Firearms. (1989). *Firearms State laws and published ordinances—1989*. Washington, DC: U.S. Government Printing Office.

U.S. Bureau of the Census. (1994). *1990 Census of the Population. Volume I: Characteristics of the Population*. Washington, DC: U.S. Government Printing Office.

U.S. Bureau of Justice Statistics. (1996). *Survey of State procedures related to firearm sales*. Washington, DC: Office of Justice Programs, U.S. Department of Justice.

U.S. Bureau of Justice Statistics. (2006). *Background checks for firearm transfers, 2005*. Washington, DC: Office of Justice Programs, U.S. Department of Justice.

U.S. Federal Bureau of Investigation. (1990–1992). *Crime in the United States 1989 [1990, 1991]—Uniform Crime Reports*. Washington, DC: U.S. Government Printing Office.

U.S. Federal Bureau of Investigation. (1991). *Uniform Crime Reports—1990*. Washington, DC: U.S. Government Printing Office.

U.S. Federal Bureau of Investigation. (2015). *Crime in the United States 2014 – Uniform Crime Reports*. Retrieved from https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2014/crime-in-the-u.s.-2014

U.S. National Center for Health Statistics. (1997). *Part III versions of Mortality Detail File tapes covering 1987 to 1993, which include county of death for all counties*. Rockville, MD: National Center for Health Statistics.

Vieraitis, L. M. (2000). Income inequality, poverty, and violent crime: A review of the empirical evidence. *Social Pathology*, *6*, 24–45.

Walker, S. (2011). *Sense and nonsense about crime, drugs and communities*. Belmont, CA: Wadsworth.

Wooldridge, J. M. (2000). *Introductory econometrics*. Cincinnati, OH: South-Western College.

Wooldridge, J. M. (2006). *Introductory econometrics: A modern approach*. Mason, OH: Thomson.

Wright, J. D., Rossi, P. H., & Daly, K. (1983). *Under the gun: Weapons, crime and violence*. New York, NY: Aldine.

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0047**

## Author Biographies

**Gary Kleck** is an emeritus professor at Florida State University, having retired in 2016 as the David J. Bordua Professor of Criminology and Criminal Justice. He is the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology.

**Tomislav Kovandzic** is a faculty member in the School of Economic, Political and Policy Sciences at University of Texas at Dallas. His primary areas of research interest are gun control, crime policy, and deterrence/incapacitation.

**Jon Bellows** is the district court administrator for the 4th Judicial District of the Wisconsin Supreme Court.

Downloaded from cjr.sagepub.com by guest on November 7, 2016

**Exhibit 3**

**0048**

# EXHIBIT "4"

Exhibit 4
0049

The Social Science Journal 52 (2015) 168–175



Contents lists available at ScienceDirect

# The Social Science Journal

journal homepage: www.elsevier.com/locate/soscij



# The impact of minimum age and child access prevention laws on firearm-related youth suicides and unintentional deaths



## Mark Gius*

*Department of Economics, Quinnipiac University, Hamden, CT 06518, USA*

### ARTICLE INFO

*Article history:*
Received 17 July 2014
Received in revised form 14 January 2015
Accepted 14 January 2015
Available online 11 February 2015

*Keywords:*
Minimum age handgun laws
Child access prevention laws
Suicides
Unintentional deaths

### ABSTRACT

The aim of the present study is to quantify the association between child access prevention (CAP) and minimum age laws and state-level youth firearm-related suicide and unintentional death rates. This paper differs from prior research in several ways. First, this is one of the few studies to focus exclusively on youth death rates. Second, this study looks at those laws with the most impact on youth suicides and unintentional deaths. Finally, this study uses one of the largest and most recent data sets of any study on this topic. In order to estimate the determinants of youth firearm deaths, a fixed effects regression model, controlling for both state-level and year-specific effects, is used. Results indicate that state-level minimum age laws have no significant effects on either youth suicides or unintentional deaths and that state-level CAP laws have no significant effects on unintentional deaths. States with CAP laws, however, have lower rates of youth suicide, and, after the enactment of the Federal minimum age requirement, both youth suicide and unintentional death rates fell. Given the mixed results regarding state-level juvenile firearm laws, national restrictions on juvenile handgun possession may be more effective in reducing both youth suicides and unintentional deaths than state-level regulations.

© 2015 Western Social Science Association. Published by Elsevier Inc. All rights reserved.

## 1. Introduction

In 1981, the firearm-related suicide rate for youths (ages 0–19) was 1.69 per 100,000 persons; in 2010, it was 0.9 per 100,000 persons, a decline of over 47%. Even more dramatic was the decline in firearm related unintentional deaths (ages 0–19) over the same time period. In 1981, the firearm-related unintentional death rate was 0.84 per 100,000 persons; in 2010, it was 0.16 per 100,000 persons, a decrease of over 80%. Although a variety of factors, including more prevalent use of gun locks and gun safes and better counseling services, may explain some of the decline in firearm-related deaths among youths, it is possible that stricter gun control laws may be at least partly responsible for these dramatic declines in youth death rates.

Two gun control laws that primarily deal with children are child access prevention (CAP) laws and minimum age laws. CAP laws impose criminal liabilities on adults who allow children to have unsupervised access to firearms. One of the primary reasons for implementing CAP laws is to compel parents or guardians to supervise children's access to firearms under the belief that it prevents potentially dangerous situations that may arise when children have unsupervised access to guns.

Although there is no federal CAP law, many states have enacted such laws. According to the Law Center to Prevent Gun Violence, as of 2010, 16 states have enacted some type of CAP law. These laws, however, vary widely. Some impose a criminal liability when an adult does not secure a weapon. Others only prohibit an adult from providing a firearm to a

---

* Tel.: +1 203 582 8576; +1 203 582 8664.
*E-mail addresses:* Mark.gius@quinnipiac.edu, gius@sbcglobal.net

http://dx.doi.org/10.1016/j.soscij.2015.01.003
0362-3319/© 2015 Western Social Science Association. Published by Elsevier Inc. All rights reserved.

**Exhibit 4**
**0050**

M. Gius / The Social Science Journal 52 (2015) 168–175

child. Many of these laws also have varying definitions of what a minor is. In some states, adults only have to secure firearms from children who are at most 14 years of age; for others, the age at which supervision is required is as high as 18. Some states require secured access for all types of firearms; other states only require it for handguns. Finally, most states have exceptions for hunting, sport shooting, and other legitimate purposes. Table 1 presents the status of CAP laws at the state level for the period 1981–2010.

In addition to CAP laws, many states also have laws requiring minimum ages to possess firearms, especially handguns. In some states, the minimum age for possession is as old as 21. Some states also have minimum age requirements for possession of long guns (rifles and shotguns); the federal government has no long gun possession minimum age requirement. There are, of course, exceptions to these laws, including hunting, target practice, and other legitimate activities. Table 2 presents the status of minimum age laws at the state level for the period 1981–2010. In addition to these state regulations, federal law prohibits possession of handguns by any person under the age of 18.

There has been much prior research on the effects of gun control or gun availability on unintentional deaths (Lott & Whitley, 2001; Leenaars & Lester, 1997; Lester, 1993; Lester & Murrell, 1981) and on suicides (Gius, 2011; Conner & Zhong, 2003; Marvell, 2001; Ludwig & Cook, 2000; Cummings, Koepsell, Grossman, Savarino, & Thompson, 1997; Carrington & Moyer, 1994; Kellerman et al., 1992; Yang & Lester, 1991; Lester, 1988; Sommers, 1984; Lester & Murrell, 1982). The results of these prior studies are mixed. Some find stricter gun control laws or lower levels of gun availability reduce firearm-related unintentional death rates and suicide rates (Conner & Zhong, 2003; Marvell, 2001; Ludwig & Cook, 2000; Cummings et al., 1997; Leenaars & Lester, 1997; Carrington & Moyer, 1994; Lester, 1993; Kellerman et al., 1992; Yang & Lester, 1991; Lester, 1988; Sommers, 1984; Lester & Murrell, 1982; Lester & Murrell, 1981). Other studies find either no significant relationship or an ambiguous relationship between these death rates and gun availability or gun control (Gius, 2011; Duggan, 2003; Lott & Whitley, 2001; Marvell, 2001). When prior studies did find relationships between guns and unintentional deaths and suicides, the relationships tended to be weak and were typically overshadowed by the effects of socioeconomic factors. In addition, some studies find stricter gun control laws actually increase non-firearm related suicides. Finally, many studies look at overall suicide and unintentional death rates, instead of just youth death rates, and most do not focus on the gun control laws that would have the most significant impact on youth deaths. The present study attempts to fill that void.

The aim of the present study is to quantify the association between CAP and minimum age laws and state-level youth firearm-related suicide and unintentional death rates. This paper differs from prior research in several ways. First, it is one of the few studies focusing exclusively on youth (0–19 years of age) death rates. Most studies look at overall death rates. Second, this study looks at those laws with the most impact on youth suicide and unintentional deaths: CAP and minimum age laws. Third, this study uses a much larger data set than prior studies, containing 30 years of data for all 50 states. Using fixed effects regressions and controlling for both state-level and year-specific effects, the results of the present study suggest that state-level minimum age laws have no significant effect on either youth suicides or unintentional deaths. States with CAP laws, however, have lower youth suicide rates, but these laws have no significant effect on unintentional deaths. Finally, after the Federal government imposed minimum age requirements for handgun possession, both youth suicide rates and unintentional death rates fell. Although state laws appear mixed in their effects on youth deaths by firearms, Federal minimum age requirement laws appear to be effective in reducing both suicides and unintentional firearm related deaths among youths.

## 2. Literature review

As noted earlier, a number of studies examine the issue of gun control and its relationship to unintentional deaths and suicides. Some studies look at the effects of gun control laws or gun availability on overall suicide rates (Gius, 2011; Duggan, 2003; Conner & Zhong, 2003; Yang & Lester, 1991; Lester, 1988; Sommers, 1984; Lester & Murrell, 1982). Other studies look at the effects of gun control laws on overall unintentional firearm deaths (Leenaars & Lester, 1997; Lester, 1993; Lester & Murrell, 1981). Finally, a limited number of studies look at the effects of gun control laws on youth suicides and unintentional deaths, which is the topic of the present study (Lott & Whitley, 2001; Marvell, 2001).

Lott and Whitley (2001) examine the effects of safe-storage laws on juvenile firearm-related suicides and unintentional deaths. The authors look at CAP laws and laws requiring some type of gun lock to be used to secure a firearm. State-level data for the period 1977–1996 is used. According to the authors, by 1996, fifteen states had adopted safe-storage laws. The authors use a fixed effects tobit model that includes as explanatory variables a safe-storage dummy variable, non-firearm unintentional death rates, adult firearm unintentional death rates, and various control variables. Lott and Whitley find that safe-storage laws had no significant effects on youth firearm-related unintentional deaths or suicides.

Marvell (2001) looks at the effects of the Federal Crime Control and Law Enforcement Act of 1994 on homicides and suicides. This act banned the possession of handguns by persons under 18 years of age. The author looks at the effects of this law on both juvenile and overall homicide (1979–1998) and suicide (1976–1999) rates. Using state-level data, Marvell finds that Federal and state laws on underage possession of handguns have no statistically-significant effects on youth suicide rates.

As noted earlier, the present study differs from this prior research in several ways. First, this is one of the few studies focusing exclusively on youth death rates. Second, this study looks at those gun control laws with the most impact on firearm related youth suicides and unintentional deaths. Third, this study uses a large and recent data set. The empirical technique in the present study is discussed in the next section.

Exhibit 4
0051

M. Gius / The Social Science Journal 52 (2015) 168–175

**Table 1**
CAP Laws at the state level.

| | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 99 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| AK | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| AZ | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| AR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CA | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| CO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CT | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| DE | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| FL | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| GA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HI | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| ID | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| IL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| IN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| IA | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| KS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| KY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| LA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ME | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MD | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| MA | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X |
| MI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MN | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| MS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NV | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| NH | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NJ | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| NM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NC | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| ND | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OH | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OK | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RI | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X |
| SC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TX | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X |
| UT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| VT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| VA | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| WA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WV | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WI | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| WY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

X denotes existence of CAP law

*Sources*: Marvell (2001); Ludwig and Cook (2003); The Law Center to Prevent Gun Violence; The Brady Center.

Exhibit 4
0052

**Table 2**
Minimum age laws at the state level.

| | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 99 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| AK | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| AZ | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| AR | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| CA | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| CO | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| CT | | | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| DE | | | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| FL | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| GA | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| HI | | | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| ID | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| IL | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| IN | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| IA | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| KS | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| KY | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| LA | | | | | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X |
| ME | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MD | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| MA | | | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| MI | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| MN | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| MS | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| MO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NE | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| NV | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| NH | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NJ | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| NM | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| NY | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| NC | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| ND | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| OH | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OK | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| OR | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| PA | | | | | | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X |
| RI | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| SC | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| SD | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| TN | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| TX | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| UT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| VT | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| VA | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| WA | | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| WV | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| WI | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| WY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

X denotes existence of minimum age law

*Source*: Marvell (2001), Ludwig and Cook (2003); The Law Center to Prevent Gun Violence; The Brady Center.

Exhibit 4
0053

## 3. Empirical technique

In order to determine if CAP laws and minimum age laws are related to firearm-related youth suicides and unintentional deaths, a fixed effects model that controls for both state-level and year-specific effects is used. This type of model is similar to that used in other articles on this topic (Gius, 2011; Lott & Whitley, 2001; Marvell, 2001).

The following gun control measures are examined in the present study: CAP laws, state minimum age possession laws, and Federal minimum age possession laws. Each of these gun control measures is expressed as a dummy variable that equals one if the state or Federal government has the law in question and zero otherwise. Although dummy variables are not precise measures of gun control laws, it is reasonable to assume that if a state has any type of CAP law, for example, guns are more restricted in that state than in a state with no such law. In addition, most prior research on gun control laws have employed this methodology (Gius, 2014; Rubin & Dezhbakhsh, 2003; Dezhbakhsh & Rubin, 1998; Lott & Mustard, 1997; Kleck & Patterson, 1993).

Regarding Federal gun control measures, the Federal Crime Control and Law Enforcement Act of 1994 banned possession of handguns for persons under 18 years of age; hence, the Federal minimum age dummy variable equals one for those years post-1994 and zero otherwise. Finally, all three variables deal only with handguns and handgun possession. Restrictions on long gun possession and minimum age requirement for handgun purchases are not considered in the present study.

Regarding other factors that may affect the suicide and unintentional death rate, variables that proxy for potentially depressing events that may serve as possible catalysts for suicide are also included in the model. Guidance is obtained from several studies investigating risk factors associated with suicide and suicidal behavior (Nock et al., 2008; Bridge, Goldstein, & Brent, 2006; Mann, 2002). Given this prior research, it is reasonable to assume that traumatic life events such as divorce, prolonged unemployment, and excessive alcohol consumption may trigger suicidal tendencies.

Given the above, the following equation is estimated in the present study:

$$Y_{i,t} = \alpha_0 + \alpha_1 CAP_{i,t} + \alpha_2 State\ minimum_{i,t} + \alpha_3 Federal\ minimum_{i,t} +$$

$$\alpha_4 Control\ variables_{i,t} + \alpha_5 State\ fixed\ effects_i + \alpha_6 Year\ fixed\ effects_t + \varepsilon_{i,t}$$

where $Y$ denotes either the firearm-related youth suicide rate (ages 0–19) or the firearm-related youth unintentional death rate, State Minimum equals one if the state has a minimum age requirement for handgun possession and zero otherwise; Federal Minimum equals one if the Federal minimum age requirement for handgun possession is in effect (post 1994), and CAP equals one if the state has a CAP law. Control variables include the following: percentage of population that is white; percentage of population that is black; population density; percentage of population with a four-year college degree; per capita median income; annual unemployment rate; percentage of population under the age of 18; per capita alcohol consumption; and divorce rate per 100,000 residents. These control variables are based upon their use in prior research (Gius, 2014; Pellegrini & Rodriguez-Monguio, 2013; Moody & Marvell, 2009; Moody, 2001; Olson & Maltz, 2001; Bartley & Cohen, 1998; Lott & Mustard, 1997; Yang & Lester, 1991; Lester, 1988; Sommers, 1984).

As noted earlier, a two way fixed effects model, controlling for both state-level and year-specific effects, is used to estimate the determinants of firearm-related youth suicide rates and unintentional death rates. All observations are weighted using state-level population, and standard errors are corrected using a clustering method. A Hausman Test is used to determine if fixed effects or random effects are more appropriate. Results of this test suggest that fixed effects are better suited for estimating the model in the present study. In addition, the Breusch–Pagan Test is used to determine if heteroscedasticity is present in the model, and the Ramsey Reset Test is employed to test the specification of the model. The results of the tests indicate no heteroscedasticity and the models were properly specified.

## 4. Data and results

All data are state-level and were collected for the years 1981–2010. State-level socioeconomic data are obtained from the *Statistical Abstract of the United States* and other relevant Census Bureau documents. State-level data on youth (ages 0–19) firearm-related suicides and unintentional deaths are obtained from the National Center for Injury Prevention and Control, the Centers for Disease Control (CDC). The WISQARS system is used to obtain the necessary data from the CDC website. One issue with the CDC data, however, is that for the years 1999–2010, state-level unintentional deaths are only reported when the number of deaths was greater than ten. Hence, there are many missing observations in the state-level unintentional death data. Any observation with missing data are excluded from the sample. The latest year for which CDC data is available was 2010. The sample size for the suicide regression is 1500. The sample size for the unintentional death regression is 813. Descriptive statistics are presented on Table 3.

Regarding information on state-level CAP laws and minimum age laws, data on these laws are obtained from Marvell (2001), the Brady Center website, the Law Center to Prevent Gun Violence website, and Ludwig and Cook (2003). If a state had any minimum age requirement at all for handgun possession, the state minimum age variable was denoted with a one. If the above references contradict one another, the original state law is examined in order to determine whether it has a CAP law or minimum age law.

Regression results are presented in Tables 4 and 5. The results for gun-related suicides suggest that state-level minimum age laws have no statistically significant effects on firearm related youth suicides. However, states with CAP laws have lower youth suicide rates, and the youth suicide

**Exhibit 4**
**0054**

M. Gius / The Social Science Journal 52 (2015) 168–175

**Table 3**
Descriptive Statistics.

| Variable | Means | |
| --- | --- | --- |
| | Suicide data ($n = 1500$) | Unintentional death data ($n = 813$) |
| Suicide rate | 2.00 (1.15) | |
| Unintentional death rate | | 0.899 (0.718) |
| White | 0.83 (0.29) | 0.838 (0.38) |
| Black | 0.099 (0.094) | 0.101 (0.094) |
| Income—adjusted for inflation | 15,004 (3011) | 13,459 (2300) |
| College | 0.229 (0.0526) | 0.204 (0.043) |
| Unemployment rate | 0.0596 (0.0218) | 0.0645 (0.0218) |
| Alcohol | 2.40 (0.56) | 2.41 (0.577) |
| Divorce | 4.58 (1.48) | 5.06 (1.62) |
| Population density | 175 (242) | 149 (209) |

Notes: Standard deviations in parentheses.

**Table 4**
Firearm-related youth suicide rate.

| Variable | Coefficient | Standard error | Test statistic |
| --- | --- | --- | --- |
| Constant | 3.76 | 0.766 | 4.90[***] |
| Cap law | −0.218 | 0.0502 | −4.36[***] |
| State minimum age law | −0.046 | 0.044 | −1.05 |
| Federal minimum age law | −1.24 | 0.133 | −9.30[***] |
| White | −0.016 | 0.032 | −0.51 |
| Black | −2.04 | 1.82 | −1.12 |
| Income | −0.00003 | 0.000017 | −1.78[*] |
| College | 1.74 | 0.483 | 3.60[***] |
| Unemployment rate | 0.406 | 1.13 | 0.36 |
| Alcohol | 0.143 | 0.101 | 1.41 |
| Divorce | 0.0917 | 0.0244 | 3.76[***] |
| Age less than 18 | −7.27 | 2.22 | −3.28[***] |
| Population density | −0.0002 | 0.00104 | −0.19 |

Notes: State and year fixed effects not shown. Adjusted $R^2 = 0.789$.
** 5% level.
[*] 10% level.
[***] 1% level.

**Table 5**
Firearm-related unintentional death rate.

| Variable | Coefficient | Standard error | Test statistic |
| --- | --- | --- | --- |
| Constant | −2.102 | 0.864 | −2.43[**] |
| Cap law | −0.036 | 0.04497 | −0.80 |
| State minimum age law | −0.0636 | 0.0398 | −1.60 |
| Federal minimum age law | −0.473 | 0.0667 | −7.08[***] |
| White | −0.00385 | 0.022 | −0.17 |
| Black | 3.26 | 2.19 | 1.49 |
| Income | 0.000036 | 0.000015 | 2.41[**] |
| College | 0.713 | 0.389 | 1.83[*] |
| Unemployment rate | −2.81 | 0.965 | −2.91[***] |
| Alcohol | 0.142 | 0.112 | 1.26 |
| Age less than 18 | 5.004 | 2.19 | 2.28[**] |
| Population density | 0.00189 | 0.00124 | 1.53 |

Notes: State and year fixed effects not shown. Adjusted $R^2 = 0.716$.
[*] 10% level.
[**] 5% level.
[***] 1% level.

rate fell after the imposition of the Federal minimum age law.

For the unintentional death regression, state-level minimum age laws and CAP laws have no statistically-significant effects on firearm related youth unintentional deaths. However, youth unintentional death rates fell after the enactment of the Federal minimum age law. Hence, the Federal minimum age law is more effective in reducing both firearm related youth suicides and youth unintentional deaths than similar state-level regulations. These results contradict earlier studies on this topic (Lott & Whitley, 2001; Marvell, 2001). However, other studies that do not focus solely on youths find evidence that restricting access to or reducing the availability of guns reduces suicides and unintentional deaths.

Regarding the significance of the other explanatory variables, states with higher college education rates and divorce rates have higher suicide rates, while states with higher incomes and percentages of population less than 18 have lower suicide rates. For unintentional deaths, states with higher incomes, college education rates, and percentages of population less than 18 have higher unintentional death rates, while states with higher unemployment rates have lower unintentional death rates. These results are consistent with the findings of prior research in this area.

## 5. Discussion and concluding remarks

Youth suicide and unintentional death rates have declined dramatically since the early 1980s. As can be ascertained from Charts 1 and 2, the most significant declines came after 1994, the year when the Federal minimum age law took effect. The results of the present study further suggest that, after the Federal law was enacted, youth suicide rates dropped by 1.2 per 100,000 persons, holding all other factors constant. This is a very significant decline, especially given that the average youth suicide rate for the entire period in question (1981–2010) was 1.49 per 100,000 persons. The decline in the youth unintentional death rate was equally dramatic; according to the results of the present study, the unintentional death rate fell by 0.47 per 100,000 persons out of an average death rate for the entire period of 0.67 per 100,000 persons. Clearly, not all declines in suicides and unintentional deaths can be explained by the enactment of the Federal minimum age requirement. Other factors that were coincidental to the law's passage may have also contributed to this decrease in youth suicide and unintentional death rates. For example, it must be noted that a wide variety of other gun control measures were enacted at the Federal level at approximately the same time as the minimum age requirement for handguns. Hence, the result found in this study regarding the Federal minimum age law may also be due to the contributory effects of other gun control restrictions that went into effect in the same year as the minimum age law. It is also important to note that the laws considered in this study deal only with handgun possession and not the purchase of handguns and that the enforcement of handgun possession laws is problematic, especially if the possession occurs within the juvenile's own home.

Exhibit 4
0055

*M. Gius / The Social Science Journal 52 (2015) 168–175*



**Chart 1.** Crude youth suicide rate (source: CDC).



**Chart 2.** Crude youth unintentional death rate (source: CDC).

Several important public policy implications can be gleaned from the results presented herein. First, CAP laws and minimum age laws sometimes work. States with CAP laws have significantly lower youth suicide rates, and Federal minimum age requirements reduce both suicides and unintentional deaths. Second, these laws only affect juveniles. Therefore, for those concerned about potential Second Amendment issues, these laws only restrict access to firearms for people who have not yet reached adulthood; the restrictions are limited in scope. Finally, although there are, of course, many other factors that affect youth suicide rates and unintentional death rates, CAP laws and minimum age laws are two factors that are within the control of state and Federal legislators. Instituting

such laws uniformly across states and at the Federal level would be a low cost way to reduce youth death rates quite substantially.

## References

Bartley, W., & Cohen, M. (1998). The effect of concealed weapons laws: An extreme bound analysis. *Economic Inquiry, 36,* 258–265.

Bridge, J., Goldstein, T., & Brent, D. (2006). Adolescent suicide and suicidal behavior. *Journal of Child Psychology and Psychiatry, 47,* 372–394.

Carrington, P., & Moyer, S. (1994). Gun control and suicide in Ontario. *The American Journal of Psychiatry, 151,* 606–608.

Conner, K., & Zhong, Y. (2003). State firearm laws and the rates of suicide in men and women. *American Journal of Preventive Medicine, 25,* 320–324.

**Exhibit 4**
**0056**

M. Gius / The Social Science Journal 52 (2015) 168–175

Cummings, P., Koepsell, T., Grossman, D., Savarino, J., & Thompson, R. (1997). The association between the purchase of a handgun and homicide or suicide. *American Journal of Public Health, 87*, 974–978.

Dezhbakhsh, H., & Rubin, P. (1998). Lives saved or lives lost? The effects of concealed handgun laws on crime. *The American Economic Review, 88*, 468–474.

Duggan, M. (2003). Guns and suicide. In J. Ludwig, & P. Cook (Eds.), *Evaluating gun policy: Effects on crime and violence.* Washington, DC: The Brookings Institution.

Gius, M. (2014). An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. *Applied Economics Letters, 21*, 265–267.

Gius, M. (2011). The effects of gun ownership rates and gun control laws on suicide rates. *New York Economic Review, 42*, 35–46.

Kellerman, A., Rivara, F., Somes, G., Reay, D., Francisco, J., Banton, J., et al. (1992). Suicide in the home in relation to gun ownership. *New England Journal of Medicine, 327*, 467–472.

Kleck, G., & Patterson, E. B. (1993). The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology, 9*, 249–287.

Leenaars, A., & Lester, D. (1997). The effects of gun control on the unintentional death rate from firearms in Canada. *Journal of Safety Research, 28*, 119–122.

Lester, D. (1988). Gun control, gun ownership, and suicide prevention. *Suicide and Life-Threatening Behavior, 18*, 176–180.

Lester, D. (1993). Firearm availability and unintentional deaths from firearms. *Journal of Safety Research, 24*, 167–169.

Lester, D., & Murrell, M. (1981). The influence of gun control laws on the incidence of accidents with guns: A preliminary study. *Accident Analysis and Prevention, 13*, 357–359.

Lester, D., & Murrell, M. (1982). The preventive effect of strict gun control laws on suicide and homicide. *Suicide and Life-Threatening Behavior, 12*, 131–140.

Lott, J., & Mustard, D. (1997). Crime, deterrence, and right-to-carry concealed handguns. *The Journal of Legal Studies, 26*, 1–68.

Lott, J., & Whitley, J. (2001). Safe-storage gun laws: Unintentional deaths, suicides, and crime. *Journal of Law and Economics, 44*(S2), 659–689.

Ludwig, J., & Cook, P. (2000). Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA, 284*, 585–591.

Ludwig, J., & Cook, P. (Eds.). (2003). *Evaluating gun policy: Effects on crime and violence.* Washington, DC: The Brookings Institution.

Mann, J. (2002). A current perspective of suicide and attempted suicide. *Annals of Internal Medicine, 136*, 302–311.

Marvell, T. (2001). The impact of banning juvenile gun possession. *Journal of Law and Economics, 44*, 691–713.

Moody, C. (2001). Testing for the effects of concealed weapons laws: Specification errors and robustness. *Journal of Law and Economics, 44*, 799–813.

Moody, C., & Marvell, T. (2009). The debate on shall issue laws, continued. *Econ Journal Watch, 6*(2), 203–217.

Nock, M., Borges, G., Bromet, E., Cha, C., Kessler, R., & Lee, S. (2008). Suicide and suicidal behavior. *Epidemiologic Reviews, 30*, 133–154.

Olson, D., & Maltz, M. (2001). Right-to-carry concealed weapon laws and homicide in large U.S. counties: The effect on weapon types, victim characteristics, and victim–offender relationships. *Journal of Law and Economics, 44*, 747–770.

Pellegrini, L., & Rodriguez-Monguio, R. (2013). Unemployment, medicaid provisions, the mental health industry, and suicide. *Social Science Journal, 50*, 482–490.

Rubin, P., & Dezhbakhsh, H. (2003). The effect of concealed handgun laws on crime: Beyond the dummy variables. *International Review of Law and Economics, 23*, 199–216.

Sommers, P. (1984). The effect of gun control laws on suicide rates. *Atlantic Economic Journal, 12*, 67–69.

Yang, B., & Lester, D. (1991). The effect of gun availability on suicide rates. *Atlantic Economic Journal, 19*, 74.

**Exhibit 4**
**0057**

# EXHIBIT "5"

Exhibit 5
0058

Health Policy 101 (2011) 95–103



Contents lists available at ScienceDirect

# Health Policy

journal homepage: www.elsevier.com/locate/healthpol



# Gun control and suicide: The impact of state firearm regulations in the United States, 1995–2004

Antonio Rodríguez Andrés [a,*], Katherine Hempstead [b,1]

[a] School of Public Health, Department of Health Services Research, University of Aarhus, Bartholins Allé 1, DK - 8000 C, Aarhus, Denmark
[b] The Center for State Health Policy Rutgers, The State University of New Jersey 55 Commercial Avenue, 3rd Floor New Brunswick, NJ 08901-1340, United States

## ARTICLE INFO

Keywords:
Suicide
Guns
State regulations
Panel data

## ABSTRACT

Objective: To empirically assess the impact of firearm regulation on male suicides.
Method: A negative binomial regression model was applied by using a panel of state level data for the years 1995–2004. The model was used to identify the association between several firearm regulations and male suicide rates.
Results: Our empirical analysis suggest that firearms regulations which function to reduce overall gun availability have a significant deterrent effect on male suicide, while regulations that seek to prohibit high risk individuals from owning firearms have a lesser effect.
Conclusions: Restricting access to lethal means has been identified as an effective approach to suicide prevention, and firearms regulations are one way to reduce gun availability. The analysis suggests that gun control measures such as permit and licensing requirements have a negative effect on suicide rates among males. Since there is considerable heterogeneity among states with regard to gun control, these results suggest that there are opportunities for many states to reduce suicide by expanding their firearms regulations.

© 2010 Elsevier Ireland Ltd. All rights reserved.

## 1. Introduction

### 1.1. Firearms and suicide

Suicide is a major cause of preventable death. In 2006, more than 32,000 suicides occurred in the United States, as compared with approximately 18,000 homicides. In the United States, suicide was the 8th leading cause of death for males, and the 19th leading cause of death for females in 2006. For every suicide, there were more than ten hospitalizations for non-fatal attempts. In 2006, on average 46 Americans committed suicide with a firearm every day, accounting for approximately 50 percent of all suicides [1].

Prevention of suicide is an important part of the American public health agenda, and the goal of many programmatic activities undertaken by the Centers for Disease Control and Prevention (CDC) and other national and state agencies. In an attempt to combat this problem, spending by state mental health agencies (SMHAs) in the U.S. totalled $ 30.7 billion dollars in 2006 [2]. In recent years, restricting access to firearms and other lethal means has been increasingly recognized as one of the most effective strategies for suicide prevention (for an excellent review of this literature see, for example [3]), and is one of the key elements of suicide prevention in countries such as England [4], and Denmark [5].

There is a considerable body of empirical work that has documented a positive relationship between access to firearms and suicide (e.g. [6,7]). In fact, much of the decline in suicide in the United States over the past decades has been linked to the reduced prevalence of firearms (see for example [7–9]). Although the respective roles of

* Corresponding author. Tel.: +45 89 423122.
  E-mail addresses: ara@folkesundhed.au.dk (A. Rodríguez Andrés), khempstead@ifh.rutgers.edu (K. Hempstead).
  [1] Tel.: +1 732 932 3105; fax: +1 732 932 0069.

0168-8510/$ – see front matter © 2010 Elsevier Ireland Ltd. All rights reserved.
doi:10.1016/j.healthpol.2010.10.005

**Exhibit 5**
**0059**

96                          A. Rodríguez Andrés, K. Hempstead / Health Policy 101 (2011) 95–103

self-selection and availability in explaining the relationship between guns and suicide have not been completely resolved, the implication in either case is that reducing access to firearms should reduce suicide [10]. Restricting access to firearms has been recommended as a suicide prevention strategy by national and international organizations such as the CDC and the WHO. Gun control policies can serve to reduce overall gun availability by creating barriers to firearm ownership. Additionally, firearms policies can also prevent individuals who are at a relatively higher risk of suicide from purchasing firearms.

### 1.2. Gun control

Gun control is a highly contentious issue in the American political debate. Guns are common in the United States–40 percent of Americans reported having a gun in their home in 2009 (see [11]) Calls for increased regulation are based on the belief that restrictions will reduce gun violence. Regulation is opposed by those who claim infringement on the constitutional right to bear arms, and/or argue that firearm ownership deters crime. In the academic literature, the efficacy of gun control in reducing violence has received considerable attention, although little consensus has emerged from the empirical work (e.g. [9,12–14]).

The current era of gun control in the United States originated with the Brady Handgun Violence Prevention Act (1993)[2], more commonly known, as the Brady Bill. The Brady Bill established a federal requirement for a waiting period of up to five days before the transfer of a handgun to a purchaser. During this period, a background check is performed, which is intended to prohibit individuals with criminal backgrounds from purchasing firearms. The transfer of the handgun is completed whether or not the background check is finalized within the five-day period. The federal waiting period was phased out in 1998 with the development of the National Instant Criminal Background Check System (NICS), administered by the Federal Bureau of Investigation (FBI). Over time, many states have passed laws which matched or surpassed the federal minimums.

There are many different types of state firearm regulations. Some seek to establish general oversight over individuals owning firearms, and mainly consist of permit, registration, and/or license requirements, and bans on the purchase of firearms by minors. These laws also facilitate the tracing of firearms used in crimes to original purchasers. Other state laws seek to prevent gun trafficking and the use of firearms in crimes. These consist of bans on the sale of certain types of firearms, and restrictions on the number of firearms that can be sold to individuals. Restrictions on carrying concealed weapons serve a similar purpose. A number of laws are designed to prevent firearm ownership by individuals considered disproportionately likely to commit gun crimes. These laws include prohibitions on gun ownership by those with criminal histories, such as conviction for a felony, misdemeanor, or domestic violence offence, as well as those with a history

of mental illness, and alcohol or drug problem, and minors. The requirement of a "cooling off" period of some specified period before the purchase can be completed is a measure designed to reduce the consequences of impulsive firearm purchases.

There is considerable variation in the comprehensiveness of firearm regulation across U.S. states. Some states have almost no firearm regulation of their own. Forty-four states have a provision in their state constitutions similar to the Second Amendment of the Bill of Rights (the exceptions are California, Iowa, Maryland, Minnesota, New Jersey, and New York). Firearm license holders are subject to the firearm laws of the state in which they are carrying and not the laws of the state in which the permit was issued. Reciprocity between states may exist for certain licenses such as concealed carry permits. These are recognized on a state-by-state basis.

Some firearms regulations are more relevant to suicide prevention than others. Restrictions banning the purchase of guns by convicted felons, or laws banning the sale of "Saturday Night Specials", for example, have little obvious applicability to suicide. Yet other categories of restriction are potentially more salient, particularly those that reduce overall firearm availability. Permit requirements create barriers to gun ownership and may also serve to prevent impulsive purchases. The prohibition of purchases by minors serves a similar function. Some of the "prohibited persons" categories, such as those related to mental illness, a drug or alcohol problem, or history of domestic violence problems may theoretically be relevant to suicide prevention.[3] Mental illness is the single most important risk factor for suicide, and substance abuse and domestic violence are also risk factors. However, while the criteria for "prohibited persons" categories vary by state, they are generally based on fairly serious incidents, such as hospitalization against one's will or conviction records. Such bans are likely to identify only a fraction of the population with mental health, substance abuse, or domestic violence problems.

At the state level, the comprehensiveness of gun control laws tends to be correlated with firearm prevalence. The causality most likely runs in both directions, since restrictive gun control regimes reduce gun ownership, yet these laws are more likely to be passed in states where overall gun ownership rates are low and the population of gun rights advocates is relatively small. In general, Western and more rural states have fewer gun control restrictions and higher rates of gun ownership as compared with more urbanized states in the Northeast. These states also have significantly higher rates of suicide, particularly firearm suicide.

It should be noted that gun control is only one of the factors that affect gun ownership. Aside from geographical patterns related to urbanization, popularity of hunting, and so forth, there are also trends in gun ownership at the

---

[2] The Gun Control Act (1968) was the first firearm act in the USA.

[3] In some states, the alcohol regulation means that sale of firearms are prohibited to people who are intoxicated at the time they are trying to buy them, while in other states it refers to people with a documented alcohol problem. Indeed, in some states it covers both situations.

**Exhibit 5**
**0060**

national level. Widespread anxiety can lead to an increase in firearm purchases, as was the case shortly after September 11th, 2001. Similarly, economic trends can potentially affect the propensity toward gun ownership—although the direction of the effect is not certain. Concern about crime associated with rising unemployment may result in increased gun ownership, while unemployment itself may make guns less affordable to more people. The recent recession does not seem to be associated an increase in gun purchases, as the proportion of households reporting a gun between October 2007 and 2008 was unchanged (see [11]).

## 2. Gun control and suicide: empirical evidence

Much of the empirical evidence on gun control comes from the United States [15] and might not be applicable to other countries [16]. One excellent review of gun control in the United States, framed within the context of historical and rational choice theory, covers attempts to curb firearm violence in that country and the success of such measures, yet has relatively little treatment of the relationship between gun control and suicide [17].

In an important early study of gun ownership and suicide, Kellerman et al. [18] found that individuals who commit suicide in their own homes were disproportionately likely to own a gun. In general, the literature on gun control and suicide has found a negative relationship between firearm restrictions and suicide. However, most of these studies lack a strong design and are essentially pre- and post-comparisons [16]. Lambert and Silva [19] perform a literature review of studies in the United States and Canada and conclude that available information generally supports the notion that gun control reduces suicide rates, particularly among males. A recently published analysis suggests that states where background checks are conducted locally have lower rates of firearm suicide and homicide [20].

Several other studies find no empirical evidence in favor of a relationship between firearms regulations and suicide. However, one study has a weak design, while the other does not capture the most relevant types of firearms regulations. Price et al. [21] use cross-sectional state data for 1999 to perform a simple partial correlation analysis between several types of gun control laws and suicide rates. Their results suggest that gun control laws were not significantly related to suicide in 1999, even after controlling for firearm prevalence. Rosengart et al. [22] conduct a study of the relation between firearm regulations and homicides and suicides using state panel data over 1979–1998. They fail to uncover a statistically robust link between suicide rates and firearm regulations. However, most of the regulations they examined- such as bans on carrying concealed weapons, "junk gun" bans, and quantity sales restrictions are not particularly relevant to suicide.

Several studies in other countries where regulatory change restricted general access to firearms have found evidence of an effect on suicide. Cheung and Dewa [23] examine the relationship between suicide and the implementation of new restrictions on firearms (Bill C-17), using time series data from Canada. They concluded that there was a relationship between means used by young peo-

ple and the imposition of the restrictions. In the case of New Zealand, Beautrais et al. [24] find that after the introduction of legislation restricting ownership and access to firearms, firearm suicides significantly decreased, particularly among the young. Ozanne-Smith et al. [25] similarly conclude that the implementation of a strong reform in New Zealand lowered firearms deaths, particularly suicides. An evaluation of the 1996 National Firearms Agreement (NFA) in Australia documents a decline in firearm suicides after the implementation of the agreement [26]. However, these findings may be confounded with an overall decline in gun ownership that preceded the NFA. Additionally, there was some evidence of increased suicides by hanging.

In Europe, there are a few studies examining the efficacy of firearm regulation in reducing firearm suicides and homicides. For example, in Austria, Kapusta et al. [27] provide evidence that the introduction of restrictive firearm legislation reduced both firearm suicide and homicide. Also, a number of studies in the UK [28,29] have shown that changes in firearm legislation have led to fewer firearm suicides. Another analysis of Austria found that firearm regulations enacted in 1997 had a statistically significant effect on suicide rates [30]. A very recent study in Switzerland, finds a positive association between firearm ownership and firearm suicides at the local level [31].

Much of the empirical literature is based on simple correlations or time series analysis. Most of these models cannot account for correlations that arise between suicide deaths and firearm availability due to exogenous factors. Furthermore, there are many factors affecting suicidal behavior and gun ownership which are not observable. A panel data approach is more compelling in this context, as it is possible to control for unobserved heterogeneity across states. Similarly, time varying factors that affect all states in the same way can be controlled by using fixed specific effects. Additionally, there are many socioeconomic factors that might influence suicide deaths, and can be included in a panel data model.

## 3. Empirical model and data

### 3.1. Empirical model

The basic model that motivates the empirical analysis is that firearm availability affects suicide rates, and that gun control affects firearm availability (see for a discussion of the mechanisms by which firearms might affect death rates [9]). Our hypothesis is that regulations such as permit requirements, which create overall barriers to gun ownership, are the most important way type of gun control from the standpoint of suicide prevention. While it is possible that "prohibited persons" categories can affect the likelihood that certain persons at above average risk of suicide will obtain firearms, the ways in which these categories are defined in most cases will result in the prohibition of a relatively small proportion of people at risk. Firearms regulations designed to prevent gun trafficking or other criminal activity involving guns are not expected to influence suicide rates.

Exhibit 5
0061

98                    A. Rodríguez Andrés, K. Hempstead / Health Policy 101 (2011) 95–103

There are several potential complications to this simple model. The first is that of state variation in attitudes towards guns is likely to affect both firearm prevalence and the comprehensiveness of gun control regulation. Additionally, views toward gun ownership evolve over time. Finally, there is the problem of the measurement error of gun ownership.

The basic model can be expressed with two equations:

$$S = \alpha + \beta G + \mu \tag{1}$$

$$G = \delta - \Delta R + \Phi \tag{2}$$

where $S$ is suicide, $G$ is firearm prevalence, and $R$ is firearms regulation. The reduced form is:

$$S = \alpha + \beta \delta - \beta \Delta R + \beta \Phi + \mu \tag{3}$$

The potential endogeneity of firearm prevalence with respect to gun control is reflected in the identifying equation,

$$R = \omega + \eta G + \varphi \tag{4}$$

However, $G$ is not measured annually. For our main specification we estimate the reduced form Eq. (3), thereby assuming that $\eta$ is zero. In an alternative specification, we proxy for $G$ by using the number of hunting licenses per capita, a statistic which is collected annually for all states.

The dependent variable, $S_{ijt}$, is the number of suicides for age group $i = 15–24, 25–44, 45–64,$ and $65+$; in state $j = 1, \ldots, 50$ during the year $t = 1995, \ldots, 2004$. The independent variables included in the model were based on previous studies of suicide. In particular, the variables selected were: education, income, alcohol consumption, the proportion of the population over age 65, and the proportion of non-Hispanic white population. Each model also includes the relevant population size as a right hand side control variable to normalize by exposure. The specification includes state fixed effects that account for potential unobserved heterogeneity across states. The fixed effects model is appropriate in this case given the almost complete population coverage by the sample and it is likely that the omitted variables captured by the $\alpha_i$ are correlated with some of the included covariates [32]. We also account for the time effect over the years by including time dummies.

The expected value of the number of suicides, conditional on the independent variables is assumed to follow a negative binomial distribution with expected value

$$E\left[\frac{S_{it}}{X_{it}}\right] = \mu_{it} = \exp(x'_{it}\beta) \tag{5}$$

and variance function

$$\text{Var}[\mu_{it}] = \mu_{it} + \alpha(\mu_{it}^2) \tag{6}$$

The negative binomial distribution was assumed since the dependent variable is a count and over-dispersed relative to the Poisson distribution which assumes that the mean is equal to the variance. The negative binomial distribution accounts for extra Poisson dispersion through the quadratic term in the variance function [33].

We face several identification challenges. The first is that gun control regulations by state tend to change slowly,

so there tends to be relatively little within-state year–on-year change. Further, once states adopt particular gun control regulations, they never remove them. For these reasons, it is not possible to analyze leads and lags, which would be a desirable robustness check. To maximize variation, we have created several indices of categories of gun control regulations, which are additive measures of individual measures. The total sample contains 500 state-year observations. The sample period (1995–2004) was chosen because data on gun control regulations by state are not available before 1995, in part because there are relatively few state regulations. Since nearly ninety percent of firearm suicides are committed by males [1], we have excluded females from the analysis. The analysis was conducted using *STATA* v.10 statistical software.

### 3.2. Data

#### 3.2.1. Dependent variable

Data on the number of suicides in states over the period 1995–2004 come from the Centers for Disease Control and Prevention (CDC). Deaths included in the study are those categorized as suicides according to the International Classification of Diseases (ICD). In 1999, there was a change in the classification system from ICD–9 to ICD–10. This change in ICD version did not influence suicide classification. For 1995–98, suicide deaths were coded as E950–E959. Starting in 1999 and later, suicide deaths were coded as X60–X84, Y87.0, and U03.

Table 1 displays the average age adjusted male suicide rates[4] across US states for the years 1995–2004.[5] As Table 1 shows reported suicide rates in the US vary considerably across states. The annual average male suicide rate for the whole country during the study period was 21.05 per 100,000. As can be seen, suicide rates vary considerably across states. The suicide rate in Nevada (34.2), for example, is nearly thrice that in New York (11.3). Also it can be seen from the standard deviations that the suicide rate varied substantially over time in each state.

#### 3.2.2. Independent variables

*3.2.2.1. Socio-economic variables.* Data on state personal income (*income*) were obtained from the Bureau of Economic Analysis and deflated by the consumer price index (CPI) extracted from the Bureau of Labor Statistics (BLS). Unemployment rates (*unemployment*) also come from the BLS. Data on per capita ethanol consumption of beer (*beer*), an estimate for the amount of pure ethanol consumption per capita, was extracted from the NIIA Surveillance Reports. Alcohol consumption and economic conditions have been linked to suicide in a number of population level studies (e.g. [34,35]). The percentage of people over 65 (*psh65*) years of age and the proportion of the population which is non-

---

[4] For making comparisons across states and over time, the usual practice is to use age adjusted suicide rates that standardize the rates across the age distribution of the population of interest.

[5] We do not show average suicide rates over 1995–2004 because of the relative position of the states is basically unchanged during the study period.

**Exhibit 5**
**0062**

**Table 1**
Average age-adjusted male suicide rates (per 100,000 pop), by state, 1995–2004.

| State | Average | Std. Dev. |
| --- | --- | --- |
| Alabama | 21.13 | 1.46 |
| Alaska | 31.45 | 4.05 |
| Arizona | 26.37 | 1.52 |
| Arkansas | 22.95 | 0.97 |
| California | 16.79 | 1.85 |
| Colorado | 26.30 | 2.37 |
| Connecticut | 13.59 | 1.40 |
| Delaware | 18.75 | 2.29 |
| Florida | 21.64 | 1.28 |
| Georgia | 19.64 | 0.99 |
| Hawaii | 16.28 | 1.70 |
| Idaho | 27.26 | 2.32 |
| Illinois | 14.50 | 0.99 |
| Indiana | 20.31 | 1.17 |
| Iowa | 18.81 | 1.23 |
| Kansas | 20.60 | 1.28 |
| Kentucky | 22.30 | 0.93 |
| Louisiana | 19.94 | 1.25 |
| Maine | 21.61 | 3.10 |
| Maryland | 16.02 | 1.25 |
| Massachusetts | 11.56 | 1.33 |
| Michigan | 17.83 | 1.02 |
| Minnesota | 16.71 | 1.20 |
| Mississippi | 20.54 | 1.26 |
| Missouri | 21.81 | 1.62 |
| Montana | 33.15 | 3.31 |
| Nebraska | 18.78 | 1.67 |
| Nevada | 34.19 | 3.46 |
| New Hampshire | 19.00 | 1.71 |
| New Jersey | 11.47 | 0.45 |
| New Mexico | 31.48 | 1.30 |
| New York | 11.32 | 1.05 |
| North Carolina | 19.71 | 0.93 |
| North Dakota | 20.45 | 2.67 |
| Ohio | 17.43 | 0.98 |
| Oklahoma | 24.03 | 1.06 |
| Oregon | 25.28 | 1.73 |
| Pennsylvania | 18.88 | 1.11 |
| Rhode Island | 13.25 | 0.99 |
| South Carolina | 19.31 | 1.15 |
| South Dakota | 24.76 | 3.89 |
| Tennessee | 21.93 | 0.53 |
| Texas | 18.59 | 1.37 |
| Utah | 25.51 | 1.90 |
| Vermont | 22.12 | 2.56 |
| Virginia | 19.26 | 1.32 |
| Washington | 21.84 | 1.45 |
| West Virginia | 24.64 | 2.10 |
| Wisconsin | 19.04 | 0.83 |
| Wyoming | 32.29 | 3.96 |
| United States | 21.05 | 5.64 |

*Source*: Centers for Disease Control and Prevention (CDC), and own construction.
*Note*: The District of Columbia is excluded, since it had essentially banned the possession of handguns during the study years.

Hispanic white (*white*) were obtained from the US Census Bureau.

*3.2.2.2. Firearms regulations.* In order to maximize variation across states and over time in the measure of gun control, we created three additive indices that reflect different categories of firearms regulations. The first index––arguably is the most important in terms of suicide prevention––measures general prohibitions. It is the sum of two indicator variables reflecting the presence

or absence of permit requirements and prohibitions on firearm purchases by minors. This index thus varies between 0 and 2.

The second index measures prohibitions based on behavioral problems, some of which have been identified as risk factors for suicide. This index is the sum of five indicators variables reflecting the presence of bans on persons with mental health, alcohol, or drug problems, as well as prohibitions on those with prior convictions for misdemeanors and for domestic violence offenses.

Our third and last index captures four types of prohibitions related to the potential purchaser's criminal history. We include this variable primarily as a robustness check, since the prohibitions captured are least likely to affect suicide. The index, varying between 0 and 4, is the sum of indicator variables measuring the presence of prohibitions against "aliens",[6] convicted felons, fugitives from justice, and those who committed serious offenses as juveniles. Data on state gun regulations was obtained from the Bureau of Justice Statistics.[7]

*3.2.2.3. Gun ownership.* Given the relationship between firearm regulations and firearm prevalence, as well as that between firearm prevalence and suicide, it is necessary to control for gun ownership. One concern is the accuracy of data on firearm availability. Gun ownership at the household level is measured every several years by the CDC's Behavioral Risk Factor Surveillance System, but there is no annual data at the state level, and the available data only dates back to 2001. The most commonly used proxies for gun ownership are the proportion of homicides and the proportion of suicides committed with firearms (e.g. [36–42]). These variables are combined to create a measure called Cook's index. However, given that the dependent variable for this analysis is the total number of suicides, it was felt that this proxy was inappropriate. As an alternative, the number of hunting licenses per capita from the Fish and Wild Life Service[8] was used as a control for gun ownership[9]. Hunting licenses per capita and firearm suicides as a proportion of suicides (i.e. Cook's Index) were highly correlated ($r = 0.74$, *p*-value < .05).

Table 2 reports summary statistics for the variables used in regressions.

### 4. Results

The regression results for the negative binomial regression model of suicides are presented in Table 3. In all regression models, the state and year fixed effects are statistically significant. Table 3 shows the incidence rate ratios (henceforth, IRR). The IRR are obtained by exponentiation of the regression coefficients, that is, exp ($\beta$). The expression $100*(\exp(\beta) - 1)$ is the percentage change in the

---

[6] In some states, this prohibition refers to undocumented immigrants, while in others to individuals who have "forsaken their allegiance to the United States".
[7] http://www.ojp.usdoj.gov/bjs/.
[8] Available at www.fws.gov.
[9] The model was also estimated using the firearm suicide proxy, and results were very similar. We do not report them here for brevity.

**Exhibit 5**
**0063**

100                                    A. Rodríguez Andrés, K. Hempstead / Health Policy 101 (2011) 95–103

**Table 2**
Summary statistics ($N = 500$).

| Variables | Mean | Std. Dev. | Min | Max |
|---|---|---|---|---|
| *Dependent variables* | | | | |
| Male suicides, total | 484.09 | 476.87 | 49 | 2939 |
| Male suicide, ages 15–24 | 70.95 | 62.67 | 3 | 421 |
| Male suicide, ages 25–44 | 191.06 | 181.23 | 18 | 1191 |
| Male suicide, ages 45–64 | 134.20 | 134.80 | 7 | 831 |
| Male suicide, ages >65 | 93.36 | 102.79 | 1 | 575 |
| | | | | |
| *Socio-economic variables* | | | | |
| Percent with bachelor's degree | 24.65 | 4.67 | 12.70 | 38.70 |
| Real per capita income (log) | 10.20 | 0.15 | 9.82 | 10.65 |
| Unemployment rate | 4.81 | 1.17 | 2.20 | 8.20 |
| Beer consumption per capita (units) | 1.27 | 0.20 | 0.73 | 1.91 |
| Percent non-hispanic white (multiply by 100) | 0.78 | 0.15 | 0.26 | 0.99 |
| Percent 65 years or older (same) | 0.14 | 0.11 | 0.05 | 1.34 |
| | | | | |
| *Gun supply* | | | | |
| Hunting licenses per capita | 0.087 | 0.071 | 0.007 | 0.340 |
| | | | | |
| *Firearm regulation* | | | | |
| *General prohibitions* (1) | | | | |
| Permit requirements | 0.22 | 0.41 | 0 | 1 |
| Ban on purchase by minors | 0.68 | 0.47 | 0 | 1 |
| General prohibitions index | 0.90 | 0.63 | 0 | 2 |
| | | | | |
| *Behavioral prohibitions* (2) | | | | |
| Mental health problem | 0.47 | 0.50 | 0 | 1 |
| Alcohol problem | 0.34 | 0.47 | 0 | 1 |
| Drug problem | 0.41 | 0.49 | 0 | 1 |
| Misdemeanor conviction | 0.36 | 0.48 | 0 | 1 |
| Domestic violence conviction | 0.29 | 0.45 | 0 | 1 |
| Behavioral prohibitions index | 1.87 | 1.70 | 0 | 5 |
| | | | | |
| *Criminal prohibitions* (3) | | | | |
| Alien | 0.15 | 0.36 | 0 | 1 |
| Felony | 0.73 | 0.45 | 0 | 1 |
| Juvenile offense | 0.41 | 0.49 | 0 | 1 |
| Fugitive | 0.17 | 0.38 | 0 | 1 |
| Criminal prohibitions index | 1.46 | 1.11 | 0 | 4 |

*Sources*: See text.

incidence or risk of suicide mortality for each unit increase in the independent variable.

The first two models show the effects of fixed state and year effects (Model 1), and the fixed effects in addition to a set of socio-demographic variables—namely education, income, alcohol consumption, the proportion of the population over age 65, and the proportion of the population which is non-Hispanic white (Model 2). Model 3 introduces the index of general prohibitions—namely gun control regulations which affect the largest number of people and which create general barriers to entry. We find the general prohibition index to be statistically significant, both individually and when we include our proxy for gun prevalence, (hunting licenses per capita), which enters insignificantly (Model 4).

The next model includes the second index of gun control measures, which aims to capture firearm restrictions based on behavioral issues such as a history of mental health or alcohol/drug problems. While significant, the IRR is 0.9946, as compared with the IRR from Model 3 which was 0.9440, and the coefficient in Model 4 is only significant at the 10 percent level. The addition of the gun ownership measure (Model 5) does not affect the results. Model 6 includes our last index, which captures gun control measures that are hypothesized to be unlikely to affect suicide. This model

is included primarily as a robustness check. As expected, this variable does not enter with a statistically significant coefficient.

Table 4 shows the effects of the specific firearm restrictions on suicide for particular age groups. Separate models were estimated for males aged 15–24, 25–44, 45–64, and 65 years of age and older. In all models, we control for gun prevalence by including the number of hunting licenses per capita. We find that gun control measures do not affect all age groups identically. For instance, a ban on firearm purchases by minors affects suicides particularly among younger males, while restrictions on permits and waiting period requirements have a more deterrent effect on for older males. Unexpectedly, permit requirements appear to have a positive effect on suicide rates among younger males. Among the behavior-related restrictions, prohibitions related to mental health problems are only significant for males aged 25–44 years, and prohibitions related to alcohol problems are only significant for males aged 65 years or older. The drug and misdemeanor conviction bans do not enter significantly for any of the age groups, and the prohibition linked to a history of domestic violence only affects suicides among those aged 45–64 years. None of the criminal prohibitions enter significantly for specific age groups, and are therefore omitted.

**Exhibit 5**
**0064**

*A. Rodríguez Andrés, K. Hempstead / Health Policy 101 (2011) 95–103*                101

**Table 3**
Results of negative binomial regressions with additive indices of firearm restrictions. Regressions for all males, 1995–2004 ($N = 500$). Dependent variable is the number of male suicides, exposure variable is the male population.

| | Model 1 Fixed effects only | Model 2 Socio-economic variables | Model 3 General Prohibitions | Model 4 General prohibitions and hunting licenses per capita | Model 5 Behavioral prohibitions | Model 6 Criminal prohibitions |
|---|---|---|---|---|---|---|
| State Fixed Effects | X | X | X | X | X | X |
| Year Fixed Effects | X | X | X | X | X | X |
| High School graduates (%) | | 0.9985 | 0.9991 | 0.9991 | 0.9986 | 0.9984 |
| S.E. | | 0.0017 | 0.0017 | 0.0017 | 0.0016 | 0.0017 |
| Beer Consumption per capita | | 1.1067 | 1.1022 | 1.1021 | 1.1184 | 1.0988 |
| S.E. | | 0.1062 | 0.1039 | 0.1037 | 0.1012 | 0.1011 |
| Unemployment rate | | 1.0181** | 1.0185** | 1.0185** | 1.0165** | 1.0179** |
| S.E. | | 0.0075 | 0.0076 | 0.0075 | 0.0074 | 0.0073 |
| Log of median HH income | | 0.6394** | 0.6433** | 0.6428** | 0.6376** | 0.6375** |
| S.E. | | 0.1424 | 0.1418 | 0.1429 | 0.1338 | 0.1435 |
| Percent non-Hispanic White | | 3.5333*** | 3.5115*** | 3.5152*** | 3.3638*** | 3.5250*** |
| S.E. | | 1.5326 | 1.5247 | 1.5171 | 0.0145 | 1.5327 |
| Percent > 65 years | | 1.1245*** | 1.1232*** | 1.1232*** | 1.1166*** | 1.1261*** |
| S.E. | | 0.0147 | 0.0153 | 0.0153 | 0.0145 | 0.0157 |
| General prohibitions index (1) | | | 0.9440*** | 0.9438*** | | |
| S.E. | | | 0.0093 | 0.0099 | | |
| Behavioral prohibitions index (2) | | | | | 0.9946* | |
| S.E. | | | | | 0.0030 | |
| Criminal prohibitions index (3) | | | | | | 1.0035 |
| S.E. | | | | | | 0.0068 |
| Hunting Licenses Per Capita | | | | 0.9692 | | |
| S.E. | | | | 0.4548 | | |
| Log likelihood | −2228.3 | −2199.2 | | −2199.1 | −2199.1 | −2200.3 |
| Ln alpha | −7.0532 | −7.6410 | −7.6475 | −7.6477 | −7.6692 | −7.6597 |
| Alpha | 0.0009 | 0.0005 | 0.0005 | 0.0005 | 0.0005 | 0.0005 |

*Notes*: Constant term included but not reported. (1) General prohibitions index: permit requirement, ban on purchase by minor. Range 0–2 (2) Behavioral prohibitions index: mental health, alcohol problems (or intoxication), drug problems, domestic violence conviction, misdemeanor conviction. Range: 0–5. (3) Criminal prohibitions index: alien, prior felony conviction, fugitive from justice, serious offense as a juvenile. Range: 0–4.
  * $p < .10$.
  ** $p < .05$.
  *** $p < .01$.

**Table 4**
Results of negative binomial regressions with individual firearm restrictions. Regressions by age groups (15–24, 25–44, 45–64, 65+) $N = 500$. Dependent variable is the number of male suicides, exposure variable is the male population, within age groups.

| | Model 1 15–24 years | Model 2 25–44 years | Model 3 45–64 years | Model 4 65+ |
|---|---|---|---|---|
| General prohibitions | | | | |
| Permit requirement | 1.2043*** | 0.9741 | 0.8601*** | 0.8518*** |
| S.E. | 0.0343 | 0.0188 | 0.0208 | 0.0222 |
| Ban on minor purchase | 0.8715* | 0.8647*** | 0.9867 | 1.0304 |
| S.E. | 0.0679 | 0.0183 | 0.0817 | 0.0756 |
| Behavioral prohibitions | | | | |
| History of mental health problems | 0.9949 | 0.9657*** | 0.9948 | 1.0435 |
| S.E. | 0.0245 | 0.0111 | 0.0212 | 0.0246 |
| History of alcohol abuse | 1.0015 | 1.0085 | 0.9916 | 0.9437*** |
| S.E. | 0.0199 | 0.0168 | 0.0196 | 0.0166 |
| History of drug abuse | 0.9723 | 0.9972 | 1.0017 | 1.0086 |
| S.E. | 0.0229 | 0.0167 | 0.0220 | 0.0241 |
| Misdemeanor conviction | 1.0169 | 0.9848 | 0.9758 | 1.0062 |
| S.E. | 0.0216 | 0.0159 | 0.0160 | 0.0293 |
| Domestic violence conviction | 0.9812 | 1.0048 | 0.9630** | 0.9700 |
| S.E. | 0.0261 | 0.0190 | 0.0167 | 0.0185 |

*Note*: All models include state and year fixed effects, as well as control variables for the level of education, unemployment rate, income per capita, and the percent of non-Hispanic white population. A proxy for gun prevalence (hunting licenses per capita) is also included. Constant term included but not reported.
  * $p < .10$.
  ** $p < .05$.
  *** $p < .01$.

**Exhibit 5**
**0065**

102                     A. Rodríguez Andrés, K. Hempstead / Health Policy 101 (2011) 95–103

## 5. Discussion

Restricting access to lethal means is an important element in suicide prevention. While means restriction activities are not solely focused on firearms, in the United States, firearms are the most significant suicide mechanism, as they are used in more than half of suicides. At the individual and population levels, a number of means restriction activities have been developed to prevent suicides by reducing access to lethal means. Individual activities involve counseling to high-risk individuals about dangers posed by a firearm in their homes. When such activities occur, they are usually directed at individuals who have been identified as being at risk of self-injury, perhaps as a result of a non-fatal suicide attempt. However from a population perspective, gun control remains one of the only avenues to restrict access to firearms.

Our study suggests that general barriers to firearm access created through state regulation can have a significant effect on male suicide rates in the United States. Permit requirements and bans on sales to minors were the most effective of the regulations analyzed. These findings have important implications for U.S. gun control policy, which remains exceptionally heterogeneous across states. While all states except Wyoming have banned sales of handguns to minors, twelve states still allow the sale of long guns to minors. Furthermore, only twelve states currently require purchase permits for firearms.

The political aspect of the gun control debate in the United States has made increased regulation of firearms very difficult in many states, due to the strong advocacy of the gun rights lobby, and the opposition to any restriction on gun ownership by many gun owners. Many of the more controversial aspects of firearms regulations battles concern provisions intended to reduce crime, such as bans on "straw purchases", or limits on the number of guns individuals can purchase in a year. The relationship between firearm prevalence and suicide, while well known in the public health community, rarely if ever enters into the national or state debates over gun control provisions. In very recent years, gun rights groups have made significant gains, most notably in the Supreme Court decision regarding handgun bans in the District of Columbia (District of Columbia v. Heller, 2008). These trends do not bode particularly well for increased regulation of gun ownership in U.S. states. However, while gun control remains a controversial issue both at the state and federal level in the U.S., this analysis of male suicide suggests that there are clear public health benefits to restricting access to firearms through regulation.

## Conflict of interest

The authors have no conflicts of interest.

## Acknowledgements

The authors are grateful to four anonymous reviewers for useful comments and suggestions on an earlier version of this work. The authors also thank Sara Markowitz, Camelia Minoiu, and Gary Kleck for helpful comments and suggestions on earlier drafts.

## References

[1] Centers for Disease Control and Prevention (CDC), National Center for Injury Prevention and Control; 2009.http://www.cdc.gov/ncipc/dvp/suicide/suicide_data_sheet.pdf [accessed 2 February 2009].
[2] National Association of State Mental Health Program Directors Research Institute (NRI); 2006. http://www.nri-inc.org/projects/Profiles/RevExp2008/T20.pdf [accessed 27 September 2010].
[3] Florentine JB, Crane C. Suicide prevention by limiting access to methods: a review of theory and practice. Social Science and Medicine 2010;70:1626–32.
[4] Department of Health. National suicide prevention strategy for England. London; 2002.
[5] Nordentoft M. Prevention of suicide and attempted suicide in Denmark. Danish Medical Bulletin 2007;54:306–69.
[6] Miller M, Hemenway D. Guns and suicide in the United States. The New England Journal of Medicine 2008;4:989–91.
[7] Miller M, Azrael D, Hepburn L, Hemenway D, Lippman S. The association between changes in household firearm ownership and rates of suicide in the United States, 1981–2002. Injury Prevention 2005;12:178–82.
[8] Miller M, Lippman S, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. The Journal of Trauma, Injury, Infection and Critical Care 2007;62:1029–35.
[9] Cook PJ, Ludwig J. The social costs of gun ownership. Journal of Public Economics 2006;90:379–91.
[10] Duggan M. Guns and suicide: correlation or causation? In: Cook P, Ludwig J, editors. Evaluating gun policy. Washington: Brookings Institution Press; 2003.
[11] Gallup Poll. Do you have a gun in your home?; 2009 http://www.gallup.com/poll/1645/Guns.aspx[accessed 5 November 2009].
[12] Lott J, Whitley J. Safe storage, gun laws: accidental deaths, suicides, and crime. Working Paper # 237; 2000. Yale Law School.
[13] Kleck G, Kates D. Armed, New Perspectives on Gun Control. Prometeus:Amherst; 2001.
[14] Kleck G. Measures of gun ownership for macro level crime and violence research. Journal of Research in Crime and Delinquency 2004;41:3–36.
[15] Ludwig J, Cook P. Homicide and Suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. Journal of the American Medical Association 2000;284:585–91.
[16] Killias M, van Kesteren J, Rindlisbacher M. Guns, violent crime and suicide in 21 countries. Canadian Journal of Criminology 2001:429–48.
[17] Cook P, Moore M, Braga A. Gun Control. Working Paper Series SANO1-14, Sanford Institute of Public Policy, Durham, NC; 2001.
[18] Kellerman AL, Rivara FP, Somes G, Reay DT, Francisco J, Banton JG, Prodinsky J, Fligner C, Hackman BB. Suicide in home in relation to gun ownership. New England Journal of Medicine 1992;327:467–72.
[19] Lambert M, Silva P. An update of the impact of gun control legislation on suicide. Psychiatric Quarterly 1998;69:127–34.
[20] Sumner S, Layde P, Guse C. Firearm death rates and association with level of firearm purchase background check. American Journal of Preventive Medicine 2008;35:1–6.
[21] Price J, Thompson A, Dake J. Factors associated with state variations in homicide, suicide, and unintentional firearm deaths. Journal of Community Health 2004;29:271–83.
[22] Rosengart M, Cummings P, Nathens A, Heagerty P, Maier R, Rivara F. An evaluation of state firearm regulations and homicide and suicide death rates. Injury Prevention 2005;11:77–83.
[23] Cheung A, Dewa C. Current trends in youth suicide and firearm regulations. Canadian Journal of Public Health 2005;96:131–5.
[24] Beautrais A, Fergusson D, Horwood L. Firearms legislation and reductions in firearm-related suicide deaths in New Zealand. Australian and New Zealand Journal of Psychiatry 2006;40:253–9.
[25] Ozanne-Smith J, Ashby K, Newstead S, Stathakis V, Clapperton A. Firearm related deaths: the impact of regulatory reform. Injury Prevention 2004;10:280–6.
[26] Klieve H, Barnes M, De Leo D. Controlling firearms use in Australia: has the 1996 gun law reform produced the decrease in rates of suicide with this method? Social Psychiatry and Psychiatric Epidemiology 2009;44:285–92.

Exhibit 5
0066

A. Rodríguez Andrés, K. Hempstead / Health Policy 101 (2011) 95–103                                                                103

[27] Kapusta N, Etzersdorfer E, Krall C, Sonneck G. Firearm legislation reform in the European Union: Impact on firearm availability, firearm suicide and homicide rates in Austria. British Journal of Psychiatry 2007;191:253–7.

[28] Hawton K, Fagg J, Simkin S, Harris L, Malmberg A. Methods used for suicide by farmers in England and Wales. The contribution of availability and its relevance to prevention. British Journal of Psychiatry 1998;173:320–4.

[29] Haw C, Sutton L, Simkin S, Gunnell D, Kapur N, Nowers M, Hawton K. Suicide by gunshot in the United Kingdom: a review of the literature. Medicine, Science and the Law 2004;44:295–310.

[30] Wahlbeck K, Mäkinen M, editors. Prevention of Depression and Suicide. Consensus paper. Luxembourg: European Communities; 2008 http://ec.europa.eu/health/ph_determinants/life_style/mental/docs/Cyprus.pdf [accessed 30 November 2009].

[31] Ajdacic-Gross V, Killias M, Hepp U, Haymoz S, Bopp M, Gutzwiller F, Rössler W. Firearm suicides and availability of firearms: the Swiss experience. European Psychiatry, forthcoming.

[32] Kennedy P. A guide to econometrics. Oxford: Blackwell; 1998.

[33] Cameron C, Trivedi P. Regression analysis of count data. Econometric Society Monograph No. 30, Cambridge University Press; 1998.

[34] Yang B. The economy and suicide: a time-series study of the USA. American Journal of Economics and Sociology 1992;51:87–99.

[35] Markowitz S, Chatterji P, Kaestner R. Estimating the impact of alcohol policies on youth suicide. Journal of Mental Health Policy and Economics 2003;6:37–46.

[36] Lester D. Availability of guns and the likelihood of suicide. Sociology and Social Research 1987;71:287–8.

[37] Lester D. Gun ownership and suicide in the United States. Psychological Medicine 1989;19:519–21.

[38] Hemenway D, Kennedy B, Kawachi R. Firearm prevalence and social capital. Annals of Epidemiology 2001;11:484–90.

[39] Miller M, Azrael D, Hemenway D. Rates of household firearm ownership and homicide across US Regions and States, 1988–1997. American Journal of Public Health 2002;92:1988–93.

[40] Shennasa E, Dasklakis C, Buka S. Utility of indices of gun availability in the community. Journal of Epidemiology and Community Health 2006;60:44–9.

[41] Azrael D, Cook P, Miller M. State and local prevalence of firearms ownership measurement, structure and trends. Journal of Quantitative Criminology 2004;20:43–62.

[42] Bridges FS, Kunselman JC. Gun availability and use of guns for suicide, homicide, and murder in Canada. Perceptual and Motor Skills 2004;98:594–8.

Exhibit 5
0067

# EXHIBIT "6"

Exhibit 6
0068

Inj Prev: first published as 10.1136/ip.2004.007062 on 1 April 2005. Downloaded from http://injuryprevention.bmj.com/ on 16 July 2019 by guest. Protected by copyright.

**ORIGINAL ARTICLE**

# An evaluation of state firearm regulations and homicide and suicide death rates

## M Rosengart, P Cummings, A Nathens, P Heagerty, R Maier, F Rivara

Injury Prevention 2005;**11**:77–83. doi: 10.1136/ip.2004.007062

See end of article for authors' affiliations

Correspondence to:
Dr M R Rosengart, University of Pittsburgh, F1266.1, 200 Lothrop Street, Pittsburgh, PA 15213, USA;
rosengartmr@upmc.edu

**Objective:** To determine if any of five different state gun laws were associated with firearm mortality: (1) "shall issue" laws permitting an individual to carry a concealed weapon unless restricted by another statute; (2) a minimum age of 21 years for handgun purchase; (3) a minimum age of 21 years for private handgun possession; (4) one gun a month laws which restrict handgun purchase frequency; and (5) junk gun laws which ban the sale of certain cheaply constructed handguns.
**Design:** A cross sectional time series study of firearm mortality from 1979 to 1998.
**Setting:** All 50 states and the District of Columbia.
**Subjects:** All residents of the United States.
**Main outcome measures:** Firearm homicides, all homicides, firearm suicides, and all suicides.
**Results:** When a "shall issue" law was present, the rate of firearm homicides was greater, RR 1.11 (95% confidence interval 0.99 to 1.24), than when the law was not present, as was the rate of all homicides, RR 1.08 (95% CI 0.98 to 1.17), although this was not statistically significant. No law was associated with a statistically significant decrease in the rates of firearm homicides or total homicides. No law was associated with a statistically significant change in firearm suicide rates.
**Conclusion:** A "shall issue" law that eliminates most restrictions on carrying a concealed weapon may be associated with increased firearm homicide rates. No law was associated with a statistically significant reduction in firearm homicide or suicide rates.

During 2001 there were approximately 81 firearm fatalities each day in the United States[1][2] Over the decade 1991–2000, 215 822 homicides occurred, of which 147 281 (68%) were committed with a firearm, and 305 384 suicides occurred, of which 179 244 (59%) were committed with a firearm.[3]

Legislators have passed many state level statutes regulating ownership or access to handguns with the anticipated goal of curtailing deaths related to firearms.[1][4] Many laws have not been studied, and little is known about the association of these state laws with firearm deaths. For other laws, uncertainty persists regarding the presence and direction of the association with firearm mortality.[5][6] Studies of "shall issue" laws that permit an individual to carry a concealed weapon unless restricted by another statute have reported decreased, unchanged, and increased homicide rates with law implementation.[5][6] An evaluation of Maryland's junk gun law, banning cheaply constructed handguns, reported both increased and decreased firearm homicide rates after law enactment, although the association and its magnitude depended upon the manner by which the effect of the law was modeled.[7] Recently a study of minimum age restrictions for the purchase and possession of firearms reported that neither law appeared to reduce overall rates of suicide among youth.[8] Because of the lack of evidence and continued controversy, we studied the association between five different state gun laws and four outcomes: firearm homicides, all homicides, firearm suicides, and all suicides. The laws studied were: (1) "shall issue" laws permitting an individual to carry a concealed handgun unless that person is restricted to do so by another statute; (2) laws restricting the minimum age for purchase of a handgun to 21 years; (3) laws restricting the minimum age for private possession of a handgun to 21 years; (4) one gun a month laws which restrict handgun purchase frequency to one in a 30 day period; and (5) junk gun laws which ban the sale of certain

cheaply constructed handguns. We used a longitudinal analysis to estimate the adjusted rate of each mortality outcome after each law went into effect, compared with what would have been anticipated without that law. We used cross sectional time series data for all 50 states and the District of Columbia in the US with data regarding mortality, laws, and other variables for each year from 1979–98.

## MATERIALS AND METHODS

### Outcome data
Our main outcome measures were firearm related and total homicide, and firearm related and total suicide death rates per 100 000 person years. Total mortality rates were included in the analysis to evaluate whether any association between the law and firearm mortality rates persisted in the respective total death rate. State and year specific deaths and population data were available from the National Center for Health Statistics' compressed mortality files for the period 1979–98.[3] Data were categorized by sex, race (white, black, or other), and age (less than 1 years, 1–4, 5–9, 10–14, 15–19, 20–24, 25–34, 35–44, 45–54, 55–64, 65–74, 75–84, and older than 85 years). Violent deaths were categorized using the International Classification of Disease, Ninth Revision (ICD-9) external cause of death codes as follows: homicides (E960–969), suicides (E950–959), homicides by firearm (E965.0–965.4), and suicides by firearm (E955.0–955.4).[9]

### Legislation data
Information about the presence of each law was obtained by reviewing the criminal statutes and codes of each state for the period 1979 through 1998. Enactment dates for each law were ascertained by reviewing the sessions of each statute for each state. From 1979–98, 23 states adopted "shall issue"

**Abbreviations:** ICD-9, International Classification of Diseases, Ninth Revision.

**Exhibit 6**
**0069**

www.injuryprevention.com

Inj Prev: first published as 10.1136/ip.2004.007062 on 1 April 2005. Downloaded from http://injuryprevention.bmj.com/ on 16 July 2019 by guest. Protected by copyright.

laws permitting an individual to carry a concealed weapon unless restricted by another statute, seven states adopted and two states repealed a law restricting the minimum age for the private purchase of a handgun to 21 years, five states adopted laws restricting the minimum age for the private possession of a handgun to 21 years, two states adopted laws restricting the number of guns purchased to one in a thirty day period, and one state adopted a law banning the manufacture and sale of junk guns (table 1).

This information was compared with the state legislation data published by the Bureau of Justice Statistics and the Open Society Institute to confirm the laws of each state.[1 4] Within each state, the time period affected by each law was considered to start with the first calendar year in which each law was in effect for at least six months. This assumes that the law's effect occurs during the first complete year after it is implemented and that this effect is constant over time.

## Statistical methods

Mortality rate ratios (RRs) were estimated using Poisson regression to compare time periods during which a law was in effect with time periods without a law within each state; hence, 50 indicator variables were included to represent each

**Table 1**   Year of statute implementation, United States, 1979–98

| State | Year |
|---|---|
| "Shall issue" law | |
| Alaska | 1994 |
| Arizona | 1994 |
| Arkansas | 1995 |
| Florida | 1987 |
| Georgia | 1989 |
| Idaho | 1990 |
| Kentucky | 1996 |
| Louisiana | 1996 |
| Maine | 1985 |
| Mississippi | 1990 |
| Montana | 1991 |
| Nevada | 1995 |
| North Carolina | 1995 |
| Oklahoma | 1995 |
| Oregon | 1990 |
| Pennsylvania | 1989 |
| South Carolina | 1996 |
| Tennessee | 1994 |
| Texas | 1995 |
| Utah | 1995 |
| Virginia | 1986 |
| West Virginia | 1989 |
| Wyoming | 1994 |
| Minimum age of 21 years for private purchase | |
| California | 1984 |
| Connecticut | 1994 |
| Delaware | 1987 |
| Georgia | 1994 (repealed) |
| Hawaii | 1994 |
| Massachusetts | 1994 |
| Missouri | 1981 |
| Nebraska | 1991 |
| Washington | 1994 (repealed) |
| Minimum age of 21 years for private possession | |
| Connecticut | 1994 |
| Hawaii | 1994 |
| Maryland | 1996 |
| Massachusetts | 1994 |
| Missouri | 1981 |
| One gun per month | |
| Maryland | 1996 |
| Virginia | 1993 |
| Junk gun ban | |
| Maryland | 1990 |

state and the District of Columbia.[10] To control for national trends over time in firearm mortality rates, all states and the District of Columbia were included in the analysis, and 19 indicator variables were used to represent each calendar year. This approach attempted to control for the influences of unmodeled factors that were common across states and were associated with trends in homicide or suicide. We also controlled for state level and individual level changes in the following factors that may have influenced rates of crime and violence: proportion of the population living in metropolitan areas, proportion of the population living below the official poverty line, proportion unemployed, and age, sex, and race distribution.[11–13] Each of the state level variables was measured annually except proportion living in metropolitan areas, which were statistics from the decennial census and were interpolated for intercensal years. In addition, all laws were modeled simultaneously in the regression analysis for each outcome. We used a robust (sandwich) estimator of variance, which accounts for overdispersion and for clustering of events within a state.[14 15]

Because temporal trends in mortality rates varied by state, we included interaction terms between each state and time (year as a continuous variable) to account for this variation, thereby modeling temporal trends in mortality rates specific to each state. In addition, because the effect of a law may vary by state, interaction terms between the categorical variables state and law were included, and state specific RRs were calculated. Each law was modeled with state interactions, while the remaining laws were included as binary covariates. Variation in state specific RRs was evaluated with both tests of homogeneity and $I^2$.[16–19] This latter statistic ranges from 0–100% and estimates the percentage of total variation in RR estimates that is due to heterogeneity between states. Because of the heterogeneity in RRs, we summarized rate ratio estimates across states using the random effects method of DerSimonian and Laird.[17] The random effects summary allows for the possibility that each law may have a different effect in each state and this additional variation between states is accounted for in the confidence interval. All rate ratios were adjusted for temporal trends and for all potential confounding variables.

The minimum age laws restricted the purchase or possession of a handgun to people over 20 years of age. To evaluate whether the association of these laws with each outcome may vary with a particular age group, we introduced interaction terms between age and each of these two laws. Initially we introduced interaction terms between age (younger than 20 years, 20 years or older) and all other model terms. We chose this definition for this new dichotomous age covariate as it was compatible with the categories of age stratification provided by the available database. The model with the lowest Akaike information criteria statistic included terms for the interaction of both state and year with age.[15] We then introduced a term for the interaction of age and the two laws and estimated separate RRs for each age group.

## Regression to the mean

There was temporal variation in state specific firearm mortality rates. If a state were to have a period of unusually high firearm mortality rates as part of this expected variation, lawmakers might have been stimulated to pass laws regulating handguns. Hence, any observed beneficial response of legislation may represent the natural tendency for mortality rates to regress to their mean rates.[20] Similarly, a law may be observed to have an adverse effect if mortality rates were particularly low before its implementation. To evaluate whether regression to the mean might explain all or part of any statistically significant association of any law with

**Exhibit 6**
**0070**

Inj Prev: first published as 10.1136/ip.2004.007062 on 1 April 2005. Downloaded from http://injuryprevention.bmj.com/ on 16 July 2019 by guest. Protected by copyright.

firearm mortality, we compared the firearm mortality rate in the two year period before that law went into effect with previous years in the same state, adjusted as in all our analyses.

All data used were publicly available without identifiers, and thus the study was considered exempt from institutional review board review.

## RESULTS

### Temporal trends in mortality

During the 20 years of the study, there were 442 702 homicide deaths, of which 289 719 (65%) were firearm related, and 596 704 suicides, of which 352 196 (59%) were firearm related (figs 1 and 2). Firearm homicide rates peaked at 7.1 per 100 000 person years in 1993, while total homicide rates peaked at 10.5 in 1980 and again at 10.4 in 1991. Firearm suicide rates peaked twice at 7.6 per 100 000 person years, once in 1986 and again in 1990; total suicide rates peaked at 12.9 in 1986. Mortality rates differed substantially between states; to display this we plotted the median mortality rate among the states with the interquartile range (figs 1 and 2).

### Homicide rate ratios

There was little evidence of variation in state rate ratios with a minimum age of 21 years for private purchase law or a one gun a month law; p values for heterogeneity were not less than 0.38 and the I² values did not exceed 7% (fig 3, table 2).

For the minimum age of 21 years for possession law, the I² reached 39%. For "shall issue" laws the p values for tests of heterogeneity in rate ratios were statistically significant (p<0.001) and the I² values were 86% and 85%. The observed homicide rate after passage of a "shall issue" law was lower in the period without the law (table 2). However, after adjusting for potential confounding and temporal trends in homicide rates, when a "shall issue" law was present, the rate of firearm homicides was greater than when it was not present, RR 1.11 (95% CI 0.99 to 1.24), as was the rate for all homicides, RR 1.07 (95% CI 0.98 to 1.17), although neither was statistically significant (table 2). Summarized across all states, no law was associated with a statistically significant decrease in the rates of firearm homicides or total homicides.

We found little evidence that regression to the mean might explain this association of a "shall issue" law and increased firearm homicide, as the firearm homicide rate in the two

years before implementation of the shall issue law was nearly the same as in earlier years, RR 1.01 (95% CI 0.94 to 1.09).

### Homicide rate ratios by age subgroups

The RRs for laws restricting the minimum age to 21 years for private purchase or possession varied little by age group; p values for a test that RRs varied by age group (younger than 20 years, 20 years or older), were all equal to or greater than 0.10 (table 3).

In all subgroups the RR estimates had 95% confidence intervals that included 1.

### Suicide rate ratios

There was little evidence that state rate ratios varied with each law, except for the minimum age of 21 years for possession: p = 0.02 and I² reached 64% (fig 4, table 4).

No law was associated with a statistically significant change in firearm suicide rates (table 4). A law that banned the sale of junk guns was associated with a decrease in total suicide rates, RR 0.86 (95% CI 0.77 to 0.96).

### Suicide rate ratios by subgroups

The RRs for laws restricting the minimum age to 21 years for private purchase or possession varied little by age group; p values for a test that RRs varied by age group (younger than 20 years, 20 years or older), were all equal to or greater than 0.20 (table 3).

## DISCUSSION

From 1979 to 1998 many states passed laws regulating handguns. Our analyses suggest that a "shall issue" law that eliminates most restrictions on carrying a concealed weapon does not confer a reduction in firearm homicide and may be associated with increased mortality rates. No law was associated with a statistically significant decrease in firearm homicide or suicide rates.

Due to the observational and ecological nature of this study, bias due to confounding may persist because of an inability to account for all risk factors that might distort the observed associations.[21][22] However, the "shall issue" law was passed in many states, which are diverse in nature and represent all regions of the United States. In addition, the analysis was state specific, based upon a comparison within each state before and after each law took effect. Information



**Figure 1** Trends in firearm and total homicide rates, United States, 1979–98. Each box and whisker represents the range of state mortality rates for that year. Horizontal line indicates the median; box denotes the 25–75th percentile (interquartile range (IQR)); whiskers indicate outer limits and extend to the last value before 1.5 × IQR past the 25th and 75th percentile; squares and circles indicate states exceeding outer limits.

Exhibit 6
0071

www.injuryprevention.com

Inj Prev: first published as 10.1136/ip.2004.007062 on 1 April 2005. Downloaded from http://injuryprevention.bmj.com/ on 16 July 2019 by guest. Protected by copyright.



**Figure 2** Trends in firearm and total suicide rates, United States, 1979–98. Each box and whisker represents the range of state mortality rates for that year. Horizontal line indicates the median; box denotes the 25–75th percentile (IQR); whiskers indicate outer limits and extend to the last value before 1.5 × IQR past the 25th and 75th percentile; squares and circles indicate states exceeding outer limits.

from other states was only used to control for any national trend in mortality.

The increased firearm homicide rate observed after implementation of a "shall issue" law permitting nearly unrestricted carrying of concealed weapons was based upon an analysis of 23 states. Regression to the mean does not explain our observations, as the homicide rate in the two years preceding the law differed little from the rate in previous years within the same state.

Our results are in contrast to those of Lott and Mustard, who reported a 7.65% reduction in homicide rates associated

with "shall issue" laws.[5] This difference may stem from the additional 13 states that implemented a "shall issue" law during the period of our study. We have used dates of enactment similar to those of Lott and Mustard and of Ayres and Donohue.[5][6] Even if we employ the coding scheme of Vernick, which identified different implementation dates for five states, we obtain a similar increase in firearm homicide with passage of a "shall issue" law, RR 1.10 (95% CI 0.98 to 1.23).[23]

Hence, differing statistical methods appear to account for most of the discrepancy. Lott and Mustard used weighted



**Figure 3** State mortality rate ratio: firearm homicide, United States, 1979–98. (A) "Shall issue" law; (B) minimum age of 21 years for private purchase; (C) minimum age of 21 years for private possession; (D) one gun a month law. States enacting the law during the study period are represented on the ordinate. Boxes indicate state rate ratio. Box size is proportional to the inverse variance of each state rate ratio. Lines indicate 95% confidence interval. Diamond indicates random effects summary estimate of mortality rate ratio.

Exhibit 6
0072

Inj Prev: first published as 10.1136/ip.2004.007062 on 1 April 2005. Downloaded from http://injuryprevention.bmj.com/ on 16 July 2019 by guest. Protected by copyright.

**Table 2**   Homicides in states with a change in the law, United States, 1979–98*

| | "Shall issue" law | Minimum age of 21 years for purchase | Minimum age of 21 years for possession | One gun a month | Junk gun ban |
|---|---|---|---|---|---|
| **Firearm homicides** | | | | | |
| Rate† with law | 5.00 | 4.91 | 4.61 | 6.13 | 8.83 |
| Rate† without law | 5.90 | 3.10 | 3.86 | 6.55 | 6.12 |
| Range of rate ratios | 0.53–2.71 | 0.60–1.64 | 0.93–1.72 | 1.01–1.07 | NA |
| p Value‡ | <0.001 | 0.38 | 0.16 | 0.76 | NA |
| I²§ | 86% | 7% | 39% | 0% | NA |
| RR¶ | 1.11 | 0.98 | 1.06 | 1.02 | 0.94 |
| 95% CI | 0.99–1.24 | 0.91–1.06 | 0.88–1.27 | 0.89–1.17 | 0.73–1.19 |
| **All homicides** | | | | | |
| Rate† with law | 7.50 | 7.70 | 6.99 | 8.49 | 12.2 |
| Rate† without law | 8.99 | 5.51 | 6.48 | 9.74 | 9.71 |
| Range of rate ratios | 0.58–2.10 | 0.85–1.37 | 0.89–1.43 | 0.99–1.09 | NA |
| p Value‡ | <0.001 | 0.55 | 0.12 | 0.56 | NA |
| I²§ | 85% | 0% | 46% | 0% | NA |
| RR¶ | 1.07 | 1.00 | 1.02 | 1.00 | 0.94 |
| 95% CI | 0.98–1.17 | 0.94–1.05 | 0.89–1.18 | 0.90–1.12 | 0.78–1.14 |

*For states amending or implementing the law during the period 1979–98.
†Mean count per 100 000 person years for states in which law was implemented during study period.
‡p Value for test of homogeneity.
§Percentage of total variation in RR due to between state heterogeneity.
¶Regression derived rate ratio of mortality rate with the law to mortality rate without the law, adjusted for all confounders.
NA, not applicable because there was only one state with this law.

least squares linear regression to evaluate the association between the natural logarithm of homicide rates and passage of the law. Their regression aggregated all states, thereby assuming a similar impact of the law for each state in which it was implemented. However, the heterogeneity in state specific RRs after implementation of the law was substantial; the RRs for firearm homicide ranged from 0.53 to 2.71 (test of homogeneity, p<0.001), and 86% of this variation was due to heterogeneity beyond what was expected by chance. Donohue and Ayers reported similar state variation in the association between "shall issue' laws and homicide rates. They emphasized that the aggregated estimate was more heavily influenced by earlier adopting jurisdictions, as they contributed more post-passage years to the analysis.[6] In their disaggregated analysis of Lott's data, 16 of the 23 states implementing a "shall issue" law observed an increase in murder, similar to the 15 noted in our study, and the population weighted fixed effects summary estimate was associated with a non-significant 0.6% increase in homicides.

We tried to account for this variation in state rate ratios by including state specific interactions and calculating state specific RRs. We also modeled time specific to each state by allowing temporal trends in homicide rates to vary between states through the inclusion of interactions terms between state and year. Finally, we used a random effects summary estimator to calculate a final law summary estimate, which gives more weight to smaller states compared with a fixed effects summary. Nevertheless, although the confidence intervals for the random effects summary rate ratios were appreciably greater than those from a fixed effects summary estimate, the rate ratios for random and fixed effects never differed by more than 0.01. If we assume a constant impact of the law across all adopting states and combine the states by removing the state-law interaction term and assume that temporal trends in mortality were the same for every state by removing the state-year interactions from our regression model, yet still employ a Poisson regression model with robust variance estimator and control for all the same demographic and socioeconomic covariates, we produce estimates similar to those of Lott and Mustard for firearm homicide, RR 0.95 (95% CI 0.91 to 1.00) and total homicide, RR 0.97 (95% CI 0.94 to 1.01). We believe these estimates are inaccurate because they fail to account for the variation in risk ratios across states and the variation between states in homicide rates over time.

No law was associated with a significant reduction in either firearm homicide or suicide rates. Similar to the recent study of Webster et al, we did not find significant evidence

**Table 3**   Rate ratios for homicide and suicide rates post-law compared with pre-law by age group, United States, 1979–98*

| | Minimum age of 21 years for purchase | | | | Minimum age of 21 years for possession | | | |
|---|---|---|---|---|---|---|---|---|
| | Homicide | | Suicide | | Homicide | | Suicide | |
| | RR† | 95% CI | RR | 95% CI | RR | 95% CI | RR | 95% CI |
| **Firearm deaths** | | | | | | | | |
| <20 years | 0.92 | 0.80–1.06 | 0.94 | 0.80–1.06 | 0.91 | 0.72–1.15 | 0.93 | 0.77–1.12 |
| ≥20 years | 0.99 | 0.93–1.06 | 1.02 | 0.96–1.08 | 1.08 | 0.89–1.31 | 0.99 | 0.88–1.13 |
| p Value‡ | 0.22 | | 0.62 | | 0.10 | | 0.95 | |
| **All deaths** | | | | | | | | |
| <20 years | 0.92 | 0.81–1.05 | 1.10 | 0.94–1.29 | 0.98 | 0.79–1.20 | 1.15 | 0.93–1.42 |
| ≥20 years | 1.01 | 0.95–1.06 | 1.04 | 0.99–1.10 | 1.03 | 0.88–1.20 | 1.04 | 0.95–1.13 |
| p Value‡ | 0.39 | | 0.12 | | 0.43 | | 0.21 | |

*For states implementing the law during the period 1979–98.
†Regression derived rate ratio of mortality rate with the law to mortality rate without the law.
‡p Value for age-law interaction.

**Exhibit 6**
**0073**

www.injuryprevention.com

Inj Prev: first published as 10.1136/ip.2004.007062 on 1 April 2005. Downloaded from http://injuryprevention.bmj.com/ on 16 July 2019 by guest. Protected by copyright.

A



B



**Figure 4** State mortality rate ratio: firearm suicide, United States, 1979–98. (A) "Shall issue" law; (B) minimum age of 21 years for private purchase; (C) minimum age of 21 years for private possession; (D) one gun a month law. States enacting the law during the study period are represented on the ordinate. Boxes indicate state rate ratio. Box size is proportional to the inverse variance of each state rate ratio. Lines indicate 95% confidence interval. Diamond indicates random effects summary estimate of mortality rate ratio.

C



D



that laws restricting the minimum age for purchase or possession reduced either firearm suicide or homicide rates in youths, although our estimated rate ratios were all less than 1.[8] These minimum age for purchase or possession laws, however, were amended in only nine and five states, respectively, for which only three and one state had at least five years of post-amendment data. This, in combination with the increase, albeit non-significant, in total suicides for either

law, raises suspicion as to the validity of these observations. Alternatively, our results may stem from our assumption that the effect of each law was immediate and constant. A study of Maryland's ban on "Saturday Night Specials" noted that estimates of the law effect on firearm homicide rates depended upon assumptions made about the timing of the law's effect; assuming a delayed and gradual effect of the law best accounted for the variability in the data.[7]

**Table 4** Suicides in states with a change in the law, United States, 1979–98*

|  | Shall issue law | Minimum age of 21 years for purchase | Minimum age of 21 years for possession | One gun a month | Junk gun ban |
|---|---|---|---|---|---|
| **Firearm suicides** |  |  |  |  |  |
| Rate† with law | 9.70 | 7.03 | 5.98 | 7.34 | 5.46 |
| Rate† without law | 10.2 | 4.94 | 4.18 | 7.20 | 6.07 |
| Range of rate ratios | 0.90–1.28 | 0.80–1.46 | 0.83–1.50 | 0.99–1.09 | NA |
| p Value‡ | 0.56 | 0.26 | 0.02 | 0.32 | NA |
| I²§ | 0% | 21% | 64% | 0% | NA |
| RR¶ | 1.00 | 1.00 | 0.99 | 1.03 | 0.91 |
| 95% CI | 0.97–1.02 | 0.94–1.06 | 0.88–1.13 | 0.94–1.12 | 0.81–1.04 |
| **All suicides** |  |  |  |  |  |
| Rate† with law | 14.5 | 12.4 | 11.5 | 11.6 | 9.95 |
| Rate† without law | 14.5 | 10.7 | 9.80 | 11.8 | 11.0 |
| Range of rate ratios | 0.87–1.18 | 0.95–1.25 | 0.93–1.21 | 0.96–1.02 | NA |
| p Value‡ | 0.35 | 0.37 | 0.12 | 0.40 | NA |
| I²§ | 8% | 8% | 45% | 0% | NA |
| RR¶ | 0.98 | 1.02 | 1.03 | 1.00 | 0.86 |
| 95% CI | 0.96–1.01 | 0.98–1.07 | 0.96–1.11 | 0.94–1.08 | 0.77–0.96 |

*For states amending or implementing the law during the period 1979–98.
†Mean count per 100 000 person years for states in which law was implemented during study period.
‡p Value for test of homogeneity.
§Percentage of total variation in RR due to between state heterogeneity.
¶Regression derived mortality rate ratio of mortality rate with the law to mortality rate without the law, adjusted for all confounders.
NA, not applicable because there was only one state with this law.

**Exhibit 6**
**0074**

Inj Prev: first published as 10.1136/ip.2004.007062 on 1 April 2005. Downloaded from http://injuryprevention.bmj.com/ on 16 July 2019 by guest. Protected by copyright.

## Key points

- There is disagreement regarding the effects of some laws regulating handguns on firearm mortality rates.
- This ecological study observed considerable variation between states in the association of some laws regulating handguns with firearm homicide and suicide rates.
- A ''shall issue'' law that permits the carrying of a handgun in an unrestricted fashion may be associated with an increase in firearm homicide rates.
- Little evidence was observed that any of the laws evaluated were associated with a significant reduction in either firearm homicide or firearm suicide rates.

The junk gun statute, which was enacted in only one state, was associated with a statistically significant 14% reduction in all suicide deaths. However, the reduction in firearm suicide deaths associated with this law was only 8%. It does not seem plausible to us that this law would reduce suicide deaths by means other than a gun, and therefore we suspect that the association between this policy and all suicides is not likely to be causal.

Our analysis was restricted to states that had passed any of the laws under study. Had smaller jurisdictions within these states passed similar laws before statewide implementation, then our analysis might underestimate any effect. Similarly, if any city or town passed these laws without statewide implementation or if passage of these laws affected gun accessibility in surrounding states without the law, then our analysis might also underestimate any effect. Finally, if any city or smaller ordinance passed the law after state enactment, we might be simultaneously measuring the effects of these local statutes.

. . . . . . . . . . . . . . . . . . . .

**Authors' affiliations**
**M Rosengart,** University of Pittsburgh Medical Center, Pittsburgh, PA, USA
**P Cummings, A Nathens, F Rivara,** Harborview Injury and Prevention Research Center, Seattle, WA, USA
**A Nathens, R Maier,** Department of Surgery, Harborview Medical Center, Seattle, WA, USA
**P Cummings, F Rivara,** Department of Epidemiology, University of Washington, Seattle, WA, USA
**P Heagerty,** Department of Biostatistics, University of Washington, Seattle, WA, USA

**F Rivara,** Department of Pediatrics, University of Washington, Seattle, WA, USA

Competing interests: the authors declare no competing interests.

## REFERENCES

1  **Open Society Institute**. Gun Control in the United States. New York, 2000:1–15.
2  **Arias E,** Anderson RN, Kung HC, et al. Deaths: final data for 2001. Natl Vital Stat Rep 2003;**52**:1–115.
3  **Compressed Mortality Files**. National Center for Health Statistics, Centers for Disease Control and Prevention (Hyattsville, MD), 2002. Available at http://wonder.cdc.gov (accessed 28 January 2005).
4  **US Department of Justice**. Survey of state procedures related to firearm sales, midyear 2001. St Louis, Missouri: Bureau of Justice Statistics, 2002:1–87.
5  **Lott JR,** Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. J Legal Stud 1997;**XXVI**:1–69.
6  **Ayres I,** Donohue D. Shooting down the ''more guns, less crime'' hypothesis. Stanford Law Rev 2003;**55**:1193–312.
7  **Webster DW,** Vernick JS, Hepburn LM. Effects of Maryland's law banning ''Saturday night special'' handguns on homicides. Am J Epidemiol 2002;**155**:406–12.
8  **Webster DW,** Vernick JS, Zeoli AM, et al. Association between youth-focused firearm laws and youth suicides. JAMA 2004;**292**:594–601.
9  **World Health Organization**. Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death. Ninth Revision (ICD-9). Geneva, Switzerland: World Health Organization, 1977.
10  **Breslow NE,** Day NE. Statistical methods in cancer research, II: design and analysis of cohort studies. Lyon, France: International Agency for Research on Cancer, 1987:207–9.
11  **Historical Poverty Tables**. United States Census Bureau (Washington DC), 2002. Available at http://www.census.gov/hhes/poverty/histpov/hstpov21.html (accessed 28 January 2005).
12  **Unemployment Rates**. United States Department of Labor (Washington DC), 2002. Available at http://data.bls.gov (accessed 20 February 2005).
13  **Census of Population and Housing**. United States Census Bureau (Washington DC), 2000. Available at http://census.gov/population/www/censusdata/hiscendata.html (accessed 28 January 2005).
14  **White HA**. A heteroskedasticity-consistency covariance matrix estimator and a direct test for heteroskedasticity. Econometrica 1980;**48**:817–30.
15  **Hardin J,** Hilbe J. Generalized Linear Models and Extensions. College Station, Texas: Stata Press, 2001, 27–28, 45.
16  **Higgins JP,** Thompson SG, Deeks JJ, et al. Measuring inconsistency in meta-analyses. BMJ 2003;**327**:557–60.
17  **DerSimonian R,** Laird N. Meta-analysis in clinical trials. Control Clin Trials 1986;**7**:177–88.
18  **Higgins J,** Thompson S, Deeks J, et al. Statistical heterogeneity in systematic reviews of clinical trials: a critical appraisal of guidelines and practice. J Health Serv Res Policy 2002;**7**:51–61.
19  **Higgins JP,** Thompson SG. Quantifying heterogeneity in a meta-analysis. Stat Med 2002;**21**:1539–58.
20  **Fisher LD,** van Belle G. Biostatistics: a methodology for the health sciences. New York, NY: John Wiley & Sons, Inc, 1993:389–90.
21  **Morgenstern H**. Ecologic studies in epidemiology: concepts, principles, and methods. Annu Rev Public Health 1995;**16**:61–81.
22  **Morgenstern H**. Uses of ecologic analysis in epidemiologic research. Am J Public Health 1982;**72**:1336–44.
23  **Vernick JS,** Hepburn LM. State and Federal Gun Laws: Trends for 1970–1999. In: Ludwig J, PJ C, eds. Evaluating gun policy. Washington DC: The Brookings Institution, 2003:345–411.

**Exhibit 6**
**0075**

www.injuryprevention.com

# EXHIBIT "7"

Exhibit 7
0076

■ ORIGINAL CONTRIBUTION

# Association Between Youth-Focused Firearm Laws and Youth Suicides

Daniel W. Webster, ScD, MPH

Jon S. Vernick, JD, MPH

April M. Zeoli, MPH

Jennifer A. Manganello, PhD, MPH

S UICIDE IS THE THIRD LEADING cause of death among youth aged 10 to 19 years in the United States, accounting for 1883 deaths in 2001.[1] Firearms were used in approximately half of suicides within this age group in 2001; however, as recently as 1994, 7 of every 10 suicides among teenagers involved firearms.[1]

Firearms are one of the most lethal methods of self-harm.[2] Case-control studies using community and clinical samples have consistently found that the presence of firearms in the home substantially increased the risk of adolescent suicide.[3-7] In addition, a recent state-level study, using the ratio of firearm suicides to total suicides as a proxy for the prevalence of gun ownership, found that suicide rates among teenagers and adults are significantly higher in states with higher rates of gun ownership.[8]

Several firearm policies are intended to limit the access that underage youth have to firearms. Since 1968, federal law has required licensed firearms dealers to prohibit handgun sales to purchasers younger than 21 years. In 1994, a federal law established 18 years as the minimum legal age for possessing or purchasing handguns, including sales by gun owners who are not licensed dealers. Many states have also adopted laws establishing a minimum legal age for being able to purchase or possess a firearm. Another type

of law intended to keep firearms from youth are gun safe storage laws, often referred to as child access prevention (CAP) laws. As of 2001, 18 states had some form of CAP law that makes it a crime to store firearms in a manner that allows them to be easily accessed by children and adolescents. Most require gun owners to lock up their guns.

**Context** Firearms are used in approximately half of all youth suicides. Many state and federal laws include age-specific restrictions on the purchase, possession, or storage of firearms; however, the association between these laws and suicides among youth has not been carefully examined.

**Objective** To evaluate the association between youth-focused firearm laws and suicides among youth.

**Design, Setting, and Participants** Quasi-experimental design with annual state-level data on suicide rates among US youth aged 14 through 20 years, for the period 1976-2001. Negative binomial regression models were used to estimate the association between state and federal youth-focused firearm laws mandating a minimum age for the purchase or possession of handguns and state child access prevention (CAP) laws requiring safe storage of firearms on suicide rates among youth.

**Main Outcome Measures** Association between youth-focused state and federal firearm laws and rates of firearm, nonfirearm, and total suicides among US youth aged 14 to 17 and 18 through 20 years.

**Results** There were 63954 suicides among youth aged 14 through 20 years during the 1976-2001 study period, 39655 (62%) of which were committed with firearms. Minimum purchase-age and possession-age laws were not associated with statistically significant reductions in suicide rates among youth aged 14 through 20 years. State CAP laws were associated with an 8.3% decrease (rate ratio [RR], 0.92; 95% confidence interval [CI], 0.86-0.98) in suicide rates among 14- to 17-year-olds. The annual rate of suicide in this age group in states with CAP laws was 5.97 per 100000 population rather than the projected 6.51. This association was also statistically significant for firearm suicides (RR, 0.89; 95% CI, 0.83-0.96) but not for nonfirearm suicides (RR, 1.00; 95% CI, 0.91-1.10). CAP laws were also associated with a significant reduction in suicides among youth aged 18 through 20 years (RR, 0.89; 95% CI, 0.85-0.93); however, the association was similar for firearm suicides (RR, 0.87; 95% CI, 0.82-0.92) and nonfirearm suicides (RR, 0.91; 95% CI, 0.85-0.98).

**Conclusions** There is evidence that CAP laws are associated with a modest reduction in suicide rates among youth aged 14 to 17 years. As currently implemented, minimum age restrictions for the purchase and possession of firearms do not appear to reduce overall rates of suicide among youth.

*JAMA. 2004;292:594-601*                                           www.jama.com

**Author Affiliations:** Center for the Prevention of Youth Violence (Dr Webster and Mr Vernick and Ms Zeoli) and Center for Gun Policy and Research (Dr Webster and Mr Vernick), Johns Hopkins Bloomberg School of Public Health, Baltimore, Md; Annenberg Public Policy Center, University of Pennsylvania, Philadelphia (Dr Manganello).

**Corresponding Author:** Daniel W. Webster, ScD, MPH, Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 624 N Broadway, Room 593, Baltimore, MD 21205 (dwebster @jhsph.edu).

©2004 American Medical Association. All rights reserved.

**Exhibit 7**
**0077**

There has been little empirical research on the association between these youth-focused laws and rates of suicide among youth. Marvel[9] examined laws banning the possession of firearms by juveniles and found no evidence that these laws reduced youth suicides. However, in that study the outcome examined was suicides among youth aged 15 to 19 years, over half of which involve suicides among 18- and 19-year-olds, an age group not covered by most of the laws. We are not aware of any other study that has examined the association between minimum age restrictions for firearm purchases and firearm suicides among youth. In a study of the association between the first 12 CAP laws and mortality among youth through 1994, Cummings et al[10] reported that state CAP laws were associated with a 19% decline in suicides among youth aged 10 to 14 years. This estimate was not emphasized by the authors, presumably because the upper bound of the 95% confidence interval for the rate ratio was 1.01. Lott and Whitley[11] reported no statistically significant association between CAP laws and suicides among children younger than 15 years or among youth aged 15 to 19 years. However, their use of Tobit regression to estimate the laws' effects is vulnerable to bias when data are highly skewed and heteroskedastic, as is the case for state-level data on youth suicides.[12]

The study herein seeks to address the gap in research on the effects of firearm laws specifically designed to reduce the access that children and youth have to firearms. We examine the association between these laws and suicides among youth aged 14 through 20 years, an age group at much greater risk of firearm suicide than the younger groups examined in prior research.

## METHODS
### Study Design

To estimate the association between youth-focused firearm policies and suicide, we used a quasi-experimental design and regression analyses (described below) to contrast changes in rates of suicide among youth in states that adopted laws to restrict youth access to firearms with rate changes in states that did not make such changes in their laws, while controlling for potential confounders. State-level data sets were constructed that included the number of suicides among youth within each state for the years 1976 through 2001 for the 2 age groups potentially affected by the laws. Youth aged 14 to 17 years were the target group for laws establishing 18 years or younger as a minimum age for handgun purchase or possession, and for most CAP laws. Youth aged 18 through 20 years were legally affected by laws that increased the minimum age for handgun purchase or possession from 18 to 21 years.

### Outcome Variables

The outcome variables were the number of total, firearm, and nonfirearm suicides in each age group targeted by the laws. Death certificate data from the National Center for Health Statistics were used to identify suicide as a cause of death (*International Classification of Diseases, Ninth Revision* external cause of death codes E950-E959[13] and *International Classification of Diseases, 10th Revision* codes X60-X84, Y87.0, and U03[14]).

### Firearm Laws

We conducted legal research and consulted existing compilations of state laws[15] to obtain information about the youth-focused firearm laws of interest: minimum purchase age, minimum possession age, and CAP laws. When states had minimum-age cutoffs for purchase or possession of handguns that were different from those for purchase or possession of long guns, we used the cutoffs for handguns. We also collected information about other firearm laws, such as handgun licensing requirements (also known as permit-to-purchase laws), which might affect our outcomes of interest. For each law, we then determined the date it took effect, and whether there had been any changes to the law itself during the study period.

Dummy variables were created, set equal to 1 when the law was in effect for the whole year and equal to 0 when no law was in effect. For laws that were in effect for only part of a specific year, we set the law variable equal to 1 in a state-year if the law was in place for at least half of the year and equal to 0 otherwise. For the few laws that affected one part of our age groups (eg, age 17 years as the minimum age for firearm purchase), we set the law variable equal to 1 if the law applied to the majority of youth committing suicide in the age group and equal to 0 otherwise. The federal law establishing a minimum legal age for handgun purchase and possession was assumed to affect only states that, prior to the federal law, either had no minimum-age law of this type or had a law that established a minimum legal age younger than 18 years.

### Statistical Analysis

To derive estimates of the association between the laws and youth suicide, we used negative binomial regression models and generalized estimating equations to estimate regression parameters. Negative binomial regression is appropriate for estimating models for count data that are overdispersed (ie, the variance is greater than the mean),[16] as is the case with state-level youth suicide data. Likelihood ratio tests rejected the null hypothesis that the distributions were Poisson. Generalized estimating equations take into account that the data are correlated, in this case by state and year, and make appropriate adjustments to standard errors for accurate hypothesis testing.[17] Correlation matrices of model residuals were examined to identify any clear pattern of autocorrelation; however, no pattern was evident. Therefore, the models were specified with unstructured autocorrelation, as is recommended for studies of this type,[18] using the PROCGEN program in SAS version 8.2 (SAS Institute Inc, Cary, NC). Each model included the natural logarithm of the population as an offset variable with the coefficient constrained to equal 1. Model coefficients

©2004 American Medical Association. All rights reserved.

Exhibit 7
0078

were converted to rate ratios (RRs) so that effects could be expressed in terms of percentage changes in suicide rates. We used 2-tailed tests of significance and $\alpha \le .05$ for rejecting the null hypothesis of no effect.

When statistically significant associations were identified, we assessed whether an association not attributable to change in the covariates could be attributable to differential prelaw trends in states that passed the law vs those that did not pass the law. This was assessed by estimating the effects for a set of dummy variables representing each of the 5 years just prior to the passage of the law and each of the first 5 years the law was in place. We assessed the plausibility that significant changes in suicide rates for an age group were caused by the law by examining whether statistically significant associations were specific to suicides using firearms and were not associated with changes in suicide rates among young persons aged 22 to 24 years, a group not legally affected by the laws. We also estimated a model that included only those states that had enacted their laws prior to 1996, providing at least 6 years of follow-up data. Model fit was assessed by comparing deviance statistics with their asymptotic $\chi^2$ distribution[19] and the Akaike information criterion statistic.[30]

**Other Explanatory Variables**

In addition to the firearm law variables, the models included indicator variables for each state, suicides for a within-state comparison group (individuals aged 22 to 24 years), per capita beer consumption, percentage of the population living in rural areas, real income per capita, unemployment rates, percentage of the adult population with a bachelors degree, percentage of the population of black race, the ratio of adult firearm suicides to total suicides as a proxy for the prevalence of gun ownership, and percentage of the population affiliated with specific religious denominations. The dummy variables for each state control for baseline differences in youth suicide levels across the 50 states

(the District of Columbia was not included in our study). Because the state firearm policies of interest target a particular age group, we used within-state suicide rates among young persons aged 22 to 24 years who were not targeted by the law to control for difficult-to-measure social factors (eg, social norms regarding suicide) that influence suicide rates among young persons in a particular state and year. We used year dummy variables to control for national trends in suicides among youth but also estimated alternative models with linear trend parameters when such patterns were clearly evident.

Data on state population of youth aged 14 through 20 years[21-23] and the percentage of residents living in rural areas were obtained from the US Census.[24] Annual per capita beer consumption data based on beer sales were obtained from the Alcohol Epidemiologic Data System of the National Institute of Alcoholism and Alcohol Abuse.[25] Data on personal income, unemployment, educational attainment, and religious affiliation were provided by Markowitz et al,[26] who obtained the data from government and private sources.[27-29]

## RESULTS

### Youth-Focused Firearm Laws

As of 2001, federal law and the laws of 46 states have mandated a minimum age for the purchase of a handgun, with the age ranging from 14 to 21 years. Of these, 21 states enacted or changed their law during the study period. Federal law and the laws of 39 states mandated a minimum possession age, ranging from 15 to 21 years, with 29 states enacting or changing their law during the study period. Nearly all of these changes established 18 years as the minimum age for firearm possession. Only 3 states increased their minimum legal age for handgun possession to 21 years during the study period. Eighteen states had CAP laws as of 2001. The maximum age of youth covered by these CAP laws ranged from 13 to 17 years (TABLE 1). Only 3 states adopted permit-to-purchase firearms licensing systems during the study period.

Most law changes restricting the access of youth to firearms went into effect between 1990 and 1995. The federal law establishing 18 years as the minimum age for handgun purchase and possession went into effect in 1994. After Florida implemented the nation's first CAP law in late 1989, 14 more states followed suit before the end of 1995.

### Suicide Trends Among Youth

There were 63954 suicides among youth aged 14 through 20 years during the 1976-2001 study period, 39655 (62%) of which were committed with firearms. Firearm suicide rates among youth aged 14 to 17 years increased steadily from 2.6 (per 100000 population) in 1976 to 5.7 in 1994, and then declined rapidly to 2.5 in 2001 (FIGURE). There were less-dramatic changes in firearm suicide rates among youth aged 18 through 20 years, except for a steep decrease from 9.6 in 1994 to 5.9 in 2001. There were no noteworthy trends in rates of nonfirearm suicides within the 2 age groups.

### Association Between Firearm Laws and Suicides Among Youth Aged 14 to 17 Years

Our regression models for suicides among youth aged 14 to 17 years reveal no statistically significant association between suicide rates and laws setting minimum ages for firearm purchase or possession enacted at the state or federal level (TABLE 2). State CAP laws were associated with an 8.3% reduction in suicide rates (RR, 0.92; 95% confidence interval [CI], 0.86-0.98). In states with CAP laws, the annual suicide rate for youth aged 14 to 17 years was 5.97 per 100000 during the period in which these laws were in effect. Our model estimates that in the absence of these laws the expected rate would have been 6.51.

The reduction associated with CAP laws was observed for firearm suicides, which decreased an estimated 10.8% in response to the introduction of CAP laws (RR, 0.89; 95% CI, 0.83-0.96). There was no statistically significant association between CAP

©2004 American Medical Association. All rights reserved.

Exhibit 7
0079

**Table 1.** State Firearm Laws Focused on Youth, 1976-2001

| State | Minimum Purchase/Sale Age | | Minimum Possession Age | | CAP Law (Effective Date) |
|---|---|---|---|---|---|
| | Age, y | Change During Study Period (Effective Date) | Age, y | Change During Study Period (Effective Date) | |
| Federal law | 18 | No law to age 18 (09/19/94) | 18 | No law to age 18 (09/19/94) | NA |
| Alabama | 18 | NA | * | NA | NA |
| Alaska | 16 | No law to age 16 (09/14/92) | 16 | No law to age 16 (01/01/80) | NA |
| Arizona | 18 | NA | 18 | No law to age 18 (07/18/93) | NA |
| Arkansas | 18 | No law to age 18 (01/01/76) | 18 | No law to age 18 (03/17/89) | NA |
| California | 18 | NA | 18 | NA | Up to age 17 (01/01/92) |
| Colorado | 18 | No law to age 18 (09/13/93) | 18 | No law to age 18 (09/13/93) | NA |
| Connecticut | 21 | Age 18 to age 21 (10/01/95) | * | NA | Up to age 15 (10/01/90) |
| Delaware | 21 | Age 16 to age 21 (07/16/87) | 18 | No law to age 18 (07/15/94) | Up to age 17 (07/12/94) |
| Florida | 18 | NA | 18 | No law to age 18 (01/01/94) | Up to age 15 (10/01/89) |
| Georgia | 18 | Age 21 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| Hawaii | 21 | Age 18 to age 21 (07/01/94) | * | NA | Up to age 15 (06/29/92) |
| Idaho | 18 | Age 16 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| Illinois | 21 | NA | 21 | NA | Up to age 14 (01/01/00) |
| Indiana | 18 | Age 21 to age 18 (07/01/77) | 18 | No law to age 18 (07/01/94) | NA |
| Iowa | 21 | Age 18 to age 21 (01/01/79) | * | NA | Up to age 13 (04/05/90) |
| Kansas | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Kentucky | 18 | No law to age 18 (07/15/94) | 18 | No law to age 18 (07/15/94) | NA |
| Louisiana | 18 | NA | 17 | No law to age 17 (09/07/99) | NA |
| Maine | 16 | NA | * | NA | NA |
| Maryland | 21 | NA | 21 | No law to age 21 (10/01/96) | Up to age 15 (10/01/92) |
| Massachusetts | 21 | Age 18 to age 21 (10/21/98) | 21 | Age 18 to age 21 (10/21/98) | Up to age 17 (10/21/98) |
| Michigan | 18 | NA | 18 | No law to age 18 (03/28/91) | NA |
| Minnesota | 18 | NA | 18 | NA | Up to age 13 (08/01/93) |
| Mississippi | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Missouri | 21 | Age 18 to age 21 (09/28/81) | * | NA | NA |
| Montana | * | NA | * | NA | NA |
| Nebraska | 21 | Age 18 to age 21 (06/07/91) | 18 | NA | NA |
| Nevada | 18 | NA | 18 | Age 14 to age 18 (07/01/95) | Up to age 17 (10/01/91) |
| New Hampshire | 18 | NA | * | NA | Up to age 16 (01/01/01) |
| New Jersey | 21 | Age 18 to age 21 (01/01/01) | 21 | Age 18 to age 21 (01/01/01) | Up to age 15 (01/17/92) |
| New Mexico | * | NA | 19 | No law to age 19 (07/01/94) | NA |
| New York | 21 | No law to age 21 (11/01/00) | 16 | NA | NA |
| North Carolina | 18 | NA | 18 | No law to age 18 (09/01/93) | Up to age 17 (12/01/93) |
| North Dakota | 18 | Age 17 to age 18 (07/01/85) | 18 | Age 17 to age 18 (07/01/85) | NA |
| Ohio | 21 | Age 17 to age 21 (11/09/95) | * | NA | NA |
| Oklahoma | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Oregon | 18 | NA | 18 | No law to age 18 (01/01/90) | NA |
| Pennsylvania | 18 | NA | 18 | No law to age 18 (09/11/94) | NA |
| Rhode Island | 21 | NA | 15 | NA | Up to age 15 (06/19/95) |
| South Carolina | 21 | NA | 21 | NA | NA |
| South Dakota | * | NA | 18 | No law to age 18 (07/01/94) | NA |
| Tennessee | 18 | NA | 18 | No law to age 18 (07/01/94) | NA |
| Texas | 18 | NA | * | NA | Up to age 16 (09/01/95) |
| Utah | 18 | No law to age 18 (10/21/93) | 18 | NA | NA |
| Vermont | 16 | NA | 16 | NA | NA |
| Virginia | 18 | NA | 18 | No law to age 18 (07/01/93) | Up to age 13 (07/01/92) |
| Washington | 18 | Age 21 to age 18 (07/01/94) | 18 | No law to age 18 (07/01/94) | NA |
| West Virginia | 18 | No law to age 18 (07/08/89) | 18 | No law to age 18 (07/08/89) | NA |
| Wisconsin | 18 | NA | 18 | NA | Up to age 13 (04/16/92) |
| Wyoming | * | NA | * | NA | NA |

Abbreviations: CAP, child access prevention; NA, not applicable/no change.     *Minimum age not established.

©2004 American Medical Association. All rights reserved.

Exhibit 7
0080

YOUTH-FOCUSED FIREARM LAWS AND YOUTH SUICIDES



**Figure.** Youth Suicide Rates by Method and Age Group, United States, 1976-2001

cide rates (RR, 1.13; 95% CI, 1.01-1.27) (Table 2). This effect was not statistically significant, however, either for firearm suicides (RR, 1.14; 95% CI, 0.98-1.34) or nonfirearm suicides (RR, 1.07; 95% CI, 0.90-1.27). State laws raising the minimum legal purchase age to 21 years were associated with a 9.0% decline in rates of firearm suicides among youth aged 18 through 20 years (RR, 0.91; 95% CI, 0.83-1.00); however, there was no statistically significant association for overall suicide rates (RR, 0.97; 95% CI, 0.91-1.05).

State CAP laws were associated with an 11.1% decline in suicide rates among youth aged 18 through 20 years (RR, 0.89; 95% CI, 0.85-0.93). In this group, suicide reductions associated with CAP laws were similar for firearm suicides (−12.9%; RR, 0.87; 95% CI, 0.82-0.92) and nonfirearm suicides (−8.8%; RR, 0.91; 95% CI, 0.85-0.98). The 3 permit-to-purchase licensing laws were associated with a 17.7% increase in suicide rates (RR, 1.18; 95% CI, 1.04-1.34).

## COMMENT

After steadily increasing between 1976 and 1994, rates of firearm suicides among youth have decreased sharply. Although many laws enacted during the early 1990s were intended to decrease access to firearms by children and youth, this study found no evidence that minimum-age restrictions for firearm purchase and possession have reduced suicide rates among the age groups targeted by the laws.

Our models estimate that 3 state laws that increased the minimum legal age for handgun possession to 21 years were associated with a 12.9% increase in total suicide risks among youth ages 18 through 20 years. There are several reasons, however, to doubt the validity of this estimate, including: (1) firearm and nonfirearm suicide rates were affected equally; (2) there was no increase in suicides among 14- to 17-year-olds associated with minimum possession age laws; (3) it is based on only 3 states, 2 of which adopted the change in the final 2 years of the study; and (4) the ab-

laws and nonfirearm suicides among youth aged 14 to 17 years (RR, 1.00; 95% CI, 0.91-1.10). Estimates of the association between CAP laws and suicides among 14- to 17-year-olds were dependent on how national suicide trends were modeled. The estimates from the primary model noted above included separate linear-trend parameters for the 1976-1994 period of increasing suicide rates and for the 1995-2001 period of a downturn in rates. The trend parameters in this model were highly significant and, based on Akaike information criterion statistics, this model fit the data better than did a model that included year indicator variables. Models that assumed no overall pattern in youth suicide trends but that controlled for year-to-year fluctuations nationally with year indicator variables found no statistically significant association between CAP laws and suicide rates in the group aged 14 to 17 years. CAP law estimates did not vary substantially by whether violators could be charged with felony crimes or by the maximum age of youth targeted by the laws (data not shown).

The models used to estimate differences in suicide rates among youth aged 14 to 17 years in each of the 5 years before and after the adoption of a CAP law revealed no pattern of unmodeled dif-

ferences between states with and those without CAP laws just prior to the adoption of these laws. When we examined the relationship between the length of time a CAP law was in place and the effects of the laws, there was also no clear pattern in successive post-law year effects on total suicide rates, but the association between CAP laws and firearm suicide rates for this group was most pronounced for the first year the law was in effect (RR, 0.89; 95% CI, 0.77-1.02).

There was no statistically significant association between permit-to-purchase licensing laws and suicide rates among youth aged 14 to 17 years (RR, 1.06; 95% CI, 0.92-1.23). Association between the laws and suicide rates among youth aged 14 to 17 years were not substantially altered when the suicide rate among 22- to 24-year-olds and other covariates were removed from the model.

### Association Between Firearm Laws and Suicides Among Youth Aged 18 Through 20 Years

The model for total suicides among youth aged 18 through 20 years estimated that state laws that increased the legal age for handgun possession to 21 years during the study period were associated with a 12.9% increase in sui-

©2004 American Medical Association. All rights reserved.

**Exhibit 7**
**0081**

sence of a theory for how an intervention designed to reduced access to means of suicide could lead to a substantial increase in suicide rates. Similarly, our findings for permit-to-purchase licensing laws should be regarded with skepticism since they are based on just 3 changes in state law occurring during the study period, none

of which involved a very restrictive licensing scheme.

We did find convincing evidence that the 18 CAP laws adopted during the study period led to an 8.3% reduction in suicide rates among youth aged 14 to 17 years. As would be expected if these reductions were attributable to reduced access to firearms, the reduc-

tions were specific to suicides committed with firearms and to the age group principally targeted by CAP laws. We found no association between CAP laws and suicide rates among young persons aged 22 to 24 years. Our estimate of the association between CAP laws and firearm suicides (−10.8%; 95% CI, −18.4% to −3.7%) among youth aged 14

**Table 2.** Association Between Youth-Focused Firearm Laws and Suicides Among Youth Aged 14 to 17 Years and 18 Through 20 Years

| | Aged 14 to 17 Years | | Aged 18 Through 20 Years | |
|---|---|---|---|---|
| | RR (95% CI) | P Value | RR (95% CI) | P Value |
| **Total Suicides** | | | | |
| Firearm laws | | | | |
| Federal law | | | | |
| Minimum purchase age | 1.02 (0.91-1.14) | .72 | NA | NA |
| Minimum possession age | 0.98 (0.90-1.08) | .75 | NA | NA |
| State laws | | | | |
| Minimum purchase age | 1.04 (0.90-1.21) | .58 | 0.97 (0.91-1.05) | .47 |
| Minimum possession age | 0.97 (0.90-1.05) | .44 | 1.13 (1.01-1.27) | .04 |
| Child access prevention laws | 0.92 (0.86-0.98) | .005 | 0.89 (0.85-0.93) | <.001 |
| Permit to purchase laws | 1.06 (0.92-1.23) | .43 | 1.18 (1.04-1.34) | .01 |
| Other covariates | | | | |
| Linear time trend, 1976-1994 | 1.10 (1.07-1.12) | <.001 | NA | NA |
| Linear time trend, 1995-2001 | 0.95 (0.93-0.98) | <.001 | NA | NA |
| Per capita beer consumption | 0.99 (0.99-1.00) | .10 | 1.00 (0.99-1.01) | .27 |
| Population living in rural areas | 0.99 (0.98-1.01) | .37 | 1.00 (0.99-1.01) | .50 |
| Unemployment | 1.00 (0.99-1.00) | .48 | 1.01 (1.00-1.02) | .12 |
| Real per capita income | 1.00 (1.00-1.00) | .22 | 1.00 (1.00-1.00) | .85 |
| Adult population with bachelors degree | 0.99 (0.98-1.00) | .08 | 1.00 (0.99-1.01) | .78 |
| Religious affiliation | | | | |
| Southern Baptist | 1.04 (1.00-1.07) | .01 | 1.01 (0.98-1.03) | .57 |
| Other Protestant | 1.01 (0.99-1.02) | .37 | 0.99 (0.98-1.00) | .16 |
| Mormon | 1.12 (1.05-1.18) | <.001 | 1.04 (0.98-1.09) | .17 |
| Catholic | 0.98 (0.97-1.00) | .006 | 0.98 (0.98-0.99) | .002 |
| Proxy for adult firearm prevalence | 0.41 (0.26-0.64) | <.001 | 0.46 (0.32-0.65) | <.001 |
| Suicide rates among ages 22-24 y | 1.01 (1.00-1.01) | .002 | 1.01 (1.00-1.01) | .002 |
| **Firearm Suicides** | | | | |
| Federal law | | | | |
| Minimum purchase age | 1.00 (0.87-1.16) | .96 | NA | NA |
| Minimum possession age | 0.99 (0.89-1.09) | .80 | NA | NA |
| State laws | | | | |
| Minimum purchase age | 1.04 (0.87-1.16) | .66 | 0.91 (0.83-1.00) | .05 |
| Minimum possession age | 1.02 (0.92-1.12) | .77 | 1.14 (0.98-1.34) | .10 |
| Child access prevention laws | 0.89 (0.83-0.96) | .003 | 0.87 (0.82-0.92) | <.001 |
| Permit to purchase laws | 0.92 (0.76-1.10) | .33 | 1.22 (1.04-1.43) | .02 |
| **Nonfirearm Suicides** | | | | |
| Federal law | | | | |
| Minimum purchase age | 1.08 (0.91-1.28) | .40 | NA | NA |
| Minimum possession age | 1.12 (0.99-1.26) | .08 | NA | NA |
| State laws | | | | |
| Minimum purchase age | 1.05 (0.85-1.31) | .64 | 1.05 (0.94-1.17) | .37 |
| Minimum possession age | 0.93 (0.82-1.05) | .24 | 1.07 (0.90-1.27) | .44 |
| Child access prevention laws | 1.00 (0.91-1.10) | .95 | 0.91 (0.85-0.98) | .02 |
| Permit to purchase laws | 1.27 (1.00-1.61) | .047 | 1.14 (0.93-1.39) | .21 |

Abbreviations: CI, confidence interval; NA, not applicable; RR, rate ratio.

©2004 American Medical Association. All rights reserved.

Exhibit 7
0082

to 17 years is consistent with, though smaller in magnitude than, the estimate of Cummings et al[10] of the association between CAP laws and firearm suicides among adolescents younger than 15 years (−19.0%; 95% CI, −34.0% to +1.0%). CAP laws were also associated with statistically significant declines in suicide rates among those in the group aged 18 through 20 years. However, the statistically significant negative association between CAP laws and rates of suicide using means other than firearms casts doubt on any causal connection between the laws and lower suicide rates in this group of older youth.

Some may question whether the reductions in youth suicides that were associated with CAP laws in this study might be spurious, since many in the group aged 14 to 17 years were older than the maximum age required for safe firearm storage. However, many older youth have younger siblings, relatives, or friends that may prompt their parents to comply with CAP law requirements. In addition, CAP laws may encourage gun owners with children young enough to be covered by the law to adopt safe storage practices that endure even after their children are beyond the age required for safe firearms storage under the law. Finally, gun owners simply may not respond to very specific aspects of a CAP law in order to be in compliance. Instead, CAP laws may increase awareness and change social norms to encourage gun owners to secure firearms from underage youth. These interpretations are consistent with our finding that the ages covered by the CAP law were unrelated to the association between CAP laws and suicides among youth.

There are several reasons that CAP laws might be more effective than minimum-age restrictions for firearm purchases and possession in reducing suicides among youth. First, a large majority of youth who commit or attempt suicide with a firearm use guns owned by their parents or relatives.[30,31] Second, the adopted restrictions on minimum purchase age did not affect the handgun sales practices re-

quired of licensed firearm dealers. Since 1968, federal law has prohibited licensed dealers from selling handguns to individuals younger than 21 years. In addition, there is little evidence that laws governing sales by those who are not dealers are vigorously enforced in most states[32] (Frattaroli S, unpublished doctoral dissertation, 1999; on file with the authors).

Thus, it is important to recognize that our study is not a test of the relationship between firearm availability and risk of suicide among youth. Our results for minimum purchase-age and possession-age laws suggest that these laws have not substantially reduced the availability of firearms to youth at risk for suicide. Therefore, our results are not necessarily inconsistent with prior research, such as findings from Wintemute et al[33] that adult handgun purchasers were at higher risk for suicide, even 6 years after purchase. If a youth's risk of suicide were greatest several years after he or she had acquired a firearm, we may have underestimated the full effect of these laws. But when we limited the analysis to state laws enacted through 1995—providing at least 6 years of follow-up data for the remaining 45 states—we still identified no significant effects for these laws.

As with prior studies of CAP laws, we were unable to directly measure whether these laws resulted in actual changes in firearm storage practices. Nevertheless, our weapon-specific estimates of the effects of CAP laws suggest that these laws did limit the access that youth have to firearms.

This study does not examine the full range of potential effects of CAP laws. Lott and Whitley[11] report that CAP laws were associated with increases in rapes (9%) and robberies (10%), presumably because firearms kept in locked storage are potentially less available for self-defense. Their findings are questionable because the vast majority of these crimes take place outside the home[34] and firearms are very rarely used for self-defense.[35]

Our study also does not consider the potential role that laws restricting the

access of youth to firearms might have in reducing unintentional shootings or homicides. Two prior studies of the association between CAP laws and deaths among children younger than 15 years from unintentional shootings, with similar methods but over different time periods, produced similar estimates of aggregate effect (−23% and −17%).[10,36] However, one of these studies[36] found that the aggregate benefits were largely driven by a single state law (Florida). Marvel[9] found no evidence that laws prohibiting possession of firearms by juveniles were associated with youth being killed by guns or with their use of guns to commit homicide.

The reductions in suicides associated with CAP laws are relatively modest in terms of percentage change. However, because the laws target an important risk factor, a high-risk group, and a leading cause of death, the public health significance of the laws is meaningful. Assuming that the observed association is causal, we estimate that the 18 CAP laws implemented prior to 2002 have prevented 333 suicides among youth aged 14 to 17 years from the time that Florida implemented the nation's first CAP law (October 1989) through 2001. In 2001 alone, we estimate that there were 35 fewer suicides among this group in the 18 states with CAP laws than would have been expected without the laws. These benefits have been obtained with very modest levels of publicity and enforcement. Increased efforts to encourage compliance with CAP laws have the potential to enhance their effectiveness in preventing deaths and injuries resulting from unsupervised access of youth to firearms.

Further research is needed to ascertain what factors have contributed to the recent decline in firearm suicides among youth in the United States. The timing of the decline is coincident with the adoption of several laws designed to reduce youth access to firearms, yet the only evidence we found that these laws are responsible for reductions in suicides among youth was a modest reduction associated with CAP laws. The

©2004 American Medical Association. All rights reserved.

**Exhibit 7**
**0083**

passage of many youth-focused firearm restrictions during the early 1990s may have been associated with broader changes in those social norms that involve allowing youth access to firearms—norms that affect states both with and without recent changes to their firearm laws. If the passage of laws restricting youth access to firearms influenced norms and practices both within and outside the states that adopted the laws, our estimates would understate the effect of these laws on suicide rates among youth.

**Author Contributions:** Dr Webster, as principal investigator of this study, had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analyses.

*Study concept and design; drafting of the manuscript; obtained funding:* Webster, Vernick.

*Acquisition of data; critical revision of the manuscript for important intellectual content; administrative, technical, or material support:* Vernick, Manganello, Zeoli.

*Analysis and interpretation of data:* Webster, Vernick, Manganello, Zeoli.

*Statistical analysis; study supervision:* Webster.

**Funding/Support:** This study was funded by grant R49/CCR318627-04 from the Centers for Disease Control and Prevention, National Center for Injury Prevention and Control to the Johns Hopkins Center for the Prevention of Youth Violence.

**Role of the Sponsor:** The Centers for Disease Control and Prevention had no role in the design and conduct of the study; in the collection, analysis, or interpretation of the data; in the preparation of the data; or in the preparation, review, or approval of the manuscript.

**Acknowledgment:** We thank Lisa Hepburn and Sara Markowitz for assistance in obtaining the data for this study, Maria Bulzacchelli for assistance with data management, and Elizabeth Johnson for statistical advice.

## REFERENCES

1. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics and Query Reporting System. Available at: http://www.cdc.gov/ncipc/wisqars. Accessed December 17, 2003.

2. Shenassa ED, Catlin SN, Buka SL. Lethality of firearms relative to other suicide methods: a population based study. *J Epidemiol Community Health.* 2003; 57:120-124.

3. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide: a community case-control study. *AJDC.* 1993;147:1066-1071.

4. Brent DA, Perper J, Moritz G, et al. Suicide in adolescents with no apparent psychopathology. *J Am Acad Child Adolesc Psychiatry.* 1993;32:494-500.

5. Kellermann AL, Rivara FP, Rushforth NB, et al. Suicide in the home in relationship to gun ownership. *N Engl J Med.* 1992;327:467-472.

6. Brent DA, Perper JA, Allman CJ, et al. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *JAMA.* 1991; 266:2989-2995.

7. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. *Arch Gen Psychiatry.* 1988;45:581-588.

8. Miller M, Azrael D, Hemenway D. Household firearm ownership and suicide in the United States. *Epidemiology.* 2002;13:517-524.

9. Marvel TB. The impact of banning juvenile gun possession. *J Law Econ.* 2001;44:691-713.

10. Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *JAMA.* 1997;278:1084-1086.

11. Lott JR Jr, Whitley JE. Safe storage gun laws: accidental deaths, suicides, and crime. *J Law Econ.* 2001; 44:6596-6689.

12. Greene WH. *Econometric Analyses.* 5th ed. Upper Saddle River, NJ: Prentice Hall; 2003:768-771.

13. World Health Organization (WHO). *Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death.* Geneva, Switzerland: WHO; 1977.

14. World Health Organization (WHO). *International Statistical Classification of Diseases and Related Health Problems.* Geneva, Switzerland: WHO; 1992.

15. Bureau of Alcohol, Tobacco and Firearms. *State Laws and Published Ordinances—Firearms.* Washington, DC: US Dept of the Treasury; 1988, 1994, 1998, 2000.

16. Lawless JE. Negative binomial and mixed Poisson regression. *Can J Stat.* 1987;15:209-225.

17. Liang KY, Zeger SL. Longitudinal data analysis using generalized linear models. *Biometrika.* 1986;73: 13-22.

18. Bertrand M, Duflo E, Mullainathan S. How much should we trust differences-in-differences estimates? *Q J Econ.* 2004;249-275.

19. Williams DA. Generalized linear model diagnostics using the deviance and single case deletions. *Appl Stat.* 1987;36:181-191.

20. Akaike H. A new look at the statistical model identification. *IEEE Trans Automatic Control.* 1974;19: 716-723.

21. US Census Bureau. Intercensal Estimates of the Resident Populations of States 1970 to 1980. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/pre1980/e7080sta.txt. Accessed October 1, 2003.

22. US Census Bureau. Historical Annual Time Series of State Population Estimates and Demographic Components of Change 1980 to 1990, by Single Year of Age and Sex. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/state/st_stig.php. Accessed October 1, 2003.

23. US Census Bureau. Population Estimates: 1990 to 1999 Annual Time Series of State Population Estimates, by Single Year of Age and Sex. US Dept of Commerce, 2002. Available at: http://eire.census.gov/popest/archives/state/st-99-10.php. Accessed October 1, 2003.

24. US Census Bureau. *Statistical Abstract of the United States.* Washington, DC: US Dept of Commerce; 1977-2002.

25. Nephew TM, Williams GD, Yi H, Hoy AK, Stinson FS, Dufour MC. *Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends, 1977-2000.* Bethesda, Md: National Institute on Alcohol Abuse and Alcoholism, Division of Biometry and Epidemiology, Alcohol Epidemiologic Data System; August 2003.

26. Markowitz S, Chatterji P, Kaestner R. Estimating the impact of alcohol policies on youth suicides. *J Ment Health Policy Econ.* 2003;6:37-46.

27. Bureau of Economic Analysis. *State Personal Income, 1929-2002* [database on CD-ROM]. Washington, DC: US Dept of Commerce; 2004.

28. Bureau of Labor Statistics. Historical data from the Current Population Survey. Washington, DC: US Department of Labor, 2003. Available at: http://www.bls.gov/lau/staadoc.htm. Accessed June 29, 2004.

29. Jones DE, Doty S, Horsch JE, et al. *Religious Congregations and Membership in the United States, 2000: An Enumeration by Region, State, and County Based on Data Reported by 149 Religious Bodies.* Nashville, Tenn: Glenmary Research Center; 2002.

30. Shah S, Hoffman RE, Wake L, Marine WM. Adolescent suicide and household access to firearms in Colorado: results of a case-control study. *J Adolesc Health.* 2000;26:157-163.

31. Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents: the source of the firearm. *Arch Pediatr Adolesc Med.* 1999;153:875-878.

32. Vernick JS, Hepburn LM. State and federal gun laws: trends for 1970-99. In: Ludwig J, Cook PJ, eds. *Evaluating Gun Policy.* Washington, DC: Brookings Institution Press; 2003.

33. Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. *N Engl J Med.* 1999;341:1583-1589.

34. Bureau of Justice Statistics. *Criminal Victimization in the United States, 2002: Statistical Tables.* Washington, DC: US Department of Justice; December 2003. Bureau of Justice Statistics Special Report NCJ 200561.

35. Perkins C. *Weapon Use and Violent Crime: National Crime Victimization Survey 1993-2001.* Washington, DC: US Dept of Justice; September 2003. Bureau of Justice Statistics Special Report NCJ 194820.

36. Waxweiler DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional firearm deaths of children. *Pediatrics.* 2000;106:1466-1469.

©2004 American Medical Association. All rights reserved.

Exhibit 7
0084

dividuals already infected with HIV should thus continue vigilant personal protection through safe-sex practices or clean needle use for injection drugs, even if their risk exposures are with other HIV-infected people.

Davey M. Smith, MD
d13smith@ucsd.edu
Department of Medicine
University of California, San Diego
La Jolla

Joseph K. Wong, MD
George K. Hightower, BA
Caroline C. Ignacio, BS
Kersten K. Koelsch, MD
Department of Medicine
University of California, San Diego

Eric S. Daar, MD
Division of HIV Medicine, Harbor-UCLA Research and Education
Institute and the David Geffen School of Medicine at UCLA
Los Angeles, Calif

Douglas D. Richman, MD
Departments of Medicine and Pathology
University of California, San Diego
San Diego Veterans Affairs Healthcare Systems

Susan J. Little, MD
Department of Medicine
University of California, San Diego

Access to Data: Dr Smith had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analyses.
Funding/Support: This work was supported by National Institutes of Health grants 5K23AI055276, AI27670, AI38858, AI43638, AI43752, UCSD Centers for AIDS Research (AI36214), AI29164, and M01-RR00425, and the Research Center for AIDS and HIV Infection of the San Diego Veterans Affairs Healthcare System.

Role of the Sponsors: The organizations funding this study had no role in the design and conduct of the study; the collection, analysis, and interpretation of the data; or the preparation, review, or approval of the manuscript.

1. Allen T, Altfeld M. HIV superinfection. J Allergy Clin Immunol. 2003;112:829-835.
2. Koelsch KK, Smith DM, Little SJ, et al. Clade B HIV-1 superinfection with wild-type virus after infection with drug resistant clade B virus. AIDS. 2003;17:F11-F16.
3. Smith DM, Wong JK, Hightower GK, et al. The clinical consequences of HIV superinfection. Presented at: XV International AIDS Conference; July 11-16, 2004; Bangkok, Thailand.
4. Gonzales MJ, Delwart E, Rhee SY, et al. Lack of detectable human immunodeficiency virus type 1 superinfection during 1072 person-years of observation. J Infect Dis. 2003;188:397-405.
5. Watanabe ME. Skeptical scientists skewer VaxGen statistics. Nat Med. 2003; 9:376.
6. Lyles RH, Munoz A, Yamashita TE, et al. Multicenter AIDS Cohort Study. Natural history of human immunodeficiency virus type 1 viremia after seroconversion and proximal to AIDS in a large cohort of homosexual men. J Infect Dis. 2000; 181:872-880.

# CORRECTIONS

**Incorrect Dosages:** In the Original Contribution entitled "Safety and Efficacy of Enoxaparin vs Unfractionated Heparin in Patients With Non–ST-Segment Elevation Acute Coronary Syndromes Who Receive Tirofiban and Aspirin: A Randomized Controlled Trial" published in the July 7, 2004, issue of JAMA (2004;292:55-64), there were 2 incorrect dosages on page 56. At the bottom of column 2, the sentence should read, "The dosing regimen for tirofiban in the A to Z trial was a hybrid between the previously proven ACS and percutaneous coronary intervention dosing regimens: a bolus of 10 µg/kg over 3 minutes, followed by a maintenance infusion of 0.1 µg/kg per minute for a suggested minimum of 48 hours (or a minimum of 12 hours after intervention) and a maximum of 120 hours.[9,13]"

**Funding Source Omitted:** In the Original Contribution entitled "Association Between Youth-Focused Firearm Laws and Youth Suicides" published in the August 4, 2004, issue of JAMA (2004;292:594-601), a funding source was omitted. In addition to the sources cited, the study also received support from the David and Lucile Packard Foundation.

©2004 American Medical Association. All rights reserved.

Exhibit 7
0085

# EXHIBIT "8"

Exhibit 8
0086

# THE IMPACT OF BANNING JUVENILE GUN POSSESSION

*THOMAS B. MARVELL*
*Justec Research*

### ABSTRACT

A 1994 federal law bans possession of handguns by persons under 18 years of age. Also in 1994, 11 states passed their own juvenile gun possession bans. Eighteen states had previously passed bans, 15 of them between 1975 and 1993. These laws were intended to reduce homicides, but arguments can be made that they have no effect on or that they even increase the homicide rate. This paper estimates the laws' impacts on various crime measures, primarily juvenile gun homicide victimizations and suicide, using a fixed-effects research design with state-level data for at least 19 years. The analysis compares impacts on gun versus nongun homicides and gun versus nongun suicides. Even with many different crime measures and regression specifications, there is scant evidence that the laws have the intended effect of reducing gun homicides.

## I. INTRODUCTION

Guns are the second leading cause of death in the United States among youths ages 10–24, and the firearm death rate for U.S. minors is 12 times the average for other industrialized countries.[1] Gun murders of and by juveniles roughly doubled between 1985 and 1992, while the number of nongun murders remained stable.[2] Consequently, governments have attempted to get guns out of the hands of juveniles. The federal government and probably all states have long prohibited gun sales to minors.[3] Later laws, the subject of this study, go further and prohibit possession of guns by juveniles (aimed at, presumably, guns that were originally purchased by adults). States passed such laws with increasing frequency in the 1980s and early 1990s, and Title XI of the Federal Crime Control and Law Enforcement Act of 1994 made the ban effective nationwide on September 13, 1994.

Table 1 lists 34 state laws that ban juvenile gun possession, along with their effective dates (the laws only apply to violations on or after the

---

[1] Susan DeFrancesco, Children and Guns, 29 Pace L. Rev. 275 (1999).

[2] James A. Fox & Marianne W. Zawitz, Homicide Trends in the United States (2000).

[3] Jens Ludwig, Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data, 18 Int'l Rev. L. & Econ. 239 (1998).

[*Journal of Law and Economics,* vol. XLIV (October 2001)]
© 2001 by The University of Chicago. All rights reserved. 0022-2186/2001/4402-0015$01.50

**Exhibit 8**
**0087**

TABLE 1

LAWS BANNING JUVENILE HANDGUN POSSESSON

| | Under Age of | Brief Citation | Effective Date |
|---|---|---|---|
| Federal | 18 | 18-922(x) | September 13, 1994 |
| Alaska[a] | 16 | 11.61.220 | January 1, 1980 |
| Arizona[a,b] | 18 | 13-3111 | July 18, 1993 |
| Arkansas[a,b] | 18 | 5-73-119 | July 4, 1989 |
| California[a] | 18 | Penal 12101 | January 1, 1989 |
| Colorado[a] | 18 | 18-12-108.5 | September 13, 1993 |
| Delaware | 18 | 11-1448 | July 15, 1994 |
| Florida | 18 | 790.22 | January 1, 1994 |
| Georgia[b] | 18 | 16-11-132 | July 1, 1994 |
| Idaho[b] | 18 | 18-3302F | July 1, 1994 |
| Illinois | 18 | 720-5/24-3 | pre-1970 |
| Indiana | 18 | 35-47-10-5 | July 1, 1994 |
| Kansas[b] | 18 | 21-4204a | July 1, 1994 |
| Kentucky[b] | 18 | 527.100 | July 15, 1994 |
| Michigan[a] | 18 | 750.234f | March 28, 1991 |
| Minnesota[a] | 18 | 624.713 | August 1, 1975 |
| Mississippi[b] | 18 | 97-37-14 | July 1, 1994 |
| Nebraska[a] | 18 | 28-1204 | July 1, 1978 |
| Nevada[b,c] | 18 | 202.300 | July 1, 1995 |
| New Jersey[a] | 18 | 2C:58-6.1 | June 27, 1980 |
| New York[a] | 16 | 265.05 | September 1, 1974 |
| North Carolina[a,b] | 18 | 14-269.7 | September 1, 1993 |
| North Dakota[a,b] | 18 | 62.1-02-01 | July 1, 1985 |
| Oklahoma[a,b] | 18 | 21-1273 | June 7, 1993 |
| Oregon[a] | 18 | 166.250 | January 1, 1990 |
| Rhode Island[b] | 15 | 11-47-33 | pre-1970 |
| South Carolina[b] | 21 | 16-23-30 | pre-1970 |
| South Dakota[b] | 18 | 23-7-44 | July 1, 1994 |
| Tennessee | 18 | 39-17-1319 | July 1, 1994 |
| Utah[a] | 18 | 76-10-509 | October 21, 1993 |
| Vermont[b] | 16 | 13-4008 | pre-1970 |
| Virginia[a] | 18 | 18.2-308.7 | July 1, 1993 |
| Washington[b] | 21 | 9.41.040 | July 1, 1994 |
| West Virginia[a,b] | 18 | 61-7-8 | July 9, 1989 |
| Wisconsin | 18 | 948.60 | pre-1970 |

NOTE.—Sixteen states do not have bans. Ten are Brady Act states (Alabama, Louisiana, Maine, Montana, New Hampshire, New Mexico, Ohio, Pennsylvania, Texas, and Wyoming), and six are non–Brady Act states (Connecticut, Hawaii, Iowa, Maryland, Massachusetts, and Missouri).

[a] States with laws effective 1974–93.

[b] Brady Act states. (Federal waiting periods and background checks apply in 1994 because these states did not have preexisting laws.)

[c] A pre-1970 Nevada law applied to persons under 14.

effective dates). This information was obtained through research into state statutory compilations and session laws, and it was checked against two other surveys.[4]

[4] Gwen A. Holden, *et al.*, Compilation of State Firearm Codes that Affect Juveniles (1994); Bureau of Alcohol, Tobacco and Firearms, Firearms State Laws and Published Ordinances (20th ed. 1994) (hereafter referred to as ATF).

**Exhibit 8**
**0088**

   The federal law, as well as the typical state law, makes it a misdemeanor for a person under 18 (21 in two states) to possess a handgun, with several exceptions, such as hunting or target shooting with the permission of a parent. Many state laws also ban possession of rifles and other deadly weapons by juveniles. As of 1994, five state bans applied only to persons younger than 15 or 16 (Table 1). These are not counted as juvenile gun ban laws for the purpose of this study because children that young seldom commit homicide.[5] Among the states that did not enact juvenile gun possession bans, Massachusetts and New York have strict general gun possession laws,[6] and lawmakers there might have believed that special laws for juveniles were unnecessary. The federal law also makes it illegal for a person to provide a minor with a handgun. Most states have similar laws, some enacted with the possession ban and some before the ban.

   The issue addressed in this article is whether the juvenile gun possession bans have the effect of reducing gun homicides, especially of juveniles. The assumption behind the laws is that the bans reduce the number of juveniles who have guns and, thus, the number who use guns.[7] The impact on crime might be limited because existing laws prohibited juveniles from purchasing guns, carrying concealed handguns, and possessing guns if they have been convicted of a felony.[8] Thus, the question is whether crime rates are affected by a change from a situation where juveniles can possess guns, but cannot legally purchase or conceal them, to a situation where they can possess guns only with adult monitoring. Perhaps the major practical impact is creating disincentives to keeping guns at home. The laws might add an additional incentive for juveniles not to carry concealed weapons or purchase weapons since it adds a second charge when prosecuted, a charge that can be prosecuted in federal court.

   An initial consideration is whether the bans increase the expected cost to juveniles for possessing guns, which largely determines whether the ban can have any effect.[9] The costs include confiscation of the weapon, informal sanctions applied by such persons as relatives, juvenile officers, and prose-

   [5] See Terry Allen & Glen Buckner, A Graphical Approach to Analyzing Relationships between Offenders and Victims Using *Supplementary Homicide Reports,* 1 Homicide Stud. 129 (1997); and Michael D. Maltz, Visualizing Homicide: A Research Note, 14 J. Quantitative Criminology 397 (1998).

   [6] ATF, *supra* note 4.

   [7] There apparently is no statement that this is the actual intent of juvenile gun bans. The legislative history of the federal ban consists of justifications for federal action under the Commerce Clause of the U.S. Constitution; that is, guns and drug markets are interrelated and cross state lines. See Steven Rosenberg, Just Another Kid with a Gun? *United States v. Michael R.*: Reviewing the Youth Handgun Safety Act under the *United States v. Lopez* Commerce Clause Analysis, 28 Golden Gate Univ. L. Rev. 51 (1998).

   [8] ATF, *supra* note 4.

   [9] See Philip J. Cook & James A. Leitzel, "Perversity, Futility, Jeopardy": An Economic Analysis of the Attack on Gun Control, 59 Law & Contemp. Probs. 91 (1996).

**Exhibit 8**
**0089**

cutors, and conviction and sentencing by courts. These costs are more likely to occur with greater efforts to uncover and report juveniles' gun possession. Information on all these topics is lacking, so it is impossible at this point to hypothesize whether the laws have much impact.

Assuming that possession actually entails a cost, there are many mechanisms by which the bans might affect the actual use of guns and, thus, crime rates. The most obvious is that juveniles who do not possess guns are less likely to carry guns and thus less likely to use them during crimes or altercations. If they do not possess guns, juveniles are less likely to retrieve them in the middle of a dispute or to use them later in retaliation. The bans can disrupt gun markets among juveniles because the law increases the costs of carrying gun inventories.

On the other hand, the gun bans might increase crime against young persons because criminals might consider them less risky targets.[10] A criminal contemplating robbery or assault probably takes into consideration the likelihood that potential victims are armed and likely to defend themselves. If the potential victim appears to be under 18 years old, after a ban goes into effect, an aggressor might believe that armed resistance is less likely because of the juvenile gun possession ban. As discussed earlier, the possession bans do not make it any more illegal to carry a concealed handgun, but, again, the juvenile is less likely to have a handgun available if possession is less likely. The ban also can make aggression more likely because the aggressor is less concerned that the victim will retaliate by retrieving a gun.

An additional indicator of the impact of the juvenile gun possession bans is whether they reduce gun suicide by juveniles. There is a close relationship over time between the percentages of juvenile suicides and homicides by gun.[11] One would expect that the choice of whether to use a gun in suicide depends largely on whether a gun is readily available. Although possession is only one of several factors suggesting availability, if the laws reduce possession, they should reduce gun suicides.

Preliminary indications of the likely impact can be seen in trends for gun homicide victimization for persons 15–19 years old, which is a group likely to be affected by the ban if it has an impact. Figure 1 plots the trends for the percentage of homicide victims who were killed by guns (since the number of nongun homicides changed little over time, the lines in Figure 1 also approximate trends in the number of gun homicides). This percentage rose from about 65 percent in the first half of the 1980s to 86 percent in 1992, leveled off for 2 years, and then declined modestly. The leveling off occurred when more and more states were enacting juvenile gun possession

[10] For example, John R. Lott, Jr., & David B. Mustard, Crime, Deterrence, and Right-to-Carry Concealed Handguns, 26 J. Legal Stud. 1 (1997).

[11] Alfred Blumstein & Daniel Cork, Linking Gun Availability to Youth Gun Violence, 59 Law & Contemp. Probs. 5 (1996).

Exhibit 8
0090



FIGURE 1.—Percent of homicides with guns

bans, and the decline occurred right after the substantial lawmaking activity in 1994, when most states first became covered by the ban (Table 1). At first glance, the trends suggest that the laws have the desired effect of reducing gun homicides. However, this impression disappears when one looks at trends in adult crimes; the post-1994 drop in percentage of homicides with guns occurred here as well. The initial impression from Figure 1 that the laws reduce gun homicide is probably only a reflection of general trends in homicides.[12]

The purpose of this paper is to explore this relationship with more elaborate data and analysis than are illustrated in Figure 1. The next section describes the methodology, which is a state-level multiple time-series regression that

---

[12] Commentators have given many reasons for the decline in murder and other crimes in the 1990s. I argue that it is due to the incapacitating impact of rising prison populations and the slackening of the crack era. Thomas B. Marvell & Carlisle E. Moody, The Impact of Out-of-State Prison Population on State Homicide Rates: Displacement and Free-Rider Effects, 36 Criminology 513 (1998); Thomas B. Marvell & Carlisle E. Moody, Female and Male Homicide Victimization Rates: Comparing Trends and Regressors, 37 Criminology 879 (1999). Other suggested causes include the legalization of abortion in the 1970s (John J. Donohue III & Steven D. Levitt, The Impact of Legalized Abortion on Crime, 116 Q. J. Econ. 379 (2001)) and better police practices (Malcolm Gladwell, The Tipping Point: How Little Things Can Make a Big Difference (2000)).

Exhibit 8
0091

compares the impacts of the laws on different homicide categories. The third section describes the variables, and the fourth gives the results, which are that there is no evidence that the juvenile gun possession bans, taken as a whole, reduce gun homicides or total homicides.

## II.   Methodology

The multiple time-series regression has become a common tool to estimate the impact of legal changes, and the methods are continually improving.[13] The regressions here encompass 45–50 states and 18–29 years, depending on the dependent variable, using the standard fixed-effects procedure. The regressions are weighted by population when the dependent variable is homicide and by lesser amounts (varying from population to the .3 power to population to the .7 power) for other crimes as determined by the Bruesch-Pagan test.[14] Weighting is necessary because crime rates vary over time more in small states, and weights are greater in homicide equations because homicides are less frequent events; so the discrepancy between variation in small and large states is especially large. The data start in 1970 because several control variables lack data for earlier years. The last year with available data is 1998 or 1999, depending on the series. The analysis, therefore, includes at least 4 full years of experience under each law. The main dependent variables are homicide victimizations for various age groups, and I use a sizeable number of other crime measures for robustness checks. The gun possession bans are represented by dummy variables.

The basic procedure is strengthened by comparing the estimated impacts of the laws on crimes that one would expect to be affected the most by the laws to the impacts on crimes less likely to be affected. The analysis, for example, compares the coefficients on the law dummies when gun homicides are the dependent variable with coefficients with nongun homicides. This helps control for missing variables that are not otherwise controlled for by the elaborate control mechanism possible with the multiple time-series design, as discussed below. The comparison is done with the STEST option in the SYSLIN procedure in SAS,[15] which tests whether differences between co-

---

[13] For example, Lott & Mustard, *supra* note 10; Thomas B. Marvell & Carlisle E. Moody, Determinate Sentencing and Abolishing Parole: The Long-Term Impacts on Prisons and Crime, 34 Criminology 107 (1996).

[14] William H. Greene, Econometric Analysis 394–95 (2d ed. 1993).

[15] SAS Institute, SAS/ETS User's Guide, Version 6 (2d ed. 1993). Using the multiple time-series procedure with dummy variables to evaluate the impact of laws or other impacts is the same as the difference-on-difference procedure (Jeffrey M. Wooldridge, Introductory Economics: A Modern Approach (2000)), but it has the benefit that one can set dummies at the effective date of each law that went into effect during the period when data are available, as opposed to setting a uniform date for all laws. Also, using an *F*-test to compare coefficients is an improvement on the difference-on-difference-on-difference procedure, whereby the impact of the law change on a crime type that is expected to be affected by the law is compared with the impact on a crime having no expected impact (for example, Ludwig, *supra* note 3). The

**Exhibit 8**
**0092**

efficients on an independent variable used in separate regressions are statistically significant.

## III.   DEPENDENT VARIABLES[16]

Most dependent variables are gun homicide victimization rates for various age groups and homicide offending rates by juveniles. When juveniles commit homicide, the victims are overwhelmingly persons of the same age or slightly older,[17] so measures of gun homicide victimization are for persons in their late teens and early twenties. Alternate specifications use measures of juvenile homicide offending and general crime rate variables. All crimes are expressed as rates, divided by 100,000 persons in the age group in question. The numerous variables are best described in outline form.

### A.   Victimization (Homicide and Suicide)

1. The primary victimization data are from the Centers for Disease Control and Prevention Internet site, where state-level mortality data are available for 1979–98. In addition, earlier total homicide and gun homicide data were obtained from published mortality tables.[18] The four types of data, and the years available, are the following:
   a. Gun and nongun homicide victims, ages 15–19 (1979–98).
   b. Gun and nongun homicide victims, ages 15–24 (1979–98).
   c. Gun and nongun homicide victims of all ages (1968–98).
   d. Gun and nongun suicide victims, ages 15-19 (1979–98).

2. Additional juvenile victimization data, compiled by James A. Fox in January 2001, were obtained from the Bureau of Justice Statistics (BJS) Internet site. Data are not used for five states for which observations are missing for more than 2 years (Florida, Iowa, Kansas, Maine, and Montana):
   a. Homicide victims, ages 14–17 (1976–99).
   b. Homicide victims, ages 14–24 (1976–99).

---

separate regressions mean that the two types of crime are allowed to have their own coefficients on the control variables, and again we need not set law dummies at the same year.

[16] The data set and basic programs used here are available from the author at marvell@cox.net or at http://www.mmarvell.com/justec.html.

[17] Allen & Buckner, supra note 5; Maltz, supra note 5.

[18] Data are from National Center for Health Statistics, Vital Statistics of the United States 1978 (1982), and earlier versions. All the homicide data exclude legal homicides (executions and police killings).

**Exhibit 8**
**0093**

### B. Offending and Reported Crime

Homicide arrests for the following two categories were also prepared by James A. Fox and placed on the BJS Internet site:

1.  Homicide offending ages 14–17 (1976–99).
2.  Homicide offending ages 14–24 (1976–99).

Finally, we use the seven Uniform Crime Report (UCR) categories (homicide, rape, robbery, assault, burglary, larceny, and auto theft) with data from 1968–99.

### C. Issues Pertaining to Homicide and Suicide Data

Small states often have no juvenile homicides in any given year. Because this theoretically creates problems with regression analysis, I have dropped states from a given analysis if the dependent variable is zero for more than 2 years. The states that were dropped, which number up to 16, are listed in the tables along with the regression results. In the parallel SYSLIN regressions, the state is dropped when data are missing for either dependent variable. For the remaining zero values (that is, one or two such zeros in a state), the number of homicides is set at .1 before logging (or for the Fox data sets, the homicide rate is set at .1). Coefficients on aggregate law variables change little when all states are included (because the regressions are weighted by population), but coefficients for individual state law dummies are erratic in states with many zero homicide years.

The juvenile homicide offending rates, because they are based on arrests, are probably overstated in relation to victimization rates and offending rates for older age groups because juveniles are less likely to escape arrest.[19]

We have no measure of gun homicides committed by juveniles, although that is the immediate target of the law, because data at the state level are very incomplete and erratic. As a practical matter, however, the measure of total juvenile homicide offending serves nearly the same purpose because the variation in homicide rates is largely due to variations in gun homicide rates.[20] Also, for policy purposes, victimization is more important than offending because the overriding purpose of the laws is to reduce harm, and any impact on offending is simply the means to achieve that purpose.

---

[19] Howard N. Snyder, The Overrepresentation of Juvenile Crime Proportions in Robbery Clearance Statistics, 15 J. Quantitative Criminology 151 (1999); Thomas B. Marvell & Carlisle E. Moody, Age Structure and Crime Rates: The Conflicting Evidence, 7 J. Quantitative Criminology 237 (1991).

[20] Fox & Zawitz, *supra* note 2.

**Exhibit 8**
**0094**

## IV.   INDEPENDENT VARIABLES

### A.   Juvenile Gun Bans

The key independent variables, of course, are those representing laws that ban juvenile gun possession, as listed in Table 1. After the year the law went into effect, the law variable is one. During that year, it is a decimal representing the portion of the year the law was in effect. The states are divided into three groups (Table 1): (1) 15 states that passed laws in 1975–93, (2) 11 states that passed laws in 1994, and (3) 21 states without laws by 1994 (the remaining three states had laws before 1970).[21] Again, laws banning possession only for those under 15 or 16 are ignored. In the second group, the state laws went into effect only a few months before the federal law, so that dummy variables cannot separate their impact from that of the federal law. The main difference between the second and third groups is that the latter is affected only by the federal law, typically enforced only in the federal courts, whereas in the second group enforcement is possible in both state and federal courts. These 11 states received a double dose of law, although largely redundant (state authorities can enforce the federal law, and it is unlikely that federal prosecutors indict many juveniles for gun possession).

Homicides in the second and third groups of states, where dummy variables begin in 1994, are also subject to the changes made by other federal laws that year. The most important are waiting periods and background checks for firearm purchases, required under the Brady Act, beginning February 28, 1994. The act is applicable to the majority of states that did not already require waiting periods.[22] These states are indicated in Table 1, and dummies representing the Brady Act for these states are included in later regressions. Also, the Crime Control and Law Enforcement Act of 1994 contains several major crime-reduction programs such as truth in sentencing, enhanced penalties for drug offenses and using firearms in crimes, and funds for hiring new police and advancing community policing. These nationwide events are controlled for by entering year effects and by comparing gun and nongun crime regressions.

### B.   Other Independent Variables

Additional independent variables are those typically used in other state-level studies of crime.[23] These studies explain the theoretical importance of

---

[21] The fact that most law dummies are for the same year suggests that clustering effects might bias the $t$-ratios. To test for these, I used the ACOV option in SAS PROC REG, with the TEST statement for the law dummies. The resulting significance levels for the law dummies are very close to those for the original $t$-ratios.

[22] ATF, *supra* note 4.

[23] See Thomas B. Marvell & Carlisle E. Moody, The Lethal Effects of Three-Strikes Laws, 30 J. Legal Stud. 89 (2001).

**Exhibit 8**
**0095**

the variables and describe the sources of data. Age structure variables are census data for the percent population of persons ages 15–17, 18–24, 25–29, and 30–34, the ages with highest arrest rates. Economic variables are the unemployment rate, the number employed, real welfare payments, real personal income, and the poverty rate. Economic downturns might increase violent crime by increasing strain or might reduce it by reducing interaction among potential aggressors and victims. Prison population is the number of prisoners sentenced to more than 1 year, and it is the average of the current and prior year-end figures. All these variables are per capita and logged.

In addition, I make full use of the unique ability of the multiple time-series design to control for missing variables—variables that are not known or that lack adequate data. State dummies control for such factors that cause crime rates to differ generally from one state to another. Year dummies control for missing variables that cause crime rates to rise or fall nationwide in a year. Separate linear trend variables for each state control for factors that cause trends in the state to differ from nationwide trends. Without them, coefficients on the law dummies are likely to be dominated by such trend differences, as opposed to any changes that took place at the time the law went into effect. Finally, lagged dependent variables reduce autocorrelation and further mitigate missing-variable bias. Two lags are entered when the dependent variables are UCR crimes and total gun and nongun victimization because data start before 1970. The remaining regressions have one lagged dependent variable and lose 1 year of data.

## V.   Results

The most important regressions are in Tables 2, 3, and 4, where dependent variables are homicide victimization rates for persons 15–19 years old, persons 15–24 years old, and all persons, respectively. For each table, there are two regressions, one with gun and one with nongun homicides. The coefficients for the early state laws are very small and not significant throughout except for the negative estimate for nongun total homicides (Table 4). On the one hand, the coefficients on the 1994 state law dummies are positive in the three gun homicide regressions, but only significant to the .10 level. On the other hand, the elasticities of up to .17 are fairly sizeable, and their decline as the age bracket expands is consistent with the suggestion that the 1994 state laws increase juvenile homicide. The 1994 state law dummy has no noticeable impact on nongun homicides. Finally, all coefficients on the "federal law only" dummies are negative, but significant to the .05 level only for gun homicides of all ages (Table 4), which is due solely to New York, a topic discussed later. As might be expected, in a separate analysis in which the 1994 state law variable and the federal law variable are combined into one variable, it is everywhere far from significant. The same result also occurs when the three law variables are combined into a single variable.

Exhibit 8
0096

TABLE 2

HOMICIDE VICTIMIZATIONS OF PERSONS AGES 15–19, REGRESSED
ON JUVENILE GUN BAN LAWS

| | GUN HOMICIDE | | NONGUN HOMICIDE | |
|---|---|---|---|---|
| | Coefficient | t | Coefficient | t |
| Early state laws | .000 | .008 | −.135 | 1.175 |
| 1994 state laws | .172 | 1.787 | −.010 | .068 |
| Federal law only | −.045 | .582 | −.181 | 1.501 |
| Ages 15–17 | −.447 | .721 | .195 | .203 |
| Ages 18–24 | 2.181 | 3.473 | −.291 | .300 |
| Ages 25–29 | .882 | 1.511 | −.775 | .862 |
| Ages 30–34 | 1.293 | 1.409 | −2.185 | 1.535 |
| Unemployment rate | −.102 | .844 | .265 | 1.413 |
| Employment | −1.222 | 1.068 | 1.816 | 1.022 |
| Welfare | .193 | 1.010 | −.302 | 1.014 |
| Military employment | .478 | 1.977 | .718 | 1.929 |
| Real personal income | 1.672 | 1.711 | −.358 | .237 |
| Poverty rate | −.039 | .374 | .246 | 1.499 |
| Prison population | −.510 | 3.368 | −.192 | .819 |
| Lag dependent variable | .174 | 4.409 | −.134 | 3.213 |
| Degrees of freedom | 597 | | 597 | |
| Adjusted $R^2$ | .90 | | .48 | |
| *F*-statistics: | | | | |
|   For three law types | 1.59 (.19) | | 1.21 (.30) | |
|   For differences between equations: | | | | |
|     Early state laws | | | .98 (.32) | |
|     1994 state laws | | | 1.05 (.31) | |
|     Federal law only | | | .90 (.34) | |
|     All three types | | | .74 (.53) | |

NOTE.—These two regressions encompass 37 states over 19 years, 1980–98 (after losing a year because of the lagged dependent variable). Thirteen small states are not included because they had at least 3 years with zeros for one of the dependent variables (Alaska, Delaware, Hawaii, Idaho, Maine, Montana, Nebraska, New Hampshire, North Dakota, Rhode Island, South Dakota, Vermont, and Wyoming). Not shown are year dummies, state dummies, and individual state linear trend variables. The first three variables listed are dummies representing laws banning juvenile gun possession. Except for dummies and trends, the variables are per capita and logged. The first *F*-statistics are for the significance of the three law types taken as a group. The remaining *F*-statistics are for comparing coefficients on the individual law types, determining whether differences between the two equations and the net effect of the three are statistically significant. Numbers in parentheses are probabilities.

A key feature of these tables is the *F*-test to determine whether differences between each law dummy coefficients in gun and nongun homicide regressions are significant. The laws are designed to reduce gun use, and, if that were the only theory involved, one would not expect to see a reduction in nongun homicides. In fact, the laws might even increase nongun homicides because the reduced availability of guns might lead juveniles to substitute other means of killing. Thus, if the laws have their intended effects, one would expect the coefficients on the law dummies to be significantly lower in the gun homicide regressions. However, if the opposing theory—the one that holds that bans increase juvenile homicides because the victims are more vulnerable—dominates, both gun and nongun homicides should increase. The

Exhibit 8
0097

TABLE 3

HOMICIDE VICTIMIZATIONS OF PERSONS AGES 15–24, REGRESSED
ON JUVENILE GUN BAN LAWS

| | GUN HOMICIDE | | NONGUN HOMICIDE | |
|---|---|---|---|---|
| | Coefficient | t | Coefficient | t |
| Early state laws | −.000 | .007 | .007 | .118 |
| 1994 state laws | .129 | 1.757 | .124 | 1.450 |
| Federal law only | −.079 | 1.324 | −.052 | .748 |
| Ages 15–17 | .195 | .419 | .140 | .259 |
| Ages 18–24 | 1.098 | 2.524 | −.136 | .271 |
| Ages 25–29 | 1.208 | 2.826 | −.101 | .207 |
| Ages 30–34 | .462 | .682 | −1.050 | 1.330 |
| Unemployment rate | .018 | .202 | .135 | 1.295 |
| Employment | −.336 | .388 | −.221 | .219 |
| Welfare | .121 | .831 | .027 | .162 |
| Military employment | .350 | 1.913 | .065 | .310 |
| Real personal income | 1.366 | 1.901 | .811 | .970 |
| Poverty rate | .007 | .089 | .097 | 1.047 |
| Prison population | −.449 | 3.898 | −.200 | 1.497 |
| Lag dependent variable | .211 | 6.005 | −.100 | 2.749 |
| Degrees of freedom | 750 | | 750 | |
| Adjusted $R^2$ | .91 | | .72 | |
| *F*-statistics: | | | | |
| For three law types | 2.44 (.06) | | 1.29 (.28) | |
| For differences between equations: | | | | |
| Early state laws | | | .01 (.92) | |
| 1994 state laws | | | .00 (.96) | |
| Federal law only | | | .09 (.77) | |
| All three types | | | .04 (.99) | |

NOTE.—See note to Table 2. The regressions encompass 46 states over 19 years, 1980–98. Four small states are excluded (New Hampshire, North Dakota, Vermont, and Wyoming).

increase might be greater for nongun homicides, because if the attacker no longer fears the victim has a gun, he or she is less likely to rely on the quickest and most lethal means of attack.

In practice, both hypotheses receive little support. Nowhere in Tables 2–4 is there evidence that the laws cause gun homicides to decline more than nongun homicides. The hypothesis that the laws increase homicides receives only very slight support: the difference for early state laws in Table 4 is significant to the .10 level. With the large number of comparisons and *F*-tests, however, one such result is to be expected by chance. Finally, an important result is that coefficients on the three law variables as a group are not significantly different between the gun and nongun variables (last rows in Tables 2–4).

By aggregating the laws into three groups in Tables 2–4, I am assuming that the coefficients on the dummies are the same for each law in a group. Similar assumptions are common in time-series cross-sectional analyses of legal changes, but they are unrealistic. One would expect that impacts vary

Exhibit 8
0098

TABLE 4

HOMICIDE VICTIMS, ALL AGES, REGRESSED ON JUVENILE GUN BAN LAWS

| | GUN HOMICIDE | | NONGUN HOMICIDE | |
|---|---|---|---|---|
| | Coefficient | $t$ | Coefficient | $t$ |
| Early state laws | −.002 | .080 | −.063 | 2.529 |
| 1994 state laws | .060 | 1.659 | .014 | .400 |
| Federal law only | −.084 | 2.786 | −.048 | 1.670 |
| Ages 15–17 | .158 | .829 | .036 | .196 |
| Ages 18–24 | .186 | 1.029 | .170 | .966 |
| Ages 25–29 | .365 | 2.130 | .282 | 1.719 |
| Ages 30–34 | −.167 | .784 | .249 | 1.197 |
| Unemployment rate | −.069 | 1.794 | .068 | 1.829 |
| Employment | −.151 | .464 | 1.114 | 3.465 |
| Welfare | −.149 | 3.093 | −.175 | 3.744 |
| Military employment | .213 | 3.107 | .260 | 3.897 |
| Real personal income | .408 | 1.774 | −.372 | 1.650 |
| Poverty rate | −.002 | .057 | .076 | 1.838 |
| Prison population | −.172 | 4.456 | −.147 | 3.882 |
| Lag dependent variable | .349 | 12.774 | .106 | 3.919 |
| Second lag dependent variable | .173 | 6.212 | .050 | 1.885 |
| Degrees of freedom | 1,307 | | 1,307 | |
| Adjusted $R^2$ | .95 | | .90 | |
| $F$-statistics: | | | | |
| For three law types | 5.55 (.001) | | 3.25 (.02) | |
| For differences between equations: | | | | |
| Early state laws | | | 2.94 (.09) | |
| 1994 state laws | | | .83 (.36) | |
| Federal law only | | | .72 (.39) | |
| All three types | | | 1.90 (.13) | |

NOTE.—See note to Table 2. The regressions encompass all 50 states for 29 years, 1970–98.

between states because of differences in the precise terms of the laws, enforcement efforts, other contemporaneous changes in criminal law and operations, and preexisting conditions. To address this problem, each law is given a separate dummy variable, which is zero except in the postlaw period in the particular state. Dummies were not entered for three states that had laws before 1970. Because we only have data for juvenile homicides beginning in 1979, regressions with these variables do not include dummies for three early laws. Also, as indicated in Tables 2–4, several small states were deleted because they had more than 2 years with no homicides.

As expected, the coefficients vary greatly (Table 5). The coefficients for New York stand out; they are negative, large, and highly significant because of the extreme decline in homicide rates there since the early 1990s. Most coefficients are positive, however, and a few are large. One cannot attribute these, or any other individual coefficient in Table 5, specifically to the juvenile gun possession bans because the coefficients might be affected by other contemporaneous changes that are not captured by control variables, although the multiple time-series design permits numerous controls. Assuming that

Exhibit 8
0099

TABLE 5

Gun Homicide Victimization Regressed on Individual State Law Dummies

| | Ages 15–19 | | Ages 15–24 | | All Ages | |
|---|---|---|---|---|---|---|
| | Coefficient | t | Coefficient | t | Coefficient | t |
| States passing laws in 1975–93: | | | | | | |
| Arizona | .284 | .942 | .299 | 1.316 | .302 | 2.922 |
| Arkansas | .546 | 1.275 | .203 | .630 | .110 | .805 |
| California | .163 | 1.315 | .135 | 1.451 | .081 | 1.883 |
| Colorado | −.367 | 1.189 | −.065 | .280 | .168 | 1.500 |
| Michigan | −1.002 | 4.504 | −.553 | 3.319 | −.188 | 2.668 |
| Minnesota | . . . | . . . | . . . | . . . | −.293 | 2.965 |
| Nebraska | . . . | . . . | . . . | . . . | −.225 | 1.411 |
| New Jersey | . . . | . . . | . . . | . . . | −.025 | .308 |
| North Carolina | .036 | .145 | .044 | .237 | .101 | 1.274 |
| North Dakota | . . . | . . . | . . . | . . . | −.331 | 1.201 |
| Oklahoma | −.245 | .737 | −.062 | .251 | .079 | .706 |
| Oregon | .752 | 2.129 | −.388 | 1.455 | −.250 | 2.066 |
| Utah | .360 | .838 | .498 | 1.540 | .342 | 2.245 |
| Virginia | −.105 | .424 | .082 | .442 | .162 | 1.972 |
| West Virginia | −.064 | .133 | −.271 | .740 | −.120 | .773 |
| States passing laws in 1994: | | | | | | |
| Delaware | . . . | . . . | .537 | 1.070 | .295 | 1.227 |
| Florida | −.112 | .690 | .047 | .383 | −.011 | .202 |
| Georgia | −.202 | .823 | −.118 | .639 | .108 | 1.303 |
| Idaho | . . . | . . . | .617 | 1.490 | .421 | 2.165 |
| Indiana | .752 | 3.065 | .743 | 3.986 | .261 | 2.994 |
| Kansas | .212 | .596 | .347 | 1.290 | .229 | 1.795 |
| Kentucky | 1.076 | 3.586 | .448 | 1.995 | .248 | 2.365 |
| Mississippi | −.149 | .414 | −.069 | .258 | .021 | .169 |
| South Dakota | . . . | . . . | −.271 | .544 | −.176 | .752 |
| Tennessee | .462 | 1.757 | .217 | 1.096 | .181 | 1.976 |
| Washington | −.282 | 1.020 | −.150 | .723 | .081 | .861 |
| Federal law (states without laws by 1994): | | | | | | |
| Alabama | −.083 | .297 | .033 | .158 | .116 | 1.150 |
| Alaska | . . . | . . . | .675 | 1.230 | .476 | 1.758 |
| Connecticut | −.263 | .827 | −.107 | .446 | −.107 | .928 |
| Hawaii | . . . | . . . | .121 | .306 | .379 | 1.987 |
| Iowa | .630 | 1.855 | .505 | 1.968 | .254 | 2.112 |
| Louisiana | −.282 | 1.010 | −.199 | .945 | .052 | .533 |
| Maine | . . . | . . . | .433 | 1.166 | .015 | .088 |
| Maryland | .290 | 1.076 | .053 | .264 | .148 | 1.576 |
| Massachusetts | .077 | .300 | −.130 | .671 | −.091 | 1.021 |
| Missouri | −.438 | 1.753 | −.249 | 1.324 | −.022 | .244 |
| Montana | .104 | .171 | .360 | .780 | .134 | .612 |
| Nevada | −.219 | .460 | .078 | .219 | .280 | 1.613 |
| New Hampshire | . . . | . . . | . . . | . . . | −.197 | 1.047 |
| New Mexico | .089 | .204 | .236 | .713 | .342 | 2.151 |
| New York | −.468 | 3.078 | −.506 | 4.387 | −.551 | 9.415 |
| Ohio | .119 | .677 | .047 | .356 | .005 | .088 |
| Pennsylvania | .537 | 2.936 | .395 | 2.870 | .276 | 4.250 |
| Rhode Island | .193 | .343 | .172 | .405 | −.274 | 1.357 |

Exhibit 8
0100

| | | | | | | |
|---|---|---|---|---|---|---|
| Texas | −.379 | 2.127 | −.254 | 1.900 | −.184 | 3.109 |
| Vermont | . . . | . . . | . . . | . . . | −.252 | .956 |
| Wyoming | . . . | . . . | . . . | . . . | −.112 | .378 |
| Means (with *t*-ratios): | | | | | | |
| All laws | .073 | .818 | .096 | 1.938 | .048 | 1.447 |
| Early states | .032 | .224 | −.007 | .071 | −.006 | .099 |
| 1994 states | .224 | 1.174 | .214 | 1.921 | .151 | 2.515 |
| Federal only | −.005 | .067 | .088 | 1.280 | .033 | .591 |

NOTE.—See note to Table 2. These three regressions are the essentially the same as the regressions in the "Gun Homicide" columns in Tables 2–4, except that there are separate law dummies for each state. The Minnesota, Nebraska, and New Jersey laws are not included in the first two regressions because the laws went into effect before or during 1980, when the data in the regressions start. The remaining blank spaces occur because states are deleted if they have 3 or more years with no murders. The *t*-ratio for the means is based on the standard error of the means, which is a conservative estimate.

the other changes are largely random, the overall impact of each law type can be estimated by taking the means of the coefficients.[24] As seen at the end of Table 5, these estimates are generally consistent with those in Tables 2–4, although the evidence is a little stronger that the 1994 state laws are associated with more gun homicides.[25]

Table 6 gives the results of the analysis of suicides of persons ages 15–19 years, presenting only the results concerning the law variables. In regressions similar to those in Table 2, the law dummies are never significant and there is no evidence of a difference between gun and nongun suicide. It is likely, however, that any impact of the laws is dampened in Table 6 because the suicide measure includes persons 18 and 19 years old, who are not covered by the gun possession ban, and unlike with the gun homicide measures, one would expect an exact correspondence between age and impact of the law.

Next, in Tables 7–9, the basic homicide regressions are replicated with seven additional homicide measures, again using dummies for the three types of laws. Only the law coefficients are shown. The results are consistent with the gun homicide regressions in Tables 2–4; the 1994 state laws have positive coefficients, while the federal law has negative coefficients, significant in two regressions. Coefficients on the federal law are greatly affected by New

[24] There is no uniformly accepted way to calculate the standard error of means of coefficients. The procedure used in Table 6 is that recommended in M. Hashem Persaran & Ron Smith, Estimating Long-Run Relationships from Dynamic Heterogenous Panels, 68 J. Econometrics 79 (1995). Another procedure is to calculate the standard deviation of the mean by dividing the mean standard deviation by the square root of the number of law dummies involved (see Badi H. Baltagi & James M. Griffin, Pooled Estimators vs. Their Heterogeneous Counterparts in the Context of Dynamic Demand for Gasoline, 77 J. Econometrics 303 (1997)), which usually produces larger *t*-ratios. Baltagi & Griffin, *supra*, and Pesaran & Smith, *supra*, address coefficient heterogeneity by conducting separate regressions for each unit. That is not feasible here because the time series are too short and, more importantly, because separate regressions are likely to be misspecified because they lack year effects.

[25] One reason for the slight differences between the means in Table 5 and the law coefficients in Tables 2–4 is that the latter are based on regressions weighted by population, whereas the means in Table 5 treat each coefficient equally and thus emphasize smaller states. Thus, excluding New York has little impact on the mean for the federal law only states in Table 5.

Exhibit 8
0101

TABLE 6

Suicide Rates Regressed on Juvenile Gun Ban Laws (Ages 15–19), 1980–98

|  | FIREARM | | NONFIREARM | |
|---|---|---|---|---|
|  | Coefficient | t | Coefficient | t |
| Early state laws | −.009 | .155 | .127 | 1.346 |
| 1994 state laws | .005 | .063 | .022 | .187 |
| Federal law | −.060 | .940 | .078 | .800 |
| Number of states | 46 | | 46 | |
| Degrees of freedom | 750 | | 750 | |
| Adjusted $R^2$ | .78 | | .36 | |
| F-statistics: | | | | |
| Three law types | .35 (.79) | | .77 (.51) | |
| For difference between equations: | | | | |
| Early state laws | | | 1.58 (.21) | |
| 1994 state laws | | | .01 (.92) | |
| Federal law only | | | 1.40 (.24) | |
| All three types | | | .97 (.41) | |

NOTE.—This table gives coefficients on the three law variables from regressions that are the same as in Table 2 except for the dependent variables.

York, and when it is dropped from the analysis, there is no evidence that the federal law reduces homicide.

Table 9 also analyzes UCR crimes other than homicides. If the laws actually reduce gun possession, they might reduce these crimes because some juveniles might be reluctant to commit them without the protection of firearms. If the laws embolden criminals to commit crimes because they believe that victims who appear to be juveniles are less likely to be armed, then one would expect these other crimes to increase after the bans. The increases would probably be greater for violent crimes, where the offender comes into contact with the victim. All these possible impacts, however, are likely to be muted because the bans do not apply to adults, who comprise the majority of victims and offenders, and there are no useable data disaggregated by age. In any event, there is no sign that the bans affect nonhomicides (Table 9). In particular, the F-statistics for the three law types are far from significant.

The regressions discussed thus far were also estimated with a wide variety of variable specifications. Results change little when law variables are lagged 1 year or converted into distributed lags (a linear trend until the fourth lag). The same is true when the regression is conducted in differences, when the continuous variables are not per capita, and when they are not logged. Coefficients on the 1994 state law variable are usually a little larger and more likely to be significant when the law variable is lagged, but they are less likely to be significant when variables are differenced or not logged.

As stated earlier, interpretation of the 1994 laws is uncertain because many other nationwide changes were made that year. The regression design mitigates this problem by entering year dummies and state trends and by com-

Exhibit 8
0102

TABLE 7

Homicide Victimization Rates Regressed on Juvenile Gun Ban Laws

| | 1980–98 | | | | 1977–99 | | | |
| | Ages 15–19 | | Ages 15–24 | | Ages 14–17 | | Ages 14–24 | |
| | Coefficient | t | Coefficient | t | Coefficient | t | Coefficient | t |
|---|---|---|---|---|---|---|---|---|
| Early state laws | −.021 | .332 | .024 | .547 | .000 | .005 | .035 | .879 |
| 1994 state laws | .160 | 1.910 | .132 | 2.285 | .157 | 1.339 | .092 | 1.320 |
| Federal law | −.063 | .932 | −.064 | 1.383 | −.166 | 2.261 | −.125 | 2.817 |
| F for three types | 2.21 (.09) | | 3.59 (.01) | | 3.00 (.03) | | 4.51 (.004) | |
| Number of states | 44 | | 49 | | 34 | | 42 | |
| Degrees of freedom | 716 | | 801 | | 672 | | 838 | |
| Adjusted $R^2$ | .87 | | .92 | | .80 | | .89 | |

Note.—This table gives coefficients on the three law variables from regressions that are the same as in Table 2 except for the dependent variables.

paring coefficients in gun and nongun homicides. Still, the best estimates are probably for the pre-1994 laws, which were passed before the spate of federal law activity. There is virtually no evidence that the pre-1994 laws have an impact.

Another way to control for at least some of the other changes occurring around 1994 is to add dummy variables for specific laws. I added three categories to the regressions in Tables 2–4. The first is background checks for handgun purchases, which under the Brady Act were first applied after February 1994 in 33 states that did not already have background checks (indicated in Table 1).[26] The second is that 24 states have three-strikes laws (usually enhanced penalties for third violent felonies).[27] The third is that 25 states have shall-issue laws (which facilitate concealed handgun permits).[28] These additions had very little impact on the results reported above.[29]

[26] Jens Ludwig & Philip J. Cook, Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act, 284 JAMA 585 (2000).

[27] See Marvell & Moody, supra note 23.

[28] See Lott & Mustard, supra note 10. The dates for these laws are as follows: Alaska, August 30, 1994; Arizona, July 17, 1994; Arkansas, July 8, 1995; Florida, October 1, 1987; Georgia, August 25, 1989; Idaho, July 1, 1990; Kentucky, October 1, 1996; Louisiana, April 19, 1996; Maine, August 7, 1980; Mississippi, July 1, 1990; Montana, October 1, 1991; Nevada, October 1, 1995; New Hampshire, August 1, 1994; North Carolina, December 1, 1995; Oklahoma, September 1, 1995; Oregon, January 1, 1990; Pennsylvania, June 18, 1989, and October 19, 1995; South Carolina, August 23, 1996; Tennessee, July 1, 1994; Texas, August 28, 1995; Utah, May 1, 1995; Virginia, July 1, 1983, and July 1, 1995; West Virginia, July 1, 1988; Wyoming, October 1, 1994.

[29] Analysis of the results for these three law variables is outside the scope of this paper. A rough summary is that the shall-issue laws have little discernable impact except for reducing rape. The three-strikes laws are strongly associated with increases in almost all measures of homicide (the major exceptions are nongun homicides of persons ages 15–19 and 15–24). The likely reasons for this result are discussed in Marvell & Moody, supra note 23. The Brady Act is also strongly associated with more homicides (except victimizations of persons ages 15–19 and 15–24), as well as with robbery, burglary, and auto thefts. A possible reason is that criminals believe that citizens are more vulnerable. However, this finding suffers from the

Exhibit 8
0103

TABLE 8

Homicide Arrest Rates Regressed on Juvenile Gun Ban Laws, 1977–99

|  | Ages 14–17 | | Ages 14–24 | |
|---|---|---|---|---|
|  | Coefficient | t | Coefficient | t |
| Early state laws | .054 | .796 | .080 | 1.843 |
| 1994 state laws | .218 | 1.784 | .159 | 2.103 |
| Federal law | −.095 | 1.254 | −.070 | 1.454 |
| F for three types | 2.31 (.08) | | 4.03 (.01) | |
| Number of states | 35 | | 44 | |
| Degrees of freedom | 693 | | 880 | |
| Adjusted $R^2$ | .83 | | .86 | |

Note.—This table gives coefficients on the three law variables from regressions that are the same as in Table 2 except for the dependent variables.

The next analysis is another comparison of coefficients, with young person and adult victimizations as dependent variables. If the juvenile handgun bans act to increase homicides because criminals have less cause to fear that victims are armed, then the impact should fall only on persons whom the attacker believes to be juveniles (it is possible, however, that offenders might refrain from attacking adults if there are juveniles present whom the offender believes might be armed). Although the bans apply to persons under 18, the attacker often does not know the victim's age and might believe older persons are similarly without gun protection. In any event, I use victimizations of persons ages 14–17, 15–19, and 15–24. Likewise, it is difficult to determine which age group is not affected, and the variables used are persons older than 19 and persons older than 24. These various combinations lead to five comparisons, and there is no indication of a difference between the age groups for any of the three law types.

It is possible that the apparent lack of crime-reduction impact of the law is due to simultaneity—that is, state legislatures pass juvenile bans in response to rising juvenile homicide, such that this positive relationship counteracts a negative impact of the laws. This possibility is suggested by Figure 1 and Table 1. Most laws in the "early state law" category were enacted in the late 1980s and early 1990s, just when juvenile gun homicide was increasing. Although these crimes peaked in about 1992, the 1994 federal and state laws might be in response to the trends in the prior decade. This issue is addressed in two ways. First, any such simultaneity would be mitigated (but not eliminated) by lagging the law dummy variables, because the legislatures are not

___

fact that the categorization of states as Brady Act states and non–Brady Act states by Ludwig & Cook, *supra* note 26, has little to do with the extent of gun control exercised before and after the Brady Act. Several Brady Act states (subjected to the law) already had strong gun control laws, while the federal government classified several states as non–Brady Act states on the basis of laws passed just before the Brady Act went into effect. In all, because of this problem and because of the positive coefficients on the Brady Act variable, I question the results in Ludwig & Cook, *supra* note 26.

Exhibit 8
0104

TABLE 9

Uniform Crime Report Crime Rates Regressed on Juvenile Gun Ban Laws
(50 States, 1,353 Degrees of Freedom), 1970–99

| | Homicide | | Rape | | Robbery | | Assault | | Burglary | | Larceny | | Auto Theft | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Coefficient | t | Coefficient | t | Coefficient | t | Coefficient | t | Coefficient | t | Coefficient | t | Coefficient | t |
| Early state laws | .003 | .161 | −.010 | .702 | −.002 | .113 | −.000 | .011 | .001 | .171 | .010 | 1.260 | −.001 | .093 |
| 1994 state laws | .051 | 1.741 | −.026 | 1.326 | .019 | .790 | −.024 | 1.186 | −.008 | .604 | .009 | .856 | .007 | .333 |
| Federal law | −.076 | 3.180 | −.013 | .827 | .007 | .361 | −.027 | 1.563 | −.015 | 1.281 | .001 | .119 | −.017 | .944 |
| F for three types | 6.89 | | .67 | | .24 | | .99 | | .62 | | .71 | | .51 | |
| | (.001) | | (.57) | | (.87) | | (.40) | | (.60) | | (.55) | | (.67) | |
| Adjusted $R^2$ | .95 | | .97 | | .99 | | .98 | | .98 | | .98 | | .98 | |

Note.—This table gives coefficients on the three law variables from regressions that are the same as in Table 2 except for the dependent variables. Two dependent-variable lags are used.

Exhibit 8
0105

influenced by crime rates in the next year. As discussed earlier, lagging the dummy has little impact on the results.

Another way to explore possible simultaneity is the Granger test.[30] Using a probit procedure, with the variables listed in Table 2 plus the state effects, the law dummies are regressed on crime lagged 2 years, as well as the law dummies lagged 2 years. If rising crime caused the laws to be enacted, the coefficients on the crime variables would be significant and positive.[31] The analysis showed that there is no evidence of this for any of the three law categories and for any of the numerous crime measures. Most coefficients on lagged crime (the regressions use lags of 1 and 2 years) are negative, and none is positive and significant.

## VI.  CONCLUSION

Juvenile handgun bans have little or no impact on a wide variety of crime measures. This finding renders the analysis more difficult than if an impact were found. Most published evaluations of laws do find an impact one way or another, and they typically only present a regression with significant results, with perhaps a few supporting analyses. Such a procedure, however, is not valid to show the absence of an impact because still other specifications might uncover an apparent impact. Also, the lack of significant results does not mean absence of impact, just that it is less likely. One can never claim to have covered all possibilities, but this paper attempts to mitigate these by using numerous crime measures as well as several configurations of the law variables and of the continuous variables. The multiple time-series design using coefficient comparisons, moreover, provides far more controls than other procedures.

One can posit theories that the juvenile gun bans either increase or decrease homicides. If the bans reduce juvenile gun access, they would probably reduce the use of guns by juveniles in crimes. If the bans lead others to believe that juveniles are more vulnerable targets, the result is likely to be more crime, especially violent crimes involving juveniles. The finding that the laws have little or no impact could mean that both types of theories are without merit or that they cancel each other out. The former appears more likely. It is not likely that theories cancel each other in a similar way for so many different

---

[30] Clive W. J. Granger, Investigating Causal Relations by Econometric Models and Cross-Spectral Methods, 37 Econometrica 424 (1969).

[31] The rationale for the Granger test is that there is no simultaneity between the dependent variable and lagged independent variable, so long as the lagged dependent variable is entered to control for possible serial correlation between the lagged independent variable and dependent variable through the lagged dependent variable. It is possible for the Granger test to miss causation if it occurs only in the current year, since the current year independent variable is not entered (because the causal direction in the current year is undetermined). This is very unlikely here because the legislature in one year is unlikely to react only to crime in that year and not consider crime in the prior year.

**Exhibit 8**
**0106**

crime measures, and the lack of impact on juvenile suicide rates suggests that the laws do not reduce gun access.

The results are almost uniform with respect to the pre-1994 state laws banning juvenile gun possession: they have no discernible crime-reduction impact, and there is only very slight evidence of an increase, mainly with respect to total gun homicides (Table 5). The results for the 1994 law variables are more uncertain because the results might be influenced by substantial federal efforts commenced that year to regulate guns and reduce crime generally. Where the 1994 laws seem to have an impact, the suggestion is almost always that crime increases; thus, there is no evidence that these bans had their intended effect. There is some slight support for the theory that the bans increase homicides because juveniles appear more vulnerable. With aggregate law variables, this effect appears mainly for state 1994 laws and it is usually counterbalanced by negative results for the federal 1994 law. The strongest indication occurs when the law variable is disaggregated, but these results are affected by large positive coefficients in a few small states. Finally, there is no discernable difference between the impact of the laws on murders by juveniles and those by adults; if the laws encouraged crime, the impact would only apply to the former.

## BIBLIOGRAPHY

Allen, Terry, and Buckner, Glen. "A Graphical Approach to Analyzing Relationships between Offenders and Victims Using *Supplementary Homicide Reports*." *Homicide Studies* 1 (1997): 129–40.

Baltagi, Badi H., and Griffin, James M. "Pooled Estimators vs. Their Heterogeneous Counterparts in the Context of Dynamic Demand for Gasoline." *Journal of Econometrics* 77 (1997): 303–27.

Blumstein, Alfred, and Cork, Daniel. "Linking Gun Availability to Youth Gun Violence." *Law and Contemporary Problems* 59 (1996): 5–24.

Bureau of Alcohol, Tobacco and Firearms. *Firearms State Laws and Published Ordinances*, 20th ed. Washington, D.C.: Department of the Treasury, 1994.

Cook, Philip J., and Leitzel, James A. " 'Perversity, Futility, Jeopardy': An Economic Analysis of the Attack on Gun Control." *Law and Contemporary Problems* 59 (1996): 1–118.

DeFrancesco, Susan. "Children and Guns." *Pace Law Review* 29 (1999): 275–92.

Donohue, John J., III, and Levitt, Steven D. "Legalized Abortion and Crime." *Quarterly Journal of Economics* 116 (2001): 379–420.

Fox, James Alan, and Zawitz, Marianne W. *Homicide Trends in the United States*. Washington, D.C.: U.S. Department of Justice, 2000.

Gladwell, Malcolm. *The Tipping Point: How Little Things Can Make a Big Difference*. Boston: Little, Brown & Company, 2000.

**Exhibit 8**
**0107**

712          THE JOURNAL OF LAW AND ECONOMICS

Granger, Clive W. J. "Investigating Causal Relations by Econometric Models and Cross-Spectral Methods." *Econometrica* 37 (1969): 424–38.

Greene, William H. *Econometric Analysis*. 2d ed. New York: Macmillan Publishing Co., 1993.

Holden, Gwen A., et al. *Compilation of State Firearm Codes that Affect Juveniles*. Washington, D.C.: National Criminal Justice Association, 1994.

Lott, John R., Jr., and Mustard, David B. "Crime, Deterrence, and Right-to-Carry Concealed Handguns." *Journal of Legal Studies* 26 (1997): 1–68.

Ludwig, Jens. "Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data." *International Review of Law and Economics* 18 (1998): 239–54.

Ludwig, Jens, and Cook, Philip J. "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act." *JAMA* 284 (2000): 585–91.

Maltz, Michael D. "Visualizing Homicide: A Research Note." *Journal of Quantitative Criminology* 14 (1998): 397–410.

Marvell, Thomas B., and Moody, Carlisle E. "Age Structure and Crime Rates: The Conflicting Evidence." *Journal of Quantitative Criminology* 7 (1991): 237–73.

Marvell, Thomas B., and Moody, Carlisle E. "Determinate Sentencing and Abolishing Parole: The Long-Term Impacts on Prisons and Crime." *Criminology* 34 (1996): 107–28.

Marvell, Thomas B., and Moody, Carlisle E. "The Impact of Out-of-State Prison Population on State Homicide Rates: Displacement and Free-Rider Effects." *Criminology* 36 (1998): 513–36.

Marvell, Thomas B., and Moody, Carlisle E. "Female and Male Homicide Victimization Rates: Comparing Trends and Regressors." *Criminology* 37 (1999): 879–902.

Marvell, Thomas B., and Moody, Carlisle E. "The Lethal Effects of Three-Strikes Laws." *Journal of Legal Studies* 30 (2001): 89–106.

National Center for Health Statistics. *Vital Statistics of the United States 1978*. Washington, D.C.: Government Printing Office, 1982.

Pesaran, M. Hashem, and Smith, Ron. "Estimating Long-Run Relationships from Dynamic Heterogenous Panels." *Journal of Econometrics* 68 (1995): 79–113.

Rosenberg, Steven. "Just Another Kid with a Gun? *United States v. Michael R.*: Reviewing the Youth Handgun Safety Act under the *United States v. Lopez* Commerce Clause Analysis." *Golden Gate University Law Review* 28 (1998): 51–88.

SAS Institute. *SAS/ETS User's Guide*. Version 6, 2d ed. Cary, N.C.: SAS Institute, 1993.

Snyder, Howard N. "The Overrepresentation of Juvenile Crime Proportions

Exhibit 8
0108

in Robbery Clearance Statistics." *Journal of Quantitative Criminology* 15 (1999): 151–62.

Wooldridge, Jeffrey M. *Introductory Economics: A Modern Approach*. Cincinnati: South-Western College Publishing, 2000.

**Exhibit 8**
**0109**

# EXHIBIT "9"

Exhibit 9
0110

ResearchGate

See discussions, stats, and author profiles for this publication at:
https://www.researchgate.net/publication/225935642

# The Impact of Gun and Gun Ownership Levels on Violence Rates

**Article** *in* Journal of Quantitative Criminology · September 1993

DOI: 10.1007/BF01064462

CITATIONS
157

READS
6,719

2 authors:



Gary Kleck
Florida State University

**85** PUBLICATIONS   **2,720** CITATIONS

SEE PROFILE



E. Britt Patterson
Shippensburg University

**8** PUBLICATIONS   **331** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:



Updating of Targeting Guns View project

All content following this page was uploaded by Gary Kleck on 10 September 2014.

The user has requested enhancement of the downloaded file.

**Exhibit 9**
**0111**

*Journal of Quantitative Criminology, Vol. 9, No. 3, 1993*

# The Impact of Gun Control and Gun Ownership Levels on Violence Rates

## Gary Kleck[1] and E. Britt Patterson[2]

What effects do gun control restrictions and gun prevalence have on rates of violence and crime? Data were gathered for all 170 U.S. cities with a 1980 population of at least 100,000. The cities were coded for the presence of 19 major categories of firearms restriction, including both state- and city-level restrictions. Multiple indirect indicators of gun prevalence levels were measured and models of city violence rates were estimated using two-stage least-squares methods. The models covered all major categories of intentional violence and crime which frequently involve guns: homicide, suicide, fatal gun accidents, robbery, and aggravated assaults, as well as rape. Findings indicate that (1) gun prevalence levels generally have no net positive effect on total violence rates, (2) homicide, gun assault, and rape rates increase gun prevalence, (3) gun control restrictions have no net effect on gun prevalence levels, and (4) most gun control restrictions generally have no net effect on violence rates. There were, however, some possible exceptions to this last conclusion—of 108 assessments of effects of different gun laws on different types of violence, 7 indicated good support, and another 11 partial support, for the hypothesis of gun control efficacy.

**KEY WORDS:** gun control; violence.

## 1. INTRODUCTION

Crime is widely viewed by the public as one of the most important problems facing our society, and violent crime is regarded as the most serious and fearful kind of crime. While violence is often regarded as an intractable problem difficult to reduce through deliberate governmental effort, many have argued that it, nonetheless, may be reduced through the regulation of weapons, especially firearms.

[1]School of Criminology and Criminal Justice, The Florida State University, Tallahassee, Florida 32306.
[2]Department of Criminal Justice, Shippensburg University, Shippensburg, Pennsylvania 17257.

0748-4518/93/0900-0249$07.00/0 © 1993 Plenum Publishing Corporation

**Exhibit 9**

**0112**

The rationale for gun control, of course, includes the assumption that the availability of guns has a significant net positive effect on violence rates. This assumption has not yet been consistently supported by a credible body of evidence, partly because evidence from better studies has largely been negative or mixed regarding the assumption and partly because so much of the evidence is too weak to be credible one way or the other (see overviews by Wright *et al.*, 1983, pp. 129–137; Kleck and McElrath, 1991). There are a number of possible effects which gun availability could have on violence rates. If a gun is available, it could encourage attacks, especially by weaker attackers on stronger victims, and could facilitate attacks from a distance or attacks by persons too squeamish to attack with messier weapons such as knives or too timid to attack at close quarters. Similarly, guns may enable some people to attempt robberies they could not complete unarmed (Newton and Zimring, 1969; Cook, 1976). The sight of a gun might "trigger" attacks by angered persons, due to the learned association between guns and violence (Berkowitz and LePage, 1967). On the other hand, research also indicates that the presence of guns usually inhibits the expression of aggression, reducing the likelihood of attack (Kleck and McElrath, 1991; Kleck and DeLone 1993). There is support for the claim that once an injury is inflicted, it is more likely to result in death if a gun was used, due to the weapon's greater lethality (Newton and Zimring, 1969; Block, 1977; Kleck and McElrath, 1991), although part of the higher fatality rates of gun attacks is probably due to greater seriousness of intent on the part of those using guns, rather than just the weapon itself (Wright *et al.*, 1983). Regarding suicide, some authors argue that guns provide a uniquely quick, easy, and sure means of self-destruction which reduces the chances of successful outside intervention (Newton and Zimring, 1969). On the other hand, many highly lethal and otherwise satisfactory means for committing suicide are even more widely available than guns, and can easily be substituted where guns are not available.

Prior studies of the aggregate relationship between gun availability and violence rates have used a variety of measures, none entirely satisfactory (Cook, 1982, pp. 264–272). These studies have failed to generate consistent evidence of a net positive effect of gun availability on violent crime rates (Kleck, 1984a, 1991, Chap. 5). The present study measures gun levels through the use of multiple indirect indicators, for two purposes: (1) to assess the impact of gun availability on violence rates and (2) to assess the effects of gun laws on violence rates, including both direct effects and indirect effects operating through the impact of gun control on gun availability. The study addresses every major form of gun control and every major form of violence involving firearms, including not only the violent crimes of homicide, robbery, assault and rape, but also suicides and fatal gun accidents.

**Exhibit 9**
**0113**

## 2. METHODS OF PRIOR RESEARCH

Two general strategies have been used to assess the impact of gun control laws on violence rates: interrupted time series designs and cross-sectional designs. In the typical time series design, monthly violence rates for a single jurisdiction are analyzed with ARIMA or regression time series methods to see if there is a significant downward shift in crime around the time a new gun law goes into effect. Cross-sectional designs compare legal jurisdictions, usually states, with each other to see if those having a given type of gun law have lower levels of violence than those lacking the law.

Studies of gun control's impact on violence have been characterized by a variety of methodological flaws. The first is the failure to control adequately for other determinants of violence rates besides gun control laws, before attributing crime reduction effects to gun regulation. This is at least as much of a problem for time series studies as for cross-sectional ones. Careful modeling of preintervention trends in violence is required in time series studies, rather than simple before-and-after comparisons, because the time when an intervention is most likely to be implemented is at, or shortly after, the time when the target problem peaks, i.e., when it is most likely to stimulate attempts to combat it. Thus, one would expect to find decreases in the problem after an intervention even if the intervention were ineffective, due to this simple timing issue—the problem was peaking and thus was going to decline at the time of intervention anyway, even if nothing was done about it. Unfortunately, if this reasoning applies to the intervention being evaluated, it also applies to other "interventions" as well. Other efforts, public or private, collective or individual, to reduce the target problem would also be most likely to start (or peak) at about the same time. Time series modelers attempting to isolate the impact of gun laws necessarily assume that the evaluated intervention was the only new element in the causal structure generating trends in violence rates. This is, at best, a convenient simplification; at worst, an implausible one.

Cross-sectional designs can take advantage of considerable data in census years for cities, metropolitan areas, or states on extraneous determinants of crime rates, while time series data on most such variables, except at the national level, are nonexistent. Consequently, time series designs usually do not explicitly control for any other important determinants of crime which might show changes coincident with changes in gun laws. Thus, they do not allow the analyst to rule out explicitly any alternative explanations of violence decreases. Instead they, at best, make do with comparisons to "control" jurisdictions which, it is assumed, would show crime trends similar to those in the intervention jurisdiction, were it not for the impact of the gun law changes. This was the strategy followed by Pierce and Bowers (1981). Other time series studies use trends in

**Exhibit 9**
**0114**

*non*gun violence rates within the impact jurisdiction as internal controls, relying on the implicit, and implausible, assumption that gun and nongun rates would follow similar trends were it not for changes in gun regulation (e.g., Loftin and McDowall, 1981, 1984). Evidence from the present study (Table III) indicates that gun violence and nongun violence rates are driven by different sets of exogenous variables (apart from gun laws and gun prevalence), suggesting that they are likely to show divergent trends even in the absence of new gun laws.

Cross-sectional studies of a large number of jurisdictions offer clear advantages over longitudinal designs if one wants to identify which specific features of gun regulation are likely to generally produce violence reductions. The former tests the average effect of many specific instances of a form of regulation, while the latter tests only the effects of a single new gun law in a single jurisdiction, allowing little generalizability. With the former design it is possible to separate the effects of different types of gun controls which are sometimes lumped together in a single new law, while this is impossible in the latter.

Further, it is impossible to state for certain, a priori, *when* the effect of a new law should become evident, rendering the gun law efficacy hypothesis difficult to falsify with a time series design. For example, some analysts have assumed that any impact should begin at the law's "effective date," while others assert that effects can begin earlier, due to an "announcement effect" (Pierce and Bowers, 1981). Loftin and his colleagues (1991) even concluded that local handgun bans reduced homicide in the District of Columbia, even though the declines in both gun homicides and total homicides began *2 years* before the law went into effect! One could just as easily argue that effects would only become evident after a lag of indeterminate length. In contrast, with a cross-sectional design the corresponding question is *where* the law would have its effects, and there is little doubt that the effects should be most pronounced in the jurisdiction which implemented the regulation.

The principal weakness of cross-sectional studies is one shared by time series studies—the difficulty of meeting the *ceteris paribus* condition by correctly specifying a model of how crime rates are generated. It should, however, be noted that the cross-sectional design does *not* require, as Wright *et al.* (1983, p. 285) assert, that "the investigator have a fairly complete understanding of how the particular crime rates are generated." This is an impossible standard to meet and fortunately, an unnecessary one. Instead, unbiased estimates of the impact of a gun control measure can be obtained if one includes in the model only those extraneous variables which affect crime rates *and* which also have nontrivial correlations with the gun control measures. It turns out that none of the known

**Exhibit 9**
**0115**

causes of variation in violence rates are strongly correlated with gun laws, making this a less crucial empirical issue than it seemed.

With only two exceptions (Geisel et al., 1969; Cook, 1979), prior cross-sectional studies have exclusively used states as their unit of analysis. This exacerbates the problem of aggregation bias. States are larger units than cities and, also, more heterogeneous with regard to levels of violence and variables affecting violence rates. Consequently, the best level of aggregation to use would be the lowest and most homogeneous one at which gun law is made—the city level.

Another problem with state-level analyses is that they cannot incorporate measures of local gun controls. Only one prior study has measured gun regulation at both the state level and the city level (Geisel et al., 1969), yet the most restrictive gun laws in the nation are at the local level. Many, even most, of the residents of a given state might be subject to very strong gun laws, at the city level, yet be subject to little or no state regulation. Consequently, studies failing to measure local ordinances seriously mismeasure the degree of gun control to which much of the population is subject.

For some gun laws, one presumed reason for any effects on violence they may have is that they reduce levels of gun prevalence or availability, which in turn affects violence rates. Indeed, regardless of the way the laws were designed to work, almost any restriction on guns could in practice discourage gun ownership, by reinforcing public perceptions of guns as dangerous objects. Conversely, most gun laws could hypothetically reduce violence in ways other than by reducing gun ownership, e.g., by making carrying or criminal use more risky or reducing the immediate availability of guns in violence-prone situations. Only three of the studies published to date explicitly measured gun prevalence or availability (see column 5 in Table I). Thus it was usually impossible to tell whether observed effects were produced through reductions in gun ownership or through some other causal mechanism. Further, if high gun prevalence makes it harder to pass gun laws, and also contributes to higher violence rates, failing to control for gun prevalence could result in a spurious negative association between gun laws and violence rates.

None of the three gun law studies which measured gun levels treated the gun–violence relationship as a simultaneous reciprocal one. This is problematic because there is both individual-level and aggregate-level evidence that violence rates can motivate gun acquisition and increase aggregate gun ownership levels (Lizotte and Bordua, 1980; Lizotte et al., 1981; Kleck, 1984a; McDowall, 1986; Smith and Uchida, 1988). If the relationship were a simultaneous reciprocal one, failing to model it properly would result in biased and inconsistent estimates of the gun coefficient, and

**Exhibit 9**
**0116**

        

**Table I.** Previous Studies of the Impact of Gun Control on Violent Crime Rates[a]

| Study | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Gun control effective? |
|---|---|---|---|---|---|---|---|---|
| Wisconsin (1960) | × | × | × | × | × | | | No |
| Krug (1967) | × | × | × | × | × | × | | No |
| Geisel et al. (1969) | | | (×) | × | × | × | | No |
| Olin Mathieson (1969?) | × | × | × | × | ? | × | | No |
| Seitz (1972) | × | × | × | (×) | × | × | | Yes |
| Murray (1975) | × | × | × | (×) | × | | | No |
| Zimring (1975) | × | − | − | | − | − | × | Mixed |
| Beha (1977) | × | | × | (×) | − | − | × | Mixed[b] |
| Deutsch and Alt (1977) | × | | − | × | − | − | × | Mixed[b] |
| Cook (1979) | | | × | | ? | | | No |
| Hay and McCleary (1979) | × | | − | × | − | − | × | No[b] |
| Nicholson and Garner (1980) | × | | − | × | − | − | × | Mixed |
| Sommers (1980) | × | × | × | × | × | | × | Mixed |
| Jones (1981) | × | − | − | × | − | − | × | Mixed |
| Lester and Murrell (1981) | × | | × | × | × | × | | No |
| Pierce and Bowers (1981) | × | | − | × | − | − | × | Mixed[b] |
| Lester and Murrell (1982) | × | × | × | × | × | × | | Mixed |
| Magaddino and Medoff (1982) | × | × | × | × | × | | | No |
| DeZee (1983) | | × | × | × | × | | | No |
| Loftin et al. (1983) | × | | | × | | | × | No |
| Loftin and McDowell (1984) | × | | | × | | | × | No |
| Magaddino and Medoff I (1984) | | × | × | × | × | | | No |
| Magaddino and Medoff II (1984) | | − | − | | − | − | × | No |
| McPheters et al. (1984) | × | − | | × | − | − | × | Yes |
| Lester and Murrell (1986) | × | × | × | × | × | × | | No |
| Lester (1987) | × | × | × | × | × | × | | No |
| Lester (1988) | (×) | × | × | | × | × | | Yes |
| Jung and Jason (1988) | × | | − | × | − | | × | No |
| Loftin et al. (1991) | × | | | × | | | × | Yes |

[a]Summary: 4 yes, 8 mixed, 17 no. "Gun control effective?" means "Did gun laws appear to reduce significantly total (gun plus nongun) rates of violence or crime?" Weakness codes: ×, problem existed; blank, no problem; −, problem is irrelevant; (×), partial presence of problem or problem inadequately dealt with. Weaknesses: (1) included no, or very few, control variables; (2) state level of analysis used, rather than city; (3) no measure of local gun control laws; (4) no measure of gun ownership included; (5) only one source of information on gun control laws used; (6) lumped heterogeneous mixture of gun laws together, without separate measures of impact of different types of gun laws; (7) studied just one specific law; little generalizability.

[b]These four studies are not independent since they are all evaluations of the same law (the Massachusetts Bartley–Fox law) in the same time period, using the same general methods. They contributed three of the eight studies classified as "mixed." Their findings are classified this way because, taken as a whole, they indicate that the law had no effect on homicide, may have reduced robbery (two studies indicated this, one did not), and reduced gun assaults by a moderate amount, while increasing nongun assaults by a larger amount.

**Exhibit 9**
**0117**

the positive effects of violence on gun levels would be confused with the possible positive effects of gun levels on violence rates.

Finally, close examination of the various surveys and compilations of gun laws reveals significant differences between sources, indicating in many instances that at least one source was in error. Consequently, studies using a single source of information are especially vulnerable to error in measurement of the key variables. This was true of all prior studies of multiple laws.

## 3. RESULTS OF PRIOR RESEARCH

The Table I summary of prior research on gun law effects indicates that most of the 29 studies found no impact of gun laws on total violence rates. [Throughout this paper, the term "total violence rate" refers to rates of gun violence plus nongun violence in a given violence category. For example, the term could refer to total homicide (gun homicide plus nongun homicide) or to total robbery (gun robbery plus nongun robbery), and so on. It does not refer to homicide plus robbery plus assault and so on.] Of the 12 studies yielding favorable or mixed results, 3 were time series evaluations of the same law, the Bartley–Fox carrying law. Of these three, the Pierce and Bowers (1981) study found a drop in violence which *preceded* the law's effective date, casting doubt on the authors' favorable assessment of the law. Further, a fourth study of this same law concluded that evidence regarding the law's impact was inconsistent and that the optimistic conclusions of previous researchers were premature (Hay and McCleary, 1979). The middle columns in Table I indicate that most of the rest of the studies offering at least mixed support for gun control efficacy are seriously flawed. Taking prior research as a whole, it would be fair to say at this point that a consistent, credible case for gun control efficacy in reducing violence has not yet been made.[3] [For reviews of research on the impact of gun

[3]Assessments of the studies' implications regarding gun control efficacy are based on their empirical findings, not necessarily on their authors' conclusions. As an example of conclusions diverging from data, Geisel *et al.* (1969) concluded that increased gun control severity would save lives, based on analyses using an index which lumped together all forms of gun control. Construction of this index involved a weighting scheme which, contrary to the author's claims, biased results in favor of finding a stronger correlation with violence rates (see p. 659). Even so, the results of analyses using the index did not generally support the author's conclusions. Of the seven violence rates studied, only two showed a significant negative association with the index: gun suicides (but not total suicides, indicating nothing more than a substitution effect) and accidental death by firearm (p. 663). Further, buried in the last page of their Appendix was a one-paragraph summary of the results of their more appropriate analysis (which even the authors described as "more refined"), using separate dummy variables for each type of gun control: "We could obtain no significant or even meaningful results" (p. 676).

**Exhibit 9**
**0118**

prevalence on crime, suicide, and gun accident rates, see Kleck (1991, pp. 187–188, 214–214, 248–250, 265, 303–304).]

## 4. METHODS OF THE PRESENT STUDY

The present study is a city-level cross-sectional study. Data were gathered on all 170 U.S. cities which had a population of 100,000 or larger in 1980, i.e., all large cities. Cities were chosen as the unit of analysis because they are the smallest, most homogeneous unit or area to which gun laws apply, and analyses which use larger units necessarily must ignore laws passed by smaller constituent areas. A majority of the reported violent crimes in the United States occurred in these 170 cities [U.S. Federal Bureau of Investigation (FBI), 1981, p. 173]. Smaller cities could not be included because person-level vital statistics mortality data do not identify locations of deaths for cities with populations smaller than 100,000 [U.S. National Center for Health Statistics, (NCHS), 1983, p. 8]. These data were needed to obtain city counts of gun homicides and gun suicides, data which were essential both as components in dependent variables and as indirect indicators of gun prevalence.

The dependent variables are the rates per 100,000 resident population of homicide, suicide, aggravated assault, robbery, rape, and fatal gun accidents. For all but the last two of these, we had data allowing separate analyses of rates of violence with guns, without guns, and with gun and nongun events combined.

The violence rates were averaged over 3 years, 1979 to 1981, thus bracketing the Census year of 1980 for which data on most of the control variables were available. Some of the smaller cities had fewer than a half-dozen homicides or suicides per year; thus, misclassification of just one or two homicides or suicides as other kinds of deaths could substantially alter a single year's official count. Therefore, 3 years were covered, to minimize the potential measurement error produced by misclassification and to minimize the instability due to year-to-year fluctuations.

The dependent variables were expressed as natural logs. The transformation produced more normal distributions on the violence rate variables. (Without exception, skewness and kurtosis statistics moved closer to zero after the transformation.) It also helped to stabilize the variance of the residuals, reducing heteroscedasticity.

Models of violence rates were estimated using two-stage least-squares procedures because a simultaneous reciprocal relationship was specified between violence rates and gun prevalence levels, based on the assumption that higher violent crime rates could motivate gun acquisition, in addition to gun prevalence increasing violence rates. No effect of suicide and fatal

**Exhibit 9**
**0119**

gun accident rates on gun acquisition was expected, so models of these violence rates were specified as recursive and estimated using ordinary least-squares methods. Figure 1 illustrates the general form of the models estimated. This is the general causal structure assumed for all models estimated, except that we assumed there was no effect of suicide and gun accidents on gun prevalence. There was a total of 14 models (one for each type of violence rate listed in Table II), and each model consisted of two equations, one for the violence rate and one for the gun prevalence level.

The initial choice of possible control variables to include in the models was based on a review of previous city-level and metro area-level studies. An effort was made to include all predictors which had frequently and consistently been found to significantly predict the violence rates examined here. Most of the violence predictors besides the gun law dummies and gun prevalence indicators were measures of the relative sizes of population groups which have especially high or low violence rates, or were measures of social integration, isolation, or transience, or measured the prevalence of statuses which can give rise to violence, such as divorce, alcoholism, and unemployment. Theoretical rationales for including these variables, and relevant empirical evidence, can be found in numerous sources (e.g., Byrne, 1986; Sampson, 1986; Land *et al.*, 1990, and studies reviewed therein). Exogenous variables which remained in the final models were those whose coefficients in the violence rate equations were significant at the 0.10 level in preliminary screening using OLS.



**Fig. 1.** General causal diagram of violence rate models.

**Exhibit 9**
**0120**

**Table II.** Descriptive Statistics for Variables Used in Analysis ($N = 170$ Cities)[a]

|  | Mean | SD | Source[b] |
|---|---|---|---|
| Violence rates (1979–1981 average, rates per 100,000 resident population, in natural logs) |  |  |  |
| LNMR, Homicides (total) | 2.47 | 0.78 | a |
| LNASLT, Aggravated assaults (total) | 5.90 | 0.58 | b |
| LNROB, Robberies (total) | 5.79 | 0.75 | b |
| LNRAPE, Forcible rapes (total) | 4.04 | 0.54 | b |
| LNSUICID, Suicides (total) | 2.63 | 0.35 | a |
| LNFGA, Fatal gun accidents (total) | 0.50 | 1.35 | a |
| LNGUNMR, Homicides with gun | 1.98 | 0.88 | a |
| LNNGMR, Homicides without gun | 1.42 | 0.72 | a |
| LNGNASLT, Assaults with gun | 4.55 | 0.75 | b, c |
| LNNGASLT, Assaults without gun | 5.55 | 0.60 | b, c |
| LNGNROB, Robberies with gun | 4.87 | 0.76 | b, c |
| LNNGROBR, Robberies without gun | 5.22 | 0.84 | b, c |
| LNGNSUIC, Suicides with gun | 1.94 | 0.56 | a |
| LNNGSUIC, Suicides without gun | 1.81 | 0.47 | a |
| Gun prevalence indicators |  |  |  |
| PGH7982, % gun, homicide, 1979–1982 | 61.48 | 11.89 | d |
| PCTGNAST, % gun, aggr. assault, 1979–1980 | 28.31 | 11.39 | c |
| PCTGNROB, % gun, robbery, 1979–1980 | 42.00 | 13.11 | c |
| PGS7982, % gun, suicide, 1979–1982 | 53.37 | 14.91 | a |
| GUNSTOL, ($ value, stolen guns/$ value, all stolen property) × 100 | 1.20 | 0.75 | e |
| Instrumental variables |  |  |  |
| RGUNMAG, Subscription rate top 4 gun/hunting magazines, county | 6,564.74 | 8,656.41 | f |
| HUNTERS, Hunting License holder rate per 100K pop., state | 6,985.58 | 4,252,36 | g |
| NRA, NRA members per 100K pop. | 870.90 | 634.59 | t |
| LIBERAL, % 1972 presidential vote for McGovern, county | 38.46 | 9.90 | u |

[a]Unless otherwise noted, each variable refers to a city, as of 1980. In variable descriptions, "county" indicates variable refers to county in which city was located, and "state" indicates variable refers to state in which city is located. Methods of estimating missing values may be obtained from senior author.
[b](a) Tabulations from Mortality Detail Files (U.S. NCHS, 1983); (b) U.S. FBI (1980–1982); (c) ICPSR (1983); (d) ICPSR (1984a); (e) ICPSR (1984b); (f) Audit Bureau of Circulations (1979–1982); (g) U.S. Fish and Wildlife Service (1980); (h) Blose and Cook (1980); (i) U.S. Bureau of Alcohol, Tobacco and Firearms (1980); (j) Ronhovde and Sugars (1982); (k) Jones and Ray (1980); (l) Wright *et al.* (1983); (m) U.S. Bureau of the Census (1983a); (n) U.S. Bureau of the Census (1983b); (o) Quinn *et al.* (1982); (p) U.S. Bureau of the Census (1981); (q) Gastil (1971); (r) U.S. Bureau of Justice Statistics (1982); (s) U.S. Federal Bureau of Investigation (undated); (t) unpublished membership counts supplied to senior author by National Rifle Association; (u) Scammon (1972).

**Exhibit 9**
**0121**

**Table II.** Continued

|  | Mean | SD | Source[b] |
|---|---|---|---|
| Gun control variables |  |  |  |
| LICENSE, License to possess gun in home | 0.11 | 0.32 | h, i, j |
| BYPERMIT, Permit to purchase or acquire | 0.34 | 0.47 | h, i, j |
| WAITPER, Waiting period to buy, receive, etc | 0.44 | 0.50 | h, j |
| CRIMINAL, Prohibit possession (poss.)—criminals | 0.82 | 0.38 | i, j, k |
| MENTAL, Prohibit poss., mentally ill, incomp. | 0.25 | 0.43 | i, j, k |
| ADDICT, Prohibit poss., drug addicts, users | 0.41 | 0.49 | i, j, k |
| ALCOHOLIC, Prohibit poss., alcoholics, etc. | 0.19 | 0.40 | i, j, k |
| MINORS, Prohibit purchase by minors | 0.98 | 0.15 | i, j |
| REGISTER, Registration of guns | 0.47 | 0.50 | h, i |
| DEALER, State or city license, gun dealers | 0.61 | 0.49 | h, i, j |
| CARYHIDN, Concealed handgun carrying forbidden or permit hard to get | 0.88 | 0.33 | j, k |
| CARYOPEN, Open handgun carrying forbidden or permit hard to get | 0.56 | 0.50 | j |
| MANDPEN, Mandatory penalty, illegal carrying | 0.12 | 0.33 | j |
| ADDONDIS, Additional penalty for committing crimes with gun, discretionary | 0.58 | 0.50 | j |
| ADDONMND, Additional penalty for committing crimes with gun, mandatory | 0.61 | 0.49 | j |
| RTBRARMS, State constitutional provision—individual right to bear arms | 0.43 | 0.50 | j |
| HGBAN, De facto ban on handgun possession | 0.01 | 0.11 | i |
| SNSBAN, Saturday Night Special sales ban | 0.04 | 0.20 | i |
| HGBYBAN, Ban on handgun sales | 0.01 | 0.11 | i |
| Control variables |  |  |  |
| PCTBLACK, % respop, black | 19.27 | 16.69 | m |
| PCTHISP, % respop, Spanish origin | 8.82 | 12.23 | m |
| PCTM1524, % respop, male, age 15–24 | 10.05 | 2.30 | n |
| PCTOLD, % respop, age 65 + | 11.20 | 3.53 | m |
| RUNM1624, Unemployment rate males, age 16–24 | 13.18 | 6.12 | n |
| RPOV, % respop < poverty line 1979 | 13.97 | 5.16 | m |
| MFI, Median family income, $s, 1979 | 19,435.52 | 3,592.01 | m |
| INEQUALT, % hshlds w. income > $10K or > $50K | 35.51 | 6.91 | m |
| OWNEROCC, % housing units owner-occupied | 54.14 | 11.19 | m |
| COLLEGE, College enrollment/100K respop | 7,619.66 | 4,267.42 | n |
| PCTMOVE, % respop age 5 + not in same house as 5 yr before | 51.01 | 8.44 | m |
| TRNSIENT, % respop, born out of state | 42.74 | 15.79 | m |
| PCTFOREN, % respop, foreign born | 7.68 | 8.25 | n |
| POPCHANG, % pop change 1970 to 1980 | 7.32 | 20.37 | m |
| CNTDIVRT, Divorces per 100K respop, county | 639.20 | 245.25 | m |
| FEMHEAD, % families headed by females | 21.21 | 10.93 | m |
| CHRCHMEM, Church membership per 100 respop, county | 20.38 | 12.02 | o |

**Exhibit 9**

**0122**

**Table II.** Continued

|  | Mean | SD | Source[b] |
|---|---|---|---|
| ALCHLSM, Alcoholic liver disease deaths per 100K respop | 7.77 | 4.45 | a |
| ADDICTRT, Deaths due to nonmedical accidental poisoning by opiates per 100K respop | 0.22 | 0.52 | a |
| PCTSMSA, City respop as a % of SMSA respop | 34.58 | 22.73 | n |
| VISITORS, Lodging receipts in dollars/100K respop, SMSA | 111.00 | 269.38 | p |
| INVPOP, Inverse population, 1/(respop in 100,000s) | 0.56 | 0.29 | m |
| HSACTRAT, Household activity ratio—fraction of households not of husband–wife, wife not working type | 0.71 | 0.05 | n |
| HOSPITAL, Hospital beds per 100K respop | 1,013.90 | 661.20 | m |
| LIVLONE, % households with 1 person | 10.18 | 2.91 | m |
| STORES, Retail establishments/100K respop | 851.72 | 167.09 | m |
| MAXTEMP, Avg. daily max temperature, July | 87.16 | 6.64 | m |
| CROWDING, Percent of occupied housing units with 1.01 + persons/room | 4.89 | 3.23 | m |
| DENSITY, Persons per square mile | 4,334,26 | 3,375.96 | m |
| STHNBORN, Percent respop born in South | 12.93 | 6.33 | n |
| SOUTH, South region dummy | 0.32 | 0.47 | m |
| WEST, West region dummy | 0.28 | 0.45 |  |
| STHNNESS, Gastil "Southernness Index" | 20.24 | 7.43 | q |
| POLEXP, Police expenditures per capita | 70.65 | 24.92 | m |
| COPS, Sworn police officers/100K respop | 207.57 | 82.40 | b |
| STPRISRT, State prisoners/100K respop | 157.90 | 164.58 | r |
| WEAPARST, Weapons arrests, avg. for 1979–1981, per 100 sworn police officers | 58.26 | 30.83 | s |
| ACCIDENT, Accidental deaths, excl. gun accidents/100K respop | 46.43 | 15.45 | a |

It is important to stress at this point that the exact combination of control variables included in each model was not critical with respect to the gun control results. Gun law coefficient estimates were not sensitive to the choice of control variables to include because correlations between the gun law variables and the control variables were almost all weak. Of 290 bivariate correlations between gun law variables and control variables, none exceeded 0.4, and only 7 even reached 0.3. Multicollinearity involving the gun law variables was generally minor. In the final violence rate equations, variance inflation factors (VIF) for each of the 19 gun law variables were under 10, and all but two were under 4. [Kennedy (1985, p. 153) suggests that a VIF over 10 incidates harmful collinearity.] Thus, regardless of which theoretical perspectives might be used to inform the specification of control variables, the key coefficient estimates were not

**Exhibit 9**
**0123**

substantially affected by specification decisions concerning which control variables to include in the models.

A few of the control variables are sufficiently uncommon to require comment. Like nearly all aggregate analyses of violence, the present study uses ratio variables, with city population being the denominator in many variables, both exogenous and endogenous. Some critics have argued that the presence of common components in ratio variables can lead to biased or artifactual associations. Firebaugh and Gibbs (1985, p. 715) recommended that if one seeks unbiased coefficient estimates in a regression model containing both endogeneous and exogenous variables with a common component (commonly population size) in the denominator, one should also include one divided by the common component as another predictor. Thus we have included, in all models, one divided by resident population (in 100,000's) as a predictor.

Computing aggregate crime variables as per capita rates is conventionally done to control for the size of the population at risk of either committing crimes or being victimized in crime. Standard city resident population figures, however, are not completely adequate for this purpose because they do not count nonresident persons at risk, including daily commuters and visitors such as tourists and business travelers. We roughly controlled for the omission of commuters by including as a separate predictor the city population as a fraction of the surrounding metropolitan area, on the assumption that cities located in much larger metro areas are likely to have more commuters, in which case resident population would be a more serious underestimate of the population at risk [see Gibbs and Erickson (1976) for a fuller rationale]. We controlled for the contribution of short-term visitors by including as a separate predictor a "visitors index": the per capita total receipts for hotels, motels, and other lodging places, for the metropolitan area in which a city is located, in 1977. This is an especially important control for cities with large numbers of tourists relative to resident population, such as Las Vegas, Orlando (Disney World), and Miami.

### 4.1. Measurement of Gun Laws

Table II lists all of the variables which are included in later tables, as well as control variables which were evaluated but found to be unrelated to violence rates, along with the sources of the data. The following four sources were used for gun law coding, in descending order of importance: U.S. Bureau of Alcohol, Tabacco, and Firearms (BATF) (1980), Jones and Ray (1980), Blose and Cook (1980), and Ronhovde and Sugars (1982). Multiple sources were used wherever possible because each source provided

**Exhibit 9**
**0124**

some information the others did not, and each served as a reliability check on the others. When sources conflicted, state statute books were consulted.

Both state laws and city ordinances were coded. Nineteen major categories of existing gun laws which could affect violence rates were included in the analysis. The philosophy guiding coding of the gun law variables was to code them so that each variable would measure the presence or absence of a given form of regulation, regardless of what other elements might have accompanied it in a given law, and regardless of what governmental level imposed the restriction. Thus a gun law variable was coded 1 if the form of regulation applied in 1980 to a given city, either due to a city ordinance or because the city was located in a state with such a law, whether the law applied to all types of guns or, as was usually the case, only to handguns; the city was coded 0 otherwise. A single law therefore might result in a city being coded 1 on two or three different gun control variables.

The gun law variables were constructed in such a way that any city subject to a gun license law was also subject to purchase permit requirements, since existing license laws all include as a component a requirement that a license be presented in order to buy guns from licensed dealers, in addition to requiring a license for home possession of guns. On the other hand, a city could be subject to a purchase permit requirement without requiring a license for home possession of firearms.

The gun registration variable was coded 1 if gun sales were recorded in such a way that a governmental agency received a record of a specific gun being sold to a specific person or if all persons currently possessing a gun were required to record their ownership of each gun with an agency.

The codings for most gun law variables were simply 1 for the regulation being present at either the state or the local level and 0 if they were absent. However, for the gun carrying law variables (CARYHIDN, CARYOPEN), 1 indicated that gun carrying (concealed or open, respectively) was either completely unlawful or required a license which was hard to get and rarely issued, while 0 indicated that the city was located in a so-called "shall issue" state—carry permits are fairly easy to get because they must be granted to applicants unless they have certain specified disqualifying attributes (Blackman, 1985).

### 4.2. Measurement of Gun Prevalence

We measured gun prevalence using a principal-components factor based on multiple indirect indicators. For cities, Cook (1979) used a simple index consisting of the average of two indicators: the percentage of suicides committed with guns and the percentage of nonfelony homicides com-

**Exhibit 9**
**0125**

mitted with guns. He showed this measure to be highly correlated with survey measures of urban household gun prevalence, aggregated over eight regions, indicating validity for purposes of cross-sectional analyses. Earlier researchers had used similar indirect measures (Brearley, 1932, p. 71; Seitz, 1972; Curtis, 1974, p. 110; Brill, 1977, p. 20).

We improved on these measures by using as many as five indicators of city gun prevalence levels: (1) percentage of suicides committed with guns, 1979–1982; (2) percentage of nonfelony homicides committed with guns, 1979–1982; (3) percentage of aggravated assaults known to the police committed with guns, 1979–1980; (4) percentage of robberies known to the police committed with guns, 1979–1980; and (5) percentage of the dollar value of all stolen property reported to the police which was due to firearms thefts, 1979–1981. We also evaluated three other indicators: the fatal gun accident rate, the rate of National Rifle Association members, and the rate of contributors to the Second Amendment Foundation, another gun owners' group. However, in a factor analysis these did not load with the other indicators. A simple explanation would be that the latter group of indicators reflects mainly gun prevalence among noncriminals, while the first five measures reflect mainly gun prevalence among criminals.

In each model, when the dependent variable could have an artifactual association with one of the gun prevalence indicators, that indicator was deleted. Thus, for example, the percentage of homicides involving guns was omitted from the homicide model, the gun percentage of assaults was omitted from the assault model, etc.

All these indicators but the suicide item relate on their face to criminal gun possession. Therefore, we interpret the gun index as an indirect measure of gun prevalence among criminals. For conceptual and theoretical purposes, and at the individual level of empirical analysis, it is important to maintain the distinction between criminal and noncriminal gun possession. However, at the city level it is doubtful whether the two can be distinguished, as we suspect they are highly correlated. One simple reason would be the high rate of illegal gun transfers (Wright and Rossi, 1986)—cities with high noncriminal gun ownership will also have high criminal gun ownership because criminals steal guns from noncriminals. Therefore, as a practical matter, our indicators probably necessarily serve as indicators of noncriminal gun prevalence, as well as gun prevalence among criminals.

### 4.3. Validation of the Gun Prevalence Measure

Following Cook (1979), we assessed the validity of our gun indicators by measuring their associations with survey-based measures of gun

**Exhibit 9**
**0126**

prevalence. We combined the results of three national surveys, the General Social Surveys for 1980, 1982 and 1984, to compute reported gun prevalence figures for the nine major U.S. census regions, among persons living in places of 100,000 or larger population. Comparable measures were computed for each of our gun indicator variables by weighting each city measure by the city's population and calculating a weighted average for our cities in each of the nine regions.

All but one of the indirect indicators was strongly correlated across regions with the regional survey measures of gun prevalence, and the indicators were highly correlated among themselves. The only indicator about which there was some doubt is one of the two used by Cook (1979) —the percentage of homicides committed with guns. It was correlated only 0.38 with the survey-based percentage of households reporting a gun, over the nine regions, which was not significantly different from zero. The other indicators showed the following significant correlations with the percentage of households reporting a gun: 0.69 for percentage of aggravated assaults committed with a gun, 0.83 for percentage of robberies committed with a gun, 0.86 for percentage of suicides committed with guns, and 0.90 for the percentage of the value of reported stolen property attributable to guns. This last measure, not previously used in gun research, appeared to be the best single indicator of gun prevalence. These same results were confirmed using survey-based measures of respondent (as opposed to household) gun prevalence and both household and respondent prevalence of handguns. An important finding of this validity test was that all of the indicators were more strongly associated with survey measures of handgun prevalence than with gun prevalence in general. Thus our indicators may reflect handgun prevalence more strongly than longgun prevalence. This is probably advantageous, since handguns are the predominant gun type involved in crime (U.S. Bureau of Justice Statistics, 1987).

### 4.4. Reciprocal Effects

Levels of violence might influence how much gun control a city has, as well as the reverse. If violence levels and the presence of gun laws had a simultaneous reciprocal relationship, a nonrecursive model would be called for, using an appropriate estimation procedure. However, gun laws were not passed frequently enough for violence levels in 1979–1981 to influence the passage of any significant number of gun laws during the same period [see Jones and Ray (1980, Appendix III) regarding the pace of gun law changes]. Rather, the level of gun control strictness in 1979–1981 was almost entirely a cumulative product of legislative activity before 1979. Further, there is no evidence that actual or measured violence

**Exhibit 9**
**0127**

rates have any impact on legislative decisions regarding gun controls. Nevertheless, the relationship was treated as a simultaneous one in supplementary estimations, and recursive models were specified.

We always treated the relationships between gun prevalence and violent crime rate as simultaneous reciprocal ones, expecting that while gun levels may affect crime levels, crime may also simultaneously stimulate gun acquisitions (Kleck, 1984a). We used the rate of subscriptions to gun-related magazines and the state hunting license rate as measures of recreational interest in firearms. They served as instruments which should have a direct effect on gun prevalence but not on violence or crime rates, allowing identification of the model. [For a good introduction to identification problems, see Maddala (1988, pp. 293–304).]

This study improves on previous work in the following ways: (1) we modeled the two-way relationship between gun levels and violence levels, (2) we measured gun prevalence, and used multiple, validated indicators of gun prevalence levels, instead of just one or two, (3) we used extensive controls for possible sources of spuriousness, (4) we used cities as the unit of analysis, a smaller, more homogeneous unit than states, (5) we took account of both city and state gun laws, (6) we used four different sources for measuring gun laws, (7) we assessed 19 different types of gun laws instead of just 1 or 2, (8) we assessed whether the effectiveness of gun laws depends on the level of enforcement of weapons laws, and (9) we used a large sample of 170 cases, rather than the 50 or fewer common in prior studies.

## 5. INFERENTIAL LOGIC

The conditions under which one could tentatively conclude that gun laws reduce violence are as follows: If gun laws are effective, they should have (1) a significant negative association with the *gun* violence rate (e.g., the rate of homicides committed with guns), (2) a significant negative association with the *total* violence rate [e.g., the total homicide (gun homicide plus nongun homicide) rate], and, preferably, (3) a weaker association with the *nongun* violence rate (e.g., the rate of homicides not committed with guns) than with the gun violence rate.

If 1 is true, but not 2, it would generally indicate that gun laws merely shift people from guns to nongun weapons, with no net reduction in deaths or crimes. If 2 is true, but 1 is not, it suggests that gun laws are merely associated with some omitted variables which have an effect on total violence rates but that gun laws themselves have no effect, since they should have their effects by, at minimum, reducing rates of violence committed with guns. Interpretation is ambiguous if 1 and 2 are true, but 3 is

**Exhibit 9**
**0128**

not (i.e., gun laws are as strongly negatively associated with nongun rates as with gun rates). This would suggest that either (a) the gun control variable is simply a correlate of some omitted variable which affects the violence rate, since there is no strong a priori reason why gun controls should reduce the rate of violent acts without guns, or (b) the gun control does reduce acts of violence with guns but is also a correlate of some factor which reduces violent acts without guns as well. Interpretation is also ambiguous if 1 is true, 2 is not true, *and* the gun control was not significantly associated with the nongun violence rate. As noted, the first two circumstances would ordinarily suggest substitution of nongun means for guns, with no net effect on total violence. However, the fact that the gun law did not show any evidence of increasing the nongun violence rate would seem to contradict this interpretation, making a clear interpretation impossible.

Note that this logic is irrelevant to the analyses of rape and fatal gun accidents since there were no data available to separately measure gun and nongun rates of rape, and the inferential logic is irrelevant to gun accidents. For these two, interpretations had to be based entirely on findings concerning the total rape and fatal gun accident rates.

## 6. FINDINGS

Table III reports two-stage least-squares (2SLS) parameter estimates of the effects of gun laws, gun prevalence, and control variables on rates of total (gun plus nongun) violence, gun violence, and nongun violence. To clarify interpretation of Table III, consider A, pertaining to homicide rates. It reports estimates for three homicide models, with each pair of columns referring to a two-equation model of a given type of homicide. For example, the columns 2 and 3 present estimates of a two-equation model, column 2 pertaining to the total (gun plus nongun) homicide equation and column 3 pertaining to the gun prevalence equation.

Now consider estimates pertaining to a particular predictor variable. The row of numbers for BYPERMIT is estimates of coefficients reflecting the effects of laws requiring gun purchase permits on: (column 2) the total homicide rate, (column 3) gun prevalence in the total homicide model, (column 4) the rate of homicides committed with guns, (column 5) gun prevalence in the gun homicide model, (column 6) the rate of homicides not committed with guns, and (column 7) gun prevalence in the nongun homicide model, respectively. These estimates indicate that this type of gun control appears to have a significant negative effect on the total homicide rate, no significant negative effect on the gun homicide rate, and a significant negative effect on the nongun homicide rate. The interpreta-

**Exhibit 9**
**0129**

Impact of Gun Control and Ownership Levels on Violence Rates                    267

Table III. Two-Stage Least-Squares Estimates (Standardized Coefficients)

| | Total homicide | Gun prevalence | Gun homicide | Gun prevalence | Nongun homicide | Gun prevalence |
|---|---|---|---|---|---|---|
| (A) Homicide models | | | | | | |
| PCTHISP | −0.035 | −0.017 | −0.041 | −0.005 | −0.030 | −0.028 |
| RPOV | 0.762*** | −0.257 | 0.704*** | −0.298 | 0.746*** | −0.175 |
| COLLEGE | −0.299*** | 0.034 | −0.302*** | 0.068 | −0.254*** | −0.017 |
| CNTDIVRT | 0.243*** | | 0.164*** | | 0.325*** | |
| PCTSMSA | −0.135** | 0.030 | −0.132** | 0.033 | −0.121* | 0.022 |
| INVPOP | −0.223*** | | −0.213*** | | −0.232*** | |
| DENSITY | −0.037 | −0.266*** | −0.008 | −0.268*** | −0.056 | −0.275*** |
| STHNNESS | 0.253* | 0.472*** | 0.289** | 0.400*** | 0.129 | 0.582*** |
| RGUNMAG | | 0.150** | | 0.131** | | 0.174** |
| HUNTERS | | 0.247*** | | 0.237*** | | 0.255*** |
| LICENSE | −0.077 | −0.028 | −0.083 | −0.011 | −0.047 | −0.052 |
| BYPERMIT | −0.150** | −0.13 | −0.095 | −0.030 | −0.248*** | 0.012 |
| WAITPER | −0.060 | 0.049 | −0.041 | 0.046 | −0.088 | 0.055 |
| CRIMINAL | −0.035 | −0.150** | −0.026 | −0.138** | −0.032 | −0.167*** |
| MENTAL | −0.018** | 0.029 | −0.177*** | 0.046 | −0.020** | 0.021 |
| ADDICT | 0.112 | 0.072 | 0.114 | 0.053 | 0.092 | 0.099 |
| ALCOHOLIC | 0.037 | 0.028 | 0.035 | 0.020 | 0.033 | 0.040 |
| MINORS | 0.015 | 0.049 | 0.020 | 0.041 | −0.010 | 0.064 |
| REGISTER | 0.124* | 0.079 | 0.120* | 0.068 | 0.127* | 0.091 |
| DEALER | −0.065 | −0.133 | −0.079 | −0.117 | −0.039 | −0.155* |
| CARYHIDN | 0.077 | 0.075 | 0.033 | 0.078 | 0.143 | 0.070 |
| CARYOPEN | −0.056 | −0.078 | −0.058 | −0.064 | −0.023 | −0.105 |
| MANDPEN | −0.050 | 0.003 | −0.075 | 0.025 | −0.027 | −0.013 |
| ADDONDIS | −0.088 | −0.058 | −0.115** | −0.027 | −0.033 | −0.095 |
| ADDONMND | −0.023 | −0.071 | −0.030 | −0.054 | 0.019 | −0.094 |
| RTBRARMS | −0.047 | −0.003 | −0.038 | −0.005 | −0.031 | −0.012 |
| HHGBAN | 0.08 7 | 0.014 | 0.093 | −0.002 | 0.073 | 0.298 |
| SNSBAN | 0.083 | −0.086 | 0.089* | −0.094 | 0.088 | −0.082 |
| HGBYBAN | 0.001 | 0.005 | −0.013 | 0.011 | 0.028 | −0.003 |
| LNMR | | 0.487** | | | | |
| LNGUNMR | | | | 0.561** | | |
| LNMGMR | | | | | | 0.413* |
| Gun prevalence[a] | −0.283 | | −0.111 | | −0.525* | |
| Gun Law Index[b] | 0.409** | −0.775 | 0.408** | −0.714 | 0.324* | −0.799 |

Exhibit 9
0130

**Kleck and Patterson**

**Table III.** Continued

| (B) Aggravated assault models | | | | | |
|---|---|---|---|---|---|
| | Total assault | Gun prevalence | Gun assault | Gun prevalence | Nongun assault | Gun prevalence |
|---|---|---|---|---|---|---|
| RPOV | 0.626*** | | 0.487*** | | 0.591*** | |
| COLLEGE | −0.154*** | | −0.116* | | −0.132* | |
| CNTDIVRT | 0.247*** | 0.078 | 0.168*** | 0.079 | 0.264*** | 0.077 |
| ALCHLSM | 0.232*** | | 0.253*** | | 0.210*** | |
| PCTSMSA | −0.124* | | −0.111 | | −0.116 | |
| INVPOP | 0.087 | | −0.036 | | 0.128* | |
| STHNNESS | 0.103 | 0.640*** | 0.159 | 0.580*** | 0.109 | 0.659*** |
| RGUNMAG | | 0.133** | | 0.143*** | | 0.127** |
| GUNTERS | | 0.177*** | | 0.158*** | | 0.183*** |
| LICENSE | −0.040 | −0.083 | −0.029 | −0.075 | −0.068 | −0.083 |
| BYPERMIT | 0.114 | −0.064 | 0.129 | −0.069 | 0.072 | −0.056 |
| WAITPER | −0.014 | 0.013 | −0.028 | −0.021 | −0.033 | −0.003 |
| CRIMINAL | −0.028 | −0.105* | −0.167** | −0.079 | 0.051 | −0.114* |
| MENTAL | 0.109 | −0.118* | 0.112 | −0.125* | 0.093 | −0.112 |
| ADDICT | 0.093 | 0.050 | 0.161 | 0.026 | 0.049 | 0.057 |
| ALCOHOLIC | 0.082* | 0.130** | 0.017 | 0.128** | 0.019 | 0.132** |
| MINORS | −0.044 | 0.064 | −0.036 | 0.061 | −0.043 | 0.065 |
| REGISTER | 0.013 | 0.019 | 0.111 | −0.002 | 0.134 | 0.027 |
| DEALER | −0.167 | −0.086 | −0.225** | −0.056 | −0.137 | −0.096 |
| CARYHIDN | 0.045 | 0.025 | 0.040 | 0.020 | 0.017 | 0.028 |
| CARYOPEN | 0.118 | −0.060 | 0.004 | −0.049 | 0.166* | −0.061 |
| MANDPEN | −0.026 | −0.025 | −0.050 | −0.020 | −0.024 | −0.024 |
| ADDONDIS | −0.078 | −0.118** | −0.096 | −0.103* | −0.026 | −0.127** |
| ADDONMND | 0.014 | −0.109 | 0.068 | −0.111 | −0.011 | −0.111 |
| RTBRARMS | 0.098 | −0.008 | 0.046 | −0.007 | 0.122 | −0.009 |
| HGBAN | 0.022 | −0.026 | 0.045 | −0.037 | 0.017 | −0.024 |
| SNSBAN | 0.069 | −0.064 | 0.156** | −0.075 | 0.043 | −0.065 |
| HGBYBAN | −0.106 | 0.038 | −0.103 | 0.044 | −0.084 | 0.034 |
| LNASLT | | 0.126 | | | | |
| LNGNASLT | | | | 0.190** | | |
| LNNGASLT | | | | | | 0.107 |
| Gun prevalence[c] | −0.021 | | 0.277 | | −0.194 | |
| Gun Law Index[b] | 0.095 | −0.607** | 0.014 | −0.711*** | 0.107 | −0.531** |

**Exhibit 9**
**0131**

Impact of Gun Control and Ownership Levels on Violence Rates    269

Table III.  Continued

(C)  Robbery models

| | Total robbery | Gun prevalence | Gun robbery | Gun prevalence | Nongun robbery | Gun prevalence |
|---|---|---|---|---|---|---|
| PCTBLACK | 0.525* | 0.541** | 0.375 | 0.446*** | 0.610* | 0.550*** |
| PCTM1524 | −0.073 | | −0.101 | | −0.051 | |
| INEQUALT | 0.458*** | | 0.385*** | | 0.438*** | |
| COLLEGE | −0.197*** | | −0.087 | | −0.236*** | |
| ADDICTRT | 0.082 | | 0.096* | | 0.070 | |
| PCTSMSA | −0.201** | 0.085 | −0.311*** | 0.103 | −0.010 | 0.089 |
| VISITORS | 0.257*** | 0.042 | 0.278*** | 0.004 | 0.212*** | 0.046* |
| INVPOP | −0.277*** | | −0.252*** | | −0.276*** | |
| WEST | 0.176 | | 0.219** | | 0.160 | |
| RGUNMAG | | 0.082 | | 0.105 | | 0.064 |
| HUNTERS | | 0.100 | | 0.108 | | 0.085 |
| LICENSE | −0.013 | −0.078 | 0.012 | −0.085 | −0.029 | −0.072 |
| BYPERMIT | −0.089 | −0.143* | −0.081 | −0.132 | −0.077 | −0.129 |
| WAITPER | 0.033 | −0.175 | 0.066 | −0.227** | −0.024 | −0.150 |
| CRIMINAL | −0.070 | 0.034 | −0.107* | 0.031 | −0.033 | 0.038 |
| MENTAL | −0.142 | −0.292*** | −0.035 | −0.321*** | −0.234 | −0.273*** |
| ADDICT | 0.164 | 0.249** | 0.160 | 0.233** | 0.180 | 0.234** |
| ALCOHOLIC | 0.066 | 0.040 | 0.047 | 0.037 | 0.059 | 0.038 |
| MINORS | −0.002 | 0.013 | −0.008 | 0.016 | 0.004 | 0.012 |
| REGISTER | −0.007 | −0.126 | 0.020 | −0.145* | −0.065 | −0.122 |
| DEALER | −0.143* | −0.125 | −0.126* | −0.110 | −0.155 | −0.121 |
| CARYHIDIN | 0.063 | 0.094 | 0.088 | 0.077 | 0.049 | 0.089 |
| CARYOPEN | −0.032 | −0.112 | 0.008 | −0.126 | −0.082 | −0.106 |
| MANDPEN | −0.147** | −0.066 | −0.124** | −0.062 | −0.164** | −0.066 |
| ADDONDIS | −0.167** | −0.114 | −0.110* | −0.102 | −0.181** | −0.113 |
| ADDONMND | 0.018 | −0.003 | 0.054 | −0.011 | −0.017 | 0.000 |
| RTBRARMS | 0.032 | 0.137 | 0.014 | 0.119 | 0.062 | 0.138 |
| HGBAN | 0.104 | −0.031 | 0.194*** | −0.052 | 0.051 | −0.031 |
| SNSBAN | 0.060 | 0.019 | 0.070 | 0.020 | 0.074 | 0.019 |
| HGBYBAN | −0.105* | 0.007 | −0.095* | 0.034 | −0.095 | −0.003 |
| LNROB | | −0.149 | | | | |
| LNGNROB | | | | 0.012 | | |
| LNNGROBR | | | | | | −0.206* |
| Gun prevalence[d] | −0.538 | | 0.197 | | −0.793* | |
| Gun Law Index[b] | 0.140 | −0.216 | −0.062 | −0.538*** | −0.043 | −0.197*** |

Exhibit 9
0132

**Table III.** Continued

| | Rape | Gun prevalence | Fatal gun accidents | Gun prevalence |
|---|---|---|---|---|
| PCTBLACK | 0.750*** | | 0.296*** | 0.384*** |
| CNTDIVRT | 0.249*** | | | |
| INVPOP | −0.242*** | | −0.117 | −0.064 |
| WEST | 0.340*** | −0.310* | | |
| DENSITY | −0.168 | | 0.088 | |
| MFI | | 0.340 | | |
| OWNEROCC | | 0.556** | | |
| ALCHLSM | | | −0.143 | |
| ACCIDENT | | | 0.217** | |
| RGUNMAG | | 0.187 | | 0.155*** |
| HUNTERS | | −0.065 | | 0.178*** |
| LICENSE | 0.079 | −0.191* | −0.101 | −0.129 |
| BYPERMIT | −0.109 | 0.079 | 0.025 | −0.189** |
| WAITPER | −0.061 | −0.050 | 0.053 | −0.248** |
| CRIMINAL | 0.053 | −0.106 | 0.123 | 0.023 |
| MENTAL | −0.045 | −0.076 | −0.157 | −0.287*** |
| ADDICT | 0.215 | −0.038 | 0.001 | 0.176* |
| ALCOHOLIC | 0.103 | −0.127 | 0.030 | 0.068 |
| MINORS | 0.087 | −0.057 | −0.062 | −0.033 |
| REGISTER | −0.097 | −0.059 | −0.018 | −0.039* |
| DEALER | −0.063 | 0.114 | 0.098 | −0.159* |
| CARYHIDN | 0.078 | 0.111 | | |
| CARYOPEN | −0.015 | −0.098 | | |
| MANDPEN | −0.096 | 0.113 | | |
| ADDONDIS | −0.066 | −0.038 | | |
| ADDONMND | 0.133 | −0.237* | | |
| RTBRARMS | 0.182** | −0.144 | | |
| HGBAN | −0.092 | 0.138 | 0.009 | −0.028 |
| SNSBAN | 0.084 | −0.128 | 0.063 | 0.000 |
| HGBYBAN | −0.112 | 0.055 | −0.099 | 0.061 |
| LNRAPE | | 1.088*** | | |
| Gun prevalence[e] | −0.249 | | 0.121 | |
| Gun Law Index[b] | −0.051 | −0.593 | 0.111 | −1.262*** |

**Exhibit 9**
**0133**

Impact of Gun Control and Ownership Levels on Violence Rates                          271

Table III. Continued

(E) Suicide models (OLS estimates)

|  | Total suicide | Gun suicide | Nongun suicide | Gun prevalence |
|---|---|---|---|---|
| TRNSIENT | 0.240*** | 0.098* | 0.286*** | |
| CNTDIVRT | 0.159** | 0.165*** | 0.004 | 0.134 |
| ALCHLSM | 0.332*** | 0.255*** | 0.275*** | |
| INVPOP | 0.020 | −0.071 | 0.125* | |
| DENSITY | −0.237*** | −0.386*** | 0.017 | −0.197* |
| HOSPITAL | 0.069 | 0.101* | 0.008 | |
| LIVLONE | 0.183** | 0.065 | 0.257*** | |
| PCTOLD | 0.138* | 0.064 | 0.113 | |
| RGUNMAG | | | | 0.065 |
| HUNTERS | | | | 0.063 |
| LICENSE | −0.033 | −0.062 | 0.008 | −0.171* |
| BYPERMIT | −0.089 | −0.146** | 0.053 | −0.005 |
| WAITPER | 0.005 | −0.025 | 0.008 | −0.211* |
| CRIMINAL | 0.071 | 0.090 | −0.056 | −0.129 |
| MENTAL | −0.071 | −0.134* | 0.014 | −0.095 |
| ADDICT | 0.058 | −0.008 | 0.154 | 0.240*** |
| ALCOHOLIC | −0.038 | −0.010 | −0.087 | 0.041 |
| MINORS | −0.038 | −0.018 | −0.048 | 0.036 |
| REGISTER | −0.063 | −0.089 | 0.016 | −0.139 |
| DEALER | −0.229*** | −0.140** | −0.207** | 0.001 |
| CARYHIDN | | | | |
| CARYOPEN | | | | |
| MANDPEN | | | | |
| ADDONDIS | | | | |
| ADDONMND | | | | |
| RTBRARMS | | | | |
| HGBAN | −0.062 | −0.095 | −0.037 | 0.114 |
| SNSBAN | 0.094 | −0.014 | 0.148** | −0.013 |
| HGBYBAN | −0.066 | 0.051 | −0.093 | 0.107 |
| Gun prevalence[f] | 0.132** | 0.252*** | −0.101 | |
| Gun Law Index[b] | −0.242 | −0.319* | 0.005 | −0.084 |

[a] Principal-components factor with indicators PCTGNAST, PCTGNROB, PGS7982, and GUNSTOL.

[b] Principal-components factor with indicators: all gun laws.

[c] Principal-components factor with indicators PGH7982, PCTGNROB, PGS7982, and GUNSTOL.

[d] Principal-components factor with indicators PGH7982, PCTGNAST, PGS7982, and GUNSTOL.

[e] Principal-components factor with indicators PCTGNAST, PCTGNROB, PGS7982, GUNSTOL, and PGH7982.

[f] Principal-components factor with indicators PGH7982, PCTGNROB, PCTGNAST, and GUNSTOL.

 *$P < 0.10$.
 **$P < 0.05$.
 ***$P < 0.01$.

**Exhibit 9**
**0134**

tion of this pattern of results is that the law is ineffective in reducing homicide, since it did not have a significant negative association with the rate of gun homicide.

## 6.1. Effects of Gun Prevalence Levels on Violence Rates

Estimates of the impact of gun prevalence on violence rates can be found in Table III in the penultimate row of each column referring to a violence rate. For example, the 2SLS coefficient estimating the impact of gun prevalence on the total murder rate is a nonsignificant $-0.283$ (column 2 in A).

Gun prevalence had an apparent significant positive effect on total rates of suicide, but not on any of the other five types of violence. The apparent effect of gun prevalence on suicide rates, however, is not entirely stable, being evident only when the suicide models were estimated with OLS. Some would argue that high suicide rates could discourage gun acquisition among people living in households with a person they believed to be suicide-prone. If this were true, then gun prevalence should be treated as endogenous in the suicide models, just as in the other models (though for different reasons). When gun prevalence was treated as endogenous, and the model was estimated with 2SLS, the results indicated no significant impact of gun prevalence on suicide. We tentatively conclude that gun prevalence rates *may* increase total suicide rates but have no effect on total rates of homicide, robbery, aggravated assault, rape, or fatal gun accidents.

## 6.2. Effects of Violence Rates on Gun Prevalence Levels

Coefficients estimating these effects can be found in the Gun Prevalence columns in Table III, in the rows near the bottom of each panel labeled with the names of the various violence rates. For example, in column 3 in A, the LNMR coefficient is a significant 0.487, indicating that the total homicide rate appears to have a positive impact on gun prevalence.

Homicide (gun, nongun, and total), gun assault, and rape rates all had significant positive coefficients in the gun prevalence equations. This supports the hypothesis that some violence rates encourage the acquisition of firearms for self-defense, accounting at least partially for bivariate positive associations observed between gun prevalence levels and violence levels. That rape in particular should have this effect is consistent with survey evidence that women's gun ownership, while lower than men's, is disproportionately likely to be motivated by self-defense concerns and with county-level findings that female gun ownership rates are more responsive to violence rates than men's ownership rates are (Bordua and Lizotte,

**Exhibit 9**
**0135**

1979, p. 172). More generally, the results support the simple idea that rates of more serious violent crimes are more likely to increase gun acquisition.

## 6.3. Effects of Gun Controls on Gun Prevalence Levels

The effects of 19 types of gun regulations on gun prevalence levels are summarized in Table IVA. The effect of each gun restriction on gun prevalence was estimated multiple times, once in each of six violence rate models. Because the exact set of gun prevalence indicators used varied from one model to the next, it therefore was possible for estimated effects of gun controls on gun prevalence levels to vary somewhat from one violence rate model to the next. None of the gun controls appeared to have any impact on gun prevalence. Each law's effect on gun prevalence was initially estimated six times, but only bans on gun possession by criminals and mentally ill persons showed significant effects in even half of the initial tests.

**Table IV.** Summary of Effects of Gun Prevalence and Gun Controls on Violence Rates

(A) Significant negative impact of gun controls on gun prevalence?[a]

| | Violence rate model | | | | | |
| | Homicide | Aggrvtd. assault | Robbery | Rape | Gun accidents | Suicide |
|---|---|---|---|---|---|---|
| LICENSE | No | No/Yes | No/Yes | Yes | No/Yes | Yes |
| BYPERMIT | No | No/Yes | Yes | No | Yes | No |
| WAITPER | No | No | No | No | Yes | Yes |
| CRIMINAL | Yes | Yes | No | No | No | No/No/Yes |
| MENTAL | No | Yes | Yes | No | Yes | No |
| ADDICTS | No | No | No | No | No | No |
| ALCOHOLIC | No | No | No | No | No | No |
| MINORS | No | No | No | No | No | No |
| REGISTER | No | No | No/No/Yes | No | Yes | No |
| DEALER | No | No | No | No | Yes | No |
| CARYHIDN | No | No | No | No | | |
| CARYOPEN | No | No | No | No | | |
| MANDPEN | No | No | No | No | | |
| ADDONDIS | No | Yes | No | No | | |
| ADDONMND | No | No | No | Yes | | |
| RTBRARMS | No | No | No | No | | |
| HGBAN | No | No | No | No | No | No |
| SNSBAN | No | No | No | No | No | No |
| HGBYBAN | No | No | No | No | No | No |

**Exhibit 9**
**0136**

**Table IV.** Continued

(B) Effects of gun prevalence and gun laws on violence rates

| | Homicide | Aggrvtd. assault | Robbery | Rape | Gun accidents | Suicide |
|---|---|---|---|---|---|---|
| | | | Violence rate model | | | |
| Significant positive effect of gun prevalence? | No | No | No | No | No | (Yes)[b] |
| Significant negative effect of gun laws?[a] | | | | | | |
| LICENSE | No/Yes/Maybe | No | No | No | No | No/Maybe/No |
| BYPERMIT | No/Maybe/No | No | No | No | No | Maybe |
| WAITPER | No | No | No | No | No | No |
| CRIMINAL | No | Maybe | Maybe | No | No | No |
| MENTAL | Yes | No | No | No | No | Maybe |
| ADDICT | No | No | No | No | No | No |
| ALCOHOLIC | No | No | No | No | No | No |
| MINORS | No | No | No | No | No | No |
| REGISTER | No | No | No | No | No | No |
| DEALER | No | Maybe | Yes | No | No | Maybe |
| CARYHIDN | No | No | No | No | | |
| CARYOPEN | No | No | No | No | | |
| MANDPEN | No | No | Maybe | No | | |
| ADDONDIS | Maybe/ /Yes | No | Maybe | No/ /Yes | | |
| ADDONMND | No | No | No | No | | |
| RTBRARMS | No | No | No | No | | |
| HGBAN | No | No | No | No/Yes/Yes | No | No/No/Maybe |
| SNSBAN | No | No | No | No | No | No |
| HGBYBAN | No | No | Yes | No | No | No |
| Gun Law Index | No | No | No | No | No | No |

[a]Where more than one interpretation appears in a cell, it means that interpretations became more supportive of the gun control efficacy hypothesis when different specifications were used. (1) The first (and usually the only) interpretation pertains to models containing all 19 gun laws and no provision for interactions; (2) the second one pertains to results when using a reduced set of four gun control variables; (3) the third one pertains to results when multiplicative terms testing for interactions between gun laws and enforcement levels were specified (see text). Unsupportive results which remained unsupportive (No) under the latter two alternative specifications are not shown, to simplify the table.

[b]An effect of gun prevalence on total suicide rates was evident only when the model was estimated with OLS. When gun prevalence was treated as endogenous and the model was estimated with 2SLS, results did not indicate an impact of gun prevalence.

**Exhibit 9**
**0137**

We checked to see if gun control effects on gun prevalence would become evident if we used a reduced set of four of the stronger gun laws (listed in a later section). The results for just one type of gun control changed (indicated by Yes appearing after one slash in a given cell in Table IVA)—gun owner licensing appears to reduce gun prevalence in five of the six violence models. However, since this apparent effect is evident only when there are no controls for other gun laws, this result may reflect the cumulative, albeit apparently slight, effects of other, correlated, gun laws as well as the effects of licensing itself. Therefore, interpretation of this result must remain ambiguous.

We also checked for interactions between gun laws and police enforcement effort by adding to each gun prevalence equation a multiplicative term for each gun control variable, consisting of the gun control variable multiplied times the weapons arrest rate. Of 108 tests for interactions, only 2 suggested an effect of gun controls on gun prevalence which was contingent upon enforcement effort, where no impact of the controls had been evident in the additive analysis. These are denoted by Yes appearing after two slashes in any of the cells in Table IVA (see CRIMINAL in the Suicide model and REGISTER in the Robbery model). Given the large number of tests, we believe that these two deviant results could be the product of chance. Thus, our evidence generally fails to support the hypothesis that the impact of gun controls on gun levels depends on the level of police enforcement.

## 6.4. Effects of Gun Control Laws on Violence Rates

Table III contains detailed results on this issue, which are summarized in Table IV. The findings indicate that most gun restrictions appear to exert no significant negative effect on total violence rates, though some gun controls do seem to be effective. Of 102 possible effects tested, 7 were consistently supportive of, and 11 others were at least partially consistent with, a hypothesis of gun control effectiveness, albeit using fairly generous evaluative criteria. As described below, each gun law's effect on a given form of violence was estimated under three conditions: (1) with all gun law variables specified in the models but with no measure of enforcement effort included, (2) with all gun control variables specified in the models and with interactions of gun laws and enforcement effort included, and (3) with a reduced set of four especially strong gun control variables included in the models. In the subsequent discussion, each law is assessed based on the most supportive of the three sets of results, i.e., the results most supportive of a violence-reducing impact of the law. Thus, the gun control efficacy hypothesis was given 18 chances at confirmation for any one form of gun

**Exhibit 9**
**0138**

control, with hypothesis tests in three sets of circumstances, in each of six violence rate models. (There were, however, no tests of the impact of carry laws, add-on penalties for committing a crime with a gun, or right-to-bear-arms provisions on suicide or gun accident rates, as these regulations were considered irrelevant to suicides or accidents. For example, nearly all gun suicides are committed in a private location and thus are unlikely to be affected by carry laws.)

### 6.4.1. Results with All 19 Gun Control Variables Included, No Enforcement Interactions

Because we could not know in advance which gun control measures affected violence rates, we initially specified all 19 gun control variables in each violence rate equation (with the exceptions described in the previous paragraph). As noted previously, collinearity among these variables was generally slight, so this was not a serious statistical problem. We first present interpretations based on these specifications, followed by discussion of any results which were modified when a reduced set of gun laws were used or when interactions with enforcement levels were specified.

Requiring permits to buy guns (BYPERMIT) may reduce rates of suicide. Bans on possession of guns by convicted criminals (CRIMINAL) may reduce rates of aggravated assault and robbery. Bans on possession of guns by mentally ill persons (MENTAL) appear to reduce homicide and may reduce suicide. Requiring a state or local license to be a gun dealer (DEALER) appears to reduce rates of robbery and may reduce aggravated assaults and suicides. Laws that provide mandatory penalties for unlawful gun carrying (MANDPEN) may reduce robbery. Laws providing discretionary additional penalties for committing crimes with a gun (ADDONDIS) may reduce murder and robbery. Finally, local bans on the purchase of handguns appear to reduce robbery rates.

### 6.4.2. Results Using a Reduced Set of Gun Law Variables

While the problem is mild, there is some collinearity among the gun law variables which could inflate standard errors somewhat and thereby bias hypothesis tests in favor of the null hypothesis. Therefore the violence rate models were reestimated with just four gun law variables thought to be especially likely to show effects, since they were fairly strong measures—licenses, purchase permits, handgun possession bans, and bans on sale of "Saturday Night Specials." When this was done, four of the previous results were altered so as to strengthen, to varying degrees, support for the hypothesis of gun control efficacy. (Two results changed mildly from No to Maybe, while two changed substantially from No to Yes.) With the reduced set of gun law variables, estimates indicated that owner licensing

**Exhibit 9**
**0139**

appears to reduce homicides and may reduce total suicides. Purchase permits may reduce homicides (there was still, however, a stronger negative association of permits with nongun homicide than with gun homicide). These estimations also indicated that handgun bans appear (somewhat implausibly, given how rarely rapists use guns) to reduce rapes, but not any other forms of violence. The rest of the gun law assessments were unaffected. Gun prevalence still showed no positive effect on any of the violence rates except the gun suicide and total suicide rates, the same as with models including the full set of gun laws. (Results are summarized in Table IV; estimates are not reported here but are available from the senior author.)

### 6.4.3. Interactions with Enforcement Level

It could be argued that gun laws are not always given a fair chance to work because in many places they are not adequately enforced. We tested this idea by forming multiplicative interaction terms between each gun law variable and a measure of police enforcement effort, the number of weapons arrests per 100 sworn police officers (WEAPARTS), and adding these terms into our models of violence rates. The resulting estimates generally confirmed the previous results. The coefficients for the interaction terms were rarely negative and significant, indicating that the effects of gun laws apparently were not dependent on the level of police enforcement effort, at least not based on the measure of effort used and not within the range of enforcement effort currently exerted in large U.S. cities. Of 102 possible interaction effects tested, only 5 suggested possible gun law effectiveness contingent upon the level of law enforcement effort: (1) laws providing discretionary add-on penalties for committing crimes with a gun appear to reduce the total homicide rate when accompanied by sufficient enforcement effort, (2) the same appears to be true for rape, (3) owner licensing may have such a contingent effect on homicide (4) handgun bans appear to have a contingent effect on the rape rate, and (5) handgun bans may have such an effect on the suicide rate. Given the large number of tests for interaction effects, however, five "significant" results might be little more than a product of chance. (Interaction test results are summarized in Table IV; estimates are available from the senior author.)

## 6.5. Gun Control as a Single Endogenous Variable

As noted before, we consider it unlikely that there is a simultaneous reciprocal relationship between gun laws and violence rates. Nevertheless, we estimated models of violence rates which assumed that such a relationship was possible. To do this, a Gun Law Index (GLI) was created

Exhibit 9
0140

from all 19 gun control variables, using principal components analysis. This variable was treated as endogenous, in a model which assumed that simultaneous relationships existed among the GLI, the violence rate, and gun prevalence. Two instrumental variables were assumed to affect directly the GLI but not violence rates or gun ownership: LIBERAL, the percentage of a city's voters who voted for George McGovern in the 1972 presidential election (a measure of political liberalism), and NRA, the city's rate of membership in the National Rifle Association.

Estimates of the GLI coefficient are reported near the bottom of each violence rate column in Table III. Note that these are estimates from separate models which did *not* include the individual gun control variables and, thus, are not a part of the models to which the rest of the coefficients in Table III correspond. These estimates indicate that the overall level of gun control in a city does not appear to exert a significant negative effect on any of the six violence rates. The only hint of a possible exception was with suicide. Although the GLI was not related to the total suicide rate, its coefficient was negative and marginally significant ($0.05 \leqslant P < 0.10$) in the gun suicide equation and nonsignificant in the nongun suicide equation. Thus, treating gun control as a single endogenous variable did not strengthen support for the gun control efficacy hypothesis.

## 7. DISCUSSION

These results generally support the view that (1) existing gun control laws do not reduce gun prevalence in U.S. cities, (2) gun prevalence does not have any measurable net positive effect on violence rates except for a possible effect on suicide rates, and (3) most gun control laws do not reduce violence rates, though a few may do so.

For many gun regulations, such as carry controls or add-on penalties, it is not surprising that they do not reduce gun ownership, since they were not intended to do so. Still other gun controls may operate to restrict ownership only among "high-risk" groups such as criminals or alcoholics. However, results indicated that most gun controls fail to reduce gun use in acts of violence, undercutting the idea that controls reduce gun prevalence even in criminally involved subsets of the population. One simple explanation for this failure would be the huge size of the U.S. gun stock. With over 200 million guns in private hands, it is hard to keep guns away from anyone who strongly desires one.

Few of the tests unambiguously supported the gun law efficacy hypothesis. However, it increases confidence in some of these few supportive findings to know that they correspond closely with similar results in past research. (1) The present study found partial support for the claim

**Exhibit 9**
**0141**

that laws establishing additional penalties for committing felonies with a gun may reduce total robbery rates, and prior research by McPheters *et al.* (1984) indicated the same thing. (2) Bans on gun possession by mentally ill persons may reduce suicide, consistent with the findings of Sommers (1984). (3) Mixed evidence suggested that handgun bans *may* reduce suicide, though this weak result reflected such controls in only two cities (New York City and Washington, DC). This is consistent with results of Loftin *et al.* (1991). (4) Finally, a previous study indicated that a mandatory penalty carry law, the Bartley–Fox law, appeared to reduce robbery (Deutsch and Alt, 1977), and the present research also indicates that such laws may reduce robbery.

As actually administered, "mandatory penalty" carry laws do not impose penalties in a truly mandatory fashion but, rather, merely in a relatively less discretionary one (Beha, 1977). Rather than mandatory penalties being viewed as essential, a more plausible interpretation of these results is that the mandatory penalty provision serves as an indicator of strong support among court actors for relatively severe punishment of unlicensed gun carrying. Where such laws exist, prosecutors may devote more resources to prosecuting illegal weapons carriers, and may be more likely to seek stiff penalties, even though they could evade the mandatory provisions if they chose to do so.

One type of gun law which clearly appeared to have some beneficial effect was a somewhat surprising one. Laws requiring a state or local license to be a firearms dealer were negatively related to aggravated assault, robbery, and suicide rates, with the results being strong (i.e., a Yes conclusion) for robbery. Because dealers everywhere in the United States are required to have a federal gun dealer license, additional state or local licensing requirements might seem trivial. However, if these requirements are more stringent or require high licensing fees, they can reduce the number of retail gun outlets and possibly reduce casual acquisition of guns among persons not sufficiently motivated or persistent to seek out less convenient stores or nonretail sources (Blose and Cook, 1980, p. 20). Although results summarized in Table IVA do not support the idea that this law reduces aggregate gun prevalence levels, it may affect a subset of weakly motivated buyers.

## 7.1. Gun Prevalence Effects

Why do gun prevalence levels have no apparent net positive effect on violence rates, with the possible exception of suicide? The absence of any net effects of gun levels could be due to counterbalancing effects of opposite sign, with criminal ownership increasing the rates and noncriminal

**Exhibit 9**
**0142**

ownership decreasing them, due to deterrent effects of ownership among prospective victims (Kleck, 1988). If this were so, it might still be useful to reduce gun levels among criminals if measures used to accomplish this did not also reduce gun levels among noncriminals by an equal or greater amount.

Ordinary least-squares results indicated that gun prevalence may influence the choice of method in suicides and also the overall frequency of suicide. Gun prevalence was positively associated with both total suicide rates and gun suicide rates and negatively (though nonsignificantly) related to the nongun suicide rate.

No impact of gun prevalence on fatal gun accident rates was detected. Given the random component in accident causation and the rarity of fatal gun accidents (one or two a year in most cities), the absence of a relationship is perhaps not that surprising. It may also be that many cities with a higher gun prevalence, especially smaller cities and those in the South and West, have gun owners more thoroughly socialized from childhood into safe handling of guns, as opposed to getting guns as adults, without training.

The present results confirm those of the two best previous studies of city gun ownership and robbery rates, which also found no evidence of a net impact of gun ownership levels on the total robbery rate (Cook, 1979; McDowall, 1986). The present findings indicate that gun ownership levels increase (albeit nonsignificantly) gun robbery and decrease nongun robbery, suggesting that where guns are not available, robbers substitute other weapons, with no net effect on total robbery rates. Gun ownership levels also may have no net effect on total robbery because they may have a mixture of both positive and negative effects. On the one hand, guns make it possible for larger numbers of people to rob, including those too timid to rob without a gun, and expand the number of targets a given robber can successfully tackle. On the other hand, guns also enable robbers to rob more lucrative targets, increasing the average "take" per robbery and allowing them to gain a given amount of income with fewer robberies (Cook, 1976; Wright et al., 1983). Also, gun ownership by prospective victims, especially retail store owners, may deter some robbers (Wright and Rossi, 1986, pp. 141–159; Kleck, 1988). The finding are consistent with an interpretation that these effects of opposite sign cancel each other out, with no net effect on the total robbery rate.

In assaultive crimes such as homicide and aggravated assault, gun availability also seems to have a mixture of positive and negative effects. In an individual-level analysis of violent incidents, Kleck and McElrath (1991) found that an aggressor's possession or use of a gun appears to reduce the probability of a physical attack (as opposed to a mere threat) on the victim

**Exhibit 9**
**0143**

and appears to reduce the probability that the attack will result in a physical injury, while increasing the probability that an injury will be fatal. Further, possession of guns by prospective victims may exert a modest deterrent effect on would-be aggressors (Wright and Rossi, 1986; Kleck, 1988). The present aggregate level findings are consistent with a claim that the negative, violence-reducing effects of gun ownership may roughly cancel out the violence-increasing effects, consistent with the findings of previous time series research indicating no net effect, positive or negative, of gun ownership levels on the homicide rate (Kleck, 1984a).

## 7.2. Gun Law Effects

Why do most of 19 different major varieties of gun control laws appear to have no impact, with a few exceptions, on the types of violence which frequently involve guns? Many explanations are suggested by both our own results and those of prior research. First, some gun laws are intended to have their effects by reducing gun ownership levels, so some gun laws may fail because they do not achieve their proximate goal of reducing gun ownership (Table IVA). However, our results also generally indicate that gun prevalence levels do not have a net positive effect on violence rates (top row, Table IVB). Consequently, gun laws may fail simply because, even if they did reduce gun prevalence, this would not produce a reduction in violence rates.

On the other hand, the rationale for some gun regulations does not rely on an assumption that gun ownership levels affect violence. For example, carrying laws are intended to make guns less immediately available in public places rather than to reduce overall gun ownership levels; the rationale for such laws assumes only that the immediate availability of guns in public places is relevant to some violence rates, especially robbery. Likewise, add-on penalties are intended to discourage criminals from choosing guns to use in their crimes. It is also possible that gun laws have only a short-term effect on violence rates when they are passed and that the effect then fades. Most of the laws we have evaluated were implemented well in the past, so we cannot assess this idea.

Most gun laws regulate only handguns, or regulate handguns more stringently than the more numerous longguns such as rifles and shotguns (Kleck, 1991, Chap. 8). This permits the substitution of relatively unregulated longguns for the more heavily regulated handguns. While longguns are larger than handguns, and thus not so easily concealed or conveniently carried on the person, such a limitation is rarely relevant for suicides and is also irrelevant for many violent crimes, because either (1) the crime is committed in or near a private place, in a way which

**Exhibit 9**
**0144**

does not require carrying or concealment of the gun, or (2) the crime was committed after some advance planning, in a way which would require only short-term carrying or which could involve use of a longgun whose barrel and stock had previously been cut down to render it concealable. Longguns are generally more lethal than handguns. Thus, while restrictions on handgun availability could cause some violent persons to go without guns of any kind, they may also have the undesirable effect of encouraging others to substitute more lethal longguns. The implication for the homicide rate would be that these effects would cancel out or, worse, produce a net increase in homicides (Kleck, 1984b).

No matter how severe current measures are, it is always possible that stronger measures are needed. However, even fairly strong measures such as banning sales of "Saturday Night Specials" and de facto bans on handgun possession appear generally to exert no negative effect on violence rates. Nevertheless, the findings reported herein cannot inform us about the effectiveness of gun control measures not yet tried.

It has been argued that many gun laws fail because they are local and that guns from more lenient jurisdictions "leak" into the stricter jurisdictions. Thus, federal measures regulating acquisition of guns might work (Newton and Zimring, 1969). Research on existing federal regulations has failed to generate consistent evidence of their effectiveness (Zimring, 1975; Magaddino and Medoff, 1984), but these controls were very weak, loophole-ridden measures. Some of the few measures found in this study to be effective were controls which are not vulnerable to this "leakage" problem. "Leakage" is an issue relevant mainly to regulations aimed at the acquisition of guns, rather than their use. In contrast, laws forbidding possession of handguns, regulating the carrying of guns, or providing for add-on penalties for using guns in crimes are not affected by interjurisdictional leakage because the legal risks of possessing or carrying a gun or using it in a crime in a given jurisdiction are the same regardless of whether bordering areas have similar measures.

It cannot be argued that the effects of gun ownership and gun control could not be detected due to a lack of meaningful variation in these variables. It is clear from the standard deviations for the gun prevalence indicators and the means for the gun law dummies in Table II that levels of both gun prevalence and gun control strictness vary enormously across U.S. cities. Direct survey measures of gun prevalence in very large cities indicate that the fraction of households reporting a gun varies from extremely low levels, such as 6% in New York City and Washington, DC (lower than in many Western European nations), to high levels, such as 61% in Houston (unpublished tabulations from specially geocoded General Social Surveys for 1973–1989).

**Exhibit 9**
**0145**

Three limitations of this study should be noted. First, we had no measures of how strictly permit and license laws are administered, e.g., how narrowly authorities interpret rules defining which applicants are qualified, as distinct from how much effort is put into apprehending and punishing violators. Second, analysts always need to be skeptical about restrictions used to achieve identifiability in structural equation models. The key identification restrictions needed to model the assumed reciprocal relationship between gun prevalence and violence rates were the exclusion of gun magazine subscription rates and hunting license rates from the violence equations. Interest in hunting and other gun-related sports was assumed to affect gun prevalence rates but to not directly affect violence rates. One might argue that such interests may reflect, or even generate, proviolent attitudes, but Eskridge (1986) and Bordua (1986) have found county hunting license rates to have small to moderate *negative* associations with violence rates. Finally, it is possible that we have failed to control for some confounding variable which suppresses a guns–violence or gun law–violence association, though we do not know what that variable might be.

## 8. CONCLUSIONS

While the results are generally negative for the violence control effectiveness of gun control, the significance of the few supportive results should not be overlooked. There do appear to be some gun controls which work, all of them relatively moderate, popular, and inexpensive. Thus, there is support for a gun control policy organized around gun owner licensing or purchase permits (or some other form of gun buyer screening), stricter local dealer licensing, bans on possession of guns by criminals and mentally ill people, stronger controls over illegal carrying, and possibly discretionary add-on penalties for committing felonies with a gun. On the other hand, popular favorites such as waiting periods and gun registration do not appear to affect violence rates.

## ACKNOWLEDGMENTS

The authors wish to thank the Inter-University Consortium for Political and Social Research for making available three datasets utilized in this research (ICPSR, 1983, 1984a, b). Neither the collectors of the original data nor the Consortium bear any responsibility for the analyses or interpretations presented here. The staff of the Florida State University Computing Center provided computer advice and data entry services, while Paul Hanna of the College of Social Sciences helped in acquiring many

Exhibit 9
0146

datasets. We are also grateful to the National Technical Information Service for supplying the 1979–1982 Mortality Detail File datasets, to the National Rifle Association, and Mary Rose, for supplying unpublished city NRA membership figures, to the Federal Bureau of Identification for furnishing unpublished weapons arrest data for cities, and to William G. Kleck of the Audit Bureau of Circulations for providing county-level gun magazine subscription counts. Finally, the senior author would like to thank his research assistants, who helped gather some of the data, including Byron Johnson, Tracy Griffith, Susan Sayles, Wesley Johnson, and Miriam DeLone. The first version of this paper was presented at the annual meetings of the American Society of Criminology, Reno, Nevada, November 10, 1989.

## REFERENCES

Audit Bureau of Circulations (1979–1982). *Supplementary Data Report*, covering county paid circulation figures for gun/hunting/outdoor magazines, ABC, Chicago.

Beha, J. (1977). And *nobody* can get you out. *Boston Univ. Law Rev.* 57: 96–146, 289–333.

Bendis, P., and Balkin, S. (1979). A look at gun control enforcement. *J. Police Sci. Admin.* 7: 439–448.

Berkowitz, L., and LePage, A. (1967). Weapons as aggression-eliciting stimuli. *J. Personal. Soc. Psychol.* 7: 202–207.

Blackman, P. (1985). Carrying handguns for personal protection. Paper presented at the annual meeting of the American Society of Criminology, San Diego, CA, Nov. 13–16.

Block, R. (1977). *Violent Crime*, Lexington Books, Lexington, MA.

Blose, J., and Cook, P. J. (1980). *Regulating Handgun Transfers*, Duke University, Institute of Policy Sciences and Public Affairs, Durham, NC.

Bordua, D. J. (1986). Firearms ownership and violent crime: A comparison of Illinois counties. In Byrne, J. M., and Sampson, R. J. (eds.), *The Social Ecology of Crime*, Springer-Verlag, New York, pp. 156–188.

Bordua, D. J., and Lizotte, A. J. (1979). Patterns of legal firearms ownership. *Law Policy Q.* 1: 147–175.

Bordua, D. J., Lizotte, A. J., and Kleck, G. (1979). *Patterns of Firearms Ownership and Regulation in Illinois*, A Report to the Illinois Law Enforcement Commission, Illinois Law Enforcement Commission, Springfield.

Brearley, H. C. (1932). *Homicide in the United States*, University of North Carolina Press, Chapel Hill.

Brill, S. (1977). *Firearm Abuse*, Police Foundation, Washington, DC.

Byrne, J. M. (1986). Cities, citizens, and crime. In Byrne, J. M., and Sampson, R. J. (eds.), *The Social Ecology of Crime*, Springer-Verlag, New York, pp. 77–101.

Cook, P. J. (1976). A strategic choice analysis of robbery. In Skogan, W. (ed.), *Sample Surveys of the Victims of Crime*, Ballinger, Cambridge, MA, pp. 173–187.

Cook, P. J. (1979). The effect of gun availability on robbery and robbery murder. Haveman, R., and Zellner, B. B. (eds.), *Policy Studies Review Annual.*, Sage, Beverly Hills, pp. 743–781.

Cook, P. J. (1982). The role of firearms in violent crime. In Wolfgang, M. E., and Werner, N. A. (eds.), *Criminal Violence*, Sage, Beverly Hills, pp. 236–291.

**Exhibit 9**
**0147**

Cook, P. J., and Blose, J. (1981). State programs for screening handgun buyers. *Annals* 455: 80–91.

Curtis, L. (1974). *Criminal Violence*, Lexington Books, Lexington, MA.

Deutsch, S. J., and Alt, F. B. (1977). The effect of Massachusetts' gun control law on gun-related crimes in the city of Boston. *Evaluat. Q.* 1: 543–568.

DeZee, M. R. (1983). Gun control legislation: Impact and ideology. *Law Policy Q.* 5: 367–379.

Eskridge, C. W. (1986). Zero-order inverse correlations between crimes of violence and hunting licenses in the United states. *Sociol. Soc. Res.* 71: 55–57.

Firebaugh, G., and Gibbs, J. P. (1985). User's guide to ratio variables. *Am. Sociol. Rev.* 50:713–722.

Gastil, R. D. (1971). Homicide and a regional culture of violence. *Am. Sociol. Rev.* 36:412–427.

Geisel, M. S., Roll, R., and Wettick, R. S. (1969). The effectiveness of state and local regulations of handguns. *Duke Univ. Law J.* 4: 647–676.

Gibbs, J. P., and Erickson, M. L. (1976). Crime rates of American cities in an ecological context. *Am. J. Sociol.* 82: 605–620.

Hay, R., and McCleary, R. (1979). Box-Tiao time series models for impact assessment. *Evaluat. Q.* 3: 277–314.

Inter-university Consortium for Political and Social Research (ICPSR) 1983. *Uniform Crime Reports: National Time Series Community-level Database, 1967–1980*, ICPSR Study 8214 (machine readable dataset), Principal Investigators: Pierce, G. L., Bowers, W. J., Baird, J., and Heck, J. ICPSR, Ann Arbor, MI.

ICPSR (1984a). *Uniform Crime Reporting Program Data*, ICPSR Study 9028, Parts 3, 7, 11, 15, Supplementary Homicide Reports, 1979–1982, Federal Bureau of Investigation, ICPSR, Ann Arbor, MI.

ICPSR (1984b). *Uniform Crime Reporting Program Data*, ICPSR Study 9028, Parts 2, 6, 14, Property Stolen and Recovered, 1979–1981, Federal Bureau of Investigation, ICPSR, Ann Arbor, MI.

Jones, E. D., III (1981). The District of Columbia's "Firearms Control Regulations Act of 1975," *Annals* 455: 138–149.

Jones, E. D., and Ray, M. W. (1980). *Handgun Control: Strategies, Enforcement and Effectiveness*, Unpublished report, U.S. Department of Justice, Washington, D.C.

Jung, R. S., and Jason, L. A. (1988). Firearm violence and the effects of gun control legislation. *Am. J. Commun. Psychol.* 16: 515–524.

Kennedy, P. (1985). *A Guide to Econometrics*, Basil Blackwell, London.

Kleck, G. (1979). Capital punishment, gun ownership, and homicide. *Am. J. Sociol.* 84: 882–910.

Kleck, G. (1984a). The relationship between gun ownership levels and rates of violence in the United States. In Kates, D. B., Jr. (ed.), *Firearms and Violence: Issues of Public Policy*, Ballinger, Cambridge, MA., pp. 99—135.

Kleck, G. (1984b). Handgun-only gun control. In Kates, D. B., Jr. (ed.), *Firearms and Violence: Issues of Public Policy*, Cambridge, Ballinger, MA, pp. 167–199.

Kleck, G. (1988). Crime control through the private use of armed force. *Soc. Problems* 35: 1–21.

Kleck, G. (1991). *Point Blank: Guns and Violence in America*, Aldine de Gruyter, New York.

Kleck, G., and McElrath, K. (1991). The effects of weaponry on human violence. *Soc. Forces* 69: 669–692.

Kleck, G., and DeLone, M. (1993). Victim resistance and offender weapon effects in robbery. *J. Quant. Criminol.* 9: 55–81.

Krug, A. S. (1967). A statistical study of the relationship between firearms licensing laws and crime rates. *Congress. Record* 7-25-67, pp. H9366–H9370.

**Exhibit 9**
**0148**

Land, K. C. (1990). Structural covariates of homicide rates. *Am. J. Sociol.* 95: 922–963.

Lester, D. (1987). An availability-acceptability theory of suicide. *Act. Nervosa Super.* 29: 164–166.

Lester, D. (1988). Gun control, gun ownership, and suicide prevention. *Suicide Life-threat. Behav.* 18: 176–180.

Lester, D., and Murrell, M. E. (1981). The relationship between gun control statutes and homicide rates: A research note. *Crime Just.* 4: 146–148.

Lester, D., and Murrell, M. E. (1982). The preventive effect of strict gun control laws on suicide and homicide. *Suicide Life-Threat. Behavior.* 12: 131–140.

Lester, D., and Murrell, M. E. (1986). The influence of gun control laws on personal violence. *J. Commun. Psychol.* 14: 315–318.

Lizotte, A. J., Bordua, D. J., and White, C. S. (1981). Firearms ownership for sport and protection: Two not so divergent models. *Am. Sociol. Rev.* 46: 499–503.

Loftin, C., Heumann, M., and McDowall, D. (1983). Mandatory sentencing and firearms violence: Evaluating an alternative to gun control. *Law Soc. Rev.* 17: 287–318.

Loftin, C., and McDowall, D. (1981). "One with a gun gets you two": Mandatory sentencing and firearms violence in Detroit. *Annals* 455: 150–167.

Loftin, C., and McDowall, D. (1984). The deterrent effects of the Florida Felony Firearm Law. *J. Crim. Law Criminol.* 75: 250–259.

Loftin, C., McDowall, D., Wiersema, B., and Cottey, J. (1991). Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N. Engl. J. Med.* 325: 1615–1621.

Maddala, G. S. (1988). *Introduction to Econometrics*, Macmillan, New York.

Magaddino, J. P., and Medoff, M. H. (1982). Homicides, robberies and state "cooling-off" schemes. In Kates, D. B., Jr. (ed.), *Why Handgun Bans Can't Work*, Second Amendment Foundation, Bellevue, WA.

Magaddino, J. P., and Medoff, M. H. (1984). An empirical analysis of federal and state firearm controls. In Kates, D. B., Jr. (ed.), *Firearms and Violence*, Ballinger, Cambridge, MA.

McDowall, D. (1986). Gun availability and robbery rates: A panel study of large U.S. cities, 1974-1978. *Law & Policy* 8: 135–148.

McPheters, L. R., Mann, RT., and Schlagenhauf, D. (1984). Economic response to a crime deterrence program. *Econ. Inquiry* 22: 550–570.

Murray, D. R. (1975). Handguns, gun control laws and firearm violence. *Soc. Problems* 23: 81–92.

Newton, G. D., and Zimring, F. E. (1969). *Firearms and Violence in American Life: A Staff Report to the National Commission on the Causes and Prevention of Violence*, U.S. Government Printing Office, Washington, DC.

Nicholson, R., and Garner, A. (1980). *The Analysis of the Firearms Control Act of 1975*, U.S. Conference of Mayors, Washington, D.C.

Olin Mathieson Company (1969). Unpublished study summarized by Newton and Zimring (1969, p. 182).

Pierce, G. L., and Bowers, W. J. (1981). The Bartley–Fox gun law's short-term impact on crime in Boston. *Annals* 455: 120–137.

Quinn, B., *et al.* (1982). *Churches and Church Membership in the United States, 1980*, Glenmary Research Center, Atlanta, GA.

Ronhovde, K. M., and Sugars, G. P. (1982). Survey of select state firearm control laws. In Congressional Research Service, *Federal Regulation of Firearms*, a report prepared for the Senate Judiciary Committee, pp. 201–228.

Sampson, R. J. (1986). Crime in cities. In Reiss, A. J., Jr., and Tonry, M. (eds.), *Communities and Crime*, University of Chicago Press, Chicago, pp. 271–311.

**Exhibit 9**
**0149**

Scammon, R. M. (ed.) (1972). *America Votes, Vol. 10*, Macmillan, New York.

Seitz, S. T. (1972). Firearms, homicides, and gun control effectiveness. *Law Soc. Rev.* 6: 595–614.

Shields, D. J. (1976). Two judges look at gun control. *Chicago Bar Record* 1976: 180–185.

Smith, D. A., and Uchida, C. D. (1988). The social organization of self-help. *Am. Sociol. Rev.* 53:94–102.

Sommers, P. M. (1980). Deterrence and gun control: An empirical analysis. *Atlantic Econ. J.* 8: 89–94.

Sommers, P. M. (1984). Letter to the Editor. *N. Engl. J. Med.* 310: 47–48.

U.S. Bureau of Alcohol Tobacco and Firearms (BATF) (1980). *State Laws and Published Ordinances, Firearms—1980*, U.S. Government Printing Office, Washington, D.C.

U.S. Bureau of the Census (1981). *1977 Census of Service Industries—Geographic Area Series—United States*, U.S. Government Printing Office, Washington , D.C.

U.S. Bureau of the Census (1983a). *County and City Data Book 1983*, U.S. Government Printing Office, Washington, DC.

U.S. Bureau of the Census (1983b). *1980 Census of the Population, Vol. 1. Characteristics of the Population, Chapter C, General Social and Economic Characteristics*, Table 118, U.S. Government Printing Office, Washington, DC.

U.S. Bureau of the Census (1986). *Statistical Abstract of the United States, 1987*, U.S. Government Printing Office, Washington, DC.

U.S. Bureau of Justice Statistics (1982). *Prisoners in State and Federal Institutions on December 31, 1980*, U.S. Government Printing Office, Washington, DC.

U.S. Bureau of Justice Statistics (1987). *Criminal Victimization in the United States, 1985*, U.S. Government Printing Office, Washington, DC.

U.S. Department of Justice (1989). Draft report on systems for identifying felons who attempt to purchase firearms; Notice and request for comments. *Fed. Register* June 26: 26901–26941.

U.S. Federal Bureau of Investigation (1980–1982). *Crime in the United States*, annual issues covering 1979–1981, U.S. Government Printing Office, Washington, DC.

U.S. Federal Bureau of Investigation (1984). *Uniform Crime Reporting Handbook*, U.S. Government Printing Office, Washington, D.C.

U.S. Federal Bureau of Investigation (undated). *AS&R Data by State and County (year)*, covering each of years 1979–1981, Computer printout supplied by FBI to senior author, reporting arrests for individual reporting police agencies.

U.S. Fish and Wildlife Service (1980). *Federal Aid in Fish and Wildlife Restoration, 1980*, U.S. Government Printing Office, Washington, DC.

U.S. National Center for Health Statistics (NCHS) (1983). *Public Use Data Tape Documentation: Mortality Detail 1980 Data*, U.S. Department of Health and Human Services, Hyattsville, MD.

Wisconsin (1960). *The Regulation of the Firearms by the States*, Research Bulletin 130, Wisconsin Legislative Reference Library, Wisconsin.

Wright, J. D., and Rossi, P. H. (1986). *Armed and Considered Dangerous*, Aldine, New York.

Wright, J. D., Rossi, P. H., and Daly, K. (1983). *Under the Gun: Weapons, Crime and Violence*, Aldine, New York.

Zimring, F. E. (1975). Firearms and federal law: The Gun Control Act of 1968. *J. Legal Stud.* 4: 133–198.

**Exhibit 9**
**0150**

# EXHIBIT "10"

**Exhibit 10**
**0151**



# The Science of Gun Policy

**A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States**

A PART OF THE RAND

**Gun Policy**
in **AMERICA**

INITIATIVE

RAND
CORPORATION

Exhibit 10
0152

For more information on this publication, visit www.rand.org/t/RR2088

Library of Congress Cataloging-in-Publication Data

Names: Rand Corporation, issuing body.
Title: The science of gun policy : a critical synthesis of research evidence
 on the effects of gun policies in the United States / The RAND Corporation.
Description: Santa Monica, CA : RAND, [2018] | Includes bibliographical
 references.
  Identifiers: LCCN 2017060115| ISBN 9780833098412 (pbk. : alk. paper) | ISBN
 9780833098436 (epub) | ISBN 9780833098443 (prc) | ISBN 9780833098429
 (ebook pdf)
Subjects: LCSH: Gun control--United States.
Classification: LCC HV7436 .S387 2018 | DDC 363.330973--dc23
LC record available at https://lccn.loc.gov/2017060115

Published by the RAND Corporation, Santa Monica, Calif.

© Copyright 2018 RAND Corporation

RAND® is a registered trademark.

Updated Aug. 16, 2018, to correct minor errata on pp. 296–297.

Limited Print and Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law. This representation of RAND intellectual property is provided for noncommercial use only. Unauthorized posting of this publication online is prohibited. Permission is given to duplicate this document for personal use only, as long as it is unaltered and complete. Permission is required from RAND to reproduce, or reuse in another form, any of its research documents for commercial use. For information on reprint and linking permissions, please visit www.rand.org/pubs/permissions.

The RAND Corporation is a research organization that develops solutions to public policy challenges to help make communities throughout the world safer and more secure, healthier and more prosperous. RAND is nonprofit, nonpartisan, and committed to the public interest.

RAND's publications do not necessarily reflect the opinions of its research clients and sponsors.

Support RAND
Make a tax-deductible charitable contribution at
www.rand.org/giving/contribute

www.rand.org

Exhibit 10
0153

# Gun Policy in America Research Synthesis Project Team

**Project Director**
Andrew R. Morral, Ph.D.

**Research Synthesis Project Leadership**
Rajeev Ramchand, Ph.D.
Rosanna Smart, Ph.D.

**Literature Review Groups**

*Suicides*
Rajeev Ramchand, Ph.D.

*Homicides and Violent Crime*
Carole Roan Gresenz, Ph.D.
John Speed Meyers, M.P.A.
Rouslan I. Karimov, M.P.A.
Lea Xenakis, M.P.A.

*Accidents and Unintentional Injuries*
Eric Apaydin, M.P.P.
Rajeev Ramchand, Ph.D.

*Mass Shootings and Taxation*
Rosanna Smart, Ph.D.

*Officer-Involved Shootings*
Carter C. Price, Ph.D.

*Defensive Gun Use*
Nancy Nicosia, Ph.D.
John Speed Meyers, M.P.A.

*Hunting and Sport Shooting*
Rosanna Smart, Ph.D.
Eric Apaydin, M.P.P.

*Gun Industry*
Carter C. Price, Ph.D.

*Mental Health*
Stephanie Brooks Holliday, Ph.D.

*Public Information Campaigns*
Elizabeth L. Petrun Sayers, Ph.D.

**Policy Descriptions**
Samantha Cherney, J.D.
Rosanna Smart, Ph.D.

**Methodology Review**
Carole Roan Gresenz, Ph.D.
Beth Ann Griffin, Ph.D.
Andrew R. Morral, Ph.D.
Nancy Nicosia, Ph.D.
Rajeev Ramchand, Ph.D.
Terry L. Schell, Ph.D.
Rosanna Smart, Ph.D.

**Effect-Size Calculation**
Brett Ewing, M.S.

**Programming**
Joshua Lawrence Traub, M.S.

**Exhibit 10**
**0154**

**Exhibit 10**
**0155**

# Preface

Effective gun policies in the United States must balance the constitutional right to bear arms and public interest in gun ownership with concerns about public health and safety. However, current efforts to craft legislation related to guns are hampered by a paucity of reliable information about the effects of such policies. To help address this problem, the RAND Corporation launched the Gun Policy in America initiative. Throughout RAND's 70-year history, in multiple projects, in many policy arenas, and on topics that are sensitive and controversial, researchers have conducted analyses, built tools, and developed resources to help policymakers and the public make effective decisions. The primary goal of the Gun Policy in America project is to create resources where policymakers and the general public can access unbiased information that facilitates the development of fair and effective firearm policies.

This report is one of several research products stemming from the initiative. The research described here synthesizes the available scientific evidence on the effects of 13 types of firearm policies on a range of outcomes related to gun ownership. In addition, this report includes essays on several topics that frequently arise in discussions of gun policy.

Other project components include a survey of policy experts that identifies where access to reliable data would be most useful in resolving policy debates, plus an online tool allowing users to explore how different combinations of gun policies are likely to affect a range of outcomes. In another line of effort, RAND conducted simulation studies to evaluate the strengths and weaknesses of different approaches to modeling the effects of gun policies on outcomes, the results of which will be used to develop new estimates of the effects of state firearm policies. Finally, the project includes the development of a longitudinal database of state firearm laws as a resource for other researchers and the public.

The Gun Policy in America initiative did not attempt to evaluate the merits of different values or principles that sometimes drive policy disagreements. Rather, our focus is strictly on the empirical effects of policies on the eight outcomes specified in this report. All of our resources are publicly available on the project website at www.rand.org/gunpolicy.

The work should be of interest to policymakers and other stakeholders considering decisions related to firearm policy. Furthermore, this report may be of interest to the research community and to the general public.

## RAND Ventures

The RAND Corporation is a research organization that develops solutions to public policy challenges to help make communities throughout the world safer and more secure, healthier and more prosperous. RAND is nonprofit, nonpartisan, and committed to the public interest.

RAND Ventures is a vehicle for investing in such policy solutions. Philanthropic contributions support our ability to take the long view, tackle tough and often-controversial topics, and share our findings in innovative and compelling ways. RAND's research findings and recommendations are based on data and evidence and therefore do not necessarily reflect the policy preferences or interests of its clients, donors, or supporters.

Funding for this venture was provided by gifts from RAND supporters and income from operations.

**Exhibit 10**
**0157**

# Contents

Gun Policy in America Research Synthesis Project Team......................................... iii
Preface ........................................................................................................ v
Figures ...................................................................................................... xiii
Tables ........................................................................................................ xv
Summary ................................................................................................... xvii
Acknowledgments ..................................................................................... xxix
Abbreviations ............................................................................................ xxxi

PART A
Introduction and Methods ......................................................................... 1

CHAPTER ONE
Introduction .............................................................................................. 3
Gun Policy in America ................................................................................ 4
Research Focus ........................................................................................... 4
Organization of This Report ....................................................................... 10
Chapter One References .............................................................................. 11

CHAPTER TWO
Methods .................................................................................................... 15
Selecting Policies ....................................................................................... 15
Selecting and Reviewing Studies ................................................................. 17
Effects of the Inclusion and Exclusion Criteria on the Literature Reviewed ... 25
Effect Size Estimates .................................................................................. 29
Chapter Two References .............................................................................. 31

PART B
Evidence on the Effects of 13 Policies ......................................................... 37

CHAPTER THREE
Background Checks ..................................................................................... 39
State Implementation of Background Checks ................................................ 41

**Exhibit 10**
**0158**

Effects on Suicide ................................................................. 43
Effects on Violent Crime........................................................ 48
Effects on Mass Shootings ...................................................... 54
Outcomes Without Studies Examining the Effects of Background Checks ................. 56
Chapter Three References......................................................... 57

CHAPTER FOUR
Bans on the Sale of Assault Weapons and High-Capacity Magazines.................... 61
State Implementation of Assault Weapon Bans ..................................... 63
Effects on Violent Crime........................................................ 65
Effects on Mass Shootings ...................................................... 67
Effects on the Gun Industry..................................................... 69
Outcomes Without Studies Examining the Effects of Assault Weapon Bans ................ 70
Chapter Four References ........................................................ 71

CHAPTER FIVE
Stand-Your-Ground Laws ....................................................... 73
State Implementation of Stand-Your-Ground Laws............................... 74
Effects on Suicide ............................................................. 77
Effects on Violent Crime........................................................ 78
Effects on Defensive Gun Use................................................... 81
Outcomes Without Studies Examining the Effects of Stand-Your-Ground Laws ............ 82
Chapter Five References......................................................... 83

CHAPTER SIX
Prohibitions Associated with Mental Illness .................................... 85
State Implementation of Prohibitions Associated with Mental Illness...................... 87
Effects on Suicide ............................................................. 89
Effects on Violent Crime........................................................ 91
Outcomes Without Studies Examining the Effects of Prohibitions Associated with
    Mental Illness............................................................. 94
Chapter Six References......................................................... 95

CHAPTER SEVEN
Lost or Stolen Firearm Reporting Requirements.............................. 97
State Implementation of Lost or Stolen Firearm Reporting Requirements ................. 98
Outcomes Without Studies Examining the Effects of Lost or Stolen Firearm
    Reporting Requirements .................................................... 99
Chapter Seven References....................................................... 100

**Exhibit 10**
**0159**

CHAPTER EIGHT
**Licensing and Permitting Requirements** ...................................................... 101
State Implementation of Licensing and Permitting Requirements ............................ 103
Effects on Suicide ............................................................................ 104
Effects on Violent Crime ...................................................................... 107
Effects on Mass Shootings .................................................................... 109
Outcomes Without Studies Examining the Effects of Licensing and Permitting
     Requirements .............................................................................. 110
Chapter Eight References ..................................................................... 111

CHAPTER NINE
**Firearm Sales Reporting and Recording Requirements** ...................................... 113
State Implementation of Firearm Sales Reporting and Recording Requirements ........... 114
Outcomes Without Studies Examining the Effects of Firearm Sales Reporting and
     Recording Requirements ................................................................. 116
Chapter Nine References ...................................................................... 117

CHAPTER TEN
**Child-Access Prevention Laws** .............................................................. 119
State Implementation of Child-Access Prevention Laws ...................................... 121
Effects on Suicide ............................................................................ 124
Effects on Violent Crime ...................................................................... 128
Effects on Unintentional Injuries and Deaths ................................................ 130
Effects on Mass Shootings .................................................................... 134
Outcomes Without Studies Examining the Effects of Child-Access Prevention Laws  .... 135
Chapter Ten References ....................................................................... 136

CHAPTER ELEVEN
**Surrender of Firearms by Prohibited Possessors** ........................................... 139
State Implementation of Firearm-Surrender Laws ............................................. 140
Effects on Violent Crime ...................................................................... 141
Outcomes Without Studies Examining the Effects of Firearm-Surrender Laws ........... 143
Chapter Eleven References .................................................................... 144

CHAPTER TWELVE
**Minimum Age Requirements** ................................................................. 145
State Implementation of Minimum Age Requirements ........................................ 147
Effects on Suicide ............................................................................ 148
Effects on Violent Crime ...................................................................... 153
Effects on Unintentional Injuries and Deaths ................................................ 155
Effects on Mass Shootings .................................................................... 156

**Exhibit 10**
**0160**

x   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

Outcomes Without Studies Examining the Effects of Minimum Age Requirements ..... 158
Chapter Twelve References.................................................................. 159

CHAPTER THIRTEEN
**Concealed-Carry Laws**.................................................................. 161
State Implementation of Concealed-Carry Laws............................... 163
Effects on Suicide ................................................................................ 164
Effects on Violent Crime..................................................................... 166
Effects on Unintentional Injuries and Deaths.................................... 176
Effects on Mass Shootings .................................................................. 179
Effects on the Gun Industry................................................................ 181
Outcomes Without Studies Examining the Effects of Concealed-Carry Laws ............ 182
Chapter Thirteen References................................................................ 183

CHAPTER FOURTEEN
**Waiting Periods** ............................................................................. 187
State Implementation of Waiting Periods ......................................... 190
Effects on Suicide ............................................................................... 190
Effects on Violent Crime..................................................................... 191
Effects on Mass Shootings ................................................................. 194
Outcomes Without Studies Examining the Effects of Waiting Periods ..................... 196
Chapter Fourteen References ............................................................... 197

CHAPTER FIFTEEN
**Gun-Free Zones** ............................................................................. 199
State Implementation of Gun-Free Zones........................................... 200
Outcomes Without Studies Examining the Effects of Gun-Free Zones ...................... 201
Chapter Fifteen References .................................................................. 202

PART C
**Supplementary Essays on Gun Policy Mechanisms and Context**........................ 203

CHAPTER SIXTEEN
**The Relationship Between Firearm Availability and Suicide** ............................. 205
Methods.............................................................................................. 205
Individual Access to Firearms ............................................................ 206
Regional Availability of Firearms ...................................................... 215
Conclusions........................................................................................ 225
Chapter Sixteen References ................................................................. 228

**Exhibit 10**
**0161**

CHAPTER SEVENTEEN
**The Relationship Between Firearm Prevalence and Violent Crime** ..................... 233
Methods ........................................................................................ 233
Firearm Prevalence and Violent Crime............................................... 234
Conclusions ................................................................................... 237
Chapter Seventeen References............................................................ 239

CHAPTER EIGHTEEN
**Firearm and Ammunition Taxes**...................................................... 241
Conclusions..................................................................................... 243
Chapter Eighteen References ............................................................. 244

CHAPTER NINETEEN
**Mental Health Care Access and Suicide**.......................................... 245
Availability of Health Care and Mental Health Services...................... 245
Use of Health and Mental Health Services .......................................... 247
Barriers to Mental Health Care ......................................................... 248
Policies That May Affect Access to Services.......................................... 249
International and Cross-National Studies.............................................. 249
Conclusions..................................................................................... 251
Chapter Nineteen References............................................................. 252

CHAPTER TWENTY
**Education Campaigns and Clinical Interventions for Promoting Safe Storage**....... 255
Evidence on Safe Storage.................................................................... 255
Education Campaigns........................................................................ 256
Clinical Interventions....................................................................... 257
Conclusions .................................................................................... 257
Chapter Twenty References................................................................ 259

CHAPTER TWENTY-ONE
**Restricting Access to Firearms Among Individuals at Risk for or Convicted of
    Domestic Violence or Violent Crime**.......................................... 261
The Policy Defined........................................................................... 261
Research Synthesis Findings............................................................... 262
Conclusions..................................................................................... 263
Chapter Twenty-One References......................................................... 264

CHAPTER TWENTY-TWO
**Mass Shootings**............................................................................ 265
What Is a Mass Shooting?.................................................................. 265

**Exhibit 10**
**0162**

Are Mass Shootings on the Rise?...............................................................267
Conclusions..............................................................................................270
Chapter Twenty-Two References ...............................................................271

CHAPTER TWENTY-THREE
Defensive Gun Use ...................................................................................273
What Is Defensive Gun Use?.....................................................................274
What Are the Challenges in Measuring Defensive Gun Use?  ...................275
Does Defensive Gun Use Reduce Harm?....................................................280
Chapter Twenty-Three References..............................................................286

CHAPTER TWENTY-FOUR
The Effects of the 1996 National Firearms Agreement in Australia on Suicide,
    Violent Crime, and Mass Shootings........................................................289
Methods....................................................................................................290
Research Synthesis Findings......................................................................291
Conclusions..............................................................................................297
Chapter Twenty-Four References ...............................................................298

PART D
Summary of Findings and Recommendations ...........................................299

CHAPTER TWENTY-FIVE
Summary and Conclusions .......................................................................301
Summarizing the Strength of Evidence .....................................................302
What Can We Conclude About the Effects of Gun Policies?.......................307
Why Don't We Know More? ......................................................................310
Chapter Twenty-Five References ................................................................319

APPENDICES
A. Methodological Challenges to Identifying the Effects of Gun Policies..............323
B. Source Data Used to Produce the Forest Plot Figures....................................339

**Exhibit 10**
**0163**

# Figures

3.1. Incidence Rate Ratios Associated with the Effect of Background Checks on Suicide.................................................................. 46

3.2. Incidence Rate Ratios Associated with the Effect of Background Checks on Violent Crime .................................................. 52

3.3. Incidence Rate Ratios Associated with the Effect of Background Checks on Mass Shootings.............................................. 55

4.1. Incidence Rate Ratios Associated with the Effect of Assault Weapon Bans on Violent Crime.............................................. 66

4.2. Incidence Rate Ratios Associated with the Effect of Assault Weapon Bans on Mass Shootings ........................................... 68

5.1. Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Suicide................................................. 78

5.2. Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Violent Crime......................................... 80

5.3. Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Defensive Gun Use..................................... 82

6.1. Incidence Rate Ratios Associated with the Effect of Mental Health–Related Prohibitions on Suicide.................................... 90

6.2. Incidence Rate Ratios Associated with the Effect of Mental Health–Related Prohibitions on Violent Crime ........................... 92

8.1. Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Suicide............................... 106

8.2. Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Violent Crime....................... 108

8.3. Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Mass Shootings..................... 110

10.1. Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Suicide........................................ 127

10.2. Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Violent Crime................................ 129

10.3. Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Unintentional Firearm Injuries and Deaths................ 133

10.4.   Incidence Rate Ratios Associated with the Effect of Child-Access
Prevention Laws on Mass Shootings ................................................ 135
11.1.   Incidence Rate Ratios Associated with the Effect of Firearm-Surrender
Laws on Violent Crime.............................................................. 142
12.1.   Incidence Rate Ratios Associated with the Effect of Minimum Age
Requirements on Suicide............................................................ 151
12.2.   Incidence Rate Ratios Associated with the Effect of Minimum Age
Requirements on Violent Crime ..................................................... 154
12.3.   Incidence Rate Ratios Associated with the Effect of Minimum Age
Requirements on Unintentional Injuries and Deaths ............................. 156
12.4.   Incidence Rate Ratios Associated with the Effect of Minimum Age
Requirements on Mass Shootings.................................................... 157
13.1.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Suicide.................................................................... 165
13.2.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Violent Crime.............................................................. 174
13.3.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Unintentional Injuries and Deaths......................................... 178
13.4.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Mass Shootings............................................................ 180
13.5.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Gun Ownership ........................................................... 182
14.1.   Incidence Rate Ratios Associated with the Effect of Waiting Periods on
Violent Crime  .................................................................... 193
14.2.   Incidence Rate Ratios Associated with the Effect of Waiting Periods on
Mass Shootings ................................................................... 195
22.1.   Trends in Mass Shooting Incidents, by Type of Incident.......................... 269
22.2.   Trends in Mass Shooting Fatalities, by Type of Incident ......................... 269

Exhibit 10
0165

# Tables

S.1.   Strength of Evidence Across Gun Policies and Outcomes ........................ xx
2.1.   Databases Searched for Studies Examining the Effects of Firearm Policies ...... 18
2.2.   Number of Studies Selected for Review at Each Stage of the Review Process.... 25
2.3.   Studies Meeting Inclusion Criteria .................................................. 26
2.4.   Superseded Studies ..................................................................... 27
2.5.   Included Studies, by Policy and Outcome............................................ 28
16.1.  Individual-Level Studies Published in or After 2003 That Examined the
       Relationship Between Firearm Access and Suicide................................ 212
16.2.  Estimated Effects of a 1-Percent Increase in Firearm Prevalence on
       Firearm and Total Suicides .......................................................... 217
16.3.  Quasi-Experimental Studies Published in or After 2003 That Examined
       the Regional Relationship Between Firearm Prevalence and Suicide .......... 219
16.4.  Cross-Sectional Studies Published in or After 2003 That Examined the
       Regional Relationship Between Firearm Availability and Suicide ............. 221
17.1.  Studies Published in or After 2005 That Examined the Relationship
       Between Firearm Prevalence and Violent Crime ................................. 235
22.1.  Variation in How Mass Shootings Are Defined and Counted ................... 266
24.1.  Summary of Studies Examining the Effects of the National Firearms
       Agreement on Suicide in Australia................................................. 292
25.1.  Strength of Evidence Across Gun Policies and Outcomes ...................... 304
A.1.   Illustrative Data, with Spline and Dummy-Coded Effect Variables............ 330
B.1.   Source Data Used to Estimate Study Effect Sizes in the Forest Plot
       Figures................................................................................. 340
B.2.   Methodological Concerns Identified for Analyses Included in the
       Report's Forest Plot Figures......................................................... 363

**Exhibit 10**
**0167**

# Summary

The RAND Corporation's Gun Policy in America initiative is a unique attempt to systematically and transparently assess available scientific evidence on the real effects of gun laws and policies. Our goal is to create resources where policymakers and the general public can access unbiased information that informs and enables the development of fair and effective policies. Good gun policies in the United States require consideration of many factors, including the law and constitutional rights, the interests of various stakeholder groups, and information about the likely effects of different policies on a range of outcomes. This report seeks to provide the third factor—objective information about what the scientific literature examining gun policies can tell us about the likely effects of those policies.

This report synthesizes the available scientific evidence on the effects of various gun policies on firearm deaths, violent crime, the gun industry, participation in hunting and sport shooting, and other outcomes.[1] It builds and expands on earlier comprehensive reviews of scientific evidence on gun policy conducted more than a decade ago by the National Research Council (NRC) (see NRC, 2004) and the Community Preventive Services Task Force (see Hahn et al., 2005).

## Methodology

We used Royal Society of Medicine guidelines for conducting systematic reviews of a scientific literature (Khan et al., 2003). We focused on the empirical literature assessing the effects of 13 classes of firearm policies or of the prevalence of firearms on any of eight outcomes, which include both public health outcomes and outcomes of concern to many gun owners. We reviewed scientific reports that have been published since 2003, a date chosen to capture studies conducted since the last major systematic reviews of the science of gun policy were published by NRC (2004) and Hahn et al. (2005).

---

[1]   Although not all guns are firearms, in this report, we follow conventional use in U.S. policy discussions and treat the terms *gun* and *firearm* as interchangeable.

The 13 classes of gun policies considered in this research are as follows:

1. background checks
2. bans on the sale of assault weapons and high-capacity magazines
3. stand-your-ground laws
4. prohibitions associated with mental illness
5. lost or stolen firearm reporting requirements
6. licensing and permitting requirements
7. firearm sales reporting and recording requirements
8. child-access prevention laws
9. surrender of firearms by prohibited possessors
10. minimum age requirements
11. concealed-carry laws
12. waiting periods
13. gun-free zones.

The eight outcomes considered in this research are

1. suicide
2. violent crime
3. unintentional injuries and deaths
4. mass shootings
5. officer-involved shootings
6. defensive gun use
7. hunting and recreation
8. gun industry.[2]

## Policy Analyses, by Outcome

Building on the earlier reviews (NRC, 2004; Hahn et al., 2005) and using standardized and explicit criteria for determining the strength of evidence that individual studies provide for the effects of gun policies, we produced research syntheses that describe the quality and findings of the best available scientific evidence. Each synthesis defines the class of policies being considered; presents and rates the available evidence; and describes what conclusions, if any, can be drawn about the policy's effects on outcomes.

In many cases, we were unable to identify any research that met our criteria for considering a study as providing minimally persuasive evidence for a policy's effects. Studies were excluded from this review if they offered only correlational evidence for a

---

[2] The terms in these lists describe broad categories of policies and outcomes that are defined and described in detail in the full report.

Exhibit 10
0169

possible causal effect of the law, such as showing that states with a specific law had lower firearm suicides at a single point in time than states without the law. Correlations like these can occur for many reasons other than the effects of a single law, so this kind of evidence provides little information about the effects attributable to specific laws. We did not exclude studies on the basis of their findings, only on the basis of their methods for isolating causal effects. For studies that met our inclusion criteria, we summarize key findings and methodological weaknesses, when present, and provide our consensus judgment on the overall strength of the available scientific evidence. We did this by establishing the following relativistic scale describing the strength of available evidence:

1.  *No studies.* This designation was made when no studies meeting our inclusion criteria evaluated the policy's effect on the outcome.
2.  *Inconclusive evidence.* This designation was made when studies with comparable methodological rigor identified inconsistent evidence for the policy's effect on an outcome or when a single study found only uncertain or suggestive effects.
3.  *Limited evidence.* This designation was made when at least one study meeting our inclusion criteria and not otherwise compromised by serious methodological problems reported a significant effect of the policy on the outcome, even if other studies meeting our inclusion criteria identified only uncertain or suggestive evidence for the effect of the policy.
4.  *Moderate evidence.* This designation was made when two or more studies found significant effects in the same direction and contradictory evidence was not found in other studies with equivalent or strong methods.
5.  *Supportive evidence.* This designation was made when (1) at least three studies found suggestive or significant effects in the same direction using at least two independent data sets or (2) the effect was observed in a rigorous experimental study.

These ratings are meant to describe the relative strengths of evidence available across gun policy research domains, not any rating of our absolute confidence in the reported effects. For instance, when we find *supportive* evidence for the conclusion that child-access prevention laws reduce self-inflicted injuries and deaths, we do not mean to suggest that it is comparable to the evidence available in more-developed fields of social science. That is, in comparison to the evidence that smoking causes cancer, the evidence base in gun policy research is very limited. Nevertheless, we believe that it may be valuable to the public and to policymakers to understand which laws currently have more or less persuasive evidence concerning the effects the laws are likely to produce.

Table S.1 summarizes our judgments for all policy and outcome pairings. Several outcomes show multiple judgments, and these correspond to different characterizations of the specific policy-outcome association. For instance, we identified limited evidence that background checks reduce *total suicides* and moderate evidence that they reduce *firearm suicides.*

**Exhibit 10**
**0170**

**Table 5.1**
**Strength of Evidence Across Gun Policies and Outcomes**

| Policy | Total suicides | Firearm suicides | Firearm suicides among children | Firearm self-injuries (nonfatal) | Firearm self-injuries (including suicides) | Violent crime | Total homicides | Firearm homicides | Intimate partner homicides | Robberies | Assaults | Rapes | Other violent crime |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gun-Free Zones** | | | | | | | | | | | | | |
| **Waiting Periods** | | | | | | | I | | I | | | | |
| **Concealed-Carry Laws — Permitless Carry** | | | | | | | | | | | | | |
| **Concealed-Carry Laws — Shall Issue** | I | I | | I | | | ↑L | I | | I | I | I | |
| **Minimum Age Requirements — Possessing** | I | I | | | | | | I | I | | | | |
| **Minimum Age Requirements — Purchasing** | I | | ↓L | | | | | I | I | | | | |
| **Surrender of Firearms by Prohibited Possessors** | | | | | | | I | | I | | | | |
| **Child-Access Prevention Laws** | ↓L | ↓M | | | ↓S | I | | I | | | | | |
| **Firearm Sales Reporting and Recording Requirements** | | | | | | | | | | | | | |
| **Licensing and Permitting Requirements** | I | I | | | | | I | I | | | | | |
| **Lost or Stolen Firearm Reporting Requirements** | | | | | | | | | | | | | |
| **Prohibitions Associated with Mental Illness** | ↓L | ↓L | | | | ↓M | ↓L | I | | | | | |
| **Stand-Your-Ground Laws** | I | I | | | | | ↑M | ↑L | | | | | I |
| **Bans on the Sale of Assault Weapons and High-Capacity Magazines** | | | | | | | I | I | | | | | |
| **Background Checks** | ↓L | ↓M | | | | ↓L | ↓L | ↓M, I[a] | | | | | |

Note: Outcome columns 1–5 (Total suicides through Firearm self-injuries including suicides) fall under **Suicide**; outcome columns 6–13 (Violent crime through Other violent crime) fall under **Violent crime**. Symbols: ↓ = decreasing effect, ↑ = increasing effect, I = inconclusive, L/M/S = strength of evidence.

Exhibit 10
0171

**Table S.1—Continued**

| | Background Checks | Bans on the Sale of Assault Weapons and High-Capacity Magazines | Stand-Your-Ground Laws | Prohibitions Associated with Mental Illness | Firearm Reporting Requirements | Lost or Stolen Firearm Reporting Requirements | Licensing and Permitting Requirements | Firearm Sales Reporting and Recording Requirements | Child-Access Prevention Laws | Surrender of Firearms by Prohibited Possessors | Minimum Age Requirements Purchasing | Minimum Age Requirements Possessing | Concealed-Carry Laws Shall Issue | Concealed-Carry Laws Permitless Carry | Waiting Periods | Gun-Free Zones |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unintentional injuries and deaths | | | | | | | | | | | | | | | | |
|   Unintentional firearm deaths | | | | | | | | | | | | I | | | | |
|   Unintentional firearm injuries and deaths among adults | | | | | | | | | ↓ L | | | | | | | |
|   Unintentional firearm injuries and deaths among children | | | | | | | | | ↓ S | | | | | | | |
|   Unintentional firearm injuries among adults | | | | | | | | | | | | | ↑ L | | | |
|   Unintentional firearm injuries among children | | | | | | | | | | | | | I | | | |
| Mass shootings | I | I | | | | | I | | I | | I | | I | I | I | |
| Officer-involved shootings | | | | | | | | | | | | | | | | |
| Defensive gun use | | | I | | | | | | | | | | | | | |
| Hunting and recreation | | | | | | | | | | | | | | | | |

Exhibit 10
0172

Table S.1—Continued

| | Background Checks | Bans on the Sale of Assault Weapons and High-Capacity Magazines | Stand-Your-Ground Laws | Prohibitions Associated with Mental Illness | Lost or Stolen Firearm Reporting Requirements | Licensing and Permitting Requirements | Firearm Sales Reporting and Recording Requirements | Child-Access Prevention Laws | Surrender of Firearms by Prohibited Possessors | Minimum Age Requirements | | Concealed-Carry Laws | | Waiting Periods | Gun-Free Zones |
| | | | | | | | | | | Purchasing | Possessing | Shall Issue | Permitless Carry | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gun industry | | | | | | | | | | | | | | | |
| Gun ownership | | | | | | | | | | | | I | | | |
| Prices of banned firearms in the short term | | ↑ L | | | | | | | | | | | | | |

NOTE: I = inconclusive; L = limited; M = moderate; S = supportive. When we identified no studies meeting eligibility criteria, cells are blank. ↑ = the policy increases the outcome; ↓ = the policy decreases the outcome.

[a] We concluded that there is moderate evidence that dealer background checks decrease firearm homicides, and there is inconclusive evidence for the effect of private-seller background checks on firearm homicides.

Exhibit 10
0173

Rather than concerning how strong a policy's effects are, our findings concern the strength of the available scientific evidence examining those effects. Thus, even when the available evidence is limited, the actual effect of the policy may be strong. Presumably, every policy has some effect on a range of outcomes, however small or unintended. Until researchers design studies that can detect these effects, available evidence is likely to remain inconclusive or limited. But this fact should not be confused with the conclusion that the policies themselves have limited effects. They may or may not have the effects they were designed to produce; available scientific research cannot yet answer that question. Moreover, even a policy with a small effect may nevertheless be beneficial to society or worth its costs. For instance, a policy that reduces firearm deaths by just a few percentage points could save more than 1,000 lives per year. This kind of "small" effect might be very difficult to detect with existing study methods but could represent an important contribution to public health and safety.

## Supplementary Essays

The 13 types of policies reviewed in this report and the scope of the systematic review for the research synthesis were selected a priori and represent the central focus of our research synthesis efforts. Nevertheless, in reviewing evidence on these policies, other important themes emerged that the research team believed provided useful context for the policies or that were frequently cited in gun policy debates. Thus, we also researched what rigorous studies reveal about

- the possible mechanisms by which laws may affect outcomes
- how taxes, access to health care, and media campaigns might affect gun violence
- the effectiveness of laws used to target domestic violence
- methodological challenges in defining and estimating the prevalence of mass shootings and defensive gun use
- how suicide, violence, and mass shootings were affected by Australia's implementation of the National Firearms Agreement.

## Conclusions and Recommendations

Of more than 100 combinations of policies and outcomes, we found that surprisingly few were the subject of methodologically rigorous investigation. Notably, research into four of our outcomes was essentially unavailable, with three of these four outcomes— defensive gun use, hunting and recreation, and the gun industry—representing issues of particular concern to gun owners or gun industry stakeholders. Here, we summarize the key conclusions and recommendations that can be drawn from the policy-outcome

**Exhibit 10**
**0174**

combinations with the strongest available evidence (conclusions 1 through 8). Thereafter, we draw conclusions and recommendations concerning how to improve evidence on the effects of gun policies (conclusions 9 through 13).

## Conclusions and Recommendations Based on the Existing Evidence Base

Our first set of conclusions and recommendations describes the policy-outcome combinations with the strongest available evidence as identified through our review of the existing literature, as well as recommendations for policy based on this evidence.

**Conclusion 1.** Available evidence supports the conclusion that child-access prevention laws, or safe storage laws, reduce self-inflicted fatal or nonfatal firearm injuries among youth. There is moderate evidence that these laws reduce firearm suicides among youth and limited evidence that the laws reduce total (i.e., firearm and nonfirearm) suicides among youth.

**Conclusion 2.** Available evidence supports the conclusion that child-access prevention laws, or safe storage laws, reduce unintentional firearm injuries or unintentional firearm deaths among children. In addition, there is limited evidence that these laws may reduce unintentional firearm injuries among adults.

> *Recommendation 1.* States without child-access prevention laws should consider adopting them as a strategy to reduce firearm suicides and unintentional firearm injuries and deaths. We note, however, that scientific research cannot, at present, address whether these laws might increase or decrease crime or rates of legal defensive gun use.

> *Recommendation 2.* When considering adopting or refining child-access prevention laws, states should consider making child access to firearms a felony; there is some evidence that felony laws may have the greatest effects on unintentional firearm deaths.

**Conclusion 3.** There is moderate evidence that background checks reduce firearm suicides and firearm homicides, as well as limited evidence that these policies can reduce overall suicide and violent crime rates.

**Conclusion 4.** There is moderate evidence that stand-your-ground laws may increase state homicide rates and limited evidence that the laws increase firearm homicides in particular.

**Conclusion 5.** There is moderate evidence that laws prohibiting the purchase or possession of guns by individuals with some forms of mental illness reduce violent crime, and there is limited evidence that such laws reduce homicides in particular. There is also limited evidence these laws may reduce total suicides and firearm suicides.

> *Recommendation 3.* States that currently do not require a background check investigating all types of mental health histories that lead to federal prohibi-

**Exhibit 10**
**0175**

tions on firearm purchase or possession should consider implementing robust mental illness checks, which appear to reduce rates of gun violence. The most robust procedures involve sharing data on all prohibited possessors with the National Instant Criminal Background Check System.

**Conclusion 6.** There is limited evidence that before implementation of a ban on the sale of assault weapons and high-capacity magazines, there is an increase in the sales and prices of the products that the ban will prohibit.

**Conclusion 7.** There is limited evidence that a minimum age of 21 for purchasing firearms may reduce firearm suicides among youth.

**Conclusion 8.** No studies meeting our inclusion criteria have examined required reporting of lost or stolen firearms, required reporting and recording of firearm sales, or gun-free zones.

### Conclusions and Recommendations for Improving Gun Policy Research

Based on our review of the existing literature on the effects of firearm policy changes, we offer the following conclusions and recommendations for improving the evidence base on the effects of gun laws.

**Conclusion 9.** The modest growth in knowledge about the effects of gun policy over the past dozen years reflects, in part, the reluctance of the U.S. government to sponsor work in this area at levels comparable to its investment in other areas of public safety and health, such as transportation safety.

> *Recommendation 4.* To improve understanding of the real effects of gun policies, Congress should consider whether to lift current restrictions in appropriations legislation, and the administration should invest in firearm research portfolios at the Centers for Disease Control and Prevention, the National Institutes of Health, and the National Institute of Justice at levels comparable to its current investment in other threats to public safety and health.

> *Recommendation 5.* Given current limitations in the availability of federal support for gun policy research, private foundations should take further steps to help fill this funding gap by supporting efforts to improve and expand data collection and research on gun policies.

**Conclusion 10.** Research examining the effects of gun policies on officer-involved shootings, defensive gun use, hunting and recreation, and the gun industry is virtually nonexistent.

> *Recommendation 6.* To improve understanding of outcomes of critical concern to many in gun policy debates, the U.S. government and private research sponsors should support research examining the effects of gun laws on a wider

**Exhibit 10**
**0176**

set of outcomes, including crime, defensive gun use, hunting and sport shooting, officer-involved shootings, and the gun industry.

**Conclusion 11.** The lack of data on gun ownership and availability and on guns in legal and illegal markets severely limits the quality of existing research.

> *Recommendation 7.* To make important advances in understanding the effects of gun laws, the Centers for Disease Control and Prevention or another federal agency should resume collecting voluntarily provided survey data on gun ownership and use.

> *Recommendation 8.* To foster a more robust research program on gun policy, Congress should consider whether to eliminate the restrictions it has imposed on the use of gun trace data for research purposes.

**Conclusion 12.** Crime and victimization monitoring systems are incomplete and not yet fulfilling their promise of supporting high-quality gun policy research in the areas we investigated.

> *Recommendation 9.* To improve the quality of evidence used to evaluate gun policies, the National Violent Death Reporting System should be expanded to include all states with rigorous quality control standards.

> *Recommendation 10.* The Bureau of Justice Statistics should examine the cost and feasibility of expanding its existing programs to generate state-level crime data.

> *Recommendation 11.* The Bureau of Justice Statistics should continue to pursue its efforts to generate state-level victimization estimates. The current goal of generating such estimates for 22 states is a reasonable compromise between cost and the public's need for more-detailed information. However, the bureau should continue to expand its development of model-based victimization rates for all states and for a wider set of victimization experiences (including, for instance, crimes involving firearm use by an assailant or victim).

**Conclusion 13.** The methodological quality of research on firearms can be significantly improved.

> *Recommendation 12.* As part of the Gun Policy in America initiative, we have published a database containing a subset of state gun laws from 1979 to 2016 (Cherney, Morral, and Schell, 2018). We ask that others with expertise on

**Exhibit 10**

**0177**

state gun laws help us improve the database by notifying us of its errors, proposing more-useful categorizations of laws, or submitting information on laws not yet incorporated into the database. With such help, we hope to make the database a resource beneficial to all analysts.

*Recommendation 13*. Researchers, reviewers, academics, and science reporters should expect new analyses of the effects of gun policies to improve on earlier studies by persuasively addressing the methodological limitations of earlier studies, including problems with statistical power, model overfitting, covariate selection, poorly calibrated standard errors, multiple testing, undisclosed state variation in law implementation, unjustified assumptions about the time course of each policy's effects, the use of spline and hybrid effect codings that do not reveal coherent causal effect estimates, and inadequate attention to threats of reciprocal causation and simultaneity bias.

In conclusion, with a few exceptions, there is a surprisingly limited base of rigorous scientific evidence concerning the effects of many commonly discussed gun policies. This does not mean that these policies are ineffective; they might well be quite effective. Instead, it reflects shortcomings in the contributions that scientific study can currently offer to policy debates in these areas. It also reflects, in part, the policies we chose to investigate, all of which have been implemented in some U.S. states and, therefore, have proven to be politically and legally feasible, at least in some states. This decision meant that none of the policies we examined would dramatically increase or decrease the stock of guns or gun ownership rates in ways that would produce more readily detectable effects on public safety, health, and industry outcomes. The United States has a large stock of privately owned guns in circulation—estimated in 2014 to be somewhere between 200 million and 300 million firearms (Cook and Goss, 2014). Laws designed to change who may buy new weapons, what weapons they may buy, or how gun sales occur will predictably have only a small effect on, for example, homicides or participation in sport shooting, which are affected much more by the existing stock of firearms. Although small effects are especially difficult to identify with the statistical methods common in this field, they may be important. Even a 1-percent reduction in homicides corresponds to more than 1,500 fewer deaths over a decade.

By highlighting where scientific evidence is accumulating, we hope to build consensus around a shared set of facts that have been established through a transparent, nonpartisan, and impartial review process. In so doing, we also mean to highlight areas where more and better information could make important contributions to establishing fair and effective gun policies.

**Exhibit 10**
**0178**

## Summary References

Cherney, Samantha, Andrew R. Morral, and Terry L. Schell, *RAND State Firearm Law Database*, Santa Monica, Calif.: RAND Corporation, TL-283-RC, 2018. As of March 2, 2018: https://www.rand.org/pubs/tools/TL283.html

Cook, Philip J., and Kristin A. Goss, *The Gun Debate: What Everyone Needs to Know*, New York: Oxford University Press, 2014.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Khan, Khalid S., Regina Kunz, Jos Kleijnen, and Gerd Antes, "Five Steps to Conducting a Systematic Review," *Journal of the Royal Society of Medicine*, Vol. 96, No. 3, 2003, pp. 118–121.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

**Exhibit 10**
**0179**

# Acknowledgments

We wish to thank many staff and researchers inside and outside RAND who helped us to collect, interpret, and present the research discussed in this report. In particular, we wish to thank our quality assurance reviewers who provided expert and valuable guidance on how to improve earlier versions of this report or sections of it. These reviewers included James Anderson, Deborah Azrael, John Donohue, Susan Gates, Andy Hoehn, and Priscillia Hunt, as well as Jack Riley, whom we wish to especially thank for his encouragement and support of the idea that RAND could make important contributions to the gun policy discourse in the United States. The report also benefited from candid written reviews provided by two reviewers who wished to remain anonymous, one affiliated with a gun rights advocacy organization and one affiliated with a gun violence prevention advocacy organization. Within RAND, we wish to acknowledge the exceptional support we received from our research librarians, Roberta Shanman and Sachi Yagyu; our publication editor, Allison Kerns; and members of RAND's Office of External Affairs, including Lee Floyd, Chandra Garber, Stephan Kistler, Heather McCracken, Lauren Skrabala, Mary Vaiana, and Chara Williams.

**Exhibit 10**
**0181**

# Abbreviations

| | |
|---|---|
| aOR | adjusted odds ratio |
| ARIMA | autoregressive integrated moving average |
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| BJS | Bureau of Justice Statistics |
| BRFSS | Behavioral Risk Factor Surveillance Survey |
| CAP | child-access prevention |
| CC | concealed carry |
| CDC | Centers for Disease Control and Prevention |
| CI | confidence interval |
| DGU | defensive gun use |
| FBI | Federal Bureau of Investigation |
| FS/S | proportion of suicides that are firearm suicides |
| GSS | General Social Survey |
| IPH | intimate partner homicide |
| IRR | incidence rate ratio |
| NCVS | National Crime Victimization Survey |
| NFA | (Australian) National Firearms Agreement |
| NIBRS | National Incident-Based Reporting System |
| NICS | National Instant Criminal Background Check System |

| | |
|---|---|
| NIS | Nationwide Inpatient Sample |
| NRC | National Research Council |
| NSDS | National Self Defense Survey |
| NSPOF | National Survey of Private Ownership of Firearms |
| NSSF | National Shooting Sports Foundation |
| NVDRS | National Violent Death Reporting System |
| OR | odds ratio |
| VA | U.S. Department of Veterans Affairs |

**Exhibit 10**
**0183**

PART A
## Introduction and Methods

Exhibit 10
0184

**Exhibit 10**
**0185**

CHAPTER ONE
# Introduction

Americans are deeply divided on gun policy (Parker et al., 2017). Many Americans cherish the traditions of hunting, sport shooting, and collecting guns and value the security and protection that guns can provide. Many regions rely on hunting as an important driver of the tourism economy (Nelson, 2001; BBC Research & Consulting, 2008; Hodur, Leistritz, and Wolfe, 2008), and the wider gun industry employs hundreds of thousands of Americans, including instructors; shooting range operators; hunting equipment suppliers; and manufacturers, distributors, and retailers of firearms and ammunition. At the same time, many Americans have suffered grievous injuries and lost friends and family members in incidents involving firearms.[1] More than 36,000 Americans die annually from deliberate and unintentional gun injuries, and two-thirds of these deaths are suicides (Centers for Disease Control and Prevention [CDC], 2017a). Another 90,000 Americans per year receive care in a hospital for a nonfatal gun injury (CDC, 2017c).

Few are satisfied with the levels of mortality and injury associated with firearms, but there is passionate disagreement about how policies could be shaped to create a better future. There is a quite limited base of science on which to build sound and effective gun policies. Instead, when the public or members of Congress consider proposals affecting gun policy, they encounter conflicting opinions and inconsistent evidence about the likely effects of new laws. Views on what is factual concerning gun policies, or what the facts imply for decisionmaking, frequently divide along political and partisan lines (Kahan, 2017).

Entrenched disagreements on gun policy are not surprising, given the number and variety of contested and contradictory studies, selective misuse of facts by some on all sides of the debate, and today's hyper-partisan political environment. Moving past such roadblocks will be impossible unless decisionmakers can draw on a common set of facts based on transparent, nonpartisan, and impartial research and analysis. Even when individuals disagree about the objectives of gun policies, empirical evidence can help determine the most likely benefits and harms associated with such policies.

---

[1] Although not all guns are firearms, in this report, we follow conventional use in U.S. policy discussions and treat the terms *gun* and *firearm* as interchangeable.

## Gun Policy in America

To help fill the gap in impartial research and analysis, the RAND Corporation launched the Gun Policy in America initiative, which is premised on the idea that the real effects of policies can be objectively determined and that establishing these facts will help lead to sound policies. Our goal is to create a resource where policymakers and the general public can access unbiased information that informs and enables the development of fair and effective firearm policies.

This report synthesizes the available scientific data on the effects of various firearm policies on firearm deaths, violent crime, the gun industry, participation in hunting and sport shooting, and other outcomes. It builds and expands on earlier comprehensive reviews of scientific evidence on gun policy conducted more than a decade ago by the National Research Council (2004) and the Community Preventive Services Task Force (see Hahn et al., 2005). This report is one of several research products stemming from RAND's Gun Policy in America initiative (see www.rand.org/gunpolicy).

In the Gun Policy in America initiative, we have made no attempt to evaluate the merits of different values and principles that sometimes drive policy disagreements. We also have not evaluated the legality of any candidate laws or how they may infringe on Second Amendment rights. Instead, our focus is strictly on the empirical effects of policies on the eight outcomes specified in this report. However, all of the policies we investigate have been implemented in multiple states, and many have withstood Supreme Court review; therefore, we have selected policies that have previously been found not to violate the Constitution.

Laws are not the only interventions that have been used to shape how guns are used in the United States, and research is available on the effectiveness of other approaches, such as public information campaigns, safety and training programs, policing interventions, and school and community programs. In this report, however, our focus is on what scientific studies tell us about the probable effects of certain laws.

## Research Focus

The primary focus of this report is our systematic review of 13 broad classes of gun policies that have been implemented in some states and the effects of those policies on eight outcomes. We selected the 13 classes from a larger set of more than 100 gun policies that have been advocated for; proposed; or passed into law by the federal government, states, or municipalities. Specifically, we restricted our attention to policies or laws that have already been implemented in some states so that researchers could examine the effects of each. In addition, we sought policies designed to have a direct effect on our selected outcomes. These policies, the presumed mechanisms whereby they produce intended (and possibly unintended) effects on our selected outcomes,

**Exhibit 10**
**0187**

and the various ways that U.S. states have implemented them are discussed in detail in Chapters Three through Fifteen of this report. Although, in many cases, these policies have been implemented by local municipalities rather than states, we have not sought to review implementation at the local level.

The 13 classes of gun policies considered in this research are as follows:

1. background checks
2. bans on the sale of assault weapons and high-capacity magazines
3. stand-your-ground laws
4. prohibitions associated with mental illness
5. lost or stolen firearm reporting requirements
6. licensing and permitting requirements
7. firearm sales reporting and recording requirements
8. child-access prevention laws
9. surrender of firearms by prohibited possessors
10. minimum age requirements
11. concealed-carry laws
12. waiting periods
13. gun-free zones.

When deciding on the outcomes to examine in our research, we first included those related to public health and safety—suicide, violent crime, unintentional injuries and deaths, mass shootings, and officer-involved shootings. These are the outcomes most commonly examined in the research literature we were familiar with. However, we recognized that such outcomes omit many of the benefits of gun ownership that are attractive to gun owners and that may also be affected by laws designed to reduce the gun-related harms to public health and safety. Therefore, we also systematically searched the research literature for studies examining how gun laws affect defensive gun use, hunting and recreation, and the gun industry. Together, these eight outcomes cover many of the areas of concern frequently discussed in debates on gun policy. Here, we provide a short description of each outcome.

### Suicide

Official statistics on suicide in the United States are compiled by the CDC. Recent data, from 2015, indicate that 44,193 suicides occurred that year, for a rate of 13.75 per 100,000 people. Of these, 22,018 (49.8 percent) were firearm suicides (CDC, 2017a). Researchers have often examined the effects of laws on total suicides (i.e., suicide deaths by any means, including those involving a firearm), firearm suicides, nonfirearm suicides, and suicide attempts. From a societal perspective, the most important of these outcomes is total suicide; that is, the goal is to reduce the total number of suicide deaths, regardless of how one goes about attempting to die. In many cases, however, we would expect the effects of gun laws to be more easily observed in rates of firearm

**Exhibit 10**
**0188**

suicides, not total suicides. The consensus among public health experts is that reducing firearm suicides in contexts where more-lethal means of attempting suicide are unavailable will result in reductions in the total suicide rate (see, for example, Office of the Surgeon General and National Alliance for Suicide Prevention, 2012; World Health Organization, 2014; for review, see Azrael and Miller, 2016). Nevertheless, it is also clear that some people prevented from attempting suicide with a firearm will substitute another lethal means and successfully end their lives. The rate at which this substitution occurs is not known. Thus, for laws that increase or decrease firearm suicides, the effects on total suicides are likely smaller and harder to detect. For this reason, we examine the effects of policies on both total suicides and firearm suicides.

Suicide rates in the United States have increased 25 percent since 1999 (Curtin, Warner, and Hedegaard, 2016).[2] There is some degree of misclassification of suicide deaths, with some suicides likely classified as unintentional deaths (Kapusta et al., 2011) or overdose deaths (Bohnert et al., 2013). The CDC provides limited nationwide data on suicides for all states. More-expansive data are contained in the National Violent Death Reporting System, also maintained by the CDC, but because that system currently releases information on just a subset of U.S. states, we cannot use this data set to characterize suicides nationally.

Data on suicide attempts generally derive from two sources: hospital admission records and self-reports. In hospital data, suicides are generally categorized as "self-harm" with unspecified intent; although there is a field to code cause of injury, this field is completed inconsistently across states (Coben et al., 2001). In 2014, there were 469,096 self-harm, nonfatal hospital admissions to emergency departments in the United States, 3,320 (less than 1 percent) of which were caused by a firearm (CDC, 2017c). This may be because between 83 and 91 percent of those who attempt suicide with a firearm die, which is a higher rate than some other methods of suicide, such as drowning (66–84 percent) or hanging (61–83 percent) (Azrael and Miller, 2016).

Emergency room data contain only self-harm incidents that resulted in an emergency room visit; as a complementary data source, national data based on self-reports reveal that, in 2015, 1.4 million adults aged 18 or older (0.6 percent) attempted suicide in the past year (Piscopo et al., 2016).

## Violent Crime

The Federal Bureau of Investigation (FBI) defines *violent crime* as including forcible rape, robbery, aggravated assault, and murder or nonnegligent manslaughter. The last category excludes deaths caused by suicide, negligence, or accident, as well as justifiable homicides (such as the killing of a felon by a peace officer in the line of duty) (FBI, 2016d).

---

[2]   The 25-percent increase in suicides refers to the age-adjusted rate, although the crude rate and the absolute number of suicides have also increased.

**Exhibit 10**
**0189**

Case 3:19-cv-01226-L-AHG   Document 21-15   Filed 11/12/19   PageID.3918   Page 203 of 232

One source of data on violent crime is the FBI's Uniform Crime Reporting program, which relies on voluntary reporting of crimes by city, university/college, county, state, tribal, and federal law enforcement agencies. Data from the program indicate that there were approximately 1.2 million violent crimes in the United States in 2015, including 764,449 aggravated assaults, 327,374 robberies, 124,047 rapes, and 15,696 instances of murder or nonnegligent manslaughter (FBI, 2016d). The overall violent crime rate was 372.6 per 100,000 people, with the highest rate for aggravated assault (237.8 per 100,000), followed by robbery (101.9 per 100,000), rape (38.6 per 100,000) and murder or nonnegligent manslaughter (4.9 per 100,000). Nationwide, firearms were used in 71.5 percent of all instances of murder or nonnegligent manslaughter, 40.8 percent of robberies, and 24.2 percent of aggravated assaults in 2015 (FBI, 2016d).

Death certificate data and emergency department admission data provide additional insights into the prevalence and consequences of violent crime. Based on mortality data, the CDC estimated that there were 17,793 homicides in the United States in 2015, for a rate of 5.54 per 100,000 people; of these, 12,979 (73 percent) were caused by a firearm (CDC, 2017a). Emergency department data show that in 2014 there were more than 1.5 million admissions to hospital emergency departments for assault; of these, 60,470 (3.8 percent) were firearm-related (CDC, 2017c).

### Unintentional Injuries and Deaths

Like suicide, official statistics on unintentional injuries and deaths in the United States are compiled by the CDC. The most recent data, from 2015, indicate that 146,571 fatal unintentional injuries occurred that year, for a rate of 46.50 per 100,000 people (CDC, 2017a). Of these, 489 (less than 1 percent) were caused by a firearm. Some of these fatal unintentional injuries were likely misclassified and were actually suicides or homicides. Nevertheless, the true number of unintentional firearm deaths may be substantially greater than reported in the CDC's vital data. For example, inconsistent classification of child firearm deaths by local coroners may result in 35–45 percent of all unintentional firearm deaths being classified instead as suicides or homicides (Everytown for Gun Safety Support Fund, 2014; Hemenway and Solnick, 2015a). We also include research examining nonfatal unintentional injuries. There were close to 29 million unintentional injury discharges from emergency rooms in 2014, of which 15,928 (less than 1 percent) were caused by a firearm. These reports omit injuries that did not result in an emergency room visit.

### Mass Shootings

Although only a small fraction of annual firearm deaths result from a mass shooting, these events attract enormous public, media, and social media attention in the country, and they frequently prompt discussions about legislative initiatives for how better to prevent gun violence. The U.S. government has never defined *mass shooting*, and there is no single universally accepted definition of the term. The FBI's definition of a *mass*

**Exhibit 10**
**0190**

*murderer* requires at least four casualties, excluding the offender or offenders, in a single incident. Public law (the Investigative Assistance for Violent Crime Act of 2012; Pub. L. 112-265) defines a *mass killing* as a single incident in which three or more people were killed. Alternative definitions include two or more injured victims or four or more people injured or killed, including the shooter. Depending on which data source is referenced, and its definitions, there were seven, 65, 332, or 371 mass shootings in the United States in 2015 (see a discussion of these estimates in Chapter Twenty-Two).

### Officer-Involved Shootings

Police shootings of civilians have triggered fierce debates locally and nationally about when use of lethal force is appropriate and whether it is being used disproportionately against minorities. Although the FBI has tried to collect information on police shootings from around 17,000 local law enforcement agencies, recent efforts by news organizations (such as the *Washington Post* and the *Guardian*) have demonstrated that the FBI's data collection misses many such cases. Whereas the FBI's count typically comes to around 400 killings by police per year, the *Washington Post* documented news stories on 963 individuals shot and killed by law enforcement in 2016, a number that could omit any individuals shot and killed by police about whom no news story was written. The FBI has announced plans to begin a new data collection effort that will reportedly track all incidents in which law enforcement seriously injure or kill citizens (Kindy, 2015).

Because reliable data on police shootings are often available only for individual police departments, prior studies using such data typically present information at the city level. For example, using police reports and other administrative data, Klinger et al. (2016) looked at 230 use-of-force shootings by police officers involving 373 suspects in St. Louis between 2003 and 2012. Similarly, medical records of shooting victims contain information on whether the shooter was a member of the law enforcement community. Using data from New York City's medical examiner, Gill and Pasquale-Styles (2009) looked at law enforcement shootings resulting in a fatality there between 2003 and 2006. The data included 42 cases for the four-year period. Like suicide attempts and unintentional injuries and deaths, this data source misses incidents in which the officer did not injure the suspect or the suspect did not seek medical attention.

### Defensive Gun Use

Defensive gun use has typically been measured in the empirical literature using self-reports on surveys of gun owners, although some studies have used firearm deaths coded as justifiable homicides to investigate subsets of defensive gun use. Although there are some variations, *defensive gun use* has often been defined as incidents that involve (1) protection against humans (i.e., not animals); (2) gun use by civilians (not official use by military, police, or security personnel); (3) contact between persons (not, for instance, carrying a firearm to investigate a suspicious sound when no intruder is encountered); and (4) use of a gun, at least as a visual or verbal threat (not

**Exhibit 10**
**0191**

incidents in which a gun may have simply been available for use). Definitions this broad would include defensive use of a gun by criminals during the commission of a crime, as well as use of a gun for personal defense by those who are prohibited by law from being in possession of a weapon (itself a crime). More-restrictive definitions specify that the defensive gun use be performed by the victim of certain crimes or by someone trying to protect the victim. These definitions may miss instances in which crimes were deterred or averted when a firearm was brandished.

Differences in the definitions of defensive gun use, and in the manner of collecting information about it, lead to wide differences in estimates of the annual incidence of defensive gun use. Low estimates (based on the experiences of crime victims) are a little more than 100,000 such incidents per year, and high estimates are 4.7 million per year (Cook and Ludwig, 1996, 1997, 1998; McDowall, Loftin, and Wiersema, 1998). This literature and the challenges of defining and measuring defensive gun use are reviewed in Chapter Twenty-Three.

## Hunting and Recreation

Federal statistics on hunters largely come from the National Survey of Fishing, Hunting, and Wildlife-Associated Recreation Survey, which is conducted every five years as a coordinated effort by the U.S. Fish and Wildlife Service and the U.S. Census Bureau. According to the most recent data, from 2011, approximately 13 million people used firearms for hunting, more than 50 percent of all hunters participated in target shooting, and 22 percent of hunters visited shooting ranges (U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, 2012). Estimates from the National Shooting Sports Foundation (NSSF) suggest that approximately 20 million individuals participate in target shooting annually (Southwick Associates, 2013). Data from the General Social Survey suggest that hunting has decreased significantly since 1977, when 31.6 percent of adults lived in households where they, their spouse, or both hunted. In 2014, households with a hunter was down to 15.4 percent (Smith and Son, 2015).

## Gun Industry

Estimates produced by the NSSF suggest that there are 141,000 jobs in the United States involving the manufacture, distribution, or retailing of ammunition, firearms, and hunting supplies and potentially another 150,000 jobs in supplier and ancillary industries connected with the firearm market (NSSF, 2017). According to the U.S. Census Bureau, in 2014, more than 90,000 people were employed in U.S. firms coded as being involved in just the manufacture of firearms, ammunition, or ordnance (North American Industry Classification System [NAICS] codes 332992, 332993, and 332994; U.S. Census Bureau, 2016). The manufacturing industry alone is estimated to generate $16 billion in revenue annually (IBISWorld, 2016). In 2011, hunters spent $3 billion on firearms and $1.2 billion on ammunition (U.S. Fish and Wildlife Ser-

Exhibit 10
0192

vice, U.S. Department of the Interior, and U.S. Department of Commerce, 2012). More than 9 million firearms were manufactured in the United States in 2014, nearly triple the number manufactured one decade prior. An additional 3.6 million firearms were imported in 2014, while just more than 420,900 firearms were exported from the United States (Bureau of Alcohol, Tobacco, Firearms and Explosives, 2016b).

As of the end of fiscal year 2015, 139,840 federal firearms licensees had active licenses to sell firearms in the United States. Just more than 46 percent of these licenses were held by dealers or pawnbrokers, 43 percent were held by collectors, about 9 percent were held by manufacturers of ammunition or firearms, and less than 1 percent were held by importers (Bureau of Alcohol, Tobacco, Firearms and Explosives, 2016b).

## Organization of This Report

The report is organized into five parts. Part A introduces the project scope and objectives in Chapter One and the methods used to conduct systematic reviews and syntheses of the literature in Chapter Two. In Part B, we present a research synthesis on each of the 13 state policies selected for review (Chapters Three through Fifteen). Each of these chapters defines the class of policies under review; presents and rates the available evidence; and describes what conclusions, if any, can be drawn about how each policy affects each outcome. Part B includes all of the research syntheses we selected a priori; however, in the course of developing these, several related themes frequently came up in the literature and in policy debates, and we believed that these themes warranted further discussion or review. Therefore, to augment and provide context for Part B's syntheses, Part C presents supplementary essays on what rigorous studies reveal about

- the possible mechanisms by which laws may affect outcomes (Chapters Sixteen and Seventeen on the effects of firearm prevalence on suicide and violent crime)
- how taxes, access to health care, and media campaigns might affect gun violence (Chapters Eighteen through Twenty)
- the effectiveness of laws used to target domestic violence (Chapter Twenty-One)
- methodological challenges in defining and estimating the prevalence of mass shootings and defensive gun use (Chapters Twenty-Two and Twenty-Three)
- how suicide, violent crime, and mass shootings were affected by Australia's implementation of the National Firearms Agreement (Chapter Twenty-Four).

In Part D, we draw general conclusions from the main policy analyses and offer recommendations for how to improve the state of evidence for the effects of state laws. Finally, in an appendix section, Appendix A describes common methodological shortcomings found in the existing scientific literature examining gun policy, and Appendix B describes the source data used to display study effect sizes and rate study methodologies.

**Exhibit 10**

**0193**

## Chapter One References

Azrael, Deborah, and Matthew Miller, "Reducing Suicide Without Affecting Underlying Mental Health: Theoretical Underpinnings and a Review of the Evidence Base Lining the Availability of Lethal Means and Suicide," in Rory C. O'Connor and Jane Pirkis, eds., *The International Handbook of Suicide Prevention*, 2nd ed., Hoboken, N.J.: John Wiley and Sons, 2016.

BBC Research & Consulting, *The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado*, Denver, Colo., September 26, 2008. As of October 13, 2017:
https://cpw.state.co.us/Documents/About/Reports/08DOWEconomicImpactReport.pdf

Bohnert, A. S., J. F. McCarthy, R. V. Ignacio, M. A. Ilgen, A. Eisenberg, and F. C. Blow, "Misclassification of Suicide Deaths: Examining the Psychiatric History of Overdose Decedents," *Injury Prevention*, Vol. 19, No. 6, 2013, pp. 326–330.

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2016*, Washington, D.C.: U.S. Department of Justice, 2016b.

CDC—*See* Centers for Disease Control and Prevention.

Centers for Disease Control and Prevention, "Fatal Injury Reports, National, Regional, and State 1981–2015," WISQARS database, Atlanta, Ga., 2017a. As of May 8, 2017:
https://webappa.cdc.gov/sasweb/ncipc/mortrate.html

———, "Nonfatal Injury Reports: 2001–2014," WISQARS database, Atlanta, Ga., 2017c. As of January 15, 2017:
https://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html

Coben, J. H., C. A. Steiner, M. Barrett, C. T. Merrill, and D. Adamson, "Completeness of Cause of Injury Coding in Healthcare Administrative Databases in the United States," *Injury Prevention*, Vol. 12, No. 3, 2001, pp. 199–201.

Cook, Philip J., and Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, Washington, D.C.: Police Foundation, 1996.

———, *Guns in America: National Survey on Private Ownership and Use of Firearms: Research in Brief*, Rockville, Md.: National Institute of Justice, 1997.

———, "Defensive Gun Uses: New Evidence from a National Survey," *Journal of Quantitative Criminology*, Vol. 14, No. 2, 1998, pp. 111–131.

Curtin, Sally C., Margaret Warner, and Holly Hedegaard, *Suicide Rates for Females and Males by Race and Ethnicity: United States, 1999 and 2014*, Atlanta, Ga.: Centers for Disease Control and Prevention, 2016.

Everytown for Gun Safety Support Fund, *Innocents Lost: A Year of Unintentional Child Gun Deaths*, June 2014. As of May 12, 2017:
https://everytownresearch.org/documents/2015/04/innocents-lost.pdf

FBI—*See* Federal Bureau of Investigation.

Federal Bureau of Investigation, "Crime in the United States 2015: Violent Crime," Washington, D.C.: U.S. Department of Justice, 2016d. As of May 8, 2017:
https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/offenses-known-to-law-enforcement/violent-crime/violentcrimemain_final.pdf

Gill, J. R., and M. Pasquale-Styles, "Firearm Deaths by Law Enforcement," *Journal of Forensic Science*, Vol. 54, No. 1, 2009, pp. 185–188.

**Exhibit 10**
**0194**

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Hemenway, David, and Sara J. Solnick, "Children and Unintentional Firearm Death," *Injury Epidemiology*, Vol. 2, No. 26, 2015a.

Hodur, Nancy M., F. Larry Leistritz, and Kara L. Wolfe, "Developing the Nature-Based Tourism Sector in Southwestern North Dakota," *Great Plains Research: A Journal of Natural and Social Sciences*, Vol. 18, Spring 2008, pp. 81–92.

IBISWorld, *Guns and Ammunition Manufacturing in the U.S.: Market Research Report,* Los Angeles, Calif., August 2016.

Kahan, Dan M., "On the Sources of Ordinary Science Knowledge and Extraordinary Science Ignorance," in Kathleen Hall Jamieson, Dan Kahan, and Dietram A. Scheufele, eds., *Oxford Handbook of the Science of Science Communication*, Oxford, UK: Oxford University Press, 2017.

Kapusta, N. D., U. S. Tran, I. R. Rockett, D. DeLeo, C. P. Naylor, T. Niederkrotenthaler, M. Voracek, E. Etzersdorfer, and G. Sonneck, "Declining Autopsy Rates and Suicide Misclassification: A Cross-National Analysis of 35 Countries," *Archives of General Psychiatry*, Vol. 68, No. 10, 2011, pp. 1050–1057.

Kindy, Kimberly, "FBI to Sharply Expand System for Tracking Fatal Police Shootings," *Washington Post,* December 8, 2015.

Klinger, D., R. Rosenfeld, D. Isom, and M. Deckard, "Race, Crime, and the Micro-Ecology of Deadly Force," *Criminology and Public Policy*, Vol. 15, No. 1, February 2016, pp. 193–222.

McDowall, D., C. Loftin, and B. Wiersema, "Estimates of the Frequency of Firearm Self Defense from the National Crime Victimization Survey," Albany, N.Y.: State University of New York, School of Criminal Justice, Violence Research Group Discussion Paper 20, 1998 (unpublished).

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

National Shooting Sports Foundation, *Firearms and Ammunition Industry Economic Impact Report,* Newtown, Conn., 2017. As of October 18, 2017:
https://d3aya7xwz8momx.cloudfront.net/wp-content/uploads/2017/07/EconomicImpactofIndustry2017.pdf

Nelson, Charles M., *Economic Implications of Land Use Patterns for Natural Resource Recreation and Tourism*, Lansing, Mich.: Michigan Land Resource Project, Public Sector Consultants, 2001.

NSSF—*See* National Shooting Sports Foundation.

Office of the Surgeon General and National Action Alliance for Suicide Prevention, *National Strategy for Suicide Prevention: Goals and Objectives for Action: A Report of the U.S. Surgeon General and of the National Action Alliance for Suicide Prevention*, Washington, D.C.: U.S. Department of Health and Human Services, 2012.

Parker, Kim, Juliana Menasce Horowitz, Ruth Igielnik, Baxter Oliphant, and Anna Brown, *America's Complex Relationship with Guns*, Washington, D.C.: Pew Research Center, June 22, 2017. As of August 14, 2017:
http://assets.pewresearch.org/wp-content/uploads/sites/3/2017/06/06151541/Guns-Report-FOR-WEBSITE-PDF-6-21.pdf

**Exhibit 10**
**0195**

Piscopo, Kathryn, Rachel N. Lipari, Jennifer Cooney, and Christie Galsheen, *Suicidal Thoughts and Behavior Among Adults: Results from the 2015 National Survey on Drug Use and Health*, NSDUH Data Review, September 2016. As of May 23, 2017:
https://www.samhsa.gov/data/sites/default/files/
NSDUH-DR-FFR3-2015/NSDUH-DR-FFR3-2015.pdf

Public Law 112-265, Investigative Assistance for Violent Crimes Act of 2012, January 14, 2013.

Smith, T. W., and J. Son, *Trends in Gun Ownership in the United States, 1972–2014*, Chicago, Ill.: NORC at the University of Chicago, March 2015. As of March 9, 2017:
http://www.norc.org/PDFs/GSS%20Reports/
GSS_Trends%20in%20Gun%20Ownership_US_1972-2014.pdf

Southwick Associates, *Target Shooting in America*, Newtown, Conn.: National Shooting Sports Foundation, 2013.

U.S. Census Bureau, *Number of Firms, Number of Establishments, Employment, and Annual Payroll by Enterprise Employment Size for the United States, All Industries: 2014*, Washington, D.C., December 2016. As of January 15, 2017:
https://www.census.gov/data/tables/2014/econ/susb/2014-susb-annual.html

U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, *2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*, Washington, D.C., FH2/11-NAT, 2012.

World Health Organization, *Preventing Suicide: A Global Imperative*, Geneva, 2014. As of May 8, 2017:
http://apps.who.int/iris/bitstream/10665/131056/1/9789241564779_eng.pdf

**Exhibit 10**
**0196**

**Exhibit 10**
**0197**

CHAPTER TWO
# Methods

Our review of evidence concerning the effects of 13 policies on eight outcomes used Royal Society of Medicine (Khan et al., 2003) guidelines for conducting systematic reviews of a scientific literature. Those guidelines consist of a five-step protocol: framing questions for review, identifying relevant literature, assessing the quality of the literature, summarizing the evidence, and interpreting the findings. Our objective was to identify and assess the quality of evidence provided in research that estimated the causal effect of one of the selected gun policies (or the prevalence of firearm ownership) on any of our eight key outcomes.

Before undertaking the review, we knew that we would need to draw on primarily observational studies across a range of disciplines, including economics, psychology, public health, sociology, and criminology. The Royal Society of Medicine approach is suitable in this context because of its flexibility and applicability to social and policy interventions. Other approaches for systematic reviews (e.g., Institute of Medicine, 2011; Higgins and Green, 2011) are designed primarily for reviews specific to health care. We consulted guidelines from the Campbell Collaboration to ensure that our review criteria were based on relevant factors prescribed for reviews of social and policy interventions (e.g., determination of independent findings, statistical procedures; Campbell Collaboration, 2001). However, to more efficiently examine the range of outcomes and interventions we set out to review, and because of the wide range of methods researchers have used to examine these effects, we do not follow the Campbell Collaboration guidelines exactly, as detailed next.

## Selecting Policies

RAND assembled a list of close to 100 distinct gun policies advocated by diverse organizations, including the White House and other U.S. government organizations, advocacy organizations focused on gun policy (such as the National Rifle Association and the Brady Campaign to Prevent Gun Violence), academic organizations focused on gun policy or gun policy research, and professional organizations that had made public recommendations related to gun policy (e.g., the International Association of Chiefs of

Police and the American Bar Association). Our objective was to evaluate state firearm laws because there is considerable variation that could be examined to understand the causal effects of such laws. Moreover, because the laws are applied statewide, observed effects may generalize to new jurisdictions better than the effects of local gun policies or programs that may be more tailored to the unique circumstances giving rise to them. We therefore eliminated policies that chiefly concerned local programs or interventions that are not mandated by state laws (e.g., gun buy-back programs or policing strategies that have been recommended on the basis of favorable research findings). For the same reason, we eliminated policies that either have never been passed into state laws or that have not yet had their intended effects (e.g., laws requiring new handguns to incorporate smart-gun technologies). We excluded policies that we concluded were likely to have only an indirect effect on any of the eight outcomes we were examining (e.g., policies concerning mental health coverage in group health insurance plans; the public availability of Bureau of Alcohol, Tobacco, Firearms and Explosives data on gun traces). We clustered some policy proposals that we regarded as sufficiently similar in concept to be included in the same general class of policies (e.g., policies of repealing the Safe Schools Act and the conceptually similar policy to prohibit gun-free zones).

This process resulted in 13 classes of firearm policies that we subsequently reviewed with multiple representatives of two advocacy organizations (one strongly aligned with enhanced gun regulation, and one strongly aligned with reduced gun regulation). The purpose of these consultations was to establish whether we had identified policies that are important, coherent, and relevant to current gun policy debates. This consultation resulted in substituting two of our original 13 classes of laws. As noted in Chapter One, the final set of policies, defined and explained in Chapters Three through Fifteen, is as follows:

1. background checks
2. bans on the sale of assault weapons and high-capacity magazines
3. stand-your-ground laws
4. prohibitions associated with mental illness
5. lost or stolen firearm reporting requirements
6. licensing and permitting requirements
7. firearm sales reporting and recording requirements
8. child-access prevention laws
9. surrender of firearms by prohibited possessors
10. minimum age requirements
11. concealed-carry laws
12. waiting periods
13. gun-free zones.

**Exhibit 10**
**0199**

These classes of gun policies do not comprehensively account for all—or necessarily the most effective—laws or programs that have been implemented in the United States with the aim of reducing gun violence. For example, our set of policies does not include mandatory minimum sentencing guidelines for crimes with firearms. Further, by restricting our evaluation to state policies, we exclude local interventions (e.g., problem-oriented policing, focused deterrence strategies) that have been found to reduce overall crime in prior meta-analyses (Braga, Papachristos, and Hureau, 2014; Braga and Weisburd, 2012). However, we recognize the potential importance of these other interventions and believe a similar systematic review of their effects on outcomes relevant to the firearm policy debate merits future research.[1]

While Part B of this report evaluates the existing literature on the effects of these 13 classes of firearm policies, Part C includes essays describing scientific research on possible mechanisms by which laws may affect firearm-related outcomes, such as by affecting the prevalence of gun ownership (see Chapters Sixteen and Seventeen).

## Selecting and Reviewing Studies

Our selection and review of the identified literature involved the following steps:

1. Article retrieval: Across all outcomes, we identified a common set of search terms to capture articles relevant to firearm prevalence or firearm policies. We then identified search terms unique for each outcome.
2. Title and abstract review: We conducted separate title and abstract reviews for each outcome using DistillerSR to code criteria used to determine whether the article appeared to meet minimum inclusion criteria (described later).
3. Full-text review: All studies retained after abstract review received full-text review and coding using DistillerSR. The purpose of this review was to identify studies that examined the effects of one or more of our policies on any of our outcomes and that employed methods designed to clarify the causal effects of the policy.
4. Synthesis of evidence: Once we identified the subset of quasi-experimental studies for each outcome and policy,[2] members of the multidisciplinary methodology team met to discuss each study's strengths and limitations. Then, the group discussed each set of studies available for a policy-outcome pair to make a determination about the level of evidence supporting the effect of the policy on each outcome.

---

[1] For a recent review of the evidence on criminal justice interventions to reduce criminal access to firearms, see Braga, 2017.

[2] We identified no experimental studies.

**Exhibit 10**
**0200**

## Article Retrieval

In spring 2016, we queried all databases listed in Table 2.1 for English-language studies. Because the National Research Council (NRC) (2004) and the Community Preventive Services Task Force (Hahn et al., 2005) published comprehensive and high-quality research reviews in 2004 and 2005, we limited our search primarily to research published during or after 2003 (assuming a lag from the time the NRC review was complete and the final report was published). We supplemented this search with a review of all studies reviewed by NRC (2004) and Hahn et al. (2005). Finally, to ensure inclusion of the most-seminal studies, including those that may have been missed by NRC or Hahn et al., we conducted additional searches in the Web of Science and Scopus

**Table 2.1**
**Databases Searched for Studies Examining the Effects of Firearm Policies**

| Database | Details |
|---|---|
| PubMed | National Library of Medicine's database of medical literature. *Not used for gun industry or hunting searches.* |
| PsycINFO | Journal articles, books, reports, and dissertations on psychology and related fields. *Not used for gun industry or hunting searches.* |
| Index to Legal Periodicals | Includes indexing of scholarly articles, symposia, jurisdictional surveys, court decisions, books, and book reviews. |
| Social Science Abstracts | Journal articles and book reviews on anthropology, crime, economics, law, political science, psychology, public administration, and sociology. |
| Web of Science | Includes the Book Citation Index, Science Citation, Social Science Citation, Arts & Humanities Citation Indexes, and Conference Proceedings Citation Indexes for Science, Social Science, and Humanities, which include all cited references from indexed articles. |
| Criminal Justice Abstracts | Abstracts related to criminal justice and criminology; includes current books, book chapters, journal articles, government reports, and dissertations published worldwide. |
| National Criminal Justice Reference Service | Contains summaries of the more than 185,000 criminal justice publications housed in the National Criminal Justice Reference Service Library collection. |
| Sociological Abstracts | Citations and abstracts of sociological literature, including journal articles, books, book chapters, dissertations, and conference papers. |
| EconLit | Journal articles, books, and working papers on economics. |
| Business Source Complete | Business and economics journal articles, country profiles, and industry reports. |
| WorldCat | Catalog of books, web resources, and other material worldwide. |
| Scopus | An abstract and citation database with links to full-text content, covering peer-reviewed research and web sources in scientific, technical, medical, and social science fields, as well as arts and humanities. |
| LawReviews (LexisNexis) | A database of legal reviews. |

**Exhibit 10**
**0201**

databases for any study that had been cited in the literature 70 or more times, regardless of its publication date. Finally, after completing our search, several relevant studies were published in summer and fall 2016. When we became aware of these, we included them in our review.

We conducted separate searches for each of the eight outcomes. The search strings that were applied universally across all outcomes included the following:

- gun or guns or firearm* or handgun* or shotgun* or rifle* or longgun* or machinegun* or pistol* OR automatic weapon OR assault weapon OR semi-automatic weapon OR automatic weapons OR assault weapons OR semi-automatic weapons
  AND
- ownership OR own OR owns OR availab* OR access* OR possess* OR purchas* OR restrict* OR regulat* OR distribut* OR "weapon carrying" OR "weapon-carrying" OR legislation OR legislating OR legislative OR law OR laws OR legal* OR policy OR policies OR "ban" OR "bans" OR "banned."

In addition, we searched for the following outcome-specific search terms:

- suicide: (suicide* OR self-harm* OR self-injur*);
  - the following were the only terms used for "firearms" for this search: gun or guns or firearm* or handgun* or shotgun* or rifle* or longgun* or machine-gun* or pistol*
- violent crime: homicide* OR murder* OR manslaughter OR "domestic violence" OR "spousal abuse" OR "elder abuse" OR "child abuse" OR "family violence" OR "child maltreatment" OR "spousal maltreatment" OR "elder maltreatment" OR "intimate relationship violence" OR "intimate partner violence" OR "dating violence" OR (violen* AND [crime* OR criminal*]) OR rape OR rapes OR rapist* OR "personal crime" OR "personal crimes" OR robbery OR assault* OR stalk* OR terroris*
- unintentional injuries and deaths: accident* OR unintentional
- mass shootings: "mass shooting" OR "mass shootings"
- officer-involved shootings: "law enforcement" OR police* OR policing
- defensive gun use: self-defense OR "self defense" OR "personal defense" OR defens* OR self-protect* OR self protect* OR DGU OR SDGU
- hunting and recreation: hunt OR hunting OR "sport shooting" OR "shooting sports" OR recreation* (The terms "ammunition" and "bullets" were also included in the set containing the terms for "firearms.")
- gun industry: industr* OR manufactur* OR produc* OR distribut* OR supply OR trade OR price* OR export* OR revenue* OR sales OR employ* OR profit* OR cost OR costs OR costing OR "gun show" OR tax OR taxes OR taxing OR taxation OR payroll OR "federal firearms license."

**Exhibit 10**
**0202**

We used a three-stage study review process and standardized review criteria (described next) to identify all studies with evidence for policy effects meeting minimum evidence standards. When possible, we calculated and graphed standardized effect sizes for reported effects included in our research syntheses (Chapters Three through Fifteen).

In addition to the planned research syntheses analyzing the effects of the 13 policies outlined in Chapter One, we summarized evidence on other topics when members of the research team believed that a topic provided important supplemental evidence or explanatory information (see Chapters Sixteen through Twenty-Four). For instance, we identified a substantial literature examining the effects of firearm prevalence on rates of suicide (Chapter Sixteen) and homicide (Chapter Seventeen). This literature did not evaluate the effects of a specific policy but nevertheless examined a key mechanism by which policies might affect the outcomes. For these discussions, we occasionally augmented the search strategy described earlier, as detailed in the individual chapters.

### Title and Abstract Review

At this stage, we screened studies to determine whether they met our inclusion criteria. In all cases, a study was included if it met the following: *any empirical study that demonstrated a relationship between a firearm-related public policy and the relevant outcome* OR *any empirical study that demonstrated a relationship between firearm ownership and access and a relevant outcome (including proxy measures for gun ownership)*.

Studies were excluded if they were case studies, systematic reviews, dissertations, commentaries or conceptual discussions, descriptive studies, studies in which key variables were assumed rather than measured (e.g., a region was assumed to have higher rates of gun ownership), studies that did not concern one of the eight outcomes we selected, studies that did not concern one of the 13 policies we selected (or gun ownership), or studies that duplicated the analyses and results of other included studies.

### Full-Text Review

Next, we used full-text review to ensure that the studies included thus far did not meet any of the exclusion criteria and to exclude studies with no credible claim to having identified a causal effect of policies. In addition to coding all studies on the policy and outcome they examined and on their research design, we coded the country or countries in which the policy effects were evaluated. Because of the United States' unique legal, policy, and gun ownership context, we excluded studies examining the effects of policies on foreign populations. However, in the special-topic discussions (Chapters Sixteen through Twenty-Four), we include analysis of some studies in foreign countries (such as an analysis of the Australian experience with gun regulation) and various foreign studies of the effects of gun prevalence on suicide.

Our research syntheses (Chapters Three through Fifteen) focus exclusively on studies that used research methods designed to identify causal effects among observed

**Exhibit 10**
**0203**

Case 3:19-cv-01226-L-AHG   Document 21-15   Filed 11/12/19   PageID.3932   Page 217 of 232

associations between policies and outcomes. Specifically, we required, at a minimum, that studies include time-series data and use such data to establish that policies preceded their apparent effects (a requirement for a causal effect) and that studies include a control group or comparison group (to demonstrate that the purported causal effect was not found among those who were not exposed to the policy). Experimental designs provide the gold standard for establishing causal effects, but we identified none in our literature reviews. On a case-by-case basis, we examined studies that made a credible claim to causal inference on the basis of data that did not include a time series. In practice, these discussions determined that some studies using instrumental-variable approaches to isolating causal effects satisfied our minimum standards for inclusion.

We refer to the studies that met our inclusion criteria as *quasi-experimental*. We distinguish these from simple *cross-sectional* studies that may show an association between states with a given policy and some outcome but that have no strategy for ensuring that it is the policy that caused the observed differences across states. For instance, there could be some other factor associated with both state policy differences and outcome differences or there could be reverse causality (that is, differences in the outcome across states could have caused states to adopt different policies). In excluding cross-sectional studies from this review, we have adopted a more stringent standard of evidence for causal effects than has often been used in systematic reviews of gun policy.

Although excluding cross-sectional research eliminates a large number of studies on gun policy, longitudinal data are much better for estimating the causal effect of a policy. Specifically, empirical demonstration of causation generally requires three types of evidence (Mill, 1843):

- The cause and effect regularly co-occur (i.e., association).
- The cause occurs before the effect (i.e., precedence).
- Alternative explanations for the association have been ruled out (i.e., elimination of confounds).

Cross-sectional research is largely limited to demonstrating association. Longitudinal studies that include people or regions that are exposed to a policy and those that are not exposed have the potential to provide all three types of evidence. Such a design can demonstrate that the policy preceded the change in the outcome of interest, and it can rule out a wider range of potential confounds, including historical time trends and the time-invariant characteristics of the jurisdictions in which the policies were implemented (Wooldridge, 2002).

We also excluded studies that offered no insight into the causal effects of individual policies. For instance, we excluded studies that evaluated the effects of an aggregate state score describing the totality of each state's gun policies or studies of the aggregate effects of legislation that included multiple gun policies. In rare cases, we excluded from consideration studies that provided insufficient information about their methodologies to evaluate whether they used a credible approach to isolating a causal

**Exhibit 10**
**0204**

effect of policies. In one case (Kalesan et al., 2016), we excluded a study that examined the effects of many of our selected policies on firearm deaths. We did so because of significant methodological problems that we concluded made the findings uninformative, as documented in Schell and Morral (2016). In cases in which authors updated prior published analyses, we generally chose the updated study. However, in one case (Cook and Ludwig, 2003), we present the results from the earlier analysis (Ludwig and Cook, 2000), which was inclusive of more years of data, provided more detail, and included multiple model specifications (although findings were qualitatively the same). The identified studies included individual-level studies (i.e., studies comparing outcomes among people over time) and ecological studies (i.e., studies comparing outcomes in regions over time).

Finally, we excluded studies published prior to 2003 on one policy-outcome pair—concealed-carry laws and violent crime. Our discussion of this topic (see Chapter Thirteen) reviews much of the earlier literature in this area, but we do not count the earlier work in our evidence ratings for several reasons. For starters, this area of gun policy has received the greatest research attention since 2003, and considerable advances have been made in understanding the effects of these laws. In addition, researchers have uncovered serious problems with data sets that were frequently used before 2003. Indeed, Hahn et al. (2005) dismissed all the earlier work that had been done with county-level data (which meant most of the work) on grounds that it was too flawed to rely on for evidence. We do not take that position but do agree with NRC (2004) and Hahn et al. (2005) that the primary conclusion that can be drawn from this earlier literature is that estimates of the effects of concealed-carry laws are highly sensitive to model specification choices, meaning no conclusive evidence can be drawn from the estimates. Because many of the authors engaged in the pre-2003 concealed-carry research continued to publish improved models on improved data sets, we restrict our evidence ratings to just this later work. We do not exclude pre-2003 studies of concealed-carry laws for outcomes other than violent crime, because there are much fewer later studies on which to base evidence ratings for these other outcomes.

Using these inclusion and exclusion criteria, we identified the studies providing the highest-quality evidence of a causal relationship between a policy and an outcome. In judging the quality of studies, we always explicitly considered common methodological shortcomings found in the existing gun policy scientific literature (see Appendix A), especially the following:

- *Models that may have too many estimated parameters for the number of available observations.* We consistently note whenever estimates were based on models with a ratio of less than ten observations per estimated parameter. When the ratio of observations to estimated parameters dropped below five to one and no supplemental evidence of model fit was provided (such as the use of cross-validation or evidence from an analysis of the relative fit of different model specifications), we discount the study's results and do not calculate effect sizes for its estimates.

**Exhibit 10**
**0205**

- *Models making no adjustment to standard errors for the serial correlation regularly found in panel data frequently used in gun policy studies.* We consistently note when studies did not report having made any such adjustment. When a study noted a correction for only heteroscedasticity, we consider that to be evidence of some correction, although this does not generally fully correct bias in the standard errors due to clustering (Aneja, Donohue, and Zhang, 2014).
- *Models for which the dependent variable appears to violate model assumptions, such as linear models of dichotomous outcomes or linear models of rate outcomes (many of which are close to zero).* We consistently note when the data appeared to violate modeling assumptions.
- *Effects with large changes in direction and magnitude across primary model specifications.* We consistently note when a study presented evidence that model results were highly sensitive to different model specifications.
- *Models that identify the effect of policies with too few cases.* We consistently note when the effects of policies were identified on the experiences of a single state or a small number of states. These analyses generally provide less persuasive evidence that observed differences between treated and control cases result from the effects of the policy as opposed to other contemporaneous influences on the outcome.

In Appendix A, we describe other common shortcomings in the existing literature that we do not explicitly discuss in our research syntheses. For instance, in the main chapters of the report, we do not note when papers provided no goodness-of-fit tests or other statistical evidence to justify their covariate selections. Neither do we focus on interpretational difficulties and confusion frequently present in studies using spline or hybrid models to estimate the effects of policies, although we discuss this problem in detail in Appendix A. These problems are so common in this literature that consistently commenting on them as shortcomings would become repetitive and cumbersome.

## Synthesis of Evidence

Members of the research team summarized all available evidence from prioritized studies for each of the 13 policies on each of the eight outcomes. When at least one study met inclusion criteria, a multidisciplinary group of methodologists on the research team discussed each study to identify its strengths and weaknesses. The consensus judgments from these group discussions are summarized in the research syntheses. Then, the group discussed the set of available studies as a whole to make a determination about the level of evidence supporting the effect of the policy on each outcome.

When considering the evidence provided by each analysis in a study, we counted effects with $p$-values greater than 0.20 as providing *uncertain* evidence for the effect of a policy. We use this designation to avoid any suggestion that the failure to find a statistically significant effect means that the policy has no effect. We assume that every policy will have some effect, however small or unintended, so any failure to detect it is a shortcoming of the science, not the policy. When the identified effect has a $p$-value

**Exhibit 10**
**0206**

less than 0.05, we refer to it as a *significant effect*. Finally, when the *p*-value is between 0.05 and 0.20, we refer to the effect as *suggestive*.

We include the suggestive category for several reasons. First, the literature we are reviewing is often underpowered. This means that the probability of rejecting the null hypothesis of no effect even when the policy has a true effect is often very low. As we argue in Appendix A, conducting analyses with low statistical power results in an uncomfortably high probability that effects found to be statistically significant at $p < 0.05$ are in the wrong direction and all effects have exaggerated effect sizes (Gelman and Carlin, 2014). If we had restricted our assessment of evidence to just statistically significant effects, we might base our judgments on an unreliable and biased set of estimates while ignoring the cumulative evidence available in studies reporting nonsignificant results. While the selection of $p < 0.20$ as the criterion for rating evidence as suggestive is arbitrary, this threshold corresponds to effects that are meaningfully more likely to be in the observed direction than in the opposite direction. For instance, if we assume that the policy has about as much chance of having a nonzero effect as having no effect, and the power of the test is 0.8, then $p < 0.20$ suggests that there is only a 20-percent probability of incorrectly rejecting the null hypothesis of no effect. For tests that are more weakly powered, as is common in models we review, a *p*-value less than 0.20 will result in false rejection less than half the time so long as the power of the test is above 0.2 (see, for example, Colquhoun, 2014).

In the final step, we rated the overall strength of the evidence in support of each possible effect of the policy. We approached these evidence ratings with the knowledge that research in this area is modest. Compared with the study of the effects of smoking on cancer, for instance, the study of gun policy effects is in its infancy, so it cannot hope to have anything like the strength of evidence that has accrued in many other areas of social science. Nevertheless, we believed that it would be useful to distinguish the gun policy effects that have relatively stronger or weaker evidence, given the limited evidence base currently available. We did this by establishing the following relativistic scale describing the strength of available evidence:

1. *No studies.* This designation was made when no studies meeting our inclusion criteria evaluated the policy's effect on the outcome.
2. *Inconclusive evidence.* This designation was made when studies with comparable methodological rigor identified inconsistent evidence for the policy's effect on an outcome or when a single study found only uncertain or suggestive effects.
3. *Limited evidence.* This designation was made when at least one study meeting our inclusion criteria and not otherwise compromised by serious methodological problems reported a significant effect of the policy on the outcome, even if other studies meeting our inclusion criteria identified only uncertain or suggestive evidence for the effect of the policy.

Exhibit 10
0207

4.  *Moderate evidence.* This designation was made when two or more studies found significant effects in the same direction and contradictory evidence was not found in other studies with equivalent or strong methods.

5.  *Supportive evidence.* This designation was made when (1) at least three studies found suggestive or significant effects in the same direction using at least two independent data sets or (2) the effect was observed in a rigorous experimental study. Our requirement that the effect be found in distinct data sets reflects the fact that many gun policy studies use identical or overlapping data sets (e.g., state homicide rates over several years). Chance associations in these data sets are likely to be identified by all who analyze them. Therefore, our supportive evidence category requires that the effect be confirmed in a separate data set.

These rating criteria provided a framework for our assessments of where the weight of evidence currently lies for each of the policies, but they did not eliminate subjectivity from the review process. In particular, the studies we reviewed spanned a wide range of methodological rigor. When we judged a study to be particularly weak, we discounted its evidence in comparison with stronger studies, which sometimes led us to apply lower evidence rating labels than had the study been stronger.

## Effects of the Inclusion and Exclusion Criteria on the Literature Reviewed

Table 2.2 presents the results of the literature search across all eight outcomes. The final column shows the number of studies meeting all inclusion criteria. No studies satisfying our inclusion criteria were found for two of the eight outcomes.

**Table 2.2**
**Number of Studies Selected for Review at Each Stage of the Review Process**

| Outcome | Total Search Results | Included After Title and Abstract Review | Included After Full-Text Review |
|---|---|---|---|
| Suicide | 1,274 | 183 | 11 |
| Violent crime | 2,656 | 373 | 47 |
| Unintentional injuries and deaths | 531 | 27 | 3 |
| Mass shootings | 77 | 11 | 8 |
| Officer-involved shootings | 187 | 34 | 0 |
| Defensive gun use | 1,435 | 115 | 1 |
| Hunting and recreation | 229 | 0 | 0 |
| Gun industry | 3,180 | 19 | 2 |

**Exhibit 10**
**0208**

Of the studies that were published before 2003, all but Duwe, Kovandzic, and Moody (2002) were considered in the earlier reviews (Hahn et al., 2005; NRC, 2004). Table 2.3 lists the 63 studies meeting all inclusion criteria.

**Table 2.3**
**Studies Meeting Inclusion Criteria**

| No. | Study | No. | Study |
|---|---|---|---|
| 1 | Aneja, Donohue, and Zhang (2011) | 33 | La Valle and Glover (2012) |
| 2 | Aneja, Donohue, and Zhang (2014) | 34 | Lott (2003) |
| 3 | Ayres and Donohue (2003a) | 35 | Lott (2010) |
| 4 | Ayres and Donohue (2003b) | 36 | Lott and Mustard (1997) |
| 5 | Ayres and Donohue (2009a) | 37 | Lott and Whitley (2001) |
| 6 | Ayres and Donohue (2009b) | 38 | Lott and Whitley (2003) |
| 7 | Cheng and Hoekstra (2013) | 39 | Lott and Whitley (2007) |
| 8 | Cook and Ludwig (2003) | 40 | Luca, Deepak, and Poliquin (2016) |
| 9 | Crifasi et al. (2015) | 41 | Ludwig and Cook (2000) |
| 10 | Cummings et al. (1997a) | 42 | Maltz and Targonski (2002) |
| 11 | DeSimone, Markowitz, and Xu (2013) | 43 | Manski and Pepper (2015) |
| 12 | Donohue (2003) | 44 | Martin and Legault (2005) |
| 13 | Donohue (2004) | 45 | Moody and Marvell (2008) |
| 14 | Duggan (2001) | 46 | Moody and Marvell (2009) |
| 15 | Duggan, Hjalmarsson, and Jacob (2011) | 47 | Moody et al. (2014) |
| 16 | Durlauf, Navarro, and Rivers (2016) | 48 | Plassman and Whitley (2003) |
| 17 | Duwe, Kovandzic, and Moody (2002) | 49 | Raissian (2016) |
| 18 | French and Heagerty (2008) | 50 | Roberts (2009) |
| 19 | Gius (2014) | 51 | Rosengart et al. (2005) |
| 20 | Gius (2015a) | 52 | Rudolph et al. (2015) |
| 21 | Gius (2015b) | 53 | Sen and Panjamapirom (2012) |
| 22 | Gius (2015c) | 54 | Strnad (2007) |
| 23 | Grambsch (2008) | 55 | Swanson et al. (2013) |
| 24 | Helland and Tabarrok (2004) | 56 | Swanson et al. (2016) |
| 25 | Hepburn et al. (2006) | 57 | Vigdor and Mercy (2003) |
| 26 | Humphreys, Gasparrini, and Wiebe (2017) | 58 | Vigdor and Mercy (2006) |
| 27 | Kendall and Tamura (2010) | 59 | Webster, Crifasi, and Vernick (2014) |
| 28 | Koper (2004) | 60 | Webster and Starnes (2000) |
| 29 | Kovandzic, Marvell, and Vieraitis (2005) | 61 | Webster et al. (2004) |
| 30 | La Valle (2007) | 62 | Wright, Wintemute, and Rivara (1999) |
| 31 | La Valle (2010) | 63 | Zeoli and Webster (2010) |
| 32 | La Valle (2013) | | |

**Exhibit 10**
**0209**

In a few cases, some studies published updates to earlier works that expanded the time frame of the analysis, corrected errors, or applied more-advanced statistical methods to a nearly identical data set. In these cases, we do not treat both the earlier and later works as each contributing an equally valid estimate of the effects of a policy. Instead, we treat the latest version of the analysis as superseding the earlier versions, and we focus our reviews on the superseding analysis. In one case, we substituted an earlier study (Ludwig and Cook, 2000) for a later study (Cook and Ludwig, 2003). We did this because the earlier study included a longer data series, used a model with greater statistical power, and provided more-detailed results; in addition, the estimated effects of policies in the two papers were identical for the estimates of interest to us in this review. Table 2.4 lists the superseded studies and their superseding versions.

Table 2.5 describes the policies and outcomes evaluated by each study that was not superseded, and studies are indicated with their corresponding number in Table 2.3. These studies are discussed in detail in subsequent chapters.

**Table 2.4**
**Superseded Studies**

| Superseded | Superseding |
| --- | --- |
| Aneja, Donohue, and Zhang (2011); Ayres and Donohue (2003a, 2003b, 2009a, 2009b); Donohue (2003, 2004) | Aneja, Donohue, and Zhang (2014) |
| La Valle (2007, 2010) | La Valle (2013), La Valle and Glover (2012) |
| Moody and Marvell (2008, 2009) | Moody et al. (2014) |
| Vigdor and Mercy (2003) | Vigdor and Mercy (2006) |

**Exhibit 10**
**0210**

**Table 2.5**
**Included Studies, by Policy and Outcome**

| Policy | Suicide | Violent Crime | Unintentional Injuries and Deaths | Mass Shootings | Officer-Involved Shootings | Defensive Gun Use | Hunting and Recreation | Gun Industry | Total |
|---|---|---|---|---|---|---|---|---|---|
| Background checks | 15, 41, 53 | 15, 20, 32, 35, 41, 53, 55, 56, 58, 62 | | 40 | | | | | 11 |
| Bans on the sale of assault weapons and high-capacity magazines | | 19, 35 | | 22, 40 | | | | 28 | 5 |
| Stand-your-ground laws | 26 | 7, 26, 59 | | | | 7 | | | 3 |
| Prohibitions associated with mental illness | 53, 56 | 53, 55, 56 | | | | | | | 3 |
| Lost or stolen firearm reporting requirements | | | | | | | | | 0 |
| Licensing and permitting requirements | 9, 61 | 32, 52, 59 | | 40 | | | | | 6 |
| Firearm sales reporting and recording requirements | | | | | | | | | 0 |
| Child-access prevention laws | 10, 11, 21, 37, 61 | 10, 37 | 10, 11, 21, 25, 37, 60, 61 | 34 | | | | | 8 |
| Surrender of firearms by prohibited possessors | | 49, 58, 63 | | | | | | | 3 |
| Minimum age requirements | 21, 51, 61 | 51, 52 | 21 | 40 | | | | | 5 |
| Concealed-carry laws | 11, 51 | 2, 16, 18, 19, 23, 24, 27, 29, 32, 33, 38, 39, 42, 43, 44, 47, 48, 50, 51, 54, 59 | 11, 36 | 17, 34, 40 | | | | 14 | 27 |
| Waiting periods | 41 | 41, 50 | | 34, 40 | | | | | 4 |
| Gun-free zones | | | | | | | | | 0 |
| Total | 12 | 37 | 8 | 4 | 0 | 1 | 0 | 2 | 50 |

NOTE: Numbers refer to individual studies; see Table 2.3 to view which study corresponds to which number. Totals along the bottom row do not exactly match those in Table 2.2 because superseded studies are not counted in this table, and other studies were identified after the initial literature search.

28   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

Exhibit 10
0211

## Effect Size Estimates

To compare the magnitude of effects across studies, we calculated and present incidence rate ratios (IRRs) for most of the estimates of policy effects that we considered in reaching our consensus ratings. In rare cases noted in the text, we were unable to calculate IRRs from the information provided in the report. Studies reporting the results from a negative binomial or Poisson regression model are directly reported in our report figures as IRRs with their associated confidence intervals (CIs). Given the low probability of most of our outcomes, odds ratios were interpreted and reported as IRRs with their associated CIs.

Many studies used fixed-effects ordinary linear regression models. In these cases, an average base rate (usually taken from the study's paper itself) of the outcome of interest was determined. We then used the base rate to transform the regression estimate, $\beta$, to an IRR using the following formula:

$$IRR = \frac{(\text{average base rate} + \beta)}{\text{average base rate}}.$$

However, if the linear model used a logged dependent variable, we used the exponentiated estimate as its IRR. CIs for the IRRs derived from the linear regression models were transformed in a similar fashion.

When a study did not report a measure of variation, we performed back calculation from a test statistic to estimate the CIs. For Rudolph et al. (2015), we inferred approximate standard errors from the $p$-value associated with a permutation test presented to demonstrate the likely statistical significance of the reported finding. For Crifasi et al. (2015), we present the IRR and CI for a secondary specification that used a negative binomial model. For several other studies, we note that we could not extrapolate an IRR or its CIs from the data provided in the paper.

Models estimating linear or other trend effects for policies do not have a constant effect size over time. Even if we selected an arbitrary period over which to calculate an effect size, these papers do not provide sufficient information to estimate CIs for such effects. Therefore, we do not calculate or display IRR values that take into account trend effects or effects calculated as the combination of a trend and a step effect (*hybrid models*). Although we report the authors' interpretation of these effects, we do not count them as compelling evidence for the effects of a policy, for reasons discussed in Appendix A.

IRRs are calculated and graphed so that estimates of the effects of policies can be compared on a common metric. We do not use them to construct meta-analytic estimates of policy effects for two reasons. First, most studies we reviewed examining the effect of a policy on a particular outcome used nearly identical data sets, meaning the studies do not offer independent estimates of the effect. Second, there are usually only

**Exhibit 10**
**0212**

30    The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

two or three studies available on which to estimate the effect of the policy, and these studies often differ considerably in their methodological rigor. These limitations in the existing literature led us to pursue a more qualitative evaluation of the conclusions that available studies can support.

**Exhibit 10**
**0213**

## Chapter Two References

Aneja, Abhay, John J. Donohue III, and Alexandria Zhang, "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," *American Law and Economics Review*, Vol. 13, No. 2, 2011, pp. 565–631.

———, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy*, Stanford, Calif.: Stanford Law School, Olin Working Paper No. 461, December 1, 2014. As of May 21, 2017:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681

Ayres, Ian, and John J. Donohue III, "Shooting Down the More Guns, Less Crime Hypothesis," *Stanford Law Review*, Vol. 55, No. 4, 2003a, pp. 1193–1312.

———, "The Latest Misfires in Support of the More Guns, Less Crime Hypothesis," *Stanford Law Review*, Vol. 55, No. 4, 2003b, pp. 1371–1398.

———, "Yet Another Refutation of the More Guns, Less Crime Hypothesis—with Some Help from Moody and Marvell," *Econ Journal Watch*, Vol. 6, No. 1, January 2009a, pp. 35–59.

———, "More Guns, Less Crime Fails Again: The Latest Evidence from 1977–2006," *Econ Journal Watch*, Vol. 6, No. 2, May 2009b, pp. 218–238.

Braga, Anthony A., "Guns and Crime," in F. Parisi, ed., *The Oxford Handbook of Law and Economics*, Vol. 3: *Public Law and Legal Institutions*, New York: Oxford University Press, 2017, pp. 344–369.

Braga, Anthony A., Andrew V. Papachristos, and David M. Hureau, "The Effects of Hot Spots Policing on Crime: An Updated Systematic Review and Meta-Analysis," *Justice Quarterly*, Vol. 31, No. 4, 2014, pp. 633–663.

Braga, Anthony A., and David L. Weisburd, "The Effects of Focused Deterrence Strategies on Crime: A Systematic Review and Meta-Analysis of the Empirical Evidence," *Journal of Research in Crime and Delinquency*, Vol. 49, No. 3, 2012, pp. 323–358.

Campbell Collaboration, *Guidelines for Preparation of Review Protocols*, Version 1.0, Oslo, Norway, January 1, 2001. As of October 13, 2017:
https://www.campbellcollaboration.org/images/pdf/plain-language/C2_Protocols_guidelines_v1.pdf

Cheng, Cheng, and Mark Hoekstra, "Does Strengthening Self-Defense Law Deter Crime or Escalate Violence? Evidence from Expansions to Castle Doctrine," *Journal of Human Resources*, Vol. 48, No. 3, 2013, pp. 821–853.

Colquhoun, D., "An Investigation of the False Discovery Rate and the Misinterpretation of *p*-Values," *Royal Society Open Science*, Vol. 1, No. 3, 2014.

Cook, P. J., and Jens Ludwig, "The Effect of the Brady Act on Gun Violence," in B. Harcourt, ed., *Guns, Crime, and Punishment in America*, New York: New York University Press, 2003, pp. 283–298.

Crifasi, C. K., J. S. Meyers, J. S. Vernick, and D. W. Webster, "Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates," *Preventive Medicine*, Vol. 79, 2015, pp. 43–49.

Cummings, P., D. C. Grossman, F. P. Rivara, and T. D. Koepsell, "State Gun Safe Storage Laws and Child Mortality Due to Firearms," *JAMA*, Vol. 278, No. 13, 1997a, pp. 1084–1086.

DeSimone, J., S. Markowitz, and J. Xu, "Child Access Prevention Laws and Nonfatal Gun Injuries," *Southern Economic Journal*, Vol. 80, No. 1, 2013, pp. 5–25.

**Exhibit 10**
**0214**

Donohue, John J., "The Impact of Concealed Carry Laws," in Jens Ludwig and Phillip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence,* Washington, D.C.: Brookings Institution Press, 2003, pp. 287–341.

———, "Guns, Crime, and the Impact of State Right-to-Carry Laws," *Fordham Law Review,* Vol. 73, No. 2, 2004, pp. 623–652.

Duggan, Mark, "More Guns, More Crime," *Journal of Political Economy,* Vol. 109, No. 5, 2001, pp. 1086–1114.

Duggan, Mark, Randi Hjalmarsson, and Brian A. Jacob, "The Short-Term and Localized Effect of Gun Shows: Evidence from California and Texas," *Review of Economics and Statistics,* Vol. 93, No. 3, 2011, pp. 786–799.

Durlauf, Steven, S. Navarro, and D. A. Rivers, "Model Uncertainty and the Effect of Shall-Issue Right-to-Carry Laws on Crime," *European Economic Review,* Vol. 81, 2016, pp. 32–67.

Duwe, Grant, Tomislav Kovandzic, and Carlisle E. Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies,* Vol. 6, No. 4, 2002, pp. 271–296.

French, B., and P. J. Heagerty, "Analysis of Longitudinal Data to Evaluate a Policy Change," *Statistics in Medicine,* Vol. 27, No. 24, 2008, pp. 5005–5025.

Gelman, Andrew, and John Carlin, "Power Calculations: Assessing Type S (Sign) and Type M (Magnitude) Errors," *Perspectives on Psychological Science,* Vol. 9, No. 6, 2014, pp. 641–651.

Gius, Mark, "An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates," *Applied Economics Letters,* Vol. 21, No. 4, 2014, pp. 265–267.

———, "The Effects of State and Federal Background Checks on State-Level Gun-Related Murder Rates," *Applied Economics,* Vol. 47, No. 38, 2015a, pp. 4090–4101.

———, "The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths," *Social Science Journal,* Vol. 52, No. 2, 2015b, pp. 168–175.

———, "The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings," *Applied Economics Letters,* Vol. 22, No. 4, 2015c, pp. 281–284.

Grambsch, P., "Regression to the Mean, Murder Rates, and Shall-Issue Laws," *American Statistician,* Vol. 62, No. 4, 2008, pp. 289–295.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine,* Vol. 28, No. 2, 2005, pp. 40–71.

Helland, E., and A. Tabarrok, "Using Placebo Laws to Test 'More Guns, Less Crime,'" *Advances in Economic Analysis and Policy,* Vol. 4, No. 1, 2004.

Hepburn, L., D. Azrael, M. Miller, and D. Hemenway, "The Effect of Child Access Prevention Laws on Unintentional Child Firearm Fatalities, 1979–2000," *Journal of Trauma-Injury Infection and Critical Care,* Vol. 61, No. 2, 2006, pp. 423–428.

Higgins, Julian P. T., and Sally Green, eds., *Cochrane Handbook for Systematic Reviews of Interventions,* Version 5.1.0, London: Cochrane Collaboration, March 2011. As of October 13, 2017: http://handbook.cochrane.org

Humphreys, David K., Antonio Gasparrini, and Douglas J. Wiebe, "Evaluating the Impact of Florida's 'Stand Your Ground' Self-Defense Law on Homicide and Suicide by Firearm: An Interrupted Time Series Study," *JAMA Internal Medicine,* Vol. 177, No. 1, 2017, pp. 44–50.

**Exhibit 10**
**0215**

Institute of Medicine, *Finding What Works in Health Care: Standards for Systematic Reviews*, Washington, D.C.: National Academies Press, 2011.

Kalesan, Bindu, Matthew E. Mobily, Olivia Keiser, Jeffrey A. Fagan, and Sandro Galea, "Firearm Legislation and Firearm Mortality in the USA: A Cross-Sectional, State-Level Study," *Lancet*, Vol. 387, No. 10030, April 30, 2016, pp. 1847–1855.

Kendall, Todd D., and Robert Tamura, "Unmarried Fertility, Crime, and Social Stigma," *Journal of Law and Economics*, Vol. 53, No. 1, 2010, pp. 185–221.

Khan, Khalid S., Regina Kunz, Jos Kleijnen, and Gerd Antes, "Five Steps to Conducting a Systematic Review," *Journal of the Royal Society of Medicine*, Vol. 96, No. 3, 2003, pp. 118–121.

Koper, Christopher S., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence 1994–2003*, Washington, D.C.: National Institute of Justice, U.S. Department of Justice, 2004.

Kovandzic, T. V., T. B. Marvell, and L. M. Vieraitis, "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates—Evidence from Panel Data for Large Urban Cities," *Homicide Studies*, Vol. 9, No. 4, 2005, pp. 292–323.

La Valle, James M., "Rebuilding at Gunpoint: A City-Level Re-Estimation of the Brady Law and RTC Laws in the Wake of Hurricane Katrina," *Criminal Justice Policy Review*, Vol. 18, No. 4, 2007, pp. 451–465.

———, "Re-Estimating Gun-Policy Effects According to a National Science Academy Report: Were Previous Reports of Failure Premature?" *Journal of Crime and Justice*, Vol. 33, No. 1, 2010, pp. 71–95.

———, "'Gun Control' vs. 'Self-Protection': A Case Against the Ideological Divide," *Justice Policy Journal*, Vol. 10, No. 1, 2013, pp. 1–26.

La Valle, James M., and Thomas C. Glover, "Revisiting Licensed Handgun Carrying: Personal Protection or Interpersonal Liability?" *American Journal of Criminal Justice*, Vol. 37, No. 4, 2012, pp. 580–601.

Lott, John R., Jr., *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control Is Wrong*, Washington, D.C.: Regnery Publishing, Inc., 2003.

———, *More Guns, Less Crime: Understanding Crime and Gun-Control Laws*, 3rd ed., Chicago, Ill.: University of Chicago Press, 2010.

Lott, John R., Jr., and D. B. Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," *Journal of Legal Studies*, Vol. 26, No. 1, 1997, pp. 1–68.

Lott, John R., Jr., and John E. Whitley, "Safe-Storage Gun Laws: Accidental Deaths, Suicides, and Crime," *Journal of Law and Economics*, Vol. 44, No. 2, 2001, pp. 659–689.

———, "Measurement Error in County-Level UCR Data," *Journal of Quantitative Criminology*, Vol. 19, No. 2, June 2003, pp. 185–198.

———, "Abortion and Crime: Unwanted Children and Out-of-Wedlock Births," *Economic Inquiry*, Vol. 45, No. 2, 2007, pp. 304–324.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy*, working paper, Boston, Mass.: Harvard Business School, 2016.

Ludwig, J., and P. J. Cook, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act," *JAMA*, Vol. 284, No. 5, 2000, pp. 585–591.

**Exhibit 10**
**0216**

Maltz, M. D., and J. Targonski, "A Note on the Use of County-Level UCR Data, *Journal of Quantitative Criminology,* Vol. 18, No. 2, 2002, pp. 297–318.

Manski, Charles F., and John V. Pepper, *How Do Right-to-Carry Laws Affect Crime Rates? Coping with Ambiguity Using Bounded-Variation Assumptions,* Cambridge, Mass.: National Bureau for Economic Research, NBER Working Paper 21701, November 2015.

Martin, Robert A., and Richard L. Legault, "Systematic Measurement Error with State-Level Crime Data: Evidence from the 'More Guns, Less Crime' Debate," *Journal of Research in Crime and Delinquency,* Vol. 42, No. 2, May 2005, pp. 187–210.

Mill, John Stuart, *A System of Logic,* London: Parker, 1843.

Moody, Carlisle E., and Thomas B. Marvell, "The Debate on Shall-Issue Laws," *Econ Journal Watch,* Vol. 5, No. 3, 2008, pp. 269–293.

———, "The Debate on Shall-Issue Laws, Continued," *Econ Journal Watch,* Vol. 6, No. 2, 2009.

Moody, Carlisle E., Thomas B. Marvell, Paul R. Zimmerman, and Fasil Alemante, "The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," *Review of Economics and Finance,* Vol. 4, 2014, pp. 33–43.

National Research Council, *Firearms and Violence: A Critical Review,* Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Plassmann, F., and J. E. Whitley, "Comments: Confirming More Guns, Less Crime," *Stanford Law Review,* Vol. 55, No. 4, 2003, pp. 1313–1369.

Raissian, Kerri M., "Hold Your Fire: Did the 1996 Federal Gun Control Act Expansion Reduce Domestic Homicides?" *Journal of Policy Analysis and Management,* Vol. 35, No. 1, Winter 2016, pp. 67–93.

Roberts, Darryl W., "Intimate Partner Homicide: Relationships to Alcohol and Firearms," *Journal of Contemporary Criminal Justice,* Vol. 25, No. 1, 2009, pp. 67–88.

Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Rivara, "An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates," *Injury Prevention,* Vol. 11, No. 2, 2005, pp. 77–83.

Rudolph, K. E., E. A. Stuart, J. S. Vernick, and D. W. Webster, "Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides," *American Journal of Public Health,* Vol. 105, No. 8, 2015, pp. E49–E54.

Schell, Terry L., and Andrew R. Morral, *Evaluating Methods and Findings from a Study of State Gun Policies,* Santa Monica, Calif.: RAND Corporation, RR-1642-RC, 2016. As of January 13, 2017: http://www.rand.org/pubs/research_reports/RR1642.html

Sen, B., and A. Panjamapirom, "State Background Checks for Gun Purchase and Firearm Deaths: An Exploratory Study," *Preventive Medicine,* Vol. 55, No. 4, 2012, pp. 346–350.

Strnad, Jeff, "Should Legal Empiricists Go Bayesian?" *American Law and Economics Review,* Vol. 9, No. 1, Spring 2007, pp. 195–303.

Swanson, Jeffrey W., Michele M. Easter, Allison G. Robertson, Marvin S. Swartz, Kelly Alanis-Hirsch, Daniel Moseley, Charles Dion, and John Petrila, "Gun Violence, Mental Illness, and Laws That Prohibit Gun Possession: Evidence from Two Florida Counties," *Health Affairs,* Vol. 35, No. 6, 2016, pp. 1067–1075.

**Exhibit 10**
**0217**

Swanson, J. W., A. G. Robertson, L. K. Frisman, M. A. Norko, H. Lin, M. S. Swartz, and P. J. Cook, "Preventing Gun Violence Involving People with Serious Mental Illness," in D. W. Webster and J. S. Vernick, eds., *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Baltimore, Md.: Johns Hopkins University Press, 2013, pp. 33–51.

Vigdor, E. R., and J. A. Mercy, "Disarming Batterers: The Impact of Domestic Violence Firearms Laws," in Jens Ludwig and Phillip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence,* Washington, D.C.: Brookings Institution Press, 2003, pp. 157–200.

————, "Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Homicide?" *Evaluation Review,* Vol. 30, No. 3, 2006, pp. 313–346.

Webster, D., C. K. Crifasi, and J. S. Vernick, "Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides," *Journal of Urban Health,* Vol. 91, No. 2, 2014, pp. 293–302.

Webster, D. W., J. S. Vernick, A. M. Zeoli, and J. A. Manganello, "Association Between Youth-Focused Firearm Laws and Youth Suicides," *JAMA,* Vol. 292, No. 5, 2004, pp. 594–601.

Wooldridge, J. M., *Econometric Analysis of Cross Section and Panel Data,* Cambridge, Mass.: MIT Press, 2002.

Wright, M. A., G. J. Wintemute, and F. P. Rivara, "Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence," *American Journal of Public Health,* Vol. 89, No. 1, 1999, pp. 88–90.

Zeoli, A. M., and D. W. Webster, "Effects of Domestic Violence Policies, Alcohol Taxes and Police Staffing Levels on Intimate Partner Homicide in Large U.S. Cities," *Injury Prevention,* Vol. 16, No. 2, 2010, pp. 90–95.

**Exhibit 10**
**0218**

**Exhibit 10**
**0219**