1  John W. Dillon (Bar No. 296788)
2  Gatzke Dillon & Ballance LLP
   2762 Gateway Road
3  Carlsbad, California 92009
   Telephone: (760) 431-9501
4  Facsimile: (760) 431-9512
5  E-mail:  jdillon@gdandb.com

6  Attorney for Plaintiffs

7

8              **UNITED STATES DISTRICT COURT**

9             **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | MATTHEW JONES; THOMAS FURRH;          | Case No.: 19-cv-01226-L-AHG
12 | KYLE YAMAMOTO; PWGG, L.P.             | Hon. Judge M. James Lorenz and
   | (d.b.a. POWAY WEAPONS AND GEAR        | Magistrate Judge Allison H. Goddard
13 | and PWG RANGE); NORTH COUNTY          |
14 | SHOOTING CENTER, INC.; BEEBE          | **DECLARATION OF THOMAS B.**
   | FAMILY ARMS AND MUNITIONS             | **MARVELL IN SUPPORT OF**
15 | LLC (d.b.a. BFAM and BEEBE FAMILY     | **PLAINTIFFS' MOTION FOR**
   | ARMS AND MUNITIONS); FIREARMS         | **PRELIMINARY INJUNCTION**
16 | POLICY COALITION, INC.;               | **(Part 2 of 2)**
17 | FIREARMS POLICY FOUNDATION;           |
18 | CALIFORNIA GUN RIGHTS                 |
   | FOUNDATION (formerly, THE             | Complaint Filed: July 1, 2019
19 | CALGUNS FOUNDATION); and              | Second Amended Complaint Filed:
   | SECOND AMENDMENT                      | November 8, 2019
20 | FOUNDATION              Plaintiffs,   |
21 |                                       |
   | v.                                    | Date: Monday, December 16, 2019
22 |                                       | Time: 10:30 a.m.
   | XAVIER BECERRA, *et al*.,             | Courtroom: Dept. 5B (5th Floor)
23 |                        Defendants     |
24 |                                       | No oral argument should be heard
25 |                                       | unless ordered by the Court
26
27
28

PART B
## Evidence on the Effects of 13 Policies

Exhibit 10
0220

**Exhibit 10**
**0221**

CHAPTER TWELVE
# Minimum Age Requirements

Under federal law, licensed dealers cannot sell or deliver handguns to individuals under age 21 or long guns to those under age 18. Unlicensed individuals cannot sell, transfer, or deliver handguns to individuals under age 18. With some exceptions, federal law prohibits individuals under age 18 from possessing handguns, but it does not place age restrictions on the possession of long guns (18 U.S.C. 922).

Laws requiring a minimum age for purchase aim to make it more difficult for underage individuals to acquire a handgun through formal channels, while laws requiring a minimum age of possession are intended to make it more difficult or risky for an underage individual to carry firearms in public. Thus, although the mechanisms by which these laws influence youth access differ, both are designed to limit the availability of firearms to young people—and therefore reduce the gun violence and unintentional shootings they commit.

Firearm homicides and violent crimes disproportionately involve individuals under age 21, both as perpetrators and as victims. Indeed, in 2012, arrest rates for violent crimes peaked at age 18 (Office of Juvenile Justice and Delinquency Prevention, 2016). Of the 7,152 firearm homicides committed in 2014 for which the age of the offender was known, 47.2 percent were perpetrated by individuals aged 12–24 (Puzzanchera, Chamberlin, and Kang, 2017), although this group represents only 17.7 percent of the general U.S. population (U.S. Census Bureau, 2017). By influencing the possession of guns among youth, minimum age laws could thus reduce rates of firearm crime perpetrated by juveniles. However, youth are similarly at high risk of victimization. Of all deaths among those aged 16–21, 16.5 percent are homicides, which is greater than the homicide rates for the next-highest risk ages (13.3 percent for those aged 22–27; 8.8 percent for those aged 28–33) (Centers for Disease Control and Prevention [CDC], 2017b). In theory, therefore, stricter age limits on purchasing or possessing a firearm could reduce the incidence of defensive gun use by youth and potentially increase perpetration of violence against younger populations if offenders believe that the likelihood of encountering armed resistance is lower (Marvell, 2001).

Conceptually, by restricting youth access, minimum age restrictions could also reduce rates of firearm suicide or unintentional shootings by the affected age group. Research suggests that the association between firearm availability and suicide is stron-

gest among adolescents and young adults (Birckmayer and Hemenway, 2001; Miller and Hemenway, 1999). In 2015, there were 3,111 suicide deaths among individuals aged 16–21, 43.6 percent of which involved a firearm (calculated using data from CDC, 2015). Evidence indicates that 50 percent to 60 percent of all firearm suicides by youth under age 21 involve a handgun, suggesting that minimum age laws that cover all firearms may have larger effects on suicide rates compared with laws focused on handguns alone (Johnson et al., 2010; Wright, Wintemute, and Claire, 2008; Shah et al., 2000; Grossman, Reay, and Baker, 1999).

The effects of laws requiring a minimum purchase age will depend largely on how youth acquire firearms. Much of the existing evidence on sources of guns to youth comes from surveys of juvenile offenders or high-risk adolescents and suggests that purchases from retailers are relatively rare among adolescents involved with criminal activity. Among juveniles who have been incarcerated or arrested, surveys have found that youth offenders acquire their firearms through similar sources as adult offenders, with more than 80 percent citing a friend, a family member, or the black market as the means by which they acquired their weapon (Webster et al., 2002; LaFree and Birbeck, 1998). This finding indicates that minimum age laws may be effective at limiting youth access through legitimate retail sources. An early study of firearms used by students in school-associated firearm deaths (both suicide and homicide) between 1992 and 1999 similarly found that only 9.6 percent of the firearms used in homicide events and none of the firearms used in suicide events were purchased legally (CDC, 2001). Still, in a 1996 national survey of male high school students, 50 percent of respondents reported that they would have little or no trouble obtaining a gun (Sheley and Wright, 1998). In a 1996 national study of students in grades 8 through 12, 21 percent of respondents reported having easy access to guns at home, and the types of firearms available were evenly distributed among handguns, rifles, and shotguns (Ruback, Shaffer, and Clark, 2011).

The effects of laws requiring a minimum age of possession will depend on the expected costs youth perceive to be associated with violating such laws, which will likely be influenced by state legal penalties and the level of enforcement efforts devoted to enforcing the prohibition (Marvell, 2001). Semi-structured interviews with incarcerated adolescent males in 1998 found fear of arrest and incarceration as the most commonly reported reasons for choosing not to acquire or carry a gun (Freed et al., 2001). Still, in 2015, 5.3 percent of high school students reported carrying a gun (Kann et al., 2016). Given the relative importance of the home and family members as a source of guns to juveniles, the most-significant effects of minimum age of possession policies may occur if they create a disincentive for older individuals to keep guns at home or to allow guns in the home to be easily accessed (Marvell, 2001).

Much of the conversation about minimum age restrictions revolves around handguns rather than long guns. This is because handguns are more frequently used than long guns in firearm suicides and violent crime, so, in theory, raising the minimum age

**Exhibit 10**
**0223**

for such weapons could decrease violence without impacting lawful activities, such as hunting (Tritch, 2014). More-restrictive minimum age laws could plausibly impact the gun industry by reducing the size of the consumer population and decreasing the ownership and use of guns by youth for hunting or recreational purposes. Overall, hunting participation in the United States has declined dramatically over the past decades, and although data on youth recreational firearm use are limited (Vittes and Sorenson, 2005), estimates from 2006 showed 1.7 million youth hunters aged 6–15 (Families Afield, 2010). Further, the vast majority of adult hunters initiate hunting activities before age 20, and those who have not learned to hunt by age 20 have a very low likelihood of participating in hunting activities as an adult (Duda and Young, 1993). Should minimum age laws reduce initiation of firearm use for hunting or recreational purposes, there could be longer-term effects on these outcomes.

Data on suicides and self-inflicted nonfatal injury stratified by age are readily available; thus, analyses can directly test whether effects of minimum age laws on these outcomes are driven by the relevant age group affected by the policy. For outcomes of violent crime and non-self-inflicted injury, causal analyses could be improved with data that reported the age of the shooter. However, as most data sources report only the age of the victim,[1] none of the studies we identified that met our inclusion criteria for this policy used this type of data. Methodological approaches could also leverage state variation in the types of guns restricted under the minimum age laws for outcome data that have information on the type of firearm involved. For any analysis, estimates of causal effects would be strengthened with data showing how minimum age laws affected gun purchase or carrying behavior by youth of the affected age group. While some national surveys (e.g., the Youth Behavioral Risk Surveillance System, National Survey of Drug Use and Health, National Longitudinal Study of Adolescent to Adult Health) ask youth about gun ownership or carrying behaviors, their samples are often limited to high school students, focused on handguns, or available for a limited set of years.

## State Implementation of Minimum Age Requirements

States have adopted a range of minimum age requirements that are, in some cases, higher or lower than the federal minimums. For instance, nine states and the District of Columbia restrict all handgun sales to individuals aged 21 or older and long gun sales to individuals aged 18 or older. In effect, this raises the minimum age restrictions above those set by federal law in two ways: The age to purchase handguns through pri-

---

[1] Exceptions include the Federal Bureau of Investigation's Supplementary Homicide Reports, which contain age of victim and age of offender for murders when such information is known, and the National Violent Death Reporting System, which contains information on the age of the shooter for non-self-inflicted fatal injuries when such information is known for a subset of states.

**Exhibit 10**
**0224**

vate sales is raised from 18 to 21, and a minimum age for private sales of long guns is set to 18.[2] Two states, Hawaii and Illinois, restrict sales for all firearms to those aged 21 or older.[3] This imposes more-restrictive age limits than federal law on all sales other than handgun sales by dealers. Other states set minimums below the federal limits. For instance, Vermont imposes a minimum age of 16 for all sales, and Maine imposes a minimum age of 18 for handgun sales and 16 for long gun sales.[4] In practice, these affect only long gun sales from nondealers, because minimum age requirements for all other sales would be governed by the more-restrictive federal laws.

As mentioned, federal law places no minimum on the age of possession of long guns (18 U.S.C. 922), but several states have imposed such minimums. For instance, 14 states restrict possession of long guns to those aged 18 or older,[5] and Illinois and the District of Columbia restrict long gun possession to those aged 21 or older.[6] The minimum age for possession of a long gun in Alaska, Minnesota, and New York is 16,[7] and it is 14 in Montana.[8]

## Effects on Suicide

### Research Synthesis Findings

In 2004, the National Research Council (NRC) identified four quasi-experimental studies of gun policy effects on suicide outcomes, none of which examined minimum age restrictions. Hahn et al. (2005) identified one cross-sectional study of the associa-

---

[2]   California, Connecticut, Delaware, Iowa, Maryland, Massachusetts, New Jersey, Ohio, Rhode Island, and the District of Columbia. See Calif. Penal Code § 27505; Conn. Gen. Stat. Ann. §§ 29-34, 29-37a; Del. Code tit. 24 § 901, 903, tit. 11 § 1445; Iowa Code Ann. § 724.22; Md. Code Ann., Pub. Safety §§ 5-101, 5-134; Mass. Gen. Laws Ch. 140 §§ 121, 130; N.J. Stat. Ann. § 2C:39-10; Ohio Rev. Code Ann. § 2923.21; R.I. Gen. Laws §§ 11-47-30, 11-47-35; D.C. Code Ann. §§ 7-2507.07, 22-4507.

[3]   Hawaii Rev. Stat. Ann. § 134-2; Ill. Comp. Stat. 65/3, 65/4. Although Hawaii's law is silent about sales, the state issues permits to acquire to those aged 21 or older, and permits are required for purchases. Illinois requires a firearm owner's identification card for transfer, and the card is issued only to those aged 21 or older. However, 720 Ill. Comp. Stat. 5/24-3.1 prohibits sales of handguns to those under age 18.

[4]   Vt. Stat. Ann. tit. 13, § 4007; Me. Rev. Stat. Ann. tit. 17-A §§ 554-A, 554-B.

[5]   Florida, Idaho, Indiana, Iowa, Michigan, Nevada, New Jersey, Oklahoma, Oregon, Pennsylvania, Rhode Island, Utah, Washington, and Wisconsin. See Fla. Stat. Ann. § 790.22; Idaho Code Ann. § 18-3302E; Ind. Ann. Code § 35-47-10-5; Iowa Code Ann. § 724.22; Mich. Comp. Laws Ann. § 750.234f; Nev. Rev. Stat. Ann. § 202.300; N.J. Stat Ann. § 2C:58-6.1; Okla. Stat. Ann. §§ 1272, 1273; Ore. Rev. Stat. Ann. § 166.250; Pa. Cons. Stat. § 6110.1; R.I. Gen. Laws Ann. § 11-47-33; Utah Code Ann. § 76-10-509; Wash. Rev. Code Ann. § 9.41.040; Wisc. Stat. § 948.60.

[6]   Ill. Comp. Stat. Ann. 65/4 (regulates the firearm owners identification card); D.C. Code Ann. § 7-2502.03.

[7]   Alaska Stat. § 11.61.220; Minn. Stat. § 97B.021 (but individuals aged 14 or 15 and with firearm safety certificates may possess long guns); N.Y. Penal Code § 265.05.

[8]   Mont. Code Ann. § 45-8-344.

**Exhibit 10**
**0225**

tion between minor age and suicide (Kleck and Patterson, 1993), a study that does not meet our inclusion criteria. Since then, three longitudinal studies provided evidence on the impact of minimum age requirements on suicide.

Using data from 1976 to 2001, Webster et al. (2004) examined the effect of state-level changes in minimum purchase and possession age laws on suicide rates among those aged 14–17 and 18–20. The authors used negative binomial regression models that employed generalized estimating equations and that included state fixed effects and other covariates. They found uncertain effects of the laws on suicide rates among those aged 14–17. However, states that increased the minimum purchase age to 21 saw a statistically significant decrease in firearm suicides among those aged 18–20, but the authors found uncertain effects of the laws on total or nonfirearm suicides. They found that the three states that increased the age of handgun possession to 21 experienced a statistically significant increase in total suicides among those aged 18–20, accounted for, in part, by a suggestive increase in firearm suicides in this group. The authors suggested that this result was weakly estimated, having been based on just three states, two of which implemented their laws in the final years of the study period, meaning there was little time over which to observe changes in state suicide rates attributable to the law. These limitations raise valid questions about whether the observed effects are attributable to raising the age of possession of handguns to 21 or to other factors affecting these states' suicide rates. Finally, the authors examined the effect of federal minimum age of possession and purchase of handguns among states that previously had lower minimum age laws compared with those for which the federal law did not raise the minimum ages. These analyses identified a suggestive increase in total suicides among those aged 14–17 from raising the federal minimum possession age but only uncertain effects for other outcomes associated with raising the minimum age to purchase handguns among this age group.

Gius (2015b) examined how both state-specific laws for minimum age for firearm possession and federal laws for minimum age for handgun possession implemented in 1994 affected suicides by those aged 19 or younger. This analysis controlled for several state-level sociodemographic characteristics and enactment of child-access prevention laws between 1981 and 2010. Its results suggest that state-level minimum age restrictions had uncertain effects on suicide. The weighted least-squares statistical model is not likely to produce reliable estimates for the nonlinear outcome of suicide rates, meaning the model's estimates and their standard errors may be unreliable (Freedman, 2006). The study's estimate for the federal minimum age law for handgun possession passed in 1994 did not meet our inclusion criteria, because, as specified in this model, there was no comparison group that did not get the identical intervention in 1994.

Rosengart et al. (2005) used a similar approach to model the effects of state laws between 1979 and 1998, when "seven states adopted and two states repealed a law restricting the minimum age for the *private purchase* of a handgun to 21 years, [and] five states adopted laws restricting the minimum age for the *private possession* of a hand-

**Exhibit 10**
**0226**

gun to 21 years" (emphasis added). In these models controlling for state fixed effects, time trends, state-level variation in poverty and demographic factors, and two other firearm laws[9] (but not the federal 1994 law imposing a minimum age requirement for handgun possession), they found mostly uncertain effects of these laws on the firearm suicide rate. However, they did find suggestive effects consistent with minimum possession age laws increasing the total suicide rate among those under age 20, as well as minimum purchase age laws increasing total suicides among those aged 20 or older. These models had limited information to use in identifying causal effects of these laws because relatively few states changed one or both laws over the study period; in addition, every state but one that raised its minimum age for possession did so the same year it implemented a minimum purchase law, making the effects of these laws confounded. Moreover, the statistical model had an unfavorable ratio of covariates to observations (less than one to eight), meaning the model may have been overfit, resulting in estimates and confidence intervals (CIs) that are unreliable indicators of the true causal effects of the laws.

Figure 12.1 displays the incidence rate ratios (IRRs) and CIs associated with the minimum age requirements examined in these studies. We do not present estimates of the federal minimum possession age from Gius (2015b) because they do not meet our criteria for inclusion. Estimates of the federal minimum purchase age and minimum possession age laws from Webster et al. (2004) are included because, although details of the model are not specified, it appears to satisfy our inclusion criteria based on the authors' following statement: "The federal law establishing a minimum legal age for handgun purchase and possession was assumed to affect only states that, prior to the federal law, either had no minimum-age law of this type or had a law that established a minimum legal age younger than 18 years."

## Conclusions

We identified two qualifying studies that examined how suicide rates were affected by laws requiring a minimum purchase age and three that examined how they were affected by laws requiring a minimum possession age.

*Minimum age requirements for purchasing a firearm.* Webster et al. (2004) found uncertain effects for minimum purchase age laws (with restrictions from ages 16 to 21) on suicides among those aged 14–17 and those 18–20. They also found uncertain effects for firearm suicides among the younger age group but a significant effect consistent with these laws reducing firearm suicides among the older group. When re-estimating these effects only for states that set age 21 as the minimum for purchasing a firearm, the authors again found uncertain effects on total suicide rates for the older

---

[9]   The other laws modeled simultaneously were "one-gun-a-month" laws; "shall-issue" laws, otherwise known as right-to-carry laws, which guarantee the right to a concealed-carry permit for all citizens who are not prohibited from possessing a firearm (see Chapter Thirteen); and "junk-gun" laws, which ban the sale of certain cheaply constructed handguns.

**Exhibit 10**
**0227**

**Figure 12.1**
**Incidence Rate Ratios Associated with the Effect of Minimum Age Requirements on Suicide**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **State minimum purchase age** | **Suicide** | |
| Webster et al. (2004) | Total, aged 14–17 | 1.04 [0.90, 1.21] |
| Webster et al. (2004) | Total, aged 18–20 | 0.97 [0.91, 1.05] |
| Webster et al. (2004) | Firearm, aged 14–17 | 1.04 [0.87, 1.16] |
| Webster et al. (2004) | Firearm, aged 18–20 | 0.91 [0.83, 1.00] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 1.05 [0.85, 1.31] |
| Webster et al. (2004) | Nonfirearm, aged 18–20 | 1.05 [0.94, 1.17] |
| **State minimum purchase age of 21** | | |
| Rosengart et al. (2005) | Total | 1.02 [0.98, 1.07] |
| Rosengart et al. (2005) | Total, aged 0–19 | 1.10 [0.94, 1.29] |
| Rosengart et al. (2005) | Total, aged 20+ | 1.04 [0.99, 1.10] |
| Rosengart et al. (2005) | Firearm | 1.00 [0.94, 1.06] |
| Rosengart et al. (2005) | Firearm, aged 0–19 | 0.94 [0.80, 1.06] |
| Rosengart et al. (2005) | Firearm, aged 20+ | 1.02 [0.96, 1.08] |
| **State minimum possession age** | | |
| Webster et al. (2004) | Total, aged 14–17 | 0.97 [0.90, 1.05] |
| Webster et al. (2004) | Total, aged 18–20 | 1.13 [1.01, 1.27] |
| Webster et al. (2004) | Firearm, aged 14–17 | 1.02 [0.92, 1.12] |
| Webster et al. (2004) | Firearm, aged 18–20 | 1.14 [0.98, 1.34] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 0.93 [0.82, 1.05] |
| Webster et al. (2004) | Nonfirearm, aged 18–20 | 1.07 [0.90, 1.27] |
| Glus (2015b) | Firearm death, aged 0–19 | 0.98 [0.93, 1.02] |
| **State minimum possession age of 21** | | |
| Rosengart et al. (2005) | Total | 1.03 [0.96, 1.11] |
| Rosengart et al. (2005) | Total, aged 0–19 | 1.15 [0.93, 1.42] |
| Rosengart et al. (2005) | Total, aged 20+ | 1.04 [0.95, 1.13] |
| Rosengart et al. (2005) | Firearm | 0.99 [0.88, 1.13] |
| Rosengart et al. (2005) | Firearm, aged 0–19 | 0.93 [0.77, 1.12] |
| Rosengart et al. (2005) | Firearm, aged 20+ | 0.99 [0.88, 1.13] |
| **Federal minimum purchase age** | | |
| Webster et al. (2004) | Total, aged 14–17 | 1.02 [0.91, 1.14] |
| Webster et al. (2004) | Firearm, aged 14–17 | 1.00 [0.87, 1.16] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 1.08 [0.91, 1.28] |
| **Federal minimum possession age** | | |
| Webster et al. (2004) | Total, aged 14–17 | 0.98 [0.90, 1.08] |
| Webster et al. (2004) | Firearm, aged 14–17 | 0.99 [0.89, 1.09] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 1.12 [0.99, 1.26] |

0.75    1    1.25    1.5

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

**Exhibit 10**
**0228**



Minimum age requirements for purchasing a firearm have

**uncertain**

effects on total suicides.

Evidence for this relationship is

**inconclusive.**



Minimum age requirements for purchasing a firearm may

**decrease**

firearm suicides among children.

Evidence for this relationship is

**limited.**

age group and a significant effect indicating such laws reduce firearm suicides among those aged 18–20. Using overlapping, but shorter, time-series data, Rosengart et al. (2005) found the effects of laws requiring a minimum age of 21 to purchase to have uncertain effects on suicides and firearm suicides for all age groups, except for a suggestive effect consistent with these laws increasing total suicides among adults aged 20 or older.

Based on these findings and an assessment of the relative strengths of these studies, we find *inconclusive evidence for how minimum age requirements for purchasing a firearm affect total suicides*. Studies of the effect of laws setting 21 as the minimum age of firearm purchase provide *limited evidence that such laws may reduce firearm suicides among some people aged 20 or younger.*

*Minimum age requirements for possessing a firearm.* Webster et al. (2004) found uncertain effects of minimum possession age laws (with restrictions from ages 14 to 21) on suicides and firearm suicides among those aged 14–17. However, they found that these laws significantly increase suicide rates among those aged 18–20 and a suggestive effect consistent with increases in firearm suicide rates among this group. For laws requiring a minimum handgun possession age of 21, Rosengart et al. (2005) found uncertain effects on suicides overall and among those aged 20 or older, as well as a suggestive effect consistent with these laws increasing suicides among those under age 20. All effects of these laws on firearm suicides, however, were uncertain. Gius (2015b)



Minimum age requirements for possessing a firearm have

**uncertain**

effects on total suicides and firearm suicides.

Evidence for this relationship is

**inconclusive.**

found only uncertain effects of state minimum age of possession laws on firearm suicides among those aged 19 or younger.

Based on these findings and an assessment of study strengths, we find *inconclusive evidence for how minimum age requirements for possessing a firearm affect suicides and firearm suicides.*

**Exhibit 10**
**0229**

Case 3:19-cv-01226-L-AHG   Document 21-16   Filed 11/12/19   PageID.3959   Page 12 of 171

## Effects on Violent Crime

### Research Synthesis Findings

NRC (2004) did not review evidence on the effects of minimum age requirements, and Hahn et al. (2005) identified no research on this topic meeting our inclusion criteria. We identified two studies since 2003 that met our criteria. Rosengart et al. (2005) analyzed state-level data from 1979 to 1998 and examined the effects on violent crime of four types of state laws:

1. restricting handgun purchase to those aged 21 or older
2. restricting private handgun possession to those aged 21 or older
3. limiting the frequency of gun purchases to one gun per 30 days
4. prohibiting the sale of "junk" (cheaply constructed) guns.

The authors controlled for whether a state had a shall-issue (otherwise known as right-to-carry) provision; these results are described in more detail in Chapter Thirteen. The authors found uncertain effects of both types of minimum age laws on total homicide and firearm homicide rates. These models had limited information to use in identifying causal effects of these laws because relatively few states changed one or both laws over the study period; in addition, every state but one that raised its minimum age for possession did so the same year it implemented a minimum purchase age law, making the effects of these laws confounded. Moreover, the statistical model had an unfavorable ratio of covariates to observations (less than one to eight), meaning the model may have been overfit, resulting in estimates and CIs that are unreliable indicators of the true causal effects of the laws.

Rudolph et al. (2015) found a significant effect for a decrease in firearm homicides (and an uncertain effect for nonfirearm homicides) associated with the implementation of a law in Connecticut that established a requirement to have a permit to purchase a firearm and increased the minimum age of handgun purchase from age 18 to age 21. The firearm homicide rate after passage of both provisions was found to be 63 percent of what would have been expected without them. However, because the law included both policies simultaneously, the effect attributable specifically to the minimum age law cannot be identified. In addition, because only one state in the analysis experienced the law change, the effects of the law are not well identified. The observed reduction in firearm homicides could be due to the law or to other events occurring in Connecticut around the same time the law passed.

Figure 12.2 displays the IRRs and CIs associated with the minimum age requirements examined in these studies.

**Exhibit 10**
**0230**

**Figure 12.2**
**Incidence Rate Ratios Associated with the Effect of Minimum Age Requirements on Violent Crime**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **State minimum purchase** | | | |
| **age of 21** | Homicide | | |
| Rosengart et al. (2005) | Total | 1.00 [0.94, 1.05] | |
| Rosengart et al. (2005) | Total, aged 0–19 | 0.92 [0.81, 1.05] | |
| Rosengart et al. (2005) | Total, aged 20+ | 1.01 [0.95, 1.06] | |
| Rosengart et al. (2005) | Firearm | 0.98 [0.91, 1.06] | |
| Rosengart et al. (2005) | Firearm, aged 0–19 | 0.92 [0.80, 1.06] | |
| Rosengart et al. (2005) | Firearm, aged 20+ | 0.99 [0.93, 1.06] | |
| **State minimum possession** | | | |
| **age of 21** | | | |
| Rosengart et al. (2005) | Total | 1.02 [0.89, 1.18] | |
| Rosengart et al. (2005) | Total, aged 0–19 | 0.98 [0.79, 1.20] | |
| Rosengart et al. (2005) | Total, aged 20+ | 1.03 [0.88, 1.20] | |
| Rosengart et al. (2005) | Firearm | 1.06 [0.88, 1.27] | |
| Rosengart et al. (2005) | Firearm, aged 0–19 | 0.91 [0.72, 1.15] | |
| Rosengart et al. (2005) | Firearm, aged 20+ | 1.08 [0.89, 1.31] | |
| **Permit to purchase** | | | |
| **+ state minimum purchase** | | | |
| **age of 21** | | | |
| Rudolph et al. (2015) | Firearm | 0.60 [0.37, 0.97] | |

0.3   1   1.4

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified two qualifying studies that examined the effect of minimum age requirements for purchasing or possessing a firearm on total or firearm homicide rates.



Minimum age requirements for purchasing a firearm have **uncertain** effects on total homicides and firearm homicides.

Evidence for this relationship is **inconclusive.**

*Minimum age requirements for purchasing a firearm.* Rosengart et al. (2005) found uncertain effects of laws making 21 the minimum age to purchase handguns on homicide rates and firearm homicide rates among all age groups. Rudolph et al. (2015) reported a significant effect consistent with minimum age requirements reducing firearm homicide rates, but they could

**Exhibit 10**
**0231**

not attribute this effect solely to a minimum purchase age policy because a permit-to-purchase provision was passed concurrently in the one state evaluated. On the basis of these results, and in consideration of the relative strengths of these studies, we find *inconclusive evidence for how minimum age requirements for purchasing a firearm affect total and firearm homicides.*

*Minimum age requirements for possessing a firearm.* Estimates by Rosengart et al. (2005) for the effect of laws making 21 the minimum age for possession of handguns on total and firearm homicides were uncertain for all age groups examined. Therefore, we find *inconclusive evidence for how minimum age requirements for possessing a firearm affect total and firearm homicides.*



### Effects on Unintentional Injuries and Deaths

#### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of minimum age requirements on unintentional injuries and deaths. One longitudinal study since then examined this relationship. Using data from 1981 to 2010, Gius (2015b) examined the effect of the 1994 federal law establishing a minimum age for handgun possession, as well as other state-specific minimum age requirements for handguns. This model controlled for time and state fixed effects, state-level sociodemographic characteristics, and state-level child-access prevention laws. The authors found that state-level minimum age requirements had uncertain effects on unintentional deaths. The weighted least-squares statistical model used in this study may not have been appropriate for the rate outcome, with many values close to zero in state-year observations. The model's lower bound at zero may result in violations of its assumptions and can yield biased and incorrect parameter estimates and CIs.

Figure 12.3 displays the IRR and CI associated with the minimum age requirements examined in Gius (2015b). The analysis of the federal minimum age of possession law in this study did not meet our inclusion criteria, because, as specified in this model, it appeared that there was no comparison group that did not get the identical intervention in 1994. Therefore, this effect is not included in Figure 12.3.

**Exhibit 10**
**0232**

**Figure 12.3**
**Incidence Rate Ratios Associated with the Effect of Minimum Age Requirements on Unintentional Injuries and Deaths**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| State minimum possession age | Unintentional injuries | | |
| Gius (2015b) | Firearm death, aged 0–19 | 0.93 [0.84, 1.02] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified one qualifying study examining the effect of laws requiring either minimum age to purchase or minimum age to possess a firearm. Gius (2015b)



found a suggestive effect consistent with minimum possession age laws decreasing unintentional firearm deaths among those aged 19 or younger. Therefore, we conclude that *there is inconclusive evidence that minimum age requirements for possessing a firearm may reduce unintentional firearm deaths among those aged 19 or younger.*

## Effects on Mass Shootings

### Research Synthesis Findings

NRC (2004) did not identify any research examining the effects of minimum age requirements on mass shootings. Hahn et al. (2005) identified one study, but it did not satisfy our inclusion criteria. Our own search yielded one study. Using a two-way fixed-effects linear probability model, Luca, Deepak, and Poliquin (2016) estimated the effects of minimum age requirements on a binary indicator for whether a mass shooting occurred in a given state-year. The authors included two measures of minimum age requirements: (1) an indicator variable for whether laws prevent vendors from selling handguns to those under age 18 or prevent those under age 18 from purchasing handguns and (2) an analogous indicator variable for laws that set the minimum age at 21. The authors' analysis covered 1989–2014 and included controls for time-invariant state characteristics, national trends, and a host of other state-level gun policies, as well as time-varying state-level demographic, socioeconomic, and political characteristics. They found uncertain effects of laws setting 18 as the minimum age of purchase on the probability of a mass shooting

**Exhibit 10**
**0233**

event occurring, but they found a suggestive effect consistent with laws setting 21 as the minimum age of purchase reducing the likelihood of a mass shooting occurrence. However, it should be noted that assessing the effects of gun policies on mass shootings was not the primary focus of Luca, Deepak, and Poliquin (2016), and the authors intended the estimates to serve solely as a robustness check for their main specification (the effects of mass shootings on gun policy). Although the paper provided limited information to use in evaluating the reported statistical models (e.g., on how these policies were coded), it is clear that the analysis used a linear model to predict a dichotomous outcome. Therefore, model assumptions were violated, making model estimates and CIs unreliable.

Figure 12.4 displays the IRRs and CIs associated with the minimum age requirements examined in Luca, Deepak, and Poliquin (2016).

**Figure 12.4**
**Incidence Rate Ratios Associated with the Effect of Minimum Age Requirements on Mass Shootings**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| State minimum purchase | | | |
| age of 18 | Mass shooting | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (no political controls) | 1.06 [0.65, 1.47] | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 1.08 [0.66, 1.51] | |
| State minimum purchase | | | |
| age of 21 | | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (no political controls) | 0.51 [0.00, 1.34] | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 0.38 [0.00, 1.21] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified one qualifying study examining how minimum age requirements for purchasing a firearm affect the incidence of mass shootings. Luca, Deepak, and Poliquin (2016) found that laws setting age 18 as the minimum age to purchase a firearm had uncertain effects on mass shooting incidence, but they found a suggestive effect consistent with such laws reducing the incidence of mass shootings when the minimum purchase age is 21. On the basis of this study, *we find inconclusive evidence for how minimum age requirements for purchasing a firearm affect mass shootings.*



Minimum age requirements for purchasing a firearm have **uncertain** effects on mass shootings. Evidence for this relationship is **inconclusive.**

**Exhibit 10**
**0234**

## Outcomes Without Studies Examining the Effects of Minimum Age Requirements

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of minimum age requirements on the following outcomes, and we identified no such studies that met our inclusion criteria:

- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

**Exhibit 10**
**0235**

## Chapter Twelve References

Birckmayer, J., and D. Hemenway, "Suicide and Firearm Prevalence: Are Youth Disproportionately Affected?" *Suicide and Life-Threatening Behavior*, Vol. 31, No. 3, 2001, pp. 303–310.

CDC—*See* Centers for Disease Control and Prevention.

Centers for Disease Control and Prevention, "Source of Firearms Used by Students in School-Associated Violent Deaths—United States, 1992–1999," *Morbidity and Mortality Weekly Report*, Vol. 50, No. 31, 2001, pp. 657–660.

