1  John W. Dillon (Bar No. 296788)
2  Gatzke Dillon & Ballance LLP
   2762 Gateway Road
3  Carlsbad, California 92009
   Telephone: (760) 431-9501
4  Facsimile: (760) 431-9512
5  E-mail:  jdillon@gdandb.com

6  Attorney for Plaintiffs

7

8              **UNITED STATES DISTRICT COURT**

9             **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | MATTHEW JONES; THOMAS FURRH; | Case No.: 3:19-cv-01226-L-AHG

12 KYLE YAMAMOTO; PWGG, L.P. (d.b.a. | Hon. M. James Lorenz and Magistrate
   POWAY WEAPONS AND GEAR and | Judge Allison H. Goddard
13 PWG RANGE); NORTH COUNTY
   SHOOTING CENTER, INC.; BEEBE
14 FAMILY ARMS AND MUNITIONS LLC | **DECLARATION OF JOHN W.**
15 (d.b.a. BFAM and BEEBE FAMILY | **DILLON IN SUPPORT OF**
   ARMS AND MUNITIONS); FIREARMS | **PLAINTIFFS' MOTION FOR**
16 POLICY COALITION, INC.; FIREARMS | **PRELIMINARY INJUNCTION**
   POLICY FOUNDATION; CALIFORNIA | **(Part 2 of 2)**
17 GUN RIGHTS FOUNDATION; and
18 SECOND AMENDMENT | Complaint Filed: July 1, 2019
   FOUNDATION, | Second Amended Complaint Filed:
19 | November 8, 2019
                        Plaintiffs,
20
   v.
21 | Date: Monday, December 16, 2019
22 XAVIER BECERRA, in his official | Time: 10:30 a.m.
   capacity as Attorney General of the | Courtroom: Dept. 5B (5th Floor)
23 State of California, et al.,
24 | No oral argument should be heard unless
                        Defendants. | ordered by the Court
25

26

27

28

---

*DECLARATION OF JOHN W. DILLON IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION*

# EXHIBIT "7"

EXHIBIT 7
0105

# PROTECTING AMERICA'S SCHOOLS

# A U.S. SECRET SERVICE ANALYSIS OF TARGETED SCHOOL VIOLENCE



# 2019

*U.S. Department of Homeland Security*
**UNITED STATES SECRET SERVICE**
*National Threat Assessment Center*

EXHIBIT 7
0106

This report was authored by the staff of the
U.S. Secret Service National Threat Assessment Center (NTAC)

Lina Alathari, Ph.D.
Chief

**Diana Drysdale, M.A.**
Supervisory Social Science Research Specialist

**Steven Driscoll, M.Ed.**
Lead Social Science Research Specialist

**Ashley Blair, M.A.**
Social Science Research Specialist

**David Mauldin, M.S.W.**
Social Science Research Specialist

**Arna Carlock, Ph.D.**
Social Science Research Specialist

**Jeffrey McGarry, M.A.**
Social Science Research Specialist

**Aaron Cotkin, Ph.D.**
Social Science Research Specialist

**Jessica Nemet, M.A.**
Social Science Research Specialist

**Brianna Johnston, M.A.**
Social Science Research Specialist

**Natalie Vineyard, M.S.**
Social Science Research Specialist

**Christina Foley, M.S.W.**
Assistant to the Special Agent in Charge

**John Bullwinkel, M.A.**
Assistant to the Special Agent in Charge

Special thanks to the following for their contributions to the project:

**Peter Langman, Ph.D.**
Psychologist and Author

**Wade Buckland**
Senior Scientist,
Human Resources
Research Organization

**Eric B. Elbogen, Ph.D.**
Professor of Psychiatry and
Behavioral Sciences, Duke
University School of Medicine

Front Cover:
FEBRUARY 15-19, 2018
Flags flown at half-staff in honor of the victims of the shooting at
Marjory Stoneman Douglas High School in Parkland, Florida

National Threat Assessment Center
U.S. Secret Service
U.S. Department of Homeland Security

November 2019

This publication is in the public domain. Authorization to copy and distribute this publication in whole or in part is granted. However, the U.S. Secret Service star insignia may not be otherwise reproduced or used in any other manner without advance written permission from the agency. While permission to reprint this publication is not necessary, when quoting, paraphrasing, or otherwise referring to this report, the citation should be: National Threat Assessment Center. (2019). *Protecting America's Schools: A U.S. Secret Service Analysis of Targeted School Violence*. U.S. Secret Service, Department of Homeland Security.

PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE**/2019

## MESSAGE FROM THE DIRECTOR

The U.S. Secret Service has a longstanding tradition of conducting threat assessments as part of its mandate to ensure the safety of this Nation's highest elected officials. Our National Threat Assessment Center (NTAC) is dedicated to expanding the field of violence prevention by closely examining the targeted violence that affects communities across the United States. As part of this mission, NTAC has maintained a particular focus on the prevention of targeted school violence. For 20 years, the Center has studied these tragedies, and the following report titled, *Protecting America's Schools: A U.S. Secret Service Analysis of Targeted School Violence*, supports past Secret Service research findings that indicate targeted school violence is preventable.

While communities can advance many school safety measures on their own, our experience tells us that keeping schools safe requires a team effort and the combined resources of the federal, state, and local governments; school boards; law enforcement; and the public. With this study, the Secret Service provides an unprecedented base of facts about school violence, as well as an updated methodology and practical guidelines for prevention. We encourage all of our public safety partners and education partners to review the information within, and to use it to guide the best practices for maintaining a safe learning environment for all children.

For 150 years, the men and women of the Secret Service have carried out our no-fail mission to protect the Nation's leaders and financial infrastructure. Our relationships across the federal, state, and local level have been instrumental to our success. The agency is committed to carrying on this collaborative approach to better protect our children and our schools. We are proud to release this report.



James M. Murray
Director

*The U.S. Secret Service's National Threat Assessment Center (NTAC) was created in 1998 to provide guidance on threat assessment both within the U.S. Secret Service and to others with criminal justice and public safety responsibilities. Through the Presidential Threat Protection Act of 2000, Congress formally authorized NTAC to conduct research on threat assessment and various types of targeted violence; provide training on threat assessment and targeted violence; facilitate information-sharing among agencies with protective and/or public safety responsibilities; provide case consultation on individual threat assessment investigations and for agencies building threat assessment units; and develop programs to promote the standardization of federal, state, and local threat assessment processes and investigations.*

PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE**/2019

EXHIBIT 7
0107

# EXECUTIVE SUMMARY

Ensuring the safety of children at school is a responsibility that belongs to everyone, including law enforcement, school staff, mental health practitioners, government officials, and members of the general public. To aid in these efforts, the U.S. Secret Service National Threat Assessment Center (NTAC) studied 41 incidents of targeted school violence that occurred at K-12 schools in the United States from 2008 to 2017. This report builds on 20 years of NTAC research and guidance in the field of threat assessment by offering an in-depth analysis of the motives, behaviors, and situational factors of the attackers, as well as the tactics, resolutions, and other operationally-relevant details of the attacks.

The analysis suggests that many of these tragedies could have been prevented, and supports the importance of schools establishing comprehensive targeted violence prevention programs as recommended by the Secret Service in *Enhancing School Safety Using a Threat Assessment Model: An Operational Guide for Preventing Targeted School Violence.*[1] This approach is intended to identify students of concern, assess their risk for engaging in violence or other harmful activities, and implement intervention strategies to manage that risk. The threshold for intervention should be low, so that schools can identify students in distress before their behavior escalates to the level of eliciting concerns about safety.

Because most of these attacks ended very quickly, law enforcement rarely had the opportunity to intervene before serious harm was caused to students or staff. Additionally, many of the schools that experienced these tragedies had implemented physical security measures (e.g., cameras, school resource officers, lockdown procedures). *Prevention is key.*

Some of the key findings from this study, and their implications for informing school violence prevention efforts, include:

- **There is no profile of a student attacker, nor is there a profile for the type of school that has been targeted:** Attackers varied in age, gender, race, grade level, academic performance, and social characteristics. Similarly, there was no identified profile of the type of school impacted by targeted violence, as schools varied in size, location, and student-teacher ratios. Rather than focusing on a set of traits or characteristics, a threat assessment process should focus on gathering relevant information about a student's behaviors, situational factors, and circumstances to assess the risk of violence or other harmful outcomes.

- **Attackers usually had multiple motives, the most common involving a grievance with classmates:** In addition to grievances with classmates, attackers were also motivated by grievances involving school staff, romantic relationships, or other personal issues. Other motives included a desire to kill, suicide, and seeking fame or notoriety. Discovering a student's motive for engaging in concerning behavior is critical to assessing the student's risk of engaging in violence and identifying appropriate interventions to change behavior and manage risk.

- **Most attackers used firearms, and firearms were most often acquired from the home:** Many of the attackers were able to access firearms from the home of their parents or another close relative. While many of the firearms were unsecured, in several cases the attackers were able to gain access to firearms that were secured in a locked gun safe or case. It should be further noted, however, that some attackers used knives instead of firearms to perpetrate their attacks. Therefore, a threat assessment should explore if a student has access to *any* weapons, with a particular focus on weapons access at home. Schools, parents, and law enforcement must work together rapidly to restrict access to weapons in those cases when students pose a risk of harm to themselves or others.

- **Most attackers had experienced psychological, behavioral, or developmental symptoms:** The observable mental health symptoms displayed by attackers prior to their attacks were divided into three main categories: psychological (e.g., depressive symptoms or suicidal ideation), behavioral (e.g., defiance/misconduct or symptoms of ADHD/ADD), and neurological/developmental (e.g., developmental delays or cognitive deficits). The fact that half

of the attackers had received one or more mental health services prior to their attack indicates that mental health evaluations and treatments should be considered a component of a multidisciplinary threat assessment, but not a replacement. Mental health professionals should be included in a collaborative threat assessment process that also involves teachers, administrators, and law enforcement.

- **Half of the attackers had interests in violent topics:** Violent interests, without an appropriate explanation, are concerning, which means schools should not hesitate to initiate further information gathering, assessment, and management of the student's behavior. For example, a student who is preoccupied or fixated on topics like the Columbine shooting or Hitler, as was noted in the backgrounds of several of the attackers in this study, may be the focus of a school threat assessment to determine how such an interest originated and if the interest is negatively impacting the student's thinking and behavior.

- **All attackers experienced social stressors involving their relationships with peers and/or romantic partners:** Attackers experienced stressors in various areas of their lives, with nearly all experiencing at least one in the six months prior to their attack, and half within two days of the attack. In addition to social stressors, other stressors experienced by many of the attackers were related to families and conflicts in the home, academic or disciplinary actions, or other personal issues. All school personnel should be trained to recognize signs of a student in crisis. Additional training should focus on crisis intervention, teaching students skills to manage emotions and resolve conflicts, and suicide prevention.

- **Nearly every attacker experienced negative home life factors:** The negative home life factors experienced by the attackers included parental divorce or separation, drug use or criminal charges among family members, or domestic abuse. While none of the factors included here should be viewed as predictors that a student will be violent, past research has identified an association between many of these types of factors and a range of negative outcomes for children.

- **Most attackers were victims of bullying, which was often observed by others:** Most of the attackers were bullied by their classmates, and for over half of the attackers the bullying appeared to be of a persistent pattern which lasted for weeks, months, or years. It is critical that schools implement comprehensive programs designed to promote safe and positive school climates, where students feel empowered to report bullying when they witness it or are victims of it, and where school officials and other authorities act to intervene.

- **Most attackers had a history of school disciplinary actions, and many had prior contact with law enforcement:** Most attackers had a history of receiving school disciplinary actions resulting from a broad range of inappropriate behavior. The most serious of those actions included the attacker being suspended, expelled, or having law enforcement interactions as a result of their behavior at school. An important point for school staff to consider is that punitive measures are not preventative. If a student elicits concern or poses a risk of harm to self or others, removing the student from the school may not always be the safest option. To help in making the determination regarding appropriate discipline, schools should employ disciplinary practices that ensure fairness, transparency with the student and family, and appropriate follow-up.

- **All attackers exhibited concerning behaviors. Most elicited concern from others, and most communicated their intent to attack:** The behaviors that elicited concern ranged from a constellation of lower-level concerns to objectively concerning or prohibited behaviors. Most of the attackers communicated a prior threat to their target or communicated their intentions to carry out an attack. In many cases, someone observed a threatening communication or behavior *but did not act*, either out of fear, not believing the attacker, misjudging the immediacy or location, or believing they had dissuaded the attacker. Students, school personnel, and family members should be encouraged to report troubling or concerning behaviors to ensure that those in positions of authority can intervene.

A multidisciplinary threat assessment team, in conjunction with the appropriate policies, tools, and training, is the best practice for preventing future tragedies. A thorough review of the findings contained in this report should make clear that tangible steps can be taken to reduce the likelihood that any student would cause harm, or be harmed, at school.

EXHIBIT 7
0108

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

PART I: OVERVIEW OF THE ATTACKS ...............................................................7

School & Community Information ........................................................................7

School Security & Prevention Measures ..............................................................8

Weapons Used.................................................................................................9

Timing & Location ...........................................................................................9

Response Times .............................................................................................11

Resolution & Harm .........................................................................................12

Judicial Outcomes ..........................................................................................13

PART II: THE ATTACKERS ...............................................................................14

Motives ........................................................................................................15

Targeting.......................................................................................................18

Planning .......................................................................................................20

Firearm Acquisition.........................................................................................22

Law Enforcement Contact ...............................................................................23

Psychological, Behavioral, & Developmental Health.............................................24

Substance Use & Abuse ..................................................................................27

Weapons Use & Violence .................................................................................27

Home Life Factors ..........................................................................................29

Stressors ......................................................................................................31

Bullying ........................................................................................................33

School Interactions & Relationships ..................................................................37

Academic Performance & Extracurricular Activities ..............................................37

Disciplinary History.........................................................................................38

Threat Assessment .........................................................................................42

Concerning Behaviors .....................................................................................43

PART III: IMPLICATIONS.................................................................................49

APPENDIX A: STATISTICAL ANALYSES .............................................................55

APPENDIX B: COMPARISON TO THE SAFE SCHOOL INITIATIVE ...........................57



PROTECTING AMERICA'S SCHOOLS
**A U.S. SECRET SERVICE ANALYSIS
OF TARGETED SCHOOL VIOLENCE**

**EXHIBIT 7**
**0109**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

## INTRODUCTION

For the past 20 years, the U.S. Secret Service National Threat Assessment Center (NTAC) has been conducting a unique blend of operationally relevant and behavior-based research on the prevention of targeted violence in various contexts, including attacks targeting public officials and public figures, government facilities, workplaces, public spaces, K-12 schools, and institutions of higher education. Targeted violence is a term coined by the Secret Service to refer to any incident of violence where an attacker selects a particular target prior to an attack. Through the Presidential Threat Protection Act of 2000, NTAC was congressionally authorized to conduct research, training, consultation, and information sharing on the prevention of targeted violence, and to provide guidance to law enforcement, government agencies, schools, and other public safety and security professionals.

Threat assessment is the best practice for preventing incidents of targeted violence. It is an investigative approach pioneered by the Secret Service, originally developed as a means to prevent assassinations. A threat assessment, when conducted by the Secret Service, involves identifying individuals who have a concerning or threatening interest in the President of the United States or another protected person, conducting an investigation to assess whether or not that individual poses a risk of violence or other unwanted outcome, and then taking steps to manage that risk. These cases receive the highest priority of all Secret Service investigations, and the agency considers these investigations to be as important as the physical security measures it employs.

The Secret Service's threat assessment model has since been adapted to prevent other acts of targeted violence impacting communities across the United States. These attacks have a profound and devastating impact on those directly affected and the Nation as a whole, none more so than attacks at K-12 schools.[2] Following the tragedy at Columbine High School in 1999, the Secret Service partnered with the U.S. Department of Education on a study that examined 37 incidents of targeted school violence that occurred from 1974 to 2000. The Safe School Initiative focused on gathering and analyzing information about the thinking and behavior displayed by the students who committed these violent acts.[3] The publication of the final report and accompanying guide provided schools and law enforcement with a framework for how to identify, assess, and manage students who display such threatening or concerning behavior.

### Key Findings from the Safe School Initiative (2002)

- Incidents of targeted violence at school rarely were sudden or impulsive acts.
- Prior to most incidents, other people knew about the attacker's idea and/or plan to attack.
- Most attackers did not threaten their targets directly prior to advancing the attack.
- There is no accurate or useful "profile" of students who engaged in targeted school violence.
- Most attackers engaged in some behavior prior to the incident that caused others concern or indicated a need for help.
- Most attackers had difficulty coping with significant losses or personal failures. Moreover, many had considered or attempted suicide.
- Many attackers felt bullied, persecuted, or injured by others prior to the attack.
- Most attackers had access to and had used weapons prior to the attack.
- Most attackers demonstrated some interest in violence, through movies, video games, books, or other media.
- Most attackers had no history of prior violent or criminal behavior.
- In many cases, other students were involved in some capacity.
- Despite prompt law enforcement responses, most attacks were stopped by means other than law enforcement intervention.



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

Since the release of the study in 2002, the findings of the Safe School Initiative have informed the targeted violence prevention efforts of schools and law enforcement across the country. To date, NTAC has delivered over 500 trainings on K-12 school threat assessment to over 100,000 school personnel, law enforcement, mental health professionals, and others with school safety responsibilities. NTAC has further consulted with individual schools and school districts, as well as county and state governments, as they developed threat assessment protocols geared toward proactively preventing these tragedies.

There is more work to be done.

In 2018, two incidents of targeted school violence alone resulted in the tragic loss of 27 students and staff, and serious injuries to 30 more. The February 14, 2018 attack at Marjory Stoneman Douglas High School in Parkland, FL and the May 18, 2018 attack at Santa Fe High School in Santa Fe, TX prompted school personnel, law enforcement, government agencies, and others to identify strategies for preventing future attacks. To support these efforts, NTAC initiated programs to provide updated research and guidance on threat assessment and the prevention of targeted school violence.

The first phase involved the creation and distribution of an operational guide titled *Enhancing School Safety Using a Threat Assessment Model: An Operational Guide for Preventing Targeted School Violence*. Released in July 2018, the guide outlines actionable steps schools can take to create multidisciplinary threat assessment teams, establish central reporting mechanisms, identify student behaviors of concern, define the threshold for law enforcement intervention, promote safe school climates, and identify intervention and management strategies for decreasing the risk of a targeted attack. The guide is available on the Secret Service public website and was distributed to 40,000 public school districts and private schools across the country.

The second phase was to conduct a new research study expanding on the Secret Service's previous work in studying targeted school violence. The report that follows is the culmination of these efforts and represents the most in-depth analysis of targeted school violence to be conducted in decades. *Protecting America's Schools: A U.S. Secret Service Analysis of Targeted School Violence* examines 41 attacks against K-12 schools in the United States from 2008 to 2017. The report examines the background and behaviors of the attackers, in order to inform the best practices of multidisciplinary school threat assessment programs nationwide.

ENHANCING SCHOOL SAFETY USING A THREAT ASSESSMENT MODEL
An Operational Guide for Preventing Targeted School Violence

**EXHIBIT 7**
**0110**



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

## Methodology

### Incident Identification

NTAC researchers initiated a systematic review of relevant databases, publications, and public reports. The review sought to identify incidents of targeted school violence that occurred in the United States from 2008 to 2017. For this study, an incident of *targeted school violence* was defined as any incident in which (i) a current or recently former* K-12 school student (ii) purposefully used a weapon (iii) to cause physical injury to, or the death of, at least one other student and/or school employee (iv) in or on the immediate property of the school (v) while targeting in advance one or more specific and/or random student(s) and/or employee(s).

Certain exclusions were used in order to focus this project on incidents of *targeted* school violence. This study does not include attacks where a perpetrator could not be identified, or incidents related to gang violence, drug violence, or other incidents with a strong suggestion of a separate criminal nexus. Similarly, it does not include violence from the surrounding community that spilled onto school property by happenstance. It also excludes spontaneous acts, such as those that were the immediate result of an unplanned fight or other sudden confrontation.

Because this project was initiated in early 2018, incident identification and collection was limited to cases that occurred through 2017, thereby allowing researchers to gather the most comprehensive case information for each incident. For this reason, the tragedies that have occurred in 2018 and 2019 were not able to be included in the analysis.

Based on the stated criteria, researchers identified 41 incidents of targeted school violence, perpetrated by 41 current or recently former students, from January 2008 through December 2017.

### Case Information

Information for the 41 identified incidents was drawn largely from primary source materials obtained by researchers related to the incident. Secret Service Field Offices across the United States worked with their local law enforcement partners to acquire investigative case files for 36 of the 41 incidents. These files included police investigative records, publicly available court records, and other publicly available information. These source materials may have also contained school records and mental health records. Obtained records included interviews with the attackers, interviews with witnesses and people who knew the attackers, school transcripts and disciplinary histories, social media screen captures, data from the searches of phones and computers used by the attackers, the results of searches of the attackers' residences, personal journals and other writings, and court records containing the results of mental health evaluations both before and after the attacks. All case examples used in the drafting of this report were vetted through the agencies who provide the investigative files. Case analysis was further supplemented through a rigorous, structured review of open source information, including news articles and reports from government and private agencies. NTAC staff considered all available qualitative information to develop data relevant to threat assessment and prevention factors for each case. Some data were analyzed and are reported here for all 41 cases, including information on how the attacks were executed, school information, and demographic information about the



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

attackers. Information on the behavioral histories of the attackers, however, were only analyzed for 35 of the 41 cases due to the limited information available on the backgrounds of 6 of the attackers.

Multiple layers of review were applied to every stage of the project to ensure accuracy and reliability of reported findings.



**EXHIBIT 7**
**0111**

 United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*





PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE**/2019

PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE**/2019

5

6

**EXHIBIT 7**
**0112**



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

# PART I: OVERVIEW OF THE ATTACKS

### School & Community Information

*SCHOOL TYPES:* All but two of the attacks occurred in public schools ($n$ = 39, 95%). Nearly three-quarters of the attacks were carried out at high schools ($n$ = 30, 73%), which are defined in this report as any school that reaches 12th grade. Nine attacks took place at middle schools (22%), and one attack occurred at an elementary school (2%). One additional attack occurred at a K-11 school (2%).

