1  XAVIER BECERRA
   Attorney General of California
2  STEPAN A. HAYTAYAN
   Supervising Deputy Attorney General
3  JENNIFER E. ROSENBERG
   Deputy Attorney General
4  State Bar No. 275496
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013
     Telephone:  (213) 269-6617
6    Fax:  (916) 731-2124
     E-mail:  Jennifer.Rosenberg@doj.ca.gov
7  *Attorneys for Defendants Xavier Becerra, in
   his official capacity as Attorney General of
8  the State of California, and Brent E. Orick,
   in his official capacity as Acting Director of
9  the Department of Justice Bureau of
   Firearms*

10

IN THE UNITED STATES DISTRICT COURT

11

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| 15  **MATTHEW JONES; et al.,** | 3:19-cv-01226-L-AHG |
| 16                               Plaintiffs, | |
| 17        **v.** | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 18  **XAVIER BECERRA, in his official capacity as Attorney General of the** | |
| 19  **State of California, et al.,** | Judge:        Hon. M. James Lorenz and Magistrate Judge Barbara Lynn Major |
| 20                               Defendants. | Action Filed:        July 1, 2019 |
| 21 | |
| 22 | Second Amended Complaint Filed and |
| 23 | Served:        November 8, 2019 |
| 24 | No hearing set for this motion pursuant to Dkt. 23. |
| 25 | |

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION .................................................................................................1

4

BACKGROUND ..................................................................................................2

5

    I.     Challenged Laws ................................................................................2

6

          A.    SB 1100 Imposed Modest Restrictions on FFL sales and

7
                   Transfers to Young Adults Aged 18-20................................2

8
          B.    SB 61 Will Impose a Narrow Further Restriction on FFL
                   Sales and Transfers of a Subset of Semi-Automatic Long

9
                   Guns ....................................................................................3

10
          C.    Section 27510 Imposes Only Modest Restrictions and
                   Preserves for Young Adults the Rights to Possess, Use,

11
                   and Acquire Handguns and Long Guns, Including Semi-
                   Automatic Centerfire Rifles ...............................................3

12

    II.    Relevant Procedural History ..............................................................4

13

LEGAL STANDARD ..........................................................................................5

14

ARGUMENT........................................................................................................5

15

    I.     Plaintiffs Cannot Establish a Likelihood of Success on the

16
             Merits of Their Second Amendment Challenge. ...............................5

17
          A.    The Second Amendment Framework .......................................5

18
          B.    Section 27510's Age-Based Restrictions on FFL Sales
                   and Transfers Are Consistent with Historical Prohibitions

19
                   and Are Presumptively Lawful Regulations That Do Not
                   Implicate the Second Amendment..........................................7

20
          C.    Assuming the Second Amendment is Implicated at All,

21
                   Intermediate Scrutiny Is the Appropriate Standard..................9

22
          D.    Section 27510's Age-Based Restrictions on FFL Sales
                   and Transfers Satisfy Intermediate Scrutiny..........................11

23
               1.    Section 27510's Age-Based Restrictions on FFL

24
                   Sales and Transfers Serve California's Substantial
                   Interest in Public Safety and Crime Prevention. ...........12

25
               2.    Section 27510's Age-Based Restrictions on FFL

26
                     Sales and Transfers Reasonably Fit the Public's
                   Interest in Protecting Public Safety and Reducing

27
                     Gun Violence.................................................................13

28

i

1

**TABLE OF CONTENTS**

2

(continued)

**Page**

3

a.    There is Substantial Evidence that Young
      Adults Are Disproportionately Disposed to
4     Harm Themselves or Others, Including
      Because of Their Incomplete Brain
5     Development.......................................................14

6     b.    Requiring Young Adults Without Military or
            Law Enforcement Training to Purchase Long
7           Guns Via the Hunting License Exemption Is
            a Modest Requirement that Reasonably Fits
8           California's Public Safety Goal............................19

9     c.    Limiting Sales and Transfers of Long Guns
            Through FFLs Appropriately Serves the
10          Legislature's Desire to Limit Gun Violence
            Occasioned by Mass Shootings............................22

11    d.    SB 61's Further Limitations on Access to
12          Semi-Automatic Centerfire Rifles Are
            Justified ..............................................................24

13    II.   Plaintiffs Have Not Established That They Will Suffer Any
14          Irreparable Harm Absent Preliminary Injunctive Relief. ...................26

15    III.  The Balance of Equities and the Public Interest Weigh Against
            Preliminary Injunctive Relief. ............................................................29

16    CONCLUSION ................................................................................30

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011)...................................................................5

*Bauer v. Becerra*
    858 F.3d 1216 (9th Cir. 2017)........................................... 6, 10, 13, 20

*Burford v. Sun Oil Co.*
    319 U.S. 315 (1943)................................................................................30

*Chem. Specialties Mfrs. Ass'n, Inc. v. Allenby*
    958 F.2d 941 (9th Cir. 1992)...............................................................21

*City of Los Angeles v. Lyons*
    461 U.S. 95 (1983)..................................................................................26

*City of Renton v. Playtime Theatres, Inc.*
    475 U.S. 41 (1986)..................................................................................11

*Coal. for Econ. Equity v. Wilson*
    122 F.3d 718 (9th Cir. 1997)...............................................................30

*Constructors Ass'n of W. Penna. v. Kreps*
    573 F.2d 811 (3d Cir. 1978)................................................................26

*District of Columbia v. Heller*
    554 U.S. 570 (2008)..........................................................................*passim*

*Dymo Indus., Inc. v. Tapeprinter, Inc.*
    326 F.2d 141 (9th Cir. 1964)...............................................................18

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015).......................................................11, 13

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) ..........................................................6

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*
    No. 3:18-CV-00103, 2019 WL 4923955 (W.D. Va. Oct. 4, 2019) .............*passim*

1
2

# TABLE OF AUTHORITIES
## (continued)

Page

3

*Hohe v. Casey*
4
    868 F.2d 69 (3d Cir. 1989)...................................................................26

5

*Horsley v. Trame*
6
    808 F.3d 1126 (7th Cir. 2015)........................................................12, 16

7

*Jackson v. City & County of San Francisco*
    746 F.3d 953 (9th Cir. 2014)...................................................6, 10, 11
8

*Kolbe v. Hogan*
9
    849 F.3d 114 (4th Cir. 2017)...........................................................13

10

*Kwong v. Bloomberg*
11
    723 F.3d 160 (2d Cir. 2013).............................................................20

12

*Lydo Enters. v. Las Vegas*
13
    745 F.2d 1211 (9th Cir. 1984)..........................................................28

14

*Maryland v. King*
15
    133 S. Ct. 1 (2012)........................................................................30

16

*McDonald v. Chicago*
17
    561 U.S. 742 (2010)...................................................................5, 18

18

*Miller for & on Behalf of N.L.R.B. v. California Pac. Med. Ctr.*
19
    991 F.2d 536 (9th Cir. 1993)...........................................................28

20

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,*
    *& Explosives*
21
    700 F.3d 185 (5th Cir. 2012)....................................................*passim*

22

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*
23
    719 F.3d 338 (5th Cir. 2013)............................................................7

24

*Nken v. Holder*
25
    556 U.S. 418 (2009).......................................................................29

26

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*
    762 F.2d 1374 (9th Cir. 1985)..........................................................28
27

28

iv

1

2

### TABLE OF AUTHORITIES
#### (continued)

**Page**

3

4

*Pena v. Lindley*
   898 F.3d 969 (9th Cir. 2018)........................................................................*passim*

5

6

*Powell v. Tompkins*
   926 F. Supp. 2d 367 (D. Mass. 2013)..........................................................9, 10

7

8

*Preminger v. Principi*
   422 F.3d 815 (9th Cir. 2005).............................................................................26

9

*Rupp v. Becerra*
   401 F. Supp. 3d 978 (C.D. Cal. 2019) ...............................................................6

10

11

12

*Rupp v. Becerra*
   No. 8:17-CV-00746-JLS-JDE, 2018 WL 2138452 (C.D. Cal. May
   9, 2018)........................................................................................................13, 29

13

14

*Silvester v. Harris*
   843 F.3d 816 (9th Cir. 2016).........................................................................*passim*

15

16

*Teixeira v. County of Alameda*
   873 F.3d 670 (9th Cir. 2017) ..........................................................................6, 7

17

18

*Tracy Rifle & Pistol LLC v. Harris*
   118 F. Supp. 3d 1182 (E.D. Cal. 2015) ............................................................29

19

*Turner Broad. Sys., Inc. v. FCC*
   520 U.S. 180 (1997)...........................................................................................11

20

21

*United States v. Chovan*
   735 F.3d 1127 (9th Cir. 2013)...........................................................................10

