1  XAVIER BECERRA
   Attorney General of California
2  STEPAN A. HAYTAYAN
   Supervising Deputy Attorney General
3  JENNIFER E. ROSENBERG
   Deputy Attorney General
4  State Bar No. 275496
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013
     Telephone:  (213) 269-6617
6    Fax:  (916) 731-2124
     E-mail:  Jennifer.Rosenberg@doj.ca.gov
7  *Attorneys for Defendants Xavier Becerra, in*
   *his official capacity as Attorney General of*
8  *the State of California, and Brent E. Orick,*
   *in his official capacity as Acting Director of*
9  *the Department of Justice Bureau of*
   *Firearms*
10
                  IN THE UNITED STATES DISTRICT COURT
11
                FOR THE SOUTHERN DISTRICT OF CALIFORNIA
12

13

14

| | |
|---|---|
| 15  **MATTHEW JONES; et al.,** | 3:19-cv-01226-L-AHG |
| 16                          Plaintiffs, | |
| 17          **v.** | **DECLARATION OF JENNIFER E. ROSENBERG IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 18  **XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,** | |
| 19 | |
| 20                          Defendants. | **(Part 3 of 3)** |
| 21 | Judge:        Hon. M. James Lorenz and Magistrate Judge Barbara Lynn Major |
| 22 | |
| 23 | Action Filed:        July 1, 2019 |
| 24 | Second Amended Complaint Filed and |
| 25 | Served:        November 8, 2019 |
| 26 | No hearing set for this motion pursuant to Dkt. 23. |
| 27 | |
| 28 | |

# EXHIBIT 13

# MotherJones

**CRIME AND JUSTICE   OCTOBER 21, 2014**

## Yes, Mass Shootings Are Occurring More Often

*New research from Harvard shows a chilling rise in public mass shootings—and debunks a popular claim that they haven't increased.*

**MARK FOLLMAN**



**(Click to enlarge)**

*Editor's note: A version of this article first appeared in the* Los Angeles Times.

It's not a matter of if, but when and where the next mass shooting will happen: It might take place at another shopping mall, or college campus, or suburban office building, and probably not long from now. Yet, as these disturbing incidents keep appearing in the headlines, various commentators have argued that mass shootings are not on the rise.

That may be true if you look at all mass shootings, including gang killings and in-home violence stemming from domestic abuse. But new research from the Harvard School of Public Health demonstrates that mass shootings in public have become far more frequent. The Harvard findings are also corroborated by a separate report issued recently by the FBI.

After a heavily armed young man gunned down 12 people and wounded 58 others at a movie theater in Aurora, Colorado, in July 2012, my colleagues at *Mother Jones* and I began examining how often mass shootings in public places occurred. Finding no reliable answer, we set about gathering three decades of data. We discovered that such shootings were on the rise—even before the horror at Sandy Hook Elementary, the Washington Navy Yard, Ft. Hood, and near UC-Santa Barbara.

Though mass shootings make an outsize psychological impact, they are

**The FBI data is nearly identical to the data Mother Jones collected: "That the results of the two studies are so similar,"**

Though mass shootings make an outsize psychological impact, they are a tiny fraction of the nation's overall gun violence, which takes more than 30,000 lives annually. Rather than simply tallying the yearly number of mass shootings, Harvard researchers Amy Cohen, Deborah Azrael, and Matthew Miller determined that their frequency is best measured by tracking the time between each incident. This method, they explain, is most effective for detecting meaningful shifts in relatively small sets of data, such as the 69 mass shootings we documented. Their analysis of the data shows that from 1982 to 2011, mass shootings occurred every 200 days on average. Since late 2011, they found, mass shootings have occurred at triple that rate—every 64 days on average. (For more details on their analytical method, see this related piece.)

the Harvard researchers say, "reinforces our finding that public mass shootings have increased."

(**Click to enlarge**)

There has never been a clear, universally accepted definition of "mass shooting." The data we collected includes attacks in public places with four or more victims killed, a baseline established by the FBI a decade ago. We excluded mass murders in private homes related to domestic violence, as well as shootings tied to gang or other criminal activity. (Qualitative consistency is crucial, even though any definition can at times seem arbitrary. For example, by the four-fatality threshold neither the attack at Ft. Hood in April nor the one in

definition can at times seem arbitrary. For example, by the four-fatalities threshold neither the attack at Ft. Hood in April nor the one in Santa Barbara in May qualifies as a "mass shooting," with three victims killed by gunshots in each incident.) A report from the FBI on gun rampages, issued in late September, includes attacks with fewer than four fatalities but otherwise uses very similar criteria.

▬▬▬▬▬▬▬▬

## One criminologist argues that mass shootings are too rare to merit significant policy changes—and suggests that we may simply have to live with them.

The FBI report, which includes 160 "active shooter" cases between 2000 and 2013, notes explicitly that it is not a study of mass shootings. Rather, it analyzes incidents in which shooters are "actively engaged in killing or attempting to kill people" in a public place, regardless of the number of casualties. But within the FBI's 160 cases is a subset of 44 mass shootings (in which four or more were murdered) nearly identical to *Mother Jones*' data set from the same time period. The Harvard researchers underscore that the FBI had access to law enforcement sources that *Mother Jones* did not: "That the results of the two studies are so similar reinforces our finding that public mass shootings have increased."

James Alan Fox, a widely cited criminologist from Northeastern University, has argued that mass shootings are not on the rise, and that they are too rare to merit significant policy changes. As he put it recently in an interview with CNN's Jake Tapper: "We treasure our personal freedoms in America, and unfortunately, occasional mass shootings, as horrific as they are, is one of the prices that we pay for the freedoms that we enjoy."

But in drawing his conclusions, Fox relies on overly broad data. His study is misguided, the Harvard researchers say, because it conflates public mass shootings with a larger set of mass murders that are "contextually distinct," primarily those in private homes. According to data compiled by *USA Today*, there have been at least 95 domestic-violence-related mass shootings since 2006 alone. These crimes are no less awful (and we've reported on them too). But mass murders in schools and shopping malls are a different monster in terms of impact on public safety and the complicated policy questions they raise—not least how they might be stopped.

