1  Robert A. Sacks (Bar No. 150146)
   SULLIVAN & CROMWELL LLP
2  1888 Century Park East
   Los Angeles, California 90067
3  Telephone:   (310) 712-6600
   Facsimile:    (310) 712-8800
4

5  Attorney for *Amicus Curiae*
   Giffords Law Center to Prevent Gun Violence
6

7  [ADDITIONAL COUNSEL ON SIGNATURE PAGE]

8

9                 UNITED STATES DISTRICT COURT

10              SOUTHERN DISTRICT OF CALIFORNIA

11

12 MATTHEW JONES, et al.,          )   Case No.: 3:19-cv-01226-L-AHG
                                   )
13                 Plaintiffs,     )   BRIEF OF *AMICUS CURIAE*
                                   )   GIFFORDS LAW CENTER TO
14        v.                       )   PREVENT GUN VIOLENCE IN
                                   )   SUPPORT OF DEFENDANTS'
15 XAVIER BECERRA, in his          )   OPPOSITION TO PLAINTIFFS'
   official capacity as Attorney   )   MOTION FOR PRELIMINARY
16 General of the State of         )   INJUNCTION
   California, et al.,             )   _____
17                 Defendants.     )
                                   )   Judges:   Honorable M. James Lorenz
18                                 )   and Magistrate Judge Allison H.
                                   )   Goddard
19 _____  )
                                   )   No hearing set for this motion pursuant
20                                     to Dkt. 23.

21

22

23

24

25

26

27

28

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Giffords Law Center to Prevent Gun Violence has no parent corporations.  It has no stock and hence no publicly held company owns 10% or more of its stock.

-i-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-CV-01226-L-AHG)

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 2

ARGUMENT ................................................................................................................... 4

I.    At Most, Section 27510 Is Subject to Intermediate Scrutiny. .................. 5

II.   Section 27510 Easily Satisfies Intermediate Scrutiny. ........................... 7

      A.    Legislative History Demonstrates that Section 27510 Is a Commonsense and Targeted Response to a Grave Public Safety Risk. ................................................................................ 8

      B.    Scientific Research Confirms that the Legislature's Concerns Were Well Founded and Its Solution Is Data-Driven. ...................................................................................... 10

            1.    Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes, Including Homicide, by Firearm. ..................... 11

            2.    Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts. ......................................... 14

            3.    State-Level Gun Control Measures, Including Age Restrictions, Are Effective. ................................. 16

III.   Plaintiffs Rely on Dubious Evidence from a Widely Discredited Declarant. ................................................................................. 18

      A.    Mr. Lott's Research Methodologies Have Been Widely Criticized. ........................................................................ 19

      B.    Mr. Lott Has a History of Failing to Provide Data and Evidence to Back up His Claims. ............................... 21

      C.    Mr. Lott's Work Is Rarely Published in Peer-Reviewed Journals. .............................................................. 22

      D.    Mr. Lott Has Committed Several Ethical Violations to Defend His Work from Criticism. ............................. 22

-ii-

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

SULLIVAN & CROMWELL LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs* v. *AG N.J.*,
    910 F.3d 106 (3d Cir. 2018) ................................................................. 1

*City of Renton* v. *Playtime Theatres, Inc.*,
    475 U.S. 41 (1986) ......................................................................... 8

*Daubert* v. *Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...................................................................... 22

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008) ............................................................... 1, 5, 6

*Fyock* v. *City of Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) ................................................. 1, 8, 16

*Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    2019 WL 4923955 (W.D. Va. Oct. 4, 2019) ........................................ 1

*Jackson* v. *City & Cty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ........................................................ 4, 6

*Kansas* v. *Hendricks*,
    521 U.S. 346 (1997) ...................................................................... 23

*Mahoney* v. *Sessions*,
    871 F.3d 873 (9th Cir. 2017) ......................................................... 24

*Marshall* v. *United States*,
    414 U.S. 417 (1974) ...................................................................... 23

*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010) ........................................................................ 1

*Md. Shall Issue* v. *Hogan*,
    353 F. Supp. 3d 400 (D. Md. 2018) .................................................. 1

*Nat'l Paint & Coatings Ass'n v. City of Chicago*,
    45 F.3d 1124 (7th Cir. 1995) ......................................................... 18

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

*Nat'l Rifle Assoc. of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives,*
700 F.3d 185 (5th Cir. 2012) ........................................................................ 10, 11

*Paris Adult Theatre I* v. *Slaton,*
413 U.S. 49 (1973) ........................................................................................ 23

*Pena* v. *Lindley,*
898 F.3d 969 (9th Cir. 2018) ..................................................................... 7, 8

*People* v. *Fields,*
24 N.E.3d 326 (Ill. App. Ct. 2014) ............................................................ 13

*Peruta* v. *Cty. of San Diego,*
824 F.3d 919 (9th Cir. 2016) (*en banc*) ...................................................... 1

*Silvester* v. *Harris,*
843 F.3d 816 (9th Cir. 2016) ..................................................................... 5, 6

*Stimmel* v. *Sessions,*
879 F.3d 198 (6th Cir. 2018) ......................................................................... 1

*Teixeira* v. *Cty. of Alameda,*
873 F.3d 670 (9th Cir. 2017) (*en banc*) ................................................... 1, 4

*Turner Broad. Sys., Inc.* v. *FCC,*
520 U.S. 180 (1997) ........................................................................................ 8

*United States* v. *Chovan,*
735 F.3d 1127 (9th Cir. 2013) ............................................................. 4, 5, 6, 7

*United States* v. *Torres,*
911 F.3d 1253 (9th Cir. 2019) ................................................................. 4, 5, 6

**Statutes**

California Penal Code
§ 16720 ............................................................................................................ 6
§ 16960(g) ....................................................................................................... 6
§ 26545 ............................................................................................................ 6
§ 27510 ...................................................................................................... *passim*
§ 27875 ............................................................................................................ 6
§ 27880 ............................................................................................................ 6
§ 27885 ............................................................................................................ 6
§ 27910 ............................................................................................................ 6

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-CV-01226-L-AHG)

## Other Authorities

American Public Health Association, *Reducing Suicides by Firearms (2018)* .............................................................................................. 14

Abhay Aneja et al., *The Impact of Right-to-Carry Laws and the NRC Report:  Lessons for the Empirical Evaluation of Law and Policy*, 13 AM. LAW & ECON. REV. 565 (2011) .............................................. 19

*Assembly Floor Hearing of 08-28-2018*, 2017-2018 Sess. (Cal. 2018) (statement of Assemb. Rob Bonta) ........................................... 3, 8, 9, 10

*Assembly Standing Committee on Public Safety Hearing of 06-19-2018*, 2017-2018 Sess. (Cal. 2018) (statement of Sen. Anthony Portantino) ............................................................................................ 2, 9

