# Exhibit 1


*Developmental Neuroscience*

Dev Neurosci 2014;36:220–227
DOI: 10.1159/000357755

Received: October 23, 2013
Accepted after revision: December 3, 2013
Published online: May 8, 2014

# Teens Impulsively React rather than Retreat from Threat

Michael Dreyfuss[a]    Kristina Caudle[a]    Andrew T. Drysdale[a]    Natalie E. Johnston[a]
Alexandra O. Cohen[a]    Leah H. Somerville[b]    Adriana Galván[c]    Nim Tottenham[c]
Todd A. Hare[d]    B.J. Casey[a]

[a]Sackler Institute, Department of Psychiatry, Weill Cornell Medical College, New York, N.Y., [b]Department of Psychology, Harvard University, Cambridge, Mass., and [c]Department of Psychology, University of California Los Angeles, Los Angeles Calif., USA; [d]Laboratory for Social and Neural Systems Research, Department of Economics, University of Zurich, Zurich, Switzerland

## Key Words

Adolescence · Fear · Impulsivity · Limbic circuitry · Orbitofrontal cortex · Medial prefrontal cortex

## Abstract

There is a significant inflection in risk taking and criminal behavior during adolescence, but the basis for this increase remains largely unknown. An increased sensitivity to rewards has been suggested to explain these behaviors, yet juvenile offences often occur in emotionally charged situations of negative valence. How behavior is altered by changes in negative emotional processes during adolescence has received less attention than changes in positive emotional processes. The current study uses a measure of impulsivity in combination with cues that signal threat or safety to assess developmental changes in emotional responses to threat cues. We show that adolescents, especially males, impulsively react to threat cues relative to neutral ones more than adults or children, even when instructed not to respond. This adolescent-specific behavioral pattern is paralleled by enhanced activity in limbic cortical regions implicated in the detection and assignment of emotional value to inputs and in the subsequent regulation of responses to them when successfully suppressing impulsive responses to threat cues. In contrast, prefrontal control regions implicated in detecting and resolving competing responses show an adolescent-emergent pattern (i.e. greater activity in adolescents and adults relative to children) during successful suppression of a response regardless of emotion. Our findings suggest that adolescence is a period of heightened sensitivity to social and emotional cues that results in diminished regulation of behavior in their presence.

© 2014 S. Karger AG, Basel

## Introduction

Adolescents commit more crimes per capita than children or adults in the USA [1] and in nearly all industrialized cultures [2]. Their proclivity toward incentives [3, 4] and risk taking [5–8] has been suggested to underlie the inflection in criminal activity observed during this time. Yet heightened sensitivity to incentives and risk taking are only part of the equation, as criminal behaviors often occur in emotionally charged situations of negative valence. Does negative emotional information impact self-

M.D. and K.C. contributed equally to this work.

**KARGER**

© 2014 S. Karger AG, Basel
0378–5866/14/0364–0220$39.50/0

E-Mail karger@karger.com
www.karger.com/dne

B.J. Casey, PhD
Sackler Institute for Developmental Psychobiology
Weill Cornell Medical College, 1300 York Avenue, Box 140
New York, NY 10065 (USA)
E-Mail bjc2002@med.cornell.edu

control differently across development? Previous work has shown that positive emotional cues lead to poorer self-control in adolescents relative to children and adults [3], but do negative emotional cues also lead to poor impulse control? The current study tests whether adolescents are more impulsive relative to adults or children when there is a signal of potential threat, using a measure of impulsivity in combination with cues that signal threat (e.g. a frightened face) relative to neutral ones (calm face) and examines potential mechanisms for developmental differences in behavior.

The fight-or-flight response is a physiological reaction to perceived threat [9]. Fearful faces are a reliable indicator of threat in the immediate environment [10], evoking a well-defined neural response [11, 12]. Negatively valenced stimuli such as fearful faces generally inhibit behavior, slowing response times and inhibiting motor responses in various tasks [13–15]. Adolescents, however, show difficulty suppressing attention and actions toward emotional stimuli even when irrelevant to the task at hand [16, 17]. This relative lack of cognitive control in the presence of emotional and motivational cues may underlie the behavioral risks that are characteristic of adolescence [18].

Prior work suggests that diminished self-control during adolescence may result from competition between limbic and control circuitry [17–20]. A combination of evidence from human imaging [3, 21–25], postmortem [26] and animal [27, 28] studies of regional brain changes over the course of development indicate that limbic and prefrontal circuitry interact differentially across development [29]. Specifically, limbic circuitry is thought to develop earlier than control circuitry as a result of evolutionary pressure and changes in gonad hormone levels that impact limbic structures. This developmental imbalance is suggested to result in a greater influence of limbic than prefrontal regions on behavior during adolescence. This pattern is in contrast to that observed in adulthood when these circuits have matured or in childhood when they are still developing.

The current study uses a A go/no-go paradigm to measure impulsivity in combination with cues that signal threat or safety (fearful or calm facial expressions) to assess developmental changes in emotional responses to such cues, their influence on behavior and their neurobiological correlates. In previous work using the same task and overlapping sample, we have shown a heightened sensitivity to emotional cues during adolescence. In the first study [30] we showed longer response latencies to negative (fear faces) relative to positive (happy faces) emotional cues across

ages but adolescent-specific increases in amygdala activity when having to respond (go) to fear faces. In a second study [3], we focused on the ability to withhold a response to positive cues, focusing solely on happy no-go trials and showed that adolescents made more false alarms to happy cues than to neutral cues compared to children and adults. This pattern was paralleled by greater ventral striatal activity in adolescents relative to children and adults. Finally, recent reports by other laboratories have noted decrements in behavioral performance on cognitive control tasks in the presence of negatively valenced stimuli versus neutral stimuli in adolescents relative to children or adults [15, 16].

In the current study, expanding on these previous adolescent-specific findings toward emotionally valenced stimuli, we test for developmental differences in brain and behavior when required to suppress responses to cues of potential threat. Second, we explore individual differences in brain activity associated with overall behavioral performance. Finally, we explore possible sex differences in behavior and brain responses to cues of potential threat.

## Methods

### Subjects

A total of 80 participants between the ages of 6 and 27 years were scanned using functional magnetic resonance imaging (fMRI). Data from 23 participants were excluded due to poor overall accuracy (mean no-go accuracy <70%, n = 9), too much head motion (>2 mm translational or 2° rotational motion within a run, n = 12) or technical problems (n = 2), resulting in data from 57 usable subjects (27 females) in all reported analyses. Participants were grouped into child (aged 6–12 years, n = 18, 10 male), adolescent (aged 13–17 years, n = 19, 10 male) and adult (18 years or older, n = 20, 10 male) age groups. Data from this sample have been published previously on a different subset of the data [3, 30]. All participants provided informed written consent (parental consent and subject assent for children and adolescents) approved by the Institutional Review Board of Weill Cornell Medical College.

### Behavioral Paradigm

Participants completed six runs of a go/no-go task [3, 30] using fearful, happy and calm facial expressions as target (go) and nontarget (no-go) stimuli (fig. 1a). Within each run, two types of facial emotions were presented, one serving as the target (go) stimulus, to which they were instructed to press a button, and the other serving as a nontarget (no-go) stimulus, for which they were instructed to withhold a button press. Facial expressions were pseudorandomized across the run to control for presentation order, and all combinations of expression were used as both targets and nontargets, resulting in a 2 (response: go, no-go) ×3 (emotion: fear, calm, happy) factorial design. Prior to each run, participants were instructed as to which expression served as the target (go) stimulus and that they should respond with a button press only to that ex-



**Fig. 1.** Development of impulse control to threat cues. **a** The emotional go/no-go task illustrating 5 trials with calm faces as the target stimuli, for which participants should go by pressing a button. Fearful faces are the nontarget (no-go) stimuli, to which participants should withhold a button press. Each face was displayed for 500 ms followed by a variable intertrial interval. **b** False alarms (dark gray line) to fear relative to calm no-go trials show an adolescent-specific pattern of more commission errors for adolescents than either children ($t_{35} = 2.79$, $p < 0.009$) or adults ($t_{37} = 2.30$, $p < 0.03$).

pression. Participants were also instructed to respond as fast as possible but to try to avoid making errors. The present report focuses specifically on the analysis of fear no-go trials relative to calm no-go trials. Previously published work on this task focused on no-go trials to happy facial expressions [3] and go trials to fearful facial expressions [30].

### Stimuli and Apparatus

The stimuli consisted of fearful, happy and calm faces from the NimStim set of facial expressions [31]. We used calm faces (mildly pleasant neutral faces) because we [32] and others [33, 34] have shown that developmental populations may perceive neutral faces as negative. The task was programmed using E-Prime software and presented to subjects on an overhead liquid crystal display panel integrated with the IFIS-SA system (fMRI Devices Corporation, Waukesha, Wisc., USA). Button responses and reaction times were logged using E-Prime software integrated with the IFIS system.

### Task Parameters

The data were acquired in six functional imaging runs that combined each emotion (happy, calm and fear) and response (go and no-go; fig. 1) using a rapid event-related design. On each trial, a face appeared for 500 ms followed by a jittered intertrial interval of between 2 and 14.5 s (mean 5.2 s) during which participants were presented with a fixation crosshair. A total of 48 trials were presented per run in pseudorandomized order (36 go and 12 no-go). A total of 24 no-go trials and 72 go trials were acquired for each expression type.

### Image Acquisition

Participants were scanned with a General Electric Signa 3.0-T fMRI scanner (General Electric Medical Systems, Milwaukee, Wisc., USA) and quadrature head coil. A high-resolution, T1-weighted anatomical scan ($256 \times 256$ in-plane resolution, 240-mm field of view, 124 1.5-mm slices) was acquired for each subject for transformation and localization of data to Talairach grid space. A spiral in and out sequence [35] was used to acquire functional imaging data (repetition time = 2,500 ms, echo time = 30 ms, field of view = 200 mm, flip angle = 90, skip 0, $64 \times 64$ matrix). In all, 34 4-mm-thick coronal slices ($3.125 \times 3.125$ mm resolution) covering the entire brain except for the posterior portion of the occipital lobe were acquired per repetition time.

### Behavioral Analysis

Behavioral data from the emotional go/no-go task were analyzed for false alarms (incorrect presses to a 'no-go' stimulus) to fear and calm cues. Errors were calculated as a difference score between errors to fear nontargets relative to calm nontargets to isolate the effects of negative valence from the overall error rate. Error rates were compared between age groups (children, adolescents and adults). A positive value represents a greater proportion of errors to nontarget fear faces than calm faces, while a negative value represents the inverse. Mean reaction times and hit rates have been reported elsewhere [30]. A two-way ANOVA was performed with age group and sex as the between-subject variables and a difference score between errors to fear nontargets and errors to calm nontargets as the dependent variable of interest.

### Imaging Analysis

Imaging data processing and analyses were performed using AFNI (analysis of functional neuroimages) software [36]. Functional imaging data were slice-time corrected, realigned within and across runs to correct for head movement, coregistered with each participant's high-resolution anatomical scan, scaled to percent signal change units, and smoothed with a 6-mm FWHM gaussian kernel. A general linear model (GLM) analysis was performed on

Dev Neurosci 2014;36:220–227
DOI: 10.1159/000357755

Dreyfuss et al.

each subject to characterize task effects with task regressors (calm/go, calm/no-go, happy/go, happy/no-go, fear/go, fear/no-go, errors), convolved with a gamma-variate hemodynamic response function. Separate regressors were created for correct go and no-go trials, broken down by emotion (errors were grouped and modeled separately with insufficient numbers to analyze separately). Only correct fear and calm trials were considered of interest and included in the second-level analysis.

We modeled the effects of response (go vs. no-go), age group (child, adolescent or adult) and emotion (fear or calm) on brain activity using a linear mixed-effects model [37]. Parameter estimate ($\beta$) maps representing task effects were then transformed into the standard coordinate space of Talairach and Tournoux [38] (1988) by applying the warping parameters obtained from the transformation of each subject's high-resolution anatomical scan. Talairach-transformed parameter estimate maps were resampled to a resolution of $3 \times 3 \times 3$ mm. A group linear mixed-effects model was performed to identify functional regions of interest (ROIs) implicated in the interaction of response, age group and emotion. Imaging findings considered statistically significant exceeded whole-brain correction for multiple comparisons to preserve an alpha <0.05 by using a p value/cluster size combination stipulated by Monte Carlo simulations run in the AlphaSim program within AFNI. Off-line analyses were conducted in SPSS Statistics 17.0 software (SPSS, Chicago, Ill., USA). Beta values were extracted from whole-brain-corrected ROIs (drawing a 5-mm sphere around the peak voxel in each region) and submitted to offline post hoc analyses with SPSS.

### Control Analyses

All imaging analyses were based on correct no-go trials. As task performance was significantly different between age groups, a second analysis was conducted to verify that the observed developmental effects were not due to less power in one age group relative to another. First-level GLMs were estimated in which number of correct trials were equated for all participants across conditions (fear/go, fear/no-go, calm/go, calm/no-go), using the lowest mean number of correct trials of all age groups (calm no-go trials in children; mean = 17 out of 24 possible, or 70% mean accuracy). New regressors were generated by randomly selecting 17 (of 24) trials per condition for inclusion. All other trials were modeled as separate regressors that were not further examined. Beta values were extracted from the 17-trial regressors using the previously defined ROIs, tested for replication, and reported in Results.

### Results

#### Behavioral Results

The 2-way ANOVA showed a main effect of age group on false alarm rates to fear relative to calm nontargets ($F_{2, 59} = 8.58$, $p < 0.001$), but no main effect of sex ($F_{1, 51} = 0.05$, $p > 0.85$) or interaction with sex ($F_{2, 51} = 0.27$, $p > 0.77$). Post hoc t tests showed that adolescents made more false alarms to fear nontargets in comparison to calm nontargets than either children ($t_{35} = 2.79$, $p < 0.009$) or adults ($t_{37} = 2.30$, $p < 0.03$; fig. 1b).

#### Imaging Results

The whole-brain age group (3) × response (go/no-go) × emotion (fear, calm) linear mixed-effects model revealed 7 ROIs (see table 1). Given the behavioral results we performed post hoc tests on beta values extracted from each whole-brain-corrected ROI to determine if teens differed from adults and from children in these regions. When we tested each region to determine whether significant variance could be attributed to adolescent-specific differences in response to fear relative to calm nontargets, two patterns emerged (see fig. 2): (1) *adolescent-specific* effects were of greater activity in adolescents compared to children or adults on correct threat no-go trials relative to calm no-go trials and (2) *adolescent-emergent* effects of adolescents and adults activated this region more than children on correct threat no-go trials. The left orbitofrontal cortex (LOFC) and medial prefrontal cortex (mPFC) showed adolescent-specific effects. Although the striatum showed a similar developmental pattern post hoc tests did not reach significance between age groups (adolescents vs. children: p = 0.09 and adolescents vs. adults: p = 0.11). The right inferior frontal gyrus (RIFG), right anterior cingulate cortex (RACC) and left premotor cortex showed adolescent-emergent effects. Our control analysis, equating power across age groups and conditions, revealed similar patterns of activity, but to a lesser degree given less overall power of the analysis. However, the LOFC maintained a robust pattern of activity across analyses (adolescents vs. children: $t_{35} = 2.74$, $p < 0.01$ and adolescents vs. adults: $t_{37} = 2.27$, $p < 0.03$).

#### Sex Differences

We performed exploratory analyses to test for sex differences within the three adolescent-specific findings (i.e. false alarm rates and OFC and mPFC activity to threat nontargets relative to calm nontargets). These exploratory analyses revealed that males rather than females appeared to be driving the inflection in false alarms to threat nontargets during adolescence (fig. 3a). Independent t tests revealed that in males, adolescents made more false alarms than children ($t_{18} = 2.28$, $p < 0.04$) or adults ($t_{18} = 2.96$, $p < 0.009$) and showed a similar pattern in the activation of the OFC, a region implicated in the regulation of approach-related behavior (adolescents vs. children: $t_{18} = 2.31$, $p < 0.04$; adolescents vs. adults: $t_{18} = 2.39$, $p < 0.03$; fig. 3b).

In contrast, the female age groups did not differ from one another in performance (children vs. adolescents: p = 0.44 and adolescents vs. adults: p = 0.07) or in OFC activity (children vs. adolescents: p = 0.19 and adolescents vs.



**Fig. 2.** Adolescent-specific and adolescent-emergent brain regions. Representative axial images and beta weights for those regions showing an age effect on correct fear no-go trials relative to calm ones from the whole-brain-corrected age (3) × response (2) × emotion (2) interaction. L = Left. Adolescent-specific effects on correct fear relative to calm no-go trials were found in contrasts between adolescents relative to children and adults together in the LOFC ($t_{55}$ = 2.612, p < 0.012) and left mPFC ($t_{55}$ = 2.832, p < 0.006) Adolescent-emergent effects were found in activation contrasts in children relative to adolescents and adults together on correct fear relative to calm no-go trials in the RIFG ($t_{55}$ = 2.503, p < 0.02), RACC ($t_{55}$ = 2.44, p < 0.02) and left premotor cortex ($t_{55}$ = 3.658, p < 0.001).

**Table 1.** ROIs (Talairach) for the interaction of age group × emotion × response type

| Voxels, n | Region | Brodmann's area | Coordinates (peak) | F value |
|---|---|---|---|---|
| 193 | RIFG | 45 | 32, 17, 18 | 8.41 |
| 104 | LOFC | 11 | −38, 41, −7 | 8.86 |
| 78 | L mPFC | 9 | −8, 53, 24 | 7.95 |
| 72 | L premotor | 6 | −41, 2, 7 | 8.68 |
| 58 | L striatum | | −20, 8, −10 | 6.59 |
| 56 | L motor/premotor | 4, 6 | −14, −8, 63 | 7.74 |
| 51 | RACC | 32 | 11, 2, 45 | 6.86 |

Results are whole-brain corrected (alpha = 0.05, 47 voxels). L = Left.



**Fig. 3.** Sex Differences in behavior and limbic activity by age group. **a** Difference score in number of false alarms to fear no-go trials relative to calm no-go trials by age group and sex. **b** Beta weights for OFC to correct fear no-go trials relative to calm no-go trials by age group and sex. **c** Beta weights for mPFC to correct fear no-go trials relative to calm no-go trials by age group and sex. L = Left.

adults: p = 0.76). Rather, adolescent females showed greater activity in the mPFC, a region implicated in the regulation of avoidance-related behavior (fig. 3c; children vs. adolescents $t_{15}$ = 2.53, p < 0.03 and adolescents vs. adults $t_{17}$ 2.65, p < 0.02). Males did not differ across age groups in this region (children vs. adolescents: p = 0.79 and adolescents vs. adults: p = 0.26).

## Discussion

Prior research has focused almost exclusively on how incentives and positive social cues lead to impulsive decisions during adolescence to help explain inflections in risk taking and criminal behavior during this period [3, 8, 25, 39]. The current study examined the effect of threat cues on impulse control and the underlying neural circuitry in adolescents. We found that just as positive cues can lead to more impulsive responses by adolescents relative to children and adults [3], so too can threat cues. This adolescent-specific inflection in false alarms to threat cues was paralleled by marked increases in limbic prefrontal (orbitofrontal and medial prefrontal) regions, implicated in regulating emotional and behavioral responses, particularly in the case of threat-related stimuli.

In contrast to the adolescent-specific effects in limbic prefrontal regions, prefrontal control circuitry implicated in detecting and resolving conflict between two competing responses showed an adolescent-emergent pattern [40–42]. Specifically, activity in RIFG and RACC increased from childhood to adolescence and then plateaued. These findings are consistent with developmental studies showing that the ability to ignore irrelevant information on cognitive tests like the flanker and go/no-go tasks reaches maturity levels roughly by adolescence [16, 41, 43–45].

The difficulty of adolescents in suppressing attention and actions specifically toward negatively valenced information in the current study is a pattern that is emerging in the developmental literature [15, 16]. This diminished performance in adolescents is not observed in tasks demanding suppression of attention or actions toward neutral information [3, 16]. One explanation for the results reported here may be a failure of adolescents to withhold responses to any emotional stimuli [41]. However, recent work suggests that the actions of adolescents may be disrupted more easily by negative than positive emotional information [15] and differential patterns of activity have been shown for positive and negative emotional stimuli [3, 30]. Together these findings suggest that changes in behavior and limbic circuitry during adolescence coincide with a heightened sensitivity to emotional cues that may cause them to impulsively react rather than retreat from cues of potential threat.

Theoretical and empirical accounts for this diminished performance during adolescence fall along two lines of evidence. The first is evidence of regional brain development with lateral PFC continuing to reach structural and functional maturity throughout the adolescent years [3, 23] and the connections between subcortical and cortical structures continuing to strengthen [46, 47]. Given the role of the lateral PFC in the regulation of behavior, immature connections between it and limbic structures might reduce the capacity to exert cognitive control, particularly in emotionally salient contexts [15, 16]. The second line of evi-

Ex. 1
Page 7

dence comes from neuroendocrinology studies, showing an influx of hormones during puberty thought to sensitize functional properties of certain brain circuits [19, 48, 49], potentially resulting in adolescent-specific enhanced signaling in limbic regions that are especially sensitive to hormonal changes. Thus the heightened recruitment of regulatory prefrontal circuitry when successfully suppressing attention to emotional cues may suggest an adolescent-specific hyper-responsiveness to emotional cues that requires greater recruitment of regulatory regions. Together, these observations suggest that diminished regulation of sensitized limbic circuits may heighten the detection of, and response to, salient social cues during adolescence, even when irrelevant for goal-directed behavior.

An elevated sensitivity or reaction to threat cues during adolescence may have important implications for understanding risky or criminal-related behaviors under a heightened sense of threat. These behaviors have been reported to be higher in males than females [50–52]. So how might the adolescent-specific behavioral and imaging findings relate to sex differences observed in real world behavior? Although there was no main effect of, or interaction with, sex in the 2-factor ANOVA, exploratory independent t tests revealed that males rather than females appeared to be driving the inflection in false alarms to threat cues during adolescence. Specifically, male adolescents made more false alarms than either male children or adults and showed a parallel increased activation pattern in the OFC when successfully inhibiting a response, a region implicated in the regulation of approach-related behavior. In contrast, female adolescents did not significantly differ from female children or adults in their performance or in activity in this region. Rather, they showed greater activity in the mPFC, a region implicated in regulation of avoidance-related behavior. Adolescent males did not significantly differ from children or adults in this region. These exploratory results suggest a possible double dissociation between adolescent males and females in cortical limbic activity related to impulsively reacting and retreating from cues of potential threat, respectively, that warrants further investigation in a larger sample. In addition, a number of other factors, not specifically measured in this study, may have contributed to the observed age and sex differences such as discrepancies between the sexes in pubertal onset, pubertal stage and quality and/or lack of sleep.

The present study demonstrates that impulsive behavior during adolescence is as likely to occur in the presence of threat as reward cues. We show that rather than retreating or withholding a response to threat cues, adolescents are more likely than children or adults to impulsively react to them, even when instructed not to respond. This developmental pattern is mirrored by adolescent-specific changes in limbic cortical circuitry implicated in the detection and assignment of emotional value to inputs and in the subsequent regulation of responses to them [53–56]. Clearly more research will be required to specify the impact of threat cues on adolescent behavior. Nonetheless, these findings may have significant implications for conditions in which adolescents impulsively react and put themselves and others in harm's way.

### Acknowledgments

The authors thank Doug Ballon, Gary Glover, Henning Voss, and the resources and the staff at the Biomedical Imaging Core and Citigroup Biomedical Imaging Center at Weill Cornell Medical College for their assistance in collecting these data. This work was supported by the National Institute of Health grants P50MH079513 (B.J.C.), R01DA018879 (B.J.C.) and F31MH073265 (T.A.H.), MSTP training grant GM07739 (M.D. and A.T.D.), NSRA vision training grant 5T32EY007138-20 (N.E.J.) and by the MacArthur Law and Neuroscience Network.

### References

1 Snyder H: Arrest in the United States, 1990–2010. Washington, US Department of Justice, 2012.
2 Steffensmeier DJ, Allan EA, Harer MD, Streifel C: Age and the distribution of crime. Am J Sociol 1989;94:803–831.
3 Somerville LH, Hare T, Casey BJ: Frontostriatal maturation predicts cognitive control failure to appetitive cues in adolescents. J Cogn Neurosci 2011;23:2123–2134.
4 Steinberg L, Albert D, Cauffman E, Banich M, Graham S, Woolard J: Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: evidence for a dual systems model. Dev Psychol 2008;44:1764–1778.
5 Weller JA, Levin I, Denburg N: Trajectory of risky decision making for potential gains and losses from ages 5 to 85. J Behav Decis Making 2010;24:331–334.
6 Paulsen D, Platt ML, Huettel SA, Brannon EM: Decision-making under risk in children, adolescents, and young adults. Front Psychol 2011;2:72.
7 Harbaugh W, Krause K, Vesterlund L: Risk attitudes of children and adults: choices over small and large probability gains and losses. Exp Econ 2002;5:53–84.
8 Chien J, Albert D, O'Brien L, Uckert K, Steinberg L: Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry. Dev Sci 2011;14:F1–F10.
9 LeDoux JE: The Emotional Brain. New York, Simon & Schuster, 1996.
10 Davis FC, Somerville LH, Ruberry EJ, Berry AB, Shin LM, Whalen PJ: A tale of two negatives: differential memory modulation by threat-related facial expressions. Emotion 2011;11:647–655.

11 Whalen PJ, Rauch SL, Etcoff NL, McInerney SC, Lee MB, Jenike MA: Masked presentations of emotional facial expressions modulate amygdala activity without explicit knowledge. J Neurosci 1998;18:411–418.

12 Sagaspe P, Schwartz S, Vuilleumier P: Fear and stop: a role for the amygdala in motor inhibition by emotional signals. Neuroimage 2011;55:1825–1835.

13 MacLeod CM: Half a century of research on the Stroop effect: an integrative review. Psychol Bull 1991;109:163–203.

14 Simpson JR, Ongür D, Akbudak E, Conturo TE, Ollinger JM, Snyder AZ, Gusnard DA, Raichle ME: The emotional modulation of cognitive processing: an fMRI study. J Cogn Neurosci 2000;12(suppl 2):157–170.

15 Cohen-Gilbert JE, Thomas KM: Inhibitory control during emotional distraction across adolescence and early adulthood. Child Dev 2013;84:1954–1966.

16 Grose-Fifer J, Rodrigues A, Hoover S, Zottoli T: Attentional capture by emotional faces in adolescence. Adv Cogn Psychol 2013;9:81–91.

17 Casey BJ, Jones RM, Hare TA: The adolescent brain. Ann NY Acad Sci 2008;1124:111–126.

18 Steinberg L: A social neuroscience perspective on adolescent risk-taking. Dev Rev 2008;28:78–106.

19 Ernst M, Romeo RD, Andersen SL: Neurobiology of the development of motivated behaviors in adolescence: a window into a neural systems model. Pharmacol Biochem Behav 2009;93:199–211.

20 Casey BJ, Jones RM: Neurobiology of the adolescent brain and behavior: implications for substance use disorders. J Am Acad Child Adolesc Psychiatry 2010;49:1189- 1201.

21 Chugani HT, Phelps ME, Mazziotta JC: Positron emission tomography study of human brain functional development. Ann Neurol 1987;22:487–497.

22 Sowell ER, Thompson PM, Holmes CJ, Jernigan TL, Toga AW: In vivo evidence for post-adolescent brain maturation in frontal and striatal regions. Nat Neurosci 1999;2:859–861.

23 Shaw P, Kabani NJ, Lerch JP, Eckstrand K, Lenroot R, Gogtay N, Greenstein D, Clasen L, Evans A, Rapoport JL, Giedd JN, Wise SP: Neurodevelopmental trajectories of the human cerebral cortex. J Neurosci 2008;28:3586–3594.

24 Gogtay N, Giedd JN, Lusk L, Hayashi KM, Greenstein D, Vaituzis AC, Nugent TF 3rd, Herman DH, Clasen LS, Toga AW, Rapoport JL, Thompson PM: Dynamic mapping of human cortical development during childhood through early adulthood. Proc Natl Acad Sci USA 2004;101:8174–8179.

25 Galván A, Hare TA, Parra CE, Penn J, Voss H, Glover G, Casey BJ: Earlier development of the accumbens relative to orbitofrontal cortex might underlie risk-taking behavior in adolescents. J Neurosci 2006;26:6885–6892.

26 Huttenlocher PR: Synaptic density in human frontal cortex – developmental changes and effects of aging. Brain Res 1979;163:195–205.

27 Bourgeois JP, Goldman-Rakic PS, Rakic P: Synaptogenesis in the prefrontal cortex of rhesus monkeys. Cereb Cortex 1994;4:78–96.

28 Rakic P: Synaptic development of the cerebral cortex: implications for learning, memory and mental illness. Prog Brain Res 1994;102:227–243.

29 Casey BJ, Getz S, Galván A: The adolescent brain. Dev Rev 2008;28:62–77.

30 Hare TA, Tottenham N, Galván A, Voss HU, Glover GH, Casey, BJ: Biological substrates of emotional reactivity and regulation in adolescence during an emotional go-nogo task. Biol Psychiatry 2008;63:927–934.

31 Tottenham N, Tanahka JW, Leon AC, McCarry T, Nurse M, Hare TA, Marcus DJ, Westerlund A, Casey BJ, Nelson C: The NimStim set of facial expressions: judgments from untrained research participants. Psychiatry Res 2009;168:242–249.

32 Thomas KM, Drevets WC, Dahl RE, Ryan ND, Birmaher B, Eccard CH, Axelson D, Whalen PJ, Casey BJ: Amygdala response to fearful faces in anxious and depressed children. Arch Gen Psychiatry 2001;58:1057–1063.

33 Herba C, Phillips M: Annotation: development of facial expression recognition from childhood to adolescence: behavioural and neurological perspectives. J Child Psychol Psychiatry 2004;45:1185–1198.

34 Gross AL, Ballif B: Children's understanding of emotion from facial expressions and situations: a review. Dev Rev 1991;11:368–398.

35 Glover GH, Thomason ME: Improved combination of spiral-in/out images for BOLD fMRI. Magn Reson Med 2004;51:863–868.

36 Cox RW: AFNI: software for analysis and visualization of functional magnetic resonance neuroimaging. Comp Biomed Res 1996;29:162–173.

37 Chen G, Saad ZS, Britton JC, Pine DS, Cox RW: Linear mixed-effects modeling approach to FMRI group analysis. Neuroimage 2013;73:176–190.

38 Talairach J, Tournoux P: Co-planar Stereotaxic Atlas of the Human Brain: 3-Dimensional Proportional System – an Approach to Cerebral Imaging. New York, Thieme, 1988.

39 Van Leijenhorst L, Zanolie K, Van Meel CS, Westenberg PM, Rombouts SA, Crone EA: What motivates the adolescent? Brain regions mediating reward sensitivity across adolescence. Cereb Cortex 2010;20:61–69.

40 Botvinick M, Nystrom LE, Fissell K, Carter CS, Cohen JD: Conflict monitoring versus selection-for-action in anterior cingulate cortex. Nature 1999;402:179–181.

41 Casey BJ, Thomas KM, Welsh TF, Badgaiyan R, Eccard CH, Jennings JR, Crone EA: Dissociation of response conflict, attentional control, and expectancy with functional magnetic resonance imaging. Proc Natl Acad Sci USA 2002;97:8728–8733.

42 Guitart-Masip M, Huys QM, Fuentemilla L, Dayan P, Duzel E, Dolan RJ: Go and no-go learning in reward and punishment: interactions between affect and effect. Neuroimage 2012;62:154–166.

43 Passler MA, Isaac W, Hynd GW: Neuropsychological development of behavior attributed to frontal lobe functioning in children. Dev Neuropsychol 1985;1:349–370.

44 Enns JT, Cameron S: Selective attention in young children: the relations between visual search, filtering, and priming. J Exp Child Psychol 1987;44:38–63.

45 Ridderinkhof KR, van der Molen MW, Band GP, Bashore TR: Sources of interference from irrelevant information: a developmental study. J Exp Child Psychol 1997;65:315–341.

46 Asato MR, Terwilliger R, Woo J, Luna B: White matter development in adolescence: a DTI study. Cereb Cortex 2010;20:2122–2131.

47 Liston C, Watts R, Tottenham N, Davidson MC, Niogi S, Ulug AM, Casey BJ: Frontostriatal microstructure modulates efficient recruitment of cognitive control. Cereb Cortex 2006;16:553–560.

48 Nelson EE, Leibenluft E, McClure EB, Pine DS: The social re-orientation of adolescence: a neuroscience perspective on the process and its relation to psychopathology. Psychol Med 2005;35:163–174.

49 Sisk CL, Zehr JL: Pubertal hormones organize the adolescent brain and behavior. Front Neuroendocrinol 2005;26:163–174.

50 D'Unger AV, Land KC, McCall PL: Sex differences in age patterns of delinquent/criminal careers: results from Poisson latent class analyses of the Philadelphia cohort study. J Quant Criminol 2002;18:349–375.

51 Poe-Yamagata E, Butts JA: Female offenders in the juvenile justice system: statistics summary. National Center for Juvenile Justice, 1996.

52 Byrnes JP, Miller DC, Schafer WD: Gender differences in risk taking: a meta-analysis. Psychol Bull 1999;125:367–383.

53 Blakemore SJ: The social brain in adolescence. Nat Rev Neurosci 2008;9:267–277.

54 Nelson EE, Guyer AE: The development of the ventral prefrontal cortex and social flexibility. Dev Cogn Neurosci 2011;1:233–245.

55 Somerville LH, Jones RM, Ruberry EJ, Dyke JP, Glover G, Casey BJ: The medial prefrontal cortex and the emergence of self-conscious emotion in adolescence. Psychol Sci 2013;24:1554–1562.

56 Roy M, Shohamy D, Wager TD: Ventromedial prefrontal-subcortical systems and the generation of affective meaning. Trends Cogn Sci 2012;16:147–156.

Ex. 1
Page 9

# Exhibit 2

# The Case for Gun Policy Reforms in America



Daniel W. Webster, ScD, MPH
Jon S. Vernick, JD, MPH
Katherine Vittes, PhD, MPH
Emma E. McGinty, MS
Stephen P. Teret, JD, MPH
Shannon Frattaroli, PhD, MPH

**JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH**
www.jhsph.edu/GunPolicy
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

*OCTOBER, 2012

*On February 5, 2014, this White Paper was updated
to reflect a correction concerning the number of
states that allow 18-20 year-olds to legally purchase
handguns (page 5).



JOHNS HOPKINS
BLOOMBERG
SCHOOL *of* PUBLIC HEALTH

COVER PHOTO CREDIT: Photo used with permission of Garen J. Wintemute from Inside Gun Shows: What Takes Place When Everybody Thinks Nobody is Watching. Violence Prevention Research Group,
Department of Emergency Medicine, University of California, Davis, 2009. © 2009 by Garen Wintemute, MD, MPH. All rights reserved. Published September 2009.

### The Burden of Gun Violence in the United States

More than 31,000 people a year in the United States die from gunshot wounds.[1] Because victims are disproportionately young, gun violence is one of the leading causes of premature mortality in the U.S. In addition to these deaths, in 2010, there were an estimated 337,960 non-fatal violent crimes committed with guns,[2] and 73,505 persons treated in hospital emergency departments for non-fatal gunshot wounds.[3,4]

Gun violence in the United States is unusually high for a nation of such wealth. Although there is little difference in the overall crime rates between the United States and other high-income countries, the homicide rate in the U.S. is seven times higher than the combined homicide rate of 22 other high-income countries.[5] This is because the *firearm* homicide rate in the U.S. is twenty times greater than in these other high-income countries. The higher prevalence of gun ownership and much less restrictive gun laws are important reasons why violent crime in the U.S. is so much more lethal than in countries of similar income levels.

There are enormous economic costs associated with gun violence in the U.S. Firearm-related deaths and injuries resulted in medical and lost productivity expenses of about $32 billion in 2005.[6] But the overall cost of gun violence goes well beyond these figures. When lost quality of life, psychological and emotional trauma, decline in property values, and other legal and societal consequences are included, the cost of gun violence in the U.S. was estimated to be about $100 billion annually in 1998.[7] A new study has examined the direct and indirect costs of violent crime in eight geographically-diverse U.S. cities, and estimated the average annual cost of violent crime was more than $1,300 for every adult and child. Because much of these costs are due to lowering residential property values, violent crime greatly reduces tax revenues that local governments need to address a broad array of citizens' needs. The direct annual cost of violent crime to all levels of government was estimated to be $325 per resident.[8]

### Gun Control Policies in the United States

Debates about gun control often drift towards general arguments about whether guns make us safer or less safe, and gun control is equated with restricting gun ownership. However, with recent Supreme Court decisions overturning laws which ban firearm possession in the District of Columbia and Chicago, current gun control policies in the U.S. do not disarm law-abiding adults over the age of 21. Rather, gun control laws today focus on one or more of four general objectives. These laws aim to:

1. Define conditions that prohibit a person from possessing firearms;
2. Implement regulations to prevent prohibited persons from possessing firearms;
3. Restrict carrying of concealed firearms outside the home; and
4. Regulate the design of firearms to enhance public and personal safety.

Below, we draw upon research evidence to suggest how improvements in each of these types of gun policies could enhance public safety in the United States.

2

*Rationale for Current Conditions that Prohibit Firearm Possession*

Federal law prohibits certain categories of individuals from possessing firearms, including: felons; fugitives; persons convicted of a misdemeanor crime for domestic violence; those who are subject to certain restraining orders for domestic violence; unlawful users of or those addicted to controlled substances; those who have been found by a judge to be mentally incompetent, a danger to themselves or others as a result of mental illness, or been involuntarily committed to a mental institution; those who have been dishonorably discharged from the military; illegal aliens; and persons who have renounced their U.S. citizenship. In addition, federal law sets 21 years as the minimum age at which a person can lawfully purchase a handgun from a federally licensed firearms dealer, but sets 18 as the minimum legal age for handgun possession and for transfers of handguns from anyone who is not a licensed gun dealer.[9]

Most of these categories of persons prohibited from possessing firearms can be justified based on data indicating increased risk for violence. Individuals with prior felony convictions are far more likely to commit future crimes of violence than non-felons. A history of perpetrating intimate partner violence (IPV) is associated with increased risk of subsequent murder of an intimate partner, and a perpetrator's ownership of a firearm increases the risk of domestic homicide five-fold for victims.[10] Several studies indicate that a significant proportion of domestic violence abusers also commit serious offenses against strangers and non-family members.[11,12,13,14]

Firearm prohibitions for drug abusers are also justified. Substance abuse is associated with increased risk of domestic violence,[15,16,17,18] and incarceration for violent crime,[19] as well as suicide.[20,21] Homicide offenders are nearly five times more likely to abuse drugs than non-offender controls.[22] Although the majority of persons with mental illnesses are not violent,[23,24] and only a small portion of violence is attributable to mental illness alone,[25] persons with serious mental illnesses, such as schizophrenia, bipolar disorder, and major depression, are more likely to commit violence against others and themselves than are individuals who do not have these disorders.[26,27, 28]

Minimum age restrictions for firearm possession are prudent because the risk of perpetrating or being victimized by serious violent crimes increases rapidly during adolescence and in the early 20s.[29, 30] (See Figure below.) Brain structures related to risk-taking and impulse-control are developing throughout adolescence, and this may contribute to heightened risk of violent behavior among this age group.[31,32]

*Why Firearms Prohibitions for High-Risk Persons Should be Broadened*

*Criminal Prohibitions*

In addition to the exclusion criteria for firearm possession under federal law, many states have additional disqualifications for legal firearm possession. The differences in exclusion criteria across states are significant. For example, New Jersey prohibits firearm possession by anyone who has been convicted of a crime for which the penalty can be 6 months or more of

imprisonment, and sets the minimum legal age for handgun possession at 21 years. In contrast, 13 states have standards for legal firearm possession that either mirror or are weaker than federal standards.

Most people believe that criminals should not be able to possess firearms lawfully. Yet, our current laws permit many people who have been convicted of crimes—most misdemeanor crimes adjudicated in adult court and felony crimes handled in juvenile court—to possess firearms. Data from two studies of individuals who have committed the most serious crimes indicate that prior to committing these crimes, the perpetrators were not prohibited from possessing a firearm under federal law. A recent study, based on surveys of inmates in state prisons, examined the criminal history and ages of persons imprisoned for committing crimes with a gun in the 13 states with standards for legal gun ownership that do not go beyond those set in federal law. At the time when they committed the gun crime leading to their incarceration, only 27 percent of these gun offenders were prohibited from possessing firearms because they had previously been convicted of a felony. Of these offenders, 60 percent could legally possess guns prior to committing the gun crime that led to their incarceration, including four percent who had prior misdemeanor convictions involving violence and/or firearms, six percent convicted of other misdemeanors, five percent convicted of a felony in a juvenile court, and 13 percent with prior arrests but no convictions.[33]

Some may assume that persons convicted of misdemeanor crimes do not pose a significant threat for committing serious violent crimes. But many suspects charged with felony crimes are convicted of lesser charges as a result of a plea agreement. Research has shown that misdemeanants who were legally able to purchase handguns committed crimes involving violence following those purchases at a rate two to ten times higher than that of handgun purchasers with no prior convictions.[34] Handgun purchasers with a history of arrest but no convictions have an equally high or higher risk of committing violent crimes following handgun purchases as do misdemeanants who legally purchased a handgun.[35]

We believe the evidence above justifies an extension of firearm prohibitions for persons with a history of criminal behavior to include persons convicted of all misdemeanor crimes of violence, as well as individuals who have committed felony crimes as a juvenile. Such prohibitions do not necessarily need to be life-long. Many states have laws prohibiting firearm possession for individuals convicted of serious crimes as juveniles. These restrictions are time-limited, based on either the age of the individual or the number of years since the prohibiting conviction.

*Substance Abusers*

Federal law prohibits firearm possession by anyone who is addicted to illegal drugs, but regulations written to implement the law provide a relatively narrow definition of who would be prohibited. A person would be determined to be prohibited if he has "a conviction for use or possession of a controlled substance within the past year; multiple arrests for such offenses within the past 5 years, if the most recent arrest occurred within the past year; or … [is] found through a drug test to use a controlled substance unlawfully, provided the test was administered within the past year."[36] The number of drug abusers prohibited from possessing firearms might

be increased significantly by revamping these regulations to, for example, expand the period following a drug conviction for which a person is prohibited from possessing firearms.

Expanding firearm prohibitions to include persons who are alcoholics or problem drinkers could potentially reduce alcohol-related violence. Alcohol abuse is strongly associated with the perpetration of violence. Yet federal firearm laws do not prohibit alcoholics from possessing firearms, and only 16 states have statutes prohibiting alcohol abusers from possessing firearms. Furthermore, some states with gun prohibitions for alcohol abusers lack regulations to allow authorities to enforce the prohibition.[37]

*Youth Under Age 21*

Restrictions on youths' ability to purchase and possess firearms should be broadened. Although federal law and most state law allows youth 18 to 20 years of age to legally possess a handgun, youth of these ages have some of the highest rates of homicide offending. Age-specific homicide offending rates rise sharply in the late teens and peak at age 20.[38] (See figure below.) In an examination of the background and legal status of gun offenders incarcerated in the 13 states with the weakest standards for legal firearm ownership, the largest segment of offenders who would have been prohibited in other states with stricter standards were those who were between 18 and 20 years of age.[33] Heightened risk-taking, and concerns for protecting youth and the public from alcohol abuse resulted in laws in all 50 states, establishing 21 as the minimum legal age for alcoholic beverage consumption. These laws led to significant reductions in deaths from motor vehicle crashes involving drivers ages 18-20.[39] Yet, *thirty-eight states allow 18- to 20-year-olds to legally possess as many handguns as they desire.

**Homicide offending per 100,000 population in 2009 for specific ages of offenders.**[*]



[*] Data from the Supplemental Homicide Reports, Uniform Crime Reporting System, Federal Bureau of Investigation, U.S. Department of Justice.

*On February 5, 2014, this White Paper was updated to reflect the following correction: Thirty-eight states allow 18-20 year olds to legally possess as many handguns as they desire. An earlier version incorrectly reported forty-five states allowed 18-20 year olds to legally possess as many handguns as they desire.

### Regulating Gun Sales Can Prevent Diversion of Guns to Criminals and Underage Youth

*The Brady Law – Necessary But Insufficient*

Central to effective gun policy is being able to identify higher-risk, prohibited persons attempting to buy guns, and to prevent those purchases. The Brady Law is the foundation for the federal government's attempt to achieve this objective. Before the Brady Law, "gun control" within many states worked on the honor system. Firearm purchasers simply completed a form indicating whether they met any of the exclusion criteria for legal firearm possession, without independent verification of the information provided. With the passage of the Brady bill, gun purchasers buying from a federally licensed firearm dealer are subject to a background check. Since the Brady Law was enacted in 1994, more than 2 million applications to purchase or transfer firearms were denied because the applicant was prohibited from purchasing firearms.[40] Some unknown, but likely larger number of prohibited individuals did not attempt to purchase a firearm because they were legally prohibited.

But the Brady Law only requires prospective purchasers to pass a background check if they are purchasing the firearm from a licensed firearm dealer. Data from a nationally representative sample of gun owners indicate that 40 percent of firearm acquisitions are from individuals who are not licensed gun dealers. Not surprisingly, criminals exploit the private sales loophole. Data from a national survey of inmates indicated that nearly 80 percent of those who had used a handgun in a crime had acquired it through a transaction with an individual who was not a licensed gun dealer. An advocate for closing the private sale loophole[†] once likened current federal gun policy to an airline security system which offers passengers a choice between submitting oneself to our current screening system, or side-stepping it, and boarding with whatever you would like to bring on board. Should we expect gun laws with the private-sale purchaser screening loophole to be any more effective than voluntary airline passenger screening?

A widely cited study evaluated the impact of the Brady Law and concluded that the law did not affect homicide and suicide rates.[41] The ability of the Brady Law to reduce homicides and suicides is certainly diminished by the giant loophole for private firearm sales that criminals and traffickers exploit. We believe that the Brady Law should be viewed as a necessary foundation for federal gun control laws, but that it is insufficient for achieving the goal of preventing prohibited persons from accessing firearms.

*Federal Regulations of Retail Gun Sellers are Weak, Seller Protections are Broad*

Any effective system of gun control must have adequate regulation and oversight of those who could reap substantial profits by evading the laws. Unfortunately, Congress has repeatedly weakened regulation, oversight, and accountability of federally licensed gun dealers. The Firearm Owners Protection Act of 1986 reduced penalties for gun sales law violations, increased standards of evidence for successful prosecution of gun sellers, and limited the Bureau of Alcohol, Tobacco and Firearms (ATF) compliance inspections. Federal gun policies adopted first

---

[†] Jeri Bonavia, Executive Director, Wisconsin Anti-Violence Effort.

in 2003, and known as the Tiahrt amendments, after the legislation's sponsor, Rep. Todd Tiahrt (R-KS), limit public access to crime gun trace data, prohibit the use of gun trace data in hearings pertaining to licensure of gun dealers and litigation against gun dealers, and restrict ATF's authority to require gun dealers to conduct a physical inventory of their firearms. Another act of Congress, The Protection of Lawful Commerce in Arms Act of 2005 provides broad protections from lawsuits against firearm manufacturers and retail sellers.[42]

Available research shows the harms of policies which inadequately hold gun sellers accountable for dangerous and illegal practices. In a national survey of armed criminals, illegal purchases from licensed gun dealers (e.g., no background check conducted) were as common as were legal purchases from licensed gun dealers.[43] Data from federal gun trafficking investigations indicate that scofflaw gun dealers are the most important channels for diverting guns to traffickers and criminals.[44] Phone surveys of gun dealers reveal that many are willing to bend or break the law to make a sale.[45,46] Findings from a study of Chicago's underground illegal gun markets found that certain retailers, set up just across the city's border, colluded with traffickers to funnel large numbers of guns to gang members.[47]

*Better Regulation and Oversight of Gun Sellers Reduces Diversions of Guns to Criminals*

Diversion of guns to criminals shortly following retail sales is much less common in states that license retail gun sellers, require careful record keeping that can be reviewed by local or state law enforcement, and where law enforcement agencies conduct regular compliance inspections.[48] Undercover stings to catch retailers facilitating illegal sales, followed by lawsuits against scofflaw gun dealers, also deter the diversion of guns to criminals.[49,50]

The case of a large gun shop near Milwaukee demonstrates how accountability measures, or the lack thereof, can have a dramatic effect on the diversion of guns to criminals. In 1999, a report was released that indicated that Badger Guns & Ammo had sold more guns that were later traced to crime than any other retail gun seller in the nation. Within days of the report being publicized in the news, the gun dealer voluntarily changed his sales practices. Abruptly after this change, the diversion of guns to criminals in Milwaukee within a year of being sold by the dealer dropped by 73 percent.[51] The enactment of the Tiahrt amendments, which, among several protections for gun sellers, prevented the release of data connecting gun shops to crime guns, was associated with a 204 percent increase in the diversion of guns to criminals soon after sales by Badger Guns & Ammo.[52]

Weaknesses in U.S. gun laws may cause skepticism about whether gun control can work. Yet, a growing body of research shows that common-sense policies adopted at the state and local level succeed in reducing the diversion of guns to criminals. A study using crime gun trace data from 54 U.S. cities examined the association between gun sales regulations and the diversion of guns to criminals. Strong regulation and oversight of licensed gun dealers, regulation of gun sales by private sellers, and permit-to-purchase licensing systems (which require potential gun purchasers to apply for a license directly with a law enforcement agency, where they are typically photographed and fingerprinted) were each associated with significantly fewer guns that were diverted to criminals.[48] A systematic observational study of gun sales at gun shows found anonymous undocumented firearms sales to be ubiquitous, and illegal straw sales more than six times as common in states that do not regulate private sales, compared with California,

7

which does regulate such sales.[53] Separate research shows that states which do not regulate private gun sales, adopt permit-to-purchase licensing systems, or have gun owner accountability measures, like mandatory reporting of gun thefts, export significantly more guns used by criminals to other states that have constrained the supply of guns for criminals by adopting strict gun sales regulations.[54,55] Broad adoption of these policies could greatly enhance our ability to keep guns from those most likely to use them in crime.

A common response to calls for stricter gun control laws from opponents of reform is that there is no need to change our gun laws; we just have to "enforce the laws on the books." But we do not have to choose between needed reforms and better enforcement. Effective enforcement of gun control laws can deter illegal gun trafficking,[56] but loopholes, high standards of evidence, and weak penalties make it difficult to enforce laws designed to keep guns from prohibited persons. Stronger gun laws will lead to better enforcement of those laws.

### *Firearm Prohibitions for High-Risk Groups Reduce Violence and Save Lives*

There has been very little research of high scientific quality that directly examines whether laws prohibiting individuals in high-risk groups from purchasing or possessing firearms reduce criminal offending by prohibited individuals.[57,58] One study examined the impact of a California law that expanded firearm prohibitions to include persons convicted of misdemeanor crimes of violence. A study of legal handgun purchasers in California before and after the law found that denial of firearm purchase applications by violent misdemeanants was associated with lower rates of violence by this high-risk group.[59]

Federal law and laws in many states prohibit firearm possession by individuals who were either previously convicted of a misdemeanor for domestic violence, or currently subject to a restraining order sought by a current or former intimate partner. Enforcement of these laws appears to be spotty,[60, 61] and could be improved through proactive efforts to disarm prohibited IPV offenders.[62] Nevertheless, evaluations have found that laws prohibiting firearm possession by persons restrained by court-issued protective orders for victims of domestic violence reduce domestic homicides; however, there was no measurable effect of laws prohibiting persons convicted of misdemeanors for domestic violence.[63,64]

Youth under age 18 are forbidden by federal law from purchasing or possessing handguns.[65] Most states have enacted their own laws setting a minimum legal age for handgun purchase or possession, usually at age 18. Only five have set the minimum age for handgun possession at 21. Evaluations have failed to find any beneficial effects of these laws on either juvenile homicide victimization or youth suicide.[66, 67] But prior studies have not examined the most direct outcome, violent crime perpetration by the restricted ages. Another type of age-based firearm restriction are so-called "child access prevention" (CAP) laws requiring gun owners to store their firearms so that children and teens cannot easily access firearms unsupervised. Studies have found CAP laws to be effective in reducing accidental shootings of children by as much as 23 percent,[68,69] and suicides of adolescents by 8 percent.[70]

8

*Right-to-Carry Laws Do Not Make Us Safer and Likely Increase Aggravated Assaults*

So-called right to carry (RTC) laws allow individuals who are not legally proscribed from possessing firearms to carry concealed weapons in public, either by making it easy to get a permit to do so, or by not requiring such permits at all. Arguments for RTC laws are premised on the idea that everyone who is eligible to legally own a firearm is law-abiding, and is at low risk for committing a violent crime. Research cited above concerning weak standards for legal firearm ownership calls this into question. A recent review of concealed carry permit holders in North Carolina examined criminal offending in the group over a five-year period. During that period, more than 2,400 permit holders were convicted of crimes (excluding traffic violations), including more than 200 felonies and 10 murders or manslaughters. An additional 900 had been convicted of a drunk driving offense, an offense commonly associated with substance abuse.[71]

A large body of research has been conducted to investigate the effect of RTC laws on violence. Most notably, research led by John Lott, Jr. suggests that RTC laws have led to significant reductions in violent crime.[72] But the research showing crime-reducing effects of RTC laws, including Lott's, has been carefully reviewed by a National Council of Research panel of experts, and others, and has been found to have serious flaws.[73,74,75] The most consistent finding across studies which correct for these flaws is that RTC laws are associated with an increase in aggravated assaults.[76] Using various statistical methods, estimates range from a one to nine percent increase in aggravated assaults as a result of RTC laws.[77,78]

*Regulating the Design of Guns Can Save Lives*

Not all firearms are created equal. One characteristic of guns that is relevant to public safety, particularly in regard to mass shootings, is ammunition capacity. Large capacity magazines (LCM), typically defined as holding more than 10 rounds of ammunition, increase the number of rounds someone can fire without stopping to reload. An assault weapon is generally defined as a civilian version of a military style weapon. Assault weapons are typically capable of accepting LCMs.

Assault weapons and LCMs are common characteristics of guns discussed in policy debates because they are disproportionately used in mass shootings. Mass shootings involving assault weapons typically involve more victims per incident than mass shootings with other weapons.[79] Recent examples of firearms with LCM being used in mass shootings include Jared Lee Loughner's use of a Glock 9mm semi-automatic pistol, with a magazine holding 33 rounds of ammunition, to murder 6 and wound 13 others, including Congresswoman Gabrielle Giffords, in January 2011. The suspect in the mass shooting at a movie theater in Aurora, Colorado that left 12 dead and 58 injured used an assault rifle with a 100-round magazine. Weapons with LCMs were also used in the mass shootings at Virginia Tech University and Fort Hood, Texas. It is impossible to determine if these and other perpetrators of mass shootings would have been able to acquire assault weapons or LCMs had the weapons and magazines been banned. But if the perpetrators had used firearms that were not equipped with LCMs, it seems very likely that fewer people would have been injured and killed.

9

In September, 1994, a federal law went into effect which banned the manufacture, transfer and possession of certain assault weapons and all ammunition magazines that held more than10 rounds; but the law expired in 2004. The ban had important limitations. It allowed "copy cat" assault weapons with only slight differences from banned models, it allowed the import of rifles that could accept LCM, and, most importantly, it allowed for the "grandfathering" of assault weapons and LCMs manufactured before the effective date of the law. In contrast, the Australian government developed a process for the government to buy banned weapons from citizens when that country banned semi-automatic and pump-action rifles and shotguns in response to a mass shooting. In the decade following enactment of the policy, there was not a single mass shooting, and declines in homicide rates accelerated.[80]

Criminologist Christopher Koper led a study to evaluate the federal assault weapon and LCM ban which revealed the limitation of the law's impact.[81] Just prior to the ban going into effect, production of assault rifles and assault pistols surged. Nevertheless, the percentage of crime guns recovered by police which were assault weapons dropped 70 percent between 1992-1993 (just prior to the ban) and 2001-2002. But assault weapons accounted for only 6 percent of all crime guns prior to the ban. For assaults with LCMs, which were used in 13 to 20 percent of gun crimes in selected cities, there was no detectable change in criminal use following the ban. (In contrast, a separate study of firearms recovered by police in Virginia found that the percentage of firearms with LCMs dropped sharply following the federal ban of LCMs, and then rebounded when the ban expired.[82]) Koper and colleagues found no detectible effects of the law on gun violence. The researchers attribute this negative finding of the LCM ban's effect to several factors, including the wide availability of grandfathered LCMs, their relatively low cost, and criminals' high demand for LCMs.

The finding of this study underscores the need to be realistic about the likely impact of an assault weapons or LCM ban. Ammunition capacity of 10 or more rounds becomes relevant in only a small percentage of shootings. A study of shootings in Jersey City, NJ found that 10 or more rounds were fired in only 4.7 percent of the incidents.[83] Koper indicated that the lack of statistically significant findings does not mean that the law did not prevent a small percentage of the over 10,000 firearm-involved homicides and nonfatal woundings of nearly 50,000 people annually. Even if the ban eventually prevented only 1 of every 5 of the five percent of incidents in which LCM are relevant, that would translate into about 100 fewer homicides and 500 fewer people wounded by gunshots per year. Such effects would not be definitively detectable with national data, but would be nonetheless meaningful, given the magnitude of the problem. Further, focusing solely on the "body count" glosses over the considerable psychological trauma and other social costs resulting from mass shootings. We have decided to regulate the design of numerous consumer products, such as cribs and small, high-powered magnets, in order to prevent far fewer deaths than could be prevented with a ban of LCMs. Opponents of such bans do not have a compelling reason why law-abiding citizens need to have firearms with unlimited ammunition capacity.

Aside from ammunition capacity, other characteristics of firearms that are relevant to public safety include how easily the gun can be concealed, and how prone it is to misfire or fire unintentionally. Concealability and a tendency to misfire or fire unintentionally are two of the characteristics that define what some refer to as "junk guns" or "Saturday night specials." These

weapons are over-represented among crime guns after controlling for handgun purchaser demographics, gun dealer characteristics, and sale conditions.[84] Within a year following one gun dealer's decision to stop selling junk handguns, the number of guns sold by the dealer that were linked to crime showed a 73 percent reduction.[48] When Maryland banned the sale of junk handguns, researchers found that such guns were much less likely to be used in crime in Baltimore than in other cities,[85] and that the enactment of the law was associated with an estimated 8 to 11 percent reduction in gun homicides.[86]

Although unintentional or accidental shootings account for a small share of firearm-related mortality and morbidity, these deaths and injuries are highly preventable through proper design of firearms. Some of these incidents occur because inexperienced gun handlers, often children, do not realize that a gun is loaded, or that a pistol can have a round loaded in the chamber to fire even after the ammunition clip is removed. Unintentional shootings of this type can be prevented by magazine safety disconnect devices and loaded chamber indicators, relatively inexpensive safety features already available on some handguns.[87] Guns can also be designed so that they cannot be fired by unauthorized users, and thus, prevent unintentional and self-inflicted shootings by underage youth, as well as some crimes committed with stolen guns.[88]

### There is Broad Public Support for Many Needed Reforms to Our Gun Laws

Much has been made of an apparent drop in public support for gun control in recent years. Much of this is based on findings from Gallup polls, in which respondents are asked a very general question about whether gun laws should be made stricter, less strict, or kept as they are. This may be a reasonable barometer of respondents' general attitudes toward guns and government regulation, but it tells us little about what specific policies people believe are in place, and which policies citizens support. A recent survey of gun owners found that more than half of respondents believed erroneously that background checks are required for all gun sales. In reality, most states limit background check requirements to persons purchasing firearms from a licensed gun dealer. This survey of gun owners also found: 1) 82 percent favored mandatory background checks for *all* firearms sales, not just for those by licensed dealers, 2) 68 percent supported laws mandating reporting of gun thefts, and 3) broad support of stricter standards for issuing permits to carry concealed firearms than are in place in most states.[‡][89] Another poll from 2011 on specific gun policies found broad public support for a number of measures which either expand current prohibitions for potentially dangerous people (e.g., people on terrorist watch list, persons arrested for drug crimes), or enhance accountability, so that prohibited persons cannot access firearms. Although there is relatively less support for creating a national registry for all gun owners and their guns, and for banning high-capacity ammunition magazines, such policies still garner the support of 66 percent and 58 percent of all adults, respectively, along with a plurality of gun owners.[90] We suspect that support for adopting these reforms would be even greater if more people knew the facts about weaknesses in current gun laws, and the effectiveness of regulations that most would consider reasonable.

---

[‡] Support for specific restrictions on issuing of concealed carry permits if applicant is: younger than 21 (69%), has been arrested for domestic violence (73%), been convicted of a misdemeanor crime of violence (78%), has not completed safety training for carrying concealed firearms (80%).

*Conclusion*

The burden of gun violence on American society is substantial, whether measured in years of productive life lost, disability, fear, or economic costs. The toll is unprecedented among high-income nations. Weaknesses in current gun laws contribute to this burden by establishing low standards for legal gun ownership and significant loopholes in policies designed to keep guns from prohibited persons. When states expand firearm prohibitions to high-risk groups, and adopt comprehensive measures to prevent diversion of guns to prohibited persons, fewer guns are diverted to criminals, and there is less violence.

Some mistakenly believe that the Second Amendment to the U.S. Constitution would prohibit the kinds of legal reforms we believe are warranted. In 2008, in *District of Columbia v. Heller*,[91] the U.S. Supreme Court ruled that the Second Amendment protected an individual right to own guns, striking down Washington, D.C.'s law banning handgun possession in the home. However, the *Heller* decision also mentioned numerous types of presumptively valid gun laws, including "laws imposing conditions and qualifications on the commercial sale of arms." Since *Heller*, lower courts have overwhelmingly upheld the constitutionality of a wide range of gun laws other than handgun bans.[92]

Contrary to recent media reports, a large majority of the public, including gun owners, favors remedying many current weaknesses in our gun laws. There are real political hurdles to enacting new gun control laws, and the power of the gun lobby is substantial. But politicians who want to correct flaws in our current laws, which enable dangerous people to get guns, could do so knowing that there is broad support for those policies, the reforms are constitutional, and the policies would enhance public safety.

**References**

[1] Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS) [Online]. National Center for Injury Control and Prevention, Centers for Disease Control and Prevention (producer). Available from: URL: http://www.cdc.gov/injury/wisqars/index.html. [2012, Mar. 15].

[2] Truman JL. Criminal Victimization, 2010. National Crime Victimization Survey. NCJ 235508, Washington, DC: United States Department of Justice, Bureau of Justice Statistics, Sept. 2010.

[3] Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS) [Online]. National Center for Injury Control and Prevention, Centers for Disease Control and Prevention (producer). Available from: URL: http://www.cdc.gov/injury/wisqars/index.html. [2012, Mar. 15].

[4] Vyrostek SB, Annest JL, Ryan GW. Surveillance for Fatal and Non-Fatal Injuries – United States, 2001. *MMWR*. 2004; 53(SS07):1-57.

[5] Richardson EG, Hemenway D. Homicide, suicide, and unintentional firearm mortality: comparing the United States with other high-income countries, 2003. *Journal of Trauma* 2011; 70:238-243.

[6] Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS) [Online]. National Center for Injury Control and Prevention, Centers for Disease Control and Prevention (producer). Available from: URL: http://www.cdc.gov/injury/wisqars/index.html. [2012, Mar. 22].

[7] Cook PJ, Ludwig J. Gun Violence: The Real Costs. New York: Oxford University Press, 2000.

[8] Shapiro RJ, Hassett KA. *The Economic Benefits of Reducing Violent Crime: A Case Study of 8 American Cities.* Center for American Progress, Washington, DC, June 2012.

[9] 18 U.S.C. § 922(d) (2012).

[10] Campbell JC, Webster DW, Koziol-McLain J, et al. Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study. *American Journal of Public Health* 2003; 93:1089-1097.

[11] Etter, GW, Birzer, ML. Domestic violence abusers: A descriptive study of the characteristics of defenders in protection form abuse orders in Sedgwick County, Kansas. *Journal of Family Violence*. 2007; 22:113-119.

[12] Fagan JA, Stewart DK, Hansen KV. Violent Men or Violent Husbands? Background Factors and Situational Correlates. In D. Finkelhor, R. Gelles, G. Hotaling, M.A. Straus (Eds.), *The Dark Side of Families: Current Family Violence Research* (pp. 49-68). Beverly Hills, CA: Sage Publications, 1983.

[13] Gayford JJ. Wife battering: A preliminary study of 100 cases. *British Medical Journal*. 1975; 1: 194-197.

[14] Hotaling GT, Straus MA, Lincoln, AJ. Intrafamily Violence, and Crime and Violence Outside the Family. In L. Ohlin, M. Tonry (Eds.) *Family Violence* (pp. 315-375). Chicago: University of Chicago Press, 1989.

[15] Sharps PW, Campbell JC, Campbell D, et al. The role of alcohol use in intimate partner femicide. *American Journal of Addiction*. 2001;10:122-35.

Ex. 2
Page 23

[16] Rivara FP, Mueller BA, Somes G, et al. Alcohol and illicit drug abuse and the risk of violent death in the home. *JAMA*. 1997;278:569-75.

[17] Kelleher K, Chaffin M, Hollenberg J, et al. Alcohol and drug disorders among physically abusive and neglectful parents in a community-based sample. *American Journal of Public Health*. 1994;84:1586-90.

[18] Walton-Moss BJ, Manganello J, Frye V, et al. Risk factors for intimate partner violence and associated injury among urban women. *Jounral of Community Health*. 2005;30:377-89.

[19] McClelland GM, Teplin LA. Alcohol intoxication and violent crime: implications for public health policy. *American Journal of Addiction*. 2001;10(Suppl):70-85.

[20] Rivara FP, Mueller BA, Somes G, et al. Alcohol and illicit drug abuse and the risk of violent death in the home. *JAMA*. 1997;278:569-75.

[21] Borowsky IW, Ireland M, Resnick MD. Adolescent suicide attempts: risks and protectors. *Pediatrics*. 2001;107:485-93.

[22] Rivara FP, Mueller BA, Somes G, et al. Alcohol and illicit drug abuse and the risk of violent death in the home. *JAMA*. 1997;278:569-75.

[23] Swanson JW, Swartz MS, Van Dorn RA, Elbogen EB, Wagner HR, Rosenheck RA, et al. A National Study of Violent Behavior in Persons With Schizophrenia. *Archives of General Psychiatry*. 2006;63(5):490-9.

[24] Swanson J. Mental disorder, substance abuse, and community violence: An epidemiological approach. In: Monahan J, Steadman JH, editors. *Violence and Mental Disorders: Developments in Risk Assessment.* Chicago: University of Chicago Press; 1994.

[25] Swanson J. Mental disorder, substance abuse, and community violence: An epidemiological approach. In: Monahan J, Steadman JH, editors. Violence and Mental Disorders: Developments in Risk Assessment Chicago: University of Chicago Press; 1994.

[26] Monahan J, Steadman H, Silver E, Appelbaum P, Robbins P, Mulvey E, et al. *Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence*. New York: Oxford University Press. 2001.

[27] Swanson J, Borum R, Swartz M, et al. Violent behavior preceding hospitalization among persons with severe mental illness. *Social Psychiatry and Psychiatric Epidemiology*. 1999;33:75-80.

[28] Nock MK, Borges G, Bromet EJ, Cha CB, Kessler RC, Lee S.  Suicide and Suicidal Behavior. *Epidemiologic Reviews*. 2008; 30, 133-154.

14

[29] Fox JA, Zawitz MW. Homicide trends in the US: age, gender, and race trends. Bureau of Justice Statistics, US Department of Justice, Washington DC. 2010.

[30] Fabio A, Loeber R, Balasubramani GK, Roth J, Fu W, Farrington DP. Why some generations are more violent than others: assessment of age, period, and cohort effects. *Am J Epidemiology*. 2006;164(2):151-60.

[31] Steinberg L. Risk taking in adolescence: what changes, and why? . Ann N Y Acad Sci. 2004;1021:51-8.

[32] Johnson SB, Blum RW, Giedd JN. Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy. Journal of Adolescent Health. 2009;45(3):216-21.

[33] Vittes KA, Vernick JS, Webster DW. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership. *Injury Prevention* 2012; Epub.

[34] Wintemute GJ, Drake CM, Beaumont JJ, Wright MA. Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. JAMA. 1998;280:2083-7.

[35] Wright MA, Wintemute GJ. Felonious or violent criminal activity that prohibits gun ownership among prior handgun purchasers: incidence and risk factors. *J Trauma* 2010;69:948-55.

[36] 18 U.S.C § 922(g)(3) (2012); 27 C.F.R. § 478.11 (2012).

[37] Webster DW, Vernick JS. Keeping Firearms from Drug and Alcohol Abusers. *Injury Prevention* 2009;15:425-427.

[38] Bureau of Justice Statistics. Homicide Trends in the U.S. 2012 [cited 2012 March 20]; Available from: http://bjs.ojp.usdoj.gov/content/homicide/teens.cfm.

[39] O'Malley PM, Wagenaar AC. Effects of minimum drinking age laws on alcohol use, related behaviors and traffic crash involvement among American youth: 1976-1987. *Journal of Studies on Alcohol*. 1991;52:478-491.

[40] Bureau of Justice Statistics. *Background Checks for Firearms Transfer, 2009 – Statistical Table*. Washington, DC: U.S. Department of Justice; 2010.

[41] Ludwig J, Cook PJ. The impact of the Brady Act on homicide and suicide rates. *JAMA*. 2000; 284:2718-21.

[42] Vernick JS, Rutkow L, Salmon DA. Availability of litigation as a public health tool for firearm injury prevention: comparison of guns, vaccines, and motor vehicles. *American Journal of Public Health.* 2007;97:1991-1997.

[43] Webster DW, Vittes KA, Vernick JS. *Analyzing Policies to Restrict Firearm Access by High Risk Persons: Findings from a National Survey of Criminals Incarcerated for Violent Crimes.* Report submitted to The Joyce Foundation by the Johns Hopkins Center for Gun Policy and Research, July 2012.

[44] Bureau of Alcohol, Tobacco and Firearms (ATF). *Crime Gun Trace Reports (2000): The Youth Gun Interdiction Initiative.* Washington, DC: U.S. Department of the Treasury, 2002.

[45] Sorenson SB, Vittes KA. Buying a handgun for someone else: Firearm dealers' willingness to sell. *Injury Prevention.* 2003; 9:147-150.

[46] Wintemute GJ, Cook PJ, Wright MA. Risk factors among handgun retailers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prevention* 2005; 11:357-363.

[47] Cook PJ, Ludwig J, Venkadesh S, Braga AA. Underground gun markets. *The Economic Journal* 2007;117;F588-F618.

[48] Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearms trafficking. *Journal of Urban Health* 2009;86:525-537.

[49] Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. *Injury Prevention.* 2006; 12:225-230.

[50] Webster DW. Supplemental expert report submitted for City of New York V. A-1 Jewerly & Pawn, Inc. *et al.*, 06 CV 2233, City of New York V. Bob Moates' Sport Shop, INC., *et al.*, 06 CV 6504, May 27, 2008.

[51] Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *Journal of Urban Health* 2006; 83:778-787.

[52] Webster DW, Vernick JS, Bulzacchelli MT, Vittes KA. Recent federal gun laws, gun dealer accountability and the diversion of guns to criminals in Milwaukee. *Journal of Urban Health* 2012;89:87-97.

[53] Wintemute GJ. Gun shows across a multistate American gun market: observational evidence of the effects of regulatory policies. *Injury Prevention* 2007;13:150-156.

[54] Webster DW. State gun laws and the diversion of guns to criminals: intrastate and interstate effects. Paper presented at the annual meeting of the American Society of Criminology, Washington, DC, November 2011.

[55] Knight BG. State Gun Policy and Cross-State Externalities: Evidence from Crime Gunn Tracing. National Bureau of Economic Research Working Paper 17469. September 2011. http://www.nber.org/papers/w17469

[56] Braga AA, Pierce GL. Disrupting illegal firearms markets in Boston: The effects of Operation Ceasefire on the supply of new handguns to criminals. *Criminology and Public Policy.* 2005;4:717–748.

[57] Hahn RA, Bilukha O, Crosby A, et al. Task Force on Community Preventive Services. Firearms laws and the reduction of violence: a systematic review. *American Journal of Preventive Medicine* 2005;28(2S1):40-64.

[58] Welford CA, Pepper J,
[59] Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *Journal of the American Medical Association* 2001;285:1019-1026.

[60] Moracco KE, 2006. Frattaroli and Teret, 2006. Seave et al. 2006.

[61] Webster DW, Frattaroli S, Vernick JS, O'Sullivan C, Roehl J, Campbell JC. Women with protective orders report failure to remove firearms from their abusive partners: Results from an exploratory study. *Journal of Women's Health* 2010;19:93-98.

[62] Vittes KA, Webster DW, Frattaroli S, Claire BE, Wintemute GJ. Removing guns from batterers: Findings from a survey of domestic violence restraining order recipients in California. *Violence Against Women*, in press.

[63] Vigdor ER, Mercy JA. Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide? *Evaluation Review* 2006;30:313-346.

[64] Zeoli AM, Webster DW. Effects of domestic violence policies, alcohol taxes and police staffing levels on intimate partner homicide in large U.S. cities. *Injury Prevention* 2010;16:90-95.

[65] 18 U.S.C. § 922 (x) (2012).

[66] Webster DW, Vernick JS, Zeoli AM, Manganello J. Association between youth-focused firearm laws and youth suicides. *JAMA*; 2004:292:594-601

[67] Marvell TB. The impact of banning juvenile gun possession. *Journal of Law and Economics* 2001;44:691-713.

[68] Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *JAMA* 1997;278:1084-6.

[69] Hepburn L, Azrael D, Miller M, Hemenway D. The effects of child access prevention laws on unintentional child firearm fatalities, 1979-2000. *J Trauma* 2006;61:423-8.

[70] Webster DW, Vernick JS, Zeoli AM, Manganello J. Association between youth-focused firearm laws and youth suicides. *JAMA*; 2004:292:594-601.

[71] Luo M. Guns in public and out of Sight. *The New York Times* Dec. 26, 2011. http://www.nytimes.com/2011/12/27/us/more-concealed-guns-and-some-are-in-the-wrong-hands.html
.

[72] Lott JR, Mustard D. Crime, Deterrence and Right-to-Carry Concealed Handguns. Journal of Legal Studies. 1997; 26: 1-68

[73] Aneja A, Donohue JJ, Zhang A. The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy. American Law and Economics Review. 2011;13(2):565-632.

[74] National Research Council. Firearms and Violence: A Critical Review. Washington, DC: National Academies Press. 2005.

[75] Ayers I, Donohue JJ. Shooting down the more guns, less crime hypothesis. Stanford Law Review. 2003;55:1993-312.

[76] Aneja A, Donohue JJ, Zhang A. The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy. American Law and Economics Review. 2011;13(2):565-632.

[77] Aneja A, Donohue JJ, Zhang A. The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy. American Law and Economics Review. 2011;13(2):565-632.

[78] Ayers I, Donohue JJ. Shooting down the more guns, less crime hypothesis. Stanford Law Review. 2003;55:1993-312.

[79] Roth JA, Koper CS. Appendix A in *Impact Evaluation of the Public Safety and Recreational Firearm Use Protection Act of 1994*. Urban Institute: Washington, DC, 1997.

[80] Chapman S, Alpers A, Agho K, Jones M. Australia's 1996 gun law reforms: faster falls in firearm deaths, firearm suicides, and a decade without mass shootings. *Injury Prevention* 2006:12:365-372.

[81] Koper CS, Woods DJ, Roth JA. An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003. Report to the National Institute of Justice, U.S. Department of Justice. Jerry Lee Center for Criminology, University of Pennsylvania, 2004.

[82] Fallis DS, Grimaldi JV. Va. Data Show Drop in Criminal Firepower During Assault Gun Ban, *The Washington Post*, January 23, 2011.

18

[83] Reedy DC, Koper CS. Impact of handgun types of gun assault outcomes: a comparison of outcomes with semi-automatic pistols and revolvers. *Injury Prevention* 2003;9:151-155.

[84] Wright MA, Wintemute GJ, Webster DW. Factors affecting a recently-purchased handgun's risk for use in crime under circumstances that suggest gun trafficking. *Journal of Urban Health* 2010; 87:352-364.

[85] Vernick JS, Webster DW, Hepburn LM. Maryland's law banning Saturday night special handguns: Effects on crime guns. *Injury Prevention* 1999; 5:259-263.

[86] Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on homicides. *American Journal of Epidemiology* 2002;155:406-412.

[87] Vernick JS, O'Brien M, Hepburn LM, Johnson SB, Webster DW, Hargarten SW. Unintentional and undetermined firearm related deaths: a preventable death analysis for three safety devices. *Injury Prevention* 2003;9:307-311.

[88] Teret SP, Webster DW. Reducing gun deaths in the United States: Personalized guns would help – and would be achievable. *British Medical Journal* 1999:318:1160-1161.

[89] Mayors Against Illegal Guns and Luntz Global. Gun Owners Poll. July 2012. http://www.mayorsagainstillegalguns.org/downloads/pdf/poll-07-24-2012.pdf

[90] Momentum Analysis & American Viewpoint/National Survey/January 2011, http://www.mayorsagainstillegalguns.org/downloads/pdf/maig_poll_01_18_2011.pdf

[91] 554 U.S. 570 (2008).

[92] Vernick JS, Rutkow L, Webster DW, Teret SP. Changing the constitutional landscape for firearms: the Supreme Court's recent second amendment decisions. *American Journal of Public Health* 2011;101;2021-6.

# Exhibit 3

# Absolute Risk of Suicide After First Hospital Contact in Mental Disorder

*Merete Nordentoft, MD; Preben Bo Mortensen, MD; Carsten Bøcker Pedersen, MD*

**Context:** Estimates of lifetime risk of suicide in mental disorders were based on selected samples with incomplete follow-up.

**Objective:** To estimate, in a national cohort, the absolute risk of suicide within 36 years after the first psychiatric contact.

**Design:** Prospective study of incident cases followed up for as long as 36 years. Median follow-up was 18 years.

**Setting:** Individual data drawn from Danish longitudinal registers.

**Participants:** A total of 176 347 persons born from January 1, 1955, through December 31, 1991, were followed up from their first contact with secondary mental health services after 15 years of age until death, emigration, disappearance, or the end of 2006. For each participant, 5 matched control individuals were included.

**Main Outcome Measures:** Absolute risk of suicide in percentage of individuals up to 36 years after the first contact.

**Results:** Among men, the absolute risk of suicide (95% confidence interval [CI]) was highest for bipolar disorder, (7.77%; 6.01%-10.05%), followed by unipolar affective disorder (6.67%; 5.72%-7.78%) and schizophrenia (6.55%; 5.85%-7.34%). Among women, the highest risk was found among women with schizophrenia (4.91%; 95% CI, 4.03%-5.98%), followed by bipolar disorder (4.78%; 3.48%-6.56%). In the nonpsychiatric population, the risk was 0.72% (95% CI, 0.61%-0.86%) for men and 0.26% (0.20%-0.35%) for women. Comorbid substance abuse and comorbid unipolar affective disorder significantly increased the risk. The co-occurrence of deliberate self-harm increased the risk approximately 2-fold. Men with bipolar disorder and deliberate self-harm had the highest risk (17.08%; 95% CI, 11.19%-26.07%).

**Conclusions:** This is the first analysis of the absolute risk of suicide in a total national cohort of individuals followed up from the first psychiatric contact, and it represents, to our knowledge, the hitherto largest sample with the longest and most complete follow-up. Our estimates are lower than those most often cited, but they are still substantial and indicate the continuous need for prevention of suicide among people with mental disorders.

*Arch Gen Psychiatry. 2011;68(10):1058-1064*

**Author Affiliations:** Psychiatric Centre Copenhagen, Mental Health Services, Capital Region of Denmark, and Faculty of Health Sciences, Copenhagen University, Copenhagen, Denmark (Dr Nordentoft); and National Centre for Register-Based Research, University of Aarhus, Aarhus, Denmark (Drs Mortensen and Pedersen).

ALL MENTAL DISORDERS ARE associated with increased risk of suicide,[1-6] and this risk is often reported as the increased relative risk or odds ratio for death by suicide by people with mental disorders who have contact with health services compared with those who do not. The absolute risk of death by suicide, often mentioned as lifetime risk of suicide after the onset of mental disorders, can be estimated as the percentage of a cohort expected to die by suicide before extinction. Although no studies have actually conducted lifetime follow-up, lifetime risk is mentioned in many scientific papers[7,8] and textbooks.[9] It has been estimated to be high, but these estimates have never previously been based on a large national sample with a prospective long-term follow-up. One of the most cited reports is the 1977 review conducted by Miles.[7] This review estimated that 15% of persons affected with unipolar affective disorder would die by suicide, as well as 15% of persons with alcoholism and 10% of persons with schizophrenia. However, this review was based on rather small studies with selected samples and a rather short follow-up, and several authors later concluded that, for different reasons, Miles' estimates were most likely too high.[10-14] Later meta-analyses,[12-14] based on more sophisticated statistical methods and including some large long-term follow-up studies, found clearly lower figures. Inskip et al[14] estimated the lifetime risk to be 6% for affective disorder, 7% for alcohol dependence, and 4% for schizophrenia. Bostwick and Pankratz[12] estimated the risk to

Downloaded from jamanetwork.com by guest on 02/27/2019
©2011 American Medical Association. All rights reserved.

Ex. 3
Page 31

be 4% for patients hospitalized for affective disorders and 8.6% for those hospitalized for affective disorder and suicidality. Palmer et al[13] estimated the lifetime risk to be 5.6% for schizophrenia. Recently, Dutta et al[5] estimated the lifetime risk of suicide to be 3.23% for patients 20 years after the first psychotic diagnosis.

Although the lifetime risk of suicide has been reported in many studies, most estimates were based on incomplete follow-up in selected samples or were based on rather short-term follow-up of patients with first-time treated mental disorders. In addition, the lifetime morbid risk is not well defined from an epidemiological viewpoint. We will estimate the absolute risk of committing suicide within 36 years after the first onset of the disorder, using competing risks Cox regression to account for censoring emigration and death from other causes. Omitting such censoring will bias the estimated cumulative incidences upward. By using competing risks survival analyses,[15] the absolute risks of suicide (or cumulative incidences) can be calculated as the percentages of persons in the population who had committed suicide at a given time since onset of the disorder of interest, taking into account that people may migrate or die of other causes.

For any dynamic population, the cumulative incidence of suicide is the best possible estimate of long-term absolute risk of suicide. We were able to use the unique Danish registers to estimate absolute cumulative risk of suicide for different mental disorders and to include a complete national sample of persons born after 1955 with follow-up to 51 years of age.

---

## METHODS

### STUDY POPULATION

The Danish Civil Registration System[16] was established in 1968, and all persons who are alive and living in Denmark are registered. Among many other variables, it includes information on personal identification number, sex, and date of birth; continuously updated information on vital status; and the personal identification number of parents. The personal identification number is used in all national registers, which enables accurate linkage between registers. Our study population included all persons born in Denmark from January 1, 1955, through December 31, 1991 (2.46 million people). A cohort of 176 347 persons who came into contact with secondary mental health services for the first time and 881 735 controls without any contact with mental health services were followed up prospectively for a maximum of 36 years, from 15 years through as old as 51 years (median follow-up, 18 years).

### ASSESSMENT OF SUICIDE AND MENTAL ILLNESS

The study population was linked with the Danish Registers of Causes of Death[17] to obtain information about any history of suicide (codes 950-959 from the *International Statistical Classification of Diseases, 8th Revision* [*ICD-8*], or codes X60-X84 from the *International Statistical Classification of Diseases, 10th Revision* [*ICD-10*]) and date of suicide, if any. The registry contains information for all residents who died in Denmark from 1970 through 2006. In Denmark, the legal regulation of death certification states that any case of sudden and unexpected death

shall be reported to the police, and the death certificate may only be issued after a medicolegal examination.

The study population was also linked with the Danish Psychiatric Central Register[18] to obtain information about mental illness. The Danish Psychiatric Central Register was computerized in 1969 and contains data on all admissions to Danish psychiatric inpatient facilities; from 1995, information on outpatient visits to psychiatric departments was included in the register. The register currently includes data on approximately 630 000 persons and 2.7 million contacts. From 1969 through 1993, the diagnostic system used was the Danish modification of the *ICD-8*,[19] and from 1994, the *ICD-10*.[20] Cohort members were categorized with a history of schizophrenia (*ICD-8* code 295 or *ICD-10* code F20), schizophrenialike psychoses (*ICD-8* codes 297, 298.39, and 301.83 or *ICD-10* codes F21-F29), bipolar affective disorder (*ICD-8* codes 296.19 and 296.39 or *ICD-10* codes F30 and F31), unipolar affective disorder (*ICD-8* codes 296.09, 296.29, 296.89, 296.99, 298.09, 298.19, 300.49, and 301.19 or *ICD-10* codes F32-F34, F38, and F39), substance abuse (*ICD-8* codes 291, 294.30, 294.38, 303, and 304 or *ICD-10* codes F10-F19), anorectic disorder (*ICD-8* code 306.50 or *ICD-10* code F50.0), and any mental illness (any *ICD-8* or *ICD-10* code) if they had been admitted to a psychiatric hospital or had been in outpatient care with one of these diagnoses. For each mental disorder, the date of onset was defined as the first day of the first contact (inpatient or outpatient) with the diagnosis of interest. The National Hospital Register was established in 1977, and information about all admissions to public hospitals in Denmark was prospectively recorded. Since 1995, outpatient visits were also registered. Because some patients with substance abuse disorders are treated only in somatic departments, we decided to include patients in the National Hospital Register[21] who had a diagnosis of substance use disorders (*ICD-8* codes 291, 294.30, 294.38, 303, and 304 or *ICD-10* codes F10-F19).

Identifying deliberate self-harm in Danish registers is rather complicated because procedures have changed, and some procedures are not well complied with. We have identified deliberate self-harm in the different periods with different algorithms. From 1977 to 1986, deliberate self-harm was identified as persons with the diagnoses classified in *ICD-8* codes E9500 through E9599 in the National Hospital Register or Danish Psychiatric Central Register. From 1987 to 1993, deliberate self-harm was identified as persons admitted with a "reason for contact code" of 4 in the National Hospital Register. After 1994, suicide attempts were identified as people fulfilling at least 1 of the following criteria in the National Hospital Register or Danish Psychiatric Central Register:

1. Reason for contact code of 4;
2. Any psychiatric diagnosis (*ICD-10* chapter F) and a comorbid diagnosis of poisoning with medication and biological compounds (*ICD-10* codes T36 through T50) or nonmedical compounds, excluding alcohol and poisoning from food (T52 through T60);
3. Any psychiatric disorder (*ICD-10* chapter F) and comorbid diagnosis reflecting lesions on the forearm, wrist, or hand (*ICD-10* codes S51, S55, S59, S61, S65, or S69);
4. Any contact with a hospital because of poisoning with weak or strong analgesics, hypnotics, sedatives, psychoactive drugs, antiepileptics, and antiparkinsonian drugs or carbon monoxide (*ICD-10* codes T39, T42, T43, and T58); and
5. Any somatic or psychiatric diagnosis X60 through X84.

The classification of deliberate self-harm was identical to that used previously.[22,23]

Analyses of deliberate self-harm were only possible beginning in 1977; therefore, the follow-up for these analyses is no longer than 30 complete years.

Downloaded from jamanetwork.com by guest on 02/27/2019

©2011 American Medical Association. All rights reserved.

Ex. 3

Page 32

**Table 1. Cumulative Incidence of Suicide Up to 36 Years After First Psychiatric Contact[a]**

| | Men | | | Women | | |
|---|---|---|---|---|---|---|
| Disorder | No. of Suicides | No. Followed Up | Cumulative Incidence, % (95% CI) | No. of Suicides | No. Followed Up | Cumulative Incidence, % (95% CI) |
| Schizophrenia | 422 | 10 213 | 6.55 (5.85-7.34) | 163 | 5796 | 4.91 (4.03-5.98) |
| Schizophrenialike disorders | 413 | 11 798 | 5.90 (5.21-6.67) | 236 | 9739 | 4.07 (3.28-5.04) |
| Bipolar affective disorder | 97 | 2571 | 7.77 (6.01-10.05) | 78 | 3356 | 4.78 (3.48-6.56) |
| Unipolar affective disorder | 417 | 17 362 | 6.67 (5.72-7.78) | 292 | 28 871 | 3.77 (3.05-4.66) |
| Substance abuse at psychiatric department | 804 | 30 626 | 4.71 (4.24-5.23) | 233 | 13 469 | 3.34 (2.80-3.98) |
| Substance abuse at somatic hospital | 672 | 56 351 | 2.54 (2.20-2.93) | 202 | 27 370 | 1.71 (1.40-2.09) |
| Anorectic disorder[b] | 3 | 145 | 5.61 (1.46-21.65) | 25 | 3559 | 2.62 (1.08-6.38) |
| Any mental illness | 1679 | 80 621 | 4.33 (3.92-4.77) | 740 | 95 726 | 2.10 (1.86-2.37) |
| No mental illness | 747 | 403 105 | 0.72 (0.61-0.86) | 199 | 478 630 | 0.26 (0.20-0.35) |

Abbreviation: CI, confidence interval.

[a] Population includes the 2.46 million people born in Denmark from January 1, 1955, through December 31, 1991, and followed up from 15 years of age to 2006. Cumulative incidence measures the percentage of persons in the population who had committed suicide within 36 years after onset of the disorder of interest, taking into account that people may migrate or die of other causes.

[b] Cumulative suicide risk for men with anorectic disorder was based on only 3 suicides.

## STUDY DESIGN AND STATISTICAL ANALYSIS

For each mental disorder, cohort members were followed up from their first hospital contact as inpatients or outpatients after 15 years of age until suicide, death from other causes, emigration from Denmark, disappearance, or December 31, 2006 (whichever came first). Because we aimed to study suicidal behavior among adolescents, we excluded from the analyses individuals who had their psychiatric disorder before 15 years of age. By selecting only persons born in 1955 and later, we ensured that the cohort consisted of incident cases, as the number of persons who had their first hospital contact owing to one of the mental disorders of interest before 15 years of age is very small.[24]

Competing risks survival analyses[15] allowed us to calculate the absolute risks of suicide (or cumulative incidences) as the percentages of persons in the population who had committed suicide at a given time since the onset of the disorder of interest, taking into account that people may migrate or die of other causes. These analyses were made for each sex and were subdivided according to the age at onset of the disorder of interest. In this report, our interest is the probability of suicide. This probability, also referred to as the *cumulative incidence*, is not a simple function of the incidence rate of suicide; rather, it is estimated as the weighted integral of the incidence rates, in which the weights equal the survival function. In this situation, people born in 1955 contribute to the estimation of the incidence rate from time 0 to time 36, whereas people born in 1991 only contribute to the estimation of the incidence rate until 1 year after the first psychiatric contact. Additional details can be found in Rosthøj et al.[25]

To estimate the cumulative incidence of suicide among people with no history of mental illness, we adopted a slightly alternative strategy. For each person with a history of any mental illness (as defined in the "Assessment of Suicide and Mental Illness" subsection), we randomly selected 5 people of the same sex and same birth date who had no history of mental illness (time matched). Using the described strategy, we followed up this healthy population (881 735 persons) to provide absolute suicide risks. Because this healthy population was selected at random among all 2.46 million people included in the study population, the estimates obtained represent the absolute risk of suicide among all 2.46 million people without a mental disorder.

In addition, we performed analyses of comorbidity. Patients who had a diagnosis of substance abuse disorder plus any other mental disorder—at the same time or at different times—underwent separate analyses. Similarly, we performed analyses of comorbidity for patients with unipolar affective disorder in combination with any other psychiatric disorders and any history of hospital treatment after deliberate self-harm. This study was approved by the Danish Data Protection Agency.

## RESULTS

The absolute risk of suicide according to diagnostic group is shown in **Table 1**. Among men, suicide risk was highest in bipolar disorder (7.77%; 95% confidence interval [CI], 6.01%-10.05%), followed by unipolar affective disorder (6.67%; 5.72%-7.78%), schizophrenia (6.55%; 5.85%-7.34%), schizophrenialike disorders (5.90%; 5.21%-6.67%), and substance abuse treated in a psychiatric department (4.71%; 4.24%-5.23%). Among women, the highest risk was found among women with schizophrenia (4.91%; 95% CI, 4.03%-5.98%), followed by bipolar disorder (4.78%; 3.48%-6.56%), schizophrenialike disorder (4.07%; 3.28%-5.04%), unipolar affective disorder (3.77%; 3.05%-4.66%), substance abuse treated in a psychiatric department (3.34%; 2.80%-3.98%), and anorexia (2.62%; 1.08%-6.38%). In the nonpsychiatric population, the risk was 0.72% (95% CI, 0.61%-0.86%) for men and 0.26% (0.20%-0.35%) for women. The estimate of the suicide risk for men with anorexia is based on small numbers of cases.

The cumulative incidence of suicide by time since the first psychiatric contact for each of the disorders investigated is shown in the **Figure** for men and women. The steepest increase in suicide incidence occurs during the first years after first contact. The cumulative incidences of suicide were virtually independent of age at onset of the different mental disorders (data not shown).

In **Table 2**, the cumulative incidence of suicide is presented for patients who had a diagnosis of a substance

Downloaded from jamanetwork.com by guest on 02/27/2019

©2011 American Medical Association. All rights reserved.

Ex. 3

Page 33

abuse disorder and a different additional mental disorders during the same contact or at different times. In all diagnostic groups, comorbidity with substance abuse disorder increased the cumulative incidence of suicide except among men with schizophrenia. In **Table 3**, the cumulative incidence of suicide is presented for patients who had a diagnosis of a unipolar affective disorder and a different additional mental disorder. For all mental disorders, comorbid occurrence of unipolar affective disorder increased the cumulative incidence of suicide.

In **Table 4**, the cumulative incidence for patients who had attempted suicide at least once is presented in different diagnostic groups among men and women. Overall, across all diagnostic groups, deliberate self-harm doubled the risk. The highest cumulative incidence of suicide was found among men with bipolar disorder and deliberate self-harm (17.08%; 95% CI, 11.19%-26.07%).



**Figure.** Cumulative incidence of suicide by time since the first psychiatric contact among men (A) and women (B).

## COMMENT

To our knowledge, this study has the hitherto largest sample and includes a long-term follow-up of a complete national sample from 15 to 51 years of age. We found the absolute risk of suicide in different psychiatric disorders to vary from 2% to 8%, higher for men than for women and highest for men and women with bipolar disorder, unipolar affective disorder, schizophrenia, and schizophrenialike disorder. For both sexes, comorbid occurrence of substance abuse and unipolar affective disorders increased the absolute suicide risk, and co-occurrence of deliberate self-harm generally doubled the risk in each diagnostic group. The suicide risk increased steeply during the first few years after first contact with psychiatric services.

Although the absolute suicide risks identified in this study are high, they are clearly lower than the often-cited figures reported by Guze and Robins[8] and Miles.[7] References to those old, exaggerated estimates should be replaced by more recent and correct ones. Estimates of the cumulative incidences in the literature have often ignored the fact that people may emigrate or die of other causes.

The strengths of this study are the large and representative number of cases investigated, the long follow-up, and the fact that we accounted for emigration and death from other causes. Omitting such censoring in our sample would bias the absolute risks upward by approximately 10%.[15,25]

Table 2. Cumulative Incidence of Suicide Up to 36 Years After the First Psychiatric Contact Among Individuals With Comorbid Substance Abuse[a]

| Disorder | Men | | | Women | | |
|---|---|---|---|---|---|---|
| | No. of Suicides | No. Followed Up | Cumulative Incidence, % (95% CI) | No. of Suicides | No. Followed Up | Cumulative Incidence, % (95% CI) |
| Schizophrenia | 170 | 4955 | 5.88 (4.90-7.04) | 59 | 1734 | 6.88 (4.86-9.74) |
| Schizophrenialike disorders | 197 | 5607 | 6.26 (5.23-7.51) | 82 | 2703 | 5.74 (4.41-7.49) |
| Bipolar affective disorder | 42 | 1101 | 10.01 (6.40-15.66) | 19 | 870 | 5.20 (2.81-9.60) |
| Unipolar affective disorder | 180 | 6763 | 6.74 (5.24-8.67) | 92 | 5439 | 7.12 (4.68-10.83) |
| Anorectic disorder[b] | 1 | 23 | 5.56 (0.87-35.37) | 11 | 441 | 4.95 (2.58-9.48) |
| Any mental illness | 862 | 34 539 | 4.60 (4.13-5.12) | 270 | 17 733 | 3.26 (2.75-3.87) |

Abbreviation: CI, confidence interval.
[a] Population includes the 2.46 million people born in Denmark from January 1, 1955, through December 31, 1991, and followed up from 15 years of age to 2006. Cumulative incidence measures the percentage of persons in the population who had committed suicide within 36 years after onset of the disorder of interest, taking into account that people may migrate or die of other causes.
[b] Cumulative suicide risk for men with anorectic disorder was based on only 1 suicide.

Downloaded from jamanetwork.com by guest on 02/27/2019

©2011 American Medical Association. All rights reserved.

Ex. 3

Page 34

**Table 3. Cumulative Incidence of Suicide Up to 36 Years After the First Psychiatric Contact Among Individuals With Comorbid Unipolar Affective Disorder[a]**

| Disorder | Men | | | Women | | |
|---|---|---|---|---|---|---|
| | No. of Suicides | No. Followed Up | Cumulative Incidence, % (95% CI) | No. of Suicides | No. Followed Up | Cumulative Incidence, % (95% CI) |
| Schizophrenia | 64 | 1698 | 7.02 (5.06-9.73) | 46 | 1649 | 6.18 (4.30-8.89) |
| Schizophrenialike disorders | 96 | 2521 | 9.20 (6.89-12.30) | 95 | 3140 | 5.16 (4.05-6.57) |
| Bipolar affective disorder | 60 | 1173 | 9.63 (7.10-13.06) | 42 | 1915 | 5.03 (3.12-8.11) |
| Substance abuse at psychiatric department | 159 | 5827 | 6.85 (5.34-8.79) | 81 | 4085 | 7.39 (4.86-11.26) |
| Substance abuse at somatic hospital | 94 | 3727 | 5.66 (3.68-8.69) | 58 | 3177 | 5.61 (3.56-8.85) |
| Anorectic disorder[b] | 1 | 23 | 5.59 (0.88-35.65) | 5 | 644 | 3.77 (0.93-15.23) |
| Any mental illness | 410 | 16 984 | 6.63 (5.67-7.75) | 292 | 28 307 | 3.81 (3.08-4.72) |

Abbreviation: CI, confidence interval.

[a] Population includes the 2.46 million people born in Denmark from January 1, 1955, through December 31, 1991, and followed up from 15 years of age to 2006. Cumulative incidence measures the percentage of persons in the population who had committed suicide within 36 years after onset of the disorder of interest, taking into account that people may migrate or die of other causes.

[b] Cumulative suicide risk for men with anorectic disorder was based on only 1 suicide.

**Table 4. Cumulative Incidence of Suicide Up to 36 Years After the First Psychiatric Contact Among Individuals Admitted After Deliberate Self-harm[a]**

| Disorder | Men | | | Women | | |
|---|---|---|---|---|---|---|
| | No. of Suicides | No. Followed Up | Cumulative Incidence, % (95% CI) | No. of Suicides | No. Followed Up | Cumulative Incidence, % (95% CI) |
| Schizophrenia | 193 | 2801 | 10.26 (8.36-12.58) | 111 | 2118 | 10.85 (8.43-13.95) |
| Schizophrenialike disorders | 215 | 3112 | 9.98 (8.35-11.93) | 151 | 2994 | 8.00 (6.46-9.91) |
| Bipolar affective disorder | 58 | 651 | 17.08 (11.19-26.07) | 47 | 991 | 9.39 (6.07-14.54) |
| Unipolar affective disorders | 223 | 4277 | 10.48 (8.24-13.32) | 184 | 6567 | 6.51 (5.23-8.09) |
| Substance abuse at psychiatric department | 439 | 10 461 | 6.54 (5.82-7.34) | 174 | 5999 | 5.04 (4.19-6.06) |
| Substance abuse at somatic hospital | 351 | 10 555 | 5.53 (4.68-6.53) | 155 | 6968 | 4.03 (3.32-4.90) |
| Anorectic disorder[b] | 1 | 16 | 10.42 (1.79-60.55) | 14 | 555 | 4.38 (2.48-7.75) |
| Any mental illness | 799 | 16 274 | 8.10 (7.32-8.96) | 450 | 17 993 | 4.57 (4.03-5.17) |

Abbreviation: CI, confidence interval.

[a] Population includes the 2.46 million people born in Denmark from January 1, 1955, through December 31, 1991, and followed up from 15 years of age to 2006. Cumulative incidence measures the percentage of persons in the population who had committed suicide within 30 years after onset of the disorder of interest, taking into account that people may migrate or die of other causes.

[b] Cumulative suicide risk for men with anorectic disorder was based on only 1 suicide.

The findings in our study are in agreement with the meta-analysis performed by Bostwick and Pankratz[12] and Palmer et al,[13] partly because Danish register-based studies contributed a large proportion of the patients and person-years included in their analyses. Our study population includes all the Danish patients included in the meta-analyses; in our study, they were followed up longer than in previous studies.

There are some limitations in a register-based study compared with a population-based survey. The study population includes only persons who have received some kind of treatment in psychiatric treatment facilities, and outpatient treatment was recorded only since 1995. However, most other studies have the same limitations.

Another limitation is that we were able to identify incident cases of mental illness only among people born in 1955 or later and to follow up these individuals until

2006, that is, people who had received a diagnosis of a mental illness before 51 years of age. We can only speculate whether the absolute risks reported are applicable to people with later onset of a mental disorder.

Based on our material, we cannot estimate lifetime risk because the cohort was followed up until, at most, 51 years of age. Also, because the design of the study exploits the advantages of including the longest possible historical period, there is a risk that changes in suicide risk occurred during the period investigated. Prior investigations have previously demonstrated that suicide rates for patients with schizophrenia,[26] affective disorder, and substance abuse[27] decreased and can be influenced by a range of conditions related to the treatment, as well as to other factors, such as availability of dangerous means.

The number of persons with bipolar disorder in our sample is much lower than the number of cases of schizo-

©2011 American Medical Association. All rights reserved.

Downloaded from jamanetwork.com by guest on 02/27/2019

phrenia. The explanation for the smaller figures is that many cases classified as bipolar II disorder in *DSM* terms will not be classified as bipolar disorders in *ICD-8* and *ICD-10* and also that the incidence of bipolar disorder peaks at a later age[28] compared with schizophrenia.[29] In the present, rather young cohort, some individuals have not yet developed bipolar disorder.

All persons in this study were classified according to the clinical diagnosis given at first contact with mental health services after 15 years of age. Diagnostic switch between, for instance, schizophrenialike disorder and schizophrenia or a switch between unipolar affective disorder and bipolar disorder is therefore not taken into account. Theoretically, persons who later switched from one group to another could have a different risk than those who remained in the same group, thereby artificially leveling out differences between diagnostic groups. However, diagnostic switch cannot be taken into account without introducing survival bias (healthy-worker effect).

Large prospective studies of first-onset cases with a long follow-up, such as the present study and the recent British 40-year follow-up of first-episode psychosis cases,[30] provide good estimates of suicide risk. However, an inherent problem with such studies is that, by the time the results become available, the risk for new patients with first-episode psychosis may have changed because of changes in treatment and other factors.[31] Since 2000, suicide rates in Denmark have been clearly lower than those in the previous decades, when many of the cases in the cohort died.[31]

We did find higher figures than Dutta et al[5,30] in their study of patients with first-episode psychosis, which can be partly explained by differences between the 2 countries in classification of suicide, with higher suicide rates in Denmark.[32] Other possible explanations are the higher proportion of outpatients in the British sample, differences in determination of cause of death, differences in access to data on previous treatment, or differences in the completeness of follow-up due to the Danish unique nationwide personal identifier, which ensures the most optimal conditions for selecting a true first-time-treated population and a complete follow-up. It is a limitation that the data are only available from Denmark, which might limit generalization of our findings to other countries. In the 1980s, Denmark had extraordinarily high suicide rates, most likely because of a large number of suicides with barbiturates.[33] Because some suicides in this study occurred during that period, these figures might not reflect conditions in other countries.

Despite these limitations, it is beyond doubt that the risk of suicide is high in all the investigated mental disorders, and suicide preventive measures should be a mandatory part of treatment programs, not only for affective disorders but also for schizophrenia and related disorders, for substance abuse, and for anorexia.[34] It is also evident that a history of deliberate self-harm markedly increases the risk of suicide across all diagnostic groups. In addition, as underlined in recent findings from a large Swedish study,[35] attempted suicide should be considered a very important risk factor among patients with different mental disorders.

The fact that the steepest increase in suicide risk occurs during the initial years after first contact with mental health services can serve as an argument for intensive early-intervention services. By establishing closer contact and closer monitoring of symptoms, we hope that such services can reduce suicide risk in this high-risk period and thereby ensure that the long-term risk of suicide may be influenced positively.

**Submitted for Publication:** January 24, 2011; final revision received April 10, 2011; accepted May 20, 2011.
**Correspondence:** Merete Nordentoft, MD, Psychiatric Centre Copenhagen, Bispebjerg Bakke 23, 2400 Copenhagen NV, Denmark (mn@dadlnet.dk).
**Author Contributions:** All authors had full access to all the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.
**Financial Disclosure:** None reported.
**Funding/Support:** This study was supported in part by the Stanley Medical Research Institute (Drs Mortensen and Pedersen).
**Role of the Sponsors:** The funding organization had no influence on the design or conduct of the study.

## REFERENCES

1. Mortensen PB, Agerbo E, Erikson T, Qin P, Westergaard-Nielsen N. Psychiatric illness and risk factors for suicide in Denmark. *Lancet.* 2000;355(9197):9-12.
2. Qin P, Nordentoft M. Suicide risk in relation to psychiatric hospitalization: evidence based on longitudinal registers. *Arch Gen Psychiatry.* 2005;62(4):427-432.
3. Harris EC, Barraclough B. Suicide as an outcome for mental disorders: a meta-analysis. *Br J Psychiatry.* 1997;170:205-228.
4. Lönnqvist JK, Henriksson MM, Isometsä ET, Marttunen MJ, Heikkinen ME, Aro HM, Kuoppasalmi KI. Mental disorders and suicide prevention. *Psychiatry Clin Neurosci.* 1995;49(suppl 1):S111-S116.
5. Dutta R, Murray RM, Hotopf M, Allardyce J, Jones PB, Boydell J. Reassessing the long-term risk of suicide after a first episode of psychosis. *Arch Gen Psychiatry.* 2010;67(12):1230-1237.
6. Caldwell CB, Gottesman II. Schizophrenics kill themselves too: a review of risk factors for suicide. *Schizophr Bull.* 1990;16(4):571-589.
7. Miles CP. Conditions predisposing to suicide: a review. *J Nerv Ment Dis.* 1977;164(4):231-246.
8. Guze SB, Robins E. Suicide and primary affective disorders. *Br J Psychiatry.* 1970;117(539):437-438.
9. Goodwin FK, Jamison KR. *Manic-Depressive Illness: Bipolar Disorders and Recurrent Depression.* 2nd ed. New York, NY: Oxford University Press; 2007.
10. Blair-West GW, Mellsop GW, Eyeson-Annan ML. Down-rating lifetime suicide risk in major depression. *Acta Psychiatr Scand.* 1997;95(3):259-263.
11. Blair-West GW, Cantor CH, Mellsop GW, Eyeson-Annan ML. Lifetime suicide risk in major depression: sex and age determinants. *J Affect Disord.* 1999;55(2-3):171-178.
12. Bostwick JM, Pankratz VS. Affective disorders and suicide risk: a reexamination. *Am J Psychiatry.* 2000;157(12):1925-1932.
13. Palmer BA, Pankratz VS, Bostwick JM. The lifetime risk of suicide in schizophrenia: a reexamination. *Arch Gen Psychiatry.* 2005;62(3):247-253.
14. Inskip HM, Harris EC, Barraclough B. Lifetime risk of suicide for affective disorder, alcoholism and schizophrenia. *Br J Psychiatry.* 1998;172:35-37.
15. Andersen PK, Borgan Ø, Gill RD, Keiding N. *Statistical Models Based on Counting Processes.* Corrected ed. New York, NY: Springer-Verlag; 1997.
16. Pedersen CB, Gøtzsche H, Møller JO, Mortensen PB. The Danish Civil Registration System: a cohort of eight million persons. *Dan Med Bull.* 2006;53(4):441-449.
17. Juel K, Helweg-Larsen K. The Danish Registers of Causes of Death. *Dan Med Bull.* 1999;46(4):354-357.
18. Munk-Jørgensen P, Mortensen PB. The Danish Psychiatric Central Register. *Dan Med Bull.* 1997;44(1):82-84.
19. World Health Organization. *Classification of Diseases: Extended Danish-Latin Ver-*

Downloaded from jamanetwork.com by guest on 02/27/2019
©2011 American Medical Association. All rights reserved.

Ex. 3

Page 36

sion of the World Health Organization International Classification of Diseases, 8th Revision. Copenhagen: Danish National Board of Health; 1971.

20. World Health Organization. WHO ICD-10: Mental and Behavioural Disorders: Classification and Diagnostic Criteria [in Danish]. Copenhagen: Munksgaard Danmark; 1994.

21. Andersen TF, Madsen M, Jørgensen J, Mellemkjoer L, Olsen JH. The Danish National Hospital Register: a valuable source of data for modern health sciences. Dan Med Bull. 1999;46(3):263-268.

22. Qin P, Mortensen PB, Pedersen CB. Frequent change of residence and risk of attempted and completed suicide among children and adolescents. Arch Gen Psychiatry. 2009;66(6):628-632.

23. Christiansen E, Goldney RD, Beautrai AL, Agerbo E. Youth suicide attempts and the dose-response relationship to parental risk factors: a population-based study. Psychol Med. 2011;41(2):313-319.

24. Pedersen CB. No evidence of time trends in the urban-rural differences in schizophrenia risk among five million people born in Denmark from 1910 to 1986. Psychol Med. 2006;36(2):211-219.

25. Rosthøj S, Andersen PK, Abildstrom SZ. SAS macros for estimation of the cumulative incidence functions based on a Cox regression model for competing risks survival data. Comput Methods Programs Biomed. 2004;74(1):69-75.

26. Nordentoft M, Laursen TM, Agerbo E, Qin P, Høyer EH, Mortensen PB. Change in suicide rates for patients with schizophrenia in Denmark, 1981-97: nested case-control study. BMJ. 2004;329(7460):261-266.

27. Qin P, Nordentoft M, Høyer EH, Agerbo E, Laursen TM, Mortensen PB. Trends in suicide risk associated with hospitalized psychiatric illness: a case-control study

based on Danish longitudinal registers. J Clin Psychiatry. 2006;67(12):1936-1941.

28. Laursen TM, Munk-Olsen T, Nordentoft M, Mortensen PB. A comparison of selected risk factors for unipolar depressive disorder, bipolar affective disorder, schizoaffective disorder, and schizophrenia from a Danish population-based cohort. J Clin Psychiatry. 2007;68(11):1673-1681.

29. Thorup A, Waltoft BL, Pedersen CB, Mortensen PB, Nordentoft M. Young males have a higher risk of developing schizophrenia: a Danish register study. Psychol Med. 2007;37(4):479-484.

30. Dutta R, Murray RM, Allardyce J, Jones PB, Boydell J. Early risk factors for suicide in an epidemiological first episode psychosis cohort. Schizophr Res. 2011; 126(1-3):11-19.

31. Nordentoft M. Prevention of suicide and attempted suicide in Denmark: epidemiological studies of suicide and intervention studies in selected risk groups. Dan Med Bull. 2007;54(4):306-369.

32. Atkinson MW, Kessel N, Dalgaard JB. The comparability of suicide rates. Br J Psychiatry. 1975;127:247-256.

33. Nordentoft M, Qin P, Helweg-Larsen K, Juel K. Restrictions in means for suicide: an effective tool in preventing suicide: the Danish experience. Suicide Life Threat Behav. 2007;37(6):688-697.

34. Hawton K, Saunders KE. Psychiatric service development and suicide. Lancet. 2009;373(9658):99-100.

35. Runeson B, Tidemalm D, Dahlin M, Lichtenstein P, Långström N. Method of attempted suicide as predictor of subsequent successful suicide: national long term cohort study. BMJ. 2010;341:c3222. doi:10.1136/bmj.c3222.

Downloaded from jamanetwork.com by guest on 02/27/2019
©2011 American Medical Association. All rights reserved.

Ex. 3

Page 37

# Exhibit 4

# PERSPECTIVES

OPINION

# Why do many psychiatric disorders emerge during adolescence?

Tomáš Paus, Matcheri Keshavan and Jay N. Giedd

Abstract | The peak age of onset for many psychiatric disorders is adolescence, a time of remarkable physical and behavioural changes. The processes in the brain that underlie these behavioural changes have been the subject of recent investigations. What do we know about the maturation of the human brain during adolescence? Do structural changes in the cerebral cortex reflect synaptic pruning? Are increases in white-matter volume driven by myelination? Is the adolescent brain more or less sensitive to reward? Finding answers to these questions might enable us to further our understanding of mental health during adolescence.

Across cultures and centuries, adolescence has been noted as a time of dramatic changes in body and behaviour. Although most teenagers successfully navigate the transition from dependence on a caregiver to being a self-sufficient member of society, adolescence is also a time of increasing incidence of several classes of psychiatric illness, including anxiety and mood disorders, psychosis, eating disorders, personality disorders and substance abuse. The patho-physiology of these disorders is increasingly understood as arising from aberrations of the maturational changes that normally occur in the adolescent brain.

In this Perspective we address the neuro-biological changes that occur during adolescence and discuss their possible relationship to the emergence of psychopathology. We focus on three major disorders, namely schizophrenia, substance-use disorders and affective/anxiety disorder, because our understanding of their developmental neuro-biological basis has increased considerably in recent years.

**Typical development of the adolescent brain**
In the past 15 years there has been an impressive accumulation of knowledge about the development of the structure and the function of the human brain. Studies carried out with MRI[1–4] in children and adolescents have allowed investigators to chart trajectories of grey- and white-matter volumes, cortical thickness and, more recently, other structural properties of white matter, such as fractional anisotropy and magnetization-transfer ratio (MTR), as well as age-related changes in brain activity (BOX 1).

**Brain structure.** Most of the existing literature on age-related changes in brain structure has been reviewed in detail elsewhere[5,6]. Here we note only the most salient findings.

Volumes of cortical grey matter seem to increase during childhood, reaching peak levels at approximately the time of puberty onset, after which they gradually decline; this is the case for the frontal and parietal lobes but not for the temporal lobes[7]. Local volume of cortical grey matter declines during childhood and adolescence in most regions, with the slope of the decline varying from relatively gentle (for example, in the anterior portion of the superior temporal gyrus (STG)) to steep (for example, in the posterior portion of the STG) and, in some cases, displaying a nonlinear relationship with age; for example, between 10 and 20 years of age, an 'inverted-U-shaped' relationship between age and cortical grey matter has been found in the post-central gyrus, and a 'U-shaped' relationship has been found in the mid-dorsolateral frontal cortex[8,9] (FIG. 1).

Volumes of white matter show a rather clear linear increase throughout child-hood and adolescence, with the maximum volumes often reached as late as the third decade of life[10]. It seems that the slope of the age-related increase is steeper in males than in females[7,11]. More recently, diffusion tensor imaging (DTI) has been used to assess white-matter changes in more detail in the human brain during childhood and adolescence. Overall, DTI studies reveal age-related decreases in the magnitude and increases in the directionality of water diffusion in a number of white-matter regions[12–14], many of which are identical to those revealed by structural MRI studies, such as those of the arcuate fasciculus. Such changes in DTI-derived measures may indicate ongoing maturation of axons and/or their myelin sheaths (see below).

**Brain activity.** The overall picture to be gleaned from the existing descriptive studies of age-related changes in brain activity is less coherent than that for structural changes. This is due to the fact that functional MRI (fMRI) studies usually focus on a particular brain function, and to the fact that the behav-ioural paradigms used to assess that brain function often differ across laboratories. It is also more challenging to interpret fMRI data than structural measurements, owing to the indirect nature of the fMRI signal (BOX 1) and the large number of potential confounders, such as levels of anxiety and arousal during scanning, varying task performance across participants, and the use of different cogni-tive strategies by different participants in the same task — all of these might interact with the effects of age. We will touch here on two sets of fMRI studies of adolescents that respectively focused on cognitive control (or executive functions) and on experiencing gains and losses of various rewards.

A number of the initial studies that investigated how task-related brain activ-ity changes during development focused on executive functions, such as working memory and response inhibition. But, as we reviewed previously[6], many such executive abilities are fully developed by the time a child enters adolescence[6]. On the other hand, certain aspects of executive function, such as

© 2008 Macmillan Publishers Limited. All rights reserved

Box 1 | Neuroimaging

MRI has revolutionized the way we can study the structure and function of the brain in living human beings throughout the entire lifespan[1]. The principles of MRI are relatively straightforward: in most applications, the magnetic resonance signal results from the magnetic properties of hydrogen atoms, which form part of the most abundant substance in the human body, water. By placing the human body in a strong (0.5–7.0 T) static magnetic field ($B_0$) and applying a brief pulse of electromagnetic energy, we can make the dipoles formed by the hydrogen nuclei rotate away from their axes and, in turn, measure the time it takes for the nuclei to 'relax' back to their original position. By slightly changing the static magnetic field at different positions along/across the $B_0$, we can establish the spatial origin of the signal and, eventually, create a three-dimensional image of the measurement. What is measured depends on the combination of various imaging parameters or, in the terminology of the MR physicists, on the acquisition sequence.

For imaging brain structure, the most common acquisition sequences include T1-weighted (T1W) and T2W images, diffusion-tensor images (DTI) and magnetization-transfer images (MT). The T1W and T2W images are typically used to quantify the volume of grey and white matter (global and regional) and to estimate the cortical thickness or other morphological properties of the cerebral cortex, such as its folding. Using DTI and MT imaging one can assess different properties of white matter, again in both a global and a regional manner. The various features of brain structure that can be extracted from these four types of images are described in the main text. In addition to the above sequences, less common but often even more informative acquisitions include T1 and T2 relaxometry (that is, measurement of the actual relaxation times[2]) and magnetic resonance spectroscopy[3].

For imaging brain function, the most common MR parameter to measure is the so-called blood-oxygenation-level-dependent (BOLD) signal. The BOLD signal reflects the proportion of oxygenated and deoxygenated blood in a given brain region at a given moment. A strong correlation between the amount of synaptic activity and regional cerebral blood flow is the reason why the BOLD signal is a good, albeit indirect, measure of brain 'function' (REF. 4). In most functional MRI studies, one measures changes in BOLD signal in response to various sensory, motor or cognitive stimuli. Therefore, only brain regions that are likely to respond to such stimuli can be interrogated using a given paradigm.

planning time and delayed gratification, do improve significantly from mid-adolescence (~16 years of age) onward, as indicated by recent behavioural studies[15]. An fMRI study found age-related (between the ages of 7 and 22 years) increases in the blood-oxygenation-level-dependent (BOLD) signal in the prefrontal and parietal cortices during the performance of a working-memory task even after factoring out inter-individual differences in performance[16]. Similar BOLD increases were observed in these regions during the performance of a variety of tasks that involve some form of response inhibition, including the Stroop task[17], the anti-saccade task[18], the stop task[19] and, to a certain extent, the go/no-go task[20] and the Eriksen flanker task[21].

Adolescence has traditionally been associated with risk-taking and sensation-seeking behaviour[22]. In this context, several investigators used fMRI to examine possible differences in brain activity between children, adolescents and young adults during the experience of gains or losses of various rewards. Owing to its role in reward and motivation[23], the nucleus accumbens (or ventral striatum) was the focus of most of these studies. If adolescents were 'driven' by reward seeking, one would expect a heightened engagement of this structure during tasks that involve reward seeking. This seemed to be the case in participants in some[24,25] but not other[26] studies. For example, one study[26] described an increase from early adolescence to young adulthood (12 to 28 years) in the BOLD signal in the nucleus accumbens during the anticipation of monetary gains; this was the case even when self-reported level of excitement in response to seeing anticipatory cues was taken into account. It is worthwhile to point out that in the same study, excitement correlated positively with the BOLD signal in the nucleus accumbens even when age was taken into account. This observation highlights the importance of considering various aspects of behaviour when interpreting fMRI findings.

Although functional imaging studies are beginning to illuminate the functional maturation of the neural circuits that are involved in, for example, executive functions and reward processing, future studies need to increase substantially sample sizes and enhance the behavioural characterization of subjects' performance in the scanner in order to learn more about brain–behaviour relationships during adolescence.

### Interpretation of underlying mechanisms

The age-related changes in brain structure and function during adolescence described above have been interpreted using various conceptual frameworks. Changes in synaptic pruning and myelination have been the most popular explanations for the structural findings in the adolescent brain, whereas age-related alterations in neural connectivity and neurotransmission might underlie the functional changes associated with adolescence. We will now address, in a critical manner, such mechanistic interpretations.

*Does adolescence involve changes in pruning and myelination?* MRI-based estimates of the volume of cortical grey matter and cortical thickness seem to decrease during adolescence. This has often been interpreted as an indication of 'synaptic pruning', a process by which 'redundant' synapses that were overproduced in the early years of life are eliminated (see REF. 27 for a critical appraisal of "neural Darwinism").

The initial evidence for accelerated synaptic pruning during development came from post-mortem studies by Huttenlocher and colleagues, who described a decrease in the number of synapses in the human cerebral cortex during childhood and adolescence[28,29,30]. It should be noted, however, that these studies were limited by the low number of specimens that were available for the different stages of human development, especially the adolescent period. Furthermore, most of the data do not actually indicate accelerated pruning of synapses during adolescence; rather, they indicate a gradual decrease in synapse number that begins (in several cortical regions) in childhood. More-definite evidence of synapse elimination during adolescence was provided by studies carried out by Rakic and colleagues in non-human primates[31,32]. Using electron microscopy, they observed a dramatic decrease in the number of synapses in the monkey visual cortex, as well as in other cortical areas, during puberty (that is, between the age of 2.5 and 5 years), whether the data were expressed as number of synapses per neuron or as number of synapses per 1 mm³ of neuropil (~45% loss). But it is unlikely that this decrease in synaptic density translates into a decrease in cortical volume: Bourgeois and Rakic commented that "changes in the density of synapses affect very little either the volume or surface of the cortex because the total volume of synaptic boutons … is only a very small fraction of the cortical volume" and concluded that "…a decline of synaptic number during puberty should have a rather small effect on the overall volume of the cortex" (REF. 32). Finally, it is often assumed that age-related

Ex. 4
Page 40
© 2008 Macmillan Publishers Limited. All rights reserved

changes in cortical grey matter, glucose metabolism and synaptic density follow similar developmental trajectories from birth to adulthood and, hence, reflect the same cellular events; this is clearly not the case, especially during adolescence (FIG. 1).

If the number of synapses *per se* is unlikely to change the cortical volume and/or thickness, then what other cellular elements could affect it? Approximately 10% of the (mouse) cortex is occupied by glial cells and approximately 60% is occupied by neuropil, which consists of intra-cortical and axonal processes[33]. It is conceivable that a reduced number of synapses, and a corresponding decrease in metabolic requirements, would be accompanied by a reduction in the number of glial cells, leading to a decrease in the regional volume and/or thickness of cortical grey matter. But it is perhaps even more likely that the apparent loss of grey matter reflects an increase in the degree of myelination of intra-cortical axons. Myelination of intra-cortical fibres progresses gradually from birth to adulthood[34,35]. The more myelinated the fibres are, the less 'grey' the cortex would appear on regular T1-weighted images. Such a 'partial-volume' effect could result in an apparent loss of cortical grey matter[6].

Given the well-documented histology-based increase in the degree of myelination of white-matter pathways during the first two decades of human life[36], it is perhaps not surprising that any changes in the volume or density of white matter, as revealed by computational analyses of T1-weighted images, are attributed to changes in myelination. Again, assumptions based on previous knowledge influence the interpretation of new data. Quite often we read articles that report age-related changes in myelination only to realize that what had actually been measured were volumes of white matter. Is it only a matter of semantics or could other, myelination-independent processes affect the volume and/or other features of white matter? In one of our large studies of human adolescence, we have observed a dissociation between age-related changes in the volume of white matter and changes in the MTR (an indirect index of the amount of myelin in white matter)[37]. Although white-matter volume increased with age during male adolescence, MTR values decreased, indicating a decrease in the amount of myelin per unit of volume (FIG. 2).

If myelin does not increase, what could be driving the observed increase in white-matter volume in males? Our tentative answer is a change in axonal calibre: the



Grey-matter density



Glucose metabolism



Synaptic density

Figure 1 | **Schematic representations of developmental trajectories in local volume of cortical grey matter, glucose metabolism and synaptic density.** Plots of grey-matter density (top graph) are based on data by Gogtay *et al.*[8] and illustrate the local grey-matter density in the mid-dorsolateral prefrontal cortex in red, in the angular gyrus of the parietal cortex in blue, in the posterior superior temporal sulcus of the temporal cortex in purple, and in the occipital pole in green. Plots of glucose metabolism (middle graph) are based on data by Chugani *et al.*[109] and provide information about the absolute values of local cerebral metabolic rate (LCMR) for glucose in the frontal (red), parietal (blue), temporal (purple) and occipital (green) cortices. Plots of synaptic density in the prefrontal (red) and visual (green) cortices (bottom graph) are based on data by Huttenlocher and de Courten[28] and Huttenlocher[110], as re-plotted on a semi-logarithmic scale by Rakic *et al.*[111]. To facilitate the comparison across the different plots, the vertical line indicates age 15 years. Note the following features of the trajectories, especially between childhood and adulthood: for cortical grey matter, different trajectories are observed in different cortical regions; for glucose metabolism, the same trajectories are found in the four different lobes; the same trajectories are also found for synaptic density in the prefrontal and occipital cortices. Taken together, these plots indicate that it is unlikely that there is a direct relationship between the three sets of measures.

Ex. 4
Page 41

© 2008 Macmillan Publishers Limited. All rights reserved



**Figure 2 | Sexual dimorphism in the maturation of white matter during adolescence. a** | Age-related changes in the relative (brain-size corrected) volume of white matter summed across the frontal, parietal, temporal and occipital lobes. **b** | Age-related changes in mean-centred values of magnetization transfer ratio (MTR) in the lobar white matter; the MTR provides an indirect index of myelination. Note that the opposite developmental trajectories in volume and MTR in males suggest that age-related increases in white-matter volume during male adolescence are not driven by myelination. Graphs are based on data from REF. 37.

larger the calibre, the fewer axons fit into the same unit of imaged volume, resulting in a relative decrease in the myelination index[37]. Although more work is needed to confirm this initial observation, it serves as a reminder that most of the MRI studies are not specific enough to allow one to interpret their findings as reflecting a single neurobiological process such as myelination.

Overall, as tempting as it might be to interpret descriptive findings obtained from structural MRI using mechanistic neurobiological processes, such as synaptic pruning or myelination, the evidence that supports such interpretations is limited. There is a pressing need to acquire direct evidence of the processes that underlie the observed changes in grey- and white-matter volume during adolescence using experimental models, in which investigators can combine *in vivo* and *ex vivo* methods to bring together descriptive and mechanistic levels of analysis. Until this happens, we suggest that a more cautious and open-minded approach is warranted.

*Neural connectivity.* Two key features characterize the functional organization of the mammalian brain: specialization and integration. Clearly, the structural and functional maturation of the neural pathways that connect a set of specialized brain regions is therefore essential for the successful development of cognitive, motor and sensory functions from infancy through childhood and adolescence and into adulthood. There are many different 'connectivities'. Studies

of anatomical connectivity allow one to detect, using injection of radioactive tracers into the brain of experimental animals, the efferent and afferent projections of small populations of neurons. This is not the same as anatomical 'connectivity' assessed with DTI-based tractography, as this technique does not allow one to identify point-to-point (or cell-to-cell) connections between distinct neural populations. Functional connectivity captures the correlation between the neural activity of a set of brain regions that are 'engaged' during a particular task or measured at rest. But such correlations do not provide information regarding the causality or directionality of inter-regional interactions. Effective connectivity attempts to address this issue either by manipulating brain activity in one region and evaluating the effect of such manipulation elsewhere, or by using mathematical models[38].

An example of a study that investigated functional connectivity during childhood and adolescence is an investigation of memory encoding in subjects between 11 and 19 years of age[39]. The study showed an age-related decrease in the fMRI signal in the left medial temporal lobe of subjects viewing photographs of natural outdoor scenes, whereas no age-related change was found in the control condition in which subjects viewed the same scene over and over. The authors used voxel-wise regression analysis to identify brain regions in which the fMRI signal correlated with that measured in two subregions of the left medial

temporal lobe, namely the hippocampus and the entorhinal cortex — structures that are known to participate in encoding new information. This analysis revealed an age-related increase in the correlation between activity in the left entorhinal cortex and activity in the left dorsolateral prefrontal cortex. This work nicely illustrates the importance of including analyses of functional connectivity in developmental studies: although the fMRI signal decreased with age in one of the memory-relevant structures (the entorhinal cortex), the proposed interaction between this structure and other brain regions (the prefrontal cortex) actually increased with age.

Another study investigated functional connectivity in the context of possible neural substrates of resistance to peer influences (RPI) in early adolescence (10-year-old children)[40]. This study aimed to determine whether the probability with which an adolescent follows the goals set by peers or those set by themselves might depend on the interplay between three neural systems. First, the action-observation network, which is considered by many to be the neural substrate of imitation[41]; it consists of frontal and parietal regions that are involved in the preparation and execution of actions. In this network, so-called 'mirror neurons' in the inferior premotor cortex, the inferior frontal gyrus and the anterior inferior parietal lobe are active both when subjects perform a specific action themselves and when they observe another individual performing the same action[41]. Second, the biological-motion processing network[42] (also known as the superior temporal sulcus (STS) network), which has an important role in extracting socially relevant cues, such as those imparted by the movements of eyes or hands. Neurons in the STS respond selectively to the presentation of human dynamic bodies, body parts or faces[42]. Third, the executive network[43], which supports a number of cognitive processes that underlie decision making, working memory and the suppression of alternative programmes that would otherwise interfere with planned actions; it consists of a set of regions in the lateral and medial prefrontal cortex[43]. In the study, subjects lying in an MRI scanner were asked to watch brief video clips containing face or hand/arm actions that were executed in neutral or angry ways, while changes in fMRI signals were measured. Outside the scanner, the subjects completed an RPI questionnaire[44]. Children with high RPI scores showed stronger inter-regional activity correlations in brain activity across the three networks while watching angry hand actions than the children who had low RPI scores (FIG. 3).

© 2008 Macmillan Publishers Limited. All rights reserved

This method identified activity correlations between areas that included both regions involved in action observation (the fronto-parietal and temporo-occipital systems) and regions in the prefrontal cortex. Thus, what distinguished subjects with high and low resistance to peer influences was not the magnitude of the BOLD response in individual brain regions but the degree of functional connectivity between regions.

*Neurochemistry.* The efficacy of communication across neuronal networks depends crucially on the state of the various neurotransmitter systems (BOX 2). In adults, positron emission tomography (PET) is one of the *in vivo* techniques that is used to assess the state of neurotransmitter systems, such as the activity of the enzymes that are involved in the synthesis or metabolism of a given neurotransmitter or the number of










Figure 3 | **Functional connectivity correlates with resistance to peer influence.** This figure shows functional connectivity, indexed by inter-regional correlations in functional MRI (fMRI) signals, during the observation of angry hand movements in children who differ in their resistance to peer influences (RPI). **a** | Correlations between the fMRI signal in a combination of brain regions during observation of angry and neutral hand movements and facial expressions and scores on the RPI questionnaire. **b** | Brain activity (brain score) during angry hand movements correlated strongly with RPI scores. **c** | Locations of brain regions in which the fMRI signal correlated with the RPI score during the observation of angry hand movements; only regions that are visible on the lateral surface of the left and right hemispheres are shown. **d** | Correlation matrices depicting inter-regional correlations of fMRI signals measured during the observation of angry hand movements in subjects with high (left) and low (right) RPI scores (subjects with RPI scores above and below the group median, respectively). The degree of inter-regional correlation (that is, functional connectivity) is higher in children with high RPI scores than in children with low RPI scores. **e** | Multi-dimensional scaling representations of the inter-regional correlations of the 25-dimensional matrix depicted in part **d**. Brain regions between which the fMRI signals (during the observation of angry hand movements) were strongly correlated are placed close together. Functional connectivity between regions is greater in children with high RPI scores (left graph) than in children with low RPI scores (right graph). CB1, cerebellum, right; CB2, cerebellum, right; CN, caudate nucleus, right; F01, premotor cortex, dorsal, left; F02, premotor cortex, dorsal, right; F03, premotor cortex, ventral, left; F04, premotor cortex, ventral, right; F05, frontal operculum, right; F06, cingulate motor area, left; F07, insula, anterior, left; F08, prefrontal cortex, ventrolateral, right; F09, prefrontal cortex, dorsolateral, left; F10, prefrontal cortex, dorsolateral, right; F11, prefrontal cortex, ventrolateral, left; F12, anterior cingulate cortex, right; F13, orbitofrontal cortex, lateral, left; F14, prefrontal cortex, medial; O01, fusiform gyrus, left; P01, posterior cingulate cortex; P02, precuneus, left; P03, parietal cortex, dorsolateral, right; P04, parietal cortex, dorsomedial, right; SC, superior colliculus, right; T01, superior temporal sulcus, middle, right; T02, superior temporal sulcus, posterior, right; T03, hippocampus, right. Figure reproduced, with permission, from REF. 40 © (2007) Society for Neuroscience.

Ex. 4
Page 43

© 2008 Macmillan Publishers Limited. All rights reserved

Box 2 | **Basics of neurotransmission**

Transmission of information from one neuron to the next involves several steps. Local excitatory and inhibitory postsynaptic potentials (EPSPs and IPSPs) are continuously being summed at the axonal hillock, and once a threshold value is reached an action potential is generated. The action potential then travels along the axon and, at the synapse, causes a release of neurotransmitters. The so-called conduction velocity is higher in myelinated axons than in non-myelinated axons and is also higher in large-diameter axons than in small-diameter axons[104–106]. Neurotransmitters are chemicals that either relay excitatory information or modulate (for example, amplify) this process. Neurotransmitters include amino acids (for example, glutamate and GABA (γ-aminobutyric acid)), monoamines (for example, dopamine, serotonin and noradrenaline), acetylcholine and many neuropeptides (for example, oxytocin). Glutamate and GABA are the main excitatory and inhibitory neurotransmitters, respectively, and dopamine is one of the most studied neuromodulators. The action of a particular neurotransmitter is mediated by a receptor; a given neurotransmitter can bind to a number of receptor subtypes that are found in different brain regions, or different layers of the cerebral cortex, in different densities[107,108]. The complex interaction between the various neurotransmitters released at any given time at the synapse determines the number of EPSPs and IPSPs generated on the postsynaptic membrane and, in turn, the firing of the neuron.

the receptors for the transmitter. Owing to radiation concerns, however, PET cannot be used in healthy children or adolescents. Therefore, most of our knowledge of developmental changes in neurotransmitters is derived from post-mortem studies in human and non-human primates.

We now consider developmental changes in the dopaminergic system, which has often been conceptualized as underlying adolescent-specific changes in motivational behaviour[45]. The existing data are not entirely consistent with this view, however. In the monkey, levels of the catecholamine-synthesizing enzyme tyrosine hydroxylase (TH) do not change during postnatal development in cortical layers I and VI. In layer III, TH levels are highest during infancy (5–7 months of age) in the entorhinal cortex[46] and during puberty (2–3 years of age) in the prefrontal cortex[47].

In humans, two recent post-mortem studies evaluated age-related changes in TH, catechol-O-methyltransferase (COMT) and a number of dopamine receptors in the human prefrontal cortex; COMT is a dopamine-metabolizing enzyme that is particularly important for dopaminergic transmission in the prefrontal cortex. No differences in COMT activity were found between infants (5–11 months of age), adolescents (14–18 years) and young adults (20–24 years)[48]— COMT activity increased only in adulthood (31–43 years)[48]. The second study showed that TH levels in the human prefrontal cortex were highest in neonates and by adolescence had declined to the levels observed in adults[49]. The same was true, in the same region, for expression of the dopamine D2 receptor gene, DRD2. By contrast, expression of DRD1 was highest in adolescents (14–18 years) and young adults

(20–24 years) in all layers of the prefrontal cortex. Levels of DRD4 in the prefrontal cortex did not change with age[49]. These findings illustrate that, contrary to prior assumptions, developmental changes in the different elements of dopaminergic transmission during adolescence are complex — very few, if any, of these elements peak during adolescence. As such, these age-related variations — in particular in the prefrontal cortex — are not likely to account for differences between adolescents and adults in motivation-related modulation of cortical activity.

**Psychopathology and adolescence**
The results of the National Comorbidity Survey Replication study, which entailed in-person household assessments of over 9,000 people representative of the US population (conducted from February 2001 to April 2003), indicated that the peak age of onset for any mental health disorder is 14 years[50]. Anxiety disorders, bipolar disorder, depression, eating disorder, psychosis (including schizophrenia) and substance abuse all most commonly emerge during adolescence[50,51] (FIG. 4). The emergence of certain psychopathologies is probably related to anomalies or exaggerations of typical adolescent maturation processes acting in concert with psychosocial factors (for example, school and relationships) and/or biological environmental factors (for example, pubertal hormonal changes and drugs of abuse), as will be discussed later. Here we focus on schizophrenia, affective and anxiety disorders and substance-use disorders because they are among the most well-studied, common and disabling disorders that emerge during adolescence, and they serve to highlight aberrations in the key developmental domains of cognition, affect and motivational behaviour.

*Schizophrenia.* Schizophrenia is a common disorder, with a lifetime prevalence of approximately 1%. It typically begins in adolescence or early adulthood and is characterized by unusual beliefs and experiences, namely delusions and hallucinations (collectively termed positive symptoms), social withdrawal and flat affect (negative symptoms), and cognitive impairment, notably in executive functions. An early onset of schizophrenia, during or even before adolescence, is associated with more-severe impairments[52]. The emerging ability to think abstractly during adolescence permits the application of advanced reasoning to social and interpersonal processes. These abilities are critically impaired in patients with schizophrenia, which led Feinberg to propose a relationship between late-adolescence-onset schizophrenia and changes that occur during adolescent brain development[53]. For example, the number and the duration of delta-wave sleep normally decrease during healthy adolescence[53]. In adolescents and young adults with schizophrenia, this reduction in delta-wave sleep is even more pronounced[54,55]. Delta-wave sleep represents the summed synchronous electrical activities of large assemblies of cortical neurons. On the basis of these observations, Feinberg speculated that schizophrenia might be a consequence of an exaggeration of the typical synaptic elimination that takes place during adolescence[53].

Subsequently, several lines of evidence have lent support to this hypothesis (that an "exaggeration of typical adolescent changes" has occurred in patients with schizophrenia)[54]. In addition to the exaggerated reductions in delta-wave sleep in adolescent patients with schizophrenia[55], patients with schizophrenia have prominent reductions in the level of membrane phospholipid precursors in the prefrontal cortex[56], in prefrontal metabolism[57] and in volumes of grey matter in the frontal cortex[58]; all of these observations are consistent with an exaggeration of the changes that occur in typical development. In a rare case of childhood-onset schizophrenia (onset before the age of 12 years), which is phenomenologically similar to adolescent- or adult-onset schizophrenia, the typical decrease in frontal grey-matter volume that is seen in healthy subjects during adolescence was exaggerated fourfold[58].

Direct evidence of a decrease in the number of synapses and other neural elements in schizophrenia comes from post-mortem studies that indicated a decreased density of synaptic spines[59], a reduction in neuropil[60] and decreased expression of the

© 2008 Macmillan Publishers Limited. All rights reserved



Figure 4 | **Ranges of onset age for common psychiatric disorders.** Recent data from the National Comorbidity Survey Replication study[50,112], a nationally representative epidemiological survey of mental disorders, suggest that approximately half of the population fulfil the criteria for one or other psychiatric disorder in their lifetimes. Most of those with a mental disorder have the beginnings of the illness in childhood or adolescence. Some anxiety disorders (such as phobias and separation anxiety) and impulse-control disorders begin in childhood, whereas other anxiety disorders (such as panic, generalized anxiety and post-traumatic stress disorder), substance disorders and mood disorders begin later, with onsets rarely before the early teens. Schizophrenia typically begins in late adolescence or the early twenties, with men having a somewhat earlier age of onset than women[51]. Psychiatric disorders with childhood or adolescent onsets tend to be more severe, are frequently undetected early in the illness and accrue additional co-morbid disorders, especially if untreated. It is therefore crucial to focus efforts on early identification and intervention.

synaptic marker synaptophysin[61]. Although this evidence supports a neurodevelopmental pathophysiology of schizophrenia, it does not provide indications regarding its aetiology. The cause of schizophrenia probably lies in the interplay between genetic and environmental factors, perhaps involving pre- and perinatal adverse events, a suboptimal postnatal environment during infancy and childhood, and biological stressors during adolescence.

*Substance abuse.* Adolescents are more likely to experiment with drugs. Substance-abuse disorders in adults typically begin during the teenage years; they can be preceded by behavioural disturbances and poor adjustment in childhood, as shown by recent results from the National Child Development Study[62]. An earlier onset of drug use predicts a greater severity of addiction problem[63] and might serve as a 'gateway' to the use of multiple substances later in life[64].

Certain personality traits are important risk factors for substance use, including high levels of novelty seeking and low levels of harm avoidance[65,66]. Across a wide array of mammalian species, adolescents exhibit increased risk taking and novelty seeking and a greater valuation of social factors[67,68]. Although these characteristics foster independence from the natal family, they also increase the risk for harmful behaviours, including, in humans, substance use and abuse. Some investigators have speculated that risk-taking and reward-seeking behaviours in adolescents might be related to a heightened sensitivity for reward[24]. As

discussed above, this notion has been supported by fMRI studies that found greater feedback-related activity using a monetary-reward task in reward circuitry, namely the nucleus accumbens, in adolescents[25]. But other studies found the opposite pattern, namely lower accumbens activity in response to monetary gains in adolescents than in young adults[26]. On the other hand, the activity of the medial-frontal circuitry, which is implicated in conflict monitoring and decision making, increases from adolescence to adulthood during fMRI tasks in which participants assume some risk of penalty in pursuit of an explicit reward. This developmental difference is less pronounced, however, when potential penalties in the task are severe[69].

Compounding these social and behavioural risks is the possibility that adolescents have less-aversive biological responses to substances of abuse. In adolescent rats, nicotine, amphetamine and alcohol produce less-pronounced acute effects and milder withdrawal responses[70,71]. Under the influence of alcohol, for instance, adolescent rats are less sensitive to developing motor impairment[72], getting a 'hangover' (REF. 73) or becoming sedated. These developmental differences might be related to immaturity of the developing GABA$_A$ receptor (γ-aminobutyric acid type A receptor) systems[74].

By contrast to their possibly more-rewarding and less-aversive responses, adolescents might be more prone to the deleterious effects of substance abuse. The hippocampus of adolescent rats is unusually susceptible to ethanol-induced inhibition of

long-term potentiation, making the rats more sensitive to the memory-impairing effect of alcohol[75]. This effect (which occurs at alcohol concentrations as low as 5 mM — equivalent to a single drink in humans), seems to be largely mediated through alcohol's effect on NMDA (N-methyl-D-aspartate) receptors, occurs at the single-cell level and is not confined to the hippocampus[76].

Clearly, some neural alterations that take place during adolescence predispose to risk, whereas others, such as memory impairments, might be actually the result of the abuse. Morphometric studies of humans support this notion. For instance, in youths with a family history of alcohol abuse the right amygdala is smaller even before the onset of problem drinking, whereas hippocampal volumes are reduced only after a history of alcohol use[77,78].

Exposure to substances of abuse in adolescence might also increase the likelihood of addictive disorders emerging later in life. For example, exposure to nicotine during adolescence, but not in the post-adolescent period, increases the reinforcing effects of nicotine in a self-administration paradigm in adult rats[79].

*Affective and anxiety disorders.* Affective disorders, such as major depression, are common and serious disorders of adolescence; adolescent onset is associated with more-severe and more-disabling forms of these illnesses[80,81]. Anxiety symptoms frequently precede depression in adolescence[82] and during childhood[83].

Structural MRI studies of adolescents with anxiety and affective disorders have reported structural anomalies in the superior temporal gyrus, the ventral prefrontal cortex and the amygdala[84–86]. An fMRI study of depressed and anxious adolescents reported anomalous amygdala responses to social stimuli[87]. In another fMRI study, adults but not adolescents engaged the orbitofrontal cortex when asked to switch from an emotional assessment of a face (that is, "How afraid does it make you feel?") to a non-emotional one (that is, "How wide is the nose?")[88]. The abnormal engagement of brain regions to emotional facial expressions in adolescents might underlie an unrealistic appraisal of emotions and thereby predispose to anxiety and depression.

Hormonal changes that occur during adolescence are likely to account for at least part of the risk for mood and anxiety disorders. Indeed, an intriguing clue to the biology of depression, anxiety and panic disorders is the change from equal female–male prevalence prepuberty to a 2:1 female–male

Ex. 4
Page 45

© 2008 Macmillan Publishers Limited. All rights reserved

prevalence after puberty. Epidemiological evidence indicates that it is only after Tanner stage III that the sex differences in the incidence of depression emerge[89]. The finding that pubertal status predicts the sex difference in prevalence better than age[90,91] suggests that sex hormones play a part in the pathophysiology of these disorders.

A recent mouse study that examined the effect of tetrahydroprogesterone (THP), a steroid derived from progesterone, provides a possible mechanism for this phenomenon[92]. This hormone is released during stress and has an anxiolytic effect that is mediated by the activation of GABA$_A$ receptors, which are also activated by alcohol and benzodiazepines. However, when it binds to a particular subtype of GABA$_A$ receptor, namely the α4β2δ receptor subtype, THP has the opposite effect to that of alcohol and benzodiazepines: it increases anxiety. The expression of the α4β2δ receptor in the CA1 region of the hippocampus surges after puberty and is accompanied by increased anxiety, as measured on an elevated plus maze. Moreover, blocking the formation of THP alleviated the increase in anxiety in adolescent mice[92]. Whether the effects of stress-related hormones on the brain can explain the difference in rates of anxiety and depressive disorders between prepubescents and adults awaits further investigation.

In summary, robust changes in hormones and hormonal receptors, increasingly powerful emotional responses to social stimuli and rapid alterations in motivation and reward systems might underlie the onset of anxiety and depressive disorders during adolescence.

**Conclusions and future directions**
The relationship between typical changes in the adolescent brain and the onset of psychopathology is not a unitary phenomenon, but an underlying theme can be conceptualized as 'moving parts get broken'. Adolescence is characterized by major changes in the neural systems that subserve higher cognitive functions, reasoning and interpersonal interactions, cognitive control of emotions, risk-versus-reward appraisal and motivation. Not surprisingly, it is precisely these changes that, when suboptimal in timing or magnitude, increase the risk of cognitive, affective and addictive disorders. Understanding the basis of these disorders therefore requires a comprehensive knowledge of how the brain is put together. Many advances are being made, but a lot remains to be learnt.

An emerging theme from paediatric neuroimaging studies is that the journey of brain development is often as important as the destination. For example, IQ is predicted by the developmental trajectory of cortical thickness, not by the adult cortical thickness[93]. The large individual variability in brain anatomy and function calls for longitudinal study designs that capture the nuances of heterochronous developmental curves. The first phases of longitudinal studies have mapped developmental trajectories for typical development, but those of patients with psychiatric illnesses have been mapped to a lesser extent. The next phases should go beyond simply mapping brain growth and begin to discern the adverse as well as protective factors that influence those trajectories.

A common initial approach to assessing causal influences on brain development is to discern the relative effects of genetic and non-genetic factors. This is best addressed through comparisons of monozygotic and dizygotic twins. Results from an ongoing paediatric longitudinal neuroimaging project at the Child Psychiatry Branch of the National Institute of Mental Health indicate significant age-by-heritability interactions, with heritability of grey-matter volume generally decreasing with age and heritability of

---

**Glossary**

**Androgen insensitivity syndrome**
(Also known as androgen resistance syndrome or testicular feminization.) An X-linked, recessive condition characterized by a complete or partial failure of virilization that is due to a mutation on the gene that encodes the androgen receptor.

**Anti-saccade task**
A task in which subjects are required to suppress the automatic response of making a saccade towards a target and, instead, produce an eye movement in the opposite direction.

**Congenital adrenal hyperplasia**
A group of autosomal-recessive disorders caused by mutations in the genes for the enzymes that are involved in steroid synthesis. The result of these mutations is excessive or deficient production of sex steroids.

**Delta-wave sleep**
A stage of non-rapid-eye-movement sleep characterized by slow, or delta, waves (0.5–4 Hz); the more delta waves there are, the deeper the sleep.

**Diffusion tensor imaging**
(DTI). An MRI-based technique that allows one to characterize the structural properties of white matter.

**Eriksen flanker task**
A task in which subjects have to respond to a stimulus that is flanked by other stimuli that may code an alternative response.

**Familial male precocious puberty**
An autosomal-dominant disorder that occurs in males and is characterized by the onset of puberty (testicular enlargement) before 4 years of age.

**Founder effect**
The loss of genetic variation when a new colony is established by a very small number of individuals from a larger population.

**Fractional anisotropy**
(FA). The directionality of the (fast) diffusion of water in the extracellular space around the axons (in most common acquisition protocols). The more unidirectional the water diffusion is in a given fibre tract, the higher the FA value in that location.

**Go/no-go task**
A task in which the subject must produce a motor response for one class of stimulus but withhold responding to other classes of stimuli.

**Magnetization transfer ratio**
(MTR). A measure used for assessing white-matter properties; it provides information on the macromolecular content and structure of the tissue. Given that the macromolecules of myelin are the dominant source of MT signal in white matter, one can use MTR as an index of myelination. Note, however, that myelin is not likely to be the sole factor influencing the MTR.

**Neural Darwinism**
A neurodevelopmental process in which the synapses that are used the most are kept whereas the least-used connections are destroyed ('pruned').

**Stop task**
A test of response inhibition. On each trial, a stimulus (for example, a leftward- or rightward-pointing arrow) is displayed on a screen, and the subject has to respond as soon as possible by pressing the corresponding (left or right) key, unless a second stimulus (for example, a sound) signals that the response has to be withheld.

**Stroop task**
A task in which the subject is asked to name the colour of ink in which a word is displayed. The task is easy when the ink colour is congruent with the printed word (for example, 'red' printed in red ink). The task becomes difficult when the ink colour is incongruent with the printed word (for example, 'red' printed in green ink).

**STS network**
A set of regions, located along the superior temporal sulcus, that are involved in processing biological motion induced by the movement of different body parts, such as the eyes, the face or the entire body.

**Tanner stage III**
One of the five stages of puberty. Without resorting to a physical exam, pubertal stages can be assessed using, for example, the Puberty Development Scale, which is an eight-item self-report measure of physical development based on the Tanner stages with separate forms for males and females. For this scale there are five categories of pubertal status: prepubertal, beginning pubertal, midpubertal, advanced pubertal and postpubertal.

**XXY**
(Klinefelter's syndrome). A genetic syndrome that affects males and is caused by the presence of two X chromosomes (resulting in a 47-chromosome karotype).

---

Ex. 4
Page 46

© 2008 Macmillan Publishers Limited. All rights reserved

white-matter volume generally increasing with age[94]. Heritability-by-age interactions might be related to the timing of gene expression, which in turn might relate to the timing of the onset of illness. Post-mortem human and animal studies indicate that 'developmental' genes have diverse effects at various stages of brain development. But differences in heritability in different age groups may also reflect the cumulative effect of experience on brain structure; depending on certain inherent traits (for example, musical talent or personality), it is only with time that specific experiences start to shape the brain.

Multivariate analyses of twin data indicate that a relatively small number of shared genetic and environmental factors account for a substantial portion of the variance across multiple neuroanatomic structures[95]. Ongoing studies of specific gene effects on brain maturation may help to sharpen our understanding of brain-development mechanisms and provide insight into the aetiologies of various pathologies. The Saguenay Youth Study, carried out in a geographically isolated population with a known founder effect, will facilitate our search for genes that influence brain and behaviour during adolescence[96]. Finally, genetics may also provide biologically relevant subtypes of neuropsychiatric disorders that are obscured in current diagnostic schemes.

The marked sex differences in age of onset, prevalence and symptomatology for nearly every neuropsychiatric disorder may provide important clues as to these disorders' pathophysiology. The most-obvious outward physical manifestations of puberty are caused by changing levels of hormones[97]. Perhaps this has contributed to the tendency to attribute all of the cognitive and behavioural changes of adolescence to 'raging hormones'. But the relationship between hormones, the brain and behaviour is complex, reciprocal and poorly understood. Steroid hormones affect neuronal activity and morphology throughout development. Most neurons have receptors for adrenal and gonadal hormones, and when these receptors are activated they can affect neuronal function. Short-term effects are mediated by membrane-bound receptors, whereas long-term effects alter gene expression through intracellular or nuclear receptors. Conversely, the dramatic hormonal changes of puberty are triggered by alterations in excitatory and inhibitory inputs to gonadotropin-releasing hormone neurons in the pituitary. Hormonal effects drive aggression and sexual interest, but their

impact on impulse control, logical problem solving and other cognitive tasks has not been well established.

Social and cultural factors for boys and girls are profoundly different, and the relationship of these differences to manifest pathology should be explored. In the biological realm, sex differences probably stem directly from different genes on the X and Y chromosomes or indirectly from the effects of different hormone levels. Studies of subjects with sex-chromosome variations (for example, XO, XXY, XXYY, XXX or XXXXY) or anomalous hormone levels (for example, owing to congenital adrenal hyperplasia, androgen insensitivity syndrome or familial male precocious puberty) will be useful for sorting out the relative contributions of gene and hormone effects. For instance, males with an extra X chromosome (XXY or Klinefelter's syndrome) have a high incidence of language disorders, ADHD and social-skill deficits that are reflected in differences in cortical thickness, consistent with reports in the literature for XY subjects with such disorders[98]. Girls with congenital adrenal hyperplasia, which is characterized by intrauterine exposure to high levels of testosterone, have an entirely different pattern of structural findings, indicating differential effects of sex chromosomes and hormones on the brain[99].

Although neuroimaging is beginning to establish correlations between brain structure/physiology and behaviour, the link between typical behavioural changes and psychopathology has not been firmly established. For example, the neural circuitry that underlies 'moodiness' in an adolescent might not be the same as that which is involved in depression or bipolar disorder. Neuroimaging data can help in the development of neuroanatomical models of cognitive, affective and social processes that are based on findings from developmental psychology[100]. Imaging studies of healthy adolescents are also helping to construct age-appropriate structural and functional brain templates.

Newer imaging approaches are being developed. Magnetic resonance spectroscopy studies using strong magnetic fields can help to quantify neurotransmitter systems, such as glutamate and GABA systems, as well as markers of neurogenesis[101]. Combining multiple imaging modalities, such as structural MRI, fMRI, DTI, magnetization transfer imaging, electroencephalography or magnetoencephalography, in the examination of single individuals will enhance our ability to

interpret the signals for each of the modalities. Being able to examine simultaneously inter-individual variation from cellular to macroscopic levels will be instrumental in bridging the gaps between genes, the brain and behaviour.

Studies of the neural substrates of adolescent behaviour and decision making will need to be better integrated with social and educational science. Laboratory studies of teenagers using hypothetical situations in calm environments without peer influence might have little relevance for understanding real-world decision making, which often occurs in the presence of peers and in the context of intense physical or emotional arousal and conflicting priorities[102].

Many questions about adolescent brain development and its impact on disease can best be investigated in animal models. Modelling the adolescent phase in animals is useful for investigating the risk for addictive and other early-onset neuropsychiatric disorders[79]. Although there are no animal models that represent the full phenotypic spectrum of a psychiatric disorder, such as schizophrenia or depression, individual phenotypic components of disorders — such as developmental alterations that might be associated with the illness — can be used to construct animal models that are aimed at unravelling disease mechanisms and that allow novel interventions to be tested[103].

Another translational approach involves combined in vivo (for example, MRI) and post-mortem studies in animals; such studies are essential for clarifying the nature of the neurobiological changes that drive the MRI findings. Of immediate relevance will be studies that attempt to discern the degree to which changes in cortical grey matter, as detected by MRI, are related to dendritic arborization, intracortical myelination or the encroachment of white matter on the inner cortical border.

Adolescence is a time of substantial neurobiological and behavioural change. These changes are usually beneficial and optimize the brain for the challenges ahead, but they can also confer a vulnerability to certain types of psychopathology. The technologies to elucidate the relationship between specific neurobiological maturational processes and specific normative or pathological changes are already in place. Applying these tools to understand when and how deviations from typical development occur may enhance our ability to prevent or treat disorders that affect a substantial number of people.

Ex. 4
Page 47

© 2008 Macmillan Publishers Limited. All rights reserved

# PERSPECTIVES

*Tomás Paus is at the Brain & Body Centre, University of Nottingham, Nottingham, NG7 2RD, UK and at the Montreal Neurological Institute, McGill University, Montreal, H2A 3B4, Canada.*

*Matcheri Keshavan is at the Beth Israel and Deaconess Medical center, Boston, Massachusetts, USA; at Harvard University, Boston, Massachusetts, USA; and at Wayne State University, Detroit, Michigan 48201, USA.*

*Jay N. Giedd is at the Child Psychiatry Branch, National Institute of Mental Health, Bethesda, Maryland 20892-1600, USA.*

*Correspondence to T.P. and J.N.G.*
*e-mails: tomas.paus@nottingham.ac.uk;*
*jgiedd@mail.nih.gov*

doi:10.1038/nrn2513
Published online 12 November 2008

1. Bushong, S. *Magnetic Resonance Imaging* 3rd edn (Mosby, Inc., 2003).
2. Roberts, T. P. & Mikulis, D. Neuro MR: principles. *J. Magn. Reson. Imaging* **26**, 823–837 (2007).
3. Keshavan, M. S., Kapur, S. & Pettegrew, J. W. Magnetic resonance spectroscopy in psychiatry: potential, pitfalls and promise. *Am. J. Psychiatry* **148**, 976–985 (1991).
4. Logothetis, N. K., Pauls, J., Augath, M., Trinath, T. & Oeltermann, A. Neurophysiological investigation of the basis of the fMRI signal. *Nature* **412**, 150–157 (2001).
5. Lenroot, R. K. & Giedd, J. N. Brain development in children and adolescents: insights from anatomical magnetic resonance imaging. *Neurosci. Biobehav. Rev.* **30**, 718–729 (2006).
6. Paus, T. Mapping brain maturation and cognitive development during adolescence. *Trends Cogn. Sci.* **9**, 60–68 (2005).
7. Giedd, J. N., Blumenthal, J. & Jeffries, N. O. *et al.* Brain development during childhood and adolescence: a longitudinal MRI study. *Nature Neurosci.* **2**, 861–863 (1999).
8. Gogtay, N. *et al.* Dynamic mapping of human cortical development during childhood through early adulthood. *Proc. Natl Acad. Sci. USA* **101**, 8174–8179 (2004).
9. Sowell, E. R. *et al.* Mapping cortical change across the human life span. *Nature Neurosci.* **6**, 309–315 (2003).
10. Pfefferbaum, A. *et al.* A quantitative magnetic resonance imaging study of changes in brain morphology from infancy to late adulthood. *Arch. Neurol.* **51**, 874–887 (1994).
11. DeBellis, M. D. *et al.* Sex differences in brain maturation during childhood and adolescence. *Cereb. Cortex* **11**, 552–557 (2001).
12. Klingberg, T., Vaidya, C. J., Gabrieli, J. D., Moseley, M. E. & Hedehus, M. Myelination and organization of the frontal white matter in children: a diffusion tensor MRI study. *Neuroreport* **10**, 2817–2821 (1999).
13. Schmithorst, V. J., Wilke, M., Dardzinski, B. J. & Holland, S. K. Correlation of white matter diffusivity and anisotropy with age during childhood and adolescence: a cross-sectional diffusion-tensor MR imaging study. *Radiology* **222**, 212–218 (2002).
14. Snook, L., Paulson, L. A., Roy, D., Phillips, L. & Beaulieu, C. Diffusion tensor imaging of neurodevelopment in children and young adults. *Neuroimage* **26**, 1164–1173 (2005).
15. Steinberg, L. *et al.* Age differences in sensation seeking and impulsivity as indexed by behaviour and self-report: evidence for a dual systems model. *Dev. Psychol.* (in the press).
16. Kwon, H., Reiss, A. L. & Menon, V. Neural basis of protracted developmental changes in visuo-spatial working memory. *Proc. Natl Acad. Sci. USA* **99**, 13336–13341 (2002).
17. Adleman, N. E. *et al.* A developmental fMRI study of the Stroop color-word task. *Neuroimage* **16**, 61–75 (2002).
18. Luna, B. *et al.* Maturation of widely distributed brain function subserves cognitive development. *Neuroimage* **13**, 786–793 (2001).
19. Rubia, K. *et al.* Functional frontalisation with age: mapping neurodevelopmental trajectories with fMRI. *Neurosci. Biobehav. Rev.* **24**, 13–19 (2000).
20. Tamm, L., Menon, V. & Reiss, A. L. Maturation of brain function associated with response inhibition. *J. Am. Acad. Child Adolesc. Psychiatry* **41**, 1231–1238 (2002).
21. Bunge, S. A., Dudukovic, N. M., Thomason, M. E., Vaidya, C. J. & Gabrieli, J. D. Immature frontal lobe contributions to cognitive control in children: evidence from fMRI. *Neuron* **33**, 301–311 (2002).
22. Steinberg, L. A neurobehavioral perspective on adolescent risk-taking. *Dev. Rev.* **28**, 78–106 (2008).
23. Robbins, T. W. & Everitt, B. J. Neurobehavioural mechanisms of reward and motivation. *Curr. Opin. Neurobiol.* **6**, 228–236 (1996).
24. Galvan, A. *et al.* Earlier development of the accumbens relative to orbitofrontal cortex might underlie risk-taking behavior in adolescents. *J. Neurosci.* **26**, 6885–6892 (2006).
25. Ernst, M. Amygdala and nucleus accumbens in responses to receipt and omission of gains in adults and adolescents. *Neuroimage* **25**, 1279–1291 (2005).
26. Bjork, J. M. *et al.* Incentive-elicited brain activation in adolescents: similarities and differences from young adults. *J. Neurosci.* **24**, 1793–1802 (2004).
27. Purves, D., White, L. E. & Riddle, D. R. Is neural development Darwinian? *Trends Neurosci.* **19**, 460–464 (1996).
28. Huttenlocher, P. R. & de Courten, C. The development of synapses in striate cortex of man. *Hum. Neurobiol.* **6**, 1–9 (1987).
29. Huttenlocher, P. R. Synapse elimination and plasticity in developing human cerebral cortex. *Am. J. Ment. Defic.* **88**, 488–496 (1984).
30. Huttenlocher, P. R. & Dabholkar, A. S. Regional differences in synaptogenesis in human cerebral cortex. *J. Comp. Neurol.* **387**, 167–178 (1997).
31. Rakic, P., Bourgeois, J. P., Eckenhoff, M. F., Zecevic, N. & Goldman-Rakic, P. S. Concurrent overproduction of synapses in diverse regions of the primate cerebral cortex. *Science* **232**, 232–235 (1986).
32. Bourgeois, J. P. & Rakic, P. Changes of synaptic density in the primary visual cortex of the macaque monkey from fetal to adult stage. *J. Neurosci.* **13**, 2801–2820 (1993).
33. Braitenberg, V. & Schuz, A. *Cortex: Statistics and Geometry of Neuronal Connectivity* (Springer, Heidelberg, 1998).
34. Kaes, T. *Die Grosshirnrinde des Menschen in ihren Massen und ihrem Fasergehalt* (Fisher, Jena, 1907).
35. Conel, J. *Postnatal Development of the Human Cerebral Cortex: the Cortex of the Seventy-Two-Month Infant. Vol. 8.* (Harvard Univ. Press, Cambridge, Massachusetts, 1967).
36. Yakovlev, P. & Lecours, A. in *Regional Development of the Brain in Early Life* (ed. Minkowski, A.) 3–70 (Blackwell Scientific, Oxford, 1967).
37. Perrin, J. *et al.* Growth of white matter in the adolescent brain: role of testosterone and androgen receptor. *J. Neurosci.* **28**, 9519–9524 (2008).
38. Paus, T. in *Handbook of Brain Connectivity* (eds Jirsa, V. & McIntosh, A. R.) 463–476 (Springer, New York, 2007).
39. Menon, V., Boyett-Anderson, J. M. & Reiss, A. L. Maturation of medial temporal lobe response and connectivity during memory encoding. *Brain Res. Cogn. Brain Res.* **25**, 379–385 (2005).
40. Grosbras, M. H. *et al.* Neural mechanisms of resistance to peer influence in early adolescence. *J. Neurosci.* **27**, 8040–8045 (2007).
41. Rizzolatti, G. & Craighero, L. The mirror-neuron system. *Annu. Rev. Neurosci.* **27**, 169–192 (2004).
42. Puce, A. & Perrett, D. Electrophysiology and brain imaging of biological motion. *Philos. Trans. R. Soc. Lond. B Biol. Sci.* **358**, 435–445 (2003).
43. Petrides, M. Lateral prefrontal cortex: architectonic and functional organization. *Philos. Trans. R. Soc. Lond. B Biol. Sci.* **360**, 781–795 (2005).
44. Steinberg, L. & Monahan, K. C. Age differences in resistance to peer influence. *Dev. Psychol.* **43**, 1531–1543 (2007).
45. Tseng, K. Y. & O'Donnell, P. Dopamine modulation of prefrontal cortical interneurons changes during adolescence. *Cereb. Cortex* **17**, 1235–1240 (2007).
46. Erickson, S. L., Akil, M., Levey, A. I. & Lewis, D. A. Postnatal development of tyrosine hydroxylase- and dopamine transporter-immunoreactive axons in monkey rostral entorhinal cortex. *Cereb. Cortex* **8**, 415–427 (1998).
47. Rosenberg, D. R. & Lewis, D. A. Postnatal maturation of the dopaminergic innervation of monkey prefrontal and motor cortices: a tyrosine hydroxylase immunohistochemical analysis. *J. Comp. Neurol.* **358**, 383–400 (1995).
48. Tunbridge, E. M. *et al.* Catechol-o-methyltransferase enzyme activity and protein expression in human prefrontal cortex across the postnatal lifespan. *Cereb. Cortex* **17**, 1206–1212 (2007).
49. Weickert, C. S. *et al.* Postnatal alterations in dopaminergic markers in the human prefrontal cortex. *Neuroscience* **144**, 1109–1119 (2007).
50. Kessler, R. C. *et al.* Lifetime prevalence and age-of-onset distributions of DSM-IV disorders in the National Comorbidity Survey Replication. *Arch. Gen. Psychiatry* **62**, 593–602 (2005).
51. Hafner, H. *et al.* How does gender influence age at first hospitalization for schizophrenia? A transnational case register study. *Psychol. Med.* **19**, 903–918 (1989).
52. Kyriakopoulos, M. & Frangou, S. Pathophysiology of early onset schizophrenia. *Int. Rev. Psychiatry* **19**, 315–324 (2007).
53. Feinberg, I. Schizophrenia: caused by a fault in programmed synaptic elimination during adolescence? *J. Psychiatr. Res.* **17**, 319–334 (1982–1983).
54. Keshavan, M. S., Anderson, S. & Pettegrew, J. W. Is schizophrenia due to excessive synaptic pruning in the prefrontal cortex? The Feinberg hypothesis revisited. *J. Psychiatr. Res.* **28**, 239–265 (1994).
55. Keshavan, M. S. *et al.* Delta sleep deficits in schizophrenia: evidence from automated analyses of sleep data. *Arch. Gen. Psychiatry* **55**, 443–448 (1998).
56. Pettegrew, J. W. *et al.* Alterations in brain high-energy phosphate and membrane phospholipid metabolism in first-episode, drug-naive schizophrenics. A pilot study of the dorsal prefrontal cortex by *in vivo* phosphorus 31 nuclear magnetic resonance spectroscopy. *Arch. Gen. Psychiatry* **48**, 563–568 (1991).
57. Andreasen, N. C. *et al.* Hypofrontality in neuroleptic-naive patients and in patients with chronic schizophrenia. Assessment with xenon 133 single-photon emission computed tomography and the Tower of London. *Arch. Gen. Psychiatry* **49**, 943–958 (1992).
58. Sporn, A. L. *et al.* Progressive brain volume loss during adolescence in childhood-onset schizophrenia. *Am. J. Psychiatry* **160**, 2181–2189 (2003).
59. Garey, L. J. *et al.* Reduced dendritic spine density on cerebral cortical pyramidal neurons in schizophrenia. *J. Neurol. Neurosurg. Psychiatr.* **65**, 446–453 (1998).
60. Selemon, L. D., Rajkowska, G. & Goldman-Rakic, P. S. Abnormally high neuronal density in the schizophrenic cortex. A morphometric analysis of prefrontal area 9 and occipital area 17. *Arch. Gen. Psychiatry* **52**, 805–818; discussion 819–820 (1995).
61. Eastwood, S. L. & Harrison, P. J. Decreased synaptophysin in the medial temporal lobe in schizophrenia demonstrated using immunoautoradiography. *Neuroscience* **69**, 339–343 (1995).
62. Maggs, J. L., Patrick, M. E. & Feinstein, L. Childhood and adolescent predictors of alcohol use and problems in adolescence and adulthood in the National Child Development Study. *Addiction* **103** (Suppl. 1), 7–22 (2008).
63. Chambers, R. A., Taylor, J. R. & Potenza, M. N. Developmental neurocircuitry of motivation in adolescence: a critical period of addiction vulnerability. *Am. J. Psychiatry* **160**, 1041–1052 (2003).
64. Kandel, D. B., Yamaguchi, K. & Chen, K. Stages of progression in drug involvement from adolescence to adulthood: further evidence for the gateway theory. *J. Stud. Alcohol* **53**, 447–457 (1992).
65. Cloninger, C. R., Sigvardsson, S. & Bohman, M. Childhood personality predicts alcohol abuse in young adults. *Alcohol. Clin. Exp. Res.* **12**, 494–505 (1988).
66. Wills, T. A., Vaccaro, D. & McNamara, G. Novelty seeking, risk taking, and related constructs as predictors of adolescent substance use: an application of Cloninger's theory. *J. Subst. Abuse* **6**, 1–20 (1994).
67. Adams, G., Montemayor, R. & Gullotta, T. *Biology of Adolescent Behavior and Development* (Sage, Newbury Park, California, 1989).
68. Savin-Williams, R. *Adolescence: an Ethological Perspective* (Springer, New York, 1987).
69. Bjork, J. M., Smith, A. R., Danube, C. L. & Hommer, D. W. Developmental differences in posterior mesofrontal cortex recruitment by risky rewards. *J. Neurosci.* **27**, 4839–4849 (2007).
70. Levin, E. D., Rezvani, A. H., Montoya, D., Rose, J. E. & Swartzwelder, H. S. Adolescent-onset nicotine self-administration modeled in female rats. *Psychopharmacology (Berl.)* **169**, 141–149 (2003).

Ex. 4
Page 48

© 2008 Macmillan Publishers Limited. All rights reserved

71. Spear, L. P. Alcohol's effects on adolescents. *Alcohol Res. Health* **26**, 287–291 (2002).
72. White, A. M. *et al.* Differential effects of ethanol on motor coordination in adolescent and adult rats. *Pharmacol. Biochem. Behav.* **73**, 673–677 (2002).
73. Doremus, T. L., Brunell, S. C., Varlinskaya, E. I. & Spear, L. P. Anxiogenic effects during withdrawal from acute ethanol in adolescent and adult rats. *Pharmacol. Biochem. Behav.* **75**, 411–418 (2003).
74. Silveri, M. M. & Spear, L. P. The effects of NMDA and GABA_A pharmacological manipulations on ethanol sensitivity in immature and mature animals. *Alcohol. Clin. Exp. Res.* **26**, 449–456 (2002).
75. White, A. M. & Swartzwelder, H. S. Hippocampal function during adolescence: a unique target of ethanol effects. *Ann. NY Acad. Sci.* **1021**, 206–220 (2004).
76. Li, Q., Wilson, W. A. & Swartzwelder, H. S. Differential effect of ethanol on NMDA EPSCs in pyramidal cells in the posterior cingulate cortex of juvenile and adult rats. *J. Neurophysiol.* **87**, 705–711 (2002).
77. Brown, S. A. & Tapert, S. F. Adolescence and the trajectory of alcohol use: basic to clinical studies. *Ann. NY Acad. Sci.* **1021**, 234–244 (2004).
78. De Bellis, M. D. *et al.* Hippocampal volume in adolescent-onset alcohol use disorders. *Am. J. Psychiatry* **157**, 737–744 (2000).
79. Adriani, W. & Laviola, G. Windows of vulnerability to psychopathology and therapeutic strategy in the adolescent rodent model. *Behav. Pharmacol.* **15**, 341–352 (2004).
80. Andersen, S. L. & Teicher, M. H. Stress, sensitive periods and maturational events in adolescent depression. *Trends Neurosci.* **31**, 183–191 (2008).
81. Birmaher, B. & Axelson, D. Course and outcome of bipolar spectrum disorder in children and adolescents: a review of the existing literature. *Dev. Psychopathol.* **18**, 1023–1035 (2006).
82. Beesdo, K. *et al.* Incidence of social anxiety disorder and the consistent risk for secondary depression in the first three decades of life. *Arch. Gen. Psychiatry* **64**, 903–912 (2007).
83. Reinherz, H. Z., Paradis, A. D., Giaconia, R. M., Stashwick, C. K. & Fitzmaurice, G. Childhood and adolescent predictors of major depression in the transition to adulthood. *Am. J. Psychiatry* **160**, 2141–2147 (2003).
84. Blumberg, H. P. *et al.* Amygdala and hippocampal volumes in adolescents and adults with bipolar disorder. *Arch. Gen. Psychiatry* **60**, 1201–1208 (2003).
85. De Bellis, M. D. *et al.* Brain structures in pediatric maltreatment-related posttraumatic stress disorder: a sociodemographically matched study. *Biol. Psychiatry* **52**, 1066–1078 (2002).
86. DelBello, M. P., Zimmerman, M. E., Mills, N. P., Getz, G. E. & Strakowski, S. M. Magnetic resonance imaging analysis of amygdala and other subcortical brain regions in adolescents with bipolar disorder. *Bipolar Disord.* **6**, 43–52 (2004).
87. Thomas, K. M. *et al.* Amygdala response to fearful faces in anxious and depressed children. *Arch. Gen. Psychiatry* **58**, 1057–1063 (2001).
88. Monk, C. S. *et al.* Adolescent immaturity in attention-related brain engagement to emotional facial expressions. *Neuroimage* **20**, 420–428 (2003).
89. Angold, A. & Costello, E. J. Puberty and depression. *Child Adolesc. Psychiatr. Clin. N. Am.* **15**, 919–937 (2006).
90. Hayward, C. & Sanborn, K. Puberty and the emergence of gender differences in psychopathology. *J. Adolesc. Health* **30** (4 Suppl.), 49–58 (2002).
91. Patton, G., *et al.* Menarche and the onset of depression and anxiety in Victoria, Australia. *J. Epidemiol. Community Health* **50**, 661–666 (1996).
92. Shen, H. *et al.* Reversal of neurosteroid effects at α4β2δ GABA_A receptors triggers anxiety at puberty. *Nature Neurosci.* **10**, 469–477 (2007).
93. Shaw, P. *et al.* Intellectual ability and cortical development in children and adolescents. *Nature* **440**, 676–679 (2006).
94. Wallace, G. L. *et al.* A pediatric twin study of brain morphometry. *J. Child Psychol. Psychiatry* **47**, 987–993 (2006).
95. Schmitt, J. E. *et al.* A multivariate analysis of neuroanatomic relationships in a genetically informative pediatric sample. *Neuroimage* **35**, 70–82 (2007).
96. Pausova, Z. *et al.* Genes, maternal smoking, and the offspring brain and body during adolescence: design of the Saguenay Youth Study. *Hum. Brain Mapp.* **28**, 502–518 (2007).
97. Sisk, C. L. & Foster, D. L. The neural basis of puberty and adolescence. *Nature Neurosci.* **7**, 1040–1047 (2004).
98. Shen, D. *et al.* Automated morphometric study of brain variation in XXY males. *Neuroimage* **23**, 648–653 (2004).
99. Giedd, J. N. *et al.* Puberty-related influences on brain development. *Mol. Cell. Endocrinol.* **254–255**, 154–162 (2006).
100. Ernst, M. & Mueller, S. C. The adolescent brain: insights from functional neuroimaging research. *Dev. Neurobiol.* **68**, 729–743 (2008).
101. Manganas, L. N. *et al.* Magnetic resonance spectroscopy identifies neural progenitor cells in the live human brain. *Science* **318**, 980–985 (2007).
102. Steinberg, L. Cognitive and affective development in adolescence. *Trends Cogn. Sci.* **9**, 69–74 (2005).
103. Arguello, P. A. & Gogos, J. A. Modeling madness in mice: one piece at a time. *Neuron* **52**, 179–196 (2006).
104. Hursh, J. Conduction velocity and diameter of nerve fibers. *Am. J. Physiol.* **127**, 131–139 (1939).
105. Rushton, W. A. A theory of the effects of fiber size in medullated nerve. *J. Physiol.* **115**, 101–122 (1951).
106. Schmidt-Nielson, K. *Animal Physiology: Adaptation and Environment* 5th edn (Cambridge Univ. Press, 1997).
107. Eickhoff, S. B., Schleicher, A., Scheperjans, F., Palomero-Gallagher, N. & Zilles, K. Analysis of neurotransmitter receptor distribution patterns in the cerebral cortex. *Neuroimage* **34**, 1317–1330 (2007).
108. Zilles, K., Palomero-Gallagher, N. & Schleicher, A. Transmitter receptors and functional anatomy of the cerebral cortex. *J. Anat.* **205**, 417–432 (2004).
109. Chugani, H. T., Phelps, M. E. & Mazziotta, J. C. Positron-emission tomography study of human brain functional development. *Ann. Neurol.* **22**, 487–497 (1987).
110. Huttenlocher, P. R. Synaptic density in human frontal cortex - developmental changes and effects of aging. *Brain Res.* **163**, 195–205 (1979).
111. Rakic, P., Bourgeois, J. P. & Goldman-Rakic, P. S. Synaptic development of the cerebral cortex: implications for learning, memory, and mental illness. *Prog. Brain Res.* **102**, 227–243 (1994).
112. Kessler, R. C. & Wang, P. S. The descriptive epidemiology of commonly occurring mental disorders in the United States. *Annu. Rev. Public Health* **29**, 115–129 (2008).

**Acknowledgements**
The authors' work is supported by the Canadian Institutes of Health Research (T.P.), the Royal Society, UK (T.P.) and the US National Institutes of Health (T.P., K.M. and J.N.G.).

**DATABASES**

**Entrez Gene:**
http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?db=gene
*DRD1* | *DRD2* | *DRD4*

**FURTHER INFORMATION**
Tomáš Paus's homepage:
http://brainbody.nottingham.ac.uk/people/paus.php
Matcheri Keshavan's homepage:
http://brain.wayne.edu/kesh/kesh.htm
Jay Giedd's homepage:
http://intramural.nimh.nih.gov/research/pi/pi_giedd_j.html
**ALL LINKS ARE ACTIVE IN THE ONLINE PDF**

---

SCIENCE AND SOCIETY

# Beyond polemics: science and ethics of ADHD

*Ilina Singh*

Abstract | What is attention-deficit hyperactivity disorder (ADHD)? Why are so many children being diagnosed with ADHD and prescribed medication? Are stimulant drugs an effective and safe treatment strategy? This article explores the current state of scientific research into ADHD and the key social and ethical concerns that are emerging from the sharp rise in the number of diagnoses and the use of stimulant drug treatments in children. Collaborations among scientists, social scientists and ethicists are likely to be the most promising route to understanding what ADHD is and what stimulant drugs do.

Attention-deficit hyperactivity disorder (ADHD) is one of the most common childhood psychiatric disorders in the world[1]. Its core symptoms are inattention, hyperactivity and impulsiveness. Most children are first diagnosed with ADHD when they reach school age[2] and approximately 75% of those diagnosed are male[3]. The most common forms of treatment for ADHD are the stimulants methylphenidate and amphetamine[4].

Rising rates of ADHD diagnosis and stimulant drug use in children have led to a public debate over the validity of the diagnosis, the root causes of ADHD and the ethics of treating children with psychotropic drugs. There are three partially overlapping positions in the debate. First, that ADHD is primarily caused by a combination of biological factors. From this perspective, diagnosis is valid and drug treatment is justified because it corrects an underlying neurochemical imbalance that affects cognitive and motor functions. Second, that ADHD is caused by a combination of biological and social factors; the diagnosis does not yet adequately capture the heterogeneity and complexity of the disorder. This perspective accepts the utility of stimulant drug medication, but some

Ex. 4
Page 49

© 2008 Macmillan Publishers Limited. All rights reserved

# Exhibit 5

MENU

# Health

(https://www.hopkinsmedicine.org/health)

# Mental Health Disorder Statistics

🏷 Mental and Behavioral Health (https://www.hopkinsmedicine.org/health/mental-and-behavioral-health)

## Statistics related to mental health disorders

The following are the latest statistics available from the National Institute of Mental Health Disorders, part of the National Institutes of Health:

- Mental health disorders account for several of the top causes of disability in established market economies, such as the U.S., worldwide, and include: major depression (also called clinical depression), manic depression (also called bipolar disorder), schizophrenia, and obsessive-compulsive disorder.

- An estimated 26% of Americans ages 18 and older -- about 1 in 4 adults -- suffers from a diagnosable mental disorder in a given year.

- Many people suffer from more than one mental disorder at a given time. In particular, depressive illnesses tend to co-occur with substance abuse and anxiety disorders.

- Approximately 9.5% of American adults ages 18 and over, will suffer from a depressive illness (major depression, bipolar disorder, or dysthymia) each year.

  - Women are nearly twice as likely to suffer from major depression than men. However, men and women are equally likely to develop bipolar disorder.

  - While major depression can develop at any age, the average age at onset is the mid-20s.

  - With bipolar disorder, which affects approximately 2.6% of Americans age 18 and older in a given year -- the average age at onset for a first manic episode is during the early 20s.

- Most people who commit suicide have a diagnosable mental disorder -- most commonly a depressive disorder or a substance abuse disorder.

- Four times as many men than women commit suicide. However, women attempt suicide more often than men.

- The highest suicide rates in the U.S. are found in Caucasian men over age 85. However, suicide is also one of the leading causes of death in adolescents and adults ages 15 to 24.

- Approximately 1% of Americans are affected by schizophrenia.

- In most cases, schizophrenia first appears in men during their late teens or early 20s. In women, schizophrenia often first appears during their 20s or early 30s.

- Approximately about 18% of people ages 18- 54 in a given year, have an anxiety disorder in a given year. Anxiety disorders include: panic disorder, obsessive-compulsive disorder (OCD), post-traumatic stress disorder (PTSD), generalized anxiety disorder (GAD), and phobias (social phobia, agoraphobia, and specific phobia).

- Panic disorder typically develops in late adolescence or early adulthood.

- The first symptoms of OCD often begin during childhood or adolescence.

- GAD can begin at any time, though the risk is highest between childhood and middle age.

- Individuals with OCD frequently can have problems with substance abuse or depressive or eating disorders.

- Social phobia typically begins in childhood or adolescence.

## Request an Appointment

Maryland 410-955-5000

Outside of Maryland 855-695-4872

International +1-410-502-7683

## Related

How to Help Someone with Anxiety
(https://www.hopkinsmedicine.org/health/treatment-tests-and-
therapies/how-to-help-someone-with-anxiety)

Major Depression
(https://www.hopkinsmedicine.org/health/conditions-and-
diseases/major-depression)

Domestic Violence
(https://www.hopkinsmedicine.org/health/conditions-and-
diseases/domestic-violence)

## Related Topics

Mental and Behavioral Health (https://www.hopkinsmedicine.org/health/mental-and-behavioral-health)

Copyright © 2020 The Johns Hopkins University, The Johns Hopkins Hospital, and Johns Hopkins Health System. All rights reserved.

Ex. 5
Page 53

# Exhibit 6



# Reducing Suicides by Firearms

**Date:** Nov 13 2018 | **Policy Number:** 20184

**Key Words:** Gun Violence, Mental Behavioral Health, Mental Health, Violence

### Abstract

Suicide by firearm is a public health problem. In 2016, firearm suicides accounted for half of all suicide deaths in the United States. Access to a firearm, particularly during a time of increased risk for suicide (e.g., divorce, job loss), has been identified as a key factor increasing one's risk for completing suicide. States with higher rates of gun ownership have higher suicide rates than states with low gun ownership, whereas non–firearm suicide rates are comparable, indicating that firearm access drives overall suicide rates. The most promising evidence-based strategies to reduce access to firearms during a period of high risk are (1) temporary relocation of household firearms away from home when a family member is at risk for suicide, (2) safe storage at home if relocation is not possible, (3) working with leaders in the gun community to develop and implement messaging about the preceding two strategies that will be acceptable to gun owners, and (4) increasing screening for and counseling about access to guns by health professionals and other gatekeepers. Working with gun owners, industry, law enforcement, physical and mental health professionals, and researchers is important in decreasing firearm suicides via evidence-based strategies. Declines in firearm suicides do not require decreased gun ownership rates. A concerted social marketing approach can incorporate firearm suicide prevention into standard firearm safety messaging. Moreover, the entertainment industry can model firearm suicide prevention behaviors. Through these efforts, firearm safety can include suicide prevention in a manner fully consistent with the Second Amendment.

### Relationship to Existing APHA Policy Statements

The following APHA policy statements are relevant to the current statement:

- APHA Policy Statement 7524(PP): Suicide Prevention

- APHA Policy Statement 9818: Handgun Injury Reduction

This statement supplements 7524 regarding the role of firearms in suicide. Statement 9818 is replaced by this statement.

### Problem Statement

According to the Centers for Disease Control and Prevention (CDC), suicide rates in the United States have increased by nearly one third over the past 20 years, with half of U.S. states experiencing an increase above 30% during this period.[1] Rates have risen among both sexes, all racial/ethnic groups, and all age groups under 75 years, as well as in rural, suburban, and urban settings.[2,3] There were 44,965 suicide deaths in the United States in 2016, with an age-adjusted rate of 15.6 per 100,000.[4] Suicide was the second-leading cause of death among individuals 10–14, 15–24, and 25–34 years of age.[5] It was the 10th-leading cause of death among all age groups combined and is one of only three leading causes that are increasing in prevalence.[5,6]

While suicide affects all individuals, males are four times more likely than females to die by suicide,[4] and the prevalence of suicidal thoughts, planning, and attempts is significantly higher among younger age groups (18–29 years) than older age groups.[7] Racial/ethnic and other groups with high suicide rates include American Indians and Alaska Natives, rural populations, and active or retired military personnel.[8] Suicide also affects the health of others; when people die by suicide, their family, friends, and community often experience shock, anger, guilt, and depression.

Suicide is a public health problem both economically and physically. According to the Suicide Prevention Resource Center, the estimated average cost of a single suicide is $1,329,553.[9] Nearly all of this cost (97%) is attributed to lost productivity, with the remaining 3% due to medical treatment. It has been reported that the total cost of suicides and suicide attempts is $70 billion per year.[10]

Multiple risk factors for suicide exist, including a previous suicide attempt (the strongest predictor), a history of depression or other mental illness, alcohol or drug abuse, a family history of suicide or violence, physical illness, and a feeling of being alone.[11,12] However, as evidenced by the far greater prevalence of these factors than of suicide deaths, most people with one or more such factors do not go on to die by suicide.[13] While individuals with these risk factors are encouraged to obtain mental health treatment, many of those who die by suicide have no known record of such treatment,[1] indicating a need for additional strategies to increase the safety of people at risk. Reducing access to lethal means is one such strategy.

There is ample evidence that suicidality is transitory. Should a person survive a suicidal impulse, his or her prognosis is quite good. The results of a meta-analysis of nearly 100 studies of suicide attempters showed that 90% of attempters who survive do not go on to die by suicide.[14] In fact, many suicide attempts occur with little planning,[15,16] often in response to a short-term crisis.[17,18] However, if a person attempts suicide through a means that is highly lethal, such as a firearm, the odds of survival are quite low.[19]

One must not opt to make a suicide attempt using a highly lethal means such as a firearm if there is to be any opportunity to obtain mental health treatment or endure a painful short-term crisis. In 2016, 51% of all suicide deaths in the United States (a total of 22,936 deaths) involved firearms, with an age-adjusted rate of 7.8 per 100,000.[4] In nearly every age group, firearms were the leading mechanism for suicide deaths (among 10- to 14-year-olds, they were the second-leading mechanism).[4] Access to firearms is a key risk factor for suicide.[20–23] Several studies have shown that rates of suicide are higher in states with higher levels of gun ownership (but not higher rates of suicide attempts) and that these heightened rates are driven by increases in firearm suicides.[21,22,24] Suicides by methods other than firearms are not significantly different in states with lower or higher overall suicide rates.[24] Multiple reviews offer strong evidence that rises in gun ownership prevalence are associated with increases in firearm suicides, which in turn lead to increases in the overall suicide rate.[25–27] Studies of gun prevalence and suicide rates typically control for multiple potential confounders such as psychological distress, substance use, poverty, education, and unemployment.[22,28,29] They also typically reveal that the relationship between household gun ownership and suicide rates holds for men, women, children 5 to 14 years old, and those in nearly every other age group.[30–32] Decreasing the number of firearm suicides would yield a significant reduction in the overall suicide rate in the United States.[20–22]

A note on terminology: It is recognized in this policy statement that the terms "firearm" and "gun" are not identical in the weapons they cover. Precisely speaking, this statement addresses suicide by firearm. However, in much of the scientific literature, mass media, and common speech, the term gun is used when firearm would be more accurate. Here the term firearm is primarily used; however, in some cases the term gun is used when quoting the literature or referring to programs that use similar language (e.g., gun violence restraining order).

## Evidence-Based Strategies to Address the Problem

A number of international studies have indicated that when lethal means are made less available or less deadly, suicide rates by the method in question decline, and often (when the method is commonly used) suicide rates overall decline.[27,33] This has been demonstrated in multiple countries and with a variety of suicide methods: bridges, domestic gas, pesticides, medications, and firearms.[34–38] Decreasing access to firearms is likely to reduce suicide in the United States overall because firearms are the most commonly used method,[4] consistent with their ubiquity in certain regions of the country (personal gun ownership is estimated to be as high as 25% in the South)[39] and high case fatality rate (92% versus 78% for hanging and lower percentages for other methods).[19] In addition, the speed with which one can carry out suicide by firearm increases the odds of a fatal outcome during an unplanned attempt or one involving minimal planning: 25% of attempters make an attempt within 5 minutes of deciding to end their lives.[16] Creating safer environments for those at risk of suicide by reducing their access to highly lethal means is emphasized in the CDC's technical guidelines for preventing suicide.[8] Numerous U.S.-based studies indicate that the most promising evidence-based strategies to decrease firearm suicides involve reducing access to guns in the following ways: (1) relocation of household firearms away from the home when a family member is at risk for suicide, (2) safe storage at home if relocation is not possible, (3) working with leaders in the gun community to develop and implement messaging about the preceding two strategies that will be favorable to most gun owners, and (4) increasing screening for access to firearms by health professionals and other gatekeepers.

Relocation of household firearms away from home when a family member is at risk for suicide: Between 2003 and 2005, about 90% of all suicides in the Israeli Defense Force (IDF), a mandatory population-based army drafting all youths 18–21 years of age, were firearm suicides. Since many IDF soldiers go home on the weekends, the IDF changed its weapons policy in 2006 to require that firearms remain on base when soldiers take a weekend leave. After this policy change, the overall IDF suicide rate decreased by 40% in

2007–2008. Most of this decrease was due to a reduction in weekend firearm suicides; there was no significant change in weekday suicide rates.[38] A study of suicides in Switzerland showed that when the army halved the number of soldiers from 2003 to 2004 (leading to a decrease in gun availability nationwide), both firearm suicide and overall suicide (but not non-firearm suicide) rates dropped among military-aged men but not military-aged women or older men.[40]

These IDF and Switzerland data support nationwide research indicating that restricting firearm access is effective in decreasing overall suicide rates. Over a 3-year period (2000–2002), the 15 states with the highest household firearm ownership rate (47%) had almost twice as many suicides (14,809) as the six states with the lowest ownership rate (15%; 8,052 suicides). This difference in overall suicides was largely accounted for by the difference in firearm suicides (9,749 versus 2,606). Non-firearm suicides and the total populations of the two sets of states were comparable.[22] During a more recent 2-year period (2008–2009), these findings persisted.[24] If the relationship is causal, these results suggest that a 1% decrease in household firearm ownership could reduce the firearm suicide rate by 3.5% and the overall suicide rate by 1.5%, with even greater effects for adolescents.[22] By extrapolation, reducing household firearm ownership by 5% could prevent about 3,000 suicides per year in the United States.[4] This is not to say, however, that gun owners must sell their firearms in order to reduce firearm suicides. Suicide prevention professionals are having success working with gun owners to help them identify offsite storage options (e.g., firearm retailers, shooting ranges, pawn shops, law enforcement facilities, storage facilities, and family members and friends authorized to store firearms) that will keep loved ones safe while preserving gun ownership rights.[41,42] These options could be temporary or permanent depending on the gun owner and his or her family's assessment of the benefits and risks of bringing firearms back into the home.

Safe storage of firearms at home: A gun owner may not find temporary relocation of firearms outside the home to be feasible. Gun owners may wish to talk over tenable storage options with loved ones as well as with mental health clinicians or other health professionals. In the event firearms cannot be relocated, numerous studies indicate a reduced risk of firearm suicide when household guns are stored locked and unloaded, with ammunition locked separately.[23,43,44] Having a locked gun closet, keeping firearms unloaded, and locking ammunition or storing it in a different part of the house each reduces the risk of suicide by 55% to 73%.[23] One study revealed that the risk of suicide was three times greater among individuals in households with loaded firearms than among those in homes with unloaded guns. Households with guns stored in unlocked places were associated with more than twice the risk of suicide than households in which firearms were kept in a locked place, and homes with one or more handguns were associated with a risk of suicide almost twice as high as that in homes containing only long guns.[43] An evaluation of a community-based giveaway of gun storage devices indicated a 13% increase in safe storage of firearms.[45] Also, a review of firearm safe storage interventions showed that providing owners with a safety device such as a lock box significantly improved storage practices.[46] Safe storage of firearms in the home is a critical component of reducing firearm suicide.

Education of gun owners on the relationship between firearms and suicide: Since 2009, gun rights advocates and suicide prevention experts have been working together to develop and test messages for gun owners on the importance of temporarily relocating firearms outside the home when a household member is struggling with a mental health or substance abuse problem or going through a painful crisis such as a divorce or job loss. A study of firearm retailers in New Hampshire showed that 48% of retailers that received intervention materials were still using at least one of the materials several months later. Retailers who believed that there was a relationship between firearm accessibility and risk of suicide were more likely to be using intervention materials.[41] Changing social norms related to firearms and safety is critical in intervention efforts and requires spreading accurate information via trusted messengers. Success in changing norms has been shown elsewhere in the public health literature, illustrating the role of advocacy and grassroots efforts, especially when combined with a multicomponent strategy.

For example, campaigns have been effective in spreading messages about the physical dangers and legal consequences of drunk driving.[47] An especially successful organization is Mothers Against Drunk Driving (MADD). Through its widespread programs, services, and legislative efforts, MADD has influenced social norms related to drinking and driving such that the number of U.S. alcohol-related auto fatalities fell from 25,000 to 17,000 between 1982 and 2003, while the number of auto fatalities from crashes unrelated to alcohol increased from 18,000 to 25,000.[48,49] During that time, the entertainment industry worked with public health experts to promote the "designated driver" campaign on popular television shows.[50] The industry has also worked with public health experts to promote the use of checklists during surgery, educate the public about human papillomavirus (HPV) and HIV, reduce the occurrence of smoking in youth-rated movies, and publicize countless other public health issues.[51–53] The American Foundation for Suicide Prevention's recent partnership with the National Shooting Sports Foundation is an important step toward communicating effectively with gun owners about preventing firearm suicides.[54]

Increasing screening for access to firearms: Doctors, nurses, mental health providers, and other health professionals have a critical opportunity to increase awareness about the link between firearms and suicide among those living in homes with firearms. Many people considering suicide do not seek mental health services, so it is important for primary care providers, emergency department (ED) doctors, and other health providers to screen for access to firearms, even among patients without mental health concerns.[55,56] One study showed a threefold increase in actions intended to limit access to household firearms among parents who brought their children to an ED for mental health treatment and received counseling on firearm access relative to those who did not receive counseling in the ED.[57] A more recent study revealed an increase in safe storage of firearms after ED-based counseling.[58] In spite of this, another recent study showed that only 18% of suicidal patients presenting at an ED received a lethal means assessment, with only 8% of these individuals receiving actual counseling on how to reduce access to lethal means.[59] Surveys of providers have shown that only 50% usually screen for access to firearms among suicidal patients, even though most think it is important to do so.[60] There are resources available to educate providers on the importance of conducting lethal means counseling and how to do so in a way that is respectful of the right to own guns.[61]

Each of these four strategies would benefit greatly from funding to further examine effective methods of implementation, but suicide prevention research is woefully underfunded. Alcoholism receives five times more research funding for 50% more deaths, and breast cancer receives nearly seven times more funding for fewer annual deaths.[62]

## Opposing Arguments/Evidence

Firearm suicide is a public health issue wrought with assumptions and misinformation. While suicide is a subject familiar to Americans, guns as a suicidal determinant are underestimated. A common assumption is that suicide is premeditated, giving a person ample time to obtain access to a highly lethal means such as a firearm. While some suicides are planned, many suicide attempts occur within less than an hour of thinking about them. [15,16] Depression and substance abuse are risk factors for suicide that a person may be managing long term, but the elevated risk of a suicidal attempt is often short and fleeting. [16,63] A person experiencing an acutely distressing incident may respond impulsively to suicidal thoughts.[63] If this person does not have access to a highly lethal means such as a firearm during this crisis, she or he is more likely to survive the crisis either by attempting suicide with a less lethal means and surviving or by opting not to make an attempt at all.[27]

It is often argued that someone suicidal cannot be stopped, regardless of what methods are readily available. This implies that someone who survives a suicide attempt will simply die by suicide in a subsequent attempt. While there are certainly some suicides that cannot be prevented, as previously mentioned, a review of nearly 100 studies determined that 90% of people who attempted suicide and survived did not go on to die by suicide later.[14] One is more likely to survive a suicide attempt if one does not use the most highly lethal means available to make that attempt. Firearm suicide is the suicide method with the highest case fatality rate, with over 90% of attempts resulting in death.[19] By contrast, case fatality rates for hanging, carbon monoxide poisoning, and drug poisoning are 61%, 42%, and 2%, respectively.[19] Most people who die by suicide have not made an earlier attempt.[64,65] Their choice of method does not leave room for a change of heart later, whereas other methods do, and we see the change of heart in the literature on those who survive suicide attempts. Unfortunately, a firearm typically results in death after only one attempt.[66]

Those opposed to reducing firearm access have pointed out that some countries have high suicide rates but low firearm ownership rates. The effectiveness of means restriction in suicide reduction is well documented across a variety of means. Australian suicide rates decreased as barbiturate access was restricted.[67] Suicide in Asia dropped once access to pesticide, the most common means of suicide in the region, was limited.[36] In the United Kingdom in the 1960s, carbon monoxide levels in domestic gas were reduced from 20% to nearly 0%, corresponding with a 30% decrease in the suicide rate.[35] Countries seeking to reduce their suicide rate should contemplate means reduction strategies for the methods most likely to effect a sizeable reduction in suicides among their population. In the United States, firearms are the most common method of suicide.[20,27,63]

When asked about offering gun storage, some retailers have expressed concern about liability risks should a death occur once the firearm has been returned to the owner.[68] Having discussed this issue with lawyers familiar with relevant case law, the authors are unaware of any evidence of legal liability for events that might occur when a gun is returned. [69]

Some would oppose reducing access to lethal means because this would make a firearm unavailable for self-defense. Each household must weigh the likelihood of needing a firearm for self-defense against the likelihood of that firearm being used in a suicide or other gun death. These odds may well change repeatedly over time and can be reassessed regularly.

There have also been challenges to the professional autonomy of doctors involving the powers of the state to limit the topics that physicians can discuss with patients. In Florida, an act that prohibited physicians from asking patients about firearm ownership and storage was ruled invalid by the courts.[70] While there is the possibility of additional attempts to gag medical professionals, this ruling supports the rights of physicians.

## Alternative Strategies

In popular media regarding firearm violence, both self-directed and outward, mental health care is often raised as the most important method for preventing shooting deaths.[71] The importance of access to mental health treatment cannot be denied. However, a recent CDC report noted that 54% of suicide decedents in 27 states in 2015 did not have a known mental health condition.[1] If, for the sake of argument, it is assumed that those decedents had an undiagnosed mental illness, it must be acknowledged that a lethal suicide attempt cut short the available time for persuading them to seek help. The pervasive stigma against acknowledging mental health struggles, as well as the lack of a cure for mental illnesses, must also be noted. The mental health field cannot be solely responsible for the universe of people at risk for suicide. Support from public health can be offered around how to talk about firearms with patients and their loved ones, as well as around information about local storage options for families seeking alternatives to storing firearms at home. Furthermore, the majority of people living with mental illness will not attempt suicide, and predicting who among them will is a very inexact science.[71] It is important not to reduce their propensity to seek treatment by categorically infringing upon their rights (e.g., by prohibiting anyone who has ever been diagnosed with a mental illness from owning a firearm).[72,73] Moreover, research into the impact of mental health on suicide has demonstrated that firearm access has independent effects on risk above and beyond other covarying risk factors, including mental illness. [24]

There are two other ways to reduce access to guns among those at risk for suicide that are more controversial and lack sufficient evidence to currently promote their implementation as firearm suicide prevention strategies: gun violence restraining orders (or other legislative approaches) and smart gun technology.

Gun violence restraining orders allow family members, intimate partners, and law enforcement personnel to formally request confiscation of firearms that belong to someone at risk of hurting him- or herself or others. These orders are fairly new, and their efficacy is as yet undetermined regarding firearm suicide prevention.[74] It is worth noting that 30% to 40% of firearm sales take place in the secondary market, where sellers are unlicensed, meaning that law enforcement cannot rely on a database to know what guns are in the home to confiscate.[75] Furthermore, a detailed discussion of legislative approaches in general was left out of this policy statement for several reasons. First, studies of firearm legislation and suicide, even those controlling for gun ownership rates, have been unable to demonstrate an actual reduction in firearm availability stemming from such legislation.[27] Second, the U.S. gun stock is so large relative to the marginal firearm likely to be affected by a given piece of legislation that, similar to Azrael and Miller,[27] the authors of this statement are unwilling to assume that firearm exposures have changed sufficiently to impact suicide rates as a result of said legislation. Finally, legislating gun access stands to further deepen the divide between gun owners and non–gun owners. Instead, health professionals can support innovative work being done within suicide prevention to regard gun owners as part of the solution rather than part of the problem.[76–78] With more research, strategies to reduce firearm suicide deaths may involve contemplating a legislative agenda; however, gun owners may not be receptive. This would be counterproductive to efforts regarding the present policy.

Smart gun technology prevents unauthorized use of a firearm by rendering it inoperable for anyone other than the owner. This could potentially prevent many suicidal individuals from obtaining quick access to a firearm, especially in the home (e.g., adolescents). However, this technology is not sufficiently widespread to evaluate its impact on firearm suicide,[26] and support for such an approach among gun owners is limited.[79]

## Action Steps

1. Mental health advocates and governing associations for mental health professionals should adopt and promote available guidelines for mental health providers on screening for guns in the home if a client/patient is having a psychiatric crisis or has a chronic mental illness.[58,61] State-level professional associations should equip mental health providers with information about local offsite storage options when available for families that need to temporarily or permanently relocate their firearms outside the home.

2. State associations affiliated with national organizations such as the American Academy of Pediatrics and the American Medical Association, or accreditors such as the Joint Commission and the American College of Surgeons, should adopt and promote guidelines promulgated by their parent organizations advocating screening for firearms in the home along with counseling so that lethal means reduction awareness can be spread in general office appointments and emergency departments and safe storage strategies can be discussed, in addition to provision of firearm safety devices when possible.

3. State public health agencies should collaborate with public safety and mental health agencies to advocate for an increase in the availability of temporary firearm storage outside the home. Law enforcement personnel, firearm retailers, range owners, instructors, and other leaders in the firearms community are important partners, as they can provide low-cost gun storage for clients and normalize the inclusion of suicide prevention in gun safety education.

4. Public safety agencies should work with the legal community to educate law enforcement personnel and retailers/range owners about their rights and protections should they offer firearm storage.

5. Public health and mental health agencies should collaborate with firearm owners to increase awareness of the importance of lethal means reduction when a loved one is at risk for suicide. It is important to include gun owners as part of the solution instead of assuming that they are opposed to safety measures when it comes to firearm suicides.

6. Public health agencies and advocates should collaborate with the entertainment industry as well as the news media and communications firms to support safe storage practices. Films, television shows, news stories, and so forth should provide venues to normalize messaging on gun access in instances in which there is concern about someone's risk for suicide (whether on the part of a parent, spouse, health provider, teacher, or other concerned stakeholder).

7. Public health agencies should collaborate with gun owners and suicide prevention professionals to advocate for increased public and private funding of firearm suicide research. A small number of private foundations and funders have shouldered an undue portion of the responsibility to fund firearm research efforts, as support from the federal government and large foundations is minimal. Public agencies should work with foundations and private funders to develop funding opportunities that support firearm suicide prevention.[78] Such efforts should include development and evaluation of firearm safety education that incorporates suicide prevention and development of social marketing campaigns around firearm suicide prevention.

**References**

1. Stone DM, Simon TR, Fowler KA, et al. Trends in state suicide rates—United States, 1999–2016 and circumstances contributing to suicide—27 states, 2015. MMWR Morb Mortal Wkly Rep. 2018;67:617–624.
2. Ivey-Stephenson AZ, Crosby AE, Jack SPD, Haileyesus T, Kresnow-Sedacca MJ. Suicide trends among and within urbanization levels by sex, race/ethnicity, age group, and mechanism of death—United States, 2001–2015. MMWR Surveill Summ. 2017;66:1–16.
3. Curtin SC, Warner M, Hedegaard H. Increase in Suicide in the United States, 1999–2014 (NCHS Data Brief 241). Hyattsville, MD: National Center for Health Statistics; 2016. 4. Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System. Available at: https://www.cdc.gov/injury/wisqars/index.html. Accessed December 26, 2018.
5. Centers for Disease Control and Prevention. Leading causes of death reports, 1981–2016. Available at: https://www.cdc.gov/injury/wisqars/fatal.html. Accessed December 26, 2018.
6. Kochanek K, Murphy S, Xu J, Arias E. Mortality in the United States, 2016 (NCHS Data Brief 293). Hyattsville, MD: National Center for Health Statistics; 2017. 7. Results From the 2013 National Survey on Drug Use and Health: Mental Health Findings. Rockville, MD: Substance Abuse and Mental Health Services Administration; 2014.
8. Stone DM, Holland KM, Bartholow BN, Crosby AE, Davis SP, Wilkins N. Preventing suicide: a technical package of policy, programs, and practice. Available at: https://www.cdc.gov/violenceprevention/pdf/suicidetechnicalpackage.pdf. Accessed December 26, 2018.
9. Suicide Prevention Resource Center. Costs of suicide. Available at: http://www.sprc.org/about-suicide/costs. Accessed December 26, 2018.
10. Centers for Disease Control and Prevention. Suicide: consequences. Available at: https://www.cdc.gov/violenceprevention/suicide/consequences.html. Accessed December 26, 2018.
11. Nock MK, Borges G, Bromet EJ, Cha CB, Kessler RC, Lee S. Suicide and suicidal behavior. Epidemiol Rev. 2008;30:133–154.
12. Centers for Disease Control and Prevention. Suicide: risk and protective factors. Available at https://www.cdc.gov/violenceprevention/suicide/riskprotectivefactors.html. Accessed December 26, 2017.
13. Kessler RC, Berglund P, Demler O, Jin R, Merikangas KR, Walters EE. Lifetime prevalence and age-of-onset distributions of DSM-IV disorders in the National Comorbidity Survey replication. Arch Gen Psychiatry. 2005;62:593–602.
14. Owens D, Horrocks J, House A. Fatal and non-fatal repetition of self-harm: systematic review. Br J Psychiatry. 2002;181:193–199. 15. Deisenhammer EA, Ing CM, Strauss R, Kemmler G, Hinterhuber H, Weiss EM. The duration of the suicidal process: how much time is left for intervention between consideration and accomplishment of a suicide attempt? J Clin Psychiatry. 2009;70:19–24.

16. Simon OR, Swann AC, Powell KE, Potter LB, Kresnow M, O'Carroll PW. Characteristics of impulsive suicide attempts and attempters. Suicide Life Threat Behav. 2001;32(suppl 1):49–59.

17. Drum DJ, Brownson C, Burton Denmark A, Smith SE. New data on the nature of suicidal crises in college students: shifting the paradigm. Prof Psychol Res Pract. 2009;40:213–222.

18. Hawton K, Ware C, Mistry H, et al. Why patients choose paracetamol for self poisoning and their knowledge of its dangers. BMJ. 1995;310:164.

19. Spicer RS, Miller TR. Suicide acts in 8 states: incidence and case fatality rates by demographics and method. Am J Public Health. 2000;90:1885–1891.

20. Harvard Injury Control Research Center. Means matter. Available at: https://www.meansmatter.org. Accessed December 26, 2018.

21. Miller M, Azrael D, Hemenway D. Household firearm ownership levels and suicide across U.S. regions and states, 1988–1997. Epidemiology. 2002;13:517–524.

22. Miller M, Lippmann SJ, Azrael D, et al. Household firearm ownership and rates of suicide across the 50 United States. J Trauma. 2007;62:1029–1034.

23. Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional firearm injuries. JAMA. 2005;293:707–714.

24. Miller M, Barber C, White RA, et al. Firearms and suicide in the United States: is risk independent of underlying suicidal behavior? Am J Epidemiol. 2013;178:946–955. 25. Office of the Surgeon General. 2012 National Strategy for Suicide Prevention: Goals and Objectives for Action. Washington, DC: U.S. Department of Health and Human Services; 2012.

26. Mann JJ, Michel CA. Prevention of firearm suicide in the United States: what works and what is possible. Am J Psychiatry. 2016;173:969–979.

27. Azrael D, Miller M. Reducing suicide without affecting underlying mental health: theoretical underpinnings and a review of the evidence base linking the availability of lethal means and suicide. In: O'Connor R, Pirkis J, eds. The International Handbook of Suicide Prevention. New York, NY: John Wiley and Sons; 2016.

28. Miller M, Azrael D, Barber C. Suicide mortality in the United States: the importance of attending to method in understanding population-level disparities in the burden of suicide. Annu Rev Public Health. 2012;33:393–408.

29. Miller M, Hemenway D, Azrael D. Firearms and suicide in the Northeast. J Trauma. 2004;57:626–632.

30. Miller M, Azrael D, Hemenway D. Firearm availability and suicide, homicide, and unintentional firearm deaths among women. J Urban Health. 2002;79:26–38. 31. Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. J Trauma. 2002;52:267–274.

32. Miller M, Azrael D, Hemenway D. Household firearm ownership and suicide rates in the United States. Epidemiology. 2002;13:517–524.

33. Zalsman G, Hawton K, Wasserman D, et al. Suicide prevention strategies revisited: 10-year systematic review. Lancet Psychiatry. 2016;3:646–659.

34. Sinyor M, Schaffer A, Redelmeier DA, et al. Did the suicide barrier work after all? Revisiting the Bloor Viaduct natural experiment and its impact on suicide rates in Toronto. BMJ Open. 2017;7:e015299.

35. Kreitman N. The coal gas story: United Kingdom suicide rates, 1960–71. Brit J Prev Soc Med. 1976;30:86–93.

36. Gunnell D, Knipe D, Chang SS, et al. Prevention of suicide with regulations aimed at restricting access to highly hazardous pesticides: a systematic review of the international evidence. Lancet Glob Health. 2017;5:e1026–e1037.

37. Nordentoft M, Qin P, Helweg-Larsen K, Juel K. Time-trends in method-specific suicide rates compared with the availability of specific compounds: the Danish experience. Nordic J Psychiatry. 2006;60:97–106.

38. Lubin G, Werbeloff N, Halperin D, et al. Decrease in suicide rates after a change of policy reducing access to firearms in adolescents: a naturalistic epidemiological study. Suicide Life Threat Behav. 2010;40:421–424.

39. Azrael D, Hepburn L, Hemenway D, Miller M. The stock and flow of U.S. firearms: results from the 2015 National Firearms Survey. J Soc Sci. 2017;3:38–57. 40. Reisch T, Steffen T, Habenstein A, Tschacher W. Change in suicide rates in Switzerland before and after firearm restriction resulting from the 2003 "Army XXI" reform. Am J Psychiatry. 2013;170:977–984.

41. Vriniotis M, Barber C, Frank E, et al. A suicide prevention campaign for firearm dealers in New Hampshire. Suicide Life Threat Behav. 2015;45:157–163.

42. Runyan CW, Brooks-Russell A, Brandspigel S, et al. Law enforcement and gun retailers as partners for safely storing guns to prevent suicide: a study in 8 mountain west states. Am J Public Health. 2017;107:1789–1794.

43. Kellermann A, Rivara F, Somes G, et al. Suicide in the home in relation to gun ownership. N Engl J Med. 1992;327:467–472.

44. Shenassa ED, Rogers ML, Spalding KL, et al. Safer storage of firearms at home and risk of suicide: a study of protective factors in a nationally representative sample. J Epidemiol Community Health. 2004;58:841–848.

45. Simonetti JA, Rowhani-Rahbar A, King C, Bennett E, Rivara FP. Evaluation of a community-based safe firearm and ammunition storage intervention. Inj Prev. 2017;24:218–223.

46. Rowhani-Rahbar A, Simonetti JA, Rivara FP. Effectiveness of interventions to promote safe firearm storage. Epidemiol Rev. 2016;38:111–124.

47. Centers for Disease Control and Prevention. What works: strategies to reduce or prevent drunk driving. Available at: https://www.cdc.gov/motorvehiclesafety/impaired_driving/strategies.html. Accessed December 26, 2018.

48. Hemenway D. While We Were Sleeping: Success Stories in Injury and Violence Prevention. Berkeley, CA: University of California Press; 2009.

49. El-Guebaly N. Don't drink and drive: the successful message of Mothers Against Drunk Driving (MADD). World Psychiatry. 2005;4:35–36.

50. Winsten J. The designated driver campaign: why it worked. Available at: https://www.huffingtonpost.com/jay-winston/designated-driver-campaig_b_405249.html. Accessed December 26, 2018.

51. Harvard T.H. Chan School of Public Health. Hollywood and health: harnessing the power of storytelling. Available at: https://www.hsph.harvard.edu/news/features/baer-hollywood-and-health/. Accessed December 26, 2018.

52. Harvard T.H. Chan School of Public Health. Presentations to the Motion Picture Association of America (MPAA) on smoking in the movies. Available at: https://www.hsph.harvard.edu/mpaa/. Accessed December 26, 2018.

53. USC Annenberg Norman Lear Center Hollywood, Health, and Society Program. Available at: https://hollywoodhealthandsociety.org/node. Accessed December 26, 2018.

54. American Foundation for Suicide Prevention. Firearms and Suicide Prevention Program. Available at: https://afsp.org/about-suicide/firearms-and-suicide-prevention/firearms-and-suicide-prevention-program/. Accessed December 26, 2018.

55. Barber CW, Miller MJ. Reducing a suicidal person's access to lethal means of suicide: a research agenda. Am J Prev Med. 2014;47:264–272.

56. Anestis MD. Prior suicide attempts are less common in suicide decedents who died by firearms relative to those who died by other means. J Affect Disord. 2016;189:106–109.

57. Kruesi M, Grossman J, Pennington J, Woodward P, Duda D, Hirsch J. Suicide and violence prevention: parent education in the emergency department. J Am Acad Child Psychiatry. 1999;38:250–255.

58. Runyan CW, Becker A, Brandspigel S, Barber C, Trudeau A, Novins D. Lethal means counseling for parents of youth seeking emergency care for suicidality. West J Emerg Med. 2016;17:8–14.

59. Betz ME, Kautzman M, Segal DL, et al. Frequency of lethal means assessment among emergency department patients with a positive suicide risk screen. Psychiatr Res. 2018;260:30–35.

60. Betz ME, Miller M, Barber C, et al. Lethal means restriction for suicide prevention: beliefs and behaviors of emergency department providers. Depress Anxiety. 2013;30:1013–1020.

61. Suicide Prevention Resource Center. CALM: counseling on access to lethal means. Available at: http://www.sprc.org/resources-programs/calm-counseling-access-lethal-means. Accessed December 26, 2018.

62. Reuters. U.S. suicide prevention programs say more funding needed. Available at: https://www.reuters.com/article/us-usa-suicides/u-s-suicide-prevention-programs-say-more-funding-needed-idUSKCN1J42WF. Accessed December 26, 2018.

63. Lewiecki EM, Miller SA. Suicide, guns, and public policy. Am J Public Health. 2013;103:27–31.

64. Cavanagh J, Carson A, Sharpe M, Lawrie S. Psychological autopsy studies of suicide: a systematic review. Psychol Med. 2003;33:395–405. 65. Brent D, Perper J, Moritz G, et. al. Psychiatric risk factors for adolescent suicide: a case-control study. J Am Acad Child Psychiatry. 1993;32:521–529.

66. Boggs JM, Simon GE, Ahmedani BK, Peterson E, Hubley S, Beck A. The association of firearm suicide with mental illness, substance use conditions, and previous suicide attempts. Ann Intern Med. 2017;167:287–288.

67. Oliver RG, Hetzel BS. Rise and fall of suicide rates in Australia: relation to sedative availability. Med J Aust. 1972;2:919–923.

68. Pierpoint LA, Tung GJ, Brooks-Russell A, Brandspigel S, Betz M, Runyan CW. Gun retailers as storage partners for suicide prevention: what barriers need to be overcome? Inj Prev. 2018 [Epub ahead of print].

69. Vriniotis M. Personal communication with staff at the Giffords Law Center. January 2017.

70. McCourt AD, Vernick JS. Law, ethics, and conversations between physicians and patients about firearms in the home. AMA J Ethics 2018;20:69–76.71. Swanson JW, McGinty EE, Fazel S, Mays VM. Mental illness and reduction of gun violence and suicide: bringing epidemiologic research to policy. Ann Epidemiol. 2015;25:366–376.

72. Appelbaum PS. Public safety, mental disorders, and guns. JAMA Psychiatry. 2013;70:565–566.

73. Swanson JW. Mental illness and new gun law reforms: the promise and peril of crisis-driven policy. JAMA. 2013;309:1233–1234.

74. Parker GF. Circumstances and outcomes of a firearm seizure law: Marion County, Indiana, 2006–2013. Behav Sci Law. 2015;33:308–322.

75. Siebel BJ. The case against the gun industry. Public Health Rep. 2000;115:410–418.

76. Marino E, Wolsko C, Keys SG, et al. A culture gap in the United States: implications for policy on limiting access to firearms for suicidal persons. J Public Health Policy. 2016;37:S110–S121.

77. Barber C, Frank E, Demicco R. Reducing suicides through partnerships between health professionals and gun owner groups—beyond Docs vs Glocks. JAMA Intern Med. 2017;177:5–6.

78. Branas CC, Flescher A, Formica M, et al. Academic public health and the firearm crisis: an agenda for action. Am J Public Health. 2017;107:365–367.

79. Barry CL, McGinty EE, Vernick JS, Webster DW. After Newtown—public opinion on gun policy and mental illness. New Engl J Med. 2013;68:1077–1081.

2019 © American Public Health Association

# Exhibit 7

Annu. Rev. Public Health 2012.33:393–408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

# Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide

Matthew Miller, Deborah Azrael, and Catherine Barber

Harvard Injury Control Research Center, Harvard School of Public Health, Boston, Massachusetts 02115; email: mmiller@hsph.harvard.edu, azrael@hsph.harvard.edu, cbarber@hsph.harvard.edu

Annu. Rev. Public Health 2012. 33:393–408

First published online as a Review in Advance on January 3, 2012

The *Annual Review of Public Health* is online at publhealth.annualreviews.org

This article's doi: 10.1146/annurev-publhealth-031811-124636

Copyright © 2012 by Annual Reviews. All rights reserved

0163-7525/12/0421-0393$20.00

## Keywords

suicide methods, means restriction, firearms, case fatality ratio

## Abstract

Suicide mortality varies widely across age, sex, race, and geography, far more than does mortality from the leading causes of natural death. Unlike the tight correlation between cancer mortality and the incidence of cancer, suicide mortality is only modestly correlated with the incidence of suicidal acts and other established risk factors for suicidal behavior, such as major psychiatric disorders. An implication of this modest correlation is that the proportion of all suicidal acts that prove fatal (the case fatality ratio) must account for a substantial portion of the (nonrandom) variation observed in suicide mortality. In the United States, the case fatality ratio is strongly related to the availability of household firearms. Findings from ecologic and individual-level studies conducted over the past two decades illustrate the importance of accounting for the availability of highly lethal suicide methods in efforts to understand (and ultimately reduce) disparities in suicide mortality across populations.

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

## INTRODUCTION

In 2007, the most recent year for which data are available, nearly 100 Americans died each day by suicide, making suicide the eleventh-leading cause of death for Americans (26; see sidebar, Definition of Terms). For Americans 40 years of age and younger, suicide is the second leading cause of death, exceeded only by motor vehicle fatalities (26).

The age-adjusted mortality rate for suicide, 11.3 per 100,000 population, is approximately three times higher than the age-adjusted death rate from HIV/AIDS (3.7) and twice that from leukemia (5.0), but much lower than the mortality rate from heart disease (197.2) or from cancer as a whole (182.9) (24).

Compared with suicide rates among adults in other industrialized countries, the suicide rate among adults in the United States falls roughly in the middle (125). Among younger persons, however, suicide mortality is relatively high: For children under 15 years of age, for example, the overall suicide rate in the United States is twice that of the average of other industrialized Westernized countries, largely accounted for by a firearm suicide rate 11 times that of the average of these countries (65).

Age, sex, race, and other demographic characteristics—including marital status, income, educational attainment, and employment status—all influence suicide mortality (94).

### DEFINITION OF TERMS

Suicide, in this review, refers to death by suicide, suicide attempts to nonfatal suicidal acts, and suicidal acts to the sum of suicide and suicide attempts. Case fatality ratio (CFR) is an aggregate measure of the proportion of all suicidal acts that result in death. Method-specific CFRs refer to the probability of death given a suicidal act with a particular method. We use the term deliberate self-harm when referring to hospital data because the coding system for hospital data does not differentiate suicide attempts from nonsuicidal self-harm. The majority of hospital visits for deliberate self-harm are for suicide attempts (22). When we report data on suicide attempts, we are referring to survey-based, self-report data.

Suicide rates are higher, for example, for white and Native Americans than for black, Hispanic, and Asian Americans (24, 94). For white men, suicide rates peak in midlife and again in very old age; for white women, rates peak in midlife (24, 94). For nonwhite men and women, suicide mortality is highest in early adulthood (24, 94). A consistent finding across numerous studies is that the strongest individual-level risk factor for completing suicide is having previously attempted suicide (12, 46, 62, 94, 106); other strong risk factors include psychiatric and substance abuse disorders (2, 6, 12, 21, 45, 46, 55, 62, 94, 106, 112, 126).

Although the great majority of suicides appear to be associated with a retrospectively diagnosable mental health or addictive disorder (2, 21, 55, 126), identifying in advance those individuals who will subsequently die by suicide has not been possible (44, 99, 100). Moreover, psychiatric and behavioral factors appear to explain little of the marked, systematic variation in suicide mortality observed across populations: Whereas psychiatric factors may help explain why a particular person died by suicide, they do not explain why, year after year, residents of some states die by suicide at three times the rate of residents of other states (26), why residents of rural areas in the United States are more than one and one-half times more likely to die by suicide compared with city dwellers (26) or why more than four times as many males (compared with females) die by suicide (26), even though females attempt suicide more often than do males (22, 94, 95).

This article reviews how questions such as these have been addressed in the recent empirical literature and examines how, as a result, a better understanding of the population-level determinants of suicide mortality has been achieved in recent years. The empirical focus is the distribution of suicide mortality in the United States, but pertinent international studies are adduced to elaborate conceptual insights and illustrate practical advances. The review concludes with an assessment of the implications of recent insights for future research, policy, and prevention efforts.

Ex. 7

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

## INSIGHTS FROM JOHN WENNBERG AND THE FIELD OF INJURY PREVENTION

Research on small area variation, pioneered by John Wennberg in studies of medical practice and extended to work that explains systematic variation in nontraumatic causes of death (82, 118–121), has demonstrated the benefit of focusing on and teasing apart different systematic components of variation in mortality rates. These insights suggest that geographic (or other) variation in mortality rates can usefully be decomposed into variation in the incidence of disease or injury, and the probability of death given the disease or injury (e.g., the proportion of people with cancer who die from cancer in a given year, the proportion of motor vehicle collisions or suicidal acts that prove fatal).

This approach, sometimes referred to as the decomposition method, suggests that, with reference to understanding patterns of suicide mortality, it may prove useful to view the suicide mortality rate (SMR; suicides/population) as the literal product of the incidence of suicidal acts (ISA; suicidal acts/population) and the proportion of suicidal acts that result in death [the case fatality ratio (CFR); suicide deaths/suicide acts]:

$$SMR = ISA*CFR$$

**CFR:** case fatality ratio

## ECOLOGIC PATTERNS OF SUICIDE IN THE UNITED STATES

In the United States, as in most countries, disparities in the burden of death by suicide are generally more pronounced across geography, age, sex, and race than over time, as a result of which the vast majority of ecological studies have focused on the former dimensions rather than the latter. Over the half-century between 1955 and 2005, for example, the suicide rate for the United States as a whole ranged between 10.2 and 12.8 per 100,000 population (124), whereas across the 50 states in any given year, suicide mortality varied more than threefold (**Figure 1**), a range nearly as large as the discrepancy in suicide rates by sex [18.4 per 100,000 among males, compared with 4.8 per 100,000 among females (24)].



**Figure 1**

Age-adjusted suicide rate by state of residence, 1999–2007. Rates are age-adjusted to the year 2000 standard. Source: CDC WONDER (24).

Ex. 7

By contrast, geographical variation in mortality for other leading causes of death is more modest. For example, across the 50 states cancer mortality rates vary less than twofold [and the standard deviation is ∼10% of the mean, compared with suicide, for which the standard deviation is 30% of the mean (26)]. The distributions of mortality from cancer and suicide do, however, share one salient characteristic: A single broad subcategory of disease (or injury) accounts for a large proportion of all deaths and a substantial amount of the observed variation in mortality rates. For cancer, lung cancer accounts, on average, for approximately one-third of all cancer deaths (but fewer than one-sixth of all cancers); for suicide, firearm suicides account for more than half of all suicide deaths (but fewer than 1% of all suicidal acts) (116).

Unlike the tight correlation between (a) the mortality rate for cancer, and (b) the incidence of new cases of cancer, suicide mortality is only modestly correlated with the incidence of suicidal acts. Indeed, rates of suicide attempts (and strong correlates of attempts, such as major psychiatric illness) and rates of death by suicide are often weakly, sometimes inconsistently, and occasionally perversely correlated across many dimensions, including geography (e.g., U.S. states), spatial constructs (e.g., the rural-urban continuum) (61, 62), time (59), and demographic characteristics (e.g., sex, age, and race) (3, 6, 29, 61, 62).

For example, the Spearman rank correlation coefficient relating the incidence of hospital discharges for deliberate self-harm (1) and mortality from suicide (24) across the 26 states for which data are available is 0.2. Adding suicide fatalities (24) to hospitalized acts of deliberate self-harm (to approximate the incidence of suicidal acts overall) increases the correlation with suicide mortality, but the association remains modest (correlation coefficient = 0.4). By contrast, the correlation coefficient between suicide mortality and the CFR for suicidal acts is 0.7, a correlation as strong as that between cancer incidence and cancer mortality across these same 26 states.

A no-more-than-modest correlation between mortality due to suicide and suicide attempts is also apparent over time. For example, whereas suicide rates in the United States declined by more than 15% between 1990 and 2000 (81), and by ∼25% among youth over this same time period (23, 81), suicide attempt rates remained virtually unchanged for both adults (59) and youth (25).

Publicly available data from the National Survey of Drug Use and Health, used by a recent study (92) that examined predictors of variation in suicide rates across the 50 states, also reveal only modest correlations between suicide mortality and measures of psychiatric and behavioral problems. For example, across the 50 states, correlation coefficients relating suicide mortality and (a) major depressive disorder, (b) drug or alcohol abuse or dependence, and (c) a composite measure of serious psychological distress were, respectively, 0.4, 0.2, and 0.2.

A partial explanation for the modest correlation between suicide mortality and these strong individual-level risk factors for suicide is suggested by the observations that (a) the great majority of people who have engaged in suicidal acts do not die by suicide either in the short term (116) or in the long term (98), and (b) the major determinant of the proportion of suicidal acts in a population that prove fatal is the distribution of highly lethal methods used in suicidal acts, which is itself not strongly related to the underlying base rate of suicidal behavior.

## DETERMINANTS OF THE CASE FATALITY RATIO

Because ecologic patterns of suicide mortality are not well explained by patterns of suicide attempt rates, variation in the proportion of suicidal acts that prove fatal (i.e., the CFR) must explain the residual systematic variation in death by suicide. For geographic and demographic subgroups, the CFR is determined largely by the distribution of methods used in suicidal acts, rather than by marked variation in method-specific case fatality across subgroups (28, 40, 56, 87, 113). For example, compared

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

with females, males are less likely to engage in suicidal behavior (and only slightly more likely to die by suicide when they use a given method), but three to four times more likely to die in a suicidal act because the methods that men use are far more lethal (56, 87, 113). The same pattern is observed across age groups: Younger people engage in suicidal behavior more frequently, but older people are far more likely to die in any suicidal act because the methods older people use are, on average, more lethal (87, 113). Likewise, white and black Americans appear to engage in suicidal acts at similar rates (and have similar method-specific CFRs), but suicide rates are nearly twice as high for whites because the overall CFR for whites is nearly twice that for blacks (113).

Using data that include only those cases of intentional self-harm that received medical evaluation in an emergency department or hospital, several studies have found enormous differences in the CFR for different methods used in suicidal acts. For example, 85–90% of self-injuries with a firearm and 60–70% of hanging/suffocations prove fatal, but only 2% or less of overdoses and self-injuries with a sharp instrument result in death (87, 113, 116) (**Table 1**). Even within the category of poisoning, CFRs vary considerably: Pesticides and other agricultural chemicals often used in suicidal acts in developing countries are, on average, more lethal than the psychotropic and analgesic medications often used in deliberate self-poisonings in industrialized countries (39). In the United States, a predominant determinant of the CFR across geographic and demographic subgroups, and over time, is the proportion of suicidal acts that are committed using firearms (87, 113).

## THE FIREARM–SUICIDE CONNECTION: EVIDENCE FROM ECOLOGIC AND INDIVIDUAL-LEVEL STUDIES

### Cross-Sectional Studies

Just as the distribution of mortality rates for lung cancer accounts for a significant proportion of the variation in mortality from cancer overall, suicide mortality rates in the United States appear to be driven largely by rates of firearm suicide (86, 88, 91, 92). For example, **Figure 2** shows that suicide rates in rural areas of the United States are considerably higher than in urban areas: The most urban areas have mortality rates of less than 10 per 100,000 residents, compared with rates of more than 14 per 100,000 residents in the most rural areas. Moreover, mortality from suicide across the

Table 1   Case fatality ratio by method of self-harm, United States, 2001. Listed here are all U.S. suicide deaths in 2001 and estimated visits to the emergency department based on a nationally representative sample of emergency departments. Source: Vyrostek et al. (116)[a]

| Method | Fatal | Nonfatal | Total | Case fatality ratio |
|---|---|---|---|---|
| Firearm | 16,869 | 2,980 | 19,849 | 85 |
| Suffocation/hanging | 6,198 | 2,761 | 8,959 | 69 |
| Poisoning/overdose | 5,191 | 215,814 | 221,005 | 2 |
| Fall | 651 | 1,434 | 2,085 | 31 |
| Cut/pierce | 458 | 62,817 | 63,275 | 1 |
| Other | 1,109 | 35,089 | 36,198 | 3 |
| Unspecified | 146 | 2,097 | 2,243 | 7 |
| Total | 30,622 | 322,992 | 353,614 | 9 |

[a]Case fatality ratio is the proportion of cases recorded in a year that are fatal. The emergency department (ED) estimate overstates ED-treated suicide attempts (because nonsuicidal self-harm cannot be disaggregated from actual suicide attempts), but it underestimates nonfatal attempts because it does not capture suicide attempts that do not result in medical care.

Ex. 7

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.



**Figure 2**

Suicide rate per 100,000, United States, 1999–2007, aggregated by level of urbanization of the decedent's county of residence. Source: CDC WONDER (24).

rural-urban continuum is accounted for by differences in rates of firearm suicide, without compensatory changes in rates of nonfirearm suicide. Notably, most (60–62, 101, 102), though not all (104), studies have found that rates of suicidal acts and risk factors for suicidal behavior, such as depression, are not higher in rural areas compared with urban areas.

In 2001, the Behavioral Risk Factor Surveillance System (BRFSS) (27) obtained the first state-level estimates of firearm prevalence sufficiently precise to allow for empirical evaluation of the relation of firearm ownership to suicide for the nation as a whole. Prior to 2001, nationally representative ecologic studies relied on proxies for gun ownership or examined variation across larger areas of aggregation, such as the census regions. Despite the imprecision of the proxies used and the small number of observations across which variation in firearm ownership had been measured directly, studies consistently found a positive association between cross-sectional measures of firearm prevalence and firearm suicide (8, 57, 63, 70, 72, 79, 84–86, 110). Findings in these earlier

studies with respect to the association between firearm prevalence and rates of overall suicide, however, were mixed, depending largely on the way firearm prevalence was measured, as reviewed elsewhere (11, 90, 93). In the absence of more precise measures of firearm ownership, questions about the relation between household firearm prevalence and overall suicide mortality lingered, in part because questions were raised about whether the proxies used in ecologic studies produced associations that were biased away from the null (93). This criticism was put to rest once the BRFSS made its 2001 survey results available (27).

One of the first studies to exploit comprehensive state-level firearm prevalence data from the BRFSS examined the relationship between rates of household gun ownership and suicide across the 50 states for the period 2000–2002 (92). The study controlled for rates of serious psychological distress, along with rates of poverty, urbanization, unemployment, and drug and alcohol dependence and abuse. As in a smaller study of northeast states for which deliberate self-harm data were available (91),

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.





**Figure 3**

Rate of suicide per 100,000 in 2004 for overall suicide, firearm suicide, and nonfirearm suicide, in the 50 states, by state-level prevalence of firearm ownership. Sources: CDC BRFSS (83), CDC WONDER (24).

this study found in both crude and multivariate analyses, among men and women and in every age group, that states with higher rates of household gun ownership had higher rates of firearm suicide and overall suicide. The study showed no association between firearm ownership rates and nonfirearm suicide (92).

A graphical depiction of the bivariate findings from the study is presented in **Figures 3a** and **3b**, updated to include data from the most recent year for which BRFSS firearm ownership data are available (2004) and suicide mortality data from the corresponding year. Trend lines depict the correlations between firearm prevalence and suicide mortality overall and by method. Firearm prevalence, as shown in the figure, correlates strongly with mortality due to suicide overall (correlation coefficient = 0.7) and with firearm suicide (correlation

coefficient = 0.8), but not with nonfirearm suicide (correlation coefficient = 0.1).

## Longitudinal Studies

One approach to mitigating potential confounding by cross-sectional differences in psychopathology (or other markers of suicide-proneness that might sort by geography) is to conduct longitudinal analyses. An early study using aggregate national data on firearm ownership, 1959–1984, found a significant bivariate relation between firearm ownership and firearm suicide, but no relation between firearm ownership and overall suicide (30). Firearm availability was measured by responses to Gallop and National Opinion Research Council (NORC) polls (the biannual General Social Survey, GSS). The variability in

Ex. 7

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

measured firearm ownership over time appears to have been largely a function of differences in the samples and methodologies used by Gallop and NORC (90), and the null finding, on that basis, may have been due to measurement error (90). Until recently most ecologic time-series studies abandoned direct measures of firearm prevalence because available measures were too imprecise (relative to secular changes in suicide rates) to power analyses adequately. Instead, most ecologic studies focused on the relation between passage of firearm legislation and subsequent rates of suicide (or geographic variation in firearm laws and cross-sectional variation in suicide rates) with mixed results (20, 32, 71, 73, 74, 76, 103, 117), as reviewed elsewhere (11, 91). One drawback to longitudinal studies on firearm legislation is that investigators did not measure whether firearm prevalence or exposure changed after legislation was enacted (11, 91).

During the 1990s, the percentage of Americans living in households with firearms declined far more than it had over the previous three decades (36). The ongoing General Social Survey, for example, found that compared with the 1960s, 1970s, 1980s, and early 1990s, when roughly one in two Americans lived in a home with a firearm, by 2000 that fraction had fallen to one in three. The first study to exploit this significant decline in household firearm ownership examined whether changes in firearm prevalence had been accompanied by significant changes in rates of suicide by firearms, by other means, and overall (88). The findings, illustrated below for the nation as a whole (**Figure 4**), were consistent with those from cross-sectional studies and case-control studies in that the time-series study found a significant relation between declines in household firearm ownership and declines in rates of suicide overall and by firearms, but not by nonfirearm methods. These results held for the population as a whole, for men, for women, and most markedly for children and young adults, even after adjustment for several potential confounders including rates of poverty, unemployment, per capita alcohol consumption, the age distribution of the population, and census region.



**Figure 4**

Method-specific suicide rate per 100,000, United States, 1985–2007. Source: CDC WONDER (24).

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

## Individual-Level Studies

The literature reviewed thus far has focused on ecologic patterns of suicide mortality in the United States. Considered as a whole, these studies point to the strong association between the availability of firearms and suicide mortality. The empirical foundation for this assertion rests not only on analytic studies of aggregate data, but also on compelling evidence from individual-level studies, many of which have been conducted over the past two decades. These studies, the most pertinent of which are summarized below, address concerns about the ecologic fallacy by providing associations at the individual level analogous to those observed at the aggregate level.

Every U.S. case-control study in the peer-reviewed literature that has examined the firearm-suicide connection has found that a firearm in the home is associated with an increased risk of suicide (10, 12–16, 31, 34, 47, 48, 58, 67, 68, 107, 122). The increase in risk is large, typically 2–10 times that of homes without firearms, depending on the sample population (e.g., adolescents versus older adults) and on the way in which the firearms are stored (48). The association between firearms in the home and the risk of suicide is due to a large increase in the risk of suicide by firearm that is not counterbalanced by a reduced risk of nonfirearm suicide.

Three additional findings from the case-control studies are notable. First, the higher risk of suicide in homes with firearms applies not only to the gun owner but also to the gun owner's spouse and children (12–15, 17, 18, 33, 34, 58, 122); the relative risk of suicide associated with a firearm in the home is greater for young people (11, 58, 90), and greatest for those without known psychopathology (13). Second, the presence of a firearm in the home, no matter how it is stored, is a risk factor for completed suicide (11, 58, 90). Third, how household guns are stored matters (11, 31, 48, 58, 90). One case-control study that focused on the role of firearm storage in suicide risk among younger people found that adolescent suicide was four times more likely in homes with a loaded, unlocked firearm, compared with homes where firearms were stored unloaded and locked (48).

Case-control studies adjust for potential confounding of the association between firearms and suicide by adjusting for underlying psychopathology among cases and controls. Other studies have used survey instruments designed to assess psychopathology to address directly the possibility that people who live in homes with firearms are inherently more suicidal than people who live in homes without firearms (7, 54, 89, 111). All these studies have found that people who live in homes with firearms are no more likely to have any of the major psychopathological disorders known to increase suicide risk, no more likely to have suicidal thoughts, and no more likely to have made suicide attempts, compared with people who live in homes without firearms.

## REDUCING ACCESS TO LETHAL MEANS

The literature reviewed above points to the potential for reducing the population-level suicide burden by reducing population-level access to lethal means. Natural experiments from other countries provide evidence of the dominant role that the ready availability of highly lethal, commonly used means can play in determining suicide mortality rates (4, 35, 41, 49, 51, 53, 66, 69, 77, 80). The most famous and dramatic large-scale natural experiment that drew attention to the benefits of means restriction has been called the Coal Gas Story (50, 64). During the 1950s, nearly half of all suicides in the United Kingdom were domestic poisonings with the gas used in ovens and heaters. With the discovery of a new, less toxic and less expensive source of gas in the North Sea, the carbon monoxide content of domestic gas fell over the next 15 years to near-zero levels. Following what was, in effect, the detoxification of gas used in homes, rates of suicide by gas fell in effect to zero (e.g., in 1960 there were 2,499 suicides by domestic gas, whereas in 1977 there were 8). Rates of nongas suicide increased somewhat, but overall rates

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

of completed suicide dropped substantially (by ~30%) for both men and women.

A similar experiment occurred in Sri Lanka, where pesticides are the leading method of suicide. From 1950 to 1995, the suicide rate increased eightfold, owing almost entirely to increases in suicide with toxic pesticides, a byproduct of the agricultural revolution. In 1995 and again in 1998, the government banned several of the most highly toxic pesticides that were commonly used in Sri Lankan suicides. By 2005, the suicide rate had fallen by half (49). Declines in suicide were from poisoning suicides; nonpoisoning suicides did not decline, nor did attempts by poisoning. Secular trends in unemployment, alcohol misuse, divorce, overall pesticide use, and Sri Lanka's civil war did not appear to be associated with the decline. Agricultural output did not suffer, and the cost of production did not appear to increase (78). Western Samoa provides another case in point; there suicides—but not suicide attempts—closely tracked the introduction and later banning of paraquat on the island (9).

A recent study in Israel also found a substantial reduction in suicide rates after a policy that reduced access to lethal means was put into effect. After the policy change, which reduced soldiers' access to firearms on weekends, the total suicide rate in the Israel Defense Forces decreased by 40%. Most of this decrease was due to a decrease in weekend firearm suicides, with no significant change in weekday suicide rates or any compensatory increase in nonfirearm suicides (75).

The coal gas in the United Kingdom, the pesticides banned in Sri Lanka and Western Samoa, and the firearms in Israel and the United States share critical characteristics that make them logical targets for means restriction. First, they account for a large proportion of the total number of suicides in their respective countries. Second, they all have a relatively high probability of causing death when used in an attempt. Third, alternative methods readily available and commonly used in suicidal acts are less likely to prove fatal. In this context, it is worth noting that reducing ready access to methods

with low CFR, such as over-the-counter medications (52) and methods that make up a very low proportion of total suicides locally [such as jumps from bridges (5)], may not produce a measurable impact on the overall suicide mortality rate for the population, though lives may be saved. Furthermore, when restrictions are only partial [such as erecting a barrier at one bridge and not at nearby bridges that afford similarly accessible lethal jumping opportunities (109)], it is more uncertain that suicides will be prevented.

The rationale for why reducing the ready availability of lethal means in the short run can save lives in the long run rests on three well-established clinical and epidemiologic observations. First, many suicidal acts have an impulsive component. For example, among people who made near-lethal suicide attempts, 24% took less than 5 min (108) between the decision to kill themselves and the actual attempt, and 70% took less than 1 h (T.R. Simon, personal communication). In a study of emergency department–treated suicide attempts, 40% reported less than 5 min from decision to action (123); in another study of people referred to a psychiatric hospital following an attempt, 48% reported acting on their ultimate decision to attempt suicide within 10 min (37).

Second, many suicidal crises are self-limiting. Such crises are often precipitated by an immediate stressor, such as the breakup of a romantic relationship, the loss of a job, or a run-in with police, even as an underlying vulnerability may be explained by a more chronic problem, such as a mental health, behavioral, or substance abuse problem (45, 53, 97). As the acute phase of the crisis passes, often so does the urge to attempt suicide. A recent study of college and university students, for example, found that among those who seriously considered suicide in the past year, approximately one in three reported that the suicidal episode lasted less than an hour (38).

Third, the great majority of people who survive a suicide attempt, including attempts that they expected to be lethal (such as a gunshot to the head or jumping in front of a train), do

Ex. 7

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

not go on to die by suicide. Indeed, a review of more than 90 studies that have followed suicide attempters over time (70 of which examined fatal outcomes) found that, on average, 7% (range: 5–11%) eventually died by suicide, 23% reattempted nonfatally, and 70% made no further attempts (98). Even studies that counted equivocal deaths as suicides, followed attempters for several decades, and focused on medically serious attempts (such as jumping in front of a train) found similarly low completion rates.

## SUMMARY AND IMPLICATIONS

Suicide mortality rates vary widely across geography, age, sex, race, and other sociodemographic dimensions, a disparity in burden that, at the population level, is more exaggerated than that for the leading causes of natural death. Unlike the tight correlation between the incidence of cancer and the incidence of death due to cancer, ecologic patterns of suicide mortality are more tightly correlated with the CFR than with the incidence of suicide attempts (or with the incidence of established risk factors for suicidal behavior, such as major depression or other measures of mental illness). Because this is a striking feature of suicide mortality patterns in the United States, research attempting to test the impact of putative causal factors on suicide mortality should employ the decomposition approach, championed by Wennberg, by specifying, a priori, and testing, a posteriori, whether an observed variation in suicide rates across population groups is the result of a change in the incidence of suicidal acts or a result of a change in the lethality of the act itself (and if so, in what way and to what measurable effect).

To date, however, ecologic studies of suicide mortality in the United States that have examined interventions that are presumed to affect suicidal behavior, rather than the CFR, have not applied the decomposition approach (e.g., ecologic studies of antidepressant prescription rates and suicide mortality) (19, 42, 43, 83, 96, 114). One practical reason for this lacuna is that suicide attempt data are not readily available for all 50 states. Nevertheless, even in the absence of attempt data, indirect assessment is still possible by examining whether suicide methods were affected differentially, and if so, in what way. As reviewed here, a plausible—and testable—alternative explanation for ecologic associations between suicide mortality in the United States and putative causal factors is that the factor is serving as a proxy for household firearm prevalence. By parsing suicide mortality by method, the plausibility of competing explanations can better be assessed.

More than ten years ago, in his *Letter to the American People*, then–Surgeon General David Satcher (115) asserted that suicide should be seen as a serious public health problem. In making this assertion, Satcher made the case that accounting for ecologic variation in suicide mortality is central to any public health approach to reducing the population-level burden of suicide. The ecologic and individual-level studies reviewed herein illustrate the importance of considering access to highly lethal means in approaches to understanding population-level suicide patterns. These studies also point to the great, yet largely unrealized potential that means-reduction strategies hold out to save lives, not only in the short run, but also in the long run, not only for individuals, but also for populations that bear a disproportionately large burden of suicide mortality, even if they do not bear a disproportionately large burden of risk factors for suicidal behavior or engage in a disproportionately large number of suicidal acts.

## DISCLOSURE STATEMENT

The authors are not aware of any affiliations, memberships, funding, or financial holdings that might be perceived as affecting the objectivity of this review.

Ex. 7

## ACKNOWLEDGMENTS

This work was supported by grants from the Joyce and Bonnett Foundations. We thank Justin Granstein for his invaluable assistance preparing this manuscript.

## LITERATURE CITED

1. Agency Healthc. Res. Quality. 2011. *State statistics on all ED visits database.* HCUPnet: Healthcare Cost and Utilization Project. **http://hcupnet.ahrq.gov/**

2. Arsenault-Lapierre G, Kim C, Turecki G. 2004. Psychiatric diagnoses in 3275 suicides: a meta-analysis. *BMC Psychiatry* 4:37

3. Beautrais A. 2003. Suicide in New Zealand II: a review of risk factors and prevention. *N. Z. Med. J.* 116(1175):U461. **http://journal.nzma.org.nz/journal/116-1175/461/**

4. Beautrais A. 2007. The contribution to suicide prevention of restricting access to methods and sites. *Crisis* 28:1–3

5. Beautrais A. 2007. Suicide by jumping: a review of research and prevention strategies. *Crisis* 28:58–63

6. Beautrais AL. 2001. Suicides and serious suicide attempts: two populations or one? *Psychol. Med.* 31:837–45

7. Betz ME, Barber C, Miller M. 2011. Suicidal behavior and firearm access: results from the Second Injury Control and Risk Survey. *Suicide Life Threat. Behav.* doi: 10.1111/j.1943-278X.2011.00036.x. **http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Citation& list_uids=21535097**

8. Birckmayer J, Hemenway D. 2001. Suicide and firearm prevalence: Are youth disproportionately affected? *Suicide Life Threat. Behav.* 31:303–10

9. Bowles JR. 1995. Suicide in Western Samoa: an example of a suicide prevention program in a developing country. In *Preventive Strategies on Suicide*, ed. R Diekstra, R Gulbinat, D De Leo, I Kienhorst, pp. 173–206. Leiden: Brill Acad.

10. Brent DA. 1995. Risk factors for adolescent suicide and suicidal behavior: mental and substance abuse disorders, family environmental factors, and life stress. *Suicide Life Threat. Behav.* 25(Suppl.):52–63

11. Brent DA. 2001. Firearms and suicide. *Ann. N. Y. Acad. Sci.* 932:225–39; discussion 39–40

12. Brent DA, Baugher M, Bridge J, Chen T, Chiappetta L. 1999. Age- and sex-related risk factors for adolescent suicide. *J. Am. Acad. Child Adolesc. Psychiatry* 38:1497–505

13. Brent DA, Perper J, Moritz G, Baugher M, Allman C. 1993. Suicide in adolescents with no apparent psychopathology. *J. Am. Acad. Child Adolesc. Psychiatry* 32:494–500

14. Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. 1991. The presence and accessibility of firearms in the homes of adolescent suicides. A case-control study. *JAMA* 266:2989–95

15. Brent DA, Perper JA, Goldstein CE, Kolko DJ, Allan MJ, et al. 1988. Risk factors for adolescent suicide. A comparison of adolescent suicide victims with suicidal inpatients. *Arch. Gen. Psychiatry* 45:581–88

16. Brent DA, Perper JA, Moritz G, Allman C, Friend A, et al. 1993. Psychiatric risk factors for adolescent suicide: a case-control study. *J. Am. Acad. Child Adolesc. Psychiatry* 32:521–29

17. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. 1993. Firearms and adolescent suicide. A community case-control study. *Am. J. Dis. Child.* 147:1066–71

18. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. 1994. Suicide in affectively ill adolescents: a case-control study. *J. Affect. Disord.* 31:193–202

19. Bridge JA, Greenhouse JB, Weldon AH, Campo JV, Kelleher KJ. 2008. Suicide trends among youths aged 10 to 19 years in the United States, 1996–2005. *JAMA* 300:1025–26

20. Carrington PJ, Moyer S. 1994. Gun control and suicide in Ontario. *Am. J. Psychiatry* 151:606–8

21. Cavanagh JT, Carson AJ, Sharpe M, Lawrie SM. 2003. Psychological autopsy studies of suicide: a systematic review. *Psychol. Med.* 33:395–405

22. Cent. Dis. Control Prev. 2002. Nonfatal self-inflicted injuries treated in hospital emergency departments—United States, 2000. *MMWR* 51:436–38

23. Cent. Dis. Control Prev. 2007. Suicide trends among youths and young adults aged 10–24 years—United States, 1990–2004. *MMWR* 56:905–8

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org Access provided by 38.88.13.122 on 04/05/19. For personal use only.

Ex. 7

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

24. Cent. Dis. Control Prev. 2010. *Compressed mortality file* (*underlying cause-of-death*). Wide-Ranging Online Data for Epidemiologic Research (WONDER) database. **http://wonder.cdc.gov/mortSQL.html**

25. Cent. Dis. Control Prev., Natl. Cent. Chronic Dis. Prev. Health Promot. 2010. *YRBSS Youth Online: Comprehensive Results. Youth Risk Behavior Surveillance System* (*YRBSS*). Atlanta, GA: Cent. Dis. Control Prev., Div. Adolesc. Sch. Health. **http://apps.nccd.cdc.gov/yrbss/**

26. Cent. Dis. Control Prev., Natl. Progr. Cancer Regist. (NPCR). 2010. *1999–2007 Incidence and Mortality Web-Based Report. United States Cancer Statistics* (*USCS*). Atlanta, GA: Cent. Dis. Control Prev., Div. Cancer Prev. Control. **http://apps.nccd.cdc.gov/uscs/**

27. Cent. Dis. Control Prev., Off. Surveill., Epidemiol. Lab. Serv. 2011. Behavioral Risk Factory Surveillance System. *Behavioral Risk Factor Surveillance System* (*BRFSS*). Atlanta, GA: Cent. Dis. Control Prev. **http://www.cdc.gov/BRFSS/**

28. Chen VC, Cheng AT, Tan HK, Chen CY, Chen TH, et al. 2009. A community-based study of case fatality proportion among those who carry out suicide acts. *Soc. Psychiatry Psychiatr. Epidemiol.* 44:1005–11

29. Chen VC, Tan HK, Chen CY, Chen TH, Liao LR, et al. 2011. Mortality and suicide after self-harm: community cohort study in Taiwan. *Br. J. Psychiatry* 198:31–36

30. Clarke RV, Jones PR. 1989. Suicide and increased availability of handguns in the United States. *Soc. Sci. Med.* 28:805–9

31. Conwell Y, Duberstein PR, Connor K, Eberly S, Cox C, Caine ED. 2002. Access to firearms and risk for suicide in middle-aged and older adults. *Am. J. Geriatr. Psychiatry* 10:407–16

32. Cummings P, Grossman DC, Rivara FP, Koepsell TD. 1997. State gun safe storage laws and child mortality due to firearms. *JAMA* 278:1084–86

33. Cummings P, Koepsell TD, Grossman DC, Savarino J, Thompson RS. 1997. The association between the purchase of a handgun and homicide or suicide. *Am. J. Public Health* 87:974–78

34. Dahlberg LL, Ikeda RM, Kresnow MJ. 2004. Guns in the home and risk of a violent death in the home: findings from a national study. *Am. J. Epidemiol.* 160:929–36

35. Daigle MS. 2005. Suicide prevention through means restriction: assessing the risk of substitution. A critical review and synthesis. *Accid. Anal. Prev.* 37:625–32

36. Davis JA, Smith TW. 2004. *General Social Survey* (*GSS*), *1972–2002*. Natl. Opin. Res. Center. **http://www3.norc.org/GSS+Website/**

37. Deisenhammer EA, Ing CM, Strauss R, Kemmler G, Hinterhuber H, Weiss EM. 2009. The duration of the suicidal process: How much time is left for intervention between consideration and accomplishment of a suicide attempt? *J. Clin. Psychiatry* 70:19–24

38. Drum DJ, Brownson C, Denmark AB, Smith SE. 2009. New data of the nature of suicidal crisis in college students: shifting the paradigm. *Prof. Psychol. Res. Pract.* 40:213–22

39. Eddleston M. 2000. Patterns and problems of deliberate self-poisoning in the developing world. *QJM* 93:715–31

40. Elnour AA, Harrison J. 2008. Lethality of suicide methods. *Inj. Prev.* 14:39–45

41. Florentine JB, Crane C. 2010. Suicide prevention by limiting access to methods: a review of theory and practice. *Soc. Sci. Med.* 70:1626–32

42. Gibbons RD, Brown CH, Hur K, Marcus SM, Bhaumik DK, et al. 2007. Early evidence on the effects of regulators' suicidality warnings on SSRI prescriptions and suicide in children and adolescents. *Am. J. Psychiatry* 164:1356–63

43. Gibbons RD, Hur K, Bhaumik DK, Mann JJ. 2005. The relationship between antidepressant medication use and rate of suicide. *Arch. Gen. Psychiatry* 62:165–72

44. Goldstein RB, Black DW, Nasrallah A, Winokur G. 1991. The prediction of suicide. Sensitivity, specificity, and predictive value of a multivariate model applied to suicide among 1906 patients with affective disorders. *Arch. Gen. Psychiatry* 48:418–22

45. Gould MS, Fisher P, Parides M, Flory M, Shaffer D. 1996. Psychosocial risk factors of child and adolescent completed suicide. *Arch. Gen. Psychiatry* 53:1155–62

46. Gould MS, Greenberg T, Velting DM, Shaffer D. 2003. Youth suicide risk and preventive interventions: a review of the past 10 years. *J. Am. Acad. Child Adolesc. Psychiatry* 42:386–405

47. Grassel KM, Wintemute GJ, Wright MA, Romero MP. 2003. Association between handgun purchase and mortality from firearm injury. *Inj. Prev.* 9:48–52

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

48. Grossman DC, Mueller BA, Riedy C, Dowd MD, Villaveces A, et al. 2005. Gun storage practices and risk of youth suicide and unintentional firearm injuries. *JAMA* 293:707–14

49. Gunnell D, Fernando R, Hewagama M, Priyangika WD, Konradsen F, Eddleston M. 2007. The impact of pesticide regulations on suicide in Sri Lanka. *Int. J. Epidemiol.* 36:1235–42

50. Gunnell D, Middleton N, Frankel S. 2000. Method availability and the prevention of suicide—a re-analysis of secular trends in England and Wales 1950–1975. *Soc. Psychiatry Psychiatr. Epidemiol.* 35:437–43

51. Gunnell D, Miller M. 2010. Strategies to prevent suicide. *BMJ* 341:c3054

52. Hawkins LC, Edwards JN, Dargan PI. 2007. Impact of restricting paracetamol pack sizes on paracetamol poisoning in the United Kingdom: a review of the literature. *Drug Saf.* 30:465–79

53. Hawton K. 2007. Restricting access to methods of suicide: rationale and evaluation of this approach to suicide prevention. *Crisis* 28:4–9

54. Ilgen MA, Zivin K, McCammon RJ, Valenstein M. 2008. Mental illness, previous suicidality, and access to guns in the United States. *Psychiatr. Serv.* 59:198–200

55. Isometsa ET. 2001. Psychological autopsy studies—a review. *Eur. Psychiatry* 16:379–85

56. Jansen E, Buster MC, Zuur AL, Das C. 2009. Fatality of suicide attempts in Amsterdam 1996–2005. *Crisis* 30:180–85

57. Kaplan MS, Geling O. 1998. Firearm suicides and homicides in the United States: regional variations and patterns of gun ownership. *Soc. Sci. Med.* 46:1227–33

58. Kellermann AL, Rivara FP, Somes G, Reay DT, Francisco J, et al. 1992. Suicide in the home in relation to gun ownership. *N. Engl. J. Med.* 327:467–72

59. Kessler RC, Berglund P, Borges G, Nock M, Wang PS. 2005. Trends in suicide ideation, plans, gestures, and attempts in the United States, 1990–1992 to 2001–2003. *JAMA* 293:2487–95

60. Kessler RC, Berglund P, Demler O, Jin R, Koretz D, et al. 2003. The epidemiology of major depressive disorder: results from the National Comorbidity Survey Replication (NCS-R). *JAMA* 289:3095–105

61. Kessler RC, Berglund P, Demler O, Jin R, Merikangas KR, Walters EE. 2005. Lifetime prevalence and age-of-onset distributions of DSM-IV disorders in the National Comorbidity Survey Replication. *Arch. Gen. Psychiatry* 62:593–602

62. Kessler RC, Borges G, Walters EE. 1999. Prevalence of and risk factors for lifetime suicide attempts in the National Comorbidity Survey. *Arch. Gen. Psychiatry* 56:617–26

63. Killias M. 1993. International correlations between gun ownership and rates of homicide and suicide. *CMAJ* 148:1721–25

64. Kreitman N. 1976. The coal gas story. United Kingdom suicide rates, 1960–71. *Br. J. Prev. Soc. Med.* 30:86–93

65. Krug EG, Dahlberg LL, Powell KE. 1996. Childhood homicide, suicide, and firearm deaths: an international comparison. *World Health Stat. Q.* 49:230–35

66. Krug EG, Mercy JA, Dahlberg LL, Zwi AB. 2002. The world report on violence and health. *Lancet* 360:1083–88

67. Kung HC, Pearson JL, Liu X. 2003. Risk factors for male and female suicide decedents ages 15–64 in the United States. Results from the 1993 National Mortality Followback Survey. *Soc. Psychiatry Psychiatr. Epidemiol.* 38:419–26

68. Kung HC, Pearson JL, Wei R. 2005. Substance use, firearm availability, depressive symptoms, and mental health service utilization among white and African American suicide decedents aged 15 to 64 years. *Ann. Epidemiol.* 15:614–21

69. Leenaars A, Cantor C, Connolly J, EchoHawk M, Gailiene D, et al. 2000. Controlling the environment to prevent suicide: international perspectives. *Can. J. Psychiatry* 45:639–44

70. Lester D. 1987. Availability of guns and the likelihood of suicide. *Sociol. Soc. Res.* 71:287–88

71. Lester D. 1988. Firearm availability and the incidence of suicide and homicide. *Acta Psychiatr. Belg.* 88:387–93

72. Lester D. 1989. Gun ownership and suicide in the United States. *Psychol. Med.* 19:519–21

73. Lester D, Leenaars A. 1993. Suicide rates in Canada before and after tightening firearm control laws. *Psychol. Rep.* 72:787–90

74. Loftin C, McDowall D, Wiersema B, Cottey TJ. 1991. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N. Engl. J. Med.* 325:1615–20

Ex. 7

Page 78

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

75. Lubin G, Werbeloff N, Halperin D, Shmushkevitch M, Weiser M, Knobler HY. 2010. Decrease in suicide rates after a change of policy reducing access to firearms in adolescents: a naturalistic epidemiological study. *Suicide Life Threat. Behav.* 40:421–24

76. Ludwig J, Cook PJ. 2000. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA* 284:585–91

77. Mann JJ, Apter A, Bertolote J, Beautrais A, Currier D, et al. 2005. Suicide prevention strategies: a systematic review. *JAMA* 294:2064–74

78. Manuweera G, Eddleston M, Egodage S, Buckley NA. 2008. Do targeted bans of insecticides to prevent deaths from self-poisoning result in reduced agricultural output? *Environ. Health Perspect.* 116:492–95

79. Markush RE, Bartolucci AA. 1984. Firearms and suicide in the United States. *Am. J. Public Health* 74:123–27

80. McClurg AJ. 2000. The public health case for the safe storage of firearms: Adolescent suicides add one more "smoking gun." *Hastings Law J.* 21:953–1001

81. McKeown RE, Cuffe SP, Schulz RM. 2006. US suicide rates by age group, 1970–2002: an examination of recent trends. *Am. J. Public Health* 96:1744–51

82. McPherson K, Wennberg JE, Hovind OB, Clifford P. 1982. Small-area variations in the use of common surgical procedures: an international comparison of New England, England, and Norway. *N. Engl. J. Med.* 307:1310–14

83. Milane MS, Suchard MA, Wong ML, Licinio J. 2006. Modeling of the temporal patterns of fluoxetine prescriptions and suicide rates in the United States. *PLoS Med.* 3:e190

84. Miller M, Azrael D, Hemenway D. 2002. Firearm availability and suicide, homicide, and unintentional firearm deaths among women. *J. Urban. Health* 79:26–38

85. Miller M, Azrael D, Hemenway D. 2002. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. *J. Trauma.* 52:267–74; discussion 74–75

86. Miller M, Azrael D, Hemenway D. 2002. Household firearm ownership and suicide rates in the United States. *Epidemiology* 13:517–24

87. Miller M, Azrael D, Hemenway D. 2004. The epidemiology of case fatality rates for suicide in the northeast. *Ann. Emerg. Med.* 43:723–30

88. Miller M, Azrael D, Hepburn L, Hemenway D, Lippmann SJ. 2006. The association between changes in household firearm ownership and rates of suicide in the United States, 1981–2002. *Inj. Prev.* 12:178–82

89. Miller M, Barber C, Azrael D, Hemenway D, Molnar BE. 2009. Recent psychopathology, suicidal thoughts and suicide attempts in households with and without firearms: findings from the National Comorbidity Study Replication. *Inj. Prev.* 15:183–87

90. Miller M, Hemenway D. 1999. The relationship between firearms and suicide: a review of the literature. *Aggress. Violent Behav.* 4:59–75

91. Miller M, Hemenway D, Azrael D. 2004. Firearms and suicide in the northeast. *J. Trauma* 57:626–32

92. Miller M, Lippmann SJ, Azrael D, Hemenway D. 2007. Household firearm ownership and rates of suicide across the 50 United States. *J. Trauma* 62:1029–34; discussion 34–35

93. Natl. Res. Counc. 2005. Firearms and suicide. In *Firearms and Violence: A Critical Review*, ed. C Wellsford, J Pepper, C Petrie, pp. 152–200. Washington, DC: Natl. Acad. Press

94. Nock MK, Borges G, Bromet EJ, Cha CB, Kessler RC, Lee S. 2008. Suicide and suicidal behavior. *Epidemiol. Rev.* 30:133–54

95. Off. Appl. Stud. 2009. *Results from the 2008 National Survey on Drug Use and Health: National Findings.* DHHS Publ. No. SMA 09-4434, NSDUH Ser. H-36. Rockville, MD: Subst. Abuse Mental Health Serv. Admin. (SAMSHA)

96. Olfson M, Shaffer D, Marcus SC, Greenberg T. 2003. Relationship between antidepressant medication treatment and suicide in adolescents. *Arch. Gen. Psychiatry* 60:978–82

97. Owens C, Booth N, Briscoe M, Lawrence C, Lloyd K. 2003. Suicide outside the care of mental health services: a case-controlled psychological autopsy study. *Crisis* 24:113–21

98. Owens D, Horrocks J, House A. 2002. Fatal and non-fatal repetition of self-harm. Systematic review. *Br. J. Psychiatry* 181:193–99

99. Pokorny AD. 1993. Suicide prediction revisited. *Suicide Life Threat. Behav.* 23:1–10

Ex. 7

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

100. Powell J, Geddes J, Deeks J, Goldacre M, Hawton K. 2000. Suicide in psychiatric hospital in-patients. Risk factors and their predictive power. *Br. J. Psychiatry* 176:266–72

101. Probst JC, Laditka SB, Moore CG, Harun N, Powell MP, Baxley EG. 2006. Rural-urban differences in depression prevalence: implications for family medicine. *Fam. Med.* 38:653–60

102. Qin P. 2005. Suicide risk in relation to level of urbanicity—a population-based linkage study. *Int. J. Epidemiol.* 34:846–52

103. Rich CL, Young JG, Fowler RC, Wagner J, Black NA. 1990. Guns and suicide: possible effects of some specific legislation. *Am. J. Psychiatry* 147:342–46

104. Rost K, Zhang M, Fortney J, Smith J, Smith GR Jr. 1998. Rural-urban differences in depression treatment and suicidality. *Med. Care* 36:1098–107

105. Deleted in proof

106. Shaffer D, Gould MS, Fisher P, Trautman P, Moreau D, et al. 1996. Psychiatric diagnosis in child and adolescent suicide. *Arch. Gen. Psychiatry* 53:339–48

107. Shah S, Hoffman RE, Wake L, Marine WM. 2000. Adolescent suicide and household access to firearms in Colorado: results of a case-control study. *J. Adolesc. Health* 26:157–63

108. Simon TR, Swann AC, Powell KE, Potter LB, Kresnow MJ, O'Carroll PW. 2001. Characteristics of impulsive suicide attempts and attempters. *Suicide Life Threat. Behav.* 32:49–59

109. Sinyor M, Levitt AJ. 2010. Effect of a barrier at Bloor Street Viaduct on suicide rates in Toronto: natural experiment. *BMJ* 341:c2884

110. Sloan JH, Rivara FP, Reay DT, Ferris JA, Kellermann AL. 1990. Firearm regulations and rates of suicide. A comparison of two metropolitan areas. *N. Engl. J. Med.* 322:369–73

111. Sorenson SB, Vittes KA. 2008. Mental health and firearms in community-based surveys: implications for suicide prevention. *Eval. Rev.* 32:239–56

112. Sourander A, Klomek AB, Niemela S, Haavisto A, Gyllenberg D, et al. 2009. Childhood predictors of completed and severe suicide attempts: findings from the Finnish 1981 Birth Cohort Study. *Arch. Gen. Psychiatry* 66:398–406

113. Spicer RS, Miller TR. 2000. Suicide acts in 8 states: incidence and case fatality rates by demographics and method. *Am. J. Public Health* 90:1885–91

114. Tondo L, Albert MJ, Baldessarini RJ. 2006. Suicide rates in relation to health care access in the United States: an ecological study. *J. Clin. Psychiatry* 67:517–23

115. US Public Health Serv. 1999. *The Surgeon General's Call to Action to Prevent Suicide*. Washington, DC: Dep. Health Hum. Serv., US Public Health Serv.

116. Vyrostek SB, Annest JL, Ryan GW. 2004. Surveillance for fatal and nonfatal injuries—United States, 2001. *MMWR Surveill. Summ.* 53:1–57

117. Webster DW, Vernick JS, Zeoli AM, Manganello JA. 2004. Association between youth-focused firearm laws and youth suicides. *JAMA* 292:594–601

118. Wennberg J, Gittelsohn. 1973. Small area variations in health care delivery. *Science* 182:1102–8

119. Wennberg J, Gittelsohn A. 1982. Variations in medical care among small areas. *Sci. Am.* 246:120–34

120. Wennberg JE. 1984. Dealing with medical practice variations: a proposal for action. *Health Aff.* 3:6–32

121. Westerling R. 1995. Components of small area variation in death rates: a method applied to data from Sweden. *J. Epidemiol. Community Health* 49:214–21

122. Wiebe DJ. 2003. Homicide and suicide risks associated with firearms in the home: a national case-control study. *Ann. Emerg. Med.* 41:771–82

123. Williams CL, Davidson JA, Montgomery I. 1980. Impulsive suicidal behavior. *J. Clin. Psychol.* 36:90–94

124. World Health Organ. 2005. *Suicide rates (per 100,000), by gender, USA, 1950–2005*. World Health Organ., Geneva. **http://www.who.int/mental_health/media/unitstates.pdf**

125. World Health Organ. 2010. *Mental health: suicide prevention*. World Health Organ., Geneva. **http://www.who.int/mental_health/prevention/suicide/suicideprevent/en/index.html**

126. Yoshimasu K, Kiyohara C, Miyashita K. 2008. Suicidal risk factors and completed suicide: meta-analyses based on psychological autopsy studies. *Environ. Health Prev. Med.* 13:243–56

Ex. 7

Annu. Rev. Public Health 2012.33:393–408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.



Annual Review of
Public Health

Volume 33, 2012

# Contents

**Symposium: Comparative Approaches to Reducing Health Disparities**

Health Disparities Research in Global Perspective: New Insights
and New Directions
*Shiriki Kumanyika* ............................................................ 1

Health Inequalities: Trends, Progress, and Policy
*Sara N. Bleich, Marian P. Jarlenski, Caryn N. Bell, and Thomas A. LaVeist* ............ 7

Conceptual Approaches to the Study of Health Disparities
*Ana V. Diez Roux* ............................................................ 41

How Society Shapes the Health Gradient: Work-Related Health
Inequalities in a Comparative Perspective
*Christopher B. McLeod, Peter A. Hall, Arjumand Siddiqi, and Clyde Hertzman* ........ 59

Disparities in Infant Mortality and Effective, Equitable Care:
Are Infants Suffering from Benign Neglect?
*Diane L. Rowley and Vijaya Hogan* ........................................... 75

Clinical Care and Health Disparities
*B. Starfield, J. Gérvas, and D. Mangin* ...................................... 89

**Epidemiology and Biostatistics**

A Review of Spatial Methods in Epidemiology, 2000–2010
*Amy H. Auchincloss, Samson Y. Gebreab, Christina Mair, and Ana V. Diez Roux* ... 107

Early Intervention to Reduce the Global Health and Economic Burden
of Major Depression in Older Adults
*Charles F. Reynolds III, Pim Cuijpers, Vikram Patel, Alex Cohen, Amit Dias,
Neerja Chowdhary, Olivia I. Okereke, Mary Amanda Dew, Stewart J. Anderson,
Sati Mazumdar, Frank Lotrich, and Steven M. Albert* ........................ 123

Preventability of Cancer: The Relative Contributions of Biologic
and Social and Physical Environmental Determinants
of Cancer Mortality
*Graham A. Colditz and Esther K. Wei* ...................................... 137

Ex. 7

Annu. Rev. Public Health 2012.33:393–408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

The Hurrider I Go the Behinder I Get: The Deteriorating
International Ranking of U.S. Health Status
*Stephen Bezruchka* .................................................................. 157

Unintentional Injuries: Magnitude, Prevention, and Control
*Sarah Stewart de Ramirez, Adnan A. Hyder, Hadley K. Herbert,
and Kent Stevens* ................................................................... 175

## Environmental and Occupational Health

Community-Based Approaches to Controlling Childhood Asthma
*Noreen M. Clark* .................................................................. 193

Future Challenges to Protecting Public Health from
Drinking-Water Contaminants
*Eileen A. Murphy, Gloria B. Post, Brian T. Buckley, Robert L. Lippincott,
and Mark G. Robson* .............................................................. 209

Speed Limits, Enforcement, and Health Consequences
*Rune Elvik* ....................................................................... 225

Toward a Systems Approach to Enteric Pathogen Transmission:
From Individual Independence to Community Interdependence
*Joseph N.S. Eisenberg, James Trostle, Reed J.D. Sorensen,
and Katherine F. Shields* .......................................................... 239

## Public Health Practice

Advertising of Prescription-Only Medicines to the Public:
Does Evidence of Benefit Counterbalance Harm?
*Barbara Mintzes* ................................................................. 259

Economic Evaluation of Pharmaco- and Behavioral Therapies
for Smoking Cessation: A Critical and Systematic Review
of Empirical Research
*Jennifer Prah Ruger and Christina M. Lazar* ..................................... 279

Policies for Healthier Communities: Historical, Legal, and Practical
Elements of the Obesity Prevention Movement
*Samantha K. Graff, Manel Kappagoda, Heather M. Wooten, Angela K. McGowan,
and Marice Ashe* ................................................................. 307

Public Health and the Epidemic of Incarceration
*Dora M. Dumont, Brad Brockmann, Samuel Dickman, Nicole Alexander,
and Josiah D. Rich* ............................................................... 325

Ex. 7

Annu. Rev. Public Health 2012.33:393-408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

Quitlines and Nicotine Replacement for Smoking Cessation:
Do We Need to Change Policy?
*John P. Pierce, Sharon E. Cummins, Martha M. White, Aimee Humphrey,
and Karen Messer* ................................................................ 341

Systems Science Methods in Public Health: Dynamics, Networks,
and Agents
*Douglas A. Luke and Katherine A. Stamatakis* ............................ 357

Health Inequalities: Trends, Progress, and Policy
*Sara N. Bleich, Marian P. Jarlenski, Caryn N. Bell, and Thomas A. LaVeist* ............ 7

## Social Environment and Behavior

Health Disparities Research in Global Perspective: New Insights
and New Directions
*Shiriki Kumanyika* ................................................................ 1

Health Inequalities: Trends, Progress, and Policy
*Sara N. Bleich, Marian P. Jarlenski, Caryn N. Bell, and Thomas A. LaVeist* ............ 7

Conceptual Approaches to the Study of Health Disparities
*Ana V. Diez Roux* ................................................................ 41

How Society Shapes the Health Gradient: Work-Related Health
Inequalities in a Comparative Perspective
*Christopher B. McLeod, Peter A. Hall, Arjumand Siddiqi, and Clyde Hertzman* ........ 59

Disparities in Infant Mortality and Effective, Equitable Care:
Are Infants Suffering from Benign Neglect?
*Diane L. Rowley and Vijaya Hogan* ........................................ 75

Suicide Mortality in the United States: The Importance of Attending
to Method in Understanding Population-Level Disparities in the
Burden of Suicide
*Matthew Miller, Deborah Azrael, and Catherine Barber* ................ 393

## Health Services

From Small Area Variations to Accountable Care Organizations:
How Health Services Research Can Inform Policy
*Harold S. Luft* ................................................................ 377

Suicide Mortality in the United States: The Importance of Attending
to Method in Understanding Population-Level Disparities in the
Burden of Suicide
*Matthew Miller, Deborah Azrael, and Catherine Barber* ................ 393

The Medicalization of Chronic Disease and Costs
  *Kenneth E. Thorpe and Meredith Philyaw* ................................................. 409

The Methods of Comparative Effectiveness Research
  *Harold C. Sox and Steven N. Goodman* ................................................. 425

Clinical Care and Health Disparities
  *B. Starfield, J. Gérvas, and D. Mangin* ................................................. 89

## Indexes

Cumulative Index of Contributing Authors, Volumes 24–33 ........................... 447

Cumulative Index of Chapter Titles, Volumes 24–33 ................................... 452

## Errata

An online log of corrections to *Annual Review of Public Health* articles may be found at http://publhealth.annualreviews.org/

Annu. Rev. Public Health 2012.33:393–408. Downloaded from www.annualreviews.org
Access provided by 38.88.13.122 on 04/05/19. For personal use only.

# Exhibit 8

Journal of Adolescent Health 65 (2019) 366–370



JOURNAL OF
ADOLESCENT
HEALTH

www.jahonline.org

Original article

# Type of Firearm Used in Suicides: Findings From 13 States in the National Violent Death Reporting System, 2005–2015



Thomas J. Hanlon [a], Catherine Barber, M.P.A. [a], Deborah Azrael, Ph.D. [a], and
Matthew Miller, M.D., M.P.H., Sc.D. [a,b,*]

[a] Harvard Injury Control Research Center, Harvard School of Public Health, Boston, Massachusetts
[b] Department of Health Sciences, Bouvé College of Health Sciences, Northeastern University, Boston, Massachusetts

Article history: Received November 27, 2018; Accepted March 25, 2019
Keywords: Firearms; Handguns; Suicide; Long guns

A B S T R A C T

**Purpose:** Although household firearm ownership has been consistently associated with increased suicide rates in the U.S., scant data speak to the type of gun used in U.S. suicides. We address this research gap using data from the National Violent Death Reporting System Restricted Access Data Set, 2005–2015, by describing the types of guns used in firearm suicides over time, by urban versus rural residence, for the population as a whole, and separately among adolescents, and by sex, race, and age.
**Methods:** The types of firearm used by 44,540 firearm suicide decedents in 13 states from 2005 to 2015 are based on individual-level data from the National Violent Death Reporting System and urban–rural classification schemes from the National Center for Health Statistics. Rates are calculated using population data from the National Center for Health Statistics' CDC WONDER online database.
**Results:** Between 2005 and 2015, suicide rates by handguns, but not long guns, increased markedly in both urban and rural counties. Among adolescents, handgun suicide rates doubled over the study period in both rural and urban areas; long gun suicide rates increased modestly. Although handguns were used in nearly three fourths of firearm suicides for the population as a whole, long gun use was relatively higher in rural counties and among adolescents. In rural counties, long guns were used in 51% of adolescent male suicides.
**Conclusions:** Suicide prevention efforts that advise gun-owning families to reduce access to household firearms should focus not only on handguns but also on long guns, especially in rural areas and among households with adolescents.

© 2019 Society for Adolescent Health and Medicine. All rights reserved.

IMPLICATIONS AND CONTRIBUTION

Handguns are used in nearly three fourths of firearm suicides, but long guns constitute two fifths of the guns used in suicides by adolescents and in rural areas. More than half of firearm suicides among rural adolescent males are with rifles or shotguns. Clinical and other interventions to reduce suicide should incorporate this information into efforts focused on reducing access to lethal means, especially in rural areas and among families of adolescents.

---

**Conflicts of interest:** The authors have no conflicts of interest to disclose.
**Disclaimer:** The findings and conclusions of this study are those of the authors alone and do not necessarily represent the views of the Centers for Disease Control and Prevention or of participating National Violent Death Reporting System states.
 * Address correspondence to: Matthew Miller, M.D., M.P.H., Sc.D., Department of Health Sciences, Bouvé College of Health Sciences, Northeastern University, Room 316 Robinson Hall, 360 Huntington Avenue, Boston, MA 02115-5000.
 E-mail address: ma.miller@neu.edu (M. Miller).

1054-139X/© 2019 Society for Adolescent Health and Medicine. All rights reserved.
https://doi.org/10.1016/j.jadohealth.2019.03.015

Household firearm ownership has been consistently associated with elevated suicide rates in the U.S. [1–15]. Medical associations and others involved in suicide prevention efforts, such as physicians and mental health practitioners, have limited data to draw from when advising gun owners whether suicide risk is chiefly related to handguns or also to long guns. One reason so little is known about the type of gun used in U.S.

suicides, overall and by specific subgroups, is that official mortality data (the National Vital Statistics System) list gun type as unspecified in nearly two thirds of all firearm suicides [16].

A relatively new data system, the Centers for Disease Control and Prevention's National Violent Death Reporting System (NVDRS), supplements death certificate data with additional information about suicide deaths gathered from police and medical examiner/coroner reports. As such, NVDRS categorizes gun type far more comprehensively than does the National Vital Statistics System and has done so for over a dozen states since 2005. A 2002 pilot study for the NVDRS, for example, found that gun type was reported in all but 1 of 145 youth firearm suicides, and that long guns were used in 48% of firearm suicides under age 18 years [17]. A recent study using the NVDRS found that long guns were used in just under 50% of firearm suicides among those under age 21 years [18], consistent with the few prior peer-reviewed studies of youth suicide using local data sources [19,20]. For example, a study of 59 youth aged <19 y who intentionally shot themselves with a firearm in Washington State between 1990 and 1995 [19] found that slightly more than half of the guns used in self-inflicted deaths and injuries were handguns (n = 33), about one-third were rifles (n = 18), and 9% (n = 5) were shotguns. By contrast, the earliest study to examine gun type in firearm suicide found that between 1983 and 1985 in Sacramento County, CA, among 235 firearm suicides, 88% of all firearms used were handguns. The authors note that the high proportion of handguns was perhaps due to the largely urban population of Sacramento County [21].

The present study uses data on over 44,000 firearm suicides from the NVDRS Restricted Access Data Set, 2005–2015. The size of the data set allows us to extend prior work on the types of guns used in suicides by examining patterns of gun type over time and urbanization, sex, race, and age group.

## Methods

This study examined individual-level data from the Centers for Disease Control and Prevention's NVDRS Restricted Access Data Set. The NVDRS is a state-based surveillance system now in 40 states providing comprehensive information on deaths classified as suicide, homicide, legal intervention, unintentional firearm injury, or injury of unknown intent. The NVDRS gathers information from sources including death certificates, coroner/medical examiner reports, and police reports. The Division of Violence Prevention at the Center for Disease Control and Prevention has provided a detailed description of the NVDRS [22].

Sixteen states provided data to NVDRS throughout the period of 2005–2015 (Alaska, Colorado, Georgia, Kentucky, Maryland, Massachusetts, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Rhode Island, South Carolina, Utah, Virginia, and Wisconsin). Three of these states—Georgia, Kentucky, and New Jersey—were excluded from this study, as the gun type used in firearm suicides was unknown in 22.5%, 36.5%, and 24.3% of incidents, respectively. We selected all firearms deaths that were coded as suicides (n = 45,811) in the remaining 13 states. Of these, a total of 3.6% (n = 1,645) were missing gun type information or coded as "unknown" or "other" for firearm type in the "firearm type" variable. However, of these cases, there were 374 cases for which another variable, the ICD-10 "Underlying Cause of Death" variable was coded either X72 (intentional self-harm by handgun) or X73 (intentional self-harm by rifle, shotgun, or larger firearm). These 374 cases were assigned to the handgun or

long gun category, as appropriate. As such, our data set of "known gun type" suicides included 44,540 suicide cases.

Each incident was classified into one of six urbanization categories according to the National Center for Health Statistics' Urban-Rural Classification Scheme for Counties. We collapsed the first four categories—large central metro, large fringe metro, medium metro, and small metro—into one urban category, and the remaining two—micropolitan and noncore—into one rural category. Average annual rates per 100,000 population (by age, sex, race, and rurality) were calculated using population data accessed from CDC Wonder [16]. Analyses were performed in 2018. The Harvard School of Public Health's Institutional Review Board determined that the study was exempt from human subject review.

## Results

As summarized in Table 1, among the 44,540 firearm suicides in our analytic data set, 73% were by handguns, and 27% by long guns (44% rifles and 56% shotguns). Handguns were used in most suicides in each subcategory except American Indian/Alaska Natives and rural adolescent males (not shown). Long gun use was relatively higher in rural settings compared with urban settings and among adolescents compared with adults. Females, African American/Blacks, and Asian/Pacific Islander were the groups least likely to use a long gun, with 87%, 84%, and 86% of decedents, respectively, having used a handgun.

The rate of handgun suicide—which was highest in rural counties—increased steadily from 2005 to 2015 in both urban and rural counties, for the population as a whole and among

**Table 1**
Gun type used in firearm suicides by urbanization of victim's county of residence, sex, race, and age group, 2005–2015, 13 states

|  | Handgun | | | Long gun | | |
|---|---|---|---|---|---|---|
|  | N | Rate/ 100,000 | Row % | N | Rate/ 100,000 | Row % |
| Total[a] | 32,452 | 5.0 | 73 | 12,088 | 1.9 | 27 |
| Type of county of residence |  |  |  |  |  |  |
| Large metro[b] | 4,169 | 4.2 | 81 | 1,008 | 1.0 | 19 |
| Large fringe metro[b] | 7,726 | 3.6 | 76 | 2,500 | 1.2 | 24 |
| Medium metro[b] | 9,666 | 5.7 | 75 | 3,219 | 1.9 | 25 |
| Small metro[b] | 3,631 | 5.6 | 71 | 1,514 | 2.3 | 29 |
| Micropolitan[c] | 4,200 | 6.7 | 69 | 1,906 | 3.0 | 31 |
| Noncore[c] | 3,004 | 7.0 | 61 | 1,919 | 4.4 | 39 |
| Sex |  |  |  |  |  |  |
| Male | 27,243 | 8.5 | 71 | 11,338 | 3.5 | 29 |
| Female | 5,209 | 1.6 | 87 | 750 | .2 | 13 |
| Age group (y) |  |  |  |  |  |  |
| <18 | 671 | .4[d] | 61 | 421 | .3[d] | 39 |
| 18–24 | 2,916 | 4.5 | 66 | 1,479 | 2.3 | 34 |
| 25–44 | 9,492 | 5.4 | 72 | 3,671 | 2.1 | 28 |
| 45–64 | 11,946 | 7.0 | 73 | 4,369 | 2.6 | 27 |
| 65+ | 7,421 | 8.7 | 78 | 2,146 | 2.5 | 22 |
| Race |  |  |  |  |  |  |
| White | 29,089 | 5.6 | 72 | 11,074 | 2.1 | 28 |
| Black/African American | 2,052 | 2.1 | 84 | 380 | .4 | 16 |
| American Indian/Alaska Native | 304 | 2.1 | 47 | 345 | 2.4 | 53 |
| Asian/Pacific Islander | 266 | 1.0 | 86 | 45 | .2 | 14 |

[a] Type of county was unknown in 78 cases, age unknown in eight cases, and decedents were not listed as one of the above four races in 1,026 cases.
[b] Suicides classified as urban.
[c] Suicides classified as rural.
[d] Rate calculated using 0- to 17-year-old population.

adolescents (Figure 1A,B). Among adolescents (Figure 1B), handgun suicide rates in rural and urban areas doubled from the beginning of the study period (2005—2007), when rates of handgun suicide were .67 per 100,000 in urban areas and .97 per 100,000 in rural areas, to the end of the study period (2014—2015), by which time rates of handgun suicide in urban and rural areas had increased to 1.36 and 2.09 per 100,000, respectively. Over the corresponding period, rates of adolescent suicide by long guns increased modestly in urban areas, from .42 to .57 per 100,000, and in rural areas, from 1.03 to 1.48 per 100,000. Over the same period, rates of long gun suicide for the population as a whole changed little (Figure 1A).

The firearm suicide rate (handgun and long gun rates combined) among males aged 10—17 years was substantially higher among rural versus urban adolescents (4.6 and 2.2 per 100,000, respectively; Figure 2). The handgun suicide rate among rural male adolescents was 1.6 times that of their urban counterparts, whereas the long gun suicide rate was 2.6 times higher. A total of 51% of rural male adolescent firearm suicides were by long guns. Even by the end of the study period (2014—2015), 44% of rural male adolescent firearm suicides involved long guns (not

shown). Gun type did not vary greatly between rural and urban counties among adolescent female decedents.

Among males, long guns as a proportion of overall firearm suicides were highest among the young (Figure 3). Overall, long guns accounted for 39% of firearm suicides among 10- to 17-year-old men (in rural areas, half used long guns; in urban areas, closer to one-third). Among young adult men, the proportion of long gun suicides was 47% among 19-year-olds, 43% among 20-year-olds, 34% among 21-year-olds, and 29% among 22-year-olds. After age 22 years, long gun use among men did not exceed 35% for any single year of age.

In each of the 13 states, across all ages, a majority of firearm suicides involved handguns, ranging from 57% to 78%. Among youth aged 10—17 years, however, handguns were used in as many as 82% of firearm suicides (in Massachusetts) to as few as 31% (in Wisconsin; Table A1, Appendix).

### Discussion

Between 2005 and 2015, among our NVDRS states, the rate of suicide by handguns increased substantially in both rural and



**Figure 1.** (A) Rate of handgun and long gun suicide by year and urban—rural status among all ages, 2005—2015, 13 NVDRS states. (B) Rate of handgun and long gun suicide by year and urban—rural status among adolescents aged 10—17 years, 2005—2015, 13 NVDRS states. NVDRS = National Violent Death Reporting System.



**Figure 2.** Rate of handgun and long gun suicides among 10- to 17-year-olds by sex and urban–rural status, 2005—2015, 13 NVDRS states.

urban counties, with rates doubling among adolescents. These findings are consistent with ongoing changes in the composition of the U.S. gun stock. For example, data from a recent study found that although household gun ownership rates in the U.S. have remained relatively stable over the past two decades [23,24], almost four of five gun owners currently own at least one handgun, and millions of guns, the large majority of which are handguns, have been added to the U.S. gun stock over the past several decades [24]. That study also found that handguns, which are more often owned for protection than are long guns [24], are far more likely than long guns to be stored loaded and unlocked [25,26].

Our finding that handguns predominate among firearm suicides as a whole, but that long guns play a prominent role in adolescent and young adult male suicides, particularly in rural areas, reflects findings from two prior small studies that gathered information about gun type among firearm suicide decedents [19,20]. Because hunting and sport shooting with rifles and shotguns are often traditional parts of young rural males' upbringing, ready access to these guns may explain the disproportionate contribution long guns make to both the distribution of gun types we observed in rural compared with urban areas and the higher suicide rates among rural versus urban male adolescents reported in prior studies [19,20].

The role of long guns in adolescent suicides has ramifications for gun safety messages to teenagers' parents, particularly in rural areas. Pediatricians, primary care providers, mental health clinicians, hunting safety educators, and firearm safety instructors should emphasize that when a family member is at risk for suicide, preventing their access to *all* household firearms—both handguns and long guns—is important, the latter particularly in rural areas. The importance of delivering this message about long guns to parents is underscored by the observation that a majority of guns used in suicides by youth belong to their parents [19,27], and by our finding (Figure 3) that among young adult males, the proportion of long gun suicides was approximately 40%—45% among suicide decedents under age 21 years and even higher for youth living in rural areas.

Our findings are based on the largest data set that includes information about the type of gun used in suicides ever analyzed. Nevertheless, interpreting our results should bear in mind the following limitations. First, our findings come from only 13 states, are limited to descriptive statistics of decedents only (and therefore should not be construed as predictors of method choice), and may not be representative of the nation as a whole. Second, although we examine patterns of gun type over time and by urbanization, sex, race, and age group, we do not describe how gun type varies by other characteristics collected by NVDRS, such as mental health diagnoses, mental health treatment, or evidence of a recent crisis. Third, we classify whether decedents lived in a rural or urban area based on their county of residence. Counties sometimes include both rural and urban areas, so in some cases, a decedent's county classification will not describe the urban or rural character of their specific city or town. Notwithstanding these limitations, clear strengths of NVDRS data are that firearm type is reported or can be easily determined in 97% of suicides, and that these data can be used to monitor trends over time and across jurisdictions.

Despite these limitations, findings from our study draw attention not only to recent increases in suicide rates by handguns but also to the substantial role that long guns continue to play in U.S. suicide, particularly among rural male youth. Our results underscore the importance of including both handguns and long guns in suicide prevention discussions aimed at reducing access to highly lethal suicide methods and help identify groups, such as hunter safety organizations, that might otherwise be overlooked as partners in suicide prevention efforts.



**Figure 3.** Long gun suicides as a percentage of total firearm suicides among male decedents by age and urban–rural status, 2005—2015, 13 NVDRS states.

## Acknowledgments

The authors thank the state and federal National Violent Death Reporting System offices for collecting and providing the data.

## Funding Sources

Support for this study was provided by the Joyce Foundation. The Joyce Foundation was not involved in designing or conducting the study, analyzing the data, creating the article, or the decision to submit the report for publication.

## Supplementary Data

Supplementary data related to this article can be found at https://doi.org/10.1016/j.jadohealth.2019.03.015.

## References

[1] Brent DA. Firearms and suicide. Ann N Y Acad Sci 2001;932:225–40.

[2] Miller M, Hemenway D. The relationship between firearms and suicide: A review of the literature. Aggress Violent Behav 1999;4:59–75.

[3] Miller M, Azrael D, Hemenway D. Household firearm ownership and suicide rates in the United States. Epidemiology 2002;13:517–24.

[4] Miller M, Hemenway D, Azrael D. Firearms and suicide in the northeast. J Trauma Inj Infect Crit Care 2004;57:626–32.

[5] Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. N Engl J Med 1992;327:467–72.

[6] Brent DA, Perper J, Moritz G, et al. Suicide in adolescents with no apparent psychopathology. J Am Acad Child Adolesc Psychiatry 1993;32:494–500.

[7] Brent DA, Perper JA, Allman CJ, et al. The presence and accessibility of firearms in the homes of adolescent suicides: A case-control study. JAMA 1991;266:2989–95.

[8] Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: A systematic review and meta-analysis. Ann Intern Med 2014;160:101–10.

[9] Brent DA, Perper JA, Moritz G, et al. Firearms and adolescent suicide: A community case-control study. Am J Dis Child 1993;147:1066–71.

[10] Conwell Y, Duberstein PR, Connor K, et al. Access to firearms and risk for suicide in middle-aged and older adults. Am J Geriatr Psychiatry 2002;10: 407–16.

[11] Bailey JE, Kellermann AL, Somes GW, et al. Risk factors for violent death of women in the home. Arch Intern Med 1997;157:777–82.

[12] Wiebe DJ. Homicide and suicide risks associated with firearms in the home: A national case-control study. Ann Emerg Med 2003;41:771–82.

[13] Wintemute GJ, Parham CA, Beaumont JJ, et al. Mortality among recent purchasers of handguns. N Engl J Med 1999;341:1583–9.

[14] Dahlberg LL, Ikeda RM, Kresnow MJ. Guns in the home and risk of a violent death in the home: Findings from a national study. Am J Epidemiol 2004; 160:929–36.

[15] Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. J Trauma Acute Care Surg 2002;52:267–75.

[16] Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying cause of death 1999-2016 on CDC WONDER online database. 2017. Available at: http://wonder.cdc.gov/ucd-icd10.html. Accessed June 10, 2018.

[17] Suicide Prevention Resource Center, Harvard Injury Control Research Center. Youth suicide findings from a pilot for the National Violent Death Reporting System. Waltham, MA: Suicide Prevention Resource Center; 2007. Available at: https://www.sprc.org/sites/default/files/migrate/library/YouthSuicideFactSheet.pdf. Accessed June 10, 2018.

[18] Choi NG, DiNitto DM, Marti CN. Youth firearm suicide: Precipitating/risk factors and gun access. Child Youth Serv Rev 2017;83:9–16.

[19] Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents: The source of the firearm. Arch Pediatr Adolesc Med 1999;153:875–8.

[20] Wright MA, Wintemute GJ, Claire BE. Gun suicide by young people in California: Descriptive epidemiology and gun ownership. J Adolesc Health 2008;43:619–22.

[21] Wintemute GJ, Teret SP, KRAus JF, Wright MW. The choice of weapons in firearm suicides. Am J Public Health 1988;78:824–6.

[22] Karch DL, Logan J, McDaniel D, et al. Surveillance for violent deaths—national violent death reporting system, 16 states, 2009. MMWR Morb Mortal Wkly Rep 2012;61:1–43.

[23] Smith TW, Son J. Trends in gun ownership, 1972–2014. Chicago, IL. 2015. Available at: http://www.norc.org/PDFs/GSS%20Reports/GSS_Trends%20in %20Gun%20Ownership_US_1972-2014.pdf. Accessed July 22, 2018.

[24] Azrael D, Hepburn L, Hemenway D, Miller M. The stock and flow of US firearms: Results from the 2015 national firearms survey. RSF 2017;3: 38–57.

[25] Azrael D, Cohen J, Salhi C, Miller M. Firearm storage in gun-owning households with children: Results of a 2015 national survey. J Urban Health 2018;95:295–304.

[26] Crifasi CK, Doucette ML, McGinty EE, et al. Storage practices of US gun owners in 2016. Am J Public Health 2018;108:532–7.

[27] Johnson RM, Barber C, Azrael D, et al. Who are the owners of firearms used in adolescent suicides? Suicide Life Threat Behav 2010;40:609–11.

# Exhibit 9



Editor's choice
Scan to access more
free content

# Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership

Katherine A Vittes, Jon S Vernick, Daniel W Webster

Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland, USA

**Correspondence to**
Dr Katherine A Vittes, Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 624 North Broadway, Baltimore, MD 21205, USA; kvittes@jhsph.edu

Accepted 7 March 2012
Published Online First
23 June 2012

## ABSTRACT

**Background** Gun possession by high-risk individuals presents a serious threat to public safety. U.S. federal law establishes minimum criteria for legal purchase and possession of firearms; many states have laws disqualifying additional categories for illegal possession.
**Methods** We used data from a national survey of state prison inmates to calculate: 1) the proportion of offenders, incarcerated for crimes committed with firearms in 13 states with the least restrictive firearm purchase and possession laws, who would have been prohibited if their states had stricter gun laws; and 2) the source of gun acquisition for offenders who were and were not legally permitted to purchase and possess firearms.
**Results** Nearly three of ten gun offenders (73 of 253 or 28.9%) were legal gun possessors but would have been prohibited from purchasing or possessing firearms when committing their most recent offense if their states had stricter prohibitions. Offenders who were already prohibited under current law acquired their gun from a licensed dealer, where a background check is required, five times less often than offenders who were not prohibited (3.9% vs. 19.9%; $\chi^2=13.31$; $p\leq0.001$). Nearly all (96.1%) offenders who were legally prohibited, acquired their gun from a supplier not required to conduct a background check.
**Conclusions** Stricter gun ownership laws would have made firearm possession illegal for many state prison inmates who used a gun to commit a crime. Requiring all gun sales to be subject to a background check would make it more difficult for these offenders to obtain guns.

## INTRODUCTION

Gun violence has long been one of the most significant public safety and social problems in the USA. In the USA, in 2008, gun violence resulted in 12 179 homicides and an estimated 56 626 assaultive injuries serious enough to warrant a hospital emergency room visit.[1] Among high-income countries, the USA is unique in its extraordinarily high rate of homicides. This disparity is most striking for homicides committed with firearms where the US rate is 20 times higher than other high-income countries.[2]

Despite the magnitude of the problem, US gun policy rarely considers appropriate criteria for disqualifying someone from lawfully possessing a firearm. Federal law disqualifies certain groups of high-risk individuals from owning guns, including felons, fugitives, unlawful users of or those addicted to controlled substances, those who have been 'adjudicated as a mental defective' or committed to a mental institution, individuals who have been dishonourably discharged from the armed forces, persons subject to certain domestic violence restraining orders, persons less than the age of 18 years (for handguns) and domestic violence misdemeanants. Federal law does not set a minimum age requirement for the legal possession of long guns (ie, rifles and shotguns).[3]

Although the federal firearm prohibitions apply minimum standards for all US states, many states have enacted broader disqualifications for firearm possession including: a minimum age of 21 for all guns; convictions for some misdemeanour crimes involving violence, firearms or drugs; multiple convictions for alcohol-related offences; or convictions for serious crimes committed as a juvenile.[4]

Research supports the underlying premise of laws that widen exclusionary criteria for firearm possession: that some groups have higher rates of criminal offending than do those without a criminal history or other indicia of risk.[5–9] For example, Wintemute and colleagues found that individuals denied legal handgun purchase, as a result of a new California law expanding firearm prohibitions to include misdemeanants convicted of crimes of violence, were less likely to commit a new crime of violence than were demographically-matched Californian misdemeanants who had been approved for handgun sales during the years just prior to the new restrictions.[9] A study of homicide offenders in Illinois found that 42% would have been prohibited from possessing firearms as a result of a prior felony conviction; however, convictions for misdemeanours as an adult or more serious crimes as a juvenile were not reported.[6]

Under federal law, persons buying guns from licensed gun dealers must undergo a criminal history background check.[10] But federal law and the law of most states do not require firearm sellers who are not licensed gun dealers to verify that purchasers of firearms are legally qualified to possess a firearm such as through a background check.[4] Understanding how those with and without a criminal history acquire guns can also inform policies intended to keep guns from prohibited persons.

Prior research on firearm acquisition suggests that incarcerated adults often obtain their guns from casual sources such as from friends and family members, and 'off the street.'[11–13] To our knowledge, whether and to what extent the source varies based on the legal status of the purchaser has not been investigated.

Therefore, the goals of the current study are to: (1) identify the proportion of state prison inmates

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on 15 April 2019 by guest. Protected by copyright.

Ex. 9
Page 92

incarcerated for gun-related offences in states with the least strict standards for firearm purchase and possession who would have been prohibited from possessing firearms if laws in their states had included additional exclusion criteria and (2) describe how these inmates acquired their firearms.

## METHODS
### Data
This study used data from the most recent (2004) Survey of Inmates in State Correctional Facilities (SISCF), a nationally-representative survey of state prison inmates administered by the Bureau of the Census for the US Department of Justice.[14] The 2004 SISCF consisted of computer-assisted personal interviews conducted between October 2003 and May 2004. Inmates were asked about a broad range of topics including: demographic characteristics; offences for which they were currently serving time; prior criminal history; gun possession and use; prior drug and alcohol use and treatment; and physical and mental health status. In the 2004 survey, 14 499 inmates were interviewed. Of those eligible to participate in the study, 89.1% participated.

Additional information about data collection and analysis methodology for the SISCF is available from the University of Michigan's Inter-university Consortium for Political and Social Research.[15] Prior research using data from the SISCF include studies on incarcerated women, veterans and parents.[16–18] No reported studies have used SISCF data on inmates who used firearms in their most recent crimes.

### Study sample
To focus on the potential effects of broadening state laws regarding firearm restrictions, we limited our analysis to offenders currently serving time for an offence committed with a firearm in states that, as of 2004, did *not* have laws prohibiting persons in the following five groups from purchasing or possessing a firearm: (1) persons less than 21 years of age; (2) persons convicted of a serious juvenile offence; (3) violent misdemeanants; (4) drug misusers; and (5) alcohol abusers. To identify states meeting these criteria, we consulted the Bureau of Justice Statistics 2004 Survey of State Procedures Related to Firearm Sales,[19] supplemented by legal research to confirm some state laws.

Because domestic violence misdemeanants are already prohibited from purchasing or possessing firearms under federal law,[20–22] we included states with laws that prohibited domestic violence misdemeanants if the states did not also prohibit other violent misdemeanants from purchasing or possessing firearms. In addition, although federal law restricts firearm purchase or possession for drug misusers, the law's definition of a drug misuser does not provide objective criteria that can be implemented via a background check, limiting its practical use.[23] We excluded states with separate legal restrictions on possession of firearms by those convicted of serious offences, not technically classified as felonies, when committed by a juvenile.

Nine states—Arkansas, Idaho, Louisiana, Michigan, Mississippi, Montana, New Hampshire, Vermont and Wyoming—lacked all five types of expanded firearm disqualifications. Four additional states—Georgia, Maine, New Mexico and Wisconsin—lacked these expanded disqualifications with some exceptions. For example, New Mexico had a minimum age law stating that handgun possession is unlawful by persons <19-years-old[24] and Wisconsin restricted individuals convicted of a felony as a juvenile only if the offence occurred on or after 21 April 1994.[25] We excluded a total of 12 cases meeting these exceptions, because they were already prohibited from firearm

purchase and possession under state law. The final sample consisted of 13 states, though there were no inmates meeting our case definition in two states (New Hampshire, Wyoming; see table 1).

### Measures
To determine whether offenders had a firearm while committing the crime for which they were currently incarcerated, SISCF interviewers were asked, 'Did you use, carry or possess a weapon when the (…offense…) occurred?' If the answer was 'yes,' the interviewer asked, 'What kind of weapon was it?' Offenders who said they used a firearm were included in our analyses. Offenders who reported using a firearm in their current crime were asked follow-up questions, including questions about the type of gun(s) (eg, handgun, shotgun, rifle), how and where they obtained the gun, whether they fired it, and their reasons for having it.

SISCF interviewers also asked the offenders a series of questions about their prior arrests and convictions leading to probation or incarceration. Those who had been convicted and sentenced to probation or incarceration were asked about the type of offence, length of sentence, and whether they were sentenced as a juvenile or as an adult for up to 10 prior probations and 10 prior incarcerations. Offence information for juvenile convictions leading to probation and no incarceration was not collected in the SISCF.

To examine the potential for current and expanded disqualifications to curtail gun crime, we categorised offenders into the following groups based on their prior criminal convictions: (1) those who would have no firearm disqualification even under stricter state laws (described below); (2) those who were disqualified under current federal law; and (3) those who were legal firearm possessors under current federal law, but who would have been prohibited in states with stricter standards.

We further categorised offenders in the third group—those who might be impacted if the laws in their states were changed—based on whether they fell into any of the following categories: (1) age 18–20 years at incarceration for their current offence if that offence involved a handgun; (2) less than age 21 years at incarceration for their current offence if that offence involved a long gun; (3) committed a prior serious crime as a juvenile (<18-years-old); (4) conviction for a violent or firearms-related misdemeanour; (5) convictions for *two or more* drug-related misdemeanours; and (6) convictions for *two or more* alcohol-related misdemeanours. These laws were chosen because each is in effect in at least some states.[19] Violent and firearm-related misdemeanours included convictions for a simple assault or a weapons offence. Drug-related misdemeanours included convictions for driving under the influence of drugs, possession or use of marijuana and unspecified drug-related offences (but did not include drug-related offences involving heroin, powder cocaine or crack cocaine which are generally felonies). Alcohol-related misdemeanours included DUI/DWI convictions or convictions for public drunkenness.

### Analysis
We first calculated the proportion of offenders who would have been legally prohibited from purchasing or possessing firearms if their states had a variety of stricter laws. We then examined the method and source of firearm acquisition for offenders and calculated $\chi^2$ statistics to identify any significant differences between offenders who were currently prohibited versus offenders who were not prohibited from purchasing and possessing firearms.

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on 15 April 2019 by guest. Protected by copyright.

**Table 1** Demographic and offence characteristics of state prison inmates incarcerated for an offence committed with a firearm in 13 states (n=253)

| | n (%) |
|---|---|
| **Demographic characteristics** | |
| **Sex** | |
| Male | 234 (92.5) |
| Female | 19 (7.5) |
| **Age when sentenced for current offence (years)** | |
| 14–17 | 48 (19.0) |
| 18–20 | 58 (22.9) |
| 21–24 | 46 (18.2) |
| 25–29 | 35 (13.8) |
| 30 and older | 66 (26.1) |
| **Race/ethnicity** | |
| Non-Hispanic Black | 169 (66.8) |
| Non-Hispanic White | 63 (24.9) |
| Hispanic | 9 (3.6) |
| Other | 12 (4.7) |
| **Education (n=251)** | |
| Less than high school | 185 (73.7) |
| High School or equivalent | 41 (16.3) |
| More than high School | 25 (10.0) |
| **Marital status (n=252)** | |
| Never married | 177 (70.2) |
| Divorced/separated/widowed | 48 (19.1) |
| Married | 27 (10.7) |
| **Employed in the month before incarceration (n=246)** | |
| Full-time | 129 (52.4) |
| Part-time/occasional | 24 (9.8) |
| Unemployed: looking for work | 32 (13.0) |
| Unemployed: not looking for work | 61 (24.8) |
| **State of current offense** | |
| Arkansas | 21 (8.3) |
| Georgia | 64 (25.3) |
| Idaho | 5 (2.0) |
| Louisiana | 39 (15.4) |
| Maine | 1 (0.4) |
| Michigan | 67 (26.5) |
| Mississippi | 27 (10.7) |
| Montana | 5 (2.0) |
| New Hampshire | 0 (0) |
| New Mexico | 13 (5.1) |
| Vermont | 1 (0.4) |
| Wisconsin | 10 (4.0) |
| Wyoming | 0 (0) |
| **Current offences* †** | |
| Violent offences | |
| Murder/voluntary non-vehicular manslaughter | 86 (34.0) |
| Robbery | 75 (29.6) |
| Aggravated assault/assault on police officer | 32 (12.6) |
| Other violent acts | 6 (2.4) |
| Property offences | |
| Burglary | 6 (2.4) |
| Other property offences | 3 (1.2) |
| Drug offences | |
| Trafficking | 15 (5.9) |
| Possession or use | 7 (2.8) |
| Public order offences | |
| Weapons offences | 19 (7.5) |
| Parole/probation violation or contempt | 2 (0.8) |
| Other public order offences | 2 (0.8) |

Continued

**Table 1** Continued

| | n (%) |
|---|---|
| **Type of gun used in current offense‡** | |
| Handgun | 204 (80.6) |
| Rifle | 30 (11.9) |
| Shotgun | 25 (9.9) |
| Other firearm | 4 (1.6) |

*For inmates currently incarcerated for more than one offence, only the most serious is included here.
†All offence categories include attempted and completed offences.
‡Percentages do not sum to 100 because 10 respondents used more than one type of gun in their current offence.

## RESULTS

The overall SISCF sample of 50 states included 14 499 inmates, 2046 of whom used a gun in the crime for which they were incarcerated. The distribution of the total sample of gun users was similar to the 13 states in our sample with regard to crime type, type of gun, sex, education, marital status and employment status. Our 13-state sample had a somewhat higher proportion of younger (age 14–17 years) and non-Hispanic Black offenders than for all 50 states.

### Sample characteristics

Our initial sample consisted of 281 offenders who were incarcerated for offences involving firearms from the 13 states with the most lenient firearm restrictions (no stricter than existing federal law). Due to missing or insufficiently specific information about the nature of the prior convictions, 28 offenders were excluded from the analyses for a final sample of 253. The majority of the respondents came from Georgia, Louisiana, Michigan, Mississippi and New Mexico. Some of the more populous US states (eg, California, New York, Texas) were excluded from our analysis because they did not meet our legal inclusion criteria.

Three-quarters (n=190) of offenders committed their current offence (ie, the offence for which they were serving time when the interview occurred) in their state of residence. All offenders were sentenced as adults and age at sentencing for the current incarceration ranged from 14 to 55 years with a mean of 25 years. A majority of the offenders were male subjects, non-Hispanic Black, had not completed high school, were employed in the month before they were incarcerated and had never been married (table 1).

### Current offences

More than three-quarters (n=199) of the offenders were serving time for a violent offence at the time of the SISCF interview. In all, 43% of these violent offenders were incarcerated for an attempted or completed murder, or voluntary non-vehicular manslaughter (table 1). The remainder of the sample was incarcerated for property, drug or public order offences (all involving firearms).

Although fewer than half (44.3%) of the offenders reported that they fired a gun while committing the current crime, most (83.4%) identified one or more other or additional reasons for possessing the gun, including using the gun to scare the victim(s) (42.7%), or for self-protection (32.4%).

### Legal status for firearm possession prior to firearm offence leading to current incarceration

Inmates were categorised into three mutually-exclusive groups based on their actual or potential legal status for firearm possession (table 2). In all, 31% (n=78) of offenders would not

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on 15 April 2019 by guest. Protected by copyright.

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on 15 April 2019 by guest. Protected by copyright.

**Table 2** Firearm prohibition status of state prison inmates incarcerated for offence committed with firearm in 13 states (n=253)

|  | n (%) |
|---|---|
| May possess even under stricter standards | 78 (30.8) |
|   No prior arrests or convictions and offender age ≥21 years | 28 (11.1) |
|   Prior arrests but no convictions and offender age ≥21 years | 34 (13.4) |
|   Prior non-disqualifying misdemeanour convictions, and no convictions for serious juvenile offence, and offender age ≥21 years | 16 (6.3) |
| Prohibited under current state or federal laws | 102 (40.3) |
|   Prior adult (≥18 years) felony conviction(s) or dishonourable discharge | 69 (27.3) |
|   Offender age <18 years at sentencing and used handgun in current offence | 33 (13.0) |
| Would be prohibited only under stricter standards* | 73 (28.9) |
|   Handgun offender age 18–20 years at sentencing for current offence | 43 (17.0) |
|   Long gun offender age 1–20 years at sentencing for current offence | 17 (6.7) |
|   Prior conviction for serious juvenile offence | 13 (5.1) |
|   Prior conviction for firearms or violent misdemeanour | 9 (3.6) |
|   Prior conviction for 2+ drug misdemeanours | 2 (0.8) |
|   Prior conviction for 2+ alcohol misdemeanours | 1 (0.4) |

*These subcategories are *not* mutually exclusive.

have been disqualified from firearm possession based on prior convictions or minimum age even if their states had laws prohibiting the legal purchase and possession of firearms by persons <21-years-old, persons with a conviction for a serious juvenile offence, violent misdemeanants, and drug and alcohol misusers.

In the second group, 40% (n=102) of offenders were already prohibited from legal firearm possession under current state or federal law and, thus, would be unaffected by the implementation of the stricter firearm prohibition standards we considered.

The third group consists of 73 offenders (28.9%) who were not prohibited under current standards, but would have been prohibited if their states adopted stricter standards similar to those already in place in a number of other states. Most of this group (58.9% and 17.0% of all firearm offenders, n=43) would have been prohibited if their state had a law that raised the minimum age to possess a handgun to 21 years. An additional 17 offenders would have been prohibited if their state passed a law restricting possession to *all* firearms, including long-guns, for persons <21 years. If persons convicted of a serious crime as a juvenile were to become prohibited, it would have been illegal for 13 offenders (5.1% of all firearm offenders) to purchase or possess a firearm. Nine offenders (3.6% of all firearm offenders) would also have been disqualified if their states had prohibited persons convicted of a violent or firearms-related misdemeanour from purchasing or possessing a firearm. Two offenders would have been prohibited if states were to restrict firearm purchase and possession for those with two or more drug related misdemeanours and one offender would be prohibited if the same restriction were applied to alcohol-related misdemeanours.

### How and where criminals obtained their firearms

About eight of every 10 offenders reported using a handgun (vs rifle or shotgun) in the offence for which they were serving time. Half of the offenders reported that they had bought the gun used in the crime (table 3). The second most common method of gun acquisition—cited by fewer than one in five offenders—was borrowing or holding the gun for someone. Regardless of how they obtained the gun, friends and family members were the most common source (34.0%), followed by drug dealers or other black market sources (30.4%). Only 13.4% got the gun directly from a gun store or pawnshop where federal law requires

prospective firearm purchasers to pass a background check. It is important to recognise, however, that table 3 represents only the most recent acquisition of a specific gun: it does not indicate whether the gun *ever* passed through a particular distribution channel (eg, a gun show).

There were few differences between the groups of offenders with regard to how and where they got the gun used in their most recent offence. More than half (55.6%) of offenders for whom firearm purchase and possession was legal under current standards (adding the 45 inmates who would be legal even under stricter standards with the 39 inmates who would be prohibited only under stricter standards) bought or traded for the gun used in their most recent crime compared with two-fifths (39.2%) of offenders who were prohibited under current state or federal law ($\chi^2$=6.56; p≤0.01). Offenders who were prohibited from purchasing and possessing a gun under current law acquired their gun from a licensed dealer, where a background check would be required, five times less often than offenders who were not prohibited (3.9% vs 19.9%; $\chi^2$=13.31; p≤0.001). Similarly, nearly all (96.1%) offenders who were legally prohibited from possessing a firearm acquired their gun from a supplier not required to conduct a background check.

### DISCUSSION

Our findings indicate that 40% of offenders incarcerated for committing crimes with a gun in the 13 US states with the least strict standards for legal firearm purchase and possession were in possession of the gun illegally. If these states had adopted more restrictive standards like those in place in a number of other states, an additional 29% of the persons incarcerated for committing a crime with a firearm would have been legally prohibited from possessing a firearm at the time of their current offence. The vast majority of these individuals—nearly a quarter of the entire sample of firearm offenders—would have been prohibited if the minimum legal age for possessing any type of firearm was 21 years. An additional 9.9% would have been legally prohibited from firearm possession as a result of convictions for serious crimes as a juvenile or for misdemeanours involving violence, firearms, drugs or alcohol.

Nearly two in five offenders were <18-years-old at the time they were sentenced for the current offence; 41.9% were less than age 21 when sentenced. An even greater proportion would

**Table 3** Source of gun used in current offence by state prison inmates incarcerated for offence committed with firearm in 13 states, by firearm prohibition status*

| | Total (n=253) N (%) | Legal even under stricter standards (n=78) n (%) | Prohibited under current state or federal law (n=102) n (%) | Would be prohibited only under stricter standards (n=73) n (%) |
|---|---|---|---|---|
| **How gun was got** | | | | |
| Stole | 8 (3.2) | 0 (0) | 4 (3.9) | 4 (5.5) |
| Borrowed | 44 (17.4) | 12 (15.4) | 17 (16.7) | 15 (20.6) |
| Bought/traded | 124 (49.0) | 45 (57.7) | 40 (39.2) | 39 (53.4) |
| Given as gift | 21 (8.3) | 8 (10.3) | 9 (8.8) | 4 (5.5) |
| Other | 23 (9.1) | 4 (5.1) | 13 (12.8) | 6 (8.2) |
| Don't know (DK)/refused | 33 (13.0) | 9 (11.5) | 19 (18.6) | 5 (6.9) |
| **Where gun was got** | | | | |
| Gun store or pawnshop | 34 (13.4) | 24 (30.8) | 4 (3.9) | 6 (8.2) |
| Gun show | 1 (0.4) | 0 (0) | 0 (0) | 1 (1.4) |
| Friend/family member | 86 (34.0) | 25 (32.1) | 35 (34.3) | 26 (35.6) |
| Street/black market | 77 (30.4) | 14 (18.0) | 36 (35.3) | 27 (37.0) |
| Burglary | 1 (0.4) | 0 (0) | 1 (1.0) | 0 (0) |
| Other | 21 (8.3) | 6 (7.7) | 8 (7.8) | 7 (9.6) |
| DK/refused/skipped† | 33 (13.0) | 9 (11.5) | 18 (17.7) | 6 (8.2) |

*If inmate used more than one gun in current offence, response pertains to the most recently acquired gun.
†Respondents who refused to disclose how they got the gun were not subsequently asked where they got it.

have fallen into the <18 group if we had data on offenders' age at the time the offence occurred rather than age at incarceration. These findings underscore the importance of minimum-age restrictions for firearms possession and disqualifications for serious offences committed as juveniles, even if the duration of these disqualifications is limited.

It is also important to consider the political feasibility of any new restrictions on access to firearms. In a 1998 survey, a large majority of respondents—including the majority of gun owners—favoured laws that would restrict guns from various categories of misdemeanants including assault and battery without a lethal weapon or serious injury, driving under the influence of alcohol, and carrying a concealed weapon without a permit.[26] Although public support was strong for a variety of firearm laws, firearm restrictions based on criminal history may be among the most politically feasible.[23 27] Each firearm policy considered in this study is currently law in at least one state.

Although setting appropriate standards for legal firearm ownership is important, it is equally important to make sure that databases used to screen gun purchasers and ascertain legal status for gun possession are up-to-date so that prohibited individuals can be identified. For example, juvenile convictions must be recorded in an accessible database so that they are picked up in background checks in order for prohibitions for serious offences committed as a juvenile to be useful in restricting the legal purchase and possession of firearms in this high-risk group.

Relatively few offenders purchased their guns directly from licensed firearms dealers. Only 3.9% of individuals disqualified based on current federal or state prohibitions and 3.8% who were <21-years-old at the time of their incarceration obtained their gun from a licensed firearms dealer. Presumably most, if not all, of these prohibited individuals purchased their firearm prior to becoming a prohibited person. Among individuals who appeared to be legally qualified to purchase firearms, only one in five (19.9%) obtained their firearm directly from a licensed firearm dealer, perhaps to avoid having their firearms transactions recorded and therefore traceable to the purchaser. Given offenders' preferences for new firearms,[13 28] it is noteworthy how criminals avoid the regulated gun market of licensed sellers and prefer the largely unregulated market involving unlicensed sellers where new guns are harder to obtain. The lack of regulation of firearm sales by unlicensed sellers is likely to

significantly limit the government's ability to keep firearms from prohibited individuals.[28] Requiring all gun sales to be subject to a background check, and holding sellers accountable for failure to do so, are policies that could address this problem.[29]

To our knowledge, this is the first study to use data on gun offenders' age and criminal histories to examine the potential benefits of strengthening the criteria for legal firearm possession. Nonetheless, it is subject to several limitations. The data used in this analysis come from inmates' self-report. As such, they share the limitations inherent to all self-report data (eg, recall and social desirability bias). And although the data were drawn from a nationally-representative survey of state prison inmates, they are not necessarily representative of state prison populations. In addition, the 13 states in our sample may not have the same distribution of offenders as in all 50 states. For example, the five states with the most offenders in our sample may be more urban, on average, than the USA as a whole. We chose states for inclusion in the sample based on their laws in 2004, the year the SISCF survey took place. These laws may be different from the laws that were in effect at the time the offenders were convicted for their prior offences, though it is rare for laws prohibiting certain persons from owning guns, based on criminal history, to be repealed. Moreover, we were unable to determine whether the guns used in the current crimes were obtained in the state in which the crime was committed. This is particularly relevant for considering criteria for firearm purchase rather than possession.

The numbers of offenders with prior misdemeanour convictions are likely undercounted because we did not have status information about juveniles sentenced to probation nor did we have information about persons who were convicted but not sentenced to probation or incarceration (eg, those sentenced only to pay a fine). It is also possible (though unlikely) that some of the offenders with a prior felony had their gun rights reinstated. Finally, it is also important to remember that this is a prison population. As such, our findings may not generalise to offenders who avoid imprisonment.

However, our sample comes from a large national survey of state prison inmates and contains extensive information on their prior criminal history. In addition, we have focused on the population that is most likely to be affected by the policy changes we considered by including only offenders who used a firearm in their current offence.

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on 15 April 2019 by guest. Protected by copyright.

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on 15 April 2019 by guest. Protected by copyright.

## What is already known on the subject

▶ Guns in the hands of high-risk individuals present a serious threat to public safety.
▶ Among high-income countries, the USA is unique in its extraordinarily high rate of firearm homicides.
▶ US federal law establishes minimum criteria for who may legally purchase and possess firearms; state laws vary widely in this regard.

## What this study adds

▶ This study is the first to use data on incarcerated gun offenders' age and criminal histories to examine the potential benefits from strengthening the criteria for legal firearm possession.
▶ Nearly three of every 10 gun offenders in the 13 US states with the least stringent criteria for legal gun ownership would have been prohibited from purchasing or possessing a firearm when they committed their most recent offence if their states had more restrictive laws in place.
▶ Offenders for whom access to firearms was legal under current standards were five times more likely to have obtained their gun from a gun store or pawnshop than were offenders who were prohibited under current state or federal law.

Our findings indicate that stricter gun ownership laws in states with the lowest standards would have made firearm possession illegal for many who used a gun to commit a crime. We are uncertain about the degree to which stricter legal standards for firearm possession might deter criminal gun possession and use. But, adding barriers for the acquisition of guns by high-risk persons is an underused potential intervention.

**Funding** This study was funded by a grant from The Joyce Foundation. Grant no: 07-30160.

**Competing interests** None.

**Ethics approval** Ethics approval was provided by the Johns Hopkins Bloomberg School of Public Health Institutional Review Board.

**Provenance and peer review** Not commissioned; externally peer reviewed.

**Data sharing statement** The study analyses data from a publically-available secondary database.

## REFERENCES

1. **Centers for Disease Control and Prevention.** Web-based injury statistics Query and reporting System (WISQARS). National Center for Injury Prevention and Control, Centers for Disease Control and Prevention (producer), 2007. http://www.cdc.gov/ncipc/wisqars (accessed 10 Nov 2011).
2. **Richardson EG,** Hemenway D. Homicide, suicide, and unintentional firearm fatality: comparing the United States with other high-income countries, 2003. *J Trauma* 2011;**70**:238–43.
3. **18 U.S.C.** §922(g). 2011.
4. **Vernick JS,** Webster DW, Vittes KA. Law and policy approaches to keep guns away from high risk people. In: Culhane JG, ed. *Social Issues, Welfare Consequences, and Public Health Law.* New York: Cambridge University Press, 2010.
5. **Berk R,** Sherman L, Barnes G, *et al.* Forecasting murder within a population of probationers and parolees: a high stakes application of statistical learning. *J Roy Stat Soc* 2009;**172**:191–211.
6. **Cook PJ,** Ludwig J, Braga AA. Criminal records of homicide offenders. *JAMA* 2005;**294**:598–601.
7. **Huebner B,** Varano S, Barnes G, *et al.* Gangs, guns, and drugs: recidivism among serious young offenders. *Criminol Publ Pol* 2007;**6**:187–222.
8. **Lucker GW,** Holt VL, Kruzich DJ, *et al.* The prevalence of antisocial behavior among U.S. Army DWI offenders. *J Stud Alc* 1991;**52**:318–20.
9. **Wintemute GJ,** Drake CM, Beaumont JJ, *et al.* Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. *JAMA* 1998;**280**:2083–7.
10. **18 U.S.C.** §922(s). 2011.
11. **Cook PJ,** Ludwig J, Venkatesh S, *et al.* Underground gun markets. *Econ J* 2007;**117**:F588–618.
12. **Wright JD,** Rossi PH. *Armed and Considered Dangerous. Armed and Considered Dangerous: A Survey of Felons and their Firearms.* New York: Aldine de Gruyter, 1994.
13. **Webster DW,** Freed LH, Frattaroli S, *et al.* How delinquent youth acquire guns: initial versus most recent gun acquisitions. *J Urban Health* 2002;**79**:60–9.
14. **U.S. Department of Justice.** Bureau of Justice Statistics, *Survey of Inmates in State and Federal Correctional Facilities, 2004.* Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 2007. doi:10.3886/ICPSR04572
15. **U.S. Department of Justice.** Bureau of Justice Statistics, *Survey of Inmates in State and Federal Correctional Facilities, 2004.* Codebook. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor]. http://dx.doi.org/10.3886/ICPSR04572.v1
16. **Glaze LE,** Maruschak LM. *Parents in prison and their Minor Children.* Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2008. Report No.: NCJ 222984.
17. **Leigey ME,** Reed KL. A woman's life before serving life: examining the negative pre-incarceration life events of female life-sentenced inmates. *Women Crim Just* 2010;**20**:302–22.
18. **Noonan ME,** Mumola CJ. *Veterans in State and Federal Prisons, 2004. Special Report.* Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2007. Report No.: NCJ 217199.
19. *Survey of State Procedures Related to Firearm Sales, Midyear 2004.* Washington, DC: National Institute of Justice, Bureau of Justice Statistics, 2005. Report No.: NCJ 209288.
20. **18 U.S.C.** §922(d)(9). 2011.
21. **18 U.S.C.** §922(g)(9). 2011.
22. **Vigdor ER,** Mercy JA. Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide? *Eval Rev* 2006;**30**:313–46.
23. **Webster DW,** Vernick JS. Keeping firearms from drug and alcohol abusers. *Inj Prev* 2009;**15**:425–7.
24. **N.M.** Stat Ann. §30-7-2.2. 2004.
25. **Wis. Stat.** §941.29. 2004.
26. **Teret SP,** Webster DW, Vernick JS, *et al.* Support for new policies to regulate firearms: results of two national surveys. *N Engl J Med* 1998;**339**:813–18.
27. **Vernick JS,** Rutkow L, Webster DW, *et al.* Changing the constitutional landscape for firearms: the Supreme Court's recent Second Amendment decisions. *Am J Public Health* 2011;**101**:2021–6.
28. **Cook PJ,** Molliconi S, Cole TB. Regulating gun markets. *J Crim Law Criminol* 1995;**86**:59–92.
29. **Webster DW,** Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *J Urban Health* 2009;**86**:525–37.

# Exhibit 10

# State Gun Laws and Pediatric Firearm-Related Mortality

Monika K. Goyal, MD, MSCE,[a,b] Gia M. Badolato, MPH,[a] Shilpa J. Patel, MD, MPH,[a,b] Sabah F. Iqbal, MD,[c] Kavita Parikh, MD, MS,[a,b] Robert McCarter, ScD[a,b]

abstract

**BACKGROUND:** Firearms are the second leading cause of pediatric death in the United States. There is significant variation in firearm legislation at the state level. Recently, 3 state laws were associated with a reduction in overall deaths from firearms: universal background checks for firearm purchases, universal background checks for ammunition purchases, and identification requirement for firearms. We sought to determine if stricter firearm legislation at the state level is associated with lower pediatric firearm-related mortality.

**METHODS:** This was a cross-sectional study in which we used 2011–2015 Web-based Injury Statistics Query and Reporting System and Census data. We measured the association of the (1) strictness of firearm legislation (gun law score) and (2) presence of the 3 aforementioned gun laws with pediatric firearm-related mortality. We performed negative binomial regression accounting for differences in state-level characteristics (population-based race and ethnicity, education, income, and gun ownership) to derive mortality rate ratios associated with a 10-point change in each predictor and predicted mortality rates.

**RESULTS:** A total of 21 241 children died of firearm-related injuries during the 5-year period. States with stricter gun laws had lower rates of firearm-related pediatric mortality (adjusted incident rate ratio 0.96 [0.93–0.99]). States with laws requiring universal background checks for firearm purchase in effect for ≥5 years had lower pediatric firearm-related mortality rates (adjusted incident rate ratio 0.65 [0.46–0.90]).

**CONCLUSIONS:** In this 5-year analysis, states with stricter gun laws and laws requiring universal background checks for firearm purchase had lower firearm-related pediatric mortality rates. These findings support the need for further investigation to understand the impact of firearm legislation on pediatric mortality.



[a]Children's National Health System, Washington, District of Columbia; [b]Department of Pediatrics, School of Medicine and Health Sciences, The George Washington University, Washington, District of Columbia; and [c]PM Pediatrics, Rockville, Maryland

Dr Goyal conceptualized and designed the study, drafted the initial manuscript, and assisted with data analysis and interpretation; Ms Badolato performed data analysis and critically revised the manuscript for important intellectual content; Dr McCarter supervised and performed data analysis and critically revised the manuscript for important intellectual content; Drs Iqbal, Patel, and Parikh helped design the study, assisted with data interpretation, and critically revised the manuscript for important intellectual content; and all authors approved the final manuscript as submitted.

**DOI:** https://doi.org/10.1542/peds.2018-3283

Accepted for publication May 6, 2019

Address correspondence to Monika K. Goyal, MD, MSCE, Children's National Health System, 111 Michigan Ave, NW, Washington, DC 20010. E-mail: mgoyal@cnmc.org

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2019 by the American Academy of Pediatrics

**WHAT'S KNOWN ON THIS SUBJECT:** Firearm-related injuries are the second leading cause of pediatric death in the United States, yet there is significant variation in firearm legislation at the state level.

**WHAT THIS STUDY ADDS:** States with stricter firearm legislation, specifically legislation regarding universal background checks for firearms, had lower firearm-related mortality rates in children.

**To cite:** Goyal MK, Badolato GM, Patel SJ, et al. State Gun Laws and Pediatric Firearm-Related Mortality. *Pediatrics.* 2019;144(2):e20183283

Downloaded from www.aappublications.org/news by guest on December 20, 2019

Firearm injury is the second leading cause of traumatic death and the third leading cause of death overall among children in the United States.[1] The United States has the highest rate of firearm-related injuries in children relative to other industrialized countries.[1,2] Of note, ~7 US children die of firearm-related injuries daily.[3]

When compared with other high-income countries, the United States has the highest rate of gun ownership, the weakest gun laws, and the highest rate of firearm-related deaths in children.[4–6] Firearm legislation varies at the state level and regulations differ with respect to the presence or absence of laws for firearm purchase, ownership, and carriage.[7] Each year, the Brady Campaign to Prevent Gun Violence gathers an expert panel to objectively assess and rate state firearm legislation on the basis of a series of 33 different gun policies.[8] Additionally, authors of a recent study found 3 state laws in particular to be strongly associated with a reduction in firearm-related deaths among children and adults combined: universal background checks for firearm purchase, universal background checks for ammunition purchase, and identification requirement for firearms.[9]

Authors of several previous studies have described lower rates of pediatric suicide, homicide, firearm carriage, and firearm-related morbidity in states with strict gun laws.[10–15] We performed this study to test the hypothesis that stricter firearm legislation at the state level is associated with lower pediatric firearm-related mortality rates.

## METHODS

### Study Design and Data Source

This was a repeated cross-sectional study using the 2011–2015 Web-based Injury Statistics Query and Reporting System (WISQARS). WISQARS is a publicly available,

interactive, online, de-identified database that provides fatal injury data in the United States from the Centers for Disease Control and Prevention by broad demographic characteristics and cause of injury.[3] These data were used to select firearm-related deaths per year for those aged ≤21 years by state, except in states with <10 annual firearm-related deaths where the counts were suppressed. These data were matched to comparable state population data for all children aged ≤21 years. Although the intent of injury may differ across the pediatric age group, we chose to focus this study across the entire pediatric age spectrum because the primary purpose of this analysis was to measure the relationship between a comprehensive score of state-based firearm legislation (which may impact children from infancy through young adulthood) and firearm-related mortality. This study was exempt from institutional review board approval because of the use of publicly available de-identified data.

### Outcome Variable

The primary outcome was firearm-related mortality rate in children. Deaths were identified by using *International Classification of Diseases, 10th Revision* codes W32–W34, X72–X74, X93–X95, Y22–Y24, Y35.0, and *U01.4 to specify firearm-related mortality. State-specific firearm-related mortality rates were calculated by using respective US 2011–2015 census data.

### Exposure Variables

The primary exposure variable was gun law score based on the 2011–2015 Gun Law Scorecards from the Brady Campaign to Prevent Gun Violence. States can receive a maximum of 100 points, based on points awarded for having consistently strong laws. The higher the state gun law score, the stricter the firearm legislation. In 2013, states

began losing points for laws considered to weaken public safety. Because states could lose points, negative scores were possible.[8] To facilitate statistical modeling, scores were inflated by a constant of 40 to prevent negative values while preserving the original scale.

Secondary exposure variables included individual laws previously associated with lower mortality rates in the total population of adults and children. These included the following 3 laws: (1) universal background checks for firearm purchase, (2) universal background checks for ammunition purchase, and (3) identification requirement for firearms (microstamping, ballistic fingerprinting).[9] States were categorized into the following groups on the basis of 2015 laws: states having no law, law in effect for <5 years, or law in effect for ≥5 years.[16,17]

### Confounding Variables

We used the following state-level data from the 2011–2015 US Census to adjust for characteristics previously associated with firearm-related mortality: population-based race and ethnicity proportions, percent of the population with college education, and percent of the population living below the poverty threshold.[2,4,18–20] We adjusted for gun ownership using 2013 data from YouGov, an Internet-based market research company, as reported in a study by Kalesan et al.[21] States were dichotomized as having low or high gun ownership on the basis of the median value of the percentage of gun ownership.

### Data Analysis

We used standard descriptive statistics to summarize the characteristics of the study population and calculate the overall and state-level firearm-related mortality per 100 000 US children. After determining that the data were

Downloaded from www.aappublications.org/news by guest on December 20, 2019

too dispersed for Poisson modeling, we used negative binomial multiple regression models to measure the associations of state gun law scores (primary exposure variable) and the presence of the 3 aforementioned laws (secondary exposure variables) with firearm-related mortality rates among children. Four separate models incorporated population-level adjustments for state-level proportions by race and ethnicity, education level, household income, and gun ownership. Variance estimates were adjusted to account for clustering by state across the study years.

Because states with <10 firearm-related deaths among children had suppressed mortality rates, we performed a sensitivity analysis using the mean number of firearm-related deaths over the 5-year study period to estimate an annual mortality rate for states with suppressed data. We compared these results with our primary analysis to assess the robustness of our results. We report incident (mortality) rate ratios (IRRs) and predicted mortality rates with 95% confidence intervals (CIs). We used the "margins" command in Stata version 12.0 (Stata Corp, College Station, TX) to derive predicted mortality rates associated with a 10-point change in the gun law score or in the proportion by race and ethnicity, education level, poverty level, and gun ownership. Similarly, when measuring the impact of the 3 aforementioned laws, we separately calculated predicted mortality rates for states that did not have the law present, states that had the law in effect for <5 years, and states that had the law in effect for ≥5 years.

## RESULTS

From 2011 through 2015, there were 21 241 firearm-related deaths among US children reported in WISQARS (~4250 deaths per year). This translates to an annual

firearm-related mortality rate of 4.65 per 100 000 US children. The majority of firearm-related deaths were assault related (61.6%) and occurred among males (87.3%) and 18- to 21-year-old individuals (68.7%) (Table 1).

State-specific mortality rates ranged from 1.1 to 18.1 per 100 000 children. State gun law scores ranged from −39 to +81, and after scaling, 1 to 121, with higher scores indicating stricter gun laws. Gun ownership ranged from 5.2% to 61.7% (median value: 32.2%).

In unadjusted analysis, the association between the gun law score and pediatric firearm-related mortality demonstrated that for every 10-point increase in the gun law score (eg, stricter firearm legislation), the firearm-related mortality rate among children decreased by 8% (IRR 0.92 [95% CI 0.89–0.96]). Sensitivity analysis, in which we used the mean mortality rate over the 5-year period as the annual mortality rate for states that had suppressed mortality data (DE, HI, ME, NH, RI, SD, VT, and WY), revealed similar results (IRR 0.92 [95% CI 0.88–0.96]).

Table 2 reveals the results of the fully adjusted model. In this fully adjusted model, every 10-point increase in gun law score decreases the firearm-related mortality rate in children by 4% (adjusted incident rate ratio [aIRR] 0.96 [95% CI 0.93–0.99]). Figure 1 illustrates the relationship between the gun law score and firearm-related mortality in children after population-level adjustments by race and ethnicity, education level, household income, and gun ownership. As illustrated in Fig 1, predicted firearm-related mortality decreases as firearm laws get stronger.

Table 3 reveals the relationship between specific laws and firearm-related mortality in children. A summary of the presence of these laws by state can be found in the Supplemental Information. In 2015, 7 states had laws requiring universal background checks for firearm purchases that had been in effect for ≥5 years, 5 states had these laws for <5 years, and 38 states did not have such laws. After population-level adjustments, states that had these laws in effect for ≥5 years had

**TABLE 1** Characteristics of Study Population, 2011–2015

| Demographic | N (%) (Total N = 21 241) | Rate of Firearm-Related Mortality per 100 000 US Children |
| --- | --- | --- |
| Age group, y | | |
| ≤12 | 1141 (5.4) | 0.4 |
| 13–17 | 5517 (26.0) | 5.3 |
| 18–21 | 14 583 (68.7) | 16.5 |
| Sex | | |
| Male | 18 544 (87.3) | 7.9 |
| Female | 2697 (12.7) | 1.2 |
| Race | | |
| White | 11 133 (52.4) | 3.2 |
| African American | 9471 (44.6) | 12.4 |
| Other | 637 (3.0) | 1.8 |
| Hispanic ethnicity | | |
| Yes | 3407 (16.0) | 3.2 |
| No | 17 786 (83.7) | 5.1 |
| Unknown | 48 (0.2) | — |
| Intent | | |
| Assault | 13 082 (61.6) | 2.9 |
| Suicide | 7217 (40.0) | 1.6 |
| Unintentional | 696 (3.3) | 0.2 |
| Undetermined | 251 (1.2) | 0.1 |

—, not applicable.

Downloaded from www.aappublications.org/news by guest on December 20, 2019

Ex. 10
Page 101

**TABLE 2** Association of State Gun Law Scores With Firearm-Related Mortality Rates, 2011–2015

| | aIRR (95% CI)[a] |
| --- | --- |
| Gun law score | 0.96 (0.93–0.99)[b] |
| High gun ownership (referent = low gun ownership) | 0.96 (0.83–1.12) |
| Percent of population with African American race | 1.16 (1.07–1.25)[b] |
| Percent of population with Hispanic ethnicity | 0.98 (0.91–1.05) |
| Percent of population with a college education | 0.72 (0.57–0.90)[b] |
| Percent of population living below the poverty level | 0.79 (0.51–1.22) |

[a] For every 10-point increase in the gun law score (eg, stricter firearm legislation), the firearm-related mortality rate among children decreases by 4%.

[b] Statistical significance at $P$ value <.05; adjusted for year and clustered by state.

a predicted mortality rate of 3.80 (2.67–4.94) per 100 000 children compared with 5.88 (5.25–6.52) per 100 000 children in states that did not have such laws (aIRR 0.65 [95% CI 0.46–0.90]). The majority of states ($n$ = 47) did not have laws requiring universal background checks for ammunition purchases in 2015. After population-level adjustment, the 1 state that had laws regarding universal background checks for ammunition purchase in effect for <5 years had a lower firearm-related mortality rate than states that did not have such laws (aIRR 2.18 [CI 0.52–3.84] per 100 000 children compared with aIRR 5.69 [CI 5.17–6.22] per 100 000 children;

aIRR 0.38 [CI 0.19–0.82]); however, this association was not significant when compared with the 2 states that had such laws for ≥5 years. Only 2 states had laws requiring firearm identification in 2015, and there was no statistically significant difference in mortality rates between the 2 states that had these laws versus the states that did not.

## DISCUSSION

This study supports the hypothesis that states with stricter firearm-related legislation have lower rates of pediatric firearm-related deaths compared with states with less strict firearm legislation. This association

persists after adjustment for gun ownership and other sociodemographic variables. We found that of the 21 241 children who died of firearm-related injuries from 2011 through 2015, rates of firearm-related death were lower in states that had higher (more strict) gun law scores and in states that had laws requiring universal background checks for firearm purchases.

Our findings reveal an important association between firearm legislation and pediatric firearm-related mortality. This association was strong even after adjustment for rates of gun ownership. These data suggest that strict firearm legislation may be protective of children even in areas of high gun ownership.

Our results are consistent with previous studies that revealed lower rates of firearm-related injury in states with stricter firearm laws in a hospitalized population.[13,18] Safavi et al[13] found lower pediatric hospitalization rates in states with stricter firearm legislation. Simonetti et al[18] demonstrated that stricter firearm legislation is associated with lower hospital discharge rates for firearm-related injuries in a combined adult and pediatric population in 18 states. Similarly, authors of other studies have observed an association between firearm-related mortality and strictness of firearm legislation or specific firearms laws across 50 states.[9,19,22] For instance, Fleegler et al[22] demonstrated that states with more firearm laws had lower rates of firearm fatalities in a population of adults and children. In an exhaustive review of the literature, Lee et al[19] found that stronger gun policies were associated with lower rates of firearm homicide in the United States. Furthermore, authors of a 2015 international review of 130 studies concluded that the implementation of firearm restrictions is associated with reductions in firearm deaths in the combined population of adults and children.[23]



**FIGURE 1**
Gun law score and predicted pediatric firearm-related mortality rates, 2011–2015.

Downloaded from www.aappublications.org/news by guest on December 20, 2019

**TABLE 3** Specific Firearm Legislation in 2015 and Pediatric Firearm-Related Mortality Rates

| Law | No. States | Predicted Mortality Rate[a] (95% CI) | Adjusted IRR[b] (95% CI) |
|---|---|---|---|
| Universal background checks for firearm purchase | | | |
| Not present | 38 | 5.88 (5.25–6.52) | Referent |
| Present <5 y | 5 | 5.25 (3.53–6.96) | 0.89 (0.63–1.27) |
| Present ≥5 y | 7 | 3.80 (2.67–4.94) | 0.65 (0.46–0.90) |
| Universal background checks for ammunition purchase | | | |
| Not present | 47 | 5.69 (5.17–6.22) | Referent |
| Present <5 y | 1 | 2.18 (0.52–3.84) | 0.38 (0.19–0.82) |
| Present ≥5 y | 2 | 3.65 (1.94–5.36) | 0.64 (0.39–1.03) |
| Identification requirement for firearms | | | |
| Not present | 48 | 5.59 (5.03–6.15) | Referent |
| Present <5 y | 0 | — | — |
| Present ≥5 y | 2 | 5.89 (2.86–8.91) | 1.05 (0.63–1.77) |

—, not applicable.
[a] Per 100 000 children.
[b] Population-level adjustments by race and ethnicity, education level, household income, and gun ownership.

In general, firearm legislation impacts overall mortality in adults; states with higher numbers of laws regulating firearms have lower rates of overall firearm mortality as well as fewer suicides and homicides than states with fewer total laws.[22] Additionally, laws enforcing strict waiting periods before firearm purchases, universal background checks, restrictions to carrying guns in public, and mandated gun locks were associated with lower adult suicides.[24] Studies such as these suggest that specific laws may have particular efficacy in preventing firearm mortality. Kalesan et al[9] studied 25 different regulations related to firearms and found that 3 laws were associated with a decrease in overall firearm mortality: universal background checks for firearm purchases, background checks for ammunition purchases, and a requirement of identification on the firearm (microstamping or ballistic fingerprinting). In our study, which was specific to children, we found that states with laws requiring universal background checks for firearm purchases had lower firearm-related mortality. The presence of these laws was associated with a >35% lower rate of firearm-related mortality, even after adjustment for socioeconomic factors and gun ownership. Few states had laws regarding background checks for ammunition purchases or identification requirements for firearms; therefore, the sample was too small to draw conclusions on the impact. Furthermore, laws regarding firearm identification faced challenges at the state level in both California and Maryland. In 2013, California expanded its firearm identification laws and was the first state to pass a microstamping requirement for all new handguns. However, the law faced multiple legal challenges, and gun manufacturers refused to sell new handguns in the state to avoid this requirement. Additionally, in Maryland, a ballistics fingerprinting program that had been in place for almost 15 years was repealed in 2015.[17] Therefore, it may be too early to study the impact of microstamping or ballistics identification on preventing firearm-related injury.

Although many state and federal laws are passed with the intent to reduce firearm-related morbidity and mortality, the nuances of differential implementation can make it difficult to elucidate the effectiveness of these laws individually or as a whole. In previous studies, mostly focused on the general population rather than specifically on children, authors have suggested that there are lower firearm-related deaths in states with lower gun ownership[25,26] in states with specific laws on safer firearm storage practices,[20,27–29] and in states with background check requirements for firearm or ammunition purchase.[9,19] Alternatively, authors of other studies have used composite scores, such as the gun law score, to measure differences in firearm-related injury and mortality. In these studies, authors found lower rates of firearm-related injury and death in states with more restrictive firearm legislation.[13,18,22] However, these studies were limited to either a hospitalized population or a population consisting of both adults and children. We used a combined approach in our study in which we evaluated the association of firearm-related mortality among children with strictness of firearm legislation using the gun law score as well as the presence of the 3 laws previously noted by Kalesan et al[9] to be associated with lower rates of firearm mortality across all ages. We also studied these trends over a 5-year study period rather than limiting our analysis to just 1 year. In addition, we were able to assess the impact of firearm legislation after adjustment for gun ownership.

Evidence-based policy to drive legislative change suggests that a combination of laws may be the most effective to reduce firearm-related injury and death. Moreover, the American Academy of Pediatrics affirms that the most effective method for preventing pediatric firearm-related injuries is a multilateral approach, advocating for legislation that reduces firearm availability and imposes stricter requirements regarding child access, safety, and design.[2] This approach requires more detailed data sources with information on the acquisition of firearms, types of firearms, and enforcement of firearm laws.

Downloaded from www.aappublications.org/news by guest on December 20, 2019

Ex. 10
Page 103

The findings of this study build on previous literature and help provide compelling data that an evidence-based, data-driven, public health approach to firearm legislation may be successful in reducing firearm-related injury in children. Legislation to decrease injury from other obvious public health hazards, such as motor vehicle collisions and secondhand smoke exposure, has shown that the adoption of restrictive laws (eg, seat belts, use of car seats, limits on where an individual can smoke, etc) results in lower injury rates.[30,31] For instance, as a result of the evidence-based approach taken to reduce mortality from motor vehicle collisions, motor vehicle–related mortality rates have decreased from 9.8 per 100 000 children in 2007 to 6.1 in 2015.[32] In contrast, firearm-related crude mortality has not changed, with 5.4 per 100 000 children in 2007 to 5.2 in 2015.[32] Thus, an evidence-driven approach, based on more comprehensive data sources, is needed to inform decision-making to reduce childhood injury and death from firearms.

There are several potential limitations to this study. First, because this is a repeated cross-sectional study, we are unable to establish causality between the strictness of firearm legislation and state-based mortality. However, given that the study was conducted over a 5-year period, we believe this adds to the robustness of our findings. Second, the Gun Law Scorecard is not a validated measure of strictness of firearm legislation. However, many studies have used the Gun Law Scorecard to assess "strictness" of firearm legislation at the state level.[10,13,18,33] We are unaware of any validated scoring system for firearm legislation, but given the comprehensiveness of the Gun Law Scorecard and its use in published literature, it is a reasonable means to compare levels of firearm strictness. Third, we used the 2013 YouGov survey to estimate gun ownership in our models. Although this survey provides the most recent estimate of gun ownership in the United States, it is possible that this estimate is inaccurate. Nevertheless, it likely reflects relative patterns in gun ownership because its estimates approximate those derived from the Centers for Disease Control and Prevention 2002 Behavioral Risk Factor Surveillance System and has been used in previously published studies.[9,34] Furthermore, although we assessed the presence or absence of certain firearm legislation, we were unable to assess the effectiveness of the enforcement of these laws. In addition, when the presence of specific gun laws was evaluated, the effect of other coexistent laws was not adjusted for in the multivariable model. Lastly, these analyses were limited strictly to firearm-related deaths rather than firearm-related injuries, which underestimates the burden of firearm-related morbidity among children.

## CONCLUSIONS

We found that states with stricter firearm legislation had lower rates of firearm-related death in children. This association remained after population-based adjustment for sociodemographic factors and gun ownership. Furthermore, states with laws requiring universal background checks for firearm purchase also had lower rates of pediatric firearm-related deaths. These results support the need for more robust research related to the impact of firearm legislation on firearm-related injury and death in children. Implementation of evidence-based policies and legislation is required to reduce firearm-related injury in children.

---

### ABBREVIATIONS

aIRR: adjusted incident rate ratio
CI: confidence interval
IRR: incident rate ratio
WISQARS: Web-based Injury
　　　　　Statistics Query and
　　　　　Reporting System

---

**FINANCIAL DISCLOSURE:** The authors have indicated they have no financial relationships relevant to this article to disclose.

**FUNDING:** No external funding.

**POTENTIAL CONFLICT OF INTEREST:** The authors have indicated they have no potential conflicts of interest to disclose.

**COMPANION PAPER:** A companion to this article can be found online at www.pediatrics.org/cgi/doi/10.1542/peds.2019-1300.

---

### REFERENCES

1. Cunningham RM, Walton MA, Carter PM. The major causes of death in children and adolescents in the United States. *N Engl J Med.* 2018;379(25): 2468–2475

2. Dowd MD, Sege RD; Council on Injury, Violence, and Poison Prevention Executive Committee; American Academy of Pediatrics. Firearm-related injuries affecting the pediatric population. *Pediatrics.* 2012;130(5). Available at: www.pediatrics.org/cgi/content/full/130/5/e1416

3. Centers for Disease Control and Prevention. Injury prevention & control: data and statistics (WISQARS). Available

Downloaded from www.aappublications.org/news by guest on December 20, 2019

Ex. 10
Page 104

at: www.cdc.gov/injury/wisqars/index.html. Accessed August 6, 2016

4. Richardson EG, Hemenway D. Homicide, suicide, and unintentional firearm fatality: comparing the United States with other high-income countries, 2003. *J Trauma*. 2011;70(1):238–243

5. Hemenway D, Miller M. Firearm availability and homicide rates across 26 high-income countries. *J Trauma*. 2000;49(6):985–988

6. Naghavi M, Marczak LB, Kutz M, et al; Global Burden of Disease 2016 Injury Collaborators. Global mortality from firearms, 1990-2016. *JAMA*. 2018;320(8):792–814

7. Siegel M, Pahn M, Xuan Z, et al. Firearm-related laws in all 50 US states, 1991-2016. *Am J Public Health*. 2017;107(7):1122–1129

8. Law Center to Prevent Gun Violence. 2015 gun law state scorecard. 2015. Available at: https://lawcenter.giffords.org/scorecard2015/. Accessed August 5, 2017

9. Kalesan B, Mobily ME, Keiser O, Fagan JA, Galea S. Firearm legislation and firearm mortality in the USA: a cross-sectional, state-level study. *Lancet*. 2016;387(10030):1847–1855

10. Xuan Z, Hemenway D. State gun law environment and youth gun carrying in the United States. *JAMA Pediatr*. 2015;169(11):1024–1031

11. Webster DW, Vernick JS, Zeoli AM, Manganello JA. Association between youth-focused firearm laws and youth suicides. *JAMA*. 2004;292(5):594–601

12. Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional shooting deaths of children. *Pediatrics*. 2000;106(6):1466–1469

13. Safavi A, Rhee P, Pandit V, et al. Children are safer in states with strict firearm laws: a National Inpatient Sample study. *J Trauma Acute Care Surg*. 2014;76(1):146–150; discussion 150–151

14. Hepburn L, Azrael D, Miller M, Hemenway D. The effect of child access prevention laws on unintentional child firearm fatalities, 1979-2000. *J Trauma*. 2006;61(2):423–428

15. Lee J, Moriarty KP, Tashjian DB, Patterson LA. Guns and states: pediatric firearm injury. *J Trauma Acute Care Surg*. 2013;75(1):50–53; discussion 53

16. McClenathan J, Pahn M, Siegel M. *The Changing Landscape of U.S. Gun Policy: State Firearm Arms, 1991-2016*. Boston, MA: Boston University School of Public Health; 2016. Available at: https://www.statefirearmlaws.org/sites/default/files/2017-12/report_0.pdf. Accessed March 25, 2019

17. Giffords Law Center to Prevent Gun Violence. Microstamping & ballistics. Available at: https://lawcenter.giffords.org/gun-laws/policy-areas/crime-guns/microstamping-ballistics/. Accessed March 25, 2019

18. Simonetti JA, Rowhani-Rahbar A, Mills B, Young B, Rivara FP. State firearm legislation and nonfatal firearm injuries. *Am J Public Health*. 2015;105(8):1703–1709

19. Lee LK, Fleegler EW, Farrell C, et al. Firearm laws and firearm homicides: a systematic review. *JAMA Intern Med*. 2017;177(1):106–119

20. Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. *N Engl J Med*. 1992;327(7):467–472

21. Kalesan B, Villarreal MD, Keyes KM, Galea S. Gun ownership and social gun culture. *Inj Prev*. 2016;22(3):216–220

22. Fleegler EW, Lee LK, Monuteaux MC, Hemenway D, Mannix R. Firearm legislation and firearm-related fatalities in the United States. *JAMA Intern Med*. 2013;173(9):732–740

23. Santaella-Tenorio J, Cerdá M, Villaveces A, Galea S. What do we know about the association between firearm legislation and firearm-related injuries? [published correction appears in *Epidemiol Rev*. 2017;39(1):171–172]. *Epidemiol Rev*. 2016;38(1):140–157

24. Anestis MD, Anestis JC. Suicide rates and state laws regulating access and exposure to handguns. *Am J Public Health*. 2015;105(10):2049–2058

25. Miller M, Lippmann SJ, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. *J Trauma*. 2007;62(4):1029–1034; discussion 1034–1035

26. Miller M, Azrael D, Hemenway D. Rates of household firearm ownership and homicide across US regions and states, 1988-1997. *Am J Public Health*. 2002;92(12):1988–1993

27. Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional firearm injuries. *JAMA*. 2005;293(6):707–714

28. Shenassa ED, Rogers ML, Spalding KL, Roberts MB. Safer storage of firearms at home and risk of suicide: a study of protective factors in a nationally representative sample. *J Epidemiol Community Health*. 2004;58(10):841–848

29. Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: a systematic review and meta-analysis. *Ann Intern Med*. 2014;160(2):101–110

30. Center for Disease Control and Prevention. Child passenger safety: get the facts. Available at: https://www.cdc.gov/motorvehiclesafety/child_passenger_safety/cps-factsheet.html. Accessed May 24, 2017

31. Center for Disease Control and Prevention. Smokefree policies improve health. Available at: https://www.cdc.gov/tobacco/data_statistics/fact_sheets/secondhand_smoke/protection/improve_health/#. Accessed May 24, 2017

32. Centers for Disease Control and Prevention. National Center for Health Statistics. Underlying cause of death 1999-2015 on CDC WONDER online database, data are from the multiple cause of death files, 1999-2015, as compiled from data provided by the 57 vital statistics jurisdictions through the vital statistics cooperative program. Available at: http://wonder.cdc.gov/ucd-icd10.html. Accessed May 24, 2017

33. Giffords Law Center to Prevent Gun Violence. 2013 state scorecard: why gun laws matter. Available at: https://lawcenter.giffords.org/resources/gun-law-scorecard/2013-state-scorecard-why-gun-laws-matter/. Accessed May 24, 2019

34. Anestis MD, Houtsma C. The association between gun ownership and statewide overall suicide rates. *Suicide Life Threat Behav*. 2018;48(2):204–217

Downloaded from www.aappublications.org/news by guest on December 20, 2019

Ex. 10
Page 105

# Supplemental Information

**SUPPLEMENTAL TABLE 4** States With Laws Requiring Universal Background Checks for Firearm Purchases

| State | Year |
| --- | --- |
| California | 1991 |
| Connecticut | 1999 |
| Hawaii | 2006 |
| Illinois | 1991 |
| Massachusetts | 1991 |
| New Jersey | 1991 |
| Rhode Island | 1991 |
| Colorado | 2013 |
| Delaware | 2013 |
| New York | 2013 |
| Washington | 2014 |
| Oregon | 2015 |

**SUPPLEMENTAL TABLE 5** States With Laws Requiring Universal Background Checks for Ammunition Purchases

| State | Year |
| --- | --- |
| Connecticut | 2013 |
| Illinois | 1991 |
| Massachusetts | 1991 |

**SUPPLEMENTAL TABLE 6** States With Laws Requiring Firearm Identification (Microstamping or Ballistics Fingerprinting)

| State | Year(s) |
| --- | --- |
| California | 2007 |
| Maryland | 2000–2015 |
| New York | 2002–2012 |

Downloaded from www.aappublications.org/news by guest on December 20, 2019
Ex. 10
Page 106

## State Gun Laws and Pediatric Firearm-Related Mortality

Monika K. Goyal, Gia M. Badolato, Shilpa J. Patel, Sabah F. Iqbal, Kavita Parikh and Robert McCarter

*Pediatrics* 2019;144;
DOI: 10.1542/peds.2018-3283 originally published online July 15, 2019;

| | |
|---|---|
| **Updated Information & Services** | including high resolution figures, can be found at: http://pediatrics.aappublications.org/content/144/2/e20183283 |
| **References** | This article cites 26 articles, 3 of which you can access for free at: http://pediatrics.aappublications.org/content/144/2/e20183283#BIBL |
| **Subspecialty Collections** | This article, along with others on similar topics, appears in the following collection(s): **Injury, Violence & Poison Prevention** http://www.aappublications.org/cgi/collection/injury_violence_-_poison_prevention_sub **Firearms** http://www.aappublications.org/cgi/collection/firearms_sub |
| **Permissions & Licensing** | Information about reproducing this article in parts (figures, tables) or in its entirety can be found online at: http://www.aappublications.org/site/misc/Permissions.xhtml |
| **Reprints** | Information about ordering reprints can be found online: http://www.aappublications.org/site/misc/reprints.xhtml |



American Academy of Pediatrics

DEDICATED TO THE HEALTH OF ALL CHILDREN™

Downloaded from www.aappublications.org/news by guest on December 20, 2019

# PEDIATRICS®

### OFFICIAL JOURNAL OF THE AMERICAN ACADEMY OF PEDIATRICS

**State Gun Laws and Pediatric Firearm-Related Mortality**
Monika K. Goyal, Gia M. Badolato, Shilpa J. Patel, Sabah F. Iqbal, Kavita Parikh and
Robert McCarter
*Pediatrics* 2019;144;
DOI: 10.1542/peds.2018-3283 originally published online July 15, 2019;

The online version of this article, along with updated information and services, is
located on the World Wide Web at:
http://pediatrics.aappublications.org/content/144/2/e20183283

Data Supplement at:
http://pediatrics.aappublications.org/content/suppl/2019/07/12/peds.2018-3283.DCSupplemental

Pediatrics is the official journal of the American Academy of Pediatrics. A monthly publication, it
has been published continuously since 1948. Pediatrics is owned, published, and trademarked by
the American Academy of Pediatrics, 141 Northwest Point Boulevard, Elk Grove Village, Illinois,
60007. Copyright © 2019 by the American Academy of Pediatrics. All rights reserved. Print
ISSN: 1073-0397.



American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN™

Downloaded from www.aappublications.org/news by guest on December 20, 2019

# Exhibit 11

# Firearm Legislation Stringency and Firearm-Related Fatalities among Children in the US



Sriraman Madhavan, MS, Jordan S Taylor, MD, Julia M Chandler, MD,
Kristan L Staudenmayer, MD, FACS, Stephanie D Chao, MD, FACS

**BACKGROUND:** Firearm-related injuries are the second leading cause of pediatric deaths in the US. We sought to evaluate the effectiveness of both state child access prevention (CAP) laws and gun regulations on pediatric firearm mortality. We hypothesized that states with more stringent firearm legislation had lower pediatric firearm mortality.

**STUDY DESIGN:** We used 2014-2015 firearm mortality data from the Web-Based Injury Statistics Query and Reporting System, 2014 Brady scores (used to quantify stringency of state gun regulations) and CAP laws. State-level covariates were obtained from government sources, including the Bureau of Labor Statistics and the Department of Education. Spearman rank correlations and linear regression were used to determine the relationship between overall pediatric firearm mortality and gun regulations. We also examined the relationship between gun regulations and firearm-related homicides and suicides.

**RESULTS:** Annually, there were approximately 2,715 pediatric firearm fatalities among children; 62.1% were homicides and 31.4% suicides. There was a moderate negative correlation between states' firearm legislation stringency and overall pediatric firearm mortality ($\rho = -0.66$; $p < 0.001$), and between CAP laws and firearm suicide rates ($\rho = -0.56$; $p < 0.001$). After controlling for poverty, unemployment, substance abuse, and the number of registered firearms, the association between firearm legislation stringency and overall pediatric firearm mortality remained significant ($p = 0.04$). The association between CAP laws and firearm suicide rate remained significant after controlling for socioeconomic factors, registered firearms, and other firearm legislation ($p = 0.04$).

**CONCLUSIONS:** Strict gun legislation and CAP laws are associated with fewer pediatric firearm fatalities and firearm suicides, respectively, though no such association was identified with pediatric firearm homicides. Although more studies are needed to determine causality, state-level legislation could play an important role in reducing pediatric firearm-related deaths. (J Am Coll Surg 2019;229:150−157. © 2019 by the American College of Surgeons. Published by Elsevier Inc. All rights reserved.)

Firearm-related injuries and fatalities among children are important public health problems in the US. Mass shootings continue to occur with regrettable frequency and

Disclosure Information: Nothing to disclose.

Mr Madhavan and Dr Taylor contributed equally to this work.

Abstract presented at the American College of Surgeons 104th Annual Clinical Congress, Scientific Forum, Boston, MA, October 2018.

Received December 7, 2018; Revised February 28, 2019; Accepted February 28, 2019.

From the Departments of Statistics (Madhavan) and Surgery, Division of Pediatric Surgery (Taylor, Chao), and Division of General Surgery (Chandler, Staudenmayer), Stanford University, Stanford, CA.

Correspondence address: Jordan S Taylor, MD, Department of Surgery, Division of Pediatric Surgery, 300 Pasteur Dr, Always Building M116, Stanford University, Stanford, CA 94305. email: jtaylor4@stanford.edu

dominate news headlines, serving as grim reminders of the consequences of firearm violence on children. In 2018, there were more than 85 incidents of gunfire on school grounds, including the especially deadly shootings at Marjory Stoneman Douglas High School (Parkland, FL) and Santa Fe High School (Santa Fe, TX) that left 27 dead, 27 injured, and hundreds of thousands of teens speaking out to demand legislative change.[1-3] Less well publicized, but even more staggering, are the pediatric lives lost each year due to suicide, homicide, or accidental death. Firearms were the second leading cause of death among children in the US in 2014, resulting in more pediatric deaths than cancer and heart disease combined.[4] Firearms contribute substantially to pediatric suicide and homicide rates. In 2014, firearms accounted for

© 2019 by the American College of Surgeons. Published by Elsevier Inc. All rights reserved.

https://doi.org/10.1016/j.jamcollsurg.2019.02.055
ISSN 1072-7515/19

71% of all homicides and 41% of all suicides among children.[5] In 2010, the combined medical and work-loss cost for all fatal firearm injuries among children was estimated to be more than $4.8 billion in the US.[5] In addition to the direct health and fiscal impacts of firearm injuries, there are significant long-term psychological effects on survivors and family members. Nearly 1 in 25 children have witnessed a shooting in the past year.[6]

Federal and state lawmakers are responsible for legislating public policy on firearms, though the effect of these policies on public health is often unclear and can be difficult to evaluate. Several studies have examined the association of overall firearm-related fatalities for all ages with state-level firearm legislation, but with varying results. Kwon and colleagues,[7] analyzing data from 1990, found that firearm legislation might have a very mild effect on the number of gun-related deaths, and socioeconomic variables have a significant impact. In their analysis of firearm fatalities between 2007 and 2010, Fleegler and colleagues[8] found the absolute number of firearm laws in a state is inversely correlated with firearm fatalities. Price and colleagues[9] found a strong association between restrictiveness of gun laws and firearm suicide, but little association with firearm homicide. However, these studies did not focus on the pediatric population.

Many states have enacted child-focused firearm legislation, known as child access prevention (CAP) laws intended to keep firearms away from youth. Several studies have examined the effect of CAP laws on unintentional injury or death in children and have suggested limited reductions in unintentional injury. These reductions have been limited largely to states that impose felony prosecution on CAP violations.[10-12] Webster and colleagues[13] found a modest reduction in adolescent suicides was associated with CAP laws; however, to our knowledge, no studies have examined the combined effects of CAP laws and overall state firearm legislation stringency on pediatric firearm mortality.

Previous research on the impact of firearm laws have focused largely on adults, or adults and children combined. To date, the few pediatric studies completed have largely evaluated the impact of firearm legislation on pediatric injuries or hospital admissions, with reference to in-hospital mortality, but not all pediatric firearm-related fatalities. In this article, we evaluate the association between CAP laws and state gun regulations on firearm mortality rates among children in 2014 and 2015. We also analyzed other state-level factors that have previously been associated with mortality, including socioeconomic variables and neighboring states' firearms legislation.[9] We hypothesized that states with more stringent legislation and CAP laws would correlate with a lower incidence of firearm-related fatalities among children.

## METHODS

### Firearm-related injury and mortality

Firearm-related mortality data from 2014 and 2015 for children (ages 0 to 19 years) were accessed from the Web-Based Injury Statistics Query and Reporting System (WISQARS).[5] The WISQARS provides injury-related deaths and mortality rates derived from the National Vital Statistics System maintained by the Centers for Disease Control and Prevention National Center for Health Statistics. The WISQARS stratifies fatalities based on intent of injury (ie unintentional, homicide, suicide, or undetermined), mechanism of injury (eg firearm, drowning, or poisoning), sex, age, race/ethnicity, and state of residence of the injured person. The WISQARS uses the following ICD-10 codes to determine firearm-related fatalities: W32 to W34, X72 to X74, X93 to X95, Y22 to Y24, Y35.0, and U01.4. To prevent inadvertent disclosure of identifiable cases, no data are reported if totals are <10 in tabulations for a specific geographic region.

### State legislation data

The state-level variation in overall gun legislation stringency was quantified using the 2014 Brady Scorecard (Brady score) compiled annually by the Brady Campaign to Prevent Gun Violence since 2007.[14] In brief, the Brady score ranks 50 states based on a series of 33 gun policies, state gun death rates, and state crime gun export rates. Scores range from −100 for the least restrictive states to +100 for the most restrictive states.

We also considered state laws that are specifically designed to protect children from accessing firearms, or CAP laws. In 2014, the Brady score did not account for CAP laws, so this category of laws offered a second metric to measure child-specific gun legislation. Data on CAP laws by state were obtained from the Giffords Law Center, which tabulated CAP laws in effect in 2014.[15] The CAP scores (0 to 2 points) were assigned to each state, with 1 point given for presence of laws that address children gaining access to guns, and 1 point for any law that requires safe storage or firearm locks for guns in a home.

### State-level factors

Socioeconomic and demographic factors that have been correlated previously with firearm-related violence[9] were included in the analysis. These variables include unemployment rates, poverty level, percent urbanization, alcohol

dependence, tobacco and marijuana use among teens, and high school graduation rates. Unemployment rates were obtained from the 2015 US Bureau of Labor Statistics[16]; state poverty rates and Supplemental Poverty Measures were taken from the US Census Bureau.[17] State public high school graduation rates for the 2014 to 2015 school year were obtained from the US Department of Education.[18] Health-related data (alcohol use, tobacco use, and marijuana use) were obtained from the 2014-2015 National Surveys on Drug Use and Health.[19] The surveys capture the percentage of 12- to 17-year-old individuals who have used marijuana in the past month or have had alcohol dependence in the past year, as defined by the Diagnostic and Statistical Manual of Mental Disorders, 4th edition.[20] In 2016, the Bureau of Alcohol, Tobacco, Firearms, and Explosives traced more than 60,000 firearms that were illegally trafficked across state lines, and many more are trafficked unnoticed.[21] To partially account for this, we examined the average Brady scores of neighboring states as separate state-level factors that could influence pediatric firearm mortality rates. Finally, the number of registered firearms per 100,000 children in each state was obtained from a 2014 Alcohol, Tobacco, Firearms, and Explosives report as a surrogate for total number of firearms in each state.[22]

### Data analysis
The primary outcomes measures were annual pediatric firearm mortality rates, homicide rates, and suicide rates per 100,000 children, ages 0 to 19 years. We calculated simple descriptive statistics and performed correlation analysis of each state-level factor against our outcomes measures. We computed the Spearman's $\rho$ statistic to estimate a rank-based measure of association between the state-level factors and the outcomes measures. Interpretation of correlation coefficients were defined by Mukaka,[23] with 0 to 0.3 considered negligible, 0.3 to 0.5 ($-0.3$ to $-0.5$) considered low positive (negative) correlations, 0.5 to 0.7 ($-0.5$ to $-0.7$) considered moderate positive (negative) correlations, and >0.7 (<$-0.7$) considered high or very high positive (negative) correlations. A p value < 0.05 was considered statistically significant. Data analysis was performed using R (R Foundation for Statistical Computing).

Multiple linear regression models were used to evaluate the relationship between the outcomes measures (overall pediatric firearm mortality rate, firearm-related homicide rate, and firearm-related suicide rate) and state-level factors. This allowed for evaluation of the association of firearm regulations and CAP laws with each of the outcomes measures, relative to other independent variables like socioeconomic factors.

## RESULTS
There is considerable state-to-state variation in the stringency of firearm legislation (Fig. 1). In 2014, California had a Brady score of +76, and Arizona had a score of $-39$. The number of firearm-related fatalities among children and teens in the US has been relatively stable from 2008 to 2015, with an average of 2,715 victims per year (Fig. 2), and an overall pediatric firearm mortality rate of 3.28 per 100,000 children. However, there is significant variation in the pediatric firearm mortality rates between states, ranging from 0.45 deaths per 100,000 in Hawaii, to 7.55 deaths per 100,000 in Alaska. We found that an average of 62.1% of all the fatalities were homicides, and 31.4% were suicides; the remaining were categorized as unintentional firearm deaths, legal interventions, or deaths due to undetermined intent.

In unadjusted analysis, higher state gun legislation stringency (Brady score) was moderately associated with lower rates of firearm-related deaths among children and teens ($\rho = -0.66$; p < 0.001) (Fig. 3). States in the highest quartile of Brady scores have an annual pediatric firearm mortality rate of 2.563 per 100,000 population compared with states in the lowest quartile, where the mortality rate is almost twice as high at 5.005 per 100,000. A low negative association was found between CAP laws and firearm-related death rates ($\rho = -0.31$; p = 0.03).

There was a moderate association between higher pediatric firearm mortality rates and lower Brady scores in the neighboring states in unadjusted analysis ($\rho = -0.50$; p < 0.001). Non-legislative factors were also significantly associated with pediatric firearm mortality. There was a moderately positive association between state-wide unemployment and pediatric firearm homicide rates ($\rho = 0.55$; p < 0.001). Similarly, there was a moderately positive correlation between teen tobacco use and adolescent firearm suicide rates ($\rho = 0.50$; p < 0.001). No such association was found with marijuana use or alcohol dependence and any of our outcomes measures (Fig. 4).



**Figure 1.** Brady scores and child access prevention (CAP) scores for 2014; higher scores indicate stricter overall and child-specific firearm legislation in that state, respectively.



**Figure 2.** Pediatric firearm mortality rates in children (ages 0 to 19 years) in the US by year and by intent, 2000-2015.

After controlling for socioeconomic factors (poverty, unemployment, graduation rates, percent urbanization, alcohol dependence, tobacco use, and marijuana use) and number of registered firearms, the association between Brady scores and pediatric firearm mortality rates remained significant ($\beta = -0.018$; 95% CI $-0.035$ to $-0.0006$; p = 0.04). In adjusted analysis, other variables that maintained a significant relationship with pediatric firearm mortality rates included the state's unemployment rate ($\beta = 0.81$; 95% CI 0.35 to 1.27; p < 0.001) and the neighboring states' Brady scores ($\beta = -0.022$; 95% CI $-0.038$ to $-0.005$; p = 0.01). The association between CAP laws and pediatric firearm mortality was not significant after controlling for Brady score and number of registered firearms.

We next evaluated the association between laws and suicide and homicide rates separately. In unadjusted analyses, Brady scores had low negative associations with both firearm homicide rates ($\rho = -0.42$; p = 0.01) and firearm suicide rates ($\rho = -0.49$; p = 0.001) among children. The presence of CAP laws was moderately associated with fewer firearm suicides among children ($\rho = -0.56$; p < 0.001). States that had a CAP score of 2 had a pediatric firearm suicide rate of 0.633 per year per 100,000 children, although states that lack both access laws or laws regulating firearm storage or lock requirements (CAP score = 0) had a firearm suicide rate of 2.573 per year per 100,000 children (Fig. 5). The negative association between the presence of CAP laws and firearm homicide rates was negligible.

When controlling for unemployment rates, poverty rates, and the number of registered firearms, the correlation between Brady score and firearm homicide rates

was no longer statistically significant. Similarly, the relationship between Brady score and firearm suicide rates was not statistically significant after controlling for the same state-level factors. However, even after controlling for socioeconomic factors, Brady score, and number of registered firearms, the association between presence of CAP laws and firearm suicide rates remained significant ($\beta = -0.22$; 95% CI $-0.440$ to $-0.003$; p = 0.04).

## DISCUSSION

Our study found that stricter state firearm legislation as quantified by the Brady scorecard was significantly associated with fewer firearm-related fatalities in children and teens. The CAP laws were similarly and significantly associated (moderate negative) with decreased firearm-related suicide rates, but not with overall firearm-related mortality. These associations remained significant after accounting for socioeconomic factors. The Brady scorecard had low negative associations with firearm homicide and suicide rates individually that were not statistically significant after accounting for socioeconomic factors. Likewise, the CAP score had low negative and negligible associations with overall firearm mortality and homicide rates, respectively, which were also not significant on multivariate analysis.

This research contributes to the national dialogue on how to address firearm-related fatalities, particularly in children. There are more than 300 federal gun laws that regulate the sale, transport, and possession of firearms in the US[5,24]; however, there is great variability on the state and local levels in the implementation of firearm regulations and little research on the effect of these laws. When compared with countries with similar economic



**Figure 3.** Relationship between Brady score (2014) and firearm-related mortality rate by state and region.

development and political structure, the US is the most dangerous of nations for children, with pediatric deaths from firearm injuries as a leading contributor. Among the 23 wealthiest developed nations, the US accounts for approximately 30% of the overall population, but >90% of deaths due to firearms among children aged younger than 15 years.[25] A child is 82 times more likely to die from firearm-related injuries in the US than in other similar nations.[26] Fowler and colleagues[27] estimated nearly 19 children per day die or are treated for gunshot wounds in the US. The US has higher rates of homicide, suicide, and unintentional injury by firearm than any other industrialized nation.[28]

To our knowledge, this is the first study to examine the relationship between firearm legislation stringency and pediatric firearm fatalities using both overall stringency and child-specific legislation. To date, a few studies have examined firearm legislation stringency and pediatric

firearm injuries. Safavi and colleagues[29] dichotomized states into strict firearm law states or non-strict firearm law states, based on child-specific legislation using Brady Campaign data and data pulled from individual state resources. Their group found that non-strict states had a higher mean firearm injury rate per 1,000 pediatric trauma patients. Non-strict states in their analyses increased the mean firearm injury rate by 3.75 compared with strict firearm law states. Tashiro and colleagues[30] compared legislative stringency with inpatient pediatric hospital admissions. Using Brady scores to classify states as either lenient or strict, they found that more hospital admissions due to firearm-related injuries occurred in lenient states. They identified an overall pediatric in-hospital mortality of 7% from firearm injuries during their study period. Propensity score-matched analysis found mortality was higher in lenient states (7.5%) vs strict states (6.5%). Our study findings of a moderate negative correlation between pediatric fatality and increased legislative stringency are consistent with these previously noted overall trends in pediatric firearm-related injuries. We note that when firearm legislation is treated as a continuous variable, rather than dichotomous, there is a dose-dependent correlation: states with more stringent firearm legislation are associated with decreased pediatric firearm mortality. We found the states with the least stringent laws had an annual pediatric firearm mortality rate twice that of states with the most stringent laws. Additionally, we found suggestion that the cumulative stringency of laws of neighboring states might have a similar relationship, as exhibited by the low negative correlation with pediatric firearm mortality.

Of note, studies examining the effect of legislative stringency on firearm injuries have found the most common mechanism of injury is typically assault, followed by accidental or undetermined, and trailed distantly by self-

| Variable | Correlation with Firearm Mortality Rate (0-19 yrs) | Spearman's rank correlation coefficient | Correlation with | |
|---|---|---|---|---|
| | | | Firearm Homicide rate | Firearm Suicide Rate |
| Brady score | Moderate negative | $\rho = -0.662, P < 0.001$ | Low negative | Low negative |
| Neighbors' Brady score | Low negative | $\rho = -0.497, P < 0.001$ | Low negative | Negligible |
| Unemployment rate | Low positive | $\rho = 0.463, P = 0.003$ | Moderate positive | Negligible |
| CAP score | Low negative | $\rho = -0.314, P = 0.03$ | Negligible | Moderate negative |
| Tobacco use % | Low positive | $\rho = 0.382, P < 0.001$ | Low positive | Moderate positive |
| High school graduation rate | Low negative | $\rho = -0.330, P = 0.02$ | Negligible | Low negative |
| Urban population % | Low negative | $\rho = -0.338, P = 0.02$ | Low negative | Low negative |
| Firearms registration rate | Low positive | $\rho = 0.426, P = 0.003$ | Negligible | Low positive |
| Supplemental poverty rate | Negligible | $\rho = 0.202, P = 0.172$ | Low positive | Negligible |
| Marijuana use % | Negligible | $\rho = -0.247, P = 0.100$ | Negligible | Negligible |
| Alcohol dependence % | Negligible | $\rho = -0.162, P = 0.274$ | Negligible | Negligible |

**Figure 4.** State-level factors and their correlation with the outcome measures. Spearman's rank correlation coefficient ($\rho$) and p values are given for the primary end point, overall pediatric firearm mortality. All variables treated as continuous. Child access prevention (CAP) scores hold values of 0, 1, or 2. Tobacco use and marijuana use reflect percentage of survey respondents who indicated use within the last 30 days; participants were 12 to 17 years old.



| Any Safe Storage or Gun Lock Requirement? | Any Child Access Prevention Law? | | |
|---|---|---|---|
| | | No | Yes |
| | No | 2.57 | 1.51 |
| | Yes | 0.99 | 0.63 |

AL, AK, AZ, AR, ID, KS, LA, MT, NE, NM, ND, OR, SC, WA, WV, WY

MI, NY, OH, PA

CO, FL, GA, IN, IA, KY, MN, MS, MO, NV, NH, NC, OK, TN, TX, UT, VA, WI

CA, IL, MD

**Figure 5.** Firearm suicide rates by presence of any child access prevention law (ie laws imposing criminal liability when a minor child gains access to a firearm, laws preventing people from providing firearms to minors, and safe storage requirements that apply to all firearms) and safe storage or gun lock requirements (ie laws concerning locking devices or storage in certain circumstances, or with certain types of guns). Five states (CA, CT, MD, MA, NY) have state-mandated standards for locking devices.

inflicted/suicide, with suicide typically accounting for just 3% of the cohorts.[30,31] Consequently, many studies have focused on the effect of firearms legislation on unintentional injury.[11,12] In our study, we found that suicides accounted for 31.4% of national pediatric firearm fatalities. The leading cause of fatality remains assault. This underscores the lethality of firearms when the intent is to cause harm. The case-fatality rate (ie proportion of cases resulting in death) is highest for suicides. Fowler and colleagues[27] reported that from 2012 to 2014, average annual case fatality rate was 74% for firearm-related suicides, 14% for firearm-related assault, and 6% for unintentional firearm injuries. In unadjusted analyses, we found that higher Brady scores and CAP laws were negatively associated (moderate-strength correlation) with fewer firearm-related suicide deaths. States without CAP laws had a 4-fold higher firearm-related suicide rates compared with states with the most extensive CAP laws (CAP score = 2). This association remained significant, even after accounting for potential confounders, such as gun ownership rates.

The use of firearms has consistently been one of the most common methods for suicide in adolescents in the US, accounting for 42.6% of adolescent suicides from 2000 to 2016.[5] Numerous case-control studies have demonstrated that the presence of firearms in the home substantially increases the risk of adolescent suicide.[32-34] A separate case-control study in 2005 found that safe gun storage practices are associated with a decreased risk of teen suicide and unintentional firearm injuries.[35] Our analysis found only a low negative association between overall state firearm legislation stringency and suicide; however, CAP laws were more significantly associated (moderate correlation) with decreased suicide rates, suggesting that they can play an important role in reducing pediatric firearm suicide. Firearm storage and lock requirements can provide enough of a barrier to adolescents who are contemplating suicide, which is often an impulsive decision in this age group. Studies have demonstrated that teens who attempt suicide deliberate for as few as 10 minutes or less.[36,37] Preventing access to lethal means like firearms, even without adapting broader firearm legislation, can help reduce pediatric suicide rates across the country.

Between 2002 and 2007, there was a 17% increase in firearm homicide rates among children; from 2007 to 2014, there was a 60% increase in child firearm suicide rates.[27] Although we did find a significant association (moderate negative correlation) between firearm legislation stringency and overall pediatric mortality after accounting for socioeconomic factors, the correlation did not remain significant when considering homicide deaths alone. The CAP scores similarly had a negligible association with pediatric firearm homicide rates that was not statistically significant. Firearm homicide rates, however, are thought to be multifactorial and more closely associated with socioeconomic variables. Price and colleagues[9] found that firearm legislation was associated with only 10% of the variation in homicide rates; the majority of the variation was ascribed to firearm ownership rates and socioeconomic factors. Other studies have noted significant variations in pediatric firearm homicide rates associated with racial disparities, drug and alcohol abuse, and poverty.[38,39] Our study similarly found many socioeconomic variables, including unemployment rates, percent urbanization, poverty rates, and teen tobacco use, were associated with firearm homicide rates in unadjusted analysis. Firearm-related homicide in children remains a complex, multifaceted problem. Given the recent trends, more research is needed to identify meaningful ways to reduce firearm-related homicides among children.

There are several limitations to this study. As we evaluated only state-level information, these results are not

generalizable at the individual person level. Our study examined a limited time period, and a longitudinal study can provide additional details about important time trends and draw stronger conclusions on the effect of firearm legislation on pediatric firearm mortality. This study was not able to control for differences in enforcement of state firearm legislation. There might be additional state-level variables or socioeconomic factors that were not captured by our identified confounders. Some of the state-level variables, like tobacco use and marijuana use, were gathered from a subset of the pediatric population (ages 12 to 17 years). Extrapolating data from subsets of the population and applying it to the entire group can cause error in our analysis, including our positive correlation between tobacco use and firearm-related suicide rates. However, suicide by any mechanism in children younger than 10 years is exceedingly rare,[40] therefore, we are confident that the correlation is valid, despite the limitation in the data set. Overall state gun death rates are a component of the Brady scores, which can correlate to pediatric firearm mortality rates independently. However, the death rates contribute only 10% to the Brady scores and include both adults and children, minimizing the possible correlation to pediatric firearm mortality rates independently. Lastly, when analyzing independent predictors, we attempted to control for the number of firearms in each state with the number of registered firearms, which is a limited subset of the total number of firearms, as only certain types of firearms are required to be registered. Furthermore, each state has separate and variable laws related to what type of firearm must be registered in that state. Future work will aim to address some of these limitations by examining pediatric firearm-related deaths and state-level legislation over time.

## CONCLUSIONS

Stricter state firearm legislation and CAP laws are associated with lower overall pediatric firearm mortality rates and pediatric firearm suicide rates, respectively. Additional state legislation could play an important role in reducing firearm fatalities in the pediatric population, particularly by reducing the number of suicides.

### Author Contributions

Study conception and design: Madhavan, Staudenmayer, Chao

Acquisition of data: Madhavan, Taylor, Chandler, Chao

Analysis and interpretation of data: Madhavan, Taylor, Chandler, Staudenmayer, Chao

Drafting of manuscript: Madhavan, Taylor, Chandler, Staudenmayer, Chao

Critical revision: Madhavan, Taylor, Staudenmayer, Chao

## REFERENCES

1. EverytownResearch.org. The long, shameful list of school shootings in America. Available at: https://everytownresearch.org/gunfire-in-school/6708. Accessed December 4, 2018.
2. Follman M, Aronsen G, Pan D. US mass shootings, 1982-2018: data from Mother Jones' investigation. Available at: https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/. Accessed July 1, 2018.
3. The Mass Shootings in America Database. Available at: https://github.com/StanfordGeospatialCenter/MSA. Accessed June 18, 2018.
4. Heron M. Deaths: leading causes for 2010. National Vital Statistics Reports. Vol 62, no 6. Hyattsville, MD: National Center for Health Statistics; 2013.
5. Centers for Disease Control and Prevention. Injury Prevention and Control. Welcome to WISQARS. Available at: www.cdc.gov/injury/wisqars. Accessed August 1, 2018.
6. Finkelhor D, Turner HA, Shattuck A, Hamby SL. Prevalence of childhood exposure to violence, crime, and abuse: results from the national survey of children's exposure to violence. JAMA Pediatr 2015;169:746−754.
7. Kwon IWG, Scott B, Safranski SR, Bae M. The effectiveness of gun control laws. Am J Econ Sociol 1997;56:41−50.
8. Fleegler EW, Lee LK, Monuteaux MC, et al. Firearm legislation and firearm-related fatalities in the United States. JAMA Intern Med 2013;173:732−740.
9. Price JH, Thompson AJ, Dake JA. Factors associated with state variations in homicide, suicide, and unintentional firearm deaths. J Community Health 2004;29:271−283.
10. Hepburn L, Azrael D, Miller M, Hemenway D. The effect of child access prevention laws on unintentional child firearm fatalities, 1979−2000. J Trauma Acute Care Surg 2006;61:423−428.
11. Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional shooting deaths of children. Pediatrics 2000;106:1466−1469.
12. Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. JAMA 1997;278:1084−1086.
13. Webster DW, Vernick JS, Zeoli AM, Manganello JA. Association between youth-focused firearm laws and youth suicides. JAMA 2004;292:594−601.
14. The Brady Campaign State Scorecard. Brady Campaign to Prevent Gun Violence. 2014. Available at: http://www.crimadvisor.com/data/Brady-State-Scorecard-2014.pdf. Accessed May 1, 2017.
15. Maris J, Hogarty M, Bagatell R. Neuroblastoma. Lancet 2007; 369:2106−2120.
16. US Department of Labor Bureau of Labor Statistics. Occupational Employment Statistics. Available at: https://www.bls.gov/oes/. Accessed August 28, 2017.
17. Bishaw A, Glassman B. Poverty: 2014 and 2015. Suitland, MD: US Census Bureau; 2016.
18. Kena G, Hussar W, McFarland J, et al. The Condition of Education 2016 (NCES 2016-144). Washington, DC: US Department of Education, National Center for Education Statistics; 2016. Available at: https://nces.ed.gov/pubs2016/2016144.pdf. Accessed April 8, 2019.
19. 2014-2015 National Surveys on Drug Use and Health. Available at: https://www.samhsa.gov/data/report/2014-2015-nsduh-state-estimates-substance-use-and-mental-disorders. Accessed August 28, 2017.

20. Diagnostic and Statistical Manual of Mental Disorders. 4th ed. Washington, DC: American Psychological Association; 1994.

21. Bureau of Alcohol, Tobacco, Firearms and Explosives. Firearms Trace data-2016. Available at: https://www.atf.gov/resource-center/firearms-trace-data-2016. Accessed August 1, 2017.

22. US Department of Justice. Bureau of Alcohol, Tobacco, Firearms and Explosives. Firearm Commerce in the United States: Annual Statistical Update 2014. Available at: https://www.atf.gov/resource-center/docs/firearmscommerceannualstatisticalreport2014pdf/download. Accessed August 28, 2017.

23. Mukaka MM. A guide to appropriate use of correlation coefficient in medical research. Malawi Med J 2012;24:69—71.

24. Hutchinson A. Report of the National School Shield Task Force. 2013. Available at: https://cdn.cnsnews.com/documents/National%20School%20Shield%20Report.pdf. Accessed April 8, 2019.

25. Grinshteyn E, Hemenway D. Violent death rates: the US compared with other high-income OECD countries, 2010. Am J Med 2016;129:266—273.

26. Thakrar AP, Forrest AD, Maltenfort MG, Forrest CB. Child mortality in the US and 19 OECD comparator nations: a 50-year time-trend analysis. Health Aff 2018;37:140—149.

27. Fowler KA, Dahlberg LL, Haileyesus T, et al. Childhood firearm injuries in the United States. Pediatrics 2017: e20163486.

28. Richardson EG, Hemenway D. Homicide, suicide, and unintentional firearm fatality: comparing the United States with other high-income countries, 2003. J Trauma Acute Care Surg 2011;70:238—243.

29. Safavi A, Rhee P, Pandit V, et al. Children are safer in states with strict firearm laws: a National Inpatient Sample study. J Trauma Acute Care Surg 2014;76:146—151.

30. Tashiro J, Lane RS, Blass LW, et al. The effect of gun control laws on hospital admissions for children in the United States. J Trauma Acute Care Surg 2016;81[Suppl 1]:S54—S60.

31. Hamilton EC, Miller CC III, Cox CS Jr, et al. Variability of child access prevention laws and pediatric firearm injuries. J Trauma Acute Care Surg 2018;84:613—619.

32. Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. N Engl J Med 1992;327:467—472.

33. Brent DA, Perper JA, Moritz G, et al. Firearms and adolescent suicide: a community case-control study. Am J Dis Child 1993;147:1066—1071.

34. Brent DA, Perper JA, Allman CJ, et al. The presence and accessibility of firearms in the homes of adolescent suicides. JAMA 1991;266:2989—2995.

35. Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional firearm injuries. JAMA 2005;293:707—714.

36. Simon TR, Swann AC, Powell KE, et al. Characteristics of impulsive suicide attempts and attempters. Suicide Life Threat Behav 2001;32:49—59.

37. Deisenhammer EA, Strauss R, Kemmler G, et al. The duration of the suicidal process: how much time is left for intervention between consideration and accomplishment of a suicide attempt? J Clin Psychiatry 2009;70:19—24.

38. White N, Lauritsen JL. Violent Crime Against Youth, 1994—2010. Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics; 2012.

39. Hohl BC, Wiley S, Wiebe DJ, et al. Association of drug and alcohol use with adolescent firearm homicide at individual, family, and neighborhood levels. JAMA Int Med 2017;177:317—324.

40. Ivey-Stephenson AZ, Crosby AE, Jack SP, et al. Suicide trends among and within urbanization levels by sex, race/ethnicity, age group, and mechanism of death—United States, 2001—2015. MMWR Surveill Summ 2017;66:1.

# Exhibit 12

# The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy

Abhay Aneja and John J. Donohue III, *Stanford University*, and
Alexandria Zhang, *Johns Hopkins University*

Send correspondence to: John J. Donohue III, School of Law, Stanford University,
559 Nathan Abbott Way, Stanford, CA 94305, USA; Fax: 650-723-4669; E-mail:
donohue@law.stanford.edu.

For over a decade, there has been a spirited academic debate over the impact on crime of
laws that grant citizens the presumptive right to carry concealed handguns in public—
so-called right-to-carry (RTC) laws. In 2005, the National Research Council (NRC)
offered a critical evaluation of the "more guns, less crime" hypothesis using
county-level crime data for the period 1977–2000. Seventeen of the eighteen NRC
panel members essentially concluded that the existing research was inadequate to con-
clude that RTC laws increased or decreased crime. The final member of the panel,
though, concluded that the NRC's panel data regressions supported the conclusion that
RTC laws decreased murder. We evaluate the NRC evidence and show that, unfortu-
nately, the regression estimates presented in the report appear to be incorrect. We im-
prove and expand on the report's county data analysis by analyzing an additional six
years of county data as well as state panel data for the period 1977–2006. While we have
considerable sympathy with the NRC's majority view about the difficulty of drawing
conclusions from simple panel data models, we disagree with the NRC report's judg-
ment that cluster adjustments to correct for serial correlation are not needed. Our ran-
domization tests show that without such adjustments, the Type 1 error soars to 40–70%.
In addition, the conclusion of the dissenting panel member that RTC laws reduce mur-
der has no statistical support. Finally, our article highlights some important questions to

The authors wish to thank David Autor, Alan Auerbach, Phil Cook, Peter Siegelman,
and an anonymous referee for helpful comments, as well as Stanford Law School and Yale
Law School for financial support.

American Law and Economics Review
doi:10.1093/aler/ahr009

© The Author 2011. Published by Oxford University Press on behalf of the American Law and Economics
Association. All rights reserved. For permissions, please e-mail: journals.permissions@oup.com.

consider when using panel data methods to resolve questions of law and policy effectiveness. Although we agree with the NRC's cautious conclusion regarding the effects of RTC laws, we buttress this conclusion by showing how sensitive the estimated impact of RTC laws is to different data periods, the use of state versus county data, particular specifications, and the decision to control for state trends. Overall, the most consistent, albeit not uniform, finding to emerge from both the state and the county panel data models conducted over the entire 1977–2006 period with and without state trends and using three different models is that aggravated assault rises when RTC laws are adopted. For every other crime category, there is little or no indication of any consistent RTC impact on crime. It will be worth exploring whether other methodological approaches and/or additional years of data will confirm the results of this panel data analysis. (*JEL* K49, K00, C52)

## 1.  Introduction

The debate on the impact of "shall-issue" or "right-to-carry" (RTC) concealed handgun laws on crime—which has now raged on for over a decade—demonstrates one of the many difficulties and pitfalls that await those who try to use observational data to estimate the effects of controversial laws.[1] John Lott and David Mustard initiated the "more guns, less crime" (MGLC) discussion with their widely cited 1997 article arguing that the adoption of RTC laws has played a major role in reducing violent crime. However, as Ayres and Donohue (2003b) note, Lott and Mustard's period of analysis ended just before the extraordinary crime drop of the 1990s. They concluded that extending Lott and Mustard's data set beyond 1992 undermined the MGLC hypothesis. Other studies have raised further doubts about the claimed benefits of RTC laws (e.g., see Black and Nagin, 1998; Ludwig, 1998).

But even as the empirical support for the Lott-Mustard thesis was weakening, its political impact was growing. Legislators continued to cite this work in support of their votes on behalf of RTC laws, and the MGLC claim has been invoked often in support of ensuring a personal right to have handguns under the Second Amendment. In the face of this scholarly and political ferment, in 2003, the National Research Council (NRC) convened a committee of top experts in criminology, statistics, and economics. Its purpose was to evaluate the existing data in hopes of reconciling the various methodologies and

---

1.    The term "RTC laws" is used interchangeably with "shall-issue laws" in the guns and crime literature.

findings concerning the relationship between firearms and violence, of which the impact of RTC laws was a single, but important, issue. With so much talent on board, it seemed reasonable to expect that the committee would reach a decisive conclusion on this topic, and put the debate to rest.

The bulk of the NRC report on firearms, which was finally issued in 2005, was uncontroversial. The chapter on RTC laws, however, proved to be extremely contentious. Citing the extreme sensitivity of point estimates to various panel data model specifications, the NRC report failed to narrow the domain of uncertainty about the effects of RTC laws. Indeed, it may have broadened it. However, while the NRC report concluded there was no reliable statistical support for the MGLC hypothesis, the vote was not unanimous. One dissenting committee member argued that the committee's own estimates revealed that RTC laws did in fact reduce the rate of murder. Conversely, a different member went even further than the majority's opinion by doubting that *any* econometric evaluation could illuminate the impact of RTC laws.

Given the prestige of the committee and the conflicting assessments of both the substantive issue of RTC laws' impact and the suitability of empirical methods for evaluating such laws, a reassessment of the NRC's report would be useful for researchers seeking to estimate the impact of other legal and policy interventions. Our systematic review of the NRC's evidence—its approach and findings—also provides important lessons on the perils of using traditional observational methods to elucidate the impact of legislation. To be clear, our intent is not to provide what the NRC panel could not—that is, the final word on how RTC laws impact crime. Rather, we show how fragile panel data evidence can be, and how a number of issues must be carefully considered when relying on these methods to study politically and socially explosive topics with direct policy implications.

The outline of this article is as follows. Section 2 offers background on the debate over RTC laws, and Section 3 describes relevant aspects of the NRC report in depth. Section 4 enumerates the critical flaws of the key results in the NRC report. Sections 5 and 6 explore two key econometric issues where the NRC panel may have erred—whether to control for state-specific trends and whether to adjust standard errors to account for serial or within-group correlation. Section 7 extends the analysis through 2006, and Section 8 offers improvements to the NRC model by revising the regression specification in accordance with past research on crime. Section 9 discusses the issue of whether the impact of RTC laws can be better estimated using

county- or state-level data. Section 10 delves further into three issues in this debate that merit special attention: the problem of omitted variable bias in assessing the impact of RTC laws (and in particular, the difficult-to-measure effect of the crack epidemic), the plausibly endogenous adoption of RTC legislation, and the relatively untouched issue of how RTC laws affect gun violence in particular. Section 11 offers concluding comments on the current state of the research on RTC laws, the difficulties in ascertaining the causal effects of legal interventions, and the dangers that exist when policy makers can simply pick their preferred study from among a wide array of conflicting estimates.

## 2. Background on the Debate

In a widely discussed 1997 article, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," John Lott and David Mustard (1997) argued, based on a panel data analysis, that RTC laws were a primary driving force behind falling rates of violent crime. Lott and Mustard used county-level crime data (including county and year fixed effects, as well as a set of control variables) to estimate the impact of RTC laws on crime rates over the time period 1977–92. In essence, Lott and Mustard's empirical approach was designed to identify the effect of RTC laws on crime in the ten states that adopted them during this time period. Using a standard difference-in-difference model, the change in crime in the ten RTC states is compared with the change in crime in non-RTC states. The implicit assumption is that the controls included in the regression will explain other movements in crime across states, and the remaining differences in crime levels can be attributed to the presence or absence of the RTC laws.

Lott and Mustard estimated two distinct difference-in-difference-type models to test the impact of RTC laws: a dummy variable model and a trend, or "spline," model[2]. The "dummy model" tests whether the average crime level in the pre-passage period is statistically different from the post-passage crime level (after controlling for other factors). The "spline model" measures whether crime *trends* are altered by the adoption of RTC laws. Lott and Mustard noted that the

---

2. In the "dummy model," RTC laws are modeled as a dummy variable that takes on a value of 1 in the first full year after passage and retains that value thereafter (since no state has repealed its RTC law once adopted). In the "trend model," RTC laws are modeled as a spline variable indicating the number of years post-passage.

spline approach would be superior if the intervention caused a reversal in a rising crime rate. Such a reversal could be obscured in a dummy variable model that only estimates the average change in crime between the pre- and post-passage periods. An effective RTC law might show no effect in the dummy model if the rise in the pre-passage crime rate and the fall in the post-passage rate were to leave the average "before" and "after" crime levels the same.

In both regression models, Lott and Mustard included only a single other criminal justice explanatory variable—county-level arrest rates—plus controls for county population, population density, income, and thirty-six(!) categories of demographic composition. As we will discuss shortly, we believe that many criminological researchers would be concerned about the absence of important explanatory factors such as the incarceration rate and the level of police force.

Lott and Mustard's results seemed to support the contention that laws allowing the carry of concealed handguns lead to less crime. Their estimates suggested that murder, rape, aggravated assault, and overall violent crime fell by 4–7% following the passage of RTC laws. In contrast, property crime rates (auto theft, burglary, and larceny) were estimated to have increased by 2–9%. Lott and Mustard thus concluded that criminals respond to RTC laws by substituting violent crime with property crime to reduce the risk that they would be shot (since, according to them, victims are more often absent during the commission of a property crime). They also found that the MGLC contention was strengthened by the trend analysis, which ostensibly suggested significant decreases in murder, rape, and robbery (but no significant increases in property crime).

From this evidence, Lott and Mustard (1997) concluded that permissive gun-carrying laws deter violent crimes more effectively than any other crime reduction policy: "concealed handguns are the most cost-effective method of reducing crime thus far analyzed by economists, providing a higher return than increased law enforcement or incarceration, other private security devices, or social programs like early education." They went even further by claiming that had the remaining non-RTC states enacted such legislation, over 1,400 murders and 4,100 rapes would have been avoided nationwide, and that each new handgun permit would reduce victim losses by up to $5,000.

## 2.1. The Far-Reaching Impact of MGLC

The first "MGLC" article and Lott's subsequent research (and pro-gun advocacy) have had a major impact in the policy realm. Over the past decade,

politicians as well as interest groups such as the National Rifle Association have continually trumpeted the results of this empirical study to oppose gun control efforts and promote less restrictive gun-carrying laws. Lott relied on his own research to advocate for the passage of state-level concealed-carry gun laws, testifying on the purported safety benefits of RTC laws in front of several state legislatures, including Nebraska, Michigan, Minnesota, Ohio, and Wisconsin (Ayres and Donohue, 2003b).

The impact of the Lott-Mustard article can also be seen at the federal level. In 1997, ex-Senator Larry Craig (R-Idaho) introduced the Personal Safety and Community Protection Act with Lott's research as supporting evidence. This bill was designed to allow state nonresidents with valid handgun permits in their home state to possess concealed firearms (former football athlete Plaxico Burress sought to invoke this defense when he accidentally shot himself in a Manhattan nightclub with a gun for which he had obtained a Florida permit). According to Craig, Lott's work confirmed that positive externalities of gun carrying would result in two ways: by affording protection for law-abiding citizens during criminal acts and by deterring potential criminals from ever committing offenses for fear of encountering an armed response.[3] Clearly, Lott's work has provided academic cover for policy makers and advocates seeking to justify the view—on public safety grounds—that the Second Amendment confers a private right to possess handguns.

## 2.2. Questioning MGLC

Immediately after the publication of the Lott–Mustard article, scholars started raising serious questions about the theoretical and empirical validity of the MGLC hypothesis. For example, Zimring and Hawkins (1997) claimed that the comparison of crime between RTC and non-RTC states is inherently misleading because of factors such as poverty, drugs, and gang activity, which vary significantly across gun-friendly and non-gun-friendly

---

3. 143 CONG. REC. S5109 (daily ed. May 23, 1997) (statement of Sen. Craig). The bill was again introduced in 2000 by Congressman Cliff Stearns (R-Florida), who also cited Lott's work. 146 CONG. REC. H2658 (daily ed. May 9, 2000) (statement of Rep. Stearns). Indeed, this proposed legislation, now derisively referred to as "Plaxico's Law," is a perennial favorite of the NRA and frequently introduced by supportive members of Congress (Collins, 2009).

states (and are often difficult to quantify). To the extent that the relatively better crime performance seen in shall-issue states during the late 1980s and early 1990s was the product of these other factors, researchers may be obtaining biased impact estimates. Underscoring this point,  Ayres and Donohue (2003b) pointed out that crime rose across the board from 1985 to 1992, and most dramatically in non-RTC states. Since the Lott-Mustard data set ended in 1992, it could not capture the most dramatic reversal in crime in American history. Figures 1–7 depict the trends of violent and property crimes over the period 1970–2007. For each of the seven crimes, the fifty states (plus DC) fall into four groupings: non-RTC states, states that adopted RTC laws over the period 1985–88 ("early adopters"), those that adopted RTC laws over the period 1989–91 ("mid-adopters"), and those that adopted RTC laws over the period 1994–96 ("late adopters"). The crime rate shown for each group is a within-group average, weighted by population. The figures corroborate Ayres and Donohue's point: crime rates declined sharply across the board beginning in 1992. In fact, there was a steady *upward* trend in crime rates in the years leading up to 1992, most distinctly for rape and aggravated assault. Moreover, the average crime rates in non-RTC states seemed to have dropped even more drastically than those in RTC states, which suggests that crime-reducing factors other than RTC laws were at work.

Ayres and Donohue (2003b) also recommended the use of a more general model, referred to as the "hybrid model," which essentially combined the dummy variable and spline models, to measure the immediate and long-run



**Figure 1.**  Murder Trends in RTC versus Non-RTC States—Weighted Average of Murder Rates per 100,000 Residents (1970–2007).



**Figure 2.**  Rape Trends in RTC versus Non-RTC States—Weighted Average of
Rape Rates per 100,000 Residents (1970–2007).

impact of RTC laws on crime. Since the hybrid model nests both the dummy
and spline models, one can estimate the hybrid and generate either of the
other models as a special case (depending on what the data show). This ex-
ercise seemed to weaken the MGLC claim. Their analysis of the county data
set from 1977–1997 using the Lott-Mustard specification (revised to mea-
sure state-specific effects) indicated that RTC laws in aggregate *raised* total
crime costs by as much as $524 million.

Just as Lott had identified a potential problem with the dummy model (it
might understate a true effect if crime followed either a V-shaped or an



**Figure 3.**  Assault Trends in RTC versus Non-RTC States—Weighted Average of
Assault Rates per 100,000 Residents (1970–2007).



**Figure 4.** Robbery Trends in RTC versus Non-RTC States—Weighted Average of Robbery Rates per 100,000 Residents (1970–2007).

inverted V-shaped pattern), there is a potential problem with models (such as the spline and the hybrid models) that estimate a post-passage linear trend. Early adopters of RTC laws have a far more pronounced impact on the trend estimates of RTC laws than later adopters since there may only be a few years of post-passage data available for a state that adopts RTC laws close to the end of the data period. If those early adopters were unrepresentative of low-crime states, then the final years of the spline estimate would suggest a dramatic drop in crime, not because crime had in fact fallen in adopting states but because the more representative states had dropped out of the estimate (since there would be no post-passage data after, say, three years for



**Figure 5.** Auto Theft Trends in RTC versus Non-RTC States—Weighted Average of Auto Theft Rates per 100,000 Residents (1970–2007).



**Figure 6.** Burglary Trends in RTC versus Non-RTC States—Weighted Average of Burglary Rates per 100,000 Residents (1970–2007).

a state that had adopted the RTC law only three years earlier, but there would be such data for Maine, Indiana, and North Dakota, which were the earliest RTC adopters). We recognize that each model has limitations, and present the results of all three in our tables below.[4]

## 3.  Findings of the NRC

The sharply conflicting academic assessments of RTC laws specifically and the impact of firearms more generally, not to mention the heightened political salience of gun issues, prompted the NRC to impanel a committee of experts to critically review the entire range of research on the relationships between guns and violence. The blue-chip committee, which included prominent scholars such as sociologist Charles Wellford (the committee chair), political scientist James Q. Wilson, and economists Joel Horowitz, Joel Waldfogel, and Steven Levitt, issued its wide-ranging report in 2005.

While the members of the panel agreed on the major issues discussed in eight of the nine chapters of the NRC report, the single chapter devoted to

---

4.   We note that in the latest version of his book, Lott (2010) criticizes the hybrid model, but he fails to appreciate that the problem with the hybrid model—and with the spline model he prefers—is that they both yield estimates that are inappropriately tilted down as the more representative states drop out of the later years, which drive the post-passage trend estimates. An apples-and-apples comparison that included the identical states to estimate the post-passage trend would not suggest a negative slope. This is clear in Figure 1 and Table 1 of Ayres and Donohue (2003b).



**Figure 7.** Larceny Trends in RTC versus Non-RTC States—Weighted Average of Larceny Rates per 100,000 Residents (1970–2007).

exploring the causal effects of RTC laws on crime proved to be quite contentious. After reviewing the existing (and conflicting) literature and undertaking their own evaluation of Lott's county-level crime data, seventeen of the eighteen committee members concluded that the data provided no reliable and robust support for the Lott-Mustard contention. In fact, they believed the data could not support any policy-relevant conclusion. In addition, they claimed they could not estimate the true impact of these laws on crime because (1) the empirical results were imprecise and highly sensitive to changes in model specification and (2) the estimates were not robust when the data period was extended eight years beyond the original analysis (through 2000), a period during which a large number of states adopted the law.

One can get an inkling of the NRC majority's concern about model sensitivity by examining Table 2a (which we will discuss in detail in Section 4.2), which reports estimates from the NRC report on the impact of RTC laws on seven crimes. The estimates are based on the Lott and Mustard (1997) dummy and spline models and county data for the period 1997–2000. The vastly different results produced by the two models gave the majority considerable pause. For example, if one believed the dummy model, then RTC laws considerably *increased* aggravated assault and robbery, while the spline model suggested RTC laws *decreased* the rate of both of these crimes.

The tension created by conflicting estimates was epitomized by the intra-panel dissention, as two members of the committee wrote separately on the NRC's evaluation of RTC laws. One sought to refute the majority's skepticism, and one sought to reinforce it. Noted political scientist James Q. Wilson offered the lone dissent to the committee's report, claiming that Lott and

Mustard's MGLC finding actually held up under the panel's reanalysis. Specifically, Wilson rejected the majority's interpretation of the regression estimates seen in Table 2a. Although the panel noted that the RTC impact estimates disagreed across their two models (dummy and spline) for six of the seven crime categories, Wilson emphasized the similar finding of murder rate declines in the two models. The agreement in the murder estimates led him to heartily endorse the MGLC view. Indeed, after dismissing articles that had cast doubt on the MGLC hypothesis (such as Black and Nagin, 1998), on the grounds that they were "controversial," Wilson concluded: "I find the evidence presented by Lott and his supporters suggests that RTC laws do in fact help drive down the murder rate, though their effect on other crimes is ambiguous" (NRC, 2005, p. 271).

The committee penned a response to Wilson's dissent (separate from its overall evaluation of RTC legislation), which stressed that the only disagreement between the majority and Wilson (throughout the entire volume on gun issues) concerned the impact of RTC laws on murder. They noted that, while there were a number of negative estimates for murder using the Lott-Mustard approach, there were also several positive estimates that could not be overlooked. In addition, even the results for murder failed to support the MGLC contention when restricting the period of analysis to five years or less after law adoption.[5] The important task was to try to reconcile these contradictions—and the panel majority believed that was not possible using the existing data.

Committee member (and noted econometrician) Joel Horowitz was the ardent skeptic, and not without merit. Horowitz joined the refutation of Wilson but also authored his own appendix discussing at length the difficulties of measuring the impact of RTC laws on crime using observational rather than experimental data.[6] He began by addressing a number of flaws in the panel data approach. First, if factors other than the adoption of the RTC law change but are not controlled for in the model, then the resulting estimates would not effectively isolate the impact of the law (we demonstrate the

---

5. The importance of this restriction on the post-passage data was mentioned earlier: As states dropped out of the post-passage data, the estimated impact of RTC laws became badly biased (since one was no longer deriving the estimated effect from a uniform set of states).

6. While his chapter is directed at the analysis of RTC laws, Horowitz's comments applied to an array of empirical studies of policy that were discussed throughout the entire NRC volume.

likelihood of this possibility in Section 10). Second, if crime increases before the adoption of the law at the same rate it decreases after adoption, then a measured zero difference would be misleading. The same problem arises for multiyear averages. Third, the adoption of RTC laws may be a *response* to crime waves. If such an endogeneity issue exists, the difference in crime rates may merely reflect these crime waves rather than the effect of the laws. Lastly, as even Lott (2000) found in his data, RTC states differ noticeably from non-RTC states (e.g., RTC states are mainly Republican and had low but rising rates of crime). It would not be surprising if these distinctive attributes influence the measured effect of RTC laws. In this event, looking at the impact of RTC laws in current RTC states may not be useful for predicting impact if they are adopted in very different states.

Ideally, states would be randomly selected to adopt RTC laws, thereby eliminating the systematic differences between RTC states and non-RTC states. In the absence of such randomization, researchers introduce controls to try to account for these differences, which generates debate over which set of controls is appropriate. Lott (2000) defended his model by claiming that it included "the most comprehensive set of control variables yet used in a study of crime" (p. 153). We show here that this claim is gravely outdated. Moreover, Horowitz noted that not only are the data limited for these variables, it is also possible to control for too many variables—or too few. He pointed out that Donohue (2003) found a significant relationship between crime and *future* adoption of RTC legislation, suggesting the likelihood of omitted variable bias and/or the endogenous adoption of the laws. Horowitz concludes by noting that there is no test that can determine the right set of controls: "it is not possible to carry out an empirical test of whether a proposed set of X variables is the correct one . . . it is largely a matter of opinion which set [of controls] to use" (NRC, 2005, p. 307). Noting the likelihood of misspecification in the evaluation of RTC laws, and that estimates obtained from a misspecified model can be highly misleading, he concluded that there was little hope of reaching a scientifically supported conclusion based on the Lott-Mustard/NRC model.

## 3.1. The Serious Need for Reassessment

The story thus far has been discouraging for those hoping for illumination of the impact of legislation through econometric analysis. If the NRC majority is right, then years of observational work by numerous researchers,

topped off with a multiyear assessment of the data by a panel of top scholars, were not enough to pin down the actual impact of RTC laws. However, given that the panel only presented estimates based on the Lott-Mustard (1997) approach (except for a sparse model with no covariates, which we describe in Section 4), it is possible the committee overlooked quantitative models and potentially useful evidence that could have influenced their view on the topic. If Horowitz is right, then the entire effort to estimate the impact of state RTC policies from observational data is doomed. Indeed, there may be simply too much that researchers do not know about the proper structure of econometric models of crime. Notably, however, the majority did not join Horowitz in the broad condemnation of all observational microeconometrics for the study of this topic. Perhaps a model that better accounts for all relevant, exogenous, crime-influencing factors and secular crime trends could properly discern the effects of RTC laws. As we show below, a number of plausible explanations and factors were excluded from the committee's examination.

## 4. Attempts to Replicate the NRC Findings

Previous research on guns and crime has shown how data and methodological flaws can produce inaccurate conclusions. In a follow-up to their initial 2003 *Stanford Law Review* article, Ayres and Donohue (2003a) showed how coding errors can yield inaccurate estimates of the effect of RTC laws on crime. Commenting on a study in support of the MGLC premise by Plassman and Whitley (2003), Ayres and Donohue (2003a) described numerous coding flaws. After correcting these errors, the evidence supporting the MGLC hypothesis evaporated.

### 4.1. Panel Data Models with No Covariates

Since the NRC panel based their reported estimates on data provided by John Lott, we thought it prudent to carefully examine the NRC committee's own estimates. We first attempt to replicate the results of the report using the NRC 1977–2000 county data set, which the committee supplied to us. We begin with the committee's no-controls model, which, apart from the dummy and trend variables, only includes year and county fixed effects. The reported NRC estimates are presented in Table 1a, and the first two rows of Table 1b show our efforts at replicating them. While the estimates of the dummy variable model are reasonably close, the trend estimates are not at all

comparable: The sign on the estimates in the spline model switches when going from Table 1a to Table 1b for all crimes except auto theft. Table 1b also includes our own estimates from the more flexible version of these specifications—the hybrid model—which combines the dummy and trend approaches. In other words, taken at face value, Table 1b tells us that crime clearly worsened for six or seven crime categories after the passage of RTC laws, regardless of whether one used the dummy variable, spline, or hybrid models.

**Table 1a.** Estimated Impact of RTC Laws—Published NRC Estimates—No Controls, All Crimes, 1977–2000 (County Data)[a]

| | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −1.95 1.48 | 17.91*** 1.39*** | 12.34*** 0.90*** | 19.99*** 1.21*** | 23.33*** 0.85*** | 19.06*** 0.61*** | 22.58*** 0.59*** |
| 2. Spline model | 0.12 0.32 | −2.17*** 0.30*** | −0.65*** 0.20*** | −0.88*** 0.26*** | 0.57*** 0.19*** | −1.99*** 0.13*** | −0.71*** 0.13*** |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 1b.** Estimated Impact of RTC Laws—Using NRC County Data—No Controls, All Crimes, 1977—2000[a]

| | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −2.58 1.87 | 18.40*** 2.29*** | 12.60*** 1.40*** | 19.70*** 1.75*** | 22.80*** 1.69*** | 19.00*** 1.24*** | 22.60*** 1.08*** |
| 2. Spline model | −0.57* 0.34* | 2.36*** 0.39*** | 1.52*** 0.25*** | 2.43*** 0.31*** | 3.17*** 0.30*** | 2.23*** 0.24*** | 3.01*** 0.22*** |
| 3. Hybrid model | | | | | | | |
| Post-passage dummy | −0.06 2.33 | 16.20*** 2.22*** | 11.90*** 1.69*** | 17.40*** 1.88*** | 16.80*** 1.86*** | 17.70*** 1.34*** | 18.50*** 1.20*** |
| Trend effect | −0.56 0.43 | 0.58 0.40 | 0.22 0.30 | 0.51 0.35 | 1.32*** 0.35*** | 0.28 0.27 | 0.98*** 0.25*** |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 1c.** Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—No Controls, All Crimes, 1977–2000 (without 1993 Data)[a]

| | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −2.20 | 27.80*** | 16.40*** | 19.50*** | 23.90*** | 22.80*** | 28.10*** |
| | 1.87 | 3.53*** | 2.16*** | 2.06*** | 2.27*** | 2.06*** | 2.29*** |
| 2. Spline model | 0.68** | 4.65*** | 4.31*** | 3.18*** | 4.72*** | 5.06*** | 6.02*** |
| | 0.28** | 0.46*** | 0.26*** | 0.27*** | 0.28*** | 0.25*** | 0.27*** |
| 3. Hybrid model | | | | | | | |
| Post-passage dummy | −7.99*** | 12.00*** | −3.50 | 8.91*** | 5.50** | 1.44 | 3.26 |
| | 2.19*** | 3.08*** | 2.72 | 2.32*** | 2.70** | 2.60 | 2.98 |
| Trend effect | 1.34*** | 3.66*** | 4.60*** | 2.44*** | 4.27*** | 4.94*** | 5.75*** |
| | 0.33*** | 0.37*** | 0.32*** | 0.30*** | 0.32*** | 0.31*** | 0.35*** |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates.
*Significant at 10%; **significant at 5%; ***significant at 1%.

We contacted the committee to see if we might be able to understand why the efforts at replication were failing, but the files for reproducing their results and tables had not been retained.[7] Thus, we thought it wise to analyze county-level data by constructing our own data set, which we will refer to as the "updated 2009 data set." We create the same variables found in Lott's data—crime rates, demographic composition, arrest rates, income, population, and population density—and extend our new set as far forward as the data are available—2006 (the NRC data ended in 2000).[8] This data extension also gives us an opportunity to explore how the NRC's results are

---

7. In an attempt to reconcile the divergence, we initially speculated that perhaps the NRC committee did not weight its panel data regressions by county population as we do throughout, but this turned out not to explain the difference. Our best guess is that the NRC did weight the regression by population since they essentially adopted the Lott and Mustard (1997) approach. We also determined that the NRC data set was missing all county identifiers for 1999 and 2000, so we speculated that this might explain the results (since data for any year with a missing country identifier would be omitted from the regression). Again, we could not replicate the NRC spline model results of Table 1a, whether we included all years of data or dropped 1999 and 2000.

8. We also add 0.1 to all zero crime values before taking the natural log in our county-level data set, as the NRC did.

affected when using the most current data available. As we will see in Section 7, the additional years of data will also enable us to estimate the effect of six additional state adoptions of RTC laws, not present in the NRC analysis: Michigan (2001), Colorado (2003), Minnesota (2003), Missouri (2003), New Mexico (2003), and Ohio (2004).[9]

We obtained our crime data from the University of Michigan's Interuniversity Consortium for Political and Social Research, which maintains the most comprehensive collection of Uniform Crime Reports (UCR) data. Unfortunately, county-level crime data for 1993 are currently unavailable. The National Archive of Criminal Justice Data recently discovered an error in the crime data imputation procedure for 1993 and, for this reason, has made 1993 data inaccessible until the error has been corrected. Thus, for all of the following tables with estimates using our updated data, we are missing values for 1993.

Table 1c reproduces Table 1b using our own newly constructed data set (with 1993 omitted). In the case of every crime-model permutation, the use of this new data set further weakened the crime-reducing effects of RTC laws.[10] The bottom line is that (1) we cannot replicate the NRC no-controls estimates of Table 1a whether we use our own newly constructed county data or the data used by the NRC committee and (2) the best estimates in the no-controls model overwhelmingly show that all crime was *higher* after RTC laws adoptions.

## 4.2. Panel Data Models with Covariates

After failing to replicate the NRC "no-covariates" model, we next undertook the same replication exercise with the "covariates" model, which adds to the county and year fixed effects model the following Lott-Mustard explanatory variables: arrest rate, county population, population density, real per capita income variables, and thirty-six variables designed to capture the

---

9.    Kansas and Nebraska adopted RTC laws in 2006, which is too late to be captured in our analysis, since we assume a state to be an "RTC state" beginning in the first full year after a law's passage.

10.    Table 1c differs from Table 1b in two respects—it uses our new data set instead of the NRC, and it omits 1993 data. To see how important the 1993 omission is, we reproduced Table 1b (using the NRC data) dropping that year, which turned out to have little effect on the estimates.

county's demographic composition.[11] Although we have already noted Lott's claim that this is "the most comprehensive set of control variables yet used in a study of crime," in fact, this set of variables omits many important influences on crime, which we will reintroduce in Section 8.

To be clear about our approach, we use annual county-level crime data (and later, state-level data) for the United States from 1977 through either 2000 (to conform to the NRC report) or 2006 (the last year for which data are available). We explore the impact of RTC laws on seven Index I crime categories by estimating the reduced-form regression:

$$Y_{it} = \eta \text{RTC}_{jt} + \alpha_i + \theta_t + \beta_{jt} + \gamma X_{ijt} + \epsilon_{it}, \tag{1}$$

where the dependent variable $Y_{it}$ denotes the natural log of the individual violent and property crime rates for county $i$ and year $t$. Our explanatory variable of interest—the presence of an RTC law within state $j$ in year $t$—is represented by $\text{RTC}_{jt}$. The exact form of this variable shifts according to the three variations of the model we employ (these include the Lott-Mustard dummy and spline models, as well as the Ayres and Donohue hybrid model).[12]

The variable $\alpha_i$ indicates county-level fixed effects (unobserved county traits) and $\theta_t$ indicates year effects. As we will discuss below, there is no consensus on the use of state-specific time trends in this analysis, and the NRC report did not address this issue. Nevertheless, we will explore this possibility, with $\beta_{jt}$ indicating state-specific trends, which are introduced in selected models. Since neither Lott and Mustard (1997) nor the NRC (2005) examines state

---

11. The NRC uses the Lott-Mustard method of calculating arrest rates, which is the number of arrests for crimes divided by the contemporaneous number of crimes. Econometrically, it is inappropriate to use this contemporaneous measure since it leaves the dependent variable on both sides of the regression equation (a better approach would lag this variable one year, as discussed in Ayres and Donohue, 2009). Another issue about the arrest rates is unclear: The NRC report does not indicate whether it uses the individual Index I crime categories to compute arrest rates, or alternatively, if they use the broad categories of violent and property crimes, as has been used in recent articles (Moody and Marvell, 2008). We adopt this latter approach for all tables in this article, although we also explored the possibility of arrest rates for individual crimes. Regardless of which arrest rate we used, our estimates still diverged considerably from the estimates presented by the NRC.

12. As noted previously, in the dummy variable approach, the RTC variable is a dichotomous indicator that takes on a value of 1 in the first full year that a state $j$ has an RTC law. In the spline model, the RTC variable indicates the number of post-passage years. The hybrid specification contains both dummy and trend variables.

trends, this term is dropped when we estimate their models. The term $X_{ijt}$ represents a matrix of observable county and state characteristics thought by researchers to influence criminal behavior. The components of this term, however, vary substantially across the literature. For example, while Lott uses only "arrest rates" as a measure of criminal deterrence, we discuss the potential need for other measures of deterrence, such as incarceration levels or police presence, which are measured at the state level.

In Tables 2a–c, we follow the same pattern as that of Tables 1a–c: We begin by showing the NRC published estimates (Table 2a) and then show our effort at replication using the NRC data set (Table 2b). We then show the estimates obtained from our reconstruction of the county data set from 1977 through 2000 (Table 2c, which omits 1993 data).[13] The basic story that we saw above with respect to the no-covariates model holds again: We cannot replicate the NRC results using the NRC's own data set (compare Tables 2a and b), and omitting 1993 data does not make a substantive difference. Once again, our Table 2c estimates diverge wildly from the Table 2a estimates, which appeared in the NRC report. As we will see in a moment, the results that Professor Wilson found to be consistent evidence of RTC laws reducing murder (see Table 2a) were probably inaccurate (see Table 2c).

**Table 2a.** Estimated Impact of RTC Laws—Published NRC Estimates—Lott-Mustard Controls, All Crimes, 1977–2000[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −8.33*** 1.05*** | −0.16 0.83 | 3.05*** 0.80*** | 3.59*** 0.90*** | 12.74*** 0.78*** | 6.19*** 0.57*** | 12.40*** 0.59*** |
| 2. Spline model | −2.03*** 0.26*** | −2.81*** 0.20*** | −1.92*** 0.20*** | −2.58*** 0.22*** | −0.49*** 0.13*** | −2.13*** 0.19*** | −0.73*** 0.13*** |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

_____

13. Once again, we explored whether omitting 1993 data had an impact on the results, and again our Table 2 estimates looked quite similar when 1993 data were dropped.

**Table 2b.** Estimated Impact of RTC Laws—Using NRC Data—with Lott-Mustard Controls, All Crimes, 1977–2000[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −3.80* | 10.50*** | 11.20*** | 11.20*** | 16.80*** | 11.00*** | 17.60*** |
|  | 2.14* | 2.18*** | 1.55*** | 1.81*** | 1.54*** | 0.98*** | 0.86*** |
| 2. Spline model | −0.61 | 1.38*** | 1.91*** | 1.63*** | 2.61*** | 1.62*** | 3.12*** |
|  | 0.38 | 0.36*** | 0.25*** | 0.32*** | 0.29*** | 0.19*** | 0.17*** |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −2.51 | 9.77*** | 7.01*** | 9.02*** | 12.20*** | 8.92*** | 9.72*** |
|  | 2.63 | 2.28*** | 1.76*** | 1.92*** | 1.74*** | 1.06*** | 0.94*** |
| Trend effect | −0.30 | 0.18 | 1.05*** | 0.53 | 1.11*** | 0.52** | 1.92*** |
|  | 0.47 | 0.36 | 0.27*** | 0.33 | 0.34*** | 0.22** | 0.19*** |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 2c.** Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—with Lott-Mustard Controls, All Crimes, 1977–2000 (without 1993 Data)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −3.80** | 9.82*** | 8.96*** | 5.44*** | 13.60*** | 4.36*** | 12.90*** |
|  | 1.87** | 2.74*** | 1.34*** | 1.45*** | 1.40*** | 0.95*** | 0.88*** |
| 2. Spline model | −0.26 | 0.48 | 1.10*** | 0.26 | 1.50*** | 0.30** | 1.16*** |
|  | 0.28 | 0.33 | 0.18*** | 0.21 | 0.19*** | 0.15** | 0.14*** |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −3.98* | 11.40*** | 6.34*** | 6.39*** | 10.60*** | 4.53*** | 11.80*** |
|  | 2.22* | 2.62*** | 1.48*** | 1.66*** | 1.57*** | 1.05*** | 0.94*** |
| Trend effect | 0.04 | −0.38 | 0.63*** | −0.23 | 0.70*** | −0.04 | 0.28* |
|  | 0.33 | 0.30 | 0.20*** | 0.25 | 0.22*** | 0.16 | 0.15* |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

## 4.3. Potential Problems with the NRC Models and Data

Before turning to the implications of the errors in the NRC estimates, we note a few small errors in the NRC data that we corrected in all our tables. First, we identified an extraneous demographic variable that caused a substantial number of observations to drop from the NRC data set (over 20,000).[14] We do not know if the committee dropped this variable before conducting its analysis, but we drop it in our own analysis.[15] Second, Philadelphia's year of adoption is coded incorrectly—as 1995 instead of 1996. Third, Idaho's year of adoption is coded incorrectly—as 1992 instead of 1991. Fourth, the area variable, which is used to compute county density, has missing data for years 1999 and 2000.[16]

The major differences in Table 2a (the NRC committee's estimates) and Table 2c (what we think is the best estimate of what the NRC intended to present) are profound enough that they might well have changed the nature of the report. Recall that Wilson had looked at the NRC's results (Table 2a) and decided that since the dummy and spline estimates were both consistent and statistically significant for only one crime—murder—these were the only estimates that should be accepted. But applying this same logic to the Table 2c estimates would lead to the drastically different conclusion that for four crimes—aggravated assault, auto theft, burglary, and larceny—Table 2c provides uniform evidence that

---

14.    The variable is called "ppnpermpc." We stumbled into using this variable as we tried to incorporate Lott and Mustard's thirty-six demographic variables, which denote the percentage of each county's population that falls into each of six age-groups based on three racial categories for men and for women. Twelve of these variables begin with the prefix "ppn," which will then be included in the analysis if one uses a STATA command that groups together all variables with this common "ppn" prefix. For example, "ppnm2029" indicates the percentage of a county population that is male and neither white nor black. We do not know how the ppnpermpc variable fits into this grouping (or even if it is meant be a part of this group of variables). The mean value of this variable is –3.206657, with the individual observations ranging from –12.05915 to 4.859623. While the other ppn variables reflect some sort of percentage, the mean negative value obviously indicates that this variable is not a percentage.

15.    We found that whether or not we include this variable, we cannot replicate the NRC's results (in Table 2a).

16.    Because the NRC area numbers are the same for a county across all years, we fill in this gap by simply using the 1998 values for these two years. (However, we note that area should not be constant across all years, as the Census updates these data every decade.) We include complete, updated area data in our new data set.

RTC laws *increase* crime (while the evidence for the other crimes is mixed). One might go further and say that all the Table 2c dummy and spline estimates show crime *increases*, except for murder.

Although we speculate that Table 2c reflects where the NRC panel should have ended up if it had wanted to repeat Lott and Mustard's county data analysis, there is actually far more that the committee could have done to go beyond Table 2c to test the validity of the MGLC premise. We emphasize, though, that this is not necessarily a strong criticism of the NRC majority since it concluded (in our view, correctly) that the evidence was already too fragile to draw strong conclusions, and further support for this assessment would merely have been cumulative. Nevertheless, we now turn to some avenues of inquiry that Wilson might have considered before adopting the Lott and Mustard (1997) conclusion vis-à-vis murder.

## 5. Debate over the Clustering of Standard Errors

### 5.1. Is Clustering Necessary?

To this point we have said little about the important question of estimating the standard errors in panel-data regressions. The estimates presented thus far follow the NRC in providing heteroskedasticity-robust standard errors. Research has found, though, that the issue of whether to "cluster" the standard errors has a profound impact on assessments of statistical significance. This issue gained prominence beginning primarily with a 1990 article by Brent Moulton. Moulton (1990) pointed to the possible need for the clustering of observations when treatments are assigned at a group level. In such cases, there is an additive source of variation that is the same for all observations in the group, and ignoring this unique variation leads to standard errors that are underestimated. Lott, however, suggests that clustered standard errors are not needed (Lott, 2004), claiming that county-level fixed effects implicitly control for state-level effects, and therefore, clustering the standard errors on state is unnecessary.

On this point, the NRC committee (2005) sided with Lott, stating that "there is no need for adjustments for state-level clustering" (p. 138). However, we *strongly* believe the committee was mistaken in this decision. One must account for the possibility that county-level disturbances may be correlated within a state during a particular year by clustering the standard errors by state. There is also a second reason for clustering that the NRC report

did not address. Specifically, serial correlation in panel data can lead to major underestimation of standard errors. Indeed, Bertrand, Duflo, and Mullainathan (2004) point out that even the Moulton correction alone may be insufficient for panel data estimators that utilize more than two periods of data due to autocorrelation in both the intervention variable and the outcome variable of interest. Wooldridge (2003, unpublished manuscript), as well as Angrist and Pischke (2009), suggest that clustering the standard errors by state (along with heteroskedasticity-robust standard errors) will help address this problem, and at least provide a lower bound on the standard errors.

## 5.2. Using Placebo Laws to Test the Impact of Clustering

Our reading of the influential literature on this issue suggests to us that clustering would make a major difference in the results generated by the Lott and Mustard models that the NRC report adopted in its analysis. But who is correct on the clustering issue—Lott, Mustard, and the NRC panel on the one hand, or Angrist, Pischke, and several other high-end applied econometricians on the other? To address this important question, we run a series of placebo tests. In essence, we randomly assign RTC laws to states, and reestimate our model iteratively (1,000 times), recording the number of times that the variable(s) of interest are "statistically significant." For this experiment, we use our most flexible model (that incorporates both a dummy and a trend variable) with the controls employed by the NRC.

We run three versions of this test. First, we first generate a placebo law in a random year for all fifty states and the District of Columbia. Once the law is applied, it persists for the rest of our data period, which is how laws are coded in the original analysis. In our second test, we apply a placebo law in a random year to the thirty-two states that actually implemented RTC laws during the period we are analyzing. The remaining nineteen states assume no RTC law. Finally, we randomly select thirty-two states to receive a placebo law in a random year. The results of these three tests are presented in Table 3a.

Given the random assignment, one would expect to reject the null hypothesis of no effect of these randomized "laws" roughly 5% of the time if the standard errors in our regressions are estimated correctly. Instead, the table reveals that the null hypothesis is rejected 50–70% of the time for murder and robbery with the dummy variable and even more frequently with the trend variable (60–74%). Clearly, this exercise suggests that the standard errors used in the NRC report are far too small.

**Table 3a.** Hybrid Model—Percentage of Significant Estimates (at the 5% Level)—Using Updated 2009 County-Level Data—Lott-Mustard Controls, without Clustered Standard Errors, 1977–2006 (without 1993 Data)[a]

|  |  | Dummy Variable (%) | Trend Variable (%) |
|---|---|---|---|
| 1. All 50 states + DC | Murder | 50.2 | 67.4 |
|  | Robbery | 56.7 | 65.6 |
| 2. Exact 32 states | Murder | 64.2 | 71.9 |
|  | Robbery | 59.8 | 67.2 |
| 3. Random 32 states | Murder | 57.8 | 59.9 |
|  | Robbery | 70.6 | 74.2 |

[a]Simulation based on NRC with-controls model, which, similar to above estimations, includes year and county fixed effects, and weighting by county population. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.

**Table 3b.** Hybrid Model—Percentage of Significant Estimates (at the 5% Level)—Using Updated 2009 County-Level Data—Lott-Mustard Controls, with Clustered Standard Errors, 1977–2006 (without 1993 Data)[a]

|  |  | Dummy Variable (%) | Trend Variable (%) |
|---|---|---|---|
| 1. All 50 states + DC | Murder | 8.9 | 11.5 |
|  | Robbery | 8.1 | 8.1 |
| 2. Exact 32 states | Murder | 10.0 | 11.0 |
|  | Robbery | 9.2 | 7.1 |
| 3. Random 32 states | Murder | 11.2 | 13.5 |
|  | Robbery | 10.3 | 8.8 |

[a]Simulation based on NRC with-controls model, which, similar to above estimations, includes year and county fixed effects, and weighting by county population. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.

Table 3b replicates the exercise of Table 3a, but now uses the cluster correction for standard errors (on state). Table 3b suggests that clustering standard errors does not excessively reduce significance, as the NRC panel feared. In fact, the percentages of "significant" estimates produced in all three versions of the test still lie well beyond the 5% threshold. Similar results are found when we replicate Tables 3a and b while employing the dummy model instead of the hybrid model (we do not show those results here). All these tests show that if we do not cluster the standard errors, the likelihood of obtaining significant estimates is astonishingly (and unreasonably) high. The conclusion we draw from this exercise is that clustering is clearly needed to adjust the standard

errors in these panel data regressions. Accordingly, we will use this clustering adjustment for all remaining regressions in this article.

## 5.3. Does Clustering Influence the Results?

To get a sense of how clustering would have changed the NRC's estimates, we run the NRC model with standard errors clustered on state using our county-level data. Table 4 shows that clustering the standard errors in this model eliminates most of the statistical significance we saw in Table 2c (the same model but without clustering). Importantly, the significance of the negative coefficients for murder disappears. On this basis, one might suspect that had this set of results been used, the conclusions of the panel may have been quite different. These estimates—which we believe are now more accurate—provide no support for the claim that RTC laws reduce crime and, in fact, reveal evidence that aggravated assault, auto theft, and larceny all rise by between 9 and 14%. While this might suggest that RTC laws *increase* crime, the auto theft and larceny results do not readily comport with any plausible theory about the impact of RTC laws, and so we would proceed

**Table 4.** Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—with Lott-Mustard Controls, with Clustered Standard Errors, All Crimes, 1977–2000 (without 1993 Data)[a]

| | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | −3.80 | 9.82 | 8.96* | 5.44 | 13.60** | 4.36 | 12.90*** |
| model | 6.25 | 11.20 | 5.33* | 5.53 | 5.83** | 3.58 | 3.97*** |
| 2. Spline model | −0.26 | 0.48 | 1.10 | 0.26 | 1.50* | 0.30 | 1.16 |
| | 0.80 | 1.22 | 0.81 | 0.85 | 0.83* | 0.50 | 0.82 |
| 3. Hybrid model | | | | | | | |
| Post-passage dummy | −3.98 | 11.40 | 6.34 | 6.39 | 10.60* | 4.53 | 11.80*** |
| | 7.08 | 10.20 | 4.43 | 5.69 | 6.18* | 3.92 | 2.95*** |
| Trend effect | 0.04 | −0.38 | 0.63 | −0.23 | 0.70 | −0.04 | 0.28 |
| | 0.89 | 0.86 | 0.76 | 0.81 | 0.77 | 0.49 | 0.65 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

with caution in interpreting those results (even if we had more confidence in the Lott-Mustard model than we do given the concern over omitted variables).[17]

## 6. Debate over the Inclusion of Linear Trends

An important issue that the NRC did not address was whether there was any need to control for state-specific linear trends. Inclusion of state trends could be important if, for example, a clear pattern in crime rates existed before a state adopted an RTC law that continued into the post-passage period. In contrast, there is also a potential danger in using state-specific trends if their inclusion inappropriately extrapolates a temporary swing in crime long into the future. Lott and Mustard (1997) never controlled for state-specific trends in analyzing handgun laws, while Moody and Marvell (2008) always controlled for these trends. Ayres and Donohue (2003b) presented evidence with and without such trends.

Table 5 replicates the NRC's full model (with the appropriate clustering adjustment) from Table 4 while adding linear state trends to this county-data model. Strikingly, Table 5 suggests that RTC laws increase aggravated assault by roughly 3% each year, but no other statistically significant effect is observed. Thus, the addition of state trends eliminates the potentially problematic result of RTC laws increasing property crimes, which actually increases our confidence in these results. Certainly, an increase in gun carrying and prevalence induced by an RTC law could well be thought to spur more aggravated assaults. Nonetheless, one must at least consider whether the solitary finding of statistical significance is merely the product of running seven different models, is a spurious effect flowing from a bad model, or reflects some other anomaly (such as changes in the police treatment of

---

17.   Lott and Mustard offered a crime substitution theory based on a view that if RTC laws reduced robbery (because criminals feared encountering armed victims), the criminals might turn to property crimes that were less likely to result in armed resistance. Note, though, that Table 4 gives no support for a robbery reduction effect, so the premise of the crime substitution story is not supported.

**Table 5.** Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—with Lott-Mustard Controls, with Clustered Standard Errors and State Trends, All Crimes, 1977–2000 (without 1993 Data)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | −6.17 | −10.80 | 3.00 | −5.31 | 0.21 | −5.19 | −0.40 |
| model | 5.31 | 8.27 | 3.60 | 5.66 | 5.85 | 3.55 | 3.04 |
| 2. Spline model | −1.21 | −2.64 | 3.02** | −0.06 | 0.82 | 0.00 | 1.18 |
|  | 1.46 | 3.48 | 1.23** | 2.26 | 1.27 | 1.29 | 1.12 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | −5.14 | −8.28 | −0.64 | −5.69 | −0.83 | −5.63 | −1.95 |
| dummy | 5.07 | 5.65 | 3.79 | 6.28 | 5.99 | 3.95 | 3.25 |
| Trend effect | −0.87 | −2.09 | 3.06** | 0.32 | 0.88 | 0.38 | 1.31 |
|  | 1.43 | 3.28 | 1.29** | 2.42 | 1.30 | 1.40 | 1.19 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

domestic violence cases, which could confound the aggravated assault results).[18]

## 7. Extending the Data through 2006

Thus far, we have presented panel data regression results for the period 1977–2000. Since more data are now available, we can further test the strength of the MGLC premise over time by estimating the NRC Lott-Mustard covariates specification on data extended through 2006. Table 6a presents our estimates (with clustering), which can be compared with Table 4 (which also clusters the standard errors in the main NRC model, but is estimated on the shorter time period).

---

18.    We tested this theory by creating a new right-hand side dummy variable that identified if a state passed legislation requiring law enforcement officials to submit official reports of all investigated domestic violence cases. Eight states have passed this legislation of which we are aware: Florida (1984), Illinois (1986), Louisiana (1985), New Jersey (1991), North Dakota (1989), Oklahoma (1986), Tennessee (1995), and Washington (1979). We included this dummy variable when running both the NRC specification (through 2000) and our preferred specification (through 2006), and found that this dummy indicator of domestic violence reporting statutes did not undermine the finding that RTC laws increase aggravated assaults.

**Table 6a.** Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—with Lott-Mustard Controls, with Clustered Standard Errors, All Crimes, 1977–2006 (without 1993 Data)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −5.44 | 10.40 | 11.40** | 3.10 | 14.40** | 7.48* | 12.90** |
|  | 5.91 | 13.20 | 4.84** | 4.47 | 6.65** | 3.85* | 3.96*** |
| 2. Spline model | −0.28 | 0.61 | 1.05 | 0.39 | 0.99 | 0.44 | 1.07** |
|  | 0.60 | 1.03 | 0.69 | 0.54 | 0.61 | 0.43 | 0.51** |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −5.35 | 9.77 | 8.39** | 1.69 | 12.60** | 6.99* | 10.10*** |
|  | 6.05 | 12.00 | 3.48** | 5.43 | 5.91** | 3.99* | 3.68*** |
| Trend effect | −0.02 | 0.14 | 0.65 | 0.30 | 0.39 | 0.10 | 0.59 |
|  | 0.61 | 0.74 | 0.63 | 0.65 | 0.47 | 0.44 | 0.49 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 6b.** Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—with Lott-Mustard Controls, with Clustered Standard Errors and State Trends, All Crimes, 1977–2006 (without 1993 Data)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −4.45 | −13.00 | 3.44 | −0.22 | 3.81 | −0.77 | 1.51 |
|  | 4.44 | 8.14 | 3.13 | 5.48 | 4.84 | 3.53 | 3.10 |
| 2. Spline model | −0.96 | −4.51 | 1.72* | −0.95 | −0.91 | −0.82 | −0.66 |
|  | 0.96 | 3.74 | 0.94* | 1.60 | 1.10 | 1.04 | 0.87 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −3.98 | −10.70 | 2.53 | 0.31 | 4.36 | −0.32 | 1.89 |
|  | 4.55 | 7.01 | 3.09 | 5.55 | 4.67 | 3.64 | 3.08 |
| Trend effect | −0.86 | −4.26 | 1.66* | −0.96 | −1.01 | −0.82 | −0.70 |
|  | 0.98 | 3.69 | 0.93* | 1.62 | 1.08 | 1.07 | 0.89 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

This comparison reveals that the additional six years of data somewhat strengthen the evidence that RTC laws *increase* aggravated assault, auto theft, burglary, and larceny. Table 6b simply adds state trends to the Table

6a models, which can then be compared to Table 5 (clustering, state trends, and 1977–2000 data). Collectively, these results suggest that the added six years of data do not appreciably change the results from the shorter period. The inclusion of state trends on the longer data set renders all estimates insignificant except for the evidence of marginally significant *increases* in aggravated assault.

## 8.  Revising the Lott-Mustard Specification

We have already suggested that the Lott-Mustard specification that the NRC employed is not particularly appealing along a number of dimensions. The most obvious problem—omitted variable bias—has already been alluded to: the Lott and Mustard (1997) model had no control for incarceration, which Wilson considered to be one of the most important influences on crime in the last twenty years. In addition to a number of important omitted variables, the Lott-Mustard model adopted by the NRC includes a number of questionable variables, such as the highly dubious ratio of arrests to murders, and the thirty-six (highly collinear) demographic controls.[19]

To explore whether these specification problems are influencing the regression estimates, we revise the NRC models in a number of ways. First, we drop the flawed contemporaneous arrest rate variable and add in two preferable measures of state law enforcement/deterrence: the incarceration rate and the rate of police.[20] Second, we add two additional controls to capture economic conditions: the unemployment rate and the poverty rate, which are also state-level variables. Finally, mindful of Horowitz's admonition that the Lott-Mustard model might have *too many* variables (including demographic controls that are arguably irrelevant to the relationship between the guns and crime, and may have a spurious, misleading effect), we decided not to follow the NRC in using the thirty-six demographic controls employed by Lott-Mustard. Instead, we adhered to the more customary practice in the econometrics of crime and controlled only for the demographic groups considered to be most

---

19.  For extended discussion on the abundant problems with this pseudo arrest rate, see Donohue and Wolfers (forthcoming).

20.  We also estimated the model with the arrest rate (lagged by one year to avoid endogeneity concerns), and the results were qualitatively similar.

involved with criminality (as offenders and victims), namely the percentage of black and white males between ages ten and thirty years in each county.[21]

The results with this new specification are presented in Tables 7a and b (which correspond to Tables 6a and b estimated using the Lott-Mustard specification). In particular, one sees a strong adverse shift for murder. Note that had the NRC panel used our preferred specification while maintaining its view that neither clustering nor controls for state trends are needed, then we would have overwhelming evidence that RTC laws increase crime across every crime category. We do not show these regression results since we are convinced that clustering is needed, although of course when we cluster in Table 7a, the point estimates remain the same (while significance is drastically reduced).

It would indeed be a troubling state of the world if the NRC view on clustering (and linear trends) were correct, for in that event, RTC laws would increase every crime category other than murder by 20–40% (the dummy model) or increase it by 2–4% every year (the spline model)—all at the 0.01 level.[22] In fact, the version of Table 7a in which the standard errors are not adjusted by clustering generates a finding that RTC laws increase murder at the 0.10 level in the spline model and at the 0.05 level in the trend term of the hybrid model. When we do cluster, however, as shown in Table 7a, we are left with large positive point estimates but far fewer significant results: Nonetheless, this more reasonable specification suggests that RTC laws increase aggravated assault, robbery, and larceny. Interestingly, adding state trends in Table 7b wipes out all statistical significance.

This discussion again highlights how critical the choices of clustering and state trends are to an assessment of RTC laws. Using neither, the data suggest these laws are harmful. With only clustering, RTC laws show (marginally significant) signs of increases for two violent crime categories as well as for larceny. In our preferred specification (without state trends), the effect of RTC laws on murder seems to basically be zero. With both clustering

---

21.   To test the robustness of this specification to alternations in the demographic controls used, we also estimated the following models: Only black men between ages ten and forty years; black, white, and Hispanic men between ages ten and forty years; only black men between ages ten and thirty years; black and white men between ages ten and thirty years; and black, white, and Hispanic men between ages ten and forty years. The results were again qualitatively similar across our tests.

22.   These results are not presented here since standard errors clustered on state are clearly needed. The authors can provide these results upon request.

**Table 7a.**  Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—with Preferred Controls, with Clustered Standard Errors, All Crimes, 1977–2006 (without 1993 Data)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −0.44 | 21.30 | 21.60 | 19.30 | 24.80 | 26.60 | 29.50 |
|  | 7.13 | 19.40 | 19.00 | 14.50 | 21.10 | 22.40 | 26.00 |
| 2. Spline model | 0.31 | 2.34 | 3.16 | 2.64* | 3.12 | 3.59 | 4.20 |
|  | 0.79 | 1.83 | 1.89 | 1.46* | 2.11 | 2.27 | 2.61 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −2.72 | 12.60 | 7.40 | 7.92 | 12.00 | 11.10 | 10.90 |
|  | 6.96 | 15.40 | 15.80 | 12.10 | 16.80 | 18.20 | 20.50 |
| Trend effect | 0.45 | 1.70 | 2.78* | 2.24* | 2.51 | 3.03 | 3.64* |
|  | 0.81 | 1.39 | 1.62* | 1.27* | 1.74 | 1.94 | 2.15* |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 7b.**  Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—with Preferred Controls, with Clustered Standard Errors and State Trends, All Crimes, 1977–2006 (without 1993 Data)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −3.11 | −15.50 | 0.02 | 1.15 | 1.89 | −3.98 | −3.22 |
|  | 4.81 | 10.80 | 9.70 | 7.25 | 9.89 | 10.90 | 12.50 |
| 2. Spline model | −0.41 | −6.69 | 0.61 | −0.82 | −0.97 | −1.92 | −2.25 |
|  | 1.31 | 4.77 | 2.44 | 2.28 | 2.66 | 2.83 | 3.15 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −2.97 | −13.00 | −0.22 | 1.48 | 2.29 | −3.25 | −2.35 |
|  | 5.08 | 9.98 | 10.30 | 7.64 | 10.40 | 11.50 | 13.10 |
| Trend effect | −0.35 | −6.46 | 0.61 | −0.85 | −1.01 | −1.87 | −2.21 |
|  | 1.35 | 4.76 | 2.54 | 2.35 | 2.76 | 2.96 | 3.29 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

and state trends, all statistically significant effects are wiped out. The only conclusion from both the NRC/Lott-Mustard model and our preferred specification (on county data) is that there is no robust evidence that RTC laws

provide any net benefits, and there is a greater likelihood that RTC laws may cause either some or a great deal of harm.

## 9. State versus County Crime Data

In their initial study, Lott and Mustard (1997) tested the MGLC hypothesis by relying primarily on county-level data from the FBI's UCR.[23] These FBI reports present yearly estimates of crime based on monthly crime data from local and state law enforcement agencies across the country. The NRC report followed Lott and Mustard in this choice and presented regression estimates using only county data. Unfortunately, according to criminal justice researcher Michael Maltz, the FBI's county-level data are highly problematic.

The major problem with county data stems from the fact that law enforcement agencies voluntarily submit crime data to the FBI. As a result, the FBI has little control over the accuracy, consistency, timeliness, and completeness of the data it uses to compile the UCR reports. In a study published in the *Journal of Quantitative Criminology*, Maltz and Targonski (2002) carefully analyzed the shortcomings in the UCR data set and concluded that UCR county-level data are unacceptable for evaluating the impact of RTC laws. For example, in Connecticut, Indiana, and Mississippi, over 50% of the county-level data points are missing crime data for more than 30% of their populations (Maltz and Targonski, 2002). In another thirteen states, more than 20% of the data points have gaps of similar magnitude. Based on their analysis, Maltz and Targonski (2002) concluded that:

County-level crime data cannot be used with any degree of confidence . . . . The crime rates of a great many counties have been underestimated, due to the exclusion of large fractions of their populations from contributing to the crime counts. Moreover, counties in those states with the most coverage gaps have laws permitting the carrying of concealed weapons. How these shortcomings can be compensated for is still an open question . . . it is clear, however, that in their current condition, county-level UCR crime statistics cannot be used for evaluating the effects of changes in policy. (p. 316–17)

Because of the concerns raised about county-level crime data, it is prudent to test our models on state-level data. According to Maltz and Targonski (2003), state-level crime data are less problematic than county-level data because the

---

23.    Lott and Mustard present results based on state-level data, but they strongly endorse their county-level over their state-level analysis: "the very different results between state- and county-level data should make us very cautious in aggregating crime data and would imply that the data should remain as disaggregated as possible" (Lott and Mustard, 1997, p. 39).

FBI's state-level crime files take into account missing data by imputing all missing agency data. County-level files provided by National Archive of Criminal Justice Data, however, impute missing data only if an agency provides at least six months of data; otherwise, the agency is dropped completely (Maltz, 2006). As with our estimations using county-level data, we compiled our state-level data from scratch, and will refer to it as "Updated 2009 State-Level Data."

Unsurprisingly, the regression results reproduced using state-level data are again different from the NRC committee's estimates using county-level data. This is shown in Table 8a, which presents the results from the NRC's specification (the Lott-Mustard model) on state data, with the cluster adjustment.[24] Table 8b simply adds state trends. When we compare these state-level estimates to the county-level estimates (using the updated 2009 county-level data set), we see that there are marked differences. Considering the preceding discussion on the reliability—or lack thereof—of county data, this result is unsurprising. Importantly, state-level data through 2006 show not a hint of statistically significant evidence that RTC laws reduce murder.[25] None of the state results is robust to the addition or exclusion of state linear trends.

Tables 9a and b below repeat Tables 8a and b, but use the model with our preferred set of explanatory variables instead of the Lott and Mustard (1997) model. The main question raised by these estimations is whether state trends are needed in the regression models. If not, there is evidence that RTC laws increase assault and larceny. If state trends are needed, some muddiness returns but RTC laws appear to increase aggravated assault, while declines in rape are marginally significant.

## 10.  Additional Concerns in the Evaluation of Legislation Using Observational Data

We now turn to three critical issues that must be considered when using panel data to evaluate the impact of legislation and public policy (and gun

---

24.   Our placebo test on county data showed that standard errors needed to be adjusted by clustering. In Appendix A, we again find that clustering is needed for state data. Thus, all our state-level estimates include clustering.

25.   We also estimate the model on data through 2000 (the last year in the NRC report), though those results are not shown here. The results similarly do show not any statistically significant evidence that RTC laws reduce murder. Moreover, we also estimate the NRC's no-controls model on the state-level data. See Appendix B for these results.

**Table 8a.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Lott-Mustard Controls, with Clustered Standard Errors, All Crimes, 1977—2006[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −4.94 | −5.04** | 1.44 | −6.96** | 0.31 | −4.97** | 2.32 |
|  | 3.61 | 2.29** | 4.11 | 2.90** | 3.98 | 2.22** | 1.58 |
| 2. Spline model | −0.03 | −0.49 | 0.80 | −0.16 | −0.87** | −0.44 | 0.40 |
|  | 0.54 | 0.33 | 0.66 | 0.60 | 0.42** | 0.45 | 0.29 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −5.62 | −3.77 | −1.69 | −7.41** | 4.00 | −3.92* | 1.03 |
|  | 4.25 | 2.36 | 3.26 | 3.59** | 4.88 | 2.03* | 1.80 |
| Trend effect | 0.19 | −0.35 | 0.86 | 0.12 | −1.02** | −0.29 | 0.36 |
|  | 0.58 | 0.36 | 0.64 | 0.64 | 0.50** | 0.46 | 0.32 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 8b.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Lott-Mustard Controls, with Clustered Standard Errors and State Trends, All Crimes, 1977–2006[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −3.32 | −3.33 | −1.12 | −3.36 | 2.64 | −1.93 | 1.21 |
|  | 3.47 | 2.20 | 2.78 | 3.04 | 2.71 | 1.37 | 1.07 |
| 2. Spline model | 0.42 | 0.34 | 2.49*** | 0.46 | −1.95*** | 0.35 | 0.39 |
|  | 0.82 | 0.88 | 0.61*** | 1.00 | 0.72*** | 0.79 | 0.60 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −3.83 | −3.78 | −3.33 | −3.90 | 4.51 | −2.33 | 0.92 |
|  | 3.58 | 2.42 | 2.84 | 3.10 | 2.85 | 1.62 | 1.28 |
| Trend effect | 0.61 | 0.54 | 2.67*** | 0.66 | −2.19*** | 0.47 | 0.35 |
|  | 0.81 | 0.92 | 0.63*** | 1.00 | 0.77*** | 0.83 | 0.64 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables (adopted from the Lott-Mustard model) include arrest rate, county population, population density, per capita income measures, and thirty-six demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 9a.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data —with Preferred Controls, with Clustered Standard Errors, All Crimes, 1977–2006[a]

| | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −2.93 | −0.62 | 5.05 | 5.36 | 7.03 | 2.24 | 6.72** |
| | 3.94 | 3.76 | 3.71 | 4.28 | 6.05 | 3.00 | 2.98** |
| 2. Spline model | −0.16 | −0.44 | 1.09* | 0.64 | 0.45 | 0.00 | 0.57 |
| | 0.61 | 0.54 | 0.60* | 0.75 | 0.62 | 0.39 | 0.46 |
| 3. Hybrid model | | | | | | | |
| Post-passage dummy | −2.75 | 1.71 | 0.15 | 3.09 | 6.29 | 2.82 | 5.22* |
| | 3.75 | 3.52 | 3.56 | 4.74 | 5.49 | 3.21 | 3.05* |
| Trend effect | −0.04 | −0.52 | 1.09* | 0.50 | 0.17 | −0.13 | 0.34 |
| | 0.63 | 0.56 | 0.63* | 0.83 | 0.56 | 0.43 | 0.50 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 9b.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with Clustered Standard Errors and State Trends, All Crimes, 1977–2006[a]

| | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | 0.54 | −3.61* | −2.03 | 2.40 | 8.17* | 1.51 | 1.89 |
| | 2.72 | 1.83* | 3.05 | 3.67 | 4.16* | 2.18 | 1.83 |
| 2. Spline model | 0.83 | 0.08 | 3.10** | 0.51 | −1.84** | −0.22 | −0.15 |
| | 0.87 | 0.79 | 0.81** | 1.29 | 0.82** | 0.88 | 0.74 |
| 3. Hybrid model | | | | | | | |
| Post-passage dummy | 0.11 | −3.70* | −3.68 | 2.17 | 9.26** | 1.65 | 1.99 |
| | 2.86 | 1.96* | 3.15 | 3.96 | 4.24** | 2.41 | 1.97 |
| Trend effect | 0.83 | 0.19 | 3.21*** | 0.44 | −2.11** | −0.27 | −0.20 |
| | 0.89 | 0.79 | 0.82*** | 1.35 | 0.84** | 0.91 | 0.77 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

laws in particular). First, we discuss the possibility of difficult-to-measure omitted variables, and how such variables can shape estimates of policy impact. We are particularly concerned with how the crack epidemic of the 1980s and 1990s may bias results in the direction of finding a beneficial effect. Second, we explore pre-adoption crime trends in an attempt to examine the plausibly endogenous adoption of RTC legislation. Finally, given that the intent of right-to-carry legislation is to increase gun-carrying in law-adopting states, we explore whether these laws may have had a particular effect on gun-related assaults (which is the one crime category that has generated somewhat consistent results thus far).

## 10.1. Further Thoughts on Omitted Variable Bias

As discussed above, we believe it is likely that the NRC's estimates of the effects of RTC legislation are marred by omitted variable bias. In our attempt to improve (at least to a degree) on the original Lott-Mustard model, we included additional explanatory factors, such as the incarceration and police rates, and removed extraneous variables (such as unnecessary and collinear demographic measures). We recognize, however, that there are additional criminogenic influences for which we cannot fully control. In particular, we suspect that a major shortcoming of all the models presented is the inability to account for the possible influence of the crack cocaine epidemic on crime.[26]

---

26. Although Lott and Mustard (1997) do make a modest attempt to control for the potential influence of crack cocaine through the use of cocaine price data based on the U.S. Drug Enforcement Administration's STRIDE data, we find their approach wanting for both theoretical and empirical reasons. First, a control for crack should capture the criminogenic influence of the crack trade on crime. We know that prior to 1985, there was no such influence in any state and that after some point in the early to mid-1990s this criminogenic influence declined strongly. Since there is little reason to believe that cocaine prices would be informative on the criminogenic influence of crack in particular geographic areas, it is hard to see how the cocaine price data could be a useful control. Second, the data that Lott and Mustard use are themselves questionable. Horowitz (2001) argues forcefully that STRIDE data are not a reliable source of data for policy analyses of cocaine. The data are mainly records of acquisitions made to support criminal investigations in particular cities, and are not a random sample of an identifiable population. Moreover, since the STRIDE data are at the city level, we are not sure how this would be used in a county-level analysis. The data were collected for twenty-one cities, while there are over three thousand counties in the United States. In addition, the data are missing for 1988 and 1989, which are crucial years in the rise of the crack epidemic in poor urban areas. Lott and Mustard drop those years of analysis when including cocaine prices as a control.

Many scholars now suggest that rapid growth in the market for crack cocaine in the late 1980s and the early 1990s was likely one of the major influences on increasing crime rates (and violent crimes in particular) during this period (Levitt, 2004). Moreover, the harmful criminogenic effect of crack was likely more acute in urban areas of states slow to adopt RTC laws. Meanwhile, many rural states adopted such laws during this era. If this was indeed the case, this divergence between states could account for much of the purported "crime-reducing" effects attributed by Lott and Mustard to gun laws (which were then supported by scholars such as James Q. Wilson). The regression analysis would then identify a relationship between rising crime and the failure to adopt RTC legislation, when the actual reason for this trend was the influence of crack (rather than the passage of the RTC law).

We now explore how results from our main models vary when we restrict the analysis to the time periods before and after the peak of the American crack epidemic. According to Fryer et al. (2005), the crack problem throughout most of the country peaked at some point in the early 1990s. Coincidentally, the original Lott-Mustard period of analysis (1977–1992) contains years that likely represent the height of crack-induced crime problem. With this in mind, we run our main regressions after breaking up our data set into two periods: the original Lott-Mustard period of analysis (1977–1992) and the post–Lott-Mustard period (1993–2006). We first present the results for the era that includes the crack epidemic (1977–1992) on our preferred model. We run these regressions (with clustered standard errors) on state-level data, with and without state trends. These results are presented in Tables 10a and b. We then estimate the same models on the post-crack period (see Tables 11a and b).

Note that the regression results in Table 10 from the initial Lott-Mustard sixteen-year time period (1977–1992) do suggest that rape, robbery, and aggravated assault are dampened by RTC laws if state trends are not needed and that murder may have declined if state trends are needed. If we look at the following fourteen-year period from 1993 to 2006 in Table 11, however, the conclusion flips around: Now, there is evidence that all four violent crimes *rose* when states adopted RTC laws. This evidence supports the theory that the Lott-Mustard finding was likely the result of the crime-raising impact of crack in non-RTC states.

Figure 8 depicts a measure of crack prevalence for the period 1980–2000 in the five states with the greatest crack problem as well as the five states with the

**Table 10a.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with Clustered Standard Errors, All Crimes, 1977–1992[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −3.69 | −12.10*** | −6.55 | −4.85 | 7.28 | −3.73 | 0.12 |
|  | 3.81 | 3.41*** | 4.66 | 4.07 | 4.73 | 2.45 | 1.52 |
| 2. Spline model | −0.88 | −2.87*** | 0.52 | −2.28*** | 0.51 | −0.34 | −0.10 |
|  | 1.44 | 0.80*** | 1.70 | 0.72*** | 1.13 | 0.83 | 0.33 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −2.32 | −7.59** | −11.80** | 1.08 | 9.07* | −4.37 | 0.54 |
|  | 4.70 | 3.01** | 5.64** | 5.32 | 4.61* | 3.87 | 1.82 |
| Trend effect | −0.56 | −1.83*** | 2.13 | −2.42** | −0.73 | 0.26 | −0.17 |
|  | 1.67 | 0.59*** | 1.47 | 1.08** | 0.85 | 0.97 | 0.42 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 10b.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with State Trends and Clustered Standard Errors, All Crimes, 1977–1992[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −5.61 | −4.14 | −2.02 | −3.78 | −0.04 | −3.05 | 1.28 |
|  | 3.57 | 3.61 | 3.70 | 4.25 | 3.84 | 2.23 | 1.96 |
| 2. Spline model | −5.41** | 0.27 | −0.05 | −4.35* | −1.62 | −2.36 | 0.37 |
|  | 2.45** | 1.11 | 1.17 | 2.48* | 2.20 | 1.43 | 1.15 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | 2.47 | −6.67* | −2.89 | 3.08 | 3.17 | 0.18 | 1.16 |
|  | 4.31 | 3.52* | 5.10 | 6.91 | 4.98 | 4.26 | 2.02 |
| Trend effect | −6.01** | 1.88 | 0.65 | −5.10 | −2.38 | −2.41 | 0.09 |
|  | 2.51** | 1.18 | 1.84 | 3.30 | 2.64 | 2.11 | 1.26 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 11a.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with Clustered Standard Errors, All Crimes, 1993–2006[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | 3.12 | −3.47 | 1.36 | 3.64 | 2.46 | 3.58 | 0.27 |
| model | 3.61 | 2.47 | 3.54 | 4.89 | 4.50 | 2.57 | 2.74 |
| 2. Spline model | 1.11* | −0.21 | 1.91** | 1.78** | −0.30 | 0.35 | 0.08 |
|  | 0.63* | 0.68 | 0.74** | 0.87** | 0.80 | 0.71 | 0.55 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | 2.36 | −3.35 | 0.03 | 2.42 | 2.70 | 3.37 | 0.22 |
| dummy | 3.82 | 2.46 | 4.05 | 4.73 | 4.33 | 2.57 | 2.76 |
| Trend effect | 1.09* | −0.17 | 1.91** | 1.75** | −0.34 | 0.31 | 0.08 |
|  | 0.64* | 0.67 | 0.76** | 0.87** | 0.77 | 0.70 | 0.55 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table 11b.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with State Trends and Clustered Standard Errors, All Crimes, 1993–2006[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | 3.12 | 0.27 | 2.38 | 3.81 | 2.83 | 0.89 | 0.33 |
| model | 3.62 | 2.66 | 2.59 | 3.33 | 3.39 | 2.19 | 1.83 |
| 2. Spline model | −1.99 | 2.61** | 4.34*** | −0.17 | −5.53* | −0.71 | −1.49 |
|  | 2.00 | 1.16** | 1.53*** | 1.89 | 2.77* | 1.74 | 1.31 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | 4.04 | −0.75 | 0.79 | 4.04 | 5.12 | 1.20 | 0.93 |
| dummy | 3.87 | 2.46 | 2.40 | 3.48 | 3.43 | 2.29 | 1.98 |
| Trend effect | −2.44 | 2.69** | 4.25** | −0.62 | −6.10** | −0.84 | −1.59 |
|  | 2.10 | 1.14** | 1.61** | 1.95 | 2.99** | 1.80 | 1.42 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.



Source:  Authors' calculations based on the crack index of Fryer et al. (2005).

**Figure 8.** Prevalence of Crack in the Five Most and the Five Least Crack-Affected States.

least crack, according to Fryer et al. (2005). Figure 9 shows the murder rates over time for these two sets of states. We see that crime rose in the high-crack states when the crack index rises in the mid-to-late 1980s, but that the crack index does not turn down in those states at the time crime started to fall.



Source:  Bureau of Justice Statistics (2009).

**Figure 9.** Murder Rates in the Five Most and the Five Least Crack-Affected States.

Apparently, the rise of the crack market triggered a great deal of violence but once the market stabilized, the same level of crack consumption could be maintained while the violence ebbed.

Of course, omitting an appropriate control for the criminogenic influence of crack is problematic if the high-crack states tend not to adopt RTC laws and the low-crack states tend to adopt. This is in fact the case: All the five "high-crack" states are non-RTC states during this period, whereas four of the five "low-crack" states are RTC states (all four adopted an RTC law by 1994).[27] The only exception is Nebraska, a state that did not adopt an RTC law until 2007, which is outside the scope of our current analyses.[28]

**Table 12.** Population-Weighted Statistics of RTC-Adopting States between 1977 and 1990[a]

| State | Year of RTC Law Adoption | Murder Rate | Crack Index |
|---|---|---|---|
| Indiana | 1980 | 6.53 | 0.17 |
| Maine | 1985 | 2.53 | −0.04 |
| North Dakota | 1985 | 1.29 | 0.01 |
| South Dakota | 1986 | 2.10 | −0.03 |
| Florida | 1987 | 11.73 | 0.67 |
| Virginia | 1988 | 7.90 | 0.65 |
| Georgia | 1989 | 12.28 | 0.92 |
| Pennsylvania | 1989 | 5.73 | 0.65 |
| West Virginia | 1989 | 5.65 | 0.32 |
| Idaho | 1990 | 3.56 | 0.30 |
| Mississippi | 1990 | 11.65 | 0.25 |
| Oregon | 1990 | 4.85 | 0.76 |

Notes: Source—Fryer et al. (2005) and Bureau of Justice Statistics (2009).
[a]The crack index data come from the Fryer et al. (2005) study, which constructs the index based on several indirect proxies for crack use, including cocaine arrests, cocaine-related emergency room visits, cocaine-induced drug deaths, crack mentions in newspapers, and Drug Enforcement Administration drug busts. The article does suggest that these values can be negative. The state with the lowest mean value of the crack index over our data period is Maine (−0.04) and the state with the highest mean value is New York (1.15). (The article does suggest that the crack index values can be negative.)

_____

27.    New Mexico, one of the five highest crack states, adopted its RTC law in 2003. Wyoming and Montana adopted RTC laws in 1994 and 1991, respectively. North Dakota and South Dakota adopted their laws prior to the start of our data set (pre-1977), although the dates are contested (Lott and Mustard, 1997; Moody and Marvell, 2008).

28.    In fact, out of the ten states with the lowest crack cocaine index, seven adopted an RTC law by 1994. The exceptions are Nebraska, Minnesota (2003), and Iowa (no RTC law).

Moreover, as Table 12 reveals, the twelve states that adopted RTC laws during the initial Lott-Mustard period (1977–1992) had crack levels substantially below the level of the five high-crack states shown in Figures 8 and 9. None of the RTC adopters shown in Table 12 has an average crack index value that even reaches 1, while Figure 9 reveals that the high-crack states had a crack level in the neighborhood of 4 or 5.

In other words, over the initial Lott-Mustard period of analysis (ending in 1992), the criminogenic influence of crack made RTC laws look beneficial since crack was raising crime in non-RTC states. In the later period, crime fell sharply in the high-crack states, making RTC states look bad in comparison. Therefore, the effects estimated over this entire period will necessarily water down the initial Lott-Mustard results. The hope is that estimating the effect over the entire period will wash out the impact of the omitted variable bias generated by the lack of an adequate control for the effect of crack.

## 10.2.  Endogeneity and Misspecification Concerns

To this point, our analysis has remained within the estimation framework common to the NRC/Lott-Mustard analyses, which implicitly assumes that passage of RTC legislation in a given state is an exogenous factor influencing crime levels. Under this assumption, one can interpret the estimated coefficient as an unbiased measure of RTC laws' collective impact.

We probe the validity of this strong claim by estimating a more flexible year-by-year specification, adding pre- and post-passage dummy variables to the analysis.[29] Pre-passage dummies can allow us to assess whether crime trends shift in unexpected ways prior to the passage of a state's RTC law. Autor, Donohue, and Schwab (2006) point out that when analyzing the impact of state-level policies using panel data, one would ideally see lead dummies that are near zero. The graphs that we present below, though, suggest the possible presence of systematic differences between RTC law adopters that can complicate or thwart the endeavor of obtaining clean estimates of the impact of RTC laws.

Figures 10–13 present the results from this exercise in graphical form. Using our preferred model as the base specification, we introduce dummies for the eight years preceding and the first eight years following adoption. We

---

29.    In Appendix C, we further analyze the issue of misspecification and model fit by analyzing residuals from the regression analysis.



**Figure 10.** Normalized Year-by-Year Estimates of the Impact of RTC Laws on Murder.
Notes: Estimations include year and county fixed effects, state trends, and are weighted by county population. The control variables include incarceration and police rates, unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.

first estimate this regression for each violent crime category over the full sample of RTC states. However, because of the presence of one state that adopted its RTC law just three years after our data set begins, and eight states that adopted laws within the five years before our data set ends, we have nine



**Figure 11.** Normalized Year-by-Year Estimates of the Impact of RTC Laws on Rape.
Notes: Estimations include year and county fixed effects, state trends, and are weighted by county population. The control variables include incarceration and police rates, unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.



**Figure 12.** Normalized Year-by-Year Estimates of the Impact of RTC Laws on Assault.
Notes: Estimations include year and county fixed effects, state trends, and are weighted by county population. The control variables include incarceration and police rates, unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.

states that cannot enter into the full set of pre- and post-adoption dummy variables. Because Ayres and Donohue (2003a) showed that the year-by-year estimates can jump wildly when states drop in or out of the individual year estimates, we also estimate the year-by-year model after dropping out



**Figure 13.** Normalized Year-by-Year Estimates of the Percent Change in Robbery.
Notes: Estimations include year and county fixed effects, state trends, and are weighted by county population. The control variables include incarceration and police rates, unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.

the earliest (1980) and latest (post-2000) law-adopting states. In this separate series of regressions, our estimates of the full set of lead and lag variables are based on the set of all twenty-five adopters between 1985 and 1996.[30]

Unfortunately, the graphs raise concerns about the presence of endogenous adoption that complicate our thinking about the influence of RTC laws on violent crime. If one looks at the four lines in Figure 10, one sees four different sets of year-by-year estimates of the impact of RTC laws on murder. The lines have been normalized to show a zero value in the year of adoption of an RTC law. Let us begin with the bottom line (looking at the right-hand side of the figure) and the line just above it. The lower line represents the naive year-by-year estimates from the preferred model estimated on the 1977–2006 period, while the line just above it drops out the early and late adopters, so that the estimated year-by-year estimates are based on the "clean" sample of twenty-five adopters for which complete data are available from eight years prior to adoption through eight years after adoption. One immediately sees that the trimmed estimates are different and less favorable to the MGLC hypothesis, as evidenced by the higher values in the post-passage period. They also look superior in the pre-passage period in that on average the pre-passage dummies are closer to zero for the trimmed set of estimates (the mean of the pre-passage dummies is $x$ for the trimmed estimate and $Y$ for the naive estimate).[31]

How should we interpret these trimmed sample estimates? One possibility is to conclude that on average the pre-passage estimates are reasonably close to zero and then take the post-passage figures as reasonable estimates of the true effect. If we do this, none of the estimates would be statistically significant, so one could not reject the null hypothesis of no effect. But note that the pre-passage year-to-year dummies show an oscillating pattern that is not altogether different from what we see for the post-passage values. Without

---

30.    The states that drop out (with dates of RTC law passage in parentheses) include Indiana (1980), Michigan (2001), Colorado (2003), Minnesota (2003), Missouri (2003), New Mexico (2003), Ohio (2004), Kansas (2006), and Nebraska (2006).

31.    Note that this bias in favor of a deterrent effect for murder would also be operating in the aggregate estimates, further suggesting that the true aggregate estimates would be commensurately less favorable for the deterrence hypothesis than the ones we presented earlier in this article—and in all other articles providing unadjusted aggregate estimates.

the odd drop when moving from Year 4 to Year 5 and subsequent rise in values through Year 8, the zero effect story would seem more compelling, but perhaps the drop merely reflects a continuation of the pre-passage oscillations, which are clearly not the product of the passage of RTC laws.[32]

Perhaps what is most important is not the oscillations but rather the trend just prior to passage. This might suggest that rising crime in fact increases the likelihood that a state would adopt an RTC law. In particular, since murder is typically the crime most salient in the media, we suspect it has the greatest effect on implementation of purported crime control measures such as RTC legislation. Of course, this would suggest an endogeneity problem that would also likely lead to a bias in favor of finding a deterrent effect. The mechanism driving this bias would presumably be that rising crime strengthens the National Rifle Association's push for the law, and the mean reversion in crime would then falsely be attributed to the law by the naive panel data analysis (incorrectly premised on exogenous RTC law adoption). Post-adoption murder rates again decline—often to within the neighborhood of pre-law levels. We do, however, uncover some interesting findings when estimating (more cleanly) the year-by-year effects on the twenty-five states for which we have observations across the full set of dummy variables.

Another striking feature we note is the strong influence of Florida and Georgia on our estimates of the impact of RTC laws on murder and rape. When we remove these two states, the post-adoption trend lines for murder and rape shift upward substantially. Moreover, when dropping them from the set of RTC states that already excludes the early and late adopters—still leaving us with twenty-three RTC states to analyze—we see that murder increases in each post-adoption year except one. As previous articles have noted, Florida experienced enormous drops in murder during the 1990s that may have been completely unrelated to the passage of its RTC policy. Donohue (2003) points out that the 1980 Mariel boatlift temporarily added many individuals prone to committing crimes to Florida's population, causing a massive increase in crime in Florida during the 1980s. Thus, it is plausible that the massive 1990s crime reductions in Florida were not driven by the

---

32.    The ostensible pronounced drop in murder five years after adoption (exists for the full data set, as well, but it is part of a continuing downward trend in murder that simply reaches a trough five years after passage).

adoption of the state's RTC law but rather a return to traditional population dynamics that were less prone to violent crime (again, a reversion to the mean). This is important to consider given the strong downward pull of Florida on aggregate murder rates.

The line based on dropping Florida and Georgia from the trimmed sample would suggest that for the twenty-three other states, the impact of RTC laws on murder was highly pernicious—and increasingly so as the sharp upward trend in the last three years would suggest. Again a number of interpretations are possible: (1) Florida and Georgia are unusual and the best estimate of the impact of RTC laws comes from the trimmed sample that excludes them (and the early and late adopters); (2) there is heterogeneity in the impact of RTC laws, so we should conclude that the laws help in Florida and Georgia, and tend to be harmful in the other twenty-three states; and (3) omitted variables mar the state-by-state estimates but the aggregate estimates that include Florida and Georgia may be reasonable if the state-by-state biases on average cancel out.

Note that Figure 11, which presents the comparable year-by-year estimates of the impact of RTC laws on rape, shows a similar yet even more extreme pattern of apparent spikes in crime leading to adoption of RTC laws followed by a substantial amount of mean reversion. The somewhat unsettling conclusion from Figures 10 and 11 is that RTC laws might look beneficial if one only had data for four or five years, but this conclusion might be substantially reversed if a few additional years of data were analyzed. Taken as a whole, these two figures show the sensitivity of the estimates to both the time period and sample of states that are analyzed.

Further casting doubt on the possibility that drops in murder and rape could be attributed to the passage of RTC laws, a dramatically different picture emerges from our year-by-year analysis of these laws' impact on assault and robbery rates. The general story here seems to be that assault increases markedly over the time period after law passage, which squares with our results discussed in the previous sections. One observes positive coefficient changes that are initially modest, but these increase dramatically and uniformly over the second half of the post-passage period. Moreover, in contrast to the year-by-year murder and rape estimates, assault trends are not demonstrably different when we alter the sample to exclude early and late adopters, as well as Florida and Georgia. The pattern is generally unaffected by sample, giving us some confidence that RTC laws may be having an adverse

impact on the rate of assault. Robbery rates similarly increase over time after the passage of RTC laws, although not as dramatically.

Something to consider, however, is how one should interpret the assault trends in light of the murder trends just discussed. If, for example, the decline in murder to pre-law levels after RTC laws' passage is nothing more than a "mean reversion" effect, it is conceivable that the apparent increase in assault simply represents mean reversion in reverse (from relatively low to high). It is important to note, however, that while assault does return to its pre-law levels a few years after passage, the coefficients continue to rise dramatically, with no hint of any subsequent mean regression. Thus, a more plausible way to interpret the near uniform increases in assault coefficients is that aggravated assault did actually increase over time with the passage of RTC legislation, which strongly undercuts the "MGLC" thesis. Interestingly, the robbery data (Figure 13) suggest either a pernicious effect similar to that on aggravated assault (particularly for the trimmed estimates dropping only early and late adopters) or a strong upward trend in crime, starting well before passage, that might be taken as a sign of the absence of any impact of RTC laws on robbery.

## 10.3 Effects of RTC Laws on Gun-related Assaults

Thus far in our analysis, we have yet to consider whether RTC laws affect aggravated assaults committed with a firearm differently than aggravated assaults overall. This is important to consider given that the 1990s witnessed huge movements in reported assaults due to cultural shifts around the issue of domestic violence. Many of these crimes would not have involved guns, making it possible that our results above suggesting increased rates of assault in RTC states are actually a statistical artifact of changing crime-reporting norms. For this reason, gun-related aggravated assaults may be an arguably more reliable statistic for measuring RTC laws' impact than overall aggravated assaults.

To test this possibility, we estimate our preferred regression using gun-related aggravated assaults as the dependent variable (both with and without state-specific trends) in Table 13 below. Comparing these new results with the assault estimates in Tables 9a and 9b above, our bottom-line story of how RTC laws increases rates of aggravated assault does not change much when limiting our analysis to assaults involving a gun. Without state trends, we see large positive estimates, some of which are significant at the 10% level. With

**Table 13.** Estimated Impact of RTC Laws on Gun-related Aggravated Assaults—Using Updated 2009 State-Level Data—With Preferred Controls, With Clustered Standard Errors, All Crimes, 1977–2006[a]

|  | Without State Trends (%) | With State Trends (%) |
|---|---|---|
| 1. Dummy variable model: | 15.50* | 0.67 |
|  | 8.11* | 7.48 |
| 2. Spline model: | 2.23* | 5.64* |
|  | 1.27* | 3.12* |
| 3. Hybrid model: |  |  |
| *Postpassage dummy* | 7.76 | −2.19 |
|  | 7.76 | 7.13 |
| *Trend effect* | 1.90 | 5.71* |
|  | 1.28 | 3.08* |

[a]Estimations include year and county fixed effects and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

state trends, we again see some significant evidence that gun-related aggravated assault rates are increased by RTC legislation. These results solidify our overall confidence in the array of estimates we present above that suggests that RTC laws raise rates of aggravated assault.

## 11. Conclusions

In this article, we have explored the NRC panel's 2005 report detailing the impact of RTC gun laws on crime. Using the committee's models as a starting point for our analysis, we highlight the importance of thoroughly considering all the possible data and modeling choices. We also highlight some issues that should be considered when evaluating the NRC report.

Data reliability is one concern in the NRC study. We corrected several coding errors in the data that were provided to us by the NRC (which had originally been obtained from John Lott). Accurate data are essential to making precise causal inferences about the effects of policy and legislation—and this issue becomes particularly important when we are considering topics as controversial as firearms and crime control. We attempted to mitigate any uncertainty over data reliability by re-collecting the data. However, when attempting to replicate the NRC specifications—on both the NRC's and

our own newly constructed data sets—we consistently obtained point estimates that differed substantially from those published by the committee.

Thus, an important lesson for both producers and consumers of econometric evaluations of law and policy is to understand how easy it is to get things wrong. In this case, it appears that Lott's data set had errors in it, which then were transmitted to the NRC committee for use in evaluating Lott and Mustard's hypothesis. The committee then published tables that could not be replicated (on its data set or a new corrected data set), but which made at least Professor James Q. Wilson think (incorrectly it turns out—see our Tables 2a–c) that running Lott-Mustard regressions on both data periods (through 1992 and through 2000) would generate consistently significant evidence that RTC laws reduce murder. This episode suggests to us the value of making publicly available data and replication files that can re-produce published econometric results. This exercise can both help to uncover errors prior to publication and then assist researchers in the process of replication, thereby aiding the process of ensuring accurate econometric estimates that later inform policy debates.

A second lesson is that the "best practices" in econometrics are evolving. Researchers and policy makers should keep an open mind about controversial policy topics in light of new and better empirical evidence or methodologies. Case in point: The NRC report suggested that clustering standard errors on the state level in order to account for serial correlation in panel data was not necessary to ascertain the impact of RTC laws on crime. However, most applied econometricians nowadays consider clustering to be advisable in the wake of a few important articles, including one in particular by Bertrand, Duflo, and Mullainathan (2004) on difference-in-differences estimation. The evidence we present corroborates the need for this standard error adjustment. Our placebo tests showed that standard errors are greatly understated without clustering, and we believe strongly that this adjustment is vital for both county-level and state-level analyses of gun laws and crime. Otherwise, statistical significance is severely exaggerated and significant results are detected where none in fact exists.

A third lesson relates to the potential flaws in the Lott-Mustard (and by extension, the NRC) approach and specification. Issues—such as the inclusion of state-specific linear trends, the danger of omitted variable bias, and the choice of county-level over state-level data, all of which the NRC neglected to discuss—clearly have enough impact on the panel data

estimates to influence one's perception of the MGLC theory and thus warrant closer examination. These issues were not all arcane (although many were, such as the need to control for state trends). By now, empirical researchers should be well acquainted with omitted variable bias, and the increases in the prison and police populations were known major factors influencing the pattern of U.S. crime in recent decades (Wilson, 2008). Yet, the Lott-Mustard model—adopted by the NRC—had no control for incarceration or police![33] On that basis alone, Wilson might well have hesitated before accepting the MGLC hypothesis on the basis of the Lott-Mustard or NRC results. Yet, Lott, with at best questionable support for his view that RTC laws reduce murder, now claims that Wilson, one of the most eminent criminologists of our time, supports his position (Lott, 2008). Clearly, the consequences of embracing fragile empirical evidence can be severe.

Granted, much of the work of applied econometricians is of the sort that was set forth by the NRC as evidence on the impact of RTC laws. The committee, though, found this evidence inadequate to reach a conclusion, doubtless because the results seemed too dependent on different modeling choices. But Horowitz is even more nihilistic, essentially rejecting all applied econometric work on RTC legislation, as indicated by his following independent statement in an appendix to the NRC's (2005) report:

It is unlikely that there can be an empirically based resolution of the question of whether Lott has reached the correct conclusions about the effects of right-to-carry laws on crime. (p. 304)

Of course, if there can be no empirically based resolution of this question, it means that short of doing an experiment in which laws are randomly assigned to states, there will be no way to assess the impact of these laws. The econometrics community needs to think deeply about what the NRC report and the Horowitz appendix imply for the study of legislation using panel data econometrics and observational data.

Finally, despite our belief that the NRC's analysis was imperfect in certain ways, we agree with the committee's cautious final judgment on the

---

33.  The Lott-Mustard model omitted a control for the incarceration rate (which is indicated implicitly—though not explicitly—in the notes to each table of the NRC report, which listed the controls included in each specification).

effects of RTC laws: "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." Our results here further underscore the sensitivity of guns crime estimates to modeling decisions.[34] If one had to make judgments based on panel data models of the type used in the NRC report, one would have to conclude that RTC laws likely increase the rate of aggravated assault. Further research will be needed to see if this conclusion survives as more data and better methodologies are employed to estimate the impact of RTC laws on crime.

## Appendix A
## Using Placebo Laws to Test the Impact of Clustering in the State Data

Using state-level data, we again conduct our experiment with placebo laws to examine the effects of clustering the standard errors. As seen in Tables A1–4, we find results similar to those generated with our county data: Without clustering, the Type 1 error rates are often an order of magnitude too high or worse for our murder and robbery regressions (see Tables A1 and A3). In fact, even *with* clustered standard errors (Tables A2 and A4), the rejection of the null hypothesis

**Table A1.** Hybrid Model—Percentage of Significant Estimates (at the 5% Level)—Using Updated 2009 State-Level Data—Lott-Mustard Controls, without Clustered Standard Errors, 1977–2006 (without 1993 Data)

|  |  | Dummy Variable (%) | Trend Variable (%) |
|---|---|---|---|
| 1. All 50 states + DC | Murder | 47.1 | 67.2 |
|  | Robbery | 46.0 | 61.7 |
| 2. Exact 32 states | Murder | 48.5 | 57.3 |
|  | Robbery | 51.2 | 71.1 |
| 3. Random 32 states | Murder | 49.3 | 64.2 |
|  | Robbery | 50.0 | 66.0 |

---

34.    For a quick and clear sense of how sensitive estimates of the impact of RTC laws are, see Appendix D, where we visually demonstrate the range of point estimates we obtain throughout our analysis.

**Table A2.** Hybrid Model—Percentage of Significant Estimates (at the 5% Level)—Using Updated 2009 State-Level Data—Lott-Mustard Controls, with Clustered Standard Errors, 1977–2006 (without 1993 Data)

|  |  | Dummy Variable (%) | Trend Variable (%) |
|---|---|---|---|
| 1. All 50 states + DC | Murder | 18.5 | 22.6 |
|  | Robbery | 12.5 | 15.4 |
| 2. Exact 32 states | Murder | 17.1 | 19.4 |
|  | Robbery | 15.2 | 20.3 |
| 3. Random 32 states | Murder | 22.0 | 22.7 |
|  | Robbery | 16.3 | 18.2 |

**Table A3.** Dummy Variable Model—Percentage of Significant Estimates (at the 5% Level)—Using Updated 2009 State-Level Data—Lott-Mustard Controls, without Clustered Standard Errors, 1977–2006 (without 1993 Data)

|  |  | Dummy Variable (%) |
|---|---|---|
| 1. All 50 states + DC | Murder | 44.3 |
|  | Robbery | 46.7 |
| 2. Exact 32 states | Murder | 50.3 |
|  | Robbery | 49.4 |
| 3. Random 32 states | Murder | 51.9 |
|  | Robbery | 50.8 |

**Table A4.** Dummy Variable Model—Percentage of Significant Estimates (at the 5% Level)—Using Updated 2009 State-Level Data—Lott-Mustard Controls, with Clustered Standard Errors, 1977–2006 (without 1993 Data)

|  |  | Dummy Variable (%) |
|---|---|---|
| 1. All 50 states + DC | Murder | 18.0 |
|  | Robbery | 14.1 |
| 2. Exact 32 states | Murder | 16.0 |
|  | Robbery | 16.4 |
| 3. Random 32 states | Murder | 22.7 |
|  | Robbery | 14.3 |

(that RTC laws have no significant impact on crime) occurs at a relatively high rate. This finding suggests that, at the very least, we should include clustered standard errors to avoid unreasonably high numbers of significant estimates.


## Appendix B
## Panel Data Models Over the Full Period with no Covariates

The NRC panel sought to underscore the importance of finding the correct set of covariates by presenting panel data estimates of the impact of RTC without covariates but including county and year fixed effects. For completeness, this appendix presents these same estimates for the preferred models (with and without state trends) on both county and state data for the period from 1977 to 2006. If one compares the results from these four tables with no controls with the analogous tables using the preferred model for the same time period, one sees some interesting patterns. For example, if we compare the county results without state trends from both our preferred specification (Table 7a) and the no-controls specification (Table B1), we see that the results are quite similar in terms of magnitude and direction, although adding in our suggested covariates seems to both dampen the coefficients and reduce their significance. The basic story from our analysis is again strengthened: There seems to be virtually no effect of RTC laws on murder, while if there is *any* RTC effect on other crimes generally, it is a crime-*increasing* effect. The results are slightly less similar when we compare those from the models that include state trends (Tables 7b and B2). While we see that estimates are similar for murder, rape, robbery, and auto theft, the estimates for assault, burglary, and larceny change in either magnitude or direction (or both) when adding controlling factors to the model. In general, though, we only see decreases when adding state trends to either specification, and even then, the results are much too imprecise to make causal inferences. When we shift to a comparison of the state-level results, we again see similarities between the preferred and no-controls specifications. When looking at the results without state trends, we see that the estimates are very similar in terms of direction, although the no-controls estimates are often larger in magnitude and more

**Table B1.** Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—No Controls, with Clustered Standard Errors, All Crimes, 1977–2006[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | −0.55 | 33.10 | 27.30 | 25.50* | 33.50 | 35.90 | 38.00 |
| model | 8.30 | 22.60 | 18.90 | 14.60* | 21.50 | 22.00 | 25.50 |
| 2. Spline model | 0.35 | 3.35* | 3.20* | 2.86** | 3.42* | 3.85* | 4.27* |
|  | 0.76 | 1.94* | 1.66* | 1.36** | 2.01* | 2.00* | 2.29* |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | −3.48 | 21.40 | 14.30 | 14.30 | 21.40 | 21.50 | 21.30 |
| dummy | 8.07 | 18.70 | 16.90 | 12.70 | 17.60 | 18.90 | 21.60 |
| Trend effect | 0.54 | 2.17* | 2.41* | 2.07* | 2.24 | 2.66* | 3.09* |
|  | 0.72 | 1.25* | 1.27* | 1.08* | 1.48 | 1.54* | 1.69* |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table B2.** Estimated Impact of RTC Laws—Using Updated 2009 County-Level Data—No Controls, with State Trends and Clustered Standard Errors, All Crimes, 1977–2006[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | −2.80 | −13.10 | 5.02 | 3.10 | 5.58 | 1.50 | 2.98 |
| model | 5.03 | 10.60 | 9.31 | 7.71 | 9.47 | 10.50 | 11.70 |
| 2. Spline model | −0.54 | −4.74 | 1.95 | −0.37 | −0.14 | −0.78 | −0.80 |
|  | 1.23 | 4.06 | 2.30 | 2.33 | 2.52 | 2.45 | 2.61 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | −2.52 | −10.50 | 3.94 | 3.35 | 5.73 | 1.97 | 3.48 |
| dummy | 5.22 | 10.10 | 10.20 | 8.27 | 10.20 | 11.40 | 12.80 |
| Trend effect | −0.48 | −4.52 | 1.87 | −0.44 | −0.26 | −0.82 | −0.87 |
|  | 1.27 | 4.07 | 2.42 | 2.42 | 2.63 | 2.61 | 2.80 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates.
*Significant at 10%; **significant at 5%; ***significant at 1%.

statistically significant. When doing a similar comparison of the specifications that now adds in state trends, we also see similar results for nearly all crimes. The exception is aggravated assault, for which we see that our preferred specification produces more

**Table B3.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—No Controls, with Clustered Standard Errors, All Crimes, 1977–2006[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | −1.79 | 8.33 | 11.70** | 20.00** | 24.70** | 18.30*** | 16.60*** |
| model | 7.54 | 8.22 | 4.62** | 7.90** | 11.60** | 6.69*** | 4.04*** |
| 2. Spline model | 0.08 | 0.78 | 1.47** | 1.98** | 2.03* | 1.73** | 1.63*** |
|  | 0.88 | 0.90 | 0.64** | 0.96** | 1.17* | 0.72** | 0.46*** |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | −3.22 | 5.90 | 5.36 | 13.30* | 19.60** | 12.70** | 11.00*** |
| dummy | 6.96 | 5.81 | 3.82 | 7.36* | 9.00** | 4.96** | 3.69*** |
| Trend effect | 0.26 | 0.45 | 1.17* | 1.24 | 0.90 | 0.99* | 1.00** |
|  | 0.89 | 0.71 | 0.63* | 0.96 | 0.86 | 0.56* | 0.42** |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table B4.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—No Controls, with State Trends and Clustered Standard Errors, All Crimes, 1977–2006[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | −0.31 | −4.66** | 0.62 | 3.43 | 8.38 | 1.10 | 0.92 |
| model | 3.73 | 2.00** | 3.36 | 4.92 | 5.28 | 2.93 | 2.37 |
| 2. Spline model | 0.78 | −0.54 | 2.46*** | 0.29 | −0.16 | −0.20 | −0.46 |
|  | 0.93 | 0.92 | 0.91*** | 1.39 | 1.71 | 0.80 | 0.63 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | −0.80 | −4.39** | −0.90 | 3.30 | 8.63 | 1.25 | 1.24 |
| dummy | 3.67 | 2.03** | 3.37 | 5.30 | 5.17 | 3.23 | 2.55 |
| Trend effect | 0.80 | −0.44 | 2.48*** | 0.21 | −0.39 | −0.23 | −0.49 |
|  | 0.93 | 0.91 | 0.92*** | 1.43 | 1.70 | 0.84 | 0.67 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates.
*Significant at 10%; **significant at 5%; ***significant at 1%.

negative estimates for the dummy model (although this result is not particularly precise). Again, when the comparison is taken as a whole, support is lacking for the view that RTC laws lead to reductions in crime.

## Appendix C
## Trimming the Sample to Address Questions of Model Fit

Given our concerns about how well the guns crime econometric models fit all 50 U.S. states (plus DC), we decided to examine the residuals from various regressions models. For example, one potentially important issue is whether one should include linear state trends in our models. To further explore this issue, we examined the variance of the residuals for the aggravated assault regression estimates using our preferred models on state data for the period through 2006—both with and without state trends.[35] In particular, we found that the residual variance was high for smaller states, even when we do not weight our regressions by population.[36] We explored how these "high–residual variance" states (defined from the aggravated assault regressions on our preferred model through 2006) might be influencing the results. We estimated our preferred model (both with and without state trends) after removing the 10% of states with the highest residual variance. This step is also repeated after removing the highest 20% of states in terms of residual variance. Our full-sample results for our preferred specification (which includes clustered standard errors, and is run over the entire time period) are shown in Tables 11a and b (without and with state trends, respectively). The results from our two trimmed set of states are presented below. Tables C1 and C2 should be compared to Table 11a (no state trends) and Tables C3 and C4 should be compared to Table 11b (adding in state trends). Removing high–residual variance states (based on the aggravated assault regressions) has little impact on the story told in Table 11a (no state trends): There was no hint that RTC laws reduce crime in Table 11a and this message comes through again in Tables C1 and C2. All three of these tables show at least some evidence that RTC laws increase aggravated

---

35. Since our most robust results across the specifications in this article were for aggravated assault, we focused specifically on the residuals obtained using assault rate as the dependent variable.

36. We removed the population weight for this exercise because it is likely that when regressions are weighted by population, the regression model will naturally make high-population states fit the data better. As a result, we expect that residuals for smaller states will be higher. We find, however, that the results are qualitatively similar even when we obtain the residuals from regressions that include the population-weighting scheme.

**Table C1.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with Clustered Standard Errors, All Crimes, 1977–2006, Dropping States with Highest Residual Variance (Top 10%: MT, ME, WV, NH, TN)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −3.53 | −0.98 | 4.33 | 5.04 | 6.80 | 1.38 | 5.75* |
|  | 4.02 | 3.95 | 3.15 | 4.41 | 6.27 | 3.05 | 2.96* |
| 2. Spline model | −0.13 | −0.50 | 1.16** | 0.66 | 0.57 | 0.01 | 0.57 |
|  | 0.62 | 0.56 | 0.57** | 0.77 | 0.63 | 0.39 | 0.47 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −3.69 | 1.65 | −1.21 | 2.53 | 5.26 | 1.69 | 3.94 |
|  | 3.80 | 3.69 | 3.22 | 4.98 | 5.80 | 3.30 | 2.98 |
| Trend effect | 0.04 | −0.58 | 1.21* | 0.55 | 0.34 | −0.07 | 0.40 |
|  | 0.64 | 0.58 | 0.60* | 0.86 | 0.58 | 0.43 | 0.50 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table C2.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with Clustered Standard Errors, All Crimes, 1977–2006, Dropping States with Highest Residual Variance (Top 20%: MT, ME, WV, NH, TN, NE, VT, HI, OH, KY)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable model | −4.99 | −0.28 | 3.94 | 5.80 | 8.13 | 2.86 | 6.75** |
|  | 4.23 | 4.28 | 2.40 | 4.97 | 6.60 | 3.20 | 3.23** |
| 2. Spline model | −0.16 | −0.50 | 0.84* | 0.90 | 0.71 | 0.29 | 0.71 |
|  | 0.66 | 0.59 | 0.47* | 0.83 | 0.70 | 0.37 | 0.50 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage dummy | −5.38 | 2.53 | 0.15 | 2.09 | 6.16 | 1.91 | 4.39 |
|  | 3.93 | 3.95 | 3.05 | 5.54 | 6.13 | 3.64 | 3.37 |
| Trend effect | 0.09 | −0.61 | 0.83 | 0.81 | 0.43 | 0.21 | 0.52 |
|  | 0.68 | 0.61 | 0.54 | 0.92 | 0.66 | 0.43 | 0.55 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table C3.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with State Trends and Clustered Standard Errors, All Crimes, 1977–2006, Dropping States with Highest Residual Variance (Top 10%: MT, NH, VT, WV, KY)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | 1.17 | −3.56 | −0.13 | 2.28 | 7.82** | 1.31 | 1.77 |
| model | 2.95 | 2.16 | 2.82 | 3.75 | 3.26** | 2.03 | 1.66 |
| 2. Spline model | 0.80 | 0.15 | 2.83*** | 0.32 | −2.01** | −0.31 | −0.21 |
|  | 0.91 | 0.81 | 0.82*** | 1.37 | 0.83** | 0.91 | 0.79 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | 0.73 | −3.71 | −1.77 | 2.14 | 9.13*** | 1.51 | 1.93 |
| dummy | 3.12 | 2.32 | 2.80 | 4.04 | 3.23*** | 2.31 | 1.84 |
| Trend effect | 0.77 | 0.27 | 2.89*** | 0.25 | −2.29*** | −0.35 | −0.27 |
|  | 0.95 | 0.83 | 0.84*** | 1.42 | 0.83*** | 0.95 | 0.83 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

**Table C4.** Estimated Impact of RTC Laws—Using Updated 2009 State-Level Data—with Preferred Controls, with State Trends and Clustered Standard Errors, All Crimes, 1977–2006, Dropping States with Highest Residual Variance (Top 20%: MT, NH, VT, WV, KY, NE, NV, SD, ND, DE, IN)[a]

|  | Murder (%) | Rape (%) | Aggravated Assault (%) | Robbery (%) | Auto Theft (%) | Burglary (%) | Larceny (%) |
|---|---|---|---|---|---|---|---|
| 1. Dummy variable | 2.09 | −2.88 | −1.35 | 4.63 | 8.94*** | 1.42 | 2.41 |
| model | 2.97 | 2.29 | 2.78 | 3.44 | 3.18*** | 2.14 | 1.68 |
| 2. Spline model | 0.92 | 0.25 | 2.42*** | 0.63 | −2.11** | −0.43 | −0.12 |
|  | 0.97 | 0.83 | 0.80*** | 1.44 | 0.88** | 0.99 | 0.83 |
| 3. Hybrid model |  |  |  |  |  |  |  |
| Post-passage | 1.69 | −3.03 | −2.50 | 4.39 | 10.00*** | 1.63 | 2.50 |
| dummy | 3.09 | 2.40 | 2.83 | 3.71 | 3.18*** | 2.40 | 1.87 |
| Trend effect | 0.88 | 0.32 | 2.48*** | 0.53 | −2.35** | −0.47 | −0.18 |
|  | 1.01 | 0.84 | 0.81*** | 1.50 | 0.87** | 1.02 | 0.87 |

[a]Estimations include year and county fixed effects, and are weighted by county population. Robust standard errors are provided beneath point estimates. The control variables for this "preferred" specification include incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, county population, population density, per capita income, and six demographic composition measures.
*Significant at 10%; **significant at 5%; ***significant at 1%.

assault. Removing the high–residual variance states from the models with state trends does nothing to shake the Table 11b finding that RTC laws increase aggravated assault. The somewhat mixed results for auto theft seen in Table 11b also remain in Tables C3 and C4. Of the states dropped from Table C1, the following four states adopted RTC laws during the 1977–2006 period (with date of adoption in parentheses): Montana (1991), Maine (1985), West Virginia (1989), and Tennessee (1994). Of the additional states dropped from Table C2, the following four states adopted RTC laws during the 1977–2006 period (with date of adoption in parentheses): Ohio (2004), Kentucky (1996), Indiana (1980), and Oklahoma (1995).[37] Results from Table C3 come from dropping similar RTC states to Table C1, although Kentucky (1996) is dropped rather than Tennessee, and New Hampshire (1959) is dropped rather than Maine.[38] Finally, in addition to the five RTC states that were dropped in Table C3, Table C4 dropped the following four RTC states: Nevada (1995), South Dakota (1986), North Dakota (1985), and Indiana (1980).

## Appendix D
## Summarizing Estimated Effects of RTC Laws Using Different Models, State Versus County Data, and Different Time Periods

This appendix provides graphical depictions of sixteen different estimates of the impact of RTC laws for the dummy and spline models for specific crimes using different data sets (state and county), time periods (through 2000 or through 2006), and models (Lott-Mustard versus our preferred model and with and without state trends). For example, Figure D1 shows estimates of the impact on murder using

---

37.   In implementing our protocol of dropping high–residual variance states, we examined the residuals of the dummy and spline models separately to identify the high-variance states. While they match across models for three of the four tables, in the case of Table C4, the ordinal rank of the states in terms of residual variance were slightly different for the dummy versus the spline model. For this table, Indiana had the 9th highest residual variance when looking at the dummy model results, while North Dakota had the 11th highest variance. For the spline results, the residual variance ranks of these two states were reversed. Thus, for this table, we dropped both states to estimate our regressions.

38.   The dropped states are slightly different between Tables C1 and C3, as well as between Tables C2 and C4, because the state ranks based on residual variances differed when the models were run with and without state trends.



**Figure D1.** Various Murder Estimates (Dummy Model).



**Figure D2.** Various Murder Estimates (Spline Model).



**Figure D3.** Various Rape Estimates (Dummy Model).



**Figure D4.** Various Rape Estimates (Spline Model).



**Figure D5.** Various Assault Estimates (Dummy Model).



**Figure D6.** Various Assault Estimates (Spline Model).



**Figure D7.** Various Robbery Estimates (Dummy Model).



**Figure D8.** Various Robbery Estimates (Spline Model).



**Figure D9.** Various Auto Theft Estimates (Dummy Model).



**Figure D10.** Various Auto Theft Estimates (Spline Model).



**Figure D11.** Various Burglary Estimates (Dummy Model).



**Figure D12.** Various Burglary Estimates (Spline Model).



**Figure D13.** Various Larceny Estimates (Dummy Model).



**Figure D14.** Various Larceny Estimates (Spline Model).

the dummy model, designed to capture the average effect of RTC laws during the post-passage period. The first bar in each of the eight groupings corresponds to county-level estimates; the second bar corresponds to state-level estimates, for a total of sixteen estimates per figure. The value of the figures is that they permit quick visual observation of the size and statistical significance of an array of estimates. Note, for example, that none of the estimates of RTC laws on murder in either Figure D1 or D2 is significant at even the 0.10 threshold. This sharp contrast to the conclusion drawn by James Q. Wilson on the NRC panel is in part driven by the fact that all the estimates in this appendix come from regressions in which we adjusted the standard errors by clustering. In contrast to the wholly insignificant estimates for murder, the estimates of the impact of RTC laws on aggravated assault in Figure D6 are generally significant as

indicated by the shading of the columns, where again no shading indicates insignificance, and the shading darkens as significance increases (from a light gray indicating significance at the 0.10 level, slightly darker indicating significance at the 0.05 level, and black indicating significance at the 0.01 level). Note that the overall impression from Figure D6 is that RTC laws increase aggravated assault. Even in Figure D6, though, one can see that some of the estimates differ between county- and state-level data and tend to be strongest in state data controlling for state trends.

Figure D5, which provides estimates of the effect of RTC laws on aggravated assault using the dummy model (rather than the spline model of Figure D6), reveals that the conclusion that RTC laws increase aggravated assault is model dependent: If the dummy model is superior, and if we confine our attention to the complete 1977–2006 data set, the conclusion that RTC laws increase aggravated assault only holds in the Lott-Mustard county data model. In Figure D14, the state-level estimates of the preferred specifications (without state trends) through 2000 and 2006 are essentially zero (no impact), so only the county-level estimates show up in the graph.

## References

Angrist, Joshua, and Jorn-Steffen Pischke. 2009. *Mostly Harmless Econometrics*. Princeton, NJ: Princeton University Press.

Autor, David, John J. Donohue, and Stewart Schwab. 2006. "The Costs of Wrongful-Discharge Laws," 88 *Review of Economics and Statistics* 211–31.

Ayres, Ian, and John J. Donohue. 2003a. "The Latest Misfires in Support of the More Guns, Less Crime Hypothesis," 55 *Stanford Law Review* 1371–98.

———. 2003b. "Shooting Down the More Guns, Less Crime Hypothesis," 55 *Stanford Law Review* 1193–312.

———. 2009. "More Guns Less Crime Fails Again: The Latest Evidence from 1977-2006," 6 *Econ Journal Watch* 218–38. Available at: http://www.aier.org/aier/publications/ejw_com_may09_ayresdonohue.pdf (accessed September 1, 2009).

Bertrand, Marianne, Esther Duflo, and Sendhil Mullainathan. 2004. "How Much Should We Trust Differences-in-Differences Estimates?" 119 *Quarterly Journal of Economics* 249–75.

Black, Dan A., and Daniel S. Nagin. 1998. "Do Right-to-Carry Laws Deter Violent Crime?" 27 *Journal of Legal Studies* 209–19.

Collins, Gail. 2009. "Have Gun, Will Travel," *The New York Times*. July 31.

Donohue, John J. 2003. "The Impact of Concealed-carry Laws" in J. Ludwig and P. J. Cook, eds., *Evaluating Gun Policy,* 287–324. Washington, DC: Brookings Institution Press.

Donohue, John J., and Justin Wolfers. 2009. "Estimating the Impact of the Death Penalty on Murder." 11 *American Law and Economics Review* 249–309.

Fryer, Roland, Paul Heaton, Steven Levitt, and Kevin Murphy. 2005. "Measuring the Impact of Crack Cocaine," NBER Working Paper Series No. W11318. National Bureau of Economic Research, Cambridge, MA.

Horowitz, Joel L. 2001. "Should the DEA's STRIDE Data Be Used for Economic Analyses of Markets for Illegal Drugs?" 96 *Journal of the American Statistical Association* 1254–71.

Levitt, Steven D. 2004. "Understanding Why Crime Fell in the 1990s: Four Factors That Explain the Decline and Six That Do Not," 17 *Journal of Economic Perspectives* 163–90.

Lott, John R. 2000. *More Guns, Less Crime*. Chicago: University of Chicago Press.

———. 2004. "Right-to-Carry Laws and Violent Crime Revisited: Clustering, Measurement Error, and State-by-State Breakdowns." Available at: http://ssrn.com/abstract=523002 (accessed September 1, 2009).

———. 2008. "Do Guns Reduce Crime?" *Intelligence Squared Debate Series.* Available at: http://intelligencesquaredus.org/wp-content/uploads/Guns-Reduce-Crime-102808.pdf (accessed September 1, 2009).

Lott, John R., and David Mustard. 1997. "Crime, Deterrence and Right-to-Carry Concealed Handguns," 26 *Journal of Legal Studies* 1–68.

Ludwig, J. 1998. "Concealed Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data," 18 *International Review of Law and Economics* 239–54.

Maltz, Michael D. 2006. Analysis of Missingness in UCR Crime Data. NCJ 215343. Washington, DC: U.S. Department of Justice.

Maltz, Michael D., and J. Targonski. 2002. "A Note on the Use of County-Level Crime Data," 18 *Journal of Quantitative Criminology* 297–318.

———. 2003. "Measurement and Other Errors in County-Level UCR Data: A Reply to Lott and Whitley," 19 *Journal of Quantitative Criminology* 199–206.

Moody, Carlisle E., and Thomas B. Marvell. 2008. "The Debate on Shall-Issue Laws," 5 *Econ Journal Watch* 269–93. http://www.aier.org/ejw/archive/doc_view/3610-ejw-200809?tmpl=component&format=raw.

Moulton, Brent. 1990. "An Illustration of a Pitfall in Estimating the Effects of Aggregate Variables on Micro Units," 72 *Review of Economics and Statistics* 334–38.

National Research Council. 2005. *Firearms and Violence: A Critical Review*. Washington, DC: National Academies Press.

Plassman, Florenz, and John Whitley. 2003. "Confirming More Guns, Less Crime," 55 *Stanford Law Review* 1313–69.

U.S. Department of Justice–Federal Bureau of Investigation. 2009. "Crime—National or State Level: Data with One Variable." Uniform Crime Reporting Statistics. Available at: http://www.ucrdatatool.gov/Search/Crime/State/TrendsInOneVar.cfm. (accessed September 1, 2009).

Wilson, James Q. 2008. "What Do We Get from Prison?" *The Volokh Conspiracy.* Available at: http://volokh.com/posts/chain_1213046814.shtml (accessed November 20, 2009).

Wooldridge, Jeffrey M. 2003. "Cluster-Sample Methods in Applied Econometrics," 93 *American Economic Review* 133–38.

Zimring, Franklin, and Gordon Hawkins. 1997. "Concealed Handguns: The Counterfeit Deterrent," 7 *The Responsive Community* 46–60.