# Exhibit 15



# Crime Prevention Research Center

- <u>Research</u>
- <u>Data</u>
- <u>About/Board Of Academic Advisors</u>
- <u>Op-Eds</u>
- <u>Contact/Press</u>
- <u>Donate</u>

Search



<u>Featured</u>

# UPDATED: Mass Public Shootings Keep Occurring In Gun-Free Zones: 94% Of Attacks Since 1950

15 Jun , 2018



**UPDATED on July 6th, 2019**: Original title: "More misleading information from Bloomberg's Everytown for Gun Safety on guns: 'Analysis of Recent Mass Shootings,' Showing how mass public shootings keep occurring in gun-free zones"  Originally posted on September 9, 2014.

While the first part of the discussion here goes through each mass public shooting from 2009 to 2014 discussed in the Bloomberg report.  At the end of the post, we have a response to Everytown's underline response to our post.

We have since updated our information up through May 30, 2018.

### *Data on cases*

An Excel spreadsheet that lists all the mass public shootings from **1998 through April 30, 2018** is available here: <u>Case by case discussion of which cases have been in gun-free zones</u>. UPDATED: Broader and updated information on these shootings from **1998 to June 2019** is <u>available here</u>.

The report by Bill Landes at the University of Chicago and John Lott on gun-free zones that covers earlier years from 1977 to 1999 is **<u>available here</u>** (the raw data used in this study is available in a STATA file, though the sums by state and year are **<u>available here</u>**).   We used the cases identified by the New York Times that are discussed in Lott and Landes for years prior to 1977 (series is <u>discussed here</u>, though the web version doesn't have the chart that lists out each case).  A case by case discussion on the New York Times cases can be found at the bottom of this page.

**Definition of mass public shooting**.

We used the traditional FBI definition of mass public shootings in all our posts on this (e.g., here, here, and here).  There are several parts to this definition.

1. The official FBI definition of public shootings (both mass public shootings and active public shootings) excludes "shootings that resulted from gang or drug violence" or that occurred in the commission of another crime such as robbery. The reason for this is pretty obvious: the causes and solutions for gang shootings over drug turf are dramatically different than the types of mass public shootings that we see at schools and malls where the point of the attack is to kill as many people as possible.

2. The FBI also includes only shootings in "public places" such as: commercial areas (malls, stores, and other businesses); schools and colleges; open spaces; government properties (including military bases and civilian offices); houses of worship; and healthcare facilities. The reason for this is clear: for example, if the attack is in a home, the attacker is much more likely to know if a gun is owned in the home and who might have access to it.  By contrast, when an attack occurs in a public place, the attackers don't know who they have to be concerned might have a gun to stop them. [Residences were included in the FBI's total deaths "where casualties occurred inside a private residence before a shooter moved to a public area, those incidents were categorized at the location where the public was more at risk." For example, their cases would involve a residence and then a school.]

3. From 1980 to 2013, the original FBI definition of "mass killings" had been "*four or more* victims slain, in one event, in one location," "within one event, in at least one or more public locations, such as, a workplace, school," and the offender is not included in the victim count (CRS, July 30, 2015).  In 2013, the definition was changed to "three or more killings."  The vast majority of academics have continued to use the four or more definition.  This includes researchers such as James Alan Fox.  See also studies years ago such as Grant Duwe, Tom Kovandzic, and Carl Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," Homicide Studies, Nov. 1, 2002. Adam Lankford, "Public Mass Shooters and Firearms: A Cross-National Study of 171 Countries," Violence and Victims, January 2016.  Lott and Landes, 2001 and John Lott, "More Guns, Less Crime," University of Chicago Press, 3rd edition, 2010.  Even groups such as Bloomberg's Everytown, which Snopes cites approvingly, have recently used the four or more definition. The other organization that Snopes cites approvingly, Mother Jones, also has used the four or more definition for most of the period and has only recently well after we did this report started using the three or more definition.

These points were also originally used in the 1999 and 2001 versions of research on mass public shootings by William Landes and John Lott. Of course, it is hard to ignore the statements from some of these killers about why they pick the targets that they do (more details on this in Lott's book available here).
**Gun-free zones are defined as places where general citizens couldn't carry guns.**
— Places where only police or military police are classified as gun-free zones.

> Stationing a uniformed police officer or security guard in a public area often only gives a false sense of security. Knowing that the uniformed officer is the only person with a gun makes things quite simple for attackers. They need only kill him first.  It is the equivalent of having them with a neon sign saying "shoot me first." The media fact checkers seem unwilling to accept is that concealed handgun permit holders take away that strategic advantage from the killers.

— Places, where it is illegal to carry a permitted concealed handgun, are classified as gun-free zones.

> Depending on the state bans on carrying in certain areas.

— Places that are posted as not allowing permitted concealed handgun.  A few examples:

> Waffle House shooting 2018
> Cascade Mall 2016

Lafayette, Louisiana Movie Theater Shooting 2015
Aurora Movie Theater shooting 2012

— Places where by law permit holders were banned. A few  examples:

Chattanooga Marine Recruiting Office July 2015
Fort Hood Shootings 2009 and 2014
Pulse Nightclub June 2016
Borderline Bar & Grill in Thousand Oaks, California November 2018
The many school shootings keep on occurring in those schools where permitted concealed
handguns are banned (e.g., Parkland 2018, Sante Fe 2018)

— Places where general citizens are not allowed to obtain permits.  Permits are either not issued at all to
citizens or to only a very tiny selective segment (so-called may issue laws), usually judges, prosecutors,
deputy sheriffs or very wealthy individuals.  Compare to the 8.5% of adults outside of California and New
York who have a concealed handgun permit.

In Alameda County, a may issue county, there were only 85 people with concealed handgun
permits at the end of 2011 out of an adult population of 1.2 million, a rate of 0.007 percent.
 Those with permits were mainly judges, prosecutors, and wealthy businessmen.
In September 2011, there were 240 permits in all of Los Angeles County when the population
was about 7.6 million adults.  That equals a permit rate of 0.0032%.  Of the 240 permits, most
go to judges and reserve deputies (who are big campaign donors).  Ten percent of permit holders
are on Sheriff Lee Baca's "gift list"  In addition, the attack was at a residential dwelling, not a
public place.
In Orange County, a may issue county, there were only 551 people with concealed handgun
permits out of an adult population of 2.26 million, a rate of 0.02 percent.  Those with permits
were mainly judges, prosecutors, and wealthy businessmen.

**ORIGINAL POST**: Why does anyone pay attention to Bloomberg's claims on guns? Take their previous
discussions on mass public shootings. As we have previously pointed out, Bloomberg's groups have made
serious errors on the number (see also here) and trends of school shootings.  Well, that hasn't stopped the
media from sympathetically covering Everytown for Gun Safety's recent report on mass shootings (see also
here).

Everytown for Gun Safety's recent report on mass shootings contains many errors.  In addition, it muddies
the discussion on mass public shootings by including shootings in private homes along with ones in public
places, and the vast majority of the cases they include are in private homes.  But there is a distinction
between what motivates mass public shooters who are committing their crimes to get media attention and
those who engage in attacks in private residences.

There are seven mass public shootings since at least 1950 that have not been part of some other crime where
at least four people have been killed in an area where general civilians are allowed to have guns.  These
are the International House of Pancakes (IHOP) restaurant in Carson City, Nevada on September 6, 2011, the
Gabrielle Giffords shooting in Tucson, Arizona on January 8, 2011, [UPDATE] the Dallas shooting of police
on July 7, 2016 that left five dead, [UPDATE] the Kalamazoo shooting on February 20, 2016 where four
people died in one attack at a Cracker Barrel restaurant and two others in another one (while the Cracker
Barrel restaurant didn't ban guns, Uber does ban its drivers from carrying guns and the killer was on the job
when he did the shootings and the shooting was done while he was in his car); Las Vegas shooting on
October 1, 2017 that left 58 dead [UPDATE]; Melcroft, Pennsylvania attack that left four dead on January
28, 2018 [UPDATE]; and the First Baptist Church in tiny Sutherland Springs, Texas, on November 5th,

2017 claimed 26 lives [UPDATE]. With the new data through June 2019, there are now eight shootings in gun-free zones [UPDATE]. We had previously missed the Radisson Hotel killer on December 30, 1999.

Thus, while CPRC's research and that by Landes and Lott looks at Mass public shootings focuses on the killings where the point of the attack is simply to kill as many people as possible, Bloomberg's numbers overwhelmingly involve killings that have occurred within residences.

The FBI definition of mass public shootings excludes "shootings that resulted from gang or drug violence" or that were part of some other crime.  The FBI also defines "public" places as "includ[ing] commercial areas (divided into malls, businesses open to pedestrian traffic, and businesses closed to pedestrian traffic), educational environments (divided into schools [pre-kindergarten through 12th grade] and IHEs), open spaces, government properties (divided into military and other government properties), houses of worship, and health care facilities." For almost thirty years, the FBI defined mass shootings as involving four or more people killed.  A complete discussion of the definition and the history of it is available here.

Here are some general points about how to classify mass public shootings that have occurred in gun-free zones.

> **1) A lot of work is involved in obtaining information on whether the attacks occurred in gun-free zones.**  This includes calling the businesses or other facilities involved.  But many times those organizations are uncooperative and in those cases much time is spent contacting individuals in the area of the attack and asking them if they can provide pictures or other information on the facilities. Indeed, the media virtually always refuses to mention whether the attack occurred in a gun-free zone.

> Unfortunately, Everytown for Gun Safety/Mayors Against Illegal Guns did not do this work, and they have also inaccurately stated, ignored, or simply missed facts that are readily available in news stories.

> 2) What motivates mass public shootings where the killer is trying to kill or injure as many people as possible to get publicity is quite different from what motivates robbers or gang fights (see Lott and Landes).  The solutions to these two types of attacks are also vastly different.  The issue of gun-free zones is particularly important for mass public shootings.

> 3) The word "public" is also key to these cases.  Shootings that occur in people's homes will often involve killers who know if guns are owned in the home.  And if there is a gun in the home, the killer will know who has access to it.  The FBI also defines "public" places as "includ [ing] commercial areas (divided into malls, businesses open to pedestrian traffic, and businesses closed to pedestrian traffic), educational environments (divided into schools [pre-kindergarten through twelfth grade] and IHEs), open spaces, government properties (divided into military and other government properties), houses of worship, and healthcare facilities" (p. 12).

> 4) There is also the distinction between right-to-carry and may-issue laws.  If virtually no one, especially general civilians, is allowed to get a concealed handgun permit as occurs in most may-issue jurisdictions, the area is essentially a gun-free zone.

Our past work has also collected information on which schools are gun-free zones and which ones are not.

**Cases Bloomberg's Everytown organization incorrectly reports as mass public shootings in gun-free zones**

The Bloomberg discussions are indented and put in block quotes.  After the quotes there is an explanation for why they shouldn't be counted as mass public shootings.  The Bloomberg report doesn't number these events, but we will assign numbers just to make them easier to reference.

> 1) **Terrell, TX, 10/28/13**: The shooter shot and killed his mother, his aunt, two acquaintances, and a store clerk in a spree of attacks before he was captured by police. He killed the first four victims in their respective homes and the final one — the clerk — at Ali's Market on W. Moore Avenue, apparently in an attempt to rob the store.
> Shooter Name: Charles Everett Brownlow Jr.
> Gun details: Unknown
> Ammo details: Unknown
> Gun acquired: Unknown
> Prohibiting criteria: The shooter had a criminal record that prohibited him from possessing firearms. He was convicted of burglarizing a vehicle in 1996, a Class A misdemeanor, and convicted of felony burglary in 1997. In 2008 he was served a three-year sentence for unlawful possession of a firearm and in 2011 he was convicted of misdemeanor assault against a family member.
> Not a gun-free zone: The manager of the Ali's Market reported that customer's are allowed to carry firearms in the store.

**FACTS:** There was not a mass public shooting at Ali's Market.  Only one person was killed at that store.  Permitted concealed handguns can deter many attacks from occurring and can limit the harm that does occur.  But permit holders aren't expected to limit the harm for those attacks that do occur to zero.  Permitted concealed handguns deter mass shootings because they can limit the harm and take away the incentive that these killers obtain from their warped desire to get media attention.

> 2) **Washington, DC, 9/16/13**: The alleged shooter, who was a civilian contractor and former non- combat military, killed twelve and wounded three more in an attack on Building 197 at the Navy Yard.
> Shooter Name: Aaron Alexis, 34
> Gun details: The shooter arrived with a shotgun and also obtained a handgun from one a security guardthat he killed.
> Ammo details: Unknown
> Gun acquired: Two days before the incident the shooter passed a National Instant Criminal Background Check System (NICS) at the licensed gun dealer Sharpshooters in Lorton, VA, and purchased the shotgun.
> Prohibiting criteria: The shooter had been arrested at least three times including: in September 2010 in Fort Worth, Texas for shooting a firearm in a neighbor's apartment; in August 2008 in Dekalb County, Georgia for disorderly conduct; and in 2004 in Seattle, Washington for shooting out the tires of another man's vehicle. But court records do not indicate he was convicted in any of these cases, and this record did not prohibit him from buying guns. He had also received treatment for mental health conditions at two VA hospitals beginning in August, 2013 following an incident where he called Newport Rhode Island Policeto report hearing voices. But these incidents did not rise to the level of prohibiting from buying guns. And during his military service he was reportedly cited on at least eight occasions for misconduct ranging from traffic tickets and showing up late for work to insubordination, extended absences from work, and disor- derly conduct. On account of this the Navy sought to offer him a "general discharge" but he was ultimately honorably discharged through the early-enlisted transition program in January 2011.
> Not a gun-free zone: There were armed guards at the Washington Navy Yard, and the shooter was familiar with the premises, so he did not select it as a target on the presumption he would

not faced armed resistance. In fact, the shooter reportedly used a gun that he took from a guard after killing him.

**FACTS:** Whether one is looking at the attacks at the Washington Navy Yard or Fort Hood, letting military police carry guns is much different than letting other soldiers protect themselves.  While military police tend to be at the entrances to military bases, they largely patrol the rest of the base in the same way that police patrol a city.  One no more expects military police to instantly arrive at the scene of a mass public shooting than one expects police to arrive at one.  In Alexis' attack, since he worked at the Navy Yard, he knew what entrance to go to that would have only one guard and that is where he went.  For related discussions see <u>here</u> and <u>here</u>.

3) **Crab Orchard, TN, 9/11/13**: The shooters killed a woman and three teenagers, apparently during an attempted robbery during a marijuana exchange. The victims' bodies were discovered in a car parked along the side of the road in the Renegade Mountain resort community near Crossville.
Shooter Name: Jacob Allen Bennett, 26 and Brittany Lina Yvonn Moser, 25
Gun details: Handgun
Ammo details: Unknown
Gun acquired: Unknown
Prohibiting criteria: Bennett was prohibited from possessing firearms. In 2010 he received a 6-year prison sentence for charges of theft, forgery, and possession of a handgun during a felony, but was paroled on March 4, 2013. The Cumberland County sheriff's office estimated they had previously arrested Bennett five times.
Not a gun-free zone: We could find no evidence that permit holders were prohibited from carrying guns in this area. In Tennessee, concealed weapons would be prohibited only if the county or municipality declared itself a gun-free zone.

**FACTS:** This shooting was part of another crime, a robbery of illegal marijuana (see point 2 in the introduction).  It was not a mass public shooting where the point of the crime was to kill as many people as possible so as to obtain media coverage.

4) **Herkimer, NY, 4/13/13**: The shooter killed two people and critically wounded one at John's Barber Shop and then killed two more people at Gaffey's Fast Lube, a car care facility. He was killed by responding officers.
Shooter Name: Kurt Myers, 64
Gun details: According to the police superintendent, Myers used a shotgun. Additional guns and ammunition were found by emergency crews after Myers set fire to the apartment.
Ammo details: Unknown
Gun acquired: Unknown
Prohibiting criteria: There is no reason to believe Myers was prohibited him from possessing a gun. He was arrested in 1973 for drunk driving.
Not a gun-free zone: Gaffey's Fast Lube does not have a specific policy prohibiting guns and allows per- mit holders to carry concealed weapons on the premises. John's Barbershop did not reopen following the shooting but the owner of a neighboring business did not recall the barbershop having any explicit firearm policy or ban, which would have been required to prohibit customers from carrying guns on the premises.

**FACTS:** New York is a may issue state, not a right-to-carry state.  We don't yet have the number of civilian concealed carry permits, but they seem to be extremely rare.  The possession of a handgun in New York State requires a NYS Pistol Permit.  In 2012 there were only 154 permits issued to own a pistol in Herkimer county.  Over the previous five years, there were 667 permits issued, though not all over those permits own a handgun would have been active at the beginning of 2013 (that implies that there were less than 1.39% of the

adult population that even legally owns a handgun). When talking to the pistol permit office, Lott was told that there were zero restricted licenses that allowed people to carry for business purposes (concealed carry licenses that allow a business owner to carry in the course of doing business) and zero restricted for self-defense purposes (e.g., a woman who is being actively stalked).

**Report from February 2013**: At this point, the Everytown for Gun Safety report mainly repeats cases previously discussed by Bloomberg's Mayors Against Illegal Guns on MASS SHOOTING INCIDENTS, JANUARY 2009-JANUARY 2013. An earlier report on the problems with their claims about the attacks not being in gun-free zones was never corrected. Here is the analysis of these previous cases.

**5) Geneva County, AL, 3/10/09**: The shooter killed ten, including four members of his family, before killing himself.
Shooter Name: Michael Kenneth McLendon, 28
Gun details: Bushmaster AR-15, SKS Rifle, Shotgun, and .38 Pistol
Ammo details: Police recovered additional ammunition from his vehicle after the shooting.
Gun acquired: Unknown
Prohibiting criteria: The shooter had no criminal record and there is no indication he was prohibited from owning a gun.
Not a gun-free zone: It was lawful to carry a firearm in the public intersection and gas station where two of the individuals were shot.

**FACTS:** Nine people were killed by McLendon. <u>In the first shooting in a house on Pullum Street, five people were killed.</u> There was also a second shooting in another home that left two people dead. Neither were public places. It is true that two individuals were killed in separate public places as McLendon was driving along, but that is not a multiple victim public shooting in which at least four are killed in a public place. However, MAIG's report implies that all these shootings occurred in a public places.

**6) Lakewood, WA, 11/29/09**: The shooter killed four police officers in a Tacoma Coffee shop, eluding police for two days before being killed as he fled.
Shooter Name: Maurice Clemmons, 37
Gun details: When he was killed, he was in possession of the handgun of one of the officers he had killed.
Ammo details: Unknown
Gun acquired: Unknown
Prohibiting criteria: The shooter was prohibited from purchasing a firearm, having been charged with at least 13 felonies across two states. He had posted bail for raping a child just six days before the attack.
Not a gun-free zone: The police officers were armed at the time of the shooting.

**FACTS:** Lott and Landes didn't define gun-free zones in terms of whether police were allowed to carry guns, but <u>whether private citizens are able to readily obtain concealed handguns for their protection</u>. What is important is that the coffee shop <u>was posted to prevent concealed carry permit holders from carrying</u>. Presumably MAIG understood this point and that is the reason why they focused on police officers being able to carry in this venue. Obviously, however, on-duty police can carry any place. The problem for uniformed police is that they provide an easily identifiable target and it is easy to take them out. Possibly if the attacker had to worry about permit holders who he could not identify, it would have dissuaded him from attacking. While Lott had checked when this event originally occurred, he reconfirmed this information with Dave Workman who lived nearby via email on January 8, 2013.

**7) Carthage, NC, 3/29/09**: The shooter opened fire at a nursing home where his estranged wife worked, killing eight and injuring three before he was shot and arrested by a police officer.
Shooter Name: Robert Stewart, 45

Gun details: .357 Magnum handgun and Winchester 1300 shotgun
Ammo details: Unknown
Gun acquired: The guns were acquired legally from a local sporting good store.
Prohibiting criteria: There is no indication the Stewart was prohibited from owning a gun.
Not a gun-free zone: We could find no indication that the property-owner forbid carrying of firearms on their property.

**FACTS:** This <u>facility informed Lott</u> in April 2009 that they did not allow guns in the facility for either the people living there or the staff. He called up to ask what their policies had been before the attack.

Here are places listed by Bloomberg's group that may have allowed people with permits to carry in places but that made it extremely difficult or impossible for civilians to get a concealed handgun permit.

8) **Boston, MA, 09/28/10**: The shooter killed four and wounded one during a drug-related robbery.
Shooter Name: Edward Washington, 33, and Dwayne Moore, 35, were both charged in the killings. Washington was acquitted. In Moore's first trial, the jury deadlocked 11-1 in favor of his guilt, but he was later convicted in a retrial.
Gun details: 40-caliber Iberia handgun and 9mm Cobray semiautomatic. The Cobray has not been recovered, but the weapon was identified based on recovered bullets and shell casings.
Ammo details: 14 rounds fired
Gun acquired: Unknown
Prohibiting criteria: Unknown
Not a gun free zone: A person with a Massachusetts Class A license could lawfully carry a firearm in this area.

9) **Buffalo, NY, 8/14/10**: The shooter opened fire on a group of people outside a bar, killing four and wounding four others.
Shooter Name: Riccardo McCray, 24
Gun details: Unknown
Ammo details: Unknown
Gun acquired: Unknown
Prohibiting criteria: McCray had been arrested earlier that year on felony drug charges and the previous year for having a loaded rifle in his car. If he was found guilty of either crime, he would have been prohibited from possessing firearms.
Not a gun-free zone: We could find no indication that it was unlawful to carry a firearm in the area.

10) **Northridge, CA, 12/2/12**: The shooter arrived at an unlicensed boarding house on Devonshire street, reportedly in search of his girlfriend, and after a dispute shot and killed four people out- side.
Shooter Name: Ka Pasasouk, 31
Gun details: semiautomatic handgun
Ammo details: Unknown
Gun acquired: Unknown
Prohibiting criteria: The shooter was prohibited from possessing guns, having been convicted for car theft and felony robbery. While on probation in September 2012, he was arrested again for possession of methamphetamine. According to the district attorney, a prosecutor then released him on probation over the objection of probation officials, who believed he posed a threat to the safety of the community.
Not a gun-free zone: Permit holders were not prohibited from carrying guns in this area.

**11) East Oakland, CA, 3/21/09**: The shooter used a semiautomatic handgun to kill two police of- ficers after they stopped his car and then fled on foot to an apartment where he killed two SWAT officers with an assault weapon and injured a third before being killed by police.

Shooter Name: Lovelle Mixon

Gun details: 9mm semiautomatic handgun and SKS assault-style rifle

Ammo details: Police said the assault weapon had a high-capacity magazine.

Gun acquired: The shooter took part in a home invasion robbery in Modesto, CA, on February 21 2009 in which a rifle was reported stolen. Police did not comment on whether the stolen rifle was the one used in the shooting.

Prohibiting criteria: The shooter had a lengthy criminal history, including a conviction for armed battery, which would have prohibited him from possessing a gun, and he was on parole for assault with a deadly weapon at the time of the shootings.

Not a gun-free zone: Two of the victims were shot on a public roadway — the 7400 block of Macarthur Boulevard in East Oakland — where no state law would have prohibited a citizen with the appropriate per- mit to carry a gun. All of the police officers killed in the incident were armed.

**12) Medford, NY, 6/9/11**: The shooter killed four people at a pharmacy, Haven Drugs, and stole thousands of hydrocodone pills before fleeing in a vehicle. During the trial he acknowledged that he and his wife were addicted to prescription medication.

Shooter Name: David Laffer

Gun details: A .45 caliber handgun was used in the shooting. Several other legally registered guns were also recovered from the shooter's home.

Ammo details: Unknown

Gun acquired: Unknown

Prohibiting criteria: The gun was legally registered to the shooter, and there is no evidence he was prohibited from possessing a gun. But five months before the shooting, Suffolk County Detective Kenneth Ripp investigated an identity theft claim made by the shooter's mother, who said the shooter had stolen her debit card. After questioning the shooter and his mother, Ripp advised the Suffolk County Pistol License Bureau that the shooter was dangerous and that his guns should be confiscated. Despite Ripp's report, the guns were not removed.

Not a gun-free zone: We could find no evidence that Haven Drugs posted a sign or had a policy prohibit- ing the carrying of firearms. Current employees declined to comment.

**13) Brockport, NY, 2/14/09**: The shooter killed a nurse in the Lakeside Memorial Hospital parking lot and a motorist who intervened, and wounded the motorist's girlfriend. The shooter had been fired from the hospital after the nurse filed a sexual harassment complaint against him. He then drove 50 miles and killed another nurse — who had filed a similar complaint against the shooter — and her husband in their home.

Shooter Name: Frank Garcia, 34

Gun details: .40 caliber Glock handgun

Ammo details: Unknown

Gun acquired: Unknown

Prohibiting criteria: There is no evidence that the shooter was prohibited from owning a gun. However, he had applied for concealed carry permits and been denied three times. In his 1995 application, he omit- ted information about his criminal record — including arrests for criminal possession of a weapon, assault, and harassment. In 2001 and 2006 he made further omissions, and was evaluated as lacking moral character. But in 2007 a judge reversed the denial and granted Garcia a concealed weapon permit.

Not a gun-free zone: We found no indication that permit holders were prohibited from carrying guns in this area at the time of the incident.

https://crimeresearch.org/2018/06/more-misleading-information-from-bloombergs-everytow...   1/2/2020

**FACTS:** All these cities either forbid or make it incredibly difficult for law-abiding citizens to carry concealed handguns for protection.  In Boston, it is so bad that even off-duty and retired police are regularly denied unrestricted license to carry permits.  Northridge, CA is part of Los Angeles County, which refuses to issue permits to regular citizens.  In September 2011, there were <u>240 permits in all of Los Angeles County</u> when the population was <u>about 7.6 million adults</u>.  That equals a permit rate of 0.0032%.  Of the 240 permits, <u>most go to judges and reserve deputies</u> (who are big campaign donors).  Ten percent of permit holders are on Sheriff Lee Baca's "<u>gift list</u>"  In addition, the attack was at a residential dwelling, not a public place.

Similarly, East Oakland, California is part of Alameda County.  In 2010, Alameda County had granted concealed handgun permits to <u>75 people</u> out of an 1,182,534 — a permit rate of 0.006%.

Just as with Herkimer, NY; Medford in Suffolk County, New York, and Brockport in Monroe County, New York were similarly very restrictive in issuing may issue permits.  In Suffolk County, the police and sheriff's departments each handle permits in half of the permits for the county.  For the sheriff's office, Robert E. Draffin (the Suffolk County Sheriff's Freedom of information officer) informed us that were 569 sportsman permits (limited to carrying to or from a shooting range or to go hunting) and 79 business permits (where a business owner is allowed to carry only in the course of doing business).  For the police department, Inspector Derrocco (613-852-6000, ask for pistol permit department) noted the department "virtually never gives out permits for anything other than sportsman to carry to and from the range and for premises and dwellings."  Given that there are about <u>1.2 million adults</u> in Suffolk County, even assuming that the police department issued permits at the same rate as the sheriff's office, this implies a permit rate of about 0.1 percent and virtually none of these permits would have allowed a concealed handgun to be carried in the pharmacy where the attack occurred.  In addition, it should be mentioned that Riccardo McCray <u>was a gang member</u>.

