# Exhibit 1

Exhibit 1

0001



Content downloaded/printed from          *HeinOnline*

Tue Dec 31 13:54:07 2019

Citations:

Bluebook 20th ed.
William Blackstone. Commentaries on the Laws of England (1992).

ALWD 6th ed.
William Blackstone. Commentaries on the Ls of Engl& (1992).

APA 6th ed.
Blackstone, W. (1992). Commentaries on the Laws of England. Buffalo, N.Y. William S.
Hein Co, 1992. Originally published: Oxford, Clarendon Press.

Chicago 7th ed.
Blackstone William. Commentaries on the Laws of England. Buffalo, N.Y. : William S.
Hein & Co, 1992. Originally published: Oxford, Clarendon Press.

McGill Guide 9th ed.
William Blackstone, Commentaries on the Laws of England (Buffalo, N.Y. : William S.
Hein & Co, 1992. Originally published: Oxford: Clarendon Press., 1992)

MLA 8th ed.
Blackstone, William. Commentaries on the Laws of England. Buffalo, N.Y. : William S.
Hein & Co, 1992. Originally published: Oxford, Clarendon Press. HeinOnline.

OSCOLA 4th ed.
Blackstone, William. Commentaries on the Laws of England. Buffalo, N.Y. : William S.
Hein & Co, 1992. Originally published: Oxford, Clarendon Press.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



Exhibit 1

0002

# COMMENTARIES

## ON THE

# L A W S

## OF

# E N G L A N D.

## BOOK THE FIRST.

BY
WILLIAM BLACKSTONE, Esq.
VINERIAN PROFESSOR OF LAW,
AND
SOLICITOR GENERAL TO HER MAJESTY.

O X F O R D,
PRINTED AT THE CLARENDON PRESS.
M. DCC. LXV.

Exhibit 1

0003

# CONTENTS.

## INTRODUCTION.

SECT. I.

*On the* STUDY *of the* LAW.     Page 3.

SECT. II.

*Of the* NATURE *of* LAWS *in general.*     38.

SECT. III.

*Of the* LAWS *of* ENGLAND.     63.

SECT. IV.

*Of the* COUNTRIES *subject to the* LAWS *of* ENGLAND. 93.

## BOOK I.
## *Of the* RIGHTS *of* PERSONS.

CHAP. I.

*Of the absolute* RIGHTS *of* INDIVIDUALS. 117.

CHAP.

Exhibit 1

0004

# CONTENTS.

CHAP. II.

*Of the* PARLIAMENT.          142.

CHAP. III.

*Of the* KING, *and his* TITLE.     183.

CHAP. IV.

*Of the* KING's *royal* FAMILY.     212.

CHAP. V.

*Of the* COUNCILS *belonging to the* KING.  220.

CHAP. VI.

*Of the* KING's DUTIES.          226.

CHAP. VII.

*Of the* KING's PREROGATIVE.     230.

CHAP. VIII.

*Of the* KING's REVENUE.          271.

CHAP. IX.

*Of subordinate* MAGISTRATES.     327.

CHAP. X.

*Of the* PEOPLE, *whether* ALIENS, DENIZENS,
*or* NATIVES.               354.

CHAP.

Exhibit 1

0005

# CONTENTS.

CHAP. XI.

*Of the* CLERGY.                      364.

CHAP. XII.

*Of the* CIVIL STATE.                 384.

CHAP. XIII.

*Of the* MILITARY *and* MARITIME STATES.   395.

CHAP. XIV.

*Of* MASTER *and* SERVANT.            410.

CHAP. XV.

*Of* HUSBAND *and* WIFE.              421.

CHAP. XVI.

*Of* PARENT *and* CHILD.              434.

CHAP. XVII.

*Of* GUARDIAN *and* WARD.             448.

CHAP. XVIII.

*Of* CORPORATIONS.                    455.

Exhibit 1

0006

of all that he has tranfacted on his behalf, and muft anfwer for
all loffes by his wilful default or negligence. In order therefore
to prevent difagreeable contefts with young gentlemen, it has be-
come a practice for many guardians, of large eftates efpecially, to
indemnify themfelves by applying to the court of chancery, act-
ing under it's direction, and accounting annually before the offi-
cers of that court. For the lord chancellor is, by right derived
from the crown, the general and fupreme guardian of all infants,
as well as idiots and lunatics; that is, of all fuch perfons as have
not difcretion enough to manage their own concerns. In cafe
therefore any guardian abufes his truft, the court will check and
punifh him; nay fometimes proceed to the removal of him, and
appoint another in his ftead [p].

2. LET us next confider the ward, or perfon within age, for
whofe affiftance and fupport thefe guardians are conftituted by
law; or who it is, that is faid to be within age. The ages of
male and female are different for different purpofes. A male at
*twelve* years old may take the oath of allegiance; at *fourteen* is
at years of difcretion, and therefore may confent or difagree to
marriage, may choofe his guardian, and, if his difcretion be ac-
tually proved, may make his teftament of his perfonal eftate; at
*feventeen* may be an executor; and at *twenty one* is at his own
difpofal, and may aliene his lands, goods, and chattels. A female
alfo at *feven* years of age may be betrothed or given in marriage;
at *nine* is entitled to dower; at *twelve* is at years of maturity, and
therefore may confent or difagree to marriage, and, if proved to
have fufficient difcretion, may bequeath her perfonal eftate; at
*fourteen* is at years of legal difcretion, and may choofe a guardian;
at *feventeen* may be executrix; and at *twenty one* may difpofe of
herfelf and her lands. So that full age in male or female, is twenty
one years, which age is completed on the day preceding the anni-
verfary of a perfon's birth [q]; who till that time is an infant, and
fo ftiled in law. Among the antient Greeks and Romans *women*

[p] 1 Sid. 424. 1 P. Will. 703.            [q] Salk. 44. 625.

Exhibit 1

0007

were never of age, but subject to perpetual guardianship [r], unless when married, "*nisi convenissent in manum viri:*" and, when that perpetual tutelage wore away in procefs of time, we find that, in females as well as males, full age was not till twenty five years [s]. Thus, by the constitutions of different kingdoms, this period, which is merely arbitrary, and *juris positivi*, is fixed at different times. Scotland agrees with England in this point; (both probably copying from the old Saxon constitutions on the continent, which extended the age of minority "*ad annum vigefimum primum,* " *et eo usque juvenes sub tutelam reponunt* [t]") but in Naples they are of full age at *eighteen*; in France, with regard to marriage, not till *thirty*; and in Holland at *twenty five.*

3. I N F A N T S have various privileges, and various difabilities: but their very difabilities are privileges; in order to fecure them from hurting themfelves by their own improvident acts. An infant cannot be fued but under the protection, and joining the name, of his guardian; for he is to defend him againft all attacks as well by law as otherwife [u]: but he may fue either by his guardian, or *prochein amy*, his next friend who is not his guardian. This *prochein amy* may be any perfon who will undertake the infant's caufe; and it frequently happens, that an infant, by his *prochein amy*, inftitutes a fuit in equity againft a fraudulent guardian. In criminal cafes, an infant of the age of *fourteen* years may be capitally punifhed for any capital offence [w]: but under the age of *feven* he cannot. The period between *feven* and *fourteen* is fubject to much incertainty: for the infant fhall, generally fpeaking, be judged *prima facie* innocent; yet if he was *doli capax*, and could difcern between good and evil at the time of the offence committed, he may be convicted and undergo judgment and execution of death, though he hath not attained to years of puberty

---

[r] Pott. Antiq l. 4. c. 11. Cic. *pro Muren.* 12.

[s] *Inft.* 1. 23. 1.

[t] Stiernhook *de jure Sueonum. l. 2. c. 2.* This is alfo the period when the king, as well as the fubject, arrives at full age in modern Sweden. Mod. Un. Hift. xxxiii. 220.

[u] Co. Litt. 135.

[w] 1 Hal. P. C. 25.

or

Exhibit 1

0008

# Exhibit 2

Exhibit 2

0009

A

# DICTIONARY OF LAW

CONTAINING

DEFINITIONS OF THE TERMS AND PHRASES OF AMER-
ICAN AND ENGLISH JURISPRUDENCE,
ANCIENT AND MODERN

INCLUDING

THE PRINCIPAL TERMS OF INTERNATIONAL, CONSTITUTIONAL, AND COM-
MERCIAL LAW; WITH A COLLECTION OF LEGAL MAXIMS AND
NUMEROUS SELECT TITLES FROM THE CIVIL LAW
AND OTHER FOREIGN SYSTEMS

---

By HENRY CAMPBELL BLACK, M. A.

Author of Treatises on "JUDGMENTS," "TAX-TITLES," "CONSTITUTIONAL PROHIBITIONS," etc.

---

ST. PAUL, MINN.
WEST PUBLISHING CO.
1891

Exhibit 2
0010

KF
Bla
A c



COPYRIGHT, 1891,
BY
WEST PUBLISHING COMPANY.

THE dictionary now
to prepare a concise
and maxims used in
the working lawyer
history or comparativ
pilation of the body
nor attempt to supe
field of the English
construed by the cou
cyclopædic in its cha
comprehensive. Its
sought between its co
(within the compass
to the true function
tain nothing but the
the necessary terms.
tion of the present w
will be found to con
other. None is quit
include *all* these term

For the convenie
ment, as well as in i
found for numerous
and feudal law, and
of the modern inter
seemed necessary to i
Spanish, Scotch, and
adapt the work to th
of political or public
ing, and commerce,
law and forensic med
from the vernacular,
in statutes, have acqu
in laws or private doc
But the main body o
phrases used in mode

In searching for c
has carefully examine
ous states, and from
definitions thus enact
thoritative. Most; if
will be found under t
to definitions formula

Exhibit 2

0011

by human skill or fore-
...om natural causes, such
...ns, perils of the sea, in-
...quakes, or sudden death
...istible force is meant an
...man agency, from its nat-
...utely uncontrollable. 11

...sed in the civil law, this
...ymous with "fortuitous

...s where a vessel is pursuing
... a lawful manner, using the
...gainst danger, and an acci-
...hest degree of caution that
...ired. It is enough that it is
... circumstances; such as is
...and has been found by long
...cient to answer the end in
...life and property. 7 Wall.

...is only when the disaster
... causes, without negligence
...and when both parties have
...means in their power, with
...and with a proper display of
...ent the occurrence of the ac-

A guard; a watchman.

...S. In old English law.
...sands, or sea-shore. A
...ent mentioned in Heng-

...t. Infamy; ignominy or

...s meant infamy established
...nce of crime; *infamia facti*
...upposed to be guilty of such
... been judicially proved. 17

... In Roman law. A
...eputation was diminished
...of some of the rights of
...n account of his infamous
...e of conviction for crime.
...v, § 135.

...RIME. A crime which
...n one who has committed

...is"—4. *e.*, without fame or
...plied at common law to cer-
...conviction of which a person
...o testify as a witness, upon
...on would not commit so hein-
...was so depraved as to be un-
...ese crimes are treason, fel-
...*alsi.* Abbott.

...ble by imprisonment in
...r penitentiary, with or
...r, is an infamous crime,
...n of the fifth amendment

of the constitution that "no person shall be
held to answer for a capital or otherwise in-
famous crime unless on a presentment or in-
dictment of a grand jury." 117 U. S. 348,
6 Sup. Ct. Rep. 777.

"Infamous," as used in the fifth amendment to
the United States constitution, in reference to
crimes, includes those only of the class called
"*crimen falsi*," which both involve the charge of
falsehood, and may also injuriously affect the pub-
lic administration of justice by introducing false-
hood and fraud. 15 N. B. R. 335.

By the Revised Statutes of New York the term
"infamous crime," when used in any statute, is
directed to be construed as including every offense
punishable with death or by imprisonment in a
state-prison, and no other. 2 Rev. St. (p. 702, § 31,)
p. 587, §32.

**INFAMY.** A qualification of a man's
legal *status* produced by his conviction of an
infamous crime and the consequent loss of
honor and credit, which, at common law,
rendered him incompetent as a witness, and
by statute in some jurisdictions entails other
disabilities.

**INFANCY.** Minority; the state of a
person who is under the age of legal majority,
—at common law, twenty-one years. Ac-
cording to the sense in which this term is
used, it may denote the condition of the per-
son merely with reference to his years, or
the contractual disabilities which non-age en-
tails, or his *status* with regard to other pow-
ers or relations.

**INFANGENTHEF.** In old English law.
A privilege of lords of certain manors to judge
any thief taken within their fee.

**INFANS.** In the civil law. A child un-
der the age of seven years; so called "*quasi
impos fandi*," (as not having the faculty of
speech.) Cod. Theodos. 8, 18, 8.

Infans non multum a furioso distat.
An infant does not differ much from a luna-
tic. Bract. l. 3, c. 2, § 8; Dig. 50, 17, 5, 40;
1 Story, Eq. Jur. §§ 223, 224, 242.

**INFANT.** A person within age, not of
age, or not of full age; a person under the
age of twenty-one years; a minor. Co. Litt.
171b; 1 Bl. Comm. 463–466; 2 Kent, Comm.
233.

**INFANTIA.** In the civil law. The pe-
riod of infancy between birth and the age of
seven years. Calvin.

**INFANTICIDE.** The murder or killing
of an infant soon after its birth. The fact
of the birth distinguishes this act from "fœti-
cide" or "procuring abortion," which terms

denote the destruction of the *fœtus* in the
womb.

**INFANTS' MARRIAGE ACT.** The
statute 18 & 19 Vict. c. 43. By virtue of
this act every infant, (if a male, of twenty, or,
if a female, of seventeen, years,—section 4,)
upon or in contemplation of marriage, may,
with the sanction of the chancery division of
the high court, make a valid settlement or
contract of a settlement of property. Whar-
ton.

**INFANZON.** In Spanish law. A per-
son of noble birth, who exercises within his
domains and inheritance no other rights and
privileges than those conceded to him. Es-
criche.

**INFEFT.** In Scotch law. To give seisin
or possession of lands; to invest or enfeoff.
1 Kames, Eq. 215.

**INFEFTMENT.** In old Scotch law.
Investiture or infeudation, including both
charter and seisin. 1 Forb. Inst. pt. 2, p.
110.

In later law. *Saisine*, or the instrument
of possession. Bell.

**INFENSARE CURIAM.** An expres-
sion applied to a court when it suggested to
an advocate something which he had omitted
through mistake or ignorance. Spelman.

**INFEOFFMENT.** The act or instru-
ment of feoffment. In Scotland it is synony-
mous with "*saisine*," meaning the instru-
ment of possession. Formerly it was synon-
ymous with "investiture." Bell.

**INFERENCE.** In the law of evidence.
A truth or proposition drawn from another
which is supposed or admitted to be true. A
process of reasoning by which a fact or prop-
osition sought to be established is deduced as
a logical consequence from other facts, or a
state of facts, already proved or admitted.

An inference is a deduction which the rea-
son of the jury makes from the facts proved,
without an express direction of law to that
effect. Code Civil Proc. Cal. § 1958.

**INFERENTIAL.** In the law of evi-
dence. Operating in the way of inference;
argumentative. Presumptive evidence is
sometimes termed "inferential." 4 Pa. St.
272.

**INFERIOR.** One who, in relation to an-
other, has less power and is below him; one
who is bound to obey another. He who
makes the law is the superior; he who is

Exhibit 2

0012

# Exhibit 3

Exhibit 3

0013

**College of William & Mary Law School**
**William & Mary Law School Scholarship Repository**

2016

# Adulthood in Law and Culture

Vivian E. Hamilton
*William & Mary Law School*, vhamilton@wm.edu

Repository Citation

Hamilton, Vivian E., "Adulthood in Law and Culture" (2016). *Faculty Publications*. 1824.
https://scholarship.law.wm.edu/facpubs/1824

Copyright c 2016 by the authors. This article is brought to you by the William & Mary Law School Scholarship Repository.
https://scholarship.law.wm.edu/facpubs

Exhibit 3

0014

# Adulthood in Law and Culture

## Vivian E. Hamilton[*]

    *Young people today come of age in a cultural and economic milieu that prolongs their attainment of the traditional markers of adulthood. Their subjective conceptions of the transition to adulthood also depart radically from the traditional conception, with its emphasis on discrete transition events (including marriage and entry into the workforce). Instead, the modern transition to adulthood is a gradual process comprising the acquisition of general capabilities, rather than the achievement of externally constructed events. The state-established age of legal majority stands in marked contrast to this gradual and prolonged process. Not only does it categorically establish the inception of adult status, but states in the mid-twentieth century adopted laws lowering statewide ages of majority from twenty-one to eighteen.*

    *Setting legal adulthood at eighteen fails to accord with the trajectory of individual development, the time needed to acquire the skills and education demanded of individuals in the modern labor market, and even the social experiences of young people coming of age in modern America. In other words, the legal construction of adulthood is starkly at odds with its social and cultural constructions.*

    *Moreover, we now understand that young people reliably attain different capacities at distinct stages of development. Thus across a range of policymaking contexts, any categorical rule will fail to take account either of context-specific capacities or deficiencies. The core commitments of the liberal democratic state, however, require it to extend to individuals those rights which they have attained the capacity to exercise—in other words, to recognize and account for context-specific capacities.*

    *An ever-growing number of exceptions to the age of majority confirms its diminishing utility as a presumptive marker of adult capacity. Abandoning altogether the presumptive age of legal majority in favor of context-specific rules advances the state's liberal ends and better aligns the legal and socio-cultural constructions of adulthood. The developmental and behavioral sciences can and should supplement more traditional policymaking considerations. Finally, existing law, already rife with exceptions to the age of majority, demonstrates that context-specific decision making imposes no undue burden on lawmakers.*

I.     Introduction...............................................................................57
II.    The Legally Constructed Status of Adulthood.............61
     A.    *The Age of Majority: A Brief History* ...........................63
     B.    *Legal Effects of Majority: An Overview* .......................66
         1.    Disentitlement to Parental and/or State Support ........66
         2.    Freedom from Parental Authority ...............................68
         3.    Contract Rights ...........................................................70
         4.    The Right to Full Labor Market Participation............73
         5.    The Right to Political and Civic Participation............74

    *    © 2016 Vivian E. Hamilton. Cabell Research Professor of Law, William & Mary School of Law. B.A. Yale College, J.D. Harvard Law School. For helpful comments on earlier drafts, I am grateful to James Dwyer, Rebecca Green, and Elizabeth Scott. For their excellent research assistance, I am grateful to Brandi Smith, James Young, and John Tyler Carver.

Exhibit 3

0015

      6.   The Right to Medical and Procreative Choice ........... 75
   *C.   Exceptions to the Age of Majority* ................................ 76
        1.   Contract Rights, Labor Market Participation,
           and the Right to Medical and Procreative
           Choice (Redux) .......................................................... 77
        2.   Giving Sexual Consent ............................................... 77
        3.   The Right To Drive ..................................................... 78
        4.   The Right To Purchase, Possess, and Consume
           Alcohol ....................................................................... 78
        5.   Continued Entitlement to Parental Support and
           Benefits ...................................................................... 79
III.  ADULTHOOD DEINSTITUTIONALIZED ........................................... 80
   *A.   Structural Influences on the Transition to
      Adulthood* ....................................................................... 80
   *B.   Socio-Cultural Conceptions of Modern
      Adulthood* ....................................................................... 84
   *C.   Cognitive and Socio-Emotional Development
      from Adolescence Through Emerging and Early
      Adulthood* ....................................................................... 87
IV.  DISMANTLING THE CATEGORICAL AGE OF MAJORITY ................. 90
   *A.   Context-Specific Competence* ........................................ 91
        1.   Individual Competence and Core
           Commitments of the Liberal Democratic State ......... 91
        2.   Adult Status, Autonomy, and Relationship ................ 93
   *B.   Assessing Capacity: Lessons from Existing Law
      and Science* ................................................................... 94
   *C.   Reconciling Law, Culture, and Capacity: An
      Example* ......................................................................... 95
V.  CONCLUSION ............................................................................. 96

> The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. . . . [H]owever, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.[1]
>
> —*Roper v. Simmons*, 543 U.S. 551, 574 (2005)

---

    1.    The *Roper* Court went on to hold that age eighteen is "the age at which the line for death eligibility ought to rest." Roper v. Simmons, 543 U.S. 551, 574 (2005). Several years after *Roper*, the Court held that juveniles convicted of nonhomicide offenses could not be sentenced to life without the possibility of parole. Graham v. Florida, 560 U.S. 48 (2010). Most recently, the Court held that juveniles convicted of crimes, including murder, could not be subjected to sentencing schemes that mandated sentences of life without the possibility of parole. Miller v. Alabama, 132 S. Ct. 2455 (2012).

Exhibit 3

0016

I.   INTRODUCTION

The age of majority is the gateway to adult legal status, presumptively converting legal incapacity to capacity.[2]  Young people attaining adult legal status will, for example: lose the presumptive entitlement to parental support; lose the ability to disavow contracts due to age-based incapacity; gain the ability to participate in civic and political life; and, if convicted of a serious-enough criminal offense, become susceptible to sentences of life imprisonment or death.[3]

Today, the near universal U.S. age of majority is eighteen, but it has historically fluctuated from the mid-teens to the mid-twenties both here and abroad.[4]  Fluctuations in the age of majority have generally accorded with changes in the nature of the capacities required of society's adult citizens and the age by which individuals tend to attain those capacities.[5]  Historically, young people have crossed the legal— and social—threshold to adulthood upon gaining the capacities to perform the types of work required of a given time and place, to bear arms and fight on behalf of the state, and/or to form and support a family.

The U.S. age of majority was lowered from twenty-one to eighteen, however, for reasons quite unrelated to capacity.[6]  Yet research across disciplines demonstrates that setting the age of majority at eighteen fails to accord with the trajectory of individual development, the time necessary to acquire the skills and abilities demanded of individuals in the modern labor market and broader socio-economic context, and even the social experiences of young people coming of age in modern American culture.   The legal construction of adulthood is thus starkly at odds with the social meaning and experiences of adulthood.

Neither raising nor lowering the age of majority will redress its deficiencies.   Instead, individuals predictably acquire different capabilities across the course of their development and exercise them

---

2.     *See* discussion *infra* subpart II.B; *see also, e.g.*, CAL. FAM. CODE § 6501 (West 1992) ("An adult is an individual who is 18 years of age or older."); VA. CODE ANN. § 1-204 (2005) ("For the purposes of all [Virginia] laws . . . unless an exception is specifically provided in this Code, a person shall be an adult, shall be of full age, and shall reach the age of majority when he becomes 18 years of age."); Elizabeth S. Scott, *The Legal Construction of Adolescence*, 29 HOFSTRA L. REV. 547, 559 (2000) ("Currently, legal adulthood begins at age eighteen.").

3.     *See* discussion *infra* subpart II.B.

4.     *See* discussion *infra* subpart II.A.

5.     *See* discussion *infra* subpart II.A.

6.     *See* discussion *infra* subpart II.A.

Exhibit 3

0017

with varying levels of competence in different contexts.[7]  Thus, while eighteen is a singularly inapt age at which to set majority across virtually every legal context to which it applies, I argue that *no* categorical age of majority can reliably capture the context-specific acquisition of various capacities.

The inadequacy of the categorical age of majority is reflected in the ever-growing number of exceptions to it.  These exceptions aim to adapt rules to better conform to the needs of society and capacities (or incapacities) of young people.  The exceptions have historically tended towards extending rights to individuals younger than the age of majority.  Thus young people will have exercised many of the rights technically reserved to adults—entering contracts, deciding medical treatment, even marrying—long before reaching adult status.[8]

Increasingly, however, legal exceptions extend rules that once applied strictly to minors to individuals past the age of majority.[9]  In doing so, these exceptions to presumptive majority recognize that most young individuals will enter adulthood unready to assume some of the most significant attributes of their new status, such as the financial self-sufficiency intimated by adults' legal disentitlement to parental support.

For most young adults, financial dependency will instead continue well into their adult years.  For the first time in over a century, more adults aged eighteen to thirty-four live in their parents' house than in any other living arrangement.[10]  The Federal Dependent Coverage Mandate, part of the Patient Protection and Affordable Care Act (ACA), is but one example of this type of legally mandated exception.  The ACA expanded the availability of health insurance for young adults by allowing those aged nineteen to twenty-six to remain covered as dependents under their parents' plans.[11]  In doing so, it

---

7.       *See, e.g.*, Paul Arshagouni, *"But I'm an Adult Now . . . Sort of": Adolescent Consent in Health Care Decisionmaking and the Adolescent Brain*, 9 J. HEALTH CARE L. & POL'Y 315, 360 (2006); *see also* discussion *infra* subpart III.C (discussing exceptions to the age of majority).

8.       *See* discussion *infra* subpart II.C.

9.       *See* discussion *infra* subpart II.C.5.

10.      Richard Fry, *For First Time in Modern Era, Living with Parents Edges Out Other Living Arrangements for 18- to 34-Year-Olds*, PEW RES. CTR. 4 (May 24, 2016), http://www.pewsocialtrends.org/files/2016/05/2016-05-24_living-arrangemnet-final.pdf.

11.      Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of 42 U.S.C.).

Exhibit 3

0018

highlights the ongoing dependence that now characterizes the early years of adulthood.[12]

Scholars and jurists alike have critiqued the body of law affecting young people as lacking coherence.[13] Much of the criticism focuses on the challenges posed by attaching different legal consequences to different ages. Our collection of laws is indeed flawed, but these critics miss the mark. Instead, individuals acquire different capabilities across the course of their development and exercise them with varying levels of competence in different contexts.[14]

Some scholars have argued for exceptions to the age of majority in specific legal contexts. These arguments have included, for example, extending the entitlement to child support[15] or foster care[16] beyond the age of majority and extending the right to make certain medical or procreative decisions without adult intervention to individuals who have not yet attained majority.[17] Others have argued against the presumption of incapacity of minors (children[18] or adolescents[19]) in favor of presumed capacity, with some arguing for the recognition of the variable capacities of minors at different ages.[20]

This Article diverges from earlier critiques in its call for dismantling altogether the age of majority—thus doing away with the conception of adulthood as a distinct legal status. The core

---

12. *Id.* The ACA, sometimes referred to as "Health Reform" or "Obamacare," is a major federal health reform measure aiming to make healthcare coverage universal and affordable.

13. *See, e.g.*, Roper v. Simmons, 543 U.S. 551 (2005) (Scalia, J., dissenting) (criticizing differences in the legal treatment of adolescents in the abortion and juvenile justice contexts); Jonathan Todres, *Maturity*, 48 HOUS. L. REV. 1107, 1109-10 (2012) (arguing that by approaching "the concept of maturity in a piecemeal and issue-specific fashion," the law has developed "a legal construct of maturity that is anything but consistent or coherent").

14. *See, e.g.*, Arshagouni, *supra* note 7; *see also* discussion *infra* subpart III.C (discussing cognitive and socio-emotional development).

15. *See* Monica Hof Wallace, *A Federal Referendum: Extending Child Support for Higher Education*, 58 U. KAN. L. REV. 665, 666 (2010).

16. *See* Keely A. Magyar, *Betwixt and Between but Being Booted Nonetheless: A Developmental Perspective on Aging Out of Foster Care*, 79 TEMP. L. REV. 557, 558 (2006).

17. *See* J. Shoshanna Ehrlich, *Shifting Boundaries: Abortion, Criminal Culpability and the Indeterminate Legal Status of Adolescents*, 18 WIS. WOMEN'S L.J. 77, 91 (2003).

18. *See* Hillary Rodham, *Children's Rights: A Legal Perspective, in* CHILDREN'S RIGHTS: CONTEMPORARY PERSPECTIVES 21, 33 (Patricia A. Vardin & Ilene N. Brody eds., 1979); Henry H. Foster & Doris Jonas Freed, *Needed: A Bill of Rights for Children*, STUDENT LAW., Oct. 1973, at 22, 55.

19. *See* Rhonda Gay Hartman, *Adolescent Autonomy: Clarifying an Ageless Conundrum*, 51 HASTINGS L.J. 1265, 1362 (2000).

20. *See* Rodham, *supra* note 18; Foster & Freed, *supra* note 18.

Exhibit 3

0019

commitments of the liberal democratic state require extending to individuals the right to exercise those self-regarding capacities of which they are capable. That end calls for adopting context-specific rules informed by insights from the social and developmental sciences, which can help explain the development of capabilities and their exercise in different contexts.

Jettisoning the presumptive age of majority in law would have the secondary benefit of eroding what has become the cultural archetype of adulthood. Studies have revealed that young people conceive of the adult status as a state of individualism and independence.[21] It is a normative construction that not only undermines the importance of community but is also markedly incongruent with the ongoing dependence typical of today's young adults.

Part II sets the age of majority in historical and legal contexts. Insights from social history and anthropology help explain cultural and structural factors that influence adult status and the conception of adulthood. This Part thus describes the legal construction of adulthood and how the line between minority and adulthood came to be drawn at age eighteen. It demonstrates that setting the age of majority at eighteen was an ill-conceived move set in motion by the wartime need to lower the draft age and facilitated by what was a subsequent historical aberration—the rapid transition to adulthood that occurred during a postwar industrial economy that enabled young people with few skills to earn high wages, thereby enabling them to marry and establish households at young ages.

The legal construction of adult status is starkly at odds with the modern social meaning and experiences of adulthood. Part III provides a social history of the transition to adulthood and describes the sociocultural construction of modern adulthood. Young people today conceive of adulthood differently than they have in the past. They come of age in a cultural and economic context that prolongs their achievement of certain traditional markers of adulthood. For example, in a service-based postindustrial economy, the vast majority of well-paying jobs require some postsecondary education or training. Individuals achieve financial independence, marriage, and parenthood a full decade or more after reaching legal adult status. Along with insights from the developmental sciences into relevant aspects of development from adolescence through early adulthood, this survey

---

21.    *See* discussion *infra* Part IV.

Exhibit 3

0020

makes plain the incongruence between adult status as constructed by U.S. law and adult status as conceptualized and experienced by individuals.

Part IV argues that the disjunction between social and legal constructions of adulthood harms individuals and contravenes the core commitments of the liberal democratic state. It proposes that lawmakers implement fully what they have already begun to implement piecemeal—abandoning the presumptive age of legal majority and adopting legal rules that account for the context-specific acquisition of capabilities. It argues that today's lawmakers would be remiss to ignore relevant and readily available research across the social and developmental sciences, in addition to more traditional policy considerations. Indeed, some legislators, jurists, and legal scholars have begun to consider the implications of some of this research.[22]

The age of majority is a construct that has quite lost any social or legal utility it may have once had, and it should thus be abandoned. The remainder of this Article examines it, details its flaws, and proposes a principled and pragmatic alternative to it.

## II.   THE LEGALLY CONSTRUCTED STATUS OF ADULTHOOD

Sir Henry Maine's observation about the movement away from status in progressive societies may hold true as a general matter across legal realms, but counterexamples abound.[23] In law, "status" denotes a group sharing some set of attributes that justifies its membership being governed by a common set of rules.[24] Legal statuses can thus facilitate the efficient functioning of a complex society. "Corporation,"

---

22. *See, e.g.*, Roper v. Simmons, 543 U.S. 551, 574 (2005) (holding unconstitutional the imposition of the death penalty for crimes committed by an offender younger than age eighteen). Almost entirely ignored, however, though particularly useful in the legislative contexts which are this Article's primary focus, are the contributions of behavioral decision research. This research offers a framework and methods for studying and assessing decision-making competence and accounts for both individual and situational variability. Baruch Fischhoff, *Assessing Adolescent Decision-Making Competence*, 28 DEVELOPMENTAL REV. 12, 13 (2008).

23. HENRY SUMNER MAINE, ANCIENT LAW: ITS CONNECTION WITH THE EARLY HISTORY OF SOCIETY AND ITS RELATION TO MODERN IDEAS 165 (5th ed. 1873) ("[T]he movement of the progressive societies has hitherto been a movement *from Status to Contract*."); *see also* Vivian Hamilton, *Principles of U.S. Family Law*, 75 FORDHAM L. REV. 31, 38–41 (2006) (discussing the resistance to change of certain aspects of the marital status).

24. "Status" in the legal context is defined as "[t]he fact or position of belonging to a group which is subject to certain legal rights or limitations." *Status*, OXFORD ENGLISH DICTIONARY (3d ed. 2012).

Exhibit 3

0021

"marriage," and "minor," for example, are all legal statuses defined and governed by distinct sets of legal rules. "Adult" is another.

Like the law generally, statuses shape and are shaped over time by social forces. Their meanings can be at once legally and socially constructed, and they thus evolve along with changing social circumstances. The status of "wife," for example, once comprised the near total legal incapacity imposed by the doctrine of coverture.[25] Social pressure led to the revising of the status through the repeal of coverture with states' adoption of Married Women's Property Acts and eventually to the formal equality of wives and husbands.[26]

Childhood and adulthood are also socially and legally constructed statuses whose meanings have varied dramatically over time and across cultures.[27] Despite what may appear to be the inevitability of our current binary classification system, in which individuals are either minors or adults, the progression from childhood to adulthood is fluid and not readily amenable to biological definition.[28] Instead, structural (e.g., legal and economic norms) and cultural (e.g., social norms) changes have influenced the course and timing of individuals' transitions to adulthood.

The age of majority has historically fluctuated depending on the capacities required of adults at different times and places. It has also varied according to the capacities required of different social roles that young individuals were destined to fill. In Medieval England, for example, the age of majority for English males destined for the military status of knighthood was twenty-one, before which they would not have completed the training nor gained the strength required of them. However, young men destined for agricultural life attained adult status at the significantly younger age of fifteen, by which they would have gained the capacity to engage in agricultural

---

25. NANCY F. COTT, PUBLIC VOWS: A HISTORY OF MARRIAGE AND THE NATION 10-12 (2000).

26. *See, e.g.*, NORMA BASCH, IN THE EYES OF THE LAW: WOMEN, MARRIAGE, AND PROPERTY IN NINETEENTH-CENTURY NEW YORK 158-59 (1982). Marital status itself, moreover, continues to evolve, most recently when the Supreme Court held that same-sex couples have a constitutional right to marry. *See* Obergefell v. Hodges, 135 S. Ct. 2584, 2608 (2015).

27. *See, e.g.*, BARBARA BENNETT WOODHOUSE, HIDDEN IN PLAIN SIGHT: THE TRAGEDY OF CHILDREN'S RIGHTS FROM BEN FRANKLIN TO LIONEL TATE 26 (2008) ("The timing of transition from childhood to adulthood is strongly influenced by issues of class and culture as well as by issues of race and gender."); Annette Ruth Appell, *The Pre-Political Child of Child-Centered Jurisprudence*, 46 HOUS. L. REV. 703, 706 (2009) (arguing that childhood is a "socially constructed category deeply connected to race, gender, class, and citizenship").

28. *See* Scott, *supra* note 2, at 548.

Exhibit 3

0022

work.[29]  The following subparts survey the historical evolution of the legal age of majority, significant aspects of the modern construction of the legal status, and exceptions to that presumptive legal status.

## A.    *The Age of Majority: A Brief History*

Early Roman law set the age of majority at the age by which individuals would presumably have attained the intellectual capacities required to exercise full citizenship, manage their affairs, and become parents and the heads of families themselves—age fifteen for males.[30] But while the onset of puberty may have signaled the physical capacity to become parents, the Romans apparently believed that it failed to coincide with young males' attainment of full intellectual maturity.  Accordingly, Roman law placed free males who were technically "of full years and rights" under the temporary guardianship of adults known as *Curatores*.[31]  A *Curator's* approval was required to validate young males' formal acts or contracts until they reached twenty-five years of age.[32]  Indeed, Roman law used the terms "minority" and "majority" in reference, not to age fifteen, but instead to age twenty-five—the age of *plenam maturitatem, or full maturity*.[33]

Throughout other parts of Europe, the attainment of physical capacity—particularly the ability to participate in warfare— determined legal maturity.[34]  The age of majority between the ninth and eleventh centuries was fifteen for males.[35]  When the nature of warfare changed during the Middle Ages so did the age of majority.[36] The increasing weight of defensive armor and growing use of mounted cavalry required both greater strength and skill on the part of the English knights who fought on behalf of the crown.[37]  The age of

---

29.    T.E. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. 22, 30 (1960).

30.    MAINE, *supra* note 23, at 155; James, *supra* note 29, at 25.

31.    MAINE, *supra* note 23, at 156.

32.    *Id.* at 156-57.

33.    *Id.* at 156; James, *supra* note 29, at 33.

34.    James, *supra* note 29, at 25.  The age of majority freed an individual from the wardship or tutelage of his adult guardian, entitled him to marry, and required him to claim his inheritance.  *Id.* at 30-31.

35.    *Id.* at 24-25.  Historians have noted that, while fifteen was the age of majority in ninth- and tenth-century France, Germany, and northern Europe, there is no "clear authority" that it was also the English age of majority during that time.  They consider it reasonable to assume, however, that it was.  *Id.* at 26-27.

36.    *Id.*

37.    *Id.* at 27; *see also* 2 WM. A. SHAW, THE KNIGHTS OF ENGLAND (1906) (listing knights by year in which they were dubbed).

Exhibit 3

0023

eligibility for knighthood (the equivalent of the age of majority at the time) increased to twenty-one, by which age young men would have gained the strength and completed the training required of those who fought in the heavy cavalry.[38]

Not all English males were destined for the honor of military tenure. Socage tenure, for example, was an agricultural status held by tenants who worked the land of feudal lords to whom they owed rent.[39] The requisite capacities for those who held this status were the abilities to farm and conduct their "rustic employs."[40] The age of majority for socage tenants seems to have originally been fourteen, though it was later raised to fifteen by local custom.[41]

Perhaps unsurprisingly, the age required for the elite status of knighthood was the age whose imprint would endure.[42] English historical and common law traditions became law throughout the British Commonwealth.[43] Twenty-one remained the age of majority for centuries in England, as well as throughout much of the Western world and nations that incorporated English traditions.[44]

The immediate historical origins of the U.S. age of majority lie in the English common law tradition.[45] The American colonies, then the United States, adopted age twenty-one as the near universal age of majority.[46] The U.S. age of majority remained unchanged from the country's founding well into the twentieth century. In 1942 wartime needs prompted Congress to lower the age of conscription from twenty-one to eighteen, a change that would eventually lead to the lowering of the age of majority generally.[47]

For a period of years following the lowering of the draft age to eighteen, the voting age (and the general age of majority) remained twenty-one. The obligation of military service, however, has long

---

38.     *See* James, *supra* note 29, at 28.

39.     *Id.* at 30.

40.     *Id.*

41.     *Id.* at 29-30.

42.     *Id.* at 33.

43.     *See* Wendell W. Cultice, Youth's Battle for the Ballot: A History of Voting Age in America 72 (1992).

44.     James, *supra* note 29, at 22, 33.

45.     *See id.* at 25-26.

46.     Donald Grier Stephenson, Jr., The Right To Vote: Rights and Liberties Under the Law 248 (2004).

47.     *See* Cultice, *supra* note 43, at 7, 20; *see also* Vivian E. Hamilton, *Democratic Inclusion, Cognitive Development, and the Age of Electoral Majority*, 77 Brook. L. Rev. 1447, 1461-62 (2012) [hereinafter Hamilton, *Democratic Inclusion*] (discussing the influence of the Second World War on public sentiment and Congress' initiative to lower the voting age to eighteen).

Exhibit 3

0024

been linked to the right to political participation.[48] Thus Congressional debates to subject eighteen-year-olds to the draft were soon followed by proposals to also extend to eighteen-year-olds the right to vote.[49] These proposals led to the eventual passage of the Twenty-Sixth Amendment in 1971, lowering the voting age to eighteen in both state and federal elections.[50]

Once eighteen had become the age of conscription and of the franchise, it began to replace twenty-one across a range of contexts and has been adopted as the near universal age of majority.[51] Forty-four states have adopted eighteen as the presumptive age of legal majority.[52] Six have set their ages of majority higher, with five states setting it at nineteen and one at twenty-one.[53]

Eighteen has thus become firmly entrenched as the presumptive age of majority, replacing in just a few decades its centuries-old predecessor. Its widespread adoption notably reflected a desire for a certain sort of consistency rather than a widely held consensus that young people reached maturity or generally attained adult-like capabilities before age twenty-one.

The impetus for lowering the age of majority, of course, was the immediate need for large numbers of soldiers to participate in U.S. wartime efforts. Although having less to do with maturity of judgment than with physical maturity, other age-based limitations previously imposed on young people between eighteen and twenty fell alongside the age of conscription. The following subpart briefly describes some of the more significant of the legal changes that currently accompany the attainment of the age of majority.[54]

---

48. AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 19 (2005) ("In classic republican theory, the rights of collective self-government stood shoulder to shoulder with the responsibilities of collective self-defense."); *see* ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 36 (2000).

49. CULTICE, *supra* note 43, at 22.

50. U.S. CONST. amend. XXVI, § 1 ("The right of citizens . . . eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.").

51. *Termination of Support—Age of Majority*, NAT'L CONF. ST. LEGISLATURES, http://www.ncsl.org/research/human-services/termination-of-child-support-age-of-majority.aspx (last updated Mar. 2015) (listing statutory citations for the ages of majority of each U.S. state and territory).

52. *Id.*

53. *Id.*

54. For more exhaustive discussions of the effects of majority, see Larry Cunningham, *A Question of Capacity: Towards a Comprehensive and Consistent Vision of Children and Their Status Under Law*, 10 U.C. DAVIS J. JUV. L. & POL'Y 275, 285-364 (2006); Todres, *supra* note 13, at 1121-41.

Exhibit 3

0025

## B.   *Legal Effects of Majority: An Overview*

Today, the legal age of majority reflects a presumption that typical individuals of that age are "mature enough to function in society as adults, to care for themselves, and to make their own self-interested decisions."[55]  Every state has adopted a legal age of majority through various legislative or judicial measures.[56]

Designated statutory provisions establishing statewide ages of majority, for example, generally provide that upon reaching the established age, a person "shall be an adult for all purposes whatsoever and have the same legal capacity, rights, powers, privileges, duties, liabilities and responsibilities."[57]  Some states have adopted an age of majority indirectly, usually through statutory provisions that establish the age at which parents' duty of support presumptively terminates.[58]  Finally, common and statutory law frequently address more directly other age-related laws—both those that comport with the age of majority and those that act as exceptions to it.  The following subparts briefly identify some of the more significant of the civil effects that attend the age of majority.

### 1.   Disentitlement to Parental and/or State Support

There is a strong presumption that a young person's entitlement to parental support ends at majority, generally age eighteen.[59]  A number of states allow the extension of support orders past eighteen if a child is enrolled in but has not yet graduated from high school.[60]

Similarly, young people presumptively age out of foster care once they turn eighteen or, in some states, nineteen.[61]  Some states provide for continuing foster care past age eighteen when the young person is enrolled in some sort of educational or rehabilitative program.[62]  Others give their courts discretion to determine whether to

---

55.    Scott, *supra* note 2.

56.    *See, e.g., id.*

57.    *See, e.g.,* CONN. GEN. STAT. § 1-1d (2015) (lowering the statewide age of majority from twenty-one to eighteen).

58.    *See, e.g., id.*

59.    *Termination of Support—Age of Majority, supra* note 51.  Forty-four states set the age of majority at eighteen.  *Id.*

60.    *See, e.g., id.*  For example, twenty-four states will allow the extension of support orders to age nineteen if certain conditions are met; some other states permit extensions beyond nineteen.  *Id.*

61.    *See* Magyar, *supra* note 16, at 564-73.

62.    The states include Arkansas, Connecticut, Massachusetts, Pennsylvania, South Carolina, South Dakota, and Tennessee.  *See* ARK. CODE ANN. § 9-27-306(a)(1)(B)(ii) (2016); CONN. GEN. STAT. § 17a-93(1) (2015); MASS. GEN. LAWS ch. 119, § 23(f) (2016); 42

Exhibit 3

0026

continue state custody past age eighteen based on factors that can include the young person's best interests or need for services.[63]  Only a few states' statutes explicitly provide for retaining custody for the purpose of helping a young person successfully transition to independence.[64]  Dedicated federal funds exist to help states provide foster care only to individuals younger than eighteen and eighteen-year-olds enrolled in high school who will likely graduate before their nineteenth birthdays.[65]

By ending parental and state support obligations at majority, the law treats those who are aged eighteen and over or who have completed a high school education as capable of financial independence and responsible for their own financial support.[66]  A high school education may in previous decades have enabled financial self-sufficiency, but as Part IV demonstrates, high school alone rarely suffices.  In the modern economy, well-paying jobs providing the opportunity for middle-class living typically require postsecondary education or training.[67]  The legal effects of the age of majority operate to leave high school graduates without parental support before allowing them a sufficient opportunity to attain financial security.  In doing so, the age of majority both disserves young people and ineffectively meets the workforce needs of the employers that drive the nation's economy.

---

PA. CONS. STAT. § 6302 (2016); S.C. CODE ANN. § 63-3-510(B) (2008); S.D. CODIFIED LAWS § 26-6-6.1 (2015); TENN. CODE ANN. § 37-1-102(b)(5)(G) (2016).

63.    These states include Alaska, Illinois, Iowa, and New Jersey.  *See* ALASKA STAT. § 47.10.080(c)(1)(B) (2015); 705 ILL. COMP. STAT. 405/2-31(1) (1987); IOWA CODE § 232.102(1)(b) (2016); N.J. STAT. ANN. § 30:4C-2.3 (West 2016).

64.    These states include Arizona, Arkansas, Kentucky, and New Jersey.  *See* ARIZ. REV. STAT. ANN. § 8-521.01(A)-(B) (2016); ARK. CODE ANN. § 9-27-306(a)(1)(B)(ii) (2016); KY. REV. STAT. ANN. § 620.140(1)(d) (West 2016); N.J. STAT. ANN. § 30:4C-2.3 (West 2016).

65.    42 U.S.C. §§ 608a, 619(2)(B), 672 (2012).  The Foster Care Independence Act (FCIA) permits states to use federal money to fund independent living programs for young people aged eighteen to twenty-one.  Foster Care Independence Act of 1999, Pub. L. No. 106-169, § 121, 113 Stat. 1822, 1829-30 (codified as amended at 42 U.S.C. § 1396d(w)). Only about half of young people between eighteen and twenty-one are eligible for the room and board allotment provided by the statute, which totals just over $1400 annually per individual.  *See* Magyar, *supra* note 16, at 563; Cynthia Andrews Scarcella et al., *The* Cost *of Protecting Vulnerable Children* IV*: How Child Welfare Funding Fared During the Recession*, URBAN INST. 16-18 (2004), http://www.urban.org/research/publication/cost-protecting-vulnerable-children-iv (select "Download PDF").

66.    The law in just under half of the states assumes that financial dependence will end, not necessarily at age eighteen, but instead upon the young person's graduation from high school. Magyar, *supra* note 16, at 564.

67.    *See* discussion *infra* subpart IV.C.

Exhibit 3

0027

### 2.    Freedom from Parental Authority

Legal adults gain independence from parental authority.  During their children's minority, parents have not only a legally enforceable obligation to provide for the support of their children; they also have a constitutional right to the "custody and control" of their children.[68] "Custody and control" encompasses the ability to make all manner of decisions on their behalf.[69]

The state exercises its *parens patriae* power to enact regulations that interfere with parental authority in areas including education and public health.[70]  Otherwise, the state generally defers to parents' child-rearing practices so long as their caregiving does not fall to a level that would constitute statutorily defined abuse or neglect.[71]

Parents' day-to-day authority over their children is thus universally acknowledged and respected; at the same time, its contours are rarely formally defined.  Parents decide where their children will live, where they will attend school, which doctors will attend them, which medical procedures they will undergo, and every aspect of how they will be raised—their daily schedules, activities, diets, etc.  Once an individual is identified as a parent, community actors such as school officials and health care providers afford them the decision-making authority that attend that status.[72]

---

68.    *See* Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35 (1925) (holding unconstitutional state legislation requiring that all children be educated in public schools and recognizing parents' rights "to direct the upbringing and education of children under their control"); Meyer v. Nebraska, 262 U.S. 390, 399-400 (1923) (holding unconstitutional state legislation restricting the teaching of foreign languages in elementary schools and recognizing parents' rights to "establish a home and bring up children").

69.    *See* Troxel v. Granville, 530 U.S. 57, 72 (2000) (plurality opinion) (holding unconstitutional a state third-party visitation statute that permitted any person to petition a court for visitation with a child at any time because the statute "failed to accord the determination of . . . a fit custodial parent[] any material weight").  The plurality in *Troxel* stated "that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and . . . 'to direct the upbringing and education of children under their control.'"  *Id.* at 65-66 (first quoting *Meyer*, 262 U.S. at 399; then quoting *Soc'y of Sisters*, 268 U.S. at 534-35).

70.    *See, e.g.*, *Soc'y of Sisters*, 268 U.S. at 534 (noting "the power of the State reasonably to regulate all schools [and] to require that all children of proper age attend some school"); *Meyer*, 262 U.S. at 401 (observing that "the state may do much, go very far, indeed" to advance the general welfare infringing upon parents' rights).

71.    *See* Emily Buss, *Adrift in the Middle: Parental Rights After* Troxel v. Granville, 2000 Sᴜᴘ. Cᴛ. Rᴇᴠ. 279, 287-96 (arguing in favor of state noninterference in parenting generally).

72.    A notable exception exists in the case of noncustodial parents, in which case a biological parent's authority may be limited by judicial decree.

Exhibit 3

0028

Just as many aspects of the parent's authority tend to exist informally, its technical cessation once a child reaches the age of majority also tends to occur informally.   However, two legal doctrines—invoked, ironically, when there is a failure or absence of presumptive parental authority—help delineate the contours of parental authority.

The first is the doctrine of emancipation, which confers upon a minor "the rights, duties, privileges, and responsibilities provided by the civil law to a person who has reached the age of majority under civil law."[73]  Generally, minors found to be living independent of their parents and supporting themselves may be declared emancipated.[74] Most states provide for some form of emancipation through either statutory or common law.[75]  However, not all states have formally adopted the doctrine, and some that have done so provide only a limited array of rights to emancipated minors.[76]  Certain transition events most commonly appear as justification for a child's emancipation—the child's marriage, pregnancy, or military service.[77] The rights of emancipated minors typically allow them to enter contracts (such as lease agreements), receive certain forms of public assistance usually reserved to heads of household, and retain their own earnings.[78]  Emancipation also relieves parents of the duty to support the minor child.[79]

The second legal mechanism, the ungovernability action, permits parents to initiate a judicial action seeking to have a minor child found "ungovernable."[80]  A minor may be brought under court supervision if

---

73.     Haw. Rev. Stat. § 577-25 (2015).   *See generally* Carol Sanger & Eleanor Willemsen, *Minor Changes: Emancipating Children in Modern Times*, 25 U. Mich. J.L. Reform 239 (1992) (describing the legal processes by which minors may become emancipated).

74.     *See* Sanger & Willemsen, *supra* note 73, at 240.

75.     *See id.* at 240-41.

76.     *See* Bethany Stasiak, *Statutory and Judicial Emancipation of Minors in the United States*, Bos. Coop Network (2002), http://bostoncoop.net/lcd/emancipation/emancipation_deliverable.pdf.

77.     *See id.*

78.     *See, e.g.*, Kan. Stat. Ann., § 38-102 (2015) (providing only for the minor's right to enter contracts, including those involving real and personal property); Wis. Stat. § 48.987 (2015) (providing that a self-supporting minor is entitled to his or her own earnings); N.Y. Comp. Codes R. & Regs. tit. 18, § 349.5 (2016) (providing for the granting of public assistance to eligible emancipated minors).

79.     *See* William E. Dean, Note, Ireland v. Ireland: *Judicial Emancipation of Minors in Idaho: Protecting the Best Interests of the Child or Conferring a Windfall upon the Parent?*, 31 Idaho L. Rev. 205, 215 (1994).

80.     *See generally* Randy Frances Kandel & Anne Griffiths, *Reconfiguring Personhood: From Ungovernability to Parent Adolescent Autonomy Conflict Actions*, 53

Exhibit 3

0029

the minor is found to be a "habitual truant or is incorrigible, ungovernable, or habitually disobedient and beyond the lawful control of his or her parents, guardian or lawful custodian."[81] State statutes adopt intentionally vague standards under which a young person's actions, albeit lawful but which violate the parents' mores and expectations, may justify a court's determination that the youth should be in the custody of a social services department for placement and treatment in a foster home or other institution.[82] These actions can include engaging in sexual relationships over parents' objections, being truant from school, violating curfews, and general disobedience.[83]

Emancipated minors step into the shoes of their parents, exercising for themselves the authority that parents would normally exercise over them. Parents who successfully have a child adjudicated ungovernable allow the state, at least temporarily, to substitute its *parens patriae* power for parental control. Ungovernability actions illustrate the sort of authority parents are entitled to exercise over their children and with which children are expected to comply. Even if a child's actions stop short of criminal or delinquent behavior—such as general noncompliance with parents' wishes—the state may act to reinforce parental authority. Thus both emancipation and ungovernability actions help illustrate the scope of parental authority.

### 3.    Contract Rights

On reaching the age of majority, individuals may disaffirm contracts entered during their minority.[84] The common law has for centuries provided minors this protection, known as the infancy defense or infancy doctrine.[85] The infancy doctrine has historically existed to protect young people from squandering their wealth or from falling prey to unscrupulous adults who would take advantage of their inexperience in the marketplace.[86] Disaffirmance does not generally

---

SYRACUSE L. REV. 995 (2003) (describing and critiquing the ungovernability action as a means of resolving parent-child conflict and proposing in its stead a form of civil action that prioritizes not only parental decision-making rights but also adolescent autonomy rights).

    81.    N.Y. FAM. CT. ACT § 732 (McKinney 2010).
    82.    Kandel & Griffiths, *supra* note 80, at 997.
    83.    *Id.*
    84.    7 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 27.2 (rev. ed. 2002); 5 SAMUEL WILLISTON & RICHARD LORD, A TREATISE ON THE LAW OF CONTRACTS §§ 9:3-:5 (4th ed. 1993).
    85.    *See* 5 WILLISTON & LORD, *supra* note 84, § 9:2.
    86.    Larry A. DiMatteo, *Deconstructing the Myth of the "Infancy Law Doctrine": From Incapacity to Accountability*, 21 OHIO N.U. L. REV. 481, 481 n.3 (1995).

Exhibit 3

0030

permit the rescinding individual to reap the benefit of the voided contract. Instead, each party generally must return to the other any consideration given.[87]

A 2009 federal statute, the Credit Card Accountability, Responsibility, and Disclosure Act (CARD Act), goes further than the infancy doctrine in providing protection to minors.[88] The CARD Act prohibits any contract for a credit card entered by an individual younger than twenty-one unless one of two exceptions apply: (1) an adult twenty-one years or older cosigns and accepts joint liability for any debt incurred pursuant to the contract; or (2) the individual demonstrates "independent means of repaying" any debt incurred.[89]

Common and statutory law have both created several exceptions to the infancy defense.[90] One of these exceptions prevents the later disaffirmance of contracts that provide minors the "necessaries of life."[91] Thus when minors purchase basic necessities, the exception aims to counteract one of the potential drawbacks of the infancy defense—merchants' unwillingness to conduct business with minors for fear of later disaffirmance.[92] Other statutorily created exceptions prohibit the disaffirmance of certain types of contracts where legislatures deemed finality and certainty to outweigh the right of disaffirmance.[93] These exceptions commonly include insurance contracts, child support agreements, and student loans.[94]

---

[87]. 7 PERILLO, *supra* note 84, § 27.6. The common law imposed no duty on the minor to return consideration or goods no longer in the minor's possession. Modern courts, however, have been more willing to require minors to make restitution to the adult contracting party in such circumstances. *Id.*

[88]. Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111-24, § 301, 123 Stat. 1734, 1747-48 (codified at 15 U.S.C. § 1637(c) (2012)).

[89]. *Id.* For a critique of the CARD Act, see Andrew A. Schwartz, *Old Enough To Fight, Old Enough To Swipe: A Critique of the Infancy Rule in the Federal Credit CARD Act*, 2011 UTAH L. REV. 407. Schwartz argues that the Act's provisions "run[] badly afoul of th[e] broad societal consensus [that eighteen-year-olds are adults], roll[] back the clock to medieval times, and undermine[] the dignity of eighteen-year-olds." *Id.* at 408. He also argues that because the Act makes credit more difficult for young people to obtain, it stifles youthful entrepreneurship and thus deprives society of the potential benefits of these ventures. *Id.*

[90]. 7 PERILLO, *supra* note 84, § 27.8; 5 WILLISTON & LORD, *supra* note 84, § 9:18; DiMatteo, *supra* note 86, at 488-89.

[91]. Sources cited *supra* note 90.

[92]. Irving M. Mehler, *Infant Contractual Responsibility: A Time for Reappraisal and Realistic Adjustment?*, 11 U. KAN. L. REV. 361, 364-65 (1963).

[93]. DiMatteo, *supra* note 86, at 483 n.10.

[94]. 7 PERILLO, *supra* note 84, § 27.3; 5 WILLISTON & LORD, *supra* note 84, § 9:6; DiMatteo, *supra* note 86, at 513.

Exhibit 3

0031

It is only once individuals enter adulthood that merchants may transact business with them without fear of disaffirmance. Yet the threat of disaffirmance does little to dissuade merchants or hinder minors from conducting business. Minors are instead active and significant participants in the marketplace, as both consumers and sellers. Market research into a single year of their economic activity estimated that minors spent nearly $190 billion in economic transactions and estimated their spending to increase to nearly $209 billion by 2011, despite a projected 3% decline in teen population.[95] Scholars observe that teens' spending power, particularly through increasing online spending in which they can participate in economic activity in virtual anonymity, gives minors "the potential to cause serious economic consequences to online businesses by disaffirming contracts in droves."[96] Yet there is scant evidence of any impending economic calamity.

While the right to contract is regularly touted as one of the rights of adulthood, it is in reality a right that is regularly exercised by minors. This regular involvement in market transactions arguably renders the right to contract an almost-irrelevant marker of the transition to adult status. Indeed, for decades, both scholars and jurists have been calling for the doctrine's overhaul or outright repeal.[97]

Critics of the infancy doctrine argue that adolescents have sufficient capacity to enter contracts to which they should be held. The doctrine may have the perverse effect of permitting market-savvy individuals to later disavow contracts that they were sufficiently capable to enter as minors.[98] More recently, commentators have pointed to the growing body of developmental research tending to confirm the cognitive capacity of adolescents to enter contracts.[99] To

---

95. Vahe Habeshian, *By 2011, Teen Market Shrinks, Spending Clout Soars to $200B*, MARKETINGPROFS (June 29, 2007), http://www.marketingprofs.com/opinions/2007/19516/by-2011-teen-market-shrinks-spending-clout-soars-to-200b; *Teen Market To Surpass $200 Billion by 2011, Despite Population Decline*, MARKETINGCHARTS (June 28, 2007), http://www.marketingcharts.com/traditional/teen-market-to-surpass-200-billion-by-2011-despite-population-decline-817/.

96. Cheryl B. Preston, *CyberInfants*, 39 PEPP. L. REV. 225, 268 (2012).

97. *See, e.g.*, Kiefer v. Fred Howe Motors, Inc., 158 N.W.2d 288, 290 (Wis. 1968) (acknowledging the defects of the infancy doctrine but suggesting that the legislature was the proper branch to alter the doctrine rather than the court); DiMatteo, *supra* note 86, at 518; Mehler, *supra* note 92, at 364.

98. DiMatteo, *supra* note 86, at 485.

99. *See, e.g.*, Michael Glassman & Donna Karno, *On Establishing a Housing Right of Contract for Homeless Youth in America*, 7 SEATTLE J. FOR SOC. JUST. 437, 453 (2009) ("The suggestion that youth under fifteen are not capable of understanding the social contract

Exhibit 3

0032

the extent the infancy doctrine flies in the face of social reality, provides unneeded protection to (at least a subset of) minors, and contravenes the core moral underpinning of contract law itself—the keeping of promises—it is ripe for revision.[100]

### 4.   The Right to Full Labor Market Participation

Federal and state laws impose restrictions on the types and hours of employment in which individuals younger than eighteen may engage.  Federal law, through the Fair Labor Standards Act (FLSA), curtails the employment of individuals younger than sixteen, but it imposes relatively few restrictions on the employment of those aged sixteen and older.[101]  The FLSA instead leaves sixteen- and seventeen-year-olds largely free to engage in paid employment in nonhazardous occupations.[102]  Many states, however, have adopted measures that extend greater protections to older teens with the goal of preventing their paid work from interfering with their health or education.  These measures generally impose limits on the number of hours sixteen- and seventeen-year-olds may work.[103]  Once workers reach age eighteen, they are no longer subject to these special protections.

The provisions of the FLSA and other labor regulations that free individuals from restrictions on their employment upon reaching the age of majority roughly correspond with the completion of high school.  As noted above and discussed more fully below, economic changes have made postsecondary education increasingly necessary to obtaining middle-class income.  Due to increases in the costs of that education and parents' unwillingness or inability to provide ongoing financial support, more students today than in recent decades find it necessary to work either full- or part-time while enrolled in school.[104]

---

is not supported by developmental research . . . ."); Cunningham, *supra* note 54, at 292 (noting the absence of "effort to change the infancy doctrine despite criticism from academics and even courts [and] despite the . . . widespread agreement among psychologists that children's cognitive abilities develop at a far earlier age than originally thought").

100.   *See* Cunningham, *supra* note 54, at 293-94; Hartman, *supra* note 19, at 1303-04.

101.   29 U.S.C. §§ 206-07, 212 (2012); 29 C.F.R. § 570.2(a) (2011).   Federal regulations prohibit the employment of all individuals under eighteen in hazardous occupations.  29 C.F.R. § 570.2(a)(1)(ii); *see also* 29 C.F.R. § 570.50-.68 (listing hazardous occupations).

102.   The Act imposes no work hour restrictions on individuals aged sixteen and over. 29 C.F.R. §§ 570.2(a)(1)(i), .35, .70(a).

103.   *See, e.g.*, N.Y. LAB. LAW § 143 (McKinney 2016).

104.   Anne H. Gauthier & Frank F. Furstenberg Jr., *Historical Trends in Patterns of Time Use Among Young Adults in Developed Countries*, *in* ON THE FRONTIER OF

Exhibit 3

0033

It is regrettable that the difficulty of financing postsecondary education requires many students to combine work and school, increasing the length of time required to complete their educations and obtain desirable employment. Ameliorating this difficulty might entail any number of policy revisions. Those efforts arguably ought not occur, however, by way of revisions to existing labor protections.

5.    The Right to Political and Civic Participation

With few exceptions, individuals acquire the rights and duties of political and civic participation at age eighteen. The national voting age is eighteen.[105] States have the authority to set the voting age lower, but the Twenty-Sixth Amendment prevents their setting it higher.[106] Some states permit seventeen-year-olds to vote in primary elections if they will turn eighteen by the general election, but no state has chosen to allow individuals younger than eighteen to vote.[107] There has been a global move to lower the voting age, as well as scattered efforts in several U.S. states and municipalities to do so.[108] To date, only one municipality—the city of Takoma Park, Maryland has enacted legislation lowering the voting age to sixteen for local elections.[109]

The national age for draft eligibility and voluntary enlistment in any of the branches of the military absent parental consent is eighteen.[110] Individuals who obtain parental consent may voluntarily enlist at seventeen.[111]

The age at which individuals become eligible to sit on federal juries is eighteen, lowered from twenty-one in 1972 by amendment to the federal Jury Selection and Service Act.[112] In the states, there is

---

ADULTHOOD: THEORY, RESEARCH, AND PUBLIC POLICY 150, 159 (Richard A. Settersten Jr. et al. eds., 2005).

    105.   *See* Hamilton, *Democratic Inclusion, supra* note 47, at 1448.

    106.   U.S. CONST. amend. XXVI, § 1 ("The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.").

    107.   *See 17-Year-Old Primary Voting*, FAIRVOTE, http://archive3.fairvote.org/reforms/universal-voter-registration/17-year-old-primary-voting-2/ (last visited Sept. 4, 2016).

    108.   *See* Hamilton, *Democratic Inclusion, supra* note 47, at 1465-74 (listing nations that have already lowered the voting age and those with pending efforts to do so).

    109   Lindsay A. Powers, *Takoma Park Grants 16-Year-Olds Right to Vote*, WASH. POST (May 14, 2013), https://www.washingtonpost.com/local/takoma-park-grants-16-year-olds-right-to-vote/2013/05/14/b27c52c4-bccd-11e2-89c9-3be8095fe767_story.html.

    110.   10 U.S.C. § 505(a) (2012).

    111.   *Id.*

    112.   Act of Apr. 6, 1972, Pub. L. No. 92-269, 86 Stat. 117 (amending 28 U.S.C. § 1865(b)(1) (1970)) (setting the age of eligibility to serve on federal grand or petit juries at twenty-one).

Exhibit 3

0034

only slightly more variation in the age of jury eligibility, and these closely track the states' respective ages of majority.[113] Thus, the near universal age at which individuals become eligible for jury service is eighteen (in forty-six states and the District of Columbia);[114] the age for jury service eligibility is nineteen in two states[115] and twenty-one in two other states.[116]

Although individuals acquire most rights to civic and political participation upon reaching the age of majority, it is not unusual for governments to impose separate age requirements on holders of various state and federal offices. Both federal and state constitutional provisions require individuals to meet higher age requirements in order to qualify to hold certain offices.[117]

6.    The Right to Medical and Procreative Choice

The authority to make medical decisions affecting minors presumptively rests with their parents.[118] Only upon reaching the age of majority are individuals categorically entitled to make their own medical decisions.[119] Minors may consent to treatment in some circumstances, including in cases of emergency, in cases involving reproductive health care (such as contraceptive services, prenatal care, and examination and treatment for sexual assault and sexually transmitted diseases), and in cases involving mental health care (which extends to outpatient substance abuse and mental health treatment).[120]

---

113.    *Compare Termination of Support—Age of Majority*, *supra* note 51 (providing age of majority of individual states), *with* Roper v. Simmons, 543 U.S. 551 (2005) (giving jury qualification age for individual states).

114.    *Roper*, 543 U.S. 551 app. (listing minimum age for jury service in forty-eight states and the District of Columbia); OR. REV. STAT. § 10.030(2)(c) (2009); 42 PA. CONS. STAT. § 4502 (2016).

115.    ALA. CODE § 12-16-60(a)(1) (2016); NEB. REV. STAT. § 25-1601(1) (2015).

116.    MISS. CODE ANN. § 13-5-1 (2016); MO. REV. STAT. § 494.425(1) (2015).

117.    *See, e.g.*, U.S. CONST. art. I.

118.    B. Jessie Hill, *Medical Decision Making by and on Behalf of Adolescents: Reconsidering First Principles*, 15 J. HEALTH CARE L. & POL'Y 37, 38 (2012); Kimberly M. Mutcherson, *Whose Body Is It Anyway? An Updated Model of Healthcare Decision-Making Rights for Adolescents*, 14 CORNELL J.L. & PUB. POL'Y 251, 259 (2005).

119.    David M. Vukadinovich, *Minors' Rights To Consent to Treatment: Navigating the Complexity of State Laws*, 37 J. HEALTH L. 667, 667-68 (2004) ("While the law is clear with regard to the right of competent adults to consent to or refuse medical treatment, state statutes generally are more complicated when the patient is a minor.").

120.    Rhonda Gay Hartman, *Coming of Age: Devising Legislation for Adolescent Medical Decision-Making*, 28 AM. J.L. & MED. 409, 416-27 (2002); Hill, *supra* note 118, at 42-43.

Exhibit 3

0035

States may require minors to obtain parental consent prior to obtaining an abortion. But states must provide for an alternative bypass procedure where a neutral third-party must consent to the abortion upon finding either that (1) the minor is sufficiently mature and informed to make the decision independently or (2) an abortion would be in her best interests.[121] Generally, emancipated minors and minors determined on an individualized basis to possess adequate maturity (pursuant to what is known as the "mature minor" doctrine) may also make their own medical decisions.[122]

## C. *Exceptions to the Age of Majority*

A survey of just a number of the legal exceptions to the presumptive age of majority, like the one that follows, leads to two conclusions about the age of majority itself. First, the proliferation of exceptions to it demonstrates that the age of majority insufficiently meets current social needs. That the exceptions alter legal consequences for individuals variously past the age of majority and those who have not yet attained it, moreover, suggests that perhaps *no* categorical age of majority can adequately meet social needs.

Second, the existence of exceptions that apply in specific legal contexts demonstrates that it is not unduly burdensome for lawmakers to engage in this sort of context-specific rulemaking. Stated differently, categorical rules like the age of majority serve useful purposes by eliminating uncertainty and advancing efficiency. Yet lawmaking that impacts young people has already begun to alter in order to better address, in comparison to the presumptive age of majority, the needs of society and capacities or incapacities of young people.

---

121. *See* Bellotti v. Baird, 443 U.S. 622, 647-48 (1979); Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 72-76 (1976). For a cogent analysis of these cases that concludes that they fail to meaningfully expand children's broader claims to constitutional rights, see Martin Guggenheim, *Minor Rights: The Adolescent Abortion Cases*, 30 HOFSTRA L. REV. 589 (2002).

122. Andrew Newman, *Adolescent Consent to Routine Medical and Surgical Treatment*, 22 J. LEGAL MED. 501, 504-08 (2001) (discussing and critiquing exceptions applied to emancipated and "mature" minors and arguing in favor of a bright-line rule allowing all individuals over age sixteen to make medical decisions).

Exhibit 3

0036

1.    Contract Rights, Labor Market Participation, and the Right to Medical and Procreative Choice (Redux)

Young people do not formally acquire the rights to contract, fully participate in the labor market, or independently make medical and procreative choices until reaching the age of legal majority. However, as previously discussed, exceptions to each of these rules allow minors to engage regularly in these activities prior to attaining majority.[123] In each of these contexts, the exceptions better describe the reality of young people's experiences—and the needs of society— than does the presumptive rule.

2.    Giving Sexual Consent

Every state has established a minimum age at which individuals may consent to sex. Seven states have set the age of sexual consent at eighteen—the legal age of majority in those states. The remainder have set the age of consent below the age of majority.[124] The most common age adopted by states is sixteen, while four states have set the age of sexual consent at age fourteen.[125]

Although sexual consent laws on occasion lead to the criminal prosecution of teenagers who engage in consensual sex, states have generally revised their laws so that only individuals who are significantly older than the minor below the age of consent are subject to prosecution.[126] Historically, statutory rape laws aimed to protect women and restrict their sexual activity.[127] Today, the age of sexual consent and statutory rape laws that rely on the age differential between the victim and perpetrator reflect pragmatic responses to the prevalence of teenage sexual activity. Indeed, nearly half of all high school students surveyed in 2009 reported having engaged in sexual intercourse.[128]

---

123.    *See* discussion *supra* subpart I.B.

124.    *See* Jennifer Ann Drobac, *Sex and the Workplace: "Consenting" Adolescents and a Conflict of Laws*, 79 WASH. L. REV. 471, 486 (2004).

125.    *Id.*; *see also* Todres, *supra* note 13, at 1139-41 (discussing state laws on age of consent).

126.    Asaph Glosser et al., *Statutory Rape: A Guide to State Laws and Reporting Requirements*, DEPT. HEALTH & HUM. SERVICES, ES-1, 6 tbl.1, 6-8 (2004), http://aspe.hhs.gov/hsp/08/SR/StateLaws/report.pdf.

127.    *See* Frances Olsen, *Statutory Rape: A Feminist Critique of Rights Analysis*, 63 TEX. L. REV. 387, 401-02 (1984).

128.    Danice K. Eaton et al., *Youth Risk Behavior Surveillance—United States, 2009*, MORBIDITY & MORTALITY WKLY. REP., June 2010, at 98 tbl.61.

Exhibit 3

0037

### 3.    The Right To Drive

Although car crashes kill more teens than any other cause, the United States grants drivers' licenses earlier than any other nation in the developed world.[129]  Every state issues licenses to individuals younger than eighteen, with most states setting the age of licensure at sixteen.[130]  A few states set the driving age at fourteen or fifteen, and only one—New Jersey—has set it higher, at age seventeen.[131]

The youngest drivers crash at the highest rates.  Crash rates are consistently highest among sixteen-year-olds and decline substantially with each year of increasing age.[132]  Younger novice drivers have significantly higher crash rates than do older novices.[133]  This evidence has led most states to adopt graduated licensing systems which permit novice drivers to gain experience but impose on them restrictions (e.g., passenger limits and night-time driving restrictions) aimed at reducing their exposure to hazardous driving contexts.[134]

### 4.    The Right To Purchase, Possess, and Consume Alcohol

Congress conditioned states' receipt of federal highway funds on their imposing a drinking age of twenty-one.[135]  In light of high rates of alcohol-related injuries and death, many states readily raised their drinking ages.[136]  Some lawmakers argued against what they viewed as inconsistent and unfair treatment of young people eighteen and older. They reasoned that young people who were subject to the draft and permitted to enlist voluntarily in the armed services ought not be denied the adult right to consume alcohol.[137]  While arguments against raising the drinking age above states' ages of majority failed, some

---

129.    *See* Vivian E. Hamilton, *Liberty Without Capacity: Why States Should Ban Adolescent Driving*, 48 GA. L. REV. 1019 (2014) [hereinafter Hamilton, *Liberty Without Capacity*].

130.    *Id.* at 1021.

131.    *Id.* at 1034.

132.    *Id.*

133.    *Id.* at 1029-30.

134.    *Id.* at 1031.

135.    23 U.S.C. § 158 (2012); South Dakota v. Dole, 483 U.S. 203 (1987) (upholding statute as a valid exercise of Congressional spending power).

136.    Michael P. Rosenthal, *The Minimum Drinking Age for Young People: An Observation*, 92 DICK. L. REV. 649, 653-54 (1988).

137.    *See* Cunningham, *supra* note 54, at 298 (discussing debate and defeat of bill sponsored by Wisconsin state legislator to lower the drinking age for service members to nineteen).

Exhibit 3

0038

scholars have suggested that the psychological research on adolescent and emerging adult capacity supports lowering the drinking age.[138]

5.    Continued Entitlement to Parental Support and Benefits

The Dependent Coverage Mandate of the ACA expanded the availability of health insurance for young adults by allowing those aged nineteen to twenty-six to remain covered as dependents under their parents' plans.[139] Minors have long received medical coverage through their parents' employer-provided health plans.[140] After age eighteen or graduating from college, however, minors were reclassified as adults and lost their dependent status, along with the derivative health benefits that attended it.[141] These young adults obtained health coverage only with difficulty, if at all.[142] One in three young adults aged nineteen to twenty-five had no health insurance in 2010.[143] The effect of the Dependent Coverage Mandate was dramatic, and parents rushed to add their adult children to their health plans.[144] By the end of 2011, parents had extended health insurance to 6.6 million young adults who had been ineligible for such coverage before the ACA's passage.[145]

---

138.    *See id.* at 297.

139.    Sara R. Collins et al., *Young, Uninsured, and in Debt: Why Young Adults Lack Health Insurance and How the Affordable Care Act Is Helping*, COMMONWEALTH FUND 2 (June 2012), http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2012/Jun/1604_collins_young_uninsured_in_debt_v4.pdf [hereinafter Collins et al., *Why Young Adults Lack Health Insurance*].

140.    *Id.* at 3.    Children who receive health coverage through Medicaid or the Children's Health Insurance Program are reclassified as adults on their nineteenth birthdays and, with the exceptions of pregnant women or parents of children with very low incomes, also lose their health coverage.    *Id.* at 1.

141.    *Id.* at 15 n.4.

142.    Sara R. Collins et al., *Realizing Health Reform's Potential: How the Affordable Care Act Is Helping Young Adults Stay Covered*, COMMONWEALTH FUND 1 (May 2011), http://www.commonwealthfund.org/~/media/files/publications/issue-brief/2011/may/1508_collins_how_aca_is_helping_young_adults_reform_brief_v5_corrected.pdf [hereinafter Collins et al., *Realizing Health Reform's Potential*].

143.    Robin A. Cohen & Michael E. Martinez, *Health Insurance Coverage: Early Release of Estimates from the National Health Interview Survey, January–March 2011*, CDC (Sept. 2011), http://www.cdc.gov/nchs/data/nhis/earlyrelease/insur201109.pdf (finding 33.9% of nineteen- to twenty-five-year-olds to be uninsured in 2010); Carmen DeNavas-Walt et al., *Income, Poverty, and Health Insurance Coverage in the United States: 2011*, U.S. CENSUS BUREAU (Sept. 2012), http://www.census.gov/prod/2012pubs/p60-243.pdf (finding 29.8% of nineteen- to twenty-five-year-olds to be uninsured in 2010).

144.    Collins et al., *Realizing Health Reform's Potential*, *supra* note 142, at 1.

145.    Cohen & Martinez, *supra* note 143; *see also* Yaa Akosa Antwi et al., *Effects of Federal Policy To Insure Young Adults: Evidence from the 2010 Affordable Care Act Dependent Coverage Mandate*, (Nat'l Bureau of Econ. Research, Working Paper No. 18200,

Exhibit 3

0039

The Dependent Coverage Mandate extends to a wide swath of legal adults a benefit long associated with minor and dependent status. Its very title signals that this cohort of legal adults commonly remains reliant on others in significant respects. As such, they lack the independence that is one of the characteristic markers of adulthood, despite having formally attained that legal status.

III. ADULTHOOD DEINSTITUTIONALIZED

This Part discusses the nature of the transition to adulthood, which is not at all fixed nor definite.[146] It is instead variable, not only with respect to its timing (whether it occurs earlier or later in a young person's life), but also with respect to its substance (those characteristics whose attainment mark adult status). Put another way, changes over time alter the social context in which young people come of age, which in turn influences both the age at which they reach adult status and the manner by which they reach it.

Variations in social contexts have gone a long way toward shaping young people's transitions to and conceptions of adulthood. In the United States and other western countries, the transition to adulthood is both exceptionally unstructured and prolonged. This Part argues that the nature of the transition has contributed to a modern conception of adulthood itself as a status achieved only gradually and not dependent on the attainment of specific external events, such as marriage or the completion of education.[147] Part IV will discuss the policy implications of the historical developments discussed in this Part.

A. *Structural Influences on the Transition to Adulthood*

Historians of society have identified five significant events that have, for more than a century, marked the transition from minority to adulthood for most young Americans. These have been: (1) marrying; (2) leaving their parents' homes; (3) establishing

---

June 2012) (reporting on the health insurance and labor market implications of the recent Affordable Care Act).

    146. Jeffrey Jensen Arnett, *Emerging Adulthood: Understanding the New Way of Coming of Age*, *in* EMERGING ADULTS IN AMERICA: COMING OF AGE IN THE 21ST CENTURY 3, 4 (Jeffrey Jensen Arnett & Jennifer Lynn Tanner eds., 2006) [hereinafter Arnett, *Understanding the New Way of Coming of Age*] ("The timing and meaning of . . . reaching full adult status [] is different today than it was 50 or 100 years ago . . . .").

    147. Jeffrey Jensen Arnett, *Suffering, Selfish, Slackers? Myths and Reality About Emerging Adults*, 36 J. YOUTH & ADOLESCENCE 23, 25 (2007); *see also infra* subpart III.B (discussing the socio-cultural conceptions of modern adulthood).

Exhibit 3

0040

households of their own; (4) completing their educations or leaving school; and (5) entering the workforce.[148] While a minority of the young population has always taken other paths to adulthood (e.g., never marrying or remaining resident with their parents), the dominance of this five-part pathway to adulthood has made it the modern "bedrock of social organization," channeling most Americans onto "paths to a narrowly conceived adulthood."[149]

Most young Americans thus experienced each of the five transition events along the course to adulthood. The timing of the events and the order in which they have tended to occur, however, have varied in important ways over time.[150] A whole range of interrelated social contexts have influenced these variations, with structural changes having particular salience for young people coming of age in the twentieth and early twenty-first centuries. Scholars now characterize the transition to adulthood during this period of roughly one hundred years, not as a continuous evolution or trend, but as separable into three discrete but related eras.

The first era spans 1900 to 1950. During this period, young people both discontinued their educations and entered the workforce at early ages—in their teen years.[151] Although employed full-time, they nonetheless tended to remain in their parents' households, delaying marriage. Because the wages earned by young people were relatively low, full-time employment generally provided insufficient income to enable them immediately to set up independent households.[152] Instead, young people continued to rely on the financial and residential security of their parents' households for a number of years following their entry into the paid workforce.[153] Parents, in turn, relied on their children's labor and earnings, their own economic instability due largely to across-the-board job insecurity and the exclusion of married women from the workplace.[154]

The socio-economic context of this first period of the twentieth century contributed to an extended period of intergenerational interdependence. Young people did not complete the five-part

---

148. John Modell et al., *Social Change and Transitions to Adulthood in Historical Perspective*, 1 J. FAM. HIST. 7 (1976).

149. Jordan Stanger-Ross et al., *Falling Far from the Tree: Transitions to Adulthood and the Social History of Twentieth-Century America*, 29 SOC. SCI. HIST. 625, 626 (2005).

150. *Id.*

151. *Id.*

152. *Id.*

153. *Id.* at 638.

154. *Id.*

Exhibit 3

0041

transition to adulthood—which would include moving from their parents' households into their own and marrying—until relatively late in life.[155]

The nature of young people's transition to adulthood changed during a distinct second era, extending from approximately 1950 into the 1970s. Significant changes in the institutional and economic context that characterized this period prompted equally significant changes in the transition to adulthood. Wartime and postwar industrialization and the introduction of government social programs together contributed to a period of unprecedented economic prosperity in the decades that followed.[156]

Government programs introduced during this era included Social Security and old-age pensions, which lessened older Americans' reliance on their children's wages.[157] New Deal programs guaranteeing private investments facilitated individual and family saving. Other programs underwrote and made loans to homeowners, making home ownership more readily available to younger buyers.[158]

The military needs brought on by the nation's involvement in World War II provided abundant job opportunities for service members themselves and for those away from the battlefields whose labor was needed to support the war effort.[159] Manufacturing accelerated during the war, and postwar industrialization ushered in an era of unprecedented economic opportunity.[160] Jobs in manufacturing generally required neither formal education nor high levels of skill, encouraging young people to enter the workforce at younger ages. Only one in three adults took the time to complete high school during this period, and one in sixteen completed college.[161] Industries' need for laborers in the postwar economy nonetheless led to continued job opportunities and increasing wages, particularly for young men.[162]

Three factors in particular contributed to young people's leaving their parents' homes and marrying at ages younger than at any time in

---

155. *Id.* at 626.

156. *Id.* at 640.

157. *Id.* at 639.

158. *Id.*

159. *Id.*

160. Catherine A. Fitch & Steven Ruggles, *Historical Trends in Marriage Formation: The United States 1850-1990, in* THE TIES THAT BIND: PERSPECTIVES ON MARRIAGE AND COHABITATION 59, 65 (Linda J. Waite et al. eds., 2000).

161. *Percent of People 25 Years and Over Who Have Completed High School or College, by Race, Hispanic Origin and Sex: Selected Years 1940 to 2004*, U.S. CENSUS BUREAU, tbl.A-2 (Mar. 2005), www.census.gov/population/socdemo/education/tabA-2.pdf.

162. Stanger-Ross et al., *supra* note 149, at 640.

Exhibit 3
0042

the nation's history: (1) their ability to earn high wages at young ages; (2) the implementation of government programs that supported homeownership; and (3) government-provided support for higher education, particularly for former service members.[163]

This midcentury era of early and rapid transition to adulthood and family life where men's labor paid them a wage sufficient to support a family represented an historical aberration, not a new norm.[164]  Nonetheless, just as the "single-earner, breadwinner-homemaker marriage" of the 1950s became entrenched in the collective memory as the "traditional" family,[165] it is possible that shifts in the timing of these transitions that occurred during this period became entrenched as the normative transition to adulthood.  If so, adoption of this conception, in which young people became capable of establishing households, marrying, and gaining financial independence by their late teens, may help explain the readiness with which Americans accepted the across-the-board lowering of the legal age of majority that occurred shortly after this historical period.

The third era, which continues today, began in the 1970s.  By the end of that decade, the decline of industry made low-skilled manufacturing jobs scarce.  Moreover, well-paying jobs in what was becoming a service- and technology-based postindustrial economy increasingly required higher levels of formal education.[166]  College enrollment increased in the immediate aftermath of the Great Recession, which led to more young adults remaining in (or returning to) their parents' households.[167]  Employment and relative earning for young men declined, with wages in particular falling significantly from 2000 to 2010.[168]

Many of the jobs in the modern economy pay less than the manufacturing jobs of the twentieth century.[169]  The best of these jobs also require higher education.[170]  According to one report, two-thirds

---

163.  *Id.* at 640-41; Michael R. Haines, *Long Term Marriage Patterns in the United States from Colonial Times to the Present* 35-36 (Nat'l Bureau of Econ. Research, Historical Paper No. 80, 1996).

164.  Stanger-Ross et al., *supra* note 149, at 627.

165.  Andrew J. Cherlin, *The Deinstitutionalization of American Marriage*, 66 J. MARRIAGE & FAM. 848, 851 (2004).

166.  Stanger-Ross et al., *supra* note 149, at 642-43.

167.  Fry, *supra* note 10, at 6.

168.  *Id.*

169.  JEFFREY JENSEN ARNETT, EMERGING ADULTHOOD: THE WINDING ROAD FROM THE LATE TEENS THROUGH THE TWENTIES 145 (2004) [hereinafter ARNETT, THE WINDING ROAD].

170.  *Id.*

Exhibit 3

0043

of high-growth, high-wage jobs require employees to have a college degree.[171]

Individuals thus began spending more years gaining higher levels of education and participating in the workforce, both to finance their educations and to build financial resources for their future needs.[172] While engaged in these activities, they delayed marriage and forming households of their own. Instead, they tended to spend this protracted period of the transition to adulthood in relative autonomy, despite often spending part of the period living in the parents' households.[173] Young people today thus take longer to complete the five-part transition to adulthood than they did in the past, undertaking each traditional transition event at a later age than in previous decades.[174]

Viewing the "dramatic shifts" in the path to adulthood in the historical context in which they transpired helps "serve to undermine a normative understanding of the transition to adulthood and to point, instead, to its deeply historical dynamics."[175] Young people's conceptions of the transition to adulthood, examined in the following subpart, emphasize the variable aspects of the pathway to adulthood and the variable meaning of adulthood itself.

## B. Socio-Cultural Conceptions of Modern Adulthood

Psychologist Jeffrey Arnett conducted a series of studies across the United States to identify contemporary conceptions of adulthood among young people themselves.[176] The studies found that their conceptions depart radically from the traditional conception of the transition to adulthood.

Young people rarely list any of the five transition events (i.e., marrying, leaving parents' homes, establishing independent households, completing educations or leaving school, and entering the workforce) that have long defined the attainment of adult status.

---

171. John M. Bridgeland et al., *Raising the Compulsory School Attendance Age: The Case for Reform*, CIVIC ENTERPRISES (2007), http://files.eric.ed.gov/fulltext/ED503356.pdf.

172. Stanger-Ross et al., *supra* note 149, at 643. Andrew Cherlin characterized the 1950s, during which individuals married young and families could live comfortably on the wages of one spouse, as "the most unusual time for family life in the past century." ANDREW J. CHERLIN, THE MARRIAGE-GO-ROUND: THE STATE OF MARRIAGE AND THE FAMILY IN AMERICA TODAY 6 (2009).

173. Stanger-Ross et al., *supra* note 149, at 643-44.

174. *Id.* at 645.

175. *Id.*

176. ARNETT, THE WINDING ROAD, *supra* note 169, at 14-15; Arnett, *Understanding the New Way of Coming of Age, supra* note 146, at 12.

Exhibit 3

0044

Instead, researchers have consistently found that individuals perceive the most significant markers of adulthood to be: (1) accepting responsibility for oneself; (2) making independent decisions; and (3) attaining financial independence.[177]

For the young people who participated in the studies, accepting responsibility for oneself connotes shouldering the responsibilities previously assumed by parents rather than expecting parents to deal with the consequences of one's actions.[178]  Independent decision making to them connotes making important life decisions oneself, outside the influence of one's parents.[179]  And to be financially independent means no longer relying on one's parents to pay one's bills.[180]

Researchers in other industrialized countries have conducted similar studies, and results have been remarkably uniform across regions as well as across ethnic and socio-economic groups.[181]  These results hold even in regions with culturally or religiously significant coming-of-age milestones.[182]  In the Jewish tradition, for example, the bar mitzvah has long marked the adolescent boy's transition to adulthood and his assumption of the religious obligations of adult Jewish males.[183]   Similarly, in Latin cultures, the quinceañera celebration marks the adolescent girl's transition to adulthood.[184]  Yet studies conducted in Israel and Argentina, where each ceremony is celebrated almost universally, revealed that while these ceremonial milestones might be significant cultural and religious events, they are not significant markers of adulthood.[185]  Instead, individuals in these cultures, as in other industrialized regions where researchers conducted similar studies, view the three responsibility- and independence-related criteria as the more meaningful markers of adult status.[186]

---

177.   *See* sources cited *supra* note 176.

178.   ARNETT, THE WINDING ROAD, *supra* note 169, at 48.

179.   *Id.*

180.   *Id.*

181.   Arnett, *Understanding the New Way of Coming of Age*, *supra* note 146, at 12.

182.   *See* Todres, *supra* note 13, at 1148-49 (describing coming-of-age ceremonies across several cultural traditions).

183.   *Id.*

184.   *Id.*

185.   Alicia Facio & Fabiana Micocci, *Emerging Adulthood in Argentina*, *in* EXPLORING CULTURAL CONCEPTIONS OF THE TRANSITION TO ADULTHOOD 21, 30 (Jeffrey Jensen Arnett & Nancy L. Galambos eds., 2003); Ofra Mayseless & Miri Scharf, *What Does It Mean to Be an Adult?: The Israeli Experience*, *in supra*, at 5, 15-16.

186.   *See* sources cited *supra* note 185; *see also* Larry J. Nelson et al., *The Influence of Culture in Emerging Adulthood: Perspectives of Chinese College Students*, 28 INT'L. J. OF

Exhibit 3

0045

These findings also point to what appears to be a fundamental historical shift in two respects. First, in cultures across the globe, and for most of American history, marriage has been the singular event marking the attainment of full adult status.[187] Marriage continues to be an important social institution in the United States, but individuals no longer rank marriage as necessary, or even important, in making the transition to adulthood. It is losing—or has perhaps already lost—its historical primacy as a marker of adult status.[188]

Second, as Arnett explains, individuals achieve each of the three markers gradually rather than experiencing them as the transition events previously discussed—in other words, as "milestones that take place at a specific time and that a person clearly either has or has not reached," such as getting married or completing education.[189] This absence of readily identifiable markers may contribute to what young people who have attained the age of legal majority consistently report with respect to their status: Despite having formally reached legal adult status, young people in the process of developing what they perceive to be the markers of adulthood report that they do not consider themselves adults. Instead, they feel as though they occupy a status somewhere between adolescence and full adulthood.[190]

Arnett has termed this in-between period "emerging adulthood," which he characterizes as a distinct developmental period spanning approximately ages eighteen to twenty-five.[191] He emphasizes that it is a status largely experienced by young people in wealthier, developed nations rather than a universal stage of development. Nonetheless, his theory of emerging adulthood finds additional empirical support in the developmental sciences. The following subpart turns to the developmental aspects of the transition to adulthood.

---

BEHAV. DEV. 26 (2004) (finding that most Chinese college students feel that adulthood is indicated by successful acceptance of responsibilities rather than traditional markers of transition such as marriage).

187. Anthropologists and historians of American society both identify marriage as having long served this social function. *See, e.g.*, JOSEPH F. KETT, RITES OF PASSAGE: ADOLESCENCE IN AMERICA 1790 TO THE PRESENT 247 (1977); ALICE SCHLEGEL & HERBERT BARRY III, ADOLESCENCE: AN ANTHROPOLOGICAL INQUIRY 92-93 (1991).

188. ARNETT, THE WINDING ROAD, *supra* note 169, at 208.

189. Arnett, *Understanding the New Way of Coming of Age*, *supra* note 146, at 12.

190. *Id.*

191. Jeffrey Jensen Arnett, *Emerging Adulthood: A Theory of Development from the Late Teens Through the Twenties*, 55 AM. PSYCHOLOGIST 469, 469 (2000).

Exhibit 3

0046

### C. *Cognitive and Socio-Emotional Development from Adolescence Through Emerging and Early Adulthood*

The state's use of a categorical age of majority represents a rough judgment about the development of maturity and competence.[192] This subpart briefly surveys aspects of individual development that may bear on our understanding of that development and the course of young people's attainment of various capabilities. It begins with the development of general cognitive capacity over the course of adolescence, defined by researchers as the developmental period (rather than a period defined strictly by chronological age) following childhood and spanning approximately ages twelve to seventeen.[193]

General cognitive capacity includes the abilities to understand and logically reason from facts, process information, and assess the nature of a given situation.[194] These basic cognitive abilities improve more or less linearly throughout childhood and reach mature levels by midadolescence—approximately age sixteen.[195] Researchers have concluded that the reasoning and basic information-processing capacities of the typical sixteen-year-old are "essentially indistinguishable" from those of adults.[196]

However, not all cognitive processes mature by midadolescence. Some processes, including certain aspects of working memory, continue to specialize and develop into adulthood, maturing only in the early twenties.[197] Working memory is involved in a number of complex mental abilities, including the ability to filter irrelevant information and suppress inappropriate actions.[198]

Studies have confirmed adolescents' competence to make rational decisions, but the contexts in which adolescents make decisions can drastically affect the quality of their decision making.[199]

---

192. Scott, *supra* note 2, at 559-60.

193. Charles Geier & Beatriz Luna, *The Maturation of Incentive Processing and Cognitive Control*, 93 PHARMACOLOGY, BIOCHEMISTRY & BEHAV. 212, 212 (2009).

194. Laurence Steinberg et al., *Are Adolescents Less Mature Than Adults?: Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop,"* 64 AM. PSYCHOLOGIST 583, 590-92 (2009) [hereinafter Steinberg et al., *Less Mature Than Adults?*].

195. *Id.*; Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 DEVELOPMENTAL REV. 78, 80 (2008) [hereinafter Steinberg, *Adolescent Risk-Taking*].

196. Steinberg et al., *Less Mature Than Adults?, supra* note 194, at 592.

197. Beatriz Luna et al., *What Has fMRI Told Us About the Development of Cognitive Control Through Adolescence?*, 72 BRAIN & COGNITION 101, 105 (2010).

198. *Id.* at 101.

199. Margo Gardner & Laurence Steinberg, *Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental*

Exhibit 3
0047

When adolescents make decisions in contexts involving stressors that require them to exercise psychosocial maturity and regulatory competence—for example, "[i]n the heat of passion, . . . on the spur of the moment, in unfamiliar situations, . . . and when behavioral inhibition is required"—their decision making suffers.[200] Researchers have come to refer to this phenomenon as the "competence-performance distinction."[201]

Researchers have also found adolescents to be as "knowledgeable, logical, reality-based, and accurate in the ways in which they think about risky activity . . . as their elders."[202] When making decisions about risk, adolescents' decision-making process does differ in significant respects from that of adults. Compared to adults, for example, adolescents tend to weigh and value benefits more heavily than they do risks.[203] This tendency alone, though, seems inadequate to explain what are typical characteristics of adolescent behavior—impulsivity, risk taking, and sensation seeking.[204]

Developmental neuroscientists, aided by technological developments over the last decade that allow them to observe the brain as it performs different tasks, now posit that the development of neural systems along different timelines can help explain adolescent risk taking and poor decision making despite adolescents' apparent cognitive abilities, as well as other aspects of adolescent behavior.[205]

The first neural system, referred to as the *socio-emotional* system, involves social-information-processing and reward seeking and processing.[206] Activity in neural reward systems peaks rapidly

---

*Study*, 41 DEVELOPMENTAL PSYCHOL. 625, 625 (2005); Valerie F. Reyna & Frank Farley, *Risk and Rationality in Adolescent Decision Making: Implications for Theory, Practice, and Public Policy*, 7 PSYCHOL. SCI. PUB. INT. 1, 2, 11 (2006); Steinberg, *Adolescent Risk-Taking*, *supra* note 195.

200.  Reyna & Farley, *supra* note 199, at 12.

201.  Jennifer L. Woolard et al., *Theoretical and Methodological Issues in Studying Children's Capacities in Legal Contexts*, 20 L. & HUM. BEHAV. 219, 220 (1996).

202.  Steinberg, *Adolescent Risk-Taking*, *supra* note 195.

203.  *See* Fischhoff, *supra* note 22, at 19-20; Geier & Luna, *supra* note 193, at 213.

204.  Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. ADOLESCENT HEALTH 216, 218 (2009); Steinberg, *Adolescent Risk-Taking*, *supra* note 195, at 79.

205.  Stephanie Burnett et al., *The Social Brain in Adolescence: Evidence from Functional Magnetic Resonance Imaging and Behavioural Studies*, 35 NEUROSCIENCE & BIOBEHAVIORAL REVIEWS 1654, 1660 (2011); B.J. Casey et al., *The Adolescent Brain*, 1124 ANNALS N.Y. ACAD. SCI. 111, 111-15 (2008).

206.  Geier & Luna, *supra* note 193, at 216-17; *see* Steinberg, *Adolescent Risk-Taking*, *supra* note 195, at 83. The socio-emotional system includes "the amygdala, nucleus accumbens, orbitofrontal cortex, medial prefrontal cortex, and superior temporal sulcus." *Id.*

Exhibit 3

0048

around the time of pubertal maturation (in early adolescence) and then declines.[207] It is this peak in activity, neuroscientists believe, that leads to heightened reward salience—that is, adolescents experience rewarding stimuli as even more rewarding than during either childhood or adulthood. This helps explain adolescent sensation-seeking behaviors in which they seek out new and highly stimulating experiences and willingly taking risks in order to attain them.[208]

The system referred to as the *cognitive control* system, involving abilities to intentionally coordinate and engage in goal-directed behavior, follows a different developmental trajectory. Its development is more gradual and linear than that of the socio-emotional system.[209] Along with other structural changes in the brain, this developmental trajectory correlates with the steady improvement of basic cognitive processes into adolescence, with the maturation of basic cognitive processes largely complete by midadolescence.[210]

In sum, adolescents' basic cognitive abilities mature by age sixteen and give them the capacity to learn, process information, reason, and make rational decisions. Self-regulatory capacities continue to develop, however, making adolescents susceptible to the confounding influence of their heightened sensitivity to reward.[211] This heightened sensitivity, which peaks around midadolescence, inclines adolescents towards sensation seeking, risk taking, and impulsivity.[212] Self-regulatory immaturity can dominate or overwhelm

---

207. Geier & Luna, *supra* note 193, at 216-17. For a technical discussion of this aspect of brain development, see CHARLES A. NELSON ET AL., NEUROSCIENCE OF COGNITIVE DEVELOPMENT: THE ROLE OF EXPERIENCE AND THE DEVELOPING BRAIN 24 (2006).

208. Steinberg, *Adolescent Risk-Taking*, *supra* note 195, at 85.

209. *Id.* at 93. For technical discussions of these developmental processes, see Nitin Gogtay & Paul M. Thompson, *Mapping Gray Matter Development: Implications for Typical Development and Vulnerability to Psychopathology*, 72 BRAIN & COGNITION 6, 7 (2010); Tomáš Paus, *Mapping Brain Maturation and Cognitive Development During Adolescence*, 9 TRENDS COGNITIVE SCI. 60, 62 (2005); and Arthur W. Toga et al., *Mapping Brain Maturation*, 29 TRENDS NEUROSCIENCES 148, 149-50 (2006).

210. Luna et al., *supra* note 197, at 101; Steinberg, *Adolescent Risk-Taking*, *supra* note 195, at 93-94. The system includes the prefrontal cortex (involved in executive, decision-making, and self-regulatory functions), "association" areas (which connect different regions of the brain and support the complex integration of functions), and parts of the corpus callosum (which connects the left and right hemispheres of the brain). Beatriz Luna, *Developmental Changes in Cognitive Control Through Adolescence*, *in* ADVANCES IN CHILD DEVELOPMENT AND BEHAVIOR 233, 240 (Patricia Bauer ed., 2009); Luna et al., *supra* note 197, at 101; Steinberg, *Adolescent Risk-Taking*, *supra* note 195, at 93-94.

211. Steinberg, *Adolescent Risk-Taking*, *supra* note 195, at 83.

212. *Id.* at 89.

Exhibit 3

0049

cognitive processes and drive adolescent behaviors, particularly in high-pressure contexts and those triggering heightened emotion.[213]

Brain development continues well into the mid-twenties. Advanced cognitive capacities, including higher-order and executive functions such as strategic planning, continue to improve linearly through late adolescence and early adulthood.[214] These improvements correlate with structural changes that increase connections within and between different regions of the brain.[215]

Improved coordination of affect (the external expression of emotions) and cognition correlates with increased connectivity between regions of the brain involved in social and emotional information processing and those involved in cognitive processes.[216] Thus emotional regulation and impulse control both improve through adolescence and into the mid-twenties. The continuation of developmental processes into the postadolescent period provides some neurobiological support that buttresses the behavioral case for categorizing "emerging adulthood" as a distinct period of development.[217]

## IV. DISMANTLING THE CATEGORICAL AGE OF MAJORITY

Part II demonstrated that the categorical age of majority fails to comport with the legal reality created by a host of rules whose adoption has imposed a growing number of exceptions to its presumptive operation. Part III demonstrated that young people's transition to adulthood, subjective construction of the transition to adulthood, and individual developmental processes all contemplate a gradual and prolonged process comprising the acquisition of general capabilities—not the achievement of externally constructed events. These capabilities, moreover, vary across contexts. Thus young people tend to attain the capacity for financial independence relatively late in life but attain the capacity for making informed and rational decisions about their own medical care relatively early in life.

Informed by the preceding Parts, this Part contends that the exceptions to the presumptive age of majority better address the needs

---

213. Luna, *supra* note 210, at 257; Steinberg, *Adolescent Risk-Taking*, *supra* note 195, at 96-98.

214. Steinberg, *Adolescent Risk-Taking*, *supra* note 195, at 94-96. These include response inhibition, planning, and spatial working memory. *Id.*

215. *Id.*

216. *Id.*

217. JEFFREY JENSEN ARNETT, ADOLESCENCE AND EMERGING ADULTHOOD: A CULTURAL APPROACH 14 (5th ed. 2013).

Exhibit 3

0050

of society and young people alike.  It argues for the explicit adoption of a "rule comprising exceptions"—in other words, for the abandonment altogether of the presumptive age of legal majority in favor of context-specific rules.  The state's commitment to individual liberty supports such an approach because it extends to individuals those rights which they have attained the capacity to exercise.

This Part also argues that other commitments, namely commitments to community, mitigate against the retention of adulthood as a categorical legal status.  Finally, it provides guidance to lawmakers seeking to assess capacity in certain contexts, offering insights from behavioral decision research, and proposes the adoption of a number of policy measures consistent with the policymaking approach advanced here.  The subparts that follow elaborate these arguments.

## A.    *Context-Specific Competence*

Young people reliably attain different capabilities at distinct stages of development.[218]  Accordingly, across a range of policymaking contexts, a categorical rule will fail to take account either of context-specific capacities or of ongoing deficiencies.  This subpart first argues that the core commitments of the liberal democratic state require it to account for context-specific capabilities.[219]  It next argues that the state's commitment to community (in tension with individual liberty but important nonetheless) provides further support for jettisoning adulthood as status.

### 1.    Individual Competence and Core Commitments of the Liberal Democratic State

Individual liberty is the core value of the liberal constitutional democratic state, and safeguarding its citizens' liberty is therefore the state's primary end.[220]  The minimum entitlement of all citizens is the basic liberty to decide one's life course for oneself, and it is the state's

---

218.    *See* discussion *supra* subpart III.C.

219.    Behavioral scientists have posited one definition of context as "a culturally defined situation that (a) occurs in a particular time and place and (b) contains actors who perform culturally defined roles."  James P. Byrnes, *The Development of Self-Regulated Decision Making, in* THE DEVELOPMENT OF JUDGMENT AND DECISION MAKING IN CHILDREN AND ADOLESCENTS 5, 7 (Janis E. Jacobs & Paul A. Klaczynski eds., 2005).

220.    I elaborate these arguments and settle on a version of liberty embraced by certain liberal theorists in Vivian E. Hamilton, *Immature Citizens and the State*, 2010 BYU L. REV. 1055, 1068-74 [hereinafter Hamilton, *Immature Citizens*].

Exhibit 3

0051

duty to guarantee it.[221]  Those individuals whose capabilities in some respect remain immature have two basic categories of interests that the state should take account of in its decision making: welfare interests and autonomy interests.[222]  Their welfare interests pertain to their well-being, irrespective of any affirmative choice they make, including an interest in being protected from their own deficiencies.  Their autonomy-related interests pertain to their exercising those specific liberties of which they are capable.[223]

Simply put, lawmakers should work to become more cognizant of and responsive to young people's capacities and extend to them age- and context-specific liberties to make the self-regarding decisions of which they are capable.[224]  This decision-making process can indeed be a complex one, although the developmental and behavioral sciences can (and ought to) supplement the more traditional policymaking considerations.  The following subpart briefly discusses the assessment of context-specific capacity—a task which necessarily retains some level of imprecision.

Respected scholars, including Professor Elizabeth Scott, have argued against abandoning the age of majority as a categorical rule.[225]  Scott reasons that, although like all categorical rules it includes some level of imprecision, the age of majority serves society's purposes relatively well by advancing the goals of certainty and administrative efficiency.[226]  Moreover, to the extent it underestimates young persons' capacities in certain legal contexts (such as the minors' competence to execute contracts) and delays their ability to exercise certain rights, the harms are generally slight, and temporary.[227]

Although I agree with Scott's identification of the costs and benefits of the categorical rule, I would weigh them differently.  Existing law, rife with exceptions to the age of majority, demonstrates

---

221.  *Id.* at 1074.

222.  *Id.* at 1095.

223.  *Id.*

224.  *Id.* at 1128.  For a discussion of children's status as rights holders separate from their possessing any specific capacity, see JAMES G. DWYER, THE RELATIONSHIP RIGHTS OF CHILDREN 291-307 (2006).

225.  *See* Scott, *supra* note 2 (arguing in favor of recognizing the legal status of adolescence in the juvenile justice context but retaining the presumptive age of majority in other contexts where it currently applies).

226.  *See, e.g., id.* at 560 ("The use of a [categorical age of majority] to designate the end of childhood ignores individual variations in developmental maturity as well as varying maturity demands across the range of legal rights and responsibilities.  Nonetheless, it generally functions quite well.").

227.  *Id.*

Exhibit 3

0052

that context-specific decision-making poses no undue burden on lawmakers. The argument that failure to extend liberties despite individual capacity imposes minimal harm elides the primacy of the state's obligation to individual liberty. Where capacity exists, the justification for denying that liberty (or vesting it in a parent or guardian) disappears. Further, with respect to certain rights, delay itself can constitute denial. For example, the sixteen-year-old who would refuse surgery to correct a nonfatal congenital defect will be denied the right to do so if her parents consent to the procedure. For the young patient, acquiring the right to make her own medical decisions after reaching majority provides no relief from the earlier denial of that right.

### 2.    Adult Status, Autonomy, and Relationship

As discussed above, young people in today's developed nations identify as markers of adulthood: (1) accepting responsibility for oneself; (2) making independent decisions; and (3) attaining financial independence.[228] At one level, this construction of adulthood is altogether unobjectionable. Most parents, after all, work to raise their children to be responsible, financially independent adults.

At another level, this conception of adulthood is deeply troubling. Conspicuously absent from it are notions of obligation to community or family, or indeed any recognition of the role of ongoing connection and interdependence.[229] The current conception of adulthood instead emphasizes as normative the attainment of individual autonomy and independence. The absence of notions of community is particularly notable in light of the growing importance of ongoing familial support to young people coming of age today.

As discussed above, contemporary young people travel a prolonged path to independence, particularly financial independence. Many young people continue to be at least partially dependent on and tied to their natal families well past the legal age of adulthood.[230] In 2014 more adults aged eighteen to thirty-four lived with parents than

---

228.    *See* discussion *supra* subpart III.B.

229.    Feminists have drawn attention to the ways in which notions of autonomy and individuality have operated to reinforce traditionally hierarchical relationships and minimized relationships and interdependencies. *See, e.g.*, MARTHA ALBERTSON FINEMAN, THE AUTONOMY MYTH: A THEORY OF DEPENDENCY (2004); Katherine Hunt Federle, *On the Road to Reconceiving Rights for Children: A Postfeminist Analysis of the Capacity Principle*, 42 DEPAUL L. REV. 983, 1017-19 (1993).

230.    *See, e.g.*, Stanger-Ross et al., *supra* note 149, at 643-44.

Exhibit 3

0053

with a spouse or partner in their own household, and the trend continues to increase.[231]

To the extent it expresses a societal expectation or norm of across-the-board independence (decisional, financial, etc.), the current conception of adulthood is out of step with the experiences of today's young people. To the extent that the law conveys a normative expectation that they are adults and thus ought to possess adult characteristics, their inability to have done so by the legally prescribed age may be both experienced and perceived as failure.

Not attaining the characteristics of adulthood by the legal age of majority, however, merely reflects the particular social context—including the economic context—in which they are coming of age.

The state's affirmative duty to take action for the purpose of expressing the importance of connection and interdependence is arguably quite limited. But doing so presents lawmakers with what seems a rare opportunity to advance individual liberty (by rejecting the categorical rule in favor of rules more tailored to individual capacities) while also expressing the importance of relationships and community.

## B.    *Assessing Capacity: Lessons from Existing Law and Science*

Categorical rules like an age of legal majority advance goals of administrative efficiency and certainty.[232] The existence of a categorical rule spares the decision maker in a given case the task of making burdensome (and likely unreliable) individualized assessments of capacity. Yet as argued above, lawmakers in the liberal state have a duty to assess the capacities of immature citizens in legal contexts.[233]

In any given context, the interplay of various factors will influence capacity. It is possible to characterize age-related capacity as a function of: (1) patterns of cognitive and socio-emotional development; (2) the nature of the capacity being exercised (e.g., characteristics of the task to be performed or the decision to be made); (3) the context in which the capacity will be exercised; and (4) the broader social, cultural, and economic milieu.

The interrelationship of factors in these categories shapes in predictable ways the typical individual's capacity, for example, to

---

231.    *See* Fry, *supra* note 10.
232.    Scott, *supra* note 2, at 560.
233.    Hamilton, *Immature Citizens*, *supra* note 220, at 1095.

Exhibit 3

0054

make a decision in a certain context or perform a given task. Identifying and accounting for the relevant aspects of these influences on the exercise of capacity can significantly improve policymakers' predictive power.

What, if anything, can brain science contribute to lawmaking or policymaking? It is now well known that the developmental sciences have shed light on aspects of child and adolescent behavior that has important policymaking implications.[234] The most widely touted of these has been lawmaking in the area of juvenile justice.[235] Casual observation can—and has—led to erroneous generalizations about behavior. These mistaken generalizations in turn have led to misguided policymaking. For example, adolescent impulsivity and susceptibility to peer pressure in certain situations have led to the conclusion that they lack the capacity to make reliably mature voting decisions in elections or medical decisions in a doctor's office.[236] Conversely, adolescents' ability to learn the mechanics of motor vehicle operation has led to the conclusion that they have the capacity to operate them competently.[237] Both conclusions are wrong, and insights from the psychological and neurological sciences help explain why.

## C.    *Reconciling Law, Culture, and Capacity: An Example*

One of the central tensions between social and legal adulthood is that individuals are likely to attain fundamental decision-making capacities before they can realistically attain financial stability and self-sufficiency.[238] Yet a near universal consequence of reaching the age of majority is distentitlement to parental support. Indeed, for many young people approaching the age of majority, perhaps one of the most significant changes attending their new status (especially,

---

234.    *See* Laurence Steinberg, *Should the Science of Adolescent Brain Development Inform Public Policy?*, 64 AM. PSYCHOLOGIST 739, 740 (2009) ("[W]e know a good deal about brain development during adolescence that usefully informs policy discussions . . . ."); *cf.* Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 NOTRE DAME L. REV. 89, 95 (2009) ("[L]egal decisionmakers acting in a policymaking role—usually legislatures but sometimes the courts—therefore ought to consider developmental neuroscience one source among many upon which to draw when making legally relevant assumptions about adolescents as a group. To go further is unwarranted and unwise.").

235.    *See, e.g.,* ELIZABETH S. SCOTT & LAURENCE STEINBERG, RETHINKING JUVENILE JUSTICE (2008).

236.    *See* Hamilton, *Democratic Inclusion, supra* note 47, at 1447.

237.    *See* Hamilton, *Liberty Without Capacity, supra* note 129.

238.    *See* discussion *supra* subparts II.A. & II.C.

Exhibit 3

0055

perhaps, for individuals who have a parent who may be grudgingly subject to an order of support) is the expiration of parents' obligation to provide them with support.

As discussed above, it was against a background of economic prosperity that states, upon lowering the ages of conscription and voting, also lowered the age of majority generally. Young people who had previously been minors until age twenty-one (during a period when they arguably had less need of its protections until that age) became adults at eighteen. With that status, they gained the legal rights of adulthood. At the same time, they lost the right of parental support and even the special protections afforded minors by the state through its role as *parens patriae*.

In the intervening decades since lowering the age of majority, however, well-paying manufacturing jobs have all but disappeared. The incomes of workers with a high school degree or less have declined steeply, and their unemployment rates are particularly high. The largest share of jobs in the current economy has moved from manufacturing to the information and services sector, and as discussed above, the best of these jobs require postsecondary education. Failing to recognize the importance of supporting young people as they strive to become the sorts of workers required in today's economy disserves them in the short term, and the larger society in the longer term. State lawmakers should thus seriously consider raising, perhaps to twenty-one, the age through which parents are obligated to support their children.

## V.  CONCLUSION

Young people's conception of adulthood, and their experience of becoming adults, bears little resemblance to the legal construction of adulthood as status. Although they formally attain adult status upon reaching the legal age of majority, that formal marker has remarkably little meaning in young people's lives. What is now socially meaningful is the gradual attainment of the various indicia of adulthood—responsibility for oneself, autonomous decision making, and financial self-sufficiency.

I have argued in this Article that the categorical age of majority contravenes a legal reality constructed by the proliferation of exceptions to it, young people's social experience and subjective constructive of the transition to adulthood, and the capacities gained (and deficiencies retained) over the predictable course of individual developmental processes. By retaining it, the state fails its foremost

Exhibit 3

0056

obligation to safeguard the basic liberties of its citizens. Legal consequences linked to the age of majority are best amended to attach to the specific age to which they pertain—whether or not that is the current age of majority.

I suggest further that the time may have come to jettison not only adulthood as legal status but also adulthood as social construct. Doing so presents the state with a rare opportunity to simultaneously safeguard individual autonomy rights through context-specific rulemaking and also advance the importance of community relationships and the interdependencies of citizens, even in liberal society.

Exhibit 3

0057

# Exhibit 4

Exhibit 4

0058



Content downloaded/printed from          *HeinOnline*

Fri Nov  1 13:57:38 2019

Citations:

Bluebook 20th ed.
T. E. James, The Age of Majority, 4 Am. J. Legal Hist. 22 (1960).

ALWD 6th ed.
T. E. James, The Age of Majority, 4 Am. J. Legal Hist. 22 (1960).

APA 6th ed.
James, T. T. (1960). The age of majority. American Journal of Legal History, 4(1),
22-33.

Chicago 7th ed.
T. E. James, "The Age of Majority," American Journal of Legal History 4, no. 1
(January 1960): 22-33

McGill Guide 9th ed.
T E James, "The Age of Majority" (1960) 4:1 Am J Leg Hist 22.

MLA 8th ed.
James, T. E. "The Age of Majority." American Journal of Legal History, vol. 4, no. 1,
January 1960, p. 22-33. HeinOnline.

OSCOLA 4th ed.
T E James, 'The Age of Majority' (1960) 4 Am J Legal Hist 22

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
     Conditions of the license agreement available at
     *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
          *Copyright Information*

Use QR Code reader to send PDF to your smartphone or tablet device



Exhibit 4

# The Age of Majority

*By* T. E. JAMES*

A CHILD IS REGARDED, in common parlance, as a person under the age of twenty-one years. In the eyes of the common law, all persons were esteemed infants until they attained this age,[1] except for the sovereign, who attained majority at eighteen, though, for legislative purposes, he was never in minority.[2]

Variations in the age of the sovereign's majority could be found as in the case of the majority of others. The King of Denmark came of age at fourteen, according to Lacombe in his history of the ancient kings of the northern European countries. This custom would be referable to a period prior to the tenth century. "At that age the King would declare publicly that he wished no longer to have the services of a tutor."[3] Gothic kings seem frequently to have come of age at fifteen, for example Childebert II in 585 A.D.[4] The aristocracy would have been influenced by the royal example; but, inevitably, the qualifications for majority were different. Thus, in his *Memoirs of Ancient Chivalry*, St. Palaye records that the minority of the nobles in France ended at seventeen, "because they were then judged strong enough and sufficiently qualified for the culture of their lands, the mechanic arts and commerce in which they were all employed." St. Palaye referred to a period before training in arms was developed in the tenth and eleventh centuries, the age of chivalry, for he continued: "yet the profession of arms demanded an ability and strength not to be acquired til twenty-one, and this ex-

---

* Reader in Law, King's College, London, England.

[1] *Co. Litt.* 78.b; BACON *Abridgement* (1832), vol. 4, Infancy and Age, A.

[2] BLACKSTONE, *Commentaries*, vol. 1, p. 248.

[3] LACOMBE, *Abrégé chronologique de l'Histoire du Nord*, (1763), vol. 1. Remarques particuliers sur le Dannemarc, pp. 386-7.

[4] See *Theodorici Regis Italiae Epistolae*, Bk. 1, letter 38.

Exhibit 4

0060

tended to those nobles whose only profession was a military life." [5]

The profession followed, or the function played in society, must have considerably influenced the choice of majority age. In this connection the legal capacity to do certain acts and the majority age were subject to the same test. For example, borough customs which developed in England throw some light on varying ages selected for capacity: "The years of discretion, which brought to a child independent responsibility for crime and trespass, were in some boroughs chosen to give the child full legal capacity; in other cases there was a tendency to vary the age of majority needed according to the particular act which had to be made valid." [6] An anomalous case is recorded where it was pleaded that a child was of age at birth. [7] Apparently, in London, children under age were formerly allowed to devise land, though by 1419 the contrary was stated to be the custom. Municipal guardianship grew, no doubt, alongside the seignorial guardianship and eventually developed into an elaborate system. "The borough court, with orphans under its own wardship, could test for itself the reality of the discretion of the ward before the full legal capacity was granted and the terms of wardship ended." [8] Counting and yard measure tests and whether a child knew a good penny from a bad one were methods employed to ascertain the age of discretion. In some boroughs, for example at London, the rules of socage wardship were adopted under certain circumstances.

The reason why twenty-one was selected as the crucial age for majority appeared to depend upon the ancient rules of tenure. The explanation was based upon good authority; but to understand the background of thought on this subject it is necessary to go back to earlier times, namely to the Roman Law as embodied in the works of Justinian.

In Roman Law, two systems were evolved of protecting a

---

[5] ST. PALAYE, *Memoirs of Ancient Chivalry* (1759); transl. 1784, p. 42. This passage is quoted more fully below.

[6] *Borough Customs*, edited by Mary Bateson (1906), vol. 21, Selden Society. The introduction to this work is relied upon here.

[7] The same suggestion is mentioned by BEAUMANOIR, though he considers it unreasonable. See *Les Coutumes de Beauvoisis*, para. 536.

[8] *Borough Customs*, above p. cxxviii.

Exhibit 4

0061

child, or, perhaps to be more accurate, of protecting its interests. These were the institutions of *tutela* and *cura*. By the time of Justinian three age groups were recognised as carrying legal incapacities. Firstly, "infantia," which existed when the child was incapable of speech. But, about A.D. 407, this was fixed at below seven years of age. Secondly, "tutela impuberes" ceased at puberty, a tutor no longer being required when the child might have children, since the interest of his relatives in the property then ceased. Puberty was in later law fixed "post quartum decimum annum completum" for males[9] and at the completion of twelve years for females.[10] Thirdly, "cura minoris," was of later development and continued for males from the closing of *tutela* "ad vicesimum quintum annum completum."[11] This was subject to "venia aetatis," that is, the privilege of full age could be granted by imperial decree before it was actually attained. In this connection, Constantine provided that "venia aetatis" might be applied for by a man "cum vicesimi anni metas empleverint" or a woman "cum octavum et decimum annum egressae fuerint."[12]

Amongst the barbarian tribes, infancy could be terminated at fifteen[13] and it would seem that this became established as the vital age both for combat and majority. "We find in the Ripuarian laws that the age of fifteen, the ability to bear arms and majority went together."[14] As regards judicial combat, in France fifteen years was essential, for if either the challenger or the challenged were below that age, there could be no combat.[15] Many other countries required a higher age and Beaumanoir expressed the view that in France it should be twenty.

In the northern parts of Europe, between the ninth and

---

[9] *Inst.* 1.22.

[10] C.5.60.3 and *Inst.* 1.22.

[11] *Inst.* 1.23.

[12] C.2.44.2.

[13] TACITUS, *De Moribus Germ.*, c.13; CAESAR, *De Bello Gall.* Bk.6, c.15; and see SELDEN, *Titles of Honor* (1672), Bk.2, c.1, note 6. Originally as in Germany, in all the European States every person who wore a sword had a title to go to the National Assembly.

[14] MONTESQUIEU, *The Spirit of Laws*, Bk.18., c.26.

[15] PH.DE BEAUMANOIR, *Les Coutumes de Beauvoisis*, para. 1810, written in the thirteenth century.

Exhibit 4

0062

eleventh centuries, fifteen seems to have been the age of majority; but the test was quite a different one from that applied in the more stable society governed by Roman Law. In Rome, the question was: had the male "pupil" both understanding and judgment as to acts in law, in particular in relation to property rights? These capacities he was presumed to have at puberty, later fixed at fourteen years. No doubt the principles of Roman Law would have influenced all people within the Empire and the age of fourteen may have been generally accepted, as a result, as the age of maturity for males. However, there is a curious tendency to add a year to ages for capacity, as will appear below, and is noticeable for example, in relation to socage tenure. The explanations given are various, such as an additional year for the handing over of the property or livery of seisin, somewhat similar to the executors' year, or for better certainty. Gilbert[16] allows a certain latitude in calculation, for example, when the law required a year, it added a day for better certainty, as in the case of murder, when death must occur within a year and a day. On the other hand, barbarian peoples may have concluded that fifteen was the age of maturity for males without Roman influence and for needs of their own. Whatever the reason may have been, fifteen is the age that appears to have been adopted in the northern parts of Europe as the age of majority for males; and it was accepted in States far removed from the supposed scenes of feudalism. The test applied in selecting this age seems to have been different from that applied in Rome, namely, the capacity to bear arms. In this connection in Ancient Rome, before the Empire was founded, no citizen was liable to military service before completing his seventeenth year. Later, this age was changed to the sixteenth year.[17] Sir Henry Spelman, writing at the end of the seventeenth century, has a relevant passage, which is to be found in *Reliquiae Spelmannianae*, "De Aetate Militaris," to the same effect though with some variant examples accumulated over a thousand years.[18]

In England the posse comitatus included every freeman

---

[16] GILBERT, LORD CHIEF BARON, *On Tenures* (1796), Preface.

[17] MOMMSEN, *The History of Rome*, 1854-56, pp. 346-7.

[18] *Reliquiae Spelmannianae* (1689), p. 173 et seq.

Exhibit 4

0063

capable of bearing arms. The Assize of Arms, enforced by a proclamation of 1195, provided for all subjects of the age of fifteen or up to be sworn to keep the peace. However, the later *Statutum de Militibus* (1307), provided that none was to be distrained *ad arma militaria suscipienda* till the age of twenty-one.[19]

In the absence of any clear authority, it may be assumed that at one time between the ninth and tenth century, fifteen was also the age of majority in England; but, by the time of the Magna Carta, this age had been raised to twenty-one, at least so far as men holding in knight service were concerned. For it was provided that on a ward coming of age, that is on attaining twenty-one years, he should have his inheritance without relief and without fine. Nevertheless, the lord might claim his aid *pur fair fitz chevaler* as soon as the age of fifteen was attained.[20]

The raising of the age has been attributed to various causes. Some writers have alleged that it was due to the increase in the weight of arms.[21] There are some grounds for this assertion, particularly in Normandy and England in the ninth and tenth centuries, where the need had arisen for society to protect itself. The Franks dominated the situation; and the needs of the time resulted in a military revolution involving the mounted knight.[22] In the late eleventh century, knighthood became a social distinction. The reception of a young man of an age to bear arms was marked with a ceremony and armour became more elaborate, although it was not until about the middle of the thirteenth century that armour increased considerably in weight. The new feature introduced in the late eleventh and in the twelfth centuries related especially to the more elaborate defensive armour. The knee-

---

[19] 1 Ed.2, St.1.

[20] 1225, 9 Hen. *111*, c.3. This confirmed the common law rule as stated by Glanville, Lib.7, c.9; St. of Westm.1., 3 Edw.1., c.36; Co.Litt.78,.b.

[21] GILBERT, *On Tenure* (1796), in the Preface; GILBERT STUART, *Society in Europe* (1778), p. 56; MONTESQUIEU, *op. cit.,* Bk. 18.c.26.

[22] LACOMBE, *Arms and Armour,* trans. Ch. Boutall (1869). It has been suggested that the practical value of cavalry was first appreciated in the West in warfare against the Saracens in the eighth century. See also LAKING, *A Record of Armour and Arms through Seven Centuries* (1920), vol. 1, p. 61.

Exhibit 4

0064

length mail shirt was developed to give protection to the extremities of the man who wore it, the sleeves and skirt were lengthened and narrowed, until forearms, wrists, hands, legs and feet were all covered. In addition, a mail coif guarded the neck and most of the face.[23] "From the Conquest onward the history of arms and armour is, in the main, a history of fashions of knights who will fight on horseback whenever they dare risk the skin of the costly beast, the destrier or great horse." [24] At the time of the Conquest, the English were accustomed to ride to the battlefield but dismounted to fight.

Apart from the development in defensive armour in the eleventh and twelfth centuries, contributing factors to the raising of the age from fifteen would have been the use of horses in battle by the knight and the added skill required in combat. These would give rise to the need for the more thorough training of the young potential warrior.

It must be remembered that there were two classes of knights in feudal institutions: the one of great antiquity, the other evolving from the invention of a fee, that is the knight who was a receiver of a feudal grant.[25] The former class of knight signified, before the Conquest, a military dependent of a great landholder. Indeed, in Norman times, the knight and squire were the lowest in the scale of nobility to possess the privilege of wearing a sword. Knight service was of Norman introduction to England and did not, it seems, arise out of old English customs. This system would have been similar to that known throughout France. There is some evidence, moreover, that the importance of the institution of this second class of knighthood was still not developed in the late eleventh century.[26]

In about 1070, William the Conqueror reorganized the professional army, placing the emphasis on the mounted knight

---

[23] DEMAY, *Le Costume au Moyen Age d'après les Sceaux* (1880); LAKING, *A Record of Armour and Arms through Seven Centuries* (1920), vol. 1; SMAIL, *Crusading Warfare* (1956).

[24] LAKING, *op. cit.*, vol. 1, p. 32.

[25] LAKING, *op. cit.*, vol. 1, p. 61.

[26] J. SELDEN, *Titles of Honor*, Bk.2.c.1, sect. 2; J. H. ROUND, *The Introduction of Knight Service into England*, 1891.

This is born out, for example, by a document, commented upon by C. H. Haskins, from Normandy between 1070 and 1081 which related

Exhibit 4

0065

who had to serve a military apprenticeship to achieve the requisite skill.[27] The training of the knight seems to have become formalised in the age of chivalry. St. Palaye gives a detailed account of the training for knighthood, from birth till the age of twenty-one, when the youth "after so many proofs of valour might be admitted to the honour." [28]

It was at this age of twenty-one that the squire might become a knight. Particular merit might gain him the honour before that age, as is illustrated by dramatists and writers. Sovereigns in particular were regarded automatically as possessing superior genius. The regular age was, however, twenty-one for those who were destined to follow the profession of arms and this became the age also for the acceptance of a duel. St. Palaye makes the point that, though the French nobles attained their majority at seventeen, being then strong enough and sufficiently qualified to cultivate their lands and to indulge in commerce, still "the profession of arms demanded an ability and strength not to be acquired till the age of twenty-one." [29]

It follows that the study of military skill and the laborious training in the customs of chivalry would have been an added factor, if not a cause, for raising the age of majority.

The ultimate selection of the age of twenty-one, as the age at which knighthood was attained in the age of chivalry, was probably connected with the age at which infants come out of ward. So far as wardship was concerned, the Duke of Normandy had the guardianship of all orphans within age bound by homage in connection with a fief. Within age is specifically defined, in this connection, as those who have not

to the disposal by the Conqueror of an heiress, her husband to receive certain specifically defined aids, which did not include the aid for knighting the eldest son. Doc. No. 714 from the Cartulary of Mont-St. Michel: *English Historical Review* (1907), vol. 22, p. 647.

[27] G. O. SAYLES, *The Medieval Foundations of England* (1948); C. STEPHENSON, *Medieval Feudalism* (1942).

[28] ST. PALAYE, *Mémoires sur L'Ancienne Chevalerie* (1759) trans. 1784, p. 39.

[29] See, for example, SHAKESPEARE, *Henry VI*, Part III, Act 2, Scene 2, where Henry VI knights his own Edward, Prince of Wales; ST. PALAYE, *Mémoires sur L'Ancienne Chevalerie* (1759), trans. 1784, pp. 3-42.

Exhibit 4

0066

completed their twentieth year "and for these one allows another year, according to the customs of Normandy, in which they may apply to the Court and claim the property of their ancestors." [30] Why twenty was selected as the age of emancipation is a question to which there seems to be no answer. It is suggested that the choice is related to the development of the age of chivalry, in the eleventh and twelfth centuries, which required a period of training, for the attainment of the honour of knighthood, not only in the military arts but also in the principles of chivalry.[31]

Although the age of knighthood in England at the time of Coke had been fixed for several centuries at twenty-one,[32] the lord might have claimed his aid *pur faire fitz chevaler* as soon as the age of fifteen was attained.[33] This was a relic of ancient usage and follows the very early fixing of the age of majority on the completion of fourteen, later extended to twenty-one years, suggested for northern countries. Moreover, an Act of Parliament might declare a person of full age before he was twenty-one though, it is to be observed, the honour of knighthood does not appear to have been eagerly sought on all occasions.[34] With respect to military tenures, wardship was terminated at twenty-one, "at which age the law presumed he was qualified both by skill and strength of body to perform the part of a soldier." [35]

---

[30] *L'Ancienne Coutume de Normandie*, edited by Wm. Lawrence de Gruchy, 1881, c.33. Though the date of the Coutume is uncertain, commentators are almost generally agreed in placing the final composition at the end of the thirteenth century.

[31] It may be related to the rule established by Constantine that male minors might apply for *venia aetatis* at that age.

[32] *Co. Litt.* 78.b, 88b; BLACKSTONE, Commentaries, vol. 1, p. 463.

[33] St. of West. 1, 3 Edw. I., c.36; *Co.Litt.* 78b. Moreover the lord might terminate lordship by knighting the heir.

[34] 4 *Co. Inst.* 36; BLACKSTONE, *Commentaries*, vol. 2, p. 87; St. of Knights (1307), 1 Edw. II, which provided that "none shall be distrained to take upon him the order of a knight before he come to the age of one and twenty."

[35] F. S. SULLIVAN, *An Historical Treatise on the Federal Law*, 1772, Lect. 12, p. 136 etc. The above reasoning is substantiated by Sullivan, in this lecture: the lord was obliged to answer to the king, or other superior lord, for all military duties and he, therefore, took the profits of the land during the ward's minority; the lord instructed the heir meanwhile in the art of war.

Exhibit 4

0067

This reasoning would not apply to tenants in socage, where the relations of the heir, to whom the wardship appertained, were accountable for the profits of the tenancy and therefore, on the tenant attaining majority, the reason for the continuance of the wardship ceased. These tenants were not interested immediately in the change in the nature of armour and the increased skill in military arts. In socage tenure, which was essentially agricultural, the heir came of majority, or out of ward, as soon as he became capable of attaining to husbandry and "of conducting his rustic employs." Fifteen seems to have been the recognized age of majority for socage tenants, which age was later reduced to fourteen; but a certain evolution is observable as regards this age. Glanville states the age to be fifteen; Bracton refers to fifteen and fourteen; Fleta mentions no specific years but says that the heir who held by socage tenure became of age when marriageable and then states that the age of marriage was fixed at fourteen.[36] The adoption of the age of fourteen in Fleta's time may have been no more than a return to an old practice, this age being originally the age of majority in socage, which tenure some authorities suggest had an origin previous to the Norman Conquest. However, by local customs the age of majority was generally at fifteen. One of the best known examples is that of Gavelkind accepted in the County of Kent. By this custom the additional year was added, for the heir at majority was obliged to appear in the court of the lord and demand his inheritance, which the Lord was accordingly obliged to deliver.[37]

It would seem, therefore, that the present age of majority at twenty-one was early established at common law. The choice of this age evolved perhaps from the system of judicial combat and knight service, the age of knighthood being increased from fourteen or fifteen to the completion of twenty years, owing to the weight of the arms and the greater skill required in warfare. The added year may be accountable to the need for the suing of livery. For, at the conclusion of wardship, the guardian was bound to restore to the heir his

[36] *Gl.Lib.* 8,cap.9; *Br. Lib.*2, c.37, f.86b; *Lib.*5, c.21, f.422a. *Fleta Lib.* 1.c.9.f.5; *Lib.* 1, c.13.

[37] ROBINSON, *Gavelkind*, Bk.2. c.2, pp. 185-222.

Exhibit 4

0068

inheritance in good condition and freed from debts, this obligation being measured by the duration of the wardship and the amount of the inheritance. The heir would therefore require time to enter upon his lands to enquire into the state of his property. It may well be that when the age of fifteen was fixed for the purpose of military tenure, the test being the ability to bear arms, socage tenure followed the élite in accepting this age likewise. Since only military tenure was affected immediately by the bearing-of-arms test, on the development of armour and the art of combat the age was increased to twenty-one. Meanwhile the rule in socage tenure remained unchanged except for the variation described above, reducing the age of majority to fourteen.

It is of interest in considering the age of majority to refer to the age of marriage. Depending on the age of puberty, the age of fourteen for males fixed by Justinian was generally followed throughout Western Europe, subject of course to the requisite consents by guardians and parents. The authority of the guardian was an essential control of the ward. As the result of the abolition of military tenure in 1660 and the turning of all lands so held into socage, wardship would then have ended in all cases at the age of fourteen when the tenant would choose his own guardian.[38] There was therefore a grave disadvantage in this early cessation from the danger of an improvident choice of a guardian being made. Accordingly, the statute of Charles II provided that the father could in all cases appoint a guardian by deed or by will until his child attained twenty-one. Subsequently, if no such appointment were made, the Court of Chancery often intervened and appointed a guardian to prevent the infant squandering his patrimony.

Nevertheless, thereafter at fourteen an infant might dispose of himself or herself in marriage without the consent of the guardian and this was so until the Marriage Act of 1753, which rendered marriages of persons under twenty-one years,

---

[38] For at this age, the law supposed a tenant in socage to be capable of choosing a guardian for himself: BLACKSTONE, *Commentaries*, vol, 2, p. 97. See also, 12 Car. 2, c.24.

Exhibit 4

0069

even of socage tenure, in which marriage was not any per-
quisite or advantage.[39] A statute of Philip and Mary had the
effect of enlarging the duration of legal control of a father
over his daughter from fourteen to sixteen, at least insofar
as it can be enforced by habeas corpus. The direct object of
this Act was to prevent the taking and marrying of girls under
sixteen without the consent of their parents.[40] This would
seem to be the reason today for fixing the woman's age of
consent to sexual intercourse at sixteen. There is no apparent
reason, unless by analogy to the age of consent for females,
why the age at which males may marry has presently been
fixed in England at sixteen years.[41] However, the age at which
the parties to a marriage could give consent was formerly
fixed in accordance with the rules of Roman Law. Swinburne,
writing at the end of the sixteenth century, on "Spousals,"
states that under seven all espousals are void. From seven to
fourteen for males and twelve for females they are voidable.
Coke allowed a girl to be dowable once she had attained the
age of nine. Clearly, at one time marriages took place at very
early ages on occasions and could be consummated as soon
as the onset of puberty. The age of consent to sexual relations
would seem to have been of later development. No doubt, the
fixing of the age of consent for marriage in the case of males
is the origin of the common law rule that males under fourteen
are presumed to be impotent.[42]

---

[39] However, as regards the eldest son, in socage tenure in respect
to matters other than marriage "with respect to the custody of the
body alone," the guardianship of the father, which is a guardianship
by nature, continued until the son and heir apparent attain the age
of 21 years," per Holt C. J. in *King v. Thorp*, Carthew, p. 386.

Lord Hardwicke's Act, 26, Geo. 2.c.33, enacted to prevent clandes-
tine marriages. See in respect of consents ss. 3 and 11. This is no longer
the law today, see the Marriage Act, 1949.

[40] 4 and 5 Ph. & M.c.8. This statute is now repealed but its direct
object is embodied in Sexual Offenses Act 1956, s.20.

[41] See Marriage Act, 1949, s.2. and Sexual Offences Act, 1956, s.6.
for the age of consent by girls.

[42] *Co. Litt.* 78b; see also 1 BLACKSTONE, *Commentaries*, vol. 1, p. 463.

No evidence in such a case is admissible to show, when rape is
charged, that the defendant had in fact arrived at the full state of
puberty and could commit the offence; *R. v. Phillips*, 8C & P. 736; *R. v.
Waite* (1892) 2 Q.B. 600.

Exhibit 4

0070

It would seem that the age of majority, fixed at twenty-one, is a curious development from the older systems requiring military service. Having upon it the mark of usage by the élite, it became generally accepted when those services finally disappeared.[43] It is possible that the choice of twenty with the subsequent addition of a year, was influenced by *venia aetatis* for male minors of that age, allowed by Constantine.

The Roman Law rule, fixing the age of *plenam maturitatem* at twenty-five, seems nowhere in the common law to have been accepted. In ecclesiastical law, twenty-five appears as the age fixed for admission to any benefice with cure by the Lateran Council.[44] This age is familiar to conveyancers in England, as is evidenced by the cases. Since the postponement of the vesting of a gift in favour of children until twenty-five occurred so frequently in wills and settlements, it is evidence that the donors considered that the beneficiaries would attain a true sense of discretion at that age.[45]

---

[43] This is indicated in the Introduction to vol. 38, (1921) of the Selden Society, edited by Vinogradoff and Ehrlich.

[44] *Gibs. Cod.*848. By 13 Eliz.c.12,s.3, no person was to be admitted to any benefice with cure till he was at least twenty-three. Subsequently, twenty-four was fixed as the lowest age for admittance to the priesthood, which was a necessary condition to being admitted to any ecclesiastical benefice: 44 Geo.3.c.23 and *Gibs.Cod.*848.

[45] Indeed, so frequently have testators and settlors in the past used ages above twenty-one for the vesting of a gift (in fact, the age of twenty-five is most commonly to be found in the cases) that the legislature has intervened to prevent the rule against perpetuities rendering such delayed gifts void: Law of Property Act, 1925, s.163.

Exhibit 4

0071

# Exhibit 5

Exhibit 5

0072

# COMMENTARIES

ON

# AMERICAN LAW.

## BY JAMES KENT.

VOLUME II.

*NEW-YORK:*

PUBLISHED BY O. HALSTED.

1827.

Exhibit 5

0073

# CONTENTS.

---

## PART IV.

### OF THE LAW CONCERNING THE RIGHTS OF PERSONS.

Page

LECTURE XXIV.—*Of the Absolute Rights of Persons,* - - - - 1
    1. The history and character of bills of rights, *ib.*
    2. The right of personal security, - - - - - 9
    3. The law concerning slander and libels, 12
    4. The right of personal liberty, and the
        writ of *habeas corpus,* - - - - - - - - 22

LECTURE XXV.—*Of Aliens and Natives,* - - - - - - - - - - - 33
    1. Of natives, - - - - - - - - - - - - - - - *ib.*
    2. The doctrine of allegiance and expatri-
        ation, - - - - - - - - - - - - - - - - - - 36
    3. Of aliens, - - - - - - - - - - - - - - - - - 48

LECTURE XXVI.—*Of the Law concerning Marriage,* - - - - - 65
    1. Marriages, when void for lunacy or fraud, *ib.*
    2. The age of consent, - - - - - - - - - - - - 67
    3. Bigamy, - - - - - - - - - - - - - - - - - - 68
    4. Marriage between near relations, - - - - 70
    5. The consent of parents, - - - - - - - - - 73
    6. The forms of marriage, - - - - - - - - - - 75
    7. Foreign marriages, - - - - - - - - - - - - 78

LECTURE XXVII.—*Of the Law concerning Divorce,* - - - - - 81
    1 Divorce *a vinculo,* - - - - - - - - - - - - - *ib.*
    2. Foreign divorces, - - - - - - - - - - - - - 89
    3. Effect of foreign judgments, - - - - - - 101
    4. Divorce *a mensa et thoro,* - - - - - - - - 104

LECTURE XXVIII.—*Of Husband and Wife,* - - - - - - - - - 109
    1. The husband's right by marriage in the
        property of the wife, - - - - - - - - - - 110
    2. The duties of the husband, - - - - - - - - 121

Exhibit 5

0074

Page

   3. The wife's power at law to act as a *feme
      sole*, - - - - - - - - - - - - - - - - - - - 127

   4. Her capacity in equity, - - - - - - - - - - - 136
   5. Other rights and disabilities incident to
      the marriage union, - - - - - - - - - - - 149

LECTURE XXIX.—*Of Parent and Child*, - - - - - - - - - - - - - 159
   1. The duties of parents, - - - - - - - - - - - *ib.*
   2. The rights of parents, - - - - - - - - - - - 169
   3. Of illegitimate children, - - - - - - - - - 173

LECTURE XXX.—*Of Guardian and Ward*, - - - - - - - - - - - 181
   1. Guardian by nature. - - - - - - - - - - - - *ib.*
   2. Guardian by nurture, - - - - - - - - - - - 182
   3. Guardian in *socage*, - - - - - - - - - - - - *ib.*
   4. Testamentary guardians, - - - - - - - - - 184
   5. Guardians judicially appointed, - - - - - 185
   6. The duty and responsibility of guardians, 187

LECTURE XXXI.— *Of Infants.*—And herein of their acts,
      when void, when voidable, and when valid, 191

LECTURE XXXII.—*Of Master and Servant*, - - - - - - - - - - 201
   1. Slaves, domestic slavery, and its extinc-
      tion in this state, - - - - - - - - - - - - - *ib.*
   2. Hired servants, - - - - - - - - - - - - - - - 209
   3. Apprentices, - - - - - - - - - - - - - - - - - 211

LECTURE XXXIII.—*Of Corporations*, - - - - - - - - - - - - - 215
   1. The history of corporations, - - - - - - - 216
   2. The various kinds of corporations, - - - 220
   3. Their powers and capacities, - - - - - - - 224
   4. The visitation of them, - - - - - - - - - - 240
   5. Their dissolution, - - - - - - - - - - - - - 245

---

# PART V.

OF THE LAW CONCERNING PERSONAL PROPERTY.

LECTURE XXXIV.—*Of the History, Progress, and Absolute
          Rights of Property*, - - - - - - - - - - - 255
   1. Of title by occupancy, - - - - - - - - - - - 256
      Of wrecks, - - - - - - - - - - - - - - - - 259

Exhibit 5

0075

Page

2. Of markets overt, - - - - - - - - - - - - 261

3. The right of alienation, - - - - - - - - - 264

4. Of sumptuary laws, - - - - - - - - - - - 266

5. Of taxation, - - - - - - - - - - - - - - - 268

6. Of the claim for improvements on land, 271

7. The right of government to assume pro-
   perty, and control its use, - - - - - - - 274

LECTURE XXXV.—*Of the Nature, and various Kinds of Per-
   sonal Property,* - - - - - - - - - - - - 277

1. Chattels real, and fixtures, - - - - - - - 278

2. Qualified property in chattels personal, 281

3. Joint tenancy in chattels, - - - - - - - - 283

4. Chattel interests in remainder, - - - - - 285

LECTURE XXXVI.—*Of Title to Personal Property by original
   acquisition,* - - - - - - - - - - - - - - - 289

1. Of original acquisition by occupancy, - *ib.*

2. ———————— by accession, - - - - - 293

3. ———————— by intellectual labour, 293

   (1.) Of patent rights for inventions, - 299

   (2.) Of copyrights of authors, - - - - - 306

LECTURE XXXVII.—*Of Title to Personal Property by trans-
   fer by act of law,* - - - - - - - - - - - - 317

1. By forfeiture, - - - - - - - - - - - - - - *ib.*

2. By judgment, - - - - - - - - - - - - - - 319

3. By insolvency, - - - - - - - - - - - - - 321

4. By intestacy, - - - - - - - - - - - - - - 332

LECTURE XXXVIII.—*Of Title to Personal Property by Gift,* 353

1. Gifts *inter vivos,* - - - - - - - - - - - - 354

2. Gifts *causa mortis,* - - - - - - - - - - - 358

LECTURE XXXIX.—*Of the Contract of Sale,* - - - - - - - - 363

1. Of the different kinds of contracts, - - - *ib.*

2. Of the consideration, - - - - - - - - - - 364

3 Of the subject matter of the contract, - 367

4. Of the implied warranty of the articles
   sold, - - - - - - - - - - - - - - - - - - 374

5. Of the duty of mutual disclosure of ma-
   terial facts, - - - - - - - - - - - - - - - 377

6. Of passing the title by delivery, - - - - - 387

Exhibit 5

0076

CONTENTS.

Page

7. Of the memorandum required by the sta-
tute of frauds, - - - - - - - - - - - - - - 402
8. Of sales of goods as affected by fraud, - 403
9. Of sales at auction, - - - - - - - - - - - 423
10. Of the vendor's right of stoppage *in tran-
situ*, - - - - - - - - - - - - - - - - - - - 427

LECTURE XL.—*Of Bailment*, - - - - - - - - - - - - - - - - 437
1. Of *depositum*, - - - - - - - - - - - - - - *ib.*
2. Of *mandatum*, - - - - - - - - - - - - - 443
3. Of *commodatum*, - - - - - - - - - - - - 446
4. Of pledging, - - - - - - - - - - - - - - - 449
5. Of *locatum*, or hiring for a reward.—And
herein of the law concerning innkeep-
ers and common carriers, - - - - - - - 456

LECTURE XLI.—*Of Principal and Agent*, - - - - - - - - - - - 477
1. Agency, how constituted, - - - - - - - - - *ib.*
2. Of the power and duty of agents, - - - - 481
3. Of the agent's right of lien, - - - - - - - 495
4. Of the termination of agency, - - - - - - 504

LECTURE XLII.—*Of the History of Maritime Law*, - - - - - - 509
1. Of the maritime legislation of the an-
cients, - - - - - - - - - - - - - - - - - - - 510
2. Of the maritime legislation of the mid-
dle ages, - - - - - - - - - - - - - - - - - - 515
3. Of the maritime legislation of the mo-
derns, - - - - - - - - - - - - - - - - - - - 522

ERRATA.

Page  2, l.  1, for has read have.
      29,    18, for for read of.
      65, last line, for *ver.* read *rer.*
      112, l. 18, dele that.
      387,    20, for of read at.
      398,    26, for beauty read brevity.
      401,    17, for was read is.
      —,     18, for passed read passes.

Exhibit 5

0077

# LECTURE XXXI.

## OF INFANTS.

THE necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years. Within that period, minors cannot, except in a few specified cases, make a binding contract, unless it be for necessaries, or in marriage. Nor can they do any act to the injury of their property, which they may not avoid, or rescind, when they arrive at full age. The responsibility of infants for crimes by them committed, depends less on their age, than on the extent of their discretion and capacity to discern right and wrong.

Most of the acts of infants are voidable only, and not absolutely void; and it is deemed sufficient, if the infant be allowed, when he attains maturity, the privilege to affirm or avoid, in his discretion, his acts done, and contracts made in infancy. But when we attempt to ascertain from the books, the precise line of distinction between void and voidable acts, and between the cases which require some act to affirm a contract, in order to make it good, and some act to disaffirm it, in order to get rid of its operation, we meet with much contradiction and confusion. A late writer, who has compiled a professed treatise on the law of infancy, concludes, from a review of the cases, that the only safe criterion by which we can ascertain, whether the act of an infant be void or voidable, is, "that acts which are capable of being legally ratified are voidable only; and acts which are incapable of being legally ratified are absolutely void.[a] But, the

---

a  *Bingham on Infancy*, 88.

Exhibit 5

0078

criterion here given, does not appear to free the question
from its embarrassment, or afford a clear and definite test.
All the books are said to agree in one result, that whenever
the act done *may be* for the benefit of the infant, it shall not
be considered void, but he shall have his election when he
comes of age, to affirm or avoid it; and this, says Ch. J.
Parker,[a] is the only clear and definite proposition, which can
be extracted from the authorities. But we are involved in
difficulty, as that learned judge admits, when we come also
to the application of this principle. In *Zouch* v. *Parsons,*[b]
it was held by the K. B., after a full discussion and great
consideration of the case, that an infant's conveyance by
lease and release, was voidable only ; and yet Mr. Preston[c]
condemns that decision in the most peremptory terms, as
confounding all distinctions and authorities on the point ; and
he says, that Lord Eldon repeatedly questioned its accuracy
On the other hand, Mr. Bingham[d] undertakes to show, from
reason and authority, that the decision in Burrows is well
founded ; and he insists[e] that all the deeds, and acts, and con-
tracts of an infant, except an account stated, a warrant of
attorney, a will of lands, a release as executor, and a con-
veyance to his guardian, are, in judgment of law, voidable
only, and not absolutely void. But the modern as well as
ancient cases, are much broader in their exception. Thus
it is held, that a negotiable note, given by an infant, even for
necessaries, is void ;[f] and his acceptance of a bill of exchange
is void ;[g] and his contract as security for another, is abso-
lutely void ;[h] and a bond, with a penalty, though given for

---

a Whitney v. Dutch, 14 *Mass. Rep.* 457.
b 3 *Burr.* 1794.
c *Treatise on Conveyancing,* vol. ii. 249.
d *Law of Infancy,* ch. 2.
e See his work, p. 34, and also his preface.
f Swasey v. Administrator of Vanderheyden, 10 *Johns. Rep.* 33.
g Williamson v. Watts, 1 *Campb. N. P.* 552.
h Curtin v. Patton. 11 *Serg. & Rawle.* 305.

Exhibit 5

0079

necessaries, is void.* It must be admitted, however, that the tendency of the modern decisions is in favour of the reasonableness and policy of a very liberal extension of the rule, that the acts and contracts of infants should be deemed voidable only, and subject to their election when they became of age, either to affirm or disallow them. If their contracts were absolutely void, it would follow as a consequence, that the contract could have no effect, and the party contracting with the infant, would be equally discharged.*b* The doctrine of the case of *Zouch* v. *Parsons*, has been recognised as law in this country, and it is not now to be shaken. On the authority of that case, even the bond of an infant has been held to be voidable only at his election.*c* It is an equitable rule, and most for the infant's benefit, that his conveyances to and from himself, and his contracts, in most cases, should be considered to be voidable only.*d* Lord Ch. J. Eyre, in *Keane* v. *Boycott*,*e* undertook to reconcile the doctrine of void and voidable contracts, on the ground, that when the court could pronounce the contract to be to the infant's prejudice, it was void, and when to his benefit, as for necessaries, it was good; and when the contract was of an uncertain nature as to benefit or prejudice, it was voidable only at the election of the infant. Judge Story declared these distinctions to be founded in solid reason,*f* and they are considered to be so, and the point is not susceptible of greater precision.

If the deed or contract of an infant be voidable only, it is nevertheless binding on the adult with whom he dealt, so long as it remains executory, and is not rescinded by the in-

---

*a* *Co. Litt.* 172 a. recognised as being still the law by *Bayley, J.* in 3 *Maul. & Selw.* 482.

*b* 1 *Fonb. Tr. of Eq.* 74.

*c* Conroe v. Birdsall, 1 *Johns. Cas.* 127.

*d* Jackson v. Carpenter, 11 *Johns. Rep.* 539.   Oliver v. Houdlet, 13 *Mass. Rep.* 237.   Roberts v. Wiggin, 1 *N. H. Rep.* 73.   Wright v. Steele, 2 *N. H. Rep.* 55.

*e* 2 *H. Blacks.* 511.

*f* 1 *Mason's Rep.* 82.

Exhibit 5

0080

fant.[a]  It is also a general rule, that no one but the infant
himself, or his legal representatives, can avoid his voidable
deed or contract ; for while living, he ought to be the ex-
clusive judge of the propriety of the exercise of a personal
privilege intended for his benefit ; and when dead, those
alone should interfere who legally represent him.[b]  The in-
fant's privilege of avoiding acts which are matters of record,
as fines, recoveries, and recognizances, is much more limited
than his privilege of avoiding matters *en pais*.  The former
must be avoided by him by writ of error, or *audita querela*,
during his minority ; but deeds, writings, and parol contracts,
may be avoided during infancy, or after he is of age, by his
dissent, entry, suit, or plea, as the case may require.[c]  If any
act of confirmation be requisite after he comes of age, to give
binding force to a voidable act of his infancy, slight acts and
circumstances will be a ground from which to infer the as-
sent ; but the books appear to leave the question in some
obscurity, when and to what extent a positive act of con-
firmation on the part of the infant is requisite.  In *Holmes*
v. *Blogg*,[d] the Ch. Justice observed, that in every instance
of a contract, voidable only by an infant on coming of age,
he was bound to give notice of disaffirmance of the contract
in a reasonable time.  The inference from that doctrine is,
that without some act of dissent, all the voidable contracts of
the infant would become binding.  But there are other cases
which assume that a voidable contract becomes binding
upon an infant after he comes of age, only by reason of acts
or circumstances, amounting to an affirmance of the con-

---

a  Smith v. Bowin, 1 *Mod.* 25.  Holt v. Ward, *Str.* 937.  Warwick
v. Bruce, 2 *Maul. & Selw.* 205.  Brown v. Caldwell, 10 *Serg. &
Rawle*, 114.

b  8 *Co.* 42. b.  Keane v. Boycott, 2 *H. Blacks.* 511.  Van Bramer
v. Cooper, 2 *Johns. Rep.* 279.  Jackson v. Todd, 6 *ibid.* 257.  Oliver
v. Houdlet, 13 *Mass. Rep.* 237.  Roberts v. Wiggin, 1 *N. H. Rep.* 73.

c  *Co. Litt.* 380. b.

d  3 *Taunton*, 35.

Exhibit 5

0081

tract.[a]  In the cases of *Jackson* v. *Carpenter*, and *Jackson* v. *Burchin*,[b] the infant had disaffirmed the voidable deed of his infancy, by an act equally solemn, after he became of age.  This is the usual and the suitable course, when the infant does not mean to stand by his contract ; and his confirmation of the act or deed of his infancy, may be justly inferred against him after he has been of age for a reasonable time, either from his positive acts in favour of the contract, or from his tacit assent under circumstances not to excuse his silence.  In *Curtin* v. *Patton*,[c] the court required some distinct act, by which the infant either received a benefit from the contract after he arrived at full age, or did some act of express and direct assent and ratification ; but that was the case of a contract considered to be absolutely void. In the case of voidable contracts, it will depend upon circumstances, such as the nature of the contract, and the situation of the infant, whether any overt act of assent or dissent on his part be requisite to determine the fact of his future responsibility.

Infants are capable, for their own benefit, and for the safety of the public, of doing many binding acts.  Contracts for necessaries are binding upon an infant, and he may be sued and charged in execution on such a contract, provided the articles were necessary for him under the cir-

---

*a* Evelyn v. Chichester, 3 *Burr*. 1717.  1 *Rol. Abr.* tit. *Enfants.* k. *Co. Litt* 51. b.  Hubbard v. Cummings, 1 *Greenleaf*, 11.  In Holmes v. Blogg, 8 *Taunton*, 508., it is remarkable that the distinguished counsel in that case, one of whom is now Lord Chancellor, and the other Ch. J. of the C. B., treat this as an open and debateable point. Serjeant *Copley* insisted, that the infant's contract was binding on him when he became adult, because there had been no disaffirmance of it; and Sergeant *Best* contended, that disaffirmance was not necessary, and that infants were not bound by any contract, unless the same was affirmed by them after coming to full age.

*b* 11 *Johns. Rep.* 539.  14 *ibid.* 124.

*c* 11 *Serg. & Rawle*, 305.

Exhibit 5

0082

cumstances and condition in which he was placed.[a]   The
question of necessaries is governed by the real circumstances
of the infant, and not by his ostensible situation ; and, there-
fore, the tradesman who trusts him is bound to make due in-
quiry.[b]   Lord Coke considers the necessaries of the infant
to include victuals, clothing, medical aid, and " good teach-
ing or instruction, whereby he may profit himself after-
wards."[c]   If the infant lives with his father or guardian,
and their care and protection are duly exercised, he cannot
bind himself even for necessaries.[d]   It is also understood,
that necessaries for the infant's wife and children, are ne-
cessaries for him ;[e] and in all cases of contracts for neces-
saries, the real consideration may be inquired into.   The
infant is not bound to pay for the articles furnished, more
than they were really worth to him as articles of necessity,
and, consequently, he may not be bound to the extent of
his contract ; nor can he be precluded, by the form of the
contract, from inquiring into the real value of the necessa-
ries furnished.[f]

    Infancy is not permitted to protect fraudulent acts ; and,
therefore, if an infant takes an estate, and agrees to pay
rent, he cannot protect himself from the rent, after enjoying
the estate, by pretence of infancy.   If he pays money with
his own hand, without a valuable consideration for it, he
cannot get it back again.   If he receives rents, he cannot de-

---

    a  Ive v. Chester, *Cro. Jam.* 560.   Clarke v. Leslie, 5 *Esp. N. P.*
28.   Coates v. Wilson, *ibid.* 152.   Berolles v. Ramsay, 1 *Holt's N.
P.* 77.

    b  Ford v. Fothergill, *Peake's N. P.* 229.

    c  *Co. Litt.* 172 a.

    d  Bainbridge v Pickering, 2 *Blacks. Rep.* 1325.   Wailing v. Toll,
9 *Johns. Rep.* 141.

    e  Turner v  Trisby, *Str.* 168.

    f  Makarell v. Bachelor, *Cro. Eliz.* 583.

Exhibit 5

0083

mand them again when of age.[a]   There are, however, many
hard cases in which the infant cannot be held bound by his
contracts, though made in fraud ; for infants would lose all
protection if they were to be bound by their contracts made
by improper artifices, in the heedlessness of youth, before
they had learned the value of character, and the just obli-
gation of moral duties.   Where an infant had fraudulently
represented himself to be of age when he gave a bond, it
was held that the bond was void at law.[b]   But where he
obtained goods upon his false and fraudulent affirmation
that he was of age, though he avoided payment of the price
of the goods, on the plea of infancy, the vendor was held
entitled to reclaim the goods, as having never parted with
his property in them ;[c] and it has been suggested, in a re-
cent case,[d] that there might be an instance of such gross
and palpable fraud, committed by an infant arrived at the
age of discretion, as would render a release of his right to
land binding upon him.   Infants are liable in actions arising
*ex delicto*, whether founded on positive wrongs, or construc-
tive torts, or frauds.   But the fraudulent act, to charge
him, must be wholly tortious ; and a matter arising *ex con-
tractu*, though infected with fraud, cannot be changed into
a tort, in order to charge the infant in trover, or case, by a
change in the form of the action.[e]   He is liable in trover
for tortiously converting goods intrusted to him ;[f] and in
detinue, for goods delivered upon a special contract for a
specific purpose ;[g] and in *assumpsit*, for money which he
has fraudulently embezzled.[h]

---

*a* Kirton v. Elliott, 2 *Bulst.* 69.   Lord Mansfield, in 2 *Eden*, 72.
Holmes v. Blogg, 8 *Taunton*, 508.

*b* Conroe v. Birdsall, 1 *Johns Cas.* 127.

*c* Badger v. Phinney, 15 *Mass. Rep.* 359.

*d* Stoolfoos v. Jenkins, 12 *Serg. & Rawle*, 399.

*e* Jennings v. Rundall, 8 *Term Rep.* 335.   Johnson v. Pie, 1 *Lev.*
169.

*f* Homer v. Thwing, 3 *Pickering*, 492.

*g* Mills v. Graham, 4 *Bos. & Pull.* 140.

*h* Bristow v. Eastman, 1 *Esp Rep.* 172.

Exhibit 5

An infant has a capacity to do many other acts valid in
law. He may bind himself as an apprentice, it being an
act manifestly for his benefit ; but, when bound, he cannot
dissolve the relation.[a]   The weight of opinion is, that he
may make a testament of chattels, if a male, at the age of
fourteen. and if a female, at the age of twelve years.[b]   He
may convey real estate, held as a naked trustee, under an
order in chancery.  The equity jurisdiction in this case, is
grounded on the statute of 7 Ann, c. 19. which has been
re-enacted in this state, and extends only to plain and ex-
press trusts.   Whatever an infant is bound to do by law,
the general rule is, that the same will bind him, if he does
it without suit at law.[d]   If, therefore, he be a tenant in
common, he may make a reasonable partition.   He may
discharge a mortgage on due payment of the mortgage debt.
His acts as executor, at the age of seventeen, will bind him,
unless they be acts which would amount to a *devastavit.*
There was no occasion, said Lord Mansfield,[e] to enumerate
instances.   The authorities are express, that if an infant
does a right act, which he ought to do, and which he was
compellable to do, it shall bind him.   We have already
seen, that an infant of fourteen, if a male, and twelve if a
female, may enter into a valid contract of marriage ; but
he is not liable to an action, on his executory contract, to
marry, though the infant may sue an adult on such a pro-
mise.[f]

In consequence of the capacity of infants, at the age

---

a  3 *Barn. & Cress.* 484.

b  *Harg.* n. 83. to lib. 2. *Co. Litt.*   Mr. Hargrave has collected
all the contradictory opinions on this point.   The civil law gave
this power to the infant at the age of seventeen years, and this pe-
riod has been adopted by statute in Connecticut.

c  Sess. 24. ch. 30.

d  *Co. Litt.* 172. a.

e  3 *Burr.* 1801.

f  Hunt v. Peake, 5 *Cowen.* 475.

Exhibit 5

0085

of consent, to contract marriage, their marriage settle-
ments, when reasonable, have been held valid in chancery;
but it has long been an unsettled question, whether a fe-
male infant could bind her real estate by a settlement upon
marriage.   In *Drury* v. *Drury*,[a] Lord Ch. Northington de-
cided, that the statute of 27 Hen. VIII. which introduced
jointures, extended to adult women only, and that, notwith-
standing a jointure on an infant, she might waive the join-
ture, and elect to take her dower; and that a female infant
could not, by any contract previous to her marriage, bar
herself of a distributive share of her husband's personal
estate, in case of his dying intestate.   This decree was re-
versed in the House of Lords, upon the strength of the opi-
nions of Lord Hardwicke, Lord Mansfield, and the majority
of the judges;[b] and the great question finally settled in fa-
vour of the capacity of the female infant, to bar herself by
her contract before marriage, of her right of dower in her
husband's lands, and to her distributive share of her hus-
band's personal estate.   The question still remained, whe-
ther she had the capacity to bind *her own real estate* by a
marriage settlement.   Mr. Atherley,[c] after reviewing the
cases, concludes, that the weight of the conflicting authori-
ties was in favour of her capacity so to bind herself.   But
it seems he did not draw the correct conclusion; for, in *Mil-
ner* v. *Lord Harewood*,[d] Lord Eldon has subsequently held,
that a female infant was not bound by agreement to settle
her real estate upon marriage, if she did not, when of age,
choose to ratify it; and that nothing but her own act, after
the period of majority, could fetter or affect it.   The case
of *Slocombe* v. *Glubb*,[e] admits, that a male infant may bar

a 1 *Eden*, 39.
b 1 *Eden*, 60—75.
c *Treatise on Marriage Settlements*, p. 28—41.
d 18 *Vesey*, 259.
e 2 *Bro.* 545.

Exhibit 5

0086

himself by agreement before marriage, either of his estate by the curtesy, or of his right to his wife's personal property; and both the male and female infant can settle their *personal* estate upon marriage. The cases of *Strickland* v. *Croker*,[a] and *Warburton* v. *Lytton*,[b] are considered by Mr. Atherley[c] as favourable to the power of a male infant to settle his real estate upon marriage, and that seems to be decidedly his opinion. But since the decision of Lord Eldon, in *Milner* v. *Lord Harewood*, this conclusion becomes questionable; for if a female infant cannot settle her real estate without leaving with her the option, when twenty-one, to revoke it, why should not the male infant have the same option?

---

a 2 *Cas. in Ch.* 211.
b Cited in 4 *Bro.* 440.
c *Treatise on Marriage Settlements*, p. 42—45.

Exhibit 5

0087

# Exhibit 6

Exhibit 6

0088

# Journal of Gender, Social Policy & the Law

Volume 15 | Issue 4                                                    Article 1

2007

# The Roots of Law

Larry D. Barnett

Follow this and additional works at: http://digitalcommons.wcl.american.edu/jgspl

 Part of the Constitutional Law Commons

Recommended Citation

Bennett, Larry D. "The Roots of Law." American University Journal of Gender, Social Policy & the Law. 15, no. 1 (2006): 613-686.

This Article is brought to you for free and open access by the Washington College of Law Journals & Law Reviews at Digital Commons @ American University Washington College of Law. It has been accepted for inclusion in Journal of Gender, Social Policy & the Law by an authorized administrator of Digital Commons @ American University Washington College of Law. For more information, please contact fbrown@wcl.american.edu.

Exhibit 6

0089

# THE ROOTS OF LAW

LARRY D. BARNETT

## ABSTRACT

*This Article rests on the macrosociological thesis that (i) the concepts and doctrines used in law are determined by the properties of society and that (ii) these properties are produced by large-scale forces. The thesis thus maintains that the content of law is not shaped by the persons who serve as legislators, judges, and executive-branch policymakers; such individuals are merely the vehicles by which societal conditions mold law. To illustrate, the Article examines shifts in law in the United States on a number of subjects, including law setting the age of majority and law regulating access to abortion, and it links these shifts to changes in specific aspects of U.S. society. Data from the 1960 census on the forty-eight coterminous states are analyzed with logistic regression to identify system-level properties distinguishing states that liberalized their law on abortion between 1967 and 1972 (i.e., before Roe v. Wade) from states that did not. The regression analysis, in conjunction with time-series data for the nation as a whole, suggests that the liberalization by states and by Roe of law-imposed restrictions on abortion was associated mainly with increases in school enrollment and educational level among young women. This Article advances the premise that long-term growth in the quantity of knowledge broadly affected the American social system and its law, and ascribes the rising prevalence and longer duration of education among women—as antecedents of the liberalization of law on abortion—primarily to the expansion of knowledge.*

613

Exhibit 6

0090

# THE ROOTS OF LAW

LARRY D. BARNETT[*]

Abstract...................................................................................................613
I. Introduction .......................................................................................614
    A. Sex Roles ....................................................................................616
    B. The Investment Company Act and the Concept of "Person"..........617
    C. Age of Majority...........................................................................620
II. Knowledge as a Societal Property ....................................................627
III. Law and Abortion in the United States.............................................636
    A. Change in Law Regulating Abortion, 1967-1973 ..........................637
    B. Factors Affecting Decisions by Women to Abort Pregnancies.......639
    C. Time-Series Indicators of a National Need for Abortion................647
    D. System-level Properties and the Liberalization of State
         Abortion Law............................................................................651
IV. The Concept of Societal Need .........................................................672
    A. Functionalism.............................................................................673
    B. Societal Need and Abortion ........................................................677

## I. INTRODUCTION

Distinct concepts and principles characterize every profession,[1] and the reality perceived by members of one profession therefore differs to some extent from the reality perceived by members of another profession.[2] Be-

---

    * Professor, School of Law, Widener University, Wilmington, Delaware USA. Postal address: Post Office Box 7474, Wilmington, DE 19803-0474 USA. E-mail address: ldbarnett@widener.edu

The Widener University Legal Information Center provided invaluable assistance in the preparation of this article. I would particularly like to thank Enza Klotzbucher, Mary Jane Mallonee, and Kelly Pierce of the Center staff.

    1. Larry D. Barnett, *When is a Mutual Fund Director Independent? The Unexplored Role of Professional Relationships under Section 2(a)(19) of the Investment Company Act*, 4 DEPAUL BUS. & COM. L.J. 155, 173-78 (2006) (summarizing the central elements of a profession).

    2. According to research in linguistics, "the world is presented in a kaleidoscopic flux of impressions which has to be organized by our minds—and this means largely by the linguistic systems in our minds. We cut nature up, organize it into concepts, and ascribe significances as we do, largely because we are parties to an agreement to organize it in this way—an agreement that holds throughout our speech community and is codified in the patterns of our language." Benjamin Lee Whorf, *Science and Linquistics, in* LANGUAGE, THOUGHT, AND REALITY: SELECTED WRITINGS OF BENJAMIN LEE WHORF 207, 213 (John B. Carroll ed., 1956); *see also* Benjamin Lee Whorf, *Language, Mind, and Reality, in* LANGUAGE, THOUGHT, AND REALITY, *supra* at 246-47 (stating that "[e]very language . . . incorporates certain points of view and certain patterned resistances to widely divergent points of view"). Professions as well as societies differ in the concepts they use, and the concepts unique to a particular profession accordingly provide its members with perceptions that do not exist among the members of a differ-

Exhibit 6

0091

cause an understanding of the world is never complete—perhaps because "[r]eality is nothing but a collective hunch"[3]—no single profession has a monopoly on truth, and research that brings together different professions has the potential to yield new insights. Accordingly, this Article brings together two professions—law and sociology—in an attempt to answer a pair of related questions. First, why does the law of a society contain certain concepts and doctrines at one point in history but not at another? Second, why at a given point in time does the law of one society contain certain concepts and doctrines while the law of another society does not? I believe that both questions have a common answer and that the answer stems from the discipline of macrosociology. Specifically, my thesis is that the properties of society form the roots of law and that these properties, and the forces behind them, shape the content of law in the social system in which the law develops and operates.

As a social science, macrosociology assumes that the doctrines of law are not random occurrences. Instead, macrosociology contends that identifiable system-level factors account for differences in law both across time in any particular jurisdiction and across jurisdictions at any particular point in time. The macrosociological approach employed in the instant Article (i) views law as an institution of a society and, hence, as a component of a system;[4] (ii) assumes that, as an institution, law aids society by promoting the equilibrium and cohesiveness of the system in the long run;[5] (iii) contends that, for law to benefit society, the content of law—i.e., the concepts and doctrines of law—must manifest the properties of society, not the personalities of individuals; and (iv) expects, therefore, that law will change as large-scale forces alter the properties of society. The preceding principles, although generally ignored in research on law,[6] form the foundation of this

---

ent profession.

3. Michael Moncur's (Cynical) Quotations, The Quotations Page, http://www.quotationspage.com (last visited Sept. 23, 2006) (quoting JANE WAGNER, THE SEARCH FOR SIGNS OF INTELLIGENT LIFE IN THE UNIVERSE (1986)).

4. Macrosociology assumes that, as a system, a society is characterized by cohesiveness and is comprised of interacting, interdependent components. See JOHN SCOTT, SOCIOLOGICAL THEORY: CONTEMPORARY DEBATES 138-39, 150, 153 (1995). The findings of quantitative research are consistent with this assumption. See Sung-Soon Clara Kim, Dimensions of Social Integration: Solidarity and Deviance in American Cities 9-28, 142-48 (1985) (unpublished Ph.D. dissertation, University of Virginia) (on file with Widener University School of Law Delaware Campus Library).

5. In my macrosociological framework, law furthers both social integration and system integration. Social integration involves the relationships between the individuals, and between the groups of individuals, in a society; system integration involves the relationships between the structural components of a society. David Lockwood, Social Integration and System Integration, in EXPLORATIONS IN SOCIAL CHANGE 244, 245 (George K. Zollschan & Walter Hirsch eds., 1964).

6. DANIEL J. ELAZAR, AMERICAN FEDERALISM: A VIEW FROM THE STATES 97, 135-36 (1966f) (exemplifying an early use of principle (iv)). The statistical techniques available in the 1960s would not have allowed Professor Elazar to undertake the type of regression analysis reported in Part III(D) of the instant Article.

Exhibit 6

0092

Article, and the fourth principle, which follows from the three that precede it, is the focus of the Article.

Several illustrations can be given in support of the fourth principle, i.e., the principle that law evolves in response to large-scale forces that alter the properties of society. These illustrations rely on studies (including, when available, quantitative data) that concern a long time interval prior to the change in law under consideration. Shifts that occur in the concepts and doctrines of law can be traced in most instances to change in societal properties that began much earlier and that occurred gradually.

### A. Sex Roles

The first illustration is the manner in which American law during the nineteenth and twentieth centuries treated the biological trait of sex. In 1872, the United States Supreme Court, with just one dissenting justice, ruled that a state could deny a woman a license to practice law even if she were eligible for a license in a state where she had formerly resided.[7] The Court deferred to the state's police power, under which states regulate occupations, and concluded that an inconsistency between states in the requirements for admission to the bar does not nullify the requirements of the more restrictive state, even though the restriction involves the sex of the applicant and the applicant had resided in a less-restrictive state. Notably, three justices, concurring in the decision, explained the ruling with their view that:

> The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood.[8]

A full century would pass before Supreme Court jurisprudence on sex-based differences in government policy underwent substantial change. Since the 1970s, the Court has required government to justify policies that treat women differently than men[9] and to do so with a rationale that is "ex-

---

7. Bradwell v. State, 83 U.S. 130, 139 (1872). *See generally* Caroline Goddard & Gwen Hoerr McNamee, *Myra Colby Bradwell*, *in* BAR NONE: 125 YEARS OF WOMEN LAWYERS IN ILLINOIS: EIGHT WOMEN LAWYERS IN ILLINOIS 3-7 (Gwen Hoerr McNamee ed., 1998).

8. *Bradwell*, 83 U.S. at 141 (Bradley, J., concurring). A similar view appears in a majority opinion of the Court rendered in 1908 on a state statute that limited the number of hours a woman, but not a man, could work during a twenty-four hour period. *See* Muller v. Oregon, 208 U.S. 412, 421-22 (1908).

9. United States v. Virginia, 518 U.S. 515, 532-34 (1996).

Exhibit 6

0093

ceedingly persuasive."[10]  However, social science research indicates that
the shift in Supreme Court doctrine on gender just mirrored societal change
in the state of sex roles[11] and that the Court accepted gender egalitarianism
only after sex equality had markedly increased.[12]

Unfortunately, the scholarship of professionals in the field of law gener-
ally rests on the often implicit assumption that law molds society and that
society has no more than a small effect on the content of law.  As a result,
the impact of societal conditions on law has been largely ignored, and not
surprisingly, there is a dearth of quantitative research on the hypothesis that
jurisprudence on the sex trait is tied closely to societal conditions.  The
macrosociological approach I advance challenges the prevailing assump-
tion that law shapes social conditions.  In my approach, law is a mechanism
that facilitates the operation of society, and the concepts and doctrines used
by the law of a society will necessarily be in harmony with the properties
of the society.  Often, if not typically, this harmony will require time to de-
velop after societal conditions change, but eventually the concepts and doc-
trines of law must be congruent with societal conditions if law is to remain
a viable institution of society.  Thus, American law on gender evolved in
response to change in sex roles and reflected the nature of these roles.

I turn now to two additional topics that illustrate the proposition that law
is rooted in societal conditions.

## B.  The Investment Company Act and the Concept of "Person"

The Investment Company Act ("Act"),[13] which Congress adopted in
1940,[14] governs vehicles in the United States that (i) issue and sell securi-
ties to investors and (ii) invest the assets obtained from the sale of their se-
curities in securities issued by others, which are usually business entities,
governments, and/or government agencies.  Because the Act is the basis for
the regulation of mutual funds by the Securities and Exchange Commis-
sion,[15] it is a prominent aspect of law pertinent to finance in the United

---

10.  *Id.* at 533; *accord* Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 728-30,
740 (2003) (holding constitutional a federal statute that, in banning sex-based employ-
ment discrimination, removed the sovereign immunity of states that engaged in such
discrimination).

11.  LARRY D. BARNETT, LEGAL CONSTRUCT, SOCIAL CONCEPT 50-55 (1993).

12.  *Id.* at 52-55.  Between 1910 and 1990, the largest decadal decline in sex segre-
gation in occupations occurred from 1930 to 1940.  *See* Kim A. Weeden, *Revisiting
Occupational Sex Segregation in the United States, 1910-1990: Results from a Log-
Linear Approach*, 35 DEMOGRAPHY 475, 480 index A (1998).  Notable decreases in
such segregation took place in two subsequent decades (1940 to 1950 and 1960 to
1970), but these decreases were much smaller in magnitude than the decline between
1930 and 1940.  *See id.*

13.  15 U.S.C. § 80a (2006).

14.  Act of Aug. 22, 1940, ch. 686, title 1, 54 Stat. 789 (1940).

15.  15 U.S.C. § 80a-37 (2006).  The Securities and Exchange Commission defines
a mutual fund as an open-end management investment company, i.e., as an investment

Exhibit 6

0094

States and significant to the welfare of the American public. An indicator of the societal importance of mutual funds is that in 2006 mutual funds managed net assets totaling $10.4 trillion, and their investors included almost half (48%) of all households in the country.[16]

As specified in Section 3 of the Act, an investment company must inter alia be an "issuer,"[17] and given the definition of issuer in Section 2 of the Act, an issuer must be a "person."[18] Therefore, the conceptualization of person is fundamental to an investment company: an investment vehicle cannot be an investment company unless it is a person. Of relevance here, the Act defines a person to include a "company,"[19] and by doing so, Congress placed entities—i.e., artificial persons—within the scope of the Act.

By encompassing an artificial being, is the Act's definition of person consistent with the way society at large employs the word? This question is important because my thesis contends that the meaning of concepts in law is compatible with their meaning in the general population. Research in etymology suggests that, in referring to artificial beings, the definition of person in law was preceded by a similar definition in society. The word *person* came into English from the Old French word *persone*, which in turn was derived from the Latin word *persona*.[20] Before the fourteenth century ended, the English concept of person referred not only to a human being but also to "[a] character sustained or assumed in a drama or the like, or in actual life; part played; hence function, office, capacity."[21] The latter meaning can include fictionalized characters, and by extending the word *person* to such characters, the English language abstracted artificial beings from interpersonal activities and recognized artificial beings as separate from the human beings who were involved in these activities.

Prior to the fifteenth century, therefore, English as a language possessed the ability to conceptualize an intangible dimension of human interaction

---

company that issues securities redeemable by the company. Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies, Investment Company Act Release No. IC-25922, 68 Fed. Reg. 6564, 6565 n. 6 (Feb. 7, 2003); *see* 15 U.S.C. §§ 80a-2(a)(32), 80a-4, 80a-5(a).

16. INVESTMENT COMPANY INSTITUTE, 2007 INVESTMENT COMPANY FACT BOOK 58, 95 (47th ed. 2007), *available at* http://www.icifactbook.org (including net assets of money market funds in total net assets of mutual funds).

17. 15 U.S.C. § 80a-3.

18. *Id.* § 80a-2(a)(22) (defining issuer as "every person who issues or proposes to issue any security, or has outstanding any security which it has issued").

19. 15 U.S.C. § 80a-2(a)(28) (2000) (defining person as "a natural person or a company"); 15 U.S.C. § 80a-2(a)(8) (2000) (defining company to include corporations and partnerships).

20. WEBSTER'S DICTIONARY OF WORD ORIGINS 353-55 (1995).

21. 11 OXFORD ENGLISH DICTIONARY 596-97 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989) (using definition I.1); *see also* Oxford English Dictionary, www.oed.com (search "find word" for "person;" then select "person, n.;" then follow "Date Chart" hyperlink) (showing dates of meaning usage in English literature).

Exhibit 6

0095

such as business arrangements and to treat this dimension as distinct from the human participants in the arrangement. Because the idea of an artificial person had become possible in the English language, a necessary condition existed for English law to recognize this type of person—including what we call a corporation and a partnership.[22] Notably, it was in the fifteenth century that corporations and partnerships were brought within the definition of person in the law of England.[23] Artificial beings thus appeared in the lexicon of English law only after they appeared in the English language, and the sequence is not simply coincidence. Business arrangements that today would be labeled partnerships, companies, and guilds had become an important element in the economy of England well before the fifteenth century began.[24] The experience of society is the impetus for the emergence and meaning of concepts,[25] and the nature of economic activity required artificial persons to be part of the language of England and of its law.[26]

When American law included artificial beings within the definition of person, therefore, it followed a long-established practice[27] and accepted a meaning for the word that had already been adopted outside the institution

---

22. Because they are accepted by law, corporations and partnerships are logically characterized as artificial persons that *result from* fictionalizing rather than as artificial persons that *are* a fiction. However, the judiciary does not necessarily take this approach. "If [a corporation] is a fiction it is a fiction created by law with intent that it should be acted on as if true. The corporation is a person." Klein v. Bd. of Tax Supervisors, 282 U.S. 19, 24 (1930).

23. WEBSTER'S DICTIONARY OF WORD ORIGINS, *supra* note 20, at 354; Beth Stephens, *The Amorality of Profit: Transnational Corporations and Human Rights*, 20 BERKELEY J. INT'L L. 45, 54 (2002).

24. SHEPARD BANCROFT CLOUGH & CHARLES WOOLSEY COLE, ECONOMIC HISTORY OF EUROPE 56, 75, 148 (1941); A. B. Hibbert, *The Economic Policies of Towns*, *in* 3 CAMBRIDGE ECONOMIC HISTORY OF EUROPE 157, 170, 190-95 (M.M. Postan & E.E. Rich eds., 1965); *see* Shael Herman, *Trusts Sacred and Profane: Clerical, Secular, and Commercial Uses of the Medieval Commendatio*, 71 TUL. L. REV. 869, 891-94 (1997); R. de Roover, *The Organization of Trade*, *in* 3 CAMBRIDGE ECONOMIC HISTORY OF EUROPE 42, 113 (M.M. Postan & E.E. Rich eds., 1965).

25. S. I. HAYAKAWA, LANGUAGE IN THOUGHT AND ACTION 11-14 (2d ed. 1964).

26. *Cf.* Sylvia L. Thrupp, *The Gilds*, *in* 3 CAMBRIDGE ECONOMIC HISTORY OF EUROPE 230, 231-32, 244 (M. M. Postan & E.E. Rich eds., 1965) (describing the development of occupational guilds in England during the late thirteenth century: "[t]heir organization was important . . . in bringing more formal deliberation to bear on the shaping of the law and custom and on the administrative procedures through which orderly relations were maintained among buyers and sellers").

27. Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 88 (1809) .

As our ideas of a corporation, its privileges and its disabilities, are derived entirely from the English books, we resort to them for aid in ascertaining its character. It is defined as a mere creature of the law, invisible, intangible, and incorporeal. Yet, when we examine the subject further, we find that corporations have been included within terms of description appropriated to real persons.

*Id.   See generally* Franklin A. Gevurtz, *The Historical and Political Origins of the Corporate Board of Directors*, 33 HOFSTRA L. REV. 89 (2004) (outlining the historical antecedents of boards of directors of corporations).

Exhibit 6

0096

of law. However, if the theoretical framework employed in this Article accounts for the concepts used by law, the word person is only illustrative of a general principle, namely, that all concepts and rules of law develop within and are molded by the social system and culture in which the law is embedded. This principle accounts for abstractions from interpersonal relationships involving economic activity and the acceptance by law in the United States of artificial beings as persons: corporations and partnerships are, and long have been, central to the U.S. economy,[28] indicating that these forms of business organization have been an important, if not essential, aspect of U.S. society.

### C. Age of Majority

For a macrosociological theory of law, a compelling topic is the age of majority, i.e., the age at which society ceases to define an individual as a child and confers all of the rights, and imposes all of the duties, of adulthood. The topic is important sociologically for two related reasons. First, age, like gender, is a factor that organizes social life in every technologically advanced society, including the United States.[29] Second, the age of

---

28. Business receipts—data on which are available for corporations, partnerships, and nonfarm proprietorships—evidence the economic importance of corporations and partnerships in the United States. Of all receipts for the three types of business organization combined, corporations and partnerships have accounted for more than ninty percent in recent years. Calculated from U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES: 2006 (125th ed. 2005), at table 726, *available at* http://www.census.gov/prod/2005pubs/06statab/business.pdf

Unfortunately, data that use a consistent definition of proprietorship over a long period of time are unavailable. Corporations were not a customary form of conducting business in the United States before 1850. *See* William W. Bratton, Jr., *The New Economic Theory of the Firm: Critical Perspectives from History*, 41 STAN. L. REV. 1471, 1485 (1989). Sole proprietorships, too, seem not to have been the norm prior to 1850. Rather, businesses at this time were predominantly partnerships. LAWRENCE M. FRIEDMAN, A HISTORY OF AMERICAN LAW 130 (3d ed. 2005). Nonetheless, corporations were being formed in the decades preceding 1850, usually by special acts of state legislatures. William C. Kessler, *Incorporation in New England: A Statistical Study, 1800-1875*, 8 J. ECON. HIST. 43, 45-47, 50 (1948). Notably, the business corporations in existence during this period "tended to function in vital, sensitive parts of the economy, such as banking and transportation. They tended to be the largest business organizations and concentrations of economic power." Stephen A. Siegel, *Understanding the Nineteenth Century Contract Clause: The Role of the Property-Privilege Distinction and "Takings" Clause Jurisprudence*, 60 S. CAL. L. REV. 1, 68 (1986). The economy of the United States, therefore, is likely to have been dominated by corporations and/or partnerships almost since the nation began. *See* JAMES WILLARD HURST, THE LEGITIMACY OF THE BUSINESS CORPORATION IN THE LAW OF THE UNITED STATES, 1780-1970, at 14-18 (1970).

Law manifests the pivotal economic function of artificial beings both in legislation (e.g., state statutes on corporations and partnerships) and in judicial opinions. *See* Marshall v. Balt. & Ohio R.R. Co., 57 U.S. (16 How.) 314, 327 (1850) (explaining that corporations exist because "[t]he necessities and conveniences of trade and business require that [natural persons] . . . should act by representation, and have the faculty of contracting, suing, and being sued in a factitious or collective name").

29. Gunhild O. Hagestad & Peter Uhlenberg, *The Social Separation of Old and Young: A Root of Ageism*, 61 J. SOC. ISSUES 343, 344-47 (2005).

Exhibit 6

0097

majority provides a salient line in the American social system. Specifically, for persons who do not suffer from a physical or psychological disability, the line separates individuals deemed dependent by society from individuals deemed independent.[30] Given its societal importance, the age of majority is designated by law, and "[y]oung people eagerly anticipate their legal 'adulthood.' At the age of majority, our society puts them on notice that they are assuming an array of rights and responsibilities which they never had before."[31]

In examining the age of majority designated by law, I will limit myself to the forty-eight states in the continental United States. I exclude Alaska and Hawaii because I consider a period that extends to the start of the twentieth century, and Alaska and Hawaii were not states until the end of the sixth decade of that century.[32] In addition, I omit all non-state jurisdictions. Thus, the District of Columbia is excluded along with non-state jurisdictions located outside the continental United States, such as Puerto Rico, Guam, and the Virgin Islands.[33]

The table in the Appendix to this Article summarizes state law on the age of majority. Column 3 of the table shows, by state, the age of majority that was in force in the 1990s. Column 4 specifies the year in which the legislature of each state approved the age in column 3, and column 2 gives the age of majority that preceded the age in column 3. In reviewing the table, the reader should keep two points in mind. First, the last column specifies the year in which the legislature approved the age of majority that applied in the state during the 1990s, but the year of legislative approval may not have been the first year that the age of majority was in effect. Some states did not implement the revised age of majority until the year following its approval by the legislature. Because my interest is whether law setting the age of majority responds to its social environment, the point at which a law-making body accepts a new age of majority seems more significant than the point at which government officially implements it. Second, the legislation altering the age of majority may have amended an existing statute or it may have altered the common law, i.e., doctrine in court decisions. Under the common law, the age of majority was twenty-one.[34]

---

30. Sy Moskowitz, *American Youth in the Workplace: Legal Aberration, Failed Social Policy*, 67 ALB. L. REV. 1071, 1081-82 (2004).

31. Schwan v. Riverside Methodist Hosp., 452 N.E.2d 1337, 1339 (Ohio 1983).

32. Proclamation No. 3269, 24 Fed. Reg. 81 (1959) (declaring Alaska a state); Proclamation No. 3309, 24 Fed. Reg. 6868 (1959) (declaring Hawaii a state).

33. From 1960 to 1980, these jurisdictions accounted for just 1.8% of all residents of areas that were under U.S. sovereignty. Calculated from U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES: 1985, 12 Table 12, 826 Table 1451 (105th ed. 1984), *available at* http://www. census.gov/prod/www/ abs/statab.html.

34. HOMER H. CLARKE, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES 309 (2d ed. 1988).

Exhibit 6

0098

A review of the table in the Appendix yields a number of conclusions. Of greatest importance, states generally reduced the age of majority to eighteen, or in a few instances to nineteen, during a relatively short time span, viz., in the first half of the 1970s. Additionally, this period witnessed the elimination of different ages of majority for males and females by states that had such differences. However, states whose age of majority contained a gender distinction were few in number, and all but one of these states (Illinois) had small populations.[35] Gender differences in the age of majority had thus largely disappeared prior to the 1970s. Moreover, change in statutory law preceded rather than followed the emergence of constitutional law on the subject. In 1975, the U.S. Supreme Court concluded that, for purposes of child support, a gender-based distinction in the age of majority violates the equal protection guarantee of the Constitution,[36] but when the Court announced its decision in April 1975, the nine states with a different age of majority for women and men had eliminated the distinction.[37] The age of majority, therefore, was a product of the legislative process, not the judicial process.

Whether new law is developed by legislatures or by courts (or by executive-branch agencies), however, is not of central concern to my thesis. As an institution, law must aid the operation of its society in the long run, and through legislation, judicial action, or agencies of the executive branch, the doctrines of law will come to reflect the character of the social system and the forces shaping it. Let me accordingly attempt to identify the forces that contributed to reducing the age of majority in the early 1970s. Since the reduction occurred in most states during a short span of time, the forces that were involved evidently operated on a national scale and affected much of the population to roughly the same degree. But what social forces were at work? One of them, I believe, was the changing age structure of the United States that resulted from the baby boom after World War II and the historical context preceding the boom. Specifically, because of low levels of fertility before the war, especially during the Depression of the 1930s, the post-war baby boom created a large bulge in the demographic

---

35. U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES: 1998, 28 Table 26 (118th ed. 1998), *available at* http://www.census.gov/prod/ www/abs/statab.html.

36. Stanton v. Stanton, 421 U.S. 7, 17 (1975) (suggesting twice that its holding applied only in "the context of child support").

37. Stanton v. Stanton, 517 P.2d 1010 (Utah 1974) (upholding the different age of majority for men and women), *rev'd*, 421 U.S. 7 (1975) (decided April 15, 1975). The U.S. Supreme Court announced its ruling in *Stanton* on April 15, 1975. *Id.* Two of the nine states, Arkansas and Utah, eliminated the sex difference in their age of majority in 1975, but both states acted before April 15: a gender-neutral age of majority was approved by the Utah legislature on March 24, 1975 and by the Arkansas legislature on April 7, 1975. Act of Apr. 7, 1975, No. 892, 1975 Ark. Acts 2321; Act of Mar. 24, 1975, ch. 39, § 15-2-1, 1975 Utah Laws 121. In adopting a uniform age of majority, the Utah legislature thus was not responding to an adverse court decision.

Exhibit 6

0099

structure of the population, and as the passage of time moved the bulge into successive age categories, these age categories seriatim perceptibly and rapidly increased in relative size. During the three decades after the war, therefore, the salience and significance of younger age groups rose dramatically. This demographic situation probably contributed to the collective decision during the early 1970s to reduce the age of majority. Research on other topics suggests that the age makeup of the U.S. population has had distinct effects,[38] and the changing age distribution of the country after World War II was likely to have been a key factor altering the age of majority in the 1970s.

The historical context and demographic dimensions of the baby boom may be understood with data on annual births. Estimates of fertility in the United States as a whole are available by individual year starting in 1909. From 1909 until the mid-1920s, the crude birth rate (the number of births per one-thousand members of the population) was consistently above twenty-five. Subsequently, the rate declined, reaching a low of 18.4 in the mid-1930s, and stayed in a relatively narrow range until World War II ended in 1945. Once World War II was over, births rose: from 1946 to 1959, the crude birth rate was between 24.1 and 26.6.[39] The comparatively low birth rate during the decade-and-a-half before the war, together with the materially higher birth rate after the war, had a dramatic effect on the age structure of the population.

If a society is to avoid upheaval, it must absorb its youth socially as well as economically. Since my goal is to ascertain whether the post-World War II baby boom helps to explain the reduction in the age for adult status during the first half of the 1970s, the ages directly affected by the change—viz., eighteen, nineteen, and twenty—necessarily are included in my analysis. In addition, persons close to their eighteenth birthday presumably contributed to lowering the age of majority, because in the 1960s they were relatively numerous and their share of the population was growing rapidly. The appreciable expansion of the segment of the population that was approaching age twenty-one—an expansion attributable to the baby boom fol-

---

38. *See* Guy N. Burkhardt, Population Determinants of Social Change: An Analysis of the Age Composition of the United States from 1920 to 1983 (1988) (unpublished Ph.D. dissertation, Portland State University) (on file with Widener University School of Law Delaware Campus library); *see also* Henry M. McMillan & Jerome B. Baesel, *The Macroeconomic Impact of the Baby Boom Generation*, 12 J. MACROECONOMICS 167 (1990) (finding that the age composition of the U.S. population affected real interest rates, income, inflation, and unemployment); Michael D. Mumford et al., *Age-Related Changes in the Likelihood of Major Contributions*, 29 INT'L J. AGING & HUM. DEV. 171, 175 (1989); Raymond K. Oldakowski, The Influence of Population Change on Municipal Fiscal Policy (Aug. 1987) (unpublished Ph.D. dissertation, University of Illinois at Urbana-Champaign) (on file with author) (finding that age structure and other population characteristics generate changes in municipal fiscal policy).

39. NATIONAL CENTER FOR HEALTH STATISTICS, VITAL STATISTICS OF THE UNITED STATES: 1993, VOL. I, NATALITY, at Table 1-1 (1999).

Exhibit 6

0100

lowing World War II and occurring in the decade-and-a-half prior to 1970—confronted society with the necessity of assimilating a large group that would soon be adults and was probably a major source of pressure on the American social system.

Given these theoretical considerations, my focus is on the fraction of the population fifteen to twenty years of age and the manner in which this fraction changed over time. Striking shifts in this fraction may be infrequent in the history of a society, but when they occur, they have the ability to create conspicuous social and economic problems. Figure 1 shows the percentage of the U.S. population that was fifteen to twenty years old each year from 1900 to 1980.[40] Particularly important is the period from 1940 to 1970: the percentage declined by more than one-fourth between 1940 and 1954 (from 11.2% to 7.9%) and then rose by one-half between 1955 and 1976 (from 7.9% to 11.8%), with most of the rise occurring before 1970. Thus, during the three decades that preceded the reduction of the age of majority to eighteen, there was a sharp decline and rebound in the demographic presence of the age group most directly affected by whether majority was attained at age twenty-one or at age eighteen. The rapidity and magnitude of the rebound undoubtedly increased the salience of youth, and the prominence of young persons in the population is likely to have promoted law that reduced the age for adulthood.

---

40. The percentages were calculated for each year from 1900 through 1980. Percentages are based on the resident population of the forty-eight states for 1900-1939 and on the total population for 1940 and later years. Alaska and Hawaii are included by the Census Bureau in total population starting in 1950. U.S. BUREAU OF THE CENSUS, ESTIMATES OF THE POPULATION OF THE UNITED STATES, BY SINGLE YEARS OF AGE, COLOR, AND SEX: 1900 TO 1959, CURRENT POPULATION REP., Series P-25, No. 311 (1965); U.S. BUREAU OF THE CENSUS, ESTIMATES OF THE POPULATION OF THE UNITED STATES, BY AGE, SEX, AND RACE: APRIL 1, 1960 TO JULY 1, 1973, CURRENT POPULATION REP., Series P-25, No. 519 Table 1 (1974); U.S. BUREAU OF THE CENSUS, PRELIMINARY ESTIMATES OF THE POPULATION OF THE UNITED STATES, BY AGE, SEX, AND RACE: 1970 TO 1981, CURRENT POPULATION REP., Series P-25, No. 917 Table 1 (1982).

Exhibit 6

0101



Figure 1.  Percentage of U.S. Population 15-20 Years Old

Figure 1 also shows that the percentage of the population fifteen to twenty years of age was relatively high in the early decades of the twentieth century.  Why was the age of majority not reduced to eighteen at this time?  One possibility is that the substantial swing after 1940 in the proportion of persons fifteen to twenty years old by itself reduced the age of majority to eighteen.  Under this hypothesis, the magnitude and speed of the change in the proportion was decisive.  A second possibility is that the relatively large percentage of fifteen to twenty year olds in the population during the second half of the twentieth century (rather than the volatility of the percentage) acted in conjunction with one or more other factors that were present at the time—factors that did not exist or were not adequate in strength at the start of the twentieth century.  According to the second hypothesis, the level of the percentage, and not its change, was critical, but the level of the percentage was unable by itself to alter the age of majority; the presence of some other factor(s) was required.  A third possibility, of course, is that the reduction of the age of majority to eighteen in the 1970s was the product of both the large pre-reduction swing in the relative size of the age group fifteen to twenty years old and at least one additional factor.  Under the last hypothesis, the change in, and not the level of, the relative size of the age group combined with one or more other factors to lower the age of majority.  Since social phenomena are typically complex, the second and third alternatives are more plausible than the first.  Thus, the age structure of the population probably did not act alone to reduce the age of majority in the 1970s.

What else may have been at work?  One possible factor was the transformation that occurred during the twentieth century in the traits that American parents wanted to inculcate in their children.  Specifically, inde-

Exhibit 6

0102

pendence increased and obedience decreased as characteristics desired for children, and both changes were sizeable.[41]  These changes may have stemmed from the large, complex, and expanding body of knowledge found in the United States, because individualism and personal autonomy become more prevalent when knowledge grows or reaches a certain threshold.[42]  A lower age of majority is, of course, consistent with a societal emphasis on independence for youth, while a higher age of majority can be expected a priori in a social system that stresses obedience to authority.[43]

By way of conclusion, the reduction of the age of majority that occurred during the first half of the 1970s should be regarded as a means by which American society, through its law, adjusted to an important group.  The assimilation of large, distinct groups—a process that probably happens in most social systems—has long been significant in the United States, even during the nineteenth century.[44]  At the start of the twentieth century, immigration into the United States was appreciable, and a large part of the immigrant stream originated in central, eastern, and southern Europe.[45]  Adaptation to and the assimilation of groups that did not share the culture of northwestern Europe—the dominant culture of the United States—were essential to the effective operation of the American social system.  By the 1970s, on the other hand, cultural diversity was no longer a major problem for American society,[46] but the baby boom after World War II had created another substantial group, defined by age rather than culture, to which the social order needed to adjust if it was to avoid disruption.  One means employed in the adjustment process was to lower the age of majority to eighteen.  Law setting the age of majority was thus a societal device to facilitate a macrosociological process.

---

41.  Duane F. Alwin, *From Obedience to Autonomy: Changes in Traits Desired in Children, 1924-1978*, 52 PUB. OPINION Q. 33, 43 (1988).

42.  BARNETT, *supra* note 11, at 22-23.

43.  It is probably not coincidence that, prior to the reduction during the 1970s in the age of majority established by law, loyalty to religion also became less important in the values that American parents had for their children.  *See* Alwin, *supra* note 41, at 43.

44.  *See* OSCAR HANDLIN, IMMIGRATION AS A FACTOR IN AMERICAN HISTORY 1-3 (1959).

45.  U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES, 10 Table 5 (118th ed. 1998), *available at* http://www.census.gov/prod/www/abs/statab.html;  U.S. BUREAU OF THE CENSUS, HISTORICAL STATISTICS OF THE UNITED STATES: COLONIAL TIMES TO 1970, PART I, 105-09 (Series C 89-119) (1975), *available at* http://www.census.gov/prod/www/abs/statab.html [hereinafter HISTORICAL STATISTICS].

46.  *See* Campbell Gibson & Emily Lennon, *Historical Census Statistics on the Foreign-Born Population of the United States: 1850 to 1900*, Table 1 (U.S. Census Bureau, Population Division Working Paper No. 29, 1999), *available at* http://www.census.gov/population/www/documentation/twps0029/twps0029.html (showing that foreign-born persons comprised no less than 13.2% of the U.S. population between 1860 and 1920 but were just 4.7% of the population in 1970).

Exhibit 6

0103

## II. KNOWLEDGE AS A SOCIETAL PROPERTY

If the sociology of law is to advance, change in law must be studied both when it happens quickly and when it happens slowly. Sudden transformations in doctrines of law may on the surface seem more important than gradual transformations because abrupt transformations are more salient. Sudden transformations are attractive topics additionally because their triggers may be easy to identify. However, inasmuch as prediction is a central goal of the scientific enterprise, abrupt shifts in law can complicate the task of social science. Two types of situations are pertinent in this regard. First, rapid shifts in law can stem from massive but aperiodic events such as natural disasters. These events are likely to prove difficult to anticipate far in advance, and the changes in law they generate, therefore, cannot readily be predicted. Second, doctrines of law can be modified suddenly by forces that develop gradually and that have their effects when thresholds are reached. The second route to abrupt change in law is probably much more common than the first, and the changes this route generates are especially hard to anticipate because there may be more than one point at which slowly building pressure will precipitate new doctrines in law. Multiple thresholds will exist when different combinations of societal properties and their interactions transform law, and multiple thresholds probably exist in every complex society.

Regardless of the speed with which novel doctrines of law arise, the properties of a social system and the forces that affect these properties must be the focus of attention if the doctrines are to be understood and their emergence is to be predicted. In a macrosociological framework, the individuals in the system—including those who participate in law-making bodies such as legislatures, agencies of the executive branch, and courts—do not account for the content of law. Rather, pervasive forces that mold the characteristics of the social system determine the decisions of these individuals with regard to the content of law,[47] and explanations of law that are based on personalities, even personalities of prominence and charisma, treat the institution of law superficially. The character of society and the substance of its law are not formed by individuals, but by large-scale forces that operate through the actions of individuals.

In this part of the Article, I will focus on one such force that I believe shaped the social order and doctrines of law in the United States during the twentieth century and that can be expected to remain a potent influence on

---

47. Larry D. Barnett, *Law as Symbol: Appearances in the Regulation of Investment Advisers and Attorneys*, CLEV. ST. L. REV. (forthcoming 2007) (contending that in the long run the properties of society and the forces that mold these properties control the doctrines of law). I am not implying that history is governed by a master plan and moves in a preordained direction; my contention is only that certain factors precede societal change and the new concepts and doctrines of law that are generated by such change. *Id.*

Exhibit 6
0104

U.S. law for the foreseeable future. The role of this force, however, seems not to have been fully appreciated by either social scientists or law-trained scholars. The force is the expansion of knowledge. Undoubtedly, other forces (e.g., increases in population density)[48] influenced the character of American society and the content of its law, but I concentrate on knowledge because I believe that it had, and will continue to have, a major impact on the United States. Perhaps in part because accumulating knowledge shaped social life for so long, its role in the social system has not received the attention it deserves. We simply have become accustomed to improvements in knowledge.

In order to show the degree to which knowledge increased over time, I begin with a quantitative measure of it. Knowledge is difficult to study because it is an abstract concept and must be operationalized. The concept of knowledge is necessarily an abstraction because knowledge assumes different forms (e.g., a chemical compound or mechanical process in manufacturing, a statistical technique for data analysis in science), and in some forms (e.g., mathematics) it is composed entirely of written signs. Being an abstract concept, knowledge is not directly observable and must be measured by its manifestations.

What indicators can be used to determine the magnitude and growth of knowledge? The question does not have an easy answer, because no single indicator or set of indicators seems to be accepted by social scientists[49] even though the amount of knowledge available to Americans is believed to be expanding dramatically.[50] The absence of a generally accepted measure or set of measures is unfortunate. The availability of a relatively simple indicator that correctly gauges the quantity of knowledge, together with long-term data on the indicator, would benefit macrosociological analyses in general and a macrosociological framework for doctrines of law in particular.

Although at present no single indicator adequately depicts the volume and expansion of knowledge in the aggregate, figure 2 shows the annual number of patents that the U.S. Patent and Trademark Office has granted for inventions.[51] In the United States, patents are issued for inventions, for natural plants, and for designs, but of the three, patents for inventions are

---

48. BARNETT, *supra* note 11, at 23-24; Larry D. Barnett, *Population Growth, Population Organization Participants, and the Right of Privacy*, 12 FAM. L.Q. 37, 37 (1978).

49. *See* G. Nigel Gilbert, *Measuring the Growth of Science*, 1 SCIENTOMETRICS 9 (1978); Mumford et al., *supra* note 38, at 175.

50. Graham T.T. Molitor, *Trends and Forecasts for the New Millenium*, FUTURIST 53, 59 (Aug.-Sept. 1998).

51. The data in figure 2 are from U.S. PATENT & TRADEMARK OFFICE, U.S. PATENT ACTIVITY, CALENDAR YEARS 1790 TO THE PRESENT (2005), *available at* http://www.uspto.gov/web/offices /ac/ido/oeip/taf/reports.htm#by_hist.

Exhibit 6

0105

the most accurate indicator of knowledge since they are awarded for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof," that was not obvious to a person of average skill in the field in which the invention originated.[52] An invention thus constitutes a technological innovation, and since technology employs knowledge, the number of patents granted for inventions over time can serve as an indicator of change in the quantity of accumulated knowledge.

In considering figure 2, the reader should keep in mind that patented inventions represent only one form of knowledge and are just a rough indicator of such knowledge. Patented inventions cannot serve as an accurate indicator of knowledge as a whole for at least two reasons: (1) an addition to knowledge may not be incorporated into a patentable invention; and (2) all patented inventions do not utilize the same amount of knowledge. The two problems are distinct. The first exists because many types of knowledge are not within the term "invention" as defined by law, and hence they cannot be patented. For example, a new measure of sex segregation in occupations[53] is a contribution to knowledge, but it is not patentable. Moreover, even when knowledge generates patented inventions, the quantum of knowledge used is not the same in every invention. To illustrate, less knowledge is probably required to create appliances for the home than to create drugs that treat serious diseases. Unfortunately, neither of the two problems can be corrected at the present time. The first problem could be mitigated by data on copyrights issued for scientific articles and books. However, while copyrights for scientific publications could be employed as an indicator (albeit imperfect) of advances in scientific knowledge,[54] long-term data on these copyrights do not exist. The second problem necessitates a technique to measure the amount of knowledge in an invention, but such a technique has yet to be devised. As a result, time-series data are unavailable on the total amount of knowledge in patented inventions.

---

52. 35 U.S.C. §§ 101, 103(a) (2006).

53. *See generally* Weeden, *supra* note 12 (using a margin-free method to measure sex segregation in occupations in the United States from 1910 to 1990).

54. Publications such as books and articles can be copyrighted only if they are original. MARSHALL LEAFFER, UNDERSTANDING COPYRIGHT LAW § 2.07 (4th ed. 2005). Copyrighted publications in science, therefore, represent contributions to scientific principles and/or concepts.

Exhibit 6

0106



Figure 2. Patents Granted for Inventions

Figure 2 shows a secular rise in the number of patents granted for inventions. However, even during the periods when the number declined, knowledge continued to accumulate; the gains in knowledge simply were less in these periods than in the years that preceded them. Moreover, the intervals of decline in patent issuance are brief when viewed historically, and the discovery process is cumulative, i.e., the inventions in one year build on inventions (knowledge) from earlier years. For the last two centuries, then, knowledge expanded in the United States. Notably, the pace of the expansion accelerated starting in the mid-1980s, which may reflect developments in computer hardware and software.

A sustained increase in knowledge is likely to generate broad changes in the character of society,[55] and the changes resulting from this increase probably include two that are critical to understanding the content and evolution of law. The first is an increase in economic wealth. All else remaining constant, advances in knowledge add to the wealth of a society by augmenting economic productivity and permitting more efficient and/or more complete exploitation of natural resources. Wealth, in turn, allows individuals to pursue and fulfill their personal goals, i.e., wealth promotes secular individualism.[56] The second likely change is an increase in rationality. The progress of knowledge encourages rationality in part by producing a

---

55. *See* Patrick Nolan & Gerhard Lenski, *Technology, Ideology, and Societal Development*, 39 SOC. PERSP. 23, 33 (1996) (finding with cross-sectional data that, compared to ideology, improvements in subsistence technology had a larger effect on societies).

56. Ron Lesthaeghe, *A Century of Demographic and Cultural Change in Western Europe: An Exploration of Underlying Dimensions*, 9 POPULATION & DEV. REV. 411, 429-30 (1983).

Exhibit 6

0107

greater understanding of events and experiences; comprehension, in turn, fosters reason. Additionally, the progress of knowledge increases rationality by enlarging the portion of the labor force that works with information[57] and that thus relies on intellectual rather than physical skills. Concomitantly, the progress of knowledge enlarges the number of jobs that are self-directed, i.e., that involve complex, non-methodical tasks and that are not subject to close supervision.[58] In short, occupations concerned with information and characterized by self-direction encompass more people as knowledge advances, and they enhance analytical abilities, i.e., reasoning, in every facet of life.[59] The U.S. commitment to scientific research has thus had widespread effects on American society.[60]

Assuming that the growth of knowledge reshapes society, in what ways did expanding knowledge alter doctrines of law in the United States during the twentieth century? The growth of knowledge undoubtedly had multiple effects, but this Article will suggest just one. Specifically, greater rationality, a consequence of knowledge growth, probably created and intensified expectations that expertise, rather than characteristics irrelevant to occupational skill and performance, would be the basis for employment-related

---

57. *See* Clifford I. Nass, Society as Computer: The Structure and Skill of Information Work in the United States, 1900-1980, 92, 94 (Oct. 1986) (unpublished Ph.D. dissertation, Princeton University) (on file with Widener University School of Law Delaware Campus Library) (finding that between 1900 and 1980 the proportion of the U.S. labor force in occupations dealing with information rose by 5.5% per decade, and that in 1980 two out of five workers were engaged in these occupations).

58. MELVIN L. KOHN & KAZIMIERZ M. SLOMCZYNSKI, SOCIAL STRUCTURE AND SELF-DIRECTION 108 (1990).

59. *See* Nass, *supra* note 57, at 204 (identifying information as the primary substance of nonmanual occupations, not of manual occupations); *see also* Melvin L. Kohn & Carrie Schoenbach, *Class, Stratification, and Psychological Functioning, in* WORK AND PERSONALITY 154, 185 (Melvin L. Kohn & Carmi Schooler eds., 1983) (finding that nonmanual occupations, including white-collar workers, have a higher level of self-direction than manual, i.e., blue-collar, occupations). Additions to knowledge thus seriatim enlarge the number of nonmanual positions in an economy, increase intellectual autonomy and flexibility, and heighten reasoning. *Cf.* Melvin L. Kohn & Carmi Schooler, *Job Conditions and Personality: A Longitudinal Assessment of Their Reciprocal Effects, in* WORK AND PERSONALITY 125, 147 (Melvin L. Kohn & Carmi Schooler eds., 1983) (finding that self-direction in an occupation is associated with reduced authoritarianism and ideational conformity); KOHN & SLOMCZYNSKI, *supra* note 58, at 235 (finding that self-direction in work produces more intellectual flexibility and a less-conformist orientation to society). *See generally* KOHN & SCHOENBACH, *supra*, at 154 (exploring the impact of occupational self-direction and social stratification on values, orientations, and cognitive functioning).

60. *See* Kenneth C. Land & Fred C. Pampel, *Indicators and Models of Changes in the American Occupational System, 1947-73*, 4 SOC. INDICATORS RES. 1, 18-19 (1977) (finding that expenditures on science raised the mean prestige of the occupational structure in the United States between 1950 and 1973). Because professional and other white-collar occupations are highest in prestige, advances in science and hence in knowledge, which presumably resulted in part from expenditures on science, increased the prevalence of these occupations. By definition, a profession possesses a substantial quantity of complex knowledge. *See* Barnett, *supra* note 1, at 177 (identifying a large body of abstract concepts and complex principles as one of five attributes presently fundamental to the existence of a profession in the United States).

Exhibit 6

0108

decisions. Evidence that such change in expectations occurred with regard to gender is the declining sex differential in compensation since the early part of the twentieth century: the disparity between American women and men in skill levels due to work experience decreased with the passage of time, and the average pay of women rose more rapidly than the average pay of men.[61] Indeed, the gains of women in the United States seem to be a manifestation of an apparently universal phenomenon, for economic development—a process in which new knowledge is introduced and utilized in an economy[62]—has been found to augment the presence of women in information-based, self-directed occupations in numerous countries.[63] One of the attributes of these occupations is higher income.[64]

Advancing knowledge, in short, enlarges the number of jobs that require intellectual skill rather than physical strength, and it produces, or at least facilitates, pressure on employers to focus their personnel practices on job skills rather than on demographic attributes. In the United States, rationality seems to have become sufficiently pervasive and intense to generate statutes that authorized the imposition of penalties on employers that use demographic characteristics such as age, race, and sex in decisions regarding current employees and applicants for employment. Antidiscrimination statutes represent one of the striking innovations in law during the last half of the twentieth century, and because they illustrate—though by no means exhaust—the doctrines of law produced by advancing knowledge, I review below the antidiscrimination statutes at the federal level that dealt with employment.[65]

I begin with a statute enacted by Congress in 1870 that prohibits race discrimination in contracts and that has been applied to employment contracts.[66] The statute originally was aimed at slavery and associated conditions,[67] and it was extended to employment only in the 1970s.[68] Insofar as it is concerned with job discrimination, therefore, the statute is a creation of

---

61. *See* James P. Smith & Michael Ward, *Women in the Labor Market and in the Family*, 3 J. ECON. PERSP. 9, 10-11 (1989).

62. *Cf.* Eric A. Hanushek & Dongwook Kim, Schooling, Labor Force Quality, and Economic Growth 34 (Working Paper 5399, Nat'l Bureau of Economic Research 1995) (finding that national rates of economic growth rise with the level of student mastery of mathematics and science).

63. Roger Clark, *Contrasting Perspectives on Women's Access to Prestigious Occupations: A Cross-National Investigation*, 72 SOC. SCI. Q. 20, 28-29 (1991).

64. KOHN & SLOMCZYNSKI, *supra* note 58, at 133.

65. I confine myself to federal law, and exclude state law, because my focus is on the stock of knowledge of the nation as a whole. A macrosociological framework, however, is applicable at the state level. Thus, variations between states in knowledge growth and use can be expected to create differences in the content of state law.

66. Act of May 31, 1870, ch. 114, § 16, 16 Stat. 144 (codified at 42 U.S.C. § 1981 (2006)).

67. *See* Long v. Ford Motor Co., 496 F.2d 500, 504 (6th Cir. 1974).

68. *See* Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 459-60 & n.6 (1975).

Exhibit 6

0109

the last part of the twentieth century.

The Equal Pay Act of 1963 was the first federal statute explicitly fashioned to combat employment discrimination.[69]  The Act requires that, except when differential compensation is attributable to certain specified factors (e.g., a seniority program), women and men in the same establishment must receive identical compensation for work that is "equal," that demands "equal skill, effort, and responsibility," and that occurs under "similar working conditions."[70]  Congress directed the Equal Pay Act at the "ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same."[71]  It is notable, however, that this belief had already been abandoned by Americans: in a 1954 national survey, fully eighty-seven percent of respondents approved, and just thirteen percent disapproved, of equal compensation for male and female employees with the same occupational duties.[72]

While the Equal Pay Act of 1963 is confined to gender and covers only compensation, the Civil Rights Act of 1964 includes a provision (Title VII) that bans discrimination involving "race, color, religion, sex, or national origin" in all facets of employment.[73]  The aim of Title VII is to require employers, labor organizations, and employment agencies to base employment decisions on job-related qualifications and to eliminate from these decisions groundless stereotypes that have been maintained by social inertia.  In addition, Title VII renders reliance on statistical differences between groups impermissible in employment decisions without a compelling justification.  For example, employment decisions cannot be based on the statistically demonstrable fact that women with minor children more often have primary responsibility for child care than men with minor children.[74]  "Title VII prohibits the use of popular stereotypes or even statistical data to attribute general group characteristics to each individual member of the group."[75]  Under Title VII, potential and current employees must be evalu-

---

69.  29 U.S.C. § 206(d) (2006).

70.  *See* Equal Pay Act of 1963, Pub. L. No. 88-38, 77 Stat. 56 (1963) (covering employees who are, or whose employers are, "engaged in commerce or in the production of goods for commerce").  The Act was in force as of 1964.  § 4, 77 Stat. 57.

71.  S. REP. NO. 88-176, at 1 (1963).

72.  2 GEORGE H. GALLUP, THE GALLUP POLL: PUBLIC OPINION 1935-1971, at 1240 (William P. Hansen & Fred L. Israel eds., 1972).

73.  Pub. L. No. 88-352, 78 Stat. 241, 253-66 (1964) (codified at 42 U.S.C. §§ 2000e to 2000e-15 (2006)).  The Civil Rights Act was in force as of 1965.  § 716, 78 Stat. 266.  The Act applied to employers having an impact on interstate commerce and a minimum of twenty-five employees each working day during at least twenty calendar weeks in either the current or the preceding calendar year.  § 701, 78 Stat. 253.  The Act also prohibited labor organizations and employment agencies from discriminating.  § 703, 78 Stat. 255.

74.  *See* Phillips v. Martin Marietta Corp., 400 U.S. 542, 543 (1971) (per curiam).

75.  Mitchell v. Mid-Continent Spring Co., 583 F.2d 275, 281 (6th Cir. 1978) (internal quotation marks omitted); *cert. denied*, 441 U.S. 922 (1979).

Exhibit 6

0110

ated individually using criteria that are pertinent to job performance.

Because it encompassed the entire employment relationship and multiple demographic attributes and also established a governmental agency (the Equal Employment Opportunity Commission) to deal with discrimination covered by Title VII,[76] the Civil Rights Act of 1964 has been the most prominent federal legislation to date on employment discrimination. The Civil Rights Act of 1964 did not, however, include all demographic characteristics important to the structure of American society. In particular, it did not cover age, an omission that Congress eliminated three years after enactment of Title VII when it adopted legislation to prohibit discrimination in employment against persons forty to sixty-five years old. Like Title VII, the Age Discrimination in Employment Act of 1967 ("ADEA") extends to all aspects of employment, with exceptions for some types of employers,[77] and was designed to suppress "inaccurate and stigmatizing stereotypes" about age.[78] Under both statutes, decisions that affect employment must rely on factors relevant to job performance and on evaluations of individuals in terms of these factors.

The next, and last, major federal statute on employment discrimination was adopted more than two decades later. In 1990, Congress approved the Americans with Disabilities Act ("ADA") in order to prevent employers, labor organizations, and employment agencies from engaging in unwarranted discrimination against persons who have, or who are thought to have, physical or psychological disabilities.[79] Like other legislation dealing with employment discrimination, the ADA was designed to require that job-related decisions be based on the qualifications of current and potential employees, and it reflected the dissatisfaction of society with preconceptions that preclude evaluations of individuals in terms of these qualifications.[80] In enacting the ADA, "Congress acknowledged that society's ac-

---

76. *See* Pub. L. No. 88-352, §§ 705-709, 78 Stat. 241, 258 (1964).

77. *See* Pub. L. No. 90-202, 81 Stat. 602 (1967) (codified at 29 U.S.C. § 623 (2006)). The ADEA was in force as of 1968 and banned age discrimination by employers, employment agencies, and labor organizations. *Id.* The term "employer" has identical definitions in the ADEA and in Title VII but somewhat different exceptions. Although the ADEA originally did not cover persons who were older than sixty-four, a maximum age was subsequently removed for all but a few occupations. Pub. L. No. 95-256, § 3, 92 Stat. 189 (1978); Pub. L. No. 99-592, §§ 2-3, 100 Stat. 3342 (1986).

78. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610-11 (1993).

79. Pub. L. No. 101-336, 104 Stat. 327 (1990) (codified at 42 U.S.C. §§ 12101-17 (2006)). The ADA, which was in force as of 1992, covered the disabled individual, i.e., one who possesses "a physical or mental impairment that substantially limits one or more of the major life activities . . . or [who is] regarded as having such an impairment." *Id.* Employers were subject to the ADA, with some exceptions, if they had an impact on interstate commerce and a minimum of fifteen employees each working day during at least twenty calendar weeks in either the present or the prior calendar year. *Id.* §§ 3(2), 101(5), 108.

80. In 1977, i.e., thirteen years before the ADA, a national sample of adults in the United States was asked whether the government should enact legislation designed to

Exhibit 6

0111

cumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."[81]

The four statutes described above—the Equal Pay Act of 1963, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and the Americans with Disabilities Act of 1990—comprise the main innovations in federal public policy concerned with employment discrimination in the United States and serve as the central tools of the institution of law at the national level for promoting social and economic justice in employment. Indicative of the importance of these statutes to American society is that the number of employers subject to the statutes has generally been expanded over time.[82] Of particular relevance to a macrosociological framework is that the four statutes, as well as related federal legislation,[83] confer an identifiable character on the period from 1963 to 1990. By differentiating the period, the statutes form a unitary sociological phenomenon, and their enactment is presumptively not fortuitous.

In conclusion, novel doctrines are a core concern in a macrosociological approach to law, and an especially important macrosociological topic is any novel doctrine that several major pieces of legislation incorporate. Part II of this Article has focused on the impact of a growing stock of knowledge and has linked this factor to a salient development in recent law in the United States—federal antidiscrimination legislation. However, if the properties of a society have effects that are broad and fundamental, the substantial increase in knowledge is likely to have been responsible for new doctrines of law on a variety of subjects. In Part III below, I present evidence that additions to knowledge reshaped law on abortion by increasing the prevalence and lengthening the duration of schooling among young women.[84]

---

ensure equal job rights for individuals who are physically handicapped. Four out of five respondents endorsed the enactment of such legislation. CBS NEWS & NY TIMES, July 19-25, 1977, accession no. 20297, *available at* LEXIS, RPOLL File.

81. Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999).

82. *See, e.g.*, Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 2, 86 Stat. 103 (1972); Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 28, 88 Stat. 55, 74 (1974); Congressional Accountability Act of 1995, Pub. L. No. 104-1, 109 Stat. 3 (1995).

83. *See, e.g.*, Rehabilitation Act of 1973, Pub. L. No. 93-112, § 504, 87 Stat. 355, 394 (1973).

84. *See* Richard Rubinson & John Ralph, *Technical Change and the Expansion of Schooling in the United States, 1890-1970*, 57 SOC. EDUC. 134 (1984) (finding that advances in technology boosted enrollments in primary and secondary schools in the United States). However, Professors Rubinson and Ralph did not investigate whether advances in technology affected the likelihood of attending college. A study of four countries in Western Europe concluded that economic development between 1900 and 1985 increased the rate at which women enrolled in institutions of higher education. Joan Mary Hermsen, Gendering Higher Education Expansion: Explaining the Growth in Women's University Enrollment Rates in Britain, France, Germany, and Italy During the Twentieth Century 41, 49, 111-12 (1997) (unpublished Ph.D. dissertation, University of Maryland at College Park) (on file with author). Economic development requires the application of knowledge. Because economic development promoted

Exhibit 6

0112

### III. LAW AND ABORTION IN THE UNITED STATES

Because law on abortion underwent a transformation during a relatively short period in the United States, the subject of abortion affords an opportunity not only to identify societal properties and forces shaping law but also to call attention to an important point in the macrosociological thesis that I am advancing. If the concepts and principles that dominate law are attributable to the society in which they are embedded, the distinction between branches of government—the legislature, the executive branch, and the judiciary—is not of major importance, and prevailing doctrines of law do not depend on whether they are in statutes enacted by legislatures, in regulations issued by administrative agencies, or in decisions rendered by judicial bodies. In a macrosociological perspective, broad forces that determine the properties of society shape the governing doctrines of law, and the doctrines respond in the long run to these forces/properties in a manner that protects the equilibrium of the society and maintains, or increases, commitment to the society on the part of its participants. One of the branches of government will supply a doctrine of law that a society needs, because a society is a system and because law is a component that contributes to the system. Thus, merely identifying the branch of government that produces a given doctrine is insufficient for understanding why the doctrine exists. An inquiry of greater depth is necessary. The branches of government form a dependent, not an independent, variable in my framework, and the branch that happens to originate a particular doctrine is a fact requiring an explanation, not a fact providing one.[85]

In asserting that the branch of government from which any particular doctrine emanates cannot explain the content and evolution of law, I am implicitly challenging at least one widely accepted belief, namely, that the political process is an important factor determining doctrines of law. I reject this assumption at the same time I concede that politics is a precursor of law. The role of politics differs across the branches of government—a difference that is particularly apparent between the judicial branch, where politics operates through the appointment and election of judges, and the legislative and executive branches, where politics operates not just through the election of officeholders but also through lobbying efforts directed at them. In my framework, however, political activity is merely the vehicle by which societal needs and values shape doctrines of law, and political analyses—despite their popularity—are not useful for understanding either

---

college attendance in four European nations, it also is likely to have done so in the United States.

85. Barnett, *supra* note 11, at 168 (suggesting that: (1) that the branches of government are mechanisms acting in response to their social environment; and (2) that, to be useful, a theory focusing on doctrines in law must explain why one branch reacts rather than another).

Exhibit 6

0113

why certain concepts and principles of law are dominant in a society at a given point in time or why such concepts and principles change over time. The political process in a viable social system, I contend, primarily functions to communicate the requirements of society to the institution of law. Thus, social science research has found that the expenditure patterns and legislative subjects of government are not affected materially by whether the persons comprising the governing elite are replaced or retained.[86] Societal imperatives, not political considerations, drive the domestic policies of government.

The preceding points are pertinent to law governing the use of abortion, and I therefore turn to a review of the change that occurred in this law during the late 1960s and early 1970s.

### A. Change in Law Regulating Abortion, 1967-1973

*Roe v. Wade*,[87] the January 1973 decision of the U.S. Supreme Court that held unconstitutional government action intended to impose severe restrictions on access to abortion, has been regarded not just as a milestone in the rights that law accords women,[88] but more broadly as a landmark in the history of constitutional interpretation.[89] The salience of *Roe*, however, diverts attention from an important forerunner that occurred at the state level. Specifically, in the years immediately preceding *Roe*, many states, either through legislation or court decision, substantially liberalized their law on access to therapeutic abortion. The liberalization of state law began in 1967, and by 1972, sixteen states in the coterminous United States had appreciably relaxed the conditions under which women were allowed to terminate pregnancies lawfully.[90] While not all of the states that revised their

---

86. Gregory G. Brunk & Thomas G. Minehart, *How Important Is Elite Turnover to Policy Change?*, 28 AM. J. POL. SCI. 559, 568 (1984); David J. Falcone, *Legislative Change and Policy Change: A Deviant Case Analysis of the Canadian House of Commons*, 41 J. POL. 611, 632 (1979); Harold Wolman et al., *Does Changing Mayors Matter?*, 58 J. POL. 201, 219-21 (1996).

87. Roe v. Wade, 410 U.S. 113 (1973).

88. Amy S. Cleghorn, Comment, *Justice Harry A. Blackmun: A Retrospective Consideration of the Justice's Role in the Emancipation of Women*, 25 SETON HALL L. REV. 1176, 1189 (1995) (describing *Roe* as "the first victory cry for women in the fight to claim emotional and legal independence in a male-dominated world")

89. The U.S. Supreme Court regards *Roe v. Wade* as one of its most socially significant decisions during the last half of the twentieth century. In 1992, the Court described *Roe* as "a watershed decision" and added that *Roe*

calls the contending sides of a national controversy to end their national division by accepting a common mandate rooted in the Constitution.
The Court is not asked to do this very often, having thus addressed the Nation only twice in our lifetime, in the decisions of *Brown* [*v. Board of Education* holding unconstitutional purposeful racial segregation in public schools] and *Roe*.

Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 867 (1992).

90. Fifteen of the sixteen states appreciably eased their restrictions on the use of

Exhibit 6

0114

therapeutic abortion through legislation. The fifteen states were Arkansas, California, Colorado, Delaware, Florida, Georgia, Kansas, Maryland, New Mexico, New York, North Carolina, Oregon, South Carolina, Virginia, and Washington. In Washington, the legislation was drafted by the legislature, but by its terms, the legislation could become law only after it was approved by the voters in a general election. Jon F. Merz et al., *A Review of Abortion Policy: Legality, Medicaid Funding, and Parental Involvement, 1967-1994*, 17 WOMEN'S RIGHTS L. REP. 1 (1995). The pertinent session laws were: Act of Feb. 17, 1969, § 2, 1969 Ark. Acts 177-78; Act of June 15, 1967, ch. 327, 1967 Cal. Stat. 1521; Act of Apr. 25, 1967, ch. 190, 1967 Colo. Sess. Laws 284; Act of June 17, 1969, ch. 145, 57 Del. Laws 409; Act of Apr. 12, 1972, ch. 72-196, 1972 Fla. Laws 608; Act of Apr. 10, 1968, ch. 26-12, 1968 Ga. Laws 1277; Act of Apr. 23, 1969, ch. 180, § 21-3407, 1969 Kan. Sess. Laws 452; Act of May 7, 1968, ch. 470, 1968 Md. Laws 870; Act of Mar. 21, 1969, ch. 67, 1969 N.M. Laws 225; Act of Apr. 11, 1970, ch. 127, 1970 N.Y. Laws 852; Act of May 9, 1967, ch. 367, 1967 N.C. Sess. Laws 394; Act of June 16, 1969, ch. 684, 1969 Or. Laws 1782; Act of Jan. 29, 1970, No. 821, 1970 S.C. Acts 1892; Act of Apr. 4, 1970, ch. 508, 1970 Va. Acts 1101; Act of Feb. 4, 1970, ch. 3, 1970 Wash. Sess. Laws 23. The Washington legislation was approved in an election held on November 3, 1970. Wash. Rev. Code §§ 9.02.060, 9.02.070 (1977).

The sixteenth state that expanded access to therapeutic abortion prior to *Roe* was Vermont, which did so through judicial decision. Specifically, in January 1972, the Supreme Court of Vermont held unconstitutional a state statute that subjected a person who performed an abortion to imprisonment unless the pregnancy threatened the life of the woman; the statute expressly exempted from punishment the woman whose pregnancy was aborted. Beecham v. Leahy, 287 A.2d 836, 840 (Vt. 1972). Following *Beecham*, a pregnancy could be terminated lawfully in Vermont for any reason before the fetus was capable of moving in the uterus, i.e., prior to quickening. *Id.* at 839.

Under Mississippi law prior to 1966, a woman could abort a pregnancy only when the pregnancy jeopardized her life. MISS. CODE ANN. § 2223(1) (1942, recompiled 1956). In 1966, Mississippi revised its abortion statute and added rape as a permissible ground for terminating a pregnancy. Act of May 8, 1966, ch. 358, § 1, 1966 Miss. Laws 661; Merz et al., *supra*, at 33. Because the statutory change did not substantially expand access to abortion, the instant study treats Mississippi as a state that did not alter its abortion law before *Roe*.

As the result of state court decisions rendered prior to *Roe*, Massachusetts allowed a pregnancy to be terminated "to preserve the woman's life or physical or mental health." Merz et al., *supra*, at 30. The court decisions conflicted with the state statute on abortion, which did not permit abortion for any reason. MASS. GEN. LAWS ANN. ch. 272, § 19 (1970). The highest court in Massachusetts established the exception for the life or health of the woman at least as early as 1944. Commonwealth v. Wheeler, 53 N.E.2d 4, 5 (Mass. 1944). Because my focus is on the states that eased restrictions on abortion starting in the 1960s, I classify Massachusetts as a jurisdiction that did not liberalize its law. An additional basis for doing so is that the case law of the highest court in Massachusetts during the 1960s is unclear as to whether a serious threat to the mental or physical health of the pregnant woman was necessary to abort a pregnancy lawfully or whether a health threat of any degree justified an abortion. *Compare* Commonwealth v. Brunelle, 171 N.E.2d 850, 852 (Mass. 1961) (requiring that an abortion be based on a reasonable belief that the health of the pregnant woman was placed in "great peril" by her pregnancy and that her health was in danger of "serious impairment" unless the pregnancy was terminated), *with* Kudish v. Bd. of Registration in Med., 248 N.E.2d 264, 266 (Mass. 1969) (citing *Brunelle* and earlier decisions without specifying the degree to which a pregnancy must endanger the health of the pregnant woman to justify an abortion). Massachusetts would have been categorized in the instant study as a state that liberalized its law on abortion prior to *Roe* if it had clearly changed its law to allow an abortion to be performed legally for health reasons without regard to the level of risk that the pregnancy posed. (For the same reasons, the instant study treats Alabama as a state that did not liberalize its law on abortion before *Roe*: its pre-*Roe* statute allowing an abortion for health reasons was enacted in 1951, as indicated in the text accompanying note 178 *infra*, and I could find no evidence that the statute permitted an abortion regardless of the severity of the health risk created by the pregnancy.)

Exhibit 6

0115

law permitted women to terminate pregnancies as easily as *Roe*, the important point is that a substantial number of states expanded access to abortion before the Court announced *Roe* in 1973. *Roe*, therefore, must be understood to be a part of a movement that had already begun within law to reduce government barriers to therapeutic abortion.

### B. Factors Affecting Decisions by Women to Abort Pregnancies

To identify the societal properties and forces that are pertinent to law on abortion, I will begin with a review of research conducted by social scientists on variables hypothesized to be possible influences on the decisions of pregnant women whether to abort their pregnancies. The review is based on the assumption that the variables having such an effect on individuals suggest the factors determining the strength of the societal need for access to medically approved methods of terminating pregnancy. Unfortunately, social science research dealing with the antecedents of induced abortion among women is scarce, and none of the existing research employs longitudinal, i.e., time series or panel, data. The absence of longitudinal data seriously limits the conclusions that can be drawn regarding causal relationships, because longitudinal data allow temporal sequences to be studied and are thus more likely than cross-sectional data to identify causes accurately.[91]

The studies I review involved multivariate analyses of data on samples of women in the United States and focused on whether induced abortions

---

In 1970, a three-judge federal district court issued a judgment declaring a Wisconsin statute to be unconstitutional in banning abortions during the first trimester of pregnancy and later issued an injunction against enforcement of the statute. The U.S. Supreme Court declined to rule on the declaratory judgment, but it vacated the injunction of the district court and directed the district court to reconsider the injunction. Babbitz v. McCann, 310 F. Supp. 293 (E.D. Wis. 1970), *appeal dismissed*, 400 U.S. 1 (1970); Babbitz v. McCann, 320 F. Supp. 219 (E.D. Wis. 1970), *vacated*, 402 U.S. 903 (1971). The remand of the case on the issue of the injunction has no subsequent judicial history, but since Wisconsin prosecutors and the Wisconsin judiciary were evidently continuing to enforce the state abortion statute during the appeal of the district court declaratory judgment, enforcement presumably continued until the Supreme Court decided *Roe* in January 1973. *See Babbitz*, 320 F. Supp. at 223 (justifying the injunction because "the state judiciary has failed to discourage the prosecutors from trespassing on the federal rights in question. The reaction of the state authorities to our judgment relegates our ruling to nothing more than a gratuitous, advisory opinion"). Accordingly, I do not consider Wisconsin to be a state that liberalized its abortion law prior to *Roe*.

In 1972, a three-judge federal district court, in a declaratory judgment, ruled unconstitutional the New Jersey statute that imposed criminal penalties on physicians who performed abortions, but the court did not enjoin enforcement of the statute. Young Women's Christian Ass'n v. Kugler, 342 F. Supp. 1048 (D. N.J. 1972), *aff'd*, 463 F.2d 203 (3d Cir. 1972), *cert. denied*, 415 U.S. 989 (1974). Because enforcement of the statute could continue while appellate courts considered the district court ruling, I do not deem New Jersey to be a state that liberalized its abortion law before *Roe*.

91. BARNETT, *supra* note 11, at 5-7; Joanna M. Shepherd, *Deterrence versus Brutalization: Capital Punishment's Differing Impacts Among States*, 104 MICH. L. REV. 203, 213 (2005).

Exhibit 6

0116

among these women were associated with at least two of the following variables: (1) female employment; (2) female education (years of school completed or present school attendance); and/or (3) female marital status. The decisions made by women whether to end pregnancies by abortion are believed to be based on the costs of childbearing[92] and/or on the manner in which women define their role in society.[93]   Because each of the three enumerated variables can affect these costs and reflect sex-role definitions, each variable has the potential to influence the proportion of pregnancies that women seek to avoid through contraception and to terminate through abortion.  More precisely, insofar as any of the variables burdens childbearing and/or offers socially acceptable alternatives to childbearing, the variable(s) will enhance the need of the social system for ready access to abortion and for law that endorses such access.  As a result, this Article examines social science research on the variables to ascertain if one or more of them influences the likelihood that women will end pregnancies through abortion.

Before turning to these studies, it is worth mentioning that the variables being considered—the employment, education, and marital status of women—possess three important attributes.  First, the variables have been the subject of at least one well-designed study, and their effect, if any, on abortion can be ascertained tentatively.  Quantitative research of reasonable quality will thus be the basis for decisions regarding which of the variables might create a societal need for a change in law on abortion.  Second, reliable annual data on the rate or distribution of each variable in the female population of reproductive age are obtainable for years starting soon after World War II.  Since the reform of abortion law in the United States commenced in the last half of the 1960s when some states began to ease their restrictions on abortion, a variable can produce a need for this reform only if its rate or distribution in the population increased during earlier years.  Accordingly, the period covered by the data must commence well before the 1960s and, because World War II is a landmark in U.S. history, should ideally begin in the last half of the 1940s or in the early 1950s.  Third, data on states from the 1960 census are available for each of the three variables, and these data can be used to identify system-level properties that differentiate the states that liberalized their law on abortion in the late 1960s and early 1970s from the states that did not.

In light of the attention that the abortion issue has attracted in the political arena, it is surprising that few well-designed social science studies with

---

92. Lawrence B. Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37 PERSP. ON SEXUAL AND REPROD. HEALTH 110, 117 (2005).

93. Steven L. Nock, *The Symbolic Meaning of Childbearing*, 8 J. FAM. ISSUES 373 (1987).

Exhibit 6

0117

large data sets have been conducted on the factors affecting the likelihood that women who conceive will abort their pregnancies. Indeed, I was able to locate just two such studies. Like all research, the studies have methodological limitations that need to be understood in evaluating their findings. Therefore, I will discuss each study in some detail.

The first study was based on the 1976 cycle of the National Survey of Family Growth ("NSFG").[94] The NSFG sampled females fifteen to forty-four years old who resided in the coterminous United States. A female in this population was eligible for the sample if (i) she was currently or previously married, or (ii) even though she had never married, she had borne a child who was living with her.[95] In imposing these eligibility criteria, however, the sample excluded childless females who had never married. Since females in the latter category (i.e., childless never-married females) comprised most of the women who were undergoing abortions in the mid-1970s,[96] a serious question exists whether the findings of the study can be generalized to all women who experienced a pregnancy at this time.

Because the dependent variable in the study was whether a woman had ever aborted a pregnancy, the study was confined to women who reported they had been pregnant.[97] In examining the dependent variable, the study dichotomized the respondents—respondents who reported having had an abortion were placed in one category and respondents who did not report an abortion were placed in another category.[98] However, subsequent research indicates that many women in the survey did not admit that they had aborted pregnancies. Indeed, married interviewees in the 1976 NSFG are estimated to have revealed just forty-five percent of the abortions they actually obtained.[99] If the misreporting of abortions was not random but systematically associated with certain attributes of women, the findings of the study may misstate whether, how, and/or the degree to which the attributes are linked to the abortion decisions of women.

In terms of the independent variables that are of interest here, education was determined by the NSFG at the time of pregnancy and scaled with a dichotomy that separated (i) women who were still in school from (ii) women who had finished their education or whose educational status was uncertain.[100] Consequently, the study measured school attendance, not

---

94. Joanne M. Badagliacco, Who Has Abortions: Determinants of Abortion Choice among American Women (1987) (unpublished Ph.D. dissertation, Columbia University) (on file with Widener University School of Law Delaware Campus Library).

95. *Id.* at 33.

96. *Id.* at 38.

97. *Id.* at 54.

98. *Id.* at 56.

99. Elise F. Jones & Jacqueline Darroch Forrest, *Underreporting of Abortion in Surveys of U.S. Women: 1976 to 1988*, 29 DEMOGRAPHY 113, 115 (1992).

100. Badagliacco, *supra* note 94, at 64.

Exhibit 6

0118

educational attainment. Employment status of respondents was generally unknown for the point in time when respondents became pregnant, but information existed on whether respondents were economically active outside the home when they were interviewed for the NSFG. The study used the latter information for employment, and hence the variable as measured refers to a point subsequent to the occurrence of pregnancy.[101] While the study assumed that the employment status of women was the same at the time of the pregnancy as at the time of the interview, the assumption may have often been inaccurate given the tendency of women in the 1970s to withdraw from the labor force when they carried pregnancies to term.[102] The findings of the study, accordingly, may be incorrect with regard to the relationship between employment and abortion.

The final independent variable of interest was marital status. For this variable, the study grouped women into two categories: (i) those who were married when they became pregnant or ended their pregnancy; and (ii) those who, when they became pregnant or aborted their pregnancy, had never been married, were married but separated or divorced from their husbands, or were widowed. The study deemed women in the first category to be married, and women in the second category to be unmarried.[103] However, the NSFG did not interview, and the second category therefore omits, never-married females who were childless. The exclusion of the latter females prevents the study from comparing women who were married at the time of their pregnancies to all other women and undermines the ability of the study to assess marital status as an explanatory variable.

What did the statistical analysis reveal? As the investigator recognized,[104] the problems characterizing the research design require that considerable caution be exercised in drawing conclusions from the findings. Nevertheless, the findings are plausible and hence noteworthy. With a range of other variables held constant,[105] a relationship emerged between school attendance and abortion use: the probability that a woman would end a pregnancy was higher among females who were attending school than among females who were not.[106] The relationship to abortion use of both employment status and marital status, however, differed between women who were not mothers when they became pregnant and women

---

101. *Id.*

102. GUS HAGGSTROM ET AL., CHANGES IN THE LIFESTYLES OF NEW PARENTS 146 (1984).

103. Badagliacco, *supra* note 94, at 61.

104. *Id.* at 76-77.

105. Among the variables controlled was whether the pregnancy occurred before or after the U.S. Supreme Court decided *Roe v. Wade. Id.* at 62, 160.

106. Unless otherwise noted, I base my summary of the findings on the logistic regression equations, not the ordinary least-squares equations, estimated by the investigator. Badagliacco, *supra* note 94, at 158-61.

Exhibit 6

0119

who were.[107]   In terms of employment status, non-mothers were more likely to abort a pregnancy when they were employed, full-time or part-time, than when they were not employed, but among mothers, employment status was unrelated to the probability of abortion.   In terms of marital status, non-mothers were not characterized by a relationship between marital status and abortion probability, but mothers were less likely to terminate pregnancies when they were married than when they were not.

Two points emerge from the findings and merit some emphasis.   First, school attendance was the sole independent variable that did not interact with another factor; the effects of the other two independent variables were contingent on whether the woman was already a mother when she became pregnant.   Consequently, school attendance—and, by implication, educational level—offers particular promise as a factor generating a societal need for abortion.   Second, standardized regression coefficients from ordinary least-squares regression indicated that school attendance had by far the strongest effect, as well as the most uniform effect, on the likelihood of aborting a pregnancy.[108]

A second study of the antecedents of abortion use was conducted on the pregnancy outcomes of females who resided in eight states or in New York City and whose pregnancies ended during 1980.[109]   The data included information on more than a half-million pregnancies involving women twenty years of age and older, but while an impressively large number of cases could be used to assess the factors influencing pregnancy outcome, the data possessed three limitations that should be noted.

The first limitation of the study is that the dataset covered pregnancy outcomes of the residents of just a few geographic areas and therefore included only a portion of all pregnancies—specifically, only one out of nine pregnancies—that occurred in the United States among women age twenty and older and that had an outcome in 1980.[110]   While this sampling fraction is much larger than that found in surveys of large populations, the women included in the data were not chosen randomly from a larger universe, rendering tests of statistical significance inappropriate.   Accordingly, judgments are not possible whether relationships found between the independent variables and the dependent variable apply to all American women of reproductive age.

The second limitation of the study is that information was unavailable on

---

107.  *Id.* at 67.

108.  *Id.* at 143, 165.

109.  Katherine Trent & Eve Powell-Griner, *Differences in Race, Marital Status, and Education Among Women Obtaining Abortions*, 69 Soc. Forces 1121 (1991).

110.  Computed from *id.* at 1126 and from Stephanie J. Ventura et al., *Trends in Pregnancies and Pregnancy Rates, United States, 1980-88*, 41 Monthly Vital Stat. Rep., at Table 1 (Nov. 16, 1992), *available* at http://www.cdc.gov/nchs/products /pubs/pubd/mvsr/supp/42-41/42-41.htm.

Exhibit 6

0120

the employment status of women whose pregnancies were included in the study. Thus, one of the three variables of concern in this Article was omitted from the data analysis undertaken by the study.[111]  To the extent that differences in employment are related to differences in the probability of aborting a pregnancy as well as to differences in education and/or marital status, the study may yield inaccurate conclusions.  Notably, available research has identified relationships between employment, education, and marital status.[112]

The third limitation is that the data did not include information on spontaneous fetal deaths when gestation length was twenty weeks or less.  The omission of data on early spontaneous fetal deaths, the investigators point out, causes the abortion rate to be overstated, but they contend that the omission does not bias their conclusions regarding the impact on abortion use of the explanatory variables that are of interest here.  When the variables produce differences between groups in rates of abortion, the investigators argue, the magnitude of the differences will be correctly gauged because rates of early spontaneous fetal mortality are unlikely to differ between these groups.[113]  However, if the investigators are mistaken in this regard, their estimates of the impact of the variables on the probability of abortion may be biased, because while fetal deaths were relatively uncommon in 1980,[114] the fetal deaths that were omitted from the data accounted for roughly three out of four such deaths that took place.[115]

In examining the findings of the study, I concentrate on women who were at least twenty years old, because the study combined younger females into a single category that included ages eighteen and nineteen and ages below eighteen.[116]  Women who were at least twenty years old were thus the only group studied that had attained adulthood and had acquired

---

111.  In addition to educational attainment and marital status, the following independent variables were included: age, metropolitan versus nonmetropolitan residence, prior number of live births, race, and state of residence.  Trent & Powell-Griner, *supra* note 109, at 1126.

112.  Among women, educational level and marital status are related to employment status under at least some conditions.  Diane H. Felmlee, *A Dynamic Analysis of Women's Employment Exits*, 21 DEMOGRAPHY 171, 178, 180 (1984).  In addition, the educational level and the employment status of wives affect the likelihood of marital disruption, suggesting that educational level and employment status of wives are linked to current marital status.  Steven Ruggles, *The Rise of Divorce and Separation in the United States, 1880-1990*, 34 DEMOGRAPHY 455, 456, 463 (1997); Scott South & Glenna Spitze, *Determinants of Divorce Over the Marital Life Course*, 51 AM. SOC. REV. 583, 587-88 (1986).

113.  Trent & Powell-Griner, *supra* note 109, at 1125.

114.  Fetal deaths occurred in just one out of eight pregnancies that ended in 1980.  Computed from Ventura et al., *supra* note 110, at Table 2.

115.  Computed from U.S. DEP'T OF HEALTH & HUMAN SERVS., VITAL STATISTICS OF THE UNITED STATES: 1980, VOL. IIA, MORTALITY, at Table 3-3 (1985), *available at* http://www.cdc.gov/ nchs/products/pubs/pubd/vsus/1963/1963.htm.

116.  Trent & Powell-Griner, *supra* note 109, at Table 2 (reporting the findings).

Exhibit 6

0121

new rights from the reform of abortion law.[117] In this group, unmarried women had a much higher probability of aborting a pregnancy than currently married women, an effect that was net of differences on the remaining independent variables. The relationship between marital status and abortion was found even among women who were childless; indeed, childless unmarried women were ten times more likely than childless married women to abort a pregnancy. This is contrary to the Badagliacco study, which concluded that marital status did not affect the probability of abortion among childless women.

While marital status exhibited a simple relationship to abortion use, educational attainment did not. As the number of years of schooling increased, so did the likelihood that a pregnancy would end in an abortion, but when the study examined potential interactions, it found that the impact of education varied with the number of previous live births and with marital status. As to number of prior births, a clear difference existed between women who had not borne a child and women who had: the probability of an abortion generally rose with years of schooling for women who were childless, but for women having one or more births, the probability increased only to twelve years of completed schooling and then remained essentially constant. More important, however, is the finding that the effect of education depended on marital status. Among unmarried women, the proportion of pregnancies terminated by abortion rose consistently with education, but among married women, the relationship was ∩ in shape: the probability of abortion increased as the level of completed schooling went from eight or fewer years to twelve years and then fell back to its initial level as the level of completed schooling rose to sixteen or more years.

Let me now attempt to integrate the findings of the two studies. While their results are not conclusive, the studies indicate that abortion use rises with educational attainment and school enrollment and is more common among unmarried women than among married women,[118] but whether abortion is generally and substantially affected by employment is uncertain.[119]

---

117. Because the study focused on pregnancies having an outcome in 1980, all of the pregnancies in the study occurred after *Roe v. Wade*. *Roe* was applicable to adult women but not to females who were minors. 410 U.S. 113, 165 n.67. The constitutional right of minors to procure an abortion developed after *Roe* and was more circumscribed than the right of adults. Planned Parenthood Ass'n of Kansas City v. Ashcroft, 462 U.S. 476 (1983).

118. Another study that finds unmarried women are more likely to end pregnancies is Kanhaiya Lal Vaidya, Unintended Pregnancy and Abortion in the United States: Evidence from the National Survey of Family Growth, Cycle IV, 1988, at 79, 85 (1995) (unpublished Ph.D. dissertation, Bowling Green State University) (on file with author). However, the study did not include a control for the current educational level, schooling status, or employment status of women. *Id.* at 69-70, 94.

119. Among females who terminated pregnancies in 1987, the age-standardized use of abortion varied less with employment status than with school enrollment or marital status. Stanley K. Henshaw & Jane Silverman, *The Characteristics and Prior Contraceptive Use of U.S. Abortion Patients*, 20 FAM. PLAN. PERSP. 158, 162 (1988).

Exhibit 6

0122

Educational achievement may not possess a linear relationship to the probability of abortion among married women, but it must be kept in mind that unmarried women were by far the chief source of abortions in the United States in the decade-and-a-half that followed *Roe v. Wade*, whether measured by the proportion of pregnancies ended by abortion or by the proportion of females of childbearing age who had an abortion.[120]  Among women as a whole, then, a higher level of schooling is associated with a higher likelihood that a woman will terminate a pregnancy.

Before concluding this section, I would like to raise an important, but largely unrecognized and unexplored, methodological issue.  The two studies reviewed above focused exclusively on the characteristics of individual women and used these characteristics to estimate the probability that a woman would abort a pregnancy.  Neither study, however, examined whether the characteristics of geographic areas that form law-defined jurisdictions such as states are related to jurisdiction-level rates of abortion.  For instance, the two studies defined marital status by the marital status of each woman in the sample, and the studies examined whether the marital status of a woman was related to whether she aborted a pregnancy.  The studies did not consider whether a relationship existed between the proportion of women who were currently married or unmarried in each state and the percentage of all pregnancies in the state that were aborted.  Individual-level attributes and jurisdiction-level attributes are distinctly different types of information, and when studied for their relationship to a state-level measure of abortion use, they may not yield the same conclusions.  Unfortunately, while some investigators have attempted to estimate the incidence of abortion from the characteristics of jurisdictions, their research designs have serious limitations.

Future work, then, must address the question whether the antecedents of change in law on abortion are more readily and accurately identified using data on the characteristics of jurisdictions (e.g., states), data on the characteristics of individuals in these jurisdictions, or data on both.  From a macrosociological perspective, law as an institution is a component of a social system, and the antecedents of the doctrines of law are expected to stem from the system.  Two social science studies using a multivariate statistical technique support the assumption that characteristics of states shape doctrines of state law.[121]  The research reported *infra* extends this type of study to the subject of abortion law.

---

120. STANLEY K. HENSHAW & JENNIFER VAN VORT, ABORTION FACTBOOK: READINGS, TRENDS, AND STATE AND LOCAL DATA TO 1988, at 176-77 (1992).

121. Barnett, *supra* note 47; Rich Geddes & Dean Lueck, *The Gains from Self-Ownership and the Expansion of Women's Rights*, 92 AM. ECON. REV. 1079, 1084-90 (2002).  A state can be regarded as a system per se or as a subsystem in a larger system, namely, the United States as a society.

Exhibit 6

0123

### C. Time-Series Indicators of a National Need for Abortion

While employment among women may or may not be generally related to the demand for abortion, according to the studies reviewed above, the education and marital status of women are evidently important factors affecting the likelihood that women in the United States will abort their pregnancies. These two variables, therefore, may shape the need for and lawfulness of abortion. Which variable—education or marital status—more accurately predicts abortion use cannot be ascertained from research conducted to date, but each variable seems to have a definite bearing on the probability an individual woman will choose to end a pregnancy, and each variable may thus be an indicator of a system-level determinant of law on abortion.

In light of the above findings with regard to marital status and school enrollment, I consider whether the distribution of marital status and the level of school enrollment among women in the United States changed over time in a manner suggesting that one or both of these variables produced a need for lawfully available abortion prior to the shift in abortion law that occurred from 1967 to 1973.[122] Figure 3 deals with marital status. Specifically, the figure shows, for each year in the time period covered, the percentage of women at age twenty to twenty-four and at age twenty-five to twenty-nine who had not been married; these women are designated "never married." The figure also shows the percentage of women in each of the two age ranges who had been married previously but who were no longer married due to divorce. I confine my attention to unmarried women because they accounted for the vast majority of abortions in the years following *Roe v. Wade*[123] and, presumably, in the years before as well.

For marital status to be a plausible factor creating and heightening a societal need for abortion, the percentage of reproductive-age women who are unmarried, whether from having never married or from divorce, would have had to rise *before* abortion law was reformed. As explained above,

---

122. The U.S. Census Bureau gathered the data on marital status and school enrollment in the Current Population Survey. Although the years before rather than after 1967-1973 determine the possible role of marital status and school enrollment in the need for lawful abortion, the time series I present extends to 1990.

The data on marital status start in 1949 for women twenty to twenty-four years old and in 1957 for women twenty-five to twenty-nine years old; the data are limited to the civilian population in some years but not others. Data on marital status for all years except 1990 are from U.S. Bureau of the Census, Statistical Abstract of the United States (71st ed. through the 111th ed.). Data for 1990 are from U.S. Bureau of the Census, Marital Status and Living Arrangements: March 1990, Current Population Reports, Series P-20, No. 450 (May 1991), at Table 1. Yearly rates of school enrollment for the civilian noninstitutionalized population are in U.S. Census Bureau, Table A-2: Percentage of the Population 3 Years Old and Over Enrolled in School, by Age, Sex, Race, and Hispanic Origin: October 1947 to 2004, http://www.census.gov/population/www/socdemo/school.html [hereinafter Table A-2].

123. Henshaw & Van Vort, *supra* note 120.

Exhibit 6

0124

the principal doctrinal changes in that reform occurred between 1967, when some states began to ease substantially the grounds for a lawful abortion, and 1973, when the Supreme Court decided *Roe v. Wade*.[124]   (The two years are marked by vertical lines in figure 3 as well as in figures 4 and 5.) The years from 1967 to 1973 thus constitute the period of abortion law reform, and the years prior to this period are critical to deciding whether marital status produced a societal need to liberalize abortion law.

During the pre-reform period, as is evident from figure 3, the proportion never married and the proportion divorced are essentially stable among women twenty to twenty-four years old and women twenty-five to twenty-nine years old.  Distinct movement in these proportions is found only during and/or after the period when reform occurred, and during the reform period (1967-1973), the movements are generally modest.  As a consequence, there is no persuasive evidence that change in the prevalence of unmarried women in the population engendered a societal need for the liberalization of abortion law in the 1960s.  If there was a need on the part of the social system to relax the grounds for abortion permitted by law, the source of the need evidently lies elsewhere.



Figure 3.  Marital Status of Women by Age

---

124.  I regard the change in abortion law during this period as a national movement, and hence use data on marital status and school enrollment for the United States as a whole, because a decision of the highest federal court ended the period and because in 1972, thirty-nine percent of the population of the United States resided in the sixteen states whose law was changed from 1967 through 1972 to expand access to abortion. The percentage of the population was calculated from U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES: 1974, at Table 11 (95th ed. 1974), *available at* http://www.census.gov/prod/www/abs/statab1951-1994.htm.

Exhibit 6

0125

I turn now to the rate of school enrollment among women of childbearing age. Figure 4 shows the yearly percentage of adult women in each of four age groups who were enrolled in school (full-time or part-time). Schools of all levels are included in the figure; the data, therefore, cover enrollments in high schools, junior colleges, colleges granting baccalaureate and graduate degrees, and professional schools.

Substantial growth in school enrollment rates among women eighteen to nineteen years old and among women twenty to twenty-one years old characterize most of the time interval covered by figure 4. Notably, the trend commences prior to the period (1967-1973) when abortion doctrine underwent its main change. The trend was present well in advance of this period among women eighteen to nineteen years old, for whom enrollment rates begin in 1947. A rise in enrollment rates prior to the abortion-law liberalization period also is found among women twenty to twenty-one years old, for whom rates begin in 1959. Finally, an increase in enrollment rates among women twenty-two to twenty-four years old and among women twenty-five to twenty-nine years old is evident before this period, although the increase is small in absolute magnitude and does not commence until shortly before the liberalization of abortion law began. (Rates start in 1959 for women twenty-two to twenty-four years old[125] and in 1947 for women twenty-five to twenty-nine years old.) Thus, school enrollment in all of the age groups in the figure—but especially in the two youngest age groups—was changing in a manner that permitted schooling to create a societal need for abortion and promote legalization of the procedure. Indeed, school enrollment rates, by rising before as well as during the time that states significantly eased restrictions on access to abortion, behaved exactly as they would be expected to behave if they were creating and intensifying a need in American society for liberalized abortion doctrine.[126] Accordingly, macrosociological research on law regulating access to abortion must consider the variable.

---

125. TABLE A-2, *supra* note 122 (providing school enrollment rates from 1947 to 1958 for the age category twenty to twenty-four). From 1959 onward, the table separates this age range into two categories, namely, age twenty to twenty-one and age twenty-two to twenty-four. *Id.* The three-year mean percentage of women enrolled in school at age twenty to twenty-four doubled from 3.7% in 1947-1949 to 7.4% in 1956-1958. Calculated from *id.*

126. After the Supreme Court decided *Roe v. Wade*, women eighteen to twenty-nine years old were the source of approximately seven out of ten lawful abortions performed in the United States, and the proportion varied little over time. HENSHAW & VAN VORT, *supra* note 120, at Table 1. Given the consistency of this proportion in the years that followed *Roe*, the same proportion is likely to have prevailed in the years that preceded the ruling. If women eighteen to twenty-nine years old provided most of the pregnancies that were terminated in the period prior to 1967-1973, their rising rate of school enrollment before abortion law underwent liberalization had the ability to spawn and magnify a need for the liberalization.

Exhibit 6

0126



Finally, I consider female employment. Although a relationship between the employment status of a woman and the probability she will abort a pregnancy has not been established, a relationship between these variables has not been disproved. Social science research to date does not allow a conclusion to be drawn regarding such a relationship, because studies of the relationship are too few in number and suffer from too many limitations. However, a link between female employment and abortion has been posited by theory, and thus such a link is a possibility that cannot be dismissed out of hand. For this reason, I examine the labor force participation rate, i.e., the percentage of individuals in a demographically defined group who currently are employed or are engaged in finding employment.

Figure 5 presents the seasonally adjusted rate of labor force participation among civilian women in each of three age groups, viz., eighteen to nineteen, twenty to twenty-four, and twenty-five to thirty-four.[127] The data in the figure are for the fourth quarter of each year from 1948 through 1990. Labor force participants are persons (i) who are presently working or (ii) who are not working but who are available for work and have sought work during the prior four weeks.[128] Labor force participants who are unemployed—the members of group (ii)—are thus persons who are motivated to work and have an attachment to work; women in this group presumably would view a pregnancy similarly to women who are employed.

---

127. The data in the figure are from the Current Population Survey and are published by the U.S. Bureau of Labor Statistics. U.S. Bureau of Labor Statistics, Current Population Survey, http://www.bls.gov/data/home.htm (last visited May 1, 2007); the data are accessible through the link "Historical Data for the 'A' Tables of the Employment Situation Release."

128. HANDBOOK OF U.S. LABOR STATISTICS 4, 5 (Eva E. Jacobs ed., 8th ed. 2005).

Exhibit 6

0127

Notably, figure 5 reveals that the labor force participation rate of both women who were twenty to twenty-four years old and women who were twenty-five to thirty-four years old began to increase at least five years in advance of the period of abortion law reform.  Among women eighteen to nineteen years old, the labor force participation rate remained relatively flat before 1967, but the absence of change is probably due to the growing school enrollment of women in this age group that is observable in figure 4.



Figure 5.  Labor Force Participation Rate among Women by Age

### D.  System-level Properties and the Liberalization of State Abortion Law

Did change involving the role of women in the United States reshape law on abortion between 1967 and 1973 to expand access to the procedure?  If law is a macrosociological phenomenon, the properties of society rather than the idiosyncrasies of individuals or the operation of chance determine the concepts and principles that dominate law at any particular point in history.  In terms of sex roles, such properties include the level of educational attainment, extent of labor force participation, and distribution of marital status among women in the population.  Because the three variables have been the focus of social science theory, their potential to account for the modification of law on abortion in the United States during the period from 1967 to 1973 was considered in figures 3, 4, and 5.  In the instant part of this Article, the question whether the three variables contributed to liberalizing abortion law will be addressed with a different type of quantitative data and a different approach to analyzing the data.

The study that I report below involved the application of maximum-likelihood logistic regression—a statistical technique that is being used in-

Exhibit 6

0128

creasingly in social science research[129]—to state-level data from the 1960 census on a number of "independent" variables, i.e., variables that are to be tested for their ability to account for the phenomenon that is to be explained. In the instant study, the phenomenon to be explained (i.e., the dependent variable) was whether states liberalized their law on abortion in the 1967-1972 period, and the independent variables were the income, educational attainment, labor force participation, and marital status of women who resided in each state in 1960. The age categories of women used for the independent variables were largely dictated by the age categories for which the Census Bureau reported data. All of the forty-eight states in the coterminous United States were included in the study.[130]

The independent variable measuring the income of women was used in the regression equation on the assumption that, as their personal income rises, women possess not only the economic resources required to abort pregnancies but, in addition, an economic incentive to do so because child-rearing will compete with other activities for at least some of their income.[131] A macrosociological perspective suggests that a social system will eventually permit and endorse the solutions wanted by its members for serious problems they are experiencing. With increases in the income of women, accordingly, a social system becomes more likely to accept a solution (e.g., abortion) sought by its female members to a problem (e.g., unwanted pregnancy) that solely or disproportionately affects them.

In terms of problems faced by women, pregnancy was evidently creating social and economic difficulties for many women when states began to liberalize their statutes on abortion, because during 1960-1965, women in the United States did not want a substantial proportion of their pregnancies.[132]

---

129. DAVID W. HOSMER & STANLEY LEMESHOW, APPLIED LOGISTIC REGRESSION ix (2d ed. 2000).

130. Alaska and Hawaii were omitted from the data in order to exclude the possibility that their law on abortion was influenced by factors different from and/or additional to the factors operating in the coterminous states. If such factors were present in Alaska and/or Hawaii, the inclusion of the two states could have affected the findings from the data analysis. The possibility exists that Alaska and Hawaii were subject to different and/or additional factors because both states are geographically distant from the coterminous states and had become states just the year before the 1960 census. *See supra* note 32.

131. *See generally* Marshall H. Medoff, *Constituencies, Ideology, and the Demand for Abortion Legislation*, 60 PUB. CHOICE 185, 186 (1989). The proportion of pregnancies aborted has been found to rise with the family income of women. Badagliacco, *supra* note 94, at 64, 165.

132. Women who bore children during 1960-1965 indicated that approximately one out of five of their births was unwanted and would not have been wanted under any circumstances. The pregnancies resulting in an additional two out of five births were regarded by the women involved as occurring earlier than they desired. Larry Bumpass & Charles F. Westoff, *The Perfect Contraceptive Population*, 169 SCI. 1177, 1178-80 (1970). Because the preceding proportions refer to *births* and because an unknown number of pregnancies in this time period did not end in births due to miscarriage or induced abortion, the proportion of births that were unwanted was lower than the proportion of pregnancies that were unwanted.

Exhibit 6

0129

Notably, in the third quarter of the twentieth century, the birth and rearing of children reduced employment among women in the United States[133] and thus interfered with women's career goals. Moreover, much of the status difference between female and male sex roles, as indicated by the extent of sex segregation in occupations during the twentieth century, had been erased before the liberalization of state abortion law started.[134] In the context of reduced sex-role inequality, the likelihood that women would seek to eliminate unwanted pregnancies would rise with their personal income, because income supplies the financial resources and incentives to terminate pregnancies. The income of women, consequently, is a potentially important variable in the reform of abortion law.

As its measure of income, the instant study used the median number of dollars of income in 1959 received by women twenty-five to thirty-four years old who had income in that year.[135] While income at age twenty-five to twenty-nine might have been preferable to income at age twenty-five to thirty-four, income at age twenty-five to thirty-four was utilized because the U.S. Bureau of the Census did not report income by state for age twenty-five to twenty-nine separately. Instead, in publishing state data on income from the 1960 census, the Bureau combined age twenty-five to twenty-nine with age thirty to thirty-four and placed the two five-year age ranges into a single ten-year age range, i.e., twenty-five to thirty-four. State-level data on income were reported for the five-year age range twenty to twenty-four. However, age twenty-five to thirty-four was deemed more appropriate for the measure of income, because many women in the twenty to twenty-four age range, but few women in the twenty-five to thirty-four age range, were still in school in 1960.[136] School enrollment, of course, is not conducive to earning current income, and as a result, income at age twenty to twenty-four is an inappropriate gauge of the income of a cohort.

Even though the twenty-five to thirty-four age bracket includes numerous women who were older than women on whom the other independent

---

133. HAGGSTROM, *supra* note 102, at 146; Felmlee, *supra* note 112, at 180-81.

134. Weeden, *supra* note 12, at 480 index A.

135. Because every source of income was included, not all of the income received by a woman was necessarily from paid employment. However, in the United States as a whole, nine out of ten females age fourteen and over reported earned income in 1959. U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, U.S. CENSUS OF POPULATION: 1960. VOL. I, CHARACTERISTICS OF THE POPULATION. PART 1, UNITED STATES SUMMARY, at Table 98 (1964), *available at* http://www.census.gov/prod/www/abs/ decennial/1960cenpopv1.htm. Therefore, the assumption seems warranted that compensation from employment supplied most of the income received by a majority of women twenty-five to thirty-four years old.

136. In the United States as a whole, the percentage of women enrolled in school in 1960 was, for example, 19.3% among women who were twenty years old, 13.9% among women who were twenty-one years old, and 7.2% among women who were twenty-two years old. On the other hand, just 3.1% of all women twenty-five to twenty-nine years old, and 2.4% of all women thirty to thirty-four years old, were enrolled in school. *Id.* at Table 165.

Exhibit 6

0130

variables were based (who were either age twenty to twenty-four or age twenty-five to twenty-nine), income at age twenty-five to thirty-four is important because women at this age generally have a high level of fecundity.[137]  For them, unwanted pregnancy is a salient possibility, and law on abortion is a potentially important issue.  Because in most situations a social system changes at a slow pace, the system is able to anticipate the approximate average income that a cohort of women, as well as a cohort of men, will earn after its members have gone through the education institution and acquired the knowledge that is available to the cohort.  The experience of the cohort that is currently twenty-five to thirty-four years old is the basis for making a generally accurate prediction regarding what younger persons will collectively experience when they reach age twenty-five to thirty-four, because the cohort has been affected by the forces that have recently shaped the economy.

With regard to labor force participation and marital status, the study estimated odd ratios for both of these variables in each of two age ranges—age twenty to twenty-four and age twenty-five to twenty-nine.  That is, the dependent variable (whether states revised their law to increase access to abortion during 1967-1972) was regressed on inter alia labor force participation among women twenty to twenty-four years old and among women twenty-five to twenty-nine years old.  In addition, the study regressed the dependent variable on marital status among women twenty to twenty-four years old and among women twenty-five to twenty-nine years old.  Both age groups are indisputably important in studying abortion: from 1973 to 1988, women in the two age categories produced approximately one-half of all lawful abortions performed annually, and because these yearly percentages were remarkably consistent over time,[138] the percentage probably characterizes 1967 to 1972, the period of interest here.  The two age categories were thus included in the instant study.

Finally, the study measured the variable of education using the percentage of women twenty-five to twenty-nine years old who had finished four or more years of college.  The variable involved the number of years of college completed, not the receipt of a degree (for which data are unavailable in the state reports on the 1960 census).  The age range twenty-five to twenty-nine was preferable to the age range twenty to twenty-four, because college enrollment in 1960 was relatively infrequent among women

---

137.  In 1960, the number of live births per 100 women in the United States was 19.7 among women who were twenty-five to twenty-nine years old and 11.3 among women who were thirty to thirty-four years old.  NAT'L CENTER FOR HEALTH STATISTICS, U.S. DEP'T OF HEALTH, EDUCATION & WELFARE, VITAL STATISTICS OF THE UNITED STATES: 1960.  VOL. I, NATALITY, at Table 1-E (1964), *available at* http://www.cdc.gov/nchs/products/pubs/pubd/vsus/1963/1963.htm.  Women who were twenty-five to thirty-four years old accounted for a large proportion (42%) of all live births in the United States in 1960.  Calculated from *id.* at Table 2-16.

138.  HENSHAW & VAN VORT, *supra* note 120, at Table 1.

Exhibit 6

0131

twenty-five to twenty-nine years old compared to women twenty to twenty-four years old.[139]  By age twenty-five to twenty-nine, that is, women who will ultimately finish at least four years of college will have generally done so.

Table 1 gives the mnemonic label and a description of each of the variables in the regression equation.  For every independent variable, three categories—high, medium, and low—were created from the original data (median income or percentages) in order to avoid cells with zero cases, i.e., zero states.  Cells having zero cases are problematic for maximum-likelihood logistic regression,[140] and thus I collapsed the original data for each indicator into three categories even though doing so reduced the precision with which the independent variables were measured.

---

139.  In the coterminous United States in 1960, just 1.5% of women twenty-five to twenty-nine years old were enrolled in college.  The percentages are much higher at younger ages; for example, 15.4% of women twenty years old, 11.0% of women twenty-one years old, and 5.2% of women twenty-two years old were enrolled in college. U.S. BUREAU OF THE CENSUS, *supra* note 135, at Table 167.

140.  HOSMER & LEMESHOW, *supra* note 129, at 135-38.

In principle, the measure of each independent variable in the instant study is a ratio scale, and because such a scale is continuous, the data for the independent variables in the study can be used in logistic regression without being collapsed into categories. *Id.* at 136.  In practice, however, the measure of each independent variable is more appropriately treated as an ordinal scale, because the states were not spread evenly across the range of values for the variable but tended to concentrate at certain numerical values.  The kurtosis coefficient indicates the degree to which the distribution of a variable is spread out (i.e., flat) or concentrated (i.e., peaked); as the distribution of a variable becomes more peaked, the coefficient increases.  In the instant study, the distributions of four of the six independent variables were not close to being flat but, rather, were almost as peaked as, or more peaked than, the normal distribution.  The kurtosis coefficient for the individual (i.e., uncollapsed) values of these four independent variables was between 2.8 and 3.9, and the other two independent variables had kurtosis coefficients of 2.4 to 2.6.  The kurtosis coefficient for the normal distribution is 3.0.  STATA CORP., 4 STATA BASE REFERENCE MANUAL 150 (2003).

The concentration of states at particular numerical values on an independent variable is probably inherent in the nature of social systems and not attributable to the number of cases furnishing the data in a study: a social system is unlikely to operate effectively unless its important dimensions are present in certain amounts or at certain levels.  In most social science research on states, therefore, a limited number of categories seems to be the most suitable way to measure the gradations of an independent variable.

Exhibit 6

0132

Table 1.  Variables in Regression Model[141]

| Variable (mnemonic label) | Description of variable |
| --- | --- |
| ABORTIONLAW | Whether the state liberalized its law on thera-peutic abortion during the years 1967 through 1972, i.e., prior to the decision of the U.S. Su-preme Court in *Roe v. Wade*.  Each state was coded either 0 or 1.  A state was coded 0 if it did *not* liberalize its law on abortion and was coded 1 if it did liberalize its law on abortion. |
| INCFEM2534CAT | The median income in 1959 of all women in each state who were twenty-five to thirty-four years old in 1960 and who received any income in 1959.  In the regression, the variable was comprised of three categories of median in-come; the range of median income (and the number of states) in each category were: $967 to $1,495 (n = 16), $1,509 to $1,755 (n = 17), and $1,827 to $2,442 (n = 15). |
| LABOR2024CAT | The percentage of all women twenty to twenty-four years old in each state in 1960 who were in the labor force in 1960.  In the regression, the variable consisted of three categories created from the percentages of women age twenty to twenty-four who were in the labor force; the range of percentages (and the number of states) |

---

141.  The data used for abortion law, the dependent variable, are from *supra* note 90.  The data for the independent variables were derived or calculated from data in the re-port from the 1960 census for each state: U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, CENSUS OF POPULATION: 1960, VOL. I, CHARACTERISTICS OF THE POPULATION (1963), *available at* http://www.census.gov/prod/www/abs/decennial /1960cenpopv1.htm.  The state reports are numbered Part 2 (Alabama) through Part 52 (Wyoming).  The following tables in each state report were used for the data for the independent variables:

INCFEM2534CAT- table 134
LABOR2024CAT  - table 115
LABOR2529CAT  - table 115
MARR2024CAT  - table 105
MARR2529CAT  - table 105
PCTCOLL2529CAT - tables 37 and 103

Exhibit 6

0133

| | |
|---|---|
| | in each category were: 33.3% to 40.8% (n = 18), 41.3% to 44.4% (n = 16), and 45.1% to 52.7% (n = 14). |
| LABOR2529CAT | The percentage of all women twenty-five to twenty-nine years old in each state in 1960 who were in the labor force in 1960. In the regression, the variable consisted of three categories created from the percentages of women age twenty-five to twenty-nine who were in the labor force; the range of percentages (and the number of states) in each category were: 24.4% to 30.5% (n = 15), 30.9% to 34.9% (n = 16), and 35.7% to 45.0% (n = 17). |
| MARR2024CAT | The percentage of all women twenty to twenty-four years old in each state in 1960 who were currently married, i.e., who in 1960 were married. In the regression, the variable was comprised of three categories constructed from the percentages of women age twenty to twenty-four who were currently married; the range of percentages (and the number of states) in each category were: 56.9% to 70.8% (n = 17), 71.0% to 72.9% (n = 14), and 73.2% to 81.1% (n = 17). |
| MARR2529CAT | The percentage of all women twenty-five to twenty-nine years old in each state in 1960 who were currently married, i.e., who in 1960 were married. In the regression, the variable was comprised of three categories constructed from the percentages of women age twenty-five to twenty-nine who were currently married; the range of percentages (and the number of states) in each category were: 80.4% to 87.0% (n = 17), 87.2% to 88.6% (n = 16), and 88.9% to 92.7% (n = 15). |
| PCTCOLL2529CAT | The percentage of all women twenty-five to twenty-nine years old in each state in 1960 who had completed at least four years of college as of 1960. In the regression, the variable con- |

Exhibit 6

0134

| | sisted of three categories created from the percentages of women age twenty-five to twenty-nine who had finished four or more years of college; the range of percentages (and the number of states) in each category were: 3.95% to 6.33% (n = 17), 6.46% to 7.72% (n = 15), and 7.83% to 11.2% (n = 16). |
|---|---|

Table 2 presents the regression results for the forty-eight coterminous states.[142]  Although the table presents the level of statistical significance of each odds ratio, the discussion of the results will rely on the odds ratios alone.  As explained elsewhere,[143] tests of statistical significance are inappropriate when, as here, maximum-likelihood logistic regression is applied to a small number of cases,[144] and they are unnecessary when, as here, the cases comprise the entire universe under study rather than a sample drawn from the universe.[145]  Nonetheless, table 2 reports the two-tailed significance levels of the odds ratios for readers who want this information.

The regression results discussed below furnish estimates of the relationship of each independent variable to whether states changed their abortion law during 1967-1972.  Whether a particular independent variable is related to the dependent variable depends on the odds ratio for the independent variable: the closer an odds ratio is to 1.000, the lower the odds are that the dependent variable is altered by increases in the independent variable, and when the odds ratio for the independent variable is exactly (or approximately) 1.000, the independent variable does not affect the dependent variable.  Like other forms of multiple regression, logistic regression indicates the relationship that exists between a dependent variable and each independent variable, separately from the relationship to the dependent variable of every other independent variable in the same regression equation.  In the instant analysis, logistic regression estimated, for every change in category

142.  All statistical analyses were performed with Stata Release 8.2.  The results in table 2 were generated by the LOGISTIC command in Stata.  STATA CORP., 2 STATA REFERENCE MANUAL 296 (2003).

143.  Barnett, *supra* note 47.

144.  States are the cases in the instant regression analysis.  As explained earlier, sixteen of the forty-eight states in the continental United States substantially revised their law during 1967-1972 to expand access to abortion.  *See supra* note 90.  Since the remaining thirty-two states did not liberalize their law on abortion, the number of states characterized by the least-frequent outcome on the dependent variable was sixteen.  Given the latter number, the regression equation in table 2 has five too many independent variables for tests of statistical significance to be used.  *See* HOSMER & LEMESHOW, *supra* note 129, at 346-47.

145.  The universe for the present study is all states in the coterminous United States.  *See supra* note 130.

Exhibit 6

0135

of a given independent variable, the increase or decrease in the odds that a state eased its law on abortion.[146]

The odds ratios in table 2 indicate that just three of the independent variables had a relationship to the dependent variable (ABORTIONLAW) that was of practical importance. These three variables are the percentage of women twenty-five to twenty-nine years old who were in the labor force (LABOR2529CAT), the percentage of women twenty to twenty-four years old who were currently married (MARR2024CAT), and the percentage of women twenty-five to twenty-nine years old who had finished four or more years of college (PCTCOLL2529CAT). Since an odds ratio is converted into a percentage by subtracting 1.000 and multiplying the remainder by 100,[147] the odds that a state liberalized its abortion law rose by approximately thirty percent for each category increase in the labor force participation rate among women twenty-five to twenty-nine years old and by twenty-six percent for each category increase in the percentage of women twenty to twenty-four years old who were currently married. The odds ratio for PCTCOLL2529CAT, however, was by far the largest: the odds that a state eased its law-imposed restrictions on abortion jumped by approximately 101 percent—i.e., roughly doubled—for each category increase in the percentage of women twenty-five to twenty-nine years old who had finished four or more years of college.

---

146. *See* Barnett, *supra* note 47 for an explanation of the difference between probability, odds, and odds ratio.

147. *See* J. SCOTT LONG & JEREMY FREESE, REGRESSION MODELS FOR CATEGORICAL DEPENDENT VARIABLES USING STATA 146, 148 (rev. ed. 2003).

Exhibit 6

0136

Table 2.  Odds Ratios and Two-tailed Significance Levels for Regression
of ABORTIONLAW on Independent Variables: 48 States

| Variable (mnemonic label) | Odds ratio | Standard error | z | p>|z| |
|---|---|---|---|---|
| INCFEM2534CAT | 0.996 | .002 | -2.28 | 0.023 |
| LABOR2024CAT | 1.116 | .138 | 0.89 | 0.375 |
| LABOR2529CAT | 1.295 | .150 | 2.24 | 0.025 |
| MARR2024CAT | 1.260 | .169 | 1.72 | 0.085 |
| MARR2529CAT | 1.051 | .343 | 0.15 | 0.878 |
| PCTCOLL2529CAT | 2.013 | .517 | 2.72 | 0.006 |

Regression model
Number of observations         = 48
Log likelihood                 = -18.956
Likelihood ratio chi-squared (6) = 23.19
Probability > chi-square        = 0.001
Pseudo $R^2$                     = 0.380

The odds ratios in table 2 cannot be accepted, however, until several matters are considered.  The first is the possibility that the results of the regression analysis were seriously affected by one or more outliers, i.e., states whose classification (0 or 1) on the dependent variable (ABORTIONLAW) was substantially different from the classification that the regression model predicted.  An indication that an influential outlier may exist is the odds ratio in table 2 for MARR2024CAT: each category increase in the percentage of women twenty to twenty-four years old who were currently married raises the odds of abortion law liberalization by states by about twenty-six percent.  (Because the odds ratio for MARR2529CAT is essentially 1.000, no relationship is evident between MARR2529CAT and ABORTIONLAW.)  However, the odds ratio for MARR2024CAT, in substantially exceeding 1.000, is inconsistent with the data in figure 3, according to which the marital-status variables should be unrelated to change in state abortion law.  The odds ratio for MARR2024CAT is also inconsistent with theory, which suggests that increases in the prevalence of marriage among women will reduce, not raise, the odds of abortion law liberalization.

One criterion that has been recommended to identify potentially influen-

Exhibit 6

0137

tial outliers is a Cook's Statistic that is equal to or greater than the result obtained by dividing 2.0 by the square root of the number of cases.[148]  In the instant study, the criterion is $2.0 \div \sqrt{48} = 0.29$.  Cook's Statistic was of this size or higher for eighteen states.  Consequently, I re-estimated the odds ratios for the six independent variables by eliminating each of these states one at a time, i.e., the odds ratios were re-estimated based on forty-seven states.

Three of the regression analyses that used forty-seven states produced notable changes in the odds ratio for one or both of the two independent variables dealing with the prevalence of marriage among women.  The three states involved in these analyses were Arkansas, Vermont, and Texas.  Table 3 reports the odds ratios just for MARR2024CAT and for MARR2529CAT from the resulting regression analyses.  To simplify the table, the odds ratios for the other four independent variables estimated in these analyses are omitted.  A comparison of table 3 with table 2 reveals that Texas was responsible for the largest and most notable alteration in an odds ratio for the marital status variable.  Specifically, with Texas removed from the data, the odds ratio for MARR2529CAT was 0.792.  The absence of Texas also moved the odds ratio for MARR2024CAT farther above unity—from 1.260 to 1.435.  Without Texas, accordingly, each increase in category of marriage prevalence among women twenty to twenty-four years old *raised* the odds of abortion law liberalization, but each increase in category of marriage prevalence among women twenty-five to twenty-nine years old *reduced* the odds of liberalization.  The inconsistency in the direction of the relationship for the two age groups is illogical.

---

148.   DAVID A. BELSLEY ET AL., REGRESSION DIAGNOSTICS 28 (2004).

Exhibit 6

0138

Table 3.  Odds Ratios and Two-tailed Significance Levels for
MARR2024CAT and MARR2529CAT from the Regression of ABORTIONLAW
on All of the Independent Variables: 47 States

| Variable (mnemonic label) | Odds ratio | Standard error | z | p>|z| |
|---|---|---|---|---|
| Coterminous states without Arkansas | | | | |
| MARR2024CAT | 1.197 | .156 | 1.38 | 0.167 |
| MARR2529CAT | 1.341 | .496 | 0.79 | 0.428 |
| Coterminous states without Texas | | | | |
| MARR2024CAT | 1.435 | .250 | 2.07 | 0.039 |
| MARR2529CAT | 0.792 | .288 | -0.64 | 0.521 |
| Coterminous states without Vermont | | | | |
| MARR2024CAT | 1.448 | .258 | 2.07 | 0.038 |
| MARR2529CAT | 1.200 | .475 | 0.46 | 0.644 |

What accounts for the changes observed in the odds ratios for the two marital status variables when the three states are omitted?  A number of explanations are possible.  The most obvious, of course, is that one or more of the three states was indeed affecting the magnitude and direction of the relationship in the coterminous United States between the prevalence of marriage among women and the liberalization of state abortion law.  Cook's Statistic is compatible with this explanation: Cook's Statistic exceeded 1.000 for each of the three states and only for these states.  Since a case typically does not skew results unless its Cook's Statistic is at least 1.000,[149] one or more of the three states may have been an influential outlier.  On the other hand, the striking inconsistency between the odds ratios for the marital-status variables when Texas is absent suggests that a factor other than, or in addition to, an influential outlier may have been responsi-

---

149.  HOSMER & LEMESHOW, *supra* note 129, at 180.

Exhibit 6

0139

ble for the changes in the odds ratios associated with the three states.

What other factor(s) might have contributed to the changes in the odds ratios for the marital-status variables produced by individual states? One possibility is that the data on marital status suffer from measurement error that is sufficiently widespread to affect the odds ratios for MARR2024CAT and MARR2529CAT. Under this view, marital status was inaccurately reported often enough to affect appreciably the proportion of women in the United States who were counted as married. Such an effect could have distorted the results of the regression analysis undertaken in the instant study for the marital-status variables. Different sources of data on the number of marriages in any particular year exhibit inconsistencies as well as suffer from errors,[150] and data on marital status in the census contain errors, too.[151]

Let me mention three reasons that marital status may have been misreported in the 1960 census with sufficient frequency to have a material effect on the odds ratios for MARR2024CAT and MARR2529CAT. First, the 1960 census gathered data using a questionnaire that respondents received by mail, and it was the first census to rely on a mailed, respondent-completed questionnaire for the country as a whole.[152] Thus, respondents in the 1960 census classified themselves as married or unmarried.[153] Second, an unknown but appreciable number of cohabiting persons in 1960 are likely to have incorrectly identified themselves as married.[154] Misidentification probably was facilitated because respondents, on their own, completed the census questionnaire. Third, the census considered individuals

---

150. Ellen Linna Jamison & Donald S. Akers, *An Analysis of the Differences Between Marriage Statistics from Registration and Those from Censuses and Surveys*, 5 DEMOGRAPHY 460, 461 (1968).

151. U.S. BUREAU OF THE CENSUS, *supra* note 135, at liv.

152. *Id.* at xiv. After the questionnaire was mailed, a Census Bureau enumerator conducted an interview, but the purpose of the interview was only to "correct omissions and obviously wrong entries" in the questionnaire as filled out. *Id.*

The yearly data on marital status that are the basis of figure 3 are from the Current Population Survey. *See supra* note 122. The design of the Survey has changed over time. However, since the Census Bureau assumed responsibility for the methodological aspects of the Survey in the early 1940s, each respondent in the Survey has remained in the sample for a period totaling several months, and at least the initial interview of respondents has been conducted at the home of the respondent by Census Bureau personnel unless the respondent requested a telephone interview. U.S. CENSUS BUREAU, U.S. DEP'T OF COMMERCE, TECHNICAL PAPER 63RV, CURRENT POPULATION SURVEY: DESIGN AND METHODOLOGY 2-1, 2-2, 7-1, 7-3, 7-4 (2002), *available at* http://www.census.gov/prod/www/workpaps.html. As a source of data on marital status, consequently, the Current Population Survey is probably more accurate than the 1960 census.

153. Jamison & Akers, *supra* note 150, at 462.

154. Catherine Fitch et al., *The Rise of Cohabitation in the United States: New Historical Estimates* 19 (Univ. of Minnesota Population Center, Working Paper No. 2005-03, 2005), *available at* http://www.pop.umn.edu/research/papers.shtml.

Exhibit 6

0140

who were in common-law marriages to be married,[155] and respondents who did not know whether common-law marriage existed in their jurisdiction or whether a particular relationship satisfied the requirements of a common-law marriage could often have recorded marital status incorrectly. The potential extent of the misunderstanding among young adults is suggested by the relatively low educational attainment of persons who were twenty-five to twenty-nine years old in 1960: in the United States as a whole, two out of three individuals in this age range had no more than a high school education.[156]

Figure 3 and theory are consistent with the explanation that errors in marital status in the 1960 census distorted the odds ratio for at least MARR2024CAT. Figure 3 shows that, prior to 1967, change over time in the distribution of marital status among young women was minimal, and thus marital status was not a variable that could have altered state law on abortion during 1967-1972. Theory[157] suggests that an increase in the percentage of women who are married will reduce the odds of abortion law liberalization, but the odds ratio for MARR2024CAT in table 2 indicates that, in terms of marriage prevalence among women twenty to twenty-four years old, just the opposite happens. In short, the odds ratio for marriage prevalence among women twenty to twenty-four years old is suspect.

A second matter regarding the regression results—namely, collinearity[158]—will be considered just briefly. Was the correlation of any pair of independent variables sufficiently strong to keep multiple regression from estimating reliable odds ratios for the variables? The rank correlation coefficients for pairs of independent variables in table 2 were often substantial. However, the logistic regression program did not halt the computation of the odds ratio for any independent variable due to excessive collinearity with another independent variable. Because the program did not find the covariation of pairs of independent variables to be problematic, I concluded that collinearity did not exist.

Finally, I turn to the possibility that the relationship of an independent variable to the dependent variable may not be the same within all categories or at all levels of another independent variable. This is the question of interaction,[159] and the independent variables I consider here are those that theory identifies as related. Of the independent variables in the regression equations, two meet this criterion—namely, labor force participation and

---

155. U.S. BUREAU OF THE CENSUS, *supra* note 135, at liv; Jamison & Akers, *supra* note 150, at 462.

156. Calculated from U.S. BUREAU OF THE CENSUS, *supra* note 135, at Table 174.

157. *See supra* notes 92 & 93 and accompanying text.

158. William D. Berry, *Understanding Regression Assumptions*, 92 QUANTITATIVE APPLICATIONS IN THE SOC. SCIENCES 1, 24-27 (1993).

159. James Jaccard & Robert Turrisi, *Interaction Effects in Multiple Regression*, 72 QUANTITATIVE APPLICATIONS IN THE SOC. SCIENCES 1, 3-4 (2d ed. 2003).

Exhibit 6

0141

marital status. Notably, a relationship between these two variables is posited by both theory in economics and theory in sociology. Economic theory has postulated that, *ceteris paribus*, the inclination of women to marry varies inversely with the appeal of their opportunities in the economy. Under this view, marriage in a society will be less beneficial to, and less popular among, women to the extent that women have enticements (e.g., high monetary compensation) to engage in paid employment outside the home. According to economic theory, then, marriage will become less common among women as the labor force provides incentives that draw women into non-household work.[160]

Sociological theory, which incorporates social values as a central concept,[161] expects marital status and employment status (of men as well as of women) to conform to the dominant values of society. In 1960, conventional values regarding marriage seem to have still been dominant in the United States,[162] and thus paid employment outside the home was envisioned for the husband but not the wife. Only later in the decade of the 1960s did traditional values concerning marriage start to come under attack and begin to erode.[163] Notably, patterns of employment in the United States in 1960 were consistent with the traditional view regarding marriage and employment among women: labor force participation at age twenty to twenty-four existed among fully seventy-three percent of never-married women in 1960 but among only thirty-one percent of currently married women whose husband was present; at age twenty-five to twenty-nine, labor force participation existed among seventy-nine percent of never-married women but among just twenty-seven percent of currently married women whose husband was present.[164]

---

160. Sara McLanahan & Lynne Casper, Growing Diversity and Inequality in the American Family, *in* 2 STATE OF THE UNION: AMERICA IN THE 1990S 1, 32-35 (Reynolds Farley ed., 1995); Francine D. Blau et al., *Understanding Young Women's Marriage Decisions: The Role of Labor and Marriage Market Conditions*, 53 INDUS. & LAB. REL. REV. 624, 626, 645 (2000).

161. *E.g.*, Francisco Parra-Luna, *An Axiological Systems Theory: Some Basic Hypotheses*, 18 SYS. RES. & BEHAV. SCI. 479, 481 (2001).

162. While this assertion cannot be documented with quantitative data from a sample survey of the U.S. population, the observation that the traditional conception of marriage prevailed at least as late as 1960 has been made by others. McLanahan & Casper, *supra* note 160, at 35. No national survey of attitudes conducted in the 1950s, or even in the early 1960s, assessed the extent to which Americans endorsed the conventional ideal of marriage. From 1969 to 1988, national sample surveys often asked interviewees to indicate whether they approved or disapproved of paid employment on the part of a married woman whose husband was "capable of supporting her" or "able to support her." During the years from 1946 through 1968, however, national surveys included no such measure. *See* RICHARD G. NIEMI ET AL., TRENDS IN PUBLIC OPINION: A COMPENDIUM OF SURVEY DATA 225 (1989).

163. *See* McLanahan & Casper, *supra* note 160, at 35; *accord*, Elizabeth S. Scott, *The Legal Construction of Norms: Social Norms and the Legal Regulation of Marriage*, 86 VA. L. REV. 1901, 1935-36 (2000).

164. Calculated from U.S. BUREAU OF THE CENSUS, *supra* note 135, at Table 196.

Exhibit 6

0142

*Journal of Gender, Social Policy & the Law, Vol. 15, Iss. 4 [2007], Art. 1*

To ascertain the possible existence of an interaction, I created two new variables—one by multiplying the values of LABOR2024CAT and MARR2024CAT and the other by multiplying the values of LABOR2529CAT and MARR2529CAT. Both of the new variables were added to the regression equation in table 2, but the odds ratios for the two variables deviated from 1.000 by less than ±0.02 when all forty-eight states were included in the regression analysis. When Arkansas, Texas, and Vermont were omitted from the data one at a time and forty-seven states were included in the regression analysis, the odds ratios for the two variables deviated from 1.000 by no more than ±0.04. Because the two variables created to test for interaction had no relationship to the dependent variable (ABORTIONLAW), interaction was assumed to be absent from the data.

What conclusions can be drawn from the data analysis? First, increasing educational attainment of young women had the strongest relationship to liberalization of state abortion law, and the magnitude of the relationship was substantial: for each category increase in the percentage of women twenty-five to twenty-nine years old who had finished at least four years of college, the odds roughly doubled that a state eased the restrictiveness of its law on access to abortion. Second, labor force participation among women twenty-five to twenty-nine years old was related to liberalization of state abortion law: each category increase in the percentage of women in this age range who were labor force participants raised the odds of liberalization by about thirty percent. By comparison to the relationship uncovered for schooling/education, however, the relationship found for labor force participation was just modest in magnitude.

Notably, educational attainment and labor force participation exhibited relationships to the dependent variable that are consistent both with the findings of research on the attributes of women that predict the probability of aborting a pregnancy and with the trends disclosed by the time-series data in figures 4 and 5. However, the odds ratios in table 2 for the marital status variables suggest that, among women twenty to twenty-four years old, category increases in the percentage who were currently married heightened the odds of liberalization of state law on abortion. Such a relationship is inconsistent with the implication from research that has found married women are less likely than unmarried women to abort pregnancies, and of particular importance, it does not comport with the trends observed in figure 3. I have suggested that the odds ratio for the marital status variable for women twenty to twenty-four years old may be due to misreporting by Americans in the 1960 census that they were married, but this is a hypothesis that could not be tested empirically.

Before ending, table 4 should be considered given the evidence that increases in the prevalence of schooling and the duration of education among young women were important in easing restrictions that state law imposed

Exhibit 6

0143

on access to abortion. Table 4 is confined to women in the United States who were twenty-five to twenty-nine years old in each census year from 1940 to 2000. For the year specified in the first (i.e., left-hand) column of the table, the second column reports the percentage of women twenty-five to twenty-nine years old who held at least a bachelor's degree, and for each pair of sequential percentages in the second column, the third column reports the percentage change that occurred from the earlier to the later year. The third column thus shows the percentage change from one census year to the next in the prevalence of college graduation among women who were twenty-five to twenty-nine years old.

The trend that is apparent in the second column of table 4 is consistent with the trend that is seen in figure 4 for women younger than age twenty-five and with the data that footnote 126 presents on the mounting school enrollment rate between the last part of the 1940s and last part of the 1950s among women in the age range twenty to twenty-four. Table 4 shows that the percentage of women with a bachelor's degree or higher at age twenty-five to twenty-nine rose steadily from 1940 onward and that the decadal pace of the rise accelerated from 1940 to 1970. Figure 4 and footnote 126, which complement table 4, suggest that the proportion of women who received at least a bachelor's degree while twenty to twenty-four years old climbed rapidly during the 1950s and the first half of the 1960s. As these women grew older, the percentage of women with a college degree at age twenty-five to twenty-nine increased.[165] The increase from 1960 to 1970 is particularly notable; indeed, the largest percentage change found in the third column of table 4 is that occurring between 1960 and 1970. Therefore, prior to 1967 as well as during the period of abortion law liberalization that commenced in 1967, young women were increasingly entering college and earning bachelor's and graduate degrees. These trends are indicators of a fundamental shift in the role of women, and the shift that occurred before the modification of abortion law during 1967-1973 is unlikely to be mere coincidence.

---

165. Most women who hold a bachelor's degree at age twenty-five to twenty-nine evidently entered college when they were eighteen or nineteen years old. *See, e.g.*, U.S. BUREAU OF THE CENSUS, *supra* note 135, at Table 168; U.S. BUREAU OF THE CENSUS, U.S. DEP'T OF COMMERCE, CENSUS OF POPULATION: 1970, VOL. I, CHARACTERISTICS OF THE POPULATION. PART 1, UNITED STATES SUMMARY – SECTION 2, at Table 197 (1973), *available at* http://www.census.gov/prod/www/abs/decennial/1970ce-popv1.htm. Therefore, an increase in the percentage of women with a bachelor's degree at age twenty-five to twenty-nine is an indicator of change in the female sex role that took place as much as a decade prior to the increase.

Exhibit 6

0144

Table 4.  Women 25-29 Years Old with a Bachelor's Degree or Higher, 1940-2000[166]

| Year | Percentage of women age 25-29 holding at least a Bachelor's degree | Percentage change from prior year |
|---|---|---|
| 1940 | 4.9% | — |
| 1950 | 5.9 | 20.4% |
| 1960 | 7.8 | 32.2 |
| 1970 | 13.3 | 70.5 |
| 1980 | 20.5 | 54.1 |
| 1990 | 22.4 | 9.3 |
| 2000 | 29.7 | 32.6 |

Finally, let me discuss another study of the relationship between the characteristics of jurisdictions and the law on abortion that existed in the jurisdictions prior to *Roe v. Wade*.[167]  As I explain below, while this study (the Conway-Butler study) has the same subject matter as mine, there are critical differences in objectives, data, and procedures.

To begin, the Conway-Butler study, after an initial analysis, omitted women's educational attainment as a variable from its refined regression

---

166. The data in column 2 are from U.S. CENSUS BUREAU, U.S. DEP'T OF COMMERCE, *A Half-Century of Learning: Historical Statistics on Educational Attainment in the United States, 1940 to 2000*, at Table 2 (2006), *available at* http://www.census.gov/population/www/socdemo /education/phct41.html.

167. Karen Smith Conway & Michael R. Butler, *State Abortion Legislation as a Public Good—Before and After Roe v. Wade*, 30 ECON. INQUIRY 609 (1992).

In several social science studies that considered state differences on matters pertinent to law on abortion, the dependent variable was not differences in current law on abortion. Elizabeth Adell Cook et al., *State Political Cultures and Public Opinion about Abortion*, 46 POL. RES. Q. 771, 772 (1993); Leo H. Kahane, *Political, Ideological and Economic Determinants of Abortion Position: An Empirical Analysis of State Legislatures and Governors*, 53 AM. J. ECON. & SOC. 347, 348-50 (1994); Medoff, *supra* note 131.

Exhibit 6

0145

models, in part because the investigators assumed that the main impact of educational attainment would be manifested through two other variables that they included in these models, namely, women's labor force participation rate and income.[168]  Given the omission of education from the refined models, the study could not thoroughly evaluate the effect of the variable on abortion law or estimate the magnitude of any effect of the variable—an aspect of the study whose importance cannot be underrated in light of the trends in figure 4 *supra* and the odds ratio in table 2 *supra* for PCTCOLL2529CAT.

With regard to the variables that were included in the regression models of both the Conway-Butler study and my study, a difference in procedure between the studies markedly affected the interpretation of the regression results.  Professors Conway and Butler relied on tests of significance; for reasons given earlier,[169] I did not.  Using tests of statistical significance, the Conway-Butler study found that the restrictiveness of abortion law in a jurisdiction in 1970 was not associated either with the labor force participation rate among women in the jurisdiction or with the distribution of marital status among women in the jurisdiction.[170]  This conclusion, however, takes into account only whether the probability of the regression coefficient for each variable was at or below .10 if no relationship with the dependent variable existed in the universe from which the investigators drew their sample.[171]  If the regression coefficients themselves are considered[172] and their significance levels are disregarded, then the Conway-Butler study indicates that abortion law became more liberal with increases in the percentage of women in a jurisdiction who are married.  This finding is consistent with the results of my regression analysis (at least for MARR2024CAT), but as in my study, the finding cannot be reconciled with figure 3 *supra* or with theory.[173]  With regard to labor force participation, the regression results in the Conway-Butler study indicate that the odds of liberal abortion law decline with increases in the percentage of women in a jurisdiction who participate in the labor force.  This finding is curious, because it is inconsistent with the odds ratios for women's labor force participation in table 2 *supra*, with figure 5 *supra*, and with theory.[174]  The discrepant findings of the two

---

168.  Conway & Butler, *supra* note 167, at 615, 618.  The refined models are the models that Conway and Butler label the "'Best' Model" and the "Private Demand" model.  Education, although included in the model that Conway and Butler label the "Broadest model," was not in the refined models, while labor force participation and income were in all of the preceding models.  *Id.* at 618.

169.  *See supra* notes 144 & 145 and accompanying text.

170.  Conway & Butler, *supra* note 167, at 618.

171.  The notes to Table III in Conway & Butler. *Id.* at 619.

172.  *Id.* at 618 (reporting the regression coefficients).

173.  *See supra* notes 92 & 93 and accompanying text.

174.  *Id.*

Exhibit 6

0146

studies as to labor force participation may be due to the omission of education as an independent variable in the Conway-Butler study and/or to one, or a combination, of the following differences between the studies.

The reader should note that the manner in which the dependent variable was measured was not the same in both studies. Professors Conway and Butler placed each state into one of three levels of restrictiveness in terms of its abortion law prior to *Roe*—viz., abortion unrestricted, significantly restricted, or prohibited[175]—while I measured the dependent variable with just two categories—viz., whether or not the state had eased its restrictions on abortion in the years preceding *Roe*. Undoubtedly of much greater potential importance to the regression results, however, is that the studies classified three states differently in terms of their abortion law before *Roe*. Professors Conway and Butler designated Florida as a state that banned abortion and designated Alabama and Massachusetts as states that significantly restricted access to abortion.[176] My study, on the other hand, classified Florida as a state that liberalized its abortion law, because the state had done so in 1972.[177] Furthermore, my study classified Alabama and Massachusetts as states that did not liberalize their abortion law, in part because the last pre-*Roe* change in abortion law that was made by these two states

---

175. Conway & Butler, *supra* note 167, at 616, 621-22. Another study classified states into three levels of restrictiveness in terms of their law on access to abortion before *Roe v. Wade*. Sharon Kay Parsons, Abortion Policy in the Fifty States: A Comparative Analysis 96, 166-67 (1991) (unpublished Ph.D. dissertation, Florida Atlantic University) (on file with Widener University School of Law Delaware Campus Library). However, the study by Parsons is not useful for two reasons. First, the Parsons study employed factor analysis to create clusters of independent variables, and it assessed the relationship of just the clusters to the restrictiveness of state abortion law prior to *Roe*. *Id.* at 114-19. Because a cluster is global in nature, reliance on clusters rather than on the independent variables that form the clusters precludes direct comparison of the findings of the Parsons study with the findings of my study. The relationship of a cluster of independent variables to a dependent variable, moreover, supplies information that is much less precise than the relationships to the dependent variable of the independent variables comprising the cluster. The second reason the Parsons study is not helpful is that the study employed least-squares regression, but for analyzing relationships to a dependent variable that is measured in categories, least-squares regression is dubious and, accordingly, has been replaced by logistic regression. The results reported in the Conway-Butler study, which was carried out at almost the same time as the Parsons study, are based on logistic regression, and least-squares regression was not employed. Conway & Butler, *supra* note 167, at 615.

176. Conway & Butler*, supra* note 167, at 621-22.

To classify states in terms of the restrictiveness of their law on abortion prior to *Roe*, Professors Conway and Butler relied on information in a book authored by a social scientist. *Id.* at 613 n.6. The book explicitly discloses that its information on abortion law was current as of January 1971. NANETTE J. DAVIS, FROM CRIME TO CHOICE: THE TRANSFORMATION OF ABORTION IN AMERICA 254-57 (1985). Because the book was published fourteen years after January 1971, Professors Conway and Butler may have assumed that, from January 1971 until the Court announced *Roe* in January 1973, no other jurisdiction liberalized its law on abortion. However, such an assumption is mistaken as to Florida. *See infra* note 177 and accompanying text.

177. Act of Apr 12, 1972, ch. 72-196, 1972 Fla. Laws 608; Merz et al., *supra* note 90, at 19-20.

Exhibit 6

0147

occurred, respectively, in 1951[178] and in 1944, not in the 1960s.[179]

An additional difference between the studies is that the Conway-Butler study included Alaska, Hawaii, and the District of Columbia,[180] but my study omitted them. I omitted Alaska and Hawaii for reasons explained earlier,[181] and I omitted the District of Columbia in order to confine the analysis to states. The difference in the jurisdictions covered by the two studies could have markedly affected the regression results of the studies, and the difference is not simply coincidence. Professors Conway and Butler included the three jurisdictions (Alaska, Hawaii, and the District of Columbia), and I excluded them, because our studies had different purposes. Professors Conway and Butler wanted to predict the content of law on abortion in each major jurisdiction of the United States if the U.S. Supreme Court overrules *Roe*, and their refined regression models thus evidently included the District of Columbia even though the investigators had identified this jurisdiction as "a very influential outlier."[182] My goal, on the other hand, was to help build a sociological theory of law, and to this end, my study examined a universe that was more circumscribed in order to reduce the likelihood of contamination by unmeasured factors.[183]

In sum, the regression results of the Conway-Butler study appear not to be helpful in isolating the causes of current law on abortion. Professors Conway and Butler focused on predicting the law on access to abortion that jurisdictions can expect to adopt if *Roe v. Wade* is overruled—an entirely

---

178. Act of Sept. 12, 1951, no. 956, 1951 Ala. Laws 1630 (amending ALA. CODE tit. 14, § 9 (1940)).

179. *See supra* note 90.

180. Conway & Butler, *supra* note 167, at 621-22.

181. *See supra* note 130.

182. Conway & Butler, *supra* note 167, at 623 n.17.

183. Two further differences between the studies should be mentioned. First, Professors Conway and Butler measured their independent variables as of 1970. *Id.* at 616. However, 1970 was either concurrent with or after the point at which action had been taken by most of the jurisdictions that eased restrictions on abortion. *See supra* note 90. In my study, on the other hand, the data on the independent variables were for 1960 (or 1959 in the case of income), a time point that *precedes* the changes in state law. Because causation involves temporal sequences, potential causes of a phenomenon should be measured at a time that is before the occurrence of the phenomenon, not at a time that is contemporaneous with the phenomenon or that is after it.

Second, Professors Conway and Butler measured their independent variables with data for women eighteen to forty-four years old. Conway & Butler, *supra* note 167, at 616-17. On the other hand, I used data for women in the age range twenty to twenty-nine to measure all of the independent variables except income, for which the data were for women twenty-five to thirty-four years old. *See supra* note 135 and accompanying text. In the decade-and-a-half from 1973 to 1988 (and presumably in the years before 1973), women twenty to twenty-nine years old were the source of approximately half of all abortions, while women thirty years of age and older accounted for fewer than one out of five abortions. HENSHAW & VAN VORT, *supra* note 120, at 172-73. Accordingly, the characteristics of females under thirty years old are probably the chief determinants of the existence and degree of pressure on a social system to allow ready access to abortion.

Exhibit 6

0148

legitimate focus when the goal is to understand the political process. Their study, however, was not primarily concerned with a theory of law. My study, on the other hand, places a heavy emphasis on theory.

## IV. THE CONCEPT OF SOCIETAL NEED

All theories contain key concepts, and the macrosociological theory that frames the instant Article is no exception. Specifically, this Article employs the concept of need and contends that need is a principal determinant of law. My focus, however, has been on the needs of society, not on the needs of individuals, and although the two may influence one another and change concurrently in content and intensity, they possess distinctly different referents. To use abortion as an illustration, a woman who seeks to end a pregnancy does so for one or more reasons *she* considers important— because, for example, the fetus she is carrying is jeopardizing her physical health or financial goals—but *her* need to terminate a pregnancy is an individual-level attribute. I have focused instead on the degree to which society, in responding to the forces affecting it, requires the availability of abortion and the existence of supporting doctrine in law. Need in my lexicon accordingly emerges from the properties of society and from the forces that mold these properties, and it involves the propensity of every social system in the long run to (i) retain and/or strengthen the commitment of its participants to the system and (ii) operate smoothly. In accounting for the rules of social life—both those that are formal (e.g., law) and those that are informal—I believe that the concept of societal need can make a distinct and important contribution.

By considering need as an attribute of society, I do not mean to disparage the concept of need as an attribute of individuals or suggest that scientific inquiry should avoid the subject of the needs of individuals. Rather, I contend that individual need is unlikely to be a particularly helpful concept in accounting for the content and evolution of doctrine in law. Law is concerned with the ways in which individuals interact, but "relations among people have a material character which is largely independent of individual control or conscious action."[184] Doctrines in law must accordingly be understood by reference to conditions beyond the individual, i.e., by reference to the society in which the doctrines exist. In particular, I maintain that law, as a macrosociological phenomenon, is a response to societal needs and cultural values and that the need for law with a particular content on a given topic is the need of the social system.

Need, whether used in reference to social systems or to individuals, is an abstract concept, i.e., a concept that is not directly observable but that has

---

184. Bruce H. Mayhew, *Structuralism versus Individualism: Part 1, Shadowboxing in the Dark*, 59 SOC. FORCES 335, 345 (1980).

Exhibit 6

0149

observable manifestations. Accordingly, need is a concept with potential uses in theory. Science employs such concepts because they have the ability to provide a coherent view of the world: with theoretical concepts, numerous and varied observations can be transformed into a manageable set of ideas and organized in ways that permit events not yet observed to be anticipated. The concept of gravity, for example, is found in physics for this reason.

A theoretical concept, however, does not exist for its own sake. Science is an inherently practical undertaking, and unless a concept is useful to the scientific enterprise—i.e., unless a concept furthers understanding and aids prediction—it must and will be abandoned. The history of science contains instances of theoretical concepts that did not advance the goals of science and were dropped. In the 1700s, for example, the concept of phlogiston was believed to be an invisible substance produced by combustion that accounted for certain observable changes associated with heat, but the concept was finally discarded because it could not be reconciled with the results of experiments in the emerging discipline of chemistry.[185]

If the concept of need in social science is not to suffer the same fate as the concept of phlogiston in physical science, it must be shown to aid the scientific enterprise, i.e., contribute to the explanation and prediction of phenomena. The present Article has considered several topics, and for each, the concept of need is useful. Specifically, a defensible argument can be made that, because of change in system-level conditions, society developed a need for new law on sex roles, on the age of majority, and on abortion. Societal need, in short, offers promise as an efficacious concept in a macrosociological theory of law.

### A. Functionalism

In order to understand the concept of societal need, the sociological theory from which it derives must be described, and the criticisms directed at the theory must be considered. The theory is functionalism. As an approach to the nature of social life, functionalism was the first theory propounded by sociologists, and revised versions of the theory remain influential.[186] The central premise of functionalism is that a society is composed of interrelated components that promote the operation and, in turn, the continuation of the society.[187] Specifically, functionalism considers society to be a system—i.e., an interrelated whole—and contends that the components of society facilitate the performance of the system. A component that

---

185. GERALD HOLTON & DUANE H. D. ROLLER, FOUNDATIONS OF MODERN PHYSICAL SCIENCE 269-73 (1958).

186. JONATHAN H. TURNER, THE STRUCTURE OF SOCIOLOGICAL THEORY 34, 37 n.31 (Wadsworth Thomson Learning 2003); SCOTT, *supra* note 4, at 139.

187. MARK ABRAHAMSON, FUNCTIONALISM 5 (1978).

Exhibit 6

0150

becomes unable to assist the system, according to the functionalist perspective, either will change so that it once again serves the system, or it will cease to exist. A component thus does not emerge and/or persist unless it is functional for society. However, the emergence of, change in, or the disappearance of a component may not be immediate; on the contrary, these processes probably occur in the main over and/or after a substantial interval. Normally, then, the propositions of the functionalist school apply just in the long run.

What are the components of a society? In my macrosociological framework, the components are denominated "institutions,"[188] and one of them is law. Law, like every institution, possesses a distinct set of concepts and principles, i.e., doctrines, and the central doctrines of law reflect conditions in society, although usually with a time lag. Among the conditions shaping law are the values that govern the society.[189] The conformity of the content of law to social values should not be surprising, for without this conformity, the institution of law would not be accepted and could not contribute to the operation of society.

With this general outline, let me take up the principal criticisms that have been directed at the functionalist school insofar as the criticisms are relevant to doctrine in law and the theoretical framework employed in the instant Article.[190] The first criticism is that, because functionalism emphasizes stability and persistence in social systems, it cannot deal effectively with change, at least change that involves an important aspect of system structure and a major departure from established patterns. In terms of the approach I am employing to doctrines of law, the criticism is unfounded, for a theory of law based on functionalism demands that shifts in doctrine be studied. Indeed, the larger the magnitude of a doctrinal shift, the greater the importance of investigating the shift because major change is more likely than minor change to reveal (i) the societal properties and forces

---

188. An institution can be defined as "[a]n established law, custom, usage, practice, organization, or other element in the political or social life of a people; a regulative principle or convention subservient to the needs of an organized community or the general ends of civilization." OXFORD ENGLISH DICTIONARY 1047 (2d ed. 1989).

189. THOMAS R. MARSHALL, PUBLIC OPINION AND THE SUPREME COURT 192-93 (1989); Christopher Z. Mooney & Mei-Hsien Lee, *The Influence of Values on Consensus and Contentious Morality Policy: U.S. Death Penalty Reform, 1956-82*, 62 J. POL. 223, 234 (2000); Matthew E. Wetstein & Robert B. Albritton, *Effects of Public Opinion on Abortion Policies and Use in the American States*, 25 PUBLIUS 91, 102 (1995). Government policy generally manifests the attitudes of the public when crystallized attitudes exist. Paul Burstein, *Bringing the Public Back In: Should Sociologists Consider the Impact of Public Opinion on Public Policy?*, 77 SOC. FORCES 27, 41 (1998).

190. My review of these criticisms is based on ABRAHAMSON, *supra* note 187, at 37-49; JOHN REX, KEY PROBLEMS OF SOCIOLOGICAL THEORY 60-77 (1961); TURNER, *supra* note 186, at 23-37; Peter A. Munch, *The Concept of "Function" and Functional Analysis in Sociology*, 6 PHIL. SOC. SCI. 193 (1976); Jonathan H. Turner & Alexandra R. Maryanski, *"Is 'Neofunctionalism' Really Functional?"*, 6 SOC. THEORY 110, 115-17 (1988).

Exhibit 6

0151

molding law and (ii) the effects of law—two issues with which any theory of law must be concerned. It is thus not happenstance that the focus of the instant Article includes abortion law. The subject was selected because of the striking change that abortion law underwent in the United States during the 1960s and 1970s, and because of the availability of considerable data to study the change.

A second criticism of functionalism has been that it is teleological, a criticism that implicates the concept of need. Functionalism relies heavily on the concept of need; indeed, the concept is "what is distinctive about functional analysis."[191] Traditionally, functionalism incorporated the concept of need by contending that every society requires a certain degree of internal integration and equilibrium in order to survive. In advancing this argument, functionalism becomes teleological if it assumes that the goal of satisfying the need produces the features of social life that accomplish the goal, and it becomes empirically untestable if at the same time it cannot generate hypotheses identifying these features in advance.[192] Specifically, to the extent functionalism argues that the needs of society call forth processes and structures that meet the needs, functionalism assumes the existence of an inherent design in society and relies on ends to explain means. Such reliance, though teleological, does not preclude empirical testing as long as functionalism also is able to predict the means that can reach the ends, and that therefore may emerge and be observed, in a given situation. Unfortunately, however, functionalist theory seems to be insufficiently developed at this point in time to permit such predictions to be consistently generated.

The preceding problem is associated with a third criticism of the functionalist school, namely, that the societal needs named by the school are so general that empirical research cannot disprove their existence. According to this criticism, functionalists have assumed that amorphous needs such as integration and equilibrium govern the social system, but the assumption cannot be rigorously tested because of the elusive nature of these needs. One prominent theorist in sociology has concluded that, because need is unverifiable as well as teleological, functionalism as an approach is of questionable scientific utility.[193]

The obscure quality and untestable character of needs in the functionalist perspective is closely linked to and largely responsible for a fourth problem that has plagued the perspective, namely, tautological reasoning. The problem arose because functionalists, having specified needs in highly abstract terms, rely upon the conditions believed to satisfy the needs as evidence

---

191. Turner & Maryanski, *supra* note 190, at 117.

192. *Cf. id.* at 116.

193. REX, *supra* note 190, at 76.

Exhibit 6

0152

that the needs are a reality. According to the functionalist argument, the existence of need X is shown by the presence of condition Y, and the fact that condition Y exists and can satisfy need X is proof that need X is real. This is reasoning that is circular and tautological; when need is employed in this fashion, it is intellectually empty.

To recapitulate, the concept of societal need has introduced problems of teleology, indefiniteness, and tautology into the macrosociological theory of functionalism. These problems, however, are not inherent in the concept of need, and they can be avoided. To do so in the present Article, I defined need in specific rather than general terms—e.g., as the need of the system for a particular type of law on abortion rather than as the need for integration and equilibrium—and I identified observable variables from which conclusions can be drawn regarding the degree to which a societal need exists for a specific doctrine in law, e.g., acceptance of access to abortion. The latter step—identifying a measure of need—is particularly important and warrants further comment.

Operationalizing a theoretical concept is essential if science is to use the concept and ascertain the contribution the concept can make to explanation and prediction.[194] In the instant Article, the criterion for determining the extent of a societal need for a particular doctrine of law, and the level of this need over time, was (i) change in the distribution in the population of the characteristic (e.g., age) that is the subject of the doctrine and/or (ii) change in the magnitude of a system-level factor that prior research on individuals suggests has an influence on the behavior that is the subject of the doctrine (e.g., the termination of a pregnancy by abortion). Thus, a societal need to legalize abortion was deemed to have existed when, before restrictions imposed by law on access to abortion were removed, an increase occurred in a system-level variable that has been found to affect the probability that individual women will terminate pregnancies.

Need, however, remains a concept that organizes and summarizes observations and that is itself unobserved. Need thus continues to be a theoretical construct, but as used here, it does not introduce the problems of teleology, indefiniteness, and tautology for which functionalism has been attacked. First, need was not regarded in this Article as controlling the variable being employed to measure need. Rather, my focus was on a variable that was believed responsible for producing a need, and quantitative data on the variable were employed to judge the intensity of the need. The variable, as reflected in data on its rate or distribution in the population, was accordingly viewed as creating a need rather than as satisfying a need that already exists. Used in this manner, the concept of need does not generate a teleological explanation. Second, need was empirically assessed in

---

194. HOLTON & ROLLER, *supra* note 185, at 218-22.

Exhibit 6

0153

this Article with quantitative data on phenomena that were defined in a relatively unambiguous and precise manner. The referents of need, therefore, were definite, not obscure. Third, and finally, inferences regarding the intensity of need were based on the level of and trends in the quantitative variables employed—variables such as age that were themselves the subject of the doctrines of law under study or variables that research had found influence the frequency of behaviors such as abortion that were the focus of the doctrines of law under study. In this way, conclusions regarding the existence and intensity of a need do not arise from a presumption regarding the need but, instead, from change in one or more variables that are logically antecedents of the need and that are independently measured. Such an approach involves inferences in only one direction and precludes tautological reasoning.

### B. Societal Need and Abortion

Let me return to the subject of abortion. In Part III of this Article, evidence was adduced that increases in the prevalence and duration of schooling among women in their main reproductive years were key to the creation of a societal need for the nonrestrictive abortion law that materialized during the last half of the 1960s and the first half of the 1970s. The apparent impact on abortion law of schooling among females does not end the inquiry, however, for a macrosociological theory of law cannot be confined to the immediate antecedents of law doctrines if the theory is to maximize its ability to explain and predict doctrinal content and change. Rather, the theory must include the forces molding these antecedents, and an explanation, therefore, is required for the fact that, as seen in figure 4 and table 4, school enrollment and college graduation underwent an appreciable rise among young women during the 1950s and 1960s. Identification of the causes of the rise is also a prerequisite to understanding the full range of effects of the large-scale forces that altered the properties of society pertinent to the liberalization of abortion law. For example, the greater extent and length of schooling among young women seems to have been accompanied by a shift, albeit delayed, in the meaning that children have for women,[195] and all of these changes, as contributors to or concomitants of the liberalization of abortion law, may have stemmed from a common source. To obtain a complete picture of the societal setting in which abortion law evolved, an exploration of the reasons for higher rates of school enrollment and college graduation among young women is essential.

What forces expanded the pursuit of education by young women in the United States during the last half of the twentieth century? The research necessary for a definitive answer to this question remains to be done, but I

---

195. Nock, *supra* note 93, at 388-92.

Exhibit 6
0154

suspect two forces were important—viz., increases in the stock of knowledge and increases in the density of population. Elsewhere I have discussed why I believe these forces enlarged the number of court decisions during the 1960s and 1970s that dealt with the constitutional guarantee of equal protection.[196] Here, I would like to outline briefly the reasons I think the two forces made school enrollment and college graduation more common among young women and, in turn, helped to produce law that accepted the use of abortion.

I begin with growth in the stock of knowledge because I believe that, with respect to abortion, it is the more influential of the two forces. Increases in the quantity and quality of knowledge, and associated advances in technology, are presumably responsible for changes observed in the occupational structure of the United States—specifically, the noticeable enlargement during the 1950s and 1960s of the part of the occupational structure devoted to information.[197] These changes can also be seen during the twentieth century in the expanding size of the professional and technical workforce, an expansion that was especially rapid after World War II: during the fifty years from 1900 to 1950, the proportion of professional and technical workers in the economically active population rose by approximately four percentage points, but in the twenty years from 1950 to 1970, the magnitude of the rise was some five percentage points.[198] Decadal growth in professional and technical workers was thus considerably larger in the two decades that followed 1950 than in the five decades that preceded it.

The effect of knowledge and its increase are not confined to the occupational structure, however, but extend to the pursuit of education, for the greater size of the professional and technical workforce has, since the middle of the twentieth century, fostered school attendance after high school.[199] Change in the volume of knowledge, that is, altered the occupational system in a way that affected the incidence of tertiary education. Consequently, the post-World War II increase among young women in school enrollment and college completion (seen in figure 4 and table 4, respectively) was not happenstance, and it was undoubtedly a key factor in the movement of employed females into the professions after 1950.[200] Collectively,

---

196. BARNETT, *supra* note 11, at 22-24.

197. Nass, *supra* note 57, at 206.

198. Professional, technical, and kindred workers comprised 4.3% of the economically active population in 1900, 8.6% in 1950, and 13.7% in 1970. Computed from HISTORICAL STATISTICS, *supra* note 45, at 140 (Series D 233-682).

199. Pamela Barnhouse Walters, *Occupational and Labor Market Effects on Secondary and Postsecondary Educational Expansion in the United States: 1922 to 1979*, 49 AM. SOC. REV. 659, 668 (1984).

200. JAMES P. SMITH & MICHAEL P. WARD, RAND CORP., WOMEN'S WAGES AND WORK IN THE TWENTIETH CENTURY 40 (1984).

Exhibit 6

0155

these changes—which stemmed from the enlarged store of knowledge—promoted the rationality of society and, hence, individual choice on a variety of matters.[201]  In short, the volume and growth of knowledge had a major impact on the American social system at this time, an impact manifested in changes involving the role of women and, in turn, in law pertinent to women.  Law banning gender-based discrimination in employment[202] and law regulating the grounds for abortion are illustrative.

With regard to population density, it is notable that the fraction of the U.S. population residing in a relatively populous area grew steadily during the twentieth century and that the fraction was appreciable in the period preceding and accompanying the reform of abortion law.  To be exact, the percentage of the U.S. population residing in a metropolitan setting doubled between 1910 and 1950 (twenty-eight percent to fifty-six percent), and it continued to mount between 1950 and 1960 (fifty-six percent to sixty-three percent) and between 1960 and 1970 (sixty-three percent to sixty-nine percent).[203]  How did exposure to an urban environment of a large and expanding share of the population contribute to the evolution of abortion law?  Research indicates that, because its residents are more frequently college graduates,[204] such an environment is characterized by views, and presumably actions, that deviate from tradition.[205]  Indeed, the impact of urbanism on civil liberties may be greatest in terms of the role of women.[206]  Therefore, increases in metropolitan residence, by fostering or at least allowing the acceptance of nontraditional behavior, probably promoted the schooling and educational attainment of women.

In sum, I believe that, for the reasons I have outlined, growth in knowledge and increases in population density were instrumental in modifying abortion law in the United States.  As forces reshaping the American social order, they changed the core of society in a number of ways that encouraged young women to enroll in school and complete college.  Specifically, increases in the volume of knowledge and the density of population may have altered the social system in a manner that increased the ratio of burdens to benefits from childbearing and broadened the range of nonrepro-

---

201.  *See supra* notes 55-64 and accompanying text; Barnett, *supra* note 47.

202.  *See supra* notes 69-75 and accompanying text.

203.  FRANK HOBBS & NICOLE STOOPS, U.S. CENSUS BUREAU, U.S. DEP'T OF COMMERCE, DEMOGRAPHIC TRENDS IN THE 20TH CENTURY: CENSUS 2000 SPECIAL REPORTS, at A-5 (2002).  A geographic area that is labeled "metropolitan" contains "a large population nucleus, together with adjacent communities having a high degree of social and economic integration with that nucleus."  *Id.* at B-4.

204.  Laura M. Moore & Seth Ovadia, *Accounting for Spatial Variation in Tolerance: The Effects of Education and Religion*, 84 SOC. FORCES 2205, 2214 (2006).

205.  Thomas C. Wilson, *Urbanism, Migration, and Tolerance: A Reassessment*, 56 AM. SOC. REV. 117, 119-21 (1991).

206.  Thomas C. Wilson, *Urbanism and Nontraditional Opinion: Another Look at the Data*, 73 SOC. SCI. Q. 610, 612 (1992), at Table 1.

Exhibit 6

0156

ductive activities that attract women. From a functionalist perspective, society-provided constraints and inducements mold the acts of individual human beings, and growth in the stock of knowledge and the density of population may have changed the constraints and inducements that affect women with respect to bearing and rearing children. In this new social environment, the education of women began to expand and affect fertility-related decisions. As the process unfolded, society removed conspicuous restrictions imposed by law on the termination of pregnancies by adult women: since participation in and progress through the education institution, and the nonreproductive activities that stem from this participation/progress, would not be fully available to young women unless abortion was accessible, the existence of appealing alternatives to childbearing would have required that the institution of law acknowledge the importance of abortion access and eliminate doctrines regarded as major obstacles to abortion use.[207]

---

207. While the growing demand for education among young women was critical to easing restrictions placed on abortion by law, the change in abortion policy did not appreciably further the schooling of these women: the liberalization of abortion law between 1967 and 1973 did not raise the educational level of white women, and it added just a quarter-year to the average educational achievement of black women. Maya H. Klein, The Effects of Abortion Legislation on Women's Educational Attainment in the United States 83-84, 106, 109, 113-14 (1997) (unpublished Ph.D. dissertation, University of California, Berkeley) (on file with Widener University School of Law Delaware Campus library). This is further evidence that, prior to 1967, women who wished to terminate pregnancies were in general doing so, even if the terminations violated existing law, and that the chief benefit to society from the liberalization of law on abortion was symbolic. Barnett, *supra* note 47.

Exhibit 6

0157

Appendix
Age of Majority Specified by Law in Each State[208]

| State | Column 2: Age of majority before adoption of age of majority in column 3 | Column 3: Age of majority that replaced the age in column 2 | Column 4: Year of approval by legislature of age of majority in column 3 |
|---|---|---|---|
| Alabama | 21 | 19 | 1975 |
| Arizona | 21 | 18 | 1972 |
| Arkansas | 21 (males); 18 (females) | 18 | 1975 |
| California | 21; 18 if married | 18 | 1971 |
| Colorado | 21 | 18 | 1973 |
| Connecticut | 21 | 18 | 1972 |
| Delaware | 21 | 18 | 1972 |
| Florida | 21 | 18 | 1973 |
| Georgia | 21 | 18 | 1972 |
| Idaho | 21 (males); 18 (females) | 18 | 1972 |
| Illinois | 21 (males); 18 (females) | 18 | 1971 |
| Indiana | 21 | 18 | 1973 |
| Iowa | 21 or upon marriage 19 or upon marriage | 19 or upon marriage 18 or upon marriage | 1972 1973 |
| Kansas | 21; 18 if married | 18 | 1972 |
| Kentucky | 21 | 18 | 1964 |
| Louisiana | 21 | 18 | 1972 |
| Maine | 21 20 | 20 18 | 1969 1972 |
| Maryland | 21 | 18 | 1973 |
| Massachusetts | 21 | 18 | 1973 |
| Michigan | 21 | 18 | 1971 |
| Minnesota | 21 | 18 | 1973 |
| Mississippi | 21 | 21 | —— |

---

208. The age of majority that is given applies both to males and to females unless otherwise indicated.

Exhibit 6

0158

| Missouri | 21 | 18 | [See Missouri in Sources list for table.] |
|---|---|---|---|
| Montana | 21 (males); 18 (females) 19 | 19 18 | 1971 1973 |
| Nebraska | 21 or upon marriage 20 or upon marriage | 20 or upon marriage 19 or upon marriage | 1969 1972 |
| Nevada | 21 (males); 18 (females) | 18 | 1973 |
| New Hampshire | 21 | 18 | 1973 |
| New Jersey | 21 | 18 | 1972 |
| New Mexico | 21 | 18 | 1971 |
| New York | 21 | 18 | 1974 |
| North Carolina | 21 | 18 | 1971 |
| North Dakota | 21 (males); 18 (females) | 18 | 1971 |
| Ohio | 21 | 18 | 1973 |
| Oklahoma | 21 (males); 18 (females) | 18 | 1972 |
| Oregon | 21 or upon marriage | 18 or upon marriage | 1973 |
| Pennsylvania | | | [See Pennsylvania in Sources list for table |
| Rhode Island | 21 | 18 | 1972 |
| South Carolina | 21 | 18 | 1975 |
| South Dakota | 21 (males); 18 (females) | 18 | 1972 |
| Tennessee | 21 | 18 | 1972 |
| Texas | 21 | 18 | 1973 |
| Utah | 21 (males); 18 (females); or upon marriage | 18 or upon marriage | 1975 |
| Vermont | 21 | 18 | 1971 |
| Virginia | 21 | 18 | 1972 |
| Washington | 21 | 18 | 1970, 1971 |
| West Virginia | 21 | 18 | 1972 |
| Wisconsin | 21 | 18 | 1972 |
| Wyoming | 21 19 | 19 18 | 1973 1993 |

Exhibit 6

0159

Sources:

Alabama: Act of July 22, 1975, No. 77, 1975 Ala. Acts 554; *Ex parte Bayliss*, 550 So. 2d 986, 989 (Ala. 1989) ("From 1852 to 1975, the age of majority in Alabama was 21 years.").

Arizona: ARIZ. REV. STAT. § 1-215 (1956); Act of May 22, 1972, ch. 146, 1972 Ariz. Sess. Laws 1002.

Arkansas: ARK. CODE. § 57-103 (1947); Act of Apr. 4, 1975, No. 892, 1975 Ark. Acts 2321.

California: Act of Dec. 14, 1971, ch. 1748, 1971 Cal. Stat. 3736; Act of Sept. 7, 1955, ch. 183, 1955 Cal. Stat. 648.

Colorado: COLO. REV. STAT. § 2-4-211 (1989); Act of June 25, 1973, ch. 158, 1973 Colo. Sess. Laws 543.

Connecticut: Act of May 9, 1972, No. 127, 1972 Conn. Acts 129 (Reg. Sess.); *Altieri v. Altieri*, 155 A.2d 758, 760 (Conn. Super. Ct. 1959) ("Under the common law, which has been adopted in our jurisdiction, the age of majority is twenty-one years.").

Delaware: Act of June 16, 1972, ch. 439, 1972 Del. Laws 1351-52; *Wife v. Husband*, 412 A.2d 724, 725 (Del. Fam. Ct. 1980) (referring to the June 16, 1972 statutory reduction in the age of majority from twenty-one to eighteen years).

Florida: Act of May 9, 1973, ch. 73-21, 1973 Fla. Laws; Act of Nov. 6, 1829, § 1, 1829 Fla. Laws 8-9; *Riley v. Holmer*, 131 So. 330, 331 (Fla. 1930) ("Under our law, both males and females are minors till they reach the age of twenty-one years. This was the common law rule.").

Georgia: GA. CODE ANN. § 74-104 (1964); Act of Mar. 10, 1972, No. 862, 1972 Ga. Laws 193-99.

Idaho: IDAHO CODE ANN. § 32-101 (1932); Act of Mar. 10, 1972, ch. 117, 1972 Idaho Sess. Laws.

Illinois: Act of July 24, 1939, § 131, 1939 Ill. Laws 37; Act of Aug. 24, 1971, No. 77-1229, 1971 Ill. Laws 2201.

Indiana: IND. CODE ANN. § 34-1-67-1 (1973, repealed 1990); Act of Apr. 16, 1973, no. 313, 1973 Ind. Acts 1715-17; *McClain v. Chavez*, 383 N.E.2d 414, 415 (Ind. Ct. App. 1978) ("The Legislature changed the age of majority from 21 to 18 years effective as of July 26, 1973").

Iowa: IOWA CODE § 599.1 (1950); Act of April 19, 1972, ch. 1027, 1972 Iowa Acts 83; Act of Mar. 7, 1973, ch. 140, 1973 Iowa Acts 311.

Kansas: Act of Apr. 7, 1978, ch. 155, 1978 Kan. Sess. Laws 683 (reducing the age of majority to sixteen if married); Act of Mar. 26, 1972, ch.161, 1972 Kan. Sess. Laws 606; Act of Apr. 19, 1965, ch. 274, 1965 Kan. Sess. Laws 546.

Kentucky: Act of Mar. 10, 1964, ch. 21, 1964 Ky. Acts 96 (establishing eighteen as the age of majority; approved in 1964 and implemented on January 1, 1965); *Showalter v. Showalter*, 497 S.W.2d 420, 421 (Ky. 1973)

Exhibit 6

0160

("In 1965 the age of majority was lowered from twenty-one to eighteen years by the General Assembly").

Louisiana: LA. CIV. CODE ANN. art. 37 (vacated by amendment 1987); Act of June 25, 1972, No. 98, 1972 La. Acts 336.

Maine: The age of majority was reduced from twenty-one to twenty in 1969 and from twenty to eighteen in 1971. Act of Oct. 1, 1969, ch. 433, 1969 Me. Laws 1150-68; Act of June 9, 1972, ch. 598, 1971 Me. Laws 164-180 (Spec. Sess.).

Maryland: Act of May 24, 1973, ch. 651, 1973 Md. Laws 1300; Monticello v. Monticello, 315 A.2d 520, 523 (Md. 1974) (quoting legislative history stating that, except for liquor, the 1973 Act "lower[s] the age of majority from twenty-one to eighteen years of age in all areas of the common law, in all sections and articles of the Annotated Code of Maryland, and in all counties of the State of Maryland").

Massachusetts: Act of Oct. 17, 1973, ch. 925, 1973 Mass. Acts 938-53; Orlandella v. Orlandella, 347 N.E.2d 665, 665 (Mass. 1976) ("Effective January 1, 1974, the age of majority was changed from twenty-one to eighteen years of age.").

Michigan: MICH. CONST. of 1963, art. III, § 7; Act of Aug. 4, 1971, no. 79, 1971 Mich. Pub. Acts 142.

Minnesota: MINN. STAT. § 645.45 (1947); Act of May 24, 1973, ch. 725, 1973 Minn. Laws 2082.

Mississippi: MISS. CODE ANN. § 1-3-27 (1999); MISS. CODE ANN. § 1-3-27 (1972).

Missouri: Owens v. Owens, 854 S.W.2d 52, 54 (Mo. Ct. App. 1993) ("In 1974 the Legislature attempted to change the age of majority from twenty-one to eighteen years of age for all purposes except for the purchase of alcoholic beverages. However, the Supreme Court held unconstitutional this blanket attempt to change the age of majority through an improper amendment. State *ex rel.* McNary v. Stussie, 518 S.W.2d 630, 634, 637 (Mo. 1974). Since then, the Legislature has piecemeal changed the age of majority to eighteen in certain instances."). *See also In re* Marriage of Orth, 637 S.W.2d 201, 205 (Mo. Ct. App. 1982) ("The age of majority is, for most purposes, eighteen in Missouri.").

Montana: The age of majority was reduced to nineteen for all persons in 1971 and to eighteen for all persons in 1973. MONT. CODE ANN. § 64-101 (1949); Act of Mar. 6, 1973, ch. 94, 1973 Mont. Laws 109; Act of Mar. 9, 1971, ch. 240, 1971 Mont. Laws 993.

Nebraska: Until 1965, majority was reached at twenty-one or, for females only, upon marriage. NEB. REV. STAT. § 38-101 (1944). From 1965 to 1969, majority was reached at twenty-one or upon marriage for both males and females. Act of May 12, 1965, ch. 207, 1965 Neb. Laws 613. The age of majority was reduced from twenty-one to twenty in 1969 and

Exhibit 6

0161

from twenty to nineteen in 1972, with marriage conferring majority at younger ages. Act of Mar. 13, 1969, ch. 298, 1969 Neb. Laws 1072; Legis. 1086, 1972 Leg. (Neb. 1972).

Nevada: Act of May 3, 1973, ch. 753, 1973 Nev. Stat. 1577-83.

New Hampshire: N.H. CONST., pt. 2, art. 90; Act of Apr. 4, 1973, ch. 72, 1973 N.H. Laws 51.

New Jersey: Act of July 5, 1972, ch. 81, 1972 N.J. Laws 457; Act of Dec. 28, 1972, ch. 206, 1972 N.J. Laws 790; Green v. Auerbach Chevrolet Corp., 606 A.2d 1093, 1095 (N.J. 1992) ("Effective January 1, 1973, the Legislature lowered the age of majority in New Jersey from twenty-one to eighteen.").

New Mexico: Act of Apr. 2, 1971, ch. 213, 1971 N.M. Laws 727; Montoya de Antonio v. Miller, 34 P. 40, 41 (N.M. 1893) ("the common law fixes the beginning of [full legal age] on the day preceding the twenty-first anniversary of birth, and the same has not been changed by any statute of this territory.").

New York: N.Y. DOM. REL. LAW § 2 (Thompson 1964); Act of June 15, 1974, ch. 920, 1974 N.Y. Laws 2213.

North Carolina: N.C. GEN. STAT. § 4-1 (1986); Act of June 17, 1971, ch. 585, 1971 N.C. Sess. Laws 510.

North Dakota: N.D. CENT. CODE §§ 14-10-01, 14-10-02 (1960); Act of Feb. 26, 1971, ch. 145, 1971 N.D. Laws 230.

Ohio: OHIO REV. CODE ANN. § 3109.01 (1972); Act of Nov. 21, 1973, No. 1, 1973 Ohio Laws 7.

Oklahoma: OKLA. STAT. tit. 15, §§ 13, 14 (1966); Act of Apr. 7, 1972, ch. 221, 1972 Okla. Sess. Laws 332.

Oregon: OR. REV. STAT. §§ 109.510, 109.520 (1971); Act of July 20, 1973, ch. 827, 1973 Or. Laws 2417.

Pennsylvania: 23 PA. CONS. STAT. § 5101 (1991); Act of Dec. 6, 1972, No. 300, 1972 Pa. Laws 1404; 1 PA. CONS. STAT. § 1991 (1995); Act of May 28, 1937, No. 282, 1937 Pa. Laws 1019; Sutliff v. Sutliff, 528 A.2d 1318, 1322 n.4 (Pa. 1987) ("The age of majority for substantive purposes in civil matters remains twenty-one.").

Rhode Island: Act of Mar. 29, 1972, ch. 20, 1972 R.I. Pub. Laws 62, which "changed the age of majority in Rhode Island from twenty-one to eighteen." Vaillancourt v. Vaillancourt, 449 A.2d 885, 886 n.2 (R.I. 1982).

South Carolina: Act of July 2, 1976, no. 695, 1976 S.C. Acts 1886; Act of Feb. 6, 1975, No. 15, 1975 S.C. Acts 13.

South Dakota: S.D. CODIFIED LAWS § 26-1-1 (1967); Act of Feb. 17, 1972, ch. 154, 1972 S.D. Sess. Laws 185.

Tennessee: Act of Mar. 30, 1972, ch. 612, 1972 Tenn. Pub. Acts 494; Cardwell v. Bechtol, 724 S.W.2d 739, 745 (Tenn. 1987) ("That the Legislature has adopted [18 years] for attainment of majority indicates persua-

Exhibit 6

0162

sively that conditions in society have changed to the extent that maturity is now reached at earlier stages of growth than at the time that the common law recognized the age of majority at 21 years.").

Texas: Act of June 16, 1973, ch. 626, 1973 Tex. Gen. Laws 1722; Dallas Joint Stock Land Bank of Dallas v. Dolan, 92 S.W.2d 1111, 1112 (Tex. Civ. App. 1936) ("By the common law and the law of this state, the status of minority of appellee continues up to the age of 21.").

Utah: UTAH CODE ANN. § 15-2-1 (1953); Act of Mar. 24, 1975, ch. 39, 1975 Utah Laws 121.

Vermont: VT. STAT. ANN. tit. 1, § 173 (1958); Act of Apr. 16, 1971, No. 90, 1971 Vt. Acts & Resolves 208.

Virginia: Act of Apr. 10, 1972, ch. 824-25, 1972 Va. Acts 1472-97; Hurdle v. Prinz, 235 S.E.2d 354, 355 (Va. 1977) ("On July 1, 1972, . . . [chapters 824 and 825] became effective lowering the age of majority from 21 years to 18.").

Washington: The age of majority was reduced from twenty-one to eighteen in 1970 for specified purposes (e.g., contractual obligations, civil litigation) and in 1971 for all purposes. Age Qualifications Act, ch. 292, 1971 Wash. Sess. Laws 1601; Act of Feb. 20, 1970, ch. 17, 1970 Wash. Sess. Laws 145; Act of Mar. 10, 1923, ch. 72, 1923 Wash. Sess. Laws 222.

West Virginia: W. VA. CODE § 2-1-1 (1999); Act of Mar. 11, 1972, ch. 61, 1972 W. Va. Acts 310; Dimitroff v. Dimitroff, 218 S.E.2d 743 (W. Va. 1975).

Wisconsin: WIS. STAT. § 990.01 (1958); Act of Mar. 22, 1972, ch. 213, 1971 Wis. Sess. Laws 509.

Wyoming: The age of majority was reduced from twenty-one to nineteen in 1973 and from nineteen to eighteen in 1993. WYO. STAT. ANN. § 8-1-101 (1999); Act of Feb. 16, 1993, ch. 1, 1993 Wyo. Laws 1; Act of Mar. 5, 1973, ch. 213, 1973 Wyo. Sess. Laws 312.

Exhibit 6

0163