JEREMY T. ELMAN (SBN 223696)
jelman@whitecase.com
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306
Telephone: (650) 213-0300
Facsimile: (650) 213-8158

Attorneys for *Amicus Curiae*
BRADY CENTER TO PREVENT GUN
VIOLENCE

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW JONES; THOMAS FURRH; KYLE YAMAMOTO; PWGG, L.P. (d.b.a. POWAY WEAPONS AND GEAR and PWG RANGE); NORTH COUNTY SHOOTING CENTER, INC.; BEEBE FAMILY ARMS AND MUNITIONS LLC (d.b.a. BFAM and BEEBE FAMILY ARMS AND MUNITIONS); FIREARMS POLICY COALITION, INC.; FIREARMS POLICY FOUNDATION; THE CALIFORNIA GUN RIGHTS FOUNDATION; and SECOND AMENDMENT FOUNDATION, | Case No. 3:19-cv-01226-L-AHG<br><br>Hon. M. James Lorenz and Magistrate Judge Allison H. Goddard<br><br>**BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
|         Plaintiffs, | |
|     v. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California; BRENT E. ORICK, in his official capacity as Acting Director of the Department of Justice Bureau of Firearms; and DOES 1-20, | |
|         Defendants. | |

1

## <u>CORPORATE DISCLOSURE STATEMENT</u>

2

The Brady Center to Prevent Gun Violence has no parent corporation.  It has

3

no stock and hence no publicly-held company owns 10% or more of its stock.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................i

INTEREST OF *AMICUS CURIAE* ................................................................ 1

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 2

I.    Success on the Merits is Unlikely Because Significant Evidence and Data Support the Rationale for Section 27510 ................................................ 2

    A.    Mass shootings ............................................................................ 2

        1.    Mass shootings have a significant impact on public safety. .......................................................................... 2

        2.    Young adults commit a significant portion of mass school shootings and current laws restricting the mentally ill and certain types of firearms will not stop most school shooters. .......................................................................... 4

    B.    Disproportionate linkage of young adults to crime ............................. 6

        1.    Young adults are disproportionately linked to gun homicides, violent crimes, and overall criminal behavior .......... 6

        2.    Age based regulations are supported by data and are already being used to address gun violence amongst young adults. ........................................................................ 7

        3.    The Federal and state governments have long recognized a disproportionate connection between young adults and gun violence. ...................................................................... 7

    C.    Cognitive Development of Young Adults .......................................... 9

        1.    Neuroscience............................................................................. 9

        2.    Societal Changes and Sociological Evidence........................... 11

    D.    The correlation between restrictions in gun purchases with reduced crime and gun violence. ................................................ 13

II.    An Injunction is Not in the Public Interest Because Significant Evidence and Data Support the Rationale for Section 27510, Which is a Reasonable Regulatory Measure Consistent with *Heller* and *McDonald* ..................................................................................... 15

    A.    Public safety reasonably regulates constitutional rights ..................... 15

    B.    The Second Amendment is limited by reasonable regulation, including those intended to protect public safety ................................ 16

i

C.      The nature of firearms distinguishes public safety as a restraining force in the context of the Second Amendment ...............18

D.      The right to self-defense necessarily implicates the right to live safely ..................................................................................19

CONCLUSION.....................................................................................21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Federation of Government Employees, AFL-CIO, Local 2391 v. Martin*, 969 F.2d 788 (9th Cir. 1992) ........................................ 16

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) ................................................ 18

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......................................................... passim

*Drake v. Filko*,
724 F.3d 426 (3d Cir. 2013) ................................................ 17

*Gann v. Schramm*,
606 F. Supp. 1442 (D. Del. 1985) .......................................... 19

*Gov't of V.I. v. Smith*,
949 F.2d 677 (3d Cir. 1991) ................................................ 19

*Gulf, C. & S. F. R. Co. v. Ellis*,
165 U.S. 150 (1897) .......................................................... 20

*Jackson v. City & City of San Francisco*,
746 F.3d 953 (9th Cir. 2014) ................................................ 19

*Jones et al. v. Becerra et al.*,
No. 3:19-cv-01226-L-AHG ................................................ 2, 18

*Kachalsky v. County of Westchester*,
701 F.3d 81 (2d Cir. 2012) ................................................ 17

*Kolbe, v. Hogan*,
849 F.3d 114 (4th Cir. 2017) (*en banc*), *cert. denied*, 138 S. Ct. 469
(2017) ...................................................................... 17

*Mahoney v. Sessions*,
871 F.3d 873 (9th Cir. 2017) ................................................ 18

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ...................................................... 1, 16

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ................................................ 17

*New York v. Quarles*,
467 U.S. 649 (1984) .......................................................... 16

*NRA v. ATF*,
700 F.3d 185 (5th Cir. 2012) ................................................ 1

*Pena v. Lindley,*
No. 2:09-cv-01185-KJM (CKD) (9th Cir. 2015) .................................... 1

*Price v. Sery,*
513 F.3d 962 (9th Cir. 2008) ............................................................. 19

*Rhode v. Becerra,*
No. 3:18-cv-00802-BEN-JLB (S.D. Ca 2019) .................................... 1

*Robinson v. Bibb,*
840 F.2d 349 (6th Cir. 1988) ............................................................. 19

*Rodriguez v. City of San Jose,*
No. 17-1744 (9th Cir. 2018) ............................................................... 1

*Schenck v. Pro-Choice Network,*
519 U.S. 357 (1997) ......................................................................... 19

*Schenck v. United States,*
249 U.S. 47 (1919) ...................................................................... 15, 16

*Swepi, Ltd. P'ship v. Mora Cty.,*
81 F. Supp. 3d 1075 (D.N.M. 2015) ................................................. 20

*Tennessee v. Garner,*
471 U.S. 1 (1985) .............................................................................. 19

*United States v. Adams,*
914 F.3d 602 (8th Cir. 2019) ............................................................. 17

*United States v. Hayes,*
555 U.S. 415 (2009) ............................................................................ 1

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010) ................................................................ 15

*United States v. Masciandaro,*
638 F.3d 458 (4th Cir. 2011) ....................................................... 17, 18

*United States v. Salerno,*
481 U.S. 739 (1987) .......................................................................... 15

