"

"

"

"

# GZJ KDKV'35"



# THE FINAL REPORT AND FINDINGS OF THE *SAFE SCHOOL INITIATIVE:*

## IMPLICATIONS FOR THE PREVENTION OF SCHOOL ATTACKS IN THE UNITED STATES

UNITED STATES SECRET SERVICE AND
UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, D. C.
July 2004




# THE FINAL REPORT AND FINDINGS
# OF THE *SAFE SCHOOL INITIATIVE*:
IMPLICATIONS FOR THE PREVENTION OF
SCHOOL ATTACKS  IN THE UNITED STATES

UNITED STATES SECRET SERVICE
AND
UNITED STATES DEPARTMENT OF EDUCATION

by

**Bryan Vossekuil**
Director
National Violence Prevention and Study Center

**Robert A. Fein, Ph.D.**
Director
National Violence Prevention and Study Center

**Marisa Reddy, Ph.D.**
Chief Research Psychologist and Research Coordinator
National Threat Assessment Center
U.S. Secret Service

**Randy Borum, Psy.D.**
Associate Professor
University of South Florida

**William Modzeleski**
Associate Deputy Under Secretary
Office of Safe and Drug-Free Schools
U.S. Department of Education

Washington, D. C.
June 2004

**JOINT MESSAGE FROM THE SECRETARY, U.S. DEPARTMENT OF EDUCATION, AND THE DIRECTOR, U.S. SECRET SERVICE**

Littleton, Colo.; Springfield, OR; West Paducah, KY; Jonesboro, AR. These communities have become familiar to many Americans as the locations where school shootings have occurred in recent years. School shootings are a rare, but significant, component of school violence in America. It is clear that other kinds of problems are far more common than the targeted attacks that have taken place in schools across this country. However, each school-based attack has had a tremendous and lasting effect on the school in which it occurred, the surrounding community, and the nation as a whole. In the aftermath of these tragic events, educators, law enforcement officials, mental health professionals, parents, and others have asked: "Could we have known that these attacks were being planned?" and "What can be done to prevent future attacks from occurring?"

In June 1999, following the attack at Columbine High School, our two agencies–the U.S. Secret Service and the U.S. Department of Education–launched a collaborative effort to begin to answer these questions. The result was the *Safe School Initiative*, an extensive examination of 37 incidents of targeted school shootings and school attacks that occurred in the United States beginning with the earliest identified incident in 1974 through May 2000. The focus of the *Safe School Initiative* was on examining the thinking, planning, and other behaviors engaged in by students who carried out school attacks. Particular attention was given to identifying pre-attack behaviors and communications that might be detectable–or "knowable"–and could help in preventing some future attacks.

The *Safe School Initiative* was implemented through the Secret Service's National Threat Assessment Center and the Department of Education's Safe and Drug-Free Schools Program. The *Initiative* drew from the Secret Service's experience in studying and preventing assassination and other types of targeted violence and the Department of Education's expertise in helping schools facilitate learning through the creation of safe environments for students, faculty, and staff.

This document, the *Safe School Initiative*'s final report, details how our two agencies studied school-based attacks and what we found. Some of the findings may surprise you. It is clear that there is no simple explanation as to why these attacks have occurred. Nor is there a simple solution to stop this problem. But the findings of the *Safe School Initiative* do suggest that some future attacks may be preventable if those responsible for safety in schools know what questions to ask and where to uncover information that may help with efforts to intervene before a school attack can occur.

Since it began in June 1999, our partnership has been a tremendous asset to each of our respective agencies and vital to the success of this study. It is our hope that the information we present in this final report is useful to those of you on the front lines of this problem–the administrators, educators, law enforcement officials, and others with protective responsibilities in schools–and to anyone concerned with children's safety. We encourage all of you in your efforts to keep our nation's children safe in school and hope this report helps you in those efforts.

Rod Paige
Secretary
U.S. Department of Education

W. Ralph Basham
Director
U.S. Secret Service

## ACKNOWLEDGMENTS

The U.S. Secret Service and the U.S. Department of Education are grateful to many agencies and individuals for their assistance in planning and carrying out the *Safe School Initiative*. First and foremost, the authors of this report owe a debt of gratitude to the representatives of the numerous law enforcement and criminal justice agencies that permitted Secret Service personnel to review investigative files on the school attacks in their respective communities; provided other key information and materials relating to these attacks; and assisted and supported Secret Service personnel in seeking permission to interview 10 attackers. Moreover, the authors are grateful to the U.S. Department of Justice, Office of Justice Programs' National Institute of Justice for providing critical financial support that helped make the study possible.

In addition, Secret Service and Department of Education personnel benefited substantially from the contributions of several law enforcement, behavioral science and mental health professionals whose collective experience and expertise helped to inform the development of the project plan and research design. In alphabetical order, these individuals are: Gerardo Blue, Frederick Calhoun, Charles Ewing, Michael Gelles, Dennis McCarthy, Edward Mulvey, William Pollack, Larry Porte, Pam Robbins, Raymond Smyth, Sara Strizzi, and Andrew Vita.

This project would not have been possible without the support and guidance that the authors received from several key officials and personnel at the Department of Education and the Secret Service. Absent the expertise and insights of these individuals, the Secret Service's experience in researching and preventing targeted violence could not have been translated into a useful study of targeted school violence. At the Department of Education, these individuals are: Secretary of Education Rod Paige, former Secretary of Education Richard Riley and Connie Deshpande. Secret Service officials who provided guidance and support for this project are: Director Brian Stafford, Assistant Director Terry Samway, Deputy Assistant Directors Bob Byers and Tom Riopelle, Special Agent in Charge George Luczko and Resident Agent in Charge John Berglund. Special thanks are extended to Social Science Research Specialist Karissa Kumm who assisted with project data collection and was instrumental in organizing information from the *Safe School Initiative* kick-off meeting. Our thanks go also to Dean Terry, Michael Gelles and Marty Allen for providing extensive assistance with project data collection.

The authors extend special thanks to Assistant Director Barbara Riggs, Office of Protective Research, U.S. Secret Service, for her support of the *Safe School Initiative* and the National Threat Assessment Center.

The authors wish to thank Assistant Special Agent in Charge Matt Doherty, Assistant to the Special Agent in Charge Cindy Rubendall and Special Agent Ignacio Zamora for giving generously of their time in reviewing earlier drafts of this document, and former Special Agent Nancy Fogarty, Social Science Research Specialists Derricka Dean and Megan Williams and interns Marissa Savastana, Becca Norwick and Colleen Spokis for their invaluable assistance with data collection, data entry and project management.

Finally, the Secret Service and the Department of Education gratefully acknowledge the contributions of Paul Kelly and Gwen Holden of the Nauset Group, whose insightful observations and comments helped to shape the *Final Report*. Special thanks go out to Gwen Holden, who edited the *Final Report*.

Bryan Vossekuil
Robert Fein
Marisa Reddy
Randy Borum
William Modzeleski
Washington, D.C.
May 2002

**CHAPTER I:** INTRODUCTION: *THE SAFE SCHOOL INITIATIVE* .........1

The *Safe School Initiative* ...............................3

    Defining "Targeted" School Violence ......................4

    The Secret Service Threat Assessment Approach ...........4

The Prevalence of Violence in American Schools .............6

Methodology .........................................7

    The Study Population ................................8

    Sources of Information on Incidents of

      Targeted School Violence ............................8

    Coding of Primary Source Materials. .....................9

    Analysis of Responses to the Coded Study Questions .......10

Organization of the Final Report .........................10

Overview of *Safe School Initiative* Findings .................11

**CHAPTER II:** CHARACTERISTICS OF INCIDENTS OF
TARGETED SCHOOL VIOLENCE ......................13

Target and Victim Characteristics .........................16

**CHAPTER III:** FINDINGS OF THE *SAFE SCHOOL INITIATIVE* ...........17

Characterizing the Attacker .............................19

Conceptualizing the Attack .............................23

Signaling the Attack ...................................25

Advancing the Attack ..................................26

Resolving the Attack ...................................27

**CHAPTER IV:** IMPLICATIONS OF *SAFE SCHOOL INITIATIVE*
FINDINGS FOR THE PREVENTION OF
TARGETED SCHOOL VIOLENCE ......................29

The Implications of Key Study Findings ....................32

**CHAPTER V:** CONCLUSION: THREAT ASSESSMENT AS A
PROMISING STRATEGY FOR PREVENTING
SCHOOL VIOLENCE ...................................39

Threat Assessment and Targeted School Violence Prevention ...41

**APPENDIX A:** INCIDENTS OF TARGETED SCHOOL VIOLENCE,
BY STATE ...........................................45

**APPENDIX B:** INCIDENTS OF TARGETED SCHOOL VIOLENCE,
BY YEAR ...........................................47

**APPENDIX C:** RESOURCES .........................................49

CONTACT INFORMATION ...........................................51



# CHAPTER I

INTRODUCTION:

*THE SAFE SCHOOL INITIATIVE*

 

Littleton, CO; Springfield, OR; West Paducah, KY; Jonesboro, AR.  These communities have become familiar to many Americans as among the locations of those schools where shootings have occurred nationwide in recent years.  In the aftermath of these tragic events, educators, law enforcement officials, mental health professionals and parents have pressed for answers to two central questions: "Could we have known that these attacks were being planned?" and, if so, "What could we have done to prevent these attacks from occurring?"

This publication, *The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States*, is a recent product of an ongoing collaboration between the U. S. Secret Service and the U. S. Department of Education to begin to answer these questions.[1]  It is the culmination of an extensive examination of 37 incidents of targeted school violence that occurred in the United States from December 1974 through May 2000.[2]

### The *Safe School Initiative*

Following the attack at Columbine High School in April 1999, the Secret Service and the Department of Education initiated, in June 1999, a study of the thinking, planning and other pre-attack behaviors engaged in by attackers who carried out school shootings.   That study, the *Safe School Initiative*, was pursued under a partnership between the Secret Service and the Department of Education, and implemented through the Secret Service's National Threat Assessment Center and the Department of Education's Safe and Drug-Free Schools Program.  In its execution, the *Safe School Initiative* drew from the Secret Service's experience in studying and preventing targeted violence and from the Department of Education's expertise in helping schools facilitate learning through the creation of safe environments for students, faculty and staff.

The objective of the *Safe School Initiative* was to attempt to identify information that could be obtainable, or "knowable," prior to an attack.  That information would then be analyzed and evaluated to produce a factual, accurate knowledge base on targeted school attacks.  This knowledge could be used to help communities across the country to formulate policies and strategies aimed at preventing school-based attacks.

Key features of the *Safe School Initiative* were its focus on "targeted" school violence and its adaptation of earlier Secret Service research on assassination for its examination of incidents of school-based attacks.

---

[1] This report is an update and expansion of the earlier *Interim Report on the Prevention of Targeted Violence in Schools*, which was released in October 2000.  This *Final Report* supercedes the *Interim Report* and should be used and referenced in place of the *Interim Report*.
[2] See Section I, "INTRODUCTION: THE SAFE SCHOOL INITIATIVE, Methodology," for a discussion of the approach used by the Secret Service to identify incidents of school-based attacks.

### Defining "Targeted" School Violence

The *Safe School Initiative* examined incidents of "targeted violence" in school settings–school shootings and other school-based attacks where the school was deliberately selected as the location for the attack and was not simply a random site of opportunity. The term "targeted violence" evolved from the Secret Service's five-year study of the behavior of individuals who have carried out, or attempted, lethal attacks on public officials or prominent individuals. That study, the Secret Service's *Exceptional Case Study Project* (ECSP), was initiated in 1992 under funding provided by the U. S. Department of Justice, Office of Justice Programs' National Institute of Justice.

The focus of the ECSP study was an operational analysis of the thinking and behavior of those who have assassinated, attacked or tried to attack a national public official or public figure in the United States since 1949. The ECSP defined "targeted violence" as any incident of violence where a known or knowable attacker selects a particular target prior to their violent attack.[3] The purpose of the ECSP was to generate a better understanding of attacks against public officials that, in turn, would help Secret Service agents in their investigations of threats toward the president and others they protect and in the prevention of harm to these protected officials.[4]

The ECSP sought to identify what information might be knowable prior to an attack and to better enable intervention before an attack occurred. Findings from the ECSP helped to dispel several myths and misconceptions about assassination.

In addition to the ECSP's particular focus on incidents involving attacks on public officials and prominent individuals, other types of violence in which a victim is targeted specifically include assassinations, stalking, some forms of domestic violence, some types of workplace violence, and some types of school violence. In the case of targeted violence, the target may be a specific individual, such as a particular classmate or teacher, or a group or category of individuals, such as "jocks" or "geeks." The target may even be the school itself.

### The Secret Service Threat Assessment Approach

The findings of the ECSP also led to the Secret Service's development of a more thorough and focused process for conducting threat assessment investigations. As part of its mission, the Secret Service is responsible for protecting the president and vice president of the United States and their families and certain national and international leaders, all of whom are referred to as "protectees." The Secret Service provides this protection by means of two distinct yet complementary strategies: the use of physical measures–including magnetometers, armored vehicles, perimeters of armed agents, and canine units–that are designed to both deter potential attacks and serve as protective barriers in the event someone tries to attack; and a second, far less visible component known as threat assessment.

Threat assessment is a process of identifying, assessing and, managing the threat that certain persons may pose to Secret Service protectees. The goal of threat assessment is to intervene before an attack can occur. The threat assessment process involves three principal steps–all before the person has the opportunity to attack:

- identifying individuals who have the idea or intent of attacking a Secret Service protectee;
- assessing whether the individual poses a risk to a protectee, after gathering sufficient information from multiple sources; and,
- managing the threat the individual poses, in those cases where the individual investigated is determined to pose a threat.

The Secret Service considers threat assessment to be as important to preventing targeted violence as the physical measures it employs.

In 1998, the Secret Service established the National Threat Assessment Center, an entity within the Secret Service that is dedicated to continuing efforts agency-wide to better understand and prevent targeted violence, and to share this developing knowledge with other constituencies responsible for public safety and violence prevention. Adaptation of its threat assessment protocols for use in addressing the problem of school-based attacks is the most recent of the Secret Service's initiatives to share this body of knowledge and expertise with other constituencies engaged in developing strategies to address targeted violence issues. In the late 1990s, the Secret Service and the Justice Department's National Institute of Justice joined forces to make information on the Secret Service's threat assessment protocols available to a wider law enforcement audience. *Protective Intelligence & Threat Assessment Investigations: A Guide for State and Local Law Enforcement Officials,* released in July 1998, offers state and local police officials insights into the elements of carrying out and evaluating the findings of threat assessment investigations.[5]

In addition, since the release of the *Safe School Initiative* Interim Report in October 2000, personnel from the Secret Service and the Department of Education have given over 100 seminars and briefings on the study to thousands of educators, law

---

[3] Fein, R., Vossekuil, B., & Holden, G. (1995). Threat assessment: An approach to prevent targeted violence. *National Institute of Justice: Research in Action,* 1-7.
[4] Fein, R., & Vossekuil, B. (1999). Assassination in the United States: An operational study of recent assassins, attackers, and near-lethal approachers. *Journal of Forensic Sciences,* 44, 321-333.

[5] Fein, R. & Vossekuil, B. (1998). *Protective Intelligence & Threat Assessment Investigations: A Guide for State and Local Law Enforcement Officials.* U. S. Department of Justice, Office of Justice Programs, National Institute of Justice: Washington, D.C.

enforcement officials, mental health professionals and others across the United States.  Several questions and discussion points raised by seminar attendees have been addressed in this final report.

