EXHIBIT 3:"

# The Science of Gun Policy

**A Critical Synthesis of Research Evidence
on the Effects of Gun Policies in the United States**

A PART OF THE RAND

**Gun Policy
in AMERICA**

INITIATIVE



For more information on this publication, visit www.rand.org/t/RR2088

### Library of Congress Cataloging-in-Publication Data

Names: Rand Corporation, issuing body.
Title: The science of gun policy : a critical synthesis of research evidence
  on the effects of gun policies in the United States / The RAND Corporation.
Description: Santa Monica, CA : RAND, [2018] | Includes bibliographical
  references.
    Identifiers: LCCN 2017060115| ISBN 9780833098412 (pbk. : alk. paper) | ISBN
  9780833098436 (epub) | ISBN 9780833098443 (prc) | ISBN 9780833098429
  (ebook pdf)
Subjects:  LCSH: Gun control--United States.
Classification: LCC HV7436 .S387 2018 | DDC 363.330973--dc23
LC record available at https://lccn.loc.gov/2017060115

Published by the RAND Corporation, Santa Monica, Calif.

© Copyright 2018 RAND Corporation

RAND® is a registered trademark.

Updated Aug. 16, 2018, to correct minor errata on pp. 296–297.

### Limited Print and Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law. This representation of RAND intellectual property is provided for noncommercial use only. Unauthorized posting of this publication online is prohibited. Permission is given to duplicate this document for personal use only, as long as it is unaltered and complete. Permission is required from RAND to reproduce, or reuse in another form, any of its research documents for commercial use. For information on reprint and linking permissions, please visit www.rand.org/pubs/permissions.

The RAND Corporation is a research organization that develops solutions to public policy challenges to help make communities throughout the world safer and more secure, healthier and more prosperous. RAND is nonprofit, nonpartisan, and committed to the public interest.

RAND's publications do not necessarily reflect the opinions of its research clients and sponsors.

### Support RAND
Make a tax-deductible charitable contribution at
www.rand.org/giving/contribute

www.rand.org

# Gun Policy in America Research Synthesis Project Team

**Project Director**
Andrew R. Morral, Ph.D.

**Research Synthesis Project Leadership**
Rajeev Ramchand, Ph.D.
Rosanna Smart, Ph.D.

**Literature Review Groups**

*Suicides*
Rajeev Ramchand, Ph.D.

*Homicides and Violent Crime*
Carole Roan Gresenz, Ph.D.
John Speed Meyers, M.P.A.
Rouslan I. Karimov, M.P.A.
Lea Xenakis, M.P.A.

*Accidents and Unintentional Injuries*
Eric Apaydin, M.P.P.
Rajeev Ramchand, Ph.D.

*Mass Shootings and Taxation*
Rosanna Smart, Ph.D.

*Officer-Involved Shootings*
Carter C. Price, Ph.D.

*Defensive Gun Use*
Nancy Nicosia, Ph.D.
John Speed Meyers, M.P.A.

*Hunting and Sport Shooting*
Rosanna Smart, Ph.D.
Eric Apaydin, M.P.P.

*Gun Industry*
Carter C. Price, Ph.D.

*Mental Health*
Stephanie Brooks Holliday, Ph.D.

*Public Information Campaigns*
Elizabeth L. Petrun Sayers, Ph.D.

**Policy Descriptions**
Samantha Cherney, J.D.
Rosanna Smart, Ph.D.

**Methodology Review**
Carole Roan Gresenz, Ph.D.
Beth Ann Griffin, Ph.D.
Andrew R. Morral, Ph.D.
Nancy Nicosia, Ph.D.
Rajeev Ramchand, Ph.D.
Terry L. Schell, Ph.D.
Rosanna Smart, Ph.D.

**Effect-Size Calculation**
Brett Ewing, M.S.

**Programming**
Joshua Lawrence Traub, M.S.

# Preface

Effective gun policies in the United States must balance the constitutional right to bear arms and public interest in gun ownership with concerns about public health and safety. However, current efforts to craft legislation related to guns are hampered by a paucity of reliable information about the effects of such policies. To help address this problem, the RAND Corporation launched the Gun Policy in America initiative. Throughout RAND's 70-year history, in multiple projects, in many policy arenas, and on topics that are sensitive and controversial, researchers have conducted analyses, built tools, and developed resources to help policymakers and the public make effective decisions. The primary goal of the Gun Policy in America project is to create resources where policymakers and the general public can access unbiased information that facilitates the development of fair and effective firearm policies.

This report is one of several research products stemming from the initiative. The research described here synthesizes the available scientific evidence on the effects of 13 types of firearm policies on a range of outcomes related to gun ownership. In addition, this report includes essays on several topics that frequently arise in discussions of gun policy.

Other project components include a survey of policy experts that identifies where access to reliable data would be most useful in resolving policy debates, plus an online tool allowing users to explore how different combinations of gun policies are likely to affect a range of outcomes. In another line of effort, RAND conducted simulation studies to evaluate the strengths and weaknesses of different approaches to modeling the effects of gun policies on outcomes, the results of which will be used to develop new estimates of the effects of state firearm policies. Finally, the project includes the development of a longitudinal database of state firearm laws as a resource for other researchers and the public.

The Gun Policy in America initiative did not attempt to evaluate the merits of different values or principles that sometimes drive policy disagreements. Rather, our focus is strictly on the empirical effects of policies on the eight outcomes specified in this report. All of our resources are publicly available on the project website at www.rand.org/gunpolicy.

The work should be of interest to policymakers and other stakeholders considering decisions related to firearm policy. Furthermore, this report may be of interest to the research community and to the general public.

## RAND Ventures

The RAND Corporation is a research organization that develops solutions to public policy challenges to help make communities throughout the world safer and more secure, healthier and more prosperous. RAND is nonprofit, nonpartisan, and committed to the public interest.

RAND Ventures is a vehicle for investing in such policy solutions. Philanthropic contributions support our ability to take the long view, tackle tough and often-controversial topics, and share our findings in innovative and compelling ways. RAND's research findings and recommendations are based on data and evidence and therefore do not necessarily reflect the policy preferences or interests of its clients, donors, or supporters.

Funding for this venture was provided by gifts from RAND supporters and income from operations.

# Contents

**Gun Policy in America Research Synthesis Project Team** ................................... iii
**Preface** ......................................................................................... v
**Figures** ....................................................................................... xiii
**Tables** ........................................................................................ xv
**Summary** ..................................................................................... xvii
**Acknowledgments** .......................................................................... xxix
**Abbreviations** ............................................................................... xxxi

PART A
**Introduction and Methods** .................................................................. 1

CHAPTER ONE
**Introduction** ................................................................................. 3
Gun Policy in America ........................................................................ 4
Research Focus ................................................................................ 4
Organization of This Report .................................................................. 10
Chapter One References ....................................................................... 11

CHAPTER TWO
**Methods** ..................................................................................... 15
Selecting Policies ............................................................................. 15
Selecting and Reviewing Studies .............................................................. 17
Effects of the Inclusion and Exclusion Criteria on the Literature Reviewed ................. 25
Effect Size Estimates ......................................................................... 29
Chapter Two References ....................................................................... 31

PART B
**Evidence on the Effects of 13 Policies** ..................................................... 37

CHAPTER THREE
**Background Checks** .......................................................................... 39
State Implementation of Background Checks .................................................. 41

Effects on Suicide ......................................................... 43
Effects on Violent Crime.................................................. 48
Effects on Mass Shootings ............................................... 54
Outcomes Without Studies Examining the Effects of Background Checks ................. 56
Chapter Three References.................................................. 57

CHAPTER FOUR
**Bans on the Sale of Assault Weapons and High-Capacity Magazines**.................... 61
State Implementation of Assault Weapon Bans .................................... 63
Effects on Violent Crime.................................................. 65
Effects on Mass Shootings ............................................... 67
Effects on the Gun Industry............................................... 69
Outcomes Without Studies Examining the Effects of Assault Weapon Bans ................ 70
Chapter Four References ................................................. 71

CHAPTER FIVE
**Stand-Your-Ground Laws** ................................................ 73
State Implementation of Stand-Your-Ground Laws................................ 74
Effects on Suicide ......................................................... 77
Effects on Violent Crime.................................................. 78
Effects on Defensive Gun Use.............................................. 81
Outcomes Without Studies Examining the Effects of Stand-Your-Ground Laws ............ 82
Chapter Five References.................................................. 83

CHAPTER SIX
**Prohibitions Associated with Mental Illness** .................................. 85
State Implementation of Prohibitions Associated with Mental Illness....................... 87
Effects on Suicide ......................................................... 89
Effects on Violent Crime.................................................. 91
Outcomes Without Studies Examining the Effects of Prohibitions Associated with
    Mental Illness.......................................................... 94
Chapter Six References.................................................. 95

CHAPTER SEVEN
**Lost or Stolen Firearm Reporting Requirements** ................................ 97
State Implementation of Lost or Stolen Firearm Reporting Requirements ................... 98
Outcomes Without Studies Examining the Effects of Lost or Stolen Firearm
    Reporting Requirements .................................................. 99
Chapter Seven References........................................................ 100

**CHAPTER EIGHT**

**Licensing and Permitting Requirements** ...................................................... 101

State Implementation of Licensing and Permitting Requirements........................... 103

Effects on Suicide ................................................................................ 104

Effects on Violent Crime........................................................................ 107

Effects on Mass Shootings ....................................................................... 109

Outcomes Without Studies Examining the Effects of Licensing and Permitting
    Requirements ................................................................................ 110

Chapter Eight References ....................................................................... 111

**CHAPTER NINE**

**Firearm Sales Reporting and Recording Requirements** ..................................... 113

State Implementation of Firearm Sales Reporting and Recording Requirements........... 114

Outcomes Without Studies Examining the Effects of Firearm Sales Reporting and
    Recording Requirements...................................................................... 116

Chapter Nine References......................................................................... 117

**CHAPTER TEN**

**Child-Access Prevention Laws** .............................................................. 119

State Implementation of Child-Access Prevention Laws ...................................... 121

Effects on Suicide ............................................................................... 124

Effects on Violent Crime........................................................................ 128

Effects on Unintentional Injuries and Deaths................................................. 130

Effects on Mass Shootings ....................................................................... 134

Outcomes Without Studies Examining the Effects of Child-Access Prevention Laws .... 135

Chapter Ten References .......................................................................... 136

**CHAPTER ELEVEN**

**Surrender of Firearms by Prohibited Possessors**........................................... 139

State Implementation of Firearm-Surrender Laws ............................................. 140

Effects on Violent Crime........................................................................ 141

Outcomes Without Studies Examining the Effects of Firearm-Surrender Laws .......... 143

Chapter Eleven References....................................................................... 144

**CHAPTER TWELVE**

**Minimum Age Requirements**................................................................... 145

State Implementation of Minimum Age Requirements......................................... 147

Effects on Suicide ............................................................................... 148

Effects on Violent Crime........................................................................ 153

Effects on Unintentional Injuries and Deaths................................................. 155

Effects on Mass Shootings ....................................................................... 156

Outcomes Without Studies Examining the Effects of Minimum Age Requirements ..... 158
Chapter Twelve References ........................................................................ 159

**CHAPTER THIRTEEN**
**Concealed-Carry Laws** ........................................................................... 161
State Implementation of Concealed-Carry Laws ........................................... 163
Effects on Suicide ................................................................................... 164
Effects on Violent Crime .......................................................................... 166
Effects on Unintentional Injuries and Deaths .............................................. 176
Effects on Mass Shootings ........................................................................ 179
Effects on the Gun Industry ..................................................................... 181
Outcomes Without Studies Examining the Effects of Concealed-Carry Laws ............. 182
Chapter Thirteen References ..................................................................... 183

**CHAPTER FOURTEEN**
**Waiting Periods** .................................................................................... 187
State Implementation of Waiting Periods .................................................... 190
Effects on Suicide ................................................................................... 190
Effects on Violent Crime .......................................................................... 191
Effects on Mass Shootings ........................................................................ 194
Outcomes Without Studies Examining the Effects of Waiting Periods .................... 196
Chapter Fourteen References ..................................................................... 197

**CHAPTER FIFTEEN**
**Gun-Free Zones** .................................................................................... 199
State Implementation of Gun-Free Zones .................................................... 200
Outcomes Without Studies Examining the Effects of Gun-Free Zones .................... 201
Chapter Fifteen References ....................................................................... 202

**PART C**
**Supplementary Essays on Gun Policy Mechanisms and Context** ........................ 203

**CHAPTER SIXTEEN**
**The Relationship Between Firearm Availability and Suicide** ............................ 205
Methods .............................................................................................. 205
Individual Access to Firearms ................................................................... 206
Regional Availability of Firearms .............................................................. 215
Conclusions .......................................................................................... 225
Chapter Sixteen References ...................................................................... 228

CHAPTER SEVENTEEN
**The Relationship Between Firearm Prevalence and Violent Crime** ..................... 233
Methods ............................................................................................. 233
Firearm Prevalence and Violent Crime................................................. 234
Conclusions  ....................................................................................... 237
Chapter Seventeen References ............................................................. 239

CHAPTER EIGHTEEN
**Firearm and Ammunition Taxes** .................................................... 241
Conclusions ........................................................................................ 243
Chapter Eighteen References ............................................................... 244

CHAPTER NINETEEN
**Mental Health Care Access and Suicide** ...................................... 245
Availability of Health Care and Mental Health Services....................... 245
Use of Health and Mental Health Services  .......................................... 247
Barriers to Mental Health Care ........................................................... 248
Policies That May Affect Access to Services........................................... 249
International and Cross-National Studies.............................................. 249
Conclusions......................................................................................... 251
Chapter Nineteen References............................................................... 252

CHAPTER TWENTY
**Education Campaigns and Clinical Interventions for Promoting Safe Storage** ....... 255
Evidence on Safe Storage...................................................................... 255
Education Campaigns........................................................................... 256
Clinical Interventions.......................................................................... 257
Conclusions  ....................................................................................... 257
Chapter Twenty References .................................................................. 259

CHAPTER TWENTY-ONE
**Restricting Access to Firearms Among Individuals at Risk for or Convicted of**
    **Domestic Violence or Violent Crime** ..................................... 261
The Policy Defined............................................................................... 261
Research Synthesis Findings................................................................. 262
Conclusions......................................................................................... 263
Chapter Twenty-One References........................................................... 264

CHAPTER TWENTY-TWO
**Mass Shootings**................................................................................ 265
What Is a Mass Shooting?..................................................................... 265

Are Mass Shootings on the Rise?.................................................................. 267
Conclusions.................................................................................................. 270
Chapter Twenty-Two References................................................................... 271

**CHAPTER TWENTY-THREE**
**Defensive Gun Use** ................................................................................... 273
What Is Defensive Gun Use?....................................................................... 274
What Are the Challenges in Measuring Defensive Gun Use? .............................. 275
Does Defensive Gun Use Reduce Harm?....................................................... 280
Chapter Twenty-Three References................................................................. 286

**CHAPTER TWENTY-FOUR**
**The Effects of the 1996 National Firearms Agreement in Australia on Suicide,**
   **Violent Crime, and Mass Shootings**....................................................... 289
Methods..................................................................................................... 290
Research Synthesis Findings........................................................................ 291
Conclusions.................................................................................................. 297
Chapter Twenty-Four References.................................................................. 298

**PART D**
**Summary of Findings and Recommendations** ................................................ 299

**CHAPTER TWENTY-FIVE**
**Summary and Conclusions** ....................................................................... 301
Summarizing the Strength of Evidence ......................................................... 302
What Can We Conclude About the Effects of Gun Policies?................................ 307
Why Don't We Know More? ....................................................................... 310
Chapter Twenty-Five References.................................................................. 319

**APPENDIXES**
**A. Methodological Challenges to Identifying the Effects of Gun Policies**............. 323
**B. Source Data Used to Produce the Forest Plot Figures**................................. 339

# Figures

3.1. Incidence Rate Ratios Associated with the Effect of Background Checks on Suicide..................................................................... 46

3.2. Incidence Rate Ratios Associated with the Effect of Background Checks on Violent Crime ............................................................... 52

3.3. Incidence Rate Ratios Associated with the Effect of Background Checks on Mass Shootings............................................................. 55

4.1. Incidence Rate Ratios Associated with the Effect of Assault Weapon Bans on Violent Crime............................................................. 66

4.2. Incidence Rate Ratios Associated with the Effect of Assault Weapon Bans on Mass Shootings ............................................................ 68

5.1. Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Suicide.................................................................. 78

5.2. Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Violent Crime.......................................................... 80

5.3. Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Defensive Gun Use......................................................... 82

6.1. Incidence Rate Ratios Associated with the Effect of Mental Health–Related Prohibitions on Suicide.................................. 90

6.2. Incidence Rate Ratios Associated with the Effect of Mental Health–Related Prohibitions on Violent Crime .......................... 92

8.1. Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Suicide............................................. 106

8.2. Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Violent Crime...................................... 108

8.3. Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Mass Shootings.................................... 110

10.1. Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Suicide.......................................................... 127

10.2. Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Violent Crime .................................................. 129

10.3. Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Unintentional Firearm Injuries and Deaths ................ 133

10.4.   Incidence Rate Ratios Associated with the Effect of Child-Access
Prevention Laws on Mass Shootings ................................................ 135
11.1.   Incidence Rate Ratios Associated with the Effect of Firearm-Surrender
Laws on Violent Crime............................................................... 142
12.1.   Incidence Rate Ratios Associated with the Effect of Minimum Age
Requirements on Suicide............................................................. 151
12.2.   Incidence Rate Ratios Associated with the Effect of Minimum Age
Requirements on Violent Crime ..................................................... 154
12.3.   Incidence Rate Ratios Associated with the Effect of Minimum Age
Requirements on Unintentional Injuries and Deaths ........................... 156
12.4.   Incidence Rate Ratios Associated with the Effect of Minimum Age
Requirements on Mass Shootings................................................... 157
13.1.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Suicide...................................................................... 165
13.2.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Violent Crime............................................................... 174
13.3.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Unintentional Injuries and Deaths....................................... 178
13.4.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Mass Shootings............................................................. 180
13.5.   Incidence Rate Ratios Associated with the Effect of Concealed-Carry
Laws on Gun Ownership ............................................................ 182
14.1.   Incidence Rate Ratios Associated with the Effect of Waiting Periods on
Violent Crime ....................................................................... 193
14.2.   Incidence Rate Ratios Associated with the Effect of Waiting Periods on
Mass Shootings ...................................................................... 195
22.1.   Trends in Mass Shooting Incidents, by Type of Incident ...................... 269
22.2.   Trends in Mass Shooting Fatalities, by Type of Incident ...................... 269

# Tables

S.1.    Strength of Evidence Across Gun Policies and Outcomes ........................ xx
2.1.    Databases Searched for Studies Examining the Effects of Firearm Policies ...... 18
2.2.    Number of Studies Selected for Review at Each Stage of the Review Process.... 25
2.3.    Studies Meeting Inclusion Criteria .................................................. 26
2.4.    Superseded Studies .................................................................... 27
2.5.    Included Studies, by Policy and Outcome.......................................... 28
16.1.   Individual-Level Studies Published in or After 2003 That Examined the
        Relationship Between Firearm Access and Suicide ................................ 212
16.2.   Estimated Effects of a 1-Percent Increase in Firearm Prevalence on
        Firearm and Total Suicides ......................................................... 217
16.3.   Quasi-Experimental Studies Published in or After 2003 That Examined
        the Regional Relationship Between Firearm Prevalence and Suicide .......... 219
16.4.   Cross-Sectional Studies Published in or After 2003 That Examined the
        Regional Relationship Between Firearm Availability and Suicide ............. 221
17.1.   Studies Published in or After 2005 That Examined the Relationship
        Between Firearm Prevalence and Violent Crime ................................ 235
22.1.   Variation in How Mass Shootings Are Defined and Counted.................. 266
24.1.   Summary of Studies Examining the Effects of the National Firearms
        Agreement on Suicide in Australia................................................. 292
25.1.   Strength of Evidence Across Gun Policies and Outcomes ...................... 304
A.1.    Illustrative Data, with Spline and Dummy-Coded Effect Variables............ 330
B.1.    Source Data Used to Estimate Study Effect Sizes in the Forest Plot
        Figures............................................................................... 340
B.2.    Methodological Concerns Identified for Analyses Included in the
        Report's Forest Plot Figures........................................................ 363

# Summary

The RAND Corporation's Gun Policy in America initiative is a unique attempt to systematically and transparently assess available scientific evidence on the real effects of gun laws and policies. Our goal is to create resources where policymakers and the general public can access unbiased information that informs and enables the development of fair and effective policies. Good gun policies in the United States require consideration of many factors, including the law and constitutional rights, the interests of various stakeholder groups, and information about the likely effects of different policies on a range of outcomes. This report seeks to provide the third factor—objective information about what the scientific literature examining gun policies can tell us about the likely effects of those policies.

This report synthesizes the available scientific evidence on the effects of various gun policies on firearm deaths, violent crime, the gun industry, participation in hunting and sport shooting, and other outcomes.[1] It builds and expands on earlier comprehensive reviews of scientific evidence on gun policy conducted more than a decade ago by the National Research Council (NRC) (see NRC, 2004) and the Community Preventive Services Task Force (see Hahn et al., 2005).

## Methodology

We used Royal Society of Medicine guidelines for conducting systematic reviews of a scientific literature (Khan et al., 2003). We focused on the empirical literature assessing the effects of 13 classes of firearm policies or of the prevalence of firearms on any of eight outcomes, which include both public health outcomes and outcomes of concern to many gun owners. We reviewed scientific reports that have been published since 2003, a date chosen to capture studies conducted since the last major systematic reviews of the science of gun policy were published by NRC (2004) and Hahn et al. (2005).

---

[1]   Although not all guns are firearms, in this report, we follow conventional use in U.S. policy discussions and treat the terms *gun* and *firearm* as interchangeable.

The 13 classes of gun policies considered in this research are as follows:

1. background checks
2. bans on the sale of assault weapons and high-capacity magazines
3. stand-your-ground laws
4. prohibitions associated with mental illness
5. lost or stolen firearm reporting requirements
6. licensing and permitting requirements
7. firearm sales reporting and recording requirements
8. child-access prevention laws
9. surrender of firearms by prohibited possessors
10. minimum age requirements
11. concealed-carry laws
12. waiting periods
13. gun-free zones.

The eight outcomes considered in this research are

1. suicide
2. violent crime
3. unintentional injuries and deaths
4. mass shootings
5. officer-involved shootings
6. defensive gun use
7. hunting and recreation
8. gun industry.[2]

## Policy Analyses, by Outcome

Building on the earlier reviews (NRC, 2004; Hahn et al., 2005) and using standardized and explicit criteria for determining the strength of evidence that individual studies provide for the effects of gun policies, we produced research syntheses that describe the quality and findings of the best available scientific evidence. Each synthesis defines the class of policies being considered; presents and rates the available evidence; and describes what conclusions, if any, can be drawn about the policy's effects on outcomes.

In many cases, we were unable to identify any research that met our criteria for considering a study as providing minimally persuasive evidence for a policy's effects. Studies were excluded from this review if they offered only correlational evidence for a

---

[2]  The terms in these lists describe broad categories of policies and outcomes that are defined and described in detail in the full report.

possible causal effect of the law, such as showing that states with a specific law had lower firearm suicides at a single point in time than states without the law. Correlations like these can occur for many reasons other than the effects of a single law, so this kind of evidence provides little information about the effects attributable to specific laws. We did not exclude studies on the basis of their findings, only on the basis of their methods for isolating causal effects. For studies that met our inclusion criteria, we summarize key findings and methodological weaknesses, when present, and provide our consensus judgment on the overall strength of the available scientific evidence. We did this by establishing the following relativistic scale describing the strength of available evidence:

1. *No studies.* This designation was made when no studies meeting our inclusion criteria evaluated the policy's effect on the outcome.
2. *Inconclusive evidence.* This designation was made when studies with comparable methodological rigor identified inconsistent evidence for the policy's effect on an outcome or when a single study found only uncertain or suggestive effects.
3. *Limited evidence.* This designation was made when at least one study meeting our inclusion criteria and not otherwise compromised by serious methodological problems reported a significant effect of the policy on the outcome, even if other studies meeting our inclusion criteria identified only uncertain or suggestive evidence for the effect of the policy.
4. *Moderate evidence.* This designation was made when two or more studies found significant effects in the same direction and contradictory evidence was not found in other studies with equivalent or strong methods.
5. *Supportive evidence.* This designation was made when (1) at least three studies found suggestive or significant effects in the same direction using at least two independent data sets or (2) the effect was observed in a rigorous experimental study.

These ratings are meant to describe the relative strengths of evidence available across gun policy research domains, not any rating of our absolute confidence in the reported effects. For instance, when we find *supportive* evidence for the conclusion that child-access prevention laws reduce self-inflicted injuries and deaths, we do not mean to suggest that it is comparable to the evidence available in more-developed fields of social science. That is, in comparison to the evidence that smoking causes cancer, the evidence base in gun policy research is very limited. Nevertheless, we believe that it may be valuable to the public and to policymakers to understand which laws currently have more or less persuasive evidence concerning the effects the laws are likely to produce.

Table S.1 summarizes our judgments for all policy and outcome pairings. Several outcomes show multiple judgments, and these correspond to different characterizations of the specific policy-outcome association. For instance, we identified limited evidence that background checks reduce *total suicides* and moderate evidence that they reduce *firearm suicides*.

**Table S.1**
**Strength of Evidence Across Gun Policies and Outcomes**

| Policy | Suicide | Total suicides | Firearm suicides | Firearm suicides among children | Firearm self-injuries (nonfatal) | Firearm self-injuries (including suicides) | Violent crime | Total homicides | Firearm homicides | Intimate partner homicides | Robberies | Assaults | Rapes | Other violent crime |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gun-Free Zones | | | | | | | | | | | | | | |
| Waiting Periods | | | | | | | | I | | I | | | | |
| Concealed-Carry Laws — Permitless Carry | | | | | | | | | | | | | | |
| Concealed-Carry Laws — Shall Issue | | I | I | | I | | | ← L | I | | I | I | I | |
| Minimum Age Requirements — Possessing | | I | I | | | | | I | I | | | | | |
| Minimum Age Requirements — Purchasing | | I | I | → L | | | | I | I | | | | | |
| Surrender of Firearms by Prohibited Possessors | | | | | | | | I | | I | | | | |
| Child-Access Prevention Laws | | → L | → M | | | → S | | I | I | | | | | |
| Firearm Sales Reporting and Recording Requirements | | | | | | | | | | | | | | |
| Licensing and Permitting Requirements | | I | I | | | | | I | I | | | | | |
| Lost or Stolen Firearm Reporting Requirements | | | | | | | | | | | | | | |
| Prohibitions Associated with Mental Illness | | → L | → L | | | | → M | → L | I | | | | | |
| Stand-Your-Ground Laws | | I | I | | | | ← M | ← L | | | | | | I |
| Bans on the Sale of Assault Weapons and High-Capacity Magazines | | | | | | | | I | I | | | | | |
| Background Checks | | → L | → M | | | | → L | → L | → M, I[a] | | | | | |

**Table S.1—Continued**

| Policy | Unintentional injuries and deaths | Unintentional firearm deaths | Unintentional firearm injuries and deaths among adults | Unintentional firearm injuries and deaths among children | Unintentional firearm injuries among adults | Unintentional firearm injuries among children | Mass shootings | Officer-involved shootings | Defensive gun use | Hunting and recreation |
|---|---|---|---|---|---|---|---|---|---|---|
| Gun-Free Zones | | | | | | | | | | |
| Waiting Periods | | | | | | | I | | | |
| Concealed-Carry Laws — Permitless Carry | | | | | | | I | | | |
| Concealed-Carry Laws — Shall Issue | | | | | ← L | I | I | | | |
| Minimum Age Requirements — Possessing | | I | | | | | | | | |
| Minimum Age Requirements — Purchasing | | | | | | | I | | | |
| Surrender of Firearms by Prohibited Possessors | | | | | | | | | | |
| Child-Access Prevention Laws | | | → L | → S | | | I | | | |
| Firearm Sales Reporting and Recording Requirements | | | | | | | | | | |
| Licensing and Permitting Requirements | | | | | | | I | | | |
| Lost or Stolen Firearm Reporting Requirements | | | | | | | | | | |
| Prohibitions Associated with Mental Illness | | | | | | | | | | |
| Stand-Your-Ground Laws | | | | | | | | | I | |
| Bans on the Sale of Assault Weapons and High-Capacity Magazines | | | | | | | I | | | |
| Background Checks | | | | | | | I | | | |

**Table S.1—Continued**

| | Gun-Free Zones | Waiting Periods | Concealed-Carry Laws | | Minimum Age Requirements | | Surrender of Firearms by Prohibited Possessors | Child-Access Prevention Laws | Firearm Sales Reporting and Recording Requirements | Licensing and Permitting Requirements | Lost or Stolen Firearm Reporting Requirements | Prohibitions Associated with Mental Illness | Stand-Your-Ground Laws | Bans on the Sale of Assault Weapons and High-Capacity Magazines | Background Checks |
| | | | Permitless Carry | Shall Issue | Possessing | Purchasing | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gun industry | | | | | | | | | | | | | | | |
| Gun ownership | | | | I | | | | | | | | | | | |
| Prices of banned firearms in the short term | | | | | | | | | | | | | | ↑ L | |

NOTE: I = inconclusive; L = limited; M = moderate; S = supportive. When we identified no studies meeting eligibility criteria, cells are blank. ↑ = the policy increases the outcome; ↓ = the policy decreases the outcome.

a We concluded that there is moderate evidence that dealer background checks decrease firearm homicides, and there is inconclusive evidence for the effect of private-seller background checks on firearm homicides.

Rather than concerning how strong a policy's effects are, our findings concern the strength of the available scientific evidence examining those effects. Thus, even when the available evidence is limited, the actual effect of the policy may be strong. Presumably, every policy has some effect on a range of outcomes, however small or unintended. Until researchers design studies that can detect these effects, available evidence is likely to remain inconclusive or limited. But this fact should not be confused with the conclusion that the policies themselves have limited effects. They may or may not have the effects they were designed to produce; available scientific research cannot yet answer that question. Moreover, even a policy with a small effect may nevertheless be beneficial to society or worth its costs. For instance, a policy that reduces firearm deaths by just a few percentage points could save more than 1,000 lives per year. This kind of "small" effect might be very difficult to detect with existing study methods but could represent an important contribution to public health and safety.

## Supplementary Essays

The 13 types of policies reviewed in this report and the scope of the systematic review for the research synthesis were selected a priori and represent the central focus of our research synthesis efforts. Nevertheless, in reviewing evidence on these policies, other important themes emerged that the research team believed provided useful context for the policies or that were frequently cited in gun policy debates. Thus, we also researched what rigorous studies reveal about

- the possible mechanisms by which laws may affect outcomes
- how taxes, access to health care, and media campaigns might affect gun violence
- the effectiveness of laws used to target domestic violence
- methodological challenges in defining and estimating the prevalence of mass shootings and defensive gun use
- how suicide, violence, and mass shootings were affected by Australia's implementation of the National Firearms Agreement.

## Conclusions and Recommendations

Of more than 100 combinations of policies and outcomes, we found that surprisingly few were the subject of methodologically rigorous investigation. Notably, research into four of our outcomes was essentially unavailable, with three of these four outcomes—defensive gun use, hunting and recreation, and the gun industry—representing issues of particular concern to gun owners or gun industry stakeholders. Here, we summarize the key conclusions and recommendations that can be drawn from the policy-outcome

combinations with the strongest available evidence (conclusions 1 through 8). Thereafter, we draw conclusions and recommendations concerning how to improve evidence on the effects of gun policies (conclusions 9 through 13).

**Conclusions and Recommendations Based on the Existing Evidence Base**

Our first set of conclusions and recommendations describes the policy-outcome combinations with the strongest available evidence as identified through our review of the existing literature, as well as recommendations for policy based on this evidence.

**Conclusion 1**. Available evidence supports the conclusion that child-access prevention laws, or safe storage laws, reduce self-inflicted fatal or nonfatal firearm injuries among youth. There is moderate evidence that these laws reduce firearm suicides among youth and limited evidence that the laws reduce total (i.e., firearm and non-firearm) suicides among youth.

**Conclusion 2**. Available evidence supports the conclusion that child-access prevention laws, or safe storage laws, reduce unintentional firearm injuries or unintentional firearm deaths among children. In addition, there is limited evidence that these laws may reduce unintentional firearm injuries among adults.

> *Recommendation 1*. States without child-access prevention laws should consider adopting them as a strategy to reduce firearm suicides and unintentional firearm injuries and deaths. We note, however, that scientific research cannot, at present, address whether these laws might increase or decrease crime or rates of legal defensive gun use.

> *Recommendation 2*. When considering adopting or refining child-access prevention laws, states should consider making child access to firearms a felony; there is some evidence that felony laws may have the greatest effects on unintentional firearm deaths.

**Conclusion 3**. There is moderate evidence that background checks reduce firearm suicides and firearm homicides, as well as limited evidence that these policies can reduce overall suicide and violent crime rates.

**Conclusion 4**. There is moderate evidence that stand-your-ground laws may increase state homicide rates and limited evidence that the laws increase firearm homicides in particular.

**Conclusion 5**. There is moderate evidence that laws prohibiting the purchase or possession of guns by individuals with some forms of mental illness reduce violent crime, and there is limited evidence that such laws reduce homicides in particular. There is also limited evidence these laws may reduce total suicides and firearm suicides.

> *Recommendation 3*. States that currently do not require a background check investigating all types of mental health histories that lead to federal prohibi-

tions on firearm purchase or possession should consider implementing robust mental illness checks, which appear to reduce rates of gun violence. The most robust procedures involve sharing data on all prohibited possessors with the National Instant Criminal Background Check System.

**Conclusion 6**. There is limited evidence that before implementation of a ban on the sale of assault weapons and high-capacity magazines, there is an increase in the sales and prices of the products that the ban will prohibit.

**Conclusion 7**. There is limited evidence that a minimum age of 21 for purchasing firearms may reduce firearm suicides among youth.

**Conclusion 8**. No studies meeting our inclusion criteria have examined required reporting of lost or stolen firearms, required reporting and recording of firearm sales, or gun-free zones.

**Conclusions and Recommendations for Improving Gun Policy Research**

Based on our review of the existing literature on the effects of firearm policy changes, we offer the following conclusions and recommendations for improving the evidence base on the effects of gun laws.

**Conclusion 9**. The modest growth in knowledge about the effects of gun policy over the past dozen years reflects, in part, the reluctance of the U.S. government to sponsor work in this area at levels comparable to its investment in other areas of public safety and health, such as transportation safety.

> *Recommendation 4*. To improve understanding of the real effects of gun policies, Congress should consider whether to lift current restrictions in appropriations legislation, and the administration should invest in firearm research portfolios at the Centers for Disease Control and Prevention, the National Institutes of Health, and the National Institute of Justice at levels comparable to its current investment in other threats to public safety and health.

> *Recommendation 5*. Given current limitations in the availability of federal support for gun policy research, private foundations should take further steps to help fill this funding gap by supporting efforts to improve and expand data collection and research on gun policies.

**Conclusion 10**. Research examining the effects of gun policies on officer-involved shootings, defensive gun use, hunting and recreation, and the gun industry is virtually nonexistent.

> *Recommendation 6*. To improve understanding of outcomes of critical concern to many in gun policy debates, the U.S. government and private research sponsors should support research examining the effects of gun laws on a wider

set of outcomes, including crime, defensive gun use, hunting and sport shooting, officer-involved shootings, and the gun industry.

**Conclusion 11**. The lack of data on gun ownership and availability and on guns in legal and illegal markets severely limits the quality of existing research.

> *Recommendation 7*. To make important advances in understanding the effects of gun laws, the Centers for Disease Control and Prevention or another federal agency should resume collecting voluntarily provided survey data on gun ownership and use.

> *Recommendation 8*. To foster a more robust research program on gun policy, Congress should consider whether to eliminate the restrictions it has imposed on the use of gun trace data for research purposes.

**Conclusion 12**. Crime and victimization monitoring systems are incomplete and not yet fulfilling their promise of supporting high-quality gun policy research in the areas we investigated.

> *Recommendation 9*. To improve the quality of evidence used to evaluate gun policies, the National Violent Death Reporting System should be expanded to include all states with rigorous quality control standards.

> *Recommendation 10*. The Bureau of Justice Statistics should examine the cost and feasibility of expanding its existing programs to generate state-level crime data.

> *Recommendation 11*. The Bureau of Justice Statistics should continue to pursue its efforts to generate state-level victimization estimates. The current goal of generating such estimates for 22 states is a reasonable compromise between cost and the public's need for more-detailed information. However, the bureau should continue to expand its development of model-based victimization rates for all states and for a wider set of victimization experiences (including, for instance, crimes involving firearm use by an assailant or victim).

**Conclusion 13**. The methodological quality of research on firearms can be significantly improved.

> *Recommendation 12*. As part of the Gun Policy in America initiative, we have published a database containing a subset of state gun laws from 1979 to 2016 (Cherney, Morral, and Schell, 2018). We ask that others with expertise on

state gun laws help us improve the database by notifying us of its errors, proposing more-useful categorizations of laws, or submitting information on laws not yet incorporated into the database. With such help, we hope to make the database a resource beneficial to all analysts.

*Recommendation 13.* Researchers, reviewers, academics, and science reporters should expect new analyses of the effects of gun policies to improve on earlier studies by persuasively addressing the methodological limitations of earlier studies, including problems with statistical power, model overfitting, covariate selection, poorly calibrated standard errors, multiple testing, undisclosed state variation in law implementation, unjustified assumptions about the time course of each policy's effects, the use of spline and hybrid effect codings that do not reveal coherent causal effect estimates, and inadequate attention to threats of reciprocal causation and simultaneity bias.

In conclusion, with a few exceptions, there is a surprisingly limited base of rigorous scientific evidence concerning the effects of many commonly discussed gun policies. This does not mean that these policies are ineffective; they might well be quite effective. Instead, it reflects shortcomings in the contributions that scientific study can currently offer to policy debates in these areas. It also reflects, in part, the policies we chose to investigate, all of which have been implemented in some U.S. states and, therefore, have proven to be politically and legally feasible, at least in some states. This decision meant that none of the policies we examined would dramatically increase or decrease the stock of guns or gun ownership rates in ways that would produce more readily detectable effects on public safety, health, and industry outcomes. The United States has a large stock of privately owned guns in circulation—estimated in 2014 to be somewhere between 200 million and 300 million firearms (Cook and Goss, 2014). Laws designed to change who may buy new weapons, what weapons they may buy, or how gun sales occur will predictably have only a small effect on, for example, homicides or participation in sport shooting, which are affected much more by the existing stock of firearms. Although small effects are especially difficult to identify with the statistical methods common in this field, they may be important. Even a 1-percent reduction in homicides corresponds to more than 1,500 fewer deaths over a decade.

