on unintentional firearm injuries in children aged 18 or younger in the 11 states that were part of the NIS, but they did find a statistically significant effect of these laws on unintentional firearm deaths among those 18 or older. Specifically, CAP laws that included negligent storage rules only were associated with a decline to 71 percent of the rates expected without implementing such laws; the policies that included both negligent storage and reckless provision rules were associated with a decline to 69 percent of the expected rate. This similarity in estimated effects is likely because only two states (Colorado and Wisconsin) in the NIS sample passed reckless provision laws during the study time frame; thus, identification in both specifications was largely driven by changes in state laws regarding negligent storage. The findings were generally confirmed in a second analysis adding more control states (states without a change in CAP laws over the period); however, in those analyses, safe storage and negligent provision laws were associated with a significant reduction in unintentional injuries for those aged 18 or younger.

As DeSimone, Markowitz, and Xu (2013) note, however, the data set on which their estimates are made is not strictly longitudinal, and it is not possible to determine the extent to which CAP law effect estimates are estimated cross-sectionally or longitudinally. In addition, the estimated effect sizes that we calculated from the parameter estimates provided in the paper are not consistent with the effect sizes the authors calculated from the same estimates. For these reasons, we are concerned that the parameter estimates and CIs reported in DeSimone, Markowitz, and Xu (2013) may not provide generalizable evidence about the effectiveness of CAP laws.

Hepburn et al. (2006) examined the relationship between CAP laws and unintentional firearm deaths from 1979 to 2000 among children aged 14 or younger compared with adults aged 55–74. In their state and time fixed-effects models, CAP laws were significantly associated with fewer unintentional deaths in children 14 or younger (but effects were uncertain among adults aged 55–74). For those 14 or younger, the estimate in Hepburn et al. (2006) suggests that the post-law firearm death rate was 78 percent of what would have been expected without the law. Like the analysis by Webster and Starnes (2000), the reduction was greatest in a model with the subset of states with felony CAP laws, in which rates after the laws were implemented were just 64 percent of the expected rate. In states with misdemeanor CAP laws, the effects were smaller and uncertain; in models excluding California or Florida, the effects were smaller and suggestive for those aged 14 or younger (see Figure 10.3). The authors controlled for firearm availability (using the proportion of suicides that were caused by a firearm as a proxy for availability) and for changes in the coding of causes of death between the ninth and tenth revisions of the International Statistical Classification of Diseases and Related Health Problems (ICD) in 1999. Demographic, social, and economic covariates were not included in this model, meaning that state variation in factors that may correspond with adoption of CAP laws cannot be ruled out as explaining the apparent CAP law effects.

Gius (2015b) also examined the relationship between unintentional firearm deaths among youth and state CAP laws, but in a wider age range (0–19 years) and between 1981 and 2010, which partially overlaps with the period studied by Hepburn et al. (2006). Unlike the earlier studies of similar data sets, this study found uncertain evidence of a reduction in youth unintentional deaths associated with CAP laws. Gius (2015b) controlled for a variety of state-level sociodemographic characteristics, along with two other laws related to youth firearm access (state minimum age requirements for handgun possession and the federal minimum age requirement for handgun possession enacted in 1994). The weighted least-squares statistical model used in this study may not be appropriate for the rate outcome, with low values or zero in many state-year observations. The model's lower bound at zero may result in violations of its assumptions and can yield biased and incorrect parameter estimates and CIs (Freedman, 2006).

Figure 10.3 displays the IRRs and CIs associated with the CAP laws examined in these studies. Lott and Whitley (2001) did not provide enough information for us to calculate IRRs and CIs for the effect size of interest, so we do not include these in the figure.

## Conclusions

We identified six qualifying studies of the effect of CAP laws on unintentional firearm injuries or deaths. Cummings et al. (1997a) found a significant effect consistent with these laws reducing unintentional firearm deaths among children aged 14 or younger, uncertain effects on unintentional injuries for those aged 15–19, and a suggestive effect consistent with CAP laws reducing unintentional firearm injuries among those aged 20–24. Across four age groups, Lott and Whitley (2001) used an overlapping data set but found three uncertain effects and one suggestive effect consistent with CAP laws increasing unintentional firearm deaths among children aged 5–9.

Using a data set that was extended by one year beyond Lott and Whitley's, Webster and Starnes (2000) found a significant effect suggesting that CAP laws reduce such deaths in children aged 14 or younger. In subgroup analyses, they found that this effect remains strong when examining just those states with felony CAP laws, but the effect was uncertain in states with misdemeanor CAP laws. Hepburn et al. (2006) used a similar data set extended by three years and produced a pattern of findings identical to those of Webster and Starnes (2000). Finally, Gius (2015b) added a decade of data to that studied by Hepburn et al. (2006)



Child-access prevention laws may **decrease** unintentional firearm injuries and deaths among children. Evidence for this relationship is **supportive.**

**Figure 10.3**
**Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Unintentional Firearm Injuries and Deaths**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **State CAP law** | **Unintentional Injuries** | |
| Cummings et al. (1997a) | Firearm deaths, aged 0–14 | 0.77 [0.63, 0.94] |
| Cummings et al. (1997a) | Firearm deaths, aged 15–19 | 0.91 [0.77, 1.08] |
| Cummings et al. (1997a) | Firearm deaths, aged 20–24 | 0.84 [0.68, 1.03] |
| Webster & Starnes (2000) | Firearm deaths, aged 0–14 | 0.83 [0.71, 0.97] |
| Hepburn et al. (2006) | Firearm deaths, aged 0–14 | 0.78 [0.61, 0.99] |
| Hepburn et al. (2006) | Firearm deaths, aged 55–74 | 0.88 [0.63, 1.22] |
| Gius (2015b) | Firearm deaths, aged 0–19 | 0.96 [0.86, 1.06] |
| **State CAP law, negligent storage (11 states)** | | |
| DeSimone, Markowitz, & Xu (2013) | Firearm injuries, aged 0–17 | 0.76 [0.53, 1.09] |
| DeSimone, Markowitz, & Xu (2013) | Firearm injuries, aged 18+ | 0.71 [0.54, 0.94] |
| **State CAP law, negligent storage or reckless provision (11 states)** | | |
| DeSimone, Markowitz, & Xu (2013) | Firearm injuries, aged 0–17 | 0.83 [0.61, 1.12] |
| DeSimone, Markowitz, & Xu (2013) | Firearm injuries, aged 18+ | 0.75 [0.59, 0.96] |
| **Florida CAP law** | | |
| Webster & Starnes (2000) | Firearm deaths, aged 0–14 | 0.49 [0.25, 0.69] |
| **Non–Florida state CAP law** | | |
| Webster & Starnes (2000) | Firearm deaths, aged 0–14 | 0.95 [0.80, 1.12] |
| **CAP laws without Fla.** | | |
| Hepburn et al. (2006) | Firearm deaths, aged 0–14 | 0.86 [0.72, 1.03] |
| Hepburn et al. (2006) | Firearm deaths, aged 55–74 | 0.87 [0.61, 1.28] |
| **CAP laws without Calif.** | | |
| Hepburn et al. (2006) | Firearm deaths, aged 0–14 | 0.77 [0.56, 1.06] |
| Hepburn et al. (2006) | Firearm deaths, aged 55–74 | 0.86 [0.45, 1.27] |
| **Felony CAP law** | | |
| Webster & Starnes (2000) | Firearm deaths, aged 0–14 | 0.69 [0.56, 0.85] |
| Hepburn et al. (2006) | Firearm deaths, aged 0–14 | 0.64 [0.46, 0.89] |
| Hepburn et al. (2006) | Firearm deaths, aged 55–74 | 0.90 [0.72, 1.12] |
| **Misdemeanor CAP law** | | |
| Webster & Starnes (2000) | Firearm deaths, aged 0–14 | 1.00 [0.81, 1.22] |
| Hepburn et al. (2006) | Firearm deaths, aged 0–14 | 0.93 [0.76, 1.13] |
| Hepburn et al. (2006) | Firearm deaths, aged 55–74 | 0.88 [0.54, 1.44] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.



Child-access prevention laws may **decrease** unintentional firearm injuries and deaths among adults.

Evidence for this relationship is **limited.**

and found uncertain effects of CAP laws on unintentional firearm injuries among those aged 19 or younger.

Using a separate data series, DeSimone, Markowitz, and Xu (2013) found that CAP laws significantly reduced unintentional firearm injuries among those aged 17 or younger and among those 18 or older.

Considering the relative strengths of these studies and the two distinct data sets used in them, we conclude that there is *supportive evidence that child-access prevention laws reduce unintentional firearm injuries and deaths among children*. Although much more limited in number, the studies that have examined effects on young adults or adults provide *limited evidence that these laws may reduce unintentional firearm injuries and deaths among adults as well*.

## Effects on Mass Shootings

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified research examining the effects of CAP laws on mass shootings in the United States. Our search yielded one such study that met our inclusion criteria. Using a Poisson specification, Lott (2003) estimated how state laws requiring that guns be safely stored affect fatalities, injuries, and the incidence of *multiple-victim public shootings*, which the author defined as events unrelated to other criminal activity in which two or more people were killed or wounded in a public location. The analysis covered 1977 to 1997, and regression models included controls for state and year fixed effects, other state firearm policies, and a broad range of state-level socioeconomic and demographic characteristics. The findings showed uncertain effects of safe storage laws on total casualties from multiple-victim public shootings and on total number of multiple-victim public shooting incidents. However, these models had an unfavorable ratio of estimated parameters to observations (approximately one to eight), suggesting that the model may have been overfit, and thus the estimated effects of these laws may be poor indicators of their true effects. In addition, the model did not adjust for clustered standard errors. Together, these shortcomings suggest that the model results may not accurately describe the true effects of safe storage laws.

Figure 10.4 displays the IRRs and CIs associated with the CAP laws examined in these studies.

**Figure 10.4**
**Incidence Rate Ratios Associated with the Effect of Child-Access Prevention Laws on Mass Shootings**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Safe storage laws** | **Mass shooting** | | |
| Lott (2003) | Total deaths and injuries | 1.07  [0.79, 1.46] | |
| Lott (2003) | Number of shooting incidents | 0.83  [0.45, 1.50] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

**Conclusions**

We identified one qualifying study of the effect of CAP laws on mass shootings. Lott (2003) found uncertain effects for these laws on mass shooting casualties and mass shooting incidents. Therefore, we find *inconclusive evidence for the effect of child-access prevention laws on mass shootings*.



Child-access prevention laws have **uncertain** effects on mass shootings. Evidence for this relationship is **inconclusive.**

## Outcomes Without Studies Examining the Effects of Child-Access Prevention Laws

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the relationship between CAP laws and the following outcomes, and we identified no such studies that met our inclusion criteria:

- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

## Chapter Ten References

American Law Institute, Model Penal Code, Section 2.02 cmt.at 238, 1985.

Azrael, Deborah, and Matthew Miller, "Reducing Suicide Without Affecting Underlying Mental Health: Theoretical Underpinnings and a Review of the Evidence Base Lining the Availability of Lethal Means and Suicide," in Rory C. O'Connor and Jane Pirkis, eds., *The International Handbook of Suicide Prevention*, 2nd ed., Hoboken, N.J.: John Wiley and Sons, 2016.

Betz, M. E., M. Miller, C. Barber, B. Beaty, I. Miller, C. A. Camargo, Jr., and E. D. Boudreaux, "Lethal Means Access and Assessment Among Suicidal Emergency Department Patients," *Depression and Anxiety*, Vol. 33, No. 6, 2016, pp. 502–511.

Brent, D. A., J. A. Perper, C. J. Allman, G. M. Moritz, M. E. Wartella, and J. P. Zelenak, "The Presence and Accessibility of Firearms in the Homes of Adolescent Suicides: A Case-Control Study," *JAMA*, Vol. 266, No. 21, 1991, pp. 2989–2995.

Brent, D. A., J. A. Perper, G. Moritz, M. Baugher, J. Schweers, and C. Roth, "Firearms and Adolescent Suicide—A Community Case-Control Study," *American Journal of Diseases of Children*, Vol. 147, No. 10, 1993b, pp. 1066–1071.

CDC—*See* Centers for Disease Control and Prevention.

Centers for Disease Control and Prevention, "Nonfatal Injury Reports, 2001–2014," WISQARS database, Atlanta, Ga., March 28, 2013. As of March 9, 2017: https://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html

———, "Fatal Injury Reports, National and Regional, 1999–2015," WISQARS database, Atlanta, Ga., June 24, 2015. As of March 23, 2017: https://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html

Conwell, Y., P. R. Duberstein, K. Connor, S. Eberly, C. Cox, and E. D. Caine, "Access to Firearms and Risk for Suicide in Middle-Aged and Older Adults," *American Journal of Geriatric Psychiatry*, Vol. 10, No. 4, 2002, pp. 407–416.

Cummings, P., D. C. Grossman, F. P. Rivara, and T. D. Koepsell, "State Gun Safe Storage Laws and Child Mortality Due to Firearms," *JAMA*, Vol. 278, No. 13, 1997a, pp. 1084–1086.

Dahlberg, L. L., R. M. Ikeda, and M. J. Kresnow, "Guns in the Home and Risk of a Violent Death in the Home: Findings from a National Study," *American Journal of Epidemiology*, Vol. 160, No. 10, 2004, pp. 929–936.

DeSimone, J., S. Markowitz, and J. Xu, "Child Access Prevention Laws and Nonfatal Gun Injuries," *Southern Economic Journal*, Vol. 80, No. 1, 2013, pp. 5–25.

Freedman, David A., "On the So-Called 'Huber Sandwich Estimator' and 'Robust Standard Errors,'" *American Statistician*, Vol. 60, No. 4, 2006, pp. 299–302.

Gius, Mark, "The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths," *Social Science Journal*, Vol. 52, No. 2, 2015b, pp. 168–175.

Grossman, D. C., B. A. Mueller, C. Riedy, M. D. Dowd, A. Villaveces, J. Prodzinski, J. Nakagawara, J. Howard, N. Thiersch, and R. Harruff, "Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries," *JAMA*, Vol. 293, No. 6, 2005, pp. 707–714.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Hepburn, L., D. Azrael, M. Miller, and D. Hemenway, "The Effect of Child Access Prevention Laws on Unintentional Child Firearm Fatalities, 1979–2000," *Journal of Trauma-Injury Infection and Critical Care*, Vol. 61, No. 2, 2006, pp. 423–428.

Ilgen, M. A., K. Zivin, R. J. McCammon, and M. Valenstein, "Mental Illness, Previous Suicidality, and Access to Guns in the United States," *Psychiatric Services*, Vol. 59, No. 2, 2008, pp. 198–200.

Johnson, R. M., C. Barber, D. Azrael, D. E. Clark, and D. Hemenway, "Who Are the Owners of Firearms Used in Adolescent Suicides?" *Suicide and Life-Threatening Behavior*, Vol. 40, No. 6, 2010, pp. 609–611.

LaFree, G., and C. Birbeck, *Controlling New Mexico Juveniles' Possession of Firearms,* Albuquerque, N.M.: New Mexico Criminal Justice Statistical Analysis Center, Working Paper 27, 1998. As of May 9, 2017:
http://nmsc.unm.edu/reports/1998/JuvFirearmPossession.pdf

Loeber, R., and R. Stallings, "Modeling the Impact of Interventions on Local Indicators of Offending, Victimization, and Incarceration," in R. Loeber and D. P. Farrington, eds., *Young Homicide Offenders and Victims: Risk Factors, Prediction, and Prevention from Childhood*, New York: Springer, 2011, pp. 137–152.

Lott, John R., Jr., *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control Is Wrong*, Washington, D.C.: Regnery Publishing, Inc., 2003.

Lott, John R., Jr., and John E. Whitley, "Safe-Storage Gun Laws: Accidental Deaths, Suicides, and Crime," *Journal of Law and Economics*, Vol. 44, No. 2, 2001, pp. 659–689.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Office of Juvenile Justice and Delinquency Prevention, *OJJDP Statistical Briefing Book*, Washington, D.C.: U.S. Department of Justice, May 25, 2016. As of May 9, 2017:
https://www.ojjdp.gov/ojstatbb/

Oslin, D. W., C. Zubritsky, G. Brown, M. Mullahy, A. Puliafico, and T. Ten Have, "Managing Suicide Risk in Late Life: Access to Firearms as a Public Health Risk," *American Journal of Geriatric Psychiatry*, Vol. 12, No. 1, 2004, pp. 30–36.

Shenassa, E. D., M. L. Rogers, K. L. Spalding, and M. B. Roberts, "Safer Storage of Firearms at Home and Risk of Suicide: A Study of Protective Factors in a Nationally Representative Sample," *Journal of Epidemiology and Community Health*, Vol. 58, No. 10, 2004, pp. 841–848.

Smith, P. N., J. Currier, and K. Drescher, "Firearm Ownership in Veterans Entering Residential PTSD Treatment: Associations with Suicide Ideation, Attempts, and Combat Exposure," *Psychiatry Research*, Vol. 229, No. 1–2, 2015, pp. 220–224.

Spicer, R. S., and T. R. Miller, "Suicide Acts in 8 States: Incidence and Case Fatality Rates by Demographics and Method," *American Journal of Public Health*, Vol. 90, No. 12, 2000, pp. 1885–1891.

Webster, D. W., L. H. Freed, S. Frattaroli, and M. H. Wilson, "How Delinquent Youths Acquire Guns: Initial Versus Most Recent Gun Acquisitions," *Journal of Urban Health*, Vol. 79, No. 1, 2002, pp. 60–69.

Webster, Daniel W., and Marc Starnes, "Reexamining the Association Between Child Access Prevention Gun Laws and Unintentional Shooting Deaths of Children," *Pediatrics*, Vol. 106, No. 6, 2000, pp. 1466–1469.

Webster, D. W., J. S. Vernick, A. M. Zeoli, and J. A. Manganello, "Association Between Youth-Focused Firearm Laws and Youth Suicides," *JAMA*, Vol. 292, No. 5, 2004, pp. 594–601.

CHAPTER ELEVEN
# Surrender of Firearms by Prohibited Possessors

Federal law bans the sale of firearms to prohibited possessors, which include minors, illegal immigrants, convicted felons, fugitives from justice, users of controlled substances, those with adjudicated mental illnesses or involuntarily committed to mental institutions, those who have been dishonorably discharged from the military, those who have renounced their U.S. citizenship, those subject to restraining orders, and those convicted of domestic violence offenses (18 U.S.C. 922). However, there is no procedure under federal law for the *removal* of firearms from these same classes of prohibited possessors or for checking to see whether they have firearms at the time they become prohibited possessors.

While background checks and permit-to-purchase laws aim to prevent the purchase of firearms by prohibited individuals, laws requiring certain prohibited possessors to surrender firearms are designed to ensure that firearm owners relinquish their weapons once they are identified as belonging to a class of prohibited possessors. Through this mechanism, these laws should reduce rates of suicide or gun violence in this population, which is assumed to be at elevated risk. For instance, as discussed in Chapter Twenty-One, there is evidence that domestic violence offenders present an especially elevated risk of violence to their partners. For this reason, many state firearm-surrender laws focus on domestic violence offenders at the time they are convicted of such crimes.

To assess the impact of these policies, the ideal analyses would estimate effects on outcomes specifically for those populations required to surrender their firearms under the regulations. For instance, to study the impact on gun violence of laws requiring the removal or surrender of firearms by persons convicted of a domestic violence misdemeanor, one would like to estimate how violent crime rates changed after the law for this subgroup of the population relative to others not directly affected by the law. Further, because these laws will be effective only to the extent that they are enforced, causal inference could be strengthened with information on the number of firearms that were surrendered or the proportion of prohibited possessors that have been disarmed.

## State Implementation of Firearm-Surrender Laws

Although most state laws allow law enforcement to remove the guns they discover in the possession of a prohibited person, fewer have laws that specify any mechanism for such individuals to surrender their firearms on their own (Giffords Law Center to Prevent Gun Violence, undated-b).

Eight states have laws requiring the surrender of firearms by certain prohibited possessors.[1] These states define a range of procedures for prohibited possessors to dispose of their firearms and time frames for doing so, and, in some cases, the laws stipulate roles for judicial officers or law enforcement to ensure that firearms are surrendered or confiscated. In addition, 13 states require the surrender of firearms pursuant to orders of protection to last for the duration of the order.[2]

---

[1]   California, Connecticut, Hawaii, Illinois, Massachusetts, New York, Pennsylvania, and Wisconsin. See
- Calif. Penal Code § 29810. The court shall provide the notifying defendant of prohibition against firearm possession and provide a form for facilitating the transfer of firearms. The form, which notes that the prohibition is effective immediately, allows the individual to designate another to have power of attorney for the purpose of disposing of or transferring the firearms (California Department of Justice, 2015). The power of attorney lasts for 30 days. The individual may also transfer possession to a licensed dealer for storage. See also Calif. Fam. Code § 6389. The individual shall surrender firearms for the period of the protective order.
- Conn. Gen. Stat. Ann. § 29036k. The individual has two business days to surrender firearms to the state or transfer them to an eligible individual. If surrendered, the individual has one year to transfer firearms to an eligible individual.
- Hawaii Rev. Stat. Ann. § 134-7.3. The individual has 30 days to dispose of or surrender firearms to law enforcement. If not surrendered, law enforcement may seize the firearms. See also Hawaii Rev. Stat. Ann. § 134-7(f). The individual must surrender firearms following any restraining order issued by a court.
- 430 Ill. Comp. Stat. 65/9.5. The individual must surrender his or her firearm owner's identification card; submit a firearm disposition record; and, within 48 hours, place firearms in the location of or with the person reported on the disposition record.
- Mass. Gen. Laws Ch. 140 § 129B, 129D. Upon revocation of firearm identification card, the individual must surrender all firearms "without delay." The individual then has one year to transfer firearms to a licensed dealer or permitted possessor.
- N.Y. Crim. Proc. Law §§ 330.20; 380.96 N.Y. Penal Law § 400.05. A judge shall order revocation of an individual's firearm license and demand the surrender of firearms. The individual has one year to transfer or sell firearms to a licensed dealer or to himself or herself (pursuant to obtaining a valid license).
- 18 Pa. Cons. Stat. Ann. § 6105. The individual has 60 days to sell or transfer firearms to an eligible individual outside his or her household.
- Wisc. Stat. Ann. §§ 51.20, 51.45, 54.10, 55.12. If the court determines that an individual is a prohibited possessor under federal law, the court shall order the seizure of his or her firearms. See also Wisc. Stat. Ann. § 813.12. The individual must surrender firearms following a court-issued injunction after domestic abuse.

[2]   California, Colorado, Hawaii, Iowa, Maryland, Massachusetts, Minnesota, New Hampshire, New York, North Carolina, Pennsylvania, Tennessee, and Washington. See Calif. Fam. Code § 6389; Colo. Rev. Stat. § 13-14-105.5; Hawaii Rev. Stat. Ann. § 134-7(f); Iowa Code § 724.26(4); Md. Code, Fam. Law § 4-506; Mass. Gen. Laws Ch. 209A §3B; Minn. Stat. § 518B.01, subd. 6(g); N.H. Rev. Stat. Ann. § 173-B:5; N.Y. Fam. Ct. Act § 842-a; N.C. Gen. Stat. Ann. § 50B-3.1; 23 Pa. Cons. Stat. Ann. § 6108; Tenn. Code Ann. § 36-3-625(a); Rev. Code. Wash. Ann. § 9.410.800.

In addition to the states that require surrender by every prohibited possessor, four states require individuals convicted of domestic violence misdemeanors to surrender their firearms.[3]

## Effects on Violent Crime

### Research Synthesis Findings

Neither the National Research Council (NRC) (2004) nor Hahn et al. (2005) reports specifically reviewed policies that provide a mechanism for removing firearms from prohibited possessors. The NRC panel did conclude, "There is not much empirical evidence that assesses whether attempts to reduce criminal access to firearms will reduce gun availability or gun crime." However, three studies published since then provide some evidence on the effects of these laws. Vigdor and Mercy (2006) examined how intimate partner homicide is affected by laws that allow law enforcement officers to confiscate firearms at the scene of alleged domestic violence incidents. (The authors also analyzed the effects of laws that prohibit people under a domestic violence restraining order from purchasing or possessing a gun and that prohibit people who have been convicted of a misdemeanor domestic violence offense from possessing a gun.) Their state-level analysis of intimate partner homicide rates from 1982 to 2002 found no overall effect of confiscation policies. Secondary analyses of the effects of these laws on other crimes found uncertain effects on stranger homicides, rapes, robberies, and motor vehicle thefts but significant effects suggesting that confiscation laws may increase assaults and burglaries. The authors note that the effects of confiscation laws will depend, to a large extent, on how rigorously they are implemented and enforced and suggest that future research should examine associations between crime reduction and implementation differences.

Zeoli and Webster (2010) examined the effects of policies designed to restrict access to weapons by those with domestic violence–related restraining orders or those convicted of misdemeanors. Among the policies they examined were state laws allowing police to confiscate firearms from a domestic violence incident (they simultaneously examined state laws that allow police to make warrantless arrests for domestic violence restraining order violations and that mandate arrest for domestic violence restraining order violations). They analyzed data from 46 cities between 1979 and 2003 and found no evidence that laws that allow police to confiscate firearms from a domestic violence incident affected rates of intimate partner homicide. However, they

---

[3]   Illinois, Iowa, Minnesota, and Tennessee. See 730 Ill. Comp. Stat. 5/5-6-3; Iowa Code Ann. § 724.26 (court shall order the convicted individual to sell or transfer firearms; if not possible, court shall store firearms until a qualified transferee is identified or possession allowed); Minn. Stat. Ann. § 2242 (court shall order the convicted individual to transfer firearms to the state, a licensed dealer, or an eligible third party within three days; the transfer may be temporary or permanent); Tenn. Code Ann. § 39-13-111.

did find a significant reduction in intimate partner homicides from laws that restrict access to firearms for domestic violence–related restraining orders and laws that allow police to arrest restraining order violators without a warrant.

A final study also worth noting examined the 1996 Lautenberg Amendment, which was designed to extend prohibited-possessor status to those convicted of misdemeanor domestic violence offenses. The law also stipulated a mechanism for checking the firearm ownership of newly prohibited possessors and requiring that they surrender all firearms. Raissian (2016) identified the effect of the federal law by exploiting states' variation in assault statues, which, because of imprecise language in the Lautenberg Amendment, affected whether the new federal prohibitions applied to domestic violence misdemeanants. In 2009, the U.S. Supreme Court corrected the ambiguity in *United States v. Hayes*. Raissian (2016) found that intimate partner homicides and other family homicides declined when domestic violence misdemeanants were prohibited from possessing firearms and required to surrender any in their possession. However, because this study evaluates a policy change that simultaneously required firearm surrender and expanded the prohibited class, it does not isolate the specific effect of surrender, so we do not include this study as evidence for the effect of surrender per se.

Figure 11.1 displays the incidence rate ratios (IRRs) and confidence intervals (CIs) associated with the firearm-surrender laws examined in these studies.

**Figure 11.1**
**Incidence Rate Ratios Associated with the Effect of Firearm-Surrender Laws on Violent Crime**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **State confiscation law** | **Intimate partner homicide (IPH)** | |
| Vigdor & Mercy (2006) | Total IPH | 0.95 [0.87, 1.04] |
| Vigdor & Mercy (2006) | Firearm IPH | 0.94 [0.83, 1.07] |
| Vigdor & Mercy (2006) | Female IPH | 0.98 [0.89, 1.09] |
| Vigdor & Mercy (2006) | Female firearm IPH | 0.96 [0.82, 1.11] |
| Zeoli & Webster (2010) | Total IPH | 1.10 [0.92, 1.31] |
| Zeoli & Webster (2010) | Firearm IPH | 1.19 [0.97, 1.46] |
| Raissian (2016) | Total firearm IPH rate | 0.89 [0.78, 0.99] |
| Raissian (2016) | Female firearm IPH rate | 0.83 [0.72, 0.94] |
| Raissian (2016) | Male firearm IPH rate | 1.01 [0.85, 1.18] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details. IPH = intimate partner homicide.

**Conclusions**

We identified two qualifying studies that examined the effect on any violent crimes of laws requiring prohibited possessors to surrender firearms. Vigdor and Mercy (2006) found such laws to have uncertain effects on total intimate partner homicides committed with firearms. Similarly, they found only uncertain effects of these laws on intimate partner homicides committed by any means, as well as uncertain effects for firearm intimate partner homicides of women. Zeoli and Webster (2010) also found the effects of surrender laws on intimate partner homicides and firearm intimate partner homicides to be uncertain. Additional analyses by Vigdor and Mercy (2006)



that focused on other types of violent crime found significant effects of confiscation laws indicating that they increase assaults and burglaries, but they found uncertain effects of these laws on stranger homicides, rapes, and robberies.

Based on the results of these studies, we find *inconclusive evidence for how laws requiring prohibited possessors to surrender firearms affect violent crime generally and intimate partner homicides in particular.*

## Outcomes Without Studies Examining the Effects of Firearm-Surrender Laws

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the relationship between the surrender of firearms by prohibited possessors and the following outcomes, and we identified no such studies that met our inclusion criteria:

- suicide
- unintentional injuries and deaths
- mass shootings
- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

## Chapter Eleven References

California Department of Justice, "General Notice of Firearm Prohibition and Power of Attorney for Firearms Relinquishment, Sale, or Transfer for Storage," BOF 110, October 2015. As of June 29, 2017:
https://www.oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/poafirearmsdecl.pdf

Giffords Law Center to Prevent Gun Violence, "Categories of Prohibited People," web page, undated-b. As of October 18, 2017:
http://lawcenter.giffords.org/gun-laws/policy-areas/who-can-have-a-gun/categories-of-prohibited-people/

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Raissian, Kerri M., "Hold Your Fire: Did the 1996 Federal Gun Control Act Expansion Reduce Domestic Homicides?" *Journal of Policy Analysis and Management*, Vol. 35, No. 1, Winter 2016, pp. 67–93.

United States Code, Title 18, Section 922, Unlawful Acts.

Vigdor, E. R., and J. A. Mercy, "Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Homicide?" *Evaluation Review*, Vol. 30, 2006, pp. 313–346.

Zeoli, A. M., and D. W. Webster, "Effects of Domestic Violence Policies, Alcohol Taxes and Police Staffing Levels on Intimate Partner Homicide in Large U.S. Cities," *Injury Prevention*, Vol. 16, No. 2, 2010, pp. 90–95.

CHAPTER TWELVE
# Minimum Age Requirements

Under federal law, licensed dealers cannot sell or deliver handguns to individuals under age 21 or long guns to those under age 18. Unlicensed individuals cannot sell, transfer, or deliver handguns to individuals under age 18. With some exceptions, federal law prohibits individuals under age 18 from possessing handguns, but it does not place age restrictions on the possession of long guns (18 U.S.C. 922).

Laws requiring a minimum age for purchase aim to make it more difficult for underage individuals to acquire a handgun through formal channels, while laws requiring a minimum age of possession are intended to make it more difficult or risky for an underage individual to carry firearms in public. Thus, although the mechanisms by which these laws influence youth access differ, both are designed to limit the availability of firearms to young people—and therefore reduce the gun violence and unintentional shootings they commit.

Firearm homicides and violent crimes disproportionately involve individuals under age 21, both as perpetrators and as victims. Indeed, in 2012, arrest rates for violent crimes peaked at age 18 (Office of Juvenile Justice and Delinquency Prevention, 2016). Of the 7,152 firearm homicides committed in 2014 for which the age of the offender was known, 47.2 percent were perpetrated by individuals aged 12–24 (Puzzanchera, Chamberlin, and Kang, 2017), although this group represents only 17.7 percent of the general U.S. population (U.S. Census Bureau, 2017). By influencing the possession of guns among youth, minimum age laws could thus reduce rates of firearm crime perpetrated by juveniles. However, youth are similarly at high risk of victimization. Of all deaths among those aged 16–21, 16.5 percent are homicides, which is greater than the homicide rates for the next-highest risk ages (13.3 percent for those aged 22–27; 8.8 percent for those aged 28–33) (Centers for Disease Control and Prevention [CDC], 2017b). In theory, therefore, stricter age limits on purchasing or possessing a firearm could reduce the incidence of defensive gun use by youth and potentially increase perpetration of violence against younger populations if offenders believe that the likelihood of encountering armed resistance is lower (Marvell, 2001).

Conceptually, by restricting youth access, minimum age restrictions could also reduce rates of firearm suicide or unintentional shootings by the affected age group. Research suggests that the association between firearm availability and suicide is stron-

gest among adolescents and young adults (Birckmayer and Hemenway, 2001; Miller and Hemenway, 1999). In 2015, there were 3,111 suicide deaths among individuals aged 16–21, 43.6 percent of which involved a firearm (calculated using data from CDC, 2015). Evidence indicates that 50 percent to 60 percent of all firearm suicides by youth under age 21 involve a handgun, suggesting that minimum age laws that cover all firearms may have larger effects on suicide rates compared with laws focused on handguns alone (Johnson et al., 2010; Wright, Wintemute, and Claire, 2008; Shah et al., 2000; Grossman, Reay, and Baker, 1999).

The effects of laws requiring a minimum purchase age will depend largely on how youth acquire firearms. Much of the existing evidence on sources of guns to youth comes from surveys of juvenile offenders or high-risk adolescents and suggests that purchases from retailers are relatively rare among adolescents involved with criminal activity. Among juveniles who have been incarcerated or arrested, surveys have found that youth offenders acquire their firearms through similar sources as adult offenders, with more than 80 percent citing a friend, a family member, or the black market as the means by which they acquired their weapon (Webster et al., 2002; LaFree and Birbeck, 1998). This finding indicates that minimum age laws may be effective at limiting youth access through legitimate retail sources. An early study of firearms used by students in school-associated firearm deaths (both suicide and homicide) between 1992 and 1999 similarly found that only 9.6 percent of the firearms used in homicide events and none of the firearms used in suicide events were purchased legally (CDC, 2001). Still, in a 1996 national survey of male high school students, 50 percent of respondents reported that they would have little or no trouble obtaining a gun (Sheley and Wright, 1998). In a 1996 national study of students in grades 8 through 12, 21 percent of respondents reported having easy access to guns at home, and the types of firearms available were evenly distributed among handguns, rifles, and shotguns (Ruback, Shaffer, and Clark, 2011).

The effects of laws requiring a minimum age of possession will depend on the expected costs youth perceive to be associated with violating such laws, which will likely be influenced by state legal penalties and the level of enforcement efforts devoted to enforcing the prohibition (Marvell, 2001). Semi-structured interviews with incarcerated adolescent males in 1998 found fear of arrest and incarceration as the most commonly reported reasons for choosing not to acquire or carry a gun (Freed et al., 2001). Still, in 2015, 5.3 percent of high school students reported carrying a gun (Kann et al., 2016). Given the relative importance of the home and family members as a source of guns to juveniles, the most-significant effects of minimum age of possession policies may occur if they create a disincentive for older individuals to keep guns at home or to allow guns in the home to be easily accessed (Marvell, 2001).

Much of the conversation about minimum age restrictions revolves around handguns rather than long guns. This is because handguns are more frequently used than long guns in firearm suicides and violent crime, so, in theory, raising the minimum age

Case 3:19-cv-01226-L-AHG   Document 34-5   Filed 01/03/20   PageID.6523   Page 17 of 150

Minimum Age Requirements   147

for such weapons could decrease violence without impacting lawful activities, such as hunting (Tritch, 2014). More-restrictive minimum age laws could plausibly impact the gun industry by reducing the size of the consumer population and decreasing the ownership and use of guns by youth for hunting or recreational purposes. Overall, hunting participation in the United States has declined dramatically over the past decades, and although data on youth recreational firearm use are limited (Vittes and Sorenson, 2005), estimates from 2006 showed 1.7 million youth hunters aged 6–15 (Families Afield, 2010). Further, the vast majority of adult hunters initiate hunting activities before age 20, and those who have not learned to hunt by age 20 have a very low likelihood of participating in hunting activities as an adult (Duda and Young, 1993). Should minimum age laws reduce initiation of firearm use for hunting or recreational purposes, there could be longer-term effects on these outcomes.

Data on suicides and self-inflicted nonfatal injury stratified by age are readily available; thus, analyses can directly test whether effects of minimum age laws on these outcomes are driven by the relevant age group affected by the policy. For outcomes of violent crime and non-self-inflicted injury, causal analyses could be improved with data that reported the age of the shooter. However, as most data sources report only the age of the victim,[1] none of the studies we identified that met our inclusion criteria for this policy used this type of data. Methodological approaches could also leverage state variation in the types of guns restricted under the minimum age laws for outcome data that have information on the type of firearm involved. For any analysis, estimates of causal effects would be strengthened with data showing how minimum age laws affected gun purchase or carrying behavior by youth of the affected age group. While some national surveys (e.g., the Youth Behavioral Risk Surveillance System, National Survey of Drug Use and Health, National Longitudinal Study of Adolescent to Adult Health) ask youth about gun ownership or carrying behaviors, their samples are often limited to high school students, focused on handguns, or available for a limited set of years.

## State Implementation of Minimum Age Requirements

States have adopted a range of minimum age requirements that are, in some cases, higher or lower than the federal minimums. For instance, nine states and the District of Columbia restrict all handgun sales to individuals aged 21 or older and long gun sales to individuals aged 18 or older. In effect, this raises the minimum age restrictions above those set by federal law in two ways: The age to purchase handguns through pri-

---

[1]  Exceptions include the Federal Bureau of Investigation's Supplementary Homicide Reports, which contain age of victim and age of offender for murders when such information is known, and the National Violent Death Reporting System, which contains information on the age of the shooter for non-self-inflicted fatal injuries when such information is known for a subset of states.

vate sales is raised from 18 to 21, and a minimum age for private sales of long guns is set to 18.[2] Two states, Hawaii and Illinois, restrict sales for all firearms to those aged 21 or older.[3] This imposes more-restrictive age limits than federal law on all sales other than handgun sales by dealers. Other states set minimums below the federal limits. For instance, Vermont imposes a minimum age of 16 for all sales, and Maine imposes a minimum age of 18 for handgun sales and 16 for long gun sales.[4] In practice, these affect only long gun sales from nondealers, because minimum age requirements for all other sales would be governed by the more-restrictive federal laws.

As mentioned, federal law places no minimum on the age of possession of long guns (18 U.S.C. 922), but several states have imposed such minimums. For instance, 14 states restrict possession of long guns to those aged 18 or older,[5] and Illinois and the District of Columbia restrict long gun possession to those aged 21 or older.[6] The minimum age for possession of a long gun in Alaska, Minnesota, and New York is 16,[7] and it is 14 in Montana.[8]

## Effects on Suicide

### Research Synthesis Findings

In 2004, the National Research Council (NRC) identified four quasi-experimental studies of gun policy effects on suicide outcomes, none of which examined minimum age restrictions. Hahn et al. (2005) identified one cross-sectional study of the associa-

---

[2]   California, Connecticut, Delaware, Iowa, Maryland, Massachusetts, New Jersey, Ohio, Rhode Island, and the District of Columbia. See Calif. Penal Code § 27505; Conn. Gen. Stat. Ann. §§ 29-34, 29-37a; Del. Code tit. 24 § 901, 903, tit. 11 § 1445; Iowa Code Ann. § 724.22; Md. Code Ann., Pub. Safety §§ 5-101, 5-134; Mass. Gen. Laws Ch. 140 §§ 121, 130; N.J. Stat. Ann. § 2C:39-10; Ohio Rev. Code Ann. § 2923.21; R.I. Gen. Laws §§ 11-47-30, 11-47-35; D.C. Code Ann. §§ 7-2507.07, 22-4507.

[3]   Hawaii Rev. Stat. Ann. § 134-2; Ill. Comp. Stat. 65/3, 65/4. Although Hawaii's law is silent about sales, the state issues permits to acquire to those aged 21 or older, and permits are required for purchases. Illinois requires a firearm owner's identification card for transfer, and the card is issued only to those aged 21 or older. However, 720 Ill. Comp. Stat. 5/24-3.1 prohibits sales of handguns to those under age 18.

[4]   Vt. Stat. Ann. tit. 13, § 4007; Me. Rev. Stat. Ann. tit. 17-A §§ 554-A, 554-B.

[5]   Florida, Idaho, Indiana, Iowa, Michigan, Nevada, New Jersey, Oklahoma, Oregon, Pennsylvania, Rhode Island, Utah, Washington, and Wisconsin. See Fla. Stat. Ann. § 790.22; Idaho Code Ann. § 18-3302E; Ind. Ann. Code § 35-47-10-5; Iowa Code Ann. § 724.22; Mich. Comp. Laws Ann. § 750.234f; Nev. Rev. Stat. Ann. § 202.300; N.J. Stat Ann. § 2C:58-6.1; Okla. Stat. Ann. §§ 1272, 1273; Ore. Rev. Stat. Ann. § 166.250; Pa. Cons. Stat. § 6110.1; R.I. Gen. Laws Ann. § 11-47-33; Utah Code Ann. § 76-10-509; Wash. Rev. Code Ann. § 9.41.040; Wisc. Stat. § 948.60.

[6]   Ill. Comp. Stat. Ann. 65/4 (regulates the firearm owners identification card); D.C. Code Ann. § 7-2502.03.

[7]   Alaska Stat. § 11.61.220; Minn. Stat. § 97B.021 (but individuals aged 14 or 15 and with firearm safety certificates may possess long guns); N.Y. Penal Code § 265.05.

[8]   Mont. Code Ann. § 45-8-344.

tion between minor age and suicide (Kleck and Patterson, 1993), a study that does not meet our inclusion criteria. Since then, three longitudinal studies provided evidence on the impact of minimum age requirements on suicide.

Using data from 1976 to 2001, Webster et al. (2004) examined the effect of state-level changes in minimum purchase and possession age laws on suicide rates among those aged 14–17 and 18–20. The authors used negative binomial regression models that employed generalized estimating equations and that included state fixed effects and other covariates. They found uncertain effects of the laws on suicide rates among those aged 14–17. However, states that increased the minimum purchase age to 21 saw a statistically significant decrease in firearm suicides among those aged 18–20, but the authors found uncertain effects of the laws on total or nonfirearm suicides. They found that the three states that increased the age of handgun possession to 21 experienced a statistically significant increase in total suicides among those aged 18–20, accounted for, in part, by a suggestive increase in firearm suicides in this group. The authors suggested that this result was weakly estimated, having been based on just three states, two of which implemented their laws in the final years of the study period, meaning there was little time over which to observe changes in state suicide rates attributable to the law. These limitations raise valid questions about whether the observed effects are attributable to raising the age of possession of handguns to 21 or to other factors affecting these states' suicide rates. Finally, the authors examined the effect of federal minimum age of possession and purchase of handguns among states that previously had lower minimum age laws compared with those for which the federal law did not raise the minimum ages. These analyses identified a suggestive increase in total suicides among those aged 14–17 from raising the federal minimum possession age but only uncertain effects for other outcomes associated with raising the minimum age to purchase handguns among this age group.

Gius (2015b) examined how both state-specific laws for minimum age for firearm possession and federal laws for minimum age for handgun possession implemented in 1994 affected suicides by those aged 19 or younger. This analysis controlled for several state-level sociodemographic characteristics and enactment of child-access prevention laws between 1981 and 2010. Its results suggest that state-level minimum age restrictions had uncertain effects on suicide. The weighted least-squares statistical model is not likely to produce reliable estimates for the nonlinear outcome of suicide rates, meaning the model's estimates and their standard errors may be unreliable (Freedman, 2006). The study's estimate for the federal minimum age law for handgun possession passed in 1994 did not meet our inclusion criteria, because, as specified in this model, there was no comparison group that did not get the identical intervention in 1994.

Rosengart et al. (2005) used a similar approach to model the effects of state laws between 1979 and 1998, when "seven states adopted and two states repealed a law restricting the minimum age for the *private purchase* of a handgun to 21 years, [and] five states adopted laws restricting the minimum age for the *private possession* of a hand-

gun to 21 years" (emphasis added). In these models controlling for state fixed effects, time trends, state-level variation in poverty and demographic factors, and two other firearm laws[9] (but not the federal 1994 law imposing a minimum age requirement for handgun possession), they found mostly uncertain effects of these laws on the firearm suicide rate. However, they did find suggestive effects consistent with minimum possession age laws increasing the total suicide rate among those under age 20, as well as minimum purchase age laws increasing total suicides among those aged 20 or older. These models had limited information to use in identifying causal effects of these laws because relatively few states changed one or both laws over the study period; in addition, every state but one that raised its minimum age for possession did so the same year it implemented a minimum purchase law, making the effects of these laws confounded. Moreover, the statistical model had an unfavorable ratio of covariates to observations (less than one to eight), meaning the model may have been overfit, resulting in estimates and confidence intervals (CIs) that are unreliable indicators of the true causal effects of the laws.

Figure 12.1 displays the incidence rate ratios (IRRs) and CIs associated with the minimum age requirements examined in these studies. We do not present estimates of the federal minimum possession age from Gius (2015b) because they do not meet our criteria for inclusion. Estimates of the federal minimum purchase age and minimum possession age laws from Webster et al. (2004) are included because, although details of the model are not specified, it appears to satisfy our inclusion criteria based on the authors' following statement: "The federal law establishing a minimum legal age for handgun purchase and possession was assumed to affect only states that, prior to the federal law, either had no minimum-age law of this type or had a law that established a minimum legal age younger than 18 years."

## Conclusions

We identified two qualifying studies that examined how suicide rates were affected by laws requiring a minimum purchase age and three that examined how they were affected by laws requiring a minimum possession age.

*Minimum age requirements for purchasing a firearm.* Webster et al. (2004) found uncertain effects for minimum purchase age laws (with restrictions from ages 16 to 21) on suicides among those aged 14–17 and those 18–20. They also found uncertain effects for firearm suicides among the younger age group but a significant effect consistent with these laws reducing firearm suicides among the older group. When re-estimating these effects only for states that set age 21 as the minimum for purchasing a firearm, the authors again found uncertain effects on total suicide rates for the older

---

[9] The other laws modeled simultaneously were "one-gun-a-month" laws; "shall-issue" laws, otherwise known as right-to-carry laws, which guarantee the right to a concealed-carry permit for all citizens who are not prohibited from possessing a firearm (see Chapter Thirteen); and "junk-gun" laws, which ban the sale of certain cheaply constructed handguns.

**Figure 12.1**
**Incidence Rate Ratios Associated with the Effect of Minimum Age Requirements on Suicide**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **State minimum purchase age** | **Suicide** | |
| Webster et al. (2004) | Total, aged 14–17 | 1.04 [0.90, 1.21] |
| Webster et al. (2004) | Total, aged 18–20 | 0.97 [0.91, 1.05] |
| Webster et al. (2004) | Firearm, aged 14–17 | 1.04 [0.87, 1.16] |
| Webster et al. (2004) | Firearm, aged 18–20 | 0.91 [0.83, 1.00] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 1.05 [0.85, 1.31] |
| Webster et al. (2004) | Nonfirearm, aged 18–20 | 1.05 [0.94, 1.17] |
| **State minimum purchase age of 21** | | |
| Rosengart et al. (2005) | Total | 1.02 [0.98, 1.07] |
| Rosengart et al. (2005) | Total, aged 0–19 | 1.10 [0.94, 1.29] |
| Rosengart et al. (2005) | Total, aged 20+ | 1.04 [0.99, 1.10] |
| Rosengart et al. (2005) | Firearm | 1.00 [0.94, 1.06] |
| Rosengart et al. (2005) | Firearm, aged 0–19 | 0.94 [0.80, 1.06] |
| Rosengart et al. (2005) | Firearm, aged 20+ | 1.02 [0.96, 1.08] |
| **State minimum possession age** | | |
| Webster et al. (2004) | Total, aged 14–17 | 0.97 [0.90, 1.05] |
| Webster et al. (2004) | Total, aged 18–20 | 1.13 [1.01, 1.27] |
| Webster et al. (2004) | Firearm, aged 14–17 | 1.02 [0.92, 1.12] |
| Webster et al. (2004) | Firearm, aged 18–20 | 1.14 [0.98, 1.34] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 0.93 [0.82, 1.05] |
| Webster et al. (2004) | Nonfirearm, aged 18–20 | 1.07 [0.90, 1.27] |
| Gius (2015b) | Firearm death, aged 0–19 | 0.98 [0.93, 1.02] |
| **State minimum possession age of 21** | | |
| Rosengart et al. (2005) | Total | 1.03 [0.96, 1.11] |
| Rosengart et al. (2005) | Total, aged 0–19 | 1.15 [0.93, 1.42] |
| Rosengart et al. (2005) | Total, aged 20+ | 1.04 [0.95, 1.13] |
| Rosengart et al. (2005) | Firearm | 0.99 [0.88, 1.13] |
| Rosengart et al. (2005) | Firearm, aged 0–19 | 0.93 [0.77, 1.12] |
| Rosengart et al. (2005) | Firearm, aged 20+ | 0.99 [0.88, 1.13] |
| **Federal minimum purchase age** | | |
| Webster et al. (2004) | Total, aged 14–17 | 1.02 [0.91, 1.14] |
| Webster et al. (2004) | Firearm, aged 14–17 | 1.00 [0.87, 1.16] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 1.08 [0.91, 1.28] |
| **Federal minimum possession age** | | |
| Webster et al. (2004) | Total, aged 14–17 | 0.98 [0.90, 1.08] |
| Webster et al. (2004) | Firearm, aged 14–17 | 0.99 [0.89, 1.09] |
| Webster et al. (2004) | Nonfirearm, aged 14–17 | 1.12 [0.99, 1.26] |

0.75   1   1.25   1.5

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

152   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies



age group and a significant effect indicating such laws reduce firearm suicides among those aged 18–20. Using overlapping, but shorter, time-series data, Rosengart et al. (2005) found the effects of laws requiring a minimum age of 21 to purchase to have uncertain effects on suicides and firearm suicides for all age groups, except for a suggestive effect consistent with these laws increasing total suicides among adults aged 20 or older.

Based on these findings and an assessment of the relative strengths of these studies, we find *inconclusive evidence for how minimum age requirements for purchasing a firearm affect total suicides*. Studies of the effect of laws setting 21 as the minimum age of firearm purchase provide *limited evidence that such laws may reduce firearm suicides among some people aged 20 or younger*.

*Minimum age requirements for possessing a firearm*. Webster et al. (2004) found uncertain effects of minimum possession age laws (with restrictions from ages 14 to 21) on suicides and firearm suicides among those aged 14–17. However, they found that these laws significantly increase suicide rates among those aged 18–20 and a suggestive effect consistent with increases in firearm suicide rates among this group. For laws requiring a minimum handgun possession age of 21, Rosengart et al. (2005) found uncertain effects on suicides overall and among those aged 20 or older, as well as a suggestive effect consistent with these laws increasing suicides among those under age 20. All effects of these laws on firearm suicides, however, were uncertain. Gius (2015b) found only uncertain effects of state minimum age of possession laws on firearm suicides among those aged 19 or younger.



found only uncertain effects of state minimum age of possession laws on firearm suicides among those aged 19 or younger.

Based on these findings and an assessment of study strengths, we find *inconclusive evidence for how minimum age requirements for possessing a firearm affect suicides and firearm suicides*.

## Effects on Violent Crime

### Research Synthesis Findings

NRC (2004) did not review evidence on the effects of minimum age requirements, and Hahn et al. (2005) identified no research on this topic meeting our inclusion criteria. We identified two studies since 2003 that met our criteria. Rosengart et al. (2005) analyzed state-level data from 1979 to 1998 and examined the effects on violent crime of four types of state laws:

1. restricting handgun purchase to those aged 21 or older
2. restricting private handgun possession to those aged 21 or older
3. limiting the frequency of gun purchases to one gun per 30 days
4. prohibiting the sale of "junk" (cheaply constructed) guns.

The authors controlled for whether a state had a shall-issue (otherwise known as right-to-carry) provision; these results are described in more detail in Chapter Thirteen. The authors found uncertain effects of both types of minimum age laws on total homicide and firearm homicide rates. These models had limited information to use in identifying causal effects of these laws because relatively few states changed one or both laws over the study period; in addition, every state but one that raised its minimum age for possession did so the same year it implemented a minimum purchase age law, making the effects of these laws confounded. Moreover, the statistical model had an unfavorable ratio of covariates to observations (less than one to eight), meaning the model may have been overfit, resulting in estimates and CIs that are unreliable indicators of the true causal effects of the laws.

Rudolph et al. (2015) found a significant effect for a decrease in firearm homicides (and an uncertain effect for nonfirearm homicides) associated with the implementation of a law in Connecticut that established a requirement to have a permit to purchase a firearm and increased the minimum age of handgun purchase from age 18 to age 21. The firearm homicide rate after passage of both provisions was found to be 63 percent of what would have been expected without them. However, because the law included both policies simultaneously, the effect attributable specifically to the minimum age law cannot be identified. In addition, because only one state in the analysis experienced the law change, the effects of the law are not well identified. The observed reduction in firearm homicides could be due to the law or to other events occurring in Connecticut around the same time the law passed.

Figure 12.2 displays the IRRs and CIs associated with the minimum age requirements examined in these studies.

**Figure 12.2**
**Incidence Rate Ratios Associated with the Effect of Minimum Age Requirements on Violent Crime**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **State minimum purchase** | | |
| **age of 21** | **Homicide** | |
| Rosengart et al. (2005) | Total | 1.00 [0.94, 1.05] |
| Rosengart et al. (2005) | Total, aged 0–19 | 0.92 [0.81, 1.05] |
| Rosengart et al. (2005) | Total, aged 20+ | 1.01 [0.95, 1.06] |
| Rosengart et al. (2005) | Firearm | 0.98 [0.91, 1.06] |
| Rosengart et al. (2005) | Firearm, aged 0–19 | 0.92 [0.80, 1.06] |
| Rosengart et al. (2005) | Firearm, aged 20+ | 0.99 [0.93, 1.06] |
| **State minimum possession** | | |
| **age of 21** | | |
| Rosengart et al. (2005) | Total | 1.02 [0.89, 1.18] |
| Rosengart et al. (2005) | Total, aged 0–19 | 0.98 [0.79, 1.20] |
| Rosengart et al. (2005) | Total, aged 20+ | 1.03 [0.88, 1.20] |
| Rosengart et al. (2005) | Firearm | 1.06 [0.88, 1.27] |
| Rosengart et al. (2005) | Firearm, aged 0–19 | 0.91 [0.72, 1.15] |
| Rosengart et al. (2005) | Firearm, aged 20+ | 1.08 [0.89, 1.31] |
| **Permit to purchase** | | |
| **+ state minimum purchase** | | |
| **age of 21** | | |
| Rudolph et al. (2015) | Firearm | 0.60 [0.37, 0.97] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

**Conclusions**

We identified two qualifying studies that examined the effect of minimum age requirements for purchasing or possessing a firearm on total or firearm homicide rates.



Minimum age requirements for purchasing a firearm have **uncertain** effects on total homicides and firearm homicides.

Evidence for this relationship is **inconclusive.**

*Minimum age requirements for purchasing a firearm.* Rosengart et al. (2005) found uncertain effects of laws making 21 the minimum age to purchase handguns on homicide rates and firearm homicide rates among all age groups. Rudolph et al. (2015) reported a significant effect consistent with minimum age requirements reducing firearm homicide rates, but they could

not attribute this effect solely to a minimum purchase age policy because a permit-to-purchase provision was passed concurrently in the one state evaluated. On the basis of these results, and in consideration of the relative strengths of these studies, we find *inconclusive evidence for how minimum age requirements for purchasing a firearm affect total and firearm homicides.*

*Minimum age requirements for possessing a firearm.* Estimates by Rosengart et al. (2005) for the effect of laws making 21 the minimum age for possession of handguns on total and firearm homicides were uncertain for all age groups examined. Therefore, we find *inconclusive evidence for how minimum age requirements for possessing a firearm affect total and firearm homicides.*



## Effects on Unintentional Injuries and Deaths

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of minimum age requirements on unintentional injuries and deaths. One longitudinal study since then examined this relationship. Using data from 1981 to 2010, Gius (2015b) examined the effect of the 1994 federal law establishing a minimum age for handgun possession, as well as other state-specific minimum age requirements for handguns. This model controlled for time and state fixed effects, state-level sociodemographic characteristics, and state-level child-access prevention laws. The authors found that state-level minimum age requirements had uncertain effects on unintentional deaths. The weighted least-squares statistical model used in this study may not have been appropriate for the rate outcome, with many values close to zero in state-year observations. The model's lower bound at zero may result in violations of its assumptions and can yield biased and incorrect parameter estimates and CIs.

Figure 12.3 displays the IRR and CI associated with the minimum age requirements examined in Gius (2015b). The analysis of the federal minimum age of possession law in this study did not meet our inclusion criteria, because, as specified in this model, it appeared that there was no comparison group that did not get the identical intervention in 1994. Therefore, this effect is not included in Figure 12.3.

**Figure 12.3**
**Incidence Rate Ratios Associated with the Effect of Minimum Age Requirements on Unintentional Injuries and Deaths**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **State minimum possession age** | **Unintentional injuries** | | |
| Gius (2015b) | Firearm death, aged 0–19 | 0.93 [0.84, 1.02] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified one qualifying study examining the effect of laws requiring either minimum age to purchase or minimum age to possess a firearm. Gius (2015b)



found a suggestive effect consistent with minimum possession age laws decreasing unintentional firearm deaths among those aged 19 or younger. Therefore, we conclude that *there is inconclusive evidence that minimum age requirements for possessing a firearm may reduce unintentional firearm deaths among those aged 19 or younger*.

## Effects on Mass Shootings

### Research Synthesis Findings

NRC (2004) did not identify any research examining the effects of minimum age requirements on mass shootings. Hahn et al. (2005) identified one study, but it did not satisfy our inclusion criteria. Our own search yielded one study. Using a two-way fixed-effects linear probability model, Luca, Deepak, and Poliquin (2016) estimated the effects of minimum age requirements on a binary indicator for whether a mass shooting occurred in a given state-year. The authors included two measures of minimum age requirements: (1) an indicator variable for whether laws prevent vendors from selling handguns to those under age 18 or prevent those under age 18 from purchasing handguns and (2) an analogous indicator variable for laws that set the minimum age at 21. The authors' analysis covered 1989–2014 and included controls for time-invariant state characteristics, national trends, and a host of other state-level gun policies, as well as time-varying state-level demographic, socioeconomic, and political characteristics. They found uncertain effects of laws setting 18 as the minimum age of purchase on the probability of a mass shooting

event occurring, but they found a suggestive effect consistent with laws setting 21 as the minimum age of purchase reducing the likelihood of a mass shooting occurrence. However, it should be noted that assessing the effects of gun policies on mass shootings was not the primary focus of Luca, Deepak, and Poliquin (2016), and the authors intended the estimates to serve solely as a robustness check for their main specification (the effects of mass shootings on gun policy). Although the paper provided limited information to use in evaluating the reported statistical models (e.g., on how these policies were coded), it is clear that the analysis used a linear model to predict a dichotomous outcome. Therefore, model assumptions were violated, making model estimates and CIs unreliable.

Figure 12.4 displays the IRRs and CIs associated with the minimum age requirements examined in Luca, Deepak, and Poliquin (2016).

**Figure 12.4**
**Incidence Rate Ratios Associated with the Effect of Minimum Age Requirements on Mass Shootings**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **State minimum purchase age of 18** | | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (no political controls) | 1.06 [0.65, 1.47] | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 1.08 [0.66, 1.51] | |
| **State minimum purchase age of 21** | | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (no political controls) | 0.51 [0.00, 1.34] | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 0.38 [0.00, 1.21] | |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified one qualifying study examining how minimum age requirements for purchasing a firearm affect the incidence of mass shootings. Luca, Deepak, and Poliquin (2016) found that laws setting age 18 as the minimum age to purchase a firearm had uncertain effects on mass shooting incidence, but they found a suggestive effect consistent with such laws reducing the incidence of mass shootings when the minimum purchase age is 21. On the basis of this study, *we find inconclusive evidence for how minimum age requirements for purchasing a firearm affect mass shootings.*



Minimum age requirements for purchasing a firearm have **uncertain** effects on mass shootings. Evidence for this relationship is **inconclusive.**

Case 3:19-cv-01226-L-AHG   Document 34-5   Filed 01/03/20   PageID.6534   Page 28 of 150

## Outcomes Without Studies Examining the Effects of Minimum Age Requirements

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of minimum age requirements on the following outcomes, and we identified no such studies that met our inclusion criteria:

- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

## Chapter Twelve References

Birckmayer, J., and D. Hemenway, "Suicide and Firearm Prevalence: Are Youth Disproportionately Affected?" *Suicide and Life-Threatening Behavior*, Vol. 31, No. 3, 2001, pp. 303–310.

CDC—*See* Centers for Disease Control and Prevention.

Centers for Disease Control and Prevention, "Source of Firearms Used by Students in School-Associated Violent Deaths—United States, 1992–1999," *Morbidity and Mortality Weekly Report*, Vol. 50, No. 31, 2001, pp. 657–660.

———, "Fatal Injury Reports, National and Regional, 1999–2015," WISQARS database, Atlanta, Ga., June 24, 2015. As of March 23, 2017:
https://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html

———, "Leading Causes of Death Reports, National and Regional, 1999–2015," WISQARS database, Atlanta, Ga., 2017b. As of May 10, 2017:
https://webappa.cdc.gov/sasweb/ncipc/leadcaus10_us.html

Duda, M. D., and K. C. Young, *Factors Related to Hunting and Fishing Participation in the United States*, Harrisonburg, Va.: Responsive Management, report for the U.S. Fish and Wildlife Service, Grant # 14-48-0009-92-1252, 1993.

Families Afield, *An Initiative for the Future of Hunting*, 2010. As of March 23, 2017:
http://www.familiesafield.org/pdf/FamiliesAfield_Report.pdf

Freed, L. H., D. W. Webster, J. J. Longwell, J. Carrese, and M. H. Wilson, "Factors Preventing Gun Acquisition and Carrying Among Incarcerated Adolescent Males," *JAMA Pediatrics*, Vol. 155, 2001, pp. 335–341.

Freedman, David A., "On the So-Called 'Huber Sandwich Estimator' and 'Robust Standard Errors,'" *American Statistician*, Vol. 60, No. 4, 2006, pp. 299–302.

Gius, Mark, "The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths," *Social Science Journal*, Vol. 52, No. 2, 2015b, pp. 168–175.

Grossman, D. C., D. T. Reay, and S. A. Baker, "Self-Inflicted and Unintentional Firearm Injuries Among Children and Adolescents," *JAMA Pediatrics*, Vol. 153, No. 8, 1999, pp. 875–878.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Johnson, R. M., C. Barber, D. Azrael, D. E. Clark, and D. Hemenway, "Who Are the Owners of Firearms Used in Adolescent Suicides?" *Suicide and Life-Threatening Behavior*, Vol. 40, No. 6, 2010, pp. 609–611.

Kann, L., T. McManus, W. A. Harris, S. L. Shanklin, K. H. Flint, J. Hawkins, B. Queen, R. Lowry, E. O. Olsen, D. Chyen, L. Whittle, J. Thornton, C. Lim, Y. Yamakawa, N. Brener, and S. Zaza, "Youth Risk Behavior Surveillance—United States, 2015," *Morbidity and Mortality Weekly Report*, Vol. 65, No. 6, 2016, pp. 1–174.

Kleck, G., and E. B. Patterson, "The Impact of Gun Control and Gun Ownership Levels on Violence Rates," *Journal of Quantitative Criminology*, Vol. 9, No. 3, 1993, pp. 249–287.

LaFree, G., and C. Birbeck, *Controlling New Mexico Juveniles' Possession of Firearms*, Albuquerque, N.M.: New Mexico Criminal Justice Statistical Analysis Center, Working Paper 27, 1998. As of May 10, 2017:
http://nmsc.unm.edu/reports/1998/JuvFirearmPossession.pdf

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy,* working paper, Boston, Mass.: Harvard Business School, 2016.

Marvell, T. B., "The Impact of Banning Juvenile Gun Possession," *Journal of Law and Economics*, Vol. 44, 2001, pp. 691–713.

Miller, M., and D. Hemenway, "The Relationship Between Firearms and Suicide: A Review of the Literature," *Aggression and Violent Behavior*, Vol. 4, No. 1, 1999, pp. 59–75.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Office of Juvenile Justice and Delinquency Prevention, *OJJDP Statistical Briefing Book,* Washington, D.C.: U.S. Department of Justice, May 25, 2016. As of May 10, 2017: https://www.ojjdp.gov/ojstatbb/

Puzzanchera, C., G. Chamberlin, and W. Kang, "Easy Access to the FBI's Supplementary Homicide Reports: 1980–2014," 2017. As of March 22, 2017: http://www.ojjdp.gov/ojstatbb/ezashr/

Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Rivara, "An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates," *Injury Prevention*, Vol. 11, No. 2, 2005, pp. 77–83.

Ruback, R. B., J. N. Shaffer, and V. A. Clark, "Easy Access to Firearms: Juveniles' Risks for Violent Offender and Violent Victimization," *Journal of Interpersonal Violence*, Vol. 26, No. 10, 2011, pp. 2111–2138.

Rudolph, K. E., E. A. Stuart, J. S. Vernick, and D. W. Webster, "Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides," *American Journal of Public Health*, Vol. 105, No. 8, 2015, pp. E49–E54.

Shah, S., R. E. Hoffman, L. Wake, and W. M. Marine, "Adolescent Suicide and Household Access to Firearms in Colorado: Results of a Case-Control Study," *Journal of Adolescent Health*, Vol. 26, No. 3, 2000, pp. 157–163.

Sheley, J. F., and J. D. Wright, *High School Youths, Weapons, and Violence: A National Survey*, Washington, D.C.: U.S. Department of Justice, National Institute of Justice, 1998.

Tritch, Teresa, "Keep Handguns Away from Teenagers," *New York Times*, May 30, 2014. As of June 29, 2017: http://takingnote.blogs.nytimes.com/2014/05/30/keep-handguns-away-from-teenagers/

United States Code, Title 18, Section 922, Unlawful Acts.

U.S. Census Bureau, "U.S. and World Population Clock," 2017. As of March 22, 2017: https://www.census.gov/popclock/

Vittes, K. A., and S. B. Sorenson, "Recreational Gun Use by California Adolescents," *Health Education and Behavior*, Vol. 32, No. 6, 2005, pp. 751–766.

Webster, D. W., L. H. Freed, S. Frattaroli, and M. H. Wilson, "How Delinquent Youths Acquire Guns: Initial Versus Most Recent Gun Acquisitions," *Journal of Urban Health*, Vol. 79, No. 1, 2002, pp. 60–69.

Webster, D. W., J. S. Vernick, A. M. Zeoli, and J. A. Manganello, "Association Between Youth-Focused Firearm Laws and Youth Suicides," *JAMA*, Vol. 292, No. 5, 2004, pp. 594–601.

Wright, M. A., G. J. Wintemute, and B. E. Claire, "Gun Suicide by Young People in California: Descriptive Epidemiology and Gun Ownership," *Journal of Adolescent Health*, Vol. 43, No. 6, 2008, pp. 619–622.

CHAPTER THIRTEEN

# Concealed-Carry Laws

Apart from specifying classes of people who are prohibited from possessing any type of firearm, federal law imposes no restrictions on who may carry a concealed weapon in public, although it specifically grants concealed-carry rights to active and retired law enforcement officers (18 U.S.C. 926). State laws typically specify who may carry concealed weapons and the procedures those people must follow when they wish to exercise this right.

Most states once prohibited the concealed carrying of guns in public, although none does so now. Over the past several decades, many states have relaxed restrictions on concealed handguns. Several states allow individuals to carry concealed weapons without a permit (referred to as *permitless carry*), but most require gun owners to obtain a permit to carry a concealed handgun. Some states have shifted from laws that restrict concealed-carry permits to those who can demonstrate a legitimate need to carry a weapon or that give law enforcement some discretion in issuing concealed-carry permits (referred to as *may-issue* laws) to laws that guarantee the right to a concealed-carry permit for all citizens who are not prohibited from possessing a handgun (referred to as *shall-issue* or *right-to-carry* laws). The key difference among these law categories is that permitless-carry laws do not require individuals to obtain a permit or license before they can carry a concealed weapon, whereas may-issue and shall-issue laws set forth conditions by which such permits may be granted.

There are several ways that concealed-carry laws could affect gun violence and considerable disagreement about which are most likely. Permitless-carry and shall-issue laws that make it easier for citizens to carry concealed weapons could increase the number of people carrying guns. The increased prevalence of concealed weapons could lead to increased crime and violence if disagreements, perceived threats, and conflicts are more likely to result in casualties when a handgun is readily available. Alternatively, concealed-carry laws could lead to reductions in the prevalence or severity of violent crime and mass shootings either because the prospect of encountering an armed victim serves as a deterrent or because victims will more frequently be able to use a gun to defend themselves (Fortunato, 2015).

Whether those who carry concealed weapons pose an elevated or reduced risk of crime or violence is the subject of debate (Violence Policy Center, 2017; Lott, Whitley,

and Riley, 2016). A comparison of criminal conviction rates among holders and non-holders of concealed handgun licenses in Texas found that license holders were less likely to be convicted of crimes, but the license holders' convictions were significantly more likely to involve deadly conduct and intentional killings (Phillips et al., 2013). The likelihood of encountering an armed victim may further lead to increased gun violence by inducing more criminals to carry and use firearms. Alternatively, these laws may result in substitution by criminals to other types of crime, such as larceny, where the probability of encountering armed resistance is lower (Kovandzic and Marvell, 2003).

Each hypothesized effect of relaxed restrictions on concealed carrying produces an effect by increasing the proportion of the population or some subpopulation that is armed. However, data on the prevalence of concealed carrying are not generally available. Indeed, data on the number of persons with carry permits are not readily available for many states. One estimate suggests that the number of concealed-carry permit holders in the United States exceeded 14.5 million in 2016, with substantial variation across states depending on the permit fees in place, duration that the law has been in effect, and whether the law allows local authorities discretion in issuing permits (i.e., may issue versus shall issue) (Lott, Whitley, and Riley, 2016).

We identified only one study that analyzed how changes in the number of concealed-carry permits related to changes in various types of violent crime (Kovandzic and Marvell, 2003). The authors analyzed data from 58 Florida counties spanning 1980–2000, providing coverage of the period before and after the passage of Florida's shall-issue law in 1987. While this study did not analyze the effect of the shall-issue policy change, it did examine how changes in the number of concealed-carry permits over time and across counties corresponded with changes in various types of violent crime. The authors found uncertain effects of changes in per capita concealed-carry permit rates on violent crime.

There is likely to be little effect of concealed-carry laws on hunting or recreational gun use. However, shall-issue policies may encourage more individuals to obtain firearms, thereby increasing handgun sales (Steidley, 2016). To assess these or any other effects of concealed-carry laws, one would ideally like to know whether there are greater increases in gun ownership and carrying in states following passage of shall-issue or permitless-carry laws compared with states that have more-restrictive laws, but such data have not been collected systematically over time. The direct effects of increased concealed carrying by private citizens on suicides, unintentional injuries and deaths, and defensive gun use should be strongest for incidents involving handguns and that occur outside the home (where the laws apply). Similarly, for violent crime, one would expect concealed-carry laws to have greater effects (either negative or positive depending on the role of deterrence) on assaults or homicides occurring in public venues compared with those occurring within the home. Should the effects of concealed-carry laws be driven primarily by expanding the prevalence of gun ownership, then their effects could extend to both private and public areas for such outcomes as suicides, firearm homicides, and unintentional injuries and deaths.

## State Implementation of Concealed-Carry Laws

Prior to the Civil War, most states lacked legislation on the legality of carrying concealed weapons. Those states with laws prohibited the practice. Following World War II, most states adopted discretionary may-issue permit laws (Cramer and Kopel, 2005). In the 1980s, 1990s, and early 2000s, a majority of states transitioned to shall-issue laws (Grossman and Lee, 2008). Since 2003, a handful of states have eliminated the permit requirement altogether, allowing permitless carry.

As of the end of 2016, eight states allowed people to carry concealed weapons without first receiving a permit; that includes Vermont, which has never required a permit for concealed carry.[1] Mississippi allows concealed carry without a permit if the handgun is kept "in a sheath, belt holster or shoulder holster or in a purse, handbag, satchel, other similar bag or briefcase or fully enclosed case."[2] In addition, Missouri passed a permitless-carry law that went into effect on January 1, 2017.[3]

Thirty-two states have shall-issue laws, under which law enforcement agencies have no, or very limited, discretion to deny concealed-carry permits to citizens who are otherwise permitted to possess handguns.[4] Eight states have may-issue laws, in which law enforcement has significant discretionary authority to deny permits.[5]

Many states have reciprocity clauses in their concealed-carry permit laws, meaning that they recognize the concealed-carry permits issued by some but not necessarily all other states (United States Concealed Carry Association, 2013). Often, states honor

---

[1]   Alaska, Arizona, Idaho, Kansas, Maine, Vermont, West Virginia, and Wyoming. See Alaska Stat. § 11.61.220; Ariz. Rev. Stat. § 13-3112; Idaho Code Ann. § 18-3302 (applies only outside cities); Kan. Stat. Ann §§ 21-6301, 21-6302; Me. Rev. Stat. Ann. § 2001-A; Vt. Stat. Ann. tit. 13, §§ 4004, 4016 (concerning the only two places one cannot carry a concealed weapon in Vermont); W. Va. Ann. Code § 61-7-3; Wyo. Stat. Ann. § 6-8-104.

[2]   Miss. Ann. Code § 45-9-101.

[3]   Mo. Senate Bill No. 656.

[4]   Alabama, Arkansas, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Michigan, Minnesota, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wisconsin. Ala. Code § 13A-11-75; Ark. Code Ann. § 5-73-309; Colo. Rev. Stat. Ann. § 18-12-203; Conn. Gen. Stat. § 29-28(b); Fla. Stat. Ann. § 790.06; Ga. Code Ann. § 16-11-129; 430 Ill. Comp. Stat. 66/4; Ind. Ann. Code §§ 35-47-2-1, 35-47-2-3; Iowa Code Ann. §§ 724.7, 724.11; Ky. Rev. Stat. Ann. § 237.110; La. Stat. Ann. § 1379.1.1; Mich. Comp. Laws Ann. § 28.425a; Minn. Stat. Ann. § 624.714; Mont. Code Ann. § 45-8-321; Neb. Rev. Stat. § 69-2430; Nev. Rev. Stat. Ann. § 202.3657; N.H. Rev. Stat. Ann. § 159:6; N.M. Stat. Ann. § 29-19-4; N.C. Gen. Stat. § 14-415.11; N.D. Cent. Code § 62.1-04-03; Ohio Rev. Code Ann. § 2923.125; Okla. Stat. Ann. § 1290.5; Ore. Rev. Stat. Ann. § 166.291; 18 Pa. Cons. Stat. § 6109; S.C. Code § 23-31-215; S.D. Codified Laws § 23-7-7; Tenn. Code Ann. § 39-17-1351; Tex. Code Ann. § 411.177; Utah Code Ann. § 53-5-704, Va. Ann. Code § 18.2-308.04; Wash. Rev. Code § 9.41.070; Wisc. Stat. Ann. § 175.60.

[5]   California, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Rhode Island. See Calif. Penal Code § 26150; Del. Code Tit. 11 § 1441, 1442; Hawaii Rev. Stat. Ann. § 134-9; Md. Code Ann., Pub. Safety §§ 5-301–5-314; Mass. Gen. Laws Ch. 140, § 131; N.J. Stat. Ann. § 2C:58-4; N.Y. Penal Law § 400.00(2)(f); R.I. Gen. Laws § 11-47-11.

permits only from other states with laws similar to their own. There are some states, however, that recognize concealed-carry permits from states with less-restrictive laws. For instance, Delaware has a may-issue law but recognizes the concealed-carry permits from several states with shall-issue laws (USA Carry, 2017).

## Effects on Suicide

### Research Synthesis Findings

In 2004, the National Research Council (NRC) identified only four quasi-experimental studies examining the effects of gun policy on suicide outcomes, none of which examined the effect of concealed-carry laws. Hahn et al. (2005) identified two studies of the effects of shall-issue laws on suicide but concluded that the evidence those studies could provide was inconclusive. Since then, there have been no studies examining the effects of permitless-carry laws on suicide, and two quasi-experimental studies have examined the effect of concealed-carry laws on suicide. Using data from 1979 to 1998, Rosengart et al. (2005) modeled the effect of shall-issue laws on suicide mortality across states. In these models—which controlled for state fixed effects, time trends, state-level variation in poverty and demographic factors, and four other firearm laws—the authors found uncertain effects between shall-issue laws and either total suicide or firearm suicide rates (see Figure 13.1). Nevertheless, the statistical model had an unfavorable ratio of covariates to observations (less than one to eight), meaning the model may have been overfit, resulting in estimates and confidence intervals (CIs) that are unreliable indicators of the true causal effects of the laws.

DeSimone, Markowitz, and Xu (2013) also performed a fixed-effects analysis and examined the effects of shall-issue laws on self-inflicted nonfatal gun injuries using hospital discharge data from the National Inpatient Sample spanning 1988 to 2003. The authors did not find that shall-issue laws were significantly associated with self-inflicted firearm injuries for children under age 18 in the 11 states that were part of the sample, but they did find a statistically significant effect of these laws on self-inflicted firearm injuries among those aged 18 or older. Specifically, their estimate suggests that after implementation of the law, suicides were more than double what would have been expected without the law (see Figure 13.1), which would be extraordinary if true. However, the estimated effects of shall-issue laws in this study were based primarily on implementation in one state that changed its law during the study time frame (Arizona); thus, the study offers little evidence that the observed effects are due to the change in the law rather than to other factors affecting the state's suicide rate that occurred around the same time the law was changed. Moreover, as DeSimone, Markowitz, and Xu (2013) note, the data set on which their estimates are made is not strictly longitudinal, and it is not possible to determine the extent to which child-access prevention law effect estimates are estimated cross-sectionally or longitudinally.

Figure 13.1 displays the incidence rate ratios (IRRs) and CIs associated with the concealed-carry laws examined in these studies.

**Figure 13.1**
**Incidence Rate Ratios Associated with the Effect of Concealed-Carry Laws on Suicide**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **Shall-issue laws** | **Suicide** | |
| Rosengart et al. (2005) | Total | 0.98 [0.96, 1.01] |
| Rosengart et al. (2005) | Firearm | 1.00 [0.97, 1.02] |
| DeSimone, Markowitz, & Xu (2013) | Self-inflicted firearm injuries, aged 0–17 | 1.94 [0.45, 8.38] |
| DeSimone, Markowitz, & Xu (2013) | Self-inflicted firearm injuries, aged 18+ | 2.10 [1.53, 2.89] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified two qualifying studies examining the effects of shall-issue concealed-carry laws on suicide rates or firearm self-injury rates. Ronsegart et al. (2005) found uncertain effects of shall-issue laws on suicides and firearm suicides. DeSimone, Markowitz, and Xu (2013) found the effect of shall-issue laws on firearm self-injuries among those aged 17 or younger to be uncertain. Among all adults aged 18 or older, they found a significant effect indicating that shall-issue laws may increase firearm self-injury.

Based on these studies and an assessment of their relative strengths, *we find inconclusive evidence for the effect of shall-issue concealed-carry laws on total suicides, firearm suicides, and firearm self-injuries.*



Shall-issue concealed-carry laws have **uncertain** effects on total suicides, firearm suicides, and firearm self-injuries. Evidence for this relationship is **inconclusive.**

## Effects on Violent Crime

### Research Synthesis Findings

In its review of existing studies examining shall-issue laws, Hahn et al. (2005) found insufficient evidence for determining the effect of such laws on violent crime. NRC (2004) reviewed much of the same literature and reanalyzed data that were common to many of these analyses: a panel data set originally spanning 1977–1992, then expanded through 2000. These data were originally analyzed in Lott and Mustard (1997) and used again by Lott (2000) in revised analyses. Lott (2000) found that shall-issue laws decreased homicides, rapes, and assaults. Other researchers (e.g., Duggan, 2001; Ayres and Donohue, 2003a, 2003b) and NRC reanalyzed the same data but found different results, as well as significant sensitivity of results to specification. With one member dissenting, the NRC (2004) panel concluded,

> Some studies find that right-to-carry laws reduce violent crime, others find that the effects are negligible, and still others find that such laws increase violent crime. The committee concludes that it is not possible to reach any scientifically supported conclusion because of (a) the sensitivity of the empirical results to seemingly minor changes in model specification, (b) a lack of robustness of the results to the inclusion of more recent years of data (during which there were many more law changes than in the earlier period), and (c) the statistical imprecision of the results. The evidence to date does not adequately indicate either the sign or the magnitude of a causal link between the passage of right-to-carry laws and crime rates. Furthermore, this uncertainty is not likely to be resolved with the existing data and methods. If further headway is to be made, in the committee's judgment, new analytical approaches and data are needed.

Among the studies since 2003 meeting our inclusion criteria, all examined shall-issue laws; none examined permitless-carry laws. Two studies were included in the NRC review (Helland and Tabarrok, 2004; Plassman and Whitley, 2003). Their findings were subsumed into the overarching NRC finding as described earlier. Among studies from the period after the NRC review, several built on and extended analyses of the county-level panel data used in previous studies. These include Roberts (2009); Moody et al. (2014); Aneja, Donohue, and Zhang (2014); and Durlauf, Navarro, and Rivers (2016). Other studies relied on state-level data, either in addition to or instead of county-level analyses. These studies include Aneja, Donohue, and Zhang (2014); Lott (2010); Rosengart et al. (2005); Grambsch (2008); Webster, Crifasi, and Vernick, (2014); and Gius (2014). Several studies used city-level data, including Kovandzic, Marvell, and Vieraitis (2005); La Valle and Glover (2012); and La Valle (2013). We first describe studies that primarily focused on county-level data. We then turn to studies that focused on state-level data, then studies that employed city-level data.

**County-Level Studies**

Many of the earliest studies examining the effects of shall-issue laws relied on county-level data, usually county-level data constructed for the Lott and Mustard (1997) report. Subsequent evaluations identified problems with the data for estimating the effects of laws. These problems included:

- Lott and Mustard's data set used county population values that did not correspond to the crime statistics available for counties, especially those with weak reporting of crime statistics (Maltz and Targonski, 2002).
- Large numbers of counties must be dropped from analyses using, for instance, murder rates as a covariate because the counties reported no murders (Ayres and Donohue, 2003a).
- There were errors in the classification of shall-issue states that were only later corrected in this data set.

Lott and Whitley (2003) discounted these concerns, describing them as typical of the types of measurement error commonly encountered in statistical analyses. Moreover, they suggested that even when county-level data were restricted to just those with comparatively low underreporting (where many of the noted problems would have less of an effect), they still observed trends consistent with the view that shall-issue laws reduce crime. NRC (2004) and Hahn et al. (2005), however, disagreed with this claim.

Ayres and Donohue (2009a, 2009b), noting some of the weaknesses of the county-level analyses, reported that some of the significant effects from Lott and Mustard (1997) and Lott (2000) were no longer significant after correcting coding errors. Moreover, Ayres and Donohue (2009a, 2009b) argued that Lott's spline and dummy specifications of the effects of laws were unduly influenced by states that implemented the laws earlier and thus had longer post-implementation periods affecting the estimates. Instead, using county panel data from 1977 to 1997 and a hybrid model that estimated the joint effect that the laws could be shown to have on the levels and trends observed for several crimes, the authors concluded that shall-issue laws were associated with increases in all crime types (with the exception of rape, for which evidence was mixed) in the five years after the laws were passed.

Roberts (2009) analyzed the effect of shall-issue laws on intimate partner homicide rates using county-level data spanning 1985–2004. The author found that (the more-restrictive) may-issue laws significantly increased intimate partner total homicides by 71 percent compared with shall-issue laws, but may-issue (compared to shall-issue) laws had an uncertain effect on intimate partner firearm homicides. The author also found uncertain effects of concealed-carry bans compared with shall-issue laws on either overall or firearm-related intimate partner homicides. However, neither analysis clustered standard errors at the state level, so serial correlation that was unaccounted for in the panel data could have resulted in biased standard errors and CIs.

More recently, Aneja, Donohue, and Zhang (2014) analyzed the county-level data set used in NRC (2004), extended through 2006, and state-level data through 2010. The authors corrected the NRC analyses for several errors that they identified, including data-coding errors related to the timing of shall-issue legislation, an endogenous control variable (arrest rate), and a failure to cluster standard errors at the state level. The authors argued that NRC (2004) was incorrect in its decision not to cluster the standard errors of the county-level analyses at the state level and showed that CIs were badly misestimated when clustering was not accounted for. In their preferred county-level specification including state trend effects, they found no statistically significant effects of shall-issue laws on either the level or trend of any of seven crime rates, and they found only one suggestive effect across the 14 effects they tested.

Moody et al. (2014), responding to an earlier version of the Aneja, Donohue, and Zhang (2014) paper, reestimated their models after adding many more demographic control variables, robbery and assault rates, and a lagged outcome as a predictor meant to capture unmeasured state differences associated with crime rates. Moody et al. (2014) offered statistical tests suggesting that the model with added covariates predicted the data significantly better, which the authors interpreted as evidence that estimates in Aneja, Donohue, and Zhang (2014) suffered from omitted-variable biases. The revised hybrid model results in Moody et al. (2014) suggested that shall-issue laws significantly reduced the trends in rape and murder rates. They found no significant association between shall-issue laws and either assault or robbery. The fact that their model predicted a given outcome better than the Aneja, Donohue, and Zhang (2014) model is not sufficient to demonstrate the claim that the latter's model suffered from omitted variable bias, nor that the model preferred by Moody et al. (2014) offered a less biased estimate. An overfit model can predict the data exceptionally well while producing biased and unreliable coefficient estimates.

Using county-level panel data spanning 1979–2000, Durlauf, Navarro, and Rivers (2016) examined the sensitivity of analyses that estimate the relationship between shall-issue laws and violent crime. They reported that use of population weights may lead to inefficient estimates and upward biases in estimates of the effect of shall-issue laws on crime. In addition, they found that hybrid or spline models are preferred to dummy models and that models that allow for heterogeneity in the effect of laws (including effects that vary with region, the level of gun prevalence, and the level of urbanization in an area) outperform models that do not allow for variation in effects. For the spline model specifications that the authors assessed to perform best for the outcome of violent crime, they estimated that shall-issue laws increase violent crime in the first year after law passage and that violent crime continues to increase in subsequent years. The authors concluded that, overall, there was substantial variation in the estimated effects for each model across the model space analyzed and, thus, there was little evidence that shall-issue laws generate either an increase or a decrease in crime on average.

## State-Level Studies

Rosengart et al. (2005) examined the effect of several state gun laws, including shall-issue laws, on firearm homicides and total homicides using state-level data. One limitation was that the data covered only 1979–1998, and other studies have shown the sensitivity of results to shorter periods, partly because shorter periods include observation of fewer states that have adopted shall-issue laws. The policy variable was specified as a dummy variable (indicating that a shall-issue law was or was not in place). The authors found suggestive effects that shall-issue laws increased firearm and total homicide rates. French and Heagerty (2008) tested the sensitivity of these results and similarly concluded that shall-issue laws had a suggestive effect consistent with the laws increasing firearm-related homicide rates, although estimates varied across specifications. However, the Rosengart et al. (2005) paper, and presumably the French and Heagerty (2008) paper, also had an unfavorable ratio of model covariates to observations (less than one to eight), suggesting that the model may have been overfit, and thus its estimates and their CIs may be unreliable.

Martin and Legault (2005) demonstrated that Lott (2000) used incorrect state crime rate estimates that differed substantially from official Federal Bureau of Investigation (FBI) state estimates. They replicated Lott (2000)'s model despite misgivings about its specification to demonstrate that the effects Lott reported were sensitive to this measurement error. In their replication exercise using state-level crime data from the FBI's Uniform Crime Reports spanning 1977–1992, Martin and Legault (2005)'s estimates showed that shall-issue laws significantly reduced total violent crime and, specifically, aggravated assault. They found only suggestive effects that the laws reduced rates of robbery and murder, and uncertain effects on rape (see Figure 13.2). However, as with Lott (2000), their models did not statistically adjust for serial correlation in the panel data, and the model's ratio of estimated parameters to observations was less than one to ten, meaning the model may have been overfit, and thus its parameter estimates and their CIs may be unreliable.

Grambsch (2008) conducted a state-level analysis of (total) murder rates (relative to the U.S. murder rate) from 1976 to 2001 using the 25 states that passed shall-issue laws between 1981 and 1996. She found a selection effect among states adopting shall-issue laws—namely, that states that passed shall-issue laws in this period experienced an increasing trend in murder rates prior to adoption relative to other states. Her estimates showed that, after controlling for regression to the mean, there was either an uncertain effect or a significant positive effect of shall-issue laws on relative murder rates (i.e., shall-issue laws increased murder rates) depending on the model used.

Two studies that focused on assessing the relationship between unmarried fertility or abortions and violent crime included shall-issue laws as a covariate in their models (Kendall and Tamura, 2010; Lott and Whitley, 2007). Analyzing data from 1976 to 1998 and using a Poisson model that controlled for state and year fixed effects, state-specific linear trends, and time-varying state covariates, Lott and Whitley (2007)

found suggestive or significant effects (depending on specification) indicating that murder rates fell approximately 1 percent faster after the adoption of shall-issue laws relative to states without such policies. Employing a different model specification over a longer period (1957–2002), Kendall and Tamura (2010) estimated that shall-issue laws had a suggestive but small association with reduced rates of murder and uncertain relationships with rape, robbery, and assault.

Using a panel of state data, Lott (2010) provided an update of his earlier analyses examining the effect of shall-issue laws on violent crime. His preferred specification included a set of dummy variables that indicated different time intervals before and after shall-issue legislation was in effect for states that passed such legislation. Many of Lott's modeling results were presented as figures and did not indicate statistical significance. Detailed results were provided only for an analysis of homicide rates. These included information on the statistical significance of each coefficient in the model but not for a test comparing post-implementation time intervals with pre-implementation time intervals. Lott interpreted the pattern of effects as demonstrating that homicides declined significantly after implementation of shall-issue laws, but he did not provide test statistics or sufficient description to clarify what specific effect was observed. The author also included coefficients and their statistical significance from dummy and spline models similar to those from his earlier work, but he did not include standard errors or test statistics. All of the preferred models appear to have a ratio of estimated parameters to observations that is less than one to ten, meaning the model may have been overfit, and thus the reported estimates and their CIs may be unreliable.

Webster, Crifasi, and Vernick (2014) analyzed state-level data from 1999 to 2010, using generalized least-squares regression models to estimate the effect of shall-issue laws on age-adjusted homicide rates. They found suggestive effects indicating an association between the implementation of shall-issue laws and a 10-percent increase in rates of nonfirearm homicide, a 6-percent increase in rates of total homicide, and an 11-percent increase in rates of murder and nonnegligent manslaughter. However, their estimates showed an uncertain association between shall-issue laws and firearm homicide rates. The statistical model used to arrive at these results used a large number of estimated parameters relative to observations (a ratio of about one to eight), meaning the model may have been overfit, and thus its estimates and their apparent statistical significance could provide little generalizable information about the true causal effects of shall-issue laws. In addition, the assumptions of least-squares regression models are typically violated when modeling rate data for which many observations have values close to zero. This too could cause this model's estimates to be unreliable.

Gius (2014) examined the effect of shall-issue laws on gun-related murder rates using state-level data from 1980 to 2009. He found that states with may-issue or more-restrictive policies had higher gun-related murder rates than shall-issue states. Relative to states with shall-issue laws, states with more-restrictive firearm-carry policies had rates of firearm homicide that were 11 percent higher (see Figure 13.2). However,

this model did not statistically adjust for the known serial correlation in this panel data, which has been shown to result in misleadingly small standard errors (Aneja, Donohue, and Zhang, 2014). For this reason, the apparently significant effect observed in this study could be invalid.

Using their preferred specification with state-level data from 1979 to 2010 and a dummy, spline, or hybrid specification of shall-issue laws without state trends, Aneja, Donohue, and Zhang (2014) found suggestive evidence that shall-issue laws increase assault by 8 percent (see Figure 13.2). In the dummy specification, shall-issue laws significantly increased rape by 12 percent, although estimates of this effect from the spline model were uncertain. The authors also found suggestive evidence that shall-issue laws increased rates of robbery, although estimates again became uncertain in other specifications. Effects of shall-issue laws on murder rates were uncertain. The authors tested the sensitivity of their results to less-parsimonious (including the Lott and Mustard [1997] specification) and more-parsimonious demographic specifications; the inclusion of state-specific time trends; the inclusion or exclusion of years that were likely to be influenced by the crack cocaine epidemic, which affected crime rates; and the specification of the policy variable (dummy, spline, hybrid). The authors noted that their results, which showed that the significance and sign of estimated effects varied substantially depending on the specification employed, underscored the sensitivity of gun-crime modeling estimates to modeling decisions.

Responding to an earlier version of the Aneja, Donohue, and Zhang (2014) paper, Moody et al. (2014) critiqued the decision to treat models without state-specific trends as the preferred ones. Thus, Moody et al. (2014) reestimated the hybrid models in Aneja, Donohue, and Zhang (2014) and incorporated the state-specific trends and their additional covariates into the corresponding county-level analyses. In doing so, the authors found, as they had with their county-level analyses, that their specification improved model fit over that of Aneja, Donohue, and Zhang (2014). These hybrid models found that shall-issue laws significantly increased assault rate trends and increased robbery rate levels, but they also significantly reduced murder rate trends. As noted earlier, Moody et al. (2014) did not demonstrate either that their model estimates were less biased than those in Aneja, Donohue, and Zhang (2014) or that the latter's model suffered from omitted variable biases. Furthermore, the state-level analyses of Moody et al. (2014) used a statistical model with a large number of estimated parameters relative to observations (close to one to five), meaning the model may have been overfit, and thus the estimates and inferential statistics may provide little generalizable information about the true causal effects of shall-issue laws.

### City-Level Studies

Kovandzic, Marvell, and Vieraitis (2005) examined the effect of shall-issue laws on violent crime (homicide, robbery, assault, and rape) using panel data from 1980 to 2000 for 189 large U.S. cities. The authors clustered the standard errors at the state

level, addressed coding errors in previous research, allowed for a time trend in the effect of shall-issue laws, allowed for city-specific time trends, and conducted analyses that allowed for heterogeneity in the effect of shall-issue laws across states. In their analysis that estimated the average effect of shall-issue laws for all included cities using a dummy model specification, Kovandzic, Marvell, and Vieraitis (2005) found uncertain effects for all of the violent crime outcomes analyzed. These findings were largely consistent when they instead modeled the effects of shall-issue laws as a trend variable, except that their preferred spline models showed effects consistent with shall-issue laws increasing assault rates (a significant effect) and increasing rape rates (a suggestive effect). Their estimates for the effect on assault suggest that shall-issue laws are associated with a 10-percent increase in aggravated assault rates after five years. In examining state-specific effects with their spline models, the authors further found that there were more states where shall-issue laws led to statistically significant increases in crime compared with decreases. However, this study had an unfavorable ratio of model covariates to observations (less than one to ten), meaning the model may have been overfit, and thus its estimates and CIs may be unreliable indicators of the true effects of the laws.

La Valle (2013) analyzed data from 56 cities spanning 1980–2010. The author noted that the analyses "include statistical corrections for variation in sample unit independence," but he did not explicitly mention clustering the standard errors at the state level. La Valle (2013) used a dummy variable specification for the shall-issue law. In his preferred specification (using interpolated control variables for inter-censal years, population weighted analysis, and a one-year lagged outcome as a covariate), he found that shall-issue laws significantly reduced gun homicides by 15 percent and total homicides by 13 percent (see Figure 13.2). Results were sensitive to specification, however, and other authors (e.g., Kovandzic, Marvell, and Vieraitis, 2005; Durlauf, Navarro, and Rivers, 2016) have expressed concern that weighting gives undue influence to localities with large populations and worsens, rather than improves, standard error estimation. In unweighted analyses using inter-censal years, La Valle (2013) found that shall-issue laws reduced gun homicides but not total homicides. In La Valle and Glover (2012), which used similar data (panel data on 57 cities from 1980 to 2006) and a similar approach, the authors included separate indicators for may-issue and shall-issue states. In the authors' preferred analysis (with interpolated data for controls for inter-censal years and weighting), shall-issue laws were associated with a significant 23-percent increase in the homicide rate, and may-issue laws were associated with a significant 19-percent decrease in the homicide rate (compared with cities that did not clearly have either a may-issue or shall-issue law). Similarly, shall-issue laws were associated with a significant 32-percent increase in the firearm homicide rate, while may-issue laws were associated with a significant 33-percent reduction in the firearm homicide rate. (No estimates for unweighted data with inter-censal years were provided.) The diametric

findings from these two studies further highlight the sensitivity of results to model specification, as well as to how shall-issue laws are classified.

**Other Studies**

Manski and Pepper (2015) investigated the sensitivity of shall-issue effect estimates to a range of assumptions by comparing property and violent crime rates in two states under progressively less-restrictive assumptions about how the laws' effects may vary over time or between states. This study compared outcomes in just two states, meaning causal effects were not well identified. Moreover, it treated Virginia's shall-issue law as having been implemented in 1989, when we believe the correct date is 1995. For these reasons, we do not review this paper's results. Applying Bayesian model comparison techniques, Strnad (2007) reanalyzed Donohue (2004) models of the effects of shall-issue laws. In contrast to the approach of Donohue (2004) and many others, Strnad (2007) did not assess the evidence for or against shall-issue laws in terms of how frequently estimates of the effect were statistically significant or were found to have positive (as opposed to negative) estimated effects under different model specifications. Instead, he used model comparison techniques to establish which models fit the data best and to evaluate whether evidence favored models with or without shall-issue effects. He concluded that Donohue (2004)'s models provided much stronger support for a conclusion that shall-issue laws had little or no effect on most outcomes than Donohue (2004) concluded after examining patterns in the direction and significance levels of these effects.

Figure 13.2 displays the IRRs and CIs associated with the concealed-carry laws examined in the studies published after the NRC (2004) review. In this figure, we highlight effect estimates based only on dummy-coded models, for reasons discussed in Chapter Two and Appendix A. Lott (2010) did not provide enough information for us to calculate IRRs and CIs for the effect size of interest, so we do not include these in the figure. In addition, the estimates in Durlauf, Navarro, and Rivers (2016) were available only for the spline specification; Kovandzic, Marvell, and Vieraitis (2005) preferred their own spline model; Moody and Marvell (2009) and Moody et al. (2014) offered only a hybrid model; and Manski and Pepper (2015) and Strnad (2007) did not seek to produce a preferred estimate of the effect of shall-issue laws. Therefore, we do not include estimates from these studies in Figure 13.2.

**Figure 13.2**
**Incidence Rate Ratios Associated with the Effect of Concealed-Carry Laws on Violent Crime**



| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **Shall issue (vs. may** | **Crime** | |
| **issue or no issue)** | **Homicide** | |
| Martin & Legault (2005) | Murder rate | 0.95 [0.90, 1.01] |
| Rosengart et al. (2005) | Total homicides | 1.07 [0.98, 1.17] |
| Rosengart et al. (2005) | Firearm homicides | 1.11 [0.99, 1.24] |
| Grambsch (2008) | Murder rate (random effects model) | 1.01 [0.98, 1.03] |
| Grambsch (2008) | Murder rate (fixed effects model) | 1.06 [1.03, 1.09] |
| French & Heagerty (2008) | Firearm homicides | 1.10 [0.99, 1.22] |
| Kendall & Tamura (2010) | Murder rate | 1.00 [0.99, 1.00] |
| Aneja, Donohue, & Zhang (2014) | Murder | 1.03 [0.91, 1.17] |
| Webster, Crifasi, & Vernick (2014) | Total homicides | 1.06 [0.99, 1.14] |
| Webster, Crifasi, & Vernick (2014) | Firearm homicides | 1.06 [0.96, 1.17] |
| Webster, Crifasi, & Vernick (2014) | Nonfirearm homicides | 1.10 [0.99, 1.22] |
| Webster, Crifasi, & Vernick (2014) | Murder and non–negligent manslaughter | 1.11 [0.95, 1.26] |
| | **Rape** | |
| Martin & Legault (2005) | Rape rate | 0.98 [0.94, 1.03] |
| Kendall & Tamura (2010) | Rape rate | 1.00 [0.99, 1.00] |
| Aneja, Donohue, & Zhang (2014) | Rape | 1.12 [1.00, 1.26] |
| | **Robbery** | |
| Martin & Legault (2005) | Robbery rate | 0.96 [0.91, 1.02] |
| Kendall & Tamura (2010) | Robbery rate | 1.00 [1.00, 1.00] |
| Aneja, Donohue, & Zhang (2014) | Robbery | 1.15 [0.98, 1.34] |
| | **Assault** | |
| Martin & Legault (2005) | Aggravated assault | 0.93 [0.89, 0.98] |
| Kendall & Tamura (2010) | Assault rate | 1.00 [1.00, 1.00] |
| Aneja, Donohue, & Zhang (2014) | Assault | 1.08 [0.99, 1.18] |
| | **Violent crime** | |
| Martin & Legault (2005) | Violent crime | 0.94 [0.91, 0.98] |
| **May issue (vs. shall issue)** | **Homicide** | |
| Roberts (2009) | Total intimate partner homicides | 1.71 [1.29, 2.14] |
| Roberts (2009) | Firearm intimate partner homicides | 1.12 [0.87, 1.37] |
| **No concealed carry** | | |
| **(vs. shall issue)** | **Homicide** | |
| Roberts (2009) | Total intimate partner homicides | 0.96 [0.55, 1.38] |
| Roberts (2009) | Firearm intimate partner homicides | 0.86 [0.49, 1.23] |
| **Shall issue or may issue** | | |
| **(vs. no concealed carry)** | **Homicide** | |
| La Valle (2013) | Total homicides | 0.87 [0.77, 0.98] |
| La Valle (2013) | Firearm homicides | 0.85 [0.73, 0.98] |
| Gius (2014) | Firearm homicides | 1.11 [1.05, 1.16] |
| **Shall issue (vs. no issue)** | **Homicide** | |
| La Valle & Glover (2012) | Total homicides | 1.23 [1.05, 1.44] |
| La Valle & Glover (2012) | Firearm homicides | 1.32 [1.14, 1.52] |
| **May issue (vs. no issue)** | **Homicide** | |
| La Valle & Glover (2012) | Total homicides | 0.81 [0.71, 0.92] |
| La Valle & Glover (2012) | Firearm homicides | 0.77 [0.66, 0.90] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. Green circles indicate that we identified no significant methodological concerns. See Appendix B for details.

**Conclusions**

We focused our review on studies examining the effects of concealed-carry laws on violent crime outcomes since NRC (2004) and Hahn et al. (2005) found that estimates of such effects were too sensitive to reasonable differences in methods to draw conclusions about the direction or magnitude of the laws' effects. Because so much more study has been done of this relationship than of any other gun policy and outcome, there is a much richer evidence base to draw on, including studies raising serious methodological concerns and several that did not raise as many concerns among our methodology review team. Therefore, to focus this review on the best available evidence, we draw our conclusions in this section based just on those seven studies that did not raise serious methodological concerns.

*Total homicides.* Five of the seven studies examined the effects of shall-issue laws on total homicides. Two studies found only uncertain effects of these laws (Aneja, Donohue, and Zhang, 2014; Kendall and Tamura, 2010); Moody et al. (2014) found that shall-issue laws cause a downward trend in homicides; La Valle and Glover (2012) found that shall-issue laws increased homicides significantly relative to having no law for the legal carriage of a concealed firearm (*no-issue laws*); and La Valle (2013) found that shall-issue or may-issue laws reduce total homicides relative to no-issue laws. This result cannot be used to distinguish the effect of shall-issue laws per se, but it suggests that either shall-issue, may-issue, or both contribute to reducing total homicides. Because comparable studies reach inconsistent results, we conclude that the best available studies provide *inconclusive evidence for the effect of shall-issue laws on homicides*.



Shall-issue concealed-carry laws have **uncertain** effects on total homicides, firearm homicides, robberies, assaults, and rapes. Evidence for this relationship is **inconclusive.**

*Firearm homicides.* Three of the seven studies examined the effects of shall-issue laws on firearm homicides. Among these, there was one suggestive (French and Heagerty, 2008) and one significant (La Valle and Glover, 2012) effect, suggesting that these laws increase firearm homicides. La Valle (2013) found that shall-issue or may-issue laws cause decreases in firearm homicide rates relative to no-issue laws. This result cannot be used to distinguish the effect of shall-issue laws per se, but it suggests that either shall-issue, may-issue, or both contribute to reducing firearm homicides. With seemingly conflicting evidence, we conclude that the best available studies provide *inconclusive evidence for the effect of shall-issue laws on firearm homicides*.

*Robberies.* Aneja, Donohue, and Zhang (2014) found a suggestive effect that shall-issue laws may increase robbery rates. Moody et al. (2014) and Kendall and Tamura (2010) found only uncertain effects of shall-issue laws on robberies. Therefore, we con-

clude that the best available studies provide *inconclusive evidence for the effect of shall-issue laws on robberies.*

*Assaults.* Aneja, Donohue, and Zhang (2014) found a suggestive effect that shall-issue laws may increase assault rates. Moody et al. (2014) and Kendall and Tamura (2010) found only uncertain effects of shall-issue laws on assault. Therefore, we conclude that the best available studies provide *inconclusive evidence for the effect of shall-issue laws on assaults.*

*Rapes.* Aneja, Donohue, and Zhang (2014) found that shall-issue laws significantly increase rates of rape. Moody et al. (2014) found that shall-issue laws produce a significant downward trend on rates of rape. Kendall and Tamura (2010) found only uncertain evidence of an association between shall-issue laws and rape. Therefore, we conclude that the best available studies provide *inconclusive evidence for the effect of shall-issue laws on rapes.*

*Violent crime.* One study—Durlauf, Navarro, and Rivers (2016)—aggregated all violent crimes into a single category and found that shall-issue laws significantly increase



violent crime rates. Because evidence for the effect of shall-issue laws on each component of violent crime is inconclusive, it could be argued that this single study of the effect of these laws on all violent crimes should not suffice to suggest that there is more than inconclusive evidence for such an effect. However, because analyses on all violent crimes may have greater power to detect any such effects, and because our scoring criteria indicate it, we conclude that there is *limited evidence that shall-issue laws may increase violent crime.*

## Effects on Unintentional Injuries and Deaths

### Research Synthesis Findings

NRC (2004) and Hahn et al. (2005) identified one quasi-experimental study examining the effect of shall-issue concealed-carry laws on unintentional injuries and deaths. Both reviews concluded that the effect of such laws could not be determined. Lott and Mustard (1997) examined county-level data on unintentional handgun deaths from national Mortality Detail Records data spanning 1982 to 1991 in counties with and without shall-issue concealed-carry laws. In an ordinary-least-squares regression controlling for arrest rates, population density, and socioeconomic characteristics, shall-issue laws had uncertain effects on unintentional handgun deaths and suggestive

effects consistent with increasing unintentional nonhandgun deaths (see Figure 13.3). However, the authors noted that with only 156 unintentional handgun deaths in counties with more than 100,000 people in 1988, most of the observations in the data set were zeros. They re-analyzed the data using Tobit regression to account for this low number of unintentional deaths but still found uncertain effects, cautioning that, because of computing limitations of the time, they were unable to include covariates other than state dummies in these regressions.

Although Lott and Mustard's 1997 study has been reanalyzed, including by the NRC review panel, the focus of most subsequent work has been on the violence and other crime outcomes they examined, not on unintentional deaths (see the previous section on the effects on violent crime).

We identified only one additional study meeting our inclusion criteria that examined the effect of shall-issue laws on unintentional injuries (no studies identified the relationship between permitless-carry laws and this outcome). DeSimone, Markowitz, and Xu (2013) performed a fixed-effects analysis to examine the effect of shall-issue laws on unintentional firearm injuries using hospital discharge data from the National Inpatient Sample spanning 1988 to 2003. In the 11 states that were part of the sample, the authors found a suggestive effect consistent with shall-issue laws increasing unintentional firearm injuries for children under age 18 and a statistically significant effect of these laws increasing self-inflicted firearm injuries among those 18 or older. Specifically, the estimate suggests that, after implementation of the law, unintentional firearm injuries among those aged 18 or older were more than twice as frequent as would be expected without the law, which would be extraordinary if true. However, the estimated effects of shall-issue laws in this study were based primarily on one state that changed its law during the study time frame (Arizona); thus, the study offers little evidence that the observed effects are due to the change in the law rather than to other factors affecting the state's unintentional injury rate that occurred around the same time the law was changed. Moreover, as DeSimone, Markowitz, and Xu (2013) note, the data set on which their estimates are made is not strictly longitudinal, and it is not possible to determine the extent to which child-access prevention law effect estimates are estimated cross-sectionally or longitudinally.

Figure 13.3 displays the IRRs and CIs associated with the concealed-carry laws examined in these studies.

**Figure 13.3**
**Incidence Rate Ratios Associated with the Effect of Concealed-Carry Laws on Unintentional Injuries and Deaths**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Shall-issue laws** | **Unintentional injuries** | | |
| Lott & Mustard (1997) | Handgun death | 1.03 [0.39, 1.68] | |
| Lott & Mustard (1997) | Nonhandgun death | 1.08 [0.99, 1.18] | |
| DeSimone, Markowitz, & Xu (2013) | Firearm injuries, aged 0–17 | 1.70 [0.83, 3.47] | |
| DeSimone, Markowitz, & Xu (2013) | Firearm injuries, aged 18+ | 2.28 [1.57, 3.31] | |

0.25   1   3.5

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

We identified two qualifying studies that examined the effect of shall-issue laws on unintentional firearm deaths. Lott and Mustard (1997) found that shall-issue laws had an uncertain relationship with unintentional handgun deaths and a suggestive relationship with increased nonhandgun unintentional deaths. DeSimone, Markowitz, and Xu (2013) found a significant effect indicating that these laws increase unintentional injury rates among adults aged 18 or older and a suggestive effect in the same direction among youth aged 17 or younger.

Based on these studies and an assessment of their relative strengths, we conclude that there is *limited evidence that shall-issue concealed-carry laws may increase unintentional firearm injuries among adults* and *inconclusive evidence for the effect of these laws on such injuries among children.*



Shall-issue concealed-carry laws may **increase** unintentional firearm injuries among adults. Evidence for this relationship is **limited.**

Shall-issue concealed-carry laws have **uncertain** effects on unintentional firearm injuries among children. Evidence for this relationship is **inconclusive.**

## Effects on Mass Shootings

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified research examining the effects of concealed-carry laws on mass shootings in the United States. Our search of studies since 2003 that met our inclusion criteria yielded one on permitless carry and three on shall-issue laws.

The three studies that examined the effects of shall-issue laws on mass shootings employed a difference-in-differences methodological design, exploiting state variation in the timing of law enactment to identify the causal effect of these policies on mass shooting incidents.[6]

Using a Poisson specification, Lott (2003) estimated the effect of shall-issue laws on fatalities, injuries, and the incidence of multiple-victim public shootings. The analysis covered 1977 to 1997, and regression models included controls for state and year fixed effects, other state firearm policies, and a broad range of state-level socioeconomic and demographic characteristics. Results showed that shall-issue laws were significantly associated with reductions in total casualties from multiple-victim public shootings and in the total number of multiple-victim public shooting incidents. However, these models had an unfavorable ratio of estimated parameters to observations (approximately one to eight), suggesting that the model may have been overfit, and thus the estimated effects of these laws may be poor indicators of their true effects. In addition, the model did not adjust for clustered standard errors. Together, these shortcomings suggest that the model results may not accurately describe the true effects of shall-issue laws.

Duwe, Kovandzic, and Moody (2002) used a fixed-effects negative binomial model—controlling for national time trends, state-level variation in socioeconomic and demographic factors, and state-level criminal justice characteristics (e.g., prison population)—to estimate the effect of these laws on the number of mass public shooting incidents, fatalities from mass public shootings, and injuries from mass public shooting injuries between 1976 and 1999. In their model, shall-issue laws were represented using two separate measures. A step dummy variable that takes a value of 1 the year after the law went into effect (0 otherwise) captured the immediate impact of the law, while a time trend variable captured dynamic effects of the policy. The authors

---

[6] These studies adopted different definitions for *mass shooting* (see Chapter Twenty-Two for further detail on definitional issues). Lott (2003) examined multiple-victim public shootings, which the author defined as events unrelated to other criminal activity in which two or more people were killed or wounded in a public location. Duwe, Kovandzic, and Moody (2002) focused on *mass public shootings*, which the authors defined as incidents resulting in four or more firearm-related fatalities (excluding the offender), where both the victims and offender(s) were not engaged in criminal activities. Luca, Deepak, and Poliquin (2016) set the same casualty threshold as Duwe, Kovandzic, and Moody (2002) but excluded any incident that occurred in connection with criminal activity or in which fewer than three of the fatally injured victims were not related (e.g., family, romantic partner) to the shooter.

estimated several alternative models, including Poisson fixed-effects models and two dynamic fixed-effects negative binomial models, as specification checks. The findings showed uncertain effects (i.e., no statistically significant evidence) for a relationship between the laws and public mass shooting outcomes (see Figure 13.4). The preferred specification had an unfavorable ratio of estimated parameters to observations (less than one to ten), meaning the model may have been overfit, and thus the estimated effects of these laws may be poor indicators of their true effects.

Examining a partially overlapping but later period (1989–2014), Luca, Deepak, and Poliquin (2016) used a linear probability model to estimate the impact of shall-issue concealed-carry laws on a binary indicator for whether a mass shooting occurred in a given state-year. Controlling for time-invariant state characteristics, national trends, and a host of other state-level gun policies, as well as time-varying state-level demographic, socioeconomic, and political characteristics, the authors found a small and uncertain effect of shall-issue laws and a large but statistically insignificant positive effect of permitless-carry laws on the probability of a mass shooting event occurring. However, assessing the effects of gun policies on mass shootings was not the primary focus of this paper, and the authors intended the estimates to serve solely as a robustness check for their main specification (the effects of mass shootings on gun policy). Although the paper provided limited information to use in evaluating the reported statistical models (e.g., on how these policies were coded), it is clear that the analysis used a linear model to predict a dichotomous outcome. Therefore, model assumptions were violated, making CIs unreliable.

Figure 13.4 displays the IRRs and CIs associated with the concealed-carry laws examined in these studies. Estimates from Duwe, Kovandzic, and Moody (2002) are not included in this figure because their approach yielded effect sizes that vary with time.

**Figure 13.4**
**Incidence Rate Ratios Associated with the Effect of Concealed-Carry Laws on Mass Shootings**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Permitless carry** | **Mass shooting** | | |
| Luca, Deepak, & Poliquin (2016) | State–year indicator (no political controls) | 2.27 [0.00, 5.24] | |
| Luca, Deepak, & Poliquin (2016) | State–year indicator (political controls) | 2.73 [0.00, 5.66] | |
| **Shall issue laws** | | | |
| Lott (2003) | Total deaths and injuries | 0.22 [0.16, 0.29] | |
| Lott (2003) | Number of shooting incidents | 0.33 [0.19, 0.58] | |
| Luca, Deepak, & Poliquin (2016) | State–year indicator (no political controls) | 0.91 [0.27, 1.55] | |
| Luca, Deepak, & Poliquin (2016) | State–year indicator (political controls) | 0.92 [0.30, 1.55] | |



NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

## Conclusions

*Permitless-carry laws.* We identified one qualifying study that examined the effects of permitless-carry laws on the incidence of mass shootings. Luca, Deepak, and Poliquin (2016) found that such laws had uncertain effects on the likelihood that at least one mass shooting event occurred in a given state. On the basis of this study, we find *inconclusive evidence for the effect of permitless-carry laws on mass shootings*.



*Shall-issue concealed-carry laws.* We identified three qualifying studies that examined the effect of shall-issue laws on mass shooting outcomes. Lott (2003) found that shall-issue laws were associated with significant reductions in multiple-victim shooting incidence and the number of deaths or injuries resulting from multiple-victim shootings. Duwe, Kovandzic, and Moody (2002) and Luca, Deepak, and Poliquin (2016) found uncertain effects of shall-issue laws on mass shooting outcomes (e.g., incidence, injuries, and fatalities).

Based on these studies and an assessment of their relative strengths, we find *inconclusive evidence for the effect of shall-issue laws on mass shootings*.

## Effects on the Gun Industry

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified research examining the effects of concealed-carry laws on the gun industry. We identified one such study meeting our inclusion criteria. Duggan (2001) examined the effect of shall-issue laws on changes in gun ownership, using state-level subscription rates to *Guns & Ammo* magazine as a proxy for gun ownership. This study identified uncertain effects of these laws on gun ownership. However, the model also had an unfavorable ratio of explanatory variables to observations (approximately one to five) and provided no information about the quality of the model fit. This raises the possibility that the model was overfit, and thus the estimates may be unreliable indicators of the generalizable effect of shall-issue laws on gun ownership.

Figure 13.5 displays the IRR and CI associated with the concealed-carry laws examined in Duggan (2001).

**Figure 13.5**
**Incidence Rate Ratios Associated with the Effect of Concealed-Carry Laws on Gun Ownership**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Shall issue laws** | | | |
| Duggan (2001) | Gun ownership | 1.00  [0.98, 1.02] | 0.95  1  1.05 |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.



Shall-issue concealed-carry laws have **uncertain** effects on gun ownership.

Evidence for this relationship is **inconclusive.**

**Conclusions**

The single study we identified (Duggan, 2001) found an uncertain effect of shall-issue concealed-carry laws on gun ownership. Therefore, we find *inconclusive evidence for the effect of these laws on gun ownership.*

## Outcomes Without Studies Examining the Effects of Concealed-Carry Laws

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of concealed-carry laws on the following outcomes, and we identified no such studies that met our inclusion criteria:

- officer-involved shootings
- defensive gun use
- hunting and recreation.

Several of the studies reviewed here drew inferences about how concealed-carry laws influenced the deterrence and defensive benefits of guns, but none we identified directly examined the laws' effects on defensive gun use.

## Chapter Thirteen References

Aneja, Abhay, John J. Donohue III, and Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, Stanford, Calif.: Stanford Law School, Olin Working Paper No. 461, December 1, 2014. As of May 21, 2017: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681

Ayres, Ian, and John J. Donohue III, "Shooting Down the More Guns, Less Crime Hypothesis," *Stanford Law Review*, Vol. 55, No. 4, 2003a, pp. 1193–1312.

———, "The Latest Misfires in Support of the More Guns, Less Crime Hypothesis," *Stanford Law Review*, Vol. 55, No. 4, 2003b, pp. 1371–1398.

———, "Yet Another Refutation of the More Guns, Less Crime Hypothesis—with Some Help from Moody and Marvell," *Econ Journal Watch*, Vol. 6, No. 1, January 2009a, pp. 35–59.

———, "More Guns, Less Crime Fails Again: The Latest Evidence from 1977–2006," *Econ Journal Watch*, Vol. 6, No. 2, May 2009b, pp. 218–238.

Cramer, Clayton E., and David B. Kopel, "'Shall Issue': The New Wave of Concealed Handgun Permit Laws," *Tennessee Law Review*, Vol. 62, No. 3, 2005, pp. 679–757.

DeSimone, J., S. Markowitz, and J. Xu, "Child Access Prevention Laws and Nonfatal Gun Injuries," *Southern Economic Journal*, Vol. 80, No. 1, 2013, pp. 5–25.

Donohue, John J., "Guns, Crime, and the Impact of State Right-to-Carry Laws," *Fordham Law Review*, Vol. 73, No. 2, 2004, pp. 623–652.

Duggan, Mark, "More Guns, More Crime," *Journal of Political Economy*, Vol. 109, No. 5, 2001, pp. 1086–1114.

Durlauf, Steven, S. Navarro, and D. A. Rivers, "Model Uncertainty and the Effect of Shall-Issue Right-to-Carry Laws on Crime," *European Economic Review*, Vol. 81, 2016, pp. 32–67.

Duwe, Grant, Tomislav Kovandzic, and Carlisle E. Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies,* Vol. 6, No. 4, 2002, pp. 271–296.

Fortunato, David, "Can Easing Concealed Carry Deter Crime?" *Social Science Quarterly*, Vol. 96, No. 4, December 2015, pp. 1071–1085.

French, B., and P. J. Heagerty, "Analysis of Longitudinal Data to Evaluate a Policy Change," *Statistics in Medicine*, Vol. 27, No. 24, 2008, pp. 5005–5025.

Gius, Mark, "An Examination of the Effects of Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder Rates," *Applied Economics Letters*, Vol. 21, No. 4, 2014, pp. 265–267.

Grambsch, P., "Regression to the Mean, Murder Rates, and Shall-Issue Laws," *American Statistician*, Vol. 62, No. 4, 2008, pp. 289–295.

Grossman, Richard S., and Stephen A. Lee, "May Issue Versus Shall Issue: Explaining the Pattern of Concealed-Carry Handgun Laws, 1960–2001," *Contemporary Economic Policy*, Vol. 26, No. 2, 2008, pp. 198–206.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Helland, E., and A. Tabarrok, "Using Placebo Laws to Test 'More Guns, Less Crime,'" *Advances in Economic Analysis and Policy*, Vol. 4, No. 1, 2004.

Kendall, Todd D., and Robert Tamura, "Unmarried Fertility, Crime, and Social Stigma," *Journal of Law and Economics*, Vol. 53, No. 1, 2010, pp. 185–221.

Kovandzic, Tomislav V., and Thomas B. Marvell, "Right-to-Carry Concealed Handguns and Violent Crime: Crime Control Through Gun Control?" *Criminology and Public Policy*, Vol. 2, No. 3, 2003, pp. 363–396.

Kovandzic, T. V., T. B. Marvell, and L. M. Vieraitis, "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates—Evidence from Panel Data for Large Urban Cities," *Homicide Studies*, Vol. 9, No. 4, 2005, pp. 292–323.

La Valle, James M., "'Gun Control' vs. 'Self-Protection': A Case Against the Ideological Divide," *Justice Policy Journal*, Vol. 10, No. 1, 2013, pp. 1–26.

La Valle, James M., and Thomas C. Glover, "Revisiting Licensed Handgun Carrying: Personal Protection or Interpersonal Liability?" *American Journal of Criminal Justice*, Vol. 37, No. 4, 2012, pp. 580–601.

Lott, John R., Jr., *More Guns, Less Crime: Understanding Crime and Gun-Control Laws*, Chicago, Ill.: University of Chicago Press, 2000.

———, *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control Is Wrong*, Washington, D.C.: Regnery Publishing, Inc., 2003.

———, *More Guns, Less Crime: Understanding Crime and Gun-Control Laws*, 3rd ed., Chicago, Ill.: University of Chicago Press, 2010.

Lott, J. R., and D. B. Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," *Journal of Legal Studies*, Vol. 26, No. 1, 1997, pp. 1–68.

Lott John R., Jr., and John E. Whitley, "Measurement Error in County-Level UCR Data," *Journal of Quantitative Criminology*, Vol. 19, No. 2, June 2003, pp. 185–198.

———, "Abortion and Crime: Unwanted Children and Out-of-Wedlock Births," *Economic Inquiry*, Vol. 45, No. 2, 2007, pp. 304–324.

Lott, John R., Jr., John E. Whitley, and Rebekah C. Riley, *Concealed Carry Permit Holders Across the United States*, Crime Prevention Research Center, 2016.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy*, working paper, Boston, Mass.: Harvard Business School, 2016.

Maltz, M. D., and J. Targonski, "A Note on the Use of County-Level UCR Data, *Journal of Quantitative Criminology*, Vol. 18, No. 2, 2002, pp. 297–318.

Manski, Charles F., and John V. Pepper, *How Do Right-to-Carry Laws Affect Crime Rates? Coping with Ambiguity Using Bounded-Variation Assumptions*, Cambridge, Mass.: National Bureau for Economic Research, NBER Working Paper 21701, November 2015.

Martin, Robert A., Jr., and Richard L. Legault, "Systematic Measurement Error with State-Level Crime Data: Evidence from the 'More Guns Less Crime' Debate," *Journal of Research in Crime and Delinquency*, Vol. 42, No. 2, May 2005, pp. 187–210.

Moody, Carlisle E., and Thomas B. Marvell, "The Debate on Shall Issue Laws, Continued," *Econ Journal Watch*, Vol. 6, No. 2, 2009.

Moody, Carlisle E., Thomas B. Marvell, Paul R. Zimmerman, and Fasil Alemante, "The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," *Review of Economics and Finance*, Vol. 4, 2014, pp. 33–43.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Phillips, C. D., O. Nwaiwu, D. K. McMaughan Moudouni, R. Edwards, and S. Lin, "When Concealed Handgun Licensees Break Bad: Criminal Convictions of Concealed Handgun Licensees in Texas, 2001–2009," *American Journal of Public Health*, Vol. 103, No. 1, 2013, pp. 86–91.

Plassmann, F., and J. E. Whitley, "Comments: Confirming More Guns, Less Crime," *Stanford Law Review*, Vol. 55, No. 4, 2003, pp. 1313–1369.

Roberts, Darryl W., "Intimate Partner Homicide: Relationships to Alcohol and Firearms," *Journal of Contemporary Criminal Justice*, Vol. 25, No. 1, 2009, pp. 67–88.

Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Rivara, "An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates," *Injury Prevention*, Vol. 11, No. 2, 2005, pp. 77–83.

Steidley, Trent Taylor, *Movements, Malefactions, and Munitions: Determinants and Effects of Concealed Carry Laws in the United States*, dissertation, Columbus, Ohio: Ohio State University, 2016. As of May 12, 2017:
http://rave.ohiolink.edu/etdc/view?acc_num=osu1466007307

Strnad, Jeff, "Should Legal Empiricism Go Bayesian?" *American Law and Economics Review*, Vol. 9, No. 1, Spring 2007, pp. 195–304.

United States Code, Title 18, Section 926, Rules and Regulations.

United States Concealed Carry Association, "Traveling? Know Concealed Carry Permit Info by State," West Bend, Wisc., August 7, 2013. As of June 29, 2017:
https://www.usconcealedcarry.com/traveling-ccw-permit/

USA Carry, "Concealed Carry Permit Reciprocity Maps," web page, April 20, 2017. As of June 29, 2017:
http://www.usacarry.com/concealed_carry_permit_reciprocity_maps.html

Violence Policy Center, "Concealed Carry Killers," web page, 2017. As of March 23, 2017:
http://concealedcarrykillers.org/

Webster, D., C. K. Crifasi, and J. S. Vernick, "Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides," *Journal of Urban Health*, Vol. 91, No. 2, 2014, pp. 293–302.

CHAPTER FOURTEEN

# Waiting Periods

The Brady Handgun Violence Prevention Act (the Brady Act), which went into effect in 1994, imposed a five-day waiting period for handguns purchased from licensed dealers in states with unsatisfactory procedures for conducting background checks. However, this requirement lasted only until 1998, when the National Instant Criminal Background Check System (NICS) became available. Since then, all firearm purchases have required NICS background checks, which normally take no more than a few minutes to complete. Nevertheless, in approximately 10 percent of background checks, the NICS check requires supplementary reviews (Criminal Justice Information Services Division, 2014), and federal law allows the Federal Bureau of Investigation (FBI) up to three days to complete these (18 U.S.C. 922). After three days, the dealer may, but is not required to, transfer possession of a firearm to its purchaser even without completion of the background check. By giving the FBI three days to complete the checks before allowing someone to take possession of a new firearm, the federal law can introduce delays comparable to a waiting period, although most buyers experience no such delay.

Waiting-period laws are intended to reduce suicide, violent crime, and mass shootings in several ways. First, waiting periods are primarily designed to disrupt impulsive acts of violence and self-harm, giving angry or distraught buyers time to "cool off" or gain perspective. While it is plausible that this cooling-off period could reduce impulsive interpersonal gun violence, some evidence exists for the potential effects of this mechanism in reducing suicides. Many suicidal acts are impulsive, with a short time between ideation (thinking about suicide) and attempt (Miller, Azrael, and Barber, 2012; Simon et al., 2002). Suicidal crises are often short-lived and characterized by ambivalence (Daigle, 2005; Glatt, 1987). Delaying access to firearms for individuals in these circumstances can reduce suicide attempts (see Chapter Sixteen, on the relationship between firearm prevalence and suicide). Even if many distraught suicide attempters would seek alternative means of killing themselves, waiting periods may still reduce total rates of suicide because of the high case-fatality ratio of firearms compared with other methods (Anestis, 2016; Vyrostek, Annest, and Ryan, 2004).

Still, for some individuals, waiting periods may serve only to delay suicides rather than prevent them. Evidence from a cohort of handgun purchasers in California found

that, while almost no firearm suicides were committed by this population during the 15-day waiting period, the most elevated relative risk of firearm suicide (compared with the general population) occurred in the first week after receipt of the weapon and remained highly elevated over the first month of purchase (Wintemute et al., 1999). Moreover, most firearms are purchased by individuals who already own a firearm. Azrael et al. (2017) found that, on average, gun owners had close to five firearms each, and a large majority (62 percent) purchased their most recent weapon from a gun dealer. For those who already own guns, a waiting period may have little or no effect on suicide risk. However, a cooling-off period could still yield some violence reduction benefits by deferring the acquisition of, for instance, more or more-lethal weapons, although such benefits are likely more limited for this group.

Second, waiting periods may provide law enforcement with opportunities to investigate possible straw purchases (in which a lawful buyer makes the purchase on the behalf of a prohibited buyer) under the theory that it is less difficult to intercept a weapon prior to delivery. To assess whether waiting periods disrupt illegal firearm trafficking or transfers through this mechanism, causal inference could be strengthened by examining crime gun trace data in addition to changes in homicide or violent crime rates.[1] Specifically, if these laws restrict straw purchasing from in-state retailers, one should observe a larger share of crime guns originating from out-of-state sources after law passage and/or a reduction in guns with a short time-to-crime (Webster and Wintemute, 2015; Braga et al., 2012).[2] However, a series of provisions attached to Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) appropriations (commonly known as the Tiahrt Amendments) has denied most researchers access to firearm trace data since 2003, making it currently infeasible to conduct this type of analysis (Krouse, 2009).

Third, waiting periods provide law enforcement agencies with additional time to complete background checks that sometimes cannot be completed within the three-day window provided by the federal law. In 2014, for instance, 2,511 firearms were transferred from federally licensed firearm dealers to prohibited persons as a result of delays in NICS background checks that exceeded three business days (Criminal Justice Information Services Division, 2015). An additional 1 percent of all background checks, or about 230,000, could not be completed within 88 days and were thus purged from the NICS review system by law without a determination about whether the buyer was a prohibited possessor (Office of the Inspector General, U.S. Department of Justice, 2016). When a buyer is determined to have been a prohibited possessor and has

---

[1]   The Bureau of Alcohol, Tobacco, and Firearms (2002, p. A-3) defined *crime gun* as "any firearm that is illegally possessed, used in a crime, or suspected to have been used in a crime. An abandoned firearm may also be categorized as a crime gun if it is suspected it was used in a crime or illegally possessed."

[2]   Per Webster and Wintemute (2015), the metric known as *time-to-crime* is the "unusually short interval—ranging from less than 1 year to less than 3 years—between a gun's retail sale and its subsequent recovery by police from criminal suspects or crime scenes . . . . A short [time-to-crime] is considered an indicator of diversion, especially when the criminal possessor is someone different from the purchaser of record."

taken possession of a firearm, the NICS alerts ATF, which in the vast majority of cases (e.g., 116 of the 125 examined by the Office of the Inspector General, U.S. Department of Justice, 2016) is successful in recovering the weapon.

Waiting periods provide additional time that can facilitate a more thorough check before buyers take possession of a new weapon, thereby increasing the effectiveness of background check laws in limiting firearm access by prohibited possessors who are considered to present elevated risk of violence. As discussed in Chapter Three, the majority of prohibited possessors who perpetrate gun violence acquire their firearms from social acquaintances or the black market; thus, a large portion of violent gun crime is unlikely to be affected through this mechanism. In addition, it is unclear whether extending the time to complete background checks would reduce mass shootings. An analysis of the sources of firearms used in a sample of 16 mass shootings between 2009 and 2016 found one instance (6.3 percent) in which the shooter acquired a firearm used in the assault because the background check could not be completed in three business days (Buchanan et al., 2016). One additional instance involved an administrative error that resulted in a failure to trigger an automatic rejection and delayed completion of the background check within the requisite three-day period (Buchanan et al., 2016). However, the small sample of mass shooting cases explored in this analysis makes generalizations about the association of waiting periods and mass shooting incidents unwarranted.

Waiting-period laws may have the unintended consequence of delaying needed self-protection, although little empirical evidence exists to assess how often this may occur. The waiting periods may inconvenience some hunters or sport shooters who would otherwise benefit from more quickly obtaining a new firearm and, by extension, could reduce gun sales. Moreover, the laws may discourage some gun sales because they can require buyers to make two trips to the dealer, which delays the satisfaction of taking possession of the weapon.

Ideally, the effects of waiting periods would be studied among those populations most directly affected by the presumed mechanisms of their effect. In particular, it would be valuable to examine the effects of waiting periods on suicide and violence among those who do not already own a gun. However, this information is not available in the large data sets typically used to analyze the effects of gun policy (although there are some data on the time frame between purchase of a firearm and suicide risk; see Chapter Sixteen). Similarly, understanding the effect of waiting periods on the gun industry would be straightforward if sales data were available at state or local levels.

Analyses could also exploit the types of firearms for which waiting periods are required, as well as the duration of the waiting period. The importance of accounting for such policy heterogeneity will depend on the extent to which different types of firearms are substitutes and the marginal effect of requiring an additional day or days of delay before transfer can occur. State waiting-period laws applying to only a subset of firearms (e.g., handguns) should primarily affect outcomes involving those

firearms, although one might expect to observe substitution toward other firearms excluded from waiting-period requirements. With respect to the waiting-period length, should the urge to commit suicide subside within one day, waiting periods of 48 hours or two weeks should generate similar effects, but if suicidal impulses persist for one week, different waiting period lengths may generate heterogeneous effects (Lewiecki and Miller, 2013).

## State Implementation of Waiting Periods

A few jurisdictions impose a waiting period to purchase a firearm (Giffords Law Center to Prevent Gun Violence, undated-g). For example, California and the District of Columbia require a ten-day waiting period before buyers take possession of a new firearm.[3] In Hawaii, buyers must wait 14 days to receive a permit to purchase a firearm.[4] Other states impose waiting periods only for handguns or only for handguns and assault rifles.

## Effects on Suicide

### Research Synthesis Findings

The Hahn et al. (2005) review identified six studies that examined the effects of waiting periods on suicides, but the authors found that the evidence was inconclusive. And according to the National Research Council (NRC) (2004, p. 184), "While suicide has rarely been the basis for public support of specific gun laws, suicide prevention may be the unintended by-product of such laws." Although NRC did not make any conclusions about specific gun policies, the report stated, "Some gun control policies may reduce the number of gun suicides, but they have not yet been shown to reduce the overall risk of suicide in any population." On waiting-period policies, NRC concluded, "The risk of suicide is highest immediately after purchase of a handgun, suggesting that some firearms are specifically purchased for the purpose of committing suicide."[5]

Cook and Ludwig (2003) provides results similar to the authors' earlier paper (Ludwig and Cook, 2000). Because the earlier paper included a larger data set spanning a wider time frame, we focus on its analyses, although the results reported in the two papers are comparable. Both papers examined changes in suicide rates before and

---

[3]   Calif. Penal Code §§ 26815, 27540, 27545 (the waiting period applies to dealers, but, in California, all sales must be processed through a dealer); D.C. Code Ann. §§ 22-4508.

[4]   Hawaii Rev. Stat. Ann. § 134-2. A separate permit is required for each handgun purchase, and the permit expires after ten days; long-gun permits are valid for one year.

[5]   This finding derives from studies that have estimated suicide risk after purchase of firearms, described in more detail in Chapters Sixteen and Seventeen.

after the implementation of the Brady Act in 1994, which initially imposed waiting periods and background checks for purchases from licensed firearm dealers. When the Brady Act was implemented, 18 states and the District of Columbia already had background checks, 27 states were required to implement background checks and waiting periods, and five states were required to implement only background checks (because they already had waiting periods or had an instant background check procedure that satisfied the Brady requirements). Ludwig and Cook (2000) sought to identify the effects of waiting periods by comparing reductions in suicide rates found in the states that did and did not implement waiting periods. They found that, when compared with the 18 unaffected states (plus the District of Columbia), the states implementing and those not implementing waiting periods saw uncertain reductions in suicide and firearm suicide rates. A subgroup analysis found a significant 9-percent reduction in firearm suicide rates among older victims in states that introduced waiting periods, whereas the reductions in states that did not have to introduce waiting periods were smaller and uncertain. The paper did not demonstrate that the difference between these rate reductions was statistically significant. In addition, the analyses of states that were not required to implement waiting periods had a ratio of estimated parameters to observations of less than one to three, and the study provided no additional evidence to demonstrate model fit. Therefore, in accordance with our review methodology, we discount the evidence provided by this analysis because of the possibility the model was overfit, and thus the estimated effects and their confidence intervals (CIs) may be unreliable indicators of the true causal effects of the laws.

### Conclusions

We identified no qualifying studies that estimated the effects of waiting periods on suicides.

## Effects on Violent Crime

### Research Synthesis Findings

In their review of existing science, Hahn et al. (2005) found insufficient evidence for determining the effectiveness of waiting periods on violent crime. In its review, NRC (2004) profiled a study by Ludwig and Cook (2000)—a version of which was published in our review period (Cook and Ludwig, 2003)—that examined changes in homicide rates before and after implementation of the Brady Act in 1994. The authors sought to identify the effects of waiting periods by comparing reductions in homicide rates in states that had to implement waiting periods in 1994 with reductions in states that did not. Ludwig and Cook (2000) found that, compared with the 18 unaffected states (plus the District of Columbia), states implementing waiting periods saw nonsignificant drops in homicide and nonfirearm homicide rates, whereas the five states

that were not required to implement waiting periods saw nonsignificant increases in homicide and firearm homicide rates. However, the paper did not report whether these effects differed by a statistically significant amount. In addition, the analyses of states that were not required to implement waiting periods had a ratio of estimated parameters to observations of less than one to three, and the paper provided no additional evidence to demonstrate model fit. Therefore, in accordance with our review methodology, we discount the evidence provided by this analysis because of the possibility the model was overfit, and thus the estimated effects and their CIs may be unreliable indicators of the true causal effects of the laws.

We identified one study that specifically examined the effect of waiting periods on violent crime. Roberts (2009) separately analyzed the effects of waiting-period length (none, 24 hours, between two and seven days, and more than seven days) and shall-issue laws on intimate partner homicides (using county-level data from 1985 to 2004). The author found that a waiting period of between two and seven days significantly lowered intimate partner homicide rates compared with no waiting period, but longer (more than seven days) or shorter (24-hour) waiting periods (compared with no waiting period) had only suggestive effects on reducing total intimate partner homicides. The author also reported that a waiting period of between two and seven days significantly reduced firearm-related intimate partner homicides (compared with no waiting period), but a waiting period longer than seven days significantly increased intimate partner firearm homicides (compared with no waiting period). However, these analyses did not cluster standard errors at the state level, so serial correlation that was unaccounted for in the panel data could have resulted in biased standard errors and CIs. In addition, the analysis examined alternative specifications, such as spline or hybrid models, for the effects of shall-issue laws.

Figure 14.1 displays the incidence rate ratios (IRRs) and CIs associated with the waiting-period policies examined in these studies (except for Ludwig and Cook [2000] and Cook and Ludwig [2003] for the reasons stated earlier). Our standardized effects suggest that after a 24-hour waiting period went into effect, the intimate partner firearm homicide rate was 58 percent of what would have been expected without the policy, and the intimate partner total homicide rate was 56 percent of what would have been expected without the policy. Further, when the waiting period of between two and seven days went into effect, the intimate partner firearm homicide rate and total homicide rate were 72 percent and 42 percent, respectively, of what would have been expected without the policy. Oddly, waiting periods of longer than seven days were

**Figure 14.1**
**Incidence Rate Ratios Associated with the Effect of Waiting Periods on Violent Crime**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **24-Hour waiting period** | **Homicide** | |
| Roberts (2009) | Total intimate partner | 0.56 [0.21, 0.91] |
| Roberts (2009) | Firearm intimate partner | 0.58 [0.23, 0.92] |
| **2–7 Day waiting period** | | |
| Roberts (2009) | Total intimate partner | 0.47 [0.37, 0.57] |
| Roberts (2009) | Firearm intimate partner | 0.72 [0.57, 0.87] |
| **>1 Week waiting period** | | |
| Roberts (2009) | Total intimate partner | 0.74 [0.47, 1.02] |
| Roberts (2009) | Firearm intimate partner | 1.56 [1.01, 2.11] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details.

estimated to decrease total intimate partner homicide rates by 36 percent but increase firearm intimate partner homicide rates by 56 percent.

## Conclusions

We identified one qualifying study that examined the effects of waiting periods on homicide rates. Specifically, Roberts (2009) found that a waiting period of between two and seven days was significantly associated with reduced intimate partner homicides generally and those committed with firearms in particular. He found only a suggestive effect for 24-hour waiting periods reducing total and firearm-involved intimate partner homicides. He found suggestive effects for waiting periods of more than seven days reducing intimate partner homicides. However, he also found that these longer waiting periods were significantly associated with increases in intimate partner homicides in which a firearm was the murder weapon. Based on this one study and an assessment of its strengths, we find *inconclusive evidence for the effect of waiting periods on violent crime generally or intimate partner homicides in particular.*



Waiting periods have **uncertain** effects on violent crime and intimate partner homicide.

Evidence for this relationship is **inconclusive.**

## Effects on Mass Shootings

### Research Synthesis Findings

Neither NRC (2004) nor Hahn et al. (2005) identified research examining the effects of waiting periods on mass shootings in the United States. Our search yielded two studies that met our inclusion criteria.

Lott (2003) used a Poisson regression model to estimate the effect of waiting periods on fatalities, injuries, and the incidence of *multiple-victim public shootings*, which the author defined as events unrelated to other criminal activity in which two or more people were killed or wounded in a public location. The analysis covered 1977 to 1997, and regression models included controls for state and year fixed effects, other state firearm policies, and a broad range of state-level socioeconomic and demographic characteristics. The author characterized waiting-period laws using three variables: a dummy variable for whether state laws required a waiting period before delivery of a firearm, the length of the waiting period in days, and the length of the waiting period in days squared. For all three policy variables, findings showed effects that were small and not statistically significant for total casualties from multiple-victim public shootings and for total number of multiple-victim public shooting incidents (see Figure 14.2). However, these models had an unfavorable ratio of estimated parameters to observations (approximately one to eight), suggesting that the model may have been overfit, and thus the estimated effects of these laws may be poor indicators of their true effects. In addition, the model did not adjust for clustered standard errors. Together, these shortcomings suggest that the model results may not accurately describe the true effects of waiting periods.

Using a two-way fixed-effects linear probability model, Luca, Deepak, and Poliquin (2016) estimated the effects of waiting periods on a binary indicator for whether a mass shooting occurred in a given state-year. The authors included two measures of waiting periods: the number of days that purchasers must wait before accepting delivery of a handgun and the number of days before accepting delivery of a long gun. The authors' regression analysis covered 1989–2014 and included controls for time-invariant state characteristics, national trends, and a host of other state-level gun policies, as well as time-varying state-level demographic, socioeconomic, and political characteristics. Their findings showed uncertain effects that were small in magnitude of both waiting-period measures on the probability of a mass shooting event. However, assessing the effects of gun policies on mass shootings was not the primary focus of Luca, Deepak, and Poliquin (2016), and the authors intended the estimates to serve solely as a robustness check for their main specification (the effects of mass shootings on gun policy). Although the paper provided limited information to use in evaluating the reported statistical models (e.g., on how these policies were coded), it is clear that the analysis used a linear model to predict a dichotomous outcome. Therefore, model assumptions were violated, making CIs unreliable.

Figure 14.2 displays the IRRs and CIs associated with the waiting-period policies examined in these studies.

**Figure 14.2**
**Incidence Rate Ratios Associated with the Effect of Waiting Periods on Mass Shootings**

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] |
|---|---|---|
| **Handgun waiting period (days)** | **Mass shooting** | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 1.04 [0.98, 1.11] |
| **Long-gun waiting period (days)** | | |
| Luca, Deepak, & Poliquin (2016) | State-year indicator (political controls) | 0.95 [0.64, 1.26] |
| **Waiting period** | | |
| Lott (2003) | Total deaths and injuries (waiting period dummy) | 0.90 [0.67, 1.21] |
| Lott (2003) | Total deaths and injuries (waiting period in days) | 0.99 [0.97, 1.01] |
| Lott (2003) | Number of shooting incidents (waiting period dummy) | 4.20 [0.66, 26.87] |
| Lott (2003) | Number of shooting incidents (waiting period in days) | 0.67 [0.39, 1.14] |

NOTE: IRR values marked with blue squares indicate that methodological concerns are discussed in the text. See Appendix B for details. We abbreviated the full range of the CI for one Lott (2003) outcome measure so that it fit within the scale of the figure; for this CI, we use a dotted line.

## Conclusions

We identified two qualifying studies examining the effect of waiting periods on mass shooting outcomes. Luca, Deepak, and Poliquin (2016) found the length of waiting periods required for handguns and for long guns to have uncertain effects on the likelihood that at least one mass shooting occurred in a state. Lott (2003) found a suggestive effect consistent with the passage of any waiting-period law increasing the incidence of mass shootings. However, estimates in the same model also showed a suggestive effect of waiting-period length on decreasing the incidence of mass shootings, which complicates interpretation of the overall effect of the law. Further, Lott



Waiting periods have **uncertain** effects on mass shootings.

Evidence for this relationship is **inconclusive.**

(2003) found uncertain effects of both waiting-period measures on the number of casualties from mass shooting events. Based on these studies, we find *inconclusive evidence for the effect of waiting periods on mass shootings.*

## Outcomes Without Studies Examining the Effects of Waiting Periods

Neither NRC (2004) nor Hahn et al. (2005) identified any research examining the effects of waiting periods on the following outcomes, and we identified no such studies that met our inclusion criteria:

- unintentional injuries and deaths
- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

# Chapter Fourteen References

Anestis, M. D., "Prior Suicide Attempts Are Less Common in Suicide Decedents Who Died by Firearms Relative to Those Who Died by Other Means," *Journal of Affective Disorders*, Vol. 189, No. 1, 2016, pp. 106–109.

Azrael, Deborah, Lisa Hepburn, David Hemenway, and Matthew Miller, "The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey," *Russell Sage Foundation Journal of the Social Sciences*, Vol. 3, No. 5, 2017, pp. 38–57.

Braga, Anthony A., Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway, "Interpreting the Empirical Evidence on Illegal Gun Market Dynamics," *Journal of Urban Health*, Vol. 89, No. 5, 2012, pp. 779–793.

Buchanan, Larry, Josh Keller, Richard A. Oppel, Jr., and Daniel Victor, "How They Got Their Guns," *New York Times*, June 12, 2016. As of March 16, 2017:
https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-guns.html

Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Reports (2000): Memphis, Tennessee*, Washington, D.C.: U.S. Department of the Treasury, July 2002.

Cook, P. J., and Jens Ludwig, "The Effect of the Brady Act on Gun Violence," in B. Harcourt, ed., *Guns, Crime, and Punishment in America*, New York: New York University Press, 2003, pp. 283–298.

Criminal Justice Information Services Division, *National Instant Criminal Background Check System (NICS) Operations 2013*, Washington, D.C.: U.S. Department of Justice, Federal Bureau of Investigation, 2014. As of June 29, 2017:
https://archives.fbi.gov/archives/about-us/cjis/nics/reports/2013-operations-report

———, *National Instant Criminal Background Check System (NICS) Operations 2014*, Washington, D.C.: U.S. Department of Justice, Federal Bureau of Investigation, 2015. As of March 16, 2017:
https://www.fbi.gov/file-repository/2014-nics-ops-report-050115.pdf

Daigle, M. S., "Suicide Prevention Through Means Restriction: Assessing the Risk of Substitution—A Critical Review," *Accident Analysis and Prevention*, Vol. 37, 2005, pp. 625–632.

Giffords Law Center to Prevent Gun Violence, "Waiting Periods," web page, undated-g. As of October 18, 2017:
http://lawcenter.giffords.org/gun-laws/policy-areas/gun-sales/waiting-periods/

Glatt, K. M., "Helpline: Suicide Prevention at a Suicide Site," *Suicide and Life-Threatening Behavior*, Vol. 17, 1987, pp. 299–309.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Krouse, W. J., *Gun Control: Statutory Disclosure Limitations on ATF Firearms Trace Data and Multiple Handgun Sales Reports*, Washington, D.C.: Congressional Research Service, 7-5700, 2009.

Lewiecki, E. M., and S. A. Miller, "Suicide, Guns, and Public Policy," *American Journal of Public Health*, Vol. 103, No. 1, 2013, pp. 27–31.

Lott, John R., Jr., *The Bias Against Guns: Why Almost Everything You've Heard about Gun Control Is Wrong*, Washington, D.C.: Regnery Publishing, Inc., 2003.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy,* working paper, Boston, Mass.: Harvard Business School, 2016.

Ludwig, J., and P. J. Cook, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act," *JAMA*, Vol. 284, No. 5, 2000, pp. 585–591.

Miller, M., D. Azrael, and C. Barber, "Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide," *Annual Review of Public Health*, Vol. 33, 2012, pp. 393–408.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Office of the Inspector General, U.S. Department of Justice, *Audit of the Handling of Firearms Purchase Denials Through the National Instant Criminal Background Check System*, Washington, D.C., September 2016. As of May 11, 2017:
https://oig.justice.gov/reports/2016/a1632.pdf

Roberts, Darryl W., "Intimate Partner Homicide: Relationships to Alcohol and Firearms," *Journal of Contemporary Criminal Justice*, Vol. 25, No. 1, 2009, pp. 67–88.

Simon, T. R., A. C. Swann, K. E. Powell, L. B. Potter, M. Kresnow, and P. W. O'Carroll, "Characteristics of Impulsive Suicide Attempts and Attempters," *Suicide and Life-Threatening Behavior*, Vol. 32, No. 1, 2002, pp. 49–59.

United States Code, Title 18, Section 922, Unlawful Acts.

Vyrostek, S. B., J. L. Annest, and G. W. Ryan, "Surveillance for Fatal and Nonfatal Injuries—United States, 2001," *MMWR Surveillance Summary*, Vol. 53, 2004, pp. 1–57.

Webster, D.W., and G. J. Wintemute, "Effects of Policies Designed to Keep Firearms from High-Risk Individuals," *Annual Review of Public Health*, Vol. 36, 2015, pp. 21–37.

Wintemute, G. J., C. A. Parham, J. J. Beaumont, M. Wright, and C. Drake, "Mortality Among Recent Purchasers of Handguns," *New England Journal of Medicine*, Vol. 341, No. 21, 1999, pp. 1583–1589.

CHAPTER FIFTEEN

# Gun-Free Zones

Federal and state laws bar most individuals from carrying firearms or other weapons in certain locations. For instance, federal laws prohibit the possession of firearms in federal facilities, other than federal court facilities, except for hunting or other lawful purposes (18 U.S.C. 930). Similarly, firearms are prohibited on property belonging to the U.S. Department of Veterans Affairs (38 C.F.R. 1.218) or the U.S. Postal Service (39 C.F.R. 232.1).

Two federal laws restrict guns in or around schools offering elementary or secondary education. The Gun-Free School Zones Act of 1990 prohibits most firearms within 1,000 feet of a school, but it does not apply to possession by individuals with state licenses (18 U.S.C. 922).[1] In addition, the Gun-Free Schools Act of 1994 applies to schools receiving federal funds and requires the schools to expel for at least one year any student found in possession of a firearm on school property (20 U.S.C. 7961).

Gun-free zones are intended to reduce violent crime, suicides, unintentional firearm injuries and deaths, and mass shootings in specific locations. In theory, the gun-free zone reduces or eliminates the presence of guns in these areas, thereby eliminating the risk of unintentional firearm injuries due to recklessness, escalatory conflicts, or criminal activity. Gun-free zones establish the legal foundation for imposing screening measures, such as bag checks at stadiums or magnetometer screening at some schools or public buildings, that can be used to ensure that fewer or no guns are present in the location.

Alternatively, if the presence or potential presence of armed civilians deters violence, gun-free zones could serve as more-attractive targets to violent criminals or mass shooters because perpetrators will be less likely to encounter armed resistance in these areas. There is debate over the extent to which perpetrators target gun-free zones. One analysis of 133 mass shooting events between 2009 and 2016 found that 10 percent of

---

[1]   The law states, "It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone." A Supreme Court decision (*United States v. Lopez*, 514 U.S. 549) ruled the act to be an unconstitutional attempt to legislate under the Commerce Clause of the U.S. Constitution, so the law was amended in 1995 to restrict application to firearms that have moved via interstate commerce.

incidents occurred in designated gun-free zones (Everytown for Gun Safety Support Fund, 2017b). However, another analysis focused on public mass shootings between 1998 and 2015 and reported that 96.2 percent of incidents took place in gun-free zones (Crime Prevention Research Center, 2014). While the discrepancy in these estimates is partially due to differences in how mass shootings are defined—the latter study restricts analysis to public mass shootings—there also appears to be some disagreement about how gun-free zones are classified.

To evaluate the effects of gun-free zones, the ideal data would be at fine-enough geographic detail to examine changes in outcomes specifically in areas in which gun-free zones were implemented or removed. However, a nationwide database on gun-free zones does not exist, and different decisions about how to classify these areas can lead to widely differing conclusions. Determining whether a given shooting incident occurred in a gun-free zone requires collecting information on local firearm policies; determining whether the place an incident occurred had a policy of allowing or disallowing firearms; and determining whether it had a means of enforcing that policy, such as bag checks or magnetometer screening.

## State Implementation of Gun-Free Zones

Courts are explicitly exempted from the ban on weapons in federal facilities, but many states have enacted laws banning firearms, or concealed firearms, in state court buildings.[2] Most states prohibit guns in schools for kindergarten through grade 12. In addition, many have more-restrictive laws for gun-free school zones, extending the prohibition to holders of concealed-carry permits (see Chapter Thirteen), prohibiting the open carry of firearms, or making colleges and other postsecondary schools gun-free zones (Giffords Law Center to Prevent Gun Violence, undated-c).

---

[2]   Alaska, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. See Alaska Stat. Ann. § 11.61.220; Ark. Code Ann. § 5-73-122; Calif. Penal Code § 171b; Col. Rev. Stat. § 18-12-214; Fla. Stat. Ann. § 790.06; Ga. Stat. Ann. § 16-11-127; Ida. Code Ann. § 18-3302C; 430 Ill. CS 66/65; Kan. Stat. Ann. § 21-6309; Ky. Rev. Stat. Ann. § 237.110; La. Stat. Ann. § 1379.3; 17 Me. Rev. Stat. Ann. § 1058; Administrative Order of the Michigan Supreme Court 2001-1; Minn. Stat. Ann. § 609.66; Miss. Ann. Code § 45-9-101; Mo. Stat. Ann. § 571.030; Neb. Rev. Stat. § 69-2441; Nev. Rev. Stat. Ann. § 202.3673; N.H. Rev. Stat. § 159:19; N.M. Stat. Ann. § 29-19-11; N.C. Gen. Stat. Ann. § 14-269.4; Ohio Rev. Code Ann. § 2923.123; Okla. Stat. Ann. § 1272; Ore. Rev. Stat. Ann. § 166.370; 18 Pa. Cons. Stat. § 91; R.I. Supreme Court Executive Order 2003-6; S.C. Ann. Code § 23-31-215; S.D. Cod. Laws § 22-14-23; Tenn. Code Ann. § 39-17-1306; Tex. Penal Code § 46.03; Utah Code Ann. § 78A-2-203; 18 Vt. Stat. Ann. § 4016; Va. Code Ann. § 18.2-283.1; Wash. Rev. Code Ann. § 9.41.300; W. Va. Code § 61-7-11a; Wisc. Stat. Ann. § 175.60; Wyo. Stat. § 6-5-209.

Recently, some states have passed laws requiring college and university campuses to allow concealed carry,[3] although some of these states still prohibit, or allow schools to prohibit, guns in particular locations on campus.[4] Idaho removed the authority of the governing bodies of colleges or universities to regulate or prohibit gun possession on campus.[5] Tennessee allows nonstudents to carry concealed weapons on campus.[6]

In Colorado, the courts found that only the General Assembly can regulate firearm possession on any college campus, and according to statute, concealed weapons are allowed on campus. Schools may regulate but not ban guns.[7] Similarly, Oregon's Court of Appeals ruled that public colleges and universities may not ban weapons on campus grounds.[8] In contrast, Oklahoma recently granted schools and universities authority to make their own policies concerning guns on campus.[9]

## Outcomes Without Studies Examining the Effects of Gun-Free Zones

Although Hahn et al. (2005) did identify one cross-sectional study on the effect of magnetometers on school violence, neither the National Research Council (2004) nor Hahn et al. (2005) identified any research examining the effects of gun-free zones on the following outcomes, and we identified no such studies that met our inclusion criteria:

- suicide
- violent crime
- unintentional injuries and deaths
- mass shootings
- officer-involved shootings
- defensive gun use
- hunting and recreation
- gun industry.

---

[3]  Idaho, Kansas, Mississippi, Texas, Utah, and Wisconsin. See Ida. Code Ann. § 18-3309; Kan. Stat. Ann. § 75-7c20 (concealed weapons shall not be prohibited unless adequate security measures are in place to ensure that no weapons are permitted); Miss. Ann. Code §§ 97-37-7, 45-9-101 (advanced permit required); Tex. Govt. Code § 411.2031; Utah Code Ann. § 53B-3-103; Wisc. Stat. Ann. § 943.13.

[4]  For example, Idaho and Texas.

[5]  Ida. Code Ann. § 18-3309.

[6]  Tenn. Code Ann. § 39-17-1309.

[7]  *Regents of the Univ. of Colorado v. Students of Concealed Carry on Campus, LLC*, 271 P.3d 496 (Colo. 2012); Colo. Rev. Stat. Ann. § 18-12-201 et seq.

[8]  Ore. Firearms Educ. Found. v. Bd. Of Higher Educ., 264 P.3d 160 (Or. Ct. App. 2011).

[9]  Okla. Stat. Ann. tit 21, § 1277.

## Chapter Fifteen References

Code of Federal Regulations, Title 38, Section 1.218, Security and Law Enforcement at VA Facilities.

Code of Federal Regulations, Title 39, Section 232.1, Conduct on Postal Property.

Crime Prevention Research Center, "Updated: More Misleading Information from Bloomberg's Everytown for Gun Safety on Guns: 'Analysis of Recent Mass Shootings,' Showing How Mass Public Shootings Keep Occurring in Gun-Free Zones," September 1, 2014. As of March 13, 2017: http://crimeresearch.org/2014/09/more-misleading-information-from-bloombergs-everytown-for-gun-safety-on-guns-analysis-of-recent-mass-shootings/

Everytown for Gun Safety Support Fund, "Mass Shootings in the United States: 2009–2016," April 11, 2017b. As of May 3, 2017: http://everytownresearch.org/reports/mass-shootings-analysis/

Giffords Law Center to Prevent Gun Violence, "Guns in Schools," web page, undated-c. As of October 18, 2017: http://lawcenter.giffords.org/gun-laws/policy-areas/guns-in-public/guns-in-schools/

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

United States Code, Title 18, Section 922, Unlawful Acts.

United States Code, Title 18, Section 930, Possession of Firearms and Dangerous Weapons in Federal Facilities.

United States Code, Title 20, Section 7961, Gun-Free Schools Act.

PART C

# Supplementary Essays on Gun Policy Mechanisms and Context

## A Note on the Scope of Part C

The 13 policies reviewed in Part B and the scope of the systematic review for the research syntheses were selected a priori and represent the central focus of our research synthesis efforts. Nevertheless, in reviewing evidence on these policies, other important themes emerged that we believed warranted further discussion or review. Therefore, to augment and provide context for Part B's syntheses, Part C includes supplementary essays on what rigorous studies reveal about

- the possible mechanisms by which laws may affect outcomes (Chapters Sixteen and Seventeen on the effects of firearm prevalence on suicide and violent crime)
- how taxes, access to health care, and media campaigns might affect gun violence (Chapters Eighteen through Twenty)
- the effectiveness of laws used to target domestic violence (Chapter Twenty-One)
- methodological challenges in defining and estimating the prevalence of mass shootings and defensive gun use (Chapters Twenty-Two and Twenty-Three)
- how suicide, violent crime, and mass shootings were affected by Australia's implementation of the National Firearms Agreement (Chapter Twenty-Four).

CHAPTER SIXTEEN
# The Relationship Between Firearm Availability and Suicide

In 2004, the National Research Council (NRC) concluded,

> States, regions, and countries with higher rates of household gun ownership have higher rates of gun suicide. There is also cross-sectional, ecological association between gun ownership and *overall* risk of suicide, but this association is more modest than the association between gun ownership and gun suicide; it is less consistently observed across time, place, and persons; and the causal relation remains unclear. . . . The risk of suicide is highest immediately after the purchase of a handgun, suggesting that some firearms are specifically purchased for the purpose of committing suicide.

Suicide attempts involving a firearm are more likely to result in death than attempts using any other means (Azrael and Miller, 2016). If firearms are available to a person who is thinking about taking his or her life, the presence of firearms might be linked with a higher likelihood of suicide and higher regional suicide rates. However, if firearms are not available, a person might either not attempt to take his or her life or might do so using other means. In this chapter, we examine the empirical evidence on the relationship between firearm availability (or prevalence) and suicide.

## Methods

Our literature review strategy was based on the comprehensive search described in Chapter Two of this report. Although the focus of that search was from 2003 forward, we highlight some highly cited articles published prior to 2003. As we did for the policy discussions (Chapters Three through Fifteen), we prioritize the evidence from studies that employ a quasi-experimental approach. However, because this line of scientific inquiry is so much more extensive than most of the other topics reviewed in these syntheses, we take a broader approach referencing noteworthy international studies and cross-sectional studies that were identified in our review.

We categorize these studies as those that examine associations between individual *access* to firearms and suicide rates and those that examine associations between the regional *prevalence* of firearms and suicide rates in census regions, states, and cities.

## Individual Access to Firearms

A primary conclusion of the NRC report was that although there are limitations of studies that examine suicide outcomes among those with access to guns (e.g., gun purchasers) or those that look at firearm ownership among suicide decedents relative to some other group, these research approaches have generally been "underutilized in the literature" (NRC, 2004, p. 183). These studies are broadly defined as "individual-level studies" and, as described in this section, can be categorized into two groups: those that examine suicide risk among gun owners and those that examine firearm access among suicide decedents.

Our review identified eight U.S.-based individual-level studies conducted since 2003, six of which analyzed data from the 1993 National Mortality Followback Survey (Dahlberg, Ikeda, and Kresnow, 2004; Joe, Marcus, and Kaplan, 2007; Kung, Pearson, and Liu, 2003; Kung, Pearson, and Wei, 2005; Shenassa et al., 2004; Wiebe, 2003), one of which examined suicides in the Navy (Stander et al., 2006), and one of which examined suicides in California (Grassel et al., 2003).

### Suicide Risk Among Gun Owners

In 2004, NRC identified that the strongest evidence for the effect of firearm availability on individual suicide rates derived from two studies that examined individual outcomes after the purchase of a firearm; we identified no similar studies that have been conducted since NRC published its findings. Cummings et al. (1997b) used a case-control approach in which they linked health insurance records with firearm licenses in Washington state from 1980 to 1992. During this time, those who died by suicide (using any means) were more likely than living, demographically matched controls to have a history of the decedent or somebody in the family having purchased a handgun (24.6 percent versus 15.1 percent, respectively; incidence rate ratio [IRR] = 1.9; 95-percent confidence interval [CI]: 1.4, 2.5). Compared with the controls, this risk was greatest in the year after the handgun was purchased (3.1 percent versus 0.7 percent; IRR = 5.7; 95-percent CI: 2.4, 13.5); the median interval between the first handgun purchase and any suicide with a firearm was 10.7 years (range: 11 days to 52.5 years). Wintemute et al. (1999) took a prospective study approach in which they linked applications for handgun purchases among California residents in 1991 to death records maintained by the state from 1991 to 1994. Compared with the general mortality trends in the state for the same years and adjusting for age and sex, handgun purchasers had elevated standardized mortality ratios for suicide (4.31) and firearm suicide

(7.12). The elevated firearm suicide rate among purchasers was seen across all six years after purchase, although the effect was greatest in the first week after purchase (644 per 100,000) and diminished over longer intervals—specifically, the first month after purchase (350–375 per 100,000) and the first year after purchase (75–100 per 100,000). This pattern may indicate that a subset of handgun purchasers acquire a firearm for the purpose of killing themselves.

Whether the mere availability of a gun increases the risk of suicide is a complex question to disentangle from observational data because some of the association between gun accessibility and suicide is likely attributable to the fact that those who wish to kill themselves may go out of their way to procure a gun or otherwise ensure that a gun is accessible. Others with access to guns may be at higher risk of suicide because their attempt to kill themselves with an available gun is more likely to be fatal than if they had used a less lethal means, such as poison or drug overdose. Experimental studies that could systematically test the effects of gun availability on suicides are unlikely to be performed, because they would almost certainly be found to be unethical. The next-best source of rigorous evidence, quasi-experimental observational studies, may never be able to adequately control for the myriad, sometimes intersecting, reasons why individuals might want guns available and might also wish to kill themselves. Nevertheless, the results of such studies shed some light on this association, as we discuss next.

**Firearm Access Among Suicide Decedents**

Prior to 2004, a series of U.S.-based studies routinely and consistently found that access to a firearm, particularly a handgun, in one's home was more prevalent among those who died by suicide than among various comparison groups. These studies were generally based on psychological autopsies, in which ascertainment about the presence of firearms was provided by proxy respondents for the decedent after his or her death and compared with the presence of firearms as reported by comparison or control cases who were matched to the decedent in various ways but who typically had not died. A concern with all such studies is the possibility that cases and controls may not be matched on important characteristics that influence both the person's decision to acquire firearms and his or her risk of suicide. Relatedly, while proxy respondents are likely to know and acknowledge that the decedent who died by firearm suicide had access to a firearm, it is less certain that all controls would acknowledge having access to a gun. Either bias could result in firearm access appearing to be more closely associated with suicide risk than it really is. (For more on potential biases in psychological autopsy studies, see NRC, 2004, pp. 171–172.) Only three U.S.-based psychological autopsy studies have been conducted since 2005.

The relationship between firearm access and suicide has been shown in studies comparing suicide decedents with those who have died by other causes (Dahlberg, Ikeda, and Kresnow, 2004; Grassel et al., 2003; Kung, Pearson, and Liu, 2003; Kung, Pearson, and Wei, 2005; Shenassa et al., 2004), those living in the same community

(Bailey et al., 1997; Brent et al., 1993a; Brent et al., 1993b; Brent et al., 1999; Conwell et al., 2002; Kellermann et al., 1992; Wiebe, 2003), and those with histories of mental illness who have not died by suicide (Brent et al., 1991; Brent et al., 1993a; Brent et al., 1994). This relationship has also been seen in suicides among older adolescents and adults in the general population (Dahlberg, Ikeda, and Kresnow, 2004; Grassel et al., 2003; Kellermann et al., 1992; Kung, Pearson, and Liu, 2003; Kung, Pearson, and Wei, 2005; Shenassa et al., 2004; Wiebe, 2003), as well as specifically among older age groups (Conwell et al., 2002), adolescents (Brent et al., 1991; Brent et al., 1993a; Brent et al., 1993b; Brent et al., 1994; Brent et al., 1999; Bukstein et al., 1993), and women (Bailey et al., 1997). In addition, studies with community-based controls often control for demographic characteristics (through either matching or covariate adjustment) and other family and clinical characteristics (e.g., history of mental illness, alcohol misuse, drug use). Furthermore, studies limited to suicide decedents have shown that prevalence of firearms was higher among those who died by suicide using a firearm than those who used other means (Dahlberg, Ikeda, and Kresnow, 2004; Joe, Marcus, and Kaplan, 2007; Shenassa et al., 2004; Stander et al., 2006).

Eight individual-level studies were published in or after 2003 (Dahlberg, Ikeda, and Kresnow, 2004; Grassel et al., 2003; Joe, Marcus, and Kaplan, 2007; Kung, Pearson, and Liu, 2003; Kung, Pearson, and Wei, 2005; Shenassa et al., 2004; Stander et al., 2006; Wiebe, 2003) (see Table 16.1 for details). One of these studies (Grassel et al., 2003) is particularly informative, as it linked California death data with administrative data on handgun purchases. Findings showed that those who died by suicide were more likely to have purchased a handgun in the previous three years, with the relationship even greater between suicide death and purchase of a handgun in the past year, an effect magnified for women. Five studies used the 1993 National Mortality Followback Survey. One compared suicide decedents with living, matched controls from the National Health Interview Survey and found having a gun in the home to be associated with suicide and specifically firearm suicide, but not with nonfirearm suicide (Wiebe, 2003). The other four studies limited their findings to decedents only and found a relationship between having a gun in the home and elevation in the risk of suicide (Kung, Pearson, and Wei, 2005; Shenassa et al., 2004), a relationship generally robust in models that stratify by gender (Dahlberg, Ikeda, and Kresnow, 2004; Kung, Pearson, and Liu, 2003)[1] and race (Kung, Pearson, and Wei, 2005). Two studies limited their analysis of the 1993 National Mortality Followback Survey to suicides and found a relationship between having a gun in the home and firearm suicide (Dahlberg, Ikeda, and Kresnow, 2004; Joe, Marcus, and Kaplan, 2007), an approach similar to that employed by Stander et al. (2006) in analysis of Navy suicides.

---

[1]  For an exception, see Dahlberg, Ikeda, and Kresnow (2004), who found that among suicides in the home, the relationship for women was only marginally statistically significant, as the lower limit of the CI was the null value, 1.0.

With individual-level studies, any observed differences in gun access between groups can be interpreted in at least two ways: The differences could suggest that gun access increases the risk of suicide, or they could suggest that people who are suicidal may obtain guns at a higher rate because they are considering killing themselves with guns. In other words, these studies are criticized for providing little insight into the relationship between firearm access and suicide because they are generally consistent with a wide range of causal models, including models postulating effects in opposite directions. A recent review by Azrael and Miller (2016) suggests that the evidence in support of the former of these two interpretations (that gun access increases the risk of suicide) is strong based on two findings. First, the authors note that a series of studies find that the relationship between household gun ownership and suicide exists not just for the firearm owner but for all other household members. Second, although covariate adjustment for factors related to suicidality could attenuate the relationship between the presence of a firearm and suicide, a number of studies reveal no difference in past suicide attempts (described in the next section), mental illness, and substance use disorders between households with firearms and those without. In addition, an omitted variable analysis suggests that if there is actually some third risk factor associated with both household firearm ownership and suicide, this third factor would need to be a better predictor of suicide than any currently known risk factor to fully account for the association between household firearms and suicide (Miller, Swanson, and Azrael, 2016). While compelling, this does not entirely refute an argument about reverse causation: An individual feeling suicidal may acquire a firearm as a means to take his or her life and thus make the weapon readily available in the household.

Other work has used different control groups to attempt to address this selection bias (that suicidal people are more likely to acquire guns so that they can kill themselves). For example, firearm access was higher among adolescents who had committed suicide than among adolescents in inpatient mental health treatment who had either previously attempted suicide or never attempted suicide (Brent et al., 1991). Additionally, adolescent suicides with no history of a mental health disorder had higher rates of firearm access relative to adolescent suicides with a mental health disorder (Brent et al., 1994). This pattern of results may indicate that access to firearms was a causal factor in the suicidal adolescent's death or that parents or caretakers removed guns from the homes of adolescents at risk of suicide because of prior attempts or mental health problems, or a combination of the two.

### Firearm Storage Among Suicide Decedents

Individual-level studies have examined not only whether decedents had access to firearms in their households but also how those guns were stored. In general, these studies consistently show that, relative to comparison groups of individuals who die other ways or of living community members, those who die by suicide have guns stored less safely (Conwell et al., 2002; Shenassa et al., 2004; Grossman et al., 2005). These studies sug-

gested to one set of researchers a "dose-response" relationship between firearm accessibility and risk for suicide (Azrael and Miller, 2016). However, the relationship is not seen in all studies. Brent et al. (1991; 1993b) found no differences in storage practices in homes with adolescents who died by suicide and a comparison group of adolescents living in the community. Dahlberg, Ikeda, and Kresnow (2004) found no association between storage practices and firearm suicide (versus suicide by other means).

### Suicidality (Not Death) as an Outcome

Individual-level studies that conduct postmortem inventories of the presence of firearms may be biased because they rely on proxy respondents who may report incorrect information either purposely or because they do not know the correct information. At times, researchers have used proxy outcomes—most commonly, living individuals' past suicide attempts and *suicide ideation* (thinking about suicide), which they can ascertain directly from the individuals whose behavior and firearm access are being studied. Yet, while suicide attempts and ideation are potentially important markers of anguish or distress, they are not reliable proxies for or predictors of suicide deaths.[2]

Since 2005, one longitudinal study (Watkins and Lizotte, 2013) and a series of cross-sectional studies (described in Table 16.1) examined firearm access among those who have attempted suicide (and survived), who have made plans to kill themselves, or who have thought about suicide (*suicide ideation*). In general, there was not much evidence of a relationship between suicide ideation and firearm access (Ilgen et al., 2008; Miller et al., 2009; Oslin et al., 2004; Simonetti et al., 2015; Smith, Currier, and Drescher, 2015), although Thompson et al. (2006) found that veterans receiving outpatient treatment for opioid dependence and who had suicide ideation were more likely to own a firearm than those in treatment without such thoughts. However, those with a history of suicide attempts are less likely to have access to a firearm in both population-based (Ilgen et al., 2008; Miller et al., 2009; Simonetti et al., 2015) and psychiatric clinical samples (Kolla, O'Connor, and Lineberry, 2011; Smith, Currier, and Drescher, 2015).[3] In another study, firearm access was higher among those who had made a plan to take their lives using a firearm than among those who made a plan involving some other means (Betz, Barber, and Miller, 2011). Although cross-sectional studies examining suicide attempts and ideation are common, they provide little insight into the relationship between firearm access and suicide, because these results are consistent with a wide range of causal models, including ones that postulate effects in opposite directions.

---

[2]   A history of self-injurious thoughts and behaviors is a weak predictor of risk for suicide death (Ribeiro et al., 2016).

[3]   An exception is Borowsky et al. (1999), which found that knowing where to get a gun was associated with lifetime suicide attempts among American Indian youth, particularly girls.

There are similar studies examining suicide attempts and ideation with respect to firearm storage practices. Studies generally find no difference in storage practices between adults who have thought about or attempted suicide versus those who have not (Betz et al., 2016; Ilgen et al., 2008; Oslin et al., 2004; Smith, Currier, and Drescher, 2015).

Although suicide attempts and ideation are not reliable proxies of suicide risk, these studies do yield insights into the differences in suicidality between those who have access to guns and those who do not. These studies find little evidence that firearm access or storage practices are associated with suicidality among household members, which refutes criticism that associations between access and suicide are due to differences in a propensity to take one's life and whether a person owns or how he or she stores guns. However, other problems in a household might cause poor storage security and increased suicide risk, which could account for their apparent association without storage practice itself contributing to suicide risk. Still, at least one study suggests that such an omitted variable would need to be improbably influential to explain the strong observed association between household firearm access and suicide risk (Miller, Swanson, and Azrael, 2016).

### Weapon-Carrying and Suicide Attempts

A third type of individual-level study examined the association between weapon-carrying and suicide attempts. Three such studies fell within the time frame of our literature review (2003–2016), most of which derived from analyses of the Youth Risk Behavior Survey. Two studies documented positive relationships between past suicide attempts and carrying a gun in the past 30 days (Molina and Duarte, 2006; Ruggles and Rajan, 2014), and one found a positive relationship between past suicide attempts and carrying a weapon (though not necessarily a gun) in the past 30 days (Swahn et al., 2012). Again, these results are consistent with a wide range of causal models, including ones that postulate effects in opposite directions (i.e., that suicidality causes one to carry a weapon).

Table 16.1 details the studies published in or after 2003 that examined the relationship between firearm access and suicide.

**Table 16.1**
**Individual-Level Studies Published in or After 2003 That Examined the Relationship Between Firearm Access and Suicide**

| Study | Sample | Cases | Controls | Results |
|---|---|---|---|---|
| **Case status: Suicide deaths** | | | | |
| Grassel et al., 2003 | California deaths in 1998 | 2,798 suicides in California | 207,851 noninjury causes of death (with some exclusions) | Those who died by suicide were more likely to have purchased a handgun in the past three years (aOR = 6.8; CI: 5.7, 8.1) and in the past year (aOR = 12.5; CI: 10.0, 15.6). The association for purchase in the past three years was especially pronounced for women (aOR = 33.9; CI: 19.3, 59.3). |
| Kung, Pearson, and Liu, 2003 | 1993 National Mortality Followback Survey | 441 female and 1,022 male suicides | 2,337 female and 5,055 male deaths from natural causes | Both males and females who died by suicide were more likely to have lived in a home with a gun, regardless of whether they lived alone or with others (female, lived with others: aOR = 2.99; CI: 1.58, 5.65; female, lived alone: aOR = 25.83; CI: 8.36, 77.29; male, lived with others: aOR = 3.53; CI: 2.42, 5.15; male, lived alone: aOR = 16.13; CI: 6.97, 37.25). |
| Wiebe, 2003 | 1993 National Mortality Followback Survey | 1,959 suicides | 13,535 respondents from the 1994 National Health Interview Survey | Those who died by suicide were more likely to have lived in a home with a gun (aOR = 3.44; CI: 3.06, 3.86). Having a gun in the home was also associated with firearm suicide (aOR = 16.89; CI: 13.26, 21.52) but inversely associated with nonfirearm suicide (aOR = 0.68; CI: 0.55, 0.84). |
| Dahlberg, Ikeda, and Kresnow, 2004 | 1993 National Mortality Followback Survey | 1,049 suicides in the home and 687 firearm suicides | 535 deaths in the home from other means, excluding suicide, and 362 nonfirearm suicides | Males with guns in the home were at a significantly greater risk of suicide than males without guns in the home (OR = 10.4; CI: 5.8, 18.9); the association for females included the null value (= 1.0) in the CI. Among those who died by suicide, those living with a gun in the home were more likely to take their lives using a gun than other means. There was no evidence of an association between suicide method and type or number of guns in the home or between suicide method and storage practices. |
| Shenassa et al., 2004 | 1993 National Mortality Followback Survey | Firearm suicide | Died from other causes | Those who died by firearm suicide were more likely to have lived in a home with a firearm (no adjustment). |

**Table 16.1—Continued**

| Study | Sample | Cases | Controls | Results |
|---|---|---|---|---|
| Kung, Pearson, and Wei, 2005 | 1993 National Mortality Followback Survey | Suicide death among those aged 15–64 | Death from natural causes among those aged 15–64 | Those who died by suicide were more likely to have lived in a home with a gun in analyses adjusted for race, living arrangements, educational status, marijuana use, excessive alcohol use, depressive symptoms, and past-year use of mental health services. |
| Stander et al., 2006 | 1999–2004 Navy suicides | Firearm suicide | Nonfirearm suicide | Among Navy suicides, 66 percent of those with access to a military weapon used a gun to die, compared with 54 percent of those without access. Furthermore, 65 percent of those with training on military weapons used a gun to die, compared with 54 percent of those without training. |
| Joe, Marcus, and Kaplan, 2007 | 1993 National Mortality Followback Survey | Firearm suicide | Nonfirearm suicide | In models controlling for demographic, socioeconomic, and clinical variables, having a firearm in the home was associated with firearm suicide in the total sample and when stratified by race. |
| **Case status: Suicide ideation or attempts** | | | | |
| Oslin et al., 2004 | Older adults receiving primary care treatment | Suicide ideation | No suicide ideation | There was no relationship between suicide ideation and having a gun in the home. |
| Thompson et al., 2006 | Veterans receiving outpatient treatment for opiate addiction | Suicide ideation ($n = 26$) | No suicide ideation ($n = 75$) | Owning a firearm was associated with suicide ideation in bivariate analyses. |
| Ilgen et al., 2008 | National Comorbidity Survey | Those who report having ever thought about committing suicide, made a plan for committing suicide, or attempted suicide | Those who did not meet case criteria | There was no significant difference in gun access between those who thought about attempting suicide (31 percent) or made a plan to attempt suicide (31 percent) and those who did not (36 percent for both sets of controls), but those who had attempted suicide were less likely to have access (36 percent versus 24 percent; OR = 0.6; CI: 0.5, 0.8). |
| Miller et al., 2009 | National Comorbidity Survey Replication | Past-year suicide ideation, suicide planning, or suicide attempt | No past-year suicide ideation, suicide planning, or suicide attempt | Living in a home with a firearm was not associated with past-year suicide ideation, planning, or attempts in models that accounted for age, sex, race/ethnicity, educational attainment, and poverty. |

**Table 16.1—Continued**

| Study | Sample | Cases | Controls | Results |
|---|---|---|---|---|
| Betz, Barber, and Miller, 2011 | Second Injury Control and Risk Survey | 20 people who, in the past 12 months, had a suicide plan involving a firearm | 155 people who, in the past 12 months, had a suicide plan that did not involve a firearm | Of those who had a suicide plan involving a firearm, 81 percent lived in a home with a firearm, compared with 38 percent of those whose plan did not involve a firearm (OR = 7.4). |
| Kolla, O'Connor, and Lineberry, 2011 | Psychiatric inpatients | Access to a firearm ($N = 138$) | No access to a firearm | Females, those with a past suicide attempt, those with a family history of a suicide attempt, and those aged 65 or older were less likely to report access to a firearm in multiple logistic regression. Patients with bipolar disorder diagnoses were more likely to report access in multiple regression analyses. |
| Simonetti et al., 2015 | National Comorbidity Survey: Adolescent Supplement | Access to a firearm in the home | No access to a firearm in the home | There was no relationship between household access to a firearm and lifetime suicide ideation, planning, or attempts, nor in any stratified analyses or multivariable models. |
| Smith, Currier, and Drescher, 2015 | Veterans entering treatment for posttraumatic stress disorder | Two samples of veterans with suicidal thoughts or attempts:<br>• Sample 1: $N = 82$ ideators, 62 attempters<br>• Sample 2: $N = 27$ ideators, 23 attempters | Veterans without suicidal thoughts or attempts (Sample 1 = 57, Sample 2 = 22) | In Sample 1, attempters were likely to own a gun at the beginning of treatment (26 percent) relative to ideators (39 percent) or nonattempters/nonideators (32 percent). In Sample 2, there were no significant differences among groups (attempters = 29 percent, ideators = 36 percent, nonattempters/ nonideators = 36 percent). |
| Betz et al., 2016 | Seven emergency departments across the United States | 1,358 emergency department patients with suicidal thoughts or an attempt | None | Of patients with suicidal thoughts or an attempt, 11 percent reported having access to a gun at home. Among those with a firearm at home, 58 percent of men and 25 percent of women personally owned at least one gun. |

NOTE: All CIs in this table are at the 95-percent level. aOR = adjusted odds ratio; OR = odds ratio.

## Regional Availability of Firearms

NRC (2004) concluded that there were regional associations between firearm prevalence and firearm suicide but uncertain relationships between firearm availability and total suicides. The report also concluded that results varied by the age group studied, the covariates included in the models, and the measure of firearm availability used (discussed later in this section). Further, the report noted that there was uncertain evidence that firearm prevalence explained changes in total suicide rates over time. Evidence about change over time derived primarily from studies examining suicide rates in the District of Columbia before and after 1976, when the District established a policy that prohibited the purchase, sale, transfer, and possession of handguns. There was a 23-percent reduction in the frequency of firearm-related suicides following the policy change, and no changes in nonfirearm-related suicides or in firearm-related suicides in the surrounding areas (Loftin et al., 1991), although, as NRC pointed out, this study was sensitive to modeling choices (Britt, Kleck, and Bordua, 1996), and its results may have been caused by other changes in the District of Columbia over the same period (Jones, 1981).

In this discussion, we prioritize longitudinal studies conducted since 2003 that applied a quasi-experimental research design. We describe these studies in the following sections, noting that while some studies are longitudinal, only a handful utilize measures of exposure (firearm prevalence, or a proxy for prevalence) and outcome (suicides) that vary over time, conditions necessary to employ a quasi-experimental design. The studies meeting that criteria are Briggs and Tabarrok (2014), Miller et al. (2006), Phillips and Nugent (2013), and Rodriguez Andrés and Hempstead (2011). Each of these four studies employs unique methods to reach empirical and causal estimates of the effects of changes in firearm prevalence on changes in suicides. This is challenging to estimate empirically because firearm prevalence does not change significantly over regions over time (Smith and Son, 2015) and because, in cross-sectional analyses, firearm prevalence is consistently associated with suicide. Thus, methods need to decompose within-region changes over time from cross-region known associations. In the four studies described here, three (Miller et al., 2006; Briggs and Tabarrok, 2014; and Rodriguez Andrés and Hempstead, 2011) did so in a time-series model with regional fixed effects. Phillips and Nugent (2013) employed a decomposition random-effects model approach that estimated separate between- and within-region effects.

## Measures of Firearm Prevalence

One of the biggest challenges to estimating the effects of regional firearm availability (i.e., prevalence) on suicide risk is the lack of valid data on the exposure of interest: household prevalence of firearms or of firearm ownership at the state level. Survey data on firearm ownership collected as part of the Centers for Disease Control and Prevention's Behavioral Risk Factor Surveillance Survey (BRFSS) for all 50 states are

available for three years (2001, 2002, and 2004) and for census regions (and large cities) as part of the General Social Survey (GSS) biannually (though for some periods, annually). Thus, while there are studies examining the relationship between regional prevalence rates and suicide outcomes, researchers interested in examining variability in gun prevalence and its association with suicide at the state level must rely on proxy measures. Sometimes they apply the earlier BRFSS estimates to the current period or apply regional measures to the states within the region.

Some studies validate different proxy measures of firearm prevalence (see, for example, Azrael, Cook, and Miller, 2004; Kleck, 2004; Siegel, Ross, and King, 2014). However, evidence for the validity of these proxies as measures of gun prevalence over time is limited (Kleck, 2004), and establishing such evidence in the absence of survey data, particularly at the state level, over time is challenging. Our goal here is not to review all proxy measures; rather, we describe information on the ones found in the quasi-experimental studies described in this chapter, as well as those used in Chapter Seventeen. The proxy measures we discuss are as follows:

- *FS/S.* The most frequently utilized measure of firearm prevalence is the proportion of total suicides that are firearm suicides (FS/S). The correlation between FS/S and BRFSS state-based prevalence estimates is 0.80 (Siegel, Ross, and King, 2014), between FS/S and GSS regional-based prevalence estimates is 0.93 (Azrael, Cook, and Miller, 2004), and between FS/S and estimates from large cities is 0.87 (Kleck, 2004). NRC (2004, p. 169), however, emphasized that FS/S could introduce biases in models examining the effects of gun availability on suicide.
- *Hunting licenses per capita.* Rodriguez Andrés and Hempstead (2011) used hunting licenses per capita. Kleck (2004) provided only a correlation of this proxy with 45 large cities and estimated a weak correlation of 0.37, although Rodriguez Andrés and Hempstead (2011) reported that hunting license per capita has a 0.74 correlation with FS/S.
- *FS/S combined with hunting license rate.* In Chapter Seventeen, we review Siegel, Ross, and King (2014), which used a composite measure that includes both FS/S and the hunting license rate. The authors presented evidence that this measure has a 0.95 correlation with BRFSS estimates, although they suggest that the measure overestimates absolute levels of gun ownership and thus its utility should be restricted to a proxy reflecting proportional differences between states.
- *Google searches for gun-related terms.* Briggs and Tabarrok (2014) used as a proxy of gun ownership Google searches, aggregated to states, for gun-related terms. The correlation between this measure and the three-year average of the BRFSS estimates is greater than 0.80, although the authors did not present the actual correlation estimate.
- *Composite index of FS/S, the rate of background checks for gun purchases, and the rate of* unintentional *death by firearm.* Briggs and Tabarrok (2014) also used this

composite index to "overcome weaknesses" of the measures individually. The correlation between this composite measure and the three-year average of the BRFSS estimates is 0.84.

For other proxy measures—including firearm homicides divided by homicides, subscriptions to firearm-related publications (e.g., *Guns & Ammo*), membership in the National Rifle Association, percentage of hunters, and carry permits per population—see Azrael, Cook, and Miller (2004) and Kleck (2004).

## Quasi-Experimental Results

In the earliest of the four studies in our review, Miller et al. (2006) used data from the GSS on firearm prevalence in census regions over time. Using generalized estimating equations with region-level fixed effects, the authors concluded that a *regional reduction* in firearms of 10 percent would result in an estimated 4.2-percent reduction in firearm suicides, 2.5-percent reduction in total suicides, and no change in nonfirearm suicides.

Briggs and Tabarrok (2014) used four measures of gun prevalence over time: state-level ownership from the BRFSS in 2001, 2002, and 2004; state-level estimates of searches for gun-related terms on Google from 2004 to 2009; FS/S from 2000 to 2009; and a composite index comprising FS/S, the rate of background checks for gun purchases, and the rate of unintentional death by firearm for 2000 to 2009. In ordinary-least-squares models with time and regional (not state) fixed effects, along with other regional covariate adjustments, all four measures of gun prevalence showed that a 1-percent increase in the prevalence of individuals having firearms in their households in a state is associated with a positive and statistically significant increase in firearm suicides (between 1.3 and 3.1 percent), and three of the four measures found positive and statistically significant increases in total suicides (between 0.7 and 0.9 percent) (Table 16.2). The effect on total suicide was not significant at $p < 0.05$ for the direct measure of gun ownership from the BRFSS.

The foregoing findings were correlational, without additional analyses that attempted to determine whether the correlation should be interpreted as evidence

**Table 16.2**
**Estimated Effects of a 1-Percent Increase in Firearm Prevalence on Firearm and Total Suicides**

| Measure of Gun Prevalence | Increase in Firearm Suicide | Increase in Total Suicide |
|---|---|---|
| Gun ownership (from the BRFSS) | 1.7 percent | 0.5 percent (not significant) |
| Gun-related Google searches | 1.3 percent | 0.7 percent |
| FS/S | 3.1 percent | 0.9 percent |
| Composite index (FS/S, rate of background checks for gun purchases, rate of unintentional death by firearm) | 2.3 percent | 0.8 percent |

NOTE: All effects are significant at $p < 0.01$, except as noted (Briggs and Tabarrok, 2014).

that increases in gun prevalence cause an increased suicide rate. However, Briggs and Tabarrok (2014) also reported results using methods that might better support causal interpretation. In these analyses, gun prevalence measures were modeled using "interest in hunting" (based on hunting magazine subscriptions and Google searches for hunting-related terms). This type of "instrumental variable" method can provide evidence of a causal effect if the chosen instrument has no direct effect on suicide but instead can affect suicide only indirectly through its effect on gun prevalence. These models showed suggestive, but nonsignificant, effects consistent with gun prevalence causing suicide. However, the authors provided no empirical evidence for the validity of their instruments, and the instruments' conceptual validity may also be questioned.

Phillips and Nugent (2013) used a decomposition random-effects model that provided separate estimates for the effect of gun prevalence on suicide between states and on annual suicides within states from 1976 to 2000. The authors measured gun prevalence using GSS data at the regional level (with each state in a region assigned the regional value). They found that gun prevalence was associated with total and firearm suicides across states, but there was no evidence that prevalence explained variation *within* states (for total, firearm, or nonfirearm suicides) over time.

Rodriguez Andrés and Hempstead (2011) was the only study to find no association between changes in firearm prevalence and total or firearm suicides. The authors used a negative binomial model of suicides between 1995 and 2004 with fixed effects for state and year. However this analysis used one of the weakest proxies of gun ownership: hunting licenses per capita (Kleck, 2004).

Table 16.3 details the four longitudinal studies conducted since 2003 that applied a quasi-experimental research design and examined the regional relationship between firearm availability and suicide.

**Table 16.3**
**Quasi-Experimental Studies Published in or After 2003 That Examined the Regional Relationship Between Firearm Prevalence and Suicide**

| Study | Sample | Outcome | Measure of Prevalence | Covariates | Analytic Approach | Results |
|---|---|---|---|---|---|---|
| Miller et al., 2006 | U.S. Census regions | Suicide rates, 1981–2002 | GSS gun ownership data (1982, 1984, 1985, 1987–1991, 1993, 1994, 1996–2002; missing years imputed); for sex-specific and child outcomes, gun availability was estimated using responses from these specific groups | Age, unemployment, per capita alcohol consumption, poverty, and region of the country | Log-log generalized estimating equation regressions with regional fixed effects | Percentage decrease in outcome based on a 10-percent regional decrease in firearm ownership:<br>• Total suicides: 2.5 percent (95% CI: 1.4, 3.6)<br>• Firearm suicides: 4.2 percent (95% CI: 2.3, 6.1)<br>• Nonfirearm suicides: 0.3 percent (95% CI: −1.4, 2.3).<br>Rate of decline did not vary significantly by gender but was greatest for those aged 0–19. |
| Rodriguez Andrés and Hempstead, 2011 | U.S. states | Number of male suicides, 1999–2004 | Hunting licenses per capita | Education, income, alcohol consumption, percentage older than age 65, percentage non-Hispanic white, relevant population size, one index of gun availability (general prohibitions) | Negative binomial with state and year fixed effects | There was no statistically significant association between gun availability and outcome. |
| Phillips and Nugent, 2013 | U.S. states | Suicide rates, 1976–2000 | GSS gun ownership (regional) using the three-year moving average | Percentage aged 15–24; percentage older than age 65; percentage male; percentage white; population size; percentage living in urban areas; percentage foreign-born; unemployment rate; per capita income; percentage divorced; religious adherence rate per 1,000; percentage Catholic, Episcopalian, or other mainline Protestant; annual alcohol consumption | Decomposition model with random effects and regional and year-level fixed effects | Gun ownership rate was associated with increases in total suicide rate across states (0.105 percent, $p < 0.05$) and firearm suicide rate across states (0.129 percent, $p < 0.05$) but not across time for either outcome. Also, neither outcome was related to nonfirearm suicide. |

**Table 16.3—Continued**

| Study | Sample | Outcome | Measure of Prevalence | Covariates | Analytic Approach | Results |
|---|---|---|---|---|---|---|
| Briggs and Tabarrok, 2014 | U.S. states | Suicide rates, 2000–2009 | (1) BRFSS gun ownership from 2001, 2002, and 2004; (2) Google searches for gun-related terms (2004–2009); (3) FS/S; (4) composite index comprising FS/S, the rate of background checks for gun purchases, and the rate of unintentional death by firearm | **Baseline model:** population, poverty rate, annual average unemployment rate, percentage urban land area, percentage urban population, Gini coefficient of household income inequality, prevalence of drug and/or alcohol abuse or dependence in the population aged 12+, prevalence of frequent mental distress among noninstitutionalized adults, percentage of males aged 65+, and percentage white<br><br>**Full model:** median household, percentage of children living in a single-mother family, percentage of divorced adults, distance to the nearest hospital emergency room, and a measure of social connectedness | Ordinary-least-squares model with time-specific and regional-specific (not state-specific) fixed effects; standard errors account for clustering at the state level. Minimal model excluded Gini, frequent mental distress, drug/alcohol covariates. Used circulation of *Field & Stream* magazine as an instrumental variable. For Google exposure, the instrumental variable was a Google search for hunting-related terms. | **Ownership (BRFSS):**<br>• Total suicides: $\beta = 0.003$–$0.005$, $p < 0.10$ in baseline and minimal model, not significant in full model<br>• Firearm suicides: $\beta = 0.014$–$0.017$, $p < 0.01$<br>• Nonfirearm suicides: $\beta = -0.008$–$0.01$, $p < 0.01$ in full model, $p < 0.05$ in baseline model, $p < 0.10$ in minimal model<br>**Google searches, baseline model:**<br>• Total suicides: $\beta = 0.007$, $p < 0.01$<br>• Firearm suicides: $\beta = 0.013$, $p < 0.01$<br>• Nonfirearm suicides: $\beta = -0.000$, $p =$ not significant<br>**FS/S, baseline model:**<br>• Total suicides: $\beta = 0.009$, $p < 0.01$<br>• Firearm suicides: $\beta = 0.031$, $p < 0.01$<br>• Nonfirearm suicides: $\beta = -0.012$, $p < 0.01$<br>**Composite index, baseline model:**<br>• Total suicides: $\beta = 0.008$, $p < 0.01$<br>• Firearm suicides: $\beta = 0.023$, $p < 0.01$<br>• Nonfirearm suicides: $\beta = -0.007$, $p < 0.01$<br><br>When adding a quadratic term to the baseline regressions, they found that it was significant and negative (diminishing effect). The instrumental variable results reported qualitatively similar findings. |

### Longitudinal, Non-Quasi-Experimental Results

In addition to the four studies just discussed, our search identified two other U.S.-based longitudinal studies that do not meet our criteria for a quasi-experimental design. Desai, Dausey, and Rosenheck (2008) did not use a measure of gun prevalence that varied over time but found that state-level firearm prevalence (measured prior to hospital discharge) is associated with increased risk that a veteran discharged from an inpatient U.S. Department of Veterans Affairs facility with a psychiatric diagnosis will use a firearm to take his or her life relative to not taking his or her life or doing so using some other means. Wadsworth, Kubrin, and Herting (2014) did not employ a control group but found that the suicide rate increase among black males aged 15–34 between 1982 and 1993 was not associated with changes in gun availability (while also controlling for social and economic disadvantage) but that reductions in gun availability during the 1990s had some association with decreasing suicide rates in that group over the same period.

### Cross-Sectional Results

Cross-sectional studies that examined regional associations provided little or no evidence for the causal effect of gun availability on suicide. Nonetheless, most such studies since 2003 generally found a positive relationship between gun prevalence and total or firearm suicide in the United States (Duggan, 2003; Miller, Azrael, and Hemenway, 2004; Price, Thompson, and Dake, 2004; Miller et al., 2009; Kubrin and Wadsworth, 2009; Price, Mrdjenovich, and Dake, 2009; Kposowa, 2013; Miller et al., 2013; Smith and Kawachi, 2014; Miller et al., 2015; Kposowa, Hamilton, and Wang, 2016), although there were exceptions (e.g., Shenassa, Daskalakis, and Buka, 2006). Details of these studies are presented in Table 16.4.

**Table 16.4**
**Cross-Sectional Studies Published in or After 2003 That Examined the Regional Relationship Between Firearm Availability and Suicide**

| Study | Focal Area | Main Findings |
|---|---|---|
| Duggan, 2003 | U.S. states | Firearm prevalence (FS/S and sales rates for *Guns & Ammo* magazine) was positively correlated with total, firearm, and nonfirearm suicide rates (although there were age groups for which the relationship with nonfirearm suicides was not significant or was negative). Change in firearm prevalence (sales rates for *Guns & Ammo* magazine, 1980–1998) was correlated with change in firearm suicide, but there was no evidence of a statistically significant association with nonfirearm suicide, while the association with total suicide was dependent on model specification. |
| Miller, Azrael, and Hemenway, 2004 | U.S. states | Among seven Northeastern states, prevalence of firearms was positively correlated with suicides (except female suicides) and firearm suicides (but not nonfirearm suicides), as well as suicide attempts (except among those aged 15–64), firearm suicide attempts, and nonfirearm suicide attempts among females. |

**Table 16.4—Continued**

| Study | Focal Area | Main Findings |
|---|---|---|
| Price, Thompson, and Dake, 2004 | U.S. states | Firearm prevalence (FS/S) was positively associated with firearm suicide mortality (1999) in models controlling for number of firearm dealers, race, presence of gun laws, per capita alcohol consumption, level of urbanization, violent crime rate, and socioeconomic status. |
| Shenassa, Daskalakis, and Buka, 2006 | Chicago neighbor-hoods | Neighborhood levels of gun-carrying and gun availability (based on youth self-report) were not associated with the proportion of suicides by firearm. |
| Kubrin and Wadsworth, 2009 | U.S. cities | Firearm prevalence (combined FS/S and ratio of homicides that are firearm homicides) was associated with a greater number of suicides among both white males and black males aged 35 or younger aggregated between 1998 and 2001, with some suggestion that gun availability mediates the effect of structural disadvantage and suicide among black males. |
| Miller et al., 2009 | U.S. states | Firearm prevalence (2001 BRFSS) was positively associated with 2000–2002 total and firearm suicides in models that controlled for rates of unemployment, urbanization, poverty, serious mental illness, and alcohol and illicit drug dependence and abuse. |
| Price, Mrdjenovich, and Dake, 2009 | U.S. states | Firearm prevalence (2002 BRFSS) was positively associated with firearm suicide mortality (2002) in models controlling for prevalence of serious mental illness, psychotropic medications, access to mental health care, per capita expenditures for mental health services, race/ethnicity, untreated mental health conditions, and educational expenditures and attainment. |
| Kposowa, 2013 | U.S. states | Firearm prevalence (2001 BRFSS) was positively associated with death by suicide relative to other causes of death (2000–2004) in models that controlled for individual-level (marital status, sex, race, place of residence, city size, age, year of death) and state-level (2000 suicide rate, percentage voted for George W. Bush, percentage church adherents, percentage immigrants) variables. |
| Miller et al., 2013 | U.S. states | Firearm prevalence (2004 BRFSS) was positively associated with 2008–2009 total and firearm suicide rates in models that accounted for state-level suicide attempt rates. These relationships held in models stratified by gender and age (18–29, 30+). |
| Smith and Kawachi, 2014 | U.S. states | Firearm prevalence (2001 BRFSS) was positively associated with 1999–2002 total suicides among all men and all women, as well as in stratified analyses for white men and non-Hispanic white men. |
| Miller et al., 2015 | U.S. cities | Firearm prevalence (BRFSS averaged for 2002 and 2004) was positively associated with firearm and total suicides in U.S. cities (data aggregated from 1999 to 2010). |
| Kposowa, Hamilton, and Wang, 2016 | U.S. states | Firearm prevalence (BRFSS) was positively associated with 2011–2013 total and firearm suicide rates in models that controlled for religious adherence, long-term unemployment, percentage of population with a serious mental illness, divorce rate, and percentage rural. |

### International Evidence

Some of the most suggestive evidence that the prevalence of guns in a community may have a causal effect on suicide rates comes from two international studies published since 2003. Reisch et al. (2013) examined suicide rates in Switzerland between 1995 and 2008, following large-scale reforms in the Swiss military in 2004 that reduced the size of the Swiss Army by half; lowered the discharge age from 43 to 33; and adopted new policies that, among other things, increased the cost to service members of purchasing their military guns after separation from the service and introduced a gun license requirement. This study showed that suicide rates among men aged 18–43 were lower immediately after the 2004 Army reforms than would have been expected based on the pre-reform trends. The authors reasonably suggested that the two new firearm policies probably had the effect of reducing firearm ownership in the country and that this reduced gun prevalence caused the observed reductions in suicide rates.

The quasi-experimental Reisch et al. (2013) study relied on data from a single treated unit: Switzerland (i.e., there was no control or comparison country or region). To demonstrate that it was specifically the firearm restrictions imposed in 2004 that led to reductions in suicide by younger men, rather than other aspects of the Army reform or other changes in Swiss society around 2004, the authors noted that the observed reductions among younger men were exclusively found for firearm suicides, not other forms of suicide, and that similar reductions were not found among women after 2004. In addition, they found that the effect was more pronounced for younger men (aged 18–43) who would be more directly affected by the firearm restrictions than older men (aged 44–53).

The strength of these findings rests on the question of whether it is plausible that changes other than a reduction in gun prevalence could account for this pattern. For instance, there were, contemporaneously, large-scale changes to the military and, by extension, to Swiss society and the experience of young men after the military reforms. It is plausible that these large social changes affected suicide rates or attitudes toward firearm suicide. If so, then the effect of the additional cost of acquiring a firearm and any consequent effect on firearm prevalence is not well identified. Moreover, other changes in Swiss society must have been responsible for the substantial declines in suicide rates and firearm suicide rates among younger men in the years immediately preceding the Army reforms. Without understanding the factors driving that change, it is not possible to know whether they also shifted around 2004 in ways that further reduced firearm suicides.

Moreover, the comparison group of older men does not offer a strong demonstration that the effect was specific to those who would have been directly affected by the Army's new gun policies. Specifically, Reisch et al. (2013) found marginally significant reductions in suicide rates after 2004 among older men aged 44–53. Although this effect was no longer significant after Bonferonni corrections, the report did not provide an estimate for whether the reductions found among younger men

were significantly different from those found for older men. If the two estimates were not significantly different, then either reducing access to separating soldiers' service weapons had powerful spillover effects that reduced suicides among older men or, conversely, the Army reforms were not the best explanation of reduced suicides among younger men. If the reductions in suicides among younger and older men were significantly different, then (as the authors argued) changes in firearm policies may well have been the Army reforms' key feature that explains why suicides declined among younger men.

In our assessments of quasi-experimental studies of U.S. law, we raised concerns about any study with fewer than four treated units. This is because, as the number of treated units declines, it becomes increasingly difficult to distinguish the effect of interest from the effects of other contemporaneous events affecting the treated unit or units. Given that only one treated unit was available in the Reisch et al. (2013) natural experiment, stronger evidence for the effect of firearm restrictions on suicide reductions among younger men in Switzerland might include evidence that reductions in suicide rates were disproportionately found among younger men who left the Army in 2004 or later, or that reductions in suicides were disproportionately found among those using their service weapon to kill themselves. Similarly, evidence that Army reforms had a meaningful effect on household gun ownership among younger men could bolster the argument that the effects of Army reforms on suicide were likely to have been mediated by significant changes to gun prevalence among younger men.

A second compelling foreign study examined a 2006 policy implemented by the Israel Defense Forces, which required soldiers to leave their firearms on base when they returned home on weekends. The Israeli suicide rate among men aged 18–21 (including men both in service and not in service) following this policy decreased by 40 percent, from 28 per year in 2003–2005 to 16.5 per year in 2007–2008—a change largely resulting from weekend firearm suicide rates (ten per year in 2003–2005 to three per year in 2007–2008) (Lubin et al., 2010).

As with the Swiss study, Lubin et al. (2010) investigated an intervention on a single treatment unit (Israeli soldiers), so it must provide a strong argument that it was the weekend firearm policy that accounted for the observed changes, not any other contemporaneous changes that could have affected suicide rates. Because firearm and nonfirearm suicide rates were falling in Israel over the studied period (World Health Organization, 2017), the fact that firearm suicides among men aged 18–21 declined by 40 percent may not itself be distinguishable from declines in firearm suicides in groups that would be less directly affected by the military policy. For instance, firearm suicides among Israelis aged 25–29 also fell by 40 percent over this same period, from 10.7 per year to 6.3 per year (World Health Organization, 2017). On the other hand, the fact that greater reductions in firearm suicide rates among those aged 18–21 were found among weekend suicides rather than weekday suicides suggests that the policy may well have had an influence on suicidal behavior. Whether that involved shifting

suicides from the weekend to the weekday or contributing to the ongoing reductions in suicides cannot be answered with the reported analyses.

Both the Swiss and Israeli studies provide some evidence that gun prevalence may have a causal effect on suicides. Both also suffer from studying a single intervention that occurred once in a particular population. The challenge posed by this design is to show persuasively that other events that occurred at the same time, such as the large-scale reform of the Army in Switzerland, do not provide plausible alternative explanations for observed changes in suicide rates. Other relevant international evidence is reviewed in Chapter Twenty-Four on Australia's experience banning certain firearms through its National Firearms Agreement. However, that law also does not provide strong evidence of a causal effect of gun prevalence on suicide risk. As we conclude later in the report, although there is some evidence that the 1996 agreement reduced firearm suicides in Australia, studies also found significant reductions in nonfirearm suicides at the same time, calling into question whether the reductions in firearm and nonfirearm suicides were caused by the new law or some other concurrent events.

## Conclusions

NRC (2004) concluded that the causal relationship between household gun ownership and suicide is unclear. Since that 2004 report, evidence from U.S.-based studies has substantiated associations that existed then—namely, that

- people who die by suicide are more likely than matched controls to live in a house known by informants to contain a gun
- living in a house known by informants to have a gun stored unsafely is associated with higher risk of firearm suicide than living in a house with a safely secured gun, but unsafe storage has no association with nonfirearm suicide
- changes in firearm prevalence in a region are associated with changes in suicide prevalence in the region.

These observations are all consistent with the conclusion that gun availability increases the risk of suicide. Indeed, there appears to be a consensus among most experts in the public health community that these observed associations, in combination with the results of natural experiments like those in Switzerland and Israel (Reisch et al., 2013; Lubin et al., 2010), provide strong evidence that gun availability has a causal effect on suicide rates. Despite this mounting evidence, quasi-experimental studies providing strong evidence for an effect of gun prevalence on suicide risk have not yet been conducted. Therefore, those who doubt the causal effect can view the observed associations between gun prevalence and suicide rates over time or across regions as indicating that the kinds of people who might consider suicide at some future time may be more

likely to purchase a gun (which is a plausible interpretation of, for instance, findings in Wintemute et al., 1999) or that informants in case-control studies may be biased toward describing unsafe storage practices in cases where firearms were used in suicides or may be more likely to incorrectly deny gun availability for control cases in which no firearm injuries occurred.

For example, Kleck (1997) suggests that "one would expect the personality trait of self reliance to encourage both suicide and gun ownership for self-protection, contributing to a spurious correlation between the two" (p. 282). Miller, Swanson, and Azrael (2016) counter this suggestion by noting that any such third-factor explanation (such as a "self-reliance" trait) would have to be as strong a predictor of suicide as are the strongest known predictors (e.g., major depression), as well as "an order of magnitude more imbalanced across households with versus without firearms than is any known risk factor" (p. 1). This, the authors argue correctly, would make explanations of the association based on unmeasured factors highly unlikely. However, their analysis is based on the large gun availability effect sizes produced by the same case-control studies that are subject to methodological concerns about, for instance, whether informants provide unbiased information about gun availability in case versus control homes.

The natural experiments investigated in Switzerland and Israel (Reisch et al., 2013; Lubin et al., 2010) are quite interesting and suggest a possible effect of firearm prevalence on suicide risk but, for reasons described earlier, do not provide especially strong or unambiguous evidence for such an effect. Moreover, even if the studies did provide strong evidence, it is not clear whether similar interventions would have comparable effects in the context of the United States. For these reasons, even though new and important studies have been published since NRC reviewed the case for gun prevalence having a causal effect on suicides, we draw the same conclusion that NRC reached in 2004: Available empirical research does not provide strong causal evidence for the effects of gun prevalence on suicide risk.

Although the empirical research is ambiguous, which suggests that there is more to learn before we can conclude with confidence that gun prevalence has a causal effect of increasing suicide rates, the theoretical or logical arguments for this claim are sufficiently compelling that individuals and policymakers might reasonably choose to assume that gun availability *does* increase the risk of suicide. These logical considerations include that guns are an especially lethal means of attempting suicide and that suicide attempts are impulsive acts that may never be repeated if the first attempt fails. Because those who impulsively attempt suicide with a gun rarely get a chance to reconsider the decision, it is reasonable to suspect that when guns are less available, fewer suicide attempts will result in fatality, more people will have the chance to reconsider their decisions, and suicide rates will therefore decline. We view this as a logical and reasonably persuasive argument but distinguish it from what empirical research can currently demonstrate persuasively about the net effects of gun prevalence on suicide rates.

Stronger study designs may be available to more persuasively establish the causal effects of gun availability or gun prevalence on suicide risk. However, many such study designs are currently hampered by poor information on the prevalence of gun ownership and the consequent reliance on proxy measures of availability and prevalence. For this reason, we recommend in Chapter Twenty-Five that the Centers for Disease Control and Prevention or another federal agency resume routine collection of voluntarily provided survey data on gun ownership and use.

## Chapter Sixteen References

Azrael, Deborah, Philip J. Cook, and Matthew Miller, "State and Local Prevalence of Firearms Ownership Measurement, Structure, and Trends," *Journal of Quantitative Criminology*, Vol. 20, No. 1, March 2004, pp. 43–62.

Azrael, Deborah, and Matthew Miller, "Reducing Suicide Without Affecting Underlying Mental Health: Theoretical Underpinnings and a Review of the Evidence Base Lining the Availability of Lethal Means and Suicide," in Rory C. O'Connor and Jane Pirkis, eds., *The International Handbook of Suicide Prevention*, 2nd ed., Hoboken, N.J.: John Wiley and Sons, 2016.

Bailey, J. E., A. L. Kellermann, G. W. Somes, J. G. Banton, F. P. Rivara, and N. P. Rushforth, "Risk Factors for Violent Death of Women in the Home," *Archives of Internal Medicine*, Vol. 157, No. 7, 1997, pp. 777–782.

Betz, M. E., C. Barber, and M. Miller, "Suicidal Behavior and Firearm Access: Results from the Second Injury Control and Risk Survey," *Suicide and Life-Threatening Behavior*, Vol. 41, No. 4, 2011, pp. 384–391.

Betz, M. E., M. Miller, C. Barber, B. Beaty, I. Miller, C. A. Camargo, Jr., and E. D. Boudreaux, "Lethal Means Access and Assessment Among Suicidal Emergency Department Patients," *Depression and Anxiety*, Vol. 33, No. 6, 2016, pp. 502–511.

Borowsky, I. W., M. D. Resnick, M. Ireland, and R. W. Blum, "Suicide Attempts Among American Indian and Alaska Native Youth: Risk and Protective Factors," *Archives of Pediatrics and Adolescent Medicine*, Vol. 153, No. 6, 1999, pp. 573–580.

Brent, D. A., M. Baugher, J. Bridge, T. H. Chen, and L. Chiappetta, "Suicide in Affectively Ill Adolescents: A Case-Control Study," *Journal of Affective Disorders*, Vol. 31, No. 3, 1994, pp. 193–202.

———, "Age- and Sex-Related Risk Factors for Adolescent Suicide," *Journal of the American Academy of Child and Adolescent Psychiatry*, Vol. 38, No. 12, 1999, pp. 1497–1505.

Brent, D. A., J. A. Perper, C. J. Allman, G. M. Moritz, M. E. Wartella, and J. P. Zelenak, "The Presence and Accessibility of Firearms in the Homes of Adolescent Suicides: A Case-Control Study," *JAMA*, Vol. 266, No. 21, 1991, pp. 2989–2995.

Brent, D. A., J. Perper, G. Moritz, M. Baugher, and C. Allman, "Suicide in Adolescents with No Apparent Psychopathology," *Journal of the American Academy of Child and Adolescent Psychiatry*, Vol. 32, No. 3, 1993a, pp. 494–500.

Brent, D. A., J. A. Perper, G. Moritz, M. Baugher, J. Schweers, and C. Roth, "Firearms and Adolescent Suicide—A Community Case-Control Study," *American Journal of Diseases of Children*, Vol. 147, No. 10, 1993b, pp. 1066–1071.

Briggs, J. T., and A. Tabarrok, "Firearms and Suicides in U.S. States," *International Review of Law and Economics*, Vol. 37, 2014, pp. 180–188.

Britt, Chester L., Gary Kleck, and David J. Bordua, "A Reassessment of the D.C. Gun Law: Some Cautionary Notes on the Use of Interrupted Time Series Designs for Policy Impact Assessment," *Law and Society Review*, Vol. 30, No. 2, 1996, pp. 361–380.

Bukstein, O. G., D. A. Brent, J. A. Perper, G. Moritz, M. Baugher, J. Schweers, C. Roth, and L. Balach, "Risk Factors for Completed Suicide Among Adolescents with a Lifetime History of Substance Abuse: A Case-Control Study," *Acta Psychiatrica Scandinavica*, Vol. 88, No. 6, 1993, pp. 403–408.

Conwell, Y., P. R. Duberstein, K. Connor, S. Eberly, C. Cox, and E. D. Caine, "Access to Firearms and Risk for Suicide in Middle-Aged and Older Adults," *American Journal of Geriatric Psychiatry*, Vol. 10, No. 4, 2002, pp. 407–416.

Cummings, P., T. D. Koepsell, D. C. Grossman, J. Savarino, and R. S. Thompson, "The Association Between the Purchase of a Handgun and Homicide or Suicide," *American Journal of Public Health*, Vol. 87, No. 6, 1997b, pp. 974–978.

Dahlberg, L. L., R. M. Ikeda, and M. J. Kresnow, "Guns in the Home and Risk of a Violent Death in the Home: Findings from a National Study," *American Journal of Epidemiology*, Vol. 160, No. 10, 2004, pp. 929–936.

Desai, R. A., D. Dausey, and R. A. Rosenheck, "Suicide Among Discharged Psychiatric Inpatients in the Department of Veterans Affairs," *Military Medicine*, Vol. 173, No. 8, 2008, pp. 721–728.

Duggan, Mark, "Guns and Suicide," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, D.C.: Brookings Institution Press, 2003, pp. 41–73.

Grassel, K. M., G. J. Wintemute, M. A. Wright, and M. P. Romero, "Association Between Handgun Purchase and Mortality from Firearm Injury," *Injury Prevention*, Vol. 9, No. 1, 2003, pp. 48–52.

Grossman, D. C., B. A. Mueller, C. Riedy, M. D. Dowd, A. Villaveces, J. Prodzinski, J. Nakagawara, J. Howard, N. Thiersch, and R. Harruff, "Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries," *JAMA*, Vol. 293, No. 6, 2005, pp. 707–714.

Ilgen, M. A., K. Zivin, R. J. McCammon, and M. Valenstein, "Mental Illness, Previous Suicidality, and Access to Guns in the United States," *Psychiatric Services*, Vol. 59, No. 2, 2008, pp. 198–200.

Joe, S., S. C. Marcus, and M. S. Kaplan, "Racial Differences in the Characteristics of Firearm Suicide Decedents in the United States," *American Journal of Orthopsychiatry*, Vol. 77, No. 1, 2007, pp. 124–130.

Jones, Edward D. III, "The District of Columbia's 'Firearms Control Regulations Act of 1975': The Toughest Handgun Control Law in the United States—or Is It?" *Annals of the American Academy of Political and Social Science*, Vol. 455, 1981, pp. 138–149.

Kellermann, A. L., F. P. Rivara, G. Somes, D. T. Reay, J. Francisco, J. G. Banton, J. Prodzinski, C. Fligner, and B. B. Hackman, "Suicide in the Home in Relation to Gun Ownership," *New England Journal of Medicine*, Vol. 327, No. 7, 1992, pp. 467–472.

Kleck, Gary, *Targeting Guns: Firearms and Their Control*, New York: Aldine de Gruyter, 1997.

———, "Measures of Gun Ownership Levels for Macro-Level Crime and Violence Research," *Journal of Research in Crime and Delinquency*, Vol. 41, No. 1, 2004, pp. 3–36.

Kolla, B. P., S. S. O'Connor, and T. W. Lineberry, "The Base Rates and Factors Associated with Reported Access to Firearms in Psychiatric Inpatients," *General Hospital Psychiatry*, Vol. 33, No. 2, 2011, pp. 191–196.

Kposowa, A. J., "Association of Suicide Rates, Gun Ownership, Conservatism and Individual Suicide Risk," *Social Psychiatry and Psychiatric Epidemiology*, Vol. 48, No. 9, 2013, pp. 1467–1479.

Kposowa, A., D. Hamilton, and K. Wang, "Impact of Firearm Availability and Gun Regulation on State Suicide Rates," *Suicide and Life-Threatening Behavior*, Vol. 46, No. 6, 2016, pp. 678–696.

Kubrin, Charis E., and Tim Wadsworth, "Explaining Suicide Among Blacks and Whites: How Socioeconomic Factors and Gun Availability Affect Race-Specific Suicide Rates," *Social Science Quarterly*, Vol. 90, No. 5, 2009, pp. 1203–1227.

Kung, H. C., J. L. Pearson, and X. Liu, "Risk Factors for Male and Female Suicide Decedents Ages 15–64 in the United States—Results from the 1993 National Mortality Followback Survey," *Social Psychiatry and Psychiatric Epidemiology*, Vol. 38, No. 8, 2003, pp. 419–426.

Kung, H. C., J. L. Pearson, and R. Wei, "Substance Use, Firearm Availability, Depressive Symptoms, and Mental Health Service Utilization Among White and African American Suicide Decedents Aged 15 to 64 Years," *Annals of Epidemiology*, Vol. 15, No. 8, 2005, pp. 614–621.

Loftin, C., D. McDowall, B. Wiersema, and T. J. Cottey, "Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia," *New England Journal of Medicine*, Vol. 325, No. 23, 1991, pp. 1615–1620.

Lubin, G., N. Werbeloff, D. Halperin, M. Shmushkevitch, M. Weiser, and H. Y. Knobler, "Decrease in Suicide Rates After a Change of Policy Reducing Access to Firearms in Adolescents: A Naturalistic Epidemiological Study," *Suicide and Life-Threatening Behavior*, Vol. 40, No. 5, 2010, pp. 421–424.

Miller, M., D. Azrael, and D. Hemenway, "The Epidemiology of Case Fatality Rates for Suicide in the Northeast," *Annals of Emergency Medicine*, Vol. 43, No. 6, 2004, pp. 723–730.

Miller, M., D. Azrael, L. Hepburn, D. Hemenway, and S. J. Lippmann, "The Association Between Changes in Household Firearm Ownership and Rates of Suicide in the United States, 1981–2002," *Injury Prevention*, Vol. 12, No. 3, 2006, pp. 178–182.

Miller, M., C. Barber, D. Azrael, D. Hemenway, and B. E. Molnar, "Recent Psychopathology, Suicidal Thoughts and Suicide Attempts in Households With and Without Firearms: Findings from the National Comorbidity Study Replication," *Injury Prevention*, Vol. 15, No. 3, 2009, pp. 183–187.

Miller, M., C. Barber, R. A. White, and D. Azrael, "Firearms and Suicide in the United States: Is Risk Independent of Underlying Suicidal Behavior?" *American Journal of Epidemiology*, Vol. 178, No. 6, 2013, pp. 946–955.

Miller, M., S. A. Swanson, and D. Azrael, "Are We Missing Something Pertinent? A Bias Analysis of Unmeasured Confounding in the Firearm-Suicide Literature," *Epidemiologic Reviews,* Vol. 38, No. 1, 2016, pp. 62–69.

Miller, M., M. Warren, D. Hemenway, and D. Azrael, "Firearms and Suicide in U.S. Cities," *Injury Prevention*, Vol. 21, No. E1, 2015, pp. E116–E119.

Molina, J. A., and R. Duarte, "Risk Determinants of Suicide Attempts Among Adolescents," *American Journal of Economics and Sociology,* Vol. 65, No. 2, 2006, pp. 407–434.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Oslin, D. W., C. Zubritsky, G. Brown, M. Mullahy, A. Puliafico, and T. Ten Have, "Managing Suicide Risk in Late Life: Access to Firearms as a Public Health Risk," *American Journal of Geriatric Psychiatry*, Vol. 12, No. 1, 2004, pp. 30–36.

Phillips, J. A., and C. N. Nugent, "Antidepressant Use and Method of Suicide in the United States: Variation by Age and Sex, 1998–2007," *Archives of Suicide Research*, Vol. 17, No. 4, 2013, pp. 360–372.

Price, James H., Adam J. Mrdjenovich, and Joseph A. Dake, "Prevalence of State Firearm Mortality and Mental Health Care Resources," *Journal of Community Health*, Vol. 34, No. 5, 2009, pp. 383–391.

Price, James H., Amy J. Thompson, and Joseph A. Dake, "Factors Associated with State Variations in Homicide, Suicide, and Unintentional Firearm Deaths," *Journal of Community Health*, Vol. 29, No. 4, 2004, pp. 271–283.

Reisch, T., T. Steffen, A. Habenstein, and W. Tschacher, "Change in Suicide Rates in Switzerland Before and After Firearm Restriction Resulting from the 2003 'Army XXI' Reform," *American Journal of Psychiatry*, Vol. 170, No. 9, 2013, pp. 977–984.

Ribeiro, J. D., J. C. Franklin, K. R. Fox, K. H. Bentley, E. M. Kleiman, B. P. Chang, and M. K. Nock, "Self-Injurious Thoughts and Behaviors as Risk Factors for Future Suicide Ideation, Attempts, and Death: A Meta-Analysis of Longitudinal Studies," *Psychological Medicine*, Vol. 46, No. 2, January 2016, pp. 225–236.

Rodriguez Andrés, Antonio, and Katherine Hempstead, "Gun Control and Suicide: The Impact of State Firearm Regulations in the United States, 1995–2004," *Health Policy*, Vol. 101, No. 1, 2011, pp. 95–103.

Ruggles, K. V., and S. Rajan, "Gun Possession Among American Youth: A Discovery-Based Approach to Understand Gun Violence," *PLoS ONE*, Vol. 9, No. 11, 2014.

Shenassa, E. D., and S. L. Buka, "Utility of Indices of Gun Availability in the Community," *Journal of Epidemiology and Community Health*, Vol. 60, No. 1, 2006, pp. 44–49.

Shenassa, E. D., M. L. Rogers, K. L. Spalding, and M. B. Roberts, "Safer Storage of Firearms at Home and Risk of Suicide: A Study of Protective Factors in a Nationally Representative Sample," *Journal of Epidemiology and Community Health*, Vol. 58, No. 10, 2004, pp. 841–848.

Siegel, M., C. S. Ross, and C. King, "Examining the Relationship Between the Prevalence of Guns and Homicide Rates in the USA Using a New and Improved State-Level Gun Ownership Proxy," *Injury Prevention*, Vol. 20, No. 6, 2014, pp. 424–426.

Simonetti, Joseph A., Jessica L. Mackelprang, Ali Rowhani-Rahbar, Douglas Zatzick, and Frederick P. Rivara, "Psychiatric Comorbidity, Suicidality, and in-Home Firearm Access Among a Nationally Representative Sample of Adolescents," *JAMA Psychiatry*, Vol. 72, No. 2, 2015, pp. 152–159.

Smith, N. D., and I. Kawachi, "State-Level Social Capital and Suicide Mortality in the 50 U.S. States," *Social Science and Medicine*, Vol. 120, 2014, pp. 269–277.

Smith, P. N., J. Currier, and K. Drescher, "Firearm Ownership in Veterans Entering Residential PTSD Treatment: Associations with Suicide Ideation, Attempts, and Combat Exposure," *Psychiatry Research*, Vol. 229, No. 1–2, 2015, pp. 220–224.

Smith, T. W., and J. Son, *Trends in Gun Ownership in the United States, 1972–2014,* Chicago, Ill.: NORC at the University of Chicago, March 2015. As of March 9, 2017: http://www.norc.org/PDFs/GSS%20Reports/ GSS_Trends%20in%20Gun%20Ownership_US_1972-2014.pdf

Stander, V. A., S. M. Hilton, A. P. Doran, A. D. Werbel, and C. J. Thomsen, *Department of the Navy Suicide Incident Report (DONSIR): Summary of 1999–2004 Findings*, San Diego, Calif.: Naval Health Research Center, 2006.

Swahn, M. H., B. Ali, R. M. Bossarte, M. van Dulmen, A. Crosby, A. C. Jones, and K. C. Schinka, "Self-Harm and Suicide Attempts Among High-Risk, Urban Youth in the U.S.: Shared and Unique Risk and Protective Factors," *International Journal of Environmental Research and Public Health,* Vol. 9, No. 1, 2012, pp. 178–191.

Thompson, R., V. Kane, J. M. Cook, R. Greenstein, P. Walker, and G. Woody, "Suicidal Ideation in Veterans Receiving Treatment for Opiate Dependence," *Journal of Psychoactive Drugs*, Vol. 38, No. 2, 2006, pp. 149–156.

Wadsworth, T., C. E. Kubrin, and J. R. Herting, "Investigating the Rise (and Fall) of Young Black Male Suicide in the United States, 1982–2001," *Journal of African American Studies*, Vol. 18, No. 1, 2014, pp. 72–91.

Watkins, Adam M., and Alan J. Lizotte, "Does Household Gun Access Increase the Risk of Attempted Suicide? Evidence from a National Sample of Adolescents," *Youth and Society*, Vol. 45, No. 3, 2013, pp. 324–346.

Wiebe, Douglas J., "Homicide and Suicide Risks Associated with Firearms in the Home: A National Case-Control Study," *Annals of Emergency Medicine*, Vol. 41, No. 6, 2003, pp. 771–782.

Wintemute, G. J., C. A. Parham, J. J. Beaumont, M. Wright, and C. Drake, "Mortality Among Recent Purchasers of Handguns," *New England Journal of Medicine*, Vol. 341, No. 21, 1999, pp. 1583–1589.

World Health Organization, World Health Organization Mortality Database, Geneva, 2017. As of October 13, 2017:
http://www.who.int/healthinfo/mortality_data/en/

CHAPTER SEVENTEEN

# The Relationship Between Firearm Prevalence and Violent Crime

In its 2004 review, the National Research Council (NRC) found that

> existing research studies and data include a wealth of descriptive information on homicide, suicide, and firearms, but, because of the limitations of existing data and methods, do not credibly demonstrate a causal relationship between the ownership of firearms and the causes or prevention of criminal violence or suicide.

Conceptually, the effects of gun prevalence on violent crimes are ambiguous. Firearms could embolden criminals or disputants or make their encounters more lethal, suggesting that as the prevalence of firearms increases, so too would the number of violent crimes. But gun prevalence may also deter would-be criminals, which could have the opposite effect on violent crime (see Chapter Twenty). In this chapter, we examine the empirical evidence on the relationship between firearm prevalence and violent crime, including homicide, domestic violence, aggravated assault, rape, and robbery. Most of the studies we examined used the proportion of suicides that were firearm suicides (FS/S) as a proxy for gun prevalence.

## Methods

Our synthesis focuses on research published after NRC (2004) and takes up where that report left off, reviewing the literature from 2005 to 2016 to assess available new evidence on the relationship between firearm prevalence and violent crime. Our search yielded 25 studies that examined the relationship between gun availability and homicide, other types of violent crime, or domestic violence. We focus our synthesis on U.S.-based studies that met similar methodological criteria for our policy discussions (Chapters Three through Fifteen) in that they attempted to identify a causal effect of prevalence on violent crime. The studies we include here either identify the effect of gun prevalence on violent crime using changes over time in gun prevalence and in violent crime outcomes or use an instrumental-variable approach to cross-sectional data on gun prevalence and violent crime ($N = 11$).

233

## Firearm Prevalence and Violent Crime

We identified 11 studies that met our criteria. Two were by the same authors: Kleck, Kovandzic, and Schaffer (2005) and Kovandzic, Schaffer, and Kleck (2013). We consider the 2013 study, which used the same basic data and approach as the 2005 study, to supersede the earlier study. One study (Hoskin, 2011) provided insufficient information on its methods for us to evaluate the evidence it provided; in particular, the study used instrumental-variable methods, but the author did not indicate what variable(s) he used to instrument for household gun prevalence and did not provide results of empirical tests for the appropriateness of the instrument(s). We thus excluded this study from consideration in our assessment of the overall weight of the evidence. Three studies (Miller, Azrael, and Hemenway, 2002; Swedler et al., 2015; and Monuteaux et al., 2015) employed longitudinal data but had study designs that limited causal inference, and we thus excluded them from our synthesis results. Specifically, Miller, Azrael, and Hemenway (2002) analyzed data from 2001 to 2003 but aggregated the outcome (homicide rate) over the three-year period, resulting in a cross-sectional analysis. Swedler et al. (2015) pooled data from 1996 to 2010 to create a state-level law enforcement officer homicide rate because these deaths are rare, so the main analyses in that study were cross-sectional as well. The authors reanalyzed their data using three five-year periods but provided few details and no tabled results on this analysis. Additionally, their primary measure of gun prevalence was an average measure from the Behavioral Risk Factor Surveillance Survey for the 2001–2004 period, potentially violating a requirement of causal analysis that causes must be known to precede their effects. Monuteaux et al. (2015) analyzed state-level firearm ownership rates and annual rates of criminal acts from 2001, 2002, and 2004. But the length of the longitudinal panel was limited, and the authors were not primarily using the temporal variation in firearm ownership and outcomes for identification.

The six remaining studies examined a range of homicide outcomes, including total homicides, firearm-related homicides, nonfirearm-related homicides, intimate partner homicides, homicides committed by youth (aged 13–17 or 18–24), and homicides by race (of the decedent). These six studies are summarized in Table 17.1.

Five studies (Cook and Ludwig, 2006; Zeoli and Webster, 2010; Chauhan et al., 2011; Parker et al., 2011; Siegel, Ross, and King, 2014) used longitudinal data to analyze changes over time in gun prevalence and changes over time in homicide outcomes. Cook and Ludwig (2006) identified the effect of gun prevalence on total homicides, firearm homicides, and nonfirearm homicides using data from 200 large U.S. counties from 1980 to 1999. Given the absence of longitudinal information on gun prevalence, the authors used as a proxy of gun prevalence the proportion of suicides committed with a firearm (FS/S), an approach commonly used in the literature. They found statistically significant positive effects of gun prevalence on the total homicide rate and firearm homicide rate and no statistically significant effect of gun prevalence

**Table 17.1**
**Studies Published in or After 2005 That Examined the Relationship Between Firearm Prevalence and Violent Crime**

| Study | Sample | Time Frame | Gun Prevalence Measure | Crime Measure | Result |
|---|---|---|---|---|---|
| Cook and Ludwig, 2006 | 200 largest U.S. counties (in 1990) | 1980–1999 | FS/S in county; sensitivity with FS/S by state | Total, firearm, and nonfirearm homicide rates | Firearm prevalence positively associated with total and firearm homicides |
| Zeoli and Webster, 2010 | 46 large U.S. cities | 1979–2003 | FS/S in the county in which the majority of city residents reside | Intimate partner homicide rate; firearm intimate partner homicide rate | No statistically significant effects |
| Chauhan et al., 2011 | 76 New York City police precincts | 1990–1999 | FS/S by precinct | Firearm homicide rate by race of decedent (black, white, Hispanic) | Firearm prevalence positively associated with firearm homicides of Hispanics |
| Parker et al., 2011 | 91 large U.S. cities | 1984–2006 | FS/S by city; data for 1990 and 2000; interpolated in other years | Homicides committed by youth aged 13–17; homicides committed by youth aged 18–24 | Firearm prevalence positively associated with homicides committed by youth aged 13–17 and youth aged 18–24 |
| Kovandzic, Schaffer, and Kleck, 2013 | U.S. counties with population of 25,000 or more (in 1990) | 1990 | FS/S in county, averaged 1987–1993 | Total, firearm, and nonfirearm homicide rates, averaged for 1987–1993 | Firearm prevalence negatively associated with total and firearm homicides |
| Siegel, Ross, and King, 2014 | 50 U.S. states | 1981–2010 | FS/S; also FS/S combined with hunting license rate | Total, firearm, and nonfirearm homicide rates | Firearm prevalence positively associated with total and firearm homicides |

on the nonfirearm homicide rate. Parker et al. (2011) used data from 91 large U.S. cities spanning 1984–2006 to study the effect of gun prevalence on homicides by two categories of young offenders (aged 13–17 and aged 18–24). The authors used FS/S, measured at the city level, as a proxy for gun prevalence. They found a positive and statistically significant effect of gun prevalence on homicides committed by both those aged 13–17 and those aged 18–24. A methodological limitation was the imputation of FS/S for most observations in the time series (other than 1990 and 2000). Using data from 76 New York City police precincts and FS/S as a proxy for gun prevalence, Chauhan et al. (2011) found a statistically significant positive effect of gun prevalence on the homicide rate of Hispanics. However, sample sizes of suicides by precinct were likely to be relatively small, affecting the precision of the proxy, and the localized nature of the data also limited the generalizability of the findings.

Zeoli and Webster (2010) used data from 46 large U.S. cities spanning 1979–2003 and found no statistically significant effect of county-level gun prevalence (proxied by FS/S) on the city-level intimate partner homicide rate. For this study, measurement of the outcome variable was affected by missing data on the characteristics of the perpetrators of violent crime—either because the perpetrator was not known or the characteristics of the perpetrator were not available (e.g., whether the perpetrator was an intimate partner). This was also true for the Parker et al. (2011) study, but the authors employed a multiple imputation approach to address the issue of missing data on offender age. Siegel, Ross, and King (2014) analyzed state-level data covering 1981–2010. As a proxy for gun prevalence, the authors used FS/S and a measure that incorporated both FS/S and the hunting license rate. They found that higher gun prevalence was associated with more total and firearm homicides. But the authors acknowledged that their methodological approach primarily relied on cross-sectional variation for identification of the effect of gun prevalence on homicide outcomes.

Instead of analyzing changes over time in gun prevalence and changes over time in homicides, Kovandzic, Schaffer, and Kleck (2013) used an instrumental-variable approach to analyzing cross-sectional data from large U.S. counties in 1990. The authors used FS/S as a proxy for gun prevalence and tested the following four instruments, as well as different combinations of these instruments:

- subscriptions per 100,000 people to *Field & Stream, Outdoor Life,* and *Sports Afield*
- percentage of county voting for George H. W. Bush in the 1988 presidential election
- military veterans per 100,000 people
- subscriptions per 100,000 people to *Guns & Ammo.*

The authors analyzed the fourth instrument, in part, because it was used in previous research (Duggan, 2001, 2003), but they suggested that, conceptually, it may be endogenous because "subscribers may include people who have an interest in vio-

lence more generally." The authors' preferred specification used a combination of the first three instruments (outdoor magazines, voting, veteran variables), although in the first-stage analysis with this combination of instruments, only the voting and magazine measures were statistically significant predictors of firearm prevalence. In the authors' preferred specification, they found a statistically significant negative relationship between firearm prevalence and firearm homicides and the same for total homicides. In analyses that used the voting, veteran population, and outdoor magazine instruments individually (each of which was statistically significant in the first stage), the authors found no statistically significant effect of firearm prevalence on firearm homicides for two of the instruments (voting, veteran population) and a statistically significant negative relationship between firearm prevalence and firearm homicides for the third (outdoor magazine subscription rate). When the subscription rate to *Guns & Ammo* was used, the direction of the effect changed (became positive), but the effect was not statistically significant, and the authors noted that the instrument failed a statistical test for exogeneity.

With the exception of Siegel, Ross, and King (2014), none of the studies used data from the past decade. For example, Kovandzic, Schaffer, and Kleck (2013) used data from 1990, now more than 25 years old, and Cook and Ludwig (2006) used data from before 2000.

## Conclusions

The NRC (2004) review found insufficient evidence to draw a conclusion about the causal relationship between gun prevalence and violent crime. We examined new evidence from U.S.-based studies since the NRC review (2005–2016) that were designed to estimate the causal effect of gun prevalence on violent crime. The six studies we identified examined total homicides, firearm-related homicides, nonfirearm-related homicides, intimate partner homicides, homicides committed by youth (aged 13–17 or 18–24), and homicides by race (of the decedent).

Four of the six studies found the prevalence of firearms to be significantly and positively associated with homicide rates, and these associations were found across reasonably independent data sets. A fifth study found no significant effect of gun prevalence on the intimate partner homicide rate and the firearm intimate partner homicide rate, and a sixth study found significant negative effects (indicating that gun prevalence reduced violent crime) in the preferred specification. While most of the new studies provide evidence consistent with the hypothesis that gun prevalence increases violent crime, the methodological weaknesses that led NRC (2004) to conclude that the causal effects of gun prevalence were not proven continue to apply. In particular, if people are more likely to acquire guns when crime rates are rising or high (as suggested by, for instance, Bice and Hemley, 2002, and Kleck and Patterson, 1993), then

the same pattern of evidence would be expected, but it would be crime rates causing gun prevalence, not the reverse.

A fundamental limitation for all of the studies is the lack of direct measures of gun prevalence. All of the authors use FS/S as a proxy for gun prevalence (with one study combining FS/S with an indicator of the hunting license rate). Moreover, in the new evidence we examined, FS/S was imputed for all but the beginning and end periods of the decade in one study, and in another, the number of suicides for the small catchment area being studied was likely to be relatively limited, affecting the precision of the proxy. Other methodological issues are specific to studies that examine specific types of homicides, such as those committed by youth or by an intimate partner. Because many homicides go unsolved, issues of missing data may be important. Finally, in studies that use an instrumental variable approach, the conceptual and empirical validity of possible instruments has been an issue. One of the six more recent studies took this approach, and the results were sensitive to specification, including which and how many of the instruments of the potential set were included.

Stronger study designs may be available to more persuasively establish the causal effects of gun ownership or gun prevalence on violent crime; however, many such study designs are currently hampered by poor information on the prevalence of gun ownership and the consequent reliance on proxy measures of availability and prevalence. For this reason, we recommend in Chapter Twenty-Five that the Centers for Disease Control and Prevention or another federal agency resume routine collection of voluntarily provided survey data on gun ownership and use.

# Chapter Seventeen References

Bice, Douglas C., and David D. Hemley, "The Market for New Handguns: An Empirical Investigation," *Journal of Law & Economics*, Vol. 45, No. 1, 2002, pp. 251–265.

Chauhan, P., M. Cerda, S. F. Messner, M. Tracy, K. Tardiff, and S. Galea, "Race/Ethnic-Specific Homicide Rates in New York City: Evaluating the Impact of Broken Windows Policing and Crack Cocaine Markets," *Homicide Studies*, Vol. 15, No. 3, 2011, pp. 268–290.

Cook, Philip J., and Jens Ludwig, "The Social Costs of Gun Ownership," *Journal of Public Economics*, Vol. 90, No. 1–2, 2006, pp. 379–391.

Duggan, Mark, "More Guns, More Crime," *Journal of Political Economy*, Vol. 109, No. 5, 2001, pp. 1086–1114.

———, "Guns and Suicide," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, D.C.: Brookings Institution Press, 2003, pp. 41–73.

Hoskin, Anthony, "Household Gun Prevalence and Rates of Violent Crime: A Test of Competing Gun Theories," *Criminal Justice Studies*, Vol. 24, No. 1, 2011, pp. 125–136.

Kleck, Gary, Tomislav Kovandzic, and Mark E. Schaffer, *Gun Prevalence, Homicide Rates and Causality: A GMM Approach to Endogeneity Bias,* London: Centre for Economic Policy Research, Discussion Paper No. 5357, 2005.

Kleck, G., and E. B. Patterson, "The Impact of Gun Control and Gun Ownership Levels on Violence Rates," *Journal of Quantitative Criminology*, Vol. 9, No. 3, 1993, pp. 249–287.

Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck, "Estimating the Causal Effect of Gun Prevalence on Homicide Rates: A Local Average Treatment Effect Approach," *Journal of Quantitative Criminology*, Vol. 29, No. 4, 2013, pp. 477–541.

Miller, M., D. Azrael, and D. Hemenway, "Household Firearm Ownership and Suicide Rates in the United States," *Epidemiology*, Vol. 13, No. 5, 2002, pp. 517–524.

Monteaux, M. C., L. K. Lee, D. Hemenway, R. Mannix, and E. W. Fleegler, "Firearm Ownership and Violent Crime in the U.S.: An Ecologic Study," *American Journal of Preventive Medicine*, Vol. 49, No. 2, 2015, pp. 207–214.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Parker, R. N., K. R. Williams, K. J. McCaffree, E. K. Acensio, A. Browne, K. J. Strom, and K. Barrick, "Alcohol Availability and Youth Homicide in the 91 Largest U.S. Cities, 1984–2006," *Drug and Alcohol Review*, Vol. 30, No. 5, 2011, pp. 505–514.

Siegel, M., C. S. Ross, and C. King, "Examining the Relationship Between the Prevalence of Guns and Homicide Rates in the USA Using a New and Improved State-Level Gun Ownership Proxy," *Injury Prevention*, Vol. 20, No. 6, 2014, pp. 424–426.

Swedler, D. I., M. M. Simmons, F. Dominici, and D. Hemenway, "Firearm Prevalence and Homicides of Law Enforcement Officers in the United States," *American Journal of Public Health*, Vol. 105, No. 10, 2015, pp. 2042–2048.

Zeoli, A. M., and D. W. Webster, "Effects of Domestic Violence Policies, Alcohol Taxes and Police Staffing Levels on Intimate Partner Homicide in Large U.S. Cities," *Injury Prevention*, Vol. 16, No. 2, 2010, pp. 90–95.

CHAPTER EIGHTEEN

# Firearm and Ammunition Taxes

Taxation is a policy lever frequently used as a means to influence social welfare and well-being. In this chapter, we synthesize the limited research that has been conducted on firearm and ammunition taxes in the United States. The information was collected from a targeted search of the literature separate from that described in Chapter Two of this report.

Taxation has rarely been used as a policy tool to manage risks associated with gun violence. A federal excise tax of 10–11 percent on the import and production of firearms and ammunition has been in place since 1919, but the rate has not been changed since it was first instituted. The National Firearms Act of 1934 imposed a $200 tax on the transfer of certain firearms, but the tax applied to a very narrow set of weapons and has not been changed since initial enactment. Only two states impose special taxes on guns and ammunition over the standard sales tax: Pennsylvania adds a $3 surcharge on firearms subject to the sales tax, and Tennessee has a $0.10 special privilege tax for use, possession, and sales of shotgun shells of metallic cartridges (Pinho and Rappa, 2013).

Local jurisdictions have recently taken action to directly influence the prices of guns and ammunition. In January 2016, Seattle, Washington, began collecting taxes at the point of sale of $25 for each firearm and $0.02 to $0.05 for each round of ammunition sold within city limits. Cook County, Illinois, which passed a $25 tax on firearms in 2013, implemented a similar tax increase on ammunition of $0.01 to $0.05 per cartridge in June 2016. While these local tax increases were primarily intended as revenue-generating mechanisms, larger tax hikes have occasionally been proposed as a preventive mechanism to reduce new purchases of firearms or ammunition and limit gun violence. Most proposed state and local measures to this effect have not passed, but in April 2016, the Northern Mariana Islands (a U.S. territory) passed a provision imposing a $1,000 tax on pistols.

Understanding the potential consequences of higher taxes on guns and ammunition is important both for policy considerations moving forward and for assessing laws that increase the effective price of legal gun purchases, such as permit-to-purchase laws (Cook and Leitzel, 1996). While opponents have voiced concern that increased local taxes will push legal consumers and suppliers to conduct business outside city limits

(Beekman, 2015), to our knowledge, no rigorous evaluations of the causal effects of taxation policy on the gun industry have been reported.

Conceptually, the societal effects of increasing taxes on firearms or ammunition will hinge on how responsive gun purchasers are to changes in price and how this varies for different types of purchasers (i.e., those using firearms for recreational, self-protection, or criminal purposes). Because guns are durable goods, there is also a need to understand price linkages between the formal and informal markets.[1] Just as the "durability" of ammunition may vary across individuals and reasons for use, policies affecting the price of firearms may have very different consequences compared with policies affecting the price of ammunition. While several studies have examined the theoretical consequences of increasing the price of firearms (e.g., McDonald, 1999; Chaudri and Geanakoplos, 1998; Cook and Leitzel, 1996), there exists little empirical evidence to inform whether taxation can be an effective policy measure to limit criminal or violent gun misuse.

Several factors complicate evaluation of the price sensitivity of demand for guns or ammunition. First, because few policy changes have substantially influenced the price of firearms or ammunition, research has faced insufficient variation to empirically estimate the price responsiveness of various participants in gun markets. Second, in the absence of exogenous price shocks, researchers cannot disentangle changes in consumer demand that are driven by changes in price from changes in price that are driven by changes in consumer demand. And third, the market for firearms and ammunition is highly differentiated, and there are no publicly available gun or ammunition price data over a sufficient period to support policy analysis (National Research Council, 2004). A few sources provided information on national average prices of guns and ammunition,[2] but these averages obscured notable price variation across jurisdictions and offered only a rough approximation of the retail prices facing consumers. Thus, these data have generally been used to evaluate how demand shocks influence prices and not to estimate how responsive consumers are to changes in prices (Koper and Roth, 2002).

Furthermore, because these data sources applied solely to the formal market, they provided little insight into linkages between the formal and informal markets, which limited analysis of how taxation in the formal market would affect criminal markets for firearms. Theoretically, price changes in the primary market should affect informal markets, but some evidence suggests that the informal market for firearms operates quite differently from the formal market. For instance, qualitative interviews with adult male detainees in Cook County Jail found that 40 percent of inmate respon-

---

[1]   The *informal market* is defined here as comprising legal but unrecorded private transactions (i.e., secondary markets), as well as illegal trade in firearms (i.e., black markets), following Cook and Leitzel (1996).

[2]   See, for example, Fjestad (2017) and *Shotgun News* (renamed *Firearm News Magazine*). AmmoSpy (undated), a relatively new website, provides web-scraped data on ammunition prices.

dents acquired firearms through means other than purchase or trade (Cook, Parker, and Pollack, 2015), most commonly through borrowing or sharing arrangements. The importance of social networks in illegal gun markets has been found in other studies (Cook et al., 2007; Kennedy, Piehl, and Braga, 1996; Sheley and Wright, 1993), but while this provides some evidence about how criminal markets for firearms function, there exist no reliable estimates of the price elasticity of demand for guns or ammunition by violent individuals or criminal organizations (Cook and Pollack, 2016). As research grows in this area and examines underground gun markets across different jurisdictions, we may gain a better understanding of whether taxation can serve as an effective measure to prevent criminal acquisition and use of firearms.

In contrast to violent or criminal offenders, there exists some empirical evidence on how responsive hunters are to changes in price. Several articles that exploited variation in hunting license fees have found hunting demand to be relatively unrelated to changes in license fees (Poudyal, Cho, and Bowker, 2008; Sun, Van Kooten, and Voss, 2005; Teisl, Boyle, and Record, 1999). While this research suggests that moderate tax increases on guns or ammunition would do little to disrupt hunting or recreational gun use, the evidence is based on changes in hunting license fees (which are a very small fraction of the total cost of hunting) and may not be congruent with the actual response to significant increases in the price of firearms or ammunition.

## Conclusions

Overall, we currently have little empirical evidence to indicate how taxation would influence firearm-related outcomes, such as violent crime or suicides. Nor is there evidence establishing how taxing firearms or ammunition would affect the gun industry, defensive gun use, or recreational gun use. Given that taxation has been a standard policy lever for other potentially harmful goods (e.g., cigarettes, alcohol, and soda or sugary beverages), we may be able to derive insights from policy changes in these markets. However, understanding the costs and benefits of taxation in gun markets requires special consideration of the varied purposes for which individuals acquire and retain firearms or ammunition, the relationship between various market sources for guns and ammunition, and the political feasibility of imposing price regulations in a market for which regulations are already highly contentious.

## Chapter Eighteen References

AmmoSpy, "Trending," web page, undated. As of June 29, 2017:
http://www.ammospy.net/trending

Beekman, Daniel, "How Gun-Tax Legislation Would Affect Seattle Firearms Stores," *Seattle Times*, July 29, 2015. As of February 20, 2017:
http://www.seattletimes.com/seattle-news/politics/
how-gun-tax-legislation-would-affect-seattle-firearms-stores/

Chaudri, V., and J. Geanakoplos, "A Note on the Economic Rationalization of Gun Control," *Economics Letters*, Vol. 58, 1998, pp. 51–53.

Cook, P. J., and J. A. Leitzel, "'Perversity, Futility, Jeopardy': An Economic Analysis of the Attack on Gun Control," *Law and Contemporary Problems*, Vol. 59, No. 1, 1996, pp. 91–118.

Cook, P. J., J. Ludwig, S. Venkatesh, and A. A. Braga, "Underground Gun Markets," *Economic Journal*, Vol. 117, 2007, pp. F558–F888.

Cook, P. J., and H. A. Pollack, "Reducing Access to Guns by Violent Offenders," presented at RSF Journal Conference: The Underground Gun Market, April 2016.

Cook, Philip J., Susan T. Parker, and Harold A. Pollack, "Sources of Guns to Dangerous People: What We Learn by Asking Them," *Preventive Medicine*, Vol. 79, 2015, pp. 28–36.

Fjestad, S. P., *Blue Book of Gun Values*, 38th ed., Minneapolis, Minn.: Blue Book Publications, 2017.

Kennedy, D. M., A. M. Piehl, and A. A. Braga, "Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy," *Law and Contemporary Problems*, Vol. 59, No. 1, 1996, pp. 147–196.

Koper, Christopher S., and Jeffrey A. Roth, "The Impact of the 1994 Federal Assault Weapons Ban on Gun Markets: An Assessment of Short-Term Primary and Secondary Market Effects," *Journal of Quantitative Criminology*, Vol. 18, No. 3, 2002, pp. 239–266.

McDonald, J. F., "An Economic Analysis of Guns, Crime, and Gun Control," *Journal of Criminal Justice*, Vol. 27, No. 1, 1999, pp. 11–20.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

Pinho, R., and J. Rappa, *Special Taxes on Guns, Ammunition, and Gun Shows*, Hartford, Conn.: Connecticut General Assembly, Office of Legislative Research, OLR Research Report 2013-r-0034, January 10, 2013.

Poudyal, N., S. H. Cho, and J. M. Bowker, "Demand for Resident Hunting in the Southeastern United States," *Human Dimensions of Wildlife*, Vol. 13, No. 3, 2008, pp. 158–174.

Sheley, J. F., and J. D. Wright, *Gun Acquisition and Possession in Selected Juvenile Samples*, Washington, D.C.: National Institute of Justice, 1993.

Sun, L. G., C. Van Kooten, and G. M. Voss, "Demand for Wildlife Hunting in British Columbia," *Canadian Journal of Agricultural Economics*, Vol. 53, 2005, pp. 25–46.

Teisl, M. F., K. J. Boyle, and R. E. Record, Jr., "License-Sales Revenues: Understanding Angler and Hunter Reaction to Changes in License Prices," *Human Dimensions of Wildlife*, Vol. 4, No. 4, 1999, pp. 1–17.

CHAPTER NINETEEN
# Mental Health Care Access and Suicide

Increased access to mental health services is commonly promoted as a strategy to decrease firearm violence and suicide. Indeed, organizations on opposite sides of gun regulation debates often agree that policies designed to improve access to mental health care offer a promising approach to reducing gun violence.[1] Here, we synthesize the evidence on access to mental health care and its effects on suicide; we find that evidence regarding the relationship between the two has been mixed. The information was collected from a targeted search of the literature separate from that described in Chapter Two of this report.

*Access to care* can be defined in many ways. Several studies have defined access as the *availability of health care and mental health services* in a given region. Other studies focus on the *use of health and mental health services* by individuals who have a history of suicide ideation, suicide attempts, or a completed suicide. Still others focus on the *barriers to mental health care* that may preclude an individual from accessing services even when they are available. Finally, a handful of studies has focused on more-foundational *policies that may affect access* to and availability of care (e.g., health insurance laws, mental health expenditures). Our synthesis proceeds by examining the evidence for each of these definitions.

## Availability of Health Care and Mental Health Services

Several studies examining the availability of health care have used state-level data on suicide rates in different regions, as well as the density of health care providers, including general practitioners, psychiatrists, and clinical psychologists. These studies have yielded some evidence that density of mental health providers is associated with lower suicide rates. For instance, one study examined the association between indexes of health care access—including proportion of state residents without health insurance and proportion of psychiatrists and nonpsychiatrist physicians per 100,000 residents—and rates of suicide at the state level. Data were obtained from the U.S. Census Bureau,

---

[1]   See, for example, Lexington (2013) or Robbins (2014).

the Centers for Disease Control and Prevention (CDC), and the American Board of Medical Specialties, with most data collected in the early 2000s. Both the density of psychiatrists and density of nonpsychiatrist physicians were associated with lower suicide rates (Tondo, Albert, and Baldessarini, 2006), controlling for sociodemographic factors (e.g., population density, proportion of men, and proportion of racial/ethnic minorities) and economic indexes (e.g., amount of federal mental health aid received by the state). A second study focused on access to care and suicide rates at the state level using data from the CDC (Thomson Healthcare, 2007). That study found evidence that states with higher proportions of psychiatrists, psychologists, and social workers had lower suicide rates, although these conclusions were based on bivariate analyses. Both of these studies used cross-sectional designs, raising questions about whether the proportion of health care providers accounts for lower suicide rates or whether some other factor associated with both suicide and health care availability causes the observed associations.

However, if access to mental health care is an important predictor of suicide risk, we might expect that the farther individuals have to travel to access care, the higher their risk of suicide might be. McCarthy et al. (2012) examined this relationship in the population of military veterans living at a range of distances from the nearest U.S. Department of Veterans Affairs (VA) mental health provider. Among veterans who accessed outpatient or inpatient services during fiscal years 2003–2004 and 2006–2007, and controlling for sociodemographic factors and mental health diagnoses, the authors found that distance to the nearest provider was not a predictor of suicide, except among the subgroup of veterans living at extreme distances (i.e., more than 800 miles) from the nearest VA provider. However, this study focused on individuals who used VA services at least once, regardless of the distance to the nearest hospital. If distance to the nearest VA provider could discourage an initial visit, as well as follow-up visits, then this study design could fail to observe true effects of health care services on suicide risk.

Price, Mrdjenovich, and Dake (2009) examined state-level variation in firearm suicide rates in relation to state indexes of access to care, including the number of clinically active mental health professionals per 100,000 population (including psychiatrists, psychologists, social workers, and counselors per state), the number of mental health facilities and psychiatric treatment beds, the number of physicians who wrote prescriptions for psychotropic medications, and the proportion of psychiatrists to other physicians who wrote prescriptions for psychotropic medications. In bivariate analyses, states with higher numbers of physicians writing psychotropic medication prescriptions, and those with higher proportions of psychiatrists to other physicians writing these prescriptions, had lower rates of firearm suicide. However, in multivariate models, neither of these factors was associated with firearm suicide rates. Instead, the significant predictors of firearm suicide rates were

firearm ownership and state educational expenditures.[2] The authors did not examine total suicide rates.

Fewer studies have focused on the availability of specific services rather than the availability of practitioners. Shumway et al. (2012) examined the effect of psychiatric care capacity reductions in a large city in the United States. The primary provider of inpatient and emergency psychiatric services for the community experienced a reduction in acute inpatient capacity. However, this did not appear to impact rates of suicide among individuals who were engaged in community mental health services in the city. Because there was no comparison group for this study, it was not possible to rule out the possibility that reductions in psychiatric care capacity did affect suicide rates, but this relationship was obscured by other contemporaneous changes to suicide risk with the opposite effect.

These studies suggest that states with more mental health providers have lower rates of suicide. However, the cause of this association is not clear. It may be that mental health providers have a direct protective effect on suicide risk; however, findings that distance to providers is only weakly associated with suicide risk or that the association disappears when controlling for state-level indicators of education level and firearm ownership rates raise questions about this conclusion. Alternatively, it may be that other factors associated with both suicide risk and mental health availability explain the association.

## Use of Health and Mental Health Services

Even when services are available, not all individuals with mental health treatment needs use them. For this reason, several studies have focused on use of health and mental health services by individuals who have expressed suicide ideation, attempted suicide, or completed suicide.

A systematic review conducted in 2002 examined rates of contact with mental health and primary care services among individuals who died by suicide (Luoma, Martin, and Pearson, 2002). The authors included 40 studies from the United States, Australia, and Europe from inception to 2000. On average, 19 percent (95-percent confidence interval [CI]: 7, 28) of decedents made contact with the mental health system in the month before death, and 32 percent (95-percent CI: 16, 46) made contact in the year before death. Older adults and men were generally less likely to make contact with the mental health system. Contact with primary care providers was more common: Across studies, an average of 45 percent made such contact in the month before death, and 77 percent made contact within the year before death. Older adults were more likely to make contact with primary care providers. A more recent study

---

2    See Chapter Sixteen for more on the association between suicide and firearm ownership.

used data from 18 U.S. states to examine mental health treatment among suicide decedents (Niederkrotenthaler et al., 2014). Using data from the National Violent Death Reporting System from 2005 to 2010, researchers identified 57,877 suicides. This study found similar results to the previously described review: 38.5 percent of suicide decedents received mental health treatment during the two months before death. Individuals with depressed mood, substance use problems, and a history of suicide attempts were more likely to have accessed treatment, suggesting that individuals with a longer history of mental health problems may be more likely to access services.

Although these studies suggest that a large proportion of individuals who take their lives make contact with the health or mental health system prior to their deaths, the studies do not answer whether the availability and use of mental health care reduce the incidence of suicide that would exist without such care. Moreover, there are unanswered questions about the quality and appropriateness of the care received by those at risk of suicide (e.g., with respect to frequency, service type or setting, or intensity). In addition, given that these studies are generally based on record reviews or psychological autopsies, it is usually not possible to determine whether providers assessed respondents for depression or suicide risk or whether the problems elevating individuals' suicide risk were ever discussed (Simon and Gold, 2016). Moreover, there are still large numbers of individuals who do not make contact with the health care system leading up to their deaths. These factors all make it difficult to interpret the meaning of findings that individuals who take their lives have often accessed health and mental health services leading up to their deaths.

## Barriers to Mental Health Care

Also relevant to these questions is a consideration of barriers to care. Even when mental health care is available, there are numerous reasons why individuals might not access services. In surveys of college students who have thought about suicide or were identified as being at elevated risk for suicide (due to current suicide ideation, history of suicide attempt, current depression, or current alcohol abuse), common barriers included beliefs that they can manage their problems without treatment or that their problems did not warrant treatment (Arria et al., 2011; Czyz et al., 2013). Some students reported preferences to seek help from family or friends, whereas others cited logistical challenges, including a lack of time to seek treatment, long waiting periods for services, and financial barriers. A study in Utah contacted the family (including parents, siblings, and other relatives) and friends of 49 youth (aged 13–21) who took their lives (Moskos et al., 2007). The most commonly endorsed barrier to mental health treatment was a belief that treatment would not help (cited as a barrier by more than 70 percent of parents, siblings, relatives, and friends), stigma toward help-seeking (endorsed by 52–79 percent of interviewees), and reluctance to admit that there was a problem

(endorsed by 58–79 percent of interviewees). Substantial proportions of family members and friends reported that the decedent did not know where to go to seek help, could not afford help, or did not have insurance coverage for mental health services. A larger-scale analysis of state-level characteristics also found that rates of suicide were higher in states in which a higher proportion of the population reported that they were unable to obtain health care because of costs (Thomson Healthcare, 2007). However, there is little evidence examining whether removing these barriers increases the likelihood of accessing needed services and what this may mean for reducing suicide risk.

## Policies That May Affect Access to Services

U.S. studies have found that state mental health expenditures per capita are not associated with rates of suicide (Thomson Healthcare, 2007; Price, Mrdjenovich, and Dake, 2009). However, there is some evidence that states receiving more federal mental health aid have lower suicide rates (Tondo, Albert, and Baldessarini, 2006), and in a multivariate model, this was a stronger correlate of suicide rates than the proportion of uninsured individuals in the state, density of psychiatrists or physicians, or sociodemographic variables (specifically, male gender). Because these studies are generally based on cross-sectional state-level data, however, it is difficult to know what type of effect an increase in mental health funding or increase in the number of insured individuals would have on rates of suicide.

A recent study by Lang (2013) analyzed the implementation of mental health parity laws on suicide rates. These laws require health insurance plans to provide comparable coverage for physical and mental health (U.S. Department of Labor, 2010). Between 1990 and 2004, 29 states enacted parity laws, and this study used variation in implementation dates to explore the causal effect of parity laws on suicide. Results demonstrated that in the first year after states enacted parity laws, the suicide rate declined by 5 percent. Moreover, these effects were maintained two or more years after the laws were enacted, although the magnitude of the change decreased somewhat. Subsequent analyses demonstrated that these laws had a particular effect on adults aged 18–64 but did not seem to affect the suicide rate in older adults who were less likely to be affected by the laws. Because this study was able to examine changes in suicide rates before and after the implementation of parity laws, it provided a more rigorous test of the association between access to services and suicide.

## International and Cross-National Studies

International studies provide fairly consistent evidence that the presence of psychiatrists in a region is associated with lower suicide rates. In Japan, municipalities with at

least one psychiatrist experienced lower rates of suicide (Kawaguchi and Koike, 2016), and in Slovenia, regions with a higher number of psychiatrists working in outpatient settings had lower suicide rates (Jagodič et al., 2013). In addition, a multinational study found that countries with a higher density of psychiatrists had lower suicide rates (Rajkumar et al., 2013). However, studies in other countries, such as Austria, have found no association between the density of psychiatrists and suicide standardized mortality ratios (Kapusta et al., 2010). Most of these studies were based on cross-sectional data, and when multiyear data were available, the effects of changes over time were not reported. Therefore, it is not clear that the prevalence of psychiatrists caused reductions in suicide rates, because other factors may be associated with both the presence of psychiatrists and lower suicide rates (e.g., urbanicity, gun ownership, education).

The evidence regarding nonphysician mental health providers has been more mixed. An Austrian study focused on the availability of psychotherapists—a broad category that included psychologists, psychiatrists, teachers, and social workers— and found that a larger number of psychotherapists was associated with lower rates of suicide (Kapusta et al., 2009). In contrast, other studies have found no association between the density of nonphysician psychotherapists, clinical psychologists, and general practitioners and suicide (Jagodič et al., 2013; Kapusta et al., 2010). The availability of certain types of services may also make a difference: A study in Finland found that regions with a higher ratio of outpatient to inpatient services had lower rates of suicide (Pirkola et al., 2009).

As in the United States, there have been efforts in other countries to examine suicide decedents' health care utilization prior to death. These studies share many of the same weaknesses as the U.S. studies, including an inability to directly connect use of mental health services to increased or decreased risk of suicide. However, one study in the United Kingdom highlighted the importance of identifying periods of vulnerability for individuals who are engaged with the health care system. Appleby et al. (1999) compared individuals who had inpatient psychiatric care within five years of their suicide with a comparison group of individuals who received inpatient care but did not die by suicide. Comparison participants were identified from hospitals in the same region as decedents, which were selected via block randomization and, to the extent possible, were matched on age (within five years), sex, diagnosis, and date of admission (within six months). This study focused on care received by patients after discharge. The authors found that individuals who died by suicide were more likely to have had their level of care reduced at the final appointment before their deaths. These decreases in care included reduced appointment frequency, transfer to a less supervised care location, or a lowered medication dose. For 56 percent of these cases, the death was within three months of the reduction in care. This study suggests that the period of time following a reduction in care may be particularly risky for suicidal individuals. This is an important consideration, even when a reduction in the intensity or level of care is clinically indicated.

## Conclusions

Correlations have frequently been found between suicide rates and the availability of mental health care, use of mental health care, or barriers to use of care. Typically, these correlations are found in cross-sectional studies, where it is not possible to establish with confidence whether the observed associations are attributable to a causal effect of mental health care or to other factors that might be associated with both suicide risk and the availability or use of mental health care. However, two studies that use methods better designed to establish causal effects suggest that (1) mental health parity laws, which facilitate access to mental health services, may indeed reduce suicide rates and (2) suicidal individuals may be particularly at risk after experiencing reductions in their health care.

# Chapter Nineteen References

Appleby, Louis, John A. Dennehy, Christopher S. Thomas, E. Brian Faragher, and Glyn Lewis, "Aftercare and Clinical Characteristics of People with Mental Illness Who Commit Suicide: A Case-Control Study," *Lancet*, Vol. 353, No. 9162, 1999, pp. 1397–1400.

Arria, Amelia M., Emily R. Winick, Laura M. Garnier-Dykstra, Kathryn B. Vincent, Kimberly M. Caldeira, Holly C. Wilcox, and Kevin E. O'Grady, "Help Seeking and Mental Health Service Utilization Among College Students with a History of Suicide Ideation," *Psychiatric Services*, Vol. 62, No. 12, 2011, pp. 1510–1513.

Czyz, Ewa K., Adam G. Horwitz, Daniel Eisenberg, Anne Kramer, and Cheryl A. King, "Self-Reported Barriers to Professional Help Seeking Among College Students at Elevated Risk for Suicide," *Journal of American College Health*, Vol. 61, No. 7, 2013, pp. 398–406.

Jagodič, Helena Korošec, Tatjana Rokavec, Mark Agius, and Peter Pregelj, "Availability of Mental Health Service Providers and Suicide Rates in Slovenia: A Nationwide Ecological Study," *Croatian Medical Journal*, Vol. 54, No. 5, 2013, pp. 444–452.

Kapusta, Nestor D., Thomas Niederkrotenthaler, Elmar Etzersdorfer, Martin Voracek, Kanita Dervic, Elisabeth Jandl-Jager, and Gernot Sonneck, "Influence of Psychotherapist Density and Antidepressant Sales on Suicide Rates," *Acta Psychiatrica Scandinavica*, Vol. 119, No. 3, 2009, pp. 236–242.

Kapusta, Nestor D., Martin Posch, Thomas Niederkrotenthaler, Melitta Fischer-Kern, Elmar Etzersdorfer, and Gernot Sonneck, "Availability of Mental Health Service Providers and Suicide Rates in Austria: A Nationwide Study," *Psychiatric Services*, Vol. 61, No. 12, 2010, pp. 1198–1203.

Kawaguchi, Hideaki, and Soichi Koike, "Association Between the Density of Physicians and Suicide Rates in Japan: Nationwide Ecological Study Using a Spatial Bayesian Model," *PLoS ONE*, Vol. 11, No. 2, 2016.

Lang, Matthew, "The Impact of Mental Health Insurance Laws on State Suicide Rates," *Health Economics*, Vol. 22, No. 1, 2013, pp. 73–88.

Lexington, "Why the NRA Keeps Talking About Mental Illness, Rather Than Guns," *Economist*, March 13, 2013. As of June 29, 2017:
http://www.economist.com/blogs/lexington/2013/03/guns-and-mentally-ill

Luoma, Jason B., Catherine E. Martin, and Jane L. Pearson, "Contact with Mental Health and Primary Care Providers Before Suicide: A Review of the Evidence," *American Journal of Psychiatry*, Vol. 159, No. 6, 2002, pp. 909–916.

McCarthy, John F., Frederic C. Blow, Rosalinda V. Ignacio, Mark A. Ilgen, Karen L. Austin, and Marcia Valenstein, "Suicide Among Patients in the Veterans Affairs Health System: Rural-Urban Differences in Rates, Risks, and Methods," *American Journal of Public Health*, Vol. 102, No. S1, March 2012, pp. S111–S117.

Moskos, Michelle A., Lenora Olson, Sarah R. Halbern, and Doug Gray, "Utah Youth Suicide Study: Barriers to Mental Health Treatment for Adolescents," *Suicide and Life-Threatening Behavior*, Vol. 37, No. 2, 2007, pp. 179–186.

Niederkrotenthaler, Thomas, Joseph E. Logan, Debra L. Karch, and Alex Crosby, "Characteristics of U.S. Suicide Decedents in 2005–2010 Who Had Received Mental Health Treatment," *Psychiatric Services*, Vol. 65, No. 3, 2014, pp. 387–390.

Pirkola, Sami, Reijo Sund, Eila Sailas, and Kristian Wahlbeck, "Community Mental-Health Services and Suicide Rate in Finland: A Nationwide Small-Area Analysis," *Lancet*, Vol. 373, No. 9658, 2009, pp. 147–153.

Price, James H., Adam J. Mrdjenovich, and Joseph A. Dake, "Prevalence of State Firearm Mortality and Mental Health Care Resources," *Journal of Community Health*, Vol. 34, No. 5, 2009, pp. 383–391.

Rajkumar, A. P., E. M. Brinda, A. S. Duba, P. Thangadurai, and K. S. Jacob, "National Suicide Rates and Mental Health System Indicators: An Ecological Study of 191 Countries," *International Journal of Law and Psychiatry*, Vol. 36, No. 5, 2013, pp. 339–342.

Robbins, Mel, "The Real Gun Problem Is Mental Health, Not the NRA," CNN, 2014. As of June 29, 2017:
http://www.cnn.com/2014/06/24/opinion/robbins-mental-health

Shumway, Martha, Jennifer Alvidrez, Mark Leary, Deborah Sherwood, Eric Woodard, Emily K. Lee, Heather Hall, Ralph A. Catalano, and James W. Dilley, "Impact of Capacity Reductions in Acute Public-Sector Inpatient Psychiatric Services," *Psychiatric Services*, Vol. 63, No. 2, 2012, pp. 135–141.

Simon, Robert I., and Liza H. Gold, "Decreasing Suicide Mortality: Clinical Risk Assessment and Firearm Management," in Liza H. Gold and Robert I. Simon, eds., *Gun Violence and Mental Illness*, Arlington, Va.: American Psychiatric Association Publishing, 2016, pp. 249–289.

Thomson Healthcare, *Ranking America's Mental Health: An Analysis of Depression Across the States*, Washington, D.C.: Mental Health America, 2007.

Tondo, Leonardo, Matthew J. Albert, and Ross J. Baldessarini, "Suicide Rates in Relation to Health Care Access in the United States: An Ecological Study," *Journal of Clinical Psychiatry*, Vol. 67, No. 4, 2006, pp. 517–523.

U.S. Department of Labor, *Fact Sheet: The Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA)*, Washington, D.C., January 29, 2010. As of October 18, 2017:
https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/mhpaea.pdf

CHAPTER TWENTY

# Education Campaigns and Clinical Interventions for Promoting Safe Storage

The safe storage of firearms has been proposed by both gun advocacy groups and violence prevention groups as a means to address suicides and unintentional injuries and deaths associated with guns in the United States. In addition, safe storage is described explicitly in the Surgeon General's 2012 *National Strategy for Suicide Prevention* (Office of the Surgeon General and National Action Alliance for Suicide Prevention, 2012).

In this chapter, we briefly review the evidence on the relationship between firearm storage and both suicides and unintentional injuries and deaths. Then, we review two nonpolicy approaches: education campaigns and clinical interventions. Safe storage policy approaches—specifically, child-access prevention laws—are discussed in Chapter Ten. The information was collected from a targeted search of the literature separate from that described in Chapter Two of this report but relies heavily on a recent systematic review (Rowhani-Rahbar, Simonetti, and Rivara, 2016) that updated an earlier review (McGee, Coyne-Beasley, and Johnson, 2003).

## Evidence on Safe Storage

As discussed in Chapter Sixteen (on the relationship between firearm prevalence and suicide), there is evidence that those who die by suicide have guns stored less safely than various comparison groups (Conwell et al., 2002; Shenassa et al., 2004). A study on adolescent suicides did not yield similar results but may have been underpowered (Brent et al., 1991; Brent et al., 1993b). In addition, Grossman et al. (2005) examined a combined group of fatal and nonfatal youth suicides and unintentional injuries relative to community controls. They found that, relative to controls, guns used in the injuries or deaths were less likely to be stored unloaded or locked, to have the ammunition locked, or to have the ammunition and gun stored separately and were more likely to be stored without using an extrinsic device. Research has also shown a correlation between firearm storage practices among gun owners, measured in 2004, and state-level unintentional firearm deaths aggregated between 1991 and 2000 (Miller et al., 2005).

## Education Campaigns

Public health communication is a common mechanism used to inform or influence audience behaviors to produce positive health benefits to individuals and society. Decades of research on public health campaigns for a range of behaviors reveal that, over time, campaigns can produce long-term, systemic behavioral change. Communication has been a major contributor, for example, to both the increase in tobacco use (caused by advertising and promotion) and the substantial decline of smoking since the 1960s (through public health campaigns) (National Cancer Institute, 2008). Meta-analyses of how media campaigns affect behavior change provide evidence that campaigns can produce short-term effects of approximately 9 percent more people performing a desired behavior after the campaign than before (Snyder and Hamilton, 2002). When combining campaigns with enforcement strategies (for instance, the campaign combines messages designed to change behavior and to advise the public of penalties for noncompliance), effect sizes can jump to 17 percent (Snyder and Hamilton, 2002). Other meta-analyses corroborate significant effect sizes from more-specific types of campaigns. For example, Noar, Benac, and Harris (2007) examined interventions promoting messages about health behavior change and found small but significant average effects.

Gun rights advocacy organizations, violence prevention organizations, and public health advocacy organizations have implemented small- to large-scale educational campaigns to promote safe firearm storage and safe use. For instance, the National Shooting Sports Foundation (2016) promotes Project ChildSafe, a program designed to encourage safe storage of firearms. With funding from the U.S. Department of Justice, the Ad Council and the National Crime Prevention Council developed the "Lock It Up" information campaign in 2013, which included public service announcements delivered to nearly 15,000 radio stations and more than 500 cable networks in 210 markets (U.S. Department of Justice, 2013). Relatedly, the Brady Campaign to Prevent Gun Violence (undated) produces a variety of safety and education materials spanning various media (e.g., digital, print, and social media). The Brady Campaign's approach extends beyond safe storage practices and implements campaigns targeting gun dealers to promote background checks for all gun sales, illegal dealers who supply guns used in crimes, and the general public to educate them about the dangers of guns in the home (for more about the relationship between firearm prevalence and violent crime, see Chapter Seventeen). The Everytown for Gun Safety Support Fund also has a "Be SMART" program, which promotes safely storing firearms, modeling responsible behavior around guns, asking about unsecured guns in other homes, and recognizing the risks of teen suicide (Everytown for Gun Safety Support Fund, 2017a).

There is only one rigorous evaluation of a national-level mass media campaign promoting safe firearm storage. That campaign centered on the slogan "Buy a Box for Your Gun, Not Your Kid" and included television and radio announcements,

billboards, community-distributed materials, and discount coupons for lockboxes (Sidman et al., 2005). Campaign materials contained memorable images of an empty, child-sized coffin or an unlocked cabinet containing a handgun. The campaign materials were distributed to physicians, clinics, nursing organizations, churches, schools, parent-teacher conferences, and law enforcement offices (Sidman et al., 2005). The evaluation did not find the campaign to have statistically significant effects on improving safe storage practices.

## Clinical Interventions

The Surgeon General's 2012 *National Strategy for Suicide Prevention* specifically states that one of its objectives is to "encourage providers who interact with individuals at risk for suicide to routinely assess for access to lethal means" (Office of the Surgeon General and National Action Alliance for Suicide Prevention, 2012). The report states that "providers can educate individuals with suicide risk and their loved ones about safe firearm storage and access." There is recent guidance about when and how physicians can counsel their patients on firearms (Wintemute, Betz, and Ranney, 2016), but such counseling is not often performed (Butkus and Weissman, 2014).

Rowhani-Rahbar, Simonetti, and Rivara (2016) identified five randomized controlled trials or quasi-experimental studies that evaluated clinical-based interventions designed to promote safe firearm storage practices. All interventions were conducted at family medicine or pediatric clinics in the United States, in which practitioners generally counseled families with children. Two of the trials, both of which provided a free safe storage device for firearms in addition to counseling, showed that the intervention improved safe storage (Carbone, Clemons, and Ball, 2005; Barkin et al., 2008). One of the trials that did not provide a free storage device also found positive effects (Stevens et al., 2002). On the other hand, there was no evidence that an intervention that provided counseling plus economic incentives (e.g., coupons for discounted locking devices) to encourage safe storage was effective (Grossman et al., 2000).[1]

## Conclusions

Safe storage of firearms may prevent suicide and unintentional injuries and deaths. As described in Chapter Ten, there is comparatively strong evidence that child-access prevention laws, which require safe storage practices, can effectively reduce suicides and unintentional injuries and deaths. Interventions other than laws may also success-

---

[1]   A sixth study was not a clinical intervention per se but installed free long storage cabinets in western Alaska. Households that received a free cabinet installation improved safe storage of guns and ammunition (Grossman et al., 2012).

fully promote safe storage. Although education campaigns have been found to produce behavior change in other domains, evidence that they have successfully promoted safe storage of firearms is limited. On the other hand, there is evidence that clinicians who counsel patients (mostly families with children) can effectively promote safe storage practices, particularly if storage devices (e.g., gun locks) are given away for free.

## Chapter Twenty References

Barkin, Shari L., Stacia A. Finch, Edward H. Ip, Benjamin Scheindlin, Joseph A. Craig, Jennifer Steffes, Victoria Weiley, Eric Slora, David Altman, and Richard C. Wasserman, "Is Office-Based Counseling About Media Use, Timeouts, and Firearm Storage Effective? Results from a Cluster-Randomized, Controlled Trial," *Pediatrics*, Vol. 122, No. 1, 2008, pp. E15–E25.

Brady Campaign to Prevent Gun Violence, "About Brady," web page, undated. As of January 10, 2016:
http://www.bradycampaign.org/about-brady

Brent, D. A., J. A. Perper, C. J. Allman, G. M. Moritz, M. E. Wartella, and J. P. Zelenak, "The Presence and Accessibility of Firearms in the Homes of Adolescent Suicides: A Case-Control Study," *JAMA*, Vol. 266, No. 21, 1991, pp. 2989–2995.

Brent, D. A., J. A. Perper, G. Moritz, M. Baugher, J. Schweers, and C. Roth, "Firearms and Adolescent Suicide—A Community Case-Control Study," *American Journal of Diseases of Children*, Vol. 147, No. 10, 1993b, pp. 1066–1071.

Butkus, Renee, and Arlene Weissman, "Internists' Attitudes Toward Prevention of Firearm Injury," *Annals of Internal Medicine*, Vol. 160, No. 12, 2014, pp. 821–827.

Carbone, Paul S., Conrad J. Clemens, and Thomas M. Ball, "Effectiveness of Gun-Safety Counseling and a Gun Lock Giveaway in a Hispanic Community," *Archives of Pediatrics and Adolescent Medicine*, Vol. 159, No. 11, 2005, pp. 1049–1054.

Conwell, Y., P. R. Duberstein, K. Connor, S. Eberly, C. Cox, and E. D. Caine, "Access to Firearms and Risk for Suicide in Middle-Aged and Older Adults," *American Journal of Geriatric Psychiatry*, Vol. 10, No. 4, 2002, pp. 407–416.

Everytown for Gun Safety Support Fund, "Be SMART," web page, 2017a. As of May 7, 2017: http://besmartforkids.org/

Grossman, David C., Peter Cummings, Thomas D. Koepsell, Jean Marshall, Luann D'Ambrosio, Robert S. Thompson, and Chris Mack, "Firearm Safety Counseling in Primary Care Pediatrics: A Randomized, Controlled Trial," *Pediatrics*, Vol. 106, No. 1, 2000, pp. 22–26.

Grossman, D. C., B. A. Mueller, C. Riedy, M. D. Dowd, A. Villaveces, J. Prodzinski, J. Nakagawara, J. Howard, N. Thiersch, and R. Harruff, "Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries," *JAMA*, Vol. 293, No. 6, 2005, pp. 707–714.

Grossman, David C., Helen A. Stafford, Thomas D. Koepsell, Ryan Hill, Kyla D. Retzer, and Ward Jones, "Improving Firearm Storage in Alaska Native Villages: A Randomized Trial of Household Gun Cabinets," *American Journal of Public Health*, Vol. 102, No. S2, 2012, pp. S291–S297.

McGee, K. S., T. Coyne-Beasley, and R. M. Johnson, "Review of Evaluations of Educational Approaches to Promote Safe Storage of Firearms," *Injury Prevention*, Vol. 9, No. 2, 2003, pp. 108–111.

Miller M., D. Azrael, D. Hemenway, and M. Vriniotis, "Firearm Storage Practices and Rates of Unintentional Firearm Deaths in the United States," *Accident Analysis and Prevention*, Vol. 37, No. 4, 2005, pp. 661–667.

National Cancer Institute, *The Role of the Media in Promoting and Reducing Tobacco Use*, Washington, D.C.: U.S. Department of Health and Human Services, National Institutes of Health, No. 07-6242, 2008.

National Shooting Sports Foundation, "Project ChildSafe," web page, 2016. As of January 10, 2017: http://www.projectchildsafe.org/

Noar, Seth M., Christina N. Benac, and Melissa S. Harris, "Does Tailoring Matter? Meta-Analytic Review of Tailored Print Health Behavior Change Interventions," *Psychological Bulletin,* Vol. 133, No. 4, 2007, pp. 673–693.

Office of the Surgeon General and National Action Alliance for Suicide Prevention, *National Strategy for Suicide Prevention: Goals and Objectives for Action: A Report of the U.S. Surgeon General and of the National Action Alliance for Suicide Prevention,* Washington, D.C.: U.S. Department of Health and Human Services, 2012.

Rowhani-Rahbar, Ali, Joseph A. Simonetti, and Frederick P. Rivara, "Effectiveness of Interventions to Promote Safe Firearm Storage," *Epidemiologic Reviews*, Vol. 38, No. 1, 2016, pp. 111–124.

Shenassa, E. D., M. L. Rogers, K. L. Spalding, and M. B. Roberts, "Safer Storage of Firearms at Home and Risk of Suicide: A Study of Protective Factors in a Nationally Representative Sample," *Journal of Epidemiology and Community Health*, Vol. 58, No. 10, 2004, pp. 841–848.

Sidman, Elanor A., David C. Grossman, Thomas D. Koepsell, Luann D'Ambrosio, John Britt, Evan S. Simpson, Frederick P. Rivara, and Abraham B. Bergman, "Evaluation of a Community-Based Handgun Safe-Storage Campaign," *Pediatrics*, Vol. 115, No. 6, 2005, pp. E654–E661.

Snyder, L. B., and M. A. Hamilton, "A Meta-Analysis of U.S. Health Campaign Effects on Behavior: Emphasize Enforcement, Exposure, and New Information, and Beware the Secular Trend," in R. C. Hornik, ed., *Public Health Communication: Evidence for Behavior Change*, New York: Lawrence Erlbaum Associates, Inc., 2002, pp. 357–383.

Stevens, Marguerite M., Ardis L. Olson, Cecelia A. Gaffney, Tor D. Tosteson, Leila A. Mott, and Pamela Starr, "A Pediatric, Practice-Based, Randomized Trial of Drinking and Smoking Prevention and Bicycle Helmet, Gun, and Seatbelt Safety Promotion," *Pediatrics*, Vol. 109, No. 3, 2002, pp. 490–497.

U.S. Department of Justice "Department of Justice Awards $1 Million to the National Crime Prevention Council to Support Gun Safety Campaign," press release, March 7, 2013. As of January 10, 2016:
https://www.justice.gov/opa/pr/department-justice-awards-1-million-national-crime-prevention-council-support-gun-safety

Wintemute, Garen J., Marian E. Betz, and Megan L. Ranney, "Yes, You Can: Physicians, Patients, and Firearms," *Annals of Internal Medicine*, Vol. 165, No. 3, 2016, pp. 205–213.

CHAPTER TWENTY-ONE

# Restricting Access to Firearms Among Individuals at Risk for or Convicted of Domestic Violence or Violent Crime

Nearly half of all women murdered in the United States are killed by a current or former intimate partner, often with a firearm (Petrosky et al., 2017). In about 10 percent of these murders, the women had already been victims of violence in the preceding month (Petrosky et al., 2017). Under some definitions of mass shootings, more than half of the mass shootings between 2009 and 2016 involved domestic violence (Everytown for Gun Safety Support Fund, 2017b). Recognizing the potential lethality of domestic violence, many states have implemented laws designed to prevent domestic violence perpetrators from acquiring or retaining firearms. Chapter Three reviews the literature on background checks, and Chapter Eleven reviews the literature on surrender of firearms by prohibited possessors. Both types of policies can be applied to persons convicted of domestic violence offenses. In this chapter, we consolidate findings from research studies of the effects of laws designed to reduce intimate partner violence, several of which were described in Part B. We review five empirical studies identified during our full-text review (described in Chapter Two) that met our review criteria—that is, at a minimum, the study included (1) time-series data that were used to establish that policies preceded their apparent effects and (2) a control group or comparison group.

## The Policy Defined

In 1994, Congress enacted the Violent Crime Control and Law Enforcement Act (Pub. L. 103-322), making it illegal to possess or receive a firearm while subject to a restraining order protecting an intimate partner or the child of an intimate partner. Subsequently, in 1996, the Lautenberg Amendment (Pub. L. 104-208) to the Gun Control Act of 1968 prohibited possession of a firearm by anyone who has been convicted of a misdemeanor crime of domestic violence, although not all domestic violence misdemeanors are covered. Both before and after the 1994 and 1996 federal law changes, many states enacted additional and sometimes more-stringent legislation related to the purchase or possession of guns by those under domestic violence restraining orders or who have been convicted of a misdemeanor domestic violence offense.

These domestic violence–related "prohibited-possessor" restrictions are one form of a broad class of policy levers meant to reduce violent crime by limiting the availability of guns to individuals who are likely to use them criminally. Such requirements may result in prohibited possessors purchasing guns through other (unregulated or illegal) markets or relying more heavily on gun theft (instead of buying guns through the affected markets). On the other hand, restrictions on the legal market for gun purchase may have trickle-down effects on gun supply in illegal markets because many guns cross from legal to illegal markets. In the case of prohibited-possessor regulations related to domestic violence, these restrictions may also reduce violent crime by restricting the availability of guns to individuals who may have no criminal intent at the time of purchase and are unwilling to commit the act of illegally obtaining a gun but for whom access to a firearm may result in impulsive illegal violence.

## Research Synthesis Findings

Vigdor and Mercy (2006) examined the effects on intimate partner homicide of two types of legislation: that which prohibits people under a domestic violence restraining order from purchasing or possessing a firearm and that which prohibits people who have been convicted of a misdemeanor domestic violence offense from possessing a firearm. The authors also examined laws that allow law enforcement officers to confiscate firearms at the scene of alleged domestic violence incidents. Their state-level analysis of intimate partner homicide rates from 1982 to 2002 found no effect of regulations related to domestic violence misdemeanors (or confiscation policies) but a statistically significant reduction in intimate partner violence from restraining order policies. The authors acknowledged that potentially dissimilar laws related to restraining order and misdemeanor convictions were grouped together in the analysis and that further research is needed to understand how differences in these policies and their enforcement influence their effectiveness. They also noted that the effect of federal law provisions (not estimated by Vigdor and Mercy, 2006) might dominate the effects of marginally more-restrictive state laws.

Similarly, Bridges, Tatum, and Kunselman (2008) examined the effects on intimate partner homicide of laws that prohibit people under a domestic violence restraining order from purchasing or possessing a firearm and others that prohibit people who have been convicted of a misdemeanor domestic violence offense from possessing a firearm. The authors used state-level data from 1995 to 1999 and found a reduction in family homicide rates from prohibited-possessor policies related to people under a restraining order, but they found no effect of the state policies related to misdemeanor domestic violence convictions. However, their narrow time frame means that identification of the effect of these policies came from just a handful of states that enacted relevant legislation during this period and that had both pre- and post-policy observations.

In addition to examining the effects of restricted access for those on domestic violence–related restraining orders or those convicted of misdemeanors, Zeoli and Webster (2010) studied the effects of state laws allowing police to confiscate firearms from a domestic violence incident, allowing police to make warrantless arrests for domestic violence restraining order violations, and mandating arrest for domestic violence restraining order violations. The authors analyzed data from 46 cities from 1979 to 2003 and found a reduction in intimate partner homicides from laws that restrict access to firearms for domestic violence–related restraining orders and laws that allow police to arrest restraining order violators.

Rather than estimating the effects of laws related to domestic violence restraining orders and misdemeanors, Sen and Panjamapirom (2012) examined the effect of whether a state, in its background check process, checks on restraining orders and misdemeanors. They found that the existence of these checks was associated with fewer firearm homicides.

Instead of focusing on the effects of state legislation, Raissian (2016) looked at the effect of the federal 1996 Lautenberg Amendment. She identified the effect of the federal law by exploiting variation across states in their assault statues, which affected the applicability of the law. Specifically, at the time of the 1996 amendment, some states had only a general assault statute and others had both a general statute and a domestic violence statute. Defendants convicted under domestic violence statutes were subject to the gun ban and those convicted under a general statute were not—unless a circuit court ruling applied the ban to misdemeanor domestic violence defendants convicted of a general assault statute. This narrow interpretation of the applicability of the gun ban ended in 2009 with the Supreme Court's *United States v. Hayes* decision. Raissian (2016) used this variation in the implementation dates of domestic violence gun bans to identify the effects of the ban on changes in intimate partner violence. The author found that intimate partner homicides and other family homicides declined when the federal law took effect barring firearm possession among those with a domestic violence misdemeanor conviction.

## Conclusions

Policies that make it illegal for particular groups of people to purchase or possess guns are one form of a broad class of policy levers that attempt to reduce the incidence of criminal gun violence. Recent research evidence suggests that such laws targeting domestic violence offenders may reduce homicide rates. There is less-compelling evidence that laws permitting police to confiscate firearms at scenes of domestic violence reduce violence, although the extent to which police have used this authority is unclear.

# Chapter Twenty-One References

Bridges, F. Stephen, Kimberly M. Tatum, and Julie C. Kunselman, "Domestic Violence Statutes and Rates of Intimate Partner and Family Homicide," *Criminal Justice Policy Review*, Vol. 19, No. 1, 2008, pp. 117–130.

Everytown for Gun Safety Support Fund, "Mass Shootings in the United States: 2009–2016," April 11, 2017b. As of May 3, 2017:
http://everytownresearch.org/reports/mass-shootings-analysis/

Petrosky, E., J. M. Blair, C. J. Betz, K. A. Fowler, S. P. Jack, and B. H. Lyons, "Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence—United States, 2003–2014," *Morbidity and Mortality Weekly Report*, Vol. 66, No. 28, 2017, pp. 741–746.

Public Law 103-322, Violent Crime Control and Law Enforcement Act of 1994, 1994.

Public Law 104-208, Gun Ban for Individuals Convicted of a Misdemeanor Crime of Domestic Violence, 1996.

Raissian, Kerri M., "Hold Your Fire: Did the 1996 Federal Gun Control Act Expansion Reduce Domestic Homicides?" *Journal of Policy Analysis and Management*, Vol. 35, No. 1, Winter 2016, pp. 67–93.

Sen, B., and A. Panjamapirom, "State Background Checks for Gun Purchase and Firearm Deaths: An Exploratory Study," *Preventive Medicine*, Vol. 55, No. 4, 2012, pp. 346–350.

Vigdor, E. R., and J. A. Mercy, "Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Homicide?" *Evaluation Review*, Vol. 30, No. 3, 2006, pp. 313–346.

Zeoli, A. M., and D. W. Webster, "Effects of Domestic Violence Policies, Alcohol Taxes and Police Staffing Levels on Intimate Partner Homicide in Large U.S. Cities," *Injury Prevention*, Vol. 16, No. 2, 2010, pp. 90–95.

CHAPTER TWENTY-TWO

# Mass Shootings

In this chapter, we provide an overview of mass shootings, one of the eight outcomes examined in our research syntheses (Chapters Three through Fifteen). We first describe different approaches for defining a mass shooting and then discuss how using different definitions can influence estimates of mass shooting levels and trends. The information was collected from a targeted search of the literature separate from that described in Chapter Two of this report.

## What Is a Mass Shooting?

In the 1980s, the Federal Bureau of Investigation (FBI) defined *mass murderer* as someone who "kills four or more people in a single incident (not including himself), typically in a single location" (Krouse and Richardson, 2015). However, the government has never defined *mass shooting* as a separate category, and there is not yet a universally accepted definition of the term. Thus, media outlets, academic researchers, and law enforcement agencies frequently use different definitions when discussing mass shootings, which can complicate our understanding of mass shooting trends and their relationship to gun policy. Table 22.1 provides examples of the variation in the criteria set by five of the most commonly referenced data sources on mass shootings in the United States.

Although there is no official standard for the casualty threshold that distinguishes a mass shooting from other violent crimes involving a firearm, a common approach in the literature is to adopt the FBI's criteria for a mass murderer and set a casualty threshold of four fatalities by firearm, excluding the offender or offenders (Duwe, Kovandzic, and Moody, 2002; Krouse and Richardson, 2015; Gius, 2015c; Fox and Fridel, 2016). However, this categorization is not without controversy. It does not capture incidents in which fewer than four victims were killed but additional victims were injured, and it does not include multiple-victim homicides in which fewer than four fatalities resulted from gunshots but additional fatalities occurred by other means. Additionally, the FBI classification of mass murderer was established primarily with the aim of clarifying criminal profiling procedures, not for the purpose of data collection or statistical

**Table 22.1**
**Variation in How Mass Shootings Are Defined and Counted**

| Source | Casualty Threshold (for injuries or deaths by firearm) | Location of Incident | Motivation of Shooter | Number of U.S. Mass Shootings in 2015 |
|---|---|---|---|---|
| *Mother Jones* (see Follman, Aronsen, and Pan, 2017) | Three fatal injuries (excluding shooter)[a] | Public | Indiscriminate (excludes crimes of armed robbery, gang violence, or domestic violence) | 7 |
| Gun Violence Archive (undated) | Four fatal or nonfatal injuries (excluding shooter) | Any | Any | 332 |
| Mass Shooting Tracker (undated) | Four fatal or nonfatal injuries (including shooter) | Any | Any | 371 |
| Mass Shootings in America database (Stanford Geospatial Center, undated) | Three fatal or nonfatal injuries (excluding shooter) | Any | Not identifiably related to gangs, drugs, or organized crime | 65 |
| Supplementary Homicide Reports (FBI) (see Puzzanchera, Chamberlin, and Kang, 2017) | The FBI's Supplementary Homicide Reports do not define *mass shooting* but do provide information on the number of victims, and the reports have been used by researchers in conjunction with news reports or other data sources. | | | |

[a] Before January 2013, the casualty threshold for *Mother Jones* was four fatal injuries (excluding the shooter).

analysis (Ressler, Burgess, and Douglas, 1988). Thus, many have chosen alternative definitions of casualty thresholds for mass shootings. For instance, Lott and Landes (2000) adopted the definition of two or more injured victims, the Gun Violence Archive (undated) defined *mass shooting* as an incident in which four or more victims (excluding the shooter) are injured or killed, and Mass Shooting Tracker (undated) set a criterion of four or more people injured or killed (including the shooter).

Another definitional disagreement is whether to include multiple-victim shooting incidents that occur in connection with some other crime or domestic dispute. Because mass shootings that stem from domestic and gang violence are contextually distinct from high-fatality indiscriminate killings in public venues, some have argued that they should be treated separately. In their analyses of "mass public shootings," Lott and Landes (2000) excluded any felony-related shooting, and Duwe, Kovandzic, and Moody (2002) excluded incidents where "both the victims and offender(s) were involved in unlawful activities, such as organized crime, gang activity, and drug deals" (p. 276). Similarly, Gius (2015c) restricted analysis to events that occurred in a relatively public area and in which victims appeared to have been selected randomly. However, others have claimed that this narrow definition ignores a substantial proportion

of gun-related violence from family- or felony-related murder (Fox and Levin, 2015). Data collection efforts by Mass Shooting Tracker and the Gun Violence Archive thus counted all incidents that met their designated casualty threshold as mass shootings, regardless of the circumstances that led to the event.

These definitions matter. Depending on which data source is referenced, there were seven, 65, 332, or 371 mass shootings in the United States in 2015 (see Table 22.1), and those are just some examples. More-restrictive definitions (e.g., *Mother Jones*) focus on the prevalence of higher-profile events motivated by mass murder, but they omit more-common incidents occurring in connection with domestic violence or criminal activity, which make up about 80 percent of mass shooting incidents with four or more fatally injured victims (Krouse and Richardson, 2015). Broader definitions (e.g., Mass Shooting Tracker) provide a more comprehensive depiction of the prevalence of gun violence, but they obscure the variety of circumstances in which these incidents take place and their associated policy implications. Furthermore, if the effects of a firearm policy are expected to affect only public mass shooting incidents, then analysis that includes domestic violence mass shootings in the outcome measure could obscure identification of significant effects that would be found in a more targeted analysis of public mass shootings alone. There is thus value in having multiple measurements of mass shootings—but only if their definitions are clearly and precisely explained and they are used by researchers in a manner appropriate to the analysis.

## Are Mass Shootings on the Rise?

In 2014, the FBI released a study showing that "active shooting incidents" had increased at an average annual rate of 16 percent between 2000 and 2013 (Blair and Schweit, 2014). In contrast to the varied definitions for mass shootings, there is an agreed-upon definition among government agencies for *active shooter*: "an individual actively engaged in killing or attempting to kill people in a confined and populated area; in most cases, active shooters use firearm(s) and there is no pattern or method to their selection of victims" (U.S. Department of Homeland Security, 2008, p. 2). Using a modified version of this definition to include incidents that had multiple offenders or occurred in confined spaces, Blair and Schweit (2014) found that active shootings had increased from only one incident in 2000 to 17 in 2013.

The FBI study (Blair and Schweit, 2014) highlighted several key issues in determining trends in mass shootings. First, the absence of a systematic definition of mass shootings can lead to misinterpretation of reported evidence. While the study explicitly stated, "This is not a study of mass killings or mass shootings" (p. 5), extensive media coverage cited the study as evidence of a sharp rise in mass shootings and mass shooting fatalities (Lott, 2015). However, the definition of an *active-shooter incident* is broader than any of the commonly used criteria for mass shootings (see Table 22.1) because it

does not set any casualty threshold. Of the 160 active-shooter incidents included in the FBI's analysis, 7 percent resulted in zero casualties, 20 percent resulted in zero fatalities, and 22 percent resulted in a single fatality (Lott, 2015). Setting a threshold of zero victims increases the potential for measurement error, because shooting incidents with no casualties are more difficult to identify from police records and are less likely to receive media coverage (Duwe, Kovandzic, and Moody, 2002). Additionally, because it should be relatively easier to identify more-recent shootings with few fatalities, a low casualty threshold will tend to systematically bias estimates of the number of shootings upward over time. For example, the Stanford Mass Shootings in America database, which relies solely on online media sources to identify mass shooting events, cautions its users, "Data in the [database] spans a time period that includes the transition from traditional media to digital media in reporting. Numbers of incidents per year should at least in part be assumed to reflect this collection methodology and not just changes in incident frequency." Thus, the more than threefold surge in mass shooting incidents from 2014 to 2015 shown in the Stanford data likely reflects increased online reporting and not necessarily a true increase in the rate of mass shootings.

Even when a more restrictive casualty threshold of four or more fatally injured victims (excluding the shooter) is imposed, empirical evidence on trends in these incidents varies depending on whether the motivation of the shooter is included as a criterion for considering an event a mass shooting. In their analysis of mass shooting trends from 1999 to 2013, Krouse and Richardson (2015) distinguished between mass shootings occurring in public locations that are indiscriminate in nature ("mass public shootings"), mass shootings in which the majority of victims are members of the offender's family and that are not attributable to other criminal activity ("familicide mass shootings"), and mass shootings that occur in connection to some other criminal activity ("other felony mass shootings"). Figures 22.1 and 22.2 show trends in these types of mass shooting incidents and fatalities, respectively, using the data provided in Krouse and Richardson (2015). Extending the data back to the 1970s, two studies found evidence of a slight increase in the frequency of mass public shootings over the past three decades (Cohen, Azrael, and Miller, 2014; Krouse and Richardson, 2015). However, using an expanded definition that includes domestic- or felony-related killings, there is little evidence to suggest that mass shooting incidents or fatalities have increased (Cohen, Azrael, and Miller, 2014; Krouse and Richardson, 2015; Fox and Fridel, 2016). Thus, different choices about how to define a mass shooting result in different findings for both the prevalence of these events at a given time and whether their frequency has changed over time.

Definitional issues aside, the relative rarity of mass shooting events makes analysis of trends particularly difficult. Chance variability in the annual number of mass shooting incidents makes it challenging to discern a clear trend, and trend estimates will be sensitive to outliers and to the time frame chosen for analysis. For example, while Krouse and Richardson (2015) found evidence of an upward trend in mass public

**Figure 22.1**
**Trends in Mass Shooting Incidents, by Type of Incident**



SOURCE: Adapted from data in Krouse and Richardson, 2015.
**RAND** *RR2088-22.1*

**Figure 22.2**
**Trends in Mass Shooting Fatalities, by Type of Incident**



SOURCE: Adapted from data in Krouse and Richardson, 2015.
**RAND** *RR2088-22.2*

shootings from 1999 to 2013, they noted that the increase was driven largely by 2012, which had an unusually high number of mass public shooting incidents. Additionally, Lott (2015) showed that the FBI study's estimate of a dramatic increase in active-shooter incidents was largely driven by the choice of 2000 as the starting date, because that year had an unusually low number of shooting incidents; extending the analysis to cover 1977 onward and adjusting the data to exclude events with fewer than two

fatalities, Lott (2015) found a much smaller and statistically insignificant increase (less than 1 percent annually) in mass shooting fatalities over time.

## Conclusions

While different choices about how to define a mass shooting and the period over which to calculate mass shooting trends have resulted in disagreement about whether the frequency of mass shootings has risen, there is clear evidence that the media's use of the term *mass shooting* has increased significantly over recent decades (Roeder, 2016). Unfortunately, the ambiguity in how mass shootings are defined and counted may result in increased media coverage influencing public perception without better informing our understanding of the prevalence of mass shootings or their determinants, trends, social costs, or policy implications.

# Chapter Twenty-Two References

Blair, J. Pete, and Katherine W. Schweit, *A Study of Active Shooter Incidents, 2000–2013*, Washington, D.C.: Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, 2014.

Cohen, Amy P., Deborah Azrael, and Matthew Miller, "Rate of Mass Shootings Has Tripled Since 2011, Harvard Research Shows," *Mother Jones,* October 15, 2014.

Duwe, Grant, Tomislav Kovandzic, and Carlisle E. Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies*, Vol. 6, No. 4, 2002, pp. 271–296.

Follman, Mark, Gavin Aronsen, and Deanna Pan, "U.S. Mass Shootings, 1982–2017: Data from *Mother Jones*' Investigation," *Mother Jones*, June 14, 2017. As of August 25, 2017: http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/

Fox, James A., and Emma E. Fridel, "The Tenuous Connections Involving Mass Shootings, Mental Illness, and Gun Laws," *Violence and Gender*, Vol. 3, No. 1, 2016, pp. 14–19.

Fox, James A., and Jack Levin, *Extreme Killing: Understanding Serial and Mass Murder*, 3rd ed., Thousand Oaks, Calif.: Sage Publications, 2015.

Gius, Mark, "The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings," *Applied Economics Letters,* Vol. 22, No. 4, 2015c, pp. 281–284.

Gun Violence Archive, homepage, undated. As of October 20, 2016: http://www.gunviolencearchive.org/

Krouse, William J., and Daniel J. Richardson, *Mass Murder with Firearms: Incidents and Victims, 1999–2013*, Washington, D.C.: Congressional Research Service, R44126, 2015.

Lott, John R., Jr., "The FBI's Misinterpretation of the Change in Mass Public Shootings," *ACJS Today*, Vol. 40, No. 2, 2015, pp. 18–29.

Lott, John R., Jr., and William Landes, "Multiple Victim Public Shootings," 2000 (unpublished). As of June 29, 2017: http://www.shack.co.nz/pistoltaupo/SSRN_ID272929_code010610560.pdf

Mass Shooting Tracker, homepage, undated. As of October 20, 2016: https://www.massshootingtracker.org

Puzzanchera, C., G. Chamberlin, and W. Kang, "Easy Access to the FBI's Supplementary Homicide Reports: 1980–2014," Office of Juvenile Justice and Delinquency Prevention, 2017. As of March 22, 2017: https://www.ojjdp.gov/ojstatbb/ezashr/

Ressler, Robert K., Ann W. Burgess, and John E. Douglas, *Sexual Homicide: Patterns and Motives*, New York: Simon and Schuster, 1988.

Roeder, Oliver, "The Phrase 'Mass Shooting' Belongs to the 21st Century," FiveThirtyEight, January 21, 2016. As of January 12, 2017: http://fivethirtyeight.com/features/we-didnt-call-them-mass-shootings-until-the-21st-century/

Stanford Geospatial Center, "Mass Shootings in America," Stanford, Calif.: Stanford University Libraries, undated. As of October 20, 2016: https://library.stanford.edu/projects/mass-shootings-america

U.S. Department of Homeland Security, *Active Shooter: How to Respond,* Washington, D.C., October 2008.

CHAPTER TWENTY-THREE

# Defensive Gun Use

In the United States, self-protection is a predominant reason that many people choose to own a gun (Masters, 2016). For some gun owners, the self-defense utility they derive from ownership is *potential* in nature; that is, gun ownership provides them with comfort in knowing that they will be able to defend themselves in the face of some future possible criminal threat. For others, the self-defense utility is *realized*—they have used their guns defensively in the context of an actual criminal threat. In this chapter, we focus on, and provide an overview of, the latter outcome—the realized utility of gun ownership through defensive gun use (DGU).

Unlike other outcomes that we analyze, such as suicide and homicide, DGU is not itself an outcome of interest. Rather, DGU is important because it is a mechanism through which gun owners hope to reduce harms to themselves or others, such as through a reduction in the probability of victimization; the probability of injury, conditional on a crime being committed; or the severity of injury, conditional on both a crime being committed and an injury occurring.

In this chapter, our focus is on reviewing the literature that examines the effect of DGU on these outcomes of interest. We note that one overarching challenge in this literature is defining the appropriate counterfactual. When we estimate the effect of DGU on the probability of being a victim of a crime or on the probability of injury or severity of injury, are we interested in the estimate of DGU compared with an alternative outcome resulting from *no action* by the intended victim, compared with resistance but without any weapon, or compared with resistance but with a different weapon? Differences in counterfactuals are important for understanding differences in results across studies in the effect of DGU.

A second overarching issue—and one that affects not only the literature examining how DGU affects victimization and injury but also studies on the effect of gun policies on DGU—is determining *what is meant by DGU*. Different conceptualizations of DGU abound. Consequently, measures of DGU vary tremendously, depending on the conceptualization being used. Additionally, as in many cases in the literature on gun policy, measurement is complicated and limited by data availability, even for a given DGU definition.

In this chapter, we summarize the literature and evidence on these issues. First, we describe definitional challenges related to DGU. Second, we describe challenges related to measuring DGU. Third, we examine the literature that estimates the effect of DGU on outcomes, such as victimization and injury. The information in this chapter was collected from a targeted search of the literature separate from that described in Chapter Two of this report.

## What Is Defensive Gun Use?

It is difficult to start a narrative on the prevalence of DGU without first defining the term, but defining DGU is no simple task. The 2004 National Research Council (NRC) report on firearms and violence explains the difficulties:

> Self-defense is an ambiguous term that involves both objective components about ownership and use and subjective features about intent (National Research Council, 1993). Whether one is a defender (of oneself or others) or a perpetrator, for example, may depend on perspective. Some reports of defensive gun use may involve illegal carrying and possession (Kleck and Gertz, 1995; [Kleck, 2001]), and some uses against supposed criminals may legally amount to aggravated assault (Duncan, 2000a, 2000b; [McDowall, Loftin, and Presser, 2000; Hemenway, Azrael, and Miller, 2000]; Hemenway and Azrael, 2000). Likewise, protecting oneself against possible or perceived harm may be different from protecting oneself while being victimized. (NRC, 2004, p. 106)

Understanding the ambiguity is critical because the same factors that complicate defining DGU present difficulties in measuring its prevalence. DGU has primarily been defined in the empirical literature through the use of surveys. Within these surveys, DGUs are often defined as incidents that involve protection against humans (i.e., not animals); gun use by civilians (e.g., not military, police, or security personnel); contact between persons rather than suspicious circumstances only; specific crimes; and actual use of a gun, at least as a visual or verbal threat. There is, of course, some variation even within these parameters. For example, some surveys define DGU only within the context of certain crimes having been committed, while others include a broader set of crimes, as well as suspected and averted crimes. Perceptions about the incident and an individual's role are important because much of the literature relies on self-reports: The respondent must have perceived there to have been a crime (or, in some surveys, a suspected or averted crime) and must consider himself or herself a victim rather than a mutual combatant. Even such stringent definitions, however, may not be sufficient to determine whether the event was lawful, legitimate, or desirable from a social perspective.

## What Are the Challenges in Measuring Defensive Gun Use?

The extensive and conflicting literature on the prevalence of DGU was summarized by the NRC (2004) report:

> Over the past decade, a number of researchers have conducted studies to measure the prevalence of defensive gun use in the population. However, disagreement over the definition of defensive gun use and uncertainty over the accuracy of survey responses to sensitive questions and the methods of data collection have resulted in estimated prevalence rates that differ by a factor of 20 or more. These differences in the estimated prevalence rates indicate either that each survey is measuring something different or that some or most of them are in error. (pp. 6–7)

The NRC report summarized the major methodological challenges to studying DGU, and these challenges have received limited attention since then. Given the preponderance of survey evidence in this literature, we focus on the major methodological concerns regarding survey-based measurement. We highlight differences between the National Crime Victimization Survey (NCVS)—a national survey that is administered twice per year by the Bureau of Justice Statistics and that provides among the most-conservative estimates of DGU—and private gun surveys that have been conducted at only one point in time, such as the National Self Defense Survey (NSDS; Kleck and Gertz, 1995) conducted in 1993 or the National Survey of Private Ownership of Firearms (NSPOF; Cook and Ludwig, 1996) conducted in 1994, which provide among the least-conservative estimates. As NRC (2004) describes, definitional differences and survey differences have resulted in wide-ranging estimates. For example, McDowall, Loftin, and Wiersema (1998) estimated that there were 116,000 DGU incidents annually using the NCVS, while Kleck and Gertz (1995) estimated between 2.2 million and 2.5 million DGUs annually, of which between 1.5 million and 1.9 million involved handguns. In this section, we summarize key factors that underlie these large differences in DGU estimates, including the scope of included incidents, survey sample size and response rates, and challenges related to estimating the prevalence of rare events.

### Scope of Included Incidents

A major difference between the NCVS and private surveys is the scope of included events. In the NCVS, questions about defensive or self-protective actions are asked only of those who first reported that they had been the victims of certain personal contact crimes—even if those crimes had not been completed. These personal contact crimes include rape, assault, burglary, personal and household larceny, and car theft. As a result, respondents in several other categories are not given the opportunity to report defensive action. Among the potentially excluded respondents are those reporting incidents involving other crimes (e.g., trespassing, commercial crimes), victims of

crimes in the included categories but who did not report those crimes earlier in the interview,[1] and those reporting incidents that were not completed crimes (e.g., suspected crimes). Also, it is important to note that the NCVS does not ask directly about gun use. Rather, it simply asks the respondents to indicate what, if anything, they did in response to the crime. By not asking directly about gun use, it is possible that some respondents may fail to report a gun-related event, especially one that did not result in harm. Relatedly, there is concern that the NCVS may undercount individuals involved in criminal or other deviant behaviors—a group that may have higher rates of victimization and DGU (McDowall and Wiersema, 1994).

On the other hand, private gun surveys, such as the NSDS and the NSPOF, generally ask all respondents directly about DGU, which allows the respondents to determine which incidents to report regardless of whether the incident involved a crime or not. This approach may allow for a more comprehensive assessment of the prevalence and nature of DGU but also may count as DGU events that are more ambiguous. For example, respondents may include such events as the use of a weapon (1) while investigating a suspicious noise but not actually seeing an individual or (2) to deter someone suspected of thinking about committing a crime. While the former may be eliminated by specifying in the survey question that the incident must involve contact with another person, the latter is based solely on the perception of the survey respondent.

### Survey Samples and Response Rates

The NCVS provides a large sample of the noninstitutionalized U.S. population aged 12 or older (approximately 50,000 households and 100,000 individuals). Private surveys are typically much smaller. By comparison, the NSDS sample comprised 4,977 individuals aged 18 or older.[2] This is a stark difference considering that the NSDS is among the larger private gun surveys. The private NSPOF included 2,568 respondents.

The representativeness of the samples may also differ. The NCVS typically has a very high response rate—up to 95 percent of eligible households. Private gun surveys tend to have lower response rates. For the NSDS, 61 percent of eligible phone numbers answered by a human completed a survey. Lower response rates may influence the representativeness of the sample and the validity of the findings. Because we often do not know very much about the individuals who did not respond, it is difficult to infer how their absence affects the findings. But the higher the response rate, the fewer individuals for whom there is no information and the less likely that there are differences between those who opted to participate in a survey about gun use and those who did not.

---

[1]   There is some evidence that the NCVS underestimates the count of rapes, certain types of assaults, and even gunshot woundings (Cook, 1985; Loftin and MacKenzie, 1990; McDowall and Wiersema, 1994; NRC, 2014).

[2]   The NSDS is a random digit–dialing survey and, hence, limited to individuals with phones.

It is important to note that all surveys may miss some components of the population and outcomes of interest. An obvious limitation is that surveys exclude those who suffer fatal injuries and thus cannot participate. Therefore, whether fatally injured persons engaged in a DGU and whether that played a role in their deaths cannot be addressed with survey data. That said, omission of those who died after DGU could result only in underestimates of the true rate of DGU.

### Inaccuracies in Survey Estimates

There are compelling reasons to suspect that the true number of DGU events are exaggerated in surveys like the NSPOF and the NSDS. There are many implications of the especially high rates of DGU those surveys report that do not appear to be consistent with more-trusted sources of information. For instance, the NSDS estimates suggest that, while using a firearm for self-defense, U.S. residents likely injured or killed an opponent 207,000 times per year, but only about 100,000 people die or are treated for gunshot injuries in hospitals each year, most of whom either shot themselves or were victims of criminal assaults (Hemenway, 1997). Similarly improbable numbers of injuries are implied by self-reports of DGU in the NSPOF survey (Cook, Ludwig, and Hemenway, 1997).

Furthermore, the implied rates of DGU in response to specific crime types appear to be inconsistent with known rates of those crimes. For instance, Hemenway (1997) calculates that the 845,000 DGUs during burglaries implied by the NSDS exceeds the total estimate of burglaries that occurred against victims who owned guns, were home, and were awake when the crime occurred.

Kleck (1999) has defended the high DGU estimates, suggesting that there is greater reason to believe they represent underestimates than overestimates, because of survey respondents' reluctance to discuss their own potentially illegal behavior. He argued that all apparent inconsistencies are illusory. For instance, he suggests that the NSDS was underpowered for reliable estimates of the number of U.S. residents likely killed or injured and that analysis of such a rare subset of the DGU phenomena will naturally be less reliable than the overall DGU estimates. This is a reasonable argument, but the apparently extreme overestimate of DGU injuries raises the question of whether the confidence intervals for the estimate of 207,000 injuries and deaths could span any plausible values. This cannot, however, be calculated from the information provided in the NSDS report. If the confidence interval does not span plausible figures, this would reinforce the view that the NSDS and NSPOF yield overestimates. Kleck (1999) also argues that many gunshot injury victims avoid hospital treatment because they fear it may expose them to legal jeopardy. If, however, the number of such injuries were 207,000 per year, this would entail an implausibly large number and proportion of all injured parties foregoing medical treatment.

In response to the apparently implausible number of crimes of specific types at which DGUs were reported, Kleck (1999) notes that estimates of the number of

burglaries, rapes, and other crimes are known to be underestimates—and sometimes large underestimates, as with sexual assaults and domestic violence. Therefore, because we do not know the true number of burglaries and other crimes, "we cannot possibly know if any given DGU estimate is implausibly large relative to these unknown (and possibly unknowable) quantities" (Kleck, 1999, p. 115). Concluding that the estimated number of DGUs in response to burglaries is implausibly high requires, as Kleck notes, some assumptions about the plausible magnitude of underreporting of burglaries. As with the estimate of 207,000 DGU injuries and deaths, the assumptions required to reconcile the apparent inconsistencies are sufficiently extreme that we take such comparisons as evidence that the NSDS and NSPOF produce overestimates of the prevalence of DGU and associated phenomena, although the magnitude of this overestimate is not clear.

DGUs are rare events. In the NSDS sample of 4,977 individuals, which oversampled those most likely to be involved in DGU (e.g., men in southern and western states), 222 respondents reported DGU during the five-year recall and 66 during the past year. When events are rare, small errors in reporting can be problematic. Even a small false positive response rate can substantially influence prevalence measures. Moreover, for relatively rare events, equivalent rates of false negatives do not cancel out the inflationary effect of the false positives. For instance, if the true prevalence is 1 percent, and 1 percent of those who either experienced or did not experience a DGU incorrectly report their DGU experience, the resulting estimate will suggest that DGUs occur with twice the true prevalence.[3] The fact that private gun surveys tend to ask everyone (rather than just crime victims, as in the NCVS) about DGU may cause such errors to be magnified (e.g., Ludwig, 2000). Indeed, some authors caution against extrapolating prevalence estimates from their own survey results because small reporting errors can lead to very large errors in prevalence estimates (e.g., Hemenway, Azrael, and Miller, 2000). Because private gun surveys question respondents only once, they can contribute to false positives due to telescoping—that is, individuals may report incidents that do not fall within the appropriate recall period (e.g., 12 months). Telescoping may substantially inflate the number of events (Andersen, Frankel, and Kasper, 1979; Cantor, 1989; Lehnen and Skogan, 1984). The NCVS, on the other hand, interviews the same individuals every six months, which is a strategy to guard against telescoping because responses are checked against the individuals' previous responses to avoid the same event being reported multiple times.

In response to concerns about false positives, some have argued that false negatives in the NCVS are also a concern. The NCVS is conducted face to face by someone working for a government agency rather than via the anonymous random digit–dialing

---

[3]  If true prevalence is *t* and the error rate is *e*, then the estimated prevalence will be the true prevalence minus the false negatives, plus the false positives: $t - et + e(1-t)$. If $t = 0.01$ and $e = 0.01$, estimated prevalence will be 1.98 times, or approximately twice, the true prevalence.

used by many private survey firms. The NCVS approach could yield more-accurate responses if individuals are less likely to exaggerate events that they believe are socially desirable in a nonanonymous, face-to-face interview (Ludwig, 2000; Hemenway, 1997). On the other hand, this approach may lead to underreporting if respondents are concerned about the legitimacy or legality of their gun use and the lack of anonymity. Indeed, there is evidence that a substantial share of those reporting DGU did not own a legal gun or have one in the household at the time of the incident, and many DGU incidents occurred outside the home, thereby implying gun-carrying. Furthermore, judicial review suggests that many DGU incidents may be illegal or socially undesirable (even if the individual was permitted or licensed and the incident truthfully reported) (see, for example, Kleck and Gertz, 1995; Cook and Ludwig, 1996, 1997, 1998; Hemenway, Azrael, and Miller, 2000).

As noted earlier, however, there are also good reasons to suspect that the NCVS underestimates the true number of DGUs. The NCVS provides an opportunity for respondents to describe DGUs only in the context of certain types of crimes. DGUs resulting from crimes not covered by the NCVS will likely be undercounted. DGUs may occur in the context of suspected crimes that respondents on the NCVS might not judge as events in which they were a victim of a crime, in which case those DGUs would be undercounted. At the time research on DGUs was being conducted, the NCVS did not explicitly ask crime victims whether they used a firearm to defend themselves. Thus, some DGUs might go uncounted if respondents choose not to volunteer their use of a gun when asked whether they attempted to resist the perpetrator (Kleck, 1999). Finally, NCVS respondents victimized while engaging in illegal activity may not volunteer these experiences, meaning any associated DGUs would not be counted (McDowall and Wiersema, 1994).

NCVS and NSDS estimates of the prevalence of DGU differ by an order of magnitude. In an effort to understand these differences, McDowall, Loftin, and Presser (2000) fielded both surveys in an experimental design to determine whether "survey methods account for the divergent results" or "the questions cover unrelated activities." The goal was to compare across surveys rather than provide prevalence estimates, so the authors selected individuals to contact from commercial gun lists. Half the sample ($n = 1,522$) responded to the NCVS first and then the NSDS, while the other half ($n = 1,484$) completed the surveys in reverse order. Certain questions were standardized between surveys (e.g., one-year recall, specific question about gun use, only self-reports versus household reports) to eliminate them as sources of diverging results.

The conclusion was that the NCVS measures a particular dimension of DGU (self-protective behaviors in response to crime) while the NSDS measures a wider array of behaviors, which may include preemptive action in response to what may or may not have been an intended crime. DGU cases were more common in the NSDS even after excluding items that were clearly not self-defense (e.g., practice for self-defense). The NCVS identified 24 cases, and the NSDS identified between 48 and 72 cases (with

24 cases defined as ambiguous[4]). Regression analyses suggested that, even after standardizing some questions across surveys, the differences were not entirely attributable to their different scope but that other methods also contributed. Interviews with individuals who differed in their reports between surveys indicated that questions were not well understood, respondents were not clear on why they did not report an incident, or the incident did not involve serious harm.

**Conclusions**

Estimates for the prevalence of DGU span wide ranges and include high-end estimates—for instance, 2.5 million DGUs per year—that are not plausible given other information that is more trustworthy, such as the total number of U.S. residents who are injured or killed by guns each year. At the other extreme, the NCVS estimate of 116,000 DGU incidents per year almost certainly underestimates the true number. There have been few substantive advances in measuring prevalence counts or rates since the NRC (2004) report. The fundamental issues of how to define DGU and what method for obtaining and assessing those measurements is the most unbiased have not been resolved. As a result, there is still considerable uncertainty about the prevalence of DGU. Efforts to resolve the uncertainty provide insight into some, but not all, aspects of DGU measurement, which may drive the large differences in prevalence estimates. The difficulties of defining and measuring DGU have implications for understanding not only the prevalence of DGU but also the relationship between DGU and outcomes of interest, such as the probability of victimization and injury. We turn to the evidence on this question in the next section.

## Does Defensive Gun Use Reduce Harm?

In theory, DGU provides individuals with additional means to protect themselves, their families, their property, and others from crimes. Police officers are issued firearms because society believes that they will be able to use those weapons effectively to produce similar defensive and protective benefits. The extent to which DGU actually reduces harm for individuals or society is controversial. NRC (2004) summarized what was known then about the effects of DGU:

> The results suggest interesting associations: victims who use guns defensively are less likely to be harmed than those using other forms of self-protection. Whether these findings reflect underlying causal relationships or spurious correlations remains uncertain. Much of the existing evidence reports simple bivariate correlations, without controlling for any confounding factors. Kleck and DeLone (1993) rely on multivariate linear regression methods that implicitly assume that firearms

[4]  Ambiguous cases included incidents in which the respondent failed to provide sufficient details.