use, conditional on observed factors, is statistically independent of the unobserved factors influencing the outcomes, as would be the case in a classical randomized experiment. Is this exogenous selection assumption reasonable? Arguably, the decisions to own, carry, and use a firearm for self-defense are very complex, involving both individual and environmental factors that are related to whether a crime is attempted, as well as the outcomes of interest. The ability of a person to defend himself or herself, attitudes toward violence and crime, emotional well-being, and neighborhood characteristics may all influence whether a person uses a firearm and the resulting injury and crime. Thus, in general, it is difficult to be confident that the control variables account for the numerous confounding factors that may result in spurious correlations. Furthermore, the committee is not aware of any research that considers whether the finding is robust to a variety of methodological adjustments. Without an established body of research assessing whether the findings are robust to the choice of covariates, functional form, and other modeling assumptions, it is difficult to assess the credibility of the research to date.

Similar to the literature on the prevalence of DGU (see earlier discussion), there has been little additional work on this question since the NRC (2004) report.

## Methods

When researching this topic, we included studies that provided an empirical estimate of whether DGU reduces harm, which is operationalized as perceptions of whether DGU affected crime completion, injury, level of injury, or property loss.

## Findings

Using multivariate logistic regression with extensive controls to analyze the NCVS, Kleck and DeLone (1993) found that self-defense was associated with a lower probability of robbery completion and victim injury. However, the results were not always statistically significantly different from other forms of resistance. The results also indicated that victim resistance was significantly and negatively associated with the offender's choice of weapon. Offender gun use reduced the likelihood of the victims engaging in resistance (of any kind), which raises concerns that the decision to resist may not be independent. That is, the apparent relationship between DGU and improved outcomes may reflect the fact that DGUs are more likely to occur when offenders are not using guns, rather than because DGUs themselves produce better outcomes.

Examining robberies and assaults in NCVS data from 1992 to 1999, Schnebly (2002) used multinomial logit regression to examine whether DGU influences the likelihood of being injured and the severity of injury. DGU was associated with significantly lower odds of severe injury (odds ratio [OR] = 0.61; $p < 0.05$) and mild injury (OR = 0.49; $p < 0.05$) but not significantly associated with severe versus mild injury. The benefits of DGU were primarily found among men, in urban settings, and among higher-income respondents. However, the analyses did not account for the specifics of

other action taken by comparing DGU with no action or any other action combined, did not differentiate whether the injury occurred before or after the DGU, and could not control for other factors that might influence the decision to use a gun defensively. Moreover, assaults might be considered somewhat controversial in that they may involve mutual combat (albeit the respondent may perceive himself or herself to be the victim), whereas robberies have more clearly defined roles.

A later study by Tark and Kleck (2004) examined the association between DGU and property loss and between DGU and injury using NCVS data from 1992 to 2001. Multivariate logistic regression models found that when the victim attacked the offender with a gun, there was a lower risk of property loss for robberies, and when the victim threatened the offender with a gun, there was a lower risk of property loss for all included property crimes. These associations were generally not statistically significantly different from those of some other protective actions, such as the victim attacking or threatening the offender with a nongun weapon.

Tark and Kleck (2004) found that crime victims who resist attackers by any means are rarely injured after they initiate some form of active resistance. Considering just those confrontations in which victims initiate resistance before having been injured, the authors found no statistically significant reduction in injuries among those who threatened or attacked the assailant with a gun compared with those who called the police. Indeed, the only form of resistance that was significantly better than calling the police was running or hiding. There were no significant differences in victim injuries and whether victims threatened with or attacked with a gun.

There may be important differences between crimes in which victims are able to resist or resist before being injured and those in which they are not. Similarly, crimes in which victims are armed may differ systematically from those in which they are not. These differences raise questions about what causal effects of resistance, armed or otherwise, can be drawn from Tark and Kleck (2004)'s models. The authors acknowledged these challenges and responded by including a host of controls describing the offender, victim, and incident,[5] but they acknowledged that the results could not necessarily be interpreted causally because of the lack of clear insight into how the decisions to resist and means of resistance were made, including the decisions on whether to own and to carry a gun.

---

[5]  Covariates included 16 self-protective actions, proxies for power differences (number of offenders, male offender, offender aged 15–29 while victim is under age 15 or over age 30, offender weapon [gun, knife, sharp object], and whether offender attacked victim), victim characteristics (owned the house, had a job last week or for two weeks in the past six months, aged 65 or older, married, high school diploma or higher, black, Asian, Hispanic, and number of victimizations in the past six months), offender characteristics (gang member, substance at time of incident, sexual partner of victim, acquaintance of victim, work acquaintance of victim, black, white, and repeat offender), and incident characteristics (urban, home, near home, public place [may have security], and others present).

Most recently, Hemenway and Solnick (2015b) provided additional evidence using NCVS data from 2007 to 2011. Among personal contact crimes, DGU was not uniquely beneficial in reducing injury or property loss, implying that it did not necessarily improve outcomes over other forms of resistance. With respect to injury, cross-tabulations indicated that victims who engaged in DGU were less likely to be injured (10.9 percent) relative to other self-protective action, but injury rates were similar to those who took no self-protective action (11 percent). And multivariate analyses controlling for a host of covariates indicated that DGU did not significantly improve the odds of no injury overall (OR = 0.67; not significant) relative to all incidents. Further, taking advantage of the chronology of results suggests that DGU did not improve the odds of no injury after self-protective action (OR = 1.28; not significant) relative to all incidents involving self-protective action.[6] These findings suggest that DGU incidents may be intrinsically different from incidents that do not involve DGUs; for example, the incidents with DGU may involve escalating violence so that the defender has a greater opportunity to respond with a gun or is more aware or more able to respond quickly. With respect to property loss, individuals who took action were less likely to experience loss.[7] DGU improved the odds of no property loss in robbery, larceny, and personal contact larceny relative to not taking that defensive action (OR range = 0.26 to 0.30; significant) but not necessarily relative to other defensive action.[8] While this work is a recent and substantive contribution to the literature, there remain concerns about relying on self-reports and the difficulty of assessing situational differences between events that involved DGU and those that did not.

An important concern with survey reports is that the assessment of the outcome is provided by the same respondent who decided to engage in a particular action. Another fundamental concern is that the individuals who suffered the most harm are, by definition, excluded; that is, those who were fatally injured cannot self-report, so the extent to which DGU or other actions played a role cannot be explored.

Branas et al. (2009) took an entirely different approach to assessing the perceived benefits of DGU. They considered whether gun possession increased the likelihood that an individual was shot or killed in an assault. They assessed the circumstances surrounding 677 individuals shot in Philadelphia. The police determined that, in 6 percent of these cases, the victims had a gun in their possession at the time they were shot. The authors compared these cases with controls recruited by a survey firm via random digit–dialing and asked about gun possession at the time when matched cases had been shot; about 7 percent of controls had a gun in their possession. Comparing cases and

---

[6]  Control variables included defender (age, gender, urban/rural), incident (at home/away), and offender (male, had gun) characteristics.

[7]  The chronology of events was not available for property loss.

[8]  Some non-DGU protective actions produced similar and significant ORs, suggesting that DGU is not uniquely beneficial.

controls, Branas et al. (2009) found that when victims had a gun in their possession, they had 4.46 times higher odds of being shot compared with victims who had no gun. The authors' second set of results incorporated whether victims had a chance to defend themselves. Among those who had the opportunity to resist, those with a gun were even more likely to be shot than those without a gun. The authors noted, "Case participants with at least some chance to resist were typically either 2-sided, mutual combat situations precipitated by a prior argument or 1-sided attacks where a victim was face-to-face with an offender who had targeted him or her for money, drugs, or property." That is, an opportunity to resist does not necessarily mean that it was not mutual combat (versus defensive only).

The results suggest that gun possession may not be an effective way to ensure safety. But the decision to carry a gun is not random, which raises similar concerns about inferring causality as are present with survey-based studies: Individuals who decide to carry at a particular time or to use a gun within a specific circumstance may have considered themselves at greater risk for reasons that may be unobservable to the researcher.

Hemenway, Azrael, and Miller (2000) broadened the assessment of the benefits of DGU incidents by examining whether they represent legal and socially desirable events. The authors summarized DGU incidents in the Harvard Injury Control Research Center surveys and then sent these descriptions to five criminal court judges from California, Pennsylvania, and Massachusetts. Approximately half of the incidents were deemed potentially illegal and contrary to interests of society, even under the assumptions that the individual had a permit to own and carry and had characterized the situation honestly. Given that survey reports are already one-sided (e.g., incidents may involve mutual combat even though the individual perceives himself or herself as the victim) and that additional DGU incidents could not be summarized and evaluated because respondents refused details, the authors concluded that the majority of reported DGUs were likely illegal and contrary to society's interests.

## Conclusions

There has been little empirical work since the NRC (2004) report, so the serious limitations in the literature remain largely unresolved. At first glance, individuals engaged in DGU appear less likely to lose property and suffer injury and more likely to report that their action helped the outcome. However, several important caveats emerge. First, it is not clear that DGU is uniquely beneficial relative to other actions. Second, given that the literature is largely based on cross-tabulations and relatively basic multivariate analyses, when associations are found between DGU and reduced injury, for instance, it is not clear whether this is due to a causal effect of the DGUs on reduced injury or whether the circumstances that make a DGU possible also make injury less likely. In the latter case, it may not be DGUs that reduce the likelihood of injury but rather unique features of the circumstances in which DGUs occur. For instance, individuals may be more likely to defend themselves with a weapon when they feel that they have

a greater opportunity to be successful in that defense, which may bias estimates toward a beneficial impact of gun use. Statistical models designed to identify the causal effect of DGUs on various outcomes have not yet been reported.

Survey-based analyses of the effects of DGU suffer from more-general limitations. For example, individuals reporting the outcomes were also the ones who made the decision to engage in DGU, which may influence their assessment. Furthermore, survey data cannot be used to assess the relationship between DGU and fatalities, because those killed during incidents cannot be included. And more broadly, it is unclear whether this literature, which rests largely on the NCVS, suffers from the limited generalizability of DGU events within its scope. It has been widely noted that DGUs not involving an included crime category are less likely to be captured by the NCVS. To the extent that these incidents have different outcomes or different characteristics, NCVS-based findings may not be generalizable. Efforts to use other sources of data, however, have encountered similar limitations regarding the size and representativeness of samples and the ability to identify the causal effects of DGU.

Finally, even if DGUs have a positive causal effect on such outcomes as injuries and property loss, it may still be the case that DGUs do not provide net societal benefits if many or most involve illegal use of firearms. Whether any net social harms outweigh the benefits to those individuals who succeed with legitimate or just DGU in protecting their own or others' well-being is a value judgment that society must make. Having better data on the frequency of legitimate and illegitimate DGU, and on the magnitude of harms and benefits associated with those events, would assist in making that judgment.

For these reasons, we conclude that the existing evidence for any causal effect of DGU on reducing harm to individuals or society is inconclusive.

## Chapter Twenty-Three References

Andersen, Ronald, Martin R. Frankel, and Judith Kasper, *Total Survey Error: Applications to Improve Health Surveys*, San Francisco, Calif.: Jossey-Bass, 1979.

Branas, C. C., T. S. Richmond, D. P. Culhane, T. R. Ten Have, and D. J. Wiebe, "Investigating the Link Between Gun Possession and Gun Assault," *American Journal of Public Health*, Vol. 99, No. 11, 2009, pp. 2034–2040.

Cantor, D., "Substantive Implications of Longitudinal Design Features: The National Crime Survey as a Case Study," in D. Kasprzyk, G. Duncan, G. Kalton, and M. P. Singh, eds., *Panel Surveys*, New York: John Wiley, 1989, pp. 25–51.

Cook, Philip J., "The Case of the Missing Victims: Gunshot Woundings in the National Crime Survey," *Journal of Quantitative Criminology*, Vol. 1, No. 1, March 1985, pp. 91–102.

Cook, Philip J., and Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, Washington, D.C.: Police Foundation, 1996.

———, *Guns in America: National Survey on Private Ownership and Use of Firearms: Research in Brief*, Rockville, Md.: National Institute of Justice, 1997.

———, "Defensive Gun Uses: New Evidence from a National Survey," *Journal of Quantitative Criminology*, Vol. 14, No. 2, 1998, pp. 111–131.

Cook, Philip J., Jens Ludwig, and David Hemenway, "The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?" *Journal of Policy Analysis and Management*, Vol. 16, No. 3, 1997, pp. 463–469.

Duncan, O. D., *As Compared to What? Offensive and Defensive Gun Use Surveys, 1973–1994*, Rockville, Md.: National Institute of Justice, working paper 185056, 2000a.

———, "Gun Use Surveys: In Numbers We Trust?" *Criminologist*, Vol. 25, No. 1, 2000b, pp. 1–6.

Hemenway, David, "Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates," *Journal of Criminal Law and Criminology*, Vol. 87, No. 4, 1997, pp. 1430–1445.

Hemenway, David, and Deborah Azrael, "The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey," *Violence and Victims*, Vol. 15, No. 3, 2000, pp. 257–272.

Hemenway, David, Deborah Azrael, and Matthew Miller, "Gun Use in the United States: Results from Two National Surveys," *Injury Prevention*, Vol. 6, No. 4, 2000, pp. 263–267.

Hemenway, David, and Sara J. Solnick, "The Epidemiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007–2011," *Preventive Medicine*, Vol. 79, 2015b, pp. 22–27.

Kleck, Gary, "Degrading Scientific Standards to Get the Defensive Gun Use Estimate Down," *Journal on Firearms and Public Policy*, Vol. 11, 1999, pp. 77–138.

———, "The Nature and Effectiveness of Owning, Carrying and Using Guns for Self-Protection," in G. Kleck and D. B. Kates, eds., *Armed: New Perspectives on Gun Control,* New York: Prometheus Books, 2001.

Kleck, G., and M. A. DeLone, "Victim Resistance and Offender Weapon Effects in Robbery," *Journal of Quantitative Criminology*, Vol. 9, No. 1, 1993, pp. 55–81.

Kleck, Gary, and Marc G. Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," *Journal of Criminal Law and Criminology*, Vol. 86, No. 1, 1995, pp. 150–187.

Lehnen, R., and W. Skogan, *The National Crime Survey: Working Papers*, Vol. 2: *Methodological Studies*, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, 1984.

Loftin, Colin, and Ellen J. MacKenzie, "Building National Estimates of Violent Victimization," paper presented at the National Research Council Symposium on the Understanding and Control of Violent Behavior, Destin, Fla., April 1–6, 1990.

Ludwig, Jens, "Gun Self-Defense and Deterrence," *Crime and Justice: A Review of Research*, Vol. 27, 2000, pp. 363–417.

Masters, Kate, "Fear of Other People Is Now the Primary Motivation for American Gun Ownership, a Landmark Survey Finds," *The Trace*, September 19, 2016. As of October 13, 2017: https://www.thetrace.org/2016/09/harvard-gun-ownership-study-self-defense/

McDowall, D., C. Loftin, and S. Presser, "Measuring Civilian Defensive Firearm Use: A Methodological Experiment," *Journal of Quantitative Criminology*, Vol. 16, No. 1, 2000, pp. 1–19.

McDowall, D., C. Loftin, and B. Wiersema, "Estimates of the Frequency of Firearm Self Defense from the National Crime Victimization Survey," Albany, N.Y.: State University of New York, School of Criminal Justice, Violence Research Group Discussion Paper 20, 1998 (unpublished).

McDowall, D., and B. Wiersema, "The Incidence of Defensive Firearm Use by U.S. Crime Victims, 1987 Through 1990," *American Journal of Public Health*, Vol. 84, No. 12, 1994, pp. 1982–1984.

National Research Council, *Understanding and Preventing Violence,* A. J. Reiss and J. Roth, eds., Washington, D.C.: National Academies Press, 1993.

———, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

———, *Estimating the Incidence of Rape and Sexual Assault*, Washington, D.C.: National Academies Press, 2014.

NRC—*See* National Research Council.

Schnebly, Stephen M., "An Examination of the Impact of Victim, Offender, and Situational Attributes on the Deterrent Effect of Defensive Gun Use: A Research Note," *Justice Quarterly*, Vol. 19, No. 2, 2002, pp. 377–398.

Tark, Jongyeon, and Gary Kleck, "Resisting Crime: The Effects of Victim Action on the Outcomes of Crimes," *Criminology*, Vol. 42, No. 4, 2004, pp. 861–909.

CHAPTER TWENTY-FOUR

# The Effects of the 1996 National Firearms Agreement in Australia on Suicide, Violent Crime, and Mass Shootings

Following a 1996 mass shooting in which 35 people in Tasmania, Australia, were killed, Australian states and territories reached the National Firearms Agreement (NFA) to adopt "a consistent set of firearm management principles into their own legislation and regulation" (McPhedran, 2016, p. 65). The principle features of the agreement, as described in a study on regulatory reform, were as follows:

- Ban on importation, ownership, sale, resale, transfer, possession, manufacture, or use of all self loading centre rifles, all self loading and pump action shotguns, and all self-loading rimfire rifles (some exemptions allowable to primary producers and clay target shooters)
- Compensatory buyback scheme through which firearm owners would be paid the market value for prohibited firearms handed in during a 12-month amnesty
- Registration of all firearms as part of integrated shooter licensing scheme
- Shooter licensing based on requirement to prove "genuine reason" for owning a firearm, including occupational use, demonstrated membership of an authorized target shooting club, or hunting (with proof of permission from a rural landowner)
- Licensing scheme based on five categories of firearms, minimum age of 18 years, and criteria for a "fit and proper person"
- New licence applicant required to undertake accredited training course in firearm safety
- As well as licence to own a firearm, separate permit required for each purchase of a firearm subject to a 28-day waiting period
- Uniform and strict firearm storage requirements
- Firearms sales to be conducted only through licensed firearm dealers and all records of sale to be provided to the police
- Sale of ammunition only for firearms for which purchaser is licensed and limitations on quantities purchased within time period. (Ozanne-Smith et al., 2004, pp. 282–283)

During the 12-month amnesty (the second principle in the list), Australia purchased back 695,940 newly prohibited firearms as of August 2001, and during a

second buyback, in 2003, 68,727 handguns were destroyed (Chapman, Alpers, and Jones, 2016).[1]

The 2004 National Research Council (NRC) review of gun policies did not comment extensively on the Australian reform. The report referenced a 2003 study (Reuter and Mouzos, 2003) that estimated that approximately 20 percent of Australia's firearms were retrieved during the buyback but that these weapons did not account for a significant share of the prior homicides or violent crimes. Whereas Reuter and Mouzos (2003) found no evidence of a decline in homicides, violent crime, or total suicides after the buyback, they noted that, during the six post-law years, there "were no mass murders with firearms and fewer mass murders than in the previous period," findings that NRC (2004) called "weak tests given the small numbers of such incidents annually."

## Methods

In our review, the available evidence of the effect of the NFA on mass shootings, homicides, and suicides all derives from the same preliminary source. McPhedran (2016) reviewed the effect of the NFA on homicide. Studies that were included had to meet the following criteria:

- Contain original quantitative data analysis (i.e., the author excluded summaries, representations, or replications of previously published work; letters to the editor; opinion pieces; literature reviews; legal analyses; media analyses; and the like).
- Focus specifically on firearm homicide in Australia.
- Include time-series data.
- Use formal statistical methods to detect legislative impacts or change over time.

Although McPhedran's review was limited to homicide, the five studies that were included in the review also examined suicide. Thus, we use the same five articles to examine these outcomes.

We also include additional studies for mass shootings and suicide identified in our search for U.S. policy effects (described in earlier chapters). Two studies—Chapman, Alpers, and Jones (2016) and Baker and McPhedran (2015)—are also relevant to homicide but were published the same year as or shortly before McPhedran (2016) and thus were not included in her review but are referenced here.

Because NFA principles were applied universally throughout Australia, researchers are generally unable to conduct case-control analyses, such as comparing outcomes

---

[1]   The National Handgun Buyback Bill of 2003 prohibited handguns with (1) a barrel length of less than 100 mm for revolvers and 120 mm for semiautomatics, (2) a caliber in excess of .38 (except for specially accredited events), and (3) a shot capacity in excess of ten rounds.

in one Australian state that enacted a law with outcomes in another state that did not (McPhedran, 2016; Chapman et al., 2006). As a result, most researchers exploited changes over time to assess the effects of the law, although one examined changes in mass shootings in Australia versus New Zealand (McPhedran and Baker, 2011) and two examined regional variation: Ozanne-Smith et al. (2004) examined one Australian state (Victoria), which had firearm legislation in place prior to the NFA, relative to the rest of Australia, and Leigh and Neill (2010) examined variation in the number of guns in each state that were reportedly "bought back" and the association with suicide and homicide rates in those states.