———, "Fatal Injury Reports, National and Regional, 1999–2015," WISQARS database, Atlanta, Ga., June 24, 2015. As of March 23, 2017:
https://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html

———, "Leading Causes of Death Reports, National and Regional, 1999–2015," WISQARS database, Atlanta, Ga., 2017b. As of May 10, 2017:
https://webappa.cdc.gov/sasweb/ncipc/leadcaus10_us.html

Duda, M. D., and K. C. Young, *Factors Related to Hunting and Fishing Participation in the United States*, Harrisonburg, Va.: Responsive Management, report for the U.S. Fish and Wildlife Service, Grant # 14-48-0009-92-1252, 1993.

Families Afield, *An Initiative for the Future of Hunting*, 2010. As of March 23, 2017:
http://www.familiesafield.org/pdf/FamiliesAfield_Report.pdf

Freed, L. H., D. W. Webster, J. J. Longwell, J. Carrese, and M. H. Wilson, "Factors Preventing Gun Acquisition and Carrying Among Incarcerated Adolescent Males," *JAMA Pediatrics*, Vol. 155, 2001, pp. 335–341.

Freedman, David A., "On the So-Called 'Huber Sandwich Estimator' and 'Robust Standard Errors,'" *American Statistician*, Vol. 60, No. 4, 2006, pp. 299–302.

Gius, Mark, "The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths," *Social Science Journal*, Vol. 52, No. 2, 2015b, pp. 168–175.

Grossman, D. C., D. T. Reay, and S. A. Baker, "Self-Inflicted and Unintentional Firearm Injuries Among Children and Adolescents," *JAMA Pediatrics*, Vol. 153, No. 8, 1999, pp. 875–878.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Johnson, R. M., C. Barber, D. Azrael, D. E. Clark, and D. Hemenway, "Who Are the Owners of Firearms Used in Adolescent Suicides?" *Suicide and Life-Threatening Behavior*, Vol. 40, No. 6, 2010, pp. 609–611.

Kann, L., T. McManus, W. A. Harris, S. L. Shanklin, K. H. Flint, J. Hawkins, B. Queen, R. Lowry, E. O. Olsen, D. Chyen, L. Whittle, J. Thornton, C. Lim, Y. Yamakawa, N. Brener, and S. Zaza, "Youth Risk Behavior Surveillance—United States, 2015," *Morbidity and Mortality Weekly Report*, Vol. 65, No. 6, 2016, pp. 1–174.

Kleck, G., and E. B. Patterson, "The Impact of Gun Control and Gun Ownership Levels on Violence Rates," *Journal of Quantitative Criminology*, Vol. 9, No. 3, 1993, pp. 249–287.

LaFree, G., and C. Birbeck, *Controlling New Mexico Juveniles' Possession of Firearms*, Albuquerque, N.M.: New Mexico Criminal Justice Statistical Analysis Center, Working Paper 27, 1998. As of May 10, 2017:
http://nmsc.unm.edu/reports/1998/JuvFirearmPossession.pdf

**Exhibit 10**
**0236**

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy*, working paper, Boston, Mass.: Harvard Business School, 2016.

Marvell, T. B., "The Impact of Banning Juvenile Gun Possession," *Journal of Law and Economics*, Vol. 44, 2001, pp. 691–713.

Miller, M., and D. Hemenway, "The Relationship Between Firearms and Suicide: A Review of the Literature," *Aggression and Violent Behavior*, Vol. 4, No. 1, 1999, pp. 59–75.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Office of Juvenile Justice and Delinquency Prevention, *OJJDP Statistical Briefing Book*, Washington, D.C.: U.S. Department of Justice, May 25, 2016. As of May 10, 2017:
https://www.ojjdp.gov/ojstatbb/

Puzzanchera, C., G. Chamberlin, and W. Kang, "Easy Access to the FBI's Supplementary Homicide Reports: 1980–2014," 2017. As of March 22, 2017:
http://www.ojjdp.gov/ojstatbb/ezashr/

Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Rivara, "An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates," *Injury Prevention*, Vol. 11, No. 2, 2005, pp. 77–83.

Ruback, R. B., J. N. Shaffer, and V. A. Clark, "Easy Access to Firearms: Juveniles' Risks for Violent Offender and Violent Victimization," *Journal of Interpersonal Violence*, Vol. 26, No. 10, 2011, pp. 2111–2138.

Rudolph, K. E., E. A. Stuart, J. S. Vernick, and D. W. Webster, "Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides," *American Journal of Public Health*, Vol. 105, No. 8, 2015, pp. E49–E54.

Shah, S., R. E. Hoffman, L. Wake, and W. M. Marine, "Adolescent Suicide and Household Access to Firearms in Colorado: Results of a Case-Control Study," *Journal of Adolescent Health*, Vol. 26, No. 3, 2000, pp. 157–163.

Sheley, J. F., and J. D. Wright, *High School Youths, Weapons, and Violence: A National Survey*, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, 1998.

Tritch, Teresa, "Keep Handguns Away from Teenagers," *New York Times*, May 30, 2014. As of June 29, 2017:
http://takingnote.blogs.nytimes.com/2014/05/30/keep-handguns-away-from-teenagers/

United States Code, Title 18, Section 922, Unlawful Acts.

U.S. Census Bureau, "U.S. and World Population Clock," 2017. As of March 22, 2017:
https://www.census.gov/popclock/

Vittes, K. A., and S. B. Sorenson, "Recreational Gun Use by California Adolescents," *Health Education and Behavior*, Vol. 32, No. 6, 2005, pp. 751–766.

Webster, D. W., L. H. Freed, S. Frattaroli, and M. H. Wilson, "How Delinquent Youths Acquire Guns: Initial Versus Most Recent Gun Acquisitions," *Journal of Urban Health*, Vol. 79, No. 1, 2002, pp. 60–69.

Webster, D. W., J. S. Vernick, A. M. Zeoli, and J. A. Manganello, "Association Between Youth-Focused Firearm Laws and Youth Suicides," *JAMA*, Vol. 292, No. 5, 2004, pp. 594–601.

Wright, M. A., G. J. Wintemute, and B. E. Claire, "Gun Suicide by Young People in California: Descriptive Epidemiology and Gun Ownership," *Journal of Adolescent Health*, Vol. 43, No. 6, 2008, pp. 619–622.

**Exhibit 10**
**0237**

Case 3:19-cv-01226-L-AHG   Document 21-16   Filed 11/12/19   PageID.3966   Page 19 of 171

CHAPTER TWENTY-TWO
# Mass Shootings

In this chapter, we provide an overview of mass shootings, one of the eight outcomes examined in our research syntheses (Chapters Three through Fifteen). We first describe different approaches for defining a mass shooting and then discuss how using different definitions can influence estimates of mass shooting levels and trends. The information was collected from a targeted search of the literature separate from that described in Chapter Two of this report.

## What Is a Mass Shooting?

In the 1980s, the Federal Bureau of Investigation (FBI) defined *mass murderer* as someone who "kills four or more people in a single incident (not including himself), typically in a single location" (Krouse and Richardson, 2015). However, the government has never defined *mass shooting* as a separate category, and there is not yet a universally accepted definition of the term. Thus, media outlets, academic researchers, and law enforcement agencies frequently use different definitions when discussing mass shootings, which can complicate our understanding of mass shooting trends and their relationship to gun policy. Table 22.1 provides examples of the variation in the criteria set by five of the most commonly referenced data sources on mass shootings in the United States.

Although there is no official standard for the casualty threshold that distinguishes a mass shooting from other violent crimes involving a firearm, a common approach in the literature is to adopt the FBI's criteria for a mass murderer and set a casualty threshold of four fatalities by firearm, excluding the offender or offenders (Duwe, Kovandzic, and Moody, 2002; Krouse and Richardson, 2015; Gius, 2015c; Fox and Fridel, 2016). However, this categorization is not without controversy. It does not capture incidents in which fewer than four victims were killed but additional victims were injured, and it does not include multiple-victim homicides in which fewer than four fatalities resulted from gunshots but additional fatalities occurred by other means. Additionally, the FBI classification of mass murderer was established primarily with the aim of clarifying criminal profiling procedures, not for the purpose of data collection or statistical

Case 3:19-cv-01226-L-AHG   Document 21-16   Filed 11/12/19   PageID.3968   Page 21 of 171

**Table 22.1**
**Variation in How Mass Shootings Are Defined and Counted**

| Source | Casualty Threshold (for injuries or deaths by firearm) | Location of Incident | Motivation of Shooter | Number of U.S. Mass Shootings in 2015 |
|---|---|---|---|---|
| *Mother Jones* (see Follman, Aronsen, and Pan, 2017) | Three fatal injuries (excluding shooter)[a] | Public | Indiscriminate (excludes crimes of armed robbery, gang violence, or domestic violence) | 7 |
| Gun Violence Archive (undated) | Four fatal or nonfatal injuries (excluding shooter) | Any | Any | 332 |
| Mass Shooting Tracker (undated) | Four fatal or nonfatal injuries (including shooter) | Any | Any | 371 |
| Mass Shootings in America database (Stanford Geospatial Center, undated) | Three fatal or nonfatal injuries (excluding shooter) | Any | Not identifiably related to gangs, drugs, or organized crime | 65 |
| Supplementary Homicide Reports (FBI) (see Puzzanchera, Chamberlin, and Kang, 2017) | The FBI's Supplementary Homicide Reports do not define *mass shooting* but do provide information on the number of victims, and the reports have been used by researchers in conjunction with news reports or other data sources. | | | |

[a] Before January 2013, the casualty threshold for *Mother Jones* was four fatal injuries (excluding the shooter).

analysis (Ressler, Burgess, and Douglas, 1988). Thus, many have chosen alternative definitions of casualty thresholds for mass shootings. For instance, Lott and Landes (2000) adopted the definition of two or more injured victims, the Gun Violence Archive (undated) defined *mass shooting* as an incident in which four or more victims (excluding the shooter) are injured or killed, and Mass Shooting Tracker (undated) set a criterion of four or more people injured or killed (including the shooter).

Another definitional disagreement is whether to include multiple-victim shooting incidents that occur in connection with some other crime or domestic dispute. Because mass shootings that stem from domestic and gang violence are contextually distinct from high-fatality indiscriminate killings in public venues, some have argued that they should be treated separately. In their analyses of "mass public shootings," Lott and Landes (2000) excluded any felony-related shooting, and Duwe, Kovandzic, and Moody (2002) excluded incidents where "both the victims and offender(s) were involved in unlawful activities, such as organized crime, gang activity, and drug deals" (p. 276). Similarly, Gius (2015c) restricted analysis to events that occurred in a relatively public area and in which victims appeared to have been selected randomly. However, others have claimed that this narrow definition ignores a substantial proportion

**Exhibit 10**
**0239**

of gun-related violence from family- or felony-related murder (Fox and Levin, 2015). Data collection efforts by Mass Shooting Tracker and the Gun Violence Archive thus counted all incidents that met their designated casualty threshold as mass shootings, regardless of the circumstances that led to the event.

These definitions matter. Depending on which data source is referenced, there were seven, 65, 332, or 371 mass shootings in the United States in 2015 (see Table 22.1), and those are just some examples. More-restrictive definitions (e.g., *Mother Jones*) focus on the prevalence of higher-profile events motivated by mass murder, but they omit more-common incidents occurring in connection with domestic violence or criminal activity, which make up about 80 percent of mass shooting incidents with four or more fatally injured victims (Krouse and Richardson, 2015). Broader definitions (e.g., Mass Shooting Tracker) provide a more comprehensive depiction of the prevalence of gun violence, but they obscure the variety of circumstances in which these incidents take place and their associated policy implications. Furthermore, if the effects of a firearm policy are expected to affect only public mass shooting incidents, then analysis that includes domestic violence mass shootings in the outcome measure could obscure identification of significant effects that would be found in a more targeted analysis of public mass shootings alone. There is thus value in having multiple measurements of mass shootings—but only if their definitions are clearly and precisely explained and they are used by researchers in a manner appropriate to the analysis.

## Are Mass Shootings on the Rise?

In 2014, the FBI released a study showing that "active shooting incidents" had increased at an average annual rate of 16 percent between 2000 and 2013 (Blair and Schweit, 2014). In contrast to the varied definitions for mass shootings, there is an agreed-upon definition among government agencies for *active shooter*: "an individual actively engaged in killing or attempting to kill people in a confined and populated area; in most cases, active shooters use firearm(s) and there is no pattern or method to their selection of victims" (U.S. Department of Homeland Security, 2008, p. 2). Using a modified version of this definition to include incidents that had multiple offenders or occurred in confined spaces, Blair and Schweit (2014) found that active shootings had increased from only one incident in 2000 to 17 in 2013.

The FBI study (Blair and Schweit, 2014) highlighted several key issues in determining trends in mass shootings. First, the absence of a systematic definition of mass shootings can lead to misinterpretation of reported evidence. While the study explicitly stated, "This is not a study of mass killings or mass shootings" (p. 5), extensive media coverage cited the study as evidence of a sharp rise in mass shootings and mass shooting fatalities (Lott, 2015). However, the definition of an *active-shooter incident* is broader than any of the commonly used criteria for mass shootings (see Table 22.1) because it

**Exhibit 10**
**0240**

does not set any casualty threshold. Of the 160 active-shooter incidents included in the FBI's analysis, 7 percent resulted in zero casualties, 20 percent resulted in zero fatalities, and 22 percent resulted in a single fatality (Lott, 2015). Setting a threshold of zero victims increases the potential for measurement error, because shooting incidents with no casualties are more difficult to identify from police records and are less likely to receive media coverage (Duwe, Kovandzic, and Moody, 2002). Additionally, because it should be relatively easier to identify more-recent shootings with few fatalities, a low casualty threshold will tend to systematically bias estimates of the number of shootings upward over time. For example, the Stanford Mass Shootings in America database, which relies solely on online media sources to identify mass shooting events, cautions its users, "Data in the [database] spans a time period that includes the transition from traditional media to digital media in reporting. Numbers of incidents per year should at least in part be assumed to reflect this collection methodology and not just changes in incident frequency." Thus, the more than threefold surge in mass shooting incidents from 2014 to 2015 shown in the Stanford data likely reflects increased online reporting and not necessarily a true increase in the rate of mass shootings.

Even when a more restrictive casualty threshold of four or more fatally injured victims (excluding the shooter) is imposed, empirical evidence on trends in these incidents varies depending on whether the motivation of the shooter is included as a criterion for considering an event a mass shooting. In their analysis of mass shooting trends from 1999 to 2013, Krouse and Richardson (2015) distinguished between mass shootings occurring in public locations that are indiscriminate in nature ("mass public shootings"), mass shootings in which the majority of victims are members of the offender's family and that are not attributable to other criminal activity ("familicide mass shootings"), and mass shootings that occur in connection to some other criminal activity ("other felony mass shootings"). Figures 22.1 and 22.2 show trends in these types of mass shooting incidents and fatalities, respectively, using the data provided in Krouse and Richardson (2015). Extending the data back to the 1970s, two studies found evidence of a slight increase in the frequency of mass public shootings over the past three decades (Cohen, Azrael, and Miller, 2014; Krouse and Richardson, 2015). However, using an expanded definition that includes domestic- or felony-related killings, there is little evidence to suggest that mass shooting incidents or fatalities have increased (Cohen, Azrael, and Miller, 2014; Krouse and Richardson, 2015; Fox and Fridel, 2016). Thus, different choices about how to define a mass shooting result in different findings for both the prevalence of these events at a given time and whether their frequency has changed over time.

Definitional issues aside, the relative rarity of mass shooting events makes analysis of trends particularly difficult. Chance variability in the annual number of mass shooting incidents makes it challenging to discern a clear trend, and trend estimates will be sensitive to outliers and to the time frame chosen for analysis. For example, while Krouse and Richardson (2015) found evidence of an upward trend in mass public

**Exhibit 10**

**0241**

**Figure 22.1**
**Trends in Mass Shooting Incidents, by Type of Incident**



SOURCE: Adapted from data in Krouse and Richardson, 2015.
RAND RR2088-22.1

**Figure 22.2**
**Trends in Mass Shooting Fatalities, by Type of Incident**



SOURCE: Adapted from data in Krouse and Richardson, 2015.
RAND RR2088-22.2

shootings from 1999 to 2013, they noted that the increase was driven largely by 2012, which had an unusually high number of mass public shooting incidents. Additionally, Lott (2015) showed that the FBI study's estimate of a dramatic increase in active-shooter incidents was largely driven by the choice of 2000 as the starting date, because that year had an unusually low number of shooting incidents; extending the analysis to cover 1977 onward and adjusting the data to exclude events with fewer than two

**Exhibit 10**
**0242**

fatalities, Lott (2015) found a much smaller and statistically insignificant increase (less than 1 percent annually) in mass shooting fatalities over time.

## Conclusions

While different choices about how to define a mass shooting and the period over which to calculate mass shooting trends have resulted in disagreement about whether the frequency of mass shootings has risen, there is clear evidence that the media's use of the term *mass shooting* has increased significantly over recent decades (Roeder, 2016). Unfortunately, the ambiguity in how mass shootings are defined and counted may result in increased media coverage influencing public perception without better informing our understanding of the prevalence of mass shootings or their determinants, trends, social costs, or policy implications.

**Exhibit 10**
**0243**

## Chapter Twenty-Two References

Blair, J. Pete, and Katherine W. Schweit, *A Study of Active Shooter Incidents, 2000–2013*, Washington, D.C.: Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, 2014.

Cohen, Amy P., Deborah Azrael, and Matthew Miller, "Rate of Mass Shootings Has Tripled Since 2011, Harvard Research Shows," *Mother Jones*, October 15, 2014.

Duwe, Grant, Tomislav Kovandzic, and Carlisle E. Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies*, Vol. 6, No. 4, 2002, pp. 271–296.

Follman, Mark, Gavin Aronsen, and Deanna Pan, "U.S. Mass Shootings, 1982–2017: Data from *Mother Jones*' Investigation," *Mother Jones*, June 14, 2017. As of August 25, 2017: http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/

Fox, James A., and Emma E. Fridel, "The Tenuous Connections Involving Mass Shootings, Mental Illness, and Gun Laws," *Violence and Gender*, Vol. 3, No. 1, 2016, pp. 14–19.

Fox, James A., and Jack Levin, *Extreme Killing: Understanding Serial and Mass Murder*, 3rd ed., Thousand Oaks, Calif.: Sage Publications, 2015.

Gius, Mark, "The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings," *Applied Economics Letters*, Vol. 22, No. 4, 2015c, pp. 281–284.

Gun Violence Archive, homepage, undated. As of October 20, 2016: http://www.gunviolencearchive.org/

Krouse, William J., and Daniel J. Richardson, *Mass Murder with Firearms: Incidents and Victims, 1999–2013*, Washington, D.C.: Congressional Research Service, R44126, 2015.

Lott, John R., Jr., "The FBI's Misinterpretation of the Change in Mass Public Shootings," *ACJS Today*, Vol. 40, No. 2, 2015, pp. 18–29.

Lott, John R., Jr., and William Landes, "Multiple Victim Public Shootings," 2000 (unpublished). As of June 29, 2017: http://www.shack.co.nz/pistoltaupo/SSRN_ID272929_code010610560.pdf

Mass Shooting Tracker, homepage, undated. As of October 20, 2016: https://www.massshootingtracker.org

Puzzanchera, C., G. Chamberlin, and W. Kang, "Easy Access to the FBI's Supplementary Homicide Reports: 1980–2014," Office of Juvenile Justice and Delinquency Prevention, 2017. As of March 22, 2017: https://www.ojjdp.gov/ojstatbb/ezashr/

Ressler, Robert K., Ann W. Burgess, and John E. Douglas, *Sexual Homicide: Patterns and Motives*, New York: Simon and Schuster, 1988.

Roeder, Oliver, "The Phrase 'Mass Shooting' Belongs to the 21st Century," FiveThirtyEight, January 21, 2016. As of January 12, 2017: http://fivethirtyeight.com/features/we-didnt-call-them-mass-shootings-until-the-21st-century/

Stanford Geospatial Center, "Mass Shootings in America," Stanford, Calif.: Stanford University Libraries, undated. As of October 20, 2016: https://library.stanford.edu/projects/mass-shootings-america

U.S. Department of Homeland Security, *Active Shooter: How to Respond*, Washington, D.C., October 2008.

**Exhibit 10**
**0244**

**Exhibit 10**
**0245**

PART D
## Summary of Findings and Recommendations

Exhibit 10
0246

**Exhibit 10**
**0247**

CHAPTER TWENTY-FIVE
# Summary and Conclusions

Although large majorities of Americans agree on the merits of some gun policies, gun policy is divisive in the United States. In this report, we have attempted to provide a rigorous and balanced assessment of what current scientific knowledge can tell the public and policymakers about the true effects of many gun policies that are frequently discussed in state legislatures. The most recent of such comprehensive attempts, conducted more than a dozen years ago, found the research base too thin to draw any conclusions about the effects of gun laws. Specifically, a committee of the National Research Council (NRC) found that the evidence was so weak and contradictory that no causal associations between the laws it examined and crime or violence could be determined (NRC, 2004). Separately, the Community Preventive Services Task Force "found the evidence available from identified studies was insufficient to determine the effectiveness of any of the firearms laws reviewed singly or in combination" (Hahn et al., 2005).

We have thoroughly updated and expanded on the findings in NRC (2004) and Hahn et al. (2005) with studies published between 2003 and spring 2016. We systematically reviewed all empirical research that examined the effects of 13 types of state gun policies on eight outcomes, including outcomes related to public health and safety and outcomes of interest to sport shooters, hunters, and those who work in the gun industry. We restricted our analysis to only those studies using methods designed to identify plausibly causal effects of the policies. After reviewing many thousands of candidate studies, we identified just 63 meeting our inclusion criteria (described in Chapter Two), of which 54 were published since 2003.

There is a need for a factual basis on which to make policy. This does not mean basing decisions just on facts about which policies will reduce homicides or suicides the most; it means basing decisions on an accurate understanding of the trade-offs that policies entail. To make fair and effective gun policies, we need to know more about their implementation challenges, whom they affect most or least, what their unintended consequences might be, how they can be revised for better effect, what they cost society in general and gun owners in particular, and other issues central to the acceptability of any policy. These scientific questions about what is true and knowable do not supersede questions of individual rights or Second Amendment rights. Both should be central considerations in policymaking.

**Exhibit 10**
**0248**

Facts have never dictated policy, but they can inform it. The relevance of research to inform gun policy has been tarnished by deeply held assumptions about "true" policy effects, measurement error associated with key variables (such as gun ownership), skepticism about research methods, and mistrust of researchers' motives when they draw unwelcome conclusions or focus on just one aspect of what is a complex phenomenon affecting multiple stakeholders with diverse interests. We have attempted to address these concerns through the rigor and transparency of our methods and through our organizational commitment to nonpartisan, objective policy analysis. We hope, therefore, that all stakeholders in gun policy debates give our analysis of the available science a fair hearing and our recommendations careful consideration.

In this chapter, we summarize our judgments about the strength of evidence available for the effects of gun policies on outcomes of interest. We then outline our conclusions and recommendations, which are organized into two sections: What can we conclude about the effects of gun policies, and why don't we know more?

## Summarizing the Strength of Evidence

We categorized all policy and outcome pairings as having supportive, moderate, limited, inconclusive, or no evidence. We never conclude that evidence suggests that a policy has no effect. Even when multiple studies fail to find a significant effect, it is not correct that this implies the policy has no effect. Instead, the effects may simply be too small to reliably detect, or the data available to assess the policy's effects may not be sufficiently specific to the intended effects of the law. More generally, it seems reasonable to suspect that every policy has some effect on each outcome, however small or unintended. Therefore, the failure to detect a law's effects reveals more about the weakness of the analytic methods than about the possibility that a policy truly has no effect.

We categorized evidence as *inconclusive* when studies with comparable methodological rigor identified inconsistent evidence for the policy's effect on an outcome or when a single study found only uncertain or suggestive effects. We categorized evidence as *limited* when at least one study meeting our inclusion criteria and not otherwise compromised by serious methodological problems reported a significant effect of the policy on the outcome. Effects for which there is *moderate* evidence are those for which two or more studies found significant effects in the same direction and contradictory evidence was not found in other studies with equivalent or strong methods. Our finding of *supportive* evidence of an effect is limited to cases for which at least three studies found suggestive or significant effects in the same direction, and the effect was found in at least two data sets that were reasonably independent of each other (e.g., firearm suicides and hospital admissions for self-inflicted firearm injuries).

**Exhibit 10**
**0249**

Our ratings, therefore, reflect the relative strength of evidence, not, for instance, whether the evidence is strong enough that we can be highly confident that observed effects would be generalizable to future implementations of a particular law. Rather, evidence for these effects is strong relative to evidence for other gun policy effects and not necessarily strong relative to the quality and quantity of evidence available in other fields of study. For instance, the evidence that cigarette smoking causes cancer is vastly stronger than the evidence concerning any gun policy's effect on any outcome.

Table 25.1 summarizes our judgments for all 13 classes of policies across the eight outcomes. Several outcomes show multiple judgments, and these correspond to different characterizations of the specific policy-outcome association. For instance, we identified limited evidence that background checks reduce *total suicides* and moderate evidence that they reduce *firearm suicides*. Looking down the columns, it is apparent that research into four outcomes is essentially unavailable. It is noteworthy that three of these four outcomes—defensive gun use, hunting and recreation, and the gun industry—are issues of particular concern to gun owners or gun industry stakeholders, including firearm manufacturers, firearm dealers, hunting outfitters, firing ranges, and others. That there is no empirical research examining these outcomes limits the ability for policymakers to use evidence to consider how laws are likely to affect different interests.

**Exhibit 10**
**0250**

304   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

**Table 25.1**
**Strength of Evidence Across Gun Policies and Outcomes**

| | Gun-Free Zones | Waiting Periods | Concealed-Carry Laws: Permitless Carry | Concealed-Carry Laws: Shall Issue | Minimum Age Requirements: Possessing | Minimum Age Requirements: Purchasing | Surrender of Firearms by Prohibited Possessors | Child-Access Prevention Laws | Firearm Sales Reporting and Recording Requirements | Licensing and Permitting Requirements | Lost or Stolen Firearm Reporting Requirements | Prohibitions Associated with Mental Illness | Stand-Your-Ground Laws | Bans on the Sale of Assault Weapons and High-Capacity Magazines | Background Checks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Suicide** | | | | | | | | | | | | | | | |
| Total suicides | | | | I | I | I | | ↓L | | I | | ↓L | I | | ↓L |
| Firearm suicides | | | | I | I | | | ↓M | | I | | ↓L | I | | ↓M |
| Firearm suicides among children | | | | | | ↓L | | | | | | | | | |
| Firearm self-injuries (nonfatal) | | | | I | | | | | | | | | | | |
| Firearm self-injuries (including suicides) | | | | | | | | ↓S | | | | | | | |
| Violent crime | | | | ↑L | | | | I | | | | ↓M | | | ↓L |
| Total homicides | | I | | I | I | I | I | | | I | | ↓L | ↑M | I | ↓L |
| Firearm homicides | | | | I | I | I | | I | | I | | I | ↑L | I | ↓M, I[a] |
| Intimate partner homicides | | I | | | | | I | | | | | | | | |
| Robberies | | | | I | | | | | | | | | | | |
| Assaults | | | | I | | | | | | | | | | | |
| Rapes | | | | I | | | | | | | | | | | |
| Other violent crime | | | | | | | | | | | | | I | | |

**Table 25.1—Continued**

| Outcome | Gun-Free Zones | Waiting Periods | Concealed-Carry Laws: Permitless Carry | Concealed-Carry Laws: Shall Issue | Minimum Age Requirements: Possessing | Minimum Age Requirements: Purchasing | Surrender of Firearms by Prohibited Possessors | Child-Access Prevention Laws | Firearm Sales Reporting and Recording Requirements | Licensing and Permitting Requirements | Lost or Stolen Firearm Reporting Requirements | Prohibitions Associated with Mental Illness | Stand-Your-Ground Laws | Bans on the Sale of Assault Weapons and High-Capacity Magazines | Background Checks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unintentional injuries and deaths | | | | | | | | | | | | | | | |
| Unintentional firearm deaths | | | | | I | | | | | | | | | | |
| Unintentional firearm injuries and deaths among adults | | | | | | | | →L | | | | | | | |
| Unintentional firearm injuries and deaths among children | | | | | | | | →S | | | | | | | |
| Unintentional firearm injuries among adults | | | | ←L | | | | | | | | | | | |
| Unintentional firearm injuries among children | | | | I | | | | | | | | | | | |
| Mass shootings | | I | I | I | | I | | I | | I | | | | I | I |
| Officer-involved shootings | | | | | | | | | | | | | | | |
| Defensive gun use | | | | | | | | | | | | | I | | |
| Hunting and recreation | | | | | | | | | | | | | | | |

Exhibit 10
0252

306   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

**Table 25.1—Continued**

| | Gun-Free Zones | Waiting Periods | Concealed-Carry Laws | | Minimum Age Requirements | | Surrender of Firearms by Prohibited Possessors | Child-Access Prevention Laws | Firearm Sales Reporting and Recording Requirements | Licensing and Permitting Requirements | Lost or Stolen Firearm Reporting Requirements | Prohibitions Associated with Mental Illness | Stand-Your-Ground Laws | Bans on the Sale of Assault Weapons and High-Capacity Magazines | Background Checks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Permitless Carry | Shall Issue | Possessing | Purchasing | | | | | | | | | |
| Gun industry | | | | | | | | | | | | | | | |
| Gun ownership | | | | I | | | | | | | | | | | |
| Prices of banned firearms in the short term | | | | | | | | | | | | | | ↑ L | |

NOTE: I = inconclusive; L = limited; M = moderate; S = supportive. When we identified no studies meeting eligibility criteria, cells are blank. ↑ = the policy increases the outcome; ↓ = the policy decreases the outcome.

[a] We concluded that there is moderate evidence that dealer background checks decrease firearm homicides, and there is inconclusive evidence for the effect of private-seller background checks on firearm homicides.

Exhibit 10
0253

## What Can We Conclude About the Effects of Gun Policies?

Our first set of conclusions and recommendations describes the policy-outcome combinations with the strongest available evidence as identified through our review of the existing literature, as well as recommendations for policy based on this evidence.

**Conclusion 1.** Available evidence supports the conclusion that child-access prevention (CAP) laws, or safe storage laws, reduce self-inflicted fatal or nonfatal firearm injuries among youth. There is moderate evidence that these laws reduce firearm suicides among youth and limited evidence that the laws reduce total (i.e., firearm and nonfirearm) suicides among youth.

**Conclusion 2.** Available evidence supports the conclusion that CAP laws, or safe storage laws, reduce unintentional firearm injuries or unintentional firearm deaths among children. In addition, there is limited evidence that these laws may reduce unintentional firearm injuries among adults.

In the available literature examining CAP laws, self-inflicted injuries represent an ambiguous outcome because not all self-inflicted firearm injuries are the result of a suicide attempt. Some are unintentional injuries. But with case fatality rates for suicide attempts with a firearm at around 82.5 percent (Spicer and Miller, 2000), a substantial number of self-inflicted firearm injuries are likely the result of a suicide attempt. Furthermore, there is a clear pattern of CAP laws appearing to reduce a range of related firearm injuries to youth, ranging from unintentional injuries to suicides. That they also reduce the more ambiguous "self-inflicted injuries" fits squarely within that pattern and contributes to our confidence that the evidence currently supports a conclusion that CAP laws reduce these injuries and fatalities.

Across all of the 13 classes of policies that we studied, only CAP laws had any evidence that we classified as *supportive* for a particular conclusion. CAP laws differ from many of the other policies we considered in this report. Most of the others affect the acquisition of new firearms (e.g., background checks or waiting periods), or they are designed to affect a relatively small proportion of gun owners (e.g., prohibitions that target the mentally ill; firearm surrender laws, which have usually targeted domestic violence offenders). Thus, the other laws generally concern either the small proportion of guns that are newly acquired every year or a small proportion of the gun-owning population. CAP laws, in contrast, are designed to influence how all guns in a state are stored when children could be expected to encounter them. This likely represents a large proportion of all guns because one-third of all households in the country have children under age 18 (Vespa, Lewis, and Kreider, 2013), and many more have children as occasional visitors. With such large numbers of guns potentially affected, even imperfect compliance with CAP laws may have a greater chance than other types of laws of producing observable effects in population-level outcome statistics.

*Recommendation 1.* States without CAP laws should consider adopting them as a strategy to reduce firearm suicides and unintentional firearm injuries and deaths.

**Exhibit 10**
**0254**

We note, however, that scientific research cannot, at present, address whether these laws might increase or decrease crime or rates of legal defensive gun use.

*Recommendation 2.* When considering adopting or refining CAP laws, states should consider making child access to firearms a felony; there is some evidence that felony laws may have the greatest effects on unintentional firearm deaths.

Gun industry and gun-owner organizations have promoted voluntary and educational programs to promote the safe storage of firearms. Our conclusions and recommendations should not be interpreted to suggest that only CAP laws can reduce firearm deaths. As we discussed in Chapter Twenty, scientific evaluations of education campaigns have found that they can produce behavior change in domains other than gun storage, but rigorous evidence that they have successfully promoted safe storage of firearms is limited. On the other hand, there is evidence that clinicians who counsel patients (mostly families with children) can effectively promote safe storage practices, particularly if storage devices (e.g., gun locks) are provided along with the counseling.

**Conclusion 3.** There is moderate evidence that background checks reduce firearm suicides and firearm homicides, as well as limited evidence that these policies can reduce overall suicide and violent crime rates.

Most available studies have examined the effects of dealer background checks or the combined effects of dealer and private-seller background checks when both are required by a state. Therefore, the evidence base for universal background checks compared with the dealer background checks required under federal law is quite limited. Logically, however, if there is moderate evidence that dealer background checks reduce firearm suicides and homicides, it seems likely that extending those same background checks to private sales of firearms could further reduce firearm suicides and homicides. We emphasize, though, that the available research on this question is limited and inconclusive.

**Conclusion 4.** There is moderate evidence that stand-your-ground laws may increase state homicide rates and limited evidence that the laws increase firearm homicides in particular.