*COMMUNITIES:* Approximately one-third ($n$ = 14, 34%) of the attacks occurred in schools located in suburban communities, while 11 attacks occurred in cities (27%). Ten incidents were carried out in rural schools (24%), and the fewest attacks took place in small towns ($n$ = 6, 15%).[5]

**SCHOOL TYPE**



Other School 2%
Elementary School 2%
Middle School 22%
High School 73%

*Percentages may not total 100 due to rounding.*

| Student Enrollment | | |
|---|---|---|
| < 500 | 9 | 22% |
| 500 - 999 | 15 | 37% |
| 1000 - 1499 | 8 | 20% |
| 1500+ | 9 | 22% |
| *Percentages may not total 100 due to rounding.* | | |

*SCHOOL SIZE:* Over half ($n$ = 24, 59%) of the attacks took place at schools with fewer than 1,000 students, and 17 (41%) occurred at schools with 1,000 students or more. Over one-third of the attacks took place at schools with between 500 and 999 students ($n$ = 15, 37%).

*CLASS SIZE:* Teacher to pupil ratios also varied among the impacted schools, with eight of the schools (20%) at the national average of 1:15 to 1:16. One-third ($n$ = 13, 32%) had lower ratios than the average, and 20 schools (49%) had higher ratios. The highest ratio was 1 teacher for every 26 students.[7]

| Teacher to Pupil Ratios | | |
|---|---|---|
| 1:9 to 1:14 | 13 | 32% |
| 1:15 to 1:16*[6] | 8 | 20% |
| 1:17 to 1:19 | 9 | 22% |
| 1:20 to 1:26 | 11 | 27% |
| * National average | | |
| Percentages may not total 100 due to rounding. | | |

---



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

### School Security & Prevention Measures

**Most of the schools ($n$ = 33, 80%) in this study implemented some type of *physical security measure,*** and two-thirds ($n$ = 27, 66%) had full- or part-time *school resource officers* (SROs) on campus.

*PHYSICAL SECURITY MEASURES:* The most frequently used physical security measure was school lockdown procedures, present in at least 28 (68%) of the schools where an attack took place. Fourteen (34%) schools had security cameras, which were located either inside or outside of the schools. Seven (17%) had alert systems, which were used to notify members of the school community of emergencies via automated text messages or phone calls. Three (7%) schools had magnetometers, but they were not regularly used. Six (15%) schools employed private security guards, who were usually unarmed.

*SCHOOL RESOURCE OFFICERS:* At the time of the attacks, nearly half of the schools ($n$ = 19, 46%) had one or more full-time SROs. An additional eight schools (20%) had an SRO who operated at the school part-time, because they were assigned to multiple schools within the district.

*REPORTING TOOLS:* Only seven (17%) schools had any type of system in place to notify school staff or administrators of threatening or concerning student behaviors before an attack. These systems usually involved a phone number, email address, or a paper referral through which the school could be contacted. At the time of the incidents, few states had implemented comprehensive statewide reporting programs, like Safe2Tell™ Colorado.

*ASSESSMENT AND INTERVENTION PROTOCOLS:* Nine (22%) schools had some type of program involving employees who were assigned to assess unwanted or potentially harmful student behavior. For some of these schools, they had developed basic protocols for assessing and responding to reports of a student threat. In others, school staff created more formal threat assessment teams, but the participation, training, and protocols of these teams varied. The Secret Service recommends that schools implement multidisciplinary school threat

### Physical Security and Threat Assessment

*When the Safe School Initiative was published in 2002, it stated that "the Secret Service considers threat assessment to be as important to preventing targeted violence as the physical measures it employs." The Secret Service protects our Nation's highest elected officials using physical security measures in conjunction with, and complimented by, a threat assessment approach designed to proactively intervene with those individuals who intend to cause harm. This complimentary approach to protection recognizes that either of the approaches, alone, would not constitute the most effective means of preventing an attack.*

### Safe2Tell™ Colorado

*Safe2Tell is a statewide, anonymous reporting tool, which accepts tips 24/7 regarding any concern of safety to self or others. Every tip is evaluated by Safe2Tell analysts at the Colorado Information Analysis Center (CIAC), then disseminated to schools and local law enforcement as appropriate. Built-in accountability ensures that every tip is responded to before a case can be closed.*

*During the 2018-2019 school year, 19,861 tips were received by Safe2Tell. The most common tips received were related to student suicide, drug use, and bullying.*

*For states that would like to implement this type of reporting program, Safe2Tell provides information and resources at:*

*www.safe2tell.org*

**EXHIBIT 7**
**0113**



## United States Secret Service
### NATIONAL THREAT ASSESSMENT CENTER

assessment teams in accordance with *Enhancing School Safety Using a Threat Assessment Model: An Operational Guide for Preventing Targeted School Violence*. This framework is intended to help schools develop the capacity to identify, assess, and manage students who are displaying concerning or threatening behaviors. This process should complement the physical security measures that a school determines is appropriate for its community.

### Weapons Used

Most of the attackers (*n* = 25, 61%) used firearms, which included handguns, rifles, and shotguns. In total, attackers used 18 handguns and 9 long guns during the attacks, with two attackers using multiple firearms. The remainder (*n* = 16, 39%) used bladed weapons, which most frequently included pocket or folding knives, followed by butcher or kitchen knives, and hunting knives. In one instance, the attacker used a World War II bayonet. Three of the attackers used a combination of weapons to cause harm or damage, including one who used a knife and a claw hammer, another who used a knife and bo staff, and another who used a firearm and a Molotov cocktail.



**WEAPON USED***

Knife 39%
Firearm 61%

*Three attackers also used another weapon including a hammer, a bo staff, and a Molotov cocktail.

Several of the attackers brought other weapons to the attack that they did not ultimately use. Some brought knives in addition to the firearm or knife that was used, while others brought items ranging from a wrench wrapped in a bandana to home-made explosives. For example, one attacker who used a knife in his attack also brought five other knives, a blowtorch, three containers of flammable liquid, and firecrackers.

### Timing & Location

**TIMING OF THE ATTACK:** The 41 attacks occurred with varying frequency from year to year and do not appear to be steadily increasing or decreasing. While these incidents comprise only some of the acts of violence that occur in K-12 schools each year, data from the CDC regarding all school associated violent deaths similarly does not show a steady increase or decrease.[6]



**Incidents by Year**

2008 2009 2010 2011 2012 2013 2014 2015 2016 2017
1    1    5    4    2    8    7    4    6    3

Incidents in the current study took place in every month except July and occurred on every day of the week except Sunday. The one incident that occurred on a Saturday took place outside of a school prom. Three-quarters of the attacks were carried out before the school day began (*n* = 10, 24%) or during morning classroom hours (*n* = 21, 51%).



**Timing of the Attacks**

| | |
|---|---|
| Before School | 10 (24%) |
| Morning Classroom Hours | 20 (51%) |
| During Lunch | 3 (7%) |
| Afternoon Classroom Hours | 6 (15%) |
| Outside School Hours | 1 (2%) |

---



## United States Secret Service
### NATIONAL THREAT ASSESSMENT CENTER

**BREAKS IN ATTENDANCE:** Incidents occurred most frequently at the start of the school year (Sep) or after students returned from winter break (Jan). **Seventeen attacks (41%) took place within the first week back to school following a break in attendance**, including suspensions, school holidays, or an absence due to illness or truancy. Nearly one quarter of the attacks (*n* = 10, 24%) took place on the first day that the attacker returned to school after an absence. In two of these incidents, the attacker was actively suspended from the school at the time of the attack. These findings suggest that schools should



**Incidents Over Academic Year**

Aug Sep Oct Nov Dec Jan Feb Mar Apr May Jun
4    8    7    3    1    8    2    4    2    1    1

**Start**    **Winter**    **End**

make concerted efforts to facilitate positive student engagement following discipline, including suspensions and expulsions, and especially within the first week that the student returns to school.

*A 14-year-old student fatally stabbed a classmate at the middle school they both attended. At the time of the incident, the attacker was suspended for truancy. Despite the suspension, witnesses reported seeing him walking the school's hallways in search of the target shortly before the stabbing took place.*

Four attacks (10%) occurred on the first day back from a regularly scheduled *school holiday*. Of those, three took place on the first day following an extended break, including the summer, fall, and winter holidays.

*A 15-year-old student shot and wounded a random classmate in the high school cafeteria on the first day of the school year. The attacker had planned the attack over the last week of his summer break. On the morning of the incident, he shared a message on social media stating, "First day of school, last day of my life." The shooting took place four hours later.*

**DURATION OF THE ATTACKS:** Most of the attacks (*n* = 34, 83%) lasted five minutes or less. Two-thirds of the incidents (*n* = 28, 68%) lasted for two minutes or less, and **nearly half of the attacks (*n* = 18, 44%) ended within one minute**. Only six of the attacks (15%) lasted longer than five minutes, and none of the attacks lasted longer than 15 minutes.[9]



**DURATION OF THE ATTACKS**

5-15 min 15%
2-5 min 15%
1-2 min 24%
1 min or less 44%

Percentages may not total 100 due to rounding.

**LOCATION OF THE ATTACKS:** The attacks usually started and ended in the same location (*n* = 36, 88%). The most common locations of attacks were in classrooms and immediately outside of the school. Other locations included cafeterias, hallways, and administrative offices. Attacks in restrooms, locker rooms, a gymnasium, and a vestibule were less common.



**Locations of the Attacks**

Classroom    Outside    Office
Cafeteria    Hallway    Restroom
Locker Room    Gym    Vestibule

**EXHIBIT 7**
**0114**



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

### Response Times

**SCHOOL OFFICERS:** In 27 cases (66%), a security officer or SRO was assigned to the school on either a full- or part-time basis. During 20 of the attacks (49%), the officer was *on duty at the school*. In over one-quarter of the cases (*n* = 12, 29%), the officer or SRO was able to make it to the scene of the attack within one minute. In three of the attacks (7%), it took between one and five minutes for the officer to respond, and for two attacks (5%), it took between five and ten minutes. Of note, in two cases the officers themselves were the targets of the attacks, and in the remaining, it was not possible to determine the response time based on information that was available.

**OUTSIDE LAW ENFORCEMENT:** In just over one-third of the attacks (*n* = 16, 39%), outside law enforcement were *notified* within one minute or less from the start of the attack, and in just under one-third (*n* = 12, 29%), outside police were notified between one and five minutes after the start of the attack. In nine cases, it took longer than five minutes for someone to notify outside law enforcement, and in four cases the timing could not be determined from information available.

In nearly one-third of the cases (*n* = 13, 32%), it took external first responders between one and five minutes to *arrive* on scene after the attack was initiated, and in about a quarter of the cases (*n* = 11, 27%) first responders arrived between five and ten minutes after the attack began. In only one case, outside law enforcement were able to respond in one minute or less, because officers were already at the school conducting K-9 drug sweeps at the time of the attack.

| | School Officer Response Time* | Outside LE Notification | Outside LE Response Time |
|---|---|---|---|
| 1 min or less | 12 (29%) | 16 (39%) | 1 (2%) |
| >1 to 5 min | 3 (7%) | 12 (29%) | 13 (32%) |
| >5 to 10 min | 2 (5%) | 4 (10%) | 11 (27%) |
| >10 to 15 min | — | 5 (12%) | 4 (10%) |
| >15 min | — | — | 3 (7%) |
| Not Applicable | 21 (51%)** | — | — |
| Not Found | 3 (7%) | 4 (10%) | 9 (22%) |

*Percentages may not equal 100 due to rounding
**Includes those schools without officers assigned, assigned officers off duty at the time, or cases in which the SROs were targeted.

### Resolution & Harm

**ATTACK RESOLUTION:** Half of the attackers (*n* = 21, 51%) ended the attack without any external intervention. Seven attackers (17%) committed suicide, six (15%) left the scene, three (7%) surrendered to a school official(s), three (7%) dropped their weapons and waited to be arrested, one (2%) stopped and called family, and one attacker (2%) left the scene before calling family.

Non-law enforcement adult school staff brought nine attacks (22%) to an end. This included teachers, guidance counselors, an assistant principal, a sports coach, a campus supervisor, and a janitor. Six of the attacks (15%) were ended with law enforcement intervention, either by SROs (*n* = 5, 12%) or by local police who were already on campus (*n* = 1, 2%). Two of the attackers were killed by the law enforcement response. *No attacks were ended by outside law enforcement agencies responding to the scene from off campus.* Other attacks ended due to student bystander intervention (*n* = 4, 10%) or a weapon malfunction (*n* = 1, 2%).

**HARM:** Ninety-eight victims were harmed in the 41 attacks, including 79 injured and 19 killed. The victims included students, school staff, and law enforcement.[10] One stabbing incident accounted for 20 of the 98 victims, all of whom were injured but survived. In just over half of the attacks (*n* = 22, 54%), only one individual was harmed. In the remaining attacks, two persons were harmed (*n* = 9, 22%), or three or more were harmed (*n* = 10, 24%).

**TWENTY VICTIMS:** A 16-year-old student randomly slashed and stabbed people at his high school using two kitchen knives he had brought from home. Nineteen students and one staff member were injured, but all survived. The attack ended after about five minutes when the assistant principal tackled the assailant.

**PERSONS INJURED OR KILLED**



Law Enforcement 2%
Staff 13%
Students 85%

### Mass Attacks

*The definition of a "mass attack," as used by the U.S. Secret Service in its Mass Attacks in Public Spaces report series, includes harm (e.g., injury or death) to three or more persons, not including the attacker. About one-quarter of attacks (*n* = 10, 24%) in this study would meet that definition of a mass attack.*

PROTECTING AMERICA'S SCHOOLS / ANALYSIS OF TARGETED SCHOOL VIOLENCE / 2019

EXHIBIT 7
0115



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

### Judicial Outcome

**CRIMINAL CHARGES:** Thirty-two attackers (78%) were criminally charged, twenty-two of whom (54%) were charged as adults. Nearly all of those charged as adults accepted plea agreements (17 pled guilty; 2 pled no contest). Only two cases went to trial, where both attackers were found guilty and sentenced as adults. A third attacker is still awaiting trial in adult court.

Twelve attackers were processed through the juvenile justice system. Of those charged as juveniles, the majority pled to their charges (9 pled guilty; 1 pled no contest).

**CURRENT DISPOSITIONS:** Twenty-two of the attackers (54%) are currently incarcerated, and one attacker is a patient at a mental health facility. Eight attackers (20%) have been released from juvenile and/or adult correctional institutions.[11]

| Judicial Actions | | |
|---|---|---|
| **Adult** | **22** | **54%** |
| Subject pled guilty | 17 | 41% |
| Subject found guilty | 2 | 5% |
| Subject pled no contest | 2 | 5% |
| Charges filed, case pending | 1 | 2% |
| **Juvenile** | **12** | **29%** |
| Subject pled guilty | 9 | 22% |
| Unknown | 2 | 5% |
| Subject pled no contest | 1 | 2% |
| **No Charges Filed** | **9** | **22%** |
| Subject committed suicide | 7 | 17% |
| Subject fatally shot | 2 | 5% |

Percentages exceed 100 as two attackers had both adult and juvenile charges.



---



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

## PART II: THE ATTACKERS

**GENDER, RACE, & AGE:** While the attackers were predominantly male (n = 34, 83%), seven of the attackers were female (17%). Based on police report designations, approximately two-thirds of the attackers (n = 26, 63%) were White, six were Black (15%), and two were Hispanic (5%). Their ages ranged from 12 to 18, with an average age of 15.

*YOUNGEST: A 12-year-old student* opened fire at his middle school. He killed one teacher and injured two classmates before fatally shooting himself. The attacker had a history of being bullied and felt mistreated by students and teachers.

*OLDEST: An 18-year-old former student, who had graduated the year prior,* opened fire outside of his old high school toward a group of students exiting the prom. Two of the students were shot and injured. Local police were already on scene conducting drug sweeps, and instructed the attacker to drop his weapon. When the attacker failed to comply with police instructions, he was fatally shot by one of the officers. The attacker believed that his ex-girlfriend and her new boyfriend were attending the prom together, but two were actually in attendance.



GENDER

Male 83%
Female 17%

| Race | | |
|---|---|---|
| White | 26 | 63% |
| Black/African American | 6 | 15% |
| Hispanic | 2 | 5% |
| American Indian or Alaska Native | 1 | 2% |
| Two or More Races | 4 | 10% |
| Undetermined | 2 | 5% |

Categories consistent with the U.S. Department of Education guidance on the collection & Reporting of racial & ethnic data. (72 Fed. Reg. 59267 Pub. Oct 2002.)

**GRADE LEVEL:** The grade levels of the attackers ranged from 7th grade to 12th grade.

**FORMER STUDENTS:** Four of the attackers (10%) targeted schools in which they were no longer enrolled as students. They included a student who attacked his former high school after transferring to an alternative school; a student whose mother

**Grade level of the Attackers**

| 7th | 8th | 9th | 10th | 11th | 12th | Former Student | Unknown |
|---|---|---|---|---|---|---|---|
| 5 | 6 | 7 | 8 | 7 | 3 | 4 | 1 |

withdrew him from school because he was about to be expelled; a student who had graduated the previous year, but was working at the school as a teacher's assistant and occasionally performed with the school marching band; and a middle school student who attacked his former elementary school.

**EXHIBIT 7**
**0116**



**United States Secret Service**
## NATIONAL THREAT ASSESSMENT CENTER

### Motives

When determining motives, all available information about each attacker's thinking and behavior in the time leading up to the attack was considered, including explicit explanations of motive that the attackers provided through verbal statements made before the attack, in suicide notes or manifestos, and during post-incident interviews with law enforcement.

Consistent with other forms of targeted violence, the motives behind these 41 school attacks varied widely and were based on the personal perceptions and experiences of the attackers. **Most attackers had *multiple motivations for carrying out their attacks**. This analysis indicates that a student's motive to carry out a violent act at school is usually multifaceted and is the byproduct of the student's individual circumstances, as well as their personal perception of those circumstances.

| Components to Motive[13] | Primary | Secondary | Total |
|---|---|---|---|
| Grievances | 25 (61%) | 9 (22%) | 34 (83%) |
| Peers | 15 (37%) | 11 (27%) | 26 (63%) |
| Related to bullying | – | – | 19 (46%) |
| Staff | 4 (10%) | 6 (15%) | 10 (24%) |
| Romantic | 4 (10%) | 5 (12%) | 9 (22%) |
| Other personal | 2 (5%) | 4 (10%) | 6 (15%) |
| Desire to kill | 7 (17%) | 8 (20%) | 15 (37%) |
| Suicidal | 3 (7%) | 14 (34%) | 17 (41%) |
| Fame/Notoriety | 2 (5%) | 2 (5%) | 4 (10%) |
| Psychotic symptoms | 2 (5%) | 3 (7%) | 5 (12%) |
| Unknown | 2 (5%) | n/a | 2 (5%) |
| Total | 41 (100%) | | |

All but two of the 41 attackers had an identifiable *primary* motive, defined as the motive that appeared to most strongly contribute to the attacker's decision to act violently. Most of the attackers (*n* = 35, 85%), however, had at least one additional *secondary* motive that contributed to their decision for carrying out the attack.

*SINGLE MOTIVE: A recently suspended 14-year-old student fatally stabbed a classmate in the chest as he exited his middle school. The students had been friends, but due to frequent conflicts, their relationship had deteriorated. The victim of the stabbing had previously threatened, harassed, and bullied the attacker. The attacker grew to fear for his life and stopped attending school in order to avoid the victim, which led to the attacker's suspension for missing class. The attacker later reported that he had been motivated by fear, stating that if he had not returned to school to stab his classmate, he believed that he would have been killed himself.*



**United States Secret Service**
## NATIONAL THREAT ASSESSMENT CENTER

*MULTIPLE MOTIVES: An 18-year-old student shot and killed a classmate he encountered immediately upon entering his school. He then sought out the debate team coach, who escaped, before the attacker killed himself. The attacker appeared to have been primarily motivated by a grievance with the debate team coach, who had removed him from a captain position on the debate team. Additional motivations appeared to include grievances with other staff members and classmates, a sadistic desire to hurt other people, and suicidal ideations.*

GRIEVANCES: For most of the attackers (*n* = 34, 83%), retaliating for a grievance played a role in their motive. For nearly two-thirds of the attackers (*n* = 25, 61%), it appeared to be their *primary* motive.

- **Peers:** Most frequently, grievances involved classmates (*n* = 26, 63%), and these peer grievances were usually related to bullying in some way (*n* = 19, 46%). Other examples of peer grievances that did not involve bullying included ongoing conflicts and contentious relationships between students, or anger over a specific event or situation among classmates.

  *A 14-year-old student fatally shot a classmate at his middle school. The victim had been the subject of harassment by the attacker and other students, who would call the victim derogatory homophobic names. The attacker later reported that the victim had made comments that made him uncomfortable, citing them as "the final straw" in his decision to attack.*

- **Staff:** In a quarter of the attacks, the attacker had a grievance that involved school staff (*n* = 10, 24%). For four attackers (10%), this grievance with teachers or administrators was the *primary* motivation. In each of those four incidents, the school staff members were specifically targeted in the attack.

  *A 16-year-old student fatally stabbed his high school principal. According to his confession after the incident, the attacker began planning his attack on the principal three months earlier, after he learned that he would be returning to the same high school for 11th grade. He stated that the school principal made him the most angry, and he "didn't like the school and didn't want to attend there anymore." He was also angry at having to follow school rules, for example, when the principal repeatedly made him tuck in his shirt.*

- **Romantic:** Nine cases (22%) involved a grievance related to a romantic relationship as a *primary* or *secondary* motive. Two of these cases involved female attackers, while seven involved male attackers.

  *A 15-year-old student fatally shot a former romantic partner outside of their high school before committing suicide. The students had dated for over two years, but the victim had recently informed the attacker that the relationship was ending. According to media reports, the attacker also had a history of suicidal ideations and depressive symptoms. In redacted versions of the notes released publicly, the attacker expressed anger at the victim for wasting the attacker's money, time, affection, and "so much more." The attacker also wrote, "we planned our future together," adding, "This week has been the worst in my life," and, "All of this has destabilized me."*

EXHIBIT 7
0117



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

- **Other Personal Issues:** Six students (15%) were motivated by other personal issues, and for two (5%), it was their *primary* motive. These personal issues involved things like anger over a failed drug test at school and retaliating for abuse or neglect occurring at home.