22

23

*United States v. Masciandaro*
   638 F.3d 458 (4th Cir. 2011) ............................................................................29

24

25

*United States v. Rene E.*
   583 F.3d 8 (1st Cir. 2009) ...................................................................................9

26

*United States v. Salerno*
   481 U.S. 739 (1987)...........................................................................................21

27

28

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

*Wash. State Grange v. Wash. State Republican Party*

4
    552 U.S. 442 (2008)...........................................................................................21

5

*Wiese v. Becerra*

6
    No. 2:17-cv-903-WBS-KJN, 2017 WL 2619110 (E.D. Cal. June 16,
    2017) .....................................................................................................................28

7

*Winter v. Nat. Res. Def. Council, Inc.*

8
    555 U.S. 7 (2008)...........................................................................................5, 29

9

*Worman v. Healey*

10
    922 F.3d 26 (1st Cir. 2019) ........................................................... 23, 24, 25

11

STATUTES

12

Cal. Pen. Code

13
    § 16720......................................................................................................................3

14
    § 16960(g)................................................................................................................4
    § 26545......................................................................................................................4

15
    § 27510............................................................................................................*passim*

16
    § 27510(b)(1).......................................................................................................1, 2
    § 27510(b)(2)...........................................................................................................1

17
    § 27510(b)(2)(A)....................................................................................................2

18
    § 27510(b)(2)(B)....................................................................................................2
    § 27510(b)(2)(C)....................................................................................................2

19
    § 27510(b)(2)(D)....................................................................................................3

20
    § 27510(b)(2)(E)....................................................................................................3
    § 27510 (b)(3).........................................................................................................3

21
    § 27545......................................................................................................................3

22
    § 27585...................................................................................................................3, 4
    § 27880......................................................................................................................4

23
    § 27885......................................................................................................................4

24
    § 27910.................................................................................................................4, 27
    § 31615....................................................................................................................19

25
    § 31700(c)...............................................................................................................19

26

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

**OTHER AUTHORITIES**

Cal. Dep't of Justice, Criminal Justice Statistics Center, *Crime in
    California* (2018) ..............................................................15

Daniel W. Webster et al., *Association between Youth-focused Firearm
    Laws and Youth Suicides*, 292 JAMA 594 (2004) ............................17

Cal. Dept. Fish & Wildlife, Hunting License: Number Issued (2010s)...................21

Cal. Dept. of Justice, Firearm Safety Certificate Program FAQs,
    https://oag.ca.gov/firearms/fscpfaqs..................................................20

11A Charles Alan Wright et al., Federal Practice and Procedure §
    2948.1 (3d ed.)..............................................................................28

Daniel W. Webster et al., Johns Hopkins Ctr. For Gun Policy and
    Research, *Firearms on College Campuses: Research Evidence and
    Policy Implications* (Oct. 2016) .......................................16

Elzerie de Jager, et al., *Lethality of Civilian Active Shooter Incidents
    With and Without Semiautomatic Rifles in the United States*, 320
    JAMA 10 (2018)..............................................................................25

Eric Escalante, *Nonprofit Marks El Paso Shooting as 250th Mass
    Shooting in the U.S. for 2019*, ABC10 (Aug. 3, 2019) ......................22

*Firearm-Related Youth Suicides and Unintentional Deaths*, 52 THE
    SOC. SCI. J. 168 (2015).......................................................................17

Infant, Black's Law Dictionary 847 (11th ed. 2019) ...............................8

Joaquin Palomino, *Mass Shootings in California: Rare But
    Increasingly Deadly*, San Francisco Chronicle (July 31, 2019) ..........22

U.S. Department of Justice, *Crime in the United States*, Arrests, by
    Age, 2017 (Table 38) ......................................................................15

Larry Buchanan et al., *How They Got Their Guns*, N.Y. Times
    (updated Feb. 16, 2018) ..................................................................23

1

2

### TABLE OF AUTHORITIES
### (continued)

**Page**

3

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural*

4
*Correlates of Adolescent Sensitivity to Appetitive and Aversive*
*Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010)........................15

5

Mariam Arain et al., *Maturation of the Adolescent Brain*,

6
9 Neuropsychiatric Disease & Treatment 449, 453-54, 458 (2013)...................15

7

Mark Follman, *Yes, Mass Shootings Are Occurring More Often*,

8
Mother Jones (October 21, 2014)......................................................................23

9

Mark Follman, Gavin Aronsen, and Deanna Pan, *US Mass Shootings,*

10
*1982-2019: Data From Mother Jones' Investigation*, Mother Jones

11
(updated Dec. 11, 2019, 9:15 AM)....................................................................23

12

Luis Melgar and Lisa Dunn, *Since 1982, 74 Percent of Mass Shooters*

13
*Obtained Their Guns Legally*, Guns & America (Nov. 2, 2018) ......................23

14

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed.

15
1883) ...................................................................................................................23

16

Tim Craig et al., *As the Wounded Kept Coming, Hospitals Dealt with*

17
*Injuries Rarely Seen in U.S.*, Wash. Post (Oct. 3, 2017)...................................25

18

William Blackstone, 1 Commentaries On The Laws Of England 463

(1st ed. 1765) ........................................................................................................8

19

20

21

22

23

24

25

26

27

28

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction  (3:19-cv-01226-L-AHG)

**INTRODUCTION**

The Legislature enacted SB 1100 and SB 61 to serve public safety goals. These reasonable public safety laws should not be enjoined while this lawsuit proceeds.  The new limitation in California Penal Code § 27510, as amended by SB 1100, promotes safety and responsible firearm ownership and use by restricting firearm transfers by licensed firearms dealers to young adults aged 18-20 ("Young Adults").  The law imposes only modest restrictions; it is not an outright ban as Plaintiffs contend.  Rather, SB 1100 permits the sale, rental, delivery, or transfer of long guns to those with valid, unexpired hunting licenses (with prerequisite training), young people currently serving in law enforcement or the armed forces, and young people who have been honorably discharged from the armed forces or reserves.  Cal. Pen. Code § 27510(b)(1) & (2).  Those Young Adults who wish to purchase long guns who do not currently or have not previously served in law enforcement, the armed forces, or the reserves thus may become eligible to purchase long guns by simply taking a hunter education course and paying a modest fee for a hunting license.

The narrow additional limitation related to semi-automatic centerfire rifles imposed by SB 61 is a common sense measure that ensures that only those Young Adults with adequate training are able to purchase from FFLs semi-automatic centerfire rifles capable of inflicting serious injury.  And neither SB 1100 nor SB 61 foreclosed firearms transfers to Young Adults through immediate family.

Plaintiffs are not entitled to the broad relief they seek—a court order enjoining enforcement of the age-based restrictions of Section 27510 in all applications. Plaintiffs cannot show that they are likely to succeed on the merits of their claims, as every court to have considered similar restrictions on commercial transactions through federally licensed dealers has upheld them under intermediate scrutiny.

Plaintiffs also cannot meet their burden to establish the other preliminary injunction factors.  Their claimed irreparable harm relies solely on their arguments

1

on the merits, and fails for the same reasons.  The balance of the equities and public interest both weigh against enjoining enforcement of laws that promote firearm safety education and limited access to dangerous semi-automatic centerfire rifles for those in an age group the social science shows is disproportionately disposed to violence and irresponsible, impulsive, or reckless behavior.  This Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I. CHALLENGED LAWS

#### A. SB 1100 Imposed Modest Restrictions on FFL sales and Transfers to Young Adults Aged 18-20

On September 28, 2018, then-Governor Edmund G. Brown, Jr. signed into law Senate Bill 1100 ("SB 1100", 2017-2018 Reg. Sess.).  As relevant here, SB 1100 amended California Penal Code Section 27510 to add age-based restrictions for the sale or transfer of long guns by a federally licensed firearms dealer in California ("FFL").  More specifically, SB 1100 amended Section 27510 to prohibit licensed firearms dealers from selling or otherwise transferring any firearm to any person under the age of 21, but permits otherwise lawful transfers to Young Adults in certain circumstances described below.  SB 1100's amendments to Section 27510 became effective January 1, 2019.

Regarding long guns in particular, Section 27510's restriction on sales or transfers of long guns from FFLs to Young Adults does not apply to several categories of persons older than 18 years of age who are subject to firearm safety education and training, including: a person who "possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife" (Cal. Pen. Code § 27510(b)(1)); an active peace officer authorized to carry a firearm (*id.* § 27510(b)(2)(A)); "[a]n active federal officer or law enforcement agent" (*id.* § 27510(b)(2)(B)); "[a] reserve peace officer" (*id.* § 27510(b)(2)(C)); an active member of "the United States Armed Forces, the National Guard, the Air National

2

Guard, or active reserve components of the United States" (*id.* § 27510(b)(2)(D));
or "an honorably discharged member of the United States Armed Forces, the
National Guard, the Air National Guard, or the active reserve components of the
United States" (*id.* § 27510(b)(2)(E)).