In response to the Harvard research, Fox insisted that mass shootings should not be distinguished categorically by their circumstances. "To the victims who are slain, it hardly matters whether they were killed in public or in a private home," he told the *Huffington Post*. "Nor does it matter if the assailant was a family member or a stranger. They are just as dead."

But the question of whether public mass shootings can be prevented hinges on understanding the complex factors behind them—which starts with tracking these shootings accurately. That, at least, is a role that the federal government is poised to assume: Last year President Obama signed the Investigative Assistance for Violent Crimes Act, which authorizes the Department of Justice to investigate mass shootings in public places. Notably, the law defines the threshold for these crimes as three or more people killed—which means eventually we'll have data showing that the scope of the problem is far greater than we've already seen.

*For more of **Mother Jones'** reporting on guns in America, see all of our latest coverage here, and our award-winning special reports.*

Copyright © 2019 Mother Jones and the Foundation for National Progress. All Rights Reserved.

# EXHIBIT 14

**WAMU** | NOV 2, 2018

# Since 1982, 74 Percent Of Mass Shooters Obtained Their Guns Legally

 Luis Melgar     Lisa Dunn



Since 1982, there have been 114 mass shootings in the U.S., most of them involved guns bought legally.

Luis Melgar / WAMU

In the aftermath of a mass shooting, a recurring question arises: How did the shooter get the gun?

In most cases, the perpetrator legally bought the firearms in question.

Case 3:19-cv-01226-L-AHG Document 23-4 Filed 12/27/19 PageID.4982 Page 8 of 42



Since 1982, there have been 114 mass shootings in the U.S.

Luis Melgar, WAMU / WAMU

Of the 114 mass shootings committed in the U.S. since 1982, 85 (or 74%) involved firearms obtained by legal means, as shown in this analysis of the mass shooting database created by news organization _Mother Jones_.



74% of the shootings involved firearms bought legally.

Luis Melgar / WAMU

## What's considered a "mass shooting"?

There is no standard definition of what constitutes a mass shooting, which can make analyzing mass shooting incidents difficult. It can also lead to different results in studies of mass shootings. More on that here.

*The Mother Jones* data used for this visual defines mass shootings as public attacks in which the shooter and victims were *generally* unknown to each other, and four or more people were killed. The data set excludes all multiple murders related to drugs, gangs or domestic violence.

## Where did the rest of the guns come from?

Seventeen of the guns used in mass shootings in the last 36 years — roughly 15% — were obtained in other ways:

- In **eight cases** shooters took their guns from family members

- In **four cases** they were purchased illegally

- In **three cases** they were stolen

- In **one case** the shooter illegally kept his gun after loosing his state firearms license, which required him to surrender his firearm

- And in **one case** the shooter illegally built their own firearms

## 74 + 15 does not equal 100. What about the other 10%?

In 12 of the mass shootings — roughly 10.5% — we don't know how the shooter obtained their firearms.

In the case of the shooter in Dayton, Ohio, he used a legal 100-round drum magazine attached to his gun, with which he fired 41 shots in 30 seconds.

In the aftermath of a mass shooting,
there's one recurring question:

How did the shooter
get **the gun?**

Most of the firearms used in mass shootings were bought legally.

Luis Melgar / WAMU

## Some other national studies on how mass shooters got their guns

While we started with data from *Mother Jones* for this visual, there are numerous other studies that support our findings and can provide further resources.

For example, *The New York Times* recently studied 19 mass shootings and found that in the vast majority (**more than 75%**) of instances the firearms used were bought legally with a federal background check. This group does not include the Tree of Life Synagogue shooting in Pittsburgh, but the ATF concluded the alleged perpetrator of that shooting legally purchased the 10 guns he owned, including those allegedly used in the shooting.

Last October, *The Washington Post* studied 156 public mass shootings in the U.S. dating back to 1966 and found that **77%** of the guns used (where there was information on how the gun was obtained) were bought legally.

Case 3:19-cv-01226-L-AHG   Document 25-4   Filed 12/27/19   PageID.4983   Page 11 of 42

In June 2018, the FBI studied dozens of active shooting incidents between 2000 and 2013 and found that **only 2%** of the active shooters studied purchased firearms *illegally*.

## Methodology

The data was compiled by *Mother Jones* and was updated by *Guns & America*. In some cases, additional reporting suggested changes to how Mother Jones had categorized the method the shooters used to obtain the firearms used.

*Guns & America is a public media reporting project on the role of guns in American life.*



FILED UNDER: Data Visualization, Explainer, News



### Luis Melgar

Luis Melgar is the data journalist for Guns & America, based in Washington, D.C.

## RELATED STORIES

**GUNS & AMERICA**, AUG 4

### What Is A Mass Shooting?



**WAMU**, AUG 23, 2018

### 6 Common Misconceptions About Mass Shooters



**GUNS & AMERICA**, SEP 2

### El Paso, Dayton, Odessa. Understanding Mass Shooting Trends In America

Ex. 14
Page 206

Case 3:19-cv-01226-L-AHG Document 25-4 Filed 12/27/19 PageID.4980 Page 12 of 42



**CONNECTICUT PUBLIC RADIO**, FEB 15

### The Disconnect Between Banning High-Capacity Magazines And Decreasing Deaths

3:47



# EXHIBIT 15

- Manage Account
- Today's Paper
- Tools & Services
- Jobs
- Classifieds
- Corrections
- More

**Site Mobile Navigation**

- Share

U.S.

# How They Got Their Guns

By LARRY BUCHANAN, JOSH KELLER, RICHARD A. OPPEL JR. and DANIEL VICTOR UPDATED FEB. 16, 2018

A vast majority of guns used in 19 recent mass shootings were bought legally and with a federal background check. At least nine gunmen had criminal histories or documented mental health problems that did not prevent them from obtaining their weapons. Related Article



FEB. 14, 2018

Seventeen people were killed when Nikolas Cruz, 19, opened fire at his former high school in Parkland, Fla., with a Smith & Wesson M&P semiautomatic rifle.

RELATED ARTICLE

---

**FEBRUARY 2017**

Mr. Cruz legally bought the AR-15-style rifle at Sunrise Tactical Supply in Florida.