Ian Ayres et al., *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 STAN. L. REV. 1193 (2002-2003) ............................... 19

Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), Leading Cause of Death Reports ..................................................................... 14

Centers for Disease Control and Prevention, Wide-ranging Online Data for Epidemiologic Research (WONDER) ................................ 15

Claudia Deane et al., *A Fabricated Fan and Many Doubts*, WASH. POST, Feb. 11, 2003 ................................................................... 21

Evan Defilippis et al., *The GOP's Favorite Gun 'Academic' is a Fraud*, ThinkProgress (Aug. 12, 2016, 4:45 PM) .................... 20, 22, 23

Michael Dreyfuss et al., *Teens Impulsively React Rather than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014) ....... 11

Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS No. 2 (2019) ............................. 17

Thomas J. Hanlon et al., *Type of Firearm Used in Suicides: Findings from 13 States in the National Violent Death Reporting System, 2005–2015*, 65 J. ADOLESCENT HEALTH 366 (2019) ......................... 15

Meg Kelly, *Do 98 Percent of Mass Public Shootings Happen in Gun-Free Zones?*, WASH. POST., May 10, 2018 ....................................... 20

-v-

James Lindgren, *Comments on Questions About John R. Lott's Claims Regarding a 1997 Survey* (Jan. 17, 2003) ....................................21

Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLLEGE SURGEONS 150 (2019) .......................................................17

*Mental Health Disorder Statistics*, JOHNS HOPKINS MEDICINE .............................14

Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393 (2012) ..........................................................................15

Richard Morin, *Scholar Invents Fan to Answer His Critics*, WASH. POST, Feb. 1, 2003 ...................................................................22

Andrew R. Morral et al., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* (2018) ...................................................................13

Peter Moskowitz, *Inside the Mind of America's Favorite Gun Researcher*, PACIFIC STANDARD (Updated Sept. 23, 2018) ...............................22

Timothy Noah, *The Bellesiles of the Right? Another Firearms Scholar Whose Dog Ate His Data*, CHATTERBOX, Feb. 3, 2003 ....................................21

Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES OF GENERAL PSYCHIATRY 1058 (2011) ...................................................................14

Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVIEWS NEUROSCIENCE 947 (2008)...........................................................................................14

SB 1100 Assembly Committee on Public Safety Bill Analysis (June 18, 2018)...........................................................................................9

SB 1100 Assembly Floor Analysis (Aug. 23, 2018)...............................................8

SB 1100 Senate Committee on Public Safety Bill Analysis (Apr. 16, 2018)...........................................................................................9

SB 1100 Senate Floor Analysis (May 26, 2018)..............................................2, 7

-vi-

SULLIVAN & CROMWELL LLP

SB 1100 Senate Floor Analysis (Aug. 28, 2018) ..................................... 9

SB 61, 2019-2020 Sess. (Cal. 2019).................................................... 3

SB 61 Assembly Committee on Public Safety Bill Analysis (June 24, 2019)................................................................................ 10

*Senate Floor Hearing of 08-29-2018*, 2017-2018 Sess. (Cal. 2018) (statement of Sen. Anthony Portantino)............................................. 10

*UPDATED: Mass Public Shootings Keep Occurring In Gun-Free Zones: 94% of Attacks Since 1950*, Crime Prevention Research Center (updated July 6, 2019) ........................................................ 20

U.S. Census Bureau, *Current Population Reports*, Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 – 2050.......................................................................... 12

U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2017........................................................................................... 12

U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013* (June 2018) ................................................. 18

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26 (2013) ................................. 17

Daniel W. Webster et al., *Association between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004)............... 16

Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POLICY & RESEARCH (2012)................................................................................................ 13

-vii-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-CV-01226-L-AHG)

## **INTEREST OF *AMICUS CURIAE***

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to effectively reduce gun violence.  The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords.  Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to improve the safety of their communities.  Giffords Law Center has provided informed analysis as an *amicus* in many firearm-related cases, including in *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2019 WL 4923955 (W.D. Va. Oct. 4, 2019), *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), *Fyock* v. *City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), and *Teixeira* v. *Cty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (*en banc*).[1]

---

[1]     Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings.  *E.g.*, *Hirschfeld*, 2019 WL 4923955, at \*5, \*9; *Ass'n of N.J. Rifle & Pistol Clubs* v. *AG N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Md. Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta* v. *Cty. of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (*en banc*) (Graber, J., concurring).  Giffords Law Center filed the latter two briefs under its former name, the Law Center to Prevent Gun Violence.

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

## INTRODUCTION[2]

The data is clear that young people aged 18-to-20 disproportionately use firearms to commit crime and attempt suicide.  Cognitive science explains these troubling statistics: minors are more impulsive and volatile than adults because their brains are still developing.  This impulsivity makes them more likely to use guns irresponsibly.  Accordingly, restricting 18-to-20-year-olds' access to firearms represents a calibrated, data-driven solution to reduce gun violence.

California lawmakers recognized this when they enacted California Penal Code § 27510 in 2011.  Cal. Penal Code § 27510 (2011).  The 2011 law restricted 18-to-20-year-olds from purchasing handguns, but the law did not extend to long guns, including assault rifles.  Then, "[o]n February 14, 2018 Nikolas Cruz shot and killed seventeen people and wounded an additional seventeen people at Marjory Stoneman Douglas High School in Parkland, Florida.  The perpetrator was 19-years old at the time of the incident, and he used assault rifles."  SB 1100 Senate Floor Analysis (May 26, 2018), at 5.

The Parkland massacre prompted the California Legislature to reexamine the distinction between long guns and hand guns.  The Legislature considered the fact that, "of the 26,682 guns used in crimes that were entered into the California Department of Justice Automated Firearms Systems database, 11,500 were long guns." *Assembly Standing Committee on Public Safety Hearing of 06-19-2018*, 2017-2018 Sess. (Cal. 2018) (statement of Sen. Anthony Portantino).  The Legislature also considered the outsized role of long guns in youth suicides, emphasizing that "[d]ata shows about 39% of all suicides by people under 21 are committed with a gun, and more often than not a long gun is used rather than a

---

[2]     No counsel for a party authored this brief in whole or in part.  No person other than *amicus* or its counsel contributed money to fund this brief's preparation or submission.

1    handgun." *Assembly Floor Hearing of 08-28-2018*, 2017-2018 Sess. (Cal. 2018)

2    (statement of Assemb. Rob Bonta).

3              Faced with these stark statistics, and the grave responsibility to protect

4    its citizens, the California Legislature determined that the distinction between long

5    guns and handguns was unsupportable.  In 2019, the Legislature amended California

6    Penal Code § 27510.  SB 1100, enacted in 2018 and effective as of January 1, 2019,

7    prohibits federally licensed firearms dealers ("FFLs") in California from transferring

8    long guns to individuals under 21 years of age.  This restriction does not apply to

9    those who "possess[] a valid, unexpired hunting license"; are employed as peace

10   officers, federal officers or law enforcement agents; or are members of the military.