14) **Oak Creek, WI, 8/5/12:** The shooter killed six people at a Sikh temple and injured three others, including a responding police officer, before killing himself.
Shooter Name: Wade Michael Page, 40
Gun details: 9mm semiautomatic handgun
Ammo details: Page reportedly bought three 19-round magazines when he purchased the gun.
Gun acquired: Page acquired the gun at a local gun shop a week before the shooting.
Prohibiting criteria: Page was involved with the white supremacist movement but he does not appear to have been prohibited from purchasing a gun. Federal officials investigated Page's ties to supremacist groups more than once prior to the shooting, but did not collect enough evidence to open an investigation.

**FACTS:** From FoxNews.com: <u>"No guns [were] allowed in the temple," Kulbir Singh, an attendee of the Sikh Temple of Wisconsin, told FoxNews.com. "Everyone knows that it's not allowed, anywhere in the temple."</u>

15) **Norcross, GA, 2/22/12**: The shooter returned to a Korean spa from which he'd been kicked out after an altercation, where he shot and killed two of his sisters and their husbands before committing suicide.
Shooter Name: Jeong Soo Paek, 59
Gun details: .45 caliber handgun
Ammo details: Unknown
Gun acquired: Police reported that he acquired the gun legally.
Prohibiting criteria: Paek did not appear to have been prohibited, although he had allegedly served two months in jail for assaulting his sister six years earlier.
Not a gun-free zone: We could find no indication that the property owner forbade possession of a firearm on their property.

**FACTS:** Lott spoke the spa after the attack and was told that the killer knew "nobody there had a gun." It was a family establishment, and the killer knew the family's policy on guns in the workplace. The person at the spa indicated that they were sure that neither the sisters nor their husbands had guns at the spa and that the killer who was the brother of the women knew that was the case. While the official policy at the spa isn't clear because the conversation was very short, the important thing was that the killer knew that there were no guns for people to defend themselves there. This was a small family owned establishment so it is most likely that this was the official policy of the family. Note that they have the wrong date on this event. (UPDATE: Mayors Against Illegal Guns originally claimed that this event occurred on February 22nd, but the event underlying actually occurred on February 20, 2012. After Lott wrote his analysis, they corrected the data but did not update their discussion of gun-free zones.) Note also that the business has since closed.

16) **Hialeah, FL, 6/6/10**: The shooter killed four women, including his wife — who had just separat- ed from him. He injured three others before shooting and killing himself. The shooting occurred in Yoyito-Cafe Restaurant, where the shooter's wife was employed as a waitress, and in the park- ing lot immediately outside.
Shooter Name: Gerardo Regalado, 38
Gun details: .45 caliber handgun
Ammo details: Unknown
Gun acquired: The shooter had a concealed weapons permit.
Prohibiting criteria: There is no evidence that the shooter was prohibited from owning a gun. However, relatives said the shooter had abused and terrorized women in the past, and had been imprisoned in Cuba for a particularly violent incident, but he did not have a criminal record in the United States.
Not a gun-free zone: We could find no indication that guns were prohibited in this area. Guns are prohibited in Florida restaurants only in areas primarily devoted to the serving of alcohol.

**FACTS:** Strangely, while Bloomberg's group mentions that the restaurants that get 50 percent of their revenue from alcohol, they didn't actually go and check whether that was the case for this restaurant, which apparently was at the time a very popular venue for parties serving alcohol. If Bloomberg's group had checked, they would have found that it was a gun-free zone. The organization of the bar in the center of the restaurant is also important for this determination.

17) **Washington, DC, 3/30/10**: Three gunmen killed four and wounded five in retaliation for an- other murder.
Shooter Name: Nathaniel D. Simms, 26; Orlando Carter, 20, and unnamed 14-year-old juvenile
Gun details: An AK-47 assault rifle and 9mm and .45-caliber handguns
Ammo details: Unknown
Gun acquired: Unknown
Prohibiting criteria: The adults were reported to have lengthy criminal histories, which prohibited them from purchasing guns, and the 14-year-old was too young to purchase or own a gun.

**FACTS:** This is one case where Bloomberg's Everytown doesn't include this as a place that allows guns (obviously DC completely bans the carrying of concealed handguns), we include it here simply as an example of one of the many cases where they are including what are pretty obviously a drive-by gang shootings. Even the DC police chief, Cathy Lanier, indicated that it was a "gang retaliation." The AK-47 was used to spray bullets into a group in another gang's territory in retaliation for another murder. We are focused on cases identified by Everytown as occurring in gun-free zones, but gang shootings, while are obviously quite different from the types of mass public shootings that garner national attention.

18) **Mount Airy, NC, 11/1/09**: The shooter killed four people outside a television store before eventually surrendering to the police.

Shooter Name: Marcos Chavez Gonzalez, 29
Gun details: Assault rifle
Ammo details: Unknown
Gun acquired: Unknown
Not a gun-free zone: It was lawful to carry a firearm in the area of the shooting.

**FACTS:** Indications are that the attack was <u>part of gang related crime</u>.  As explained above, <u>that would exclude it from the mass public shootings done specifically to harm people as distinct from other types of violent crime.</u>

***Other recent cases pointed to by gun control advocates***

1) **Waco Texas, May 18, 2015**: biker brawl, nine killed.

FACTS: This was a fight between two gangs, the <u>Bandidos and Cossacks motorcycle gangs</u>, that were involved in an array of operations such as <u>selling drugs</u>.

2) **San Francisco, January 12, 2015**: four were killed in a stolen parked car.

**FACTS:** In 2015 there were <u>just four concealed handgun permits issued in all of San Francisco County</u>. One of them was issued to the personal lawyer of the then county Sheriff. Three others were to judges. In any case, that is a rate of 0.00053% of the adult population.
In addition, the four people who were shot were in a stolen car and members of a gang. Media discussions noted that it might also have been a fight between rival drug gangs. "<u>It is not clear whether the gang is involved in these killings.</u>"

3) **Palestine Texas, November 16, 2015**: 6 killed on a residential property

**FACTS:** "<u>Four males initially thought missing were found dead Monday afternoon in a pond on Hudson's property.</u>"

4) **Houston Texas, August 10, 2015**: 8 killed in a residential property

**FACTS:** "<u>A suspect in the killing of eight people in Texas broke into their house and handcuffed the victims in their bedrooms — then shot them, authorities said.</u>"

5) Bulington, Washington, September 23, 2016: mall shooting

**Facts:** <u>All the entrances to the mall had gun-free zone signs posted.</u>

6) Orlando, Florida, June 5, 2017: 5 killed at office

**FACTS:** "<u>five people [were] killed by a former disgruntled employee (John Robert Neumann, Jr.) at Fiamma before he turned the gun on himself.</u>"  We talked to Fiamma Inc on September 6, 2017 and we were informed that employees were banned from having guns at the facility, where RV awnings are manufactured.
***More detailed information on other cases***
There are a few other cases that we have collected that we will link to here.
<u>4  killed, 3 injured in Tennessee Waffle House shooting4 killed, 3 injured in Tennessee Waffle House shooting</u> — April 22, 2018, Waffle Houses have a <u>strict no gun policy</u>.

<u>Orlando business shooting</u>, June 5, 2017, A gunman fatally shot five of his former coworkers then killed himself during a mass shooting at Fiamma, an Orange County business, Monday morning, according to

sheriff's officials. Called business and was told that this business didn't allow employees to have weapons there.

Yet another mall shooting where guns were banned: Monroeville Mall near Pittsburgh, February 8, 2015

The Melbourne Square Mall in Florida is yet another gun-free zone, January 17, 2015

Seattle Pacific University shooting took place in yet another gun-free zone, June 5, 2014

6 killed, seven wounded in Mass Public Shooting in Santa Barbara, a giant gun-free zone, May 24, 2014

Mass shooting yesterday at FedEx facility in Kennesaw Georgia took place in yet another "gun-free zone", April 30, 2014

Maryland Mall Shooting at yet another gun free zone, January 25, 2014

At a tribal court hearing over an eviction of Cherie Lash Rhodes, Alturas, California (February 20, 2014).

The Azana Salon & Spa shooting in Milwaukee, Wisconsin (November, 2012).

Accent Signage Systems in Minneapolis, Minnesota on September 27, 2012.  Talked to Joe Bailey who has worked at the comapny since 2007 and he informed us that the factory did not allow permitted concealed handguns there before or after the attack.

Aurora, Colorado movie theater shooting (July, 2012). The Cinemark movie theater chain posted signs at their theaters (See here).

Cafe Racer, Seattle, Washington, four killed at restaurant (May 30, 2012).

Another shooting in a another gun free zone: Binghamton, NY(April, 2009).

Atlantis Plastics, Inc shooting on June 25, 2008 left 5 murdered at a factory in Henderson, Kentucky (see here).

Trolley Square Mall in Utah (February, 2007).

Omaha, Nebraska mall shooting (December 2007).

John Lott has about 327 postings on gun-free zones available here.

The relevant 1950 to 1976 time period for the **NYT List**:
YEAR NAME AGE KILLED HURT
2 '66 Charles J. Whitman 25  16  31 — Concealed carry completely banned, guns kept off campus
3 '66 Robert B. Smith 18  5  2 — Concealed carry completely banned
4 '67 Leo Held 40  6 6 — No right to carry concealed handguns, very few permits issued, at plant that banned guns
5 '72 Edwin J. Grace 33 6 6 — No right to carry concealed handguns, very few permits issued in New Jersey
6 '74 Anthony Barbaro 17 3  9 — fewer than 4 killed, New York with no right-to-carry law
7 '76 Robert D. Patty 43  3  2  — fewer than 4 killed
8 '76 Charles E. Allaway 37 7 2  — No right to carry concealed handguns, very few permits issued in Orange County, California, Cal-State University shooting

For those who object to the New York Times list of mass public shootings, the very beginning of this post also shows a graphic for the last twenty years and the rate of shootings in gun-free zones is also high. Given that very few states had right-to-carry laws prior to 1977, to the extent that the New York Times missed attacks, our numbers will likely underestimate the rate of attacks in gun-free zones.

**UPDATE**: Everytown provides a response to our post **here**.

Regarding the count of whether mass public shootings occurred in gun-free zones, Everytown brings up a total of four cases.
— Two of the four cases that they raise were cases that we agree with and clearly listed as cases where a shooting had occurred where general citizens were able to have guns: The IHOP shooting in Carson City and the Tucson, AZ shooting with Giffords.
— On the Oak Creek case note what we pointed out above that Everytown didn't respond to (from Fox News):"No guns [were] allowed in the temple," Kulbir Singh, an attendee of the Sikh Temple of Wisconsin, told FoxNews.com. "Everyone knows that it's not allowed, anywhere in the temple."
— On the Herkimer county case, note what we pointed out above that Everytown didn't respond to: there were **zero** restricted licenses that allowed people to carry for business purposes (concealed carry licenses that allow a business owner to carry in the course of doing business) and **zero** restricted for self defense purposes (e.g., a woman who is being actively stalked).  Even less than 1.4% of the adult population even owns a handgun in the country.  A license to own a handgun is not the same being able to carry it.
Why ignore our points in writing up their responses?  If Everytown had responses, you would think that they would provide them.
=4/251
UPDATE:  A new report titled "Firearms on College Campuses: Research Evidence and Policy Implications" claims on page 10 that there were a few other cases that we supposedly missed.

William Hudson's rampage that claimed six lives at the Tennessee Colony campsite — This attack occurred while people were on their own private property (see here for a discussion).

Christopher Harper-Mercer's shooting spree that claimed nine lives at Umpqua Community College in Roseburg, Oregon — See here for a discussion.

Syed Rizwan Farook and Tashfeen Malik's attack that claimed fourteen lives at a holiday party being held at the Inland Regional Center in San Bernardino, California — given that this occurred in a government workplace in California, there is little question that this was a gun-free zone.

Biker gang fight in Texas May 2015.  Gang fight doesn't meet FBI criteria.



CPRC original research, mass public shootings, Michael Bloomberg

  Share on Facebook
0
0



**By <u>johnrlott</u>**

Related posts

<u>New Research: Survey on the views on gun control by academic criminologists, economists, and public health researchers</u>

<u>New Research on Red Flag Laws: Do they save lives? Reduce homicides or suicides?</u>

<u>Person legally carrying gun stops Walmart shooting in Duncan, Oklahoma</u>

## 138 Responses

1. *<u>More misleading information from Bloomberg's Everytown for Gun Safety on guns: "Analysis of Recent Mass Shootings" - The Gun Feed</u>* says:
   <u>September 1, 2014 at 9:28 AM</u>

   […] Go read this article… […]

   <u>Reply</u>

2. *<u>Terrorists can strike any time, anywhere: Self defense saves lives - People's News Now</u>* says:
   <u>March 6, 2015 at 3:27 AM</u>

   […] at least 1950 every single mass public shooting in Europe (and all but two of the ones in the US) has occurred in gun-free […]

# Exhibit 16

Advertisement



**Scientists: This
Breakthrough "Ends"
Toenail Fungus (Watch)**

Loading...

# The GOP's favorite gun 'academic' is a fraud

The journalistic quest for neutrality has led to a
sacrifice of intellectual integrity.

EVAN DEFILIPPIS,   DEVIN HUGHES   AUG 12, 2016, 4:45 PM



CREDIT: AL JAZEERA, THINKPROGRESS

John Lott is, if not the most influential, certainly the most prolific "academic" in the gun debate. He has authored weekly columns in local newspapers on the horrors of gun free zones, published widely-distributed books on the ostensible benefits of right-to-carry laws, and his newest book *The War on Guns* has received rave reviews by prominent conservatives, like Sen. Ted Cruz (R-TX), Sen. Marco Rubio (R-FL), and Newt Gingrich.

Before Lott's flurry of activity, it was difficult to find anybody arguing that widespread gun ownership made societies safer—even the NRA was reticent to make such a bold claim, defending gun ownership with reference to the constitution, not criminology.

But Lott's recent successes belie a far more shadowy past. A little over a decade ago, he was disgraced and his career was in tatters. Not only was Lott's assertion that more guns leads to more safety formally repudiated by a National Research Council panel, but he had also been caught pushing studies with severe statistical errors on numerous occasions. An investigation uncovered that he had almost certainly fabricated an entire survey on defensive gun use. And a blogger revealed that Mary Rosh, an online commentator claiming to be a former student of Lott's who would frequently post about how amazing he was, was in fact John Lott himself. He was all but excommunicated from academia.

Despite his ethical failings, Lott rose from the ashes in the wake of the 2012 mass shooting at Sandy Hook Elementary School to once more become a prominent voice in the gun debate.

Advertisement

Loading...

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign…**

Read Next Story ›



Perhaps unaware of Lott's previous transgressions, or believing he had turned a new page by founding the Crime Prevention Research Center (CPRC), many in the media who were desperate for an authoritative, pro-gun academic voice seized on Lott's credentials and provided him with a new platform. In the past few years, Lott and his organization have been cited by dozens of media outlets as an authority on gun violence statistics, including the Washington Post, the Wall Street Journal, LA Times, Politifact, CBS, CNN, Fox News, and many others.

However, the media's newfound faith in John Lott is deeply misguided. Rather than turn a new page, Lott has instead returned to his old playbook and used his platform to deceive the public. Our own multi-year investigation into Lott and his organization has uncovered a startling array of new ethical violations, ranging from the profoundly bizarre to the outright fraudulent.

Here are just five of the most troubling incidents:





CREDIT: SHUTTERSTOCK, THINKPROGRESS/ADRIENNE MAHSA VARKIANI

Last fall, Lott's website proudly declared it published a study in a peer-reviewed journal. "CPRC Has New Refereed Publication in Econ Journal Watch: Explaining a Bias in Recent Studies on Right-to-Carry Laws" blared the headline on his website. A link to a downloadable copy of the paper also touts its place in the economic journal.

Having a study accepted in a peer-reviewed journal was a big win for Lott, boosting both his own reputation and that of the CPRC. After all, this would be one of the few publications in recent history that Lott dared subject to peer-review.

The only problem? The paper was never actually published in the Econ Journal Watch.

As the head editor of the journal explained to us, while Lott's paper had initially been considered for publication, it was ultimately rejected. The issue of the journal Lott said he was published in has no trace of his paper. It is impossible for Lott to have not known his paper was in fact rejected, and it would have taken little effort to correct both the post on the CPRC website and the uploaded paper on SSRN. This is a clear cut case of fraud.



CREDIT: SHUTTERSTOCK, THINKPROGRESS/ADRIENNE MAHSA VARKIANI

Lott often claims that there is no difference between the frequency of public shootings in Europe and the United States. This is unabashedly false—but he continues to spread the falsehood anyway.

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign...**

Read Next Story ›

Advertisement



**If You Have Toenail Fungus, Do This Immediately (Genius!)**

Loading...

In February, he made the claim before the Tennessee Senate. "Most people may not realize this, but the rate of mass public shootings in Europe is actually fairly similar to the rate in the United States," he said. "There is no statistically significant difference there, either in terms of the rate or fatalities."

A couple of months earlier, he said something similar to the Washington Post, which quickly highlighted that his analysis was quite different from that of other experts in the field. As the Post noted, while Lott said the per capita rates of mass shootings in Europe and the United States were approximately the same, another researcher found the U.S. rate to be five times higher. The Post explained that the gulf between the results was due to Lott and the other researcher using different definitions.

But there is an even simpler explanation for the differing conclusions: Lott wasn't being honest about his own findings.

While Lott claims the per capita rate in the United States and Europe are approximately the same, his own data tables tell a different story. Accepting his data at face value, between 2009 and 2015, the United States had 25 mass shootings versus 19 in the E.U. and 24 in Europe as a whole. This comes out as a rate of .078 shootings per million individuals in the United States, .038 for the E.U., and .032 for Europe as a whole. The United States has more than double the mass shooting rate of the E.U. and Europe, directly contradicting Lott's statements about his own data.

Further, Lott's carefully crafted criteria to include an incident as a mass shooting is highly suspect. Lott goes to great lengths to exclude mass shootings that are the result of burglaries and gang violence, but he includes terrorist attacks. This choice means that while the Texas biker gang gunfight last summer is excluded in his statistics, the

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign…**

Read Next Story >

November Paris attacks, which accounted for more than one-third of Europe's mass shooting fatalities, are included.

However, when scholars study these mass shootings, they frequently exclude terrorist attacks from the analysis, for much the same reason Lott excludes burglaries and gang violence: the motivations are different. When researchers use a more appropriate set of criteria, the chasm between the rate of mass shootings in Europe and the United States widens even further. Researchers can also include all incidents of mass shootings (regardless of motivation) or use complex statistical analysis to determine whether the mass shooting difference between the United States and Europe is significant. The result remains the same—the United States fares far worse.

Advertisement



Seniors Should Be Eating This To Wash Out Sugar From Blood

Loading...

All of these methods point to the same conclusion: even if Lott wasn't lying about his own results, his analysis would still be deeply flawed.



CREDIT: SHUTTERSTOCK, THINKPROGRESS/ADRIENNE MAHSA VARKIANI

In their paper "The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," Carlisle Moody, a CPRC board member, and three co-authors examine the impact of

Senate candidate Amy McGrath blasts Mitch McConnell in new campaign…

Read Next Story ›

right-to-carry (RTC) laws on violent crime and critique an earlier study by John Donohue and his colleagues.

Donohue and his colleagues had concluded that the most significant effect of concealed carry laws is an increase in aggravated assault, but Moody et al. reported that: "the most robust result, confirmed using both county and state data, is that RTC laws significantly reduce murder. There is no robust, consistent evidence that RTC laws have any significant effect on other violent crimes, including assault." This result fits well with Lott's long established hypothesis that concealed carry significantly decreases crime, and the authors interpret it as a direct repudiation of Donohue's results.

But there's just one problem. Moody and his co-authors misread their own analysis.

As Table 3 on page 7 (pictured below) clearly demonstrates, the increase in aggravated assault for county level data is statistically significant, yet is not bolded by the authors like all the other statistically significant findings. In statistics, a result is usually considered significant if there is a less than 5 percent chance that the result is due to random chance, meaning it has a "t-statistic" greater than 1.96. A significant result in turn means that the authors of a study can put a higher degree of confidence in their finding. As the table below shows, the "stat" for the "post-law trend" for "Assault" (highlighted with a red box) has t-statistics of 2.8 and 2.25 for the general and specific model respectively. Further, the result itself is a positive number, indicating an increase in assault.

Nowhere in the Moody paper does it explain why significant T-stats are un-bolded, and it remains undiscussed in the conclusion, despite the fact that it directly undermines the thrust of their entire paper. Ironically, their paper actually supports Donohue's finding that RTC laws significantly increase aggravated assaults.

Had Moody and his co-authors reported their own results correctly, they would have been left with the puzzling conundrum of concealed carry laws both reducing murder and increasing aggravated assaults. This finding flies in the face of well-established criminological facts and indicates the paper is likely crippled by bad statistical modeling choices.

Senate candidate Amy McGrath blasts Mitch McConnell in new campaign…

Read Next Story ›



crime hypothesis. Again, Donohue proved that their results were based on coding errors, undermining the authors' central claim.

Given the extensive history of Lott supporting erroneous research, one is forced to wonder whether Moody and his colleagues were influenced at all by the thank you note at the beginning of their paper: "The authors thank The Crime Prevention Research Center for its support."



CREDIT: SHUTTERSTOCK, THINKPROGRESS/ADRIENNE MAHSA VARKIANI

After the mass shooting at a gay nightclub in Orlando, Florida in June, Lott published a piece in which he wrote, "Since at least as far back as 1950, all but three U.S. mass public shootings (with more than three fatalities) have occurred in places where citizens are not allowed to carry their own firearms."

This claim has been a staple for Lott, who has repeated it numerous times in numerous articles, usually phrasing it as areas "where citizens were banned from carrying guns."

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign...**

Read Next Story  >

To support his contention, Lott cites his own report analyzing different aspects of mass shootings.

However, what Lott repeats in public is quite different from what his report actually shows. While Lott's public statements equate gun-free zones with areas that prohibit concealed carry, his mass shooting report expands the gun-free zone definition to include areas where Lott feels it might be difficult to obtain a permit or where there might not be many permit holders despite being able to legally carry. Indeed, Lott admits in the report that more than six mass public shootings in the past six years have occurred in areas that legally allow citizens to carry their firearms, a direct contradiction of his public statements.

And not only does Lott mischaracterize his own research, but the research itself is also filled with significant errors.

In October 2015, after a student at Umpqua Community College in Oregon opened fire in a classroom, killing nine others, the CPRC website immediately proclaimed: "Umpqua Community College is yet Another Mass Public Shooting in a Gun-Free Zone." As evidence, Lott cited the student handbook and the fact that the campus guards were not allowed to carry.

However, while it is true that campus guards were unarmed, Lott's claim that concealed carry was prohibited is definitively false. Public colleges in Oregon are prohibited from banning guns on campus, thanks to a 2011 state court decision. The Umpqua Community College student handbook also expressly states that there is an exception to the prohibition of firearms "as expressly authorized by law or college regulations." This includes concealed carry permits.

"UCC was never designated as a 'gun-free zone' by any signage or policy," Umpqua Community College spokeswoman Anne Marie Levis told Politifact shortly after the shooting. "Umpqua Community College does comply with state law by allowing students with concealed carry licenses to bring firearms on campus."

Not only was Umpqua not a gun-free zone by policy and law, it also wasn't a gun-free zone in practice. Multiple reports at the time revealed that there were several armed students on campus at the time of the shooting.

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign**

Read Next Story >

In June 2010, a gunman in Hialeah, Florida targeted his estranged wife who was working at the Yoyito Cafe-Restaurant, killing her and three other women before taking his own life. And again, Lott classified the shooting as taking place in a gun-free zone.

As Lott noted, under Florida law, guns are not allowed in establishments that primarily serve alcohol. As proof that this shooting took place in a gun-free zone, Lott argued that the Yoyito Cafe Restaurant was a popular destination for parties where alcohol was served, and because it primarily served alcohol, the restaurant was a gun-free zone.

That logic is absurd. Serving alcohol at parties is in no way indicative that an establishment is primarily devoted to selling alcohol. Even a cursory glance at the restaurant's reviews clearly indicate that Yoyito is a small Cuban restaurant devoted to selling traditional dishes.

Furthermore, Lott completely ignores the pertinent Florida law regarding restaurants with bars. A letter from the concealed weapons division of the Florida Department of Agriculture clearly notes that the law is written in such a way as to "allow the carrying of firearms in restaurants or similar businesses that primarily serve food but that also happen to serve alcohol as well." In other words, the serving area where patrons are dining in a restaurant does not constitute the part of the establishment primarily devoted to the sale and consumption of alcohol." By law, the Yoyito Cafe was clearly not a gun-free zone at the time of the shooting.



CREDIT: SHUTTERSTOCK, THINKPROGRESS/ADRIENNE MAHSA VARKIANI

"Dear Dartmouth, I am one of your students, I am being stalked, please let me carry a gun to protect myself" read the headline of a piece on concealed carry in 2014.

**Senate candidate Amy McGrath blasts Mitch McConnell's new campaign.**

Read Next Story ›

The first person account was a harrowing story about teenager Taylor Woolrich's desperate attempts to escape and protect herself from a persistent stalker who was ruining her life. The article blasted Dartmouth for not allowing her to carry a gun, and noted that carrying a gun was the only way she could remain truly safe.

The story quickly went viral, and is one that's still brought up by right-wing gun activists. But Woolrich didn't actually write the article.

As a BuzzFeed investigation later revealed, Lott, who is neither a young female nor a stalking victim, was the one who penned the piece. Indeed, Woolrich's article is almost a copy and paste rendition of a previous article published by Lott on the Daily Caller.

"It's his op-ed… Word for word, except the chunks that match what's said in my speech," Woolrich later told BuzzFeed. "It's not like John Lott held a gun to my head and told me to talk to the media… I wanted to talk to the media, if it could mean something positive. But I wanted to talk to the media about stalking."

Despite reservations about her message being co-opted, Taylor agreed to have him help her write for Fox, worrying: "I don't know if I should just say yes and not piss him off." Eventually, Woolrich changed her number and completely broke off contact with Lott.

> "I was trying to be brave and just speak up," she said. "I didn't realize I was being turned into an NRA puppet."

While Woolrich may have been eager to share her story at first, this doesn't excuse the fact that Lott wrote a first person narrative on behalf of someone else, using his own words. When a Fox editor later thanked Lott for the piece, Lott replied, "It was actually easier for me to write this in the first person for her than the way I had originally written it."

This isn't the first time Lott has written in the first-person female voice. Back in the early 2000s, Lott and his research were coming under increasing fire from the academic community. Mary Rosh, claiming to be a former student of Lott's, rose to his defense in online chatrooms and comment sections. She praised Lott as the best professor she had ever had and took deep offense whenever somebody questioned Lott's research. A

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign**

Read Next Story >

few online commenters found her passion rather bizarre, consoling her: "I'm sorry if you're taking this personally, but you are not John Lott."

Except she actually was. A blogger matched Lott's IP address with that of Mary Rosh, and a humiliated Lott was forced to admit that he and Mary were the same person.

As conservative journalist Michelle Malkin emphasized at the time, "Lott's invention of Mary Rosh to praise his own research and blast other scholars is beyond creepy. And it shows his extensive willingness to deceive to protect and promote his work."