*United States v. Singh,*
924 F.3d 1030 (9th Cir. 2019) ........................................................... 18

*United States v. Torres,*
911 F.3d 1253 (9th Cir. 2019) ........................................................... 17

*United States v. Yancey,*
621 F.3d 681 (7th Cir. 2010) ............................................................. 18

*Weinmann v. McClone,*
787 F.3d 444 (7th Cir. 2015) ............................................................. 19

BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................... 2

*Yates v. Cleveland*,
   941 F.2d 444 (6th Cir. 1991) ............................................. 19

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ........................................................... 20

*Young v. Hawaii*,
   896 F.3d 1044 (9th Cir. 2018) ........................................... 19

*Youngberg v. Romeo*,
   457 U.S. 307 (1982) ........................................................... 19

## STATUTES AND REGULATIONS

15 U.S.C. § 1637(c)(8) ........................................................... 13

18 U.S.C. § 922(b)(1) ............................................................... 8

23 U.S.C. § 158 ........................................................................ 12

Cal. Penal Code § 27505 ........................................................ 8

Conn. Gen. Stat. § 29-34(b) ................................................... 8

Conn. Gen. Stat. § 29-36(f)(a) ............................................... 8

D.C. Code § 7-2502.03 ........................................................... 8

D.C. Code § 22-4507 .............................................................. 8

Del. Code Ann. tit. 24, § 903 ................................................. 8

Fla. Stat. § 790.065(13) .......................................................... 8

Haw. Rev. Stat. § 134-2(d) ..................................................... 8

Ill. Comp. Stat. 65/4(a)(2)(i) .................................................. 8

Iowa Code § 724.22(2) ........................................................... 8

Mass. Gen. Laws Chapter 140, § 130 ..................................... 8

Md. Code Ann., Pub. Safety § 5-134(b)(1) ............................ 8

N.J. Stat. Ann. § 2C:58-6.1 .................................................... 8

N.Y. Penal Law 400.00(1)(a) ................................................. 8

Neb. Rev. Stat. § 69-2403 ....................................................... 8

Neb. Rev. Stat. § 69-2404 ....................................................... 8

Ohio Rev. Code Ann. § 2923.21(2) ............................................................. 8

R.I. Gen. Laws § 11-47-35(a) ..................................................................... 8

Vt. Stat. Ann. Title 13, § 4020 ................................................................... 8

Wyo. Stat. Ann. § 6-8-404(d)(i)(A) ............................................................ 8

## FEDERAL CONSTITUTION

Article I, § 9 .............................................................................................. 15

First Amendment ...................................................................................... 16

Second Amendment ............................................................................ passim

Fourth Amendment ............................................................................. 16, 19

Fifth and Fourteenth Amendments ............................................................ 19

## TREATISES

75 A.L.R.3d 228 ........................................................................................ 11

## LEGISLATIVE HISTORY

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary,* 90th Cong. 36 (1967) ................................................................................ 7

S. Rules Comm. Rep. for S.B. 1100 (Ca. Aug. 28, 2018) ...................... 1, 6

1    **INTEREST OF *AMICUS CURIAE***

2    　　Brady is the nation's most long-standing nonpartisan, non-profit organization

3    dedicated to reducing gun violence through education, research, and legal

4    advocacy.  In support of that mission, Brady files this brief as *amicus curiae* in

5    support of Defendant.

6    　　Brady has a substantial interest in ensuring that the Second Amendment is

7    not interpreted or applied in a way that would jeopardize the public's interest in

8    protecting individuals, families, and communities from the effects of gun violence.

9    Brady has filed *amicus* briefs in numerous cases involving firearms regulations

10   including *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *United States v.*

11   *Hayes*, 555 U.S. 415 (2009); *District of Columbia v. Heller*, 554 U.S. 570 (2008);

12   *Rhode v. Becerra*, No. 3:18-cv-00802-BEN-JLB (S.D. Ca 2019); *Rodriguez v. City*

13   *of San Jose*, No. 17-1744 (9th Cir. 2018); and *Pena v. Lindley*, No. 2:09-cv-01185-

14   KJM (CKD) (9th Cir. 2015).  Further, Brady filed an *amicus* brief supporting

15   federal minimum age laws in *NRA v. ATF*, 700 F.3d 185 (5th Cir. 2012).

16   **INTRODUCTION**

17   　　When the California Senate considered, and ultimately passed, SB 1100, its

18   rationale was clear and supported by research: "those under age 21 are

19   disproportionately linked to crime."  *See* Declaration of Jeremy T. Elman ("Elman

20   Decl."), Exh. 1 at 5.  Because existing law already prohibited "the sale or transfer of

21   a handgun to any person below the age of 21[,]" and because long guns and assault

22   rifles were prominently used in mass shootings, it made sense that "the same age

23   restriction should apply to long guns."  *See id.* at 4-5.  Accordingly, the legislature

24   passed and the Governor signed SB 1100, modifying Section 27510 of the

25   California Penal Code, to improve the public safety of Californians and combat the

26   nationally recognized epidemic of gun violence.

27   　　Plaintiffs ignore this reality and the scientific research underlying it.  They

28   cite to four state interests underlying SB 1100, which they mischaracterize as a

1

blanket ban.  *See* Pls.' Mem. P. & A. Supp. Mot. Prelim. Inj. at 18, *Jones et al. v. Becerra et al.*, No. 3:19-cv-01226-L-AHG (ECF 21-1) ("Pl. Br.").  Specifically, Plaintiffs highlight (1) mass school shootings; (2) the immaturity and recklessness of individuals between the ages of 18 and 20 ("young adults"); (3) crime and gun violence reduction; and (4) the disproportionate linkage between young adults and crime.  *See id.*  They claim that "none" of these state interests "are supported by facts and reasonable inferences based on relevant data."  *Id.* at 18-19.

This could not be further from the truth.  Overwhelming data and facts support each of the four bases identified by the state and challenged by Plaintiffs. This support demonstrates that Plaintiffs cannot satisfy their foremost burden for a preliminary injunction: that success is likely on the merits.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In addition, SB 1100's reasonable regulation of firearm purchases by young adults – consistent with relevant Supreme Court jurisprudence and a constitutional right to live safely – demonstrates that a preliminary injunction is not in the public interest.  *See id.*

## ARGUMENT

I.    **Success on the Merits is Unlikely Because Significant Evidence and Data Support the Rationale for Section 27510**

A.    **Mass shootings**

Plaintiffs allege that mass school shootings by young adults are "rare," yet themselves cite three examples committed by young adults between the ages of 18-20.  *See* Pl. Br. at 18-19.  Gun violence's frequency, randomness, and – in the case of mass school shootings – effects on children creates a devastating picture of gun culture in America.