Finally, the Department of Education and the Secret Service currently are completing work on a guide to investigating and responding to threats in schools.  The guide is scheduled for publication in 2002.  The guide will include recommendations for investigating and evaluating threats and other behaviors of concern in school; address considerations for developing policies and capacity to support threat assessment efforts in schools; and provide suggestions for approaches schools can adopt to foster school environments that reduce threats of targeted violence.

### The Prevalence of Violence in American Schools

Public policy-makers, school administrators, police officials, and parents continue to search for explanations for the targeted violence that occurred at Columbine High School and other schools across the country, and seek assurance that similar incidents will not be repeated at educational institutions in their communities.  While the quest for solutions to the problem of targeted school violence is of critical importance, reports from the Department of Education, the Justice Department, and other sources indicate that few children are likely to fall prey to life-threatening violence in school settings.[6]

To put the problem of targeted school-based attacks in context, from 1993 to 1997, the odds that a child in grades 9-12 would be threatened or injured with a weapon in school were 7 to 8 percent, or 1 in 13 or 14; the odds of getting into a physical fight at school were 15 percent, or 1 in 7.[7]  In contrast, the odds that a child would die in school—by homicide or suicide—are, fortunately, no greater than 1 in 1 million.[8]  In 1998, students in grades 9-12 were the victims of 1.6 million thefts and 1.2 million nonfatal violent crimes, while in this same period 60 school-associated violent deaths were reported for this student population.[9]

The findings of the *Safe School Initiative*'s extensive search for recorded incidents of targeted school-based attacks underscore the rarity of lethal attacks in school settings.  The Department of Education reports that nearly 60 million children attend the nation's 119,000+ schools.[10]  The combined efforts of the Secret Service and the Department of Education identified 37 incidents of targeted school-based attacks, committed by 41 individuals over a 25-year period.[11]

Nevertheless, the impact of targeted school-based attacks cannot be measured in statistics alone. While it is clear that other kinds of problems in American schools are far more common than the targeted violence that has taken place in them, the high-profile shootings that have occurred in schools over the past decade have resulted in increased fear among students, parents, and educators.  School shootings are a rare, but significant, component of the problem of school violence.  Each school-based attack has had a tremendous and lasting effect on the school in which it occurred, the surrounding community, and the nation as a whole.  In the wake of these attacks, fear of future targeted school violence has become a driving force behind the efforts of school officials, law enforcement professionals, and parents to identify steps that can be taken to prevent incidents of violence in their schools.

### Methodology

The Secret Service and the Department of Education began work on the *Safe School Initiative* study in June 1999.  Research protocols employed in carrying out and analyzing the findings of this work reflect an adaptation of the ECSP operational approach to examining targeted attacks against public officials and prominent individuals.  Researchers used a similar operational focus for the *Safe School Initiative* to develop information that could be useful to schools in better understanding and preventing targeted violence in school settings.  The emphasis of the study was on examining the attackers' pre-incident thinking and behavior, to explore information that could aid in preventing future attacks.

For the purposes of this study, an incident of targeted school violence was defined as any incident where (i) a current student or recent former student attacked someone at his or her school with lethal means (e.g., a gun or knife); and, (ii) where the student attacker purposefully chose his or her school as the location of the attack.  Consistent with this definition, incidents where the school was chosen simply as a site of opportunity, such as incidents that were solely related to gang or drug trade activity or to a violent interaction between individuals that just happened to occur at the school, were not included.

---

[6] See, for example, Kaufman, P., et. al. (2000).  *Indicators of School Crime and Safety, 2000.*  U. S. Department of Education (NCES 2001-017) and U. S. Department of Justice (NCJ-184176): Washington, D. C.  Online Vers.:  http://nces.ed.gov/pubsearch/pubinfo.asp?pubid=2001017; Anderson, M., et. al. (2001).  School-associated Violent Deaths in the United States, 1994-1999.  *Journal of the American Medical Association, 286,* 2695-2702; and, National Research Council and Institute of Medicine, Committee on Law and Justice and Board on Children, Youth, and Families. (2001).  *Juvenile Crime, Juvenile Justice.* Panel on Juvenile Crime: Prevention, Treatment, and Control.  McCord, J., et. al. (Eds.).  National Academy Press:  Washington, D.C.

[7] Snyder, H.N., & Sickmund, M. (1999).  *Juvenile offenders and victims: 1999 National Report.* Washington, D.C.: Office of Juvenile Justice & Delinquency Prevention, U.S. Department of Justice. Available online at http://www.ncjrs.org/html/ojjdp/nationalreport99/index.html.

[8] U.S. Department of Education and U.S. Department of Justice (1999).  *1999 Annual Report on School Safety.*  Washington, D.C.: Authors.

[9] Ibid.

[10] U.S. Department of Education. National Center for Education Statistics (2002).  *Digest of Education Statistics 2000,* Washington D.C.: Authors

[11] *Supra* note 2.

Under the study's research strategy, each incident of targeted violence was assigned to a study review team comprised of criminal investigators and social science researchers. At least two reviewers were assigned to each incident.

The Secret Service and the Department of Education made every effort to ensure that the *Safe School Initiative* would produce information that would be useful for school administrators, educators, law enforcement officials, and others working with schools. To that end, researchers consulted regularly with experts in the fields of education, school violence, and juvenile homicide, among others, in the course of developing the study design and protocols. Feedback from these various experts was incorporated into the final study design.

### The Study Population

Researchers from the Secret Service and the Department of Education initiated their study of targeted school violence with an extensive search for information that would identify incidents of targeted school violence that have occurred in the United States. Beginning with June 2000 and working back in time, researchers explored all relevant, searchable databases maintained in the public domain or available by subscription, such as public news databases and professional publications, to identify incidents meeting the definition of the study population. Researchers also consulted with law enforcement officials and school violence experts to develop leads on incidents of school violence that might meet the criteria for inclusion in the study constituency.

In the end, researchers identified 37 incidents of targeted school violence involving 41 attackers that occurred in the United States from 1974, the year in which the earliest incident identified took place, through June 2000, when data collection for the study was completed.[12] The school-based attacks included in the *Safe School Initiative* represent all of the incidents of targeted school violence meeting the study criteria that Secret Service and Department of Education researchers were able to identify in that time frame.

### Sources of Information on Incidents of Targeted School Violence

Information on each incident of targeted school violence identified by Secret Service and Department of Education researchers was drawn principally from primary

[12] It is possible that incidents of targeted school violence other than those identified by *Safe School Initiative* researchers might have occurred prior to the 1974 incident included in the study, or between 1974 and the completion of data collection for the study in June 2000. For example, incidents that met the study definition, but that were not identifiable under the study search strategy, or that were not reported as school-based crimes, would have been unlikely to come to the attention of Secret Service and Department of Education researchers. In addition, incidents of targeted school violence that have occurred since June 2000 were outside the scope of the study.

source materials concerning the incident. These primary source materials included investigative, school, court, and mental health records.

In addition, study researchers conducted supplemental interviews with 10 of the perpetrators of incidents of the school-based attacks identified by the Secret Service and the Department of Education. These interviews provided researchers with further opportunity to examine the incident from the point of view of the attacker and to "walk through the process of the attack" from its conceptualization to its execution. Insights gleaned from these interviews have been used by the Secret Service primarily in training venues to illustrate particular aspects of incidents of targeted school violence.

### Coding of Primary Source Materials

Each member of the review team assigned to a particular incident independently answered several hundred questions about each case, entering his or her answers to the questions in a codebook. Review team members were instructed to record information gathered from primary sources as it appeared in those sources, and not to engage in interpretation of facts presented.

Information gathered and reflected in incident reviewers' responses to the coded study questions included facts about:

- the attacker's development of an idea to harm the target, and progression from the original idea to the attack;
- the attacker's selection of the target(s);
- the attacker's motive(s) for the incident;
- any communications made by the attacker about his or her ideas and intent, including any threats made to the target(s) or about the target(s);
- evidence that the attacker planned the incident;
- the attacker's mental health and substance abuse history, if any; and,
- the attacker's life circumstances/situation at the time of the attack, including relationships with parents and other family members; performance in school; and treatment by fellow students.

Information regarding the attacker's demographic characteristics and personal history, including criminal and school history, also were coded. When each reviewer had completed his or her response to the questions, the review team met as a whole to compare responses and produce a single "reconciled" coding of the incident.

***Analysis of Responses to the Coded Study Questions***

Findings presented in Chapter III of this report reflect researchers' careful analysis of the coded responses to the extensive questionnaire employed in recording information gathered on each of the 37 school-based attacks and 41 attackers that were examined in the *Safe School Initiative*.  Researchers were cautious not to overreach in drawing conclusions from this information.

Primary source materials reviewed for the 37 incidents did not provide answers in every case to all of the areas of inquiry covered in the questionnaire.  In general, researchers declined to draw a conclusion if information directly responsive to a particular area of inquiry was available for fewer than half of the incidents reviewed.

Moreover, even when answers to a particular coded study question were available for the majority of incidents, these responses collectively did not suggest in all cases a common or shared characteristic.  Here again, researchers were cautious not to draw a conclusion in a particular area of inquiry if that conclusion was supported by fewer than the majority of the responses to the subject question.

However, in some cases, researchers believed that the absence of a common or shared characteristic or behavior in the coded responses to inquiries–most notably with respect to the characteristics and behaviors of the attackers–was sufficiently compelling to note those observations as findings as well.

**Organization of the Final Report**

The remainder of this report is organized into four chapters.  Chapter II: "Characteristics of Incidents of Targeted School Violence," presents basic descriptive information about the attacks examined by the *Safe School Initiative*, including incident, target, and victim characteristics.  Chapter III: "Findings of the *Safe School Initiative*," describes the conclusions reached by *Safe School Initiative* researchers after careful analysis of the facts and other information collected in the course of the Secret Service's and the Department of Education's study of targeted school violence.

Chapter IV: "Implications of *Safe School Initiative* Findings for the Prevention of Targeted School Violence," will be of particular interest to educators, law enforcement officials, and others who are seeking guidance to inform efforts to address the problem of targeted school violence.  In this chapter, the authors focus in on 10 key findings of the *Safe School Initiative* that appear to have implications for

the development of strategies to prevent targeted school violence.  These findings specifically concern what information was known–or "knowable"–about these incidents prior to the attack, and that, in turn, might be relevant to efforts to prevent future attacks.  Discussion of these key findings also includes consideration of how this information might be applicable to investigating threats and other behavior in schools that may raise concerns.

In the final chapter of this report, Chapter V: "Threat Assessment as a Promising Strategy for Preventing School Violence," the authors offer some concluding observations on how threat assessment protocols might be incorporated into strategies to prevent targeted violence in schools.

**Overview of *Safe School Initiative* Findings**

The findings of the *Safe School Initiative* suggest that there are productive actions that educators, law enforcement officials, and others can pursue in response to the problem of targeted school violence.  Specifically, *Initiative* findings suggest that these officials may wish to consider focusing their efforts to formulate strategies for preventing these attacks in two principal areas:

- developing the capacity to pick up on and evaluate available or knowable information that might indicate that there is a risk of a targeted school attack; and,
- employing the results of these risk evaluations or "threat assessments" in developing strategies to prevent potential school attacks from occurring.

Support for these suggestions is found in 10 key findings of the *Safe School Initiative* study.  These findings are as follows:

- Incidents of targeted violence at school rarely were sudden, impulsive acts.
- Prior to most incidents, other people knew about the attacker's idea and/or plan to attack.
- Most attackers did not threaten their targets directly prior to advancing the attack.
- There is no accurate or useful "profile" of students who engaged in targeted school violence.[15]
- Most attackers engaged in some behavior prior to the incident that caused others concern or indicated a need for help.
- Most attackers had difficulty coping with significant losses or personal failures.  Moreover, many had considered or attempted suicide.

[15] Here the term "profile" refers to a set of demographic and other traits that a set of perpetrators of a crime have in common.  Please refer to "Characterizing the Attacker" in Chapter III and to Reddy et al. (2001), "Evaluating risk for targeted violence in schools" in the Resources section for further explanation of the term "profile."

- Many attackers felt bullied, persecuted, or injured by others prior to the attack.
- Most attackers had access to and had used weapons prior to the attack.
- In many cases, other students were involved in some capacity.
- Despite prompt law enforcement responses, most shooting incidents were stopped by means other than law enforcement intervention.







# CHAPTER II

CHARACTERISTICS OF
INCIDENTS OF TARGETED
SCHOOL VIOLENCE





The *Safe School Initiative* found that targeted school violence is not a new or recent phenomenon. The earliest case that researchers were able to identify occurred in 1974. In that incident, a student brought guns and homemade bombs to his school; set off the fire alarm; and shot at emergency and custodial personnel who responded to the alarm.

The *Safe School Initiative* identified 37 incidents involving 41 attackers that met the study definition of targeted school violence and occurred between 1974 and the end of the 2000 school year.[14] These incidents took place in 26 states, with more than one incident occurring in Arkansas, California, Georgia, Kentucky, Missouri, and Tennessee.[15]

Analysis of the study findings identified the following characteristics of incidents of targeted school violence:

- In almost three-quarters of the incidents, the attacker killed one or more students, faculty, or others at the school (73 percent, n=27[16]). In the remaining incidents, the attackers used a weapon to injure at least one person at school (24 percent, n=9). In one incident, a student killed his family and then held his class hostage with a weapon.
- More than one-half of the attacks occurred during the school day (59 percent, n=22), with fewer occurring before school (22 percent, n=8) or after school (16 percent, n=6).
- Almost all of the attackers were current students at the school where they carried out their attacks (95 percent, n=39). Only two attackers were former students of the school where they carried out their attacks at the time of those attacks (5 percent, n=2).
- All of the incidents of targeted school violence examined in the *Safe School Initiative* were committed by boys or young men (100 percent, n=41).[17]
- In most of the incidents, the attackers carried out the attack alone (81 percent, n=30). In four of the incidents, the attacker engaged in the attack on his own but had assistance in planning the attack (11 percent, n=4). In three incidents, two or more attackers carried out the attack together (8 percent, n=3).

---

[14] See Appendix B for a list of the dates of the incidents of targeted school violence examined by the Safe School Initiative.

[15] See Appendix A for a list of the locations of the incidents of targeted school violence studied under the Safe School Initiative.

[16] "N" refers to the number of attackers that corresponds to the reported percentage. Unless indicated otherwise, when the finding pertains to total attackers all Ns are out of a total of 41. When the finding pertains to total incidents (i.e., school-based attacks) all Ns are out of a total of 37 incidents.

[17] While all the attackers in this study were boys, it would be misleading to read the findings of this study as suggesting that a girl could not or would not carry out a school-based attack. For example, an incident occurred after the completion of this study in which a girl shot her classmate at a parochial school in Williamsport, Pa. In addition, a well-publicized school shooting that occurred in San Diego, Calif., in 1976 was carried out by a woman. The San Diego incident was not included in this study because the attacker was not a current or former student of the school where she conducted her attack, but, rather, lived across the street from the school.

- Most attackers used some type of gun as their primary weapon, with over half of the attackers using handguns (61 percent, n=25), and nearly half of them using rifles or shotguns (49 percent, n=20).[18]  Three-quarters of the attackers used only one weapon (76 percent, n=31) to harm their victims, although almost half of the attackers had more than one weapon with them at time of the attack (46 percent, n=19).