By highlighting where scientific evidence is accumulating, we hope to build consensus around a shared set of facts that have been established through a transparent, nonpartisan, and impartial review process. In so doing, we also mean to highlight areas where more and better information could make important contributions to establishing fair and effective gun policies.

## Summary References

Cherney, Samantha, Andrew R. Morral, and Terry L. Schell, *RAND State Firearm Law Database*, Santa Monica, Calif.: RAND Corporation, TL-283-RC, 2018. As of March 2, 2018: https://www.rand.org/pubs/tools/TL283.html

Cook, Philip J., and Kristin A. Goss, *The Gun Debate: What Everyone Needs to Know*, New York: Oxford University Press, 2014.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Khan, Khalid S., Regina Kunz, Jos Kleijnen, and Gerd Antes, "Five Steps to Conducting a Systematic Review," *Journal of the Royal Society of Medicine*, Vol. 96, No. 3, 2003, pp. 118–121.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

# Acknowledgments

We wish to thank many staff and researchers inside and outside RAND who helped us to collect, interpret, and present the research discussed in this report. In particular, we wish to thank our quality assurance reviewers who provided expert and valuable guidance on how to improve earlier versions of this report or sections of it. These reviewers included James Anderson, Deborah Azrael, John Donohue, Susan Gates, Andy Hoehn, and Priscillia Hunt, as well as Jack Riley, whom we wish to especially thank for his encouragement and support of the idea that RAND could make important contributions to the gun policy discourse in the United States. The report also benefited from candid written reviews provided by two reviewers who wished to remain anonymous, one affiliated with a gun rights advocacy organization and one affiliated with a gun violence prevention advocacy organization. Within RAND, we wish to acknowledge the exceptional support we received from our research librarians, Roberta Shanman and Sachi Yagyu; our publication editor, Allison Kerns; and members of RAND's Office of External Affairs, including Lee Floyd, Chandra Garber, Stephan Kistler, Heather McCracken, Lauren Skrabala, Mary Vaiana, and Chara Williams.

## Abbreviations

| | |
|---|---|
| aOR | adjusted odds ratio |
| ARIMA | autoregressive integrated moving average |
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| BJS | Bureau of Justice Statistics |
| BRFSS | Behavioral Risk Factor Surveillance Survey |
| CAP | child-access prevention |
| CC | concealed carry |
| CDC | Centers for Disease Control and Prevention |
| CI | confidence interval |
| DGU | defensive gun use |
| FBI | Federal Bureau of Investigation |
| FS/S | proportion of suicides that are firearm suicides |
| GSS | General Social Survey |
| IPH | intimate partner homicide |
| IRR | incidence rate ratio |
| NCVS | National Crime Victimization Survey |
| NFA | (Australian) National Firearms Agreement |
| NIBRS | National Incident-Based Reporting System |
| NICS | National Instant Criminal Background Check System |

| | |
|---|---|
| NIS | Nationwide Inpatient Sample |
| NRC | National Research Council |
| NSDS | National Self Defense Survey |
| NSPOF | National Survey of Private Ownership of Firearms |
| NSSF | National Shooting Sports Foundation |
| NVDRS | National Violent Death Reporting System |
| OR | odds ratio |
| VA | U.S. Department of Veterans Affairs |

PART A
## Introduction and Methods

CHAPTER ONE

# Introduction

Americans are deeply divided on gun policy (Parker et al., 2017). Many Americans cherish the traditions of hunting, sport shooting, and collecting guns and value the security and protection that guns can provide. Many regions rely on hunting as an important driver of the tourism economy (Nelson, 2001; BBC Research & Consulting, 2008; Hodur, Leistritz, and Wolfe, 2008), and the wider gun industry employs hundreds of thousands of Americans, including instructors; shooting range operators; hunting equipment suppliers; and manufacturers, distributors, and retailers of firearms and ammunition. At the same time, many Americans have suffered grievous injuries and lost friends and family members in incidents involving firearms.[1] More than 36,000 Americans die annually from deliberate and unintentional gun injuries, and two-thirds of these deaths are suicides (Centers for Disease Control and Prevention [CDC], 2017a). Another 90,000 Americans per year receive care in a hospital for a nonfatal gun injury (CDC, 2017c).

Few are satisfied with the levels of mortality and injury associated with firearms, but there is passionate disagreement about how policies could be shaped to create a better future. There is a quite limited base of science on which to build sound and effective gun policies. Instead, when the public or members of Congress consider proposals affecting gun policy, they encounter conflicting opinions and inconsistent evidence about the likely effects of new laws. Views on what is factual concerning gun policies, or what the facts imply for decisionmaking, frequently divide along political and partisan lines (Kahan, 2017).

Entrenched disagreements on gun policy are not surprising, given the number and variety of contested and contradictory studies, selective misuse of facts by some on all sides of the debate, and today's hyper-partisan political environment. Moving past such roadblocks will be impossible unless decisionmakers can draw on a common set of facts based on transparent, nonpartisan, and impartial research and analysis. Even when individuals disagree about the objectives of gun policies, empirical evidence can help determine the most likely benefits and harms associated with such policies.

---

[1]  Although not all guns are firearms, in this report, we follow conventional use in U.S. policy discussions and treat the terms *gun* and *firearm* as interchangeable.

## Gun Policy in America

To help fill the gap in impartial research and analysis, the RAND Corporation launched the Gun Policy in America initiative, which is premised on the idea that the real effects of policies can be objectively determined and that establishing these facts will help lead to sound policies. Our goal is to create a resource where policymakers and the general public can access unbiased information that informs and enables the development of fair and effective firearm policies.

This report synthesizes the available scientific data on the effects of various firearm policies on firearm deaths, violent crime, the gun industry, participation in hunting and sport shooting, and other outcomes. It builds and expands on earlier comprehensive reviews of scientific evidence on gun policy conducted more than a decade ago by the National Research Council (2004) and the Community Preventive Services Task Force (see Hahn et al., 2005). This report is one of several research products stemming from RAND's Gun Policy in America initiative (see www.rand.org/gunpolicy).

In the Gun Policy in America initiative, we have made no attempt to evaluate the merits of different values and principles that sometimes drive policy disagreements. We also have not evaluated the legality of any candidate laws or how they may infringe on Second Amendment rights. Instead, our focus is strictly on the empirical effects of policies on the eight outcomes specified in this report. However, all of the policies we investigate have been implemented in multiple states, and many have withstood Supreme Court review; therefore, we have selected policies that have previously been found not to violate the Constitution.

Laws are not the only interventions that have been used to shape how guns are used in the United States, and research is available on the effectiveness of other approaches, such as public information campaigns, safety and training programs, policing interventions, and school and community programs. In this report, however, our focus is on what scientific studies tell us about the probable effects of certain laws.

## Research Focus

The primary focus of this report is our systematic review of 13 broad classes of gun policies that have been implemented in some states and the effects of those policies on eight outcomes. We selected the 13 classes from a larger set of more than 100 gun policies that have been advocated for; proposed; or passed into law by the federal government, states, or municipalities. Specifically, we restricted our attention to policies or laws that have already been implemented in some states so that researchers could examine the effects of each. In addition, we sought policies designed to have a direct effect on our selected outcomes. These policies, the presumed mechanisms whereby they produce intended (and possibly unintended) effects on our selected outcomes,

and the various ways that U.S. states have implemented them are discussed in detail in Chapters Three through Fifteen of this report. Although, in many cases, these policies have been implemented by local municipalities rather than states, we have not sought to review implementation at the local level.

The 13 classes of gun policies considered in this research are as follows:

1. background checks
2. bans on the sale of assault weapons and high-capacity magazines
3. stand-your-ground laws
4. prohibitions associated with mental illness
5. lost or stolen firearm reporting requirements
6. licensing and permitting requirements
7. firearm sales reporting and recording requirements
8. child-access prevention laws
9. surrender of firearms by prohibited possessors
10. minimum age requirements
11. concealed-carry laws
12. waiting periods
13. gun-free zones.

When deciding on the outcomes to examine in our research, we first included those related to public health and safety—suicide, violent crime, unintentional injuries and deaths, mass shootings, and officer-involved shootings. These are the outcomes most commonly examined in the research literature we were familiar with. However, we recognized that such outcomes omit many of the benefits of gun ownership that are attractive to gun owners and that may also be affected by laws designed to reduce the gun-related harms to public health and safety. Therefore, we also systematically searched the research literature for studies examining how gun laws affect defensive gun use, hunting and recreation, and the gun industry. Together, these eight outcomes cover many of the areas of concern frequently discussed in debates on gun policy. Here, we provide a short description of each outcome.

### Suicide

Official statistics on suicide in the United States are compiled by the CDC. Recent data, from 2015, indicate that 44,193 suicides occurred that year, for a rate of 13.75 per 100,000 people. Of these, 22,018 (49.8 percent) were firearm suicides (CDC, 2017a). Researchers have often examined the effects of laws on total suicides (i.e., suicide deaths by any means, including those involving a firearm), firearm suicides, nonfirearm suicides, and suicide attempts. From a societal perspective, the most important of these outcomes is total suicide; that is, the goal is to reduce the total number of suicide deaths, regardless of how one goes about attempting to die. In many cases, however, we would expect the effects of gun laws to be more easily observed in rates of firearm

suicides, not total suicides. The consensus among public health experts is that reducing firearm suicides in contexts where more-lethal means of attempting suicide are unavailable will result in reductions in the total suicide rate (see, for example, Office of the Surgeon General and National Alliance for Suicide Prevention, 2012; World Health Organization, 2014; for review, see Azrael and Miller, 2016). Nevertheless, it is also clear that some people prevented from attempting suicide with a firearm will substitute another lethal means and successfully end their lives. The rate at which this substitution occurs is not known. Thus, for laws that increase or decrease firearm suicides, the effects on total suicides are likely smaller and harder to detect. For this reason, we examine the effects of policies on both total suicides and firearm suicides.

Suicide rates in the United States have increased 25 percent since 1999 (Curtin, Warner, and Hedegaard, 2016).[2] There is some degree of misclassification of suicide deaths, with some suicides likely classified as unintentional deaths (Kapusta et al., 2011) or overdose deaths (Bohnert et al., 2013). The CDC provides limited nationwide data on suicides for all states. More-expansive data are contained in the National Violent Death Reporting System, also maintained by the CDC, but because that system currently releases information on just a subset of U.S. states, we cannot use this data set to characterize suicides nationally.

Data on suicide attempts generally derive from two sources: hospital admission records and self-reports. In hospital data, suicides are generally categorized as "self-harm" with unspecified intent; although there is a field to code cause of injury, this field is completed inconsistently across states (Coben et al., 2001). In 2014, there were 469,096 self-harm, nonfatal hospital admissions to emergency departments in the United States, 3,320 (less than 1 percent) of which were caused by a firearm (CDC, 2017c). This may be because between 83 and 91 percent of those who attempt suicide with a firearm die, which is a higher rate than some other methods of suicide, such as drowning (66–84 percent) or hanging (61–83 percent) (Azrael and Miller, 2016).

Emergency room data contain only self-harm incidents that resulted in an emergency room visit; as a complementary data source, national data based on self-reports reveal that, in 2015, 1.4 million adults aged 18 or older (0.6 percent) attempted suicide in the past year (Piscopo et al., 2016).

### Violent Crime

The Federal Bureau of Investigation (FBI) defines *violent crime* as including forcible rape, robbery, aggravated assault, and murder or nonnegligent manslaughter. The last category excludes deaths caused by suicide, negligence, or accident, as well as justifiable homicides (such as the killing of a felon by a peace officer in the line of duty) (FBI, 2016d).

---

[2]   The 25-percent increase in suicides refers to the age-adjusted rate, although the crude rate and the absolute number of suicides have also increased.

One source of data on violent crime is the FBI's Uniform Crime Reporting program, which relies on voluntary reporting of crimes by city, university/college, county, state, tribal, and federal law enforcement agencies. Data from the program indicate that there were approximately 1.2 million violent crimes in the United States in 2015, including 764,449 aggravated assaults, 327,374 robberies, 124,047 rapes, and 15,696 instances of murder or nonnegligent manslaughter (FBI, 2016d). The overall violent crime rate was 372.6 per 100,000 people, with the highest rate for aggravated assault (237.8 per 100,000), followed by robbery (101.9 per 100,000), rape (38.6 per 100,000) and murder or nonnegligent manslaughter (4.9 per 100,000). Nationwide, firearms were used in 71.5 percent of all instances of murder or nonnegligent manslaughter, 40.8 percent of robberies, and 24.2 percent of aggravated assaults in 2015 (FBI, 2016d).

Death certificate data and emergency department admission data provide additional insights into the prevalence and consequences of violent crime. Based on mortality data, the CDC estimated that there were 17,793 homicides in the United States in 2015, for a rate of 5.54 per 100,000 people; of these, 12,979 (73 percent) were caused by a firearm (CDC, 2017a). Emergency department data show that in 2014 there were more than 1.5 million admissions to hospital emergency departments for assault; of these, 60,470 (3.8 percent) were firearm-related (CDC, 2017c).

### Unintentional Injuries and Deaths

Like suicide, official statistics on unintentional injuries and deaths in the United States are compiled by the CDC. The most recent data, from 2015, indicate that 146,571 fatal unintentional injuries occurred that year, for a rate of 46.50 per 100,000 people (CDC, 2017a). Of these, 489 (less than 1 percent) were caused by a firearm. Some of these fatal unintentional injuries were likely misclassified and were actually suicides or homicides. Nevertheless, the true number of unintentional firearm deaths may be substantially greater than reported in the CDC's vital data. For example, inconsistent classification of child firearm deaths by local coroners may result in 35–45 percent of all unintentional firearm deaths being classified instead as suicides or homicides (Everytown for Gun Safety Support Fund, 2014; Hemenway and Solnick, 2015a). We also include research examining nonfatal unintentional injuries. There were close to 29 million unintentional injury discharges from emergency rooms in 2014, of which 15,928 (less than 1 percent) were caused by a firearm. These reports omit injuries that did not result in an emergency room visit.

### Mass Shootings

Although only a small fraction of annual firearm deaths result from a mass shooting, these events attract enormous public, media, and social media attention in the country, and they frequently prompt discussions about legislative initiatives for how better to prevent gun violence. The U.S. government has never defined *mass shooting*, and there is no single universally accepted definition of the term. The FBI's definition of a *mass*

*murderer* requires at least four casualties, excluding the offender or offenders, in a single incident. Public law (the Investigative Assistance for Violent Crime Act of 2012; Pub. L. 112-265) defines a *mass killing* as a single incident in which three or more people were killed. Alternative definitions include two or more injured victims or four or more people injured or killed, including the shooter. Depending on which data source is referenced, and its definitions, there were seven, 65, 332, or 371 mass shootings in the United States in 2015 (see a discussion of these estimates in Chapter Twenty-Two).

### Officer-Involved Shootings

Police shootings of civilians have triggered fierce debates locally and nationally about when use of lethal force is appropriate and whether it is being used disproportionately against minorities. Although the FBI has tried to collect information on police shootings from around 17,000 local law enforcement agencies, recent efforts by news organizations (such as the *Washington Post* and the *Guardian*) have demonstrated that the FBI's data collection misses many such cases. Whereas the FBI's count typically comes to around 400 killings by police per year, the *Washington Post* documented news stories on 963 individuals shot and killed by law enforcement in 2016, a number that could omit any individuals shot and killed by police about whom no news story was written. The FBI has announced plans to begin a new data collection effort that will reportedly track all incidents in which law enforcement seriously injure or kill citizens (Kindy, 2015).

Because reliable data on police shootings are often available only for individual police departments, prior studies using such data typically present information at the city level. For example, using police reports and other administrative data, Klinger et al. (2016) looked at 230 use-of-force shootings by police officers involving 373 suspects in St. Louis between 2003 and 2012. Similarly, medical records of shooting victims contain information on whether the shooter was a member of the law enforcement community. Using data from New York City's medical examiner, Gill and Pasquale-Styles (2009) looked at law enforcement shootings resulting in a fatality there between 2003 and 2006. The data included 42 cases for the four-year period. Like suicide attempts and unintentional injuries and deaths, this data source misses incidents in which the officer did not injure the suspect or the suspect did not seek medical attention.

### Defensive Gun Use

Defensive gun use has typically been measured in the empirical literature using self-reports on surveys of gun owners, although some studies have used firearm deaths coded as justifiable homicides to investigate subsets of defensive gun use. Although there are some variations, *defensive gun use* has often been defined as incidents that involve (1) protection against humans (i.e., not animals); (2) gun use by civilians (not official use by military, police, or security personnel); (3) contact between persons (not, for instance, carrying a firearm to investigate a suspicious sound when no intruder is encountered); and (4) use of a gun, at least as a visual or verbal threat (not

incidents in which a gun may have simply been available for use). Definitions this broad would include defensive use of a gun by criminals during the commission of a crime, as well as use of a gun for personal defense by those who are prohibited by law from being in possession of a weapon (itself a crime). More-restrictive definitions specify that the defensive gun use be performed by the victim of certain crimes or by someone trying to protect the victim. These definitions may miss instances in which crimes were deterred or averted when a firearm was brandished.

Differences in the definitions of defensive gun use, and in the manner of collecting information about it, lead to wide differences in estimates of the annual incidence of defensive gun use. Low estimates (based on the experiences of crime victims) are a little more than 100,000 such incidents per year, and high estimates are 4.7 million per year (Cook and Ludwig, 1996, 1997, 1998; McDowall, Loftin, and Wiersema, 1998). This literature and the challenges of defining and measuring defensive gun use are reviewed in Chapter Twenty-Three.

### Hunting and Recreation

Federal statistics on hunters largely come from the National Survey of Fishing, Hunting, and Wildlife-Associated Recreation Survey, which is conducted every five years as a coordinated effort by the U.S. Fish and Wildlife Service and the U.S. Census Bureau. According to the most recent data, from 2011, approximately 13 million people used firearms for hunting, more than 50 percent of all hunters participated in target shooting, and 22 percent of hunters visited shooting ranges (U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, 2012). Estimates from the National Shooting Sports Foundation (NSSF) suggest that approximately 20 million individuals participate in target shooting annually (Southwick Associates, 2013). Data from the General Social Survey suggest that hunting has decreased significantly since 1977, when 31.6 percent of adults lived in households where they, their spouse, or both hunted. In 2014, households with a hunter was down to 15.4 percent (Smith and Son, 2015).

### Gun Industry

Estimates produced by the NSSF suggest that there are 141,000 jobs in the United States involving the manufacture, distribution, or retailing of ammunition, firearms, and hunting supplies and potentially another 150,000 jobs in supplier and ancillary industries connected with the firearm market (NSSF, 2017). According to the U.S. Census Bureau, in 2014, more than 90,000 people were employed in U.S. firms coded as being involved in just the manufacture of firearms, ammunition, or ordnance (North American Industry Classification System [NAICS] codes 332992, 332993, and 332994; U.S. Census Bureau, 2016). The manufacturing industry alone is estimated to generate $16 billion in revenue annually (IBISWorld, 2016). In 2011, hunters spent $3 billion on firearms and $1.2 billion on ammunition (U.S. Fish and Wildlife Ser-

vice, U.S. Department of the Interior, and U.S. Department of Commerce, 2012). More than 9 million firearms were manufactured in the United States in 2014, nearly triple the number manufactured one decade prior. An additional 3.6 million firearms were imported in 2014, while just more than 420,900 firearms were exported from the United States (Bureau of Alcohol, Tobacco, Firearms and Explosives, 2016b).

As of the end of fiscal year 2015, 139,840 federal firearms licensees had active licenses to sell firearms in the United States. Just more than 46 percent of these licenses were held by dealers or pawnbrokers, 43 percent were held by collectors, about 9 percent were held by manufacturers of ammunition or firearms, and less than 1 percent were held by importers (Bureau of Alcohol, Tobacco, Firearms and Explosives, 2016b).

## Organization of This Report

The report is organized into five parts. Part A introduces the project scope and objectives in Chapter One and the methods used to conduct systematic reviews and syntheses of the literature in Chapter Two. In Part B, we present a research synthesis on each of the 13 state policies selected for review (Chapters Three through Fifteen). Each of these chapters defines the class of policies under review; presents and rates the available evidence; and describes what conclusions, if any, can be drawn about how each policy affects each outcome. Part B includes all of the research syntheses we selected a priori; however, in the course of developing these, several related themes frequently came up in the literature and in policy debates, and we believed that these themes warranted further discussion or review. Therefore, to augment and provide context for Part B's syntheses, Part C presents supplementary essays on what rigorous studies reveal about

- the possible mechanisms by which laws may affect outcomes (Chapters Sixteen and Seventeen on the effects of firearm prevalence on suicide and violent crime)
- how taxes, access to health care, and media campaigns might affect gun violence (Chapters Eighteen through Twenty)
- the effectiveness of laws used to target domestic violence (Chapter Twenty-One)
- methodological challenges in defining and estimating the prevalence of mass shootings and defensive gun use (Chapters Twenty-Two and Twenty-Three)
- how suicide, violent crime, and mass shootings were affected by Australia's implementation of the National Firearms Agreement (Chapter Twenty-Four).

In Part D, we draw general conclusions from the main policy analyses and offer recommendations for how to improve the state of evidence for the effects of state laws. Finally, in an appendix section, Appendix A describes common methodological shortcomings found in the existing scientific literature examining gun policy, and Appendix B describes the source data used to display study effect sizes and rate study methodologies.

## Chapter One References

Azrael, Deborah, and Matthew Miller, "Reducing Suicide Without Affecting Underlying Mental Health: Theoretical Underpinnings and a Review of the Evidence Base Lining the Availability of Lethal Means and Suicide," in Rory C. O'Connor and Jane Pirkis, eds., *The International Handbook of Suicide Prevention*, 2nd ed., Hoboken, N.J.: John Wiley and Sons, 2016.

BBC Research & Consulting, *The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado*, Denver, Colo., September 26, 2008. As of October 13, 2017:
https://cpw.state.co.us/Documents/About/Reports/08DOWEconomicImpactReport.pdf

Bohnert, A. S., J. F. McCarthy, R. V. Ignacio, M. A. Ilgen, A. Eisenberg, and F. C. Blow, "Misclassification of Suicide Deaths: Examining the Psychiatric History of Overdose Decedents," *Injury Prevention*, Vol. 19, No. 6, 2013, pp. 326–330.

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2016*, Washington, D.C.: U.S. Department of Justice, 2016b.

CDC—*See* Centers for Disease Control and Prevention.

Centers for Disease Control and Prevention, "Fatal Injury Reports, National, Regional, and State 1981–2015," WISQARS database, Atlanta, Ga., 2017a. As of May 8, 2017:
https://webappa.cdc.gov/sasweb/ncipc/mortrate.html

———, "Nonfatal Injury Reports: 2001–2014," WISQARS database, Atlanta, Ga., 2017c. As of January 15, 2017:
https://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html

Coben, J. H., C. A. Steiner, M. Barrett, C. T. Merrill, and D. Adamson, "Completeness of Cause of Injury Coding in Healthcare Administrative Databases in the United States," *Injury Prevention*, Vol. 12, No. 3, 2001, pp. 199–201.

Cook, Philip J., and Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, Washington, D.C.: Police Foundation, 1996.

———, *Guns in America: National Survey on Private Ownership and Use of Firearms: Research in Brief*, Rockville, Md.: National Institute of Justice, 1997.

———, "Defensive Gun Uses: New Evidence from a National Survey," *Journal of Quantitative Criminology*, Vol. 14, No. 2, 1998, pp. 111–131.

Curtin, Sally C., Margaret Warner, and Holly Hedegaard, *Suicide Rates for Females and Males by Race and Ethnicity: United States, 1999 and 2014*, Atlanta, Ga.: Centers for Disease Control and Prevention, 2016.

Everytown for Gun Safety Support Fund, *Innocents Lost: A Year of Unintentional Child Gun Deaths*, June 2014. As of May 12, 2017:
https://everytownresearch.org/documents/2015/04/innocents-lost.pdf

FBI—*See* Federal Bureau of Investigation.

Federal Bureau of Investigation, "Crime in the United States 2015: Violent Crime," Washington, D.C.: U.S. Department of Justice, 2016d. As of May 8, 2017:
https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/offenses-known-to-law-enforcement/violent-crime/violentcrimemain_final.pdf

Gill, J. R., and M. Pasquale-Styles, "Firearm Deaths by Law Enforcement," *Journal of Forensic Science*, Vol. 54, No. 1, 2009, pp. 185–188.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Hemenway, David, and Sara J. Solnick, "Children and Unintentional Firearm Death," *Injury Epidemiology*, Vol. 2, No. 26, 2015a.

Hodur, Nancy M., F. Larry Leistritz, and Kara L. Wolfe, "Developing the Nature-Based Tourism Sector in Southwestern North Dakota," *Great Plains Research: A Journal of Natural and Social Sciences*, Vol. 18, Spring 2008, pp. 81–92.

IBISWorld, *Guns and Ammunition Manufacturing in the U.S.: Market Research Report*, Los Angeles, Calif., August 2016.

Kahan, Dan M., "On the Sources of Ordinary Science Knowledge and Extraordinary Science Ignorance," in Kathleen Hall Jamieson, Dan Kahan, and Dietram A. Scheufele, eds., *Oxford Handbook of the Science of Science Communication*, Oxford, UK: Oxford University Press, 2017.

Kapusta, N. D., U. S. Tran, I. R. Rockett, D. DeLeo, C. P. Naylor, T. Niederkrotenthaler, M. Voracek, E. Etzersdorfer, and G. Sonneck, "Declining Autopsy Rates and Suicide Misclassification: A Cross-National Analysis of 35 Countries," *Archives of General Psychiatry*, Vol. 68, No. 10, 2011, pp. 1050–1057.

Kindy, Kimberly, "FBI to Sharply Expand System for Tracking Fatal Police Shootings," *Washington Post*, December 8, 2015.

Klinger, D., R. Rosenfeld, D. Isom, and M. Deckard, "Race, Crime, and the Micro-Ecology of Deadly Force," *Criminology and Public Policy*, Vol. 15, No. 1, February 2016, pp. 193–222.

McDowall, D., C. Loftin, and B. Wiersema, "Estimates of the Frequency of Firearm Self Defense from the National Crime Victimization Survey," Albany, N.Y.: State University of New York, School of Criminal Justice, Violence Research Group Discussion Paper 20, 1998 (unpublished).

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

National Shooting Sports Foundation, *Firearms and Ammunition Industry Economic Impact Report*, Newtown, Conn., 2017. As of October 18, 2017:
https://d3aya7xwz8momx.cloudfront.net/wp-content/uploads/2017/07/
EconomicImpactofIndustry2017.pdf

Nelson, Charles M., *Economic Implications of Land Use Patterns for Natural Resource Recreation and Tourism*, Lansing, Mich.: Michigan Land Resource Project, Public Sector Consultants, 2001.

NSSF—*See* National Shooting Sports Foundation.

Office of the Surgeon General and National Action Alliance for Suicide Prevention, *National Strategy for Suicide Prevention: Goals and Objectives for Action: A Report of the U.S. Surgeon General and of the National Action Alliance for Suicide Prevention*, Washington, D.C.: U.S. Department of Health and Human Services, 2012.

Parker, Kim, Juliana Menasce Horowitz, Ruth Igielnik, Baxter Oliphant, and Anna Brown, *America's Complex Relationship with Guns*, Washington, D.C.: Pew Research Center, June 22, 2017. As of August 14, 2017:
http://assets.pewresearch.org/wp-content/uploads/sites/3/2017/06/06151541/
Guns-Report-FOR-WEBSITE-PDF-6-21.pdf

Piscopo, Kathryn, Rachel N. Lipari, Jennifer Cooney, and Christie Galsheen, *Suicidal Thoughts and Behavior Among Adults: Results from the 2015 National Survey on Drug Use and Health*, NSDUH Data Review, September 2016. As of May 23, 2017:
https://www.samhsa.gov/data/sites/default/files/
NSDUH-DR-FFR3-2015/NSDUH-DR-FFR3-2015.pdf

Public Law 112-265, Investigative Assistance for Violent Crimes Act of 2012, January 14, 2013.

Smith, T. W., and J. Son, *Trends in Gun Ownership in the United States, 1972–2014,* Chicago, Ill.: NORC at the University of Chicago, March 2015. As of March 9, 2017:
http://www.norc.org/PDFs/GSS%20Reports/
GSS_Trends%20in%20Gun%20Ownership_US_1972-2014.pdf

Southwick Associates, *Target Shooting in America*, Newtown, Conn.: National Shooting Sports Foundation, 2013.

U.S. Census Bureau, *Number of Firms, Number of Establishments, Employment, and Annual Payroll by Enterprise Employment Size for the United States, All Industries: 2014,* Washington, D.C., December 2016. As of January 15, 2017:
https://www.census.gov/data/tables/2014/econ/susb/2014-susb-annual.html

U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, *2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation*, Washington, D.C., FH2/11-NAT, 2012.

World Health Organization, *Preventing Suicide: A Global Imperative,* Geneva, 2014. As of May 8, 2017:
http://apps.who.int/iris/bitstream/10665/131056/1/9789241564779_eng.pdf

CHAPTER TWO

# Methods

Our review of evidence concerning the effects of 13 policies on eight outcomes used Royal Society of Medicine (Khan et al., 2003) guidelines for conducting systematic reviews of a scientific literature. Those guidelines consist of a five-step protocol: framing questions for review, identifying relevant literature, assessing the quality of the literature, summarizing the evidence, and interpreting the findings. Our objective was to identify and assess the quality of evidence provided in research that estimated the causal effect of one of the selected gun policies (or the prevalence of firearm ownership) on any of our eight key outcomes.

Before undertaking the review, we knew that we would need to draw on primarily observational studies across a range of disciplines, including economics, psychology, public health, sociology, and criminology. The Royal Society of Medicine approach is suitable in this context because of its flexibility and applicability to social and policy interventions. Other approaches for systematic reviews (e.g., Institute of Medicine, 2011; Higgins and Green, 2011) are designed primarily for reviews specific to health care. We consulted guidelines from the Campbell Collaboration to ensure that our review criteria were based on relevant factors prescribed for reviews of social and policy interventions (e.g., determination of independent findings, statistical procedures; Campbell Collaboration, 2001). However, to more efficiently examine the range of outcomes and interventions we set out to review, and because of the wide range of methods researchers have used to examine these effects, we do not follow the Campbell Collaboration guidelines exactly, as detailed next.

## Selecting Policies

RAND assembled a list of close to 100 distinct gun policies advocated by diverse organizations, including the White House and other U.S. government organizations, advocacy organizations focused on gun policy (such as the National Rifle Association and the Brady Campaign to Prevent Gun Violence), academic organizations focused on gun policy or gun policy research, and professional organizations that had made public recommendations related to gun policy (e.g., the International Association of Chiefs of

Police and the American Bar Association). Our objective was to evaluate state firearm laws because there is considerable variation that could be examined to understand the causal effects of such laws. Moreover, because the laws are applied statewide, observed effects may generalize to new jurisdictions better than the effects of local gun policies or programs that may be more tailored to the unique circumstances giving rise to them. We therefore eliminated policies that chiefly concerned local programs or interventions that are not mandated by state laws (e.g., gun buy-back programs or policing strategies that have been recommended on the basis of favorable research findings). For the same reason, we eliminated policies that either have never been passed into state laws or that have not yet had their intended effects (e.g., laws requiring new handguns to incorporate smart-gun technologies). We excluded policies that we concluded were likely to have only an indirect effect on any of the eight outcomes we were examining (e.g., policies concerning mental health coverage in group health insurance plans; the public availability of Bureau of Alcohol, Tobacco, Firearms and Explosives data on gun traces). We clustered some policy proposals that we regarded as sufficiently similar in concept to be included in the same general class of policies (e.g., policies of repealing the Safe Schools Act and the conceptually similar policy to prohibit gun-free zones).

This process resulted in 13 classes of firearm policies that we subsequently reviewed with multiple representatives of two advocacy organizations (one strongly aligned with enhanced gun regulation, and one strongly aligned with reduced gun regulation). The purpose of these consultations was to establish whether we had identified policies that are important, coherent, and relevant to current gun policy debates. This consultation resulted in substituting two of our original 13 classes of laws. As noted in Chapter One, the final set of policies, defined and explained in Chapters Three through Fifteen, is as follows:

1. background checks
2. bans on the sale of assault weapons and high-capacity magazines
3. stand-your-ground laws
4. prohibitions associated with mental illness
5. lost or stolen firearm reporting requirements
6. licensing and permitting requirements
7. firearm sales reporting and recording requirements
8. child-access prevention laws
9. surrender of firearms by prohibited possessors
10. minimum age requirements
11. concealed-carry laws
12. waiting periods
13. gun-free zones.

These classes of gun policies do not comprehensively account for all—or necessarily the most effective—laws or programs that have been implemented in the United States with the aim of reducing gun violence. For example, our set of policies does not include mandatory minimum sentencing guidelines for crimes with firearms. Further, by restricting our evaluation to state policies, we exclude local interventions (e.g., problem-oriented policing, focused deterrence strategies) that have been found to reduce overall crime in prior meta-analyses (Braga, Papachristos, and Hureau, 2014; Braga and Weisburd, 2012). However, we recognize the potential importance of these other interventions and believe a similar systematic review of their effects on outcomes relevant to the firearm policy debate merits future research.[1]

While Part B of this report evaluates the existing literature on the effects of these 13 classes of firearm policies, Part C includes essays describing scientific research on possible mechanisms by which laws may affect firearm-related outcomes, such as by affecting the prevalence of gun ownership (see Chapters Sixteen and Seventeen).

## Selecting and Reviewing Studies

Our selection and review of the identified literature involved the following steps:

1. Article retrieval: Across all outcomes, we identified a common set of search terms to capture articles relevant to firearm prevalence or firearm policies. We then identified search terms unique for each outcome.
2. Title and abstract review: We conducted separate title and abstract reviews for each outcome using DistillerSR to code criteria used to determine whether the article appeared to meet minimum inclusion criteria (described later).
3. Full-text review: All studies retained after abstract review received full-text review and coding using DistillerSR. The purpose of this review was to identify studies that examined the effects of one or more of our policies on any of our outcomes and that employed methods designed to clarify the causal effects of the policy.
4. Synthesis of evidence: Once we identified the subset of quasi-experimental studies for each outcome and policy,[2] members of the multidisciplinary methodology team met to discuss each study's strengths and limitations. Then, the group discussed each set of studies available for a policy-outcome pair to make a determination about the level of evidence supporting the effect of the policy on each outcome.

---

[1] For a recent review of the evidence on criminal justice interventions to reduce criminal access to firearms, see Braga, 2017.

[2] We identified no experimental studies.

## Article Retrieval

In spring 2016, we queried all databases listed in Table 2.1 for English-language studies. Because the National Research Council (NRC) (2004) and the Community Preventive Services Task Force (Hahn et al., 2005) published comprehensive and high-quality research reviews in 2004 and 2005, we limited our search primarily to research published during or after 2003 (assuming a lag from the time the NRC review was complete and the final report was published). We supplemented this search with a review of all studies reviewed by NRC (2004) and Hahn et al. (2005). Finally, to ensure inclusion of the most-seminal studies, including those that may have been missed by NRC or Hahn et al., we conducted additional searches in the Web of Science and Scopus

**Table 2.1**
**Databases Searched for Studies Examining the Effects of Firearm Policies**

| Database | Details |
|---|---|
| PubMed | National Library of Medicine's database of medical literature. *Not used for gun industry or hunting searches.* |
| PsycINFO | Journal articles, books, reports, and dissertations on psychology and related fields. *Not used for gun industry or hunting searches.* |
| Index to Legal Periodicals | Includes indexing of scholarly articles, symposia, jurisdictional surveys, court decisions, books, and book reviews. |
| Social Science Abstracts | Journal articles and book reviews on anthropology, crime, economics, law, political science, psychology, public administration, and sociology. |
| Web of Science | Includes the Book Citation Index, Science Citation, Social Science Citation, Arts & Humanities Citation Indexes, and Conference Proceedings Citation Indexes for Science, Social Science, and Humanities, which include all cited references from indexed articles. |
| Criminal Justice Abstracts | Abstracts related to criminal justice and criminology; includes current books, book chapters, journal articles, government reports, and dissertations published worldwide. |
| National Criminal Justice Reference Service | Contains summaries of the more than 185,000 criminal justice publications housed in the National Criminal Justice Reference Service Library collection. |
| Sociological Abstracts | Citations and abstracts of sociological literature, including journal articles, books, book chapters, dissertations, and conference papers. |
| EconLit | Journal articles, books, and working papers on economics. |
| Business Source Complete | Business and economics journal articles, country profiles, and industry reports. |
| WorldCat | Catalog of books, web resources, and other material worldwide. |
| Scopus | An abstract and citation database with links to full-text content, covering peer-reviewed research and web sources in scientific, technical, medical, and social science fields, as well as arts and humanities. |
| LawReviews (LexisNexis) | A database of legal reviews. |

databases for any study that had been cited in the literature 70 or more times, regardless of its publication date. Finally, after completing our search, several relevant studies were published in summer and fall 2016. When we became aware of these, we included them in our review.

We conducted separate searches for each of the eight outcomes. The search strings that were applied universally across all outcomes included the following:

- gun or guns or firearm* or handgun* or shotgun* or rifle* or longgun* or machinegun* or pistol* OR automatic weapon OR assault weapon OR semi-automatic weapon OR automatic weapons OR assault weapons OR semi-automatic weapons
  AND
- ownership OR own OR owns OR availab* OR access* OR possess* OR purchas* OR restrict* OR regulat* OR distribut* OR "weapon carrying" OR "weapon-carrying" OR legislation OR legislating OR legislative OR law OR laws OR legal* OR policy OR policies OR "ban" OR "bans" OR "banned."