## Research Synthesis Findings

### Suicide

McPhedran (2016) produced an evidence table, and we created a modified version of it that focuses on suicide (Table 24.1). Six of the studies found statistically significant evidence that suicide rates declined more rapidly after implementation of the NFA in 1996 than before. In addition, Leigh and Neill (2010) found that Australian states with the highest per capita rates of turning in banned guns also had greater declines in firearm suicides. These findings are consistent with the claim that the NFA reduced suicides in Australia (Baker and McPhedran, 2007; Baker and McPhedran, 2015; Chapman, Alpers, and Jones, 2016; Chapman et al., 2006; Klieve, Sveticic, and De Leo, 2009; Ozanne-Smith et al., 2004).

Two sets of findings, however, raise questions about whether these observed associations are attributable to a causal effect of the NFA. First, two models (McPhedran and Baker, 2012; Lee and Suardi, 2010) that used similar methods examined changes in suicide rates over time and failed to find evidence of a break at the time of the NFA, with one exception: McPhedran and Baker (2012) examined trends in population subgroups and found some evidence of a break in 1997 in firearm suicide trends among those aged 35–44, but the evidence was not robust across statistical tests.

Perhaps more importantly, three studies that did find reductions in firearm suicides also found statistically significant reductions in nonfirearm suicides (Chapman et al., 2006; Chapman, Alpers, and Jones, 2016; Baker and McPhedran, 2015). McPhedran and Baker (2012) also found significant breaks in the time series of hanging suicides in 1997 among those aged 15–24 and 25–34, and in 1998 among those aged 35–44. Although it is possible that the NFA caused reductions in firearm and nonfirearm suicides, the mechanism by which it may have had an effect on nonfirearm suicides was not obvious, nor would most public health experts predict such an effect. An alternative explanation for these findings is that factors other than the NFA led to changes in nonfirearm suicide rates around 1996, and these factors might also have had an effect on firearm suicide that was independent of the NFA's effects. Another study found only

**Table 24.1**
**Summary of Studies Examining the Effects of the National Firearms Agreement on Suicide in Australia**

| Study | Geographic Coverage | Statistical Method | Research Focus | Period | Firearm Suicide | Nonfirearm Suicide | Total Suicide |
|---|---|---|---|---|---|---|---|
| | | | | | **Available Statistical Information and Main Findings** | | |
| Ozanne-Smith et al., 2004 | Focus on one Australian state (Victoria); comparisons performed against the rest of Australia | Poisson regression | Did trends differ between the different periods? | 1979–2000 | • −31.7-percent change (a reduction) between 1979–1987 and 1988–1996 ($p = 0.008$) <br> • No statistical information provided for 1988–1996 and 1997–2000 or for 1979–1987 and 1997–2000 | Not available | Not available |
| Chapman et al., 2006 | Whole of Australia | Negative binomial regression | Did trends differ before and after 1977? | 1979–2003 | • Trend before 1997: IRR = 0.970 (95% CI: 0.964, 0.977) <br> • Trend after 1997: IRR = 0.926 (95% CI: 0.892, 0.961) <br> • Ratio of slopes: IRR = 0.954 (95% CI: 0.922, 0.987); $p = 0.007$ (sig.) | • Trend before 1997: IRR = 1.023 (95% CI: 1.018, 1.029) <br> • Trend after 1997: IRR = 0.959 (95% CI: 0.951, 0.968) <br> • Ratio of slopes: IRR = 0.938 (95% CI: 0.920, 0.956); $p < 0.001$ (sig.) | • Trend before 1997: IRR = 1.010 (95% CI: 1.005, 1.015) <br> • Trend after 1997: IRR = 0.956 (95% CI: 0.948, 0.964) <br> • Ratio of slopes: IRR = 0.946 (95% CI: 0.930, 0.963); $p < 0.001$ (sig.) |
| Baker and McPhedran, 2007 | Whole of Australia | Autoregressive integrated moving average (ARIMA), paired sample $t$-tests | Did trends differ before and after 1996? | 1979–2004 | • Mean predicted rate (per 100,000) after 1996: 1.85 <br> • Mean observed rate (per 100,000) after 1996: 1.22 <br><br> $p < 0.001$ (sig.) | • Mean predicted rate (per 100,000) after 1996: 11.82 <br> • Mean observed rate (per 100,000) after 1996: 11.31 <br><br> $p = 0.21$ (n.s.) | Not available |

The Effects of the 1996 NFA in Australia on Suicide, Violent Crime, and Mass Shootings   293

**Table 24.1—Continued**

| Study | Geographic Coverage | Statistical Method | Research Focus | Period | Available Statistical Information and Main Findings | | |
|---|---|---|---|---|---|---|---|
| | | | | | Firearm Suicide | Nonfirearm Suicide | Total Suicide |
| Klieve, Sveticic, and De Leo, 2009 | Queensland | Negative binomial regression | Did trends differ before and after 1996? | 1988–2004 | • Queensland ratio of trends (1990–2004): 1.0072; $p = 0.7794$ (n.s.)<br>• Australia ratio of trends: 0.9672; $p = 0.0102$ (sig.) | Not available | Not available |
| Lee and Suardi, 2010 | Whole of Australia | ARIMA, Quandt (Chow), Bai and Perron | Were there changes in the time-series structure? | 1915–2004 | • Quandt: no sig. break<br>• Bai and Perron:<br>  ○ UDmax = 10.45; critical value = 8.88 ($p < 0.05$)<br>  ○ WDmax = 10.68; critical value = 9.91 ($p < 0.05$)[a]<br>  ○ Estimated break date: 1987 (90% CI: 1978, 2001) | • Quandt: no sig. break<br>• Bai and Perron:<br>  ○ UDmax = 3.97; critical value = 8.88 (n.s.)<br>  ○ WDmax = 4.72; critical value = 9.91 (n.s.) | Not available |
| Leigh and Neill, 2010 | Whole of Australia, based on jurisdiction-level data | Linear regression<br>Difference between averages for 1990–1995 and 1998–2003 | What was the estimated effect of the number of guns handed in on firearm, nonfirearm, and total suicides? | 1990–2003 | • 1990–1995 average death rate (per million) = 2.55<br>• Implied change in death rate 1998–2003 (per million) = −1.9 (95% CI: −2.9, −0.8); $p = 0.004$ (sig.) | • 1990–1995 average death rate (per million) = 10.2<br>• Implied change in death rate 1998–2003 (per million) = 1.7 (95% CI: −4.7, 8.2); $p = 0.532$ (n.s.) | • 1990–1995 average death rate (per million) = 12.7<br>• Implied change in death rate 1998–2003 (per million) = −0.01 (95% CI: −6.2, 5.9); $p = 0.956$ (n.s.) |

**Table 24.1—Continued**

| Study | Geographic Coverage | Statistical Method | Research Focus | Period | Available Statistical Information and Main Findings | | |
|---|---|---|---|---|---|---|---|
| | | | | | Firearm Suicide | Nonfirearm Suicide | Total Suicide |
| McPhedran and Baker, 2012 | Whole of Australia | Zivot-Andrews, Quandt | Were there changes in the time-series structure? | 1907–2007 | Zivot-Andrews:<br>• Estimated break date, ages 25–34:<br>  ◦ 1994 (intercept only, 1979–2007; $p < 0.05$)<br>  ◦ 1994 (intercept and trend, 1979–2007; $p < 0.05$)<br>• Estimated break date, ages 35–44:<br>  ◦ 1997 (intercept only, 1979–2007; $p < 0.05$)<br>  ◦ 1997 (intercept and trend, 1979–2007; $p < 0.05$)<br>Quandt:<br>• Estimated break date 1997, ages 35–44 (1979–2007): Max F statistic = 3.90 (n.s.) | Results for suicide by hanging:<br>Zivot-Andrews:<br>• Estimated break date, ages 15–24:<br>  ◦ 1987 (intercept only, 1907–2007; $p < 0.05$)<br>  ◦ 1997 (intercept and trend, 1979–2007; $p < 0.10$)<br>• Estimated break date, ages 25–34: 1998 (intercept and trend, 1979–2007; $p < 0.01$)<br>• Estimated break date, ages 35–44: 1998 (intercept and trend, 1979–2007; $p < 0.05$)<br>Quandt:<br>• Estimated break date 1987, ages 15–24 (1979–2007): Max F statistic = 176.38; $p < 0.01$<br>• Estimated break date 1987, ages 15–24 (1979–2007): Max F statistic = 63.20; $p < 0.01$<br>• Estimated break date 1987, ages 25–34 (1979–2007): Max F statistic = 54.90; $p < 0.01$<br>• Estimated break date 1988, ages 25–34 (1979–2007): Max F statistic = 14.20; $p < 0.01$ | Not available |

**Table 24.1—Continued**

| Study | Geographic Coverage | Statistical Method | Research Focus | Period | Available Statistical Information and Main Findings | | |
|---|---|---|---|---|---|---|---|
| | | | | | Firearm Suicide | Nonfirearm Suicide | Total Suicide |
| Baker and McPhedran, 2015 | Whole of Australia | ARIMA | Did trends differ before and after 1996? | 1979–2010 | • Mean predicted rate (per 100,000) after 1996: 1.50<br>• Mean observed rate (per 100,000) after 1996: 1.05<br><br>*p < 0.001 (sig.)* | • Mean predicted rate (per 100,000) after 1996: 12.35<br>• Mean observed rate (per 100,000) after 1996: 10.64<br><br>*p < 0.01 (sig.)* | Not available |
| Chapman, Alpers, and Jones, 2016 | Whole of Australia | Negative binomial regression | Did trends differ before and after 1996? | 1979–2013 | • Ratio of trends = 0.981 (95% CI: 0.970, 0.993); *p = 0.001 (sig.)*<br>• Step change = 0.652 (95% CI: 0.582, 0.731); *p < 0.001 (sig.)* | • Ratio of trends = 0.981 (95% CI: 0.958, 0.973); *p < 0.001 (sig.)*<br>• Step change = 1.070 (95% CI: 0.988, 1.159); *p = 0.10 (n.s.)* | • Ratio of trends = 0.975 (95% CI: 0.968, 0.982); *p < 0.001 (sig.)*<br>• Step change = 1.004 (95% CI: 0.931, 1.083); *p = 0.90 (n.s.)* |

NOTE: CI = confidence interval; IRR = incidence rate ratio; sig. = significant; n.s. = not significant.
[a] UDmax and WDmax are test statistics evaluating whether there is evidence that time-series data show a departure from their expected trendline.

nonsignificant declines in nonfirearm suicide rates after passage of the NFA, despite finding significant decreases in firearm suicides associated with the number of banned guns turned in across Australia's provinces and states (Leigh and Neill, 2010). The study did not show, however, that the declines in firearm suicide rates associated with turning in guns were significantly greater than the nonsignificant declines in nonfirearm suicides. Thus, although there is some evidence that the 1996 agreement reduced firearm suicides in Australia, studies also found significant reductions in nonfirearm suicides at the same time, calling into question whether it was the NFA or some other concurrent events that led to reductions in gun and nongun suicides.

### Violent Crime

Australia's homicide rate was decreasing prior to the 1996 NFA. Thus, as reviewed by McPhedran (2016), the research focus has largely investigated whether the rate at which homicides were declining changed after the NFA was implemented (Baker and McPhedran, 2007; Chapman et al., 2006; Ozanne-Smith et al., 2004; Baker and McPhedran, 2015; Chapman, Alpers, and Jones, 2016). Other lines of research have examined the relationship between the number of firearms turned in during the buyback period and firearm homicides (Leigh and Neill, 2010) and for any structural breaks in the rate of firearm homicides between 1915 and 2004 (Lee and Suardi, 2010). No study found statistically significant evidence that trends in firearm homicides changed from before to after implementation of the NFA.[2] However, Chapman, Alpers, and Jones (2016) found that the ratio of pre-law to post-law trends was statistically significant and less than one (suggesting a more rapid decline in the post-law period) for total homicide, nonfirearm homicide, and total firearm deaths (suicide and homicide). The greater declines in nonfirearm homicides led the authors to doubt whether any changes can be attributed to the NFA.

### Mass Shootings

Two studies examined the impact of the NFA on mass shootings. Both studies indicated that there were mass shootings in Australia prior to enactment of the law, but there were none thereafter. Specifically, Chapman, Alpers, and Jones (2016)—which defined *mass shootings* as those in which five or more people, excluding the shooter, were killed by gunshot—found that there were 13 mass shooting incidents in Australia between 1979 and the NFA's implementation in 1996 but none between 1997 and May 2016. Using the broader definition of four or more people killed, McPhedran and Baker (2011) reported that there were 12 such incidents from 1980 to 1996 and none between 1997 and 2009. McPhedran and Baker (2011) also reported that there have been no mass shootings in New Zealand since 1997 (though three between 1980

---

[2]  The relationship between number of guns returned in Leigh and Neill (2010) was also not statistically significant.

and 1996 and one in February 1997 while the gun buyback provisions of the NFA were being implemented in Australia), even though New Zealand did not introduce a similar ban on certain firearms. On the basis of this analysis, the authors suggest that reductions in mass shootings in Australia are not likely to be attributable to the NFA, because similar reductions were seen elsewhere without laws like the NFA. However, New Zealand did pass a law in 1992 (though not subsequently) tightening its regulation of guns. In other words, mass shootings in New Zealand declined from four in the years prior to and during implementation of the NFA in Australia to zero thereafter, and that reduction occurred shortly after imposing stricter gun legislation in New Zealand. Therefore, we do not view the McPhedran and Baker (2011) results as offering a strong refutation of the possibility that the NFA caused a reduction in mass shootings in Australia.

## Conclusions

Analyses of the effects of Australia's NFA are limited by the lack of a comparison group—the exceptions being Leigh and Neill (2010) and McPhedran and Baker (2011). Attributing reductions in suicide and homicide rates to the NFA is complicated by the fact that these rates were decreasing even before the NFA was enacted. There is more evidence consistent with the claim that the NFA caused reductions in firearm suicides and mass shootings than reductions in violent crime, but there is also evidence that raises questions about whether those changes can be attributed to the NFA or to other factors that influenced suicide and mass shooting rates around the time the NFA was implemented.

## Chapter Twenty-Four References

Baker, Jeanine, and Samara McPhedran, "Gun Laws and Sudden Death: Did the Australian Firearms Legislation of 1996 Make a Difference?" *British Journal of Criminology*, Vol. 47, No. 3, 2007, pp. 455–469.

———, "Australian Firearm Related Deaths: New Findings and Implications for Crime Prevention and Health Policies Following Revisions to Official Death Count Data," *International Journal of Criminal Justice Sciences*, Vol. 10, No. 1, 2015, pp. 1–9.

Chapman, S., P. Alpers, K. Agho, and M. Jones, "Australia's 1996 Gun Law Reforms: Faster Falls in Firearm Deaths, Firearm Suicides, and a Decade Without Mass Shootings," *Injury Prevention*, Vol. 12, No. 6, 2006, pp. 365–372.

Chapman, Simon, Philip Alpers, and Michael Jones, "Association Between Gun Law Reforms and Intentional Firearm Deaths in Australia, 1979–2013," *JAMA*, Vol. 316, No. 3, 2016, pp. 291–299.

Klieve, H., J. Sveticic, and D. De Leo, "Who Uses Firearms as a Means of Suicide? A Population Study Exploring Firearm Accessibility and Method Choice," *BMC Medicine*, Vol. 7, 2009.

Lee, Wang-Sheng, and Sandy Suardi, "The Australian Firearms Buyback and Its Effect on Gun Deaths," *Contemporary Economic Policy*, Vol. 28, No. 1, 2010, pp. 65–79.

Leigh, Andrew, and Christine Neill, "Do Gun Buybacks Save Lives? Evidence from Panel Data," *American Law and Economics Review*, Vol. 12, No. 2, 2010, pp. 462–508.

McPhedran, Samara, "A Systematic Review of Quantitative Evidence About the Impacts of Australian Legislative Reform on Firearm Homicide," *Aggression and Violent Behavior*, Vol. 28, 2016, pp. 64–72.

McPhedran, Samara, and Jeanine Baker, "Mass Shootings in Australia and New Zealand: A Descriptive Study of Incidence," *Justice Policy Journal*, Vol. 8, No. 1, 2011.

———, "Lethal and Non-Lethal Violence Against Women in Australia: Measurement Challenges, Conceptual Frameworks, and Limitations in Knowledge," *Violence Against Women*, Vol. 18, No. 8, 2012, pp. 958–972.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Ozanne-Smith, J., K. Ashby, S. Newstead, V. Z. Stathakis, and A. Clapperton, "Firearm Related Deaths: The Impact of Regulatory Reform," *Injury Prevention*, Vol. 10, No. 5, 2004, pp. 280–286.

Reuter, Peter, and Jenny Mouzos, "Australia: A Massive Buyback of Low-Risk Guns," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, D.C.: Brookings Institution Press, 2003, pp. 121–156.

PART D
## Summary of Findings and Recommendations

CHAPTER TWENTY-FIVE
# Summary and Conclusions

Although large majorities of Americans agree on the merits of some gun policies, gun policy is divisive in the United States. In this report, we have attempted to provide a rigorous and balanced assessment of what current scientific knowledge can tell the public and policymakers about the true effects of many gun policies that are frequently discussed in state legislatures. The most recent of such comprehensive attempts, conducted more than a dozen years ago, found the research base too thin to draw any conclusions about the effects of gun laws. Specifically, a committee of the National Research Council (NRC) found that the evidence was so weak and contradictory that no causal associations between the laws it examined and crime or violence could be determined (NRC, 2004). Separately, the Community Preventive Services Task Force "found the evidence available from identified studies was insufficient to determine the effectiveness of any of the firearms laws reviewed singly or in combination" (Hahn et al., 2005).

We have thoroughly updated and expanded on the findings in NRC (2004) and Hahn et al. (2005) with studies published between 2003 and spring 2016. We systematically reviewed all empirical research that examined the effects of 13 types of state gun policies on eight outcomes, including outcomes related to public health and safety and outcomes of interest to sport shooters, hunters, and those who work in the gun industry. We restricted our analysis to only those studies using methods designed to identify plausibly causal effects of the policies. After reviewing many thousands of candidate studies, we identified just 63 meeting our inclusion criteria (described in Chapter Two), of which 54 were published since 2003.

There is a need for a factual basis on which to make policy. This does not mean basing decisions just on facts about which policies will reduce homicides or suicides the most; it means basing decisions on an accurate understanding of the trade-offs that policies entail. To make fair and effective gun policies, we need to know more about their implementation challenges, whom they affect most or least, what their unintended consequences might be, how they can be revised for better effect, what they cost society in general and gun owners in particular, and other issues central to the acceptability of any policy. These scientific questions about what is true and knowable do not supersede questions of individual rights or Second Amendment rights. Both should be central considerations in policymaking.

Facts have never dictated policy, but they can inform it. The relevance of research to inform gun policy has been tarnished by deeply held assumptions about "true" policy effects, measurement error associated with key variables (such as gun ownership), skepticism about research methods, and mistrust of researchers' motives when they draw unwelcome conclusions or focus on just one aspect of what is a complex phenomenon affecting multiple stakeholders with diverse interests. We have attempted to address these concerns through the rigor and transparency of our methods and through our organizational commitment to nonpartisan, objective policy analysis. We hope, therefore, that all stakeholders in gun policy debates give our analysis of the available science a fair hearing and our recommendations careful consideration.

In this chapter, we summarize our judgments about the strength of evidence available for the effects of gun policies on outcomes of interest. We then outline our conclusions and recommendations, which are organized into two sections: What can we conclude about the effects of gun policies, and why don't we know more?

## Summarizing the Strength of Evidence

We categorized all policy and outcome pairings as having supportive, moderate, limited, inconclusive, or no evidence. We never conclude that evidence suggests that a policy has no effect. Even when multiple studies fail to find a significant effect, it is not correct that this implies the policy has no effect. Instead, the effects may simply be too small to reliably detect, or the data available to assess the policy's effects may not be sufficiently specific to the intended effects of the law. More generally, it seems reasonable to suspect that every policy has some effect on each outcome, however small or unintended. Therefore, the failure to detect a law's effects reveals more about the weakness of the analytic methods than about the possibility that a policy truly has no effect.

We categorized evidence as *inconclusive* when studies with comparable methodological rigor identified inconsistent evidence for the policy's effect on an outcome or when a single study found only uncertain or suggestive effects. We categorized evidence as *limited* when at least one study meeting our inclusion criteria and not otherwise compromised by serious methodological problems reported a significant effect of the policy on the outcome. Effects for which there is *moderate* evidence are those for which two or more studies found significant effects in the same direction and contradictory evidence was not found in other studies with equivalent or strong methods. Our finding of *supportive* evidence of an effect is limited to cases for which at least three studies found suggestive or significant effects in the same direction, and the effect was found in at least two data sets that were reasonably independent of each other (e.g., firearm suicides and hospital admissions for self-inflicted firearm injuries).

Our ratings, therefore, reflect the relative strength of evidence, not, for instance, whether the evidence is strong enough that we can be highly confident that observed effects would be generalizable to future implementations of a particular law. Rather, evidence for these effects is strong relative to evidence for other gun policy effects and not necessarily strong relative to the quality and quantity of evidence available in other fields of study. For instance, the evidence that cigarette smoking causes cancer is vastly stronger than the evidence concerning any gun policy's effect on any outcome.