**Conclusion 5.** There is moderate evidence that laws prohibiting the purchase or possession of guns by individuals with some forms of mental illness reduce violent crime, and there is limited evidence that such laws reduce homicides in particular. There is also limited evidence these laws may reduce total suicides and firearm suicides.

Federal law prohibits some people who have been adjudicated as mentally ill from purchasing or possessing firearms, but this prohibition is not uniformly enforced across the nation. States maintain mental health records, but many have been reluctant to share those records for use in the Federal Bureau of Investigation (FBI)'s National Instant Criminal Background Check System (NICS), the federal database used for background checks. Although most states have laws allowing for the voluntary shar-

**Exhibit 10**
**0255**

ing of some mental health records with NICS, there is considerable variation in which classes of individuals prohibited under federal law are shared with NICS. Thus, by the end of 2016, there were large differences in the number of active mental health records in NICS across states; for example, Alaska, Montana, New Hampshire, Rhode Island, and Wyoming had contributed less than 500 records, whereas most other states had tens of thousands or hundreds of thousands of active mental health records in the database (Criminal Justice Information Services Division, 2016).

Our finding that there is limited evidence that some mental health–related background checks can reduce gun violence should be of interest to states that currently share only partial or limited mental health data with NICS and that do not have a comprehensive in-state database that is reliably used for background checks for firearm sales. It is likely that many individuals with mental health histories making them prohibited possessors under federal law can nevertheless purchase firearms in these states. Moreover, states that do check state databases but do not share information on all individuals with disqualifying mental health histories with NICS create opportunities for prohibited possessors to purchase firearms out of state. Establishing procedures to prevent these people from purchasing firearms appears to yield small but appreciable reductions in suicides, homicides, and other violent crimes after implementing mental health checks.

> *Recommendation 3*. States that currently do not require a background check investigating all types of mental health histories that lead to federal prohibitions on firearm purchase or possession should consider implementing robust mental illness checks, which appear to reduce rates of gun violence. The most robust procedures involve sharing data on all prohibited possessors with NICS.

**Conclusion 6**. There is limited evidence that before implementation of a ban on the sale of assault weapons and high-capacity magazines, there is an increase in the sales and prices of the products that the ban will prohibit.

This finding is based on persuasive evidence from a single case, the implementation of the Violent Crime Control and Law Enforcement Act of 1994, which banned the sale of certain semiautomatic weapons designated in the law as assault weapons. Therefore, this finding may not generalize well to other instances of assault weapon bans. For instance, the 1994 law grandfathered banned weapons sold before the law's implementation date. This likely created a market for speculators who drove up sales and prices in the months preceding the ban (Koper, 2004).

**Conclusion 7**. There is limited evidence that a minimum age of 21 for purchasing firearms may reduce firearm suicides among youth.

**Conclusion 8**. No studies meeting our inclusion criteria have examined required reporting of lost or stolen firearms, required reporting and recording of firearm sales, or gun-free zones.

**Exhibit 10**
**0256**

## Why Don't We Know More?

Based on our review of the existing literature on the effects of firearm policy changes, we offer the following conclusions and recommendations for improving the evidence base on the effects of gun laws.

**Conclusion 9.** The modest growth in knowledge about the effects of gun policy over the past dozen years reflects, in part, the reluctance of the U.S. government to sponsor work in this area at levels comparable to its investment in other areas of public safety and health, such as transportation safety.

Of the 54 studies meeting our inclusion criteria that have been published since 2003, just seven (13 percent) reported receiving any federal funding. Two studies listed funding from the National Science Foundation, and one study each listed funding from the National Institute of Justice; National Institute on Drug Abuse; National Institute on Alcohol Abuse and Alcoholism; National Heart, Lung, and Blood Institute; and the Centers for Disease Control and Prevention (CDC). Ten studies received some foundation support, with the Robert Wood Johnson Foundation and the Joyce Foundation each supporting four. Of studies since 2003 that met our inclusion criteria, the large majority (40 studies, or 74 percent) reported no sources of external support.

While most of the 54 studies focused on public safety or health outcomes (e.g., suicide and homicide), the number of high-quality quasi-experimental studies on which to base estimates of the effects of policies was surprisingly small compared with the literatures that evaluate the effects of many other policies, such as those designed to improve traffic safety, a problem that claims about as many lives each year as are lost in firearm suicides and homicides.

Federal funding for research on gun-related mortality is far below the levels for other sources of mortality in the United States. Stark and Shah (2017), for instance, found that federal gun violence research funding is just 1.6 percent the amount predicted based on federal funding for other leading causes of death. With this federal inattention comes a corresponding deficit in research: Stark and Shah (2017) also found that the volume of research publications on gun mortality was just 4.5 percent of what would be expected based on publication volume for other leading causes of mortality.

The federal government previously supported a more robust program of research examining firearm violence and policy. In the 1990s, the CDC was sponsoring millions of dollars of research on firearm violence, until researchers found that having a gun in the home was associated with an elevated risk of firearm homicide for members of the household. This finding was viewed by some as a one-sided attempt to manipulate the gun policy debate.

In an effort led by the National Rifle Association (Cagle and Martinez, 2004), a sufficient proportion of Congress was persuaded to adopt the Dickey Amendment in 1996, cutting $2.6 million of funding from the CDC, an amount equal to what its injury prevention center had been spending on gun violence research. The Dickey

**Exhibit 10**
**0257**

Amendment also introduced new language forbidding the CDC from advocating or promoting gun control. This language did not explicitly prohibit all research on gun violence or gun policy, but concern that any gun research could be viewed as advocacy has led the CDC to avoid supporting gun policy research lest it invite a budget adjustment like that in 1996 (Kellermann and Rivara, 2013).

Congress has included Dickey Amendment language in each CDC appropriations bill since 1996. Moreover, in 2012, similar language was added to an appropriations bill for the National Institutes of Health in the Consolidated Appropriations Act of 2012 (Pub. L. 112-74).

Research on firearm policy and violence prevention has since declined dramatically. According to a report by the advocacy organization Mayors Against Illegal Guns, by 2012, CDC funding of gun violence research had declined 96 percent since the mid-1990s, and academic publishing on gun violence fell 64 percent from 1998 to 2012 (Mayors Against Illegal Guns, 2013; Alcorn, 2016). Although comparable numbers of people die in car crashes and by firearm suicides and homicides, federal investment in traffic safety research funding is more than 270 times greater than in firearm violence research (Mayors Against Illegal Guns, 2013).

As suggested in a 2015 joint statement by Jay Dickey, the sponsor of the Dickey Amendment, and Mark Rosenberg, who ran the CDC's injury center when the amendment first passed, a gun violence research agenda should be developed with the dual goals of protecting citizens' and gun owners' rights and making our homes and communities safer:

> Our nation does not have to choose between reducing gun-violence injuries and safeguarding gun ownership. Indeed, scientific research helped reduce the motor vehicle death rate in the United States and save hundreds of thousands of lives— all without getting rid of cars. For example, research led to the development of simple four-foot barricades dividing oncoming traffic that are preventing injuries and saving many lives. We can do the same with respect to firearm-related deaths, reducing their numbers while preserving the rights of gun owners. (Dickey and Rosenberg, 2015).

The science on which to base gun policy has advanced slowly since 2004, when the NRC panel concluded, "If policy makers are to have a solid empirical and research base for decisions about firearms and violence, the federal government needs to support a systematic program of data collection and research that specifically addresses that issue." Unfortunately, federal support for research that could help states and communities reduce firearm crime, violence, and suicide remains virtually nonexistent, and the state and federal surveys describing gun ownership and use, on which a better understanding of state policies could be built, have not lived up to the optimism expressed in NRC (2004) and Hahn et al. (2005). In some important respects, such federal support has deteriorated since then.

**Exhibit 10**
**0258**

*Recommendation 4.* To improve understanding of the real effects of gun policies, Congress should consider whether to lift current restrictions in appropriations legislation, and the administration should invest in firearm research portfolios at the CDC, the National Institutes of Health, and the National Institute of Justice at levels comparable to its current investment in other threats to public safety and health.

*Recommendation 5.* Given current limitations in the availability of federal support for gun policy research, private foundations should take further steps to help fill this funding gap by supporting efforts to improve and expand data collection and research on gun policies.

**Conclusion 10.** Research examining the effects of gun policies on officer-involved shootings, defensive gun use, hunting and recreation, and the gun industry is virtually nonexistent.

The lack of rigorous studies examining the effects of gun policies on these outcomes is problematic because many stakeholders in gun policy debates are especially concerned about the effects laws could have on these matters. The desire to protect oneself, for instance, is self-reported as one of the primary reasons for gun ownership among 63 percent of all U.S. gun owners and among 76 percent of all U.S. handgun owners (Azrael et al., 2017), yet rigorous studies of the effects of laws on this outcome have rarely been conducted. As we discuss in Chapter Twenty-Three, on defensive gun use, the lack of research in this area stems, to some extent, from difficulties defining and measuring legal defensive gun use. In some—perhaps most—such cases, guns may contribute to an individual's self-defense by deterring crimes that would otherwise occur. For this reason and others, it has proven difficult to estimate the frequency with which guns are used defensively.

Nevertheless, opportunities for understanding how policies affect defensive gun use exist and should be pursued. For instance, it may be possible to examine whether policies change the rate at which gun owners are the victims of crime or are injured during a crime. Similarly, FBI records of justifiable homicides, although imperfect as a proxy for defensive gun use, may nevertheless be useful for examining one aspect of a policy's effects on defensive gun use, as demonstrated by Cheng and Hoekstra (2013). Given the strength of evidence of CAP laws on self-inflicted and unintentional injuries, studying the impact of these policies on defensive gun use can help inform the trade-offs between this outcome and the potential public safety benefits.

The dearth of research examining how policies affect the gun industry is a particularly significant shortcoming in the available scientific literature. Data from the U.S. Bureau of Labor Statistics (2017) suggest that more than 47,000 people in the United States are employed just in the manufacture of small arms and ammunition. The National Sports Shooting Foundation, a gun industry trade association, estimates

**Exhibit 10**
**0259**

Case 3:19-cv-01226-L-AHG   Document 21-16   Filed 11/12/19   PageID.3989   Page 42 of 171

that an additional 250,000 may be employed in the distribution and sale of firearms and hunting supplies or in ancillary services, such as operating gun ranges or providing supplies or services to manufacturers and retailers (National Sports Shooting Foundation, 2017). The National Survey of Fishing, Hunting, and Wildlife-Associated Recreation Survey in 2011 found that more than 12 million people used firearms for hunting, with total expenditures on firearms exceeding $3 billion and expenditures on ammunition exceeding $1.2 billion (U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, 2012). In addition, more than 50 percent of all hunters participated in target shooting, and 22 percent of hunters visited shooting ranges (U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, 2012). As important as the concerns of this industry may be to the fate of proposed gun policies, there is, at present, little scientific evidence available to the public on this topic.

> *Recommendation 6.* To improve understanding of outcomes of critical concern to many in gun policy debates, the U.S. government and private research sponsors should support research examining the effects of gun laws on a wider set of outcomes, including crime, defensive gun use, hunting and sport shooting, officer-involved shootings, and the gun industry.

**Conclusion 11.** The lack of data on gun ownership and availability and on guns in legal and illegal markets severely limits the quality of existing research.

There are no regularly collected data series that describe gun ownership or use at the state level since the CDC suspended its collection of this information on the Behavioral Risk Factor Surveillance System more than a decade ago. Most gun laws are designed to specify who can own guns or to change the ways that gun owners store and use their weapons. Therefore, gun ownership and use are the behaviors through which laws may affect such outcomes as suicide, homicide, hunting and recreation, and firearm sales. In the absence of reliable state-level information about gun ownership and use, researchers cannot assess the most-direct intended effects of policies—that is, the effects on gun ownership and use—which may otherwise be easier to detect than the downstream effects of such policies on comparatively rare outcomes, such as suicide and homicide. Is it the case that gun laws cannot have their intended effect because the stock of guns is so great in the United States that anyone who wants a gun can easily obtain one, whether or not they are prohibited? This is a question that cannot easily be answered with available data on gun ownership and use.

> *Recommendation 7.* To make important advances in understanding the effects of gun laws, the CDC or another federal agency should resume collecting voluntarily provided survey data on gun ownership and use.

**Exhibit 10**
**0260**

Additionally, the federal government no longer collects or shares with researchers data on illegal gun markets, which investigators could use to examine how policies change the availability of firearms. This is a problem that has also worsened since NRC (2004) identified it as a critical shortcoming for research on gun policy. Specifically, the Tiahrt Amendments (a series of provisions attached to Bureau of Alcohol, Tobacco, Firearms and Explosives appropriations bills since 2003) block researchers and others from studying gun trace data and gun purchaser data. When trace data were available to researchers prior to 2003, the information provided important insights into how criminals obtain their weapons (Kennedy, Piehl, and Braga, 1996; Bureau of Alcohol, Tobacco, and Firearms, 1997); whether states with more-restrictive gun laws create shortages of guns for those who may be prohibited from purchasing them (Weil and Knox, 1996; Cook and Braga, 2001); how guns move between states with less- and more-restrictive gun laws (Cook and Braga, 2001; Webster, Vernick, and Hepburn, 2001); the characteristics of gun sales likely to be associated with diversion to prohibited possessors (Pierce et al., 2003); and other valuable, actionable, policy-relevant information (for further discussion, see Braga et al., 2012).

Trace data and purchaser data have significant limitations that can make inferences about gun markets and crime difficult or uncertain. That is a caveat that applies to most data used in evaluating gun policies, but it should not be a reason for prohibiting access to trace data for research purposes.

> *Recommendation 8*. To foster a more robust research program on gun policy, Congress should consider whether to eliminate the restrictions it has imposed on the use of gun trace data for research purposes.

**Conclusion 12**. Crime and victimization monitoring systems are incomplete and not yet fulfilling their promise of supporting high-quality gun policy research in the areas we investigated.

NRC (2004) and Hahn et al. (2005) each expressed optimism about new sources of data that had only recently begun and that could, in theory, be used to improve the study of gun policy. These included the National Violent Death Reporting System (NVDRS) and the National Incident-Based Reporting System (NIBRS).

The NVDRS was designed to provide unprecedented detail on the circumstances of violent deaths in participating states, such as information on the victim's life stresses, the relationship between the victim and the offender, and other crimes that were committed at the time of the suicide or homicide. Despite the richness of the information available through the NVDRS, not one of the quasi-experimental studies meeting the inclusion criteria for this report used NVDRS data. It could be that there have not been enough states participating in the NVDRS collection process for long enough to permit the use of strong causal models. State participation in the NVDRS is voluntary

**Exhibit 10**

**0261**

and has been growing slowly but steadily. Currently, 42 states participate, but data are available from only 18, and not from some large states, such as California and Texas.

The NIBRS was designed to collect more-detailed information on incidents of crime in the United States than has been available through the FBI's Uniform Crime Reporting system. Whereas the FBI system collects summary or aggregate statistics on serious violent and property crimes reported to law enforcement agencies, NIBRS was designed to collect incident-level information about crimes reported to police. It officially launched in the mid-1980s, but by the time of the NRC review, only 16 percent of the U.S. population was served by a law enforcement agency that reported crime information to NIBRS (NRC, 2004, p. 33). Because the NIBRS program is voluntary and can be costly for law enforcement agencies to adopt, participation rates have not improved as rapidly as the NRC reviewers may have expected. By 2012, the proportion of U.S. residents served by a participating law enforcement agency had risen to just 30 percent (Bureau of Justice Statistics [BJS], 2017a). Perhaps for this reason, none of the studies meeting the inclusion criteria for this report used NIBRS data.

Although the current NIBRS data are of limited use for the kind of research we have reviewed, a new BJS initiative offers hope that this could soon change. The National Crime Statistics Exchange is an attempt to recruit and facilitate the participation of a representative sample of 400 law enforcement agencies to participate in NIBRS. With this sampling approach and data from the more than 6,000 agencies already participating, BJS expects to be able to begin generating reliable national crime trend information based on NIBRS data.

> *Recommendation 9.* To improve the quality of evidence used to evaluate gun policies, the NVDRS should be expanded to include all states with rigorous quality control standards.

> *Recommendation 10.* BJS should examine the cost and feasibility of expanding its existing programs to generate state-level crime data.

Another potentially valuable source of information on crimes is the National Crime Victimization Survey (NCVS), which collects detailed information on crime from a panel of U.S. residents selected to be representative of the nation. This survey provides critically important information about crimes that may never be reported to the police, as well as credible information on how victims and potential crime victims have been able to use guns defensively. But NCVS cannot readily be used to understand the effects of state gun laws on crime because it does not generate state-level estimates. Therefore, the studies meeting our eligibility criteria primarily used data from the Uniform Crime Reporting program (or its Supplemental Homicide Report) when examining crimes, meaning they worked with data that had few details about

**Exhibit 10**
**0262**

individual crimes and, thus, could examine only the subset of crimes reported to law enforcement.

Recognizing the need for state-level victimization data, BJS has explored options for generating such estimates through NCVS (BJS, 2017b). BJS is conducting a pilot program that expands the survey panel with the intention of eventually generating reliable estimates for 22 states. In addition, the bureau has published model-based state estimates for some types of crime over three-year periods from 1999 to 2013 (Fay and Diallo, 2015).

> *Recommendation 11.* BJS should continue to pursue its efforts to generate state-level victimization estimates. The current goal of generating such estimates for 22 states is a reasonable compromise between cost and the public's need for more-detailed information. However, the bureau should continue to expand its development of model-based victimization rates for all states and for a wider set of victimization experiences (including, for instance, crimes involving firearm use by an assailant or victim).

**Conclusion 13.** The methodological quality of research on firearms can be significantly improved.

Over the past several decades, studies have offered a great deal of information about how to use what data are available to generate reliable and credible estimates of the effects of gun policies on various outcomes, and the computing power that researchers need to implement the increasingly demanding modeling requirements has more than kept pace with the diffusion of knowledge about appropriate statistical methods. Nevertheless, the scientific literature we reviewed shows that many of the best recent studies suffer from important limitations that should be addressed in future research. These shortcomings concern the following:

- Interpreting effects generated in models that lack the statistical power to have any reasonable chance of detecting the likely effects of policies. This problem can result in a high likelihood that statistically significant effects are in the opposite direction of the true effects or that the statistically significant effects grossly exaggerate the magnitude of the true effects.
- Estimating too many parameters for the number of available observations. This problem can result in statistically significant effects that tell virtually nothing about the true generalizable effects of the policies.
- Poorly calibrated tests for whether the effects of policies are statistically significant. This problem can result in many discoveries of effects that reject the null hypothesis that the policy had no effect when, in fact, under proper inferential procedures, the discoveries would be consistent with the law having no effect (or a small effect in the opposite direction).

**Exhibit 10**
**0263**

- Poorly justified selections of statistical models or covariates. This problem can result in estimates of a policy's effects that are in the wrong direction or that badly misconstrue the magnitude or statistical significance of their effects.
- Presenting the results of exploratory statistical modeling as though they reflect findings from a confirmatory analysis. When dozens of hypothesis tests are conducted, about 5 percent would be expected to achieve statistical significance at the $p < 0.05$ level even if the law had no effect. Failure to acknowledge that findings are the result of exploratory analysis can lead to overconfident interpretations of effect estimates that may not reflect the true effects of a policy.
- Undisclosed categorization of which states had which laws and when they were implemented. Gun policy analysts need reliable and shared databases of state laws. Correct coding of state laws is challenging, and when researchers have disclosed their state law codings, those codings have often been found to contain errors that could affect results.
- Poorly justified models of the time course of a policy's effects. Statistical models of the effects of a policy impose assumptions about the period over which the effects of the policy will build. Often, the implicit assumption is that the full effect of the policy will be observed instantaneously in the first year after the date it is scheduled for implementation. At best, this can lead to underestimates of the effects of policies.
- The use of spline and hybrid models that do not estimate coherent causal effects.
- Inadequate attention to threats of reciprocal causation or simultaneity biases in effect estimation.

These are technical points of interest chiefly to researchers, so we relegate our detailed discussion of each point to Appendix A. However, our final recommendations are for other researchers interested in the analysis of the effects of gun policies.

*Recommendation 12.* As part of the Gun Policy in America initiative, we have published a database containing a subset of state gun laws from 1979 to 2016 (Cherney, Morral, and Schell, 2018). We ask that others with expertise on state gun laws help us improve the database by notifying us of its errors, proposing more-useful categorizations of laws, or submitting information on laws not yet incorporated into the database. With such help, we hope to make the database a resource beneficial to all analysts.

*Recommendation 13.* Researchers, reviewers, academics, and science reporters should expect new analyses of the effects of gun policies to improve on earlier studies by persuasively addressing the methodological limitations of earlier studies, including problems with statistical power, model overfitting, covariate selection, poorly calibrated standard errors, multiple testing, undisclosed state varia-

**Exhibit 10**
**0264**

318    The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

tion in law implementation, and unjustified assumptions about the time course of each policy's effects.

In conclusion, with a few exceptions, there is a surprisingly limited base of rigorous scientific evidence concerning the effects of many commonly discussed gun policies. This does not mean that these policies are ineffective; they might well be quite effective. Instead, it reflects shortcomings in the contributions that scientific study can currently offer to policy debates in these areas. It also reflects, in part, the policies we chose to investigate, all of which have been implemented in some U.S. states and, therefore, have proven to be politically and legally feasible, at least in some states. This decision meant that none of the policies we examined would dramatically increase or decrease the stock of guns or gun ownership rates in ways that would produce more readily detectable effects on public safety, health, and industry outcomes. The United States has a large stock of privately owned guns in circulation—estimated in 2014 to be somewhere between 200 million and 300 million firearms (Cook and Goss, 2014). Laws designed to change who may buy new weapons, what weapons they may buy, or how gun sales occur will predictably have only a small effect on, for example, homicides or participation in sport shooting, which are affected much more by the existing stock of firearms. Although small effects are especially difficult to identify with the statistical methods common in this field, they may be important. Even a 1-percent reduction in homicides corresponds to more than 1,500 fewer deaths over a decade.

By highlighting where scientific evidence is accumulating, we hope to build consensus around a shared set of facts that have been established through a transparent, nonpartisan, and impartial review process. In so doing, we also mean to highlight areas where more and better information could make important contributions to establishing fair and effective gun policies.

**Exhibit 10**
**0265**

## Chapter Twenty-Five References

Alcorn, Ted, "Trends in Research Publications About Gun Violence in the United States, 1960 to 2014," *JAMA Internal Medicine*, Vol. 177, No. 1, 2016, pp. 124–126.

Azrael, Deborah, Lisa Hepburn, David Hemenway, and Matthew Miller, "The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey," *Russell Sage Foundation Journal of the Social Sciences*, Vol. 3, No. 5, 2017, pp. 38–57.

BJS—*See* Bureau of Justice Statistics.

Braga, Anthony A., Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway, "Interpreting the Empirical Evidence on Illegal Gun Market Dynamics," *Journal of Urban Health*, Vol. 89, No. 5, 2012, pp. 779–793.

Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Market in Seventeen Communities*, Washington, D.C.: U.S. Department of the Treasury, 1997.

Bureau of Justice Statistics, "Data Collection: National Incident-Based Reporting System (NIBRS)," web page, 2017a. As of May 12, 2017:
https://www.bjs.gov/index.cfm?ty=dcdetail&iid=301

———, "NCVS Redesign: Subnational," web page, 2017b. As of May 12, 2017:
https://www.bjs.gov/index.cfm?ty=tp&tid=911

Cagle, M. Christine, and J. Michael Martinez, "Have Gun, Will Travel: The Dispute Between the CDC and the NRA on Firearm Violence as a Public Health Problem," *Politics & Policy*, Vol. 32, No. 2, 2004, pp. 278–310.

Cheng, Cheng, and Mark Hoekstra, "Does Strengthening Self-Defense Law Deter Crime or Escalate Violence? Evidence From Expansions to Castle Doctrine," *Journal of Human Resources*, Vol. 48, No. 3, 2013, pp. 821–853.

Cherney, Samantha, Andrew R. Morral, and Terry L. Schell, *RAND State Firearm Law Database*, Santa Monica, Calif.: RAND Corporation, TL-283-RC, 2018. As of March 2, 2018:
https://www.rand.org/pubs/tools/TL283.html

Cook, Philip J., and Anthony A. Braga, "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets," *Arizona Law Review*, Vol. 43, No. 2, 2001, pp. 277–309.

Cook, Philip J., and Kristin A. Goss, *The Gun Debate: What Everyone Needs to Know*, New York: Oxford University Press, 2014.

Criminal Justice Information Services Division, "National Instant Criminal Background Check System (NICS) Section Active Records in the NICS Index," Washington, D.C.: U.S. Department of Justice, Federal Bureau of Investigation, December 31, 2016. As of March 31, 2017:
https://www.fbi.gov/file-repository/active-records-in-the-nics-index-by-state.pdf/view

Dickey, Jay, and Mark Rosenberg, "How to Protect Gun Rights While Reducing the Toll of Gun Violence," *Washington Post*, December 25, 2015.

Fay, Robert E., and Mamadou S. Diallo, *Developmental Estimates of Subnational Crime Rates Based on the National Crime Victimization Survey*, Washington, D.C.: Westat, 2015. As of May 12, 2017:
https://www.bjs.gov/index.cfm?ty=pbdetail&iid=5499

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

**Exhibit 10**
**0266**

Kellermann, Arthur L., and Frederick P. Rivara, "Silencing the Science on Gun Policy," *JAMA*, Vol. 309, No. 6, 2013, pp. 549–550.

Kennedy, D. M., A. M. Piehl, and A. A. Braga, "Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy," *Law and Contemporary Problems*, Vol. 59, No. 1, 1996, pp. 147–196.

Koper, Christopher S., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence 1994–2003*, Washington, D.C.: National Institute of Justice, U.S. Department of Justice, 2004.

Mayors Against Illegal Guns, "Access Denied: How the Gun Lobby Is Depriving Police, Policy Makers, and the Public of the Data We Need to Prevent Gun Violence," Everytown for Gun Safety Support Fund, 2013. As of May 12, 2017:
http://everytownresearch.org/reports/access-denied/

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

National Shooting Sports Foundation, *Firearms and Ammunition Industry Economic Impact Report*, Newtown, Conn., 2017. As of October 18, 2017:
https://d3aya7xwz8momx.cloudfront.net/wp-content/uploads/2017/07/
EconomicImpactofIndustry2017.pdf

NRC—*See* National Research Council.

Pierce, Glenn L., Anthony A. Braga, Christopher Koper, Jack McDevitt, David Carlson, Jeffrey Roth, Alan Saiz, Raymond Hyatt, and Roberta E. Griffith, *The Characteristics and Dynamics of Crime Gun Markets: Implications for Supply-Side Focused Enforcement Strategies*, Boston, Mass.: National Institute of Justice, 2003.

Public Law 112-74, Consolidated Appropriations Act, 2012, December 23, 2011.

Spicer, R. S., and T. R. Miller, "Suicide Acts in 8 States: Incidence and Case Fatality Rates by Demographics and Method," *American Journal of Public Health*, Vol. 90, No. 12, 2000, pp. 1885–1891.

Stark, David E., and Nigam H. Shah, "Funding and Publication of Research on Gun Violence and Other Leading Causes of Death," *JAMA*, Vol. 317, No. 1, January 3, 2017, pp. 84–86.

U.S. Bureau of Labor Statistics, "Current Employment Statistics (National)," 2017. As of May 15, 2017:
https://www.bls.gov/web/empsit/ceseeb1a.htm

U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, *2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*, Washington, D.C., FH2/11-NAT, 2012.

Vespa, Jonathan, Jamie M. Lewis, and Rose M. Kreider, *America's Families and Living Arrangements: 2012, Current Population Reports*, Washington, D.C.: U.S. Census Bureau, P20-570, 2013.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn, "Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns," *Injury Prevention*, Vol. 7, 2001, pp. 184–189.

Weil, Douglas S., and Rebecca C. Knox, "Effects of Limiting Handgun Purchase on Interstate Transfer of Firearms," *JAMA*, Vol. 275, No. 22, 1996, pp. 1759–1761.

**Exhibit 10**
**0267**

**Appendixes**

Exhibit 10
0268

**Exhibit 10**
**0269**

APPENDIX A

# Methodological Challenges to Identifying the Effects of Gun Policies

A review by the National Research Council (NRC) (2004) highlighted important problems with the methods used in many studies examining the effects of gun policies. Since then, the literature has grown, often in a series of critiques and counter-critiques of the statistical methods used by different sets of researchers. Having carefully reviewed, discussed, and debated among our own project team the relative merits of different methods used in this literature, we offer here our assessment of the principal methodological challenges that future research on gun policy should seek to overcome.

## Power

Statistical models using variation in state policies to identify causal effects of gun policies sometimes face serious problems with statistical power, meaning that the models may have little chance to detect effects even when they exist, and any statistically significant effects the models detect are likely to have greatly exaggerated magnitudes and may often get the direction of the effect wrong. These serious problems are common when effects of interest are small relative to other sources of variation in the outcomes (Gelman and Carlin, 2014). This is likely the case for the effects of gun policies (like those we examined in this report) that might affect new purchases of firearms but not the much larger stock of firearms available for use or that might have a modest effect on a small number of firearm incidents.

Nevertheless, even small effects may be important. For example, a 3-percent reduction in firearm deaths corresponds to 1,000 fewer deaths per year nationally. But a 3-percent effect, or an incidence rate ratio (IRR) of 0.97, is small relative to the much larger variation in firearm death rates over time or across U.S. states. Many observations (for instance, years of data for each state) may be required before a model has sufficient power to detect such an effect. Moreover, power is diminished as large numbers of covariates are added to the model.

To illustrate, consider the preferred model reported by one set of researchers reviewed here. The reported effect for one policy was an IRR of 0.97 (confidence interval [CI]: 0.72, 1.15). We can infer from these statistics that such a model could detect

a realistically small 3-percent reduction in the outcome at the $p < 0.05$ level of significance with a power of just 6 percent, well below the 80-percent level researchers typically seek when designing research.[1] Moreover, there is a nearly one in four chance that any statistically significant effect identified is in the wrong direction, and any statistically significant effect the model identifies will necessarily describe an effect size vastly greater than the true effect size. In the present example in which the true effect has an IRR of 0.97, the model would not identify a statistically significant effect any smaller in magnitude than an IRR of about 0.74. That is, the true 3-percent reduction would be found to be significant only if the model estimates it to actually be a 26-percent reduction in the outcome.

In other words, models like some that we find in the existing literature have almost no chance of detecting realistically small effects of firearm policies, and any significant effects the models do discover are likely to be grossly exaggerated in their magnitude and almost equally likely to be in the wrong direction as the right one. While this problem is by no means universally true in this literature, it is common enough that we present it as a general concern rather than citing by name the article from which we drew our example.

### Overfitting

The problem of poorly powered models is exacerbated when, as is common in this field, investigators include many covariates and fixed effects in their models of the effects of policies. Most guidance on reliable regression modeling emphasizes that models should have at least ten or 15 times as many observations as parameters being estimated (Cavanaugh, 1997; Draper and Smith, 1998; Good and Hardin, 2012). However, with fixed effects for each year in time-series data; fixed effects for each state; and a wide range of demographic, social, and economic covariates, models in this field frequently violate such recommendations, sometimes falling below even five observations per parameter (Schell and Morral, 2016). Such models are likely to be overfit, meaning, among other things, that their estimates are unreliable or unlikely to describe generalizable relationships between covariates of interest (such as policies) and the modeled outcomes.

Although problems with statistical power are common in this literature, they may not be inevitable. Models that do a good job explaining sources of variance across time or among states will have more statistical power than those that explain less of this variance. In a separate line of work, RAND's Gun Policy in America project has examined the performance (power, bias, and error rates) for many gun policy model specifications

---

[1] The inferences about power in this paragraph rely on power calculations and calculations of the probability of an error in the sign of the estimate and calculations of the probability of the estimate using methods described in Gelman and Carlin (2014). We assume that the standard error of the (unexponentiated) model estimate is $(\log(\text{IRR}) - \log(\text{LB}))/1.96$, where IRR is the reported effect size, and LB is the lower (or higher) bound of the 95-percent CI reported for the estimate.

**Exhibit 10**
**0271**

Case 3:19-cv-01226-L-AHG   Document 21-16   Filed 11/12/19   PageID.4001   Page 54 of 171

using simulations for which the true effect of policies is known. This work demonstrates that many statistical models commonly used in gun policy research have quite poor performance in terms of type 1 error, power, and bias but that there are modeling approaches with comparatively good characteristics on these and other criteria.[2]

## Standard Errors

Most of the studies meeting our inclusion criteria identified the effects of policies by examining state-level changes in an outcome (such as homicides) over time. In many such models, there is a strong correlation within states among the error terms over time. Whether this clustering of error components mandates some adjustment to ensure that standard errors and even parameter estimates are unbiased has been a source of contention and confusion in the field. According to NRC (2004), cluster adjustments for fixed-effects models like many we reviewed in this report were unnecessary and produced misleadingly large CIs.

As Aneja, Donohue, and Zhang (2014) have argued, however, NRC did not properly consider how serial correlations in panel data can produce misleading standard errors when no adjustments are made for state-level clustering within the data. The authors provided compelling evidence that, without adjustment, standard errors are so severely underestimated that two-thirds or more of effects known to have no systematic association with the outcome variable appear to be statistically significant, a proportion far higher than the 5 percent expected for significance levels set at the $p < 0.05$ level. They further showed that even a common cluster adjustment procedure does not fully correct the underestimation of standard errors. Although state-level cluster adjustment vastly improves upon unadjusted estimates, standard errors are still inflated, frequently leading to statistically significant null effects at rates between 10 percent and 15 percent where a properly calibrated standard error would produce such errors in only 5 percent of cases.