*A 14-year-old student opened fire toward random classmates in his high school cafeteria. Two students were shot and injured, and two other students received minor injuries, possibly when struck by shrapnel. The attacker later stated his motive was attributed to his troubled home life, including a distant relationship with his mother, conflicts with his father, and an addiction to Adderall.*

**DESIRE TO KILL:** The second most prevalent motive among student attackers ($n = 15$, 37%) was a desire to kill, evidenced by a sadistic interest in violence or violent topics, a desire for power over their victims, or the expectation of joy or pleasure in causing physical harm to others. For seven attackers (17%), this appeared to be their *primary* motive, and eight additional students (20%) experienced these types of thoughts as a *secondary* motive. Nearly all attackers were primarily motivated by a desire to kill targeted random victims (see Appendix A: Statistical Analyses). While it is possible that a desire to kill could be associated with psychological symptoms, it more often appeared to develop as a response to the student's personal circumstances and life experiences.

*A 15-year-old student fatally shot a classmate at his high school. The attacker had been in previous conflicts with the victim, but he also displayed a fascination with causing physical harm to others. A few days before the attack, the attacker showed a handgun and ammunition to classmates, highlighting that "these bullets bounce around inside of your body." He was also overheard saying that he was interested in seeing what it felt like to kill someone. During his subsequent trial, a clinical psychologist said that the attacker had been "born to violent addicts, shoved into abusive foster homes, and largely ignored by courts and caseworkers."*

**SUICIDAL:** Seventeen attackers (41%) were motivated by suicide to carry out their attacks. For three attackers (7%), this appeared to be their *primary* motive, only one of whom appeared to be motivated by suicide alone. An additional 14 attackers (34%) had suicidality as a *secondary* motive. These findings reveal that suicidal ideations were rarely the sole or primary factor in an attacker's motivation for violence. Suicidal ideations were more typically found in combination with, and secondary to, other motives.

*A 16-year-old student intended to commit suicide-by-cop when he stabbed his SRO seven times with a bayonet. The officer struggled with the attacker before fatally shooting him in self-defense. The attacker's final words to the officer were, "Thank you sir, thank you." In a suicide note, the attacker described human civilization as an "unnatural system," and included additional language like, "if you're reading this, I'm either dead or on my way to dying. If I fail at suicide, something else will end me. I have had enough of this tainted and corrupted world we live in," and, "I hope for a better existence after my passing."*

**Youth Suicide**

In 2017, the CDC reported suicide as the 2nd leading cause of death among those between the ages of 10-24 years old.

The National Suicide Prevention Lifeline provides free and confidential 24/7 support to people in crisis. If you or someone you know needs help, call 1-800-273-TALK (8255).



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

*FAME/NOTORIETY:* Four students (10%) were motivated by a desire for fame or notoriety as a *primary* or *secondary* motive. Each of these four students expressed a desire to emulate previous mass attackers, including those who perpetrated the attacks at Columbine High School, Virginia Tech, and Sandy Hook Elementary School.

*A 14-year-old student opened fire at his SRO in an effort to steal the officer's weapon. He intended to use the officer's firearm to perpetrate a mass shooting at his high school. The officer was burned by the discharging firearm, but was able to detain the student before further harm occurred. Three months prior, the attacker began keeping an extensive journal about his plans, in which he described his research into the attacks at Columbine High School and Virginia Tech. He wrote about his desire to be "worshipped" like previous attackers, adding, "I hope to out-do my idols and leave my mark on the world." He wrote about how he hoped that security camera footage of his attack would be on YouTube for his "followers" to study. After the attack, while in juvenile detention, the student continued to express interest in the media coverage of his attack, asking staff at the detention center if he could read the comments posted by readers of the online news articles.*

*PSYCHOTIC SYMPTOMS:* Five students (12%) appeared to be motivated by psychotic symptoms, either as a *primary* or *secondary* motive. These cases involved such symptoms as auditory hallucinations instructing the student to hurt people, compulsive homicidal thoughts and visions, and a delusional belief that the student was in a romantic relationship with a classmate.

*A 15-year-old student randomly stabbed two classmates in a high school restroom. Both victims survived the attack. The attacker had a history of homicidal and suicidal thoughts, thoughts of violence towards her family and girls at school, and had previously threatened to stab a friend's boyfriend. According to court records, six months prior to the attack, she was admitted to an outpatient hospitalization program for her mental health. One counselor asked the attacker if she had suicidal or homicidal ideations, and she responded, "Sometimes I get really sick thoughts. Sick ways of killing them, stabbing them, slitting their throats, sexually abusing people at school."*

### Targeting

In all forms of targeted violence, the targeted person or persons are usually selected by the attacker in relation to his or her motive. For example, if an attacker has a grievance with a specific person or group, they may target that person or group during the attack. In many of those cases, however, additional bystanders may be injured or killed, either as unintended collateral victims or as victims of opportunity. In other instances, the attacker may indiscriminately target a population of people, like the entire student body at a school, depending on the attacker's goals and motives.

*SPECIFIC PERSON TARGETED:* In nearly three-quarters of the attacks ($n = 30$, 73%), a specific person or persons were targeted by the attacker. In 22 attacks (54%), a specifically targeted person was injured or killed.

*A 12-year-old student stabbed her middle school classmate in the neck and stomach, injuring him. Other students had previously observed the victim teasing the attacker and calling her names. A few days before the incident, the attacker told another student that she hated the target. Just minutes before the stabbing, the attacker told a group of classmates that she hated the target and that she wanted to kill him, because he was annoying and was a bad person. Nobody else was targeted or harmed in the attack.*

PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE/2019**    PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE/2019**

**EXHIBIT 7**
**0118**



## United States Secret Service
### NATIONAL THREAT ASSESSMENT CENTER

**SPECIFIC GROUP TARGETED:** In six attacks (15%), a specific group of students was targeted (e.g., bullies, "jocks," "emos," "preps," "sinners"). In only one of those attacks was a member of the targeted group actually harmed.

*A 17-year-old former student opened fire in his previous high school cafeteria toward a group of students who had bullied him. The attacker was in his previous high school because he would arrive there each morning before being bused to an alternative school. Three students were killed and three more were injured. Those killed had all reportedly bullied the attacker, and one of them was dating the attacker's ex-girlfriend. One of the injured students had also bullied the attacker, but the two other injured students were bystanders.*

**RANDOM VICTIMS:** Seventeen attacks (41%) involved random victims who were attacked indiscriminately or opportunistically by the attacker (e.g., the attacker fired into a crowd or fired upon the first student he saw).

*A 16-year-old student randomly attacked a female classmate with a serrated knife and a claw hammer when she walked into the high school restroom. The victim was stabbed and hit several times, but survived the attack. The attacker's motive was to kill as many people as she could before fleeing the school. She then planned to purchase a gun and commit suicide.*

**COLLATERAL VICTIMS:** Five attacks (12%) involved random victims who were injured as collateral bystanders (e.g., the attacker aimed at a specific target, but an unintended student was shot).



19    PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE/ 2019**

---



## United States Secret Service
### NATIONAL THREAT ASSESSMENT CENTER

### Planning

Over half of the attackers (n = 21, 51%) engaged in observable planning behaviors prior to carrying out their attack that went beyond making statements of intent. Twelve attackers (29%) exhibited three or more different types of planning activities that were observable to others. Of note, the attackers in this study who perpetrated mass attacks averaged more than twice as many planning behaviors as attackers with fewer victims (see Appendix B: Statistical Analyses). For 10 of the attackers (24%), their first act of planning was within one month of the incident. Seven attackers (17%) began planning between one and six months before the attack, and rarely did planning begin more than six months prior (n = 3, 7%).[18] While some attackers discussed their plans with others, no attackers appeared to receive direct assistance in planning their specific school attack.

**WEAPONS RESEARCH AND SELECTION:** One-third of the attackers (n = 13, 32%) researched weapons prior to the attack. This included conducting online searches, reading books and pamphlets, or asking others about weapons experience and other related topics. The research focused on how to make explosives, weapon functionality and utility, how to inflict maximum damage, and types of protective equipment.

**DECEPTIVE PRACTICES:** Nine attackers (22%) engaged in deceptive practices in order to hide their activities and avoid detection. This included lying about weapons purchases and other materials (e.g., telling parents that purchased materials were for chemistry class), concealing weapons for transport, claiming needing a weapon

| Planning for the Attack | |
|---|---|
| Weapons Research and Selection | Planning the Execution of the Attack |
| Deceptive Practices | Practicing with a Weapon |
| Weapons-related | |
| Documentation of Plans | Recruiting Others |
| Approaching, Surveilling, or Researching the Target | Packing an Attack Bag |
| | Researching Prior Attacks |

for protection, or waiting until after dark to manufacture weapons. For example, on the night prior to one attack, the attacker waited until his mother went to sleep before building homemade explosives. He then pretended to be asleep so that his mother could wake him up to start the day, thus maintaining their normal routine and not arousing any suspicion.

**WEAPONS-RELATED:** Seven attackers (17%) engaged in weapons-related planning behaviors, in addition to weapons research (see Weapons Research and Selection) and the acquisition of the weapons used in the attack (see Firearm Acquisition section). These other activities included manufacturing explosives, modifying guns or knives, stockpiling additional weapons, or failed attempts to acquire other weapons. Some who failed to acquire certain weapons or materials adjusted their plans to use other weapons already acquired or more readily accessible.

*A 12-year-old student shot and wounded several classmates and a school security officer in his middle school gymnasium before surrendering to a teacher. Two days prior to the incident, the attacker had attempted to acquire his father's handgun, but was unsuccessful. Then the night before the attack, he took a shotgun from his home and sawed off the barrel so that it could fit into his duffel bag.*

PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE/2019**    20

**EXHIBIT 7**
**0119**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

**DOCUMENTATION OF PLANS:** Seven attackers (17%) documented their plans and intentions for the attack in journal entries or other writings. These writings included hit lists, safe lists (e.g., lists of those individuals who would *not* be targeted), supply lists, lessons learned from past attackers, and diagrams of school hallways.

*A 15-year-old student fatally shot a classmate and injured three others at his high school, before surrendering to the school janitor. In his journal and other scattered writings, police found diagrams mapping his high school, along with written homicidal statements and lists of chemicals, weapons, and ammunition. The attacker had also written "X Kill" on the photo page in his yearbook and had crossed out the photographs of 26 classmates.*

**APPROACHING, SURVEILLING, OR RESEARCHING THE TARGET:** Five of the attackers (12%) researched their targets prior to the attack. This included surveilling the SRO in order to learn his routine, noting security camera locations, and trying to arrange meetings with a targeted teacher.

*A 14-year-old student shot and killed his father before driving to his former elementary school, where he opened fire near the playground. One elementary student was fatally shot, and at least one other student and one teacher were injured. The attacker had researched the schedules of schools he had attended and inquired about security and the presence of SROs. He chose to target his former elementary school due to the more robust security at his middle school, his understanding of police response times to different schools, and the proximity of the elementary school to his home.*

**PLANNING THE EXECUTION OF THE ATTACK:** Five of the attackers (12%) spent time carefully considering how they would execute their attacks. They considered the "best" location to kill their intended target(s), the class period to initiate the attack, and the route they would take through the school. One of the attackers shared his plan via social media.

**RESEARCHING PRIOR ATTACKS:** Five of the attackers (12%) conducted research on prior incidents of targeted violence, including past school attacks. This research was usually conducted through online searches, or by watching videos or documentaries of prior attacks.

*A 16-year-old student used two kitchen knives to slash and stab 19 classmates and a school security guard. The attacker selected the birthday of one of the Columbine attackers as the date of his attack. Prior to the incident, the attacker had watched a documentary about the Columbine shooting in an effort to "numb himself," in preparation for his planned attack.*

**PRACTICING WITH A WEAPON:** Four attackers (10%) practiced with a weapon prior to their attack. This included one attacker who tested his homemade pipe bombs, one who practiced loading and unloading a shotgun, and one who practiced wearing tactical gear.

**RECRUITING OTHERS:** Four attackers (10%) contemplated or attempted recruiting others to help execute the acts of violence. Two of these attackers attempted unsuccessfully to recruit a specific individual to assist with the attack. Two others considered recruiting help, but did not. One of those attackers realized that attempts for recruitment could make him vulnerable to detection and therefore refrained from asking.



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

**PACKING AN ATTACK BAG:** Two attackers (5%) packed a supply bag prior to the incident. One of them packed clothes, cash, and other items needed to run away from home after the attack, and the other packed additional weapons, an energy drink, and a lollipop.

**OTHER TYPES OF PLANNING:** Nine attackers (22%) took steps to plan their attack in ways that were unique and could not be categorized among the other behaviors. This included stealing money to buy weapons, deleting an email account, and specifically wearing baggy pants the day of the attack in order to conceal a weapon.

### Firearm Acquisition

The primary weapons used in the 41 attacks were firearms ($n = 25$, 61%) and knives ($n = 16$, 39%). In most of the incidents involving knives, the weapons were taken by the attacker from their kitchens or other areas of their homes. Because knives are commonly available with little restriction, this section focuses on how the attackers acquired the firearms used in the attacks. **All percentages provided in this section are based on the 25 attackers who used firearms.**

**FROM THE HOME:** Nineteen attackers (76%) acquired a firearm from the home of a parent or another close relative. **In half of the firearms cases ($n = 12$, 48%), evidence indicates the firearm was either readily accessible, or it was not secured in a meaningful way.** For example, some firearms had been kept locked in accessible wooden or glass cabinets, locked in vehicles, or hidden in closets. **In four cases (16%), the firearms were kept in more secured locations, but the attacker was still able to gain access to them.** In these instances, the firearms were secured in a locked gun safe or case, but the attackers were able to gain access to them because they knew the combination or where the keys were kept, or they were able to guess the password or combination. In three cases, it is unknown if the firearm had been secured.

*A 15-year-old student fatally shot one classmate and injured three others at his high school. The attacker knew the combination to his father's gun safe, from which he was able to obtain a loaded semi-automatic .223-caliber AR-15 rifle with a 30-round magazine, and a .32-caliber semi-automatic pistol. The attacker transported the weapons on the school bus by concealing the rifle and seven extra boxes of ammunition in a golf bag. He kept the handgun in his pocket.*

**TIMING OF THE ACQUISITION:** Eight of the attackers (32%) acquired a firearm on the day of the attack. Five additional attackers (20%) acquired a firearm the day before the attack, and four attackers (16%) acquired a firearm between two and seven days prior. This finding reinforces the importance of a swift response to situations involving students who may pose a risk of harm to themselves or others, especially those who have access to weapons in the home.

#### Juvenile Access to Weapons

*Under federal law, individuals under the age of 18 may not legally possess a handgun, except in limited circumstances. Federal law does not restrict the age of individuals who may possess long guns (e.g., shotguns and rifles). Some states have implemented additional restrictions on juvenile possession of firearms, for example, prohibiting minors from possessing any firearm, except for certain activities and with parental consent.[14]*

*If a child poses a risk of harm to him/herself or others, it is the responsibility of parents, law enforcement, and schools to collaboratively determine the most appropriate avenue for ensuring that the child does not have access to weapons.*

**EXHIBIT 7**
**0120**



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

**WEAPONS TRANSPORT:** Half of the attackers ($n = 12$, 48%) who used a firearm in their attack transported the weapon into the school building while concealed in their backpacks. Three attackers (12%) transported their firearms into the school in another type of bag, including a guitar case, a golf bag, or a gym bag. One attacker transported a firearm into the school concealed in his waistband. Two attackers did not conceal their firearm, carrying it openly into the school building after the start of the school day.

Additionally, two attackers transported firearms from home to school, but perpetrated the attack on school property without entering the building. One of those attackers carried his weapon out in the open, while the other concealed the firearm in a guitar case as he rode his bike to the school grounds.

> For 6 of the 41 incidents included in this study, there was little information available on the background of the attackers in both primary source files and open sources. As a result, those six attackers were removed from the analysis of behavioral histories. *All percentages provided in the remainder of the report are based on the 35 attackers for whom substantive information was available.*

### Law Enforcement Contact

Half of the attackers ($n = 17$, 49%) had contact with law enforcement prior to carrying out their attacks, which included prior arrests and other encounters, like welfare checks at home. For some ($n = 6$, 17%), these prior contacts or interactions were with an SRO.

**PAST CRIMINAL CHARGES:** About one-third of attackers ($n = 11$, 31%) had previously been arrested or faced criminal charges, and the crimes for which they were charged included both non-violent ($n = 7$, 20%) and violent ($n = 6$, 17%) offenses. In some of these cases, the charges against the attacker were ultimately dismissed. The non-violent charges included alcohol or drug related offenses, a curfew violation, criminal conspiracy, shoplifting or theft, trespassing, and reckless driving. The violent charges included affray, assault with a deadly weapon, and weapons possession at school with intent to cause harm. Physical fights, which occurred both at home and at school, resulted in charges of disorderly conduct and disrupting public school. In one case, the charge was related to a domestic violence incident when the attacker physically assaulted his mother, threatened to kill her, and ended up having to undergo a mental health evaluation. None of the charges were for sex offenses.

> *An 18-year-old student shot and injured a classmate at his high school before surrendering to the SRO. According to investigative records, the attacker had been previously arrested for carrying a concealed gun, possession with the intent to distribute a controlled dangerous substance, trespassing, and resisting a public officer.*

**OTHER CONTACT WITH LAW ENFORCEMENT:** Some attackers ($n = 10$, 29%) had prior interactions with law enforcement that did not result in arrests or charges, or were related to issues with their families. These types of interactions included instances where the attacker had gotten into fights or displayed other inappropriate behavior at school and was spoken to by the SRO as a result. In one case, the prior contact was part of a threat assessment conducted by



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

school officials during which the SRO searched the attacker's home for weapons. Prior contact with law enforcement also involved an attacker being detained by law enforcement after being reported as a runaway and police visits to attackers' homes for issues regarding the attackers' families.

### Psychological, Behavioral, & Developmental Health

According to national prevalence rates, nearly 20% of children are *diagnosed* with at least one mental health and/or behavioral disorder.[15] **In this study, a documented mental health diagnosis was received by fourteen (40%) of the attackers prior to their attack.**

This section will focus on the observable mental health *symptoms* displayed by attackers prior to their attack. Such mental health factors were divided into three main categories: psychological, behavioral, and neurological/developmental. Most of the attackers ($n = 32$, 91%) in this study exhibited symptoms in at least one of these categories, and half of the attackers ($n = 17$, 49%) displayed symptoms of more than one type, with the most frequent combinations involving psychological and behavioral symptoms. When considering such signs and symptoms, it is possible that underlying situational factors may be the cause of the behavior (e.g., stressors the child is experiencing), as opposed to a diagnosable disorder.

| Symptom Categories | | |
|---|---|---|
| Psychological | 24 | 69% |
| Behavioral | 20 | 57% |
| Neuro/Developmental | 7 | 20% |

> *The vast majority of individuals in the United States displaying the symptoms or traits identified in this section do not commit acts of crime or violence. The symptoms described in this section constitute potential contributing factors, as part of a constellation of other factors, and should not be viewed as causal explanations for why the attacks occurred.*

### Psychological

This section describes attackers who exhibited several clusters of emotional and psychological symptoms. The most common of these types of symptoms was related to depression, with two-thirds of the attackers ($n = 22$, 63%) exhibiting some sign or symptom. A similar number of attackers ($n = 21$, 60%) also experienced suicidal thoughts and ideations.[16] Anxiety ($n = 10$, 29%), anger ($n = 9$, 26%), and symptoms of psychosis ($n = 7$, 20%) were also documented in the available sources of information.



**Common Psychological Symptoms**

**EXHIBIT 7**
**0121**



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

*A 16-year-old student shot his high school principal in the arm before his weapon malfunctioned. Prior to the incident, the attacker exhibited a wide range of symptoms typically associated with depression. For example, he began to isolate himself after his parents divorced and his siblings moved out of the home. While he had played multiple sports and enjoyed video games, the attacker withdrew from these activities as his depression worsened. He began going to school without shaving, showering, or washing his hair, and multiple people noted his body odor. The student reported feeling helpless, hopeless, and worthless, and he had low energy, trouble sleeping, reduced appetite, decreased interest in activities, impaired concentration, and his grades began to decline. He often sat alone in his room in the dark. He began having suicidal thoughts and came close to killing himself prior to the incident. According to media reports, a state psychiatrist concluded that mental illness played a role in the attacker's actions in carrying out the incident.*

### Behavioral

Twenty attackers (57%) displayed behavioral symptoms, including defiance towards authority, poor impulse control, and other violations of social norms. Also included here are those attackers who exhibited symptoms of, or were diagnosed with, ADHD or ADD. Anger was included here if it occurred in the absence of any identifiable psychological or emotional issues that would account for it.

| Symptom/Behavior | | |
|---|---|---|
| Defiance/misconduct | 14 | 40% |
| ADHD/ADD | 10 | 29% |
| Aggression | 8 | 23% |
| Anger | 5 | 14% |
| Animal cruelty | 3 | 9% |

*A 15-year-old student shot and injured two classmates at his high school. The attacker had a history of misconduct beginning at a young age. His academic record included dozens of discipline referrals at school for disobedience, disrespect to teachers, threats, harassment, and assault. He had numerous in-school and out-of-school suspensions. In 6th grade alone, he had 24 discipline referrals from 5 different staff members. The reasons for the referrals included refusing to cooperate with authority and altercations with peers. He was viewed as a bully and repeatedly tried to pick a fight with the boy he later targeted in the shooting.*

### Neurological/Developmental

Neurological conditions or developmental issues were found for seven attackers (20%), which included developmental delays, cognitive deficits (e.g., poor problem-solving or decision-making skills), and learning disabilities (e.g., dyslexia), and symptoms or diagnoses within the autism spectrum.