Section 27510 regulates *only* conduct of the *dealer*—Section 27510 does not
expressly regulate anyone else of *any* age.

### B. SB 61 Will Impose a Narrow Further Restriction on FFL Sales and Transfers of a Subset of Semi-Automatic Long Guns

Under SB 61, an FFL may not transfer semi-automatic centerfire rifles to any
person under the age of 21.  While exemptions are available for law enforcement
officers and active and reserve members of the Armed Forces described in the
current version of Section 27510, subdivision (b)(3), under SB 61, neither the
hunting license exemption nor the exemption for retired members of the Armed
Forces in Section 27510 will extend to transfers of semi-automatic centerfire rifles.
SB 61's amendments to Section 27510 will become effective January 1, 2020.

### C. Section 27510 Imposes Only Modest Restrictions and Preserves for Young Adults the Rights to Possess, Use, and Acquire Handguns and Long Guns, Including Semi-Automatic Centerfire Rifles

In addition to the express exemptions set forth in the text of Section 27510, SB
1100's and SB 61's amendments preserve several avenues for Young Adults to
own, inherit, borrow, possess, and use both handguns and long guns (including
semi-automatic centerfire rifles).  Although most sales and transfers of firearms in
California must be made through a FFL (*see* Cal. Pen. Code § 27545), there are
several provisions permitting Young Adults to receive firearms without having to
effect any transfer or loan through a FFL.  Because these transfers may occur
without the FFL as intermediary, the limitations of Section 27510 do not apply:

- Young Adults may receive transfers of handguns and long guns from an immediate family member—defined as a parent or grandparent—"by gift, bequest, intestate succession, or other means from one individual to another[.]" Cal. Pen. Code § 27585; Cal. Pen. Code § 16720.

3

- Young Adults may also receive a handgun or long gun from a spouse.  Cal. Pen. Code § 27585 (providing that transfer need not be through licensed dealer where the recipient "takes title or possession of a firearm by operation of law"); Cal. Pen. Code §16960(g) ("operation of law" includes transfer by "transmutation of property between spouses").

- Young Adults not otherwise prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm also may be loaned firearms by parents, siblings, grandparents, spouses, registered domestic partners, and others for up to 30 days, Cal. Pen. Code § 27880, and they may be loaned firearms by other people for up to three days at a time if the Young Adult handles and uses the firearm in the presence of the person loaning the firearm, Cal. Pen. Code § 27885.

- And Young Adults may be loaned firearms

    for the purposes of shooting at targets if the loan occurs on the premises of a target facility that holds a business or regulatory license or on the premises of any club or organization organized for the purposes of practicing shooting at targets upon established ranges, whether public or private, if the firearm is at all times kept within the premises of the target range or on the premises of the club or organization.

Cal. Pen. Code § 27910; Cal. Pen. Code § 26545 (providing that no federal or state dealer license is required to loan firearms for target shooting).  Even Young Adults without valid hunting licenses may have lawful opportunities to practice shooting with loaned firearms.

## II.   RELEVANT PROCEDURAL HISTORY

Plaintiffs filed their initial complaint challenging SB 1100's amendments to Section 27510 on July 1, 2019 (ECF No. 1), but never served the initial complaint or any summons thereon (ECF No. 5 at 1, n.2).  Instead, Plaintiffs filed a First Amended Complaint for Declaratory and Injunctive Relief a full month later on July 30, 2019, and served the FAC and summons on August 1, 2019.  (ECF No. 3; ECF No. 5 at 1, n.2.)  Plaintiffs waited until October 4, 2019 to file their first preliminary injunction motion—*more than nine months* after SB 1100 took effect, and more than a year after SB 1100 was signed into law.  (ECF Nos. 12, 12-1.)  Following Governor Newsom's signing of SB 61, Plaintiffs withdrew their

1  initial motion for preliminary injunction regarding SB 1100's amendments to

2  Section 27510 on October 18, 2019 in light of their desire to file an amended

3  complaint addressing SB 61's further amendments.  (ECF No. 16.)  Plaintiffs filed

4  their Second Amended Complaint (SAC) three weeks later, on November 8, 2019

5  (ECF No. 20), and did not file the instant motion for preliminary injunction until

6  November 12, 2019 (ECF No. 21.)

7  ## LEGAL STANDARD

8  "A preliminary injunction is an extraordinary remedy never awarded as of

9  right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs

10  seeking an injunction bear the burden of establishing that:  (1) their claims are

11  likely to succeed on the merits; (2) they will likely suffer irreparable harm in the

12  absence of preliminary relief; (3) the balance of equities tips in their favor; *and*

13  (4) an injunction is in the public interest.  *Id.* at 20.  Alternatively, "[a] preliminary

14  injunction is appropriate when a plaintiff demonstrates that serious questions going

15  to the merits were raised and the balance of hardships tips sharply in the plaintiff's

16  favor."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir.

17  2011) (internal citation omitted).  Plaintiffs carry the burden to establish that all

18  four *Winter* factors tip in their favor.  *Id.* at 1135.

19  ## ARGUMENT

20  **I.   PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE
       MERITS OF THEIR SECOND AMENDMENT CHALLENGE.**

21

22  ### A.   The Second Amendment Framework

23  In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme

24  Court held that "the Second Amendment protects the right to possess a handgun in

25  the home for the purpose of self-defense."  *McDonald v. Chicago*, 561 U.S. 742,

26  791 (2010).  "*Heller* indicated that the Second Amendment does not preclude

27  certain 'longstanding prohibitions' and 'presumptively lawful regulatory measures,'

28  such as . . . 'laws imposing conditions and qualifications on the commercial sale of

arms[.]"  *Jackson v. City & County of San Francisco*, 746 F.3d 953, 959 (9th Cir. 2014) (quoting *Heller*, 554 U.S. at 626-27 & n.26).

To analyze a Second Amendment challenge, courts engage in a two-step inquiry:  first, they ask whether a law burdens the Second Amendment at all; and second, if it does, they determine the appropriate level of scrutiny.  *Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc).[1]

"[C]ourts determine the appropriate level by considering (1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right."  *Bauer v. Becerra*, 858 F.3d 1216, 1221-22 (9th Cir. 2017) (quotation marks omitted), *cert. denied*, 138 S. Ct. 982 (2018). This test "amounts to a sliding scale."  *Id.* at 1222 (quotation marks omitted).  "A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny."  *Id.* (quotation marks omitted). "Further down the scale, a law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny."  *Id.*  "Otherwise, intermediate scrutiny is appropriate."  *Id.*

Section 27510's narrow age limitations on FFL sales and transfers are the kind of presumptively lawful statutory provisions that the Supreme Court has said do not implicate the Second Amendment.  *See Jackson*, 746 F.3d at 959.  But even if they did implicate the Second Amendment, these laws would be subject only to, and

---

[1] Incorrectly casting Section 27510 as a categorical ban on lawful *possession* of all firearms for *all* people under 21, Plaintiffs suggest that this Court should "select[]" a framework rooted *solely* in "history and tradition" and eschew any form of means-end scrutiny rather than conducting the two-step inquiry mandated by Ninth Circuit precedent and every Circuit Court to have addressed what form of analysis to apply post-*Heller*.  (ECF No. 21-1 ("Mot.") at 17 [advocating for adopting a framework rejected by the majority of the D.C. Circuit in *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011), and set forth in a dissenting opinion]; *see also* Mot. at 4-5.)  As other district courts have noted when asked to adopt such an alternative approach, that framework is not "persuasive," and in any case, "the Court is bound by the Ninth Circuit's two-step inquiry."  *Rupp v. Becerra*, 401 F. Supp. 3d 978, 985 (C.D. Cal. 2019).

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction  (3:19-cv-01226-L-AHG)

satisfy, intermediate scrutiny.

**B.    Section 27510's Age-Based Restrictions on FFL Sales and Transfers Are Consistent with Historical Prohibitions and Are Presumptively Lawful Regulations That Do Not Implicate the Second Amendment**

Where text, history, and tradition show that a challenged law is consistent with the Second Amendment, the restriction "'passes constitutional muster'" and this Court's inquiry "'is complete.'" *Teixeira*, 873 F.3d at 682; *see Heller*, 554 U.S. at 626, 627 n.26.  Here, California's modest restrictions on the sale or transfer of long guns through licensed dealers to a narrow category of Young Adults aged 18-20 are consistent with the "historical understanding" of the right to keep and bear arms. *Heller*, 554 U.S. at 625.  Thus, Plaintiffs' challenge to Section 27510 will likely fail on the merits at step one of the relevant framework because Section 27510's age-based restriction on sale of long guns to Young Adults does not affect conduct within the ambit of the Second Amendment.