**2017**

Mr. Cruz was expelled from Marjory Stoneman Douglas High School for disciplinary reasons. He was described as a "troubled kid" who enjoyed showing off his firearms and bragged about killing animals.

**JANUARY 2018**

A person close to Mr. Cruz warned the F.B.I. that Mr. Cruz had the potential to conduct a school shooting and a "desire to kill people, erratic behavior, and disturbing social media posts." The F.B.I. said it failed to act on the tip.

**FEB. 14, 2018**

Mr. Cruz killed 17 people at Marjory Stoneman Douglas High School.



NOV. 5, 2017

A gunman identified as Devin Patrick Kelley, 26, opened fire at a Sunday service in a rural Texas church, killing at least 26 people. The authorities said Mr. Kelley used a Ruger AR-15 variant, a knockoff of the standard service rifle carried by the American military.

RELATED ARTICLE

| 2012 | 2014 | 2016 - 2017 | NOV. 5, 2017 | NOV. 6, 2017 |
|---|---|---|---|---|
| Mr. Kelley, who was in the Air Force, was convicted of assaulting his wife and breaking his infant stepson's skull. An airman first class, he was sentenced to 12 months' confinement and a reduction to the lowest possible rank, E-1. | Mr. Kelley received a "bad conduct" discharge from the Air Force. | Mr. Kelley purchased two firearms — one in 2016 and one in 2017 — from two Academy Sports & Outdoors stores in San Antonio. He passed a federal background check in both cases , according to a statement released by the store. | Twenty-six people were killed and at least 20 more were wounded at the church shooting in Sutherland Springs. Mr. Kelley was later found dead in his vehicle. The police recovered two additional handguns from the car. | The Air Force admitted that it had failed to enter Mr. Kelley's domestic violence conviction into federal databases, which could have blocked him from buying the rifle he used in the massacre. |

OCT. 1, 2017

Fifty-eight people were killed and more than 500 were wounded when Stephen Paddock, from a perch high in a hotel, opened fire onto a crowd of concertgoers at an outdoor music festival in Las Vegas. Authorities recovered an arsenal of weapons — at least 23 from his hotel room — including AR-15-style rifles.

RELATED ARTICLE

SINCE 1982

Mr. Paddock started buying firearms in 1982, said Jill Snyder, a special agent in charge at the Bureau of Alcohol, Tobacco, Firearms and Explosives.

• WITHIN A YEAR OF THE SHOOTING

Mr. Paddock legally purchased 33 firearms from Oct. 2016 to Sept. 2017, Ms. Snyder said. Most of those guns were rifles. Such purchases do not prompt reports to the bureau because there is no federal law requiring a seller to alert the bureau when a person buys multiple rifles.

• OCT. 1

Fifty-eight people were killed when Mr. Paddock fired onto the crowd of more than 22,000 from his hotel room at the Mandalay Bay Resort and Casino in Las Vegas. He used at least one semiautomatic rifle modified to fire like an automatic weapon by attaching a "bump stock," not shown above.

• AFTER THE SHOOTING

Authorities retrieved 47 guns from the hotel room and Mr. Paddock's homes in Mesquite and Verdi, Nev. The bureau found Mr. Paddock purchased most of the guns in Nevada, Utah, California and Texas. Twelve of the rifles recovered from the hotel were each outfitted with a bump stock.

JUNE 12, 2016

Forty-nine people were killed and 53
wounded when Omar Mateen
opened fire at a crowded gay
nightclub in Orlando, Fla. He used
two guns: a Sig Sauer AR-15-style
assault rifle and a Glock handgun.

RELATED ARTICLE

2013

The F.B.I. learned that Mr. Mateen had made comments to co-workers alleging possible terrorist ties, an official said. The next year, the F.B.I. investigated him again for possible ties to an American who went to Syria to fight for an extremist group, but authorities concluded that he "did not constitute a substantive threat at that time."

A FEW DAYS BEFORE THE SHOOTING

Mr. Mateen  legally bought two guns , a federal official said. "He is not a prohibited person, so he can legally walk into a gun dealership and acquire and purchase firearms," said Trevor Velinor, an agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives.

JUNE 12, 2016

Forty-nine people were killed and 53 more were wounded in the crowded nightclub. Mr. Mateen was killed inside the club by the police.

DEC. 2, 2015

Syed Rizwan Farook and Tashfeen
Malik, husband and wife, killed 14
people at a holiday office party in
San Bernardino, Calif. Four guns
were recovered: a Smith & Wesson
M&P assault rifle, a DPMS Panther
Arms assault rifle, a Smith &

Wesson handgun and a Llama
handgun.

RELATED ARTICLE

---

**BEFORE THE SHOOTING**

"We believe that both subjects
were radicalized and for quite
some time," said David Bowdich,
the F.B.I. assistant director. The
attackers are not known to have
had previous contact with law
enforcement.

**BETWEEN 2007 AND 2012**

Mr. Farook bought the two
handguns legally in California,
federal officials said. The guns were
purchased at Annie's Get Your Gun,
a gun store in Corona, Calif., The
Los Angeles Times reported.

**BETWEEN 2007 AND 2012**

Enrique Marquez, a former neighbor of Mr.
Farook's family, bought the two assault rifles
in California, officials said. Mr. Marquez was
later charged with lying about the rifle
purchases and supplying the assault weapons
to the attackers.

**DEC. 2, 2015**

The couple killed 14 people
at a holiday party. Moments
before the attack began, Ms.
Malik posted an oath of
allegiance to the Islamic
State on Facebook.

OCT. 1, 2015

Christopher Harper-Mercer, 26, killed nine people at Umpqua Community College in Oregon, where he was a student. He was armed with six guns, including a Glock pistol, a Smith & Wesson pistol, a Taurus pistol and a Del-Ton assault rifle, according to The Associated Press.

RELATED ARTICLE

| | | | | |
|---|---|---|---|---|
| 2008 | 2009 | BEFORE SHOOTING | | OCT. 1, 2015 |

Mr. Harper-Mercer was in the Army for one month, but was discharged before completing basic training.