11   Cal. Penal Code § 27510(b).  SB 61, enacted in 2019 and effective as of January 1,

12   2020, narrowed these exceptions by prohibiting FFLs from transferring semi-

13   automatic centerfire rifles (a subset of long guns that does not include, for example,

14   shotguns) to any person under the age of 21.  Law enforcement agents and active

15   and reserve members of the Armed Forces are exempted from SB 61, but the

16   exemption does not extend to those with a hunting license or retired members of the

17   Armed Forces.  SB 61, 2019-2020 Sess. (Cal. 2019).  This means that under the new

18   measure, hunting license-holders may still purchase shotguns from FFLs, but may

19   not purchase semi-automatic centerfire rifles from them.  Neither SB 1100 nor SB

20   61 prevents transfers of firearms to 18-to-20-year-olds by immediate family.

21             Plaintiffs now challenge amended California Penal Code § 27510

22   ("Section 27510").  They acknowledge (as they must) that California's interest in

23   reducing gun violence is "important," and that 18-to-20-year-olds commit gun

24   violence "at a higher rate comparatively." (ECF No. 21-1 ("Pls.' Mem.") at 18, 23.)

25   Nevertheless, they contend that Section 27510 "will have no effect on homicides,

26   suicides, or mass shootings."  (*Id*. at 29.)  This is simply wrong.  Studies the

27   California legislature could legitimately rely on repeatedly find a robust connection

28   between the enactment of age-based restrictions such as Section 27510 and a decline

-3-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

in firearm-related adolescent deaths.  This is unsurprising, given the outsized role of 18-to-20-year-olds in violent crimes and suicides.

For these reasons, and those explained in Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 25 ("Defs.' Opp. to Pls.' Mot.")), Section 27510 comports with the Second Amendment.  Plaintiffs failed to establish that they are likely to succeed on the merits of their claim and their motion should be denied.

## **ARGUMENT**

Courts in the Ninth Circuit must apply a "two-step inquiry to analyze claims that a law violates the Second Amendment."  *United States* v. *Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019).  This test "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny."  *Id.*  Section 27510 easily passes this test.

"[T]he first step of [the] analysis requires [the court] to explore the amendment's reach based on a historical understanding of the scope of the [Second Amendment] right" because a court "cannot apply the Second Amendment to protect a right that does not exist under the Amendment."  *Id.* (internal quotations omitted). If the challenged law does not burden conduct historically protected by the Second Amendment, then the law is valid without further review.  *Teixeira* v. *Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (*en banc*).

"If a prohibition falls within the historical scope of the Second Amendment, [the court] must then proceed to the second step of the Second Amendment inquiry to determine the appropriate level of scrutiny."  *Jackson* v. *City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014).  The level of scrutiny "depend[s] on (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right."  *United States* v. *Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (internal quotations omitted).  The core of the Second Amendment is "the right of law-abiding, *responsible* citizens to use arms in

-4-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

1   defense of hearth and home." *District of Columbia* v. *Heller*, 554 U.S. 570, 635

2   (2008) (emphasis added).   Only a law that "implicates the core of the Second

3   Amendment right and severely burdens that right warrants strict scrutiny.

4   Otherwise, intermediate scrutiny is appropriate." *Silvester* v. *Harris*, 843 F.3d 816,

5   821 (9th Cir. 2016) (citation omitted).   "To uphold a regulation under intermediate

6   scrutiny, [the Ninth Circuit has] identified two requirements: (1) the government's

7   stated objective must be significant, substantial, or important; and (2) there must be

8   a 'reasonable fit' between the challenged regulation and the asserted objective." *Id.*

9   at 821-22.

10          A law may be upheld as constitutional at either step of the two-step

11   inquiry.   Here, Section 27510 survives at both steps.   *First*, as the Defendants

12   explained, history and tradition show that state and federal governments have

13   regulated 18-to-20-year-olds' access to firearms since the founding of this nation.

14   (*See* Defs.' Opp. to Pls.' Mot. at 7-9.)   Section 27510 is therefore constitutional at

15   the threshold inquiry.   *Second*, as explained below, even if this Court proceeds to

16   step two, Section 27510 survives because (1) at most, intermediate scrutiny applies,

17   as the law does not substantially burden the core of the Second Amendment; and

18   (2) legislative history and scientific data demonstrate that Section 27510 easily

19   survives intermediate scrutiny: California's interests in public health and safety are

20   significant, substantial and important, and there is a reasonable fit between Section

21   27510's restrictions and California's public safety objectives.

22

23   **I.    AT MOST, SECTION 27510 IS SUBJECT TO INTERMEDIATE
           SCRUTINY.**

24

25          The second step of the Ninth Circuit's Second Amendment inquiry

26   "directs courts to apply an appropriate level of scrutiny." *Chovan*, 735 F.3d at 1136.

27   "[I]ntermediate scrutiny is appropriate 'if a challenged law does not implicate a core

28   Second Amendment right, or does not place a substantial burden on the Second

-5-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

1  Amendment right.'" *Torres*, 911 F.3d at 1262 (quoting *Jackson*, 746 F.3d at 961).

2  There is "near unanimity in the post-*Heller* case law that, when considering

3  regulations that fall within the scope of the Second Amendment, intermediate

4  scrutiny is appropriate." *Id.* (quoting *Silvester*, 843 F.3d at 823).

5  This case is no exception: Section 27510 is a common-sense measure

6  that does not substantially burden Second Amendment rights. *First*, it applies only

7  to a class of people—minors—who fall outside the core of the Second Amendment's

8  protections. *Heller* defines the core Second Amendment right as "the right of law-

9  abiding, *responsible* citizens to use arms in defense of hearth and home." *Heller*,

10  554 U.S. at 635 (emphasis added). Section 27510 does not apply to this core group,

11  but to minors, a group recognized throughout history to require close supervision to

12  access firearms responsibly. Furthermore, the measure is limited in time, as those

13  covered by the age restriction will age out in a limited number of years and be able

14  to fully exercise the right to bear arms once they have developed the maturity to

15  responsibly do so. *Cf. Torres*, 911 F.3d at 1263 (applying intermediate scrutiny and

16  finding the challenged law's burden was "tempered, because there is nothing

17  indicating that the prohibition on firearm possession extends beyond the time that an

18  alien's presence in the United States is unlawful"); *Chovan*, 735 F.3d at 1138

19  (applying intermediate scrutiny even when law imposes a "lifetime ban" on all

20  firearm possession by individuals with domestic violence convictions because it

21  "exempts those with expunged, pardoned, or set-aside convictions, or those who

22  have had their civil rights restored").