## Why does the media still rely on John Lott?



CREDIT: CSPAN/SCREENSHOT

In an attempt to appear fair and balanced, news outlets have offered John Lott a platform to debate a subject for which there really is not two sides. Gun violence is decidedly uncontroversial among scholars: more guns cause more suicides, homicides, and accidents.

These are the arguments being made by serious academics in peer-reviewed journals from Harvard, Stanford, Yale, and Johns Hopkins. On the other side of the debate, you have John Lott, a handful of conservative academics on the board of the CPRC, Gary Kleck, and a few others.

Much like the public debate over climate change, the journalistic quest for neutrality in discussing gun control has led to a sacrifice of intellectual honesty. Over the past two decades, John Lott has routinely demonstrated an unwillingness to

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign...**

Read Next Story >

engage honestly in the gun violence debate. Lott is not a credible source, and it's time the media stop treating him as such.

*Update: Since the publication of this article, the description of the study Lott claimed to have published in the Econ Journal Watch has been* <u>*corrected*</u> *on the Social Science Research website. An archived version of the paper touting its publication in the journal is still available* <u>*here*</u>*. The news of the study has also been* <u>*changed*</u> *on the CPRC website, removing the reference of it being published in the Econ Journal Watch. The original headline touting this publication is still evident in the URL, and an archived version of this news on the CPRC website is still available* <u>*here*</u>*.*

*Evan DeFilippis is a master's student at Princeton's Woodrow Wilson School. He is currently a Summer Fellow at Harvard's Government Performance Lab.*

*Devin Hughes is the founder of Hughes Capital Management, LLC, a registered investment adviser.*

*Evan and Devin write on gun violence issues at Armed With Reason.*

#FEATURES, #GUN CONTROL, #GUN VIOLENCE, #GUNS, #NRA

**8 Incredible New 2020 Cars Under 20K! Search For Luxury Cars**
Cars

Sponsored

**You May Like**                                          Sponsored Links

**District Of Columbia: Low Mileage Senior Drivers Are in For a Big Surprise**
Insured Nation

**The world's best invisible hearing aid won't cost you anything**
Eargo

**Luxury Senior Living Near Washington Is Actually Affordable. Search For Senior Living Communities**
Senior Living/Assisted Living

Sponsored

 **Recommended For You**

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign…**

**Senate candidate Amy McGrath blasts Mitch McConnell in new campaign ad**

Read Next Story >

# Exhibit 17

## *A Fabricated Fan and Many Doubts*

The Washington Post

February 11, 2003 Tuesday, Final Edition

Copyright 2003 The Washington Post

### The Washington Post
#### washingtonpost.com

**Section:** A SECTION; THE IDEAS INDUSTRY CLAUDIA DEANE AND RICHARD MORIN; Pg. A19

**Length:** 917 words

# Body

---

The cyber-pundits are piling on John R. Lott Jr., the embattled American Enterprise Institute researcher who acknowledged that he created an online fan, "Mary Rosh," to defend his work against critics.

The latest to weigh in is Timothy Noah, the Slate "Chatterbox" columnist who summarizes a cresting flood of online attacks against Lott. At issue isn't Lott's overactive imagination and faux fan, but a 1997 survey the researcher purportedly did to support claims in his provocative book, "More Guns, Less Crime." In particular, the UCLA-trained economist contended that merely brandishing a weapon successfully deterred criminal attacks 98 percent of the time, based on his national survey.

Now his critics are asking: What national survey? Lott has been unable to produce the poll data, which he says were lost when his computer crashed.

Lott vehemently denies faking the study but does acknowledge that he created Mary -- an admission that has his critics suspecting the worst. "We know Lott invented an online persona. Did he invent the 98 percent figure? Did he invent the survey it purportedly came from? We don't know," Noah wrote last week.

Does all this sound familiar? Last year, Emory University historian Michael Bellesiles was unable to produce the data on which his prizewinning book "Arming America: The Origins of a National Gun Culture" were based. The study suggested that few people in frontier America had guns, a finding that displeased gun lovers. Bellesiles said his records were lost in a flood. A university investigation raised doubts, and he resigned. No comment, say AEI administrators.

EVERYTHING GOES BETTER WITH FRIENDS: In the war on Iraq and the larger struggle against international terrorism, size matters. The more countries that join with the United States in a coalition to defeat the enemy, the greater the chances of a lasting peace.

And that is why President Bush should be willing to wait a few weeks or even months to assemble an army of nations to march against Iraqi President Saddam Hussein, argues Georgetown adjunct professor Andrew Pierre, author of a new book, "Coalitions: Building and Maintenance." The book is a product of a study sponsored by the Institute for the Study of Diplomacy at Georgetown University and the American Academy of Diplomacy.

"It is important that we move against Iraq with a true international coalition, made up of as many countries as possible," Pierre said.

A Fabricated Fan and Many Doubts

That's not to say that the United States should stop threatening to go it alone, Pierre says. The history of coalition building in the past decade suggests just the opposite: The noise of sabers rattling is just the thing to prod reluctant nations to join the coalition. "Coalition-building will be facilitated if it is clear that the lead nation has the will and the ability to act alone, if necessary," Pierre wrote.

Pierre says the United States doesn't need allies for the guns they would provide. "We need allies in a coalition because we want to be perceived by the world as doing the right thing," he said. "We want the support of the Arab world as much as possible. Unilateral action risks fueling instability in moderate countries in the Middle East."

ED SCHOLARS MAKE GOOD: Remember how we told you the Thomas B. Fordham Foundation was going to give away serious moola ($ 25,000) to some lucky (and gifted) education researchers? Well, the results are in: The winners for distinguished research on education are the University of Chicago's Anthony Bryk and Harvard's Paul E. Peterson.

Why the new prize program? "The good guys in education never win prizes. The decks are always stacked in favor of people with bad ideas," said Fordham head Chester E. Finn Jr.

PEOPLE: For the first time in its 10-year existence, Rand Europe -- the Netherlands-based branch of the Rand Corp. -- will have a European head: Dutchman Martin van der Mandele, a longtime management consultant who has served as a senior fellow in Rand's Santa Monica office since April. David Gompert, the current head, will return to the D.C. office as emeritus vice president.

Speaking of Rand, a researcher who resigned from the defense think tank last fall under murky circumstances has landed at the Hudson Institute. Laurent Murawiec became radioactive in July when he dumped on U.S. ally Saudi Arabia in a briefing before the Pentagon's Defense Policy Board. He left Rand in September, and in January, he joined Hudson as a senior fellow in the Center for Mideast Studies.

The Council on Foreign Relations has hired Eric Schwartz to direct a new task force on post-conflict reconstruction in Iraq. He was a senior director for multinational and humanitarian affairs at the National Security Council. CFR also promoted Lisa Shields to vice president and director of communications.

The Cato Institute has a new director of foreign policy studies: Christopher Preble. Preble comes from Minnesota's St. Cloud State University, where he taught history.

Mark Iwry is joining the Brookings Institution as a nonresident senior fellow. Iwry was a Treasury benefits tax counsel under secretaries Robert E. Rubin and Lawrence H. Summers, and was a partner at Covington & Burling. He plans to practice law on a part-time basis.

Philip Merrill, Ex-Im Bank president and former Washingtonian magazine publisher, has committed a whopping $ 4 million to Johns Hopkins University's School of Advanced International Studies to establish the Philip Merrill Center for Strategic Studies.

**Load-Date:** February 11, 2003

End of Document

# Exhibit 18

**Comments on Questions**
**About John R. Lott's Claims Regarding a 1997 Survey**

## Personal Note, January 17, 2003:

In September 2002 I offered to look into a question raised about John Lott's work. I thought that offering such help to Lott and to the profession was the responsible thing to do when serious questions were raised, and I thought it would be exceedingly simple to establish that a survey of 2,424 people had been done. While I recognized that it is extremely easy to lose data in a computer crash, I had not anticipated that Lott would claim to have done a large national survey without discussing the sampling design with anyone, leaving any financial or other records of the study, or remembering anyone who had worked on it. I had never heard of a professor doing anything of that size with no funding, paid support, paid staff, phone reimbursements, or records (though there are probably precedents for such an unusual method). As it stands now, unless someone comes forward to verify working on the study--as I still hope occurs--we may never know with any certainty whether the 1997 study was done. Although I strongly favor emailing 1997-98 University of Chicago college graduates to see if any remember any classmates working on the study, John Lott now raises serious questions about how complete the University's alumni records are, rendering that approach a less reliable route to an answer than I had anticipated.

I recently contacted Otis Dudley Duncan, who first raised questions about Lott's claim that 98% of defensive gun uses involved the mere brandishing of a weapon. He agrees (as I do) with this statement of Tim Lambert on Lambert's website:

> "I should comment on the overall significance of this question. Lott's 98% claim takes up just one sentence of his book. Whether or not it's true, it doesn't affect his main argument, which is about alleged benefits of concealed carry laws."

So there agreement even among those who have raised questions about Lott's work that his 98% claim is not central to his book, More Guns, Less Crime. Both Duncan and Lambert, however, emphasize their belief that whether the study was done does go to John Lott's credibility.

I find recent developments in this affair personally troubling. I carefully recorded what John Lott told me and now Lott has changed the story he told me in several specific ways--most of them minor. They are discussed in my revisions to this report. I have no research interests in this subfield and no ideas for further efforts to get to the bottom of this inquiry beyond surveying graduates and Lott's looking at picture books of former students. This project detracts from my other scholarly efforts. Accordingly, my part in this affair is essentially done, at least if John Lott will stop changing his stories about our conversation. If not, then I suspect that I will have to stay in it a little longer, at least to respond to comments on this report.

For those who have been following the dispute over Lott's 1997 study, other than a few fairly small changes, the portions of this report new on January 17, 2003 are this Personal Note, Sections 4 and 5 ("Comments on John Lott's Response to this Report" and "Conclusion"), and Appendix 3 (John Lott's email responding to this report).

**James Lindgren**
**Professor of Law**
**Northwestern University**

# Comments on Questions
# About John R. Lott's Claims Regarding a 1997 Survey

December 24, 2002;
Revised January 12, 2003;
Sections 4-5 added and Appendix 3 added on January 17, 2003
Chicago, IL

## 1. Background and John R. Lott's Claims

### a. Different Sources Cited for the 98% of Defensive Gun Uses Being Mere Brandishing

On September 15, 2002 on the discussion list *FirearmsRegProf*, Tim Lambert raised the possibility that John R. Lott fabricated a study claiming that 98% of defensive gun uses involved brandishing with no shots being fired. Lambert wrote: "it seems increasingly likely that the survey is fictional." He was following up on problems first identified by Otis Dudley Duncan and discussed publicly in the Jan./Feb. 2000 issue of *The Criminologist*. These extremely serious charges concerned a study referred to in the second edition of Lott's *More Guns, Less Crime*, but never actually published. Over the years, however, Lott has referred to this 98% number over four dozen times in publicly available sources.

Here is Lott's statement in the (first) May 1998 edition of *More Guns, Less Crime*, which attributes the number to "national surveys."

"If national surveys are correct, 98 percent of the time that people use guns defensively, they merely have to brandish a weapon to break off an attack." *More Guns, Less Crime* (University of Chicago Press, 1998), p. 3.

The year before, in the July 16, 1997 *Wall Street Journal*, Lott appeared to attribute the 98% figure to one or more of three specific survey organizations:

"Other research shows that guns clearly deter criminals. **Polls by the Los Angeles Times, Gallup and Peter Hart Research Associates show** that there are at least 760,000, and possibly as many as 3.6 million, defensive uses of guns per year. In 98% of the cases, **such polls show**, people simply brandish the weapon to stop an attack." John R. Lott Jr., Childproof Gun Locks: Bound to Misfire, *Wall Street Journal*, 7/16/97 Wall St. J. A22

The same language (other than typesetting conventions) appears the following year in two articles by Lott on the same topic for the *Chicago Tribune* and the *Washington Times*. John R. Lott Jr., Prime Suspect: Gun-Lock Proposal Bound to Misfire, 8/6/98 Chi. Trib. 23; John Lott, Commentary: Gun Locks That are Bound to Misfire, 8/14/98 Wash. Times (D.C.) A17.

Starting in January 1999, Otis Dudley Duncan began writing a series of letters to Lott questioning aspects of his work, including the 98% figure.  In May 1999, Duncan informed Lott that he was writing an article calling the 98% a "rogue number" and then sent him a draft of an article containing these words, "The '98 percent' is either a figment of Lott's imagination or an artifact of careless computation or proofreading."

Lott then called Duncan on May 21, 1999 and, for the first time, told Duncan that he had conducted a hitherto unrevealed study in 1997.  Not long after that phone call, Duncan received a letter dated May 13, 1999, which also mentioned a 1997 study.  In that letter, Lott responded to Duncan's suggestion that the 98% figure might have resulted from a misreading of a study by Gary Kleck:

> "I am a great admirer of Gary Kleck's work, and I think that he has done a great deal to advance the study of crime.  Few academics have his integrity and courage.  His numbers are a little higher in terms of the total number of defensive uses that I have found and the frequency of brandishing is lower than I have found.  The information of over 2 million defensive uses and 98 percent is based upon survey evidence that I have put together involving a large nationwide telephone survey conducted over a three month period during 1997.  Follow up telephone calls were made to ensure that the questions were answered by those who we attempted to contact.  The survey was not as detailed as several other surveys, but it did try to include a couple initial questions to ensure accuracy and screen out any problems and then focus exclusively on defensive gun uses.  I plan on repeating the survey again during the next year to year and a half.  I will be happy to inform you what the results of that survey are after I have conducted it."  Letter from John Lott to Otis Dudley Duncan, dated May 13, 1999.

Note that Lott makes no mention of having lost the data for the 1997 study.  According to Duncan, Lott's claim that he had lost his data surfaced only much later.

In the second 2000 edition of *More Guns, Less Crime*, Lott gives the same 98% figure, but (as in his letter to Duncan) attributes the number to his own study:

> "If a national survey that I conducted is correct, 98 percent of the time that people use guns defensively, they merely have to brandish a weapon to break off an attack." *More Guns, Less Crime*, second edition (University of Chicago Press, 2000), p. 3.

In an email to me on December 26, 2002, Lott writes that he submitted the manuscript at least 9 months before publication, which would place Lott's submission of this language in late 1999.

Then, in February and March 2000, Lott gives the same 98% figure, but this time attributes it to Gary Kleck, an authority that he had disavowed as the source for the 98% figure in 1999.  In his March 2000 piece on gun locks, Lott wrote:

"Guns clearly deter criminals. Americans use guns defensively over 2 million times every year--five times more frequently than the 430,000 times guns were used to commit crimes in 1997, according to research by Florida State University criminologist Gary Kleck. **Kleck's study of defensive gun uses found that 98 percent of the time, simply brandishing the weapon is sufficient to stop an attack.**" John Lott, Gun Locks: Bound to Misfire, online publication of the Independence Institute, March 1, 2000.

Lott used almost identical language in a version of the same article on February 9, 2000, also published by the Independence Institute.  Kleck's work does not support this claim, though (as I understand it) some others have mistakenly read it as supporting this claim.  As Duncan points out based on a discussion with the Independence Institute, there is a chance that Lott might have written the article earlier than 2000, though when he covers the same ground in several articles in 1997-98, he does not list Kleck as the source.

Then in his comment in the September/October 2000 *Criminologist*, Lott returned to claiming that he got his 98% number, not from Kleck, but from his own 1997 study.  Otis Dudley Duncan raised questions about the 98% figure in *The Criminologist* (Jan./Feb. 2000), after exchanges between Lott and Duncan that occurred in 1999.  In response to Duncan's comments in *The Criminologist*, Lott describes his 1997 survey, also in *The Criminologist* (Sept./Oct. 2000):

"The survey that I oversaw interviewed 2,424 people from across the United States. It was done in large part to see for myself whether the estimates put together by other researchers (such as Gary Kleck) were accurate. The estimates that I obtained implied about 2.1 million defensive gun uses, a number somewhat lower than Kleck's. However, I also found a significantly higher percentage of them (98 percent) involved simply brandishing a gun. My survey was conducted over 3 months during 1997. I had planned on including a discussion of it in my book, but did not do so because an unfortunate computer crash lost my hard disk right before the final draft of the book had to be turned in. Duncan raises a related issue that "Lott may well have read Will, in as much as Will's article is in the bibliography of More Guns, Less Crime. ... Did Lott borrow the '98 percent' from Kleck . . . from Snyder, via Will? Even if that account explains part of the puzzle, the question remains. Where did the 2 million come from?" (Page 6) The course that Duncan tries to follow - from a 1988 article by Kleck to a 1993 piece by Snyder to George Will to my book because it cites Will - is fascinating. Yet, I am not sure why this entire discussion was necessary since I told Duncan on the telephone last year that the "98 percent" number came from the survey that I had done and I had also mentioned the source for the 2 million number."

That means that the source that Lott gave for the 98% figure has shifted over time:

1.  In the 1998 edition of *More Guns, Less Crime*, John Lott attributes the 98% figure to "national surveys."

2.  Elsewhere in 1997 and 1998, Lott appears to attribute the 98% figure to "such polls" as the "Los Angeles Times, Gallup and Peter Hart Research Associates."

3.  In a May 13, 1999 letter and in 1999 revisions to the 2000 edition of his book, Lott attributes the 98% number instead to his own 1997 study, saying in the letter that the 98% figure is not based on Kleck.

4.  In almost identical February 9, 2000 and March 1, 2000 articles for the Independence Institute, Lott switches to attributing the 98% figure, not to his own study, but to Gary Kleck's (which does not support this figure).

5.  In the *Criminologist* (Sept./Oct. 2000), Lott switches back to claiming that the 98% figure came from Lott's own 1997 study, not from Kleck, which is where things stand as of this report.

Note that by using the plural "national surveys" and "such studies" Lott is stating that there are more than just one study showing the 98% figure, yet he now insists that the 98% figure came from his own study, not Kleck's (and Kleck's study does not support the 98% figure). Indeed, as discussed in the next section, because the 98% figure is supposed to be based on his own study, not those done by others, Lott says that his critics will have "nailed" him if they find that he began talking about the 98% figure before he says he did his study in 1997. Yet, if Lott really based the 98% figure on his own study alone, it seems strange that he would attribute the 98% figure to such plural entities as "national surveys" or "such studies"--until Duncan challenged him in 1999 and Lott revealed for the first time that the 98% figure was based on a study he did himself.

### c.  A Study Done "over 3 months during 1997"

In the *Criminologist*, Lott also wrote: "My survey was conducted over 3 months during 1997." Lott called me on the telephone and repeated that he had conducted the study over several months during 1997. If he spent 3 months doing it in 1997, as he claims, the earliest that he could have completed it would be early April. Further, in an email to me Lott wrote, "I am willing to bet that I don't start mentioning this [98%] figure until the spring of 1997. If I use it before I said that I did the survey, I will say that they nailed me. But if I only started using it about the time that I said that I did the survey, I think that it would be strong evidence the other way."

Lott's first mention of the 98% figure located by Dudley Duncan is February 6, 1997, nearly two months before he could have completed the survey, according to his prior claims:

"There are surveys that have been done by the Los Angeles Times, Gallup, Roper, Peter Hart, about 15 national survey organizations in total that range from anything from 760,000 times a year to 3.6 million times a year people use guns defensively.

> **About 98 percent of those simply involve people brandishing a gun and not using them.**"
> Page 41, State of Nebraska, Committee on Judiciary LB465, **February 6, 1997**, statement of John Lott, Transcript prepared by the Clerk of the Legislature, Transcriber's Office [Otis Dudley Duncan & Tim Lambert, http://www.cse.unsw.edu.au/~lambert/guns/lottbrandish.html]

I have not verified this transcript, but if accurate, Lott's February 6, 1997 testimony is inconsistent with Lott's claims--published, by phone, and by email--that he did the study in "three months" (and "several months") in 1997. Lott himself set up this timing issue as the test whether he "will say that they nailed me." It is possible that Lott's memory was simply off on the year the study was done, that he instead did it in 1996, but if Lott did indeed conduct the study over 3 months in 1997 (as Lott wrote in the *Criminologist*), then he could not have reported the results on February 6, 1997, just weeks after beginning data collection.

After this discrepancy was noted in the first draft of this report, on December 26, 2002, Lott wrote me by email:

> "The overwhelming majority of the survey work was done at the beginning of the period over which the survey was done. It has obviously been a while, but my recollection is that the small number of people surveyed after the first four or five weeks (mainly January 1997) did not include any more defensive gun uses."

While again this story is certainly possible, Lott himself gave spring 1997 as the time before which he should not have been discussing the 98% figure. Additional matters bear mentioning. It hardly matters whether all of the defensive gun uses were found in the first 4-5 weeks of the study, since Lott could not have known that at the time he spoke about the results unless data collection were complete. If data collection were partial, the precise percentage of defensive gun uses would have been higher with partial data. Collecting so much data in 4-5 weeks would have been unusual for unpaid volunteers who were full-time undergraduate students at the University of Chicago at the time, unless there were a very large number of volunteers. As I discuss below in the section on technical problems with the study, Lott's numbers suggest that only ½ or 1/8th or 5/8ths of a respondent reported certain kinds of defensive uses. The partial respondents to support Lott's percentages would be most likely to result from some extreme demographic weights being applied after the data collection were complete and the results were compared with the characteristics of the adult population. If the study were not complete, it would be very unlikely that someone would have weighted the results against the general population before knowing how skewed his sample was. Such weighting is not easy and would have been a colossal waste of time before data collection were complete, since they would need to be redone at the end of data collection. Last, of course, Lott does not mention that he is reporting partial data in his February 6, 1997 testimony.

There are other, more ambiguous contextual clues that Lott had contrasted his main work, which was done on county-wide data, with surveys done by others, which involved household surveys. For example, in the *Washington Times* in 1999, Lott wrote:

"Indeed, about 450,000 crimes, including 10,744 murders, were committed with guns in 1996. But Americans also use guns defensively over 2 million times a year and 98 percent of the time merely brandishing the weapon is sufficient to stop an attack. In my own recent research on gun ownership across states and over time, I found that states with the largest increases in gun ownership rates had the largest drops in crime rates." John R. Lott, Lethal Handgun Fears, 2/24/99 Wash. Times (D.C.) A17.

In a long 1999 *Chicago Tribune Magazine* story, after speaking to John Lott, Linnet Myers twice contrasted Lott's county-wide work with Kellermann's household study:

Bolstering the other side is Dr. Arthur Kellermann, of Emory University's Center for Injury Control in Atlanta. His research
indicates that owning a gun is far more dangerous to a homeowner than it is to potential intruders.
. . .
**Lott didn't examine home protection, but he did study the impact of armed self-defense.** In his book, "More Guns, Less Crime" (University of Chicago Press), he wrote that violent crime dropped noticeably in the 31 states that now give permits to qualified
citizens who want to carry handguns. Twelve states allow permits in certain cases. Seven, including Illinois, prohibit carrying.
…
[Tom] Smith points out that while the two researchers clearly support opposing sides in America's gun debate, their findings aren't exactly opposite. Kellermann addresses the risks of keeping a gun at home and he measured only self-defense shootings--not occasions when guns were used simply to threaten.
**Lott didn't study gun use at home, but looked at the impact of laws that allow guns to be carried outdoors. Even so, Lott said that in most cases of self-defense, "people merely need to brandish a gun . . . less than 2 percent are fired."** He said guns particularly help women, who become more "equal" to men when they're armed. "Women who behave passively are 2.5 times more likely to end up being seriously injured than women who are able to brandish a gun when confronted by a criminal," said Lott. Linnet Myers, Go Ahead Make Her Day With Her Direct Approach And Quiet Confidence, Chicago Lawyer Anne Kimball Gives Gunmakers A Powerful Weapon, *Chicago Tribune*, 5/2/99 Chi. Trib. 12.

If this newspaper account is accurate (and newspapers often aren't), it is odd that Lott would try to answer the reporter's claims about the Kellermann household study without pointing out that he had done a big household study himself. Although this contextual evidence is less telling, it does tend to fit the pattern that, until Lott replied to Duncan in mid-May 1999, Lott had consistently attributed the 98% figure to several specific survey organizations or to no one, never to his own 1997 study.

## 2. Technical Problems

Another problem (mentioned by Tim Lambert and Dudley Duncan) is the small and almost impossible numbers of respondents on which Lott would have based his claim about the rate of firing v. merely brandishing. According to Lott, the study found that 98% of the defensive uses of a gun involve mere brandishing, and that 3/4ths of that 2% involve firing warning shots, the other 1/4[th] of that 2% involves firing at a person threatening the shooter. With Lott's estimate of 2.1 defensive gun uses a year and about 200 million adults, that would mean that about 25-26 respondents reported defensive gun uses out of his 2,424 people surveyed. Thus, only ½ of a person (2% of 25 people) reported firing a gun--and that ½ of a person breaks down further into 3/8[ths] of a person firing warning shots and 1/8[th] of a person firing at someone.

While one can get fractions of a person if one weights respondents by their numbers in the general population, getting 8 times more people in a sample group than ideal would be rare (the number needed to justify a weight of 1/8[th]). Further, how can one generalize three different rates (firing, firing a warning shot, and firing at a person) from at most only one (or two) people, people who are so unrepresentative that they are weighted as 1/8[th] or 3/8[ths] of a person?

It is possible that a multi-year window was inquired about, though even with a five year rate, one still has only 5/8ths of a person and 15/8ths of a person to support his reported rates. Further, Lott never gives the rate as being for a multi-year window such as 1993-97, sometimes implying that the rate is for 1997. Even if a five-year window were used, the numbers of respondents would be still be so low (e.g., 5/8ths of a person) as to be unreliable for reporting a rate.

Unless John Lott can come up with a sensible explanation for why his rates could possibly be justified with only a 2,424 person sample, it is my opinion that Lott should withdraw the 98% figure as probably erroneous and, in any event, too unreliable to form the basis of an estimated rate. Perhaps he has an explanation that doesn't appear yet. If not, withdrawing the 98% figure in some appropriate way would be a simple matter of good social science.

After this report was written, Lott disclosed that he had done a new survey of about 1,000 respondents in the fall of 2002. Daniel Polsby has spoken to enough people involved and seen enough records to determine conclusively that this new study was done. Even more than with the earlier study, however, I don't see how one can get an estimate of something that Lott says happened to about 1 out of every 4,800 people each year (2% of 1.05%) with a sample size of just over 1,000 people, asking about their experiences over the last year.

## 3. The More Serious Issue: Was the 1997 Study Ever Done?

### a. Circumstantial Evidence of a 1997 Computer Crash

The more serious question, which Tim Lambert has raised, is whether Lott ever did the 1997 survey giving rise to the 98% figure. As I posted in September, all evidence of a study with 2,400 respondents does not just disappear when a computer crashes. Having

done one large survey (about half the size of John Lott's) and several smaller surveys, I can attest that it is an enormous undertaking. Typically, there is funding, employees who did the survey, financial records on the employees, financial records on the mailing or telephoning, the survey instrument, completed surveys or tally sheets, a list of everyone in the sample, records on who responded and who declined to participate, and so on. While all of these things might not be preserved in every study, some of them would almost always be retained or recoverable.  Just to get a representative list of the US public would take consultation with an experienced sampler and probably the purchase of an expensive sample.  As far as I know, there was no cheap commercial list of almost every person or household in the United States from which to draw a good sample.