**1. Mass shootings have a significant impact on public safety.**

Mass shootings are an epidemic affecting the entire country.  Despite the national scale, however, outcomes differ between states.  There are more mass shootings in states with lax gun regulations than in states with strict gun

2

regulations.  *See* Elman Decl., Exh. 2.  California is no exception.  The state's rate of gun deaths from mass shootings is relatively low when compared to smaller states, and research suggests that the state's relatively strong gun laws are responsible for preventing shootings.  *See id.*  Even so, California suffers mass shootings all too often, with some of the deadliest and most notorious committed by individuals between the ages of 18-20.  Namely, the Poway Synagogue shooting (19-year-old shooter);[1] the Gilroy Garlic Festival shooting (19-year-old shooter) that killed three and injured 12 others;[2] and the Orinda Halloween party shooting (two 20-year-old shooters) that killed five.[3]

Beyond California, there has been a mass shooting in the United States, on average, ***every 47 days since 2015***.  *See* Elman Decl., Exh. 6.  These shootings include two of the top-ten deadliest mass shootings in U.S. history (only five of which occurred after 2015), each committed by someone in the age range targeted by Section 27510.  Specifically, the February 14, 2018, Parkland, Florida shooting at Marjory Stoneman Douglas High School, in which a 19-year-old shooter killed 17 and injured 17 victims; and the August 3, 2019 El Paso, Texas shooting at a Wal-Mart, in which a shooter killed 22 and injured at least 24 victims one week after turning 21 years old.[4]  *See* Elman Decl., Exh. 8.

According to the Center for Homeland Defense and Security, in the last ten years, 655 people have been killed or injured in school shootings alone.[5]  *See* Elman Decl., Exh. 9.  In sum, mass shootings – both in and beyond the classroom – exact a devastating societal cost.  Reasonable regulations can prevent these tragedies.

---

[1] *See* Elman Decl., Exh. 3.
[2] *See* Elman Decl., Exh. 4.
[3] *See* Elman Decl., Exh. 5.
[4] *See* Elman Decl., Exh. 7.
[5] This number may be under-inclusive as it only covers grades K-12 and omits fatalities and injuries on college campuses.

BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1

2

3

**2. Young adults commit a significant portion of mass school shootings and current laws restricting the mentally ill and certain types of firearms will not stop most school shooters.**

4   Young adults commit a greater proportion of mass school shootings than

5   Plaintiffs' brief admits.  As Plaintiffs state, the simple average age of mass school

6   shooters is about 33.  However, a weighted average – which accounts for the

7   frequency and severity of these shootings – demonstrates an average shooter age of

8   20 years old.  *See* Elman Decl., Exh. 10.  Mass school shooters aged 18-20 tend to

9   legally obtain firearms themselves.  *See* Elman Decl., Exh. 11 at 17, 28.  Such legal

10   means to purchase firearms may explain why this age group represents the second

11   largest proportion based on weighted averages, comprising 16.02 percent of all

12   mass school shooters.  *See* Elman Decl., Exh. 10.  Other reports show that 75

13   percent of active school shooters were under the age of 21, *see generally* Elman

14   Decl., Exh. 12, and that school shooters are generally "adolescent" males.  *See*

15   Elman Decl., Exh. 11 at 19.[6]

16   Despite these clear statistics, current gun laws overlook mass shooters in the

17   18-20 age range.  For example, regulations targeting mental illness have been a

18   popular response to school shootings, but school shooters often have "no

19   documented history of medical treatment for mental disorders[.]"  *Id.*  Moreover,

20   although younger shooters often use guns found in their homes, college-aged

21   shooters between 18 and 21 typically purchase firearms from licensed dealers, the

22   internet, or gun shows.  *See* Elman Decl., Exh. 11 at 19, 28.  This underscores the

23   need for a regulation like Section 27510, which addresses the problem through its

24   focus on the various legal means through which individuals aged 18-20 purchase

25

26

27

28

---

[6] Exhibit 11, "Youth Violence: What We Know and What We Need to Know" by Brad J. Bushman et al., cites studies that define "adolescent" as ranging in age from 11 to 21 years old, with most attackers between the ages of 13 and 18, thereby capturing the age range targeted by Section 27510.  *See* Elman Decl., Exh. 11 at 19 (citing Elman Decl., Exh. 13 at 19 ("The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attack in the United States")).

1  firearms.

2    Thus, 18-20 year-olds are often using *legally* obtained weapons to commit

3  school shootings, including the 19-year-old shooter who legally purchased the AR-

4  15 he used to murder 17 people at Marjory Stoneman Douglas High School in

5  Parkland, Florida.  *Id.* at 28; *see also* Elman Decl., Exh. 14; *cf.* Elman Decl., Exh.

6  15 (discussing how most mass shooters attain weapons legally).  Moreover, many

7  school shooters are "ambivalent," so "anything that raises the stakes and makes it

8  harder for them to access guns can be an effective part of [gun violence] prevention

9  strategies."  *See* Elman Decl., Exh. 11 at 28.  Sensible and effective legislation

10 focused on young adults aged 18-20 could literally save lives.

11   Effective regulation of a wide range of firearms is needed to prevent further

12 tragedies from occurring.  The Center for Homeland Defense and Security notes

13 that the type of weapon used in school shootings varies, ranging from pistols to

14 assault-style AR-15s.  *See* Elman Decl., Exh. 16.  While most school shooters used

15 handguns, young adults in the deadliest school shootings[7] used a combination of

16 handguns and long guns, including pistols, shotguns, and semiautomatic rifles like

17 AR-15s.[8]  *Id.*; *see also* Elman Decl., Exh. 14.  Off-campus, young adult mass

18 shooters used a similar combination of handguns and long guns, frequently using

19 pistols, rifles, semiautomatic rifles like AR-15s and AK-47s, shotguns, and

20 revolvers.  *Id.*, *see also* Elman Decl., Exh. 16.