**Target and Victim Characteristics**

Perpetrators of incidents of targeted school violence chose a range of targets for their attacks, including fellow students, faculty and staff, and the school itself.  These incidents were usually planned in advance and for most part included intent to harm a specific, pre-selected target, whether or not the attacker's execution of the incident, in fact, resulted in harm to the target.

Target and victim characteristics identified by the *Safe School Initiative* were:

- In over half of the incidents (54 percent, n=22), the attacker had selected at least one school administrator, faculty member, or staff member as a target. Students were chosen as targets in fewer than half of the incidents (41 percent, n=15).
- In nearly half of the incidents, the attackers were known to have chosen more than one target prior to their attack (44 percent, n=16).
- Most attackers had a grievance against at least one of their targets prior to the attack (73 percent, n=30).[19]
- In almost half of the incidents (46 percent, n=17), individuals who were targeted prior to the attack also became victims (i.e., individuals actually harmed in the attack).  However, other individuals at the school, who were not identified as original targets of the attack, were injured or killed as well. Among these non-targeted individuals, over half were other students (57 percent, n=21) and over one-third (39 percent, n=16) were school administrators, faculty, or staff.

---

[18] These percentages include all weapons used (i.e., discharged) in the attack, and therefore total more than 100 percent.
[19] For the purposes of this study, "grievance" was defined as "a belief that some other person or organization is directly or indirectly responsible for injury or harm to self and/or someone whom the subject cares about."





## CHAPTER III

FINDINGS OF THE *SAFE
SCHOOL INITIATIVE*

 

The findings of researchers' analysis of the 37 incidents of targeted school violence that were examined under the *Safe School Initiative* fall generally into five areas:

- characterizing the attacker;
- conceptualizing the attack;
- signaling the attack;
- advancing the attack; and,
- resolving the attack.

The findings in each of these areas are presented and explained below.

**Characterizing the Attacker**

*Finding*

There is no accurate or useful "profile" of students who engaged in targeted school violence.[20]

*Explanation*

Although all of the attackers in this study were boys, there is no set of traits that described all-or even most-of the attackers.  Instead, they varied considerably in demographic, background, and other characteristics.

- The attackers ranged in age from 11 to 21, with most attackers between the ages of 13 and 18 at the time of the attack (85 percent, n=35).
- Three-quarters of the attackers were white (76 percent, n=31).  One-quarter of the attackers came from other racial and ethnic backgrounds, including African American (12 percent, n=5), Hispanic (5 percent, n=2), Native Alaskan (2 percent, n=1), Native American (2 percent, n=1), and Asian (2 percent, n=1).

The attackers came from a variety of family situations, ranging from intact families with numerous ties to the community, to foster homes with histories of neglect.

- Almost two-thirds of the attackers came from two-parent families (63 percent, n=26), living either with both biological parents (44 percent, n=18) or with one biological parent and one stepparent (19 percent, n=8).
- Some lived with one biological parent (19 percent, n=8) or split time between two biological parents (2 percent, n=1).
- Very few lived with a foster parent or legal guardian (5 percent, n=2).

[20] *Supra note* 13.

For those incidents for which information on the attackers' school performance was available, that information indicates that those attackers differed considerably from one another in their academic achievement in school, with grades ranging from excellent to failing (n=34).

- The attackers in the largest grouping were doing well in school at the time of the attack, generally receiving As and Bs in their courses (41 percent; n=17); some were even taking Advanced Placement courses at the time of the incident or had been on the honor roll repeatedly.
- Fewer of the attackers were receiving Bs and Cs (15 percent, n=6), or Cs and Ds (22 percent, n=9).
- Very few of the attackers were known to be failing in school (5 percent, n=2).

Attackers also varied in the types of social relationships they had established, ranging from socially isolated to popular among their peers.

- The largest group of attackers for whom this information was available appeared to socialize with mainstream students or were considered mainstream students themselves (41 percent, n=17).
- One-quarter of the attackers (27 percent, n=11) socialized with fellow students who were disliked by most mainstream students or were considered to be part of a "fringe" group.
- Few attackers had no close friends (12 percent, n=5).
- One-third of attackers had been characterized by others as "loners," or felt themselves to be loners (34 percent, n=14).
- However, nearly half of the attackers were involved in some organized social activities in or outside of school (44 percent, n=18). These activities included sports teams, school clubs, extracurricular activities, and mainstream religious groups.

Attackers' histories of disciplinary problems at school also varied. Some attackers had no observed behavioral problems, while others had multiple behaviors warranting reprimand and/or discipline.

- Nearly two-thirds of the attackers had never been in trouble or rarely were in trouble at school (63 percent, n=26).
- One-quarter of the attackers had ever been suspended from school (27 percent, n=11).
- Only a few attackers had ever been expelled from school (10 percent, n=4).

Most attackers showed *no marked change* in academic performance (56 percent, n=23), friendship patterns (73 percent, n=30), interest in school (59 percent, n=24), or school disciplinary problems (68 percent, n=28) prior to their attack.

- A few attackers even showed some *improvements* in academic performance (5 percent, n=2) or *declines* in disciplinary problems at school (7 percent, n=3) prior to the attack. In one case, the dean of students had commended a student a few weeks before he attacked his school for improvements in his grades and a decline in the number of disciplinary problems involving that student in school.

*Finding*

Many attackers felt bullied, persecuted, or injured by others prior to the attack.

*Explanation*

Almost three-quarters of the attackers felt persecuted, bullied, threatened, attacked, or injured by others prior to the incident (71 percent, n=29).[21]

In several cases, individual attackers had experienced bullying and harassment that was long-standing and severe. In some of these cases the experience of being bullied seemed to have a significant impact on the attacker and appeared to have been a factor in his decision to mount an attack at the school.[22] In one case, most of the attacker's schoolmates described the attacker as "the kid everyone teased." In witness statements from that incident, schoolmates alleged that nearly every child in the school had at some point thrown the attacker against a locker, tripped him in the hall, held his head under water in the pool, or thrown things at him. Several schoolmates had noted that the attacker seemed more annoyed by, and less tolerant of, the teasing than usual in the days preceding the attack.

*Finding*

A history of having been the subject of a mental health evaluation, diagnosed with a mental disorder, or involved in substance abuse did not appear to be prevalent among attackers. However, most attackers showed some history of suicidal attempts or thoughts, or a history of feeling extreme depression or desperation.

*Explanation*

- Only one-third of attackers had ever received a mental health evaluation (34 percent, n=14), and fewer than one-fifth had been diagnosed with mental health or behavior disorder prior to the attack (17 percent, n=7).

[21] It is important to note that the way in which information was gathered for the *Safe School Initiative* did not permit researchers to determine the exact proportion of attackers who had been victims of bullying specifically. Moreover, not every attacker in this study felt bullied.

[22] The *Safe School Initiative*'s approach to gathering information concerning incidents of targeted school violence did not permit researchers to determine conclusively whether the experience of being bullied–or perceptions that they had been bullied–*caused* the attacker to engage in targeted school violence.

- Although most attackers had not received a formal mental health evaluation or diagnosis, most attackers exhibited a history of suicide attempts or suicidal thoughts at some point prior to their attack (78 percent, n=32). More than half of the attackers had a documented history of feeling extremely depressed or desperate (61 percent, n=25).
- Approximately one-quarter of the attackers had a known history of alcohol or substance abuse (24 percent, n=10).
- The only information collected that would indicate whether attackers had been prescribed psychiatric medications concerned medication non-compliance (i.e., failure to take medication as prescribed). Ten percent of the attackers (n=4) were known to be non-compliant with prescribed psychiatric medications.

*Finding*

Over half of the attackers demonstrated some interest in violence, through movies, video games, books, and other media (59 percent, n=24). However, there was no one common type of interest in violence indicated. Instead, the attackers' interest in violent themes took various forms.

*Explanation*

- Approximately one-quarter of the attackers had exhibited an interest in violent movies (27 percent, n=11).
- Approximately one-quarter of the attackers had exhibited an interest in violent books (24 percent, n=10).
- One-eighth of the attackers exhibited an interest in violent video games (12 percent, n=5).
- The largest group of attackers exhibited an interest in violence in their own writings, such as poems, essays, or journal entries (37 percent, n=15).

*Finding*

Most attackers had no history of prior violent or criminal behavior.

*Explanation*

- Fewer than one-third of the attackers were known to have acted violently toward others at some point prior to the incident (31 percent, n=13).
- Very few of the attackers were known to have harmed or killed an animal at any time prior to the incident (12 percent, n=5).
- Approximately one-quarter of the attackers had a prior history of arrest (27 percent, n=11).

*Finding*

Most attackers were known to have had difficulty coping with significant losses or personal failures. Moreover, many had considered or attempted suicide.

*Explanation*

Most attackers appeared to have difficulty coping with losses, personal failures, or other difficult circumstances. Almost all of the attackers had experienced or perceived some major loss prior to the attack (98 percent, n=40). These losses included a perceived failure or loss of status (66 percent, n=27); loss of a loved one or of a significant relationship, including a romantic relationship (51 percent, n=21); and a major illness experienced by the attacker or someone significant to him (15 percent, n=6). In one case, the attacker, who was a former student at the school where the attack occurred, was laid off from his job because he did not have a high school diploma. The attacker blamed the job loss on the teacher who failed him in a senior-year course, which kept him from graduating. He returned to the school a year after leaving the school, killed his former teacher and two students, and then held over 60 students hostage for 10 hours.

For most attackers, their outward behaviors suggested difficulty in coping with loss (83 percent, n=34). For example, the mother, the brother, and a friend of the attacker who lost his job each had commented that the attacker became depressed and withdrawn following the lay-off. The friend also reported that he knew that the attacker blamed his former teacher for his problems and had begun planning how to retaliate.

**Conceptualizing the Attack**

*Finding*

Incidents of targeted violence at school *rarely* are sudden, impulsive acts.

*Explanation*

Several findings of the *Safe School Initiative* indicate clearly that the school-based attacks studied were rarely impulsive. Rather, these attacks typically were thought out beforehand and involved some degree of advance planning. In many cases, the attacker's observable behavior prior to the attack suggested he might be planning or preparing for a school attack.

In nearly all of the incidents for which information concerning the attacker's conceptualization of the attack was available, researchers found that the attacker had

developed his *idea to harm* the target(s) before the attack (95 percent, n=39).  The length of time that attackers held this idea prior to the actual attack varied considerably.  Some attackers conceived of the attack as few as one or two days prior to advancing that attack; other attackers had held the idea of the attack for as long as a year prior to carrying it out.  For those incidents where information was available to determine how long the attacker had an idea to harm the target (n=33), the analysis showed that a little over half of the attackers developed their idea for the incident at least a month prior to the attack (51 percent, n=17).

In addition, almost all of the attackers *planned* out the attack in advance of carrying it out (93 percent; n=38).  Moreover, there was evidence from the attacker's *behavior* prior to the attack that the attacker had a plan or was preparing to harm the target(s) (93 percent, n=38).  For example, one attacker asked his friends to help him get ammunition for one of his weapons; sawed off the end of a rifle to make it easier to conceal beneath his clothes; shopped for a long trench coat with his mother; and cut the pockets out of the coat so that he could conceal the weapon within the coat while holding the weapon through one of the cut-out pockets.  That attacker had a well-known fascination with weapons and had told his friends on several occasions that he thought about killing certain students at school.

The length of time between the planning and execution of the attacks also varied considerably for the targeted school violence incidents studied.  Some attackers developed their plans on the day of their attack or only one or two days prior; others developed their plans between six and eight months prior to the attack.  In cases where there was information available to establish the date planning began (n=29), analysis of available information revealed that most of the attackers developed a plan at least two days prior to the attack (69 percent, n=21).

Revenge was a motive for more than half of the attackers (61 percent, n=25).  Other motives included trying to solve a problem (34 percent, n=14); suicide or desperation (27 percent, n=11); and efforts to get attention or recognition (24 percent, n=10).  More than half of the attackers had *multiple* motives or reasons for their school-based attacks (54 percent, n=22).  In addition, most of the attackers held some sort of grievance at the time of the attack, either against their target(s) or against someone else (81 percent, n=33).  Many attackers told other people about these grievances prior to their attacks (66 percent, n=27).[21]

**Signaling the Attack**

*Finding*

Prior to most incidents, other people knew about the attacker's idea and/or plan to attack.

*Explanation*

In most cases, other people knew about the attack before it took place.  In over three-quarters of the incidents, at least one person had information that the attacker was thinking about or planning the school attack (81 percent, n=30).  In nearly two-thirds of the incidents, *more than one* person had information about the attack before it occurred (59 percent, n=22).  In nearly all of these cases, the person who knew was a peer–a friend, schoolmate, or sibling (93 percent, n=28/30).  Some peers knew exactly what the attacker planned to do; others knew something "big" or "bad" was going to happen, and in several cases knew the time and date it was to occur.  An adult had information about the idea or plan in only two cases.

In one incident, for example, the attacker had planned to shoot students in the lobby of his school prior to the beginning of the school day.  He told two friends exactly what he had planned and asked three others to meet him that morning in the mezzanine overlooking the lobby, ostensibly so that these students would be out of harm's way.  On most mornings, usually only a few students would congregate on the mezzanine before the school day began.  However, by the time the attacker arrived at school on the morning of the attack, word about what was going to happen had spread to such an extent that 24 students were on the mezzanine waiting for the attack to begin.  One student who knew the attack was to occur brought a camera so that he could take pictures of the event.

*Finding*

Most attackers did not threaten their targets directly prior to advancing the attack.

*Explanation*

The majority of the attackers in the targeted school violence incidents examined under the *Safe School Initiative* did not threaten their target(s) directly, i.e., did not tell the target they intended to harm them, whether in direct, indirect, or conditional language prior to the attack.  Only one-sixth of the attackers threatened their target(s) directly prior to the attack (17 percent, n=7).

---

[21] *Supra note* 19.

*Finding*

Most attackers engaged in some behavior, prior to the incident, that caused others concern or indicated a need for help.

*Explanation*

Almost all of the attackers engaged in some behavior prior to the attack that caused others–school officials, parents, teachers, police, fellow students–to be concerned (93 percent, n=38). In most of the cases, at least one *adult* was concerned by the attacker's behavior (88 percent, n=36). In three-quarters of the cases, at least three people–adults and other children–were concerned by the attacker's behavior (76 percent, n=31). In one case, for example, the attacker made comments to at least 24 friends and classmates about his interest in killing other kids, building bombs, or carrying out an attack at the school. A school counselor was so concerned about this student's behavior that the counselor asked to contact the attacker's parents. The attacker's parents also knew of his interest in guns.

The behaviors that led other individuals to be concerned about the attacker included both behaviors specifically related to the attack, such as efforts to get a gun, as well as other disturbing behaviors not related to the subsequent attack. In one case, the student's English teacher became concerned about several poems and essays that the student submitted for class assignments because they treated the themes of homicide and suicide as possible solutions to his feelings of despair. In another case, the student worried his friends by talking frequently about plans to put rat poison in the cheese shakers at a popular pizza establishment. A friend of that student became so concerned that the student was going to carry out the rat poison plan, that the friend got out of bed late one night and left his house in search of his mother, who was not home at the time, to ask her what to do.

**Advancing the Attack**

*Finding*

In many cases, other students were involved in the attack in some capacity.