In addition, we searched for the following outcome-specific search terms:

- suicide: (suicide* OR self-harm* OR self-injur*);
  – the following were the only terms used for "firearms" for this search: gun or guns or firearm* or handgun* or shotgun* or rifle* or longgun* or machine-gun* or pistol*
- violent crime: homicide* OR murder* OR manslaughter OR "domestic violence" OR "spousal abuse" OR "elder abuse" OR "child abuse" OR "family violence" OR "child maltreatment" OR "spousal maltreatment" OR "elder maltreatment" OR "intimate relationship violence" OR "intimate partner violence" OR "dating violence" OR (violen* AND [crime* OR criminal*]) OR rape OR rapes OR rapist* OR "personal crime" OR "personal crimes" OR robbery OR assault* OR stalk* OR terroris*
- unintentional injuries and deaths: accident* OR unintentional
- mass shootings:  "mass shooting" OR "mass shootings"
- officer-involved shootings:  "law enforcement" OR police* OR policing
- defensive gun use: self-defense OR "self defense" OR "personal defense" OR defens* OR self-protect* OR self protect* OR DGU OR SDGU
- hunting and recreation: hunt OR hunting OR "sport shooting" OR "shooting sports" OR recreation* (The terms "ammunition" and "bullets" were also included in the set containing the terms for "firearms.")
- gun industry: industr* OR manufactur* OR produc* OR distribut* OR supply OR trade OR price* OR export* OR revenue* OR sales OR employ* OR profit* OR cost OR costs OR costing OR "gun show" OR tax OR taxes OR taxing OR taxation OR payroll OR "federal firearms license."

We used a three-stage study review process and standardized review criteria (described next) to identify all studies with evidence for policy effects meeting minimum evidence standards. When possible, we calculated and graphed standardized effect sizes for reported effects included in our research syntheses (Chapters Three through Fifteen).

In addition to the planned research syntheses analyzing the effects of the 13 policies outlined in Chapter One, we summarized evidence on other topics when members of the research team believed that a topic provided important supplemental evidence or explanatory information (see Chapters Sixteen through Twenty-Four). For instance, we identified a substantial literature examining the effects of firearm prevalence on rates of suicide (Chapter Sixteen) and homicide (Chapter Seventeen). This literature did not evaluate the effects of a specific policy but nevertheless examined a key mechanism by which policies might affect the outcomes. For these discussions, we occasionally augmented the search strategy described earlier, as detailed in the individual chapters.

## Title and Abstract Review

At this stage, we screened studies to determine whether they met our inclusion criteria. In all cases, a study was included if it met the following: *any empirical study that demonstrated a relationship between a firearm-related public policy and the relevant outcome* OR *any empirical study that demonstrated a relationship between firearm ownership and access and a relevant outcome (including proxy measures for gun ownership).*

Studies were excluded if they were case studies, systematic reviews, dissertations, commentaries or conceptual discussions, descriptive studies, studies in which key variables were assumed rather than measured (e.g., a region was assumed to have higher rates of gun ownership), studies that did not concern one of the eight outcomes we selected, studies that did not concern one of the 13 policies we selected (or gun ownership), or studies that duplicated the analyses and results of other included studies.

## Full-Text Review

Next, we used full-text review to ensure that the studies included thus far did not meet any of the exclusion criteria and to exclude studies with no credible claim to having identified a causal effect of policies. In addition to coding all studies on the policy and outcome they examined and on their research design, we coded the country or countries in which the policy effects were evaluated. Because of the United States' unique legal, policy, and gun ownership context, we excluded studies examining the effects of policies on foreign populations. However, in the special-topic discussions (Chapters Sixteen through Twenty-Four), we include analysis of some studies in foreign countries (such as an analysis of the Australian experience with gun regulation) and various foreign studies of the effects of gun prevalence on suicide.

Our research syntheses (Chapters Three through Fifteen) focus exclusively on studies that used research methods designed to identify causal effects among observed

associations between policies and outcomes. Specifically, we required, at a minimum, that studies include time-series data and use such data to establish that policies preceded their apparent effects (a requirement for a causal effect) and that studies include a control group or comparison group (to demonstrate that the purported causal effect was not found among those who were not exposed to the policy). Experimental designs provide the gold standard for establishing causal effects, but we identified none in our literature reviews. On a case-by-case basis, we examined studies that made a credible claim to causal inference on the basis of data that did not include a time series. In practice, these discussions determined that some studies using instrumental-variable approaches to isolating causal effects satisfied our minimum standards for inclusion.

We refer to the studies that met our inclusion criteria as *quasi-experimental*. We distinguish these from simple *cross-sectional* studies that may show an association between states with a given policy and some outcome but that have no strategy for ensuring that it is the policy that caused the observed differences across states. For instance, there could be some other factor associated with both state policy differences and outcome differences or there could be reverse causality (that is, differences in the outcome across states could have caused states to adopt different policies). In excluding cross-sectional studies from this review, we have adopted a more stringent standard of evidence for causal effects than has often been used in systematic reviews of gun policy.

Although excluding cross-sectional research eliminates a large number of studies on gun policy, longitudinal data are much better for estimating the causal effect of a policy. Specifically, empirical demonstration of causation generally requires three types of evidence (Mill, 1843):

- The cause and effect regularly co-occur (i.e., association).
- The cause occurs before the effect (i.e., precedence).
- Alternative explanations for the association have been ruled out (i.e., elimination of confounds).

Cross-sectional research is largely limited to demonstrating association. Longitudinal studies that include people or regions that are exposed to a policy and those that are not exposed have the potential to provide all three types of evidence. Such a design can demonstrate that the policy preceded the change in the outcome of interest, and it can rule out a wider range of potential confounds, including historical time trends and the time-invariant characteristics of the jurisdictions in which the policies were implemented (Wooldridge, 2002).

We also excluded studies that offered no insight into the causal effects of individual policies. For instance, we excluded studies that evaluated the effects of an aggregate state score describing the totality of each state's gun policies or studies of the aggregate effects of legislation that included multiple gun policies. In rare cases, we excluded from consideration studies that provided insufficient information about their methodologies to evaluate whether they used a credible approach to isolating a causal

effect of policies. In one case (Kalesan et al., 2016), we excluded a study that examined the effects of many of our selected policies on firearm deaths. We did so because of significant methodological problems that we concluded made the findings uninformative, as documented in Schell and Morral (2016). In cases in which authors updated prior published analyses, we generally chose the updated study. However, in one case (Cook and Ludwig, 2003), we present the results from the earlier analysis (Ludwig and Cook, 2000), which was inclusive of more years of data, provided more detail, and included multiple model specifications (although findings were qualitatively the same). The identified studies included individual-level studies (i.e., studies comparing outcomes among people over time) and ecological studies (i.e., studies comparing outcomes in regions over time).

Finally, we excluded studies published prior to 2003 on one policy-outcome pair—concealed-carry laws and violent crime. Our discussion of this topic (see Chapter Thirteen) reviews much of the earlier literature in this area, but we do not count the earlier work in our evidence ratings for several reasons. For starters, this area of gun policy has received the greatest research attention since 2003, and considerable advances have been made in understanding the effects of these laws. In addition, researchers have uncovered serious problems with data sets that were frequently used before 2003. Indeed, Hahn et al. (2005) dismissed all the earlier work that had been done with county-level data (which meant most of the work) on grounds that it was too flawed to rely on for evidence. We do not take that position but do agree with NRC (2004) and Hahn et al. (2005) that the primary conclusion that can be drawn from this earlier literature is that estimates of the effects of concealed-carry laws are highly sensitive to model specification choices, meaning no conclusive evidence can be drawn from the estimates. Because many of the authors engaged in the pre-2003 concealed-carry research continued to publish improved models on improved data sets, we restrict our evidence ratings to just this later work. We do not exclude pre-2003 studies of concealed-carry laws for outcomes other than violent crime, because there are much fewer later studies on which to base evidence ratings for these other outcomes.

Using these inclusion and exclusion criteria, we identified the studies providing the highest-quality evidence of a causal relationship between a policy and an outcome. In judging the quality of studies, we always explicitly considered common methodological shortcomings found in the existing gun policy scientific literature (see Appendix A), especially the following:

- *Models that may have too many estimated parameters for the number of available observations.* We consistently note whenever estimates were based on models with a ratio of less than ten observations per estimated parameter. When the ratio of observations to estimated parameters dropped below five to one and no supplemental evidence of model fit was provided (such as the use of cross-validation or evidence from an analysis of the relative fit of different model specifications), we discount the study's results and do not calculate effect sizes for its estimates.

- *Models making no adjustment to standard errors for the serial correlation regularly found in panel data frequently used in gun policy studies.* We consistently note when studies did not report having made any such adjustment. When a study noted a correction for only heteroscedasticity, we consider that to be evidence of some correction, although this does not generally fully correct bias in the standard errors due to clustering (Aneja, Donohue, and Zhang, 2014).

- *Models for which the dependent variable appears to violate model assumptions, such as linear models of dichotomous outcomes or linear models of rate outcomes (many of which are close to zero).* We consistently note when the data appeared to violate modeling assumptions.

- *Effects with large changes in direction and magnitude across primary model specifications.* We consistently note when a study presented evidence that model results were highly sensitive to different model specifications.

- *Models that identify the effect of policies with too few cases.* We consistently note when the effects of policies were identified on the experiences of a single state or a small number of states. These analyses generally provide less persuasive evidence that observed differences between treated and control cases result from the effects of the policy as opposed to other contemporaneous influences on the outcome.

In Appendix A, we describe other common shortcomings in the existing literature that we do not explicitly discuss in our research syntheses. For instance, in the main chapters of the report, we do not note when papers provided no goodness-of-fit tests or other statistical evidence to justify their covariate selections. Neither do we focus on interpretational difficulties and confusion frequently present in studies using spline or hybrid models to estimate the effects of policies, although we discuss this problem in detail in Appendix A. These problems are so common in this literature that consistently commenting on them as shortcomings would become repetitive and cumbersome.

## Synthesis of Evidence

Members of the research team summarized all available evidence from prioritized studies for each of the 13 policies on each of the eight outcomes. When at least one study met inclusion criteria, a multidisciplinary group of methodologists on the research team discussed each study to identify its strengths and weaknesses. The consensus judgments from these group discussions are summarized in the research syntheses. Then, the group discussed the set of available studies as a whole to make a determination about the level of evidence supporting the effect of the policy on each outcome.

When considering the evidence provided by each analysis in a study, we counted effects with *p*-values greater than 0.20 as providing *uncertain* evidence for the effect of a policy. We use this designation to avoid any suggestion that the failure to find a statistically significant effect means that the policy has no effect. We assume that every policy will have some effect, however small or unintended, so any failure to detect it is a shortcoming of the science, not the policy. When the identified effect has a *p*-value

less than 0.05, we refer to it as a *significant effect*. Finally, when the *p*-value is between 0.05 and 0.20, we refer to the effect as *suggestive*.

We include the suggestive category for several reasons. First, the literature we are reviewing is often underpowered. This means that the probability of rejecting the null hypothesis of no effect even when the policy has a true effect is often very low. As we argue in Appendix A, conducting analyses with low statistical power results in an uncomfortably high probability that effects found to be statistically significant at $p < 0.05$ are in the wrong direction and all effects have exaggerated effect sizes (Gelman and Carlin, 2014). If we had restricted our assessment of evidence to just statistically significant effects, we might base our judgments on an unreliable and biased set of estimates while ignoring the cumulative evidence available in studies reporting nonsignificant results. While the selection of $p < 0.20$ as the criterion for rating evidence as suggestive is arbitrary, this threshold corresponds to effects that are meaningfully more likely to be in the observed direction than in the opposite direction. For instance, if we assume that the policy has about as much chance of having a nonzero effect as having no effect, and the power of the test is 0.8, then $p < 0.20$ suggests that there is only a 20-percent probability of incorrectly rejecting the null hypothesis of no effect. For tests that are more weakly powered, as is common in models we review, a *p*-value less than 0.20 will result in false rejection less than half the time so long as the power of the test is above 0.2 (see, for example, Colquhoun, 2014).

In the final step, we rated the overall strength of the evidence in support of each possible effect of the policy. We approached these evidence ratings with the knowledge that research in this area is modest. Compared with the study of the effects of smoking on cancer, for instance, the study of gun policy effects is in its infancy, so it cannot hope to have anything like the strength of evidence that has accrued in many other areas of social science. Nevertheless, we believed that it would be useful to distinguish the gun policy effects that have relatively stronger or weaker evidence, given the limited evidence base currently available. We did this by establishing the following relativistic scale describing the strength of available evidence:

1. *No studies.* This designation was made when no studies meeting our inclusion criteria evaluated the policy's effect on the outcome.
2. *Inconclusive evidence.* This designation was made when studies with comparable methodological rigor identified inconsistent evidence for the policy's effect on an outcome or when a single study found only uncertain or suggestive effects.
3. *Limited evidence.* This designation was made when at least one study meeting our inclusion criteria and not otherwise compromised by serious methodological problems reported a significant effect of the policy on the outcome, even if other studies meeting our inclusion criteria identified only uncertain or suggestive evidence for the effect of the policy.

4. *Moderate evidence.* This designation was made when two or more studies found significant effects in the same direction and contradictory evidence was not found in other studies with equivalent or strong methods.

5. *Supportive evidence.* This designation was made when (1) at least three studies found suggestive or significant effects in the same direction using at least two independent data sets or (2) the effect was observed in a rigorous experimental study. Our requirement that the effect be found in distinct data sets reflects the fact that many gun policy studies use identical or overlapping data sets (e.g., state homicide rates over several years). Chance associations in these data sets are likely to be identified by all who analyze them. Therefore, our supportive evidence category requires that the effect be confirmed in a separate data set.

These rating criteria provided a framework for our assessments of where the weight of evidence currently lies for each of the policies, but they did not eliminate subjectivity from the review process. In particular, the studies we reviewed spanned a wide range of methodological rigor. When we judged a study to be particularly weak, we discounted its evidence in comparison with stronger studies, which sometimes led us to apply lower evidence rating labels than had the study been stronger.

## Effects of the Inclusion and Exclusion Criteria on the Literature Reviewed

Table 2.2 presents the results of the literature search across all eight outcomes. The final column shows the number of studies meeting all inclusion criteria. No studies satisfying our inclusion criteria were found for two of the eight outcomes.

**Table 2.2**
**Number of Studies Selected for Review at Each Stage of the Review Process**

| Outcome | Total Search Results | Included After Title and Abstract Review | Included After Full-Text Review |
|---|---|---|---|
| Suicide | 1,274 | 183 | 11 |
| Violent crime | 2,656 | 373 | 47 |
| Unintentional injuries and deaths | 531 | 27 | 3 |
| Mass shootings | 77 | 11 | 8 |
| Officer-involved shootings | 187 | 34 | 0 |
| Defensive gun use | 1,435 | 115 | 1 |
| Hunting and recreation | 229 | 0 | 0 |
| Gun industry | 3,180 | 19 | 2 |

Of the studies that were published before 2003, all but Duwe, Kovandzic, and Moody (2002) were considered in the earlier reviews (Hahn et al., 2005; NRC, 2004). Table 2.3 lists the 63 studies meeting all inclusion criteria.

**Table 2.3**
**Studies Meeting Inclusion Criteria**

| No. | Study | No. | Study |
|-----|-------|-----|-------|
| 1 | Aneja, Donohue, and Zhang (2011) | 33 | La Valle and Glover (2012) |
| 2 | Aneja, Donohue, and Zhang (2014) | 34 | Lott (2003) |
| 3 | Ayres and Donohue (2003a) | 35 | Lott (2010) |
| 4 | Ayres and Donohue (2003b) | 36 | Lott and Mustard (1997) |
| 5 | Ayres and Donohue (2009a) | 37 | Lott and Whitley (2001) |
| 6 | Ayres and Donohue (2009b) | 38 | Lott and Whitley (2003) |
| 7 | Cheng and Hoekstra (2013) | 39 | Lott and Whitley (2007) |
| 8 | Cook and Ludwig (2003) | 40 | Luca, Deepak, and Poliquin (2016) |
| 9 | Crifasi et al. (2015) | 41 | Ludwig and Cook (2000) |
| 10 | Cummings et al. (1997a) | 42 | Maltz and Targonski (2002) |
| 11 | DeSimone, Markowitz, and Xu (2013) | 43 | Manski and Pepper (2015) |
| 12 | Donohue (2003) | 44 | Martin and Legault (2005) |
| 13 | Donohue (2004) | 45 | Moody and Marvell (2008) |
| 14 | Duggan (2001) | 46 | Moody and Marvell (2009) |
| 15 | Duggan, Hjalmarsson, and Jacob (2011) | 47 | Moody et al. (2014) |
| 16 | Durlauf, Navarro, and Rivers (2016) | 48 | Plassman and Whitley (2003) |
| 17 | Duwe, Kovandzic, and Moody (2002) | 49 | Raissian (2016) |
| 18 | French and Heagerty (2008) | 50 | Roberts (2009) |
| 19 | Gius (2014) | 51 | Rosengart et al. (2005) |
| 20 | Gius (2015a) | 52 | Rudolph et al. (2015) |
| 21 | Gius (2015b) | 53 | Sen and Panjamapirom (2012) |
| 22 | Gius (2015c) | 54 | Strnad (2007) |
| 23 | Grambsch (2008) | 55 | Swanson et al. (2013) |
| 24 | Helland and Tabarrok (2004) | 56 | Swanson et al. (2016) |
| 25 | Hepburn et al. (2006) | 57 | Vigdor and Mercy (2003) |
| 26 | Humphreys, Gasparrini, and Wiebe (2017) | 58 | Vigdor and Mercy (2006) |
| 27 | Kendall and Tamura (2010) | 59 | Webster, Crifasi, and Vernick (2014) |
| 28 | Koper (2004) | 60 | Webster and Starnes (2000) |
| 29 | Kovandzic, Marvell, and Vieraitis (2005) | 61 | Webster et al. (2004) |
| 30 | La Valle (2007) | 62 | Wright, Wintemute, and Rivara (1999) |
| 31 | La Valle (2010) | 63 | Zeoli and Webster (2010) |
| 32 | La Valle (2013) | | |

In a few cases, some studies published updates to earlier works that expanded the time frame of the analysis, corrected errors, or applied more-advanced statistical methods to a nearly identical data set. In these cases, we do not treat both the earlier and later works as each contributing an equally valid estimate of the effects of a policy. Instead, we treat the latest version of the analysis as superseding the earlier versions, and we focus our reviews on the superseding analysis. In one case, we substituted an earlier study (Ludwig and Cook, 2000) for a later study (Cook and Ludwig, 2003). We did this because the earlier study included a longer data series, used a model with greater statistical power, and provided more-detailed results; in addition, the estimated effects of policies in the two papers were identical for the estimates of interest to us in this review. Table 2.4 lists the superseded studies and their superseding versions.

Table 2.5 describes the policies and outcomes evaluated by each study that was not superseded, and studies are indicated with their corresponding number in Table 2.3. These studies are discussed in detail in subsequent chapters.

**Table 2.4**
**Superseded Studies**

| Superseded | Superseding |
| --- | --- |
| Aneja, Donohue, and Zhang (2011); Ayres and Donohue (2003a, 2003b, 2009a, 2009b); Donohue (2003, 2004) | Aneja, Donohue, and Zhang (2014) |
| La Valle (2007, 2010) | La Valle (2013), La Valle and Glover (2012) |
| Moody and Marvell (2008, 2009) | Moody et al. (2014) |
| Vigdor and Mercy (2003) | Vigdor and Mercy (2006) |

**Table 2.5**
**Included Studies, by Policy and Outcome**

| Policy | Suicide | Violent Crime | Unintentional Injuries and Deaths | Mass Shootings | Officer-Involved Shootings | Defensive Gun Use | Hunting and Recreation | Gun Industry | Total |
|---|---|---|---|---|---|---|---|---|---|
| Background checks | 15, 41, 53 | 15, 20, 32, 35, 41, 53, 55, 56, 58, 62 | | 40 | | | | | 11 |
| Bans on the sale of assault weapons and high-capacity magazines | | 19, 35 | | 22, 40 | | | | 28 | 5 |
| Stand-your-ground laws | | 7, 26, 59 | | | | 7 | | | 3 |
| Prohibitions associated with mental illness | 53, 56 | 53, 55, 56 | | | | | | | 3 |
| Lost or stolen firearm reporting requirements | | | | | | | | | 0 |
| Licensing and permitting requirements | 9, 61 | 32, 52, 59 | | 40 | | | | | 6 |
| Firearm sales reporting and recording requirements | | | | | | | | | 0 |
| Child-access prevention laws | 10, 11, 21, 37, 61 | 10, 37 | 10, 11, 21, 25, 37, 60, 61 | 34 | | | | | 8 |
| Surrender of firearms by prohibited possessors | | 49, 58, 63 | | | | | | | 3 |
| Minimum age requirements | 21, 51, 61 | 51, 52 | 21 | 40 | | | | | 5 |
| Concealed-carry laws | 11, 51 | 2, 16, 18, 19, 23, 24, 27, 29, 32, 33, 38, 39, 42, 43, 44, 47, 48, 50, 51, 54, 59 | 11, 36 | 17, 34, 40 | | | | 14 | 27 |
| Waiting periods | 41 | 41, 50 | | 34, 40 | | | | | 4 |
| Gun-free zones | | | | | | | | | 0 |
| Total | 12 | 37 | 8 | 4 | 0 | 1 | 0 | 2 | 50 |

NOTE: Numbers refer to individual studies; see Table 2.3 to view which study corresponds to which number. Totals along the bottom row do not exactly match those in Table 2.2 because superseded studies are not counted in this table, and other studies were identified after the initial literature search.

## Effect Size Estimates

To compare the magnitude of effects across studies, we calculated and present incidence rate ratios (IRRs) for most of the estimates of policy effects that we considered in reaching our consensus ratings. In rare cases noted in the text, we were unable to calculate IRRs from the information provided in the report. Studies reporting the results from a negative binomial or Poisson regression model are directly reported in our report figures as IRRs with their associated confidence intervals (CIs). Given the low probability of most of our outcomes, odds ratios were interpreted and reported as IRRs with their associated CIs.

Many studies used fixed-effects ordinary linear regression models. In these cases, an average base rate (usually taken from the study's paper itself) of the outcome of interest was determined. We then used the base rate to transform the regression estimate, $\beta$, to an IRR using the following formula:

$$IRR = \frac{(\text{average base rate} + \beta)}{\text{average base rate}}.$$

However, if the linear model used a logged dependent variable, we used the exponentiated estimate as its IRR. CIs for the IRRs derived from the linear regression models were transformed in a similar fashion.

When a study did not report a measure of variation, we performed back calculation from a test statistic to estimate the CIs. For Rudolph et al. (2015), we inferred approximate standard errors from the $p$-value associated with a permutation test presented to demonstrate the likely statistical significance of the reported finding. For Crifasi et al. (2015), we present the IRR and CI for a secondary specification that used a negative binomial model. For several other studies, we note that we could not extrapolate an IRR or its CIs from the data provided in the paper.

Models estimating linear or other trend effects for policies do not have a constant effect size over time. Even if we selected an arbitrary period over which to calculate an effect size, these papers do not provide sufficient information to estimate CIs for such effects. Therefore, we do not calculate or display IRR values that take into account trend effects or effects calculated as the combination of a trend and a step effect (*hybrid models*). Although we report the authors' interpretation of these effects, we do not count them as compelling evidence for the effects of a policy, for reasons discussed in Appendix A.

IRRs are calculated and graphed so that estimates of the effects of policies can be compared on a common metric. We do not use them to construct meta-analytic estimates of policy effects for two reasons. First, most studies we reviewed examining the effect of a policy on a particular outcome used nearly identical data sets, meaning the studies do not offer independent estimates of the effect. Second, there are usually only

two or three studies available on which to estimate the effect of the policy, and these studies often differ considerably in their methodological rigor. These limitations in the existing literature led us to pursue a more qualitative evaluation of the conclusions that available studies can support.

## Chapter Two References

Aneja, Abhay, John J. Donohue III, and Alexandria Zhang, "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," *American Law and Economics Review*, Vol. 13, No. 2, 2011, pp. 565–631.

———, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy*, Stanford, Calif.: Stanford Law School, Olin Working Paper No. 461, December 1, 2014. As of May 21, 2017:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681

Ayres, Ian, and John J. Donohue III, "Shooting Down the More Guns, Less Crime Hypothesis," *Stanford Law Review*, Vol. 55, No. 4, 2003a, pp. 1193–1312.

———, "The Latest Misfires in Support of the More Guns, Less Crime Hypothesis," *Stanford Law Review*, Vol. 55, No. 4, 2003b, pp. 1371–1398.

———, "Yet Another Refutation of the More Guns, Less Crime Hypothesis—with Some Help from Moody and Marvell," *Econ Journal Watch*, Vol. 6, No. 1, January 2009a, pp. 35–59.

———, "More Guns, Less Crime Fails Again: The Latest Evidence from 1977–2006," *Econ Journal Watch*, Vol. 6, No. 2, May 2009b, pp. 218–238.

Braga, Anthony A., "Guns and Crime," in F. Parisi, ed., *The Oxford Handbook of Law and Economics*, Vol. 3: *Public Law and Legal Institutions*, New York: Oxford University Press, 2017, pp. 344–369.

Braga, Anthony A., Andrew V. Papachristos, and David M. Hureau, "The Effects of Hot Spots Policing on Crime: An Updated Systematic Review and Meta-Analysis," *Justice Quarterly*, Vol. 31, No. 4, 2014, pp. 633–663.

Braga, Anthony A., and David L. Weisburd, "The Effects of Focused Deterrence Strategies on Crime: A Systematic Review and Meta-Analysis of the Empirical Evidence," *Journal of Research in Crime and Delinquency*, Vol. 49, No. 3, 2012, pp. 323–358.

Campbell Collaboration, *Guidelines for Preparation of Review Protocols*, Version 1.0, Oslo, Norway, January 1, 2001. As of October 13, 2017:
https://www.campbellcollaboration.org/images/pdf/plain-language/C2_Protocols_guidelines_v1.pdf

Cheng, Cheng, and Mark Hoekstra, "Does Strengthening Self-Defense Law Deter Crime or Escalate Violence? Evidence from Expansions to Castle Doctrine," *Journal of Human Resources*, Vol. 48, No. 3, 2013, pp. 821–853.

Colquhoun, D., "An Investigation of the False Discovery Rate and the Misinterpretation of *p*-Values," *Royal Society Open Science*, Vol. 1, No. 3, 2014.

Cook, P. J., and Jens Ludwig, "The Effect of the Brady Act on Gun Violence," in B. Harcourt, ed., *Guns, Crime, and Punishment in America*, New York: New York University Press, 2003, pp. 283–298.

Crifasi, C. K., J. S. Meyers, J. S. Vernick, and D. W. Webster, "Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates," *Preventive Medicine*, Vol. 79, 2015, pp. 43–49.

Cummings, P., D. C. Grossman, F. P. Rivara, and T. D. Koepsell, "State Gun Safe Storage Laws and Child Mortality Due to Firearms," *JAMA*, Vol. 278, No. 13, 1997a, pp. 1084–1086.

DeSimone, J., S. Markowitz, and J. Xu, "Child Access Prevention Laws and Nonfatal Gun Injuries," *Southern Economic Journal*, Vol. 80, No. 1, 2013, pp. 5–25.

Donohue, John J., "The Impact of Concealed Carry Laws," in Jens Ludwig and Phillip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence,* Washington, D.C.: Brookings Institution Press, 2003, pp. 287–341.

———, "Guns, Crime, and the Impact of State Right-to-Carry Laws," *Fordham Law Review*, Vol. 73, No. 2, 2004, pp. 623–652.

Duggan, Mark, "More Guns, More Crime," *Journal of Political Economy*, Vol. 109, No. 5, 2001, pp. 1086–1114.

Duggan, Mark, Randi Hjalmarsson, and Brian A. Jacob, "The Short-Term and Localized Effect of Gun Shows: Evidence from California and Texas," *Review of Economics and Statistics*, Vol. 93, No. 3, 2011, pp. 786–799.

Durlauf, Steven, S. Navarro, and D. A. Rivers, "Model Uncertainty and the Effect of Shall-Issue Right-to-Carry Laws on Crime," *European Economic Review*, Vol. 81, 2016, pp. 32–67.

Duwe, Grant, Tomislav Kovandzic, and Carlisle E. Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies*, Vol. 6, No. 4, 2002, pp. 271–296.

French, B., and P. J. Heagerty, "Analysis of Longitudinal Data to Evaluate a Policy Change," *Statistics in Medicine*, Vol. 27, No. 24, 2008, pp. 5005–5025.

Gelman, Andrew, and John Carlin, "Power Calculations: Assessing Type S (Sign) and Type M (Magnitude) Errors," *Perspectives on Psychological Science*, Vol. 9, No. 6, 2014, pp. 641–651.

Gius, Mark, "An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates," *Applied Economics Letters*, Vol. 21, No. 4, 2014, pp. 265–267.

———, "The Effects of State and Federal Background Checks on State-Level Gun-Related Murder Rates," *Applied Economics*, Vol. 47, No. 38, 2015a, pp. 4090–4101.

———, "The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths," *Social Science Journal*, Vol. 52, No. 2, 2015b, pp. 168–175.

———, "The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings," *Applied Economics Letters,* Vol. 22, No. 4, 2015c, pp. 281–284.

Grambsch, P., "Regression to the Mean, Murder Rates, and Shall-Issue Laws," *American Statistician*, Vol. 62, No. 4, 2008, pp. 289–295.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Helland, E., and A. Tabarrok, "Using Placebo Laws to Test 'More Guns, Less Crime,'" *Advances in Economic Analysis and Policy*, Vol. 4, No. 1, 2004.

Hepburn, L., D. Azrael, M. Miller, and D. Hemenway, "The Effect of Child Access Prevention Laws on Unintentional Child Firearm Fatalities, 1979–2000," *Journal of Trauma-Injury Infection and Critical Care*, Vol. 61, No. 2, 2006, pp. 423–428.

Higgins, Julian P. T., and Sally Green, eds., *Cochrane Handbook for Systematic Reviews of Interventions*, Version 5.1.0, London: Cochrane Collaboration, March 2011. As of October 13, 2017: http://handbook.cochrane.org

Humphreys, David K., Antonio Gasparrini, and Douglas J. Wiebe, "Evaluating the Impact of Florida's 'Stand Your Ground' Self-Defense Law on Homicide and Suicide by Firearm: An Interrupted Time Series Study," *JAMA Internal Medicine*, Vol. 177, No. 1, 2017, pp. 44–50.

Institute of Medicine, *Finding What Works in Health Care: Standards for Systematic Reviews*, Washington, D.C.: National Academies Press, 2011.

Kalesan, Bindu, Matthew E. Mobily, Olivia Keiser, Jeffrey A. Fagan, and Sandro Galea, "Firearm Legislation and Firearm Mortality in the USA: A Cross-Sectional, State-Level Study," *Lancet*, Vol. 387, No. 10030, April 30, 2016, pp. 1847–1855.

Kendall, Todd D., and Robert Tamura, "Unmarried Fertility, Crime, and Social Stigma," *Journal of Law and Economics*, Vol. 53, No. 1, 2010, pp. 185–221.

Khan, Khalid S., Regina Kunz, Jos Kleijnen, and Gerd Antes, "Five Steps to Conducting a Systematic Review," *Journal of the Royal Society of Medicine*, Vol. 96, No. 3, 2003, pp. 118–121.

Koper, Christopher S., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence 1994–2003*, Washington, D.C.: National Institute of Justice, U.S. Department of Justice, 2004.

Kovandzic, T. V., T. B. Marvell, and L. M. Vieraitis, "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates—Evidence from Panel Data for Large Urban Cities," *Homicide Studies*, Vol. 9, No. 4, 2005, pp. 292–323.

La Valle, James M., "Rebuilding at Gunpoint: A City-Level Re-Estimation of the Brady Law and RTC Laws in the Wake of Hurricane Katrina," *Criminal Justice Policy Review,* Vol. 18, No. 4, 2007, pp. 451–465.

———, "Re-Estimating Gun-Policy Effects According to a National Science Academy Report: Were Previous Reports of Failure Premature?" *Journal of Crime and Justice,* Vol. 33, No. 1, 2010, pp. 71–95.

———, "'Gun Control' vs. 'Self-Protection': A Case Against the Ideological Divide," *Justice Policy Journal*, Vol. 10, No. 1, 2013, pp. 1–26.

La Valle, James M., and Thomas C. Glover, "Revisiting Licensed Handgun Carrying: Personal Protection or Interpersonal Liability?" *American Journal of Criminal Justice*, Vol. 37, No. 4, 2012, pp. 580–601.

Lott, John R., Jr., *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control Is Wrong*, Washington, D.C.: Regnery Publishing, Inc., 2003.

———, *More Guns, Less Crime: Understanding Crime and Gun-Control Laws*, 3rd ed., Chicago, Ill.: University of Chicago Press, 2010.

Lott, John R., Jr., and D. B. Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," *Journal of Legal Studies,* Vol. 26, No. 1, 1997, pp. 1–68.

Lott, John R., Jr., and John E. Whitley, "Safe-Storage Gun Laws: Accidental Deaths, Suicides, and Crime," *Journal of Law and Economics*, Vol. 44, No. 2, 2001, pp. 659–689.

———, "Measurement Error in County-Level UCR Data," *Journal of Quantitative Criminology*, Vol. 19, No. 2, June 2003, pp. 185–198.

———, "Abortion and Crime: Unwanted Children and Out-of-Wedlock Births," *Economic Inquiry*, Vol. 45, No. 2, 2007, pp. 304–324.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy,* working paper, Boston, Mass.: Harvard Business School, 2016.

Ludwig, J., and P. J. Cook, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act," *JAMA*, Vol. 284, No. 5, 2000, pp. 585–591.

Maltz, M. D., and J. Targonski, "A Note on the Use of County-Level UCR Data, *Journal of Quantitative Criminology*, Vol. 18, No. 2, 2002, pp. 297–318.

Manski, Charles F., and John V. Pepper, *How Do Right-to-Carry Laws Affect Crime Rates? Coping with Ambiguity Using Bounded-Variation Assumptions*, Cambridge, Mass.: National Bureau for Economic Research, NBER Working Paper 21701, November 2015.

Martin, Robert A., and Richard L. Legault, "Systematic Measurement Error with State-Level Crime Data: Evidence from the 'More Guns, Less Crime' Debate," *Journal of Research in Crime and Delinquency*, Vol. 42, No. 2, May 2005, pp. 187–210.

Mill, John Stuart, *A System of Logic,* London: Parker, 1843.

Moody, Carlisle E., and Thomas B. Marvell, "The Debate on Shall-Issue Laws," *Econ Journal Watch*, Vol. 5, No. 3, 2008, pp. 269–293.

———, "The Debate on Shall-Issue Laws, Continued," *Econ Journal Watch*, Vol. 6, No. 2, 2009.

Moody, Carlisle E., Thomas B. Marvell, Paul R. Zimmerman, and Fasil Alemante, "The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," *Review of Economics and Finance*, Vol. 4, 2014, pp. 33–43.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Plassmann, F., and J. E. Whitley, "Comments: Confirming More Guns, Less Crime," *Stanford Law Review*, Vol. 55, No. 4, 2003, pp. 1313–1369.

Raissian, Kerri M., "Hold Your Fire: Did the 1996 Federal Gun Control Act Expansion Reduce Domestic Homicides?" *Journal of Policy Analysis and Management*, Vol. 35, No. 1, Winter 2016, pp. 67–93.

Roberts, Darryl W., "Intimate Partner Homicide: Relationships to Alcohol and Firearms," *Journal of Contemporary Criminal Justice*, Vol. 25, No. 1, 2009, pp. 67–88.

Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Rivara, "An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates," *Injury Prevention*, Vol. 11, No. 2, 2005, pp. 77–83.

Rudolph, K. E., E. A. Stuart, J. S. Vernick, and D. W. Webster, "Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides," *American Journal of Public Health*, Vol. 105, No. 8, 2015, pp. E49–E54.

Schell, Terry L., and Andrew R. Morral, *Evaluating Methods and Findings from a Study of State Gun Policies*, Santa Monica, Calif.: RAND Corporation, RR-1642-RC, 2016. As of January 13, 2017: http://www.rand.org/pubs/research_reports/RR1642.html

Sen, B., and A. Panjamapirom, "State Background Checks for Gun Purchase and Firearm Deaths: An Exploratory Study," *Preventive Medicine*, Vol. 55, No. 4, 2012, pp. 346–350.

Strnad, Jeff, "Should Legal Empiricists Go Bayesian?" *American Law and Economics Review*, Vol. 9, No. 1, Spring 2007, pp. 195–303.

Swanson, Jeffrey W., Michele M. Easter, Allison G. Robertson, Marvin S. Swartz, Kelly Alanis-Hirsch, Daniel Moseley, Charles Dion, and John Petrila, "Gun Violence, Mental Illness, and Laws That Prohibit Gun Possession: Evidence from Two Florida Counties," *Health Affairs*, Vol. 35, No. 6, 2016, pp. 1067–1075.

Swanson, J. W., A. G. Robertson, L. K. Frisman, M. A. Norko, H. Lin, M. S. Swartz, and P. J. Cook, "Preventing Gun Violence Involving People with Serious Mental Illness," in D. W. Webster and J. S. Vernick, eds., *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis*, Baltimore, Md.: Johns Hopkins University Press, 2013, pp. 33–51.

Vigdor, E. R., and J. A. Mercy, "Disarming Batterers: The Impact of Domestic Violence Firearms Laws," in Jens Ludwig and Phillip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence,* Washington, D.C.: Brookings Institution Press, 2003, pp. 157–200.

———, "Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Homicide?" *Evaluation Review*, Vol. 30, No. 3, 2006, pp. 313–346.

Webster, D., C. K. Crifasi, and J. S. Vernick, "Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides," *Journal of Urban Health*, Vol. 91, No. 2, 2014, pp. 293–302.

Webster, D. W., J. S. Vernick, A. M. Zeoli, and J. A. Manganello, "Association Between Youth-Focused Firearm Laws and Youth Suicides," *JAMA*, Vol. 292, No. 5, 2004, pp. 594–601.

Wooldridge, J. M., *Econometric Analysis of Cross Section and Panel Data*, Cambridge, Mass.: MIT Press, 2002.

Wright, M. A., G. J. Wintemute, and F. P. Rivara, "Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence," *American Journal of Public Health*, Vol. 89, No. 1, 1999, pp. 88–90.

Zeoli, A. M., and D. W. Webster, "Effects of Domestic Violence Policies, Alcohol Taxes and Police Staffing Levels on Intimate Partner Homicide in Large U.S. Cities," *Injury Prevention*, Vol. 16, No. 2, 2010, pp. 90–95.

PART B
## Evidence on the Effects of 13 Policies

CHAPTER THREE

# Background Checks

Background checks for gun purchases are designed to prevent access to guns by convicted felons and other prohibited possessors—such as minors, fugitives from justice, those who live in the United States illegally, users of controlled substances, those with certain histories of mental illness, those who have been dishonorably discharged from the military, those who have renounced their U.S. citizenship, those subject to a restraining order, and those convicted of domestic violence offenses (18 U.S.C. 922).