Table 25.1 summarizes our judgments for all 13 classes of policies across the eight outcomes. Several outcomes show multiple judgments, and these correspond to different characterizations of the specific policy-outcome association. For instance, we identified limited evidence that background checks reduce *total suicides* and moderate evidence that they reduce *firearm suicides*. Looking down the columns, it is apparent that research into four outcomes is essentially unavailable. It is noteworthy that three of these four outcomes—defensive gun use, hunting and recreation, and the gun industry—are issues of particular concern to gun owners or gun industry stakeholders, including firearm manufacturers, firearm dealers, hunting outfitters, firing ranges, and others. That there is no empirical research examining these outcomes limits the ability for policymakers to use evidence to consider how laws are likely to affect different interests.

**Table 25.1**
**Strength of Evidence Across Gun Policies and Outcomes**

| Policy | | Suicide | Total suicides | Firearm suicides | Firearm suicides among children | Firearm self-injuries (nonfatal) | Firearm self-injuries (including suicides) | Violent crime | Total homicides | Firearm homicides | Intimate partner homicides | Robberies | Assaults | Rapes | Other violent crime |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gun-Free Zones | | | | | | | | | | | | | | | |
| Waiting Periods | | | | | | | | I | | I | | | | |
| Concealed-Carry Laws | Permitless Carry | | | | | | | | | | | | | | |
| | Shall Issue | | I | I | | | I | ←L | I | I | | I | I | I | |
| Minimum Age Requirements | Possessing | | I | I | | | | | I | I | | | | | |
| | Purchasing | | I | I | →L | | | | I | I | | | | | |
| Surrender of Firearms by Prohibited Possessors | | | | | | | | I | | | I | | | | |
| Child-Access Prevention Laws | | | →L | →M | | | →S | I | | I | | | | | |
| Firearm Sales Reporting and Recording Requirements | | | | | | | | | | | | | | | |
| Licensing and Permitting Requirements | | | I | I | | | | | I | I | | | | | |
| Lost or Stolen Firearm Reporting Requirements | | | | | | | | | | | | | | | |
| Prohibitions Associated with Mental Illness | | | →L | →L | | | | →M | →L | I | | | | | |
| Stand-Your-Ground Laws | | | I | I | | | | ←M | ←L | | | | | | I |
| Bans on the Sale of Assault Weapons and High-Capacity Magazines | | | | | | | | | I | I | | | | | |
| Background Checks | | | →L | →M | | | | →L | →L | →M, I[a] | | | | | |

**Table 25.1—Continued**

| Policy | Unintentional injuries and deaths | Unintentional firearm deaths | Unintentional firearm injuries and deaths among adults | Unintentional firearm injuries and deaths among children | Unintentional firearm injuries among adults | Unintentional firearm injuries among children | Mass shootings | Officer-involved shootings | Defensive gun use | Hunting and recreation |
|---|---|---|---|---|---|---|---|---|---|---|
| Gun-Free Zones | | | | | | | | | | |
| Waiting Periods | | | | | | | I | | | |
| Concealed-Carry Laws: Permitless Carry | | | | | | | I | | | |
| Concealed-Carry Laws: Shall Issue | | | | | ←L | I | I | | | |
| Minimum Age Requirements: Possessing | | I | | | | | | | | |
| Minimum Age Requirements: Purchasing | | | | | | | I | | | |
| Surrender of Firearms by Prohibited Possessors | | | | | | | | | | |
| Child-Access Prevention Laws | | | →L | →S | | | I | | | |
| Firearm Sales Reporting and Recording Requirements | | | | | | | | | | |
| Licensing and Permitting Requirements | | | | | | | I | | | |
| Lost or Stolen Firearm Reporting Requirements | | | | | | | | | | |
| Prohibitions Associated with Mental Illness | | | | | | | | | | |
| Stand-Your-Ground Laws | | | | | | | | | I | |
| Bans on the Sale of Assault Weapons and High-Capacity Magazines | | | | | | | I | | | |
| Background Checks | | | | | | | I | | | |

306   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

**Table 25.1—Continued**

| | Background Checks | Bans on the Sale of Assault Weapons and High-Capacity Magazines | Stand-Your-Ground Laws | Prohibitions Associated with Mental Illness | Lost or Stolen Firearm Reporting Requirements | Licensing and Permitting Requirements | Firearm Sales Reporting and Recording Requirements | Child-Access Prevention Laws | Surrender of Firearms by Prohibited Possessors | Minimum Age Requirements: Purchasing | Minimum Age Requirements: Possessing | Concealed-Carry Laws: Shall Issue | Concealed-Carry Laws: Permitless Carry | Waiting Periods | Gun-Free Zones |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gun industry | | | | | | | | | | | | | | | |
| Gun ownership | | | | | | | | | | | | I | | | |
| Prices of banned firearms in the short term | | ↑ L | | | | | | | | | | | | | |

NOTE: I = inconclusive; L = limited; M = moderate; S = supportive. When we identified no studies meeting eligibility criteria, cells are blank. ↑ = the policy increases the outcome; ↓ = the policy decreases the outcome.

a We concluded that there is moderate evidence that dealer background checks decrease firearm homicides, and there is inconclusive evidence for the effect of private-seller background checks on firearm homicides.

## What Can We Conclude About the Effects of Gun Policies?

Our first set of conclusions and recommendations describes the policy-outcome combinations with the strongest available evidence as identified through our review of the existing literature, as well as recommendations for policy based on this evidence.

**Conclusion 1**. Available evidence supports the conclusion that child-access prevention (CAP) laws, or safe storage laws, reduce self-inflicted fatal or nonfatal firearm injuries among youth. There is moderate evidence that these laws reduce firearm suicides among youth and limited evidence that the laws reduce total (i.e., firearm and nonfirearm) suicides among youth.

**Conclusion 2**. Available evidence supports the conclusion that CAP laws, or safe storage laws, reduce unintentional firearm injuries or unintentional firearm deaths among children. In addition, there is limited evidence that these laws may reduce unintentional firearm injuries among adults.

In the available literature examining CAP laws, self-inflicted injuries represent an ambiguous outcome because not all self-inflicted firearm injuries are the result of a suicide attempt. Some are unintentional injuries. But with case fatality rates for suicide attempts with a firearm at around 82.5 percent (Spicer and Miller, 2000), a substantial number of self-inflicted firearm injuries are likely the result of a suicide attempt. Furthermore, there is a clear pattern of CAP laws appearing to reduce a range of related firearm injuries to youth, ranging from unintentional injuries to suicides. That they also reduce the more ambiguous "self-inflicted injuries" fits squarely within that pattern and contributes to our confidence that the evidence currently supports a conclusion that CAP laws reduce these injuries and fatalities.

Across all of the 13 classes of policies that we studied, only CAP laws had any evidence that we classified as *supportive* for a particular conclusion. CAP laws differ from many of the other policies we considered in this report. Most of the others affect the acquisition of new firearms (e.g., background checks or waiting periods), or they are designed to affect a relatively small proportion of gun owners (e.g., prohibitions that target the mentally ill; firearm surrender laws, which have usually targeted domestic violence offenders). Thus, the other laws generally concern either the small proportion of guns that are newly acquired every year or a small proportion of the gun-owning population. CAP laws, in contrast, are designed to influence how all guns in a state are stored when children could be expected to encounter them. This likely represents a large proportion of all guns because one-third of all households in the country have children under age 18 (Vespa, Lewis, and Kreider, 2013), and many more have children as occasional visitors. With such large numbers of guns potentially affected, even imperfect compliance with CAP laws may have a greater chance than other types of laws of producing observable effects in population-level outcome statistics.

*Recommendation 1.* States without CAP laws should consider adopting them as a strategy to reduce firearm suicides and unintentional firearm injuries and deaths.

We note, however, that scientific research cannot, at present, address whether these laws might increase or decrease crime or rates of legal defensive gun use.

*Recommendation 2.* When considering adopting or refining CAP laws, states should consider making child access to firearms a felony; there is some evidence that felony laws may have the greatest effects on unintentional firearm deaths.

Gun industry and gun-owner organizations have promoted voluntary and educational programs to promote the safe storage of firearms. Our conclusions and recommendations should not be interpreted to suggest that only CAP laws can reduce firearm deaths. As we discussed in Chapter Twenty, scientific evaluations of education campaigns have found that they can produce behavior change in domains other than gun storage, but rigorous evidence that they have successfully promoted safe storage of firearms is limited. On the other hand, there is evidence that clinicians who counsel patients (mostly families with children) can effectively promote safe storage practices, particularly if storage devices (e.g., gun locks) are provided along with the counseling.

**Conclusion 3.** There is moderate evidence that background checks reduce firearm suicides and firearm homicides, as well as limited evidence that these policies can reduce overall suicide and violent crime rates.

Most available studies have examined the effects of dealer background checks or the combined effects of dealer and private-seller background checks when both are required by a state. Therefore, the evidence base for universal background checks compared with the dealer background checks required under federal law is quite limited. Logically, however, if there is moderate evidence that dealer background checks reduce firearm suicides and homicides, it seems likely that extending those same background checks to private sales of firearms could further reduce firearm suicides and homicides. We emphasize, though, that the available research on this question is limited and inconclusive.

**Conclusion 4.** There is moderate evidence that stand-your-ground laws may increase state homicide rates and limited evidence that the laws increase firearm homicides in particular.

**Conclusion 5.** There is moderate evidence that laws prohibiting the purchase or possession of guns by individuals with some forms of mental illness reduce violent crime, and there is limited evidence that such laws reduce homicides in particular. There is also limited evidence these laws may reduce total suicides and firearm suicides.

Federal law prohibits some people who have been adjudicated as mentally ill from purchasing or possessing firearms, but this prohibition is not uniformly enforced across the nation. States maintain mental health records, but many have been reluctant to share those records for use in the Federal Bureau of Investigation (FBI)'s National Instant Criminal Background Check System (NICS), the federal database used for background checks. Although most states have laws allowing for the voluntary shar-

ing of some mental health records with NICS, there is considerable variation in which classes of individuals prohibited under federal law are shared with NICS. Thus, by the end of 2016, there were large differences in the number of active mental health records in NICS across states; for example, Alaska, Montana, New Hampshire, Rhode Island, and Wyoming had contributed less than 500 records, whereas most other states had tens of thousands or hundreds of thousands of active mental health records in the database (Criminal Justice Information Services Division, 2016).

Our finding that there is limited evidence that some mental health–related background checks can reduce gun violence should be of interest to states that currently share only partial or limited mental health data with NICS and that do not have a comprehensive in-state database that is reliably used for background checks for firearm sales. It is likely that many individuals with mental health histories making them prohibited possessors under federal law can nevertheless purchase firearms in these states. Moreover, states that do check state databases but do not share information on all individuals with disqualifying mental health histories with NICS create opportunities for prohibited possessors to purchase firearms out of state. Establishing procedures to prevent these people from purchasing firearms appears to yield small but appreciable reductions in suicides, homicides, and other violent crimes after implementing mental health checks.

> *Recommendation 3*. States that currently do not require a background check investigating all types of mental health histories that lead to federal prohibitions on firearm purchase or possession should consider implementing robust mental illness checks, which appear to reduce rates of gun violence. The most robust procedures involve sharing data on all prohibited possessors with NICS.

**Conclusion 6**. There is limited evidence that before implementation of a ban on the sale of assault weapons and high-capacity magazines, there is an increase in the sales and prices of the products that the ban will prohibit.

This finding is based on persuasive evidence from a single case, the implementation of the Violent Crime Control and Law Enforcement Act of 1994, which banned the sale of certain semiautomatic weapons designated in the law as assault weapons. Therefore, this finding may not generalize well to other instances of assault weapon bans. For instance, the 1994 law grandfathered banned weapons sold before the law's implementation date. This likely created a market for speculators who drove up sales and prices in the months preceding the ban (Koper, 2004).

**Conclusion 7**. There is limited evidence that a minimum age of 21 for purchasing firearms may reduce firearm suicides among youth.

**Conclusion 8**. No studies meeting our inclusion criteria have examined required reporting of lost or stolen firearms, required reporting and recording of firearm sales, or gun-free zones.

## Why Don't We Know More?

Based on our review of the existing literature on the effects of firearm policy changes, we offer the following conclusions and recommendations for improving the evidence base on the effects of gun laws.

**Conclusion 9**. The modest growth in knowledge about the effects of gun policy over the past dozen years reflects, in part, the reluctance of the U.S. government to sponsor work in this area at levels comparable to its investment in other areas of public safety and health, such as transportation safety.

Of the 54 studies meeting our inclusion criteria that have been published since 2003, just seven (13 percent) reported receiving any federal funding. Two studies listed funding from the National Science Foundation, and one study each listed funding from the National Institute of Justice; National Institute on Drug Abuse; National Institute on Alcohol Abuse and Alcoholism; National Heart, Lung, and Blood Institute; and the Centers for Disease Control and Prevention (CDC). Ten studies received some foundation support, with the Robert Wood Johnson Foundation and the Joyce Foundation each supporting four. Of studies since 2003 that met our inclusion criteria, the large majority (40 studies, or 74 percent) reported no sources of external support.

While most of the 54 studies focused on public safety or health outcomes (e.g., suicide and homicide), the number of high-quality quasi-experimental studies on which to base estimates of the effects of policies was surprisingly small compared with the literatures that evaluate the effects of many other policies, such as those designed to improve traffic safety, a problem that claims about as many lives each year as are lost in firearm suicides and homicides.

Federal funding for research on gun-related mortality is far below the levels for other sources of mortality in the United States. Stark and Shah (2017), for instance, found that federal gun violence research funding is just 1.6 percent the amount predicted based on federal funding for other leading causes of death. With this federal inattention comes a corresponding deficit in research: Stark and Shah (2017) also found that the volume of research publications on gun mortality was just 4.5 percent of what would be expected based on publication volume for other leading causes of mortality.

The federal government previously supported a more robust program of research examining firearm violence and policy. In the 1990s, the CDC was sponsoring millions of dollars of research on firearm violence, until researchers found that having a gun in the home was associated with an elevated risk of firearm homicide for members of the household. This finding was viewed by some as a one-sided attempt to manipulate the gun policy debate.

In an effort led by the National Rifle Association (Cagle and Martinez, 2004), a sufficient proportion of Congress was persuaded to adopt the Dickey Amendment in 1996, cutting $2.6 million of funding from the CDC, an amount equal to what its injury prevention center had been spending on gun violence research. The Dickey

Amendment also introduced new language forbidding the CDC from advocating or promoting gun control. This language did not explicitly prohibit all research on gun violence or gun policy, but concern that any gun research could be viewed as advocacy has led the CDC to avoid supporting gun policy research lest it invite a budget adjustment like that in 1996 (Kellermann and Rivara, 2013).

Congress has included Dickey Amendment language in each CDC appropriations bill since 1996. Moreover, in 2012, similar language was added to an appropriations bill for the National Institutes of Health in the Consolidated Appropriations Act of 2012 (Pub. L. 112-74).

Research on firearm policy and violence prevention has since declined dramatically. According to a report by the advocacy organization Mayors Against Illegal Guns, by 2012, CDC funding of gun violence research had declined 96 percent since the mid-1990s, and academic publishing on gun violence fell 64 percent from 1998 to 2012 (Mayors Against Illegal Guns, 2013; Alcorn, 2016). Although comparable numbers of people die in car crashes and by firearm suicides and homicides, federal investment in traffic safety research funding is more than 270 times greater than in firearm violence research (Mayors Against Illegal Guns, 2013).

As suggested in a 2015 joint statement by Jay Dickey, the sponsor of the Dickey Amendment, and Mark Rosenberg, who ran the CDC's injury center when the amendment first passed, a gun violence research agenda should be developed with the dual goals of protecting citizens' and gun owners' rights and making our homes and communities safer:

> Our nation does not have to choose between reducing gun-violence injuries and safeguarding gun ownership. Indeed, scientific research helped reduce the motor vehicle death rate in the United States and save hundreds of thousands of lives— all without getting rid of cars. For example, research led to the development of simple four-foot barricades dividing oncoming traffic that are preventing injuries and saving many lives. We can do the same with respect to firearm-related deaths, reducing their numbers while preserving the rights of gun owners. (Dickey and Rosenberg, 2015).

The science on which to base gun policy has advanced slowly since 2004, when the NRC panel concluded, "If policy makers are to have a solid empirical and research base for decisions about firearms and violence, the federal government needs to support a systematic program of data collection and research that specifically addresses that issue." Unfortunately, federal support for research that could help states and communities reduce firearm crime, violence, and suicide remains virtually nonexistent, and the state and federal surveys describing gun ownership and use, on which a better understanding of state policies could be built, have not lived up to the optimism expressed in NRC (2004) and Hahn et al. (2005). In some important respects, such federal support has deteriorated since then.

*Recommendation 4*. To improve understanding of the real effects of gun policies, Congress should consider whether to lift current restrictions in appropriations legislation, and the administration should invest in firearm research portfolios at the CDC, the National Institutes of Health, and the National Institute of Justice at levels comparable to its current investment in other threats to public safety and health.

*Recommendation 5*. Given current limitations in the availability of federal support for gun policy research, private foundations should take further steps to help fill this funding gap by supporting efforts to improve and expand data collection and research on gun policies.

**Conclusion 10**. Research examining the effects of gun policies on officer-involved shootings, defensive gun use, hunting and recreation, and the gun industry is virtually nonexistent.

The lack of rigorous studies examining the effects of gun policies on these outcomes is problematic because many stakeholders in gun policy debates are especially concerned about the effects laws could have on these matters. The desire to protect oneself, for instance, is self-reported as one of the primary reasons for gun ownership among 63 percent of all U.S. gun owners and among 76 percent of all U.S. handgun owners (Azrael et al., 2017), yet rigorous studies of the effects of laws on this outcome have rarely been conducted. As we discuss in Chapter Twenty-Three, on defensive gun use, the lack of research in this area stems, to some extent, from difficulties defining and measuring legal defensive gun use. In some—perhaps most—such cases, guns may contribute to an individual's self-defense by deterring crimes that would otherwise occur. For this reason and others, it has proven difficult to estimate the frequency with which guns are used defensively.

Nevertheless, opportunities for understanding how policies affect defensive gun use exist and should be pursued. For instance, it may be possible to examine whether policies change the rate at which gun owners are the victims of crime or are injured during a crime. Similarly, FBI records of justifiable homicides, although imperfect as a proxy for defensive gun use, may nevertheless be useful for examining one aspect of a policy's effects on defensive gun use, as demonstrated by Cheng and Hoekstra (2013). Given the strength of evidence of CAP laws on self-inflicted and unintentional injuries, studying the impact of these policies on defensive gun use can help inform the trade-offs between this outcome and the potential public safety benefits.

The dearth of research examining how policies affect the gun industry is a particularly significant shortcoming in the available scientific literature. Data from the U.S. Bureau of Labor Statistics (2017) suggest that more than 47,000 people in the United States are employed just in the manufacture of small arms and ammunition. The National Sports Shooting Foundation, a gun industry trade association, estimates

that an additional 250,000 may be employed in the distribution and sale of firearms and hunting supplies or in ancillary services, such as operating gun ranges or providing supplies or services to manufacturers and retailers (National Sports Shooting Foundation, 2017). The National Survey of Fishing, Hunting, and Wildlife-Associated Recreation Survey in 2011 found that more than 12 million people used firearms for hunting, with total expenditures on firearms exceeding $3 billion and expenditures on ammunition exceeding $1.2 billion (U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, 2012). In addition, more than 50 percent of all hunters participated in target shooting, and 22 percent of hunters visited shooting ranges (U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, 2012). As important as the concerns of this industry may be to the fate of proposed gun policies, there is, at present, little scientific evidence available to the public on this topic.

> *Recommendation 6.* To improve understanding of outcomes of critical concern to many in gun policy debates, the U.S. government and private research sponsors should support research examining the effects of gun laws on a wider set of outcomes, including crime, defensive gun use, hunting and sport shooting, officer-involved shootings, and the gun industry.

**Conclusion 11**. The lack of data on gun ownership and availability and on guns in legal and illegal markets severely limits the quality of existing research.

There are no regularly collected data series that describe gun ownership or use at the state level since the CDC suspended its collection of this information on the Behavioral Risk Factor Surveillance System more than a decade ago. Most gun laws are designed to specify who can own guns or to change the ways that gun owners store and use their weapons. Therefore, gun ownership and use are the behaviors through which laws may affect such outcomes as suicide, homicide, hunting and recreation, and firearm sales. In the absence of reliable state-level information about gun ownership and use, researchers cannot assess the most-direct intended effects of policies—that is, the effects on gun ownership and use—which may otherwise be easier to detect than the downstream effects of such policies on comparatively rare outcomes, such as suicide and homicide. Is it the case that gun laws cannot have their intended effect because the stock of guns is so great in the United States that anyone who wants a gun can easily obtain one, whether or not they are prohibited? This is a question that cannot easily be answered with available data on gun ownership and use.