Longitudinal analyses of state firearm policies that take no steps to address clustering continue to be published, although there is good evidence that the kinds of serial correlation found in state panel data used in gun policy research can result in large biases in estimated standard errors (Aneja, Donohue, and Zhang, 2014). The significance of the effects that these studies report should be regarded with deep skepticism. Similarly, studies frequently use robust standard error corrections or weight the regression models by state or county populations, but neither approach is likely to satisfactorily account for bias resulting from serial correlation, and population weighting could make it worse (Aneja, Donohue, and Zhang, 2014; Durlauf, Navarro, and Rivers, 2016). Further challenges for estimating standard errors arise for studies that

---

[2]   A report on this effort is forthcoming and will be available on the Gun Policy in America project website.

**Exhibit 10**
**0272**

Case 3:19-cv-01226-L-AHG   Document 21-16   Filed 11/12/19   PageID.4002   Page 55 of 171

use difference-in-differences approaches in which policy effects are identified from only a small number of states (or jurisdictions), because inference based on clustered standard errors has been shown to severely over-reject in these cases (Conley and Taber, 2011; MacKinnon and Webb, 2017).

## Multiple Testing

Among studies examining the effects of firearm policies, it is common to present multiple model specifications, each with multiple effect estimates and sometimes run on multiple subsets of the population (e.g., deaths of those under age 19 or over age 55). In some cases, additional models may have been explored using alternative covariates or design characteristics. This type of exploratory modeling is valuable. It clarifies how robust findings are to different aspects of model specification, and it can detect associations or effects that are important but might otherwise have been overlooked.

In the context of such exploratory modeling, however, conventional interpretations of statistical significance erode. Whereas a significant effect at the $p < 0.05$ level is designed to occur in only one of 20 tests where there is, in fact, no effect, a study that conducts 20 such tests stands a good chance of identifying at least one statistically significant effect, even when no true effects are present. Such accidental statistically significant effects could contribute to the confusing and sometimes contradictory findings reported in the literature.

There are procedures for adjusting levels of statistical significance in the presence of multiple hypotheses testing that could help to reduce erroneous findings (Shaffer, 1995), but these were rarely used in the studies we examined. Moreover, these procedures would not address all sources of questionable findings that can occur in exploratory analysis. Instead, we believe that studies of the effects of state policies should be explicitly treated as exploratory rather than as testing a specific hypothesis. Therefore, strong conclusions about the apparent effects of policies should almost never be made. Instead, effects should be regarded with suspicion until they have been confirmed through independent studies. Because results in this field tend to be sensitive to details of the model specification and covariates, we propose that anyone undertaking such confirmatory analyses preregister the details of their models and data before assembling an analytic data set. Such preregistration does not prevent investigators from making changes to the analytic plan that may become necessary once results become available, but departing from the preregistered plan should signal to the researchers that their analysis should be considered exploratory rather than confirmatory.

**Exhibit 10**
**0273**

## Coding State Laws

Gun policy analysts need a reliable and shared database of state laws. There are many well-known problems associated with the coding of state laws. As noted by NRC (2004) and Hahn et al. (2005), there are frequently inconsistencies across studies in the specification of which states or jurisdictions have which laws and when they took effect. In some cases, researchers have used the year in which bills were passed into law as the year the law was implemented; in others, researchers have used the year the law was designed to take effect or the first full year after the law took effect. Although some researchers (e.g., Aneja, Donohue, and Zhang, 2014; Lott and Mustard, 1997; Rosengart et al., 2005; Vernick and Hepburn, 2003) have published or shared their coding of laws, which allows for debate and improvement of the coding schemes, such coding often is not transparent and cannot be reviewed for accuracy or to understand what assumptions about laws were made. More generally, public databases of gun laws over time are unavailable for many laws. Because of the cost and complexity of constructing such data sets, researchers interested in the effectiveness of gun laws have often favored weak, cross-sectional study designs or have collected proprietary data sets of laws that are not shared.

One important assumption that all such efforts necessarily must make concerns the features of different laws that make them sufficiently similar to be grouped together under a broad class of laws. For instance, as we described in Chapter Ten, on child-access prevention laws, states differ in whether penalties for violating the law result in criminal, misdemeanor, or civil penalties, and there is evidence (albeit inconclusive) that criminal penalties may have different and stronger effects than other approaches. Such variation in laws and their associated effects means that combining them within a particular class of laws, such as child-access prevention laws, may obscure important effects that some variants of the law have (Alcorn and Burris, 2016). On the other hand, distinguishing each variant of a law reduces the number of jurisdictions implementing any particular version of the law, which reduces the statistical power of most models used to identify the causal effects of the law. Therefore, specification of a homogenous set of laws could increase the average effect size, but it also can reduce the statistical power that models have to detect the larger effects. Rarely, however, have published analyses explicitly addressed this conflict or the choices and assumptions made to address it.

We believe that the science of gun policy will be substantially advanced with the public release of comprehensive state law time-series data, and we have made that one of the goals of the Gun Policy in America project. Specifically, we have assembled a state law database for 1979–2016 that codes our 13 broad classes of state gun policies and many subcategories (see Cherney, Morral, and Schell, 2018). As noted, this database is available for use and further improvement by the scientific community.

**Exhibit 10**
**0274**

## Coding the Time Course of a Policy's Effects

Even with a reliable database of state laws, however, investigators of gun policy effects face a further complication in coding the time course over which gun laws exert their effects. Frequently, investigators assume that a policy's full effects occur in the year it is implemented or the first full year after the year of implementation. This coding implies that all of a policy's effect is observed shortly after its implementation, which may be reasonable for some types of policies. Others, however, might accumulate their effects over longer periods. For instance, laws that expand the class of prohibited possessors will primarily affect those members of the class who are seeking to buy new firearms but not those who already own firearms. Indeed, it may be many years before such a law affects firearm ownership of a sizable proportion of the population. The proper coding of this type of effect might involve additive or multiplicative effects over several years.

Similarly, the effects of some policies, such as child-access prevention laws, may not be fully realized until a large proportion of gun owners become aware of them, meaning that the time course of the effect may depend on media campaigns to raise awareness or high-profile prosecutions under the law. Unfortunately, however, unless investigators know when these effects occur, their effect estimates will underestimate the policy's true effects. For this reason, we believe that researchers modeling the effects of policies should carefully consider when effects are likely to appear and should make these assumptions and the corresponding model specifications explicit in their analyses.

## Spline and Hybrid Effect Coding

Several studies investigating the effects of concealed-carry policies (see Chapter Thirteen) and studies of Australia's 1996 National Firearms Agreement (see Chapter Twenty-Four) have used model specifications referred to as *spline* or *hybrid* models within this field. In most models investigating the causal effects of a policy on an outcome, the effect is assumed to produce a shift in the level of the outcome; for example, a policy may result in a lower homicide rate after implementation relative to before. The type of spline models used in this field differ from standard causal effect models because the policy is assumed to modify the trajectory of the outcome over time rather than the level or in addition to a change in the level. More specifically, these models assume that the states or counties that implement the policy will diverge from the national trend at a constant rate for an indefinite period.[3]

---

[3]   Typically in gun policy models, a spline will be entered as a predictor in a regression equation that takes on values of zero before the policy was implemented (as well as in states that never implemented) and then takes on values that increase linearly in time for a given state once the policy is implemented in that state. For the models used in this field, these state-specific trends are estimated while controlling for national trends by including year

**Exhibit 10**
**0275**

Although we discuss the reported results of these models, for practical and theoretical reasons, we do not present effect sizes from these spline models (or from spline and dummy hybrid models), even when the authors preferred those models. The practical reason is that the effect size is assumed to vary over time, so there is no single effect size to report. In fact, at a date sufficiently long after implementation, these models often assume that the states that implemented the policy will have extremely large or small effects on the outcome. In such cases, the effect size one presents is based entirely on a relatively arbitrary decision about the length of time over which to compute the effect. Moreover, even if we had arbitrarily selected a specific time interval over which to compute the effect, the research articles do not contain the information necessary to assess the CIs around those estimates.

Furthermore, two features of these spline models make them difficult to interpret as the causal effects of a gun policy. First, the spline coefficient is highly sensitive to the timing of any shifts in the outcome, and it responds to the timing in the opposite way as would standard methods for causal inference. A large increase in crime that does not occur until many years after a policy has been implemented will yield a large positive spline coefficient, suggesting that the policy is harmful. However, a similarly large increase in crime that occurs immediately after the policy is implemented will yield a negative spline coefficient, suggesting that the policy is beneficial even though it was followed immediately by an increase in crime.[4] Standard frameworks for inferring causality from observations (e.g., Mill, 1843) would suggest that an increase in crime immediately after the policy was implemented is the strongest evidence that the policy was harmful, and if a similar increase did not occur until years after implementation, it would constitute weaker evidence of a harmful effect of the policy. However, inferring causation from the spline coefficient leads to the opposite inferences, with an immediate increase in the outcome interpreted as the policy causing a decrease in the outcome but a delayed increase interpreted as evidence that the policy caused the outcome to increase. It is important to note that this interpretational challenge occurs in models that use only the spline to indicate the causal effect, as well as in hybrid models that use both a dummy variable and a spline (i.e., a step and a slope). (For more information, see the box on the next page.)

---

fixed effects in the same model. Thus, the splines are state trends that should be interpreted as deviations from the national trend.

[4]   More technically, the spline predictor in the regression equation has a mean value that corresponds to a specific time after implementation. This spline's mean typically falls a few years after implementation, but precisely when it occurs depends on the number of states that implemented the law and how long the study follows the states. Any increase in crime that occurs before this mean spline creates a more negative spline coefficient. An increase in crime, no matter how large, that occurs at that mean has no effect on the spline coefficient. Any increase in crime that occurs after that mean results in a more positive spline coefficient, with progressively greater leverage over the coefficient occurring with greater time.

**Exhibit 10**
**0276**

### The Interpretational Problem with Spline and Hybrid Models

To illustrate the problem discussed here, consider a hypothetical state that would have shown a constant linear trend in crime (slope = 1) from 1980 to 2001 (see Table A.1). However, a policy went into effect in 1991 that raised the crime rate by 1 point in that year. If one fits a linear trend and standard spline effect to these data, it yields a spline coefficient of –0.04. If one fits a hybrid effect to these data, it yields a spline coefficient of –0.05 and a dummy effect of 0.36. Thus, although everyone who views this data series would conclude that it is inconsistent with the conclusion that the policy caused a decline in crime, the spline coefficient is negative in both models.

**Table A.1. Illustrative Data, with Spline and Dummy-Coded Effect Variables**

| Year | Crime Rate | Spline | Dummy |
|------|-----------|--------|-------|
| 1980 | 10 | 0 | 0 |
| 1981 | 11 | 0 | 0 |
| 1982 | 12 | 0 | 0 |
| 1983 | 13 | 0 | 0 |
| 1984 | 14 | 0 | 0 |
| 1985 | 15 | 0 | 0 |
| 1986 | 16 | 0 | 0 |
| 1987 | 17 | 0 | 0 |
| 1988 | 18 | 0 | 0 |
| 1989 | 19 | 0 | 0 |
| 1990 | 20 | 0 | 0 |
| 1991 | 22 | 1 | 1 |
| 1992 | 22 | 2 | 1 |
| 1993 | 23 | 3 | 1 |
| 1994 | 24 | 4 | 1 |
| 1995 | 25 | 5 | 1 |
| 1996 | 26 | 6 | 1 |
| 1997 | 27 | 7 | 1 |
| 1998 | 28 | 8 | 1 |
| 1999 | 29 | 9 | 1 |
| 2000 | 30 | 10 | 1 |
| 2001 | 31 | 11 | 1 |

**Exhibit 10**
**0277**

Stated more generally, the direction and size of the spline coefficient serves as an unbiased estimator of the causal effect if, and only if, the duration of the spline's slope corresponds to the actual period over which the policy's effects are increasing in magnitude. If the true effect phases in earlier than assumed by the chosen spline function, the spline coefficient will be biased away from the true direction of the causal effect, possibly even reversing the sign of the true effect. Thus, researchers should probably avoid using splines that assume that the effect of the policy increases linearly into perpetuity. Such an assumption makes it likely that the true effect of the policy is in the opposite direction of the spline coefficient.

The second challenge in the interpretation of the spline coefficient as a causal effect comes from the null hypothesis that is typically used when testing the spline coefficient. Specifically, the state-specific linear slope in the outcome with respect to time after the implementation of the policy is compared with the state-specific linear slope over the years prior to implementation. The null hypothesis in this case is that a given state's deviation from a national trend in the pre-policy period should be expected to continue in a linear manner, absent any intervention, indefinitely. Thus, the null hypothesis being tested is derived from a time trend that has been extrapolated, often many years into the future. This assumption has not been justified within this field, neither with a theory about an underlying data-generating mechanism for which the assumption is appropriate nor by showing that it is a good fit to the available data. In contrast, our analysis of U.S. crime data suggests that the data do not show the pattern predicted by this assumption.[5] Moreover, making an assumption of constant state-specific trends in crime can result in obvious research artifacts. Many types of data show regression to the mean, which describes a pattern of data generated by a random process in which an extreme observation is more likely to be followed by a less extreme observation than a more extreme observation. Failure to account for regression to the mean can result in spurious research conclusions. For example, if legislators pass gun legislation as a response to rising crime rates, any tendency for crime rates to return toward more-typical levels due to regression to the mean may be misinterpreted as evidence that the legislation lowered crime.

The risk of this type of error is much greater in spline models because the assumption used to generate the null hypothesis is that the data display regression away from the mean. Essentially, these models assume a process in which extreme observations are likely to be followed by observations that become progressively more extreme in the same direction—the opposite of regression to the mean. In contrast, in data showing regression to the mean, the null hypothesis that the trend before a given date equals

---

[5]   Specifically, the assumption predicts that state trends that deviate from the national trend in a positive direction (increasing crime rates relative to the nation) will continue to get progressively higher over time, while those states that deviate negatively (decreasing crime rates relative to the nation) will continue to decrease indefinitely. This predicts a "fan" pattern in crime trends in which the divergence in crime rates across states perpetually increases over time. Actual crime data do not show any consistent divergence of trends across states.

**Exhibit 10**

**0278**

the trend after the date is routinely rejected. That is, the null hypothesis that state-specific deviations from the national crime trend will continue to grow indefinitely can often be rejected in the states that implemented the policy of interest, as well as many of those that did not.[6] Rejecting this implausible null hypothesis is not evidence of a causal effect of any policy.

In spite of clear statistical problems with inferring causal effects of policy on crime data using these methods, some researchers advocate this approach. In our view, their arguments misinterpret conventional effects identified by a shift in the mean (e.g., dummy-coded effects) and spline effects based on changes in slope. For example, Lott, Moody, and Whitley (2016) stated,

> The problems with using the dummy variable can be illustrated using results of 3 other papers. Santaella-Tenorio et al. [2016] reported the dummy model from Table 8b of the article by Ayres and Donohue [2003a]. Had they reported the other specification in Table 8b (or other tables) that showed the trends before and after implementation of the law (specifications that reject the assumptions behind the simple dummy approach), they would have shown the statistically significant downward trend in murder rates that indicated that the longer the right-to-carry laws were in effect, the greater the drop in murder rates was.

That is, the three papers interpret the spline coefficient as a "statistically significant downward trend in murder rates." This is incorrect; the negative spline term indicates that the slope coefficient is of lower value after implementation than before, but it does not imply that rates are actually declining over time either in absolute terms or relative to the other states that did not implement *shall-issue* (or right-to-carry) laws (see Chapter Thirteen). It is quite possible to get a negative spline coefficient even if shall-issue laws cause a large and immediate spike in murder. Similarly, such a negative coefficient could occur even if the law has no effect on murder, because it is not reasonable to extrapolate a pre-implementation trend of increasing murder rates indefinitely into the future. Historically, state-specific increases in murder have been followed by later reversion to more-typical values, even without passage of shall-issue laws. Indeed, if the authors' descriptions of the data as showing progressively larger drops in murder rates over time had been correct, there would have been a lower murder rate after implementation than before. That is, if their descriptions of the data were correct, there

---

[6]   For example, imagine that the states that implemented a given policy had an aggregate firearm homicide rate of eight homicides per 100,000 population in the year leading up to implementation and nine homicides per 100,000 in the year prior to that. The null hypothesis based on extrapolating this trend is that the rate of homicides will be seven per 100,000 the year after implementation and will decline to exactly zero homicides within eight years in all of the states that implemented the policy. It is likely that the null hypothesis will be correctly rejected because the states do not actually have zero homicides after eight years, but it would also be rejected because it incorrectly assumed that preexisting trends would continue, unchanged and indefinitely. The null would be rejected for reasons that have nothing to do with any causal effect of firearm policy.

**Exhibit 10**
**0279**

would have been a significant negative coefficient on the dummy variable that they dismissed as unimportant, but there may or may not have been a significant negative spline coefficient.

It is important to note that our critique of how spline models have been used in this field is not, in any way, a critique of the use of splines more generally. Splines are extremely general regression tools to allow variations in slopes across a predictor variable. It is entirely reasonable to assume, for example, that the effects of a policy on crime phase in over several years. In such a case, a simple dummy-coded effect may underestimate the true effect size, while using a spline that is designed for that particular phase-in period would not. In our view, using these types of splines to identify a causal effect of policy on some crime outcome would require the following three things:

1. The model would need to be constructed so that the researchers would not conclude that increases in crime immediately after policy implementation are evidence that the policy lowers crime. This is a typical feature of spline models, particularly when the change in slope is modeled as persisting for a long period. This problem can be limited by using splines whose slopes operate over a narrow time frame, which can be justified as the phase-in period of the policy's effect (e.g., as used in the preferred specifications in Donohue, 2004). Such splines are similar to dummy-coded variables but with a gradual transition between 0 and 1 rather than an abrupt transition. If the phase-in period is hypothesized to last more than a few years, it may be necessary to estimate a more complex function to avoid making the wrong causal inference.

2. The null hypothesis that is interpreted as no causal effect must be something that is reasonably true in the absence of the policy in question. The null should be a hypothesis that would not be routinely rejected if tested within states that never implemented the policy or if tested using randomized implementation dates. In practice, this usually requires a null hypothesis that does not extrapolate pre-policy crime trends indefinitely into the future. Instead, the null should be based on deviations from the pre-policy average crime level or on deviations from a state-specific trend that is identified by both pre-implementation and post-implementation crime rates (i.e., based on deviations from an interpolated rather than extrapolated trend).

3. When regression models contain multiple effects of the policy, such as hybrid models that contain a spline and a dummy variable, the various effects cannot be tested or interpreted independently. The effect size and statistical significance can be assessed only by integrating all of the ways in which the policy influences the outcome within the model. For example, researchers should not claim that a policy is associated with a reduction in crime based on a significant negative spline coefficient when the model includes another effect that simultaneously predicts increased crime following implementation of the policy. Despite the

**Exhibit 10**
**0280**

significant negative spline, the model may still predict that the policy is associated with a subsequent increase in crime in all years represented in the data. Thus, while hybrid models can avoid some of the interpretational problems of spline models, any conclusions about the effect of the policy on crime must reflect all of the modeled effects relating the policy to the outcome within the model. Ideally, this analysis would test the effect at some point after the policy is hypothesized to be fully phased in but well within the period that states were typically followed in the data set. This requirement applies to the direction, size, and statistical significance of the joint effect.

Our view of the existing literature is that none of the available studies presents a spline or hybrid model that meets these three requirements for interpreting the effects. Some of the models in the literature meet some of these requirements, but none is readily interpreted as estimating a causal effect of gun policies. For this reason, we generally present the simple dummy-coded causal effect when it is provided by the authors, although we do discuss the authors' preferred specification in the text.

## Simultaneity and Reciprocal Causation

To obtain an unbiased estimate for the causal effect of firearm policy changes, the ideal research design would be akin to a randomized trial in which policies were randomly assigned across states and over time (Aneja, Donohue, and Zhang, 2014; Donohue, 2003). This type of experimental design is infeasible in the context of gun policies, so researchers have had to rely on quasi-experimental methods in which the implicit assumptions require that state adoption of a given firearm policy is unconfounded by omitted factors that influence both law passage and the outcome of interest (i.e., omitted variables bias) and that changes in firearm policy are not themselves driven by changes in the outcome of interest (i.e., simultaneity bias). These issues are not unique to the study of firearm policies and merit consideration across a broad range of program and policy evaluations.

Potential issues of simultaneity have been discussed primarily in the research on shall-issue laws and crime (for a discussion of shall-issue and other concealed-carry laws, see Chapter Thirteen). Specifically, many studies have noted the potential for reciprocal causation—that is, that state legislatures pass shall-issue laws as a response to high or rising rates of violent crime (Aneja, Donohue, and Zhang, 2014; Grambsch, 2008; Kovandzic, Marvell, and Vieraitis, 2005; Ayres and Donohue, 2003a; Donohue, 2003; Manning, 2003; Kovandzic and Marvell, 2003; Plassman and Whitley, 2003; Lott and Mustard, 1997). Indeed, Grossman and Lee (2008) found that the percentage change in the violent crime rate over the preceding five years had a statistically significant positive effect on the likelihood that states with may-issue laws switch to

**Exhibit 10**
**0281**

shall-issue laws; Luca, Deepak, and Poliquin (2016) found that the occurrence of a public mass shooting significantly increased the number of firearm bills introduced within a state one year later. If such reciprocal causation exists, the estimated effects of firearm policies on crime rates from the difference-in-differences strategy employed by most of the qualifying studies we identified may be inconsistent and biased, although the direction of such bias is ambiguous. While some studies have tested for potential reciprocal causation and found little evidence of bias driven by differential pre-trends in law-enacting states (Rosengart et al., 2005; Plassman and Whitley 2003), other studies have found this to be an issue of concern for shall-issue laws (Aneja, Donohue, and Zhang, 2014; Grambsch, 2008; Donohue, 2003).

The presence of reciprocal causation complicates causal identification of the true effects of firearm policy changes and requires alternative approaches to those used most commonly in the literature we identified. Unfortunately, some of the existing methods for handling simultaneity problems may not be feasible or may face other limitations. For instance, Lott and Mustard (1997) and Gius (2015a) employ instrumental variables techniques, but the instruments chosen are questionable and neither study provides sufficient evidence to assess instrument validity (Manning, 2003). Synthetic control methods (Abadie, Diamond, and Hainmueller, 2010) have been used to construct a counterfactual "control state" that matches the pre-trend of the law-passing state (Crifasi et al., 2015; Rudolph et al., 2015), but these methods do not readily accommodate inferential statistics and provide estimated effects that are often identified from a policy change in only one state or one state-year, meaning the observed effect is confounded with many other changes in the state that might equally explain any observed differences between the state and its synthetic controls.

More research and methodological innovation is required to address simultaneity and reciprocal causation challenges to causal inference in this and other fields of research. In particular, it would be useful to understand better the factors leading to state or municipal decisions to pass different types of policies. Studies estimating the effects of laws should explore and report whether states that passed the laws differed systematically from those that did not, in terms of their recent gun use or violence trends. In some cases, explorations of the possible effects of reciprocal causation on effect estimates may provide useful insights.

**Exhibit 10**
**0282**

## Appendix A References

Abadie, Alberto, Alexis Diamond, and Jens Hainmueller, "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program," *Journal of the American Statistical Association*, Vol. 105, No. 490, 2010, pp. 493–505.

Alcorn, Ted, and Scott Burris, "Gun Violence Prevention," *Lancet*, Vol. 388, No. 10041, 2016, p. 233.

Aneja, Abhay, John J. Donohue III, and Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, Stanford, Calif.: Stanford Law School, Olin Working Paper No. 461, December 1, 2014. As of May 21, 2017: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681

Ayres, Ian, and John J. Donohue III, "Shooting Down the More Guns, Less Crime Hypothesis," *Stanford Law Review*, Vol. 55, No. 4, 2003a, pp. 1193–1312.

Cavanaugh, Joseph E., "Unifying the Derivations for the Akaike and Corrected Akaike Information Criteria," *Statistics and Probability Letters*, Vol. 33, No. 2, April 1997, pp. 201–208.

Cherney, Samantha, Andrew R. Morral, and Terry L. Schell, *RAND State Firearm Law Database*, Santa Monica, Calif.: RAND Corporation, TL-283-RC, 2018. As of March 2, 2018: https://www.rand.org/pubs/tools/TL283.html

Conley, Timothy G., and Christopher R. Taber, "Inference with 'Difference in Differences' with a Small Number of Policy Changes," *Review of Economics and Statistics*, Vol. 93, No. 1, 2011, pp. 113–125.

Crifasi, C. K., J. S. Meyers, J. S. Vernick, and D. W. Webster, "Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates," *Preventive Medicine*, Vol. 79, 2015, pp. 43–49.

Donohue, John J. "The Impact of Concealed-Carry Laws," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington D.C.: Brookings Institution Press, 2003, pp. 287–324.

———, "Guns, Crime, and the Impact of State Right-to-Carry Laws," *Fordham Law Review*, Vol. 73, No. 2, 2004, pp. 623–652.

Draper, Norman R., and Harry Smith, *Applied Regression Analysis*, 3rd ed., New York: John Wiley and Sons, 1998.

Durlauf, Steven, Salvador Navarro, and David Rivers, "Model Uncertainty and the Effect of Shall-Issue Right-to-Carry Laws on Crime," *European Economic Review*, Vol. 81, 2016, pp. 32–67.

Gelman, Andrew, and John Carlin, "Power Calculations: Assessing Type S (Sign) and Type M (Magnitude) Errors," *Perspectives on Psychological Science*, Vol. 9, No. 6, 2014, pp. 641–651.

Gius, Mark, "The Effects of State and Federal Background Checks on State-Level Gun-Related Murder Rates," *Applied Economics*, Vol. 47, No. 38, 2015a, pp. 4090–4101.

Good, Phillip I., and James W. Hardin, *Common Errors in Statistics (And How to Avoid Them)*, 4th ed., New York: John Wiley and Sons, 2012.

Grambsch, Patricia, "Regression to the Mean, Murder Rates, and Shall-Issue Laws," *American Statistician*, Vol. 62, No. 4, 2008, pp. 289–295.

Grossman, Richard S., and Stephen A. Lee, "May Issue Versus Shall Issue: Explaining the Pattern of Concealed-Carry Handgun Laws, 1960–2001," *Contemporary Economic Policy*, Vol. 26, No. 2, 2008, pp. 198–206.

**Exhibit 10**
**0283**

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Kovandzic, Tomislav V., and Thomas B. Marvell, "Right-to-Carry Concealed Handguns and Violent Crime: Crime Control Through Gun Decontrol," *Criminology and Public Policy*, Vol. 2, No. 3, 2003, pp. 363–396.

Kovandzic, Tomislav V., Thomas B. Marvell, and Lynne M. Vieraitis, "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates," *Homicide Studies*, Vol. 9, No. 4, 2005, pp. 292–323.

Lott, John R., Jr., Carlisle E. Moody, and John E. Whitley, "Re: 'What Do We Know About the Association Between Firearm Legislation and Firearm-Related Injuries?'" *American Journal of Epidemiology*, Vol. 184, No. 1, 2016, pp. 81–82.

Lott, J. R., and D. B. Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," *Journal of Legal Studies*, Vol. 26, No. 1, 1997, pp. 1–68.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy*, working paper, Boston, Mass.: Harvard Business School, 2016.

MacKinnon, James G., and Matthew D. Webb, "Wild Bootstrap Inference for Wildly Different Cluster Sizes," *Journal of Applied Econometrics*, Vol. 32, No. 2, 2017, pp. 233–254.

Manning, Willard, "Comment: The Impact of Concealed-Carry Laws," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, D.C.: Brookings Institution Press, 2003, pp. 331–341.

Mill, John Stuart, *A System of Logic*, London: Parker, 1843.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Plassman, Florenz, and John Whitley, "Confirming 'More Guns, Less Crime,'" *Stanford Law Review*, Vol. 55, No. 4, 2003, pp. 1313–1369.

Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Rivara, "An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates," *Injury Prevention*, Vol. 11, No. 2, 2005, pp. 77–83.

Rudolph, K. E., E. A. Stuart, J. S. Vernick, and D. W. Webster, "Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides," *American Journal of Public Health*, Vol. 105, 2015, pp. E49–E54.

Santaella-Tenorio, J., M. Cerdá, A. Villaveces, and S. Galea, "What Do We Know About the Association Between Firearm Legislation and Firearm-Related Injuries?" *Epidemiologic Reviews*, Vol. 38, No. 1, 2016, pp. 140–157.

Schell, Terry L., and Andrew R. Morral, *Evaluating Methods and Findings from a Study of State Gun Policies*, Santa Monica, Calif.: RAND Corporation, RR-1642-RC, 2016. As of January 13, 2017: http://www.rand.org/pubs/research_reports/RR1642.html

Shaffer, J. P., "Multiple Hypothesis Testing," *Annual Review of Psychology*, Vol. 46, 1995, pp. 561–584.

Vernick, J. S., and L. M. Hepburn, "State and Federal Gun Laws: Trends for 1970–1999," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, D.C.: Brookings Institution Press, 2003, pp. 345–402.

**Exhibit 10**

**0284**

**Exhibit 10**
**0285**

APPENDIX B
## Source Data Used to Produce the Forest Plot Figures

To construct the figures in this report showing estimated effect sizes (i.e., the forest plots), we used results reported as the preferred models in each study. In some cases, these sources reported incidence rate ratios (IRRs) as the estimated effect of a law and provided confidence intervals (CIs). In such cases, we used these numbers as reported. In other cases, we calculated IRRs from effects estimated in the studies as regression coefficients, and we calculated CIs from standard errors, test statistics, or reported *p*-values. Discussion of these calculations is provided in Chapter Two. Table B.1 provides the source data used in this report to calculate IRRs and CIs as presented in each forest plot figure.