Attackers in this category often experienced delays in language acquisition (e.g., lifelong speech challenges, not conversing until five years old), sensory sensitivity (e.g., covering ears when other kids were loud, disliking school assemblies, or attempting to avoid pep rallies due to noise), and poor communication skills (e.g., saying things that did not make sense). In addition, these students often misinterpreted social cues or isolated themselves. With an inability to integrate socially and

**Neurological/Developmental Symptoms**

Sensory Sensitivity     Cognitive Deficits
Poor Communication     Learning Disabilities
Developmental Delays     Poor Social Skills
Delayed Language Acquisition



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

communicate effectively, most of the attackers who experienced these conditions had difficulty regulating their emotions, while also experiencing other psychological and/or behavioral symptoms.

*A 12-year-old student fatally shot one teacher and wounded two classmates at his middle school, before killing himself. According to open source reporting, the attacker was late in his language development and required speech therapy. As he progressed through elementary school he continued to have problems with communication, cognitive deficits, and academics. In 6th grade, he was still performing 1st grade work in math and 2nd grade work in reading. The attacker exhibited poor social skills and did not make friends easily. His ability to pick up on social cues was limited, and he had difficulty with transitions from one activity to another. His emotions were unstable, with frequent episodes of anxiety, anger, and crying. He often seemed confused and was described as being in his own world.*

### Personality Traits

A fourth category, related to personality traits, was also considered, in order to highlight the personality dynamics that may have impacted the attackers' behavior. A personality disorder is a manner of thinking, feeling, or behaving that falls outside of social norms and causes distress or problems functioning. It is possible that persistent patterns of defiance and misconduct at a young age may be indicative of a personality disorder as a student reaches adulthood. Research shows that as many as two-thirds of adolescents with a diagnosis of conduct disorder can go on to develop a personality disorder as an adult.[17]

One notable feature of attackers in this study with possible personality traits was narcissism, which manifested in multiple ways. These attackers generally had an inflated sense of self, believing that they were superior to others. Because they viewed themselves as superior, they had little concern for rules or laws, believing that they were above such conventions. Similarly, they did not respect people in positions of authority over them. Some of them sought fame through violence as a way to validate their inflated self-concepts. Furthermore, these attackers tended to lack empathy and derived sadistic pleasure from the thought of hurting or killing others. Further evidence of callousness was seen in their lack of remorse or emotional reaction to the enormity of what they had done.

*A student shot and injured a classmate and a teacher in his high school science classroom. The attacker had previously written stories and told friends about his desire to attack the school and his bullies. Prior to the incident, the attacker had expressed fantasies of killing and mutilating his brother, pushing a child out of a wheel chair, and punching a crying infant. Classmates also observed the attacker drawing portrayals of children being massacred on a playground. After the incident, investigators found journals with similar violent content. During trial, a psychologist retained by the prosecutor stated that attacker had antisocial, paranoid, and narcissistic features.*

**Personality Traits**

Narcissistic          Sadistic
Deceitful     Disregard for Rules
Lacks Empathy          Callous
Manipulative

**EXHIBIT 7**
**0122**



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

---

### Mental Health Treatment

**Of the 35 attackers in this study, 19 (54%) had received some type of mental health treatment.** Eleven (31%) had received services within their schools, and half ($n = 17$, 49%) had received services in the community. Nine of the attackers (26%) received services both at school and in the community. For some attackers, mental health treatment was in place at the time of the attack, while for others, the treatment had ended by the time the incident occurred.

The fact that half of the attackers had received one or more mental health services prior to their attack indicates that mental health evaluations and treatments should be considered a *component* of a multidisciplinary threat assessment, but not a replacement. Keep in mind that standard mental health evaluations and treatments will not include things like a review of criminal records, corroborative interviews with people who know the student, an analysis of a student's social media accounts, or a search of the student's home or locker. Mental health professionals, both in and out of the school, should be included in a *collaborative* threat assessment process that also involves teachers, administrators, and law enforcement.

### Substance Use & Abuse

Half of the attackers ($n = 17$, 49%) had a history of substance use and/or abuse. The most frequently used substances included marijuana ($n = 14$, 40%) and alcohol ($n = 12$, 34%). Some attackers used other controlled substances ($n = 7$, 20%), including opiates (e.g., Percocet, oxycodone), amphetamines (e.g., Adderall), Valium, Seroquel, K2, and anabolic steroids, none of which had been prescribed to them. A few attackers ($n = 3$, 9%) misused drugs that had been prescribed by a doctor, or over-the-counter (OTC) drugs, including Benadryl and cough syrup with codeine.

For seven of the attackers (20%), their substance use reached the level of abuse, causing negative consequences or problems in their lives such as alcohol or drug related criminal charges, school suspensions, or being sent to drug treatment.

> *A 16-year-old student stabbed and injured a classmate at his high school. Other classmates subdued the attacker until school officials arrived at the scene. According to court records, around the age of 13 or 14, the attacker began using marijuana and alcohol with his friends, as well as using non-prescribed oral steroids and abusing cough syrup containing codeine. The attacker reported that he consumed a four-ounce bottle of the cough syrup every two days for about a year.*

### Weapons Use & Violence

**Weapons Use:** Three-quarters of attackers ($n = 27$, 77%) had a history of using weapons prior to their attack. These histories included the attackers owning, using, training with, or practicing with weapons, including firearms, knives, or other types. For example, some attackers were experienced in hunting or target shooting, were members of the Junior Reserve Officer Training Corps (JROTC), had interests in airsoft guns, regularly carried a knife, or played with BB guns. While each of these activities, independently, do not indicate that a student poses a risk of violence, they do provide the student with familiarity, and in some cases explicit training, on how to handle and use weapons.

---



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

---

Twenty-five attackers (71%) had previous experience with firearms, including pistols, rifles, shotguns, and other weapons that closely mimicked firearms, such as BB guns, airsoft guns, and paintball guns. Thirteen attackers (37%) had previous experience with knives, outside of normal usage, and eleven (31%) had previous experience with *both* firearms and knives. Eight attackers (23%) had experience with other types of weapons, which included manufacturing explosives (e.g., pipe bombs) or incendiary devices (e.g., Molotov cocktails), or using a bow and arrow, nun chucks, throwing stars, or a machete.



**History of Weapons Use**

| | |
|---|---|
| Firearm | 25 |
| Knife | 13 |
| Other | 8 |

> *A 15-year-old student fatally shot one classmate and wounded one teacher, before killing himself. In his freshman year language arts notebook, the attacker had made several entries about weapons. He wrote, "Weapons-I know A LOT! About guns, knives, and body armor. I can tell the name of a gun ... and tell you it's [sic] caliber. I can also disassemble two guns." The attacker's brother had taken him shooting in the year prior to the attack, where they practiced shooting pellet guns, an AR-15 style rifle, and a rifle the attacker had received as a gift from his brother for his birthday. During that same year, the attacker occasionally brought knives to school and showed them to at least one other student on the school bus.*

**HISTORY OF VIOLENCE:** Half of the attackers ($n = 18$, 51%) engaged in violent behaviors that did not result in an arrest or contact with law enforcement, including violence towards a family member (e.g., hitting a parent or stabbing a sibling), physical assaults (e.g., choking a friend or hitting another student), threatening or aggressive behavior (e.g., pointing a pair of scissors at and threatening to stab a classmate), or hurting animals. Additional cases of attackers with a history of violent arrests or criminal charges are described in the Law Enforcement Contact section of this report.

> *A 14-year-old student killed his father at home, before opening fire on his former elementary school. One elementary student was fatally shot, and at least one other student and one teacher were injured. The attacker had a history of hurting small animals and watching videos of animals being hurt.*

**INTEREST IN VIOLENCE AND WEAPONS:** Half of the attackers ($n = 17$, 49%) had an unusual or concerning interest in violence or weapons. For example, some of the attackers researched past incidents of mass violence, drew figures of dead students, consumed violent or graphic media, completed writing assignments or kept journals referencing violent topics, hurt animals or watched videos of animals being abused, or described themselves as obsessed with weapons. For an interest in weapons to be concerning, it had to be viewed as a fixation or fascination that was beyond what would be considered a normal interest or knowledge of weapons.

> *A 12-year-old student fatally shot a teacher and wounded two classmates at his middle school, before killing himself. In the months preceding his attack, the attacker conducted internet searches using the following terms: bullying, Top 10 evil children, Super Columbine Massacre Role Playing Game, shoot, guns, revenge, murder, school shooting, killer, hate, and what if Nazi's won WW2. The attacker also owned forty-seven first-person shooter video games and had saved photographs of the Columbine shooters on his phone.*

**EXHIBIT 7**
**0123**



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

Two specific interests emerged as common and particularly concerning among the attackers. These were a fascination with the *Columbine attack* or an interest in *Hitler and Nazism*.

· **Columbine:** About one-quarter (*n* = 8, 23%) of attackers displayed a concerning interest in the attack at Columbine High School. This was demonstrated by the attacker having saved photos of the Columbine attackers, watched documentaries or read about the attack, or paraphrased the diary of one of the Columbine attackers in their own diary. These attackers also consumed the movies or music that they knew the Columbine attackers had liked, spoke to friends about the attack, posted about it on social media, or wrote about Columbine in class assignments, journals, or manifestos.

*A 14-year-old student opened fire toward his SRO, burning the officer on the head with the discharging firearm. The attacker had previously written a report for class titled, "The Columbine High School Massacre." Throughout his personal journal, he referenced the Columbine attackers, referring to them by nicknames, and also referenced a movie they liked. He wrote, "[The Columbine] story is SO fascinating to me!" and, "They're so... INSPIRATIONAL!"*

· **Hitler/Nazism:** Seven attackers (20%) displayed a concerning interest in Hitler or Nazism. This interest was revealed through a pattern of behavior, including attackers who turned in school assignments describing their admiration for Hitler, collected Nazi propaganda and Hitler speeches, used known Nazi references and symbols, viewed neo-Nazi websites, wrote about Hitler or Nazism in journals, or had conversations with classmates about these topics.

*A 14-year-old student fatally shot a classmate at his high school. The attacker was known to have shown an interest in Hitler, and he knew the names of all of Hitler's deputies. After the attack, a copy of Hitler's Mein Kampf was discovered in the attacker's backpack along with drawings of swastikas in his notebooks. A later search of the attacker's residence identified Nazi paraphernalia, Nazi and white supremacist materials, anti-Semitic drawings, Nazi videos, Hitler speeches, and Nazi propaganda posters from internet websites.*

### Home Life Factors

This section is intended to describe the family dynamics and home experiences for each of the 35 attackers, using several home life factors that emerged as common and impactful. While none of the factors included here should be viewed as *predictors* that a student will be violent, the field of study examining adverse childhood experiences (ACEs) finds that experiencing certain adverse events in childhood can result in a range of negative outcomes later in life, particularly when a child experiences multiple ACEs.[18] ACEs include things like parent separation and divorce, substance abuse in the home, family violence, abuse, family incarceration, and family mental illness. The first analysis of nationally-representative data on ACEs found that the percentage of youth displaying indicators of poor well-being is greater among those who have experienced three or more such factors.[19] In other words, the more ACEs a child experiences, the greater the risk for negative outcomes for the child.



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

**All but two of the attackers (*n* = 33, 94%) experienced at least one of the home-life factors listed here.** Those attackers experienced between one and six factors each, with an average of 3.4.

| Home Life Factors | | |
|---|---|---|
| Parent(s) separated/divorced | 25 | 71% |
| Family financial difficulty | 24 | 69% |
| Parent(s) or sibling(s) arrested/incarcerated | 19 | 54% |
| Parent(s) or sibling(s) substance abuse | 16 | 46% |
| Family discord (including domestic violence/abuse) | 14 | 40% |
| Family mental health | 8 | 23% |
| Abuse/neglect suffered by the attacker | 8 | 23% |
| Non-parental custody/care | 4 | 11% |

*DIVORCE/SEPARATION:* The most common home life factor experienced was parent divorce or separation, which was experienced by 25 of the attackers (71%).

*FINANCIAL DIFFICULTY:* Twenty-four attackers (69%) experienced a home life with at least one indicator of financial difficulty.

*ARRESTS OR INCARCERATIONS:* Nineteen attackers (54%) had a home life where a parent, guardian, or sibling was arrested or incarcerated at some point after the attacker's birth. Research has found that the arrest or incarceration of a family member can have a number of negative consequences for childhood development. Children who witness a parent's criminal activity, arrest, and incarceration have a greater likelihood of emotional maladjustment and a harder time regulating their emotions.[20]

*A 15-year-old student fatally shot a classmate at her high school. She then fled the scene before turning herself in. At the time of the incident, the attacker's father was serving a 25-year sentence for second-degree murder. He was arrested two years prior to the attack. While the attacker had not visited her father in prison, she was able to speak with him on the phone and had lived with him intermittently prior to his incarceration.*

**Financial Difficulty**

Bankruptcy
Eviction or Homelessness
Failure to Pay
Child Support
Foreclosure
Fraudulent Check(s)
Lien
Low Income
Poverty

*SUBSTANCE ABUSE:* Sixteen attackers (46%) had parents, guardians, or siblings using or abusing illicit drugs or alcohol. Research has found that children of parents with substance use disorders are more likely to experience abuse or neglect, develop behavioral problems, display violent behaviors, or engage in substance use themselves.[21]

**EXHIBIT 7**
**0124**


*A 15-year-old student stabbed two classmates multiple times in the restroom. Both victims, selected at random, survived the attack. When she was a child, the attacker's father was incarcerated multiple times for drug possession and other drug-related offenses. On at least one occasion prior to the attack, according to open source reporting, the attacker snuck out of her mother's home in order to smoke marijuana with her father.*

**FAMILY DISCORD:** Fourteen attackers (40%) had evidence of exposure to family discord. The types of discord captured here varied, from repeated verbal arguments to domestic and other physical violence. These hostile events often occurred multiple times throughout the attackers' lives, and most of these attackers experienced more than one type of family discord.

*A 17-year-old student entered his former high school and fatally shot three classmates and wounded three others. The attacker came from a troubled home with both of his parents involved in multiple unions and divorces. According to public records, both parents also had a history of criminal charges and substance abuse. Domestic violence was common in the home, and the parents' criminal behavior resulted in the attacker ultimately being raised by his grandparents.*

**FAMILY MENTAL HEALTH:** Eight attackers (23%) had evidence of living with a family member in the home who experienced symptoms of a mental illness. The most prevalent conditions appeared to involve mood disorders (e.g., depression and bipolar disorder), with a few instances of possible psychosis.

**ABUSE/NEGLECT:** Eight attackers (23%) suffered from neglect or were the victims of physical, verbal, or sexual abuse in the home. Physical abuse was the most common type of abuse, and five attackers experienced multiple types of abuse prior to their attacks.

**NON-PARENTAL CUSTODY/CARE:** Four attackers (11%) were raised by someone other than a biological parent at some point in their lives. Three had lived with, or were raised by, their grandparents. One attacker had been placed in the foster care system and spent time in multiple foster homes before he was adopted.

## Stressors

It is widely recognized that high stress levels are associated with emotional and behavioral problems for children.[22] **All 35 attackers (100%) experienced stressors**, with nearly all ($n$ = 33, 94%) experiencing at least one in the six months prior to their attack. Three-quarters of the attackers ($n$ = 26, 74%) experienced a stressor within one month of the attack, and half of the attackers ($n$ = 18, 51%) did so within two days. Research indicates that some types of stress, like the loss of a loved one, can be tolerated by children if they have emotional supports to help them process the experience.[23] Even with those supports, however, children will be challenged if the stressors they experience are intense or frequent enough. In such cases, children may exhibit a range of responses, from depression to hyperactivity.[24]




**Types of Stressors Experienced by Attackers**

| Stressor | Count |
|---|---|
| Social | 35 |
| Family | 32 |
| Academic/Disciplinary | 31 |
| General Personal | 22 |
| Changing Schools | 19 |
| Criminal/Judicial | 10 |
| Physical Health | 9 |
| Employment | 6 |

**SOCIAL:** All of the 35 attackers (100%) in this study experienced at least one social stressor. Social stressors identified in this analysis included stress related to the attackers' relationships with peers (e.g., bullying or other peer conflicts) or romantic partners. These types of stressors in particular, including peer rejection during childhood and adolescence, have previously been linked to depression, anxiety, substance use, and behavior problems.[25] For half of the attackers ($n$ = 19, 54%), a social event, such as a breakup or an incident of bullying, was the most recent stressor experienced before carrying out their attack. Those stressors often occurred within a week prior ($n$ = 11, 31%).

*A 16-year-old student stabbed and injured his classmate in the high school cafeteria with a knife. The attacker later described himself as having experienced chronic verbal and physical bullying throughout his childhood and adolescence. In the weeks leading up to the attack, the victim of the stabbing began to date the attacker's ex-girlfriend, which angered the attacker.*

**FAMILY:** Stressors related to the attackers' families included conflicts in the home, abuse or neglect by a parent, and family financial difficulties. Nearly all attackers experienced family-related stressors ($n$ = 32, 91%). At least three attackers had a stressful interaction with a parent within one day of the attack.

*A 14-year-old student fatally shot one elementary school student and injured at least one other student and one teacher outside of his former elementary school. According to the attacker, his father had been angry and aggressive over the previous 24 hours, complaining about his finances and engaging in a confrontation with the attacker over homework. The attacker fatally shot his father before the attack at the school.*

**ACADEMIC/DISCIPLINARY:** Most attackers ($n$ = 31, 89%) had experienced school stressors related to academic or disciplinary actions, including failing grades or school suspensions. More than half of the attackers ($n$ = 21, 60%) had both academic and disciplinary issues. For seven of the attackers (20%), a disciplinary issue at school was the most recent stressor experienced prior to the attack.

**GENERAL PERSONAL:** Two-thirds of the attackers ($n$ = 22, 63%) experienced stressors that were unique or personal in nature, and therefore not easily categorized. These stressors included a failed drug test, homelessness, or feeling unhappy with one's physical appearance. At least three attackers (9%) had witnessed violence against a friend or loved one, including a death by stabbing.

**EXHIBIT 7**
**0125**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

*CHANGING SCHOOLS:* Over half of the attackers (*n* = 19, 54%) had changed schools at least once, not including the normal transition from primary to secondary schools. Those 19 attackers changed schools more than two times on average. Seven attackers (20%) had switched schools during the six months leading up to the attack. The reasons for the school changes included expulsions, placements in an alternative school setting, moving to a new residence, enrolling in school after homeschooling, and transferring for personal reasons (e.g., to avoid bullies).

Some attackers experienced additional types of stressors that were less common, including stressors related to *criminal or judicial activity* (*n* = 10, 29%), *physical health problems* (*n* = 9, 26%), or *problems at work* (*n* = 6, 17%). Only eight attackers were known to have been employed, and most of them were employed in the food service industry.

The number of contexts in which the attackers in this study experienced stressors ranged from two to eight, with an average of five. Two of the attackers experienced stressors in all eight contexts.

*A 17-year-old former student fatally shot three classmates and wounded three others at his old high school. The attacker had reportedly been bullied by the targets of the attack, and he was angered that one of the victims was dating his ex-girlfriend. Years prior, the attacker's parents had lost custody of him due to their drug and alcohol abuse. More recently, the attacker struggled academically and was eventually transferred to an alternative school, but according to investigative files, his attendance at the alternative school suffered due to frequent migraine headaches. The attacker had a part-time job in the food service industry, but he was not a good employee, and newer coworkers were promoted above him. Law enforcement were often called to the attacker's home due to family issues. A few months before the attack, the attacker was cited by police after crashing his mother's vehicle into a ditch.*

## Bullying

Bullying is a problem faced by students and continues to be identified as a factor in NTAC's research on targeted violence in schools. **Most of the attackers in this study (*n* = 28, 80%) were bullied by their classmates.** For more than half of the attackers (*n* = 20, 57%), the bullying appeared to be of a persistent pattern which lasted for weeks, months, or years.

Bullying includes unwanted, aggressive behavior among school-aged children with an intent to do physical, social, or emotional harm; which involves a real or perceived power imbalance; and is, or could be, repeated.[26] Between one-quarter and one-third of students in the United States report that they have been bullied, while almost three-quarters of students and school officials have reported witnessing bullying.[27] The U.S. Department of Health and Human Services warns that bullying has lasting negative effects for those who are bullied, those who bully others, and those who witness bullying.

The evidence presented here supports past research findings that bullying causes significant stress and harmful outcomes for students. Schools should adopt and enforce a zero tolerance policy towards bullying and should encourage students to report bullying when they witness it or are victims of it. School officials and other authorities must act to intervene and stop bullying when it is reported to them, and bullying does not have to meet a legal threshold before schools can intervene.

PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE/2019**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

*TYPES OF BULLYING:* The Centers for Disease Control and Prevention (CDC) identifies four types of bullying: verbal, physical, social, and property.[28] This study additionally incorporated cyber bullying.

• *Verbal:* For nearly three-quarters of the attackers (*n* = 26, 74%), there was evidence that they experienced some form of verbal bullying. This included spoken or written forms of aggression. Examples of verbal bullying experienced by attackers prior to their attacks included threats, crude gestures, name calling, teasing, taunting, and suggestions that they kill themselves.



**Types of Bullying**

Verbal: 26, Physical: 14, Social: 6, Property: 4, Cyber: 3

• *Physical:* Many attackers (*n* = 14, 40%) experienced bullying that involved physical aggression. Examples included hitting, kicking, tripping, pinching, pushing, threatening or menacing gestures, and nonconsensual sexual contact.

• *Social:* Six of the attackers (17%) experienced some kind of social bullying, which involved words or actions designed to harm the victim's reputation or social standing. Examples included having rumors spread about them, being ostracized by others (e.g., classmates got up and left when the attacker sat down at a table), and being maliciously ignored.

• *Property:* Four of the attackers (11%) experienced bullying involving acts of theft or destruction of property. Examples included having money stolen and having toilet paper thrown at their house.

• *Cyber:* A few attackers (*n* = 3, 9%) experienced cyber bullying, which involved the use of digital technologies, such as text messaging or social media platforms. Cyber bullying can be done in public or in private. Some cyber bullying occurs in a way that may only be known to the victim (e.g., direct text messages), while other cyber bullying may be broadcast for public view (e.g., publicly viewable social media posts). The attackers who were cyber bullied were harassed on social media and received threatening emails, social media messages, and text messages.