Indeed, courts addressing similar age-based restrictions on the rights of 18-20 year-olds to purchase or carry firearms have reasoned that such

> statutes enacted to safeguard the public using age-based restrictions on access to and use of firearms are part of a succession of "longstanding prohibitions," *Heller*, 554 U.S. at 626, 128 S.Ct. 2783, that are likely outside the scope of the Second Amendment, because such restrictions are "consistent with" both the "longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety" and the "longstanding tradition of age-and safety-based restrictions on the ability to access arms."

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 203 (5th Cir. 2012) (*BATF*), *cert. denied*, 571 U.S. 1196 (2014)).

In *BATF*, the Fifth Circuit conducted an exhaustive review of the historical context of limitations on the rights of those under the age of 21 in determining

7

whether the federal government's ban on the sale of handguns to those under the age of 21 through FFLs violated the Second Amendment.  The Court concluded that "[m]odern restrictions on the ability of persons under 21 to purchase handguns—and the ability of persons under 18 to possess handguns—seem, to us, to be firmly historically rooted." *BATF*, 700 F.3d at 204.  The Court's conviction in this respect was based on an analysis of legal commentary regarding founding-era attitudes, nineteenth-century legislators, courts, and commentators, nineteenth-century case law evidencing the criminalization of providing firearms and other dangerous weapons to minors under the age of 21, and historical evidence showing that the age of majority at the founding and through the first half of the 20th century was 21, even though younger individuals could serve in militias.  *Id.* at 200-04.

In evaluating another challenge to the federal ban on handgun sales to those under 21 by FFL, a district court in the Western District of Virginia also recently stated that "evidence suggests that full adulthood, at the time of the Founding, was not reached until age 21." *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:18-CV-00103, 2019 WL 4923955, at *4 (W.D. Va. Oct. 4, 2019) (citing William Blackstone, 1 Commentaries On The Laws Of England 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."); Infant, Black's Law Dictionary 847 (11th ed. 2019) (legal infancy lasts until age 21) (citing sources from 1878, 1899, and 1974)); *see also id.* (noting that "legal scholars of the time accepted that 'the State may prohibit the sale of arms to minors'" (quoting Thomas M. Cooley, Treatise on Constitutional Limitations 740 n.4 (5th ed. 1883))).  And the First Circuit recently concluded that limitations on the ability of Young Adults aged 18-20 to carry firearms in public were presumptively lawful in light of the relevant historical record, including because "[c]ase law from jurisdictions across the country confirms that during the late nineteenth and early twentieth centuries"—when "minors" included those under 21—"minors' capacity to purchase and own

8

firearms was significantly curtailed." *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015) (citing *United States v. Rene E.*, 583 F.3d 8, 14-15 (1st Cir. 2009), *cert. denied*, 558 U.S. 1133 (2010) (compiling cases); Larry D. Barnett, *The Roots of Law*, 15 Am. U.J. Gender Soc. Pol'y & L. 613, 681–86 app. (2007)).

These authorities demonstrate that limitations on the ability of those under the age of 21 to procure firearms from dealers are consistent with the "historical understanding" of the right to keep and bear arms, *Heller*, 554 U.S. at 625, and therefore pass constitutional muster without the need for applying any level of means-end scrutiny. *See Powell*, 926 F. Supp. 2d at 388 (holding as a matter of law at step one that the historical record established that age-based restrictions on licenses to carry enacted for purposes of public safety "comport[] with the Second Amendment and impose[] no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms").

Because section 27510's age restrictions on FFL sales and transfers impact only persons under 21, they are the kind of presumptively lawful statutory provisions that the Supreme Court has said do not implicate the Second Amendment. Plaintiff's Second Amendment challenge fails on that basis alone.

### C. Assuming the Second Amendment is Implicated at All, Intermediate Scrutiny Is the Appropriate Standard.

Neither *BATF* nor *Hirschfeld* ended the analysis at step one; while each court enunciated a view that the Second Amendment was not implicated by age-based restrictions on the sale or purchase of firearms through FFLs, each court proceeded to uphold the federal handgun ban after applying intermediate scrutiny. *BATF*, 700 F.3d at 204; *Hirschfeld*, 2019 WL 4923955, at *7.

"Unquestionably, the challenged [state] laws trigger nothing more than 'intermediate' scrutiny." *BATF*, 700 F.3d at 205 (applying intermediate scrutiny to federal ban on handgun sales to those under age 21 by FFLs, and upholding the law

9

under that level of scrutiny).  The Ninth Circuit's recent cases have repeatedly held that, for purposes of determining an appropriate level of scrutiny, the "core" of the Second Amendment right is limited to what *Heller* identified: the right to keep and carry "in defense of hearth and home."  *Heller*, 554 U.S. at 635; *see United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013), *cert. denied*, 574 U.S. 878 (2014); *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016), *cert. denied sub nom. Silvester v. Becerra*, 138 S.Ct. 945 (2018); *Bauer*, 858 F.3d at 1222; *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018).  "[F]irearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not."  *Jackson*, 746 F.3d at 961 (applying intermediate scrutiny to a regulation imposing conditions on how handguns must be stored, because such regulation regulated only the *manner* of exercise of the right, and therefore did not substantially burden the core right to use a handgun in the home for purposes of self-defense).

In keeping with these principles, federal courts have consistently applied intermediate scrutiny in the context of Second Amendment challenges to statutory limitations on Second Amendment conduct where—as here—such limitations affect only the "discrete category" of 18 to 20-year olds, impose only temporary limitations, and do not amount to a total ban having the effect of "disarm[ing] an entire community."  *BATF*, 700 F.3d at 205; *accord Powell*, 926 F. Supp. 2d at 393. Courts consistently reason that where the challenged limitations "only implicate commercial transactions: 'conduct occurring outside the home,'" they do not "implicate a core Second Amendment right."  *Hirschfeld*, 2019 WL 4923955, at *7. Courts have repeatedly determined that the federal ban on handgun sales through FFLs to Young Adults aged 18-20 warrants—at the most—intermediate scrutiny, because such a prohibition involves merely commercial transactions, and because "18–to–20–year–olds may possess and use handguns for self-defense, hunting, or any other lawful purpose; they may acquire handguns from responsible parents or

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction  (3:19-cv-01226-L-AHG)

guardians; and they may possess, use, and purchase long-guns." *BATF*, 700 F.3d at 206-07; *Hirschfeld*, 2019 WL 4923955, at *7.  And Courts emphasize that the "temporary nature of the burden reduces its severity." *BATF*, 700 F.3d at 207.

### D. Section 27510's Age-Based Restrictions on FFL Sales and Transfers Satisfy Intermediate Scrutiny.

The intermediate scrutiny "test is not a strict one." *Silvester*, 843 F.3d at 827. "Intermediate scrutiny requires (1) a significant, substantial, or important government objective, and (2) a 'reasonable fit' between the challenged law and the asserted objective." *Pena*, 898 F.3d at 979.  It does not require the fit between the challenged regulation and the stated objective to be perfect, nor does it require that the regulation be the least restrictive means of serving the interest. *Jackson*, 746 F.3d at 969.  Rather, the government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).  And in determining whether a law survives intermediate scrutiny, courts "accord substantial deference to the predictive judgments of the legislature." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997).

Courts do not look to evidence "in the technical sense" because "legislatures are not obligated, when enacting their statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review[.]" *Pena*, 898 F.3d at 979 (quotation marks omitted).  Rather, the State may "rely on any evidence 'reasonably believed to be relevant' to substantiate its important interests," and the Court "may consider 'the legislative history of the enactment as well as studies in the record or cited in pertinent case law.'" *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (citations omitted).

California has a substantial interest in increasing public safety and preventing gun violence, including but not solely in the context of mass shootings.  Section 27510's narrow limitations on FFL sales and transfers to Young Adults, except as

expressly permitted, further those interests by ensuring that those Young Adults with access to long guns have had firearm safety training—either because they have had training and supervision as a member of law enforcement, the Armed Forces or the reserves, or because they have received training by way of a hunter education course. The further limitation on commercial sales and transfers by FFLs of semi-automatic centerfire rifles also reasonably fit the Legislature's interest in ensuring that weapons capable of quickly inflicting violence on large numbers of people remain in the hands of those with proper training.