He graduated from the Switzer Learning Center in Torrance, Calif., which teaches students with learning disabilities and emotional issues.

In all, Mr. Harper-Mercer owned 14 firearms, all of which were bought legally through a federally licensed firearms dealer , a federal official said. Some were bought by Mr. Harper-Mercer, and some by members of his family.

He killed nine people in Roseburg, Ore.

AUG. 26, 2015

## Vester Lee Flanagan II, 41, shot and killed a Roanoke, Va., television reporter and a cameraman with a Glock handgun while they were reporting a story live.

RELATED ARTICLE

---

**2000**

Mr. Flanagan filed a lawsuit against a TV station in Tallahassee, Fla., that had fired him, alleging he was the victim of racial slurs and bullying.

**2012**

He was hired at WDBJ in Roanoke, but within months his bosses had documented problems with his harsh language and aggressive behavior. He was later fired and filed another harassment lawsuit.

**JUNE 2015**

Federal officials said Mr. Flanagan bought the gun legally from a licensed dealer . He had not been convicted of a crime or determined to be mentally ill.

**AUG. 26, 2015**

Mr. Flanagan killed the reporter and cameraman, injured a woman who was being interviewed and died after shooting himself.

JULY 23, 2015

## Using a .40-caliber semiautomatic pistol bought from a pawnshop, John R. Houser killed two people and wounded nine others at a movie theater in Lafayette, La.

RELATED ARTICLE

---

**2006**

Mr. Houser was denied a state-issued concealed weapons permit because he was accused of

**2008**

A judge ordered him sent to a psychiatric hospital.

**2014**

Mr. Houser bought the weapon in Alabama. Officials said it had been purchased legally , though he had been denied a concealed

**JULY 23, 2015**

He killed two people in Lafayette.

Ex. 15
Page 216

domestic violence and soliciting arson.

weapons permit earlier, and despite concerns among family members that he was violent and mentally ill.

JUNE 17, 2015

## Dylann Roof, 21, killed nine people with a .45-caliber Glock pistol at a historic black church in Charleston, S.C.

RELATED ARTICLE

---

**FEBRUARY 2015**

Mr. Roof was charged with a misdemeanor for possessing Suboxone, a prescription drug frequently sold in illegal street transactions.

**APRIL 2015**

He purchased a gun from a store in West Columbia, S.C. Mr. Roof should have been barred from buying a gun because he had admitted to possessing drugs, but the F.B.I. examiner conducting the required background check failed to obtain the police report from the February incident.

**JUNE 17, 2015**

Mr. Roof joined a Bible study group at Emanuel A.M.E. Church and opened fire with the gun he bought in April.

OCT. 24, 2014

## Jaylen Ray Fryberg, 15, used his father's Beretta pistol to shoot and kill four students in his high school's cafeteria in Marysville, Wash.

RELATED ARTICLE

---

**2002**

Raymond Lee Fryberg Jr., Jaylen's father, was the subject of a permanent domestic violence protection order, which should have been entered into the federal criminal background database.

**2013**

Mr. Fryberg applied to buy the Beretta from a gun shop on the Indian reservation where he lived with Jaylen. A background check failed to come up with the protection order because it was never entered into the system.

**OCT. 24, 2014**

Jaylen Fryberg texted five of his fellow students to come to the cafeteria, where he opened fire.

APRIL 2, 2014

Specialist Ivan Antonio Lopez
opened fire at Fort Hood with a
Smith & Wesson semiautomatic
pistol, killing three people and
wounding 16 others.

RELATED ARTICLE

---

**2011**

Specialist Lopez came back from a four-month deployment to Iraq and told his superiors that he had suffered a traumatic head injury there. Military officials said he had never seen combat and was being evaluated for possible post-traumatic stress disorder.

**MARCH 2014**

Specialist Lopez had seen a military psychiatrist as recently as the month before the shooting. He was being treated for depression and anxiety, and had been prescribed Ambien to help him sleep.

**MARCH 1, 2014**

Mr. Lopez legally bought his gun at the same shop where Nidal Malik Hasan, an Army major, had bought at least one of the weapons used in a 2009 mass shooting on the base that killed 13 people.

**APRIL 2, 2014**

Around 4 p.m., Mr. Lopez started firing on soldiers.

SEPT. 16, 2013

Aaron Alexis, 34, used a Remington shotgun
to kill 12 people at the Washington Navy Yard.

RELATED ARTICLE

---

| 2011 | | A MONTH BEFORE THE SHOOTING | | SEPT. 2013 | | SEPT. 16, 2013 |
|---|---|---|---|---|---|---|
| Mr. Alexis was given an honorable discharge after showing what Navy officials called a "pattern of | | He twice sought treatment from the Department of Veterans Affairs for psychiatric issues. He told police in Rhode Island that | | He was stopped from buying an assault rifle at a Virginia gun store, but was allowed to buy a shotgun. | | He killed 12 people at the Navy Yard. |

Ex. 15
Page 221

Case 3:19-cv-01226-L-AHG   Document 25-2   Filed 12/27/19   PageID.5001   Page 27 of 42

"misbehavior" during four years as a reservist.

people were pursuing him and sending vibrations through the walls of his hotel.

He passed local and state background checks.

DEC. 14, 2012

Adam Lanza, 20, shot and killed his mother in their home, then killed 26 people, mostly children, at Sandy Hook Elementary School in Newtown, Conn., using a Bushmaster XM-15 rifle and a .22-caliber Savage Mark II rifle.

RELATED ARTICLE

---

2009

Mr. Lanza graduated from high school. Some classmates said he had been bullied in high school. He struggled with a developmental disorder and was described as acutely shy, not known to have close friends.

AFTER HIGH SCHOOL

He was "completely untreated in the years before the shooting" for psychiatric and physical ailments like anxiety and obsessive-compulsive disorder, a state report found.

BEFORE THE SHOOTING

His mother, Nancy Lanza, a gun enthusiast, legally obtained and registered a large collection of weapons and would often take her sons to shooting ranges.

DEC. 14, 2012

Mr. Lanza used his mother's guns to kill her and 26 others.