23  *Second*, Section 27510 is a commercial regulation on sales and

24  transfers. It is not a ban on possession. Several avenues remain open for 18-to-20-

25  year-olds to possess and use handguns and long guns, including transfers from

26  immediate family members and loans for target shooting. (*See* Defs.' Opp. to Pls.'

27  Mot. at 3-4 (citing Cal. Penal Code §§ 16720, 16960(g), 26545, 27875, 27880,

28  27885, 27910)).) Section 27510 also provides numerous exemptions, including

-6-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

1  permitting individuals under the age of 21 to purchase long guns (other than semi-
2  automatic centerfire rifles) if they have a valid hunting license.  The Legislature
3  found this exception appropriate because California residents who wish to obtain a
4  hunting license must complete safety and other instruction to help ensure they use
5  firearms responsibly.  In particular, license applicants must complete the California
6  Hunter Education Certification requirements, including an online safety course, a
7  four-hour lesson with a certified hunter education instructor, a student demonstration
8  of safe firearm handling, and a test.[3]  And though Plaintiffs complain that a hunting
9  license is not "easy to obtain" (Pls.' Mem. at 8 n.5), courts have upheld much more
10 burdensome firearm eligibility requirements under intermediate scrutiny, such as the
11 requirement that one get a criminal record expunged.  *Chovan*, 735 F.3d at 1138
12 ("[W]hile we recognize that [the challenged law] substantially burdens Second
13 Amendment rights, the burden is lightened by these exceptions.").[4]

## II.  SECTION 27510 EASILY SATISFIES INTERMEDIATE SCRUTINY.

17         Intermediate scrutiny requires "(1) the government's stated objective to
18 be significant, substantial, or important; and (2) a reasonable fit between the
19 challenged regulation and the asserted objective."  *Chovan*, 735 F.3d at 1139.  In
20 evaluating the constitutionality of a firearm restriction, courts should not "substitute
21 [their] own policy judgment for that of the legislature."  *Pena* v. *Lindley*, 898 F.3d
22 969, 979 (9th Cir. 2018).  Rather, they "must accord substantial deference to the
23 predictive judgments of" the legislature and allow it "a reasonable opportunity to

---

[3]     *See* SB 1100 Senate Floor Analysis (May 26, 2018), at 6-7.

[4]     Even if this Court applies strict scrutiny (it should not), Section 27510 should
be upheld because, for the reasons discussed further below, the Legislature narrowly
tailored the law to a compelling governmental interest in safety and crime reduction.
*See Chovan*, 735 F.3d at 1150 (Bea, J., concurring) ("[T]he government's interest in
public safety and preventing gun violence is sufficiently compelling and narrowly
tailored to satisfy th[e] prongs of strict scrutiny analysis.").

-7-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

experiment with solutions to [this] admittedly serious problem[].” *Id.* at 979-80 (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 195 (1997) and *City of Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).  Courts may look to legislative history as well as scientific or other studies to determine whether intermediate scrutiny is satisfied.  *Id.* at 979 (citing *Fyock* v. *Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (considering legislative history “as well as studies in the record or cited in pertinent case law”)).  Here, both the legislative history and studies on adolescent gun violence demonstrate that Section 27510 is a constitutional and prudent measure to address gun violence.

>     **A.    Legislative History Demonstrates that Section 27510 Is a Commonsense and Targeted Response to a Grave Public Safety Risk.**

The California Legislature amended Section 27510 to address a serious public safety concern.[5]  California’s interest in protecting citizens is undoubtedly “substantial”; indeed, the Ninth Circuit found it “self-evident” that the government’s “interests in promoting public safety and reducing violent crime are substantial and important government interests.”  *Fyock*, 779 F.3d at 1000 (affirming denial of preliminary injunction motion).

Here, the Legislature “recognize[d] the fact that young adults ages 18 to 20 are statistically far more likely to commit homicide than older adults.”[6]  The Legislature also considered these troubling facts: “In 2015, 23.4 percent of those arrested for murder and non-negligent manslaughter in the U.S. were under 21 and 26.5 percent of those arrested for ‘weapons carrying, possession, etc.’ were under

---

[5]    SB 1100 Assembly Floor Analysis (Aug. 23, 2018), at 3, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100.

[6]    *Assembly Floor Hearing of 08-28-2018*, 2017-2018 Sess. (Cal. 2018) (statement of Assemb. Rob Bonta).

-8-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS’ OPPOSITION TO PLAINTIFFS’ MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

age 21."[7]  Further, while "[i]ndividuals age 18 to 20 compromise [sic] only 4% of the population[,]" they "commit 17% of gun homicides."[8]   Ultimately, the Legislature agreed with the point that "[m]aturity, impulsive or reckless behavior, and responsibility vary greatly among 18-20 year olds," which is why this age group is subject to numerous restrictions on otherwise lawful activity, including "buy[ing] alcohol, rent[ing] a car, or purchas[ing] a handgun" and that "the same age restriction should apply to long guns."[9]

Prior California law set different age requirements for handguns and long guns (at 21 and 18, respectively), but statistical evidence undermined that distinction:

- "Over the years, long guns have changed . . . . Today's semi-automatic guns are more powerful and more lethal.   While handguns are used in the majority of gun deaths, long guns have been used to perpetrate many of the largest mass shootings in U.S. history, including the tragic event that took place in San Bernardino, California."[10]

- "Of the 26,682 guns used in crimes that were entered into the California Department of Justice Automated Firearms Systems database, 11,500 were long guns."[11]

---

[7]    SB 1100 Senate Floor Analysis (Aug. 28, 2018), at 5, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100.

[8]    *Id.*

[9]    *Id.*; *see also* SB 1100 Assembly Committee on Public Safety Bill Analysis (June 18, 2018), at 2-3, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100.

[10]   *Assembly Floor Hearing of 08-28-2018*, 2017-2018 Sess. (Cal. 2018) (statement of Assemb. Rob Bonta).

[11]   *Assembly Standing Committee on Public Safety Hearing of 06-19-2018*, 2017-2018 Sess. (Cal. 2018) (statement of Sen. Anthony Portantino); *see also* SB 1100 Senate Committee on Public Safety Bill Analysis (Apr. 16, 2018), at 6-7, *available*

1
2

- "[T]he two most deadly recent school tragedies have been perpetrated by people under 21 with long guns."[12]

3
4
5

- "[A]bout 38% of all suicides by people under 21 are committed with a gun, and more often than not a long gun is used rather than a handgun."[13]

6 The California Legislature responded to these specific and significant concerns by

7 enacting SB 1100 and SB 61, which provide similar restrictions on 18-to-20-year-

8 olds' access to long guns as already existed for handguns.  As SB 61's author stated,

9 "[m]ore and more shootings are occurring with long guns so it is important that we

10 treat the laws of both handguns and long guns the same."[14]

11
12
13

### B.   Scientific Research Confirms that the Legislature's Concerns Were Well Founded and Its Solution Is Data-Driven.

14 Empirical research overwhelmingly supports the Legislature's

15 judgment: 18-to-20-year-olds are disproportionately likely to commit violent crimes

16 and attempt suicide.  Firearms make violent crimes and suicide attempts far deadlier.