According to Lott, he lost all of his data on his hard drive when it crashed in June of 1997.  I talked with one of Lott's co-authors on another paper, Bill Landes, and received emails from David Mustard, another co-author, and Gregory Huck, Lott's editor at the time at the *University of Chicago Press*.  With varying degrees of certainty, all give circumstantial support to Lott's story of a sudden loss of data and text on projects, requiring delays and regeneration of work.  Further, Mustard recalls hearing about the 1997 study, though when Lott told him about it is a little unclear from Mustard's email to me:

> John told me that he had conducted a survey in 1997. I did not participate in the survey--it was after our concealed carry paper had been published (Jan 1997) and was after I was on the job market and while I was finishing my dissertation and then moving to Georgia (Aug 1997).

> John had some major computer problems in 1997 or 1998--I am not sure of the exact timing, but I think I was already here in Georgia.  John lost a lot of data and material and I and others tried to replace what he lost. Lott indicated that the survey results were not backed up and that he lost all of that, none of which could be replaced. Nobody else had the survey data. That is about all I know about the survey.

> John has always impressed me with his willingness to give out his data; to anyone who requests them. To my knowledge John has always released his data to anyone who asks of it. In fact, we gave out our data about 4 months before the article even came out in print. We have now given our data out to about 75 people from around the world; perhaps more[.] As I understand the survey situation, John does not release the survey data because he no longer has it, not because he is unwilling to do so.

Mustard also is not sure when the data loss occurred.  At first he uncertainly placed it after he moved from Chicago in August 1997, later than Lott's time of June 1997.  But in a follow-up December 26, 2002 email to me after the first draft of this report, Mustard quite plausibly explained:

> "As to the _date_ of John's computer crash, it could have happened in June 1997. My previous response would more accurately be that I _sent him the data_ after I was at Georgia. I do not really remember _when_ it crashed, only that it did and I sent him

the data shortly after I arrived in Georgia. Given that I was gone for large parts of July and that our possessions were being shipped, it is feasible that John's crash could have occurred in June and I sent him the data after I got set up in Georgia."

David Mustard, like Bill Landes, Russell Roberts, and Daniel Polsby, also went out of his way to note Lott's scrupulousness in sharing data on other projects.

### b.  No Direct Evidence of a 1997 Survey

As for obtaining direct, rather than circumstantial, evidence that the study was done, I did not fare as well as might be expected.  Lott called me and told me the following:

1.  Lott had no funding for the project; he paid for expenses himself.

2.  The survey was done by phone by several University of Chicago undergraduate volunteers in their junior or senior years in 1997, so there are no financial employee records.

3.  The calling was done by the undergraduates from their own phones.  Periodically, they would bring over their phone bills and Lott would reimburse them out of his own pocket--either in cash or by check.  Asked whether he retained his checks, Lott said that he destroyed them after 3 years. I did not think to mention it, but the phone research expenses should have been deductible if they were not reimbursed by his employers.

4.  Lott does not remember the names of any of the undergraduates who did the calling for him.

5.  Lott had no discussions with any samplers about his sampling design.

6.  Lott did not weight his sample for household size and did not ask how many adults were in the household (as is standardly done, thus rendering his results too heavily influenced by small households). [In response to Lott's recent question to me about why weighting for household size is necessary, if the unit of interest is households rather than people, then you do not have to weight responses by the number of adults in the household.  If, however, the unit of analysis is people rather than households, then you should weight for household size, otherwise you will over represent people who live alone and under represent those who live in large households. For example, if the average number of adults in households were 2 people, then you would normally weight the result for a person living in a household with 4 adults by 2, and weight the result for a person who lives alone by ½.  I asked this question of Lott for another reason; it might have explained his small apparent weights for some people if he had adjusted for household size, but he didn't.  Sampling is a lot more complicated than this simple example implies, which is why very few people would attempt a national sample without consulting a sampling expert.]

7.  For his list from which to draw the sample, Lott used a commercially available CD-ROM with names on it.  He does not remember where he got it or now have the CD.

8.  Lott does not remember how he drew his sample from the CD-ROM.

9.  Lott does not have a copy of the survey instrument and doesn't remember the wording of the questions, though he was probing defensive uses in more detail than other studies.  He ended with a very few demographic questions.

10.  Lott weighted his respondents by demographic information taken from his main national study in *More Guns, Less Crime.*

11.  In his book *More Guns, Less Crime*, Lott had planned to include a chapter on the 1997 study, a chapter that he had not yet written, but decided not to do so after the data loss.  He did not end up publishing the 1997 study itself, just referring to it many times, including a sentence about it in the second edition of *More Guns, Less Crime.*

12.  Lott thinks that he did not retain any of the tally sheets, though he is not certain.  He reported that he might have tossed out tally sheets or other evidence of the 1997 study during one of his several moves over the years.

The discussion of the tally sheets is possibly in conflict with what Lott wrote to Dudley Duncan on AEI letterhead dated June 4, 2002: "I used students to conduct the survey. Most (though not all) of the information was originally entered into the students' own computers and then they were combined onto my machine. You know what happened to my computer."  This version of the story suggested original computer entry of data, which would have required central programming of a data form and then sharing of that program with several callers for their home computers.  From Lott's discussions with me, I was left with the impression that the callers instead used sheets to record answers, which he thought that he no longer retained.  Besides the possible discrepancy between the two versions of the ways that the students collected and conveyed the data, if the data were instead sitting on the students' computers, it is possible that Lott could have replaced most or all of his lost data by asking the students to give it to him again.

With the surprising lack of any of the normal indicia of having done a large national study of 2,424 respondents, the key remains locating the undergraduates who Lott says did the calling.  The 1997 study was large, extremely time-consuming, and very expensive in phone charges.  Getting 2,424 respondents with refusals and callbacks would have required thousands and thousands of phone calls.  Students would have had to spend many hours calling, which they and their friends would well remember.  With John Lott's permission, I therefore contacted Saul Levmore, the Dean of the University of Chicago Law School, requesting him to try to obtain from the alumni office the email addresses of the 1997 and 1998 college graduating classes at the University of Chicago, so that I could contact them asking whether any of them or any of their friends had done any research for John Lott during his fellowship at Chicago.  Levmore declined to make such a request for email addresses from the University of Chicago Alumni Office at this time, but he did not rule out cooperating with a request coming from other quarters or in a different situation.  Of course, my request was in the form of fact-finding, rather than a complaint, which might have triggered a different process.

Thus, I have reached a temporary dead end.  If someone were to email the 1997-98 Chicago college alumni twice, it is likely that at least one of those who did the study for Lott would come forward, if the study were actually done.

## 4. Comments on John Lott's Response to this Report

### a. Several Changes in Lott's Story

On January 14, 2003, John Lott sent an emailed response commenting on this Report to me, three bloggers, and several of his friends and colleagues. Most of it was posted on the internet by Marie Gryphon. Lott makes several good points, which you can read below in his own words in the third appendix to this report. There are, however, several changes in his story from what he told me when he called me in September that bear mentioning. I will restate what Lott told me on the phone in September and then print what he is saying now:

> THIS REPORT (above): "2. The survey was done by phone by several University of Chicago undergraduate volunteers in their junior or senior years in 1997, so there are no financial employee records."

> LOTT'S RESPONSE (Appendix 3 below): "Lindgren does not accurately report my conversation with him about how I paid people (in that I said that I possibly paid by check) . . . . Incidentally, I told Jim that there were "two" Chicago students. Those students had also gotten others that they knew from other campuses from places such as I think the University of Illinois at Chicago circle (but I am not sure that I remember this accurately)."

> THIS REPORT: 3. "The calling was done by the undergraduates from their own phones. Periodically, they would bring over their phone bills and Lott would reimburse them out of his own pocket--either in cash or by check."

> LOTT'S RESPONSE: "most of this next statement ["calling was done by the undergraduates from their own phones "] is correct except the point about the "possible" use of checks."

The facts of my conversation with John are different than he now remembers them. John Lott called me shortly after I posted a notice to the FireArmsRegProf discussion list on September 15, 2002 offering my help to Lott to help sort out Tim Lambert's extremely serious charges. I was looking for evidence to support Lott's claim that he did the 1997 study. At the time I knew very little about the affair and had no other scenarios running around in my head other than what Lott told me. I did not even know when Lott called whether he had supposedly done a mail or telephone survey. I listened very closely to his answers, especially on questions that went to credibility. I was pleased when he told me that he had sometimes paid the students by check and sometimes in cash. There are a lot of reasons to pay by check, including the size of the phone bills that would have been involved and the costs being tax-deductible (though I wasn't thinking specifically about that latter point at the time). Even though I thought that Lott's contacting his bank for check records would be unsuccessful, I thought that by claiming that he sometimes paid by check, Lott was leaving himself open to the possibility of being checked, which was a good sign for assessing his credibility. Now sadly Lott has changed his story, claiming that he told me instead that he only "possibly" paid some by check. That is not what he said to me in

September.  I noticed then both what he said and his demeanor in saying it; he was not defensive or hesitant to say that he sometimes paid them by check.

What is most surprising about this claim is that Lott emailed me on January 13, 2003, the day before he wrote his long response quoted above.  On January 13 Lott wrote to me:

> As to the check issue, I believe that the word "possible" was included, but you have to go on what you remember.  In any case, I am sure that I can get many people who will say that I paid them with cash over the years.

As you can see, on Monday afternoon, Lott is "sure" on one issue, but he only "believe[s]" that he included the word "possible" and says that I have to go on what I remember. Just a day later, on Tuesday, Lott is suddenly certain that I am wrong, writing: "Lindgren does not accurately report my conversation with him about how I paid people (in that I said that I possibly paid by check)" and "most of [Lindgren's] . . .  next statement is correct except the point about the 'possible' use of checks."

In September, I carefully listened to both Lott's words and his demeanor, taking notes on the more important parts of the long conversation.  I wrote up those notes (which formed the basis for what Lott told me listed in items 1-12 above), later revising them into my report. I retain a vivid recollection of what Lott told me on many points, including this one. One day, four months after the conversation, Lott sent me an email saying that he "believe [s]" that he said that he qualified his having paid students by check with the word "possible," but appears not to be sure (as he is about other instances of paying cash on other projects). He tells me that I have to go on what I remember.  Then the very next day, Lott is certain enough to accuse me of "inaccuracy."

Lott's new assertion about there being only two University of Chicago students involved and the rest of the callers coming from other universities is perhaps the most disturbing of his changes of story.  John and I had a long discussion about how best to reach the University of Chicago students who did the calling.  When he first mentioned University of Chicago students, I thought he meant law students, but he corrected me, saying that they were all University of Chicago undergraduates, both those he dealt with and the callers.   We discussed perhaps looking at a picture book of Chicago students (which he was willing to do, though he didn't sound optimistic about his being able to recognize the students).  He said that he "mostly" dealt with one or two guys who were seniors in 1997, but that some of the callers, who were also Chicago students, might have been juniors.  Indeed, when I suggested emailing just the 1997 senior class, Lott said that although he was pretty sure the ones he dealt with were seniors, some of the callers might have been University of Chicago juniors at the time, so I said I would try to email that class as well. We talked about how to contact the people who did the calling and at all times he talked about contacting University of Chicago students.  He never even hinted that there might be callers from any other school.  If he had mentioned University of Illinois-Chicago students, we would have discussed how to contact them as well.  Lott could not have been clearer that the callers were University of Chicago undergraduates.  Now his story has shifted.

Lott goes on to make less serious changes in his story.  For example:

THIS REPORT: "5. Lott had no discussions with any samplers about his sampling design."

LOTT'S RESPONSE: "I had lunch Tom Smith during the fall of 1996. However, while I asked him many questions about surveys, I did not tell him what I was planning on doing because Tom works very closely with gun control organizations."

A related LOTT RESPONSE: "Russell Roberts is someone that I bounced the survey questions off of and he can possibly talk to you about it, though he hasn't kept e-mails from 1997."

One of the online commentators is reassured that Lott now says that he discussed the survey questions at the time with Russell Roberts of Wash. U. But Lott did not say this when I asked him in September. He said that he regularly asked Roberts for advice and that he might or might not have discussed his 1997 survey with Roberts. He didn't remember whether he did or not. I spoke with Russell Roberts yesterday and Roberts said exactly what Lott told me in September--that Roberts regularly discussed matters with Lott, but couldn't remember hearing about the 1997 study and couldn't remember one way or the other whether Lott had discussed it with him. Lott could well have discussed the study, but Roberts didn't remember him doing so.

Also, on January 13, 2003, just the day before Lott first claimed in his response to this report that he discussed the survey questions with Russell Roberts, Lott wrote me the following: "Russell is a friend who I talk to about lots of things. Whether you classify him as an expert is up to you. Hopefully, he will be able to recover an e-mail." This statement is much closer to what Lott said to me in September--then Lott had said that he discusses things with Roberts, but didn't remember whether he had discussed the survey with him.

Lott's recent change of story--that he discussed specifically the survey questions with Roberts--might well be true (Lott's memory might have been jogged), but it is not what Lott said to me in September (or even bothered to mention the day before he changed his story when he reasserted his contacts with Roberts in an email). If Lott had told me in September that he had discussed the survey questions with Roberts, I certainly would have called Roberts right away, as I did yesterday. After all, I was looking for ways to verify the study.

By the way, in Lott's defense I must point out that some online commentators have falsely claimed that Lott never mentioned the study to anyone, but if you read my report carefully above, David Mustard quite strongly confirmed Lott's claim to have discussed the 1997 study with him (and his data loss), but Mustard does not remember when he first heard about it.

As to my statement that "Lott had no discussions with any samplers about his sampling design," I said this because I asked Lott this question point blank and he flatly said "No." He did mention that he talked with Tom Smith, but he said that he did not discuss his sampling design with him. One doesn't just pull a national sample out of one's head. One usually either uses a random digit dialing program or a national sample provided or designed by an expert in survey sampling. A CD-ROM with names on it designed for telemarketing is not the sort of thing academics usually use if they want a representative sample, which is the reason I asked whom he consulted on his sampling design.

Another change in story involved the CD-ROM and the survey questions:

> THIS REPORT: 8. "Lott does not remember how he drew his sample from the CD-ROM."

> LOTT'S RESPONSE:  "Not true. I told Jim that one of the students had a program to randomly sample the telephone numbers by state. My guess is that it was part of the CD, but on that point I can¹t be sure."

> THIS REPORT: "9. Lott does not have a copy of the survey instrument and doesn't remember the wording of the questions, though he was probing defensive uses in more detail than other studies. He ended with a very few demographic questions."

> LOTT'S RESPONSE: "It is also not quite correct to say that "doesn¹t remember the wording of the questions." I told Jim that I don¹t remember the "exact wording" of the questions, but I gave him the general outline of the questions."

Once again, Lott's memory fails him.  I was listening closely to Lott's answers to these questions to see what details he could pull off the top of his head.  I asked him how he drew the sample from the CD.  He said that he didn't remember, but assured me it was drawn randomly.  I remember being disappointed in his answer because I thought that a social scientist would probably remember how he solved this problem of getting a random sample (there are several solutions).  Also, I am absolutely positive that he did not mention pre-stratifying the sample by state, which is a form of proportional sampling, not random sampling.  His current claim is inconsistent with his September claim made to me that the sample was drawn randomly from the list of names on the CD (though he didn't remember how he drew that random sample); he seems to be claiming now that he drew the sample proportionally by state then randomly within states.  I was paying close attention to any details he mentioned about sampling design and he never mentioned breaking down proportionally by state first.  I am not disturbed by the content of his claim so much as that he would think he could just tell me one thing in September (he did not remember how he drew the sample from the CD) and tell people something else in January ("I told Jim that one of the students had a program to randomly sample the telephone numbers by state").

A similar problem obtains for question wording.  I asked him directly whether he remembered the wording for any questions.  He said "No," not their wording, but he assured me that he was trying to probe defensive uses in more detail than prior studies had and that he ended with a few demographic questions.  He gave no details of his questions other than this.  The notion that he gave me "the general outline of the questions" beyond what I faithfully reported is just plain false.  Drafting questions to probe something you care about might (or might not) be just the kind of thing that would stick in someone's mind, so I was hoping that he could come up with plausible approximate wording off the top of his head.  If he had, I certainly would have noted it.  He couldn't.  I was looking for exculpatory evidence and was disappointed to find not much more than good evidence of his exemplary pattern of sharing data and very good circumstantial evidence that Lott had a major computer crash in 1997.

**b. Lott's Attempt to Put Things in Context**

In his response to this report, John Lott makes several odd statements other than about our conversation.  For example, Lott claims: "I have told people directly (including Otis Duncan) from the beginning that the data were lost."  Otis Dudley Duncan, who first raised questions about Lott's 98% figure in early 1999, however, says that he first he learned of any data loss when Lott published his comment in the Sept./Oct. 2000 *Criminologist*. Duncan retained Lott's May 13, 1999 letter to Duncan, which was the first documented time that Lott disclosed that he did the 1997 study.  I have not seen a photocopy of it, though Dudley Duncan sent me a full transcript. It is quoted earlier in this report, though I repeat here the relevant portion of that May 13, 1999 letter:

> "The information of over 2 million defensive uses and 98 percent is based upon survey evidence that I have put together involving a large nationwide telephone survey conducted over a three month period during 1997. Follow up telephone calls were made to ensure that the questions were answered by those who we attempted to contact. The survey was not as detailed as several other surveys, but it did try to include a couple initial questions to ensure accuracy and screen out any problems and then focus exclusively on defensive gun uses. I plan on repeating the survey again during the next year to year and a half. I will be happy to inform you what the results of that survey are after I have conducted it." Letter from John Lott to Otis Dudley Duncan, dated May 13, 1999.

As you can see, while far from conclusive on the point, Lott's letter is consistent with Duncan's contention that Lott did not disclose that he had lost his data when he first notified Duncan in May 1999 about the 1997 study. Certainly, Lott said nothing about losing the data in this letter, the first documented time that Lott claimed to have done the 1997 study.

Lott also claims that he has "always acknowledged" that the 98% figure is based on small samples.

> LOTT'S RESPONSE (Appendix 3 below): "As to so-called technical problems, I am [sic] have always acknowledged that these are small samples, especially when one breaks down the composition of those who use guns defensively.  Even the largest of the surveys have few observations in this category."

As pointed out above in the section of my report called "Technical Problems," in a sample of 2,424 respondents and a one-year window, Lott would find only about 25 respondents reporting defensive gun uses, 2% of which (1/2 of a person) answering that they had fired their gun.  On the more than four dozen occasions collected by Dudley Duncan and Tim Lambert in which Lott mentioned the 98% figure, I do not see a single instance in which Lott "acknowledged that these are small samples." When Lott says that he has "always acknowledged" this fact, he seems to be in error.

Lott uses another style of argumentation that I find troubling.  Lott writes:

> As to the attribution of sources, look at the complete context of the quote Lindgren mentions:

Polls by the Los Angeles Times, Gallup and Peter Hart Research Associates show that there are at least 760,000, and possibly as many as 3.6 million, defensive uses of guns per year. In 98 percent of the cases, such polls show, people simply brandish the weapon to stop an attack. -- August 6, 1998, Chicago Tribune and August 14, 1998, Washington Times

References by Lindgren to things like the Linnet Myers piece in the Chicago Tribune to provide evidence that I didn¹t do a survey or that I have changed my statements over time are simply bizarre. Attached below is an edited down version of the letter that was published by me in the Tribune. Myers used her article to refloat claims such as my Olin Funding, inaccurately reported exactly what the concealed handgun research covered, and claimed that "others haven't confirmed (my) findings." I no longer have the original letter to the editor, but as I recall this is just a partial listing of her inaccurate statements. The Tribune was not willing to run a longer letter, though the letter that they ran was quite long.

Lott says that he is going to give "the complete context" for a statement that I "mention" from the *Chicago Tribune* and *Washington Times*. A fair minded reader would conclude that Lott is actually quoting me, but he isn't. I didn't quote the *Chicago Tribune* version of the statement, but rather quoted the original version in the *Wall Street Journal*:

The year before, in the July 16, 1997 *Wall Street Journal*, Lott appeared to attribute the 98% figure to one or more of three specific survey organizations:

"Other research shows that guns clearly deter criminals. **Polls by the Los Angeles Times, Gallup and Peter Hart Research Associates show** that there are at least 760,000, and possibly as many as 3.6 million, defensive uses of guns per year. In 98% of the cases, **such polls show**, people simply brandish the weapon to stop an attack." John R. Lott Jr., Childproof Gun Locks: Bound to Misfire, *Wall Street Journal*, 7/16/97 Wall St. J. A22

The same language (other than typesetting conventions) appears the following year in two articles by Lott on the same topic for the *Chicago Tribune* and the *Washington Times*. John R. Lott Jr., Prime Suspect: Gun-Lock Proposal Bound to Misfire, 8/6/98 Chi. Trib. 23; John Lott, Commentary: Gun Locks That are Bound to Misfire, 8/14/98 Wash. Times (D.C.) A17.

Instead of responding to the quotation I actually use from his 1997 oped in the *Wall Street Journal*, Lott instead quotes an almost identical version of the same statement that he published in a later Aug. 1998 oped in the *Chicago Tribune*, fails to mention that the words in the *Tribune* are under his byline, and then appears to provide "the complete context" for his own statement by questioning an unrelated May 1999 *Chicago Tribune* story by a reporter. In the guise of providing "context" Lott omits crucial information that is in my presentation above. Lott omits that he first used the language in the *Wall Street Journal* in 1997 and presents the quotation as if these are the words of the *Chicago Tribune* or the *Washington*

*Times*.  Lott never mentions that these are <u>his words</u>, published in an oped under <u>his byline</u>--a failure that tends to undercut his claim that he is providing "the complete context."

Lott never says why he chose to quote a *Chicago Tribune* version of his statement rather than the earlier *Wall Street Journal* version that I actually quote, nor does he say what his *Tribune* oped has to do with a later *Tribune* story by a reporter.  Yet (whatever Lott's intentions) I think a fair minded reader might presume that one somehow gives context for the other--perhaps one might conclude that I am wrong to mention a 1998 statement in the *Chicago Tribune* because you can't trust their 1999 reporting on him.  That might appear to be a sound implication if one fails to realize that the 1998 *Tribune* statement he quotes is not the version I quoted (I quoted the 1997 *Wall Street Journal*), that the words he quotes are from his own 1998 oped in the *Tribune* under his own byline (a fact that he neglects to mention), and that he made a close version of the same statement in his own oped in the *Wall Street Journal* the year before (presumably untainted by any supposed *Tribune* bias).  Of course, Lott never tells us what part of the context he is providing for his 1998 *Tribune* oped that I mentioned but didn't actually quote.

In the course of this, Lott also criticizes my use of a 1999 Linnet Myers story in the *Chicago Tribune*.  I did qualify my use of that story with these words:

> "If this newspaper account is accurate (and newspapers often aren't), it is odd that Lott would try to answer the reporter's claims about the Kellermann household study without pointing out that he had done a big household study himself.  Although this contextual evidence is less telling, it does tend to fit the pattern that, until Lott replied to Duncan in mid-May 1999, Lott had consistently attributed the 98% figure to several specific survey organizations or to no one, never to his own 1997 study." (This Report, above)

In the course of his criticism of my use of that story, Lott makes a potentially damaging disclosure.  Lott reveals that he published a 1999 letter in the *Tribune* complaining about errors in Myers's story. The text of his *Tribune* letter is included in Lott's email response in Appendix 3 below.  Myers had written: "Lott didn't examine home protection, but he did study the impact of armed self-defense. . . . Lott didn't study gun use at home, but looked at the impact of laws that allow guns to be carried outdoors." Linnet Myers, Go Ahead Make Her Day With Her Direct Approach And Quiet Confidence, Chicago Lawyer Anne Kimball Gives Gunmakers A Powerful Weapon, *Chicago Tribune*, 5/2/99 Chi. Trib. 12.

In his June 1999 letter to the editor published in the *Tribune*, Lott responded particularly to Myers's sentence in which she claims that Lott didn't study gun use at home, but rather the impact of laws that allow carrying guns outdoors:

> "My book analyzed FBI crime statistics for all 3,054 American counties from 1977 to 1994 as well as extensive cross-county information on accidental gun deaths and suicides. This is by far the largest study ever conducted on crime, accidental gun deaths or suicide. I examined not only concealed-handgun laws, but also other gun-control laws such as state waiting periods, the length of waiting periods, the Brady law, criminal background checks, penalties for using guns in commission of crime and the impact of increasing gun ownership. The only gun laws that produced

benefits were those allowing concealed handguns. The evidence also strongly indicates that increased gun ownership on net saves lives." John Lott, Letter, Chicago Tribune, June 20, 1999.

Note that in his letter to the *Tribune*, Lott makes no mention of his 1997 study of households that he claimed to have done, even while responding to a sentence that asserted that Lott didn't study gun use at home. Lott lists seven things he looked at: concealed-carry laws, waiting periods, waiting period length, the Brady law, background checks, extra penalties, and gun ownership rates. In his published letter, he omits to mention his 1997 telephone household study, even though Myers twice says he didn't do a household study. In Lott's defense, Lott says that the letter was cut; the original was longer. But Lott's published letter as it stands includes a long sentence listing the sorts of inquiries Lott did, but fails to mention his 1997 study done at the household level, rather than his other inquiries at the county level.

## 5. Conclusion

I think it prudent to withhold judgment on the question whether the 1997 study was done until an email inquiry of University of Chicago students has been done and its results are known. I hope that John Lott and the University of Chicago Press will join in encouraging the administration of the University of Chicago to conduct or coordinate the appropriate email inquiry. Further, I think it advisable that Lott examine the University of Chicago undergraduate picture book for the classes of 1997 and 1998, if such a book exists. Perhaps a few names or faces might seem familiar and be worth contacting.

I remain hopeful that University of Chicago undergraduates will come forward with a credible story about hours of phone calling in January 1997. Everyone would be enormously relieved were that to occur. If no one does come forward, Lott has done his career a great disservice this January by changing his story in so many ways. Although most of these changes are small ones, the fact that he would make them at this worst possible time is profoundly disappointing to those of us who would like to think the best of him. As it stands now, unless someone comes forward to verify working on the study--as I still hope occurs-- we may never know with any certainty whether the 1997 study was done.

**James Lindgren**
Professor of Law
Director, Demography of Diversity Project
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611
312-503-8374

Note: In some cases, I relied on secondary sources for quotations, in particular a compilation by Tim Lambert and Dudley Duncan< http://www.cse.unsw.edu.au/~lambert/guns/lottbrandish.html>--this is, after all, only an informal preliminary inquiry. If I have misquoted anything, I would appreciate any corrections.

APPENDICES:
+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

*1. Email of 12/26/02 from John Lott to James Lindgren, commenting on the first draft of the report.*

Dear James:

My survey never had the ambition of yielding precise numbers.  Rather the main intention was to check the general accuracy of the claim that there were 2.5 million defensive gun uses each year.

1) You are of course right that the sample of people using guns defensively is very small and has an obviously large 95 percent confidence interval associated with it. The estimate provided was a point estimate, nothing more and I have never made any pretense to it being more than that.  I am sure that you can provide the confidence intervals for the subgroups estimates.

2) The overwhelming majority of the survey work was done at the beginning of the period over which the survey was done.  It has obviously been a while, but my recollection is that the small number of people surveyed after the first four or five weeks (mainly January 1997) did not include any more defensive gun uses.