21   In sum, the age of mass school shooters coalesces around 20 years old, and

22 bans targeting the mentally-ill will likely do nothing to prevent the majority of

23 shooters – who have no documented history of mental illness – from getting

24 firearms.  Mass shooters in this age range commonly obtain their guns through

---

25 [7] Citing data from the Columbine High School shooting, the Sandy Hook
26 Elementary School shooting, and the Marjory Stoneman Douglas High School
    shooting.
27 [8] It is widely understood that these assault-style weapons "dramatically increase the
    lethality of shootings": 155% more people are shot and 47% more are killed in
28 mass shootings where the killer used weapons like AR-15s and AK-47s.  *See* Elman
    Decl., Exh. 17.

BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1   *lawful purchases*, not from their homes or the black market.  Because 18-20 year-

2   olds have used a broad spectrum of weapons to kill on-campus and off, half-

3   measures targeting only certain types of guns are no better.  Thus, the data supports

4   a reasonable, focused regulation like Section 27510, which effectively curbs young

5   adults from legally purchasing firearms.

6          **B.**    **Disproportionate linkage of young adults to crime**

7               **1. Young adults are disproportionately linked to gun homicides,**

8                  **violent crimes, and overall criminal behavior.**

9      It is well-documented that violent crimes disproportionately involve

10   individuals under the age of 21.  *See* Elman Decl., Exh. 18 at 145.  Criminal

11   behavior is most common during young adulthood and is attributed to a broader

12   behavioral pattern in this age range.  *See* Elman Decl., Exh. 19 at 645.  Research

13   consistently documents an age-crime curve in which "rates of criminal behavior

14   increase over the course of adolescence, peak around age 18, and then decline

15   during the early twenties."  *Id*.  This trend demonstrates why the focus on ages 18-

16   20 in Section 27510 is justified: it addresses the age range during which rates of

17   criminal behavior are highest (*i.e.*, around age 18), and no longer applies once they

18   begin to decline (*i.e.*, 21 onward).

19      These academic conclusions are supported by substantial, real-world

20   evidence.  Young adults commit gun homicides at a rate **four times** higher than

21   adults over 21.  *See* Elman Decl., Exh. 20 at 18.  Young adults, *i.e.*, 18-20-year-

22   olds, made up only 4 percent of the U.S. population in 2017, but committed 18

23   percent of all gun homicides.  *Id*.  S.B. 1100's legislative history specifically cites

24   this linkage as a reason for passing the bill, finding that:

25       [T]hose under age 21 are disproportionately linked to crime . . .  23.4

26       percent of those arrested for murder and non-negligent manslaughter in
        the U.S. were under 21 and 26.5 percent of those arrested for

27       "weapons carrying, possession, etc." were under age 21.

28   *See* Elman Decl., Exh. 1 at 5.

1
2

**2. Age based regulations are supported by data and are already being used to address gun violence amongst young adults.**

3    Many states have implemented reasonable age-based restrictions based on
4  data showing a strong link between young adults and gun violence.  Because young
5  adults make up such a large proportion of firearm offenders, age-based regulations
6  have the potential to decrease gun violence.

7    According to research conducted by the Johns Hopkins Bloomberg School of
8  Public Health, stronger gun regulations lead to fewer firearm deaths overall.  *See*
9  *generally* Elman Decl., Exh. 21.  The strength of a state's gun laws reduces the rate
10 of gun violence, with one study finding that the 10 states with the weakest gun laws
11 had rates of gun violence 3.2 times higher than the 10 states with the strongest laws,
12 and that these laws specifically impacted youth violence rates.  *See* Elman Decl.,
13 Exh. 17.  Another study found that 17 percent of incarcerated offenders in the states
14 with the weakest gun laws would have been prohibited from buying a gun, if their
15 state had raised the minimum age of possession to 21.  *See* Elman Decl., Exh. 22 at
16 29.

17    Not every young adult will become a criminal, but the data demonstrates that
18 18-20-year-olds are responsible for a disproportionate number of gun deaths, and
19 thus, age-based regulations could save lives.  Thus, 17 states and the District of
20 Columbia have already passed reasonable age-based regulations on gun purchases
21 in an attempt to decrease gun violence and crime rates.  Section 27510 puts
22 California in good company by addressing the undeniable connection between
23 young adults and gun crimes.

24
25
26

**3. The Federal and state governments have long recognized a disproportionate connection between young adults and gun violence.**

27    The linkage between young adults and gun violence is long-standing.  In
28 1967, Congress found that:

> [T]he greatest growth of crime today is in the area of young people, juveniles, and young adults.  The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly.

*See* Elman Decl., Exh. 23 at 57.

In 1999, the Federal Government recognized the "significant role that 18 to 20-year-olds have in gun crime and violence" – concluding that "our Nation demands that we make changes in the legal regulation of their access to guns." *See* Elman Decl., Exh. 24 at 4.  The same investigation found that:

> 18, 19, and 20 year olds ranked first, second, and third in the number of gun homicides committed.  For each of these ages, the number of homicides exceeded the number for any ages older or younger than 18 to 20.

*Id*. at 6.  In 2005, the U.S. Department of Justice ("DOJ") reported that the rate of murder offenses peaks between 18 and 24.  *See* Elman Decl., Exh. 25.  In 2009, the FBI found that arrests for murder, non-negligent homicides, and other violent crimes culminate at ages 18-20.  *See* Elman Decl., Exh. 26. The pervasiveness of this linkage means that continued action is necessary to regulate this group's access to deadly firearms.

Thus, federal law bars licensed firearms dealers from selling handguns to those under 21.  18 U.S.C. § 922(b)(1).  Additionally, 17 states and the District of Columbia prohibit individuals under 21 from purchasing or possessing a handgun,[9] while six states prohibit individuals under 21 from purchasing a long gun.  *See* Elman Decl., Exh. 27.