*Explanation*

Although most attackers carried out their attacks on their own, many attackers were influenced or encouraged by others to engage in the attacks. Nearly half of the attackers were influenced by other individuals in deciding to mount an attack, dared or encouraged by others to attack, or both (44 percent; n=18). For example, one attacker's original idea had been to bring a gun to school and let other students see

him with it. He wanted to look tough so that the students who had been harassing him would leave him alone. When he shared this idea with two friends, however, they convinced him that exhibiting the gun would not be sufficient and that he would have to *shoot at* people at the school in order to get the other students to leave him alone. It was after this conversation that this student decided to mount his school attack.

In other cases, friends assisted the attacker in his efforts to acquire a weapon or ammunition, discussed tactics for getting a weapon into school undetected, or helped gather information about the whereabouts of a target at a particular time during the school day.

*Finding*

Most attackers had access to and had used weapons prior to the attack.

*Explanation*

Experience using weapons and access to them was common for many attackers. Nearly two-thirds of the attackers had a known history of weapons use, including knives, guns, and bombs (63 percent, n=26). Over half of the attackers had some experience specifically with a gun prior to the incident (59 percent, n=24), while others had experience with bombs or explosives (15 percent, n=6). However, fewer than half of the attackers demonstrated any fascination or excessive interest with weapons (44 percent, n=18), and fewer than one-third showed a fascination with explosives (32 percent, n=15) prior to their attacks. Over two-thirds of the attackers acquired the gun (or guns) used in their attacks from their own home or that of a relative (68 percent, n=28).

**Resolving the Attack**

*Finding*

Despite prompt law enforcement responses, most attacks were stopped by means other than law enforcement intervention.

*Explanation*

Most school-based attacks were stopped through intervention by school administrators, educators, and students or by the attacker stopping on his own. In about one-third of the cases, the attacker was apprehended by or surrendered to administrators, faculty, or school staff (27 percent, n=10) or to students (5 percent, n=2). In just over one-fifth of the incidents, the attacker stopped on his own or left

the school (22 percent, n=8).  In a few incidents, the attacker killed himself during the course of the incident (13 percent, n=5).

Just over one-quarter of the incidents were stopped through law enforcement intervention (27 percent, n=10).  Law enforcement personnel discharged weapons in only three of the incidents of targeted school violence studied (8 percent, n=3).

Close to half of the incidents were known to last 15 minutes or less from the beginning of the shooting to the time the attacker was apprehended, surrendered or stopped shooting (47 percent, n=16).[24]  One-quarter of the incidents were over within five minutes of their inception (27 percent, n=9).  The fact that it was not through law enforcement intervention that most of the targeted school violence incidents studied were stopped appears in large part to be a function of how brief most of these incidents were in duration.

---

[24] Information on incident duration was not available for seven of the incidents (19 percent).





## CHAPTER IV

IMPLICATIONS OF *SAFE
SCHOOL INITIATIVE* FINDINGS
FOR THE PREVENTION OF
TARGETED SCHOOL
VIOLENCE

 

After careful review of the case histories of the 37 incidents of targeted school violence examined under the *Safe School Initiative*, 10 key findings were identified that highlight information that may have been known or knowable prior to school-based attacks and that therefore might inform some type of intervention in or prevention of future attacks.  In this chapter, the authors discuss the implications that these findings may have for schools and communities in developing strategies for preventing targeted violence in schools.

In focusing in on these findings for their potential relevance to the development of prevention and intervention strategies, the authors acknowledge that these findings may raise other issues for consideration in addressing the problem of targeted school violence beyond those noted here.  Moreover, the authors recognize that the conditions, circumstances and facts underlying the findings highlighted here may not manifest themselves in the same way in every school.  Schools and communities therefore are in the best position to determine whether and how these findings and the implications suggested may apply to their particular problems and needs.

The 10 key findings that the authors believe may have implications for the development of strategies to address the problem of targeted school violence are as follows:

- Incidents of targeted violence at school rarely are sudden, impulsive acts.
- Prior to most incidents, other people knew about the attacker's idea and/or plan to attack.
- Most attackers did not threaten their targets directly prior to advancing the attack.
- There is no accurate or useful profile of students who engaged in targeted school violence.
- Most attackers engaged in some behavior prior to the incident that caused others concern or indicated a need for help.
- Most attackers had difficulty coping with significant losses or personal failures.  Moreover, many had considered or attempted suicide.
- Many attackers felt bullied, persecuted, or injured by others prior to the attack.
- Most attackers had access to and had used weapons prior to the attack.
- In many cases, other students were involved in some capacity.
- Despite prompt law enforcement responses, most shooting incidents were stopped by means other than law enforcement intervention.

**The Implications of Key Study Findings**

*Key Finding 1*

Incidents of targeted violence at school *rarely* are sudden, impulsive acts.

*Implications*

Students who engaged in school-based attacks typically did not "just snap" and then engage in impulsive or random acts of targeted school violence.  Instead, the attacks examined under the *Safe School Initiative* appeared to be the end result of a comprehensible process of thinking and behavior: behavior that typically began with an idea, progressed to the development of a plan, moved on to securing the means to carry out the plan, and culminated in an attack. This is a process that potentially may be knowable or discernible from the attacker's behaviors and communications.

To the extent that information about an attacker's intent and planning is knowable and may be uncovered before an incident, some attacks may be preventable. However, findings from the *Safe School Initiative* suggest that the time span between the attacker's decision to mount an attack and the actual incident may be short. Consequently, when indications that a student may pose a threat to the school community arise in the form of revelations about a planned attack, school administrators and law enforcement officials will need to move quickly to inquire about and intervene in that plan.[25]

*Key Finding 2*

Prior to most incidents, other people knew about the attacker's idea and/or plan to attack.  In most cases, those who knew were other kids–friends, schoolmates, siblings, and others.  However, this information rarely made its way to an adult.

*Implications*

First and foremost, this finding suggests that students can be an important part of prevention efforts.  A friend or schoolmate may be the first person to hear that a student is thinking about or planning to harm someone.  Nevertheless, for a variety of reasons, those who have information about a potential incident of targeted school violence may not alert an adult on their own.  Schools can encourage students to report this information in part by identifying and breaking down barriers in the

[25] The Department of Education and the Secret Service have prepared a companion work to the Final Report, *Threat Assessment in Schools: A Guide to Managing Threatening Situations and Creating Safe School Climates*.  This guide is scheduled for publication in May 2002.  The guide will include recommendations for investigating and evaluating threats and other behaviors of concern in school; address considerations for developing policies and the capacity to support threat assessment efforts in schools; and provide suggestions for approaches schools can adopt to foster school environments that reduce violence.

school environment that inadvertently may discourage students from coming forward with this information.  Schools also may benefit from ensuring that they have a fair, thoughtful, and effective system to respond to whatever information students do bring forward.  If students have concerns about how adults will react to information that they bring forward, they may be even less inclined to volunteer such information.

In addition, this finding highlights the importance in an inquiry of attempts to gather all relevant information from anyone who may have contact with the student. Efforts to gather all potentially relevant pieces of information, however innocuous they may appear on their own, from all individuals with whom the student has contact may help to develop a more comprehensive picture of the student's ideas, activities, and plans.  In the end, investigators may find that different people in the student's life have different pieces of the puzzle.

*Key Finding 3*

Most attackers did not threaten their targets directly prior to advancing the attack.

*Implications*

This finding underscores the importance of *not waiting* for a threat before beginning an inquiry.  The *Safe School Initiative* found that most attackers in fact did not threaten their target directly and some made no threat at all.  Instead, other behaviors and communications that may prompt concern, such as hearing that a child is talking about bringing a gun to school, are indicators that the child may pose a threat and therefore should prompt the initiation of efforts to gather information.

School administrators should respond to all students who make threats.  The lack of response could be taken by the threatener as permission to proceed with carrying out the threat.  In the end, however, it is important to distinguish between someone who *makes* a threat–tells people they intend to harm someone–and someone who *poses* a threat–engages in behaviors that indicate an intent, planning, or preparation for an attack.  Those conducting inquiries should focus particular attention on any information that indicates that a student *poses* a threat, regardless of whether the student has told a potential target he or she intends to do them harm.

*Key Finding 4*

There is no accurate or useful profile of students who engaged in targeted school violence.

*Implications*

The demographic, personality, school history, and social characteristics of the attackers varied substantially. Knowing that a particular student shares

characteristics, behaviors, features or traits with prior school shooters does not help in determining whether that student is thinking about or planning for a violent act.

The use of profiles in this way likewise is not an effective approach to identifying students who may pose a risk for targeted school violence at school or for assessing the risk that a particular student may pose for a school-based attack, once a particular student has been identified. Reliance on profiles to predict future school attacks carries two substantial risks: (1) the great majority of students who fit any given profile of a "school shooter" will not actually pose a risk of targeted violence; and, (2) using profiles will fail to identify some students who in fact pose a risk of violence but share few if any characteristics with prior attackers.[26]

Rather than trying to determine the "type" of student who may engage in targeted school violence, an inquiry should focus instead on a student's *behaviors and communications* to determine if that student appears to be planning or preparing for an attack. Rather than asking whether a particular student "looks like" those who have launched school-based attacks before, it is more productive to ask whether the student is engaging in behaviors that suggest preparations for an attack, if so how fast the student is moving toward attack, and where intervention may be possible.

*Key Finding 5*

Most attackers engaged in some behavior, prior to the incident, that caused others concern or indicated a need for help.

*Implications*

Several key findings point to the fact that kids send signals–both directly and indirectly–to others regarding their problems. The boys who engaged in the targeted school violence examined by the *Safe School Initiative* were not "invisible" students. In fact nearly all of these students engaged in behaviors–prior to their attacks–that caused concern to at least one person, usually an adult, and most concerned at least three people.

This finding highlights the range of behaviors in a student's life that may be noticeable and that could prompt some additional probing by a caring adult. A student's family, teachers, friends and others may have information regarding aspects of a student's behavior that has raised concern. As was true in some of the incidents covered in this study, individuals in contact with the attacker may have observed something of concern about that student's behavior, but not of sufficient concern for them to notify anyone in a position to respond.

[26] Please refer to Reddy et al. (2001), "Evaluating risk for targeted violence in schools: Comparing risk assessment, threat assessment, and other approaches," for a full discussion of assessment approaches currently available to schools. The full citation for the article is listed in Appendix C of this document.

Educators and other adults can learn how to pick up on these signals and make appropriate referrals.[27] By inquiring about any information that may have prompted some concern, an investigator may be able to develop a more comprehensive picture of the student's past and current behavior, and identify any indications that the student is intent on or planning to attack. However, discretion should be exercised in determining whom to talk to about the student, so as not to alienate or stigmatize the student of concern. A significant challenge facing schools is to determine how best to respond to students who are already known to be in trouble or needing assistance.

*Key Finding 6*

Most attackers had difficulty coping with significant losses or personal failures. Many had considered or attempted suicide.

*Implications*

Many students, not just those who engaged in school-based attacks, experience or perceive major losses in their lives. Most students who face a significant loss, or who have difficulty coping with such a loss, are not going to be at risk for a school-based attack. However, information that indicates a student is facing or having trouble dealing with a significantly difficult situation may indicate a need to refer the student to appropriate services and resources.

In cases where there is concern about the possibility that a student may engage in targeted violence, attention should be given to any indication that a student is having difficulty coping with major losses or perceived failures, particularly where these losses or failures appear to have prompted feelings of desperation and hopelessness. An inquiry also should anticipate changes in the life of a troubled student, and consider whether these changes might increase–or decrease–the threat the student poses.

*Key Finding 7*

Many attackers felt bullied, persecuted, or injured by others prior to the attack.

*Implications*

Bullying was not a factor in every case, and clearly not every child who is bullied in school will pose a risk for targeted violence in school. Nevertheless, in a number of the incidents of targeted school violence studied, attackers described being bullied in terms that suggested that these experiences approached torment. These attackers

[27] See "Early Warning, Timely Response," listed in Appendix C of this report, for more information about how to identify students who may need assistance.

told of behaviors that, if they occurred in the workplace, likely would meet legal definitions of harassment and/or assault.

The prevalence of bullying found in this and other recent studies should strongly support ongoing efforts to reduce bullying in American schools.[28]  Educators can play an important role in ensuring that students are not bullied in schools and that schools not only do not permit bullying but also empower other students to let adults in the school know if students are being bullied.

*Key Finding 8*

Most attackers had access to and had used weapons prior to the attack.

*Implications*

Access to weapons among some students may be common.  However, when the idea of an attack exists, *any* effort to acquire, prepare, or use a weapon or ammunition may be a significant move in the attacker's progression from idea to action.  Any inquiry should include investigation of and attention to weapon access and use and communications about weapons.  Attention should also be given to indications of any efforts by a student to build a bomb or acquire bomb-making components.

The large proportion of attackers who acquired their guns from home points to the need for schools and law enforcement officials to collaborate on policies and procedures for responding when a student is thought to have a firearm in school.  In particular, schools should be aware of the provisions of the Federal Gun-Free Schools Act, which requires that all schools expel students who bring a gun to school and should report all violations to local law enforcement officials.[29]

*Key Finding 9*

In many cases, other students were involved in the attack in some capacity.

*Implications*

This finding highlights the importance of considering what prompting or encouragement a student may receive from others in his life that influences his intent, planning, or preparations for a potential attack.  Any investigation of potential targeted school violence should include attention to the role that a student's friends or peers may be playing in that student's thinking about and preparations for an

attack.  It is possible that feedback from friends or others may help to move a student from an unformed thought about attacking to developing and advancing a plan to carry out the attack.

*Key Finding 10*

Despite prompt law enforcement responses, most attacks were stopped by means other than law enforcement intervention, and most were brief in duration.

*Implications*

The short duration of most incidents of targeted school violence argues for the importance of developing preventive measures in addition to any emergency planning for a school or school district.  The preventive measures should include protocols and procedures for responding to and managing threats and other behaviors of concern.

---

[28] See, for example, Nansel, T., Overpeck, M., Pilla, R., Ruan, J., Simons-Morton, B., & Scheidt, P. (2001). Bullying behavior among U.S. youth.  *Journal of the American Medical Association, 285*, pp. 2094-2100.
[29] Elementary and Secondary Education Act of 1965, as amended by No Child Left Behind Act of 2001, Title IV, Part A, Subpart 3, Section 4141.

## CHAPTER V

CONCLUSION: THREAT
ASSESSMENT AS A PROMISING
STRATEGY FOR PREVENTING
SCHOOL VIOLENCE

 

Taken together, the findings from the *Safe School Initiative* suggest that some future attacks may be preventable.  Most incidents of targeted school violence were thought out and planned in advance.  The attackers' behavior suggested that they were planning or preparing for an attack.  Prior to most incidents, the attackers' peers knew the attack was to occur.  And most attackers were not "invisible," but already were of concern to people in their lives.

In light of these findings, the use of a threat assessment approach may be a promising strategy for preventing a school-based attack. Educators, law enforcement officials and others with public safety responsibilities may be able to prevent some incidents of targeted school violence if they know what information to look for and what to do with such information when it is found.  In sum, these officials may benefit from focusing their efforts on formulating strategies for preventing these attacks in two principal areas:

- developing the capacity to pick up on and evaluate available or knowable information that might indicate that there is a risk of a targeted school attack; and,
- employing the results of these risk evaluations or "threat assessments" in developing strategies to prevent potential school attacks from occurring.