The Brady Handgun Violence Prevention Act (the Brady Act), which went into effect in 1994, imposed federal requirements for background checks on sales by licensed dealers (18 U.S.C. 922) but not for private sales or transfers of firearms (such as gifts). Several states have expanded this federal requirement to mandate that background checks be conducted for all firearm sales and transfers, including those between private parties. Such laws are referred to as *universal background check* laws.

Background check laws prevent firearm purchase or possession by individuals thought to be at high risk of presenting a danger to themselves or others. By restricting the means by which dangerous individuals could otherwise access guns, these laws are designed to reduce gun crime and violence. While compliance is likely to be imperfect, a universal background check may still reduce gun-related homicides or suicides by deterring prohibited possessors from attempting to acquire firearms or by making it harder for them to succeed in doing so. Universal background checks may also reduce illegal gun trafficking. For instance, when analyzing crime guns,[1] Webster, Vernick, and Bulzacchelli (2009) found that fewer of the out-of-state guns originated in states with universal background checks than in states with no background checks for private sales of firearms. The magnitude of the effects of such laws will, in part, be influenced by the level of enforcement and the availability of firearms through alternative markets, such as illegal markets or legal markets in states without background checks for private transactions.

---

[1] The Bureau of Alcohol, Tobacco, and Firearms (2002, p. A-3) defined *crime gun* as "any firearm that is illegally possessed, used in a crime, or suspected to have been used in a crime. An abandoned firearm may also be categorized as a crime gun if it is suspected it was used in a crime or illegally possessed."

We found no routinely collected data on how individuals obtain guns, but a 2015 national survey of gun owners who obtained a firearm within the previous two years found that 22 percent had purchased, or received as a gift or an inheritance, their most recent firearm without undergoing a background check (Miller, Hepburn, and Azrael, 2017). For firearms purchased through private sources, 50 percent were acquired without a background check (Miller, Hepburn, and Azrael, 2017). Obtaining firearms from private sources is likely substantially more common among prohibited possessors. Indeed, a 2004 survey of state prison inmates found that among those who used a gun, only 10 percent purchased the weapon from a licensed dealer, whereas 70 percent acquired it from a friend, family member, or "street" source, such as an illicit broker (Cook, Parker, and Pollack, 2015). Using the same survey data but restricting the sample to 13 states considered by the authors to have less-restrictive firearm regulations, another study found that among inmates who acquired their gun from a friend, family member, or "street" source, just more than 40 percent had a disqualifying condition (e.g., prior felony conviction, dishonorable discharge, under age 18) that should have prohibited them from obtaining the firearm had they undergone a background check (Vittes, Vernick, and Webster, 2012).

Universal background check policies may do little to limit existing illegal sources of firearms to criminal offenders (Kopel, 2016), and background check policies can, at best, prevent such individuals only from acquiring new firearms, not from maintaining possession of those they owned before becoming a prohibited possessor. However, if the implementation and enforcement of such policies is successful in stemming the flow of new firearms and ammunition to criminal markets, universal background check laws could reduce gun crime by increasing the price of firearms in the secondary markets on which criminals mostly rely (Cook, Molliconi, and Cole, 1995).

The effects of background check policies will hinge on the scope of disqualifications for high-risk individuals and whether these disqualifications correctly target individuals who present greater danger to themselves or others. As of April 2017, the Federal Bureau of Investigation (FBI)'s National Instant Criminal Background Check System (NICS) database currently includes more than 16,500,000 active records on prohibited possessors (FBI, 2017). However, this figure substantially undercounts prohibited possessors because states' reporting is incomplete and the FBI does not maintain records on those prohibited only for being underage. The excess risk of firearm violence attributable to prohibited individuals is unknown, although research has shown that the majority of violent offenders have previous involvement with the criminal justice system (Wright and Wintemute, 2010; Cook, Ludwig, and Braga, 2005; Kleck and Bordua, 1983) and that individuals prohibited from owning a firearm because of mental health problems are at elevated risk of suicide (see Chapter Nineteen).

Although firearms are used relatively rarely in intimate partner violence overall— for example, in fewer than 1 percent of nonfatal intimate partner violence police reports

in New York City (Joshi and Sorenson, 2010)—the majority of domestic homicides involve firearms (Cooper and Smith, 2011). In addition, more than two-thirds of these homicides are preceded by a history of assaults (Juodis et al., 2014; Campbell et al., 2003; McFarlane et al., 1999). Furthermore, one study found that of the 116 mass shooting incidents between 2009 and 2016 for which information was available, 44 incidents (34 percent) involved a prohibited possessor (Everytown for Gun Safety Support Fund, 2017b). This share may be much lower for public mass shootings; one analysis reports that the majority of recent public mass shooters purchased at least one of their weapons legally and with a federal background check (Buchanan et al., 2016).

In assessing background check policies, the ideal analyses would estimate effects on outcomes specifically for those populations or individuals whose access to firearms became restricted under the regulations. For instance, to study the impact on suicide of background check laws that disqualify individuals with mental illness, one would like to estimate how, after the law was implemented, suicide rates changed specifically among individuals newly prohibited by the law. Similarly, data on the price of firearms in secondary and illegal markets would be valuable for understanding whether background check laws or their expansion to new populations of prohibited possessors cause access to firearms in secondary markets to become restricted.

However, there are numerous challenges to undertaking this type of analysis, because most data sources available to researchers lack detailed information on the characteristics of criminal offenders or suicide victims beyond age, gender, and race/ethnicity. In some cases (e.g., restraining orders), an individual may be only temporarily prohibited from possessing a firearm, and, in the case of crime outcomes, details on the criminal offender can be known only if the perpetrator is known. (See discussion of data limitations in Chapter Twenty-Five.) Given these challenges, it is unsurprising that most of the articles meeting our inclusion criteria for this policy did not use these types of data. Nevertheless, two studies (Swanson et al., 2013; Swanson et al., 2016) were able to merge administrative records from public health and criminal justice agencies to focus on violent crime outcomes for individuals with disqualifying mental health conditions.

## State Implementation of Background Checks

As of January 1, 2017, 19 states and the District of Columbia have promulgated some universal background check laws (Giffords Law Center to Prevent Gun Violence, undated-f). Eight states and the District of Columbia have comprehensive background check laws that require checks at the point of transfer for all firearms.[2] Even within

---

[2]   California, Colorado, Delaware, Nevada, New York, Oregon, Rhode Island, and Washington. See Calif. Penal Code §§28220; Colo. Rev. Stat. § 18-12-112; 11 Del.C. § 1448A; Nev. Rev. Stat. Ann. § 202.254; N.Y.

these states, there are some differences in the laws. For example, California, Colorado, Delaware, Nevada, New York, Washington, and the District of Columbia require that all transfers to individuals (with some minor exceptions) are processed through licensed dealers, who conduct the background checks.[3] Somewhat similarly, Oregon requires all transfers and background checks to be processed through dealers, except that sellers at gun shows may request background checks directly with the Department of State Police.[4] Two more states, Pennsylvania and Maryland, have the same universal background check requirements, but they are applicable only to handguns.[5]

Other states require background checks before law enforcement can issue a permit to purchase. Five states have promulgated such laws for all firearms,[6] while four states have such laws for handguns only.[7] Under these laws, firearms (or handguns in the latter four states) may not be purchased without permits, but the permitting systems and rules differ. For example, in Hawaii, a permit for a handgun must be used within ten days of receipt, and a new permit must be issued for each handgun transfer.[8] In Illinois, however, a permit lasts ten years.[9] Furthermore, some states allow exceptions for those who hold permits to carry or concealed-carry permits, which may have longer durations than the permits to purchase.[10]

---

Gen. Bus. Law §§ 897, 898; O.R.S. § 166.435; R.I. Gen. Laws §§ 11-47-35; Wash. Rev. Code Ann. § 9.41.113; D.C. Code Ann. §§ 7-2502.01, 7-2502.03.

[3]   Calif. Penal Code §§ 27545, 27875; Colo. Rev. Stat. § 18-12-112; 24 Del.C. § 904A; Nev. Rev. Stat. Ann. § 202.254; N.Y. Gen. Bus. Law § 898; Wash. Rev. Code Ann. § 9.41.113; D.C. Code Ann. § 7-2505.02.

[4]   O.R.S. §§ 166.435, 166.436.

[5]   18 Pa. Cons. Stat. Ann. § 6111; Md. Code Ann., Pub. Safety § 5-124. In Pennsylvania, the checks must be processed through a licensed dealer. In Maryland, the seller may go through a dealer or contact the law enforcement agency personally.

[6]   Connecticut, Hawaii, Illinois, Massachusetts, and New Jersey. See Conn. Gen. Stat. §§ 29-33, 28, 36f, 36g; Hawaii Rev. Stat. Ann. § 134-2; 430 Ill. Comp. Stat. 65/2, 65/4; Mass. Gen. Laws Ch.140 §§ 129B, 129C; N.J. Stat. Ann. § 2C: 58-3.

[7]   Iowa, Michigan, Nebraska, and North Carolina. See Ia. Code § 724.15; Mich. Comp. Laws § 28.422; Neb. Rev. Stat. Ann. § 69-2404 69-2405; N.C. Gen. Stat. § 14-402, 14-404.

[8]   Hawaii Rev. Stat. Ann. § 134-2. But note that long-gun permits last for one year and can be used for multiple purchases.

[9]   430 Ill. Comp. Stat. 65/7.

[10]   For example, individuals purchasing a firearm in Massachusetts must obtain a firearm identification card, which lasts three years; however, there is an exception for holders of permits to carry, which last up to six years (Mass. Gen. Laws Ch. 140 §§ 122, 129C). In Illinois, there is an exception for holders of concealed-carry permits, but those last only five years (compared with the ten years for the permit to purchase), so the exception does not typically extend the permit period for gun purchases (430 Ill. Comp. Stat. 65/2).

## Effects on Suicide

### Research Synthesis Findings

In 2004, the National Research Council (NRC) identified only four quasi-experimental studies that examine the impact of gun policies on suicide outcomes. One of these four was Ludwig and Cook (2000), which studied the impact of the 1994 Brady Act and found uncertain effects of the policy on total suicides, firearm suicides, and the proportion of adult suicides caused by a firearm. When restricted to suicides among those aged 55 and older, however, there was a statistically significant decrease in firearm suicides of around 6 percent and in the proportion of suicides involving a firearm of 2.2 percent. However, there was an offsetting increase in suicides by other means and thus only suggestive evidence of a statistically significant decrease in total suicides in this age group. A limitation of the Ludwig and Cook (2000) study is that it had an unfavorable ratio of estimated parameters to observations (less than one to six), meaning it could have misleading parameter estimates and confidence intervals (CIs) due to model overfitting.[11]

In another systematic review, Hahn et al. (2005) evaluated the effects of the gun-acquisition prohibitions that background checks enforce. That review identified one other study of suicide, but it was cross-sectional and did not meet our inclusion criteria. Hahn and colleagues concluded that "available evidence is insufficient to determine the effects of firearms acquisition restriction on public health and criminal violence" (p. 51).

Since the NRC (2004) and Hahn et al. (2005) reports, two additional studies provided evidence on the impact of background checks on suicide. Sen and Panjamapirom (2012) assessed how different *types* of background checks conducted by states affected suicides between 1996 and 2005. They noted that the supply of state and local records to the NICS is voluntary and that substantial variation exists in state laws regarding the categories of records included in background checks. The authors characterized variation across states in background check requirements using an index of the comprehensiveness of such checks, as well as individual indicators for whether states check on restraining orders, mental illness, fugitive status, misdemeanors, and other miscellaneous records. Using state-level data from 1996 to 2005, the authors examined the effects of these types of checks and the effects of a state having a pre–Brady Act background check requirement on both firearm and total suicides. Their regression models included state-level covariates, a lagged outcome variable, and fixed effects for year and census subregion.

---

[11]  Ludwig and Cook (2000) also tested the effects of background checks specifically (separate from waiting periods, also imposed by the Brady Act) by comparing five of 32 states that were required to implement background checks but that did not experience a change in their waiting periods (either because they already had a waiting period of five days or more when the Brady Act required this nationally or they implemented an instantaneous background check). These analyses had a ratio of estimated parameters to observations of less than five to one, which did not meet our inclusion criteria.

Sen and Panjamapirom (2012) found an effect of the total number of background check categories on firearm suicides (adjusted incidence rate ratio [IRR] = 0.98; 95-percent CI: 0.96, 1.00). Background checks for mental illness were related to lower firearm suicide and total suicide rates. Sen and Panjamapirom's estimates suggest the post-policy firearm suicide rate to be 96 percent of the expected rate had this policy not been in effect and the total suicide rate to be 97 percent of the expected rate. Background checks for fugitive status were also associated with lower firearm suicide and total suicide rates; the estimated effect for checks of fugitive status suggests that these checks lower firearm suicide rates to 95 percent of what they would otherwise be, and they lower total suicide rates to 91 percent of the expected rate. In this case, however, so few states changed this policy during the study time frame that these effects cannot persuasively be attributed to the background check policy as opposed to other factors affecting suicides in the states around the same time their laws changed. Checks for misdemeanor offenses were also associated with a firearm suicide rate just 95 percent of the expected rate without such checks, although the effect on total suicide was uncertain.

One additional study (Duggan, Hjalmarsson, and Jacob, 2011) examined the short-term effect of gun shows on firearm suicides. Absent state legislation to the contrary, gun-show vendors (and other private sellers) that are not federally licensed dealers are not required to conduct background checks on purchasers, which Duggan, Hjalmarsson, and Jacob (2011) referred to as the *gun-show loophole and which is hereafter termed the gun-show exception*. Some states have passed legislation requiring background checks for all buyers at gun shows. Duggan, Hjalmarsson, and Jacob (2011) examined whether there is a differential effect of gun shows on suicides (separating firearm from nonfirearm suicides, but not estimating total suicides) in a state that has a gun-show *exception* (Texas) compared with a state that has no such *exception* (California). Although they found small but suggestive decreases in firearm suicides in the four weeks after gun shows in Texas, effects were uncertain for nonfirearm suicides in Texas and for either outcome in California. However, the study focused only on background check requirements as they relate to gun shows and not on a broader set of background check policies. Moreover, as the authors acknowledged, their focus was on very short-term (four-week) and localized effects. The study had low statistical power, meaning that even if gun-show *exceptions* had meaningful effects on violence or homicide, these might not have been detected using this paper's procedures (see Wintemute et al., 2010). No covariates were included in the model to account for demographic, social, or economic differences between regions that could obscure any differential effects gun shows have in states with and without the *exception*.

Finally, Swanson et al. (2016) evaluated how changes in state reporting of gun-disqualifying mental health records to the NICS affected suicide rates among individuals in Florida with a disqualifying mental health condition relative to individuals diagnosed with serious mental health illness but not prohibited from purchasing a fire-

arm. The authors found no significant difference between suicide rates before and after implementing expanded NICS reporting for the two groups.

Figure 3.1 displays the IRRs and CIs associated with the background check policies examined in these studies. Because Swanson et al. (2013) and Swanson et al. (2016) did not provide effect estimates or test statistics for their findings, we do not include effect sizes for these studies in the figure. Duggan, Hjalmarsson, and Jacob (2011) did not test the effect of interest here and did provide enough information for us to calculate effect estimates or test statistics, so they too are omitted from the figure.

### How to Read Forest Plots

The forest-plot figures in this report show the standardized effect sizes (or incidence rate ratios [IRRs]) and their 95-percent confidence intervals (CIs) for each outcome, by policy or law, as revealed in the studies examined. (See Chapter Two for details on how we calculated these effect sizes.) An effect size of 1.00 indicates that, after a state passes the law, we would expect the outcome (e.g., suicide or firearm suicide) to be unaffected. That is, the rate of suicide after the law was passed would by 1 times the rate before the law was passed. An effect size of less than 1.00 indicates that the law appears to reduce the outcome. For example, if the effect size for the effect of background checks on suicides were 0.92, we would expect the suicide rate to fall to 0.92 times the rate prior to passage of the background check law. Conversely, an effect size of more than 1.00 indicates that the law appears to increase the outcome by a factor equivalent to the effect size value. When the CIs do not include the value of 1.00, the estimated effect is statistically significant at $p < 0.05$.

Where relevant, we note in the text when individual analyses relied on methods that we thought might produce inaccurate estimates or CIs. IRRs corresponding to analyses for which we expressed such concerns are indicated by blue squares in the forest plots. Green circles indicate IRR estimates about which we raise no specific methodological concern. Information on the source data and methodological ratings is available in Appendix B.

**Figure 3.1**
**Incidence Rate Ratios Associated with the Effect of Background Checks on Suicide**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **Check on restraining order** | **Suicide** | |
| Sen & Panjamapirom (2012) | Total | 1.02 [0.98, 1.06] |
| Sen & Panjamapirom (2012) | Firearm | 1.03 [0.98, 1.09] |
| **Check on mental illness** | | |
| Sen & Panjamapirom (2012) | Total | 0.97 [0.95, 0.99] |
| Sen & Panjamapirom (2012) | Firearm | 0.96 [0.92, 0.99] |
| **Check on fugitive status** | | |
| Sen & Panjamapirom (2012) | Total | 0.91 [0.87, 0.95] |
| Sen & Panjamapirom (2012) | Firearm | 0.95 [0.90, 0.99] |
| **Check on misdemeanor** | | |
| Sen & Panjamapirom (2012) | Total | 0.98 [0.95, 1.02] |
| Sen & Panjamapirom (2012) | Firearm | 0.95 [0.92, 1.00] |
| **Check on "other miscellaneous" records** | | |
| Sen & Panjamapirom (2012) | Total | 1.00 [0.97, 1.03] |
| Sen & Panjamapirom (2012) | Firearm | 1.01 [0.97, 1.05] |
| **Index of background check comprehensiveness** | | |
| Sen & Panjamapirom (2012) | Firearm | 0.98 [0.96, 1.00] |
| **Brady act** | | |
| Ludwig & Cook (2000) | Total rate, aged 21+ | 0.98 [0.93, 1.03] |
| Ludwig & Cook (2000) | Total rate, aged 55+ | 0.97 [0.93, 1.01] |
| Ludwig & Cook (2000) | Firearm rate, aged 21+ | 0.98 [0.94, 1.02] |
| Ludwig & Cook (2000) | Firearm rate, aged 55+ | 0.94 [0.90, 0.98] |
| Ludwig & Cook (2000) | Nonfirearm rate, aged 21+ | 1.01 [0.95, 1.08] |
| Ludwig & Cook (2000) | Nonfirearm rate, aged 55+ | 1.03 [0.97, 1.11] |
| Ludwig & Cook (2000) | Committed with firearm, %, aged 21+ | 1.17 [0.87, 1.58] |
| Ludwig & Cook (2000) | Committed with firearm, %, aged 55+ | 0.97 [0.94, 0.99] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

## Conclusions

*Total suicides.* We identified two qualifying studies that evaluated the effects of background checks on the total number of suicides using largely independent data sets (one examined state suicide rates from 1990 to 1997, and the other examined state rates from 1996 to 2015). The first concluded that dealer background checks have an uncertain effect on total suicide rates among those aged 21 or older (Ludwig and Cook, 2000). In a secondary analysis, the study found a significant effect that background checks might reduce total suicides in the subgroup of adults aged 55 or older. All of these effects were partially confounded with possible effects of waiting periods that were simultaneously introduced in many states when the Brady Act was implemented. The second study, Sen and Panjamapirom (2012), examined components of background

checks, finding significant effects indicating that checks on mental illness and checks on fugitive status reduce total suicide rates. Three other components of background checks (checks on restraining orders, checks on misdemeanor records, and other miscellaneous checks) had only uncertain effects on total suicide rates.



Considering the relative strengths of these studies, we conclude that available research provides *limited evidence that background checks may reduce total suicides*.

*Firearm suicides.* We identified three qualifying studies that evaluated the effects of background checks on firearm suicide rates, including the two studies that examined total suicides. These studies provided two analyses of the total effect of background checks on firearm suicides. Ludwig and Cook (2000) found an uncertain effect of dealer background checks on this outcome among those aged 21 or older, although they reported a statistically significant decrease in firearm suicides associated with background checks for those aged 55 or older. Sen and Panjamapirom (2012) found a statistically significant association between their background check comprehensiveness index and reduced firearm suicides. Across five other reported component analyses, checks on mental illness, fugitive status, and misdemeanors were associated with significant reduction in firearm suicides, whereas checks on restraining orders and other miscellaneous checks had only uncertain effects. Duggan, Hjalmarsson, and Jacob (2011), examining private-seller background checks at gun shows, found that these had uncertain effects.



With largely consistent evidence across three studies, and considering the relative strengths of these studies, we conclude that the available studies provide *moderate evidence that background checks reduce firearm suicides*.

## Effects on Violent Crime

### Research Synthesis Findings

Hahn et al. (2005) found insufficient evidence for determining the effectiveness of gun-acquisition restrictions, including background checks, on violent crime. NRC (2004) concluded, "There is not much empirical evidence that assesses whether attempts to reduce criminal access to firearms will reduce gun availability or gun crime." NRC reviewed Ludwig and Cook (2000), which found no difference in homicide rates across states that had laws comparable to those the Brady Act would impose (which initially included both background checks and a waiting period) and states that experienced larger changes in the law when the Brady Act was implemented.[12] The Ludwig and Cook study had an unfavorable ratio of estimated parameters to observations (less than one to six), meaning its parameter estimates and CIs may not be accurate because of model overfitting.

Of studies that examined the relationship between background checks and violent crime, we identified eight that met our inclusion criteria.[13]

Gius (2015a) examined the effect of the federal Brady Act, state-mandated dealer background checks (either a check that was in place before the Brady Act or checks for categories of state-prohibited possessors other than those mandated by the Brady Act), and state-mandated private-seller background checks on gun-related homicides (the paper did not evaluate the effect of these variables on total homicides). The analysis of the federal Brady Act does not meet our criteria for inclusion because although the regression model evaluated whether changes occurred after implementation of the Brady Act, there was no comparison (control) group. State dealer background checks were found to significantly reduce firearm homicides by 20 percent (see Figure 3.2), but the study's design cannot distinguish whether this effect is attributable to a state's implementation of background checks prior to the Brady Act, prohibition of more classes of people from owning guns after the Brady Act was passed, or some combination of the two. Private-seller background checks appeared to increase firearm homi-

---

[12]  Ludwig and Cook (2000) also tested the effects of background checks specifically (separate from waiting periods, also imposed by the Brady Act) by comparing five of 32 states that were required to implement background checks but that did not experience a change in their waiting periods (either because they already had a waiting period of five days or more when the Brady Act required this nationally or they implemented an instantaneous background check). These analyses had a ratio of estimated parameters to observations of less than five to one, which did not meet our inclusion criteria. Cook and Ludwig (2003) presents results for a shorter time period but that are qualitatively similar.

[13]  We did not consider the findings from two studies because of methodological limitations. Although Ruddell and Mays (2005) had longitudinal data spanning 1999 through 2001 and compared states with various forms of background check systems, the authors created and analyzed a single average homicide rate for each state that spanned this time period. We excluded this study from further consideration because of the resulting cross-sectional nature of the analysis. Likewise, while Sumner, Layde, and Guse (2008) used data from 2002 through 2004, they aggregated the independent and dependent variables over this time period, resulting in a cross-sectional analysis.

cides to levels 131 percent of what would be expected without the policy. Gius (2015a) does not provide information on the variation in state laws over the period evaluated, so the quality of causal effect estimates is uncertain.

La Valle (2013) examined the effect of the existence of a pre–Brady Act state background check law on gun homicides and total homicides (as well as other state policies). Using data from 56 large U.S. cities over 1980–2010, the author found in his preferred models (weighted models with a one-year lag and using control variables that were interpolated over the period, but where the dependent variable was not interpolated) that pre–Brady Act state background check requirements had an uncertain effect on either gun homicides or total homicides.

Sen and Panjamapirom (2012) examined the effects of the *types* of background checks conducted by states on homicides. They noted that the supply of state and local records to the NICS is voluntary and that substantial variation exists in state laws regarding the categories of records included in background checks, such as restraining orders, mental illness, fugitive status, and misdemeanors. The authors characterized variation across states in background check requirements using an index of the comprehensiveness of such checks, as well as individual indicators for whether states check on restraining orders, mental illness, fugitive status, misdemeanors, and other miscellaneous records. Using state-level data from 1996 to 2005, the authors examined the effect of these types of checks on both firearm and total homicides. They found that, compared with background checks that examine only criminal history, background checks that include restraining orders, mental illness, and fugitive status are associated with significantly fewer total homicides and firearm homicides. Background checks that include restraining orders were associated with 13-percent drops in firearm homicide rates and 9-percent drops in overall homicide rates; background checks for mental illness were associated with 7-percent drops in both firearm and overall homicide rates; and background checks for fugitive status were associated with 21-percent and 23-percent reductions in firearm and total homicide rates, respectively (see Figure 3.2). However, so few states changed criminal history background check or fugitive check policies during the study time frame that these effects cannot confidently be attributed to the background check policies as opposed to other factors affecting homicides in the states around the same time their laws changed. Although the authors also included a control for whether a state had a pre–Brady Act background check requirement, the variation in this policy variable was only across states and not over time because the period of analysis was post-Brady only. Thus, the analysis of the effect of pre-Brady background check policy does not meet our criteria for inclusion.

Duggan, Hjalmarsson, and Jacob (2011) examined the localized, short-term effect of gun shows on firearm homicides. Absent state legislation to the contrary, gun-show vendors (and other private sellers) that are not federally licensed dealers are not required to conduct background checks on purchasers, which Duggan, Hjalmarsson, and Jacob (2011) referred to as the *gun-show loophole* and which we call the *gun-show*

*exception.* Some states have legislation requiring background checks for all buyers at gun shows. Duggan, Hjalmarsson, and Jacob (2011) examined whether there is a differential effect of gun shows on violent crime or homicide in a state that has a gun-show *exception* (Texas) compared with a state that has no such *exception* (California). The authors found only uncertain effects of state background check policies on homicides that occur near where gun shows were recently held. However, the study focused only on background check requirements as they relate to gun shows and not on a broader set of background check policies. Moreover, as the authors acknowledged, their focus was on very short-term (four-week) and localized effects. The study had low statistical power, meaning that even if gun-show background check policies had meaningful effects on violence or homicide, these might not have been detected using this paper's procedures (see Wintemute et al., 2010).

Lott (2010) examined how state-required background checks for private sales affect violent crime. Detailed results that include coefficients and test statistics were available for only one specification and for the outcome of homicide (Lott, 2010, Table A6.3). This model indicated an uncertain effect of background checks on homicide rates. This model had an unfavorable ratio of estimated parameters to observations (less than one to ten), meaning the estimated effects and significance values may be inaccurate because of model overfitting.

Swanson et al. (2013) and Swanson et al. (2016) merged administrative records from public health and criminal justice agencies to evaluate how changes in state reporting of gun-disqualifying mental health records to the NICS affected violent crime arrest rates for individuals with a disqualifying mental health condition relative to individuals diagnosed with serious mental health illness but not prohibited from purchasing a firearm. Swanson et al. (2013) obtained data from 2002 to 2009 for individuals in Connecticut who had been hospitalized for schizophrenia, bipolar disorder, or major depressive disorder. The authors estimated changes in violent crime arrest rates for individuals with at least one of the mental health adjudications reported to the NICS before and after Connecticut began reporting mental health records in 2007. The authors found a significant 31-percent decline in the probability of violent crime arrest in their sample of individuals who had a mental health adjudication but no disqualifying criminal record (see Figure 3.2). The authors also estimated the likelihood of violent crime arrest for individuals with at least one voluntary psychiatric hospitalization but no mental health adjudication. Relative to the legally disqualified population, the nondisqualified group had a lower likelihood of violent crime arrest both before and after the NICS reporting change, but the magnitude of the decrease following NICS reporting was smaller than the reduction experienced by the "treated" group with a disqualifying mental health condition. However, neither test statistics nor CIs for this difference were reported.

Swanson et al. (2016) employed analogous methods to analyze the effects of NICS reporting changes in 2007 for two Florida counties using data from 2002 to

2011. The authors similarly found a larger reduction in violent crime arrest rates for individuals with a disqualifying mental health condition compared with individuals with a serious mental health illness that did not legally prohibit firearm acquisition. This difference, a decline of 38 percent (see Figure 3.2), was statistically significant. However, estimates became insignificant when the outcome variable was restricted specifically to violent crimes involving firearms, which could indicate the absence of a causal connection or could be due to measurement error in classifying crimes as involving firearms (Swanson et al., 2016).

Wright, Wintemute, and Rivara (1999) used a retrospective cohort design to assess whether firearm purchase denial based on criminal record background checks affects subsequent criminal activity among a sample of individuals with a prior felony arrest in California. Specifically, the authors examined subsequent arrest rates for a sample of individuals with a prior felony arrest who attempted to purchase a handgun in California in 1997, comparing outcomes for a group of individuals who were able to purchase a handgun successfully because they had a prior felony arrest but no conviction ("purchaser cohort") with a group of individuals who should have been denied purchase because of a felony conviction ("denied cohort"). In individual-level analyses, controlling for number of prior weapons and violent arrest charges, the authors found that the purchaser cohort was significantly more likely to be arrested for a subsequent offense in the three-year follow-up period. Estimates showed that, relative to the denied cohort, the purchaser cohort experienced an increase in the risk of arrest of 5 percent for any offense, 21 percent for gun offenses, and 24 percent for violent offenses (see Figure 3.2). While this study did not specifically examine the effects of background check laws, the findings suggest that enforcing background checks for felony records may reduce violent crime.

Finally, Vigdor and Mercy (2006) examined the effects of restraining order and violent misdemeanor background checks on intimate partner homicides and firearm intimate partner homicides, by comparing states with more-comprehensive or less-comprehensive approaches to performing those checks. The authors found small differences in rates of such homicides between states with high and low capacities for performing such checks, but they did not provide a test of the significance of these differences.

Figure 3.2 displays the IRRs and CIs associated with the background check policies examined in these studies. Duggan, Hjalmarsson, and Jacob (2011); Swanson et al. (2013); and Vigdor and Mercy (2006) did not provide sufficient data for us to calculate IRRs and CIs for the effect size of interest, so these are not displayed in figure. Furthermore, we exclude the estimate of the Brady Act from Gius (2015a) because the estimate does not meet our criteria for inclusion. The Swanson et al. (2016) estimate in the figure is the change from before and after the NICS reporting requirements for legally disqualified individuals relative to the change for nonlegally disqualified individuals.

**Figure 3.2**
**Incidence Rate Ratios Associated with the Effect of Background Checks on Violent Crime**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **State dealer background check** | **Homicide** | |
| Gius (2015a) | Firearm | 0.80 [0.73, 0.87] |
| **State private–seller background check** | | |
| Gius (2015a) | Firearm | 1.31 [1.23, 1.39] |
| Lott (2010) | Homicide | 1.02 [0.98, 1.07] |
| **Check on restraining order** | | |
| Sen & Panjamapirom (2012) | Total | 0.91 [0.85, 0.98] |
| Sen & Panjamapirom (2012) | Firearm | 0.87 [0.79, 0.95] |
| **Check on mental illness** | | |
| Sen & Panjamapirom (2012) | Total | 0.93 [0.86, 0.99] |
| Sen & Panjamapirom (2012) | Firearm | 0.93 [0.87, 1.01] |
| **Check on fugitive status** | | |
| Sen & Panjamapirom (2012) | Total | 0.77 [0.71, 0.84] |
| Sen & Panjamapirom (2012) | Firearm | 0.79 [0.72, 0.88] |
| **Check on misdemeanor** | | |
| Sen & Panjamapirom (2012) | Total | 1.02 [0.95, 1.10] |
| Sen & Panjamapirom (2012) | Firearm | 0.99 [0.90, 1.08] |
| **Check on "other miscellaneous" records** | | |
| Sen & Panjamapirom (2012) | Total | 1.05 [0.98, 1.13] |
| Sen & Panjamapirom (2012) | Firearm | 1.12 [1.03, 1.22] |
| **Index of background check comprehensiveness** | | |
| Sen & Panjamapirom (2012) | Firearm | 0.93 [0.91, 0.96] |
| **Brady law** | | |
| La Valle (2013) | Total | 1.00 [0.89, 1.13] |
| La Valle (2013) | Firearm | 1.02 [0.89, 1.17] |
| Ludwig & Cook (2000) | Total rate, aged 21+ | 0.97 [0.87, 1.08] |
| Ludwig & Cook (2000) | Total rate, aged 55+ | 1.00 [0.90, 1.12] |
| Ludwig & Cook (2000) | Firearm rate, aged 21+ | 0.99 [0.86, 1.13] |
| Ludwig & Cook (2000) | Firearm rate, aged 55+ | 1.07 [0.97, 1.16] |
| Ludwig & Cook (2000) | Nonfirearm rate, aged 21+ | 0.94 [0.87, 1.02] |
| Ludwig & Cook (2000) | Nonfirearm rate, aged 55+ | 0.95 [0.81, 1.12] |
| Ludwig & Cook (2000) | Committed with firearm, %, aged 21+ | 1.02 [0.99, 1.04] |
| Ludwig & Cook (2000) | Committed with firearm, %, aged 55+ | 1.07 [0.98, 1.18] |
| **NICS reporting** | **Violent crime** | |
| Swanson et al. (2016) | Violent crime arrest (legally disqualified after) | 0.62 [0.50, 0.76] |
| **No felony checks** | **Arrests** | |
| Wright, Wintemute & Rivara (1999) | Any offense | 1.05 [1.04, 1.07] |
| Wright, Wintemute & Rivara (1999) | Gun offense | 1.21 [1.08, 1.36] |
| Wright, Wintemute & Rivara (1999) | Violent offense | 1.24 [1.11, 1.39] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

## Conclusions

*Homicides and violent crime.* We identified six qualifying studies providing evidence on the effects of background checks, or some component of background checks, on violent crime. Three of these studies provided an overall effect of either dealer background checks or private-seller background checks on total homicide rates, although two of these estimated effects were partially confounded with the effect of waiting periods that were simultaneously introduced in many states when the Brady Act was passed. All three studies found those effects to be uncertain (the analyses of effects on those aged 21 and older in Ludwig and Cook, 2000; the Brady Act effect in La Valle, 2013; and the private-seller background check effect in Lott, 2010). Three background check component analyses identified significant effects indicating that mental illness checks, restraining order checks, or fugitive status checks reduced violent crime specific to homicides (Sen and Panjamapirom, 2012). A fourth component analysis found that mental illness checks significantly reduce violent crime arrests (Swanson et al., 2016). A component analysis of misdemeanor checks found that they had uncertain effects on homicides, while "other miscellaneous checks" had a suggestive effect consistent with increases in homicides (Sen and Panjamapirom, 2012). Finally, a component analysis of background checks targeting firearm purchase by individuals with prior felony convictions (Wright, Wintemute, and Rivara, 1999) found significant effects consistent with a reduction in arrests for firearm and violent crime offenses.



The cumulative evidence is puzzling, as overall effects of background checks appear to be uncertain, but some components of background checks appear to significantly reduce homicides or violent crime. Because the studies examining component effects of background checks generally suffer from fewer noted weaknesses, we conclude that available studies provide *limited evidence that background checks reduce violent crime and total homicide rates.*

*Firearm homicide rates.* We identified four qualifying studies that provided estimates for the effects of background checks, or some component of background checks, on firearm homicide rates. Four studies examined the overall effect of dealer background checks on firearm homicide rates; two used large independent data sets and





found significant effects indicating that dealer background checks reduce firearm homicides (Gius, 2015a; Sen and Panjamapirom, 2012), and two found uncertain effects (La Valle, 2013; Ludwig and Cook, 2000). One analysis found significant effects consistent with private-seller checks increasing firearm homicides (Gius, 2015a). Component analyses from a single study found significant effects indicating that restraining order and fugitive checks reduce firearm homicides (Sen and Panjamapirom, 2012). The analyses also found that mental illness checks have suggestive effects consistent with a reduction in firearm homicides, uncertain effects for misdemeanor checks, and a significant effect indicating that "miscellaneous checks" increase firearm homicides.

Based on these findings and an assessment of the relative strengths of the studies, we conclude that *available studies provide moderate evidence that dealer background checks may reduce firearm homicides* and *inconclusive evidence for the effect of private-seller background checks on firearm homicides.*

## Effects on Mass Shootings

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified research examining the effects of gun policies on mass shootings in the United States. Using a two-way fixed-effects linear probability model, Luca, Deepak, and Poliquin (2016) estimated the effects of background check laws on a binary indicator for whether a mass shooting occurred in a given state-year. The authors included two measures of background check laws: an indicator for whether laws required a background check for all handgun transactions (including private sales) and an indicator for whether laws required a background check for all firearm transactions (including private sales). The authors' regression analysis covered 1989–2014 and included controls for time-invariant state characteristics; national trends; a host of other state-level gun policies; and time-varying state-level demographic, socioeconomic, and political characteristics. Their findings showed an uncertain relationship between background check laws and the probability of at least one mass shooting event occurring (see Figure 3.3). However, assessing the effects of gun policies on mass shootings was not the primary focus of the study, and the authors intended the estimates to serve solely as a robustness check for their main specification (the effects of mass shootings on gun policy). Although the paper provided limited information to use in evaluating the reported statistical models (e.g., on how these poli-

cies were coded), it is clear that the analysis used a linear model to predict a dichotomous outcome. Therefore, model assumptions were violated, making CIs unreliable.

Figure 3.3 displays the IRRs and CIs associated with the background check policies examined in Luca, Deepak, and Poliquin (2016).

**Figure 3.3**
**Incidence Rate Ratios Associated with the Effect of Background Checks on Mass Shootings**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Background check** | | | |
| **all handgun sales** | **Mass shooting** | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (no political controls) | 0.07  [0.00, 1.52] | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 0.00  [0.00, 1.57] | |
| **Background check** | | | |
| **all firearm sales** | | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (no political controls) | 1.09  [0.00, 3.23] | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 0.73  [0.00, 3.05] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

**Conclusions**

We identified a single qualifying study that estimated the effects of background checks for all handgun sales and for all firearm sales on mass shootings (Luca, Deepak, and Poliquin, 2016). This study found uncertain effects of these universal background check laws on whether at least one mass shooting occurred in a state. Therefore, the available study provides *inconclusive evidence for the effect of background checks on mass shootings*.



Background checks have **uncertain** effects on mass shootings.

Evidence for this relationship is **inconclusive.**

## Outcomes Without Studies Examining the Effects of Background Checks

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of background check policies on the following outcomes, and we identified no such studies that met our inclusion criteria:

- unintentional injuries and deaths
- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

# Chapter Three References

Buchanan, Larry, Josh Keller, Richard A. Oppel, Jr., and Daniel Victor, "How They Got Their Guns," *New York Times*, June 12, 2016. As of March 22, 2017: https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-guns.html?_r=0

Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Reports (2000): Memphis, Tennessee*, Washington, D.C.: U.S. Department of the Treasury, July 2002.