> *Recommendation 7.* To make important advances in understanding the effects of gun laws, the CDC or another federal agency should resume collecting voluntarily provided survey data on gun ownership and use.

Additionally, the federal government no longer collects or shares with researchers data on illegal gun markets, which investigators could use to examine how policies change the availability of firearms. This is a problem that has also worsened since NRC (2004) identified it as a critical shortcoming for research on gun policy. Specifically, the Tiahrt Amendments (a series of provisions attached to Bureau of Alcohol, Tobacco, Firearms and Explosives appropriations bills since 2003) block researchers and others from studying gun trace data and gun purchaser data. When trace data were available to researchers prior to 2003, the information provided important insights into how criminals obtain their weapons (Kennedy, Piehl, and Braga, 1996; Bureau of Alcohol, Tobacco, and Firearms, 1997); whether states with more-restrictive gun laws create shortages of guns for those who may be prohibited from purchasing them (Weil and Knox, 1996; Cook and Braga, 2001); how guns move between states with less- and more-restrictive gun laws (Cook and Braga, 2001; Webster, Vernick, and Hepburn, 2001); the characteristics of gun sales likely to be associated with diversion to prohibited possessors (Pierce et al., 2003); and other valuable, actionable, policy-relevant information (for further discussion, see Braga et al., 2012).

Trace data and purchaser data have significant limitations that can make inferences about gun markets and crime difficult or uncertain. That is a caveat that applies to most data used in evaluating gun policies, but it should not be a reason for prohibiting access to trace data for research purposes.

> *Recommendation 8*. To foster a more robust research program on gun policy, Congress should consider whether to eliminate the restrictions it has imposed on the use of gun trace data for research purposes.

**Conclusion 12**. Crime and victimization monitoring systems are incomplete and not yet fulfilling their promise of supporting high-quality gun policy research in the areas we investigated.

NRC (2004) and Hahn et al. (2005) each expressed optimism about new sources of data that had only recently begun and that could, in theory, be used to improve the study of gun policy. These included the National Violent Death Reporting System (NVDRS) and the National Incident-Based Reporting System (NIBRS).

The NVDRS was designed to provide unprecedented detail on the circumstances of violent deaths in participating states, such as information on the victim's life stresses, the relationship between the victim and the offender, and other crimes that were committed at the time of the suicide or homicide. Despite the richness of the information available through the NVDRS, not one of the quasi-experimental studies meeting the inclusion criteria for this report used NVDRS data. It could be that there have not been enough states participating in the NVDRS collection process for long enough to permit the use of strong causal models. State participation in the NVDRS is voluntary

and has been growing slowly but steadily. Currently, 42 states participate, but data are available from only 18, and not from some large states, such as California and Texas.

The NIBRS was designed to collect more-detailed information on incidents of crime in the United States than has been available through the FBI's Uniform Crime Reporting system. Whereas the FBI system collects summary or aggregate statistics on serious violent and property crimes reported to law enforcement agencies, NIBRS was designed to collect incident-level information about crimes reported to police. It officially launched in the mid-1980s, but by the time of the NRC review, only 16 percent of the U.S. population was served by a law enforcement agency that reported crime information to NIBRS (NRC, 2004, p. 33). Because the NIBRS program is voluntary and can be costly for law enforcement agencies to adopt, participation rates have not improved as rapidly as the NRC reviewers may have expected. By 2012, the proportion of U.S. residents served by a participating law enforcement agency had risen to just 30 percent (Bureau of Justice Statistics [BJS], 2017a). Perhaps for this reason, none of the studies meeting the inclusion criteria for this report used NIBRS data.

Although the current NIBRS data are of limited use for the kind of research we have reviewed, a new BJS initiative offers hope that this could soon change. The National Crime Statistics Exchange is an attempt to recruit and facilitate the participation of a representative sample of 400 law enforcement agencies to participate in NIBRS. With this sampling approach and data from the more than 6,000 agencies already participating, BJS expects to be able to begin generating reliable national crime trend information based on NIBRS data.

> *Recommendation 9.* To improve the quality of evidence used to evaluate gun policies, the NVDRS should be expanded to include all states with rigorous quality control standards.

> *Recommendation 10.* BJS should examine the cost and feasibility of expanding its existing programs to generate state-level crime data.

Another potentially valuable source of information on crimes is the National Crime Victimization Survey (NCVS), which collects detailed information on crime from a panel of U.S. residents selected to be representative of the nation. This survey provides critically important information about crimes that may never be reported to the police, as well as credible information on how victims and potential crime victims have been able to use guns defensively. But NCVS cannot readily be used to understand the effects of state gun laws on crime because it does not generate state-level estimates. Therefore, the studies meeting our eligibility criteria primarily used data from the Uniform Crime Reporting program (or its Supplemental Homicide Report) when examining crimes, meaning they worked with data that had few details about

individual crimes and, thus, could examine only the subset of crimes reported to law enforcement.

Recognizing the need for state-level victimization data, BJS has explored options for generating such estimates through NCVS (BJS, 2017b). BJS is conducting a pilot program that expands the survey panel with the intention of eventually generating reliable estimates for 22 states. In addition, the bureau has published model-based state estimates for some types of crime over three-year periods from 1999 to 2013 (Fay and Diallo, 2015).

> *Recommendation 11.* BJS should continue to pursue its efforts to generate state-level victimization estimates. The current goal of generating such estimates for 22 states is a reasonable compromise between cost and the public's need for more-detailed information. However, the bureau should continue to expand its development of model-based victimization rates for all states and for a wider set of victimization experiences (including, for instance, crimes involving firearm use by an assailant or victim).

**Conclusion 13**. The methodological quality of research on firearms can be significantly improved.

Over the past several decades, studies have offered a great deal of information about how to use what data are available to generate reliable and credible estimates of the effects of gun policies on various outcomes, and the computing power that researchers need to implement the increasingly demanding modeling requirements has more than kept pace with the diffusion of knowledge about appropriate statistical methods. Nevertheless, the scientific literature we reviewed shows that many of the best recent studies suffer from important limitations that should be addressed in future research. These shortcomings concern the following:

- Interpreting effects generated in models that lack the statistical power to have any reasonable chance of detecting the likely effects of policies. This problem can result in a high likelihood that statistically significant effects are in the opposite direction of the true effects or that the statistically significant effects grossly exaggerate the magnitude of the true effects.
- Estimating too many parameters for the number of available observations. This problem can result in statistically significant effects that tell virtually nothing about the true generalizable effects of the policies.
- Poorly calibrated tests for whether the effects of policies are statistically significant. This problem can result in many discoveries of effects that reject the null hypothesis that the policy had no effect when, in fact, under proper inferential procedures, the discoveries would be consistent with the law having no effect (or a small effect in the opposite direction).

- Poorly justified selections of statistical models or covariates. This problem can result in estimates of a policy's effects that are in the wrong direction or that badly misconstrue the magnitude or statistical significance of their effects.
- Presenting the results of exploratory statistical modeling as though they reflect findings from a confirmatory analysis. When dozens of hypothesis tests are conducted, about 5 percent would be expected to achieve statistical significance at the $p < 0.05$ level even if the law had no effect. Failure to acknowledge that findings are the result of exploratory analysis can lead to overconfident interpretations of effect estimates that may not reflect the true effects of a policy.
- Undisclosed categorization of which states had which laws and when they were implemented. Gun policy analysts need reliable and shared databases of state laws. Correct coding of state laws is challenging, and when researchers have disclosed their state law codings, those codings have often been found to contain errors that could affect results.
- Poorly justified models of the time course of a policy's effects. Statistical models of the effects of a policy impose assumptions about the period over which the effects of the policy will build. Often, the implicit assumption is that the full effect of the policy will be observed instantaneously in the first year after the date it is scheduled for implementation. At best, this can lead to underestimates of the effects of policies.
- The use of spline and hybrid models that do not estimate coherent causal effects.
- Inadequate attention to threats of reciprocal causation or simultaneity biases in effect estimation.

These are technical points of interest chiefly to researchers, so we relegate our detailed discussion of each point to Appendix A. However, our final recommendations are for other researchers interested in the analysis of the effects of gun policies.

*Recommendation 12.* As part of the Gun Policy in America initiative, we have published a database containing a subset of state gun laws from 1979 to 2016 (Cherney, Morral, and Schell, 2018). We ask that others with expertise on state gun laws help us improve the database by notifying us of its errors, proposing more-useful categorizations of laws, or submitting information on laws not yet incorporated into the database. With such help, we hope to make the database a resource beneficial to all analysts.

*Recommendation 13.* Researchers, reviewers, academics, and science reporters should expect new analyses of the effects of gun policies to improve on earlier studies by persuasively addressing the methodological limitations of earlier studies, including problems with statistical power, model overfitting, covariate selection, poorly calibrated standard errors, multiple testing, undisclosed state varia-

tion in law implementation, and unjustified assumptions about the time course of each policy's effects.

In conclusion, with a few exceptions, there is a surprisingly limited base of rigorous scientific evidence concerning the effects of many commonly discussed gun policies. This does not mean that these policies are ineffective; they might well be quite effective. Instead, it reflects shortcomings in the contributions that scientific study can currently offer to policy debates in these areas. It also reflects, in part, the policies we chose to investigate, all of which have been implemented in some U.S. states and, therefore, have proven to be politically and legally feasible, at least in some states. This decision meant that none of the policies we examined would dramatically increase or decrease the stock of guns or gun ownership rates in ways that would produce more readily detectable effects on public safety, health, and industry outcomes. The United States has a large stock of privately owned guns in circulation—estimated in 2014 to be somewhere between 200 million and 300 million firearms (Cook and Goss, 2014). Laws designed to change who may buy new weapons, what weapons they may buy, or how gun sales occur will predictably have only a small effect on, for example, homicides or participation in sport shooting, which are affected much more by the existing stock of firearms. Although small effects are especially difficult to identify with the statistical methods common in this field, they may be important. Even a 1-percent reduction in homicides corresponds to more than 1,500 fewer deaths over a decade.

By highlighting where scientific evidence is accumulating, we hope to build consensus around a shared set of facts that have been established through a transparent, nonpartisan, and impartial review process. In so doing, we also mean to highlight areas where more and better information could make important contributions to establishing fair and effective gun policies.

## Chapter Twenty-Five References

Alcorn, Ted, "Trends in Research Publications About Gun Violence in the United States, 1960 to 2014," *JAMA Internal Medicine*, Vol. 177, No. 1, 2016, pp. 124–126.

Azrael, Deborah, Lisa Hepburn, David Hemenway, and Matthew Miller, "The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey," *Russell Sage Foundation Journal of the Social Sciences*, Vol. 3, No. 5, 2017, pp. 38–57.

BJS—*See* Bureau of Justice Statistics.

Braga, Anthony A., Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway, "Interpreting the Empirical Evidence on Illegal Gun Market Dynamics," *Journal of Urban Health*, Vol. 89, No. 5, 2012, pp. 779–793.

Bureau of Alcohol, Tobacco, and Firearms, *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Market in Seventeen Communities*, Washington, D.C.: U.S. Department of the Treasury, 1997.

Bureau of Justice Statistics, "Data Collection: National Incident-Based Reporting System (NIBRS)," web page, 2017a. As of May 12, 2017: https://www.bjs.gov/index.cfm?ty=dcdetail&iid=301

———, "NCVS Redesign: Subnational," web page, 2017b. As of May 12, 2017: https://www.bjs.gov/index.cfm?ty=tp&tid=911

Cagle, M. Christine, and J. Michael Martinez, "Have Gun, Will Travel: The Dispute Between the CDC and the NRA on Firearm Violence as a Public Health Problem," *Politics & Policy*, Vol. 32, No. 2, 2004, pp. 278–310.

Cheng, Cheng, and Mark Hoekstra, "Does Strengthening Self-Defense Law Deter Crime or Escalate Violence? Evidence From Expansions to Castle Doctrine," *Journal of Human Resources*, Vol. 48, No. 3, 2013, pp. 821–853.

Cherney, Samantha, Andrew R. Morral, and Terry L. Schell, *RAND State Firearm Law Database*, Santa Monica, Calif.: RAND Corporation, TL-283-RC, 2018. As of March 2, 2018: https://www.rand.org/pubs/tools/TL283.html

Cook, Philip J., and Anthony A. Braga, "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets," *Arizona Law Review*, Vol. 43, No. 2, 2001, pp. 277–309.

Cook, Philip J., and Kristin A. Goss, *The Gun Debate: What Everyone Needs to Know*, New York: Oxford University Press, 2014.

Criminal Justice Information Services Division, "National Instant Criminal Background Check System (NICS) Section Active Records in the NICS Index," Washington, D.C.: U.S. Department of Justice, Federal Bureau of Investigation, December 31, 2016. As of March 31, 2017: https://www.fbi.gov/file-repository/active-records-in-the-nics-index-by-state.pdf/view

Dickey, Jay, and Mark Rosenberg, "How to Protect Gun Rights While Reducing the Toll of Gun Violence," *Washington Post*, December 25, 2015.

Fay, Robert E., and Mamadou S. Diallo, *Developmental Estimates of Subnational Crime Rates Based on the National Crime Victimization Survey*, Washington, D.C.: Westat, 2015. As of May 12, 2017: https://www.bjs.gov/index.cfm?ty=pbdetail&iid=5499

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Kellermann, Arthur L., and Frederick P. Rivara, "Silencing the Science on Gun Policy," *JAMA*, Vol. 309, No. 6, 2013, pp. 549–550.

Kennedy, D. M., A. M. Piehl, and A. A. Braga, "Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use-Reduction Strategy," *Law and Contemporary Problems*, Vol. 59, No. 1, 1996, pp. 147–196.

Koper, Christopher S., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence 1994–2003*, Washington, D.C.: National Institute of Justice, U.S. Department of Justice, 2004.

Mayors Against Illegal Guns, "Access Denied: How the Gun Lobby Is Depriving Police, Policy Makers, and the Public of the Data We Need to Prevent Gun Violence," Everytown for Gun Safety Support Fund, 2013. As of May 12, 2017: http://everytownresearch.org/reports/access-denied/

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

National Shooting Sports Foundation, *Firearms and Ammunition Industry Economic Impact Report,* Newtown, Conn., 2017. As of October 18, 2017: https://d3aya7xwz8momx.cloudfront.net/wp-content/uploads/2017/07/EconomicImpactofIndustry2017.pdf

NRC—*See* National Research Council.

Pierce, Glenn L., Anthony A. Braga, Christopher Koper, Jack McDevitt, David Carlson, Jeffrey Roth, Alan Saiz, Raymond Hyatt, and Roberta E. Griffith, *The Characteristics and Dynamics of Crime Gun Markets: Implications for Supply-Side Focused Enforcement Strategies*, Boston, Mass.: National Institute of Justice, 2003.

Public Law 112-74, Consolidated Appropriations Act, 2012, December 23, 2011.

Spicer, R. S., and T. R. Miller, "Suicide Acts in 8 States: Incidence and Case Fatality Rates by Demographics and Method," *American Journal of Public Health*, Vol. 90, No. 12, 2000, pp. 1885–1891.

Stark, David E., and Nigam H. Shah, "Funding and Publication of Research on Gun Violence and Other Leading Causes of Death," *JAMA*, Vol. 317, No. 1, January 3, 2017, pp. 84–86.

U.S. Bureau of Labor Statistics, "Current Employment Statistics (National)," 2017. As of May 15, 2017: https://www.bls.gov/web/empsit/ceseeb1a.htm

U.S. Fish and Wildlife Service, U.S. Department of the Interior, and U.S. Department of Commerce, *2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation,* Washington, D.C., FH2/11-NAT, 2012.

Vespa, Jonathan, Jamie M. Lewis, and Rose M. Kreider, *America's Families and Living Arrangements: 2012, Current Population Reports*, Washington, D.C.: U.S. Census Bureau, P20-570, 2013.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn, "Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns," *Injury Prevention*, Vol. 7, 2001, pp. 184–189.

Weil, Douglas S., and Rebecca C. Knox, "Effects of Limiting Handgun Purchase on Interstate Transfer of Firearms," *JAMA*, Vol. 275, No. 22, 1996, pp. 1759–1761.

# Appendixes

APPENDIX A
# Methodological Challenges to Identifying the Effects of Gun Policies

A review by the National Research Council (NRC) (2004) highlighted important problems with the methods used in many studies examining the effects of gun policies. Since then, the literature has grown, often in a series of critiques and counter-critiques of the statistical methods used by different sets of researchers. Having carefully reviewed, discussed, and debated among our own project team the relative merits of different methods used in this literature, we offer here our assessment of the principal methodological challenges that future research on gun policy should seek to overcome.

## Power

Statistical models using variation in state policies to identify causal effects of gun policies sometimes face serious problems with statistical power, meaning that the models may have little chance to detect effects even when they exist, and any statistically significant effects the models detect are likely to have greatly exaggerated magnitudes and may often get the direction of the effect wrong. These serious problems are common when effects of interest are small relative to other sources of variation in the outcomes (Gelman and Carlin, 2014). This is likely the case for the effects of gun policies (like those we examined in this report) that might affect new purchases of firearms but not the much larger stock of firearms available for use or that might have a modest effect on a small number of firearm incidents.

Nevertheless, even small effects may be important. For example, a 3-percent reduction in firearm deaths corresponds to 1,000 fewer deaths per year nationally. But a 3-percent effect, or an incidence rate ratio (IRR) of 0.97, is small relative to the much larger variation in firearm death rates over time or across U.S. states. Many observations (for instance, years of data for each state) may be required before a model has sufficient power to detect such an effect. Moreover, power is diminished as large numbers of covariates are added to the model.

To illustrate, consider the preferred model reported by one set of researchers reviewed here. The reported effect for one policy was an IRR of 0.97 (confidence interval [CI]: 0.72, 1.15). We can infer from these statistics that such a model could detect

a realistically small 3-percent reduction in the outcome at the $p < 0.05$ level of significance with a power of just 6 percent, well below the 80-percent level researchers typically seek when designing research.[1] Moreover, there is a nearly one in four chance that any statistically significant effect identified is in the wrong direction, and any statistically significant effect the model identifies will necessarily describe an effect size vastly greater than the true effect size. In the present example in which the true effect has an IRR of 0.97, the model would not identify a statistically significant effect any smaller in magnitude than an IRR of about 0.74. That is, the true 3-percent reduction would be found to be significant only if the model estimates it to actually be a 26-percent reduction in the outcome.

In other words, models like some that we find in the existing literature have almost no chance of detecting realistically small effects of firearm policies, and any significant effects the models do discover are likely to be grossly exaggerated in their magnitude and almost equally likely to be in the wrong direction as the right one. While this problem is by no means universally true in this literature, it is common enough that we present it as a general concern rather than citing by name the article from which we drew our example.

## Overfitting

The problem of poorly powered models is exacerbated when, as is common in this field, investigators include many covariates and fixed effects in their models of the effects of policies. Most guidance on reliable regression modeling emphasizes that models should have at least ten or 15 times as many observations as parameters being estimated (Cavanaugh, 1997; Draper and Smith, 1998; Good and Hardin, 2012). However, with fixed effects for each year in time-series data; fixed effects for each state; and a wide range of demographic, social, and economic covariates, models in this field frequently violate such recommendations, sometimes falling below even five observations per parameter (Schell and Morral, 2016). Such models are likely to be overfit, meaning, among other things, that their estimates are unreliable or unlikely to describe generalizable relationships between covariates of interest (such as policies) and the modeled outcomes.

Although problems with statistical power are common in this literature, they may not be inevitable. Models that do a good job explaining sources of variance across time or among states will have more statistical power than those that explain less of this variance. In a separate line of work, RAND's Gun Policy in America project has examined the performance (power, bias, and error rates) for many gun policy model specifications

---

[1] The inferences about power in this paragraph rely on power calculations and calculations of the probability of an error in the sign of the estimate and the magnitude of the estimate using methods described in Gelman and Carlin (2014). We assume that the standard error of the (unexponentiated) model estimate is (log(IRR) − log(LB))/1.96, where IRR is the reported effect size, and LB is the lower (or higher) bound of the 95-percent CI reported for the estimate.

using simulations for which the true effect of policies is known. This work demonstrates that many statistical models commonly used in gun policy research have quite poor performance in terms of type 1 error, power, and bias but that there are modeling approaches with comparatively good characteristics on these and other criteria.[2]

## Standard Errors

Most of the studies meeting our inclusion criteria identified the effects of policies by examining state-level changes in an outcome (such as homicides) over time. In many such models, there is a strong correlation within states among the error terms over time. Whether this clustering of error components mandates some adjustment to ensure that standard errors and even parameter estimates are unbiased has been a source of contention and confusion in the field. According to NRC (2004), cluster adjustments for fixed-effects models like many we reviewed in this report were unnecessary and produced misleadingly large CIs.