**Table B.1**
**Source Data Used to Estimate Study Effect Sizes in the Forest Plot Figures**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Ludwig and Cook (2000) | Brady Act | Firearm suicide rate | Aged 21+ | 0.98 | | 0.94 | 1.02 | | | Table 1: Col 3 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Firearm suicide rate | Aged 55+ | 0.94 | | 0.90 | 0.98 | | | Table 1: Col 6 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Nonfirearm suicide rate | Aged 21+ | 1.01 | | 0.95 | 1.08 | | | Table 1: Col 3 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Nonfirearm suicide rate | Aged 55+ | 1.03 | | 0.97 | 1.11 | | | Table 1: Col 6 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Proportion of suicides with firearm | Aged 21+ | 1.17 | | 0.87 | 1.58 | | | Table 1: Col 3 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Proportion of suicides with firearm | Aged 55+ | 0.97 | | 0.94 | 0.99 | | | Table 1: Col 6 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Total suicide rate | Aged 21+ | 0.98 | | 0.93 | 1.03 | | | Table 1: Col 3 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Total suicide rate | Aged 55+ | 0.97 | | 0.93 | 1.01 | | | Table 1: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on fugitive status | Firearm suicide rate | All ages | 0.95 | | 0.90 | 0.99 | | | Table 2: Col 4 |
| 3.1 | Sen and Panjamapirom (2012) | Check on fugitive status | Total suicide rate | All ages | 0.91 | | 0.87 | 0.95 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm suicide rate | All ages | 0.96 | | 0.92 | 0.99 | | | Table 2: Col 4 |

Exhibit 10
0287

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Sen and Panjamapirom (2012) | Check on mental illness | Total suicide rate | All ages | 0.97 | | 0.95 | 0.99 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on misdemeanor | Firearm suicide rate | All ages | 0.95 | | 0.92 | 1.00 | | | Table 2: Col 4 |
| 3.1 | Sen and Panjamapirom (2012) | Check on misdemeanor | Total suicide rate | All ages | 0.98 | | 0.95 | 1.02 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Firearm suicide rate | All ages | 1.01 | | 0.97 | 1.05 | | | Table 2: Col 4 |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Total suicide rate | All ages | 1.00 | | 0.97 | 1.03 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on restraining order | Firearm suicide rate | All ages | 1.03 | | 0.98 | 1.09 | | | Table 2: Col 4 |
| 3.1 | Sen and Panjamapirom (2012) | Check on restraining order | Total suicide rate | All ages | 1.02 | | 0.98 | 1.06 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Background check comprehensiveness | Firearm suicide rate | All ages | 0.98 | | 0.96 | 1.00 | | | Table 2: Col 2 |
| 3.2 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Total homicide rate | All ages | 1.05 | | 0.98 | 1.13 | | | Table 2: Col 5 |

Exhibit 10
0288

Table B.1—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.2 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Firearm homicide rate | All ages | 1.12 | | 1.03 | 1.22 | | | Table 2: Col 3 |
| 3.2 | Sen and Panjamapirom (2012) | Background check comprehensiveness | Firearm homicide rate | All ages | 0.93 | | 0.91 | 0.96 | | | Table 2: Col 1 |
| 3.2 | Sen and Panjamapirom (2012) | Check on restraining order | Total homicide rate | All ages | 0.91 | | 0.85 | 0.98 | | | Table 2: Col 5 |
| 3.2 | Sen and Panjamapirom (2012) | Check on restraining order | Firearm homicide rate | All ages | 0.87 | | 0.79 | 0.95 | | | Table 2: Col 3 |
| 3.2 | Sen and Panjamapirom (2012) | Check on mental illness | Total homicide rate | All ages | 0.93 | | 0.86 | 0.99 | | | Table 2: Col 5 |
| 3.2 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm homicide rate | All ages | 0.93 | | 0.87 | 1.01 | | | Table 2: Col 3 |
| 3.2 | Sen and Panjamapirom (2012) | Check on fugitive status | Total homicide rate | All ages | 0.77 | | 0.71 | 0.84 | | | Table 2: Col 5 |
| 3.2 | Sen and Panjamapirom (2012) | Check on fugitive status | Firearm homicide rate | All ages | 0.79 | | 0.72 | 0.88 | | | Table 2: Col 3 |
| 3.2 | Sen and Panjamapirom (2012) | Check on misdemeanor | Total homicide rate | All ages | 1.02 | | 0.95 | 1.1 | | | Table 2: Col 5 |

Exhibit 10
0289

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.2 | Sen and Panjamapirom (2012) | Check on misdemeanor | Firearm homicide rate | All ages | 0.99 | | 0.9 | 1.08 | | | Table 2: Col 3 |
| 3.2 | La Valle (2013) | Brady Act | Total homicide rate | All ages | 0.003 | 0.060 | | | | | Table 7 |
| 3.2 | La Valle (2013) | Brady Act | Firearm homicide rate | All ages | 0.022 | 0.071 | | | | | Table 7 |
| 3.2 | Gius (2015a) | State dealer background check | Gun-related murder rate | All ages | −0.683 | | | | −5.34 | | Table 2 |
| 3.2 | Gius (2015a) | State private-seller background check | Gun-related murder rate | All ages | 1.05 | | | | 7.47 | | Table 2 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Total homicide rate | Aged 21+ | 0.97 | | 0.87 | 1.08 | | | Table 1: Col 3 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Firearm homicide rate | Aged 21+ | 0.99 | | 0.86 | 1.13 | | | Table 1: Col 3 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Nonfirearm homicide rate | Aged 21+ | 0.94 | | 0.87 | 1.02 | | | Table 1: Col 3 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Proportion of homicides with firearm | Aged 21+ | 1.02 | | 0.99 | 1.04 | | | Table 1: Col 3 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Total homicide rate | Aged 55+ | 1.00 | | 0.90 | 1.12 | | | Table 1: Col 6 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Firearm homicide rate | Aged 55+ | 1.07 | | 0.97 | 1.16 | | | Table 1: Col 6 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Nonfirearm homicide rate | Aged 55+ | 0.95 | | 0.81 | 1.12 | | | Table 1: Col 6 |

Exhibit 10
0290

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.2 | Ludwig and Cook (2000) | Brady Act | Proportion of homicides with firearm | Aged 55+ | 1.07 | | 0.98 | 1.18 | | | Table 1: Col 6 |
| 3.2 | Swanson et al. (2016) | NICS reporting (Fla.) | Violent crime arrest | No crim. disqualified | 0.62 | | 0.50 | 0.76 | | | In text (page 1071) |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Any offense | Calif. purchasers | 1.05 | | 1.04 | 1.07 | | | Table 1, row 3 |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Gun offense | Calif. purchasers | 1.21 | | 1.08 | 1.36 | | | Table 1, row 3 |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Violent offense | Calif. purchasers | 1.24 | | 1.11 | 1.39 | | | Table 1, row 3 |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all handgun sales) | Any mass shooting incident | N/A | −0.112 | 0.089 | | | | | Table C2: Col 1 |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all handgun sales) | Any mass shooting incident | N/A | −0.124 | 0.098 | | | | | Table C2: Col 2 |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all firearm sales) | Any mass shooting incident | N/A | 0.011 | 0.131 | | | | | Table C2: Col 1 |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all firearm sales) | Any mass shooting incident | N/A | −0.032 | 0.142 | | | | | Table C2: Col 2 |
| 4.1 | Lott (2010) | State/federal assault weapon ban | Total homicide | All ages | 0.004 | | | | 0.11 | | Table A6.3 |
| 4.1 | Gius (2014) | State assault weapon ban | Firearm murder rate | All ages | −0.29 | | | | −1.57 | | Table 1 |
| 4.2 | Gius (2015c) | State assault weapon ban | Mass shooting deaths | All ages | −0.59202 | | | | −2.28 | | Table 1: Col 1 |

Exhibit 10
0291

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4.2 | Gius (2015c) | State assault weapon ban | Mass shooting injuries | All ages | 0.298 | | | | 1.16 | | Table 1: Col 2 |
| 4.2 | Luca, Deepak, and Poliquin (2016) | State assault weapon ban | Any mass shooting incident | N/A | 0.062 | 0.056 | | | | | Table C2: Col 1 |
| 4.2 | Luca, Deepak, and Poliquin (2016) | State assault weapon ban | Any mass shooting incident | N/A | 0.067 | 0.057 | | | | | Table C2: Col 2 |
| 5.1 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Total suicide rate | All ages | 0.99, 1.00 | | | | | 0.97 | Table 1 |
| 5.1 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Firearm suicide rate | All ages | 0.98, 0.95 | | | | | 0.54 | Table 1 |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Homicide | All ages | 0.0937 | 0.029 | | | | | Table 5: Col 3 |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Burglary | All ages | 0.0223 | 0.0223 | | | | | Table 4: Col 3 |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Robbery | All ages | 0.0262 | 0.0229 | | | | | Table 4: Col 3 |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Aggravated assault | All ages | 0.0372 | 0.0319 | | | | | Table 4: Col 3 |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Total homicide rate | All ages | 0.102 | 0.183 | | | | | Corrected Supplement Table 3 |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Firearm homicide rate | All ages | 0.16 | 0.17 | | | | | Corrected Supplement Table 1 |

Exhibit 10
0292

346   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Nonfirearm homicide rate | All ages | 0.01 | 0.1 | | | | | Corrected Supplement Table 2 |
| 5.2 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Total homicide rate | All ages | 1.24, 1.06 | | | | | 0.001 | Table 1 |
| 5.2 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Firearm homicide rate | All ages | 1.32, 1.08 | | | | | 0.001 | Table 1 |
| 5.3 | Cheng and Hoekstra (2013) | Castle doctrine law | Justifiable homicide | All ages | 0.283 | 0.235 | | | | | Table 6: Panel E: Col 3 |
| 6.1 | Sen and Panjamapirom (2012) | Check on mental illness | Total suicide rate | All ages | 0.97 | | 0.95 | 0.99 | | | Table 2: Col 6 |
| 6.1 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm suicide rate | All ages | 0.96 | | 0.92 | 0.99 | | | Table 2: Col 4 |
| 6.2 | Sen and Panjamapirom (2012) | Check on mental illness | Total homicide rate | All ages | 0.93 | | 0.86 | 0.99 | | | Table 2: Col 5 |
| 6.2 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm homicide rate | All ages | 0.93 | | 0.87 | 1.01 | | | Table 2: Col 3 |
| 6.2 | Swanson et al. (2016) | NICS reporting (Fla.) | Violent crime arrest | No crim. disqualified | 0.62 | | 0.50 | 0.76 | | | In text (p. 1071) |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Total suicide rate | Aged 14–17 | 1.06 | | 0.92 | 1.23 | | | Table 2: Col 1 |

**Exhibit 10**
**0293**

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Total suicide rate | Aged 18–20 | 1.18 | | 1.04 | 1.34 | | | Table 2: Col 2 |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Firearm suicide rate | Aged 14–17 | 0.92 | | 0.76 | 1.10 | | | Table 2: Col 1 |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Firearm suicide rate | Aged 18–20 | 1.22 | | 1.04 | 1.43 | | | Table 2: Col 2 |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Nonfirearm suicide rate | Aged 14–17 | 1.27 | | 1.00 | 1.61 | | | Table 2: Col 1 |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Nonfirearm suicide rate | Aged 18–20 | 1.14 | | 0.93 | 1.39 | | | Table 2: Col 2 |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Total suicide rate | All ages | 1.01 | | 0.95 | 1.08 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Firearm suicide rate | All ages | 0.88 | | 0.81 | 0.96 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Nonfirearm suicide rate | All ages | 1.14 | | 1.05 | 1.24 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Total suicide rate | All ages | 1.03 | | 0.97 | 1.08 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Firearm suicide rate | All ages | 1.02 | | 0.96 | 1.09 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Nonfirearm suicide rate | All ages | 1.03 | | 0.95 | 1.11 | | | Appendix Table 2 |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Total homicide rate | All ages | 1.08 | 0.16 | | | | | Corrected Table 2 |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Firearm homicide rate | All ages | 1.18 | 0.13 | | | | | Corrected Table 2 |

Exhibit 10
0294

Table B.1—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Nonfirearm homicide rate | All ages | –0.08 | 0.1 | | | | | Corrected Table 2 |
| 8.2 | Rudolph et al. (2015) | Connecticut permit-to-purchase | Firearm homicide rate | All ages | 0.60 | | | | | 0.04 | In text (p. e51) and Table 2, "2xMSPE" |
| 8.3 | Luca, Deepak, and Poliquin (2016) | Handgun permit system | Any mass shooting incident (no political controls) | All ages | –0.009 | 0.115 | | | | | Table C2: Col 1 |
| 8.3 | Luca, Deepak, and Poliquin (2016) | Handgun permit system | Any mass shooting incident (political controls) | All ages | 0.004 | 0.117 | | | | | Table C2: Col 2 |
| 10.1 | Cummings et al. (1997a) | CAP law | Firearm suicide rate | Aged 0–14 | 0.81 | | 0.66 | 1.01 | | | In text (p. 1085) |
| 10.1 | Cummings et al. (1997a) | CAP law | Nonfirearm suicide rate | Aged 0–14 | 0.95 | | 0.75 | 1.2 | | | In text (p. 1085) |
| 10.1 | Webster et al. (2004) | CAP law | Total suicide rate | Aged 14–17 | 0.92 | | 0.86 | 0.98 | | | Table 2: Col 1 |
| 10.1 | Webster et al. (2004) | CAP law | Total suicide rate | Aged 18–20 | 0.89 | | 0.85 | 0.93 | | | Table 2: Col 2 |
| 10.1 | Webster et al. (2004) | CAP law | Firearm suicide rate | Aged 14–17 | 0.89 | | 0.83 | 0.96 | | | Table 2: Col 1 |
| 10.1 | Webster et al. (2004) | CAP law | Firearm suicide rate | Aged 18–20 | 0.87 | | 0.82 | 0.92 | | | Table 2: Col 2 |
| 10.1 | Webster et al. (2004) | CAP law | Nonfirearm suicide rate | Aged 14–17 | 1.00 | | 0.91 | 1.10 | | | Table 2: Col 1 |

Exhibit 10
0295

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.1 | Webster et al. (2004) | CAP law | Nonfirearm suicide rate | Aged 18–20 | 0.91 | | 0.85 | 0.98 | | | Table 2: Col 2 |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage (11 states) | Firearm self-inflicted injury rate | Aged 0–17 | −1.165 | 0.339 | | | | | Table 3: Col 3 |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage (11 states) | Firearm self-inflicted injury rate | Aged 18+ | −0.003 | 0.228 | | | | | Table 3: Col 4 |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Firearm self-inflicted injury rate | Aged 0–17 | −1.06 | 0.296 | | | | | Table 3: Col 1 |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Firearm self-inflicted injury rate | Aged 18+ | 0.161 | 0.227 | | | | | Table 3: Col 2 |
| 10.1 | Gius (2015b) | CAP law | Firearm suicide rate | Aged 0–19 | −0.218 | | | | −4.36 | | Table 4 |
| 10.2 | Cummings et al. (1997a) | CAP law | Firearm homicide rate | Aged 0–14 | 0.89 | | 0.76 | 1.05 | | | In text (p. 1085) |
| 10.2 | Cummings et al. (1997a) | CAP law | Nonfirearm homicide rate | Aged 0–14 | 0.96 | | 0.86 | 1.06 | | | In text (p. 1085) |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Murder rate | All ages | 0.039 | | | | 1.141 | | Table 3: Col 2 |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Rape rate | All ages | 0.092 | | | | 3.357 | | Table 3: Col 3 |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Robbery rate | All ages | 0.1056 | | | | 2.823 | | Table 3: Col 4 |

Exhibit 10
0296

350   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.2 | Lott and Whitley (2001) | Safe storage law | Assault rate | All ages | −0.041 | | | | 1.493 | | Table 3: Col 5 |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 0–14 | 0.77 | | 0.63 | 0.94 | | | In text (p. 1085) |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 15–19 | 0.91 | | 0.77 | 1.08 | | | In text (p. 1085) |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 20–24 | 0.84 | | 0.68 | 1.03 | | | In text (p. 1085) |
| 10.3 | Webster and Starnes (2000) | CAP law | Unintentional firearm death rate | Aged 0–14 | 0.83 | | 0.71 | 0.97 | | | Table 1 |
| 10.3 | Webster and Starnes (2000) | Felony CAP law | Unintentional firearm death rate | Aged 0–14 | 0.69 | | 0.56 | 0.85 | | | Table 1 |
| 10.3 | Webster and Starnes (2000) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 0–14 | 1.00 | | 0.81 | 1.22 | | | Table 1 |
| 10.3 | Webster and Starnes (2000) | Florida CAP law | Unintentional firearm death rate | Aged 0–14 | 0.49 | | 0.25 | 0.69 | | | Table 1 |
| 10.3 | Webster and Starnes (2000) | Non-Florida CAP law | Unintentional firearm death rate | Aged 0–14 | 0.95 | | 0.80 | 1.12 | | | Table 1 |
| 10.3 | Hepburn et al. (2006) | CAP law | Unintentional firearm death rate | Aged 0–14 | 0.78 | | 0.61 | 0.99 | | | Table 3: Col 1 |

**Exhibit 10**
**0297**

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.3 | Hepburn et al. (2006) | CAP law | Unintentional firearm death rate | Aged 55–74 | 0.88 | | 0.63 | 1.22 | | | Table 3: Col 2 |
| 10.3 | Hepburn et al. (2006) | Felony CAP law | Unintentional firearm death rate | Aged 0–14 | 0.64 | | 0.46 | 0.89 | | | Table 3: Col 1 |
| 10.3 | Hepburn et al. (2006) | Felony CAP law | Unintentional firearm death rate | Aged 55–74 | 0.90 | | 0.72 | 1.12 | | | Table 3: Col 2 |
| 10.3 | Hepburn et al. (2006) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 0–14 | 0.93 | | 0.76 | 1.13 | | | Table 3: Col 1 |
| 10.3 | Hepburn et al. (2006) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 55–74 | 0.88 | | 0.54 | 1.44 | | | Table 3: Col 2 |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Fla.) | Unintentional firearm death rate | Aged 0–14 | 0.86 | | 0.72 | 1.03 | | | Table 3: Col 1 |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Fla.) | Unintentional firearm death rate | Aged 55–74 | 0.87 | | 0.61 | 1.28 | | | Table 3: Col 2 |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Calif.) | Unintentional firearm death rate | Aged 0–14 | 0.77 | | 0.56 | 1.06 | | | Table 3: Col 1 |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Calif.) | Unintentional firearm death rate | Aged 55–74 | 0.86 | | 0.45 | 1.27 | | | Table 3: Col 2 |

Exhibit 10
0298

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.3 | Gius (2015b) | CAP law | Unintentional firearm death rate | Aged 0–19 | –0.036 | | | | –0.8 | | Table 5 |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | CAP law, negligent storage (11 states) | Unintentional firearm injury rate | Aged 0–17 | –0.273 | 0.184 | | | | | Table 3: Col 3 |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | CAP law, negligent storage (11 states) | Unintentional firearm injury rate | Aged 18+ | –0.343 | 0.143 | | | | | Table 3: Col 4 |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Unintentional firearm injury rate | Aged 0–17 | –0.191 | 0.154 | | | | | Table 3: Col 1 |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Unintentional firearm injury rate | Aged 18+ | –0.283 | 0.121 | | | | | Table 3: Col 2 |
| 10.4 | Lott (2003) | Safe storage law | Shooting fatalities and injuries | All ages | 1.073774 | | | | 0.459 | | Appendix Table 6.2: Col 3 |
| 10.4 | Lott (2003) | Safe storage law | Number of shooting incidents | All ages | 0.8250622 | | | | 0.628 | | Appendix Table 6.2: Col 4 |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Total IPH rate | All ages | 0.95 | | 0.87 | 1.04 | | | Table 5: Panel 1 |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Firearm IPH rate | All ages | 0.94 | | 0.83 | 1.07 | | | Table 5: Panel 1 |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Total IPH rate | Female victims | 0.98 | | 0.89 | 1.09 | | | Table 5: Panel 1 |

**Exhibit 10**

**0299**

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Firearm IPH rate | Female victims | 0.96 | | 0.82 | 1.11 | | | Table 5: Panel 1 |
| 11.1 | Zeoli and Webster (2010) | Confiscation law | Total IPH rate | All ages | 1.10 | | 0.92 | 1.31 | | | Table 1 |
| 11.1 | Zeoli and Webster (2010) | Confiscation law | Firearm IPH rate | All ages | 1.19 | | 0.97 | 1.46 | | | Table 1 |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | All intimate partners | −0.0667 | 0.0309 | | | | | Table 3: Model 3 |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | Female IPH victims | −0.136 | 0.0443 | | | | | Table 3: Model 3 |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | Male IPH victims | 0.0053 | 0.0312 | | | | | Table 3: Model 3 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Total suicide rate | Aged 14–17 | 1.04 | | 0.90 | 1.21 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Total suicide rate | Aged 18–20 | 0.97 | | 0.91 | 1.05 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Firearm suicide rate | Aged 14–17 | 1.04 | | 0.87 | 1.16 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Firearm suicide rate | Aged 18–20 | 0.91 | | 0.83 | 1.00 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Nonfirearm suicide rate | Aged 14–17 | 1.05 | | 0.85 | 1.31 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Nonfirearm suicide rate | Aged 18–20 | 1.05 | | 0.94 | 1.17 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Total suicide rate | Aged 14–17 | 0.97 | | 0.90 | 1.05 | | | Table 2: Col 1 |

**Exhibit 10**
**0300**

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Webster et al. (2004) | State minimum possession age | Total suicide rate | Aged 18–20 | 1.13 | | 1.01 | 1.27 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Firearm suicide rate | Aged 14–17 | 1.02 | | 0.92 | 1.12 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Firearm suicide rate | Aged 18–20 | 1.14 | | 0.98 | 1.34 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Nonfirearm suicide rate | Aged 14–17 | 0.93 | | 0.82 | 1.05 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Nonfirearm suicide rate | Aged 18–20 | 1.07 | | 0.90 | 1.27 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Total suicide rate | Aged 14–17 | 1.02 | | 0.91 | 1.14 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Firearm suicide rate | Aged 14–17 | 1.00 | | 0.87 | 1.16 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Nonfirearm suicide rate | Aged 14–17 | 1.08 | | 0.91 | 1.28 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Total suicide rate | Aged 14–17 | 0.98 | | 0.90 | 1.08 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Firearm suicide rate | Aged 14–17 | 0.99 | | 0.89 | 1.09 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Nonfirearm suicide rate | Aged 14–17 | 1.12 | | 0.99 | 1.26 | | | Table 2: Col 1 |
| 12.1 | Gius (2015b) | State minimum possession age | Firearm suicide rate | Aged 0–19 | −0.046 | | | | −1.05 | | Table 4 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | All ages | 1.02 | | 0.98 | 1.07 | | | Table 4 |

**Exhibit 10**
**0301**

Table B.1—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | Aged 0–19 | 1.1 | | 0.94 | 1.29 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | Aged 20+ | 1.04 | | 0.99 | 1.1 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | All ages | 1 | | 0.94 | 1.06 | | | Table 4 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | Aged 0–19 | 0.94 | | 0.8 | 1.06 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | Aged 20+ | 1.02 | | 0.96 | 1.08 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | All ages | 1.03 | | 0.96 | 1.11 | | | Table 4 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | Aged 0–19 | 1.15 | | 0.93 | 1.42 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | Aged 20+ | 1.04 | | 0.95 | 1.13 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | All ages | 0.99 | | 0.88 | 1.13 | | | Table 4 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | Aged 0–19 | 0.93 | | 0.77 | 1.12 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | Aged 20+ | 0.99 | | 0.88 | 1.13 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | All ages | 1 | | 0.94 | 1.05 | | | Table 2 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | Aged 0–19 | 0.92 | | 0.81 | 1.05 | | | Table 3 |

**Exhibit 10**
**0302**

Table B.1—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | Aged 20+ | 1.01 | | 0.95 | 1.06 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | All ages | 0.98 | | 0.91 | 1.06 | | | Table 2 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | Aged 0–19 | 0.92 | | 0.8 | 1.06 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | Aged 20+ | 0.99 | | 0.93 | 1.06 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | All ages | 1.02 | | 0.89 | 1.18 | | | Table 2 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | Aged 0–19 | 0.98 | | 0.79 | 1.2 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | Aged 20+ | 1.03 | | 0.88 | 1.2 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | All ages | 1.06 | | 0.88 | 1.27 | | | Table 2 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | Aged 0–19 | 0.91 | | 0.72 | 1.15 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | Aged 20+ | 1.08 | | 0.89 | 1.31 | | | Table 3 |
| 12.2 | Rudolph et al. (2015) | State minimum purchase age of 21 | Firearm homicide rate | All ages | 0.6 | | | | | 0.04 | In text (p. e51) and Table 2, "2xMSPE" |
| 12.3 | Gius (2015b) | State minimum possession age | Unintentional firearm death rate | Aged 0–19 | −0.0636 | | | | −1.6 | | Table 5 |

Exhibit 10
0303

Table B.1—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 18 | Any mass shooting incident | N/A | 0.007 | 0.025 | | | | | Table C2: Col 1 |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 18 | Any mass shooting incident | N/A | 0.01 | 0.026 | | | | | Table C2: Col 2 |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 21 | Any mass shooting incident | N/A | −0.059 | 0.051 | | | | | Table C2: Col 1 |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 21 | Any mass shooting incident | N/A | −0.075 | 0.051 | | | | | Table C2: Col 2 |
| 13.1 | Rosengart et al. (2005) | Shall-issue law | Total suicide rate | All ages | 0.98 | | 0.96 | 1.01 | | | Table 4 |
| 13.1 | Rosengart et al. (2005) | Shall-issue law | Firearm suicide rate | All ages | 1 | | 0.97 | 1.02 | | | Table 4 |
| 13.1 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Self-inflicted firearm injury rate | Aged 0–17 | 0.662 | 0.747 | | | | | Table 5 |
| 13.1 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Self-inflicted firearm injury rate | Aged 18+ | 0.742 | 0.163 | | | | | Table 6 |
| 13.2 | Rosengart et al. (2005) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | 1.07 | | 0.98 | 1.17 | | | Table 2 |
| 13.2 | Rosengart et al. (2005) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | 1.11 | | 0.99 | 1.24 | | | Table 2 |
| 13.2 | Grambsch (2008) | Shall-issue vs. no CC (random effects) | Murder rate | All ages | 0.005 | 0.011 | | | | | Table 3 |
| 13.2 | Grambsch (2008) | Shall-issue vs. no CC (fixed effects) | Murder rate | All ages | 0.06 | 0.015 | | | | | Table 3 |

Exhibit 10
0304

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.2 | French and Heagerty (2008) | Shall-issue law vs. no CC | Firearm homicide rate | All ages | 1.101 | | 0.993 | 1.22 | | | In text (p. 14) |
| 13.2 | Roberts (2009) | May-issue vs. shall-issue | Total IPH rate | All ages | 1.7128 | 0.216 | | | | | Table 2 |
| 13.2 | Roberts (2009) | No CC vs. shall-issue | Total IPH rate | All ages | 0.9621 | 0.212 | | | | | Table 2 |
| 13.2 | Roberts (2009) | May-issue vs. shall-issue | Firearm IPH rate | All ages | 1.1202 | 0.128 | | | | | Table 3 |
| 13.2 | Roberts (2009) | No CC vs. shall-issue | Firearm IPH rate | All ages | 0.8608 | 0.19 | | | | | Table 3 |
| 13.2 | La Valle and Glover (2012) | May-issue | Total homicide rate | All ages | −0.214 | 0.065 | | | | | Table 8 |
| 13.2 | La Valle and Glover (2012) | Shall-issue | Total homicide rate | All ages | 0.206 | 0.08 | | | | | Table 8 |
| 13.2 | La Valle and Glover (2012) | May-issue | Firearm homicide rate | All ages | −0.263 | 0.08 | | | | | Table 7 |
| 13.2 | La Valle and Glover (2012) | Shall-issue | Firearm homicide rate | All ages | 0.274 | 0.075 | | | | | Table 7 |
| 13.2 | La Valle (2013) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | −0.137 | 0.062 | | | | | Table 7 |
| 13.2 | La Valle (2013) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | −0.166 | 0.073 | | | | | Table 7 |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | 0.38 | 0.23 | | | | | Corrected Supplement Table 3 |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | 0.25 | 0.21 | | | | | Corrected Supplement Table 1 |

Exhibit 10
0305

Table B.1—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Nonfirearm homicide rate | All ages | 0.21 | 0.12 | | | | | Corrected Supplement Table 2 |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Murder/manslaughter rate | All ages | 0.58 | 0.42 | | | | | Corrected Supplement Table 4 |
| 13.2 | Gius (2014) | Restrictive vs. lenient CC laws | Firearm murder rate | All ages | 0.365 | | | | 3.74 | | Table 1 |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Murder rate | All ages | 0.0331 | 0.0651 | | | | | Table 8A |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Rape rate | All ages | 0.1153 | 0.0573 | | | | | Table 8A |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Robbery rate | All ages | 0.1385 | 0.0803 | | | | | Table 8A |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Assault rate | All ages | 0.0803 | 0.0446 | | | | | Table 8A |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Violent crime | All ages | −0.0566 | | | | −3.067 | | Table 6: Model V |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Murder rate | All ages | −0.0492 | | | | −1.696 | | Table 6: Model V |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Rape rate | All ages | −0.0161 | | | | −0.739 | | Table 6: Model V |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Aggravated Assault | All ages | −0.0705 | | | | −2.927 | | Table 6: Model V |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Robbery rate | All ages | −0.0385 | | | | −1.322 | | Table 6: Model V |

Exhibit 10
0306

Table B.1—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Murder rate | All ages | −0.003 | | | | 1.52 | | Table 3 |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Rape rate | All ages | −0.002 | | | | 0.99 | | Table 3 |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Robbery rate | All ages | 0.001 | | | | 0.55 | | Table 3 |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Assault rate | All ages | 0 | | | | 0.05 | | Table 3 |
| 13.3 | Lott and Mustard (1997) | Shall-issue law | Unintentional handgun death rate | All ages | 0.00478 | | | | 0.096 | | Table 18: Col 1 |
| 13.3 | Lott and Mustard (1997) | Shall-issue law | Unintentional nonhandgun death rate | All ages | 0.098 | | | | 1.706 | | Table 18: Col 2 |
| 13.3 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Unintentional firearm injury rate | Aged 0–17 | −0.53 | 0.364 | | | | | Table 5 |
| 13.3 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Unintentional firearm injury rate | Aged 18+ | 0.823 | 0.191 | | | | | Table 6 |
| 13.4 | Lott (2003) | Shall-issue law | Multiple-victim gun deaths, injuries | All ages | 0.2151 | | | | 9.609 | | Appendix Table 6.2: Col 3 |
| 13.4 | Lott (2003) | Shall-issue law | No. of multiple-victim gun incidents | All ages | 0.3280486 | | | | 3.82 | | Appendix Table 6.2: Col 4 |
| 13.4 | Luca, Deepak, and Poliquin (2016) | Permitless carry | Any mass shooting incident | All ages | 0.152 | 0.182 | | | | | Table C2: Col 1 |

Exhibit 10
0307

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.4 | Luca, Deepak, and Poliquin (2016) | Permitless carry | Any mass shooting incident | All ages | 0.207 | 0.18 | | | | | Table C2: Col 2 |
| 13.4 | Luca, Deepak and Poliquin (2016) | Shall-issue law | Any mass shooting incident | All ages | −0.011 | 0.039 | | | | | Table C2: Col 1 |
| 13.4 | Luca, Deepak and Poliquin (2016) | Shall-issue law | Any mass shooting incident | All ages | −0.009 | 0.038 | | | | | Table C2: Col 2 |
| 13.5 | Duggan (2001) | Right-to-carry laws | Gun ownership | None | 0.0038 | 0.0099 | | | | | Table 10: Col 3 |

NOTE: CAP = child-access prevention; CC = concealed carry; Col = column; IPH = intimate partner homicide; N/A = not applicable; NICS = National Instant Criminal Background Check System.

Exhibit 10
0308

Table B.2 shows the most-common methodological concerns we identified for analyses included in this report's forest plot figures. When we identified no such concerns for a study, the forest plots show that study's IRR values with green circles (see, for example, Figure 3.1). In Table B.2, we identify five categories of concerns:

- The *Parameter* column identifies with an *X* the analyses we believed to have been performed with fewer than ten observations per parameter estimate. In several cases, models with random effects were conducted, but no estimate of the effective number of parameters was reported. In these cases, we guessed that the effective number of random effect parameters was about half the total number of random effects. This resulted in none of the random effects models having fewer than ten observations per parameter estimate.

- The *Tx Units* column identifies the analyses that we believed identified a causal effect with three or fewer units (states, usually) exposed to the law.

- The *Cluster* column identifies the analyses that appeared to make no adjustments to the standard error to account for either serial correlation in the longitudinal data or heteroscedasticity. We were sparing in assigning this concern to analyses, giving credit for some type of standard error adjustment even when papers reported, for instance, having checked for the presence of serial correlation or performing adjustments of doubtful validity. Studies that made no reference to any type of adjustment or check are identified with this concern.

- The *Model* column identifies the analyses that reported results from models we believe may have been misspecified. We assigned this concern to just two types of models: those using ordinary least squares (OLS) to model dichotomous outcomes and those using OLS to model rates, many of which are close to zero. We did not assign this concern to OLS models of logged rate values, although this too is problematic.

- The *Other* column identifies studies with other methodological features that raised significant concerns for us. It was often the case that studies had multiple idiosyncratic methodological features that concerned us. However, we did not assign the *Other* concern to studies that had already been identified as having one of the other four common concerns. When a study is listed as having an *Other* concern, that concern is described in the text of the report whenever the study is discussed.