Though verbal and physical bullying were the most common types of bullying experienced by the attackers, several of the attackers experienced three or four different types of bullying.

*VERBAL, PHYSICAL, AND PROPERTY BULLYING: A 12-year-old student fatally shot one teacher and wounded two classmates, before killing himself. The attacker had been teased and called names by his middle school classmates, including "gay," "lazy," "stupid," and an "idiot." Classmates had poured water down his pants, and then said the attacker had wet himself. In other instances, the attacker had his pants pulled down by classmates, was tripped in the hall, and had money stolen from him. The attacker referenced some of these incidents in one of the suicide notes he left, which was addressed to classmates and teachers.*

*VERBAL, PHYSICAL, SOCIAL, AND CYBER BULLYING: A 13-year-old student stabbed and injured a classmate multiple times in her head and arm at their middle school. The victim and her friends had called the attacker "ugly," had pushed her in the hallway, had spread rumors about her, and had subjected her to threatening phone calls and internet messages.*

**EXHIBIT 7**
**0126**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

*WHO KNEW ABOUT THE BULLYING:* From case-to-case, there were differences among who was aware of the bullying experienced by the attacker. In almost half of the cases ($n = 16$, 46%), at least one of the attacker's parents was aware that their child experienced bullying. In 16 cases (46%) a classmate was aware, and in 12 cases (34%) a school official was aware. In five cases (14%), there was evidence that all three groups knew that bullying was taking place.

*A 13-year-old student attacked classmates with a knife, injuring four. Classmates knew that the attacker had experienced bullying for years and that he had threatened revenge. The attacker's parents were aware of the bullying, and the attacker had sought help from the school nurse and school guidance counselor, but the situation did not improve.*



**Who Knew About the Bullying**

| Parent/Guardian | Classmates | School Officials |
| 16 | 16 | 12 |

In three cases (9%), the attacker perceived himself as a victim of bullying, but no one else shared that perception. For example, one attacker noted in his journal that he had been bullied, yet no evidence could be identified to indicate the attacker's parents, classmates, or school officials were aware of any bullying or the attacker's perceived victimization.

Of note, there were 10 instances (29%) where evidence indicates at least one classmate knew the attacker was being bullied, but no school officials were aware. This highlights the need for schools to establish climates that encourage both students and parents to share concerns with school staff. Providing students with a means to anonymously report bullying, while also ensuring that all students have at least one positive relationship with a school staff member, will help to encourage students to share actionable information when they observe incidents of bullying at school.

*WHERE BULLYING OCCURRED:* The attackers experienced bullying most frequently at school, including on the bus. Bullying, however, was also experienced in private residences, in public spaces, online, and via phone calls and text messages.



**Where Bullying Occured**

| School | 25 |
| Private Residences and Public Spaces | 7 |
| Online/Phone/Text | 3 |



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

*BULLYING TOLERATED:* In a few cases, there was evidence that school officials knew about the bullying an attacker was experiencing, but there was no indication that the school responded to address the bullying in any way. In other cases, when school officials did respond to address the bullying, the responses were minor and ineffective, or the responses made the bullying worse.

*A 16-year-old student shot and injured his classmate and a teacher. Prior to the attack, the attacker had sought help from a teacher after being bullied. In response, the teacher told the attacker to "man up." The attacker's mother later called the school about the bullying, but there is no evidence that school officials took any action to intervene. The only intervention occurred after the attacker got into a fist fight with his bullies, after which the attacker was suspended. At his trial after the shooting, several classmates testified that the attacker had been relentlessly bullied and teased.*

*ATTACKERS AS BULLIES:* Just over one-third of the attackers ($n = 13$, 37%) were bullies themselves. Prior to their attacks, these attackers bullied their classmates verbally, physically, and through cyber bullying. Nearly all of the attackers who had bullied others were also the victims of bullying

*A 14-year-old student shot and injured one classmate in his high school cafeteria. The attacker had been teased and called names. He had also been struck with binders, punched, and pushed around. The attacker also had a history of bullying others. He would insult other students or scream at them, and had pushed, kicked, and slapped his classmates.*



PROTECTING AMERICA'S SCHOOLS/ANALYSIS OF TARGETED SCHOOL VIOLENCE/2019

**EXHIBIT 7**
**0127**



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

### School Interactions & Relationships

**STUDENT-TEACHER RELATIONSHIPS:** Over one-third of the attackers ($n = 13$, 37%) had at least one positive relationship with a staff member at their current school. Positive relationships were perceived from the student's and/or teacher's perspective, and were evidenced by the attacker being well-liked by teachers; a teacher writing a job recommendation for the attacker; teachers complimenting the attacker's academic work; and describing the attacker as a model student, a good kid, or a pleasure to have in class. In addition, there were a few cases where a school staff member attempted to make a positive impact on an attacker's life prior to the attack, for example, by looking out for a student or checking in with them on a weekly basis to make sure they were okay.

A similar number of attackers ($n = 10$, 29%) had a negative relationship with at least one staff member at their current school. Negative relationships were characterized by the attacker previously disliking or threatening a teacher, not feeling supported by staff, not receiving assistance from school staff when they needed help, thinking teachers were disrespectful, or the attacker being disrespectful toward teachers or refusing to follow directions. Only three attackers (9%) felt they had a neutral relationship with the staff at their current school, which was evidenced by the attacker describing their relationship with teachers as cordial.

**SOCIAL LIFE:** The majority of attackers ($n = 29$, 83%) had at least one friend, and at least four of the attackers (11%) were in a romantic relationship at the time of their attack. Only a few attackers ($n = 5$, 14%) appeared to have no friends or romantic relationships.[29] It is important to note that these relationships were seen on a continuum. For example, an attacker may have been described by others as having friends, but others also noted that the same attacker kept to himself.

### Academic Performance & Extracurricular Activities

**Recent Academic Performance:** Attackers' recent academic achievement was categorized as a positive, neutral, or negative performance for the school year in which they were enrolled at the time of the attack. For example, if the attack took place in February 2012, the academic performance was captured for the 2011-2012 school year. If the attack took place close to the start of the school year, the attacker's academic performance was captured for the previous school year. The academic performance of seven attackers could not be identified.

- **Positive Performance:** About one-third of the attackers ($n = 12$, 34%) demonstrated a positive academic performance through one or more achievements, to include making the Honor Roll, earning grades of A's and B's, or being enrolled in an Advanced Placement (AP) class or a gifted/talented program.

- **Neutral Performance:** Five attackers (14%) demonstrated a neutral academic performance. Those who were rated as neutral included those who received a broader range of grades (e.g., A's, B's, and C's), or attackers who were able to raise their failing grades into more average levels.

- **Negative Performance:** About one-third of the attackers ($n = 11$, 31%) demonstrated a negative academic performance, evidenced by failing classes, repeating a grade, not completing homework, or performing below grade-level.



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

**ACADEMIC ASSISTANCE:** Ten attackers (29%) received some form of academic assistance during their school career. This assistance took the form of special education services, tutoring received or recommended, working with an English as a Second Language (ESL) teacher, or a learning strategies teacher. Eight students had received an Individualized Education Program (IEP), or a 504 plan.

**CHANGES IN PERFORMANCE:** Several attackers ($n = 7$, 20%) displayed a negative academic change in the year leading up to their attack, which was most often displayed through declining grades. Due to the change, they also experienced negative effects in other areas of their academics, for example, failing a class, being removed from an honors or gifted program, or being removed from a school sports team. For example, one attacker had ended his junior year with a 3.0 GPA (B average). Within two months of the attack, the attacker's GPA declined to a 1.7, as he was earning D's and F's in all of his classes during his senior year.

**EXTRACURRICULAR ACTIVITIES:** Nearly three-quarters of the attackers ($n = 25$, 71%) had been involved in an extracurricular activity at school, in the community, or both. School extracurricular activities included sports, Junior Reserve Officer Training Corps (JROTC), band, theater, orchestra, choir, debate team, art club, and Spanish club. Extracurricular activities in the community included sports, Boy Scouts, lifeguarding, volunteering, chess club, and religious activities.

**NOTEWORTHY ACHIEVEMENTS:** Just under half of the attackers ($n = 16$, 46%) accomplished at least one noteworthy achievement in their school career or in the community. These accomplishments were often related to:

- **Academics:** Attackers received honors or awards for academic achievement, were enrolled in Advanced Placement (AP) courses or an honors/gifted/talented program, were selected to skip a class or grade level due to high proficiency, were on the honor roll, and graduated early.

- **Extracurricular Activities:** Attackers won first place on a school sports team, received a scholarship for music camp, won an essay contest, and won a school talent show.

- **Social Achievements:** An attacker was elected by classmates as Homecoming Prince.

- **Other Personal Achievements:** Attackers achieved a weight loss goal, became a deacon, earned a black belt in karate, appeared on television, gained a large number of subscribers to a YouTube channel, and successfully completed a marksmanship qualification program.

### Disciplinary History

**Almost three-quarters of the attackers ($n = 25$, 71%) received some form of school disciplinary action in the five years prior to the attack.** The behaviors that elicited disciplinary actions occurred along a continuum in terms of severity, ranging from cheating or using profanity to threatening or engaging in physical assaults. As with many of the topics addressed in this report, the presence of these behaviors alone does not necessarily indicate that a student will carry out a targeted school attack. However, gathering information about a student's disciplinary history, along with

**EXHIBIT 7**
**0128**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

other behaviors and circumstances, will assist school officials in identifying appropriate interventions to support the student and decrease the risk of harmful outcomes.

**BEHAVIORS RECEIVING DISCIPLINE:** Disciplinary actions resulted from a wide range of behaviors in the school setting. Attackers were disciplined for the following types of behavior:

- **Fighting:** Fourteen attackers (40%) were disciplined for fighting at school. These incidents included fights on the school bus and hitting other students.

- **Classroom Conduct:** Twelve attackers (34%) were disciplined for behavior that affected the classroom environment, including interrupting the teacher, causing a disturbance, using a cell phone, demonstrating a bad attitude, and not following directions.

- **Threatening/Violent Behavior:** Eleven attackers (31%) were disciplined for displaying threatening or violent behaviors at school. This included having weapons on campus; angry outbursts; using violent language; threatening a teacher, the school, or classmates; drawing pictures that depicted killings; and sharing a note with classmates that implied the attacker was going to do something bad.

- **Academic Integrity:** Seven attackers (20%) were disciplined for behaviors related to their academics, including cheating on a test, failing to complete homework, and stealing another student's paper and claiming it as their own.

- **Inappropriate Language:** Six attackers (17%) were disciplined for using inappropriate language in school. This was not limited to profanity, but also included the use of vulgar or abusive language, inappropriate comments, and name-calling towards teachers or classmates.

- **Tardiness/Truancy:** Five attackers (14%) were disciplined for being tardy to school or to class. Eight attackers (23%) were disciplined for truancy, which included skipping class, leaving class and not returning, leaving school without permission, and refusing to attend school.

- **Banned Substances:** Four attackers (11%) were disciplined for behaviors involving banned substances at school, including selling and distributing marijuana, possessing cigarettes or a cigarette lighter, possessing drug paraphernalia, and being under the influence of alcohol or drugs.

- **Harassment/Bullying:** Four attackers (11%) were disciplined for bullying and harassing behaviors, which included groping a female classmate and pulling down a classmate's pants.

- **Other Discipline:** Beyond the categories described in this section, attackers were also disciplined for gambling, vandalism, riding a scooter on school property, violating the school dress code, riding a different school bus without permission, and miscellaneous misconduct incidents.



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

**CONSEQUENCES RECEIVED:** The types of school discipline received as a result of these behaviors varied, and some of the attackers received multiple actions for the same repeated behaviors. Twenty-five attackers (71%) received disciplinary action in the five years prior to their attack. The level or severity of the discipline ranged from classroom consequences (e.g., having the student's seat moved) to being expelled or arrested, and there were a few cases in which an attacker was disciplined, but the type of discipline received was not specified in the attacker's school records. Attackers received the following forms of discipline:

- **Suspension:** Eighteen attackers (51%) had received at least one suspension from school. Suspensions included formal in-school suspensions (ISS) and out-of-school suspensions (OSS), as well as instances where a student was sent home from school, even if the school did not classify the discipline as a suspension. Attackers were issued suspensions for a broad range of behaviors, from disruptive behavior to death threats. The length of suspensions also varied, from a half-day to multiple days.

  *A 16-year-old student shot and injured a classmate and a teacher in his high school science classroom. The attacker had been previously suspended for five days after making threats about killing other students on the school bus.*

- **Parental Contact:** Thirteen attackers (37%) received discipline in the form of parental notification. Parents were contacted through letters sent home, documents requiring a parent signature, phone calls home, and parent meetings with school staff. Some, but not all, of the meetings with parents involved the attacker as well.

- **Conversations with Staff:** Eleven attackers (31%) received discipline in the form of conversations with teachers, administrators, or SROs. These meetings were either one-on-one or occurred in a group setting. In one case, an attacker had a reentry meeting with school staff to discuss his behavior and plan for his return to school following a suspension.



**EXHIBIT 7**
**0129**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

- **Criminal Charges or Arrests:** Eight attackers (23%) were arrested or criminally charged at school for various infractions, including possession of marijuana, simple assault, disrupting public school, affray, trespassing, and disturbing the peace.

- **Referrals for an Evaluation/Assessment/Support Services:** Eight attackers (23%) were referred to a team or mental health professional for an evaluation, assessment, or support services. These included referrals for a threat assessment, risk assessment, and mental health evaluation. Referrals were also made to school counselors and school psychologists, and some students were placed on behavioral contracts or behavioral intervention plans.

- **Formal Documentation:** Eight attackers (23%) received discipline in the form of formal documentation in their school record. Schools used formal documentation to create a record of behavior in the form of behavioral referrals, discipline referrals, school hearings, and progress reports.

- **Detention:** Eight attackers (23%) received school detention or lunch detention, or were required to attend Saturday school for their behavior.

- **Classroom Consequences:** Seven attackers (20%) received discipline in the form of classroom consequences. These consequences included placing the attacker in timeout, modifying assignment instructions, confiscating a cell phone, moving the attacker's seat, removing the attacker from the class temporarily, or transferring the attacker to a different class permanently.

- **Expulsion:** Six attackers (17%) had been expelled from school. An expulsion included being removed from the school system for a predetermined number of days or permanently removed from the school district. Expulsions resulted from an accumulation of multiple suspensions, fighting, threatening harm to other students or self, and bringing a weapon to school.

- **Other Consequences:** Seven attackers (20%) received other school disciplinary actions, including removal from the football team, having to write a statement about their behavior, and having a scooter confiscated.



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

### Threat Assessment

A multidisciplinary school threat assessment team provides schools with a structured approach to identify students exhibiting threatening or concerning behavior, gather information to assess if the student poses a risk of harm to him/herself or the school community, and manage the risk through appropriate interventions, resources, and supports.[30] A threat assessment should focus on a range of behaviors, from lower-level concerns (e.g., self-harm, depressed mood, bullying) to imminent or direct threats of violence. **It is critical that student threat assessments be multidisciplinary and focused on providing robust interventions to students assessed as posing any level of risk to themselves or others.**

Four attackers in this study (11%) were referred to their school's threat assessment team prior to their attack. In each of these four cases, a student or teacher at the school reported to someone in a position of authority that the attacker had made a direct threat toward classmates or school staff.

| | Who was the threat directed toward? | Who reported the threat? | Was a threat assessment completed? | When was the assessment completed? | What was the outcome? |
|---|---|---|---|---|---|
| Case 1 | Staff Member | Teacher | Yes | Within 1 year prior to attack | Assessed as a low level of risk; parents monitored student; student saw psychiatrist once a week |
| Case 2 | Specific Student | The threatened student | Yes | Within 1 year prior to attack | Out-of-school suspension; intervention plan |
| Case 3 | Specific Student/School | Teachers and 15 students | Yes | Within 1 year prior to attack | Assessed at risk level 4 out of 5, where 1 is the highest risk; behavior/academic contract |
| Case 4 | Threat 1 – Students | The threatened student | No | Within 3 years prior to attack | Staff determined the student did not meet criteria to be assessed |
| | Threat 2 – Students | The threatened student | Yes | Within 2 years prior to attack | Assessed as posing a threat; expelled for 21 days; returned to school for the start of the new school year |

**EXHIBIT 7**
**0130**


Information was identified regarding some of the gaps and limitations in how the threat assessments in these four cases were conducted. For example, an independent review of one case (Case 1) was requested by the school superintendent and the local board of education following the attack. The resulting public report identified several limitations in how the attacker's threat assessment had been conducted.[31] According to the report, these gaps included:

- "...data sources used for the threat assessments were not specified on the form and many forms lacked specific behavioral information. Forms varied in completion and therefore it was also sometimes difficult to see the reasoning behind assigned risk levels."
- "All steps of the [school district's] process as outlined by [the school district] do not appear to have been followed by the [school] staff in the threat assessment of [the attacker]."
- "There was only a two-person team in the threat assessment of [the attacker]. The SRO was not involved at the [threat assessment] meeting."
- "No interviews were conducted with [the attacker] or his family outside the meeting process."

Available court records related to Case 3 describe a threat assessment process that appeared comprehensive in regards to the volume of information gathered by the team about the concerning student. Of the 15 students who reported the attacker's threatening behavior on the school bus, seven filed written incident reports to the school. As a result, the attacker was suspended for five days, and a threat assessment was initiated. The attacker met with the assistant principal and the school psychologist, and the threat assessment team conducted interviews with the attacker and his family, classmates, and teachers. The SRO checked the student's residence for weapons, where the officer only located paintball guns. The assessment revealed that the attacker had spoken about his "dream of killing students," was a loner, and had concerned the assistant principal so much that "she made a point to check on him regularly and asked how he was doing almost daily." Despite this thorough and appropriate information-gathering process, the student was deemed to be low risk. The school rated him a "4" on a 5-point scale, where "1" would have indicated high risk.

### Concerning Behaviors

**Every attacker included in this analysis ($n = 35$, 100%) exhibited concerning behaviors prior to their attack.** In all but two of these cases ($n = 33$, 94%), concerning behaviors were displayed at school. About three-quarters of the attackers ($n = 27$, 77%) displayed concerning behaviors at home or in the community, and three-quarters displayed them online ($n = 26$, 74%).

Concerning behaviors ranged from relatively minor activities, to actions that elicited fear in those who observed them. For example, some attackers made statements that were simply out of character for the attacker or displayed other minor changes in behavior, while in other cases, attackers made direct threats of violence or brought weapons to school. **In most of the cases ($n = 28$, 80%), the attacker's behavior elicited concern from bystanders regarding the safety of the attacker or those around them.**


These findings support previous Secret Service research projects examining targeted violence in other contexts (e.g., mass attacks in public spaces[32], which routinely find that the vast majority of attackers displayed behaviors that elicit concern in others prior to their attack. These behaviors provide opportunities for school staff, law enforcement, families, and friends, to recognize students who are in crisis and intervene as appropriate. In this report, concerning behaviors refer to actions an attacker took, communications an attacker made, or other observable acts displayed by an attacker prior to their attack.

### Range in Severity

In most cases, attackers displayed a behavior that was so concerning that it should have been met with an immediate response, including a threat assessment. These behaviors are seen as being *objectively concerning* or *prohibited*. Examples include threats to cause harm, violent acts, bringing weapons to school, and suicidal statements. Of note, references to suicide, though not necessarily an indication of potential violence, are concerning and require immediate intervention to protect the student involved. Thirty-one attackers (89%) had displayed *objectively concerning* or *prohibited* behaviors that were observed by others. These behaviors were reported to the attackers' parents ($n = 15$, 43%), school staff ($n = 14$, 40%), and other officials ($n = 8$, 23%), including law enforcement. **In two-thirds of the cases ($n = 23$, 66%), at least one prohibited behavior was observed by classmates or adults that was *not* reported.**

Most attackers also displayed a range of lower-level concerning behaviors that observers may not have recognized as concerning without knowing the full context of the situation. These behaviors are seen as being part of a *constellation* of lower-level behaviors, and may not warrant an immediate safety response. Nonetheless, they should elicit some level of concern. Examples of these behaviors include a depressed or angry mood, conflicts between classmates, and an interest in violent topics. When these types of behaviors are assessed in context with other factors, the level of concern could increase. Thirty attackers (86%) exhibited a *constellation* of such lower-level behaviors.



**EXHIBIT 7**
**0131**



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

### Common Themes

The analysis revealed 10 common themes among the concerning behaviors that were *displayed* by the attackers, meaning those behaviors that were observable to others. For example, while 28 attackers had experienced bullying, only 12 openly spoke about it. Each of the attackers in this study exhibited between two and eight of the below listed themes, with an average number of five.

• **Threats to the Target, Others, and/or Intent to Attack:** Most of the attackers (*n* = 29, 83%) shared verbal, written, visual, or video communications that referenced their intent to carry out an attack, threatened the target, and/or threatened others.

• **Intense or Escalating Anger:** Three-quarters of the attackers (*n* = 26, 74%) displayed behaviors or shared communications indicating significant or increasing anger. These behaviors included having angry outbursts at school or engaging in aggressive acts at home.

• **Interest in Weapons:** Nearly three-quarters of the attackers (*n* = 25, 71%) stockpiled weapons or communicated about weapons in a way that indicated an unusual or concerning level of interest. For some, their interest in weapons was expressed through drawings or artwork, while others had developed a reputation among classmates for having an intense interest in guns, knives, or explosives. A few attackers had built and detonated explosives.

• **Sadness, Depression, or Isolation:** Nearly two-thirds of the attackers (*n* = 22, 63%) either spoke about their sadness, depression, or loneliness, or appeared to be experiencing these feelings through their observable behaviors. Some attackers confided in others about their feelings, or wrote about them online or in school assignments. Bystanders also observed the attackers isolating themselves, withdrawing from others, appearing sad, or crying.

• **Changes in Behavior or Appearance:** More than half of the attackers (*n* = 20, 57%) exhibited observable changes in demeanor, appearance, or routine prior to their attack. Examples included increased apathy about life, decreased effort on school work, withdrawing from activities, decreased personal hygiene, spending time in new places or with new people, changes in eating and sleeping patterns, and changes in online behaviors (e.g., changing profile picture to something unusual for the person).