Every challenge to modest restrictions on the ability of Young Adults to procure firearms through a FFL has survived intermediate scrutiny, based in large part on the fact that—like here—the laws limited access through a dealer, but imposed no restriction on the ability of a Young Adult to possess or use a firearm for self-defense purposes, and on social science evidence showing that Young Adults are both disproportionately linked to crime and also less likely to have completely developed those portions of the brain responsible for controlling impulsivity, regulating responsible decision-making, and exercising good judgment. *See BATF*, 700 F.3d at 211; *Hirschfeld*, 2019 WL 4923955, at *8; *cf. Horsley v. Trame*, 808 F.3d 1126, 1133-34 (7th Cir. 2015) (upholding Illinois Firearm Owner's Identification Card licensing scheme, which required parental consent for those aged 18-20, or approval by the Director of State Police, where the scheme did not prohibit possession or use of firearms, but merely required limited burden of applying for card.) Section 27510's modest age restrictions on sale or transfer through FFLs likewise strikes a reasonable fit that comports with the Second Amendment.

### 1. Section 27510's Age-Based Restrictions on FFL Sales and Transfers Serve California's Substantial Interest in Public Safety and Crime Prevention.

"It is beyond question that promoting public safety and reducing incidents of gun violence are legitimate government objectives, as the Ninth Circuit, like many

12

other circuits, has found these interests not merely legitimate but substantial or compelling." *Rupp v. Becerra*, No. 8:17-CV-00746-JLS-JDE, 2018 WL 2138452, at *5 (C.D. Cal. May 9, 2018) (citing *Fyock*, 779 F.3d at 1000; *Silvester*, 843 F.3d at 827; *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017)); *see also*, *e.g.*, *Pena*, 898 F.3d at 981-82 ("public safety and crime prevention . . . are substantial government interests"). And as the Ninth Circuit has recognized, "public safety is advanced by keeping guns out of the hands of people who are most likely to misuse them[.]" *Bauer*, 858 F.3d at 1223.

Plaintiffs do not appear to contest the legitimacy of the Legislature's interest in promoting public safety and the reduction of gun violence in California, including the goal of reducing instances of mass shootings in California. (*See* Mot. at 19, 22.) Nor do Plaintiffs contest that Young Adults aged 18-20 are disproportionately linked to violent crime, including committing homicides at a "higher rate comparatively." (Mot. at 23.) Rather than disputing that California has substantial and compelling interests in promoting public safety and reducing gun violence committed by Young Adults, Plaintiffs appear to direct their arguments to the "fit" prong of the intermediate scrutiny test. Accordingly, Defendants address Plaintiffs' arguments regarding fit.

### 2. Section 27510's Age-Based Restrictions on FFL Sales and Transfers Reasonably Fit the Public's Interest in Protecting Public Safety and Reducing Gun Violence.

This "'legislative history of the enactment as well as studies in the record'" demonstrates "a 'reasonable fit between the government's stated objective[s] and the regulation' considered." *See Pena*, 898 F.3d at 979 (quoting *Fyock*, 779 F.3d at 1000). "The State is required to show only that the regulation 'promotes a substantial government interest that would be achieved less effectively absent the regulation." *Silvester*, 843 F.3d at 829 (quoting *Fyock*, 779 F.3d at 1000).)

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    **a.**     **There is Substantial Evidence that Young Adults Are Disproportionately Disposed to Harm Themselves or Others, Including Because of Their Incomplete Brain Development**

As the legislative history of SB 1100 confirms, the Legislature intended to bring parity to California restrictions on access to handguns and long guns by Young Adults aged 18-20 by raising the minimum age for sale or transfer of long guns through FFLs.  (ECF No. 21-8, Combs Decl., Ex. 2 at 0012.)  In doing so, the Legislature aimed to take an important step toward ensuring public safety (ECF No. 21-9, Combs Decl., Ex. 3 at 0015), particularly in light of the propensity of Young Adults aged 18-20 to engage in violent crime, and the developing nature of their brains (ECF No. 21-8, Combs Decl., Ex. 2 at 0011-12.)

Although the author's statement regarding SB 1100 did not reference social science, the legislative history shows that the California Chapters of the Brady Campaign offered the following statistics in support of the age restrictions:

- 11,500 of the 26,682 crime guns entered into the California Department of Justice's Firearms Systems database since 2009 were long guns, demonstrating that long guns are often used in the commission of crimes in California;

- The FBI's 2015 report on Crime in the United States showed that in 2015, "23.4 percent of those arrested for murder and non-negligent manslaughter in the U.S. were under 21 and 26.5 percent of those arrested for 'weapons carrying, possession, etc.' were under age 21" (citing FBI 2015 Crime in the United States, https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-41);

- Despite making up a large portion of the arrests for violent crimes and weapons crimes and committing 17 percent of gun homicides in the U.S., those aged 18-20 comprised just 4 percent of the U.S. population (citing Uniform Crime Reporting Program Data: Supplementary Homicide Reports, 2015," US Department of Justice, Federal Bureau of Investigation, https://ucr.fbi.gov/nibrs/addendumfor-submitting-cargo-theft-data/shr).

(ECF No. 21-8, Combs Decl., Ex. 2 at 0011-12.)  The Brady Campaign also emphasized that "[m]aturity, impulsive or reckless behavior, and responsibility vary greatly among 18-20 year olds."  (*Id.*)

1    Updated statistics show that in recent years in which offenses were broken
2    down into individual years, Young Adults aged 18-20 continued to commit a
3    disproportionately large number of violent crimes, and that indeed the ages of 18-20
4    were the years in which arrests for homicide, rape, and robbery were their highest.
5    (See Rosenberg Decl., Ex. 1, U.S. Department of Justice, *Crime in the United*
6    *States*, Arrests, by Age, 2017, at Table 38, https://ucr.fbi.gov/crime-in-the-
7    u.s/2017/crime-in-the-u.s.-2017/topic-pages/tables/table-38.)  In 2017, although 18-
8    20 year-olds comprised less than 5 percent of the U.S. population, they accounted
9    for more than 15 percent of the homicide and manslaughter arrests reported.  (*Id.*;
10   *see also* U.S. Census Bureau, *2017 National Population Projections Datasets* (last
11   revised Sept. 6, 2018), *datasets available at* https://bit.ly/2JKictP.)  And arrests in
12   California specifically show that Young Adults commit a disproportionately large
13   portion of the homicides here, too; 18-19 year-olds alone accounted for 11.8
14   percent of the homicide arrests in the entire State.  (Rosenberg Decl., Ex. 2,
15   CRIMINAL JUSTICE STATISTICS CENTER, CAL. DEP'T OF JUSTICE, *Crime in California*,
16   at 39 (Table 32) (2018), https://data-openjustice.doj.ca.gov/sites/default/files/2019-
17   07/Crime%20In%20CA%202018%2020190701.pdf.)

18       Moreover, social science has long established that the human brain continues
19   to develop into the early or mid-20s, and that Young Adults under the age of 21 are
20   less likely to have developed the maturity necessary to make responsible decisions
21   than older counterparts, that they are more reactive and take more risks.  (*See, e.g.*,
22   Rosenberg Decl., Ex. 3, Mariam Arain et al., *Maturation of the Adolescent Brain*, 9
23   NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453-54, 458 (2013) ["the
24   adolescent brain is structurally and functionally vulnerable to environmental stress"
25   and thus this age group is predisposed to "quickness to anger, intense mood swings,
26   and making decisions on the basis of 'gut' feelings"]; Rosenberg Decl., Ex. 4, Leah
27   H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of*
28   *Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN &

15

COGNITION 124, 125 (2010) [minors are uniquely prone to "negative emotional states"].)  Indeed, science shows that young adults have weaker impulse control and "demonstrate poorer emotional regulation in the context of threat than other age groups," which makes them uniquely disposed to use firearms "in the very situations in which adolescents are most developmentally vulnerable: in the context of high emotional arousal, situations that require rapid, complex social information processing, those that involve reinforcing or establishing peer relationships (i.e., showing off), or in conditions of perceived threat."  (Rosenberg Decl., Ex. 5, Daniel W. Webster et al., Johns Hopkins Ctr. For Gun Policy and Research, *Firearms on College Campuses: Research Evidence and Policy Implications*, 3, 18-19 (Oct. 2016), https://bit.ly/2QfZJHN; *see also id.* at 3 ["Risky decision-making in adolescence and early adulthood is due, in part, to on-going brain development during that stage of life that can compromise emotional and behavioral regulation, impulse control, and judgment – all of which are essential for avoiding the circumstances in which firearm access leads to tragedy."].)[2]

Such evidence of the prevalence of violent crime committed by Young Adults aged 18-20, coupled with social science evidence definitely establishing that brain maturation in that age group is not complete, is precisely the social science support that the Fifth Circuit in *BATF*, the Seventh Circuit in *Horsley*, and the Western District of Virginia in *Hirschfeld* determined established support for adopting restrictions on the means for Young Adults to purchase firearms from FFLs and to establish entitlement to a FOID card (in Illinois).  *See BATF*, 700 F.3d at 207-11; *Horsley*, 808 F.3d at 1132-34; *Hirschfeld*, 2019 WL 4923955, at *2-3 (noting, that in developing the federal handgun ban, "Congress . . . found a 'causal relationship between the easy availability' of handguns 'and juvenile and youthful criminal

---

[2] Webster, et al., also note the enhanced suicide risk in Young Adults as a reason for limiting firearm carry and access.  (*Id.* at 19 [noting that "suicide was the second leading cause of death in the U.S. among college age youth 17-24 years in 2014, that 49 percent of males aged 17-24 who committed suicide used firearms, and that suicide attempts by firearm result in death 90 percent of the time].)