AUG. 5, 2012

Wade M. Page, 40, killed six people with a Springfield Armory semiautomatic handgun when he opened fire in the lobby of a Sikh temple in Oak Creek, Wis., as congregants arrived for Sunday services.

RELATED ARTICLE

---

1994

While in the Army at Fort Bliss in El Paso, Tex., Mr. Page was charged with criminal mischief after kicking

EARLY 2000S

He came to the attention of authorities because of his affiliation with a white-power

JULY 2012

He bought the firearm legally at a gun shop outside Milwaukee. He

AUG. 5, 2012

He killed six people and wounded three

Ex. 15
Page 222

Case 3:19-cv-01226-L-AHG   Document 25-4   Filed 12/27/19   PageID.5002   Page 28 of 42

holes in the wall of a bar. He pleaded guilty.

band called End Apathy, which performed songs with violent lyrics.

passed a background check and paid $650 in cash.

others at the temple.

https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-guns.html                                    18/23

JULY 20, 2012

James E. Holmes, 24, killed 12
people and wounded 70 at a theater
in Aurora, Colo., using a Smith &
Wesson semiautomatic rifle, a
Remington shotgun and a Glock .40-
caliber semiautomatic pistol.

RELATED ARTICLE

**MARCH 2012**

Over four months, Mr. Holmes legally bought more than 3,000 rounds of ammunition for handguns, 3,000 rounds for a semiautomatic rifle and 350 shells for a 12-gauge shotgun, all over the Internet.

**MAY 2012**

He was seeing a psychiatrist and in the process of withdrawing from a graduate program at the University of Colorado Denver's Anschutz Medical Campus.

**MAY 2012**

In the 60 days before the shooting, he bought four guns legally at local gun shops . Seeing a psychiatrist, even for a serious mental illness, would not disqualify him from buying a gun.

**JULY 20, 2012**

He opened fire in the theater, killing 12 people.

APRIL 2, 2012

One L. Goh, 43, opened fire with a semiautomatic handgun at a small religious college in Oakland, Calif., where he had been a student. He killed seven people.

RELATED ARTICLE

**BEFORE SHOOTING**

"He was a loner and what some might call a loser, but he didn't exhibit any behaviors that would have alerted anyone," a district attorney told reporters after the shooting, according to CNN.

**EARLY 2012**

Mr. Goh legally bought the handgun at a gun store in Castro Valley, Calif. , passing a federal background check.

**APRIL 2, 2012**

He killed seven people at Oikos University in Oakland.

**JAN. 2013**

A judge ruled he was not fit for trial after two psychiatric evaluations concluded that he had paranoid schizophrenia.

JAN. 8, 2011

Jared L. Loughner, 22, killed six people with a Glock handgun in a supermarket parking lot in Tucson, Ariz., at an event for Gabrielle Giffords, who was a Democratic representative from Arizona.

RELATED ARTICLE

2007       OCT. 2010       NOV. 30, 2010       JAN. 8, 2011

Mr. Loughner was arrested for possession of drug paraphernalia, but the charges were dropped. The next year, he failed a drug test when trying to enlist in the Army. Neither incident barred him from buying a gun.

He was forced to withdraw from community college because of campus officials' fears about the safety of the staff and students, his parents later said. The incident would not have shown up on a background check.

He passed a background check and bought the handgun at a store in Tucson, Ariz.

He killed six people in Tucson.

NOV. 5, 2009

Maj. Nidal Malik Hasan, 39, an Army psychiatrist facing deployment to Afghanistan, opened fire inside a medical processing building at Fort Hood in central Texas, killing 13 people and wounding 43 others. He was armed with an FN Herstal pistol.

RELATED ARTICLE

DEC. 2008-JUNE 2009

Intelligence agencies intercepted 10 to 20 messages between Mr. Hasan and Anwar al-Awlaki, a radical cleric in Yemen known for his incendiary anti-American teachings.

JUNE 2009

Federal authorities dropped an inquiry about the messages after deciding that they did not suggest any threat of violence.

JULY 31, 2009

Mr. Hasan bought the pistol legally at a popular weapons store in Killeen, Tex., paying more than $1,100.

NOV. 5, 2009

He shot and killed 13 people at Ford Hood.

APRIL 3, 2009

Jiverly Wong, 41, fired at least 98 shots from two handguns, a Beretta 92 FS 9-millimeter pistol and a Beretta PX4 Storm pistol, inside a civic association in Binghamton, N.Y., where he had taken an English class. He killed 13 former classmates and association employees.

RELATED ARTICLE

**BEFORE THE SHOOTING**

Mr. Wong had been arrested, cited or had some minor contact with the police at least five times since 1990, but details about the cases remain unclear. At the time of the shootings, he was not a subject in any investigation, nor did he have a documented mental health issue.

**MARCH 2008**

Mr. Wong bought the first gun, the Beretta 92, at a store in Johnson City, N.Y.  He passed a background check.

**MARCH 2009**

Mr. Wong bought the second gun from the same store, but his background check was not approved immediately.  He received the gun under a federal rule that allows a gun to be sold if the background check system does not return a decision in three business days.

**APRIL 3, 2009**

He killed 13 people in Binghamton.

Note: Information on the precise version or year of manufacture of each gun was not always available, so a version of the model or a similar one is shown. The handguns used by Christopher Harper-Mercer are omitted because the models have not been released. The guns shown for Adam Lanza do not include the gun he used to shoot himself.

Source: Government and law enforcement officials

Additional work by Wilson Andrews, Sarah Almukhtar, Alicia DeSantis, Guilbert Gates, Josh Katz, Julie Shaver and Karen Yourish.

- Email
- Share
- Tweet
- More

## Orlando Shooting



### Why the Orlando Shooting Was So Deadly

June 16, 2016

# EXHIBIT 16

The Washington Post

**Health Science**

# As the wounded kept coming, hospitals dealt with injuries rarely seen in the U.S.

By Tim Craig ,
Felicia Mello and
Lena H. Sun

October 3, 2017

LAS VEGAS — As trauma nurse Renae Huening rushed into Sunrise Hospital and Medical Center on Sunday night, she "followed a trail of blood indoors."