17 Research also confirms that age-based firearm restrictions reduce firearm-related

18 injuries and deaths.

19 This is unsurprising.  Scientific literature is clear that 18-to-20-year-

20 olds are prone to take risks and deprioritize long-term outcomes.  *See Nat'l Rifle*

21 *Assoc. of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700

22 _____

23 *at*                    https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill
_id=201720180SB1100.

24 [12]    *Senate Floor Hearing of 08-29-2018*, 2017-2018 Sess. (Cal. 2018) (statement

25 of Sen. Anthony Portantino).

26 [13]    *Assembly Floor Hearing of 08-28-2018*, 2017-2018 Sess. (Cal. 2018)
(statement of Assemb. Rob Bonta).

27 [14]    SB 61 Assembly Committee on Public Safety Bill Analysis (June 24, 2019),

28 at 3, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml
?bill_id=201920200SB61.

-10-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

F.3d 185, 210 n.21 (5th Cir. 2012) ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."). Because "[t]he brain's frontal lobes are still structurally immature well into late adolescence, and the prefrontal cortex is one of the last brain regions to mature," key brain functions such as "response inhibition, emotional regulation, planning and organization . . . continue to develop between adolescence and young adulthood." *Id.* (quoting submission from the American Medical Association).

These qualities—impulsiveness and emotional volatility—make easy gun access a disproportionate public health risk. "Adolescents commit more crimes per capita than children or adults in the USA and in nearly all industrialized cultures. Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time."[15] The result is a pressing public safety problem, for which Section 27510 was a targeted and reasonable solution.

1. *Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes, Including Homicide, by Firearm.*

Eighteen-to-twenty-year-olds account for a disproportionate share of violent crimes and homicides in California.

- In California, 18-to-20-year-olds make up **4%** of the state population. From 2014 to 2018, there were 6,657 homicide offenders for whom the age of the offender was known.[16] **860** of these homicide offenders were between 18 and 20, amounting to approximately 13%. This means that, where the offender's age

---

[15]   Sacks Decl., Ex. 1 at 1, 2, Michael Dreyfuss et al., *Teens Impulsively React Rather than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014).

[16]   This count excludes negligent homicides.

-11-

is known, **4% of California's population is responsible for 13% of homicides**.[17]

- Firearms are the most common method for committing homicide in the nation and in California.   Eighteen-to-twenty-year-old homicide offenders in California are also more likely to use firearms than any other means.   Roughly **70%** of California homicide offenders in this age range used firearms to kill.[18]

These statistics from California are consistent with nationwide research demonstrating the specific and significant danger posed by 18-to-20-year-olds with firearms:

- Arrests for homicide, rape, and robbery peak from ages 18 to 20.[19]

- Though 18-to-20-year-olds make up under 5% of the population, they account for over 15% of homicide and manslaughter arrests.[20]

- This general pattern has persisted over time.   The following chart, from 2009 and showing homicide offending rate by age,

---

[17]    Federal Bureau of Investigation; U.S. Department of Justice Uniform Crime Reporting Program Data: Supplementary Homicide Reports, 2014–2018, Ann Arbor Inter-university Consortium for Political and Social Research.   This count includes all offenders, including co-offenders.

[18]    *Id.*

[19]    U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2017, at Table 38, https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/topic-pages/tables/table-38.

[20]    *Id.*; U.S. Census Bureau, *Current Population Reports*, Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 – 2050 at 76, *available at* https://www.census.gov/prod/1/pop/p25-1130/p251130.pdf.

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

vividly illustrates the disproportionate share of homicides committed by minors that year[21]:



- FBI data also suggests that young people disproportionately commit homicides.  For example, 18-to-20-year-olds comprise under 5% of the U.S. population, but account for 17% of known homicide offenders.[22]

- "Firearm homicides and violent crimes disproportionately involve individuals under age 21, both as perpetrators and as victims."[23]

---

[21]    Sacks Decl., Ex. 2 at 10, 15, Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POLICY & RESEARCH 1, 5 (2012).

[22]    Calculated using data from the FBI's Supplementary Homicide Reports and US Census Bureau. Uniform Crime Reporting Program: Supplementary Homicide Reports (SHR), Washington, DC: Department of Justice, Federal Bureau of Investigation; US Census Bureau Population Estimates.

[23]    ECF No. 21-15 (Marvell Decl.), Ex. 10 at 151, 222, Andrew R. Morral et al., *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* 1, 145 (2018); *see also People* v. *Fields*, 24 N.E.3d 326, 344 (Ill. App. Ct. 2014) ("We also note that the 18-to-20-year-old age group is more likely to be directly interacting with and, thus, endangering juveniles under 18 years of age.").

-13-

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

2.      *Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts.*

Eighteen-to-twenty-year-olds are also disproportionately at risk of attempting suicide, and firearm access exacerbates this risk. Many major psychiatric conditions first develop in adolescence,[24] and suicide risk "increase[s] steeply during the first few years after" an individual's first contact with psychiatric services.[25] Data from the Centers for Disease Control and Prevention show that suicide accounts for a higher percentage of deaths for 15-to-24-year-olds than for any other age group.[26] Indeed, suicide is the second-most common cause of death among 18-to-20-year-olds.[27]

"Access to firearms is a key risk factor for suicide."[28] Firearm suicide is the suicide method with the highest fatality rate. Whereas 4% of suicide attempts

---

[24]     *See* Sacks Decl., Ex. 4 at 38, 44, Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVIEWS NEUROSCIENCE 947, 952 (2008) ("Anxiety disorders, bipolar disorder, depression, eating disorder, psychosis (including schizophrenia) and substance abuse all most commonly emerge during adolescence."); Sacks Decl., Ex. 5 at 50, 52, *Mental Health Disorder Statistics*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/wellness-and-prevention/mental-health-disorder-statistics (explaining that schizophrenia typically "first appears in men during their late teens or early twenties") (last visited Jan. 2, 2020).

[25]     Sacks Decl., Ex. 3 at 30, 34, Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES OF GENERAL PSYCHIATRY 1058, 1061 (2011).

[26]     Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), Leading Cause of Death Reports, https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.

[27]     *Id.*

[28]     Sacks Decl., Ex. 6 at 54, 56, American Public Health Association, *Reducing Suicides by Firearms* (2018), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2019/01/28/reducing-suicides-by-firearms.

-14-

SULLIVAN & CROMWELL LLP

1  are fatal when the attempts do not involve a firearm,[29] 85% of suicide attempts

2  involving a firearm are fatal.[30]  Suicide attempts are rarely repeated—more than 90%

3  of people who survive a suicide attempt do not later die by suicide.[31]  Therefore a

4  minor's access to firearms during a suicide attempt often determines whether he dies

5  or recovers.