3) Unfortunately, the documentation and results for the survey was lost.  However, concerns about the accuracy of the survey can be addressed through replication. I did another survey over 10 days this past fall and it will be discussed in a book coming out in a couple of months.  The results of the survey are very similar to those previously reported.  All the documentation and the results will be made available to anyone interested in examining it after the book is released.

4) Just a note on your discussion of the timing of things.  The University of Chicago Press is not particularly fast.  It took them over nine months to publish the second edition after receiving a finalized manuscript.  For them, that was an incredibly fast turn around.  I am sure that the Press is happy to confirm these types of time lags for you if you are interested.  The time lags are much longer than for other types of publications, but you should consider it when putting together your time line.

5) I am not sure that I understand why things should be weighted by household size since I was asking questions about individual experiences.

Sincerely,

John Lott

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
*2. Email of 12/26/02 from David Mustard to James Lindgren, commenting on the first draft of the report:*

Jim,

　　I emailed quickly when I responded the first time and that is probably some reason for the ambiguity. I did not realize that you were trying to use it for such a complete accounting of the details and timing of the events. Below I try to be more clear about the timing of events.

　　John and I started working on our paper in the fall of 1995 or so. We worked on it intensively from about Feb. 1996-Sep. 1996. We presented it at the Am Law and Econ meetings in May and then at a couple of Chicago workshops in either May or June of 1996. We finished the JLS proofs in Sep or so and were then essentially done with the article.

As we finished the concealed carry paper John talked about working on other projects related to guns. So the first sentence of my previous response should be more accurately "... after our concealed carry paper had been finished (about Sep 1996)...". Once it was finished he started to work on a number of extensions, including the book. This is about the extent of my knowledge about John's activities and the timing of those activities from the fall of 1996 when we finished our JLS paper through the summer of 1997, when I left Chicago. I did not work with John on any of these other projects because I had to finish my job market paper and send my applications out (most due by 1 Dec 1996). In the rest of Dec 1996 I worked on my job market paper and practiced interviews. In Jan. 1997 I went to the AEA annual meetings and interviewed. I had campus visits through early Feb and signed my contract with Georgia around the second or third week of Feb in 1997. From March to June I finished my dissertation and taught. In July I defended and traveled a lot, and my wife moved down to Georgia. I moved to Georgia in early August.

As to the _date_ of John's computer crash, it could have happened in June 1997. My previous response would more accurately be that I _sent him the data_ after I was at Georgia. I do not really remember _when_ it crashed, only that it did and I sent him the data shortly after I arrived in Georgia. Given that I was gone for large parts of July and that our possessions were being shipped, it is feasible that John's crash could have occurred in June and I sent him the data after I got set up in Georgia.

I hope this more complete documentation is helpful. If you have other questions let me know.

David

David B. Mustard
Terry College of Business
528 Brooks Hall
University of Georgia
Athens, GA 30602

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
*3. Email of 1/14/03 from John Lott to various bloggers, colleagues, and James Lindgren, responding to the second draft of this report:*

Tue, 14 Jan 2003 15:51:35 -0500
Subject: Responses

Dear Everyone:

Here is a response to some of what has been going on over the web.  I have already sent much of this information to people who have already contacted me in person.  If Eugene would like to post this on his web site, I must ask that all the e-mail addresses and telephone numbers be removed.  If you all don't trust the leg work done by Dan Polsby on this issue, you can nominate someone else to go and do it, but I don't think that it is appropriate for everyone from Lambert on to go and harass these people.  I suppose that such an edited copy could be sent to Mark A. R. Kleiman.

Regnery (the publisher of my new book due the middle or end of March) wants me not to release the results from the poll last year.  They want me to keep quite about the book until it comes out.  As has been reported previously, the survey was done with similar questions in a very similar way to what was done earlier and the results were essentially the same.  I am sure that I could arrange it so that interested parties could question the person who keep the survey results as they came in to confirm that we only got one person who said that they had actually fired a gun.

Here are some of the things that I have done to try to establish a record of events.  1) My wife contacted the bank that we had in Chicago and tried to get copies of bank statements and checks from the period of time.  Unfortunately, the bank does not keep copies of statements or checks longer than five years.  (If you would like to verify, we talked to Yvonne Macias in the book keeping department at University National Bank, [phone number omitted].) Lindgren does not accurately report my conversation with him about how I paid people (in

that I said that I possibly paid by check), but this information makes that point irrelevant.  2) I asked Sam Peltzman last year about whether the Alumni Association has the e-mail of past students.  Sam, who seems to know virtually everything that is going on at the University, told me that they have the e-mail addresses for at most 10 percent of the former students.  3) I had a former alumni and several time co-author, John Whitley, placed in an ad in the Alumni magazine in the December issue to track down the students. I don't know if the ad has appeared but thus far I have gotten no response.

I have given out massive amounts of data to people on the guns and other issues, and I will be happy to do so on the new survey.  Data has been given to critics as well as people who have been unwilling to share their own data on other projects.  I have given out county, state, and city level crime data to academics at dozens of universities, with data sets ranging from 36MB to over 300MB.  I have given out data on multiple victim public shootings as well as safe storage laws.  These different data have often been given out before the research is published and sometimes even before it has been accepted for publications.  We are not talking about recent events or conversations and there is a question about what is a reasonable time period for people to keep records.  There is also a question as to why people have waited so long to ask for this additional information when people have known about the lost data for years.

As to the claims about ²apparently changing positions,² I disagree.  I have told people directly (including Otis Duncan) from the beginning that the data were lost.  Op-ed pieces and other public statements where I mention these numbers briefly usually do not lend themselves to discussions of the sources of numbers.  The fact that David Mustard does not remember exactly when we discussed the survey 6+ years ago does not surprise me given how long ago this was.

Unfortunately, there are many problems with Lindgren¹s write up.  He gives essentially uncritical acceptance of Otis Duncan¹s discussion of events in 1999.  Yet, while Lindgren writes that ³Otis Dudley Duncan raised questions about the 98% figure . . .  after exchanges between Lott and Duncan,² Duncan¹s write-up in the Criminologist news letter failed to mention any such possible discussions.  In fact his newsletter piece leaves the opposite impression as he endlessly speculates about what I may have meant about certain statements.  My response in the Criminologist also discussed other incorrect claims by Duncan.

As to the attribution of sources, look at the complete context of the quote Lindgren mentions:

Polls by the Los Angeles Times, Gallup and Peter Hart Research Associates
show that there are at least 760,000, and possibly as many as 3.6 million,
defensive uses of guns per year. In 98 percent of the cases, such polls
show, people simply brandish the weapon to stop an attack. -- August 6,
1998, Chicago Tribune and August 14, 1998, Washington Times

References by Lindgren to things like the Linnet Myers piece in the Chicago Tribune to provide evidence that I didn¹t do a survey or that I have changed my statements over time are simply bizarre.  Attached below is an edited down version of the letter that was published by me in the Tribune.  Myers used her article to refloat claims such as my Olin Funding, inaccurately reported exactly what the concealed handgun research covered, and claimed that "others haven't confirmed (my) findings."  I no longer have the original letter to the editor, but as I recall this is just a partial listing of her inaccurate statements.  The Tribune was not willing to run a longer letter, though the letter that they ran was quite long.

As to so-called technical problems, I am have always acknowledged that these are small samples, especially when one breaks down the composition of those who use guns defensively.  Even the largest of the surveys have few observations in this category.  The attached e-mail that I sent to Glenn Reynolds goes into this more in depth.

 ³No direct evidence of survey²  discussing Lindgren¹s point-by-point
discussion of our conversation

1) ³No funding for the project²
    I regularly have paid for research myself.  Sometimes large amounts of
money have been spent, but it is not uncommon for me to spend several

thousand dollars.  On the paper on multiple victim public shootings, I know that one payment that I made to Kevin, a research assistant to Landes and Posner, was $750.  I paid for the special issue of the JLE in 1999 on sentencing myself, and the special issue and part of the conference cost me around $30,000.  I have not applied for funds from outside sources over the years.

2) ³No financial employee records²
   This is not unrelated to the first point.  Incidentally, I told Jim that there were ³two² Chicago students.  Those students had also gotten others that they knew from other campuses from places such as I think the University of Illinois at Chicago circle (but I am not sure that I remember this accurately).

3) ³calling was done by the undergraduates from their own phones.²
most of this next statement is correct except the point about the ³possible² use of checks. But as noted earlier this point is irrelevant in terms of evidence.

4) ³does not remember names²
I have had 12 interns and RAs just since I arrived at AEI.  This excludes people whose only work was on the survey.  I am horrible at names and I couldn¹t even give you the names for all of these folks let alone people who did something six years ago.  All my names and addresses for everything were on my computer when the hard disk crashed.

5) ³no discussions with any samplers²

I had lunch Tom Smith during the fall of 1996.  However, while I asked him many questions about surveys, I did not tell him what I was planning on doing because Tom works very closely with gun control organizations.

6) weighting the sample

I did not weight the sample by household size but used the state level age, race, and sex data that I had used in the rest of my book.  There where 36 categories by state.  Lindgren hypotheses why you can get such small weights for some people and I think that this fine of a breakdown easily explains it.  I don¹t remember who answered what after all these years, but suppose someone who fired a gun was a elderly black in Utah or Vermont.

7) ³commercially available CD-ROM with names on it.  He does not remember where he got it from.²

It is true that I don¹t have the original CD-ROM.  I have a telephone number CD from the end of 1997, but it is not the one that we used. I only picked up the other one on the off chance that I was going to have the time and resources to redo the lost data.  The CD did have the features that the earlier one had and was not very useable.  I was so rapped up in trying to replace my lost data on so many other projects that I had no thought of going back to what I regarded as a minor project.  I had revise and resubmits at the JPE and other journals that had much greater importance and the data for the book had to be replaced.

8) ³Lott does not remember how he drew his sample from the CD-ROM²

Not true.  I told Jim that one of the students had a program to randomly sample the telephone numbers by state.  My guess is that it was part of the CD, but on that point I can¹t be sure.

9) ³doesn¹t remember the wording of the questions.²

It is also not quite correct to say that ³doesn¹t remember the wording of
the questions.²  I told Jim that I don¹t remember the ³exact wording² of the
questions, but I gave him the general outline of the questions.

10)  more on weighting

See point 6 above.

11)  ³A chapter he had not yet written²

This is not correct.  What I had done is write up the section, but I only
had a computer file of it.  When the hard disk crashed, I only had a hard
copy of the book and I had to spend considerable time scanning in the book
and correcting the new file.  I was unable to replace the lost polling
section that I had recently added.  I didn¹t think that it was worthwhile
relying solely on memory for different things and I had too much else to do
to concern myself with something that wasn¹t central to the book.

12) ³did not retain any of the tally sheets²

I have looked through some things but I haven¹t found anything.  As Lindgren
correctly notes, I have moved three times in the last six years.

13) Sheets versus entry of data into computers

Lindgren has the ³impression² that the students entered the data on sheets.
I do not directly recall this part of our conversation, but I would have
said that both were done.

I sent Lindgren two e-mails on December 26th.  Just so no one accuses me of
adding new things in now, one of my e-mails to Lindgren noted: "I did not
take the time to correct or respond to all the issues raised, but I wanted
to mention a few points."  Recent e-mails to Lindgren have also already
responded to some of these points beyond the e-mail that he apparently
posted.

I have not participated in the firearms discussion group nor in the apparent
online newsgroup discussions, but what I have done is respond to e-mails.
(The one exception are those from Lambert whose e-mail address was placed on
my blocked list.)  If you all have questions, I will be happy to discuss
them, but I am not going be involved in these online groups.  My response to
Glenn below goes through some of the history of what I heard on this and
when I heard it.  The bottom line is that you all should not assume that
everyone participates in these discussions.

Appendix

Chicago Tribune
June 20, 1999 Sunday, CHICAGOLAND FINAL EDITION

SECTION: MAGAZINE; Pg. 4; ZONE: C; LETTERS TO THE EDITOR.

LENGTH: 684 words

HEADLINE: GUNS AND CRIME

BODY:
The article accompanying "Anne, Get Your Gun" (May 2), discussing my book "More Guns, Less Crime" (University of Chicago Press, 1998), made several inaccurate claims.

Despite the claims in the article, my research looked at much more than just the "impact of laws that allow guns to be carried outdoors." My book analyzed FBI crime statistics for all 3,054 American counties from 1977 to 1994 as well as extensive cross-county information on accidental gun deaths and suicides. This is by far the largest study ever conducted on crime, accidental gun deaths or suicide. I examined not only concealed-handgun laws, but also other gun-control laws such as state waiting periods, the length of waiting periods, the Brady law, criminal background checks, penalties for using guns in commission of crime and the impact of increasing gun ownership. The only gun laws that produced benefits were those allowing concealed handguns. The evidence also strongly indicates that increased gun ownership on net saves lives.

More disappointing were inaccurate references to the funding of my research. The claims previously floated by gun-control groups like Handgun Control were found by the Tribune's own Steve Chapman to be false (Aug. 15, 1996). Chapman pointed out that not only was the Olin Foundation "independent" of the ties the Sunday Magazine article discussed, but also that the "foundation didn't (1) choose Lott as a fellow, (2) give him money or (3) approve his topic."

The article's claim that "others haven't confirmed (my) findings" is bizarre. To date, I have made the data available to academics at 37 universities, from Harvard to Berkeley. Everyone who has tried has been able to replicate my findings, and only three have written pieces critical of my general approach. Although the vast majority of researchers concur that concealed weapons deter crime, not even those three critics have argued that more guns cost lives or increase crime.
- John R. Lott Jr., University of Chicago
- 

Editor's note: Reporter Linnet Myers responds:

Various researchers have praised John Lott's thorough research, although some disagree with his results, which indicate that crime drops when laws allow citizens to carry concealed guns. Whether his findings have been "confirmed" may depend on exactly what that means.

Three professors interviewed at separate universities said Lott's data and computations were mathematically correct. But because each professor's analysis differed, one didn't find significant drops in crime while another found more dramatic decreases than Lott did. The third said Lott's results have been "confirmed in the sense that they've been replicated."

Yet the findings remain hotly debated. Some researchers, as well as many gun-control advocates, flat-out reject them. Others say only time will tell.  In the midst of this controversy, my statement that Lott's results haven't been "confirmed" was one of caution. And the article did not suggest that he hasn't studied anything beyond those laws.

Most researchers interviewed did agree on one point: Despite the fears of gun-control groups, there is currently little evidence that the laws have caused any rise in crime.

Lastly, though I don't think the reference to Lott's funding was "inaccurate," it may have been unclear. The original version of my article quoted a researcher who said that while Lott's fellowship had a link to an ammunition company, "Lott's findings weren't swayed by the somewhat remote connection." The researcher said that though gun-control advocates have focused on it, the funding foundation "isn't reputed to be an arm of the gun industry any more than the Rockefeller Foundation is a tool of the oil companies."

Because of limited space, however, the story was cut and that quote never made it into print. I apologize to Mr. Lott for that trim.


Most of an e-mail that I sent recently to Glenn Reynolds (cutting some personal comments at the end)


Dear Glenn:

First, I have responded to people.  I responded to the e-mail from you that had been forwarded via Clayton Cramer last year (you did not send it directly to me for some reason).  I have responded extensively to Polsby when he wrote me after Christmas and I responded again to Lindgren (twice) when he e-mailed me on December 24th.  During the last week, I have also corresponded with Dave Kopel.  The data on the original survey was lost and I will go into it later.  First, here is a similar survey that I did as well as some comments on it.  This survey is NOT for public dissemination as it is for a book that I have that will shortly becoming out.  My publisher would be very upset if the results of the survey or the survey itself were released.

Survey questions:

[questions in email omitted here] . . .

Write up by James Knowles of the discussion of the survey:

We had a small army of interns and AEI staff making phone calls. The callers for any given night varied according to who was available/willing to make phone calls. I was here every night supervising from my office at AEI. The survey was conducted over eight nights. Calls were made between 7pm and 9pm local time. Here are the list of callers and their email addresses, I can
try to track down phone numbers if need be.

[names and emails in Lott's email omitted here] . . .

. . . [details in email of random digit dialing procedure used omitted here]

_____

End discussion on survey.  . . .   [notes about Lott's contact info omitted here] . . .

1) I have lots of people who can say that I lost my hard disk in July of 1997: for example, David Mustard ([phone omitted]), Geoff Huck (the editor at the University of Chicago Press ([phone omitted]),  John Whitley, William Landes.  If you want to you can feel free to contact especially David and John.  Russell Roberts is someone that I bounced the survey questions off of
and he can possibly talk to you about it, though he hasn't kept e-mails from 1997. . . . [Personal comment about Lott omitted for privacy reasons] I have told people for years about the data being lost.

2) I lost ALL the data for my paper with David in the JLS and for my book. David and I reconstructed the county and state level data from our paper and I got the rest together that was in my book.  I have consistently provided the county, state, and city level data as well as the multiple victim shooting data and the safe storage data to people when they have asked. That constitutes almost all the numbers mentioned in the book.  Months were spent redoing this data so that it could be given out to people.   (Just a note, the critics to whom we had given out the data up to that point were unwilling to return the data to us so we had to put the JLS data together all over again.)  If I had the other data, I would have been happy to give it to who ever wanted it.

The survey data could not be replaced by going to things like the UCR or the census data.  It could only be replaced by doing another survey.  I ended up only briefly mentioning the survey in the past and worked on replacing all the other data that I lost for not just the book but for all the other projects that I was working on.  I spent a good portion of the next two years trying to replace data for other projects that I had been working on. I had important papers for the Journal of Political Economy and other journal for which replacing the data was my first priority after replacing the data for the JLS and the book.  Thinking about the survey was well down on my list.  Its importance was not particularly high given that I had only one sentence on the issue in my book and have never written the survey into a research paper because the data was lost.

3) This is something that was done six years ago.  During the intervening time I have moved three times.  Usually I pay students in cash.  When I am at universities I don't apply for grants and the money is mine so there is no record of universities paying for the students.  My records of the
students names and contact information were lost.  You can get an idea of how much total time was involved from the survey discussed above.  An ad was taken out in the fall in the University of Chicago Alumni magazine

to try to contact the two University of Chicago students who organized some other people from different places to work on it.  I have gone through well over 12 RAs and interns independent of those used on the survey since I got to AEI and I can't say that I remember most of their names (I am really horrible at names).

4) Issues about the significance difference in results.  Given the very small sample sizes, the differences in results are not statistically significant and are really trivial.  About one percent of people in a survey note that they have used a gun defensively.  Whether one is talking about 2
percent or 20 percent simply brandishing a gun, you are talking about the different of 2 percent of 1 percent or 20 percent of 1 percent.  Depending upon who answers the questions and what weighted group they are in, you are literally talking about the answers of a few people out of 1,000 that is the difference between these two results.

5) If you have doubts about anything in specific, you should ask me about it.  Last year I worked extremely hard.  I was the only affirmative numbers expert for the Senator Mitch McConnell's side in the campaign finance case. Once that was done, I had to deal with something that Ian Ayres and John Donohue wrote attacking my work and finishing things for my book.  Only in the last couple of weeks have I gotten a breath on things, but I have responded when people e-mailed me.  I am not a member of the firearms discussion groups and I have not been following them.  I read your site once in a while just to keep up with the news (and because of that I have sent you some money from time to time e.g., just on Saturday), but otherwise I have been too busy to follow a lot of things.  (When I recently accidentally sent you an e-mail it was at the end of one of many all nighters.)


So as to state things clearly, the bottom line is that I have provided data on county, state, and city level crime data when I have been asked as well as the data on the multiple victim public shootings and the data on safe storage laws, even before the papers have been published. We are talking about one number in one sentence in the book, a claim that I have also used in some op-eds and in some talks.  I know of no one who has given out his data as quickly and consistently before even papers are published as I have and over the years. Finally, let me note the most important bottom line: the survey that was done last fall produced very similar results.  The earlier results were replicated.  This survey was done more recently and I will release the data when the book is released in March.  To keep the publisher happy, I will not release it before hand unless you can give me a
very good reason.

[cut [by Lott]]  There are errors in Lindgren's write up (at least the one that he sent me) and if you have specific questions about it, I will respond.  But instead of claiming that I haven't responded to people you should talk to people like Dan Polsby who raised claims voiced to him by others that I had fabricated this second survey.  He spent a good deal of time verifying that the survey did indeed take place.  Polsby can be reached at [phone omitted]. I am sure that he would be happy to talk to you.

Best.

John

 Site

# Exhibit 19

Menu ≡

 LOOKS DIAPHANOUSLY SOLID

CHATTERBOX

# The Bellesiles of the Right?

Another firearms scholar whose dog ate his data.

By TIMOTHY NOAH
FEB 03, 2003 • 7:19 PM

TWEET

SHARE

COMMENT

What is it about statistics and guns? Last year, Michael Bellesiles, a historian at Emory College, came under criticism for his Bancroft Prize-winning book, *Arming America: The Origins of a National Gun Culture*, which argued that gun ownership was far less common during the 18th and 19th century than is generally supposed. His analysis, which was obviously pleasing to proponents of gun control, was drawn from probate records. But Bellesiles was unable to produce all of his data, owing, he said, to a flood in his office. After a committee of three scholars examined Bellesiles' research, they concluded that "his

scholarly integrity is seriously in question." Bellesiles resigned from Emory in disgrace.

---

Now one of Bellesiles' principal critics, a Northwestern law professor named James Lindgren, has turned his skeptical attention to a scholar who is Bellesiles' ideological opposite: John R. Lott, author of *More Guns, Less Crime*. Once again, the issue is the disappearance of supporting data.

Lott's *More Guns, Less Crime* is the bible of the national movement to persuade state legislatures to pass so-called "concealed carry" laws, which permit citizens to carry concealed firearms. The book's thesis is that populations with greater access to firearms are better able to deter crime. Some scholars have quarreled with Lott's interpretation, but this controversy is about underlying data. Lindgren and others want to know where Lott got the evidence to support the following sentence, which appears on Page 3 of Lott's book: "98 percent of the time that people use guns defensively, they merely have to brandish a weapon to break off an attack."

Initially, Lott sourced the 98 percent figure to "national surveys." That's how the first edition of *More Guns, Less Crime* put it. In an August 1998 op-ed for the *Chicago Tribune*, Lott appeared to cite three specific surveys:

**Polls by the *Los Angeles Times*, Gallup and Peter Hart Research Associates show that there are at least 760,000, and possibly as many as 3.6 million, defensive uses of guns per year. In 98percent of the cases, such polls show, people simply brandish the weapon to stop an attack.**

But polls by the *Los Angeles Times*, Gallup, and Peter Hart show no such thing.

Alternatively, Lott would sometimes attribute the 98 percent figure to Gary Kleck, a criminologist at Florida State University. In a February 2000 op-ed for Colorado's Independence Institute, Lott wrote: "Kleck's study of defensive gun uses found that ninety-eight percent of the time simply brandishing the weapon is sufficient to stop an attack." But Kleck's research shows no such thing.

Eventually, Lott settled on yet another source for the 98 percent figure: "a national survey that I conducted," as Lott put it in a second edition of *More Guns, Less Crime*. When asked about the survey, Lott now says it was done by telephone in 1997 and that the data was lost a few months later in a computer crash.

Lott's conflicting explanations naturally attracted suspicion, first from Otis Dudley Duncan, a retired sociologist at the University of California, San Diego, who wrote an article on the matter for the *Criminologist*, and eventually from Lindgren, the Bellesiles gumshoe, who has been posting his findings online. (Chatterbox is indebted to Tim Lambert, a computer scientist and gun-control advocate at the University of New South Wales, for compiling various documents relating to the Lott case.) When Chatterbox asked Lott about the serial attributions to "national surveys," to three specific polls, and to Kleck, Lott conceded, "A lot of those discussions could have been written more clearly." He said that in the computer crash, he lost all his data for the book and had to reconstruct it, but that he couldn't reconstruct the survey. Lott has been able to produce witnesses who remember him talking about this obviously traumatic event soon after it occurred. But none of these people specifically remember him talking about losing data for a survey he'd conducted. Nor has Lott been able to produce the names of the college students he says conducted the phone surveys in Chicago, where Lott was teaching at the time. (Lott is now at Washington's American Enterprise Institute.)

The only compelling evidence that the 1997 survey ever took place is the testimony of David M. Gross, a Minnesotan who contacted Lott after the controversy spread to various Weblogs. (To date, the only mainstream news organization that's covered the data dispute is the *Washington Times*, whose Robert Stacy McCain had a piece about the Lott affair on Jan. 23. The Feb. 1 *Washington Post* examined a bizarre side issue, but we're getting ahead of ourselves.) Gross told Chatterbox, "I have come to the conclusion that I in fact did" participate in the study, "based on some of the details of my recollection." What Gross recalls is that in January 1999—a year before questions were first raised about Lott's data—he attended a talk Lott gave at the Minneapolis Athletic Club. (Gross can pinpoint the date, he says, because he bought a tape.) After Lott's remarks, Gross walked up to Lott and told him he'd figured out, while listening to Lott discuss the 1997 survey, that he, Gross, had participated in that survey. Both the timing and the content, as described

by Lott, match what Gross remembers about the survey, which is the only gun poll he recalls ever participating in.

Gross recited his story to Chatterbox with a precision that seemed to reflect both his natural temperament and his professional training as a lawyer. It didn't *sound* as though Gross could be getting this wrong. But, as the bloggers Atrios and Mark Kleiman have noted, Gross is a pro-gun activist—indeed, a former national board member of the National Rifle Association. Gross was also the founding director of the Minnesota Gun Owners Civil Rights Alliance, and as an attorney he now represents that group in a legal challenge stemming from its appropriation of the name, Citizens for a Safer Minnesota, which previously belonged to a gun-control group that carelessly let lapse its registration with the Minnesota secretary of state. It's odd (though not impossible) that such a bare-knuckled advocate would turn up in a randomly generated survey.

Even if the survey did take place, why should we believe the stated finding? Lott says he repeated the 1997 survey last year. He can't reveal the results, he says, because the publisher of his next book won't let him. But he has shown the results to Daniel Polsby, a law professor at George Mason. Polsby reports that while he won't endorse the methodology—"I have questions about it"—the results were "approximately the same." (This time the percentage was slightly lower than 98 percent—by how much, Polsby won't say.) "John is a very intense man, he rubs a lot of people the wrong way," Polsby told Chatterbox. But "faking something like this would not be John's style."

One type of faking that apparently *is* Lott's style is the assumption of a fictional identity on the Internet. (This is the piece of the story that the *Washington Post*'s Richard Morin zeroed in on.) Lott has posted Web comments defending his work using a "sock puppet" named Mary Rosh. He was busted by Julian Sanchez, a blogger who works at the Cato

Institute, a libertarian think tank in Washington. One posting that Lott
has admitted to posting read as follows:

**I had [Lott] for a PhD level empirical methods class when he taught at the
Wharton School at the University of Pennsylvania back in the early 1990s,
well before he gained national attention, and I have to say that he was the
best professor that I ever had. You wouldn't know that he was a 'right-
wing' ideologue from the class. … There were a group of us students who
would try to take any class that he taught. Lott finally had to tell us that it
was best for us to try and take classes from other professors more to be
exposed to other ways of teaching graduate material.**

Mary Rosh also gave *More Guns, Less Crime* a <u>rave review</u> on
Amazon.com:

**Lott writes very well. He explains things in an understandable
commonsense way. I have loaned out my copy a dozen times and while it
may have taken some effort to get people started on the book, once they
read it no one was disappointed. If you want an emotional book, this is
not the book for you.**

Lott says he didn't post the Amazon review; his 16-year-old son did. The
"Mary Rosh" e-mail address belongs to his four sons, Lott told
Chatterbox—it's derived from their first names—and Lott has used it
now and then so that, if he fails to answer a response, it won't be
interpreted as "me conceding things." Lott now says the deception was
"wrong."