/////

---

[9] Cal. Penal § 27505; Conn. Gen. Stat. §§ 29-34(b), 29-36(f)(a); D.C. Code §§ 7-2502.03, 22-4507; Del. Code Ann. tit. 24, § 903; Fla. Stat. § 790.065(13); Haw. Rev. Stat. § 134-2(d); 430 Ill. Comp. Stat. 65/4(a)(2)(i); Iowa Code § 724.22(2); Md. Code Ann., Pub. Safety § 5-134(b)(1); Mass. Gen. Laws ch. 140, § 130; Neb. Rev. Stat. §§ 69-2403, 69-2404; N.J. Stat. Ann. § 2C:58-6.1; N.Y. Penal Law 400.00(1)(a); Ohio Rev. Code Ann. § 2923.21(2); 11 R.I. Gen. Laws § 11-47-35(a); Vt. Stat. Ann. tit. 13, § 4020; Wyo. Stat. Ann. § 6-8-404(d)(i)(A); Wash. Rev. Code. § 9.41.240(1).

BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### C.    Cognitive Development of Young Adults

Beyond historical data, scientific research provides further support for limiting access to firearms by individuals aged 18-20.  Neuroscientific and sociological research demonstrate that young adults under 21 have less capacity to control impulsivity, make good decisions, and appreciate the consequences of their actions than older individuals.  As the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention explains:

> Recent research indicates that youth experience protracted maturation, into their midtwenties, of brain systems responsible for self-regulation. . . .  Between ages 14 and 25, youth continue to develop an increasing ability to control impulses, suppress aggression, consider the impact of their behavior on others, consider the future consequences of their behavior, take personal responsibility for their actions, and resist the influence of peers. ***Psychosocial development is far from over at age 18.***

*See* Elman Decl., Exh. 28 at 1, 8 (emphasis added).

#### 1.   Neuroscience

The age of 18 as the cut-off for adulthood is unsupported by the weight of science.  *See* Elman Decl., Exh. 29 at 217 (noting in the *Journal of Adolescent Health* that the brain continues to develop beyond cultural cut-offs for maturity in ways that affect "planning, response inhibition, working memory, and attention," as well as "impulse control.").

One key distinction in neurological development relates to "cold" versus "hot" cognition.

> Cold cognition refers to mental processes (such as working memory or response inhibition) employed in situations calling for deliberation in the absence of high levels of emotion . . . .  Hot cognition involves mental processes in affectively charged situations where deliberation is unlikely or difficult.

*See* Elman Decl., Exh. 30 at 71.  As further explained by author Grace Icenogle:

> [I]f our laws were more closely aligned with developmental science,

9

age boundaries for matters involving cold cognition might be lower
than those involving hot cognition, because effective hot cognition
requires both cognitive capacity and psychosocial maturity (e.g., self-
restraint).

*Id.*

Studies from the American Bar Association and the Johns Hopkins Center for Gun Policy and Research show the dangers of allowing individuals aged 18-20 to acquire firearms, because:

The evidence now is strong that the brain does not cease to mature
until the early 20s in those relevant parts that govern impulsivity,
judgment, planning for the future, foresight of consequences, and other
characteristics that make people morally culpable.

*See* Elman Decl., Exh. 31 at 2; *see also id.*, Exh. 32.  Scientists have concluded that the "age 21 or 22 would be closer to the 'biological' age of maturity."  *See* Elman Decl., Exh. 31 at 2; *see also* Elman Decl., Exh. 33 at 422 ("[T]he human brain continues to develop well past age eighteen and in most cases into the early twenties and perhaps beyond.").  Such scientific research is voluminous, extensive, long-established, and ever-growing.[10]

This does not mean that people under 21 may not make any "adult" decisions.  It is widely accepted within the scientific community that, "because different abilities mature along different timetables, adolescents of a given age could be adult-like in some respects but not others."  *See* Elman Decl., Exh. 31 at 71 (citing an article in *American Psychologist* by Laurence Steinberg et al., Elman Decl., Exh. 41).  Thus, while it might be appropriate for an 18-year-old to vote, or engage in some other activity requiring cold cognition; this is not the same as using

---

[10] *See, e.g.,* various studies showing this research, including Elman Decl., Exhs. 34-36; Exh. 37 (TIME magazine article discussing Dr. Jay N. Giedd's study finding that adolescents' brains undergo extensive structural changes well past puberty, he commented: "When we started, . . . we thought we'd follow kids until about 18 or 20.  If we had to pick a number now, we'd probably go to age 25."); Exh. 38 ("The rational part of a teen's brain isn't fully developed and won't be until age 25 or so."); *see also* Exhs. 39-40 (further studies on neurodevelopment and neuroscience related to adolescents).

10

1  a firearm – which is more likely to involve "hot" cognition.  Recent studies have

2  confirmed this distinction:[11] guns "may be called on in the very situations in which

3  adolescents are most developmentally vulnerable," such as:

4      [I]n the context of high emotional arousal, situations that require rapid,
        complex social information processing, those that involve reinforcing
5      or establishing peer relationships (*i.e.*, showing off), or in conditions of
        perceived threat.
6

7  See Elman Decl., Exh. 32, at 19.

8      In sum, the ongoing brain development of young adults ages 18-20 means

9  that they make decisions in a fundamentally different manner than adults 21 and

10  over, have weaker self-control than adults, engage in riskier behavior, and

11  demonstrate poorer emotional regulation.  These scientifically-backed

12  demonstrations demonstrate why selling guns to this age group is particularly

13  dangerous to the rest of society.

14              **2.  Societal Changes and Sociological Evidence**

15      Significant societal changes over the past half-century provide further

16  reasons for why adolescents under the age of 21 should not be permitted to legally

17  purchase firearms.

18      Views of adulthood have shifted over time.  As shown by recent law review

19  articles, the majority age of 21 was settled in England around the fifteenth century.

20  *See* Elman Decl., Exh. 33 at 415.  This was "accepted and endured as the

21  unquestioned legal age of majority . . . from the Middle Ages until well into the

22  twentieth century."  *Id.* (citing Elman Decl., Exh. 42 at 410).  This is reflected in

23  the common law.  *See*, *e.g.*, 75 A.L.R.3d 228, at 2a.  However, societal changes in

24  the second half of the twentieth century resulted in the age of 18 being widely

---

25  [11] *See, e.g.*, Elman Decl., Exh. 31 at 71 (finding that "on response inhibition tasks,

26  young adults (aged 18-21) perform comparably with somewhat older individuals
    when tested under emotionally neutral conditions but more poorly—and similarly

27  with younger teenagers—when tested under arousing ones"); *see also* Elman Decl.,
    Exh. 31, at 72 (research published in 2019 replicated an earlier study "in a large

28  international sample," confirming the validity of this distinction in 11 diverse
    countries).

BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1  accepted as the age of majority.  *See* Elman Decl., Exh. 33 at 413-18.

2       In the twenty-first century, society has returned to viewing 21 as the

3  appropriate age for maturity.  *See* Elman Decl., Exh. 33 at 423-430, citing Elman

4  Decl., Exh. 43, at 469-470 ("Recently, Arnett coined the term 'emerging adulthood'

5  for the age range from eighteen to twenty-five" based on observations "that

6  traditional adult roles were not being assumed as early as had been typical before

7  this time.").  Adolescence, in turn, is defined as "the time from the beginning of

8  puberty until adult responsibilities are taken on" in the early twenties.  *See* Elman

9  Decl., Exh. 44 at 340-341; *see also* Elman Decl., Exh. 45 at 136-140 (assessing

10  seven different indicators to becoming an adult and by what age the transition

11  should occur).[12]  The mean ages at which the respondents thought each of these

12  transition indicators should occur varied between 20.9 and 26.2.[13]  Demographic

13  data corroborates such findings.[14]

14       Societal changes recognizing 21 as the age of majority are now reflected in

15  law.  The national legal drinking age is 21, not 18.  23 U.S.C. § 158.  Federal law

16  requires that a credit card applicant under the age of 21 provide either the signature

17  of a cosigner over 21 years old or "financial information . . . indicating an

18  _____

19  [12] The seven indicators were: (1) financial independence from parents/guardians;
   (2) independent living; (3) educational completion; (4) full-time employment; (5)

20  ability to support a family financially; (6) child rearing and care; and (7) marriage.
   [13] This phenomenon is not limited to the United States.  *See* Elman Decl., Exh. 46

21  at 3 ("That the schedule for coming of age has been rather sharply revised both in
   the United States and more broadly throughout the industrialized world is by now

22  widely recognized."); *see also* Elman Decl., Exh. 47 ("New guidance for
   psychologists will acknowledge that adolescence now effectively runs up until the

23  age of 25 for the purposes of treating young people. . . . Child psychologists are
   being given a new directive which is that the age range they work with is increasing

24  from 0-18 to 0-25.").
   [14] For instance, the Census Bureau has collected data on the median age of first

25  marriages in the United States from 1890 to the present.  *See* Elman Decl., Exh. 48
   (The median age, which in 1950 was 22.8 for men and 20.3 for women, in 2018

26  was 29.8 for men and 27.8 for women).  According to data collected by the U.S.
   Department of Health and Human Services, the mean age of mothers giving birth to

27  their first child rose from 21.4 in 1970 to 26.3 in 2014, a five year increase in mean
   age.  *See* Elman Decl., Exh. 49 at 2; *see also* Elman Decl., Exh. 50.  According to a

28  study by the Census Bureau, as of 2015 more than half of young adults (aged 18 to
   24) live in their parents' home.  *See* Elman Decl., Exh. 51.

BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

independent means of repaying any obligation arising from" credit obligations related to the card. *See* 15 U.S.C. § 1637(c)(8); *see also* Elman Decl., Exh. 33 at 433-435 (identifying Congress' goal in passing the legislation as reforming credit card companies' efforts to market to students on college and university campuses). Eighteen states, including California, and the District of Columbia, have raised the tobacco purchase age to 21, and recently, the Food and Drug Administration announced that, as of December 20, 2019, the Federal Food, Drug, and Cosmetic Act had been amended to "raise the federal minimum age of sale of tobacco products from 18 to 21 years." *See* Elman Decl., Exh. 52.  In all states that have legalized marijuana use, including California, the age threshold is 21.  *See* Elman Decl., Exh. 53.

It does not make sense that an individual who is too young to purchase an alcoholic beverage or tobacco product, rent a car, or acquire a credit card without restrictions can legally purchase a semiautomatic rifle capable of firing hundreds of rounds per minute.

### D.   The correlation between restrictions in gun purchases with reduced crime and gun violence.

Social science research demonstrates a correlation between restrictions on gun ownership and a reduction in gun violence and crime.  More guns correlate with more gun violence and crime, and less guns correlate with less gun violence and crime.  It follows that Section 27510's remedy of restricting legal gun purchases for people between the ages of 18 to 20 is appropriate: not only are young adults disproportionately linked to crime, but gun violence also has a disproportionate impact on young adults.[15]

Guns are increasingly becoming the murderer's weapon of choice.[16]  As a

---

[15] In 2014, gun violence surpassed vehicle accidents as the leading cause of death for young adults.  *See* Elman Decl., Exh. 17.  In the United States in 2011, 84% of homicide victims age 15-24 were killed with guns.  *See* Elman Decl., Exh. 11 at 23.
[16] In 2014, firearms were used in 64% of murders.  *See* Elman Decl., Exh. 54.  In 2018, firearms were used in 73% of murders.  *Id.*

13

response, some states have passed "right-to-carry" or "shall issue" laws, which attempt to address this epidemic by putting more guns into circulation. *See* Elman Decl., Exh. 55. Yet, states that have passed these "right-to carry" laws suffer increased incidences of gun violence. *See* Elman Decl., Exh. 56 at 198 (Right-to-carry handgun laws are associated with a 13% to 15% increase in violent crime rates a decade after a state adopts them). Put simply, "where there are more guns, there are more violent deaths." *See* Elman Decl., Exh. 57 at 13-15. *See also* Elman Decl., Exh. 58 (based on data collected by John J. Donohue et al. in the *Journal of Empirical Analysis* between 1977–2006, aggravated assault rises when right-to-carry laws are adopted.).