**Threat Assessment and Targeted School Violence Prevention**

Threat assessment, as developed by the Secret Service and applied in the context of targeted school violence, is a fact-based investigative and analytical approach that focuses on what a particular student is doing and saying, and not on whether the student "looks like" those who have attacked schools in the past.  Threat assessment emphasizes the importance of such behavior and communications for identifying, evaluating and reducing the risk posed by a student who may be thinking about or planning for a school-based attack. The Department of Education and the Secret Service currently are completing work on a publication that will provide school administrators and law enforcement officials with guidance on planning and implementing a threat assessment approach within school settings.[30]

In relying on a fact-based threat assessment approach, school officials, law enforcement professionals and others involved in the assessment will need tools, mechanisms and legal processes that can facilitate their efforts to gather and analyze information regarding a student's behavior and communications.  For example, school and law enforcement personnel should be offered training regarding what information to gather, how to gather and evaluate it, and how they might try to intervene in cases where the information collected suggests a student may be planning or preparing for a school-based attack.

[30] *Supra* note 25.

Several states have enacted legislation that makes it easier for schools to share student information with law enforcement agencies and others who are trying to determine whether a student might be moving toward a school-based attack.[31] Localities and states may wish to explore such options for supporting threat assessment components in schools and facilitating sharing information across school, law enforcement and community systems participating in the threat assessment process.

Finally, educators can play a part in prevention by creating an environment where students feel comfortable telling an adult whenever they hear about someone who is considering doing harm to another person, or even whether the person is considering harming themselves. Once such an environment is created, it will remain important that the adults in that environment listen to students and handle the information they receive in a fair and responsible manner.

---

[31] See "Legal Issues" in Appendix C of this report for listings of documents that include descriptions of state statutes in this area.

APPENDIX



**Appendix A**
INCIDENTS OF
TARGETED SCHOOL
VIOLENCE, BY STATE

**Appendix B**
INCIDENTS OF
TARGETED SCHOOL
VIOLENCE, BY YEAR

**Appendix C**
RESOURCES

**Contact
Information**

 

## INCIDENTS OF TARGETED SCHOOL VIOLENCE, BY STATE

| STATE | TOWN OR COUNTY |
| --- | --- |
| Alabama | Lanett |
| Alaska | Bethel |
| Arkansas | Jonesboro, Stamps |
| California | Anaheim, Napa, Olivehurst, Palo Alto, Redlands |
| Colorado | Jefferson County (Littleton) |
| Florida | Lake Worth |
| Georgia | Conyers, Scottsdale |
| Idaho | Notus |
| Iowa | Manchester |
| Kansas | Goddard |
| Kentucky | Grayson, Union, West Paducah |
| Massachusetts | Great Barrington |
| Mississippi | Pearl |
| Missouri | DeKalb, Patterson |
| Montana | Lewistown |
| New Mexico | Deming |
| New York | Olean |
| North Carolina | Greensboro |
| Oklahoma | Fort Gibson |
| Oregon | Springfield |
| Pennsylvania | Edinboro |
| South Carolina | Blacksville |
| Tennessee | Fayetteville, Lynville |
| Texas | Austin |
| Virginia | Virginia Beach |
| Washington | Moses Lake |
| Wisconsin | Wauwatosa |

## INCIDENTS OF TARGETED SCHOOL VIOLENCE, BY YEAR

| YEAR | MONTH AND DAY |
|------|---------------|
| 1974 | December 30 |
| 1978 | May 18, October 15 |
| | |
| 1985 | January 21 |
| 1986 | December 4 |
| 1987 | March 2 |
| 1988 | December 14 |
| 1989 | October 5 |
| | |
| 1992 | May 1, May 14, December 14 |
| 1993 | January 18, December 1 |
| 1994 | May 26, October 12, November 8 |
| 1995 | January 23, October 12, November 15 |
| 1996 | February 2, February 8, March 25, September 25 |
| 1997 | February 19, October 1, December 1, December 15 |
| 1998 | March 24, April 24, May 19, May 24 |
| 1999 | April 16, April 20, May 20, November 19, December 6 |
| | |
| 2000 | May 26 |

## RESOURCES

**Boys and Violence**

Pollack, W. (1998).  *Real boys: Rescuing our sons from the myths of boyhood*. New York: Henry Holt, Inc.

Pollack, W., & Cushman, K. (2001).  *Real boys workbook*.  New York: Villard.

Pollack, W., & Shuster, T. (2000).  *Real boys' voices*.  New York: Random House.

**Legal Issues**

Medaris, M.L., Campbell, E., & James, B. (1997, June).  *Sharing information: A guide to the Family Educational Rights and Privacy Act and participation in juvenile justice programs*.  Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention and U.S. Department of Education, Family Policy Compliance Office.

Slayton, J. (2000, March).  Establishing and maintaining interagency information sharing.  *JAIBG Bulletin*.  Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

Thomerson, J. (2001, May).  *School violence: Sharing student information*. Denver, Colo.: National Conference of State Legislatures.

**Related Research**

Borum, R. (2000).  Assessing violence risk among youth.  *Journal of Clinical Psychology*, 56, 1263-1288.

Dwyer, K., Osher, D., & Wagner, C. (1998).  *Early warning, timely response: A guide to safe schools*.  Washington, D.C.: U.S. Department of Education.

Fein, R.A., & Vossekuil, B.V. (1999).  Assassination in the United States: An operational study of recent assassins, attackers, and near-lethal approachers.  *Journal of Forensic Sciences, 44*, 321-333.  Available at http://www.secretservice.gov/ntac.htm

**Threat Assessment**

Borum, R., Fein, R., Vossekuil, B., & Berglund, J. (1999).  Threat assessment: Defining an approach for evaluating risk of targeted violence.  *Behavioral Sciences & the Law, 17*, 323-337.  Available at http://www.secretservice.gov/ntac.htm

Fein, R.A., & Vossekuil, B. (1998).  *Protective intelligence & threat assessment investigations: A guide for state and local law enforcement officials* (NIJ/OJP/DOJ Publication No. 170612).  Washington, D.C.: U.S. Department of Justice.  Available at http://www.secretservice.gov/ntac.htm

Fein, R.A., Vossekuil, B., & Holden, G.A. (1995, September).  Threat assessment: An approach to prevent targeted violence.  *National Institute of Justice: Research in Action*, 1-7. Available at http://www.secretservice.gov/ntac.htm

Reddy, M., Borum, R., Berglund, J., Vossekuil, B., Fein, R., & Modzeleski, W. (2001).  Evaluating risk for targeted violence in schools: Comparing risk assessment, threat assessment, and other approaches.  *Psychology in the Schools, 38*, 157-172. Available at http://www.secretservice.gov/ntac.htm

**Web Sites**

United States Department of Education  . . . . . . . . . .www.ed.gov

United States Secret Service  . . . . . . . . . . . . . . . . . .www.secretservice.gov

## CONTACT INFORMATION

**United States Secret Service**
National Threat Assessment Center
950 H Street NW, Suite 9100
Washington, DC  20223
Phone: 202-406-5470
Fax: 202-406-6180
Web site: www.secretservice.gov/ntac

**United States Department of Education**
Safe and Drug-Free Schools Program
400 Maryland Avenue, SW
Washington, DC 20202-6123
Phone: 202-260-3954
Fax: 202-260-7767
Web site: www.ed.gov/offices/OESE/SDFS

**U.S. Department of Education**
Rod Paige
*Secretary*

**Office of Safe And Drug-Free Schools**
Deborah Price
*Deputy Under Secretary*

William Modzeleski
*Associate Deputy*

**U.S. Secret Service**
W. Ralph Basham
*Director*

**Office of Protective Research**
Michael Stenger
*Assistant Director*

**National Threat Assessment Center**
Matthew Doherty
*Special Agent in Charge*

First printed in May 2002.  Revised in May 2004.

This report is in the public domain.  Authorization to reproduce it in whole or in part is granted.  While permission to reprint this publication is not necessary, the citation should be: Vossekuil, B., Fein, R., Reddy, M., Borum, R., & Modzeleski, W., *The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States*. U.S. Department of Education, Office of Elementary and Secondary Education, Safe and Drug-Free Schools Program and U.S. Secret Service, National Threat Assessment Center, Washington, D.C., 2002.

**To order copies of this report,**

**write to:**  ED Pubs, Education Publications Center, U.S. Department of Education, P.O. Box 1398, Jessup, MD 20794-1398;

or **fax** your request to: (301) 470-1244;

or **email** your request to:  edpubs@inet.ed.gov or ntac@secretservice.gov.

or **call** in your request toll-free:  1-877-433-7827 (1-800-4-ED-Pubs).  If 877 service is

not yet available in your area, call 1-800-872-5327 (1-800-USA-LEARN).  Those who use a telecommunications device for the deaf (TDD) or a teletypewriter (TTY), should call 1-800-437-0833.

or **order online** at:  www.ed.gov/pubs/edpubs.html.

This report is also available on the Department of Education's Web site at: www.ed.gov/offices/OESE/SDFS and the U.S. Secret Service Web site at: www.secretservice.gov/ntac.

On request, this publication is available in alternate formats, such as Braille, large print, audiotape, or computer diskette.  For more information, please contact the Department of Education's Alternate Format Center (202) 260-9895 or (202) 205-8113.

"

"

"

"

# EXHIBIT 14

The Washington Post

National • Analysis

# The terrible numbers that grow with each mass shooting

NOV. 17, 2019



Four people killed at a back yard party
in Fresno, Calif.

By Bonnie Berkowitz, Chris Alcantara and Denise Lu
Updated Nov. 18, 2019

*The Orinda, Calif., and Fresno, Calif., shootings are developing
stories, and details will be updated..*

The places change, the numbers change, but the choice of weapon
remains the same. In the United States, people who want to kill a
lot of other people most often do it with guns.

Public mass shootings account for a tiny fraction of the country's
gun deaths, but they are uniquely terrifying because they occur
without warning in the most mundane places. Most of the victims
are chosen not for what they have done but simply for where they
happen to be.

There is no universally accepted definition of a public mass
shooting, and this piece defines it narrowly. It looks at the **170
shootings** in which four or more people were killed by a lone
shooter (two shooters in a few cases). It does not include shootings
tied to robberies that went awry, and it does not include domestic
shootings that took place exclusively in private homes. A broader
definition would yield much higher numbers.

This tally begins Aug. 1, 1966,
when a student sniper fired down
on passersby from the
observation deck of a clock tower
at the University of Texas. By the
time police killed him, 17 other
people were dead or dying. As
Texas Monthly's Pamela Colloff
wrote, the shooting "ushered in the notion that any group of people,
anywhere — even walking around a university campus on a summer
day — could be killed at random by a stranger."

RELATED

The number of U.S.
mass shootings
depends on how you
count ➜

**Public mass shootings are a
small slice of gun deaths**

| | |
|---|---|
| Mass shootings | 77 deaths in 2019 |
| Gun related | 13,243 |

Source: Gun Violence Archive. Excludes the roughly
22,000 annual gun suicides, which are not publicly
reported in real time.

**Search for details of a particular shooting. The most recent is
selected.**



| FRESNO, CALIF. – NOV. 17, 2019 | |
|---|---|
| **Football-watching party shooting** | ▼ |
| Victims: **4** killed and **6** injured   Guns: **2**   Shooters: **2**   Read details ⓘ | |

## 1,220 killed



The people who were killed came from nearly every imaginable
race, religion and socioeconomic background. Their ages range
from the unborn to the elderly; **192 were children and teenagers** .
In addition, thousands of survivors were left with devastating
injuries, shattered families and psychological scars.

CLICK ON AN ICON FOR DETAILS ABOUT EACH VICTIM.



**The oldest victim**

Louise De Kler, 98, still took her pool cue and boombox to the rec room at Pinelake Health and Rehab to play pool with the "young guys," her daughter told the Associated Press. She was shot to death in 2009 by a man who had come to her Carthage, N.C., nursing home looking for his estranged wife.

**The youngest victims**

Eight-month-old Carlos Reyes was buried in a casket with his mother, Jackie, who had tried to shield him as an unemployed father of two opened fire at a busy McDonald's in San Ysidro, Calif., in 1984. Three unborn children are included in the official death tolls from shootings in Austin, Wilkinsburg, Pa., and Sutherland Springs, Texas.

# 324 guns

Shooters often carried more than one weapon; one was found with 24. At least **179 of mass shooters' weapons were obtained legally** and **61 were obtained illegally** . It's unclear how **84 weapons** were acquired.

SILHOUETTES REPRESENT A BASIC TYPE OF GUN RATHER THAN EXACT MAKES OR MODELS. CLICK ON AN ICON FOR DETAILS ABOUT EACH GUN.

**Semiautomatic rifles**

Semiautomatic rifles have been used in some of the country's deadliest shootings, such as those in Newtown, Orlando, San Bernardino and Las Vegas. The AR-15, a lightweight, customizable version of the military's M16, soared in popularity after a 10-year federal ban on assault weapons expired in 2004. Some of the Las Vegas shooter's guns had been fitted with legal devices called "bump-fire stocks," which allow semiautomatic rifles to fire as quickly as automatic ones.

**Semiautomatic pistols**

The country's most popular type of firearm, 9mm semiautomatic handguns, are used by many law enforcement officers. They are generally light and inexpensive, easy to conceal and control, and they fire as quickly as a person can pull the trigger. The gunman who killed 32 students and teachers at Virginia Tech in 2007 used a 9mm semiautomatic Glock 19 (and a .22-caliber Walther P22, another popular caliber). In this data, 9mm semiautomatic handguns show up more than any other weapon.

# 177 shooters

Some of these mass shooters were known to have violent tendencies or criminal pasts. Others seemed largely fine until they attacked. All but 3 were male. The vast majority were between the ages of 20 and 49. More than half — **97 of them** — died at or near the scene of the shooting, often by killing themselves.

**CLICK ON AN ICON FOR DETAILS ABOUT EACH SHOOTER.**



**Women**

The most recent female shooter was a Pakistani mother who helped kill 14 partygoers at her husband's workplace in San Bernardino, Calif., in 2015. The others are an ex-postal worker who killed a former neighbor and six employees at a Goleta, Calif., mail-processing facility in 2006; and a former tribal council chairwoman who killed her brother and three others during an eviction hearing in Alturas, Calif., in 2014.

**Middle-schoolers**

Andrew Golden, 11, and Mitchell Johnson, 13, pulled a fire alarm to flush students and teachers out of their Jonesboro, Ark., middle school in 1998, and began shooting from a wooded perch nearby. They killed four girls and a teacher and wounded 10 others.

# 170 shootings

In the 50 years before the Texas tower shooting, there were just 25 public mass shootings in which four or more people were killed, according to author and criminologist Grant Duwe. Since then, the number has risen dramatically, and many of the deadliest shootings have occurred within the past few years.

**HOVER FOR DETAILS ABOUT EACH SHOOTING.**



## 42 states and the District

Shootings in schools and houses of worship tend to stand out in our minds, but they make up a relatively small portion of public mass shootings. More common are those in offices and restaurant and stores. California has had more of these public mass shootings than any other state, with 28.

HOVER FOR INFO ABOUT EACH SHOOTING.



SCHOOLS　　STORES, RESTAURANTS AND BARS　　OFFICES

PLACE OF WORSHIP　　MILITARY BASES　　OTHER PLACES

Some locations have simply become shorthand for the horrors that occurred there — Columbine, Aurora, Sandy Hook. And some have added other tragic phrases to the national vocabulary.:end

**"Going postal"**

One of the most notorious workplace shootings was carried out by an ex-Marine in an Edmond, Okla., post office in 1986. He killed 14 and wounded six before killing himself. It was the deadliest in a string of rage-fueled killings by current and former postal employees that gave rise to the phrase "going postal."