Campbell, J. C., D. Webster, J. Kozio-McLain, C. Block, D. Campbell, M. A. Curry, F. Gary, N. Glass, J. McFarlane, C. Sachs, P. Sharps, Y. Ulrich, S. A. Wilt, J. Manganello, X. Xu, J. Schollenberger, V. Frye, and K. Laughon, "Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study," *American Journal of Public Health*, Vol. 93, No. 7, 2003, pp. 1089–1097.

Cook, Philip J., and Jens Ludwig, "The Effect of the Brady Act on Gun Violence," in B. Harcourt, ed., *Guns, Crime, and Punishment in America*, New York: New York University Press, 2003, pp. 283–298.

Cook, Philip J., J. Ludwig, and A. A. Braga, "Criminal Records of Homicide Offenders," *JAMA*, Vol. 294, No. 5, 2005, pp. 598–601.

Cook, Philip J., Stephanie Molliconi, and Thomas B. Cole, "Regulating Gun Markets," *Journal of Criminal Law and Criminology*, Vol. 86, No. 1, 1995, pp. 59–92.

Cook, Philip J., Susan T. Parker, and Harold A. Pollack, "Sources of Guns to Dangerous People: What We Learn by Asking Them," *Preventive Medicine*, Vol. 79, 2015, pp. 28–36.

Cooper, Alexia, and Erica L. Smith, *Homicide Trends in the United States, 1980–2008*, Washington, D.C.: U.S. Department of Justice, November 2011.

Duggan, Mark, Randi Hjalmarsson, and Brian A. Jacob, "The Short-Term and Localized Effect of Gun Shows: Evidence from California and Texas," *Review of Economics and Statistics*, Vol. 93, No. 3, 2011, pp. 786–799.

Everytown for Gun Safety Support Fund, "Mass Shootings in the United States: 2009–2016," April 11, 2017b. As of May 3, 2017: http://everytownresearch.org/reports/mass-shootings-analysis/

FBI—*See* Federal Bureau of Investigation.

Federal Bureau of Investigation, "Active Records in the NICS Index," April 30, 2017. As of May 8, 2017: https://www.fbi.gov/file-repository/active_records_in_the_nics-index.pdf/view

Giffords Law Center to Prevent Gun Violence, "Universal Background Checks," web page, undated-f. As of October 18, 2017: http://lawcenter.giffords.org/gun-laws/policy-areas/background-checks/universal-background-checks/

Gius, Mark, "The Effects of State and Federal Background Checks on State-Level Gun-Related Murder Rates," *Applied Economics*, Vol. 47, No. 38, 2015a, pp. 4090–4101.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Joshi, M., and S. B. Sorenson, "Intimate Partner Violence at the Scene: Incident Characteristics and Implications for Public Health Surveillance," *Evaluation Review*, Vol. 34, No. 2, 2010, pp. 116–136.

Juodis, Marcus, Andrew Starzomski, Stephen Porter, and Michael Woodworth, "A Comparison of Domestic and Non-Domestic Homicides: Further Evidence for Distinct Dynamics and Heterogeneity of Domestic Homicide Perpetrators," *Journal of Family Violence*, Vol. 29, No. 3, 2014, pp. 299–313.

Kleck, G., and D. J. Bordua, "The Factual Foundation for Certain Key Assumptions of Gun Control," *Law and Policy*, Vol. 5, No. 3, 1983, pp. 271–298.

Kopel, D. B., "Background Checks for Firearms Sales and Loans: Law, History, and Policy," *Harvard Journal on Legislation*, Vol. 53, 2016, pp. 303–367.

La Valle, James M., "'Gun Control' vs. 'Self-Protection': A Case Against the Ideological Divide," *Justice Policy Journal*, Vol. 10, No. 1, 2013, pp. 1–26.

Lott, John R., Jr., *More Guns, Less Crime: Understanding Crime and Gun-Control Laws*, 3rd ed., Chicago, Ill.: University of Chicago Press, 2010.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy*, working paper, Boston, Mass.: Harvard Business School, 2016.

Ludwig, J., and P. J. Cook, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act," *JAMA*, Vol. 284, No. 5, 2000, pp. 585–591.

McFarlane, J., J. C. Campbell, S. Wilt, C. Sachs, Y. Ulrich, and X. Xu, "Stalking and Intimate Partner Femicide," *Homicide Studies*, Vol. 3, 1999, pp. 300–316.

Miller, M., L. Hepburn, and D. Azrael, "Firearm Acquisition Without Background Checks: Results of a National Survey," *Annals of Internal Medicine*, Vol. 166, 2017, pp. 233–239.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Ruddell, R., and G. L. Mays, "State Background Checks and Firearms Homicides," *Journal of Criminal Justice*, Vol. 33, No. 2, 2005, pp. 127–136.

Sen, B., and A. Panjamapirom, "State Background Checks for Gun Purchase and Firearm Deaths: An Exploratory Study," *Preventive Medicine*, Vol. 55, No. 4, 2012, pp. 346–350.

Sumner, S. A., P. M. Layde, and C. E. Guse, "Firearm Death Rates and Association with Level of Firearm Purchase Background Check," *American Journal of Preventive Medicine*, Vol. 35, No. 1, 2008, pp. 1–6.

Swanson, Jeffrey W., Michele M. Easter, Allison G. Robertson, Marvin S. Swartz, Kelly Alanis-Hirsch, Daniel Moseley, Charles Dion, and John Petrila, "Gun Violence, Mental Illness, and Laws That Prohibit Gun Possession: Evidence from Two Florida Counties," *Health Affairs*, Vol. 35, No. 6, 2016, pp. 1067–1075.

Swanson, J. W., A. G. Robertson, L. K. Frisman, M. A. Norko, H. Lin, M. S. Swartz, and P. J. Cook, "Preventing Gun Violence Involving People with Serious Mental Illness," in D. W. Webster and J. S. Vernick, eds., *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis*, Baltimore, Md.: Johns Hopkins University Press, 2013, pp. 33–51.

United States Code, Title 18, Section 922, Unlawful Acts.

Vigdor, E. R., and J. A. Mercy, "Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Homicide?" *Evaluation Review*, Vol. 30, No. 3, 2006, pp. 313–346.

Vittes, K. A., J. S. Vernick, and D. W. Webster, "Legal Status and Source of Offenders' Firearms for States with the Least Stringent Criteria for Gun Ownership," *Injury Prevention*, Vol. 19, No. 1, June 23, 2012, pp. 26–31.

Webster, Daniel W., Jon S. Vernick, and Maria T. Bulzacchelli, "Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking," *Journal of Urban Health: Bulletin of the New York Academy of Medicine*, Vol. 86, No. 4, 2009, pp. 525–537.

Wintemute, G. J., D. Hemenway, D. Webster, G. Pierce, and A. A. Braga, "Gun Shows and Gun Violence: Fatally Flawed Study Yields Misleading Results," *American Journal of Public Health*, Vol. 100, No. 10, 2010, pp. 1856–1860.

Wright, M. A., and G. J. Wintemute, "Felonious of Violent Criminal Activity That Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors," *Journal of Trauma and Acute Care Surgery*, Vol. 69, No. 4, 2010, pp. 948–955.

Wright, M. A., G. J. Wintemute, and F. P. Rivara, "Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence," *American Journal of Public Health*, Vol. 89, No. 1, 1999, pp. 88–90.

CHAPTER FOUR

# Bans on the Sale of Assault Weapons and High-Capacity Magazines

The term *assault weapon* is controversial. In state and federal gun laws, it generally refers to specific semiautomatic firearm models that are designed to fire a high volume of ammunition in a controlled way or to firearms that have specified design features, such as folding stocks or pistol grips (Giffords Law Center to Prevent Gun Violence, undated-a).[1] Those in the gun industry refer to many of these firearms as *modern sporting rifles*, contending that *assault rifle* should apply only to automatic weapons used by militaries. Furthermore, they argue that the characteristics used to differentiate banned firearms from nonbanned semiautomatic weapons are cosmetic and do not make them more deadly than similar weapons without those features. In 1994, Congress passed the Violent Crime Control and Law Enforcement Act, which banned "the manufacture of military-style assault weapons, assault weapons with specific combat features, 'copy-cat' models, and certain high-capacity ammunition magazines of more than ten rounds" (U.S. Department of Justice, 1994; see also Pub. L. 103-322). The law included a sunset provision, calling for its repeal after ten years. It was not renewed in 2004, and thus there is not currently a federal assault weapon ban (Plumer, 2012).

Laws banning or restricting assault weapons or high-capacity magazines are primarily intended to reduce firearm-related casualties and fatalities from violent crime—and, more specifically, from mass shooting incidents. The bans could impact firearm-related violence by decreasing the number of shooting incidents, decreasing the number of casualties in a given shooting, and decreasing the case fatality rate. That is, other things being equal, a shooter with an assault weapon or other weapon equipped with a high-capacity magazine can fire more ammunition and hence inflict more casualties in a given length of time than would a shooter using weapons with a lower rate of fire and capacity. In a mass shooting incident, the lower rate of fire should allow for more people to evacuate and for law enforcement or others to intervene. To most precisely

---

[1]   Semiautomatic pistols and rifles, as defined in 27 C.F.R. 478.11, are firearms that use energy expended from the firing cartridge to extract the fired cartridge case and automatically chamber the next round of ammunition but require a pull of the trigger for each shot (Krouse and Richardson, 2015). In contrast, fully automatic weapons (i.e., machine guns) can produce continuous fire by a single trigger function without manual reloading, and their sale and possession has been federally regulated since the National Firearms Act of 1934 (currently codified as amended as 26 U.S.C. 5801 et seq.).

characterize the causal effect of these laws on violent crime or mass shootings, the ideal data would distinguish crime and violence outcomes by whether a designated assault weapon or high-capacity magazine was used. Although limited data on the weapons used in homicides are available through the Federal Bureau of Investigation (FBI)'s Supplementary Homicide Reports and details of the weapons and ammunition used in mass shooting incidents are increasingly being compiled on a case-by-case basis (e.g., by the Stanford University Mass Shootings in America project), none of the articles meeting our inclusion criteria for this policy analyzed crime or violence outcomes by weapon type.

The majority of crimes are not conducted with rifles but with handguns, most of which are not considered assault weapons (although most assault weapon bans also list certain "assault pistols" among the banned firearms). In 2015, 252 of the 9,616 firearm-related murders reported in FBI data involved any type of rifle; the type of firearm used in 2,477 of these murders was not specified (FBI, 2016a). Assuming that no sub-stitution to other types of firearms would occur, the elimination of all rifle homicides would have decreased the number of firearm-related murders by 2.6 percent.

Assault weapons and high-capacity magazines are used disproportionately in mass public shootings and killings of law enforcement officers compared with murders overall. However, these incidents are relatively rare. Data combining 184 mass shooting, spree shooting, and active shooter events from 1982 to 2015 suggest that about 30 percent of incidents involved assault weapons and 37 percent of incidents involved high-capacity magazines (Blau, Gorry, and Wade, 2016). Another analysis that focused on mass shooting events involving four or more fatalities between 2009 and 2016 reported that 15 of these incidents (11 percent) involved an assault weapon or high-capacity magazine, resulting in 155 percent more injuries and 47 percent more fatalities compared with other incidents (Everytown for Gun Safety Support Fund, 2017b). Other research, focused on a small subset of shootings in which multiple vic-tims were targeted, suggests that the rate of fire at mass shootings is not so high that reloading would affect the number of rounds fired (Kleck, 2016). If this finding gen-eralized to all multiple-victim shootings, it would call into question the usefulness of laws banning high-capacity magazines, because the primary objective of such laws is to reduce the number of rounds a shooter can fire before having to reload.

Of the 38 felonious fatal shootings of law enforcement officers in 2015, 18.4 per-cent involved any type of rifle (FBI, 2016c). Although relatively outdated, estimates from 1994 suggest that between 31 percent and 41 percent of firearms used in murders of police officers involved assault weapons or other guns equipped with high-capacity magazines (Adler et al., 1995).

There is little theoretical basis to suggest that bans of assault weapons and high-capacity magazines would impact rates of suicide or unintentional injury. And although these policies could plausibly impact defensive gun use, the magnitudes of any such

effects are likely small. The FBI reported that, in 2015, eight of the 328 firearm-related justifiable homicides by private citizens involved any type of rifle (FBI, 2016b).

Laws banning assault weapons and high-capacity magazines would have direct market effects for the gun industry, including impacts on production, price, and potential spillovers from primary to secondary markets (Koper, 2004). The market effects of restricting the manufacturing and sales of a class of weapons or ammunition will depend on the relative demand for these items, the availability of nonbanned weapons that serve as close substitutes, and the costs of modifying existing weapon types to meet the requirements of the ban, to name a few. A nationwide ban could also impact the industry more broadly by generating market effects for ancillary gun companies that produce or sell certain replacement parts, accessories, or specialized magazines and precision barrels used primarily for sport shooting.

Overall, the effects of these policies will depend largely on the design and implementation of the law. Except for heavily regulated weapons manufactured prior to May 1986, assault weapons capable of automatic fire are not available for sale in the United States. Thus, the specifics of which weapons or weapon features are prohibited by a particular ban are key to understanding the marginal effect of each policy on outcomes of interest. Targeting weapons with close substitutes or features unrelated to the deadliness of the weapon or its likelihood of being used in the perpetration of violence likely limits any potential policy effects on violent crime. Further, most existing state bans (and the federal ban of 1994) influence the flow of only new weapons or magazines and do little to affect the existing stock; the National Shooting Sports Foundation, a trade association for the gun industry, estimates that more than 8.5 million assault rifles were either manufactured in or imported to the United States between the 1990s and 2013 (Chang, 2013).

## State Implementation of Assault Weapon Bans

Seven states and the District of Columbia currently ban assault weapons.[2] Five of the eight jurisdictions list the specific assault weapons banned and prohibit all weapons with specific features; one state bans only the weapons listed, and two states ban only specific features. The laws that list specific banned models are similar state to state, although the lists are not generally identical.

California is an example of a state that has a list of banned assault weapons, both rifles and shotguns, as well as firearms with specific design features. Specifically, it bans "all AK series including, but not limited to, the models identified," and explains

---

[2]  California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, New York, and the District of Columbia. See Calif. Penal Code § 30505; Conn. Gen. Stat. § 53-202b; Hawaii Rev. Stat. Ann. § 134-4; Md. Code Ann. § 4-303; Mass. Gen. Laws Ch. 140 § 131M; N.J. Stat. Ann. § 2C:39-1 and 39-5; N.Y. Penal Law § 265.02; D.C. Code Ann. § 7-2502.02.

that the term *series* "includes all other models that are only variations, with minor differences, of those models listed in subdivision (a), regardless of the manufacturer."[3] Furthermore, the state provides a list of features, any one of which renders a firearm an assault weapon and therefore banned.[4] For example, the law states that a "semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine" is an assault weapon if it also contains any of the following features: "(A) a pistol grip that protrudes conspicuously beneath the action of the weapon; (B) a thumbhole stock; (C) a folding or telescoping stock; (D) a grenade launcher or flare launcher; (E) a flash suppressor; (F) a forward pistol grip."[5]

Connecticut's list is similar to California's, but the language is different. For example, in its subsection banning the AK series of weapons, Connecticut's law includes "[a]ny of the following specified semiautomatic centerfire rifles, or copies or duplicates thereof with the capability of any such rifles, that were in production prior to or on April 4, 2013." In addition, like California, Connecticut has a long list of features, any of which render a firearm banned.[6] The District of Columbia's list is shorter and does not include statements that the ban includes similar makes and models to the ones listed. However, the law also bans firearms with specific design features.[7] Maryland and Massachusetts are the other two states that ban by both list and features. Maryland bans weapons that possess any two features from its list.[8] The Massachusetts law, which refers to the now-expired federal law (Pub. L. 103-322), also requires two features to be included.[9]

New Jersey is the only state that includes a list of banned assault weapons but not generic features.[10] Conversely, New York and Hawaii ban a list of only features, not specified models of firearms.[11] However, unlike the other states, Hawaii bans only certain pistols, not rifles.

In addition to definitional differences, the laws are distinct in other ways—notably, their treatment of grandfathered weapons. For example, the District of Columbia does not allow grandfathering of assault weapons (Giffords Law Center to Prevent Gun Violence, undated-a); however, all seven states with assault weapon bans do, but under different regimes. Six of the states require registration of grandfathered assault weap-

---

[3]   Calif. Penal Code § 30510.

[4]   Calif. Penal Code § 30515.

[5]   Calif. Penal Code § 30515.

[6]   Conn. Gen. Stat. § 53-202a.

[7]   D.C. Code Ann. § 7-2501.01.

[8]   Md. Code Ann. § 4-301.

[9]   Mass. Gen. Laws Ch. 140 § 121.

[10]   N.J. Stat. Ann. § 2C: 39-1.

[11]   N.Y. Penal Law § 265.00; Hawaii Rev. Stat. Ann. § 134-1.

ons; in New Jersey, registration allows grandfathered assault weapons to be used only for target shooting.[12]

The same jurisdictions that have banned assault weapons have also banned high-capacity magazines, as has Colorado. Hawaii, which bans only assault pistols, similarly bans only high-capacity magazines for pistols.[13] The rest ban high-capacity magazines for all firearms,[14] although there are differences in definition here too. California, Connecticut, Hawaii, Maryland, Massachusetts, New York, and the District of Columbia ban magazines with a capacity of more than ten rounds.[15] Colorado and New Jersey allow up to 15 rounds.[16]

## Effects on Violent Crime

### Research Synthesis Findings

In their review of available science, Hahn et al. (2005) found insufficient evidence for determining the effectiveness of bans on specific firearms or ammunition on violent crime. In its review, the National Research Council (NRC) (2004) described two studies that examined the effects of the 1994 federal assault weapon ban (Koper and Roth, 2001, 2002). The studies found no short-term (within two years) effect of the ban on gun violence outcomes but a temporary increase in prices of assault weapons in both primary and legal secondary markets.

We identified two studies that evaluated federal and state assault weapon bans and met our criteria. Gius (2014) analyzed state-level data from 1980 through 2009 and controlled for the 1994–2004 federal assault weapon ban and for the existence of state assault weapon bans. The analysis of the federal assault weapon ban does not meet our criteria for inclusion: The author included an indicator for years prior to and after the ban as a control, but there was no comparison (control) group. The author found a suggestive effect consistent with state assault weapon bans decreasing firearm-related homicides (see Figure 4.1). However, the model did not account for serial correlation in panel data, which can result in large biases in standard errors (Aneja, Donohue, Zhang, 2014).

---

[12]  Calif. Penal Code § 30605; Conn. Gen. Stat. § 53-202c; Hawaii Rev. Stat. Ann. § 134-4; Md. Code Ann. § 4-303; Mass. Gen. Laws Ch. 140 §§ 121, 123, 131, 131M; N.J. Stat. Ann. § 2C: 58-12; N.Y. Penal Law § 265.20.

[13]  Hawaii Rev. Stat. Ann. § 134-8.

[14]  Calif. Penal Code §, 32310; Colo. Rev. Stat. § 18-12-302; Conn. Gen. Stat. § 53-202w; Md. Code Ann. § 4-305; Mass. Gen. Laws Ch. 140 § 131M; N.J. Stat. Ann. § 2C: 39-3; N.Y. Penal Law § 265.02; D.C. Code Ann. § 7-2506.01.

[15]  Calif. Penal Code §§ 16350, 16740; Conn. Gen. Stat. § 53-202w; Hawaii Rev. Stat. Ann. § 134-8; Md. Code Ann. § 4-305; Mass. Gen. Laws Ch. 140 § 121; N.Y. Penal Law § 265.00; D.C. Code Ann. § 7-2506.01.

[16]  Colo. Rev. Stat. § 18-12-301; N.J. Stat. Ann. § 2C: 39-1.

Lott (2010) examined the effect of assault weapon bans on violent crime. Detailed results that include coefficients and test statistics were available only for the outcome of homicide (Lott, 2010, Table A6.3). This model indicated an uncertain effect of assault weapon bans on homicide rates, but it had an unfavorable ratio of estimated parameters to observations (less than one to ten), meaning the model may have been overfit, and thus its effect estimates and significance levels may be inaccurate.

Figure 4.1 displays the incidence rate ratios (IRRs) and confidence intervals (CIs) associated with the assault weapon ban policies examined in these studies. We exclude the estimate of the federal assault weapon ban from Gius (2014) because the estimate does not meet our criteria for inclusion.

**Figure 4.1**
**Incidence Rate Ratios Associated with the Effect of Assault Weapon Bans on Violent Crime**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Assault weapon ban** | **Homicide** | | |
| Lott (2010) | Homicide | 1.00 [0.93, 1.08] | |
| **State assault weapon ban** | | | |
| Gius (2014) | Firearm | 0.92 [0.81, 1.02] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified two qualifying studies that estimated the effects of assault weapon bans on different violent crime outcomes. One found uncertain effects of such bans on total homicide rates (Lott, 2010); the other found a suggestive effect consistent with assault weapon bans decreasing firearm homicides (Gius, 2014). Considering the relative strengths of these studies, available evidence is *inconclusive for the effect of assault weapon bans on total homicides and firearm homicides*.



Assault weapon bans have **uncertain** effects on total homicides and firearm homicides. Evidence for this relationship is **inconclusive.**

## Effects on Mass Shootings

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) reviewed evidence for the effects of assault weapon bans on mass shootings. Two studies since then met our inclusion criteria. Both used a two-way fixed-effects model, controlling for both state-specific and year-specific effects, to estimate the effects of state or federal assault weapon bans on mass shooting incidents or casualties.[17]

Using a Poisson model and data from 1982 through 2011, Gius (2015c) tested whether state assault weapon bans influence public mass shooting fatalities or public mass shooting injuries, controlling for the federal assault weapon ban and state-level variation in demographic, socioeconomic, and criminal justice characteristics. Although the author found a large and statistically significant association between implementation of the *federal* assault weapon ban and reductions in mass shooting deaths and injuries, the analysis of the federal ban does not meet our criteria for inclusion because the model included an indicator for years prior to and after the federal ban as a control, but there was no comparison group. However, findings showed that *state* assault weapon bans had a statistically significant but smaller effect of reducing mass shooting death rates to 55 percent of what would have been expected without the bans, but uncertain effects on mass shooting injuries (see Figure 4.2). This report provided little detail describing variation in the timing of the state bans in relation to the federal ban, and it is unclear whether the estimated effects were confounded by correlation between the state and federal bans. The model did not account for serial correlation in panel data, which can result in large biases in standard errors (Aneja, Donohue, Zhang, 2014).

Using a linear probability model and data from a later period (1989–2014), Luca, Deepak, and Poliquin (2016) estimated the effects of state assault weapon bans on a binary indicator for whether a mass shooting occurred in a given state-year. In contrast to Gius (2015c), Luca, Deepak, and Poliquin (2016) did not control for the federal assault weapon ban from 1994 through 2004, but they controlled for a host of other state-level gun policies and for state-level demographic, socioeconomic, and political characteristics. Their findings showed uncertain effects of state assault weapon bans on the probability of a mass shooting incident occurring. However, the effects of gun policies on mass shootings were not the primary focus of Luca, Deepak, and Poliquin

---

[17] The two studies adopted slightly different definitions for *mass shooting* (see Chapter Twenty-Two for further detail on definitional issues). Gius (2015c) focused on *public mass shootings*, which the author defined as incidents resulting in four or more firearm-related fatalities (excluding the offender), where the shooting occurred in a relatively public place, victims were selected indiscriminately, and the shooting was not related to criminal activity. Luca, Deepak, and Poliquin (2016) set the same casualty threshold and also excluded any incident that occurred in connection with criminal activity, but they did not restrict to public settings and excluded all events in which fewer than three of the fatally injured victims were not related to the shooter (e.g., family, romantic partner).

(2016), and the authors intended the estimates to serve solely as a robustness check for their main specification (the effects of mass shootings on gun policy). Although the paper provided limited information to use in evaluating the reported statistical models (e.g., on how these policies were coded), it is clear that the analysis used a linear model to predict a dichotomous outcome. Therefore, model assumptions were violated, making CIs unreliable.

Figure 4.2 displays the IRRs and CIs associated with the assault weapon ban policies examined in these studies. We exclude estimates of the federal assault weapon ban from Gius (2015c) because they do not meet our criteria for inclusion.

**Figure 4.2**
**Incidence Rate Ratios Associated with the Effect of Assault Weapon Bans on Mass Shootings**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Assault weapon ban** | **Mass shooting** | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (no political controls) | 1.52 [0.60, 2.43] | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 1.56 [0.63, 2.49] | |
| **State assault weapon ban** | | | |
| Gius (2015c) | Deaths | 0.55 [0.33, 0.92] | |
| Gius (2015c) | Injuries | 1.35 [0.81, 2.23] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified two qualifying studies that estimated the effects of state assault weapon bans on different aspects of mass shootings. Gius (2015c) found that these bans significantly reduce mass shooting deaths but have uncertain effects on injuries resulting from mass shootings. Using a similar data set, Luca, Deepak, and Poliquin (2016) found uncertain effects of state assault weapon bans on the annual incidence of mass shootings. Based on an assessment of these findings and the relative strengths of these studies, we find *inconclusive evidence for the effect of assault weapon bans on mass shootings.*



Assault weapon bans have **uncertain** effects on mass shootings. Evidence for this relationship is **inconclusive.**

## Effects on the Gun Industry

In its review, NRC (2004) described two studies that examined the effects of the 1994 federal assault weapon ban (Koper and Roth, 2001, 2002). The studies found that the bans were associated with a temporary increase in prices of assault weapons in both primary and legal secondary markets. Hahn et al. (2005) identified no studies on this topic meeting our inclusion criteria.

Since 2003, we identified one study examining the effects of the federal assault weapon ban on prices in secondary markets of assault weapons that were purchased before 1994 and thus not prohibited from being sold under the terms of the federal ban. In an update to the earlier Koper and Roth (2001, 2002) studies, Koper (2004) compared secondary-market prices for firearms banned under the law with prices for similar firearms unaffected by the ban between 1991 and 1999, a period that includes when the federal ban took effect (September 13, 2004). In an analysis of assault pistols covered under the ban, the author reported no significant changes in price before or after the ban. Although the comparison firearms, "Saturday night special" handguns (i.e., inexpensive, small-caliber guns), showed steady declines in price over the same period, the effect of the federal law on these different price trends was not well identified. An analysis of secondary-market prices for banned assault rifles compared with other semiautomatic rifles not covered under the ban found sharp increases in price of the banned rifles in 1994 and 1995, but prices returned to pre-ban levels for the remainder of the study period. In contrast, the price of comparison rifles remained constant over the same time frame.

Koper (2004) also examined manufacturer production of banned and comparison weapons between 1985 and 2001. He found that production of banned assault pistols rose substantially in 1993 and 1994 before the ban took place, but then fell to below pre-ban levels even though several manufacturers were producing modified versions of the banned assault pistols that were not covered by the law. Surprisingly, however, a similar surge and subsequent decline was found for the manufacture of "Saturday night special" handguns, which were not subject to the ban, although these shifts were not as large.

Production of assault rifles also surged immediately prior to the ban but declined to pre-ban levels by 1996. In contrast with assault pistols, a strong demand for semi-automatic rifles modified so as not to be covered by the ban is reflected in a surge of production by the end of the 1990s, and production remained above pre-1993 levels in 2000 and 2001.

**Conclusions**

One study provided some evidence that secondary-market prices of assault rifles, but not assault pistols, surged immediately before and in the year after the ban took effect. The ban appeared to affect manufacturer behavior, with production of assault pistols and



Assault weapon bans may **increase** prices of banned firearms in the short term.

Evidence for this relationship is **limited.**

assault rifles rising in the two or three years prior to the law taking effect. The production of semiautomatic pistols modified so as not to be covered by the ban did not recover to pre-ban levels over the study period, at least for the four manufacturers analyzed. Production of semiautomatic rifles modified so as not to be covered ban did recover to greater than pre-ban levels. Because this is a single study on just one version of an assault weapon ban, we conclude that there is *limited evidence that assault weapon bans led to short-term price increases and had mixed effects on the production of different classes of banned weapons.*

## Outcomes Without Studies Examining the Effects of Assault Weapon Bans

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of assault weapon bans on the following outcomes, and we identified no such studies that met our inclusion criteria:

- suicide
- unintentional injuries and deaths
- officer-involved shootings
- defensive gun use
- hunting and recreation.

## Chapter Four References

Adler, W. C., F. M. Bielke, D. J. Doi, and J. F. Kennedy, *Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns with High Capacity*, Washington, D.C.: Handgun Control, Inc., 1995.

Aneja, Abhay, John J. Donohue III, and Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy*, Stanford, Calif.: Stanford Law School, Olin Working Paper No. 461, December 1, 2014. As of May 21, 2017: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681

Blau, Benjamin M., Devon H. Gorry, and Chip Wade, "Guns, Laws, and Public Shootings in the United States," *Applied Economics*, Vol. 48, No. 49, 2016, pp. 4732–4746.

Chang, Ailsa, "Why the AR-15 Is More Than Just a Gun," NPR, June 24, 2013. As of June 29, 2017: http://www.npr.org/2013/06/24/194228925/why-the-ar-15-is-more-than-just-a-gun

Code of Federal Regulations, Title 27, Section 478.11, Meaning of Terms.

Everytown for Gun Safety Support Fund, "Mass Shootings in the United States: 2009–2016," April 11, 2017b. As of May 3, 2017: http://everytownresearch.org/reports/mass-shootings-analysis/

FBI—*See* Federal Bureau of Investigation.

Federal Bureau of Investigation, "Crime in the United States 2015: Expanded Homicide Data Table 8," web page, 2016a. As of May 9, 2017: https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/ expanded_homicide_data_table_8_murder_victims_by_weapon_2011-2015.xls

———, "Crime in the United States 2015: Expanded Homicide Data Table 15," web page, 2016b. As of May 9, 2017: https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/e xpanded_homicide_data_table_15_justifiable_homicide_by_weapon_private_citizen_2011-2015.xls

———, "Crime in the United States 2015: Expanded Homicide Data Table 28," web page, 2016c. As of May 9, 2017: https://ucr.fbi.gov/leoka/2015/tables/table_28_leos_fk_type_of_weapon_2006-2015.xls

Giffords Law Center to Prevent Gun Violence, "Assault Weapons," web page, undated-a. As of October 18, 2017: http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons/

Gius, Mark, "An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates," *Applied Economics Letters*, Vol. 21, No. 4, 2014, pp. 265–267.

———, "The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings," *Applied Economics Letters*, Vol. 22, No. 4, 2015c, pp. 281–284.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," *Justice Research and Policy*, Vol. 17, No. 1, 2016, pp. 28–47.

Koper, Christopher S., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence 1994–2003*, Washington, D.C.: National Institute of Justice, U.S. Department of Justice, 2004.

Koper, Christopher S., and Jeffrey A. Roth, "The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation," *Journal of Quantitative Criminology*, Vol. 17, No. 1, 2001, pp. 33–74.

———, "Impact of the 1994 Federal Assault Weapons Ban on Gun Markets: An Assessment of Short-Term Primary and Secondary Market Effects," *Journal of Quantitative Criminology*, Vol. 18, 2002, pp. 239–266.

Krouse, William J., and Daniel J. Richardson, *Mass Murder with Firearms: Incidents and Victims, 1999–2013*, Washington, D.C.: Congressional Research Service, R44126, 2015.

Lott, John R., Jr., *More Guns, Less Crime: Understanding Crime and Gun-Control Laws*, 3rd ed., Chicago, Ill.: University of Chicago Press, 2010.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy*, working paper, Boston, Mass.: Harvard Business School, 2016.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Plumer, Brad, "Everything You Need to Know About the Assault Weapons Ban, in One Post," *Washington Post*, December 17, 2012. As of May 30, 2017:
https://www.washingtonpost.com/news/wonk/wp/2012/12/17/everything-you-need-to-know-about-banning-assault-weapons-in-one-post/

Public Law 103-322, Violent Crime Control and Law Enforcement Act of 1994, 1994.

United States Code, Title 26, Section 5801, Imposition of Tax.

U.S. Department of Justice, "Violent Crime Control and Law Enforcement Act of 1994 Fact Sheet," Washington, D.C., October 24, 1994. As of May 30, 2017:
https://www.ncjrs.gov/txtfiles/billfs.txt

CHAPTER FIVE
# Stand-Your-Ground Laws

Self-defense has long been available as a criminal defense for fatal and nonfatal confrontations. Traditionally, this defense imposes a duty to retreat before using force, if safe retreat is available. Stand-your-ground laws—referred to by some as *shoot-first laws*—remove this duty to retreat in some cases of self-defense. By removing that rule, stand-your-ground laws are intended to reduce barriers for self-defense with the aim of further deterring aggressive or antisocial behavior. Given the availability of self-defense laws for situations in which safe retreat is not possible, stand-your-ground laws primarily apply when an individual could safely retreat from an attack , or when the availability of safe retreat is ambiguous.

By reducing the threshold for the justified use of lethal force for self-protection, stand-your-ground laws should increase defensive gun use and, if a deterrent effect exists, may reduce rates of crime and violence. Specifically, stand-your-ground laws reduce the expected legal costs of defensive gun use by reducing the probability of incurring criminal or civil liability for inflicting fatal or nonfatal injury. The laws, in turn, increase the expected costs of violent criminal behavior, as victims are more likely to respond using deadly force. This mechanism could serve to lower crime rates or could induce criminals to substitute to other types of crime in which they are less likely to encounter armed resistance. In that case, crime rates could remain stable while the composition of crime types (e.g., robbery versus larceny) shifts.

Alternatively, by lowering the legal risks of using deadly force, these laws could encourage the escalation of aggressive encounters, resulting in an overall increase in firearm homicides or injuries. Furthermore, the greater likelihood of facing a citizen willing to use a firearm defensively under these policies could induce criminals to carry firearms more often and thus increase the share of violent or property crimes involving firearms.

To disentangle these mechanisms, the ideal analyses would distinguish between the effects of stand-your-ground laws on criminal violence and the effects on violence committed in self-defense. Data on homicides, violent crime, and property crime are readily available. Methodological weaknesses in collecting data on defensive gun use are well-documented, but several data sources do exist (see Chapter Twenty-Three for further discussion). Ideally, analyses of the effects of stand-your-ground laws on defen-

sive gun use would use data that capture whether the laws affected self-defense rates in the home (where castle-doctrine law already relieves victims of a duty to retreat) or in other areas as allowed under expanded stand-your-ground laws. However, this level of detail on the circumstances surrounding defensive gun use is not readily available from existing data sources, and there may be additional concerns about changes in the reporting of defensive gun use (as opposed to changes in actual prevalence) should estimation rely on self-reported data on gun use for self-protection. One of the two studies we identified that met our inclusion criteria for this policy separately examined total homicides (as well as other crime types) and justifiable homicides using statistics collected through the Federal Bureau of Investigation (FBI)'s Uniform Crime Reporting Program—although, as the authors point out, the program's definition of *justifiable homicide* does not capture certain incidents that would explicitly count as defensive gun use under expanded stand-your-ground laws (Cheng and Hoekstra, 2013).

There is likely to be little effect of stand-your-ground laws on hunting or recreational gun use. However, should these policies encourage more individuals to obtain or carry firearms, we might expect increased gun sales, unintentional injuries and deaths, and suicides outside the home following passage of the law. To assess this possibility, one would ideally like to know whether there are greater increases in gun ownership and carrying following passage of stand-your-ground laws compared with other states, but data on gun ownership have not been collected systematically over time. Only one of the studies we identified that met our criteria evaluated the effects of stand-your-ground laws on these outcomes: Humphreys, Gasparrini, and Wiebe (2017) estimated the impact of such laws on suicide rates as a placebo test (i.e., on the theory that stand-your-ground laws should have no effect on suicides).

## State Implementation of Stand-Your-Ground Laws

Utah passed a stand-your-ground law in 1994, but widespread legislative change did not begin until 2005. That year, Florida adopted such a law, which became the basis for a model law adopted by the American Legislative Exchange Council. In the ensuing decade, an additional 26 states passed similar laws (Giffords Law Center to Prevent Gun Violence, undated-e). It is important to note that different experts use "stand-your-ground" terminology differently. In particular, we include states where castle doctrine is expanded to motor vehicles. Other sources, therefore, count fewer states with stand-your-ground laws (e.g., Everytown for Gun Safety Support Fund, 2013).

Utah's law states, "A person does not have a duty to retreat from the force or threatened force described in Subsection (1) in a place where that person has lawfully entered or remained, except as provided in Subsection (2)(a)(iii)." Subsection 1 says, in part, that force that is likely to cause death or serious injury is justified to "prevent death or serious bodily injury . . . as a result of another person's imminent use of

unlawful force, or to prevent the commission of a forcible felony." The exception in (2)(a)(iii) applies to a situation where the individual in question was the aggressor or was "engaged in combat by agreement," unless they have withdrawn from the combat or expressed their intention to do so.[1]

Florida's stand-your-ground law is similar to Utah's. It says that a "person who is attacked in his or her dwelling, residence, or vehicle has no duty to retreat and has the right to stand his or her ground and use or threaten to use force, including deadly force, if he or she uses or threatens to use force in accordance with Sections 776.012(1) or (2) or sections 776.013(1) or (2)."[2] Section 776.012(2) and 776.013(2) both provide that deadly force is justified when "necessary to prevent imminent death or great bodily harm to [oneself] or another or to prevent the imminent commission of a forcible felony."[3]

States that followed Florida generally modeled their laws on those of Florida and Utah,[4] sometimes with distinct features.[5] A few other laws strayed further from the Florida and Utah statutes.[6] For instance, Mississippi's law uses the term *felony* rather than the narrower *forcible felony*.[7] Other states do not include the language that there is no duty to retreat to prevent the commission of a forcible felony, but they do allow individuals to use deadly force to prevent specific, named felonies. In most states, this is quite broad, either listing many types of felonies or describing a class of felonies.[8] In

---

[1]   Utah Code Ann. § 76-2-402.

[2]   Florida Stat. Ann. § 776.013.

[3]   Florida Stat. Ann. §§ 776.012, 776.013.

[4]   In particular, Georgia, Indiana, Montana, and Oklahoma. See Ga. Code Ann. §§ 16-3-23.1, 16-3-21; Ind. Code Ann. § 35-41-3-2; Mont. Ann. Code §§ 45-3-102, 103, 104, 110; Okla. Stat. Ann. Tit. 21 § 1289.25.