As Aneja, Donohue, and Zhang (2014) have argued, however, NRC did not properly consider how serial correlations in panel data can produce misleading standard errors when no adjustments are made for state-level clustering within the data. The authors provided compelling evidence that, without adjustment, standard errors are so severely underestimated that two-thirds or more of effects known to have no systematic association with the outcome variable appear to be statistically significant, a proportion far higher than the 5 percent expected for significance levels set at the $p < 0.05$ level. They further showed that even a common cluster adjustment procedure does not fully correct the underestimation of standard errors. Although state-level cluster adjustment vastly improves upon unadjusted estimates, standard errors are still inflated, frequently leading to statistically significant null effects at rates between 10 percent and 15 percent where a properly calibrated standard error would produce such errors in only 5 percent of cases.

Longitudinal analyses of state firearm policies that take no steps to address clustering continue to be published, although there is good evidence that the kinds of serial correlation found in state panel data used in gun policy research can result in large biases in estimated standard errors (Aneja, Donohue, and Zhang, 2014). The significance of the effects that these studies report should be regarded with deep skepticism. Similarly, studies frequently use robust standard error corrections or weight the regression models by state or county populations, but neither approach is likely to satisfactorily account for bias resulting from serial correlation, and population weighting could make it worse (Aneja, Donohue, and Zhang, 2014; Durlauf, Navarro, and Rivers, 2016). Further challenges for estimating standard errors arise for studies that

---

[2]   A report on this effort is forthcoming and will be available on the Gun Policy in America project website.

use difference-in-differences approaches in which policy effects are identified from only a small number of states (or jurisdictions), because inference based on clustered standard errors has been shown to severely over-reject in these cases (Conley and Taber, 2011; MacKinnon and Webb, 2017).

## Multiple Testing

Among studies examining the effects of firearm policies, it is common to present multiple model specifications, each with multiple effect estimates and sometimes run on multiple subsets of the population (e.g., deaths of those under age 19 or over age 55). In some cases, additional models may have been explored using alternative covariates or design characteristics. This type of exploratory modeling is valuable. It clarifies how robust findings are to different aspects of model specification, and it can detect associations or effects that are important but might otherwise have been overlooked.

In the context of such exploratory modeling, however, conventional interpretations of statistical significance erode. Whereas a significant effect at the $p < 0.05$ level is designed to occur in only one of 20 tests where there is, in fact, no effect, a study that conducts 20 such tests stands a good chance of identifying at least one statistically significant effect, even when no true effects are present. Such accidental statistically significant effects could contribute to the confusing and sometimes contradictory findings reported in the literature.

There are procedures for adjusting levels of statistical significance in the presence of multiple hypotheses testing that could help to reduce erroneous findings (Shaffer, 1995), but these were rarely used in the studies we examined. Moreover, these procedures would not address all sources of questionable findings that can occur in exploratory analysis. Instead, we believe that studies of the effects of state policies should be explicitly treated as exploratory rather than as testing a specific hypothesis. Therefore, strong conclusions about the apparent effects of policies should almost never be made. Instead, effects should be regarded with suspicion until they have been confirmed through independent studies. Because results in this field tend to be sensitive to details of the model specification and covariates, we propose that anyone undertaking such confirmatory analyses preregister the details of their models and data before assembling an analytic data set. Such preregistration does not prevent investigators from making changes to the analytic plan that may become necessary once results become available, but departing from the preregistered plan should signal to the researchers that their analysis should be considered exploratory rather than confirmatory.

## Coding State Laws

Gun policy analysts need a reliable and shared database of state laws. There are many well-known problems associated with the coding of state laws. As noted by NRC (2004) and Hahn et al. (2005), there are frequently inconsistencies across studies in the specification of which states or jurisdictions have which laws and when they took effect. In some cases, researchers have used the year in which bills were passed into law as the year the law was implemented; in others, researchers have used the year the law was designed to take effect or the first full year after the law took effect. Although some researchers (e.g., Aneja, Donohue, and Zhang, 2014; Lott and Mustard, 1997; Rosengart et al., 2005; Vernick and Hepburn, 2003) have published or shared their coding of laws, which allows for debate and improvement of the coding schemes, such coding often is not transparent and cannot be reviewed for accuracy or to understand what assumptions about laws were made. More generally, public databases of gun laws over time are unavailable for many laws. Because of the cost and complexity of constructing such data sets, researchers interested in the effectiveness of gun laws have often favored weak, cross-sectional study designs or have collected proprietary data sets of laws that are not shared.

One important assumption that all such efforts necessarily must make concerns the features of different laws that make them sufficiently similar to be grouped together under a broad class of laws. For instance, as we described in Chapter Ten, on child-access prevention laws, states differ in whether penalties for violating the law result in criminal, misdemeanor, or civil penalties, and there is evidence (albeit inconclusive) that criminal penalties may have different and stronger effects than other approaches. Such variation in laws and their associated effects means that combining them within a particular class of laws, such as child-access prevention laws, may obscure important effects that some variants of the law have (Alcorn and Burris, 2016). On the other hand, distinguishing each variant of a law reduces the number of jurisdictions implementing any particular version of the law, which reduces the statistical power of most models used to identify the causal effects of the law. Therefore, specification of a homogenous set of laws could increase the average effect size, but it also can reduce the statistical power that models have to detect the larger effects. Rarely, however, have published analyses explicitly addressed this conflict or the choices and assumptions made to address it.

We believe that the science of gun policy will be substantially advanced with the public release of comprehensive state law time-series data, and we have made that one of the goals of the Gun Policy in America project. Specifically, we have assembled a state law database for 1979–2016 that codes our 13 broad classes of state gun policies and many subcategories (see Cherney, Morral, and Schell, 2018). As noted, this database is available for use and further improvement by the scientific community.

## Coding the Time Course of a Policy's Effects

Even with a reliable database of state laws, however, investigators of gun policy effects face a further complication in coding the time course over which gun laws exert their effects. Frequently, investigators assume that a policy's full effects occur in the year it is implemented or the first full year after the year of implementation. This coding implies that all of a policy's effect is observed shortly after its implementation, which may be reasonable for some types of policies. Others, however, might accumulate their effects over longer periods. For instance, laws that expand the class of prohibited possessors will primarily affect those members of the class who are seeking to buy new firearms but not those who already own firearms. Indeed, it may be many years before such a law affects firearm ownership of a sizable proportion of the population. The proper coding of this type of effect might involve additive or multiplicative effects over several years.

Similarly, the effects of some policies, such as child-access prevention laws, may not be fully realized until a large proportion of gun owners become aware of them, meaning that the time course of the effect may depend on media campaigns to raise awareness or high-profile prosecutions under the law. Unfortunately, however, unless investigators know when these effects occur, their effect estimates will underestimate the policy's true effects. For this reason, we believe that researchers modeling the effects of policies should carefully consider when effects are likely to appear and should make these assumptions and the corresponding model specifications explicit in their analyses.

## Spline and Hybrid Effect Coding

Several studies investigating the effects of concealed-carry policies (see Chapter Thirteen) and studies of Australia's 1996 National Firearms Agreement (see Chapter Twenty-Four) have used model specifications referred to as *spline* or *hybrid* models within this field. In most models investigating the causal effects of a policy on an outcome, the effect is assumed to produce a shift in the level of the outcome; for example, a policy may result in a lower homicide rate after implementation relative to before. The type of spline models used in this field differ from standard causal effect models because the policy is assumed to modify the trajectory of the outcome over time rather than the level or in addition to a change in the level. More specifically, these models assume that the states or counties that implement the policy will diverge from the national trend at a constant rate for an indefinite period.[3]

---

[3]   Typically in gun policy models, a spline will be entered as a predictor in a regression equation that takes on values of zero before the policy was implemented (as well as in states that never implemented) and then takes on values that increase linearly in time for a given state once the policy is implemented in that state. For the models used in this field, these state-specific trends are estimated while controlling for national trends by including year

Although we discuss the reported results of these models, for practical and theoretical reasons, we do not present effect sizes from these spline models (or from spline and dummy hybrid models), even when the authors preferred those models. The practical reason is that the effect size is assumed to vary over time, so there is no single effect size to report. In fact, at a date sufficiently long after implementation, these models often assume that the states that implemented the policy will have extremely large or small effects on the outcome. In such cases, the effect size one presents is based entirely on a relatively arbitrary decision about the length of time over which to compute the effect. Moreover, even if we had arbitrarily selected a specific time interval over which to compute the effect, the research articles do not contain the information necessary to assess the CIs around those estimates.

Furthermore, two features of these spline models make them difficult to interpret as the causal effects of a gun policy. First, the spline coefficient is highly sensitive to the timing of any shifts in the outcome, and it responds to the timing in the opposite way as would standard methods for causal inference. A large increase in crime that does not occur until many years after a policy has been implemented will yield a large positive spline coefficient, suggesting that the policy is harmful. However, a similarly large increase in crime that occurs immediately after the policy is implemented will yield a negative spline coefficient, suggesting that the policy is beneficial even though it was followed immediately by an increase in crime.[4] Standard frameworks for inferring causality from observations (e.g., Mill, 1843) would suggest that an increase in crime immediately after the policy was implemented is the strongest evidence that the policy was harmful, and if a similar increase did not occur until years after implementation, it would constitute weaker evidence of a harmful effect of the policy. However, inferring causation from the spline coefficient leads to the opposite inferences, with an immediate increase in the outcome interpreted as the policy causing a decrease in the outcome but a delayed increase interpreted as evidence that the policy caused the outcome to increase. It is important to note that this interpretational challenge occurs in models that use only the spline to indicate the causal effect, as well as in hybrid models that use both a dummy variable and a spline (i.e., a step and a slope). (For more information, see the box on the next page.)

---

fixed effects in the same model. Thus, the splines are state trends that should be interpreted as deviations from the national trend.

[4]   More technically, the spline predictor in the regression equation has a mean value that corresponds to a specific time after implementation. This spline's mean typically falls a few years after implementation, but precisely when it occurs depends on the number of states that implemented the law and how long the study follows the states. Any increase in crime that occurs before this mean spline creates a more negative spline coefficient. An increase in crime, no matter how large, that occurs at that mean has no effect on the spline coefficient. Any increase in crime that occurs after that mean results in a more positive spline coefficient, with progressively greater leverage over the coefficient occurring with greater time.

**The Interpretational Problem with Spline and Hybrid Models**

To illustrate the problem discussed here, consider a hypothetical state that would have shown a constant linear trend in crime (slope = 1) from 1980 to 2001 (see Table A.1). However, a policy went into effect in 1991 that raised the crime rate by 1 point in that year. If one fits a linear trend and standard spline effect to these data, it yields a spline coefficient of –0.04. If one fits a hybrid effect to these data, it yields a spline coefficient of –0.05 and a dummy effect of 0.36. Thus, although everyone who views this data series would conclude that it is inconsistent with the conclusion that the policy caused a decline in crime, the spline coefficient is negative in both models.

**Table A.1. Illustrative Data, with Spline and Dummy-Coded Effect Variables**

| Year | Crime Rate | Spline | Dummy |
|------|-----------|--------|-------|
| 1980 | 10 | 0 | 0 |
| 1981 | 11 | 0 | 0 |
| 1982 | 12 | 0 | 0 |
| 1983 | 13 | 0 | 0 |
| 1984 | 14 | 0 | 0 |
| 1985 | 15 | 0 | 0 |
| 1986 | 16 | 0 | 0 |
| 1987 | 17 | 0 | 0 |
| 1988 | 18 | 0 | 0 |
| 1989 | 19 | 0 | 0 |
| 1990 | 20 | 0 | 0 |
| 1991 | 22 | 1 | 1 |
| 1992 | 22 | 2 | 1 |
| 1993 | 23 | 3 | 1 |
| 1994 | 24 | 4 | 1 |
| 1995 | 25 | 5 | 1 |
| 1996 | 26 | 6 | 1 |
| 1997 | 27 | 7 | 1 |
| 1998 | 28 | 8 | 1 |
| 1999 | 29 | 9 | 1 |
| 2000 | 30 | 10 | 1 |
| 2001 | 31 | 11 | 1 |

Stated more generally, the direction and size of the spline coefficient serves as an unbiased estimator of the causal effect if, and only if, the duration of the spline's slope corresponds to the actual period over which the policy's effects are increasing in magnitude. If the true effect phases in earlier than assumed by the chosen spline function, the spline coefficient will be biased away from the true direction of the causal effect, possibly even reversing the sign of the true effect. Thus, researchers should probably avoid using splines that assume that the effect of the policy increases linearly into perpetuity. Such an assumption makes it likely that the true effect of the policy is in the opposite direction of the spline coefficient.

The second challenge in the interpretation of the spline coefficient as a causal effect comes from the null hypothesis that is typically used when testing the spline coefficient. Specifically, the state-specific linear slope in the outcome with respect to time after the implementation of the policy is compared with the state-specific linear slope over the years prior to implementation. The null hypothesis in this case is that a given state's deviation from a national trend in the pre-policy period should be expected to continue in a linear manner, absent any intervention, indefinitely. Thus, the null hypothesis being tested is derived from a time trend that has been extrapolated, often many years into the future. This assumption has not been justified within this field, neither with a theory about an underlying data-generating mechanism for which the assumption is appropriate nor by showing that it is a good fit to the available data. In contrast, our analysis of U.S. crime data suggests that the data do not show the pattern predicted by this assumption.[5] Moreover, making an assumption of constant state-specific trends in crime can result in obvious research artifacts. Many types of data show regression to the mean, which describes a pattern of data generated by a random process in which an extreme observation is more likely to be followed by a less extreme observation than a more extreme observation. Failure to account for regression to the mean can result in spurious research conclusions. For example, if legislators pass gun legislation as a response to rising crime rates, any tendency for crime rates to return toward more-typical levels due to regression to the mean may be misinterpreted as evidence that the legislation lowered crime.

The risk of this type of error is much greater in spline models because the assumption used to generate the null hypothesis is that the data display regression away from the mean. Essentially, these models assume a process in which extreme observations are likely to be followed by observations that become progressively more extreme in the same direction—the opposite of regression to the mean. In contrast, in data showing regression to the mean, the null hypothesis that the trend before a given date equals

---

5   Specifically, the assumption predicts that state trends that deviate from the national trend in a positive direction (increasing crime rates relative to the nation) will continue to get progressively higher over time, while those states that deviate negatively (decreasing crime rates relative to the nation) will continue to decrease indefinitely. This predicts a "fan" pattern in crime trends in which the divergence in crime rates across states perpetually increases over time. Actual crime data do not show any consistent divergence of trends across states.

the trend after the date is routinely rejected. That is, the null hypothesis that state-specific deviations from the national crime trend will continue to grow indefinitely can often be rejected in the states that implemented the policy of interest, as well as many of those that did not.[6] Rejecting this implausible null hypothesis is not evidence of a causal effect of any policy.

In spite of clear statistical problems with inferring causal effects of policy on crime data using these methods, some researchers advocate this approach. In our view, their arguments misinterpret conventional effects identified by a shift in the mean (e.g., dummy-coded effects) and spline effects based on changes in slope. For example, Lott, Moody, and Whitley (2016) stated,

> The problems with using the dummy variable can be illustrated using results of 3 other papers. Santaella-Tenorio et al. [2016] reported the dummy model from Table 8b of the article by Ayres and Donohue [2003a]. Had they reported the other specification in Table 8b (or other tables) that showed the trends before and after implementation of the law (specifications that reject the assumptions behind the simple dummy approach), they would have shown the statistically significant downward trend in murder rates that indicated that the longer the right-to-carry laws were in effect, the greater the drop in murder rates was.

That is, the three papers interpret the spline coefficient as a "statistically significant downward trend in murder rates." This is incorrect; the negative spline term indicates that the slope coefficient is of lower value after implementation than before, but it does not imply that rates are actually declining over time either in absolute terms or relative to the other states that did not implement *shall-issue* (or right-to-carry) laws (see Chapter Thirteen). It is quite possible to get a negative spline coefficient even if shall-issue laws cause a large and immediate spike in murder. Similarly, such a negative coefficient could occur even if the law has no effect on murder, because it is not reasonable to extrapolate a pre-implementation trend of increasing murder rates indefinitely into the future. Historically, state-specific increases in murder have been followed by later reversion to more-typical values, even without passage of shall-issue laws. Indeed, if the authors' descriptions of the data as showing progressively larger drops in murder rates over time had been correct, there would have been a lower murder rate after implementation than before. That is, if their descriptions of the data were correct, there

---

[6]   For example, imagine that the states that implemented a given policy had an aggregate firearm homicide rate of eight homicides per 100,000 population in the year leading up to implementation and nine homicides per 100,000 in the year prior to that. The null hypothesis based on extrapolating this trend is that the rate of homicides will be seven per 100,000 the year after implementation and will decline to exactly zero homicides within eight years in all of the states that implemented the policy. It is likely that the null hypothesis will be correctly rejected because the states do not actually have zero homicides after eight years, but it would also be rejected because it incorrectly assumed that preexisting trends would continue, unchanged and indefinitely. The null would be rejected for reasons that have nothing to do with any causal effect of firearm policy.

would have been a significant negative coefficient on the dummy variable that they dismissed as unimportant, but there may or may not have been a significant negative spline coefficient.

It is important to note that our critique of how spline models have been used in this field is not, in any way, a critique of the use of splines more generally. Splines are extremely general regression tools to allow variations in slopes across a predictor variable. It is entirely reasonable to assume, for example, that the effects of a policy on crime phase in over several years. In such a case, a simple dummy-coded effect may underestimate the true effect size, while using a spline that is designed for that particular phase-in period would not. In our view, using these types of splines to identify a causal effect of policy on some crime outcome would require the following three things:

1. The model would need to be constructed so that the researchers would not conclude that increases in crime immediately after policy implementation are evidence that the policy lowers crime. This is a typical feature of spline models, particularly when the change in slope is modeled as persisting for a long period. This problem can be limited by using splines whose slopes operate over a narrow time frame, which can be justified as the phase-in period of the policy's effect (e.g., as used in the preferred specifications in Donohue, 2004). Such splines are similar to dummy-coded variables but with a gradual transition between 0 and 1 rather than an abrupt transition. If the phase-in period is hypothesized to last more than a few years, it may be necessary to estimate a more complex function to avoid making the wrong causal inference.

2. The null hypothesis that is interpreted as no causal effect must be something that is reasonably true in the absence of the policy in question. The null should be a hypothesis that would not be routinely rejected if tested within states that never implemented the policy or if tested using randomized implementation dates. In practice, this usually requires a null hypothesis that does not extrapolate pre-policy crime trends indefinitely into the future. Instead, the null should be based on deviations from the pre-policy average crime level or on deviations from a state-specific trend that is identified by both pre-implementation and post-implementation crime rates (i.e., based on deviations from an interpolated rather than extrapolated trend).

3. When regression models contain multiple effects of the policy, such as hybrid models that contain a spline and a dummy variable, the various effects cannot be tested or interpreted independently. The effect size and statistical significance can be assessed only by integrating all of the ways in which the policy influences the outcome within the model. For example, researchers should not claim that a policy is associated with a reduction in crime based on a significant negative spline coefficient when the model includes another effect that simultaneously predicts increased crime following implementation of the policy. Despite the

significant negative spline, the model may still predict that the policy is associated with a subsequent increase in crime in all years represented in the data. Thus, while hybrid models can avoid some of the interpretational problems of spline models, any conclusions about the effect of the policy on crime must reflect all of the modeled effects relating the policy to the outcome within the model. Ideally, this analysis would test the effect at some point after the policy is hypothesized to be fully phased in but well within the period that states were typically followed in the data set. This requirement applies to the direction, size, and statistical significance of the joint effect.

Our view of the existing literature is that none of the available studies presents a spline or hybrid model that meets these three requirements for interpreting the effects. Some of the models in the literature meet some of these requirements, but none is readily interpreted as estimating a causal effect of gun policies. For this reason, we generally present the simple dummy-coded causal effect when it is provided by the authors, although we do discuss the authors' preferred specification in the text.

## Simultaneity and Reciprocal Causation

To obtain an unbiased estimate for the causal effect of firearm policy changes, the ideal research design would be akin to a randomized trial in which policies were randomly assigned across states and over time (Aneja, Donohue, and Zhang, 2014; Donohue, 2003). This type of experimental design is infeasible in the context of gun policies, so researchers have had to rely on quasi-experimental methods in which the implicit assumptions require that state adoption of a given firearm policy is unconfounded by omitted factors that influence both law passage and the outcome of interest (i.e., omitted variables bias) and that changes in firearm policy are not themselves driven by changes in the outcome of interest (i.e., simultaneity bias). These issues are not unique to the study of firearm policies and merit consideration across a broad range of program and policy evaluations.