**Exhibit 10**
**0309**

**Table B.2**
**Methodological Concerns Identified for Analyses Included in the Report's Forest Plot Figures**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx | Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Ludwig and Cook (2000) | Brady Act | Firearm suicide rate | Aged 21+ | X | | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Firearm suicide rate | Aged 55+ | X | | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Nonfirearm suicide rate | Aged 21+ | X | | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Nonfirearm suicide rate | Aged 55+ | X | | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Proportion of suicides with firearm | Aged 21+ | X | | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Proportion of suicides with firearm | Aged 55+ | X | | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Total suicide rate | Aged 21+ | X | | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Total suicide rate | Aged 55+ | X | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on fugitive status | Firearm suicide rate | All ages | | X | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on fugitive status | Total suicide rate | All ages | | X | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm suicide rate | All ages | | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on mental illness | Total suicide rate | All ages | | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on misdemeanor | Firearm suicide rate | All ages | | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on misdemeanor | Total suicide rate | All ages | | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Firearm suicide rate | All ages | | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Total suicide rate | All ages | | | | | | |

Exhibit 10
0310

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Sen and Panjamapirom (2012) | Check on restraining order | Firearm suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on restraining order | Total suicide rate | All ages | | | | | . |
| 3.1 | Sen and Panjamapirom (2012) | Background check comprehensiveness | Firearm suicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Total homicide rate | All ages | | | | | . |
| 3.2 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Firearm homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Background check comprehensiveness | Firearm homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on restraining order | Total homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on restraining order | Firearm homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on mental illness | Total homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on fugitive status | Total homicide rate | All ages | | X | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on fugitive status | Firearm homicide rate | All ages | | X | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on misdemeanor | Total homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on misdemeanor | Firearm homicide rate | All ages | | | | | |
| 3.2 | La Valle (2013) | Brady Act | Total homicide rate | All ages | | | | | |

Exhibit 10
0311

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 3.2 | La Valle (2013) | Brady Act | Firearm homicide rate | All ages | | | | | |
| 3.2 | Gius (2015a) | State dealer background check | Gun-related murder rate | All ages | | | | X | |
| 3.2 | Gius (2015a) | State private-seller background check | Gun-related murder rate | All ages | | X | | X | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Total homicide rate | Aged 21+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Firearm homicide rate | Aged 21+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Nonfirearm homicide rate | Aged 21+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Proportion of homicides with a firearm | Aged 21+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Total homicide rate | Aged 55+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Firearm homicide rate | Aged 55+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Nonfirearm homicide rate | Aged 55+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Proportion of homicides with a firearm | Aged 55+ | X | | | | |
| 3.2 | Swanson et al. (2016) | NICS reporting (Fla.) | Violent crime arrest | No crim. disqualified | | X | | | |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Any offense | Calif. purchasers | | | | | |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Gun offense | Calif. purchasers | | | | | |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Violent offense | Calif. purchasers | | | | | |

Exhibit 10
0312

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all handgun sales) | Any mass shooting incident | N/A | | | X | X | |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all handgun sales) | Any mass shooting incident | N/A | | | | X | |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all firearm sales) | Any mass shooting incident | N/A | | | | X | |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all firearm sales) | Any mass shooting incident | N/A | | | | X | |
| 4.1 | Lott (2010) | State/federal assault weapon bans | Total homicide | All ages | X | | X | | |
| 4.1 | Gius (2014) | State assault weapons ban | Firearm murder rate | All ages | | | X | X | |
| 4.2 | Gius (2015c) | State assault weapons ban | Mass shooting deaths | All ages | | | X | | |
| 4.2 | Gius (2015c) | State assault weapons ban | Mass shooting injuries | All ages | | | X | | |
| 4.2 | Luca, Deepak, and Poliquin (2016) | State assault weapons ban | Any mass shooting incident | N/A | | | | X | |
| 4.2 | Luca, Deepak, and Poliquin (2016) | State assault weapons ban | Any mass shooting incident | N/A | | | | X | |
| 5.1 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Total suicide rate | All ages | | X | | | |
| 5.1 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Firearm suicide rate | All ages | | X | | | |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Homicide | All ages | X | | | | |

Exhibit 10
0313

Table B.2—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Burglary | All ages | X | | | | |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Robbery | All ages | X | | | | |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Aggravated assault | All ages | X | | | | |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Total homicide rate | All ages | X | X | | X | |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Firearm homicide rate | All ages | X | X | | X | |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Nonfirearm homicide rate | All ages | X | X | | X | |
| 5.2 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Total homicide rate | All ages | | X | | | |
| 5.2 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Firearms homicide rate | All ages | | X | | | |
| 5.3 | Cheng and Hoekstra (2013) | Castle doctrine law | Justifiable homicide | All ages | X | | | | |
| 6.1 | Sen and Panjamapirom (2012) | Check on mental illness | Total suicide rate | All ages | | | | | |
| 6.1 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm suicide rate | All ages | | | | | |
| 6.2 | Sen and Panjamapirom (2012) | Check on mental illness | Total homicide rate | All ages | | | | | |
| 6.2 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm homicide rate | All ages | | | | | |
| 6.2 | Swanson et al. (2016) | NICS reporting (Fla.) | Violent crime arrest | No crim. disqualified | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Total suicide rate | Aged 14–17 | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Total suicide rate | Aged 18–20 | | X | | | |

Exhibit 10
0314

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Firearm suicide rate | Aged 14–17 | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Firearm suicide rate | Aged 18–20 | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Nonfirearm suicide rate | Aged 14–17 | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Nonfirearm suicide rate | Aged 18–20 | | X | | | |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Total suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Firearm suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Nonfirearm suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Total suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Firearm suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Nonfirearm suicide rate | All ages | | X | | | |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Total homicide rate | All ages | X | X | | X | |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Firearm homicide rate | All ages | X | X | | X | |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Nonfirearm homicide rate | All ages | X | X | | X | |
| 8.2 | Rudolph et al. (2015) | Connecticut permit-to-purchase | Firearm homicide rate | All ages | | X | | | |
| 8.3 | Luca, Deepak, and Poliquin (2016) | Handgun permit system | Any mass shooting incident | All ages | | | | X | |

Exhibit 10
0315

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx | Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| 8.3 | Luca, Deepak, and Poliquin (2016) | Handgun permit system | Any mass shooting incident | All ages | | | | | X | |
| 10.1 | Cummings et al. (1997a) | CAP law | Firearm suicide rate | Aged 0–14 | | | | | | |
| 10.1 | Cummings et al. (1997a) | CAP law | Nonfirearm suicide rate | Aged 0–14 | | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Total suicide rate | Aged 14–17 | | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Total suicide rate | Aged 18–20 | | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Firearm suicide rate | Aged 14–17 | | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Firearm suicide rate | Aged 18–20 | | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Nonfirearm suicide rate | Aged 14–17 | | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Nonfirearm suicide rate | Aged 18–20 | | | | | | |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage (11 states) | Firearm self-inflicted injury rate | Aged 0–17 | | | | | | X |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage (11 states) | Firearm self-inflicted injury rate | Aged 18+ | | | | | | X |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Firearm self-inflicted injury rate | Aged 0–17 | | | | | | X |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Firearm self-inflicted injury rate | Aged 18+ | | | | | | X |
| 10.1 | Gius (2015b) | CAP law | Firearm suicide rate | Aged 0–19 | | | | | X` | |
| 10.2 | Cummings et al. (1997a) | CAP law | Firearm homicide rate | Aged 0–14 | | | | | | |
| 10.2 | Cummings et al. (1997a) | CAP law | Nonfirearm homicide rate | Aged 0–14 | | | | | | |

Exhibit 10
0316

370   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 10.2 | Lott and Whitley (2001) | Safe storage law | Murder rate | All ages | X | | X | X | |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Rape rate | All ages | X | | X | X | |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Robbery rate | All ages | X | | X | X | |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Assault rate | All ages | X | | X | X | |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 15–19 | | | | | |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 20–24 | | | | | |
| 10.3 | Webster and Starnes (2000) | CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | |
| 10.3 | Webster and Starnes (2000) | Felony CAP law | Unintentional firearm death rate | Aged 0–14 | | X | | | |
| 10.3 | Webster and Starnes (2000) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | |
| 10.3 | Webster and Starnes (2000) | Florida CAP law | Unintentional firearm death rate | Aged 0–14 | | X | | | |
| 10.3 | Webster and Starnes (2000) | Non-Florida CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | |
| 10.3 | Hepburn et al. (2006) | CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law | Unintentional firearm death rate | Aged 55–74 | | | | | X |

**Exhibit 10**
**0317**

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx | Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| 10.3 | Hepburn et al. (2006) | Felony CAP law | Unintentional firearm death rate | Aged 0–14 | | X | | | | X |
| 10.3 | Hepburn et al. (2006) | Felony CAP law | Unintentional firearm death rate | Aged 55–74 | | X | | | | X |
| 10.3 | Hepburn et al. (2006) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | | X |
| 10.3 | Hepburn et al. (2006) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 55–74 | | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Fla.) | Unintentional firearm death rate | Aged 0–14 | | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Fla.) | Unintentional firearm death rate | Aged 55–74 | | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Calif.) | Unintentional firearm death rate | Aged 0–14 | | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Calif.) | Unintentional firearm death rate | Aged 55–74 | | | | | | X |
| 10.3 | Gius (2015b) | CAP law | Unintentional firearm death rate | Aged 0–19 | | | | | X | |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | CAP law, negligent storage (11 states) | Unintentional firearm injury rate | Aged 0–17 | | | | | | X |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | CAP law, negligent storage (11 states) | Unintentional firearm injury rate | Aged 18+ | | | | | | X |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Unintentional firearm injury rate | Aged 0–17 | | | | | | X |

Exhibit 10
0318

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 10.3 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Unintentional firearm injury rate | Aged 18+ | | | | | X |
| 10.4 | Lott (2003) | Safe storage law | Shooting fatalities + injuries | All ages | X | | X | | |
| 10.4 | Lott (2003) | Safe storage law | Number of shooting incidents | All ages | X | | X | | |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Total IPH rate | All ages | | | | | |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Firearm IPH rate | All ages | | | | | |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Total IPH rate | Female victims | | | | | |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Firearm IPH rate | Female victims | | | | | |
| 11.1 | Zeoli and Webster (2010) | Confiscation law | Total IPH rate | All ages | | | | | |
| 11.1 | Zeoli and Webster (2010) | Confiscation law | Firearm IPH rate | All ages | | | | | |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | All intimate partners | | | | X | |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | Female IPH victims | | | | X | |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | Male IPH victims | | | | X | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Total suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Total suicide rate | Aged 18–20 | | | | | |

**Exhibit 10**
**0319**

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Webster et al. (2004) | State minimum purchase age | Firearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Firearm suicide rate | Aged 18–20 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Nonfirearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Nonfirearm suicide rate | Aged 18–20 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Total suicide rate | Aged 14–17 | X | | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Total suicide rate | Aged 18–20 | X | | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Firearm suicide rate | Aged 14–17 | X | | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Firearm suicide rate | Aged 18–20 | X | | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Nonfirearm suicide rate | Aged 14–17 | X | | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Nonfirearm suicide rate | Aged 18–20 | X | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Total suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Firearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Nonfirearm suicide rate | Aged 14–17 | | | | | |

**Exhibit 10**
**0320**

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Total suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Firearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Nonfirearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Gius (2015b) | State minimum possession age | Firearm suicide rate | Aged 0–19 | | | | X | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | All ages | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | Aged 0–19 | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | Aged 20+ | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | All ages | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | Aged 0–19 | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | Aged 20+ | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | All ages | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | Aged 0–19 | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | Aged 20+ | X | | | | |

Exhibit 10
0321

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx | Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | All ages | X | | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | Aged 0–19 | X | | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | Aged 20+ | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | All ages | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | Aged 0–19 | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | Aged 20+ | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | All ages | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | Aged 0–19 | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | Aged 20+ | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | All ages | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | Aged 0–19 | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | Aged 20+ | X | | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | All ages | X | | | | | |

Source Data Used to Produce the Forest Plot Figures    375

Exhibit 10
0322

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | Aged 0–19 | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | Aged 20+ | X | | | | |
| 12.2 | Rudolph et al. (2015) | State minimum purchase age of 21 | Firearm homicide rate | All ages | | X | | | |
| 12.3 | Gius (2015b) | State minimum possession age | Unintentional firearm death rate | Aged 0–19 | | | | X | |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 18 | Any mass shooting incident | N/A | | | | X | |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 18 | Any mass shooting incident | N/A | | | | X | |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 21 | Any mass shooting incident | N/A | | | | X | |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 21 | Any mass shooting incident | N/A | | | | X | |
| 13.1 | Rosengart et al. (2005) | Shall-issue law | Total suicide rate | All ages | X | | | | |
| 13.1 | Rosengart et al. (2005) | Shall-issue law | Firearm suicide rate | All ages | X | | | | |
| 13.1 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Self-inflicted firearm injury rate | Aged 0–17 | | X | | | |
| 13.1 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Self-inflicted firearm injury rate | Aged 18+ | | X | | | |
| 13.2 | Rosengart et al. (2005) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | X | | | | |

Exhibit 10
0323

Table B.2—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Rosengart et al. (2005) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | X | | | | |
| 13.2 | Grambsch (2008) | Shall-issue vs. no CC (random effects) | Murder rate | All ages | | | X | | |
| 13.2 | Grambsch (2008) | Shall-issue vs. no CC (fixed effects) | Murder rate | All ages | X | | X | | |
| 13.2 | French and Heagerty (2008) | Shall-issue law vs. no CC | Firearm homicide rate | All ages | | | | | |
| 13.2 | Roberts (2009) | May-issue vs. shall-issue | Total IPH rate | All ages | | | X | | |
| 13.2 | Roberts (2009) | No CC vs. shall-issue | Total IPH rate | All ages | | | X | | |
| 13.2 | Roberts (2009) | May-issue vs. shall-issue | Firearm IPH rate | All ages | | | X | | |
| 13.2 | Roberts (2009) | No CC vs. shall-issue | Firearm IPH rate | All ages | | | X | | |
| 13.2 | La Valle and Glover (2012) | May-issue | Total homicide rate | All ages | | | | | |
| 13.2 | La Valle and Glover (2012) | Shall-issue | Total homicide rate | All ages | | | | | |
| 13.2 | La Valle and Glover (2012) | May-issue | Firearm homicide rate | All ages | | | | | |
| 13.2 | La Valle and Glover (2012) | Shall-issue | Firearm homicide rate | All ages | | | | | |
| 13.2 | La Valle (2013) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | | | | | |
| 13.2 | La Valle (2013) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | | | | | |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | X | | | X | |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | X | | | X | |

Exhibit 10
0324

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Nonfirearm homicide rate | All ages | X | | | X | |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Murder/manslaughter rate | All ages | X | | | X | |
| 13.2 | Gius (2014) | Restrictive vs. lenient CC laws | Firearm murder rate | All ages | | | X | X | |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Murder rate | All ages | | | | | |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Rape rate | All ages | | | | | |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Robbery rate | All ages | | | | | |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Assault rate | All ages | | | | | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Violent crime | All ages | X | | X | X | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Murder rate | All ages | X | | X | X | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Rape rate | All ages | X | | X | X | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Aggravated assault | All ages | X | | X | X | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Robbery rate | All ages | X | | X | X | |

**Exhibit 10**
**0325**

Table B.2—Continued

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Murder rate | All ages | | | | | |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Rape rate | All ages | | | | | |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Robbery rate | All ages | | | | | |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Assault rate | All ages | | | | | |
| 13.3 | Lott and Mustard (1997) | Shall-issue law | Unintentional handgun death rate | All ages | X | | X | | |
| 13.3 | Lott and Mustard (1997) | Shall-issue law | Unintentional nonhandgun death rate | All ages | X | | X | | |
| 13.3 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Unintentional firearm injury rate | Aged 0–17 | | X | | | |
| 13.3 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Unintentional firearm injury rate | Aged 18+ | | X | | | |
| 13.4 | Lott (2003) | Shall-issue law | Multiple-victim gun deaths, injuries | All ages | X | | X | | |
| 13.4 | Lott (2003) | Shall-issue law | No. of multiple-victim gun incidents | All ages | X | | X | | |
| 13.4 | Luca, Deepak, and Poliquin (2016) | Permitless carry | Any mass shooting incident | All ages | | | | X | |
| 13.4 | Luca, Deepak, and Poliquin (2016) | Permitless carry | Any mass shooting incident | All ages | | | | X | |

Exhibit 10
0326

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 13.4 | Luca, Deepak, and Poliquin (2016) | Shall-issue law | Any mass shooting incident | All ages | | | | X | |
| 13.4 | Luca, Deepak, and Poliquin (2016) | Shall-issue law | Any mass shooting incident | All ages | | | | X | |
| 13.5 | Duggan (2001) | Right-to-carry laws | Gun ownership | None | X | | | | |

NOTE: CAP = child-access prevention; CC = concealed carry; IPH = intimate partner homicide; N/A = not applicable; NICS = National Instant Criminal Background Check System.

Exhibit 10

0327



The RAND Corporation's Gun Policy in America initiative is a unique attempt to systematically and transparently assess available scientific evidence on the real effects of firearm laws and policies. Good gun policies require consideration of many factors, including the law and constitutional rights, the interests of various stakeholder groups, and information about the likely effects of different laws or policies on a range of outcomes. This report seeks to provide the third—objective information about what the scientific literature examining gun policy can tell us about the likely effects of laws. The study synthesizes the available scientific data on the effects of various firearm policies on firearm deaths, violent crime, the gun industry, participation in hunting and sport shooting, and other outcomes. By highlighting where scientific evidence is accumulating, the authors hope to build consensus around a shared set of facts that have been established through a transparent, nonpartisan, and impartial review process. In so doing, they also illuminate areas where more and better information could make important contributions to establishing fair and effective gun policies.

Download a free
electronic copy at
www.rand.org/t/RR2088

$80.00

ISBN-10 0-8330-9841-1
ISBN-13 978-0-8330-9841-2

58000

9 780833 098412

RR-2088-RC

**Exhibit 10**
**0329**

# EXHIBIT "11"

Exhibit 11
0330

HARVARD | BUSINESS | SCHOOL

# The Impact of Mass Shootings on Gun Policy

Michael Luca
Deepak Malhotra
Christopher Poliquin

**Working Paper 16-126**



Exhibit 11
0331

# The Impact of Mass Shootings on Gun Policy

Michael Luca
Harvard Business School

Deepak Malhotra
Harvard Business School

Christopher Poliquin
UCLA Anderson School of Management

**Working Paper 16-126**

Copyright © 2016, 2019 by Michael Luca, Deepak Malhotra, and Christopher Poliquin

Working papers are in draft form. This working paper is distributed for purposes of comment and discussion only. It may not be reproduced without permission of the copyright holder. Copies of working papers are available from the author.

Funding for this research was provided in part by Harvard Business School.

**Exhibit 11**
**0332**

# The Impact of Mass Shootings on Gun Policy

Michael Luca
Harvard Business School and NBER
<mluca@hbs.edu>

Deepak Malhotra
Harvard Business School
<dmalhotra@hbs.edu>

Christopher Poliquin
UCLA Anderson School of Management
<chris.poliquin@anderson.ucla.edu>

August 2019

## Abstract

There have been dozens of high-profile mass shootings in recent decades. This paper presents three main findings about the impact of mass shootings on gun policy. First, mass shootings evoke large policy responses. A single mass shooting leads to a 15% increase in the number of firearm bills introduced within a state in the year after a mass shooting. This effect increases with the extent of media coverage. Second, mass shootings account for a small portion of all gun deaths, but have an outsized influence relative to other homicides. Third, when looking at bills that were actually enacted into law, the impact of mass shootings depends on the party in power. The annual number of laws that loosen gun restrictions doubles in the year following a mass shooting in states with Republican-controlled legislatures. We find no significant effect of mass shootings on laws enacted when there is a Democrat-controlled legislature, nor do we find a significant effect of mass shootings on the enactment of laws that tighten gun restrictions.

We thank Joseph Hall and Jessica Li for excellent research assistance.

**Exhibit 11**
**0333**

# 1. Introduction

Recent decades have witnessed a series of high-profile mass shootings throughout the United States. While most homicides receive little attention from the public, mass shooting incidents are extremely salient. Nonetheless, a common and frequently articulated view is that despite extensive discussion about mass shootings, they have little influence on policymaking.

Should we expect policymakers to propose new legislation in the wake of a mass shooting? Given that the vast majority of gun deaths do not result from mass shootings, it would be difficult to reconcile large responses to mass shootings with basic models of optimal policy aimed exclusively at reducing gun violence. However, mass shootings may have another effect—bringing attention to the issue of gun violence. Mass shootings could potentially lead to policy changes by focusing attention on gun violence, even if they do not provide new information regarding effective policy or change politicians' preferences.

Political scientists have noted that issues tend to rise and fall in importance within a policy agenda, creating periods in which specific policies shift very rapidly and other periods in which they do not change at all (Baumgartner and Jones 1993, Kingdon 1984). In the context of gun violence, events like the Columbine High School shooting in Colorado have led to calls for new restrictions on guns as well as vehement responses from groups that oppose such changes and favor the loosening of gun laws (Goss 2006; Spitzer 2012). More generally, mass shootings may create "policy windows" during which legislatures become receptive to change—potentially due to shifts in the attention of the media and constituents. Nonetheless, the extent to which mass shootings affect policy and the nature of the resulting changes are empirical questions.

**Exhibit 11**
**0334**

In this paper, we explore the impact of mass shootings on gun policy, constructing a dataset of all U.S. gun legislation and mass shootings over a period of twenty-five years (1989–2014)—combining data from a variety of media and government sources. We begin by looking at the extent of deaths resulting from mass shootings relative to other gun deaths. Overall, there are more than 30,000 gun related fatalities in the United States per year. Approximately 56% of these are suicides and 40% are homicides. The remaining 4% are accidents or incidents of undetermined intent. Mass shootings accounted for about 0.13% of all gun deaths and 0.34% of gun murders between 1989 and 2014.

Because mass shootings are salient and plausibly random occurrences, we are able to implement a difference-in-differences strategy around the timing of mass shootings to estimate their causal impact on gun regulation. Specifically, we compare gun laws before and after mass shootings, in states where mass shootings occur relative to all other states.

We then present three main findings about the impact of mass shootings on policy. First, mass shootings evoke large policy responses. A single mass shooting leads to an approximately 15% increase in the number of firearm bills introduced within a state in the year after a mass shooting. This effect is largest after shootings with the most fatalities and is greatest in the Republican-controlled legislatures.

Second, although mass shootings account for a small portion of all gun deaths, they have an outsized influence relative to other homicides. Our estimates suggest that the per-death impact of mass shootings on bills introduced is much larger than the impact of gun homicides in non-mass shooting incidents.

Third, when looking at enacted laws, the impact of mass shootings depends on the party in power. A mass shooting roughly doubles the number of laws enacted in a year that loosen gun

3

**Exhibit 11**

**0335**

restrictions in states with Republican-controlled legislatures. We find no significant effect of mass shootings on laws enacted when there is a Democrat-controlled legislature. We also find no significant effect of mass shootings on the number of enacted laws that tighten gun restrictions.

These findings contribute to the political economy literatures on public attention, accountability, policymaking, and law. Empirical research on policymaking emphasizes that factors beyond social welfare—such as ideology, opportunism, and fiscal considerations—influence policy (Makowsky and Stratmann 2009; Bardhan and Mookherjee 2010). As we show, mass shootings cause intense legislative activity despite accounting for less than 1% of firearm deaths, suggesting factors beyond optimal deterrence affect debates concerning gun policy.

Additionally, our results contribute to the literature on issue selection and salience, which examines when and why politicians emphasize or downplay elements of their policy platform (Riker 1996; Petrocik 1996; Dragu and Fan 2016). Our finding that Republican-controlled states loosen restrictions on firearms following mass shootings is consistent with the literature's prediction that politicians in the majority tend to focus policymaking on issues they "own"—i.e. those which they have a reputation for successfully handling in the interests of their constituents. Using this definition, and at least during our sample period, Republicans do appear to have "owned" the gun issue (Goss 2006).

Finally, our results relate to the literature on media and public attention (Eisensee and Strömberg 2007; Durante and Zhuravskaya 2018). We find that mass shootings receive considerable media attention and that this attention is correlated with the number of gun bills introduced following mass shootings, suggesting that increased attention is a plausible mechanism for the higher levels of legislative activity we observe following mass shootings. This sheds light

4

**Exhibit 11**
**0336**

on the role of attention and salience in policymaking, and on the interaction between issue salience and political preferences in shaping the degree and direction of enacted policies.

## 2. Background and Data

As described above, of the roughly 30,000 annual gun deaths in the United States, fewer than 100 occur in mass shootings. For the purpose of this paper, we define a "mass shooting" as an incident in which 4 or more people, other than the perpetrator(s), are unlawfully killed with a firearm in a single, continuous incident that is not related to gangs, drugs, or other criminal activity. This definition closely matches the one used by Krouse and Richardson (2015) and the FBI's definition of "mass murder" as 4 or more murders "occurring during the same incident, with no distinctive time period between the murders… typically involv[ing] a single location" (Morton and Hilts 2008). We further restrict our analysis to cases where at least three of the fatalities were individuals unrelated to, and not romantically involved with, the shooter(s). We include spree murders—homicides at multiple locations without a significant pause between incidents —if they result in four or more deaths.

We assemble a list of mass shootings since 1989 from a variety of government and media sources because there is no single, comprehensive government database of mass murders. We first extract all gun-related mass murders (four or more dead) that are not felony related from the FBI supplementary homicide reports (SHR). We then verify each incident in the SHR using media accounts; the SHR may contain errors in which separate homicides in a month are reported as a single incident, which is why it is necessary to verify the incidents with media coverage. Participation in the SHR program is voluntary and many law enforcement agencies do not report detailed data to the FBI. We therefore supplement the FBI data with mass shootings gathered from

media accounts or compiled by other researchers and journalists interested in the topic. Specifically, we combine the SHR data with data on mass shootings collected by the Mass Shootings in America (MSA) project at Stanford University (Stanford Geospatial Center and Stanford Libraries 2015) and a list created by *USA Today* (2013). For each shooting, we determine the event location as well as the number of victim fatalities and injuries. We also classify shootings based on the relationship (if any) between the alleged shooter(s) and victims. Previous work on mass shootings (Duwe 2007; Krouse and Richardson 2015) distinguishes between public mass shootings that occur in places frequented by the public, felony-related murders, and familicide. We categorize shootings by whether they are public events or primarily related to domestic conflicts, and we focus on incidents in which at least three people not related or romantically involved with the shooter died. This restriction filters out family-killings in residences as well as family-related murders in public places.[1]

Figure 1 shows the number of incidents and fatalities in mass shootings by year. The data show a slight upward trend in the number of incidents and fatalities over time, but both incidents and fatalities vary substantially from year to year. Figure 2 shows a map of the locations of mass shootings in the United States between 1989 and 2014.

## 2.2. Gun Legislation

State governments are the primary regulators of firearms. Federal laws establish a minimum level of gun control, which is augmented to varying degrees by state and local policies. The federal government has put some restrictions on firearm commerce, the possession of guns by potentially dangerous individuals, and ownership of certain types of firearms and ammunition.

---

[1] A 2006 shooting at a church in Louisiana is one example. A man killed his wife and in-laws while abducting her and their children from a church. Only the wife's family was present at the church during the shooting.

States decide a variety of gun policies ranging from who can purchase and possess a gun to what types of guns are allowed in different situations to how guns should be stored and what types of training should be undertaken by gun owners. Local ordinances can also restrict firearm possession and use, but state statutes enacted in the past few decades have limited the importance of local government in this arena by pre-empting local regulations.

We create a comprehensive dataset of gun legislation in all fifty states using the bill tracking reports service from LexisNexis, which includes all bills introduced in state legislatures since at least 1990 with a synopsis and timeline of each bill's progress. This allows us to determine whether bills pass the legislature and become law. We identify firearm bills by searching for the firearm-related terms "firearm", "handgun", "pistol", "revolver", "rifle", "shotgun", "long-gun", and "assault weapon." We identify 20,409 firearm bills and 3,199 laws between 1990 and 2014. In other words, there were 20,409 *proposals* made and 3,199 laws passed in the twenty-five-year sample period across all fifty states. This includes laws that loosen or tighten gun restrictions, and many that do neither or both. We exclude resolutions, executive orders, and ballot initiatives from the analysis.[2] Figure 3 shows the total number of bills introduced and laws enacted by year.

To explore whether gun control is tightened or loosened after mass shootings, we hired eight people to manually code the summary of bills that became law. Coders were given instructions explaining how to code legislation, but were otherwise blind to the topic and design of the study. We presented bill summaries from LexisNexis to coders in randomly chosen groups

---

[2] Our data source—Lexis Advance—includes resolutions, but it's unclear whether it includes all executive orders or ballot initiatives. Including those we do have along with all resolutions does not meaningfully change the results—the correlation between our measure of legislation and a measure including these other actions is 0.99. In addition, legislators in some states first submit ideas for bills in the form of a "draft request" or similar document. We exclude these from our analyses because they result in double counting some legislation. We instead focus only on actual bills.

of 50. Two people coded each summary, and no coder saw the same summary multiple times. For each summary, coders decided whether the bill was tightening (stricter gun control), loosening (weaker gun control), uncertain (insufficient information), both tightening and loosening, or neither tightening nor loosening (neutral). There were therefore five possible labels for bills: tighten, loosen, both, neutral, or uncertain. Appendix A shows example bill summaries and their expected labels.

To cross-validate (and incentivize) the bill coding, we coded a small fraction of bills ourselves as a baseline comparison point. For this process, we blinded ourselves from any information about when or where the bill was proposed. We then used our scores to assess the quality of coders. Specifically, each group of 50 bills given to a coder contained five bills that we had also coded (they did not know which bills were and weren't coded by us, and did not have access to any of our assessments of whether a bill was looser or tighter). Coders were paid up to a 50% bonus based on the extent to which their coding matched ours (which we simply told them was a "gold standard" of known codes).

Across all five categories, the two coders for each bill agreed with each other 52% of the time (the agreement rate would be 20% by chance) and agreed with the gold standard 71% of the time. Coders performed worst on the neutral category, and best on the tighten-only and loosen-only categories; when a bill tightens gun control (according to the gold standard), the two coders agree on tightening 67% of the time, and when a bill loosens gun control, they agree on loosening 60% of the time. The fact coders were not able to agree on a category for 48% of laws reduces the sample available for analysis and is a limitation of our study. In principle, laws might be unclear for coders either because the law is relatively minor and intended to be window dressing, or because it was complicated for the coders to read (leading to coder errors or ambiguity). To

explore, we compared 100 random laws that coders disagreed about to 100 they agreed on. We then classified each as a minor (e.g. convening a committee to study an issue) or major (e.g. allowing guns in schools) policy change. We find a similar number of minor laws in both samples, suggesting that coder disagreement likely results from coder inattention rather than laws being especially likely to be minor policy changes. We do not see differences in the rate of disagreement among coders about laws enacted in the wake of a mass shooting, relative to laws enacted at other times. Appendix A includes a breakdown of the coding for all 3,199 laws, further discussion of coder agreement, and examples of bills that coders found difficult.

Most importantly for the purposes of our analysis, however, is that when the two coders of a bill agree with each other on tightening, they also agree with our coding 93% of the time; when the two coders agree on loosening, they are consistent with our scores 91% of the time. When analyzing the direction of policy change, we leverage this high degree of reliability by restricting our analysis to laws that coders agreed were designed to tighten or loosen gun control.[3] Because states can pass either, none, or both types of laws in a year, our dependent variable is the count of laws in each direction.

Figure 4 shows mean bills introduced, laws enacted, and tightening and loosening laws by political control of the state legislature. Republicans enact more laws loosening gun control, and fewer laws tightening gun control, than do Democrats. Republican, Democratic, and split legislatures enact a similar number of total gun laws. The coders who classified the legislation were only given summaries of each bill; they were not provided with the state, year, or any information on political affiliation.

---

[3] This is 37% of all enacted laws in our data. As mentioned, nearly half of laws cannot be categorized because coders disagreed on the classification. Another 13% are not used because coders agreed they were neutral or uncertain.

## 2.3. Control Variables

Our main specification controls for state and year fixed effects, as well as an indicator for whether the legislature is in a regular session in the given year, and whether it is the first year of a legislative biennium (since bills are more likely to be enacted then). Specifically, we create two dummy variables. First, we create a dummy for legislatures that held a regular session in a given year because not all legislatures meet annually. Legislatures that are not in regular session would have to rely on special sessions, which can be difficult to call, in order to consider new gun legislation (though some do this). Second, we control for the first year of each legislative biennium (a two-year period of law making), which varies by whether states hold elections in odd or even years. Typically, more bills are introduced during the first year of the biennium, which leads to alternating years of high and low bill introductions (Figure 3). Building on this main specification, we then add time varying controls as a robustness check. These include economic and demographic factors such as unemployment, divorce rates, and rates of military service. We then layer on controls for the political party in power, since the direction of proposed changes often vary between Democrats (who generally favor more restrictive gun laws) and Republicans (who generally favor less restrictive gun laws). Table 1 contains summary statistics for all variables used in the analyses.

# 3. The Impact of Mass Shootings on Gun Policy

## 3.1 Identification Strategy

We implement a difference-in-differences strategy that compares gun laws before and after mass shootings, in states where mass shootings occur relative to all other states. Our dependent variables are counts of bills or enacted laws at the state-year level. We study the effect of mass shootings using Poisson regressions with conditional mean:

$$\mathbf{E}\big[y_{s,t}|\alpha_s,\lambda_t,Shoot_{s,t-1},X_{s,t}\big]=\exp\big(\alpha_s+\lambda_t+\delta_s t+\beta\,Shoot_{s,t-1}+\gamma' X_{s,t}\big)$$

where $y_{s,t}$ is a count of bills introduced or laws enacted in state $s$ and year $t$; $\alpha_s$ and $\lambda_t$ are state and year fixed effects; the $\delta_s t$ are state-specific time trends; $Shoot_{s,t-1}$ is either an indicator for states with a mass shooting or the fatality count in mass shootings, and $X_{s,t}$ is a vector of time-varying political, economic, and demographic factors. We estimate the parameters via maximum likelihood by conditioning on the sum of $y_{s,t}$ within states and including year indicators.[4]

Our identification allows us to measure the impact of a mass shooting within that state, controlling for other changes that are happening at the national level. Because this identification strategy does not identify national responses to mass shootings (which would be absorbed by our year effect), our estimates of changes in gun policy may underestimate the total impact of a mass shooting. We can and do account for potential spillovers into neighboring states, but do not see significant spillover effects; these results are presented in Appendix B.

### 3.2 The Effect of Mass Shootings on Gun Bill Introductions

Table 2 shows that a mass shooting leads to a 15% increase in firearm bills introduced (column 4). For the average state, this amounts to an additional 2.4 firearm bills introduced in the year following a mass shooting. Mass shootings with more deaths lead to larger effects. On average, each additional death in a mass shooting leads to a 2.3% increase in the number of gun bills introduced (column 8). These results hold for both Republican-controlled and Democrat-controlled legislatures, for alternative victim thresholds used to define mass shootings, models that

---

[4] It is possible that the number of bills introduced in a given year within a state would depend on the number introduced in recent years in ways that we do not capture with the state fixed effects or time trends. To allow for this possibility, we also estimated an exponential feedback model in which past legislative activity can affect current activity. Our results suggest past legislation does not substantively affect current legislation; state fixed effects adequately capture time series persistence in legislation and the coefficient estimate for the impact of mass shootings is similar in the exponential feedback model.

**Exhibit 11**
**0343**

examine the year of the shooting in addition to the previous year, and models that use the log of fatalities instead of the count.[5]

### 3.3 Comparing Mass Shootings and Non-Mass Shootings

Table 3 shows that fatalities resulting from mass shootings lead to much larger increases in gun bill introductions than gun homicides in non-mass shooting incidents. We estimate the models in this table using mass shooting fatalities and ordinary gun homicides per 100,000 people to facilitate comparison between the two types of murder. Our estimates are imprecise, but suggest it would take approximately *125 people dying in individual gun homicide incidents* to have as much impact on bills introduced as each person who dies in a mass shooting. There are, however, a number of caveats to this estimate. First, ordinary gun homicides are less random than mass shootings and therefore not exogenous in the model. Second, the victims of mass shootings and ordinary gun homicides have different attributes; the impact of mass shootings is not easily decomposed into the effect of victim count, media salience, and attributes of the victims. Any differences in response between ordinary and mass shootings could be driven in part by attributes of the victims. Our estimates, however, are still suggestive evidence that mass shootings tend to have a greater impact on legislative activity than changes in the ordinary gun homicide rate.

### 3.4 The Role of Political Party on Laws Enacted

As mentioned previously, the two major political parties in the United States differ dramatically in their stances on how restrictive gun policy should be, with the Republican Party favoring fewer gun restrictions.[6] To look at the impact of political parties on gun policy, we restrict

---

[5] Results by political affiliation are presented in Table 4 and discussed in section 3.4 below. Results using alternative victim thresholds for the definition of mass shooting (e.g. 5+, 7+, 10+ deaths) and alternative models are available from the authors upon request.

[6] See, for example, https://www.gop.com/platform/ and https://www.democrats.org/party-platform.

our analysis to enacted laws, all of which were coded for whether they loosened or tightened gun restrictions (see data description for more details).

Tables 4 and 5 show the effect of mass shootings interacted with Democrat and Republican control of state legislatures. The results show that Democrats and Republicans respond differently to mass shootings. Table 4 shows that Republicans introduce 48% more bills and Democrats introduce 11% more bills following mass shootings than in other years, although the coefficient for Democrats is not statistically significant.[7] The results also indicate that Republican legislatures enact 32% more laws the year after a mass shooting than in other years, a statistically significant increase. Democratic legislatures enact 7% more laws the year after a mass shooting, but this estimate is imprecise and not statistically significant.[8]

When there is a Republican-controlled legislature, mass shootings lead to more firearm laws that loosen gun control (Table 5). Our point estimates indicate that a mass shooting in the previous year increases the number of enacted laws that loosen gun restrictions by 115% in states with Republican-controlled legislatures. When there is a Democrat-controlled legislature, mass shootings lead to a statistically insignificant reduction in laws that loosen gun control. This result is similar across models using the count of fatalities instead of a shooting indicator, across alternative victim thresholds, with or without year fixed effects, with or without control variables, and when we include only a limited set of controls.[9] We find no significant effects of mass shootings on laws that tighten gun restrictions, but the estimates are imprecise.