> **Common Themes of Concerning Behaviors**
>
> Threats to the target, others, and/or intent to attack
>
> Intense or escalating anger
>
> Interest in weapons
>
> Sadness, depression, or isolation
>
> Changes in behavior or appearance
>
> Suicide and/or self-harm
>
> Interests in violence
>
> Talk of being bullied
>
> Concerns over grades/attendance
>
> Harassing others



United States Secret Service
*NATIONAL THREAT ASSESSMENT CENTER*

• **Suicide and/or Self-harm:** Half of the attackers (*n* = 19, 54%) had communicated about, or engaged in behaviors related to, suicide or self-harm. In some cases, multiple friends knew that the attacker was suicidal. In other cases, evidence of self-harm was noted by friends, parents, and/or school staff.

• **Interest in Violence:** About one-third of attackers (*n* = 13, 37%) spoke or wrote about their violent interests, including topics related to previous school attacks, Hitler/Nazism, and other violent themes. Sometimes these interests were shared openly, while in other instances the attacker was more subtle (e.g., viewing photos of previous school attacks while in the cafeteria).

• Other common themes among the concerning behaviors included attackers *talking about being bullied* (*n* = 12, 34%), *poor grades or attendance* that elicited concerns from parents or school staff (*n* = 10, 29%), and the attackers *harassing others* (*n* = 5, 14%). In three of the five cases involving harassment, the victim of the harassment was later targeted in the attack.

> **Timing of Concerning Behaviors**
>
> Three-quarters of the attackers (*n* = 26, 74%) displayed their most recent concerning behaviors within the two days prior to their attack. Nearly all of the attackers (*n* = 32, 91%) shared or exhibited such behaviors within one month of their attack. It should be noted, however, that these behaviors were not necessarily new, as nearly half of the attackers (*n* = 14, 40%) had been displaying concerning behaviors for more than a year prior to their attack.

### Communications

Among the concerning behaviors displayed by an attacker, the communications they made to others provide particular insight into their thinking, motivations, and intention. **The majority of attackers shared concerning communications verbally through in-person statements (*n* = 31, 89%).** About half shared concerning electronic messages sent to a specific person or persons (*n* = 20, 57%) or posted online to groups or the general public (*n* = 17, 49%). One-third of the attackers (*n* = 12, 34%) conveyed concerning thoughts through school assignments (e.g., writing essays on violent topics).

| Conveyance of Communication | | |
|---|---|---|
| In-person | 31 | 89% |
| Electronic message to specific person(s) | 20 | 57% |
| Online posting | 17 | 49% |
| School assignments | 12 | 34% |
| Phone | 1 | 3% |

*A 13-year-old student injured four classmates using a knife. Though disarmed by classmates, he was later found to have also brought a blowtorch, gasoline container, water bottle filled with a clear flammable liquid, firecrackers, a bottle of vodka, a mask used to prevent the inhalation of fumes, and several other knives. About one week prior, the attacker posted a video on YouTube titled, "Testing my Blowtorch," in which he lit the flame on a gas blowtorch, presumably the same one he brought during the attack.*

**EXHIBIT 7**
**0132**



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

Most attackers (n = 27, 77%) threatened their targets or shared their intentions to carry out an attack. In two-thirds of the cases (n = 23, 66%), those communications gave some level of imminence to the attack. About 90% of attackers who selected specific targets had made a threat prior to the attack (see Appendix A: Statistical Analyses).

*A 15-year-old student fatally shot a classmate in her high school. The night before, the attacker texted a friend stating, "I can't take it anymore. I want to kill myself so bad, the pain she causes hurts too bad. I just want to blow my brains out." The next morning, she texted a friend at another high school saying that she was going to shoot someone and go to jail. Within an hour before the shooting, the attacker told a friend in class that she was going to make the victim feel "pain," showed the classmate her handgun, and began crying.*

### Timing of Threats
Two-thirds of the attackers (n = 23, 66%) communicated their intent to attack or threatened the target within two weeks of the attack, and half (n = 19, 54%) did so within two days. Over one-third of the attackers (n = 13, 37%) communicated their intent or threatened the target within an hour of the attack.

*Final Communications:* Half of the attackers (n = 19, 54%) prepared or delivered final communications prior to their attack. While some attackers kept these communications to themselves (e.g., left a suicide note in their bedroom), over one-third of the attackers (n = 13, 37%) sent these communications to others. Final communications included manifestos, journal entries, goodbye messages to friends and family (sent by text message, email or internet posts), and wills or funeral requests.

*A 15-year-old student fatally shot four of his classmates and injured one other in his high school cafeteria, before killing himself All of the victims were his close friends or cousins. The day prior, he tweeted, "It won't last…It'll never last" and texted his ex-girlfriend asking her to meet after school so he could say goodbye. He also sent her a Facebook message that said, "read my messages tomorrow from 7:15 to 12:30." The attacker posted on Instagram, "Tell my mom I love her," and included an emoji image of a gun. On the day of the attack, the attacker drafted a message on his phone titled, "My funeral shit," which outlined how his funeral should be handled. Minutes before the shooting, he sent the prepared text message about his funeral to 14 of his family members. He also texted his father, telling him, "Read the paper on my bed. Dad, I love you."*

Three of these attackers also took other actions that were akin to final acts, including one attacker who deleted his email account, one who hugged her father goodbye when being dropped off at school (which she had never done before), and another who said goodbye to his pets.

### Response to Concerning Student Behaviors

The response elicited from those individuals who observed the attackers' concerning behavior varied. The more cautious responses included actively avoiding the attacker (n = 7, 20%) or expressing concern to other peers (n = 8, 23%). In two-thirds of the attacks (n = 23, 66%), someone approached the attacker at least once to ask if the attacker was okay, offer help, or attempt to dissuade the attacker from engaging in any harmful acts towards



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

themselves or others. In fewer than half of the incidents (n = 14, 40%), adults received information about what a bystander had observed. These included classmates telling a parent or school staff member (n = 8, 23%), or adults talking to other adults to discuss their concerns about the attacker (n = 14, 40%). Ten cases (29%) involved other types of responses, including:

- **Parents:** Attackers' parents searched rooms for drugs, set a new curfew, confiscated an attacker's pellet gun or knife, gave their son a punching bag to help him deal with anger, filed reports of their concern to the school district, or asked the school to develop an IEP for their child,

- **School Staff:** School personnel removed the student from an activity, made the student throw away violent drawings, sent a school memo to other school staff informing them that the attacker and the victim were not to be left alone together, developed plans to escape the school if the student were to do something violent, or considered resignation from the school to protect himself and the community,

- **Students:** Classmates warned peers of the attacker's intentions if they were viewed as potential targets and filed reports of their concern to the school district.

In just under half of these cases (n = 16, 46%), the observed behavior elicited a significant response, including school staff calling the police in response to a criminal act or concern for safety, school staff suspending or expelling the attacker, or family members getting the attacker a mental health evaluation or therapy. In one case, the attacker himself asked for mental health treatment after police responded to a physical altercation between him and his mother at home.

**In two-thirds of the attacks (n = 23, 66%), there was at least one communication by the attacker about his or her intent to attack, or another observed threatening behavior, to which there was not a response.** Some of the reasons provided by bystanders for not reporting their concerns, included:

- Classmates believed that the attacker was joking, or they dismissed the threat, because the attacker had a history of making threatening statements and had never done anything before.

- Classmates believed that they had helped calm the attacker down enough that they would not act on the suicidal or homicidal statements, or classmates had checked in on the attacker and decided he or she was fine.

- Classmates feared what the attacker may do to them if they reported what they knew.

- Classmates intended to try to help the attacker with his or her problems, but the attack occurred sooner than they expected.

- Classmates believed the attacker would do something violent, but did not think it would happen at school.

- A teacher assumed that an administrator would take action, because the administrator had observed the same concerning behavior that the teacher had witnessed.

**EXHIBIT 7**
**0133**



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

## PART III: IMPLICATIONS

Like the February 14, 2018 shooting at Marjory Stoneman Douglas High School in Parkland, FL, this analysis suggests that many of the 41 attacks described in this report could have been prevented. Like the Parkland attacker, many of the attackers in this study had a history of violent, threatening, and other concerning behavior; prior contact with law enforcement; instability in the home; access to and inappropriate interest in weapons; or issues related to psychological, emotional, or behavioral factors. While every situation is unique and should be treated as such, one common factor across all of these tragedies is that there appears to have been an opportunity to identify and intervene with the attacker before violence occurred.

> **States Mandating Threat Assessment**
>
> *In 2013, Virginia became the first state to legislatively mandate the use of threat assessment teams in K-12 schools under state law.*
>
> *In more recent years, other states have passed similar laws that require threat assessment teams at the school or district level. Some additional states have proposed such legislation.*

*Threat Assessment is the best practice for preventing targeted violence.* The goal of a threat assessment is to identify students of concern, assess their risk for engaging in violence or other harmful activities, and deliver intervention strategies to manage that risk. **Schools should implement a threat assessment process in conjunction with the most appropriate physical security measures as determined by the school and its community.**

Threat assessment procedures should recognize that concerning student behaviors occur along a continuum, from a constellation of lower-level concerning behaviors (e.g., depressed mood and behavior changes) to behaviors that are objectively concerning or prohibited (e.g., threats of harm and physical assaults). Many of these behaviors that elicit concern may not involve physical violence or criminal acts, but still require an assessment and appropriate intervention. **The threshold for intervention should be low, so that schools can identify students in distress before their behavior escalates to the level of eliciting concerns about safety.**

The threat assessment process begins with establishing a comprehensive targeted violence prevention plan, as described in *Enhancing School Safety Using a Threat Assessment Model: An Operational Guide for Preventing Targeted School Violence.* The guide provides a framework for establishing an effective threat assessment process intended to proactively intervene with students who may pose a risk of violence or other unwanted behavior. The steps include establishing a multidisciplinary threat assessment team of highly trained school personnel; defining concerning and prohibited behaviors; establishing and providing training on a central reporting mechanism; determining the threshold for law enforcement intervention; establishing threat assessment procedures and investigation protocols; developing risk management options; creating and promoting a safe school climate; and providing training for school personnel, students, parents, and law enforcement.

The findings in this report underscore the importance of establishing a targeted violence prevention plan. A multidisciplinary threat assessment team, in conjunction with the appropriate policies, tools, and training, is the best practice for identifying, assessing, and managing students who elicit concern. Major findings, and their implications on the threat assessment process, are highlighted here.



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

### Key Findings and Implications

#### There is no profile of a student attacker, nor is there a profile for the type of school that has been targeted.

Attackers varied in age, gender, race, grade level, academic performance, and social characteristics. The use of a student profile or checklist does not yield accurate or useful results when determining the risk a student poses for conducting a school attack. Similarly, there was no identified profile of the type of school impacted by targeted violence, as schools varied in size, location, and teacher to pupil ratio. Rather than focusing on a set of traits or characteristics, a threat assessment process should focus on gathering relevant information about a student's behaviors, situational factors, and circumstances to assess the risk of violence or other harmful outcomes.

#### Attackers usually had multiple motives, the most common involving a grievance with classmates.

Discovering a student's motive for engaging in concerning behavior is critical to assessing the student's risk of violence, and it allows the threat assessment team to intervene and develop management strategies that can redirect the student away from violent choices. This finding also highlights the importance of providing training on conflict mediation and coping skills for students. When multiple motives are involved, the school may need to implement multiple strategies to reduce the risk of unwanted behavior.

#### Most attackers used firearms, and firearms were most often acquired from the home.

The findings of this report illustrate that students can be very resourceful in accessing firearms stored in the home. While many of the attackers used unsecured firearms, others were able to gain access to firearms that were secured in a safe. It should be further noted, however, that some students perpetrated attacks using knives instead of firearms. Therefore, a threat assessment should explore if a student has access to *any* weapons, with a particular focus on weapons access at home. Schools, parents, and law enforcement must work together rapidly to restrict a student's access to weapons in those cases when a student poses a risk of harm to self or others.

#### Most attackers had experienced psychological, behavioral, or developmental symptoms.

A recently published study that surveyed a sample ($n = 16,000$) of 10th-12th grade students found that providing or increasing mental health services for students was the most common factor selected by students as something that would increase feelings of safety at school, selected by more than one-third (38%) of students surveyed.[33] The findings of this survey, and those highlighted in this report, illustrate the importance of ensuring that students and parents have access to, and are informed about, mental health resources, social services, and substance use treatment. It should also be noted that many of the attackers in this study had received prior mental health treatment, illustrating that mental health treatment should be viewed as a *component* of managing risk.

#### Half of the attackers had interests in violent topics.

Half of the attackers in this study had displayed an unusual or concerning interest in violence or weapons. These types of interests, without an appropriate explanation, should initiate further information gathering, assessment, and

**EXHIBIT 7**
**0134**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

management by school personnel. For example, a student who is preoccupied or fixated on topics like the Columbine shooting or Hitler, as was noted in several of these cases, may be the focus of a school threat assessment to determine how such an interest originated and if the interest is negatively impacting the student's thinking and behavior.

*All attackers experienced social stressors involving their relationships with peers and/or romantic partners.*

Every attacker in this study experienced at least one social stressor, frequently related to bullying. Many attackers experienced stressors in other aspects of their lives, as well, including family, academics, or school discipline. In addition to adopting and enforcing zero-tolerance policies on school bullying, schools should also provide students with strategies related to stress management and the development of coping skills. All school personnel, including teachers, administrators, and other staff members, should be trained to recognize signs of a student in crisis. Additional training should focus on crisis intervention, de-escalation, and suicide prevention.

*Nearly every attacker experienced negative home life factors.*

The negative home life factors experienced by many of the attackers included parental divorce or separation, drug use or criminal charges among family members, or domestic abuse. While none of the factors included here should be viewed as predictors that a student will be violent, past research has identified an association between many of these types of factors and a range of negative outcomes for children. In some cases, school staff may not be aware of such home life factors that may be impacting how a student behaves at the school. Information-sharing among agencies is crucial in helping to address the impact of negative home experiences. For example, some cities and states have enacted laws that require law enforcement or other emergency care providers to inform school officials if a student is involved in, or present at, the scene of a traumatic event. Information sharing among schools, law enforcement, social services, and courts can help to ensure that the students most in need of additional resources do not go unrecognized.

*Most attackers were victims of bullying, which was often observed by others.*

In many cases, the school was aware that the attacker had experienced bullying, but the responses to the bullying varied. In some cases, the school did little to intervene or intervened in a way that caused the bullying to worsen. Students should be encouraged to report bullying that they experience or observe, both in and out of school. Students should also be provided an avenue to anonymously report such concerns, so that they can do so without fear of reprisal from classmates. Further, it is critical that schools implement comprehensive programs designed to promote safe and positive school climates, where students feel empowered to support the social and emotional wellbeing of classmates.

*Most attackers had a history of school disciplinary actions, and many had prior contact with law enforcement.*

Most attackers had a history of receiving school disciplinary actions resulting from a broad range of inappropriate behavior. The most serious of those actions included the attacker being suspended, expelled, or having law enforcement interactions as a result of their behavior at school. An important point for school staff to consider is that punitive measures are not preventative. For example, two of the attackers in this study were suspended from school



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

at the time of their attack. If a student elicits concern or poses a risk of harm to him/herself or others, removing the student from the school may not always be the safest option. In other instances, disciplinary actions will be deemed necessary. To help in making the determination regarding appropriate discipline, schools should employ disciplinary practices that ensure fairness, transparency with the student and family, and appropriate follow-up. For example, the school should make efforts to maintain a positive rapport with the student and family, even during those instances of suspension or expulsion. This might include checking in on the student during his or her time out of school and taking steps to ensure a positive transition for the student when they return.

*All attackers exhibited concerning behaviors. Most elicited concern from others, and most communicated their intent to attack.*

The initial indicators of a student who was in distress or exhibiting concerning behavior were often observed by peers, school staff, family members, or others in their immediate community systems. The behaviors that elicited concern ranged from a *constellation* of lower-level concerns to *objectively concerning* or *prohibited* behaviors. Most of the attackers communicated a prior threat to their target or communicated their intentions to carry out an attack. In many of these cases, someone observed a threatening communication or behavior *but did not act*, either out of fear, not believing the attacker, misjudging the immediacy or location, or believing they had dissuaded the attacker. These findings continue to highlight the importance of encouraging students, school personnel, and family members to report troubling or concerning behaviors, in order to ensure that those in positions of authority can intervene. These same community members need to be trained on identifying risk factors for student violence and students in crisis.

## Conclusion

NTAC's experience delivering training and consultations for public safety entities has provided a first-hand account of what works, and of the challenges facing schools, law enforcement, and others tasked with keeping communities safe.

NTAC knows that many of the recommendations offered in this report, and in NTAC's *Enhancing School Safety Guide*, can be implemented by schools and their local partners right away. However, some key strategies for keeping schools safe can best be implemented only with the appropriate resources, policies, and authorities to support the effort. For example, several states have recently passed laws requiring schools or school districts to implement multidisciplinary school threat assessment teams. Similarly, some states have passed laws to create statewide, anonymous reporting tools, following the model of Safe2Tell™ Colorado.

In some cases, grant funding may be available to support these efforts. For example, the STOP School Violence Act of 2018 provides the U.S. Department of Justice's Community Oriented Policing Services (COPS) Office the authority to provide monetary awards directly to states, units of local government, or Indian tribes to improve security at schools through evidence-based school safety programs, specifically including school threat assessment programs and anonymous reporting systems.[34] Some individual states have provided similarly intended grants to their schools and school districts, as well.

The safety of children in school is a topic that everyone agrees on. Ensuring their safety requires leadership and vision, as well as common sense. A thorough review of the findings contained in this report should make clear that tangible steps can be taken to reduce the likelihood that any student would cause harm, or be harmed, at school.

**EXHIBIT 7**
**0135**



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

### CREATING A TARGETED VIOLENCE PREVENTION PLAN

In July 2018, the Secret Service National Threat Assessment Center (NTAC) released *Enhancing School Safety Using a Threat Assessment Model: An Operational Guide for Preventing Targeted School Violence*, which outlined eight actionable steps for implementing a comprehensive targeted violence prevention plan in schools. The guide, which is available on the Secret Service public website, provides a framework for schools to identify, assess, and manage students who pose a risk of violence or other harmful behavior.

*Step 1:* **Establish a multidisciplinary threat assessment team** of school personnel including faculty, staff, administrators, coaches, and available school resource officers who will direct, manage, and document the threat assessment process.

*Step 2:* **Define concerning behaviors,** including those that are *objectively concerning* or *prohibited*, which should trigger an immediate intervention (e.g., threats, violent acts, or weapons on campus), and other *lower-level concerning* behaviors (e.g., depressed mood, interest in violent topics, or conflicts between classmates).

*Step 3:* **Establish and provide training on a central reporting system,** like a smartphone application, an online form, or a dedicated school email address or phone number. Ensure that it provides anonymity to those reporting concerns, and is monitored by personnel who will follow-up on all reports.

*Step 4:* **Determine the threshold for law enforcement intervention** especially if there is a risk of harm to self or others.

*Step 5:* **Establish threat assessment procedures** that include practices for maintaining documentation, identifying sources of information, reviewing records, and conducting interviews. The assessment should be guided by an understanding of the thinking and behavior observed in past school attackers, as described in *Protecting America's Schools: A U.S. Secret Service Analysis of Targeted School Violence.*

*Step 6:* **Develop risk management options** to enact, once an assessment is complete. Create individualized management plans to mitigate identified risks. Notify law enforcement immediately if the student is determined to pose an imminent risk of harm to self or others. Take steps to ensure the safety of potential targets, create a situation less prone to violence, redirect the student's motive, and reduce the effect of stressors.

*Step 7:* **Create and promote a safe school climate** built on a culture of safety, respect, trust, and emotional support for students. Encourage communication, intervene in conflicts and bullying, and empower students to share their concerns.

*Step 8:* **Provide training for all stakeholders,** including school personnel, students, parents, and law enforcement.

PROTECTING AMERICA'S SCHOOLS/**ANALYSIS OF TARGETED SCHOOL VIOLENCE**/2019



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

### FINDINGS TABLE

| General Information (n = 41) | |
| --- | --- |
| Gender | 83% Male, 17% Female |
| Age: average/range | 15 / 12-18 |
| Disposition: charged | 20 as adults, 10 as juveniles, 2 as both |
| deceased | 7 suicides, 2 by law enforcement |
| **Backgrounds (n = 35)** | |
| Substance use/abuse | 49% |
| Contact with law enforcement | 49% |
| Arrests or criminal charge(s): | 31% |
| Other context: | 29% |
| Mental health symptoms | 91% |
| Psychological: | 69% |
| Behavioral: | 57% |
| Neurological/developmental: | 20% |
| Mental health treatment | 54% |
| Bullied | 80% |
| Bullied others: | 37% |
| School disciplinary histories (top 3 of 12) | 71% |
| Fighting: | 40% |
| Class misconduct: | 34% |
| Threatening/aggressive behaviors: | 31% |
| Suspended, expelled, or law enforcement intervention | 60% |
| **Investigative Themes (n = 35)** | |
| History of weapons use | 77% |
| History of anger or aggression | 74% |
| History of violent behavior: | 51% |
| Violent interests | 49% |
| Home life factors (top 3 of 8) | 94% |
| Divorce/separation of parent(s): | 71% |
| Finance: | 69% |
| Arrest/incarceration of family member(s): | 54% |
| Stressors (top 3 of 8) | 100% |
| Social: | 100% |
| Family: | 91% |
| Academic or school disciplinary issues: | 89% |
| Concerning behaviors (top 5 of 10) | 100% |
| Intent to attack/threats: | 83% |
| Anger: | 74% |
| Weapons-related: | 71% |
| Depression: | 63% |
| Behavior changes: | 57% |
| Final communications or gestures | 54% |
| Elicited concern about safety | 80% |

**EXHIBIT 7**
**0136**



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

## APPENDIX A: STATISTICAL ANALYSES

Statistical tests revealed some significant differences among the attackers on topics involving their amount of planning, communication of threats, bullying experienced, target selection, motive, weapon used, and harm caused. Fisher's exact tests of independence and chi-square tests of independence evaluated whether there were relationships between two dichotomous variables, with the appropriate test selected based on the number of cases within the subcategories (i.e., cross-tabulations with fewer than five cases in a cell required Fisher's exact test). Computation of $t$ tests for independent samples compared averages of some continuous variables (i.e., number of planning behaviors and number of deaths) across subsamples. All significance tests were two-tailed. The cutoff for statistical significance was an alpha level of .05; however, Appendix A presents some statistically non-significant, but substantively meaningful, results. The results should be interpreted with the understanding that students are only coded "yes" when there is evidence of the presence of the variable, and that absence of evidence is not equivalent to evidence of absence of the variable.