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction  (3:19-cv-01226-L-AHG)

behavior, and that such firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior.' Pub. L. No. 90–351, § 901(a)(6), 82 Stat. 197, 225–226.").  Here, too, evidence regarding Young Adult-perpetrated crime, coupled with the social science showing that Young Adults may not yet be capable of making responsible decisions about the use of firearms, demonstrated much more than a reasonable fit between the Legislature's desire to curb gun violence and its promulgation of limited restrictions on the manner in which Young Adults may procure firearms.

Plaintiffs argue that there is no evidence that age-based limitations on access to firearms will prevent crime, promote public safety, or prevent any mass shootings.  (Mot. at 19, 22 [citing, e.g., ECF No. 21-15, Marvell Decl. ¶¶ 5-9 & Ex. 2.]  But even evidence they cite contradicts this contention:  A 2014 study confirmed that federal minimum-age restrictions contributed to a "very significant decline" in youth suicide and unintentional death rates.  (*See* ECF No. 21-15, Marvell Decl., Ex. 4 at 0055, Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 THE SOC. SCI. J. 168, 173 (2015); *see also* ECF No. 21-15, Marvell Decl. ¶ 14 & Ex. 7, Daniel W. Webster et al., *Association between Youth-focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004) [finding significant decline in suicides in the 18-20 year old group following implementation of some age restriction statutes].)  Reduction in suicide and unintentional death rates among young persons alone would serve as a substantial public interest.

Regarding crime rates, The RAND Corporation analysis cited by Plaintiffs in their favor (ECF No. 21-15 and 21-16, Ex. 10), does not actually contradict crime reducing effects.  Instead The RAND Corporation analysis concludes that there is insufficient evidence in the universe of social science commentary to determine whether minimum age laws reduce crime in particular.  (*Id.* at 0170, 0222-0235

1    [surveying conflicting studies and available research], 0257-0259.)  But even if that

2    analysis constituted conflicting evidence, uncertainty counsels strongly *against*

3    issuing a preliminary injunction.  *See Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326

4    F.2d 141, 143 (9th Cir. 1964) ("[O]n application for preliminary injunction the

5    court is not bound to decide doubtful and difficult questions of law or disputed

6    questions of fact.").

7         Further, Plaintiffs demand that the State comport with a standard not required

8    by law.  If states were required to show evidence that a particular approach to

9    curtailing violence had *already* proved effective, or to *guarantee* that it would

10   prove effective, states would be prevented from innovating and experimenting with

11   new ways to address, for example, "the problem of handgun violence in this

12   country[.]"  *See Heller I*, 554 U.S. at 636.  But this is not the proper standard, as the

13   Ninth Circuit's decision in *Pena* shows.  Applying intermediate scrutiny, the court

14   upheld California's "microstamping requirement," a law that was "the first of its

15   kind," and "an experimental solution to admittedly serious problems."  *Pena*, 898

16   F.3d at 984 ("[A] single courageous state may, if its citizens choose, *serve as* a

17   laboratory, and try novel legislative experiments." (internal alterations and

18   quotation marks omitted)); *accord McDonald*, 561 U.S. at 785 (plurality op.)

19   (Second Amendment "by no means eliminates" a state's "ability to devise solutions

20   to social problems that suit local needs and values").  California, like other states,

21   may experiment with placing targeted limitations on the manner in which

22   commercial sales and transfers are made to Young Adults by FFLs in an attempt to

23   reduce the incidence of gun violence, suicide, accidental death or injury, and other

24   harms without offending the core Second Amendment right.

25              **b.    Requiring Young Adults Without Military or Law
                        Enforcement Training to Purchase Long Guns Via the
26                      Hunting License Exemption Is a Modest Requirement
                        that Reasonably Fits California's Public Safety Goal**

27   Plaintiffs argue that a "vast array of firearms regulations already in place" are

28

sufficient to protect the public safety, including the firearm safety certificate requirement generally applicable to firearms purchases.  (*See* Mot. at 29).  Plaintiffs' views should not override the predictive judgments of the Legislature about what education courses will best protect Young Adults and the general public from the risk of accidental or intentional firearm injury or death.  In developing the hunting license exemption to the firearm safety certificate requirement of California Penal Code § 31615 now contained in Penal Code § 31700(c), the Legislature clearly compared the scope and components of the firearm safety certificate educational program with that of the hunter education program.  Legislative analysis from the 2013 legislative session demonstrates that the Legislature considered that "[t]he amount of firearm safety information included in the hunting education course is more extensive than that in the safety certificate education component," and the broader scope of the hunter education course's firearm safety information "prompt[ed] the exemption in [SB 683] from the safety certificate requirement for those in possession of a hunting license."  (Rosenberg Decl., Ex. 6, Cal. Leg., Assemb. Comm. On Public Safety, Bill Analysis, SB 683 (2013-14 Reg. Sess.), at 4 (Aug. 13, 2013).)  And, of course, the firearm safety certificate program does not include any in-person training component; it merely requires passage of a multiple-choice test and a safe handling demonstration, all of which can be accomplished at a firearms dealer location at the point of sale of the firearm.  (*See* ECF No. 21-19, Bogan Decl., Ex. 4 at 0138.)  The Legislature certainly could have reasonably determined that a more intensive firearms training program involving an-in person instructive component—whether through the rigors of military or law enforcement training, or a hunter education course—would better prepare Young Adults in light of science regarding the immaturity and impulsivity of that age group.

　　　Hunter education and licensing is a modest requirement, not nearly of constitutional import.  Neither any small delay occasioned by the availability of

follow-up hunter education classes (notably not subject to State control) nor the imposition of minor fees is so onerous as to substantially impinge Young Adults' Second Amendment rights. *See, e.g.*, *Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring) (concurring in upholding California's 10-day waiting period statute for pick-up of purchased firearms under intermediate scrutiny, and noting that "delay has not always been associated with government regulation," and "the ability to immediately exercise Second Amendment rights has no foundation in history"); *Bauer*, 858 F.3d at 1222, 1226 (upholding $19 dealer record of sale fee under intermediate scrutiny). Indeed, the Second Circuit has upheld even a $340 licensing fee for a firearm under intermediate scrutiny, noting that even a fee of that scale might be only a "marginal" restraint on the core Second Amendment right to possess and use firearms in the home—especially where, as here, not a single plaintiff alleged that the fee was actually prohibitive. *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013). The standard fee for the online portion of the hunter education course is $28.95; this fee is virtually identical to the $25 fee imposed for the procurement of a firearm safety certificate. (*See* ECF No. 21-8, Combs Decl., Ex. 6 at 0156; *see also* Rosenberg Decl., Ex. 7, Cal. Dept. of Justice, Firearm Safety Certificate Program FAQs, https://oag.ca.gov/firearms/fscpfaqs).[3] Further, despite Plaintiffs' attempt to show otherwise, hunter education courses are widely available and merely require signing up in advance. (Rosenberg Decl., Ex. 8 [as of December 13, 2019, there were 130 open seats in hunter education courses across California through January 11, 2020, including courses available in mid-December]; Rosenberg Decl., Ex. 9 [as of December 10, 2019, 221 seats were available in hunter education courses located within 75 miles of San Diego County zip code 92101 through September 7, 2020].)

---

[3] Available follow-up course locations and sign-up are readily accessible online at https://register-ed.com/programs/california/161.

1      Moreover, substantial evidence in the record shows that Young Adults across

2 the State have made ample use of the exemptions set forth in Section 27510 in order

3 to purchase or receive transfer of long guns since SB 1100's amendments took

4 effect on January 1, 2019.  Department of Justice data regarding long gun sales and

5 transfer transactions from January 1, 2019 through December 23, 2019 show that

6 Young Adults aged 18-20 purchased or otherwise received transfer of 3,789 long

7 guns.  (Declaration of Maricela Leyva Chavez ("Leyva Decl.") ¶ 11.)[4]

8      Nor does it appear that Section 27510's restrictions have had any significant

9 impact on the ability of Californians generally or Young Adults specifically to

10 obtain the requisite hunter education to secure a valid hunting license.  The

11 California Department of Fish and Wildlife reported that, as of October 31, 2019,

12 with two months of 2019 left to go, it had sold 193,771 annual resident hunting

13 licenses and 5,814 lifetime hunting licenses—numbers consistent with the reported

14 full-year numbers for each of the prior nine years.  (*See* Rosenberg Decl., Ex. 10,

15 Cal. Dept. Fish & Wildlife, Hunting License: Number Issued (2010s),

16 https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=59821&inline.)