Dozens of patients already were crammed into the waiting area, hallways and rooms of the hospital's emergency department. Some were "red-tagged," meaning they needed attention immediately. Names were being assigned randomly because there was no time to register people or find IDs.

Huening could smell the blood.

"The air smells like iron," she recalled Tuesday, barely 24 hours after hundreds of doctors and nurses throughout Las Vegas treated more than 500 victims of the worst mass shooting in modern U.S. history.

"You're standing in a pool of blood trying to care for your patient, slipping and sliding," Huening said. "Soon you're covered in blood yourself."

As investigators fill in the details of Stephen Paddock's rampage during a country music festival along the Las Vegas Strip, doctors, nurses and paramedics are recounting injuries they say are rarely seen in this country. And even the hardiest medical professionals acknowledged being rattled.

With Paddock perched on the 32nd floor of the Mandalay Bay Resort and Casino and firing military-style rifles onto the crowd of concertgoers below, the scale and degree of physical damage were extreme.

So many patients poured into the city's hospitals that pediatric surgeons were operating on adults and obstetricians were attending to trauma patients.

Many of the most critically wounded patients arrived at the 541-bed University Medical Center of Southern Nevada, the state's only Level One trauma center. Over about four hours, it received 104 patients. More than 80 percent were gunshot victims.

Douglas R. Fraser, the hospital's chief of trauma surgery, struggled with other doctors there to deal with bullet wounds in torsos and limbs that had shredded human flesh into "unusual patterns," caused "extreme fractures" and bounced through bodies with horrific force.

"These were quite large wounds that we saw," he said Tuesday. "The fractured shrapnel created a different pattern and really injured bone and soft tissue very readily. This was not a normal pattern of injuries."

Gun deaths are this nation's third-leading cause of injury-
related fatalities, with the most recent data showing that firearms accounted for more than 36,200 deaths in 2015. Over a nine-year period, according to data from the Centers for Disease Control and Prevention, almost 971,000 people were hurt or killed by firearms in the United States — with a just-released study finding that such injuries cost nearly $25 billion in hospital emergency and inpatient care from 2006 to 2014.

The devastation that semiautomatic rifles cause to the human body is extreme because they put vastly more energy behind bullets than handguns do.

The velocity of a bullet fired from a typical 9mm handgun is 1,200 feet per second. From an AR-15 semiautomatic, the bullet travels roughly three times faster, and the body must absorb all of that energy.

If a 9mm bullet strikes someone in the liver, for example, that person might suffer a wound perhaps an inch wide, said Ernest E. Moore, a longtime trauma surgeon at Denver Health and editor of the Journal of Trauma and Acute Care Surgery. "But if you're struck in the liver with an AR-15, it would be like dropping a watermelon onto the cement. It just is disintegrated."

Survival generally depends on several factors: the position of the body when it was struck and its distance from the weapon; the velocity of the bullet and the type used; and the location of the entry wound and path the bullet follows before it exits — if it exits at all.

Once inside the body, a high-velocity bullet causes a shock wave as it blasts through tissue. The reverberations expand outward, causing more harm.

"When that happens, it stretches all the blood vessels and tears them, and you lose blood supply to the entire area," said Faran Bokhari, chairman of the Trauma and Burn Unit at Cook County Health and Hospitals System in Chicago, which sees 1,000 gunshot victims a year.

By contrast, even a grievous knife wound damages only the organs and tissues directly in its path.

About half of the victims taken to University Medical Center suffered graze wounds, probably from bullets that ricocheted off the ground, Fraser said. Other patients may have been struck by bullets that passed through

other victims. Some were hurt as they tried to flee — or were trampled in the panic.

But 30 were in critical condition after suffering direct hits, he said.

Across the city, hospital administrators called in their entire staffs within minutes of hearing of the shooting and mass casualties. Elite neurosurgeons were mobilized. Environmental technicians were tasked with cleaning up blood.

And the patients just kept coming — by ambulance, in the beds of pickup trucks, in the backs of SUVs.

Of those who arrived at University Medical Center, Fraser believes, doctors were unable to revive only one — someone who had been shot in the head.

"A lot of the injuries were gunshots to the chest," Fraser said. He spoke Tuesday as a professional, matter of fact rather than emotional. "Many did not require surgery but required chest tubes to the chest so they could breathe better. The other patients had surgery to remove holes to their bowels and intestines."

For hours, some patients were in danger of suffocating on their own blood. So many wounds resembled those most often seen on battlefields that the hospital quickly contacted four Air Force trauma surgeons who happened to be participating in a visiting-fellow program there.

"They are used to seeing those things," Fraser said.

At one point early Monday, surgeons were conducting five operations simultaneously. "They just came in by the dozens — some of them in a bed, some on a seat — and we just tried to make room for these folks," said Syed Saquib, who was the chief surgeon on duty.

About five miles away at Sunrise Hospital, 214 patients were treated in three hours — nearly the number typically seen in a day.

Scott Scherr, the director of emergency medicine, got to his hospital about 30 minutes after the attack began, breaking "every traffic law in Las Vegas" along the way.

The scene inside stunned him. He remembers blood pouring off gurneys.

"That moment was shocking, but as soon as that moment passed, I knew I had a job to do," Scherr said. He would end up working 20 straight hours.

Hospital staffers gave each patient red or green triage tags identifying the degree of their injuries. When beds filled up, some of the less injured sat on the floor.

Identifying the most critical wasn't always easy. Bullets can tumble as they pierce a body, meaning that even a patient with a small hole in a shoulder could have a tear in a lung or aorta, too.

"They look okay, but they can turn in a heartbeat," said Huening, the trauma nurse.

The surgeries were back to back and seemingly endless. Anesthesiologist Dean Polce was involved in 27 operations. Twenty-six of the patients lived, he said Tuesday, breaking down as he spoke.

"I wish we could have done more," Polce said, lowering his eyes as he choked up. "Where that bullet goes in the body is really hard to guess."

There weren't enough X-ray machines at times, given the volume. Some supplies ran low. At one point, the emergency room ran out of chest tubes, and staff from nearby MountainView Hospital drove over with a pickup truck full of them.

Certified nursing assistant Jacqueline Rodriguez said she can't forget one patient, clearly very scared, who needed a chest tube inserted quickly.