6          As the Legislature recognized, *see supra* Section II.A, 18-to-20-year-

7  olds are particularly at risk for suicides involving long guns.  Of suicides where the

8  firearm type is known, most adults are twice as likely to die by handgun suicide as

9  they are by long gun suicide.[32]  But 18-to-20-year-olds are much more likely to die

10 by *long gun* suicides than other groups, likely at least in part because, prior to the

11 effective date of Section 27510, they have had far easier access to long guns

12 compared to handguns.  A recent study found that, while handguns are used in most

13 suicides, long gun use is relatively higher among adolescents compared with

14 adults.[33]  In fact, 18- and 19-year-olds are the *only groups more likely to die by long*

15 *gun suicide than handgun suicide*.[34]  Long guns pose a unique risk to the 18-to-20-

16 year-old age group.  Section 27510's long-gun age restriction addresses this risk.

---

[29]    Sacks Decl., Ex. 7 at 64, 69, Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012) (establishing that in 2001, there were 333,765 non-firearm suicide attempts and 13,753 fatalities).

[30]    *Id.*

[31]    *Id.* at Ex. 7 at 74-75, Miller et al. at 402-03.

[32]    Sacks Decl., Ex. 8 at 85, 87, Thomas J. Hanlon et al., *Type of Firearm Used in Suicides: Findings from 13 States in the National Violent Death Reporting System*, 2005–2015, 65 J. ADOLESCENT HEALTH 366, 367 (2019).

[33]    *Id.*

[34]    Centers for Disease Control and Prevention, Wide-ranging Online Data for Epidemiologic Research (WONDER), https://wonder.cdc.gov/controller/datarequest?stage=search&action=current.

-15-

3.      *State-Level Gun Control Measures, Including Age Restrictions, Are Effective.*

Studies also show that there is a more than "reasonable fit" between the government's safety objectives and Section 27510.  Plaintiffs assert that "there is no evidence that gun laws banning the purchase or possession of legal firearms based on age restrictions have the intended effect of reducing gun homicides and suicides." (Pls.' Mem. at 22 (quoting Marvell Decl. ¶ 5).)[35]  This is false.  Studies have repeatedly found a connection between age restrictions such as Section 27510 and a decline in firearm-related adolescent deaths, especially suicides and unintentional shootings.  For instance, an August 2004 study found that state laws raising the minimum legal age to purchase a handgun to 21 were associated with a nine percent decline in firearm suicide rates among 18-to-20-year-olds.[36]  A survey of convicted gun offenders in 13 states also found that 17% of the offenders would have been prohibited from obtaining firearms at the time of the crime if the minimum legal age

---

[35]      In a declaration, Thomas Marvell states that "[t]he impact of increasing minimum age to purchase a firearm from 18 to 21 is difficult to determine because very few states have made such a change."  (ECF No. 21-15 (Marvell Decl.) ¶ 8.) Nevertheless, Mr. Marvell states that, "based on [his] and others' research . . . [he has] no reason to believe" that an increase in the minimum age could reduce the 30,000 annual gun deaths per year in the United States.  (*Id.* ¶¶ 8, 19.)  *First*, Mr. Marvell's view of the literature is at odds with the twenty years of scholarship cited in this Section.  *Second*, Mr. Marvell's uncertainty about the effectiveness of minimum age laws has no bearing on the constitutionality of Section 27510 because "[California is] entitled to rely on any evidence reasonably believed to be relevant to substantiate its important interests."  *Fyock*, 779 F.3d at 1000 (internal quotation marks omitted).  Here, the record shows that California considered crime and suicide data when enacting Section 27510.  *See supra* Section II.A.

[36]      ECF No. 21-15 (Marvell Decl.), Ex. 7 at 76, 81, Daniel W. Webster et al., *Association between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

-16-

1  in that state had been 21 years, a finding that, according to the authors,
2  "underscore[d] the importance of minimum-age restrictions."[37]

3          State gun control measures more generally have also proven effective
4  in reducing gun violence among young people, including in the 18-to-20-year-old
5  range.  An August 2019 study examined the 21,241 firearm-related deaths among
6  U.S. children from 2011 to 2015.  Eighteen-to-twenty-one-year-olds made up more
7  than half of these deaths (68.7%).  But state laws make a difference: the study found
8  that every 10-point increase in a score measuring the strictness of a state's gun
9  control laws "decreases the firearm-related mortality rate in children by 4%" in its
10  fully adjusted model.[38]  Another study published in August 2019 examined states
11  using the same gun-law scores and found that the quartile of states with the strictest
12  laws "have an annual pediatric firearm mortality rate of 2.563 per 100,000 [children
13  aged 0-to-19-years-old] compared with states in the lowest quartile [with the least
14  strict laws], where the mortality rate is almost twice as high at 5.005 per 100,000."[39]

15          Finally, research on the characteristics of mass shooters contradicts
16  Plaintiffs' casual assumption that state law cannot influence criminals' behavior.
17  Plaintiffs suggest that criminal shooters will simply continue to get guns in disregard
18  of the law (see Pls.' Mem. at 19 (quoting Lott Decl. ¶ 9)), such as by obtaining
19  weapons illegally or from out-of-state.  In fact, most mass shooters obtain their
20  weapons lawfully.  In a report examining active shootings from 2000 to 2013, the
21  FBI concluded that "only very small percentages [of shooters] obtain[ed] a firearm

22

23

---

[37]     Sacks Decl., Ex. 9 at 91, 95-96, Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26, 29-30 (2013).

[38]     Sacks Decl., Ex. 10 at 98, 101, Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS No. 2, at 3 & tbl. 1 (2019).

[39]     Sacks Decl., Ex. 11 at 109, 112, Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLLEGE SURGEONS 150, 152 (2019).

-17-

illegally,"[40] indicating that these perpetrators are not necessarily sophisticated participants in the firearms black market.  Lawmakers therefore can, and should, assume that restricting access to long guns will deter criminal use of long guns—precisely the type of reasonable assumption that underlies virtually all laws aimed at regulating dangerous products.  *Accord, e.g.*, *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1128-29 (7th Cir. 1995) ("Legislatures often enact laws that reduce but cannot eliminate the effects of movements across municipal and state borders.").