We know Lott invented an online persona. Did he invent the 98 percent figure? Did he invent the survey it purportedly came from? We don't know. "People who are on the gun-control side of the debate," says Polsby, "are hurting on account of Bellesiles. And they want a scalp. John, for one reason or another, is a beautiful scalp to get. For one thing, he's not a terribly good witness on his own behalf." *Is* Lott the Bellesiles of the right? Chatterbox is not yet prepared to say.

[*Clarification, Feb. 5*: In the Minneapolis lecture that Gross attended, Lott recited the "98 percent" statistic, but did not specifically attribute it to a study that *he himself* had conducted. Gross simply deduced that he, Gross, had participated in whatever study produced the 98 percent figure. Also, although the anti-gun-control group, Citizens for a Safer Minnesota, is part of the Minnesota Gun Owners Civil Rights Alliance, MGOCRA is not technically a party to the lawsuit about whether CSM can keep its name.]

Tweet          Share          Comment

Do Not Sell My Info

**Dear Care and Feeding: How Should I Respond to Sexist Co-Workers Who Think I Should Be a Stay-at-Home Mom?**

# Exhibit 20

# Pacific Standard

HOME › MAGAZINE › THE FIX

## INSIDE THE MIND OF AMERICA'S FAVORITE GUN RESEARCHER

John Lott is a one-man pro-gun research machine whose work has been cited nearly 200 times by the National Rifle Association. The problem? Many of his peers have major misgivings about his methods.

PETER MOSKOWITZ · UPDATED:SEP 23, 2018 · ORIGINAL:JUN 1, 2017

I returned from Orlando depressed. I was there reporting a few days after a man had opened fire in a crowded nightclub with a semi-automatic weapon, killing 49 and wounding dozens of others. Mass shootings have been a common news item in the United States over the last few years, but this one seemed different, both in its scale and in the response (or lack thereof) that followed.

After Columbine (two high school seniors shot and killed 12 students and one teacher), Sandy Hook (one man shot and killed 20 six- and seven-year-olds and six adults), Fort Hood (an Army major shot and killed 13 people and injured 30 more), the Navy Yard in Washington, D.C. (a man shot and killed 12 at a naval base), Aurora (a man shot and killed 12 and injured 70 in a movie theater), and Charleston (a white supremacist shot and killed nine black churchgoers), there was at least debate about what to do. Background checks? End the sale of assault rifles? Create an interstate tracking system?

A few days after Orlando, former President Barack Obama, speaking on the block-long grass field in the downtown district where thousands of mourners had left notes to those who died at Pulse nightclub, implored lawmakers to "do the right thing"—to change their minds about background checks, to consider legislation, to at least create a watch list for suspected terrorists who want to purchase guns. It was a milquetoast speech. And nothing followed it. There were no new laws; the push for background checks failed. The usual debate that had raged in the U.S. after mass shootings in the past did not happen after Orlando. Calls for specific action had turned into pleas to at least acknowledge there was a problem. It was the deadliest mass shooting in modern U.S. history, and yet the debate had gone so far backwards that gun-control advocates were no longer advocating for control, but for some debate about control.

In Orlando, I'd attended a gun show where, outside, an LED sign had been set up to scroll the hashtag #PrayForOrlando, and, inside, everyone told me that guns did not kill people. Even at the memorial, the same one Obama spoke at, yards away from where family members of the deceased were gathering, crying, adding to a quickly growing pile of flowers and homemade signs with their letters streaked from a near-constant drizzle, people told me that this was not about guns, that actually guns were good, that really the solution was more guns—guns at home, guns on the street, guns at clubs (or at least security guards with guns). There was relatively little gun debate in Orlando after Pulse, virtually no gun debate in Congress. There was just a general feeling that guns are good, and a feeling that, if you believe that, you're right.

A man named John Lott can be assigned a degree of responsibility.

Lott is a one-man pro-gun research machine. He's published four books on the subject. He speaks at countless conferences and colleges. He writes dozens of op-eds each year, and is cited in thousands of news stories. If you know a statistic or a fact-based argument about how guns save lives, it's likely, whether you know it or not, you're citing some of Lott's work. Lott is not affiliated with any university, and hasn't been for years. Little of his gun research has been published in peer-reviewed journals. And yet he is, without a doubt, the most influential pro-gun researcher in the U.S.

I will not be able to debunk Lott here and now. I am not an academic. I—and 99 percent of people, I'd venture to guess—am not as good with statistics as Lott. What I can tell you is what the people who do have that skillset say. There are many people who agree with Lott—especially in the fields of criminology and economics. But it appears the majority of researchers who work in the field say Lott's wrong: that his analyses are misleading, that they skew data to favor certain outcomes, and that his research methods don't stand up to scrutiny. If they did, his critics would still be published in academic journals, or doing his research out of a university instead of a non-profit called the Crime Prevention Research Center.

After a bit of coaxing, Lott agreed to meet me at a debate on campus-carry laws he'd be participating in at Baylor University in Waco, Texas. Lott arrived at the debate, his hair wispy, his suit loose-fitting, his shirt tucked in only halfway. The mostly conservative students who filed into the auditorium, dressed in well-fitting skirts and heels and khakis and boat shoes, looked like the best of conservative America—professional, jovial, past the more juvenile aspects of college. But Lott's look just added to his authenticity. He exudes professorial vibes. He does not look like a snake-oil salesman. He is, it seems, a true believer.

The school's chapter of the Federalist Society, a national conservative group, had invited him here. According to Lott and another organizer, it took months to set the meeting up—first there was mysteriously no classroom available in the law school, where the Federalist Society usually held events, and then no one would debate Lott. Lott told me he'd reached out to around 20 people, including professors at Baylor, with no luck. The backdrop was this: Texas had recently passed a law mandating that public universities allow students to carry weapons on campus. It sparked protests at public schools, and pushed leaders of private schools to come down on a side of the gun debate. Ken Starr, Baylor's president at the time, banned weapons from campus, a move a vocal minority of students disagreed with. So it made sense professors did not want to broach the issue. Instead, Lott found Andrea Brauer, the executive director of Texas Gun Sense, a small non-profit that pushes for small changes in gun laws in Texas.

The debate went well for Lott—he arrived prepared with a PowerPoint chock full of data, most of which was based on his own research from his seminal book *More Guns, Less Crime*, published in 1998. He hit on all the pro-gun tropes, and backed them with numbers—terrorists pick gun-free zones, he said; public shootings happen more frequently in Europe; good guys with guns stop bad ones. Brauer couldn't compete. She had talking points, but she was not a researcher, she could not debunk him on technical grounds, and the audience was already in Lott's pocket. She stumbled over her words. She let Lott speak over her and could only answer many of his retorts by saying he was wrong, but that she did not have the data to prove it. "Aren't you making a feelings-based argument," one student asked her. "That's good for you, throwing your opinion out there," another student said after the debate.

"I know his research is flawed," Brauer told me afterwards. "A lot has been discredited. But it's hard to argue with him."

Lott's main assertion is that states that pass right-to-carry laws (laws that allow you to carry a concealed handgun) have significantly lowered their crime rates. Lott first made the claim in a 1997 study that he conducted while at the University of Chicago, along with David Mustard, then a graduate student at the University of Chicago and now a respected economist at the University of Georgia. Lott expanded on the study in his *More Guns* book, a herculean undertaking: Lott, with a few assistants, collected 15 years' worth of gun and violence data from 3,054 U.S. counties. It was, and still is, one of the grandest studies of gun violence ever conducted. Lott found that, were all 50 states to pass concealed-carry laws, more than 1,500 murders, 60,000 aggravated assaults, and 4,000 rapes could be avoided per year. The influential criminologist Gary Kleck told *Mother Jones* that Lott's early work "was light-years ahead of anybody else at the time."

Even those prone to support gun control agreed it was an impressive body of work. And for those who agree with Lott, *More Guns* remains one of the most important works in the field to date.

"A lot of his research is some of the most highly cited research on firearms," says Mustard, who hasn't conducted research with Lott since their original project, though they've collaborated in other ways. "It's clearly the most highly cited by academics and it's also incredibly frequently cited by politicians."

Lott's work quickly became a favorite of pro-gun legislators, academics, and policy wonks, including at the National Rifle Association (the group's Institute for Legislative Action has cited his work 175 times). And Lott's research attracted media attention. According to one count, his work has been cited no fewer than 1,100 times in newspapers. After *More Guns, Less Crime* was published, Lott rose to be the most prominent gun researcher in America by far—appearing on television shows dozens of times a year, constantly touring college campuses, cited by state and federal lawmakers in gun-policy debates—all while being, according to many of his colleagues, wrong about his research. But that just shows the bias of academia, according to Lott.

"In a field such as public health, I suspect a school like Harvard University may not even have a single Republican," Lott wrote me in an email (he insisted on email after our initial in-person interview). "No matter how well done my research is there is no way someone who wrote the types of studies that I do would ever get hired there. The entire field is like that."

But researchers told me their qualms with Lott originate not in the field of politics, but basic scientific method. Several pointed out that concealed-carry laws tend to be passed after a spike in violent crime, and that many of the states Lott researched for his 1997 paper passed laws right after the crack epidemic. But, as researchers have pointed out, most concealed-carry permits are issued to white men outside of urban areas, so Lott was measuring two separate trends—an increase in violent crime associated with the crack epidemic in urban areas, and an increase in concealed-carry permits in rural areas—and then concluding they influenced each other. Lott did discuss the crack epidemic in a footnote in 1997, and the rural-urban issue in later research that appeared in the influential *American Economic Review*, but he continued defending his position long after the scholarly consensus rejected it.

"He's able to find things in data that most people don't," says Daniel Webster, a professor of health policy at the Johns Hopkins Bloomberg School of Public Health and the director of the school's Center for Gun Policy and Research, noting that Lott hasn't been peer-reviewed for his gun research in over a decade.

Other researchers have found it problematic that Lott's landmark 1997 paper depended on the state of Florida and incorporated crime data he collected from police departments on his own, as opposed to relying solely on data from the Federal Bureau of Investigation. If you take out Florida, Lott's claimed reductions in crime become much less dramatic.

After Sandy Hook, Evan DeFilippis and Devin Hughes, two young, independent gun researchers, noticed the usual slew of pro-gun arguments on Facebook from conservative family members and friends. They realized that nearly all who used statistics in an attempt to prove that guns were safe relied solely on Lott's work.

As undergraduates at the University of Oklahoma, DeFilippis and Hughes began looking carefully into Lott's research. They found that his models only worked under strict and often unrealistic conditions. Adding new variables often produced results that didn't match real-world observations—a conclusion other researchers have also reached.

"To debunk him, you have to dive down this rabbit hole [of data]," Hughes says. "People just don't want to go down that rabbit hole, and they don't realize how important he is to the entire pro-gun narrative."

In the four years immediately following the conclusion of Lott's 1997 study, 14 more jurisdictions passed concealed-carry laws. Ian Ayres, a lawyer and economist at Yale Law School, and Stanford Law School professor John Donohue, both of whom have published extensively on gun control, jointly wrote a 106-page takedown of Lott's work in 2002. They decided to add those 14 jurisdictions to Lott's models, and found that, in every jurisdiction, all categories of crime increased after concealed-carry laws were passed.

David Hemenway, a professor of health policy at Harvard, found that, if you increase the unemployment rates in Lott's models, homicides drop dramatically—the opposite of what research on gun violence and unemployment shows. And if you reduce the number of black women age 40 to 49 in Lott's models by 1 percent, homicides drop by 59 percent and rapes increase by 74 percent. Hemenway argued that such massive effects from such a tiny change in just one demographic suggest Lott's model is "no good." Lott, as he usually does when criticized, responded with a litany of blog posts, op-eds, and media appearances.

The failure of variable-testing Hemenway identified in Lott's work is among the clearest signs that his methods are flawed. If research is strong, it should stand up to being tested and picked apart by other researchers, which is what the peer-review process is for. Lott's recent research hasn't gotten the same scrutiny most scientific researchers do, because if it did, other researchers told me, it would be torn apart.

"He is, perhaps, perceived by some [to have] the same credibility as myself or other people who have published tons of stuff in scientific, peer-reviewed literature and have been through rigorous academic vetting," Webster says. "He's just some guy who anointed himself as the pro-gun researcher."

"What I dislike is he says all these things that are clearly wrong, and his science is not very good at all," Hemenway says. John Donohue says Lott obfuscates with bad data, and won't admit when he's wrong. "Lott's work was mainstreamed very quickly because it did appeal to a powerful economic interest, and political interests, and so the work got more prominence more rapidly than it probably deserved."

"What I've found over the years, at least for me, is the best way to move forward is to kind of pretend he doesn't exist," says Stephen Teret, another professor at the Bloomberg School of Public Health who is familiar with Lott's work.

These researchers hold the majority opinion. Hemenway, with the help of his graduate students, compiled a list of academics in peer-reviewed journals who had published on gun safety within the last four years. Those surveyed came from various fields—criminology, economics, political science, public health, public policy. And there was a clear consensus: 84 percent concluded guns in the home increase the risk of suicide, 64 percent said guns make homes more dangerous in general, and 73 percent said guns are used for crimes more often than for self-defense. Perhaps most damningly for Lott, Hemenway's survey found that only 9 percent of researchers thought that concealed-carry laws reduced gun violence rates.

Lott countered with another survey showing that a smaller majority of researchers from only two fields (criminology and economics) agreed with him. "They only surveyed academics, and only three economists. That's their way of discrediting my research," he said. "They never mention all the published studies that confirm my results. They always want to make it seem like it's only me saying these things." Hemenway and others have disputed the results of Lott's survey too.

When challenged on his research, Lott has, in the past, resorted to odd behavior. He admitted to using an alternate online persona named Mary Rosh, who would defend Lott's articles. "I shouldn't have used it, but I didn't want to get directly involved with my real name because I could not commit large blocks of time to discussions," Lott said once the Rosh debacle was uncovered. Lott has also come under fire for writing an op-ed under the name of a real woman who had a stalker and became a gun advocate after her college would not provide her with adequate protection. Even pro-gun-rights outlets like Townhall and *Reason* have criticized these efforts.

And Lott has never publicly shared the data behind one of his most-cited statistics—that 98 percent of defensive gun use doesn't even require a gun to be fired, just pulled out to scare away the attacker or intruder. When the late sociologist Otis Dudley Duncan, who pioneered the field of human ecology at the University of Chicago, asked Lott for more raw data, Lott said he'd lost it in a hard drive crash. Lott then redid the survey with a sample of about 1,000 people, and found that 13 had used a gun in self-defense. Only one had actually fired the gun—not the largest sample, but even one out of 13 (7 percent) is far from the 2 percent that Lott has touted for most of his career.

For every attack lobbed at him, Lott has hit back with lengthy posts on his blog that attempt to dismantle his opponent's critiques. And in each one he dives deep into statistical analyses that seem designed to confuse more than elucidate. DeFilippis and Hughes call this "security through obscurity." Similarly, Rutgers University sociologist Ted Goertzel has said Lott's work "would never have been taken seriously if it had not been obscured by a maze of equations."

"I have been willing to debate other academics, and I have done so every time that I have been asked to do so," Lott wrote me in an email. "I have [asked people] many times to try to set up debates but it has been very difficult to get other academics to participate."

When DeFilippis debated Lott on a liberal radio show a few years ago, he experienced the deluge-of-data technique firsthand. "You end up getting into a high-level, technical debate, which is not going to persuade the lay audience," DeFilippis says. "You're fighting an uphill battle."

Outside of the Baylor auditorium, Lott told me about his journey to becoming the most prominent and most hated gun researcher: His interest in guns, he said, started when he was an economist at the Wharton School of the University of Pennsylvania. Students asked him about his thoughts on gun control, and so Lott started researching. He wasn't a gun expert then, just an economist. But he noticed that, despite the volume of gun research, there were few well-designed studies with large sample sizes. Around the same time, Lott had become disillusioned with the Clinton administration. He said he had been a Democrat, but found himself starting to align with more-conservative belief systems. He felt that the response to the research he'd started doing on guns encouraged his political transformation. It appeared to Lott that the liberal establishment had gotten everything wrong, and that, in their rush to prove their progressive fantasies, they had ignored the facts.

By the time Lott's first research came out, he was a researcher at the University of Chicago. But his new fascination with guns made him a pariah there. He says he began receiving death threats from gun-control advocates, and so his wife and kids moved back to Pennsylvania so they wouldn't be harmed if one of the threats ever materialized. Then, Lott says, under pressure from a gun-conscious mayor, the university terminated him because of his pro-gun views. (The University of Chicago declined to comment on the specifics of Lott's departure.)

Lott returned to Pennsylvania and eventually started the Crime Prevention Research Center, which is funded through small donations and operates with a limited budget. When he flies around the country giving talks, it's with his own money. His lifestyle does not appear lavish. He seems isolated, and he seems impassioned—doing this of his own volition, making a decent living but not an offensive one. The Crime Prevention Research Center is mostly run out of his house, in the suburbs of Philadelphia. He sleeps little, because he does his research at night.

Seeing Lott slouching in an uncomfortable, shiny lounge chair at Baylor made me wonder why he does this—when so many of his peers say he's wrong, when he's not being given obscene amounts of money for his work, when he's been essentially banished from academia, pushed to self-publishing and creating fake identities to advance his research.

After half an hour of me trying to figure out his motivations, Lott said he'd be late if we talked any longer, so he got up and opened the double doors to the auditorium, where he was introduced by a smiling student in a suit to a round of applause.

# Exhibit 21

## _Scholar Invents Fan To Answer His Critics_

The Washington Post

February 1, 2003 Saturday, Final Edition

Copyright 2003 The Washington Post

**The Washington Post**

**washingtonpost.com**

**Section:** STYLE; Pg. C01

**Length:** 896 words

**Byline:** Richard Morin, Washington Post Staff Writer

## Body

Mary Rosh thinks the world of John R. Lott Jr., the controversial American Enterprise Institute scholar whose book "More Guns, Less Crime" caused such a stir a few years ago.

In postings on Web sites in this country and abroad, Rosh has tirelessly defended Lott against his harshest critics. He is a meticulous researcher, she's repeatedly told those who say otherwise. He's not driven by the ideology of the left or the right. Rosh has even summoned memories of the classes she took from Lott a decade ago to illustrate Lott's probity and academic gifts.

"I have to say that he was the best professor I ever had," Rosh gushed in one Internet posting.

Indeed, Mary Rosh and John Lott agree about nearly everything.

Well they should, because Mary Rosh is John Lott -- or at least that's the pseudonym he's used for three years to defend himself against his critics in online debates, Lott acknowledged this week.

"I probably shouldn't have done it -- I know I shouldn't have done it -- but it's hard to think of any big advantage I got except to be able to comment fictitiously," said Lott, an economist who has held senior research positions at the University of Chicago and Yale.

Moreover, the AEI resident scholar acknowledged on Friday that he permitted his 13-year-old son to write an effusive review of "More Guns, Less Crime" and then post it on the Amazon.com Web site. It was signed "Maryrosh."

His son gave the book five stars -- the highest possible rating.

"If you want to learn about what can stop crime or if you want to learn about many of the myths involving crime that endanger people's lives, this is the book to get," the review stated. "It was very interesting reading and Lott writes very well. He explains things in an understandable commonsense way. I have loaned out my copy a dozen times and while it may have taken some effort to get people started on the book, once they read it no one was disappointed."

Scholar Invents Fan To Answer His Critics

Lott denied that he was the author of the review, an assertion made on various Web sites that have been tracking the controversy. He said his son wrote it, with some help from his wife. "They told me they had done it. They showed it to me. I wasn't going to tell them not to do it. Should I have?"

Lott's book, which argues that gun ownership deters crime, has been praised by gun advocates and attacked by those who favor gun control.

Lott also is a lesser player in the now-diminishing debate over the 2000 elections. In a study two years ago, Lott reported that the decision by the major television networks to call the Florida election for Al Gore before the polls had closed everywhere in the state led thousands of Republican-leaning voters in the Florida Panhandle not to vote. Other researchers dispute his findings, which have been embraced by conservatives as well as by critics of exit polling.

Lott said that he frequently has used the name "Mary Rosh" to defend himself in online debates. The name is an amalgam of the first two letters of his four sons' first names. In a posting to the Web site maintained by Tim Lambert, an Australian professor who has relentlessly attacked Lott's guns studies, "Mary Rosh" claims to be a former student of Lott at the University of Pennsylvania, where the economist taught between 1991 and 1995.

"I had him for a PhD level empirical methods class when he taught at the Wharton School at the University of Pennsylvania back in the early 1990s, well before he gained national attention, and I have to say that he was the best professor that I ever had. You wouldn't know that he was a 'right-wing' ideologue from the class. . . . There were a group of us students who would try to take any class that he taught. Lott finally had to tell us that it was best for us to try and take classes from other professors more to be exposed to other ways of teaching graduate material."

When a reporter attempted to read the posting to him over the telephone, Lott stopped him after the first few words. "I'm sure I did that. I shouldn't have done it."

Julian Sanchez, a Cato Institute staffer, is the cybersleuth who tracked Mary Rosh back to John Lott.

Sanchez is a blogger -- someone who maintains a Web site where they report and comment on the news -- who had been tracking the debate between Lott and critics of his gun research. He became suspicious about Rosh after he noticed that several of Rosh's online defenses of Lott seemed to track closely with arguments the scholar himself had made in private e-mails to Sanchez and other bloggers. He tracked Mary Rosh's IP address (the computer code translation of the standard e-mail address) to Pennsylvania.

"I compared that IP with the header of an email Dr. Lott had sent me from his home address. And by yet another astonishing coincidence, it had originated at the very same IP address. Now, what are the odds of that?" he wrote in a posting on his Web site. "Sarcasm aside, we're a little old to be playing dress up, aren't we Dr. Lott?"

Lott said he initially used his own name in online debates with critics. "But you just get into really emotional things with people. You also run into other problems." So he started using the name Mary Rosh. "I should not have done it, there is no doubt. But it was a way to get information into the debate."

Officials at the American Enterprise Institute declined to comment yesterday.

**Load-Date:** February 1, 2003

---

# Exhibit 22





A STUDY OF THE
**PRE-ATTACK BEHAVIORS**
**OF ACTIVE SHOOTERS**
IN THE UNITED STATES
*BETWEEN 2000 AND 2013*

JUNE 2018

# Authors

*James Silver, Ph.D., J.D., Worcester State University*

*Andre Simons, Supervisory Special Agent, Behavioral Analysis Unit, FBI*

*Sarah Craun, Ph.D., Behavioral Analysis Unit, FBI*

This publication is in the public domain. Authorization to reproduce this publication in whole or in part is granted. The citation should be: Silver, J., Simons, A., & Craun, S. (2018). A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 – 2013. Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 20535.

# A Study of the Pre-Attack Behaviors of Active Shooters in the United States

*Between 2000 and 2013*

Acknowledgments.................................................................................................4

Introduction ......................................................................................................6

Key Findings......................................................................................................7

Methodology .....................................................................................................8

Findings

     *Shooter Demographics*.............................................................................. 9

     *Planning and Preparation*.........................................................................13

     *Firearms Acquisition* ...............................................................................14

     *Stressors*....................................................................................................15

     *Mental Health* ..........................................................................................17

     *Concerning Behaviors* ..............................................................................17

     *Primary Grievance*...................................................................................21

     *Targeting* ..................................................................................................23

     *Suicide: Ideation and Attempts*.................................................................24

     *Concerning Communications* ....................................................................24

Limitations ..................................................................................................... 26

Conclusion ...................................................................................................... 27

Appendices....................................................................................................... 28

 Click on a link above to jump to a page.

# Acknowledgments

The authors wish to thank the many dedicated members and former members of the FBI's Behavioral Analysis Unit (BAU) who supported this study, including Crime Analyst Kristen Solik, BAU; Unit Chief John Wyman, BAU; Unit Chief Kristen Slater, BAU; Unit Chief Kevin Burton, BAU; Unit Chief Shawn VanSlyke, BAU (ret.); Research Coordinator Kristen Lybert, BAU; Supervisory Special Agents (SSAs) Karie Gibson and Adrienne Isom, BAU; Mr. Bryan Czako; Mr. Davis Moore; and Mr. James Russell. The authors also offer special thanks and gratitude to our colleagues in the BAU's Behavioral Threat Assessment Center (BTAC).

Further, the authors express their appreciation to Assistant Director Kerry Sleeper, Section Chief Katherine Schweit (ret.), Unit Chief James Green, and Supervisory Intelligence Analyst Deborah Cryan of the FBI's Office of Partner Engagement for their past and ongoing support of this project. Special thanks as well to Visual Information Specialist Erin Kim of the FBI's Office of Public Affairs.

The authors are exceptionally grateful to our many threat assessment colleagues who have partnered with and supported the BAU over several years. These professionals quietly and tirelessly work each day to prevent active shootings in our schools, universities, houses of worship, and businesses.





The authors and researchers from the FBI's Behavioral Analysis Unit involved in preparing this report are aware of the horrific impact these shootings have had on victims, survivors, families, and communities. We extend our deepest sympathies to those who have suffered the unimaginable tragedy of an active shooting, either personally or as a family member. We know that behind the statistics and numbers presented here are thousands of individuals with personal stories of grief, bravery, and resilience. In partnership with other law enforcement and threat assessment professionals, we remain committed to doing everything possible to prevent future attacks. Although much work remains, we present this report as a step towards disrupting those who would seek to inflict catastrophic harm.

# Introduction

In 2017 there were 30 separate active shootings in the United States, the largest number ever recorded by the FBI during a one-year period.[1] With so many attacks occurring, it can become easy to believe that nothing can stop an active shooter determined to commit violence. "The offender just snapped" and "There's no way that anyone could have seen this coming" are common reactions that can fuel a collective sense of a "new normal," one punctuated by a sense of hopelessness and helplessness. Faced with so many tragedies, society routinely wrestles with a fundamental question: can *anything* be done to prevent attacks on our loved ones, our children, our schools, our churches, concerts, and communities?

There is cause for hope because there *is* something that can be done. In the weeks and months before an attack, many active shooters engage in behaviors that may signal impending violence. While some of these behaviors are intentionally concealed, others are observable and — if recognized and reported — may lead to a disruption prior to an attack. Unfortunately, well-meaning bystanders (often friends and family members of the active shooter) may struggle to appropriately categorize the observed behavior as malevolent. They may even resist taking action to report for fear of erroneously labeling a friend or family member as a potential killer. Once reported to law enforcement, those in authority may also struggle to decide how best to assess and intervene, particularly if no crime has yet been committed.

By articulating the concrete, observable pre-attack behaviors of many active shooters, the FBI hopes to make these warning signs more visible and easily identifiable. This information is intended to be used not only by law enforcement officials, mental health care practitioners, and threat assessment professionals, but also by parents, friends, teachers, employers and anyone who suspects that a person is moving towards violence.