Conversely, the strength of a state's gun laws is inversely correlated with the rate of gun violence.[17] Most recently, an October 2019 study in the Journal of General Internal Medicine examined the relationship between state firearm laws and overall homicide rates at the state level across all 50 states over a 26-year period. *See* Elman Decl., Exh. 61 at 2021. The findings provide scientific proof that fewer guns mean less crime and gun violence: "Universal background checks were associated with a 14.9% . . . reduction in overall homicide rates, violent misdemeanor laws were associated with a 18.1% . . . reduction in homicide." *Id.* at 2021. The study also concluded that "shall issue" laws were associated with a nine percent increase in homicides. *Id.* Studies regarding firearm policies beyond the United States also confirm the correlation between less guns and less crime.[18]

---

[17] One study found that the ten states with the weakest gun laws had rates of gun violence more than three times higher than the ten states with the strongest laws. *See* Elman Decl., Exh. 59. Another recent study in the Journal of the American Medical Association examined whether firearm laws in one state may be associated with increased firearm death rates from homicide and suicide in neighboring states. *See* Elman Decl., Exh. 60 at 692 ("Strong state firearm policies were associated with lower suicide rates regardless of other states' laws. Strong policies were associated with lower homicide rates, and strong interstate policies were also associated with lower homicide rates, where home state policies were permissive. Strengthening state firearm policies may prevent firearm suicide and homicide, with benefits that may extend beyond state lines.").

[18] *See*, *e.g.*, Elman Decl. Exh. 62 at 152-153 (reviewing 130 studies across ten countries and concluding that "simultaneous implementation of laws targeting

---

14

1    In sum, extensive scientific and statistical data provides overwhelming

2 support for all four of the rationales underlying Section 27510:  Plaintiffs' assertion

3 that "none" of these justifications "are supported by facts and reasonable inferences

4 based on the relevant data" is wrong.  Pl. Br. at 18-19.  Accordingly, Plaintiffs are

5 unlikely to succeed on the merits.

6 **II.    An Injunction is Not in the Public Interest Because Significant Evidence**

7 **        and Data Support the Rationale for Section 27510, Which is a Reasonable**

8 **        Regulatory Measure Consistent with *Heller* and *McDonald***

9 **    A.    Public safety reasonably regulates constitutional rights**

10    The rights enshrined in the Constitution are constrained by public safety.  In

11 some cases, such constraints are explicit.  For example, the Habeas Corpus

12 provision of the Constitution is explicitly limited by public safety concerns:  "The

13 Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in

14 Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I,

15 § 9.  Where, however, the Constitution does not contain explicit restrictions, Courts

16 have recognized that public safety constitutes a compelling interest that can justify

17 state or federal limitations on constitutional rights.  *See*, *e.g.*, *Heller*, 554 U.S. at

18 689 (Breyer, J., dissenting) ("the Court has in a wide variety of constitutional

19 contexts found such public-safety concerns sufficiently forceful to justify

20 restrictions on individual liberties"); *Schenck v. Pro-Choice Network*, 519 U.S. 357,

21 376 (1997) (mentioning the "significant governmental interest in public safety");

22 *United States v. Salerno*, 481 U.S. 739, 745 (1987) (discussing the "Federal

23 Government's compelling interests in public safety"); *see also United States v.*

24 *Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (citing to the Supreme Court's

25 "caution" in *Heller* that the Second Amendment right "is not absolute.").

26    For example, the Supreme Court held that a police officer's "need for

27 ───────────────

multiple elements of firearms regulations reduced firearm-related deaths in certain

28 countries" and that "some specific restrictions on purchase, access, and use of
firearms are associated with reductions in firearm deaths.").

answers to questions in a situation posing a threat to the public safety outweighs . . . the Fifth Amendment's privilege against self-incrimination." *New York v. Quarles*, 467 U.S. 649, 657 (1984).  Likewise, public safety constrains individuals' First Amendment rights, which do not include falsely yelling "fire" in a crowded theatre. *Schenck v. United States*, 249 U.S. 47, 52 (1919).  Where the public safety is threatened, the Fourth Amendment does not protect individuals from otherwise-unconstitutional searches.  *See*, *e.g.*, *American Federation of Government Employees, AFL-CIO, Local 2391 v. Martin*, 969 F.2d 788, 792 (9th Cir. 1992) (citing prior holdings upholding random drug testing for individuals whose jobs affected the public safety, including government employees with security clearances; truck drivers; and airline employees).

### B.   The Second Amendment is limited by reasonable regulation, including those intended to protect public safety

As with other constitutional amendments, public safety constrains the Second Amendment right to keep and bear arms.

> Like most rights, the right secured by the Second Amendment is ***not unlimited***.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.

*Heller*, 554 U.S. at 626 (2008) (emphasis added).

Put differently, *Heller* made clear that reasonable regulation of the right to bear and keep arms does not infringe Second Amendment rights.  Indeed, the Supreme Court offered a non-exhaustive list of "presumptively lawful" measures, including prohibitions on the possession by the mentally ill or felons, limitations on the carrying in places like schools and government buildings, conditions and qualifications imposed on the commercial sale of arms.  *Id*. at 626-27.  In *McDonald*, the Supreme Court reaffirmed the validity of these longstanding regulatory measures.  *See* 561 U.S. 742, 786 (2010).

16

Following *Heller* and *McDonald*, courts, including the Ninth Circuit, have upheld reasonable regulations of the right to keep and bear arms:

> A law does not burden Second Amendment rights, if it either falls within one of the presumptively lawful regulatory measures identified in *Heller* or **regulates conduct that historically has fallen outside the scope of the Second Amendment**.

*United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019) (emphasis added, internal quotation marks omitted).

Other circuit courts have made similar findings. *See*, *e.g.*, *Kolbe, v. Hogan*, 849 F.3d 114, 135 (4th Cir. 2017) (*en banc*), *cert. denied*, 138 S. Ct. 469 (2017) (holding that "banned assault weapons and large-capacity magazines . . . are among those arms that the Second Amendment does not shield"); *United States v. Adams*, 914 F.3d 602, 611 (8th Cir. 2019) (It is "most likely that the presumptively lawful regulatory measures listed in *Heller*, including prohibitions on possession of firearms by those with felony convictions, simply do not infringe on the Second Amendment right.") (internal quotations and citation omitted); *see also Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 258 n.76 (2d Cir. 2015).  An age-based limitation on firearms – aimed at regulating "conduct that historically fallen outside the scope of the Second Amendment" – is similar to these other reasonable regulations.