**"Active shooter"**

The 1999 siege by two seniors at Columbine High School in Colorado became a turning point after which school shootings could no longer be considered unthinkable aberrations. After a confused response that played out over several hours while a wounded teacher bled to death, U.S. law enforcement agencies overhauled procedures and officer training to create protocols for stopping an "active shooter."

**"Lockdown drill"**

After Columbine, many schools created safety plans so that children and educators would know what to do during an attack. After Sandy Hook, "lockdown drills" became as common as fire drills. No children were killed at the Rancho Tehama Elementary School shooting in California in 2017, when fast-acting educators and students executed lockdown procedures that kept the gunman out of the school.

*Additional contributions by Alex Horton, Lazaro Gamio, Kevin Uhrmacher, Richard Johnson and Ted Melnik.*

**About this story**

This data is compiled from Grant Duwe, author of "Mass Murder in the United States: A History," Mother Jones and Washington Post research.

Death tolls include victims killed by shooters within a day of the main shooting, including any who were killed in another way. Totals also include people who later died from injuries received during the shootings. Injuries include everyone reportedly hurt in the event, not just gunshot injuries. A gun purchase that should have been rejected but was allowed because of a bureaucratic or reporting glitch is considered illegal. Reports disagree on some ages in this dataset.

Additional sources: Violence Policy Center, Gun Violence Archive; FBI 2014 Study of Active Shooter Incidents; published reports.

This is an updated version of a piece originally published in December 2015.

Originally published Feb. 14, 2018.

Share   🐦   f   ✉   in    💬 Comments

---

**More stories**

### A gunman opens fire in your building. What do you do?

What would you do if someone walked into the building you are in right now and started shooting?







### Mass shootings: How U.S. gun culture compares with the rest of the world

After mass shooting events, much debate centers around Americans' relatively easy access to guns.



**Most Read**

**Follow Post Graphics**

🐦 Twitter    f Facebook    t Tumblr

**GZJ IDKV'37"**

# MotherJones

# A Guide to Mass Shootings in America

*There have been at least 115 in the past four decades—and most of the killers got their guns legally.*

**MARK FOLLMAN, GAVIN ARONSEN, AND DEANNA PAN**    **UPDATED: NOV. 18, 2019, 8:30 A.M. PT**

**In July 2012,** in the aftermath of the movie theater massacre in Aurora, Colorado, *Mother Jones* created a first-of-its-kind **open-source database documenting mass shootings** in the United States. Our research focused on indiscriminate rampages in public places resulting in four or more victims killed by the attacker. We exclude shootings stemming from more conventionally motivated crimes such as armed robbery or gang violence. (Or in which the perpetrators have not been identified.) Other news outlets and researchers have since published larger tallies that include a wide range of gun crimes in which four or more people have been either wounded or killed. While those larger datasets of multiple-victim shootings are useful for studying the broader problem of gun violence, our investigation provides an in-depth look at a distinct phenomenon—from the firearms used and mental health factors to the growing copycat problem. Tracking mass shootings is complex; we believe ours is the most useful approach for studying this specific phenomenon.



**Can the next attack be prevented?**

Since we began, our interactive map below and the downloadable database behind it have been expanded with 53 additional cases from 2013-2019. Dating back to at least 2005, the FBI and leading criminologists essentially defined a mass shooting as a single attack in a public place in which four or more victims were killed. We adopted

that baseline for fatalities when we gathered data in 2012 on three decades worth of cases. (It is important to note that there have been many similar indiscriminate gun rampages in public places—but resulting in fewer fatalities—that would otherwise be included in our dataset. In that regard, ours is a conservative measure of the problem.) In January 2013, a mandate for federal investigation of mass shootings authorized by President Barack Obama lowered that baseline to three or more victims killed. Accordingly, we include attacks dating from January 2013 in which three or more victims were killed. (Any analysis of the frequency of mass shootings using our database should account for this.) Our original analysis, which covers cases from 1982-2012 with four or more victims killed, follows below. The cases we've documented since then using the revised federal baseline reaffirm our major analytical findings.



[Zoom in to view multiple cases located in close proximity. **View and download the full database behind the map here.**]

*Additional reporting and production contributed by: **AJ Vicens, Olivia Exstrum, Tasneem Raja, Jaeah Lee,** and **Maggie Caldwell**.*

**It is perhaps too easy** to forget how many times this has happened. The gun massacre at a movie theater in Aurora, Colorado, in July 2012, another at a Sikh temple in Wisconsin that August, another at a manufacturer in Minneapolis that

September—and then the unthinkable nightmare at a Connecticut elementary school that December—were some of the latest in an epidemic of such gun violence over the last three-plus decades. Since 1982, there have been at least 115 public mass shootings across the country, with the killings unfolding in 34 states, from Massachusetts to Hawaii. They are occurring more often: An analysis of this database by researchers at Harvard University, further corroborated by a different study from the FBI, determined that mass shootings have tripled in frequency in recent years.

We've gathered detailed data on nearly four decades worth of cases, including information on the attackers' profiles, the types of weapons they used, and the number of victims they injured and killed. [*Editor's note:* The following analysis covers our original dataset comprised of 62 cases from 1982-2012.]

**Weapons:** Of the 143 guns possessed by the killers, more than three quarters were obtained legally. They included dozens of assault weapons and semi-automatic handguns with high-capacity magazines. (See charts below.) Just as a perpetrator used a .40-caliber Glock to slaughter students in Red Lake, Minnesota, in 2005, so too did the one in Aurora, along with an AR-15 assault rifle, when blasting away at his victims in a darkened movie theater. In Newtown, Connecticut, the attacker wielded a .223 Bushmaster semi-automatic assault rifle as he massacred 20 school children and six adults.

**The perpetrators:** More than half of the cases involved school or workplace shootings (12 and 20, respectively); the other 30 cases took place in locations including shopping malls, restaurants, and religious and government buildings. Forty-four of the killers were white males. Only one was a woman. (See Goleta, Calif., in 2006.) The average age of the killers was 35, though the youngest among them was a mere 11 years old. (See Jonesboro, Ark., in 1998.) A majority were mentally troubled—and many displayed signs of mental health problems before setting out to kill. Explore the above map and database for further details—we do not consider it to be all-inclusive, but based on the criteria we used, we believe that we have produced the most comprehensive rundown available on this particular type of violence. (Mass shootings represent a small fraction of America's overall gun violence.) For the stories of the 151 shooting rampage victims of 2012, click here, and for our groundbreaking investigation into the economic costs of the nation's gun violence, including mass shootings, click here.

Here is a description of the criteria we use:

- **The perpetrator took the lives of at least four people**. A 2008 FBI report identifies an individual as a mass murderer—versus a spree killer or a serial killer—if he kills four or more people in a single incident (not including himself), typically in a single location. (*In 2013, the US government's fatality baseline was revised down to three; our database reflects this change beginning from Jan. 2013, as detailed above.)

- **The killings were carried out by a lone shooter**.
  (Except in the case of the Columbine massacre and
  the Westside Middle School killings, which involved
  two shooters.)

- **The shootings occurred in a public place.** (Except
  in the case of a party on private property in
  Crandon, Wisconsin, and another in Seattle, where
  crowds of strangers had gathered, essentially
  constituting a public crowd.) Crimes primarily
  related to gang activity or armed robbery are not
  included, nor are mass killings that took place in
  private homes (often stemming from domestic
  violence).

- **Perpetrators who died or were wounded** during
  the attack are not included in the victim tallies.

- **We included a handful of cases also known as
  "spree killings"**—cases in which the killings
  occurred in more than one location, but still over a
  short period of time, that otherwise fit the above
  criteria.

For more on the thinking behind our criteria, see these two explanatory pieces. Plus:
more on the mental health factor and on state laws rolling back gun restrictions
across the US. And: Explore the full data set behind our investigation.

Here are two charts detailing the killers' weapons:

This guide was first published on July 20, 2012. Since then, we've updated and
expanded it numerous times with additional research and reporting. The analysis and
charts above cover the data through 2012 (comprising 62 cases); additional data and
analysis on the shooters' weapons are in this story. Information on 53 additional mass
shootings from 2013-2019 is included in our full data set here. For much more of our
reporting on mass shootings, gun violence, and gun laws, see our special
investigations: America Under the Gun and The True Cost of Gun Violence.

Case 3:19-cv-01226-L-AHG   Document 34-5   Filed 01/03/20   PageID.6318   Page 51 of 76

Copyright © 2019 Mother Jones and the Foundation for National Progress. All Rights Reserved.

# EXHIBIT 16

# K-12 School Shooting Database

SHOOTING INCIDENTS GRAPHS 2010-PRESENT

### INCIDENTS BY CALIBER OF FIREARM
*Based on publicly available data from 2010-present*

Date
Last 10 years ▼

# EXHIBIT 17

5/17/2018
Case 3:19-cv-01226-L-AHG    Document 34-5    Filed 01/03/20    PageID.6322    Page 55 of 76
America's Youth Under Fire - Center for American Progress
Introduction and summary







# Center for American Progress

GUN VIOLENCE PREVENTION

# America's Youth Under Fire

The Devastating Impact of Gun Violence on Young People

By Chelsea Parsons, Maggie Thompson, Eugenio Weigend Vargas, and Giovanni Rocco Posted on May 4, 2018, 9:02 am



Getty/Melina Mara

Students from across the Washington, D.C., area filled the west lawn of the U.S. Capitol demanding congressional action concerning gun violence, March 2018.

**OVERVIEW**

Young people in the United States bear the brunt of the nation's gun violence and are leading efforts to stop it.

**PRESS CONTACT**                                                            ⌄

# Introduction and summary

On February 14, 2018, 14 students and three staff members were murdered at Marjory Stoneman Douglas High School in Parkland, Florida, by a single shooter armed with an assault rifle. This horrific massacre galvanized the nation's attention to the issue of gun violence, particularly as it affects young people in this country. However, the scope of gun violence as it affects America's youth is much vaster than this most recent mass shooting. Gunfire has officially overtaken car accidents as one of the leading killers of young people in the United States.[1] As of publication time, since the beginning of 2018, 820 teens ages 12 to 17 have been killed or injured with a gun.[2] As mass shootings become more common and more deadly, a staggering 57 percent of teenagers now fear a school shooting.[3]

The epidemic of gun violence against America's youth is more than just a disturbing data point. For each bullet fired, there are multiple stories of lives changed forever. When he was just 6 years old, Missouri State Rep. Bruce Franks Jr. saw his brother shot in front of their neighbor's home.[4] Nevada activist Mariam El-Haj witnessed the shooting of her mother by her estranged father, who then turned the gun on Mariam.[5] Oregon youth mentor Jes Phillip's siblings have all had close calls—she has three younger sisters who were present at the Reynolds High School shooting in Troutdale, Oregon, and two bullets landed next to her brother's bed when they came through her family's apartment wall during a neighborhood shooting.[6] Nineteen- year-old student Eli Saldana, a member of the Native American community living in Chicago, was shot on his walk home from work.

**SUBSCRIBE TO *INPROGRESS***

Email

SUBSCRIBE

These stories of gun violence are all too common among young Americans. The United States' gun violence epidemic disproportionately ravages young people, particularly young people of color. In short, gun violence is shattering a generation.

Young people are not simply victims of gun violence in this country, they are among the leading voices calling for change to the nation's weak gun laws and deadly gun culture. Organizers of the Black Lives Matter movement; survivors of the Parkland shooting; youth organizers working in cities hardest hit by gun violence, such as Chicago, Baltimore, and St. Louis, have all lent their voices to an increasingly loud call to action.

These young people do not just want to reform gun laws—they are also demanding that the issue of gun violence be examined as part of a complex and intersectional web of issues that also include community disinvestment, criminal justice reform, and policing. They are advocating not only for solutions to make

5/17/2018    Case 3:19-cv-01226-L-AHG    Document 34-3    Filed 01/03/20    PageID.6324    Page 57 of 76
America's Youth Under Fire - Center for American Progress

Introduction and summary

This report breaks down how gun violence is affecting young people, and how young activists are rising to build an intersectional movement working for solutions. It examines the specific impact of gun violence on young people and considers both how young people as a collective are disproportionately affected and how different communities of young people share different aspects of the burden of this violence. This report also highlights examples of young people leading the advocacy efforts around this issue and discusses a number of policy solutions that are crucial to reducing gun violence, reforming the criminal justice system, improving police-community relations, and encouraging reinvestment in impacted communities.

## Impact of gun violence on young people: A national overview

Young people make up a very small percentage of all deaths in the United States each year. Consider 2016: That year, more than 2.7 million people in the United States died, with the top-three leading causes of death being heart disease, cancer, and unintentional injuries.[7] Of these 2.7 million deaths, only 2.2 percent were individuals between the ages of 15 and 29.[8] However, looking only at deaths caused by gunfire, the picture changes dramatically. Young people in this age range accounted for 31 percent of all gun deaths in 2016 and nearly 50 percent of all gun-related homicides.[9]



FIGURE 1

**Young people ages 15 to 29 made up a large share of gun-related deaths in 2016**
Percentage of deaths in 2016, by age and cause

Source: CAP analysis of Centers for Disease Control and Prevention, "About Underlying Cause of Death, 1999-2016," available at https://wonder.cdc.gov/ucd-icd10.html (last accessed April 2018).

5/17/2018 Case 3:19-cv-01226-L-AHG Document 34-3 Filed 01/03/20 PageID.6325 Page 58 of 76
America's Youth Under Fire - Center for American Progress

Introduction and summary

States and was second only to drug overdose. Following decades of advocacy and policymaking to make automobiles and driving safer, the number of young people killed in car accidents has steadily declined. In contrast, years of relative inaction to reduce U.S. gun violence has led to the number of gun deaths among young people between the ages of 15 to 29 to rise, with 11,947 individuals in this age group dying as the result of gun violence in 2016.[10]



FIGURE 2

**Gun violence recently surpassed vehicle accidents as a leading cause of death for young Americans ages 15 to 29**

Total gun-related deaths versus vehicle-related deaths of young Americans, 1999–2016

Source: Centers for Disease Control and Prevention, "Fatal Injury Reports, National, Regional and State (RESTRICTED), 1999–2016," available at https://webappa.cdc.gov/cgi-bin/broker.exe (last accessed April 2018).

### DeJuan's story

The summer before he started his senior year of high school in 2005, DeJuan Patterson, now 29, was walking home from work when he was approached by a man who robbed him of his belongings and then shot him in the head. His body went into shock, but when he gathered the strength to open one of his eyes, he stared into the barrel of another gun, this time from the Baltimore police.

Patterson has relived that harrowing incident in his mind countless times and wondered what would prompt a police officer to revictimize a man sprawled on the ground bleeding from a gunshot wound to the head instead of offering help. Patterson understands that what he went through is something all too familiar to many black men, many of whom are victims of gun violence in their neighborhoods and at the hands of police. And while Patterson can make no sense of the police officer's actions that night, he has focused his energy on speaking up against gun violence, for the need for policing reform, and for investment in youth outreach and community engagement.

Leadership Council and is a leader in his Baltimore community. [11]

Young people are also overrepresented in another category of gun deaths: fatal shootings by police. The use of lethal force by police has been a top concern in many communities for decades and gained increased attention nationwide in the wake of a spate of fatal shootings of unarmed black men in recent years. The criminal justice system deems most fatal shootings by police officers justified as a lawful use of force. Each of these deaths, however, has a significant impact on the community and its relationship with law enforcement—particularly in communities of color that have a deep and complicated history with their local police department. These police shootings are a core part of what gun violence looks like in many communities across the country. [12] According to data collected by The Washington Post, in the nearly 3,300 fatal shootings by police from January 2015 through April 2018, approximately 31 percent of the victims were between the ages of 18 and 29. This means that a young person is shot and killed by a police officer in the United States almost every day. [13] Out of the young people fatally shot by police officers, 34 percent were African American, among which at least 12 percent were unarmed. [14]

In addition, young people are at a heightened risk for being victims of violent crime involving a gun. Data from the National Crime Victimization Survey suggests that close to 840,000 young people between the ages of 15 and 29 were victims of violent crimes involving a firearm from 2012 to 2016. [15] When compared to other age groups, young people present the highest rate of victimization at a rate that is 69 percent higher than the national average. [16]

### Jes' story

Jes Phillip, 28, moved with her family from Micronesia to Portland, Oregon in 2008. As a teenager at the time, she left behind a country that experiences little to no gun violence to live a city neighborhood where gun violence was—and still is—part of daily life. Phillip made it to college without directly experiencing a shooting herself. However, all of her siblings were directly affected by gun violence in their school. On June 10, 2014, a student walked into Reynolds High School where Phillip's three younger sisters were present, armed with two guns, nine ammunition magazines, and a knife. A teacher was injured, and a student was shot and killed before the gunman committed suicide. [17]

Gun violence touched Phillip's life again just a year later when two stray bullets tore through the wall of her family's apartment, landing next to her brother's bed. That same day, several bullets peppered different apartments in her neighborhood, killing one of her neighbors. [18]

routine. She is afraid that this issue continues to threaten her child, her students at Parkrose High School, her family, and her community. Despite this, she has turned fear into action, by speaking out, sharing her story, and mobilizing her local community for gun reform.

**Eli's story**

On the evening of December 5, 2017, Eli Saldana, a 19-year-old Native American who lives in Chicago, was just walking home when he was shot. Right before he was attacked, he noticed a man walking behind him. When he turned around to look, Saldana was hit with the butt of the gun on the left side of his temple. As he tried to run away the man fired his gun. The bullet entered Saldana's right calf muscle but fortunately he escaped, making it home with his life.

Like Saldana, 70 percent of American Indians and Alaska Natives live in urban areas[19] and are thus exposed to the dangers of gun violence, like other racial minority groups. Saldana now lives with the physical scar of the bullet wound and the emotional scars of the event. However, he has used his traumatic experience to educate young people on gun violence and avoiding gang life. He's taken up music and uses that to connect with his nieces, nephews, and other Native American youth in hopes of being a positive role model.[20]

## Different communities, different impacts

Generation Z and Millennials are the largest and most diverse generations in American history, and the burden of gun violence does not fall equally across their communities. Young African Americans, for example, face an exponentially higher risk of being the victim of a gun murder compared to young people of other races in the United States. African Americans between the ages of 15 and 29 are 18 times more likely than their white peers to be the victim of a gun homicide.[21] While African Americans accounted for 15 percent of the population of young people in this age range, they comprise 64 percent of gun homicide victims.[22] This dynamic is present among both men and women—young African American women, although they represent a small portion of gun-related homicides overall, are six times more likely than young white women to be the victim of a gun homicide.[23] Young Hispanics also face higher rates of gun homicides, with rates that are four times higher than their white peers.[24]

**of gun homicide than young people of other races**

Gun homicides per every 100,000 young people, by race and ethnicity, 2007–2016



| | |
|---|---|
| Asian | 1.90 |
| White | 2.29 |
| American Indian and Native Alaskan | 7.55 |
| Hispanic | 8.79 |
| African American | 40.79 |

Notes: For data on Asian, white, American Indian and Native Alaskan, and African American gun homicides, the authors selected "non-Hispanics" in the "Hispanic Origin" search menu. The national rate of gun homicide is 9.39 deaths per every 100,000 young people. Data are for young Americans ages 15–29.
Source: Centers for Disease Control and Prevention, "Fatal Injury Reports, National, Regional and State (RESTRICTED), 1999–2016," available at https://webappa.cdc.gov/cgi-bin/broker.exe (last accessed April 2018).

**CAP**

2 In contrast, gun suicides disproportionately impact white and Native American youth in the United States. From 2007 to 2016, the gun suicide rate among young white Americans was 2.6 times higher than Hispanics, 1.7 times higher than African Americans, and 3.5 times higher than Asian Americans.[25] Similarly, young American Indians and Native Alaskans presented a rate that was 3.7, 2.4, and 5.1 times higher than the rates among Hispanics, African Americans, and Asians, respectively.[26] A young Native American commits suicide with a gun every six days in the United States.[27] These numbers likely do not tell the whole story, as studies have found that overall deaths for American Indian or Alaska Native populations are underreported by 30 percent.[28] The elevated rate of suicide among young Native Americans presents a serious concern for tribal leaders, and as the National Congress of American Indians explained in 2015, "The higher incidence of suicide in Native peoples is informed by a long history of systemic discrimination and abuse."[29]



FIGURE 4

**There is an elevated rate of gun suicide among American Indian and Native Alaskan young people**

Gun suicides per every 100,000 young people, by race and ethnicity, 2007–2016

| | |
|---|---|
| Asian | 2.03 |
| Hispanic | 2.76 |
| African American | 4.26 |
| White | 7.12 |
| American Indian and Native Alaskan | 10.30 |

Notes: For data on Asian, white, American Indian and Native Alaskan, and African American gun suicides, the authors selected "non-Hispanics" in the "Hispanic Origin" search menu. The national rate of gun suicide is 5.54 per every 100,000 young people. Data are for young Americans ages 15–29.
Source: Centers for Disease Control and Prevention, "Fatal Injury Reports, National, Regional and State (RESTRICTED), 1999–2016," available at https://webappa.cdc.gov/cgi-bin/broker.exe (last accessed April 2018).

**CAP**

homicides of women.

3   The experience of gun violence among young people varies widely depending on location. While the national numbers tell a disturbing story about the extent to which young lives in the United States are taken by gunfire, the reality is that a young person's risk of becoming a victim of gun violence depends, largely, on where they live.

4   While approximately 17 young people are murdered with a gun every day in the United States, this risk is not borne equally by young people across the country.[30] The gun homicide rate of young people ages 15 to 29 varies dramatically from state to state. Louisiana has the highest rate of gun homicides of young people in the country, followed by Maryland, Mississippi, Alabama, and Illinois.[31] The average gun homicide rate of young people in these five states is 14 times higher than the average of the five states with the lowest rates: Hawaii, New Hampshire, North Dakota, Vermont, and Maine.[32] Louisiana's rate alone is more than 2.6 times higher than the national rate and 47 percent higher than Maryland's rate, the second-ranking state.[33]



Gun homicides per every 100,000 young people, by state, 2007–2016



Note: The national rate of gun homicide is 9.39 per every 100,000 young people. Data are for young Americans ages 15–29.
Source: Centers for Disease Control and Prevention, "Fatal Injury Reports, National, Regional and State (RESTRICTED), 1999–2016,"
available at https://webappa.cdc.gov/cgi-bin/broker.exe (last accessed April 2018).

**CAP**

although with a different distribution among the states. Alaska has the highest rate of gun suicide among people ages 15 to 29, followed by Wyoming, Montana, New Mexico, and Idaho. Massachusetts, New Jersey, Rhode Island, New York, and Connecticut have the lowest rates.[34] Young people in the five highest ranking states are 10 times more likely to die by gun suicide than young people in the five lowest ranking states.[35]



Gun suicides per every 100,000 young people, by state, 2007–2016

Note: The national rate of gun suicide is 5.54 per every 100,000 young people. Data are for young Americans ages 15–29.
Source: Centers for Disease Control and Prevention, "Fatal Injury Reports, National, Regional and State (RESTRICTED), 1999–2016,"
available at https://webappa.cdc.gov/cgi-bin/broker.exe (last accessed April 2018).

on geography is gun homicides of women by intimate partners or family members. The risk posed by the presence of a gun in domestic violence situations is well established, particularly with respect to women of all ages.

7　Research has shown that the presence of a gun in a domestic violence situation increases the risk of homicides against women by 500 percent.[36] Young women in abusive relationships face a substantial risk by partners or family members with access to guns. From 2006 to 2015, 36 percent of murders of young women between the ages of 15 and 29 were committed by an intimate partner or family member, and 54 percent of those murders were committed with a gun.[37] Indeed, young women are more vulnerable to domestic violence gun homicides when compared to other women. From 2006 to 2015, the rate of domestic violence gun homicides of young women was 30 percent higher than for women of all ages.[38] This statistic is mainly driven by violence in dating-partner relationships. From 2006 to 2015, out of the more than 1,550 young women killed with a gun in domestic violence situations, 65 percent were murdered by a dating partner.[39]

### Mariam's story

Mariam El-Haj, 26, grew up in south Texas in a strict, multicultural family. While she had a tense relationship with her father, nothing prepared her for what happened on June 15, 2012. Mariam was at home with her boyfriend, mother, and two sisters, when her estranged father broke into the house wielding a handgun. Angered by an ongoing divorce from his wife and enraged by his daughter having a boyfriend, El-Haj's father unleashed a volley of bullets. El-Haj was shot two times, her mother was shot twice, and Mariam's boyfriend was shot once. After six shots were fired, one of Mariam's sisters was able to take the gun from her father.

Miraculously, everyone survived, but the memory lives in the family's mind, continuing to torment them years after the incident. After her traumatic event, El-Haj decided that she wanted to use her voice so no one else would have to share her experience. She is an outspoken advocate for gun violence prevention; joined Generation Progress' Fight4AFuture National Leadership Council; and regularly shares her powerful story in order to push for tougher restrictions on the ability of domestic abusers to acquire guns.[40]

8　Again, the risk varies widely from state to state. Louisiana, Nevada, and Tennessee have the highest rates of gun homicides of young women by intimate partners or family members, while Illinois, Massachusetts, Hawaii, and Iowa have the lowest.[41]



Domestic violence gun homicides per every one million young women, by state, 2007–2016

Note: Data are for young American women ages 15–29. The national average is estimated with information from 49 states. Data from the state of Florida is not included.
Source: Federal Bureau of Investigation, *Supplemental Homicide Data* (U.S. Department of Justice, 2006–2015).

three categories for people ages 15 to 29: gun homicides, suicides, and domestic violence gun homicides of women. In contrast, 11 states are not among the 25 worst in any of these categories.

10  There are many factors that influence the rate of gun violence in a particular state, and attempting to parse out the precise reasons behind these rates has been a frequent subject of academic research. One factor that appears to have a significant effect is the relative strength of a state's gun laws. A 2016 CAP study found that the 10 states with the weakest gun laws collectively had rates of gun violence that were 3.2 times higher than the 10 states with the strongest gun laws.[42] Similarly, relative strength of gun laws seems to be a factor in the state-to-state variations in gun death rates among young people. Out of the 11 states that ranked among the 25 worst in all three categories, nine received an "F" by the Giffords Law Center to Prevent Gun Violence for the strength of their gun laws, the lowest possible score.[43]

# Young people are at the center gun violence solutions

11  Long before the student survivors at Marjory Stoneman Douglas High School turned their grief into action,[44] young people, especially young African Americans and Latinos, have been working to curb gun violence in their communities. Being the communities that gun violence affects the most, young people have been at the forefront in the fight to end cyclical violence, mass shootings, and suicide. Survivors and students from Virginia Tech mobilized to push for tougher gun safety measures across the United States.[45] After the June 2016 massacre at the Pulse nightclub in Orlando, Florida, young LGBTQ leaders stepped up to demand immediate action on gun laws.[46] The groundwork these and other young activists laid contributed to the recent enactment of a package of new gun laws in Florida in March 2018.[47]

12  Young people's activism is not limited to responding to mass shootings nor is it limited to legislative solutions. The Parkland students had a blueprint for success modeled after the work of Black Lives Matter organizers who, for years, have organized in communities across the country to pressure elected officials to fix broken systems and laws that are not serving a majority of people.[48] Young black leaders in the United States have used the tools at their disposal, including personal narratives and social media, to light up a movement that, since its inception, has shifted the national conversation and resulted in positive and concrete changes to laws around the country.

## Policy options to reduce gun violence

13  A Harvard University poll showed that almost two-thirds of Americans under 30 support stronger gun laws.[49] Young people understand that legislative action is key to ending the gun violence epidemic, but they also understand that further steps must be taken. In addition to stronger gun laws, youth leaders have demanded support for community-based violence intervention programs and ensuring sufficient data and research to

demand immediate attention from lawmakers, the following six priority policies are among the most urgent and would have a significant impact on saving young lives.

- **Ban assault weapons and high capacity magazines.** Assault weapons and high-capacity magazines dramatically increase the lethality of shootings. For example, a review of mass shootings found that 155 percent more people were shot and 47 percent more people were killed when assault weapons or large-capacity magazines were used.[50] Assault weapons and guns equipped with high capacity magazines, together, account for up to 36 percent of guns used in crime.[51]

- **Enable the Centers for Disease Control to research gun violence as a public health issue.** In 1996, Congress imposed new restrictions on the ability of the Centers for Disease Control and Prevention (CDC) to study gun violence and drastically cut the funding available for this research. Since then, the CDC's annual funding for this research has fallen 96 percent, leaving many gaps in our knowledge regarding gun violence.[52]

- **Require background checks for all gun sales.** Under current federal law, only gun sales conducted by a gun dealer require a background check. Sales by private sellers at gun shows, online, or anywhere else can be completed without a background check and with no questions asked.[53]

- **Support local violence prevention and intervention programs.** Community-based programs that engage all local stakeholders to address gun violence are a crucial part of reducing gun deaths. These evidence-based programs can have a significant effect. For example, from 2011 to 2016, three cities in Connecticut experienced a 50 percent decline in gun homicides thanks to the Group Violence Intervention Program.[54] Similarly, between 2007 and 2016, Richmond, California, saw a 71 percent reduction in gun violence leading to injury or death due to a comprehensive strategy that addressed gun violence in the city.[55]

- **Disarm all domestic abusers.** Current federal law only prohibits some domestic abusers from buying and possessing guns, but abusers in dating relationships, those convicted of stalking, and those subject to temporary restraining orders are free to buy guns under federal law. These gaps in the law put many young women at risk. [56]

- **Make extreme risk protection orders available in every state**. This is a tool that allows family members or law enforcement officers to request that a court temporarily remove firearms from a person who has shown signs of being a risk of harm to themselves or to others. This type of law has already shown promising results in states where it has been enacted. Researchers found that for every 10 to 20 such orders issued in Connecticut, one life was saved.[57]

Along with these proposals, young people understand that curbing the epidemic of gun violence requires a comprehensive gun violence reduction strategy that places the problem in context with the criminal justice

reinvestment in areas hardest hit by gun violence is just as essential to reducing gun violence as solutions that regulate firearms. Examples of these policies include:

- **Youth jobs programs.** Economic opportunities for young people are key to violence reduction. Programs such as the summer jobs programs in Chicago[58] and Boston[59] have demonstrated significant reductions in violent crime among youth from neighborhoods hard hit by gun violence.

- **Reinvestment in high-quality education programs in areas suffering from gun violence.** For students in areas most affected by gun violence, investing in education programs are key to achieving violence reduction. Similar to how jobs programs offer economic opportunity, high-quality educational opportunities—through funding to ensure high-quality schooling, including after-school programming,[60] and education for youth in prison[61]—are important to curbing cyclical gun violence among young people.

- **Implement trauma-informed education programs**. Young people dealing with trauma, given their generation's high-level of exposure to gun violence in the United States, must be provided support. Investing in trauma-informed education programs in schools has proved effective at increasing resiliency among children suffering from trauma[62] and reducing recurring violence in communities.[63]

- **Smart on crime approaches to criminal justice**. Cities that implement local efforts to reduce unnecessary arrests and incarceration as well as promote re-entry success by removing significant barriers to opportunity for the formerly incarcerated help to make communities safer. These programs have been implemented in cities such as Philadelphia, New York, Washington, D.C., and Los Angeles. These "second chance" cities offer an alternate path for system-involved individuals that reduces recidivism and can serve as a key part of reducing violence.[64]

### Bruce's story

Bruce Franks Jr., 33, a leader in Generation Progress' Fight4AFuture gun violence prevention network, is no stranger to gun violence. Growing up in St. Louis, Missouri, he's been exposed to gun violence from an early age. When he was just 6 years old, he saw his 9-year-old brother shot and killed in front of a neighbor's house. In 2004, as a young man, a stray bullet struck him in the knee, ending his track career. Gun violence, however, was not the only barrier Franks faced growing up. He quickly realized how systematic racism and an unjust criminal justice system impacted his life and his community as well.

Following the fatal shooting of Michael Brown in Ferguson, Missouri, Franks became a leader in the Black Lives Matter movement during the protests in the wake of the shooting. He went on to build civic power by becoming a liaison between the community and the St. Louis Police Department. Then, in 2016, he ran and won a seat in the Missouri state legislature. As a state representative, Franks has

Case 3:19-cv-01226-L-AHG    Document 34-3    Filed 01/03/20    PageID.6338    Page 71 of 76

his first legislative victory last year when he secured $6 million for Missouri's youth summer jobs program in the state's budget. In announcing the summer jobs program Franks said, "[T]hat's 2,700 youths off the streets, doing something productive."[65]

# Conclusion

[5] Young people should not have to live in fear of being gunned down. Not in their schools, not in their churches, not in their neighborhoods—nowhere. All forms of gun violence need to be eradicated wherever present and elected leaders must heed the calls of the young people leading the movement. The solutions exist, and young people have been loud and clear in their demands. It is now time for policymakers to act.

# About the author

[6] **Chelsea Parsons** is the vice president of Gun Violence Prevention at American Progress. Her work focuses on advocating for progressive laws and policies relating to gun violence prevention and the criminal justice system at the federal, state, and local levels. In this role, she has helped develop measures to strengthen gun laws and reduce gun violence that have been included in federal and state legislation and executive actions. Prior to joining the Center, Parsons was general counsel to the New York City criminal justice coordinator, a role in which she helped develop and implement criminal justice initiatives and legislation in areas including human trafficking, sexual assault, family violence, firearms, identity theft, indigent defense, and justice system improvements. She previously served as an assistant New York state attorney general and a staff attorney clerk for the 2nd U.S. Circuit Court of Appeals.

[7] **Maggie Thompson** is the executive director of Generation Progress. Prior to joining Generation Progress, Thompson served in the Obama administration at the White House Council on Environmental Quality as well as in the Office of the Director at U.S. Citizenship and Immigration Services. She has bachelor's degrees in economics and classical archaeology from Macalester College.

[8] **Eugenio Weigend** is the associate director for Gun Violence Prevention at American Progress. His work is focused on public security. He has conducted research on gun violence, arms trafficking, and firearm regulations in the United States. He has a Ph.D. from Tecnologico de Monterrey and a master's degree in public affairs from Brown University.

people in the media. Before joining Generation Progress, Rocco was a field organizer with the Florida Democratic Party in Broward County, where he mobilized hundreds of volunteers on behalf of progressive issues and candidates. He graduated from Florida State University in 2016 with a B.S. in political science and a B.A. in media studies.

# Endnotes

1. Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html (last accessed April 2018). ↩

2. Gun Violence Archive "Gun Violence Archive 2018," available at http://www.gunviolencearchive.org/ (last accessed May 2018). Data form January 1, 2018 to April 30, 2018. ↩

3. Nikki Graf, "A majority of U.S. teens fear a shooting could happen at their school, and most parents share their concern," Pew Research Center, April 18, 2018, available at http://www.pewresearch.org/fact-tank/2018/04/18/a-majority-of-u-s-teens-fear-a-shooting-could-happen-at-their-school-and-most-parents-share-their-concern/?utm_source=newsletter&utm_medium=email&utm_campaign=newsletter_axiospm&stream=top-stories. ↩

4. Doug Moore, "From Ferguson protestor to state legislator, Bruce Franks Jr. says he will never stop fighting." *St. Louis Post Dispatch,* November 12 2017, available at http://www.stltoday.com/news/local/govt-and-politics/from-ferguson-protester-to-state-legislator-bruce-franks-jr-says/article_e2fc824e-3cdf-5d4b-8b32-91e5fa72549c.html. ↩

5. Ildefonso Ortiz, "Mission man to serve 30 years in prison for shooting family," *The Monitor,* May 16 2013, available at http://www.themonitor.com/news/local/article_bfe79f20-bdbf-11e2-9bfc-001a4bcf6878.html. ↩

6. Maxine Bernstein, "Oregon school shooting: Reynolds High gunman Jared Padgett wrote about killing classmates in journal," *The Oregonian*, June 13 2014, available at http://www.oregonlive.com/gresham/index.ssf/2014/06/oregon_school_shooting_gunman_1.html; .Natalie Diblasio, John Bacon, and Michael Winter, "'A very tragic day': Student, teen gunman dead at Ore. High School," *USA Today*, available at https://www.usatoday.com/story/news/nation/2014/06/10/reynolds-high-school-shooting-portland/10279083/. ↩

7. Center for Disease Control and Prevention, "About Underlying Cause of Death, 1999-2016," available at https://wonder.cdc.gov/ucd-icd10.html (last accessed April 2018). ↩

9. Ibid.; Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data." The population over 84 years of age accounted for 2.4 percent of gun deaths and 0.2 percent of gun homicides. ↩

10. Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data." ↩

11. Generation Progress, "Meet The New Fight4afuture National Leadership Council," available at http://genprogress.org/voices/2016/05/02/43258/meet-2016-2017-fight4afuture-national-leadership-council/ (last accessed May 2018). ↩

12. For a discussion of the intersection of policing and race, see Danyelle Solomon, "The Intersection of Policing and Race" (Washington: Center for American Progress, 2016), available at https://www.americanprogress.org/issues/race/reports/2016/09/01/143357/the-intersection-of-policing-and-race/. ↩

13. Center for American Progress analysis of The Washington Post, "Fatal Force," available at https://www.washingtonpost.com/graphics/2018/national/police-shootings-2018/?utm_term=.1c311dbbfb39 (last accessed April 2018). Data updated until April 5, 2018. ↩

14. Ibid. ↩

15. Center for American Progress analysis of Bureau of Justice Statistics, "National Crime Victimization Survey 2012-2016," available at http://www.bjs.gov/index.cfm?ty=dcdetail&iid=245 (last accessed March 2018). The authors obtained the annual number of violent crimes and summed them up to obtain the 2012–2016 total. Violent Crimes include rapes, assaults, threats, and robberies. Homicides are not included. ↩

16. Ibid. To estimate the rates, the authors used population reported in Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data." For the overall population the authors include ages 12 and older. ↩

17. Bernstein, "Oregon school shooting: Reynolds High gunman Jared Padgett wrote about killing classmates in journal." ↩

18. Personal communication with Jes Phillip on April 15, 2018. ↩

19. Indian Health Service, "Urban Indian Health Program," available at https://www.ihs.gov/newsroom/factsheets/uihp/ (last accessed April 2018). ↩

20. Personal communication with Eli Saldana on April 23, 2018. ↩

21. Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data." The rate of gun homicides from 2007 to 2016 for

white individuals was 2.29 per every 100,000. 

22. Ibid. 

23. Ibid. The rate gun homicides for young African American women from 2007 to 2016 was 6.71 per every 100,000 while the rate for young white women was 1.12 per every 100,000. 

24. Ibid. The rate of gun homicides for young Hispanics from 2007 to 2016 was 8.79 per every 100,000 people while the rate for young white individuals was 2.29 per every 100,000. 

25. Ibid. 

26. Ibid. 

27. Ibid. 

28. Centers for Disease Control and Prevention, *Racial and Gender Disparities in Suicide Among Young Adults Aged 18-24: United States, 2009-2013* (U.S. Department of Health and Human Services, 2015), available at https://www.cdc.gov/nchs/data/hestat/suicide/racial_and_gender_2009_2013.pdf. 

29. Alexandra Sifferlin, "Suicide Rates High Among Young American Indians," *Time*, September 30, 2015, available at http://time.com/4054087/suicide-rate-american-indians/. 

30. Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data." 

31. Ibid. 

32. Ibid. 

33. Ibid. 

34. Ibid. 

35. Ibid. 

36. J.C. Campbell and others, "Risk factors for femicide within physically abusive intimate relationships: results from a multi-site case control study," *American Journal of Public Health* 93 (2003): 1089–1097. 

37. Center of American Progress analysis of Federal Bureau of Investigation, "Supplemental Homicide Data" (U.S. Department of Justice, 2006–2015). "Intimate partner" includes boyfriends, girlfriends, husbands, wives, ex-wives, ex-husbands, common-law wives, and common-law husbands. The state of Florida does not report information to the FBI and therefore is not included in this analysis. 

38. Ibid. To estimate rates, we used population data provided by the CDC.

40. Generation Progress, "Meet The New Fight4afuture National Leadership Council." ↩

41.  Center of American Progress analysis of Federal Bureau of Investigation, "Supplemental Homicide Data" (U.S. Department of Justice, 2006–2015). ↩

42. Chelsea Parsons and Eugenio Weigend, "America Under Fire" (Washington: Center for American Progress, 2016), available at https://cdn.americanprogress.org/wp-content/uploads/2016/10/11100940/AmericaUnderFire-report.pdf. ↩

43. Center for American Progress analysis of Giffords Law Center to Prevent Gun Violence, "Annual Gun Law Scorecard," available at http://lawcenter.giffords.org/scorecard/ (last accessed April 2018). ↩

44. Julie Tukewitz and Anemona Hartocollis, "Highlights: Students Call for Action Across Nation; Florida Lawmakers Fail to Take Up Assault Rifle Bill," *The New York Times*, available at https://www.nytimes.com/2018/02/20/us/gun-control-florida-shooting.html ↩

45. Everytown for Gun Safety, "Virginia Tech Survivor, Maryland Resident and Everytown Survivor Network Member Colin Goddard Urges Maryland Legislators to Act on Domestic Violence Legislation," Press release, March 22, 2017, available at https://everytown.org/press/virginia-tech-survivor-maryland-resident-and-everytown-survivor-network-member-colin-goddard-urges-maryland-legislators-to-act-on-domestic-violence-legislation/. ↩

46. Susan Lundine, "LGBTQ PAC to end gun violence launches in Orlando," Orlando Business Journal, August 15, 2016, available at https://www.bizjournals.com/orlando/news/2016/08/15/americas-first-lgbtq-pac-to-end-gun-violence.html ↩

47. Dan Sweeney, "Gov. Rick Scott signs sweeping gun bill; NRA files suit," *Sun Sentinel*, March 9, 2018, available at http://www.sun-sentinel.com/local/broward/parkland/florida-school-shooting/fl-florida-school-shooting-rick-scott-gun-bill-20180308-story.html ↩

48. Touré, "How America's new generation of civil rights activists is mobilizing in the age of Trump," *Rolling Stone*, available at https://www.rollingstone.com/politics/news/toure-inside-black-lives-matter-w513190 ↩

49. John Wagner, "Poll shows growing support for stricter gun control among younger Americans," *The Washington Post*, April 18, 2018, available at https://www.washingtonpost.com/news/post-politics/wp/2018/04/18/new-poll-shows-growing-support-for-stricter-gun-control-among-younger-americans/?noredirect=on&utm_term=.40cc6eae711c. ↩

50. Everytown for Gun Safety, "Analysis of Recent Mass Shootings" (2015), available at https://everytownresearch.org/documents/2015/04/analysis-of-recent-mass-shootings.pdf. ↩

Firearms: an Updated Examination of Local and National Sources," *Journal of Urban Health* (2017): 1–9, available at https://link.springer.com/article/10.1007%2Fs11524-017-0205-7. ↩

52. Everytown for Gun Safety, "Access Denied: How the Gun Lobby is Depriving Police, Policy Makers, and the Public of the Data we Need to Prevent Gun Violence" (2013), available at https://everytownresearch.org/documents/2015/04/access-denied.pdf. ↩

53. Matthew Miller, Lisa Hepburn, and Deborah Azrael, "Firearm Acquisition Without Background Checks: Results of a National Survey," *Annals of Internal Medicine* 166 (4) (2017): 233–239, available at http://annals.org/aim/fullarticle/2595892/firearm-acquisition-without-background-checks-results-national-survey. ↩

54. PICO National Network, Community Justice Reform Coalition, and Giffords Law Center to Prevent Gun Violence, "Investing in Intervention: The Critical Role of State-Level Support in Breaking the Cycle of Urban Gun Violence" (2017), available at http://lawcenter.giffords.org/wp-content/uploads/2017/12/Investing-in-Intervention-12.18.17.pdf. ↩

55. City of Richmond Office of Neighborhood Safety, "2016 Highlights" (2016), available at https://www.ci.richmond.ca.us/DocumentCenter/View/41749. ↩

56. Giffords, "Guns and Domestic Violence," available at https://giffords.org/issue/guns-domestic-violence/ (last accessed May 2018). ↩

57. Educational Fund to Stop Gun Violence, "Data behind Extreme Risk Protective Order Policies" (2017), available at http://efsgv.org/wp-content/uploads/2017/09/CT-Risk-Warrant-Data-One-pager-ERPO-9-15-17-FINAL.pdf. ↩

58. UChicago News, "Chicago jobs program reduces youth violence, Urban Labs study shows," June 29, 2017, available at https://news.uchicago.edu/article/2017/06/29/chicago-jobs-program-reduces-youth-violence-urban-labs-study-shows. ↩

59. Betsy Pearl and Ed Chung, "Resisting 'Tough on Crime': Smarter Ways to Keep American Cities Safe," Center for American Progress, February 1, 2018, available at https://www.americanprogress.org/issues/criminal-justice/news/2018/02/01/445678/resisting-tough-crime-smarter-ways-keep-american-cities-safe/. ↩

60. Corey Matthews, "Targeting High Risk Offenders: A Violence Reduction Strategy" (Oakland, CA: City of Oakland Human Service Department, 2015), available at http://oaklandunite.org/wp-content/uploads/2011/05/Targeting-High-Risk-Offenders_Advanced-Policy-Analysis_Matthews_Corey-Spring-2015.pdf. ↩

61. Jasmine Hardy, Betsy Pearl, and Rebecca Vallas, "A Criminal Record Shouldn't Be a Life Sentence to Poverty," Center for American Progress, April 12, 2018, available at