[5]   Alabama, Alaska, Arizona, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nevada, New Hampshire, North Carolina, North Dakota, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, and Wisconsin. See Ala. Code § 13A-3-23; Alaska Stat. Ann. § 11.81.335; Ariz. Rev. Stat. Ann. § 13-411; Kan. Stat. Ann. §§ 21-5222, 5223, 5230; Ky. Rev. Stat. Ann. §§ 503.050, 503.055; La. Stat. Ann. § 14:20; Mich. Comp. Laws § 780.972; Miss. Ann. Code § 97-3-15; Mo. Stat. Ann. § 563.031; Nev. Rev. Stat. Ann. § 200.120; N.H. Rev. Stat. Ann. §§ 627:4, 627:7; N.C. Gen. Stat. Ann. §§ 14-51.3, 51.2; N.D. Ann. Code § 12.1-05-07; 18 Pa. Const. Stat. § 505; S.C. Ann. Code §§ 16-11-440, 16-1-60; S.D. Laws § 22-18-4; Tenn. Ann. Code § 39-11-611; Tex. Penal Code § 9.32; Wisc. Stat. Ann. § 939.48.

[6]   Iowa, Ohio, and West Virginia. See Iowa Code Ann. § 704.1, which states that deadly force may be used even if there is an alternative, if the alternative requires one to retreat from one's dwelling or workplace. Ohio Rev. Code Ann. § 2901.09, which applies to every section in the code that sets forth a criminal offense. W. Va. Ann. Code § 55-7-22, which strays from Florida's and Utah's laws in the section dealing with civil actions, discussing lawsuits brought by intruders or attackers for injuries sustained.

[7]   Miss. Ann. Code § 97-3-15.

[8]   For example, Ala. Code § 13-A-3-23 (kidnapping; assault; burglary; robbery; forcible rape; forcible sodomy; "using or about to use physical force against an owner, employee, or other person authorized to be on business property when the business is closed to the public while committing or attempting to commit a crime involving death, serious physical injury, robbery, kidnapping, rape, sodomy, or a crime of a sexual nature involving

some states, the list of felonies is quite limited.[9] Finally, four states limit their laws to defense of self and others in the face of death or serious physical injury, thereby implicitly excluding any other felonies.[10]

West Virginia, which discusses stand-your-ground laws only in the context of civil actions, does not require an individual to retreat if facing risk of death, serious bodily harm, or commission of a felony in his or her own home. However, the law requires the risk of death or serious bodily harm for the stand-your-ground provisions to apply when outside the home.[11] In North Dakota, the stand-your-ground law applies in an individual's home, workplace, or occupied motor home or travel trailer, unless the individual "is assailed by another individual who the individual knows also dwells or works there or who is lawfully in the motor home or travel trailer."[12] Ohio's statute applies only in the person's home, vehicle, or vehicle owned by an immediate family member.[13] In Wisconsin, the law applies in an individual's home, motor vehicle, or place of business.[14] In Iowa and Connecticut, it applies in the home or workplace.[15]

---

a child under the age of 12"; or against someone who "in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered, a dwelling, residence, business property, or occupied vehicle, or federally licensed nuclear power facility, or is in the process of sabotaging or attempting to sabotage a federally licensed nuclear power facility, or is attempting to remove, or has forcefully removed, a person against his or her will from any dwelling, residence, business property, or occupied vehicle when the person has a legal right to be there, and provided that the person using the deadly physical force knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring"); Alaska Stat. Ann. § 11.81.335 (in addition to death and serious physical injury, lists kidnapping, sexual assault, sexual abuse of a minor, and robbery); Ky. Rev. Stat. Ann. § 503.050, 503.055 (503.050 states that an individual may stand his or her ground when at risk of kidnapping or sexual intercourse compelled by force or threat of force, in addition to death, great bodily harm, or felony by force, while 503.055 states that individuals may stand their ground when they or other individuals face only death, great bodily harm, or felony by force); Mo. Stat. Ann. § 563.031 (adds defense of unborn child); and Nev. Rev. Stat. Ann. § 200.120 ("necessary self-defense, or in defense of an occupied habitation, an occupied motor vehicle or a person, against one who manifestly intends or endeavors to commit a crime of violence, or against any person or persons who manifestly intend and endeavor, in a violent, riotous, tumultuous or surreptitious manner, to enter the occupied habitation or occupied motor vehicle, of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein"). See also La. Stat. Ann. § 14:20; N.H. Rev. Stat. Ann. §§ 627:4, 627:7; N.D. Ann. Code § 12.1-05-07; Ohio Rev. Code Ann. § 2901.09; S.C. Ann. Code §§ 16-11-440, 16-1-60; S.D. Laws §§ 22-18-4, 22-18-34, 22-18-35; Tex. Penal Code § 9.32.

9   Mich. Comp. Laws § 780.972 (sexual assault); N.C. Gen. Stat. Ann. §§ 14-51.3, 51.2 (forcibly entering home, motor vehicle, or workplace or attempting to remove someone from their home, motor vehicle, or workplace); 18 Pa. Cons. Stat. § 505 (kidnapping or sexual intercourse by force or threat).

10   Iowa, Kansas, Tennessee, and Wisconsin. See Iowa Code Ann. § 704.1; Kan. Stat. Ann. §§ 21-5222, 5223, 5230; Tenn. Ann. Code § 39-11-611; Wisc. Stat. Ann. § 939.48.

11   W. Va. Ann. Code § 55-7-22.

12   N.D. Ann. Code § 12.1-05-07.

13   Ohio Rev. Code Ann. § 2901.09.

14   Wisc. Stat. Ann. § 939.48.

15   Iowa Code Ann. § 704.1; Conn. Gen. Stat. Ann. § 53a-20.

Some states exclude specific situations from applying under the stand-your-ground doctrine. In Louisiana, it "shall not apply when the person committing the homicide is engaged, at the time of the homicide, in the acquisition of, the distribution of, or possession of, with intent to distribute a controlled dangerous substance in violation of the provisions of the Uniform Controlled Dangerous Substances Law."[16] Other policies are broader, excluding any situation where the individual is "actively engaged in conduct in furtherance of criminal activity."[17]

## Effects on Suicide

### Research Synthesis Findings

Neither the National Research Council (NRC) (2004) nor Hahn et al. (2005) identified any research examining the effects of stand-your-ground laws on suicide. However, we identified one study that met our criteria (Humphreys, Gasparrini, and Wiebe, 2017), although this study's analysis of the impact of stand-your-ground laws on suicide rates was used as a placebo test (i.e., on the theory that stand-your-ground laws should have no effect on suicides) to support the authors' primary findings of an effect of the laws on homicide rates.[18]

Humphreys, Gasparrini, and Wiebe (2017) examined changes between 1999 and 2014 in Florida's monthly total and firearm suicide rates before and after the introduction of Florida's 2005 stand-your-ground law compared with changes over time in these rates in four of the 27 states without stand-your-ground laws at the beginning of the period (New Jersey, New York, Ohio, and Virginia). The paper reported that these were the only states with consistent monthly homicide data. It did not indicate if suicide data were available on a wider set of control states. The authors found uncertain evidence of an effect of the stand-your-ground law on either total or firearm suicides in Florida; they did find a suggestive reduction in control states' firearm suicide rates after Florida's stand-your-ground law was passed, but no evidence that this effect was different from the uncertain change in Florida. Their model included no covariates to adjust for other sources of differences between Florida and control states in suicide rates over time, potentially obscuring the effects of the stand-your-ground law in Florida.

Figure 5.1 displays the incidence rate ratios (IRRs) and confidence intervals (CIs) associated with the stand-your-ground policies examined in Humphreys, Gasparrini, and Wiebe (2017).

---

[16]  La. Stat. Ann. § 14:20.

[17]  Nev. Rev. Stat. Ann. § 200.120; Tex. Penal Code § 9.32; Wisc. Stat. Ann. § 939.48.

[18]  We identified one additional study that examined the effects of castle-doctrine legislation on the proportion of firearm suicides as a proxy for firearm ownership (Wallace, 2014). However, without simultaneously examining firearm or total suicide rates, this outcome is difficult to interpret as providing a causal effect of stand-your-ground law, so the study did not meet our inclusion criteria.

**Figure 5.1**
**Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Suicide**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Stand your ground** | **Suicide** | | |
| Humphreys, Gasparrini, & Wiebe (2017) | Total rate, all ages | 0.99  [0.59, 1.67] | |
| Humphreys, Gasparrini, & Wiebe (2017) | Firearm rate, all ages | 1.03  [0.93, 1.14] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified one qualifying study that estimated the effects of stand-your-ground laws on total suicides and firearm suicides. The estimates for these effects in Humphreys, Gasparrini, and Wiebe (2017) suggest that such laws have an uncertain effect on both total suicides and firearm suicides. Therefore, available studies provide *inconclusive evidence for the effect of stand-your-ground laws on total suicides and firearm suicides.*



Stand-your-ground laws have **uncertain** effects on total suicides and firearm suicides. Evidence for this relationship is **inconclusive.**

## Effects on Violent Crime

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of stand-your-ground laws on violent crime.

We identified three studies that met our criteria. Cheng and Hoekstra (2013) exploited state and time variation in the passage of stand-your-ground laws using data from 2000 to 2010 to estimate the laws' effects on homicide rates. The authors defined stand-your-ground laws using a binary variable equal to one for polices that "remove the duty to retreat in some place outside the home" (Cheng and Hoekstra, 2013, p. 825). Controlling for state and year fixed effects, the study explored several model specifications, including additional controls for region-by-year fixed effects, time-varying covariates that account for changes in policing and incarceration rates, and state-specific linear trends. Using negative binomial regression models, they found stand-your-ground laws to be associated with significant increases in homicide rates of 6 to 11 percent, a result that is relatively robust across model specifications. However, given the relatively short time frame studied and large set of controls, the

Case 3:19-cv-01226-L-AHG   Document 34-4   Filed 01/03/20   PageID.6455   Page 112 of 163

ratio of estimated parameters to observations is less than one to six in specifications that include time-varying covariates, indicating that the model may have been overfit, and thus its estimates and their CIs may be unreliable indicators of the true effect of the law.

Covering a similar period (1999–2010) with state-level data, Webster, Crifasi, and Vernick (2014) analyzed the effects of stand-your-ground laws on age-adjusted homicide rates. Using generalized least-squares regression models, their estimates showed an uncertain association between stand-your-ground laws and homicides rates, firearm homicide rates, and nonfirearm homicide rates. The statistical model used to arrive at these results used a large number of estimated parameters relative to observations (a ratio of about one to eight), meaning the model may have been overfit, and thus its estimates of the laws' effects may not generalize to other implementations of a stand-your-ground law.

Humphreys, Gasparrini, and Wiebe (2017) used segmented quasi-Poisson regression analysis to examine changes between 1999 and 2014 in Florida's monthly homicide rate before and after the introduction of Florida's 2005 stand-your-ground law. They compared these changes in four of the 27 states without stand-your-ground laws at the beginning of the period (New Jersey, New York, Ohio, and Virginia). The paper reported that these were the only states with reliable monthly homicide data. The authors found that the stand-your-ground law increased both total homicides and firearm homicides. Their estimates show that Florida experienced a significant 24-percent increase in total homicides and 32-percent increase in firearm homicides following enactment of the stand-your-ground law in 2005 (see Figure 5.2). The comparison states experienced a statistically insignificant 6-percent increase in total homicides and 8-percent increase in firearm homicides after 2005. The authors' model included no covariates to adjust for other sources of differences between Florida and control states in homicide rates over time, meaning that factors other than the stand-your-ground law cannot be ruled out as the cause of the observed differences between Florida and the control states.

Figure 5.2 displays the IRRs and CIs associated with the stand-your-ground policies examined in these studies.

**Figure 5.2**
**Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Violent Crime**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Stand your ground** | **Homicide** | | |
| Humphreys, Gasparrini, & Wiebe (2017) | Total rate, all ages | 1.17  [1.07, 1.28] | |
| Humphreys, Gasparrini, & Wiebe (2017) | Firearm rate, all ages | 1.22  [1.08, 1.38] | |
| Webster, Crifasi, & Vernick (2014) | Total rate | 1.02  [0.96, 1.07] | |
| Webster, Crifasi, & Vernick (2014) | Firearm rate | 1.04  [0.97, 1.11] | |
| Webster, Crifasi, & Vernick (2014) | Nonfirearm rate | 1.00  [0.92, 1.09] | |
| Cheng & Hoekstra (2013) | Homicide rate | 1.10  [1.04, 1.16] | |
| | **Violent crime** | | |
| Cheng & Hoekstra (2013) | Burglary | 1.02  [0.98, 1.07] | |
| Cheng & Hoekstra (2013) | Robbery | 1.03  [0.98, 1.07] | |
| Cheng & Hoekstra (2013) | Aggravated assault | 1.04  [0.97, 1.10] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

*Homicides and other violent crime.* We identified three qualifying studies that estimated the effects of stand-your-ground laws on total homicides or other violent crimes. Cheng and Hoekstra (2013) found that these laws significantly increase homicide rates, but they have uncertain effects on robbery, aggravated assault, and burglary rates. Webster, Crifasi, and Vernick (2014) found that these laws have an uncertain effect on the total homicide rate. Finally, Humphreys, Gasparrini, and Wiebe (2017) found significant effects consistent with the law increasing total homicides in Florida after its passage. These studies draw on two distinct data sources: FBI crime-rate data from the Uniform Crime Reports system and the Center for Disease Control and Prevention's Fatal Injury Reports.

Based on these findings, we conclude that there is *moderate evidence that stand-your-ground laws may*



Stand-your-ground laws may **increase** total homicides.

Evidence for this relationship is **moderate.**

Stand-your-ground laws have **uncertain** effects on other violent crimes.

Evidence for this relationship is **inconclusive.**

*increase homicide rates* but *inconclusive evidence for the effect of stand-your ground laws on other types of violent crime.*

*Firearm homicides.* We identified two qualifying studies that estimated the effects of stand-your-ground laws on firearm homicide rates. Webster, Crifasi, and Vernick (2014) found that these laws have uncertain effects on firearm homicides. Humphreys, Gasparrini, and Wiebe (2017) found a significant effect suggesting that after the law's introduction, it increased fire-



Stand-your-ground laws may **increase** firearm homicides.

Evidence for this relationship is **limited.**

arm homicides in Florida. Based on these findings, we conclude that there is *limited evidence that stand-your-ground laws may increase firearm homicides.*

## Effects on Defensive Gun Use

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of stand-your-ground laws on defensive gun use. We identified one such study meeting our inclusion criteria.

Cheng and Hoekstra (2013) exploited state-time variation in the passage of stand-your-ground laws using data from 2000 to 2010 to estimate such laws' effects on justifiable homicides committed by private citizens. The authors defined stand-your-ground laws using a binary variable equal to one for polices that "remove the duty to retreat in some place outside the home" (Cheng and Hoekstra, 2013, p. 825), and data on justifiable homicides were collected from the FBI's supplementary homicide data. Under the FBI's classification in this data set, for a homicide to be considered justifiable, the incident must have occurred in conjunction with other offenses (e.g., the fatal shooting of an armed robber by a storeowner during the commission of the robbery), and those other offenses must have been reported. As noted by the authors, justifiable homicides are likely severely underreported in this data source. Controlling for state and year fixed effects, the study explored several model specifications, including additional controls for region-by-year fixed effects, time-varying covariates that account for changes in policing and incarceration rates, and contemporaneous crime rates. Using negative binomial regression models, they found stand-your-ground laws to be associated with increases in justifiable homicide, ranging from an uncertain 28-percent rise to a significant 57-percent rise depending on the model specification. However, given the relatively short time frame studied and large set of controls, the ratio of estimated parameters to observations is less than one to six in specifications that include time-varying

covariates, indicating that the model may have been overfit, and thus it may yield estimates that are unreliable indicators of the true causal effect of stand-your-ground laws.

Figure 5.3 displays the IRRs and CIs associated with the stand-your-ground policies examined in Cheng and Hoekstra (2013).

**Figure 5.3**
**Incidence Rate Ratios Associated with the Effect of Stand-Your-Ground Laws on Defensive Gun Use**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Stand your ground laws** | | | |
| Cheng & Hoekstra (2013) | Justifiable homicide | 1.33  [0.84, 2.10] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified one study that estimated the effects of stand-your-ground laws on justifiable homicides, which is an imperfect measure of the rate of defensive gun use. In their



Stand-your-ground laws have **uncertain** effects on defensive gun use. Evidence for this relationship is **inconclusive.**

specification that accounts for how justifiable homicides are counted and controls for time-varying state characteristics, Cheng and Hoekstra (2013) found that the effect of the law on this outcome is uncertain. Therefore, we find *inconclusive evidence for the effect of stand-your-ground laws on defensive gun use.*

## Outcomes Without Studies Examining the Effects of Stand-Your-Ground Laws

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of stand-your-ground laws on the following outcomes, and we identified no such studies that met our inclusion criteria:

- unintentional injuries and deaths
- mass shootings
- officer-involved shootings
- hunting and recreation
- gun industry.

# Chapter Five References

Cheng, Cheng, and Mark Hoekstra, "Does Strengthening Self-Defense Law Deter Crime or Escalate Violence? Evidence from Expansions to Castle Doctrine," *Journal of Human Resources*, Vol. 48, No. 3, 2013, pp. 821–853.

Everytown for Gun Safety Support Fund, *Shoot First: "Stand Your Ground" Laws and Their Effect on Violent Crime and the Criminal Justice System*, New York, 2013.

Giffords Law Center to Prevent Gun Violence, "'Stand Your Ground' Laws," web page, undated-e. As of October 18, 2017:
http://lawcenter.giffords.org/gun-laws/policy-areas/guns-in-public/stand-your-ground-laws/

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Humphreys, David K., Antonio Gasparrini, and Douglas J. Wiebe, "Evaluating the Impact of Florida's 'Stand Your Ground' Self-Defense Law on Homicide and Suicide by Firearm: An Interrupted Time Series Study," *JAMA Internal Medicine*, Vol. 177, No. 1, 2017, pp. 44–50.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Wallace, Lacey N., "Castle Doctrine Legislation: Unintended Effects for Gun Ownership?" *Justice Policy Journal*, Vol. 11, No. 2, Fall 2014.

Webster, D., C. K. Crifasi, and J. S. Vernick, "Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides," *Journal of Urban Health*, Vol. 91, No. 2, 2014, pp. 293–302.

CHAPTER SIX
# Prohibitions Associated with Mental Illness

Federal law prohibits the possession or purchase of firearms by certain individuals who have been adjudicated as mentally ill (18 U.S.C. 922).[1] The number of people covered by that exclusion is not known. An estimated 44 million adults in the United States have some form of *mental illness*, defined as any "diagnosable mental, behavioral, or emotional disorder, other than a developmental or substance use disorder" (Substance Abuse and Mental Health Services Administration, 2016). Of these adults, approximately 10 million suffer from a "serious mental illness" that results in substantial impairment in carrying out major life activities. Existing laws that prohibit those with mental health conditions from accessing firearms affect a subset of individuals who likely fall into the "serious mental illness" category. Expanding such prohibitions has the potential to affect a much larger subset of individuals who fall within the "any mental illness" category, although broadening the scope of mental health restrictions poses technological, coordination, and legal (i.e., privacy) challenges (Liu et al., 2013).

If individuals with mental illness present a higher violence risk to themselves or others compared with those without mental illness, then restricting their access to firearms should reduce suicides or homicides. The magnitude of these effects will depend primarily on the reliability of the screening process instituted to identify disqualifying mental health conditions, the size of the marginal population affected by the expanded prohibitions, and the likelihood of individuals in that population committing harm to others or to themselves.

Epidemiological evidence suggests that a diagnosis of mental illness alone has little relation to risk of interpersonal violence (Swanson et al., 2015); in particular, studies estimate that between 2 percent and 4 percent of all violent behavior may be attributable to mental illness (Corrigan and Watson, 2005; Swanson, 1994). One study found that among a sample of convicted murderers in Indiana, perpetrators with serious mental illness were significantly less likely to have used a firearm compared with other perpetrators (Matejkowski et al., 2014). A study of 82,000 individuals with mental illness in Florida showed that the arrest rate for violent crimes involving a firearm

---

[1]   The Gun Control Act of 1968 prohibited the sale of firearms to any person who has been "adjudicated as mental defective or has been committed to any mental institution" (Pub. L. 90-618).

was the same among the study population as the estimated general population rate—approximately 215 arrests per 100,000 people (Swanson et al., 2016). Elevated rates of violence tend to be reported for involuntarily committed patients (Choe, Teplin, and Abram, 2008), but this population is already barred from acquiring firearms through existing federal mental health–related prohibitions. Overall, between 2001 and 2010, less than 5 percent of the 120,000 firearm-related homicides in the United States were committed by individuals diagnosed with a mental illness (Metzl and MacLeish, 2015), suggesting that expanded prohibitions based on mental health status may not have a large effect on firearm crimes.

Although media coverage often links mass shootings with serious mental illness (McGinty et al., 2014), an analysis of 133 mass shooting events between 2009 and 2015 (Everytown for Gun Safety Support Fund, 2017b) reported that in only one incident (0.8 percent) did the perpetrator have a history of mental illness that prohibited purchase of a firearm from a federally licensed dealer; however, formal concerns about the mental health of the perpetrator had been previously expressed for 15 cases (11.3 percent), and informal concerns about the shooter's mental health had been previously expressed for 13 additional cases (9.8 percent). Although public mass shooters are more likely to have a psychotic disorder compared with perpetrators of multiple-victim shootings related to familicide or profit-motivation, the prevalence of severe mental illness among this subgroup is still quite low (Fox and Levin, 2015). Counting less-severe forms of mental illness, Follman, Aronsen, and Pan (2017) found that 50 of the 90 public mass shootings between 1982 and 2017 that were identified by *Mother Jones* magazine involved a shooter with a history of possible mental health problems.

At the same time, research indicates that individuals with mental disorders are more likely to be victims than perpetrators of violence (Desmarais et al., 2014). One study of persons with severe mental illness (in treatment at mental health agencies in Chicago) found that their annual exposure to violent crime victimization was more than four times higher than rates in the general population (Teplin et al., 2005). Another meta-analysis produced similar results, finding the prevalence of violent victimization among individuals with mental illness to be 24 percent (with estimates of the reviewed studies ranging from 7 percent to 63 percent) (Hughes et al., 2012). Extrapolating this estimate to the national population of individuals with serious mental illness in 2015 would suggest that approximately 2.3 million individuals with serious mental illness are victims of violent crime each year; however, this is likely an overestimate because most studies sampled individuals who were receiving inpatient or outpatient treatment for diagnosed psychiatric illnesses or focused on severe mental illnesses (such as schizophrenia) (Hughes et al., 2012). For instance, while the National Crime Victimization Survey (NCVS) does not collect information on mental health directly, NCVS estimates suggest that there are about 780,000 cases annually of violent crime against individuals with cognitive disabilities (defined as serious difficulty in concentrating, remembering, or making decisions because of a physical, mental, or emotional condi-

tion) (Harrell, 2017). Therefore, expanding the class of prohibited possessors to include more people with severe mental illness may lead to additional victimization because those people have reduced opportunities for defensive gun use. At the same time, such an expansion may decrease violent crime, mass shootings, and suicides carried out by this population.

Indeed, evidence supports that expanding prohibitions associated with mental illness may have larger effects in reducing rates of firearm suicides. Research has demonstrated a strong link between mental illness and suicide; it is estimated that between 47 percent and 74 percent of suicides are attributed to mental disorders (Li et al., 2011; Cavanagh et al., 2003). A study of 82,000 individuals with mental illness in Florida found that suicide was nearly four times as prevalent among this subpopulation compared with the general population, but firearms were half as likely to be used as a means of suicide; in more than 70 percent of these firearm suicide cases, the individual's mental health condition did not prohibit him or her from obtaining a firearm legally (Swanson et al., 2016).

To assess the effects of expanded mental health–related prohibitions, the ideal data would distinguish outcomes between those who are affected by the expanded prohibitions and those who are not. This type of analysis would necessitate a detailed database containing rich information on the mental health conditions of perpetrators of crime or victims of suicide. Because an individual's medical records are private, it may be particularly difficult to identify firearm-involved crime incidents in which the perpetrator was a prohibited possessor because of mental illness. Given these data challenges, as well as wide variation across states in mental health disqualifiers and inconsistencies in reporting, it is not surprising that we identified no studies meeting our inclusion criteria that estimated the effects of expanded prohibitions associated with mental illness. Nevertheless, three studies reviewed in Chapter Three (on background checks) examined the effect of implementing the Brady Handgun Violence Prevention Act (the Brady Act) checks on certain mentally ill people. Implementation of this law had the effect of expanding the class of mentally ill people who could not purchase a firearm, so we review those studies in this chapter as well.

## State Implementation of Prohibitions Associated with Mental Illness

The District of Columbia and 33 states have laws restricting access to firearms by individuals with mental illness. Although the laws may use different language,[2] many

---

2   For example, Alabama prohibits "anyone of unsound mind" from owning, possessing, or controlling a firearm and defines *unsound mind* as anyone

> (1) Found by a court, board, commission, or other lawful authority that, as a result of marked subnormal intelligence, mental illness, incompetency, condition, or disease, is a danger to himself or herself or others or lacks the mental capacity to contract or manage his or her own affairs; . . . [or] (3) Involuntarily committed for a

states have basically adopted the same standards as the federal Brady Act, which went into effect in 1994.[3]

In other cases, states have narrower prohibitions than found in the Brady Act. For example, several states prohibit firearm possession by only those committed to psychiatric institutions, not those adjudicated as mentally incompetent.[4] In some states, such as Missouri, only those adjudicated as mentally incompetent are prohibited.[5] In Michigan and North Carolina, the prohibition applies only to handguns.[6] Oklahoma and Tennessee prohibit only the transfer of firearms to these prohibited individuals, but the laws are silent on whether such individuals may possess a firearm.[7]

In contrast, California, Connecticut, Illinois, Maryland, and the District of Columbia have expanded the Brady Act prohibitions to include individuals who have been voluntarily admitted into psychiatric hospitals.[8] Hawaii has extended the prohibition to those diagnosed with "significant" mental disorders, and California, Connecticut, Illinois, and Maryland have widened the class of prohibited possessors in other ways.[9]

---

final commitment for inpatient treatment to the Department of Mental Health or a Veterans' Administration hospital by a court after a hearing. (Ala. Code § 13A-11-72)

Alabama also includes individuals who have been "found to be insane, [found to be] not guilty by reason of mental disease or defect, found mentally incompetent to stand trial, or found not guilty by reason of a lack of mental responsibility." The Center to Prevent Gun Violence considers these restrictions separately, and we agree.

[3]   Alabama, Arkansas, California, Florida, Nevada, New York, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Utah, Virginia, West Virginia, and Wyoming. See Ala. Code § 13A-11-72; Ark. Code Ann. § 5-73-103; Calif. Welf. and Inst. Code §§ 8100, 8103; Fla. Stat. Ann. § 790.065; Nev. Rev. Stat. Ann. § 202.360; N.Y. Penal Law §§ 265.00, 400, N.Y. Mental Hygiene Law § 9.46; Ohio Rev. Code Ann § 2923.13; Ore. Rev. Stat. Ann. §§ 166.250, 426.130; 18 Pa. Cons. Stat. § 6105; R.I. Gen. Laws. § 11-47-6; S.C. Ann. Code § 23-31-1040; Utah Code Ann. § 76-10-503; Va. Ann. Code § 18.2-308.1:2; W. Va. Ann. Code § 61-7-7; Wyo. Stat. Ann. § 6-8-404.

[4]   Arizona, Connecticut, Delaware, Hawaii, Kansas, Maine, Maryland, Massachusetts, Minnesota, New Jersey, North Dakota, Washington, Wisconsin, and the District of Columbia. See Ariz. Rev. Stat Ann. §§ 13-3101, 13-3102, 36-540; Conn. Gen. Stat. § 53a-217; Del. Code Ann. Tit. 11 § 1448; Hawaii Rev. Stat. Ann. § 134-7; Kan. Stat. Ann. §§ 21-6301, 59-2946; Me. Rev. Stat. Ann. § 393; Md. Ann. Code § 5-133; Mass. Gen. Laws Ann. § 129B; Minn. Stat. Ann. § 624.713; N.J. Stat. Ann. § 2C:39-7; N.D. Cent. Code § 62.1-02-01; Wash. Rev. Code § 941.040; Wisc. Stat. §§ 941.29, 51.20, 54.10; D.C. Ann. Code § 7-2502.03.

[5]   Mo. Stat. Ann. § 571.070.

[6]   Mich. Comp. Laws. Ann. § 28.422; N.C. Gen. Stat. Ann. § 140-402. Furthermore, in Michigan, the prohibition applies only to those committed to psychiatric institutions.

[7]   Okla. Stat. Ann. § 1289.10; Tenn. Code Ann. § 39-17-1316.

[8]   Calif. Welf. and Inst. Code § 8100 (while voluntarily in treatment for being a threat to themselves or others); Conn. Gen. Stat. Ann. § 53a-217 (admitted within previous six months); 430 Ill. Comp. Stat 65/1.1, 65/8 (admitted within past five years), 405 Ill. Comp. Stat. 5/6-103.1; Md. Ann. Code § 5-133 (admitted for more than 30 consecutive days); D.C. Code Ann. § 7-2502.03 (admitted within past five years).

[9]   In Hawaii, possession is prohibited by those "diagnosed as having a significant behavioral, emotional, or mental disorder" (Hawaii Rev. Stat. Ann. § 134-7). California has a long list of disqualifiers, including threats

Arizona, Oregon, Pennsylvania, and Virginia have also extended the mental health–related prohibitions to individuals ordered to attend outpatient treatment.[10] New York extended the prohibitions to individuals who were committed for inpatient treatment.[11]

## Effects on Suicide

### Research Synthesis Findings

Neither the National Research Council (NRC) (2004) nor Hahn et al. (2005) identified any research examining the effects of mental health–related prohibitions on suicide. Using state-level data from 1996 to 2005, Sen and Panjamapirom (2012) assessed how different *types* of background checks conducted by states affect suicides. They noted that there is substantial variation in state laws regarding which mental health records must be considered in background checks. The authors characterized variation in whether states can examine relevant mental illness records as part of the background check process. Their regression models included state-level covariates, a lagged outcome variable, and fixed effects for year and census subregion.

Sen and Panjamapirom (2012) found that, compared with states with background checks that investigate only criminal history, checks of mental health records were associated with significantly lower firearm suicide and total suicide rates. Their estimates suggest that after implementing a state check on mental health records, the firearm suicide rate was 96 percent of the expected rate had this policy not been in effect, and the total suicide rate was 97 percent of the expected rate.

Swanson et al. (2016) evaluated how changes in state reporting of gun-disqualifying mental health records to the Federal Bureau of Investigation's National Instant Criminal Background Check System (NICS) database affected suicide rates among individuals in Florida with a disqualifying mental health condition relative to individuals diagnosed with a serious mental health illness but not prohibited from purchasing a firearm. They found no significant difference between suicide rates before and after implementing expanded NICS reporting for the two groups.

---

of physical violence, various lengths of detention, and court-ordered evaluation and counseling (Calif. Welf. and Inst. Code §§ 8100, 8103, 5200-5213). Maryland restricts possession from any person who "suffers from a mental disorder . . . and has a history of violent behavior against the person or another" (Md. Ann. Code § 5-133), and Illinois and Connecticut restrict possession from those who threaten violence or demonstrate threatening behavior (430 Ill. Comp. Stat 65/1.1; Conn. Gen. Stat. Ann. § 53a-217).

[10]  Ariz. Rev. Stat §§ 36-540(A)(1), 13-3101(A)(7); Ore. Rev. Stat. §§ 166.250(1)(c)(D), 426.133; 18 Pa. Cons. Stat. § 6105; Va. Code. Ann. § 18.2-308.1:3(A).

[11]  N.Y. Penal Law § 400.001(1), N.Y. Ment. Hyg. Law § 9.27.

Figure 6.1 displays the incidence rate ratios (IRRs) and confidence intervals (CIs) associated with the mental health–related prohibition policies examined in Sen and Panjamapirom (2012). Swanson et al. (2016) did not provide effect estimates or test statistics, so we do not include effect sizes for this study in the figure.

**Figure 6.1**
**Incidence Rate Ratios Associated with the Effect of Mental Health–Related Prohibitions on Suicide**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Check on mental illness** | **Suicide** | | |
| Sen & Panjamapirom (2012) | Total | 0.97 [0.95, 0.99] | |
| Sen & Panjamapirom (2012) | Firearm | 0.96 [0.92, 0.99] | |

NOTE: IRR values marked with green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

## Conclusions

One study found evidence that when states check mental health records as part of the firearm background check process, their rates of firearm suicide and total suicide are reduced by a few percentage points. This study did not examine the effect of expanding mental health–related prohibitions beyond those in federal law. Instead, it examined how improved compliance with existing federal law concerning mental health checks affects suicide rates. Because improved compliance has the effect of prohibiting gun purchases by some with mental health conditions who would not previously have been prevented from purchasing a weapon, this study provides limited evidence that prohibitions associated with mental illness can reduce total suicides and firearm suicides. A second study reported finding no effect of implementing NICS mental health–related prohibitions on suicide but did not provide detailed results.



Prohibitions associated with mental illness may **decrease** total suicides and firearm suicides.

Evidence for this relationship is **limited.**

Based on these results, we conclude that there is *limited evidence that some state or federal laws prohibiting those with a mental illness from buying a gun reduce total suicide rates and firearm suicide rates.*

## Effects on Violent Crime

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of mental health–related prohibitions on suicide. Since 2003, three studies examined the effects of implementing background checks for individuals prohibited from purchasing or possessing firearms because of a mental illness. Using state-level data from 1996 to 2005, Sen and Panjamapirom (2012) assessed how different *types* of background checks conducted by states affect total homicides and firearm homicides. They noted that there is substantial variation in state laws regarding which mental health records must be considered in background checks. The authors characterized variation in whether states can examine relevant mental illness records as part of the background check process. Their regression models included state-level covariates, a lagged outcome variable, and fixed effects for year and census subregion.

Sen and Panjamapirom (2012) found that, compared with background checks that examine only criminal history, background checks that include mental illness records are associated with fewer total homicides and firearm homicides. However, only the reductions for total homicides reached conventional levels of statistical significance, and estimates for firearm homicides were suggestive. The authors found that, after implementation of state background checks that included mental illness records, firearm homicide rates declined to 93 percent of the level that would otherwise be expected (see Figure 6.2).

Swanson et al. (2013, 2016) merged administrative records from public health and criminal justice agencies to evaluate how changes in state reporting of gun-disqualifying mental health records to the NICS database affected violent crime arrest rates for individuals with a disqualifying mental health condition relative to individuals diagnosed with a serious mental health illness but not prohibited from purchasing a firearm. Swanson et al. (2013) obtained data from 2002 to 2009 for individuals in Connecticut who had been hospitalized for schizophrenia, bipolar disorder, or major depressive disorder. The authors estimated changes in violent crime arrests for individuals with at least one of the mental health adjudications reported to the NICS before and after Connecticut began reporting mental health records in 2007. The authors found a 31-percent decline in the probability of violent crime arrest in their sample of individuals who had a mental health adjudication but no disqualifying criminal conviction. For comparison, the authors also estimated the likelihood of violent crime arrest for individuals with at least one voluntary psychiatric hospitalization but no mental health adjudication (i.e., individuals with serious mental health problems who were not prohibited from purchasing firearms). Relative to the legally disqualified population, the nondisqualified group had lower rates of arrest both before and after the NICS reporting change, but the magnitude of the decrease following NICS reporting was smaller than the reduction seen in the "treated" group with a disqualifying condi-

tion. However, no statistical tests were provided to demonstrate that the difference was statistically significant.

Using data from 2002 to 2011, Swanson et al. (2016) employed analogous methods to analyze the effects of NICS reporting changes in 2007 for two Florida counties. The authors similarly found a larger reduction in violent crime arrest rates for individuals with a disqualifying mental health condition relative to individuals with a serious mental health illness that did not legally prohibit firearm acquisition. This difference, a relative decline of 38 percent (see Figure 6.2), was statistically significant. However, estimates became insignificant when the outcome variable was restricted specifically to violent crimes involving firearms, which could indicate the absence of a causal connection or could be due to measurement error in classifying crimes as involving firearms (Swanson et al., 2016).

Figure 6.2 displays the IRRs and CIs associated with the mental health–related prohibition policies examined in these studies. Swanson et al. (2013) did not provide enough information for us to calculate IRRs and CIs for the effect size of interest, so we do not include these in the figure. The Swanson et al. (2016) estimate is the change from before and after the NICS reporting requirements for legally disqualified individuals relative to the change for nonlegally disqualified individuals.

**Figure 6.2**
**Incidence Rate Ratios Associated with the Effect of Mental Health–Related Prohibitions on Violent Crime**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Check on mental illness** | **Violent crime** | | |
| Sen & Panjamapirom (2012) | Total homicide | 0.93  [0.86, 0.99] | |
| Sen & Panjamapirom (2012) | Firearm homicide | 0.93  [0.87, 1.01] | |
| **NICS reporting** | | | |
| Swanson et al. (2016) | Violent crime arrest (legally disqualified after) | 0.62  [0.50, 0.76] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

## Conclusions

We identified two qualifying studies that estimated how laws prohibiting gun purchases by those with a mental illness affect violent crime or homicides. Sen and Panjamapirom (2012) found that procedures to enforce state and federal mental health–related prohibitions significantly reduced total homicides. They also found a suggestive effect consistent with these procedures reducing firearm homicides. Swanson et al. (2016) found that enforcement of such federal prohibitions significantly decreased arrests for violent crime offenses in Florida among the targeted population relative to individuals without a disqualifying mental health adjudication.

Based on these results, we conclude that there is *moderate evidence that some state or federal mental health–related prohibitions on gun ownership reduce violent crime generally* and *limited evidence that these prohibitions reduce total homicide rates in particular. Evidence for the effect of these prohibitions on firearm homicides is inconclusive.*



Prohibitions associated with mental illness may **decrease** violent crime.

Evidence for this relationship is **moderate.**

Prohibitions associated with mental illness may **decrease** total homicides.

Evidence for this relationship is **limited.**

Prohibitions associated with mental illness have **uncertain** effects on firearm homicides.

Evidence for this relationship is **inconclusive.**

## Outcomes Without Studies Examining the Effects of Prohibitions Associated with Mental Illness

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of mental health–related prohibitions on the following outcomes, and we identified no such studies that met our inclusion criteria:[12]

- unintentional injuries and deaths
- mass shootings
- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

---

[12] Sen and Panjamapirom (2012) examined whether state-level mental health records or data were available for conducting background checks, not which mental health–related prohibitions states impose.

# Chapter Six References

Cavanagh, J. T., A. J. Carson, M. Sharpe, and S. M. Lawrie, "Psychological Autopsy Studies of Suicide: A Systematic Review," *Psychological Medicine*, Vol. 33, 2003, pp. 395–405.

Choe, J. Y., L. A. Teplin, and K. M. Abram, "Perpetration of Violence, Violent Victimization, and Severe Mental Illness: Balancing Public Health Outcomes," *Psychiatric Services*, Vol. 59, No. 2, 2008, pp. 153–164.

Corrigan, P. W., and A. C. Watson, "Findings from the National Comorbidity Survey on the Frequency of Violent Behavior in Individuals with Psychiatric Disorders," *Psychiatry Research*, Vol. 136, 2005, pp. 153–162.

Desmarais, S. L., R. A. Van Dorn, K. L. Johnson, K. J. Grimm, K. S. Douglas, and M. S. Swartz, "Community Violence Perpetration and Victimization Among Adults with Mental Illness," *American Journal of Public Health*, Vol. 104, 2014, pp. 2342–2349.

Everytown for Gun Safety Support Fund, "Mass Shootings in the United States: 2009–2016," April 11, 2017b. As of May 3, 2017:
http://everytownresearch.org/reports/mass-shootings-analysis/

Follman, Mark, Gavin Aronsen, and Deanna Pan, "U.S. Mass Shootings, 1982–2017: Data from *Mother Jones*' Investigation," *Mother Jones*, June 14, 2017. As of August 25, 2017:
http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/

Fox, James A., and Jack Levin, *Extreme Killing: Understanding Serial and Mass Murder*, 3rd ed., Thousand Oaks, Calif.: Sage Publications, 2015.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Harrell, Erika, *Crime Against Persons with Disabilities, 2009–2015—Statistical Tables*, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 250632, 2017.

Hughes, Karen, Mark A. Bellis, Lisa Jones, Sara Wood, Geoff Bates, Lindsay Eckley, Ellie McCoy, Christopher Mikton, Tom Shakespeare, and Alana Officer, "Prevalence and Risk of Violence Against Adults with Disabilities: A Systematic Review and Meta-Analysis of Observational Studies," *Lancet*, Vol. 379, 2012, pp. 1621–1629.

Li, Z., A. Page, G. Martin, and R. Taylor, "Attributable Risk of Psychiatric and Socio-Economic Factors for Suicide from Individual-Level, Population-Based Studies: A Systematic Review," *Social Science and Medicine*, Vol. 72, No. 4, 2011, pp. 608–616.

Liu, E. C., E. Bagalman, V. S. Chu, and C. S. Redhead, *Submission of Mental Health Records to the NICS and the HIPAA Privacy Rule*, Washington, D.C.: Congressional Research Service, R43040, 2013.

Matejkowski, J., J. Fairfax-Columbo, S. W. Cullen, S. C. Marcus, and P. L. Solomon, "Exploring the Potential of Stricter Gun Restrictions for People with Serious Mental Illness to Reduce Homicide in the United States," *Journal of Forensic Psychiatry and Psychology*, Vol. 25, No. 3, 2014, pp. 362–369.

McGinty, E. E., D. W. Webster, M. Jarlenski, and C. L. Barry, "News Media Framing of Serious Mental Illness and Gun Violence in the United States," *American Journal of Public Health*, Vol. 104, No. 3, 2014, pp. 406–413.

Metzl, J. M., and K. T. MacLeish, "Mental Illness, Mass Shootings, and the Politics of American Firearms," *American Journal of Public Health*, Vol. 105, No. 2, 2015, pp. 240–249.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Public Law 90-618, Gun Control Act of 1968, October 22, 1968.

Sen, B., and A. Panjamapirom, "State Background Checks for Gun Purchase and Firearm Deaths: An Exploratory Study," *Preventive Medicine*, Vol. 55, No. 4, 2012, pp. 346–350.

Substance Abuse and Mental Health Services Administration, *Results from the 2013 National Survey on Drug Use and Mental Health: Mental Health Detailed Tables*, Rockville, Md., 2016. As of May 9, 2017:
https://www.samhsa.gov/data/sites/default/files/2013MHDetTabs/NSDUH-MHDetTabs2013.pdf

Swanson, Jeffrey W., "Mental Disorder, Substance Abuse, and Community Violence: An Epidemiological Approach," in J. Monahan and H. Steadman, eds., *Violence and Mental Disorder*, Chicago, Ill.: University of Chicago Press, 1994, pp. 101–136.

Swanson, Jeffrey W., Michele M. Easter, Allison G. Robertson, Marvin S. Swartz, Kelly Alanis-Hirsch, Daniel Moseley, Charles Dion, and John Petrila, "Gun Violence, Mental Illness, and Laws That Prohibit Gun Possession: Evidence from Two Florida Counties," *Health Affairs*, Vol. 35, No. 6, 2016, pp. 1067–1075.

Swanson, J. W., E. E. McGinty, S. Fazel, and V. M. Mays, "Mental Illness and Reduction of Gun Violence and Suicide: Bringing Epidemiologic Research to Policy," *Annals of Epidemiology*, Vol. 25, No. 5, 2015, pp. 366–376.

Teplin, L. A., G. M. McClelland, K. M. Abram, and D. A. Weiner, "Crime Victimization in Adults with Severe Mental Illness: Comparison with the National Crime Victimization Survey," *Archives of General Psychiatry*, Vol. 62, No. 8, 2005, pp. 911–921.

United States Code, Title 18, Section 922, Unlawful Acts.

CHAPTER SEVEN
# Lost or Stolen Firearm Reporting Requirements

Federal law requires licensed firearm dealers to report lost or stolen guns to local authorities or the U.S. Attorney General within 48 hours (18 U.S.C. 923). There is no federal law requiring individuals to report lost or stolen firearms.

In 2015, federally licensed firearm dealers reported 14,800 firearms as lost or stolen (Bureau of Alcohol, Tobacco, Firearms and Explosives [ATF], 2016a). Quantifying the number of firearms lost or stolen from private citizens is more challenging, but based on data from ATF, 173,675 firearms were reported lost or stolen from non–federal firearm licensee entities and private citizens in 2012 (ATF, 2013). Using an alternative data source, another study estimated that about 233,000 guns were stolen annually during household property crimes between 2005 and 2010, and about four out of five firearms stolen were not recovered (Langton, 2012). Data from police departments in 14 American cities suggest that the number of guns reported lost or stolen in 2014 varies from 17 in San Francisco to 364 in Las Vegas (Everytown for Gun Safety Support Fund, 2016). A recent national survey (Hemenway, Azrael, and Miller, 2017) estimates that 2.4 percent of American gun owners had at least one gun stolen in the past five years and that the average number of guns stolen per person was 1.5. The authors use these data to estimate that 380,000 guns were stolen per year.

Laws requiring gun owners to report lost or stolen firearms are intended to help prevent gun trafficking and straw purchases (in which a lawful buyer makes the purchase on the behalf of a prohibited buyer) and to help ensure that prohibited possessors are disarmed. Data collected from ATF trafficking investigations covering 1999 to 2002 showed that 6.6 percent (7,758 of 117,138) of diverted firearms were stolen from a residence or vehicle (Braga et al., 2012).

There are several plausible mechanisms through which these policies might reduce criminal use or trafficking of firearms. First, reporting requirements might encourage private gun owners to take steps that decrease the ease with which their firearms might be lost or stolen. Second, reporting requirements could deter some straw purchasers who are reluctant to report as stolen the guns they have diverted to prohibited possessors but who also fear that failure to report transferred guns as stolen could leave them accountable for explaining how their guns later turned up at crime scenes. Third, timelier reporting of gun losses or thefts may aid law enforce-

ment gun-tracing efforts and increase criminal prosecutions of illegal users or traffickers of stolen firearms, potentially reducing the stock of firearms among prohibited possessors. However, required reporting policies could have the unintended effect of discouraging individuals from reporting lost or stolen weapons in order to avoid legal penalties from failing to report loss or theft within a certain number of days. Thus, to estimate how requirements for reporting lost or stolen firearms affect such outcomes as violent crime, we might first examine to what extent such policies affect gun owners' reporting and storage behavior.

To assess whether required reporting of lost or stolen guns reduces violent crime by disrupting illegal firearm trafficking, causal inference could be strengthened by examining crime gun trace data,[1] as well as changes in homicide or violent crime rates. Specifically, if these laws restrict trafficking operations from in-state sources, one should observe a larger share of crime guns originating from out-of-state sources after law passage, as well as a reduction in guns with a short time-to-crime (Webster and Wintemute, 2015; Braga et al., 2012).[2] However, a series of provisions attached to ATF appropriations (commonly known as the Tiahrt Amendments) has denied most researchers access to firearm trace data since 2003, making it currently infeasible to conduct this type of analysis (Krouse, 2009).

Requiring gun owners to report lost or stolen firearms is unlikely to have measureable effects on such outcomes as suicide, unintentional injuries and death, defensive gun use, or hunting and recreation. If the requirements successfully discouraged straw purchases, it could have a small effect on firearm sales.

## State Implementation of Lost or Stolen Firearm Reporting Requirements

A minority of states require firearm owners to report to law enforcement when their weapons are lost or stolen. California,[3] Connecticut,[4] Delaware,[5] Illinois,[6]

---

[1]   The Bureau of Alcohol, Tobacco, and Firearms (2002, p. A-3) defined *crime gun* as "any firearm that is illegally possessed, used in a crime, or suspected to have been used in a crime. An abandoned firearm may also be categorized as a crime gun if it is suspected it was used in a crime or illegally possessed."

[2]   Per Webster and Wintemute (2015), the metric known as *time-to-crime* is the "unusually short interval—ranging from less than 1 year to less than 3 years—between a gun's retail sale and its subsequent recovery by police from criminal suspects or crime scenes . . . . A short [time-to-crime] is considered an indicator of diversion, especially when the criminal possessor is someone different from the purchaser of record."

[3]   Calif. Penal Code § 25250 (within five days).

[4]   Conn. Gen. Stat. § 53-202g (report within 72 hours).

[5]   Del. Code tit. 11 § 1461 (report within seven days).

[6]   720 Ill. Comp. Stat. 5/24-4.1 (report within 72 hours).

Massachusetts,[7] New Jersey,[8] New York,[9] Ohio,[10] Rhode Island,[11] and the District of Columbia[12] require individuals to report the loss or theft of all firearms. Maryland requires the reporting of loss or theft of handguns and assault weapons,[13] and Michigan requires the reporting of thefts, but not loss, of all firearms.[14]

## Outcomes Without Studies Examining the Effects of Lost or Stolen Firearm Reporting Requirements

Neither the National Research Council (2004) nor Hahn et al. (2005) identified any research examining the relationship between required reporting of lost or stolen firearms and the following outcomes, and we identified no such studies that met our inclusion criteria:

- suicide
- violent crimes
- unintentional injuries and deaths
- mass shootings
- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

---

[7]   Mass. Gen. Laws Ch. 140 § 129C.

[8]   N.J. Stat. Ann. § 2C:58-19 (within 36 hours).

[9]   N.Y. Penal Law § 400.10 (within 24 hours).

[10]   Ohio Rev. Code § 923.20.

[11]   R.I. Gen. Laws § 11-47-48.1 (within 24 hours).

[12]   D.C. Code Ann. § 7-2502.08.

[13]   Md. Ann. Code § 5-146 (within 72 hours).

[14]   Mich. Comp. Laws § 28.430 (within five days).

# Chapter Seven References

ATF—*See* Bureau of Alcohol, Tobacco, Firearms and Explosives.

Braga, Anthony A., Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway, "Interpreting the Empirical Evidence on Illegal Gun Market Dynamics," *Journal of Urban Health*, Vol. 89, No. 5, 2012, pp. 779–793.

Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Reports (2000): Memphis, Tennessee*, Washington, D.C.: U.S. Department of the Treasury, July 2002.

Bureau of Alcohol, Tobacco, Firearms and Explosives, *2012 Summary: Firearms Reported Lost and Stolen*, Washington, D.C.: U.S. Department of Justice, 2013. As of May 9, 2017: https://www.atf.gov/resource-center/docs/2012-firearms-reported-lost-and-stolenpdf-1/download

———, *FFL Thefts/Losses: January 1, 2015–December 31, 2015*, Washington, D.C.: U.S. Department of Justice, 2016a. As of May 9, 2017: https://www.atf.gov/firearms/docs/report/2015-summary-firearms-reported-lost-and-stolen/download

Everytown for Gun Safety Support Fund, *Strategies for Reducing Gun Violence in American Cities*, June 2016. As of May 3, 2017: https://everytownresearch.org/documents/2016/06/strategies-reducing-gun-violence-american-cities.pdf

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Hemenway, David, Deborah Azrael, and Matthew Miller, "Whose Guns Are Stolen? The Epidemiology of Gun Theft Victims," *Injury Epidemiology*, Vol. 4, No. 1, 2017, p. 11.

Krouse, W. J., *Gun Control: Statutory Disclosure Limitations on ATF Firearms Trace Data and Multiple Handgun Sales Reports*, Washington, D.C.: Congressional Research Service, 7-5700, 2009.

Langton, L., *Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010*, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 239436, 2012.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

United States Code, Title 18, Section 923, Licensing.

Webster, D. W., and G. J. Wintemute, "Effects of Policies Designed to Keep Firearms from High-Risk Individuals," *Annual Review of Public Health*, Vol. 36, 2015, pp. 21–37.

CHAPTER EIGHT

# Licensing and Permitting Requirements

Federal law does not require individuals to obtain a license or permit to purchase a firearm. Several states, however, have permit-to-purchase laws that function similarly to universal background check laws. Both seek to ensure that individuals who acquire firearms through private transfers meet the same requirements as those who purchase firearms from federally licensed dealers. State policies that require permits or licenses to be renewed create a mechanism whereby law enforcement routinely confirms that a firearm owner remains eligible to possess or purchase a firearm, and the policies could facilitate firearm removal from owners who become ineligible. Requiring permits to purchase ammunition makes it more difficult for prohibited possessors to use their illicit firearms. Where no such checks occur, prohibited possessors may represent a considerable share of the market for ammunition. For instance, in a two-month period in the City of Los Angeles, prohibited possessors purchased at least 10,500 rounds of ammunition, accounting for about 2.6 percent of all such sales (Tita et al., 2006). The effects of these policies on violent crime and suicide will depend on whether they better identify disqualified firearm purchasers or possessors compared with the status quo, and whether these disqualifications correctly target individuals who are at greater risk of inflicting harm to themselves or others.

As with more-comprehensive background check laws, by restricting access to firearms for individuals presumed to present greater risk of misusing those firearms, licensing and permitting requirements are intended to reduce gun violence. Different designations for the types of conditions that disqualify an individual may generate differential impacts on such outcomes as homicide or mass shootings compared with suicides. Although compliance is likely to be imperfect, licensing and permitting laws may still reduce gun-related homicides or suicides by deterring prohibited possessors from attempting to acquire firearms. The magnitude of these effects will be influenced, in part, by the level of enforcement, the availability of firearms or ammunition through unregulated markets, and the likelihood that an individual who would be disqualified through the permitting process will seek to obtain a firearm through alternative markets.

Unlike background check laws, licensing and permitting regulations often require individuals seeking to purchase or possess a firearm to submit their applications in person at a law enforcement agency and to submit to fingerprinting. There is some

evidence that even licensed dealers sometimes fail to require valid identification cards (U.S. General Accounting Office, 2001); thus, these additional procedural requirements may be more effective in limiting prohibited possessors from accessing firearms by preventing fraud or identification inaccuracies. However, licensing systems requiring substantial coordination between local, state, and federal databases and institutions may pose technical and regulatory challenges, and it is unknown how much the additional administrative requirements of licensing and permitting laws will reduce firearm access by prohibited individuals.

State laws that additionally require an individual to pass a safety course or exam to qualify for a license or permit could reduce unintended injuries and deaths, although these effects will depend on whether passing a safety course or exam affects the storage or handling behavior of firearm owners. One 1995 survey found that gun owners who received formal firearm training (where 80 percent of training courses covered proper gun storage) were significantly more likely to store their firearms loaded and unlocked compared with gun owners who had not received formal training; however, the most common source of training for this sample was through the military, which may not produce the same effects as the training available to civilians (Hemenway, Solnick, and Azrael, 1995).

These laws could also plausibly affect defensive or recreational gun use by increasing the costs of obtaining or continuing to possess a firearm. While the monetary costs of acquiring a license or permit typically range between $10 and $100,[1] the total time and energy costs, in addition to concerns about privacy, may dissuade some legal firearm purchasers, in which case the laws could affect sales of new firearms.

To evaluate whether the effects of licensing or permitting requirements on violent crime or suicides operate through more-effective identification of prohibited possessors (as applied to purchase, possession, or both), the ideal analyses would estimate effects on outcomes specifically for those populations that would be prevented from legally acquiring or owning a firearm under the licensing law. For outcome data in which the type of weapon used can be identified, analyses also could exploit state-level variation in the types of guns that require licenses or permits and could estimate effects stratified by the type of weapon used in a violent crime, mass shooting, or suicide.

To assess whether licensing or permitting laws reduce violent crime through disrupting illegal firearm trafficking, causal inference could be strengthened by examining crime gun trace data and changes in homicide rates.[2] Specifically, if permit-to-purchase laws restrict trafficking operations from in-state retailers, one should observe a larger share of crime guns originating from out-of-state sources after law passage

---

[1]   New York City's license for handgun purchase and possession (which lasts three years) is the most expensive, at $340, not including an additional fingerprint fee (Csere, 2013).

[2]   The Bureau of Alcohol, Tobacco, and Firearms (2002, p. A-3) defined *crime gun* as "any firearm that is illegally possessed, used in a crime, or suspected to have been used in a crime. An abandoned firearm may also be categorized as a crime gun if it is suspected it was used in a crime or illegally possessed."

and/or a reduction in guns with a short time-to-crime (Webster and Wintemute, 2015; Braga et al., 2012).[3] However, a series of provisions attached to Bureau of Alcohol, Tobacco, Firearms and Explosives appropriations (commonly known as the Tiahrt Amendments) has denied most researchers access to firearm trace data since 2003; therefore, while law enforcement agencies may analyze such data, the information generally has not been available for research purposes (Krouse, 2009).

## State Implementation of Licensing and Permitting Requirements

Nine states have implemented permit-to-purchase regimes for firearms.[4] All such laws require these licenses for most private transactions. Of the nine states, four require permits for all firearms,[5] and five require them for the purchase of handguns only.[6] New York requires a license to own a firearm.[7] Michigan, Massachusetts, and Illinois require both a permit to purchase and a license to own a firearm.[8] Michigan's law, however, applies only to handguns, and it has a broad exemption for individuals who purchase handguns from licensed dealers following a background check.[9] The District of Columbia also requires that individuals obtain a registration certificate to purchase and possess a firearm.[10]

In terms of the requirements that must be met to receive a license to own or permit to purchase a firearm, some states require that applicants pass a safety course or exam,[11] while others do not. Another distinction between states' laws is the duration of

---

[3]   Per Webster and Wintemute (2015), the metric known as *time-to-crime* is the "unusually short interval—ranging from less than 1 year to less than 3 years—between a gun's retail sale and its subsequent recovery by police from criminal suspects or crime scenes . . . . A short [time-to-crime] is considered an indicator of diversion, especially when the criminal possessor is someone different from the purchaser of record."

[4]   California, Connecticut, Hawaii, Iowa, Maryland, Nebraska, New Jersey, North Carolina, and Rhode Island. Calif. Penal Code § 31610; Conn. Gen. Stat. §§ 29-33, 29-37a; Hawaii Rev. Stat. § 134-2; Iowa Code § 724.15; Md. Public Safety Code § 5-117.1; Neb. Rev. Stat. Ann. § 69-2404; N.J. Stat. Ann. § 2C:58-3; N.C. Gen. Stat. § 14-402; R.I. Gen. Laws § 11-47-35.

[5]   Calif. Penal Code § 31615; Conn. Gen. Stat. §§ 29-33, 29-37a; Hawaii Rev. Stat. § 134-2; N.J. Stat. Ann. § 2C:58-3.

[6]   Iowa Code § 724.15; Md. Public Safety Code § 5-117.1; Neb. Rev. Stat. Ann. § 69-2404; N.C. Gen. Stat. § 14-402; R.I. Gen. Laws § 11-47-35.

[7]   N.Y. Penal Law § 400.00.

[8]   Mich. Comp. Laws § 28.422; 430 Ill. Comp. Stat. 65/2; Mass. Gen. Laws Ch. 140 § 129B, 131A, 131E.

[9]   Mich. Comp. Laws § 28.422.

[10]   D.C. Code Ann. § 7-2502.01.

[11]   Calif. Penal Code §§ 31610, 31640; Conn. Gen. Stat. §§ 29-36f, 29-37p; Hawaii Rev. Stat. § 134-2; Md. Public Safety Code § 5-117.1; Mass. Gen. Laws Ch. 140 § 131P; R.I. Gen. Laws § 11-47-35; D.C. Code Ann. § 7-2502.03. The laws in Hawaii, Maryland, and Rhode Island apply to handguns only.

the licenses or permits. A handful of states issue permits to purchase that are valid for a few days or months only.[12] Other states issue permits or licenses that may last years.[13] In New Jersey, firearm identification cards are required for rifles and shotguns and remain valid indefinitely, unless the issuing or other law enforcement agency identifies specific behavior and character disqualifiers—such as being convicted of a crime, being subject to a restraining order, or having a drug dependency; for handguns, purchasers must obtain a permit to purchase, which lasts 90 days.[14] Rhode Island's law does not specify the duration of the permit to purchase.[15]

Another feature that differs among the state permit-to-purchase regimes is whether the permit covers multiple purchases. The laws in Hawaii, New Jersey, and North Carolina require separate permits for each purchase, though with some differences.[16] For example, Hawaii requires a permit for each handgun purchase but allows multiple long-gun purchases under a single permit.

Some of the aforementioned states have also extended their permitting systems to the purchase or ownership of ammunition.[17]

## Effects on Suicide

### Research Synthesis Findings

When the National Research Council (NRC) completed its review in 2004, there was no evidence from quasi-experimental studies on requiring a license or permit to purchase firearms. Similarly, Hahn et al. (2005) concluded that the evidence for how licensing or registration affects any violence outcomes was inconclusive, based on the five cross-sectional studies they examined that would not meet our inclusion criteria.

We identified two U.S.-based longitudinal studies examining the effect of firearm licensing or permitting requirements on suicide. Examining the effects of firearm

---

[12] Hawaii Rev. Stat. § 134-2 (ten days for handguns); Mich. Comp. Laws § 28.422 (30 days for handguns); Mass. Gen. Laws Ch. 140 § 131A (ten days for permit to purchase); N.J. Stat. Ann. § 2C:58-3 (90 days for handguns, may be renewed for another 90 days with good cause).

[13] Mass. Gen. Laws Ch. 140 § 129B (six years for license to own); Calif. Penal Code § 31655 (five years); Conn. Gen. Stat. §§ 29-36h, 29-37r (five years); Hawaii Rev. Stat. § 134-2 (one year for long guns); 430 Ill. Comp. Stat. 65/7 (ten years); Md. Public Safety Code § 5-117.1 (ten years for handguns); Neb. Rev. Stat. Ann. § 69-2407 (three years for handguns); N.Y. Penal Law § 400.00 (five years for handguns); N.C. Gen. Stat. § 14-403 (five years for handguns); D.C. Code Ann. § 7-2502.07a (three years).

[14] N.J. Stat. Ann. § 2C:58-3.

[15] R.I. Gen. Laws § 11-47-35.

[16] Hawaii Rev. Stat. § 134-2; N.J. Stat. Ann. § 2C:58-3; N.C. Gen. Stat. § 14-403 (handguns only).

[17] Connecticut, Illinois, Massachusetts, New Jersey, and the District of Columbia. Conn. Gen. Stat. §§ 29-38n; 430 Ill. Comp. Stat. 65/2; Mass. Gen. Laws Ch. 140 § 129C; N.J. Stat. Ann. § 2C:58-3.3; D.C. Code Ann. § 7-2502.02.

policies on suicides among teens (aged 14–17) and young adults (aged 18–20) between 1976 and 2001, Webster et al. (2004) included an indicator variable for the presence of state permit-to-purchase laws. They used negative binomial models that employed generalized estimating equations and included state-level fixed effects, controls for other firearm policies, and time-varying covariates (including the proportion of suicides by firearm as a proxy of gun prevalence). Using these methods, the authors found a significant effect of permit-to-purchase laws increasing the total suicide rate by 17.7 percent among those aged 18–20, driven by an estimated 22-percent increase in firearm suicides, with an uncertain change in nonfirearm suicides. The authors also found permit-to-purchase laws to be associated with a statistically significant 27-percent increase in *nonfirearm* suicides among those aged 14–17 but to have uncertain associations with firearm or total suicides among this age group. As the authors suggested, this perplexing set of results may be partially attributable to the fact that the effect estimate was based on changes to only three state laws during the study time frame. Therefore, the effect of permit-to-purchase laws is not well identified, and apparent effects may be attributable to other concurrent changes affecting suicide rates.

Using a synthetic control approach, Crifasi et al. (2015) estimated the percentage change in total suicide and firearm suicide in Connecticut before and after the state established a permit-to-purchase law in 1995, as well as before and after the repeal of Missouri's permit-to-purchase law in 2007. This approach enabled the researchers to estimate the likely outcomes had Connecticut and Missouri not enacted these laws, drawing on data from states that looked most similar in the pre-law period but that did not have or enact such policies (for Connecticut) or that had such policies and did not repeal them (for Missouri) during the study period.

Crifasi et al. (2015) found evidence that there was a reduction in firearm suicide rates in Connecticut and its synthetic comparison group after the law, but the reduction was greater in Connecticut. Specifically, Connecticut's firearm suicide rate was 15.4 percent lower than that of its synthetic control during the ten-year post-law period, decreasing from roughly four firearm suicides per 100,000 people the year the law was enacted to around three per 100,000 in the post-law period. The nonfirearm suicide rate remained constant in Connecticut but increased in its synthetic comparison group after the law. However, these findings were tempered by alternative regression model specifications in which Connecticut experienced a statistically significant *increase* in nonfirearm suicides after passage of the law and an uncertain effect on overall suicides.

Missouri's firearm suicide rate was consistently higher than that of its synthetic control, and rates in both the state and its synthetic control increased after the repeal of the law, although Missouri's rate grew more rapidly over the subsequent five years. In the five-year post-repeal period, the suicide rate in Missouri was 16.1 percent higher than in the synthetic control group, increasing from 7.5 firearm suicides per 100,000 people the year the law was repealed to 9.0 per 100,000. Little difference was

observed between Missouri's nonfirearm suicide rate and that of its synthetic control over the study period.

Because both the Connecticut and Missouri analyses examined only a single state's experience with either adoption or repeal of the law, the study offers limited evidence that noted differences are due to the change in the law rather than to other contemporaneous influences over each state's suicide rate around the time the law was changed. For instance, in Connecticut, the permit-to-purchase law was implemented along with other rule changes, such as raising the minimum age to purchase handguns and requiring completion of eight hours of gun-safety training. Similarly, Missouri's repeal occurred at the same time it implemented a stand-your-ground law. The study design cannot rule out that these other factors, rather than the permit-to-purchase requirement, were the cause of observed changes. Therefore, the estimates reported in Crifasi et al. (2015) may not be reliable indicators of the direction or magnitude of the true effects of permit-to-purchase laws on suicide.

Figure 8.1 displays the incidence rate ratios (IRRs) and confidence intervals (CIs) associated with the licensing and permitting policies examined in these studies. Because the synthetic control model estimates for nonfirearm suicides in Crifasi et al. (2015) have no CIs, we plot the alternative regression model estimates.

**Figure 8.1**
**Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Suicide**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **Permit to purchase** | **Suicide** | |
| Webster et al. (2004) | Total, aged 14–17 | 1.06 [0.92, 1.23] |
| Webster et al. (2004) | Total, aged 18–20 | 1.18 [1.04, 1.34] |
| Webster et al. (2004) | Firearm, aged 14–17 | 0.92 [0.76, 1.10] |
| Webster et al. (2004) | Firearm, aged 18–20 | 1.22 [1.04, 1.43] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 1.27 [1.00, 1.61] |
| Webster et al. (2004) | Nonfirearm, aged 18–20 | 1.14 [0.93, 1.39] |
| Crifasi et al. (2015) | Total, total population | 1.01 [0.95, 1.08] |
| Crifasi et al. (2015) | Firearm, total population | 0.88 [0.81, 0.96] |
| Crifasi et al. (2015) | Nonfirearm, total population | 1.14 [1.05, 1.24] |
| **Repeal of permit to purchase** | | |
| Crifasi et al. (2015) | Total, total population | 1.03 [0.97, 1.08] |
| Crifasi et al. (2015) | Firearm, total population | 1.02 [0.96, 1.09] |
| Crifasi et al. (2015) | Nonfirearm, total population | 1.03 [0.95, 1.11] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified two qualifying studies examining the effects of permit-to-purchase laws on total and firearm suicides. Webster et al. (2004) identified an uncertain effect of these laws on total suicide and firearm suicide rates, as well as a suggestive effect consistent with an increase in nonfirearm suicides, among children aged 14–17. They also identified a significant increase in suicides and firearm suicides among those aged 18–20. Crifasi et al. (2015) identified the effect of implementing a permit-to-purchase law in Connecticut and a separate effect of repealing such a law in Missouri. Both sets of effects suggested that these changes in law had uncertain effects on total suicides. However, implementation of the law significantly reduced firearm suicides in Connecticut, whereas repeal of the law in Missouri had only uncertain effects on firearm suicides.



Licensing and permitting requirements have **uncertain** effects on total suicides and firearm suicides. Evidence for this relationship is **inconclusive.**

Based on these studies, we find *inconclusive evidence for the effect of licensing and permitting requirements on total suicides and firearm suicides.*

## Effects on Violent Crime

### Research Synthesis Findings

Hahn et al. (2005) found insufficient evidence for determining the effectiveness of firearm registration and licensing on violent crime. NRC (2004) concluded, "There is not much empirical evidence that assesses whether attempts to reduce criminal access to firearms will reduce gun availability or gun crime."

Our synthesis identified two studies that examined permit-to-purchase laws in specific states. Webster, Crifasi, and Vernick (2014) used state-level data from 1999 to 2010 to analyze the effect of Missouri's repeal of a permit-to-purchase law that included a background check requirement even for private sellers and a requirement that background checks be requested at the local sheriff's office. They found a significant increase in total homicides and firearm homicides from the repeal of the law and an uncertain effect on nonfirearm homicides. Specifically, after the repeal, the total homicide rate was 115 percent of the rate expected had the law not been repealed, and the firearm homicide rate was 125 percent of the expected rate (see Figure 8.2). However, because the focus of this study was a single state, the effects associated with the law may be confounded with other changes in the state that affected homicide rates around the same time the law was passed. The statistical model used to arrive at these

results used a large number of estimated parameters relative to observations (a ratio of about one to eight), meaning the model may have been overfit, and thus its estimates of the laws' effects and their apparent statistical significance could provide little generalizable information about the true causal effects of the permit-to-purchase law.

Using a synthetic control approach, Rudolph et al. (2015) found a decrease in firearm homicides (and no statistically significant effect on nonfirearm homicides) from the implementation of a permit-to-purchase law in Connecticut that strengthened background check requirements for handguns sold by private sellers and licensed dealers by requiring purchasers to obtain an eligibility certificate in person from the local police department, increasing the minimum age of purchase from 18 to 21, and requiring individuals to complete eight hours of gun-safety training. After these policy changes, the firearm homicide rate was 63 percent of what was expected without such changes. Because only a single state experienced the law in this study, it is not possible to conclude that the changes were a result of the permit-to-purchase portion of the law as opposed to other factors influencing homicides in the state around the same time.

Figure 8.2 displays the IRRs and CIs associated with the licensing and permitting policies examined in these studies.

**Figure 8.2**
**Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Violent Crime**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Permit to purchase** | **Homicide** | | |
| Rudolph et al. (2015) | Firearm | 0.60 [0.37, 0.97] | |
| **Repeal of permit to purchase** | | | |
| Webster, Crifasi, & Vernick (2014) | Total | 1.15 [1.10, 1.20] | |
| Webster, Crifasi, & Vernick (2014) | Firearm | 1.23 [1.17, 1.29] | |
| Webster, Crifasi, & Vernick (2014) | Nonfirearm | 0.96 [0.87, 1.05] | |



NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

### Conclusions

We identified two qualifying studies examining the effects of permit-to-purchase laws on total and firearm homicides. Webster, Crifasi, and Vernick (2014) found that Missouri's repeal of its law resulted in increased total and firearm suicide rates. Rudolph et al. (2015) reported a significant effect consistent with these laws reducing firearm homicide rates, but because a



law establishing a minimum age for purchase was passed concurrently in the one state evaluated, they could not attribute this effect solely to permit-to-purchase laws. Based on this evidence and an evaluation of the studies' strengths, we find *inconclusive evidence for the effect of licensing and permitting requirements on total homicides and firearm homicides.*

## Effects on Mass Shootings

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified research examining the effects of licensing and permitting requirements on mass shootings in the United States. Our search yielded one such study that met our inclusion criteria. Using a two-way fixed-effects linear probability model, Luca, Deepak, and Poliquin (2016) estimated the effects of state laws requiring permits to purchase a handgun on a binary indicator for whether a mass shooting occurred in a given state-year. The authors' regression analysis covered 1989–2014 and included controls for time-invariant state characteristics; national trends; a host of other state-level gun policies; and time-varying state-level demographic, socioeconomic, and political characteristics. They found uncertain effects of handgun permitting requirements on the probability of a mass shooting event occurring. However, assessing the effects of gun policies on mass shootings was not the primary focus of Luca, Deepak, and Poliquin (2016), and the authors intended the estimates to serve solely as a robustness check for their main specification (the effects of mass shootings on gun policy). Although the paper provided limited information to use in evaluating the reported statistical models (e.g., on how these policies were coded), it is clear that the analysis used a linear model to predict a dichotomous outcome. Therefore, model assumptions were violated, making CIs unreliable.

Figure 8.3 displays the IRRs and CIs associated with the licensing and permitting policies examined in Luca, Deepak, and Poliquin (2016).

**Figure 8.3**
**Incidence Rate Ratios Associated with the Effect of Licensing and Permitting Requirements on Mass Shootings**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| Handgun permit system | Mass shooting | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (no political controls) | 0.92 [0.00, 2.80] | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 1.03 [0.00, 2.94] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

**Conclusions**

We identified one qualifying study that estimated the effects of licensing and permitting laws on mass shootings (Luca, Deepak, and Poliquin, 2016). This study found uncertain effects of these laws on whether at least one mass shooting occurred in a state. Therefore, available studies provide *inconclusive evidence for the effect of licensing and permitting requirements on mass shootings*.



Licensing and permitting requirements have **uncertain** effects on mass shootings. Evidence for this relationship is **inconclusive.**

## Outcomes Without Studies Examining the Effects of Licensing and Permitting Requirements

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of licensing and permitting requirements on the following outcomes, and we identified no such studies that met our inclusion criteria:

- unintentional injuries and deaths
- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

## Chapter Eight References

Braga, Anthony A., Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway, "Interpreting the Empirical Evidence on Illegal Gun Market Dynamics," *Journal of Urban Health*, Vol. 89, No. 5, 2012, pp. 779–793.

Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Reports (2000): Memphis, Tennessee*, Washington, D.C.: U.S. Department of the Treasury, July 2002.

Crifasi, C. K., J. S. Meyers, J. S. Vernick, and D. W. Webster, "Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates," *Preventive Medicine*, Vol. 79, 2015, pp. 43–49.

Csere, M., *State Comparison of Gun Permit Fees*, Hartford, Conn.: Connecticut General Assembly, Office of Legislative Research, OLR Research Report 2013-R-0048, 2013. As of May 24, 2017: https://www.cga.ct.gov/2013/rpt/2013-R-0048.htm

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Hemenway, David, Sara J. Solnick, and Deborah R. Azrael, "Firearm Training and Storage," *JAMA*, Vol. 273, No. 1, 1995, pp. 46–50.

Krouse, W. J., *Gun Control: Statutory Disclosure Limitations on ATF Firearms Trace Data and Multiple Handgun Sales Reports*, Washington, D.C.: Congressional Research Service, 7-5700, 2009.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy*, working paper, Boston, Mass.: Harvard Business School, 2016.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Rudolph, K. E., E. A. Stuart, J. S. Vernick, and D. W. Webster, "Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides," *American Journal of Public Health*, Vol. 105, No. 8, 2015, pp. E49–E54.

Tita, G. E., A. A. Braga, G. Ridgeway, and G. L. Pierce, "The Criminal Purchase of Firearm Ammunition," *Injury Prevention,* Vol. 12, No. 5, 2006, pp. 308–311.

U.S. General Accounting Office, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification*, Washington, D.C., GAO-01-427NI, 2001.

Webster, D., C. K. Crifasi, and J. S. Vernick, "Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides," *Journal of Urban Health*, Vol. 91, No. 2, 2014, pp. 293–302.

Webster, D. W., J. S. Vernick, A. M. Zeoli, and J. A. Manganello, "Association Between Youth-Focused Firearm Laws and Youth Suicides," *JAMA*, Vol. 292, No. 5, 2004, pp. 594–601.

Webster, D. W., and G. J. Wintemute, "Effects of Policies Designed to Keep Firearms from High-Risk Individuals," *Annual Review of Public Health*, Vol. 36, 2015, pp. 21–37.

CHAPTER NINE

# Firearm Sales Reporting and Recording Requirements

Under federal law, licensed dealers must maintain records of firearm sales indefinitely (18 U.S.C. 923). Although licensed dealers must respond to specific Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) inquiries about sales of individual guns, federal law does not mandate that dealers report sales; indeed, federal authorities are explicitly prohibited by law from maintaining a database of firearm sales. In addition, there is no federal law requiring recording or reporting of firearm sales by private sellers (Giffords Law Center to Prevent Gun Violence, undated-d).

As with laws requiring the reporting of lost or stolen firearms, laws requiring the recording and reporting of gun sales are designed to facilitate law enforcement traces of weapons used in crimes. Without such laws, tracing crime guns typically identifies where a gun was first legally sold, and to whom.[1] However, secondary markets appear to be the leading source of guns used in crimes (Harlow, 2001). By requiring a record of each subsequent transfer or sale of a firearm after its initial sale by a licensed dealer, ATF and other law enforcement agencies would gain valuable investigative information. Presumably, requiring recordkeeping and reporting of private gun sales could also deter illegal sales.

Furthermore, law enforcement access to sales data could facilitate identification of firearm owners who have become prohibited possessors. For instance, California passed Proposition 63 in 2016, which, among other things, requires courts to search California's centralized records of firearm sales and transfers whenever an individual is convicted of an offense that makes him or her a prohibited possessor. When such individuals are found to have purchased firearms, they will be required to relinquish or dispose of them.[2]

Required recordkeeping and reporting may impose costs to sellers of maintaining compliance, and concerns about privacy may deter some individuals seeking to acquire a firearm for self-protection or recreational gun use, with consequences for gun sales.

---

[1]   The Bureau of Alcohol, Tobacco, and Firearms (2002, p. A-3) defined *crime gun* as "any firearm that is illegally possessed, used in a crime, or suspected to have been used in a crime. An abandoned firearm may also be categorized as a crime gun if it is suspected it was used in a crime or illegally possessed."

[2]   Calif. Penal Code, Sec. 29810.

Because the principal intended benefit of laws requiring firearm sales to be reported concerns crime investigation, the data most relevant to understanding the effects of such laws would include *firearm crime clearance rates*, or the rates at which law enforcement is successful in identifying suspects in firearm-related crimes, including violent and property crimes, and firearm trafficking crimes. In California and other states that use these records to identify prohibited possessors with weapons, data on firearm-involved crime and violence perpetrated by prohibited possessors would be valuable, but such data are not generally available.

## State Implementation of Firearm Sales Reporting and Recording Requirements

Several states have laws that require firearm sellers (dealers, private sellers, or both) to maintain records of all gun sales, and some have laws that require sellers to report sales information to law enforcement. Twenty jurisdictions require firearm sellers to keep records of at least some firearm sales. Eleven states and the District of Columbia require licensed dealers to maintain records of all firearm sales,[3] and seven states and the District of Columbia require private sellers to do so.[4] Some states require recordkeeping for handgun sales only: Six states have such laws for dealers,[5] and four have them for private sellers.[6] Overall, five jurisdictions require all sellers to record all firearm sales,[7] while the other 15 states with such laws have some lesser combinations of recordkeeping requirements. In terms of recordkeeping by private sellers, some states

---

[3]   California, Connecticut, Delaware, Illinois, Maine, Massachusetts, Michigan, New Jersey, Oregon, Pennsylvania, Rhode Island, and the District of Columbia. See Calif. Penal Code § 28100; Conn. Gen. Stat. Ann. § 29-31; Del. Code Ann. tit. 24 § 904; 40 Ill. Comp. 65/3, 720 Ill. Comp. 5/24-4; Me. Rev. Stat. Ann. tit. 15 § 455; Mass. Gen. Laws Ch. 140 § 123; Mich. Comp. Laws §§ 28.422, 28.422a, 750.232; N.J. Stat. Ann. §2C: 58-2, N.J. Admin. Code § 13:54-3.14; Oreg. Rev. Stat. §§ 166.412, 166.434; 18 Pa. Cons. Stat. §§ 6111, 6102; R.I. Gen. Laws §§ 11-47-35, 11-47-35.2; D.C. Code Ann. § 7-2504.

[4]   California, Colorado, Connecticut, Delaware, Illinois, New York, Rhode Island, and the District of Columbia. See Calif. Penal Code § 28210; Colo. Rev. Stat. § 18-12-112; Conn. Gen. Stat. Ann. § 29-31; Del. Code Ann. tit. 11 § 1448B, tit. 24 § 904; 40 Ill. Comp. 65/3, 720 Ill. Comp. 5/24-4; N.Y. Gen. Bus. Law § 898; R.I. Gen. Laws §§ 11-47-35, 11-47-35.2, D.C. Code Ann. §§ 7-2505.02, 7-2504.04.

[5]   Colorado, Maryland, New York, North Carolina, Vermont, and Washington. See Colo. Rev. Stat. § 12-26-102; Md. Ann. Code §§ 5-120, 5-145; N.Y. Penal Law §§ 265.00, 400,00; N.C. Gen. Stat. § 14-402; Vt. Stat. Ann. tit. 13 § 4006; Wash. Rev. Code § 9.41.110.

[6]   Maryland, New Jersey, Michigan, and Pennsylvania. See Md. Ann. Code § 5-120 (private sellers are required to maintain copies of the application, not a sales record); N.J. Stat. Ann. § 2C: 58-3 (private sellers are required to maintain copies of the permit); Mich. Comp. Laws Ann. §§ 28.422, 28.422a, 750.232; 37 Pa. Cons. Stat. § 33.111.

[7]   California, Delaware, Illinois, Rhode Island, and the District of Columbia.

require the sellers to maintain the records,[8] and others require licensed dealers to maintain records for private sales.[9]

States differ on how long sales records must be maintained. Some do not specify the required duration,[10] and some require the records be kept for a set number of years or permanently.[11]

Some states recently abolished their recordkeeping requirements. In 2015, for example, Alabama repealed the section of law requiring dealers to maintain detailed handgun sales records. In fact, the state enacted a section stating that, within 180 days of the new law's passage, dealers and law enforcement must destroy any records they created to comply with the repealed law,[12] although gun sellers' federal recordkeeping requirements would remain.

In addition to recordkeeping requirements, 11 states require that sales records be transmitted to a law enforcement agency. Four of the states require records of all sales to be transmitted, including those by licensed dealers and private sellers.[13] Similarly, the District of Columbia's registration requirement gives law enforcement access to all sales records.[14] Five states require dealers and private sellers to report only handgun sales to law enforcement.[15] Washington requires dealers to report only handgun sales.[16]

---

[8]  Connecticut, Illinois, Maryland, Michigan, Pennsylvania, and Rhode Island. See Conn. Gen. Stat. Ann. § 29-31; 40 Ill. Comp. 65/3, 720 Ill. Comp. 5/24-4; Md. Ann. Code § 5-120; Mich. Comp. Laws Ann. §§ 28.422, 28.422a, 750.232; 37 Pa. Cons. Stat. § 33.111; R.I. Gen. Laws §§ 11-47-35, 11-47-35.2.

[9]  California, Colorado, New York, and the District of Columbia. See Calif. Penal Code § 28210; Colo. Rev. Stat. § 18-12-112; N.Y. Gen. Bus. Law § 898l; D.C. Code Ann. §§ 7-2505.02, 7-2504.04.

[10]  For example, Massachusetts, Michigan, New York, and the District of Columbia. See Mass. Gen. Laws Ch. 140 § 123; Mich. Comp. Laws §§ 28.422, 28.422a, 750.232; N.Y. Gen. Bus. Law § 898; D.C. Code Ann. § 7-2504.

[11]  For example, three years in Maryland for handguns (Md. Ann. Code § 5-120), five years in Oregon (Oreg. Rev. Stat. § 166.412), six years in Rhode Island (R.I. Gen. Laws §§ 11-47-35, 11-47-35.2), ten years in Illinois (40 Ill. Comp. 65/3), and 20 years in Connecticut and Pennsylvania (Conn. Gen. Stat. Ann. §§ 29-33, 29-37a; 18 Pa. Cons. Stat. § 6111). New Jersey requires records be kept permanently (N.J. Stat. Ann. § 2C: 58-3, N.J. Admin. Code § 13:54-3.14).

[12]  2015 Ala. H.B. 47, amending Ala. Code § 13A-11-79.

[13]  California, Connecticut, Hawaii, and Massachusetts. See Calif. Penal Code §§ 1106, 27545 (private sales must be conducted through licensed dealers, who in turn must report); Conn. Gen. Stat. §§ 29-33, 29-37; Hawaii Rev. Stat. § 134-2; Mass. Gen. Laws Ch. 140 §§ 123, 128A.

[14]  D.C. Code Ann. §§ 7-2502.08, 22-4510.

[15]  Maryland, Michigan, New Jersey, New York, and Pennsylvania. See Md. Ann. Code §§ 5-120, 5-124 (firearm applications for private sales must be reported); Mich. Comp. Laws §§ 28.422, 28.422a; N.J. Stat. Ann. § 2C:58-2; N.Y. Penal Law § 400.00; 18 Pa. Cons. Stat. §§ 6111.

[16]  Wash. Rev. Code Ann. §§ 9.41.110.

## Outcomes Without Studies Examining the Effects of Firearm Sales Reporting and Recording Requirements

Neither the National Research Council (2004) nor Hahn et al. (2005) identified any research examining the relationship between firearm sales reporting and recording requirements and the following outcomes, and we identified no such studies that met our inclusion criteria:

- suicide
- violent crime
- unintentional injuries and deaths
- mass shootings
- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

## Chapter Nine References

Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Reports (2000): Memphis, Tennessee*, Washington, D.C.: U.S. Department of the Treasury, July 2002.

Giffords Law Center to Prevent Gun Violence, "Maintaining Records of Gun Sales," web page, undated-d. As of October 18, 2017:
http://lawcenter.giffords.org/gun-laws/policy-areas/gun-sales/maintaining-records-of-gun-sales/

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Harlow, Caroline Wolf, *Survey of Inmates in State and Federal Correctional Facilities: Firearm Use by Offenders,* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 189369, November 2001.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

United States Code, Title 18, Section 923, Licensing.

CHAPTER TEN

# Child-Access Prevention Laws

Child-access prevention (CAP) laws allow prosecutors to bring charges against adults who intentionally or carelessly allow children to have unsupervised access to firearms. CAP laws aim to reduce unintentional firearm injuries and deaths, suicides, and violent crime among youths chiefly by reducing children's access to stored guns, although weaker laws targeting only reckless provision of firearms to children are sometimes considered alongside CAP laws.

In 2015, 1,458 children under age 18 were killed by firearms, and of these deaths, 566 (38.8 percent) classified as suicide and 77 (5.3 percent) classified as unintentional (calculated using data from Centers for Disease Control and Prevention [CDC], 2015). Nonfatal gun injuries are considerably more common among this age group, with 7,537 nonfatal firearm injuries reported for children under age 18 in 2014 (calculated using data from CDC, 2013). In 2014, juvenile offenders were known to have been involved in approximately 650 murders nationwide, two-thirds of which involved a firearm (Office of Juvenile Justice and Delinquency Prevention, 2016). Youth between ages 18 and 21 have among the highest rates of violent offending of any age group (Loeber and Stallings, 2011).

While current statistics on the type of firearm or circumstances surrounding these incidents are not readily available, an earlier study examining a subset of states from 2001 to 2002 found that about half of firearm-related suicides among this age group involved a handgun, with the remainder involving a rifle or shotgun (Johnson et al., 2010). Among those suicide decedents in which the method of acquisition of the firearm was recorded, 82 percent used a firearm belonging to a family member, and 64 percent of those guns were stored unlocked. Surveys have found that, among juveniles who have been incarcerated or arrested, the youth offenders acquired their firearms through similar sources as adult offenders, with more than 80 percent citing a friend, family member, or the black market as the source of the weapon (Webster et al., 2002; LaFree and Birbeck, 1998).

Conceptually, the effects of CAP laws may extend beyond those age groups that are directly targeted by the policies. In households where owners abide by CAP laws, because either underage children reside in the household or there are underage visitors,

gun locks or gun safes could also serve to restrict access to guns by older members of the household. This limited availability could, in turn, influence suicides, unintentional injuries and deaths, and violent crime among the adult population.

Studies of adolescent and adult suicides have generally found that, relative to comparison groups of individuals who died other ways or living community members, those who died by firearm suicide lived in homes where guns were less securely stored (Conwell et al., 2002; Shenassa et al., 2004; Grossman et al., 2005). These studies suggest to one set of researchers a "dose-response" relationship between firearm accessibility and risk for suicide (Azrael and Miller, 2016). However, the relationship is not seen in all studies. Brent et al. (1991, 1993b) found no differences in storage practices in homes with adolescents who died by suicide and a comparison group of adolescents living in the community. Dahlberg, Ikeda, and Kresnow (2004) found no association between storage practices and firearm suicide (versus suicide by other means).

Studies have generally found no difference in storage practices between adults who have thought about or attempted suicide versus those who have not (Smith, Currier, and Drescher, 2015; Ilgen et al., 2008; Betz et al., 2016; Oslin et al., 2004). This finding, along with the finding that those who die by firearm suicide typically live in homes with less-secure storage of firearms, could suggest that the difference between those who successfully kill themselves with a firearm and those who do not is related more to firearm storage differences than to differences in suicidality (Azrael and Miller, 2016). In the absence of strong causal models, however, alternative explanations remain plausible. If, for instance, those most determined to kill themselves leave weapons unsecured so that they will be available for use when the person is ready to die, it could be that suicide risk determines storage practices rather than that storage practices determine suicide risk.

Since 2003, only one individual-level study provided information on the association between firearm storage practices and unintentional injuries. Grossman et al. (2005) found that cases of unintentional firearm-related injury or death were less likely to occur in households where guns were stored unloaded or locked or where guns and ammunition were stored separately.

CAP laws could decrease gun crime rates by making theft of firearms more difficult. Alternatively, the laws could increase rates of crime victimization and decrease opportunities for legal defensive gun use by delaying gun owners' access to their firearms. Similarly, if firearms in the home deter such crimes as burglaries, safe storage requirements could reduce their deterrent value.

Data on suicides and self-inflicted nonfatal injury stratified by age are readily available, so analyses can directly test whether effects of CAP laws on these outcomes are driven by the relevant age group affected by the policy. For outcomes of violent crime and non-self-inflicted injury, causal analyses could be improved with data that report the age of the shooter. However, as most data sources report only the age of the

victim,[1] none of the studies we identified that met our inclusion criteria for this policy used this type of data. In estimating potential spillover effects for other age groups, one would ideally know whether different outcomes are observed after implementation of CAP laws among those households most directly affected by the laws (such as households with children under age 18 or 21) and households less directly affected by the safe storage policies.

For any analysis, estimates of causal effects would be strengthened with data showing how CAP laws actually affected gun storage behaviors, but national longitudinal data on firearm storage patterns do not currently exist.

## State Implementation of Child-Access Prevention Laws

Although there is no comparable federal law, a narrow majority of U.S. jurisdictions have imposed some sort of CAP law. Fourteen states and the District of Columbia have implemented laws concerning negligent storage, across which there is some variation. The strictest laws impose criminal penalties for negligent storage regardless of whether a child accesses any guns. Massachusetts, for instance, imposes criminal liability if a gun is stored where a minor "may have access."[2] Three other jurisdictions hold owners liable when they know or reasonably should know that access is "likely."[3] Four additional states impose criminal liability for negligent storage only where a child gains access to a gun, regardless of whether he or she uses it.[4] Some of these jurisdictions impose liability even when the gun is not loaded.[5]

Seven states impose liability for negligent storage if children publicly carry or use improperly stored firearms, although three of these states hold adults liable only if children's access results in death or serious injury.[6]

---

[1]   Exceptions include the Federal Bureau of Investigation's Supplementary Homicide Reports, which contain age of victim and age of offender for murders when such information is known, and the National Violent Death Reporting System, which contains information on the age of the shooter for non-self-inflicted fatal injuries when such information is known for a subset of states.

[2]   Mass. Gen. Laws Ch. 140, § 131L.

[3]   California, Minnesota, and the District of Columbia. See Calif. Penal Code. § 25100; Minn. Stat. Ann. § 609.666; D.C. Code Ann. § 7-2507.02.

[4]   Hawaii, Maryland, New Jersey, and Texas. See Hawaii Rev. Stat. § 707-714.5; Md. Code Ann., Crim. Law § 4-104; N.J. Stat. Ann. 2C: 58-15; Tex. Penal Code Ann. § 46.13.

[5]   California, Hawaii, Massachusetts, and the District of Columbia. Calif. Penal Code § 25200 (the child must carry the unloaded gun off the premises for liability to attach); Hawaii Rev. Stat. §§ 707-714; 134-10.5; Mass. Gen. Laws Ch. 140, § 131L; D.C. Code Ann. § 7-2507.02.

[6]   The states that require the gun to be used but not necessarily to cause injury or death are Florida, Iowa, New Hampshire, and North Carolina. See Fla. Stat. Ann. § 790.174; Iowa Code Ann. § 724.22; Rev. Stat. Ann. N.H. § 650-C:1; N.C. Gen. Stat. Ann. § 14-315.1. The states that require injury or death are Connecticut, Illinois, and

Many of the states imposing criminal liability for negligent storage allow for exceptions or defenses.[7] The most common is when the gun has been stored in a locked container.[8] Other exceptions or defenses include that the firearm had been rendered inoperable,[9] the person carried the firearm or it was close enough to be easily retrieved,[10] or there was a reasonable expectation that children would not be present where the gun was stored.[11] In addition, some states consider it an exception or defense when children enter a storage area illegally[12] or use the firearm for self-defense.[13] Some states have added other defenses too, such as those that apply to children who have a legal right to use firearms for hunting.[14]

Some states impose criminal liability for intentional, knowing, or reckless provision of firearms to children. These laws are weaker than negligent storage laws. Recklessness requires that the actor was aware of the risks involved in their actions, while negligence only requires that they should have been aware (American Law Institute, 1985). Five states impose penalties under the weaker standard for all firearms,[15]

---

Rhode Island. See Conn. Gen. Stat. Ann. §§ 29-37i, 53-217a; 720 Ill. Comp. Stat. 5/24-9; R.I. Gen. Laws Ann. § 11-47-60.1.

[7]   In some laws, certain actions are not excluded from the definition of the law, while in other states, they are affirmative defenses.

[8]   Calif. Penal Code § 25105; Conn. Gen. Stat. Ann. § 29-37i; Fla. Stat. Ann. § 790.174; Hawaii Rev. Stat. § 134-10.5; Iowa Code Ann. § 724.22; N.H. Rev. Stat. Ann. § 650-C:1; N.J. Stat. Ann. 2C: 58-15; R.I. Gen. Laws Ann. § 11-47-60.1; Tex. Penal Code Ann. § 46.13; D.C. Code Ann. § 7-2507.02.

[9]   Calif. Penal Code § 25105; Fla. Stat. Ann. § 790.174; Iowa Code Ann. § 724.22; N.J. Stat. Ann. 2C: 58-15; N.C. Gen. Stat. Ann. § 14-315.1; R.I. Gen. Laws Ann. § 11-47-60.1; Tex. Penal Code Ann. § 46.13.

[10]   Calif. Penal Code § 25105; Conn. Gen. Stat. Ann. § 29-37i; Hawaii Rev. Stat. § 134-10.5; N.H. Rev. Stat. Ann. § 650-C:1; R.I. Gen. Laws Ann. § 11-47-60.1; D.C. Code Ann. § 7-2507.02.

[11]   Calif. Penal Code § 25105; N.H. Rev. Stat. Ann. § 650-C:1; R.I. Gen. Laws Ann. § 11-47-60.1.

[12]   Calif. Penal Code § 25105; Fla. Stat. Ann. § 790.174; Iowa Code Ann. § 724.22; Hawaii Rev. Stat. § 707-714.5; Minn. Stat Ann. § 609.666; Md. Code Ann., Crim. Law § 4-104; N.H. Rev. Stat. Ann. § 650-C:1; N.J. Stat. Ann. 2C: 58-15; N.C. Gen. Stat. Ann. § 14-315.1; R.I. Gen. Laws Ann. § 11-47-60.1; Tex. Penal Code Ann. § 46.13; D.C. Code Ann. § 7-2507.02.

[13]   Calif. Penal Code § 25105; R.I. Gen. Laws Ann. § 11-47-60.1; Tex. Penal Code Ann. § 46.13.

[14]   For example, Maryland's law does not apply if the child has a hunting or firearm certificate (Md. Code Ann., Crim. Law § 4-104). In Texas, it is a defense if the child "was supervised by a person older than 18 years of age and was for hunting, sporting, or other lawful purposes" or is "engaged in an agricultural enterprise" (Tex. Penal Code Ann. § 46.13). In New Hampshire, the law does not apply if the child has completed a firearm safety or hunter safety course (N.H. Rev. Stat. Ann. § 650-C:1).

[15]   Indiana, Missouri, Nevada, Oklahoma, and Utah. See Ind. Code Ann. § 35-47-10-6; Mo. Stat. Ann. § 571.060; Nev. Rev. Stat. Ann. § 202.300; Okla. Stat. Ann. § 1273; Utah Ann. Code § 76-10-509.6 (applies only to parents and guardians regarding minors who have been convicted or adjudicated of a violent felony).

three for loaded firearms,[16] and five for handguns only.[17] Some of the laws require the weapon to be used by the minor in some way.[18] Exceptions and defenses for reckless provision of firearms to children are similar to those for negligent storage, such as that the firearm was in a locked container[19] or had been rendered inoperable.[20] Other exceptions include that the individual carried the firearm or it was close enough to be easily retrieved,[21] the defendant had no reasonable expectation that a child would have access to the premises,[22] or the child accessed the firearm through unlawful entry.[23] Use of the firearm in hunting, hunter safety, and other sporting events[24] or in self-defense[25] are also exceptions.

In addition to the main distinctions among the CAP laws already discussed, another difference is how they define minors. In the majority of states, it is an offense to provide a firearm to an individual under age 18.[26] In Texas, the age is 17.[27] In seven states, the age is 16,[28] and in another four states, a minor is under age 14.[29]

---

[16] Delaware, Virginia, and Wisconsin. See Del. Code Ann. tit. 11 § 603 (applies to parents, guardians, and other people legally charged with care of the minor); Va. Code Ann. § 18.2-56.2; Wisc. Stat. Ann. § 948.55.

[17] Colorado, Georgia, Kentucky, Mississippi, and Tennessee. See Colo. Rev. Stat § 18-12-108.7; Ga. Code Ann. § 16-11-101.1; Ky. Rev. Stats Ann. § 527.110; Miss. Ann. Code § 97-37-15 (parents, guardians, custodians); Tenn. Code Ann. § 39-17-1320.

[18] Ga. Code Ann. § 16-11-101.1 (must be used in the commission of a felony offense); Tenn. Code Ann. § 39-17-1320 (for liability to attach to parents or guardians, the gun must be used in the commission of a felony).

[19] Del. Code Ann. § 603; Nev. Rev. Stat. Ann. § 202.300; Wisc. Stat. Ann. § 948.55.

[20] Del. Code Ann. tit. 11 § 603; Wisc. Stat. Ann. § 948.55.

[21] Wisc. Stat. Ann. § 948.55.

[22] Wisc. Stat. Ann. § 948.55.

[23] Nev. Rev. Stat. Ann. § 202.300; Wisc. Stat. Ann. § 948.55.

[24] Ind. Ann. Code § 35-47-10-1; Miss. Ann. Code § 97-37-14; Nev. Rev. Stat. Ann. § 202.300 (if accompanied or under the charge of a parent or guardian); Okla. Stat. Ann. § 1273 (with permission of parent or guardian); Tenn. Code Ann. § 39-17-1319.

[25] Miss. Ann. Code § 97-37-14; Tenn. Code Ann. § 39-17-1319 (if given permission by a parent or guardian).

[26] California, Colorado, Delaware, Georgia, Indiana, Kentucky, Massachusetts, Minnesota, Mississippi, Missouri, Nevada, North Carolina, Oklahoma, Tennessee, Utah, and the District of Columbia. See Calif. Penal Code § 25000; Colo. Rev. Stat § 18-12-108.7; Del. Code Ann. tit. 11 § 603; Ga. Code Ann. § 16-11-101.1; Ind. Code Ann. § 35-47-10-1; Ky. Rev. Stats Ann. § 527.110; Mass. Gen. Laws Ch. 140, § 131L; Minn. Stat. Ann. § 609.666; Miss. Ann. Code § 97-37-15; Mo. Stat. Ann. § 571.060; Nev. Rev. Stat. Ann. § 202.300; N.C. Gen. Stat. Ann. § 14-315.1; Okla. Stat. Ann. § 1273; Tenn. Code Ann. § 39-17-1320; Utah Code Ann. § 76-10-509.6; D.C. Code Ann. § 7-2507.02.

[27] Tex. Penal Code Ann. § 46.13.

[28] Connecticut, Florida, Hawaii, Maryland, New Hampshire, New Jersey, and Rhode Island. See Conn. Gen. Stat. Ann. § 29-37i; Fla. Stat. Ann. § 790.174; Hawaii Rev. Stat. § 707-714.5; Md. Code Ann., Crim. Law § 4-104; N.H. Rev. Stat. Ann. § 650-C:1; N.J. Stat. Ann. § 2C:58-15; R.I. Gen. Laws Ann. § 11-47-60.1.

[29] Illinois, Iowa, Virginia, and Wisconsin. See 720 Ill. Comp. Stat. 5/24-9; Iowa Code Ann. § 724.22; Va. Code Ann. § 18.2-56.2; Wisc. Stat. Ann. § 948.55.

In eight states and the District of Columbia, the act of negligent storage of a firearm is a misdemeanor.[30] In Massachusetts, negligent storage is a felony. In nine states, some additional factor—such as the firearm being used to commit an act of violence, it being a second offense, or the child having committed a prior felony—is required for the act to be a misdemeanor.[31] In eight states, such factors make the negligent storage a felony: In four such jurisdictions, these factors bump the crime from a misdemeanor to a felony,[32] and in the other four, there is no misdemeanor offense, only these felonies.[33] Texas makes clear that regardless of what additional factors are included, the crime is always a misdemeanor offense. Among states with laws that prohibit recklessly or knowingly providing firearms to minors, Mississippi and Tennessee make it a misdemeanor, Missouri and Kentucky make it a felony, and Tennessee makes it a felony for a parent to recklessly or knowingly provide firearms to their children.

## Effects on Suicide

### Research Synthesis Findings

The National Research Council (NRC) (2004) and Hahn et al. (2005) reviewed two quasi-experimental studies providing insight into the impact of CAP laws on suicide. These studies, which applied different statistical models to nearly identical data sets, found somewhat conflicting evidence among those under age 15 (Cummings et al., 1997a; Lott and Whitley, 2001). The model specified by Cummings et al. (1997a) found suggestive effects consistent with a reduction in firearm suicides in a model with limited controls. On the other hand, Lott and Whitley (2001) found uncertain effects in models that employed both state and year fixed effects, states' "shall-issue" or "right-to-carry" laws (see Chapter Thirteen), "one-gun-a-month" purchase rules, states that border one-gun-a-month states, waiting periods, mandatory prison penalties for using guns in the commission of a crime, and more than 36 state-level demographic controls. Combined with the state fixed effects, year fixed effects, and law effects, this model had an unfavorable ratio of estimated parameters to observations (approximately one to eight), suggesting that the model may have been overfit, and thus the estimated effects of these laws and their statistical significance may be poor indicators of their true effects. In addition, the model did not adjust for clustered standard errors. Together, these shortcomings suggest that the model results may not accurately describe the true effects of CAP laws.

---

[30] California, Delaware, Hawaii, Maryland, Minnesota, Nevada, New Jersey, Virginia, and the District of Columbia.

[31] Florida, Illinois, Iowa, New Hampshire, North Carolina, Oklahoma, Rhode Island, Utah, and Wisconsin.

[32] California, Nevada, Utah, and the District of Columbia.

[33] Colorado, Connecticut, Georgia, and Indiana.

Published soon before the NRC report, Webster et al. (2004) examined the effect of CAP laws on suicides among teens (aged 14–17) and young adults (aged 18–20) between 1976 and 2001. In negative binomial models that employed generalized estimating equations and that included state-level fixed effects and other covariates (e.g., the proportion of suicides by firearm as a proxy for gun prevalence), the authors found a significant effect that CAP laws lowered the total suicide rate among those aged 14–17 by 8.3 percent, driven by an estimated 10.8-percent reduction in firearm suicides; in addition, they found uncertain effects on nonfirearm suicides. In this age group, the post-policy firearm suicide rate was 89 percent of the rate expected without the policy, and the total suicide rate was 92 percent of what was expected (see Figure 10.1). There was also an indication that the effect was strongest the first year after the CAP law went into effect. These findings were sensitive to the authors' choices about model specifications: An alternatively specified and worse-fitting model yielded uncertain effects.[34] The authors also found that CAP laws were associated with a reduction in total, firearm, and nonfirearm suicides among those aged 18–20. Relative to what would have been expected without the law, suicide rates in this age group were reduced to 89 percent, 91 percent, and 87 percent for total, firearm, and nonfirearm suicides, respectively. The authors questioned the validity of the causal effect detected for those aged 18–20, suggesting that the significant nonfirearm suicide effects "cast doubt on any causal connection between the laws and lower suicides rates among this group of older youth." They did not, however, suggest that this skepticism should extend to the effects found for the lower age group, although the difference between the reductions in nonfirearm suicide detected for the two age groups was not significantly different. Therefore, for this review, we interpret both models as providing some evidence that CAP laws reduce total and firearm suicide.

Gius (2015b) examined data from 1981 to 2010 and found that CAP laws were associated with a reduction in firearm suicides among those aged 0–19, but he did not examine total or nonfirearm suicides. The author controlled for a variety of state-level sociodemographic characteristics, along with two other laws related to youth firearm access (state minimum age requirements for handgun possession and the federal minimum age requirement for handgun possession enacted in 1994). The effect he reports suggests that the post-policy firearm suicide rate was 89 percent of the rate expected if there were no such laws in place, which matches the estimate by Webster et al. (2004) for those aged 14–17 and is close to their estimate of 92 percent for those aged 18–20.

An additional study (DeSimone, Markowitz, and Xu, 2013) found evidence of an effect of CAP laws on nonfatal self-inflicted gun injuries recorded in the Nationwide Inpatient Sample (NIS). Self-inflicted gun injuries are not all suicide attempts; some

---

[34] Specifically, the primary model (which had better model fit based on Akaike information criterion statistics) included adjusting for national suicide rate trends using two linear trend parameters; the alternative model included year fixed effects.

are unintentional injuries. But case fatality rates for suicide attempts with a firearm are around 82.5 percent (Spicer and Miller, 2000), so a substantial number of self-inflicted firearm injuries are likely the result of suicide attempts. Therefore, DeSimone, Markowitz, and Xu (2013) should be understood to evaluate the effects of CAP laws on nonfatal firearm injuries resulting from a combination of suicide attempts and self-inflicted unintentional injuries. The authors looked at hospital discharges in 11 states between 1988 and 2003 and employed fixed effects for state and year in their statistical models (along with other state- and hospital-level covariates). They found that CAP laws based on negligent storage alone or on both negligent storage and reckless provision were associated with a reduction of 66–69 percent in self-inflicted firearm injuries among those under age 18, although estimates showed an uncertain effect on self-inflicted injuries for those 18 or older. These estimated effects were largely unchanged when considering whether the CAP laws were specified as those more-stringent policies that impose criminal penalties for negligent storage or were more broadly defined to include both negligent storage and reckless provision. This similarity in estimated effects is likely because only two states (Colorado and Wisconsin) in the NIS sample passed reckless provision laws during the study time frame; thus, identification in both specifications was largely driven by changes in state laws regarding negligent storage.

As DeSimone, Markowitz, and Xu (2013) note, however, the data set on which their estimates are made is not strictly longitudinal, and it is not possible to determine the extent to which CAP law effect estimates are estimated cross-sectionally or longitudinally. In addition, cases of firearm self-injury among young people were extremely sparse in the data, with just more than 200 such injuries reported in more than 9,000 hospital observations. Finally, the estimated effect sizes that we calculated from the parameter estimates provided in the paper are improbably large and inconsistent with the effect sizes the authors calculated from the same estimates. For these reasons, we are concerned that the parameter estimates and confidence intervals (CIs) reported in DeSimone, Markowitz, and Xu (2013) may not provide generalizable evidence about the effectiveness of CAP laws.

Figure 10.1 displays the incidence rate ratios (IRRs) and CIs associated with the CAP laws examined in these studies. Lott and Whitley (2001) did not provide sufficient data for us to calculate IRRs and CIs for the effect size of interest, so these are not displayed in figure.

**Figure 10.1**
**Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Suicide**



NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

## Conclusions

*Total suicides.* We identified one qualifying study that estimated the effect of CAP laws on total suicides in two population groups, those aged 14–17 and those aged 18–20 (Webster et al., 2004). For both groups, significant effects were found consistent with CAP laws reducing total suicides.

We conclude that available research offers *limited evidence that child-access prevention laws reduce total suicides among youth aged 14–20.*

Child-access prevention laws may **decrease** total suicides.

Evidence for this relationship is **limited.**

*Firearm suicides and firearm self-injury.* We identified five qualifying studies that estimated the effect of CAP laws on firearm suicide or firearm self-injury. Cummings et al. (1997a) identified a suggestive effect consistent with CAP laws reducing firearm suicides among children 14 or younger. Using a similar data series, Lott and Whitley (2001) identified uncertain effects of CAP laws on those younger than age 15 and among those aged 15–17. Using a longer but overlapping data series, Webster et al. (2004) found significant effects suggesting that CAP laws reduce firearm suicide among those aged 14–17 and those aged 18–20. Gius (2015b) used a later, though partially overlapping, data series and similarly found a significant effect indicating that CAP laws reduce firearm suicides among those aged 19 or younger. Finally, using data on hospitalizations for self-inflicted firearm injuries, DeSimone, Markowitz, and Xu (2013) found significant effects suggesting that CAP laws reduce such injuries among those aged 17 or younger, but they found uncertain effects among adults aged 18 or older.



Child-access prevention laws may **decrease** firearm self-injuries (including suicides).

Evidence for this relationship is **supportive.**

Based on these studies, our assessment of their relative strengths, and the fact that effects are found across multiple data sets, we conclude that *there is supportive evidence that child-access prevention laws reduce all* firearm *self-injuries (including suicide attempts and self-injuries that were not the result of suicide attempts) among young people.* In addition, we find *moderate evidence that CAP laws reduce firearm suicides among this population.*



Child-access prevention laws may **decrease** firearm suicides.

Evidence for this relationship is **moderate.**

## Effects on Violent Crime

### Research Synthesis Findings

Based on results from the same two quasi-experimental studies (Cummings et al., 1997a; Lott and Whitley, 2001), both NRC (2004) and Hahn et al. (2005) concluded that the evidence of the effects of CAP laws on violent crime was inconclusive. Using a limited set of controls and data spanning 1979 to 1994, Cummings et al. (1997a) found a suggestive relationship between CAP laws and firearm homicides for children

aged 15 or younger and uncertain effects for nonfirearm homicides. In contrast, examining an overlapping period from 1977 to 1996, Lott and Whitley (2001) found that CAP laws were significantly related to higher rates of rape (9-percent increase) and robbery (10-percent increase). In additional analyses, estimates showed a suggestive relationship between CAP laws and lower rates of assault, as well as uncertain effects of CAP laws on murder rates. However, the authors' model had an unfavorable ratio of estimated parameters to observations (approximately one to eight), meaning the model may have been overfit, and thus parameter estimates and their CIs may have been invalid. Further, Lott and Whitley (2001) made no adjustment for clustering of standard errors at the state level, which threatens the validity of the significance values estimated from their model. In reviewing the more recent literature, we identified no new studies meeting our inclusion criteria that examined this relationship.

Figure 10.2 displays the IRRs and CIs associated with the CAP laws examined in these studies.

**Figure 10.2**
**Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Violent Crime**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **State CAP law** | **Crime** | | |
| Cummings et al. (1997a) | Firearm homicides, aged 0–14 | 0.89 [0.76, 1.05] | |
| Cummings et al. (1997a) | Nonfirearm homicides, aged 0–14 | 0.96 [0.86, 1.06] | |
| Lott & Whitley (2001) | Murder | 1.04 [0.97, 1.11] | |
| Lott & Whitley (2001) | Rape | 1.10 [1.04, 1.16] | |
| Lott & Whitley (2001) | Robbery | 1.11 [1.03, 1.20] | |
| Lott & Whitley (2001) | Assault | 0.96 [0.91, 1.01] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

## Conclusion

We identified two studies meeting our quality standards that evaluated the effect of CAP laws on any violent crime outcomes. Cummings et al. (1997a) reported a suggestive effect consistent with CAP laws reducing firearm homicide rates among children aged 14 or younger. Lott and Whitley (2001) found that these laws



Child-access prevention laws have **uncertain** effects on firearm homicides and violent crime. Evidence for this relationship is **inconclusive.**

significantly increased rates of robbery and rape. They also reported a suggestive effect consistent with the laws decreasing assault rates. The effect of CAP laws on murder rates was uncertain.

Considering the relative strengths of the two studies, we find *inconclusive evidence for the effect of child-access prevention laws on violent crimes generally and on specific violent crimes, including firearm homicides.*

## Effects on Unintentional Injuries and Deaths

### Research Synthesis Findings

In 2004, NRC reported that "the credibility of existing research [on CAP laws] cannot be assessed." NRC made that conclusion based on three quasi-experimental studies that used overlapping data (Cummings et al., 1997a; Lott and Whitley, 2001; Webster and Starnes, 2000). Hahn et al. (2005) reached virtually the same conclusion after reviewing the same studies. With a limited set of controls, Cummings et al. (1997a) found that CAP laws were associated with a lower risk of unintentional firearm death in children aged 15 or younger (relative risk = 0.77; 95-percent CI: 0.63, 0.94) and suggestive evidence that the laws reduced such deaths in those aged 20–24 as well. In their re-analysis adding three more years of data and more states with CAP laws, Webster and Starnes (2000) also found that CAP laws were associated with a significant decrease in unintentional firearm deaths among those aged 14 or younger. In addition, they showed that this effect was not consistent across all states that have CAP laws. Significant reductions in such deaths were observed in states with felony CAP laws, and in states without felony laws, the effects were uncertain. Indeed, the authors noted that much of the observed effect of CAP laws was attributable to a single state, Florida, without which the overall effect of CAP laws still suggested that they reduce deaths, but the effect was uncertain. On the other hand, Lott and Whitley (2001) found only uncertain effects among youth aged 19 or younger, with some suggestive effects of an increase in unintentional injuries among children aged 5–9. Nevertheless, this model used an unfavorable ratio of estimated parameters to observations (approximately one to eight), meaning the model may have been overfit, and thus parameter estimates and CIs may be invalid; furthermore, no adjustment was made for clustered standard errors, so the standard errors and significance values reported in the paper were unreliable.

Since the NRC (2004) and Hahn et al. (2005) reports, three additional quasi-experimental studies provided new evidence on CAP laws, all of which used state and time fixed-effects models to examine the relationship between state CAP laws and firearm-related unintentional death or injury.

DeSimone, Markowitz, and Xu (2013) performed a fixed-effects analysis on unintentional non-self-inflicted gun injuries using hospital discharge data from the NIS spanning 1988 through 2003. They found that CAP laws based on negligent storage alone or on both negligent storage and reckless provision had uncertain effects