Potential issues of simultaneity have been discussed primarily in the research on shall-issue laws and crime (for a discussion of shall-issue and other concealed-carry laws, see Chapter Thirteen). Specifically, many studies have noted the potential for reciprocal causation—that is, that state legislatures pass shall-issue laws as a response to high or rising rates of violent crime (Aneja, Donohue, and Zhang, 2014; Grambsch, 2008; Kovandzic, Marvell, and Vieraitis, 2005; Ayres and Donohue, 2003a; Donohue, 2003; Manning, 2003; Kovandzic and Marvell, 2003; Plassman and Whitley, 2003; Lott and Mustard, 1997). Indeed, Grossman and Lee (2008) found that the percentage change in the violent crime rate over the preceding five years had a statistically significant positive effect on the likelihood that states with may-issue laws switch to

shall-issue laws; Luca, Deepak, and Poliquin (2016) found that the occurrence of a public mass shooting significantly increased the number of firearm bills introduced within a state one year later. If such reciprocal causation exists, the estimated effects of firearm policies on crime rates from the difference-in-differences strategy employed by most of the qualifying studies we identified may be inconsistent and biased, although the direction of such bias is ambiguous. While some studies have tested for potential reciprocal causation and found little evidence of bias driven by differential pre-trends in law-enacting states (Rosengart et al., 2005; Plassman and Whitley 2003), other studies have found this to be an issue of concern for shall-issue laws (Aneja, Donohue, and Zhang, 2014; Grambsch, 2008; Donohue, 2003).

The presence of reciprocal causation complicates causal identification of the true effects of firearm policy changes and requires alternative approaches to those used most commonly in the literature we identified. Unfortunately, some of the existing methods for handling simultaneity problems may not be feasible or may face other limitations. For instance, Lott and Mustard (1997) and Gius (2015a) employ instrumental variables techniques, but the instruments chosen are questionable and neither study provides sufficient evidence to assess instrument validity (Manning, 2003). Synthetic control methods (Abadie, Diamond, and Hainmueller, 2010) have been used to construct a counterfactual "control state" that matches the pre-trend of the law-passing state (Crifasi et al., 2015; Rudolph et al., 2015), but these methods do not readily accommodate inferential statistics and provide estimated effects that are often identified from a policy change in only one state or one state-year, meaning the observed effect is confounded with many other changes in the state that might equally explain any observed differences between the state and its synthetic controls.

More research and methodological innovation is required to address simultaneity and reciprocal causation challenges to causal inference in this and other fields of research. In particular, it would be useful to understand better the factors leading to state or municipal decisions to pass different types of policies. Studies estimating the effects of laws should explore and report whether states that passed the laws differed systematically from those that did not, in terms of their recent gun use or violence trends. In some cases, explorations of the possible effects of reciprocal causation on effect estimates may provide useful insights.

# Appendix A References

Abadie, Alberto, Alexis Diamond, and Jens Hainmueller, "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program," *Journal of the American Statistical Association*, Vol. 105, No. 490, 2010, pp. 493–505.

Alcorn, Ted, and Scott Burris, "Gun Violence Prevention," *Lancet*, Vol. 388, No. 10041, 2016, p. 233.

Aneja, Abhay, John J. Donohue III, and Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, Stanford, Calif.: Stanford Law School, Olin Working Paper No. 461, December 1, 2014. As of May 21, 2017: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681

Ayres, Ian, and John J. Donohue III, "Shooting Down the More Guns, Less Crime Hypothesis," *Stanford Law Review*, Vol. 55, No. 4, 2003a, pp. 1193–1312.

Cavanaugh, Joseph E., "Unifying the Derivations for the Akaike and Corrected Akaike Information Criteria," *Statistics and Probability Letters*, Vol. 33, No. 2, April 1997, pp. 201–208.

Cherney, Samantha, Andrew R. Morral, and Terry L. Schell, *RAND State Firearm Law Database*, Santa Monica, Calif.: RAND Corporation, TL-283-RC, 2018. As of March 2, 2018: https://www.rand.org/pubs/tools/TL283.html

Conley, Timothy G., and Christopher R. Taber, "Inference with 'Difference in Differences' with a Small Number of Policy Changes," *Review of Economics and Statistics*, Vol. 93, No. 1, 2011, pp. 113–125.

Crifasi, C. K., J. S. Meyers, J. S. Vernick, and D. W. Webster, "Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates," *Preventive Medicine*, Vol. 79, 2015, pp. 43–49.

Donohue, John J. "The Impact of Concealed-Carry Laws," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington D.C.: Brookings Institution Press, 2003, pp. 287–324.

———, "Guns, Crime, and the Impact of State Right-to-Carry Laws," *Fordham Law Review*, Vol. 73, No. 2, 2004, pp. 623–652.

Draper, Norman R., and Harry Smith, *Applied Regression Analysis*, 3rd ed., New York: John Wiley and Sons, 1998.

Durlauf, Steven, Salvador Navarro, and David Rivers, "Model Uncertainty and the Effect of Shall-Issue Right-to-Carry Laws on Crime," *European Economic Review*, Vol. 81, 2016, pp. 32–67.

Gelman, Andrew, and John Carlin, "Power Calculations: Assessing Type S (Sign) and Type M (Magnitude) Errors," *Perspectives on Psychological Science*, Vol. 9, No. 6, 2014, pp. 641–651.

Gius, Mark, "The Effects of State and Federal Background Checks on State-Level Gun-Related Murder Rates," *Applied Economics*, Vol. 47, No. 38, 2015a, pp. 4090–4101.

Good, Phillip I., and James W. Hardin, *Common Errors in Statistics (And How to Avoid Them)*, 4th ed., New York: John Wiley and Sons, 2012.

Grambsch, Patricia, "Regression to the Mean, Murder Rates, and Shall-Issue Laws," *American Statistician*, Vol. 62, No. 4, 2008, pp. 289–295.

Grossman, Richard S., and Stephen A. Lee, "May Issue Versus Shall Issue: Explaining the Pattern of Concealed-Carry Handgun Laws, 1960–2001," *Contemporary Economic Policy*, Vol. 26, No. 2, 2008, pp. 198–206.

Hahn, Robert A., Oleg Bilukha, Alex Crosby, Mindy T. Fullilove, Akiva Liberman, Eve Moscicki, Susan Snyder, Farris Tuma, and Peter A. Briss, "Firearms Laws and the Reduction of Violence: A Systematic Review," *American Journal of Preventive Medicine*, Vol. 28, No. 2, 2005, pp. 40–71.

Kovandzic, Tomislav V., and Thomas B. Marvell, "Right-to-Carry Concealed Handguns and Violent Crime: Crime Control Through Gun Decontrol," *Criminology and Public Policy*, Vol. 2, No. 3, 2003, pp. 363–396.

Kovandzic, Tomislav V., Thomas B. Marvell, and Lynne M. Vieraitis, "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates," *Homicide Studies*, Vol. 9, No. 4, 2005, pp. 292–323.

Lott, John R., Jr., Carlisle E. Moody, and John E. Whitley, "Re: 'What Do We Know About the Association Between Firearm Legislation and Firearm-Related Injuries?'" *American Journal of Epidemiology*, Vol. 184, No. 1, 2016, pp. 81–82.

Lott, J. R., and D. B. Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," *Journal of Legal Studies*, Vol. 26, No. 1, 1997, pp. 1–68.

Luca, Michael, Lahotra Deepak, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy,* working paper, Boston, Mass.: Harvard Business School, 2016.

MacKinnon, James G., and Matthew D. Webb, "Wild Bootstrap Inference for Wildly Different Cluster Sizes," *Journal of Applied Econometrics*, Vol. 32, No. 2, 2017, pp. 233–254.

Manning, Willard, "Comment: The Impact of Concealed-Carry Laws," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, D.C.: Brookings Institution Press, 2003, pp. 331–341.

Mill, John Stuart, *A System of Logic,* London: Parker, 1843.

National Research Council, *Firearms and Violence: A Critical Review*, Washington, D.C.: National Academies Press, 2004.

NRC—*See* National Research Council.

Plassman, Florenz, and John Whitley, "Confirming 'More Guns, Less Crime,'" *Stanford Law Review*, Vol. 55, No. 4, 2003, pp. 1313–1369.

Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Rivara, "An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates," *Injury Prevention*, Vol. 11, No. 2, 2005, pp. 77–83.

Rudolph, K. E., E. A. Stuart, J. S. Vernick, and D. W. Webster, "Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides," *American Journal of Public Health*, Vol. 105, 2015, pp. E49–E54.

Santaella-Tenorio, J., M. Cerdá, A. Villaveces, and S. Galea, "What Do We Know About the Association Between Firearm Legislation and Firearm-Related Injuries?" *Epidemiologic Reviews*, Vol. 38, No. 1, 2016, pp. 140–157.

Schell, Terry L., and Andrew R. Morral, *Evaluating Methods and Findings from a Study of State Gun Policies*, Santa Monica, Calif.: RAND Corporation, RR-1642-RC, 2016. As of January 13, 2017: http://www.rand.org/pubs/research_reports/RR1642.html

Shaffer, J. P., "Multiple Hypothesis Testing," *Annual Review of Psychology*, Vol. 46, 1995, pp. 561–584.

Vernick, J. S., and L. M. Hepburn, "State and Federal Gun Laws: Trends for 1970–1999," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence*, Washington, D.C.: Brookings Institution Press, 2003, pp. 345–402.

APPENDIX B
# Source Data Used to Produce the Forest Plot Figures

To construct the figures in this report showing estimated effect sizes (i.e., the forest plots), we used results reported as the preferred models in each study. In some cases, these sources reported incidence rate ratios (IRRs) as the estimated effect of a law and provided confidence intervals (CIs). In such cases, we used these numbers as reported. In other cases, we calculated IRRs from effects estimated in the studies as regression coefficients, and we calculated CIs from standard errors, test statistics, or reported $p$-values. Discussion of these calculations is provided in Chapter Two. Table B.1 provides the source data used in this report to calculate IRRs and CIs as presented in each forest plot figure.

**Table B.1**
**Source Data Used to Estimate Study Effect Sizes in the Forest Plot Figures**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Ludwig and Cook (2000) | Brady Act | Firearm suicide rate | Aged 21+ | 0.98 | | 0.94 | 1.02 | | | Table 1: Col 3 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Firearm suicide rate | Aged 55+ | 0.94 | | 0.90 | 0.98 | | | Table 1: Col 6 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Nonfirearm suicide rate | Aged 21+ | 1.01 | | 0.95 | 1.08 | | | Table 1: Col 3 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Nonfirearm suicide rate | Aged 55+ | 1.03 | | 0.97 | 1.11 | | | Table 1: Col 6 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Proportion of suicides with firearm | Aged 21+ | 1.17 | | 0.87 | 1.58 | | | Table 1: Col 3 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Proportion of suicides with firearm | Aged 55+ | 0.97 | | 0.94 | 0.99 | | | Table 1: Col 6 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Total suicide rate | Aged 21+ | 0.98 | | 0.93 | 1.03 | | | Table 1: Col 3 |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Total suicide rate | Aged 55+ | 0.97 | | 0.93 | 1.01 | | | Table 1: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on fugitive status | Firearm suicide rate | All ages | 0.95 | | 0.90 | 0.99 | | | Table 2: Col 4 |
| 3.1 | Sen and Panjamapirom (2012) | Check on fugitive status | Total suicide rate | All ages | 0.91 | | 0.87 | 0.95 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm suicide rate | All ages | 0.96 | | 0.92 | 0.99 | | | Table 2: Col 4 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Sen and Panjamapirom (2012) | Check on mental illness | Total suicide rate | All ages | 0.97 | | 0.95 | 0.99 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on misdemeanor | Firearm suicide rate | All ages | 0.95 | | 0.92 | 1.00 | | | Table 2: Col 4 |
| 3.1 | Sen and Panjamapirom (2012) | Check on misdemeanor | Total suicide rate | All ages | 0.98 | | 0.95 | 1.02 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Firearm suicide rate | All ages | 1.01 | | 0.97 | 1.05 | | | Table 2: Col 4 |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Total suicide rate | All ages | 1.00 | | 0.97 | 1.03 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Check on restraining order | Firearm suicide rate | All ages | 1.03 | | 0.98 | 1.09 | | | Table 2: Col 4 |
| 3.1 | Sen and Panjamapirom (2012) | Check on restraining order | Total suicide rate | All ages | 1.02 | | 0.98 | 1.06 | | | Table 2: Col 6 |
| 3.1 | Sen and Panjamapirom (2012) | Background check comprehensiveness | Firearm suicide rate | All ages | 0.98 | | 0.96 | 1.00 | | | Table 2: Col 2 |
| 3.2 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Total homicide rate | All ages | 1.05 | | 0.98 | 1.13 | | | Table 2: Col 5 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.2 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Firearm homicide rate | All ages | 1.12 | | 1.03 | 1.22 | | | Table 2: Col 3 |
| 3.2 | Sen and Panjamapirom (2012) | Background check comprehensiveness | Firearm homicide rate | All ages | 0.93 | | 0.91 | 0.96 | | | Table 2: Col 1 |
| 3.2 | Sen and Panjamapirom (2012) | Check on restraining order | Total homicide rate | All ages | 0.91 | | 0.85 | 0.98 | | | Table 2: Col 5 |
| 3.2 | Sen and Panjamapirom (2012) | Check on restraining order | Firearm homicide rate | All ages | 0.87 | | 0.79 | 0.95 | | | Table 2: Col 3 |
| 3.2 | Sen and Panjamapirom (2012) | Check on mental illness | Total homicide rate | All ages | 0.93 | | 0.86 | 0.99 | | | Table 2: Col 5 |
| 3.2 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm homicide rate | All ages | 0.93 | | 0.87 | 1.01 | | | Table 2: Col 3 |
| 3.2 | Sen and Panjamapirom (2012) | Check on fugitive status | Total homicide rate | All ages | 0.77 | | 0.71 | 0.84 | | | Table 2: Col 5 |
| 3.2 | Sen and Panjamapirom (2012) | Check on fugitive status | Firearm homicide rate | All ages | 0.79 | | 0.72 | 0.88 | | | Table 2: Col 3 |
| 3.2 | Sen and Panjamapirom (2012) | Check on misdemeanor | Total homicide rate | All ages | 1.02 | | 0.95 | 1.1 | | | Table 2: Col 5 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.2 | Sen and Panjamapirom (2012) | Check on misdemeanor | Firearm homicide rate | All ages | 0.99 | | 0.9 | 1.08 | | | Table 2: Col 3 |
| 3.2 | La Valle (2013) | Brady Act | Total homicide rate | All ages | 0.003 | 0.060 | | | | | Table 7 |
| 3.2 | La Valle (2013) | Brady Act | Firearm homicide rate | All ages | 0.022 | 0.071 | | | | | Table 7 |
| 3.2 | Gius (2015a) | State dealer background check | Gun-related murder rate | All ages | −0.683 | | | | −5.34 | | Table 2 |
| 3.2 | Gius (2015a) | State private-seller background check | Gun-related murder rate | All ages | 1.05 | | | | 7.47 | | Table 2 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Total homicide rate | Aged 21+ | 0.97 | | 0.87 | 1.08 | | | Table 1: Col 3 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Firearm homicide rate | Aged 21+ | 0.99 | | 0.86 | 1.13 | | | Table 1: Col 3 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Nonfirearm homicide rate | Aged 21+ | 0.94 | | 0.87 | 1.02 | | | Table 1: Col 3 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Proportion of homicides with firearm | Aged 21+ | 1.02 | | 0.99 | 1.04 | | | Table 1: Col 3 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Total homicide rate | Aged 55+ | 1.00 | | 0.90 | 1.12 | | | Table 1: Col 6 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Firearm homicide rate | Aged 55+ | 1.07 | | 0.97 | 1.16 | | | Table 1: Col 6 |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Nonfirearm homicide rate | Aged 55+ | 0.95 | | 0.81 | 1.12 | | | Table 1: Col 6 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3.2 | Ludwig and Cook (2000) | Brady Act | Proportion of homicides with firearm | Aged 55+ | 1.07 | | 0.98 | 1.18 | | | Table 1: Col 6 |
| 3.2 | Swanson et al. (2016) | NICS reporting (Fla.) | Violent crime arrest | No crim. disqualified | 0.62 | | 0.50 | 0.76 | | | In text (page 1071) |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Any offense | Calif. purchasers | 1.05 | | 1.04 | 1.07 | | | Table 1, row 3 |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Gun offense | Calif. purchasers | 1.21 | | 1.08 | 1.36 | | | Table 1, row 3 |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/checks | Violent offense | Calif. purchasers | 1.24 | | 1.11 | 1.39 | | | Table 1, row 3 |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all handgun sales) | Any mass shooting incident | N/A | –0.112 | 0.089 | | | | | Table C2: Col 1 |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all handgun sales) | Any mass shooting incident | N/A | –0.124 | 0.098 | | | | | Table C2: Col 2 |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all firearm sales) | Any mass shooting incident | N/A | 0.011 | 0.131 | | | | | Table C2: Col 1 |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all firearm sales) | Any mass shooting incident | N/A | –0.032 | 0.142 | | | | | Table C2: Col 2 |
| 4.1 | Lott (2010) | State/federal assault weapon ban | Total homicide | All ages | 0.004 | | | | 0.11 | | Table A6.3 |
| 4.1 | Gius (2014) | State assault weapon ban | Firearm murder rate | All ages | –0.29 | | | | –1.57 | | Table 1 |
| 4.2 | Gius (2015c) | State assault weapon ban | Mass shooting deaths | All ages | –0.59202 | | | | –2.28 | | Table 1: Col 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4.2 | Gius (2015c) | State assault weapon ban | Mass shooting injuries | All ages | 0.298 | | | | 1.16 | | Table 1: Col 2 |
| 4.2 | Luca, Deepak, and Poliquin (2016) | State assault weapon ban | Any mass shooting incident | N/A | 0.062 | 0.056 | | | | | Table C2: Col 1 |
| 4.2 | Luca, Deepak, and Poliquin (2016) | State assault weapon ban | Any mass shooting incident | N/A | 0.067 | 0.057 | | | | | Table C2: Col 2 |
| 5.1 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Total suicide rate | All ages | 0.99, 1.00 | | | | | 0.97 | Table 1 |
| 5.1 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Firearm suicide rate | All ages | 0.98, 0.95 | | | | | 0.54 | Table 1 |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Homicide | All ages | 0.0937 | 0.029 | | | | | Table 5: Col 3 |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Burglary | All ages | 0.0223 | 0.0223 | | | | | Table 4: Col 3 |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Robbery | All ages | 0.0262 | 0.0229 | | | | | Table 4: Col 3 |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Aggravated assault | All ages | 0.0372 | 0.0319 | | | | | Table 4: Col 3 |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Total homicide rate | All ages | 0.102 | 0.183 | | | | | Corrected Supplement Table 3 |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Firearm homicide rate | All ages | 0.16 | 0.17 | | | | | Corrected Supplement Table 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Nonfirearm homicide rate | All ages | 0.01 | 0.1 | | | | | Corrected Supplement Table 2 |
| 5.2 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Total homicide rate | All ages | 1.24, 1.06 | | | | | 0.001 | Table 1 |
| 5.2 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Firearm homicide rate | All ages | 1.32, 1.08 | | | | | 0.001 | Table 1 |
| 5.3 | Cheng and Hoekstra (2013) | Castle doctrine law | Justifiable homicide | All ages | 0.283 | 0.235 | | | | | Table 6: Panel E: Col 3 |
| 6.1 | Sen and Panjamapirom (2012) | Check on mental illness | Total suicide rate | All ages | 0.97 | | 0.95 | 0.99 | | | Table 2: Col 6 |
| 6.1 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm suicide rate | All ages | 0.96 | | 0.92 | 0.99 | | | Table 2: Col 4 |
| 6.2 | Sen and Panjamapirom (2012) | Check on mental illness | Total homicide rate | All ages | 0.93 | | 0.86 | 0.99 | | | Table 2: Col 5 |
| 6.2 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm homicide rate | All ages | 0.93 | | 0.87 | 1.01 | | | Table 2: Col 3 |
| 6.2 | Swanson et al. (2016) | NICS reporting (Fla.) | Violent crime arrest | No crim. disqualified | 0.62 | | 0.50 | 0.76 | | | In text (p. 1071) |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Total suicide rate | Aged 14–17 | 1.06 | | 0.92 | 1.23 | | | Table 2: Col 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Total suicide rate | Aged 18–20 | 1.18 | | 1.04 | 1.34 | | | Table 2: Col 2 |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Firearm suicide rate | Aged 14–17 | 0.92 | | 0.76 | 1.10 | | | Table 2: Col 1 |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Firearm suicide rate | Aged 18–20 | 1.22 | | 1.04 | 1.43 | | | Table 2: Col 2 |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Nonfirearm suicide rate | Aged 14–17 | 1.27 | | 1.00 | 1.61 | | | Table 2: Col 1 |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Nonfirearm suicide rate | Aged 18–20 | 1.14 | | 0.93 | 1.39 | | | Table 2: Col 2 |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Total suicide rate | All ages | 1.01 | | 0.95 | 1.08 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Firearm suicide rate | All ages | 0.88 | | 0.81 | 0.96 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Nonfirearm suicide rate | All ages | 1.14 | | 1.05 | 1.24 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Total suicide rate | All ages | 1.03 | | 0.97 | 1.08 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Firearm suicide rate | All ages | 1.02 | | 0.96 | 1.09 | | | Appendix Table 2 |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Nonfirearm suicide rate | All ages | 1.03 | | 0.95 | 1.11 | | | Appendix Table 2 |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Total homicide rate | All ages | 1.08 | 0.16 | | | | | Corrected Table 2 |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Firearm homicide rate | All ages | 1.18 | 0.13 | | | | | Corrected Table 2 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Nonfirearm homicide rate | All ages | −0.08 | 0.1 | | | | | Corrected Table 2 |
| 8.2 | Rudolph et al. (2015) | Connecticut permit-to-purchase | Firearm homicide rate | All ages | 0.60 | | | | | 0.04 | In text (p. e51) and Table 2, "2xMSPE" |
| 8.3 | Luca, Deepak, and Poliquin (2016) | Handgun permit system | Any mass shooting incident (no political controls) | All ages | −0.009 | 0.115 | | | | | Table C2: Col 1 |
| 8.3 | Luca, Deepak, and Poliquin (2016) | Handgun permit system | Any mass shooting incident (political controls) | All ages | 0.004 | 0.117 | | | | | Table C2: Col 2 |
| 10.1 | Cummings et al. (1997a) | CAP law | Firearm suicide rate | Aged 0–14 | 0.81 | | 0.66 | 1.01 | | | In text (p. 1085) |
| 10.1 | Cummings et al. (1997a) | CAP law | Nonfirearm suicide rate | Aged 0–14 | 0.95 | | 0.75 | 1.2 | | | In text (p. 1085) |
| 10.1 | Webster et al. (2004) | CAP law | Total suicide rate | Aged 14–17 | 0.92 | | 0.86 | 0.98 | | | Table 2: Col 1 |
| 10.1 | Webster et al. (2004) | CAP law | Total suicide rate | Aged 18–20 | 0.89 | | 0.85 | 0.93 | | | Table 2: Col 2 |
| 10.1 | Webster et al. (2004) | CAP law | Firearm suicide rate | Aged 14–17 | 0.89 | | 0.83 | 0.96 | | | Table 2: Col 1 |
| 10.1 | Webster et al. (2004) | CAP law | Firearm suicide rate | Aged 18–20 | 0.87 | | 0.82 | 0.92 | | | Table 2: Col 2 |
| 10.1 | Webster et al. (2004) | CAP law | Nonfirearm suicide rate | Aged 14–17 | 1.00 | | 0.91 | 1.10 | | | Table 2: Col 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.1 | Webster et al. (2004) | CAP law | Nonfirearm suicide rate | Aged 18–20 | 0.91 | | 0.85 | 0.98 | | | Table 2: Col 2 |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage (11 states) | Firearm self-inflicted injury rate | Aged 0–17 | −1.165 | 0.339 | | | | | Table 3: Col 3 |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage (11 states) | Firearm self-inflicted injury rate | Aged 18+ | −0.003 | 0.228 | | | | | Table 3: Col 4 |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Firearm self-inflicted injury rate | Aged 0–17 | −1.06 | 0.296 | | | | | Table 3: Col 1 |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Firearm self-inflicted injury rate | Aged 18+ | 0.161 | 0.227 | | | | | Table 3: Col 2 |
| 10.1 | Gius (2015b) | CAP law | Firearm suicide rate | Aged 0–19 | −0.218 | | | | −4.36 | | Table 4 |
| 10.2 | Cummings et al. (1997a) | CAP law | Firearm homicide rate | Aged 0–14 | 0.89 | | 0.76 | 1.05 | | | In text (p. 1085) |
| 10.2 | Cummings et al. (1997a) | CAP law | Nonfirearm homicide rate | Aged 0–14 | 0.96 | | 0.86 | 1.06 | | | In text (p. 1085) |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Murder rate | All ages | 0.039 | | | | 1.141 | | Table 3: Col 2 |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Rape rate | All ages | 0.092 | | | | 3.357 | | Table 3: Col 3 |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Robbery rate | All ages | 0.1056 | | | | 2.823 | | Table 3: Col 4 |

350   The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of U.S. Policies

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.2 | Lott and Whitley (2001) | Safe storage law | Assault rate | All ages | −0.041 | | | | 1.493 | | Table 3: Col 5 |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 0–14 | 0.77 | | 0.63 | 0.94 | | | In text (p. 1085) |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 15–19 | 0.91 | | 0.77 | 1.08 | | | In text (p. 1085) |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 20–24 | 0.84 | | 0.68 | 1.03 | | | In text (p. 1085) |
| 10.3 | Webster and Starnes (2000) | CAP law | Unintentional firearm death rate | Aged 0–14 | 0.83 | | 0.71 | 0.97 | | | Table 1 |
| 10.3 | Webster and Starnes (2000) | Felony CAP law | Unintentional firearm death rate | Aged 0–14 | 0.69 | | 0.56 | 0.85 | | | Table 1 |
| 10.3 | Webster and Starnes (2000) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 0–14 | 1.00 | | 0.81 | 1.22 | | | Table 1 |
| 10.3 | Webster and Starnes (2000) | Florida CAP law | Unintentional firearm death rate | Aged 0–14 | 0.49 | | 0.25 | 0.69 | | | Table 1 |
| 10.3 | Webster and Starnes (2000) | Non-Florida CAP law | Unintentional firearm death rate | Aged 0–14 | 0.95 | | 0.80 | 1.12 | | | Table 1 |
| 10.3 | Hepburn et al. (2006) | CAP law | Unintentional firearm death rate | Aged 0–14 | 0.78 | | 0.61 | 0.99 | | | Table 3: Col 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.3 | Hepburn et al. (2006) | CAP law | Unintentional firearm death rate | Aged 55–74 | 0.88 | | 0.63 | 1.22 | | | Table 3: Col 2 |
| 10.3 | Hepburn et al. (2006) | Felony CAP law | Unintentional firearm death rate | Aged 0–14 | 0.64 | | 0.46 | 0.89 | | | Table 3: Col 1 |
| 10.3 | Hepburn et al. (2006) | Felony CAP law | Unintentional firearm death rate | Aged 55–74 | 0.90 | | 0.72 | 1.12 | | | Table 3: Col 2 |
| 10.3 | Hepburn et al. (2006) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 0–14 | 0.93 | | 0.76 | 1.13 | | | Table 3: Col 1 |
| 10.3 | Hepburn et al. (2006) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 55–74 | 0.88 | | 0.54 | 1.44 | | | Table 3: Col 2 |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Fla.) | Unintentional firearm death rate | Aged 0–14 | 0.86 | | 0.72 | 1.03 | | | Table 3: Col 1 |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Fla.) | Unintentional firearm death rate | Aged 55–74 | 0.87 | | 0.61 | 1.28 | | | Table 3: Col 2 |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Calif.) | Unintentional firearm death rate | Aged 0–14 | 0.77 | | 0.56 | 1.06 | | | Table 3: Col 1 |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Calif.) | Unintentional firearm death rate | Aged 55–74 | 0.86 | | 0.45 | 1.27 | | | Table 3: Col 2 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10.3 | Gius (2015b) | CAP law | Unintentional firearm death rate | Aged 0–19 | −0.036 | | | | −0.8 | | Table 5 |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | CAP law, negligent storage (11 states) | Unintentional firearm injury rate | Aged 0–17 | −0.273 | 0.184 | | | | | Table 3: Col 3 |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | CAP law, negligent storage (11 states) | Unintentional firearm injury rate | Aged 18+ | −0.343 | 0.143 | | | | | Table 3: Col 4 |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Unintentional firearm injury rate | Aged 0–17 | −0.191 | 0.154 | | | | | Table 3: Col 1 |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Unintentional firearm injury rate | Aged 18+ | −0.283 | 0.121 | | | | | Table 3: Col 2 |
| 10.4 | Lott (2003) | Safe storage law | Shooting fatalities and injuries | All ages | 1.073774 | | | | 0.459 | | Appendix Table 6.2: Col 3 |
| 10.4 | Lott (2003) | Safe storage law | Number of shooting incidents | All ages | 0.8250622 | | | | 0.628 | | Appendix Table 6.2: Col 4 |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Total IPH rate | All ages | 0.95 | | 0.87 | 1.04 | | | Table 5: Panel 1 |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Firearm IPH rate | All ages | 0.94 | | 0.83 | 1.07 | | | Table 5: Panel 1 |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Total IPH rate | Female victims | 0.98 | | 0.89 | 1.09 | | | Table 5: Panel 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Firearm IPH rate | Female victims | 0.96 | | 0.82 | 1.11 | | | Table 5: Panel 1 |
| 11.1 | Zeoli and Webster (2010) | Confiscation law | Total IPH rate | All ages | 1.10 | | 0.92 | 1.31 | | | Table 1 |
| 11.1 | Zeoli and Webster (2010) | Confiscation law | Firearm IPH rate | All ages | 1.19 | | 0.97 | 1.46 | | | Table 1 |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | All intimate partners | −0.0667 | 0.0309 | | | | | Table 3: Model 3 |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | Female IPH victims | −0.136 | 0.0443 | | | | | Table 3: Model 3 |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | Male IPH victims | 0.0053 | 0.0312 | | | | | Table 3: Model 3 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Total suicide rate | Aged 14–17 | 1.04 | | 0.90 | 1.21 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Total suicide rate | Aged 18–20 | 0.97 | | 0.91 | 1.05 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Firearm suicide rate | Aged 14–17 | 1.04 | | 0.87 | 1.16 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Firearm suicide rate | Aged 18–20 | 0.91 | | 0.83 | 1.00 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Nonfirearm suicide rate | Aged 14–17 | 1.05 | | 0.85 | 1.31 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Nonfirearm suicide rate | Aged 18–20 | 1.05 | | 0.94 | 1.17 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Total suicide rate | Aged 14–17 | 0.97 | | 0.90 | 1.05 | | | Table 2: Col 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Webster et al. (2004) | State minimum possession age | Total suicide rate | Aged 18–20 | 1.13 | | 1.01 | 1.27 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Firearm suicide rate | Aged 14–17 | 1.02 | | 0.92 | 1.12 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Firearm suicide rate | Aged 18–20 | 1.14 | | 0.98 | 1.34 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Nonfirearm suicide rate | Aged 14–17 | 0.93 | | 0.82 | 1.05 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | State minimum possession age | Nonfirearm suicide rate | Aged 18–20 | 1.07 | | 0.90 | 1.27 | | | Table 2: Col 2 |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Total suicide rate | Aged 14–17 | 1.02 | | 0.91 | 1.14 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Firearm suicide rate | Aged 14–17 | 1.00 | | 0.87 | 1.16 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Nonfirearm suicide rate | Aged 14–17 | 1.08 | | 0.91 | 1.28 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Total suicide rate | Aged 14–17 | 0.98 | | 0.90 | 1.08 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Firearm suicide rate | Aged 14–17 | 0.99 | | 0.89 | 1.09 | | | Table 2: Col 1 |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Nonfirearm suicide rate | Aged 14–17 | 1.12 | | 0.99 | 1.26 | | | Table 2: Col 1 |
| 12.1 | Gius (2015b) | State minimum possession age | Firearm suicide rate | Aged 0–19 | −0.046 | | | | −1.05 | | Table 4 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | All ages | 1.02 | | 0.98 | 1.07 | | | Table 4 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | Aged 0–19 | 1.1 | | 0.94 | 1.29 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | Aged 20+ | 1.04 | | 0.99 | 1.1 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | All ages | 1 | | 0.94 | 1.06 | | | Table 4 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | Aged 0–19 | 0.94 | | 0.8 | 1.06 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | Aged 20+ | 1.02 | | 0.96 | 1.08 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | All ages | 1.03 | | 0.96 | 1.11 | | | Table 4 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | Aged 0–19 | 1.15 | | 0.93 | 1.42 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | Aged 20+ | 1.04 | | 0.95 | 1.13 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | All ages | 0.99 | | 0.88 | 1.13 | | | Table 4 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | Aged 0–19 | 0.93 | | 0.77 | 1.12 | | | Table 3 |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | Aged 20+ | 0.99 | | 0.88 | 1.13 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | All ages | 1 | | 0.94 | 1.05 | | | Table 2 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | Aged 0–19 | 0.92 | | 0.81 | 1.05 | | | Table 3 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | Aged 20+ | 1.01 | | 0.95 | 1.06 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | All ages | 0.98 | | 0.91 | 1.06 | | | Table 2 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | Aged 0–19 | 0.92 | | 0.8 | 1.06 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | Aged 20+ | 0.99 | | 0.93 | 1.06 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | All ages | 1.02 | | 0.89 | 1.18 | | | Table 2 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | Aged 0–19 | 0.98 | | 0.79 | 1.2 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | Aged 20+ | 1.03 | | 0.88 | 1.2 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | All ages | 1.06 | | 0.88 | 1.27 | | | Table 2 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | Aged 0–19 | 0.91 | | 0.72 | 1.15 | | | Table 3 |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | Aged 20+ | 1.08 | | 0.89 | 1.31 | | | Table 3 |
| 12.2 | Rudolph et al. (2015) | State minimum purchase age of 21 | Firearm homicide rate | All ages | 0.6 | | | | | 0.04 | In text (p. e51) and Table 2, "2xMSPE" |
| 12.3 | Gius (2015b) | State minimum possession age | Unintentional firearm death rate | Aged 0–19 | –0.0636 | | | | –1.6 | | Table 5 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 18 | Any mass shooting incident | N/A | 0.007 | 0.025 | | | | | Table C2: Col 1 |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 18 | Any mass shooting incident | N/A | 0.01 | 0.026 | | | | | Table C2: Col 2 |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 21 | Any mass shooting incident | N/A | −0.059 | 0.051 | | | | | Table C2: Col 1 |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 21 | Any mass shooting incident | N/A | −0.075 | 0.051 | | | | | Table C2: Col 2 |
| 13.1 | Rosengart et al. (2005) | Shall-issue law | Total suicide rate | All ages | 0.98 | | 0.96 | 1.01 | | | Table 4 |
| 13.1 | Rosengart et al. (2005) | Shall-issue law | Firearm suicide rate | All ages | 1 | | 0.97 | 1.02 | | | Table 4 |
| 13.1 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Self-inflicted firearm injury rate | Aged 0–17 | 0.662 | 0.747 | | | | | Table 5 |
| 13.1 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Self-inflicted firearm injury rate | Aged 18+ | 0.742 | 0.163 | | | | | Table 6 |
| 13.2 | Rosengart et al. (2005) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | 1.07 | | 0.98 | 1.17 | | | Table 2 |
| 13.2 | Rosengart et al. (2005) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | 1.11 | | 0.99 | 1.24 | | | Table 2 |
| 13.2 | Grambsch (2008) | Shall-issue vs. no CC (random effects) | Murder rate | All ages | 0.005 | 0.011 | | | | | Table 3 |
| 13.2 | Grambsch (2008) | Shall-issue vs. no CC (fixed effects) | Murder rate | All ages | 0.06 | 0.015 | | | | | Table 3 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.2 | French and Heagerty (2008) | Shall-issue law vs. no CC | Firearm homicide rate | All ages | 1.101 | | 0.993 | 1.22 | | | In text (p. 14) |
| 13.2 | Roberts (2009) | May-issue vs. shall-issue | Total IPH rate | All ages | 1.7128 | 0.216 | | | | | Table 2 |
| 13.2 | Roberts (2009) | No CC vs. shall-issue | Total IPH rate | All ages | 0.9621 | 0.212 | | | | | Table 2 |
| 13.2 | Roberts (2009) | May-issue vs. shall-issue | Firearm IPH rate | All ages | 1.1202 | 0.128 | | | | | Table 3 |
| 13.2 | Roberts (2009) | No CC vs. shall-issue | Firearm IPH rate | All ages | 0.8608 | 0.19 | | | | | Table 3 |
| 13.2 | La Valle and Glover (2012) | May-issue | Total homicide rate | All ages | −0.214 | 0.065 | | | | | Table 8 |
| 13.2 | La Valle and Glover (2012) | Shall-issue | Total homicide rate | All ages | 0.206 | 0.08 | | | | | Table 8 |
| 13.2 | La Valle and Glover (2012) | May-issue | Firearm homicide rate | All ages | −0.263 | 0.08 | | | | | Table 7 |
| 13.2 | La Valle and Glover (2012) | Shall-issue | Firearm homicide rate | All ages | 0.274 | 0.075 | | | | | Table 7 |
| 13.2 | La Valle (2013) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | −0.137 | 0.062 | | | | | Table 7 |
| 13.2 | La Valle (2013) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | −0.166 | 0.073 | | | | | Table 7 |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | 0.38 | 0.23 | | | | | Corrected Supplement Table 3 |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | 0.25 | 0.21 | | | | | Corrected Supplement Table 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Nonfirearm homicide rate | All ages | 0.21 | 0.12 | | | | | Corrected Supplement Table 2 |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Murder/manslaughter rate | All ages | 0.58 | 0.42 | | | | | Corrected Supplement Table 4 |
| 13.2 | Gius (2014) | Restrictive vs. lenient CC laws | Firearm murder rate | All ages | 0.365 | | | | 3.74 | | Table 1 |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Murder rate | All ages | 0.0331 | 0.0651 | | | | | Table 8A |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Rape rate | All ages | 0.1153 | 0.0573 | | | | | Table 8A |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Robbery rate | All ages | 0.1385 | 0.0803 | | | | | Table 8A |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Assault rate | All ages | 0.0803 | 0.0446 | | | | | Table 8A |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Violent crime | All ages | −0.0566 | | | | −3.067 | | Table 6: Model V |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Murder rate | All ages | −0.0492 | | | | −1.696 | | Table 6: Model V |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Rape rate | All ages | −0.0161 | | | | −0.739 | | Table 6: Model V |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Aggravated Assault | All ages | −0.0705 | | | | −2.927 | | Table 6: Model V |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Robbery rate | All ages | −0.0385 | | | | −1.322 | | Table 6: Model V |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Murder rate | All ages | –0.003 | | | | 1.52 | | Table 3 |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Rape rate | All ages | –0.002 | | | | 0.99 | | Table 3 |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Robbery rate | All ages | 0.001 | | | | 0.55 | | Table 3 |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Assault rate | All ages | 0 | | | | 0.05 | | Table 3 |
| 13.3 | Lott and Mustard (1997) | Shall-issue law | Unintentional handgun death rate | All ages | 0.00478 | | | | 0.096 | | Table 18: Col 1 |
| 13.3 | Lott and Mustard (1997) | Shall-issue law | Unintentional nonhandgun death rate | All ages | 0.098 | | | | 1.706 | | Table 18: Col 2 |
| 13.3 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Unintentional firearm injury rate | Aged 0–17 | 0.53 | 0.364 | | | | | Table 5 |
| 13.3 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Unintentional firearm injury rate | Aged 18+ | 0.823 | 0.191 | | | | | Table 6 |
| 13.4 | Lott (2003) | Shall-issue law | Multiple-victim gun deaths, injuries | All ages | 0.2151 | | | | 9.609 | | Appendix Table 6.2: Col 3 |
| 13.4 | Lott (2003) | Shall-issue law | No. of multiple-victim gun incidents | All ages | 0.3280486 | | | | 3.82 | | Appendix Table 6.2: Col 4 |
| 13.4 | Luca, Deepak, and Poliquin (2016) | Permitless carry | Any mass shooting incident | All ages | 0.152 | 0.182 | | | | | Table C2: Col 1 |

**Table B.1—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Estimate | Standard Error | Lower CI | Upper CI | Test Statistic | p | Source Table |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13.4 | Luca, Deepak, and Poliquin (2016) | Permitless carry | Any mass shooting incident | All ages | 0.207 | 0.18 | | | | | Table C2: Col 2 |
| 13.4 | Luca, Deepak and Poliquin (2016) | Shall-issue law | Any mass shooting incident | All ages | –0.011 | 0.039 | | | | | Table C2: Col 1 |
| 13.4 | Luca, Deepak and Poliquin (2016) | Shall-issue law | Any mass shooting incident | All ages | –0.009 | 0.038 | | | | | Table C2: Col 2 |
| 13.5 | Duggan (2001) | Right-to-carry laws | Gun ownership | None | 0.0038 | 0.0099 | | | | | Table 10: Col 3 |

NOTE: CAP = child-access prevention; CC = concealed carry; Col = column; IPH = intimate partner homicide; N/A = not applicable; NICS = National Instant Criminal Background Check System.

Table B.2 shows the most-common methodological concerns we identified for analyses included in this report's forest plot figures. When we identified no such concerns for a study, the forest plots show that study's IRR values with green circles (see, for example, Figure 3.1). In Table B.2, we identify five categories of concerns:

- The *Parameter* column identifies with an *X* the analyses we believed to have been performed with fewer than ten observations per parameter estimate. In several cases, models with random effects were conducted, but no estimate of the effective number of parameters was reported. In these cases, we guessed that the effective number of random effect parameters was about half the total number of random effects. This resulted in none of the random effects models having fewer than ten observations per parameter estimate.

- The *Tx Units* column identifies the analyses that we believed identified a causal effect with three or fewer units (states, usually) exposed to the law.

- The *Cluster* column identifies the analyses that appeared to make no adjustments to the standard error to account for either serial correlation in the longitudinal data or heteroscedasticity. We were sparing in assigning this concern to analyses, giving credit for some type of standard error adjustment even when papers reported, for instance, having checked for the presence of serial correlation or performing adjustments of doubtful validity. Studies that made no reference to any type of adjustment or check are identified with this concern.

- The *Model* column identifies the analyses that reported results from models we believe may have been misspecified. We assigned this concern to just two types of models: those using ordinary least squares (OLS) to model dichotomous outcomes and those using OLS to model rates, many of which are close to zero. We did not assign this concern to OLS models of logged rate values, although this too is problematic.

- The *Other* column identifies studies with other methodological features that raised significant concerns for us. It was often the case that studies had multiple idiosyncratic methodological features that concerned us. However, we did not assign the *Other* concern to studies that had already been identified as having one of the other four common concerns. When a study is listed as having an *Other* concern, that concern is described in the text of the report whenever the study is discussed.

**Table B.2**
**Methodological Concerns Identified for Analyses Included in the Report's Forest Plot Figures**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Ludwig and Cook (2000) | Brady Act | Firearm suicide rate | Aged 21+ | X | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Firearm suicide rate | Aged 55+ | X | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Nonfirearm suicide rate | Aged 21+ | X | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Nonfirearm suicide rate | Aged 55+ | X | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Proportion of suicides with firearm | Aged 21+ | X | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Proportion of suicides with firearm | Aged 55+ | X | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Total suicide rate | Aged 21+ | X | | | | |
| 3.1 | Ludwig and Cook (2000) | Brady Act | Total suicide rate | Aged 55+ | X | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on fugitive status | Firearm suicide rate | All ages | | X | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on fugitive status | Total suicide rate | All ages | | X | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on mental illness | Total suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on misdemeanor | Firearm suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on misdemeanor | Total suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Firearm suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Total suicide rate | All ages | | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 3.1 | Sen and Panjamapirom (2012) | Check on restraining order | Firearm suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on restraining order | Total suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Background check comprehensiveness | Firearm suicide rate | All ages | | | | | |
| 3.1 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Total homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on "other miscellaneous" records | Firearm homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Background check comprehensiveness | Firearm homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on restraining order | Total homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on restraining order | Firearm homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on mental illness | Total homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on fugitive status | Total homicide rate | All ages | | X | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on fugitive status | Firearm homicide rate | All ages | | X | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on misdemeanor | Total homicide rate | All ages | | | | | |
| 3.2 | Sen and Panjamapirom (2012) | Check on misdemeanor | Firearm homicide rate | All ages | | | | | |
| 3.2 | La Valle (2013) | Brady Act | Total homicide rate | All ages | | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 3.2 | La Valle (2013) | Brady Act | Firearm homicide rate | All ages | | | | | |
| 3.2 | Gius (2015a) | State dealer background check | Gun-related murder rate | All ages | | | | X | |
| 3.2 | Gius (2015a) | State private-seller background check | Gun-related murder rate | All ages | | X | | X | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Total homicide rate | Aged 21+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Firearm homicide rate | Aged 21+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Nonfirearm homicide rate | Aged 21+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Proportion of homicides with a firearm | Aged 21+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Total homicide rate | Aged 55+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Firearm homicide rate | Aged 55+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Nonfirearm homicide rate | Aged 55+ | X | | | | |
| 3.2 | Ludwig and Cook (2000) | Brady Act | Proportion of homicides with a firearm | Aged 55+ | X | | | | |
| 3.2 | Swanson et al. (2016) | NICS reporting (Fla.) | Violent crime arrest | No crim. disqualified | | X | | | |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/ checks | Any offense | Calif. purchasers | | | | | |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/ checks | Gun offense | Calif. purchasers | | | | | |
| 3.2 | Wright, Wintemute, and Rivara (1999) | No felony prohibition/ checks | Violent offense | Calif. purchasers | | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all handgun sales) | Any mass shooting incident | N/A | | | X | X | X |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all handgun sales) | Any mass shooting incident | N/A | | | | X | |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all firearm sales) | Any mass shooting incident | N/A | | | | X | |
| 3.3 | Luca, Deepak, and Poliquin (2016) | Background check (all firearm sales) | Any mass shooting incident | N/A | | | | X | |
| 4.1 | Lott (2010) | State/federal assault weapon bans | Total homicide | All ages | X | | X | | |
| 4.1 | Gius (2014) | State assault weapons ban | Firearm murder rate | All ages | | | X | X | |
| 4.2 | Gius (2015c) | State assault weapons ban | Mass shooting deaths | All ages | | | X | | |
| 4.2 | Gius (2015c) | State assault weapons ban | Mass shooting injuries | All ages | | | X | | |
| 4.2 | Luca, Deepak, and Poliquin (2016) | State assault weapons ban | Any mass shooting incident | N/A | | | | X | |
| 4.2 | Luca, Deepak, and Poliquin (2016) | State assault weapons ban | Any mass shooting incident | N/A | | | | X | |
| 5.1 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Total suicide rate | All ages | | X | | | |
| 5.1 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Firearm suicide rate | All ages | | X | | | |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Homicide | All ages | X | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Burglary | All ages | X | | | | |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Robbery | All ages | X | | | | |
| 5.2 | Cheng and Hoekstra (2013) | Castle doctrine law | Aggravated assault | All ages | X | | | | |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Total homicide rate | All ages | X | X | | | X |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Firearm homicide rate | All ages | X | X | | | X |
| 5.2 | Webster, Crifasi, and Vernick (2014) | Stand-your-ground law | Nonfirearm homicide rate | All ages | X | X | | | X |
| 5.2 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Total homicide rate | All ages | | X | | | |
| 5.2 | Humphreys, Gasparrini, and Wiebe (2017) | Stand-your-ground law | Firearms homicide rate | All ages | | X | | | |
| 5.3 | Cheng and Hoekstra (2013) | Castle doctrine law | Justifiable homicide | All ages | X | | | | |
| 6.1 | Sen and Panjamapirom (2012) | Check on mental illness | Total suicide rate | All ages | | | | | |
| 6.1 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm suicide rate | All ages | | | | | |
| 6.2 | Sen and Panjamapirom (2012) | Check on mental illness | Total homicide rate | All ages | | | | | |
| 6.2 | Sen and Panjamapirom (2012) | Check on mental illness | Firearm homicide rate | All ages | | | | | |
| 6.2 | Swanson et al. (2016) | NICS reporting (Fla.) | Violent crime arrest | No crim. disqualified | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Total suicide rate | Aged 14–17 | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Total suicide rate | Aged 18–20 | | X | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Firearm suicide rate | Aged 14–17 | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Firearm suicide rate | Aged 18–20 | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Nonfirearm suicide rate | Aged 14–17 | | X | | | |
| 8.1 | Webster et al. (2004) | Permit-to-purchase law | Nonfirearm suicide rate | Aged 18–20 | | X | | | |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Total suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Firearm suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Permit-to-purchase law | Nonfirearm suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Total suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Firearm suicide rate | All ages | | X | | | |
| 8.1 | Crifasi et al. (2015) | Repeal of Missouri permit-to-purchase | Nonfirearm suicide rate | All ages | | X | | | |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Total homicide rate | All ages | X | | | X | |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Firearm homicide rate | All ages | X | | | X | |
| 8.2 | Webster, Crifasi, and Vernick (2014) | Repeal of Missouri permit-to-purchase | Nonfirearm homicide rate | All ages | X | | | X | |
| 8.2 | Rudolph et al. (2015) | Connecticut permit-to-purchase | Firearm homicide rate | All ages | | X | | | |
| 8.3 | Luca, Deepak, and Poliquin (2016) | Handgun permit system | Any mass shooting incident | All ages | | | | X | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 8.3 | Luca, Deepak, and Poliquin (2016) | Handgun permit system | Any mass shooting incident | All ages | | | | | X |
| 10.1 | Cummings et al. (1997a) | CAP law | Firearm suicide rate | Aged 0–14 | | | | | |
| 10.1 | Cummings et al. (1997a) | CAP law | Nonfirearm suicide rate | Aged 0–14 | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Total suicide rate | Aged 14–17 | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Total suicide rate | Aged 18–20 | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Firearm suicide rate | Aged 14–17 | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Firearm suicide rate | Aged 18–20 | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Nonfirearm suicide rate | Aged 14–17 | | | | | |
| 10.1 | Webster et al. (2004) | CAP law | Nonfirearm suicide rate | Aged 18–20 | | | | | |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage (11 states) | Firearm self-inflicted injury rate | Aged 0–17 | | | | | X |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage (11 states) | Firearm self-inflicted injury rate | Aged 18+ | | | | | X |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Firearm self-inflicted injury rate | Aged 0–17 | | | | | X |
| 10.1 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Firearm self-inflicted injury rate | Aged 18+ | | | | | X |
| 10.1 | Gius (2015b) | CAP law | Firearm suicide rate | Aged 0–19 | | | | X | |
| 10.2 | Cummings et al. (1997a) | CAP law | Firearm homicide rate | Aged 0–14 | | | | | |
| 10.2 | Cummings et al. (1997a) | CAP law | Nonfirearm homicide rate | Aged 0–14 | | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 10.2 | Lott and Whitley (2001) | Safe storage law | Murder rate | All ages | X | | X | X | X |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Rape rate | All ages | X | | X | X | X |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Robbery rate | All ages | X | | X | X | X |
| 10.2 | Lott and Whitley (2001) | Safe storage law | Assault rate | All ages | X | | X | X | X |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 15–19 | | | | | |
| 10.3 | Cummings et al. (1997a) | CAP law | Unintentional firearm death rate | Aged 20–24 | | | | | |
| 10.3 | Webster and Starnes (2000) | CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | |
| 10.3 | Webster and Starnes (2000) | Felony CAP law | Unintentional firearm death rate | Aged 0–14 | | X | | | |
| 10.3 | Webster and Starnes (2000) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | |
| 10.3 | Webster and Starnes (2000) | Florida CAP law | Unintentional firearm death rate | Aged 0–14 | | X | | | |
| 10.3 | Webster and Starnes (2000) | Non-Florida CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | |
| 10.3 | Hepburn et al. (2006) | CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law | Unintentional firearm death rate | Aged 55–74 | | | | | X |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 10.3 | Hepburn et al. (2006) | Felony CAP law | Unintentional firearm death rate | Aged 0–14 | | X | | | X |
| 10.3 | Hepburn et al. (2006) | Felony CAP law | Unintentional firearm death rate | Aged 55–74 | | X | | | X |
| 10.3 | Hepburn et al. (2006) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 0–14 | | | | | X |
| 10.3 | Hepburn et al. (2006) | Misdemeanor CAP law | Unintentional firearm death rate | Aged 55–74 | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Fla.) | Unintentional firearm death rate | Aged 0–14 | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Fla.) | Unintentional firearm death rate | Aged 55–74 | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Calif.) | Unintentional firearm death rate | Aged 0–14 | | | | | X |
| 10.3 | Hepburn et al. (2006) | CAP law (exclude Calif.) | Unintentional firearm death rate | Aged 55–74 | | | | | X |
| 10.3 | Gius (2015b) | CAP law | Unintentional firearm death rate | Aged 0–19 | | | | X | |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | CAP law, negligent storage (11 states) | Unintentional firearm injury rate | Aged 0–17 | | | | | X |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | CAP law, negligent storage (11 states) | Unintentional firearm injury rate | Aged 18+ | | | | | X |
| 10.3 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Unintentional firearm injury rate | Aged 0–17 | | | | | X |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 10.3 | DeSimone, Markowitz, and Xu (2013) | Negligent storage or reckless provision (11 states) | Unintentional firearm injury rate | Aged 18+ | | | | | X |
| 10.4 | Lott (2003) | Safe storage law | Shooting fatalities + injuries | All ages | X | X | | | |
| 10.4 | Lott (2003) | Safe storage law | Number of shooting incidents | All ages | X | X | | | |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Total IPH rate | All ages | | | | | |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Firearm IPH rate | All ages | | | | | |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Total IPH rate | Female victims | | | | | |
| 11.1 | Vigdor and Mercy (2006) | Confiscation law | Firearm IPH rate | Female victims | | | | | |
| 11.1 | Zeoli and Webster (2010) | Confiscation law | Total IPH rate | All ages | | | | | |
| 11.1 | Zeoli and Webster (2010) | Confiscation law | Firearm IPH rate | All ages | | | | | |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | All intimate partners | | | | X | |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | Female IPH victims | | | | X | |
| 11.1 | Raissian (2016) | Gun Control Act expansion | Firearm IPH rate | Male IPH victims | | | | X | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Total suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Total suicide rate | Aged 18–20 | | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Webster et al. (2004) | State minimum purchase age | Firearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Firearm suicide rate | Aged 18–20 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Nonfirearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum purchase age | Nonfirearm suicide rate | Aged 18–20 | | | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Total suicide rate | Aged 14–17 | | X | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Total suicide rate | Aged 18–20 | | X | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Firearm suicide rate | Aged 14–17 | | X | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Firearm suicide rate | Aged 18–20 | | X | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Nonfirearm suicide rate | Aged 14–17 | | X | | | |
| 12.1 | Webster et al. (2004) | State minimum possession age | Nonfirearm suicide rate | Aged 18–20 | | X | | | |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Total suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Firearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum purchase age | Nonfirearm suicide rate | Aged 14–17 | | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Total suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Firearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Webster et al. (2004) | Federal minimum possession age | Nonfirearm suicide rate | Aged 14–17 | | | | | |
| 12.1 | Gius (2015b) | State minimum possession age | Firearm suicide rate | Aged 0–19 | | | | | X |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | All ages | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | Aged 0–19 | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total suicide rate | Aged 20+ | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | All ages | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | Aged 0–19 | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm suicide rate | Aged 20+ | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | All ages | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | Aged 0–19 | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Total suicide rate | Aged 20+ | X | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | All ages | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | Aged 0–19 | X | | | | |
| 12.1 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm suicide rate | Aged 20+ | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | All ages | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | Aged 0–19 | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Total homicide rate | Aged 20+ | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | All ages | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | Aged 0–19 | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum purchase age of 21 | Firearm homicide rate | Aged 20+ | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | All ages | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | Aged 0–19 | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Total homicide rate | Aged 20+ | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | All ages | X | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | Aged 0–19 | X | | | | |
| 12.2 | Rosengart et al. (2005) | State minimum possession age of 21 | Firearm homicide rate | Aged 20+ | X | | | | |
| 12.2 | Rudolph et al. (2015) | State minimum purchase age of 21 | Firearm homicide rate | All ages | | X | | | |
| 12.3 | Gius (2015b) | State minimum possession age | Unintentional firearm death rate | Aged 0–19 | | | | | X |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 18 | Any mass shooting incident | N/A | | | | | X |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 18 | Any mass shooting incident | N/A | | | | | X |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 21 | Any mass shooting incident | N/A | | | | | X |
| 12.4 | Luca, Deepak, and Poliquin (2016) | State minimum purchase age of 21 | Any mass shooting incident | N/A | | | | | X |
| 13.1 | Rosengart et al. (2005) | Shall-issue law | Total suicide rate | All ages | X | | | | |
| 13.1 | Rosengart et al. (2005) | Shall-issue law | Firearm suicide rate | All ages | X | | | | |
| 13.1 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Self-inflicted firearm injury rate | Aged 0–17 | | X | | | |
| 13.1 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Self-inflicted firearm injury rate | Aged 18+ | | X | | | |
| 13.2 | Rosengart et al. (2005) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | X | | | | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Rosengart et al. (2005) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | X | | | | |
| 13.2 | Grambsch (2008) | Shall-issue vs. no CC (random effects) | Murder rate | All ages | | | X | | |
| 13.2 | Grambsch (2008) | Shall-issue vs. no CC (fixed effects) | Murder rate | All ages | X | | X | | |
| 13.2 | French and Heagerty (2008) | Shall-issue law vs. no CC | Firearm homicide rate | All ages | | | | | |
| 13.2 | Roberts (2009) | May-issue vs. shall-issue | Total IPH rate | All ages | | | X | | |
| 13.2 | Roberts (2009) | No CC vs. shall-issue | Total IPH rate | All ages | | | X | | |
| 13.2 | Roberts (2009) | May-issue vs. shall-issue | Firearm IPH rate | All ages | | | X | | |
| 13.2 | Roberts (2009) | No CC vs. shall-issue | Firearm IPH rate | All ages | | | X | | |
| 13.2 | La Valle and Glover (2012) | May-issue | Total homicide rate | All ages | | | | | |
| 13.2 | La Valle and Glover (2012) | Shall-issue | Total homicide rate | All ages | | | | | |
| 13.2 | La Valle and Glover (2012) | May-issue | Firearm homicide rate | All ages | | | | | |
| 13.2 | La Valle and Glover (2012) | Shall-issue | Firearm homicide rate | All ages | | | | | |
| 13.2 | La Valle (2013) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | | | | | |
| 13.2 | La Valle (2013) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | | | | | |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Total homicide rate | All ages | X | | | X | |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Firearm homicide rate | All ages | X | | | X | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Nonfirearm homicide rate | All ages | X | | | | X |
| 13.2 | Webster, Crifasi, and Vernick (2014) | Shall-issue law vs. no CC permitted | Murder/manslaughter rate | All ages | X | | | | X |
| 13.2 | Gius (2014) | Restrictive vs. lenient CC laws | Firearm murder rate | All ages | | | X | | X |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Murder rate | All ages | | | | | |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Rape rate | All ages | | | | | |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Robbery rate | All ages | | | | | |
| 13.2 | Aneja, Donohue, and Zhang (2014) | Shall-issue vs. any other CC law | Assault rate | All ages | | | | | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Violent crime | All ages | X | | X | X | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Murder rate | All ages | X | | X | X | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Rape rate | All ages | X | | X | X | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Aggravated assault | All ages | X | | X | X | |
| 13.2 | Martin and Legault (2005) | Shall-issue (vs. other CC law) | Robbery rate | All ages | X | | X | X | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Murder rate | All ages | | | | | |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Rape rate | All ages | | | | | |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Robbery rate | All ages | | | | | |
| 13.2 | Kendall and Tamura (2010) | Shall-issue (vs. other CC law) | Assault rate | All ages | | | | | |
| 13.3 | Lott and Mustard (1997) | Shall-issue law | Unintentional handgun death rate | All ages | X | | X | | |
| 13.3 | Lott and Mustard (1997) | Shall-issue law | Unintentional nonhandgun death rate | All ages | X | | X | | |
| 13.3 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Unintentional firearm injury rate | Aged 0–17 | | X | | | |
| 13.3 | DeSimone, Markowitz, and Xu (2013) | Shall-issue law | Unintentional firearm injury rate | Aged 18+ | | X | | | |
| 13.4 | Lott (2003) | Shall-issue law | Multiple-victim gun deaths, injuries | All ages | X | | X | | |
| 13.4 | Lott (2003) | Shall-issue law | No. of multiple-victim gun incidents | All ages | X | | X | | |
| 13.4 | Luca, Deepak, and Poliquin (2016) | Permitless carry | Any mass shooting incident | All ages | | | | X | |
| 13.4 | Luca, Deepak, and Poliquin (2016) | Permitless carry | Any mass shooting incident | All ages | | | | X | |

**Table B.2—Continued**

| Report Figure | Study | Specific Policy or Independent Variable | Specific Outcome | Population | Parameter | Tx Units | Cluster | Model | Other |
|---|---|---|---|---|---|---|---|---|---|
| 13.4 | Luca, Deepak, and Poliquin (2016) | Shall-issue law | Any mass shooting incident | All ages | | | | | X |
| 13.4 | Luca, Deepak, and Poliquin (2016) | Shall-issue law | Any mass shooting incident | All ages | | | | | X |
| 13.5 | Duggan (2001) | Right-to-carry laws | Gun ownership | None | X | | | | |

NOTE: CAP = child-access prevention; CC = concealed carry; IPH = intimate partner homicide; N/A = not applicable; NICS = National Instant Criminal Background Check System.



**T**he RAND Corporation's Gun Policy in America initiative is a unique attempt to systematically and transparently assess available scientific evidence on the real effects of firearm laws and policies. Good gun policies require consideration of many factors, including the law and constitutional rights, the interests of various stakeholder groups, and information about the likely effects of different laws or policies on a range of outcomes. This report seeks to provide the third—objective information about what the scientific literature examining gun policy can tell us about the likely effects of laws. The study synthesizes the available scientific data on the effects of various firearm policies on firearm deaths, violent crime, the gun industry, participation in hunting and sport shooting, and other outcomes. By highlighting where scientific evidence is accumulating, the authors hope to build consensus around a shared set of facts that have been established through a transparent, nonpartisan, and impartial review process. In so doing, they also illuminate areas where more and better information could make important contributions to establishing fair and effective gun policies.

$80.00

Download a free electronic copy at www.rand.org/t/RR2088

ISBN-10 0-8330-9841-1
ISBN-13 978-0-8330-9841-2

9 780833 098412