---

[7] The difference between Republicans and Democrats is statistically significant at the 0.05 level.

[8] The difference between Republicans and Democrats in terms of enacted laws is not statistically significant. Without interacting mass shooting with political party, there is a 9% increase in gun laws enacted (i.e. bills that become law) after a mass shooting relative to other years, but this estimate is imprecise (Appendix C).

[9] Available from authors upon request. The coefficients tend to be larger in magnitude for shootings resulting in more deaths (e.g. a dummy for shootings that causes 6–9 deaths has a larger coefficient than a dummy for shootings causing 4–5 deaths). The effect for tightening laws is statistically significant and positive—for both

The finding that Republicans—who typically favor fewer restrictions on gun owners—are more active in introducing and passing new legislation following mass shootings is consistent with hypotheses in the literature on how issue salience affects policy decisions (Riker 1996; Petrocik 1996; Dragu and Fan 2016). These models of issue selection suggest that Republican-controlled legislatures might respond to increased attention to gun policy by introducing new legislation because Republican voters: (a) tend to be in favor of expanding gun rights and access to guns (Parker et al. 2017), (b) often argue that such actions reduce gun crime (Parker et al. 2017), and (c) are more likely than Democratic voters (during our sample period) to mobilize for political action on this issue (Goss 2006).[10] Research suggests that supporters of gun rights are more likely to advocate for their positions by writing letters or donating money (Schuman and Presser 1981) and are better-organized than citizens favoring gun control; membership in pro-gun-control organizations, for example, is less than 10% of the National Rifle Association's membership (Goss 2006).[11]

Anecdotally, there are several examples of Republican lawmakers proposing looser gun laws in response to mass shootings. In the year after the mass shooting at Marjory Stoneman Douglas High School, Florida passed legislation allowing teachers and volunteers to carry guns in schools. Republican Rep. Chuck Brannan explained the rationale: "It allows the good guys to stop the bad. The bad guys will never know when the good guys are there to shoot back."[12] Similarly, Texas expanded its school marshal program, which trains teachers to carry weapons, the year after

---

Democrats and Republicans—only for shootings causing 10+ deaths. This result, however, is identified from only 11 state-year observations due to the rarity of mass shootings that kill 10 or more people.

[10] Republicans appear more likely than Democrats to enact new gun legislation in the absence of a mass shooting (see Table 4, $p = 0.08$).

[11] Goss (2006) further analyzes the reasons why gun rights organizations have been better organized and more successful than gun control advocates.

[12] Anderson, Curt. "Florida lawmakers pass bill allowing more armed teachers." *AP News*. 1 May 2019.

**Exhibit 11**

**0346**

a shooting at Santa Fe High School. Republican Rep. Tony Tinderholt suggested that "what stops people with guns is other people with guns."[13]

Overall, the observed effects of mass shootings in Republican-controlled states on bill introductions, laws enacted, and loosening laws suggest that there are relevant changes to gun policy following mass shootings. However, it is possible that mass shootings also lead to an uptick in minor proposals as well; legislators may want to signal that they are making changes even if the new laws have only unsubstantial effects on policy in practice. To further examine this possibility, we look at the impact of mass shootings on laws our coders agreed where neutral since these tend to be more minor proposals (e.g. changing the official responsible for storing certain records). As seen in Appendix D, we do not see statistically significant changes in the number of neutral law changes, although the point estimate is positive.

### 3.5 Media Coverage and Mass Shootings

To explore the potential role of media in increasing the salience of mass shootings, we assemble a dataset of television news coverage related to guns. We measure the seconds of gun-related news coverage on the national, evening news programs of the three major television networks—NBC, ABC and CBS—using data from the Vanderbilt Television News Archive (VTNA).[14] This source has been used in prior research to measure media attention to natural disasters (Eisensee and Strömberg 2007) and the Israeli-Palestinian conflict (Durante and Zhuravskaya 2018). We exclude cable news networks because data on their news coverage is not available for our sample period. To calculate total gun-related news coverage, we take all news segments that mention gun-related words in either the segment title or summary provided by

---

[13] Vertuno, Jim. "Texas seeks more armed school personnel after mass shooting." *AP News.* 7 May 2019.
[14] The Vanderbilt Television News Archive is accessible online at https://tvnews.vanderbilt.edu.

VTNA and exclude segments that include the names of foreign countries.[15] We then sum the duration of these news stories by day to create a measure of total gun-related news coverage.

To capture variation in news coverage across shootings, we aggregate news coverage in the ten days following each mass shooting (including the day of the shooting). The five most covered mass shootings between 1989 and 2014 are the shootings at Sandy Hook Elementary School, a Gabrielle Giffords constituent meeting, Virginia Tech, an Aurora movie theater, and Columbine High School.

Mass shootings increase gun-related media coverage, and shootings that kill more people result in more coverage. Figure 5 shows total seconds of evening news coverage devoted to gun-related stories around the time of mass shootings. Mass shootings resulting in 10 or more fatalities receive substantially more coverage than shootings resulting 6–9 fatalities, which in turn receive more coverage than shootings with 4–5 fatalities. Appendix E provides further support for this relationship in the form of regression results.

To examine whether the amount of gun-related news coverage following a mass shooting affects policy, we add the measure of media coverage to our model by totaling the amount of gun-related news coverage following each shooting within a state during the previous year. The results in Table 6 show that the coefficient on news coverage is positive and statistically significant, indicating that more media attention is associated with a greater policy response. One hour of gun-related news coverage following a mass shooting is associated with a 13 percent increase in the number of gun-related bills introduced in state legislatures (column 4). This suggests that increased salience of gun policy after mass shootings is a plausible mechanism for the relationship between shootings and gun legislation. Media coverage, however, is strongly related to the number of

---

[15] This filter removes news stories about foreign wars.

**Exhibit 11**
**0348**

fatalities (see Figure 5), making it difficult to distinguish the impact of media coverage from other attributes of the shooting event.

Unlike other studies of the media's effect on public policy (Eisensee and Strömberg 2007; Durante and Zhuravskaya 2018), our ability to detect policy responses to gun-related news coverage is limited by the small number of events and by the delay between when a mass shooting occurs and when legislatures can act, which is usually not until the next legislative session. The natural disasters studied by Eisensee and Strömberg (2007) and military attacks studied by Durante and Zhuravskaya (2018) number in the thousands, whereas we observe 169 mass shootings. Furthermore, these authors focus on executive actions—whether to provide disaster relief (Eisensee and Strömberg 2007) or launch a military attack (Durante and Zhuravskaya 2018)—that can be taken within hours or days of an event and accompanying news story. Legislative action on the other hand must wait until a legislature is in session and rules allow for the introduction of new bills. Our results overall, however, show that attention shifts to gun violence following mass shootings, and shootings that kill more people receive more media attention. These shifts in attention are a plausible mechanism behind increased legislative activity related to guns in the year following mass shootings

### 3.6 Robustness Checks

In this section, we present four sets of robustness checks. First, we collapse our data into two-year intervals (e.g. by legislative biennium) to ensure the saw-edge pattern in bill introductions (see Figure 3) does not drive our results. Second, we provide support for the exogeneity of mass shootings. Third, we perform a falsification exercise in which we use randomly generated placebo shootings instead of actual shootings; we show there are no effects using the placebo shootings, providing support for our identification strategy. Fourth, we individually drop each state from the

sample and re-estimate the models to ensure our effect is not driven by a single state or shooting event.

### 3.6.1 Analysis by Legislative Biennium

Figure 3 shows that bill introductions vary substantially between odd- and even-numbered years. We believe this pattern is driven by most states starting their two-year legislative biennium in odd-numbered years, following elections in November of even-numbered years. Many states allow legislators to "carryover" bills that do not pass in the first year of the biennium for consideration in the second year. This means the agenda in the second year of each biennium includes both newly introduced bills and bills introduced the previous year that have been carried over.[16] Our models control for this pattern by including both year fixed effects and an indicator for the first year of each biennium. To ensure this pattern does not drive our results, however, we estimate models that collapse the data to two-year intervals and regress the total number of bills introduced on the mean of mass shootings (e.g. a variable equal to one if both years of the biennium follow a mass shooting and equal to 0.5 if only one year of the biennium follows a mass shooting). The results are shown in columns 3 and 7 in Table 2, and column 3 in Tables 3 and 6. The coefficient estimates are less precise, but remain statistically significant and suggest similar effect sizes. The estimate in column 3 of Table 2, for example, suggests mass shootings lead to the introduction of 3.5 more bills for an average state.

### 3.6.2 Determinants of Mass Shootings

Our ability to identify the causal impact of mass shootings on policy rests on the assumption that they are plausibly exogenous to other factors that would drive gun control in a

---

[16] Our analyses count each bill once, including it only in the year it was introduced. We count enacted laws in the year of enactment.

**Exhibit 11**

**0350**

given year. Given the erratic nature of mass shootings, this is a plausible assumption. Nonetheless, one might be concerned that both mass shootings and gun policy are being driven by a third variable. To provide support for our assumption and interpretation, we regress an indicator for whether a mass shooting occurs on economic, demographic, and policy variables.

Consistent with the assumption that mass shootings are exogenous with respect to potential confounds, the results in Appendix F show that, out of 32 variables we consider, only unemployment is significantly associated with a higher probability of mass shootings. Because higher unemployment is also associated with a reduction in gun bill introductions (Table 2), the potential bias of this would work in the opposite direction of our finding—making it unlikely that this is driving our results. To further support our interpretation, we control for unemployment in all models. Importantly, bills introduced, laws enacted, and major gun policies do not predict future mass shootings (Appendix F).

### 3.6.3 Placebo Tests

We perform a falsification exercise based on the insights of Bertrand, Duflo, and Mullainathan (2004) and Donald and Lang (2007). Specifically, we randomly assign placebo mass shootings to state-years in which no actual shooting occurred with probability equal to each state's frequency of shootings, and randomly draw a fatality count from the empirical distribution of fatalities. Appendix G shows percentiles of the test statistic based on 1,000 repetitions of this procedure and our actual test statistics from Tables 2 and 5. The results suggest our tests do not over-reject the null hypothesis that mass shootings have no effect on gun policy.

### 3.6.4 Excluding Individual States

To ensure our results are not driven by a single state or shooting, we separately remove each state from the sample and re-estimate the models. Appendix H presents graphs of the resulting

**Exhibit 11**
**0351**

50 coefficients for the effect of mass shootings on bills and laws, and coefficients for the Republican and Democrat interaction terms in our analysis of laws that tightened or loosened gun policy. The results show that dropping individual states has little effect on our estimates.

## 4. Discussion

Mass shootings account for a small fraction of gun deaths in the United States, but have a significant impact on gun policy. More gun laws are proposed in the year following a mass shooting. Furthermore, mass shootings seem to have much larger effects on policy, per fatality, than do ordinary gun homicides. These results are broadly consistent with qualitative research that has hypothesized the possibility of mass shootings precipitating change. For example, Godwin and Schroedel (1998) argue that the Stockton schoolyard massacre in 1989 led to the enactment of California's assault weapons ban. We find large sample empirical evidence that sporadic events such as mass shootings can lead to major policy changes.

We also find that media coverage related to guns increases following mass shootings and that Democrat-controlled and Republican-controlled legislatures differ significantly when it comes to enacting gun laws. Republicans are *more* likely to loosen gun laws in the year after a mass shooting than in other years. The effect for Democrats, which tends toward a reduction in the loosening of gun restrictions after a mass shooting, is statistically insignificant. This result aligns with the prediction from the political economy literature on issue selection, that political parties emphasize issues that they have a reputation for successfully handling in the eyes of their constituents (Riker 1996; Petrocik 1996; Dragu and Fan 2016).

Our findings raise a number of additional questions, and suggest several directions for future research. First, future research might directly explore the preferences of politicians.

Republican legislatures could loosen gun restrictions because Republican politicians themselves prefer looser restrictions (as would be the case in a citizen-candidate model) or due to pressure from constituents or interest groups. Consistent with this latter possibility, and our findings, survey evidence suggests that those opposed to increased gun control are more likely than those in favor of additional restrictions to take actions like writing a letter or donating money to support their side (Schuman and Presser 1981). If constituent preferences are driving results, we might expect increased loosening of gun policies in areas with higher rates of gun ownership. To provide exploratory evidence, Appendix I shows the results from adding a proxy for gun ownership to the models. Following Cook and Ludwig (2006), we calculate the percentage of suicides that are firearm related as a proxy for gun ownership and interact this variable with the mass shooting indicator. The coefficient on this variable is not significant either in isolation or when added to the specification with all political interactions. This suggests that changes in support for guns (as proxied by gun ownership) is not the main driver of the policy changes.

Second, our estimates focus on the impact on policy within the state in which each shooting took place. Some mass shootings get national media attention and potentially affect policy nationwide, a result that would not be identified by our fixed effects model. One direction for future research is to develop strategies to identify national responses. With respect to our findings, this suggests that the total impact of mass shootings on gun policy may be even larger than our estimates.

Third, there is a large literature on the impact of gun policies on crime (Duggan 2001; Ludwig and Cook 2000; Ludwig and Cook 2003; Abrams 2012; Luca, Malhotra, and Poliquin 2017). While some gun policies have been extensively researched, many have been difficult to study, which complicates analysis of which policies would be most effective. The relationship we

find between mass shootings and gun policy raises the possibility of using mass shootings as an instrumental variable to further study the impact of gun laws on gun deaths. Unfortunately, in our sample, mass shootings are not a sufficiently strong instrument to estimate the effects of gun policy on gun deaths, due to their relative infrequency. (Appendix J presents results of this analysis.) This leaves open the possibility of using salient and plausibly random events to instrument for policy changes in future research.

Overall, our results show that even random and infrequent events that account for a relatively small portion of total societal harm (as measured by fatalities in the current study) might nonetheless be crucial levers for policy consideration and change. This does not imply that politicians and policy makers are over-reacting; it may be that on issues where there is usually political deadlock, salient events create opportunities for change that has been sought all along. Whether these changes reflect appropriate responses to the problem remains an open question.

# References

Abrams, David S. 2012. "Estimating the Deterrent Effect of Incarceration Using Sentencing Enhancements." *American Economic Journal: Applied Economics* 4 (4): 32-56.

Andrews, Donald W. K., Marcelo J. Moreira, and James H. Stock. 2006. "Optimal Two-Sided Invariant Similar Tests for Instrumental Variables Regression." *Econometrica* 74 (3): 715-52.

Bardhan, Pranab, and Dilip Mookherjee. 2010. "Determinants of Redistributive Politics: An Empirical Analysis of Land Reforms in West Bengal, India." *American Economic Review* 100 (4): 1572–1600.

Baum, Christopher F., Mark E. Schaffer, and Steven Stillman. 2007. "Enhanced Routines for Instrumental Variables/generalized Method of Moments Estimation and Testing." *The Stata Journal* 7 (4): 465–506.

Bertrand, Marianne, Esther Duflo, and Sendhil Mullainathan. 2004. "How Much Should We Trust Differences-in-Differences Estimates?" *The Quarterly Journal of Economics* 119 (1): 249-75.

Baumgartner, Frank R. and Bryan D. Jones. 1993. *Agendas and Instability in American Politics.* Chicago, IL: University of Chicago Press.

Bouton, Laurent, Paolo Conconi, Francisco Pino, and Maurizio Zanardi. 2015. "Guns and Votes," *working paper*.

Cook, Phillip J., and Jens Ludwig. 2006. "The Social Costs of Gun Ownership." *Journal of Public Economics* 90 (1–2): 379–391.

Donald, Stephen G, and Kevin Lang. 2007. "Inference with Difference-in-Differences and Other Panel Data." *Review of Economics and Statistics* 89 (2): 221-33.

Dragu, Tiberiu and Xiaochen Fan. 2016. "An Agenda-Setting Theory of Electoral Competition." *The Journal of Politics* 78 (40): 1170–1182.

Duggan, Mark. 2001. "More Guns, More Crime." *Journal of Political Economy* 109 (5): 1086-1114.

Durante, Ruben and Ekaterina Zhuravskaya. 2018. "Attack When the World is Not Watching? US News and the Israeli-Palestinian Conflict." *Journal of Political Economy* 126 (3): 1085–1133.

Duwe, Grant, 2007. *Mass Murder in the United States.* North Carolina: McFarland & Company, Inc.

Egan, Patrick J. and Megan Mullin. 2012. "Turning Personal Experience into Political Attitudes: The Effect of Local Weather on Americans' Perceptions about Global Warming." *The Journal of Politics 74* (3): 796–809.

Eisensee, Thomas and David Strömberg. 2007. "News Droughts, News Floods, and U.S. Disaster Relief." *The Quarterly Journal of Economics*, *122* (2): 693–728.

Finlay, Keith, and Leandro M. Magnusson. 2009. "Implementing Weak-Instrument Robust Tests for a General Class of Instrumental-Variables Models." *The Stata Journal* 9 (3): 398–421.

Fuller, Wayne A. (1977). "Some Properties of a Modification of the Limited Information Estimator." *Econometrica* 45 (4): 939–53.

Godwin, Marcia L., and Jean Reith Schroedel. 1998. "Gun Control Politics in California." In *The Changing Politics of Gun Control*, edited by John M. Bruce and Clyde Wilcox, 88–110. Lanham, MD: Rowman & Littlefield Publishers, Inc.

Goss, Kristin A. 2006. *Disarmed: The Missing Movement for Gun Control in America*. Princeton, NJ: Princeton University Press.

Kingdon, John W. 1984. *Agendas, Alternatives, and Public Policies*. Boston, MA: Little, Brown & Company.

Krouse, William and Daniel J. Richardson. 2015. *Mass Murder with Firearms: Incidents and Victims, 1999-2013* (CRS Report No. 7-5700). Washington, DC: Congressional Research Service, 2015. https://fas.org/sgp/crs/misc/R44126.pdf.

Levitt, Steven D. 1996. "The Effect of Prison Population Size on Crime Rates: Evidence from Prison Overcrowding Litigation." *The Quarterly Journal of Economics* 111 (2): 319–51.

Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2017. "Handgun Waiting Periods Reduce Gun Deaths." *Proceedings of the National Academy of Sciences* 114 (46): 12162–12165.

Ludwig, Jens, and Philip J. Cook. 2000. "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act." *JAMA* 284 (5): 585-91.

Ludwig, Jens, and Philip J Cook. 2003. Evaluating Gun Policy Effects on Crime and Violence. Washington, D.C.: Brookings Institution Press.

Makowsky, Michael D., and Thomas Stratmann. 2009. "Political Economy at Any Speed: What Determines Traffic Citations?" *The American Economic Review* 99 (1): 509–27.

Moreira, Marcelo J. 2003. "A Conditional Likelihood Ratio Test for Structural Models." *Econometrica* 71 (4): 1027-48.

Morton, Robert J. and Mark A. Hilts, eds. 2008. "Serial Murder: Multi-disciplinary perspectives for investigators." *Serial Murder Symposium, San Antonio, TX, August 29-September 2, 2005*. Washington, DC: Federal Bureau of Investigation, http://www.fbi.gov/stats-services/publications/serial-murder/serial-murder-july-2008-pdf.

Parker, Kim, Juliana Menasce Horowitz, Ruth Igielnik, J. Baxter Oliphant, and Anna Brown. 2017. "America's Complex Relationship with Guns." *Pew Research Center*. 22 June 2017. https://www.pewsocialtrends.org/2017/06/22/americas-complex-relationship-with-guns/.

Petrocik, John R. 1996. "Issue Ownership in Presidential Elections, with a 1980 Case Study." *American Journal of Political Science* 40 (3): 825–850.

Riker, William H. 1996. *The Strategy of Rhetoric.* New Haven, CT: Yale University Press.

Schuman, Howard and Stanley Presser. 1981. "The Attitude-Action Connection and the Issue of Gun Control." *The ANNALS of the American Academy of Political and Social Science 455* (1): 40–47.

Spitzer, Robert J. 2012. *The Politics of Gun Control*. 5th Ed. Boulder, CO: Paradigm Publishers.

Stanford Geospatial Center and Stanford Libraries. 2015. "Stanford Mass Shootings in America," July 31 release, https://library.stanford.edu/projects/mass-shootings-america.

Stock, James H., and Motohiro Yogo. 2005. "Identification and Inference for Econometric Models." In *Identification and Inference for Econometric Models*, edited by Donald W. K. Andrews and James H. Stock, 80–108. New York: Cambridge University Press.

*USA Today.* 2013. "Behind the Bloodshed: The Untold Story of America's Mass Killings," http://www.gannett-cdn.com/GDContent/mass-killings/index.html.

**Exhibit 11**

**0357**

# Figures



**Figure 1** Mass shooting incidents and fatalities by year, 1989-2014. The upper panel shows the number of fatalities in mass shootings in which at least 3 people not related or romantically connected to the shooter were killed. The bottom panel shows the number of these incidents. Washington, D.C. is not included in the sample.



**Figure 2** Locations of public mass shootings in the United States, 1989–2014. States are shaded based on the total number of shootings during the sample period. Points represent the locations of events.



**Figure 3** Total gun bills introduced and laws enacted by year, 1990–2014.



**Figure 4** Comparison of annual legislation introduced by political party. Points represent the mean and lines are 95% confidence intervals. Legislature control means one political party includes both chambers of the legislature. The counts of tightening and loosening laws are based on laws with coder agreement (see section 2.2 of text).



(a)   Coverage around time of mass shootings



(b)   Coverage by number of fatalities

**Figure 5** Evening news coverage related to guns before and after mass shootings. Panel (a) shows average coverage around the time of all mass shootings; panel (b) shows coverage around the time of shootings by the number of fatalities caused. News coverage is measured in seconds.

# Tables

**Table 1:** Summary Statistics

|  | mean | sd | p5 | p10 | p50 | p90 | p95 |
|---|---|---|---|---|---|---|---|
| ***Gun Legislation*** | | | | | | | |
| Bills introduced | 16.33 | 22.04 | 0 | 1 | 10 | 38 | 53 |
| Laws enacted | 2.56 | 3.35 | 0 | 0 | 1 | 6 | 9 |
| Tightening laws | 0.70 | 1.29 | 0 | 0 | 0 | 2 | 3 |
| Loosening laws | 0.25 | 0.62 | 0 | 0 | 0 | 1 | 1 |
| ***Gun Violence and Media*** | | | | | | | |
| Mass shooting | 0.12 | 0.32 | 0 | 0 | 0 | 1 | 1 |
| Fatalities | 0.72 | 2.40 | 0 | 0 | 0 | 4 | 5 |
| Gun homicide rate | 3.76 | 2.55 | 0.72 | 0.98 | 3.42 | 7.40 | 8.65 |
| News coverage | 0.06 | 0.34 | 0 | 0 | 0 | 0.06 | 0.29 |
| ***Political Controls*** | | | | | | | |
| Democratic legislature | 0.42 | 0.49 | 0 | 0 | 0 | 1 | 1 |
| Republican legislature | 0.34 | 0.47 | 0 | 0 | 0 | 1 | 1 |
| Republican governor | 0.53 | 0.50 | 0 | 0 | 1 | 1 | 1 |
| ***Institutional Controls*** | | | | | | | |
| Regular session | 0.94 | 0.24 | 0 | 1 | 1 | 1 | 1 |
| First year of biennium | 0.48 | 0.50 | 0 | 0 | 0 | 1 | 1 |
| ***Demographic Controls*** | | | | | | | |
| Elderly (65+) % | 12.9 | 2.0 | 9.8 | 10.7 | 13.1 | 15.2 | 15.7 |
| Under 25 % | 35.1 | 2.7 | 31.4 | 32.2 | 34.8 | 38.0 | 39.5 |
| Black % | 10.3 | 9.5 | 0.6 | 0.8 | 7.4 | 26.4 | 30.1 |
| Hispanic % | 8.3 | 9.2 | 0.8 | 1.2 | 5.1 | 20.3 | 29.9 |
| Unemployment % | 5.7 | 1.9 | 3.1 | 3.5 | 5.4 | 8.1 | 9.3 |
| Income per capita | 19.1 | 3.3 | 14.1 | 15.0 | 18.7 | 23.3 | 25.8 |
| High school % | 85.2 | 5.2 | 75.7 | 78.4 | 86.1 | 91.2 | 92.0 |
| Veteran % | 11.8 | 2.4 | 7.9 | 8.8 | 11.8 | 15.0 | 16.1 |
| Divorce % | 11.8 | 1.8 | 8.9 | 9.5 | 11.8 | 14.1 | 14.7 |

*Note:* Sample includes 1,250 state-year observations from 1990 to 2014. *Bills introduced* is the number of bills introduced in the legislature; *Laws enacted* is the number of bills that became law. *Tightening* and *Loosening laws* are numbers of enacted laws that tightened and loosened gun control respectively. *Mass shooting* is an indicator for state-years with a mass shooting in which three or more people not romantically involved with or related to the shooter(s) were killed. *Fatalities* is the total number of deaths in mass shootings in a state-year. The *Gun homicide rate* is expressed as deaths per 100,000 residents. *News coverage* is the hours of nightly news coverage of mass shootings occurring in a state. *Democratic* and *Republican legislature* are indicators for party control of the state legislature. *Republican governor* is an indicator for Republican governors. *Regular session* indicates whether the legislature convened a regular (as opposed to special) session to consider bills; some state legislatures only meet every other year. *First year of biennium* is an indicator for the first year of the two-year legislative biennium (the calendar year immediately following elections). *Income per capita* is measured in thousands of 1987 U.S. dollars. Other demographic variables are percentages.

**Exhibit 11**

**0363**

**Table 2:** The Effect of Mass Shootings on Gun Bill Introductions

*Dependent variable: number of firearm-related bills introduced in state legislature.*

|  | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Mass Shooting | 0.145** | 0.153** | 0.198* | 0.143** | | | | |
| | (0.071) | (0.070) | (0.101) | (0.069) | | | | |
| Fatalities | | | | | 0.023*** | 0.024*** | 0.030*** | 0.023*** |
| | | | | | (0.008) | (0.007) | (0.011) | (0.007) |
| Regular Session | 1.581*** | 1.572*** | -0.201* | 1.573*** | 1.596*** | 1.586*** | -0.181 | 1.580*** |
| | (0.389) | (0.394) | (0.115) | (0.411) | (0.378) | (0.384) | (0.118) | (0.401) |
| First Year of Biennium | 0.464*** | 0.462*** | 0.031 | 0.462*** | 0.457*** | 0.453*** | 0.051 | 0.454*** |
| | (0.125) | (0.128) | (0.086) | (0.131) | (0.133) | (0.137) | (0.087) | (0.140) |
| Democratic Legislature | | -0.130 | -0.068 | -0.052 | | -0.126 | -0.057 | -0.055 |
| | | (0.087) | (0.076) | (0.062) | | (0.090) | (0.076) | (0.065) |
| Republican Legislature | | 0.078 | 0.119 | 0.030 | | 0.082 | 0.134 | 0.032 |
| | | (0.075) | (0.535) | (0.042) | | (0.075) | (0.556) | (0.044) |
| Republican Governor | | -0.025 | 0.629*** | -0.051 | | -0.019 | 0.630*** | -0.042 |
| | | (0.066) | (0.222) | (0.057) | | (0.065) | (0.223) | (0.054) |
| Demographic Controls | No | No | No | Yes | No | No | No | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes[†] | Yes | Yes | Yes | Yes[†] | Yes |
| State-Specific Trends | No | No | No | Yes | No | No | No | Yes |
| Observations | 1,250 | 1,250 | 650 | 1,250 | 1,250 | 1,250 | 650 | 1,250 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). See note to Table 1 for variable definitions.
[†] Sample collapsed to two-year intervals and year effects replaced with two-year interval fixed effects.

**Exhibit 11**
**0364**

**Table 3:** Comparing Mass Shootings and Non-Mass Shootings

*Dependent variable: number of firearm-related bills introduced in state legislature.*

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Mass Shooting Fatalities / 100,000 | 1.339*** | 1.355*** | 1.952*** | 1.427*** |
|  | (0.212) | (0.207) | (0.385) | (0.221) |
| Ordinary Gun Homicides / 100,000 | 0.014 | 0.013 | 0.012 | 0.011 |
|  | (0.031) | (0.035) | (0.037) | (0.048) |
| Regular Session | 1.559*** | 1.548*** | 0.125 | 1.541 |
|  | (0.390) | (0.397) | (0.566) | (0.415) |
| First Year of Biennium | 0.455*** | 0.452*** | 0.599*** | 0.454*** |
|  | (0.131) | (0.134) | (0.217) | (0.136) |
| Democratic Legislature |  | -0.119 | -0.177 | -0.049 |
|  |  | (0.090) | (0.116) | (0.063) |
| Republican Legislature |  | 0.084 | 0.052 | 0.030*** |
|  |  | (0.071) | (0.082) | (0.041) |
| Republican Governor |  | -0.016 | -0.056 | -0.032 |
|  |  | (0.066) | (0.077) | (0.050) |
| Demographic Controls | No | No | No | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes[†] | Yes |
| State-Specific Trends | No | No | No | Yes |
| Observations | 1,250 | 1,250 | 650 | 1,250 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). *Mass Shooting Fatalities / 100,000* is the number of deaths in mass shootings per 100,000 state residents. *Ordinary Gun Homicides / 100,000* is the number of gun homicides not in mass shootings per 100,000 state residents. See note to Table 1 for other variable definitions.

[†] Sample collapsed to two-year intervals and year effects replaced with two-year interval fixed effects.

**Exhibit 11**

**0365**

**Table 4:** Mass Shootings, Bills, and Laws by Political Party

*Dependent variable: number of firearm-related bills introduced or laws passed in state.*

| | Bills Introduced | | Laws Passed | |
|---|---|---|---|---|
| | **(1)** | **(2)** | **(3)** | **(4)** |
| Dem. Leg. × Shooting | 0.116 | 0.104 | 0.079 | 0.073 |
| | (0.080) | (0.080) | (0.101) | (0.109) |
| Rep. Leg. × Shooting | 0.393*** | 0.402*** | 0.307*** | 0.283*** |
| | (0.147) | (0.130) | (0.100) | (0.100) |
| Split Leg. × Shooting | 0.026 | 0.007 | -0.120 | -0.112 |
| | (0.072) | (0.063) | (0.099) | (0.097) |
| Democratic Legislature | -0.149 | -0.070 | -0.064 | -0.022 |
| | (0.095) | (0.067) | (0.086) | (0.104) |
| Republican Legislature | 0.021 | -0.031 | 0.190** | 0.155* |
| | (0.080) | (0.054) | (0.094) | (0.092) |
| Republican Governor | -0.026 | -0.049 | 0.016 | -0.049 |
| | (0.065) | (0.054) | (0.046) | (0.051) |
| Regular Session | 1.614*** | 1.626*** | 3.424*** | 3.474*** |
| | (0.372) | (0.387) | (0.792) | (0.781) |
| First Year of Biennium | 0.468*** | 0.468*** | 0.040 | 0.032 |
| | (0.124) | (0.127) | (0.056) | (0.053) |
| Demographic Controls | No | Yes | No | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes | Yes |
| State-Specific Trends | No | Yes | No | Yes |
| Observations | 1,250 | 1,250 | 1,250 | 1,250 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). The omitted group in all models is states without a mass shooting. See note to Table 1 for all variable definitions.

**Exhibit 11**

**0366**

**Table 5:** Mass Shootings and Enacted Laws

*Dependent variable: number of firearm-related laws enacted (i.e. bills that became law).*

| | Tightening Laws | | | | Loosening Laws | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Mass Shooting | -0.057 | -0.050 | | | 0.282* | 0.258 | | |
| | (0.100) | (0.103) | | | (0.171) | (0.171) | | |
| Dem. Leg. × Shooting | | | -0.014 | 0.007 | | | -0.213 | -0.245 |
| | | | (0.134) | (0.141) | | | (0.371) | (0.389) |
| Rep. Leg. × Shooting | | | -0.003 | 0.002 | | | 0.853*** | 0.800*** |
| | | | (0.240) | (0.236) | | | (0.261) | (0.259) |
| Split Leg. × Shooting | | | -0.223 | -0.247 | | | 0.098 | 0.137 |
| | | | (0.256) | (0.261) | | | (0.341) | (0.339) |
| Democratic Legislature | 0.066 | 0.102 | 0.034 | 0.063 | -0.232 | -0.293 | -0.191 | -0.233 |
| | (0.141) | (0.148) | (0.162) | (0.170) | (0.195) | (0.202) | (0.225) | (0.226) |
| Republican Legislature | 0.193 | 0.157 | 0.161 | 0.120 | 0.497*** | 0.497*** | 0.384* | 0.391* |
| | (0.147) | (0.136) | (0.155) | (0.145) | (0.189) | (0.187) | (0.212) | (0.213) |
| Republican Governor | -0.024 | -0.050 | -0.023 | -0.050 | -0.118 | -0.098 | -0.101 | -0.079 |
| | (0.081) | (0.084) | (0.080) | (0.083) | (0.167) | (0.171) | (0.163) | (0.167) |
| Regular Session | 3.231*** | 3.221*** | 3.237*** | 3.226*** | 16.615*** | 16.248*** | 16.290*** | 15.550*** |
| | (0.770) | (0.778) | (0.771) | (0.779) | (0.457) | (0.462) | (0.454) | (0.466) |
| First Year of Biennium | 0.016 | 0.032 | 0.021 | 0.037 | 0.421*** | 0.414*** | 0.463*** | 0.455*** |
| | (0.109) | (0.112) | (0.110) | (0.112) | (0.132) | (0.136) | (0.175) | (0.175) |
| Demographic Controls | No | Yes | No | Yes | No | Yes | No | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 1,250 | 1,250 | 1,250 | 1,250 | 1,175 | 1,175 | 1,175 | 1,175 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). Models 3-4 and 7-8 show the effect of mass shootings in Republican, Democratic, and split legislatures; the omitted group in these models is states without a mass shooting. See note to Table 1 for all variable definitions.

**Exhibit 11**

**0367**

**Table 6:** News Coverage and Bill Introductions

*Dependent variable: number of firearm-related bills introduced in state legislature.*

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Mass Shooting × News Coverage | 0.125*** | 0.126*** | 0.069* | 0.127** |
| | (0.041) | (0.040) | (0.037) | (0.054) |
| Mass Shooting | 0.070 | 0.078 | 0.128 | 0.067 |
| | (0.078) | (0.077) | (0.119) | (0.076) |
| Regular Session | 1.582*** | 1.573*** | 0.135 | 1.570*** |
| | (0.385) | (0.390) | (0.538) | (0.406) |
| First Year of Biennium | 0.456*** | 0.453*** | 0.621*** | 0.454*** |
| | (0.129) | (0.132) | (0.218) | (0.135) |
| Democratic Legislature | | -0.129 | -0.196* | -0.055 |
| | | (0.089) | (0.117) | (0.064) |
| Republican Legislature | | 0.080 | 0.035 | 0.030 |
| | | (0.075) | (0.087) | (0.043) |
| Republican Governor | | -0.020 | -0.062 | -0.042 |
| | | (0.066) | (0.076) | (0.056) |
| Demographic Controls | No | No | No | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes[†] | Yes |
| State-Specific Trends | No | No | No | Yes |
| Observations | 1,250 | 1,250 | 650 | 1,250 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). *News Coverage* does not appear by itself in the model because we only have data from the national nightly news; the coefficient is therefore absorbed by the year fixed effects. See note to Table 1 for variable definitions.

[†] Sample collapsed to two-year intervals and year effects replaced with two-year interval fixed effects.

**Exhibit 11**

**0368**

**Appendix A:** Coding Gun Laws

This appendix provides examples of coding bills and further investigates coder agreement with our gold standard when deciding whether bills tighten or loosen gun control. As explained in the text, a law can be one of the following five types:

- Tightening (stricter gun control)
- Loosening (weaker gun control)
- Uncertain (insufficient information)
- Both tightening and loosening
- Neutral (neither tightening nor loosening)

Table A1 presents examples of each type and illustrates how coders assigned laws to each category. Table A2 shows the categorization of the gun laws in our sample based on the above coding scheme. Coders agree on the type of law about 52 percent of the time; about half of these laws tighten restrictions on guns and about 20 percent loosen restrictions on guns. The remainder are uncertain, neutral, or both tightened and loosened gun policy.

Table A3 shows the frequency of coder responses for bills we classified as tightening or loosening in the gold standard. The most common response is both coders agreeing with the gold standard. When coders to not agree with the gold standard, it is common for at least one coder to supply the right answer and the other coder to be either uncertain or think the bill both tightens and loosens gun control.

The following is an example of a law that tighten gun control, which coders got wrong:

> *"Increases the penalties for carrying a concealed deadly weapon, when the weapon is a firearm, by reclassifying what is currently a class G felony as a class D violent felony; deletes a penalty provision that is unnecessary and duplicative, since any person previously convicted of a violation of section 1442 is also a person prohibited under section 1448 of Title 11."*

37

**Exhibit 11**

**0369**

Coders may have seen "deletes a penalty provision" and assumed the law also loosened gun control because they did not read that the provision was "unnecessary and duplicative." The following is an example of a law loosening gun control, which coders got wrong:

> *"Bars a county or municipality from filing a lawsuit against the manufacturer of firearms or ammunition under certain circumstances; reserves an exclusive right for the State to maintain such an action; repeals conflicting laws."*

Some coders made the mistake of thinking this bill both loosened and tightened gun control, perhaps because "bars" sounds like it relates to tightening and "repeals" sounds like it relates to loosening. Both of these are fairly long synopses; however, the share of coder pairs that supply the right answer is not correlated with the length of the synopsis.

**Table A1:** Example of Coding Gun Laws

| id | summary | tighten | loosen | uncertain |
|----|---------|---------|--------|-----------|
| 1 | Creates a new felony for firing a gun within 1,000 feet of an educational facility. | 1 | 0 | 0 |
| 2 | Reduces the age limit for purchase of a handgun from 21 to 18. | 0 | 1 | 0 |
| 3 | Allows parole officers to carry a loaded firearm while commuting to and from work. | 0 | 0 | 0 |
| 4 | Relates to the use of firearms in state parks and campgrounds. | 0 | 0 | 1 |
| 5 | Requires a license to operate a gun show. Eliminates the waiting period for firearm sales if the purchaser has a valid permit to carry a concealed weapon. | 1 | 1 | 0 |

*Note:* Table shows examples of coding gun laws based on bill summaries. Coders were given a full manual to explain the meaning of "tighten", "loosen", "neutral," and "uncertain" along with the following examples. This table mimics the appearance of the Excel workbooks used by the coders. The first bill creates a new crime related to firearms. It tightens restrictions on firearms. The second bill makes it easier for people to acquire guns; it loosens restrictions on firearms. The third bill is exclusively about parole officers; it is neutral because it does not affect the general public. The fourth bill is uncertain because the summary is a generic description that does not specify whether the law tightens or loosens restrictions on firearms. The fifth bill both tightens and loosens; it regulates gun shows, but also eliminates a restriction on firearm purchasers.


**Table A2:** Results of Coding Gun Laws

| Category | Total Laws | Percent of Total |
|----------|-----------|------------------|
| *Coders agree* | | |
|     Tightening | 872 | 27.3 |
|     Loosening | 312 | 9.8 |
|     Uncertain | 245 | 7.7 |
|     Both (Tighten and Loosen) | 79 | 2.5 |
|     Neutral | 173 | 5.4 |
| *Coders disagree* | 1,518 | 47.5 |
| Total | 3,199 | 100.0 |

**Exhibit 11**

**0371**

**Table A3:** Coder Agreement with Tightening/Loosening Gold Standard

|           | Neutral | Tighten | Loosen | Both | Uncertain |
|-----------|---------|---------|--------|------|-----------|
| **Tighten** |       |         |        |      |           |
| Neutral   | 6       | 39      | 2      | 2    | 5         |
| Tighten   |         | 460     | 11     | 53   | 61        |
| Loosen    |         |         | 0      | 2    | 0         |
| Both      |         |         |        | 13   | 2         |
| Uncertain |         |         |        |      | 30        |
|           |         |         |        |      |           |
| **Loosen** |        |         |        |      |           |
| Neutral   | 0       | 3       | 15     | 2    | 5         |
| Tighten   |         | 12      | 45     | 7    | 15        |
| Loosen    |         |         | 337    | 72   | 29        |
| Both      |         |         |        | 10   | 2         |
| Uncertain |         |         |        |      | 8         |

*Note:* Gold Standard—either tightening or loosening—in bold. Cell values represent the frequency of two coder responses across all unique pairs of coders who saw a given law.

**Exhibit 11**
**0372**

**Appendix B:** Effect of Shootings in Neighboring States

**Table B1:** Mass Shootings in Neighboring States, Bills and Laws

*Dependent variable: number of firearm-related bills introduced or laws enacted in state.*

| | Bills Introduced | | | | Laws Enacted | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Mass Shooting | 0.142** | 0.146* | | | 0.087 | 0.077 | | |
| | (0.071) | (0.079) | | | (0.073) | (0.086) | | |
| Neighbor Shooting | -0.049 | | | | 0.050 | | | |
| | (0.051) | | | | (0.056) | | | |
| Cen. Division Shooting | | -0.005 | | | | 0.021 | | |
| | | (0.041) | | | | (0.054) | | |
| Fatalities | | | 0.023*** | 0.018** | | | 0.013 | 0.008 |
| | | | (0.007) | (0.009) | | | (0.008) | (0.009) |
| Neighbor Fatalities | | | -0.001 | | | | 0.002 | |
| | | | (0.004) | | | | (0.004) | |
| Cen. Division Fatalities | | | | 0.007 | | | | 0.006 |
| | | | | (0.005) | | | | (0.005) |
| Institutional Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Political Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Demographic Controls | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| State-Specific Trends | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). *Neighbor* variables refer to states with a shared border; *Cen. Division* refers to states within the same Census division. See note to Table 1 for other variable definitions.

**Exhibit 11**
**0373**

**Table B2:** Mass Shootings in Neighboring States and Directions of Policy Change

*Dependent variable: number of firearm-related laws enacted.*

| | Tightening Laws | | Loosening Laws | |
|---|---|---|---|---|
| | **(1)** | **(2)** | **(3)** | **(4)** |
| Dem. Leg. × Shooting | 0.037 | -0.005 | -0.287 | -0.181 |
| | (0.136) | (0.134) | (0.364) | (0.399) |
| Rep. Leg. × Shooting | 0.007 | -0.080 | 0.794*** | 0.894*** |
| | (0.223) | (0.256) | (0.263) | (0.287) |
| Split Leg. × Shooting | -0.275 | -0.092 | 0.136 | 0.080 |
| | (0.247) | (0.229) | (0.329) | (0.379) |
| Dem. Leg. × Neighbor Shooting | 0.208 | | -0.061 | |
| | (0.139) | | (0.242) | |
| Rep. Leg. × Neighbor Shooting | -0.266** | | 0.356 | |
| | (0.120) | | (0.244) | |
| Split Leg. × Neighbor Shooting | -0.163 | | -0.118 | |
| | (0.207) | | (0.227) | |
| Dem. Leg. × Cen. Division Shooting | | 0.157 | | -0.186 |
| | | (0.158) | | (0.238) |
| Rep. Leg. × Cen. Division Shooting | | 0.015 | | -0.118 |
| | | (0.108) | | (0.174) |
| Split Leg. × Cen. Division Shooting | | -0.254 | | 0.101 |
| | | (0.169) | | (0.254) |
| Political Controls | Yes | Yes | Yes | Yes |
| Institutional Controls | Yes | Yes | Yes | Yes |
| Demographic Controls | Yes | Yes | Yes | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes | Yes |
| Observations | 1,250 | 1,250 | 1,175 | 1,175 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). Models show the effect of mass shootings in Republican, Democratic, and split legislatures; the omitted group in these models is states without a mass shooting. *Neighbor* variables refer to states with a shared border; *Cen. Division* refers to states within the same Census division. See note to Table 1 for other variable definitions.

**Exhibit 11**

**0374**

**Appendix C:** Laws Enacted

**Table C1:** Laws Enacted and Mass Shootings

*Dependent variable: number of firearm-related laws enacted in state.*

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Mass Shooting | 0.078 | 0.099 | 0.112 | 0.089 | | | | |
| | (0.079) | (0.074) | (0.089) | (0.075) | | | | |
| Fatalities | | | | | 0.011 | 0.014 | 0.005 | 0.013 |
| | | | | | (0.009) | (0.009) | (0.014) | (0.008) |
| Regular Session | 3.399*** | 3.392*** | 0.388 | 3.444*** | 3.401*** | 3.393*** | 0.373 | 3.443*** |
| | (0.766) | (0.777) | (0.716) | (0.763) | (0.772) | (0.784) | (0.715) | (0.769) |
| First Year of Biennium | 0.037 | 0.028 | 0.203 | 0.022 | 0.028 | 0.017 | 0.178 | 0.012 |
| | (0.051) | (0.051) | (0.290) | (0.050) | (0.051) | (0.051) | (0.298) | (0.051) |
| Democratic Legislature | | -0.026 | -0.107 | 0.012 | | -0.022 | -0.103 | 0.011 |
| | | (0.079) | (0.093) | (0.097) | | (0.082) | (0.088) | (0.098) |
| Republican Legislature | | 0.260*** | 0.168 | 0.218*** | | 0.266*** | 0.167* | 0.223*** |
| | | (0.090) | (0.103) | (0.083) | | (0.091) | (0.100) | (0.085) |
| Republican Governor | | 0.010 | -0.039 | -0.055 | | 0.012 | -0.040 | -0.053 |
| | | (0.048) | (0.050) | (0.051) | | (0.048) | (0.053) | (0.050) |
| Demographic Controls | No | No | No | Yes | No | No | No | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes[†] | Yes | Yes | Yes | Yes[†] | Yes |
| State-Specific Trends | No | No | No | Yes | No | No | No | Yes |
| Observations | 1,250 | 1,250 | 650 | 1,250 | 1,250 | 1,250 | 650 | 1,250 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). Variables are identical to those in Table 2, except for the dependent variable, which is the number of firearm-related laws enacted instead of the number of bills introduced. See note to Table 1 for variable definitions.
[†] Sample collapsed to two-year intervals and year effects replaced with two-year interval fixed effects.

**Exhibit 11**
**0375**

**Appendix D:** Mass Shootings and Neutral Laws

**Table D1.** Neutral Laws Enacted

*Dependent variable: number of neutral firearm-related laws enacted.*

| | (1) | (2) |
|---|---|---|
| Mass Shooting | 0.114 | |
| | (0.195) | |
| Dem. Leg. × Shooting | | 0.042 |
| | | (0.299) |
| Rep. Leg. × Shooting | | 0.206 |
| | | (0.381) |
| Split Leg. × Shooting | | 0.142 |
| | | (0.322) |
| Political Controls | Yes | Yes |
| Institutional Controls | Yes | Yes |
| Demographic Controls | Yes | Yes |
| State Fixed Effects | Yes | Yes |
| Year Fixed Effects | Yes | Yes |
| Observations | 1,050 | 1,050 |

*Note:* Sample size differs from other tables due to states with all zero observations (i.e. no years with neutral laws enacted).

**Exhibit 11**
**0376**

**Appendix E:** Media Coverage and Mass Shootings

This appendix presents regression results showing that mass shootings are associated with large increases in gun-related news coverage and that increased news coverage is associated with greater legislative activity in the form of firearm-related bills introduced in state legislatures.

Table E1 shows results from regressing the log of each day's total seconds of gun-related news coverage on an indicator for the occurrence of a mass shooting and 10 lags of that indicator. The results suggest that media attention to guns increases roughly 300 percent immediately following a mass shooting and that coverage remains elevated from pre-shooting levels for at least a week following the event. Table E2 presents similar results using the count of mass shooting fatalities as the independent variable instead of a mass shooting indicator variable.[17]

---

[17] Additionally, we estimated models with 10 leads of each indicator variable (not shown to conserve space) and none of the leads are statistically significant at conventional levels. This suggests that gun-related media coverage does not presage mass shootings (as would be the case if media reports about firearms caused shootings or reflected other contemporary events associated with mass shootings).

**Exhibit 11**

**0377**

**Table E1:** Mass Shootings and News Coverage

*Dependent variable: Log(1 + Seconds of News Coverage)*

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Mass Shooting | 1.509*** | 1.510*** | 1.497*** | 1.443*** |
|  | (0.218) | (0.220) | (0.218) | (0.214) |
| Lags of Mass Shooting (Days): |  |  |  |  |
| L1 | 1.667*** | 1.656*** | 1.638*** | 1.584*** |
|  | (0.226) | (0.227) | (0.226) | (0.222) |
| L2 |  | 0.735*** | 0.729*** | 0.685*** |
|  |  | (0.225) | (0.224) | (0.223) |
| L3 |  | 0.728*** | 0.726*** | 0.684*** |
|  |  | (0.214) | (0.213) | (0.204) |
| L4 |  | 0.422** | 0.426** | 0.384* |
|  |  | (0.214) | (0.213) | (0.207) |
| L5 |  | 0.844*** | 0.869*** | 0.832*** |
|  |  | (0.214) | (0.214) | (0.209) |
| L6 |  | 0.610*** | 0.620*** | 0.582*** |
|  |  | (0.206) | (0.206) | (0.194) |
| L7 |  | 0.466** | 0.453** | 0.419** |
|  |  | (0.208) | (0.207) | (0.202) |
| L8 |  | 0.255 | 0.237 | 0.194 |
|  |  | (0.196) | (0.195) | (0.185) |
| L9 |  | 0.260 | 0.254 | 0.212 |
|  |  | (0.197) | (0.197) | (0.187) |
| L10 |  | 0.302 | 0.300 | 0.258 |
|  |  | (0.194) | (0.195) | (0.185) |
| Constant | 1.544*** | 1.463*** | 1.136*** | 0.897*** |
|  | (0.025) | (0.027) | (0.060) | (0.151) |
| Fixed Effects |  |  |  |  |
| Day-of-week | No | No | Yes | Yes |
| Month | No | No | No | Yes |
| Year | No | No | No | Yes |
| Observations (Days) | 9,496 | 9,487 | 9,487 | 9,487 |

**Exhibit 11**

**0378**

**Table E2:** Mass Shooting Fatalities and News Coverage

*Dependent variable: Log(1 + Seconds of News Coverage)*

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Mass Shooting Fatalities | 0.282*** | 0.284*** | 0.280*** | 0.273*** |
|  | (0.028) | (0.028) | (0.027) | (0.026) |
| Lags of Fatalities (Days): |  |  |  |  |
| L1 | 0.307*** | 0.308*** | 0.306*** | 0.299*** |
|  | (0.030) | (0.030) | (0.030) | (0.029) |
| L2 |  | 0.175*** | 0.175*** | 0.169*** |
|  |  | (0.029) | (0.029) | (0.028) |
| L3 |  | 0.167*** | 0.166*** | 0.160*** |
|  |  | (0.028) | (0.028) | (0.026) |
| L4 |  | 0.118*** | 0.119*** | 0.114*** |
|  |  | (0.033) | (0.033) | (0.031) |
| L5 |  | 0.142*** | 0.146*** | 0.141*** |
|  |  | (0.032) | (0.032) | (0.031) |
| L6 |  | 0.119*** | 0.120*** | 0.115*** |
|  |  | (0.031) | (0.031) | (0.028) |
| L7 |  | 0.120*** | 0.117*** | 0.112*** |
|  |  | (0.028) | (0.028) | (0.028) |
| L8 |  | 0.082*** | 0.079*** | 0.073*** |
|  |  | (0.028) | (0.029) | (0.027) |
| L9 |  | 0.053 | 0.053 | 0.047 |
|  |  | (0.034) | (0.035) | (0.031) |
| L10 |  | 0.065** | 0.064* | 0.058* |
|  |  | (0.033) | (0.033) | (0.031) |
| Constant | 1.543*** | 1.440*** | 1.120*** | 0.905*** |
|  | (0.025) | (0.026) | (0.060) | (0.150) |
| Fixed Effects |  |  |  |  |
| Day-of-week | No | No | Yes | Yes |
| Month | No | No | No | Yes |
| Year | No | No | No | Yes |
| Observations (Days) | 9,496 | 9,487 | 9,487 | 9,487 |

**Exhibit 11**

**0379**

**Appendix F:** Predicting Mass Shootings

**Table F1:** Linear Probability Model for Mass Shooting using Control Variables

*Dependent variable: indicator for state-year with a mass shooting.*

| | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Lag Bills Introduced | | | -0.000 | | | |
| | | | (0.001) | | | |
| Lag Laws Enacted | | | | -0.002 | | |
| | | | | (0.006) | | |
| Lag Tightening Laws | | | | | -0.002 | |
| | | | | | (0.010) | |
| Lag Loosening Laws | | | | | | 0.009 |
| | | | | | | (0.015) |
| Dem. Legislature | | 0.006 | 0.004 | 0.005 | 0.005 | 0.006 |
| | | (0.044) | (0.046) | (0.046) | (0.045) | (0.045) |
| Rep. Legislature | | -0.030 | -0.029 | -0.028 | -0.028 | -0.029 |
| | | (0.036) | (0.038) | (0.037) | (0.037) | (0.038) |
| Rep. Governor | | -0.012 | -0.011 | -0.011 | -0.011 | -0.011 |
| | | (0.020) | (0.022) | (0.022) | (0.022) | (0.022) |
| Log Population | -0.191 | -0.131 | -0.200 | -0.192 | -0.196 | -0.199 |
| | (0.279) | (0.265) | (0.291) | (0.290) | (0.288) | (0.290) |
| Elderly (65+) % | 0.001 | -0.001 | 0.004 | 0.004 | 0.004 | 0.004 |
| | (0.025) | (0.024) | (0.024) | (0.024) | (0.024) | (0.024) |
| Under 25 % | -0.002 | 0.001 | 0.003 | 0.002 | 0.002 | 0.002 |
| | (0.020) | (0.019) | (0.020) | (0.020) | (0.019) | (0.020) |
| Black % | -0.009 | -0.009 | -0.002 | -0.001 | -0.001 | 0.000 |
| | (0.015) | (0.015) | (0.018) | (0.018) | (0.018) | (0.018) |
| Hispanic % | -0.001 | -0.003 | -0.002 | -0.003 | -0.003 | -0.003 |
| | (0.015) | (0.015) | (0.016) | (0.016) | (0.016) | (0.016) |
| Unemployment % | 0.025** | 0.025** | 0.024** | 0.024** | 0.024** | 0.024** |
| | (0.011) | (0.011) | (0.011) | (0.011) | (0.011) | (0.011) |
| Income per capita | 0.013 | 0.012 | 0.011 | 0.012 | 0.012 | 0.011 |
| | (0.013) | (0.013) | (0.014) | (0.014) | (0.014) | (0.014) |
| High School % | -0.004 | -0.003 | -0.003 | -0.003 | -0.003 | -0.003 |
| | (0.006) | (0.006) | (0.006) | (0.006) | (0.006) | (0.006) |
| Veteran % | -0.003 | -0.001 | -0.005 | -0.005 | -0.005 | -0.004 |
| | (0.012) | (0.012) | (0.013) | (0.013) | (0.012) | (0.012) |
| Divorced % | -0.004 | -0.003 | -0.001 | -0.001 | -0.001 | -0.001 |
| | (0.010) | (0.010) | (0.011) | (0.011) | (0.011) | (0.011) |
| State FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 1,250 | 1,250 | 1,200 | 1,200 | 1,200 | 1,200 |

**Exhibit 11**

**0380**

**Table F2:** Linear Probability Model for Mass Shooting using Policy Variables

*Dependent variable: indicator for state-year with a mass shooting.*

|  | (1) | (2) |
|---|---|---|
| Handgun Waiting Period (days) | 0.002 | 0.002 |
|  | (0.005) | (0.005) |
| Long-gun Waiting Period (days) | -0.005 | -0.005 |
|  | (0.019) | (0.020) |
| Age 18+ for Transaction | 0.031 | 0.026 |
|  | (0.026) | (0.028) |
| Age 21+ for Transaction | -0.067 | -0.080 |
|  | (0.057) | (0.056) |
| Handgun Permit System | -0.137 | -0.136 |
|  | (0.094) | (0.100) |
| Background Check, All Handgun Sales | -0.066 | -0.066 |
|  | (0.080) | (0.085) |
| Background Check, All Firearm Sales | 0.019 | -0.005 |
|  | (0.116) | (0.127) |
| Assault Weapons Ban | 0.042 | 0.050 |
|  | (0.051) | (0.053) |
| Shall Issue Concealed Carry | -0.010 | -0.006 |
|  | (0.038) | (0.039) |
| No Permit Needed Concealed Carry | 0.162 | 0.181 |
|  | (0.188) | (0.184) |
| Log Population | -0.494 | -0.445 |
|  | (0.325) | (0.310) |
| Political Controls | No | Yes |
| Demographic Controls | Yes | Yes |
| State FE | Yes | Yes |
| Year FE | Yes | Yes |
| Observations | 1,250 | 1,250 |

*Note: Handgun Waiting Period is the number of days purchasers must wait before accepting delivery of a handgun. Long-gun Waiting Period is similarly defined for long-guns (e.g. rifles and shotguns). Age 18+ Transaction is an indicator for laws that prevent vendors from selling handguns to minors or prevent minors from purchasing handguns. Age 21+ Transaction is defined the same way for persons under 21. Handgun Permit System is an indicator for states that require permits to purchase a handgun. Background Check, All Handgun Sales is an indicator for requiring a background check for all handgun transactions (including private sales). Background Check, All Firearm Sales is an indicator for requiring a background check for all firearm transactions (including private sales). Assault Weapons Ban is an indicator for states that ban some types of assault rifles or pistols. Shall Issue Concealed Carry is an indicator for states that require the permitting authority to grant a license to anyone meeting the minimum statutory qualifications (i.e. do not permit law enforcement discretion in issuing permits). No Permit Needed Concealed Carry is an indicator for states that allow concealed carry without a permit.*

**Exhibit 11**
**0381**

**Appendix G:** Placebo Mass Shooting Analyses

**Table G1:** Placebo Analysis for Bill Introductions (Mirrors Table 2)

|  | Actual | Percentiles of Placebo Test Statistic | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | 1st | 5th | 10th | 90th | 95th | 99th |
| *Shooting Indicator (model 4)* | 2.07 | -3.98 | -2.89 | -2.47 | 0.55 | 0.87 | 1.59 |
| *Shooting Fatalities (model 8)* | 3.29 | -3.81 | -2.87 | -2.45 | 0.71 | 1.10 | 1.93 |

**Table G2:** Placebo Analysis for Enacted Laws (Mirrors Table 5)

|  | Actual | Percentiles of Placebo Test Statistic | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | 1st | 5th | 10th | 90th | 95th | 99th |
| *Tightening Laws (models 2, 4)* |  |  |  |  |  |  |  |
| Pooled Shooting | -0.49 | -2.19 | -1.43 | -1.07 | 1.83 | 2.25 | 3.10 |
| Dem. Leg. × Shooting | 0.05 | -2.43 | -1.61 | -1.35 | 1.48 | 1.96 | 2.84 |
| Rep. Leg. × Shooting | 0.01 | -2.89 | -1.71 | -1.23 | 1.62 | 2.24 | 3.41 |
| Split Leg. × Shooting | -0.95 | -2.57 | -1.49 | -1.01 | 2.07 | 2.56 | 3.95 |
| *Loosening Laws (models 6, 8)* |  |  |  |  |  |  |  |
| Pooled Shooting | 1.51 | -3.21 | -2.26 | -1.88 | 0.82 | 1.24 | 2.03 |
| Dem. Leg. × Shooting | -0.63 | -2.64 | -1.85 | -1.41 | 1.23 | 1.60 | 2.97 |
| Rep. Leg. × Shooting | 3.09 | -3.02 | -2.27 | -1.98 | 0.71 | 1.09 | 1.73 |
| Split Leg. × Shooting | 0.40 | -2.93 | -2.02 | -1.59 | 1.34 | 1.79 | 2.72 |

*Notes:* We randomly assign placebo mass shootings to state-years in which no actual shooting occurred with probability equal to each state's frequency of shootings, and randomly draw a fatality count from the empirical distribution of fatalities. We then re-run the models and calculate the test statistic for the placebo shooting and fatality coefficients. The above percentiles are based on 1,000 replications. The "Pooled" rows in Table G2 mirror models 2 and 6 of Table 5 (the models without interaction effects). The legislature effects mirror models 4 and 8 for tightening and loosening laws respectively.

**Exhibit 11**

**0382**

**Appendix H:** Dropping Individual States

These analyses exclude each state, one at a time, from our sample. Each graph plots the resulting 50 regression coefficients (from smallest to largest) along with a 95% confidence interval and estimates using the full sample of all states. The state abbreviations in the figures indicate the state that was dropped from the sample and mark the resulting point estimate. The vertical bars represent 95% confidence intervals. The solid, horizontal line indicates the point estimate from the complete sample (presented in the text and tables). The dotted, horizontal lines represent the lower and upper bounds of the 95% confidence interval for the full sample coefficient estimate.

The results show that removing individual states has little effect on the coefficient estimates, supporting the claim that the effect of mass shootings on gun policy is not driven by an individual state or shooting.

**Figure H1** Effect of Mass Shooting on Bill Introductions.



**Figure H2** Effect of Mass Shooting on Laws (of Any Type) Enacted.



**Exhibit 11**
**0384**

**Figure H3** Effect of Republican Legislature Mass Shooting on Loosening Laws Enacted.



**Figure H4** Effect of Democratic Legislature Mass Shooting on Loosening Laws Enacted.



**Exhibit 11**
**0385**

**Figure H5** Effect of Republican Legislature Mass Shooting on Tightening Laws Enacted.



**Figure H6** Effect of Democratic Legislature Mass Shooting on Tightening Laws Enacted.



**Exhibit 11**
**0386**

**Appendix I:** Gun Ownership, Mass Shootings and Enacted Laws

**Table I1:** Effects of Mass Shootings, with Gun Ownership Proxy

*Dependent variable: number of firearm-related laws enacted (i.e. bills that became law).*

| | Tightening Laws | | | Loosening Laws | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Dem. Leg. × Shooting | 0.016 | 0.006 | | -0.192 | 0.414 | |
| | (0.141) | (0.452) | | (0.417) | (0.690) | |
| Rep. Leg. × Shooting | 0.003 | -0.008 | | 0.787*** | 1.439* | |
| | (0.233) | (0.575) | | (0.265) | (0.807) | |
| Split Leg. × Shooting | -0.240 | -0.250 | | 0.157 | 0.763 | |
| | (0.259) | (0.581) | | (0.345) | (0.776) | |
| Gun Suicide Pct. × Shooting | | 0.000 | -0.001 | | -0.011 | 0.005 |
| | | (0.009) | (0.002) | | (0.013) | (0.003) |
| Gun Suicide Pct. | 0.039 | 0.039 | 0.039 | 0.107* | 0.110* | 0.113* |
| | (0.027) | (0.028) | (0.027) | (0.060) | (0.061) | (0.059) |
| Democratic Legislature | 0.054 | 0.054 | 0.094 | -0.237 | -0.245 | -0.291 |
| | (0.171) | (0.171) | (0.150) | (0.227) | (0.222) | (0.199) |
| Republican Legislature | 0.131 | 0.131 | 0.167 | 0.412* | 0.402* | 0.517*** |
| | (0.141) | (0.142) | (0.132) | (0.216) | (0.217) | (0.190) |
| Republican Governor | -0.042 | -0.042 | -0.041 | -0.077 | -0.068 | -0.102 |
| | (0.084) | (0.085) | (0.085) | (0.164) | (0.163) | (0.167) |
| Regular Session | 3.225*** | 3.225*** | 3.220*** | 17.931*** | 17.934*** | 16.262*** |
| | (0.780) | (0.779) | (0.778) | (0.460) | (0.460) | (0.454) |
| First Year of Biennium | 0.037 | 0.037 | 0.032 | 0.443*** | 0.439** | 0.403*** |
| | (0.112) | (0.110) | (0.110) | (0.168) | (0.171) | (0.129) |
| Demographic Controls | Yes | Yes | Yes | Yes | Yes | Yes |
| State Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Year Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 1,250 | 1,250 | 1,250 | 1,250 | 1,175 | 1,175 |

*Note:* Robust standard errors clustered by state in parentheses. Stars following coefficients represent *p*-values less than .10 (*), .05 (**) and .01 (***). *Gun Suicide Pct.* is the 5-year moving average of the percentage of suicides that are firearm-related and is used to proxy for gun ownership (Cook and Ludwig 2006). Models 1 and 4 show that the main results do not change when adding this control variable; the other models suggest that the response of Republican legislatures cannot be explained by rates of gun ownership. See note to Table 1 for other variable definitions.

**Exhibit 11**
**0387**

**Appendix J:** Mass Shootings as an Instrument for Gun Policy

In this appendix we use mass shootings as an instrumental variable to study the impact of gun laws on gun deaths. We start with the following model:

$$\ln(D_{st}) = \alpha_s + \theta_t + \beta\, Gun\, Control_{st} + \delta' Z_{st} + \epsilon_{st}$$

where $D_{st}$ is non-mass shooting gun deaths per 100,000 people in state $s$ and year $t$, $\alpha_s$ and $\theta_t$ are state and year effects, $Gun\, Control_{st}$ is an index representing the strictness of gun policy, and $Z_{st}$ is a vector of controls –demographic, political, and economic factors—that potentially affect gun deaths. We use the same variables as Levitt (1996) as controls, but also include dummies for Republican and Democratic trifectas or legislatures, and a dummy for Republican governors.

We do not directly observe $Gun\, Control_{st}$; instead, we observe the enactment of new laws that change gun policy. Therefore, we estimate the equation in first differences:

$$\Delta \ln(D_{st}) = \lambda_t + \beta\, New\, Gun\, Laws_{st} + \Delta Z_{st}\delta + \Delta \epsilon_{st}$$

where $New\, Gun\, Laws_{st} = \Delta Gun\, Control_{st}$ is negative for laws that loosen gun control and positive for laws that increase gun control (according to our coders, see data description). Based on our main results, we instrument for gun laws using the first lags of mass shooting fatalities and the interaction of lagged mass shooting fatalities with Republican control of state government. The former should be positively correlated with new laws and the latter negatively correlated with new laws.

We estimate the model using Fuller's (1977) modified LIML with $\alpha = 1$ (Baum, Schaffer, and Stillman 2007). First stage results suggest the instruments are weak despite being jointly significant ($F = 5.98$) with the expected sign (Stock and Yogo 2005). The coefficients on the exogenous instruments in the reduced form equation for firearm deaths are not significant, but also have the expected signs (negative for lagged mass shooting fatalities and positive for the interaction of lagged fatalities with Republican control of government). Our estimate $\hat{\beta}$ is $-0.016$ with standard error $0.013$.

**Exhibit 11**

**0388**

A conditional likelihood ratio test (Moreira 2003; Andrews, Moreira, and Stock 2004; Finlay and Magnusson 2009) cannot reject the null hypothesis that $\beta = 0$ ($p = 0.24$). We also estimated models that include proxies for gun ownership. Including the percentage of suicides committed with a gun (Cook and Ludwig 2006) does not change our inference.