*Note: Due to the limited behavioral information available for 6 of the attackers, only 35 cases were included in the statistical analysis for the following three tests.*

• *Although not statistically significant, attackers who engaged in more planning behaviors caused harm to a greater number of victims:* Mass attackers averaged more than twice as many planning behaviors as attackers with fewer victims [$t$ (33) = 1.98, $p$ = .06].

| Table 1: Number of Victims and Average Number of Planning Behaviors | | |
|---|---|---|
| Number of Victims | Average | SD |
| One or two victims (n = 25) | 1.4 | 2.1 |
| Three or more victims (n = 10) | 3.1 | 2.8 |

• *Most attackers who targeted specific people had made a prior threat:* About 90% of attackers who selected specific targets had made a threat prior to the attack ($p$ = .01). Less than 60% of attackers who targeted random individuals had made a threat in advance ($p$ = .04).

| Table 2: Threatening Communications and Target Selection | | | | |
|---|---|---|---|---|
| | Random Target Selection (p = .04) | | Specific Target Selection (p = .01) | |
| | Yes n (col.%) | No n (col.%) | Yes n (col.%) | No n (col.%) |
| Threat (n = 27) | 8 (57%) | 19 (90%) | 24 (89%) | 3 (38%) |
| No Threat (n = 8) | 6 (43%) | 2 (10%) | 3 (11%) | 5 (63%) |
| Total | 14 (100%) | 21 (100%) | 27 (100%) | 8 (100%) |



United States Secret Service
**NATIONAL THREAT ASSESSMENT CENTER**

• *Although not statistically significant, a larger share of attackers who experienced a persistent pattern of bullying had bullying as a motive for carrying out the attack:* Of the 20 attackers who experienced a persistent pattern of bullying, 12 (60%) had bullying as a motive, compared with one third who were not persistently bullied ($\chi^2$ = 2.44, $p$ = .12)

| Table 3: Persistent Bullying and Bullying as a Motive | | |
|---|---|---|
| | Persistently Bullied | Not Persistently Bullied |
| Bullying as a Motive (n = 17) | 12 (60%) | 5 (33%) |
| Attack Not Motivated by Bullying (n = 18) | 8 (40%) | 10 (67%) |
| Total | 20 (100%) | 15 (100%) |

*Note: All 41 cases were included in the statistical analysis for the following test.*

• *Nearly all attackers primarily motivated by a desire to kill targeted random victims:* Six of the seven attackers (86%) whose primary motive was a desire to kill targeted randomly ($p$ < .01). Only two of the seven attackers (29%) primarily motivated by a desire to kill had specific targets, compared with most individuals with a different motive (n = 29, 86%; $p$ < .01). Five of the ten attackers (50%) who only targeted random victims were primarily motivated by a desire to kill ($p$ < .01).

| Table 4: Target Selection and Desire to Kill | | |
|---|---|---|
| | Desire to kill was Primary Motive | Other Primary Motive |
| Random Target Selection (p < .01) | | |
| Yes (n = 16) | 6 (86%) | 10 (29%) |
| No (n = 25) | 1 (14%) | 24 (71%) |
| Total | 7 (100%) | 34 (100%) |
| Specific Target Selection (p < .01) | | |
| Yes (n = 31) | 2 (29%) | 29 (85%) |
| No (n = 10) | 5 (71%) | 5 (15%) |
| Total | 7 (100%) | 34 (100%) |

• *Incidents in which attackers used firearms were significantly more fatal than those involving knives:* While the majority of both types of attacks were nonfatal, nearly half of the firearm attacks (n = 12, 48%) resulted in one or more deaths, while only 2 of 16 knife attacks (13%) were fatal ($p$ = .04).

| Table 5: Fatalities and Weapon Used | | |
|---|---|---|
| Fatalities | Firearm | Blade |
| Zero | 13 | 14 |
| One | 10 | 2 |
| Two | 0 | 0 |
| Three | 1 | 0 |
| Four | 1 | 0 |
| Total | 25 | 16 |
| Mean (SD) | 0.68 (0.99) | 0.13 (0.34) |

**EXHIBIT 7**
**0137**



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

## APPENDIX B: COMPARISON TO THE SAFE SCHOOL INITIATIVE

In 2002, the U.S. Secret Service's National Threat Assessment Center (NTAC) released the *Safe School Initiative (SSI)*, which examined 37 incidents of targeted violence in schools committed by 41 attackers between 1974 and June 2000. Released 17 years later, *Protecting America's Schools*, examines 41 incidents committed by 41 attackers between 2008 and 2017. In examining the major findings from both studies, a number of similarities were identified. In both studies, there was no one profile of a school attacker and there were similar percentages of those with criminal histories, substance abuse, types of mental health symptoms, and histories of being bullied or bullying others. Additionally, the majority had experienced stressors, exhibited concerning behaviors, and made their intentions to attack known to others. In *Protecting America's Schools*, however, the analysis delved deeper and identified additional factors that were not considered as part of the original study, including, but not limited to, the types of stressors, ways in which the attackers were bullied, the breadth of issues related to home life, the behaviors that elicited disciplinary action and their consequences, and various aspects of school dynamics.

The following table offers some of the statistics from the two studies, however, comparisons between the two should be made only with caution as there were variations in research design and methodology, including variations of definitions, availability of case information, and access to internet-powered research tools. For instance, 17 years ago, studying targeted violence in K-12 schools was new and the method of identifying incidents would have been somewhat more challenging as there were no databases of incidents or lists of attacks to consult. Further, in more recent years, more attention has been focused on incidents of targeted violence, especially those affecting schools. Therefore, it is no surprise that similar numbers of incidents were found even though the timespan covered in the present study (10 years) is less than half that of the SSI (26 years). These factors may have also impacted why the current study identified more attacks than the SSI that were perpetrated using bladed weapons.

Given these caveats, the following table presents the statistics which are most comparable.



**United States Secret Service**
*NATIONAL THREAT ASSESSMENT CENTER*

| | Safe School Initiative (2002) | Protecting America's Schools (2019) |
|---|---|---|
| **THE INCIDENTS** | *n = 37* | *n = 41* |
| **Years** | 1974 - 2000 | 2008 - 2017 |
| **Multiple attackers** | 8% | 0% |
| **Weapons** | 97% firearm; 3% bladed; 8% had additional weapons | 61% firearms; 39% bladed; 7% had additional weapons |
| *Handguns* | 67% of 36 firearms attacks | 72% of 25 firearms attacks |
| *Long Guns* | 50% of 36 firearms attacks | 36% of 25 firearms attacks |
| *Firearm from a residence* | 73% of 36 firearms attacks | 76% of 25 firearms attacks |
| **Victims that were specifically targeted** | 46% | 56% |
| **Committed Suicide** | 13%* | 17% |
| **THE ATTACKERS** | *n = 41* | *n = 35 (of 41)* |
| **Gender, age, status** | 100% male; ages 11-21 95% current students | 83% male; ages 12-18 90% current students |
| **History of any arrest** | 27% | 31% |
| *violent crime* | 17% | 17% |
| **Subject was abused/neglected** | 27% | 23% |
| **Mental health diagnosis before** | 17%* | 40% |
| **Mental health symptoms** | | |
| *Depression* | 61% | 63% |
| *Suicidal thoughts or gestures* | 78% | 63% |
| *Suicide attempts* | 10% | 11% |
| **Substance use and/or abuse** | 49% | 49% |
| **Perceived as loners** | 34% | 26% |
| **History of violence** | 31%* | 51% |
| **Stressors** | 98% | 100% |
| **SCHOOL PERFORMANCE** | | |
| **Academic performance** | | |
| *Positive* | 41% | 34% |
| *Neutral* | 37% | 14% |
| *Negative* | 5% | 31% |
| *Not found* | 17% | 20% |
| **Suspended (at least once)** | 27% | 51% |
| **Expelled (at least once)** | 10% | 17% |
| **Bullied by other students** | 71% | 80% |
| **Subject bullied other students** | 34% | 37% |
| **BEHAVIORS** | | |
| **At least one person knew** | 83% | 77% |
| *a peer* | 83% | 77% |
| *an adult* | 7% | 14% |
| **Concerning behaviors** | 93% | 100% |

*Reflects calculations as reported in the Final Report and Findings of the Safe School Initiative (2002).

**EXHIBIT 7**
**0138**



**United States Secret Service**
**NATIONAL THREAT ASSESSMENT CENTER**

[1] National Threat Assessment Center. (2018). Enhancing school safety using a threat assessment model: An operational guide for preventing targeted school violence. U.S. Secret Service, Department of Homeland Security.

[2] It should be noted that homicides rarely occur in schools in the United States. During the 2015–2016 school year, the most recent year for which data is available, about 1% of school-aged youth homicides in the United States occurred in a school setting: found in Musu, L., Zhang, A., Wang, K., Zhang, J., & Oudekerk, B.A. (2019). Indicators of School Crime and Safety: 2018. U.S. Department of Justice. Washington, DC. Retrieved October 19, 2019, from https://nces.ed.gov/pubs2019/2019047.pdf.

[3] Vossekuil, B., Fein, R., Reddy, M., Borum, R., & Modzeleski, W. (2002). The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States. U.S. Secret Service and U.S. Department of Education: Washington D.C.

[4] A former student was defined as a student who left the targeted school within the previous year and no longer attended a K-12 school, or a student who was currently enrolled in any K-12 school and targeted a school he or she had previously attended. For example, while the perpetrator of the 2012 attack at an elementary school in Newtown, CT was a former student, that attack was not included in the data for this report as the perpetrator had not attended a K-12 school in over three years prior to his attack.

[5] U.S. Department of Education, Institute of Education Sciences, National Center for Education Statistics. Retrieved October 18, 2019, from https://nces.ed.gov/ccd/.

[6] Public School Review. (n.d.). Average public school student-teacher ratio. Retrieved October 18, 2019, from https://www.publicschoolreview.com/average-student-teacher-ratio-stats/national-data.

[7] U.S. Department of Education, Institute of Education Sciences, National Center for Education Statistics. Retrieved October 18, 2019, from https://nces.ed.gov/ccd/.

[8] Centers for Disease Control and Prevention (CDC). (2018). 1992–2016 School-Associated Violent Death Surveillance System (SAVD-SS) (partially funded by the U.S. Department of Education, Office of Safe and Healthy Students). Unpublished tabulation. Retrieved October 19, 2019, from: https://nces.ed.gov/programs/crimeindicators/ind_01.asp.

[9] One attack did not have clear information available on the incident duration and was categorized as "unknown."

[10] One school-aged victim was not enrolled as a student at the school where the attack occurred. She was enrolled in a different high school, and was attending prom at the targeted school at the time of the attack.

[11] The status of one of the attackers is unknown.

[12] National Center for Injury Prevention and Control. CDC. (2017). 10 Leading Causes of Death by Age Group, United States-2017. Retrieved October 19, 2019, from www.cdc.gov: https://www.cdc.gov/injury/images/lc-charts/leading_causes_of_death_by_age_group_2017_1100w850h.jpg.

[13] For one incident that involved planning behaviors, the time span of the planning behavior(s) was not available.

[14] Giffords Law Center to Prevent Gun Violence. (2018). Minimum Age to Purchase and Possess. Retrieved October 19, 2019, from https://lawcenter.giffords.org/gun-laws/policy-areas/who-can-have-a-gun/minimum-age/#federal.

[15] Centers for Disease Control and Prevention. (n.d.). Many children lack access to mental health care. CDC.gov. Retrieved October 19, 2019, from https://www.cdc.gov/childrensmentalhealth/documents/access-infographic.html.

[16] One of the attackers with suicidal ideations was not coded in the psychological symptoms category due to a lack of additional symptoms indicative of a psychological or emotional health disorder. However, the attacker did experience a number of behavioral symptoms and he was appropriately coded in that category.

[17] Vitelsberg, E. (2006). Exploring the Link between Conduct Disorder in Adolescence and Personality Disorders in Adulthood. Psychiatric Times, 24 (8). Retrieved October 19, 2019, from https://www.psychiatrictimes.com/exploring-link-between-conduct-disorder-adolescence-and-personality-disorders-adulthood.

[18] Felitti, V.J., Anda, R.F., Nordenberg, D., Williamson, D.F., Spitz, A.M., Edwards, V., Koss, M.P. & Marks, J.S. (May 1998). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults. The Adverse Childhood Experiences (ACE) Study. American Journal of Preventative Medicine, 14(4):245-58.

[19] Moore, K., Sacks, V., Bandy, T., & Murphey, D. (2014). Fact Sheet: Adverse Childhood Experiences and the Well-Being of Adolescents. ChildTrends.org. Retrieved October 18, 2019, from https://www.childtrends.org/wp-content/uploads/2014/07/Fact-sheet-adverse-childhood-experiences_FINAL.pdf.

[20] Dalizle, D.H. & Wilson, L.C. (2010). The Relation of Exposure to Parental Criminal Activity, Arrest, and Sentencing to Children's Maladjustment. Journal of Child and Family Studies, 19:404-418.

[21] Smit, V.C., & Wilson, C.R. (2016, August). Families affected by parental substance use. Committee on Substance Use and Prevention. Pediatrics. 138 (2) e20161575: DOI: 10.1542/peds.2016-1575.

[22] Grant, K.E., Compas, B.E., Stuhlmacher, A.F., Thurm, A.E., McMahon S.D., & Halpert, J.A. (2003, May). Stressors and child and adolescent psychopathology: moving from markers to mechanisms of risk. Psychological Bulletin, 129(3):447-66.

[23] Shonkoff, J.P. & Garner, A.S. (2012), The Committee on Psychosocial Aspects of Child and Family Health. Committee on Early Childhood, Adoption, and Dependent Care, and Section on Developmental and Behavioral Pediatrics. The lifelong effects of early childhood adversity and toxic stress. Pediatrics, 129:e232-e246.

[24] Miller, A.J. (n.d.). Stress as Factor in Family Violence. UNICEF. Retrieved October 18, 2019, from https://www.unicef-irc.org/article/984-stress-as-a-factor-in-family-violence.html.

[25] Sontag, L.M., Graber, J.A., Brooks-Gunn, J., & Warren, M.P. (2008). Coping with social stress: Implications for psychopathology in young adolescent girls. Journal of abnormal child psychology, 36(8), 1159–1174.

[26] This definition was adopted from the definitions found in: What Is Bullying? (2019). U.S. Department of Health and Human Services Retrieved October 19, 2019, from https://www.stopbullying.gov/what-is-bullying/index.html; and, Gladden, R.M., Vivolo-Kantor, A.M., Hamburger, M.E., & Lumpkin, C.D. (2014). Bullying surveillance among youths: Uniform definitions for public health and recommended data elements (Version 1.0). National Center for Injury Prevention and Control. Centers for Disease Control and Prevention, and US Department of Education. Retrieved October 19, 2019, from https://www.cdc.gov.

[27] U.S. Department of Health and Human Services (2019). Facts about bullying. Retrieved October 19, 2019, from https://www.stopbullying.gov/media/facts/index.html.

[28] These terms were adapted from the definitions found in: Gladden, R.M., Vivolo-Kantor, A.M., Hamburger, M.E., & Lumpkin, C.D. (2014). Bullying surveillance among youths: Uniform definitions for public health and recommended data elements (Version 1.0). National Center for Injury Prevention and Control. Centers for Disease Control, and Prevention and US Department of Education.

[29] For one attacker, there was insufficient information to assess their social life.

[30] National Threat Assessment Center. (2018). Enhancing school safety using a threat assessment model: An operational guide for preventing targeted school violence. U.S. Secret Service, Department of Homeland Security.

[31] Kalnen, L., Nicoletti, J., Garrido, S., & Dreiszins, M. (2018). A Review of Psychological Safety and Threat Assessment Issues Related to the Shooting at [High School Name] on December 13, 2013. Safe and Sound Schools. Retrieved October 19, 2019, from https://www.safeandsoundschools.org/additional-resources-threat-assessment/.

[32] National Threat Assessment Center (2019), Mass Attacks in Public Spaces - 2018. U.S. Secret Service, Department of Homeland Security.

[33] Croft M., Moore, R., & Guffy, G. (2019). Creating Safe Schools: Examining Student Perceptions of Their Physical Safety at School. ACT Research & ACT's Center for Equity in Learning. ACT.org. Retrieved October 19, 2019, from https://www.act.org/content/act/en/research/pdfs/R1767-school-safety-brief.html.

[34] School Violence Prevention Program (SVPP). (n.d.). COPS. Retrieved October 19, 2019, from https://cops.usdoj.gov/svpp.

Production photo credits
Cover image courtesy: Bill Chizek/Flag/Getty. Table of contents image courtesy: Cobe66/Topics/Getty. School bus image courtesy: Edward Shorockfant/Bus/Getty. Student bench image courtesy: Kali3/Candcaps/Getty. Classroom image courtesy: Skynesher/School Building/Getty. Police line image courtesy: Clotinefox/Manufactured Object/Getty. Lady justice image courtesy: Questcor/Fictional Character/Getty. Student at school entrance image courtesy: Markystudents/images/Education/Getty. Bullying image courtesy: FatCamera/Harassment/Getty. Troubled student image courtesy: Izusek/Young Adult/Getty. Student detention image courtesy: Lumdleks/Ethnicity/Getty. Troubled at student in lockers image courtesy: Josh Blake/Human Age/Getty.

**EXHIBIT 7**
**0139**

# THE UNITED STATES
# SECRET SERVICE

*National Threat Assessment Center*

**Protecting America's Schools**
*is Protecting America's Future!*



EXHIBIT 7
0140

# EXHIBIT "8"

EXHIBIT 8
0141

Home (https://ucr.fbi.gov) • Crime in the U.S. (https://ucr.fbi.gov/crime-in-the-u.s) • 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018) • Crime in the U.S. 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018) • Tables (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables) • Expanded Homicide Data Table 3



Criminal Justice Information Services Division (https://www.fbi.gov/services/cjis)
Feedback (https://forms.fbi.gov/cjus-feedback-2018) | Contact Us (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/contact-us) | Data Quality Guidelines (https://ucr.fbi.gov/data-quality-guidelines-new) | UCR Home (https://ucr.fbi.gov/)

Home (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/home)

Offenses Known to Law Enforcement (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/offenses-known-to-law-enforcement)

Violent Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/violent-crime)

Property Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/property-crime)

Clearances (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances)

Persons Arrested (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/persons-arrested)

Police Employee Data (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/police-employee-data)

**Expanded Homicide Data Table 3**

**Murder Offenders**
by Age, Sex, Race, and Ethnicity, 2018

Download Excel (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/expanded-homicide-data-table-3.xls/output.xls)

| Age | Total | Sex | | | Race | | | | Ethnicity[1] | | |
| | | Male | Female | Unknown | White | Black or African American | Other[2] | Unknown | Hispanic or Latino | Not Hispanic or Latino | Unknown |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 16,335 | 10,306 | 1,443 | 4,586 | 4,884 | 6,318 | 312 | 4,821 | 1,576 | 6,021 | 8,375 |
| Percent distribution[3] | 100.0 | 63.1 | 8.8 | 28.1 | 29.9 | 38.7 | 1.9 | 29.5 | 9.9 | 37.7 | 52.4 |
| Under 18[4] | 920 | 827 | 92 | 1 | 336 | 552 | 20 | 12 | 164 | 440 | 297 |
| Under 22[4] | 3,238 | 2,895 | 320 | 23 | 1,210 | 1,896 | 63 | 69 | 471 | 1,593 | 1,094 |
| 18 and over[4] | 10,316 | 8,921 | 1,331 | 64 | 4,478 | 5,360 | 290 | 188 | 1,377 | 5,333 | 3,389 |
| Infant (under 1) | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 to 4 | 1 | 1 | 0 | | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| 5 to 8 | 1 | 1 | | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| 9 to 12 | 8 | 7 | 1 | | 0 | 6 | 2 | 0 | 0 | 4 | 4 |
| 13 to 16 | 496 | 444 | 52 | | 0 | 182 | 291 | 13 | 10 | 90 | 230 | 165 |
| 17 to 19 | 1,479 | 1,329 | 145 | 5 | 483 | 943 | 35 | 18 | 259 | 741 | 447 |
| 20 to 24 | 2,254 | 1,979 | 268 | 7 | 796 | 1,375 | 52 | 31 | 320 | 1,139 | 747 |
| 25 to 29 | 1,998 | 1,732 | 255 | 11 | 748 | 1,163 | 46 | 41 | 281 | 1,026 | 649 |
| 30 to 34 | 1,440 | 1,224 | 206 | 10 | 654 | 704 | 53 | 29 | 207 | 742 | 468 |
| 35 to 39 | 1,161 | 985 | 172 | 4 | 584 | 527 | 36 | 14 | 160 | 595 | 380 |

EXHIBIT 8
0142

| | | Sex | | | | Race | | | Ethnicity[1] | | |
| Age | Total | Male | Female | Unknown | White | Black or African American | Other[2] | Unknown | Hispanic or Latino | Not Hispanic or Latino | Unknown |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 to 44 | 651 | 560 | 88 | 3 | 318 | 301 | 23 | 9 | 79 | 358 | 203 |
| 45 to 49 | 495 | 422 | 68 | 5 | 275 | 200 | 13 | 7 | 57 | 263 | 168 |
| 50 to 54 | 439 | 367 | 67 | 5 | 247 | 169 | 14 | 9 | 39 | 227 | 158 |
| 55 to 59 | 346 | 289 | 43 | 14 | 183 | 137 | 5 | 21 | 21 | 182 | 133 |
| 60 to 64 | 186 | 166 | 20 | 0 | 127 | 50 | 5 | 4 | 14 | 102 | 67 |
| 65 to 69 | 106 | 89 | 17 | 0 | 75 | 24 | 5 | 2 | 5 | 63 | 37 |
| 70 to 74 | 82 | 69 | 13 | 0 | 67 | 11 | 4 | 0 | 3 | 50 | 26 |
| 75 and over | 93 | 84 | 8 | 1 | 68 | 14 | 6 | 5 | 6 | 51 | 32 |
| Unknown | 5,099 | 558 | 20 | 4,521 | 70 | 406 | 2 | 4,621 | 35 | 248 | 4,689 |

- [1] Not all agencies provide ethnicity data; therefore, the race and ethnicity totals will not be equal.
- [2] Includes American Indian or Alaska Native, Asian, and Native Hawaiian or Other Pacific Islander.
- [3] Because of rounding, the percentages may not add to 100.0.
- [4] Does not include unknown ages.

**EXHIBIT 8**
**0143**

Home (https://ucr.fbi.gov) • Crime in the U.S. (https://ucr.fbi.gov/crime-in-the-u.s) • 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018) • Crime in the U.S. 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018) • Tables (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables) • Expanded Homicide Data Table 5



Criminal Justice Information Services Division (https://www.fbi.gov/services/cjis)
Feedback (https://forms.fbi.gov/cius-feedback-2018) | Contact Us (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/contact-us) | Data Quality Guidelines (https://ucr.fbi.gov/data-quality-guidelines-new) | UCR Home (https://ucr.fbi.gov/)

**Home (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/home)**

**Offenses Known to Law Enforcement (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/offenses-known-to-law-enforcement)**

**Violent Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/violent-crime)**

**Property Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/property-crime)**

**Clearances (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances)**

**Persons Arrested (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/persons-arrested)**

**Police Employee Data (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/police-employee-data)**

Download Excel (https://ucr.fbi.gov/crime-in-the-u.s.-2018/tables/expanded-homicide-data-table-5.xls/output.xls)

**Expanded Homicide Data Table 5**

**Murder**

Age of Victim by Age of Offender, 2018

[Single victim/single offender]

| Age of victim | Total | | Age of offender | | |
|---|---|---|---|---|---|
| | | Under 18 | 18 and over | Unknown | |
| Total | 6,570 | 302 | 6,031 | 237 | |
| Under 18 | 515 | 94 | 412 | | 9 |
| 18 and over | 6,003 | 206 | 5,575 | 222 | |
| Unknown | 52 | 2 | 44 | 6 | |

- NOTE: This table is based on incidents where some information about the offender is known by law enforcement; therefore, when the offender age, sex, and race are all reported as unknown, these data are excluded from the table.

**Data Declaration (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/expanded-homicide-data-table-5.xls/@@template-layout-view?override-view=data-declaration)**

Provides the methodology used in constructing this table and other pertinent information about this table.

**Overview**

**EXHIBIT 8**

**0144**

Home (https://ucr.fbi.gov) • Crime in the U.S. (https://ucr.fbi.gov/crime-in-the-u.s) • 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018) • Crime in the U.S. 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018) • Tables (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables) • Expanded Homicide Data Table 6



Criminal Justice Information Services Division (https://www.fbi.gov/services/cjis)
Feedback (https://forms.fbi.gov/cius-feedback-2018) | Contact Us (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/contact-us) | Data Quality Guidelines (https://ucr.fbi.gov/data-quality-guidelines-new) | UCR Home (https://ucr.fbi.gov/)

Home (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/home)

Offenses Known to Law Enforcement (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/offenses-known-to-law-enforcement)

Violent Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/violent-crime)

Property Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/property-crime)

Clearances (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances)

Persons Arrested (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/persons-arrested)

Police Employee Data (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/police-employee-data)

**Expanded Homicide Data Table 6**

**Murder**

Race, Sex, and Ethnicity of Victim by Race, Sex, and Ethnicity of Offender, 2018
[Single victim/single offender]

Download Excel (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/expanded-homicide-data-table-6.xls/output.xls)

| | | Race of offender | | | | Sex of offender | | | Ethnicity of offender | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Race of victim | Total | White | Black or African American | Other[1] | Unknown | Male | Female | Unknown | Hispanic or Latino | Not Hispanic or Latino | Unknown |
| White | 3,315 | 2,677 | 514 | 61 | 63 | 2,914 | 383 | 18 | 803 | 1,476 | 1,036 |
| Black or African American | 2,925 | 234 | 2,600 | 17 | 74 | 2,603 | 291 | 31 | 83 | 1,878 | 964 |
| Other race[1] | 220 | 54 | 39 | 122 | 5 | 196 | 22 | 2 | 19 | 132 | 69 |
| Unknown race | 110 | 46 | 24 | 7 | 33 | 100 | 9 | 1 | 18 | 40 | 52 |

| | | Race of offender | | | | Sex of offender | | | Ethnicity of offender | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sex of victim | Total | White | Black or African American | Other[1] | Unknown | Male | Female | Unknown | Hispanic or Latino | Not Hispanic or Latino | Unknown |
| Male | 4,639 | 1,942 | 2,430 | 133 | 134 | 4,073 | 521 | 45 | 675 | 2,487 | 1,477 |
| Female | 1,921 | 1,064 | 745 | 72 | 40 | 1,731 | 184 | 6 | 245 | 1,036 | 640 |
| Unknown sex | 10 | 5 | 2 | 2 | 1 | 9 | 0 | 1 | 3 | 3 | 4 |

| | | Race of offender | | | | Sex of offender | | | Ethnicity of offender | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ethnicity of victim | Total | White | Black or African American | Other[1] | Unknown | Male | Female | Unknown | Hispanic or Latino | Not Hispanic or Latino | Unknown |
| Hispanic or Latino | 957 | 772 | 143 | 17 | 25 | 63 | 888 | 6 | 655 | 213 | 89 |

**EXHIBIT 8**
**0145**

FBI — Expanded Homicide Data Table 6

| | | Race of offender | | | | Sex of offender | | | Ethnicity of offender | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Race of victim | Total | White | Black or African American | Other[1] | Unknown | Male | Female | Unknown | Hispanic or Latino | Not Hispanic or Latino | Unknown |
| Not Hispanic or Latino | 4,284 | 1,685 | 2,357 | 148 | 94 | 493 | 3,751 | 40 | 231 | 3,193 | 860 |
| Unknown | 1,329 | 554 | 677 | 42 | 56 | 149 | 1,174 | 6 | 37 | 120 | 1,172 |

- [1] Includes American Indian or Alaska Native, Asian, and Native Hawaiian or Other Pacific Islander.
- NOTE: This table is based on incidents where some information about the offender is known by law enforcement; therefore, when the offender age, sex, race, and ethnicity are all reported as unknown, these data are excluded from the table.

**EXHIBIT 8**

**0146**

Home (https://ucr.fbi.gov) • Crime in the U.S. (https://ucr.fbi.gov/crime-in-the-u.s) • 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018) • Crime in the U.S. 2018 (https://ucr.fbi.gov/crime-in-the-u.s/crime-in-the-u.s.-2018) • Tables (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables) • Expanded Homicide Data Table 8



Criminal Justice Information Services Division (https://www.fbi.gov/services/cjis)
Feedback (https://forms.fbi.gov/cius-feedback-2018) | Contact Us (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/contact-us) | Data Quality Guidelines (https://ucr.fbi.gov/data-quality-guidelines-new) | UCR Home (https://ucr.fbi.gov/)

Home (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/home)

Offenses Known to Law Enforcement (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/offenses-known-to-law-enforcement)

Violent Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/violent-crime)

Property Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/property-crime)

Clearances (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances)

Persons Arrested (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/persons-arrested)

Police Employee Data (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/police-employee-data)

Download Excel (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/expanded-homicide-data-table-8.xls/output.xls)

**Expanded Homicide Data Table 8**

**Murder Victims**
by Weapon, 2014–2018

| Weapons | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Total** | **12,278** | **13,780** | **15,318** | **15,195** | **14,123** |
| Total firearms: | 7,803 | 9,103 | 10,372 | 11,006 | 10,265 |
| Handguns | 5,342 | 6,176 | 6,762 | 7,051 | 6,603 |
| Rifles | 235 | 215 | 300 | 390 | 297 |
| Shotguns | 238 | 247 | 247 | 264 | 235 |
| Other guns | 88 | 151 | 172 | 180 | 167 |
| Firearms, type not stated | 1,900 | 2,314 | 2,891 | 3,121 | 2,963 |
| Knives or cutting instruments | 1,545 | 1,525 | 1,558 | 1,609 | 1,515 |
| Blunt objects (clubs, hammers, etc.) | 431 | 436 | 464 | 472 | 443 |
| Personal weapons (hands, fists, feet, etc.)[1] | 668 | 647 | 664 | 710 | 672 |
| Poison | 9 | 8 | 12 | 15 | 5 |
| Explosives | 6 | 1 | 1 | 0 | 4 |
| Fire | 55 | 63 | 78 | 96 | 72 |
| Narcotics | 70 | 69 | 118 | 110 | 78 |
| Drowning | 12 | 12 | 9 | 8 | 9 |
| Strangulation | 84 | 96 | 97 | 89 | 70 |
| Asphyxiation | 93 | 105 | 92 | 111 | 90 |

**EXHIBIT 8**
**0147**

| Weapons | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Other weapons or weapons not stated | 1,502 | 1,715 | 1,853 | 969 | 900 |

- [1] Pushed is included in personal weapons.
- NOTE: The Uniform Crime Reporting Technical Refresh enables updating of prior years' crime data; therefore, data presented in this table may not match previously published data.

**EXHIBIT 8**

**0148**



Home (https://ucr.fbi.gov) • Crime in the U.S. (https://ucr.fbi.gov/crime-in-the-u.s) • 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018) • Crime in the U.S. 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018) • Tables (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables) • Expanded Homicide Data Table 9

Criminal Justice Information Services Division (https://www.fbi.gov/services/cjis)
Feedback (https://forms.fbi.gov/cius-feedback-2018) | Contact Us (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/contact-us) | Data Quality Guidelines (https://ucr.fbi.gov/data-quality-guidelines-new) | UCR Home (https://ucr.fbi.gov/)

Home (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/home)

Offenses Known to Law Enforcement (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/offenses-known-to-law-enforcement)

Violent Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/violent-crime)

Property Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/property-crime)

Clearances (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances)

Persons Arrested (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/persons-arrested)

Police Employee Data (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/police-employee-data)

Download Excel (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/expanded-homicide-data-table-9.xls/output.xls)

Expanded Homicide Data Table 9

Murder Victims by Age
by Weapon, 2018

| | | | | | Weapons | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age | Total murder victims | Firearms | Knives or cutting instruments | Blunt objects (clubs, hammers, etc.) | Personal weapons (hands, fists, feet, etc.)[1] | Poison | Explosives | Fire | Narcotics | Strangulation | | Asphyxiation | Other weapon or weapon not stated[2] |
| Total | 14,123 | 10,265 | 1,515 | 443 | 672 | 5 | 4 | 72 | 78 | 70 | | 90 | 909 |
| Percent distribution[3] | 100.0 | 72.7 | 10.7 | 3.1 | 4.8 | 0.0 | 0.0 | 0.5 | 0.6 | 0.5 | | 0.6 | 6.4 |
| Under 16[4] | 1,126 | 648 | 53 | 42 | 202 | 0 | 2 | 5 | 8 | 2 | | 9 | 155 |
| Under 22[4] | 2,819 | 2,131 | 155 | 55 | 213 | 1 | 2 | 11 | 13 | 11 | | 12 | 215 |
| 18 and over[4] | 12,855 | 9,560 | 1,453 | 395 | 452 | 5 | 2 | 61 | 68 | 68 | | 77 | 714 |
| Infant (under 1) | 137 | 8 | 2 | 9 | 74 | 0 | 0 | 0 | 1 | 1 | | 2 | 40 |
| 1 to 4 | 255 | 42 | 8 | 25 | 99 | 0 | 1 | 2 | 5 | | 1 | 1 | 71 |
| 5 to 8 | 76 | 37 | 5 | | 3 | 17 | 0 | 0 | 0 | 0 | 0 | 2 | 12 |
| 9 to 12 | 60 | 42 | 3 | 0 | | 5 | 0 | 0 | 1 | 1 | | 0 | 2 | 6 |
| 13 to 16 | 319 | 269 | 24 | 2 | | 7 | 0 | 0 | 2 | 0 | | 0 | 0 | 15 |
| 17 to 19 | 1,107 | 972 | 66 | 9 | | 6 | 0 | 1 | 2 | 6 | | 3 | 3 | 39 |
| 20 to 24 | 2,199 | 1,908 | 140 | 14 | 19 | 1 | 0 | 7 | 11 | 9 | | 10 | 80 |

**EXHIBIT 8**
**0149**

FBI — Expanded Homicide Data Table 9

Weapons

| Age | Total murder victims | Firearms | Knives or cutting instruments | Blunt objects (clubs, hammers, etc.) | Personal weapons (hands, fists, feet, etc.)[1] | Poison | Explosives | Fire | Narcotics | Strangulation | Asphyxiation | Other weapon or weapon not stated[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 to 29 | 2,239 | 1,827 | 220 | 22 | 39 | 0 | 0 | 5 | 15 | 9 | 10 | 92 |
| 30 to 34 | 1,721 | 1,391 | 160 | 28 | 31 | 0 | 0 | 5 | 13 | 10 | 6 | 77 |
| 35 to 39 | 1,441 | 1,100 | 156 | 24 | 45 | 0 | 1 | 4 | 5 | 8 | 7 | 91 |
| 40 to 44 | 1,018 | 758 | 125 | 30 | 42 | 0 | 0 | 6 | 4 | 4 | 4 | 45 |
| 45 to 49 | 820 | 559 | 101 | 35 | 44 | 0 | 0 | 3 | 5 | 6 | 5 | 62 |
| 50 to 54 | 717 | 410 | 150 | 43 | 56 | 1 | 0 | 4 | 2 | 4 | 1 | 46 |
| 55 to 59 | 651 | 354 | 110 | 52 | 51 | 1 | 0 | 4 | 2 | 5 | 7 | 65 |
| 60 to 64 | 423 | 197 | 91 | 40 | 38 | 2 | 0 | 5 | 1 | 4 | 8 | 37 |
| 65 to 69 | 316 | 136 | 63 | 44 | 24 | 0 | 1 | 3 | 1 | 2 | 4 | 38 |
| 70 to 74 | 189 | 95 | 35 | 24 | 12 | 0 | 0 | 3 | 3 | 1 | 3 | 13 |
| 75 and over | 293 | 103 | 47 | 33 | 45 | 0 | 0 | 10 | 1 | 3 | 11 | 40 |
| Unknown | 142 | 57 | 9 | 6 | 18 | 0 | 0 | 6 | 2 | 0 | 4 | 40 |

- [1] Pushed is included in personal weapons.
- [2] Includes drowning.
- [3] Because of rounding, the percentages may not add to 100.0.
- [4] Does not include unknown ages.

**EXHIBIT 8**

Home (https://ucr.fbi.gov) • Crime in the U.S. (https://ucr.fbi.gov/crime-in-the-u.s) • 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018) • Crime in the U.S. 2018 (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018) • Tables (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables) • Table 20



Criminal Justice Information Services Division (https://www.fbi.gov/services/cjis)
Feedback (https://forms.fbi.gov/cius-feedback-2018) | Contact Us (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/contact-us) | Data Quality Guidelines (https://ucr.fbi.gov/data-quality-guidelines-new) | UCR Home (https://ucr.fbi.gov/)

Home (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/home)

Offenses Known to Law Enforcement (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/offenses-known-to-law-enforcement)

Violent Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/violent-crime)

Property Crime (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/property-crime)

Clearances (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/clearances)

Persons Arrested (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/persons-arrested)

Police Employee Data (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/police-employee-data)

Data Declaration (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-20/table-20.xls/@@template-layout-view?override-view=data-declaration)

Download Excel (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-20/table-20.xls/output.xls)

Table 20

Murder by State, Types of Weapons, 2018

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|---|---|---|---|---|---|---|---|---|---|
| Alabama[3] | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 47 | 31 | 7 | 3 | 0 | 21 | 8 | 3 | 5 |
| Arizona | 339 | 203 | 139 | 12 | 6 | 46 | 45 | 87 | 4 |
| Arkansas | 218 | 156 | 66 | 6 | 5 | 79 | 17 | 38 | 7 |
| California | 1,739 | 1,177 | 834 | 24 | 27 | 292 | 252 | 223 | 87 |
| Colorado | 207 | 147 | 99 | 2 | 8 | 38 | 27 | 13 | 20 |
| Connecticut | 83 | 54 | 10 | 2 | 0 | 42 | 18 | 9 | 2 |
| Delaware | 48 | 40 | 14 | 1 | 2 | 23 | 4 | 3 | 1 |
| District of Columbia | 151 | 120 | 120 | 0 | 0 | 0 | 20 | 7 | 4 |
| Georgia | 568 | 460 | 410 | 11 | 10 | 29 | 44 | 62 | 2 |
| Hawaii | 33 | 11 | 6 | 1 | 0 | 4 | 10 | 6 | 6 |
| Idaho | 32 | 19 | 14 | 2 | 2 | 1 | 4 | 8 | 1 |
| Illinois[3] | 864 | 708 | 592 | 14 | 4 | 98 | 77 | 53 | 26 |
| Indiana | 371 | 294 | 136 | 10 | 7 | 141 | 33 | 29 | 15 |

**EXHIBIT 8**

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting instruments | Other weapons | Hands, fists, feet, etc.[2] |
|---|---|---|---|---|---|---|---|---|---|
| Iowa[4] | 43 | 20 | 6 | 2 | 2 | 10 | 8 | 9 | 6 |
| Kansas | 110 | 78 | 47 | 0 | 2 | 29 | 7 | 19 | 6 |
| Kentucky | 237 | 179 | 112 | 12 | 6 | 49 | 17 | 32 | 9 |
| Louisiana | 521 | 436 | 233 | 12 | 5 | 186 | 30 | 44 | 11 |
| Maine | 23 | 11 | 6 | 0 | 1 | 4 | 2 | 6 | 4 |
| Maryland | 470 | 388 | 345 | 1 | 10 | 32 | 39 | 30 | 13 |
| Massachusetts | 136 | 93 | 37 | 0 | 1 | 55 | 25 | 13 | 5 |
| Michigan | 550 | 394 | 166 | 17 | 11 | 200 | 31 | 99 | 26 |
| Minnesota | 104 | 49 | 36 | 4 | 0 | 9 | 16 | 28 | 11 |
| Mississippi | 142 | 118 | 99 | 3 | 2 | 14 | 7 | 15 | 2 |
| Missouri | 555 | 473 | 235 | 16 | 9 | 213 | 40 | 32 | 10 |
| Montana | 34 | 17 | 9 | 3 | 0 | 5 | 2 | 12 | 3 |
| Nebraska | 43 | 26 | 22 | 0 | 1 | 3 | 5 | 9 | 3 |
| Nevada | 201 | 134 | 46 | 1 | 1 | 86 | 23 | 24 | 20 |
| New Hampshire | 21 | 12 | 6 | 0 | 0 | 6 | 3 | 4 | 2 |
| New Jersey | 286 | 202 | 152 | 0 | 2 | 48 | 37 | 28 | 19 |
| New Mexico | 137 | 87 | 39 | 3 | 0 | 45 | 23 | 22 | 5 |
| New York | 546 | 313 | 254 | 6 | 10 | 43 | 124 | 63 | 46 |
| North Carolina | 479 | 346 | 231 | 15 | 16 | 84 | 44 | 52 | 37 |
| North Dakota | 16 | 9 | 8 | 0 | 0 | 1 | 1 | 1 | 5 |
| Ohio | 546 | 383 | 184 | 3 | 7 | 189 | 49 | 87 | 27 |
| Oklahoma | 202 | 134 | 95 | 7 | 3 | 29 | 28 | 29 | 11 |
| Oregon | 81 | 48 | 30 | 3 | 1 | 14 | 12 | 18 | 3 |
| Pennsylvania | 787 | 580 | 464 | 17 | 7 | 92 | 83 | 99 | 25 |
| Rhode Island | 16 | 12 | 1 | 1 | 1 | 9 | 2 | 1 | 1 |
| South Carolina | 386 | 296 | 188 | 8 | 6 | 94 | 29 | 42 | 19 |
| South Dakota | 13 | 8 | 5 | 0 | 0 | 3 | 4 | 1 | 0 |
| Tennessee | 496 | 397 | 245 | 26 | 8 | 118 | 28 | 49 | 22 |
| Texas | 1,301 | 956 | 522 | 33 | 37 | 364 | 128 | 133 | 84 |
| Utah | 59 | 28 | 17 | 1 | 0 | 10 | 12 | 10 | 9 |
| Vermont | 10 | 3 | 3 | 0 | 0 | 0 | 0 | 5 | 2 |
| Virginia | 391 | 297 | 141 | 8 | 5 | 143 | 30 | 49 | 15 |
| Washington | 232 | 138 | 76 | 2 | 5 | 55 | 45 | 35 | 14 |

**EXHIBIT 8**

FBI — Table 20

| State | Total murders[1] | Total firearms | Handguns | Rifles | Shotguns | Firearms (type unknown) | Knives or cutting Instruments | Other weapons | Hands, fists, feet, etc.[2] |
|---|---|---|---|---|---|---|---|---|---|
| West Virginia | 57 | 34 | 21 | 1 | 1 | 11 | 5 | 14 | 4 |
| Wisconsin | 178 | 136 | 67 | 4 | 2 | 63 | 15 | 16 | 11 |
| Wyoming | 12 | 8 | 6 | 0 | 2 | 0 | 2 | 0 | 2 |

- [1] Total number of murders for which supplemental homicide data were received.
- [2] Pushed is included in hands, fists, feet, etc.
- [3] Limited supplemental homicide data were received.
- [4] Limited data for 2018 were available for Iowa.

**Data Declaration (https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-20/table-20.xls/@@template-layout-view?override-view=data-declaration)**

Provides the methodology used in constructing this table and other pertinent information about this table.

**EXHIBIT 8**