17      Because Plaintiffs assert a facial challenge to SB 1100 and SB 61's

18 amendments to Section 27510, they "must establish that no set of circumstances

19 exists under which the [regulation or statute] would be valid."  *See United States v.*

20 *Salerno*, 481 U.S. 739, 745 (1987); *see also Chem. Specialties Mfrs. Ass'n, Inc. v.*

21 *Allenby*, 958 F.2d 941, 943 (9th Cir. 1992).  In other words, they must show that the

22 law is unconstitutional in *all* of its applications.  *See Wash. State Grange v. Wash.*

23 *State Republican Party*, 552 U.S. 442, 450 (2008).  Where, as here, laws have a

24 "plainly legitimate sweep," a facial challenge must fail.  *See id.* at 449 (citation and

25 internal quotations omitted).  Given the continued prevalence of both firearm sales

26 pursuant to available exemptions to Young Adults aged 18-20 and the unwavering

27

28              [4] These long gun transactions through FFLs included sales, private party transfers, pawn or consignment redemptions, and long gun loans.

21

1   rate of hunting license issuance following the enactment of SB 1100's limitations

2   on FFL sales and transfers, Plaintiffs cannot meet this demanding standard.

3             **c.**    **Limiting Sales and Transfers of Long Guns Through FFLs Appropriately Serves the Legislature's Desire to**

4                     **Limit Gun Violence Occasioned by Mass Shootings**

5         The Legislature's decision to limit access to firearms obtained from licensed

6   dealers in order to serve the interest of limiting gun violence effected through mass

7   shootings[5] is supported by evidence regarding the manner in which mass shooters

8   procure their weapons, the proliferation of mass shootings more generally, and—

9   despite Plaintiffs' contentions otherwise—the incidence of mass shootings by

10   Young Adults.  (*Contra* Mot. at 19-20.)

11         The Legislature's concern with instances of mass shootings was justified.  By

12   the end of July 2019, media reported that California had experienced 32 shootings

13   in which 4 or more people were injured or killed.  (Rosenberg Decl., Ex. 11, Eric

14   Escalante, *Nonprofit Marks El Paso Shooting as 250th Mass Shooting in the U.S. for*

15   *2019*, ABC10 (Aug. 3, 2019),

16   https://www.abc10.com/article/news/crime/nonprofit-marks-el-paso-shooting-as-

17   250th-mass-shooting-in-the-us-for-2019/103-128c6c17-89e5-4da6-8a1c-

18   7dcdde7df1d2.)  The San Francisco Chronicle reported on July 31, 2019, that

19   California had experienced 67 mass shootings in the last 2 decades, and that they

20   have become increasingly deadly, with all but two of the deadliest having occurred

21   between the years of 2011 and 2018.  (Rosenberg Decl., Ex. 12, Joaquin Palomino,

22   *Mass Shootings in California: Rare But Increasingly Deadly*, San Francisco

23   Chronicle (July 31, 2019), https://www.sfchronicle.com/crime/article/Mass-

24   shootings-in-California-Rare-but-14268411.php.)  And in 2014, both a study from

25   the Harvard School of Public Health and an FBI report confirmed that the incidence

26    

---

27       [5] Plaintiffs attempt to limit the scope of the Legislature's focus to "mass school shootings," but the Legislature's amendments to Section 27510 through SB 61 following the Poway synagogue shooting in April 2019 demonstrate that the

28   Legislature aimed to curtail incidences of mass shootings more generally.

of mass shootings in the United States *tripled* between 2011 and 2014.  (Rosenberg

Decl., Ex. 13, Mark Follman, *Yes, Mass Shootings Are Occurring More Often*,

Mother Jones (October 21, 2014),

https://www.motherjones.com/politics/2014/10/mass-shootings-rising-harvard/.)

Further, the vast majority of the guns used in mass shootings are procured

from dealers or other legal sources.  Mother Jones, a news organization that

maintains a database cataloguing mass shootings in the United States since 1982,

reports that of the 114 mass shootings in the United States from 1982 through

August 5, 2019, 74 percent involved firearms the shooter procured legally.  (*See*

Rosenberg Decl., Ex. 14, Luis Melgar and Lisa Dunn, *Since 1982, 74 Percent of*

*Mass Shooters Obtained Their Guns Legally*, Guns & America (Nov. 2, 2018),

https://gunsandamerica.org/story/18/11/02/since-1982-74-percent-of-mass-

shooters-obtained-their-guns-legally/ [citing Mark Follman, Gavin Aronsen, and

Deanna Pan, *US Mass Shootings, 1982-2019: Data From Mother Jones'*

*Investigation*, Mother Jones (updated Dec. 11, 2019, 9:15 AM), *Open Source*

*database available at* https://www.motherjones.com/politics/2012/12/mass-

shootings-mother-jones-full-data/]; *see also* Rosenberg Decl., Ex. 15, Larry

Buchanan et al., *How They Got Their Guns*, N.Y. Times (updated Feb. 16, 2018),

https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-

guns.html [*New York Times* reported in February 2018 that "A vast majority of

guns used in 19 recent mass shootings were bought legally and with a federal

background check," including the AR-15 style rifle used by 19-year-old Nikolas

Cruz in the Parkland, Florida shooting that killed 17 people) (cited with approval

as evidence lending "support to [a] legislature's conclusion that a law proscribing

semiautomatic assault weapons . . . will help curtail outbreaks of mass violence" in

*Worman v. Healey*, 922 F.3d 26, 40 (1st Cir. 2019)]).

And although Plaintiffs contend that age is not a significant factor in the

prevalence of mass shootings, their own evidence states that *14 percent* of mass

23

1  shootings were committed by youth aged 16-20.  (*See* ECF No. 21-17, Lott Decl. ¶

2  10, at 6.)  The Legislature rightfully could have determined that this number,

3  coupled with both the disproportionate propensity to commit homicide of 18-20

4  year-olds and the lack of emotional and impulse control of Young Adults in that

5  age group, supported a recalibration of access to firearms ensuring both more

6  limited access to deadly weapons, and a focus on firearm safety education.

### d.  SB 61's Further Limitations on Access to Semi-Automatic Centerfire Rifles Are Justified

9  Limiting access to semi-automatic centerfire rifles for Young Adults who the

10  social science establishes are generally more prone to impulsive or reckless

11  behavior as their brains continue to develop is one rooted in common sense.  There

12  can be no debate but that "[s]emiautomatic [] weapons permit a shooter to fire

13  multiple rounds very quickly, allowing him to hit more victims in a shorter period

14  of time," and that AR-15-style semi-automatic weapons (used with large capacity

15  magazines) "have been the weapons of choice in many of the deadliest mass

16  shootings in recent history, including horrific events in Pittsburgh (2018), Parkland

17  (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown

18  (2012), and Aurora (2012)."  *Worman*, 922 F.3d at 39.

19  Indeed, Plaintiffs' own exhibit touting "the practical benefits of being able to

20  engage [shoot] a lot of pigs at a time," to "take multiple shots without losing sight

21  of an animal" with a semi-automatic rifle (unlike with a bolt action rifle), and to

22  "take a quick follow-up shot" with an AR-15 style rifle "if you've got multiple

23  animals or you miss" underscores the inherently dangerous nature of semi-

24  automatic weapons when such weapons are placed in the hands of an untrained or

25  immature shooter: faster shooting, less opportunity for victims to escape, and the

26  ability to effect violence on multiple targets simultaneously.  (ECF No. 21-9,

27  Combs Decl., Ex. 18, at 0550-0551.)  And the social science and medical

28  community commentary overwhelmingly shows that the damage caused by the

higher caliber, higher speed bullets used in "modern sporting rifles" akin to the AR-15 and other semi-automatic centerfire rifles cause more traumatic injuries and result in a significantly higher incidence of persons wounded or killed.  (Rosenberg Decl., Ex. 16, Tim Craig et al., *As the Wounded Kept Coming, Hospitals Dealt with Injuries Rarely Seen in U.S.*, Wash. Post (Oct. 3, 2017), https://www.washingtonpost.com/national/health-science/as-the-wounded-kept-coming-hospitals-dealt-with-injuries-rarely-seen-in-the-us/2017/10/03/06210b86-a883-11e7-b3aa-c0e2e1d41e38_story.html?utm_term=.5a659eec267b ["If a 9mm bullet strikes someone in the liver . . . that person might suffer a wound perhaps an inch wide, . . . [b]ut if you're struck in the liver with an AR-15, it would be like dropping a watermelon onto the cement. It just is disintegrated." (internal quotation marks omitted)]; Rosenberg Decl., Ex.17, Elzerie de Jager, et al., *Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States*, 320 JAMA 10, at 1034-1035 (2018), https://doi.org/10.1001/jama.2018.11009 ["Semiautomatic rifles are designed for easy use . . . and fire high velocity bullets, enabling active shooters to wound and kill more people per incident."].)[6]  By limiting commercial sales or transfers to Young Adults of these destructive weapons to those with extensive safety and firearms training, the Legislature made reasonable judgments well-suited to protect the public's inarguable interest in public safety.

Further, the limitation on access to semi-automatic centerfire rifles will not substantially burden Young Adults who wish to purchase firearms for self-defense or other lawful uses.  *Cf. Pena*, 898 F.3d at 978 ("[B]eing unable to purchase a subset of semiautomatic weapons, without more, does not significantly burden the right to self-defense in the home." (citing *Heller*, 554 U.S. at 626)). Although semi-automatic rifles and shotguns *have* been popular in the past with Young Adults in California (Department of Justice data shows that between 2014 and December 23,

---

[6] *Accord Worman*, 922 F.3d at 39-40 (collecting authorities).

25

2019, Young Adults aged 18-20 completed 31,107 and 3,879 sale or transfer transactions of those firearms, respectively, and 20 transactions involving a combination of semi-automatic rifles and shotguns), Young Adults *also* purchased or received transfer of many other types of long guns in that same period, including pump-action shotguns (21,940 transactions), bolt action rifles (15,740 transactions), pump action rifles (197 transactions), lever action rifles (2,703 transactions), lever action shotguns (45 transactions), single shot shotguns (436 transactions), single shot rifles (223 transactions), and many others.  (Leyva Decl. ¶ 10.)  There are ample other options—popular options—available for those Young Adults who are (temporarily) unable to procure semi-automatic centerfire rifles by immediate family transfer.  (*See* ECF No. 21-9, Combs Decl., Ex. 18 at 00510 ["Bolt action rifles are the most common hunting rifles . . . today."].)

By contrast, the Legislature's intention to limit access to certain powerful and injurious firearms for those most likely to misuse them certainly "would be achieved less effectively absent" SB 61's limitation.  *Silvester*, 843 F.3d at 829.

## II.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY WILL SUFFER ANY IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF.

Plaintiffs have not and cannot establish that they will suffer any irreparable harm in the absence of preliminary injunctive relief, because they have not shown that they are likely to succeed on their Second Amendment claim.  *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).  Moreover, even if they could establish a likelihood of success on the merits, Plaintiffs' mere assertion of constitutional claims would not be dispositive on this factor.  *See Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction," even in the First Amendment context (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 112-13 (1983)); *Constructors Ass'n of W. Penna. v. Kreps*, 573 F.2d 811, 820 n. 33 (3d Cir. 1978) ("[U]nlike First Amendment rights whose

26

1    deprivation even from minimal periods of time constitutes irreparable injury,"

2    denial of other rights "may be more or less serious depending on the other injuries

3    which accompany such deprivation.").

4         Here, as discussed above, the Young Adults still retain the ability to possess

5    and use handguns and long guns—including semi-automatic centerfire rifles—for

6    the purposes of self-defense in the home and other lawful purposes.  Unless

7    otherwise prohibited by law, they may still receive transfers from parents,

8    grandparents, and spouses, practice at shooting ranges, receive loans of firearms for

9    limited periods of time under supervision or at a range, and purchase non-semi-

10   automatic centerfire long guns if they complete the requisite training and secure a

11   valid hunting license.  *See supra* __.  And any inconvenience they experience is

12   inherently only temporary, as they will be free of Section 27510's age limitations

13   on sales and transfers as soon as they turn 21.  *BATF*, 700 F.3d at 207; *Hirschfeld*,

14   2019 WL 4923955, at *6.  The harm Young Adults purportedly will suffer by the

15   imposition of this "mere condition or qualification" on commercial transactions

16   with FFLs is not substantial, even it imposes a modest inconvenience.  *Hirschfeld*,

17   2019 WL 4923955, at *6 (quotation marks and internal punctuation omitted).

18        Tellingly, *none* of the individual Plaintiffs alleged in the SAC or in their

19   declarations any desire to acquire a semi-automatic centerfire rifle, or even any

20   *particular* firearm.  None stated that he could not acquire a firearm of his choosing

21   through a parent, grandparent, or spouse (or that he had tried do so).  And none

22   stated that he even attempted to *seek out* firearm training or target practice

23   opportunities at a shooting range or gun club, where he could be loaned a firearm

24   for purposes of target and safe handling practice.  *Cf.* Cal. Pen. Code § 27910.  The

25   dealer Plaintiffs allege vaguely that they have ceased providing firearm safety and

26   hunting classes, but none alleges that any law enforcement authority has threatened

27   action for violation of Section 27510 based on the provision of any such

28   educational classes, or that such classes are generally unavailable to Young Adults.

27

Plaintiffs also cannot establish irreparable harm because the law they are challenging has been in effect for nearly a year (with the exception of the restriction relating to semi-automatic centerfire rifles imposed by SB 61, which will take effect January 1, 2020).  "A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action," even in cases alleging deprivation of fundamental rights.  *Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984) (considering First Amendment claim); *see also Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").  Indeed, a delay of eight months—even *less* than Plaintiffs' delay here—is enough for a district court to "'legitimately think it suspicious that the party who asks to preserve the status quo through interim relief has allowed the status quo to change through unexplained delay.'"  *Miller for & on Behalf of N.L.R.B. v. California Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) (citation omitted).

Moreover, Plaintiffs waited three months after filing their initial complaint and two months after filing their FAC to file their initial preliminary injunction motion, belying any contention that they believed they were experience grave and irreparable harm.  "There is no reason why plaintiffs could not have immediately moved for a preliminary injunction upon filing their suit, even assuming they were justified in waiting . . . to bring the action in the first place."  *Wiese v. Becerra*, No. 2:17-cv-903-WBS-KJN, 2017 WL 2619110, at *2 (E.D. Cal. June 16, 2017).

In short, Plaintiffs here do not seek to preserve the status quo that has existed for the past 12 months; instead, they ask the Court to roll back the clock despite

their own failure to move quickly to challenge the implementation of SB 1100, even though at least some subset of the Plaintiffs had knowledge of the effect SB 1100 would have on the transfer of long guns through licensed dealers months before SB 1100 was enacted.  (*See*, *e.g.*, ECF No. 21-8, Combs Decl. ¶ 4 [stating "FPC strongly opposed the legislation, Senate Bill 1100, (2017-2018 Reg. Sess.) ("SB 1100") that led to enactment of the challenged law"]; *id.*, Ex. 4 at 0021.)

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF.

In exercising sound discretion, a district court "must balance the competing claims of injury and consider the effect of granting or withholding the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).  Importantly, the balance of the equities and the public interest "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Indeed, "[t]he Ninth Circuit instructs that when balancing the hardships 'of the public interest against a private interest, the public interest should receive greater weight.'"  *Rupp*, 2018 WL 2138452, at *13 (denying preliminary injunction regarding provisions of California's Assault Weapons Control Act). These factors tip decidedly against granting Plaintiffs' motion.

Plaintiffs cannot demonstrate that it is in the public interest to enjoin a duly-enacted law designed to protect the public safety and reduce gun violence; with human lives on the line, the stakes for public safety are just too high.  *See United States v. Masciandaro*, 638 F.3d 458, 475-76 (4th Cir. 2011) (Wilkinson, J.) ("miscalculat[ion] as to Second Amendment rights" could lead to "unspeakably tragic act[s] of mayhem"); *accord Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193-94 (E.D. Cal. 2015), *aff'd* 637 F. App'x 401 (9th Cir. 2016).

The modest inconveniences any individual Young Adult may experience in procuring a hunting license in order to purchase a long gun, or lawfully securing a

29

firearm through a non-FFL transfer, do not outweigh the public safety interests discussed above. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (internal quotation marks omitted)); *Maryland v. King*, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quotation marks omitted)); *see also Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."). Accordingly, the law, the balance of harms, and the public interest all weigh decisively against entry of a preliminary injunction here.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Dated:  December 27, 2019

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
STEPAN A. HAYTAYAN
Supervising Deputy Attorney General

/s/ *Jennifer E. Rosenberg*
JENNIFER E. ROSENBERG
Deputy Attorney General
*Attorneys for Defendants Xavier Becerra, in his official capacity as Attorney General of the State of California, and Brent E. Orick, in his official capacity as Acting Director of the Department of Justice Bureau of Firearms*
Jennifer.Rosenberg@doj.ca.gov

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction  (3:19-cv-01226-L-AHG)