"I saw the look of terror in her eyes. I said, 'Squeeze my hand, scream, do whatever you need to do. It's going to hurt, but years later, you're going to look back at this, and you're going to be alive.' "

*Sun reported from Washington. Heather Long and Lynh Bui in Las Vegas contributed to this report.*

💬 **442 Comments**

**Tim Craig**
Tim Craig is a national reporter on the America desk. He previously served as head of The Washington Post's Afghanistan-Pakistan bureau, based in Islamabad and Kabul. He has also reported from Iraq, the District and Baltimore.  Follow 🐦

**Lena H. Sun**
Lena H. Sun is a national reporter for The Washington Post covering health with a special focus on public health and infectious disease. A longtime reporter at The Post, she has covered the Metro transit system, immigration, education and was a Beijing bureau chief.  Follow 🐦

The Washington Post

Get one year of access for only $30.

# EXHIBIT 17

# Letters

RESEARCH LETTER

## Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States

Semiautomatic rifles have been used in some of the largest active shooter incidents in US history.[1] The weapons were banned in 1994 under the federal assault weapons ban but were reintroduced to the public marketplace in 2004.[2] Currently, there are no comprehensive assessments of injuries from different types of firearms. We compared the number of persons wounded, killed, and either wounded or killed during active shooter incidents with and without semiautomatic rifles.

**Methods** | An active shooter incident is defined by the Federal Bureau of Investigation (FBI) as a situation in which an individual is actively engaged in killing or attempting to kill people in a confined or populated area.[3] The FBI has tracked all active shooter incidents since 2000 and has the most comprehensive data set available.[3] We retrieved active shooter incident characteristics from the publicly accessible FBI database through 2017 (accessed May 18, 2018).[3] For each incident, we extracted shooter age, name, year, location (city and state), number of people wounded, killed, and wounded or killed, place of shooting (commerce, education, government, open space, residences, health care, and house of worship), and type of firearms present (rifle, shotgun, handgun).

The FBI reports do not distinguish whether a rifle was semiautomatic; therefore, for each incident in which the FBI reported that a rifle was present, a media content analysis was performed to identify semiautomatic rifle presence. An a priori search hierarchy was established in which the primary data sources were court and police documents or statements (44.9%; 35 of 78), and secondary data sources were news articles. At least 3 news articles from different media outlets were required to triangulate data. No discrepancies among sources were found. All incidents with the presence of a semiautomatic rifle were classified as semiautomatic rifle incidents regardless of other firearm presence. The Las Vegas, Nevada, shooting, which represented a statistical outlier, and the San Bernardino, California, shooting, which had more than 1 shooter present, were excluded. Negative binomial regression was used to estimate the association between presence of a semiautomatic rifle and the total numbers nonfatally wounded, killed, and either wounded or killed, and the percentage of persons who died if wounded at the incident, controlling for the place and year of shooting and the presence of other firearms. Significance was set at $P < .05$ (2-sided). Stata version 15.1 was used for analysis.

**Results** | Of the 248 active shooter incidents, 76 involved a rifle, and we identified the type in all instances. A semiautomatic rifle

was involved in 24.6% (n = 61) of incidents, and 75.4% (n = 187) involved handguns (n = 154), shotguns (n = 38), and non-semiautomatic rifles (n = 15). Multiple firearm types were involved in 60.7% (n = 37 of 61) of semiautomatic rifle incidents and 25.1% (n = 47) of non-semiautomatic rifle incidents.

There were 898 persons wounded and 718 killed. Active shooter incidents with vs without the presence of a semiautomatic rifle were associated with a higher incidence of persons wounded (unadjusted mean, 5.48 vs 3.02; incidence rate ratio [IRR], 1.81 [95% CI, 1.30-2.53]), killed (mean, 4.25 vs 2.49; IRR, 1.97 [95% CI, 1.38-2.80]), and wounded or killed (mean, 9.72 vs 5.47; IRR, 1.91 [95% CI, 1.46-2.50]) (**Figure**). The percentage of persons who died if wounded in incidents with a semiautomatic rifle (43.7% [n = 259 of 593]) was similar to the percentage who died in incidents without a semiautomatic rifle (44.9% [n = 459 of 1023]) (IRR, 0.99 [95% CI, 0.60-1.61]).

**Discussion** | Although 44% of persons wounded in active shooter incidents died of their injuries, irrespective of the type of firearm used, more people were wounded and killed in incidents in which semiautomatic rifles were used compared with incidents involving other firearms. Semiautomatic rifles are designed for easy use, can accept large magazines, and fire high-velocity bullets, enabling active shooters to wound and kill more people per incident.[4]

Limitations of this study include the lack of data on specific injuries, demographics, and other details of the incidents. Incidents involving semiautomatic rifles may differ from other incidents in ways that may partially explain the association but could not be controlled (ie, intentionality of the shooter). This lack of data highlights the need for a national centralized database to inform the debate on an assault weapons ban.



**Figure. Unadjusted Mean Number of Victims Injured and Killed per Active Shooter Incident With and Without Semiautomatic Rifles**

The error bars indicate 95% CIs.

© 2018 American Medical Association. All rights reserved.

Exhibit 7
Page 236

Downloaded From: https://jamanetwork.com/ by a John Jay College of Criminal Justice User  on 12/27/2019

Elzerie de Jager, MBBS(Hons)
Eric Goralnick, MD, MS
Justin C. McCarty, DO
Zain G. Hashmi, MBBS
Molly P. Jarman, PhD, MPH
Adil H. Haider, MD, MPH

**Author Affiliations:** Center for Surgery and Public Health (CSPH), Brigham and Women's Hospital, Boston, Massachusetts (de Jager, McCarty, Hashmi, Jarman, Haider); Department of Emergency Medicine, Brigham and Women's Hospital, Boston, Massachusetts (Goralnick).

**Accepted for Publication:** July 11, 2018.

**Corresponding Author:** Adil H. Haider, MD, MPH, Center for Surgery and Public Health, Brigham and Women's Hospital, 75 Francis St, Boston, MA 02115 (ahhaider@bwh.harvard.edu).

**Author Contributions:** Dr Haider had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Concept and design:* De Jager, Goralnick, McCarty, Hashmi, Haider.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* De Jager, Goralnick, McCarty, Haider.
*Critical revision of the manuscript for important intellectual content:* De Jager, Goralnick, McCarty, Hashmi, Jarman, Haider.
*Statistical analysis:* Goralnick, McCarty, Hashmi, Jarman, Haider.
*Administrative, technical, or material support:* De Jager, Goralnick, McCarty, Haider.
*Supervision:* Goralnick, Haider.

**Conflict of Interest Disclosures:** All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest. Dr Haider reports stock holdings and being cofounder of Patient Doctor Technologies. No other disclosures were reported.

1. Cummings W, Jansen B. Why the AR-15 keeps appearing at America's deadliest mass shootings. *USA Today.* February 14, 2018. https://www.usatoday.com/story/news/nation/2018/02/14/ar-15-mass-shootings/339519002/. Accessed February 23, 2018.

2. Koper CS, Roth JA. The impact of the 1994 federal assault weapons ban on gun markets: an assessment of short-term primary and secondary market effects. *J Quant Criminol.* 2002;18(3):239-266. doi:10.1023/A:1016055919939

3. Federal Bureau of Investigation. Active shooter resources, Advanced Law Enforcement Rapid Response Training (ALERRT) Center at Texas State University, FBI resources. 2018. https://www.fbi.gov/about/partnerships/office-of-partner-engagement/active-shooter-resources Accessed May 18, 2018.

4. Coble YD, Eisenbrey AB, Estes EH, et al; Council on Scientific Affairs, American Medical Association. Assault weapons as a public health hazard in the United States. *JAMA.* 1992;267(22):3067-3070. doi:10.1001/jama.1992.03480220085033

## COMMENT & RESPONSE

### Antiplatelet Therapy After Coronary Artery Bypass Grafting

**To the Editor** Dr Zhao and colleagues concluded that among patients undergoing elective coronary artery bypass graft (CABG) surgery with saphenous vein grafting, ticagrelor plus aspirin significantly increased graft patency after 1 year vs aspirin alone.[1] However, based on current best evidence and standards of care, the aspirin dosage (100 mg/d) used in this study for the aspirin-alone group may have been suboptimal.[2]

The largest placebo-controlled trial to date in this field was the Veterans Administration Cooperative Study.[3] The aspirin dosage in this trial was 325 mg/d. The 1-year graft occlusion rate in the aspirin-alone group was lower than that noted by Zhao and colleagues (15.8% vs 23.5%). Similarly, a previous meta-analysis of 5 randomized clinical trials suggested that

a medium dosage of aspirin (300-325 mg/d) more successfully reduced graft occlusion within the first year of CABG than low-dosage regimes (50-100 mg/d).[4] In addition, pharmacokinetic studies have shown that an aspirin dose of 100 mg is sufficient to suppress thromboxane synthesis in healthy controls but ineffective at suppressing platelet thromboxane formation in the majority of post-CABG patients.[2,5] This observation reflects the phenomenon of platelet resistance during the post-CABG period, which is believed to be due to the effects of cardiopulmonary bypass and surgical trauma.[2,5] Therefore, current scientific guidelines prefer a higher aspirin dosage (>100 mg/d) early after CABG to improve graft patency.[2]

In the study by Zhao and colleagues, the dosage of aspirin administered in the aspirin alone group may have been suboptimal, which could have confounded their findings by favoring the ticagrelor plus aspirin group. Furthermore, any new therapy must be compared with the currently best available therapy, which was not done in this study.[2] Therefore, the generalizability of these findings is of potential concern.

Rahman Shah, MD
Kirstin Hesterberg, DO

**Author Affiliations:** Division of Cardiology, University of Tennessee School of Medicine, Memphis.

**Corresponding Author:** Rahman Shah, MD, Section of Cardiovascular Medicine, University of Tennessee School of Medicine, 1030 Jefferson Ave, Memphis, TN 38104 (shahcardiology@yahoo.com).

**Conflict of Interest Disclosures:** The authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest and none were reported.

1. Zhao Q, Zhu Y, Xu Z, et al. Effect of ticagrelor plus aspirin, ticagrelor alone, or aspirin alone on saphenous vein graft patency 1 year after coronary artery bypass grafting: a randomized clinical trial. *JAMA.* 2018;319(16):1677-1686. doi:10.1001/jama.2018.3197

2. Kulik A, Ruel M, Jneid H, et al. Secondary prevention after coronary artery bypass graft surgery: a scientific statement from the American Heart Association. *Circulation.* 2015;131(10):927-964. doi:10.1161/CIR.0000000000000182

3. Goldman S, Copeland J, Moritz T, et al. Improvement in early saphenous vein graft patency after coronary artery bypass surgery with antiplatelet therapy: results of a Veterans Administration Cooperative Study. *Circulation.* 1988;77(6):1324-1332. doi:10.1161/01.CIR.77.6.1324

4. Lim E, Ali Z, Ali A, et al. Indirect comparison meta-analysis of aspirin therapy after coronary surgery. *BMJ.* 2003;327(7427):1309. doi:10.1136/bmj.327.7427.1309

5. Zimmermann N, Kienzle P, Weber AA, et al. Aspirin resistance after coronary artery bypass grafting. *J Thorac Cardiovasc Surg.* 2001;121(5):982-984. doi:10.1067/mtc.2001.111416

**To the Editor** The Different Antiplatelet Therapy Strategy After Coronary Artery Bypass Graft Surgery (DACAB) trial provides needed insight into the utility of dual antiplatelet therapy (DAPT) with ticagrelor as the second agent in patients undergoing CABG.[1] The current American Heart Association and American College of Cardiology (AHA/ACC) guideline is based on limited evidence and restricted to resumption of DAPT in patients who present with acute coronary syndrome. Consequently, intersurgeon variability in DAPT use is high with a relatively low rate of DAPT use.[2]

Several trial characteristics deserve attention in evaluating the clinical applicability of the findings.

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by a John Jay College of Criminal Justice User on 12/27/2019

Ex. 17
Page 237