## III.   PLAINTIFFS RELY ON DUBIOUS EVIDENCE FROM A WIDELY DISCREDITED DECLARANT.

Plaintiffs rely on a 22-paragraph declaration by economist John R. Lott to argue that Section 27510 does not survive intermediate scrutiny.  (Pls.' Mem. at 17-30; *see* ECF No. 21-17 (Lott Decl.).)   Plaintiffs cite Mr. Lott extensively, including for the (incorrect) propositions that there is "no credible evidence" that "raising the age to purchase or acquire a firearm will make any difference in curtailing mass school shootings," that data suggesting that those under the age of 21 are "disproportionately linked to crime" is "badly skewed," and that "Defendants have no plausible argument that enjoining enforcement of California's age-based gun ban will endanger public safety."  (Pls.' Mem. at 19, 23, 28.)  But as explained above, *supra* Section II.B, social science research establishes that 18-to-20-year-olds face a unique risk for firearm suicides and homicides. The research also confirms that laws like Section 27510 *are* effective in protecting against this risk.

It is unsurprising, however, that Mr. Lott takes a position opposite to the wide body of research.  Mr. Lott makes his living offering intellectually dubious

---

[40]    Sacks Decl., Ex. 22 at 393, 400, U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (June 2018), https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.

and scientifically flawed opinions on firearm policy.  His declaration in this case should be given no weight.

### A.   Mr. Lott's Research Methodologies Have Been Widely Criticized.

Mr. Lott's research methodology on the impact of firearm restrictions on crime rates has been criticized as fundamentally flawed.  Academics including Stanford University Professors Abhay Aneja and John J. Donohue III, in reviewing Mr. Lott's research on "right-to-carry" laws and the National Research Council's subsequent critical evaluation of that research, concluded that Mr. Lott's data set included "several coding errors" that skewed his conclusions, such as incorrect coding for the year in which several states adopted right-to-carry laws, and an "area variable," which was used to compute county density, that was "missing data."[41] Moreover, as Professors Aneja and Donohue observed, Mr. Lott neglected "major factors influencing the pattern of U.S. crime in recent decades," such as increases in the prison and police populations.[42]  Professor Donohue published a separate critique with Yale Law School Professor Ian Ayres, concluding that Mr. Lott's research had "not withstood the test of time" as his results "collapsed" when "more complete" data sets were "tweaked in plausible ways."[43]  Like Professors Aneja and Donohue, Professors Ayres and Donohue also noted significant coding errors in Mr. Lott's past work, including one that, when corrected, undermined Mr. Lott's claim that "right to carry" laws resulted in a "statistically significant" reduction in robbery.[44]

---

[41]     Sacks Decl., Ex. 12 at 118, 167-68, Abhay Aneja et al., *The Impact of Right-to-Carry Laws and the NRC Report:  Lessons for the Empirical Evaluation of Law and Policy*, 13 AM. LAW & ECON. REV. 565, 585, 613-14 (2011).

[42]     *Id.* at Ex. 12 at 168-69, Aneja et al. at 614-15.

[43]     Sacks Decl., Ex. 13 at 187, 292, Ian Ayres et al., *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 STAN. L. REV. 1193, 1296 (2003).

[44]     *Id.* at Ex. 13 at 257, Ayres et al. at 1261.

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

Critics have also observed that Mr. Lott has adopted carefully crafted definitions for what constitute "mass shootings" and "gun-free zones," citing significant discrepancies between his research—which he claimed showed that 94% of mass shootings since 1950 occurred in gun free zones—and other experts', who have found that only 10% of mass shootings occur in gun-free zones.[45]  For example, Mr. Lott excludes from the definition of mass shootings those "that resulted from gang or drug violence or during the commission of a crime," as well as shootings that occur in a private residence.[46]  As for gun-free zones, Mr. Lott has adopted a sweeping definition that includes even areas where law enforcement and military police are regularly present and permitted to carry guns.[47]  This bizarre definition leads Mr. Lott to an illogical result: he classifies shootings that occurred in areas where guns were both *permissible* and *present*—such as those that occurred at Fort Hood, the Washington Navy Yard, and Pensacola Naval Base—as having occurred in gun-free zones.[48]   In order to support his outlier claims about the efficacy of firearm restrictions, Mr. Lott relies on assumptions that diverge from other experts and defy common sense.

---

[45]     Sacks Decl., Ex. 14 at 309, Meg Kelly, *Do 98 Percent of Mass Public Shootings Happen in Gun-Free Zones?*, WASH. POST., May 10, 2018, https://www.washingtonpost.com/news/fact-checker/wp/2018/05/10/do-98-percent-of-mass-public-shootings-happen-in-gun-free-zones; Sacks Decl., Ex. 15 at 313, *UPDATED: Mass Public Shootings Keep Occurring In Gun-Free Zones: 94% of Attacks Since 1950*, Crime Prevention Research Center (updated July 6, 2019), https://crimeresearch.org/2018/06/more-misleading-information-from-bloombergs-everytown-for-gun-safety-on-guns-analysis-of-recent-mass-shootings/;     Sacks Decl., Ex. 16 at 330, Evan Defilippis et al., *The GOP's Favorite Gun 'Academic' is a Fraud*, ThinkProgress (Aug. 12, 2016), https://thinkprogress.org/ debunking-john-lott-5456e83cf326/.

[46]     Sacks Decl., Ex. 14 at 311-12, Meg Kelly, *Do 98 Percent of Mass Public Shootings Happen in Gun-Free Zones?*, WASH. POST., May 10, 2018, https://www.washingtonpost.com/news/fact-checker/wp/2018/05/10/do-98-percent-of-mass-public-shootings-happen-in-gun-free-zones/.

[47]     *Id.*

[48]     *Id.*

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

### B.   Mr. Lott Has a History of Failing to Provide Data and Evidence to Back up His Claims.

In order for a scientific finding to be credible, the underlying research must be replicable.  But Mr. Lott is known for publishing research without revealing his underlying source data, preventing others from testing the validity of his conclusions.  For instance, critics have questioned Mr. Lott's inability to produce any of the poll data underlying a 1997 survey, which purportedly showed that "merely brandishing a weapon successfully deterred criminal attacks 98 percent of the time."[49]  According to Mr. Lott, the data was lost when his computer crashed.  But experts have found this explanation implausible.  Northwestern Professor James Lindgren, for example, commented that "all evidence of a study with 2,400 respondents does not just disappear when a computer crashes," noting the absence of records relating to the funding of the survey, the cost of the survey, student volunteers who assisted with the survey, the survey instrument, or any individual responses to the survey.[50]

---

[49]    Sacks Decl., Ex. 17 at 344, 345-46, Claudia Deane et al., *A Fabricated Fan and Many Doubts*, WASH. POST, Feb. 11, 2003, https://www.washingtonpost.com/archive/politics/2003/02/11/a-fabricated-fan-and-many-doubts/b086b96f-0c86-417e-afe9-c4623d5e936f/.

[50]    Sacks Decl., Ex. 18 at 347, 355-56, James Lindgren, *Comments on Questions About John R. Lott's Claims Regarding a 1997 Survey* (Jan. 17, 2003), https://web.archive.org/web/20130304061928/http://www.cse.unsw.edu.au/~lambert/guns/lindgren.html.  One individual, Minnesota lawyer David M. Gross, came forward several years after Mr. Lott had purportedly conducted his survey, claiming to have been a participant.  But Mr. Gross's emergence does not help Lott's credibility.  Mr. Gross was a former National Rifle Association board member and the founding director of the Minnesota Gun Owners Civil Rights Alliance.  Even assuming Mr. Lott's 1997 survey actually happened, a leading pro-gun advocate's inclusion in a sample of 2,400 out of 3 million Americans suggests that Mr. Lott's "sampling" was not random.  Sacks Decl., Ex. 19 at 375, 379-381, Timothy Noah, *The Bellesiles of the Right? Another Firearms Scholar Whose Dog Ate His Data*, SLATE, Feb. 3, 2003, https://slate.com/news-and-politics/2003/02/bellesiles-of-the-right.html.

### C.   Mr. Lott's Work Is Rarely Published in Peer-Reviewed Journals.

Mr. Lott is not affiliated with a university, and "[l]ittle of his gun research has been published in peer-reviewed journals."[51]  The Supreme Court, in the context of evaluating the reliability of expert testimony, has recognized that peer review—*i.e.*, "submission to the scrutiny of the scientific community"—"increases the likelihood that substantive flaws in methodology will be detected" and is thus a "relevant consideration" in evaluating the "validity of a particular technique or methodology on which an opinion is premised."  *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993).  Mr. Lott's failure to publish peer-reviewed work calls into question the reliability of his methods and validity of his conclusions.  Mr. Lott apparently shares this concern, having publicly claimed that he was published in a peer-reviewed journal that, in reality, actually rejected his work.[52]

### D.   Mr. Lott Has Committed Several Ethical Violations to Defend His Work from Criticism.

In addition to ample criticism about his substantive work and methods, Mr. Lott has engaged in a pattern of unethical behavior that further undermines his credibility.  For example, Mr. Lott has used an assumed, fictional identity to post praise for himself online and to defend himself from critics, even masquerading as a former student and posting:  "he was the best professor I ever had."[53]  On another

---

[51]   Sacks Decl., Ex. 20 at 384, 385, Peter Moskowitz, *Inside the Mind of America's Favorite Gun Researcher*, PACIFIC STANDARD (Updated Sept. 23, 2018), https://psmag.com/magazine/inside-the-mind-of-americas-favorite-gun-researcher.

[52]   Sacks Decl., Ex. 16 at 330, 334, Evan Defilippis et al., *The GOP's Favorite Gun 'Academic' is a Fraud*, ThinkProgress (Aug. 12, 2016), https://thinkprogress.org/debunking-john-lott-5456e83cf326.

[53]   Sacks Decl., Ex. 21 at 390, 391, Richard Morin, *Scholar Invents Fan to Answer His Critics*, WASH. POST, Feb. 1, 2003, https://www.washingtonpost.com/archive/lifestyle/ 2003/02/01/ scholar-invents-fan-to-answer-his-critics/f3ae3f46-68d6-4eee-a65e-1775d45e2133/.

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

1   occasion, Mr. Lott wrote a first-person narrative in which he claimed to be

2   Dartmouth student and stalking victim Taylor Woolrich, criticizing Dartmouth for

3   not letting her carry a gun for self-defense.[54]

4

5                               *        *        *

6        In short, Mr. Lott's work is highly suspect.   Experts have widely

7   critiqued his methodology, pointing out coding errors, biases, and questionable

8   definitions and assumptions.   He has published his gun research without peer-

9   review, and, when asked to produce his source data, he has been unable to deliver.

10  Finally, he is notorious for deceptive tactics such as posting under false identities.

11  Accordingly, this Court should give no weight to Mr. Lott's declaration.

12        Even if the Court were inclined to credit some of Mr. Lott's assertions,

13  at most, his arguments suggest that research on the effectiveness of minimum age

14  laws is subject to academic debate.   On the one side, the California legislature relied

15  on crime data from official sources and made judgments supported by peer-reviewed

16  social science studies; on the other side, the challengers produced expert witnesses

17  who reject that research.   The disagreement of experts does not render California's

18  law unconstitutional because courts "do not demand of legislatures 'scientifically

19  certain criteria of legislation.'"   *Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49, 60

20  (1973) (internal citation omitted).   Indeed, when a state regulates "in areas fraught

21  with medical and scientific uncertainties, legislative options must be especially

22  broad and courts should be cautious not to rewrite legislation."   *Marshall* v. *United

23  States*, 414 U.S. 417, 427 (1974); *Kansas v. Hendricks*, 521 U.S. 346, 360 n.3 (1997)

24  (where   psychiatric   professionals   joined   conflicting   *amicus*   briefs,   their

25  disagreements "do not tie the State's hands" in its policy choices).   The contrary

26

27  [54]      Sacks Decl., Ex. 16 at 330, 340-41, Evan Defilippis et al., *The GOP's Favorite

28  Gun 'Academic' is a Fraud*, ThinkProgress (Aug. 12, 2016, 4:45 PM), https://thinkprogress.org/debunking-john-lott-5456e83cf326.

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

1   conclusions of Plaintiffs' experts, including Mr. Lott, have no bearing on the
2   constitutionality of Section 27510 in light of the substantial record showing that
3   California considered robust and reliable data when enacting Section 27510 (*see*
4   *supra* Section II), and drew "reasonable inferences" from that data. *Mahoney v.*
5   *Sessions*, 871 F.3d 873, 883 (9th Cir. 2017).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-CV-01226-L-AHG)

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth by Defendants, the Court should deny the Plaintiffs' Motion for Preliminary Injunction.

Dated:    January 3, 2020

/s/ Robert A. Sacks
Robert A. Sacks (Bar No. 150146)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone:  (310) 712-6600
Facsimile:  (310) 712-8800

*Counsel for Amicus Curiae Giffords
Law Center to Prevent Gun
Violence*

<u>Of Counsel</u>

Hannah Shearer
hshearer@giffords.org
J. Adam Skaggs
askaggs@giffords.org
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104

Leonid Traps
trapsl@sullcrom.com
Angela N. Ellis
ellisan@sullcrom.com
Jackson Froliklong
froliklongj@sullcrom.com
Rachel VanGelder
vangelderr@sullcrom.com
125 Broad Street
New York, NY 10004
Telephone:  212-558-4000
Facsimile:  212-558-3558

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-cv-01226-L-AHG)

1

## CERTIFICATE OF SERVICE

2

3

4

5

    I certify that on January 3, 2020, I filed the foregoing document with
the Clerk of the Court for the United States District Court, Southern District of
California, by using the Court's CM/ECF system, which will send notification of
electronic filing (NEF) to all counsel of record.

6

7
                                    */s/ Robert A. Sacks*
8                                    Robert A. Sacks

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (19-CV-01226-L-AHG)