In 2014, the FBI published a report titled *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*.[2] One hundred and sixty active shooter incidents in the United States occurring between 2000 and 2013 were included in the sample. In this first report, the FBI focused on the circumstances of the active shooting events (e.g., location, duration, and resolution) but did not attempt to identify the motive driving the offender, nor did it highlight observable pre-attack behaviors demonstrated by the offender. The 2014 report will be referred to as the "Phase I" study.

The present study ("Phase II") is the natural second phase of that initiative, moving from an examination of the parameters of the shooting events to assessing the pre-attack behaviors of the shooters themselves. This second phase, then, turns from the vitally important inquiry of "what happened during and after the shooting" to the pressing questions of "how do the active shooters behave *before* the attack?" and, if it can be determined, "why did they attack?" The FBI's objective here was to examine specific behaviors that may precede an attack and which might be useful in identifying, assessing, and managing those who may be on a pathway to deadly violence.

---

1   https://www.fbi.gov/file-repository/active-shooter-incidents-us-2016-2017.pdf/view
2   https://www.fbi.gov/file-repository/active-shooter-study-2000-2013-1.pdf/view

# Key Findings of the Phase II Study

1. The **63** active shooters examined in this study did not appear to be uniform in any way such that they could be readily identified prior to attacking *based on demographics alone*.

2. Active shooters take time to plan and prepare for the attack, with **77%** of the subjects spending a week or longer planning their attack and **46%** spending a week or longer actually preparing (procuring the means) for the attack.

3. A majority of active shooters obtained their firearms legally, with only very small percentages obtaining a firearm illegally.

4. The FBI could only verify that **25%** of active shooters in the study had ever been diagnosed with a mental illness. Of those diagnosed, only three had been diagnosed with a psychotic disorder.

5. Active shooters were typically experiencing multiple stressors (an average of **3.6** separate stressors) in the year before they attacked.

6. On average, each active shooter displayed *4 to 5* concerning behaviors over time that were observable to others around the shooter. The most frequently occurring concerning behaviors were related to the active shooter's mental health, problematic interpersonal interactions, and leakage of violent intent.

7. For active shooters under age 18, school peers and teachers were more likely to observe concerning behaviors than family members. For active shooters 18 years old and over, spouses/domestic partners were the most likely to observe concerning behaviors.

8. When concerning behavior was observed by others, the most common response was to communicate directly to the active shooter (**83%**) or do nothing (**54%**). In **41%** of the cases the concerning behavior was reported to law enforcement. Therefore, just because concerning behavior was *recognized* does not necessarily mean that it was *reported* to law enforcement.

9. In those cases where the active shooter's primary grievance could be identified, the most common grievances were related to an adverse interpersonal or employment action against the shooter (**49%**).

10. In the majority of cases (**64%**) at least one of the victims was specifically targeted by the active shooter.

*All percentages in this report are rounded to the nearest whole number.

# Methodology

With the goal of carefully reviewing the pre-attack lives and behaviors of the active shooters, the FBI developed a unique protocol of 104 variables covering, among other things:

- Demographics

- Planning and preparation

- Acquisition of firearms in relation to the attack

- Stressors

- Grievance formation

- Concerning pre-attack behaviors and communications

- Targeting decisions

- Mental health

Whereas Phase I analyzed event circumstances that are typically well documented both in law enforcement incident reports and reliable open sources[3], this second phase is substantially based on observations of what are often nuanced behavioral indicators demonstrated by the active shooter prior to the attack. Given the subtle nature of many of the factors relevant to the inquiry, the FBI decided to use data that have been verified to the greatest possible extent, relying almost exclusively on information contained in official law enforcement investigative files.[4] For this reason, Phase II includes only those cases where the FBI obtained law enforcement investigative files that contained "background" materials (e.g., interviews with family members, acquaintances, neighbors; school or employment records; writings generated by the subject) adequate to answer the protocol questions.[5] In addition, as Phase II focused on identifying pre-attack behaviors of those on a trajectory to violence, active shooting events which appeared to be spontaneous reactions to situational factors (e.g., fights that escalated) were excluded. This resulted in a final sample of 63 active shooting incidents included in the Phase II study.

The use of law enforcement investigative case files as the primary source of data makes this study unique in comparison to other reports that typically rely upon unverified data derived from open sources. The comprehensive evaluation of law enforcement case files for suitability and completeness also contributed to the substantial time it has taken to prepare and publish this study.

The FBI examined whether the 63 cases included in Phase II are representative of the entire Phase I sample ($N = 160$). To identify the differences in the samples between Phase I and Phase II ($N = 160$ versus $N = 63$), the FBI compared those cases that were *only* in Phase I ($n = 97$) to those cases included in Phase II ($N = 63$), assessing potential differences between the active shooters (e.g., race, gender, age, and whether the offender committed suicide subsequent to the attack), as well as potential differences in the characteristics of the incidents (number of victims killed, number of law enforcement officers killed, location of the incident, active shooter movement during the event, and if the event concluded prior to the arrival of law enforcement).

---

3    Incident overview (e.g., date, location), incident specifics (weapon(s) used, duration of event), and incident outcome (deaths, injuries, resolution).

4    For one incident, the study relied on publicly available official reports which were based on the complete law enforcement investigative files.

5    The investigative files did not contain uniform amounts of subject-related behavioral information, as the depth and breadth of investigations varied based on several factors, including available resources, the prospect or not of trial, and the complexity of the event.

As compared to the 97 cases that were only in Phase I, the 63 cases in Phase II had the following characteristics:

■ Had a higher number of victims killed on average during each shooting;

■ Were more likely to end before law enforcement arrived;

■ Were more likely to include offenders who identified with Asian and Caucasian ethnicity, with active shooters identified with African American and Hispanic ethnicity generally underrepresented as compared to Phase I;

■ Were more likely to occur in an educational facility or a house of worship; and

■ Were more likely to end with the active shooter committing suicide.

After cases were identified, a three-stage coding process was utilized. First, two researchers read all case materials and independently coded each of the cases across all protocol variables. The researchers took a conservative approach to coding, declining to definitively answer any question that was not supported by record evidence. Second, another experienced coder (the "reviewer") also read each investigative file. In the final stage, the coders and the reviewer met for each of the 63 cases, compared answers, discussed disagreements, and produced a single reconciled set of data.

## SHOOTER DEMOGRAPHICS

The sample comprised individuals who varied widely along a range of demographic factors making it impossible to create a demographic profile of an active shooter. Indeed, the findings and conclusions of this study should be considered in light of the reality that these 63 active shooters did not appear to be uniform in any way such that they could be readily identified prior to attacking *based on demographics alone*.

### Age:

The youngest active shooter was 12 years old and the oldest was 88 years old with an average age of 37.8 years. Grouping the active shooters by age revealed the following:



FIGURE 1

**Age of Shooter**
(*N* = 63)

**Gender and Race:**

The sample was overwhelmingly male (94%, $n = 59$), with only four females in the data set (6%, $n = 4$), and varied by race as shown in Figure 2:[6]



FIGURE 2

## Race (*N* = 63)

ASIAN
10%

BLACK
16%

HISPANIC
6%

MIDDLE EASTERN
3%

NATIVE
AMERICAN
2%

WHITE
63%

**Highest Level of Education[7]:**

None of the active shooters under the age of 18 had successfully completed high school, and one (age 12) had not yet entered high school. When known, the highest level of education of adults varied considerably, as shown in Figure 3:



FIGURE 3

## Highest Level of Education Completed – 18 Years and Older
## (*n* = 55)

UNKNOWN — 36%
COMPLETED MASTERS/DOCTORATE — 5%
SOME GRADUATE EDUCATION — 2%
COMPLETED FOUR YEAR COLLEGE — 7%
ATTENDED FOUR YEAR COLLEGE — 11%
ATTENDED COMMUNITY COLLEGE/TRADE SCHOOL — 11%
COMPLETED HIGH SCHOOL — 20%
NONE OR SOME HIGH SCHOOL — 7%

0  5  10  15  20  25  30  35  40

*Does not sum to 100% due to rounding.

---

6   Descriptors of active shooters' races were obtained from law enforcement records.

7   Active shooters under the age of 18 ($n$=8) were excluded in analyses for those variables not typically pertaining to juveniles (e.g., marital status, higher education).

**Employment:**

The active shooters who were under 18 years old were all students. As featured in Figure 4, nearly equal percentages of the adult active shooters 18 years or older were employed as were unemployed, and 7% ($n = 4$) were primarily students. The rest of the adults were categorized as retired, disabled/receiving benefits, or other/unknown.



**FIGURE 4**

**Employment – 18 Years and Older**
**($n = 55$)**

UNEMPLOYED 38%
STUDENT 7%
OTHER 4%
RETIRED 4%
DISABLED 2%
UNKNOWN 2%
EMPLOYED 44%

*Does not sum to 100% due to rounding.

**Military:**

Of the active shooters 18 and older, 24% ($n = 13$) had at least some military experience, with six having served in the Army, three in the Marines, two in the Navy, and one each in the Air Force and the Coast Guard.

**Relationship Status:**

The active shooters included in the Phase II study were mostly single at the time of the offense (57%, $n = 36$). Thirteen percent ($n = 8$) were married, while another 13% were divorced. The remaining 11% were either partnered but not married ($n = 7$) or separated (6%, $n = 4$).

**Criminal Convictions and Anti-Social Behavior[8]:**

Nineteen of the active shooters aged 18 and over (35%) had adult convictions prior to the active shooting event. As visualized in Figure 5, the convictions can be categorized as crimes against society, property, or persons. The category of "crimes against society" included offenses such as driving under the influence, disorderly conduct and the possession of drug paraphernalia. Both the misdemeanor and felony "crimes against property" involved non-violent offenses, such as conspiracy to commit theft, theft, possession of stolen property, and criminal mischief. The misdemeanor "crimes against persons" were not inherently dangerous, but the felony "crimes against persons" involved convictions for criminal sexual assault of a family member, aggravated stalking, and endangering a person (although no active shooter was convicted of more than one crime against a person).

---

8    The study does not include juvenile adjudications; therefore, we did not run the analyses on those aged 17 and younger.



**FIGURE 5**

## Adult Criminal Convictions – 18 Years and Older
### (*n* = 55)

Legend: Felonies | Misdemeanors | None

SOCIETY: 0% / 14% / 86%
PROPERTY: 8% / 6% / 86%
PERSONS: 5% / 6% / 89%

*There was only one case where an active shooter had both a felony and a misdemeanor conviction in a single category (under "Property").

In sum, the active shooters had a limited history of adult convictions for violent crime and a limited history of adult convictions for crime of any kind.

Because formal criminal proceedings may not capture the full range of anti-social behaviors in a person's background, the FBI also looked for evidence of behaviors that were abusive and/or violent, but which did not result in a criminal charge. For some active shooters, no evidence of these behaviors was found, but given that these actions by definition did not involve the formal criminal justice system, it is possible that more violent incidents occurred than are reported here.

We found evidence that 62% (*n* = 39) of the active shooters had a history of acting in an abusive, harassing, or oppressive way (e.g., excessive bullying, workplace intimidation); 16% (*n* = 10) had engaged in intimate partner violence; and 11% (*n* = 7) had engaged in stalking-related conduct.[9]

### Considerations

There were very few demographic patterns or trends (aside from gender) that could be identified, reinforcing the concept that there is no one "profile" of an active shooter. Perhaps most noteworthy is the absence of a pronounced violent criminal history in an overwhelming majority of the adult active shooters. Law enforcement and threat management professionals assessing a potentially violent person may therefore wish to avoid any reliance on demographic characteristics or on evidence (or lack thereof) of prior criminal behavior in conducting their assessments.

---

9   This number may be underrepresented given the high percentage of unknown responses as related to stalking behaviors (68%).

## PLANNING AND PREPARATION

This study examined two related but separate temporal aspects of the active shooters' pre-attack lives — total time spent *planning* the attack and total time spent *preparing* for the attack.[10,11,12] The purpose in analyzing these chronologies was to establish the broad parameters during which active shooters were moving toward the attack and to identify behaviors that may have been common during these time periods.

In this context, planning means the full range of considerations involved in carrying out a shooting attack. This includes the decision to engage in violence, selecting specific or random targets, conducting surveillance, and addressing all ancillary practical issues such as victim schedules, transportation, and site access. Planning is more specific than a general intent to act violently and involves the thought processes necessary to bring about an intended outcome. Since planning may primarily be an internal thought process, it was often difficult to find objective, observable indications of an active shooter's planning. In nearly half of the cases, the total time spent planning is unknown. However, this is different than declaring that there was no evidence of planning at all, because in every case there was at least some evidence that the active shooter planned the attack; the challenge was ascertaining when the planning began.

In establishing the total duration of planning, the FBI looked for evidence of behaviors that were observable (e.g., conversations, conducting surveillance) as well as in materials that were private to the active shooter (e.g., journals, computer hard drives) and likely unknowable to others until after the attack. As demonstrated in Figure 6, there was a wide range of planning duration in the 34 cases where the time spent planning could reasonably be determined.



FIGURE 6

**Time Spent Planning**
(*n* = 34)

*Does not sum to 100% due to rounding.

With regard to specific planning activities, care should be taken in the interpretation of the data. For instance, our study indicates that few active shooters overall approached or conducted surveillance on their target (14%, *n* = 9), and fewer still researched or studied the target site where the attack occurred (10%, *n* = 6). While this could indicate that the active shooters were uninterested in knowing about their targets or attack sites in advance or engaged in little tactical planning, this is inconsistent with the operational experience of the FBI. The likely reason for this finding is that the active shooters often attacked people and places with which they were already familiar. There was

---

10   Calhoun, T., & Weston, S., (2003). *Contemporary threat management.* San Diego: Specialized Training Services;

11   Fein, R. & Vossekuil, B. (1999). Assassination in the United States: an operational study of recent assassins, attackers, and near-lethal approachers. *Journal of Forensic Sciences.*

12   Vossekuil, B., Fein, R., Reddy, M., Borum, R., & Modzeleski, W. (2004). *The final report and findings of the safe school initiative: Implications for the prevention of school attacks in the United States.* Washington, DC: U.S. Secret Service and the U.S. Department of Education.

a known connection between the active shooters and the attack site in the majority of cases (73%, *n* = 46), often a workplace or former workplace for those 18 and older (35%, *n* = 19), and almost always a school or former school for those younger than 18 (88%, *n* = 7), indicating that in most cases the active shooter was already familiar with both the attack site as well as the persons located at the site. Conversely, those active shooters with no affiliation to the targeted site behaved differently. Active shooters with no known connection to the site of their attack were more likely to conduct surveillance (p < .05) and research the site (p < .01). With routine contact, pre-attack surveillance could presumably be conducted concurrent to normalized activity and eliminate the need for a more formalized or detectable reconnaissance of a chosen target.

The investigative files also demonstrated that only some active shooters researched or studied past attacks by others (21%, *n* = 13). This is not to say that other active shooters were unaware of past attacks — it is difficult to imagine that they did not have at least some basic knowledge of prior infamous shootings that received national media coverage. The FBI again suspects that this behavior may be underrepresented in the study sample, especially as we could not determine if active shooters researched past attacks in 46% of the cases.

*Preparing* was narrowly defined for this study as actions taken to procure the means for the attack, typically items such as a handgun or rifle, ammunition, special clothing and/or body armor. The focus was on activities that could have been noticed by others (e.g., a visit to a gun store, the delivery of ammunition) and which were essential to the execution of the plan. The FBI was able to find evidence of time spent preparing in more cases than for time spent planning (likely reflecting the overt nature of procuring materials as opposed to the presumably largely internal thought process of planning). As Figure 7 demonstrates, in more than half of the cases where the time spent preparing was known, active shooters spent one week or less preparing for the attack.



### FIREARMS ACQUISITION

As part of the review of the active shooter's preparations, the FBI explored investigative records and attempted to identify how each active shooter obtained the firearm(s) used during the attack. Most commonly (40%, *n* = 25), the active shooter purchased a firearm or firearms legally and specifically for the purpose of perpetrating the attack. A very small percentage purchased firearms illegally (2%, *n* = 1) or stole the firearm (6%, *n* = 4). Some (11%, *n* = 7) borrowed or took the firearm from a person known to them. A significant number of active shooters (35%, *n* = 22) already possessed a firearm and did not appear (based on longevity of possession) to have obtained it for the express purpose of committing the shooting.



**FIGURE 8**

## Firearms Acquisition
*(N = 63)*

| Category | Percentage |
|---|---|
| Purchased Legally | 40% |
| Already Possessed | 35% |
| Borrowed/Taken from Other | 11% |
| Stolen | 6% |
| Acquired at Scene | 5% |
| Purchased Illegally | 2% |
| Unknown | 22% |

*Data percentages detailed above add to greater than 100% as active shooters could have obtained multiple firearms in different ways.

### Considerations

Active shooters generally take some time to plan and carry out the attack. However, retrospectively determining the exact moment when an active shooter decided to engage in violence is a challenging and imprecise process. In reviewing indicators of planning and preparing, the FBI notes that most active shooters (who demonstrated evidence of these processes in an observable manner) spent days, weeks, and sometimes months getting ready to attack. In fact, in those cases where it could be determined, 77% of the active shooters ($n = 26$) spent a week or longer planning their attack, and 46% ($n = 21$) spent a week or longer preparing. Readers are cautioned that simply because some active shooters spent less than 24 hours planning and preparing, this should not suggest that potential warning signs or evidence of an escalating grievance did not exist before the initiation of these behaviors. In the four cases where active shooters took less than 24 hours to plan and prepare for their attacks, all had at least one concerning behavior and three had an identifiable grievance.

Perhaps unsurprisingly, active shooters tended to attack places already familiar to them, likely as a result of a personal grievance which motivated the attack and/or as a result of operational comfort and access. A unique challenge for safety, threat assessment, and security professionals will be to identify "outside" active shooters who are not already operating within the target environment. Pre-attack site surveillance by an outsider may be one observable behavior in physical or online worlds indicative of planning and preparation activities.

## STRESSORS

Stressors are physical, psychological, or social forces that place real or perceived demands/pressures on an individual and which may cause psychological and/or physical distress. Stress is considered to be a well-established correlate of criminal behavior.[13] For this study, a wide variety of potential stressors were assessed, including financial pressures, physical health concerns, interpersonal conflicts with family, friends, and colleagues (work and/or school), mental health issues, criminal and civil law issues, and substance abuse.[14]

---

13   Felson, R.B., Osgood, D.W., Horney, J. & Wiernik, C. (2012). Having a bad month: General versus specific effects of stress on crime. *Journal of Quantitative Criminology, 28,* 347-363 for a discussion of various theories describing the relationship between stress and crime.

14   See Appendix A.

The FBI recognizes that most (if not all) people in some way confront similar issues on a regular basis in their daily lives, and that most possess adequate personal resources, psychological resiliency, and coping skills to successfully navigate such challenges without resorting to violence. Therefore, the FBI focused on identifying stressors that appeared to have more than a minimal amount of adverse impact on that individual, and which were sufficiently significant to have been memorialized, shared, or otherwise noted in some way (e.g., in the active shooter's own writings, in conversation with family or friends, work files, court records). Given the fluid nature of some (although not all) of the stressors, the analysis was limited to the year preceding the attack.

The variables were treated as binary, that is, either the stressor was present or not, without regard for the number of separate circumstances giving rise to the stressor. So, an active shooter who had conflict with *one* family member and a shooter who had conflicts with *several* family members were both coded as "yes" for "conflict with other family members."

Overall, the data reflects that active shooters were typically experiencing multiple stressors (an average of 3.6 separate stressors) in the year before they attacked. For example, in the year before his attack, one active shooter was facing disciplinary action at school for abuse of a teacher, was himself abused and neglected at home, and had significant conflict with his peers. Another active shooter was under six separate stressors, including a recent arrest for drunk driving, accumulating significant debt, facing eviction, showing signs of both depression and anxiety, and experiencing both the criminal and civil law repercussions of an incident three months before the attack where he barricaded himself in a hotel room and the police were called.

The only stressor that applied to more than half the sample was mental health (62%, $n = 39$). Other stressors that were present in at least 20% of the sample were related to financial strain, employment, conflicts with friends and peers, marital problems, drug and alcohol abuse, other, conflict at school, and physical injury.

TABLE 1: STRESSORS

| Stressors | Number | % |
| --- | --- | --- |
| Mental health | 39 | 62 |
| Financial strain | 31 | 49 |
| Job related | 22 | 35 |
| Conflicts with friends/peers | 18 | 29 |
| Marital problems | 17 | 27 |
| Abuse of illicit drugs/alcohol | 14 | 22 |
| Other (e.g. caregiving responsibilities) | 14 | 22 |
| Conflict at school | 14 | 22 |
| Physical injury | 13 | 21 |
| Conflict with parents | 11 | 18 |
| Conflict with other family members | 10 | 16 |
| Sexual stress/frustration | 8 | 13 |
| Criminal problems | 7 | 11 |
| Civil problems | 6 | 10 |
| Death of friend/relative | 4 | 6 |
| None | 1 | 2 |

## MENTAL HEALTH

There are important and complex considerations regarding mental health, both because it is the most prevalent stressor and because of the common but erroneous inclination to assume that anyone who commits an active shooting must de facto be mentally ill. First, the *stressor* "mental health" is not synonymous with a *diagnosis* of mental illness. The stressor "mental health" indicates that the active shooter appeared to be struggling with (most commonly) depression, anxiety, paranoia, etc. in their daily life in the year before the attack. There may be complex interactions with other stressors that give rise to what may ultimately be transient manifestations of behaviors and moods that would not be sufficient to warrant a formal diagnosis of mental illness. In this context, it is exceedingly important to highlight that the FBI could only verify that 25% ($n = 16$) of the active shooters in Phase II were known to have been diagnosed by a mental health professional with a mental illness *of any kind* prior to the offense.[15] The FBI could not determine if a diagnosis had been given in 37% ($n = 23$) of cases.

Of the 16 cases where a diagnosis prior to the incident could be ascertained, 12 active shooters had a mood disorder; four were diagnosed with an anxiety disorder; three were diagnosed with a psychotic disorder; and two were diagnosed with a personality disorder. Finally, one active shooter was diagnosed with Autism spectrum disorder; one with a developmental disorder; and one was described as "other." Having a diagnosed mental illness was unsurprisingly related to a higher incidence of concurrent mental health stressors among active shooters.

### Considerations

It is clear that a majority of active shooters experienced multiple stressors in their lives before the attack. While the active shooters' reactions to stressors were not measured by the FBI, what appears to be noteworthy and of importance to threat assessment professionals is the active shooters' ability to navigate conflict and resiliency (or lack thereof) in the face of challenges. Given the high prevalence of financial and job-related stressors as well as conflict with peers and partners, those in contact with a person of concern at his/her place of employment may have unique insights to inform a threat assessment.

In light of the very high lifetime prevalence of the symptoms of mental illness among the U.S. population, formally diagnosed mental illness is not a very specific predictor of violence of any type, let alone targeted violence.[16,17,18] Some studies indicate that nearly half of the U.S. population experiences symptoms of mental illness over their lifetime, with population estimates of the lifetime prevalence of diagnosable mental illness among U.S. adults at 46%, with 9% meeting the criteria for a personality disorder.[19,20] Therefore, absent specific evidence, careful consideration should be given to social and contextual factors that might interact with any mental health issue before concluding that an active shooting was "caused" by mental illness. In short, declarations that all active shooters must simply be mentally ill are misleading and unhelpful.

## CONCERNING BEHAVIORS

Concerning behaviors are *observable* behaviors exhibited by the active shooter. For this study, a wide variety of concerning behaviors were considered, including those related to potential symptoms of a mental health disorder, interpersonal interactions, quality of the active shooter's thinking or communication, recklessness, violent media usage, changes in hygiene and weight, impulsivity, firearm behavior, and physical aggression.[21] Although these may be related to stressors in the active shooter's life, the focus here was not on the internal, subjective experience of

---

15  The number of documented, diagnosed mental illness may be the result of a number of factors, including those related to situational factors (access to health care) as well as those related to the study factors (access to mental health records).

16  Elbogen, E.B., & Johnson, S.C. (2009). The intricate link between violence and mental disorder. *Arch Gen Psychiatry,66(2),*152-161.

17  Glied, S.A., and Frank, R.G. (2014). Mental illness and violence: Lessons from the evidence. *American Journal of Public Health, 104,* e5-e6 doi:10.2015/AJPH.2013.301710

18  Monahan, J., Steadman, H. J., Silver, E., Applebaum, P.S., Clark Robbins, P., Mulvey, E. P., & Banks, S. (2001). Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence. Oxford, UK: Oxford University Press

19  Kessler, R.C., Berglund, P., Demler, O., Jin, R., Merikangas, K.R., Walters, E.E. Lifetime prevalence and age-of-onset distributions of DSM-IV disorders in the National Comorbidity Survey Replication. *Arch Gen Psychiatry.* 2005:62(6): 593-602.

20  Lenzweger, M.F., Lane, M.C., Loranger, A.W., Kessler, R.C., DSM-IV personality disorders in the National Comorbidity Survey Replication. *Biol Psychiatry.* 2007;62(6): 553-564.

21  See Appendix B.

the active shooter, but rather on what was *objectively knowable* to others. So, while the assessment of stressors is meant to provide insight into the active shooter's inner turmoil, the examination of concerning behaviors addresses a related but separate issue — the possibility of identifying active shooters before they attack by being alert for observable, concerning behaviors. The FBI looked for documented confirmation that someone noticed a facet of the shooter's behavior causing the person to feel a "more than minimal" degree of unease about the well-being and safety of those around the active shooter.

Before examining what behaviors were observable by others, it is useful to address the widespread perception that active shooters tend to be cut off from those around them. In general, the active shooters in Phase II were not completely isolated and had at least some social connection to another person. While most of the active shooters age 18 and older were single/never married (51%, $n = 28$) or separated/divorced (22%, $n = 12$) at the time of the attack, the majority did live with someone else (68%, $n = 43$). This percentage was slightly less (64%, $n = 35$) for only those active shooters who were 18 years or older. Most had significant in-person social interactions with at least one other person in the year before the attack (86%, $n = 54$), and more than a quarter of them had significant online interactions with another person within a year of the attack (27%, $n = 17$). All active shooters either: a) lived with someone, or b) had significant in-person or online social interactions.

Since the observation of concerning behaviors offers the opportunity for intervention prior to the attack, this study examines not only what was observed, but when the observations were made, who made them, and what if anything the person(s) did with regard to these observations. To better serve threat assessment teams, mental health professionals, community resources, and law enforcement officials, the FBI expanded the inquiry to capture behaviors that may have been observed at any point (in many cases beyond one year) before the attack.

Overall, active shooters showed concerning behaviors in multiple ways, with an average of 4.7 concerning behaviors per active shooter. Behaviors observed in more than half of the sample were related to the shooter's mental health[22], interpersonal interactions, leakage (the communication to a third-party of an intent to harm someone, discussed with threats in a separate section), and the quality of the active shooter's thinking or communication.

Of note was that contextually inappropriate firearms behavior was noted in approximately one fifth of the active shooters, while drug and alcohol abuse figured even less prominently in the sample (for the purposes of the study, contextually inappropriate firearms behavior was defined as interest in or use of firearms that appeared unusual given the active shooter's background and experience with firearms).

**TABLE 2: CONCERNING BEHAVIORS**

| Concerning Behavior | Number | % |
|---|---|---|
| Mental health | 39 | 62 |
| Interpersonal interactions | 36 | 57 |
| Leakage | 35 | 56 |
| Quality of thinking or communication | 34 | 54 |
| Work performance* | 11 | 46 |
| School performance** | 5 | 42 |
| Threats/confrontations | 22 | 35 |
| Anger | 21 | 33 |
| Physical aggression | 21 | 33 |

*Continues on next page*

---

22   Thirty-nine active shooters were experiencing a mental health stressor, and 39 active shooters showed concerning behaviors related to mental health, but the same 39 active shooters did not appear in each category; there were five active shooters who had a mental health stressor but who did not show a concerning behavior, and five other active shooters who showed a mental health-related concerning behavior but for whom there was no evidence of mental health stress.

| | | |
|---|---|---|
| Risk-taking | 13 | 21 |
| Firearm behavior | 13 | 21 |
| Violent media usage | 12 | 19 |
| Weight/eating | 8 | 13 |
| Drug abuse | 8 | 13 |
| Impulsivity | 7 | 11 |
| Alcohol abuse | 6 | 10 |
| Physical health | 6 | 10 |
| Other (e.g. idolizing criminals) | 5 | 8 |
| Sexual behavior | 4 | 6 |
| Quality of sleep | 3 | 5 |
| Hygiene/appearance | 2 | 3 |

\* Based on the 24 active shooters who were employed at the time of the offense
\*\* Based on the 12 active shooters who were students at the time of the offense

### When Were the Concerning Behaviors Noticed?

Since the overwhelming majority of active shooters (all but three) displayed at least two concerning behaviors, there are a number of different ways to assess the data. One way is to examine the data by active shooter and to observe the first instance that any concerning behavior was noticed (this could not be determined for three active shooters). Figure 9 shows this data and helps frame the longest time before a shooting during which others were concerned about the active shooter's behavior.



Again, this chart shows the first instance of *any* concerning behavior, and it should be kept in mind that this behavior might not have been the type that by *itself* would cause a reasonable person to be alarmed or to report it to others. For example, a co-worker who noticed that an active shooter had more than the normal amount of conflict with a supervisor might be unlikely to take any action. Perhaps only after an attack and with the benefit of hindsight would this singular behavior be considered to be — in and of itself — troubling or concerning. Yet, on average, each active shooter displayed *four to five* concerning behaviors over time. While it may only be the interaction and cumulative effect of these behaviors that would cause alarm, early recognition and detection of growing or interrelated problems may help to mitigate the potential for violence.

**In What Way Were the Concerning Behaviors Noticed?**

Concerning behaviors came to the attention to others in a variety of ways, with some far more common than others. The most prevalent way in which concerning behaviors were noticed was verbal communication by the active shooter (95%, $n = 60$), followed by observing the physical actions of the active shooter (86%, $n = 54$), written communication (27%, $n = 17$), and finally instances where concerning behavior was displayed online (16%, $n = 10$). A large majority of active shooters (89%, $n = 56$) demonstrated concerning behaviors that were noticed in multiple ways.

**Who Noticed the Concerning Behaviors?**

At least one person noticed a concerning behavior in *every* active shooter's life, and on average, people from three different groups noticed concerning behaviors for each active shooter. As shown below, classmates (for those who were students), partners (for those in relationships), family members and friends most frequently noticed concerning behavior, followed by co-workers, other, and law enforcement:

TABLE 3: WHO NOTICED CONCERNING BEHAVIORS

| Who Noticed | Number | % |
|---|---|---|
| Schoolmate* | 11 | 92 |
| Spouse/domestic partner** | 13 | 87 |
| Teacher/school staff* | 9 | 75 |
| Family member | 43 | 68 |
| Friend | 32 | 51 |
| Co-worker | 25 | 40 |
| Other (e.g. neighbors) | 23 | 37 |
| Law enforcement | 16 | 25 |
| Online individual | 6 | 10 |
| Religious mentor | 3 | 5 |

\* Percentage calculated only with those active shooters who were students at the time of the offense
\*\* Percentage calculated only with those active shooters who were in a relationship at the time of the offense

**What, If Anything, Did the Concerned Party Do?**

If the person recognizes behaviors as problematic but takes no action, the opportunity for intervention is missed. Whether and how a person responds to an active shooter's concerning behavior is likely influenced by a host of personal and situational factors (e.g., whether the behavior is threatening to the observer or others, the relationship of the observer and active shooter, avenues for anonymous reporting, and/or confidence in authorities or others to address the behavior).

In this study, even in cases where an active shooter displayed a variety of concerning behaviors that might indicate an intent to act violently, the observer(s) of that information did not necessarily pass it along to anyone else. As shown above, the people most likely to notice concerning behaviors were those who knew the active shooter best — family, friends and classmates. For the very reason they are the people most likely to take note of concerning behaviors, they are also people who may feel constrained from acting on these concerns because of loyalty, disbelief, and/or fear of the consequences.[23]

---

23    Borum, R. (2013). Informing Lone-Offender Investigations. *Criminology & Public Policy,* 12(1), 103-112.

Again, keeping in mind that active shooters displayed multiple concerning behaviors and those who observed these behaviors might have responded in different ways to each, the most common response was to communicate directly to the active shooter (83%, $n = 52$) or do nothing (54%, $n = 34$). Thus, in many instances, the concern stayed between the person who noticed the behavior and the active shooter.

The next most common responses were: report the active shooter to a non-law enforcement authority (51%, $n = 32$); discuss the concerning behavior with a friend or family member (49%, $n = 31$); and, report the active shooter to law enforcement authority (41%, $n = 26$).

### Considerations

The analysis above is not intended to, nor could it, encompass the innumerable ways in which the observer of a concerning behavior might react. Nor does it suggest that every concerning behavior warrants assertive intervention; many of the concerning behaviors that registered with others likely would not have presaged deadly violence to a reasonable person. The FBI is aware that in retrospect certain facts may take on a heightened degree of significance that may not have been clear at the time.

Nevertheless, understanding that there are often opportunities before a shooting to recognize concerning behaviors that may suggest progression toward violence, the FBI is highlighting the most common behaviors displayed in the sample. There is no single warning sign, checklist, or algorithm for assessing behaviors that identifies a prospective active shooter. Rather, there appears to be a complex combination of behaviors and interactions with bystanders that may often occur in the days, weeks, and months leading up to an attack. Early recognition *and* reporting of concerning behaviors to law enforcement or threat assessment professionals may initiate important opportunities for mitigation.

## PRIMARY GRIEVANCE

A grievance is defined for this study as the cause of the active shooter's distress or resentment; a perception — not necessarily based in reality — of having been wronged or treated unfairly or inappropriately.[24,25,26] More than a typical feeling of resentment or passing anger, a grievance often results in a grossly distorted preoccupation with a sense of injustice, like an injury that fails to heal. These thoughts can saturate a person's thinking and foster a pervasive sense of imbalance between self-image and the (real or perceived) humiliation. This nagging sense of unfairness can spark an overwhelming desire to "right the wrong" and achieve a measure of satisfaction and/or revenge. In some cases, an active shooter might have what appeared to be multiple grievances but, where possible, the FBI sought to determine the primary grievance. Based on a review of the academic literature and the facts of the cases themselves, the FBI identified eight categories of grievances, with an additional category of "other" for grievances that were entirely idiosyncratic.

As shown in the following table, the FBI could not identify a primary grievance for 13 (21%) of the active shooters, either because they did not have one or because there was insufficient evidence to determine whether one existed. While it may be particularly difficult to understand the motivation(s) for attacks that do not appear to be based on identifiable grievances, these active shooters still displayed concerning behaviors, were under identifiable stressors, and engaged in planning and preparation activities. For example, for the active shooters where no grievance could be identified, all had at least two behaviors (with an average of 5.4 behaviors) that were noted to be concerning by others.

---

24   Calhoun, T., & Weston, S., (2003).
25   Fein, R., & Vossekuil, B. (1999).
26   Vossekuil, B., Fein, R., Reddy, M., Borum, R., & Modzeleski, W. (2004).

The majority (79%, $n = 50$) of the active shooters did appear to be acting in accord with a grievance of some kind. Of course, the grievance itself may not have been reasonable or even grounded in reality, but it appeared to serve as the rationale for the eventual attack, giving a sense of purpose to the shooter. Most of these grievances seem to have originated in response to some specific action taken regarding the active shooter. Whether interpersonal, employment, governmental, academic, or financial, these actions were (or were perceived to be) directed against the active shooter personally. In contrast, grievances driven by more global or broad considerations — such as ideology or hatred of a group — account for less than 7% of the overall cases. In general then, active shooters harbored grievances that were distinctly personal to them and the circumstances of their daily lives.

TABLE 4: PRIMARY GRIEVANCE

| Primary Grievance | Number | % |
|---|---|---|
| Adverse interpersonal action against the shooter | 21 | 33 |
| Adverse employment action against the shooter | 10 | 16 |
| Other (e.g. general hatred of others) | 6 | 10 |
| Adverse governmental action against the shooter | 3 | 5 |
| Adverse academic action against the shooter | 2 | 3 |
| Adverse financial action against the shooter | 2 | 3 |
| Domestic | 2 | 3 |
| Hate crime | 2 | 3 |
| Ideology/extremism | 2 | 3 |
| Unknown | 13 | 21 |

**Precipitating Events**

Of the 50 active shooters who had an identifiable grievance, nearly half of them experienced a precipitating or triggering event related to the grievance (44%, $n = 22$). Seven active shooters (14%) did not experience a precipitating event, and the FBI could not determine whether the remaining 21 (42%) did. Precipitating events generally occurred close in time to the shooting and included circumstances such as an adverse ruling in a legal matter, romantic rejection, and the loss of a job.

These precipitating events were of more consequence in the timing of the attack, and while they appear to have accelerated the active shooter's movement on the trajectory to violence, they did not by themselves appear to set the course.

**Considerations**

Of course, many people have grievances and never act violently. What caused the active shooters in this study to act the way they did cannot be explained simply by the presence of a grievance. There was likely the interaction of a variety of operational considerations and psychological stressors that eventually crystallized in the decision to ignore non-violent options and choose to attack. However, the types of grievances most commonly experienced by the active shooters in this study may be important considerations for the many threat assessment teams and law enforcement professionals who work each day to assess a subject's progression along the pathway to violence.

## TARGETING

For this study, a target is defined as a person or group of people who were *identifiable before the shooting occurred* and whom the active shooter intended to attack. It was not necessary that the active shooter knew the target by name; intending to attack a person holding a position at or affiliated with a business, educational facility, or in a governmental agency sufficed. The target could be a group, so long as members of that group could have been identified prior to the attack.

In cases where the victims could not reasonably have been identified prior to the shooting, the active shooter was deemed to have selected the victims at random. While there is *some* element of selection in any attack where there is more than one potential victim (unless the active shooter literally does not aim at all), the FBI considered victims to be random where there was: 1) no known connection between the active shooter and the victims, and 2) the victims were not specifically linked to the active shooter's grievance.

In many cases, there was a mix of targeted and random victims in the same shooting. The typical circumstance occurred when an active shooter went to a location with targets in mind and also shot others who were at the same location, either because they presented some obstacle in the attack or for reasons that could not be identified.

The overall numbers for targeted and random victims are listed below:



FIGURE 10

RANDOM VICTIMS (37%, *n* = 23)

BOTH RANDOM AND TARGETED VICTIMS (37%, *n* = 23)

TARGETED VICTIMS (27%, *n* = 17)

*Does not sum to 100% due to rounding.

### Considerations

While approximately one-third of active shooters in this sample victimized only random members of the public, most active shooters arrive at a targeted site with a specific person or persons in mind. Awareness of targeting behaviors can provide valuable insight for threat assessment professionals. Relatedly, the FBI has observed that when an active shooter's grievance generalizes — that is, expands beyond a desire to punish a specific individual to a desire to punish an institution or community — this should be considered to be progression along a trajectory towards violence and ultimately a threat-enhancing characteristic.

## SUICIDE: IDEATION AND ATTEMPTS

For this study, "suicidal ideation" was defined as thinking about or planning suicide, while "suicide attempt" was defined as a non-fatal, self-directed behavior with the intent to die, regardless of whether the behavior ultimately results in an injury of any kind. Although these definitions are broad, the FBI concluded that an active shooter had suicidal ideation or engaged in a suicide attempt only when based on specific, non-trivial evidence.

Nearly half of the active shooters had suicidal ideation or engaged in suicide-related behaviors at some time prior to the attack (48%, $n = 30$), while five active shooters (8%) displayed no such behaviors (the status of the remaining 28 active shooters was unknown due to a lack of sufficient evidence to make a reasonable determination).

An overwhelming majority of the 30 suicidal active shooters showed signs of suicidal ideation (90%, $n = 27$), and seven made actual suicide attempts (23%). Nearly three-quarters (70%, $n = 21$) of these behaviors occurred within one year of the shooting.

### Considerations

The high levels[27] of pre-attack suicidal ideation — with many appearing within 12 months of the attack — are noteworthy as they represent an opportunity for intervention. If suicidal ideation or attempts in particular are observed by others, reframing bystander awareness within the context of a mass casualty event may help to empha-size the importance of telling an authority figure and getting help for the suicidal person. Without stigmatizing those who struggle with thoughts of self-harm, researchers and practitioners must continue to explore those active shooters who combined suicide with externalized aggression (including homicidal violence) and identify the concurrent behaviors that reflect this shift.

## CONCERNING COMMUNICATIONS

One useful way to analyze concerning communications is to divide them into two categories: *threats/confrontations* and *leakage of intent*.

### Threats/Confrontations

Threats are *direct communications to a target* of intent to harm and may be delivered in person or by other means (e.g., text, email, telephone). For this study, threats need not be verbalized or written; the FBI considered in-person confrontations that were intended to intimidate or cause safety concerns for the target as falling under the category of threats as well.

More than half of the 40 active shooters who had a target made threats or had a prior confrontation (55%, $n = 22$). When threats or confrontations occurred, they were almost always in person (95%, $n = 21$) and only infrequently in writing or electronically (14%, $n = 3$). Two active shooters made threats both in person and in writing/electronically.

### Leakage

Leakage occurs when a person intentionally or unintentionally reveals clues to a *third-party* about feelings, thoughts, fantasies, attitudes or intentions that may signal the intent to commit a violent act.[28] Indirect threats of harm are included as leakage, but so are less obvious, subtle threats, innuendo about a desire to commit a violent attack, or boasts about the ability to harm others. Leakage can be found not only in verbal communications, but

---

27    The National Survey on Drug Use and Health (2015) shows that in 2015: 4% of adults had serious thoughts of suicide, 1.1% made serious plans, and 0.6% attempted suicide (https://www.samhsa.gov/data/sites/default/files/NSDUH-DR-FFR3-2015/NSDUH-DR-FFR3-2015.htm)

28    Meloy, J. R. & O'Toole, M. E. (2011). The concept of leakage in threat assessment. *Behavioral Sciences and the Law, 29*, 513-527

also in writings (e.g., journals, school assignments, artwork, poetry) and in online interactions (e.g., blogs, tweets, texts, video postings). Prior research has shown that leakage of intent to commit violence is common before attacks perpetrated by both adolescents and adults, but is more common among adolescents.[29,30,31]

Here, too, leakage was prevalent, with over half of the active shooters leaking intent to commit violence (56%, $n = 35$). In the Phase II sample, 88% ($n = 7$) of those active shooters age 17 and younger leaked intent to commit violence, while 51% ($n = 28$) of adult active shooters leaked their intent. The leaked intent to commit violence was not always directed at the eventual victims of the shootings; in some cases what was communicated was a more general goal of doing harm to others, apparently without a particular person or group in mind. For example, one active shooter talked to a clerk at a gas station about killing "a family" and another expressed interest in becoming a sniper like a character featured in *The Turner Diaries*. In 16 of the 40 cases (40%) where the active shooter had a target, however, the leaked intent to act violently was directly pertaining to that target. In these cases, the leakage was generally a statement to a third-party of the intent to specifically harm the target.

### Legacy Tokens

Finally, the FBI considered whether or not an active shooter had constructed a "legacy token" which has been defined as a communication prepared by the offender to claim credit for the attack and articulate the motives underlying the shooting.[32] Examples of legacy tokens include manifestos, videos, social media postings, or other communications deliberately created by the shooter and delivered or staged for discovery by others, usually near in time to the shooting. In 30% ($n = 19$) of the cases included in this study, the active shooter created a legacy token prior to the attack.

### Considerations

Although more than half of the active shooters with pre-attack targets made threats ($n = 22$), in the majority (65%) of the overall cases no threats were made to a target, and the FBI cautions that the absence of a direct threat should not be falsely reassuring to those assessing the potential for violence raised by other circumstances and factors. Nor should the presence of a threat be considered conclusive. There is a significant amount of research and experience to demonstrate that direct threats are not correlated to a subsequent act of targeted violence.[33,34,35,36,37,38]

It is important to highlight that in this Phase II study the overwhelming majority of direct threats were verbally delivered by the offender to a future victim. Only a very small percentage of threats were communicated via writing or electronically. In many ways this is not surprising. Written, directly communicated threats against a target (e.g., "I'm going to shoot and kill everyone here on Tuesday") often spark a predictable response that includes a heightened law enforcement presence and the enhancement of security barriers. These responses are highly undesirable to an offender planning an active shooting.[39] Verbal threats issued directly to another person appear to be far more common among the active shooters included in the Phase II study.

29   Hemple, A., Meloy, J.R., & Richards, T. (1999). Offender and offense characteristics of a nonrandom sample of mass murderers. *Journal of the American Academy of Psychiatry and the Law, 27,* 213-225. Meloy, J.R., Hoffman, J., Guldimann, A., & James, D. (2011). The role of warning behaviors in threat assessment: An exploration and suggested typology. Behavioral Sciences and the Law, 30, 256-279.

30   Meloy, J. R. & O'Toole, M. E. (2011).

31   Meloy, J.R., Hoffman, J., Guldimann, A., & James, D. (2011). The role of warning behaviors in threat assessment: An exploration and suggested typology. *Behavioral Sciences and the Law, 30,* 256-279.

32   Simons, A., & Tunkel, R. (2014). The assessment of anonymous threatening communications. In J.R. Meloy & J. Hoffman (Eds.), *International handbook of threat assessment* (pp. 195-213). New York: Oxford University Press.

33   Borum, R., Fein, R. Vossekuil, B., & Berglund, J. (1999). Threat assessment: Defining an approach for evaluating risk of targeted violence. *Behavioral Sciences and the Law,* 17, 323-337.

34   Calhoun, F. (1998). Hunters and howlers: *Threats and violence against federal judicial officials in the United States, 1789-1993.* Arlington, VA: US Marshals Service.

35   Calhoun T. & Weston, S. (2003).

36   Dietz, P., Matthews, D., Martell, D., Stewart, T., Hrouda, D., & Warren, J. (1991a). Threatening and otherwise inappropriate letters to members of the United States Congress. *Journal of Forensic Sciences, 36,* 1445-1468.

37   Dietz, P., Matthews, D., Van Duyne, C., Martell, D., Parry, C., Stewart, T., et al. (1991b). Threatening and otherwise inappropriate letters to Hollywood celebrities. *Journal of Forensic Sciences, 36,* 185-209.

38   Meloy, J.R. (2000). *Violence risk and threat assessment.* San Diego: Specialized Training Services.

39   Simons A. & Tunkel, R. (2014)

Whether verbal or written, concerning communications are challenging as those on the receiving end must assess sometimes ominously vague or nebulous verbiage. Such confusion can create doubt in the listener's mind as to the communicator's true intent toward violence.[40] As law enforcement agencies continue to remind bystanders if they "see something, say something" it becomes relevant to use this data (particularly regarding leakage behaviors) to lower the internal threshold for reporting, even in the face of ambiguous language. It is troubling to note that no bystanders reported instances of leakage to law enforcement, perhaps out of a fear of overreacting or perhaps due to a lack of understanding as to what law enforcement's response would be. This suggests that more robust efforts need to be made to educate bystanders (especially students and adolescents) on the nature of leakage and its potential significance.

# Limitations

The findings presented in this report reflect a thorough and careful review of the data derived almost exclusively from law enforcement records. Nevertheless, there are limitations to the study which should be kept in mind before drawing any conclusions based on the findings.

First, the Phase I study on which the present analysis is based included only a specific type of event. Shootings must have been (a) in progress in a public place and (b) law enforcement personnel and/or citizens had the potential to affect the outcome of the event based on their responses. The FBI acknowledges there is an inherent element of subjectivity in deciding whether a case meets the study criteria. Moreover, while every effort was made to find all cases between 2000 and 2013 which met the definition, it is possible that cases which should have been included in the study were not identified. Overall, as with the Phase I study, the incidents included in the Phase II study were not intended to and did not comprise all gun-related violence or mass or public shootings occurring between 2000 and 2013.

Second, although the FBI took a cautious approach in answering protocol questions and limited speculation by relying on identifiable data, there was some degree of subjectivity in evaluating which of the original 160 cases had sufficient data to warrant inclusion in the study.

Third, while reliance on official law enforcement investigative files was reasonable based on the study's objectives, the level of detail contained in these files was not uniform throughout and the FBI was not able to definitively answer all protocol questions for all subjects.

This is a purely descriptive study. With the exception of mental health and suicidal behaviors, the FBI did not make any comparisons to the general population or to criminals who were not active shooters. Therefore, we cannot postulate on the probability as to whether some of the behaviors and characteristics seen here would also have been seen in other populations. Furthermore, the FBI cautions readers to not treat the observed behaviors as having predictive value in determining if a person will become violent or not, as the findings and observations presented herein are not a "checklist" but instead are offered to promote awareness among potential bystanders and for consideration in the context of a thorough, holistic threat assessment by trained professionals. Future research may benefit from comparisons between those who completed active shooting attacks and those who planned to attack but were disrupted prior to the offense, and/or in comparison to those individuals who may have displayed concerning behaviors but had no true intent to commit an act of targeted violence.

---

40   The FBI noted that there were four cases where threats were made and someone notified law enforcement (out of 22 cases where a threat was made, or 14%)

# Conclusion

The ability to utilize case files (as compared to open-source documents) allowed the FBI to carefully examine both the internal issues experienced and the behaviors demonstrated by active shooters in the weeks and months preceding their attacks. What emerges is a complex and troubling picture of individuals who fail to successfully navigate multiple stressors in their lives while concurrently displaying four to five observable, concerning behaviors, engaging in planning and preparation, and frequently communicating threats or leaking indications of an intent to attack. As an active shooter progresses on a trajectory towards violence, these observable behaviors may represent critical opportunities for detection and disruption.

The information contained in this Phase II report can be utilized by myriad safety stakeholders. The successful prevention of an active shooting frequently depends on the collective and collaborative engagement of varied community members: law enforcement officials, teachers, mental health care professionals, family members, threat assessment professionals, friends, social workers, school resource officers…and many others. A shared awareness of the common observable behaviors demonstrated by the active shooters in this study may help to prompt inquiries and focus assessments at every level of contact and every stage of intervention.

While many dedicated professionals work to thwart active shootings, the FBI suspects that future active shooters themselves are looking for ways to avoid detection and maximize damage as they plan and prepare for their acts of violence. The prevention of these future attacks will depend on our ability to remain agile and recognize evolving pre-attack behaviors. To that end, the FBI continues to study active shooters to better inform all safety stakeholders and to support the development of sound threat mitigation strategies.

As tragically seen from current events, active shootings continue to impact our nation. The FBI hopes that the information contained in this Phase II study will help in efforts to promote safety across all communities.

# Appendix A:

## STRESSORS

**Abuse of illicit drugs or alcohol:** difficulties caused by the effects of drugs/alcohol and/or frustrations related to obtaining these substances.

**Civil legal problems:** being party to a non-trivial lawsuit or administrative action.

**Conflict with friends/peers:** general tension in the relationship beyond what is typical for the active shooter's age or specific instances of serious and ongoing disagreement.

**Conflict with other family members:** general tension in the relationship beyond what is typical for the active shooter's age, or specific instances of serious and ongoing disagreement.

**Conflict with parents:** general tension in the relationship beyond what is typical for the active shooter's age, or specific instances of serious and ongoing disagreement.

**Criminal legal problems:** arrests, convictions, probation, parole.

**Death of friend/relative:** death that caused emotional or psychological distress.

**Financial strain:** related to job loss, debt collection, potential or actual eviction, inability to pay normal and usual daily bills.

**Job-related problems:** ongoing conflicts with co-workers or management, pervasive poor performance evaluations, or disputes over pay or leave.

**Marital problems/conflict with intimate partner(s)/divorce or separation:** difficulties in the relationship that were a consistent source of psychological distress and/or which did or were likely to lead to the end of the relationship or the desire to end the relationship.

**Mental health problems:** symptoms of anxiety, depression, paranoia, or other mental health concerns that have a negative effect on daily functioning and/or relationships.

**Other:** any other circumstance causing physical, psychological, or emotional difficulties that interfere in a non-trivial way with normal functioning in daily life.

**Physical injury:** physical condition/injury that significantly interfered with or restricted normal and usual activities.

**School-related problems:** conflicts with teachers and staff that go beyond single instances of minor discipline; pervasive frustration with academic work; inability to follow school rules.

**Sexual stress/frustration:** pronounced and ongoing inability to establish a desired sexual relationship.

# Appendix B:

## CONCERNING BEHAVIORS

**Amount or quality of sleep:** unusual sleep patterns or noticeable changes in sleep patterns.

**Anger:** inappropriate displays of aggressive attitude/temper.

**Change, escalation, or contextually inappropriate firearms behavior:** interest in or use of firearms that appears unusual given the active shooter's background and experience with firearms.

**Changes in weight or eating habits:** significant weight loss or gain related to eating habits.

**Hygiene or personal appearance:** noticeable and/or surprising changes in appearance or hygiene practices.

**Impulsivity:** actions that in context appear to have been taken without usual care or forethought.

**Interpersonal interactions:** more than the usual amount of discord in ongoing relationships with family, friends, or colleagues.

**Leakage:** communication to a third-party of the intent to harm another person.

**Mental health:** indications of depression, anxiety, paranoia or other mental health concerns.

**Other:** any behavior not otherwise captured in above categories that causes more than a minimal amount of worry in the observer.

**Physical aggression:** inappropriate use of force; use of force beyond what was usual in the circumstances.

**Physical health:** significant changes in physical well-being beyond minor injuries and ailments.

**Quality of thinking or communication:** indications of confused or irrational thought processes.

**Risk-taking:** actions that show more than a usual disregard for significant negative consequences.

**School performance:** appreciable decrease in academic performance; unexplained or unusual absences.

**Sexual behavior:** pronounced increases or decreases in sexual interest or practices.

**Threats/Confrontations:** direct communications to a target of intent to harm. May be delivered in person or by other means (e.g., text, email, telephone).

**Use of illicit drugs or illicit use of prescription drugs:** sudden and/ recent use or change in use of drugs; use beyond social norms that interferes with the activities of daily life.

**Use or abuse of alcohol:** sudden and/or recent use or changes in use of alcohol; use beyond social norms that interferes with the activities of daily life.

**Violent media usage:** more than a usual age-appropriate interest in visual or aural depictions of violence.

**Work performance:** appreciable decrease in job performance; unexplained or unusual absences.



**U.S. Department of Justice**
Federal Bureau of Investigation