Second, courts have specifically held that public safety is a reasonable restraining force on the Second Amendment.  "The Second Amendment does not foreclose regulatory measures to a degree that would result in handcuffing lawmakers' ability to prevent armed mayhem in public places." *Kachalsky v. County of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012) (quoting *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011)) (internal quotation marks omitted).  "[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Masciandaro*, 638 F.3d at 470 (citing *Heller*, 554 U.S. at 626); *see also*

17

*Mahoney v. Sessions*, 871 F.3d 873, 882 (9th Cir. 2017) (holding that a law regulating the use of police officers' firearms while on duty ensured the safety of the public and was a significant government's interest); *United States v. Yancey*, 621 F.3d 681, 683-85 (7th Cir. 2010) (ruling that prohibiting habitual drug abusers from bearing firearms is in the public interest); *United States v. Singh*, 924 F.3d 1030, 1057 (9th Cir. 2019) (holding that prohibition on firearm possession by nonimmigrant visa holders served an important public interest in crime control and public safety).

>    **C.    The nature of firearms distinguishes public safety as a restraining force in the context of the Second Amendment**

The protection of public safety is all the more important when considering the fact that firearms are inherently lethal.  Indeed, courts have highlighted the unique consequences of the right to keep and bear arms due to their dangerous nature.  As the Tenth Circuit recognized:

> The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a risk to others.

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015).

Because the consequences of the right to bear and keep arms are unique and irremediable, the interpretation of the Second Amendment "is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."  *Masciandaro*, 638 F.3d at 475.  Consequently, the State of California had a manifest interest in enacting – and has a continuing interest in the enforcement of – Section 27510.  It is a reasonable regulatory measure to protect the public safety and, therefore, appropriately constrains the Second Amendment right to bear arms.

**D.    The right to self-defense necessarily implicates the right to live safely**

The Second Amendment is further constrained by one's right to live safely (*i.e.*, not be seriously harmed) – a right that is concordant with and inherent to the right to self-defense.

In *Heller*, the Supreme Court recognized the right to self-defense as "central to the Second Amendment right" to keep and bear arms.  554 U.S. at 628.  Courts have since held that "the Second Amendment is, and always has been, an individual right centered on self-defense[.]"  *Young v. Hawaii*, 896 F.3d 1044, 1057 (9th Cir. 2018); *see also Jackson v. City & City of San Francisco*, 746 F.3d 953 (9th Cir. 2014).  Yet the need for self-defense only arises when an individual possesses a reasonable belief of "imminent danger" to one's life or health.  *See Gov't of V.I. v. Smith*, 949 F.2d 677, 684 (3d Cir. 1991).  The right to self-defense therefore necessarily implicates a right to live safely.

The right to live safely is embedded in the Constitution – first and foremost in the Due Process Clause of the Fifth and Fourteenth Amendments.  Aside from establishing that no person shall be deprived of life without due process of law, these clauses guarantee a "right to personal security" and safety.  *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982).  The "ultimate deprivation" of this right is death.  *Gann v. Schramm*, 606 F. Supp. 1442, 1448 (D. Del. 1985).

The Constitutional right to live safely is further entrenched in the Fourth Amendment guarantee against the unreasonable use of force.  The use of deadly force can only be justified by "an objective belief that an imminent threat of death or serious physical harm[.]"  *Price v. Sery*, 513 F.3d 962, 969 (9th Cir. 2008); *see also Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  Further, this guarantee implicates "a constitutional right not to be shot" unless a police officer reasonably believes that an individual "poses a threat to the officer or someone else."  *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015); *see also Robinson v. Bibb*, 840 F.2d

349 (6th Cir. 1988); *Yates v. Cleveland*, 941 F.2d 444 (6th Cir. 1991).  Although these cases concern the exercise of force by police officers, there is no reason why this "constitutional right not to be shot" should be limited to such cases.

Moreover, the constitutional right to live safely evokes a longstanding societal principle that preexists the foundation of the United States.  John Locke, in his Two Treatises of Government, regarded the right to live safely as the "law of nature" and asserted that everyone is "bound to preserve himself[.]"  *See* Elman Decl., Exh. 63, at 197-198.  Similarly, Samuel Adams found the right to self-preservation and preservation of one's own life to be the "first law of nature."  *See* Elman Decl., Exh. 64 at 417.  Blackstone stated that life "cannot legally be disposed of or destroyed by any individual" and was such a fundamental value that "whatever is done by a man to save either life or member, is looked upon as done upon the highest necessity and compulsion."  *See id*.  These philosophers' message is consistent and clear:  life – and its preservation – constitutes society's utmost value, such that the deprivation of one life can only be justified by safeguarding another.

With this background, the Framers agreed that the purpose of any government – particularly that established with the Declaration of Independence – was to ensure inalienable rights, particularly life, liberty and pursuit of happiness.[19] The Declaration of Independence is "a statement of ideals, not law."  *Swepi, Ltd. P'ship v. Mora Cty*., 81 F. Supp. 3d 1075, 1172 (D.N.M. 2015) (citation and internal quotation marks omitted).  However, it "is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence."  *Gulf, C. & S. F. R. Co. v. Ellis*, 165 U.S. 150, 160 (1897).  Indeed, the Supreme Court has ruled:

[F]undamental rights to life, liberty, and the pursuit of happiness,

---

[19] "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.  That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed."  THE DECLARATION OF INDEPENDENCE, para. 2 (U.S. 1776).

considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws. . . .

*Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

In sum, the right to live safely is not only a Constitutional right – closely related to and from which stem many other guarantees, such as the right to self-defense and the guarantee against the use of unreasonable force – but also a fundamental national principle.  Commentators have recognized, such as in "*The Right Not to Be Shot: Public Safety, Private Guns, and the Constellation of Constitutional Liberties*", it is "America's first right."  *See* Elman Decl., Exh. 65 at 196.

This, combined with the clear constraining role that public safety plays with respect to constitutional rights, means that the continued enforcement of Section 27510 is in the public interest.  The Court should therefore deny Plaintiffs' motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, and those set forth by Defendant, the Court should deny Plaintiffs' motion for preliminary injunction.

Dated:  January 3, 2020                     Respectfully submitted,

WHITE & CASE LLP

By: */s/ Jeremy T. Elman*
      Jeremy T. Elman
Attorneys for *Amicus Curiae* Brady

BRIEF OF *AMICUS CURIAE* BRADY IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION