**GZJ KDV'3; "**

# YOUNG ADULTHOOD
## AS A TRANSITIONAL LEGAL CATEGORY: SCIENCE, SOCIAL CHANGE, AND JUSTICE POLICY

*Elizabeth S. Scott,\* Richard J. Bonnie\*\* & Laurence Steinberg\*\*\**

### INTRODUCTION

In the past decade, much attention has focused on developmental brain research and its implications for the regulation of crime. Public and policy interest has been directed primarily toward juveniles. In light of recent research, courts and legislatures increasingly have rejected the punitive response of the 1990s and embraced a developmental approach to young offenders.[1] Of particular importance in propelling this trend has been the framework offered by the U.S. Supreme Court in a series of Eighth Amendment opinions that have rejected harsh adult sentences for juveniles.[2] These decisions, supported by adolescent brain research,[3] rested on two empirically based principles: First, juvenile offenders, due to their developmental immaturity, typically are less culpable and, therefore,

\* Harold R. Medina Professor of Law, Columbia University. The authors are members of the John D. and Catherine T. MacArthur Foundation Research Network on Neuroscience and Criminal Law and are grateful to the Foundation for its support of research that has advanced understanding of young adults. This Article is part of a symposium entitled *Criminal Behavior and the Brain: When Law and Neuroscience Collide* held at Fordham University School of Law. For an overview of the symposium, see Deborah W. Denno, *Foreword: Criminal Behavior and the Brain: When Law and Neuroscience Collide*, 85 FORDHAM L. REV. 399 (2016).
\*\* Harrison Foundation Professor of Law and Medicine; Director, Institute of Law, Psychiatry, and Public Policy, University of Virginia.
\*\*\* Distinguished University Professor, Temple University.

1. *See* ELIZABETH S. SCOTT & LAURENCE STEINBERG, RETHINKING JUVENILE JUSTICE 206–13 (2008); *see also* NAT'L RES. COUNCIL, NAT'L ACADS., REFORMING JUVENILE JUSTICE: A DEVELOPMENTAL APPROACH 31–88 (Richard J. Bonnie et al. eds., 2013).
2. In 2005, the Supreme Court held that the Eight Amendment prohibits the death penalty for crimes committed by juveniles in *Roper v. Simmons*, 543 U.S. 551, 578–79 (2005). In 2010, the Court prohibited the imposition of life without parole for juveniles committed by juveniles. Graham v. Florida, 560 U.S. 48, 82 (2010). Two years later, the Court extended *Graham*, holding that the Eighth Amendment prohibits the mandatory sentence of life without parole even for juveniles convicted of homicide in *Miller v. Alabama*, 132 S. Ct. 2455, 2475 (2012). Most recently, in *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016), the Court held that *Miller* created a rule of substantive constitutional law and therefore must be applied retroactively.
3. *See Miller*, 132 S. Ct. at 2464–65 (citing developmental brain research showing differences between juvenile and adult brains); *Graham*, 560 U.S. at 68 (same).

deserve less punishment than their adult counterparts. Second, because their criminal conduct is the product of immaturity, most juveniles have a greater potential to reform than do adults. This framework has influenced broader sentencing reforms for juvenile offenders.[4] It has also led policymakers to focus on the impact of juvenile justice settings and programs on youth development and crime reduction.[5]

More recently, advocates and some policymakers have argued that developmental research should shape the law's response to young adult offenders.[6] Over the past decade, developmental psychologists and neuroscientists have found that biological and psychological development continues into the early twenties, well beyond the age of majority.[7] Recently, researchers have found that eighteen- to twenty-one-year-old adults are more like younger adolescents than older adults in their impulsivity under conditions of emotional arousal.[8] It is also well established that young adults, like teenagers, engage in risky behavior, such as drinking, smoking, unsafe sex, drug use, and criminal activity, to a greater extent than older adults.[9] The possibility that much risky behavior, including involvement in criminal activity, is a product of psychological and social immaturity raises the question of whether the presumption of reduced culpability and greater potential for reform should be applied to young adult offenders as well as juveniles.

Major reform of this kind would represent a substantial departure from what has become a commonly recognized boundary in the justice system between juveniles and adults, marked by the age of majority: legal adults charged with criminal acts are typically subject to a standard punishment regime that applies to all offenders whether they are eighteen or thirty-five years old.[10] This response is not surprising. Legal line drawing is inevitably arbitrary at the margins, and age eighteen, the default age of

---

4. *See* ELIZABETH SCOTT ET AL., THE SUPREME COURT AND THE TRANSFORMATION OF JUVENILE SENTENCING 25–29 (2015), http://modelsforchange.net/publications/778/The_Supreme_Court_and_the_Transformation_of_Juvenile_Sentencing.pdf [https://perma.cc/WM4Z-XWTC].

5. *See* NAT'L RES. COUNCIL, *supra* note 1, at 241–80.

6. *See* Vincent Schiraldi et al., *Community-Based Responses to Justice-Involved Young Adults*, NEW THINKING COMMUNITY CORRECTIONS, Sept. 2015, at 1–3 (recommending that cases involving young adults be handled by the juvenile system). Recently, New York City Mayor Bill de Blasio took action to address some of the unique challenges posed by young adults in the New York City justice system. *See* Press Release, Office of the Mayor, Mayor de Blasio Appoints Heads of Key Criminal Justice Positions (Mar. 11, 2014), http://www1.nyc.gov/office-of-the-mayor/news/082-14/mayor-de-blasio-appoints-heads-key-criminal-justice-positions#/0 [https://perma.cc/Q9JE-74M7].

7. *See* LAURENCE STEINBERG, AGE OF OPPORTUNITY: LESSONS FROM THE NEW SCIENCE OF ADOLESCENCE 5 (2014).

8. *See* Alexandra O. Cohen et al., *When Is an Adolescent an Adult?: Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 PSYCHOL. SCI. 549, 559–60 (2016).

9. Different types of risky behavior peak at different ages. For example, binge drinking peaks at age twenty, while involvement in criminal activity peaks at age eighteen.

10. *See* Elizabeth S. Scott, *The Legal Construction of Adolescence*, 29 HOFSTRA L. REV. 547, 547–50 (2000).

majority, seems like a natural dividing line between adult and juvenile status in the justice system.[11]  Further, individuals between the ages of eighteen to twenty-one commit a large portion of serious offenses and have high recidivism rates.[12]  Thus, limiting the rehabilitative and more lenient approach of the juvenile system to youths who are legal minors might be justified on public safety grounds.  Moreover, until recently, no compelling scientific argument existed for treating young adults differently than their older counterparts.  Not so long ago, developmentalists thought that eighteen-year-olds were biologically mature and that young adult brains were fully developed.[13]

In other legal domains, the age at which children attain adult status is often raised or lowered from the default age of majority (age eighteen) when social welfare interests are served.[14]  Is it time to reconsider the law's approach to young adult offenders in light of the recent scientific research?

In our view, modest policy reform is justified, although the developmental research suggesting that young adults are not fully mature is in an early stage.  In part we reach this conclusion because the scientific research is reinforced by demographic data indicating that the social transition to independent adulthood extends well beyond the age of majority.  In contemporary society, age eighteen no longer marks the assumption of mature adult roles.  Only a small percentage of young adults today marry or live self-sufficient lives.  Instead, this period has become a critical developmental stage of extended dependency and investment in acquiring the skills necessary to accomplish the transition to mature adulthood.[15]  For many young adults in the justice system, the prospect of successfully navigating this transition is low.

This Article seeks to advance discussions about the potential implications for justice policy of recent neuroscientific, psychological, and sociological research on young adults.  In doing so, we emphasize the importance of not exaggerating either the empirical findings or their policy relevance.  The available research does not indicate that individuals between the ages of eighteen and twenty are indistinguishable from younger adolescents in attributes relevant to criminal offending and punishment.[16]  Thus, we are skeptical on both scientific and pragmatic grounds about the merits of the proposal by some advocates that juvenile court jurisdiction should be

---

11.  *See id.* at 548.

12.  *See* CRAIG A. PERKINS, U.S. DEP'T OF JUSTICE, AGE PATTERNS OF VICTIMS OF SERIOUS VIOLENT CRIME 2 (1997), http://www.bjs.gov/content/pub/pdf/apvsvc.pdf (finding that the eighteen- to twenty-one-year-old population commits the highest percentage of serious violent crimes out of all age groups) [https://perma.cc/MA5A-LGBE].

13.  *See* NAT'L RES. COUNCIL, NAT'L ACADS., ADOLESCENT DEVELOPMENT AND THE BIOLOGY OF PUBERTY 1–3 (Michele D. Kipke ed., 1999).

14.  *See* Scott, *supra* note 10, at 556.

15.  *See* INST. OF MED. & NAT'L RES. COUNCIL, INVESTING IN THE HEALTH AND WELL-BEING OF YOUNG ADULTS (Richard J. Bonnie et al. eds., 2015) (providing a comprehensive discussion of the changing nature of young adulthood and finding young adulthood in contemporary society to be a vulnerable period of extended dependency and proposing policy reforms).

16.  *See infra* Part I.

categorically extended to age twenty-one.[17]  But the research does suggest that young adults, like juveniles, are more prone to risk-taking and that they act more impulsively than older adults in ways that likely influence their criminal conduct.  Moreover, correctional reform is justified because young adult offenders, like noncriminal young adults and juvenile offenders, are more likely to become productive members of society if they are given the tools to do so during a critical developmental period.

Policymakers today can draw lessons from the developmental model that has shaped juvenile justice reform.  At the heart of this reform is a conception of adolescence as a distinct stage between childhood and adulthood.[18]  This conception has supported a classification of juveniles as an intermediate category of offenders who are neither excused for their crimes as children nor deemed fully responsible adults.[19]  Juvenile justice programs increasingly respond to the developmental needs of adolescent offenders, recognizing that this is the best means of promoting their productive engagement in society and reducing crime.[20]  Young adults between the ages of eighteen and twenty-one constitute a less well-defined category that has only recently received even informal acknowledgment.  But this developmental stage has taken on heightened importance as a period of preparation for adult roles.  We conclude that the research supports a regime that recognizes young adults as a transitional category between juveniles and older adult offenders.

Part I of this Article analyzes the behavioral and neuroscientific research on young adults.  The research on age patterns of risk-taking, combined with the neuroscientific and psychological research on young adults, suggests that the period of young adulthood can be understood as a transitional stage between adolescence and mature adulthood.  Part II turns to the sociological research that reinforces this conception of young adults as occupying a transitional developmental stage.  Finally, Part III explores the implications of the developmental and sociological research for crime regulation.  We conclude that many of the developmental lessons that have driven reforms of the treatment of juveniles in the justice system can inform the response to the criminal conduct of young adults.  Young adults should be treated as a distinct, transitional category subject to reduced sanctions for less serious crimes, special expedited parole policies, and correctional programs and settings designed to serve their developmental needs.  This approach can promote the social welfare goals of the justice system more effectively than the conventional binary approach that prevails today.

---

17.  *See* Schiraldi et al., *supra* note 6.
18.  *See* SCOTT & STEINBERG, *supra* note 1, at 31.
19.  *See* Elizabeth S. Scott & Laurence Steinberg, *Adolescent Development and the Regulation of Youth Crime*, 18 FUTURE CHILD. 15, 19 (2008).
20.  *See infra* Part III.

## I. Behavioral, Psychological, and Neurobiological Development in Young Adults

Studies of behavioral, psychological, and neurobiological development indicate that the years from the late teens to the early twenties constitute a transitional period that bridges adolescence and mature adulthood. Development is gradual, and the psychological boundaries between adolescence and adulthood are fuzzy. Although eighteen- to twenty-one-year-olds are in some ways similar to individuals in their midtwenties, in other ways, young adults are more like adolescents in their behavior, psychological functioning, and brain development. Thus, developmental science does not support the bright-line boundary that is observed in criminal law under which eighteen-year-olds are categorically deemed to be adults.

### A. Age Patterns of Risk-Taking Behavior

An important similarity between adolescents and young adults—potentially relevant to justice policy—is that eighteen- to twenty-one-year-olds, like adolescents, engage in risk-taking behavior (including involvement in criminal activity) at a higher rate than older adults.[21] Research on the developmental trajectory of criminal behavior has consistently documented an age-linked pattern of offending—the "age-crime curve"—in which rates of criminal behavior increase over the course of adolescence, peak around age eighteen, and then decline during the early twenties.[22] Therefore, young adulthood is both the stage during which criminal behavior is most common and the period during which the vast majority of offenders begin desisting from crime. In this regard, young adulthood is arguably the most significant transitional period in the development of criminal behavior.

Young adult offending is best understood as part of a broader behavioral pattern, and not as an isolated phenomenon, because many forms of risk-taking behavior are disproportionately likely during this period.[23] It is noteworthy that the inverted U-shaped developmental pattern observed in the age-crime curve applies as well to most forms of risky activity, which increase over the course of adolescence, peak in the late teens or early twenties (the peak age varies somewhat across different behaviors), and then decline.[24] According to a recent Institute of Medicine/National Research Council (IOM/NRC) report, young adults (aged eighteen to twenty-four) experience higher rates of morbidity and mortality than either

---

21. *See* Inst. of Med. & Nat'l Res. Council, *supra* note 15, at 203–13; Teena Willoughby et al., *Examining the Link Between Adolescent Brain Development and Risk Taking from a Social-Developmental Perspective*, 83 Brain & Cognition 315, 315–16 (2013).

22. *See generally* Gary Sweeten et al., *Age and the Explanation of Crime, Revisited*, 42 J. Youth Adolescence 921 (2013). This pattern is found across the developed world, over time within the United States, and with respect to both violent and nonviolent crime.

23. *See* Inst. of Med. & Nat'l Res. Council, *supra* note 15.

24. *See generally* Sweeten, *supra* note 22.

adolescents or older adults from a wide variety of preventable causes, including automobile crashes, physical assaults, gun violence, sexually transmitted diseases, and substance abuse.[25]   In short, developmental changes in criminal activity follow the same age pattern as developmental changes in risky, but noncriminal, activity.[26]

Viewing criminal offending as a specific instance of the more general inclination of young adults to engage in risky activity can inform discussions of how we should respond to criminal behavior at this age. During the past two decades, developmental science has been invoked in discussions of juvenile justice reform to advance the argument that much adolescent crime is the product of developmental immaturity.[27]  This, in turn, supported policies based on the premise that adolescents are both less culpable and more amenable to reform than adults, in part, simply through maturation.[28]   To the extent that young adult offending is also the consequence of normative developmental changes that create a transient inclination toward risky behavior, it should prompt a similar conversation.

## B. Explaining Young Adult Risk-Taking: Psychological Development in Young Adults

In recent years, developmental scientists have sought to understand the underlying causes of age differences in risk-taking.  However, as we explain below, research on developmental differences between adolescents and adults often has not drawn age distinctions among individuals older than eighteen, and therefore is of limited value in understanding risk-taking among young adults.[29]  Nevertheless, theoretical models, advanced to explain heightened rates of risk-taking among adolescents relative to children or adults, can inform our discussion of risk-taking in young adulthood.  These "dual systems" or "maturational imbalance" models emphasize the different developmental trajectories of reward seeking and self-control.[30]  Heightened risk-taking during adolescence is understood to be the result of a developmental asynchrony wherein inclinations to pursue exciting, potentially rewarding experiences are especially strong, but the ability to control such urges is still relatively immature.  The tendency toward heightened sensation seeking is thought to be sparked by the

25.  *See* INST. OF MED. & NAT'L RES. COUNCIL, *supra* note 15, at 203–13.

26.  In one large longitudinal study of serious juvenile offenders tracked for seven years, impulsivity was one of the best psychological predictors of offending in young adulthood: Individuals who developed mature impulse control were most likely to desist from crime. *See* Kathryn C. Monahan et al., *Psychosocial (Im)maturity from Adolescence to Early Adulthood: Distinguishing Between Adolescence-Limited and Persisting Antisocial Behavior*, 25 DEV. & PSYCHOPATHOLOGY 1093, 1093–95 (2013).

27.  *See generally* SCOTT & STEINBERG, *supra* note 1.

28.  *See id.*  Adolescent brains are also more plastic than those of adults, which may contribute to amenability. *See generally* STEINBERG, *supra* note 7.

29.  This limitation also applies to developmental neuroscience research.

30.  *See* B.J. Casey, *Beyond Simple Models of Self-Control to Circuit-Based Accounts of Adolescent Behavior*, 66 ANN. REV. PSYCHOL. 295, 298–300 (2015); Elizabeth P. Shulman et al., *The Dual Systems Model: Review, Reappraisal, and Reaffirmation*, 17 DEVELOPMENTAL COGNITIVE NEUROSCIENCE 103, 103–05 (2016).

hormonal changes of puberty, which are believed to increase activity in the brain's reward pathways, making individuals more attentive, sensitive, and responsive to actual and potential rewards.[31]   However, because development of brain systems that regulate impulse control is more protracted, continuing into the early twenties, a period of vulnerability to risky behavior results.[32]  As some writers have described it, adolescence is a time when the "accelerator" is pressed to the floor, but a good "braking system" is not yet in place.[33]

From this perspective, the relatively high rate of risky activity observed in late adolescence and young adulthood—including criminal offending—is likely due to a combination of high reward seeking and poor self-control, leading individuals to make impetuous, short-sighted decisions that privilege the potential rewards of risky choices and underestimate the potential costs.  According to this view, risk-taking declines as individuals develop more mature judgment, as a result of a decrease in reward seeking, an increase in self-control, or both.[34]  Importantly, these developmental changes, which continue into the early twenties, are now viewed as normative, driven by processes of brain maturation that are not under the control of young people.

These theoretical models, and the research they have generated, have influenced discussions of juvenile justice policy over the past decade.[35]  Indeed, the tendency of adolescents to make impulsive and shortsighted decisions is one of the characteristic features of adolescence highlighted by the U.S. Supreme Court in its Eighth Amendment opinions limiting the use of harsh sentences for juveniles.[36]  The Court also pointed to adolescents' heightened susceptibility to social influence—particularly peer influence—and to the relatively unformed nature of adolescents' character, which makes them better candidates for rehabilitation.[37]  The Court found that these hallmark features of adolescence contribute to reduced culpability in juvenile offenders, as compared to adults, and to their greater potential to reform.   Now that policy discussions about the treatment of young offenders are beginning to include young adults, it is important to ask whether these characteristics apply to this group as well.

The age patterns in risk-taking would seem to offer support for the conclusion that young adults are also affected by the developmental

---

31.  *See* Ashley R. Smith et al., *Impact of Socio-Emotional Context, Brain Development, and Pubertal Maturation on Adolescent Risk-Taking*, 64 HORMONES & BEHAV. 323, 323–25 (2013).

32.  *See generally* Casey, *supra* note 30.

33.  *See* STEINBERG, *supra* note 7, at 85.

34.  *See generally* Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 DEVELOPMENTAL REV. 78 (2008).

35.  *See* Laurence Steinberg, *The Influence of Neuroscience on US Supreme Court Decisions About Adolescents' Criminal Culpability*, 14 NATURE REVIEWS NEUROSCIENCE 513, 513 (2013).

36.  *See generally* Montgomery v. Louisiana, 136 S. Ct. 718 (2016); Miller v. Alabama, 132 S. Ct. 2455 (2012); Graham v. Florida, 560 U.S. 48 (2010); Roper v. Simmons, 543 U.S. 551 (2005).

37.  *See Roper*, 543 U.S. at 569.

*FORDHAM LAW REVIEW* [Vol. 85

influences that contribute to juvenile offending—at least to some degree.[38] But the study of psychological development in young adulthood is less advanced, and the findings of this research are less consistent than the findings of research on adolescents.[39] One limitation is that studies rarely survey a sample that includes adolescents, young adults, and individuals in their late twenties using the same measures for all three age groups. A second limitation is that studies that span the necessary age range frequently lack the statistical power to compare narrowly defined age groups. A third limitation is that many studies cluster individuals into broad age categories, often including in the same group individuals whose chronological age would place them on different sides of a legally important age boundary.

One challenge is to formulate research questions in ways that are most informative to legal policy debates. Scientists cannot point to a specific chronological age as the appropriate boundary between legal childhood and adulthood because different aspects of psychological and neural functioning develop along different timetables.[40] But a reasonable, and potentially answerable, research question is whether development continues in legally relevant psychological domains beyond age eighteen, the presumptive age of majority. The few existing studies that may be relevant to justice policy have yielded equivocal results that vary as a function of the outcome, age range, and sample studied. Thus, a reasonable assessment is that the extant research is suggestive but inconclusive. Nonetheless, it is possible to draw several broad, albeit cautious, conclusions.

First, it is clear that individuals mature intellectually before they mature emotionally or socially and that emotional and social development continues past age eighteen in realms that are legally relevant.[41] Thus, studies of age differences in basic cognitive abilities, such as memory or logical reasoning, do not find appreciable growth after age sixteen.[42] This is consistent with studies of adjudicative competence, which also do not find significant age differences after sixteen.[43] In contrast, studies of the two hypothesized contributors to adolescents' immature judgment, often, but not always, have found continued decline in sensation seeking and improvement in self-control between ages seventeen and thirty. However,

---

38. *See infra* Parts II–III.

39. *See* Alexandra O. Cohen et al., *When Does a Juvenile Become an Adult? Implications for Law and Policy*, 88 TEMP. L. REV. 769, 769–72 (2016).

40. *See* Laurence Steinberg, *Should the Science of Adolescent Brain Development Inform Public Policy?*, ISSUES SCI. & TECH., Spring 2012, at 67, 67–70 (2012).

41. *See* Laurence Steinberg et al., *Are Adolescents Less Mature Than Adults? Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop,"* 64 AM. PSYCHOLOGIST 583, 592–93 (2009).

42. *See id.*

43. *See* Thomas Grisso & Linda Vierling, *Minors' Consent to Treatment: A Developmental Perspective*, 9 PROF. PSYCHOL. 412, 415–16 (1978); Thomas Grisso et al., *Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adults' Capacities as Trial Defendants*, 27 LAW & HUM. BEHAV. 333, 356–61 (2003).

the age at which developmental change is most evident during this interval depends on the specific outcome being assessed.[44]

Second, conclusions about whether psychological development continues beyond age eighteen are highly task dependent. Consider, for example, the question of whether young adults, like juveniles, are more susceptible than older adults to peer influence. The answer is equivocal. Studies of resistance to peer influence using self-reports do not find age differences after eighteen,[45] but experimental studies comparing individuals' performance on decision-making tasks when they are alone versus when they are with their peers find peer effects on task performance after this age, at least into the early twenties. For example, exposure to peers increases young adults' preference for immediate rewards,[46] willingness to engage in exploratory behavior,[47] and ability to learn from experience.[48] In some studies, exposure to peers has been shown to increase young adults' risk-taking;[49] but in other studies, this has not been found.[50]

Third, psychological maturity among individuals at any given age varies considerably.[51] Consider the research on the stability of personality over time. As noted above,[52] the Supreme Court cited the relatively unformed nature of character as a defining feature of adolescence that justifies more lenient sentences for juveniles.

Is young adulthood a similarly inchoate stage of character development? The empirical literature on personality development is ambiguous. The prevailing view among psychologists is that during adulthood, personality becomes more stable over time, but no consensus exists on when, if at all, personality ceases to change.[53] Some studies have found that young

---

44. *See* Laurence Steinberg et al., *Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model*, 44 DEVELOPMENTAL PSYCHOL. 1764, 1764–66 (2008).

45. *See generally* Laurence Steinberg & Kathryn C. Monahan, *Age Differences in Resistance to Peer Influence*, 43 DEVELOPMENTAL PSYCHOL. 1531 (2007).

46. *See generally* Lia O'Brien et al., *Adolescents Prefer More Immediate Rewards When in the Presence of Their Peers*, 21 J. RES. ON ADOLESCENCE 747 (2011); Alexander Weigard et al., *Effects of Anonymous Peer Observation on Adolescents' Preference for Immediate Rewards*, 17 DEVELOPMENTAL SCI. 71 (2014).

47. *See* Karol Silva et al., *Peers Increase Late Adolescents' Exploratory Behavior and Sensitivity to Positive and Negative Feedback*, J. RES. ON ADOLESCENCE 7–9 (Aug. 19, 2015), http://onlinelibrary.wiley.com/doi/10.1111/jora.12219/epdf [https://perma.cc/9QWF-3JS2].

48. *See id.*

49. *See* Margo Gardner & Laurence Steinberg, *Peer Influence on Risk Taking, Risk Preference, and Risky Decision Making in Adolescence and Adulthood: An Experimental Study*, 41 DEVELOPMENTAL PSYCHOL. 625, 632–34 (2005).

50. *See* Jason Chein et al., *Peers Increase Adolescent Risk Taking by Enhancing Activity in the Brain's Reward Circuitry*, 14 DEVELOPMENTAL SCI. F1, F7–F9 (2010).

51. *See* Steinberg, *supra* note 40, at 67–70.

52. *See supra* note 36 and accompanying text.

53. *See* Avshalom Caspi & Brent W. Roberts, *Personality Development Across the Life Course: The Argument for Change and Continuity*, 12 PSYCHOL. INQUIRY 49, 51 (2001); Robert R. McCrae & Paul T. Costa, Jr., *The Stability of Personality: Observations and Evaluations*, 3 CURRENT DIRECTIONS PSYCHOL. SCI. 173 (1994).

*FORDHAM LAW REVIEW*                    [Vol. 85

adulthood is a time of considerable stability in personality;[54] others have found that it is a time of instability, especially during the transition from adolescence to young adulthood;[55] and yet another group has found variation among individuals.[56] Moreover, some studies have also found variability *within individuals* in the stability of personality, in that some traits appear to be considerably more stable than others.[57]

Finally, age differences in psychological functioning in young adulthood vary as a function of the context in which individuals are assessed. Recent work conducted under the auspices of the MacArthur Foundation Research Network on Law and Neuroscience (of which the authors are members) is illustrative.[58] In this research, adolescents (ages thirteen to seventeen), young adults (ages eighteen to twenty-one), and somewhat older young adults (ages twenty-two to twenty-four) were asked to perform a standard task measuring self-control under conditions that were systematically manipulated to vary the degree and nature (positive or negative) of emotional arousal.[59] Under nonarousing conditions, young adults' performance did not differ from that of the younger or older subjects; however, the adolescents performed worse than the oldest group.[60] Under conditions of positive arousal, the young adults performed comparably to the older group and better than the adolescents.[61] Under negatively arousing conditions, however, the adolescent and young adult groups did not differ, and both performed worse than the oldest group.[62] In other words, whereas the differences between adolescents under age eighteen and individuals older than twenty-one were observed consistently, differences between young adults and the other two age groups depended on the emotional context. Sometimes young adults behaved like people in their mid-twenties. But sometimes they behaved like teenagers—a conclusion that will surely resonate with those who spend time on college campuses.

54. *See generally* Brent W. Roberts et al., *The Kids Are Alright: Growth and Stability in Personality Development from Adolescence to Adulthood*, 81 J. PERSONALITY & SOC. PSYCHOL. 670 (2001); Richard W. Robins et al., *A Longitudinal Study of Personality Change in Young Adulthood*, 69 J. PERSONALITY 617 (2001).

55. *See generally* Norma Haan et al., *As Time Goes By: Change and Stability in Personality over Fifty Years*, 1 PSYCHOL. & AGING 220 (1986).

56. *See generally* M. Brent Donnellan et al., *Personality Development from Late Adolescence to Young Adulthood: Differential Stability, Normative Maturity, and Evidence for the Maturity-Stability Hypothesis*, 75 J. PERSONALITY 237 (2007).

57. *See generally* Jatin G. Vaidya et al., *On the Temporal Stability of Personality: Evidence for Differential Stability and the Role of Life Experiences*, 83 J. PERSONALITY & SOC. PSYCHOL. 1469 (2002).

58. *See generally* Cohen et al., *supra* note 8.

59. *See id.*

60. *See id.*

61. *See id.*

62. *See id.*

### C.  Neurobiological Research:
### Brain Development in Young Adulthood

Research on the extent and nature of age differences in brain structure and function after age eighteen is also best characterized as suggestive but inconclusive.   As with behavioral research, very few studies have systematically examined age differences in brain development among individuals older than eighteen.  In most studies, adolescents are compared to "adults," with the latter group composed of people who may be as young as nineteen or as old as fifty.  When adult comparison groups average data from such a wide age range, it is impossible to draw specific inferences about potential differences between young adults and their older counterparts.

Brain maturation comprises several processes that vary in their developmental timetable across brain regions and systems.[63]  The most important components of brain maturation in adolescence and young adulthood involve changes in the prefrontal cortex and its connections with other brain regions.  The prefrontal cortex plays a crucial role in advanced thinking abilities, including planning ahead and weighing risk and reward, and in self-regulation, including impulse control and the coordination of emotion and cognition.  Immaturity in the prefrontal cortex is thought to make adolescents and young adults more susceptible to impetuous and shortsighted decision making and more vulnerable to the effects of emotional and social arousal on intellectual functioning.[64]  This aspect of brain development has been critically important to discussions about the appropriate legal response to criminal activity in adolescents and young adults.

The maturation of the prefrontal cortex is multifaceted, involving synaptic pruning (which increases the efficiency of information processing by eliminating unnecessary connections between neurons), myelination (which increases the speed of information processing by "insulating" neural pathways), and improved structural and functional connectivity (which enhances communication between the prefrontal cortex and other brain regions).  These processes are all ongoing during adolescence, but they are completed at different ages.[65]  For example, pruning of the prefrontal cortex is more or less complete by midadolescence, which is why there is little improvement in basic thinking abilities beyond this age.[66]  In contrast, connectivity, especially between the prefrontal cortex and brain regions that process rewards and respond to emotional and social stimuli, is not complete until the midtwenties,[67] which is why aspects of social and emotional functioning, such as impulse control and resistance to peer

63.  *See generally* Steinberg, *supra* note 40.

64.  *See id.*

65.  *See generally* Cohen et al., *supra* note 39.

66.  *See id.*

67.  *See generally* Nico U.F. Dosenbach et al., *Prediction of Individual Brain Maturity Using fMRI*, 329 Science 1358 (2010).

influence, are slower to mature.[68]  The bottom line is that brain systems that govern "cold cognition" (thinking that takes place under ideal conditions) reach adult levels of maturity long before those that govern "hot cognition" (thinking that takes place under conditions of emotional or social arousal).[69] In the MacArthur study mentioned earlier, patterns of brain activation and functional connectivity in young adults resembled those of teenagers when brain activity was assessed under emotionally arousing conditions but appeared more similar to those of people in their midtwenties when conditions were more neutral.[70]

Studies of brain development in adolescence and young adulthood have not yet significantly informed our understanding of the neural underpinnings of age differences in susceptibility to social influence or in the potential for rehabilitation—characteristics considered important in legal policy discussions on juvenile crime.[71]  The research indicates that brain systems governing thinking about social relationships undergo significant change in adolescence in ways that heighten concerns about the opinions of others.[72]  Compared to adults, adolescents seem especially sensitive to both praise and rejection, making young people potentially more easily influenced by their peers.[73]  But very little research has asked whether and how these brain systems continue to change beyond the teen years.  One study that examined the impact of peers on neural responses to reward in a sample of adolescents (ages fourteen to eighteen), young adults (nineteen to twenty-two), and adults (twenty-four to twenty-nine) found that the presence of peers increased activation in this brain region among adolescents but had no impact in the other two age groups.[74]

With respect to potential for rehabilitation, there is a growing consensus that adolescence is likely to be a period of heightened brain plasticity—the capacity of the brain to change in response to experience—not unlike the first few years of life.[75]  If so, juveniles are probably better candidates for rehabilitation than adults.  This strengthens the argument against imposing long sentences on juveniles and especially against harsh sentences that can inflict toxic harm during a susceptible developmental period.  It is not known, however, how long this period of plasticity extends.[76]  One difficulty is that much of the evidence of heightened brain plasticity in adolescence comes mainly from studies of rodents, whose development can

---

68. *See generally* Cohen et al., *supra* note 39.

69. *See generally* STEINBERG, *supra* note 7.

70. *See generally* Cohen et al., *supra* note 8; Marc Rudolph et al., At Risk of Being Risky:  The Relationship Between "Brain Age" Under Emotional States and Risk Preference (unpublished manuscript) (on file with the author).

71. *See* Sarah-Jayne Blakemore, *Development of the Social Brain in Adolescence*, 105 J. ROYAL SOC'Y MED. 111, 112 (2012); Sarah-Jayne Blakemore & Kathryn L. Mills, *Is Adolescence a Sensitive Period for Sociocultural Processing?*, 65 ANN. REV. PSYCHOL. 187, 189 (2014).

72. *See* Blakemore, *supra* note 71, at 112; Blakemore & Mills, *supra* note 71, at 189.

73. *See* Blakemore, *supra* note 71, at 112; Blakemore & Mills, *supra* note 71, at 189.

74. *See generally* Chein et al., *supra* note 50.

75. *See generally* STEINBERG, *supra* note 7.

76. *See infra* Part II.

be reliably segmented into just three stages:  infant, juvenile (peripubertal), and adult.[77]  Thus, the distinctions between "young adult" and "adult" that can be applied to humans cannot be applied to most other animals.

Because the research described in this part is at a relatively early stage, its implications for justice policies directed toward young adults are uncertain.   It is clear that the psychological and neurobiological development that characterizes adolescence continues into the midtwenties, but the research has not yet produced a robust understanding of maturation in young adults age eighteen to twenty-one.   Studies find continued development during this period but also find that, in some ways, young adults are similar to adults in their midtwenties.   The research on age patterns in risk-taking and on emotional maturation—particularly on impulse control in negative arousal states and peer influence in social contexts—provides the most powerful evidence that young adult offending likely represents a continuation of adolescent risk-taking, driven by developmental forces; but many uncertainties remain.  The question is to what extent this still-developing body of research on young adults should affect justice policy.

## II.  THE CHANGING SOCIOECONOMIC CONTEXT OF YOUNG ADULTHOOD

Although the biological and psychological account of maturation is incomplete, it is clear that the transition to *social* adulthood is grounded in cultural norms that vary over time (and across cultures), dictating when young people are expected to achieve independence and assume adult roles. Demographic research indicates that, today, young adults in the United States and other developed societies experience a prolonged and stressful period of transition to adulthood.   Contemporary society is marked by increased knowledge and information transfer, heightened risks, fairly low social mobility, and greater economic inequality—changes that have placed greater demands on young adults than previous generations experienced, while also providing less latitude for failure.[78]  Not so long ago, the typical transitional path for most young adults was to graduate from high school, enter college or the workforce, leave home, establish an enduring romantic relationship, marry, and start a family.  These milestones provided structure and direction for most young adults as they assumed adult responsibilities; they also  fostered connection with the larger society and its institutions. Today, those pathways are considerably less predictable, often extended, and—for many—significantly more challenging.[79]

Based on this trend, a 2014 IOM/NRC report characterized young adulthood in our society as a "critical" developmental period[80] that has a

---

77. *See generally* LD Selemon, *A Role for Synaptic Plasticity in the Adolescent Development of Executive Function*, 3 TRANSLATIONAL PSYCHIATRY 1 (2013).

78. INST. OF MED. & NAT'L RES. COUNCIL, *supra* note 15, at 35–67.

79. *See id.*

80. Young adults continue to mature socially, psychologically, and biologically; however, social features of maturation predominate during this period. *See id.* at 1–3.

profound impact on individuals' future life-course trajectories, analogous to the critical periods of early childhood and adolescence. Success or failure during this time can have a lifelong impact. Thus, the stakes are high both for young adults and for society. The report drew out the policy implications of this social trend, particularly emphasizing the need to provide developmentally appropriate supports and interventions for young adults during this period.[81]

### A. Education and Employment

Achievement of financial independence has become a prolonged and uncertain challenge for an increasing number of young adults. College enrollment has increased dramatically in recent years,[82] but many students who enroll in college do not earn a degree.[83] Indeed, the college graduation rate in the United States has *dropped* even as enrollment rates have increased.[84] In part, this is because the cost of college has grown substantially, and many students are unable to finance the investment. Yet prospects for well-paying jobs for young adults without a college degree are slim.

The problem for young adults without a college degree has been exacerbated in recent decades by the sharply reduced number of good manufacturing jobs. Even accounting for the increased percentage of young adults attending college (and thus not in the work force), the unemployment rate among individuals under age twenty-five is twice that of the general population.[85] This disparity has been growing in recent decades and has become especially pronounced since the start of the 2008 recession.[86] Young adults without a college degree who *are* employed generally receive low wages because they lack skills needed for higher paying, knowledge-based jobs.[87] Many obtain only part-time employment. Not surprisingly perhaps, the earning gap between college graduates and those with only a high school education has more than doubled since 1980.[88] Today, young adults without a college degree—a cohort that includes most individuals in

---

81. *See id.*
82. *See id.* at 129.
83. *See id.* at 135.
84. *See id.* at 47; Martha J. Bailey & Susan M. Dynarski, *Inequality in Postsecondary Education*, *in* WHITHER OPPORTUNITY?: RISING INEQUALITY, SCHOOLS, AND CHILDREN'S LIFE CHOICES 117 (Greg J. Duncan & Richard J. Murnane eds., 2011). Large gaps exist in Bachelor of Arts completion rates by race and socioeconomic position. Completion rates for whites exceed those for blacks and Hispanics by 20–30 percent, and students from families in the bottom socioeconomic quartile have completion rates nearly 40 percent lower than those of other students. *See* INST. OF MED. & NAT'L RES. COUNCIL, *supra* note 15, at 137–38.
85. *See* INST. OF MED. & NAT'L RES. COUNCIL, *supra* note 15, at 47; *see also* CLIVE R. BELFIELD & HENRY M. LEVIN, THE ECONOMICS OF INVESTING IN OPPORTUNITY YOUTH 7 (2012) (showing 17 percent of youth and young adults between ages sixteen and twenty-four are neither in school nor working).
86. *See* INST. OF MED. & NAT'L RES. COUNCIL, *supra* note 15, at 48.
87. *See id.* at 123–34. Many young adults earn less than similar demographic groups have earned in the past and an increasing number of low skill positions are part-time jobs.
88. *See id.* at 131.

Case 3:19-cv-01226-L-AHG   Document 34-7   Filed 01/03/20   PageID.6773   Page 16 of 620

the justice system—face greater challenges in attaining financial self-sufficiency as adults than did earlier generations.

### B. Partnering and Parenting

A similar gap has emerged in contemporary patterns of family formation. Traditionally, marriage was a marker of adult status and independence from parents across social classes.[89]  For middle and upper class couples, marriage often followed graduation from college, while working class couples tended to marry at an earlier age.[90]  Today, middle class individuals tend to become independent of their parents, marry, and have children years later than their parents did.[91]  In part, of course, this is because the period of young adulthood is devoted to education, skills training, and career development for this cohort.  Such investment in human capital can be more readily accomplished without family responsibilities.  For less educated young adults, particularly those from disadvantaged backgrounds, the pattern is quite different.  Marriage has become less common altogether for this group, and partnering typically takes the form of informal, often unstable, unions.[92]  Many less educated young people have children outside of marriage, often before they have the skills and income to support a family.[93]  In turn, the burden of raising children impedes young parents' ability to acquire the skills and training necessary to become economically self-sufficient.

### C. Inequality

Recent changes in the established economic and social pathways of young adulthood have presented more choice and opportunity for some young adults and created more barriers for many others.  Of particular importance for our purposes is the impact of these economic and social trends on marginalized young adults from disadvantaged backgrounds—namely, those who are children of low-income immigrants, those aging out of foster care, those with histories of involvement in the justice system, those with disabilities, and those who dropped out of school.  These young adults are substantially less likely than their peers to experience a successful transition to adulthood.[94]  Compared with other young adults, for example,

---

89.  *See generally* June Carbone & Naomi Cahn, Marriage Markets:  How Inequality Is Remaking the American Family (2014).

90.  *See id.*

91.  *See generally* Monica Kirkpatrick Johnson et al., *Insights on Adolescence from a Life Course Perspective*, 21 J. Res. on Adolescence 273 (2011); Glenn I. Roisman et al., *Salient and Emerging Developmental Tasks in the Transition to Adulthood*, 75 Child Dev. 123 (2004).  In the 1980s, the age at first marriage was twenty-two; today it is twenty-seven.  *See* Inst. of Med. & Nat'l Res. Council, *supra* note 15, at 45.

92.  This trend has been well documented. *See generally* Carbone & Cahn, *supra* note 89; Andrew Cherlin, The Marriage Go-Round:  The State of Marriage and the Family in America Today (2010).

93.  *See generally* Sara McLanahan & Gary Sandefur, Growing Up with a Single Parent (1997).

94.  *See supra* note 78 and accompanying text.

former foster youths are less likely to graduate from high school, have lower rates of college attendance, suffer from more mental and physical health problems, and experience higher levels of housing instability and homelessness; they are more likely to be dependent on public assistance and unemployed, and be involved with the criminal justice system.[95]  These disadvantaged young adults also are less likely to marry or cohabitate and are more likely to have children outside of marriage.[96]  A particular source of concern is the increase in early parenthood by adolescents and young adults in this cohort and the increasing number of young children with one or more incarcerated parents.[97]

Young adults in the justice system largely belong to a cohort of individuals whose prospects of making a successful transition to adulthood are poor.  As a 2015 IOM/NRC report emphasized, meeting the needs of marginalized young adults not only has the potential to improve their lives and reduce persistent inequalities due to family background, but it can also help them become more fully contributing members of society.[98]  Absent deliberate action by policymakers, however, this period of development is likely to magnify inequality, with lasting effects through adulthood.  For young adult offenders, the cost of failing to intervene to promote successful maturation extends even beyond the enormous social cost of continued involvement in criminal activity.  Many young adults in the justice system have children born into nonmarital relationships; thus, an increasing number of children have one or more incarcerated parent.[99]  This concern led the IOM/NRC committee to highlight the urgency of investing in incarcerated and otherwise marginalized young adults and their children to interrupt the transmission of disadvantage from generation to generation.[100]

Young adulthood is a period of risk and heightened stress for those individuals without the support and resources they need.  This includes young adult offenders whose prospects for productive lives may depend on the justice system's response to their crimes.  Counterintuitively perhaps, their criminal offending presents the opportunity for intervening in ways that can serve their interests and society's interest as well.

## III.  YOUNG ADULT OFFENDERS IN THE JUSTICE SYSTEM

The developmental and sociological research described in Parts I and II supports justice system reforms that focus on young adults as a transitional category of offenders between juveniles and adults.  The research, although not conclusive, indicates that offending by young adults often may be

---

95.  The IOM/NRC report emphasized the critical challenges facing this group. *See* INST. OF MED. & NAT'L RES. COUNCIL, *supra* note 15, at 4.

96.  *See id.*

97.  About 45 percent of incarcerated young adults have children.  Parental incarceration is associated with family instability, economic hardship, reductions in fathers' involvement in their children's lives, and increased child behavior problems. *See id.* at 107, 357–58.

98.  *See id.* at 347–92.

99.  *See supra* note 97 and accompanying text.

100.  *See supra* note 15 and accompanying text.

driven by tendencies toward impulsivity and risk-taking that characterize much of the criminal activity of juveniles.[101]   This conclusion is also supported by empirical data on age patterns in risky behavior.[102]   If immaturity continues to play a role in criminal involvement beyond age eighteen, many young adults, like most juveniles, are likely to desist from criminal involvement as they mature.   Moreover, recent social and economic trends have prolonged the period of dependency and vulnerability into adulthood.[103]  Against this backdrop, the potential criminogenic effects of imprisonment and the benefits of rehabilitative programs for young adult offenders have become more salient.[104]  In short, our expanded knowledge about this period of life supports legal changes that acknowledge young adults' potential for reform and aim to facilitate offenders' transitions to noncriminal adulthood.

The approach to reform that we propose draws on the developmental model that has powerfully influenced the law's response to juvenile crime in the past decade.[105]   Like juveniles, young adults are most usefully classified as a distinct category of offenders in recognition of the social reality that young adulthood, like adolescence, is a critical developmental period.[106]  This does not mean, however, that eighteen- to twenty-one-year-olds generally should be reclassified as juveniles or that their crimes should be adjudicated in the juvenile court.

The evidence suggests that young adult offenders are developmentally distinguishable from adolescents in several ways.   Furthermore, as we discuss below, pragmatic considerations militate against categorically raising the age of juvenile court jurisdiction to twenty-one.[107]  But, just as the justice system has come to recognize that adolescents are neither innocent children nor fully responsible adults, lawmakers should understand that young adults occupy a transitional developmental space between adolescents and mature adults.   As we will explain, this approach supports reforms in the adult justice system directed toward young adults that not only enhance the welfare of these individuals but also offer the potential to reduce crime.   These reforms include special sentencing and parole policies, as well as correctional programs that aim to provide young adult offenders with the skills necessary to function adequately in adult roles.

Attention to the research evidence comes at a propitious time:   when many lawmakers and the public increasingly are receptive to reform.   The extraordinary increase in incarceration rates over the past forty years has generated sharp criticism across the political spectrum.[108]  Critics recognize

---

101.  *See supra* Part I.
102.  *See supra* Part I.
103.  *See supra* Part II.
104.  *See generally* NAT'L RES. COUNCIL, *supra* note 1; SCOTT & STEINBERG, *supra* note 1.
105.  *See generally* NAT'L RES. COUNCIL, *supra* note 1; SCOTT & STEINBERG, *supra* note 1.
106.  *See supra* Part II.
107.  *See infra* Part III.C.
108.  *See* NAT'L RES. COUNCIL, NAT'L ACADS., THE GROWTH OF INCARCERATION IN THE UNITED STATES:  EXPLORING CAUSES AND CONSEQUENCES 2 (Jeremy Travis et al. eds., 2014)

that overincarceration has had only a modest impact on crime reduction, while it has generated a wide range of well-documented financial and social costs: the latter have particularly burdened the large cohort of incarcerated young adults.[109] It is well understood that criminal convictions and incarceration negatively affect employment, educational attainment, and civic engagement, diminishing the prospect that young adult offenders will become productive citizens or assume conventional adult roles.[110] The call for reform is made even more urgent because the consequences of our penal policies fall disproportionately on racial and ethnic minorities.[111]

### A. Young Adulthood: A Transitional Category

The boundary between childhood and adulthood typically creates binary legal categories: individuals are either adults or children for particular legal purposes. For most purposes, age eighteen marks the boundary, but the line between childhood and adulthood is sometimes drawn either before or after this age.[112] For example, young adults are sometimes classified as legal children; they cannot obtain and drink alcoholic beverages and may be entitled to financial support from noncustodial parents while they attend college.[113] These regulations recognize that a categorical assumption that eighteen-year-olds conform to the conventional expectations of adults in their maturity, competence, and independence sometimes can undermine social welfare.[114]

In the context of justice policy, age classification is more complex in a way that may be instructive for reforming the law's response to young adult offenders. To be sure, the binary norm currently prevails in the classification of adults in the justice system: eighteen- and thirty-five-year-old offenders typically have been subject to undifferentiated treatment as "adults." But in dealing with juvenile offenders, contemporary lawmakers have effectively created an intermediate category. Under the recent legal

---

(describing the increase as "historically unprecedented and internationally unique"). Calls for reform have come from both sides of the political spectrum.

109. Approximately 410,900 young adults ages eighteen to twenty-four were in state or federal prisons or local jails in 2010. *See id.*

110. *See generally* NAT'L RES. COUNCIL, *supra* note 1; SCOTT & STEINBERG, *supra* note 1.

111. Among young men ages twenty to twenty-four, 8 percent of non-Hispanic blacks, 3.3 percent of Hispanics, and 1.3 percent of whites, were incarcerated in 2010. *See* NAT'L RES. COUNCIL, *supra* note 108.

112. *See* Scott, *supra* note 10, at 552. For example, legal minors can obtain motor vehicle licenses, exercise their right of free speech, and consent to particular medical treatments, including treatment for substance abuse, sexually transmitted diseases, and mental illness. *See id.*

113. *See id.* at 560. Congress raised the legal drinking age in response to data indicating that drunk drivers in this age cohort caused a disproportionate percentage of serious motor vehicle accidents. *See* NAT'L RES. COUNCIL, NAT'L ACADS., REDUCING UNDERAGE DRINKING: A COLLECTIVE RESPONSIBILITY 2 (Richard J. Bonnie & Mary Ellen O'Connell eds., 2004).

114. *See* Scott, *supra* note 10, at 589; *see also* INST. OF MED. & NAT'L RES. COUNCIL, *supra* note 15, at 101–04, 235–39 (discussing parental support and minimum purchase ages).

reforms, the response to juvenile offending has been tailored to the developmental needs and capacities of adolescents.[115]

The acknowledgement that teenage offenders are neither children nor adults is grounded in pragmatic, political, and scientific considerations that have emerged from the recognition that the law's conventional binary approach is unsatisfactory as a basis for responding to juvenile crime.[116] The traditional characterization of young offenders as children who lacked responsibility for their crimes seemed discordant as applied to older youths who committed violent crimes. Not surprisingly, perhaps, this approach was effectively ridiculed by the punitive law reformers of the 1990s.[117] But their view that juveniles are not different from adult criminals has also been rejected as costly, offensive to conventional morality, and inconsistent with developmental research.[118] Under modern law reforms, juveniles are held accountable for their crimes, but their culpability is mitigated as compared to adults.[119] Furthermore, contemporary lawmakers increasingly realize that correctional programs and dispositions tailored to the developmental needs of adolescent offenders are more likely to reduce crime at a lower cost than either punitive adult sanctions or permissive policies that treat delinquent youth as children. A core objective of modern justice policy (and one submerged until recently) is to facilitate the transition of teenage offenders to productive adulthood by providing a healthy developmental context and giving them the tools they need to succeed.

This model can be adapted to young adult offenders, who also can be usefully classified as a transitional category, but one located within the adult justice system. Like juveniles, young adults are not fully mature and are more likely to reform than are older offenders. Also like juveniles, young adult offenders are in a critical period in which programs targeted to their developmental needs may powerfully influence their future lives in a positive direction. The monolithic classification of offenders over age eighteen under contemporary law assumes that uniform offense-based sentencing policies directed at adults regardless of age will protect the public and reduce crime. But this strategy is shortsighted to the extent that much young adult crime is the product of immature risk-taking propensities and that investment during this developmental period could facilitate these offenders' transitions to productive adult lives. At the same time, however, existing research does not support the classification of young adults as juveniles.[120] As we explain below, under current conditions, an institutional structure that generally treats young adults as separate transitional category of criminal offenders is likely to enhance the effectiveness of justice policy.

---

115. *See generally* NAT'L RES. COUNCIL, *supra* note 1; SCOTT & STEINBERG, *supra* note 1.
116. *See* SCOTT & STEINBERG, *supra* note 1, at 82–117.
117. *See id.*
118. *See id.*
119. *See id.*; *see also supra* Part I (discussing Supreme Court opinions).
120. *See infra* Part III.C.

*B.  Twenty-First Century Criminal Justice:*
*A Developmental Approach to Young Adult Offenders*

In this section, we suggest how an understanding of young adulthood as a period of biological, psychological, and social maturation might be translated into policies and programs directed at this group of offenders. The elements of reform already exist:  some proposals draw on sentencing and parole policies directed at juvenile offenders, while others (youthful offender statutes) would revive ameliorative statutory policies enacted in an earlier era.[121]  The heart of reform, however, is an ongoing project to develop effective interventions to provide young adult offenders with the tools to make the transition to productive adulthood.  Just as policymakers in the juvenile system turned to evidence-based correctional programs grounded in developmental knowledge in seeking effective responses to juvenile crime, criminal justice officials in some jurisdictions have begun to invest in programs directed at young adults in pursuit of the same goal.[122] As we explain, although few programs have been evaluated, investment in promising correctional programs that promote healthy development in these still maturing offenders is likely to be the most effective response to their criminal conduct.

### 1.  Young Adult Offender Status for Nonviolent Offenders

For young adults who commit nonviolent crimes, a regime modeled on the young offender statutes enacted in the 1960s and 1970s[123] can preserve future life options.  These statutes create a special status, extending rehabilitative features of juvenile proceedings to eligible young adults (as well as transferred juveniles) who are prosecuted in the criminal courts.[124] Young offender status limits sentence duration and shields offenders from the burdensome collateral consequences of having a criminal record, which can severely restrict their ability to pursue educational, employment, and

---

121. *See infra* Part III.C.1–2.

122. *See infra* Part III.C.3.

123. *See* COLO. REV. STAT. § 18-1.3-407 (2013); FLA. STAT. ANN. §§ 958.011–.15 (West 2012); GA. CODE ANN. §§ 42-7-1 to -9 (West 1997); MICH. COMP. LAWS ANN. §§ 762.11–.16 (West 2000); N.Y. CRIM. PROC. LAW § 720.10–.35 (McKinney 2011); S.C. CODE ANN. § 24-19-10 to -160 (2007).  One rationale for young offender status is to protect young offenders from the harshness and collateral consequences of criminal prosecution and conviction. *See* Raines v. State, 317 So. 2d 559, 561 (Ala. 1975); People v. Perkins, 309 N.W.2d 634, 636–37 (Mich. Ct. App. 1981).  Other rationales include provisions of educational, training, and rehabilitation programs to reduce recidivism. *See* FLA. STAT. ANN. § 958.021; GA. CODE ANN. § 42-7-3(a); S.C. CODE ANN. § 24-19-60; *Perkins*, 309 N.W.2d at 636–37.

124. *See* William Easton, *Expunging Criminal Records:  A Judge's Perspective*, 27 WAYNE L. REV. 1391, 1396 (1981); Sally Terry Green, *Realistic Opportunity for Release Equals Rehabilitation:  How the States Must Provide Meaningful Opportunity for Release*, 16 BERKELEY J. CRIM. L. 1, 24–26 (2011).  One of the most comprehensive statutes is New York's, which provides for confidentiality of records, restrictions on the consequences of a criminal conviction, and lenient sentencing alternatives. *See* N.Y. CRIM. PROC. LAW §§ 720.15, 720.35; N.Y. PENAL LAW § 60.02 (McKinney 2009). *See generally* Alison Marie Grinnell, Note, *Searching for a Solution:  The Future of New York's Juvenile Offender Law*, 16 N.Y.U. J. HUM. RTS. 635 (2000).

even housing opportunities essential to the transition to adulthood.[125] Typically, trial courts have discretion to confer this status on a young adult offender charged with designated crimes, and some laws restrict the status to first-time offenders.[126]  Most statutes limit the maximum sentence to between one and three years.[127]  Other consequences of being designated as a young offender vary from state to state and include the opportunity to avoid a criminal conviction (and thus a criminal record)[128] and to have the record sealed after a period of good behavior.[129]  A contemporary young offender statute could confer the status presumptively on all adults under twenty-one and transferred juveniles charged with particular crimes, including misdemeanors, most property crimes, and drug possession offenses.[130]  Beyond this, brief sentences, together with protection from the collateral consequences of criminal conviction, can help preserve the opportunities for productive adult lives for many young adult offenders.

### 2. Sentencing and Parole Policies

For young adults who commit serious violent offenses, young offender status is unlikely to be deemed sufficiently protective of public safety. Nonetheless, their relative youth should be considered in sentencing.  Age has long been considered a basis for mitigation under both capital and noncapital sentencing statutes.[131]  Immaturity has featured most prominently as a key mitigating factor in juvenile sentencing cases,[132] but recently courts sentencing young adults also have begun to consider

---

125. *See generally* COUNCIL OF STATE GOV'TS JUSTICE CTR., REDUCING RECIDIVISM AND IMPROVING OTHER OUTCOMES FOR YOUNG ADULTS IN THE JUVENILE AND ADULT CRIMINAL JUSTICE SYSTEMS (Nov. 2015) (discussing the collateral consequences of having a criminal record and the ways in which it inhibits the ability of young adults to transition to productive adulthood).

126. *See* MICH. COMP. LAWS ANN. §§ 762.11 (excluding offenses carrying a maximum penalty of life imprisonment, major controlled substance offenses, traffic offenses, and criminal sexual conduct, and excluding offenders with a prior conviction or adjudication for an offense requiring a sex-offender registration); N.Y. CRIM. PROC. LAW § 720.10(3) (excluding murder, armed felonies, rape in the first degree, criminal sexual act in the first degree, or aggravated sexual abuse).

127. *See* ALA. CODE § 15-19-6(a)(4) (LexisNexis 2011) (limiting to no more than three years for felonies); FLA. STAT. ANN. § 958.04(1)(2)(c)-(d) (limiting to no more than six years); MICH. COMP. LAWS ANN. § 762.13(1) (limiting to no more than one year); N.Y. PENAL CODE §§ 60.02(2), 70.00(2)(e) (limiting to no more than four years for most felonies).

128. *See* ALA. CODE § 15-19-7(a); MICH. COMP. LAWS ANN. § 762.11(1); N.Y. CRIM. PROC. LAW § 720.35(1).

129. *See* S.C. CODE ANN. § 22-5-920(B) (2007) (providing for applications to expunge records of arrest and conviction fifteen years after conviction).

130. The New York legislature is currently considering a bill that proposes a presumption of youthful offender status to young defendants who do not have a prior conviction or adjudication for a felony. *See* Assemb. 238-7642, 2015–2016 Reg. Sess. § 79 (N.Y. 2015); S. 238-5642, 2015–2016 Reg. Sess. § 79 (N.Y. 2015).

131. *See* ARIZ. REV. STAT. ANN. § 13-751(G)(5) (2010) (considering the defendant's age as a mitigating circumstance); S.C. CODE ANN. § 16-3-20(3)(C)(b)(7) (same); UTAH CODE ANN. § 76-3-207(4)(e) (LexisNexis 2012) (same).

132. *See supra* notes 2, 36 and accompanying text.

evidence of immaturity in mitigation.[133]  In 2015, for example, an Illinois court set aside a mandatory sentence of life without parole imposed on a nineteen-year-old as a violation of the Eighth Amendment prohibition of cruel and unusual punishment.[134]  The court cited the Supreme Court's juvenile sentencing opinions and also pointed to developmental research indicating that brain maturation continues into the twenties.[135]  This evidence can also support a presumption that mandatory minimum adult sentencing regimes should exclude young adult offenders, just as juvenile offenders are excluded in some states.[136]

The determination of whether a reduced sentence is warranted can also be made ex post through parole policies designed for young adult offenders. Some states have adopted special statutes that allow juvenile prisoners sentenced for serious offenses in the adult system to petition for expedited parole and provide programmatic assistance to prepare them for the hearing.[137]  These laws are premised on developmental evidence that much juvenile crime is the product of immaturity and that many young offenders will reform as they mature.[138]  If the crimes of many young adult offenders similarly represent impulsive risk-taking behavior that is characteristic of this period of life, their inclination to offend is likely to decline with maturation.  A special parole statute would allow the young adult offender to demonstrate, on an expedited basis, that he no longer represents a threat to society.  These prisoners can be held accountable and public safety can be protected through briefer sentences than those imposed on prisoners who offended as older adults or who have not demonstrated reform.

### 3. Specialized Correctional Facilities and Programs

At this point, the justice system has only begun to offer correctional programs or special facilities aimed at young adult offenders (and juvenile offenders sentenced as adults),[139] and few programs have been subject to rigorous evaluation.  Thus, no blueprint exists for transforming correctional

---

133. *See, e.g.*, United States v. C.R., 296 F.R.D. 131, 132–35 (E.D.N.Y. 2013); People v. House, No. 1-11-0580, 2015 WL 9428803, at *27 (Ill. App. Ct. Dec. 24, 2015).

134. *See House*, 2015 WL 9428803, at *27; *see also C.R.*, 296 F.R.D. at 132–35 (sentencing a nineteen-year-old defendant to the five year minimum).  In a lengthy memorandum, Judge Jack Weinstein described the research on brain development in young adulthood as justification for imposing the minimum sentence. *See* Sentencing Memorandum, *C.R.*, 296 F.R.D. 131 (No. 09 Cr. 0155 (JBW)), 2013 WL 11263190.

135. *See* Sentencing Memorandum, *supra* note 134.

136. *See* State v. Lyle, 854 N.W.2d 378, 386 (Iowa 2014) (finding mandatory minimum sentences inappropriate for juveniles).

137. *See* CAL. PENAL CODE § 4801 (West 2011) (special expedited parole statute for juvenile offenders); WASH. REV. CODE ANN. § 10.95.030 (West 2014).

138. *See* CAL. PENAL CODE § 4801, pmbl. (offering this rationale).

139. Colorado's Youthful Offender System (YOS) was legislatively created primarily to reduce recidivism in violent offenders, both transferred juveniles and (through a later statute) young adults ages eighteen and nineteen, and to provide them with the means to become productive adult citizens. *See* COLO. DEP'T OF PUB. SAFETY, EVALUATION OF THE YOUTHFUL OFFENDER SYSTEM (YOS) IN COLORADO: A REPORT OF FINDINGS PER 18-1.3-408, C.R.S. 14–17 (2014).

policy.  However, promising reforms implemented in the juvenile system over the past generation provide guidance for policymakers focusing on young adult offenders.  Effective juvenile programs, policies, and practices that are tailored to the unique needs of this population can be—and are being—adapted for young adults.[140]  For example, multi-systemic therapy, which has been shown to effectively reduce recidivism in juveniles, is being adapted to treat young adults.[141]  Substance abuse and other mental health services, as well as social skills training, are important interventions with young adult offenders, as with juveniles.  Finally, developing effective educational and vocational skills training programs for this age cohort is essential to successful justice policy and poses a challenge perhaps even greater than in the juvenile justice context.  Sociological research indicates that young adult offenders are often detached from the socializing institutions of work and family that reduce recidivism.[142]  What is needed is a comprehensive effort to provide these offenders with programs and facilities that will aid in promoting their integration into the larger society as productive adults.

Increasingly, states and localities have begun to take up this challenge, persuaded that policies targeting young adult offenders potentially can be an effective means to reduce recidivism.  Localities have developed promising community-based programs for young adult offenders that provide intensive services and supervision, with good employment and recidivism-reduction outcomes.[143]  For incarcerated young adult offenders, some states have created separate facilities modeled on successful juvenile facilities and programs.  These facilities have developmentally trained staff and emphasize education, workforce development, and cognitive behavioral training and typically are connected with specialized aftercare services.[144]  Programs directed at young adults within integrated facilities are also being

---

140.  *See* COUNCIL OF STATE GOV'TS JUSTICE CTR., *supra* note 125, at 7.

141.  *See id.*  Multisystemic therapy has been one of the most effective programs with both violent and nonviolent juvenile offenders. *See* SCOTT & STEINBERG, *supra* note 1, at 217–20.

142.  *See* Schiraldi et al., *supra* note 6, at 4.

143.  The San Francisco Adult Probation Transitional Age Youth Unit is a successful community-based program. *See id.* at 11.  Roca, a Massachusetts program that combines cognitive behavioral therapy, substance abuse treatment, and best-practice community corrections, has effectively reduced recidivism and increased employment in justice-involved high-risk young men. *See id.* at 12.

144.  The Colorado YOS is among the most comprehensive programs aimed at young adults ages eighteen and nineteen. *See generally* COLO. DEP'T OF PUB. SAFETY, *supra* note 139.  First established in 1994 for violent juvenile offenders in the adult system, YOS houses offenders in separate facilities and provides specially designed programs and services that focus on academics, rehabilitation, and the development of prosocial behaviors and reentry planning.  The recidivism rates of offenders who successfully complete the YOS program (most offenders) is far better than comparable offenders.  YOS offenders receive career and technical education, anger management treatment, and substance abuse treatment. *See id.* at 43.  New York City and California are developing facilities for young adults.  The planned California facility (the California Leadership Academy) is modeled on the successful "Missouri Model" of juvenile residential facilities. *See* COUNCIL OF STATE GOV'TS JUSTICE CTR., *supra* note 125, at 14.

developed.[145]  Through these programs, policymakers recognize that even when incarceration is justified for punishment and public protection, society's interests, as well as that of offenders, are served by investing in the education, health, and well-being of young adults who will eventually be allowed to return to the community.[146]

### C. Why Not Extend the Jurisdictional Age of Juvenile Court?

As we have indicated, reforms in the justice system's treatment of young adult offenders should build on the developmental approach to juvenile justice.  Thus, the natural next move might seem to be a unitary rehabilitative justice system with general jurisdiction over juveniles and young adults.  Nonetheless, we are hesitant to argue for this bold reform for several reasons.

As we have shown, the scientific evidence does not currently justify an institutional reform of this magnitude.  Moreover, the political and practical obstacles to such a change are formidable.  Although modest steps toward consolidating responses to minor offenses by young adults may be feasible, it is not clear that, under current conditions, the interests of either juveniles or young adults would be promoted by a unitary justice system.

Some reformers have pointed to neuroscience and other research in advocating that young adults be adjudicated in the juvenile system.[147]  But the research supporting the presumption underlying the lenient, rehabilitative approach of the juvenile system—that youthful offending is driven by developmental immaturity—is weaker for young adults.[148]  Because of their youth, adolescents are deemed less culpable and more malleable than older offenders.  The emerging developmental evidence indicates that young adult brains are developing and that these offenders may be similar to adolescents in their impulsivity.[149]  However, the developmental factors that likely drive offending in younger teens are subtler in young adults, and, in some regards, young adults are more like older adults than teenagers.[150]  As explained in Part I, scientific evidence is simply not robust enough to support a response of categorical leniency toward young adult offenders.

We are also concerned that raising the age for juvenile court adjudication to twenty-one may have the unintended consequence of making adolescents

---

145. *See About the Division of Juvenile Justice*, CAL. DEP'T OF CORRECTIONS & REHABILITATION, http://www.cdcr.ca.gov/Juvenile_Justice/About_DJJ/index.html (last visited Oct. 16, 2016) (providing training and treatment to young adult offenders) [https://perma.cc/59FM-CQEG]; FLA. S., INTERIM REPORT ON YOUTHFUL OFFENDER DESIGNATION IN THE DEPARTMENT OF CORRECTIONS, S. 2011-114, at 3 (2010) (providing educational, work, and rehabilitative programs to young adult offenders).

146. *See* INST. OF MED. & NAT'L RES. COUNCIL, *supra* note 15, at 361–66.

147. *See supra* note 17 and accompanying text.

148. *See supra* Part I.

149. *See supra* Part I.

150. Young adults respond more like adolescents on measures of self-control under conditions of threat, but they perform more like adults under conditions of positive arousal. *See supra* Part I.

in the justice system worse off than under the current regime without producing the intended benefits for young adults. Political reality dictates that public safety will always be a preeminent concern of justice policy. Indeed, the juvenile system, with its commitment to rehabilitation, often has been challenged on the ground that its lenient response to young offenders sacrifices public safety.[151] During periods when public fears about violent juvenile crime are aroused, such as the 1990s, politicians have responded by adopting punitive laws facilitating the adult prosecution and punishment of juveniles.[152] To be sure, the moral panic of that period has receded. But the lessons of the 1990s are that public and political acceptance of the special status of juveniles is tentative and that the developmental approach to juvenile justice policy could be readily destabilized.[153] Extending the general jurisdiction of the juvenile system to age twenty-one would only increase its vulnerability. A system committed to leniency and to more abbreviated sanctions is unlikely to be deemed satisfactory in dealing with a category of offenders who commit a substantial percentage of serious offenses.[154] Moreover, young adult offenders have different needs than younger juveniles, and integrating substantial numbers of young adults into the juvenile system could have a negative impact on its ability to serve the needs of the youths who are its primary concern.[155]

Young adults themselves are likely to attain greater benefit from institutional reforms in the adult system than from juvenile status. Even if the age of juvenile court jurisdiction were raised, young adults charged with serious crimes predictably would be transferred to an adult system with few programs or policies dedicated to their rehabilitation. Reformers are better advised to concentrate on ameliorative institutional reforms in the adult system. As the youngest offenders within the jurisdiction of the adult system, young adults have a claim to correctional responses that acknowledge their transitional status and potential for reform. More importantly, perhaps, if programs tailored to the needs of young adult offenders reduce crime by giving them the tools to assume conventional adult roles, society may also reap substantial benefits.

Modest extensions of juvenile court jurisdiction are possible. Indeed, many states have extended the jurisdictional age for juvenile court

---

151. *See generally* SCOTT & STEINBERG, *supra* note 1.

152. *See id.* at 94–99 (discussing moral panics of the 1990s in response to an increase in juvenile crime); Elizabeth S. Scott, Miller v. Alabama *and the (Past and) Future of Juvenile Crime Regulation*, 31 LAW & INEQ. 535 (2013).

153. *See generally* Scott, *supra* note 152.

154. *See generally* Perkins, *supra* note 12.

155. *See* Tamar R. Birckhead, *North Carolina, Juvenile Court Jurisdiction, and the Resistance to Reform*, 86 N.C. L. REV. 1143, 1494–500 (2008) (discussing arguments against raising the age of the juvenile system, such as expansion of an already underfunded system); *see also* Nancy L. Iredale & Paul L. Joffe, *Between Juvenile and Adult Courts: A No Man's Land for the Youthful Offender*, YALE REV. L. & SOC. ACTION, Spring 1971, at 49, 52–53 (noting arguments made by a juvenile court judge that the juvenile system's facilities for treating older offenders are inadequate and that raising the age of the juvenile system would dilute the trust and efficacy of the special handling of juveniles by a specialist court).

*dispositions* to twenty-one or even beyond.[156] This extension allows older juveniles, whose offenses and age warrant more extensive interventions than would be possible if jurisdiction ended at age eighteen, to avoid transfer and the harsh sanctions of the adult system and to benefit as young adults from programs in the juvenile system. A more innovative reform (and an alternative to young offender status)[157] would be the extension of juvenile court jurisdiction to individuals who commit minor crimes as young adults. Adjudication and disposition in the juvenile system of these offenders allows them to avoid the stigma of criminal conviction, without an undue destabilizing impact on the juvenile system.[158]

## CONCLUSION

At a time when policymakers and the public are likely to be receptive to reforms that reduce crime, developmental and sociological research supports a new approach to young adult offenders. Drawing on lessons from juvenile justice reforms, we argue that individuals in this age cohort should be treated as a discrete and transitional category between juveniles and adults. Tailoring sentencing policies to this group and investing in effective programs to give them the tools to become productive noncriminal adults will serve social welfare, as well as the interests of the most vulnerable young adults.

---

156. Statutes in thirty-five states extend dispositional jurisdiction beyond age eighteen. *See State Statutes Define Who Is Under Juvenile Court Jurisdiction*, JUV. OFFENDER & VICTIMS NAT'L REP. SERIES BULL. (Office of Juvenile Justice & Delinquency Prevention, Wash. D.C.), June 2003, https://www.ncjrs.gov/pdffiles1/ojjdp/195420.pdf [https://perma.cc/A5EW-MYCJ].

157. *See supra* notes 126–34 and accompanying text.

158. An alternative is youthful offender status that shields criminal records. *See supra* notes 128–29 and accompanying text.

# EXHIBIT 20





# KEEPING OUR SCHOOLS SAFE: A PLAN TO STOP MASS SHOOTINGS AND END GUN VIOLENCE IN AMERICAN SCHOOLS

## TABLE OF CONTENTS

**I. Introduction**................................................................................................ 2

**II. Executive Summary**.................................................................................4

**III. Gun Violence in America's Schools**..................................................8

What Does Gun Violence in American Schools Look Like? ...................9

What Do We Know About School Gun Violence Incidents? ...............11

**IV. A Comprehensive Plan to Prevent Mass Shootings and Other Gun Violence in Our Schools**..........................................................................................14

Tailored Gun Violence Prevention Policies and Interventions.........................14

Protecting Schools Through Threat Identification, Security, Planning And by Creating Safe School Environments..........................................................21

**V.  Arming Teachers Is Dangerous**................................................................30

**VI. Conclusion** ................................................................................................ 35

**Appendix. Guns in Schools Laws Legal Overview**......................................36

## INTRODUCTION

For the last 20 years our students, teachers and parents have lived with the reality of school shootings. Meanwhile, America's gun violence epidemic, in the form of mass shootings, homicides, assaults, unintentional discharges, and firearm suicides, has been infecting America's schools. The failure of our leaders to address the root causes of school gun violence from all angles is having lasting consequences for millions of American children.

We need meaningful action to keep our schools safe — action that addresses what we know about gun violence in America's schools and prevents it from occurring in the first place. It's time for our leaders to adopt a multi-faceted approach that provides the school community with the tools it needs to intervene and prevent school-based gun violence. We can't let risky ideas, like arming teachers, dominate the debate. Put simply, an armed teacher cannot, in a moment of extreme duress and confusion, transform into a specially trained law enforcement officer. In reality, an armed teacher is much more likely to hit a student bystander or be shot by law enforcement than to be an effective solution to an active shooter in a school.

This report focuses on approaches that are proven most effective, such as addressing students' health, empowering teachers and law enforcement to intervene when students show signs they could be a danger to themselves or others, improving our schools' physical security, and keeping guns out of the hands of people who shouldn't have them in the first place.

# OUR PLAN

1. Pass Red Flag Laws

2. Encourage Responsible Firearm Storage

3. Raise the Age to Purchase Semiautomatic Firearms

4. Require Background Checks on All Gun Sales

5. Create Threat Assessment Programs in Schools

6. Implement Expert-Endorsed School Security Upgrades

7. Initiate Effective Emergency Planning

8. Create Safe and Equitable Schools

everytownresearch.org

## EXECUTIVE SUMMARY

In this report, the nation's largest education unions and its largest gun safety organization are joining together to present a plan that combines carefully tailored gun safety policies with school-based intervention strategies. Using data to paint the full picture of what gun violence looks like on school grounds and drawing upon research and recommendations from school safety experts, Everytown for Gun Safety Support Fund, the American Federation of Teachers, and the National Education Association have crafted a plan focused on intervention that can prevent mass shooting incidents and help end gun violence in American schools.

The aim of this report is three-fold:

### 1. Demonstrate What Gun Violence in American Schools Looks Like

First, Everytown for Gun Safety Support Fund, the American Federation of Teachers, and the National Education Association want to provide policymakers and the public with an understanding of how gun violence impacts America's schools. To accomplish this goal, Everytown has updated its study of gun violence on school grounds. Analyzing this information and supplementing our data with research from other respected organizations, we learned the following:

1. Those committing gun violence on school grounds often have a connection to the school;

2. Guns used in school-based violence generally come from home, or the homes of family or friends;

3. Shooters often exhibit warning signs of potential violence; and

4. Gun violence in American schools has a disproportionate impact on students of color.

### 2. Outline a Plan to Prevent Gun Violence in Schools

Second, the report provides a proactive, research-informed intervention plan to prevent active shooter incidents and, more broadly, address gun violence in all its

forms in American schools. As representatives of educational professionals from across the country, parents of school-aged children who volunteer with Moms Demand Action for Gun Sense in America (part of Everytown), and student activists through Everytown's Students Demand Action chapters, the authors believe it is imperative to help keep our kids safe at school with approaches that are proven effective. Using what we know about school gun violence our organizations have put together a plan that focuses on intervening before violence occurs. The first part of this plan focuses on preventing shooters from getting their hands on guns by enacting sensible laws including:

1. Red Flag laws so that law enforcement and family members can act on warning signs of violence, like those that repeatedly occurred in Parkland, and temporarily prevent access to firearms;

2. Responsible firearm storage laws to address the most common source of guns used in school gun violence, including the guns that were used in the Santa Fe shooting;

3. Raising the age to purchase semiautomatic firearms to 21 to prevent minors, like the shooter in Parkland, from easily getting their hands on guns; and

4. Requiring background checks on all gun sales so people exhibiting warning signs, minors, and people with dangerous histories can't evade our gun laws and get their hands on guns.

The second part of the plan focuses on evidence-based and expert-endorsed actions that schools can take. These solutions empower educators and law enforcement to intervene to address warning signs of violence and to keep shooters out of schools. Schools can do this by:

1. Establishing threat assessment programs in schools to understand and intervene when a student is a risk to themselves or others;

2. Implementing basic security upgrades to prevent access to schools and classrooms;

3. Planning in advance for emergencies so staff can immediately lock out schools and law enforcement can respond quickly; and

4. Establishing safe and equitable schools to help reduce gun violence, especially in high-risk communities.

These solutions work hand in hand to help create safe schools, address violence at its earliest stages and block easy access to firearms by those who would do harm.

### 3. Stop Schools from Arming Teachers

Third and finally, this report provides a thorough overview of why arming teachers and allowing more guns in our schools poses a risk to our children. The authors understand the strong desire for solutions, but this report carefully considers all of the arguments for arming teachers and explains why it is an ineffective solution to gun violence in our schools. Using a wealth of research that shows allowing teachers to carry guns in schools increase the risks to children, this report demonstrates that it is unrealistic to believe a teacher would be able to protect their students, neutralize a shooter, and not be a risk to themselves and to their students. Instead, the report urges our leaders to adopt proven solutions that address what we know about school gun violence.

## WHO WE ARE

### Everytown for Gun Safety Support Fund

Everytown for Gun Safety Support Fund ("Everytown") seeks to improve our understanding of the causes of gun violence and the means to reduce it — by conducting groundbreaking original research, developing evidence-based policies, and communicating this knowledge in the courts and the court of public opinion.

### Moms Demand Action for Gun Sense in America

Moms Demand Action for Gun Sense in America ("Moms Demand Action") is a grassroots movement of Americans fighting for public safety measures that can protect people from gun violence.  Moms Demand Action has established a chapter in every state of the country.

**Students Demand Action for Gun Sense in America**

Students Demand Action for Gun Sense in America ("Students Demand Action")  is a national initiative, created by and for teens and young adults, to channel the energy and passion of high school and college-aged students into the fight against gun violence. Students Demand Action volunteers work within their schools and communities to educate their peers, register voters and demand common-sense solutions to this national crisis.

**American Federation of Teachers**

The American Federation of Teachers (AFT), represents more than 1.7 million educators, school professionals, government employees, and healthcare professionals. AFT has more than 3,000 affiliates nationwide and advocates across the country for high-quality public education, healthcare, and public-services for students, families, and communities.

**National Education Association**

The National Education Association (NEA), the nation's largest professional employee organization, is committed to advancing the cause of public education. NEA's 3 million members work at every level of education from preschool to university graduate programs. NEA has affiliate organizations in every state and in more than 14,000 communities across the United States.

# GUN VIOLENCE IN AMERICA'S SCHOOLS

Everytown's database of gunfire on school grounds details the myriad ways in which gun violence manifests in American schools.  Following the mass shooting at Sandy Hook School in 2012, Everytown began tracking all cases of gunfire on school grounds. The aim of this project was to build a detailed national database that included all scenarios involving gunfire on school grounds. As such, Everytown created a definition that was purposely broad, including incidents defined as follows:

> *Any time a gun discharges a live round inside (or into) a school building, or on (or onto) a school campus or grounds, where "school" refers to elementary, middle, and high schools — K-12 — as well as colleges and universities.[1]*

From 2013 to 2018, Everytown identified 405 incidents of gunfire on school grounds. Of these, 260 occurred on the grounds of an elementary, middle, or high school, resulting in 109 deaths and 219 injuries.[2] While Everytown's database includes higher-education institutions, for the purposes of this report all numbers and analyses reflect only those incidents that occurred on the grounds of elementary, middle, or high schools.

This analysis shows that mass shootings like the incident at Sandy Hook — and, more recently, Parkland and Santa Fe — are not commonplace. They represent less than 1 percent of overall school gun violence incidents. However, these incidents account for a disproportionate share of the overall deaths and injuries from school gun violence. Mass shootings also are imposing an unknown amount of trauma on a generation of students. It is unfathomable that our leaders have not taken the steps necessary to address and help those with patterns of violent behavior and to block their easy access to guns.

The analysis also demonstrates that other incidents of gun violence are occuring in our schools with distressing frequency. These include homicide and assaults; unintentional

---

[1] For six full years beginning in 2013, Everytown collected detailed information on all incidents that met this definition, including demographic details of shooters and victims, the shooter or shooters' intention, location, school population and racial demographic, and, where available, the original source of the firearm. To gather this material, Everytown relied on news reports by reputable media sources. Where necessary, inquiries were made to law enforcement and school officials. All incidents used in the final analyses — the data points underlying this report — were then confirmed by an independent research firm.  In addition, where appropriate, Everytown used publicly available databases and studies from the Naval Postgraduate School and the New York Police Department, to supplement original analyses and findings.

[2] Everytown's Gunfire on School Grounds database includes 145 incidents on colleges and universities. These incidents were excluded from analyses to focus on gunfire on K-12 school grounds.

discharges resulting in injury or death; and, to a slightly lesser extent, self-harm and suicide deaths using a firearm.

All of these incidents of gun violence, regardless of their intent or victim count, compromise the safety of our schools — safety that directly impacts learning outcomes and the emotional and social development of our students.[3]  A growing body of research shows that the lingering trauma from exposure to gun violence affects everything from ability to maintain attention[4] to overall enrollment numbers and performance on standardized tests.[5]  To address all of these incidents, a broader platform of solutions is required.

## WHAT DOES GUN VIOLENCE IN AMERICA'S SCHOOLS LOOK LIKE?[6]



- 56% Homicides, Assaults and Mass Shootings
- 20% Unintentional Shootings
- 12% Suicide Deaths and Attempts
- 12% Legal Interventions and Uncategorized Incidents

### Homicides, Assaults and Mass Shootings

The majority of incidents of gun violence in elementary, middle, and high schools — 56 percent — are homicides, assaults, and mass shootings. Everytown identified only three mass shootings — incidents where a shooter killed four or more people — in an elementary, middle, or high school between 2013 and 2018.[7]  Far more common were

---

[3] Cornell DG, Mayer MJ. Why do school order and safety matter? *Educational Researcher.* 2010; 39(1): 7-15.
[4] Sharkey PT, Tirado-Strayer N, Papachristos AV, Raver CC. The effect of local violence on children's attention and impulse control. *American Journal of Public Health.* 2012; 102(12): 2287-2293.
[5] Beland LP, Kim D. The effect of high school shootings on school and student performance.  *Education Evaluation and Policy Analysis.* 2016; 38(1): 113-126.
[6] Everytown was able to determine the shooter's intent in 235 incidents, the breakdown and analysis for which is provided below.
[7] Everytown defines a mass shooting as an incident in which four or more people, not including the shooter, are killed with a firearm. These shootings occurred at: Marysville Pilchuck High School in Marysville, WA, Marjory Stoneman Douglas in Parkland, FL, and Santa Fe High School, in Santa Fe, TX.

incidents involving specific individuals, arguments that escalated, acts of domestic violence, parking lot altercations, and robberies where the school was an unfortunate backdrop.

While mass shootings in schools are rare,[8] comprising only 1 percent of school gun violence incidents, they account for more than a quarter (28 percent) of overall deaths in schools and 14 percent of overall injuries. And the statistics do not begin to capture the collective impact these shootings have on the schools in which they occur, their communities, and all students and parents.

Over the last six years, there were 131 homicides and assaults with a firearm that took place on the grounds of elementary, middle, and high schools. These incidents resulted in at least 248 victims: 74 deaths and 174 non-fatal gunshot injuries.[9] At least 130 of these victims were students at the time.

## Unintentional Shootings

Approximately 20 percent of gunfire incidents that occurred on the grounds of elementary, middle, and high schools were unintentional including those resulting in injury or death and incidents in which no one was shot. These 47 incidents resulted in at least one death and 32 non-fatal gunshot injuries.[10] At least 21 of these victims were students at the time.

## Suicide Deaths and Attempts

Twelve percent of elementary, middle, and high school gunfire incidents involved suicide deaths and attempts where the shooter had no intention of harming other people. These 28 incidents resulted in 24 deaths and four injuries.[11] At least 22 of the victims were students at the time.

---

[8] This aligns with research from other organizations that have developed comparable databases of incidents in schools. The Center for Homeland Defense and Security (CHDS) at the Naval Postgraduate School, for example, maintains a public database of gun violence incidents in K-12 schools dating back to 1970. According to the CHDS database, 10 mass shootings that resulted in the deaths of four or more people not including the shooter occurred on school grounds. The CHDS database also includes more than 1,300 other incidents of school gun violence that occurred over the same time period. Center for Homeland Defense and Security. K-12 School Shooting Database. https://www.chds.us/ssdb/. Accessed February 4, 2019.
[9] The number of death and injuries for this category excludes the shooter.
[10] The number of deaths and injuries for this category includes injuries or death of the shooter.
[11] The number of deaths and injuries for this category includes injuries or death of the shooter only in the event that the shooter did not intend to harm another.

### Legal Interventions and Uncategorized Incidents

The remaining incidents of gunfire on the grounds of elementary, middle, and high schools — 12 percent — were legal interventions or other incidents in which the intention of the shooter falls outside of the categories listed here.

These 29 incidents resulted in eight deaths and four injuries.[12] Incidents involving legal intervention are those in which the shooter or potential shooter was shot or shot at by a law enforcement officer. Uncategorized incidents include, but are not limited to, those in which a firearm was discharged into the air, those in which a gun was discharged but harm was caused to others through other means, and those in which a gun was discharged with intent to damage buildings or other property.

## WHAT DO WE KNOW ABOUT SCHOOL GUN VIOLENCE INCIDENTS?

Understanding incidents of gun violence in schools is integral to effectively creating a comprehensive plan to address their threat and effects. Analyzing Everytown's gunfire on school grounds dataset and relevant studies from other respected organizations, there are several common lessons that guide our school safety proposals.

### Those Discharging Guns on School Grounds Often Have a Connection to the School

Everytown's analysis of gunfire on school grounds reveals that across all forms of gun violence in America's schools, shooters often have a connection to the school. Overall, 56 percent were associated with the school — they were either current or former students, staff, faculty, or school resource officers.[13] Of the 109 shooters involved in homicides and assaults, 40 percent were current or former students. Of the 46 shooters involved in unintentional discharges, 67 percent were current or former students. Finally, of the 27 shooters involved in self-harm injuries and suicide deaths, 89 percent were current or former students.

---

[12] The number of death and injuries for this category excludes the shooter.
[13] Everytown was able to determine both the shooter's intent and relationship to the school in 218 incidents.

Considering only active shooters — those shooters who are actively engaged in killing or attempting to kill others in a school[14] — the numbers are higher.  An analysis of the New York Police Department's review of active shooter incidents found that in 75 percent of these incidents at schools, the shooter or shooters were school-aged and were current or former students.[15] This data suggests that school-based interventions, like threat assessment programs, can be an effective tool for addressing school gun violence.

### The Guns Generally Come From Home, Family, or Friends

Evidence suggests that most school shooters obtain their guns from family, relatives, or friends rather than purchasing them legally or illegally. Everytown was able to identify the gun source in 51 percent of the incidents that involved shooters under 18 years old (a total of 100 shooters).[16] Most of these shooters — 78 percent — obtained the gun(s) from their home or the homes of relatives or friends. This finding is consistent with other studies showing that 68 to 80 percent of school shooters under the age of 18 acquired the gun(s) used from their home or the homes of relatives or friends.[17,18,19] This data suggests that responsible storage laws can be an effective tool in addressing the source of guns used in school gun violence.

---

[14] New York City Police Department. *Active shooters: Recommendation and analysis for risk mitigation.* 2016. https://on.nyc.gov/2GlEbI1. Everytown's analysis doesn't require a definition of "active shooter," but as used in this report generally, we are referring to shooters actively engaged in killing or attempting to kill people at a school. Specifically, the New York Police Department (NYPD), adopting a definition created by the U.S. Department of Homeland Security defines an active shooter as "a person(s) actively engaged in killing or attempting to kill people in a confined and populated area." In its definition, DHS notes that, "in most cases, active shooters use firearm(s) and there is no pattern or method to their selection of victims." The NYPD has limited this definition to include only cases that spill beyond an intended victim to involve others, including bystanders and collateral casualties.

[15] New York City Police Department. Active shooters: Recommendation and analysis for risk mitigation. 2016. https://on.nyc.gov/2GlEbI1. Everytown limited analysis to incidents that took place in K-12 schools and defined school-aged as under the age of 21.

[16] Everytown limited its analysis to "primary shooter" because of the unavailability of gun source data for additional shooters in multiple-shooter incidents. Everytown was able to identify the age of 182 of the 259 primary shooters. Of the remaining shooters, either the shooter was not identified in the media or police reports or demographic information was unavailable.

[17] United States Secret Service and United States Department of Education. The final report and findings of the safe school initiative: Implications for the prevention of school attacks in the United States. https://bit.ly/2oFpIwa. Published May 2002. The study analyzed targeted school violence from 1974 through June 2000 finding that 68 percent of attackers acquired the gun(s) used in the incidents from their home or that of a relative.

[18] Centers for Disease Control and Prevention. Source of firearms used by students in school-associated violent deaths, United States, 1992-1999. *MMWR Weekly.* 2003; 52(09): 169-172. The study analyzed school-associated violent deaths between 1992 and 1999 finding that 79 percent of guns used were obtained from the shooter's home or that of a friend or relative.

[19] Woodrow Cox J, Rich S. 'The gun's not in the closet.' *The Washington Post.* August 1, 2018. https://wapo.st/2TyDnTW. The study analyzed acts of gun violence at primary and secondary schools involving shooters under the age of 18 since 1999 finding that of the 105 cases in which the gun's source was identified, 80 percent were acquired from the child's home or those of relatives or friends.

## There Are Often Warning Signs

Particularly for active shooter incidents, there are often warning signs. These warning signs, if appropriately identified, can offer an opportunity for intervention. The United States Secret Service and the United States Department of Education studied targeted school violence incidents and found that in 93 percent of cases there were behavioral warning signs that caused others to be concerned.[20] They also found that in 81 percent of incidents, other people, most often the shooter's peers, had some type of knowledge about the shooter's plans.[21] This data suggests that Red Flag laws, which enable family and law enforcement to temporarily restrict a person's access to guns when they are a risk to themselves or others, can be effective tools for keeping guns out of the hands of active shooters.

## Gun Violence in American Schools Has a Disproportionate Impact on Students of Color[22]

While perpetrators of mass shootings in schools have tended to be white, and the popular narrative around school shootings has focused on predominantly white schools, the larger context of gunfire on school grounds presents a very different picture. Among the 253 shooting incidents at K-12 schools where the racial demographic information of the student body was known, 64 percent occurred in majority-minority schools.[23] The burden of gun violence has a particularly outsized impact on Black students. Although Black students represent approximately 15 percent of the total K-12 school population in America,[24] they constitute 24 percent of K-12 student victims of gunfire (those who were killed or injured on school grounds where the race of the victim was known).[25] This

---

[20] United States Secret Service and United States Department of Education. Prior knowledge of potential school-based violence: Information students learn may prevent a targeted attack. https://bit.ly/2MPrOoL. Published May 2008.
[21] Id.
[22] Everytown also analyzed racial disparities in gunfire on college and university campuses and found similar results. Not only are students of color, especially Black students, disproportionately impacted by gun violence on campus, but Historically Black College and Universities (HBCUs) experience a particularly high number of incidents compared to other high education institutions: 26 of the approximately 102 HBCUs nationwide experienced incidents of gunfire on school grounds between 2013 and 2018 and some campuses experienced multiple incidents.
[23] Everytown gathered demographic information on the student population of each school included in the database for which data were available. A majority-minority school is defined as one in which one or more racial and/or ethnic minorities (relative to the U.S. population) comprise a majority of the student population.
[24] U.S. Department of Education, National Center for Education Statistics. Common Core of Data (CCD). "State nonfiscal survey of public elementary and secondary education," 1998-99 through 2015-16; National elementary and secondary enrollment by race/ethnicity projection model, 1972 through 2027. Everytown averaged the student population size, both total and Black student populations, for the years 2013 to 2018. February 2018. https://bit.ly/2MTkw3C.
[25] Everytown identified the race of 95 of the 177 student victims identified in the database. Of those, 23 were identified as Black, 54 as white, 13 as Hispanic or Latino, 1 as Asian-Pacific Islander, and 4 as other. The analysis includes both injuries and deaths resulting from homicides, assaults, unintentional shootings, and suicides and incidents of self-harm where no one else was hurt, in the count of these victims..

suggests that creating safe and equitable schools in communities with high rates of gun violence can help address these broader trends.

# A COMPREHENSIVE PLAN FOR PREVENTING MASS SHOOTINGS AND OTHER GUN VIOLENCE IN OUR SCHOOLS

## TAILORED GUN VIOLENCE PREVENTION POLICIES AND INTERVENTIONS

In order to effectively address gun violence in our schools, it must first be acknowledged that it is, in fact, a gun violence problem. There have been many "comprehensive" school safety plans proposed over the last 20 years. Few have effectively and thoroughly addressed the issue common in all school shootings: easy access to guns by those at risk of committing harm. Everytown, AFT, and NEA firmly believe that any effective school safety plan must involve a proactive effort to enact meaningful gun violence prevention policies that enable intervention before a prospective shooter can get his or her hands on a gun. These gun violence prevention solutions work hand in hand with school-based intervention policies to intervene before a shooter ever gets to the school.

### Act on Warning Signs by Passing Red Flag Laws

As with most active shooter incidents in schools, there were warning signs prior to the Parkland shooting. Nearly 30 people knew about the shooter's violent behavior[26] and law enforcement had been called to incidents involving the shooter on more than 20 occasions. [27] However, the shooter legally bought the gun he used. He had never been convicted of a crime and his mental health history did not legally prohibit him from buying or having guns. Accounts of the shooting show that law enforcement and the shooter's family had no legal mechanism to address the shooter's easy access to guns.

---

[26] Marjory Stoneman Douglas High School Public Safety Commission. Initial report submitted to the Governor, Speaker of the House of Representatives and Senate President. See page 264. https://bit.ly/2t4NFiY. Published January 2, 2019.
[27] Id. See pages 234-39.

To fill this critical gap in our laws, Everytown, AFT, and NEA recommend that states enact Red Flag laws. Red Flag laws create a legal process by which law enforcement and family members can petition a court to prevent a person from having access to firearms when there is evidence that they are a risk of harming themselves or others.

Red Flag laws are a critical intervention tool that can be used to prevent violent situations. When family or law enforcement is made aware that a student or another person is a risk to themselves or others, and that the person has access to guns, they can go to a court and ask a judge for a civil restraining order. These Red Flag orders, commonly known as extreme risk protection orders, can only be issued only after a specific legal determination is made that a person poses a threat to him or herself or others.  They also contain strong due process protections to ensure that a person's rights are balanced with public safety. Once an order is issued, a person is required to relinquish any guns they have and is prohibited from buying new guns. This prohibition is temporary, generally lasting one year.

Given that most active shooters show warning signs, Red Flag laws are a critical tool for intervening before a violent student acts on their threats. There is strong evidence that these laws can prevent acts of violence before they happen. In Maryland, according to leaders of the Maryland Sheriffs' Association, a recently passed Red Flag law has been invoked in at least four cases involving  "significant threats" against schools.[28] In Florida, a Red Flag law passed in 2018 has been invoked in multiple cases of potential school violence, including in the case of a student who was accused of stalking an ex-girlfriend and threatening to kill himself,[29] and in another in which a potential school shooter said killing people would be "fun and addicting."[30]

Red Flag laws can also be used to help address firearm suicide in schools. One study found that following Connecticut's increased enforcement of its Red Flag law, the firearm suicide

---

[28] Broadwater L. Sheriff: Maryland's 'red flag' law prompted gun seizures after four 'significant threats' against schools. *The Baltimore Sun*. January 15, 2019. https://bit.ly/2Gdf6Qi.
[29] Kennedy E. Tate student's AR-15, father's 54 guns removed under new red flag law. *Pensacola News Journal.* July 9, 2018. https://bit.ly/2UHmaba.
[30] Lipscomb J. Florida's post-Parkland "Red Flag" law has taken guns from dozens of dangerous people. *Miami New Times*. August 7, 2018. https://bit.ly/2ORW56U.

rate decreased by 14 percent.[31] The same study found that in the 10 years following the passage of Indiana's Red Flag law, the firearm suicide rate decreased by 7.5 percent.[32]

Because Red Flag laws are a proven tool, and because they are drafted with strong due process protections, they enjoy strong bipartisan support. The Federal Commission on School Safety, which was convened by President Trump following the shootings at Parkland and Santa Fe, recently endorsed Red Flag laws as an effective tool to prevent school gun violence.[33]  Ten states, including Florida, as well as Washington, D.C., have passed Red Flag laws since the Parkland shooting; five of them were signed by Republican governors.[34]  In all, 15 states and D.C. now have Red Flag laws on the books.[35]

For states that have already enacted Red Flag laws, public awareness is a key component for successful implementation. The authors recommend that these states train law enforcement on the availability and effective use of these laws.  States and community members should also initiate public awareness campaigns to make the public aware of the option to get a Red Flag order.  Overall, these laws are a common-sense method for acting on the warning signs commonly found in active shooter incidents and they can be an effective tool for reducing firearm suicide.

## Enact Responsible Firearm Storage Laws, Enforce Them, and Raise Awareness

In Santa Fe, TX, on May 18th, 2018, a student walked into Santa Fe High School and shot and killed 10 students and staff members and injured 13 others. He had taken the firearms he used in the shooting from his father who had failed to store them responsibly.[36] The most common source of guns used in school shootings and across all school gun violence is from the shooter's home, the homes of friends, or the homes of relatives. This is unsurprising, as nearly 4.6 million American children live in homes with at least one gun

---

[31] Kivisto AJ, Phalen PL. Effects of risk-based firearm seizure laws in Connecticut and Indiana on suicide rates, 1981-2015. *Psychiatric Services.* 2018; 69(8): 855-862.
[32] Id.
[33] Federal Commission on School Safety. Final report of the Federal Commission on School Safety. https://bit.ly/2SVPqK6. Published December 18, 2018.
[34] CO, DE, FL, IL, MA, MD, NY, NJ, RI, VT. FL, IL, MA, MD, VT had Republican governors at the time of signing.
[35] The 15 states are: CA, CO, CT, DE, FL, IL, IN, MA, MD, NJ, NY, OR, RI, VT, WA.
[36] Platoff E. The Santa Fe shooter used his father's guns. But his parents aren't liable under Texas law. *The Texas Tribune.* May 21, 2018. https://bit.ly/2x8zD4C.

that is loaded and unlocked.[37] Everytown, AFT, and NEA recommend that states enact and enforce responsible firearm storage laws, often known as child access prevention laws. In addition, policymakers should promote public awareness programs that can encourage responsible storage and induce behavior change.

These laws require that people store firearms responsibly when they are not in their possession in order to prevent unauthorized access. Under these laws generally, if and when a person accesses a firearm and does harm with it, the person who failed to adequately store the firearm is liable. A common form of responsible storage laws, child access prevention laws, are more narrowly tailored and they hold individuals liable only when minors access irresponsibly stored firearms. Nineteen states and D.C. currently have some form of responsible storage law.[38] In addition, several cities, including New York City; San Francisco; Seattle; and Edmonds, Washington, have passed responsible storage laws.[39]

Studies show that these laws can have a positive impact on preventing gun violence, particularly on unintentional shootings and firearm suicide. One study found that households that locked both firearms and ammunition were associated with a 78 percent lower risk of self-inflicted firearm injuries and an 85 percent lower risk of unintentional firearm injuries among children and teenagers, than those that locked neither.[40] Given what is known about the source of guns in school gun violence, evidence suggests these laws can help prevent underage shooters from accessing irresponsibly stored guns in homes and prevent mass shootings and other violent incidents.

Enforcement and public awareness are essential components in making sure that these laws work to create a culture of responsible gun storage. To facilitate effective enforcement, state legislatures need to make sure their laws are precisely written to cover access by all minors under the age of 18. Local officials also need to ensure that they are enforcing these laws in appropriate situations.

---

[37] Azrael D, Cohen J, Salhi C, Miller M. Firearm storage in gun-owning households with children: Results of a 2015 national survey. *Journal of Urban Health.* 2018; 95(3): 295-304. Study defined children as under the age of 18.
[38] CA, CT, DC, DE, FL, IL, IA, HI, MA, MN,  MD, NV, NH, NJ, NC, RI, TX, VA, WA, WI.
[39] New York City Administrative Code 10-312; San Francisco Police Code 4512; Seattle, Wash. Mun. Code Section 10.79.010, et seq (Effective Feb. 2019) Edmonds, Wash. Mun. Code Section 5.26.010, et seq. (Effective March 2019).
[40] Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional injuries. *JAMA: The Journal of the American Medical Association.* 2005; 293(6): 707-714.

In addition to enacting responsible storage laws, policymakers should encourage a culture of responsible gun storage by increasing awareness of responsible storage practices.  For years, Moms Demand Action has run a program called Be SMART.[41] This program focuses on fostering conversations about responsible storage among parents and children to help facilitate behavior change and address the hundreds of unintentional shootings committed and experienced by children every year. The acronym SMART encourages: Secure Guns in Homes and Vehicles, Model Responsible Behavior, Ask About Unsecured Guns in Homes, Recognize the Role of Guns in Suicide, Tell Your Peers to Be Smart. The Be SMART model can be used to encourage responsible storage practices. State legislatures, non-profit organizations, and local officials should also work together to develop and fund programs that increase awareness of the need to store firearms responsibly in order to prevent unauthorized access.

Passing responsible storage laws, enforcing them, and encouraging responsible storage practices will help reduce gun violence in schools and directly intervene to address the most common source of firearms used in school gun violence incidents.

### Raise the Minimum Age to Purchase Semi-Automatic Firearms to 21

Despite the research that suggests most active shooters are school-aged and have a connection to the school and data that show that 18 to 20-year-olds commit gun homicides at a rate four times higher than adults 21 and older,[42] few states have stepped in to close gaps that allow minors to legally purchase high-powered firearms. Everytown, AFT, and NEA believe states and the federal government should raise the minimum age to purchase or possess handguns and semi-automatic rifles and shotguns to 21 in order to prevent school-aged shooters from easily obtaining firearms.

---

[41] For more information, visit http://besmartforkids.org/.
[42] Everytown for Gun Safety analysis; Uniform Crime Reporting Program: Supplementary Homicide Reports (SHR), 2013-2017. Washington, DC: Department of Justice, Federal Bureau of Investigation. While the FBI SHR does not include data from the state of Florida for the years 2013-2017, Everytown obtained data directly from the Florida Department of Law Enforcement (FDLE) and included the reported homicides in the analysis. Rates calculated using age-specific US Census Population Data, 2013-2017. Persons aged 18 to 20 made up 4 percent of the US population and represented 18 percent of all offenders in gun homicides. Adults aged 21 and over made up 73 percent of the population and 74 percent of all offenders in gun homicides. Analysis includes all offenders in single and multiple offender incidents.

To purchase a handgun from a licensed gun dealer under federal law, a person must be 21.[43] Yet, to purchase that same handgun in an unlicensed sale, or to purchase a rifle or shotgun from a licensed dealer, a person only has to be 18.[44] Only a few states have acted to close these gaps.[45]

These deficiencies in the law leave an easy path for active shooters to obtain firearms. Because he was under 21, the Parkland shooter could not have gone into a gun store and bought a handgun, but he was able to legally buy the AR-15 he used in the shooting. Following the shooting, Florida changed its law to raise the age to purchase firearms to 21.[46] Minimum age laws can work in tandem with responsible storage and Red Flag laws to cut off an easy way for shooters to obtain firearms.

## Require Background Checks on All Gun Sales

Background checks are the key to enforcing our gun laws and are an effective tool for keeping guns out of the hands of people with dangerous histories. As part of a comprehensive plan to prevent gun violence in schools, Everytown, AFT, and NEA recommend that states and the federal government act to pass laws that require background checks on all gun sales so that shooters cannot easily purchase firearms.

Current federal law requires that background checks be conducted whenever a person attempts to purchase a firearm from a licensed gun dealer, to ensure that the prospective buyer is not legally prohibited from possessing guns.[47] For example, when a person becomes subject to a Red Flag order, that record is entered into the federal background check database, and a background check at the point of sale prevents that person from buying a firearm at a gun store. However, current federal law does not require background checks on sales between unlicensed parties. This means that people with dangerous histories can easily circumvent the background check system simply by purchasing their firearm online or at a gun show.

---

[43] 18 U.S.C.§ 922(b)(1).
[44] 18 U.S.C.§ 922(b)(1); 18 U.S.C. § 922(x)(2).
[45] Only five states and D.C. require a person to be 21 to possess a handgun: D.C., IL, MA, MD, NJ, NY. Only IL and D.C. require a person to be 21 to possess a rifle or shotgun and only six states require a person to be 21 to purchase a rifle or shotgun from a licensed gun dealer: CA. DC. FL, HI, IL, VT, WA.
[46] Fla. Stat. §790.065(13).
[47] 18 U.S.C.§ 922(t).

A recent Everytown investigation showed that as many as 1 in 9 people arranging to buy a firearm on Armslist.com, the nation's largest online gun marketplace, are people who cannot legally have firearms, including because they are minors under 18.[48] And the unlicensed sale marketplace is large: the same investigation found that in 2018 there were 1.2 million ads for the sale of a firearm that would not be subject to a background check.[49] A 2015 survey found that nearly a quarter of Americans — 22 percent — who acquired a firearm within the past two years did so without a background check.[50]

Background checks are an important part of any school safety plan because they are our most comprehensive strategy to prevent minors, people subject to Red Flag orders, and other people who shouldn't have guns from accessing them. Without background checks, guns are easily accessible in the online and gun show markets without any questions asked, making it difficult for law enforcement to detect violations of the law and undermining the other strategies to keep guns out of the hands of shooters.

Background checks are proven to reduce gun violence. State laws requiring background checks for all handgun sales — by point-of-sale check and/or permit — are associated with lower firearm homicide rates, lower firearm suicide rates, and lower firearm trafficking.[51] When Connecticut passed a law requiring background checks for a handgun purchase permit and at the point of sale, its firearm homicide rate decreased by 40 percent[52] and its firearm suicide rate decreased by 15 percent.[53] Background checks reduce gun violence and are a crucial backbone for any school gun violence prevention strategy.

---

[48] Everytown for Gun Safety. UNCHECKED: OVER 1 MILLION ONLINE FIREARM ADS, NO BACKGROUND CHECKS REQUIRED. https://everytownresearch.org/unchecked/. February 2019.
[49] Id.
[50] Miller M, Hepburn L, Azrael D. Firearm acquisition without background checks: Results of a national survey. *Annals of Internal Medicine.* 2017; 166(4): 233-239.
[51] Fleegler EW, Lee LK, Monuteaux MC, Hemenway D, Mannix R. Firearm legislation and firearm-related fatalities in the United States. *JAMA Internal Medicine.* 2013; 173(9): 732-740.
[52] Rudolph KE, Stuart EA, Vernick JS, Webster DW. Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides. *American Journal of Public Health.* 2015; 105(8): e49-e54.
[53] Crifasi CK, Meyers JS, Vernick JS, Webster DW. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. *Preventive Medicine.* 2015; 79: 43-49.

## PROTECTING SCHOOLS THROUGH THREAT IDENTIFICATION, SECURITY UPGRADES, EMERGENCY PLANNING AND SAFE SCHOOL ENVIRONMENTS

### ESTABLISH THREAT ASSESSMENT PROGRAMS

The most important thing that schools can do to prevent active shooter incidents — and gun violence overall — is to intervene before a person commits an act of violence. Early intervention is key to addressing potential violent behavior and to providing students appropriate treatment. To do this, Everytown, AFT, and NEA recommend that schools create threat assessment programs and establish threat assessment teams in their schools. State legislatures should also make funding available for schools to establish threat assessment programs.

Threat assessment programs help schools identify students who are at a risk of committing violence in order to resolve student threat incidents by getting them the help they need.[54] The programs generally consist of multi-disciplinary teams that are specifically trained to intervene at the earliest warning signs of potential violence and divert those who would do harm to themselves or others to appropriate treatment.

Threat assessment teams are unanimously recommended by school safety experts. The theory of the program is rooted in the groundbreaking study on "targeted school violence" by the U.S. Secret Service[55] and Department of Education.[56] A 2002 F.B.I. report states that "*By far the most valuable prevention strategy identified was the threat assessment and management team,*"[57] and a 2018 Department of Homeland Security report (ostensibly about improving physical security of schools) stated that "*preventing violence by detecting and addressing these [behavioral] red flags is more effective than any physical security measure.*"[58] In addition, reports from federal agencies under the Bush and Trump

---

[54] Cornell DG, Sheras P. Guidelines for responding to student threats of violence. *Sopris West.* 2006.

[55] The Secret Service was assigned to the project because school shootings were seen to be as rare as political assassinations, and this definition and the analysis evolved from the Secret Service's five year study of the behavior of political assassins.

[56] United States Secret Service and United States Department of Education. The final report and findings of the safe school initiative: Implications for the prevention of school attacks in the United States. https://bit.ly/2oFpIwa. Published May 2002. Defined as any incident where (i) a current or recent former student attacked someone at his or her school with lethal means (including weapons other than a firearm); and (ii) where the student attacker purposefully chose his or her school as the location of the attack.

[57] U.S. Department of Justice, Federal Bureau of Investigation. Making prevention a reality: Identifying, assessing, and managing the threat of targeted effects. B*ehavioral Analysis Unit - National Center for the Analysis of Violent Crime*. https://bit.ly/2BllcKf.

[58] U.S. Department of Homeland Security. K-12 School Security: A Guide for Prevention and Protecting Against Gun Violence. https://bit.ly/2DXzVge. Second Edition Published 2018.

administrations, including the recent Federal Commission on School Safety report, recommend schools implement school threat assessment programs.[59,60]

## Effective Models

As a model, Everytown, AFT, and NEA endorse the Virginia Student Threat Assessment Guidelines (VSTAG) which was created by Dr. Dewey Cornell at the University of Virginia. VSTAG is a national leader in school-based threat assessment. The program is also listed on the National Registry of Evidence-based Programs and Practices, an evidence-based repository and review system designed to provide the public with reliable information on mental health and substance use interventions.

## Research Shows Threat Assessment Programs Are Effective

Several studies have found that schools that have used threat assessment programs see as few as 0.5 to 3.5 percent of students attempt or carry out their threat of violence, with none of the threats that were carried out being serious threats to kill, shoot, or seriously injure someone.[61,62,63] Schools with VSTAG threat assessment programs also see fewer expulsions, suspensions, and fewer arrests.[64]  Importantly, studies have shown that VSTAG threat assessment programs generally do not have a disproportionate impact on students of color.[65] Of course, schools should monitor and collect their own data to ensure that communities of color and students with disabilities are not disproportionately impacted in local threat assessment programs.

## Key Features of a Successful Threat Assessment Program

There are several keys to establishing a successful threat assessment program that schools should consider when they establish these programs.

---

[59] United States Secret Service and United States Department of Education. Threat assessment in schools: A guide to managing threatening situations and to creating safe school climates. https://bit.ly/2o1nWG8. Published May 2002.
[60] National Threat Assessment Center. Enhancing school safety using a threat assessment model: An operational guide for preventing targeted school violence. United States Secret Service and U.S. Department of Homeland Security. https://bit.ly/2NKlwqD. Published July 2018.
[61] Cornell D, Maeng J, Burnette AG, et al. Student threat assessment as a standard school safety practice: Results from a statewide implementation study. *School Psychology Quarterly*. 2018; 33(2): 213-222.
[62] Cornell D, Maeng J, Burnette AG, Datta P, Huang F, Jia Y. Threat assessment in Virginia Schools: Technical report of the threat assessment survey for 2014-2015. Curry School of Education, University of Virginia. https://at.virginia.edu/2UzNpEm. Published 2016.
[63] Cornell DG, Korrie A, Xitao F. A randomized controlled study of the Virginia Student Threat Assessment Guidelines in kindergarten through grade 12. *School Psychology Review*. 2012; 41(1): 100-115.
[64] Id.
[65] Id.

### *Identify Threats*

Effective threat assessment programs must have a mechanism to identify and collect information about threats of violence. The U.S. Secret Service recommends schools establish tip-lines that can be used to promote the sharing and collection of information about threats.[66] Schools may also consider using a program like Sandy Hook Promise's "Know The Signs" and "Say Something" campaigns, which train students on warning signs and encourage them to report potentially violent behavior.[67] Where appropriate, social media monitoring software can be used to scan social media sites for threats and potential warning signs. Having a mechanism to identify threats is key to ensuring those threats can be successfully addressed by a threat assessment team.

### *Determine If a Student Has Access to Guns*

Since the most common sources of guns used in school gun violence are the home or the homes of family or friends, threat assessment teams must work to identify whether students at risk of violence have access to firearms. This practice is recommended by the U.S. Secret Service.[68] Threat assessment teams can build this practice into their standard procedures for gathering information when investigating a threat. There are several non-intrusive ways that this information can be gathered including: talking to parents and students and examining social media posts to determine if a student has access to firearms.

### *Ensure That Sufficient Counselors Are Provided to Assist Students*

As part of an effective threat assessment strategy, and to ensure successful student outcomes and violence reduction overall, schools need to ensure that students have sufficient access to counselors.

Counselors help guide our children in some of their most important decisions. They can serve as a critical resource for them as they navigate the education system and the

---

[66] National Threat Assessment Center. Enhancing school safety using a threat assessment model: An operational guide for preventing targeted school violence. United States Secret Service and U.S. Department of Homeland Security. https://bit.ly/2NKlwqD. Published July 2018.
[67] Sandy Hook Promise. Know the signs programs. https://bit.ly/2S9fgPa.
[68] National Threat Assessment Center. Enhancing school safety using a threat assessment model: An operational guide for preventing targeted school violence. United States Secret Service and U.S. Department of Homeland Security. https://bit.ly/2NKlwqD. Published July 2018.

challenges of emotional and social development. Counselors may also be among the first to know when students are experiencing problems or when they are at a risk for violence. Counselors can guide students through emotional or behavioral problems and can serve as a key point of intervention and information gathering for threat assessment programs.

Yet data compiled by the National Association for College Admissions Counseling and the American School Counselor Association show that the national student-to-counselor ratio is much higher than best practices dictate. Currently, on average, each counselor handles about 482 students.[69] The recommended best practice is that each counselor be responsible for no more than 250 students.[70] To protect our schools and ensure that threat assessment programs are effective, legislatures need to fund — and schools need to prioritize — an appropriate number of counselors in schools.

## IMPLEMENT BASIC SECURITY UPGRADES

In 2017, as the sound of gunshots echoed across campus, school administrators at Rancho Tehama Elementary School in Tehama County, CA made a critical decision. They immediately put their campus on lockdown, ushering students and teachers inside, locking internal doors, and locking out anyone who would try to enter.[71] As a shooter approached, crashing through an external gate, he was unable to access the school building. Frustrated, he gave up and left school grounds before ultimately being stopped by law enforcement.[72]

Physical security is a critical intervention point to keep guns out of schools. The most effective physical security measures — the ones that are agreed on by most experts — are access control measures that keep shooters out of schools in the first place. As a secondary measure, internal door locks, which enable teachers to lock doors from the inside, can work to deter active shooters who do achieve access, protecting students and allowing law enforcement time to neutralize any potential threat.

---

[69] National Association for College Admission Counseling, American School Counselor Association. State-by-state student-to-counselor ratio report: 10-year trends. https://bit.ly/2Ipw77Y.

[70] Id.

[71] Thulin L. School lockdown saved students' lives during Northern California shooting rampage. Slate. November 15, 2017. https://bit.ly/2GbvvEZ.

[72] Id.

Of course, one of the biggest challenges with security upgrades is maintaining a welcoming school environment. Schools cannot become prisons. Everytown, AFT, and NEA endorse basic security measures universally recommended by school safety experts, like access control and internal door locks, while recommending that schools also consider other expert-endorsed security measures based on local conditions.

## Access Control

As the shooter arrived on the campus of Marjory Stoneman Douglas High School, in Parkland, FL, several critical access control failures gave him easy access to the school. He was dropped off outside of a perimeter fence. This fence had a gate that was open and left unstaffed.[73] The shooter took advantage of this and entered the school campus. As he entered Building 12, where the fatal shooting happened, he exploited another critical safety failure as the door was left unlocked and accessible by all.[74] In fact the Marjory Stoneman Douglas Public Safety Commission found that "[t]he overall lack of uniform and mandated physical site security requirements resulted in voids that allowed [the shooter] initial access to MSDHS and is a system failure." [75]

Most experts, including the Marjory Stoneman Douglas High School Public Safety Commission and the Sandy Hook Advisory Commission, agree that access control should be a component of any school security plan.[76,77] Preventing unauthorized access to schools through fencing, single access points, and by simply ensuring doors are locked can keep shooters out of schools. State legislatures should provide funding for access control measures for schools to make sure that would-be shooters cannot have easy access to schools.

## Interior Door Locks

In both Sandy Hook and Parkland, teachers had to step outside of their classrooms while the shooting was underway in order to lock their doors.  This exposed the educators and

---

[73] Marjory Stoneman Douglas High School Public Safety Commission. Initial report submitted to the Governor, Speaker of the House of Representatives and Senate President. See page 42. https://bit.ly/2t4NFiY. Published January 2, 2019.
[74] Id. See page 43.
[75] Id. See page 42.
[76] Marjory Stoneman Douglas High School Public Safety Commission. Initial report submitted to the Governor, Speaker of the House of Representatives and Senate President. See page 42. https://bit.ly/2t4NFiY. Published January 2, 2019.
[77] Sandy Hook Advisory Commission. Final report of the Sandy Hook Advisory Commission presented to Governor Dannel P. Malloy, State of Connecticut. https://bit.ly/1C5aeU3. Published March 6, 2015.

students to danger. Doors that were left unlocked were unsecured and vulnerable. That is why school safety experts, like the Sandy Hook Advisory Commission, agree that schools should make sure that classroom doors lock from the inside as well as the outside.[78] Interior door locks can mean the difference between life and death in an active shooter situation. Everytown, AFT, and NEA recommend that all schools equip doors with interior door locks to help prevent shooters from gaining access to classrooms and to add an additional layer of protection from an active shooter.

### ESTABLISH EMERGENCY PLANNING AND PREPARATION

When an incident of gun violence does occur on school grounds, planning and preparation are key to ensuring an effective response. Everytown, AFT, and NEA recommend that schools, in collaboration with law enforcement, plan for the unlikely event of a gun violence emergency or active shooter incident.

Security experts universally agree that schools need to have an effective emergency plan in place. Emergency plans can serve as an additional point of intervention by enabling law enforcement, students, or staff to respond quickly to and neutralize any threat. The Federal Emergency Management Agency maintains a six-point guide for developing high-quality emergency response plans for schools. This guide stresses collaboration and advance planning to help mitigate emergency incidents.[79]

For active shooter incidents, the guide notes that "...*it is critical that schools work with first responders, emergency management staff, and all community partners to identify, prepare, prevent, and effectively respond to an active shooter situation in a coordinated fashion*."[80] Doing so can help save lives. Recommendations for effective planning include efforts to ensure that schools work with law enforcement and first responders to provide information about the school's layout and security measures, that staff and law enforcement work together to ensure that they can identify the nature of a threat, and that schools plan out their lockdown and evacuation procedures.[81]

---

[78] Sandy Hook Advisory Commission. Final report of the Sandy Hook Advisory Commission presented to Governor Dannel P. Malloy, State of Connecticut. https://bit.ly/1C5aeU3. Published March 6, 2015.
[79] U.S. Department of Education, Office of Elementary and Secondary Education, Office of Safe and Healthy Students. Guide for developing high-quality school emergency operations plans. https://bit.ly/2Gnz764. Published June 2013.
[80] Id. See page 56.
[81] Id. See page 57.

Many experts also encourage training for students and staff on how to respond to an active shooter incident. Currently, Everytown, AFT, and NEA endorse training for adult staff on how to respond to active shooter situations. This training might include training on lockout procedures, evacuation procedures, and emergency medical training.  However, given the concerns raised by parents, students, and medical professionals about the impact that lockdown and active shooter drills can have on student development, including the risk for depression and anxiety and the risk for lasting symptoms,[82] our organizations refrain from endorsing training for students and believe schools should consider this impact before conducting live drills with children.

## CREATE SAFE AND EQUITABLE SCHOOLS

Creating safe schools also requires that schools foster healthy schools and communities. This requires schools to look externally and internally to build strong partnerships inside of schools and in the community as a whole. As schools implement school-based intervention strategies, including the ones outlined above, schools need to make sure they are helping students resolve problems, rather than overly relying on punishment or using methods meant for intervention as punishment. It will also be critically important for schools and school districts to monitor and evaluate how threat assessment implementation is impacting school discipline practices.

Zero-tolerance policies are an attempt to make schools safe and orderly, but that approach has not worked. In that connection, schools need to review their discipline policies to make sure they are not unduly punishing students and to make sure that staff are trained on appropriate ways to manage their classrooms and implicit biases. As part of a comprehensive strategy Everytown, AFT, and NEA recommend that school communities look inside their schools to make sure they are encouraging effective partnerships between students and adults while also looking externally to ensure that they are a key community resource.

---

[82] Rich S, Cox JW. School lockdowns: How many American children have hidden from gun violence? *Washington Post.* December 26, 2018. https://wapo.st/2Sb0bML.

## Community Schools

A key means of creating safe schools is to keep neighborhood schools intact and make them "community schools" — the focal point and heart of their communities. Everytown, AFT, and NEA recommend that schools utilize state, district and federal support and fund programs that help them partner with community members to move beyond the normal confines of a school and become a true community school, particularly in communities that experience high rates of gun violence.

To accomplish this schools should work in partnership with local governments, labor, management and the community, to help become places that provide valuable services that help lift students and their families. By moving beyond the normal confines of the school and partnering with local stakeholders, community schools provide real solutions to the unique problems of the students and families they serve. Community schools aren't just centers of education; they're the new heart of the community itself that help create better conditions for both teaching and learning. They're a place where teachers, families, community members and service providers can come together in coordinated, purposeful and results-focused partnerships.

These schools can become the centers of their communities by providing the services to students, families and neighbors that best serve their needs, while at the same time promoting stable, healthy neighborhoods. In schools facing high levels of violence in and outside of the school building a community school might utilize district, state, and federal support to fund programs that do things like: provide alternatives to out-of-school suspensions that offer meaningful educational opportunities for students; reduce suspension rates and break the school-to-prison pipeline; increase access to mentoring and counseling services both inside and outside school, starting in preschool; and incorporate inclusive restorative justice into discipline policies.

## School Resource Officers

Whether schools should employ trained law enforcement professionals as armed school resource officers (SROs) is a decision that must be made on the local level in consideration of the unique social and cultural needs of a school and a determination that an SRO will meet school public safety needs. However, schools that are going to employ SROs should

ensure that they are trained and utilized in a way that encourages greater transparency and accountability.

Actions that districts and communities can take in this regard include supporting community policing and using cultural competency training as a way to rebuild relationships between law enforcement/SROs and the communities and students they serve. Schools can also consider using the following rubric which was developed by the federal government to guide their employment of SROs.

The Safe School-based Enforcement Through Collaboration, Understanding, and Respect (SECURe) rubric suggests schools should do the following when employing a SRO:

1. Create sustainable partnerships and formalize memorandums of understandings (MOU) that outline clear roles and responsibilities among school districts, local law enforcement agencies, juvenile justice entities, and civil rights and community stakeholders;

2. Ensure that MOUs meet constitutional and statutory civil rights requirements;

3. Recruit and hire effective SROs and school personnel;

4. Keep SROs and school personnel well trained;

5. Continually evaluate SROs and school personnel, and recognize good performance. [83]

Following this rubric can help mitigate concerns about impacts that placing law enforcement officers in schools can have on school climate and students of color.

---

[83] U.S. Department of Education, U.S. Department of Justice. Safe school-based enforcement through collaboration, understanding, and respect (SECURe) local implementation rubric. https://bit.ly/2BlkBZ2.

everytownresearch.org

# ARMING TEACHERS IS DANGEROUS

The most dangerous idea in the American education system is that arming teachers or school staff is an effective solution to an active shooter incident. Everytown, AFT, and NEA strongly urge, as a matter of student safety, that schools reject attempts to arm teachers and instead focus on proven solutions that intervene to prevent shootings.

Arming teachers puts our children at greater risk and does nothing to stop active shooters or other forms of school gun violence. While the desire for action is understandable, the popular notion of a well-trained teacher acting as a last line of defense is not based in any experience, or research.

Is an armed teacher supposed to protect their children in their classroom? Will they be able to identify and shoot one of their own students? How will they react in a crisis situation? Will they be able to shoot accurately? In a crisis, how will law enforcement be able to distinguish between a lawfully carrying teacher and a bad guy? While those who implement the idea may be sincere in their search for a solution, arming teachers raises more questions than answers, and evidence suggests that arming teachers will do nothing to keep our kids safe. It is argued that armed teachers are cost-effective replacements for law enforcement, but arming teachers would cost billions of dollars for salaries, training, and equipment and armed teachers are never acceptable replacements for trained law enforcement.

## Arming Teachers Is Opposed by Law Enforcement, Parents and Teachers

Most parents, teachers, and law enforcement oppose arming teachers. Law enforcement, those we charge with protecting our schools, strongly oppose arming teachers. The National Association of School Resource Officers and the president and chief executive officer of the Major Cities Police Chiefs Association have all indicated their opposition to arming teachers.[84,85,86]

---

[84] National Association of School Resource Officers. NASRO opposes arming teachers. February 22, 2018. https://bit.ly/2K7iAq3.
[85] Toppo G. 132 hours to train teachers on guns: Is it enough? *USA Today*. March 8th, 2018. https://bit.ly/2SvCdes.
[86] Paterson BE. America's police chiefs call BS on arming teachers. *Mother Jones*. March 8, 2018. https://bit.ly/2HjsDT3.

Parents and teachers also oppose arming teachers. A March 2018 survey of almost 500 U.S. teachers found that 73 percent oppose proposals to arm school staff.[87] Another survey found that 63 percent of parents of elementary, middle, and high school students oppose arming teachers.[88]

However, there is evidence that the message about "well-trained" teachers is catching on with policymakers and some schools. The Federal School Safety Commission recently became the first federal entity to endorse arming teachers and school staff.[89] A number of state legislatures are considering the idea of armed teachers and many schools have looked to arming teachers or school staff as a solution to school gun violence. A recent report from Vice News found at least 466 school districts have chosen to arm school staff, 215 of them since February 2018, the month of the Parkland shooting.[90] Everytown, AFT, and NEA believe schools should reject this risky practice.

### The Notion of a Highly Trained Teacher Carrying a Gun Is a Myth

The notion that only highly trained teachers will be carrying guns in schools is a myth. Law enforcement personnel who carry guns on a daily basis receive hundreds of hours of initial training and are generally required to continue their training throughout their careers. The average number of initial training hours that a law enforcement officer receives at a basic training academy is 840.[91] On average recruits receive 168 hours of training on weapons, self-defense, and the use of force.[92]

In the ten states that have laws that are designed to allow for armed school personnel, those armed personnel receive significantly less training.  The laws vary widely, but not a single one of them requires teachers or school staff to undergo training that is akin to that completed by a full-time law enforcement officer. In fact, some of the states don't have any minimum hourly training requirement at all. For example, in Kansas, school districts are

---

[87] Brenan M. Most U.S. teachers oppose carrying guns in schools. *Gallup*. March 16, 2018. https://bit.ly/2MPTRV5.
[88] PDK Poll. School security: Is your child safe at school? September 2018. https://bit.ly/2P6HXux.
[89] Federal Commission on School Safety. Final report of the Federal Commission on School Safety. https://bit.ly/2SVPqK6. Published December 18, 2018.
[90] Owen T. Exclusive: How Parkland created a rush to arm teachers and school staff across the country. *Vice News*. January 9, 2019. https://bit.ly/2UB90fy.
[91] Reaves BA. State and local law enforcement training academies, 2013. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. https://bit.ly/2pg0whI. Published July 2016.
[92] Id.

free to set their own policy to allow staff to carry guns.[93] There is no required minimum training. The same is true in Georgia, where the law provides that armed personnel must be trained in specific subject-matter areas but does not require them to meet any minimum number of training hours.[94] Several school districts are exploiting vagaries in the law to arm teachers, with no state oversight. A gap in Texas law led to the establishment of programs commonly known as the "Guardian" program. These programs let school districts set their own policy, without any required minimum training.[95]

The fact is that even some of the most highly trained law enforcement officers in the country, those of the New York City Police Department, see their ability to shoot accurately decrease significantly when engaged in gunfights with perpetrators.[96] To have a teacher make split-second, life-or-death decisions to protect children and themselves or try to take down an active shooter is unrealistic. Given this, the notion that a teacher or school staff member will be able to effectively respond to an active shooter incident is extremely doubtful.

### Students Will Access Teachers' Guns

The simple fact is that more access to firearms is strongly correlated with additional risk. When more guns are placed into schools, children will be more likely to access them.

Research strongly supports the idea that if guns are carried into schools by teachers, children are more likely to access teachers' guns. One study showed that the majority of children are aware of where their parents store their guns and that more than one third reported handling their parents' guns, many doing so without the knowledge of their parents.[97] Nearly a quarter of parents did not know that their children had handled the gun in their house.[98] It is likely that when guns carried by teachers and staff are put into schools, children will know where they are and will access them. And we know that when children access guns, the risks of death or harm significantly increase. In fact, irrespective

---

[93] K.S.A. § 75-7c10(d)(1).
[94] O.C.G.A. § 16-11-130.1.
[95] Samuels A. Texas schools that want to arm their employees have two choices. *Star-Telegram*. July 14, 2018. https://bit.ly/2MNh2PT.
[96] Rostker B. D, Hanser L. M, Hix W. M, Jensen C, & Morral A. R. Evaluation of the New York City Police Department firearm training and firearm-discharge review process. Rand Corporation. 2008.
[97] Baxley F, Miller M. Parental misperceptions about children and firearms. *Archives of Pediatrics & Adolescent Medicine*. 2006; 160(5): 542-547.
[98] Id.

of age, access to a firearm, triples the risk of death by suicide and doubles the risk of death by homicide.[99]

Access is not only a risk, it is a reality. There have been several incidents where guns carried into schools were misplaced or children accessed them — guns left in bathrooms[100] or locker rooms,[101] even guns that fell out while a teacher did a backflip.[102] There are also multiple cases where guns were stolen from teachers by students or misplaced and later found in the hands of students.[103,104] The fact is that more guns in schools increases the chances a child will access them.

## The Risk of Shootings Increases

Child access is not the only risk. The risk of an unintentional or intentional shooting increases when civilians are allowed to carry guns in schools.  There have been several incidents of guns intentionally or unintentionally discharged on school grounds by school staff. This includes intentional shootings, such as a janitor who killed two of his colleagues at a performing arts school in Florida,[105] and firearm suicides by faculty or staff at schools.[106] It also includes a number of unintentional incidents, by both school resource officers in schools[107] and teachers who accidentally discharged their firearms.[108]

## Armed Staff Will Complicate Law Enforcement's Response

Responding to an active shooter incident can be complex. Reports and analysis of mass shootings continuously show communication errors, narrowly avoided friendly-fire

---

[99] Anglemyer A, Horvath T, Rutherford G. The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members: A Systematic Review and Meta-analysis. *Annals of Internal Medicine*. 2014; 160: 101–110.
[100] Metrick B. Ex-teacher charged for leaving gun in school bathroom, police say. *USA Today*. September 13, 2016. https://bit.ly/2G9jlfF.
[101] Associated Press. No charges after Isabella Co. sheriff accidentally leaves gun at school. *Detroit Free Press*. April 3, 2018. https://bit.ly/2GtNfeb.
[102] Rojas J. Student: Substitute teacher was doing back flip when gun fell out. *Bay News 9*. October 24, 2018. https://bit.ly/2t4SlFF.
[103] Harten D. Police: Jacksonville High student steals gun from teacher. *Arkansas Democrat Gazette*. January 17, 2012. https://bit.ly/2V3psWX.
[104] Madden R. Police find teacher's stolen gun with student. Fox 2 Now. October 25, 2018. https://bit.ly/2S9hqy7.
[105] Seltzer A. BREAKING: Man arrested in 2013 murder of Dreyfoos school janitors. *The Palm Beach Post*. May 25, 2017. https://pbpo.st/2RE4R8V.
[106] McCray V. Lithia Springs shooting intentional, teacher ID'd. *Atlanta Journal Constitution*. August 21, 2017. https://on-ajc.com/2M6D42h.
[107] Schrott M. Officer accidentally discharges weapon at George Washington Middle School. *Alexandria Times*. March 13, 2018. https://bit.ly/2BnC8zT.
[108] Larson A. Seaside High teacher accidentally fires gun in class, students injured. KSBW. March 14, 2018. https://bit.ly/2Be9cub.

incidents, and a lack of coordination during responses to active shooter incidents. To introduce a new variable into this equation — an armed teacher — into this equation will only serve to further complicate law enforcement's response to an active shooter incident. As former Dallas Police Chief David Brown said following the shooting of five law enforcement officers in Dallas where the response was complicated by people openly carrying firearms: "We don't know who the good guy is versus the bad guy when everyone starts shooting."[109]

## Liability and Insurance

Insurance companies are hesitant to insure schools that arm teachers or staff because they understand the financial and legal risks associated with doing so. When several districts in Kansas sought to arm teachers, the insurance companies informed them that they would not insure such a dangerous practice. Even where schools are able to obtain insurance, it is often at a higher premium.[110] This is because insurance companies realize that guns carried by teachers pose numerous safety risks.

Schools that have or are considering arming teachers and staff continue to put remarkably little thought into the legal liability they incur by doing so. These policies, which are often developed behind closed doors, are frequently poorly drafted and inadequately vetted. This leaves teachers and school districts legally exposed. Not only may they be civilly liable, but teachers who carry guns on the basis of a school policy may also expose themselves to criminal liability if the policy is in any way inconsistent with state law. Assuming there is an inconsistency, it is also unlikely that a school's insurance policy would indemnify the school from monetary claims. Further, even if the policy is crafted with legal precision, the likelihood that a school district, school, or teacher will be sued if a student or another person is hurt by an armed teacher is high.

Some states have sought to address this by specifically immunizing armed teachers or staff from liability claims or by arguing that existing school immunity provisions bar claims against them or cap the amount of damages that they would be liable for. In fact, these

---

[109] Hennessy-Fiske M. Dallas police chief: Open carry makes things confusing during mass shootings. *Los Angeles Times.* July 11, 2016. https://lat.ms/2GpxGUw.
[110] Hiltzik M. One big problem with the idea of arming teachers: Insurance companies won't play along, and for good reason. *Los Angeles Times.* February 26, 2018. https://lat.ms/2BkRxBb.

provisions do not operate as a complete bar to lawsuits. States also cannot exempt schools from federal civil rights liability. Schools can and will be sued in federal court and they will not be able to use state immunity provisions to protect themselves from claims.

## CONCLUSION

Using the comprehensive plan outlined in this report, policymakers and schools can prevent active shooter incidents — and gun violence more broadly — in their classrooms. These solutions are proven effective and form a thorough strategy that works by providing a point of intervention at all levels of a shooter's escalation to violence and by creating a system where people with dangerous histories can't easily access guns. Targeted gun violence prevention policies can intervene when a shooter is intent on getting their hands on a gun. The school-based strategies work to intervene when a shooter is showing warning signs that they may become violent. Finally, the planning and security strategies present a last opportunity for intervention and ensure that a school is prepared to quickly respond to and neutralize any incident.

Unlike reactive solutions focused on armed staff and teachers, which serve only to put our children in more danger, these strategies are widely supported by experts and backed by evidence. Our leaders must take responsible action to keep our schools safe — and this report offers them a framework for doing so.

# APPENDIX: GUNS IN SCHOOLS LEGAL OVERVIEW

As a general matter, the vast majority of states prohibit civilians from carrying guns in elementary, middle, and high schools.

While the laws involving firearms and other weapons on K-12 school campuses, are incredibly nuanced, there are two general categories of laws that enable people to carry guns in schools:

Ten states have laws explicitly aimed at arming school personnel: **Florida, Georgia, Kansas, Missouri, North Dakota, Oklahoma, South Dakota, Tennessee, Texas, Wyoming.**

In all of these states, there are optional programs that schools can use to arm teachers and school staff. Generally, these individuals must have a handgun carry permit, undergo some form of training, and be approved by the school district and/or the school.

Eight states generally allow permit holders to carry guns in public schools: **Delaware, Hawaii, Kansas, Mississippi, New Hampshire, Oregon, Rhode Island, Utah.**

In these states, permit holders can carry in schools as a general matter of law, although, there may be individual school policies that prevent them from doing so.

There are an additional number of states where a small number of schools have used exceptions in the law to arm teachers or other school staff. These states include: **Alabama, Arkansas, Colorado, Idaho, Indiana, Minnesota, Montana, Ohio,**[111] **Texas, Washington.**[112]

---

[111] The authority of Ohio school districts to arm teachers without full peace officer training is currently the subject of litigation.
[112] There is no comprehensive information available on which states have school districts that have armed teachers. This information is gathered from media reports and other publicly available sources and it is not intended to be an exhaustive list.

# EXHIBIT 21

# REDUCING GUN VIOLENCE IN AMERICA

## Informing Policy with Evidence and Analysis

Edited by

**DANIEL W. WEBSTER**
and **JON S. VERNICK**

Foreword by
**MICHAEL R. BLOOMBERG**



Reducing Gun Violence in America

*This page intentionally left  lank*

# Reducing Gun Violence in America

*Informing Policy with Evidence and Analysis*

EDITED BY

Daniel W. Webster, ScD, MPH,
and Jon S. Vernick, JD, MPH

Center for Gun Policy and Research
Johns Hopkins Bloomberg School of Public Health

The Johns Hopkins University Press
*Baltimore*

© 2013 The Johns Hopkins University Press
All rights reserved. Published 2013
Printed in the United States of America on acid-free paper
9  8  7  6  5  4  3  2  1

The Johns Hopkins University Press
2715 North Charles Street
Baltimore, Maryland 21218-4363
www.press.jhu.edu

Library of Congress Control Number: 2013930408
A catalog record for this book is available from the British Library.

ISBN 13: 978-1-4214-1110-1 (pbk. : alk. paper)
ISBN 10: 1-4214-1110-5 (pbk. : alk. paper)
ISBN 13: 978-1-4214-1114-8 (electronic)
ISBN 10: 1-4214-1114-3 (electronic)

*Special discounts are available for bulk purchases of this book.*
*For more information, please contact Special Sales at 410-516-6936 or*
*specialsales@press.jhu.edu.*

The Johns Hopkins University Press uses environmentally friendly book
materials, including recycled text paper that is composed of at least 30
percent post-consumer waste, whenever possible.

*To victims of gun violence and*
*to those who work daily*
*to reduce it*

*This page intentionally left  lank*

# Contents

Foreword                                                            xi
*Michael R. Bloomberg*

Preface                                                             xix
*Ronald J. Daniels and Michael J. Klag*

Acknowledgments                                                     xxi

Introduction                                                        xxv
*Daniel W. Webster and Jon S. Vernick*


Part I: Gun Policy Lessons from
the United States: Keeping Guns
from High-Risk Individuals

1   Firearms and Violent Death in the United States               3
    *Matthew Miller, Deborah Azrael, and David Hemenway*

2   The Limited Impact of the Brady Act: Evaluation
    and Implications                                               21
    *Philip J. Cook and Jens Ludwig*

3   Preventing Gun Violence Involving People with Serious
    Mental Illness                                                 33
    *Jeffrey W. Swanson, Allison Gilbert Robertson, Linda K. Frisman,
    Michael A. Norko, Hsiu-Ju Lin, Marvin S. Swartz, and Philip J. Cook*

4   Evidence for Optimism: Policies to Limit Batterers' Access
    to Guns                                                        53
    *April M. Zeoli and Shannon Frattaroli*

viii     *Contents*

5     Reconsidering the Adequacy of Current Conditions on
      Legal Firearm Ownership                                              65
      *Katherine A. Vittes, Daniel W. Webster, and Jon S. Vernick*

6     Broadening Denial Criteria for the Purchase and Possession
      of Firearms: Need, Feasibility, and Eff ctiveness                    77
      *Garen J. Wintemute*

7     Comprehensive Background Checks for Firearm Sales:
      Evidence from Gun Shows                                              95
      *Garen J. Wintemute*

8     Preventing the Diversion of Guns to Criminals through
      Eff ctive Firearm Sales Laws                                        109
      *Daniel W. Webster, Jon S. Vernick, Emma E. McGinty, and Ted Alcorn*

9     Spurring Responsible Firearms Sales Practices through Litigation:
      The Impact of New York City's Lawsuits against Gun Dealers
      on Interstate Gun Trafficking                                       123
      *Daniel W. Webster and Jon S. Vernick*

10    Curtailing Dangerous Sales Practices by Licensed Firearm
      Dealers: Legal Opportunities and Obstacles                          133
      *Jon S. Vernick and Daniel W. Webster*


      Part II. Making Gun Laws Enforceable

11    Enforcing Federal Laws against Firearms Traffickers: Raising
      Operational Eff ctiveness by Lowering Enforcement Obstacles         143
      *Anthony A. Braga and Peter L. Gagliardi*


      Part III. Gun Policy Lessons from
      the United States: High-Risk Guns

12    America's Experience with the Federal Assault Weapons Ban,
      1994–2004: Key Findings and Implications                            157
      *Christopher S. Koper*

13    Personalized Guns: Using Technology to Save Lives                   173
      *Stephen P. Teret and Adam D. Mernit*

Part IV. International Case Studies
of Responses to Gun Violence

14   Gun Control in Great Britain after the Dunblane Shootings   185
     *Michael J. North*

15   Rational Firearm Regulation: Evidence-based Gun Laws
     in Australia   195
     *Rebecca Peters*

16   The Big Melt: How One Democracy Changed after Scrapping
     a Third of Its Firearms   205
     *Philip Alpers*

17   Brazil: Gun Control and Homicide Reduction   213
     *Antonio Rangel Bandeira*

Part V. Second Amendment

18   The Scope of Regulatory Authority under the
     Second Amendment   225
     *Lawrence E. Rosenthal and Adam Winkler*

Part VI. Public Opinion on Gun Policy

19   Public Opinion on Proposals to Strengthen U.S. Gun Laws:
     Findings from a 2013 Survey   239
     *Emma E. McGinty, Daniel W. Webster, Jon S. Vernick,
     and Colleen L. Barry*

     Consensus Recommendations for Reforms to Federal
     Gun Policies   259

     Biographies of Contributors   263
     Index   275

*This page intentionally left  lank*

# Foreword

On December 14, 2012, a deranged young man pulled into the parking lot of the Sandy Hook Elementary School in Newtown, Connecticut, and then shot his way into the building with a high-capacity semi-automatic rifle. The slaughter of 6 adults and 20 children really broke the country's heart, and for many Americans this is the straw that has broken the camel's back.

Since the Sandy Hook massacre, more than 100 mayors from across the country have joined the bipartisan coalition Mayors Against Illegal Guns. The total number of mayors involved is now more than 800. As of January 14, 2013, roughly one million Americans have signed on to the coalition's "I Demand a Plan" campaign against gun violence. Vice President Joe Biden will announce his recommendations for action to President Barack Obama this week. The vice president knows that as horrific as Sandy Hook has been, as have all the other seemingly endless episodes of mass violence, we experience that level of carnage, or worse, every single day across our country, *because every day of the year, an average of 33 Americans are murdered with guns.*

Here's another way to think about what that means. On January 21, 2013, President Obama took the oath of office for his second term. Unless we take

action, during those four years some 48,000 Americans will be killed with guns—nearly twice as many people as were killed in combat during the entire Vietnam War. I have made it clear to the vice president that our bipartisan coalition of mayors is supporting seven measures—three that need legislation and four that require only executive action. We're hopeful that the vice president and president will support all seven.

First and most urgently, we need the president and Congress together to require background checks for all gun sales, including private sales at gun shows and online. These private sales now account for more than 40 percent of all gun sales nationally, which means that in 2012 alone, there were more than six million gun sales that happened with no background checks. Many of those guns are handguns, which are used in about 90 percent of all firearms murders. Across the United States, more than 80 percent of gun owners, and more than 90 percent of Americans, support requiring background checks for all gun sales. There's really no debate here. It's common sense. We have laws on the books that require a background check when dealers sell guns. It's time for the president and Congress to make that the law of the land for all sales. The forty percent to which the law does not apply means the law is basically a sham.

Second, Congress should make gun trafficking a federal crime. In New York City, 85 percent of the weapons that we recover from crime scenes come from out-of-state sources, but federal laws designed to curb illegal sales across borders are incredibly weak. Criminals who traffic in guns get a slap on the wrist. We've made New York the safest big city in the nation, in part by adopting tough gun laws and proactively enforcing them. Every state in the Union has citizens killed by guns coming from other another state, and every state is powerless to stop the mayhem. Until Congress gets tough on trafficking, guns will continue flowing to our streets from states with much looser gun laws.

The third legislative measure that the White House should support is limiting the availability of military-style weapons and of high-capacity magazines with more than 10 rounds. These guns and equipment are not designed for sport or home defense. They are designed to kill large numbers of people quickly. That's the only purpose they have. They belong on the battlefield, in the hands of our brave professionally trained soldiers, not on the streets of our cities, suburbs, or rural areas, as retired military leaders like Colin Powell and Stanley McChrystal have said.

Many of the weapons in this category were previously banned under the federal assault weapons law that expired in 2004. That law was, incidentally,

first initiated and passed by Vice President Biden. He is the right person to have been appointed by the president to come up with what we should do next. Regulating assault weapons certainly falls within the bounds of the Second Amendment. So does everything else we're urging.

This is not a constitutional question; it's a question of political courage. The U.S. Supreme Court, the entity that defines what the Constitution means, has ruled that reasonable regulations are consistent with the Second Amendment. When the gun lobby raises concerns over protection of the Second Amendment, it is nothing but a red herring. And it's time for Second Amendment defenders in Congress to call them on it.

The three measures that I've discussed—requiring background checks for all gun sales, making gun trafficking a federal crime, and limiting military-style assault weapons and high-capacity magazines—will require leadership from both the president and members of Congress. But there are other steps President Obama can take without congressional approval—any time he chooses, with the stroke of a pen. Vice President Biden understands this, and we hope his recommendations will include at least these next four steps that we've urged him to take.

In the first of these four steps, the president can order all federal agencies to submit their relevant data to the national gun background check database. Every missing record is a potential murder in the making. If the data aren't in the database, those people that use the database don't get what they need, allowing gun sales to go ahead in cases where we all agree—and federal law says—they shouldn't.

Second, the president can direct the Justice Department to make a priority of prosecuting convicted criminals who provide false personal information during gun purchase background checks. Yes, even criminals buy from dealers, knowing there's going to be a background check, except that they lie when they do so. As a matter of fact, during 2010 there were more than 76,000 cases referred by the FBI to the Justice Department. Do you know how many were prosecuted out of 76,000 in 2010, the last year for which we have data? Forty-four. Not 44,000, but 44 out of 76,000. This is a joke. It's a sad joke, and it's a lethal joke.

These are felony cases involving criminals trying to buy guns, and yet our federal government is prosecuting less than one-tenth of one percent of them. It is shameful, and it has to end, and the president can do that by just picking up the phone and saying to the Justice Department: This is your job, go do it or I'll get somebody that will.

As a third step, the president can make a recess appointment to get someone to head the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives. The ATF, as it's called, hasn't had a director for six years. Can you imagine how much outrage there'd be if we'd been without a Homeland Security Secretary for six years? You can't have an agency without somebody running it that's going to allow it to do the job for which it was, and that job is to protect everyone in this city, state, and country—including those we love the most, our children, and those we have the greatest responsibility to, the police officers who run into danger when the rest of us are running the other way.

The president, and this is our fourth recommendation, can stop supporting what's called the Tiahrt order. Todd Tiahrt is a congressman from Wichita who got the Congress to pass a law that keeps the public in the dark about who gun traffickers are and how they operate. There can be no excuse for shielding criminals from public view.

At the bidding of the gun lobby, Congress has tied the hands of the Bureau of Alcohol, Tobacco, Firearms and Explosive and has prevented it from releasing critical data to law enforcement authorities and to the public. Unfortunately, the ATF is not alone is being gagged by Congress when it comes to the issue of guns.

The bipartisan coalition of Mayors Against Illegal Guns released a report, "Access Denied" detailing how Congress, bowing to the gun lobby, has systematically denied the American people access to information about guns and gun violence. Most egregiously and outrageously, Congress has severely restricted the scientists at the Centers for Disease Control and Prevention from studying the epidemic of gun violence, and they've put similar restrictions on the scientists at the National Institutes of Health. Congress has no business dictating what public health issues scientists can and should study.

At Johns Hopkins the motto is, The truth shall make you free. When elected officials try to muzzle scientific research and bury the truth, they make our free society less free and less safe. Today, because of congressional restrictions, CDC funding for firearms injury research totals $100,000, out of an annual budget of nearly $6 billion. The National Institutes of Health is estimated to spend less than $1 million on firearms injury research, out of an annual budget of $31 billion. To put that in perspective, the NIH spends $21 million annually researching headaches. But it spends less than $1 million on all the gun deaths that happen every year. If that doesn't give you a headache, it should.

There are 31,000 gun deaths every year in America, including about 19,000 suicides, many of which are children—every parent's nightmare. In New York City, our suicide rate is less than half the national average, and one of the differences is that New York has tough gun laws. Nationally, 51 percent of suicides are by gun. In New York City, it is only 16 percent of suicides. The gun lobby callously says that someone who wants to kill him or herself will find a way to do it. In many cases, they are tragically wrong. We can prevent thousands of these senseless deaths with smart gun regulations, and we're proving it in New York City.

Unfortunately, American scientists are not the only people Congress has attempted to silence. In 2010, again at the gun lobby's bidding, Congress included language in a funding bill that prevented military officers and doctors, as well as mental health counselors, from even discussing firearms ownership with severely depressed service members. There is a suicide crisis going on right now in our military. It's tough seeing and doing what we ask our soldiers to do. We have an all-volunteer army, but they come back and many of them really do have a problem. Congress, instead of trying to help, is just doing everything it can to make it worse. Our men and women in uniform deserve better. Thankfully, after mayors and retired military leaders urged Congress to rescind this prohibition, they did—but not until December of 2012, and only after too many men and women in uniform had taken their own lives with guns.

Enough is enough. It's time for Congress and the White House to put public health above special interest politics. And it's time for Congress to stop gagging our scientists, military leaders, and law enforcement officers—and stop trying to hide the truth from the American people. That's why this summit was so important. It is especially fitting that it was hosted at the Johns Hopkins Bloomberg School of Public Health, where so much outstanding and important work is being done, in areas ranging from malaria research and environmental health to tobacco control and road safety. It's all designed around the school's motto, Protecting Health, Saving Lives—Millions at a Time. Reducing gun violence will have that kind of an impact, too.

A few years ago, Daniel Webster, director of the School's Center for Gun Policy and Research, conducted a study of an initiative in New York City that aimed to identify the most problematic out-of-state gun dealers, based on crime data, conducting undercover investigations of their sales practices and

suing those who sold guns to our straw purchasers. Straw purchasers are those who lie about who is the actual purchaser of the gun, standing in for somebody who could not pass a background check. Twenty-four of the most problematic dealers settled or were put under a court monitor. Dr. Webster found that in New York City the likelihood of recovering a gun at a crime scene from one of these dealers dropped almost overnight by 84 percent.

Ninety-nine percent of the gun dealers in our country do obey the law; one percent do not, and those are the ones that we have to go after. And the results are dramatic and almost instantaneous. Our investigation never would have happened without the data that allowed us to identify the problematic dealers. And yet, if it were up to the NRA, we would never have had access to it. More guns would have flowed onto our streets and, in all likelihood, more people would have been murdered.

The undercover investigations we've conducted are just one example of how we've worked to crack down on gun violence. At our urging, the New York state legislature enacted the toughest penalties in the nation for illegal possession of a handgun: a $3\frac{1}{2}$-year mandatory minimum prison sentence. We have also worked with our city council to adopt a law enabling the NYPD to keep tabs on gun offenders in our city, in the same way that they track sex offenders. We enforce those laws and other laws rigorously, which is an important reason New York is the safest big city in the country. In 2012, New York City had the fewest murders in nearly half a century (comparable records started to be kept back in 1963). We've never had a year remotely as safe as this past one.

As hard as we've worked, however, and as much as we've achieved, the reality remains that, in New York during 2012, there were still 418 murders in the City, and a lot of the people that were killed were kids. While shooting incidents are down in New York City, as well as murders, I recently visited three NYPD officers who'd been shot by criminals in two separate incidents on the same night. Thankfully, the officers are all expected to fully recover. But I think the events of that night really do demonstrate a flaw in an argument we've heard lately. That argument is that the solution to "bad guys with guns is good guys with guns." The problem is that sometimes the good guys get shot. Sometimes, in fact, they get killed. And I think the hardest part of my job, the part that I dread the most as mayor, is talking to the family of a police officer at a hospital to tell them that their husband, wife, mother, father, son or daughter won't ever be coming home again.

The tragic fact is that all across America today, fathers and mothers, wives and husbands, friends and neighbors will experience that kind of pain and loss in their lives because of gun violence. The rate of firearms homicides in America is 20 times higher than it is in other economically advanced nations. We have got to change that—and it has to start now, with real leadership from the White House.

If you haven't done so, go to DemandAPlan.org and join the campaign for gun safety reform, or call your senators or your congressmen and say, "We're not going to take this. Even if *you* vote the right way, your associates in Congress aren't voting the right way. And since I don't get a chance to influence them, but you want my vote, you do something about it. It is your responsibility to do it as much as it is the responsibility of the other senators and the other congressmen." Let us hope that Washington gives the issue the attention that it deserves. This is going to make a real difference between what our lives are like today and a safe future for our kids.

Michael R. Bloomberg, Mayor of New York City
*Excerpted from opening remarks given at the Summit on*
*Reducing Gun Violence in America at the Johns Hopkins*
*Bloomberg School of Public Health, January 14, 2013*

*This page intentionally left  lank*

# Preface

One month—to the hour—after the harrowing and unfathomable massacre of 20 children and 6 adults in a Newtown, Connecticut, elementary school, Johns Hopkins University convened a summit that brought together preeminent researchers on gun violence from across the country and around the world. This was a moment when advocates, lobbyists, and politicians on both sides of the gun-control debate were beginning to mobilize and spar. In this unruly mix, Johns Hopkins seized the opportunity to discharge a critical role of research universities and provided principled scaffolding for the debate. We wanted to use the opportunity to cut through the din of the shrill and the incendiary, the rancorous and the baseless, and provide rigorous, research-based considerations of the most effective gun regulations and the appropriate balance between individual rights and civic obligation.

At Johns Hopkins, our scholars and researchers have been investigating the public health effects of gun violence for well over two decades. For the past seventeen years, the Center for Gun Policy and Research has provided a home for that study, producing nationally recognized research and recommendations aimed at understanding and curtailing the impact of gun violence.

Given the national historical backdrop of a bleak record of stunted policy reform in this area, some may have considered this summit to be another exercise in futility. The skeptic's fear is that good ideas for gun-policy reform are no match for the formidable interests that oppose gun control legislation—even after an event as cataclysmic as Newtown.

But our decidedly more optimistic view is predicated on the belief that this country is not slavishly tethered to the current matrix of inadequate national gun laws. Rather, despite a long history of failed legislative and policy reform and of opportunities inexplicably squandered, progress is possible. This view is illustrated both by the experiences of other countries and those of the United States.

At the summit, speakers from Australia, Scotland, and Brazil discussed the adoption of significant new policies in the wake of horrific moments of gun violence. These nations have never had constitutional guarantees protecting individuals' rights to bear arms, their political institutions vary greatly from those in the United States, and "gun culture" is an alien concept. But there are telling lessons to be gleaned from the approaches these countries took to address the wanton loss of life from gun violence.

In the United States, there is no denying the sea change in public sentiment that has buttressed public health reforms in areas as diverse as seat belt usage, drunk driving, and lead exposure. From the passage of civil rights legislation to the regulation of tobacco products, we have observed enough nontrivial policy change in recent decades to recognize that the apparent iron grip of status quo forces can be shattered and our policy can progress.

We owe great appreciation to Daniel Webster and Jon Vernick, of the Johns Hopkins Center for Gun Policy and Research, who framed the questions at the heart of this issue, organized the summit, and edited this book, all with extraordinary sophistication and speed. They were supported by a team of committed Johns Hopkins staff who set aside daily obligations to support this urgent cause. To each of them, and to the Johns Hopkins University Press, which published this book in unprecedented time, we are grateful.

Ronald J. Daniels, President, Johns Hopkins University

Michael J. Klag, Dean, Johns Hopkins Bloomberg
School of Public Health

# Acknowledgments

This book—published in only ten days—would be nothing more than an ambitious wish without the extraordinary efforts of many people.

We owe an immense debt of gratitude to Johns Hopkins University President Ron Daniels, who, in the wake of the Newtown tragedy, urged us to seize the moment and bring the depth and rigor of empirical research to one of the most complex and fractious issues our country has ever faced. His leadership and vision epitomize the spirit of Johns Hopkins and our obligation to spread knowledge beyond the realm of academe and into the streets, where everyday citizens live the public health challenges we study.

We are grateful also to Dean Michael Klag of the Bloomberg School of Public Health, who has been an unflagging supporter of the Center for Gun Policy and Research for many years, even and especially when public attention for our research was in short supply. His enthusiastic support for the Summit and the book proved essential to making both a reality.

A few days before the December holidays, we contacted more than twenty of the world's top experts on gun policy, some scattered around the globe, and asked them to present their research and experience at a January summit

that would inform important policy decisions and to write chapters for a companion volume that would be published the same month. These colleagues and friends—many of whom have devoted their careers to the study of violence and gun policy—answered the call without hesitation, interrupting family time during the holidays to join us in this important work.

We appreciate the valuable guidance provided by Stephen Teret, the founding director of the Johns Hopkins Center for Gun Policy and Research, in addition to his important chapter in the book. Thank you to Alicia Samuels, our Center's communications director, for ensuring the outcomes of this Summit reached key audiences. We are also grateful to the work of the many Center faculty who contributed valuable chapters to the book. And we are in awe of Colleen Barry's and Emma McGinty's exceptional effort to design and carry out a survey of public opinion on gun policy of such exceptional depth and quality during the first two weeks of January 2013.

Our sincere thanks to New York City Mayor Michael R. Bloomberg, whose powerful opening remarks at the Johns Hopkins Summit on Reducing Gun Violence in America inspired courage and conviction. We are likewise grateful to Maryland Governor Martin O'Malley, who cleared his calendar to speak at the Summit in the opening days of the legislative session.

Our colleagues at the Bloomberg School rose to the considerable challenge of organizing a high-profile event with short notice. We express our deepest gratitude to Josh Else, Jim Yager, Jane Schlegel, Felicity Turner, Susan Sperry, and Susan Murrow, who set aside the considerable demands of their daily work to make the Summit happen, along with their colleagues David Croft, Brian Simpson, Lauren Haney, Chip Hickey, Rachel Howard, Scott Klein, Ross McKenzie, Robert Ollinger, Tim Parsons, Maryalice Yakutchik, Mike Smith, Jackie Powder Frank, John Replogle, Yolanda Tillett, Alyssa Vetro, and Natalie Wood-Wright. And thank you to the countless other faculty, staff, and students for their support and interest in our work.

We received incredible support from our colleagues on the Homewood Campus, especially Lois Chiang, Glenn Bieler, Tom Lewis, Eileen Fader, Dennis O'Shea, and Jill Williams. They, along with their colleagues Beth Felder, Melisa Lindamood, Dave Alexander, Doug Behr, Lauren Custer, Lisa DeNike, Amy Lunday, Erin Oglesby, Tracey Reeves, Greg Rienzi, Hilary Roxe, Tricia Schellenbach, Gus Sentementes, Glenn Simmons, Phil Sneiderman, and others, demonstrated the spirit of "One Hopkins" by traveling between various campuses and offices to get the job done.

The Johns Hopkins University Press director Kathleen Keane and editorial director Greg Britton welcomed this project from the moment it was proposed, and we extend special thanks to our editor Kelley Squazzo, who embraced the challenges of working with multiple contributors over thousands of miles to produce a book in record time. We thank the peer reviewers for their very helpful feedback on the chapters in this book. Editorial, design, and production colleagues Julie McCarthy, Martha Sewall, John Cronin, Sara Cleary, Michele Callaghan, Mary Lou Kenney, and Carol Eckhart tended this project with extraordinary care under immense time constraints. Marketing staff Becky Brasington Clark, Tom Lovett, Karen Willmes, Kathy Alexander, Claire McCabe Tamberino, Brendan Coyne, Robin Rennison, Robin Noonan, Jack Holmes, Susan Ventura, Alexis de la Rosa, Cathy Bergeron, and Vanessa Kotz did an extraordinary job with promotion.

Our deepest thanks go to our families, who sustain us and support this important work.

Daniel W. Webster, ScD, MPH

Jon S. Vernick, JD, MPH

*This page intentionally left  lank*

# Introduction

The role of guns in violence, and what should be done, are subjects of intense debate in the United States and elsewhere. But certain facts are not debatable. More than 31,000 people died from gunshot wounds in the United States in 2010.[1] Because the victims are disproportionately young, gun violence is one of the leading causes of premature mortality in the United States. In addition to these deaths, in 2010, there were an estimated 337,960 nonfatal violent crimes committed with guns,[2] and 73,505 persons were treated in hospital emergency departments for nonfatal gunshot wounds.[3,4] The social and economic costs of gun violence in America are also enormous.

Despite the huge daily impact of gun violence, most public discourse on gun policy is centered on mass shootings in public places. Such incidents are typically portrayed as random acts by severely mentally ill individuals which are impossible to predict or prevent. Those who viewed, heard, or read news stories on gun policy might conclude the following: (1) mass shootings, the mentally ill, and assault weapons are the primary concerns; (2) gun control laws disarm law-abiding citizens without affecting criminals' access to guns;

(3) there is no evidence that gun control laws work; and (4) the public has no appetite for strengthening current gun laws. Yet all of the evidence in this book counters each of these misperceptions with facts to the contrary.

As Miller et al. point out in their essay, gun availability greatly increases the risk of violent death in America because many acts of gun violence involve spontaneous altercations that result in death or serious injury when a gun is readily available. Vittes et al. explain in their call for expanding disqualifying conditions for having handguns that this is especially true when these conflicts involve individuals with criminal histories, perpetrators of domestic violence, substance abusers, and youth.

Cook and Ludwig's essay reveals disappointing but not surprising findings of their evaluation of the Brady Law given that it leaves a substantial gap in federal gun control laws by omitting private transactions from background check and record keeping requirements. Papers by Webster et al. and Wintemute provide evidence that state laws that fill this gap by requiring universal background checks reduce diversions of guns to criminals.

Addressing gaps in the background check system are important because prohibiting firearm purchase and possession by high-risk groups appears to decrease violence. Swanson et al. document beneficial effects from prohibiting firearms for individuals with certain mental illnesses as long as appropriate records are shared with law enforcement agencies that screen gun buyers. Zeoli and Frattaroli share evidence that some firearm prohibitions for domestic violence offenders are saving lives, and Wintemute provides evidence that preventing violent misdemeanors from purchasing handguns reduces violence.

Some elected officials claim that they are looking out for gun owners when they pass measures deceptively named "Firearm Owners' Protection Act" or "Protection of Lawful Commerce in Arms Act." But essays by Vernick and Webster and by Braga and Gagliardi demonstrate that these laws and others like them are designed solely to protect gun sellers against measures that would otherwise hold them accountable for practices that divert guns to criminals. Current federal laws make it very difficult to prosecute, sue, revoke the licenses of rogue gun dealers, or even share data about which gun manufacturers and retailers are connected to unusually large numbers of guns used by criminals. Studies have shown that when gun dealers experience greater regulation and oversight by law enforcement and are vulnerable to lawsuits

for illegal sales practices, far fewer of the guns they sell end up in the hands of criminals.

Koper reviews his evaluation of the 1994 federal ban on assault weapons and high-capacity ammunition magazines. That ban was designed to remove military-style weapons and make it harder for multiple rounds to be fired without reloading. Unfortunately, the assault weapon ban was easy to evade and millions of existing high-capacity ammunition magazines were grandfathered. The law was allowed to expire in 2004, but Koper's findings can teach us how to improve such laws in the future.

Firearms themselves can also be made safer. Teret and Mernit describe the benefits of safe gun designs, particularly personalized guns designed to be operable only by an authorized user. They discuss the history of these technologies, their present-day feasibility, and ways to promote their adoption.

The United States is not the only nation to have suffered from mass shootings or to address an endemic gun violence problem. Mass shootings in Dunblane, Scotland, and Port Arthur, Tasmania, led to major changes in the gun laws of the United Kingdom and Australia. Essays by North, Peters, and Alpers describe these new laws. Brazil had some of the highest rates of gun violence in the world. Yet here, too, comprehensive changes to gun laws were associated with reductions in rates of violence. Bandeira discusses this success story. Although bans on certain handguns (as in the UK) or bans and mass buybacks of specific long guns (in Australia) are unlikely to occur in the United States, the authors discuss the lessons U.S. advocates and policymakers can learn from these successes in other nations.

For many years, some groups have claimed that the Second Amendment to the U.S. Constitution stands as an obstacle to most gun laws. Rosenthal and Winkler debunk this myth with careful legal analysis of recent U.S. Supreme Court and lower court opinions. The recommendations provided in this book should withstand constitutional scrutiny.

Public opinion is also an important determinant of whether any particular evidence-based policy becomes law. McGinty et al. report on a newly conducted national public opinion poll of 33 different policies. Most were supported by strong majorities of the public, including a majority of gun owners.

The book concludes with consensus recommendations from the book's contributors. These recommendations address the full range of topics covered in this book. If implemented, these recommendations have the potential to

dramatically reduce the number of gun deaths in the United States, enhancing the quality of life for all Americans.

Daniel W. Webster, ScD, MPH

Jon S. Vernick, JD, MPH

Notes

1. Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS) [Online]. National Center for Injury Control and Prevention, Centers for Disease Control and Prevention (producer). Available from: URL: http://www.cdc.gov/injury/wisqars/index.html. [2012, Mar. 15].

2. Truman JL. Criminal Victimization, 2010. National Crime Victimization Survey. NCJ 235508, Washington, DC: United States Department of Justice, Bureau of Justice Statistics, Sept. 2010.

3. Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS) [Online]. National Center for Injury Control and Prevention, Centers for Disease Control and Prevention (producer). Available from: URL: http://www.cdc.gov/injury/wisqars/index.html. [2012, Mar. 15].

4. Vyrostek SB, Annest JL, Ryan GW. Surveillance for Fatal and Non-Fatal Injuries—United States, 2001. *MMWR*. 2004; 53(SS07):1–57.

# Part I / Gun Policy Lessons from the United States

Keeping Guns from High-Risk Individuals

*This page intentionally left  lank*

1

# Firearms and Violent Death in the United States

Matthew Miller, Deborah Azrael, and David Hemenway

## Firearm-Related Deaths in the United States

In 2010, there were more than 31,000 firearm deaths in the United States: 62% were suicides, 36% were homicides, and 2% were unintentional (2%) (CDC 2012a). Almost as many Americans die from gunfire as die from motor vehicle crashes (almost 34,000 in 2010). Americans under age 40 are more likely to die from gunfire than from any specific disease (CDC 2012a).

### *Homicide*

The United States is not a more violent country than other high-income nations. Our rates of car theft, burglary, robbery, sexual assault, and aggravated assault are similar to those of other high-income countries (van Kesteren, Mayhew, and Nieuwbeerta 2001); our adolescent fighting rates are also similar (Pickett

Matthew Miller, MD, ScD, MPH, is deputy director of the Harvard Injury Control Research Center and associate professor of Injury Prevention and Health Policy at the Harvard School of Public Health. Deborah Azrael, PhD, has been a member of the firearms research group at the Harvard School of Public Health for more than 20 years. David Hemenway, PhD, is an economist and professor at the Harvard School of Public Health and director of the Harvard Injury Control Research Center.

*Table 1.1*   Homicide, suicide, and unintentional gun deaths among 5–14 year olds: The United States versus 25 other high-income populous countries (early 2003)

|  | Mortality rate ratio |
|---|---|
| Homicides | |
| Gun homicides | 13.2 |
| Non-gun homicides | 1.7 |
| Total | 3.4 |
| Suicides | |
| Gun suicides | 7.8 |
| Non-gun suicides | 1.3 |
| Total | 1.7 |
| Unintentional firearm deaths | 10.3 |

*Source:* Richardson and Hemenway 2011

et al. 2013). However, when Americans are violent, the injuries that result are more likely to prove fatal. For example, the U.S. rate of firearm homicide for children 5 to 14 years of age is thirteen times higher than the firearms homicide rate of other developed nations, and the rate of homicide overall is more than three times higher (Table 1.1).

U.S. homicide rates vary cyclically over time. Current rates are at a 30-year low, but as recently as 1991 rates were nearly twice as high (CDC 2012a). Changes in homicide rates over the past several decades are largely attributable to changes in firearm homicide rates, mostly driven by changes in firearm homicide rates among adolescent and young men in large cities (Hepburn and Hemenway 2004, Blumstein and Wallman 2000, Cork 1999, Cook and John 2002).[1]

The U.S. homicide rate is much higher in urban than in rural areas, as are rates of all violent crime. Nine out of ten homicide offenders are male, and 75% of victims are male. African Americans are disproportionately represented among both perpetrators and victims.[2]

### Suicide

Compared with other high-income countries, the U.S. adult suicide rate falls roughly in the middle. Among younger persons, however, our suicide mortality is relatively high: for children under 15 years of age, the overall suicide

rate in the United States is 1.6 times that of the average of other high-income countries, largely accounted for by a firearm suicide rate eight times that of the average of these countries (Richardson and Hemenway 2011).

Over the past several decades, suicide rates have been more stable than have rates of homicide (Miller, Azrael, and Barber 2012). Nevertheless, after declining from a peak of 12.9/100,000 in 1986 to 10.4 in 2000, driven largely by a decline in the rate of firearm suicide, the suicide rate has increased over the past decade to 12.4/100,000 in 2010, mostly due to an increase in suicide by hanging (Miller, Azrael, and Barber 2012, CDC 2012a).

Age, sex, race, and other demographic characteristics—including marital status, income, educational attainment, and employment status—all influence suicide mortality (Nock et al. 2008). Suicide rates are higher, for example, for white and Native Americans than for black, Hispanic, and Asian Americans (CDC 2007). A consistent finding across numerous studies is that the strongest individual-level risk factor for a fatal suicidal act is having previously attempted suicide; other strong risk factors include psychiatric and substance abuse disorders (Shaffer et al. 1996).

In contrast to homicide rates, suicide rates are higher in rural than in urban areas almost entirely due to higher rates of firearm suicide in rural areas.

### Unintentional Firearm Deaths

Approximately 675 Americans per year were killed unintentionally with firearms between 2001 and 2010 (CDC 2007). Data from the National Violent Death Reporting System show that two-thirds of the accidental shooting deaths occurred in someone's home, about half of the victims were younger than 25 years, and half of all deaths were other-inflicted. In other-inflicted shootings, the victim was typically shot accidentally by a friend or family member—often an older brother (Hemenway, Barber, and Miller 2010).

## Firearm Ownership in the United States

The United States has more private guns per capita (particularly more handguns) and higher levels of household gun ownership than other developed countries (Killias 1993, SAS 2007).

Most of what we know about gun ownership levels in the United States over the past several decades comes from the General Social Survey (GSS 2010),

a relatively small biannual survey of U.S. adults. Data from the GSS show that the percentage of households with firearms has fallen from approximately 50% in the late 1970s to 33% today. Changing household demographics are believed to explain the decline in the household ownership of guns chiefly due to a fall in the number of households with an adult male (Smith 2000). Notably, however, the percentage of individuals owning firearms has remained relatively constant over the past several decades (GSS 2010).

The GSS does not speak to the number of guns in civilian hands or the distribution of guns within households. For this information, researchers have turned to data from two medium-sized national surveys conducted a decade apart. These surveys suggest that the number of guns in civilian hands grew from approximately 200 million in 1994 to 300 million in 2004—and that the average gun owner now owns more guns than previously (Hepburn et al. 2007, Cook and Ludwig 1997).

Compared with other Americans, gun owners are disproportionately male, married, older than 40, and more likely to live in nonurban areas. Their long guns (rifles, shotguns) are owned mainly for sport (hunting and target shooting). People who own only handguns typically own the guns for protection against crime (Hepburn et al. 2007, Cook 1979).

In 2001, 2002, and 2004, but not before or since, information on household gun ownership from the General Social Survey was supplemented by information from the National Behavioral Risk Factor Surveillance System (CDC 1997). The BRFSS is of sufficient size (more than 200,000 respondents annually) that household gun ownership could, for the first time, be determined at the state level for all 50 states and for some Metropolitan Statistical Areas.

Prior to these three iterations of the BRFSS, researchers generally used proxies to measure firearm ownership rates at the state and sub-state level. A validation study by Azrael, Philip, and Miller (2004) found that from among all proxies, the fraction of suicides that are committed with firearms (FS/S) correlates most strongly and consistently with cross-sectional survey-based measures of household firearm ownership at the county, state, and regional levels.

Household firearm ownership is probably a good measure of the accessibility of guns used in suicides, since most suicides involving firearms occur in the home (Kellermann et al. 1992, CDC 2012b) and involve a firearm owned by a member of the household (Kellermann et al. 1992). Household gun owner-

ship levels seem also to be the key exposure variable for firearm homicides that take place in the home, where women, children and older adults are particularly likely to be killed. The most common perpetrator in such instances is a family member (CDC 2012b). By contrast, older adolescent and young adult males are more often killed outside the home by guns owned by a non-family member.[3]

In this essay, we focus on studies that assess the relationship between gun prevalence and violent death. As such, the essay does not examine studies of gun carrying nor any literature on illegal gun markets. It also does not address research that investigates the relationship between firearm regulations and violent death. Note, however, that firearm prevalence and firearm regulation are highly collinear. Strong regulations may limit firearm ownership, and low levels of firearm ownership make it easier to pass stronger regulations.

This essay is also not an exhaustive review of the literature examining the association of firearm availability and violent death. (For more comprehensive reviews, see Hepburn and Hemenway 2004, Miller and Hemenway 1999, and Brent 2001.) Rather, it briefly summarizes (a) international ecologic studies comparing the United States to other countries, (b) ecologic studies of U.S. regions, states, and metropolitan areas, and (c) individual case-control and cohort studies.

Studies included in this brief review met a minimal threshold of attempting to control for important confounders: studies had to compare likes to likes. For case-control studies of homicide, that means—at a minimum—controlling for age, gender, and neighborhood; in suicide studies, for age, sex, and psychiatric risk factors for suicidal behavior. For international studies of homicide, it means comparing high-income countries to high-income countries. International comparisons of adult suicide rates are confounded by large differences in religion, culture and recording practices (i.e., the social meaning and cultural acceptance of adult suicide), as evidenced by tenfold differences in suicide rates across high-income nations. Thus, the only international studies of suicide included focus on the suicides of children—which all countries hold to be tragedies. For ecologic studies in the United States, making "like to like" comparisons means comparing states to states with similar levels of urbanization (or, for homicide, similar crime rates), cities to cities, and rural areas to rural areas.[4]

## Firearms and Homicide
### *Ecologic Studies*

Killias (1993) evaluated rates of violence in 14 developed countries: 11 in Europe, along with the United States, Canada, and Australia. He used data from the 1989 International Crime Survey, a telephone survey of 14 countries and 28,000 respondents, to measure firearm prevalence. Respondents were asked whether there were any firearms in their household and, if so, whether any were a handgun or a long gun. Military firearms were excluded. In this study, which did not include control variables, rates of firearm ownership and homicide were positively correlated, while rates of firearm ownership and non-firearm homicide were not.

A study by Hemenway and Miller (2000) included 26 high-income nations with populations greater than one million. To measure gun availability, the authors used two proxies, including FS/S. No control variables were included in the analysis. Firearm availability was strongly and significantly associated with homicide across the 26 countries.

A follow-up study (Hemenway, Shinoda-Tagawa, and Miller 2002) examined homicide rates among women across high-income countries. The validated proxy (FS/S, or the percentage of suicides committed with a firearm) was used to estimate firearm ownership in each country. Urbanization and income inequality were included as control variables. The United States accounted for 70% of all female homicide victims in the study and had the highest firearm ownership rates. The U.S. homicide rate for women was five times higher than that of all of the other countries combined; its female firearm homicide rate was eleven times higher.

### *U.S. Studies*

Cook (1979) conducted a cross-sectional analysis of 50 large cities in the United States to explore the relationship between gun availability and robbery, including robbery-murder. Using data on the number of robberies in 1975, Cook examined how firearm availability (as proxied by Cook's index) was related to robbery and robbery-murder rates, controlling for measures of the effectiveness of the criminal justice system, population density, and other regional and state differences. Increased gun availability was not associated with overall robbery rates, but it was positively associated with the proportion of robber-

ies that involved a gun—and with the per capita robbery-murder rate, through an increased rate of gun robbery.

Miller et al. (2002) evaluated the relationship between levels of firearm ownership at the state and regional level and the incidence of homicide from 1988 to 1997 for 50 states and 9 regions. At the state level, they used the percentage of suicides with a firearm as a proxy for ownership and they measured gun availability at the regional level with data from the GSS. Five potential confounders were included: poverty, urbanization, unemployment, alcohol consumption, and (non-homicide) violent crime rates. In the multivariate analyses, a positive and significant association between gun ownership and homicide rates was found for the entire population and for every age group (except ages 0–4), primarily due to higher firearm homicide rates.

A similar study (Miller et al. 2007) used survey estimates of household gun ownership for each state from the Behavioral Risk Factor Surveillance System. It examined data from 2001 to 2003 and controlled for state-level rates of aggravated assault, robbery, unemployment, urbanization, alcohol consumption, poverty, income inequality, the percentage of the population that was black, and the percentage of families headed by a single female parent. Again, states with higher rates of household firearm ownership had significantly higher homicide victimization rates for men, for women, and for children. The association was driven by gun-related homicide victimization rates; non-gun-related victimization rates were not significantly associated with rates of firearm ownership.

### Individual Level Studies

Ecologic studies provide evidence about whether more guns in the community are associated with more homicides in the community. Case-control and cohort studies provide data more germane to the question of whether a gun in the home increases or reduces the risk of homicide victimization for members of the household.

Kellermann et al. examined approximately 400 homicide victims from three metropolitan areas who were killed in their homes (Kellermann et al. 1993). All died from gunshot wounds. In 83% of the homicides, the perpetrator was identified; among these cases, 95% of the time, the perpetrator was not a stranger. In only 14% of all the cases was there evidence of forced entry. After controlling for illicit drug use, fights, arrests, living alone, and whether the home was rented,

10    *Matthew Miller, Deborah Azrael, and David Hemenway*

*Table 1.2*    NVDRS 2005–2010

|  | Firearm | | | Non-firearm | | |
|---|---|---|---|---|---|---|
|  | N | Occurred in a house/apt | Occurred at victim's residence | N | Occurred in a house/apt | Occurred at victim's residence |
| **Homicides by age group** | | | | | | |
| 0–4 yrs | 81 | 75% | 67% | 1,025 | 90% | 77% |
| 5–14 yrs | 257 | 72% | 51% | 205 | 78% | 67% |
| 15–24 yrs | 5,679 | 37% | 16% | 1,385 | 47% | 27% |
| 25–34 yrs | 4,906 | 44% | 24% | 1,479 | 56% | 39% |
| 35–64 yrs | 5,003 | 56% | 41% | 3,716 | 62% | 50% |
| 65+ yrs | 470 | 74% | 69% | 719 | 79% | 76% |
| **Suicides by age group** | | | | | | |
| 0–4 yrs | — | | | — | | |
| 5–14 yrs | 105 | 97% | 88% | 301 | 91% | 88% |
| 15–24 yrs | 3,332 | 75% | 64% | 3,769 | 69% | 65% |
| 25–34 yrs | 4,034 | 76% | 67% | 4,743 | 70% | 65% |
| 35–64 yrs | 15,634 | 78% | 74% | 16,568 | 72% | 70% |
| 65+ yrs | 6,019 | 89% | 88% | 2,168 | 80% | 83% |

*Note:* Unknowns for age (0.7%), house/apt (1.4%), home (3.6%) were set aside.

the presence of a gun in the home remained strongly associated with an increased risk for homicide in the home. Gun ownership was most strongly associated with an increased risk of homicide by a family member or intimate acquaintance.[5]

Whereas most men are murdered away from home, most children, older adults, and women are murdered at home (Table 1.2). A gun in the home is a particularly strong risk factor for female homicide victimization—with the greatest danger for women coming from their intimate partners.

The heightened risk of femicide is illustrated in a subgroup analysis of female homicide victimization from Kellermann's 1993 case-control study of homicide in the home. A spouse, a lover, or a close relative murdered most of the women decedents, and the increased risk for homicide from having a gun in the home was attributable to these homicides (Bailey, Flewelling, and Rosenbaum 1997). A case-control study by Wiebe et al. (2003) also found that the risk of homicide associated with living in a home with guns was particularly high for women (who were almost three times more likely to become homicide victims compared with women living in homes without guns). Here too, a gun in the home was a risk factor for homicide by firearm but not for homicide by other means.

Other case-control studies have also found that a gun in the home is a risk for homicide in the home, with especially heightened risk for women (Cummings et al. 1997, Dahlberg, Ikeda, and Kresnow 2004). Results from perpetrator-based case-control homicide studies also find that gun ownership is a risk for homicide perpetration. For example, a study of women murdered by intimate partners found that compared with a control group of living battered women, a gun in the house was present for 65% of perpetrators of murder versus 24% of perpetrators of nonfatal abuse. Access to a firearm by the battered woman had no protective effect (Campbell et al. 2003).

### Cohort Studies

There are no studies that follow a large cohort of individuals with known characteristics, comparing homicide victimization rates of those with a gun in the home and those without.

## Firearm Prevalence and Suicide

Firearm suicide rates and overall suicide rates in the United States are higher where guns are more prevalent (Miller, Hemenway, and Azrael 2007, Kubrin and Wadsworth 2009). By contrast, rates of suicide by methods other than firearms are not significantly correlated with rates of household firearm ownership (Miller, Hemenway, and Azrael 2007). This pattern has been reported in ecologic studies that have adjusted for several potential confounders, including measures of psychological distress, alcohol and illicit drug use and abuse, poverty, education, and unemployment (Miller, Azrael, and Barber 2012, Miller, Hemenway, and Azrael 2007).

Household firearm ownership has also been consistently found to be a strong predictor of suicide risk in studies that examined individual-level data. U.S. case-control studies find that the presence of a gun in the home or purchase from a licensed dealer is a risk factor for suicide (Bailey et al. 1997, Brent et al. 1993, Brent et al. 1994, Brent et al. 1991, Brent et al. 1988, Conwell et al. 2002, Cummings et al. 1997, Kellermann et al. 1992, Grassel et al. 2003, Kung, Pearson, and Lui 2003, Wiebe 2003). The relative risk is large (two- to tenfold), depending on the age group and, for younger persons, how firearms in the home are stored (Miller and Hemenway 1999, Brent et al. 1991, Kellermann et al. 1992).

The only large U.S. cohort study to examine the firearm–suicide connection found that suicide rates among California residents who purchased handguns

from licensed dealers were more than twice as likely to die by suicide as were age/sex matched members of the general population, not only immediately after the purchase but throughout the six-year study period (Wintemute et al. 1999). Here, too, the increase in suicide risk was attributable entirely to an excess risk of suicide with a firearm (Wintemute et al. 1999).

Drawing causal inferences about the relation between firearm availability and the risk of suicide from existing case-control and ecologic studies has been questioned on the grounds that these studies may not adequately control for the possibility that members of households with firearms are inherently more suicidal than members of households without firearms (NRC 2005). Additional cited limitations include the possibility of differential recall (by cases compared with controls) of firearm ownership and comorbid conditions, and reverse causation (whereby suicidal persons purchase firearms with the idea of committing suicide).

It is very unlikely, however, that the strong association between firearms and suicide reported consistently in U.S. studies is either spurious or substantially overstated. First, individual-level studies have often controlled for measures of psychopathology (Bailey et al. 1997, Brent et al. 1994, Brent et al. 1993, Brent et al. 1988, Conwell et al. 2002, Cummings et al. 1997, Kellermann et al. 1992, Wiebe 2003).

Second, directly answering the reverse causation critique, the risk of suicide associated with a household firearm pertains not only to gun owners but to *all* household members (Cummings et al. 1997, Kellermann et al. 1992, Wintemute et al. 1999); the relative risk is larger for adolescents than for the gun owner; and for the gun owner the risk persists for years after firearms are purchased (Cummings et al. 1997, Kellermann et al. 1992, Wintemute et al. 1999).

Third, studies that have examined whether people who live in homes with guns have higher rates of psychiatric illness, substance abuse, or other known suicide risk factors generally fail to find any indication of heightened risk (Oslin et al. 2004, Kolla, O' Connor, and Lineberry 2011). For example, four case-control studies found comparable rates of psychiatric illness and psychosocial distress among households with versus without firearms (Kellermann et al. 1992, Ilgen et al. 2008, Miller et al. 2009, Sorenson and Vittes 2008, Betz, Barber, and Miller 2011).

Fourth, there appears to be a hierarchy of suicide risk among children and young adults, depending on how securely household firearms are stored, suggesting a dose-response relationship (Grossman et al. 2005).

Finally, the consistency in magnitude, direction, and specificity of method-related risk observed in both the many individual-level and ecologic studies (the latter not being subject to recall bias or the reverse causation criticism) leads to only one conclusion: a gun in the home increases the likelihood that a family member will die from suicide.

## Unintentional Firearm Deaths

Not surprisingly, ecologic and case-control studies find that where there are more guns and more guns poorly stored, there are more unintentional firearm deaths (Miller, Azrael, and Hemenway 2001, Wiebe 2003, Grossman et al. 2005). U.S. children aged 5 to 14 have eleven times the likelihood of being killed accidentally with a gun compared with similarly aged children in other developed countries (Table 1.2) (Richardson and Hemenway 2011).

## Conclusion

The United States, with its many guns and highly permissive gun laws, faces a far more serious problem of lethal firearms violence than other high-income nations. The relative magnitude of our problem is illustrated in Table 1.1. This table, which compares U.S. children aged 5–14 with children of other developed countries, illustrates the stark fact that U.S. children are *thirteen* times more likely to die from a firearm homicide and *eight* times more likely to a die of a firearm suicide than children in comparable developed nations. There is no evidence that U.S. children are more careless, suicidal. or violent than children in other high-income nations. Rather, what distinguishes children in the United States from children in the rest of the developed world is the simple, devastating fact that they die—mostly by firearms—at far higher rates.

Within the United States itself, the evidence is similarly compelling: where there are more guns, there are more violent deaths—indeed, many more. The magnitude of this relationship is illustrated in Table 1.3, which compares the number of lives lost between 2001 and 2007 to homicide, suicide, and unintentional firearm accidents by sex and age groups in states with the highest compared with the lowest gun ownership rates. The consistency of findings across different populations, using different study designs, and by different researchers is striking. No credible evidence suggests otherwise.

*Table 13*   Violent deaths in states with the highest versus lowest gun ownership levels
(BRFSS 2004); Mortality Data WISQARS 1999–2007

|  | High-gun states[a] | Low-gun states[b] | Ratio |
|---|---|---|---|
| Aggregate population of adults, 2001–2007 | 356 million | 358 million | 1.0 |
| Proportion of households with firearms | 50% | 15% | 3.3 |
| Percentage of adult population reporting depression, past 12 months (NSDUH 2008–2009) | 3.7% | 3.7% | 1.0 |
| Percentage of adult population reporting suicidal ideation, past 12 months (NSDUH 2008–2009) | 6.6% | 6.5% | 1.0 |
| Number of nonlethal violent crimes in 2010 (UCR 2010) | 165,739 | 148,287 | 1.1 |
| Suicide |  |  |  |
| Women |  |  |  |
| Firearm suicide | 4,148 | 563 | 7.4 |
| Non-firearm suicide | 4,633 | 4,575 | 1.0 |
| Total suicide | 8,781 | 5,138 | 1.7 |
| Men |  |  |  |
| Firearm suicide | 26,314 | 7,163 | 3.7 |
| Non-firearm suicide | 11,592 | 12,377 | 0.9 |
| Total suicide | 37,906 | 19,540 | 1.9 |
| Men ages 15–29 |  |  |  |
| Firearm suicide | 5,803 | 1,308 | 4.4 |
| Non-firearm suicide | 3,192 | 2,671 | 1.2 |
| Total suicide | 8,995 | 3,979 | 2.2 |
| 5–14 year olds |  |  |  |
| Firearm suicide | 166 | 15 | 11.1 |
| Non-firearm suicide | 225 | 154 | 1.5 |
| Total suicide | 391 | 169 | 2.3 |
| Adults 65+ years old |  |  |  |
| Firearm suicide | 6,374 | 1,714 | 3.7 |
| Non-firearm suicide | 1,182 | 2,270 | 0.5 |
| Total suicide | 7,556 | 3,984 | 1.9 |
| Homicide |  |  |  |
| Men |  |  |  |
| Firearm homicide | 13,755 | 7,799 | 1.8 |
| Non-firearm homicide | 5,031 | 3,963 | 1.3 |
| Total homicide | 18,786 | 11,762 | 1.6 |
| Women |  |  |  |
| Firearm homicide | 3,165 | 998 | 3.2 |
| Non-firearm homicide | 2,855 | 2,132 | 1.3 |
| Total homicide | 6,020 | 3,130 | 1.9 |

*Table 13*   (Continued)

|  | High-gun states[a] | Low-gun states[b] | Ratio |
|---|---|---|---|
| **5–14 year olds** |  |  |  |
| Firearm homicide | 259 | 100 | 2.6 |
| Non-firearm homicide | 212 | 169 | 1.3 |
| Total homicide | 471 | 269 | 1.8 |
| **Men 15–29** |  |  |  |
| Firearm homicide | 6,971 | 4,900 | 1.4 |
| Non-firearm homicide | 1,187 | 1,334 | 0.9 |
| Total homicide | 8,158 | 6,234 | 1.3 |
| **Adults 65+ years old** |  |  |  |
| Firearm homicide | 620 | 139 | 4.5 |
| Non-firearm homicide | 794 | 534 | 1.5 |
| Total homicide | 1,414 | 673 | 2.1 |
| Unintentional firearm deaths | 109 | 677 | 6.2 |

*Note:* All data are from 1999–2007 because cell counts were suppressed beginning in 2008; terrorism-related homicides are not counted.
[a]Louisiana, Utah, Oklahoma, Iowa, Tennessee, Kentucky, Alabama, Mississippi, Idaho, North Dakota, West Virginia, Arkansas, Alaska, South Dakota, Montana, Wyoming
[b]Hawaii, New Jersey, Massachusetts, Rhode Island, Connecticut, New York

Firearm policy is often focused on guns used in crime. What is notable about the studies reviewed here, however, is the consistency of the story they tell about *all* firearms—not just those used in crime. In the United States, there are more firearm suicides than firearm homicides, and women, children, and older adults are more likely to die by gunfire from a household gun (typically, legally acquired and possessed) than from illegal guns.

The first step in ameliorating a public health problem is to identify what the problem is. For the purposes of this essay, the problem is that, year after year, many more Americans are dying by gunfire than people in any other high-income nation. Good firearm policy has the potential to reduce the toll of lethal firearm violence in the United States. Efforts to reduce this uniquely American problem will, however, be less effective than they could be if good policy is not accompanied by a shift in the kind of discussions politicians, academicians, and citizens engage in about firearms. Science can provide the content—and better science based on better data, better content. The best chance for durable and large-scale reductions in lethal violence in the United States is for all of us to commit to keeping the conversation about the costs and benefits of guns in American society civil, ongoing, and factually grounded.

### Acknowledgments

The text, but not the figures reported, in this essay draw in part on prior reviews written previously by the authors, often supported by the Joyce Foundation.

### Notes

1. Researchers attribute the decline in the 1990s to different causes, including reduced unemployment, increased policing, and a decline in and stabilization of illegal drug markets (Wintemute 2000). Declines in the last decade have not yet been well explained.

2. Homicide rates have been consistently higher in the southern and western regions of the United States. This is especially true for firearm homicides (CDC 2012a).

3. Measuring the availability of guns in the context of these homicides is more problematic, not least because researchers (Webster, Vernick, and Hepburn 2001, MAIG 2008) have shown that guns involved in these deaths often move across state lines from states with permissive gun laws to states with fewer guns and stronger laws.

4. Studies included in this review were those previously included in review articles by two of the authors, updated to include new articles meeting the criteria specified in these reviews which have appeared in the research literature since the time those review papers were published.

5. The study did not provide evidence about whether a gun from the home was used in any of the homicides. However, the idea that a gun in the home increased the risk of death was supported by several observations. First, the link between gun ownership and homicide was due entirely to a strong association between gun ownership and homicide by firearm; homicide by other means was not significantly linked to having a gun in the home. Second, gun ownership was most strongly associated with homicide at the hands of a family member or intimate acquaintance (i.e., guns were not significantly linked to an increased risk of homicide by non-intimate friends, unidentified persons, or strangers). Third, there was no evidence of a protective effect of keeping a gun in the home—even in the small subgroup of cases that involved forced entry.

### References

Azrael, D., J. C. Philip, and M. Miller. 2004. "State and local prevalence of firearms ownership measurement, structure, and trends." *Journal of Quantitative Criminology* 20 (1):43–62.

Bailey, S., R. Flewelling, and D. Rosenbaum. 1997. "Characteristics of students who bring weapons to school." *Journal of Adolescent Health* 20 (4):261–270.

Bailey, J. E., A. L. Kellerman, G. Somes, J. G. Banton, F. Rivara, and N. B. Rushforth. 1997. "Risk factors for violent death of women in the home." *Archives of Internal Medicine* 157 (7):777–782.

Betz, M. E., C. Barber, and M. Miller. 2011. "Suicidal behavior and firearm access: Results from the second injury control and risk survey." *Suicide and Life Threatening Behavior* 41 (4):384–391.

Blumstein, A., and J. Wallman. 2000. *The crime drop in America*. New York: Cambridge University Press.

Brent D. A. 2001. "Firearms and suicide." *Ann. N. Y. Acad. Sci.* 932:225–39.

Brent, D. A., et al. 1988. "Risk factors for adolescent suicide: A comparison of adolescent suicide victims with suicidal inpatients." *Archives of General Psychiatry* 45 (6):581–588.

Brent, D. A., J. A. Perper, C. J. Allman, G. Moritz, M. E. Wartella, and J. P. Zelenak. 1991. "The presence and accessibility of firearms in the homes of adolescent suicides: A case-control study." *JAMA* 266 (21):2989–2995.

Brent, D. A., J. A. Perper, G. Moritz, M. Baugher, J. Schweers, and C. Roth. 1994. "Suicide in affectively ill adolescents: A case-control study." *Journal of Effective Disorders* 31 (3):193–202.

Brent, D. A., J. A. Perper, G. Moritz, M. Baugher, J. Schweers, and C. Roth. 1993. "Firearms and adolescent suicide: A community case-control study." *American Journal of Diseases of Children* 147 (10):1066–1071.

Campbell, J. C., D. Webster, J. Koziol-McLain, C. Block, D. Campbell, et al. 2003. "Risk factors for femicide in abusive relationships: Results from a multisite case control study." *American Journal of Public Health* 93 (7):1089–1097.

CDC. 1997. Rates of homicide, suicide, and firearm-related death among children—26 industrialized countries. In *Morbidity and Mortality Weekly Report.* Centers for Disease Control and Prevention.

CDC. 2007. Centers for Disease Control WISQARS injury mortality report. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

CDC. 2012a. Centers for Disease Control and Prevention, National Center for Health Statistics: Compressed Mortality File 1999–2009. Edited by CDC. CDC WONDER Online Database, compiled from Compressed Mortality File 1999–2009.

CDC. 2012b. Surveillance for violent deaths—National Violent Death Reporting System, 18 states, 2012. Centers for Disease Control and Prevention.

Conwell, Y., P. R. Duberstein, K. Connor, S. Eberly, C. Cox, and E. D. Caine. 2002. "Access to firearms and risk for suicide in middle-aged and older adults." *American Journal of Geriatric Psychiatry* 10 (4):407–416.

Cook, P. J. 1979. "The effect of gun availability on robbery and robbery murder." In *Policy studies review annual*, edited by R. H. Haveman and B. B. Zellner, 743–781. Beverly Hills, CA: Sage.

Cook, P. J., and H. L. John. 2002. "After the epidemic: Recent trends in youth violence in the United States" In *Crime and justice: A review of research*, ed. Michael Tonry, 117–153. Chicago: University of Chicago Press.

Cook, P. J., and J. Ludwig. 1997. Guns in America: National survey on private ownership and use of firearms (NCJ 1654476). Washington, DC: U.S. Department of Justice.

Cork, D. 1999. "Examining time-space interaction in city-level homicide data: Crack markets and the diffusion of guns among youth." *Journal of Quantitative Criminology* 15 (4):379–406.

Cummings, P., T. D. Koepsell, D. C. Grossman, J. Savarino, and R. S. Thompson. 1997. "The association between the purchase of a handgun and homicide or suicide." *American Journal of Public Health* 87 (6):974–978.

Dahlberg, L. L., R. M. Ikeda, and M. J. Kresnow. 2004. "Guns in the home and risk of a violent death in the home: Findings from a national study." *American Journal of Epidemiology* 160 (10):974–978.

Grassel, K. M., G. J. Wintemute, M. A. Wright, and M. P. Romero. 2003. "Association between handgun purchase and mortality from firearm injury." *Injury Prevention* 9:48–52.

Grossman, D. C., B. A. Mueller, C. Riedy, M. D. Dowd, A. Villaveces, J. Prodzinski, J. Nakagawara, J. Howard, N. Thiersch, and R. Harruff. 2005. "Gun storage practices and rise of youth suicide and unintentional firearm Injuries." *JAMA* 293 (6):707–714.

GSS. 2010. "General Social Survey."

Hemenway, D., C. Barber, and M. Miller. 2010. "Unintentional firearm deaths: A comparison of other-inflicted and self-inflicted shootings." *Accident Analysis and Prevention* 42 (2):1184–1188.

Hemenway, D., & Miller, M. (2000). "Firearm availability and homicide rates across 26 high-income countries." *Journal of Trauma, Injury, Infection, and Critical Care,* 49(6), 985–988.

Hemenway, D., T. Shinoda-Tagawa, and M. Miller. 2002. "Firearm availability and female homicide victimization rates among 25 populous high-income countries." *Journal of the American Medical Women's Association* 57:1–5.

Hepburn, M., M. Miller, D. Azrael, and D. Hemenway. 2007. "The US gun stock: results from the 2004 national firearms survey." *Injury Prevention* 13:15–19.

Hepburn, L. M., and D. Hemenway. 2004. "Firearm availability and homicide: A review of the literature." *Aggression and Violent Behavior* 9:417–440.

Ilgen, M. A., K. Zivin, R. J. McCammon, and M. Valenstein. 2008. "Mental illness, previous suicidality, and access to guns in the United States." *Psychiatric Services* no. 59 (2):198–200.

Kellermann, A. L., and F. P. Rivara. 2012. "Silencing the Science on Gun Research." *JAMA* ():1–2. doi: 10.1001/jama.2012.208207.

Kellermann, A. L., F. Rivara, N. B. Rushforth, J. Banton, D. T. Reav, J. Francisco, A. B. Locci, J. Prodzinski, B. B. Hackman, and G. Somes. 1993. "Gun ownership as a risk factor for homicide in the home." *New England Journal of Medicine* 329 (15):1084–1091.

Kellermann, A. L., F. P. Rivara, G. Somes, D. T. Reay, J. Francisco, J. Banton, J. Prodzinski, C. Fligner, and B. B. Hackman. 1992. "Suicide in the home in relation to gun ownership." *New England Journal of Medicine* 327 (7):467–472.

Killias, M. 1993. "International correlations between gun ownership and rates of homicide and suicide." *Canadian Medical Association Journal* 148 (10):1721–1725.

Kolla, B. P., S. S. O' Connor, and T.W. Lineberry. 2011. "The base rates and factors associated with reported access to firearms in psychiatric inpatients." *General Hospital Psychiatry* 33 (2):191–196.

Kubrin, C. E., and T. Wadsworth. 2009. "Explaining suicide among blacks and whites: How socio-economic factors and gun availability affect race-specific suicide rates." *Social Science Quarterly* (90):1203–1227.

Kung, H. C., J. L. Pearson, and X. Lui. 2003. "Risk factors for male and female sui-
   cide decedents ages 15–64 in the United States: Results from the 1993 National
   Mortality Followback Survey." *Social Psychiatry and Psychiatric Epidemiology* 39
   (8):419–426.
MAIG (Mayors Against Illegal Guns). 2008. The movement against illegal guns in
   America.
Miller, M., D. Azrael, and C. Barber. 2012. "Suicide mortality in the United States: the
   importance of attending to method in understanding population-level disparities
   in the burden of suicide." *Annual Review of Public Health* 33:393–408.
Miller, M., D. Azrael, and D. Hemenway. 2001. "Firearm availability and uninten-
   tional firearm deaths." *Accident Analysis and Prevention* 33 (4):447–484.
Miller, M., C. Barber, D. Azrael, D. Hememway, and B. E. Molnar. 2009. "Recent
   psychopathology, suicidal thoughts and suicide attempts in households with and
   without firearms: Findings from the National Comorbidity Study Replication."
   *Injury Prevention* 15 (3):183–187.
Miller, M., and D. Hemenway. 1999. "The relationship between firearms and suicide:
   A review of the literature." *Aggression and Violent Behavior* 4 (1):59–75.
Miller, M., D. Hemenway, and D. Azrael. 2007. "State-level homicide victimization
   rates in the US in relation to survey measures of household firearm ownership,
   2001–2003." *Social Science & Medicine* 64 (3):656–664.
Miller, M., S. J. Lippmann, D. Azrael, and D. Hemenway. 2007. "Household firearm
   ownership and rates of suicide across the 50 states." *Journal of Trauma Injury, In-
   fection and Critical Care* 62 (4):1029–1035.
Nock, M. K., G. Borges, E. J. Bromet, C. B. Cha, R. C. Kessler, and S. Lee. 2008. "Sui-
   cide and suicidal behavior." *Epidemiology Reviews* 30 (1):133–154.
NRC. 2005. National Research Council: Firearms and violence: A critical review.
   Washington, DC: National Academies Press.
Oslin, D.W., C. Zubritsky, G. Brown, M. Mullahy, and A. Puliafico. 2004. "Managing
   suicide in late life: Access to firearms as a public health risk." *American Journal of
   Geriatric Psychiatry* 12 (1):30–36.
Pickett, W., F, J. Elgar, F. Brooks, M. de Looze, and K. Rathman. 2013. "Trends and
   socioeconomic correlates of adolescent physical fighting in 30 Countries." *Pediat-
   rics* 131 (1):18–26.
Richardson, E. G., and D. Hemenway. 2011. "Homicide, suicide, and unintentional
   firearm fatality: Comparing the United States with other high-income countries,
   2003." *Journal of Trauma Injury, Infection and Critical Care* 70 (1):238–243.
SAS. 2007. "Completing the count: Civilian firearms: Annexe 1: Seventy-nine coun-
   tries with comprehensive civilian ownership data." In *The small arms survey: Guns
   in the city*, ed. Small Arms Survey Geneva. Cambridge, UK: Cambridge University
   Press.
Shaffer, D., M. S. Gould, P. Fisher, P. Trautman, and D. Moreau. 1996. "Psychiatric diag-
   nosis in child and adolescent suicide." *Archives of General Psychiatry* 53(4):339–348.
Smith, T. W. 2000. 1999 National gun policy survey of the National Opinion Re-
   search Center: Research findings. Chicago, IL: National Opinion Research Cen-
   ter, University of Chicago.
Sorenson, S. B., and K. A. Vittes. 2008. "Mental health and firearms in community-based
   surveys: Implications for suicide prevention." *Evaluation Review* 32 (3):239–256.

van Kesteren, J., P. Mayhew, and P. Nieuwbeerta. 2001. Criminal victimization in seventeen industrialized countries: Key findings from the 2000 international crime victims survey. In *Netherlands Ministry of Justice: Research and Documentation Centre Netherlands*.

Webster, D., J. Vernick, and L. Hepburn. 2001. "Relationship between licensing, registration, and other gun sales laws and the source state of crime guns." *Injury Prevention* 7 (3):184–189. doi: 10.1136/ip.7.3.184.

Wiebe, D. J. 2003. "Homicide and suicide risks associated with firearms in the home: A national case-control study." *Annals of Emergency Medicine* 41 (6):771–782.

Wintemute, G. J. 2000. "Guns and gun violence." In *The crime drop in America*, ed. A. Blumstein and J. Wallman. Cambridge: Cambridge University Press.

Wintemute, G. J., C. A. Parham, J. J. Beaumont, M. Wright, and C. Drake. 1999. "Mortality among recent purchasers of handguns." *New England Journal of Medicine* 341 (21):1583–1589.

**2**

# The Limited Impact of the Brady Act

Evaluation and Implications

Philip J. Cook and Jens Ludwig

Federal firearms law divides the population into two groups: those prohibited from legally possessing a firearm due to their criminal record or certain other disqualifying conditions and everyone else. The vast majority of the adult public is allowed to acquire and possess all the firearms they want, thus preserving the personal right to "keep and bear arms" that has been established by recent U.S. Supreme Court rulings.[1] But that right, like all rights, has limits. People with serious criminal records or severe mental illness may reasonably be deemed at such high risk of misusing firearms that public-safety concerns take precedence over gun rights. While in practice it is impossible to keep all members of high-risk groups disarmed in a gun-rich environment, a selective prohibition may cause some reduction in gun misuse and save enough lives to be worthwhile.

    Philip J. Cook, PhD, is the ITT/Terry Sanford Professor of Public Policy and professor of economics and sociology at Duke University, and he is the co-director of the National Bureau of Economic Research working group on the economics of crime. Jens Ludwig, PhD, MA, is the McCormick Foundation Professor of Social Service Administration, Law and Public Policy at the University of Chicago, director of the University of Chicago Crime Lab, and co-director of the National Bureau of Economic Research working group on the economics of crime.

The effectiveness of this selective-prohibition approach may depend on how it is enforced. The two mechanisms in use to discourage disqualified people from obtaining guns are deterrence through the threat of criminal prosecution ("felon in possession" cases) and regulation of firearms transactions. The current regulatory framework was created by the Gun Control Act of 1968 (GCA), which required that those in the business of selling guns obtain a federal firearms license (FFL) and that interstate shipments of guns be limited to licensees. Anyone purchasing a gun from an FFL is required by the GCA to fill out a form 4473 stating that he or she did not have a felony conviction or other disqualifying condition, although under federal law dealers were not required to verify the information reported by the prospective buyer.

The GCA's requirement was greatly strengthened by subsequent legislation, the Brady Handgun Violence Prevention Act, implemented in 1994. The Brady Act required that FFLs conduct a background check on would-be buyers—the buyer's signature on a 4473 was no longer enough. This new regulation was enacted with high hopes of reducing gun violence, despite its limitations. Most gun crimes are committed with weapons that were not purchased from dealers, but rather acquired through off-the-books transactions. Such transactions are generally permitted and not regulated by the Brady Act. However, some disqualified individuals do attempt to buy guns from FFLs, and the *Brady* background checks have blocked over 2 million sales since the law was implemented (Bowling et al. 2010).

On March 2, 2000, President Bill Clinton declared at a news conference that "the Brady Bill is saving people's lives and keeping guns out of the wrong hands," a claim justified in part by the substantial number of people who had been denied handguns as a result of the law.[2] During the first five years of the Brady Act, 312,000 applications to purchase handguns from dealers (2.4% of the total) were denied due to a felony record or other disqualifying characteristic (Bowling et al. 2010). Other would-be buyers with criminal records may have been deterred from even attempting to buy a firearm. The logic is clear: Since guns are more lethal than knives and other likely substitutes, any reduction in criminal gun use due to *Brady* would likely translate into a net reduction in homicides (Zimring 1968, 1972).

The same year that President Clinton claimed success we published an evaluation of the Brady Act in the *Journal of the American Medical Association* (Ludwig and Cook 2000). Our conclusion was less positive—we found no evidence of a reduction in the homicide rate that could be attributed to

*Brady*. We also considered the possibility that *Brady* reduced the overall suicide rate, but found no discernible impact on that outcome either. In presenting these findings, we cautioned that our statistical method rested on certain untested (though in our judgment, reasonable) assumptions, and that our null results still left some room for the possibility that *Brady* had an effect, albeit small, and either positive or negative. Further, even if our null results are correct for the early years of *Brady*, they do not preclude the possibility that a different regulatory scheme might be more effective in achieving the purpose. Indeed, the Brady Act itself incorporated potentially important changes that were implemented in December 1998. While the initial "interim" phase, from 1994 to 1998, was limited to handgun purchases, the second "permanent" phase expanded the background check requirement to include purchasers of rifles and shotguns. Perhaps more importantly, the interim phase required a five-day waiting period from application to delivery of the handgun, while the permanent phase replaced the waiting period with a new system, known as the National Instant Criminal Background Check System (NICS). Our evaluation focused entirely on the interim phase.

In this essay we provide a summary of our evaluation, discussing its strengths and limitations, and then go on to consider two questions that are vital to the current debate: (1) What are the most important limitations of the current selective prohibition system?; and (2) How could this general approach be strengthened?

## Background and Findings

James Brady, press secretary to President Reagan, was shot during an assassination attempt against the president in March 1981. Together with his wife, Sarah, Brady became a leader of the gun control movement, and through Handgun Control, Inc. worked for seven years to achieve passage of what became known as the Brady Handgun Violence Prevention Act. The first set of provisions was implemented in February 1994, requiring that FFLs conduct a background check and wait for five business days before transferring a handgun to a customer. Only 32 states were directly affected by these provisions, because the other 18 states and the District of Columbia already met the minimum requirements of the Act. In effect these provisions created a sort of natural experiment, with 32 states in the "change" or "treatment" condition, and the 18 no-change states serving as "controls." Our evaluation took

advantage of this experiment-like setting to estimate the causal effect of the Brady Act on certain outcomes.

Our main outcome measure was the homicide rate from the Vital Statistics records. While other types of crime are also of interest, the data on homicides are more detailed and far more accurate than for the other violent crimes, such as robbery and assault. (The main limitation of the Vital Statistics data for our purposes is the lack of information on perpetrators.) We also analyzed the effects of the *Brady* regulations on suicide. The focus of our analysis for both homicide and suicide was on adult victims, and in particular for those 21 years of age and older. The primary rationale for this age limitation is that the Brady Act would logically have little or no effect on access to guns by those under 21; federal law sets 21 as the minimum age to purchase a handgun from an FFL, and the age of the customer was subject to check even before *Brady* by a requirement that he or she show identification. Of course, limiting the homicide outcome to adult victims does not provide exactly what we would like to have, namely rates of homicide *committed* by those age 21 or over; *Brady* regulations are aimed at the potential perpetrators rather than the victims. But in practice teenage killers select teenage victims, and few homicide victims aged 21 years or over are shot by perpetrators under 21 years of age (Cook and Laub 1998). It turns out that limiting the analysis to adults is not only logical given the nature of the intervention, it also enhances the validity of our evaluation method, since it helps avoid potential biases introduced by the volatility of juvenile homicides during our sample period that was associated with the rise and fall in crack-market activity (Blumstein 1995; Cork 1999).

The importance of having a control group for evaluating the effect of *Brady* on the "treatment" states' homicide rates is that other factors were at play, and homicide rates were dropping nationwide in the 1990s. In particular, the national homicide rate dropped by 34% from 1990 to 1998. Most of the crime drop during the 1990s (which was by no means limited to homicide) has been attributed to causes that are unrelated to changes in firearm regulations. Among the factors that have been suggested to explain the crime drop of the 1990s are increased imprisonment and spending on police, the waning of the crack cocaine "epidemic" that began in the mid-1980s, and, more controversially, the legalization of abortion in the early 1970s (Blumstein and Wallman 2000; Levitt 2004; Cook and Laub 2002). In any event, an evaluation of the Brady Act based only on the trend in homicide rates in

the *Brady* treatment states would mistakenly attribute to the Brady Act the effects of all of the other forces that were driving crime rates down over the 1990s.

Our assumption that the 18 states that were not directly affected by the Brady Act provide a valid control group is supported by the remarkable similarity in pre-*Brady* trends in adult homicide rates. Evidently other causal factors did exert similar impacts on the *Brady* treatment and control states. Thus if the trends in homicide rates (and especially gun homicide rates) had diverged between the two groups after *Brady*, then it would be plausible to attribute that divergence to the new regulations introduced by the Act. Our evaluation approach is further supported by the fact that the law in question was exogenous to the individual states—there is no "self-selection" problem here, as might arise if we were evaluating laws that were changed by the act of individual state legislatures (perhaps in response to state-specific changes in crime).

A distinct concern in evaluating the effects of the Brady Act is that the new law may have reduced gun running from the treatment to control states, in which case comparing the two groups of states might understate the overall effects of the law (Weil 1997). The concern here is that homicide rates in the "control" states were in fact affected by the intervention. Some support for this concern comes from ATF trace data in Chicago showing that the fraction of crime guns in the city that could be traced to the *Brady* treatment states declined dramatically following implementation of the law (Cook and Braga 2001). However, the proportion of homicides in Chicago committed with guns did not change over this period, despite the substantial changes in gun-trafficking patterns (Cook and Ludwig 2003). One explanation of these results is that traffickers were able to substitute in-state sources for out-of-state sources at little extra cost. If correct, they suggest that while *Brady* did affect trafficking to the control states, the effect was not of much consequence for gun availability to those at risk of violence in those states.

Here are the specifics of our quantitative evaluation. We utilize a "difference in difference" approach that compares the pre- and post-*Brady* changes for the treatment and control groups. The econometric technique is panel regression analysis utilizing specification (1) below, where $Y_{it}$ represents a mortality measure for state ($i$) in period ($t$), and $X_{it}$ represents a set of control variables.[3] The model includes separate dichotomous indicator variables for each state, $d_i$, to

capture unmeasured state-specific "fixed effects" that cause the level of violence to differ across states, a set of year indicator variables, $g_t$, that capture changes in the overall rate of violence in the U.S. conditional on the observed covariates, and the indicator variable $T_{it}$ that is equal to 1 in the treatment states following implementation of the Brady Act and equal to 0 otherwise. From Vital Statistics data, we had available four years of post-*Brady* data (1994 to 1997). For comparability, we define the pre-*Brady* period as the four years prior to the law's implementation (1990 to 1993).

$$Y_{it} = b_0 + b_1 X_{it} + b_2 T_{it} + d_i + g_t + e_{it} \tag{1}$$

Since state-specific fixed effects are included in the model, the key coefficient of interest ($b_2$) reflects the difference between the treatment and control states in the change in violence rates from the pre- to post-*Brady* periods. The coefficient $b_2$ captures any one-time shift in the rate of gun violence in the treatment versus control states around the time of the Brady Act, and should be negative if *Brady* reduced gun violence.

Equation (1) was estimated via weighted least squares, a technique that corrects for heteroskedasticity in the stochastic term by pre-multiplying the dependent and explanatory variables by the square root of the state's population. We calculated Huber-White standard errors to adjust for the non-independence of observations from the same state.

The findings from this regression analysis are summarized in Table 2.1. We find no statistically discernible difference in homicide trends between the *Brady* (treatment) and non-*Brady* (control) states among people aged 21 and older. While our point estimates are negative, they are even more negative for non-gun homicide than for gun homicide (and in every case statistically insignificant). In this pattern of results we see no case for a causal effect of *Brady*. The 95% confidence interval for one version of our estimates ranges from an increase of 8% to a reduction of 13%.[4]

Of course the Brady Act may have affected outcomes other than homicide. In particular, the waiting period required during phase one of *Brady* may have slowed handgun acquisition by some people experiencing a suicidal impulse. As shown in Table 2.1, our analysis of suicide rates found some evidence that *Brady* may have reduced gun suicide rates among people aged 55 and older. However, these gains were at least partially offset by an increase in non-gun suicides (perhaps due to weapon substitution), so whether waiting periods reduced overall suicides among this age group is unclear.

*Table 2.1*   Effects of the Brady Act on homicide and suicide changes from
pre- to post-*Brady* period in treatment relative to control states
(Standard-error estimates in parentheses)

|  | Victims aged 21 and older | Victims aged 55 and older |
|---|---|---|
| Homicide (rate per 100,000) | −0.36 (0.64) | −0.09 (0.27) |
|    Gun homicide rate | −0.14 (0.52) | 0.05 (0.10) |
|    Non-gun homicide rate | −0.22 (0.15) | −0.14 (0.20) |
| % homicides committed with gun | 1.1 (1.0) | 3.3 (2.4) |
| Suicide (rate per 100,000) | −0.12 (0.27) | −0.54 (0.37) |
|    Gun suicide rate | −0.21 (0.19) | −0.92** (0.25) |
|    Non-gun suicide rate | 0.09 (0.13) | 0.38* (0.20) |
| % suicides committed with gun | −0.3 (0.5) | −2.2** (0.9) |

*Source:* Cook and Ludwig (2003). The original results reported in Ludwig and Cook
(2000) were based on a data set with several minor errors which we subsequently
corrected.

    *Note:* The pre-*Brady* period is defined as 1990 to 1993 and post-*Brady* period as 1994
to 1997. Regressions are calculated by estimating equation (2) in text using state
population as weights to adjust for heteroskedasticity.

    **Statistically different from zero at the 5% p-value

    *Statistically different from zero at the 10% p-value

 

How do we reconcile our findings of no detectable impacts on homicide
with administrative records on the numbers of people denied handguns as a
result of Brady background check requirements? About 2.4% of potential
handgun buyers were denied handguns during the interim phase of the Brady
Act as a result of background checks (Bowling et al. 2010). One explanation is
that the type of person who is disqualified from legally buying a gun but shops
at an FFL anyway tends to be at relatively low risk for misusing a gun (com-
pared with other disqualified individuals). Data from California show that
individuals who were denied purchase of a handgun due to a felony record have
23% fewer violent-crime arrests than those who have been arrested but not con-
victed for a felony, and thus were able to successfully purchase a handgun from
an FFL (Wright, Wintemute and Rivara 1999). Yet the follow-up arrest rates
for both groups are fairly low, and only around 3% of violent-crime arrests are
for homicide (Wright and Wintemute 1999). Projecting the California data to
the nation suggests that those 312,000 convicted felons who were denied a
handgun in *Brady* states in the interim phase (from 1994 to 1998) would have
committed about 60 fewer homicides as a result.

### Discussion

Suppose that our null findings are correct and that the first phase of the Brady Act had little or no impact on homicide or suicide rates. What are the likely explanations, and what can we conclude about the possibility of saving lives through the Gun Control Act's ban on gun possession by certain high-risk groups?

The most prominent of the likely explanations is simply that by limiting the background-check requirement to sales by FFLs, the Brady Act's background-check requirement had no direct effect on the vast majority of transactions that provide criminals with guns. Surveys of prisoners in the 1980s show that only one-fifth obtained their guns directly from a licensed gun dealer (Wright & Rossi, 1994), even though at that time dealers in most states were not required to conduct background checks to verify the buyer's eligibility.[5] Most crime guns are obtained from people who are not licensed FFLs through private transactions that are largely unregulated under existing federal law—that is, these crime guns are obtained in the off-the-books secondary gun market.

While this "private sale loophole" is the most compelling explanation for limited impact of the Brady Act, there are several other considerations that should be taken into account. First, a majority of adults who end up using a gun in crime are not disqualified from possessing a gun. Cook, Ludwig and Braga (2005) find that nearly three in five homicide offenders in Illinois in 2001 did not have a felony conviction within the 10 years prior to the homicide. Not that they had spotless records—only one-quarter of homicide offenders had not been arrested at least once during the 10 years prior to the homicide. Expanding the crime-related disqualification criteria to include, say, conviction of any violent misdemeanor (rather than the current disqualification, which is limited to felonies and misdemeanor domestic violence) could help in this respect.

Second, even if a disqualified person did seek to buy guns from an FFL after *Brady,* there is a good chance of success, simply because the relevant records are often incomplete or difficult to access. In recognition of this problem Congress established the National Criminal History Improvement Program (NCHIP) to provide grants and technical assistance to the states to improve the quality and immediate accessibility of criminal history records and related information. This federal investment resulted in an 83% increase in

the criminal records accessible for background checks by 2003 (Ramker 2006), thereby increasing the chance that a disqualified person would be identified as such through the NICS process. NCHIP has continued to provide modest funding for improving records and was supplemented in 2007 by a new program focused on assisting states to incorporate mental health records in the NICS system. A few states have made large gains in this respect, but most do not yet have a reliable system in place for submitting relevant records on severe mental illness or drug abuse (Mayors Against Illegal Guns 2011).

In sum, the limitations of the current system for screening firearms buyers to prevent gun crimes include, in order of importance, the private sales loophole, the fact that a large share of gun criminals are not disqualified, and the incomplete coverage of the databases utilized in the NICS. The same limitations apply if the screening system is intended to prevent gun suicides, although for suicides the relative importance of these three changes differs: those at risk of suicide may be more likely to obtain guns from FFLs (in which case the private-sales loophole would be less important) but much less likely to be disqualified under current standards.[6]

There has been considerable interest in closing the private-sales loophole by simply requiring that all gun sales, whether in the primary or secondary market, be subject to background checks. California has instituted such a system for firearms transactions, which must go through an FFL who then charges a fee for conducting the background check. Such a system, were it to be enforceable, would make it more difficult for disqualified people to obtain a gun. The fundamental question is how to enforce such a system. California requires that handguns be registered to their owner, which is useful in holding owners accountable for the disposition of their handguns. Even without a registration requirement, a universal background check system could be enforced in a variety of ways, including law-enforcement oversight of gun shows and undercover "buy and bust" operations by the police. Whether the California system is successful in reducing gun violence has not been established (but see Webster, Vernick, and Bulzacchelli 2009).

While the prospects are dim for decisive victories against gun violence through modest improvements in the regulation of gun transfers, the stakes are very high. Even just a one percent reduction in gun homicides and suicides would amount to over 300 lives saved—enough to justify a billion-dollar program by the usual reckoning of the value of life. The findings from our evaluation of the Brady Act certainly do not rule out the possibility that it saved

several times that many lives during each of the early years, and hence was worthwhile. Neither our evaluation method nor any other that we know of would be precise enough to detect such a proportionally small effect.

## Acknowledgments

The original research reported in this essay was supported by a grant from the Joyce Foundation. The authors thank Bob Malme, Chris Clark, Heath Einstein, Meghan McNally, and Esperanza Ross for valuable research assistance, and Roseanna Ander, Steve Hargarten, David Hemenway, Arthur Kellermann, Debby Leff, Willard Manning, James Mercy, John Mullahy, William Schwab, Daniel Webster, Garen Wintemute, and Mona Wright for useful comments. All opinions and any errors are the authors'.

## Notes

1. *District of Columbia v. Heller* (554 US 570 (2008)) established a personal right to keep a handgun in the home for self-defense purposes. *McDonald v. Chicago* (561 US 3025 (2010)) extended this right beyond federal jurisdiction to encompass state and local governments.

2. Brady Campaign to Prevent Gun Violence, 'Saving Lives by Taking Guns Out of Crime: The Drop in Gun-Related Crime Deaths Since Enactment of the Brady Law,' Executive Summary, downloaded from http://www.bradycenter.org/xshare /Facts/brady-law-drop-in-crime.pdf

3. In our reported specification, we controlled for state-level changes in the following factors that may influence rates of crime and violence: consumption of alcohol per capita (measured in gallons of ethanol), percentage of the population living in metropolitan areas, percentage of the population living below the official poverty line and income level per worker (in 1998 constant dollars) percentage who are African American, and the percentage of the population falling into 7 different age groups.

4. In this version we used the log form of the dependent variable in each of the regressions. The results using other specifications are similar.

5. For a more recent estimate of the percent of crime guns obtained directly from an FFL, see the essay by Webster, Vernick, McGinty, and Alcorn (in this volume).

6. In a personal communication dated January 14, 2013, Mallory O'Brien, Director of the Milwaukee Homicide Review Commission, reports evidence that suicides, unlike violent criminals, are quite likely to obtain their guns directly from an FFL. "From January 1, 2010 to December 31, 2012, firearms were recovered from 59 suicide victims in the City of Milwaukee. ATF eTrace data was used to determine: first purchaser, time to event and firearm type. ATF was able to successfully trace firearms

for 52 of the victims. In 31 (60%) cases the suicide victim purchased the firearm from a licensed firearm dealer. Ten of these victims who purchased the firearm from an FFL used the weapon within a year of the event."

Refe r en c e s

Blumstein, Alfred. 1995. "Youth Gun Violence, Guns, and the Illicit-Drug Industry," *Journal of Criminal Law and Criminology* 86: 10–36.

Blumstein, Alfred and Joel Wallman, eds. 2000. *The Crime Drop in America.* New York: Cambridge University Press.

Bowling, Michael, Ronald J. Frandsen, Gene A. Lauver, Allina D. Boutilier, Devon B. Adams. 2010. *Background Checks for Firearms: Statistical Tables.* Bureau of Justice Statistics Bulletin NCJ 231679.

Brady Campaign to Prevent Gun Violence. 2002. "Saving Lives by Taking Guns Out of Crime: The Drop in Gun-Related Crime Deaths Since Enactment of the Brady Law," Executive Summary, downloaded from www.bradycampaign.org/facts/research/savinglives.asp, accessed on April 17.

Cook, Philip J. and Anthony A. Braga. 2001. "A Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets," *Arizona Law Review* 43(2): 277–310.

Cook, Philip J. and John H. Laub. 1998. "The Unprecedented Epidemic of Youth Violence" in *Crime and Justice: An Annual Review of Research*. Michael H. Moore and Michael Tonry, Editors (Chicago: University of Chicago Press), 26–64.

Cook, Philip J. and John H. Laub. 2002. "After the Epidemic: Recent Trends in Youth Violence in the United States" in *Crime and Justice: A Review of Research*, edited by Michael Tonry. Chicago: University of Chicago Press, 117–153.

Cook, Philip J. and Jens Ludwig. 2003. "The Effects of the Brady Act on Gun Violence" in Bernard E. Harcourt (ed.) *Guns, Crime, and Punishment in America.* New York: NYU Press: 283–298.

Cook, Philip J., Stephanie Molliconi, and Thomas B. Cole. 1995. "Regulating Gun Markets." *The Journal of Criminal Law and Criminology* 86(1): 59–92.

Cork, Daniel. 1999. "Examining Time-Space Interaction in City-Level Homicide Data: Crack Markets and the Diffusion of Guns Among Youth." *Journal of Quantitative Criminology* 15 (4): 379–406.

Levitt, Steven D. 2004. "Understanding Why Crime Fell in the 1990s: Four Factors that Explain the Decline and Six that Do Not." *Journal of Economic Perspectives*, 18(1): 163–190.

Ludwig, Jens and Philip J. Cook. 2000. "Homicide and suicide rates associated with the implementation of the Brady Handgun Violence Prevention Act." *Journal of the American Medical Association* 284(5): 585–591.

Mayors Against Illegal Guns. 2011. *Fatal Gaps: How missing records in the federal background check system put guns in the hands of killers.* http://mayorsagainstillegalguns.org/downloads/pdf/maig_mimeo_revb.pdf

Ramker, Gerard F. 2006. *Improving Criminal History Records for Background Checks, 2005.* Bureau of Justice Statistics Program Report NCJ 211485.

Webster Daniel W, Jon S Vernick, and MT Bulzacchelli. 2009. "Effects of state-level firearm seller accountability policies on firearms trafficking." *Journal of Urban Health*; 86:525–537.

Weil, Douglas S. 1997. *Traffic Stop: How the Brady Act Disrupts Interstate Gun Trafficking.* Washington, DC: Center to Prevent Handgun Violence.

Wright, James D. and Peter H. Rossi. 1986. *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*, New York: Aldine de Gruyter.

Wright, Mona A., Garen J. Wintemute, and Frederick P. Rivara. 1999. "Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence." *American Journal of Public Health* 89(1): 88–90.

Wright, Mona A. and Garen J. Wintemute. 1999. Unpublished calculations. Davis, CA: Violence Prevention Research Program, University of California at Davis Medical Center.

Zimring, Franklin E. 1968. "Is Gun Control Likely to Reduce Violent Killings?" *The University of Chicago Law Review* 35: 721–737.

Zimring, Franklin E. 1972. "The Medium is the Message: Firearm Calibre as a Determinant of Death from Assault," *Journal of Legal Studies.* 1: 97–124.

**3**

# Preventing Gun Violence Involving People with Serious Mental Illness

Jeffrey W. Swanson, Allison Gilbert Robertson, Linda K. Frisman, Michael A. Norko, Hsiu-Ju Lin, Marvin S. Swartz, and Philip J. Cook

The December 2012 tragedy at Newtown may soon settle in the collective memory of senseless rampages by unstable young men. But in the immediate aftermath, the question of what might have been done to prevent those 28 untimely deaths may galvanize the attention of policymakers desperate to respond. Shall we now hold mental health systems more accountable for failing

Jeffrey W. Swanson, PhD, is a professor in the Department of Psychiatry and Behavioral Sciences at Duke University School of Medicine. Allison Gilbert Robertson, PhD, MPH, is an assistant professor in the Department of Psychiatry and Behavioral Sciences at Duke University School of Medicine. Linda K. Frisman, PhD, is a research professor with the University of Connecticut School of Social Work and a senior research scientist with the Connecticut Department of Mental Health and Addiction Services. Michael A. Norko, MD, MAR, is an associate professor of psychiatry in the Law and Psychiatry Division at Yale University School of Medicine and director of Forensic Services for the Connecticut Department of Mental Health and Addiction Services. Hsiu-Ju Lin, PhD, is an associate research professor in the School of Social Work at the University of Connecticut and the principal data analyst for the Research Division at the Connecticut Department of Mental Health and Addiction Services. Marvin S. Swartz, MD, is a professor and head of the Division of Social and Community Psychiatry and director of Behavioral Health for the Duke University Health System. Philip J. Cook, PhD, is the ITT/Terry Sanford Professor of Public Policy and professor of economics and sociology at Duke University, and he is the codirector of the National Bureau of Economic Research working group on the economics of crime.

to find, treat, or confine people who incline to violence? Should we fault the loose enforcement of federal firearms restrictions, and a loophole-ridden system of background-checks, for failing to keep guns out of the hands of dangerous people? Does the problem lie with the laws themselves, with their blunt and archaic definitions that leave risky people untouched while sweeping up legions of the harmless?

Cogent answers to these questions—and any guidance for the reforms they might imply—must first acknowledge that a multiple-casualty shooting by a disturbed individual is a statistically rare and virtually unpredictable event (Nielssen et al. 2009; Swanson 2011). As such, a singular horrific incident plays an important but ambiguous role in the national conversation on gun violence and in the emergent policy discussion on what to do about it. On the one hand, gun policy scholars hope that the tragedy will focus public consciousness on the pervasive problem of firearms-related injury and mortality. On the other hand, mental health stakeholders and advocates reasonably worry that viewing the public health epidemic of firearm violence through the lens of a massacre of schoolchildren—an act nobody can imagine a sane person committing—is to misplace emphasis on an atypical and presumed psychopathology while ignoring the larger, complex, and more salient causes of a broad societal scourge (Appelbaum and Swanson 2010).

In this essay, we take as a starting place the inherent tension between public safety and civil rights in considering mental illness as a significant concern for firearms policy and law. This means grappling with the full range of social benefits and costs that may accrue in casting a wide net with a broad mesh to find a few dangerous people among the many with largely non-dangerous disorders of thought, mood, and behavior. Whatever the evidence suggests about people with mental illness and violence—and for most there is no linkage—they are often portrayed as dangerous in the mass media and perceived as such by the general public (Pescosolido et al. 1999). Fear stokes avoidance and social rejection, which in turn beget discrimination. And if they are no longer "one of us," coercion, loss of privacy, and unwarranted deprivation of liberty become easy to justify. Ironically, this alienates people with serious but treatable mental health conditions and encumbers their desire to seek help with worry about what that might entail. A public policy of categorical exclusion based on the presumed dangerousness of one group may serve the public interest but not without overreaching and not without social cost.

We acknowledge that the exigencies of policymaking must sometimes outpace the evidence for what works. But it is also true that crisis-driven law is not always carefully deliberated and that the results can make things worse and be difficult to undo. Prudence, then, makes it crucial that available empirical research contribute as much as possible to the policymaking process, even if the existing research is messy, incomplete, and not wholly generalizable. In that spirit, we present new findings from an empirical study of the effectiveness of federal gun prohibitions in reducing the risk of violent crime in a Connecticut sample of more than 23,000 people with serious mental illness. Using merged administrative records from the state's public mental health and criminal justice systems for the years 2002 through 2009, our quasi-experimental analysis spans the periods before and after Connecticut began reporting mental health records to the National Instant Criminal Background Check System (NICS) in 2007. We consider implications of our research results for possible (and perhaps newly feasible) policy reforms to reduce gun violence.

In 1968, Congress passed the Gun Control Act, which categorically prohibited people from buying firearms if they had ever been involuntarily committed to a mental hospital or "adjudicated as a mental defective" (Simpson 2007). (The latter term is gratuitous and should be amended. It has almost no clinical meaning today, and many mental health stakeholders find the language stigmatizing and offensive.) As defined more specifically in the regulations, the exclusion covers people who have been determined by an authoritative legal process to be dangerous or incompetent to manage their own affairs due to a mental illness. It also covers individuals found incompetent to stand trial or acquitted by reason of insanity.

The legacy of the 1968 Gun Control Act prohibitions remains with us today, long after civil commitment reforms and deinstitutionalization have run their course, radically reducing and reshaping the ranks of the involuntarily committed (Appelbaum 1994; Fisher and Grisso 2010). The categories of exclusion were encoded in federal regulations and retained in the 1994 Brady Violence Prevention Act, which instituted background checks—now increasingly conducted through the NICS—to screen out prohibited persons who may attempt to buy guns from a licensed gun dealer. The mental health prohibitions, in particular, are based on a set of assumptions that may have sounded reasonable 45 years ago, but today invite careful scrutiny in light of voluminous research evidence that has accumulated over the ensuing decades.

36    *J. W. Swanson et al.*

The suspect assumptions are these: that serious mental illnesses—of the sort that landed people in mental hospitals against their will—were strongly and causally associated with risk of violent behavior; that people with these dangerous mental health conditions will inevitably come to the attention of psychiatrists, who could then reliably discern the risk of violence and confine the appropriate patients to a mental hospital; that, once discharged, involuntarily treated psychiatric patients will always carry with them some risk of relapse to their dangerous mental health conditions and, thus, should be categorically prohibited from obtaining firearms; and, finally, that the law could effectively deter prohibited individuals from purchasing firearms from a licensed gun dealer—either because they would not try to buy a gun or because they would truthfully disclose their gun-disqualifying mental health histories in the attempt and, thus, be stopped. In order for the logic of the law to work effectively, *all* of these assumptions had to hold true; they were links in a chain of prevention. As it turned out, all of the assumptions were flawed.

Subsequent epidemiological research showed that mental illness contributes little to population violence over all (Fazel and Grann 2006; Swanson 1994; Van Dorn, Volavka, and Johnson 2012). The very small proportion of people with mental illnesses who are inclined to be dangerous often do not seek treatment before they do something harmful; they therefore do not acquire a gun-disqualifying record of mental health adjudication (or a criminal record, either) that would show up in a background check. Psychiatrists, using clinical judgment, cannot accurately foresee which patients will be violent (Lidz, Mulvey, and Gardner 1993) and commit many patients for reasons unrelated to violence risk. States vary widely in commitment criteria and the dangerousness standards that underlie them (Fisher and Grisso 2010). The federal background checks only affect persons who buy guns through a federally licensed gun dealer, while a substantial proportion of firearms transfers are private transactions (Cook and Ludwig 1997). And many people have access to guns in the home, even if they would not legally be able to purchase a gun (North Carolina State Center for Health Statistics 2001).

Some advocates believe the answer to preventing gun rampages by disturbed individuals lies in extending the reach of states' reporting to the NICS (Mayors Against Illegal Guns 2011). Unfortunately, there is no evidence to suggest that merely filling the NICS with more records of people with gun-disqualifying mental health histories would have any measurable impact on reducing firearm violence in the population or, for that matter, on preventing

mass shootings. Indeed, there would seem to be plenty of circumstantial evidence to the contrary. Still, what has been missing is a direct empirical evaluation of the law and policy in a single state, using longitudinal individual-level outcome data that would enable us to compare results for people with serious psychiatric disorders who have been subjected to the law's strictures and exposed to the NICS-reporting policy with those who have not. What follows is a report of the findings of such a study in Connecticut.

## Effectiveness of Firearms Prohibitions in Reducing Violence among People with Serious Mental Illness in Connecticut, 2002–2009: Findings from a New Research Study

Connecticut began reporting mental health records to the NICS in early 2007. The Department of Public Safety is responsible for forwarding to the NICS all data regarding gun-prohibited persons. This now occurs by automatic transfer of gun-disqualifying mental health records through a "black box" system, so that confidential psychiatric records are not released to anyone outside of the state mental health authority. The state uploaded 3,062 mental health records to NICS in its first year of reporting, and by 2013 nearly 14,000 records had accumulated in the database. Presumably, the persons whose records were newly made available to the gun background check system had subsequently diminished access to new guns; insofar as they might otherwise have acquired and used guns to commit violent crimes, their risk of committing a violent crime should also have diminished. What has been the impact, if any, in reduced violent crime by gun-disqualified persons with serious mental illness in the state? Our study addressed that question.

### Data

Administrative records for adults with serious mental illness spanning 8 years were assembled and merged from Connecticut's public mental health and criminal justice agencies. All research activities involving the use of private health information for this study were reviewed and approved by the relevant jurisdictional Institutional Review Boards (IRBs). Merged records from January 2002 through December 2009 were assembled for 23,292 adults meeting the following criteria: (1) diagnosis of schizophrenia, bipolar disorder, or major depressive disorder and (2) hospitalization in a state psychiatric hospital—either voluntarily or involuntarily—during the study period. Two

study cohorts were constructed for comparison: persons with at least one of the four types of mental health adjudications reported to NICS (involuntary commitment, incompetent to stand trial, insanity acquittals, and conservatorships); and persons with at least one voluntary psychiatric hospitalization but no mental health adjudications. Data were structured in person-month format.

The sample is representative of the population of persons diagnosed with a serious mental illness who use services in the public mental health care system and who either have a history of mental health adjudication or have been hospitalized voluntarily in a state-operated facility for a mental health or co-occurring substance abuse disorder. As such, the sample would not generalize well to the population of all persons in the community who meet criteria for a mental illness or those who have less severe conditions not requiring inpatient treatment or who have private health insurance. The study sample is likely to have more severe and disabling psychiatric conditions, higher rates of substance abuse comorbidity, and a higher proportion who are involved with the criminal justice system. The base rate of violent crime in the sample is much higher than estimates of crime in community samples of persons with mental illness. Records of arrest include all available information but may not have captured lifetime arrests, especially for crime events occurring remotely in the individual's past.

### Measures

The primary outcome variable was arrest for any violent crime (firearms-related or otherwise) within a given month. Violent crimes included murder, manslaughter, arson, kidnapping, sexual assault, other assault, robbery, and burglary. Ideally, we would have employed firearms charges as our primary outcome, but only arrests that resulted in conviction were available for analysis. Independent analysis from the Office of Legislative Research in Connecticut has shown that about 92% of firearms violations (e.g., illegal possession, transfer, use of a firearm in a crime, etc.) in the state do not result in convictions, due to plea bargaining and consolidation of charges (Reinhart 2007). Firearms conviction per se is thus an insensitive measure of gun-related crime. Instead, we used violent crime conviction as a proxy for gun use in crime. Violent crime is an important public health and safety outcome—arguably the distal goal of reducing the illegal use of guns—and the two variables are correlated.

Categorical variables were constructed to indicate whether a gun-disqualifying mental health record was present in a given month, whether a criminal disqualifier was in effect (record of felony conviction, misdemeanor

drug crime, or misdemeanor domestic violence offense), and whether the observation month occurred before or after NICS reporting began in Connecticut. Age, sex, race, primary psychiatric diagnosis, and co-occurring substance use diagnoses were included as covariates.

### Analysis

We used multivariable categorical regression with repeated measures to estimate effects on violent crime events. The dependent variable was lagged to ensure proper temporal ordering and to avoid confounding the occurrence of gun-disqualifying events with outcome events. We tested the change in risk of violent offending from before to after NICS reporting began. We also tested, in separate regressions not shown, the differences in violent crime risk in people who were disqualified versus not disqualified, for the pre- and post-NICS periods. We controlled for covarying effects of individuals' coincident criminal disqualification and clinical and demographic characteristics as described above. We adjusted the analysis for time at risk by removing observations when individuals were hospitalized or incarcerated. We adjusted for the non-independence of intraperson observations over time.

### Results

The mean age of participants was 36 years, and a majority were male (62.5%). The racial-ethnic composition of the sample was 62.7% non-Hispanic white, 18.4% African American, 16.6% Hispanic, and 2.3% other racial-ethnic groups. Regarding primary psychiatric diagnosis, 28.1% had schizophrenia, 30.6% had bipolar disorder, and 41.2% had depression. Across diagnostic groups, 85.9% had a co-occurring alcohol or illicit drug abuse problem at some time during the study period. The prevalence of substance abuse comorbidity is higher in this sample than would be found in a community-representative sample, due in part to the inclusion criterion of hospitalization in a state facility, which would tend to select individuals who have had more complex and severe psychiatric problems.

   Table 1 shows the numbers of individuals and proportions of the sample that were disqualified from purchasing a firearm during any time in the study period by type of disqualification. About 40% of the sample was disqualified either for mental health adjudication or a criminal record. Disqualification due to a criminal record was far more common than losing gun rights due to a mental health record (34.9% vs. 7.0%). Of the 1,634 individuals in the study with a

**Table 1. Prevalence of gun-disqualifying mental health and criminal records in sample of people with serious mental illness**

| Type of gun-disqualifying record | N | Percent |
|---|---|---|
| Involuntary civil commitment | 1,086 | (4.7%) |
| Incompetent to stand trial | 464 | (2.0%) |
| Not guilty by reason of insanity | 29 | (0.1%) |
| Conservatorship | 152 | (0.7%) |
| Any mental health disqualification | 1,634 | (7.0%) |
| Criminal disqualification | 8,129 | (34.9%) |
| Any criminal or mental health disqualification | 9,246 | (39.7%) |
| Both criminal and mental health disqualification | 512 | (2.2%) |
| Not disqualified | 14,046 | (60.3%) |

mental health disqualification, 512 (31.3%) were dually disqualified on the basis of a criminal record. The large majority (93.7%) of the participants who were convicted of a gun-disqualifying crime during the study period were never involuntarily committed or otherwise disqualified due to a mental health record.

A substantial proportion of the sample (39.0%) was convicted of a violent crime at some time during the 8-year study period. The proportion of these crimes that involved use of guns is unknown, but 4% of the sample received a conviction specifically on a gun charge, such as illegal possession of a firearm. Table 2 shows the unadjusted frequencies of violent crime events as a proportion of the person-month observations available for analysis, by status of disqualification from firearms, for observations before and after NICS reporting began. In the full sample, there was a small decline in the estimated annualized rate of violent crime associated with NICS reporting in those with a mental health disqualification—from 7.8% to 6.5%, a proportional decline of 17%. In the subgroup of observations without any criminal disqualifications, the corresponding decline was greater—from 6.7% before NICS to 3.2% after NICS, a proportional decline of 53%. These unadjusted results are consistent with a NICS reporting effect, although they do not prove a causal relationship. An appropriate quasi-experimental test of statistical significance requires a robust multivariable analysis.

Table 3 displays the multivariable regression analysis for the full sample. Having a gun-disqualifying criminal record did not reduce the likelihood of

**Table 2. Unadjusted frequencies of violent crime by gun-disqualifying mental health status and NICS policy exposure (person-month level of analysis)**

|  | N person-months | Number of violent crime months | Percent of person-months with violent crime | Estimated annualized percent of group with violent crime |
|---|---|---|---|---|
| **FULL SAMPLE [1]** | | | | |
| Gun-disqualifying mental health record and NICS policy exposure | | | | |
| Legally disqualified, before NICS reporting began | 44,345 | 289 | 0.65 | 7.8 |
| Legally disqualified, after NICS reporting began | 51,254 | 278 | 0.54 | 6.5 |
| Not legally disqualified, before NICS reporting began | 1,314,007 | 7,066 | 0.54 | 6.5 |
| Not legally disqualified, after NICS reporting began | 778,678 | 3,776 | 0.48 | 5.8 |
| *Total* | *2,188,284* | *11,409* | *0.52* | *6.3* |
| **NOT-CRIMINALLY-DISQUALIFIED SUBSAMPLE [2]** | | | | |
| Gun-disqualifying mental health record and NICS policy exposure | | | | |
| Legally disqualified, before NICS reporting began | 34,842 | 194 | 0.56 | 6.7 |
| Legally disqualified, after NICS reporting began | 35,248 | 93 | 0.26 | 3.2 |
| Not legally disqualified, before NICS reporting began | 1,128,574 | 5,552 | 0.49 | 5.9 |
| Not legally disqualified, after NICS reporting began | 537,325 | 1,753 | 0.33 | 3.9 |
| *Total* | *1,735,989* | *7,592* | *0.44* | *5.2* |

[1] Includes all person-months with community tenure; months spent hospitalized or incarcerated were removed from analysis.

[2] N=452,292 person-month observations were removed for the subsample analysis due to a gun-disqualifying criminal history.

**Table 3. Adjusted odds ratios for monthly violent crime associated with legal restrictions on firearms access for people with serious mental illness in Connecticut from 2002-2009, before and after initation of state policy of reporting gun-disqualifying mental health records to the National Instant Check System**

| | Adusted Odds Ratio | 95% Confidence Interval | Statistical Significance |
|---|---|---|---|
| **Gun-disqualifying criminal record** | | | |
| No criminal disqualification [reference category] | [1.00] | | |
| Criminal disqualification | 1.60 | (1.52 - 1.68) | *** |
| **Gun-disqualifying mental health record and NICS policy exposure** | | | |
| Legally disqualified, before NICS reporting began [reference category] | [1.00] | | |
| Legally disqualified,after NICS reporting began | 0.92 | (0.76 - 1.13) | ns |
| Not legally disqualified, before NICS reporting began | 0.76 | (0.65 - 0.88) | *** |
| Not legally disqualified, after NICS reporting began | 0.78 | (0.67 - 0.91) | *** |
| **Primary psychiatric diagnosis** | | | |
| Major depression [reference category] | [1.00] | | |
| Schizophrenia | 0.90 | (0.84 - 0.96) | *** |
| Bipolar disorder | 1.13 | (1.07 - 1.20) | ** |

**Substance abuse**

| | | |
|---|---|---|
| No co-occurring alcohol or illicit drug use disorder [reference category] | [1.00] | |
| Any co-occurring alcohol or illicit drug use disorder | 2.93 | (2.57 - 3.34) *** |
| **Demographic characteristics** | | |
| Age in years | 0.98 | (0.97 - 0.98) *** |
| Sex | | |
| Female [reference category] | [1.00] | |
| Male | 2.00 | (1.90 - 2.14) *** |
| Race/ethnicity | | |
| Non-hispanic white [reference category] | [1.00] | |
| Black | 1.77 | (1.67 - 1.88) *** |
| Hispanic | 1.20 | (1.11 - 1.26) *** |
| Other race/ethnicity | 0.41 | (0.29 - 0.58) *** |

Analytic model specifications: General estimating equations (GEE) logistic regression for repeated measures with a lagged dependent variable, controlling for time and adjusting for non-independence of intra-person observations.

N=2,187,732 person-months observations

Statistical significance: ns - not significant; ***p<0.001;

future violent crime but rather increased the likelihood of a future violent of-
fense by a factor of 1.6. The odds ratios for violent crime were significantly
lower for people with no mental health adjudications, compared with those
were disqualified in the pre-NICS period. Among all those who were dis-
qualified, the odds of violent crime did not significantly decline after NICS
reporting began. The model also shows that violent crime was associated with
having a substance use disorder, being younger, male, of African American
or Hispanic background, and having bipolar disorder versus depression. These
tend to be factors associated with crime in the population without mental
disorders, assuming that racial-ethnic minority status is functioning here as
a proxy indicator of social and economic disadvantage, which we did not mea-
sure directly. Bipolar disorder was positively associated with violent crime
compared with depression. Schizophrenia was negatively associated with vio-
lent crime compared with depression (a finding also reported in the MacArthur
Violence Risk Study; Monahan et al. 2001.)

Table 4 shows the same analysis for the sample that was uniquely susceptible
to the mental-health-related strictures in the federal law and the corresponding
NICS reporting policy in Connecticut, without the potentially confounding ef-
fect of criminal history on violent crime recidivism. In this analysis, all of the
observations were removed for any person-months in which an individual had
a criminal disqualification in effect. This model shows a significant result of
reduced violent offending among those with a disqualifying mental health re-
cord after NICS reporting began. The likelihood of violent crime was lower by
a factor of 0.69 among those disqualified in the post-NICS-reporting period
compared with those in the pre-NICS period. Indeed, the likelihood of violent
crime in disqualified individuals whose records were reported to NICS was re-
duced to about the same level as seen in people who had never been disquali-
fied. However, in groups who were never disqualified, the odds ratios for vio-
lent crime were approximately the same before and after the NICS policy was
implemented—0.65 versus 0.62—suggesting, as would be expected, that NICS
reporting did not affect people with no record to report to NICS.

## Discussion and Implications for Policy

Considering our study population as a whole, we find little evidence that that
Brady Act prohibitions serve to reduce the risk of violent crime. Indeed, having
a gun-disqualifying criminal record serves as marker for significantly *in-*

*creased* risk of committing a future violent crime. To the extent that guns were involved in the commission of these crimes by people who could not legally buy a gun, it is clear that the perpetrators did not need to patronize a federally licensed gun dealer and undergo a background check; other ways, means, and suppliers abound for those willing to exploit them.

However, considering separately the subgroup of people with serious mental illness who do not have criminal records, our data seem to suggest that the Brady Law background checks can have some positive effect, if enforced. In those with a gun-disqualifying mental health record, risk of violent criminal offending declined significantly after Connecticut began reporting gun-disqualifying mental health records to the NICS.

These findings do not prove a causal relationship between the background check system and reduced violent crime. There may be other explanations, for example, that post-2007 improvements in the mental health and criminal justice system specifically affected people with gun-disqualifying mental health adjudications, resulting in improved treatment outcomes and a concomitant lower risk of criminal offending. The study has other limitations. We used violent crime as a proxy measure for gun use in crime. The research was conducted in a single state, and the findings may not generalize well to other states.

We conclude that the existing federal criteria for mental health prohibitions on firearms are far from perfect—they tend to be both overinclusive and underinclusive—but they are indeed correlated with increased risk of violent crime in this study. And here is at least some evidence, from one state, that having a mental health adjudication record archived in the NICS can significantly reduce risk of a first violent crime. Achieving comprehensive state reporting of mental health records to NICS may thus help reduce violent crime that is facilitated by guns and, thus, improve public safety.

However, this measured step will not prevent gun violence by dangerous individuals who today can easily skirt the background check system to obtain a firearm. It does nothing to prevent disqualified persons from using the guns they may already have. And even where it appears to work, the policy can affect only a small proportion of the population of persons with serious mental illness, because the base rate of mental health adjudication in Connecticut (as many states) is very low. Only about 7% of the sample had any disqualifying mental health adjudication, and an even smaller proportion—5%—were uniquely disqualified on the basis of a mental health history without also being

**Table 4. Adjusted odds ratios for first violent crime associated with legal restrictions on firearms access for people with serious mental illness in Connecticut from 2002-2009, before and after imitation of state policy of reporting gun-disqualifying mental health records to the National Instant Check System: SUBSAMPLE WITH NO PRE-EXISTING FELONY CONVICTION OR OTHER GUN DISQUALIFYING CRIMINAL RECORD**

| | Adjusted Odds Ratio | 95% Confidence Interval | Statistical Significance |
|---|---|---|---|
| **Gun-disqualifying mental health record and NICS policy exposure** | | | |
| Legally disqualified, before NICS reporting began [reference category] | [1.00] | | |
| Legally disqualified, after NICS reporting began | 0.69 | (0.57 - 0.82) | *** |
| Not legally disqualified, before NICS reporting began | 0.65 | (0.54 - 0.79) | ** |
| Not legally disqualified, after NICS reporting began | 0.62 | (0.46 - 0.83) | *** |
| **Primary psychiatric diagnosis** | | | |
| Major depression [reference category] | [1.00] | | |
| Schizophrenia | 0.80 | (0.74 - 0.86) | *** |
| Bipolar disorder | 1.05 | (0.98 - 1.13) | ns |
| **Substance abuse** | | | |
| No co-occurring alcohol or illicit drug use disorder [reference category] | [1.00] | | |
| Any co-occurring alcohol or illicit drug use disorder | 3.08 | (2.68 - 3.54) | *** |

**Demographic characteristics**

| | | |
|---|---|---|
| Age in years | 0.98 | (0.97 - 0.98) *** |
| Sex | | |
| Female [reference category] | [1.00] | |
| Male | 2.18 | (2.04 - 2.34) *** |
| Race/ethnicity | | |
| Non-hispanic white [reference category] | [1.00] | |
| Black | 1.89 | (1.76 - 2.03) *** |
| Hispanic | 1.30 | (1.21 - 1.41) *** |
| Other race/ethnicity | 1.26 | (0.24 - 0.54) *** |

Analytic model specifications: General estimating equations (GEE) logistic regression for repeated measures with a lagged dependent variable, controlling for time and adjusting for non-independence of intra-person observations.

N=1,735,437 person-months observations

Statistical significance: ns - not significant; ** p<0.01; ***p<0.001;

disqualified on the basis of a criminal history. In the non-criminally-disqualified subsample, those with a mental health disqualifier accounted for 3.0% of the sample and 3.4% of the violent crime. In the post-NICS period, they accounted for 6.2% of the sample and 5.0% of the violent crime. In contrast, 96% percent the crimes were committed by individuals who did not have a mental health disqualifier in effect, at least not at the time of the offense. These proportions suggest that background checks to enforce the federal mental health prohibitions—even if they are completely effective—will have a very small impact on overall violent crime in persons with serious mental illness; most of those at risk are unaffected by the law.

Revisions to the outdated federal criteria for mental health prohibitions on guns are needed. Minimum standards should be both *efficient* in prohibiting dangerous people from accessing guns and *fair* in preserving the rights of those who are not dangerous. Ideally, a balancing of safety and rights should inform more practical and less onerous rules for denying firearms rights to persons with mental illness who are dangerous, and the same balancing should inform parallel criteria for timely restoration of rights to persons with the mental illness who are no longer dangerous. Most important, then, changes to the prohibited category standards should focus on individual dangerousness, rather than relying on a presumed correlation between violence risk and membership in a category of persons with a mental health adjudication record, irrespective of its remoteness or the circumstances besides dangerousness that might have required it.

Innovative models of gun disqualification exist at the state level and could provide some guidance, at least in principle, for a more rational federal minimal standard. Indiana's "dangerous persons" law (Parker 2010), for example, is not tied to involuntarily commitment or even necessarily to having a diagnosis of mental illness but rather to a determination of dangerousness. In addition, the law focuses on removing current access to guns rather than merely foreclosing the future purchase of a new gun. The Indiana law allows clinicians or the police to take steps to have firearms removed without a warrant from individuals who are assessed to pose a danger to themselves or others (Parker 2010). Another promising approach worthy of consideration is California's law that allows seizure of guns from individuals with mental illness who are detained for dangerousness in a 72-hour hold, pending a judicial hearing in 14 days (Simpson 2007). The point of the law, in both cases, is to take a public health and safety approach to more accurately identify people

who pose an appreciable risk of harming themselves or others instead of apply a broad categorical exclusion that is both insensitive and nonspecific as a practical index of gun violence risk.

Our study results suggest that, among people with mental illness who have a history of criminal offending and involvement with the justice system, existing law and policy designed to prevent access to firearms through federally licensed gun dealers is likely to be of limited effectiveness. Efforts to prevent gun violence in known criminal offenders with mental illness should also focus on reducing socially determined criminogenic risk factors; improving community-based mental health outcomes; and decreasing criminal recidivism in mentally ill offenders through targeted programs such as mental health courts, jail diversion, and community reintegration services for persons with mental illness who have been incarcerated (Monahan and Steadman 2012; Swanson 2010). Added to those measures, we should surely advocate for a range of population-based, gun-safety reforms that remain possible within constitutional limits.

Finally, a word about what might be considered the "elephant in the room" for a serious discussion of mental illness and firearm mortality: it is not homicide but suicide. When we bring suicide into the picture of gun violence, mental illness legitimately becomes a strong vector of concern; it should become an important component of effective policy to prevent firearm violence. Suicides account for 61% of all firearm fatalities in the United States—19,393 of the 31,672 gun deaths recorded in 2010 (Centers for Disease Control and Prevention 2013). Suicide is the third leading cause of death in Americans aged 15 to 24, perhaps not coincidentally the age group when young people go off to college, join the military, and experience a first episode of major mental illness. The majority of suicide victims had identified mental health problems and a history of some treatment. "How did they get a gun?" is an important question to answer. "Where was the treatment, and why did it fail?" may be even more important.

Depression is the particular psychiatric illness most strongly associated with suicide. Social disadvantage plays a role both in the etiology of depressive illness and disparities in its treatment. Depression is not, however, a disorder that gets most individuals a gun-disqualifying record of involuntarily commitment. In other words, people suffering from the one mental health condition that is most closely and frequently linked to suicidality are unlikely to show up in a gun background check. Even if every state were to report all of its records of mental health adjudications to the NICS, this "gap" would not

close. But reporting to the authorities everyone who makes a suicide threat is probably not a good idea, either; it could merely drive people away from the treatment they need. Arguably, though, better access to evidence-based treatment for depression—particularly for low-income people, the elderly, and the unemployed (not to mention college students and returning veterans)—might prevent more firearm fatalities than would relying solely on improved NICS reporting to keep guns out of the hands of dangerous people.

ac k n ow l e d g me nt

Funding for the research presented in this essay was provided by a grant from the National Science Foundation, with additional support from the Robert Wood Johnson Foundation Program on Public Health Law Research.

Refe r e nc e s

Appelbaum, Paul. 1994. Almost a Revolution: Mental Health Law and the Limits of Change. New York: Oxford University Press.

Appelbaum, Paul S., and Jeffrey W. Swanson. 2010. "Gun laws and mental illness: How sensible are the current restrictions?" Psychiatric Services 61: 652–654.

Bonnie, Richard J., James S. Reinhard, Phillip Hamilton, and Elizabeth L. McGarvey. 2009. Mental Health System Transformation After The Virginia Tech Tragedy. Health Affairs 28: 793–804.

Centers for Disease Control and Prevention. 2013. Injury Prevention & Control: Data & Statistics Web-based Injury Statistics Query and Reporting System (WISQA-RSTM). Fatal Injury Data and Nonfatal Injury Data. http://www.cdc.gov/injury/wisqars/index.html

Cook, Philip J., and Jens Ludwig. 1997. "Guns in America: National Survey on Private Ownership and Use of Firearms." National Institute of Justice, Research in Brief, Washington, DC: Department of Justice. http://www.ncjrs.gov/pdffiles/165476.pdf

Fazel, Seena, and Martin Grann. 2006. "The Population Impact of Severe Mental Illness on Violent Crime." The American Journal of Psychiatry 163: 1397–1403.

FBI. 2013. http://www.fbi.gov/about-us/cjis/nics

Fisher, William, and Thomas Grisso. 2010. "Commentary: Civil Commitment Statutes—40 Years of Circumvention." The Journal of the American Academy of Psychiatry Law 38(3): 365–368.

Lidz, Charles W., Edward P. Mulvey, and William Gardner. 1993. "The Accuracy of Predictions of Violence to Others." The Journal of American Medical Association 269: 1007–1011.

Mayors Against Illegal Guns. 2011. "Fatal Gaps: How Missing Records in the Federal Background Check System Put Guns in the Hands of Killers." http://www.mayors againstillegalguns.org/downloads/pdf/maig_mimeo_revb.pdf

Monahan, John, and Henry J. Steadman. 2012. "Extending Violence Reduction Principles to Justice-Involved Persons with Mental Illness." In Applying Social Science to Reduce Violent Offending, edited by Joel A. Dvoskin, Jennifer L. Skeem, Raymond W. Novaco, and Kevin S. Douglas, 245–261. New York: Oxford University Press.

Monahan, John, Henry J. Steadman, Eric Silver, et al. 2001. Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence. New York: Oxford University Press.

Nielssen, Olav, Dominique Bourget, Taina Laajasalo, et al. 2009. "Homicide of Strangers by People with a Psychotic Illness." Schizophrenia Bulletin 35: 1012–1021.

Norko, Michael A., and Victoria M. Dreisbach. 2008. Letter to the Editor. Journal of the American Academy of Psychiatry and the Law 36: 269.

North Carolina State Center for Health Statistics Behavioral Risk Factor Surveillance System. 2001. http://www.schs.state.nc.us/schs/brfss/2001/us/firearm3.html

Parker, George. 2010. "Application of a Firearm Seizure Law Aimed at Dangerous Persons: Outcomes from the First Two Years." Psychiatric Services 61: 478–482.

Pescosolido, Bernice A., John Monahan, and Bruce G. Link, et al. 1999. "The Public's View of the Competence, Dangerousness, and Need for Legal Coercion of Persons with Mental Health Problems." American Journal of Public Health 89: 1339–1345.

Price, M., and D. M. Norris. 2008. "National Instant Criminal Background Check Improvement Act: Implications for Persons with Mental Illness." Journal of the American Academy of Psychiatry and the Law 36: 123–130.

Reinhart, Christopher. 2007. "Case Statistics for Firearms Violations." OLR Research Report, 2007-R-0442, Connecticut Office of Fiscal Analysis Database. http://worldcat.org/arcviewer/1/CZL/2007/08/02/00000 70154/viewer/file1.html26782.75

Simpson, Joseph R. 2007. "Bad Risk? An Overview of Laws Prohibiting Possession of Firearms by Individuals with a History of Treatment for Mental Illness." Journal of the American Academy of Psychiatry and the Law 35: 330–338.

Skeem, Jennifer, and John Monahan. 2011. "Current Directions in Violence Risk Assessment." Current Directions in Psychological Science 20: 38–42.

Swanson, Jeffrey W. 1994. "Mental Disorder, Substance Abuse, and Community Violence: An Epidemiological Approach." In Violence and Mental Disorder, edited by J. Monahan and H. Steadman, 101–136. Chicago: University of Chicago Press.

Swanson, Jeffrey W. 2010. "Explaining Rare Acts of Violence: The Limits of Population Research Evidence." Psychiatric Services 62: 1369–1371.

Swanson, Jeffrey W. 2011. "Preventing the Unpredicted: Managing Violence Risk in Mental Health Care." Psychiatric Services 59: 191–193.

Van Dorn, Richard A., Jan Volavka, and Norman Johnson. 2012. "Mental Disorder and Violence: Is There a Relationship beyond Substance Use?" Social Psychiatry and Psychiatric Epidemiology 47(3): 487–503.

*This page intentionally left  lank*

**4**

# Evidence for Optimism

Policies to Limit Batterers' Access to Guns

April M. Zeoli and Shannon Frattaroli

In 2010, at least 1,082 women and 267 men were killed by their intimate partners. Fifty-four percent of these victims were killed with guns (United States Department of Justice 2012). For at least the past twenty-five years, more intimate partner homicides (IPHs) have been committed with guns than with all other weapons combined (Fox and Zawitz 2009). Furthermore, women are more likely to be killed by an intimate partner than by any other offender group (Fox and Zawitz 2009; Moracco, Runyan, and Butts 1998). The evidence is clear: when a woman is killed, it is most likely to be at the hands of an intimate partner with a gun.

In this essay, we focus on policies to limit batterers' access to guns, the evidence that supports these policies, and evidence for improvement in their implementation and expansion. We begin with an overview of the evidence about gun usage in domestic violence and how batterers become known to

April M. Zeoli, PhD, MPH, is an assistant professor in the School of Criminal Justice at Michigan State University. Shannon Frattaroli, PhD, MPH, is an associate professor at the Johns Hopkins Bloomberg School of Public Health.

the justice system. Second, we discuss existing legislation to remove guns from batterers. We then present promising evidence about policies to limit batterers' access to guns and their relationship to IPH, and we discuss implementation and enforcement of those laws. We conclude with federal gun policy recommendations to prevent IPH.

## Domestic Violence and Guns: A Brief Overview

Guns are the weapons of choice for IPH perpetrators. Domestic violence involving a gun is more likely to result in homicide than domestic violence that involves a knife, other weapon, or bodily force (Saltzman et al. 1992). Indeed, the risk of homicide increases when a violent intimate has access to a gun (Bailey et al. 1997; Kellerman et al. 1993), with one study estimating a fivefold increased risk (Campbell et al. 2003). Intimate partners are more likely to use guns to kill their female victims than are non-intimate partners who kill women (Arbuckle et al. 1996; Moracco et al. 1998). Moreover, there is growing evidence documenting the role of guns in nonfatal domestic violence perpetrated by men against women (Moracco et al. 2006; Rothman et al. 2005; Sorenson and Wiebe 2004; Tjaden and Thoennes 2000). These nonfatal uses of guns may warn of future fatal violence: batterers' use of weapons to threaten has been associated with a fourfold increased risk of homicide (Campbell et al. 2003).

There is a history of male-to-female domestic violence in the relationships of most women and men killed by their intimate partners (Bailey et al. 1997; Campbell et al. 2003; McFarlane et al. 1999; Smith, Moracco, and Butts 1998), making domestic violence against the female partner the leading risk factor for IPH (Campbell et al. 2007). Stalking may also be an important risk factor for IPH (Campbell et al. 2003), with one study reporting that 76% of homicide victims and 85% of attempted homicide victims were stalked by their abusers prior to the incident (McFarlane et al. 1999). Often this abuse is known to the authorities. Roughly half of women killed by their intimate partners had contact with the justice system to report violence and stalking within the year preceding their murders. These women reported domestic violence/stalking to the police, had their assailants arrested, filed criminal charges, and obtained domestic violence restraining orders (DVROs) against their batterers (McFarlane et al. 1999; Moracco, Runyan, and Butts 1998).

When women seek assistance from the justice system, they create opportunities for intervention that may prevent future violence and homicide. If

equipped with a comprehensive set of domestic violence laws, law enforcement may be better positioned to safeguard victims and save more lives. Laws that restrict batterers' access to guns are an essential component of any comprehensive approach to address domestic violence.

## Current Federal Law: Responding to the Risks

Two provisions under federal law address the dangerous combination of batterers and guns. In 1994, Congress amended the Gun Control Act to prohibit individuals who are under qualifying DVROs from purchasing or possessing guns (18 U.S.C. § 922(g)(8)). To qualify, a DVRO must be issued after a court hearing about which the respondent was notified and in which he had the opportunity to participate. This type of DVRO is often referred to as *permanent*. Eligible DVRO respondents include the petitioner's current or former spouse, someone the petitioner shares a child with, or a current or former cohabitant (18 U.S.C. § 921(a)(32)).

In 1996, Congress amended the Gun Control Act to prohibit those convicted of domestic violence misdemeanors from purchasing or possessing guns (18 U.S.C. § 922(g)(9)). This expansion is a lifetime ban and includes any misdemeanor that "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon" and was committed by an intimate partner (18 U.S.C. § 921(a)(33)). The list of those included as intimate partners under the misdemeanor law is more expansive than the DVRO gun prohibition and includes parents or guardians as well as those "similarly situated to a spouse, parent or guardian" (18 U.S.C. § 921(a)(33)). Importantly, this law applies to law enforcement and the military and includes qualifying offenses that pre-date the law.

## State-Level Domestic Violence Gun Legislation

Many states have laws limiting DVRO respondents' access to guns. State laws are often more inclusive than federal laws and some, for example, expand the definition of qualifying DVROs to include temporary DVROs. Courts usually consider and grant temporary DVROs before respondents have been notified of petitioners' requests for protection from abuse. This decision in the absence of the respondent is unusual in the U.S. justice system, but it is a direct response to the danger that DVRO petitioners face. Respondents to

DVROs have high rates of criminal justice system involvement (Klein 1996; Moracco et al. 2010; Vittes and Sorenson 2006) and often have committed severe domestic violence (Holt et al. 2003; Logan, Shannon, and Walker 2005; Sorenson and Shen 2005). Furthermore, women who seek DVROs often do so in the context of separation from their batterer (Logan et al. 2008), a time of heightened homicide risk (Campbell et al. 2007; Wilson and Daly 1993). Temporary DVROs allow victims to gain the protection a DVRO provides without requiring them to wait for a hearing.

Some states limit domestic violence misdemeanants' access to guns. These laws may also be more expansive than the federal legislation. One way in which both state DVRO and domestic violence misdemeanor gun restrictions increase coverage is by expanding the categories of intimate partners covered by the law, for example by including current or former dating partners. Current dating partners were responsible for 35 percent of IPHs committed between 1976 and 2005, but the share of IPHs committed annually by current dating partners has been increasing (Fox and Zawitz 2009). Additionally, one study found that more than half of DVRO applications were against current or former dating partners or fiancés and that applications against this group were more likely to mention guns than applications against current and former spouses combined (Vittes and Sorenson 2006).

There is great variation in state DVRO and domestic violence misdemeanant gun laws, including whether purchase of a gun is prohibited or only possession is prohibited. Not all states provide more coverage than the federal legislation, and many do not have these types of gun prohibitions. Because some states have only the federal law to rely on and because federal restrictions may be stronger than state restrictions, federal law is crucial.

## Evidence

Federal legislative strategies to address the risks associated with armed batterers rely on the existing system of identifying and prosecuting violent intimates through the criminal justice system and the DVRO system in place in courts in all fifty states. This approach is consistent with the evidence: past abuse in a relationship is the best predictor of future abuse and is the leading risk factor associated with IPH. It is also consistent with our current approach to regulating access to guns. Prohibitions on purchase and possession are largely based on disqualifying behaviors, with criminal

nondomestic violence convictions constituting the largest category of pro-
hibited purchasers denied through background checks (Federal Bureau of
Investigation 2011).

### *Evaluating Impacts*

Three studies have examined how state laws limiting access to guns for
DVRO respondents and domestic violence misdemeanants affect IPH (Vig-
dor and Mercy 2003, 2006; Zeoli and Webster 2010). Vigdor and Mercy ex-
amined the effects of state DVRO and domestic violence misdemeanant gun
restrictions on state-level IPH from 1982 to 1998 (2003), and again from 1982
to 2002 (2006). In both studies, DVRO laws were significantly associated with
reductions in IPH risk, both for IPHs committed with guns and total IPHs.
Further investigation uncovered that these reductions rested on the capacity
of states to support background checks on would-be gun purchasers (Vigdor
and Mercy 2003, 2006). This finding highlights the importance of ensuring
that systems for implementing these laws are in place and supported: the pro-
hibition against purchasing a gun can be effective only if background checks
yield current, comprehensive, and accurate disqualifying information.

There was also a measurable difference in the effect of laws prohibiting
gun purchases compared to laws prohibiting possession only (Vigdor and
Mercy 2006). In states prohibiting purchase, total and gun IPH had an asso-
ciated reduction of 10% to 12%; there was no measurable impact of possession-
only laws. Purchase may be the more effective prohibited action because the
restriction on possession relies on respondents to voluntarily surrender their
guns or law enforcement to collect guns from newly prohibited respondents
(Vigdor and Mercy 2006).

A later analysis of state domestic violence gun laws and IPH in 46 U.S. cit-
ies from 1979 to 2003 provides further evidence of the state DVRO laws' im-
pact (Zeoli and Webster 2010). The 46 cities were in 27 states, 15 of which have
DVRO gun prohibitions and 9 of which have domestic violence misdemean-
ant gun prohibitions. Cities in states with DVRO gun restrictions had 19%
fewer IPHs and 25% fewer IPHs committed with guns compared to cities
without those state laws (Zeoli and Webster 2010).

Taken together, these three studies provide compelling evidence that DVRO
gun restrictions reduce IPH. Importantly, the results of all three studies show
that those reductions are not limited to IPHs committed with guns, suggesting
that there is no discernible substitution effect. Would-be killers do not replace

guns with other weapons to affect the same number of killings. Or, put another way, the evidence suggests that state DVRO gun prohibitions save lives.

Unlike the beneficial effects associated with DVRO laws, the three studies found no measurable impact on IPH of state laws restricting domestic violence misdemeanants' access to guns. This may be for a number of reasons. Misdemeanor convictions for domestic violence may be too few for researchers to detect an associated reduction in homicide (Vigdor and Mercy 2006). In addition, the statute under which a batterer is charged also may determine whether he is identified through a background check as prohibited or not, and many states do not have a specific domestic violence misdemeanor crime to charge (Vigdor and Mercy 2006). Finally, a lack of implementation and enforcement of the law may impact its effectiveness.

### *Implementation and Enforcement*

With the evidence concerning laws that address the risks associated with guns and violent intimates came attention to the implementation and enforcement of these laws. DVRO policies have been a focus of this research, which offers empirical insight into why DVRO laws prohibiting purchase fare better than policies that only prohibit possession and provides strategies for strengthening the possession prohibition. We are unaware of any research examining how domestic violence misdemeanor prohibitions are implemented and enforced. However, we suspect there are similarities in the processes involved because both laws require that information about the prohibiting offense be included in the background check system and that processes for retrieving guns from newly disqualified individuals be in place.

One evaluation of North Carolina's DVRO gun law found no measurable reduction in intimate partner gun violence among petitioners post-law but also documented no change in DVROs requiring respondents to surrender their guns or cases where guns were recovered from respondents (Moracco et al. 2006). The conclusion from this study is not that the law is flawed but rather that the implementation of the law did not allow for a real test of its merits. The implementation failure is likely not unique to North Carolina. Indeed, several reports offer anecdotal evidence of neglected implementation (Attorney General's Task Force on Local Criminal Justice Response to Domestic Violence 2005; Frattaroli and Teret 2006; Gwinn 2006; Webster et al. 2010).

Behind the failures to implement the gun possession prohibition are opportunities to better ensure the prohibition is realized (Frattaroli and Teret

2006; Wintemute et al. 2012). It is essential to know whether a respondent possesses guns and, if so, how many. Such information can be obtained from state registries and gun sale databases (where they exist), DVRO petitions, and petitioners. One evaluation of an initiative to implement the California DVRO law concluded that while each source provides some unique data about respondents' guns, the information is still incomplete (Wintemute et al. 2012). Facilitating disclosure of information about guns by petitioners through the DVRO application and hearing processes is critical (Frattaroli and Teret 2006; Webster et al. 2010; Wintemute et al. 2012), and the value of complete registry or record-of-sales databases that capture all gun transactions (long guns and handguns; private sales and dealer sales) cannot be overstated for any effort to fully enforce DVRO possession prohibitions (Wintemute et al. 2012). Knowledge of which respondents may have firearms allows law enforcement to better prepare for interacting with the respondent safely, and it may increase the likelihood that guns are recovered (Wintemute et al. 2012).

Even with information about the presence of guns, that information does not always translate into DVROs issued with instructions to surrender guns (Frattaroli and Teret 2006; Sorenson and Shen 2005; Webster et al. 2010). Still, there is evidence that oversight may reduce underuse of the DVRO gun law. Following an examination of the state's DVRO database, the California Department of Justice sent letters to relevant local agencies that called attention to the low utilization of the gun prohibition on DVROs in the database (Seave 2006). A review of the data following this exchange revealed a reduction in the percentage of orders without a gun prohibition (Seave 2006).

Service of issued DVROs is also a major barrier to realizing a DVRO gun prohibition. For those orders that are served by law enforcement, the act of service offers a chance for officers to facilitate removal of guns to ensure compliance with the DVRO. The value of law enforcement access to record-of-sale databases and to information provided by the petitioner to the recovery of guns has been documented, as has the importance of trained officers tasked with handling these exchanges (Wintemute et al. 2012).

Given the findings from the above studies, we hypothesize that the documented effects associated with DVRO gun restrictions likely reflect an effect of the purchase prohibitions and not the possession prohibitions. While the implementation of this law is complex and involves participation from different agencies, these barriers are not insurmountable, as the California initiative demonstrates (Wintemute et al. 2012). Additionally, a recent report suggests

that a small number of localities are engaging in innovative strategies to en-
sure that DVRO laws are being used to improve public safety (Klein 2006).
Between the emerging initiatives at the local level and the literature that is
developing on this topic, the time is right for federal action to organize and
encourage the efforts needed to reduce the documented risks that result when
violent intimates have access to guns.

## Policy Implications

There are many ways to strengthen federal law to reduce the violence docu-
mented at the start of this essay. Following is a list of recommendations that
are evidence-informed and actionable—although not exhaustive.

*Goal: Prevent DVRO respondents and DV misdemeanants from purchasing or
possessing guns.*

**Policy: Require all gun purchasers to submit to a background check.**

• Rationale: Under federal law, background checks are not required for
sales from private sellers, providing prohibited batterers with easy access to
guns. Requiring background checks for all gun sales will eliminate an impor-
tant source of guns for prohibited batterers.

**Policy: Incentivize states to automate DVRO and domestic violence misdemeanor
records for reporting to background check systems.**

• Rationale: Background check systems must be automated and updated
regularly so that disqualifying information is included in the system and im-
mediately available to gun sellers.

**Policy: Incentivize states to create gun registries or gun purchase databases.**

• Rationale: A mechanism to allow law enforcement to quickly learn whether
a DVRO respondent or a person convicted of a domestic violence misdemeanor
owns a gun would aid efforts to enforce existing prohibitions on gun posses-
sion among this group of people known to be violent.

*Goal: Expand federal law to prohibit other categories of violent intimates from
purchasing and possessing guns.*

**Policy: Extend the DVRO prohibition to include those covered by temporary
DVROs.**

• Rationale: The initial period after filing for a DVRO, during which a
temporary DVRO is in place, is a dangerous time for petitioners. Federal law

should recognize and reduce this danger by extending the prohibition to include temporary DVROs.

**Policy: Expand the definition of intimate partners.**

• Rationale: Current and former dating partners should be included in federal law so all victims of violent intimate partners receive equal protection.

**Policy: Extend federal gun prohibitions to cover those convicted of misdemeanor stalking.**

• Rationale: Stalking is an important risk factor for intimate partner homicide. However, because misdemeanor stalking laws often do not include "the use or attempted use of physical force, or the threatened use of a deadly weapon," the domestic violence misdemeanor gun prohibition does not apply.

**Policy: Extend federal gun prohibitions to cover persons who have violated a DVRO (permanent and temporary) because of threatened or actual violence.**

• Rationale: Those who violate court-issued DVROs because of violence may be especially dangerous and should be subject to the lifetime ban on gun purchase and possession to which domestic violence misdemeanants are subject.

*Goal: Provide the resources and support needed for state and local systems to implement and enforce domestic violence gun prohibitions.*

**Policy: Establish and fund a center that will provide the training and technical assistance needed to realize full implementation of laws that prohibit DVRO respondents and misdemeanants from possessing guns.**

• Rationale: Federal law enforcement authorities, with the help of model state programs such as the California Armed and Prohibited Persons System, are well-positioned to assist state and local law enforcement in developing their infrastructures to ensure these laws are realized for the benefit of public safety.

Refe r enc e s

Arbuckle, J., L. Olson, M. Howard, J. Brillman, C. Anctil, and D. Sklar. 1996. Safe at home? Domestic violence and other homicides among women in New Mexico. *Ann Emerg Med* 27: 210–15

Attorney General's Task Force on Local Criminal Justice Response to Domestic Violence. 2005. Keeping the promise: Victims' safety and batterer accountability. Sacramento, CA: California Department of Justice.

Bailey, J., A. Kellerman, G. Somes, J. Banton, F. Rivara, and N. Rushforth. 1997. Risk factors for violent death of women in the home. *Arch Intern Med* 157:777–82.

Campbell, J.C., N. Glass, P.W. Sharps, K. Laughon, and T. Bloom. 2007. Intimate partner homicide: Review and implications of research and policy. *Trauma, Violence & Abuse* 8: 246–60.

Campbell, J.C., D.W. Webster, J. Koziol-Mclain, C. Block, D. Campbell, M.A. Curry, F. Gary, N. Glass, J. Mcfarlane, C. Sachs, P. Sharps, Y. Ulrich, S.A. Wilt, J. Manganello, X. Xu, J. Schollenberger, V. Frye, and K. Laughon. 2003. Risk factors for femicide in abusive relationships: Results from a multisite case control study. *American Journal of Public Health* 93: 1069–97.

Federal Bureau of Investigation. 2011. National Instant Criminal Background Check System (NICS) operations. Washington, D.C.: U.S. Department of Justice.

Fleury, R.E., C. Sullivan, and D. Bybee. 2000. When ending the relationship does not end the violence: Women's experiences of violence by former partners. *Violence Against Women* 6: 1363–83.

Fox, J.A., and M.W. Zawitz. 2009. Homicide trends in the United States: Bureau of Justice Statistics. http://bjs.ojp.usdoj.gov/content/homicide/homtrnd.cfm.

Frattaroli, S., and S.P. Teret. 2006. Understanding and informing policy implementation: A case study of the domestic violence provisions of the Maryland Gun Violence Act. *Evaluation Review* 30: 347–60.

Gwinn, C. 2006. Domestic violence and firearms: Reflections of a prosecutor. *Evaluation Review* 30: 237–44.

Holt, V.L., M.A. Kernic, M.E. Wolf, and F. Rivara. 2003. Do protection orders affect the likelihood of future partner violence and injury? *American Journal of Preventive Medicine* 24: 16–21.

Kellerman, A., F. Rivara, N. Rushforth, J. Banton, D. Reay, J. Francisco, A. Locci, J. Prodzinski, B. Hackman, and G. Somes. 1993. Gun ownership as a risk factor for homicide in the home. *New England Journal of Medicine* 329: 1084–91.

Klein, A.R. 1996. Re-abuse in a population of court-restrained male batterers: Why restraining orders don't work. In *Do arrests and restraining orders work?*, 192–213. Thousand Oaks, CA: Sage.

———. 2006. Enforcing domestic violence firearm prohibitions: A report on promising practices. Washington, D.C.: Office on Violence Against Women. http://www.bwjp.org/files/bwjp/articles/Enforcing_Firearms_Prohibitions.pdf.

Kurz, D. 1996. Separation, divorce, and woman abuse. *Violence Against Women* 2: 63–81.

Logan, T.K., L. Shannon, and R. Walker. 2005. Protective orders in rural and urban areas: A multiple perspective study. *Violence Against Women* 11: 876–911.

Logan, T.K., R. Walker, L. Shannon, and J. Cole. 2008. Factors associated with separation and ongoing violence among women with civil protective orders. *Journal of Family Violence* 23: 377–85.

McFarlane, J., J.C. Campbell, S.A. Wilt, C. Sachs, Y. Ulrich, and X. Xu. 1999. Stalking and intimate partner femicide. *Homicide Studies* 3: 300–16.

Moracco, K.E., K. Andersen, R.M. Buchanan, C. Espersen, J.M. Bowling, and C. Duffy. 2010. Who are the defendants in domestic violence protection order cases? *Violence Against Women* 16: 1201–23.

Moracco, K.E., K.A. Clark, C. Espersen, and J.M. Bowling. 2006. Preventing firearms violence among victims of intimate partner violence: An evaluation of a new North Carolina law: U.S. Department of Justice.

Moracco, K.E., C.W. Runyan, and J.D. Butts. 1998. Femicide in North Carolina, 1991–1993: A statewide study of patterns and precursors. *Homicide Studies* 2: 422–46.

Rothman, E.F., D. Hemenway, M. Miller, and D. Azrael. 2005. Batterers' use of guns to threaten intimate partners. *Journal of the American Medical Women's Association* 60: 62–68.

Saltzman, L.E., J.A. Mercy, P. Ocarroll, M. Rosenberg, and P. Rhodes. 1992. Weapon involvement and injury outcomes in family and intimate assaults. *Journal of the American Medical Association* 267: 3043–47.

Seave, P.L. 2006. Disarming batterers through restraining orders: The promise and the reality in California. *Evaluation Review* 30: 245–65.

Smith, P.H., K.E. Moracco, and J.D. Butts. 1998. Partner homicide in context: A population-based perspective. *Homicide Studies* 2: 400–421.

Sorenson, S.B., and H. Shen. 2005. Restraining orders in California: A look at statewide data. *Violence Against Women* 11: 912–33.

Sorenson, S.B., and D.J. Wiebe. 2004. Weapons in the lives of battered women. *American Journal of Public Health* 94: 1412–17.

Tjaden, P., and N. Thoennes. 2000. Extent, nature, and consequences of intimate partner violence. Washington, DC: U.S. Department of Justice.

United States Department of Justice. 2012. Uniform crime reporting program data: Supplementary homicide reports, 2010. Icpsr33527-v1. Ann Arbor, MI: Interuniversity Consortium for Political and Social Research [distributor].

Vigdor, E.R., and J.A. Mercy. 2003. Disarming batterers: The impact of domestic violence firearm laws. In *Evaluating gun policy*, 157–214. Washington, DC: The Brookings Institution.

———. 2006. Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide? *Evaluation Review* 30: 313–46.

Vittes, K.A., and S.B. Sorenson. 2006. Are temporary restraining orders more likely to be issued when applications mention firearms? *Evaluation Review* 30: 266–82.

Webster, D.W., S. Frattaroli, J.S. Vernick, C. O'Sullivan, J. Roehl, and J.C. Campbell. 2010. Women with protective orders report failure to remove firearms from their abusive partners: Results from an exploratory study. *Journal of Women's Health* 19: 93–98.

Wilson, M.I., and M. Daly. 1993. Spousal homicide risk and estrangement. *Violence and Victims* 8: 3–16.

Wintemute, G., S. Frattaroli, K.A. Vittes, B. Claire, M. Wright, and D.W. Webster. 2012. Firearms and domestic violence education and intervention project: Final report of process and outcome evaluations. Sacramento, CA: Violence Prevention Research Program, University of California, Davis.

Zeoli, A.M., and D.W. Webster. 2010. Effects of domestic violence policies, alcohol taxes and police staffing levels on intimate partner homicide in large us cities. *Injury Prevention* 16: 90–95.

*This page intentionally left  lank*

5

# Reconsidering the Adequacy of Current Conditions on Legal Firearm Ownership

Katherine A. Vittes, Daniel W. Webster, and Jon S. Vernick

An important objective of successful gun violence prevention policy is to keep guns from high-risk individuals without infringing on the rights of law-abiding citizens to use firearms for protection or recreation. Given the potential of laws designed to keep guns from dangerous individuals to save lives, the categories of individuals to be prohibited from possessing firearms merits careful consideration. The goals of this chapter are to (1) briefly review the current federal prohibitory criteria for firearm possession and the rationale for these prohibitions, (2) make the case for broadening these criteria to limit access to firearms among additional categories of individuals, and (3) put forth specific policy recommendations based on the available research evidence. This chapter does not address prohibitory criteria related to mental

Katherine A. Vittes, PhD, MPH, is a research associate at the Johns Hopkins Center for Gun Policy and Research. Daniel W. Webster, ScD, MPH, is a professor in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Jon S. Vernick, JD, MPH, is an associate professor and associate chair in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health.

health status and only touches on prohibitions for violent misdemeanants, because these are covered elsewhere in this volume.

### Rationale for Current Conditions that Prohibit Firearm Possession

Recognizing that certain categories of individuals are at high risk for committing violence, federal law prohibits firearm possession by the following groups: felons; fugitives; persons convicted of a misdemeanor crime for domestic violence; those who are subject to certain restraining orders for domestic violence; unlawful users of or those addicted to controlled substances; those who have been found by a judge to be mentally incompetent, a danger to themselves or others as a result of mental illness, or have been involuntarily committed to a mental institution; those who have been dishonorably discharged from the military; illegal aliens; and persons who have renounced their U.S. citizenship. In addition, federal law sets 21 years as the minimum age at which a person can lawfully purchase a handgun from a federally licensed firearms dealer but sets 18 as the minimum legal age for handgun possession and for transfers of handguns from anyone who is not a licensed gun dealer (*18 U.S.C. §922 (d) (2012)*). No minimum possession age applies to long guns (rifles and shotguns) under federal law.

Research provides justification for restricting firearm possession for many of these groups. Convicted felons are much more likely to commit subsequent violent crimes—including homicide—than are nonfelons (Cook, Ludwig, and Braga 2005). Similarly, persons with a history of committing intimate partner violence are at increased risk for killing an intimate partner (Campbell et al. 2003) and for committing violence against nonfamily members (Etter and Birzer 2007; Fagan, Stewart, and Hansen 1983; Gayford 1975; Hotaling, Straus, and Lincoln 1989).

Research also supports restricting firearm possession for drug abusers. Illicit drug use and abuse is strongly associated with violent and criminal behavior (Afifi et al. 2012; Friedman 1998; Kelleher et al. 1994; Parker and Auerhahn 1998; Rivara et al. 1997; Walton-Moss et al. 2005) and suicide (Borges, Walters, and Kessler 2000; Borowsky, Ireland, and Resnick 2001; Rivara et al. 1997). For example, homicide offenders are nearly five times more likely to abuse drugs than are nonoffenders, and the use of illicit drugs is associated with a seven times higher risk of suicide (Rivara et al. 1997).

There also is strong evidence for restricting access to firearms by young people. Involvement in violent crime, either as a perpetrator or victim, increases dramatically during adolescence and in early adulthood (Fabio et al. 2006; Fox and Zawitz 2010). Brain structures related to risk taking and impulse control are developing throughout adolescence, and this may contribute to heightened risk of violent behavior among this age group (Johnson, Blum, and Giedd 2009; Steinberg 2004).

### The Case for Broadening Firearm Prohibitions for High-Risk Persons

Federal law sets the minimum standards for legal firearm ownership, but many states have laws that disqualify additional categories of high-risk individuals. The differences across states are significant. For example, New Jersey prohibits firearm possession by anyone who has been convicted of a crime for which the penalty can be 6 months or more of imprisonment and sets the minimum legal age for handgun possession at 21 years. (Federal law sets age 18 as the minimum legal age to *possess* a handgun.) In contrast, 13 states have standards for legal firearm possession that either mirror or are weaker than federal standards. In these 13 states, individuals who are likely at high risk for committing violence against themselves or others can legally possess firearms.

A recent study, using data from a survey of inmates in state prisons, examined the criminal history and ages of 253 persons incarcerated for committing gun-related crimes in the 13 U.S. states with the least stringent criteria for legal firearm possession.[1] Sixty percent ($n = 151$) of the offenders in the study were legally permitted to possess firearms prior to committing the gun crime that led to their incarceration, including 4% who had prior misdemeanor convictions involving violence or firearms, 6% convicted of other misdemeanors, 5% convicted of a serious offense as a juvenile, and 13% who had prior arrests but no convictions. It is important to note that, if these 13 states had laws prohibiting firearm possession for these additional high-risk groups, nearly half of the 151 offenders ($n = 73$) who were legally in possession of firearms would have been prohibited when they committed the gun offense for which they were incarcerated (Vittes, Vernick, and Webster 2012). Some portion of these gun crimes might have been prevented if these offenders had been prohibited from possessing firearms when they committed the offenses for which they were incarcerated.

Few rigorous scientific studies directly examine whether laws prohibiting individuals in specific high-risk groups from purchasing or possessing firearms reduce criminal offending by prohibited individuals (Hahn et al. 2005; Welford, Pepper, and Petrie 2004). However, studies that examine the effects of prohibiting access to firearms by perpetrators of domestic violence suggest that these laws can effectively reduce violence. For example, Wintemute and colleagues (2001) examined a California law that expanded firearm prohibitions to include persons convicted of violent misdemeanors. The study found that misdemeanants who were denied purchase of a handgun due to a change in the law were less likely than handgun purchasers to commit subsequent violent and gun-related crime. Studies also have found that state laws prohibiting firearm possession by those subject to certain types of domestic violence restraining orders are associated with lower rates of intimate partner homicide (Vigdor and Mercy 2003, 2006; Zeoli and Webster 2010).

Despite the lack of specific evaluations of prohibitory criteria for firearm possession for some categories of individuals, ample evidence shows that certain categories of individuals are at increased risk for violent and criminal behavior. We draw upon this literature to make the case for broadening prohibitions for firearm possession to include alcohol abusers, persons less than 21 years of age, and adults convicted of serious crimes as juveniles.

### *Alcohol Abusers*

Unlike illicit drug abusers, alcohol abusers are not prohibited from purchasing or possessing firearms under federal law. Yet, alcohol abuse is at least as strongly associated with the perpetration and victimization of violence (Afifi et al. 2012; Friedman 1998; Kelleher et al. 1994; Parker and Auerhahn 1998; Rivara et al. 1997; Sharps et al. 2001; Walton-Moss et al. 2005) and suicide (Borges, Walters, and Kessler 2000; Borowsky et al. 2001; Rivara et al. 1997). For example, a case-control study that examined risk factors for homicide and suicide in three large urban areas in the United Sates found that subjects who drank alcohol, had ever been in trouble at work for drinking, or were ever hospitalized for alcohol abuse were at increased risk for homicide and suicide compared with controls (Rivara et al. 1997). Another multicity case-control study found that victim and perpetrator alcohol abuse was strongly associated with nonfatal and fatal intimate partner violence (Sharps et al. 2001).

Several studies suggest that firearm owners may be at increased risk for abusing alcohol (Diener and Kerber 1979; Miller, Hemenway, and Wechsler 1999, 2002; Nelson et al. 1996; Wintemute 2011). This is especially concerning, given that alcohol has been shown to hamper shooting accuracy and impair judgment about when it might be appropriate to use a gun (Carr et al. 2009). A recent study that analyzed population-based survey data from eight U.S. states found that respondents who owned firearms were more likely than those who did not live in a home with a firearm to engage in binge drinking, drive under the influence of alcohol, and have at least 60 drinks per month. Heavy drinking was also more common among firearm owners who carried a gun for protection and stored a gun loaded and unlocked (Wintemute 2011). College students who own firearms are more likely than their unarmed counterparts to binge drink (Miller, Hemenway, and Wechsler 1999, 2002), to drive after binge drinking (Miller et al. 1999, 2002), to be arrested for driving under the influence of alcohol (Miller et al. 1999), and to damage property after drinking alcohol (Miller et al. 1999).

State laws vary with regard to firearm purchase and possession prohibitions for alcohol users or problem drinkers (Carr et al. 2010; Webster and Vernick 2009). Unfortunately, the state laws that do exist may be ineffective because they fail to provide precise definitions of who is disqualified, making them impossible to enforce (Webster and Vernick 2009). Pennsylvania is an exception in that it prohibits firearm purchase by persons who have been convicted of three or more drunk driving offenses within a five-year period. Webster and Vernick (2009) point out that Pennsylvania's law is particularly useful because it provides a definition of alcohol abuser that is sufficiently specific to allow for the identification of prohibited persons. It is also highly justifiable given the abundant evidence that repeat drunk driving offenders are a high-risk group. Not only have they demonstrated reckless behavior, people who drive under the influence are also more likely to abuse illicit drugs or alcohol and to have concurrent psychiatric disorders (Freeman, Maxwell, and Davey 2011; Lapham et al. 2001, 2006; Laplante et al. 2008), have lower self-control (Keane, Maxim, and Teevan 1993), and have higher rates of repeated arrests (Lucker et al. 1991).

### Youth under Age 21

Under federal law, a person must be 18 years of age to purchase a long gun and 21 years of age to purchase a handgun from a federally licensed firearms

dealer. But persons 18 years of age and older may purchase a handgun from a private seller and may possess a handgun. And there is no minimum age to possess a long gun or to purchase one from a private seller. Yet, research shows that risk for violent perpetration and victimization continues into young adulthood. Young people between the ages of 18 and 20 have some of the highest rates of homicide offending, and age-specific homicide offending rates rise sharply in the late teens and peak at age 20 (*Homicide Trends in the U.S.* 2012).

Laws that set 21 years as the minimum legal age for alcoholic beverage consumption were enacted in all 50 states in response to the recognition that heightened risk-taking behavior by individuals in this age group was a public safety concern. These laws led to significant reductions in deaths from motor vehicle crashes involving drivers between the ages of 18 and 20 (O'Malley and Wagenaar 1991).

The few studies that have evaluated laws banning juvenile gun purchase or possession have found no effect on juvenile homicide *victimization* or suicide (Marvell 2001; Rosengart et al. 2005; Webster et al. 2004). However, there has yet to be a study on the effect of these types of laws on the *commission* of violent crimes or homicide. Violent crime and homicide perpetration may be particularly relevant outcomes. Access to firearms by juveniles increases their risk for violent offending and victimization into early adulthood (Ruback, Shaffer, and Clark 2011). In addition, a recent study of gun-using offenders incarcerated in state correctional facilities in the 13 states with the weakest standards for legal gun possession found that the largest segment of offenders who would have been prohibited in states with stricter standards were those between 18 and 20 years of age (Vittes et al. 2012).

Another type of age-based firearm restriction warrants mention. Recognizing that children and adolescents lack the requisite maturity and self-control to be trusted with firearms (Hardy 2003), child access prevention (CAP) laws hold adult gun owners criminally responsible if a child gains access to and uses a gun that is not securely stored. Eighteen states and the District of Columbia currently have some form of CAP laws (Legal Community Against Violence 2008). Studies have found that CAP laws—particularly those that carry felony rather than misdemeanor penalties—are effective in reducing accidental shootings of children (Cummings et al. 1997; Hepburn et al. 2006). Research also shows that enacting CAP laws is associated with lower rates of adolescent suicides (Webster et al. 2004).

### Persons Convicted of Serious Juvenile Offenses

A sizeable body of research suggests that the commission of crimes at a young age is a robust predictor of subsequent criminal activity and violent offending (Berk et al. 2009; Brame, Bushway, and Paternoster 2003; Farrington 1987; Ou and Reynolds 2010). For example, a study analyzing data from a cohort of low-income minority youth in Chicago found that men who were arrested before age 18 had a 38% higher likelihood of a subsequent felony conviction by age 26 compared with those who had not been arrested (Ou and Reynolds 2010). A study of probationers and parolees in Philadelphia found that serious criminal offending at a young age strongly predicted the subsequent commission of homicide or attempted homicide (Berk et al. 2009).

There is also a sizable literature suggesting that criminal recidivism is inversely associated with time since criminal conviction and with age (Blumstein and Nakamura 2009; Kurlychek, Brame, and Bushway 2005, 2007; Kurlychek, Bushway, and Brame 2012; Soothill and Francis 2009). Many of the states that have laws that restrict firearm possession from these offenders take this into account by making the restriction effective for a specified period of time or until the offender reaches a certain age. For example, Massachusetts bans firearm possession for five years after conviction for a serious juvenile offense, and California and Pennsylvania prohibit firearm possession until age 30 for juveniles adjudicated of certain felonies and misdemeanors.

## Policy Recommendations

Despite the contentious debate among policymakers and others in the United States about policies governing the ownership and use of firearms, there is wide agreement that access ought to be restricted for individuals deemed to be at high risk for using guns to inflict harm on themselves or others. There also is a growing research literature that supports prohibiting firearm access among such dangerous persons. Nonetheless, some may argue that expanding prohibitory criteria for firearm possession is unfairly discriminatory or too difficult to achieve.

Persons who are barred from firearm possession, however, do have some legal recourse under the relief from federal firearms disabilities program. Under the provisions of the Gun Control Act of 1968, felons and other persons who have been prohibited under federal law from possessing firearms can

apply to the attorney general to have this prohibition lifted. The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is responsible for reviewing and responding to requests for relief from firearms disability submitted by individual applicants. In recent years, however, appropriations have not been provided for this program (ATF 2013). Providing adequate appropriations for the relief from firearms disabilities program could make policies that broaden denial criteria for legal firearm possession more politically palatable.

Although many of the federal prohibitory criteria for firearm possession were established decades ago by the Gun Control Act of 1968, it is not the case that the categories of persons that are prohibited under federal law are unchangeable or even that they have not been changed recently. In fact, persons convicted of a domestic violence misdemeanor and those subject to certain types of domestic violence restraining orders were added to the list of prohibited firearm possessors as recently as 1996 and 1994, respectively (Vernick and Hepburn 2003).

The following recommendations are based on the evidence presented in the previous sections:

1.  Prohibit firearm purchase for persons convicted of two or more crimes involving drugs or alcohol within any three-year period for a period of 10 years.
2.  Raise the federal minimum age requirement for handgun purchase or possession to 21 years of age.
3.  Prohibit firearm purchase for persons who have committed one or more serious juvenile off nses until age 30.

The research presented in this chapter indicates that alcohol abusers, young people, and persons who have been convicted of serious crimes as juveniles are at increased risk for violence. Access to firearms by individuals in these groups increases their own and the public's risk for injury and death. Firearm prohibitions for individuals in other high-risk groups such as domestic violence misdemeanants and respondents to domestic violence restraining orders are effective injury prevention policies. Evaluations of policies that can isolate the effect of firearm restrictions on high-risk groups are needed. Universal background checks, discussed elsewhere in this volume, would aid in the implementation and enforcement of these policies. Meanwhile, broadening these prohibitions has the potential to save additional lives.

Not e s

1. The 13 U.S. states with the least stringent criteria for legal firearm possession are Arkansas, Georgia, Idaho, Louisiana, Maine, Michigan, Mississippi, Montana, New Hampshire, New Mexico, Vermont, Wisconsin, and Wyoming.

Refe r e n c e s

*18 U.S.C. §922 (d) (2012)*.

Afifi, T. O., C. A. Henriksen, G. J. G. Asmundson, and J. Sareen. 2012. "Victimization and perpetration of intimate partner violence and substance use disorders in a nationally representative sample." *Journal of Nervous and Mental Disease* 200(8): 684–691. doi: 10.1097/NMD.0b013e3182613f64.

ATF. 2013. *General Questions*. Bureau of Alcohol, Tobacco, Firearms, and Explosives. Available from http://www.atf.gov/firearms/faq/general.html.

Berk, R., L. Sherman, G. Barnes, E. Kurtz, and L. Ahlman. 2009. "Forecasting murder within a population of probationers and parolees: A high stakes application of statistical learning." *Journal of the Royal Statistical Society* 172(1): 191–211.

Blumstein, A., and K. Nakamura. 2009. "Redemption in the presence of widespread criminal background checks." *Criminology* 47(2): 327–359.

Borges, G., E. E. Walters, and R. C. Kessler. 2000. "Associations of substance use, abuse, and dependence with subsequent suicidal behavior." *American Journal of Epidemiology* 151(8): 781–789.

Borowsky, I. W., M. Ireland, and M. D. Resnick. 2001. "Adolescent suicide attempts: Risks and protectors." *Pediatrics* 107(3): 485–493.

Brame, R., S. D. Bushway, and R. Paternoster. 2003. "Examining the prevalence of criminal desistance." *Criminology* 41(2): 23–448.

Campbell, J. C., D. W. Webster, J. Koziol-McLain, et al. 2003. "Risk factors for femicide in abusive relationships: Results from a multisite case control study." *American Journal of Public Health* 93(7): 1089–1097.

Carr, B. G., G. Porat, D. J. Wiebe, and C. C. Branas. 2010. "A review of legislation restricting the intersection of firearms and alcohol in the US." *Public Health Reports* 125(5) : 674–679.

Carr, B. G., D. J. Wiebe, T. S. Richmond, R. Cheney, and C. C. Branas. 2009. "A randomised controlled feasibility trial of alcohol consumption and the ability to appropriately use a firearm." *Injury Prevention* 15(6): 409–412

Cook, P. J., J. Ludwig, and A. A. Braga. 2005. "Criminal records of homicide offenders." *Journal of the American Medical Association* 294(5): 598–601.

Cummings, P., D. C. Grossman, F. P. Rivara, and T. D. Koepsell. 1997. "State gun safe storage laws and child mortality due to firearms." *Journal of the American Medical Association* 278(13) : 1084–1086.

Diener, E., and K. W. Kerber. 1979. "Personality characteristics of American gunowners." *Journal of Social Psychology* 107(2): 227–238.

Etter, G. W., and M. L. Birzer. 2007. "Domestic violence abusers: A descriptive study of the characteristics of defenders in protection from abuse orders in Sedgwick County, Kansas." *Journal of Family Violence* 22(3): 113–119.

Fabio, A., R. Loeber, G. K. Balasubramani, J. Roth, W. Fu, and D. P. Farrington. 2006. "Why some generations are more violent than others: Assessment of age, period, and cohort effects." *American Journal of Epidemiology* 164(2): 151–160.

Fagan, J. A., D. K. Stewart, and K. V. Hansen. 1983. "Violent men or violent husbands? Background factors and situational correlates." In *The Dark Side of Families: Current Family Violence Research*, edited by D. Finkelhor, R. Gelles, G. Hotaling, and M.A. Straus, 49–68. Beverly Hills, CA: Sage Publications.

Farrington, D. P. 1987. "Predicting individual crime rates." *Crime and Justice: A Review of Research* 9: 53–101. doi: 10.1086/449132.

Fox, J. A. , and M. W. Zawitz. 2010. Homicide trends in the US: Age, gender, and race trends. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Freeman, J., J. C. Maxwell, and J. Davey. 2011. "Unraveling the complexity of driving while intoxicated: A study into the prevalence of psychiatric and substance abuse comorbidity." *Accident Analysis and Prevention* 43(1): 34–39. doi: 10.1016/j.aap.2010.06.004.

Friedman, A. S. 1998. "Substance use/abuse as a predictor to illegal and violent behavior: A review of the relevant literature." *Aggression and Violent Behavior* 3(4): 339–355. doi: 10.1016/s1359-1789(97)00012-8.

Gayford, J. J. 1975. "Wife battering: A preliminary study of 100 cases." *British Medical Journal* 1(5951): 194–197.

Hahn, R. A., O. Bilukha, A. Crosby, et al. 2005. "Firearms laws and the reduction of violence: A systematic review." *American Journal of Preventive Medicine* 28(2, Supp 1): 40–71.

Hardy, M. S. 2003. "Effects of gun admonitions on the behaviors and attitudes of school-aged boys." *Journal of Developmental & Behavioral Pediatrics* 24(5): 352–358.

Hepburn, L., D. Azrael, M. Miller, and D. Hemenway. 2006. "The effects of child access prevention laws on unintentional child firearm fatalities, 1979–2000." *Journal of Trauma* 61(2): 423–428.

*Homicide Trends in the U.S.* Bureau of Justice Statistics, March 20, 2012 2012. Available from http://bjs.ojp.usdoj.gov/content/homicide/teens.cfm.

Hotaling, G. T., M. A. Straus, and A. J. Lincoln. 1989. "Intrafamily violence, and crime and violence outside the family." In *Family Violence*, edited by L. Ohlin and M. Tonry, 315–375. Chicago: University of Chicago Press.

Johnson, S. B., R. W. Blum, and J. N. Giedd. 2009. "Adolescent maturity and the brain: The promise and pitfalls of neuroscience research in adolescent health policy." *Journal of Adolescent Health* 45(3): 216–221.

Keane, C., P. S. Maxim, and J. J. Teevan. 1993. "Drinking and driving, self-control, and gender: Testing a general-theory of crime." *Journal of Research in Crime and Delinquency* 30(1): 30–46.

Kelleher, K., Chaffin M., J. Hollenberg, and E. Fischer. 1994. "Alcohol and drug disorders among physically abusive and neglectful parents in a community-based sample." *American Journal of Public Health* 84(10): 1586–1590.

Kurlychek, M. C., R. Brame, and S. D. Bushway. 2005. "Scarlet letters and recidivism: Does an old criminal record predict future offending?" *Criminology & Public Policy* 5(3): 483–504.

———. 2007. "Enduring risk? Old criminal records and predictions of future criminal involvement." *Crime & Delinquency* 53(1): 64–83.

Kurlychek, M. C., S. D. Bushway, and R. Brame. 2012. "Long-tern crime desistance and recidivism patterns: Evidence from the Essex County convicted felon study." *Criminology* 50(1): 71–103. doi: 10.1111/j.1745-9125.2011.00259.x.

Lapham, S. C., J. C. Baca, G. P. McMillan, and J. Lapidus. 2006. "Psychiatric disorders in a sample of repeat impaired-driving offenders." *Journal of Studies on Alcohol* 67: 707–713

Lapham, S. C., E. Smith, J. C. Baca, I. Y. Chang, B. J. Skipper, G. Baum, and W. C. Hunt. 2001. "Prevalence of psychiatric disorders among persons convicted of driving while impaired." *Archives of General Psychiatry* 58: 943–949.

Laplante, D. A., S. E. Nelson, S. S. Odegaard, R. A. Labrie, and H. J. Shaffer. 2008. "Substance and psychiatric disorders among men and women repeat driving under the influence offenders who accept a treatment-sentencing option." *Journal of Studies on Alcohol and Drugs* 69(2): 209–217.

Legal Community Against Violence. 2008. Regulating guns in America: An evaluation and comparative analysis of federal, state, and selected local gun laws. San Francisco, CA.

Lucker, G. W., V. L. Holt, D. J. Kruzich, and J. D. Gold. 1991. "The prevalence of antisocial behavior among U.S. Army DWI offenders." *Journal of Studies on Alcohol* 52(4): 318–320.

Marvell, T. B. 2001. "The impact of banning juvenile gun possession." *Journal of Law & Economics* 44(2): 691–713.

Miller, M., D. Hemenway, and H. Wechsler. 1999. "Guns at College." *Journal of American College Health* 48 (1): 7–12.

———. 2002. "Guns and gun threats at college." *Journal of American College Health* 51(2): 57–65.

Nelson, D. E., J. A. Grant-Worley, K. Powell, J. Mercy, and D. Holtzman. 1996. "Population estimates of household firearm storage practices and firearm carrying in Oregon." *Journal of the American Medical Association* 275(22): 1744–1748. doi: 10.1001/jama.275.22.1744.

O'Malley, P. M., and A. C. Wagenaar. 1991. "Effects of minimum drinking age laws on alcohol use, related behaviors and traffi crash involvement among American youth: 1976–1987." *Journal of Studies on Alcohol* 52(5): 478–491.

Ou, S. R., and A. J. Reynolds. 2010. "Childhood predictors of male adult crime." *Children and Youth Services Review* 32(8): SI 1097–1107.

Parker, R. N., and K. Auerhahn. 1998. "Drugs, alcohol, and homicide: Issues in research and theory." In *Homicide: A Sourcebook of Social Research*, edited by M. D. Smith and M. A. Zahn. Thousand Oaks, CA: Sage.

Rivara, F. P., B. A. Mueller, G. Somes, C. T. Mendoza, N. B. Rushforth, and A. L. Kellermann. 1997. "Alcohol and illicit drug abuse and the risk of violent death in the home." *Journal of the American Medical Association* 278(7): 569–575.

Rosengart, M., P. Cummings, A. Nathens, P. Heagerty, R. Maier, and F. Rivara. 2005. "An evaluation of state firearm regulations and homicide and suicide death rates." *Injury Prevention* 11(2): 77–83.

Ruback, R. B., J. N. Shaffer, and V. A. Clark. 2011. "Easy access to firearms: Juveniles' risks for violent offending and violent victimization." *Journal of Interpersonal Violence* 26(10): 2111–2138. doi: 10.1177/0886260510372948.

Sharps, P.W., J. Campbell, D. Campbell, F. Gary, and D. Webster. 2001. "The role of alcohol in intimate partner femicide." *American Journal of Addictions* 10(2): 122–135.

Soothill, K., and B. Francis. 2009. "When do ex-offenders become like non-offenders?" *The Howard Journal* 48(4): 373–387.

Steinberg, L. 2004. "Risk taking in adolescence: what changes, and why?" *Annals of the New York Academy of Science* 1021: 51–58.

Vernick, J. S, and L. M. Hepburn. 2003. "Examining state and federal gun laws: Trends for 1970–1999." In *Evaluating Gun Policy*, edited by Jens Ludwig and Philip J. Cook, 345–411. Washington, DC: Brookings Institution Press.

Vigdor, E. R., and J. A. Mercy. 2003. "Disarming batterers: The impact of domestic violence firearm laws." In *Evaluating Gun Policy*, edited by Jens Ludwig and Philip J. Cook, 157–201. Washingon, DC: Brookings Institution Press.

———. 2006. "Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide?" *Evaluation Review* 30(3): 313–346.

Vittes, K. A., J. S. Vernick, and D. W. Webster. 2012. "Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership." *Injury Prevention* epub. doi: 10.1136/injuryprev-2011-040290.

Walton-Moss, B.J., J. Manganello, V. Frye, and J. C. Campbell. 2005. "Risk factors for intimate partner violence and associated injury among urban women." *Journal of Community Health* 30(5): 377–389.

Webster, D. W., and J. S. Vernick. 2009. "Keeping firearms from drug and alcohol abusers." *Injury Prevention* 15(6): 425–427.

Webster, D. W., J. S. Vernick, A. M. Zeoli, and J. A. Manganello. 2004. "Association between youth-focused firearm laws and youth suicides." *Journal of the American Medical Association* 292(5): 594–601.

Welford, C. F., J. V. Pepper, and C. V. Petrie. 2004. *Firearms and Violence: A Critical Review*. Edited by Division of Behavioral and Social Science and Education Committee on Law and Justice, National Research Council of the National Academies. Washington, DC: The National Academies Press.

Wintemute, G. J. 2011. "Association between firearm ownership, firearm-related risk and risk reduction behaviours and alcohol-related risk behaviours." *Injury Prevention* 17(6): 422–427.

Wintemute, G. J., M. A. Wright, C. M. Drake, and J. J. Beaumont. 2001. "Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: Risk factors and effectiveness of denying handgun purchase." *Journal of the American Medical Association* 285(8): 1019–1026.

Zeoli, A. M., and D. W. Webster. 2010. "Effects of domestic violence policies, alcohol taxes and police staffing levels on intimate partner homicide in large US cities." *Injury Prevention* 16(2): 90–95.

**6**

# Broadening Denial Criteria for the Purchase and Possession of Firearms

Need, Feasibility, and Effectiveness

Garen J. Wintemute

This essay presents the findings of research relating to criminal activity among legal purchasers of firearms—those who have passed their background checks—and the evidence that extending the denial criteria to additional high risk populations is feasible and effective. Its primary subject is persons convicted of violent misdemeanor crimes, a group sometimes referred to as not-so-law-abiding gun owners. It will briefly consider persons who abuse alcohol, which is discussed more fully in the essay by Katherine A. Vittes (in this volume).

### Background

Federal statute prohibits the purchase and possession of firearms by persons convicted of any felony or a misdemeanor domestic violence offense, anyone

Garen J. Wintemute, MD, MPH, is the Susan P. Baker–Stephen P. Teret Chair in Violence Prevention and a professor of emergency medicine in the University of California, Davis, School of Medicine.

who is "an unlawful user of or addicted to any controlled substance," and others (U.S. Code). From the inception of the Brady Act in 1994 through 2009, the most recent year for which data are available, 107,845,000 background checks were performed; 1,925,000 (1.8%) firearm purchases were denied (Bowling et al. 2010). In 2009 alone, 10,764,000 background checks were performed, and 150,000 (1.4%) denials resulted. Well over 90% of denials result from the would-be purchaser's prior criminal activity.

While recent Supreme Court decisions have affirmed that any individual right to possess firearms is subject to restriction (*District of Columbia v. Heller* 2008, *McDonald v. City of Chicago* 2010), there is no agreement on what those restrictions should be.

The existing federal denial criteria do not extend to all persons who are at increased risk for committing crimes. This problem of incomplete coverage has been noted at least since 1981, when Cook and Blose noted that a "considerable fraction of people who commit violent crimes are legally entitled to own guns" (Cook and Blose 1981). One notable gap concerns prior convictions for violent misdemeanors. While persons convicted of misdemeanor assault on their intimate partners are prohibited persons, those convicted of misdemeanor assault on anyone else, or of misdemeanor violence of other kinds, are not. Another important omission concerns persons who abuse alcohol. Alcohol is specifically excluded from the list of controlled substances referred to in statutes regulating firearm purchase and possession.

Two recent studies highlight the importance of such gaps in coverage. Among individuals arrested for homicide in Illinois in 2001, 42.6% had prior felony convictions. Many of the remaining 57.4% were likely not prohibited from purchasing firearms at the time of their arrests (Cook, Ludwig, and Braga 2005). The second study concerned inmates incarcerated for firearm-related felonies in 13 states where denial criteria reflected those in federal statutes. This study considered all denial criteria related to criminal activity. Of 253 inmates, 102 (40.3%) were prohibited persons at the time of their arrests (Vittes, Vernick, and Webster 2012).

This evidence suggests that most of those who commit firearm-related violent crimes are eligible to purchase firearms, under federal standards at least, at the time the crimes are committed. In fact, the narrow scope of the current federal denial criteria has been proposed as one of the reasons that the Brady Handgun Violence Prevention Act did not measurably reduce homicide rates (Ludwig and Cook 2000, Wintemute 2000).

Given the important gaps in federal regulation, many states have enacted additional prohibitions on firearm purchase and possession. Twenty-six states include at least some misdemeanor crimes, and 20 include persons with a history of alcohol abuse (Bureau of Justice Statistics 2006). The specifics vary from state to state.

Since 1991, California has denied firearm purchases to persons convicted of essentially all violent misdemeanors, including crimes such as assault and battery and brandishing a firearm, since 1991. The prohibition lasts for 10 years. Criminal convictions account for 80% to 90% of denials in California, and convictions for violent crimes account for 40% to 55% (Wintemute et al. 1999, Wright, Wintemute, and Claire 2005). Denials for felony convictions and violent misdemeanor convictions are about equal in number. Approximately 25% of denials for misdemeanor assault are for domestic violence offenses (Wright, Wintemute, and Claire 2005).

Such extensions can substantially expand the size of the population that is denied purchase and possession of firearms. Of the 253 felons in the 13-state study discussed, an additional 28.9% would have been prohibited persons under stricter criteria that are now in effect in other states (Vittes, Vernick, and Webster 2012).

## Evidence

Two important empirical questions should be addressed when considering expansions of the denial criteria. First, are there subgroups of persons who purchase firearms legally, at least under federal statute, who are demonstrably at increased risk for committing violent crimes? Second, does denial *work*—does it decrease risk for firearm-related and violent crimes among the individuals who are directly affected? There is good evidence on both questions for persons convicted of violent misdemeanors, and on the first for alcohol abusers.

### *Misdemeanor Violence*

The research on misdemeanor violence comes from California. The first study concerned 5,923 authorized purchasers of handguns ages 21 to 49 in 1977 (Wintemute et al. 1998). Of these handgun purchasers, 3,128 had at least one prior misdemeanor conviction (not necessarily for a violent offense), and 2,795 had no prior criminal history. Over 15 years of follow-up, 50.4% of purchasers with prior convictions, but only 9.8% of those with no prior criminal

history, were arrested for a new offense (Table 6.1). Approximately one in six
purchasers with a prior misdemeanor conviction (15.4%) was arrested for a
violent Crime Index offense: murder, rape, robbery, or aggravated assault.

There was a strong dose-response relationship among men; risk of arrest increased with the number of prior convictions (Table 6.1). There also appeared to
be some specificity of association, in that prior convictions for offenses involv-

*Table 6.1*   Incidence of and relative risk for new criminal activity, by type of offense,
among authorized purchasers of handguns in California

| Type and number of prior conviction(s) | Nature of new offense | | | |
|---|---|---|---|---|
| Study group | Any off nse<br>*n* (%) | Nonviolent firearm off nse<br>*n* (%) | Violent offense<br>*n* (%) | Violent Crime Index off nse<br>*n* (%) |
| Prior misdemeanor conviction (*n*=2,735) | 1379 (50.4) | 361 (13.2) | 682 (24.9) | 421 (15.4) |
| No prior criminal history (*n*=2,442) | 239 (9.8) | 50 (2.0) | 108 (4.4) | 60 (2.5) |
| Males[a] | RR (95% CI) | RR (95% CI) | RR (95% CI) | RR (95% CI) |
| Any conviction(s) | | | | |
| 1 | 5.9 (5.1–6.9) | 5.0 (3.6–7.0) | 5.0 (4.0–6.2) | 5.1 (3.8–6.9) |
| ≥2 | 8.4 (7.2–9.8) | 7.7 (5.6–10.5) | 7.3 (5.9–9.1) | 7.6 (5.7–10.2) |
| Conviction(s), none involving firearms or violence | | | | |
| 1 | 5.9 (5.0–6.9) | 4.8 (3.4–6.7) | 4.8 (3.8–6.0) | 5.0 (3.7–6.8) |
| ≥2 | 7.8 (6.7–9.2) | 6.5 (4.7–9.1) | 6.8 (5.4–8.6) | 6.4 (4.7–8.7) |
| Conviction(s) involving firearms, but none involving violence | | | | |
| 1 | 6.4 (4.9–8.2) | 7.7 (4.8–12.3) | 4.4 (3.0–6.6) | 5.2 (3.1–8.5) |
| ≥2 | 10.9 (6.0–20.0) | 14.7 (5.8–36.9) | 13.0 (6.3–26.7) | 12.4 (5.0–31.0) |
| Conviction(s) involving violence | | | | |
| 1 | 9.3 (7.7–11.3) | 8.7 (6.0–12.6) | 8.9 (6.8–11.6) | 9.4 (6.6–13.3) |
| ≥2 | 11.3 (8.3–15.3) | 11.7 (6.8–20.0) | 10.4 (6.9–15.8) | 15.1 (9.4–24.3) |

*Source:* Wintemute GJ, Drake CM, Beaumont JJ, Wright MA, Parham CA. Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity among Authorized Purchasers of Handguns. *JAMA* 1998;280:2083–2087.

RR=relative risk; CI=confidence interval

[a]Comparison is to subjects with no prior criminal history. Results are adjusted for age and time elapsed since handgun purchase.

ing firearms or violence were associated with the greatest risk of subsequent arrests for violent or firearm-related offenses. Handgun purchasers with two or more prior convictions for violent crimes were at substantially increased risk of arrest for violent crimes generally (relative risk 10.4), and the violent Crime Index offenses (relative risk 15.1). But even purchasers with only a single prior misdemeanor conviction, and that for an offense involving neither firearms nor violence, were still approximately five times as likely as those with no prior criminal history to be arrested subsequently for firearm-related or violent crimes.

At the time these handgun purchases were made, California still relied on the criminal history criteria in federal statute, as many states do today. On that parameter, this study population is generally comparable to persons who purchase handguns now from licensed retailers across the United States.

More recent research measured the incidence of criminal activity serious enough to prohibit firearm ownership among people who had previously, and legally, purchased handguns (Wright and Wintemute 2010). This study was conducted after California began prohibiting violent misdemeanants from purchasing firearms, and such persons are not part of the study population. A cohort of 7,256 handgun purchasers in 1991, 2,761 with a non-prohibiting criminal history and 4,495 with no criminal record at the time of purchase, were followed for up to five years. During that time, 21.0% of purchasers with convictions for non-violent misdemeanors were arrested, and 4.5% were convicted of a crime that prohibited firearm ownership under federal law. The incidence of criminal activity among those with no criminal history was much lower; 3.7% were arrested for any reason, and 0.9% became prohibited persons. Prior conviction for a non-violent misdemeanor was associated with a five-fold increase in risk of conviction for a prohibiting offense (hazard ratio 5.1), as in the prior study.

Risk was related inversely to age and, as before, was related directly to the extent of the prior criminal history (Table 6.2). Compared to handgun purchasers with no criminal history, and after adjustment for age and sex, those with three or more prior convictions for nonviolent misdemeanors had a hazard ratio of 13.6 for conviction for any prohibiting offense and a hazard ratio of 11.0 for a conviction for a violent Crime Index offense (Table 6.2).

Age and prior criminal history acted synergistically as risk factors. As compared to purchasers aged 35 to 49 with no prior criminal history, those aged 21 to 24 with three or more prior misdemeanor convictions had arrest rates for all types of offenses that were increased by a factor of approximately 200.

82    *Garen J. Wintemute*

*Table 6.2*  Risk of arrest and new prohibition among legal purchasers of
handguns in California[a]

| Characteristic | Arrest for any crime | Conviction for prohibiting off nse | Conviction for violent Crime Index crime[b] |
|---|---|---|---|
| Misdemeanor conviction(s) | HR (95% CI) | HR (95% CI) | HR (95% CI) |
| No criminal history | Referent | Referent | Referent |
| 1 | 5.6 (4.5–6.9) | 4.2 (2.5–6.8) | 4.9 (2.2–11.1) |
| 2 | 9.0 (6.7–12.2) | 10.4 (5.7–18.8) | 9.2 (3.1–26.8) |
| ≥3 | 11.4 (8.3–15.7) | 13.6 (7.2–25.6) | 11.0 (3.4–35.6) |
| Sex | | | |
| Male | 1.0 (0.7–1.3) | 0.6 (0.3–1.1) | 0.9 (0.3–3.1) |
| Female | Referent | Referent | Referent |
| Age, yr | | | |
| 21–24 | 4.9 (3.7–6.4) | 6.1 (3.5–10.8) | 7.7 (2.8–20.9) |
| 25–34 | 2.4 (1.9–3.1) | 2.4 (1.4–4.1) | 2.6 (1.0–6.9) |
| 35–49 | Referent | Referent | Referent |

Adapted from Wright MA, Wintemute GJ. Felonious or Violent Criminal Activity That
Prohibits Gun Ownership among Prior Purchasers of Handguns: Incidence and Risk
Factors. *J Trauma* 2010;69:948–955.
   HR=hazard ratio; CI=confidence interval.
   [a]Adjusted for all variables in the table.
   [b]Murder, forcible rape, robbery, aggravated assault.

### Alcohol Abuse

Alcohol abuse is a major risk factor for firearm-related violence of all types
(Kellermann et al. 1992, Kellermann et al. 1993, Rivara et al. 1997, Conner et al.
2001, Karch, Dahlberg, and Patel 2010). Moreover, several studies have identi-
fied an association between personal firearm ownership and heavy or abusive
alcohol consumption (Diener and Kerber 1979, Schwaner et al. 1999, Miller,
Hemenway, and Wechsler 1999, 2002, Nelson et al. 1996, Smith 2001, Casiano
et al. 2008).

A recent study of data from the 1996 and 1997 Behavioral Risk Factor Sur-
veillance System surveys examined this association more closely (Wintemute
2011). After adjustment for demographics and state of residence, firearm owners
were more likely than persons who had no firearms at home to have five or

more drinks on one occasion (odds ratio 1.3), to drink and drive (odds ratio 1.8), and to have 60 or more drinks per month (odds ratio 1.5) (Table 6.3).

Of particular interest—and perhaps not surprisingly—firearm owners who engaged in risk behaviors with firearms were also more likely than other firearm owners to drink excessively. For example, as compared with persons who had no firearms at home, firearm owners who also drove or rode in a vehicle with a loaded firearm were at greatest risk for drinking and driving (odds ratio 4.3). Firearm owners who did not travel in a vehicle with a loaded firearm available, were still at increased risk for drinking and driving (odds ratio 2.1), but less so.

*Table 6.3*   Alcohol use and alcohol-related risk behaviors among firearm owners by presence or absence of specific firearms-related behavior[a]

| Characteristic or behavior | Any alcohol OR (95% CI) | ≥5 Drinks/ occasion OR (95% CI) | Drink and drive OR (95% CI) | ≥60 Drinks/ month OR (95% CI) |
|---|---|---|---|---|
| Exposure to firearms | | | | |
| Firearm owner | 1.3 (1.2–1.5) | 1.3 (1.2–1.5) | 1.8 (1.3–2.4) | 1.5 (1.1–1.8) |
| Household | 1.2 (1.1–1.3) | 1.0 (0.9–1.3) | 1.3 (0.8–1.9) | 1.3 (0.8–2.0) |
| No firearms | Referent | Referent | Referent | Referent |
| Loaded unlocked firearm at home | | | | |
| Firearm owner, 'yes' | 1.4 (1.2–1.7) | 1.8 (1.5–2.3) | 3.5 (2.3–5.4) | 2.3 (1.6–3.3) |
| Firearm owner, 'no' | 1.3 (1.2–1.4) | 1.2 (1.1–1.4) | 1.5 (1.9–2.0) | 1.3 (1.0–1.7) |
| No firearms | Referent | Referent | Referent | Referent |
| Drive/ride in vehicle with loaded firearm | | | | |
| Firearm owner, 'yes' | 1.5 (1.3–1.9) | 1.7 (1.4–2.2) | 3.0 (1.9–4.7) | 2.2 (1.4–3.3) |
| Firearm owner, 'no' | 1.3 (1.2–1.4) | 1.2 (1.1–1.4) | 1.6 (1.2–2.2) | 1.3 (1.0–1.7) |
| No firearms | Referent | Referent | Referent | Referent |
| Carry firearm for protection against people | | | | |
| Firearm owner, 'yes' | 1.3 (0.9–1.8) | 1.5 (1.0–2.1) | 2.1 (1.0–4.6) | 1.6 (0.8–3.1) |
| Firearm owner, 'no' | 1.3 (1.2–1.5) | 1.3 (1.1–1.5) | 1.7 (1.3–2.3) | 1.4 (1.1–1.8) |
| No firearms | Referent | Referent | Referent | Referent |

*Source:* Wintemute GJ. Association between firearm ownership, firearm-related risk and risk reduction behaviors and alcohol-related risk behaviors. *Injury Prevention* 2011;17(6):422–427.

OR=odds ratio; CI=confidence interval

[a]Adjusted for state of residence, age, sex, and race.

The limited data available suggest that firearm ownership itself is associated with an increased risk of arrest (Cook and Ludwig 1996, Diener and Kerber 1979) or, among college students, "trouble with the police" (Miller, Hemenway, and Wechsler 2002). Carrying a firearm in public has also been linked to arrest for a non-traffic offense (Cook and Ludwig 1996, Smith 2001) and aggressive or hostile driving behavior (Miller et al. 2002, Hemenway, Vriniotis, and Miller 2006). Given the findings just presented, it is plausible that alcohol abuse among firearm owners is partly responsible for the association between firearm ownership and involvement with the criminal justice system.

### *Does Denial Work?*

If denying firearm purchases reduces risk for future criminal activity, it most likely does so through incapacitation. To the extent that denial deprives high-risk persons of access to firearms, it reduces their capacity for committing firearm-related and violent crimes.

Some argue that denial simply prevents ineligible persons from acquiring firearms from licensed retailers and note that firearms can easily be obtained from private parties. Jacobs and Potter, partly on this basis, have labeled background checks and denial as nothing more than "a sop to the widespread fear of crime" (Jacobs and Potter 1995). The evidence is, however, that criminal firearm markets do not function smoothly; firearms are not always easily obtained through them (Cook et al. 2005). We have no data on how frequently firearm acquisitions are merely redirected by purchase denials and not prevented.

Background check and recordkeeping requirements do divert prohibited persons away from licensed retailers. Observational research at gun shows, where licensed retailers and private party sellers operate side by side, has documented cases in which individuals who are unable to purchase firearms from licensees do so from private parties instead (Wintemute 2009). In the 1991 Survey of State Prison Inmates, half of those who purchased their most recent firearm from an illegal source said that they had not bought their weapon from a licensee because of concerns about the background check (Bureau of Justice Statistics 1994). Vittes and colleagues reported that just 3.9% of the prohibited persons in their inmate sample had gotten those weapons from a licensed retailer (Vittes, Vernick, and Webster 2012).

Comprehensive background check requirements, which subject private party sales to the same safeguards that are applied to sales by licensed retailers, interfere with the operations of criminal firearms markets (Webster,

Vernick, and Bulzacchelli 2009, Pierce et al. 2012, Mayors Against Illegal Guns 2010). These studies are reviewed in the essay by Webster (in this volume).

Most importantly, denial appears to reduce risk for new criminal activity among those persons who are denied. The strongest evidence for this comes from a quasi-experimental evaluation of California's decision to extend its prohibitions to persons convicted of violent misdemeanors (Wintemute et al. 2001). The prohibition lasts for 10 years following their convictions. Study subjects were aged 21 to 34; all had prior convictions for violent misdemeanors. The intervention group comprised 927 persons who sought to purchase handguns in 1991 and were denied under the terms of the new policy. The control group included 727 persons who sought to purchase handguns in 1989 or 1990, just before the policy changed, and whose purchases were approved. Subjects were followed for up to three years.

Overall, 33.0% of subjects were arrested during follow-up: 21.8% for a firearm-related or violent offense and 22.1% for offenses of other types (Table 6.4). Persons whose purchases were approved were more likely than those who were denied to be arrested for a firearm-related or violent offense (relative hazard 1.2) but not for other offenses (relative hazard 0.9). In both groups, as always, risk of arrest was strongly related to age and the number of prior misdemeanor convictions (Table 6.4).

Denial was associated with a significant decrease in risk of arrest, both overall and for subjects stratified by age or number of prior convictions. These findings persisted in multivariate analysis (Table 6.5). Purchasers were more likely than denied persons to be arrested for new firearm-related or violent crimes (relative hazard 1.3), but not for other crimes (relative hazard 1.0). Similar results were seen in subgroups stratified by age, number of prior convictions for any crime, and number of prior convictions for a firearm-related or violent crime. The only exception was for subjects with three or more prior convictions for firearm-related or violent crimes. In this group with an established pattern of such activity, denial of handgun purchase may have no effect.

The authors called attention to the fact that there was a decrease in arrest rates only for the types of crimes the new policy might be thought to affect. They interpreted this specificity of effect as consistent with the hypothesis that the observed effect was related to the new policy.

A second study with a similar design estimated the effectiveness of denial of purchase based on a prior felony conviction (Wright, Wintemute, and Rivara 1999). As this policy has been enforced for decades in California, no

*Table 6.4*   Incidence and relative hazard of first arrest for new crimes among violent misdemeanants who applied to purchase handguns

| Characteristic | Subjects, *n* | Firearm-related and/or violent crime | | Non-firearm, nonviolent crime | |
|---|---|---|---|---|---|
| | | Persons arrested *n* (%) | RH (95% CI) | Persons arrested *n* (%) | RH (95% CI) |
| All subjects | 1654 | 360 (21.8) | | 366 (22.1) | |
| Purchase status | | | | | |
| Denied | 927 | 186 (20.1) | Referent | 211 (22.8) | Referent |
| Approved | 727 | 174 (23.9) | 1.2 (1.0–1.5) | 155 (21.3) | 0.9 (0.8–1.1) |
| Sex | | | | | |
| Female | 65 | 11 (16.9) | Referent | 15 (23.1) | Referent |
| Male | 1589 | 349 (22.0) | 1.3 (0.7–2.5) | 351 (22.1) | 0.9 (0.6–1.6) |
| Age, yr | | | | | |
| 21–24 | 377 | 108 (28.6) | Referent | 117 (31.0) | Referent |
| 25–29 | 719 | 152 (21.1) | 0.7 (0.6–0.9) | 152 (21.1) | 0.7 (0.5–0.8) |
| 30–34 | 558 | 100 (17.9) | 0.6 (0.4–0.8) | 97 (17.4) | 0.5 (0.4–0.7) |
| Prior convictions | | | | | |
| Any crime | | | | | |
| 1 | 815 | 144 (17.7) | Referent | 126 (15.5) | Referent |
| 2 | 429 | 90 (21.0) | 1.2 (0.9–1.6) | 104 (24.2) | 1.7 (1.3–2.1) |
| 3 | 200 | 57 (28.5) | 1.7 (1.3–2.3) | 58 (29.0) | 2.0 (1.5–2.8) |
| ≥4 | 198 | 63 (31.8) | 2.0 (1.5–2.7) | 73 (36.9) | 2.8 (2.1–3.7) |
| Firearm-related and/or violent crime | | | | | |
| 1 | 1217 | 230 (18.9) | Referent | 241 (19.8) | Referent |
| 2 | 302 | 86 (28.5) | 1.6 (1.3–2.1) | 81 (26.8) | 1.4 (1.1–1.8) |
| ≥3 | 115 | 37 (32.2) | 1.8 (1.3–2.6) | 36 (31.3) | 1.7 (1.2–2.5) |

*Source:* Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent Criminal Activity among Violent Misdemeanants Who Seek to Purchase Handguns. *JAMA* 2001;285(8):1019–1026.
    RH=relative hazard; CI=confidence interval

non-intervention group was available. Instead, 177 individuals who sought to purchase handguns in 1977 but were denied as a result of a prior felony conviction were compared to 2,470 persons who purchased handguns in 1977 and at that time had records of felony arrests. (Members of this group might have been convicted of those offenses, but at the misdemeanor level.) Subjects

*Table 6.5*   Risk of arrest for new crimes for handgun purchasers compared with denied persons among violent misdemeanants who applied to purchase handguns[a]

| Characteristic | Firearm-related and/or violent crime RH (95% CI) | Non-firearm, nonviolent crime RH (95% CI) |
|---|---|---|
| Age, yr | | |
| 21–24 | 1.4 (0.9–2.0) | 1.0 (0.7–1.5) |
| 25–29 | 1.1 (0.8–1.5) | 0.9 (0.7–1.3) |
| 30–34 | 1.6 (1.1–2.5) | 1.0 (0.6–1.5) |
| Prior convictions | | |
| Any crime | | |
| 1 | 1.3 (0.9–1.8) | 1.0 (0.7–1.4) |
| 2 | 1.2 (0.8–1.8) | 0.9 (0.6–1.3) |
| 3 | 1.1 (0.7–1.9) | 1.3 (0.8–2.3) |
| ≥4 | 1.8 (1.1–3.1) | 0.9 (0.6–1.5) |
| Firearm-related and/or violent crime | | |
| 1 | 1.4 (1.1–1.8) | 1.0 (0.7–1.3) |
| 2 | 1.3 (0.8–2.0) | 1.1 (0.7–1.8) |
| ≥3 | 0.9 (0.5–1.8) | 0.8 (0.4–1.7) |

*Source:* Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent Criminal Activity among Violent Misdemeanants Who Seek to Purchase Handguns, Risk Factors and Effectiveness of Denying Handgun Purchase. *JAMA* 2001;285:1019–1026.
   RH=relative hazard; CI=confidence interval
   [a]The comparison is to persons whose handgun purchases were denied. Adjusted for sex and all variables in the table.

were followed for up to three years following their attempted or completed purchases. The small size of the study population precluded multivariate adjustment. In separate analyses adjusting for age and for the nature and extent of the prior criminal history, the felony arrestees whose purchases were approved had statistically significant increases in risk of arrest for offenses involving firearms or violence (relative risk of 1.1 to 1.3) as compared to the felons whose purchases were denied.

Studies evaluating prohibitions on firearm ownership at the population level have yielded mixed findings. State-level firearm prohibitions for persons subject to domestic violence restraining orders were associated with 7% to 20% declines in the female intimate partner homicide rate (Vigdor

and Mercy 2003, 2006, Zeoli and Webster 2010). The Brady Handgun Violence Prevention Act, however, was found to have no effect on rates of firearm homicide (Ludwig and Cook 2000). Specific reasons for this other than a lack of effect of denial on the persons directly affected have been proposed, including effects on interstate trafficking and the fact that private party transfers are not regulated by the Brady Act. These studies are discussed elsewhere.

### Recommendations

Federal and state governments should broaden their criteria for denial of firearm purchase and possession to include persons convicted of violent misdemeanors. An unknown, but possibly substantial, proportion of such persons were arrested on felony charges but convicted at the misdemeanor level in plea bargain arrangements. Among those who purchase firearms, persons convicted of violent misdemeanors are at substantially increased risk for violent crime in the future. Denial of firearm purchase can reduce that risk by an amount that is of real-world importance. The list of offenses now in use in California provides a reasonable model. At the federal level, this could perhaps be accomplished by deleting the word "domestic" from the phrase "misdemeanor crime of domestic violence" in 18 USC §922(d) and reworking the definition of the phrase as appropriate.

Federal and state governments should also deny the purchase and possession of firearms to persons who abuse alcohol. Multiple definitions of alcohol abuse are in use, and it might be reasonable to consider the second instance of any alcohol-related offense (DUI, drunk and disorderly, etc.) as the criterion for denial. This can be explored further and refined as needed. We do not have specific evidence that denial is effective in such cases, but there is good evidence that alcohol abuse is a risk factor for crime, that its prevalence is increased among firearm owners, and that it and other behaviors that increase risk for violence co-occur among firearm owners.

The question of how long these prohibitions should last has not been definitively answered. Risk of recidivism following an index arrest declines over time. Among 18-year-olds arrested for violent or property crimes, risk of arrest returned to the level seen for the never-arrested after approximately 20 years (Blumstein and Nakamura 2009). Other studies, again of juveniles and young adults, have seen risk return to baseline after less than 10 years (Kurlychek,

Brame, and Bushway 2007, 2006). In the United Kingdom, the time required is between 10 and 15 years (Soothill and Francis 2009). There appears to be no parallel research on older offenders or firearm owners. California's 10-year policy is consistent with the available evidence.

Background checks that extend to misdemeanor convictions and alcohol-related offenses will be more complex and take longer to complete. ATF encountered 3,166 cases in 2011 in which a firearm was acquired by a prohibited person because the three-day waiting period ended before the background check could be completed (Federal Bureau of Investigation 2012). In such cases, ATF agents must contact the purchasers and recover or arrange other dispositions for the firearms (Frandsen 2010). To avoid a massive increase in delayed denials, as such cases are known, the waiting period should be extended in individual cases until the background check is completed.

## *Support for Broadened Denial Criteria*

Survey research in the late 1990s found high levels of support among the general population and firearm owners for denial criteria that included violent and firearm-related misdemeanors and alcohol abuse (Table 6.6) (Teret et al. 1998). Results for the general population were confirmed in the 2001 General Social Survey (Smith 2007).

In a 2012 survey of firearm owners, 75% of members of the National Rifle Association (NRA) felt that persons with a history of misdemeanor violence

*Table 6.6*   Support overall and among firearm owners for denial of firearm purchases by persons convicted of specific misdemeanor offenses

| Off nse | Overall % | Firearm owners % |
|---|---|---|
| Public display of a firearm in a threatening manner | 95 | 91 |
| Possession of equipment for illegal drug use | 92 | 89 |
| Domestic violence | 89 | 80 |
| Assault and battery without a lethal weapon or serious injury | 85 | 75 |
| Drunk and disorderly conduct | 74 | 73 |
| Carrying a concealed weapon without a permit | 83 | 70 |
| Driving under the influence of alcohol | 71 | 59 |

*Source*: Teret SP, Webster DW, Vernick JS, et al. Support for new policies to regulate firearms. *N Engl J Med*. 1998;339:813–818.

should not receive concealed weapon permits. Many states provide such permits to anyone who is legally eligible to possess firearms. Therefore, a judgment that a class of persons should not receive concealed weapon permits suggests a judgment that they should not possess firearms (Luntz Global 2012).

### *Drawbacks and Costs*

Background checks are useful only to the extent that the databases on which they are performed are accurate and complete. There will be costs, which may be substantial, to compile the data for background checks that include these offenses. There will also be costs associated with the increasing number of denials and, presumably, appeals of those denials. Personnel, facility, and other resource requirements will all increase. No estimates of cost, or of offsetting financial benefit in crimes and injuries prevented, have been developed.

Compiling additional data on violent misdemeanors and alcohol-related offenses will take some time. Estimates of how long, and exploration of ways to shorten the time to implementation, will be needed.

These hurdles notwithstanding, California's experience with misdemeanor denials shows that such policies can be implemented and sustained over time and that a robust firearms market can operate with such regulation in place. More than 601,000 firearms were sold in California in 2011 (California Department of Justice), and the industry describes the state's market as "lucrative" (Anonymous 2007).

Refe r enc e s

Anonymous. "California Market Still Lucrative." 2007. *The New Firearms Business*, 15 March, 5.

Blumstein, Alfred, and Kiminori Nakamura. 2009. "Redemption in the Presence of Widespread Criminal Background Checks." *Criminology,* no. 47: 327–359.

Bowling, Michael, et al. 2010. Background Checks for Firearms Transfers, 2009— Statistical Tables. Washington, DC: Bureau of Justice Statistics.

Bureau of Justice Statistics. 1994. Firearms and Crimes of Violence. Washington, DC: Department of Justice.

Bureau of Justice Statistics. 2006. Survey of State Procedures Related to Firearm Sales, 2005. Washington, DC: Bureau of Justice Statistics.

California Department of Justice. 2012. Dealers Record of Sale Transactions.

Casiano, Hygiea, et al. 2008. "Mental Disorder and Threats Made by Noninstitution- alized People with Weapons in the National Comorbidity Survey Replication." *Journal of Nervous and Mental Disease,* no. 196: 437–445.

Conner, Kenneth R, et al. 2001. "Violence, Alcohol, and Completed Suicide: A Case-Control Study." *American Journal of Psychiatry,* no. 158: 1701–1705.

Cook, Philip J, et al. 2005. Underground Gun Markets. Cambridge, MA: National Bureau of Economic Research.

Cook, Philip J, and J Blose. 1981. "State Programs for Screening Handgun Buyers." *The Annals of the American Academy of Political and Social Science,* no. 445: 80–91.

Cook, Philip J, and Jens Ludwig. 1996. *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use.* Washington, DC: The Police Foundation.

Cook, Philip J, Jens Ludwig, and Anthony A Braga. 2005. "Criminal Records of Homicide Offenders." *Journal of the American Medical Association,* no. 294: 598–601.

Diener, Edward, and Kenneth W Kerber. 1979. "Personality Characteristics of American Gun-Owners." *Journal of Social Psychology,* no. 107: 227–238.

District of Columbia v. Heller, 128 S.Ct. 2783 (2008).

Federal Bureau of Investigation. 2012. National Instant Criminal Background Check System (NICS) Operation 2011. Washington, DC: Federal Bureau of Investigation.

Frandsen, Ronald J. 2010. Enforcement of the Brady Act, 2008: Federal and State Investigations and Prosecutions of Firearm Applicants Denied by a NICS Check in 2008. Final Report to the U.S. Department of Justice. Document Number: 231052.

Hemenway, David, M Vriniotis, and Matthew Miller. 2006. "Is an Armed Society a Polite Society?" *Accident Analysis and Prevention,* no. 38: 687–695.

Jacobs, James B, and Kimberly A Potter. 1995. "Keeping Guns out of the 'Wrong' Hands: The Brady Law and the Limits of Regulation." *Journal of Criminal Law and Criminology,* no. 86: 93–120.

Karch, Debra L, Linda L Dahlberg, and Nimesh Patel. 2010. "Surveillance for Violent Deaths - National Violent Death Reporting System, 16 States, 2007." *Morbidity and Mortality Weekly Report (MMWR),* no. 59: 1–50.

Kellermann, Arthur L, et al. 1992. "Suicide in the Home in Relation to Gun Ownership." *New England Journal of Medicine,* no. 327: 467–472.

Kellermann, Arthur L, et al. 1993. "Gun Ownership as a Risk Factor for Homicide in the Home." *New England Journal of Medicine,* no. 329: 1084–1091.

Kurlychek, Megan C, Robert Brame, and Shawn D Bushway. 2006. "Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?" *Criminology & Public Policy,* no. 5: 483–504.

Kurlychek, Megan C, Robert Brame, and Shawn D Bushway. 2007. "Enduring Risk? Old Criminal Records and Predictions of Future Criminal Involvement." *Crime & Delinquency,* no. 53: 64–83.

Ludwig, Jens A, and Philip J Cook. 2000. "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act." *Journal of the American Medical Association,* no. 284: 585–591.

Luntz Global. 2012. Gun Owners Poll. New York, NY: Mayors Against Illegal Guns.

Mayors Against Illegal Guns. 2010. "Trace the Guns: The Link between Gun Laws and Interstate Gun Trafficking," www.MayorsAgainstIllegalGuns.org, www.TraceTheGuns.org.

Mcdonald v. City of Chicago, 130 S.Ct. 3020 (2010).

Miller, Matthew, et al. 2002. "'Road Rage' in Arizona: Armed and Dangerous." *Accident Analysis and Prevention,* no. 34: 807–814.

Miller, Matthew, David Hemenway, and Henry Wechsler. 1999. "Guns at College." *Journal of American College Health,* no. 48: 7–12.

Miller, Matthew, David Hemenway, and Henry Wechsler. 2002. "Guns and Gun Threats at College." *Journal of American College Health,* no. 51: 57–65.

Nelson, David E, et al. 1996. "Population Estimates of Household Firearm Storage Practices and Firearm Carrying in Oregon." *Journal of the American Medical Association,* no. 275: 1744–1748.

Pierce, Glenn L, et al. 2012. New Approaches to Understanding and Regulating Primary and Secondary Illegal Firearms. Washington, DC: National Institute of Justice.

Rivara, Frederick P, et al. 1997. "Alcohol and Illicit Drug Abuse and the Risk of Violent Death in the Home." *Journal of the American Medical Association,* no. 278: 569–575.

Schwaner, Shawn L, et al. 1999. "Who Wants a Gun License?" *Journal of Criminal Justice,* no. 27: 1–10.

Smith, Tom W. 2001. National Gun Policy Survey of the National Opinion Research Center: Research Findings. Chicago, IL: National Opinion Research Center, University of Chicago.

Smith, Tom W. 2007. Public Attitudes Towards the Regulation of Firearms. Chicago, IL: National Opinion Research Center, University of Chicago.

Soothill, Keith, and Brian Francis. 2009. "When Do Ex-Offenders Become Like Non-Offenders?" *The Howard Journal,* no. 48: 373–387.

Teret, Stephen P, et al. 1998. "Support for New Policies to Regulate Firearms: Results of Two National Surveys." *New England Journal of Medicine,* no. 339: 813–818.

Title 18, *U.S. Code*, Part 1, Chapter 44, Section 922(d).

Vigdor, Elizabeth Richardson, and James A Mercy. 2003. "Disarming Batterers: The Impact of Domestic Violence Firearm Laws" In *Evaluating Gun Policy: Effects on Crime and Violence*, ed. Jens A Ludwig and Philip J Cook. Washington, DC: Brookings Institution Press, 157–213.

Vigdor, Elizabeth Richardson, and James A Mercy. 2006. "Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Homicide?" *Evaluation Review,* no. 30: 313–346.

Vittes, Katherine A, Jon S Vernick, and Daniel W Webster. 2012. "Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership." [Published Online Ahead of Print June 23, 2012] *Injury Prevention,* DOI: 10.1136/injuryprev-2011-040290.

Webster, Daniel W, Jon S Vernick, and Maria T Bulzacchelli. 2009. "Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking." *Journal of Urban Health,* no. 86: 525–537.

Wintemute, Garen J. 2000. "Impact of the Brady Act on Homicide and Suicide Rates." (Letter) *Journal of the American Medical Association,* no. 284: 2719–2720.

Wintemute, Garen J. 2009. *Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching.* Sacramento, CA: Violence Prevention Research Program.

Wintemute, Garen J. 2011. "Association between Firearm Ownership, Firearm-Related Risk and Risk Reduction Behaviours and Alcohol-Related Risk Behaviours." *Injury Prevention,* no. 17: 422–427.

Wintemute, Garen J, et al. 1998. "Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity among Authorized

Purchasers of Handguns." *Journal of the American Medical Association,* no. 280: 2083–2087.

Wintemute, Garen J, et al. 1999. "Denial of Handgun Purchase: A Description of the Affected Population and a Controlled Study of Their Handgun Preferences." *Journal of Criminal Justice,* no. 27: 21–31.

Wintemute, Garen J, et al. 2001. "Subsequent Criminal Activity among Violent Misdemeanants Who Seek to Purchase Handguns: Risk Factors and Effectiveness of Denying Handgun Purchase." *Journal of the American Medical Association,* no. 285: 1019–1026.

Wright, Mona A, and Garen J Wintemute. 2010. "Felonious or Violent Criminal Activity That Prohibits Gun Ownership among Prior Purchasers of Handguns: Incidence and Risk Factors." *Journal of Trauma,* no. 69: 948–955.

Wright, Mona A, Garen J Wintemute, and Barbara E Claire. 2005. "People and Guns Involved in Denied and Completed Handgun Sales." *Injury Prevention,* no. 11: 247–250.

Wright, Mona A, Garen J Wintemute, and Frederick A Rivara. 1999. "Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence." *American Journal of Public Health,* no. 89: 88–90.

Zeoli, April M, and Daniel W Webster. 2010. "Effects of Domestic Violence Policies, Alcohol Taxes and Police Staffing Levels on Intimate Partner Homicide in Large Us Cities." *Injury Prevention,* no. 16: 90–95.

*This page intentionally left  lank*

7

# Comprehensive Background Checks for Firearm Sales

## Evidence from Gun Shows

Garen J. Wintemute

Many lines of evidence bear on whether to institute a comprehensive background check policy that would extend the current background check and recordkeeping requirements for sales by licensed retailers to sales by private parties. This essay presents evidence from observational and other research related to gun shows and makes recommendations based on that evidence. For simplicity's sake, "sales" will be used to refer to transfers of all types.

### Background

In 1995, Philip Cook and colleagues defined buying and selling by licensed retailers as the primary market for firearms; both new and used firearms are involved (Cook, Molliconi, and Cole 1995). The secondary market consists of

Garen J. Wintemute, MD, MPH, is the Susan P. Baker–Stephen P. Teret Chair in Violence Prevention and a professor of emergency medicine in the University of California, Davis, School of Medicine.
Portions of this chapter are based on prior work by the author.

transfers by unlicensed private parties such as the individual attendees at gun shows (Cook, Molliconi, and Cole 1995, Braga et al. 2002).

The secondary market is quite large. According to the National Survey of Private Ownership of Firearms, approximately 40% of all firearms transactions occur directly between private parties (Cook and Ludwig 1996). Other estimates concur. In the 2004 National Firearms Survey, for example, 55% of 566 firearm owners reported that their most recent acquisition had been from a store (Hepburn et al. 2007). Another 8% reported purchasing their firearm from a licensed retailer at a gun show (unpublished data, National Firearms Survey).

### *The Federal Double Standard*

In order to sell a firearm, a federally licensed retailer must see the buyer's identification. The buyer must complete a lengthy Firearms Transaction Record and certify, under penalty of perjury, that he is buying the firearm for himself and is not a member of any prohibited class. The National Instant Criminal Background Check System (NICS), administered by the Federal Bureau of Investigation (FBI), must perform a background check. In over 90% of cases this background check is completed within minutes, but if important information is missing the buyer may have to wait up to three business days to acquire the firearm (Federal Bureau of Investigation 2012b).

The retailer must keep a permanent record of each purchase that includes specific identifying information for both the buyer and the firearm. If the same person buys more than one handgun from him within five business days, the retailer must file a special report with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

These procedural safeguards are intended to ensure that the buyer is who he says he is, that he and not someone else will be the actual owner of the firearm, and that he is not prohibited from owning it. They help prevent the large-volume purchasing that otherwise might fuel trafficking operations. They establish a chain of ownership that will help law enforcement authorities link the firearm to its buyer if it is used in a future crime.

But a private party can sell that same firearm—or many firearms—and none of these federal safeguards will be in place. Private-party sellers are not required to ask for identification. They *cannot* initiate a background check, except in Delaware, Nevada, and Oregon, where they may do so voluntarily. There are no forms to fill out, and no records need be kept.

Even if the purchaser is a prohibited person, let alone a non-prohibited person with criminal intent, a private party may sell him a firearm without committing a crime. The key is that while it is always illegal for a prohibited person to buy a firearm, it is only illegal to sell a firearm to a prohibited person if the seller knows or has "reasonable cause to believe" that he is doing so (U.S. Code).

How did this come to pass? The provisions of the federal Gun Control Act apply only to those who are "engaged in the business" of selling firearms. Any clear understanding of what "engaged in the business" might mean was abolished by the 1986 Firearm Owners' per style sheet Protection Act (U.S. Code). FOPA specifically excluded from the scope of engagement in the business a person who makes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms" (U.S. Code).

The practical result was to make it much more difficult to set an upper limit to the number of firearm sales that an individual could make without being required to have a license and comply with the safeguards described above (Braga and Kennedy 2000, Wintemute 2007, 2009b). ATF summarized the situation this way in a 1999 study of gun shows: "Unfortunately, the effect of the 1986 amendments has often been to frustrate the prosecution of unlicensed dealers masquerading as collectors or hobbyists but who are really trafficking firearms to felons or other prohibited persons" (Bureau of Alcohol, Tobacco and Firearms 1999b).

### State Regulation of Firearm Sales

In 33 states, statutes regulating firearm sales do not go beyond those enacted by Congress. But 17 states regulate at least some private-party sales, usually by requiring that the seller have the transaction processed by a licensed retailer (Table 7.1) (Bureau of Justice Statistics 2006). Such transactions are then subject to the same procedural safeguards that apply to the retailer's own sales that identity is confirmed, a background check is performed, and a record is kept. Six states require background checks for all firearm sales, regardless of firearm type or place of sale, and another nine do so for all handgun sales.

In at least 17 states, the background check can be waived for holders of permits to carry concealed weapons and similar permits, whether at gun shows or elsewhere (Bowling et al. 2010). This has adverse consequences that will be discussed later in this essay.

*Table 7.1*   State regulation of private-party firearm sales

| State | Handgun sales | | Long gun sales | |
|---|---|---|---|---|
| | All sales | Gun shows only | All sales | Gun shows only |
| California | • | | • | |
| Colorado | | • | | • |
| Connecticut | • | | | • |
| Hawaii | • | | • | |
| Illinois | • | | • | |
| Iowa | • | | | |
| Maryland | • | | | |
| Massachusetts | • | | • | |
| Michigan | • | | | |
| Missouri | • | | | |
| Nebraska | • | | | |
| New Jersey | • | | • | |
| New York | • | | | • |
| North Carolina | • | | | |
| Oregon | | • | | • |
| Pennsylvania | • | | | |
| Rhode Island | • | | • | |

*Source:* From *Survey of state procedures related to firearm sales, 2005.*
Washington, DC: Bureau of Justice Statistics, 2006. NCJ 214645.
   *Note:* In the remaining 33 states, private-party firearm sales are not regulated.

In California, a comprehensive background check and recordkeeping policy has been in place since 1991. In essence, private-party sales must be routed through a licensed retailer. At gun shows, designated retailers serve as transfer agents to facilitate sales between individual attendees.

All firearm types are covered, but there are exceptions for certain transactions. These include a transfer between spouses or vertically between other immediate family members, such as from a parent to a child or a grandparent to a grandchild. Temporary transfers, such as infrequent and short-term loans between persons who are personally known to each other, are also exempted.

There are no exemptions for holders of concealed weapon or other permits. Private parties are still allowed to sell firearms in small numbers, involving a licensed retailer to satisfy the background check and recordkeeping requirements.

There is no requirement that the seller and buyer be present at the licensed retailer simultaneously. Many sales are done on consignment; the seller deposits firearms with the retailer for sale, and the seller and buyer never meet. Some retailers maintain separate a display space for consignment firearms.

The retailer is allowed to charge a fee of up to $10 per firearm for serving as a transfer agent (the fee is less per firearm for transfers involving multiple firearms). Whether the sale occurs at a gun show or elsewhere, the purchaser may take delivery of his firearm from the retailer only after the state's 10-day waiting period has expired. The increased foot traffic at participating retailers provides opportunities to develop new customers. As one retailer explained, "when they come in to do the paper, everybody needs bullets and cleaning supplies" (Matthews 2009).

The system does not appear to impair the operations of California's legal firearms market. More than 601,000 firearms were sold in the state in 2011 (California Department of Justice). Trends in the California market reflect those occurring nationwide. Firearm sales increased 15.6% per year, on average, over the last five years for which we have data (California Department of Justice 2012). A leading industry newsletter has described California's market as "lucrative" (Anonymous 2007).

### *Criminal Acquisition of Firearms from Private Parties*

Private-party firearm sales are quick—they can be completed in less than a minute—and convenient. Even a law-abiding purchaser might appreciate the absence of paperwork that characterizes private-party sales. Their anonymity attracts those who put privacy at a premium.

But these same attributes make private-party sales the only viable option for prohibited persons and the principal option for purchasers with criminal intent, for whom a record of the sale would be hazardous. Again, it is only illegal to sell a firearm to a prohibited person if the seller knows or has "reasonable cause to believe" that he is doing so (U.S. Code). The matter is easily finessed. As one private-party seller said while contemplating a possibly illegal handgun sale at a gun show, "Of course, if I don't ask, nobody knows" (Wintemute 2009b).

Private-party sales are critical to illegal commerce in firearms. As discussed earlier, perhaps 40% of all firearm sales nationwide are private-party transactions. For those who commit crimes with firearms, that percentage at least doubles. Four large-scale surveys of persons incarcerated for firearm-related felonies in the 1990s asked inmates where they acquired the firearm they used in the crime for which they were incarcerated. Between 12% and 21% of these inmates acquired their weapons from licensed retailers (Harlow 2001, Scalia 2000, Wright and Rossi 1986). An analysis of more recent data also considered whether the inmates were prohibited from possessing firearms at the time of acquisition (Vittes, Vernick, and Webster). Overall, 13.4% of respondents obtained their firearms from licensed retailers. For prohibited persons, purchases from licensed retailers fell to just 3.9%.

For juveniles, direct purchase of any type of firearm from a licensed retailer is illegal, as are handgun purchases for people aged 18 to 20. Private-party sales are essentially their only source of firearms (Ash et al. 1996, Webster et al. 2002).

Private-party sales are also an important component of firearm trafficking operations. Of 1,530 trafficking investigations conducted by ATF during 1996 to 1998, 314 (20.5%) involved unlicensed sellers (Bureau of Alcohol, Tobacco and Firearms 2000b). A related study evaluated data for trafficking operations involving juveniles and youth (Braga and Kennedy 2001). Of 648 such operations, 92 (14.2%) involved private-party sellers.

There is no current estimate of the proportion of private-party sales that involve prohibited persons. But when background checks for licensed retailer sales were first required in some states by the Brady Act, as many as 9.4% of prospective purchasers were prohibited persons (Manson and Gilliard 1997). It is reasonable to estimate that the proportion is similar or higher for private-party sales that do not involve background checks.

At gun shows, some private-party handgun sellers make a point of checking the buyer's driver's license to be sure that they are not making an illegal sale to an out-of-state resident (Wintemute 2009b). But asking questions about the buyer's eligibility to purchase firearms, theoretically something that private-party sellers could do, guarantees unpleasantness (or worse) and risks the loss of the sale. In observational research at nearly 80 gun shows, such questioning was never observed (Wintemute 2009b). Other private party vendors serve as "hotspots," making repeated sales that serve criminal purposes

(Bureau of Alcohol, Tobacco and Firearms 2000 b, Braga and Kennedy 2000 , Wintemute 2009 b).

### *Criminal Acquisition of Firearms at Gun Shows*

Gun shows present a special case, in that large numbers of licensed retailers and private-party sellers are active in the same setting and competing for customers (Bureau of Alcohol, Tobacco and Firearms 1999b, Wintemute 2007, 2009 b). Between 25% and 50% of firearm sellers who rent table space at gun shows are private parties (Bureau of Alcohol, Tobacco and Firearms 1999b, Wintemute 2007). Such tables frequently carry "Private Sale" signs implying that purchases require no paperwork, no background check, no waiting period, and no recordkeeping. Individual attendees who do not rent table space but bring firearms to sell are common. In a study by the author, as many as 31.6% of gun show attendees were armed, and many of these attendees were unambiguously offering their firearms for sale (Wintemute 2007).

While there are no data on the frequency of illegal private-party sales at gun shows, it is clear that some sellers are willing to make them. Private investigators recently conducted "integrity tests" of 30 private-party sellers at seven gun shows in Nevada, Ohio, and Tennessee (City of New York 2009). The subjects were selected after observation suggested they were effectively in the business of selling firearms. An investigator then negotiated the purchase of a firearm with each seller, but during the negotiation said that he "probably could not pass a background check." Of the 30 sellers, 19 completed the sales despite the clear indication that the buyer was a prohibited person.

As a highly visible marketplace for private-party sales, gun shows have received a great deal of attention. As detailed elsewhere, however, three points suggest a more nuanced understanding of the role gun shows play in legal and illegal commerce in firearms (Wintemute 2009 b).

Gun shows account for a small proportion of firearm sales. According to the National Survey of Private Ownership of Firearms, discussed earlier, 3.9% of firearms are acquired at gun shows (Cook and Ludwig 1996). Unpublished data from the National Firearms Survey (Hepburn et al. 2007) yield a similar result; 9% of firearm owners acquired their most recent firearms at a gun show.

Most sales at gun shows probably involve licensed retailers. Most vendors at gun shows are licensed retailers, as are nearly all of the largest and most active vendors (Wintemute 2009 b). Again, unpublished data from the National

Firearms Survey agree (Hepburn et al. 2007). Of respondents who purchased firearms at gun shows, more than 75% bought them from licensed retailers.

Licensed retailers are the primary source of firearms acquired at gun shows that are later used in crime. A study of 314 ATF trafficking investigations involving gun shows reported that while an unlicensed seller was the main subject in most of the investigations (54.1%), two thirds of the trafficked firearms were linked to investigations involving a licensed retailer (Braga and Kennedy 2000).

### *Effectiveness of Background Checks*

The evidence suggests that background checks and denials of purchases by prohibited persons reduce risk of arrest among the individuals who are directly affected and interfere with the operations of criminal firearm markets, particularly with firearm trafficking. This essay considers observational evidence on the latter point from gun shows, where large numbers of firearm sales can be observed directly in a short period of time (Wintemute 2009b, 2007).

The best such evidence comes from a study comparing gun shows in California, with its comprehensive background check policy and separate regulations for gun shows, to shows in four states without such policies (Arizona, Nevada, Texas, and Florida) that are leading sources of firearms used in crime in California (Wintemute 2007). Altogether, 28 shows were included. Events in all states were well attended, and commerce was brisk. Shows in California were smaller than those in the comparison states, whether measured by number of firearm vendors or number of attendees, but the number of attendees per vendor was larger.

No direct private-party sales between attendees were observed in California. Instead, private-party sales were completed with the assistance of a licensed retailer serving as transfer agent (Wintemute 2007). In the comparison states, such transactions occurred frequently; an appropriately-stationed observer could see several occurring at any one time.

One unintended effect of California's policies may have been to displace illegal sales to nearby and more permissive states. At some shows in Reno, Nevada, which is a short distance across the border, more than 30% of the vehicles in the parking lot were from California (Wintemute 2007). Such undermining of more rigorous regulation in some states by lack of regulation in others has long been an argument for more rigorous regulation at the federal level. However, an unexpected finding suggests diffusion of benefit. Though

surrogate, or "straw man," purchases are illegal nationwide under federal law, they were more than six times as common in the comparison states as in California (Wintemute 2007).

Commenting on this study, *Shooting Sports Retailer*, a firearm industry trade magazine, agreed that "there is some evidence that gun shows with restrictive regulations mandating background checks have less illegal activity than shows in states or jurisdictions without this requirement" (Matthews 2009).

### Recommendations

Anonymous, undocumented private-party sales are an important contributor to firearm violence in the United States. Comprehensive background check requirements restore a simple, single, equitable structure to retail commerce in firearms. They have been shown to be feasible, and the evidence is that they provide concrete benefits. The United States should adopt a comprehensive background check requirement for firearm sales.

The primary direct effect of such a requirement will be to prevent, or make substantially more difficult, the criminal acquisition of firearms. Many prohibited persons attempting to purchase firearms from private parties will be detected by the background checks, and their purchases will be denied. Background checks and denials reduce risk of violent and firearm-related crime among prohibited persons (Wintemute et al. 2001, Wright, Wintemute, and Rivara 1999). Non-prohibited buyers with criminal intent will be deterred by the new requirements for purchaser identification and record keeping. Recall that 80% of felons incarcerated for firearm-related crimes who were *not* prohibited persons nonetheless acquired their firearms from private parties (Vittes, Vernick, and Webster 2012).

Some prohibited persons and others with criminal intent will continue to seek firearms from private-party sellers. There will still be individuals willing to sell firearms to prohibited persons. There are likely to be fewer, however, because a comprehensive background check policy changes the rules for sellers as well. Private parties will no longer be able to sell firearms legally, at least, without determining whether buyers can legally purchase them. Direct sales will now be crimes and could be made prohibiting offenses.

These effects at the individual level, taken together, will interfere with the operation of criminal firearm markets and disrupt firearm trafficking operations (Webster, Vernick, and Bulzacchelli 2009, Pierce et al. 2012). Mapping

trafficking networks and investigating individual crimes will be aided by more complete records of firearm transfers. Increasingly, it will be possible for law enforcement agencies to identify the most recent purchaser of a crime-involved firearm, not the first (Wintemute et al. 2004, Pierce et al. 2012).

California's policies provide a suitable model. Reasonable exemptions from the background check are allowed, and private-party sales may be made in small numbers if a licensed retailer is involved.

In order to avoid a massive increase in delayed denials, the current three-day limit to the waiting period for firearm purchases should be lifted. Firearm acquisition should be allowed once the buyer has passed the background check.

### Pitfalls to Avoid
Closing the "Gun Show Loophole"

Requiring background checks for private-party sales only at gun shows is known as closing the "gun show loophole." There is no such loophole in federal law, in the limited sense that the law does not exempt private-party sales at gun shows from regulation that is required elsewhere. The fundamental flaw in the gun show loophole proposal is its failure to address the great majority of private-party sales, which occur at other locations and increasingly over the Internet at sites where any non-prohibited person can list firearms for sale and buyers can search for private-party sellers.

Creating an Exemption for Permit Holders

The Fix Gun Checks Act, introduced in the 112th Congress and expected to be reintroduced in 2013, is described as requiring a background check for all firearm purchases. It does not. A prospective purchaser in at least 17 states may avoid a background check by presenting an unexpired permit to carry a concealed weapon, or similar permit, for which a background check was required at the time of issuance. Such permits remain valid for as long as five years. An important fraction of permit holders become prohibited persons during that time (Wright and Wintemute 2010). Nationwide, there would be many thousands each year. Their new prohibitions will most often result from new convictions for serious crimes.

No state routinely recovers permits that have not reached their nominal expiration dates from people who are no longer eligible to have them. Thus,

under the Fix Gun Checks Act, those permits will allow newly prohibited individuals who are at high risk for committing further crimes to avoid background checks and acquire firearms. Moreover, a permit exemption is unnecessary; several states operate comprehensive background check systems without it.

### Drawbacks, Costs, and Uncertainties

A comprehensive background check policy would make private-party sales less convenient. Airport security screening provides a useful analogy. All of us, regardless of our individual risk of committing violence in the air, are subjected to this inconvenience in one form or another. We tolerate it because it is one of the ways terrorists do get caught.

There would be a financial cost to firearm purchasers. In California, retailers may charge $10 per firearm, in addition to other fees required by the state. This is a small fraction of the purchase price of all but the least expensive firearms, however.

Some private-party sellers will object, finding the new requirements burdensome. The great majority of individuals who sell firearms have no interest in providing weapons for use by criminals. They will see the value of background checks and recordkeeping as means to prevent violent crime. It is unreasonable to expect private parties to question potential buyers about their eligibility, initiate background checks, and retain records. Private parties who sell firearms infrequently, who are hobbyists or collectors, will encounter the new requirements infrequently. Those who sell more often are in the business and should obtain licenses.

Retailers will object if the fee they are allowed to charge is too low to cover their costs. In California, $10 per firearm has proved satisfactory. Retailers will see an offsetting benefit in increased opportunities to develop new customers.

There will be costs to governments as they conduct background checks for nearly all firearm sales and issue more denials. The checks will only be as good as the data on which they rely. Efforts to improve the quality and completeness of these data must continue.

Implementing a comprehensive background check policy will be more a matter of substantial scaling up than of developing qualitatively new programs, which would be more expensive. In 11 states, including populous California, New York, and Pennsylvania, such policies are in effect now. Feasibility is proven.

Refe r enc es

Anonymous. 2007. "California Market Still Lucrative." *The New Firearms Business*, 15 March, 5.

Ash, Peter, et al. 1996. "Gun Acquisition and Use by Juvenile Offenders." *Journal of the American Medical Association,* no. 275: 1754–1758.

Bowling, Michael, et al. 2010. Background Checks for Firearms Transfers, 2009—Statistical Tables. Washington, DC: Bureau of Justice Statistics.

Braga, Anthony A., et al. 2002. "The Illegal Supply of Firearms." In *Crime and Justice: A Review of Research*, ed. Michael Tonry. Chicago, IL: University of Chicago Press, 319–352.

Braga, Anthony A., and David M. Kennedy. 2000. "Gun Shows and the Illegal Diversion of Firearms." *Georgetown Public Policy Review,* no. 6: 7–24.

Braga, Anthony A., and David M. Kennedy. 2001. "The Illicit Acquisition of Firearms by Youth and Juveniles." *Journal of Criminal Justice,* no. 29: 379–388.

Bureau of Alcohol, Tobacco and Firearms. 1999b. Gun Shows: Brady Checks and Crime Gun Traces. Washington, DC: Bureau of Alcohol, Tobacco and Firearms.

Bureau of Alcohol, Tobacco and Firearms. 2000b. Following the Gun: Enforcing Federal Laws against Firearms Traffickers. Washington, DC: Bureau of Alcohol, Tobacco and Firearms.

Bureau of Justice Statistics. 2006. Survey of State Procedures Related to Firearm Sales, 2005. Washington, DC: Bureau of Justice Statistics.

California Department of Justice. 2012. Dealers Record of Sale Transactions.

City of New York. 2009. Gun Show Undercover: Report on Illegal Sales at Gun Shows. New York, NY: City of New York.

Cook, Philip J., and Jens Ludwig. 1996. *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*. Washington, DC: The Police Foundation.

Cook, Philip J., Jens Ludwig, and Anthony A. Braga. "Criminal Records of Homicide Offenders." *Journal of the American Medical Association,* no. 294 (2005): 598–601.

Cook, Philip J., Stephanie Molliconi, and Thomas B. Cole. 1995. "Regulating Gun Markets." *Journal of Criminal Law and Criminology,* no. 86: 59–92.

Federal Bureau of Investigation. 2012b. National Instant Criminal Background Check System (NICS) Operation 2011. Washington, DC: Federal Bureau of Investigation.

Harlow, Caroline Wolf. 2001. Firearm Use by Offenders. Washington, DC: Bureau of Justice Statistics.

Hepburn, Lisa M., et al. 2007. "The U.S. Gun Stock: Results from the 2004 National Firearms Survey." *Injury Prevention,* no. 13: 15–19.

Manson, D., and D.K. Gilliard. 1997. Presale Handgun Checks, 1996: A National Estimate. Washington, DC: Bureau of Justice Statistics.

Matthews, Jim. 2009. "In Defense of the Neighborhood Gun Show." *Shooting Sports Retailer*, January, 58–62.

Pierce, Glenn L., et al. 2012. New Approaches to Understanding and Regulating Primary and Secondary Illegal Firearms. Washington, DC: National Institute of Justice.

Scalia, John. 2000. *Federal Firearm Offenders, 1992–98.* Washington, DC: Bureau of Justice Statistics.

Title 18, *U.S. Code*, Part 1, Chapter 44, Section 921(a)(21)(C).

Title 18, *U.S. Code*, Part 1, Chapter 44, Section 922(d).

Vittes, Katherine A., Jon S. Vernick, and Daniel W. Webster. 2012. "Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership [Published Online Ahead of Print June 23, 2012]." *Injury Prevention.* DOI: 10.1136/injuryprev-2011-040290.

Webster, Daniel W., et al. 2002. "How Delinquent Youths Acquire Guns: Initial versus Most Recent Gun Acquisitions." *Journal of Urban Health,* no. 79: 60–69.

Webster, Daniel W., Jon S. Vernick, and Maria T. Bulzacchelli. 2009. "Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking." *Journal of Urban Health,* no. 86: 525–537.

Wintemute, Garen J. 2007. "Gun Shows across a Multistate American Gun Market: Observational Evidence of the Effects of Regulatory Policies." *Injury Prevention,* no. 13: 150–156.

Wintemute, Garen J. 2009b. *Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching.* Sacramento, CA: Violence Prevention Research Program.

Wintemute, Garen J., et al. 2004. "The Life Cycle of Crime Guns: A Description Based on Guns Recovered from Young People in California." *Annals of Emergency Medicine,* no. 43: 733–742.

Wintemute, Garen J., et al. 2001. "Subsequent Criminal Activity among Violent Misdemeanants Who Seek to Purchase Handguns: Risk Factors and Effectiveness of Denying Handgun Purchase." *Journal of the American Medical Association,* no. 285: 1019–1026.

Wright, James D., and Peter H. Rossi. 1986. *Armed and Considered Dangerous: A Survey of Felons and Their Firearms.* New York, NY: Aldine de Gruyter.

Wright, Mona A., and Garen J. Wintemute. 2010. "Felonious or Violent Criminal Activity That Prohibits Gun Ownership among Prior Purchasers of Handguns: Incidence and Risk Factors." *Journal of Trauma,* no. 69: 948–955.

Wright, Mona A., Garen J. Wintemute, and Frederick A. Rivara. 1999. "Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence." *American Journal of Public Health,* no. 89: 88–90.

*This page intentionally left  lank*

**8**

# Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws

Daniel W. Webster, Jon S. Vernick, Emma E. McGinty, and Ted Alcorn

## Weaknesses in Federal Gun Laws Which Enable Criminals to Get Guns

Preventing individuals who are deemed too risky or dangerous from obtaining firearms is arguably the most important objective of gun control policies. Many perpetrators of gun violence are prohibited by federal law from purchasing firearms from a licensed dealer due to prior felony convictions or young age. Other contributions to this book provide compelling evidence that existing conditions for disqualifying someone from legally possessing firearms are justifiable and should be expanded (Vittes, Webster, and Vernick, in this volume). Wintemute (chap. 7 in this volume) and Zeoli and Frattaroli

Daniel W. Webster, ScD, MPH, is a professor in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Jon S. Vernick, JD, MPH, is an associate professor and associate chair in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Emma E. McGinty, MS, is a research assistant and fourth-year PhD candidate in Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Ted Alcorn, MA, MHS, is a senior policy analyst in the Office of the Mayor of New York City.

(in this volume) provide evidence that laws which prohibit firearm possession by persons convicted of violent misdemeanors and those who are subject to restraining orders for domestic violence can reduce violence.

Some prohibited persons will voluntarily refrain from having a firearm in order to avoid criminal sanctions. But policies that enhance firearm seller and purchaser accountability are likely to determine how effectively gun control laws prevent prohibited individuals from acquiring guns. The federal Brady Law serves as a foundation, albeit incomplete, for preventing prohibited persons from acquiring firearms by making firearm purchases from federally licensed firearm dealers contingent upon the prospective purchaser passing a background check (Cook and Ludwig, in this volume). Licensed dealers must check purchasers' IDs, submit purchase applications to the FBI's National Instant Check System (NICS), and maintain records of all firearms acquisitions and sales so that ATF auditors can assess the dealers' compliance with gun sales laws.

Data on guns recovered by police and traced by the U.S. Bureau of Alcohol, Tobacco and Firearms (ATF) have indicated that about 85% of criminal possessors were not the retail purchaser (Bureau of Alcohol, Tobacco and Firearms 2002). This is consistent with our analysis of data from the most recent (2004) Survey of Inmates in State Correctional Facilities (SISCF) to determine the source for the handguns acquired by the 1,402 inmates incarcerated for an offense committed with a handgun. The largest proportions of offenders got their handguns from friends or family members (39.5%) or from street or black market suppliers (37.5%), sales for which there are no federal background check requirements. Licensed gun dealers were the direct source for 11.4% of the gun offenders. One in 10 offenders in our sample reported that they had stolen the handgun that they used in their most recent crime. Handgun acquisitions by offenders at gun shows and flea markets were rare (1.7 %).

It is easy to understand why offenders would prefer private sellers over licensed firearms dealers. Under federal law and laws in most states, firearm purchases from unlicensed private sellers require no background check or record keeping. The lack of record keeping requirements helps to shield an offender from law enforcement scrutiny if the gun were used in a crime and recovered by police. Indeed, of the offenders in the SISCF who were not prohibited from possessing a handgun prior to the crime leading to their incarceration, two-thirds had obtained their handguns in a transaction with a private seller.

That only 11% of handgun offenders reported acquiring their handguns from a licensed gun dealer does not mean that licensed dealers play a negligible role in the diversion of guns to criminals. Federal gun trafficking investigations indicate that corrupt licensed dealers represent one of the largest channels for the illegal gun market (Bureau of Alcohol, Tobacco and Firearms 2000), and a national phone survey of gun dealers found a willingness to make gun sales likely to be illegal relatively common (Sorenson and Vittes 2003). As articulated by Vernick and Webster (in this volume) and Braga and Gagliardi (in this volume), current federal laws provide many protections to licensed firearm sellers, and the Bureau of Alcohol, Tobacco, Firearms and Explosives lacks the resources and political power to serve as a robust deterrent to illegal gun sales.

## Prior Evidence That Better Regulation of Gun Sellers Reduces Diversions of Guns to Criminals

Weaknesses in federal gun sales laws may cause skepticism about whether gun control can work in the United States. However, states vary greatly in the nature of their gun sales laws. For example, many states extend conditions for firearm prohibitions beyond those covered in federal law to include additional high-risk groups and place additional regulations on firearm sales to prevent illegal transfers. Twelve states require retail firearm sellers to be licensed by state or local governments and allow law enforcement to conduct audit inspections of gun dealers (Vernick, Webster, and Bulzachelli 2006). Fifteen states extend firearms sales regulations to sales by private, unlicensed sellers, and two additional states require background checks for firearms sold at gun shows. Nine states have some form of licensing system for handgun purchasers, five require applicants to apply directly with a law enforcement agency and be photographed and fingerprinted, and three allow agencies to use their discretion to deny an application if they deem it to be in the interest of public safety. Additional laws enacted by states to keep guns from prohibited persons include mandatory reporting of loss or theft of private firearms, limiting handgun sales to one per person per month, and banning the sale of low-quality "junk guns" that are overrepresented in crime (Wintemute 1994; Wright, Wintemute, and Webster 2010).

A study which used crime gun trace data from 53 U.S. cities for the years 2000–2002 examined the association between state gun sales regulations and

the diversion of guns to criminals (Webster, Vernick, and Bulzacchelli 2009). Diversion of guns to criminals was measured by the number of guns recovered by police within one year of retail sale unless the criminal possessor was the legal retail purchaser. In addition to examining state laws, this study also surveyed state and local law enforcement officials to ascertain their policies for conducting compliance inspections or undercover stings of licensed dealers. Strong regulation and oversight of licensed gun dealers—defined as having a state law that required state or local licensing of retail firearm sellers, mandatory record keeping by those sellers, law enforcement access to records for inspection, regular inspections of gun dealers, and mandated reporting of theft of loss of firearms—was associated with 64% less diversion of guns to criminals by in-state gun dealers. Regulation of private handgun sales and discretionary permit-to-purchase (PTP) licensing were each independently associated with lower levels of diversion of guns sold by in-state dealers. The finding on private sales regulations is consistent with the results of a systematic observational study of gun sales at gun shows that found anonymous undocumented firearms sales to be ubiquitous and illegal "straw man" sales more than six times as common in states that do not regulate private sales compared with California that does regulate such sales (Wintemute 2007; Wintemute, chap. 7 in this volume).

### Diversions of Guns to Criminals Following Missouri's Repeal of Permit to Purchase Licensing

The associations between state gun sales laws and diversions of guns to criminals cited above are cross-sectional and therefore do not capture changes in gun diversions following changes in state gun sales laws. The strong association between at least some forms of PTP licensing and lower rates of gun diversions to criminals could potentially be confounded by some variable omitted from the analyses that distinguishes states that enact the most comprehensive firearm sales regulations from those that do not. There have been few noteworthy changes in gun sales laws during a period when crime gun tracing practices were more common and the data were available to track changes over time. An exception is the repeal of Missouri's PTP law effective August 28, 2007. This law had required handgun purchasers to apply for a PTP through their local county sheriff's office and required a PTP for all handgun sales, whether by licensed or unlicensed sellers. Following the repeal, handgun

*Preventing the Diversion of Guns to Criminals through Firearm Sales Laws*   113

purchasers could purchase handguns without a background check or record keeping if the seller was not a licensed dealer, and licensed gun dealers rather than sheriff's deputies processed applications to purchase handguns.

Using annual state-level data on crime guns recovered by police in Missouri and traced by the ATF for the period 2002–2011, we examined changes in commonly used indicators of illegal gun diversion—the number and proportion of guns with short sale-to-crime intervals—before and after the state repealed its PTP law. If Missouri's PTP law had been curtailing the diversion of guns to criminals, the repeal of the law should result in more short sale-to-crime guns recovered by police, and the shift in increasing crime guns should coincide with the length of time between the repeal of the law and a crime gun's recovery by police.

Such a pattern is clearly evident in the data presented in Table 8.1. The percentage of traced crime with a sale-to-crime interval of less than three months begins to increase from a pre-repeal stable mean of 2.8% to 5.0% in 2007 when the repeal was in effect for four months, and then jumps up to a mean of 8.5% for 2008 through 2011. The percentage of crime guns with sale-to-crime intervals of three to twelve months increased sharply beginning in 2008 from a pre-repeal mean of 6.2% to 14.0% for 2008–2011 when all such guns were purchased after the law's repeal. If the PTP repeal increased the diversion of guns to criminals, the percentage of crime guns recovered at a

*Table 8.1*  Percentage of Missouri Crime Guns with Short Time Intervals between Retail Sale and Recovery by Police for Years 2002–2011

| Year | Up to 3 months (%) | 3–12 months (%) | 1–2 years (%) |
|---|---|---|---|
| 2002 | 2.9 | 5.2 | 5.2 |
| 2003 | 3.2 | 5.3 | 6.1 |
| 2004 | 2.1 | 5.6 | 5.7 |
| 2005 | 3.3 | 5.1 | 6.6 |
| 2006 | 3.2 | 7.5 | 7.2 |
| 2007 | 4.5 | 7.9 | 7.1 |
| 2008 | 9.4 | 12.6 | 6.7 |
| 2009 | 8.1 | 15.0 | 12.7 |
| 2010 | 7.6 | 13.7 | 13.0 |
| 2011 | 8.5 | 14.3 | 12.7 |

one to two years sale-to-crime interval should increase beginning in 2009. Indeed, that is what happened. These guns increased sharply from a mean of 6.4% to 13.0%. The sharp increase in very short sale-to-crime intervals for guns in Missouri was not part of a national trend; in fact, the average sale-to-crime interval increased nationally from 10.2 years in 2006 to 11.2 years in 2011.

Because states with stronger gun sales laws tend to attract guns originating in states with weaker gun laws (Cook and Braga 2001; Webster, Vernick, and Hepburn 2001), we also compared trends in the proportion of Missouri's crime guns that were initially purchased in Missouri versus those that had been purchased outside of the state. Consistent with our hypotheses that Missouri's PTP had been preventing guns from being diverted to criminals, the share of crime guns originating from Missouri increased from a mean of 55.6% when the PTP law was in place to 70.8% by 2011, while the proportion that had originated from out of state gun dealers decreased from 44.4% before the repeal, began dropping in 2008, and was 29.2% in 2011. This is a remarkable change for an indicator that tends to change very little over time.

## Effects of State Gun Sales Laws on the Export of Guns to Criminals across State Borders

In 2009, 30% of crime guns traced by the ATF were recovered in states other than the state where they were originally sold; however, there is great variation across states with respect to the proportion of crime guns which were originally sold by gun dealers in other states. Mayors Against Illegal Guns (2010) published a report showing great disparities across states in the number of crime guns exported per capita. Bivariate analyses indicated that each of ten selected gun control laws were associated with exporting fewer guns per capita that were used by criminals in other states. In a National Bureau of Economic Research (NBER) working paper, Knight used an index of eleven laws developed by MAIG to examine the flow of guns to and from states with strong versus weak gun laws and found that states with weak gun laws tended to export guns to states with strong gun laws (Knight 2011).

The present study adds to this literature by using crime gun trace data from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to examine the cross-sectional association between state gun laws and the per capita rate of exporting crime guns across the 48 contiguous U.S. states. The following state gun sales laws were considered: strong regulations of retail

gun dealers[1]; permit-to-purchase (PTP) licensing; private sales regulations (mandatory background checks of sellers or valid PTP); handgun registration; mandatory reporting to law enforcement of theft and loss of firearms by private owners; whether the state has criminal penalties for dealers who fail to conduct background checks or has penalties for illegal straw purchasers; one-gun-per-month restrictions; assault weapon bans; and junk gun bans. Three variations of PTP laws were examined: (1) discretionary PTP laws which give law enforcement the discretion to refuse to issue permits; (2) PTP with fingerprinting which requires applicants to appear at the law enforcement agency that issues the permits to be photographed and fingerprinted; and (3) nondiscretionary PTP laws which require a permit to purchase a firearm but do not require applicants to go to agencies to be fingerprinted.

We used negative binomial regression models with robust standard errors to estimate the association between state gun laws and the per capita rate of crime guns exported to criminals in other states after controlling for potential confounders. Key confounders controlled for in the analyses were the prevalence of gun ownership, out-of-state population migration, and the number of people living near the border of states with strong gun laws. State population served as an offset variable so that transformed regression coefficients could be interpreted as incident rate ratios (IRR) and percentage reductions in risk.

Data on crime gun exports were obtained from the 2009 state-level crime gun trace data posted on the ATF's website. ATF defines crime guns as recovered firearms that were "illegally possessed, used in a crime, or suspected to have been used in a crime." In 2009, 61% of the guns that police submitted to ATF were successfully traced to the first retail sale.

Data on state gun laws were obtained through legal research and from ATF and U.S. Department of Justice Publications. Oak Ridge National Laboratory's LandScan global population distribution data was used with arcGIS Version 10 to calculate state border population variables used as control variables in statistical models. These control variables included population within 50 miles of a bordering states with the strongest gun control laws[2] and states with medium level of gun control.[3] Household prevalence of firearm ownership was obtained from the Behavioral Risk Factor Surveillance System 2001 survey (Centers for Disease Control and Prevention 2001), and measures of state migration[4] were obtained from the American Community Survey (ACS) 2005–2009 five-year estimates. Finally, we measured two variables indicating that a state borders Canada or Mexico, respectively.

States that exported the most crime guns per 100,000 population were Mississippi (50.4), West Virginia (47.6), Kentucky (35.0), and Alabama (33.4). Of these four states, three (Mississippi, West Virginia, and Kentucky) had none of the state gun laws we examined. Alabama penalized gun dealers who failed to conduct background checks but had no other laws of interest in place. States that exported the fewest crime guns per capita—New York (2.7), New Jersey (2.8), Massachusetts (3.7), and California (5.4)—each had strong gun dealer oversight, regulated private sales, and handgun registries. New York, New Jersey, and Massachusetts also had discretionary PTP and required reporting of firearm theft/loss.

Data from the regression analysis are presented in Table 8.2. Due to high collinearity (Variance Inflation Factor > 10), assault weapons bans and handgun registration laws were dropped from the final models. Statistically significant lower per capita export of crime guns across state borders was found for

*Table 8.2*   Estimates of association between state gun laws and crime gun exports

|  | IRR | Robust SE | *p* value |
|---|---|---|---|
| State gun laws |  |  |  |
|   Discretionary purchase permits | 0.24 | 0.10 | .001 |
|   Purchase permits with fingerprinting | 0.55 | 0.15 | .02 |
|   Nondiscretionary permits | 0.75 | 0.15 | .15 |
|   Strong dealer regulation[a] | 1.45 | 0.30 | .07 |
|   Penalty for failure to conduct background checks | 0.76 | 0.12 | .07 |
|   Penalty for straw purchasers | 1.46 | 0.30 | .07 |
|   Junk guns banned | 0.68 | 0.13 | .04 |
|   Private sales regulated | 0.71 | 0.11 | .03 |
|   Firearm theft/loss reported | 0.70 | 0.10 | .02 |
|   One gun per month | 0.81 | 0.26 | .51 |
| Covariates |  |  |  |
|   Household gun ownership | 6.05 | 4.20 | .009 |
|   Border population in states with strong gun laws[b] | 1.00 | 1.82E-08 | .50 |
|   Border population in states with medium gun laws[c] | 1.00 | 2.57E-08 | .14 |
|   Migration out of state | 0.99 | 5.04E-07 | .50 |
|   Borders Canada | 0.68 | 0.065 | <.001 |
|   Borders Mexico | 0.84 | 0.19 | .43 |

*Note:* IRR = incidence rate ratio. Model also includes state population offset term.

[a]States were considered to have strong dealer regulation if they require licensing of gun dealers, allow inspection of dealer records, and penalize dealers who falsify records.

[b]States were considered to have strong gun laws if they have a discretionary permit-to-purchase law.

[c]States were considered to have medium gun laws if they regulate private sales, require licensing of gun dealers, and allow inspections of dealer records.

discretionary PTP laws (IRR = 0.24, lowered risk 76%), nondiscretionary PTP laws requiring fingerprinting at a law enforcement agency (IRR = 0.55, −45%), junk gun bans (IRR = 0.68, −32%), regulation of private sales (IRR = 0.71, −29%), and required reporting of firearm theft or loss by private gun owners (IRR = 0.70, −30%) were each associated with statistically significantly lower rates of crime gun exports. Effects for penalties for gun dealers' failure to conduct background checks (IRR = 0.76) and penalties for straw purchases (IRR = 1.24) approached statistical significance at the .05 level but in opposite directions. Although billed as a deterrent to interstate gun trafficking, one-gun-per-month restrictions were unrelated to trafficking and neither were strong dealer regulations, penalties for failure to conduct background checks, or penalties for straw purchasing. Household gun ownership (IRR = 6.05) was associated with higher crime gun export rates and bordering Canada was associated with lower crime gun exports (IRR = 0.84). States bordering other states where gun laws are relatively strict was unrelated to the rate of exporting crime guns after controlling for gun sales laws and other factors.

## Conclusions and Policy Implications

Data presented here provide compelling evidence that the repeal of Missouri's permit-to-purchase (PTP) law increased the diversion of guns to criminals. The timing of the effects on our indicator of diversion, short intervals between sales, and recovery in crime was in exact correspondence with the timing of the law's repeal. The changes observed in gun diversions in Missouri are likely related to the substantial change in how guns were sold following the law's repeal. Prospective purchasers of handguns being sold by private individuals no longer had to pass a background check and sellers were no longer required to document the sale. Prospective purchasers, including illegal straw purchasers, interested in buying handguns from licensed dealers applied to purchase the gun at the place that profited from the sale rather than at a law enforcement agency. Repealing the PTP law made it less risky for criminals, straw purchasers, and persons willing to sell guns to criminals and to their intermediaries, and these individuals appear to have taken advantage of the opportunities afforded to them by the repeal.

In our study of state gun sales laws in the 48 contiguous states, discretionary PTP laws were the most dramatic deterrent to interstate gun trafficking. This finding is consistent with prior research showing a negative association

between these laws and intrastate diversion of guns to criminals; however, the effects were either mediated by or explained by lower levels of gun ownership in states with these laws (Webster, Vernick, and Bulzachelli 2009). Discretionary permitting procedures such as in-depth and direct scrutiny by law enforcement, longer waiting times, higher fees, and stricter standards for legal ownership may depress gun ownership and reduce opportunities for criminals to find individuals who have guns that they would be willing to sell or who would be targets for gun theft. The strong negative association between nondiscretionary PTP laws and exporting guns to criminals in other states after statistically controlling for gun ownership levels, geography, and other gun laws suggests that PTP laws deter gun trafficking.

Perhaps most relevant to current debates about federal gun policy, we found that states which regulated all handgun sales by requiring background checks and record keeping, not just those made by licensed dealers, diverted significantly fewer guns to criminals in other states. This finding is consistent with the results of a prior study of intrastate diversions of guns to criminals (Webster, Vernick, and Bulzachelli 2009) and the findings of an observational study of sales practices gun shows (Wintemute 2007; chap. 7 in this volume). The importance of fixing this flaw in current gun law is highlighted by data first reported here which indicate that nearly 80% of handgun offenders incarcerated in state prisons reported purchasing or trading for their handgun from an unlicensed seller who, in most states, was not legally obligated to ensure that the purchaser passed a background check or to keep a record of the transaction.

Our examination of state firearms regulations and the interstate diversion of guns to criminals considered a larger array of laws than prior studies. Laws requiring private gun owners to promptly report theft or loss of firearms to police are intended to increase private gun seller accountability and provide law enforcement with a tool to combat illegal straw purchases when such purchasers accept no responsibility for the gun being in the hands of a prohibited person with dubious claims of unreported gun theft. Having this measure of accountability significantly reduced interstate gun trafficking, as did bans of junk guns. Junk guns are the least expensive guns, and their low price enables traffickers to invest relatively little money in guns that can sell for nearly five times more than retail prices on the streets in states with the most restrictive gun laws. Prior research on the effects of Maryland's ban of junk guns found the banned guns used much less in Baltimore, Maryland, than in cities with-

out such bans, seven years after Maryland's law was enacted (Vernick, Webster, and Hepburn 1999), and gun homicides were 9% lower than projected had the law not been enacted (Webster, Vernick, and Hepburn 2002).

Interestingly, a policy designed specifically to deter interstate gun trafficking—one-gun-per-month limits for gun buyers—was not associated with the export of guns to criminals in other states. Strong gun dealer regulations were also unrelated to exporting of crime guns across state lines. A prior study of intrastate trafficking found that strong dealer regulations by themselves were not effective unless law enforcement reported that they had a policy of regular compliance inspections. Unfortunately, we had no measure of enforcement for the current study.

Our assessment of the effects of state gun control laws on the export of guns to criminals in other states had several limitations. First, the cross-sectional study design precludes an assessment of whether changes in gun control laws prompt subsequent changes in crime gun exports. Longitudinal crime gun trace data could not be obtained, as many of the state laws of interest were in place before crime gun tracing become common practice. The sharp increase in diversions of guns to criminals following the repeal of Missouri's law, however, lessens this concern. Second, our outcome data does not include all crime gun exports. Not all crime guns are submitted to the ATF for tracing. In 2009, gun traces could not be completed for nearly 40% of crime guns due to insufficient or incorrect data. Third, although reducing the diversion of guns to criminals is a key objective of some gun control laws, there is currently insufficient research to discern the degree to which reductions in diverted guns affects gun violence, and it appears as though some have had no impact.

In spite of these limitations, our study is the first to estimate independent associations between a number of state gun control laws and crime gun export rates while controlling for confounders, and it is the first longitudinal assessment of the impact of permit-to-purchase licensing that regulates all handgun sales. Our findings on cross-state diversions of crime guns underscores the importance of having more comprehensive federal regulation of firearm sales because lax laws in many states facilitate the arming of criminals beyond state borders. At a minimum, federal law should require background checks and record keeping for all firearms sales. Regulating many private sellers is a challenge, yet the data suggest that it is necessary to deter the diversion of guns to criminals, and requiring gun owners to report theft or loss of firearms provides additional accountability to prevent illegal sales.

## Acknowledgments

Funding for this research was provided by grants from the Joyce Foundation and Bloomberg Philanthropies.

## Notes

   1. Licensing of gun dealers, inspection of dealer records allowed, and criminal penalties for dealers who falsified records.
   2. PTP laws or in the District of Columbia with what could be considered a ban on firearm ownership until 2008.
   3. Regulate private sales, require licensing of gun dealers, and allow inspections of dealer records.
   4. The number of people who moved out of each state between 2005 and 2009.

## References

Bureau of Alcohol, Tobacco and Firearms (ATF). 2000. *Following the Gun*. Washington, DC: U.S. Department of the Treasury.

Bureau of Alcohol, Tobacco and Firearms (ATF). 2002. *Crime Gun Trace Reports (2000): The Youth Crime Gun Interdiction Initiative.* Washington, DC: U.S. Department of the Treasury.

Bureau of Justice Statistics. 2004. *Survey of Inmates in State Correctional Facilities (SISCF)*. Washington, DC: U.S. Department of Justice.

Centers for Disease Control and Prevention (CDC). 2001. *Behavioral Risk Factor Surveillance System Survey Data.* Atlanta, GA: U.S. Department of Health and Human Services.

Cook, Philip J., and Anthony A. Braga. 2001. "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets." *Arizona Law Review* 43 (2): 277–309.

Cook, Philip J., Jens Ludwig, and Anthony A. Braga. 2005. "Criminal Records of Homicide Offenders." *Journal of the American Medical Association* 294: 598–601.

Environmental Systems Research Institute (ESRI). 2011. ArcGIS Desktop: Release 10. Redlands, CA.

Knight, Brian G. 2011. "State Gun Policy and Cross-State Externalities: Evidence from Crime Gun Tracing." National Bureau of Economic Research Working Paper no. 17469. Cambridge, MA.

Mayors Against Illegal Guns. 2010. *Trace the Guns: The Link Between Gun Laws and Interstate Gun Trafficking*. http://www.mayorsagainstillegalguns.org/downloads/pdf/trace_the_guns_report.pdf.

Sorenson, Susan B., and Katherine A. Vittes. 2003. "Buying a Handgun for Someone Else: Firearm Dealer Willingness to Sell." *Injury Prevention* 9:147–150. doi:10.1136/ip.9.2.147.

Vernick, Jon S., Daniel W. Webster, and Maria T. Bulzacchelli. 2006. "Regulating Firearms Dealers in the United States: An Analysis of State Law and Opportunities for Improvement." *Journal of Law, Medicine & Ethics* 34: 765–775.

Vernick, Jon S., Daniel W. Webster, and Lisa M. Hepburn. 1999. "Effects of Maryland's Law Banning Saturday Night Special Handguns on Crime Guns." *Injury Prevention* 5: 259–263.

Vittes, Katherine A., Jon S. Vernick, and Daniel W. Webster. 2012. "Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership." *Injury Prevention.* Published Online First: 23 June. doi:10.1136/injuryprev-2011-040290.

Webster, Daniel W., Jon S. Vernick, and Maria T. Bulzacchelli. 2009. "Effects of State-Level Firearm Seller Accountability Policies on Firearms Trafficking." *Journal of Urban Health* 86: 525–537.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn. 2001. "The Relationship between Licensing, Registration and Other State Gun Sales Laws and the Source State of Crime Guns." *Injury Prevention* 7: 184–189.

Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn. 2002. "Effects of Maryland's Law Banning Saturday Night Special Handguns on Homicides." *American Journal of Epidemiology* 155: 406–412.

Wintemute, Garen J. 1994. *Ring of Fire: The Handgun Makers of Southern California*. Sacramento, CA: Violence Prevention Research Program.

Wintemute, Garen J. 2007. "Guns Shows across a Multistate American Gun Market: Observational Evidence of the Effects of Regulatory Policies." *Injury Prevention* 13: 150–155. Erratum in: *Injury Prevention* 13: 286.

Wright, Mona A., Garen J. Wintemute, and Daniel W. Webster. 2010. "Factors Affecting a Recently Purchased Handgun's Risk for Use in Crime under Circumstances That Suggest Gun Trafficking." *Journal of Urban Health* 87: 352–364.

*This page intentionally left lank*

**9**

# Spurring Responsible Firearms Sales Practices through Litigation

The Impact of New York City's Lawsuits against
Gun Dealers on Interstate Gun Trafficking

Daniel W. Webster and Jon S. Vernick

Surveys of criminals indicate that "street or illegal sources," family, and friends are the most common proximate sources for criminals to obtain guns (Webster et al., in this volume; Harlow 2004). However, there are little data on how guns are initially diverted into the illegal market and into the hands of direct suppliers for criminals. Data from gun trafficking investigations indicate that licensed gun dealers play an important role in the diversion of guns from the legal to the illegal market. Gun dealers facilitate blatantly illegal sales by straw purchasers (individuals who buy guns on behalf of prohibited purchasers), or sell guns to traffickers or directly to criminals (Bureau of Alcohol, Tobacco and Firearms 2000). Phone surveys of licensed gun dealers, in which callers asked whether the dealer would sell them a handgun intended for their boyfriend, found between 20% and 50% were willing to make what would have been an illegal sale (Sorenson & Vittes 2003; Wintemute 2010).

Daniel W. Webster, ScD, MPH, is a professor in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Jon S. Vernick, JD, MPH, is an associate professor and associate chair in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health.

Research has shown that gun dealers' sales practices can have a powerful effect on the illicit market. Although some licensed gun dealers rarely sell guns that are subsequently recovered from criminals, others have been identified as the origin of hundreds of crime guns in a given year (Americans for Gun Safety 2004; Wintemute, Cook, & Wright 2005). In Milwaukee, for example, a single gun dealer was linked to the majority of the city's crime guns which were recovered within a year of the first retail sale (Webster, Vernick, & Bulzachelli 2006). In response to negative publicity about the gun shop's frequent connection to guns used in crime, that gun dealer voluntarily changed his shop's sales practices—including eliminating the sale of so-called "junk guns." This change was followed by an immediate 76% reduction in the flow of new guns from that gun shop to criminals in Milwaukee, and a 44% reduction in new crime guns citywide (Webster, Vernick, & Bulzacchelli 2006).

A recent study found that comprehensive state or local regulation of licensed gun dealers (e.g., state or local licensing, record-keeping requirements, mandating or allowing inspections) coupled with routine law enforcement compliance efforts was associated with less intrastate trafficking of guns (Webster, Vernick, & Bulzacchelli 2009). Litigation is another policy tool that has been used to deter gun sales practices which could enable criminals to obtain guns (Vernick, Rutkow, & Salmon 2007). Beginning in the late 1990s, several local governments began to sue gun manufacturers, wholesalers, and retail gun shops for engaging in sales practices that, according to the plaintiffs, facilitated the diversion of guns from the legal to the illegal gun market. In support of their claims that retail gun dealers were engaging in negligent sales practices which enabled criminals to obtain guns, the plaintiffs presented data from the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) which indicated that a relatively small number of gun dealers had long histories of selling a large number of guns that police later recovered from criminals. Some cities, including Chicago and Detroit, initiated a series of undercover stings of gun shops in their area which were linked to the most crime guns. These stings involved undercover police officers posing as gang members and blatantly attempting to illegally purchase firearms using straw purchasers. The videotapes of these stings were presented as evidence in the lawsuits and, in the case of Chicago, were also used in criminal cases against individuals who broke state gun sales laws. A study which tracked illegal gun trafficking indicators over time found that the Chicago and

Detroit lawsuits were associated with significant reductions in the flow of new handguns to criminals. Guns recovered by police within a year of retail sale by an in-state gun dealer dropped 62% in Chicago and 36% in Detroit. There were no significant changes in gun trafficking indicators in three comparable Midwestern cities that had not sued local gun dealers (Webster et al. 2006).

As discussed in the essay by Jon Vernick et al. (in this volume), in 2005 a new federal law was enacted which made it much more difficult for individuals or municipalities to bring lawsuits against firearm makers and sellers. Under the Protection of Lawful Commerce in Arms Act (PLCAA), lawsuits against firearm manufactures or dealers "resulting from the criminal or unlawful misuse" of a firearm "by the person or a third party" may not be brought in state or federal court (15 U.S.C. §7903(A)(5) (2010)). Thus, if a city were to sue a gun dealer alleging harm caused by the criminal (i.e., "third party") use of firearms in that city, the lawsuit would be dismissed unless one of the limited exceptions to the PLCAA applied. Even lawsuits pending at the time the PLCAA was enacted were to be "immediately dismissed." As a result, nearly all lawsuits brought by cities against gun dealers and manufacturers were dismissed (Vernick, Rutkow, & Salmon 2007).

One exception to the PLCAA's protection of the firearm industry involves lawsuits where the plaintiff can show that harm was caused by a firearm dealer or manufacturer who "knowingly violated a State or Federal statute applicable to the sale or marketing of the product . . ." (15 U.S.C. §7903(a)(5) (2010)). Under this exception, if the damages alleged in the lawsuit are associated with the knowing violation of a firearms sales law *by the defendant*—whether or not another criminal act, such as a homicide or assault by the gun buyer, was also involved—then the lawsuit may proceed.

This exception was used by New York City in its 2006 litigation against 27 gun dealers who were videotaped facilitating illegal straw gun purchases in undercover stings. This essay describes New York City's use of litigation to compel these gun dealers to adopt new business practices designed to prevent the diversion of guns to criminals and other prohibited persons. It also presents data from 10 of the dealers who had maintained electronic sales records showing a dramatic reduction in the number of guns sold by these dealers that were subsequently recovered by the New York Police Department (NYPD).

## New York City's Lawsuits against Selected Gun Dealers

Following shooting deaths of two NYPD officers and the fatal shooting of a young child caught in crossfire, in 2006 New York City Mayor Michael Bloomberg made fighting illegal guns a top priority of his administration. The success of the undercover stings and lawsuits in Chicago and Detroit in reducing the flow of new guns to criminals encouraged New York City officials to undertake a similar effort. The city hired private investigators to stage and secretly videotape undercover stings of 55 gun dealers located across seven states that were among the most common source states for guns recovered by police from criminals and crime scenes in New York City. The seven states were Alabama, Georgia, North Carolina, Ohio, Pennsylvania, South Carolina, and Virginia. Some of the targeted gun dealers had also sold guns to individuals prosecuted for crimes related to gun trafficking.

All of the stings were conducted in a similar manner. A male and a female investigator entered the gun stores together. The male investigator engaged sales staff with questions about different firearms and selected one or more to purchase. The female investigator, who had not been involved in the selection of the gun, would then attempt to complete the federal form for a background check of prospective firearm purchasers. The male investigator would attempt to pay for the firearm and receive it from the sales person after the instant background check was completed. Transactions of this type violate federal firearms laws; this was acknowledged by many of the gun dealers who were stung and refused to make the sale.

Of the 55 gun dealers, 27 were caught facilitating illegal sales in the undercover stings and were sued by New York City. Nearly all of the dealers came to an agreement with the city to change their business practices to prevent illegal gun sales. As part of the settlements, a special master was appointed to ensure that each gun dealer complied with all applicable firearm sales laws. Gun dealers were required to allow the special masters to use in-store observation (including use of videotape surveillance); records monitoring, including: all crime gun trace requests made by ATF since the date of the settlement; inventory inspections; random and repeated sales integrity testing; and instructional programs designed to provide best practices sales training to all employees involved in firearms sales. Gun dealers were also required to file a performance bond with the Court that was considered by the city to be satisfactory. The performance bond required the gun dealer, usually within

15 days of its signing, to forfeit a designated amount of money to New York City anytime the special master found that the dealer sold a gun to a straw purchaser or violated other applicable gun sales laws and regulations. Evidence of such a violation could have resulted from an indictment against a straw purchaser indicating circumstances under which a reasonable person would have recognized that a straw purchase was occurring, observation of a straw purchase from reviews of videotape monitors, or a sale made to an investigator conducting a simulated straw purchase. The performance bond lasted until the special master certified that three consecutive years of full compliance by the gun dealership had occurred.

### Assessing Program Effects on the Diversion of Guns to Criminals

Electronic sales data for specific guns sold (i.e., make, model, caliber, serial number, date of sale) for the period from January 1, 2003 through June 30, 2007 were made available to the special master by 10 of the gun dealers sued by New York City. The special master shared the data with the New York City Law Department which then provided it to researchers. To ascertain whether any of the guns sold by these 10 dealers were subsequently recovered by NYPD, we obtained NYPD's database for firearms it recovered from criminals, crime scenes, and other settings from January 1, 2003 through June 30, 2008. The NYPD database contained data on manufacturer/make, model, caliber, and serial number for each gun as well as the date on which it was recovered. The gun sales and police recovery databases were subsequently merged. To identify guns that were sold by the 10 gun dealers of interest and later recovered by NYPD, we looked for matches based on make, caliber, and serial number.

The primary goal of the analysis was to compare the likelihood of NYPD recovery for guns sold before and after the lawsuits were announced. Guns sold during the pre-lawsuit period had much greater opportunity for NYPD recovery than guns sold after the lawsuits due to more follow-up time for the pre-lawsuit-sold guns compared with post-lawsuit sales. Guns sold prior to the lawsuit had from 25 to 66 months (mean = 43 months) of follow-up time, whereas guns sold after the lawsuits had 13 to 25 months (mean = 18 months) of follow-up time. Researchers were only provided sales data for 13.5 months following the announcement of the lawsuits and had between 12 and 25.5 months of follow-up time for police recovery data for post-lawsuit sales.

Therefore, we constrained the follow-up time for the pre-lawsuit-sold guns to make it roughly equivalent to that of the post-lawsuit cohort of guns. Specifically, we selected all guns sold during the 13.5 months immediately prior to the lawsuits for comparison with the post-lawsuit-sold guns. We then determined which of these guns had been subsequently recovered by NYPD, and if the recovery occurred within a follow-up time period that was within the bounds of the appropriate follow-up period for guns sold during the post-lawsuit period. For example, a gun sold on May 16, 2006—the first day following the announcement of the first lawsuits—had a follow-up time of 776 days during which recovery was determined. Similarly, a 776-day window of exposure was examined for guns sold on the first day of the pre-lawsuit cohort of gun sales (April 15, 2005). In contrast, post-lawsuit sales which took place on the last day for which gun sales data were available (June 30, 2007) had a maximum follow-up period of 365 days. We, therefore, constrained the follow-up period for guns sold on the last day prior to the lawsuits' announcement (May 14, 2006) to 365 days.

To test whether the odds of NYPD recovery for guns sold after the lawsuits were announced was different from the odds of NYPD recovery for guns sold before the lawsuits, we calculated the crude odds ratio, its 95% confidence interval, and Pearson's chi-square statistic. In addition, we performed a logistic regression to estimate the relationship between the time period in which a gun was sold (before lawsuits $= 0$; after lawsuits $= 1$) after controlling for the exposure or days of follow-up and a set of indicator variables for the specific dealer that sold the gun.

For the 10 gun dealers included in the study, we identified sales records for 12,267 guns—6,081 before the lawsuits and 6,186 after the lawsuits. The mean follow-up time for post-lawsuit-sold gun sales was slightly longer than that of pre-lawsuit-sold guns (565.7 versus 542.3, $p < .001$). The number of recorded sales varied greatly across the 10 dealers from a low of 91 to a high of 2,337.

Only 5 of the 6,186 (0.008%) guns sold after the lawsuit were subsequently recovered by NYPD compared with 31 of the 6,081 (0.005%) guns sold during the period immediately before the lawsuit ($\chi^2 = 19.28$, df $= 1$, $p < .001$). The odds of a NYPD recovery was 84.2% lower during the post-lawsuit sales period than the pre-lawsuit sales period (OR $= 0.16$, 95% CI: 0.02, 0.41). The adjusted odds ratio for NYPD recovery for post-lawsuits guns versus pre-lawsuits guns estimated from the logistic regression which controlled for follow-up time and dealer-specific effects (OR $= 0.18$, 95% CI: 0.07, 0.46) was similar to the crude

odds ratio indicating the odds a gun sold following the lawsuits was recovered by NYPD relative to the odds of a gun sold before the lawsuits was recovered by NYPD.

## Discussion and Policy Implications

This study has several limitations which restrict our ability to ascertain the full effects of the lawsuits and any subsequent changes in business practices resulting from the settlement agreements. First, we only had access to police gun recovery data for New York City. Most gun dealers sued by the city were located in many states that were hundreds of miles from New York including Georgia, Alabama, South Carolina, North Carolina, Virginia and Ohio. Although illegal gun markets vary across states, it seems likely that the new policies and practices instituted by the gun dealers to reduce the illegal diversion of guns to criminals would reduce the flow of guns to criminals within their home states as well as that of other states. Access to crime gun trace data from ATF would have allowed us to examine broader effects of the lawsuits; however, congressionally imposed restrictions on access to these data make such research extremely difficult if not impossible (Webster et al. 2012).

Agreements with the special master for the settlements against the gun dealers prevented us from knowing the identity of any of the dealers being studied. Knowing which dealers were included and the dates of the settlements would have allowed us to more precisely measure pre- and post-lawsuit periods. We believe that our estimates of the association between the lawsuits and probability of gun sales leading to subsequent recovery of the gun by NYPD are somewhat conservative because we assumed that any protective effects would be realized immediately following the announcement of the lawsuits against the first 15 gun dealers sued. Among the five post-lawsuit-sold guns later recovered by NYPD, one had been sold the day after the first lawsuits were announced and another was sold 10 days after the first lawsuits. Certainly, the agreements to institute an array of business practices designed to reduce the diversion of guns to criminals had not been reached or implemented within 10 days of the first lawsuits.

With the available data, it is impossible to determine the degree to which the sharp reduction in the risk of NYPD recovery following gun sales is due to the active oversight of the gun dealers by the special masters for their settlements or to new sales policies and practices. Marketing researchers have theorized

Harlow, Caroline W. 2004. *Survey of Inmates in State Correctional Facilities (SISCF)*. Washington, DC: Bureau of Justice Statistics, United States Department of Justice.

Koper, C.S. 2006. "Federal Legislation and Gun Markets: How Much Have Recent Reforms of the Federal Firearms Licensing System Reduced Criminal Gun Suppliers?" *Criminology and Public Policy* 1: 151–178.

Mayors Against Illegal Guns. 2013. Responsible Firearms Sellers Partnership: A 10-Point Voluntary Code. http://www.mayorsagainstillegalguns.org/downloads/pdf/partnership.pdf

Sorenson, Susan B., and Katherine A. Vittes. 2003. "Buying a handgun for someone else: firearm dealer willingness to sell." *Injury Prevention* 9(2): 147–150.

Vernick, J.S., L. Rutkow, D.A. Salmon. 2007. "Availability of Litigation as a Public Health Tool for Firearm Injury Prevention: Comparison of Guns, Vaccines, and Motor Vehicles." *American Journal of Public Health* 97: 1991–1997.

Webster, D.W., J.S. Vernick, and M.T. Bulzacchelli. 2006. "Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals." *Journal of Urban Health* 83: 778–787.

Webster, D.W., J.S. Vernick, and M.T. Bulzacchelli. 2009. "Effects of State-Level Firearm Seller Accountability Policies on Firearms Trafficking." *Journal of Urban Health* 86: 525–537.

Webster, DW, Vernick JS, Bulzacchelli MT, Vittes KA. 2012. "Recent federal gun laws, gun dealer accountability and the diversion of guns to criminals in Milwaukee." *Journal of Urban Health* 89: 87–97.

Webster, D.W., A.M. Zeoli, M.T. Bulzacchelli, and J.S. Vernick. 2006. "Effects of Police Stings of Gun Dealers on the Supply of New Guns to Criminals." *Injury Prevention* 12: 225–230.

Wintemute, Garen. 2010. "Firearm retailers' willingness to participate in an illegal gun purchase." *Journal of Urban Health* 87(5): 865–78.

Wintemute, G.J., P.J. Cook, M.A. Wright. 2005. "Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearms Crimes." *Injury Prevention* 11: 357: 363.

*This page intentionally left  lank*

**10**

# Curtailing Dangerous Sales Practices by Licensed Firearm Dealers

Legal Opportunities and Obstacles

Jon S. Vernick and Daniel W. Webster

It is an enlightening truism of gun policy that, in the United States, the vast majority of guns used in crime were originally sold by federally licensed firearm dealers. The primary exceptions are the modest number of guns stolen from manufactures or dealers or illegally imported from abroad. This does not mean that most gun dealers flout the law or knowingly sell guns to criminals. But it does suggest that one potentially fruitful approach to make it harder for firearms to flow from the legal to the illegal market is through enhanced regulation and oversight of firearm dealers.

There are approximately 55,000 federally licensed gun dealers in the United States (ATF 2013). Yet data from a 2000 analysis indicate that just over 1% of these dealers sold more than half (57%) of the guns later traced to crime (BATF 2000a). This disproportionate supply of crime guns is not explained solely by the dealers' sales volume, local crime rates, or buyer demographics

Jon S. Vernick, JD, MPH, is an associate professor and associate chair in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Daniel W. Webster, ScD, MPH, is a professor in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health.

(Wintemute, Cook, and Wright 2005). In addition, analyses of gun trafficking investigations have found that licensed gun dealers accounted for the largest single source of guns diverted to the illegal market (BATF 2000b; Braga et al. 2012). From a policy perspective, this concentration of crime gun suppliers among a relatively small group of licensed dealers bolsters the case for increased oversight. It suggests that focusing enforcement resources on this set of dealers has the potential for substantial payoff in reducing the diversion of guns to criminals.

Interventions more widely focused on a larger set of dealers are also needed. For example, there is evidence that a substantial proportion of gun dealers are willing to make a sale under conditions of questionable legality. In one national study, more than half (52.5%) of dealers surveyed were willing to make a "straw sale," where one person unlawfully buys a gun intended for another (Sorenson and Vittes 2003). In another study of California firearm dealers, 20% were willing to participate in a straw sale (Wintemute 2010).

This essay examines some of the law and policy opportunities for improved regulation and oversight of firearm dealers. Existing law also creates certain obstacles for law enforcement efforts. Recommendations to address these legal obstacles are provided.

## Dealer Licensing and Inspection

Under federal law, persons "engaged in the business" of selling firearms must obtain a dealer's license from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). The initial license costs $200 and is good for three years. Licensed dealers may purchase firearms directly from manufactures or distributors and may transfer a firearm to another licensed dealer, even across state lines, without a background check.

Seventeen U.S. states and the District of Columbia also require a state-level firearm dealer's license. Criteria for obtaining the license vary widely. Some states impose conditions such as minimum age, criminal history standards, and fingerprinting. Others simply mandate the completion of a form and payment of a licensing fee (Vernick, Webster, et al. 2006).

Regular inspection of licensed gun dealers can serve to identify those who fail to account for their inventory, violate record keeping rules, or otherwise disobey the law. Frequent or serious violations can result in revocation of a

dealer's license. Even if no violation is found, regular inspection sends the message that law enforcement takes its dealer oversight mission seriously and that dealers are at greater risk if they break the law.

At the federal level, dealer oversight and inspection are the responsibility of ATF. Under the federal Firearm Owners' Protection Act (FOPA) of 1986, however, ATF is limited to one routine inspection of licensed gun dealers per year (18 U.S.C. 923(g)(1)(B)(ii)(I)). Resources for dealer oversight are also modest. As a result, most dealers are inspected much less frequently (Office of the Inspector General 2004). In 2007, ATF reported that it inspected each dealer on average only once every 17 years, though this figure may have improved more recently (Mayors Against Illegal Guns 2008). FOPA also raised the legal standard for revocation of a dealer's license to require a "willful" violation of the law—a much higher standard than the law usually imposes (18 U.S.C. § 923 (e)).

At the state level, just two states (Massachusetts and Rhode Island) mandate regular inspections of dealers. Overall, 23 states permit but do not require such inspections (Vernick, Webster, et al. 2006).

Research clearly demonstrates that enhanced dealer oversight reduces illegal gun trafficking. Webster et al. studied guns recovered by the police in 54 U.S. cities from 2000 to 2002 to identify factors associated with intrastate gun trafficking (defined as the share of guns with an interval between retail sale and recovery by the police, from someone other than the buyer, of less than one year). The authors defined strong gun dealer regulation and oversight as requiring under state law (1) a dealer's license; (2) record keeping of firearm sales; (3) dealers' premises to be open for inspections; and (4) prompt reporting of firearm thefts from dealers. After controlling for other factors, cities in states with strong dealer regulation had a much lower measure of intrastate gun trafficking (Webster, Vernick, and Bulzacchelli 2009).

Regarding *interstate* gun trafficking, research by Mayors Against Illegal Guns has demonstrated that states neither requiring nor permitting inspections of gun dealers are much more likely to export crime guns to other states than are jurisdictions with these laws. In fact, the average exporting rate for states without dealer inspection laws is 50% greater than for states with these laws (Mayors Against Illegal Guns 2008). Other research has also demonstrated that comprehensive enforcement of gun sales laws reduced gun trafficking in Boston (Braga and Pierce 2005).

Undercover Stings and Lawsuits against Gun Dealers

In some jurisdictions, police have used crime gun trace data to identify local firearm dealers selling disproportionate numbers of guns used in crime. Law enforcement has then conducted targeted enforcement efforts.

In 1998 and 1999, law enforcement in Chicago, Detroit, and Gary, Indiana, conducted undercover stings of retail gun stores suspecting of facilitating large numbers of illegal firearm sales. Police posed as gang members looking to "settle scores" or as straw buyers. After a number of the dealers were video-taped making illegal sales, the cities each separately sued those gun dealers. The lawsuits in Chicago and Detroit received substantial press coverage. An evaluation of the stings and lawsuits in Chicago, Detroit, and Gary compared gun trafficking indicators in these cities with three comparable midwestern cities (Cincinnati, Cleveland, and St. Louis) that did not conduct stings. The researchers found a 62% reduction in trafficked guns sold by in-state retailers in Chicago ($p < 0.001$); a 36% decline in Detroit ($p = 0.051$); and a nonsignificant increase in Gary, where the intervention and publicity were less robust (Webster, Bulzacchelli, et al. 2006).

The ability for litigation to serve as an important public health tool to address scofflaw gun dealers and the supply of crime guns was diminished in 2005 with the enactment of the federal Protection of Lawful Commerce in Arms Act (PLCAA). Under the PLCAA, gun makers and dealers received substantial protection against lawsuits "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." Following the PLCAA, numerous lawsuits brought by municipalities and individuals arguing, in part, that firearm manufacturers failed to adequately supervise their dealers, were dismissed (Vernick, Rutkow, and Salmon).

One important exception to the PLCAA allows lawsuits against gun dealers to proceed if the dealer "knowingly" violated laws governing firearm sales. A series of undercover stings and lawsuits brought by New York City took advantage of this exception. In 2006, New York City identified 55 gun dealers in seven states who were supplying guns used in crime in the city. During an undercover sting operation, 27 of these dealers were caught facilitating illegal sales and were sued by the city. Nearly all agreed to settle their case by agreeing to a number of changes to their business practices to reduce illegal gun sales. These changes were overseen by a special master. Webster and Vernick studied the effects of the settlement on crime guns recovered from

10 dealers. The odds that a crime gun sold by one of these 10 dealers was later recovered in New York City were 84% lower after the change in business practices (Webster and Vernick, in this volume).

## Access to Trace Data and the Tiahrt Amendment

Firearm trace data supplied by ATF have been critical to identifying problem dealers in need of enhanced oversight. The case of a prominent gun dealer in the Milwaukee area, Badger Guns and Ammo, provides a powerful example of the potential utility of trace data. In May 1999, ATF publicly released information that Badger led the nation in the number of guns sold that were later traced to crime. Just a few days later, Badger announced that it would no longer sell small, poorly made handguns, known as "junk guns" or "Saturday Night Specials," which are favored by some criminals and disproportionately traced to crime (Vernick, Webster, and Hepburn 1999; Webster, Vernick, and Hepburn 2002). Following this change in sales practices, there was a 71% decline in the number of new Saturday Night Special crime guns recovered in Milwaukee and an overall 44% decline in the recovery of all guns with indicia of trafficking (i.e., recovery within one year from a user other than the initial buyer) (Webster et al. 2006).

However, beginning in 2003, an amendment to ATF's annual appropriation by Congress has limited the release of trace data. Named after its sponsor, Representative Todd Tiahrt (R-KS), the Tiahrt Amendment began modestly, stating: "No funds appropriated under this Act . . . shall be available to take any action based upon . . . [the Freedom of Information Act] with respect to records . . . maintained pursuant to [the Gun Control Act] . . . or provided by . . . law enforcement agencies in connection with . . . the tracing of a firearm" (Pub. L. No. 108-7 § 644 (2003)). From 2003 to 2008, the Tiahrt Amendment was slowly expanded to prohibit any release of individual trace data by ATF to the public (including researchers); use of trace data in civil litigation; requiring dealers to conduct a physical inventory of their firearms as part of a compliance inspection; and maintaining records of background checks from firearm purchase applications for more than 24 hours (Tang 2009; Mayors Against Illegal Guns 2013).

In addition to impeding research on illegal gun trafficking, there is evidence that the Tiahrt Amendment may have emboldened some gun dealers who no longer needed to fear disclosure of trace data to the public. Researchers were

able to obtain trace information directly from the Milwaukee police department (though not for comparison cities) for the period from 2003 to 2006 to study the effects of the Tiahrt Amendment on Badger Guns and Ammo. The adoption of the Tiahrt Amendment was associated with a 203% increase in the number of guns diverted to criminals within one year of retail sale by Badger (Webster et al. 2012).

### Recommendations

The law has an important opportunity to either hinder or facilitate greater oversight of licensed gun dealers. Importantly, such oversight need not interfere with law-abiding citizens' rights under the Constitution's Second Amendment (Vernick et al. 2011).

The following six recommendations are based on the research findings described in this essay.

1. *Portions of the Firearm Owners' Protection Act (FOPA) should be repealed.* These portions limit routine dealer inspections by ATF to one per year and raise the legal standard for revocation of a dealer's license. Honest firearm dealers do not need these protections and they impede identification and prosecution of the minority of dealers who violate the law.

2. *Funds should be allocated to permit ATF to conduct regular routine inspections of gun dealers.* These inspections can identify inventory or record keeping irregularities and generally send the message that gun dealers face an increased risk of being caught if they flout the law.

3. *ATF should be granted authority to impose a range of sanctions—including license suspension, fines, or other penalties—for dealers who violate gun sales or other laws.* ATF needs the authority to impose a range of administrative sanctions, short of criminal prosecution, to address problems with scofflaw dealers before they escalate.

4. *All states should mandate a state-level firearm dealer's license in addition to the federal license.* This would provide states with leverage to revoke a license if a dealer is caught making illegal sales, without needing to rely upon the often lengthy federal revocation process. All 50 U.S. states require a license for persons engaged in practices as mundane as cosmetology. Businesses with the public safety implications of dealing in firearms merit at least as much state-level oversight.

5. *The Protection of Lawful Commerce in Arms Act (PLCAA) should be repealed*. The PLCAA interferes with litigation's ability to serve as a restraint on the dangerous practices of firearm dealers and manufacturers. There is no evidence that the firearm industry needs or merits this unprecedented liability protection.

6. *The Tiahrt Amendment should be repealed*. Researchers should have access to trace data to understand how illegal gun markets respond to changes in business practices, law enforcement efforts, or new legislation. Requiring dealers to conduct a physical inventory of their firearms as part of compliance inspections can help to identify those who sell guns off-the-books or who otherwise cannot account for their stock.

## Acknowledgments

The authors wish to thank the Johns Hopkins University for supporting the development of this essay. Much of the research described, conducted by Johns Hopkins faculty, was supported by the Joyce Foundation of Chicago or by gifts from an anonymous donor.

## References

Braga, Anthony A., Pierce, Glen L. 2005. "Disrupting Illegal Firearms Markets in Boston: The Effects of Operation Ceasefire on the Supply of New Handguns to Criminals." *Criminology and Public Policy* 4:717–748.

Braga, Anthony A., Wintemute, Garen J., Pierce, Glenn L., Cook, Philip J., Ridgeway, Greg. 2012. "Interpreting the Empirical Evidence on Illegal Gun Market Dynamics." *Journal of Urban Health* 89:779–793.

Bureau of Alcohol, Tobacco, Firearms and Explosives (BATF). 2000a. *Commerce in Firearms in the United States*. Washington, DC: US Department of the Treasury.

Bureau of Alcohol, Tobacco, Firearms and Explosives (BATF). 2000b. *Following the Gun: Enforcing Federal Gun Laws against Firearms Traffickers*. Washington, DC: US Department of the Treasury.

Bureau of Alcohol, Tobacco, Firearms and Explosives. Listing of Federal Firearm Licensees. http://www.atf.gov/about/foia/ffl-list.html.

Mayors Against Illegal Guns. 2008. *The Movement of Illegal Guns in America*. New York: Mayors Against Illegal Guns, December.

Mayors Against Illegal Guns. 2013. *The Tiahrt Amendments*. http://www.mayors againstillegalguns.org/html/federal/tiahrt.shtml.

Office of the Inspector General, US Department of Justice. 2004. *Inspection of Firearm Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives.* Report Number I-2004–005 (July).

Sorenson, Susan B., and Vittes, Katherine A. 2003. "Buying a Handgun for Someone Else: Firearm Dealer Willingness to Sell." *Injury Prevention* 9:147–150.

Tang, Angela J. 2009. "Taking Aim at Tiahrt." *William and Mary Law Review* 50: 1787–1829.

Vernick, Jon S., Rutkow, Lainie, Salmon, Daniel A. 2007. "Availability of Litigation as a Public Health Tool for Firearm Injury Prevention: Comparison of Guns, Vaccines, and Motor Vehicles." *American Journal of Public Health* 97:1991–1997.

Vernick, Jon S., Rutkow, Lainie, Webster, Daniel W., Teret, Stephen P. 2011. "Changing the Constitutional Landscape for Firearms: The Supreme Court's Recent Second Amendment Decisions." *American Journal of Public Health* 101:2021–2026.

Vernick, Jon S., Webster, Daniel W., Bulzacchelli, Maria T., Mair, Julie S. 2006. "Regulation of Firearm Dealers in the United States: An Analysis of State Law and Opportunities for Improvement." *Journal of Law, Medicine & Ethics* 765–775.

Vernick, Jon S., Webster, Daniel W., Hepburn, Lisa M. 1999. "Effects of Maryland's Law Banning Saturday Night Special Handguns on Crime Guns." *Injury Prevention* 5:259–263.

Webster, Daniel W., Bulzacchelli, Maria T., Zeoli, April M., Vernick, Jon S. 2006. "Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals." *Injury Prevention* 12: 225–230.

Webster, Daniel W., Vernick, Jon S., Bulzacchelli, Maria T. 2006. "Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals." *Journal of Urban Health* 83:778–787.

Webster, Daniel W., Vernick, Jon S., Bulzacchelli, Maria T. 2009. "Effects of Firearm Seller Accountability Policies on Firearm Trafficking." *Journal of Urban Health* 86:525–537.

Webster, Daniel W., Vernick, Jon S., Bulzacchelli, Maria T., Vittes, Katherine A. 2012. "Temporal Association between Federal Gun Laws and the Diversion of Guns to Criminals in Milwaukee." *Journal of Urban Health* 89:87–97.

Webster, Daniel W., Vernick, Jon S., Hepburn, Lisa M. 2002. "Effects of Maryland's Law Banning Saturday Night Special Handguns on Homicides." *American Journal of Epidemiology* 155: 406–412.

Wintemute, Garen. 2010. "Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase." *Journal of Urban Health* 87:865–878.

Wintemute, Garen J., Cook, Phillip J., Wright, Mona A. 2005. "Risk Factors among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes." *Injury Prevention* 11:357–363.

# Part II / Making Gun Laws Enforceable

*This page intentionally left  lank*

**11**

# Enforcing Federal Laws against Firearms Traffickers

## Raising Operational Effectiveness by Lowering Enforcement Obstacles

Anthony A. Braga and Peter L. Gagliardi

Research suggests that only about one of every six firearms used in a crime was obtained legally (Reiss and Roth 1993) and that most serious gun violence is committed by a relatively small number of very active criminals (Braga 2003; Cook, Ludwig, and Braga 2005). Clearly, the United States has a large problem with the illegal acquisition of guns by high-risk individuals who should not have access to them. Criminal demand for guns is influenced by a number of factors such as fear of victimization and status concerns, technological concerns (e.g., concealment, caliber), and economic concerns (e.g., affordability) (Sheley and Wright 1995; Wright and Rossi 1994). While semi-automatic assault rifles have been misused in some high-profile tragedies, such as the horrific school shooting in Newtown, Connecticut, handguns are most frequently recovered in crime by law enforcement agencies (Cook, Braga, and Moore 2011).

Anthony A. Braga, PhD, is the Don M. Gottfredson Professor of Evidence-Based Criminology in the School of Criminal Justice at Rutgers University and a Senior Research Fellow in the Program in Criminal Justice Policy and Management at Harvard University. Peter L. Gagliardi is the Senior Vice President, Forensic Technology Inc.

One broad class of gun control policy instruments are those designed to influence who has access to different kinds of firearms (Braga, Cook, et al. 2002; Cook, Braga, and Moore 2011). In essence, these "supply-side" interventions seek to reduce gun crimes by keeping guns out of the wrong hands without denying access to legitimate owners or infringing on legitimate uses of guns. In maintaining legal firearms commerce for law-abiding citizens, there is the serious problem of preventing illegal transfers. That prevention currently is being handled very poorly. Loopholes in existing gun laws weaken accountability of licensed gun dealers and private sellers; this facilitates illegal transfers by scofflaw licensed gun dealers, generates difficulty in screening out ineligible buyers, and, most important, results in a vigorous and largely unregulated secondary market—gun sales by private individuals—in which used guns change hands (Cook, Molloconi, and Cole 1995).

Unfortunately, no rigorous field experiments have tested whether supply-side strategies would reduce criminal gun acquisition and use. While guns used in crimes are stolen from legal owners, the available scientific evidence suggests that a noteworthy portion of crime guns are illegally diverted from legal commerce. Research also suggests that supply-side interventions have promise in limiting criminal access to firearms. A key element of supply-side interventions involves the investigation, apprehension, and prosecution of illegal gun traffickers and others who illegally divert guns to criminals. Unfortunately, the investigation of illegal gun traffickers is hampered by a variety of enforcement obstacles.

In this essay, we briefly review the available research on the workings of illegal gun markets and the potential efficacy of supply-side interventions designed to disrupt the flow of illegal guns to criminals. We then make policy and legislative recommendations to improve the enforcement of federal firearms laws against gun traffickers.

## Evidence

Much of the evidence in support of supply-side interventions comes from analyses of U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) firearm trace data and firearms trafficking investigations that indicate some percentage of the guns used in crime were recently diverted from legal firearms commerce (ATF 1997, 2000, 2002; Braga, Wintemute et al. 2012; Cook and Braga 2001; Pierce et al. 2004). Firearm tracing makes it possible, at least in principle,

to determine the chain of commerce for a firearm from the point of import or manufacture to the first retail sale (and beyond, in states that maintain records of gun purchases). Unfortunately, not all firearms can be traced and firearm trace data have some widely recognized limits. The National Academies' Committee to Improve Research Information and Data on Firearms, however, suggests that the validity of conclusions drawn from firearm trace data research depends on the care taken in the application and analyses of these data (National Research Council 2005).

Among the main findings of these research studies are (1) new guns are recovered disproportionately in crime (Cook and Braga 2001; Pierce et al. 2004; Zimring 1976). (2) Some licensed firearm retailers are disproportionately frequent sources of crime guns; these retailers are linked to more guns traced by ATF than would be expected from their overall volume of gun sales (there could be many reasons for these patterns; see Wintemute 2005). (3) Under test conditions, significant proportions of licensed retailers and private party gun sellers will knowingly participate in illegal gun sales (Sorenson and Vittes 2003; Wintemute 2010). (4) On average, about one-third of guns used in crime in any community are acquired in that community, another third come from elsewhere in the same state, and a third are brought from other states (ATF 1997, 2002; Cook and Braga 2001). (5) There are longstanding interstate trafficking routes for crime guns, typically from states with weaker gun regulations to states with stronger ones. The best known of these is the "Iron Pipeline" from the Southeast to the Middle Atlantic and New England (Cook and Braga 2001; Pierce et al. 2004).

Analyses of ATF firearm trafficking investigation data reveal that illegal gun traffickers exploit an incredibly leaky legal firearms commerce system. For instance, a 2000 report examining 1,530 gun trafficking investigations made by ATF between July 1, 1996, and December 31, 1998, found that more than 84,000 firearms were diverted from legal to illegal commerce (ATF 2000). The report identified the primary gun trafficking pathways as scofflaw and negligent firearms dealers, "straw man" legal purchasers who provide guns to criminals, and illegal diversions through secondary market sources such as gun shows, flea markets, and want ads. The analysis also revealed the organized theft of firearms from licensed dealers, common carriers, and residences as illegal diversion pathways. Moreover, ATF (2000) found that 61 percent of the cases involved the diversion of twenty or fewer firearms, and it concluded that most but not all gun trafficking investigations involve a relatively

small number of firearms. The two largest gun trafficking cases involved the illegal diversion of some 11,000 a nd 10,000 firearms, respectively.

While survey research highlights the importance of theft and secondary market acquisitions in supplying adult criminals and juveniles with guns, these studies also complement analyses of firearm trace and investigation data in suggesting a fairly substantial role, either direct or indirect, for retail outlet sales in supplying criminals with guns. About 27 percent of state prisoners in a U.S. Bureau of Justice Statistics survey said they acquired their most recent handgun from a retail outlet (Beck and Gilliard 1993). Similarly, Wright and Rossi (1994) reported that 21 percent of male prisoners had acquired their most recent handgun from a licensed dealer. Sheley and Wright (1995) found that 32 percent of juvenile inmates had asked someone, typically a friend or family member, to straw purchase a gun for them in a gun shop, pawnshop, or other retail outlet. All three survey studies also found that "street" and "black market" sources are important, sources that may well include traffickers who are buying from retail outlets and selling on the street.

Despite multiple illegal sources of firearms for criminals, ethnographic research suggests that illegal gun markets may not work well in particular urban environments. Cook, Ludwig, and Braga (2005) found evidence of considerable frictions in the underground market for guns in Chicago. These frictions existed mainly because the underground gun market was both illegal and "thin"—the number of buyers, sellers, and total transactions was small, and relevant information on reliable sources of guns was scarce. The research further found that Chicago street gangs helped to overcome these market frictions, but the gangs' economic interests caused gang leaders to limit their supply primarily to gang members, and even then transactions were usually loans or rentals with strings attached. Thin underground gun markets may be particularly vulnerable to focused gun market disruption strategies.

A growing body of evaluation evidence suggests that enforcement and regulatory interventions focused on retail sales practices can generate subsequent reductions in new guns recovered in crime. In Detroit and Chicago, the number of guns recovered within a year of first retail sale from someone other than the original purchaser was sharply reduced after undercover police stings and lawsuits targeted scofflaw retail dealers (Webster, Zeoli, et al. 2006). In Boston, a gun market disruption strategy that focused on the illegal diversion of new handguns from retail outlets in Massachusetts, southern states along Interstate 95, and elsewhere resulted in a significant reduction in

the percentage of new handguns recovered in crime by the Boston Police Department (Braga and Pierce 2005).

In Milwaukee, the number of guns recovered within a year of first retail sale from someone other than the original purchaser dramatically decreased after voluntary changes in the sales practices of a gun dealer that received negative publicity for leading the United States in selling the most guns recovered by police in crime (Webster, Vernick, and Bulzacchelli 2006). In Chicago, an analysis of recovered crime handguns found that the 1994 implementation of the Brady Handgun Violence Prevention Act was associated with a marked decrease in crime handguns imported from states that were required to institute the provisions of the Act (Cook and Braga 2001). The Brady Act mandated licensed dealers to conduct a criminal background check on all handgun buyers and required a one-week waiting period before transferring the gun to a criminal.

## Policy Implications

Research suggests that supply-side interventions could be used to good effect in reducing the illegal supply of firearms to criminals. It is the responsibility of ATF, often working with state and local law enforcement, to investigate criminal firearms trafficking, arrest the perpetrators, and refer them to U.S. Attorneys for prosecution. Unfortunately, some major obstacles hinder federal law enforcement efforts to hold gun traffickers accountable for their crimes (Braga 2001). ATF is essentially working with one hand tied behind its back because of the way the federal firearms laws are written, cuts to its operating budgets, and persistent political interference. Here, we make six policy and legislative recommendations to improve the capacity of the U.S. Department of Justice to enforce federal laws against gun traffickers. This list should not be considered exhaustive as other opportunities certainly exist.

1. *Require the Execution of Private Sales through Federal Firearms Licensees.* The lack of background checks and transaction paperwork in the secondary market makes it easy for prohibited persons to acquire firearms and difficult for law enforcement agencies to prevent, detect, and prosecute illicit buyers and sellers who operate in the secondary market. Secondary market transactions are legal but not subjected to any federal requirement that the transaction be formally recorded or paperwork maintained. Most states do not have laws that require a record of secondary market transactions. The

main federal legal requirement is that the private seller may not knowingly transfer firearms to proscribed persons such as felons, fugitives, drug users, and illegal aliens. The provisions of the 1994 Brady Act do not apply to secondary firearms market transactions; therefore, criminal background checks of the prospective buyer are not conducted during these private transactions. Requiring private sales to be executed through federally licensed gun dealers would effectively close a major legal loophole exploited by gun traffickers and criminals. As part of these reforms, mandatory reporting of multiple purchases of handguns should be extended to include multiple purchases of certain long guns (e.g., semi-automatic rifles capable of accepting high-capacity magazines), similar to current practices in states along the southwest border of the United States with Mexico.

The enforcement of laws against gun trafficking is also hindered by the cumbersome procedure ATF uses to trace firearms. Most of the relevant firearms transaction records are not centralized but kept piecemeal, much in paper form, by the dealers, distributors, and manufacturers. This arrangement reflects the intention of Congress to ensure that there would be no national registry of firearms owners while maintaining some mechanism to allow crime investigators to trace a firearm. Modest changes to the system could make a big difference (Travis and Smarrito 1992). For example, a requirement for licensed dealers to report serial numbers for all gun transfers to ATF would greatly facilitate the tracing process without creating a central registry of gun owners. Electronic exchange of this information by means of a web portal would significantly expedite the process.

2. *Enact Effective Firearms Diversion/Trafficking Statutes.* There are no federal laws that specifically prohibit firearms trafficking and that adequately reflect the public safety risks of straw purchasing of weapons. For instance, there are no defined elements of gun trafficking in existing federal statutes such as the identification of a threshold number of illegally diverted guns and the establishment of a nexus to criminal activity. While there are nearly 40 federal statutes that touch on the various relevant areas of the illegal diversion of firearms (see ATF 2009), ATF agents commonly rely upon two statutes when investigating gun trafficking crimes: engaging in the business of dealing firearms without a license (Title 18, Section 922(a)(1)(A)) and falsifying the ATF Form 4473 (Title 18, Section 922(a)(6)).

The 1986 McClure-Volkmer Firearm Owners' Protection Act (FOPA) makes it very difficult to prosecute gun traffickers for dealing firearms without a

license. Individuals who make occasional gun sales, buy guns as a hobby, or sell firearms from their private collections are exempt from acquiring a federal firearms license. Gun traffickers exploit this gaping hole in licensing law to illegally divert guns to criminals and juveniles. Since the telltale paperwork is not available for these unregulated transactions, firearms traffickers operating in the secondary market can easily avoid prosecution by claiming that they were selling only a handful of firearms from their private collection. Although federal law penalizes individuals who make false statements on firearms transfer paperwork, it is difficult for ATF agents to prove that straw purchasers are falsifying paperwork, purchasing firearms for proscribed persons rather than buying firearms for their personal collections and subsequently selling them lawfully on the unregulated secondary market. The problem is compounded because document falsification violations are seldom viewed by prosecutors as appealing cases to bring before a jury.

A telling analysis of the disposition of 1,530 ATF firearms trafficking investigations suggests that prosecuting unlicensed dealers for engaging in the business of selling firearms and for straw purchasing presents a significant challenge in court (ATF 2000). Although ATF agents reported that dealing without a license and falsifying paperwork violations were occurring in cases accepted for prosecution, the prosecutor was able to charge at least one defendant with these violations in less than 38% of cases involving dealing without a license and less than 45% of the straw purchasing cases. In these cases, defendants were charged with being a convicted felon in possession of firearms, drug offenses, or other crimes revealed during the investigation.

3. *Revisit Sentencing Guidelines for Firearm Diversion/Trafficking Crimes.* Penalties for the illegal diversion of firearms should reflect the serious public safety consequences of these crimes. Since guns are durable goods, even one illegal gun can have repetitive and dire consequences. For instance, ballistic imaging analysis of a single handgun recovered by the Boston Police Department revealed that, in one year, it had been used in 14 violent crimes across four cities in two states (Gagliardi 2010). Prosecuting scofflaw dealers, who are associated with the illegal diversion of multiple guns, is often frustrating for U.S. Attorneys and ATF investigators. For instance, corrupt licensed dealers illegally divert firearms through record keeping violations such as making false entries in their records and failing to keep the required transfer information. Although a corrupt licensed dealer may illegally divert hundreds of guns to the street, these record keeping violations are primarily misdemeanors.

Gun traffickers are often prosecuted for associated criminal conduct because trafficking charges are difficult to prove and sometimes carry lesser penalties when compared to other crimes such as being a felon in possession of a firearm or drug trafficking (ATF 2000). One quarter of firearms traffickers in the ATF analyses were charged with being a convicted felon in possession of a firearm and another 6% were charged with other prohibited persons charges. More than 27% were charged with conspiracy charges and over 12% were charged with a narcotics violation. Gun trafficking investigations are sometimes prosecuted as drug trafficking cases because prosecutors prefer the mandatory minimum sentencing provisions. For instance, using a firearm during the commission of a drug trafficking or violent crime (Title 18, Section 924(c)) carries a mandatory five-year imprisonment sentence.

Most gun criminals, unfortunately, do not have prior felony convictions (Greenfeld and Zawitz 1995). Corrupt licensed dealers and individuals who execute straw purchases are legally entitled to engage in firearm transfers and, by definition, not felons or drug abusers. Therefore, although prosecutors and ATF agents are creatively using the existing federal laws to make cases against gun traffickers, this type of prosecution strategy clearly has its limits.

4. *Develop and Implement Regional Crime Gun–Processing Protocols.* Gun crime investigations are seriously undermined when local jurisdictions do not comprehensively process all recovered crime guns and related evidence (see IACP 2011). Without these comprehensive data, federal, state, and local agencies are not able to develop an accurate assessment of the sources of illegal guns and their use in violent crime. Law enforcement agencies at the local, state, and federal level should conduct a thorough review of their internal directives on the processing of the crime guns and related evidence. Policy procedures should include processing for ballistic evidence as well as DNA, latent fingerprints, and trace evidence from firearms; processing projectiles and casings through the ATF National Integrated Ballistics Information Network (NIBIN); conducting firearms traces; and reporting to the National Crime Information Center (NCIC) (see Gagliardi 2010). The various law enforcement agencies operating within a given region should collaborate on the design of mutually agreeable crime gun–processing protocols.

5. *Create a Strong and Effective ATF.* ATF is underfunded, often without stable leadership, and routinely whipsawed by special interests and Congress. Despite the number of gun dealers having reached nearly 130,000 federal licensees, ATF's budget has been largely stagnant, increasing from $850 million in FY

2002 to only $1.1 billion in FY 2012. ATF had to eliminate more than $2 million in field contractor support and shut down 66% of its ballistic-imaging workstation sites across the United States for its NIBIN program in FY 2012. ATF has only some 2,500 special agents and roughly 800 inspectors. In terms of law enforcement personnel, the agency is roughly the same size as a city police department (the Boston Police Department has an authorized strength of some 2,250 officers). ATF has only enough inspectors to check every licensed firearms dealer once every ten years. Finally, ATF has been led by an acting director since the last confirmed director, Carl Truscott, resigned in August 2004.

In their roles as guardians of the Second Amendment, the National Rifle Association (NRA) and gun-rights politicians consistently meddle in ATF investigative initiatives. For instance, in February 2006, Congress convened two hearings on ATF's enforcement activities at eight gun shows in Richmond, Virginia, that resulted in an Inspector General's review of ATF's gun show investigation operations. Four witnesses testified that ATF agents used aggressive and harassing techniques. These individuals included the gun show promoter, a federal firearms licensee, a salesman working for a licensed gun dealer, and a private investigator hired by the NRA. The hearings did not reveal any illegal activities or other violations by ATF.

ATF needs to be properly funded to perform its mission now and in the future as newly mandated responsibilities are added. The agency clearly needs stable leadership now. Like the director of the Federal Bureau of Investigation, the ATF director's position should be a fixed ten-year term. This would ensure that the position is professional and nonpartisan and that it spans the political turnover of four-year presidential election cycles. ATF should also be able to more closely regulate the business practices of licensed dealers and set standards for secure storage and common carrier transportation of firearms and ammunition.

6. *Publish an Annual National Crime Gun–Tracing Report.* Rational debate on gun policy requires detailed information on crime guns. ATF currently produces only modest summaries of the characteristics of crime gun traces for the 50 states, the District of Columbia, U.S. territories, Canada, Mexico, and the Caribbean (www.atf.gov/statistics/index.html). Unlike the national and city-level trace reports generated by the now-defunct Youth Crime Gun Interdiction Initiative (e.g., ATF 1997, 2002), ATF's current state-level crime gun summaries do not involve external academics and do not provide more rigorous and detailed analyses of crime gun sources, trends, and patterns.

ATF should return to publishing these more detailed annual crime gun trace reports overseen by external academics.

To complement the routine reporting of detailed crime gun statistics, the U.S. government should also lift restrictions on the release of ATF trace data as mandated by the Tiahrt Amendment, remove ideological and politically motivated barriers to conducting basic gun research through grants from the Centers for Disease Control and Prevention (CDC) and the National Institutes of Health (NIH), and increase funding for gun violence reduction research through the National Institute of Justice (NIJ). Indeed, much of the research evidence reviewed here was initiated prior to the passage of the Tiahrt Amendment.

## Conclusion

The available evidence suggests that reducing the flow of guns to criminals may indeed disrupt their capacity to kill. Better record keeping and improved regulation of gun transactions can reduce access to guns by criminals and assist law enforcement agencies in launching investigations and prosecuting gun criminals. However, a measurable impact on firearms trafficking and related violence requires an adequate commitment of resources in terms of people, processes, and technology. For further gains, the firearms supply chain must be made more secure. The operational capacity of ATF must be strengthened. Success against firearms trafficking will be achieved only by separating firearms trafficking strategy from gun politics.

Reflecting upon the research and development experiences from the Clinton administration and early days of the George W. Bush administration, we suggest there should be a reinvigoration of the fusion of all-source information on crime gun sources along with comprehensive analysis and reporting, in which all sides of the gun control debate can be confident. Increased law enforcement–academic analysis and reporting of ATF firearms trace can begin the effort. Public safety and the public debate in the United States and other countries will surely benefit from the best possible information on the illegal sources of guns to criminals. Without credible data and rigorous analyses, the broader gun control policy debate will be based on ideology and conjecture. The case for a supply-side approach to gun violence is well supported by the empirical evidence on illegal gun market dynamics. To date, however, there is little empirical evidence that such an approach reduces rates of gun crime. We believe that

it is time to develop experimental evidence on whether interventions designed
to limit illegal transfers of firearms can reduce gun violence.

Refe r enc e s

Beck, Allen, and Darrell Gilliard. 1993. *Survey of State Prison Inmates, 1991.* Washington, DC: U.S. Bureau of Justice Statistics.

Braga, Anthony A. 2001. More Gun Laws or More Gun Law Enforcement? *Journal of Policy Analysis and Management* 20: 545–549.

Braga, Anthony A. 2003. Serious Youth Gun Offenders and the Epidemic of Youth Violence in Boston. *Journal of Quantitative Criminology,* 19: 33–54.

Braga, Anthony A., Philip J. Cook, David M. Kennedy, and Mark H. Moore. 2002. The Illegal Supply of Firearms. In *Crime and Justice: A Review of Research*, vol. 29, edited by Michael Tonry. Chicago: University of Chicago Press.

Braga, Anthony A., and Glenn L. Pierce. 2005. Disrupting Illegal Firearms Markets in Boston: The Effects of Operation Ceasefire on the Supply of New Handguns to Criminals. *Criminology & Public Policy* 4: 717–748.

Braga, Anthony A., Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway. 2012. Interpreting the Empirical Evidence on Illegal Gun Market Dynamics. *Journal of Urban Health* 89: 779–793.

Cook, Philip J., and Anthony A. Braga. 2001. Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets. *Arizona Law Review* 43: 277–309.

Cook, Philip J., Anthony A. Braga, and Mark H. Moore. 2011. Gun Control. In *Crime and Public Policy*, rev. ed., edited by James Q. Wilson and Joan Petersilia. New York: Oxford University Press.

Cook, Philip J., Jens Ludwig, and Anthony A. Braga. 2005. Criminal Records of Homicide Offenders. *Journal of the American Medical Association* 294: 598–601.

Cook, Philip J., Jens Ludwig, Sudhir Venkatesh, and Anthony A. Braga. 2007. Underground Gun Markets. *Economic Journal* 117: 558–588.

Cook, Philip J., Stephanie Molloconi, and Thomas Cole. 1995. Regulating Gun Markets. *Journal of Criminal Law and Criminology* 86: 59–92.

Gagliardi, Peter L. 2010. *The 13 Critical Tasks: An Inside-Out Approach to Solving More Gun Crime.* Montreal, Quebec: Forensic Technology Inc.

Greenfeld, Lawrence, and Marianne Zawitz. 1995. *Weapons Offenses and Offenders.* Washington, DC: U.S. Bureau of Justice Statistics.

International Association of Chiefs of Police (IACP). 2011. *Reducing Gun Violence in Our Communities.* Alexandria, VA: IACP.

National Research Council. 2005. *Firearms and Violence: A Critical Review.* Committee to Improve Research and Information on Firearms. Washington, DC: National Academies Press.

Pierce, Glenn L., Anthony A. Braga, Raymond R. Hyatt, and Christopher S. Koper. 2004. The Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy. *Justice Quarterly* 21: 391–422.

Reiss, Albert J., and Jeffrey Roth, eds. 1993. *Understanding and Preventing Violence*. Washington, DC: National Academies Press.

Sheley, Joseph, and James D. Wright. 1995. *In the Line of Fire: Youth, Guns, and Violence in Urban America*. New York: Aldine de Gruyter.

Sorenson, Susan and Katherine Vittes. 2003. Buying a Handgun for Someone Else: Firearm Retailer Willingness to Sell. *Injury Prevention* 9: 147–150.

Travis, Jeremy, and William Smarrito. 1992. A Modest Proposal to End Gun Running in America. *Fordham Urban Law Journal* 19: 795–811.

U.S. Bureau of Alcohol, Tobacco and Firearms (ATF). 1997. *Crime Gun Trace Analysis Reports (1997): The Illegal Firearms Market in 17 Communities*. Washington, DC: Bureau of Alcohol, Tobacco and Firearms.

U.S. Bureau of Alcohol, Tobacco and Firearms (ATF). 2000. *Following the Gun: Enforcing Federal Laws against Firearms Traffickers*. Washington, DC: ATF.

U.S. Bureau of Alcohol, Tobacco and Firearms (ATF). 2002. *Crime Gun Trace Analysis (2000): National Report*. Washington, DC: ATF.

U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). 2009. *Firearms Trafficking Investigation Guide*. Washington, DC: U.S. Department of Justice.

Webster, Daniel W., Jon Vernick, and Maria Bulzacchelli. 2006. Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals. *Journal of Urban Health* 83: 778–787.

Webster, Daniel W., April Zeoli, Maria Bulzacchelli, and Jon Vernick. 2006. Effects of Police Stings of Gun Dealers on the Supply of New Guns to Criminals. *Injury Prevention* 12: 225–230.

Wintemute, Garen J. 2005. Risk Factors among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes. *Injury Prevention* 11: 357–363.

Wintemute, Garen J. 2010. Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase. *Journal of Urban Health* 87: 865–878.

Wright, James D., and Peter H. Rossi. 1994. *Armed and Considered Dangerous*. 2nd ed. New York: Aldine de Gruyter.

Zimring, Franklin E. 1976. Street Crime and New Guns: Some Implications for Firearms Control. *Journal of Criminal Justice* 4: 95–107.

# Part III / Gun Policy Lessons from the United States

High-Risk Guns

*This page intentionally left  lank*

# America's Experience with the Federal Assault Weapons Ban, 1994–2004

Key Findings and Implications

Christopher S. Koper

In 1994, the federal government imposed a ten-year ban on military-style semi-automatic firearms and ammunition-feeding devices holding more than ten rounds of ammunition. This legislation, commonly known as the federal assault weapons ban, was intended in the broadest sense to reduce gunshot victimizations by limiting the national stock of semi-automatic firearms with large ammunition capacities and other features conducive to criminal uses. Reflecting America's general political divisions over the issue of gun control, the debate over the law was highly contentious. Ten years later, Congress allowed the ban to expire.

More recently, there have been growing calls for a reexamination of the assault weapons issue. This debate has been fueled by a series of mass shooting incidents involving previously banned firearms or magazines. Since 2007, for example, there have been at least 11 incidents in which offenders using

Christopher S. Koper, PhD, is an associate professor in the Department of Criminology, Law and Society at George Mason University and a senior fellow and co-director of the Research Program on Evidence-Based Policing at George Mason's Center for Evidence-Based Crime Policy.

assault weapons or other semi-automatics with magazines larger than 10 rounds have wounded or killed eight or more people (Violence Policy Center 2012). Some of the most notorious of these incidents have been a 2007 shooting on the college campus of Virginia Tech that left 33 dead and 17 wounded; a 2011 shooting in an Arizona parking lot that killed 6 and wounded 13, including Congresswoman Gabrielle Giffords; a 2012 shooting in an Aurora, Colorado, movie theatre that left 12 dead and 58 wounded; and, most recently, a shooting in a Newtown, Connecticut, elementary school that left 26 victims dead, 20 of whom were children (an additional victim was killed elsewhere).

To help inform the new dialogue on this issue, this essay examines America's experience with the 1994 assault weapons law. During the course of the ban, the National Institute of Justice (NIJ) funded a series of studies on the law's impacts for the U.S. Department of Justice and the U.S. Congress (Koper 2004; Koper and Roth 2001, 2002; Roth and Koper 1997, 1999). I present highlights from those studies, with an emphasis on findings from the final evaluation reported in 2004 (Koper 2004). These studies sought to assess the law's impacts on (1) the availability of assault weapons (AWs) and large-capacity magazines (LCMs) as measured by price and production (or importation) indices in legal markets; (2) trends in criminal uses of AWs and LCMs; and (3) trends in the types of gun crimes that seemed most likely to be affected by changes in the use of AWs and LCMs. (The latter two issues are emphasized in this summary.) Finally, the research team examined studies of gun attacks more generally in order to estimate the ban's potential to produce longer-term reductions in shootings.

In summary, the ban had mixed effects in reducing crimes with the banned weaponry because of various exemptions and loopholes in the legislation. The ban did not appear to affect gun crime during the time it was in effect, but some evidence suggests it may have modestly reduced gunshot victimizations had it remained in place for a longer period. The ban's most important provision was arguably its prohibition on ammunition magazines holding more than 10 rounds. Policymakers considering a new version of the ban might particularly focus on this aspect of the previous legislation and reconsider the exemptions and loopholes that undermined the effectiveness of the original ban.

## Provisions of the Assault Weapons Ban

Enacted on September 13, 1994, Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 imposed a ten-year ban on the "manufacture, transfer, and possession" of certain semi-automatic firearms designated as assault weapons. The AW ban did not prohibit all semi-automatics; rather, it was directed at semi-automatics having features that appear to be useful in military and criminal applications but unnecessary in shooting sports or self-defense. Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept ammunition magazines holding large numbers of bullets. The law specifically prohibited 18 models and variations by name (e.g., the Intratec TEC-9 pistol and the Colt AR-15 rifle), as well as revolving cylinder shotguns (see Koper 2004, 5). This list included a number of foreign rifles that the federal government had banned from importation into the country beginning in 1989 (e.g., Avtomat Kalashnikov models). In addition, the ban contained a generic "features test" provision that generally prohibited other semi-automatic firearms having two or more military-style features, as described in Table 12.1. In total, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) identified 118 model and caliber variations that met the AW criteria established by the ban.

The law also banned "copies or duplicates" of the named gun makes and models, but federal authorities emphasized exact copies. Relatively cosmetic changes, such as removing a flash hider or bayonet mount, were thus sufficient to transform a banned weapon into a legal substitute. In this sense, the law is perhaps best understood not as a gun ban but as a law that restricted weapon accessories. A number of gun manufacturers began producing modified, legal versions of some of the banned guns, though not all of these substitute weapons proved as popular as the banned versions.[1] In other respects (e.g., type of firing mechanism, ammunition fired, and the ability to accept a detachable magazine), the banned AWs did not differ from other legal semi-automatic weapons.

The other major component of the assault weapons legislation was a ban on most ammunition-feeding devices holding more than 10 rounds of ammunition (referred to as large-capacity magazines).[2] The LCM ban was arguably the most important part of the assault weapons law for two reasons. First, an LCM is the most functionally important feature of an AW-type firearm. As noted by the U.S. House of Representatives, most prohibited AWs came equipped with magazines holding 30 rounds and could accept magazines holding as

160   *Christopher S. Koper*

*Table 12.1*   Features test of the federal assault weapons ban

| Weapon category | Military-style features (2 or more qualified a firearm as an assault weapon) |
|---|---|
| Semi-automatic pistols accepting detachable magazines | 1) ammunition magazine that attaches outside the pistol grip<br>2) threaded barrel capable of accepting a barrel extender, flash hider, forward handgrip, or silencer<br>3) heat shroud attached to or encircling the barrel<br>4) weight of more than 50 ounces unloaded<br>5) semiautomatic version of a fully automatic weapon |
| Semi-automatic rifles accepting detachable magazines | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) bayonet mount<br>4) flash hider or a threaded barrel designed to accommodate one<br>5) grenade launcher |
| Semi-automatic shotguns | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) fixed magazine capacity over 5 rounds<br>4) ability to accept a detachable ammunition magazine |

many as 50 or 100 rounds (United States Department of the Treasury 1998, 14). Removing LCMs from these weapons thus greatly limits their firepower.

Second, the reach of the LCM ban was much broader than that of the AW ban because many semi-automatics that were not banned by the AW provision could accept LCMs. Approximately 40 percent of the semi-automatic handgun models and a majority of the semi-automatic rifle models that were being manufactured and advertised prior to the ban were sold with LCMs or had a variation that was sold with an LCM (calculated from Murtz and the Editors of Gun Digest 1994). Still others could accept LCMs made for other firearms and/or by other manufacturers. A national survey of gun owners in 1994 found that 18% of all civilian-owned firearms and 21% of civilian-owned handguns were equipped with magazines having 10 or more rounds (Cook and Ludwig 1996, 17). The AW provision did not affect most LCM-compatible guns, but the LCM provision limited the capacities of their magazines to 10 rounds.

The AW ban also contained important exemptions. AWs and LCMs manufactured before the effective date of the ban were "grandfathered" and thus legal to own and transfer. Though not precise, estimates suggest there were

upward of 1.5 million privately owned AWs in the United States when the ban took effect (American Medical Association Council on Scientific Affairs 1992; Cox Newspapers 1989, 1; Koper 2004, 10). Gun owners in America possessed an estimated 25 million guns that were equipped with LCMs or 10-round magazines in 1994 (Cook and Ludwig 1996, 17), and gun industry sources estimated that, including aftermarket items for repairing and extending magazines, there were at least 25 million LCMs available in the United States as of 1995 (Gun Tests 1995, 30). Moreover, an additional 4.8 million pre-ban LCMs were imported into the country from 1994 through 2000 under the grandfathering exemption, with the largest number arriving in 1999. During this same period, importers were also authorized to import another 42 million pre-ban LCMs that may have arrived after 2000.

## Criminal Use of Assault Weapons and Large-Capacity Magazines Prior to the Ban

During the 1980s and early 1990s, AWs and other semi-automatic firearms equipped with LCMs were involved in a number of highly publicized mass shootings that raised public concern about the accessibility of high-powered, military-style weaponry and other guns capable of rapidly discharging high numbers of bullets (Cox Newspapers 1989; Kleck 1997, 124–126, 144; Lenett 1995; Violence Policy Center 2012). Perhaps most notably, AWs or other semi-automatics with LCMs were used in 6, or 40%, of 15 particularly severe mass shooting incidents between 1984 and 1993 that resulted in at least 6 deaths or at least 12 killed or wounded (Kleck, 1997**,** 124–126, 144). Early studies of AWs, though sometimes based on limited and potentially unrepresentative data, also suggested that AWs recovered by police were often associated with drug trafficking and organized crime (Cox Newspapers 1989, 4; also see Roth and Koper 1997, chap. 5), fueling a perception that AWs were guns of choice among drug dealers and other particularly violent groups. These events intensified concern over AWs and other semi-automatics with LCMs and helped spur the 1989 federal import ban on selected semi-automatic rifles (implemented by executive order) and the passage of the 1994 federal AW ban (the states of California, New Jersey, Connecticut, Hawaii, and Maryland also passed AW legislation between 1989 and 1994).

Looking at the nation's gun crime problem more broadly, numerous studies of AW-type weapons conducted prior to the federal ban found that AWs

typically accounted for up to 8% of guns used in crime, depending on the specific AW definition and data source used (e.g., see Beck et al. 1993; Hargarten et al. 1996; Hutson, Anglin, and Pratts 1994; Hutson et al. 1995; McGonigal et al. 1993; New York State Division of Criminal Justice Services 1994; Roth and Koper 1997, chap. 2; Zawitz 1995). A compilation of 38 sources indicated that AWs accounted for about 2% of crime guns on average (Kleck 1997, 112, 141–143). Similarly, the most common AWs prohibited by the 1994 federal ban accounted for between 1% and 6% of guns used in crime according to most of several national and local data sources examined for the NIJ-funded studies summarized here (Koper 2004, 15).

As with crime guns in general, the majority of AWs used in crime were assault pistols rather than assault rifles. Among AWs reported by police to ATF during 1992 and 1993, for example, assault pistols outnumbered assault rifles by a ratio of three to one.

The relative rarity of AW use in crime can be attributed to a number of factors. Many of these models are long guns, which are used in crime much less often than handguns. Also, as noted, a number of the rifles named in the 1994 law were banned from importation into the United States in 1989. Further, AWs in general are more expensive and more difficult to conceal than the types of handguns that are used most frequently in crime.

Criminal use of guns equipped with LCMs had not been studied as extensively as criminal use of AWs at the time of the ban. However, the overall use of guns with LCMs, which is based on the combined use of AWs and non-banned guns with LCMs, is much greater than the use of AWs alone. Based on data examined for this and a few prior studies, guns with LCMs were used in roughly 13% to 26% of most gun crimes prior to the ban, though they appeared to be used in 31% to 41% of gun murders of police (see summary in Koper 2004, 18; also see Adler et al. 1995; Fallis 2011; New York Division of Criminal Justice Services 1994).

### The Ban's Effects on Crimes with Assault Weapons and Large-Capacity Magazines

Although there was a surge in production of AW-type weapons as Congress debated the ban in 1994, the law's restriction of the new AW supply and the interest of collectors and speculators in these weapons helped to drive prices higher for many AWs (notably assault pistols) through the end of the 1990s

*Table 12.2*   Assault weapons as a percentage of guns recovered by police

| City | Pre-ban | Post-ban | % change |
|------|---------|----------|----------|
| Baltimore, MD | 1.88% (1992–1993) | 1.25% (1995–2000) | −34% |
| Boston, MA | 2.16% (1991–1993) | 0.6% (2000–2002) | −72% |
| Miami, FL | 2.53% (1990–1993) | 1.71% (1995–2000) | −32% |
| St. Louis, MO | 1.33% (1992–1993) | 0.91% (1995–2003) | −32% |
| Anchorage, AK | 3.57% (1987–1993) | 2.13% (1995–2000) | −40% |
| Milwaukee, WI | 5.91% (1991–1993) | 4.91% (1995–1998) | −17% |

*Note:* Figures for Baltimore, Boston, Miami, and St. Louis are based on all recovered guns. Figures for Anchorage and Milwaukee are based on, respectively, guns tested for evidence and guns recovered in murder cases. Changes in Baltimore, Boston, Miami, and St. Louis were statistically significant at $p < .05$. See Koper (2004) for further details about the data and analyses.

and appeared to make them less accessible and/or affordable to criminal users.[3] Analyses of several national and local databases on guns recovered by police indicated that crimes with AWs declined following the ban.

To illustrate, the share of gun crimes involving the most commonly used AWs declined by 17% to 72% across six major cities examined for this study (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), based on data covering all or portions of the 1995–2003 post-ban period (Table 12.2). (The number of AW recoveries also declined by 28% to 82% across these locations and time periods; the discussion here focuses on changes in AWs as a share of crime guns in order to control for general trends in gun crime and gun seizures.) Similar patterns were found in a national analysis of recovered guns reported by law enforcement agencies around the country to ATF for investigative gun tracing.[4] The percentage of gun traces that were for AWs fell 70% between 1992–1993 and 2001–2002 (from 5.4% to 1.6%), though the interpretation of these data was complicated by changes that occurred during this time in gun tracing practices (see Koper 2004 for further discussion).

The decline in crimes with AWs was due primarily to a reduction in the use of assault pistols. Assessment of trends in the use of assault rifles was complicated by the rarity of crimes with such rifles and by the substitution in some cases of post-ban rifles that were very similar to the banned models. In general, however, the decline in AW use was only partially offset by substitution of post-ban AW-type models. Even counting the post-ban models as AWs, the share of crime guns that were AWs fell 24% to 60% across most of the local

jurisdictions studied. Patterns in the local data sources also suggested that crimes with AWs were becoming increasingly rare as the years passed.

The decline in crimes with AWs appeared to have been offset throughout at least the late 1990s by steady or rising use of other semi-automatics equipped with LCMs. Assessing trends in LCM use was difficult because there is no national data source on crimes with LCMs and few contacted jurisdictions maintained such information. It was possible, nonetheless, to examine trends in the use of guns with LCMs in four jurisdictions: Baltimore, Milwaukee, Anchorage, and Louisville (KY). Across the different samples analyzed from these cities (some databases included all recovered guns and some included only guns associated with particular crimes), the share of guns with an LCM generally varied from 14% to 26% prior to the ban. In all four jurisdictions, the share of crime guns equipped with LCMs rose or remained steady through the late 1990s (Table 12.3). These trends were driven primarily by handguns with LCMs, which were used in crime roughly three times as often as rifles with LCMs (though crimes with rifles having LCMs also showed no general decline). Generalizing from such a small number of jurisdictions must be done very cautiously, but the consistency of the findings across these geographically diverse locations strengthens the inference that they reflected a national pattern.

Failure to reduce LCM use for at least several years after the ban was likely because of the immense stock of exempted pre-ban magazines, which, as noted, was enhanced by post-ban imports. The trend in crimes with LCMs may have been changing by the early 2000 s, but the available data were too limited and inconsistent to draw clear inferences (post-2000 data were available for only two of the four study sites).

*Table 12.3*   Guns with large-capacity magazines as a percentage of guns recovered by police (selected years)

| City | Pre-ban | Late 1990s | Early 2000s |
|---|---|---|---|
| Baltimore, MD | 14.0% (1993) | 15.5% (1998) | 15.7% (2003) |
| Anchorage, AK | 26.2% (1992–1993) | 30.0% (1999–2000) | 19.2% (2001–2002) |
| Milwaukee, WI | 22.4% (1993) | 36.4% (1998) | N/A |
| Louisville, KY | N/A | 20.9% (1996) | 19.0% (2000) |

*Note:* Figures for Baltimore and Milwaukee are based on, respectively, guns associated with violent crimes and with murders. Figures for Anchorage and Louisville are based on guns submitted for evidentiary testing. The Anchorage figures are based on handguns only. See Koper (2004) for further details about the data and analyses.

A later media investigation of LCM use in Richmond, Virginia, suggests that the ban may have had a more substantial impact on the supply of LCMs to criminal users by the time it expired in 2004. In that city, the share of recovered guns with LCMs generally varied between 18% and 20% from 1994 through 2000 but fell to 10% by 2004 (Fallis 2011). It is not clear whether the Richmond results represented a wider national or even regional trend. (The data from this study also show that after the ban was lifted, the share of Richmond crime guns with an LCM rose to 22% by 2008.)

## The Ban's Impacts on Gun Violence

Because offenders could substitute non-banned guns and small magazines for banned AWs and LCMs, there was not a clear rationale for expecting the ban to reduce assaults and robberies with guns. But by forcing this weapon substitution, it was conceivable that the ban would reduce the number and severity of shooting deaths and injuries by reducing the number of shots fired in gun attacks (thus reducing the number of victims per gunfire incident and the share of gunshot victims sustaining multiple wounds). Based on this logic, the research team examined several indicators of trends in the lethality and injuriousness of gun violence for different portions of the 1995–2002 post-ban period. These included national-level analyses of gun murders, the percentage of violent gun crimes resulting in death, the share of gunfire cases resulting in wounded victims, the percentage of gunshot victimizations resulting in death, and the average number of victims per gun homicide incident. For selected localities, the team also examined trends in wounds per gunshot victim or the percentage of gunshot victims sustaining multiple wounds.

On balance, these analyses showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years (see Koper 2004, Koper and Roth 2001, and Roth and Koper 1997). Nationally, for example, the percentage of violent gun crimes resulting in death (based on gun homicides, gun assaults, and gun robberies reported to the Uniform Crime Reports) was the same for the period 2001–2002 (2.9%) as it was for the immediate pre-ban period 1992–1993 (Koper 2004, 82, 92). Accordingly, it was difficult to credit the ban with contributing to the general decline in gun crime and gun homicide that occurred during the 1990s.

However, the ban's exemption of millions of pre-ban AWs and LCMs meant that the effects of the law would occur only gradually. Those effects were still

unfolding when the ban was lifted and may not have been fully realized until several years beyond that, particularly if importation of foreign, pre-ban LCMs had continued in large numbers. In light of this, it was impossible to make definitive assessments of the ban's impact on gun violence.

It was also difficult to judge the ban's effects on the more specific problem of mass shootings. The research team attempted to assess changes in mass shootings during the first few years of the ban, but this effort was hampered by the difficulty of counting these incidents (results can be sensitive to the definitions and data sources used) and identifying the specific types of guns and magazines used in them (Roth and Koper 1997, app. A). There is no national data source that provides detailed information on the types of guns and magazines used in shooting incidents or that provides full counts of victims killed and wounded in these attacks. Studying mass shootings in particular poses a number of challenges with regard to defining these events, establishing the validity and reliability of methods for measuring their frequency and characteristics (particularly if done through media searches, as is often necessary), and modeling their trends, as they are particularly rare events (e.g., see Duwe 2000; Roth and Koper 1997, app. A).

Nonetheless, the issue of mass shootings continues to be a catalyst to the debate surrounding AW legislation. A recent media compilation of 62 mass shooting incidents that involved the death of four or more people over the period 1982–2012, for instance, suggests that 25% of the guns used in these attacks were AW-type weapons (these were not precisely defined) and another 48% were other types of semi-automatic handguns (Follman, Aronsen, and Pan 2012). Continuing improvements in media search tools and greater attention to the types of guns and magazines used in multiple-victim attacks may improve prospects for examining this issue more rigorously in future studies.

## Assessing the Potential Long-Term Effects of Banning Assault Weapons and Large-Capacity Magazines

Although available evidence is too limited to make firm projections, it suggests that the ban may have reduced shootings slightly had it remained in place long enough to substantially reduce crimes with both LCMs and AWs. A small number of studies suggest that gun attacks with semi-automatics— including AWs and other guns equipped with LCMs—tend to result in more shots fired, more persons wounded, and more wounds inflicted per victim

than do attacks with other firearms (see reviews in Koper 2004; Koper and Roth 2001; also see McGonigal et al. 1993; Richmond et al. 2003; Reedy and Koper 2003; Roth and Koper 1997). For example, in mass shooting incidents that resulted in at least 6 deaths or at least 12 total gunshot victims from 1984 through 1993, offenders who clearly possessed AWs or other semi-automatics with LCMs (sometimes in addition to other guns) wounded or killed an average of 29 victims in comparison to an average of 13 victims wounded or killed by other offenders (see Koper and Roth's [2001] analysis of data compiled by Kleck [1997, 144]).

Similarly, a study of handgun attacks in Jersey City, New Jersey, during the 1990s found that the average number of victims wounded in gunfire incidents involving semi-automatic pistols was in general 15% higher than in those involving revolvers (Reedy and Koper 2003). The study also found that attackers using semi-automatics to fire more than 10 shots were responsible for nearly 5% of the gunshot victims in the sample. Used as a tentative guide, this implies that the LCM ban could have eventually produced a small reduction in shootings overall, perhaps up to 5%, even if some gun attackers had the foresight to carry more than one small magazine (or more than one firearm) and the time and poise to reload during an attack.

Effects of this magnitude might be difficult to measure reliably, but they could nonetheless yield significant societal benefits. Consider that in 2010 there were 11,078 gun homicides in the United States and another 53,738 nonfatal assault-related shootings according to the federal Centers for Disease Control and Prevention (see the CDC's web-based injury statistics query and reporting system at http://www.cdc.gov/injury/wisqars/index.html). At these levels, reducing shootings by just 1% (arguably a reasonable ballpark estimate for the long-term impact of substantially reducing AW and LCM use) would amount to preventing about 650 shootings annually. The lifetime medical costs of assault-related gunshot injuries (fatal and nonfatal) were estimated to be about $18,600 per injury in 1994 (Cook et al. 1999). Adjusting for inflation, this amounts to $28,894 in today's dollars. Moreover, some estimates suggest that the full societal costs of gun violence—including medical, criminal justice, and other government and private costs (both tangible and intangible)—could be as high as $1 million per shooting (Cook and Ludwig 2000). Hence, reducing shootings by even a very small margin could produce substantial long-term savings for society, especially as the shootings prevented accrue over many years.

## Lessons and Implications from the 1994 Ban

Studies of America's previous assault weapons ban provide a number of lessons that can inform future policymaking. A new law similar to the old ban will have little impact on most gun crimes, but it may prevent some shootings, particularly those involving high numbers of shots and victims. It may thus help to reduce the number and severity of mass shooting incidents as well as produce a small reduction in shootings overall.

The most important feature of the previous ban was the prohibition on large-capacity ammunition magazines. A large magazine is arguably the most critical feature of an assault weapon, and restrictions on magazines have the potential to affect many more gun crimes than do those on military-style weapons. Restrictions focused on magazine capacity may also have a greater chance of gaining sufficient public and political support for passage than would new restrictions on assault weapons, though current polling suggests that both measures are supported by three-quarters of non-gun owners and nearly half of gun owners (Barry et al., in this volume). To enhance the potential impact of magazine restrictions, policymakers might also consider limiting magazine capacity to fewer than 10 rounds for all or selected weapons (for example, lower limits might be set for magazines made for semi-automatic rifles).[5] It is unknown whether further restrictions on the outward features of semi-automatic weapons, such as banning weapons having any military-style features, will produce measurable benefits beyond those of restricting magazine capacity.

Policymakers must also consider the implications of any grandfathering provisions in new legislation. Assessing the political and practical difficulties of registering all assault weapons and large magazines or establishing turn-in or buyback programs for them is beyond the scope of this essay. Policymakers should note, however, that it may take many years to attain substantial reductions in crimes with banned weapons and/or magazines if a new law exempts the existing stock (which has likely grown considerably since the time of the original ban). Policies regarding exemptions must also explicitly address the status of imported guns and magazines.

Past experience further suggests that public debate on reinstating the ban or crafting a new one will raise prices and production of the guns and magazines likely to be affected. This could temporarily saturate the market for the guns and magazines in question (particularly if close substitutes emerge) and delay desired reductions in crimes with some categories of the banned weap-

onry (this appeared to happen with assault rifles that were banned by the 1994 law and may have contributed as well to the observed trends in use of large magazines).

A new ban on assault weapons and/or large-capacity magazines will certainly not be a panacea for America's gun violence problem nor will it stop all mass shootings. However, it is one modest measure that, like federal restrictions on fully automatic weapons and armor-piercing ammunition, can help to prevent the further spread of particularly dangerous weaponry.

## Notes

1. In general, the AW ban did not apply to semi-automatics possessing no more than one military-style feature listed under the ban's features test provision. Note, however, that firearms imported into the country still had to meet the "sporting purposes test" established under the federal Gun Control Act of 1968. In 1989, ATF determined that foreign semi-automatic rifles having any one of a number of named military features (including those listed in the features test of the 1994 AW ban) fail the sporting purposes test and cannot be imported into the country. In 1998, the ability to accept an LCM made for a military rifle was added to the list of disqualifying features. Consequently, it was possible for foreign rifles to pass the features test of the federal AW ban but not meet the sporting purposes test for imports (U.S. Department of the Treasury 1998).

2. Technically, the ban prohibited any magazine, belt, drum, feed strip, or similar device that has the capacity to accept more than 10 rounds of ammunition or which can be readily converted or restored to accept more than 10 rounds of ammunition. The ban exempted attached tubular devices capable of operating only with .22 caliber rimfire (i.e., low velocity) ammunition.

3. See Koper (2004), Koper and Roth (2002), and Roth and Koper (1997) for more extensive discussions of the ban's impacts on prices and production of AWs, nonbanned firearms, and LCMs.

4. A gun trace is an investigation into the sales history of a firearm (e.g., see ATF 2000).

5. To support the formulation and evaluation of policy in this area, there are also a number of research needs worth noting. For one, it is important to develop better data on crimes with guns having LCMs. Policymakers should thus encourage police agencies to record information about magazines recovered with crime guns. Likewise, ATF should consider integrating ammunition magazine data into its national gun tracing system and encourage reporting of magazine data by police agencies that trace firearms. Second, there is a need for more studies that contrast the outcomes of attacks with different types of guns and magazines. Such studies would help to refine predictions of the change in gun deaths and injuries that would follow reductions in attacks with firearms having large-capacity magazines.

Refe r e n c e s

Adler, Wendy, C., Frederick M. Bielke, David J. Doi, and John F. Kennedy. (1995). *Cops under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns with High Capacity Magazines*. Washington, DC: Handgun Control, Inc.

American Medical Association Council on Scientific Affairs. 1992. "Assault Weapons as a Public Health Hazard in the United States." *JAMA* 267:3067–3070.

Beck, Allen, Darrell Gilliard, Lawrence Greenfeld, Caroline Harlow, Thomas Hester, Louis Jankowski, Tracy Snell, James Stephan, and Danielle Morton. 1993. *Survey of State Prison Inmates, 1991*. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Bureau of Alcohol, Tobacco, and Firearms (ATF). (2000). *Commerce in Firearms in the United States*. Washington, DC: United States Department of the Treasury.

Cook, Philip J., Bruce A. Lawrence, Jens Ludwig, and Ted R. Miller. 1999. "The Medical Costs of Gunshot Injuries in the United States." *JAMA* 282:447–454.

Cook, Philip J., and Jens Ludwig. 1996. *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*. Washington, DC: Police Foundation.

Cook, Philip J., and Jens Ludwig. 2000. *Gun Violence: The Real Costs*. New York: Oxford University Press.

Cox Newspapers. 1989. *Firepower: Assault Weapons in America*. Washington, DC: Cox Enterprises.

Duwe, Grant. 2000. "Body-Count Journalism: The Presentation of Mass Murder in the News Media." *Homicide Studies* 4:364–399.

Fallis, David. 2011. "VA Data Show Drop in Criminal Firepower During Assault Gun Ban." *Washington Post*, January 23.

Follman, Mark, Gavin Aronsen, and Deanna Pan. 2012. "A Guide to Mass Shootings in America." *Mother Jones,* Dec. 15. http://www.motherjones.com/politics/2012/07/mass-shootings-map.

Gun Tests. 1995. "Magazine Rule Change Unlikely." March.

Hargarten, Stephen W., Trudy A. Karlson, Mallory O'Brien, Jerry Hancock, and Edward Quebbeman. 1996. "Characteristics of Firearms Involved in Fatalities." *JAMA* 275:42–45.

Hutson, H. Range, Deirdre Anglin, Demetrios N. Kyriacou, Joel Hart, and Kelvin Spears. 1995. "The Epidemic of Gang-Related Homicides in Los Angeles County from 1979 through 1994." *JAMA* 274:1031–1036.

Hutson, H. Range, Deirdre Anglin, and Michael J. Pratts, Jr. 1994. "Adolescents and Children Injured or Killed in Drive-By Shootings in Los Angeles." *New England Journal of Medicine* 330:324–327.

Kleck, Gary. (1997). *Targeting Guns: Firearms and Their Control*. New York: Aldine de Gruyter.

Koper, Christopher S. 2004. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*. Report to the National Institute of Justice, U.S. Department of Justice. Jerry Lee Center of Criminology, University of Pennsylvania, Philadelphia, PA.

Koper, Christopher S., and Jeffrey A. Roth. 2001. "The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple

Outcome Measures and Some Lessons for Policy Evaluation." *Journal of Quantitative Criminology* 17:33–74.

Koper, Christopher S., and Jeffrey A. Roth. 2002. "The Impact of the 1994 Federal Assault Weapons Ban on Gun Markets: An Assessment of Short-Term Primary and Secondary Market Effects." *Journal of Quantitative Criminology* 18:239–266.

Lenett, Michael G. 1995. "Taking a Bite Out of Violent Crime." *University of Daytona Law Review* 20:573–617.

McGonigal, Michael D., John Cole, C. William Schwab, Donald R. Kauder, Michael F. Rotondo, and Peter B. Angood. 1993. "Urban Firearm Deaths: A Five-Year Perspective." *Journal of Trauma*: 35:532–537.

Murtz, H.A., and the Editors of Gun Digest. 1994. *Guns Illustrated 1994*. Northbrook, IL: DBI Books.

New York State Division of Criminal Justice Services. 1994. *Assault Weapons and Homicide in New York City*. Albany, NY.

Reedy, Darin C., and Christopher S. Koper. 2003. "Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers." *Injury Prevention* 9:151–155.

Richmond, Therese S., Charles C. Branas, Rose A. Cheney, and C. William Schwab. 2003. *The Case for Enhanced Data Collection of Handgun Type*. Firearm and Injury Center at Penn, University of Pennsylvania, Philadelphia, PA.

Roth, Jeffrey A., and Christopher S. Koper. 1997. *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*. Washington, DC: The Urban Institute.

Roth, Jeffrey A., and Christopher S. Koper. 1999. *Impacts of the 1994 Assault Weapons Ban: 1994–96*. Washington, DC: National Institute of Justice, U.S. Department of Justice.

United States Department of the Treasury. (1998). *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*. Washington, DC.

Violence Policy Center (2012). *Mass Shootings in the United States Involving High-Capacity Ammunition Magazines*. Washington, DC.

Zawitz, Marianne W. 1995. *Guns Used in Crime*. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

*This page intentionally left blank*

**13**

# Personalized Guns

Using Technology to Save Lives

Stephen P. Teret and Adam D. Mernit

Gunfire took the lives of 31,672 Americans in 2010.[1] Death by gunfire occurs in homes, workplaces, shopping malls, churches, schools, and on the streets, and to Americans of all ages. Often, when possible solutions to this compelling public health problem are considered, conversations focus on troubled individuals who are at risk for becoming shooters, mental health interventions for these individuals, and securing the safety of vulnerable places such as schools. Little attention is paid to modifying the gun itself, which is the vehicle that causes the human damage, such as changing the design of guns so that they are inoperable by unauthorized users—that is, making all guns personalized. But product-oriented interventions have been highly effective with other public health problems, such as motor vehicle–related deaths.[2] In fact, the impressive reductions in highway fatalities are more attributable to

Stephen P. Teret, JD, MPH, is a professor in the Department of Health Policy and Management and director of the Center for Law and the Public's Health at the Johns Hopkins Bloomberg School of Public Health. Adam D. Mernit is an undergraduate senior in public health studies at Johns Hopkins University.

changes in the design of cars than to enhancing the driving skill of hundreds of millions of motorists.

This essay explores the topic of personalized guns, sometimes called smart guns or childproof guns. The definition we use for a personalized firearm is a gun that, by design integral to the gun itself as opposed to an external locking device, can be fired only by the authorized user or users. Our argument is that if all newly manufactured guns were personalized guns, there would be a meaningful reduction in gun deaths. This is not to imply that other efforts to regulate the sale, carrying, and use of guns should be ignored. Rather, changing the design of guns so that they are personalized would complement other policy interventions to reduce gun violence.

## The Need for Personalized Guns

Of the 31,672 persons killed by firearms in 2010 in the United States, 61 percent were suicides, 35 percent were homicides, and most of the remaining deaths were unintentional or accidental deaths.[3] How many of these gun deaths would be averted if guns were personalized is difficult to assess, but it is reasonable to assume that there would be substantial saving of lives.

Perhaps the most understandable saving of lives would occur in the unintentional or accidental category of gun deaths, which in 2010 accounted for 606 fatalities, 9 percent of which were of young people aged zero to 19 years.[4] Although these unintended deaths are far fewer in number than gun suicides and homicides, when they occur to children, they are seen as particularly tragic. Children find guns in their homes, often handguns kept loaded for protection, and are able to fire them, shooting themselves, their siblings, and playmates. Wintemute et al.[5] examined the circumstances of 88 deaths involving children shooting children and concluded that changes in gun design, particularly of handguns, would be useful in preventing such deaths.

The National Rifle Association (NRA) has long argued that the way to prevent accidental gun deaths of children is to educate them about gun safety. In pursuit of this goal, the NRA has developed its Eddie Eagle GunSafe Program, for children in pre-K through third grades. It states that since the inception of the program, 18 million children have been trained.[6] The effectiveness of training young children in gun safety has been studied, and doubt has been cast as to whether such training is useful.[7]

Vernick et al.[8] studied a series (N = 117) of unintentional, undetermined intent, and negligent homicide gun deaths that occurred in Maryland and Milwaukee County, Wisconsin, from 1991 to 1998. The purpose of the study was to assess what portion of these deaths would likely have been prevented if the guns used were personalized and, separately, if the guns had other safety devices (loaded chamber indicators and magazine disconnect devices). Most (81%) of these deaths occurred with a handgun, roughly half being revolvers and half being pistols. Using specific criteria to address preventability, the researchers determined that 37 percent of the deaths would have been preventable if the guns involved were personalized.

Unintentional deaths are not the only type of gun death that could be affected by a change to personalized guns. Children and teenagers also use guns found in the home to commit suicide. In 2010, 748 youths between the ages of 10 and 19 committed suicide with a firearm.[9] Such deaths, often stemming from depression, would be less likely if the gun in the home were inoperable by the young person. Some have argued that the depressed teenager would just find another means of committing suicide, but other forms of suicide attempts (e.g., poisoning) have lower case fatality rates. The lethality of self-inflicted gunshots leaves little opportunity for medical intervention.

Stolen guns are used in crime and therefore figure prominently in homicides and assaultive injuries involving firearms. Cook and colleagues,[10] using data from the National Crime Victimization Survey (NCVS), noted that there are nearly 350,000 incidents of firearm theft from private citizens annually. Further, there are approximately 1.5 firearms taken during each of these burglaries, resulting in about half a million gun thefts each year. NCVS and FBI data show that the majority of the guns stolen are handguns.[11] These guns would be inoperable to criminals if they had been made as personalized guns.

## A Brief History of Personalized Guns

Danger from the unauthorized use of guns has long been recognized. Roy G. Jinks's *History of Smith & Wesson*[12] tells the story of D. B. Wesson, one of the founding partners of the renowned gun-making firm, learning in the early 1880s of an incident in which a child was hurt while playing with a Smith & Wesson revolver that discharged. Wesson asked his son, Joe, to design a revolver that a young child could not operate, and in 1886, Smith & Wesson began to sell a gun it believed to be childproof. The revolver employed what is now

known as a grip safety—a metallic lever on the back of the gun that must be pressed inward in order for the gun to fire. In its marketing materials for this gun, Smith & Wesson stated that "no ordinary child under eight can possibly discharge it." The concern that Smith & Wesson had for the safety of children more than 125 years ago has not carried through to present times. Smith & Wesson stopped using its childproofing technology many decades ago, and neither it nor other leading gun makers have developed and put into widespread operation newer technologies to protect the public from unauthorized gun use.

Ninety years later, however, a minor gun maker was still concerned with the danger of unauthorized use; he applied for and received a U.S. patent for a combination lock built into a carbine, a long gun. The U.S. patent was issued to Gerald Fox on May 29, 1973, Patent Number 3,735,519. The Fox Carbine featured a three-digit combination lock. The advertisement for this gun noted that "accidental and unauthorized firing is prevented by a patented, built-in combination lock safety."[13]

During the 1980s and 1990s, there was increasing interest in personalizing guns. In 1984, a Massachusetts inventor was granted a patent for a device called a "personalized safety method and apparatus for a hand held weapon." It was described as "responsive to the palm or fingerprint of one or more individuals. The safety device is activated by heat sensed when the device is hand held. The pattern of the palm or fingerprint is stored in the firearm and must match the user's in order for the blocking safety mechanism to allow the weapon to fire.[14] The renewed attention to gun personalization coincided both with advancements in electronic technologies and highly publicized mass shootings.

In 1992, faculty at the Johns Hopkins Bloomberg School of Public Health, with a $2,000 grant, commissioned a team of undergraduate students at the university's School of Engineering to create a prototype of a personalized handgun. Using an existing revolver purchased for this purpose, the students employed touch memory technology, which worked through contact between a semiconductor memory chip and a reader embedded within the grip of the gun. The chip stored a serial number, which was placed on a ring worn by the authorized gun user. When the ring came in contact with the reader on the gun, an electronic current moved a blocking mechanism that kept the gun from being able to fire.

Other technologies, such as radio frequency identification and magnetic encoding, were used in experiments to develop a personalized gun.

On May 12, 2000, President Bill Clinton announced that the United States Justice Department, through its National Institute of Justice, would provide two grants of $300,000 each to Smith & Wesson and FN Manufacturing, Inc., for research and development of personalized gun technology. The press release from the White House stated: "Smart gun technologies have the potential to limit a gun's use to its proper adult owner—and could prevent accidental shooting deaths of children, deter gun theft, and stop criminals from seizing and using the guns of police officers against them."[15]

Work by Colt's on personalized, or smart gun, technology resulted in a prototype handgun that used radio frequency identification. Colt's viewed its smart gun as a major growth prospect for the corporation. But Colt's did not want the progress it was making on personalized guns to be widely known. Colt's formed a new company, iColt, to pursue the technology, and it hoped for additional funding from the federal government. In June 1999, a memo was prepared by Colt's, noting that remarkable progress was being made on personalization technology. The memo further stated that "Colt's is working in Washington to help put $20 million to $40 million in the federal budget for research on 'smart gun' technology. Depending on how the press reports the current state of the 'smart gun,' it could be perceived by Congress that further research dollars are not needed." This memo was uncovered during discovery in a lawsuit against Colt's.[16] Shortly after the memo was written, and during substantial litigation against Colt's and other gun makers, Colt's discontinued its work on personalized guns, and so did most of the major manufacturers in the gun industry.

## Modern Personalized Gun Technology

Personalized firearms presently exist. Armatix GmbH, a German company, has produced the iP1 Pistol, which is a personalized .22 caliber handgun that works like a conventional pistol except that it is digital and battery operated, which allows for software flexibility depending on the needs of the consumer.[17] The handgun is sold with an Active RFID Wrist Watch (designated by Armatix as iW1), which uses radio frequencies to activate the handgun, making it operable. The watch uses a personal identification number (PIN) that must be entered in order to unlock the electromechanical firing pin lock, making the gun operable by the owner.[18] Microchips in both the iW1 watch and the iP1 pistol communicate with each other. If the watch is not within a specified distance

from the pistol, the gun is inoperable, rendering it useless. If the gun is first unlocked by its authorized user but then is taken beyond the distance where it can communicate with the watch, the gun will lock itself and be inoperable until the authorized user gets the watch and the gun back together.

A system of colored lights on the gun is used to convey the firearm's status to the user. A green light indicates that the firearm is in sync with the iW1 watch and is operable by the user. A red light indicates a "safe mode" in which the gun is locked and has not been made active by the authorized user. Additionally, a blue light indicates a "safe mode" in which the gun's magazine has been removed.[19] This feature ensures that the user knows that the magazine containing the ammunition is removed, that the gun is inoperable, and that, even if there is a round in the chamber, it cannot be fired. The gun can be fired only if the light indicator is green.

The Armatix personalized handgun is now being sold on a limited edition basis throughout much of Western Europe, and Armatix has been granted permission from the United States Bureau of Alcohol, Tobacco, Firearms and Explosives to sell the firearm in the United States. The limited, collector's edition is selling in Europe for 7,000 Euro (about US$10,000). Planned sales in the United States will be for a significantly lower cost, and once the pistol is selling in greater numbers, economies of scale will further reduce the cost, bringing it within the price range of many gun buyers.

TriggerSmart, a Limited Liability Irish company, is using radio frequency identification (RFID) technology in the development of its personalized pistol. TriggerSmart realized that a past issue with wireless personalization technology has been that both the firearm and the transmitter used to communicate with the firearm required batteries. This raised questions of reliability and functionality.[20] The TriggerSmart high-frequency RFID system incorporates technology that is commonly used in identification cards and in library books to establish communication between the firearm and a bracelet in order to authenticate a user.[21] The firearm's battery, antenna, and electronic interface are built into the handgrip of the gun. Once the radio frequency tags in the bracelet fall within a distance where it can communicate with the antenna in the handgrip, the gun enters an "instant on" phase and can be fired.[22]

The moment that the radio frequency tags comes out of contact, breaking communication, the firing pin locks and the gun cannot be fired. There is no battery in the bracelet component of the system, which addresses concerns over reliability and functionality. The company claims that this system is use-

ful because the closer the tags in the bracelet are to the antenna in the firearm, the less battery power is used, offering a dependable power source that will last for extended periods of time.

The New Jersey Institute of Technology, in the United States, has been working for years on a biometric version of a personalized gun. Their product employs "grip recognition." The handgun, after some period of use by its owner, recognizes the palm configuration of the owner and will work only when held by that authorized user.

### Achieving Personalized Guns

The federal government of the United States does not comprehensively regulate firearms with regard to their safe design. The U.S. Consumer Product Safety Commission, which is the federal agency that protects the public from unsafe consumer products, has expressly been forbidden by Congress to address the safety of guns.[23] Thus, gun makers are, under federal law, able to choose the design of their products without regard to safety and to ignore the lifesaving potential of personalized guns.

With other products, a manufacturer's failure to design its product in a safe, feasible manner that could prevent foreseeable injuries would likely result in liability. The threat of litigation has provided a strong incentive to the makers of most products to utilize safety technology.[24] It was argued that the same exposure to liability would force gun makers to adopt personalization.[25] But, on October 26, 2005, President George W. Bush signed into law the Protection of Lawful Commerce in Arms Act (15 U.S.C. §§ 7901–7903), which provides to gun makers far-reaching immunity from product liability litigation.

As awareness of the need for personalized handguns increased, there was also more interest in state legislative efforts that would require personalized handguns. To aid in this process, a model law entitled "A Model Handgun Safety Standard Act" was developed by the Johns Hopkins Center for Gun Policy and Research. This model legislation could be used by states or municipalities to require that all handguns manufactured or sold within their jurisdiction after a certain date be personalized. Legislation patterned after the model law was passed in New Jersey in 2002 (New Jersey Statutes, Title: 2C; Chapter 58; Sections 2C:58-2.2 et seq.) The New Jersey law provides that once a personalized gun is introduced for sale in the state and is recognized by the New Jersey attorney general as complying with the statutory definition

of a personalized or childproof gun, then three years later all new handguns sold in New Jersey must be personalized.

In addition to state legislation, there are several actions that Congress could take to introduce personalized guns into the marketplace. These actions, stated in increasing order of effectiveness, in our opinion, are:

1. Provide funds, through the National Institute of Justice or another agency, for research and development of personalized gun technology. But, because of prior difficulties involving gun manufacturers' use of such funds, the work of the gun makers must be closely monitored.
2. Use the federal government's purchasing power to create a market for personalized guns.
3. Provide states with financial incentives to enact personalized or child-proof gun laws, much as Congress has done with other areas of public safety, such as raising the drinking age.
4. Amend the Consumer Product Safety Act to give the Consumer Product Safety Commission (CPSC) jurisdiction over firearms as consumer products. Also, mandate the CPSC to promulgate a standard regarding childproof guns.
5. Enact technology-forcing legislation mandating that all newly manufactured or imported firearms be personalized, starting three years from the eff ctive date of the legislation.
6. Amend the Protection of Lawful Commerce in Arms Act, permitting litigation against firearms manufacturers for injuries sustained by an unauthorized use of a recently manufactured firearm that was not personalized but also providing a safe haven of immunity if the firearm had been personalized.

## Conclusion

Personalized guns are an idea whose time has come. The technology is now available to make guns a safer consumer product. To require all guns to be personalized does not interfere with Second Amendment rights—one can still keep and bear arms, but the arms would be designed in such a manner as to reduce the likelihood of being involved in mayhem.

Based on the longstanding behaviors of the gun industry, it would be naïve to expect them to voluntarily adopt even lifesaving technology. This means

that legislation, regulation, and perhaps litigation are needed to provide the public with safer guns.

Not es

1. CDC Web-based Injury Statistics Query and Reporting System (WISQARS): http://www.cdc.gov/injury/wisqars/index.html.

2. Lund AK, Ferguson SA. Driver Fatalities in 1985–1993 Cars with Airbags. J Trauma. 1995; 38:469–475.

3. CDC Web-based Injury Statistics Query and Reporting System (WISQARS): http://www.cdc.gov/injury/wisqars/index.html.

4. CDC Web-based Injury Statistics Query and Reporting System (WISQARS): http://www.cdc.gov/injury/wisqars/index.html.

5. Wintemute GJ, Teret SP, Kraus JF, Wright MA, Bradfield G. When Children Shoot Children: 88 Unintended Deaths in California. JAMA. 1987;257(22):3107–3109.

6. http://www.nra.org/Article.aspx?id=1353.

7. Hardy, M. Teaching Firearm Safety to Children: Failure of a Program. J. Developmental & Behavioral Pediatrics. 2002;23(2):71–76.

8. Vernick JS, O'Brien M, Hepburn LM, et al. Unintentional and Undetermined Firearm Related Deaths: A Preventable Death Analysis for Three Safety Devices. Injury Prevention. 2003; 9:307–311.

9. CDC Web-based Injury Statistics Query and Reporting System (WISQARS): http://www.cdc.gov/injury/wisqars/index.html.

10. Cook PJ, Molliconi S, Cole TB. Regulating Gun Markets. J Crim L Criminology. 1995;86:59–91.

11. Zawitz MW. Guns Used in Crime: Firearms, Crime and Criminal Justice: Selected Findings. Washington, DC: U.S. Dept. of Justice; Bureau of Justice Statistics, NCJ-160009 3. 1996.

12. Jinks RG. *History of Smith & Wesson.* North Hollywood, CA: Beinfeld Publishing. 1977.

13. http://forums.vwvortex.com/showthread.php?5127428-the-DEMRO-Fox -Carbine-a-really-really-really-dumb-gun-design.

14. Shaw FA. Personalized Safety Method and Apparatus for a Hand Held Weapon. U.S. Patent 4,467,545: Aug. 28, 1984.

15. http://clinton4.nara.gov/WH/New/html/20000531_4.html.

16. Ivey, C. Judge Orders Release of Colt's Smart Gun Research. San Jose *Mercury News,* Apr. 18, 2003; www.mercurynews.com.

17. Armatix iP1 product description at http://www.armatix.de/iP1-Pistol.779.0 .html?&L=1.

18. Armatix iW1 product description at http://www.armatix.de/iP1-Pistol779.0 .html?&L=1.

19. Armatix iP1 product description at http://www.armatix.de/iP1-Pistol.779.0 .html?&L=1.

20. Pers. comm., Robert McNamara, Jan. 6, 2013.

21.  Pers. comm., Robert McNamara, Jan. 6, 2013.

22.  Pers. comm., Robert McNamara, Jan. 6, 2013.

23.  Pub. L. 94-284, §3(e), May 11, 1976, 90 Stat. 504 (1976).

24.  Teret SP. Litigating for the Public's Health. Am J Public Health 1986;76:1027–1029.

25.  Teret SP, Culross P. Product-oriented Approaches to Reduce Youth Gun Violence. The Future of Children, 2002;12(2):119–131.

# Part IV / International Case Studies of Responses to Gun Violence

*This page intentionally left  lank*

**14**

# Gun Control in Great Britain after the Dunblane Shootings

Michael J. North

### Dunblane

On March 13, 1996, a man with a grudge against the local community walked into Dunblane Primary School in central Scotland. He was armed with two semi-automatic pistols and two revolvers and carrying hundreds of rounds of ammunition loaded into high-capacity magazines, all legally held. Within minutes Thomas Hamilton had shot and fatally wounded one teacher and sixteen 5- and 6-year-old children. Another ten children and three teachers were injured. All of his victims were shot with a 9-mm semi-automatic pistol. Hamilton then killed himself with one of his revolvers.

Gun homicide is rare in Great Britain. The deaths at Dunblane accounted for nearly a quarter of the country's gun victims in 1996. The public outrage at this scale of violence by a legally armed gunman translated into a campaign for tighter gun control, and within two years all handguns had been prohibited.

Michael J. North, PhD, was a biochemistry academic at the University of Stirling in Scotland when in March 1996 his only daughter was killed in a mass shooting at Dunblane Primary School. Following that event he became an advocate for gun control.

This essay outlines events which led to the landmark legislative changes and summarizes their impact. Only the key elements are included and more details can be found in North (2000). Inevitably, this is an insider's account and a more thorough analysis of the issues is provided by Squires (2000).

### Firearms Legislation

Firearms legislation is determined by the UK parliament, though the laws applying in Northern Ireland differ in some respects from those for Great Britain (England, Wales and Scotland), the focus of this essay.

British law permits the private ownership of guns for which an appropriate reason can be demonstrated (e.g., target shooting, hunting, vermin control), but the reasons exclude self-protection (except rarely in Northern Ireland). Under the Firearms Act (1968) handgun and rifle owners were required to hold a firearm certificate (license) issued by the local police force. Justification for the ownership of each individual weapon was needed (a different system applies to shotguns). A person had to show suitability to be entrusted with a firearm with the application counter-signed by a responsible person who knew the applicant. Hamilton held firearms certificates for nearly 20 years and owned a number of handguns, all for target shooting at an approved gun club, the "good reason" for ownership of most of the legally held handguns in Great Britain.

Applications for firearm certificates were rarely unsuccessful, with only 1% being refused. Nor were many certificates revoked. Hamilton's ownership of guns had been called into question, but the senior officer responsible for firearms licensing dismissed the concerns. He later admitted to have been worried that if his certificate had been revoked, Hamilton would have successfully appealed. Hamilton therefore retained his certificate and was able to buy and keep dangerous weapons.

Some other types of firearms were prohibited. In 1988 many self-loading and pump-action rifles and shotguns had been banned in the aftermath of a mass shooting in August 1987 in Hungerford, Berkshire, where another legal gun owner killed sixteen people, half of whom were shot with a semi-automatic rifle. However, the Conservative Party government failed to tighten controls over handguns even though the other victims were killed with a pistol. It did set up a Firearms Consultative Committee to advise the Home Secretary

(The United Kingdom's equivalent of the United States Attorney General), but the membership was biased in favor of those with interests in shooting. Victims' voices were absent and the Committee became a means by which the gun lobby could influence Home Office policy and its implementation. Traditionally the Conservative Party had close links with the shooting community and there were accusations that the post-Hungerford response had been watered down because of vested interests.

### Immediate Response to Dunblane

The Conservatives were still in power in 1996, and the Government faced awkward questions about why it had not dealt with handguns after Hungerford. Michael Forsyth, the local Member of Parliament (MP) in Dunblane, was Secretary of State for Scotland, a connection which undoubtedly gave weight to the case for tighter gun control within government. One of his first moves was to set up a Public Inquiry chaired by a senior judge, Lord Cullen, which "sought to answer questions about the circumstances that led up to and surrounded the shootings and make recommendations with a view to safeguarding the public against the misuse of firearms and other dangers" (Cullen 1996).

In the United Kingdom, Public Inquiries are held after major disasters to shed light on the causes and to offer recommendations on the lessons that can be learned. The forthcoming Inquiry provided breathing space for the Government which could delay announcing its position. On legal advice, other interested parties also had to wait until after the Inquiry's hearings were over before commenting. In retrospect, this proved to be a good thing for the victims' families, giving time for their thoughts to be collected. However, aided by continuous media coverage a widespread debate on gun control had already begun. Campaigns for a ban on handguns were initiated.

At Parliament, backbench MPs on the Home Affairs Committee held an inquiry into the possession of handguns, but evidence was heard predominantly from those with shooting interests with no input from victims. The MPs' report exposed a political split, the Conservative majority proposing that no significant new controls were necessary, and the Labour minority advocating a ban. The Government had hoped to keep politics out of the debate but the report reinforced a widely held perception that the Conservatives gave too much weight to the views of the shooters.

The ongoing national debate ensured that by the time the Cullen Report was published most groups and political parties had already established their positions, making it unlikely that anything Lord Cullen recommended would make a difference.

## Campaign for a Handgun Ban

During the early 1990s there was a perception, supported by official crime data, that handgun crime was on the increase leading to anxieties about an "American-style" gun culture taking hold, something that had little appeal to the British. There was speculation about the provenance of guns used in crime and varying estimates of the numbers of illegal weapons. Firearms enthusiasts argued that the crime problem was entirely the result of unlicensed guns. To them, and indeed many policy makers, legal guns posed no problems. Hungerford, and then Dunblane, were reminders this was not the case.

Gun ownership is low in Great Britain, with most of the population unfamiliar with what weapons can be owned legally. There was widespread shock, including among politicians, at the amount of firepower that Hamilton had available to him. Shooting with handguns in gun clubs had been on the rise and increasingly involved weapons more powerful than those used for traditional Olympics-style target shooting. In his report Cullen commented on the growth of activities like combat shooting and said that its trappings "caused others to feel uneasy about what appears to be the use of guns as symbols of personal power" (Cullen 1996).

Campaigns in support of a handgun ban began almost immediately, reflecting a majority public view confirmed in opinion polls, that handguns were too dangerous for private possession because they were easily concealable, rapidly fired, not justifiable for shooting game and criminals' weapon of choice. Most of those who became active campaigners had little, if any, prior knowledge of guns. Gun enthusiasts argued that this precluded them from influencing policy and that only those with a working knowledge of guns were qualified to discuss firearms legislation. Advocates for gun control were said to be too emotional and seeking an ill-informed knee-jerk response. For many, including the Dunblane victims' families the Inquiry hearings were, however, providing a crash course in gun-related issues.

The prime motivation of the campaigners was to minimize the risk of another shooting like Dunblane. Most thought that a minority sport (target

shooting with handguns) was insufficient justification for compromising public safety through the private ownership of dangerous weapons. Hamilton's own history with guns suggested it was impossible to design a licensing system which would ensure handguns were never owned by those who would potentially misuse them. Psychological testing, something favored by the shooting organizations to eliminate potential "madmen," was said by the British Medical Association to have no predictive measure. Campaigners concluded that in the interest of public safety it was better to keep handguns out of all private hands.

Most national newspapers immediately called on the Government to introduce tighter gun controls, and media support during the various campaigns ensured a continuous source of pressure on politicians. Individual campaigns arose spontaneously and independently around the country. Two petitions in particular gained national prominence, one launched by a Scottish tabloid newspaper, the *Sunday Mail*, and the Dunblane Snowdrop Petition, organized by parents of young families living in Central Scotland. Each called for a handgun ban and was eventually supported by hundreds of thousands of signatures before being handed into Parliament. The Snowdrop Campaign gained considerable media coverage. Gun Control Network (GCN), whose aim was to provide a permanent voice for gun control beyond the current campaign, was also set up and its founding members included parents of victims of both the Hungerford and Dunblane shootings together with lawyers and academics. The campaigns ran on limited budgets, occasionally accepting *pro bono* help from PR companies, but relying mostly on the efforts of volunteers. They never came to depend on large organizations or high-profile celebrities.

Although unable to be directly involved during the initial stages, many of the Dunblane families became active participants once the Inquiry hearings were over. Each family made its own decision to join in, but without exception all came to support the aim of a handgun ban. The families' involvement in the Snowdrop Campaign and GCN ensured the various activities were coordinated. The families boosted the public profile of the campaign, which came to be portrayed, misleadingly, as entirely their own. It was critical that the issue was kept alive and, more than anyone else, the families could do this by talking to the media about themselves and their children as well as the handgun ban. They were able to gain access to politicians, and parliamentary lobbying would become a key activity.

Inevitably the shooting organizations were opposed to any change to the gun laws. They believed many were being punished for the actions of one man. They

said Dunblane could be dismissed as another "one-off" event and were adamant that tighter controls would not stop it happening again. Pro-gun representatives gave evidence to the Public Inquiry and participated in media debates but probably believed their previous close political contacts would ensure that little would be changed. They told the Government not to react to special pleading of the Dunblane families, that a handgun ban would have no impact on gun crime, and that a "madman" cannot be stopped. The groups opposed to the ban failed to win over the general public or much of the media. Their rallies were only modestly attended, and when their tactics became more aggressive the media were quick to expose their personal attacks on gun control campaigners. The gun lobby could still rely on some support among parliamentarians, but the influence they had was limited. Some in the shooting community had, prior to Dunblane, been concerned by trends in handgun shooting that might be giving shooting the "wrong image," but all the groups stood firm against any legislative changes. Their intransigence made it inevitable that those seeking a tightening of controls would harden their position since any compromise over gun safety measures appeared impossible.

As the Cullen Report was awaited the political parties had been assessing the arguments and monitoring public opinion. The Government waited until the Report's publication, but the main opposition parties all announced that they were favoring a total ban.

## Legislative Changes

The Cullen Report was published in October 1996, six months after the shootings. Although he did not recommend an outright ban on handguns, Cullen did recommend restrictions on how handguns were kept, suggesting measures such as disablement of guns when not in use and locked barrel blocks. However, he went on to add that "if such a system is not adopted the Government should consider restricting the availability of self-loading pistols and revolvers of any caliber by banning of the possession of such handguns by individual owners" (Cullen 1996).

At the time the Government was weak; its party divided on a number of issues, and had a very small parliamentary majority. Facing an imminent general election, Conservative MPs were sensitive to the public mood, which had been reflected in the campaigns, but they also had traditional links to the shooting community. The Government opted for a compromise. Choosing

to go further than Cullen's recommendations, ministers proposed a partial ban—prohibiting all large-caliber handguns, though smaller guns (.22s) used by target shooters for events like the Olympic Games were still permitted with tighter restrictions. The compromise satisfied neither the campaigners nor the gun lobby, and within Parliament the Government faced opposition from both sides of the argument. Some MPs, mostly in the Government's own party, opposed any kind of ban whilst the main opposition parties wanted a total ban.

Through press conferences, interviews and lobbying, the Dunblane families immediately attempted to persuade more MPs to support a bill for a complete ban, highlighting the fact that .22 handguns could be just as lethal as other calibers. However, the Government retained sufficient support for the partial ban, and despite dissatisfaction from both sides of the debate a bill was passed to ban just the higher caliber handguns.

Three months after the bill had been enacted the Labour party won a general election with a huge majority. A number of the new Labour ministers had had the opportunity during the previous year to meet with the Dunblane families and listen to their views. As a result Labour had made a commitment in its election manifesto to prohibit the remaining small caliber handguns. A new law was duly passed and by February 1998 all handguns had become prohibited weapons. Handgun owners received compensation for the weapons they were required to surrender.

While there has since been a sustained attempt on the part of some shooting organizations to reverse the handgun ban this has been largely unsuccessful. The only concession was to allow an elite group of Olympic pistol shooters to practice on British soil during a limited period before the 2012 London Games.

In Great Britain the gun issue was not clouded by arguments over self-defense and the right to bear arms. Cullen's report had unambiguously rejected guns for self-defense. The United Kingdom's dominant view that guns were part of the problem, not part of the solution, remained intact and the eventual handgun ban was very much in keeping with this viewpoint (Squires 2000).

## Impact and Legacy

The precise impact of the handgun ban on the complex pattern of gun crime would be impossible to quantify. The gun lobby, rightly pointing out that

criminals were unlikely to surrender illegal handguns, claimed a handgun ban could have no effect on criminal activity. It was inevitable that it would take some time to reduce the pool of illegal handguns after the ban, but there is plenty of anecdotal evidence, for example from the National Ballistics Intelligence Service (Nabis), that there are now fewer guns on the street. In England and Wales gun crime did continue to rise during the period immediately following the ban, but after reaching a peak in 2003 and 2004 the total number of firearm offenses has fallen in every subsequent year (Lau 2012). In Scotland gun crime has decreased in almost every year since 1998 and is now less than a third of the 1996 level (Anon. 2012). Gun homicides are even rarer. In 2012 there were only six gun homicides in London reported in the media and a total of 32 across Great Britain. This is not the picture of a country in the grip of gun violence, and the risk for most of the British population remains extremely low. If there had been a drift towards an "American-style" gun culture in the 1990s the handgun ban stopped it.

Some concerns do remain, not least the difficulty some policy makers still have in recognizing any problems with other legal guns. There has been no other mass shooting involving handguns, but Britain did suffer another tragedy in 2010 when a man killed 12 people in Cumbria before killing himself. Derrick Bird's weapons, a shotgun and a rifle, were legally owned, raising questions about remaining inadequacies in Great Britain's gun laws.

Dunblane led to the birth of a gun control movement in Great Britain. Gun control advocates and campaign groups representing victims are now accepted as important participants in discussions on firearms, something which has ensured a far more balanced approach. GCN has been invited to give evidence to a number of Parliamentary Select Committees, has had regular meetings with ministers and shadow ministers and pressed for the introduction of further legislation which, since the handgun ban, has tightened controls over imitation firearms and airguns.

The handgun ban in Britain created interest around the world. It has been cited as an example of what can and should be done to stem gun violence elsewhere. The international gun lobby has sought to discredit the ban with distorted claims about its impact, especially on the level and type of violent crime in Britain. But for most of the British population it remains a positive step which has helped maintain a society that wishes to be as free as possible from the threat of gun violence.

Acknowledgments

My daughter was one of the victims of the Dunblane shootings. I wish to acknowledge the support provided since 1996 by the other Dunblane families and express my thanks to my GCN colleagues, especially Peter Squires whose book has been an invaluable help in the preparation of this essay.

References

Anon. 2012. *Recorded Crimes and Offenses Involving Firearms. Scotland, 2011–2012.* Edinburgh: Scottish Government.

Cullen, Lord W. Douglas. 1996. *The Public Inquiry into the Circumstances Leading up to and Surrounding the Events at Dunblane Primary School on Wednesday 13th March 1996.* Edinburgh: The Stationery Office.

Lau, Ivy. 2012. *Recorded Offences Involving the Use of Firearms.* In "Homicides, Firearm Offences and Intimate Violence 2010/11: Supplementary Volume 2 to Crime in England and Wales," ed. Kevin Smith. London: Home Office.

North, Mick. 2000. *Dunblane: Never Forget.* Edinburgh: Mainstream.

Squires, Peter. 2000. *Gun Culture or Gun Control.* London: Routledge.

*This page intentionally left  lank*

**15**

# Rational Firearm Regulation

Evidence-based Gun Laws in Australia

Rebecca Peters

Australians understand how Americans feel after the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, on December 14, 2012, because we had a similar experience in April 1996. In our case a disturbed young man with assault weapons killed 35 people at the Port Arthur historic site in Tasmania, one of Australia's most popular tourist destinations. Nineteen other people were seriously injured in the attack. Most of the victims were tourists from other states; some were local residents and workers. The guns used were legally available in Tasmania but banned in most other states.

It was the largest massacre by a single shooter ever recorded in the world and ignited an explosion of public sorrow and outrage as the nation demanded that the gun laws be overhauled. Responding to public pressure, the Prime Minister summoned the Australasian Police Ministers' Council (APMC) and proposed a plan for strict uniform gun laws. The Police Ministers also read the mood of the nation, and 12 days after the massacre they agreed to

Rebecca Peters is a violence prevention specialist who has worked for more than 20 years on arms control, women's rights, public health, and human security.

adopt the National Firearms Agreement into law in all eight states and territories.

## Guns in Australia

Australia is a former frontier country, with a well-established gun culture. Guns are owned mainly for sport, recreational hunting, and for use on farms. Each state and territory has its own gun laws, and in early 1996 these varied widely between the jurisdictions. Guns that were banned in some states were legally available in others; some states required all guns to be registered while others did not. The license screening process also varied, so a person barred from owning guns in one state could legally own them in another. One important element was consistent across the nation: the relatively strict regulation of handguns. All jurisdictions limited these weapons to pistol club members and security guards, and all required the ownership and transfer of handguns to be registered with police. As a result of this restrictive approach, handguns made up only around 5% of the Australian stockpile (Harding 1988).

In 1996 Australia's firearm mortality rate was 2.7/100,000 (Mouzos 1999), or about one quarter the US rate. Australia had suffered mass shootings before Port Arthur. As in the United States, each tragedy provoked calls for stronger gun laws, and a grassroots campaign had been building for a decade. Until Port Arthur, however, gun law reform tended to advance in a piecemeal fashion, one tweak in one state at a time.

## The Battle Over Firearm Regulation

The campaign for stronger laws was waged by hundreds of community and professional organizations which made up the National Coalition for Gun Control (NCGC): public health and medical societies, women's groups, senior citizens' associations, rural counselors, youth agencies, parents' groups, legal services, human rights organizations, churches, researchers, trade unions, and police. Participants ranged across the political spectrum, from the Country Women's Association to the Council for Civil Liberties, from the War Widows' Guild to the Gay & Lesbian Anti Violence Project.

This diversity reflected the multiplicity of dangers that guns pose in society: some NCGC members were especially concerned about domestic violence, others about crime on the streets, youth suicide, or workplace violence. Their

common conviction was that guns are inherently dangerous products whose availability should be strictly regulated. However useful or enjoyable guns may be for their owners, the interests of public health and public safety must prevail.

The size and breadth of the coalition also reinforced the fact that gun law reform was a mainstream concern rather than the preserve of a single-issue lobby group. Opinion polls had long indicated that the overwhelming majority of Australians wanted tough uniform gun laws; yet the issue was usually framed by the media as a tug-of-war between gun control activists and the gun lobby.

Australia has a strong pro-gun lobby which for years had blocked proposed reforms by threatening parliamentarians whose seats were held by a slim electoral margin. Although most gun owners were not opposed to tighter gun laws, the gun lobby could count on a small number of zealots who were prepared to vote solely on this issue. Thus, despite legislators from both major political parties privately acknowledging the need for reform, neither party was prepared to make the first move publicly. Campaigners had long attempted to persuade the two parties to move simultaneously toward tighter laws, but the highly adversarial nature of Australian politics prevented this shift rom occurring before 1996.

The breakthrough after Port Arthur came because John Howard, the newly elected Prime Minister, showed extraordinary leadership and took a stand for stronger gun laws. His courage was especially remarkable because his is the more conservative of our two major political parties, and traditionally considered the natural ally of the gun lobby. In fact this political configuration facilitated a bipartisan agreement: a conservative government inviting progressives to support gun control was more likely to succeed than vice versa. The bipartisan policy gave cover to state and federal parliamentarians from both parties, allowing them to support the reforms without fear of their opponents using the issue against them in an election. As one parliamentarian observed to me, "We go into public life to try to make things better, but then politics gets in the way. It's good to get the chance to do what's right without worrying about politics." John Howard still refers to reform of the gun laws as one of his proudest achievements (Howard 2012).

The bipartisan agreement was a major defeat for the gun lobby, but it continued to fight against the reforms. Rural communities were leafleted warning of total gun prohibition; government officials were harassed with floods of form letters; new political parties were formed to represent shooters.

Outlandish declarations, conspiracy theories, and threats voiced by pro-gun extremists made us realize Australia had its own "lunatic fringe"—and that it was heavily armed. Death threats were made against activists and parliamentarians. An image seared on the collective memory was our Prime Minister addressing a gathering of rural gun owners, obviously wearing a bullet-proof vest under his suit. This was said to be the first time such a precaution had been taken in Australia.

### The Importance of Information and Research

In 1996 the World Health Assembly declared violence a leading worldwide public health problem, and urged countries to develop science-based solutions to prevent it (World Health Assembly 1996).

The National Coalition for Gun Control was seeking a comprehensive regulatory system based on prevention, designed to address the real nature of gun violence in Australia. That reality, according to public health, legal and criminology research, was

- Most gun deaths were suicides; though most suicides did not involve guns (Moller 1994).
- Guns were used in about 23% of all homicides, but more often in family killings and in multiple-victim attacks (Strang 1993; Wallace 1986; Bonney 1989).
- Most homicides involved victims and perpetrators who knew each other. Among these cases, most involved close personal relationships— the victim was a family member, current or former sexual partner or rival of the perpetrator, or a person attempting to assist someone in one of those categories (Strang 1993; Wallace 1986; Bonney 1989; Gallagher et al. 1994).
- Family homicides were usually preceded by a pattern of domestic violence (Wallace 1986; Law Reform Commission of Victoria 1991; Neal 1992); but most domestic violence was not reported to police (Department of Premier & Cabinet (Victoria) 1985; Queensland Domestic Violence Task Force 1988; Task Force on Domestic Violence (WA) 1986).
- Most homicide offenders had not previously been adjudicated mentally ill or convicted of criminal violence (Strang 1993; Wallace 1986).

The last two points highlighted the limitations of gun laws based on reacting after the fact. A system that waits until violence is officially recorded before taking any action will fail to assist most victims.

In addition, research from two similar jurisdictions, New Zealand and Canada, showed many firearm homicides involved weapons owned by licensed shooters (Alpers 1995; Dansys Consultants Inc. 1992).

The NCGC consulted closely with researchers and practitioners in academia, public agencies and service delivery organizations. The campaign's policy demands were based mainly on the reports of national and state expert review committees that had considered the regulation of firearms, either as a primary focus or as part of wider violence prevention (National Committee on Violence 1990; National Committee on Violence Against Women 1993; Australian Police Ministers' Council 1991; Australian Law Reform Commission 1986; Joint Select Committee Upon Gun Law Reform 1991; New South Wales Domestic Violence Committee 1991a,b,c; Queensland Domestic Violence Task Force 1988; Task Force on Domestic Violence (WA) 1986; Women's Policy Coordination Unit 1985; Parliament of Victoria, Social Development Committee 1988; Law Reform Commission of Victoria 1991).

The most important review had been by the National Committee on Violence (NCV), established in 1988 in the wake of two mass shootings. After hearing evidence around the country over the course of a year, the NCV made some 20 recommendations for firearms regulation (National Committee on Violence 1990). It called for national uniform gun laws and uniform guidelines for their enforcement; and for the development of a national gun control strategy aimed at (a) reducing the number of firearms in Australia and (b) preventing access to firearms by individuals who were not "fit and proper persons."

Ultimately the National Firearms Agreement contained almost all the measures recommended by the NCV and sought by the NCGC. One recommendation notably omitted from the Agreement was that handguns be required to be stored at pistol clubs.

## The New Laws

The National Firearms Agreement is summarized in Table 15.1 (Australasian Police Ministers' Council 1996).

Once the National Firearms Agreement was settled, campaigners pushed for rapid implementation. As time passed and media interest waned, politicians

*Table 15.1*   National Firearms Agreement (1996) Australia

**Ban on automatic and semi-automatic long arms—and buyback**
- Ban on import, sale, resale, transfer, ownership, possession, manufacture and use

**Nationwide registration of all firearms**
- Integration of licensing and registration systems across the country

**License applicants must prove 'genuine reason' for every firearm they wish to possess**
- Personal protection is not a genuine reason; applicants for Category B, C, D and H must also prove 'genuine need'

**Uniform basic licence requirements**
- Age 18, prove genuine reason, be a 'fi  and proper person', pass an adequate safety test, waiting period at least 28 days
- Photo licence showing the holder's address, the category of firearm, issued for a maximum of five years.
- Conditions include storage requirements, inspection by police, licence withdrawal/ seizure of guns in certain circumstances.
- Categories of licenses and firearms:
  ○ Category A: air rifles; rimfire rifles (excluding self-loading); single and double barrel shotguns
  ○ Category B: muzzle-loading firearms; single shot, double barrel and repeating centrefire rifles; break action shotgun/rifle combinations
  ○ Category C (prohibited except for certain occupational purposes, later expanded to include some clay target shooters): semi-automatic rimfire rifles with max 10-round magazine; semi-automatic shotguns with max 5-round magazine; pump action shotguns with max 5-round magazine.
  ○ Category D (prohibited except for official purposes): semi-automatic centrefire rifles; semi-automatic shotguns; pump action shotguns with a capacity over 5 rounds; semi-automatic rimfire rifles with capacity over 10 rounds.
  ○ Category H: all handguns, including air pistols.

**Safety training as a prerequisite for licensing**
- An accredited course required for first-time licence; a specialized course for persons employed in the security industry.

**Grounds for licence refusal / cancellation and seizure of firearms, including:**
- General reasons: not of good character, conviction for violence in past five years, contravene firearm law, unsafe storage, no longer genuine reason, not notifying change of address, licence obtained by deception, not in the public interest.
- Specific reasons: applicant/licence holder has had a restraining order or serious assault conviction in past 5 years.
- Mental or physical fi ness: reliable evidence of a condition that would make the applicant unsuitable to possess a gun.

**Permit to acquire**
- Separate permits required for the acquisition of every firearm, with a waiting period of at least 28 days.

*Table 15.1*   (Continued)

**Uniform standard for the security and storage of firearms**
- Guns must be kept locked, ammunition stored separately; failure to store firearms safely is an offense.
- Specific storage requirements for different categories of firearms.
- Rules for safekeeping of firearms when temporarily away from the usual place of storage.

**Recording of sales**
- No private or backyard sales: all sales must be conducted by or through licensed firearm dealers.
- Dealers must ensure purchaser is licensed, and provide details of each purchase and sale to firearms registry.
- Ammunition sold only for those guns for which the purchaser is licensed; limits on the quantity that can be purchased.

**No mail order sales**
- Mail order only allowed from licensed gun dealer to licensed gun dealer.
- Advertising guns may only be conducted by or through a licensed gun dealer.
- The movement of Category C, D and H firearms must be in accordance with prescribed safety requirements.

became more susceptible to gun lobby pressure for a weak interpretation of the Agreement. However, within one year, all states and territories had amended or replaced their gun laws to comply.

The reform that received most publicity internationally was the buyback and destruction of the newly prohibited weapons. Owners had 12 months to surrender these guns for compensation, funded by a temporary increase in the national health levy. The financial carrot was backed up by a stick: after the buyback ended, possession of these weapons was a serious criminal offense. The stocks held by gun dealers were also bought back. Some 640,000 banned firearms were melted down in this 12-month program; though as discussed in the essay by Philip Alpers (in this volume), the final number of guns destroyed was considerably larger.

The legal reforms and buyback were accompanied by a large public awareness and information campaign. In addition, the computer systems of state and territory police forces were upgraded and linked together.

In 2002, following the shooting murder of two university students, the APMC made two more agreements on guns. The National Firearms Trafficking Policy Agreement strengthened border protection, regulation of gun dealers,

and penalties for gun trafficking. The National Handgun Control Agreement restricted the types of handguns allowed for civilians.

Over the years, individual states and territories have amended their laws. There is no mechanism to maintain the uniform standard, and some cracks are beginning to emerge. In 2008 New South Wales made it easier for un-licensed individuals to have handguns at target clubs, with lethal consequences: in 2011 a patron walked out of a pistol club with one of the club's guns, and used it to shoot her father dead (*Sydney Pistol Club v Commissioner of Police, NSW Police Force* 2012). Campaigners point to tragedies like this as justifying further restrictions on handguns.

Overall, Australia's reforms have proved a resounding success. We have not had another mass shooting since 1996, and the firearms mortality rate today is 1/100,000 —less than half what it was then (Australian Bureau of Statistics 2012), and one tenth the current United States rate.

This dramatic improvement in public safety has not stopped the United States gun lobby from misrepresenting the Australian experience as part of its campaign against firearm regulation. A National Rifle Association (NRA) infomercial video produced in 2000 claims crime rates have skyrocketed and Australia is overrun by criminals as a result of the reforms. The misinformation was so outrageous that our Attorney General took the unusual step of writing a letter of complaint to Charlton Heston, then president of the NRA. Attorney General Daryl Williams wrote, "There are many things that Australia can learn from the United States. How to manage firearm ownership is not one of them . . . I request that you withdraw immediately the misleading information from your latest campaign" (Williams 2000).

The NRA ignored that request back in 2000, and now the video is once again in circulation on the Internet. But the reality is that firearm regulation has fulfilled its promise to make Australia safer. We hope our experience can help the United States find its own solutions.

references

Alpers, Philip. 1995. "Firearm homicide in New Zealand: victims, perpetrators and their weapons 1992–1994." Paper presented at Public Health Association Conference, Dunedin NZ, June 27–30.

Australian Bureau of Statistics. 2012. *Causes of Death, Australia, 2010*, 3303.0. Canberra: Australian Bureau of Statistics.

Australian Law Reform Commission. 1986. *Domestic Violence*, Report No30. Canberra: Australian Government Publishing Service.

Australasian Police Ministers' Council. 1996. Resolutions from a Special Firearms Meeting. Canberra: APMC, May 10.

Australian Police Ministers' Council. 1991. "Draft  esolutions." October 23.

Bonney, Roseanne. 1989. *Homicide II*. Sydney: NSW Bureau of Crime Statistics & Research.

Dansys Consultants Inc. 1992. *Domestic Homicides Involving the Use of Firearms*. Ottawa: Department of Justice (Canada), March.

Gallagher, Patricia, Nguyen Da Huong, Marie Therese, and Bonney, Roseanne. 1994. *Trends in homicide 1968–1992.* Sydney: NSW Bureau of Crime Statistics & Research.

Harding, Richard. 1988. "Everything you need to know about gun control in Australia." Briefing paper prepared for the Australian Bankers' Association.

Howard, John. 2012. "Brothers in arms, yes, but the US needs to get rid of its guns." *The Age*, August 1. http://www.theage.com.au/opinion/politics/brothers-in-arms-yes-but-the-us-needs-to-get-rid-of-its-guns-20120731-23ct7.html#ixzz2HbNM2pA7

Joint Select Committee Upon Gun Law Reform. 1991. *Report of the Joint Select Committee Upon Gun Law Reform*. Sydney: NSW Parliament.

Law Reform Commission of Victoria. 1991. Homicide, Report No. 40. Melbourne: LRCV.

Moller, Jerry. 1994. "The spatial distribution of injury deaths in Australia: Urban, rural and remote areas." *Australian Injury Prevention Bulletin* Issue 8, December.

Mouzos, Jenny. 1999. *Firearm-related Violence: The Impact of the Nationwide Agreement on Firearms*. Trends & Issues No. 116. Canberra: Australian Institute of Criminology.

National Committee on Violence Against Women. 1993. *National Strategy on Violence Against Women*. Canberra: Australian Government Publishing Service.

National Committee on Violence. 1990. *Violence—Directions for Australia*. Canberra: Australian Institute of Criminology.

Neal, David. 1992. "The murder mystery." *Modern Times*, June. Fitzroy, Victoria: Australian Modern Times.

NSW Domestic Violence Committee. 1991a. *Report of the NSW Domestic Violence Committee, NSW Domestic Violence Strategic Plan*. Sydney: Women's Coordination Unit.

NSW Domestic Violence Committee. 1991b. *Report on Submissions, Consultations and Forums, NSW Domestic Violence Strategic Plan*. Sydney: Women's Coordination Unit.

NSW Domestic Violence Committee. 1991c. "Submission to Joint Select Committee Upon Gun Law Reform." Sydney: Women's Coordination Unit.

Parliament of Victoria, Social Development Committee. 1988. *First Report Upon the Inquiry into Strategies to Deal with the Issue of Community Violence.* Melbourne: Jean Gordon Government Printer.

Queensland Domestic Violence Task Force. 1988. *Beyond These Walls, Report of the Queensland Domestic Violence Task Force*, Brisbane.

Strang, Heather. 1993. *Homicide in Australia, 1991–1992*. Canberra: Australian Institute of Criminology.

*Sydney Pistol Club v Commissioner of Police, NSW Police Force*. 2012. NSW Administrative Decisions Tribunal 121, 21.

Task Force on Domestic Violence (WA). 1986. *Break the Silence: Report of the Task Force on Domestic Violence to the Western Australian Government*. Perth: Western Australian Government.

Wallace, Alison. 1986. *Homicide: The Social Reality*. Sydney: NSW Bureau of Crime Statistics & Research.

Williams, Daryl. 2000. Letter to Charlton Heston, March 22.

Women's Policy Co-ordination Unit. 1985. *Criminal Assault in the Home: Social and Legal Responses to Domestic Violence*. Melbourne: Department of Premier & Cabinet (Victoria).

World Health Assembly. 1996. "WHA49.25 Prevention of violence: a public health priority." Geneva: Forty-Ninth World Health Assembly, May 20–25.

**16**

# The Big Melt

How One Democracy Changed after Scrapping
a Third of Its Firearms

Philip Alpers

In recent years, several democracies have dramatically reduced the availability of firearms to private individuals. I emphasize the word *democracies* because, contrary to Internet chatter, the countries in which voters have supported gun amnesties and buybacks are not dictatorships. They include the United Kingdom, Brazil, Argentina, and Australia, which in recent years destroyed a third of its privately owned guns.

Many observers continue to cite the official tally of guns destroyed by smelting in the Australian National Firearms Buyback as 659,940 newly prohibited weapons (Australia 2002). Yet the actual number of private weapons destroyed is now estimated at well over one million. As outlined in the essay by Rebecca Peters (in this volume), in the late 1990s all Australian states and territories agreed to new uniform legislation, the primary declared purpose of which was to reduce the risk of mass shootings. Owner licensing was tightened to require proof of "genuine reason" to possess a gun; the sale and transfer of

Philip Alpers is an adjunct associate professor at the Sydney School of Public Health, the University of Sydney.

firearms was limited to licensed dealers; rapid-fire rifles and shotguns were banned, bought back, and destroyed; and remaining firearms were registered to uniform national standards (Australia 1996). Two nationwide, federally funded gun buybacks made the headlines, but until now the number of additional, voluntary, and unrecompensed surrenders for destruction remained unquantified.

In the seven years up to January 1988 and before the Port Arthur shootings in 1996, six gun massacres (five or more victims shot dead) had already claimed the lives of 40 Australians (Chapman, Alpers, et al. 2006). According to articles in the print media published during the twenty-four years that followed, we know that 38 state, territory, and federal firearm amnesties ran for a minimum combined total of 3,062 weeks. From the reports in which numbers were published, a total of 948,388 firearms were surrendered to police for destruction. Of these, 67,488 (7.1%) were collected before the federal long-gun buyback which followed the 1996 Port Arthur tragedy. In the 1996–97 National Firearms Buyback of rapid-fire long guns (mainly semi-automatic rifles but also self-loading and pump-action shotguns) and in the 2003 National Handgun Buyback which followed, Australians gave up for destruction 728,667 newly prohibited firearms in return for market-value compensation.

Having measured the scale of the Australian experiment with more accuracy, I have found that at least 219,721 additional firearms were surrendered for destruction—a number which until now has been untallied and largely unrecognized. Although the Australian initiative was most often described as a "buyback" in which gun owners received cash compensation, of all the weapons handed in for destruction since 1988, nearly one in four yielded no financial return to its owner (Alpers and Wilson 2013). Such was the swing in public opinion that large numbers of gun owners sent lawfully held firearms to the smelter, even when there was no obligation to do so.

This tally of just under a million weapons destroyed is conservative. In published reports of 20 gun amnesties we found no count of firearms collected and so were unable to include the numbers handed in for destruction (Alpers and Wilson 2013). In addition, many firearms seized by police and destroyed, for example by court order, are not included in amnesty totals. Two small "weapon" amnesties included non-firearms in their published totals without separation. Taking into account these uncertainties, it seems likely that Australia collected and destroyed well over a million firearms—

that is, between five and six firearms per 100 people. A commonly accepted estimate of the number of firearms in Australia at the time of the Port Arthur shootings is 3.2 million (Reuter and Mouzos 2003, 130). This suggests that post-massacre destruction efforts reduced the national stock of firearms by one-third. If we accept a frequently cited estimate of 270 million privately owned guns in the United States (Karp 2007, 47), a similar effort in that country would require the destruction of 90 million firearms.

This is not to say that such a massive reduction in the national stockpile could be effected in the United States. Because no two jurisdictions share the same problems or legislative or social settings—let alone attitudes—none can claim to have discovered the magic bullet. The Australian experience also suggests that a reduction in the availability of firearms might only be temporary, as removal of several types of newly banned firearms was followed by a surge of replacement buying.

Australia no longer has a firearm manufacturing industry. Gun dealers source their stock from overseas—mainly from the United States. In the year of the main Australian buyback, firearm imports briefly doubled as owners replaced their banned, surrendered multi-shot rifles and shotguns with new single-shot replacements. But in the two years that followed, annual gun imports crashed to just 20 percent of that 1996–97 peak. For two years the trade remained stagnant and then began to recover. By mid-2012, following a steady ten-year upward trend in gun buying, Australians had restocked the national arsenal of private guns to pre–Port Arthur levels. They did this by importing 1,055,082 firearms, an average of 43,961 each year since destruction programs began (Alpers, Wilson, and Rossetti 2013) (this total excludes 52,608 handguns imported for law enforcement and other non-civilian use). To this should be added the national stock of illicit firearms, which by definition cannot be counted. Although claims of large-scale gun smuggling to Australia are common, almost all such stories are evidence-free. But a recent study from the Australian Institute of Criminology, recounting a cross-governmental effort to trace firearms seized in crime, confirms a more influential source. Smuggled guns represent a much smaller proportion of recovered illicit firearms in this island nation than do legally imported firearms that were subsequently diverted or lost to the black market by lawful owners (Bricknell 2012, 41–43).

A range of public health benefits has been both observed and disputed. As policy changes took effect in the wake of the Port Arthur massacre, the risk of

an Australian dying by gunshot fell more than 50 percent and stayed at that level (Alpers, Wilson, and Rossetti 2013a). The number of gun homicides fell from 69 in 1996 (this total excludes the 35 victims shot dead at Port Arthur) to 30 in 2012 (Alpers, Wilson, and Rossetti 2013b). In the decade before the country's change of direction, 100 people died in eleven mass shootings (Chapman, Alpers, et al. 2006). Following the 1996 announcement of legislation specifically designed to reduce gun massacres, Australia has seen no more mass shootings. Firearm-related deaths that attract smaller headlines still occur, yet the national rate of gun homicide—which before Port Arthur was already one-fifteenth the U.S. rate—has now plunged to 0.13 per 100,000, or 27 times lower than that of the United States (Alpers, Wilson, and Rossetti 2013c).

The most comprehensive impact study of the Australian interventions found that "the buyback led to a drop in the firearm suicide rates of almost 80%, with no significant effect on non-firearm death rates. The effect on firearm homicides is of similar magnitude but is less precise." Important for any discussion of causality, the authors also found that "the largest falls in firearm deaths occurred in states where more firearms were bought back." This study went on to cite survey results to suggest that Australia had nearly halved its number of gun-owning households and then estimated that, by withdrawing firearms on such a scale, this nation of nearly 23 million people had saved itself 200 deaths by gunshot and US$500 million in costs each year (Leigh and Neill 2010).

The evidence is clear that following gun law reform, Australians became many times less likely to be killed with a firearm (Alpers, Wilson, and Rossetti 2013a). That said, causality and standards of proof are as contentious in Australia as in any community polarized by the gun debate. Central to the differing interpretations is that Australia's gun death rates were already declining prior to its major public health interventions. Taking this into account, one study concluded nevertheless that "the rates per 100,000 of total firearm deaths, firearm homicides and firearm suicides all at least doubled their existing rates of decline after the revised gun laws" (Chapman, Alpers, et al. 2006).

A countervailing study interpreted essentially the same empirical findings to conclude the opposite, namely that "the gun buy-back and restrictive legislative changes had no influence on firearm homicide in Australia" (Baker and McPhedran 2007). In an article for the National Rifle Association of America, one of the coauthors of this study was quoted as saying "The findings were

clear . . . the policy has made no difference. There was a trend of declining deaths which has continued" (Smith 2007). A third paper relied on different tests to find that Australia's new gun laws "did not have any large effects on reducing firearm homicide or suicide rates" (Lee and Suardi 2010). These two "little or no effect" studies and their methodology have since been heavily criticized (Neill and Leigh 2007, Hemenway 2009, 2011).

To date, one conclusion has gone uncontested. In finding "no evidence of substitution effect for suicides or homicides," the initial study of impacts showed that Australia's interventions were not followed by displacement from firearms to other methods (Chapman, Alpers, et al. 2006).

The Australian experience, catalyzed by 35 deaths in a single shooting spree, marked a national sea change in attitudes, both to firearms and to those who own them. Led by a conservative government, Australians saw that, beliefs and fears aside, death and injury by gunshot could be as amenable to public health intervention as were motor vehicle–related deaths, drunk driving, tobacco-related disease, and the spread of HIV/AIDS. The obstructions to firearm injury prevention are nothing new to public health. An industry and its self-interest groups focused on denial, the propagation of fear, and quasi-religious objections—we've seen it all before. But the future is also here to see (Mozaffarian, Hemenway, and Ludwig 2013). With gun violence, as with HIV/AIDS, waste-of-time notions such as evil, blame, and retribution can with time be sluiced away to allow long-proven public health procedures. Given the opportunity and the effort, gun injury prevention can save lives as effectively as restricting access to rocket-propelled grenades and explosives or mandating child-safe lids on bottles of poison.

## Acknowledgments

The author thanks Belinda Gardner and Amélie Rossetti, skilled and willing researchers at GunPolicy.org.

## references

Alpers, Philip, and Marcus Wilson. 2013. *Australian Firearm Amnesty, Buyback and Destruction Totals: Official Tallies and Media-reported Numbers, 1987–2012.* Sydney: GunPolicy.org, Sydney School of Public Health. http://www.gunpolicy.org

/documents/doc_download/5337-alpers-australian-firearm-amnesty-buyback
-and-destruction-totals.

Alpers, Philip, Marcus Wilson, and Amélie Rossetti. 2013. *Guns in Australia: Facts, Figures and Firearm Law (Imports)*. Sydney: GunPolicy.org, Sydney School of Public Health. http://www.gunpolicy.org/firearms/compareyears/10/firearm_imports _number.

Alpers, Philip, Marcus Wilson, and Amélie Rossetti. 2013a. *Guns in Australia: Facts, Figures and Firearm Law (Total Number of Gun Deaths)*. Sydney: GunPolicy.org, Sydney School of Public Health. http://www.gunpolicy.org/firearms/compareyears /10/total_number_of_gun_deaths.

Alpers, Philip, Marcus Wilson, and Amélie Rossetti. 2013b. *Guns in Australia: Facts, Figures and Firearm Law (Number of Gun Homicides)*. Sydney: GunPolicy.org, Sydney School of Public Health. http://www.gunpolicy.org/firearms/compareyears /10/number_of_gun_homicides.

Alpers, Philip, Marcus Wilson, and Amélie Rossetti. 2013c. *Guns in Australia: Facts, Figures and Firearm Law (Compare Australia: Rate of Gun Homicide)*. Sydney: Gun Policy.org, Sydney School of Public Health. http://www.gunpolicy.org/firearms /compare/10/rate_of_gun_homicide/31,66,69,87,91,128,178,192,194.

Australia. 1996. *Resolutions from a Special Firearms Meeting*. Canberra: Australian Police Ministers Council.

Australia. 2002. *The Australian Firearms Buyback: Tally for Number of Firearms Collected and Compensation Paid*. Canberra: Commonwealth Attorney-General's Department.

Baker, Jeanine, and Samara McPhedran. 2007. Gun Laws and Sudden Death: Did the Australian Firearms Legislation of 1996 Make a Difference? *British Journal of Criminology* 47:455–69.

Bricknell, Samantha. 2012. *Firearm Trafficking and Serious and Organised Crime Gangs*. Canberra: Australian Institute of Criminology Research and Public Policy Series 116.

Chapman, Simon, Philip Alpers, Kingsley Agho, and Michael Jones. 2006. Australia's 1996 Gun Law Reforms: Faster Falls in Firearm Deaths, Firearm Suicides and a Decade without Mass Shootings. *Injury Prevention* 12:365–72.

Hemenway, David. 2009. How to Find Nothing. *Journal of Public Health Policy* 30:260–68.

Hemenway, David. 2011. The Australian Gun Buyback. Boston: Harvard Injury Control Research Center *Bulletins* 4.

Karp, Aaron. 2007. Completing the Count: Civilian Firearms. In *Small Arms Survey 2007: Guns and the City*, 38–71. Cambridge: Cambridge University Press.

Lee, Wang-Sheng, and Sandy Suardi. 2010. The Australian Firearms Buyback and Its Effect on Gun Deaths. *Contemporary Economic Policy* 28:65–79.

Leigh, Andrew, and Christine Neill. 2010. Do Gun Buybacks Save Lives? Evidence from Panel Data. *American Law and Economics Review* 12(2):462–508.

Mozaffarian, Dariush, David Hemenway, and David S. Ludwig. 2013. Curbing Gun Violence: Lessons from Public Health Successes. *Journal of the American Medical Association* 1–2. Published online: Jan. 7, 2013. doi:10.1001/jama.2013.38

Neill, Christine, and Andrew Leigh. 2007. Weak Tests and Strong Conclusions: A Re-analysis of Gun Deaths and the Australian Firearms Buyback. Canberra: The

Australian National University, Centre for Economic Policy Research. *EPS Journal*, Discussion Paper 555.

Reuter, Peter, and Jenny Mouzos. 2003. Australia: A Massive Buyback of Low-risk Guns. In *Evaluating Gun Policy: Effects on Crime and Violence,* edited by Jens Ludwig and Philip J. Cook. Washington, DC: The Brookings Institution.

Smith, Blaine. 2007. Dim Bulb! *America's 1st Freedom*. Fairfax, VA: National Rifle Association of America, 8(2):34–54.

*This page intentionally left lank*

**17**

# Brazil

Gun Control and Homicide Reduction

## Antonio Rangel Bandeira

Brazil accounts for 13% of the world's firearm homicides, despite having only 2.8% of the world's population. Brazil holds the sad world record for the highest number of annual deaths by firearms in absolute numbers. Faced with such deplorable rates of death by gun violence, Brazil has started reversing this trend by implementing a series of controls on these lethal products. The results have been impressive. According to the national Ministry of Justice, Brazil has reduced deaths by firearms from 39,284 in 2003 to 34,300 in 2010—a saving of 5,000 lives.[1] This essay analyzes the steps that have been taken.

### Guns in Brazil

The research organization Viva Rio found that Brazil has about 16 million guns in circulation, half of which are illegal.[2] Recent gun control reforms have made it more difficult to qualify to buy weapons. This has resulted in a dramatic

Antonio Rangel Bandeira is the Coordinator of Firearms Control Programs at Viva Rio in Rio de Janeiro.

decrease in the annual sale of guns from 155,834 in 2010 to 93,334 in 2011 and down to 12,530 as of July 2012.[3] To offset this decrease in domestic sales, the Brazilian gun industry has expanded its international exports by 370% since 2000. The country is now the fourth biggest firearm exporter, just behind the USA, Italy, and Germany, selling $314 million worth of weapons internationally in 2010.[4] In 1981, the Brazilian gun maker Taurus S.A. established a manufacturing facility in Florida. This plant and the exports from Brazil account for 20% of the pistols and revolvers sold in the North American market.[5]

## Scientific Facts versus Myths

Nineteen years ago, faced with growing urban violence in Rio de Janeiro, Viva Rio sought to implement policies within the classical progressive paradigm focusing on unemployment, social inequality and illiteracy. It soon became clear that this was not enough; reducing urban violence required both gun control *and* reforms to the police force. The proliferation of weapons, which initially was viewed as a secondary cause of violence, turned out to be the key. This factor explained why personal conflicts that did not result in fatalities in other countries so often proved deadly in Rio de Janeiro. It became necessary to understand the universe of firearms.

At that time very little research had been done on gun markets, the use of guns by civilians, or their impact. Viva Rio had to create a research methodology to analyze the dynamics of arms and ammunition. (Researchers were fortunate to have as a colleague Dr. Pablo Dreyfus, an expert from Argentina, who had done field research on drug trafficking before becoming a researcher for the Small Arms Survey. He was a brilliant pioneer in this new field and his work influenced research on guns elsewhere, both in developing and developed countries. Sadly he died in the Air France crash on June 1, 2009.)

We found that guns belong to a nebulous, almost secret world. Those who profit from the production and sale of guns have no interest in sharing information with outside analysts. In Latin America gun control authorities frequently are co-opted by those who profit from the firearms trade. The arms market had never been studied in a serious manner in Latin America and usually governments did not share data with independent experts.

In 1999 a progressive city government gave us information on 250,000 weapons seized by police in Rio de Janeiro. Our analysis of this data drastically altered the public perspective about guns in Brazil. The prevailing belief

was that most illegal weapons were smuggled in from abroad, but we discovered that no more than 14% were imported[6] (and we later showed that the figure was only 10% nationwide).[7] Thus the overwhelming majority of guns used in crime had been manufactured and originally sold legally in Brazil.

Furthermore, it had been assumed that most of the guns used in crime were large caliber rifles and machine guns, but we showed that 83% were actually revolvers and pistols. In other words, because of a lack of research, the police were battling the illegal arms trade based on completely erroneous information. Our analysis provided the foundation for better policies based on factual knowledge rather than myths and ideology.

### New Law on Arms and Ammunition

With the data showing that illegal guns originated from the poorly controlled legal market, we began a campaign for stronger regulations. Those opposed to our efforts did not present research, only ideological arguments like those of the National Rifle Association (NRA). Despite having support from the major media organizations, we initially had no luck with members of the national Congress. The arms industry in Brazil, as in the United States, donates money to election campaigns for many politicians. We tried unsuccessfully to persuade them to reform the weak gun law which had been originally enacted under the influence of the arms industry and the former military dictatorship.

It was clear that in order to change the law we needed to gain the support of the electorate, to exert popular pressure on Congress for reform. We identified strategic allies (churches, women, social groups victimized by guns, physicians, academics and sympathetic journalists and politicians, and unions). With their support, we toured the country disseminating our research and countering myths about weapons and disarmament. As public awareness increased, hundreds of thousands of people marched in the major cities demanding tougher gun laws. When the polls showed that 81% of Brazilians favored a new gun law,[8] the climate changed in the Congress. Although the arms industry had the money, the voters were on our side. In December 2003 our bill was approved by all political parties. President Lula signed the Disarmament Statute into law as a Christmas gift o the people of Brazil.[9]

The new law is very advanced and is serving as inspiration for several other countries. The law banned the carrying of weapons by civilians, prohibited

guns above .38 caliber for civilians, raised the minimum age for gun pur-
chases to 25 years, and added 15 requirements to the process of qualifying to
buy a gun, including evidence of psychological stability and knowledge of
gun safety. A national database was set up to monitor gun ownership, and
ammunition sold to the police and armed forces is now marked to enable
tracing. (The marking of ammunition sold to civilians is now also under dis-
cussion, with the same objective.) Once marked, cartridges left at the scene of
crimes or confrontations can be traced. This procedure was used to prove
that police officers were responsible for the 2009 killing of Patricia Acioli, a
young judge who took a stand against organized crime and corrupt police, in
Rio de Janeiro.

### Myths about Firearms

The campaign for gun control drew on research to challenge widely held but
mistaken beliefs about firearms.[10] For example:

- A firearm is a good instrument for attack, but not for defense.
  The attacker uses the element of surprise and thus controls the
  circumstances of the attack.[11]
- Of the nearly 30 countries that have promoted voluntary disarmament,
  none is a dictatorship. Democracies seek to reduce the level of
  armament in their society, depending instead on good police and a
  strong rule of law to achieve public safety. Democratic regimes may
  be overthrown by military coups, but it is an illusion to imagine that
  citizens with guns can defend democracy against tanks and aircraft.
  We Latin Americans know what we're talking about, having suffered
  military coups and dictatorships.
- It is a simplistic analysis to merely consider the polarization between
  "good guys and bad guys" or "good guns and bad guns." This represents
  just a small part of the discussion of self-defense. In Brazil, as well as
  in most countries with high levels of gun homicides, interpersonal
  conflicts represent more than 80% of murders perpetrated with
  firearms. If we add together men killing women; fights between
  neighbors, in nightclubs, and in traffic jams; fired employees fighting
  against former bosses; and suicides and accidents involving children,
  these deaths represent many more casualties than those inflicted by

bandits and burglars. All reliable research demonstrates that, when there is a lack of governmental gun control, the most accurate sentiment is that "good guys kill good guys," usually with legal weapons. This situation represents a major part of the problem. Although the use of guns for self-defense sometimes results in successful self-protection, public policies cannot be established based on exceptions; they must be built on the facts of daily life.

• The old slogan says "Guns don't kill people. People kill people." In reality, "People with guns kill people."

## Public Destruction of Weapons

The campaign coincided with the request by the United Nations that countries publicly destroy their surplus firearms. In July 2001, on the eve of the United Nations Conference on Small Arms, the Rio de Janeiro government, with technical support from Viva Rio and the army, carried out a public destruction of 100,000 weapons. It also highlighted the danger created by the police stockpiling huge quantities of surplus weapons that are often diverted to organized crime.

## Voluntary Programs to Hand in Weapons

Another aspect of Brazil's attempt to stem gun violence has been a series of voluntary weapons buybacks. The first buyback in 2004 to 2005 saw Brazilians hand in 459,855 weapons, which were then destroyed.[12] Some of the country's largest advertising agencies worked on the campaign pro bono, and famous performers and football stars donated their services as well. Feminist and women's organizations also played an important role in changing the culture. Ad campaigns were implemented in which grandmothers, mothers, and girlfriends urged men to get rid of their guns, while pretty female soap opera stars ridiculed "insecure men who need firearms to prove their masculinity." These initiatives were especially well-received among young people. The campaign slogan was *Choose Gun Free. It Is Your Weapon or Me!* The campaign symbol was a tube of lipstick, which appeared to look like a bullet.

In addition, the 2004 to 2005 campaign featured significant involvement by community groups and the nonprofit sector (churches, NGOs, unions, etc.), which oversaw buyback locations for guns and ammunition. These sites

were numerous and easily accessible, particularly for groups reluctant to trust the police. The guns were damaged with a small hammer upon receipt; a cheap and efficient way to immediately improve public safety by eliminating the risk of diversion or reuse. Citizens were paid between US\$50 and US\$150 for their guns, depending on the caliber. (The amounts paid were deliberately modest to reduce the likelihood that recipients would use the money to buy new guns, as happened in Australia and Haiti.) The exchanges were anonymous and amnesty was offered to owners of illegal weapons.

From 2008 to 2009, the Brazilian government launched a second campaign involving the police, but at this time without the participation of civil society. Compared with the 2004 to 2005 effort, the results were modest: only 30,721 weapons were received.[13] Then in May 2011, a month after the Realengo School shooting in Rio de Janeiro (where 12 teenagers were killed by a former student), the government announced another buyback, which continues today.

Before the 2011 launch, an international conference was convened to review the results of successful exchange programs from Angola, Argentina, Colombia, Mozambique, and Brazil. This analysis led to several improvements on our previous campaigns. Participants were paid within 24 hours, whereas previously there had been a three-month delay. And although only 18% who turn in guns do so for the money,[14] compensation was increased to between US\$80 and US\$225.

The new campaign's slogan is *Hand in Your Weapon. Protect Your Family*, to counter the misguided practice of arming oneself to defend family and loved ones. Activities include programs exchanging toy guns for peaceful toys. The current campaign has some shortcomings—including not compensating for ammunition (as Argentina does, with excellent results) and a continued lack of involvement by the community sector. In a period of 19 months, about 65,144 weapons were handed in.[15]

According to the Ministry of Health, the following measures have reduced firearm homicides significantly: half a million guns were removed from circulation, public carrying of firearms was outlawed, and police reform was initiated.[16] Gun deaths have dropped by more than 70% in São Paulo and by 30% in Rio de Janeiro.[17] In addition, a process of "pacification" of the largest favelas of Rio de Janeiro has taken place over the past few years, which has contributed to the decrease. (Pacification refers to the institution of community-based police forces in the favelas, which were previously dominated by the

drug traffickers and by improved investments in health, education, and urban development.)

## Parliamentary Oversight of Weapons and Ammunition

In 2004, a Parliamentary Commission of Inquiry (PCI) was formed to investigate Brazil's illicit arms trade. Among other things, the Commission investigated Brazil's international borders and was able to identify major smuggling points for arms and ammunition. Viva Rio supplied expert technical support and performed the field work for this endeavor.[18] The PCI also forced Brazilian gun manufacturers to identify the initial purchasers of 36,000 weapons that had been seized by the Rio de Janeiro police, which revealed that most weapons used in organized crime had been diverted from initially legal sources.[19] These included guns bought by civilians from gun shops, guns purchased by private security companies, private police and military officers guns, guns stolen from legal owners, and guns diverted from police stocks by corrupt police officers. The court system also turned out to be a significant source of diversion of guns to the criminal market, as hundreds of thousand of guns are stored in court evidence rooms. The PCI's final report has been called a pioneering document—mapping the previously unexplored world of one country's illegal arms trade.[20]

A permanent Subcommittee on Control of Arms and Munitions was established in the Parliament in 2007, created with our influence and support, to oversee the implementation of the Disarmament Statute, conduct research on weapons and ammunition, and propose new control measures. Last year the parliamentary gun lobby got control of the Subcommittee and has been trying to revoke the Disarmament Statute.

In response to the PCI's work, the International Latin American Parliamentary group, PARLATINO, asked Viva Rio and an international team of experts to draft a model law. The Model Law on Firearms, Ammunition and Related Materials was developed from this effort, to assist other countries with improved gun control measures.[21]

The Disarmament Statute mandated a referendum be held on the question of whether all sales of guns and ammunitions to civilians should be banned in Brazil. The referendum was held in October 2005, and our side lost. Although public support for strong gun control was extremely high, 64% of voters voted against the total ban. Analysts suggested several possible reasons for our

defeat. Institutions receiving funds from abroad were barred from campaigning, preventing the participation of historically active groups such as most churches and nongovernmental organizations. Also relevant was the strong financial support provided by the gun lobby to the other side, as well as a slump in popularity of the Lula government, which had been accused of corruption around the time of the referendum. Even so, national support for gun control remained above 80%.

In addition to the voluntary disarmament program, the Brazilian government decided to organize an arms legalization campaign. This campaign was aimed at the large number of people who were not "criminals," but who held weapons illegally (i.e., without a license). In 2008 to 2009 the government, with support from the gun dealers, shooting clubs and pro-gun associations, secured the registration of 1,408,285 weapons[22]—a good start toward regulating 4 million illegal weapons estimated to be in the hands of non-criminals. The legalization initiative included suspending the license fee and providing an amnesty for these gun owners.

### The International Agenda—and Soccer

Trafficking arms and ammunition is an international phenomenon which requires a correspondingly international approach. The agenda for international action is clear but remains largely on paper. It includes harmonizing laws within and among countries (we recommend the Model Law as a starting point). Bilateral and multilateral agreements, regionally and internationally (like the Arms Trade Treaty) are necessary for collaboration between police in different countries. An important new regional initiative is the centralization of information about arms and ammunition in the database operated by the Observatory on Citizen Security, run by the Organization of American States.[23]

In 2014 the Soccer World Cup will be in Brazil and the social theme of the tournament will be "disarmament." Soccer fans will be able to hand in guns in exchange for tickets to the matches. Whenever the Brazilians play they will display a banner supporting disarmament, as they did before their game against the United States in Washington, DC, in May 2011. We want to unite the sporting spirit of fraternity with the culture of peace and disarmament. We invite the United States to organize gun hand-in programs during the Cup, joining other nations that have already made the commitment. We do

not want a violent society where people are armed, but rather a peaceful one where people are protected against guns.

### Notes

1. Brazilian Minister of Justice Declaration, Brasília, December 10, 2010.
2. Purcena and Nascimento, *Estoques*, 23.
3. Bergamo, "Venda de Armas no Brasil Despenca."
4. Guerra, "Fabricantes de Armas Triplicam Receita no Brasil em Apenas Cinco Anos."
5. Author's conversation with ATF officials, during their visit to Viva Rio's office, 2000.
6. Bandeira and Bourgeois, *Armas de Fogo,* 168–171.
7. Purcena and Nascimento, *Seguindo a Rota das Armas*, 20.
8. Instituto Sensus, June 2003, cited by Bandeira and Bourgeois, *Armas de Fogo*, 200.
9. *Estatuto do Desarmament.*
10. For more detailed analysis, see Bandeira, "Armas Pequeñas y Campañas de Desarme."
11. Cano, *Pesquisa sobre Vitimização nos Roubos.*
12. Secretaria Nacional de Segurança Pública (Brasilia: Ministry of Justice, January 2006).
13. Idem (January 2010).
14. Viva Rio's research, cited by Bandeira and Bourgeois, *Armas de Fogo*, 206.
15. Secretaria Nacional de Segurança Pública (Brasilia, Ministry of Justice, January 2013).
16. Based on Sistema Nacional de Saúde (SUS), Secretaria Nacional de Segurança Pública (Brasília: Ministry of Justice, December 2010).
17. Instituto de Segurança Pública (Rio de Janeiro, Secretaria de Segurança Pública, July 2012).
18. Dreyfus and Bandeira, *Watching the Neighborhood.*
19. Jungmann, *Comissão Parlamentar.*
20. Ibid.
21. Parliamentary Forum on Small Arms and Light Weapons and CLAVE.
22. Sistema Nacional de Armas e Munições (SINARM), Federal Police Department, cited by Purcena and Nascimento, *Estoques*, 39.
23. Bandeira, "Gun Control in Brazil," 38.

### References

Bandeira, Antonio. "Armas Pequeñas y Campañas de Desarma. Matar los Mitos y Salvar las Vidas." In *Seguridad Regional en América Latina y el Caribe*, ed. Hans Mathieu and Catalina Niño Guarnizo. Bogotá: Friedrich Ebert Stiftung, 2012.

Bandeira, Antonio. "Gun Control in Brazil and International Agenda." In *Report on Citizen Security in the Americas—2012.* Washington. DC: Secretariat for Multidimensional Security, OAS, 2012. www.alertamerica.org

Bandeira, Antonio, and Bourgeois, Josephine. *Armas de Fogo: Proteção ou Risco?* Rio de Janeiro: Viva Rio, 2005. http://www.comunidadesegura.org/files/active/0/armas%20de%20fogo%20protecao%20ou%20risco_port1.pdf

Bandeira, Antonio, and Bourgeois, Josephine. *Firearms: Protection or Risc?* Stockholm: Parliamentary Forum on Small Arms and Light Weapons, 2006. http://parliamentaryforum.org/sites/default/files/firearms%20protection%20or%20risk.pdf

Bergamo, Monica. "Venda de Armas no Brasil Despenca." *Folha de São Paulo*, August 14, 2012.

Cano, Ignácio. *Pesquisa sobre Vitimização nos Roubos.* Rio de Janeiro: ISER, 1999.

Dreyfus, Pablo, and Bandeira, Antonio. *Watching the Neighborhood: An Assessment of Small Arms and Ammunition "Grey Market Transactions" on the Borders Between Brazil and Paraguay, Bolivia, Uruguay and Argentina.* Rio de Janeiro: Viva Rio, 2006. http://www.comunidadesegura.org/files/active/0/Watching_Neighborhood_ing.pdf

*Estatuto do Desarmamento*, Law N. 10.826/2003. Brasília: Congresso Nacional, 2003. http://www.planalto.gov.br/ccivil_03/Leis/2003/L10.826.htm

Godnick, William, and Bustamente, Julián. *El Tráfico de Armas en América Latina y el Caribe: Mitos, Realidades y Vacios en la Agenda Internacional de Investigación*. Lima: UNLIREC, 2012.

Guerra, Natália. "Fabricantes de Armas Triplicam Receita no Brasil em Apenas Cinco Anos." *R7*, September 23, 2012.

ISER. *Referendo do Sim ao Não: Uma Experiência da Democracia Brasileira*. Rio de Janeiro: ISER, 2006. http://www.comunidadesegura.com.br/files/referendodosimaonao.pdf

Jungmann, Raul. *Comissão Parlamentar de Inquérito Sobre Organizações Criminosas do Tráfico de Armas, Sub-Relatoria de "Indústria, Comércio e C.A.C. (Colecionadores, Atiradores e Caçadores)."* Brasília: Congresso Nacional, 2006. http://www.comunidadesegura.org/files/active/0/Relatorio%20sub-relatoria%20de%20industria%20comercio%20e%20cac.pdf

Parliamentary Forum on Small Arms and Light Weapons and CLAVE (Coalición latinoamericana para la prevención de la violencia armada). *Model Law on Firearms, Ammunition and Related Materials.* Stockholm: Parliamentary Forum on Small Arms and Light Weapons, CLAVE, Swedish Fellowship of Reconciliation, and Parlatino, 2008. http://parliamentaryforum.org/sites/default/files/model_law_on_firearms_ammunition_and_related_materials_final.pdf

Purcena, Julio Cesar, and Nascimento, Marcelo. *Estoques e Distribuição de Armas de Fogo no Brasil*. Rio de Janeiro: Viva Rio, 2010. http://www.vivario.org.br/publique/media/Estoques_e_Distribuição.pdf

Purcena, Julio Cesar, and Nascimento, Marcelo. *Seguindo a Rota das Armas: Desvio, Comércio e Tráfico Ilícitos de Armamento Pequeno e Leve no Brasil.* Rio de Janeiro: Viva Rio, 2010. http://www.vivario.org.br/publique/media/Seguindo_a_Rota_das_Armas.pdf

Part V / Second Amendment

*This page intentionally left  lank*

# The Scope of Regulatory Authority under the Second Amendment

Lawrence E. Rosenthal and Adam Winkler

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*,[1] the U.S. Supreme Court ruled that the District of Columbia's prohibition on handguns and requirement that long guns in the home be kept inoperable at all times violated this provision. In *McDonald v. City of Chicago*,[2] the Court subsequently held that the Second Amendment applies equally to federal and state laws burdening the right to keep and bear arms.

The "inherent right of self-defense has been central to the Second Amendment," the Court explained in *Heller*, and D.C.'s "handgun ban amounts to a prohibition on an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." "Few laws in the history of our Nation," the Court wrote, "have

Lawrence E. Rosenthal, JD, is a professor at Chapman University School of Law in Orange, California. Adam Winkler, JD, MA, is a law professor at the University of California, Los Angeles.

come close to the severe restriction of the District of Columbia's handgun ban." Nevertheless, the Court cautioned, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." Indeed, "[f]rom Blackstone through the 19th-century cases," the Court recounted, "commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." For example, "the majority of 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or its state analogues." The Court added that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons or the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." The Court characterized such firearms regulations as "presumptively lawful," while also noting its list of presumptively permissible regulations "does not purport to be exhaustive." Accordingly, while the precise boundaries of the Second Amendment remain somewhat opaque, it is settled that many forms of gun control are consistent with the right of the people to keep and bear arms.

In this chapter, we consider the constitutionality under the Second Amendment of a number of gun control reforms that might be adopted in the wake of the tragic shooting at Sandy Hook Elementary School in Newtown, Connecticut. Discussion to date has focused on a number of potential reforms, such as universal background checks for gun purchasers, restrictions on "assault weapons," and restrictions on high-capacity ammunition magazines. While the permissibility of any reform hinges on its details, we can nevertheless begin to identify what sorts of laws are likely to be constitutional under the Second Amendment.

Since the decision in *Heller*, the lower courts have ruled on hundreds of Second Amendment challenges to a wide variety of laws. Although the overwhelming majority of these cases have upheld the challenged laws, the courts have invalidated a few held to be unusually severe burdens on the right to possess or use a firearm for self-defense. From the reasoning and language of *Heller*, *McDonald*, and the subsequent cases, we can discern an emerging jurisprudential framework for analyzing the constitutionality of gun control laws.

This emerging framework involves what the courts have called a "two-pronged approach to Second Amendment challenges."[3] The first question courts

must ask is whether a challenged law burdens conduct within the scope of the Second Amendment.[4] In *Heller*, the Court defined the right to "keep" arms as the right to possess them,[5] and the right to "bear" arms as the right to "carry[ ] for a particular purpose—confrontation."[6] The Court offered no explicit definition of what amounted to an unconstitutional infringement of these rights, but treated as unconstitutional laws that effectively nullified the core interest at the heart of the Second Amendment—the right of a law-abiding citizen to have in his or her home a functional firearm suitable for personal protection. To determine whether other conduct is within the ambit of the Second Amendment, the lower courts have since *Heller* looked to the limitations recognized in *Heller* and the historical tradition of gun rights and gun regulation.

When a law burdens conduct within the scope of the Second Amendment, courts then ask a second question: does the government have adequate justification for the law? Not all regulations restricting guns burden the right to keep and bear arms, and not all regulations that do burden the right are unconstitutional.

## Scope of the Second Amendment

The threshold inquiry asks whether a gun law burdens conduct within the scope of the Second Amendment. Although, as we have seen, the Second Amendment protects a right to possess and carry "Arms," *Heller* also makes clear that not every regulation is an unconstitutional infringement of the right to keep and bear arms.

There is a well-established historical tradition of gun regulation, which has been a prominent feature of the law since the birth of America. In the framing era, not only were portions of the population barred from owning guns—including law-abiding citizens unwilling to swear allegiance to the Revolution, in addition to slaves and free blacks—but the founding generation also had laws requiring the safe storage of firearms and gunpowder.[7] In the 1820s and 1830s, laws prohibiting the carrying of concealed firearms became commonplace;[8] as the Court in *Heller* recognized, a majority of nineteenth-century courts upheld these laws.

After the Civil War, the same Congress that drafted the Fourteenth Amendment, which was designed in part to make the Second Amendment applicable to state and local laws, abolished the militia in most southern states because such armed groups had proven "dangerous to the public peace and to the security of

Union citizens in those states."[9] This legislation was one of a series of gun control measures undertaken at the time in an effort to suppress violence in the then-turbulent South. In the early twentieth century, Congress in the National Firearms Act of 1934 severely restricted access to machine guns and sawed-off shotguns.[10] Meanwhile, many states passed laws restricting the public possession of firearms, imposed waiting periods on the purchase of certain firearms, and barred violent felons from possessing guns.[11] Thus, the right to keep and bear arms has been understood to permit lawmakers considerable leeway to regulate.

It seems equally clear that in determining the scope of the Second Amendment right, lawmakers are not restricted to enacting only the regulations in place when the Second Amendment was adopted. For example, the laws characterized as presumptively valid in *Heller*—bans on possession by felons and the mentally ill, restrictions on guns in sensitive places like schools and government buildings, and commercial sale qualifications—did not exist at the time of ratification.[12] Instead, the history of innovation in firearms regulation since the framing has led courts to conclude that legislatures are not limited to framing-era regulations.[13] One approach to assessing the permissibility of regulation is to inquire whether the challenged law comports with historical traditions broadly defined. For example, the ban on possession by felons and the mentally ill reflects a longstanding tradition of restricting access to firearms by people deemed dangerous to public safety. So, too, do laws barring possession of firearms by people convicted of domestic violence misdemeanors or subject to a domestic violence restraining order, which have been consistently upheld even though no such restrictions existed at the framing.[14]

Nothing in the text of the Second Amendment suggests that the government's power to regulate guns is limited to those regulations common in the framing era or even of long standing. As we have seen, its preamble contemplates a "well regulated Militia," which *Heller* explained meant not a formal military organization but rather "the body of all citizens capable of military service, who would be expected to bring the sorts of lawful weapons that they possessed at home to militia duty." The Court wrote that the Second Amendment's preamble is properly consulted to clarify the meaning of the Second Amendment, adding that "well regulated" meant "the imposition of proper training and discipline." The Second Amendment therefore contemplates a body of citizens that is subject to whatever regulations are warranted to impose proper discipline on those qualified to keep and bear arms. Accordingly,

the Second Amendment's preamble offers textual support for a variety of limitations on the ability of individuals to possess or carry firearms that are justified in terms of contemporary exigencies.[15]

If, after examining the history and tradition of gun regulation, a court determines a challenged law burdens only conduct outside of the protection of the Second Amendment, the inquiry is over and the law upheld. Only if a challenger can show that the law does create such a burden will the courts proceed to the next step: scrutiny of the law's burdens and justifications.

### Judicial Scrutiny of Burdens and Justification

The second step of the emerging Second Amendment jurisprudence asks whether a challenged regulation can be sufficiently justified in light of the burden it imposes on the interests protected by the Second Amendment.

In *Heller*, the Court declined to decide what types of justification are required to sustain a challenged regulation on access to or use of firearms. Nonetheless, it did hold that rational basis review, the weakest and most deferential level of judicial scrutiny, was inappropriate, as was the "freestanding 'interest-balancing' approach" proposed in Justice Stephen Breyer's dissent.[16] The Court's rejection of Justice Breyer's approach, however, does not mean that no standard of review is ever appropriate in Second Amendment cases. The Court explicitly distinguished Justice Breyer's unique formulation from "the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis)."[17]

The most rigorous form of judicial scrutiny is strict scrutiny, which requires that a challenged law be "justified by a compelling government interest" and "narrowly drawn to serve that interest."[18] Because of the requirement of narrow tailoring, strict scrutiny forbids regulations that are overinclusive—covering more conduct than necessary—or underinclusive—covering less.[19] The vast majority of courts to consider strict scrutiny have rejected it as inconsistent with the language and reasoning of *Heller*.[20] After all, *Heller* characterizes a wide variety of prophylactic regulations as presumptively lawful, which is contrary to strict scrutiny's traditional presumption of unconstitutionality. Moreover, the Second Amendment's text explicitly contemplates regulation. At the same time, *Heller* also explains that the most severe burdens on the core right of armed self-defense on the part of law-abiding persons are invalid on their face. Second Amendment jurisprudence must accommodate both points.

The prevailing view in the lower courts is that a form of intermediate scrutiny, inquiring whether a challenged law is substantially related to an important governmental objective, is appropriate for laws that impose something less than the most serious burdens on the core right of armed self-defense recognized in *Heller*.[21] Other courts have taken something of a "sliding scale" approach, concluding that laws imposing more onerous burdens on the right to keep or bear firearms should be subject to concomitantly more demanding scrutiny.[22]

These two approaches are united by consideration of the aggregate burden imposed by a challenged regulation rather than its impact on a particular individual. Laws prohibiting convicted felons from possessing firearms, for example, impose an absolute burden for the affected individuals on their right to keep and bear arms. Yet, they were treated as presumptively valid in *Heller*, and such laws have been consistently sustained, even when they also reach other categories of high-risk individuals such as convicted domestic violence misdemeanants or those subject to a domestic violence order of protection.[23] Similarly, a statute prohibiting individuals from carrying handguns in public unless they could demonstrate a special need entitling them to a carry permit was sustained, even though it imposed an absolute prohibition on those unable to qualify for the permit.[24]

Most gun control laws to date have satisfied the requirement that they be substantially related to the government's objective of enhancing public safety.[25] As the Supreme Court explained in the context of the First Amendment, where this same test often applies, "substantial deference to the predictive judgments" of the legislature is warranted.[26] Yet courts do not require lawmakers to have overwhelming proof before they act; reliable studies may not always be available, especially for innovative reforms. Courts ordinarily look to the legislative record and available empirical data to assess whether there is sufficient reason to credit the legislature's judgment.[27]

In the wake of the Newtown shooting, a number of different types of gun control laws have been proposed to reduce the likelihood of mass shootings and gun crime more generally. In this section, we consider the constitutionality of some particular reforms: universal background checks for gun purchases and regulation of trafficking and restrictions on "assault weapons" and high-capacity magazines. In our assessment, most of the types of reforms being

considered are capable of surviving judicial review under the prevailing standards.

## Universal Background Checks and Regulation of Dealers

Under current federal law, background checks are only required on people who seek to purchase a firearm from a federally licensed gun dealer. Yet, because people without a federal license are permitted to sell firearms, a significant percentage of gun transfers occur with no background check. A law designed to close this loophole, and to ensure that firearms are transferred only by licensed dealers who can perform background checks and are subject to regulatory oversight, would almost certainly be constitutional. The Supreme Court has already made clear that prohibiting felons and the mentally ill from possessing arms is not an infringement of the right to keep and bear arms. Background checks are preventative measures designed for a compelling governmental interest: to ensure that people prohibited from possessing firearms cannot lawfully purchase them. Universal background checks and comprehensive regulation of firearms sales substantially further this governmental interest. Moreover, given the instantaneous verification offered by the federal National Instant Criminal Background Check System, or NICS, a background check imposes only a minor, incidental burden on lawful gun purchasers. This is no more of a burden than we impose on numerous other fundamental rights including the right to vote, which allows states to require preregistration, and the right to marry, which allows states to require a marriage license. Using the moment of sale to confirm the eligibility of a person to possess firearms is also appropriate given the Supreme Court's approval of "laws imposing conditions and qualifications on the commercial sale of arms."

## "Assault Weapons"

One measure Congress may consider is the reenactment of the federal ban on the sale of "assault weapons." Although this terminology has been controversial, for purposes of this essay we'll accept the definition included in the 1994 assault weapons law, which applied generally to semi-automatic firearms with a detachable ammunition magazine and military-style features, like a bayonet fitting or a pistol grip.[28]

232    *Lawrence E. Rosenthal and Adam Winkler*

A restriction on the sale or possession of assault weapons would likely be constitutional because such firearms may not be "Arms" under the meaning of the Second Amendment. In *Heller*, the Court held that the Second Amendment preserves access to firearms that are "in common use" and are not "dangerous or unusual." The "Arms" protected include "weapons that were not specifically designed for military use and were not employed in a military capacity," including those arms "typically possessed by law-abiding citizens for lawful purposes" such as "self-defense within the home." This construction is consistent with historic traditions, in which "dangerous and unusual weapons" have long been subject to heavy restriction. Handguns, by contrast, were held to be constitutionally protected because they are "the most popular weapon chosen by Americans for self-defense in the home."

Arguably, assault weapons do not meet *Heller*'s definition of a protected arm. While such firearms may be commonplace, they are primarily used for recreational purposes, not self-defense. Because of their size, they can be difficult to maneuver in a tight space, and they propel bullets with such force as to travel easily through residential walls, endangering family members or neighbors. Of course, one can use an assault weapon, like any firearm, for self-defense. Yet more is required under the Second Amendment. Just as "dangerous and unusual weapons" like machine guns, which can also be used for self-defense, can be restricted consistent with the Second Amendment, so can assault weapons.

*Heller*'s language may be read to compel an alternate conclusion. On one reading, *Heller* protects any arm that is typically used for any "lawful purpose," even if that purpose isn't personal protection. While assault weapons are not primarily used for self-defense in the home, they may be typically used for other lawful purposes, like recreational shooting and hunting. Yet, there are reasons to believe this reading is too broad; machine guns, too, can be used for lawful purposes, like recreational shooting.

Another potential constitutional difficulty with an assault weapons ban is that it may not meet the requirements of means–ends scrutiny. The 1994 law was easily evaded by manufacturers who simply eliminated the distinguishing military-style features, like bayonet fittings and pistol grips, and sold what were essentially the same guns. These legal firearms may have been just as dangerous as the prohibited assault weapons, with the same lethality and firepower. Unless lawmakers can show that military-style features like bayonet fittings and pistol grips make a weapon unusually dangerous, and a sufficiently

comprehensive law is enacted that limits the possibility of evasion, it will be difficult to prove that the government's interest in public safety is substantially furthered when effectively similar guns remain legal.

Even so, the emerging jurisprudential framework provides reason to believe an assault-weapon ban could be sustained. In light of the availability of many other firearms, including handguns, characterized by *Heller* as the "quintessential self-defense weapon," it may be that a prohibition on assault-type weapons places a sufficiently modest burden on the right of armed self-defense that it would require only modest justification. Indeed, the U.S. Court of Appeals for the District of Columbia Circuit recently held that a ban on assault rifles was constitutional. In that case, the court ruled that, while assault rifles may be "in common use," a prohibition on such firearms "does not effectively disarm individuals or substantially affect their ability to defend themselves." Furthermore, the court wrote, "the evidence demonstrates a ban on assault weapons is likely to promote the Government's interest in crime control in the densely populated urban area that is the District of Columbia."[29]

## High-Capacity Ammunition Magazines

An analysis similar to that for assault weapons applies to high-capacity ammunition magazines. The District of Columbia Circuit that upheld the ban on assault weapons also upheld D.C.'s prohibition on magazines that carry more than ten rounds of ammunition. Although the court said that high-capacity magazines may be in common use, a prohibition on such magazines does not significantly burden self-defense. In fact, the court held that high-capacity magazines may be unusually dangerous when used in self-defense because so many rounds can be fired unnecessarily.[30] As with a prohibition on assault weapons, the burden imposed on the core right of armed self-defense by this type of restriction is modest.

Moreover, restricting ammunition magazines substantially furthers the government's important interest in public safety. Mass shooters and criminals prefer high-capacity magazines in order to maximize the threat they pose without having to reload. While people with malicious intent can carry multiple magazines and reload their weapons, magazine size restrictions can force them to take the two or three seconds pause necessary to reload. Even this short pause, the D.C. Circuit held, can be a "critical benefit to law enforcement," affording officers, potential victims, or bystanders the opportunity to

intercede. Requiring mass shooters to pause even an instant can be the difference between life and death for intended victims; indeed, bystanders stopped the man who shot Rep. Gabrielle Giffords when he was forced to reload his weapon. Thus, a restriction on high-capacity magazines may substantially serve the government's interest in public safety without significantly burdening the ability of law-abiding individuals to defend themselves.

The Second Amendment leaves Congress and the state and local governments significant regulatory power, at least when they do not compromise the core right recognized in *Heller* and regulate with substantial justification. Indeed, in conducting this inquiry, there is a strong case to be made for judicial modesty. As one federal appellate tribunal put it: "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."[31]

### Notes

1. 554 U.S. 570 (2008).

2. 130 S. Ct. 3020 (2010).

3. United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012) (quoting United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010)).

4. *See*, *e.g.*, Nat'l Rifle Ass'n of Am., Inc. v. BATFE, 700 F.3d 185, 194 (5th Cir. 2012); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); Greeno, 679 F.3d at 518; Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011); Ezell v. City of Chicago, 651 F.3d 684, 701–04 (7th Cir. 2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800–01 (10th Cir. 2010); United States v. Marzzarella, 634 F.3d 85, 89 (3d Cir. 2010); People v. Alvarado, 964 N.E.2d 532, 547 (Ill. App. Ct. 2011); Pohlabel v. State, 268 P.3d 1264, 1266–67 (Nev. 2012); Johnston v. State, 2012 WL 6595935 * 6 (N.C. App. Ct. Dec. 18, 2012).

5. 554 U.S. at 582.

6. *Id*. at 584.

7. *See*, *e.g.*, Adam Winkler, Gunfight: The Battle over the Right to Bear Arms in America 115–17 (2011); Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 For dh am L. Rev. 487, 506–08, 510–12 (2005).

8. *See*, *e.g.*, Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 138–44 (2006); Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform 2–3, 139–41 (1999); Winkl er , *supra* note 7, at 166–69.

9. Cong. Glob e, 39th Cong., 1st Sess. 1849 (1866) (Sen. Lane). *Accord id.* at 1848–49 (Sen. Wilson). *See* Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 Stan. L. & Pol'y Rev. 615, 621–23 (2006).

10. *See* Pub.L. 474, 48 Stat. 1236 (1934).

11. *See* Winkler, *supra* note 7, at 209–12; C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698–728 (2009).

12. *See*, *e.g.*, Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1373–79 (2009); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1356–62 (2009); Marshall, *supra* note 11 at 698–728.

13. *See, e.g.*, Nat'l Rifle Ass'n, Inc. v. BATFE, 700 F.3d 185, 196–97 (5th Cir. 2012); United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).

14. *See*, *e.g.*, United States v. Chapman, 666 F.3d 220, 227–31 (4th Cir. 2012); United States v. Staten, 666 F.3d 154, 160–67 (4th Cir. 2012); United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) (same); United States v. Reese, 627 F.3d 792, 800–04 (10th Cir. 2010); *Skoien*, 614 F.3d at 641–42.

15. On the role of the preamble in determining permissive gun regulation, *see* Lawrence Rosenthal, *Second Amendment Plumbing aft r* Heller*: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, and Criminal Street Gangs*, 41 Urb. Law. 1, 80–81 (2009).

16. *See id.* at 629 n.27, 634–35.

17. *Id.* at 634.

18. Brown v. Entertainment Merchants Association, 131 S. Ct. 2729, 2738 (2011).

19. *See*, *e.g.*, *id.* at 2738–42; Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993); Arkansas Writers' Project, Inc, v. Ragland, 481 U.S. 221, 231–32 (1987); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 786, 792–94 (1978).

20. *See, e.g.*, Heller v. District of Columbia, 670 F.3d 1244, 1252, 1256–57 (D.C. Cir. 2011).

21. *See, e.g.*, Schrader v. Holder, 2013 WL 135246 * 8–10 (D.C. Cir. Jan. 11, 2013) (upholding prohibition on possession of firearms by individuals convicted of misdemeanors punishable by more than two years' imprisonment); *Heller*, 670 F.3d at 1260–64 (upholding ordinance prohibiting possession of semi-automatic rifles and large-capacity magazines); United States v. Staten, 666 F.3d 154, 160–67 (4th Cir. 2012) (upholding statute prohibiting possession of firearms by individuals convicted of misdemeanor domestic violence); United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) (same); United States v. Reese, 627 F.3d 792, 800–04 (10th Cir. 2010) (upholding statute prohibiting possession of firearms by individuals under a domestic violence order of protection); United States v. Skoien, 614 F.3d 638, 641–42 (7th Cir. 2010) (en banc) (upholding statute prohibiting possession of firearms by individuals convicted of misdemeanor domestic violence); United States v. Marzzarella, 614 F.3d 85, 95–99 (3d Cir. 2010) (upholding statute prohibiting possession of firearms with obliterated serial number).

22. *See, e.g.*, Moore v. Madigan, 2012 WL 6156062 * 6–7 (7th Cir. Dec. 11, 2012) (invalidating a statute prohibiting carrying readily operable firearms in public); Kachalsky v. County of Westchester, 701 F.3d 81, 93–97 (2d Cir. 2012) (upholding statute prohibiting

carrying firearms absent a permit issued on a showing of special need); Nat'l Rifle Ass'n, Inc. v. BATFE, 700 F.3d 185, 195–98 (5th Cir. 2012) (upholding statute prohibiting the sale of handguns to persons under age 21); United States v. DeCastro, 682 F.3d 160, 166–68 (2d Cir. 2011) (upholding statute prohibiting purchasing firearms in another state and transporting them to state of residence); Ezell v. City of Chicago, 651 F.3d 684, 707–09 (7th Cir. 2011) (granting preliminary injunction against ordinance prohibiting firing ranges within city).

23. *See*, *e.g.*, United States v. Chapman, 666 F.3d 220, 227–31 (4th Cir. 2012); United States v. Staten, 666 F.3d 154, 160–67 (4th Cir. 2012); United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) (same); United States v. Reese, 627 F.3d 792, 800–04 (10th Cir. 2010); United States v. Skoien, 614 F.3d 638, 641–42 (7th Cir. 2010) (en banc).

24. *See* Kachalsky v. County of Westchester, 701 F.3d 81, 99–101 (2d Cir. 2012).

25. For a representative sample, see cases cited *supra* at notes 21–22.

26. Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997).

27. *See*, *e.g.*, *Kachalsky*, 701 F.3d at 97–99.

28. *See* 18 U.S.C. § 921(a)(30)(B) (1994), *repealed by* Pub. L. No. 103-322, tit. XI, § 110105(2), 108 Stat. 2000 (1994).

29. Heller v. District of Columbia, 670 F.3d 1244, 1262–63 (D.C. Cir. 2011).

30. *Id*. at 1263–64.

31. United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011).

# Part VI / Public Opinion on Gun Policy

*This page intentionally left  lank*

**19**

# Public Opinion on Proposals to Strengthen U.S. Gun Laws

Findings from a 2013 Survey

Emma E. McGinty, Daniel W. Webster, Jon S. Vernick, and Colleen L. Barry

In the aftermath of the tragedy at Sandy Hook Elementary School in New-town, Connecticut, policy proposals to reduce gun violence are being actively considered and debated at the national, state, and local levels. Within weeks of the mass shooting in Newtown, public opinion data emerged indicating some shift in views among Americans toward greater support for strengthening gun laws. For example, a Gallup survey conducted December 19 through December 22, 2012, found that 58% of Americans supported stricter gun laws, com-pared with only 43% in support of stricter gun laws in an October 2011 poll.[1]

By and large, these opinion data focused on general attitudes about gun policy rather than public support for specific policy proposals to reduce gun

Emma E. McGinty, MS, is a research assistant and fourth-year PhD candidate in Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Daniel W. Webster, ScD, MPH, is a professor in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Jon S. Vernick, JD, MPH, is an associate professor and associate chair in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Colleen L. Barry, PhD, MPP, is an associate professor and associate chair for Research and Practice in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health.

violence. For example, a national survey conducted December 17 through December 19, 2012, by the Pew Center for the People and the Press examined trends in public views about whether it was more important to control gun ownership or to protect gun rights, but examined public support for only four specific policies: bans of handguns, semi-automatic guns, high-capacity ammunition magazines, and exploding bullets, respectively.[2] The December 19–22, 2012, Gallup survey assessed support for four policies: requiring background checks at gun shows and banning handguns, semi-automatic guns, and high-capacity ammunition magazines.[3] Another survey by YouGov conducted December 21 and 22, 2012, examined public attitudes about the National Rifle Association (NRA) but did not examine specific gun policies beyond support for armed guards in schools.[4]

Following the Sandy Hook shooting, experts are recommending and policymakers are considering a much wider range of gun policy options than those assessed in recent public opinion polls. In addition, most recent polls did not examine how public opinion varied by gun ownership or by political party affiliation, and none oversampled gun owners to obtain more precise estimates of policy attitudes among this group. Prior evidence has shown that attitudes about gun policies vary significantly by gun ownership and by partisanship.[5,6]

It has been nearly 15 years since research studies have examined attitudes among the American public about a broad set of public policies aimed at curbing gun violence.[7,8,9] Given the fast-moving pace of deliberations over gun policy, it is critical to understand how the American public views specific proposals to strengthen gun laws and how policy support varies across important subgroups. To fill these gaps, we fielded the Johns Hopkins National Survey of Public Opinion on Gun Proposals in 2013 from January 2 to 14, 2013. This survey examined support for 33 different policies to reduce gun violence in America. These measures were chosen in conjunction with the policy options analyzed by gun violence experts at the 2013 Johns Hopkins Summit on Reducing Gun Violence in America and reported on in this volume.

## Data and Methods

We used the survey research firm GfK Knowledge Networks (GfK KN) to conduct this study. GfK KN has recruited a probability-based online panel of 50,000 adult members older than 18, including persons living in cell phone

only households, using equal probability sampling with a sample frame of residential addresses covering 97% of U.S. households. The survey was pilot-tested between December 28 and 31, 2012. In order to avoid priming, the specific nature of the survey was not described to respondents. They were asked to answer "some questions about public affairs," and there was no mention of the Sandy Hook school shooting. Policy item order was randomized. The survey completion rate was 69%.[10] To compare rates stratified by gun ownership, we oversampled gun owners and non-gun owners living in households with guns. We tested differences in proportions by group using the Pearson's chi square test. To make estimates representative of the U.S. population, all analyses used survey weights adjusting the sample for known selection deviations and survey nonresponse. This study was approved as exempt by the Johns Hopkins School of Public Health Institutional Review Board (#4850).

## Results

Consistent with recent data reported elsewhere,[11,3] we found that 33% of Americans reported having guns in their home or garage. Twenty-two percent of Americans identified the guns as personally belonging to them (referred to henceforth as gun owners), and 11% identified as non-gun owners living in a household with a gun. Among gun owners, 71% reported owning a handgun, 62% owned a shotgun, and 61% owned a rifle. The remaining 67% of Americans identified as non-gun owners living in non-gun households (referred to henceforth as non-gun owners).

Table 19.1 indicates that a majority of Americans supported banning the sale of military-style semi-automatic assault weapons, banning large-capacity ammunition magazines, and a range of measures to strengthen background checks and improve oversight of gun dealers. In the case of assault weapon and ammunition policies, public views differed substantially by gun ownership. Although 69% of the public overall supported banning assault weapon sales, a much higher proportion of non-gun owners (77%) and non-gun owners living in households with guns (68%) than gun-owners (46%) or self-reported NRA members (15%) supported this policy. Sixty-eight percent of the general public supported banning the sale of large-capacity ammunition magazines that allow some guns to shoot more than 10 bullets before reloading, and this policy was supported by most non-gun owners (76%), most non-gun owners living in households with guns (69%), a near majority of gun-owners

Table B.1 Percentage of people who favor gun policies, overall and by gun ownership

| Item | Overall (N = 2,703) | Non-gun owners[a] (n = 913) | Non-gun owner, gun in household (n = 843) | Gun owners (n = 947) | NRA members (n = 169) |
|---|---|---|---|---|---|
| Assault weapon and ammunition policies | | | | | |
| Banning the sale of military-style, semi-automatic assault weapons that are capable of shooting more than 10 rounds of ammunition without reloading? | 69.0 | 77.4 | 67.7** | 45.7*** | 14.9*** |
| Banning the sale of large-capacity ammunition clips or magazines that allow some guns to shoot more than 10 bullets before reloading? | 68.4 | 75.5 | 69.2* | 47.8*** | 19.2*** |
| Banning the sale of large-capacity ammunition clips or magazines that allow some guns to shoot more than 20 bullets before reloading? | 68.8 | 75.6 | 69.9 | 49.4*** | 19.9*** |
| Banning the possession of military-style, semi-automatic assault weapons that are capable of shooting more than 10 rounds of ammunition without reloading if the government is required to pay gun owners the fair market value of their weapons? | 56.0 | 63.3 | 52.6** | 36.9*** | 17.0*** |
| Banning the possession of large-capacity ammunition clips or magazines that allow some guns to shoot more than 10 bullets before reloading if the government is required to pay gun owners the fair market value of their ammunition clips? | 55.0 | 61.9 | 51.6** | 37.0*** | 22.9*** |

| | | | | | |
|---|---|---|---|---|---|
| **Prohibited person policies** | | | | | |
| Prohibiting a person convicted of two or more crimes involving alcohol or drugs within a three-year period from having a gun for 10 years? | 74.8 | 76.1 | 74.8 | 70.5* | 64.2 |
| Prohibiting a person convicted of violating a domestic violence restraining order from having a gun for 10 years? | 80.8 | 82.9 | 79.1 | 75.6** | 61.5** |
| Prohibiting a person convicted of a serious crime as a juvenile from having a gun for 10 years? | 83.1 | 84.4 | 81.3 | 80.0 | 70.0 |
| Prohibiting a person under the age of 21 from having a handgun? | 69.5 | 76.4 | 63.6*** | 52.3*** | 42.3*** |
| Prohibiting a person on the terror watch list from having a gun? | 86.0 | 87.5 | 85.6 | 82.2* | 75.5 |
| Prohibiting people who have been convicted of each of these crimes from having a gun for 10 years: | | | | | |
| Public display of a gun in a threatening manner excluding self-defense | 71.1 | 69.8 | 78.7** | 71.3 | 58.5 |
| Domestic violence | 73.7 | 72.4 | 80.4** | 73.7 | 61.4 |
| Assault and battery that does not result in serious injury or involve a lethal weapon | 53.0 | 54.6 | 53.4 | 48.5* | 33.1 |
| Drunk and disorderly conduct | 37.5 | 39.7 | 36.6 | 32.1* | 29.1* |
| Carrying a concealed gun without a permit | 57.8 | 60.3 | 61.3 | 49.0** | 43.3** |
| Indecent exposure | 25.9 | 28.1 | 23.7 | 21.2* | 27.1* |
| **Background check policies** | | | | | |
| Requiring a background check system for all gun sales to make sure a purchaser is not legally prohibited from having a gun? | 88.8 | 89.9 | 91.5 | 84.3** | 73.7* |

*(Continued)*

Table 19.1 (Continued)

| Item | Overall (N=2,703) | Non-gun owners[a] (n=913) | Non-gun owner, gun in household (n=843) | Gun owners (n=947) | NRA members (n=169) |
|---|---|---|---|---|---|
| Increasing federal funding to states to improve reporting of people prohibited by law from having a gun to the background check system? | 66.4 | 67.8 | 65.5 | 63.4 | 60.9 |
| Allowing law enforcement up to five business days, if needed, to complete a background check for gun buyers?[b] | 76.3 | 79.8 | 79.2 | 67.0** | 47.1*** |
| Policies affecting gun dealers | | | | | |
| Allowing the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives to temporarily take away a gun dealer's license if an audit reveals record-keeping violations and the dealer cannot account for 20 or more of the guns? | 84.6 | 86.4 | 84.1 | 78.9* | 64.0* |
| Allowing cities to sue licensed gun dealers when there is strong evidence that the gun dealer's careless sales practices allowed many criminals to obtain guns? | 73.2 | 77.0 | 72.2 | 62.9*** | 43.5*** |
| Allowing the information about which gun dealers sell the most guns used in crimes to be available to the police and the public so that those gun dealers can be prioritized for greater oversight? | 68.8 | 74.1 | 64.3** | 56.5*** | 41.2*** |
| Requiring a mandatory minimum sentence of two years in prison for a person convicted of knowingly selling a gun to someone who cannot legally have one? | 76.0 | 77.7 | 76.3 | 70.7** | 69.8** |

Other gun policies

| | | | | | |
|---|---|---|---|---|---|
| Requiring a person to obtain a license from a local law enforcement agency before buying a gun to verify their identity and ensure that they are not legally prohibited from having a gun? | 77.3 | 83.5 | 76.4** | 59.4*** | 37.6*** |
| Providing government funding for research to develop and test "smart guns" designed to fire only when held by the owner of the gun or other authorized user? | 44.2 | 47.4 | 43.4 | 35.3*** | 23.0*** |
| Requiring by law that people lock up the guns in their home when not in use to prevent handling by children or teenagers without adult supervision? | 67.2 | 75.3 | 62.6*** | 44.4*** | 32.2*** |

*Note:* We asked respondents whether they favored or opposed each policy using a 5-point Likert scale (strongly favor, somewhat favor, neither favor nor oppose, somewhat oppose, strongly oppose). We coded strongly favor and somewhat favor responses as being in support of a given policy.

*$p < .05$, **$p < .01$, ***$p < .001$

[a]Responses among non-gun owners with a gun in their household, gun owners, and NRA members were compared with responses among non-gun owners (no gun in household) using chi-square tests.

[b]Question informed respondents that under current federal law, most background checks for gun buyers are completed in just a few minutes. But if law enforcement needs additional time to determine if a gun buyer is not legally allowed to have a gun, they may only take up to a maximum of three business days to complete the check.

(48%), but by few NRA members (19%). Support levels did not differ meaningfully for a policy banning the sale of large-capacity ammunition magazines that allow some guns to shoot more than 20 bullets. As expected, support was lower for policies banning the possession (as opposed to the sale) of assault weapons and large-capacity ammunition magazines even if the government was required to pay gun owners their fair market value.

For many policies, differences in policy support between gun and non-gun owners were smaller in magnitude than might have been expected. Majorities of gun owners supported all policies bolstering background checks and strengthening oversight of gun dealers and almost all policies prohibiting gun ownership by certain types of persons deemed to be dangerous. A majority of NRA members supported many of these categories of policies, as well. For example, 84% of gun owners and 74% of NRA members supported requiring a background check system for all gun sales; 71% of gun owners and 64% of NRA members supported prohibiting a person convicted of two or more crimes involving alcohol or drugs from having a gun for 10 years; and 71% of gun owners and 70% of NRA members supported requiring a mandatory minimum sentence of two years in prison for a person convicted of selling a gun to someone who cannot legally have a gun. These measures were supported by large majorities of non-gun owners, as well.

We found larger differences in support between non-gun owners and gun owners for policies prohibiting handguns for those under age 21 (76% versus 52%) and requiring gun owners to lock guns when not in use to prevent handling by children or teens without adult supervision (75% versus 44%). Support for government funding to develop and test smart guns designed to fire only when held by the owner or authorized user also differed between non-gun owners and gun owners (47% versus 35%). Support among non-gun owners and gun owners was similar on those policies attracting overall low levels of support, such as prohibiting individuals with misdemeanor convictions for drunk and disorderly conduct (40% versus 32%) or indecent exposure (28% versus 21%) from having guns.

For many policies, the views of non-gun owners living in households with guns were aligned more closely with other non-gun owners than they were with gun owners. For instance, 76% of non-gun owners living in households with guns supported requiring a person to obtain a license from a local law enforcement agency before buying a gun (versus 84% of other non-gun owners and 59% of gun owners). Seventy-nine percent of non-gun owners living

in households with guns supported allowing law enforcement up to five business days to complete a background check for gun buyers (versus 80% of other non-gun owners and 67% of gun owners).

As Table 19.2 indicates, policies specifically targeting gun access by persons with mental illness received widespread public support. Most of these policies were supported by a large majority of non-gun owners and gun owners. Eighty-five percent of the general public supported requiring states to report to the background check system individuals who are prohibited from having guns due to either involuntary commitment or having been declared mentally incompetent by a court. While these mental health–related prohibitions have been in place since before the implementation of the background check system in 1998, many states do not report mental health records due to concerns about confidentiality and lack of data systems to track mental health records at the state level.[12] Seventy-five percent of the public supported requiring health care providers to report people who threaten to harm themselves or others to the background check system for a period of six months, and 79% supported requiring the military to report persons rejected from service for mental health or substance abuse reasons to the background check system to prevent them from having a gun. Public support was lower for a policy allowing police officers to search for and remove guns without a warrant from persons they believe to be dangerous due to mental illness or a tendency toward violence (53%), and only 32% of the public supported restoring the right to have a gun to people with mental illness who are determined no longer to be dangerous.

In addition to supporting policies to limit gun access among persons with mental illness, the majority of the public supported increasing government spending on mental health screening and treatment as a strategy to reduce gun violence (60%). However, far fewer supported increasing government spending on drug and alcohol abuse screening and treatment as a violence reduction strategy (44%).

Table 19.3 indicates that, in most cases, Republicans were less likely than Independents and Democrats to support gun violence prevention policies. However, support for most policies prohibiting certain persons from having guns, bolstering background checks, and strengthening oversight of gun dealers was high regardless of political party identification. For example, 77% of Republicans, 79% of Independents, and 85% of Democrats supported prohibiting a person convicted of violating a domestic violence restraining order

*Table 19.2*  Percentage who favor gun policies affecting persons with mental illness, overall and by gun ownership

| Item | Overall (N = 2,703) | Non-gun owners[a] (n = 913) | Non-gun owner, gun in household (n = 843) | Gun owners (n = 947) | NRA members (n = 169) |
|---|---|---|---|---|---|
| Background check policies | | | | | |
| Requiring states to report a person to the background check system who is prohibited from buying a gun due either to involuntary commitment to a hospital for psychiatric treatment or to being declared mentally incompetent by a court of law? | 85.4 | 85.3 | 86.5 | 85.6 | 80.7 |
| Requiring health care providers to report people who threaten to harm themselves or others to the background check system to prevent them from having a gun for six months? | 74.5 | 75.4 | 76.1 | 72.0 | 66.0 |
| Requiring the military to report a person who has been rejected from service due to mental illness or drug or alcohol abuse to the background check system to prevent them from having a gun? | 78.9 | 79.6 | 79.7 | 76.2 | 67.5 |

| | | | | | |
|---|---|---|---|---|---|
| **Other gun policies** | | | | | |
| Allowing police officers to search for and remove guns from a person, without a warrant, if they believe the person is dangerous due to a mental illness, emotional instability, or a tendency to be violent? | 52.5 | 55.3 | 53.4 | 43.6*** | 31.1** |
| Allowing people who have lost the right to have a gun due to mental illness to have that right restored if they are determined not to be dangerous? | 31.6 | 31.6 | 28.9 | 34.0 | 41.6 |
| **Government spending** | | | | | |
| Increasing government spending on mental health screening and treatment as a strategy to reduce gun violence? | 60.4 | 61.8 | 60.6 | 55.1* | 57.2 |
| Increasing government spending on drug and alcohol abuse screening and treatment as a strategy to reduce gun violence? | 43.5 | 46.6 | 44.2 | 35.0*** | 36.6*** |

*Note:* We asked respondents whether they favored or opposed each policy using a 5-point Likert scale (strongly favor, somewhat favor, neither favor nor oppose, somewhat oppose, strongly oppose). We coded strongly favor and somewhat favor responses as being in support of a given policy.

\*$p < .05$, \*\*$p < .01$, \*\*\*$p < .001$

[a]Responses among non-gun owners with a gun in their household, gun owners, and NRA members were compared with responses among non-gun owners (no gun in household) using chi-square tests.

*Table 19.3*   Percentage who favor gun policies by political party affiliation

| Item | Democrats[a] (n = 788) | Independents (n = 1,121) | Republicans (n = 794) |
|---|---|---|---|
| Assault weapon and ammunition policies | | | |
| Banning the sale of military-style, semi-automatic assault weapons that are capable of shooting more than 10 rounds of ammunition without reloading? | 86.6 | 63.9*** | 51.6*** |
| Banning the sale of large-capacity ammunition clips or magazines that allow some guns to shoot more than 10 bullets before reloading? | 83.2 | 65.6*** | 51.0*** |
| Banning the sale of large-capacity ammunition clips or magazines that allow some guns to shoot more than 20 bullets before reloading? | 82.8 | 66.7*** | 51.9*** |
| Banning the possession of military-style, semi-automatic assault weapons that are capable of shooting more than 10 rounds of ammunition without reloading if the government is required to pay gun owners the fair market value of their weapons? | 72.1 | 51.3*** | 40.2*** |
| Banning the possession of large capacity ammunition clips or magazines that allow some guns to shoot more than 10 bullets before reloading if the government is required to pay gun owners the fair market value of their ammunition clips? | 68.6 | 52.4*** | 38.9*** |
| Prohibited person policies | | | |
| Prohibiting a person convicted of two or more crimes involving alcohol or drugs within a three-year period from having a gun for 10 years? | 79.4 | 72.2* | 75.2* |
| Prohibiting a person convicted of violating a domestic violence restraining order from having a gun for 10 years? | 85.1 | 79.2* | 77.3* |
| Prohibiting a person convicted of a serious crime as a juvenile from having a gun for 10 years? | 88.5 | 79.2* | 82.0* |
| Prohibiting a person under the age of 21 from having a handgun? | 83.6 | 66.1*** | 54.5*** |
| Prohibiting a person on the terror watch list from having a gun? | 88.3 | 84.0 | 86.3 |

| | | | |
|---|---|---|---|
| Prohibiting people who have been convicted of each of these crimes from having a gun for 10 years: | | | |
| Public display of a gun in a threatening manner excluding self-defense | 70.7 | 71.1 | 71.7 |
| Domestic violence | 76.1 | 73.5 | 70.2 |
| Assault and battery that does not result in serious injury or involve a lethal weapon | 58.2 | 50.4* | 49.9* |
| Drunk and disorderly conduct | 42.3 | 33.7* | 37.4 |
| Carrying a concealed gun without a permit | 64.2 | 56.8* | 50.0*** |
| Indecent exposure | 28.4 | 24.7 | 24.4 |
| Background check policies | | | |
| Requiring a background check system for all gun sales to make sure a purchaser is not legally prohibited from having a gun? | 92.1 | 87.5 | 86.3* |
| Increasing federal funding to states to improve reporting of people prohibited by law from having a gun to the background check system? | 76.2 | 64.0*** | 56.1*** |
| Allowing law enforcement up to five business days, if needed, to complete a background check for gun buyers?[b] | 87.3 | 70.8*** | 71.1*** |
| Policies affecting gun dealers | | | |
| Allowing the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives to temporarily take away a gun dealer's license if an audit reveals record-keeping violations and the dealer cannot account for 20 or more of the guns? | 88.5 | 83.3 | 80.9* |
| Allowing cities to sue licensed gun dealers when there is strong evidence that the gun dealer's careless sales practices allowed many criminals to obtain guns? | 82.2 | 69.5*** | 66.5*** |
| Allowing the information about which gun dealers sell the most guns used in crimes to be available to the police and the public so that those gun dealers can be prioritized for greater oversight? | 79.5 | 65.3*** | 58.8*** |
| Requiring a mandatory minimum sentence of two years in prison for a person convicted of knowingly selling a gun to someone who cannot legally have a gun? | 81.1 | 73.4* | 73.0* |

*(Continued)*

*Table 19.3* (Continued)

| Item | Democrats[a]<br>($n = 788$) | Independents<br>($n = 1,121$) | Republicans<br>($n = 794$) |
|---|---|---|---|
| Other gun policies | | | |
| Requiring people to obtain a license from a local law enforcement agency before buying a gun to verify their identity and ensure that they are not legally prohibited from having a gun? | 87.8 | 73.5*** | 68.7*** |
| Providing government funding for research to develop and test "smart guns" designed to fire only when held by the owner of the gun or other authorized user? | 51.4 | 43.8* | 34.1*** |
| Requiring by law that people lock up the guns in their home when not in use to prevent handling by children or teenagers without adult supervision? | 80.8 | 65.3*** | 49.5*** |

*Note:* We asked respondents whether they favored or opposed each policy using a 5-point Likert scale (strongly favor, somewhat favor, neither favor nor oppose, somewhat oppose, strongly oppose). We coded strongly favor and somewhat favor responses as being in support of a given policy. $N = 2,703$.

$^*p < .05$, $^{**}p < .01$, $^{***}p < .001$

[a]Responses among Independents and Republicans were compared with responses among Democrats using chi-square tests.

[b]Question informed respondents that under current federal law, most background checks for gun buyers are completed in just a few minutes. But if law enforcement needs additional time to determine if a gun buyer is not legally allowed to have a gun, they may only take up to a maximum of three business days to complete the check.

from having a gun for two years. Similarly, 82% of Republicans, 79% of Independents, and 89% of Democrats supported prohibiting a person convicted of a serious crime as a juvenile from having a gun for 10 years. A large majority of Republicans (86%) also supported universal background checks for gun sales (versus 88% among Independents and 92% among Democrats) and requiring a mandatory minimum sentence of two years in prison for a person convicted of making an illegal gun sale (73% among Republicans, 73% among Independents, and 81% among Democrats). A wider gradient of support across party affiliation was evident for assault weapon and ammunition policies. Fifty-two percent of Republicans supported banning the sale of assault weapons, compared with 64% of Independents and 87% of Democrats. A similar gradient of support was observed for banning the sale of large-capacity magazines capable of holding 10 or more ammunition rounds (51% among Republicans, 66% among Independents, and 83% among Democrats).

As Table 19.4 indicates, we did not find large differences by political party affiliation in support for policies aimed at restricting access to guns by persons with mental illness. Like Democrats and Independents, Republicans were supportive of bolstering background check policies and resistant to allowing people who had lost their right to have a gun due to mental illness to have that right restored if they were determined not to be dangerous. Republicans and Independents were significantly less willing than Democrats to allow police officers to search for and remove a gun from a person, without a warrant, if they believed the person was dangerous due to mental illness, emotional instability, or a tendency to be violent. A wider gradient of support by party affiliation was also evident for increasing government spending on mental health treatment and on drug and alcohol abuse treatment as a strategy to reduce gun violence. We found that 50% of Republicans, 57% of Independents, and 71% of Democrats were in support of increased spending on mental health screening and treatment as a strategy for reducing gun violence. In contrast, 33% of Republicans, 41% of Independents, and 53% of Democrats supported increased spending on substance abuse treatment to reduce to gun violence.

## Discussion

Findings from this national survey indicate high support—including among gun owners, in most cases—for a range of policies aimed at reducing gun

*Table 19.4* Percentage who favor gun policies affecting persons with mental illness, by political party affiliation

| Item | Democrats[a] (n = 788) | Independents (n = 1,121) | Republicans (n = 794) |
|---|---|---|---|
| **Background check policies** | | | |
| Requiring states to report a person to the background check system who is prohibited from buying a gun due either to involuntary commitment to a hospital for psychiatric treatment or to being declared mentally incompetent by a court of law? | 87.1 | 84.5 | 84.5 |
| Requiring health care providers to report people who threaten to harm themselves or others to the background check system to prevent them from having a gun for six months? | 80.0 | 71.3** | 72.1* |
| Requiring the military to report a person who has been rejected from service due to mental illness or drug or alcohol abuse to the background check system to prevent them from having a gun? | 84.7 | 74.9** | 77.5* |
| **Other gun policies** | | | |
| Allowing police officers to search for and remove guns from a person, without a warrant, if they believe the person is dangerous due to a mental illness, emotional instability, or a tendency to be violent? | 60.7 | 47.9*** | 48.5** |
| Allowing people who have lost the right to have a gun due to mental illness to have that right restored if they are determined not to be dangerous? | 31.1 | 30.7 | 33.8 |
| **Government spending** | | | |
| Increasing government spending on mental health screening and treatment as a strategy to reduce gun violence? | 71.1 | 57.2*** | 50.0*** |
| Increasing government spending on drug and alcohol abuse screening and treatment as a strategy to reduce gun violence? | 53.4 | 41.1** | 32.7*** |

*Note:* We asked respondents whether they favored or opposed each policy using a 5-point Likert scale (strongly favor, somewhat favor, neither favor nor oppose, somewhat oppose, strongly oppose). We coded strongly favor and somewhat favor responses as being in support of a given policy.

*p < .05, **p < .01, ***p < .001

[a]Responses among Independents and Republicans were compared with responses among Democrats using chi-square tests.

violence. All but 5 of the 33 gun policies assessed were supported by a majority of the American public. The most feasible policies from a political perspective include 19 with support by majorities of the public regardless of gun ownership or political party identification. These policies would require a universal background check system and strengthen how the system operates, help curtail dangerous sales practices by gun dealers, require firearm licensing by law enforcement, and restrict gun access to certain groups that are not currently prohibited under federal law from possessing firearms, including individuals with a range of serious criminal convictions and on the terror watch list. Other policies supported by a majority of Americans and across all partisan affiliations, including bans on the sale of assault weapons and large-capacity magazines, had support among a majority or close to a majority of gun owners but few NRA member gun owners. These findings suggest that policymakers have a large range of options for curbing gun violence to choose from that are supported by the majority of the American public.

Among the most popular policies were those affecting access to guns by persons with mental illness. The majority of Americans also supported increasing government spending on mental health treatment as a strategy to reduce gun violence. Given substantial rates of undertreatment of mental health problems in the United States,[13] it is worth considering whether gun policies targeting persons with mental illness might negatively affect treatment-seeking behavior. This may be of particular concern if there are efforts to broaden how mental illness is defined for the purpose of screening potentially dangerous individuals from having guns.

As with all research studies, our study findings should be assessed within the context of our methodological approach. While web-based panels provide an attractive alternative to the increasing challenges of national telephone surveys, methodological issues related to their use should be considered with some care. GfK KN uses probability-based recruitment consistent with established standards.[14] We assessed these data by comparing detailed respondent socio-demographic characteristics (both weighted and unweighted) with national rates to confirm their representativeness of the U.S. population (available upon request from authors). In addition, as with all public opinion survey research, differences in question wording can lead to differences in respondent ratings about the same policy across survey instruments; therefore, it is critical to interpret all public opinion studies with a careful eye to the language used to describe policy items.

## Conclusion

The tragic mass shooting at Sandy Hook Elementary School appears to have shifted the policy debate about gun violence in America. These 2013 national public opinion data collected three weeks after the Sandy Hook massacre suggest that the American public is supportive of a range of policy options for reducing gun violence. Time will tell how public sentiments about proposals to strengthen U.S. gun laws translate into policy action in Washington, D.C., and in state capitals around the country.

### Acknowledgments

The authors gratefully acknowledge funding to conduct this study from an anonymous donor to the Johns Hopkins Center for Gun Policy and Research.

### Notes

1. Gun Control Support Soars in New Polls. http://www.huffingtonpost.com/2012/12/27/gun-control-support-poll_n_2370265.html

2. After Newtown Modest Change in Opinion about Gun Control. http://www.people-press.org/2012/12/20/after-newtown-modest-change-in-opinion-about-gun-control/

3. Americans Want Stricter Gun Laws, Still Oppose Bans. http://www.gallup.com/poll/159569/americans-stricter-gun-laws-oppose-bans.aspx

4. Sides J. Gun Owners vs. the NRA: What the Polling Shows. Washington Post, December 23, 2012. http://www.washingtonpost.com/blogs/wonkblog/wp/2012/12/23/gun-owners-vs-the-nra-what-the-polling-shows/

5. New Poll of NRA Members by Frank Luntz Shows Strong Support for Common-Sense Gun Laws, Exposing Significant Divide between Rank-and-File Members and NRA Leadership. http://www.mayorsagainstillegalguns.org/html/media-center/pr006-12.shtml

6. Stricter Gun Control. http://today.yougov.com/news/2011/01/20/stricter-gun-control/

7. Vernick JS, Teret SP, Howard KA, Teret M, and Wintemute GJ, "Public Opinion Polling on Gun Policy," *Health Affairs* 12, no.4 (1993): 198–208.

8. Blendon RJ, Young JT, and Hemenway D, "The American Public and the Gun Control Debate," *Journal of the American Medical Association* 275, no. 22 (1996): 1719–1722.

9. Teret SP, Webster DW, Vernick JS, et al., "Support for New Policies to Regulate Firearms," *New England Journal of Medicine* 339, no.12 (1998): 813–818.

10. We report a sample completion rate rather than a sample response rate as is standard for online survey research panels. Given that we used an online panel based on probability sampling at the first stage of recruitment, it is important to note the GfK KN panel recruitment response rate of 16.6%.

11. Davis JA and Smith TW, General Social Surveys, 2010. Principal Investigator, James A. Davis; Director and Co-Principal Investigator, Tom W. Smith; Co-Principal Investigator, Peter V. Marsden, NORC ed. Chicago: National Opinion Research Center.

12. Schmidt MS, Gaps in FBI Data Undercut Background Checks for Guns. New York Times, December 20, 2012. http://www.nytimes.com/2012/12/21/us/gaps-in-fbi-data-undercut-background-checks-for-guns.html?pagewanted=all&_r=0

13. Frank RG and Glied, SA, *Better but not well: Mental health policy in the United States.* Baltimore: Johns Hopkins University Press, 2006

14. American Association for Public Opinion Research (AAPOR) Standards Committee. AAPOR Report on Online Panels. March 2010. http://www.aapor.org/AM/Template.cfm?Section=AAPOR_Committee_and_Task_Force_Reports&Template=/CM/ContentDisplay.cfm&ContentID=2223+

*This page intentionally left  lank*

# Consensus Recommendations for Reforms to Federal Gun Policies

On January 14 and 15, 2013, the Johns Hopkins University brought together more than 20 global leaders in gun policy and violence—representing the fields of law, medicine, public health, advocacy and public safety—for the Summit on Reducing Gun Violence in America.

The purpose was to distill the best research, analysis, and experience from these experts into a set of clear and comprehensive policy recommendations to prevent gun violence. By summarizing both new and prior research relevant to a number of policies, and issuing policy recommendations, the outcomes of the Summit can contribute to the prevention of gun violence through more informed legislative and regulatory proposals.

The researchers identified the policy recommendations described below as the most likely to reduce gun violence in the United States.*

---

*These recommendations represent the consensus of the experts presenting at the Johns Hopkins Summit on Reducing Gun Violence in America. However, it may not be the case that every expert endorsed every specific recommendation.

## Background Checks

Fix the background check system by doing the following:

- Establish a universal background check system, which would require a background check for all persons purchasing a firearm (with an exception for inheritance transfers).
- Facilitate all sales through a federally licensed gun dealer. This would have the eff ct of mandating the same record keeping for all firearm transfers.
- Increase the maximum amount of time for the FBI to complete a background check from 3 to 10 business days.
- Require all firearm owners to report the theft or loss of their firearm within 72 hours of becoming aware of its loss.
- Subject even those persons who have a license to carry a firearm, permit to purchase, or other firearm permit to a background check when purchasing a firearm.

## Prohibiting High-Risk Individuals from Purchasing Guns

Expand the conditions for firearm purchase:

- Persons convicted of a violent misdemeanor would be prohibited from firearm purchase for a period of 15 years.
- Persons who committed a violent crime as a juvenile would be prohibited from firearm purchase until 30 years of age.
- Persons convicted of two or more crimes involving drugs or alcohol within a three-year period would be prohibited from firearm purchase for a period of 10 years.
- Persons convicted of a single drug-trafficking off nse would be prohibited from gun purchase.
- Persons determined by a judge to be a gang member would be prohibited from gun purchase.
- Establish a minimum of 21 years of age for handgun purchase or possession.
- Persons who have violated a restraining order issued due to the threat of violence (including permanent, temporary and emergency) would be prohibited from purchasing firearms.

- Persons with temporary restraining orders filed against them for violence or threats of violence would be prohibited from purchasing firearms.
- Persons who have been convicted of misdemeanor stalking would be prohibited from purchasing firearms.

## Mental Health

- Focus federal restrictions on gun purchases by persons with serious mental illness on the dangerousness of the individual.
- Fully fund federal incentives for states to provide information about disqualifying mental health conditions to the National Instant Criminal Background Check System for gun buyers.

## Trafficking and Dealer Licensing

- A permanent director for ATF should be appointed and confirmed.
- ATF should be required to provide adequate resources to inspect and otherwise engage in oversight of federally licensed gun dealers.
- Restrictions imposed under the Firearm Owners' Protection Act limiting ATF to one routine inspection of gun dealers per year should be repealed.
- The provisions of the Firearm Owners' Protection Act which raise the evidentiary standard for prosecuting dealers who make unlawful sales should be repealed.
- ATF should be granted authority to develop a range of sanctions for gun dealers who violate gun sales or other laws.
- The Protection of Lawful Commerce in Arms Act, providing gun dealers and manufacturers protection from tort liability, should be repealed.
- Federal restrictions on access to firearms trace data, other than those associated with ongoing criminal investigations, should be repealed.
- Federal law mandating reporting of multiple sales of handguns should be expanded to include long guns.
- Adequate penalties are needed for violations of the above provisions.

## Personalized Guns

- Congress should provide financial incentives to states to mandate childproof or personalized guns.
- The Federal Consumer Product Safety Commission should be granted authority to regulate the safety of firearms and ammunition as consumer products.

## Assault Weapons

- Ban the future sale of assault weapons, incorporating a more carefully crafted definition to reduce the risk—compared with the 1994 ban—that the law would be easily evaded.

## High-Capacity Magazines

- Ban the future sale and possession of large-capacity (greater than 10 rounds) ammunition magazines.

## Research Funding

- The federal government should provide funds to the Centers for Disease Control and Prevention, the National Institutes of Health, and the National Institute of Justice adequate to understand the causes and solutions of gun violence, commensurate with its impact on the public's health and safety.
- The Surgeon General of the United States should produce a regular report on the state of the problem of gun violence in America and progress toward solutions.

# Biographies of Contributors

**Ted Alcorn, MA, MHS,** is a senior policy analyst in the Office of the Mayor of New York City. He contributes frequent public health reporting to *The Lancet* and has also published work in the *International Herald Tribune, The Financial Times, Guernica,* and the *American Journal of Tropical Medicine and Hygiene.* He earned an MHS from the Johns Hopkins Bloomberg School of Public Health and MA from the Johns Hopkins School for Advanced International Studies (SAIS), and then lived in Beijing, China, as a Henry Luce Scholar.

**Philip Alpers** is an adjunct associate professor at the Sydney School of Public Health, The University of Sydney. Alpers analyzes the public health effects of armed violence, firearm injury prevention, and small arms proliferation. His website GunPolicy.org compares armed violence and gun laws across more than 200 jurisdictions. Accredited to the United Nations small arms Programme of Action since 2001, Alpers participates in the United Nations process as a member of the Australian government delegation. Relevant work includes a 20-nation regional study (*Small Arms in the Pacific*), field work with users and traffickers (*Gunrunning in Papua New Guinea: From Arrows to Assault Weapons in the Southern Highlands*), a 10-year impact analysis of the world's largest firearm buyback (*Australia's 1996 Gun Law Reforms: Faster Falls in Firearm Deaths, Firearm Suicides, and a Decade without Mass Shootings*) and the disposal of military small arms (Papua New Guinea: small numbers, big fuss, real results).

**Deborah Azrael, PhD,** has been a member of the firearms research group at the Harvard School of Public Health for more than 20 years, working collaboratively with her colleagues David Hemenway, Matthew Miller, and Cathy Barber throughout that time. Dr. Azrael's academic training is in statistics and evaluative sciences. Much of her work over the past decades has been in designing and building injury surveillance systems, including the pilot for the National Violent Death Reporting System (of which she was co-director, with Cathy Barber), and the Boston Data System, a surveillance system designed to track youth violence at the neighborhood level in Boston (which she continues to direct). Her academic work has focused, often in collaboration with David Hemenway and Matt Miller, on the relationship between firearm availability and injury-related mortality. She has also worked extensively on studies that have used ecologic- and

individual-level data to understand risk of suicide across and within populations, e.g., suicide in the Veterans Administration, suicide among young African American men, and the effects of psychotropic medications on suicide risk.

**Antonio Rangel Bandeira** is coordinator for Firearms Control, Viva Rio, Brazil. Mr. Bandeira has served as an advisor for the Parliamentary Front for Disarmament for the new firearms control law, the Disarmament Statute (2003). He also serves as the civil society coordinator for the National Buy-Back Small Arms and Light Weapons (SALW) Campaign and has been a member of the Brazilian government delegation for the UN Conference on Illicit Traffic of SALW. In addition, he has advised the governments of Mozambique, Bolivia, Angola, El Salvador, Venezuela, and the province of Buenos Aires, Argentina, on SALW public policy and ammunition control and buy-back disarmament campaigns. Mr. Bandeira is a former vice-minister of Welfare in the Brazilian government and advisor to the president of Brazil. He is a founding member of the International Network on Small Arms. He earned an MA in Political Science from York University.

**Colleen L. Barry, PhD, MPP,** is an associate professor and associate chair for Research and Practice in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Dr. Barry's research focuses on policy and regulation affecting often-stigmatized health conditions with a focus on mental illness, substance use disorders, and obesity. She teaches courses in health policy and politics and public opinion research. She is principal investigator of an NIMH R01 to understand the effects of implementation of the recent federal mental health and addiction parity law, and is principal investigator on a NIDA R01 to evaluate the effects of regulations aimed at increasing rates of use of new treatments for substance use disorders. Dr. Barry has been involved with a number of projects examining the implications of various aspects of the Affordable Care Act (ACA) on mental illness and addiction treatment. She is also principal investigator on two Robert Wood Johnson Foundation Healthy Eating Research grants, studying how news media messages used to frame the issue of childhood obesity affect public attitudes about food-marketing regulation, and testing how media messages affect public opinion about sugar-sweetened beverage taxes. She received a PhD in Health Policy from Harvard University and a master's degree in public policy from the John F. Kennedy School of Government at Harvard.

**Michael R. Bloomberg** is the 108th Mayor of the City of New York. He began his career in 1966 at Salomon Brothers, and after being let go in 1981, he began Bloomberg LP, a global media company that today has over 310,000 subscribers to its financial news and information service. As his company grew, Michael Bloomberg started directing more of his attention to philanthropy. He has sat on the boards of numerous charitable institutions, including Johns Hopkins University, where he helped build the Bloomberg School of Public Health into one of the world's leading institutions of public health research and training. In 2001 he ran for mayor of the City of New York and, in a major upset, won the election. In office, Mayor Bloomberg has cut crime more than 35 percent and created jobs

by attracting new investment and supporting small business growth. He has implemented ambitious public health strategies, including the ban on smoking in restaurants and bars, and expanded support for arts and cultural organizations. His education reforms have driven graduation rates up 40 percent since 2005. The City has weathered the national recession much better than most other places. Since October 2009, the nation has gained back only one out of every four jobs that were lost in the recession. Meanwhile, New York City has gained back nearly all of its lost jobs. Michael Bloomberg attended Johns Hopkins University and received an MBA from Harvard Business School. He is the father of two daughters, Emma and Georgina.

**Anthony A. Braga, PhD,** is the Don M. Gottfredson Professor of Evidence-Based Criminology in the School of Criminal Justice at Rutgers University and a senior research fellow in the Program in Criminal Justice Policy and Management at Harvard University. He is also a member of the University of Chicago Crime Lab and a Senior Fellow in the Chief Justice Earl Warren Institute on Law and Social Policy at the University of California, Berkeley. He is currently the President and an elected Fellow of the Academy of Experimental Criminology. Dr. Braga's research involves collaborating with criminal justice, social service, and community-based organizations to address illegal access to firearms, reduce gang and group-involved violence, and control crime hot spots. Since 1995, Braga has worked closely with criminal justice practitioners in Boston to reduce youth gun violence. He was a member of the Boston Gun Project that implemented the Operation Ceasefire gang violence reduction strategy that was associated with a 63% reduction in youth homicides in Boston. Dr. Braga's research has been published in top criminal justice, medical, and public health journals. He received his MPA from Harvard University and his PhD in Criminal Justice from Rutgers University.

**Philip J. Cook, PhD,** is ITT/Sanford Professor of Public Policy and Professor of Economics and Sociology at Duke University. He has conducted research on crime and criminal justice throughout his career, with a sustained focus on gun violence and gun policy. He serves as co-organizer of the NBER Workshop on the Economics of Crime. He has served as consultant to the U.S. Department of Justice (Criminal Division) and to the U.S. Department of Treasury (Enforcement Division). His service with the National Academy of Science includes membership on expert panels dealing with alcohol-abuse prevention, injury control, violence, school rampage shootings, underage drinking, and the deterrent effect of the death penalty. Dr. Cook is a member of the Institute of Medicine of the National Academy of Sciences and an honorary Fellow in both the American Society of Criminology and of the Academy of Experimental Criminology. Dr. Cook completed his PhD in economics at the University of California, Berkeley, in 1973.

**Ronald J. Daniels, JD, LLM,** is 14th president of The Johns Hopkins University. Previously, he was provost and professor of law at the University of Pennsylvania and dean and James M. Tory Professor of Law at the University of Toronto. Since arriving at Johns Hopkins, Daniels has focused his leadership on three overarching themes: enhanced interdisciplinary

collaboration, individual excellence, and community engagement. Under his leadership, a number of cross-school collaborations have emerged, including efforts related to individual health and the science of learning; significant investments have been made in undergraduate and graduate education and financial aid; and the university has strategically deepened its commitment to Baltimore, as evidenced by the new Elmer A. Henderson School in East Baltimore and the $10 million Homewood Community Partners Initiative. Daniels's research focuses on the intersections of law, economics, development, and public policy, and he has also has engaged on a range of policy issues from corporate governance and anti-terrorism legislation in Canada, to risk and disaster policy in the United States. Daniels received an LLM from Yale University and a BA and JD from the University of Toronto.

**Shannon Frattaroli, PhD, MPH,** is an associate professor at the Johns Hopkins Bloomberg School of Public Health where she is affiliated with the Center for Gun Policy and Research. Dr. Frattaroli's research in the area of gun violence prevention focuses on understanding and improving how policies are implemented and enforced, with particular attention to those that aim to limit batterers' access to guns. The role of policy makers, law enforcement, the courts, and advocates in assuring that laws designed to prevent gun violence are realized through implementation and enforcement strategies is a common theme in her work. Dr. Frattaroli is currently serving as a member of the Maryland Task Force to Study Access of Mentally Ill Individuals to Regulated Firearms.

**Linda K. Frisman, PhD,** is a research professor at the University of Connecticut School of Social Work and a senior research scientist with the Connecticut Department of Mental Health and Addiction Services. Dr. Frisman holds a PhD in Social Policy from the Heller School of Brandeis University and was a postdoctoral fellow in mental health services research at Yale University. She has been the principal investigator of several federally funded studies testing interventions that address homelessness, co-occurring mental health and substance use disorders, and criminal justice populations with behavioral health disorders. Currently she is the principal investigator of the Connecticut Criminal Justice Drug Abuse Treatment Studies Center funded by NIDA and co-principal investigator of an NIMH study regarding the impact of connection to entitlements by prisoners with mental illness who are being released.

**Peter L. Gagliardi** is senior vice president for Forensic Technology Inc. He has more than 40 years of experience extracting useful investigative information from crime guns and related evidence in both the public and private sectors. He spent 30 of those years in law enforcement, most of which were focused on the investigation of firearms and explosives-related crimes with ATF. In 1999, Mr. Gagliardi retired from ATF as the Special Agent in Charge of the New York Field Division. During his tenure in New York, he was responsible for managing all of ATF's law enforcement and regulatory operations within the New York/New Jersey metropolitan area. While assigned to ATF headquarters in Washington, DC, he served as the agency's principal liaison to Congress, the deputy assistant

director of Science and Technology, the deputy assistant director of Law Enforcement Programs, and the chief of Strategic Planning. In 2010, he authored the book, *The 13 Critical Tasks: An Inside-Out Approach to Solving More Gun Crime,* which Forensic Technology makes available at no cost to criminal justice agencies and educators. He currently serves on the Firearms Committee of the International Association of Chiefs of Police (IACP).

**David Hemenway, PhD,** is an economist and professor at Harvard School of Public Health (HSPH) and a former James Marsh Visiting Professor at Large at the University of Vermont. He is director of the Harvard Injury Control Research Center. He received the Excellence in Science award from the Injury and Violence Section of the American Public Health Association and fellowships from the Pew, Soros, and Robert Wood Johnson foundations. Dr. Hemenway was recognized in 2012 by the Centers for Disease Control and Prevention as one of the 20 "most influential injury and violence professionals over the past 20 years." He has written more than 165 journal articles and is sole author of five books. Recent books include *Private Guns Public Health* (2006; University of Michigan Press) and *While We Were Sleeping: Success Stories in Injury and Violence Prevention* (2009; University of California Press). Dr. Hemenway has received 10 HSPH teaching awards.

**Michael J. Klag, MD, MPH,** is dean of the Johns Hopkins Bloomberg School of Public Health. Dr. Klag is an internist and kidney disease epidemiologist whose scientific contributions have been in the prevention and epidemiology of kidney disease, hypertension, and cardiovascular disease. He was one of the earliest investigators to apply epidemiologic methods to the study of kidney disease. For eight years, he was Director of the Division of General Internal Medicine and was the first Vice Dean for Clinical Investigation at the Johns Hopkins School of Medicine, where he instituted new policies and procedures for oversight of human subject research. He was the Editor-in-Chief of the *Johns Hopkins Family Health Book*, and from 1988 to 2011 he directed one of the longest running longitudinal studies in existence, the Precursors Study, which began in 1946. Dr. Klag received his medical degree from the University of Pennsylvania and his MPH degree from the Bloomberg School.

**Christopher S. Koper, PhD,** is an associate professor in the Department of Criminology, Law and Society at George Mason University and a senior fellow and co-director of the evidence-based policing research program in George Mason's Center for Evidence-Based Crime Policy. Dr. Koper has more than 20 years of experience conducting criminological research at the Police Executive Research Forum, the University of Pennsylvania, the Urban Institute, the RAND Corporation, the Police Foundation, and other organizations, where he has written and published extensively on issues related to firearms, policing, federal crime prevention efforts, and other topics. His research on firearms, much of which he has conducted for the U.S. Department of Justice, has included studies of illegal gun markets, law enforcement strategies to reduce gun crime, trends in criminal weaponry, the 1994 federal assault weapons ban, and other federal and state policies to reduce firearms violence. He holds a PhD in criminology and criminal justice from the University of Maryland.

**Hsiu-Ju Lin, PhD,** is an associate research professor in the School of Social Work at the University of Connecticut and the principal data analyst for the Research Division at the Connecticut Department of Mental Health and Addiction Services. Dr. Lin plans and oversees data analyses of all the Division's quantitative work, including several federally funded studies. Her areas of specialization include longitudinal data analysis, multilevel modeling, structural equation modeling, and health behavior studies. She holds a doctorate in social/personality psychology from the University of Albany, State University of New York.

**Jens Ludwig, PhD, MA,** is the McCormick Foundation Professor of Social Service Administration, Law, and Public Policy at the University of Chicago, director of the University of Chicago Crime Lab, and co-director of the University of Chicago Urban Education Lab. He is also a non-resident senior fellow at the Brookings Institution, research associate of the National Bureau of Economic Research (NBER), co-director of the NBER's Working Group on the Economics of Crime, and member of the MacArthur Foundation's research network on housing and families. His research has been published in leading scientific journals across a range of disciplines, including *Science, New England Journal of Medicine, Journal of the American Medical Association, American Economic Review,* and *American Journal of Sociology.* He is co-author with Philip J. Cook of *Gun Violence: The Real Costs* (2000; Oxford University Press), co-editor with Cook of *Evaluating Gun Policy* (2003; Brookings Institution Press), and co-editor with Cook and Justin McCrary of *Controlling Crime: Strategies and Tradeoffs* (2011; University of Chicago Press). In 2012, he was elected to the National Academy of Science's Institute of Medicine. Ludwig received his BA in economics from Rutgers College and his MA and PhD in economics from Duke University.

**Emma E. McGinty, MS,** is a research assistant and fourth-year PhD candidate in Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. Her research interests include mental illness, gun violence, and the role of the news media in public policy. Her dissertation research examines the effects of news media coverage of gun violence by persons with serious mental illness, the public's support for gun control policies, and stigma toward persons with serious mental illnesses, such as schizophrenia and bipolar disorder. At the Center for Gun Policy and Research, she is collaborating on studies on the effects of minimum legal age restrictions for firearm purchasers and possessors on gun violence and the effects of state gun sales policies on interstate trafficking of guns. She also serves as a resource on mental illness and gun violence. Prior to coming to the Bloomberg School as a Sommer Scholar in 2009, she worked for the Centers for Disease Control and Prevention. She received an MS in Health and Behavior Science from Columbia University in 2006.

**Adam D. Mernit,** an undergraduate senior Public Health Studies major at Johns Hopkins University, is applying to the Master of Science in Public Health (MSPH) program at the Bloomberg School of Public Health. A native of Huntington, New York, he recently began

working with Stephen Teret in the field of gun policy. He plans to continue along the path of gun policy research and study the impact of health research on legislative action.

**Matthew Miller, MD, ScD, MPH,** is deputy director of the Harvard Injury Control Research Center and associate professor of Injury Prevention and Health Policy at the Harvard School of Public Health. Dr. Miller, a physician with training in internal medicine, medical oncology, medical ethics, health policy and management, epidemiology, and pharmaco-epidemiology, has authored more than 100 journal articles and op-ed articles on suicide, interpersonal violence, and unintentional injuries, many of which focus on the relationship between firearms and lethal violence. He has been recognized as an outstanding teacher at Harvard's School of Public Health and at Harvard College, most recently in 2011 when he received both the Burke Award from the Harvard Initiative for Global Health for teaching injury and violence prevention to undergraduates and the Harvard School of Public Health's annual Teaching Award for his graduate school course on suicide prevention. He is also the recipient of the 2011 Excellence in Science Award, an honor bestowed annually by the Injury Control and Emergency Health Services Section of the American Public Health Association.

**Michael A. Norko, MD, MAR,** is a forensic psychiatrist and serves as director of Forensic Services for the Connecticut Department of Mental Health and Addiction Services (DMHAS), where he oversees all public sector forensic services. He manages DMHAS reporting to the FBI of persons ineligible for gun purchase due to mental health adjudications. Dr. Norko is also an associate professor of psychiatry, Law & Psychiatry Division at Yale University School of Medicine. He served on the APA Task Force on the Assessment of Violence Risk. Dr. Norko collaborated in writing legislative proposals for the "Relief from Disabilities" provision required by the NICS Improvement Amendments Act.

**Michael J. North, PhD,** was a faculty member in Biochemistry at the University of Stirling in Scotland when, in March of 1996, his only daughter was killed in a mass shooting at Dunblane Primary School. Following that event, he became a tireless advocate for gun control. He participated in the Snowdrop Campaign for a handgun ban and helped to launch the Gun Control Network (GCN) to campaign for tighter gun legislation in the UK. He remains involved with the GCN and recently served on a panel advising the Scottish government on airgun legislation. He has participated in a number of international meetings relating to gun violence and public safety and has spoken about gun control in the UK to audiences in Europe, North America, and Australia. Until recently, he was on the board of the International Action Network on Small Arms.

**Rebecca Peters** is a violence prevention specialist who has worked for more than 20 years on arms control, women's rights, public health, and human security. A lawyer and a journalist, she was the first director of the International Action Network on Small Arms (IANSA), the global movement against gun violence. She previously worked for the Open Society Institute and was a Soros Senior Justice Fellow at the Johns Hopkins School of Hygiene

and Public Health. In the 1990s, she led the grassroots campaign in Australia that secured the overhaul of all state and territory gun laws. (Gun death rates in Australia have subsequently dropped by 50%.) For this work, she received the Australian Human Rights Medal, her country's highest human rights award. She is currently working for Surviving Gun Violence, a project aiming to increase assistance to survivors. A member of the IANSA Board and the Fundacio per la Pau's International Council, she is also a consultant to the University of Sydney and the Centre for Humanitarian Dialogue.

**Allison Gilbert Robertson, PhD, MPH,** is assistant professor in the Department of Psychiatry and Behavioral Sciences at Duke University School of Medicine. Dr. Robertson's interests span several areas of mental health law, policy, and services research, in particular the problems of co-occurring substance abuse and the intersection between these disorders and criminal justice involvement. She is currently an investigator on several projects including the multisite study on gun control laws, mental illness, and prevention of violence led by Dr. Jeffrey Swanson. She is principal investigator on a study funded by the Robert Wood Johnson Foundation Program on Public Health Law Research examining the effects of legal practices used in jail diversion programs for persons with serious mental illness that aim to improve participants' access to treatment and reduce recidivism. She received a PhD in Health Policy and Management from the University of North Carolina at Chapel Hill and an MPH in Health Management and Policy from the University of Michigan at Ann Arbor.

**Lawrence E. Rosenthal, JD,** is a professor at Chapman University School of Law in Orange, California. Previously, he was deputy corporation counsel for Counseling, Appeals and Legal Policy with the City of Chicago's Department of Law. In this capacity, he argued three cases before the U.S. Supreme Court and supervised a large volume of complex litigation, as well as legislative and policy matters. He entered the practice of law as an assistant U.S. attorney for the Northern District of Illinois, specializing in organized crime and public corruption prosecutions. He brought the first racketeering case involving insider trading, and secured the longest sentence–200 years–in the history of the District in an organized crime case. He clerked for Judge Prentice Marshall of the U.S. District Court for the Northern District of Illinois and for Justice John Paul Stevens of the U.S. Supreme Court. He graduated from Harvard Law School, where he won the Fay Diploma and was an editor of the Harvard Law Review. He continues to engage in litigation before the Supreme Court and other appellate courts, usually on a pro bono basis.

**Jeffrey W. Swanson, PhD,** is a professor in Psychiatry and Behavioral Sciences at Duke University School of Medicine. He is a medical sociologist with expertise in psychiatric epidemiology, mental health services research, and mental health law and policy studies. Dr. Swanson is principal investigator of a multisite study on gun control laws, mental illness and prevention of violence, cosponsored by the National Science Foundation and the Robert Wood Johnson Foundation's Program on Public Health Law Research (PHLR).

He received the 2011 Carl Taube Award from the American Public Health Association for outstanding career contributions to mental health research.

**Marvin S. Swartz, MD,** is professor and head of the Division of Social and Community Psychiatry and director of Behavioral Health for the Duke University Health System. Dr. Swartz's major research and clinical interests are in improving the care of mentally ill individuals. He has been extensively involved in policy issues related to the organization and care of mentally ill individuals at the state and national level. He was a Network Member in the MacArthur Foundation Research Network on mandated community treatment examining use of legal tools to promote adherence to mental health treatment, and led the Duke team studying the use of assisted outpatient treatment in New York. He co-led a North Carolina study examining the effectiveness of psychiatric advance directives and co-led the Duke team investigating the role of antipsychotics in treatment outcomes in schizophrenia as part of the landmark NIMH-funded Clinical Antipsychotics Trials of Intervention Effectiveness study. He is a co-investigator of a study of the cost of criminal justice involvement of mentally ill individuals and the effectiveness of gun laws in reducing gun-related deaths. Dr. Swartz is also director of the National Resource Center on Psychiatric Advance Directives and recipient of the 2011 American Public Health Association's Carl Taube Award and American Psychiatric Association's Senior Scholar, Health Services Research Award for career contributions to mental health services research.

**Stephen P. Teret, JD, MPH,** is a professor of Health Policy and director of the Johns Hopkins Center for Law and the Public's Health. Professor Teret holds joint faculty appointments in Pediatrics and in Emergency Medicine at the Johns Hopkins School of Medicine. He began his career working as a poverty lawyer and a trial lawyer in New York. Since 1979, he has been a full-time faculty member at the Johns Hopkins Bloomberg School of Public Health. His work includes research, teaching, and public service in the areas of injury prevention, vaccine policy, tobacco policy, food policy, preparedness, and, generally, public health law. Professor Teret's work has also focused on the understanding and prevention of violence, with an emphasis on gun policy. Teret is recognized as one of the first persons to write about and advocate for the use of litigation as a tool for protecting the public's health. Professor Teret is a frequent lecturer at major universities and has served as a consultant to the President, the Attorney General, the U.S. Congress, federal agencies, state legislatures, and health departments. Professor Teret is the recipient of distinguished career awards from the American Public Health Association, and the Association of Trial Lawyers of America.

**Jon S. Vernick, JD, MPH,** is an associate professor and associate chair in Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. He is co-director of the Johns Hopkins Center for Gun Policy and Research. In addition, Vernick is co-director of the Johns Hopkins Center for Law and the Public's Health and deputy director of the Center for Injury Research and Policy. His work has concentrated on ways

in which the law and legal interventions can improve the public's health. He is particularly interested in epidemiology, policy, and legal and ethical issues associated with firearm and motor vehicle injuries. He has also examined aspects of numerous other public health issues including tobacco control, preparedness and health advocacy. Vernick is also committed to graduate education, serving as an associate chair of the Johns Hopkins MPH Program. He received a BA from Johns Hopkins University, a law degree cum laude from George Washington University, and an MPH from the Johns Hopkins School of Hygiene and Public Health.

**Katherine A. Vittes, PhD, MPH,** is a research associate at the Johns Hopkins Center for Gun Policy and Research. Her research focuses on evaluating policies designed to prevent gun violence. She has published numerous articles on adolescent gun violence and gun use in intimate partner violence. In addition to having presented at more than a dozen professional conferences, Vittes has been called upon to testify in front of the Maryland legislature. Prior to joining the Bloomberg School faculty in 2008, Dr. Vittes earned her MPH and PhD at the UCLA School of Public Health and completed a post-doc at the University of Pennsylvania.

**Daniel W. Webster, ScD, MPH,** is a professor in Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health. He serves as director of the Johns Hopkins Center for Gun Policy and Research, as well as deputy director of research for the Center for the Prevention of Youth Violence. He is also affiliated with the Johns Hopkins Center for Injury Research and Policy. Webster is the author of numerous articles on the prevention of gun violence and firearm policy. His current research interests include evaluating the effects of various efforts to reduce violence, including state gun and alcohol policies, policing strategies focused on deterring gun violence, a community gun violence prevention initiative (Safe Streets) and Maryland's Lethality Assessment Program for reducing the recurrence of intimate partner violence.

**Adam Winkler, JD, MA,** is a law professor at the University of California, Los Angeles. He is a specialist in American constitutional law, known primarily for his research on the right to bear arms and on corporate political speech. His work has been cited by the U.S. Supreme Court and numerous federal and state courts. His recent book, *Gunfight: The Battle Over the Right to Bear Arms,* was called "provocative" and "illuminating" by *The New York Times;* "a fascinating survey of the misunderstood history of guns and gun control in America" by *The Wall Street Journal;* and "an antidote to so much in the gun debate that is one-sided and dishonest" by the *Los Angeles Times.* A contributor to *The Daily Beast* and *The Huffi   ton Post,* his commentary has been featured on NBC Nightly News, CNN, *The New York Times, The Wall Street Journal, Newsweek, The Atlantic, The New Republic,* and SCOTUSblog. He edited, along with Pulitzer Prize–winning historian Leonard Levy, the *Encyclopedia of the American Constitution.* He is a graduate of the Georgetown University School of Foreign Service and New York University School of Law. He also holds a master's degree in political science from UCLA.

**Garen J. Wintemute, MD, MPH,** is the inaugural Susan P. Baker-Stephen P. Teret Chair in Violence Prevention and director of the Violence Prevention Research Program at the University of California, Davis. He practices and teaches emergency medicine at UC Davis Medical Center, Sacramento (a level I regional trauma center), and is professor of emergency medicine at the UC Davis School of Medicine. Dr. Wintemute's research focuses on the nature and prevention of violence and on the development of effective violence prevention measures and policies. Selected studies include assessments of risk for criminal activity and violent death among legal purchasers of handguns, evaluations of the effectiveness of denying handgun purchase to felons and violent misdemeanants, in-depth studies of gun dealers who are disproportionate sources of crime guns, and the first empirical study of gun shows. He is the author of two books: Ring of Fire (1994), a study of the handgun makers of Southern California, and Inside Gun Shows: What Goes on When Everybody Thinks Nobody's Watching (2009). He has testified before committees of Congress and state and local legislatures as an expert on firearm violence and its prevention. In 1997 he was named a Hero of Medicine by Time magazine.

**April M. Zeoli, PhD, MPH,** is an assistant professor in the School of Criminal Justice at Michigan State University. In her research, she uses public health methods and models to increase the understanding of violence and homicide. Her main field of investigation is the prevention of intimate partner violence and homicide through public health policy.

*This page intentionally left  lank*

# Index

"Access Denied" (Mayors Against Illegal Guns), xiv
access to guns, restrictions on, 144
accidental deaths, related to guns, 174–75
Acioli, Patricia, 216
alcohol, consumption of, laws relating to, 70
alcohol abuse: federal denial criteria and, 68–69, 72, 78, 88; gun purchase and possession and, 79; personal gun ownership and, 82–83; as risk factor for gun-related violence, 82, 83. *See also* drunk driving
ammunition, marking of, 216
amnesty programs, 205
Argentina, supporting gun amnesties and buybacks, 205
Armatix GmbH, 177–78
Arms Trade Treaty, 220
assault weapons, 143; associated with drug trafficking and organized crime, 161; ban on, Americans' support of, 241–44; as crime guns, 162–64; JHU Summit recommendations on, 262; mass shootings and, 161; as percentage of guns recovered by police, 164; prices for, 162–63; prohibitions on, constitutionality of, 230–33; restrictions on, public support for, 168
assault weapons ban, federal, xii–xiii, 157; effects of, 162–65; exemptions in, 158, 160; features test provision of, 159, 160; impact on gun violence, 165–66; LCMs and, 159–60; lessons and implications from, 168–69; mixed effects of, 158; passage of, 161; provisions of, 159–61
ATF. *See* U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives
Aurora (CO), mass shootings at, 158

Australasian Police Ministers' Council (APMC), 195, 201–2
Australia: battle in, over gun regulation, 196–98; effects in, of gun policy changes, 207–9; gun manufacturing industry gone from, 207; guns in, 196; lunatic fringe in, 198; Port Arthur, mass shooting at, 195; restocking, following gun legislation, 207; supporting gun amnesties and buybacks, 205, 206–7; weapons destroyed in, 205–7
Australian Institute of Criminology, 207
AWs. *See* assault weapons
Azrael, Deborah, 6

background checks, xii, xiii, 22, 27, 35; avoiding, 104; comprehensive requirements for, potential effects of, 103–5; constitutionality of, 230–31; costs of, 90; criminal records accessible for, 28–29; effectiveness of, 45, 57, 102–3; extending, to misdemeanor convictions and alcohol-related offenses, 89; improvements in, 60; JHU Summit recommendations on, 260; mentally ill people and, 36; nondomestic violence convictions and, 56–57; results of, 78, 79; speed of, 96; state regulation of, 97; strengthening, Americans' support of, 241, 246–47; universal system for, 29; usefulness of, dependent on related databases, 90; waiving, 97. *See also* Brady Act, the
Badger Guns and Ammo, 137, 138, 147
BATF. *See* U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)
batterers: convicted, prohibited from buying or possessing guns, 55, 56; prohibiting gun access for, 68; using weapons to threaten, 54.

batterers (*continued*)
   *See also* domestic violence; domestic violence
      restraining orders; intimate partner
      homicides
Behavioral Risk Factor Surveillance System
   (BRFSS), 6, 9, 82
Biden, Joseph, xi, xiii
Bird, Derrick, 192
Bloomberg, Michael R., 126
Blose, J., 78
Boston, gun market disruption strategy in,
   146–47
Brady, James, 23
Brady, Sarah, 23
Brady Act, the (Brady Handgun Violence
   Prevention Act), 23, 25, 110; background
   check requirement of, 28; gun running and,
   25; homicide rates and, 22–23, 26–27, 78, 88;
   linked with decrease in crime gun imports,
   147; not applicable to secondary-market
   transactions, 148; private-sale loophole in, 28
   (*see also* private-sales loophole); risk of violent
   crime and, 44–45; suicide rates and, 22–23,
   26; waiting periods and, 23, 26
Braga, Anthony A., 28, 146
Brazil: arms industry in, 214, 215; arms
   legalization campaign in, 220; buyback
   programs in, 217–18; destroying weapons in,
   217, 218; dispelling myths in, about guns,
   216–17; gun control reforms in, 213–15; as gun
   exporter, 214; gun homicides in, 213; gun
   regulation in, 219–20; illegal gun trade in,
   219; pacification efforts in, 218–19; public
   opinion in, on gun control, 205, 219–20
Breyer, Stephen, Justice, 229
British Medical Association, 189
Bureau of Alcohol, Tobacco and Firearms. *See*
   U.S. Bureau of Alcohol, Tobacco, Firearms
   and Explosives (ATF)
Bush, George W., 179
Bush (George W.) administration, 152
buyback programs, 201, 205, 208, 217–18

California: allowing seizure of guns from the
   dangerous mentally ill, 48–49; background
   checks and recordkeeping policies in, 98–99;

   denying gun purchases for violent misde-
      meanor convictions, 79–81; gun market in,
      90, 99; gun shows in, 102; juvenile offenders
      in, gun possession and, 71
California Armed and Prohibited Persons
   System, 61
CAP laws. *See* child access prevention (CAP)
   laws
Centers for Disease Control and Prevention
   (CDC), xiv, 152, 262
Chicago, 146; action in, against gun dealers,
   124–25, 136; crime guns in, 25
child access prevention (CAP) laws, 70
childproof guns. *See* personalized guns; youth
children. *See* youth
Clinton, Bill, 22, 177
Clinton administration, 152
college students, gun ownership among, 69
Colt's, 177
concealed weapon permits, 90
Connecticut, NICS reporting in, 37–38,
   40–44, 45
Conservative Party (UK), 186–87, 190–91
consignment sales, 99
Consumer Product Safety Commission, 180, 262
Cook, Philip J., 8, 28, 78, 95, 146, 175
countermarketing, 130
crime guns, 143; ATF definition of, 115; assault
   weapons as, 162–64; in Brazil, 215; exporting
   of, to other states, 114–17; illegally diverted
   from legal commerce, 144; purchase of, 28;
   regional processing protocols for, 150;
   sources of, 100, 114–15, 118, 119, 124, 133–34;
   trace data on, unavailable from ATF, 129,
   130; tracing of, national report on, 151–52
crime rates, drop in (U.S., 1990s), 24
criminals: demand of, for guns, xiii, 28, 39–40,
   143; guns diverted to, 112–18; guns of, sources
   for, 110–11, 123, 145–46; with mental illness,
   preventing gun violence among, 49; selling
   guns to, 99–101, 105
Cullen, Lord W. Douglas, 187
Cullen Report, 188, 190–91

dealers, licensed, 101–2, 105, 110–11; constitu-
   tionality of regulating, 231; effect of, on the

illicit market, 124; increasing oversight of, Americans' support of, 241; inspections of, 134–35, 138; interventions on, 134; JHU Summit recommendations on, 261; lawsuits against, 136; licensing of, 134; regulation and oversight of, 112, 124, 133–34; revocation of license for, 135; role of, in gun trafficking, 123; stings against, 136; supplying crime guns, 133–34. *See also* private-party sellers

deaths: firearms-related, in the U.S., xv, 3–5; unintentional, firearms-related, 5, 13; violent, linked with gun prevalence, 13. *See also homicide, mortality, and suicide entries*

Democrats, supporting gun violence prevention policies, 247–54

denial criteria: based on prior felony conviction, effectiveness of, 85–87; federal, for gun purchase and possession, 77–78; including violent misdemeanors, 78–79, 88; support for expanding, 89–90

denials, delayed, 89, 104

depression: evidence-based treatment for, 50; suicide and, 49

Detroit, actions against gun dealers in, 124–25, 136, 146

disarmament, as social theme for 2014 World Cup, 220–21

Disarmament Statute (Brazil), 215, 219

disqualified individuals, removing guns from, 58, 59

District of Columbia, handgun ban in, 225–26

*District of Columbia v. Heller*, 225–30, 232–34

diversion of guns: to criminals, 111–13, 117–19, 125, 129–30, 134; to the illegal market, 123, 124

document falsification violations, gun sales and, 149

domestic violence, 79, 198; alcohol and, 68; gun prohibitions and, implementing and enforcing, 61; guns and, 54; increased risk of IPH and, 66; state-level gun legislation and, 55–56

domestic violence restraining orders (DVROs), 54–56; associated with lower IPH rates, 68; gun laws and, 57–61; improving public safety through, 59–60; laws relating to, and

reducing IPH risk, 57–58; permanent, 55; service of, 59; state-level gun prohibitions and, 87–88; temporary, 55–56, 60–61; violation of, 61

Dreyfus, Pablo, 214

drug abuse: associated with violent and criminal behavior, 66, 72; suicide and, 66

drunk drivers, 69

Dunblane Primary School (Scotland), shootings at, 185, 187–91, 192

Dunblane Snowdrop Petition, 189

DVROs. *See* domestic violence restraining orders

Eddie Eagle GunSafe Program, 174

federal firearms license (FFL), 22. *See also* dealers, licensed; sellers

felons, committing subsequent violent crimes, 66

FFL. *See* federal firearms license

Firearm Owners' Protection Act (FOPA), 97, 135, 138, 148–49, 261

firearms. *See assault weapons and guns entries*

Firearms Act (UK), 186

firearms convictions, data regarding, usefulness of, 38

firearms disabilities program, federal, relief from, 71–72

Firearms Transaction Record, 96

Fix Gun Checks Act, 104–5

FN Manufacturing, 177

FOPA. *See* Firearm Owners' Protection Act

Forsyth, Michael, 187

Fox, Gerald, 176

Fox Carbine, 176

Gallup, 239, 240

Gary (IN), stings of gun dealers in, 136

GCA. *See* Gun Control Act of 1968

GCN. *See* Gun Control Network

General Social Survey (GSS), 5–6, 89

Giffords, Gabrielle, 158

Great Britain: gun control movement in, 192; gun legislation in, 186; gun ownership in, 188; handgun ban in, 185, 187–92. *See also* United Kingdom

grip recognition, 179
grip safety, 176
GSS. *See* General Social Survey
Gun Control Act of 1968 (GCA), 22, 35, 71–72; amendments to, 55, 72; applicability of, 97
Gun Control Network (GCN), 189, 192
gun shows, 96, 98, 99, 100, 101–3, 112; gun show loophole, 104; oversight of, 29

Hamilton, Thomas, 185, 186, 188, 189
Handgun Control, Inc., 23
Hemenway, D., 8
high-capacity magazines. *See* large-capacity magazines
high-risk individuals, gun purchases by, JHU Summit recommendations on, 260–61
highway fatalities, reduction in, 173–74
*History of Smith & Wesson* (Jinks), 175
homicide rates: Brady Act and, 22–23, 26–27, 78, 88; dropping, 24; pre-*Brady* trends in, 25; women's, 8, 10–11; young people and, 70
homicides, 3–4; ages of victims, 24; alcohol and, 68; cyclical rates of, 4; demographics of, 4; gun ownership and, 6–10; guns and, 174, 192, 198, 208–9, 213; increased risk of, among violent intimates, 54; perpetrators of, and prior felony convictions, 28. *See also* intimate partner homicides (IPHs)
Howard, John, 197, 198
Hungerford (Berkshire, UK), mass shooting at, 186, 187, 188, 189

iColt, 177
Independents, supporting gun violence prevention policies, 247–54
Indiana, dangerous persons law in, 48–49
integrity tests, of private-party sellers, 101
International Crime Survey, 8
intimate partner homicides (IPHs), 53; declines in, for women, 87–88; effects on, of limiting gun access, 57; guns and, 54; and laws prohibiting purchase or possession, 57, 58; risk of, reducing, 57–58; risk factors for, 54, 56

intimate partners, defining, 55, 56, 61
IPHs. *See* intimate partner homicides

Jersey City (NJ), handgun attacks in, 167
Jinks, Roy G., 175
Johns Hopkins Bloomberg School of Public Health, xv, 176
Johns Hopkins Center for Gun Policy and Research, xix, 179
Johns Hopkins National Survey of Public Opinion on Gun Proposals, 240–53
Johns Hopkins University Summit on Reducing Gun Violence in America, recommendations of, 259–62
judicial scrutiny, of Second Amendment cases, 229–30
junk guns, 111, 118–19, 137
juveniles. *See* youth

Kellermann, A. L., 9, 10
Killias, M., 8
Knight, Brian G., 114

Labour Party (UK), 187, 191
large-capacity magazines (LCMs): Americans' support of ban on, 241; ban on, 158–60; constitutionality of bans on, 230–31, 233–34; JHU Summit recommendations on, 262; limiting availability of, xii; mass shootings and, 161; ownership of, 161; restrictions on, 168; used in gun crimes, 162, 164–65
life, value of, 29
litigation: against gun makers and sellers, 125; deterring certain gun sales practices, 124; diminished effectiveness of, 136; of NYC gun dealers' activities, 125–30
Ludwig, Jens, 28, 146
Lula (Luiz Inácio Lula da Silva), 215
Lula government, 220

magazine capacity, restricting, 168. *See also* large-capacity magazines
MAIG. *See* Mayors Against Illegal Guns
Maryland, banning junk guns, 118–19
Massachusetts, juvenile offenders in, gun possession and, 71

mass shootings, xxv, 157–58, 161, 185, 186, 192, 195, 206, 218; as catalyst for assault weapons debates, 166; effect on, of the federal assault weapons ban, 166; rarity of, by disturbed persons, 34

Mayors Against Illegal Guns, xi–xii, xiv, 114, 135

McChrystal, Stanley, xii

McClure-Volkmer Act. *See* Firearm Owners' Protection Act (FOPA)

*McDonald v. City of Chicago*, 225, 226

means–ends scrutiny, 232–33

mental health: JHU Summit recommendations on, 261; rates of adjudication, 45–48; revising federal criteria for prohibitions on guns and, 48

mental illness: assumptions about, 36; and disqualification from buying guns, 39–40, 44; firearms prevalence and, 12; gun policy and, 34, 35–36; violence and, 34, 36; violent crime and, 38–44, 48

Mercy, J. A., 57

military, U.S., suicides in, xv

military-style weapons, limiting availability of, xii

militias, 227–29

Miller, Matthew, 6, 8, 9

Ministry of Health (Brazil), 218

Ministry of Justice (Brazil), 213

misdemeanors: convictions for, and future arrest rates, 81–82; nonviolent, and new offenses, 81. *See also* violent misdemeanors

Missouri, PTP licensing in, repeal of, 112–14, 117

"Model Handgun Safety Standard Act," 179

Model Law on Firearms, Ammunition and Related Materials (Latin America), 219, 220

mortality rate, gun-related, Australia vs. U.S., 196, 202, 208

National Academies' Committee to Improve Research Information and Data on Firearms, 145

National Ballistics Intelligence Service (Nabis), 192

National Coalition for Gun Control (NCGC; Australia), 196–99

National Committee on Violence (NCV; Australia), 199

National Crime Victimization Survey (NCVS), 175

National Criminal History Improvement Program (NCHIP), 28–29

National Firearms Act of 1934, 228

National Firearms Agreement (Australia), 195–96, 199–201

National Firearms Buyback (Australia), 205–6

National Firearms Survey, 96, 101–2

National Firearms Trafficking Policy Agreement (Australia), 201–2

National Handgun Buyback (Australia), 206

National Handgun Control Agreement (Australia), 202

National Instant Criminal Background Check System (NICS), 23, 29, 35, 96, 231, 261; comprehensive state reporting to, of mental health records, 45; Connecticut's reporting to, 37–38, 40–44, 45; reach of reporting, extending, 36–37; reporting effect of, 40–44, 45

National Institute of Justice (NIJ), 152, 158, 177, 262

National Institutes of Health (NIH), xiv, 152, 262

National Integrated Ballistics Information Network (NIBIN), 150, 151

National Rifle Association (NRA), 151, 174; members of, responding to gun proposals, 90, 246; misrepresenting the Australian experience, 202

National Survey of Private Ownership of Firearms, 96, 101

NCGC. *See* National Coalition for Gun Control

NCHIP. *See* National Criminal History Improvement Program

NCV. *See* National Committee on Violence

NCVS. *See* National Crime Victimization Survey

Nevada, gun shows in, 102

New Jersey: personalized gun law in, 179–80; possession laws in, 67

New Jersey Institute of Technology, 179

Newtown (CT). *See* Sandy Hook Elementary School, shooting at

New York, state of, enacting penalties for illegal handgun possession, xvi

New York City: litigating gun dealers' activities, 125–30; murders in, dropping numbers of, xvi; stings and lawsuits in, against gun dealers, 136–37

NIBIN. *See* National Integrated Ballistics Information Network

NICS. *See* National Instant Criminal Background Check System

NIH. *See* National Institutes of Health

NIJ. *See* National Institute of Justice

North, Mick, 186

North Carolina, DVRO gun law in, 58

Northern Ireland, gun legislation in, 186

Obama, Barack, xi

Observatory on Citizen Security, 220

Office of Legislative Research (CT), 38

one-gun-per-month limits, 115, 119

Organization of American States, 220

out-of-state residents, sales to, 100

ownership of guns: and increased risk for alcohol abuse, 69; minimum federal standards for, 67; state laws relating to, differences in, 67

pacification, 218–19

PARLATINO, 219

Parliamentary Commission of Inquiry (PCI; Brazil), 219

Pennsylvania: juvenile offenders in, gun possession and, 71; prohibiting gun purchase by repeat DUI offenders, 69

permit holders, exempting, from background checks, 104–5

permit-to-purchase (PTP) licensing, 112–18

personalized guns, 174, 246; achieving, 179–80; history of, 175–77; JHU Summit recommendations on, 262; need for, 174–75; presently available, 177–79; technology for, 176–79

Pew Center for the People and the Press, 240

Philip, J. C., 6

PLCAA. *See* Protection of Lawful Commerce in Arms Act

Port Arthur (Australia), mass shooting at, 195

possession of guns, federal prohibitory criteria for, 65–66

Powell, Colin, xii

private-party sales, xii, 36, 102, 144, 147–48

private-party sellers, 96–97, 99–101, 103–5, 110

private-sales loophole, 28–29, 60, 149, 231

product liability litigation, gun makers immune from, 179

products, countermarketing of, 130

Protection of Lawful Commerce in Arms Act (PLCAA), 125, 136, 139, 179, 180, 261

psychiatric illness. *See* mental illness

psychological testing, for handgun ownership, 189

PTP. *See* permit-to-purchase licensing

public health issues, 173–74: death-by-gunshot, 209; gun ownership as, 228

public safety, gun control laws related to, 230

purchases of guns, multiple, extending mandatory reporting for, 148

Realengo School (Rio de Janeiro), mass shooting at, 218

recidivism, criminal, 71, 88

record-of-sale databases, 59–60

registries: for gun ownership, 60; for handguns, 29

regulation of guns, linked with firearm prevalence, 7

Republicans, supporting gun violence prevention policies, 247–54

research funding, JHU Summit recommendations on, 262

retail outlets, supplying criminals with guns, 146

retailers, licensed. *See* dealers, licensed

Richmond (VA), LCM use in, 165

rights: balancing, with safety, 48; of law-abiding citizens, 65

Rio de Janeiro, violence in, 214, 218

robbery, gun availability and, 8–9

robbery–murder, gun availability and, 8–9

Rossi, Peter H., 146

safety of guns, U.S. Consumer Product Safety Commission prohibited from addressing, 179
sales of guns: consignments, 99; to criminals, 99–101; differing laws among states, 111–12, 118; federal double standard for, 96–97; primary market for, 95; private, regulation of, 112; process for, 96; secondary market for, 95–96; special reports of, 96; state regulation of, 97–99. *See also* dealers; private-party sellers
sale-to-crime intervals, 113–14
Sandy Hook Elementary School (Newtown, CT): mass shooting at, xi, 158; policy response to shooting at, 33–34; U.S. public opinion after, on gun policy, 239, 256
Saturday Night Specials. *See* junk guns
Second Amendment, 225–26; "arms" in, meaning of, 232; challenges of, 226–27; core interest of, 227; gun lobby's concern over, xiii; limits on, constitutionality of, 226; lower courts' rulings on, 226; preamble of, 228–29; scope of, 227–29; "well-regulated militia" in, 228–29
secondary-market transactions, 147
selective prohibition, as approach to gun ownership, 21–22. *See also* Brady Act, the
sellers. *See* dealers, licensed; private-party sellers
semi-automatic weapons: attacks with, effects of, 166–67; legal, under assault weapons ban, 159; rifles, 143
Sheley, Joseph, 146
shooting organizations (UK), 187, 189–90, 191
*Shooting Sports Retailer*, 103
SISCF. *See* Survey of Inmates in State Correctional Facilities
smart guns. *See* personalized guns
Smith & Wesson, 175–76, 177
Squires, Peter, 186
stalking, 54, 61
state-level gun dealer's licenses, 138
state regulation, 97–99, 102
states: assault weapons bans in, 161; gun dealer licensing requirements in, 134; gun export rates among, 116–17, 135; gun sales laws in, 111–12, 118
sting operations, against gun sellers, 112, 124, 126, 136

straw purchases, xvi, 103, 112, 117, 124, 125, 127, 134, 148
Subcommittee on Control of Arms and Munitions (Brazil), 219
substitution effect, 209
suicide rates, 49; Brady Act and, 22–23, 26, 29; CAP laws and, 70
suicides, xv, 3, 4–5; alcohol and, 68; demographics of, 5; depression and, 49; drug abuse and, 66; and guns obtained from FFLs, 30–31n6; gun ownership and, 6–7, 11–13; guns and, 174, 198, 208–9; mental illness and, 49
*Sunday Mail* (Scotland), 189
supply-side approach to violence, support for, 152
supply-side interventions, 144, 147
Survey of Inmates in State Correctional Facilities (SISCF), 110

Taurus S.A., 214
theft f guns, 175
Tiahrt, Todd, xiv, 137
Tiahrt Amendment, xiv, 137–38, 139, 152
trace data, 144–45; limiting the release of, 137–38; utility of, 137
traces: for assault weapons, 163; difficult procedure for, 148
traffickers, charged with other crimes, 150
trafficking of guns, xii, 96, 97; Brady Act and, 25; indicia of, 137; international, 220; interstate, 135; intrastate, 124, 135; JHU Summit recommendations on, 261; licensed dealers and, 102, 111; no federal laws regarding, 148; private-party sales and, 100; reduced by enhanced dealer oversight, 135; revisiting sentencing guidelines for, 149–50; routes for, 145–46
transfer agents, 98, 102
TriggerSmart, 178–79
Truscott, Carl, 151

underground markets for guns, frictions in, 146
United Kingdom: criminal recidivism in, 89; gun legislation in, 186–87; Public Inquiries in, following disasters, 187; supporting gun amnesties and buybacks, 205. *See also* Great Britain

United States: female homicide victims in, 8,
10–11; gun homicides in, compared with
other nations, xvii; gun laws in, dividing
the population, 21; gun deaths in, 3–5, 15;
gun ownership in, 5–7, 241; gun proposals
in, responses from gun owners and non-gun
owners, 246–48; gun regulation in, historical
tradition of, 227–28; murders in, with guns,
xi–xii; policy change in, driven by public
sentiment, xx; premature mortality in, xxv,
3, 4; public opinion in, 239–40; regulation of
gun sales in, 119; suicide rates in, compared
with other nations, 4–5; violence in,
compared with other nations, 3–4; violent
deaths in, linked to gun prevalence, 13–15

U.S. Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF), xiv, 72, 96, 97, 100, 110, 111,
113, 115, 124, 134, 135, 159; approach of, to gun
trafficking crimes, 148; granting permission
for sale of personalized handguns, 178; JHU
Summit recommendations on, 261; responsi-
bility of, 147; sanctioning authority for, 138;
strengthening, 150–51; tactics of, questioned,
151; trace data and, 136, 137, 144–45

U.S. Congress, and gun lobby, xiv, xv

U.S. Constitution, Second Amendment. *See*
Second Amendment

U.S. Consumer Product Safety Commission,
179, 180

U.S. Court of Appeals (D.C. Circuit), and
assault rifle ban, 233–34

U.S. Department of Justice, xiii, 147, 177

U.S. Supreme Court, Second Amendment
rulings of, xiii, 78, 225–34

U.S. Surgeon General, JHU Summit recom-
mendations for, 262

Vigdor, E. R., 57

violence: alcohol and, 68; drug abuse and, 66;
as public health problem, 198; rates of, in
developed nations, 8

violence with guns: societal costs of, 167; trends
in, after expiration of the federal assault
weapons ban, 165–66

violent crime: Brady Act prohibitions and,
44–45; correlated with illegal gun usage, 38;

effects on, of background checks, 45; factors
associated with, 44; increasing in adoles-
cence and early adulthood, 67; mental
illness and, 38–44, 48; risks of committing,
44–45

Violent Crime Control and Law Enforcement
Act of 1994, 159, 161

violent misdemeanors: federal denial criteria
and, 77, 78, 85, 88; and new offenses, 79–80;
state treatment of, and gun purchase and
possession, 79

Virginia Tech, mass shootings at, 158

Viva Rio, 213, 214, 217, 219

waiting periods, 23, 26; and dealers, licensed,
99; ending, before completion of background
checks, 89; extending, in individual cases,
89; lifting, 104

Walmart, gun sales practices of, 130

weapon accessories, ban on, 159

weapons, threatening with, associated with
increased homicide risk, 54

Webster, Daniel, xv–xvi, 135

Wesson, D. B., 175

Wesson, Joe, 175

Wiebe, D. J., 10

Williams, Daryl, 202

Wintemute, Garen J., 68, 174

women: domestic violence against, 54;
homicide rates of, 8, 10–11; killed by
intimate partners, 53; seeking justice
system assistance for domestic violence,
54–55

World Cup (soccer), in Brazil, 220–21

World Health Assembly, 198

Wright, James D., 146

YouGov, 240

youth: broadening gun prohibitions for, 70,
72; committing suicide with guns, 175; deaths
of, related to firearms, 13; juvenile offenders,
expanding gun prohibitions for, 71, 72;
purchases by, 100; restricting gun access
for, 67; training, in gun safety, 174. *See also*
juvenile offenders

Youth Crime Gun Interdiction Initiative, 151

# GZJ KDV "44"

Original article



Editor's choice
Scan to access more
free content

# Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership

Katherine A Vittes, Jon S Vernick, Daniel W Webster

Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland, USA

**Correspondence to**
Dr Katherine A Vittes, Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 624 North Broadway, Baltimore, MD 21205, USA; kvittes@jhsph.edu

Accepted 7 March 2012
Published Online First
23 June 2012

## ABSTRACT

**Background** Gun possession by high-risk individuals presents a serious threat to public safety. U.S. federal law establishes minimum criteria for legal purchase and possession of firearms; many states have laws disqualifying additional categories for illegal possession.
**Methods** We used data from a national survey of state prison inmates to calculate: 1) the proportion of offenders, incarcerated for crimes committed with firearms in 13 states with the least restrictive firearm purchase and possession laws, who would have been prohibited if their states had stricter gun laws; and 2) the source of gun acquisition for offenders who were and were not legally permitted to purchase and possess firearms.
**Results** Nearly three of ten gun offenders (73 of 253 or 28.9%) were legal gun possessors but would have been prohibited from purchasing or possessing firearms when committing their most recent offense if their states had stricter prohibitions. Offenders who were already prohibited under current law acquired their gun from a licensed dealer, where a background check is required, five times less often than offenders who were not prohibited (3.9% vs. 19.9%; $\chi^2=13.31$; $p \leq 0.001$). Nearly all (96.1%) offenders who were legally prohibited, acquired their gun from a supplier not required to conduct a background check.
**Conclusions** Stricter gun ownership laws would have made firearm possession illegal for many state prison inmates who used a gun to commit a crime. Requiring all gun sales to be subject to a background check would make it more difficult for these offenders to obtain guns.

## INTRODUCTION

Gun violence has long been one of the most significant public safety and social problems in the USA. In the USA, in 2008, gun violence resulted in 12 179 homicides and an estimated 56 626 assaultive injuries serious enough to warrant a hospital emergency room visit.[1] Among high-income countries, the USA is unique in its extraordinarily high rate of homicides. This disparity is most striking for homicides committed with firearms where the US rate is 20 times higher than other high-income countries.[2]

Despite the magnitude of the problem, US gun policy rarely considers appropriate criteria for disqualifying someone from lawfully possessing a firearm. Federal law disqualifies certain groups of high-risk individuals from owning guns, including felons, fugitives, unlawful users of or those addicted to controlled substances, those who have been 'adjudicated as a mental defective' or committed to a mental institution, individuals who have been dishonourably discharged from the armed forces, persons subject to certain domestic violence restraining orders, persons less than the age of 18 years (for handguns) and domestic violence misdemeanants. Federal law does not set a minimum age requirement for the legal possession of long guns (ie, rifles and shotguns).[3]

Although the federal firearm prohibitions apply minimum standards for all US states, many states have enacted broader disqualifications for firearm possession including: a minimum age of 21 for all guns; convictions for some misdemeanour crimes involving violence, firearms or drugs; multiple convictions for alcohol-related offences; or convictions for serious crimes committed as a juvenile.[4]

Research supports the underlying premise of laws that widen exclusionary criteria for firearm possession: that some groups have higher rates of criminal offending than do those without a criminal history or other indicia of risk.[5–9] For example, Wintemute and colleagues found that individuals denied legal handgun purchase, as a result of a new California law expanding firearm prohibitions to include misdemeanants convicted of crimes of violence, were less likely to commit a new crime of violence than were demographically-matched Californian misdemeanants who had been approved for handgun sales during the years just prior to the new restrictions.[9] A study of homicide offenders in Illinois found that 42% would have been prohibited from possessing firearms as a result of a prior felony conviction; however, convictions for misdemeanours as an adult or more serious crimes as a juvenile were not reported.[6]

Under federal law, persons buying guns from licensed gun dealers must undergo a criminal history background check.[10] But federal law and the law of most states do not require firearm sellers who are not licensed gun dealers to verify that purchasers of firearms are legally qualified to possess a firearm such as through a background check.[4] Understanding how those with and without a criminal history acquire guns can also inform policies intended to keep guns from prohibited persons.

Prior research on firearm acquisition suggests that incarcerated adults often obtain their guns from casual sources such as from friends and family members, and 'off the street.'[11–13] To our knowledge, whether and to what extent the source varies based on the legal status of the purchaser has not been investigated.

Therefore, the goals of the current study are to: (1) identify the proportion of state prison inmates

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on November 21, 2019 by guest. Protected by copyright.

incarcerated for gun-related offences in states with the least strict standards for firearm purchase and possession who would have been prohibited from possessing firearms if laws in their states had included additional exclusion criteria and (2) describe how these inmates acquired their firearms.

## METHODS
### Data
This study used data from the most recent (2004) Survey of Inmates in State Correctional Facilities (SISCF), a nationally-representative survey of state prison inmates administered by the Bureau of the Census for the US Department of Justice.[14] The 2004 SISCF consisted of computer-assisted personal interviews conducted between October 2003 and May 2004. Inmates were asked about a broad range of topics including: demographic characteristics; offences for which they were currently serving time; prior criminal history; gun possession and use; prior drug and alcohol use and treatment; and physical and mental health status. In the 2004 survey, 14 499 inmates were interviewed. Of those eligible to participate in the study, 89.1% participated.

Additional information about data collection and analysis methodology for the SISCF is available from the University of Michigan's Inter-university Consortium for Political and Social Research.[15] Prior research using data from the SISCF include studies on incarcerated women, veterans and parents.[16–18] No reported studies have used SISCF data on inmates who used firearms in their most recent crimes.

### Study sample
To focus on the potential effects of broadening state laws regarding firearm restrictions, we limited our analysis to offenders currently serving time for an offence committed with a firearm in states that, as of 2004, did *not* have laws prohibiting persons in the following five groups from purchasing or possessing a firearm: (1) persons less than 21 years of age; (2) persons convicted of a serious juvenile offence; (3) violent misdemeanants; (4) drug misusers; and (5) alcohol abusers. To identify states meeting these criteria, we consulted the Bureau of Justice Statistics 2004 Survey of State Procedures Related to Firearm Sales,[19] supplemented by legal research to confirm some state laws.

Because domestic violence misdemeanants are already prohibited from purchasing or possessing firearms under federal law,[20–22] we included states with laws that prohibited domestic violence misdemeanants if the states did not also prohibit other violent misdemeanants from purchasing or possessing firearms. In addition, although federal law restricts firearm purchase or possession for drug misusers, the law's definition of a drug misuser does not provide objective criteria that can be implemented via a background check, limiting its practical use.[23] We excluded states with separate legal restrictions on possession of firearms by those convicted of serious offences, not technically classified as felonies, when committed by a juvenile.

Nine states—Arkansas, Idaho, Louisiana, Michigan, Mississippi, Montana, New Hampshire, Vermont and Wyoming—lacked all five types of expanded firearm disqualifications. Four additional states—Georgia, Maine, New Mexico and Wisconsin—lacked these expanded disqualifications with some exceptions. For example, New Mexico had a minimum age law stating that handgun possession is unlawful by persons <19-years-old[24] and Wisconsin restricted individuals convicted of a felony as a juvenile only if the offence occurred on or after 21 April 1994.[25] We excluded a total of 12 cases meeting these exceptions, because they were already prohibited from firearm

purchase and possession under state law. The final sample consisted of 13 states, though there were no inmates meeting our case definition in two states (New Hampshire, Wyoming; see table 1).

### Measures
To determine whether offenders had a firearm while committing the crime for which they were currently incarcerated, SISCF interviewers asked, 'Did you use, carry or possess a weapon when the (…*offense*…) occurred?' If the answer was 'yes,' the interviewer asked, 'What kind of weapon was it?' Offenders who said they used a firearm were included in our analyses. Offenders who reported using a firearm in their current crime were asked follow-up questions, including questions about the type of gun(s) (eg, handgun, shotgun, rifle), how and where they obtained the gun, whether they fired it, and their reasons for having it.

SISCF interviewers also asked the offenders a series of questions about their prior arrests and convictions leading to probation or incarceration. Those who had been convicted and sentenced to probation or incarceration were asked about the type of offence, length of sentence, and whether they were sentenced as a juvenile or as an adult for up to 10 prior probations and 10 prior incarcerations. Offence information for juvenile convictions leading to probation and no incarceration was not collected in the SISCF.

To examine the potential for current and expanded disqualifications to curtail gun crime, we categorised offenders into the following groups based on their prior criminal convictions: (1) those who would have no firearm disqualification even under stricter state laws (described below); (2) those who were disqualified under current federal law; and (3) those who were legal firearm possessors under current federal law, but who would have been prohibited in states with stricter standards.

We further categorised offenders in the third group—those who might be impacted if the laws in their states were changed—based on whether they fell into any of the following categories: (1) age 18–20 years at incarceration for their current offence if that offence involved a handgun; (2) less than age 21 years at incarceration for their current offence if that offence involved a long gun; (3) committed a prior serious crime as a juvenile (<18-years-old); (4) conviction for a violent or firearms-related misdemeanour; (5) convictions for *two or more* drug-related misdemeanours; and (6) convictions for *two or more* alcohol-related misdemeanours. These laws were chosen because each is in effect in at least some states.[19] Violent and firearm-related misdemeanours included convictions for a simple assault or a weapons offence. Drug-related misdemeanours included convictions for driving under the influence of drugs, possession or use of marijuana and unspecified drug-related offences (but did not include drug-related offences involving heroin, powder cocaine or crack cocaine which are generally felonies). Alcohol-related misdemeanours included DUI/DWI convictions or convictions for public drunkenness.

### Analysis
We first calculated the proportion of offenders who would have been legally prohibited from purchasing or possessing firearms if their states had a variety of stricter laws. We then examined the method and source of firearm acquisition for offenders and calculated $\chi^2$ statistics to identify any significant differences between offenders who were currently prohibited versus offenders who were not prohibited from purchasing and possessing firearms.

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on November 21, 2019 by guest. Protected by copyright.

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on November 21, 2019 by guest. Protected by copyright.

**Table 1** Demographic and offence characteristics of state prison inmates incarcerated for an offence committed with a firearm in 13 states (n=253)

| | n (%) |
|---|---|
| Demographic characteristics | |
| Sex | |
| Male | 234 (92.5) |
| Female | 19 (7.5) |
| Age when sentenced for current offence (years) | |
| 14–17 | 48 (19.0) |
| 18–20 | 58 (22.9) |
| 21–24 | 46 (18.2) |
| 25–29 | 35 (13.8) |
| 30 and older | 66 (26.1) |
| Race/ethnicity | |
| Non-Hispanic Black | 169 (66.8) |
| Non-Hispanic White | 63 (24.9) |
| Hispanic | 9 (3.6) |
| Other | 12 (4.7) |
| Education (n=251) | |
| Less than high school | 185 (73.7) |
| High School or equivalent | 41 (16.3) |
| More than high School | 25 (10.0) |
| Marital status (n=252) | |
| Never married | 177 (70.2) |
| Divorced/separated/widowed | 48 (19.1) |
| Married | 27 (10.7) |
| Employed in the month before incarceration (n=246) | |
| Full-time | 129 (52.4) |
| Part-time/occasional | 24 (9.8) |
| Unemployed: looking for work | 32 (13.0) |
| Unemployed: not looking for work | 61 (24.8) |
| State of current offense | |
| Arkansas | 21 (8.3) |
| Georgia | 64 (25.3) |
| Idaho | 5 (2.0) |
| Louisiana | 39 (15.4) |
| Maine | 1 (0.4) |
| Michigan | 67 (26.5) |
| Mississippi | 27 (10.7) |
| Montana | 5 (2.0) |
| New Hampshire | 0 (0) |
| New Mexico | 13 (5.1) |
| Vermont | 1 (0.4) |
| Wisconsin | 10 (4.0) |
| Wyoming | 0 (0) |
| Current offences* † | |
| Violent offences | |
| Murder/voluntary non-vehicular manslaughter | 86 (34.0) |
| Robbery | 75 (29.6) |
| Aggravated assault/assault on police officer | 32 (12.6) |
| Other violent acts | 6 (2.4) |
| Property offences | |
| Burglary | 6 (2.4) |
| Other property offences | 3 (1.2) |
| Drug offences | |
| Trafficking | 15 (5.9) |
| Possession or use | 7 (2.8) |
| Public order offences | |
| Weapons offences | 19 (7.5) |
| Parole/probation violation or contempt | 2 (0.8) |
| Other public order offences | 2 (0.8) |
| Continued | |

**Table 1** Continued

| | n (%) |
|---|---|
| Type of gun used in current offense‡ | |
| Handgun | 204 (80.6) |
| Rifle | 30 (11.9) |
| Shotgun | 25 (9.9) |
| Other firearm | 4 (1.6) |

*For inmates currently incarcerated for more than one offence, only the most serious is included here.
†All offence categories include attempted and completed offences.
‡Percentages do not sum to 100 because 10 respondents used more than one type of gun in their current offence.

## RESULTS

The overall SISCF sample of 50 states included 14 499 inmates, 2046 of whom used a gun in the crime for which they were incarcerated. The distribution of the total sample of gun users was similar to the 13 states in our sample with regard to crime type, type of gun, sex, education, marital status and employment status. Our 13-state sample had a somewhat higher proportion of younger (age 14–17 years) and non-Hispanic Black offenders than for all 50 states.

### Sample characteristics

Our initial sample consisted of 281 offenders who were incarcerated for offences involving firearms from the 13 states with the most lenient firearm restrictions (no stricter than existing federal law). Due to missing or insufficiently specific information about the nature of the prior convictions, 28 offenders were excluded from the analyses for a final sample of 253. The majority of the respondents came from Georgia, Louisiana, Michigan, Mississippi and New Mexico. Some of the more populous US states (eg, California, New York, Texas) were excluded from our analysis because they did not meet our legal inclusion criteria.

Three-quarters (n=190) of offenders committed their current offence (ie, the offence for which they were serving time when the interview occurred) in their state of residence. All offenders were sentenced as adults and age at sentencing for the current incarceration ranged from 14 to 55 years with a mean of 25 years. A majority of the offenders were male subjects, non-Hispanic Black, had not completed high school, were employed in the month before they were incarcerated and had never been married (table 1).

### Current offences

More than three-quarters (n=199) of the offenders were serving time for a violent offence at the time of the SISCF interview. In all, 43% of these violent offenders were incarcerated for an attempted or completed murder, or voluntary non-vehicular manslaughter (table 1). The remainder of the sample was incarcerated for property, drug or public order offences (all involving firearms).

Although fewer than half (44.3%) of the offenders reported that they fired a gun while committing the current crime, most (83.4%) identified one or more other or additional reasons for possessing the gun, including using the gun to scare the victim(s) (42.7%), or for self-protection (32.4%).

### Legal status for firearm possession prior to firearm offence leading to current incarceration

Inmates were categorised into three mutually-exclusive groups based on their actual or potential legal status for firearm possession (table 2). In all, 31% (n=78) of offenders would not

**Table 2** Firearm prohibition status of state prison inmates incarcerated for offence committed with firearm in 13 states (n=253)

| | n (%) |
|---|---|
| May possess even under stricter standards | 78 (30.8) |
|   No prior arrests or convictions and offender age ≥21 years | 28 (11.1) |
|   Prior arrests but no convictions and offender age ≥21 years | 34 (13.4) |
|   Prior non-disqualifying misdemeanour convictions, and no convictions for serious juvenile offence, and offender age ≥21 years | 16 (6.3) |
| Prohibited under current state or federal laws | 102 (40.3) |
|   Prior adult (≥18 years) felony conviction(s) or dishonourable discharge | 69 (27.3) |
|   Offender age <18 years at sentencing and used handgun in current offence | 33 (13.0) |
| Would be prohibited only under stricter standards* | 73 (28.9) |
|   Handgun offender age 18−20 years at sentencing for current offence | 43 (17.0) |
|   Long gun offender age 1−20 years at sentencing for current offence | 17 (6.7) |
|   Prior conviction for serious juvenile offence | 13 (5.1) |
|   Prior conviction for firearms or violent misdemeanour | 9 (3.6) |
|   Prior conviction for 2+ drug misdemeanours | 2 (0.8) |
|   Prior conviction for 2+ alcohol misdemeanours | 1 (0.4) |

*These subcategories are *not* mutually exclusive.

have been disqualified from firearm possession based on prior convictions or minimum age even if their states had laws prohibiting the legal purchase and possession of firearms by persons <21-years-old, persons with a conviction for a serious juvenile offence, violent misdemeanants, and drug and alcohol misusers.

In the second group, 40% (n=102) of offenders were already prohibited from legal firearm possession under current state or federal law and, thus, would be unaffected by the implementation of the stricter firearm prohibition standards we considered.

The third group consists of 73 offenders (28.9%) who were not prohibited under current standards, but would have been prohibited if their states adopted stricter standards similar to those already in place in a number of other states. Most of this group (58.9% and 17.0% of all firearm offenders, n=43) would have been prohibited if their state had a law that raised the minimum age to possess a handgun to 21 years. An additional 17 offenders would have been prohibited if their state passed a law restricting possession to *all* firearms, including long-guns, for persons <21 years. If persons convicted of a serious crime as a juvenile were to become prohibited, it would have been illegal for 13 offenders (5.1% of all firearm offenders) to purchase or possess a firearm. Nine offenders (3.6% of all firearm offenders) would also have been disqualified if their states had prohibited persons convicted of a violent or firearms-related misdemeanour from purchasing or possessing a firearm. Two offenders would have been prohibited if states were to restrict firearm purchase and possession for those with two or more drug-related misdemeanours and one offender would be prohibited if the same restriction were applied to alcohol-related misdemeanours.

### How and where criminals obtained their firearms

About eight of every 10 offenders reported using a handgun (vs rifle or shotgun) in the offence for which they were serving time. Half of the offenders reported that they had bought the gun used in the crime (table 3). The second most common method of gun acquisition—cited by fewer than one in five offenders—was borrowing or holding the gun for someone. Regardless of how they obtained the gun, friends and family members were the most common source (34.0%), followed by drug dealers or other black market sources (30.4%). Only 13.4% got the gun directly from a gun store or pawnshop where federal law requires

prospective firearm purchasers to pass a background check. It is important to recognise, however, that table 3 represents only the most recent acquisition of a specific gun: it does not indicate whether the gun *ever* passed through a particular distribution channel (eg, a gun show).

There were few differences between the groups of offenders with regard to how and where they got the gun used in their most recent offence. More than half (55.6%) of offenders for whom firearm purchase and possession was legal under current standards (adding the 45 inmates who would be legal even under stricter standards with the 39 inmates who would be prohibited only under stricter standards) bought or traded for the gun used in their most recent crime compared with two-fifths (39.2%) of offenders who were prohibited under current state or federal law ($\chi^2$=6.56; p≤0.01). Offenders who were prohibited from purchasing and possessing a gun under current law acquired their gun from a licensed dealer, where a background check would be required, five times less often than offenders who were not prohibited (3.9% vs 19.9%; $\chi^2$=13.31; p≤0.001). Similarly, nearly all (96.1%) offenders who were legally prohibited from possessing a firearm acquired their gun from a supplier not required to conduct a background check.

### DISCUSSION

Our findings indicate that 40% of offenders incarcerated for committing crimes with a gun in the 13 US states with the least strict standards for legal firearm purchase and possession were in possession of the gun illegally. If these states had adopted more restrictive standards like those in place in a number of other states, an additional 29% of the persons incarcerated for committing a crime with a firearm would have been legally prohibited from possessing a firearm at the time of their current offence. The vast majority of these individuals—nearly a quarter of the entire sample of firearm offenders—would have been prohibited if the minimum legal age for possessing any type of firearm was 21 years. An additional 9.9% would have been legally prohibited from firearm possession as a result of convictions for serious crimes as a juvenile or for misdemeanours involving violence, firearms, drugs or alcohol.

Nearly one in five offenders was <18-years-old at the time they were sentenced for the current offence; 41.9% were less than age 21 when sentenced. An even greater proportion would

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on November 21, 2019 by guest. Protected by copyright.

**Table 3** Source of gun used in current offence by state prison inmates incarcerated for offence committed with firearm in 13 states, by firearm prohibition status*

|  | Total (n=253) N (%) | Legal even under stricter standards (n=78) n (%) | Prohibited under current state or federal law (n=102) n (%) | Would be prohibited only under stricter standards (n=73) n (%) |
|---|---|---|---|---|
| **How gun was got** | | | | |
| Stole | 8 (3.2) | 0 (0) | 4 (3.9) | 4 (5.5) |
| Borrowed | 44 (17.4) | 12 (15.4) | 17 (16.7) | 15 (20.6) |
| Bought/traded | 124 (49.0) | 45 (57.7) | 40 (39.2) | 39 (53.4) |
| Given as gift | 21 (8.3) | 8 (10.3) | 9 (8.8) | 4 (5.5) |
| Other | 23 (9.1) | 4 (5.1) | 13 (12.8) | 6 (8.2) |
| Don't know (DK)/refused | 33 (13.0) | 9 (11.5) | 19 (18.6) | 5 (6.9) |
| **Where gun was got** | | | | |
| Gun store or pawnshop | 34 (13.4) | 24 (30.8) | 4 (3.9) | 6 (8.2) |
| Gun show | 1 (0.4) | 0 (0) | 0 (0) | 1 (1.4) |
| Friend/family member | 86 (34.0) | 25 (32.1) | 35 (34.3) | 26 (35.6) |
| Street/black market | 77 (30.4) | 14 (18.0) | 36 (35.3) | 27 (37.0) |
| Burglary | 1 (0.4) | 0 (0) | 1 (1.0) | 0 (0) |
| Other | 21 (8.3) | 6 (7.7) | 8 (7.8) | 7 (9.6) |
| DK/refused/skipped† | 33 (13.0) | 9 (11.5) | 18 (17.7) | 6 (8.2) |

*If inmate used more than one gun in current offence, response pertains to the most recently acquired gun.
†Respondents who refused to disclose how they got the gun were not subsequently asked where they got it.

have fallen into the <18 group if we had data on offenders' age at the time the offence occurred rather than age at incarceration. These findings underscore the importance of minimum-age restrictions for firearms possession and disqualifications for serious offences committed as juveniles, even if the duration of these disqualifications is limited.

It is also important to consider the political feasibility of any new restrictions on access to firearms. In a 1998 survey, a large majority of respondents—including the majority of gun owners—favoured laws that would restrict guns from various categories of misdemeanants including assault and battery without a lethal weapon or serious injury, driving under the influence of alcohol, and carrying a concealed weapon without a permit.[26] Although public support was strong for a variety of firearm laws, firearm restrictions based on criminal history may be among the most politically feasible.[23 27] Each firearm policy considered in this study is currently law in at least some states.

Although setting appropriate standards for legal firearm ownership is important, it is equally important to make sure that databases used to screen gun purchasers and ascertain legal status for gun possession are up-to-date so that prohibited individuals can be identified. For example, juvenile convictions must be recorded in an accessible database so that they are picked up in background checks in order for prohibitions for serious offences committed as a juvenile to be useful in restricting the legal purchase and possession of firearms in this high-risk group.

Relatively few offenders purchased their guns directly from licensed firearms dealers. Only 3.9% of individuals disqualified based on current federal or state prohibitions and 3.8% who were <21-years-old at the time of their incarceration obtained their gun from a licensed firearms dealer. Presumably most, if not all, of these prohibited individuals purchased their firearm prior to becoming a prohibited person. Among individuals who appeared to be legally qualified to purchase firearms, only one in five (19.9%) obtained their firearm directly from a licensed firearm dealer, perhaps to avoid having their firearms transactions recorded and therefore traceable to the purchaser. Given offenders' preferences for new firearms,[13 28] it is noteworthy how criminals avoid the regulated gun market of licensed sellers and prefer the largely unregulated market involving unlicensed sellers where new guns may be harder to obtain. The lack of regulation of gun sales by unlicensed sellers is likely to

significantly limit the government's ability to keep firearms from prohibited individuals.[28] Requiring all gun sales to be subject to a background check, and holding sellers accountable for failure to do so, are policies that could address this problem.[29]

To our knowledge, this is the first study to use data on gun offenders' age and criminal histories to examine the potential benefits of strengthening the criteria for legal firearm possession. Nonetheless, it is subject to several limitations. The data used in this analysis come from inmates' self-report. As such, they share the limitations inherent to all self-report data (eg, recall and social desirability bias). And although the data were drawn from a nationally-representative survey of state prison inmates, they are not necessarily representative of state prison populations. In addition, the 13 states in our sample may not have the same distribution of offenders as in all 50 states. For example, the five states with the most offenders in our sample may be more urban, on average, than the USA as a whole. We chose states for inclusion in the sample based on their laws in 2004, the year the SISCF survey took place. These laws may be different from the laws that were in effect at the time the offenders were convicted for their prior offences, though it is rare for laws prohibiting certain persons from owning guns, based on criminal history, to be repealed. Moreover, we were unable to determine whether the guns used in the current crimes were obtained in the state in which the crime was committed. This is particularly relevant for considering criteria for firearm purchase rather than possession.

The numbers of offenders with prior misdemeanour convictions are likely undercounted because we did not have status information about juveniles sentenced to probation nor did we have information about persons who were convicted but not sentenced to probation or incarceration (eg, those sentenced only to pay a fine). It is also possible (though unlikely) that some of the offenders with a prior felony had their gun rights reinstated. Finally, it is also important to remember that this is a prison population. As such, our findings may not generalise to offenders who avoid imprisonment.

However, our sample comes from a large national survey of state prison inmates and contains extensive information on their prior criminal history. In addition, we have focused on the population that is most likely to be affected by the policy changes we considered by including only offenders who used a firearm in their current offence.

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on November 21, 2019 by guest. Protected by copyright.

## What is already known on the subject

- ▶ Guns in the hands of high-risk individuals present a serious threat to public safety.
- ▶ Among high-income countries, the USA is unique in its extraordinarily high rate of firearm homicides.
- ▶ US federal law establishes minimum criteria for who may legally purchase and possess firearms; state laws vary widely in this regard.

## What this study adds

- ▶ This study is the first to use data on incarcerated gun offenders' age and criminal histories to examine the potential benefits from strengthening the criteria for legal firearm possession.
- ▶ Nearly three of every 10 gun offenders in the 13 US states with the least stringent criteria for legal gun ownership would have been prohibited from purchasing or possessing a firearm when they committed their most recent offence if their states had more restrictive laws in place.
- ▶ Offenders for whom access to firearms was legal under current standards were five times more likely to have obtained their gun from a gun store or pawnshop than were offenders who were prohibited under current state or federal law.

Our findings indicate that stricter gun ownership laws in states with the lowest standards would have made firearm possession illegal for many who used a gun to commit a crime. We are uncertain about the degree to which stricter legal standards for firearm possession might deter criminal gun possession and use. But, adding barriers for the acquisition of guns by high-risk persons is an underused potential intervention.

**Funding** This study was funded by a grant from The Joyce Foundation. Grant no: 07-30160.

**Competing interests** None.

**Ethics approval** Ethics approval was provided by the Johns Hopkins Bloomberg School of Public Health Institutional Review Board.

**Provenance and peer review** Not commissioned; externally peer reviewed.

**Data sharing statement** The study analyses data from a publically-available secondary database.

## REFERENCES

1. **Centers for Disease Control and Prevention.** Web-based injury statistics Query and reporting System (WISQARS). National Center for Injury Prevention and Control, Centers for Disease Control and Prevention (producer), 2007. http://www.cdc.gov/ncipc/wisqars (accessed 10 Nov 2011).
2. **Richardson EG,** Hemenway D. Homicide, suicide, and unintentional firearm fatality: comparing the United States with other high-income countries, 2003. *J Trauma* 2011;**70**:238—43.
3. **18 U.S.C.** §922(g). 2011.
4. **Vernick JS,** Webster DW, Vittes KA. Law and policy approaches to keep guns away from high risk people. In: Culhane JG, ed. *Social Issues, Welfare Consequences, and Public Health Law.* New York: Cambridge University Press, 2010.
5. **Berk R,** Sherman L, Barnes G, *et al.* Forecasting murder within a population of probationers and parolees: a high stakes application of statistical learning. *J Roy Stat Soc* 2009;**172**:191—211.
6. **Cook PJ,** Ludwig J, Braga AA. Criminal records of homicide offenders. *JAMA* 2005;**294**:598—601.
7. **Huebner B,** Varano S, Barnes G, *et al.* Gangs, guns, and drugs: recidivism among serious young offenders. *Criminol Publ Pol* 2007;**6**:187—222.
8. **Lucker GW,** Holt VL, Kruzich DJ, *et al.* The prevalence of antisocial behavior among U.S. Army DWI offenders. *J Stud Alc* 1991;**52**:318—20.
9. **Wintemute GJ,** Drake CM, Beaumont JJ, *et al.* Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. *JAMA* 1998;**280**:2083—7.
10. **18 U.S.C.** §922(s). 2011.
11. **Cook PJ,** Ludwig J, Venkatesh S, *et al.* Underground gun markets. *Econ J* 2007;**117**:F588—618.
12. **Wright JD,** Rossi PH. *Armed and Considered Dangerous. Armed and Considered Dangerous: A Survey of Felons and their Firearms.* New York: Aldine de Gruyter, 1994.
13. **Webster DW,** Freed LH, Frattaroli S, *et al.* How delinquent youth acquire guns: initial versus most recent gun acquisitions. *J Urban Health* 2002;**79**:60—9.
14. **U.S. Department of Justice.** *Bureau of Justice Statistics, Survey of Inmates in State and Federal Correctional Facilities, 2004.* Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 2007. doi:10.3886/ICPSR04572
15. **U.S. Department of Justice.** *Bureau of Justice Statistics, Survey of Inmates in State and Federal Correctional Facilities, 2004.* Codebook. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor]. http://dx.doi.org/10.3886/ICPSR04572.v1
16. **Glaze LE,** Maruschak LM. *Parents in prison and their Minor Children.* Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2008. Report No.: NCJ 222984.
17. **Leigey ME,** Reed KL. A woman's life before serving life: examining the negative pre-incarceration life events of female life-sentenced inmates. *Women Crim Just* 2010;**20**:302—22.
18. **Noonan ME,** Mumola CJ. Veterans in State and Federal Prisons, 2004. *Special Report.* Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2007. Report No.: NCJ 217199.
19. *Survey of State Procedures Related to Firearm Sales, Midyear 2004.* Washington, DC: National Institute of Justice, Bureau of Justice Statistics, 2005. Report No.: NCJ 209288.
20. **18 U.S.C.** §922(d)(9). 2011.
21. **18 U.S.C.** §922(g)(9). 2011.
22. **Vigdor ER,** Mercy JA. Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide? *Eval Rev* 2006;**30**:313—46.
23. **Webster DW,** Vernick JS. Keeping firearms from drug and alcohol abusers. *Inj Prev* 2009;**15**:425—7.
24. **N.M.** *Stat Ann.* §30-7-2.2. 2004.
25. **Wis. Stat.** §941.29. 2004.
26. **Teret SP,** Webster DW, Vernick JS, *et al.* Support for new policies to regulate firearms: results of two national surveys. *N Engl J Med* 1998;**339**:813—18.
27. **Vernick JS,** Rutkow L, Webster DW, *et al.* Changing the constitutional landscape for firearms: the Supreme Court's recent Second Amendment decisions. *Am J Public Health* 2011;**101**:2021—6.
28. **Cook PJ,** Molliconi S, Cole TB. Regulating gun markets. *J Crim Law Criminol* 1995;**86**:59—92.
29. **Webster DW,** Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *J Urban Health* 2009;**86**:525—37.

31

Inj Prev: first published as 10.1136/injuryprev-2011-040290 on 23 June 2012. Downloaded from http://injuryprevention.bmj.com/ on November 21, 2019 by guest. Protected by copyright.

# EXHIBIT "45"

Now we are back into a situation where we are considering not only that measure but S. 1 and other measures, on which as I mentioned earlier, we have had considerable testimony.

I might mention, if it isn't a violation of our meeting rules, that already this year I moved the Senator from Nebraska's bill out at a previous full Judiciary Committee meeting, and I was reminded at that time that this was an improper motion, that this subcommittee ought to have a chance to consider the legislation. Also I was reminded by the Senator from Nebraska that he hadn't placed his new bill in this year.

But I am always ready to move if need be the Senator from Nebraska's bill at any time. Hopefully we will be able, as I have mentioned previously, to report out S. 1, Amendment 90 which I strongly support, but as a last resort, the full committee might have to report the measure of the Senator from Nebraska so at least the Senate itself will have a chance to consider it.

Senator HRUSKA. So the record here will be complete, the Senator from Massachusetts well knows, and I know he would recite the fact if it occurred to him, the reason for my not introducing a bill sooner. Hearings were in progress in the House. Some of the gentlemen sitting here were testifying. Other witnesses were testifying.

It was thought well to allow those hearings to continue to a point where we could ascertain whether there would be any further need for modifying the bill in any way that I ultimately introduced. So it was not a dilatory tactic. It didn't hold us up one bit, and that I recite by way of having a full and complete record here so that there would not be any ground for suggesting maybe the Senator from Nebraska was dilatory.

Chairman DODD. Well, do you think that we can get on with the hearing?

Senator Hart, you might wish to say something.

Senator HART. Yes; I was tempted to. I think our problem is over these many months some of us have dug ourselves into positions. Politicians aren't supposed to admit that ever happens but it does. I take it that these hearings may provide an opportunity for all of us to test our own conception of these things.

Chairman DODD. Thank you very much.

Our first witness this morning is the Honorable Joseph W. Barr, accompanied by the Honorable Sheldon S. Cohen. Mr. Barr is the Under Secretary of the Treasury. Mr. Cohen is the U.S. Commissioner of Internal Revenue.

I take it that you both want to appear together.

## STATEMENT OF JOSEPH W. BARR, UNDER SECRETARY OF THE TREASURY, ACCOMPANIED BY SHELDON S. COHEN, COMMISSIONER OF INTERNAL REVENUE

Mr. BARR. Yes, sir, Mr. Chairman.

Chairman DODD. I don't think either of these gentlemen need any introduction to the subcommittee. Mr. Barr was a former Member of Congress, Assistant to the Secretary of the Treasury, Chairman of the Federal Deposit Insurance Corporation, and has been Under Secretary of the Treasury since 1965.

Mr. Cohen is a distinguished lawyer, has practiced extensively in the District of Columbia, and before all of the courts, including the Supreme Court. He has been Commissioner of Internal Revenue since 1964.

Will you proceed with your presentation?

Mr. BARR. Thank you, Mr. Chairman.

Mr. Chairman, I might say in opening my remarks that I have listened with great interest to the colloquy which has taken place in this committee. I hope that the area of agreement that it seems to me is apparent will shine through and result in substantive action in this session of the Congress.

Mr. Chairman, I welcome the opportunity to appear before this subcommittee in support of the enactment of legislation placing additional Federal controls over the movement of firearms in interstate and foreign commerce.

Mr. Sheldon S. Cohen, the Commissioner of Internal Revenue is here with me. He will discuss in more detail the inadequacies of present interstate controls and how S. 1, Amendment No. 90, will overcome those inadequacies. He will also discuss the other bills being considered by this subcommittee. I shall cover the administration's proposal, S. 1, Amendment No. 90, in a general way.

Let me begin, if I may, Mr. Chairman, with a brief summary.

First, the main objective of this bill is to give the Federal Government control over firearms in the areas of interstate and foreign commerce where State governments have no powers. The bill is to be cited as the "State Firearms Control Assistance Act of 1967".

Second, we view this legislation as part of a joint Federal-State effort to bring about a needed improvement in the Nation's system of firearms regulation.

Third, the legislation we are proposing is in the spirit of creative federalism that pervades President Johnson's March 17 message to Congress on "The Quality of American Government," in which the President said:

> Today the Federal system rests on an interlocking network of new relationships and new partnerships among all levels of government.
>
> Administration of programs which are the joint responsibility of Federal, state, and local governments should be strengthened.

It is against that background, Mr. Chairman, that I offer the following observations:

The bill before you would repeal the Federal Firearms Act now codified as chapter 18 of title 15, United States Code, and would substitute a new and improved system of Federal regulation of interstate and foreign commerce in firearms under title 18, United States Code. The Treasury Department would retain the responsibility of administering these regulatory controls.

S. 1, Amendment No. 90, implements legislative recommendations which the President set forth in his message to the Congress of February 6, 1967. It would put substantially into effect the legislative program for Federal regulation of traffic in firearms strongly urged by the President's Commission on Law Enforcement and Administration of Justice in its February 1967 report titled "The Challenge of Crime in a Free Society."

This distinguished group of citizens, headed by Under Secretary of State Nicholas Katzenbach, our former Attorney General, included

among its members nationally recognized leaders in the judiciary and in the fields of law, law enforcement, penology, and local government.

The Commission's study found agreement among police administrators of major cities that easy accessibility of firearms is a serious law enforcement problem. The Commission found that State and local laws intended to control traffic in firearms tend to be nullified by the fact that firearms are too often available in neighboring jurisdictions under less restrictive legislation, or free from any regulation.

Accordingly, the Commission favored both the enactment by the States of laws prohibiting acquisition and possession of firearms by certain classes of persons who might be inclined to use them for criminal purposes, and the enactment of Federal legislation that would complement State and local laws and assist State and local governments in achieving their goals.

The administration's proposal before you for consideration is designed to reflect the Commission's recommendations. I should like now to state briefly my understanding of what it would do and, in order to eliminate misconceptions, what it would not do.

Among other things, S. 1, Amendment No. 90, would:

(1) Channel interstate and foreign commerce in firearms through federally licensed importers, manufacturers, and dealers—thereby prohibiting the commercial mail-order traffic in firearms—although licensees could ship interstate to nonlicensed persons rifles and shotguns lawfully purchased in person at the licensee's place of business and which the consignee could lawfully receive and possess at his place of residence;

(2) Prohibit sales of firearms by Federal licensees to persons under 21 years of age, except that sales of sporting rifles and shotguns could continue to be made to persons of at least 18 years of age;

(3) Permit a Federal licensee to sell a firearm—other than a rifle or shotgun—only to persons who are residents of the State where the licensee is doing business;

(4) Curb the flow into the United States of surplus military weapons and other firearms not suitable for sporting purposes;

(5) Bring under effective Federal control the importation and interstate shipment of large caliber weapons such as bazookas and antitank guns, and other destructive devices;

(6) Provide for a licensing system with meaningful standards and annual fees somewhat higher than those now applicable under the Federal Firearms Act, so as to assure that licenses will be issued only to responsible persons actually engaging in business as importers, manufacturers, and dealers. The dealer's first year annual fee, set at a figure higher than the standard fee, would be available to help defray the cost of applicant investigations;

(7) Prohibit a nonlicensee from transporting into or receiving in his State of residence a firearm—other than a shotgun or rifle—purchased outside that State, or a rifle or shotgun which it would be unlawful for him to purchase or possess in that State or political subdivision thereof;

(8) Provide for adequate recordkeeping by licensees—to include data identifying purchasers—and for authority to furnish record information to State and local law enforcement authorities; and

(9) Retain the penalties now provided in the Federal Firearms Act for interstate transportation of firearms to or by felons and the inter-

state transportation of firearms which have been stolen or had their identifying number removed; and in addition would punish interstate transportation of a firearm with intent to commit a felony therewith.

S. 1, Amendment No. 90, is not in any sense "antigun" legislation:

(1) The bill would not outlaw possession or use of firearms by law-abiding citizens.

(2) No requirement of this bill would be violative of the second amendment to the Constitution. Those opposed to firearms controls have created a misconception of this constitutional provision by referring only to the phrase that "the right of the people to keep and bear arms shall not be infringed."

However, the complete amendment must be considered to determine the right granted to whom. This amendment was not adopted with individual rights in mind but rather was considered a protection to the militia of the various States. The Attorney General submitted a memorandum on this point at hearings before Subcommittee No. 5 of the House Judiciary Committee on the anticrime program. H.R. 538, a bill identical to S. 1, Amendment No. 90, is a part of the program. He also submitted a memorandum on the point to this subcommittee on May 19, 1965, at your hearing on firearms legislation.

(3) The bill would not prohibit the acquisition of firearms for sporting purposes, or for any other legitimate use. Sportsmen will continue to be able to obtain firearms although under the bill they would need to procure them from local licensed dealers and manufacturers and thus be subject to the requirements of their respective State and local laws.

Indeed, they can travel to another State and purchase a rifle or shotgun from a licensed dealer there and bring it home with them without interference if the purchaser's State and local law does not forbid the purchase and possession of such a firearm.

Only two minor restraints are laid upon the sportsmen of this country. They will not be able to travel to another State and purchase a pistol or concealable weapon, and they will not be able to obtain a mail-order shipment from another State of a rifle or shotgun, unless they made the purchase in person and the purchase and possession is legal in their home State and locality.

Such minor inconveniences cannot be avoided if the legislation is to make it possible for the States to regulate effectively the acquisition and possession of firearms. Obviously, State authorities cannot control acquisition and possession of firearms if they have no way of knowing or ascertaining what firearms are coming into their States through the mails or, in the case of concealed weapons, by personally being carried across State lines.

(4) The bill would not interfere with interstate transportation of firearms by the ordinary citizen hunter, marksman, or householder. Neither would it preclude the interstate shipment of a gun to a licensee for adjustment or repairs, nor the return or replacement of such a gun by the licensee.

(5) The bill would not prohibit possession or use of firearms by those too young to purchase them. It is recognized that some parents may wish their minor children, who are sufficiently mature to be entrusted with them, to enjoy the use of firearms for recreational purposes.

(6) The restriction on imports would not preclude the importation of all surplus military rifles. Some of these weapons are suitable for or readily adaptable to use in hunting and could be brought in for that purpose.

(7) The bill would not interfere with activities of collectors of antique firearms. "Antique firearms," as defined in the bill, are not subject to the bill's controls since they are specifically excluded from the definition of "firearm."

As I have already indicated, the major purpose of the bill is to institute Federal controls in areas where the Federal Government can and should operate, and where the State governments cannot, the areas of interstate and foreign commerce. Under our Federal constitutional system, the responsibility for maintaining public health and safety is left to the State governments under their police powers.

Basically, it is the province of the State governments to determine the conditions under which their citizens may acquire and use firearms. I would emphasize that it is one of the important objectives of this legislation to strengthen and make more effective the exercise of the powers of the State—and local—governments to regulate the sale of firearms in the public interest.

I expect this Federal legislation to inspire more adequate State and local legislation—and to make that more adequate non-Federal regulation enforceable where it is now all too easy to evade and will always be easy to evade in the absence of such Federal regulatory controls as S. 1, Amendment No. 90, sets up.

The bill would correct serious weaknesses of the existing Federal Firearms Act concerned with licensing and recordkeeping. Under existing law, anyone other than a felon can, upon the mere allegation that he is a dealer, and open payment of a fee of $1, obtain a license. Some 104,000 dealer licenses were outstanding as of January 1, 1967. Approximately 25 percent of these were held by people not actually engaged in business.

The reason is that licenses put these people in a position to obtain personal guns at wholesale or to avoid laws that prohibit mail shipment of concealable weapons and prohibit shipment into States that require purchase permits. This is a wide open situation in which licenses can be obtained by irresponsible elements, thus facilitating the acquisition of weapons by criminals and other undesirables.

The bill before you, by increasing license fees and imposing standards for obtaining licenses, will go a long way toward rectifying this situation. Commissioner Cohen, whose organization is responsible for the administration of the Federal Firearms Act, will discuss this aspect in more detail. He will also supply facts and figures illustrating the problems encountered in enforcing existing law because of incomplete or inaccurate licensee records, and the need for more effective recordkeeping requirements.

This bill cannot, of itself, eliminate crime. However, let us not lose sight of the fact, stated by the President in his February 6 message to the Congress, that—

Any effective crime control program requires the enactment of firearms legislation . . . This legislation is no panacea for the danger of human irrationality and violence in our society. But it will help to keep lethal weapons out of the wrong hands.

Today, the people of the United States are living under the most nearly ideal conditions ever achieved by any society. Yet, their peace of mind and security is threatened by the spreading cancer of crime and juvenile delinquency. It is absolutely essential that steps such as those proposed in this bill be taken to bring under control one of the main elements in the spread of this cancer, the indiscriminate acquisition of the weapons most frequently utilized in crimes of violence.

Right now, any person can acquire firearms with ease. This includes criminals, juveniles without the knowledge or consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest. This situation is clearly intolerable.

Mr. Chairman, I don't know if it has been brought to your attention, but here is one mail-order gun advertisement from the *Shotgun News*. The title says, "Long Hot Summer," and I would call to your attention that the first item listed is "available only from Agramonte, a .45-caliber, 30-shot, semiautomatic, completely legal gun."

Here it is. If that is for sporting purposes, this is not the sporting gun that I grew up with in southern Indiana as a farm boy, Mr. Chairman.

Senator KENNEDY. I ask that that be made part of the record.

Chairman DODD. Yes, without objection, that will be done.

(The document referred to was marked "Exhibit No. 7," and is as follows:)



Closing Dates, 1 and 15 of the Month
THE SHOTGUN NEWS, COLUMBUS, NEBRASKA
JUNE 1, 1967 Page 7
LONG HOT SUMMER
SPECIAL
AVAILABLE AGAIN! ONLY FROM AGRAMONTE
45 CAL. 30-Shot Semi-Automatic Completely Legal
Eagle Carbine
IMMEDIATE DELIVERY
$99.95
DEALER INQUIRIES INVITED
12 GAUGE
6 SHOT
MOSSBERG RIOT GUN
SPECIAL $64.95
Attention Military Collectors!
DANISH MADSEN 30-06
BRAND NEW
Original Bayonets Only
$4.00
Exclusive with Agramonte
UNFIRED
30/06 cal. Bolt Action, Built-In Muzzle Brake, Recoil Pad!
$54.00
With Columbian Crest $59.00
ONLY 2000 MADE
THE FABULOUS TEXAN
M II A
12 GAUGE
5 SHOT
HI STANDARD RIOT GUN
SPECIAL $69.95
F.N. MODEL 1949 SEMI-AUTOMATIC RIFLES
NRA Good $59.50
NRA Excellent $69.50
12 or 20 GAUGE
Complete Including Primer Feed
List ~~$224.50~~
EXTRA SPECIAL
$139.50
CONVERSION KIT
12 or 20, $18.50
U.S. ARMY
M1917!
Back Again!
CAL .30 '06
NRA GOOD
ONLY $27
Scarce, hard to find U. S. M-17 rifles. The strongest bolt-action rifle ever made. Perfect for magnum or wildcat conversions. NRA VERY GOOD only $3.00 more. Order yours today! Leather sling $1.00.
GENUINE ORIGINAL
U.S. M1
CARBINES!
CAL. 30 M1 CARBINE
NRA GOOD
ONLY $56
Authentic GI production—Original forged steel receivers. Rugged dependability and light weight. Additional 15 rd magazines only $1.00.
ACCESSORIES INCLUDED FREE!
30/06 NC BALL --- $49.50 per 1000
ED AGRAMONTE
41 Riverdale
YONKERS, N.Y.

Exhibit No. 7

Mr. BARR. The Treasury Department's experience with the Federal Firearms Act has resulted in a feeling of frustration since the controls provided by it are so inadequate. The drafters of S. 1, Amendment No. 90, had in mind these inadequacies and have, I believe, designed a bill which, when enacted, will provide effective regulation while presenting a minimum of inconvenience to the law-abiding citizen in the acquisition, ownership, and use of firearms for legitimate purposes. These light restraints are surely a small price to be borne by sportsmen gun owners when weighed against the potential benefits to the citizenry generally.

There are indications that those opposed to additional firearms regulation will assert that the present Federal statutes controlling firearms are adequate, but that these statutes are not adequately enforced. Thus, it will be inferred that any present deficiencies in firearms controls result not from lack of statutory authority, but from lack of proper enforcement.

Let me remind you that the Attorney General has stated that existing Federal firearms laws are largely ineffective and inadequate. Within these recognized limitations, I can assure you that the Treasury Department has vigorously enforced the provisions of the present National Firearms Act and Federal Firearms Act. Commissioner Cohen will offer statistics covering some aspects of the firearms enforcement program.

This subcommittee also has under consideration another bill, S. 1853, introduced by Senator Hruska, which would amend the Federal Firearms Act. In addition, S. 1854, a bill to amend the National Firearms Act, is being considered. The Treasury Department expressed its views on S. 1853 and S. 1854 in letters to this committee from the General Counsel. Briefly, the Department expressed itself as favoring S. 1, Amendment No. 90. I again urge the enacement of that bill.

As the President so aptly stated :

To pass strict firearms control laws at every level of government is an act of simple prudence and a measure of a civilized society. Further delay is unconscionable.

I would like to echo those phrases, Mr. Chairman, and my final statement is to repeat the hope that I expressed at the beginning of my testimony, that this committee will see fit to bring to the floor of the Senate legislation embodying at least some of these principles.

Chairman DODD. Thank you. We all thank you very much, Mr. Barr, for a very, very informative statement. I suggest that we hear Commissioner Sheldon Cohen now, and we can question Mr. Barr after Mr. Cohen's statement.

Mr. COHEN. Thank you, Mr. Chairman. I am likewise grateful for this opportunity to express my views on the four gun control bills your subcommittee has under consideration. I have a direct interest in these proposals since the Internal Revenue Service administers the National Firearms Act and the Federal Firearms Act, both of which would be affected by the bills being considered by this subcommittee.

One of the bills, S. 1854, which I will discuss later, would amend the National Firearms Act. That act, now found in the Internal Revenue Code, was enacted in 1934 to provide strict controls over what were

known then as gangster-type weapons. Based on the Federal taxing power, that act imposes taxes on certain occupations and transactions involving these weapons.

In addition, it requires Federal registration of all weapons, such as machineguns and sawed-off shotguns, coming within the purview of the act. The principal effect of S. 1854 would be to bring large caliber military-type weapons and grenades, bombs, et cetera, under the coverage of the National Firearms Act.

The other bills before you are intended to effect improvements in existing controls over interstate and foreign commerce in firearms—another area where the need for additional legislation is generally recognized. These control measures are now found in the Federal Firearms Act which was originally enacted in 1938 and which is codified in title 15, United States Code.

S. 1 and S. 1853 would strengthen the Federal Firearms Act by amendment. S. 1—Amendment No. 90 would repeal the act and replace it with improved controls, over interstate and foreign commerce in firearms, in title 18, United States Code.

Mr. Chairman, I know that you and the members of your subcommittee are deeply concerned over the serious crime problem which confronts the Nation, particularly as it relates to young people. I am also sure you will agree that the easy availability of firearms to juvenile offenders, professional criminals, and to others who would use them unlawfully, is a significant factor in our increasing crime rate and that more effective controls over firearm transactions would help to check that alarming increase.

Even those who strongly oppose, as too restrictive, certain of the measures before you today admit that firearm controls more effective than those presently in force are desirable if not imperative. Indeed, I feel that it is generally recognized by all who have considered this problem, that additional Federal firearms control will strike a telling blow at one of the roots of crime.

There is disagreement only as to the extent to which controls should go and at what level of Government they should be imposed. Some say they favor controls which would reduce criminal use of firearms, but strongly oppose any restraint whatever which would be applicable to the law-abiding citizen. Such controls, I feel, are punitive rather preventive and, thus, would strike the branches of the criminal problem rather than the roots.

Some maintain that no additional Federal controls are necessary and that only State and local controls, as suitable to the indigenous population, should be employed.

Others recognize that any operable controls, to effectively reduce availability of firearms to persons inclined to misuse them, must inevitably result in occasional relatively minor inconvenience to responsible citizens acquiring guns for lawful purposes and consider this a small price to pay for the public benefit derived. They also realize that State and local controls cannot be fully effective in the absence of supplemental Federal controls.

The primary responsibility for gun controls rests with State and local governments in the exercise of their police powers. In general, they should determine, as suitable to their own jurisdictions, who is entitled to possess firearms, under what circumstances firearms may

be carried, where and for what purpose they may be used. Every one of the 50 States and the District of Columbia have laws imposing controls, in some degree, over firearms.

However, the wide disparity in controls adopted by the States is in itself a major problem of law enforcement in particular States. Strict controls over acquisition or possession adopted by one jurisdiction may be nullified if its citizens can frustrate control laws by purchase of firearms through the mail or by crossing State lines. Even the States with the most lenient controls are unable to enforce laws which would prevent criminals, minors, or mental defectives from obtaining guns, since these laws are without effect beyond their borders and since mail-order and out-of-State purchase sources are available to all.

Uniform State laws would go far toward solving these problems. I would heartily endorse a move in this direction. However, if there is one thing I have learned about firearms, it is that any legislation to control them will be resisted. We cannot wait for the millennium and agreement by 50 States on laws regulating firearms. It is a fact of life that crimes of violence involving firearms are increasing. It is also a fact that under existing laws, State and Federal, it is a simple matter for criminals, or others who might misuse them, to acquire firearms through ordinary retail sources.

It is my firm conviction that the support of the Federal Government should be available to all States and political subdivisions in the enforcement of their laws pertaining to firearms. This applies to the State or locality which has a minimum of control, as well as to the State or locality with strict controls, such as those requiring a license to possess a pistol or a revolver.

The Federal Government, and only the Federal Government, with its constitutional power to regulate interstate and foreign commerce, has the capability of filling in serious gaps which thwart the effectiveness of various State and local controls.

Since firearm controls imposed by State and local governments are relatively ineffective because they cannot reach interstate transactions and since, under the Constitution, only the Federal Government has jurisdiction over interstate and foreign commerce, the Federal Government is obligated to exercise its authority in this area to give adequate support to the State and local governments in their efforts to regulate traffic in firearms within their borders.

On the basis of past experience, we, in the Internal Revenue Service, do not believe that this can be done under existing law. At the time the Federal Firearms Act was enacted in 1938, it was designed primarily to curb traffic in firearms to and by the criminal element. There was no significant attempt made to directly assist State and local governments in enforcing their gun controls. The only provision directed toward this end is found at section 2(c).

Section 2(c) of the Federal Firearms Act makes it unlawful for a person licensed under the act to ship firearms in interstate commerce to a person, other than a licensee, in a State, the laws of which require a permit to purchase a firearm, unless such permit is exhibited to the selling licensee. This law has some benefit for those eight States which require permits to purchase certain types of firearms. It is of no aid whatever to local jurisdictions requiring a permit or to other States which may impose other restrictions on the purchase and possession of

firearms within their jurisdictional boundaries. Furthermore, it is of no effect with respect to purchases made over the counter in a neighboring State in contravention of the purchaser's home State laws.

Other control provisions of the Federal Firearms Act are based solely on interstate transportation and impose no duty with respect to the sales transactions. There is a general impression among some persons, who suggest that the present Federal Firearms Act supplies all needed statutory controls, that dealers licensed under the act are prohibited from selling firearms to convicted criminals.

This is not the case, as there is nothing in the act which definitely precludes a dealer in, say, Maryland, from selling a pistol to a convicted felon from New Jersey, who could then transport the weapon back to his home State.

It is true that the New Jersey felon would have violated the provision under section 2(e) which makes it unlawful for any person who has been convicted of a crime punishable by imprisonment for a term exceeding 1 year to transport a firearm in interstate commerce. However, unless the felon is apprehended in the act of so transporting or is subsequently found in New Jersey with the weapon in his possession, proof of the offense is extremely difficult even though the dealer's records show the Maryland sale to a New Jersey resident.

In this regard, I would call to your attention the fact that a provision in section 2(f) of the act which might have been helpful in proving transportation is no longer valid.

Section 2(f) of the Federal Firearms Act makes it unlawful for a convicted felon or a fugitive from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce. The law also provides that the possession of a firearm or ammunition by such a person shall be presumptive evidence that such firearm or ammunition was so shipped, transported, or received by such person.

The Supreme Court declared this presumption unconstitutional in a 1943 case, *Tot* v. *United States*, 319 U.S. 463. Consequently, in order to establish a violation of this statute, it is necessary to prove that a convicted felon found in possession of a firearm actually received it in the course of an interstate shipment.

The problem which has most thwarted the effectiveness of State and local controls is the interstate movement of firearms through mail-order purchase and over-the-counter purchase by out-of-State residents. The pivotal problem with regard to mail-order traffic as it exists today is that neither the State nor city into which the firearm is shipped has any practical way of exercising any effective control over the importer, manufacturer, or dealer who sells the firearm and ships it in from another State.

Further, in transactions of this nature, the record of disposition to the purchaser is not maintained in the State where the purchaser resides; but in the files at the seller's premises, which may be thousands of miles away. Thus, it is of very little value for State and local law enforcement purposes. In addition, such sales are accomplished with no effective determination of the identity of the unseen purchaser.

The other major loophole in State enforcement of firearms laws involves purchase across State lines. It is well known among law en-

forcement officers that the crossing of State lines to avoid State law in the acquisition of firearms is common practice.

During the first 9 months of the fiscal year 1967, our Alcohol and Tobacco Tax Division made 24,944 inspections of firearms dealers. From the records of these licensees, 21,137 sales to out-of-State purchasers, primarily of handguns, were selected for criminal record search. Criminal record checks were actually made on only 18,670 of these names, after eliminating those obviously unidentifiable on the basis of information available.

Of this number, it was positively established that 676 had criminal records. No doubt many others making out-of-State purchasers were also felons, who did not identify themselves, or who gave fictitious names or addresses, as did a known 474 of those checked. The records do not show how many of these purchasers may have been juveniles, aliens, or mental incompetents who traveled to another jurisdiction to purchase, or were purchasers seeking to circumvent waiting periods and local police notification requirements.

It has been found by investigators that many Federal Firearms Act dealers, while apparently technically complying with existing requirements, record fictitious or incomplete names and addresses. Such misleading information is supplied by purchasers desirous of concealing a criminal record or a status making them ineligible under their own State or local law to buy a gun.

Special surveys undertaken by the Alcohol and Tobacco Tax Division clearly reveal the frustration of strict State gun laws by out-of-State purchase. The State of Massachusetts requires a permit to purchase a handgun. It was determined from police records in Massachusetts that over 86 percent of weapons used in murders and holdups had been purchased in the States of Maine and New Hampshire, and particularly in those counties that are a short driving distance from Massachusetts. Maine and New Hampshire have no permit requirement.

Missouri State law also requires a permit to purchase a concealable weapon. It was found that during the period February 1966 to February 1967 approximately 5,000 persons who gave a residence address in the city or county of St. Louis, Mo., purchased firearms—primarily handguns—in the neighboring State of Illinois which has no permit requirement. Approximately 200 of these purchasers were determined to have records of felony convictions.

During the year ending with February 1967, residents of New York, which has stringent gun controls, received 1,110 firearms from out of State. In the Reno, Nev., area, where controls are lax, it was found that 760 firearms were purchased there by residents from other States during the 6 months ended December 31, 1966. Of the purchasers, 46 resided in California; 35 of the 46 had felony records.

Detroit, Mich., also has a serious problem enforcing its rather strict firearms laws. Dealers in nearby Toledo, Ohio, brazenly advertise "No Permit Required" to buy guns and some estimate that 90 percent of their customers are from Michigan, principally Detroit.

An Ohio-Michigan Gun Committee, established by border counties most concerned with this gun traffic, is attempting to take corrective steps. They have expressed an urgent need for more complete and accurate information with respect to these interstate purchasers. Pro-

visions, such as those in S. 1 and S. 1, Amendment No. 90, which contemplate that licensees will identify purchasers and accurately record pertinent information, would provide the type of assistance sought.

Even though our Alcohol and Tobacco Tax Division applies a significant portion of its manpower to inspect Federal Firearms Act licensees and investigate alleged offenses under the two Firearms Acts, little can be done to curb transactions which may involve infractions of State and local firearms laws.

By laborious checking of dealer records and referral to criminal identification files, information indicating possible violations of the act may be found. We do refer cases to the U.S. attorney for prosecution where there is sufficient evidence to prove all elements of an offense under the act and we do provide information to State and local law-enforcement authorities on offenses of interest to them—some 10,000 last year, I might say. However, without Federal laws which are especially designed to stop firearms traffic which circumvents State and local law, we can do little of a preventive nature in their support.

The truth of the matter is that the present Federal Firearms Act is not designed to support State and local controls. While it may be helpful in some limited areas, it could never supply effective support regardless of the manpower devoted to its enforcement. For this reason, we do not favor the piecemeal approach of S. 1853, which offers some improving changes to the Federal Firearms Act but which retains its major faults—such faults as failure to provide licensing standards, inadequate provision for records to be kept by licensees, lack of import controls, and failure to include controls over essentially military-type weapons.

The most significant breakthrough offered by S. 1853, which would provide some assistance in State and local enforcement of gun laws, is its proposal to institute an affidavit and notice procedure with respect to sale, to nonresidents of the seller's State, of handguns either by mail order or over the counter.

This provision, intended to curb irresponsible sale of handguns to juveniles and persons ineligible to buy or possess such guns in their home State, is commendable in purpose. It is somewhat cumbersome, however, imposing burdens on both buyer and seller.

Furthermore, since it is applicable only to handguns, it is of no help to States and cities which may prohibit possession of machineguns by ordinary citizens or sale of rifles or shotguns to or possession of such guns by mental incompetents, drunkards, young people, or aliens. Such laws also deserve Federal implementation.

In contrast to the relatively ineffective device of the Federal Firearms Act and S. 1853, basing controls directly on shipment or transportation, S. 1 and S. 1, Amendment No. 90, adopts a new approach for their major controls. Since the persons being federally licensed in the firearms business are engaging in interstate and foreign commerce, their firearms business activities may be federally regulated.

By imposing requirements on firearms dealers with respect to the retail sale of firearms, preventive effects are achieved more directly and effectively.

These bills would provide that licensees may not sell guns to persons who are of immature years, to persons precluded by State and local

law from receiving or possession of firearms, and to convicted felons or
fugitives from justice. In addition, these licensees may not sell to per-
sons who are not residents of the seller's State—except that special
provision is made for sale of rifles or shotguns to nonresidents.

S. 1, Amendment No. 90, by prohibiting interstate commercial trans-
portation of firearms, other than between licensees, also effectively
curbs retail mail-order traffic in firearms. S. 1 adopts the same ap-
proach with respect to all but long guns and provides an affidavit and
notice procedure with respect to these. These provisions would not
prevent private individuals from transporting their personal weapons
and an exception is made in S. 1, Amendment No. 90, with respect to
the interstate shipment by licensees to nonlicensees of rifles or shot-
guns where the consignee is not precluded by his State or local laws
from receiving or possessing a rifle or shotgun.

These S. 1 and S. 1, Amendment No. 90 controls achievement all of
the intended effect of the affidavit and notice procedure of S. 1853 plus
much more. They support State and local law by curbing interstate
mail-order traffic and by restricting sales to out-of-State residents.

These controls, we feel, could be effectively administered, without
significant increase in personnel allocated to firearms law enforcement.
Such controls would give the State and local authorities assurance that
felons, mental defectives, juveniles, and others disqualified from pur-
chasing or possessing firearms at home may not obtain such weapons
by mail order or by crossing State lines to purchase.

In order to assure the effectiveness of the dealer requirements on
out-of-State sales, S. 1, Amendment No. 90, also imposes restrictions
with respect to interstate private sales or purchases. These require-
ments prohibit the sale by a nonlicensee of a firearm—other than a shot-
gun or rifle—outside the seller's State of residence. They also prohibit
a purchaser from transporting into or receiving in his State of resi-
dence a firearm—other than a shotgun or rifle—purchased outside
that State, or a rifle or a shotgun which it would be unlawful for him
to purchase or possess in his home State, county, or city.

These restrictions are necessary in order to give full support to the
State and local authorities in the implementation of their own control
measures. Any minor inconvenience to private individuals would be
more than offset by the benefits to their communities. It should also be
pointed out that the private transactions described could be consum-
mated through licensed dealers, subject only to the standard require-
ments with respect to dealer transactions. There is much to be said
for the channeling of all interstate transactions through Federal li-
censees in order to provide maximum assistance for State and local
enforcement of firearms laws.

As previously suggested, S. 1953 would preserve a major fault of
existing law by failing to prescribe standards for issuing required
licenses. Dealers licensed under the Federal Firearms Act pay an
annual fee of only $1 and, because of the failure of the law to set any
meaningful standards, many persons not actually engaged in business
obtain dealer licenses. The lack of such standards would be a particu-
larly significant problem if S. 1853 were enacted since, under the bill,
some of its major controls provide exemptions for licensees—for
example, the affidavit requirement.

The law now provides that upon payment of the prescribed fee, the Secretary shall issue a license to the applicant which shall entitle the licensee to transport, ship, or receive firearms or ammunition in interstate or foreign commerce. There are no stated conditions to the issuing of the license, except the provisions for the payment of the prescribed fee, and no discretion to withhold issuance is granted under the language of the law. All the applicant need do is to allege that he is engaged, or intends to engage, in the firearms business and pay the prescribed fee.

On the basis of dealer inspections made, we estimate that 25 percent of the 104,087 Federal Firearms Act licenses issued during 1966 went to persons not actually engaging in the licensed activity. Some misrepresented themselves to buy personal guns at dealer prices. Others sought to avoid the prohibition, in section 2(c) of the act, against interstate shipment to a buyer not exhibiting a purchase permit where one is required by State law, or to circumvent the provision in section 1715 of title 18, United States Code, which prohibits the mailing of concealable firearms.

In this regard, our investigators have discovered that some mail-orders return prospective purchase orders for hand-guns with the suggestion that the purchaser obtain a Federal Firearms Act license. They point out that if the buyer qualifies as a dealer, at a cost of $1, the gun can be forwarded more conveniently, and economically, by mail.

Any additional controls over the interstate movement of firearms would make a license even more attractive if the licensee is exempt from such controls.

We have, under existing law, refused to issue licenses to felons, persons under indictment for a felony, and fugitives from justice. We have done this on the ground that the issuance of a license to such persons would serve no purpose, since by reason of section 2 of the act it would be unlawful for them to ship or receive firearms in interstate commerce. Ordinarily, there is no other basis for denying a license even though it may seem obvious that the applicant is not a proper person to be dealing in firearms.

The customary practice is to provide standards for the issuance of licenses or permits or at least to grant some discretion to the person who has the responsibility for acting on the application. A proper and reasonable standard for the issuance of a license is the standard as to whether the applicant would be likely to conduct his operations in compliance with law. This standard, which has been adopted in S. 1 and S. 1, Amendment No. 90, has been successfully used in connection with permits issued in the liquor and tobacco tax area.

I strongly recommend that you impose meaningful conditions which applicants must comply with so that this Federal licensing system will afford realistic controls. As further encouragement to limit licensing to persons actually engaging in the firearms business and to provide funds for administration of the program, I also urge increase in license fees as proposed in S. 1853, S. 1 and S. 1, Amendment No. 90.

At this point, I would like to observe that S. 1 and S. 1, Amendment No. 90 would adequately protect applicants from any arbitrary or unreasonable denials. A specific provision would afford applicants the right to a hearing in the event adverse action was contemplated.

Another problem area which existing law and S. 1853 ignore, is that concerned with the mass importation of firearms from foreign countries. This problem can be met only at the Federal level.

It is not true, as some people suggest, that adequate control over firearms imports can be effected under the Mutual Security Act of 1954. That law is concerned with importation and exportation of firearms from the viewpoint of international relations. As the National Crime Commission stated in its February 1967 report:

> The limited statutory framework within which the State Department must operate prevents any effective control over the importation of firearms. If the import in question does not involve machine guns, sawed-off shotguns, or the other weapons covered by the 1934 National Firearms Act, each transaction is approved routinely, as long as the dealer is a bona fide businessman engaged in a bona fide business transaction.

S. 1 and S. 1, Amendment No. 90 are designed to curb this importation of military surplus weapons and other firearms not particularly suitable for target shooting, hunting, or any other lawful purpose. These bills would not, however, preclude the importation of military surplus rifles or shotguns which were suitable or adaptable to use for sporting purposes.

We are particularly concerned with the influx of relatively inexpensive .22-caliber pistols and revolvers which have plagued the law enforcement officers of our metropolitan areas. Many of these imports are of poor quality and are as dangerous to the user as they may be to the person who is often threatened or assaulted with them. This view is shared by officials of the National Rifle Association, as indicated by remarks of Mr. Orth, executive vice president of that association, in his statement before your subcommittee on May 21, 1965.

I would like to make it clear that the provisions of S. 1 and S. 1 Amendment No. 90, relating to the importation of firearms, are intended to exclude surplus military firearms—other than rifles or shotguns—and other firearms which are not suitable for lawful sporting purposes. The bills would not, and I emphasize "would not," preclude the importation of good quality sporting-type firearms or of military surplus rifles or shotguns particularly suitable for or adaptable to sporting use.

Another major problem in firearms control concerns the interstate shipment and disposition of highly destructive, large-caliber weapons, such as bazookas and antitank guns, and destructive devices such as grenades, bombs, missiles, and rockets. The lack of controls over the traffic in these highly destructive weapons is a matter of great concern to law enforcement officers.

I would also like to observe that the National Rifle Association has recognized the need for action in this area and that in their April 3, 1965, statement at the annual meeting, the National Rifle Association declared:

> That it would support properly drawn legislation to outlaw dangerous devices such as bazookas, bombs, antitank guns, and other military-type weapons that have found their way into trade channels across America.

The administration's bill would place strict controls over the importation, interstate shipment, and disposition of these highly destructive weapons and of ammunition for use in destructive devices.

The sponsors of S. 1853 have suggested that these "destructive devices," being inherently dangerous and serving no valid civilian pur-

pose, should not be classed with guns commonly used in recreational activities. They would place these "devices" under the strict controls of the National Firearms Act—now applicable to machineguns and sawed-off shotguns—but relieve them from the interstate and foreign commerce controls of the Federal Firearms Act.

This attitude seems to reflect a misunderstanding as to the purpose and operating effect of these two major Federal fiearms control measures. It is true that the national act is designed to provide strict controls over the more vicious types of firearms, generally unsuitable for lawful civilian use. These controls are not exclusive, however, and any weapon—including national act weapons—coming within the definition of "firearm" as provided in the Federal Firearms Act is also subject to all pertinent controls of that act.

We can see no reason why a "social stigma" dividing line should be drawn and would strongly oppose any attempt to relieve National Firearms Act weapons from the operation of controls based on interstate and foreign commerce. The National Firearms Act relies on the power of the Federal Government to tax. Without the present Federal Firearms Act or similar controls, a racketeer who paid the $200 transfer tax could acquire a machinegun or sawed-off shotgun and could receive and transport it interstate without violating Federal law. We need the controls of both acts over these present national act weapons and over the "destructive devices" which S. 1854 would bring under that act's control.

Illustrative of this point is the case of a west coast resident and his wife who were arrested in April 1967 on warrants charging violations of both the National Firearms Act and the Federal Firearms Act. Various seizures made at that time and in connection with subsequent arrests of the wife have included some 45 National Firearms Act weapons, of which 29 were machineguns—19 in working condition—and five or six were silencers.

The 50 other weapons seized included nine cannons. In addition, approximately 40 tons of ammunition were found at their home and at other locations of temporary storage. The husband refers to himself as a collector. He does have a criminal record, however, and the machineguns he possessed without benefit of registration under the National Firearms Act had been received or shipped by him in interstate commerce in violation of section 2 (e) and (f) of the Federal Firearms Act.

Another factor which has contributed to the ineffectiveness of the Federal Firearms Act, and which S. 1853 fails to correct is the lack of adequate recordkeeping standards applicable to licensees. Accurate dealer records are absolutely essential if full potential benefit to the States is to be realized. They are also needed to assure compliance with the law itself. If a name is to be checked through criminal files or if there is a question of possible interstate transportation, it is imperative that the purchaser be identified and that his correct name, age, and address be recorded.

S. 1 and S. 1, Amendment No. 90 recognize the importance of accurately identifying information on purchasers and make dealers directly responsible for obtaining and recording such information. These bills would also specifically authorize the Secretary of the Treasury to make information on purchasers and on firearms purchased available

to State and local governments. These proposals could be of particular significance as a factor in aiding those who must deal with the current unrest that exists in many cities where there is a potential for outbursts of violence.

As we all know, the use of firearms in civil disturbances is becoming more common. Law enforcement officials in major cities tell our alcohol and tobacco tax investigators that there is a directly related and significant increase in firearms sales by dealers in the vicinity whenever tension develops in these metropolitan areas. They feel that adequate identification of purchasers and proper recording of sales would do much to discourage the purchase of firearms by individuals who use them in times of civil disorder to harass public safety officials in the performance of their duties.

I have discussed in some detail various weaknesses of the present Federal Firearms Act and have indicated that S. 1853 would do nothing to correct many of them. You should not infer from this, however, that I am unfavorably disposed toward S. 1853 in its entirety. I recognize that the proposed affidavit and notice procedure with respect to transactions in handguns represents a significant advance in Federal firearms control.

I also favor most of the other additional controls which S. 1853 would include in the act. I do feel, however, that all of the benefits to be derived from S. 1853, and more, are incorporated in S. 1 and S.1, Amendment No. 90. In addition, the latter bills correct significant faults in the present controls over interstate and foreign commerce in firearms.

I would now call to your attention one feature of S. 1853 which the Treasury Department regards as objectionable. I refer to the reversion to the crime-of-violence standard with respect to controls over transactions involving convicted criminals and persons under indictment. Since 1961, these controls under the Federal Firearms Act have been applied on the basis of "crimes punishable by imprisonment for a term exceeding 1 year."

This proposed change would seriously reduce the effectiveness of the pertinent controls and would put the Government in the questionable position of having to place confidence, through required licensing, in certain convicted felons, including those convicted of violations of this proposed act or of the National Firearms Act and persons convicted of racketeer-type crimes, such as those related to narcotics and gambling.

These controls would revert to their status prior to the 1961 amendments of the Federal Firearms Act made by Public Law 87–342, although prior to 1961 there were provisions in that act placing restrictions on the issuance of licenses to convicted violators of the act. Even this limited restriction would not be applicable should S. 1853 be enacted in its present form.

In my comments to this point, I have generally named S. 1 and S. 1, Amendment No. 90, together as though they were substantially the same. The bills differ significantly and, as you know, S. 1, Amendment No. 90, represents the administration's proposal for revision of laws designed to regulate interstate and foreign commerce in firearms. S. 1 is a good bill and, in the 89th Congress as S. 1592, was favored by the Department. However, we prefer the somewhat stricter

approach taken in S. 1, Amendment No. 90 with respect to controls over private transactions in firearms and with respect to controls over long guns.

I have previously commented only incidentally on S. 1854, which would amend the National Firearms Act. The principal feature of that bill is the provision making certain highly destructive devices subject to the act's controls. There is a generally recognized need to bring these essentially military weapons under strict control so far as civilian transactions are concerned.

S. 1854 was discussed in detail in a recent letter from our general counsel to the chairman of the Judiciary Committee expressing the views of the Treasury Department on the proposed legislation. As was indicated in that letter, the Department finds the major objectives of the bill acceptable.

Several amendments to the bill were suggested and it was indicated that, as so amended, the Department would not object to enactment of S. 1854. However, since S. 1854 overlooks provisions of the act which also need amendment, including those prescribing the amount of tax to be paid with respect to the taxed transactions and occupations, it was stated that the Department would favor a more comprehensive modernization revision of the National Firearms Act than that proposed in S. 1854.

Summarizing my views with respect to the other three bills before you, I am convinced that the Federal Firearms Act, as now written, does not provide the statutory controls needed to regulate interstate and foreign commerce in firearms in meaningful support of State and local efforts to control gun traffic within their jurisdictions. I base this conclusion on the experience of the Internal Revenue Service in administering the provisions of the act and on the day-to-day relations of our investigators with State and local law enforcement officers.

I do not believe that S. 1853 goes far enough toward correcting the deficiencies of the Federal Firearms Act. S. 1 offers a better revision of the act. However, S. 1, Amendment No. 90, in my judgment, provides controls over interstate and foreign commerce in firearms best suited to the enhancing of State and local controls and most susceptible of efficient administration.

I favor enactment of S. 1, Amendment No. 90, and urge that it be reported to the Senate at an early date.

Thank you, Mr. Chairman.

Chairman DODD. Thank you very much, Commissioner Cohen, for a thorough, well prepared and very informative statement, in my judgment. I only have a few questions. I assume members of the committee have more.

There have been many criticisms made of S. 1, Amendment 90, and S. 1 itself. For example, it has been said that additional controls, such as contained in S. 1, Amendment 90 would be similar to requiring the registration of firearms. Sometimes it is put another way by the critics who say it would be just another step toward the elimination of private ownership of such weapons in the United States.

Perhaps you are aware of these criticisms, but we have heard them now over a period of about 4 years. I would like to know for the record what your view is.

Mr. COHEN. There is no attempt by these proposed measures to in any way license or register firearms at our Federal level. The people who have made these charges have said "Well, if there were an invasion of the United States, it would provide a list of weapons which the invader could seize." I would suggest that the best list of weapons, and those who possess them, available today, would be the membership rolls of the National Rifle Association, which are easily available, with names, addresses, and other pertinent data.

The attempt here is merely to provide, if need be, for local officials, proper identification of those people purchasing guns. There is no local registration, there is no local licensing involved here.

We are just asking the dealer to record the proper name and the proper address of the purchaser to take reasonable safeguards to insure that he has satisfied himself they are correct. No more than he would ask if he were cashing a check for the purchaser, to see a driver's license or some other valid type of identification.

Chairman DODD. Thank you very much. I think that answer is correct, but I wanted to get it on the record.

Senator HRUSKA. Mr. Chairman, if you are going to leave that point, could we ask Mr. Barr his thoughts on that same subject?

Chairman DODD. Yes, Mr. Barr, do you have anything to say on that?

Mr. BARR. Senator Hruska, the objective of this bill, I think, is plain. I emphasized it probably more specifically in my testimony than Commissioner Cohen.

The objective of this bill is to enable the State and local governments, who, under our system of government, have the responsibility for maintaining peace, welfare, and the safety of the citizen. It is to enable them to do their job better. There is nothing in this bill that I know would imply a Federal intent to restrict the lawful use of firearms in the United States.

Senator HRUSKA. Nor to lead to the registration of firearms?

Mr. BARR. No, sir.

Senator HRUSKA. By Federal law.

Mr. BARR. No, sir.

Senator HRUSKA. Let me ask then, the significance of your statement at page 3 when you say, Amendment No. 90—

Would put substantially into effect the legislative program for Federal regulation of the traffic in firearms strongly urged by the President's Commission on Law Enforcement and Administration of Justice in its February, 1967 report titled "Challenge of Crime in a Free Society."

Is it not true that one of the recommendations of that Commission calls for the registration of all firearms, shotguns, pistols and rifles in the country? The Commission also recommends that where States have not enacted a firearms registration law within 5 years the Federal Government shall do so. And further, is there not a bill now pending pertaining to the District of Columbia embodying these principles?

Now, considering your statement that the thrust of this bill is to accomplish the program of the President's Crime Commission, which includes registration, would you like to comment as to whether there is any inconsistency in your two statements?

Mr. BARR. I would be delighted to, Senator. This legislation, essentially this same legislation was proposed by the administration at

56                    FEDERAL FIREARMS ACT

least 2 years before the Crime Commission ever reported. At that
time, Senator, we made our objectives clear and we have never devi-
ated. What we are trying to do is to enable the States to act, to give
the States information which they today cannot obtain because of
the constitutionl separation of powers.

Unless we act in this narrow area, which we are recommending to
you today, Senator Hruska, I don't know how the States can dis-
charge their obligations. Now, if the States or the local governments
want to move ahead to the registration of firearms, that is another
subject. That is another subject indeed.

We are not here recommending that today. We are recommending
only one thing, that the State and local governments who are charged
with protection and the safety of the people of this country be given
the information that they need to carry out the responsibility. I am
not willing to leave State and local jurisdictions helpless to protect
the people of the United States.

Senator Hruska. Neither am I, but I come back to your language.

Mr. Barr. Yes, sir.

Senator Hruska. "It would put substantially into effect the legisla-
tive program for Federal regulation of traffic in firearms, strongly
urged by the President's Commission," and among those things which
are urged by the Commission, Mr. Barr, are registration of all fire-
arms, including shotguns, rifles, and pistol. The Commission also urges
that States not legislating a firearms registration law within 5 years,
there will be a Federal law. Is that included in the thrust of the bill?

Mr. Barr. That is not, sir.

Senator Hruska. You support the Commission in your statement,
or do you want to modify that part of the statement?

Mr. Barr. I see no reason to modify my statement, sir.

Senator Hruska. Very well.

Mr. Barr. The Crime Commission report was submitted to the
President. All its recommendations were not accepted nor are they
embodied in legislation before this committee.

The Crime Commission formed a basis for a series of recommenda-
tions that the Congress will consider. I would like to repeat, Senator
Hruska, however, that before they ever reported, we addressed our-
selves to this narrow question of enabling the States to take care of
themselves, the States and local governments. That is what we are here
to do today.

Senator Hruska. Be that as it may the record with your statement
and the recommendations of the Commission will facilitate our own
individual judgments and appraisals of that language notwithstanding
your disavowal. You see no reason to modify that portion of your
statement?

Mr. Barr. No, sir.

Senator Hruska. And that is all right with me, but the words do
stand and they also stand in the recommendations of the President's
Crime Commission.

Chairman Dodd. Do any other members of the committee wish to
address any questions on that point? I am trying to limit it to just
that question which I asked Mr. Cohen and Mr. Barr.

Senator Kennedy. Nothing on that.

Chairman Dodd. I only have two or three more questions. It has been
argued here and elsewhere that the reason we have a firearms problem

is that the Federal laws are not adequately enforced or sufficiently enforced, and that if they were, there wouldn't be any need for new legislation. Do you have anything to say to that?

Mr. COHEN. Well, sir, I would say that we are enforcing the present law as it was intended to be enforced. There are many things, as I commented in my statement, which were not intended to be covered by the present law, which in the light of today's circumstances we certainly would recommend should be covered by Federal legislation.

The present law was not designed to be a law that would enhance the controls that State and local governments put in. It was designed to be sufficient unto itself in a very narrow area really of the racketeer-type weapons.

The greatest growth of crime today is in the area of young people, juveniles and young adults. The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly, and all responsible law-enforcement officials, and indeed the very esteemed Director of the Federal Bureau of Investigation has recommended that legislation of this character be enacted.

I cited statistics before, showing the great numbers of investigations that our people have run, to trace down weapons. We have had last year about, I think it was 9,700 or 9,800 violations—possible violations of law reported to State and local officials, so that they might follow up.

Senator HRUSKA. What was that number, please?

Mr. COHEN. 9,700 or 9,800, sir, almost 10,000. These things show that our officers are doing the best job manageable under present circumstances.

We have about a thousand frontline investigators in the area who spend a substantial portion of their time, they are engaged in both alcohol-tobacco tax and the gun law enforcement, and they spend a substantial amount of their time as need be in their given locale.

We have a number of our investigators working with municipal law enforcement officials in the juvenile gang area, to try to bring some sense and semblance of order into the area, and working with State and local officials. The cooperation with local law enforcement officers is generally in this country very good. We have found very good cooperation both ways. They are referring cases to us which come within our area, and we have been referring cases to them, which are in their area.

Chairman DODD. It has frequently been argued that there is too much discretionary power placed in the Treasury Department under S. 1, Amendment 90. I think we have heard that in almost every hearing in one form or another. What is your answer to that?

Mr. COHEN. I have found, in reviewing the act, very little in the way of discretionary authority. It does present a rather anomalous situation, where a Federal official, myself acting for the Secretary, must license people to perform acts which are very responsible acts, selling of a deadly weapon, and I cannot even inquire as to their character.

There is very little I can do, and particularly one might say when one is flooded, for the price of $1 you receive a flood of applications that such a low fee would bring in, again it inhibits the proper use of manpower.

If we can restrict the kinds of people who would apply to those who are engaged in the business, and who appear to be the type of people who will lawfully engage in the business, the restrictions do not appear to be onerous, and the checking could be as thorough as needed by the individual circumstances.

The discretion is not very broad, and I am sure that the chairman recognizes that the courts of the United States have never allowed an administrator's discretion to go unfettered. This bill provides for adequate hearing, should the discretion call for the declination of the license, and in the event that the hearing is adverse in any respect, there is an appeal to the courts, which has always proved adequate in every other area that we administer.

Mr. BARR. Mr. Chairman, may I add in that regard, sir, that in addition to the courts, there is always the Congress of the United States. I have noticed that when we make a mistake or step a little bit too far in a regulation, that somebody gets to it in the Congress, and rather quickly.

I will cite you our experience with the expense accounts. I remember in 1962 we had expense accounts tightened up to the place where I thought we were going to eliminate expense account living. At that point I guess maybe we went a little bit too far, because there was recourse to the Congress, not to the courts, and the regulation was changed, and changed promptly. I would just like to reinforce what I am sure all you Senators know, that where there is a public hearing in an area that is closely watched, no administrator has an inordinate amount of discretion.

Senator HRUSKA. Did you say public hearings?

Mr. BARR. Yes, sir.

Senator HRUSKA. If the Senator will yield, public hearings provided for license applications?

Mr. COHEN. Not in the matter of application.

Mr. BARR. Any area of regulation.

Senator HRUSKA. So they are the powers that are virtually——

Mr. COHEN. No, sir; in that case if there were a declination there would be an administrative hearing by an independent hearing officer as provided by the Administrative Procedure Act.

Senator HRUSKA. Where is that provided?

Mr. COHEN. That is subject to judicial review in that case, sir.

Senator HRUSKA. But no other appeal besides that?

Mr. COHEN. This is the normal—he has a right to go to a judicial hearing.

Senator HRUSKA. If there is any evidence that would support the finding of the Treasury Department that the license should not be granted, regardless of what the preponderance of the evidence might be, your position is sustained, isn't that the size of it?

Mr. COHEN. I wouldn't like to put it that way.

Senator HRUSKA. Under the Administrative Procedures Act, isn't that the essence of the appeal?

Mr. COHEN. No; the appeal is whether we have made a proper determination.

Senator HRUSKA. And it is improper if there is no evidence whatsoever.

Mr. COHEN. No, sir; I don't believe——

Senator HRUSKA. To sustain your ruling.

Mr. COHEN. No, sir. I believe we would have the normal procedure. The potential licensee would have the burden of proving that he is entitled to the license. Should he establish prima facie that he is, we would have then the burden of overcoming that. This is the normal rule in a court proceeding.

Senator HRUSKA. Very well.

Chairman DODD. I am trying to get on the record the criticisms that were made of this legislation, Mr. Commissioner, and Secretary Barr. It has been commonly said the trouble with S. 1, amendment No. 90 is that it doesn't punish the criminal use of the firearm, but rather places unjustified restrictions on the law-abiding citizen.

Mr. COHEN. That is a common statement. I have discussed this with people with long experience in penology, criminology. Severe punishment is not enough to deter crime. We must take preventive action, and the preventive action that we are trying to take here is the preventing of firearms, of these very destructive devices, falling into the hands of people that the local jurisdictions decide are not capable of handling them.

A juvenile, a 16-year-old, doesn't worry about a potential 5-year or 10-year criminal sentence. He really doesn't have the wherewithal to take that all into account. He should not have the weapon in the first place. We won't have to worry about whether we sentence him to 5 or 10 years.

Chairman DODD. It has been said over and over again, too, that the cost of administering and enforcing this law, if it is adopted with its additional controls, would be exorbitant. I think that the critics have even said that it would be prohibitive.

Mr. COHEN. I have consulted very carefully with the Director of our Alcohol and Tobacco Tax Division, Mr. Serr, and he says that the administration of the present Act is so inefficient because of the cumbersomeness of the act that he believes that he could enforce the Act, S. 1, Amendment No. 90, with about the same manpower he has today.

He certainly said at least for the first year he would like to try, without any increase in manpower, except that we would temporarily assign several of his people who are now assigned to other duties in the original licensing, since the original licensing would be a one-time operation, rather than go out and hire temporary people.

We would make a temporary reassignment of some of our other investigative people to that function, but that the ongoing function, once the original investigation process is over, would require about the same number of men, about a thousand frontline investigators, putting about the same number of hours into this activity.

Chairman DODD. Perhaps the most frequent criticism, certainly within the last 2 years, was that this bill, if it is adopted into law, would be a violation of the second amendment to the Constitution. I know that was touched on here in Secretary Barr's testimony. This is the last question I have, and I would like to get both of you, Mr. Commissioner, and the Secretary to speak on this.

Mr. COHEN. The Secretary has covered this.

Chairman DODD. It is important to get this on the record. I get a lot of mail on this.

60                    FEDERAL FIREARMS ACT

Mr. COHEN. The former Attorney General, Mr. Katzenbach, submitted a memorandum, I understand, from the present Attorney General, Mr. Clark, that he will submit a similar memorandum to the committee, and I think that they both think that the argument is rather preposterous.

Chairman DODD. Very well. There are a lot of other questions. I don't want to take up any more time.

Senator Hruska, do you have any questions?

Senator HRUSKA. Yes; I have some. Mr. Chairman, reference was made to that portion of the President's Crime Commission report recommending State gun registration legislation and by way of other legislation by the Federal Government, if the States did not enact such laws. I ask unanimous consent that that portion with those recommendations be set forth at that point in the record so we we have them available for consideration.

Also, Mr. Cohen, inasmuch as we are dealing with enforcement of this act, I presume a lot of this enforcement has for its basis, rules and regulations of your Department?

Is that correct?

Mr. COHEN. Yes, sir.

Senator HRUSKA. Is that correct?

Mr. COHEN. Yes, sir.

Senator HRUSKA. I ask unanimous consent that copies of these regulations, both for the National Act and the Federal Act be incorporated in the record at this point.

Chairman DODD. Without objection.

(The documents referred to were marked "Exhibits Nos. 8 and 9" and are as follow:)

### EXHIBIT No. 8

#### THE PRESIDENT'S COMMISSION ON LAW ENFORCEMENT
##### AND ADMINISTRATION OF JUSTICE,
##### EXECUTIVE OFFICE OF THE PRESIDENT,
*Washington, February 19, 1967.*

I am enclosing a copy of "The Challenge of Crime in a Free Society," a report to President Johnson and the Nation by his Commission on Law Enforcement and Administration of Justice.

Because of his concern about crime, the President appointed the Commission eighteen months ago, as part of his program to develop a National Strategy against crime. The broad new legislative program which the President proposed to Congress earlier this month should help put this strategy into action.

The Commission's mandate was to examine all aspects of crime and to recommend ways in which America might meet its challenge. This report makes more than 200 specific recommendations for preventing crime, for improving the operations of the police, the courts and the correctional agencies and for mobilizing government and private support for these tasks.

The report embodies the findings of a Commission composed of distinguished men and women from many professional backgrounds and many parts of the country. It reflects the work of an outstanding staff and hundreds of expert consultants from all relevant fields. I hope you will give it your close attention.

Sincerely yours,

NICHOLAS DEB. KATZENBACH, *Chairman.*

#### THE PRESIDENT'S COMMISSION ON LAW ENFORCEMENT AND ADMINISTRATION OF JUSTICE

Nicholas DeB. Katzenbach, Chairman; Washington, D.C.; Under Secretary of State; Attorney General of the United States 1965–1966

Genevieve Blatt, Harrisburg, Pa.; Assistant Director, Office of Economic Opportunity

Charles D. Breitel, New York, N.Y.; Associate Judge, Court of Appeals of the State of New York
Kingman Brewster, Jr., New Haven, Conn.; President, Yale University
Garrett H. Byrne, Boston, Mass.; attorney
Thomas J. Cahill. San Francisco, Calif.; Chief of Police, San Francisco
Otis Chandler. San Marino, Calif.; Publisher, Los Angeles Times
Leon Jaworski, Houston, Texas; attorney, senior partner, Fulbright, Crooker, Freeman, Bates & Jaworski
Thomas C. Lynch, San Francisco, Calif.; Attorney General, State of California
Ross L. Malone, Roswell, New Mexico; attorney, partner, Atwood & Malone
James Benton Parsons, Chicago, Ill.; Judge, U.S. District Court, Northern District of Illinois
Lewis Franklin Powell, Jr., Richmond, Va.; attorney, partner, Hunton, Williams, Gay, Powell & Gibson
William Pierce Rogers, Bethesda, Md.; attorney, partner, Roynall, Koegel, Rogers & Wells (New York and Washington)
Robert Gerald Storey, Dallas, Texas; attorney, partner, Storey, Armstrong & Steger
Julia Davis Stuart, Spokane, Wash.; President, League of Women Voters of the United States
Robert F. Wagner, New York, N.Y.; Mayor, New York City, 1954–1966
Herbert Wechsler, New York, N.Y.; Harlan Fisk Stone Professor of Constitutional Law, Columbia Law School
Whitney Moore Young, Jr., New Rochelle, N.Y.; Executive Director, National Urban League
Luther W. Youngdahl, Washington, D.C.; Senior Judge, U.S. District Court, District of Columbia

### CHAPTER 10*—CONTROL OF FIREARMS

The assassination of President John F. Kennedy with a mail-order rifle offered a grim and tragic illustration of what can result when firearms are easily available to anyone in the United States. The Commission strongly believes that the increasing violence in every section of the Nation compels an effort to control possession and sale of the many kinds of firearms that contribute to that violence.

During 1963, 4,760 persons were murdered by firearms. During 1965, 5,600 murders, 34,700 aggravated assaults and the vast majority of the 68,400 armed robberies were committed by means of firearms. All but 10 of the 278 law enforcement officers murdered during the period 1960–65 were killed with firearms. And statistics, of course, cannot even indicate the personal tragedy each of these offenses caused.

The issue of firearms control has been debated heatedly throughout the country in the past few years. Many millions of the estimated 50 million privately owned guns in the United States belong to hunters, gun collectors, and other sportsmen. Their representative organizations resist controls over the present easy accessibility of rifles and shotguns. Many other millions of firearms—pistols, revolvers, rifles, and shotguns—are owned by citizens determined to protect their families from criminal attack and their property from loss to burglars. In a nationwide sampling conducted for the Commission by the National Opinion Research Center, 37 percent of the persons interviewed said that they kept firearms in the household to protect themselves. Some citizens who fear assault and robbery in the streets of our cities carry firearms about for self-protection. Many of these firearms owners contend that control over the purchase and possession of firearms conflicts with the need and right to defend themselves, their families, and their property.

Although the Commission believes that controls at all levels of government must be strengthened in order to reduce the probability that potential criminal offenders will acquire firearms. it agrees that the interests of persons desiring such weapons for legitimate purposes must be preserved as much as possible. No system of control, of course, can guarantee that society will be safe from the misuse of firearms. but the Commission is convinced that a strengthened system can make an important contribution to reducing the danger of crime in the United States.

*From *The Challenge of Crime in a Free Society*, a report by the President's Commission on Law Enforcement and Administration of Justice.

Regulation of firearms in the United States is based upon three Federal laws, various kinds of State legislation, and a large number of local ordinances.

The first of the Federal laws, the National Firearms Act of 1934, applies to machine guns, short-barreled and sawed-off rifles and shotguns, mufflers and silencers and concealable firearms—not including pistols. The 1934 act requires that possessors register all of these weapons and devices with the Treasury Department, and it imposes annual taxes on firearms manufacturers, importers, and dealers. Taxes ranging from $5 to $200 are also imposed on the transfer of registered weapons and other equipment.

The Federal Firearms Act of 1938 requires the licensing of all manufacturers and dealers who use the facilities of interstate or foreign commerce. It prohibits the knowing transportation of firearms in interstate commerce to, or receipt by, any person who has been convicted of a felony, or who is a fugitive from justice. The law requires that most kinds of firearms imported into or manufactured in the United States bear serial numbers, and it prohibits the interstate transportation of stolen firearms, or those with mutilated serial numbers. The 1938 law also prohibits the licensed manufacturers and dealers from transporting firearms into States in violation of State laws requiring a permit to purchase firearms.

The third Federal law regulating firearms is the Mutual Security Act of 1954, which authorizes the President to regulate the export and import of firearms. Administration of the act has been delegated to the Department of State.

The Department of Defense, which formerly disposed of its surplus firearms through commercial and other private channels, suspended all such sales several months ago. It is now considering the advisability of destroying surplus or obsolete weapons in the future.

There is a wide diversity in the purpose and scope of State gun control laws:

Twenty-five States require a license to sell handguns at retail, 8 require a permit (or the equivalent) to purchase a handgun, 11 require a waiting period between purchase and delivery of a handgun, 1 requires a license to possess a handgun, 29 require a license to carry a handgun, 19 prohibit the carrying of a concealed handgun, 18 require a license to carry a handgun in a vehicle, 22 prohibit the carrying of a loaded firearm in a vehicle, and 4 States require the registration of firearms.

New York State's Sullivan law is the most stringent firearms control regulation in the United States. The laws of several States require that anyone carrying concealable firearms have a license, but the Sullivan law prohibits anyone from keeping a pistol or revolver in his home or place of business without a license. Further, no one may even purchase a pistol or revolver until he has obtained either a license to possess or a license to carry such a weapon. The New York law does not require a license to possess or carry rifles and shotguns, but does state that they cannot be carried in an automobile or a public place when loaded.

In addition to the State laws, there are many county, city, town, and village ordinances that require licenses for the possession or purchase of firearms.

At first glance, the combined regulatory machinery established by these firearms laws may appear to provide sufficient control. This appearance is misleading. A 1966 Federal Bureau of Investigation survey of the chief administrators of police departments in 10 large cities discloses that all but one believe that the easy accessibility of firearms is a serious law enforcement problem.

On the Federal level, the statutes do little to control the retail and mail-order sale of handguns, rifles, and shotguns. The provision of the Federal Firearms Act of 1938 prohibiting Federal licensees from transporting firearms into States in violation of State laws requiring a permit to purchase firearms has an extremely limited effect. Only eight States have enacted permit laws. If there are local ordinances within a State, but no State law, the Federal provision does not apply. The prohibition against transport of firearms to, or receipt by, felons and fugitives applies only to direct interstate shipment and does not prevent such persons from buying firearms locally after they have been transported from another State. Despite the Federal laws, therefore, practically anyone—the convicted criminal, the mental incompetent, or the habitual drunkard—can purchase firearms simply by ordering them in those States that have few controls.

Strict controls by one State or city are nullified when a potential criminal can secure a firearm merely by going into a neighboring jurisdiction with lax con-

trols, or none at all. While information is sparse, there are strong indications that mail-order houses and other out-of-State sources provide a substantial number of guns to those who commit crimes. One study by the Massachusetts State Police showed that 87 percent of concealable firearms used during the commission of crimes in Massachusetts in a recent year were obtained from sources outside the State.

In order to prevent criminal use of firearms, the police must have some way of following weapons into the hands of the ultimate consumer. But only in four States do police agencies have a method of determining who owns firearms and where they are located. The requirement that each person register firearms—a tool available to law enforcement in almost every industrial nation in the world—has been compared with the State control of automobiles and drivers. At a time when there were very few automobiles, registration was not thought necessary. When automobiles became so numerous that they posed a serious physical threat to society, comprehensive registration was felt to be essential.

A final failing in the present system of control is the ease with which extremely low-priced, and therefore widely available, surplus weapons are brought into the United States from foreign countries. At the present time it is estimated that at least 1 million such weapons are reaching the civilian market each year. During the recent hearings of the Senate Subcommittee on Juvenile Delinquency, law enforcement officials testified that foreign imports accounted for a significant percentage of the total number of firearms coming into their possession as a result of having been used in the commission of crimes. The figures ranged from a low of 18 percent in Washington, D.C., to a high of 80 percent in Atlanta, Ga.

The limited statutory framework within which the State Department must operate prevents any effective control over the importation of firearms. If the import in question does not involve machineguns, sawed-off shotguns, or the other weapons covered by the 1934 National Firearms Act, each transaction is approved routinely, as long as the dealer is a bona fide businessman engaged in a bona fide business transaction.

### PUBLIC OPINION ABOUT FIREARMS CONTROL

Public opinion on the subject of firearms control has been sampled several times in the last few years by the Gallup Poll. According to the 1966 poll, a substantial majority of persons interviewed—67 percent—said they favored "a law which would require a person to obtain a police permit before he or she could buy a gun." Even when the same question was put to firearms owners, a majority—56 percent—indicated that they favored police permits to purchase guns.

A second question asked by the Gallup Poll was directed to the problem of guns and juveniles. "Which of these three plans would you prefer for the use of guns by persons under the age of 18—forbid their use completely; put strict regulations on their use; or continue as at present with few regulations?" In response, 27 percent of those questioned and 17 percent of firearms owners said they favored completely forbidding the use of guns by persons under 18; 55 percent of all persons and 59 percent of gun owners said they favored strict regulation; and 15 percent of all persons and 22 percent of the gun owners wanted to continue as at present.

On the question of outlawing all handguns except for police use (a question last asked in 1959) 59 percent of the sample were in favor and 35 percent were opposed.

### THE CONTROVERSY ABOUT FIREARMS CONTROL

While the majority of the public favors reasonable firearms control, the National Rifle Association and other citizen groups have provided an effective legislative lobby to represent those hunters, gun collectors, and other persons who oppose additional regulation. Many arguments are offered by this opposition.

The most emotional position—one this Commission must reject outright—is that licensing and registration provisions for handguns, rifles, and shotguns would disarm the public and thus render it easy prey for violent criminals, or an invading or subversive enemy. In fact, all proposals for regulation would permit householders and shopkeepers to continue to possess firearms. Licensing and registration for the legitimate firearms owner would merely add a small measure of inconvenience to the presently largely unregulated mail-order and over-the-counter sales of firearms. It is this inconvenience that appears to be the underlying reason for the opposition to more firearms control. Opponents suggest that laws calling for registration would penalize the law-abiding citizen, who would

comply—while not touching criminals who would not comply. They thus conclude that such laws do not address themselves to the real problem of firearms misuse.

Those supporting stricter control of firearms agree that many potential criminal offenders will obtain firearms even with additional laws. But they point to the conclusion of the Senate Subcommittee on Juvenile Delinquency, which found that criminals, for the most part, purchase their firearms through the mails or in retail stores, rather than stealing them. One police chief from a large western city told an FBI survey that, after permissive State legislation had preempted local controls, there were "several instances of homicide committed within 30 minutes of the time a short firearm was purchased by a person who would not have been granted a permit to purchase one under the former legislation."

During the first year's operation of a Philadelphia ordinance requiring a permit to obtain a firearm, 73 convicted persons were prohibited from purchasing firearms in the city. Federal Bureau of Investigation statistics demonstrate that a higher proportion of homicides are committed with firearms in those areas where firearms regulations are lax, than in those areas where there are more stringent controls. In Dallas, Tex., and Phoenix, Ariz., firearms regulations are fairly weak. In Dallas in 1963, 72 percent of homicides were committed with firearms; in Phoenix 65.9 percent were committed with firearms. In Chicago, where regulations are more strict, 46.4 percent of the homicides were committed with firearms. In New York City, with the most stringent gun controls of any major city in the United States, only about 25 percent of the homicides are committed with firearms.

Opponents of additional controls contend that firearms are dangerous only if misused and that the appropriate legal remedy is to punish illegal use of firearms—not to hamper ownership. Supporters of control argue that it is not enough to rely on the deterrent effect of punishing the wrongdoer after the act to prevent others from misusing guns. They maintain that firearms should be kept out of the hands of those who intend to use them wrongfully.

Opponents of firearms control legislation also rely upon the Second Amendment's guarantee of "the right to bear arms." The Second Amendment, in its entirety, states:

*"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."*

The U.S. Supreme Court and lower Federal courts have consistently interpreted this Amendment only as a prohibition against Federal interference with State militia and not as a guarantee of an individual's right to keep or carry firearms. The argument that the Second Amendment prohibits State or Federal regulation of citizen ownership of firearms has no validity whatsoever.

## COMMISSION RECOMMENDATIONS

Since laws, as they now stand, do not accomplish the purposes of firearms control, the Commission believes that all States and the Federal Government should act to strengthen them. Any legislative scheme should maximize the possibility of keeping firearms out of the hands of potential criminal offenders, while at the same time affording citizens ample opportunity to purchase such weapons for legitimate purposes.

It is appropriate to ban absolutely the sale of those weapons no citizen has a justifiable reason for owning.

*The Commission recommends:* Federal and State Governments should enact legislation outlawing transportation and private possession of military-type firearms such as bazookas, machine guns, mortars, and antitank guns.

In addition, dangerous or potentially dangerous persons should be prohibited from purchasing firearms.

*The Commission recommends:* States should enact laws prohibiting certain categories of persons, such as habitual drunkards, drug addicts, mental incompetents, persons with a history of mental disturbance, and persons convicted of certain offenses, from buying, owning, or possessing firearms.

Prevention of crime and apprehension of criminals would be enhanced if each firearm were registered with a governmental jurisdiction. A record of ownership would aid the police in tracing and locating those who have committed or who threaten to commit violent crime. Law enforcement officers should know where each gun is and who owns it.

*The Commission recommends:* Each State should require the registration of all handguns, rifles, and shotguns. If, after 5 years, some States still have not enacted

such laws, Congress should pass a Federal firearms registration act applicable to those States.

Government regulation to prevent those with criminal purposes from purchasing firearms cannot be effective as long as mail-order sales and retail sales to persons living outside the seller's State are not controlled. It is essential, also, to reduce and to regulate the importation into the United States of large numbers of cheap firearms. Since sporting weapons such as rifles and shotguns apparently present less danger of criminal use than do handguns, control over the latter should be more stringent. A truly effective system of regulation requires a meshing of State and Federal action.

*The Commission recommends:* Each State should require a person to obtain a permit before he can either possess or carry a handgun. Through licensing provisions, Federal law should prohibit mail-order and other interstate sales of handguns and should regulate such sales of rifles and shotguns.

Federal legislation to implement these goals should prohibit the interstate shipment of handguns except between federally licensed importers, manufacturers, and dealers. A Federal licensee should also be prohibited from selling handguns to an individual not living in the State of the seller. The interstate shipment of shotguns and rifles should be delayed a sufficient time for law enforcement authorities in the buyer's hometown to examine his sworn statement concerning age and other factors affecting his eligibility to purchase such a weapon, and the consent of these authorities should be required before the weapon may be shipped. Antique dealers could continue to operate under reasonable regulations. States may also want to prohibit firearms sales to persons under a certain age, such as 18 or 21, or require parental approval for firearms registration in a minor's name.

---

Exhibit No. 9

[Publication No. 364 (Rev. 3–64)]

National Firearms Act and Federal Firearms Act

(U.S. TREASURY DEPARTMENT, Internal Revenue Service)

INTERNAL REVENUE SERVICE,
ALCOHOL AND TOBACCO TAX DIVISION, ENFORCEMENT BRANCH.

The National Firearms Act and the Federal Firearms Act are administered by the Enforcement Branch of this operational division of your Internal Revenue Service. Uniform enforcement of these laws is in the best public interest, contributing to the suppression of crime by the process of regulating traffic in firearms and ammunition and providing the basis for prosecution of willful violators. The laws which govern the scope of the firearms program are reprinted herein for distribution as a public service.

Your cooperation and support in our effort to effectively administer the firearms program are solicited in the interest of better law enforcement.

DWIGHT E. AVIS, *Director.*

NATIONAL FIREARMS ACT

Law: United States Code, Title 26, Chapter 53.
Regulations: Part 179 of Title 26 (1954), Code of Federal Regulations.

Weapons coming within the purview of the National Firearms Act may be legally acquired and lawfully possessed subject to regulatory requirements. However, any such weapon is contraband unless properly registered, and unlawful possession thereof is subject to statutory penalties.

SPECIAL (OCCUPATIONAL) TAXES

Section 5801. Tax. (a) *Rate.*—On first engaging in business, and thereafter on or before the first day of July of each year, every importer, manufacturer, and dealer in firearms shall pay a special tax at the following rates:

   (1) *Importers or manufacturers.*—Importers or manufacturers, $500 a year or fraction thereof;
   (2) *Dealers other than pawnbrokers.*—Dealers, other than pawnbrokers, $200 a year or fraction thereof;
   (3) *Pawnbrokers.*—Pawnbrokers, $300 a year or fraction thereof:

*Provided,* That manufacturers and dealers in guns with combination shotgun and rifle barrels, 12 inches or more but less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and manufacturers and dealers in guns classified as "any other weapon" under section 5848(5), shall pay the following taxes: Manufacturers, $25 a year or fraction thereof; dealers, $10 a year or fraction thereof.

(b) *Cross Reference.*—For license to transport, ship, or receive firearms or ammunition under the Federal Firearms Act, see section 3 of the Act of June 30, 1938 (52 Stat. 1251; 15 U.S.C. 903).

Section 5802. Registration. *Importers, Manufacturers, and Dealers.*—On first engaging in business, and thereafter on or before the first day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the Secretary or his delegate in each internal revenue district in which such business is to be carried on his name or style, principal place of business, and places of business in such district.

Section 5803. Exemptions. For provisions exempting certain transfers, see section 5812.

#### TRANSFER TAX

Section 5811. Tax. (a) *Rate.*—There shall be levied, collected, and paid on firearms transferred in the United States a tax at the rate of $200 for each firearm: *Provided,* That the transfer tax on any gun with combination shotgun and rifle barrels, 12 inches or more but less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and on any gun classified as "any other weapon" under section 5848(5), shall be at the rate of $5. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

(b) *By Whom Paid.*—Such tax shall be paid by the transfer: *Provided,* That if a firearm is transferred without payment of such tax the transferor and transferee shall become jointly and severally liable for such tax.

(c) *How Paid.*—

(1) *Stamps.*—Payment of the tax herein provided shall be represented by appropriate stamps to be provided by the Secretary or his delegate.

(d) *Cross Reference.*—

(1) For assessment in case of omitted taxes payable by stamps, see sections 6155(a), 6201(a)(2)(A), 6601(c)(4), and 6201(a).

(2) For requirements as to registration and special tax, see sections 5801 and 5802.

(3) For excise tax on pistols, revolvers, and firearms, see section 4181.

Section 5812. Exemptions. (a) *Transfers Exempt.*—This chapter shall not apply to the transfer of firearms—

(1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia;

(2) to any peace officer or any Federal officer designated by regulations of the Secretary or his delegate;

(3) to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament.

(b) *Notice of Exemption.*—If the transfer of a firearm is exempted as provided in subsection (a), the person transferring such firearm shall notify the Secretary or his delegate of the name and address of the applicant, the number or other mark identifying such firearm, and the date of its transfer, and shall file with the Secretary or his delegate such documents in proof thereof as the Secretary or his delegate may by regulations prescribe.

(c) *Exemption From Other Taxes.*—For exemption from excise tax on pistols, revolvers, and firearms, see section 4182(a).

Section 5813. Stamps. (a) *Affixing.*—The stamps provided for in section 5811 (c)(1) shall be affixed to the order for such firearm, provided for in section 5814.

(b) *Other Laws Applicable.*—For provisions relating to the engraving, issuance, sale, accountability, cancellation, and distribution of taxpaid stamps, see section 5846.

Section 5814. Order Forms. (a) *General Requirements.*—It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate for that purpose by the Secretary or his delegate. Such order shall identify the applicant by such means of identification as may be prescribed by

regulations under this chapter: *Provided,* That, if the applicant is an individual such identification shall include fingerprints and a photograph thereof.

(b) *Contents of Order Form.*—Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Secretary or his delegate. The original thereof, with stamp affixed, shall be returned to the applicant.

(c) *Exemption in Case of Registered Importers, Manufacturers, and Dealers.*—Importers, manufacturers, and dealers who have registered and paid the tax as provided for in this chapter shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers or manufacturers if such dealers or manufacturers have registered and have paid such tax, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this chapter.

(d) *Supply.*—The Secretary or his delegate shall cause suitable forms to be prepared for the purposes of subsection (a), and shall cause the same to be distributed to officers designated by him.

### TAX ON MAKING FIREARMS

Section 5821. Rate. Exceptions, etc. (a) *Rate.*—There shall be levied, collected, and paid upon the making in the United States of any firearm (whether by manufacture, putting together, alteration, any combination thereof, or otherwise) a tax at the rate of $200 for each firearm so made.

(b) *Exceptions.*—The tax imposed by subsection (a) shall not apply to the making of a firearm—

(1) by any person who is engaged within the United States in the business of manufacturing firearms;

(2) from another firearm with respect to which a tax has been paid, prior to such making, under subsection (a) of this section; or

(3) for the use of—

(A) the United States Government, any State, Territory, or possession of the United States, any political subdivision thereof, or the District of Columbia, or

(B) any peace officer or any Federal officer designated by regulations of the Secretary or his delegate.

Any person who makes a firearm in respect of which the tax imposed by subsection (a) does not apply by reason of the preceding sentence shall make such report in respect thereof as the Secretary or his delegate may by regulations prescribe.

(c) *By Whom Paid; When Paid.*—The tax imposed by subsection (a) shall be paid by the person making the firearm. Such tax shall be paid in advance of the making of the firearm.

(d) *How Paid.*—Payment of the tax imposed by subsection (a) shall be represented by appropriate stamps to be provided by the Secretary or his delegate.

(e) *Declaration.*—It shall be unlawful for any person subject to the tax imposed by subsection (a) to make a firearm unless, prior to such making, he has declared in writing his intention to make a firearm, has affixed the stamp described in subsection (d) to the original of such declaration, and has filed such original and a copy thereof. The declaration required by the preceding sentence shall be filed at such place, and shall be in such form and contain such information, as the Secretary or his delegate may by regulations prescribe. The original of the declaration, with the stamp affixed, shall be returned to the person making the declaration. If the person making the declaration is an individual, there shall be included as part of the declaration the fingerprints and a photograph of such individual.

### OTHER TAXES

Section 5831. *Cross Reference.*—For excise tax on pistols, revolvers, and firearms, see section 4181.

### GENERAL PROVISIONS

Section 5841. Registration of Persons in General. Every person possessing a firearm shall register, with the Secretary or his delegate, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof. No person shall be required to register under this section with respect to a

firearm which such person acquired by transfer or importation or which such person made, if provisions of this chapter applied to such transfer, importation, or making, as the case may be, and if the provisions which applied thereto were complied with.

Section 5842. Books, Records and Returns. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this chapter as the Secretary or his delegate may by regulations require.

Section 5843. Identification of Firearms. Each manufacturer and importer of a firearm shall identify it with a number and other identification marks approved by the Secretary or his delegate, such number and marks to be stamped or otherwise placed thereon in a manner approved by the Secretary or his delegate.

Section 5844. Exportation. Under such regulations as the Secretary or his delegate may prescribe, and upon proof of the exportation of any firearm to any foreign country (whether exported as part of another article or not) with respect to which the transfer tax under section 5811 has been paid by the manufacturer, the Secretary or his delegate shall refund to the manufacturer the amount of the tax so paid, or, if the manufacturer waives all claim for the amount to be refunded, the refund shall be made to the exporter.

Section 5845. Importation. No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction, except that, under regulations prescribed by the Secretary or his delegate, any firearm may be so imported or brought in when—

(1) the purpose thereof is shown to be lawful and

(2) such firearm is unique or of a type which cannot be obtained within the United States or such territory.

Section 5846. Other Laws Applicable. All provisions of law (including those relating to special taxes, to the assessment, collection, remission, and refund of internal revenue taxes, to the engraving, issuance, sale, accountability, cancellation, and distribution of taxpaid stamps provided for in the internal revenue laws, and to penalties) applicable with respect to the taxes imposed by sections 4701 and 4721, and all other provisions of the internal revenue laws shall, insofar as not inconsistent with the provisions of this chapter, be applicable with respect to the taxes imposed by sections 5811(a), 5821(a) and 5801.

Section 5847. Regulations. The Secretary or his delegate shall prescribe such regulations as may be necessary for carrying the provisions of this chapter into effect.

Section 5848. Definitions. For purposes of this chapter—

(1) *Firearm.*—The term "firearm" means a shotgun having a barrel or barrels of less than 18 inches in length, or a rifle having a barrel or barrels of less than 16 inches in length, or any weapon made from a rifle or shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than 26 inches, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

(2) *Machine gun.*—The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

(3) *Rifle.*—The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(4) *Shotgun.*—The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(5) *Any other weapon.*—The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, but such term shall not include pistols or revolvers or weapons designed, made or intended to be fired from the shoulder and not capable of being fired with fixed ammunition.

(6) *Importer.*—The term "importer" means any person who imports or brings firearms into the United States for sale.

(7) *Manufacturer.*—The term "manufacturer" means any person who is engaged within the United States in the business of manufacturing firearms, or who otherwise produces therein any firearm for sale or disposition.

(8) *Dealer.*—The term "dealer" means any person not a manufacturer or importer, engaged within the United States in the business of selling firearms. The term "dealer" shall include wholesalers, pawnbrokers, and dealers in used firearms.

(9) *Interstate commerce.*—The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States, to any other State or to the District of Columbia.

(10) *To transfer or transferred.*—The term "to transfer" or "transferred" shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of.

(11) *Person.*—The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

Section 5849. Citation of Chapter. This chapter may be cited as the "National Firearms Act" and any reference in any other provision of law to the "National Firearms Act" shall be held to refer to the provisions of this chapter.

### UNLAWFUL ACTS

Section 5851. Possessing Firearms Illegally. It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of sections 5811, 5812(b), 5813, 5814, 5844, or 5846, or which has at any time been made in violation of section 5821, or to possess any firearm which has not been registered as required by section 5841. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

Section 5852. Removing or Changing Identification Marks. It shall be unlawful for anyone to obliterate, remove, change, or alter the number or other identification mark required by section 5843. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of any firearm upon which such number or mark shall have been obliterated, removed, changed, or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

Section 5853. Importing Firearms Illegally. It shall be unlawful—

(1) fraudulently or knowingly to import or bring any firearm into the United States or any territory under its control or jurisdiction, in violation of the provisions of this chapter ; or

(2) knowingly to assist in so doing ; or

(3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in knowing the same to have been imported or brought in contrary to law.

Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

Section 5854. Failure To Register and Pay Special Tax. It shall be unlawful for any person required to register under the provisions of section 5802 to import, manufacture, or deal in firearms without having registered and paid the tax imposed by section 5801.

Section 5855. Unlawful Transportation in Interstate Commerce. It shall be unlawful for any person who is required to register as provided in section 5841 and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 5814 or a stamp-affixed declaration as provided in section 5821, to ship, carry, or deliver any firearm in interstate commerce.

### PENALTIES AND FORFEITURES

Section 5861. Penalties. Any person who violates or fails to comply with any of the requirements of this chapter shall, upon conviction, be fined not more than $2,000, or be imprisoned for not more than 5 years, or both, in the discretion of the court.

Section 5862. Forfeitures. (a) *Laws Applicable.*—Any firearm involved in any violation of the provisions of this chapter or any regulation promulgated

thereunder shall be subject to seizure and forfeiture, and (except as provided in subsection (b) all the provisions of internal revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this chapter, and the persons to whom this chapter applies.

(b) *Disposal.*—In the case of the forfeiture of any firearm by reason of a violation of this chapter: No notice of public sale shall be required; no such firearm shall be sold at public sale; if such firearm is forfeited for a violation of this chapter and there is no remission or mitigation of forfeiture thereof, it shall be delivered by the Secretary or his delegate to the Administrator of General Services, General Services Administration, who may order such firearm destroyed or may sell it to any State, Territory, or possession, or political subdivision thereof, or the District of Columbia, or at the request of the Secretary or his delegate may authorize its retention for official use of the Treasury Department, or may transfer it without charge to any executive department or independent establishment of the Government for use by it.

## FEDERAL FIREARMS ACT

Law : United States Code, Title 15, Chapter 18.

Regulations: Part 177 of Title 26 (1954), Code of Federal Regulations.

All firearms (including parts thereof), silencers, and pistol or revolver ammunition come within the purview of this Act, and commercial (interstate) traffic therein is subject to licensing requirements. This Act is designed primarily to deny the criminal lawful access to such items, but violations of the law arise from the operations of the licensee and/or the criminal status of the person involved rather than the mere possession of a weapon.

Section 901. Definitions. As used in this chapter :

(1) The term "person" includes an individual, partnership, association, or corporation.

(2) The term "interstate or foreign commerce" means commerce between any State, Territory or possession (not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession (not including the Canal Zone), or the District of Columbia but through any place outside thereof; or within any Territory or possession or the District of Columbia.

(3) The term "firearm" means any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon.

(4) The term "manufacturer" means any person engaged in the manufacture or importation of firearms, or ammunition or cartridge cases, primers, bullets, or propellant powder for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this chapter.

(5) The term "dealer" means any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellant powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, trigger mechanisms, or breech mechanisms to firearms, and the term "licensed dealer" means any such person licensed under the provisions of this chapter.

(6) The term "fugitive from justice" means any person who has fled from any State, Territory, the District of Columbia, or possession of the United States to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year or to avoid giving testimony in any criminal proceeding.

(7) The term "ammunition" shall include only pistol or revolver ammunition. It shall not include shotgun shells, metallic ammunition suitable for use only in rifles, or any .22 caliber rimfire ammunition.

Section 902. Transporting, Shipping, or Receiving Firearms or Ammunition in Interstate or Foreign Commerce Acts Prohibited. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this chapter, to transport, ship, or receive any firearm or ammunition in interstate or foreign commerce.

(b) It shall be unlawful for any person to receive any firearm or ammunition transported or shipped in interstate or foreign commerce in violation of

subdivision (a) of this section, knowing or having reasonable cause to believe such firearms or ammunition to have been transported or shipped in violation of subdivision (a) of this section.

(c) It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearm in interstate or foreign commerce to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer by the prospective purchaser.

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States, the several States, Territories, possessions or the District of Columbia of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice.

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime punishable by imprisonment for a term exceeding one year or who is a fugitive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition.

(f) It shall be unlawful for any person who has been convicted of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be by such person in violation of this chapter.

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm or ammunition, knowing, or having reasonable cause to believe, same to have been stolen.

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or ammunition or to pledge or accept as security for a loan any firearm or ammunition moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe the same to have been stolen.

(i) It shall be unlawful for any person to transport, ship, or knowing receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possesor in violation of this chapter.

Section 903. License To Transport, Ship, or Receive Firearms or Ammunition. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce shall make application to the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum.

(b) Upon payment of the prescribed fee, the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of this chapter: *Provided*, That no license shall be issued to any applicant within two years after the revocation of a previous license.

(c) Whenever any licensee is convicted of a violation of any of the provisions of this chapter, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided*, That in the case of appeal from such conviction the licensee may furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he .nay permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secretary of the Treasury shall suspend such license until he is notified by the clerk of the court of last appeal as to the final disposition of the case.

(d) Licensed dealers shall maintain such permanent records of importation, shipment, and other disposal of firearms and ammunition as the Secretary of the Treasury shall prescribe.

Section 904. Excepted Persons. The provisions of this chapter shall not apply with respect to the transportation, shipment, receipt, or importation of any, firearm, or ammunition, sold or shipped to, or issued for the use of, (1) the United States or any department, independent establishment, or agency thereof; (2) any State, Territory, or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof; (3) any duly commissioned officer or agent of the United States, a State, Territory, or possession, or the District of Columbia, or any political subdivision thereof; (4) or to any bank, public carrier, express, or armored-truck company organized and operating in good faith for the transportation of money and valuables; (5) or to any research laboratory designated by the Secretary of the Treasury: *Provided,* That such bank, public carriers, express, and armored-truck companies are granted exemption by the Secretary of the Treasury; nor to the transportation, shipment, or receipt of any antique or unserviceable firearms, or ammunition, possessed and held as curios or museum pieces: *Provided,* That nothing contained in this section shall be construed to prevent shipments of firearms and ammunition to institutions, organizations, or persons to whom such firearms and ammunition may be lawfully delivered by the Secretary of War, nor to prevent the transportation of such firearms and ammunition so delivered by their lawful possessors while they are engaged in military training or in competitions.

Section 905. Penalties. (a) Any person violating any of the provisions of this chapter or any rules and regulations promulgated hereunder, or who makes any statement in applying for the license or exemption provided for in this chapter, knowing such statement to be false, shall, upon conviction thereof, be fined not more than $2,000, or imprisoned for not more than five years, or both.

(b) Any firearm or ammunition involved in any violation of the provisions of this chapter or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture, and all provisions of Title 26 relating to the seizure, forfeiture, and disposition of firearms as defined in section 2733 [1] of Title 26 shall, so far as applicable, extend to seizures and forfeitures incurred under the provisions of this chapter.

Section 906. Effective Date of Chapter. This chapter shall take effect thirty days after June 30, 1938.

Section 907. Rules and Regulations. The Secretary of the Treasury may prescribe such rules and regulations as he deems necessary to carry out the provisions of this chapter.

Section 908. Separability Clause. Should any section or subsection of this chapter be declared unconstitutional, the remaining portion of the chapter shall remain in full force and effect.

Section 909. Short Title. This chapter may be cited as the Federal Firearms Act.

Information regarding the firearms laws may be obtained at any regional or branch office of the Alcohol and Tobacco Tax. For the exact location of the office in your vicinity, it is suggested you consult the Government listings in your local telephone directory.

U.S. TREASURY DEPARTMENT, INTERNAL REVENUE SERVICE

ASSISTANT REGIONAL COMMISSIONER—ALCOHOL AND TOBACCO TAX

Located at:                          *Address and Telephone*

Atlanta, Georgia___ (522–4121), 275 Peachtree Street NE., Atlanta, Ga., 30303.
Boston, Massachusetts__ (523–8600), 55 Tremont Street, Boston, Mass., 02108.
Chicago, Illinois____ (222–8468). 35 East Wacker Drive, Chicago, Ill., 60601.
Cincinnati, Ohio___ (381–2200). 5th and Main Streets, Cincinnati, Ohio, 45201.
Dallas, Texas_____ (748–5611), Santa Fe Building, 1114 Commerce Street.
                                            Dallas, Tex., 75202.
New York, New York___ (732–9100), 90 Church Street, New York. N.Y., 10007.
Philadelphia, Pennsylvania___ (923–2400), Third Floor, 2 Penn Center Plaza,
                                            Philadelphia, Pa., 19102
San Francisco, California____ (986–3500), Flood Building, 870 Market Street,
                                            San Francisco, Calif., 94102.

---

[1] Sec. 5848, Internal Revenue Code of 1954.

Senator HRUSKA. Mr. Cohen, you mentioned that there are a thousand men in your department engaged in frontline efforts. Does that cover all of the enforcement requirements of your particular Alcohol and Tobacco Unit?

Mr. COHEN. Yes, sir; these are the frontline criminal investigative officers. They are not the entire Alcohol and Tobacco Tax Unit. They are the criminal law enforcement element of the Alcohol and Tobacco Tax Unit.

Senator HRUSKA. How many of those are engaged in enforcing gun legislation?

Mr. COHEN. They all are to some extent. What we do is we assign our manpower on the basis of the demands of the locale, and we have, let's say, in a given city, five officers. Now, they may spend a portion of their time on enforcement in the alcohol area, and they may spend a portion of their time as the demands of the locale are concerned in the enforcement of the gun laws, so that all of those field operating officers are engaged in enforcement of the gun laws.

Now, someone misquoted me one time as saying we had only seven full-time people engaged in the enforcement of gun laws, and that was true insofar as it was seven in the national office who managed the enforcement on a nationwide basis; but the frontline investigator out in New York City or in Chicago or in Memphis, Tenn., or in Omaha, Nebr., who is an alcohol and tobacco tax investigator has been trained in not only the alcohol work but in the firearms work; and if the firearms need is there, he spends his time on firearms.

Senator HRUSKA. Of course all of us are subject to misquotation. We usually don't misquote ourselves, however, do we? In 1965 you indicated, in testimony before the House Ways and Means Committee, that there were the equivalent of 52 man-years devoted to enforcement of the National and Federal Firearms Act. Now this year you indicated that there were or would be 113 man-years devoted to that purpose. Are those figures correct?

Mr. COHEN. That is about right.

Senator HRUSKA. Are they identifiable in your mind?

Mr. COHEN. Yes, sir.

Senator HRUSKA. Why this increase all of a sudden?

Mr. COHEN. I think we have been having more problems with firearms over the last few years than we have ever had before.

I think we have had more violence in the streets, we have had more riots, we have had more para-military activity. I feel, and so does my Director of my Alcohol and Tobacco Tax Division, as I indicated to you, sir, the investigators spend the time in enforcing the laws where the violations are occurring. Now, we don't create violations and we don't create the need for our manpower. When we find it, we apply it.

Senator HRUSKA. What are the results of this stepped up activity? You have recited 9,700 violations of State and Federal laws. How many of those were Federal violations?

Mr. COHEN. Those were 9,700 referrals to local officials.

Senator HRUSKA. How many Federal violations did you uncover?

Mr. COHEN. It will take me a few minutes to find that for you sir.

My Alcohol and Tobacco Tax Division conducts a program under which the records of some of the manufacturers and dealers are checked. The program is designated as the firearms record inspection

program. Under the program, monthly reports are made. Among the information obtained and reported as a result of these record checks, is the number of sales—primarily of handguns—the licensees make to out-of-State purchasers. Through March of last fiscal year, it was determined that some 21,000 people went outside of their State of residence to purchase a firearm. Under the program, criminal record checks are made on many of the out-of-State purchasers. Through March of last fiscal year, some 18,000 criminal record checks were made on these purchases. As a result of those criminal checks, we found that 676 of the out-of-State purchasers had criminal records. This does not mean that we could establish that each of these 676 persons transported, shipped, or received a firearm in interstate or foreign commerce. Under the program, 640 criminal investigations were initiated through March of 1967. During that period 92 cases arising from the program were referred for criminal prosecution.

Senator HRUSKA. Ninety-two out of how many?

Mr. COHEN. Ninety-two cases arising from the firearms record inspection program through March of the last fiscal year. In addition, 405 other cases under the National and Federal acts arising from other sources were referred to the Department of Justice during that period. Thus, 497 cases were referred to the Department of Justice during the first 9 months of the last fiscal year. During that same period, there were 9,700 other cases arising under the firearms record inspection program referred to local officials. These cases did not involve Federal violations and were referred to local authorities for whatever action they deemed appropriate.

We don't keep statistics on convictions in cases referred to the Department of Justice. However, the Attorney General has stated that his Department for fiscal 1966 has statistics showing that 244 cases were filed for violations of both the Federal act and the National act—183 defendants guilty; 117 defendants not guilty.

Senator HRUSKA. What is the significance of this 18,670 names with criminal records that were disclosed in the first 9 months of the fiscal year inspection of firearm dealers?

Mr. COHEN. No; I said criminal record checks were made of that many names. That doesn't mean we found that many violations.

Senator HRUSKA. 676 had criminal records.

Mr. COHEN. Yes, sir.

Senator HRUSKA. I see.

Mr. COHEN. Of which we investigated some 600 cases.

Senator HRUSKA. And you keep records of the activities of your enforcement agents, do you?

Mr. COHEN. Yes.

Senator HRUSKA. Which reflect these figures.

Mr. COHEN. Yes, sir.

Senator HRUSKA. What would the figures have been for the year 1965?

Mr. COHEN. I would have to get those for you, sir.

Senator HRUSKA. Would you please?

Mr. COHEN. Certainly.

Senator HRUSKA. Would you get them for the last 5 years?

Mr. COHEN. Yes, sir.

Senator HRUSKA. An estimate of the man-years that were devoted, the equivalent man-years that were devoted in each of these years.

Mr. COHEN. Yes, sir.

Senator HRUSKA. On this subject.

Mr. COHEN. As I indicated to you, we acknowledge that we put an increased effort here, but even with our increased effort, and we are putting as much effort as we can, we can't get results under the present law which just doesn't have the tools.

(The document referred to was marked "Exhibit No. 10" and is as follows:)

EXHIBIT No. 10

[U.S. Government memorandum, Aug. 11, 1967]

To: Commissioner.
From: Director, Alcohol and Tobacco Tax Division.
Subject: Request of Senator Hruska for information on firearms enforcement activities for past 5 years.

The following information from our records is furnished for inclusion with your July 10 testimony before the Juvenile Delinquency Subcommittee of the Senate Judiciary Committee:

UTILIZATION OF INVESTIGATIVE PERSONNEL ON FIREARMS ENFORCEMENT AND CASES PREPARED FOR PROSECUTION

| Fiscal year | Average employment investigators | Man-years on firearms enforcement | Criminal cases prepared | | | |
|---|---|---|---|---|---|---|
| | | | National Firearms Act | Federal Firearms Act | Combination (both acts) | Total |
| 1963 | 1,003 | 35 | 293 | 55 | 10 | 358 |
| 1964 | 983 | 52 | 306 | 53 | 14 | 373 |
| 1965 | 943 | 57 | 321 | 60 | 17 | 398 |
| 1966 | 937 | 101 | 346 | 100 | 19 | 465 |
| 1967 | 964 | 189 | 515 | 184 | 21 | 720 |

All of the investigators are trained in firearms work and spend the amount of time required in that area. The man-year calculation shown above is arrived at by applying the cumulative amount of time spent by each investigator on matters relating to the firearm enforcement activity.

Prior to October 1965, no statistics were maintained with respect to inspection of the premises of persons licensed under the Federal Firearms Act. The following figures reflect results of that portion of our firearms enforcement activity devoted to licensee inspections from October 1965 to June 30, 1967:

LICENSEE INSPECTIONS AS PART OF FIREARMS ENFORCEMENT

| Period | Inspections | Out-of-State purchases found | Criminal cases prepared |
|---|---|---|---|
| October 1965 to June 30, 1966 | 13,783 | 21,202 | 40 |
| July 1, 1966, to June 30, 1967 | 36,050 | 27,162 | 130 |

HAROLD A. SERR.

Senator HRUSKA. I think that would be a fair statement, providing it could show some substitute or something in S. 1-Amendment 90 that would enable you to better enforce the law under the new bill rather than the laws we have now.

Let me call your attention to a section that is very familiar to you, section 902 of the Federal Firearms Act which reads:

It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearms in interstate or foreign commerce to any person other than

a licensed manufacturer or dealer in any state the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer by the prospective purchaser.

Now, have you had any prosecutions under section 902(c) which I just read?

Mr. COHEN. That section applies to only eight States, sir. I don't recall whether we have had any specific prosecutions under that law or not. I would have to check it.

Senator HRUSKA. My question is how many prosecutions have you had under that section of the law?

Mr. COHEN. We can supply that information.

Senator HRUSKA. You have referred in your statement to——

Mr. COHEN. We have two prosecutions pending now, Mr. Shaw informs me.

Senator HRUSKA. On page 11, for example:

It was found during the period February, 1966 to 1967 approximately 5,000 persons who gave a residence address in the city or county of St. Louis, Missouri, purchased firearms, primarily handguns, in the neighboring state of Illinois, which has no permit requirement.

Presumably there have been shipments.

Mr. COHEN. No, sir. As I indicated to you, because of the *Tot* case, we cannot presume that they crossed the line with that gun, and, therefore, the mere purchase of that gun in Illinois is not a violation. We have to prove that the felon bought the gun in Illinois and carried it across that line.

Senator HRUSKA. Well, to prosecute successfully under 902(c) that involves shipment. That doesn't involve personal carriage, does it?

Mr. COHEN. 2(c) does not apply to personal carriage.

Senator HRUSKA. It applies to shipment. My question was in the light of that and this great volume of personal violence, it is to be presumed, is it not, that there were a great many shipments into Missouri by licensed dealers.

Mr. COHEN. No, sir. They are going over the counter to purchasers.

Senator HRUSKA. Well, these 5,000 were. Do you want to say to us that it is your opinion that there were no shipments made into Missouri from other——

Mr. COHEN. Well, we get the same thing, Senator, in Senator Kennedy's home State. The people up in the Boston area who want a firearm don't write to Maine to ask for the shipment; they go to Maine or they go to New Hampshire.

Senator HRUSKA. I understand, but that is not my question. I understand that and I so said, I hope you act by differentiating between personal purchases of guns and those which are shipped.

My question is: To your knowledge or from or in your records, is there anything to show that there are shipments from States like Illinois into a State having a gun law like Missouri?

Mr. COHEN. As I indicated, we have at least two cases pending at the moment. I don't know what our statistics might be for a longer period.

Senator HRUSKA. In the 1965 hearings before this subcommittee, Chief Brostron of St. Louis testified that numerous citizens of his city had obtained firearms through the mail from out-of-State dealers.

Now, in order to avoid violation of the section 902(c), those dealers should be able to prove that they had exhibited to them the Missouri license which such purchaser had before he would be qualified to buy the gun; is that not true?

Chairman Dodd. Will the Senator yield?

Senator Hruska. Surely.

Chairman Dodd. Just to clarify the record, is the Senator referring to mail order purchases?

Senator Hruska. I am referring to mail order; yes. Mail order would result in shipment.

Mr. Cohen. That is correct.

Senator Hruska. And it is shipment which is proscribed by 902(c).

Mr. Cohen. That is correct.

Senator Hruska. And that is what Chief Brostron is talking about. He said "numerous." Now, you have only two cases that you know of that have violated——

Mr. Cohen. They are pending at the moment. I don't know how many others there might be, sir.

Senator Hruska. Have you or any of you, your front line agents or your back line agents, gone in there and gone through the books and asked that licensed dealer for proof of exhibition to him of a required Missouri license?

Mr. Cohen. I would have to get that for you, sir. I don't know.

Senator Hruska. I would think that would be quite important. I would like to have the time to check it, because that is pretty important. The same provision will carry forward into this new bill, whether it is S. 1 or Amendment 90 or S. 1853, will it not?

Mr. Cohen. No, sir. The handgun situation, there would be no shipment at all.

Senator Hruska. But shipment of longarms would be allowed under S. 1853. Before shipment could be made, there would have to be a compliance with the law and an exhibition of either a State permit or license; isn't that true?

Mr. Cohen. It is true. It is the same requirement, the exhibition of license.

Senator Hruska. The same requirement. One of the witnesses before the House Ways and Means Committee, was a man, the attorney general, I believe, from New Jersey.

Mr. Cohen. I have just been handed a copy of the criminal records check. When we do check those files of the shipments, they are checked out as to the method of delivery and the description of the firearm and whether the name was properly recorded and whether there was proper authorization for receipt of the firearm.

Senator Hruska. Does that include some record of the number of the license that the buyer had given him the legal right to purchase that gun?

Mr. Cohen. If it was in the State that required it; yes, sir.

Senator Hruska. Talk about Missouri or New Jersey. They both have such laws, and so does New York, and so does Massachusetts. Is that included in the routine check that you make?

Mr. Cohen. Yes, sir.

Senator Hruska. And were any violations found?

Mr. Cohen. I don't have the statistics.

Senator HRUSKA. You don't have the statistics. You do have them on file, don't you?

Mr. COHEN. Yes, sir.

Senator HRUSKA. You keep such statistics?

Mr. COHEN. Yes, sir.

Senator HRUSKA. May I request that you furnish these statistics for the record of figures extending over the last 5 years or so and covering violations under section 902(c)?

Mr. COHEN. We will get you what we can; yes, sir.

(The information supplied for the record by Mr. Cohen was marked "Exhibit No. 11" and is as follows:)

<p style="text-align:center">EXHIBIT No. 11</p>

<p style="text-align:center">[U.S. Government memorandum, Aug. 11, 1967]</p>

To: Commissioner.

From: Director, Alcohol and Tobacco Tax Division.

Subject: Criminal cases arising from violations of section 2(c) of Federal Firearms Act (15 U.S.C. 902(c)).

It is understood that you have been asked to furnish information relative to section 2(c) violations for inclusion with your July 10 testimony before the Juvenile Delinquency Subcommittee of the Senate Judiciary Committee.

This Division does not categorize firearms cases by statutory sections in compiling violation statistics. Consequently, it is not possible to furnish data on the number of Federal Firearms Act Cases involving violations of section 2(c) which were prepared during the last five years.

It has been our experience that section 2(c) does not readily lend itself to the development of successful criminal cases. There are two basic reasons why this is true. In the first place, it has a very limited application. The prohibition on dealer shipment of guns to out-of-state buyers without state permits is applicable only if the buyer's state law requires a permit to purchase a gun. Only nine of the fifty states have such laws and only one of these nine requires permits for the purchase of rifles or shotguns.

Even as to the nine states where permits are required, our experience has demonstrated that section 2(c) is not likely to be violated. There are two ways by which its provisions may be easily avoided.

First, section 2(c) is most commonly circumvented by the simple expedient of going into another state, purchasing the weapon, and taking it home with you. There is no provision in the present law which precludes such a practice. The section 2(c) requirement imposes sanctions with respect to *shipment*, but does not preclude sale and delivery *over-the-counter* to a purchaser who will take the gun back with him into his home state, even though he could not buy it there without a permit.

Secondly, as you know, persons who hold Federal Firearms Act licenses are exempt from the state purchase-permit requirement of section 2(c). Many mail-order dealers seeking to avoid the section 2(c) provisions advertise that they sell handguns only to holders of Federal Firearms Act licenses. Others request customers to furnish their dealer license number. Influenced by these practices, many buyers obtain the $1.00 license in order to have guns shipped to them even though they are not actually engaged in the firearms business.

<p style="text-align:right">HAROLD A. SERR.</p>

Senator KENNEDY. May I ask a question on that point?

Senator HRUSKA. Surely. I will be happy to yield.

Senator KENNEDY. Wouldn't it be very difficult to ascertain really how many violations there had really been of 902(c), because it is very difficult as I understand it, even under the present law, for the dealers to know who is sending in the various requests or applications for mail orders?

Mr. COHEN. That is correct, sir, and of course many of the dealers even suggest that the purchaser acquire a license so they avoid the whole requirement of the statute that the Senator quoted.

Senator KENNEDY. So even under the kind of survey that might be done, or even under effective enforcement procedures, unless you really, unless there was some means of arresting these people, perhaps for some other crime, you would have a very difficult time in ascertaining really if there has been such a violation?

Mr. COHEN. That is correct. For $1 a person can avoid, obviate the whole problem that Senator Hruska has raised here. If I have a license which I can get for $1 almost automatically, I can receive a gun through the mail without regard to the permit requirement.

Senator KENNEDY (continuing). That go through that procedure.

Mr. COHEN. It is obviated, sir.

Senator KENNEDY (continuing). That go through that procedure.

Mr. COHEN. Well, we figure that there are at least 25,000 people in the United States who have those licenses solely for the purpose of their own convenience.

Senator KENNEDY. But the point that I was reaching is even under the most effective kind of enforcement by your people, that it would seem to me extremely difficult for them, unless there was going to be some kind of at least arrest for some other crime, to really make a determination, an accurate determination of how much abuse there is, particularly under the respect given it of even the eight States——

Mr. COHEN. As you recognize, it is a most laborious process to try and determine crime this way, to go at it from this voluminous file, this tremendous record, to try to sift through 25,000, 50,000, whatever number of transactions there might be for the few criminal transactions that are within them. A law enforcement officer has got to have infinite patience to be able to go through this kind of thing.

Senator KENNEDY. As I understand it, you feel that with the consideration of the other, of someone, with modifications of the other amendments, that procedure would be vastly simplified?

Mr. COHEN. That would. Now, it is true that S. 1853 procedure here is better, is much better than we presently have. There is a clear identification, and there is a clear notification to local authorities that Mr. Doakes is the fellow who is buying this gun from out of State, and there is some method of identifying Mr. Doakes, and whether he is the type of person who is qualified, of age and so forth, in this State, so that any one of these bills, in this regard, is superior to present law.

Senator KENNEDY. I thank the Senator.

Chairman DODD. May I ask one question?

Senator HRUSKA. Surely.

Chairman DODD. Senator Kennedy has pointed out the difficulties are very great in this area, but in the area where an individual goes across the State line and buys a weapon in a neighboring State and then carries it back to his own State, there is almost no way of knowing, unless a crime is committed or something takes place.

Mr. COHEN. Likewise, Senator, the point is well taken in that there is no requirement today that when he goes across that State line, that

he identify himself in any particular way. When the seller asks him "your name" I could say my name is Joseph W. Barr, and the seller need not ask me for anything further. If I say it in a convincing fashion, that is good enough under today's law.

Senator HRUSKA. Under the pending bill, would that be sufficient to say that he had no reasonable cause to believe that you are not Joe Barr or Joe Doakes or anybody else?

Mr. COHEN. We would contemplate that under the pending bill that at least he would undergo those items that I mentioned before, that he would go through if he were cashing a check for Joseph W. Barr. He would want to see a driver's license or some other type; if he were a military person, a military I.D. card, some valid type of identification.

Senator HRUSKA. Of course there is a little diversional tactic in asking about the conviction of crime. My line of questioning had to do with a very simple easily detectable offense. Missouri requires a permit. There are dealer records which under present law the dealer has to keep, and if he doesn't he should get hauled into the courts and disciplined for that. You could segregate the orders that were shipped into Missouri. You could ask the dealer where are the permit numbers. It is a very simple thing. You couldn't find anything more simple than section 902(c) of the present Act, even the very highly meritorious Hruska act. I don't think you could find anything more simple. That is what I am asking about, not this nebulous thing of whether he had a conviction or whether he is a hoodlum or not. This is what I had in mind. You suggested it would be a very voluminous and laborious thing. That would hamper enforcement, wouldn't it?

Mr. COHEN. There is no requirement under present law that the dealer keep records as to how he ships guns. We don't know necessarily whether Mr. Joseph W. Barr or Mr. Joe Doakes got the weapon by mail, necessarily, unless the dealer happens to keep those records. The law does not require it.

Senator HRUSKA. There is no requirement for the keeping of any records?

Mr. COHEN. Not for the keeping of that specific record.

Senator HRUSKA. Is there anything to stop you in your regulations from asking for it? Do you ask for it in your regulations?

Mr. COHEN. I don't believe we do now, Senator.

Senator HRUSKA. Why not? Why not? It is so simple. He should have evidence that he complied with the law, and you could ask for it.

Mr. COHEN. A number of years ago I understand a regulations project of that nature was gotten up, and there was a great hue and cry from a number of people that this was leading to all of the horrors that many people say these bills will lead to.

Chairman DODD. Will the Senator yield?

Senator HRUSKA. Surely.

Chairman DODD. I missed the first part of your statement. Didn't your department ask for such a regulation in 1958?

Mr. COHEN. A number of years ago it was proposed. It was long before I arrived on the scene, sir.

Chairman DODD. And the people who are opposing Amendment 90 objected then and said this would be a terrible thing to do?

Mr. COHEN. That is right, sir.

Chairman DODD. And I think that is why you didn't get it.

Mr. COHEN. This is why we are asking for statutory confirmation of our authority to do these things.

Chairman DODD. I think that is the record, Senator Hruska.

Senator HRUSKA. It may be. Maybe they didn't protest enough.

Chairman DODD. Perhaps the others protested too much.

Senator HRUSKA. Maybe the other side protested too much, Mr. Chairman. Presumably, then, in the future we will have compounded many items like this. Because in either of the bills that are before us, there will be many more requirements for the dealer to comply with and to prove to your department that he has complied. If there is complaint now about the volume of this work in connection with this simple thing, how much will your complaint be, if you have many, many, many more requirements for the dealer to follow?

Mr. COHEN. Senator, we now require that a physician who prescribes narcotic drugs must keep valid records. He keeps them both for us and for the Department of Health, Education, and Welfare. We have little problem with physicians keeping those records. We have little problem with the disposition of the drugs insofar as the physician is concerned. This is not an unusual or an unnecessarily burdensome task. We are merely trying to provide for proper controls over potentially dangerous devices.

Every automobile in the United States is subject to some kind of licensing, a form of recordkeeping requirement, so we are not asking for anything that is inordinate or unusual. We are asking only the reasonable amount of controls that we think are necessary.

Now, you have every right, of course, to believe that we are asking for stringent controls that are beyond that which are necessary, and as I indicated, your bill is better than present law. My personal view is that the administration bill, as introduced by the chairman, is somewhat better, but I think we need something more definitive, where the rules are more spelled out than under a law enacted in 1938 which was not designed to cover society as it exists today.

Senator HRUSKA. Let's compare the two then. Comparisons are odious but maybe we can get into them. We almost have to. The Administration bill prohibits, makes it unlawful, let us say, for any dealer, to sell any firearm to an individual whom the dealer knows or has reasonable cause to believe does not have certain qualifications, either age or residence or the matter of whether or not he is a felon, and so on.

Now, tell us what is the dealer's way of showing under Amendment 90, that he has no reasonable cause to believe that the prospective buyer is not disqualified under that statute.

Mr. COHEN. He would fill out the prescribed information that would be required, and he would have identified the individual.

Senator HRUSKA. That would satisfy the Department?

Mr. COHEN. If he is a reputable dealer, and we will only have reputable dealers under the proper standards, then that is sufficient. Now, he is going to make a mistake.

Senator HRUSKA. I do not question the dealers and after you get through inspecting them and making them toe the mark and weed out those that are not dealers, I think they will be even better dealers than they have been heretofore, but not all of their buyers are reputable people, are they?

FEDERAL FIREARMS ACT

Mr. COHEN. No. It will be an offense for the purchaser to misrepresent to the dealer.

Senator HRUSKA. Oh, of course it will, and that will be great stuff, won't it. A man comes into Omaha from Alliance, Nebr.; he says he is from Alliance, Nebr., which is as far away from Omaha as Chicago is from Omaha. He will fill out the required forms and say "I am over 21; I live in Alliance, I am not a felon; I am a good guy and therefore I want to buy a gun."

Now, if this law applies to intrastate sales, and the dealer behind the counter would say "I believe you, mister."

Mr. COHEN. And he sees his driver's license and other identification?

Senator HRUSKA. Even so, he may be deceived. We cannot help it. We live in a world where we cannot design absolute controls, or foolproof systems.

Contrasted with that, we have a bill which says that the purchaser must file an application. He must fill in all these details, and he must send that application to the seller, who must send a copy of that application to the chief of police in the locality in which the prospective buyer lives. Now, then, I am a little mystified about your statement in the course of your testimony that this is a piecemeal thing.

Mr. COHEN. No, sir.

Senator HRUSKA. Whereas Amendment 90 is a much more complete and thorough thing.

Mr. COHEN. Excuse me. I applaud that aspect of your bill, sir. I think that is a fine——

Senator HRUSKA. Of course, you praised it faintly and then you damned it most viciously by saying it is piecemeal.

Mr. COHEN. No, sir. If you will permit me, I said that this aspect of it was affirmative and good. The part that disturbs me is that there are many provisions in your bill otherwise that are not——

Senator HRUSKA. I see.

Mr. COHEN. But on this provision, fine. I think that that system might be unduly burdensome on some people, but I am willing, I think it is a perfectly fine way to control this thing. It may be as good, it may be better. This is a question of judgment. That aspect of your bill I have no quarrel with at all, sir.

Senator KENNEDY. Could I ask, Senator Hruska, of course as I understand if it is an intrastate transaction, the Hruska provisions would not apply.

Senator HRUSHA. No.

Senator KENNEDY. Isn't that correct?

Senator HRUSKA. For the purpose of this question it was an interstate proposition. I will come to the intrastate after a while.

Mr. COHEN. It does apply to the extent that, under the Hruska provision, an Omaha dealer selling a handgun should satisfy himself that the buyer lives in Nebraska or he should get the required affidavit.

Senator HRUSKA. I think there is a little inconsistency on the part of these witnesses, at least a conflict.

Chairman DODD. Would it be satisfactory to the Senator from Nebraska if he wishes to go to another subject that the Senator from Massachusetts ask questions?

Senator Hruska. By all means. I haven't quite finished with that. The suggestion was made that this procedure of filing an affidavit in S. 1853 is burdensome. On whom is it burdensome?

Mr. Cohen. It is not burdensome on us, sir. We have no quarrel with it.

Senator Hruska. On whom would it be burdensome?

Mr. Cohen. The dealers or purchasers may find it somewhat more burdensome.

Senator Hruska. And the chief of police maybe.

Mr. Cohen. I have no idea whether——

Senator Hruska. He would have to enforce the law, wouldn't he? He would have to get out of his office and search the records or call up somebody that knows the buyer and say, "Do you know this guy and is he actually the guy?" He would have to enforce the law. He would be given a chance to apply and enforce the law that is either in a city ordinance or a State law, wouldn't he?

Mr. Cohen. As I say, we have no problem with that aspect of this bill at all.

Senator Hruska. I was hoping you would go just a little further and say this is superior to the proposition of pulling out a wornout driver's license and saying "I am all right, please sell me a gun." But I won't ask you that question.

Chairman Dodd. Senator Kennedy?

Senator Kennedy. Mr. Cohen, I first of all want to commend you and Mr. Barr on your statements. During the course of the time that I have been involved in the deliberations on this legislation, there have been a number of difficult questions that have been raised repeatedly. I think that your testimony, and certainly your responses to date, have been effective, and have been thoughtful, and have been extremely pertinent to the areas which I think there has been a good deal of confusion about, and I want to say how much I appreciate the responses which you have given, and the way that you have approached this problem, and the fact that your testimony has really directed itself to the principal areas of confusion. It has done a great deal, I believe, to eliminate some confusion.

I would like to just ask you a few questions in one area, because I know Senator Hruska has further questions, and then I would like to come back to some additional areas. The one area that I am concerned about now is on the question of importation of weapons and firearms and other devices.

I understand that you have a relationship, sort of a joint responsibility, with the Department of State, in that an importer makes application to the State Department, and the import license is granted to the applicant by State. Then after the weapons are introduced into this country, the Treasury assumes the responsibility.

I am just wondering whether, in the course of these events, the Treasury reviews the considerations for the importation of weapons?

Mr. Cohen. The licensing operation of the State Department is one which involves only our foreign affairs. They are not concerned with the domestic situation, so that their concern is merely what are our relationships in the foreign field with the country of import or export.

Senator KENNEDY. At some time do they not register this application with the Treasury?

Mr. COHEN. We may get a copy I believe, sir, if the importation is also subject to National Firearms Act controls.

Senator KENNEDY. You get a copy.

Mr. COHEN. All of the National Act weapons you see, such as a machinegun, a sawed-off shotgun, any of the sort of exotic types require Treasury permission to import, and we would coordinate with the Department of State on the importation.

Senator KENNEDY. Since the State Department is not charged with the responsibility as far as the internal workings or considerations in this country, what standards if any do you establish?

Mr. COHEN. On the importation?

Senator KENNEDY. On the importation.

Mr. COHEN. There are no standards set up in the Federal Firearms Act, and therefore, we can apply none, and as I indicated in my testimony, other than the National Act firearms of course, but if you are talking about these cheap little starter pistols that I mentioned that may be just as dangerous to the user as the victim, we have no way of restricting the influx of weapons of that nature.

Senator KENNEDY. Do you have any control over the person who is going to receive them in this country?

Mr. COHEN. He will usually be a licensee.

Senator KENNEDY. He will be a licensee. And does the Treasury investigate the background of the licensee?

Mr. COHEN. Yes, sir, to a very limited extent.

Senator KENNEDY. You do?

Mr. COHEN. To the extent the law justifies it. As I indicated, the 104,000 Federal Act licenses are issued pretty much on request, but our regulations provide that the District Director may make inquiry to establish the bona fides of the application. No formal investigation is made.

Senator KENNEDY. Once they come into the United States, they are out of the control of the State Department, is that correct?

Mr. COHEN. That is correct, sir.

Senator KENNEDY. And then you assume the prime responsibility, is that right, while these weapons are in this country?

Mr. COHEN. That is correct to the extent that the Federal Firearms Act is applicable.

Senator KENNEDY. To the extent that you do have a mandate. Now, these licensees have to indicate, as I understand it, on their application that the weapons are going to be used for particular purposes. They outline the kinds of purposes for which these imported weapons will be used, is that your understanding?

Mr. COHEN. Yes, sir. That is, I believe the importer indicates if the guns are for personal use or for resale in commercial channels.

Senator KENNEDY. Now, I would like to know whether you follow up to find out whether the weapons that are imported are actually used for those purposes?

Mr. COHEN. Well, we follow the same procedures we would follow on a weapon manufactured in the United States, that is we periodically

make inspections of the licensed importers as well as the manufac-
turers to make sure they are keeping the proper types of records. Their
general assertion would be that these are sporting or target-type
weapons, and that is the purposes generally for which they advertise
them, so there is no violation inherent in that kind of activity.

Senator KENNEDY. I wrote the Secretary of State and asked him
about these importations of weapons. I received a letter back on April
14 from Mr. Kitchen, and he gave me some information, compre-
hensive information. We have, for example, the International Arma-
ment Corp., of Alexandria, Va., which received a license in 1965. The
purpose was the wholesale and retail distribution on the American
civilian commercial market. In this order which was license No. 9231,
they imported 150,000 long and short rifles with bayonets, and that is
caliber 7.92—they imported 175,000 long and short rifles with bayonets,
caliber 7. They imported 35,000 bayonets. They imported 98,000 steel
helmets and 12,000 sabres.

I am just wondering—there are a good many other things they
imported under that particular license. They say that the purpose is for
the wholesale and retail distribution on the American civilian commer-
cial market. What sort of investigative procedures do you follow to
make a determination whether those and the 45,000 pistols that they
imported are actually being used in these civilian markets and where
these weapons are going?

Mr. COHEN. During our firearms inspection of those importers, they
would determine that they are selling these, and this is the general
practice that I am sure this company as well as many others by orders
or shipment to other mail-order houses, this is the general disposition
of that kind of weapon. They are of course sold to local dealers for
local distribution, but most of those surplus military-type weapons
are inexpensive and are disposed of in the mail-order trade.

As much as we might find it objectionable to our taste or to our feel-
ing of what the law ought to be, there is nothing that we can do as
long as they are directing it in the wholesale and retail trade in the
United States.

Senator KENNEDY. This is only a part of the total rifles that have
been imported between 1962 and 1966. The figures that were given
me was 1,638,552 rifles, 600,000 pistols imported during that period of
time, and 513,000 revolvers. I am just wondering from your own ex-
perience how effective, under the present legislation, how effective can
the policing of these weapons be? Do we know where they go, how they
are distributed in this country, whether they are actually used for
sporting use or others? Can it be determined under the present legisla-
tion, and what you feel would be the effect under the legislation S. 1.

Mr. COHEN. Under the present legislation of course, there is virtually
no control over this kind of weapon. Whether it ought to be imported
is a question that is completely beyond the scope, whether it is of suf-
ficient quality or character to even be used for sporting purposes is now
completely beyond the scope of any inquiry that we can make.

Under the bills as proposed, the surplus military handgun would
be prohibited. There is little or no use for these kinds of weapons in
normal civilian purposes. The sporting kind of gun, the sporting gun

that is adaptable, that is designed or adaptable to sporting purposes is permissible and would be treated as if it were any other kind of gun manufactured in the United States subject to the same kind of restrictions and controls as S. 1 or S. 1, Amendment No. 90 which might have for domestically manufactured arms. Essentially the long guns would be distributable with a minimum of restrictions.

Senator KENNEDY. I suppose that the case is made that these weapons are used for targeting practice. I am not sure how familiar you are with these weapons. This is another license, No. 8361 assigned to the St. Hubert Co., in Waseca, Minn. They imported 1,700, 3.57 caliber revolvers, 1,600, 6.01 caliber, 1,700, 44 caliber revolvers. I understand that the missile that comes out is almost a half inch across.

Mr. COHEN. Those will blow a hole. Those are really not target shooting kinds of weapons, not unless you want to tear the target apart.

Senator KENNEDY. I am not going to trespass on the time of the committee. I would like to introduce copies of the various licenses that I have here, Mr. Chairman, and a copy of the letter from Mr. Kitchen at this point in the record.

Chairman DODD. Yes. I think that will be very helpful.

(The material referred to by Senator Kennedy was marked "Exhibit No. 12" and is as follows:)

### EXHIBIT No. 12

DEPARTMENT OF STATE,
*Washington, April 14, 1967.*

Hon. EDWARD M. KENNEDY,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR KENNEDY: In response to your request for information during our meeting on April 12, I am forwarding herewith as enclosure 1 certain statistical data concerning numbers of pistols, revolvers, and rifles imported into the United States during the years 1962 through 1966.

Enclosure 2 outlines firearms import license data on the five largest import transactions for each of the calendar years 1963 through 1966.

We have telegraphically asked our Embassies at Brussels, Bonn, Madrid, London, Rome, and Rio de Janeiro to provide information on the import regulations obtaining in their countries. We are also examining the question of whether under Section 414 of the Mutual Security Act the Department of State could exercise stricter controls over firearms imports. We will provide information on these two matters as soon as possible.

Sincerely yours,

JEFFREY C. KITCHEN,
*Deputy Assistant Secretary for Politico-Military Affairs.*

Enclosures: (1) Statistical Data (1963–1966). (2) Import License Data (1963–1966).

[Enclosure 1]

APRIL 14, 1967.

### RIFLES, PISTOLS, AND REVOLVERS IMPORTED TO THE UNITED STATES (1962–66)

The data compiled on the attached pages was collected from original import licenses returned to the Department of State by the Collectors of Customs. Such returns are made when the licenses expire or importation is completed, whichever occurs first. (A license is valid for a period of six months.) The back of each license is endorsed by the Collector of Customs to reflect importations made against the license.

FEDERAL FIREARMS ACT                87

The information reported for 1966 is subject to the qualification that there are some licenses issued in 1966 whose period of validity has not yet expired. Thus shipments could still be made against these licenses.

| | |
|---|---:|
| Rifles imported during 1962 | 183, 636 |
| Pistols imported during 1962 | 202, 770 |
| Revolvers imported during 1962 | 35, 158 |
| | |
| Rifles imported during 1963 | 424, 085 |
| Pistols imported during 1963 | 142, 159 |
| Revolvers imported during 1963 | 74, 452 |
| | |
| Rifles imported during 1964 | 191, 187 |
| Pistols imported during 1964 | 128, 660 |
| Revolvers imported during 1964 | 45, 981 |
| | |
| Rifles imported during 1965 | 729, 392 |
| Pistols imported during 1965 | 258, 876 |
| Revolvers imported during 1965 | 103, 057 |
| | |
| Rifles imported during 1966 | 110, 252 |
| Pistols imported during 1966 | 168, 239 |
| Revolvers imported during 1966 | 254, 938 |
| | |
| Total rifles imported 1962–66 | 1, 638, 552 |
| Total pistols imported 1962–66 | 900, 704 |
| Total revolvers imported 1962–66 | 513, 586 |

[Enclosure 2]

DEPARTMENT OF STATE,
*Washington, D.C.*

Subject: Major individual arms importations, 1963 licenses.

1. *Origin.*—Ministry of Defense, Rome, Italy.
*Consignee.*—Adam Consolidated Industries Inc., New York, N.Y.
License #6261 for:

| | |
|---|---:|
| Rifles Models 91 and 33—Cal. 6.6 | 149, 409 |
| Rifles Model 41—Cal. 6.5 | 69, 478 |
| Rifles Model 33—Cal. 7.33 | 18, 090 |
| Muskets Model 33—Cal. 7.35 | 12, 415 |
| Muskets Model 33—Cal. 6.5 | 7, 000 |

*Purpose.*—For resale as sporting rifles.

2. *Origin.*—Interarmco Industries, S. A., Geneva, Switzerland and Panama, R. P.
*Consignee.*—International Armament Corporation, Alexandria, Va.
License #6052 for:

| | |
|---|---:|
| German Walther P–38 Pistols, Cal. 9 mm | 1, 000 |
| German Mauser Pistols, Cal. 7.65 mm (.32) | 1, 000 |
| American rifles, M1903, Cal. 7.62 mm (.30) | 30, 000 |
| American rifles, M1917, Cal. 7.62 mm (.30) | 87, 000 |

*Purpose.*—For resale to approved commercial and individual buyers.

3. *Origin.*—Oy Sako Ab, Riihimaki, Finland & Fabrique Nationale d'Armes de Guerre, Herstal-lex-Liege, Belgium.
*Consignee.*—Browning Industries, Inc., St. Louis, Missouri.
License #6757 for:

| | |
|---|---:|
| .222 Cal. Bolt Action Rifle | 1, 100 |
| .222 Cal. Bolt Action Rifle | 500 |
| .22/250 Cal. Bolt Action Rifle | 250 |
| .243 Cal. Bolt Action Rifle | 1, 400 |
| .308 Cal. Bolt Action Rifle | 650 |

88                    FEDERAL FIREARMS ACT

*Purpose.*—For sale to retail sporting goods dealers.
   4. *Origin.*—J. P. Sauer & Sohn, Echernforde, Germany.
*Consignee.*—Magnum Import Company, South Gate, California.
   License #5639 for 2,500 Weatherby Mark V Rifles.
   5. *Origin.*—Oy Sako Ab, Riihimarki, Finland.
*Consignee.*—Firearms International Corporation, Washington, D.C.
   License #6041 for:

| | |
|---|---:|
| Sako Cal. 243 Rifles | 430 |
| Sako Cal. 222 Mag. Rifles | 55 |
| Sako Cal. 308 Rifles | 52 |
| Sako Cal. 338 Rifles | 36 |
| Sako Cal. 30/06 Rifles | 160 |
| Sako Cal. 300 Rifles | 16 |
| Sako Cal. 264 Rifles | 23 |
| Sako Cal. 222 Rifles | 120 |

*Purpose.*—For resale to Sporting Goods Dealers.

———

Subject: Major individual arms importations, 1964 licenses.
   1. *Origin.*—Fabrique National d'Armes de Guerre, Herstal-lex-Liege, Belgium.
*Consignee.*—Browning Industries, Inc., St. Louis, Missouri.
   License #7649 for:

| | |
|---|---:|
| .243 cal. Mausers | 91 |
| .308 cal. Mausers | 78 |
| .270 cal. Mausers | 455 |
| .30–06 cal. Mausers | 1,375 |
| .264 cal. Mausers | 905 |
| 7mm cal. Mausers | 1,021 |
| .300 H & H cal. Mausers | 140 |
| .338 cal. Mausers | 245 |
| .375 cal. Mausers | 58 |
| .458 cal. Mausers | 65 |
| .300 W. Mag. cal. Mausers | 548 |
| .308 Norma cal. Mausers | 56 |

*Purpose.*—For sale through Browning Arms Company to retail sporting goods
dealers located throughout the US.
   2. *Origin.*—Transalpina, S.A., Madrid, Spain.
*Consignee.*—International Armament Corp., Alexandria, Va.
   License #8658 for 100,000 7.92mm cal. Mausers.
   *Purpose.*—For sale within the U.S.
   3. *Origin.*—Parker-Hale Limited, Bisley Works, Golden Hillock Road, Spark-
brook, Birmingham 11, England.
*Consignee.*—Pasadena Firearms Company, Inc., Pasadena, Calif.
   License #7279 for 35,000 English SMLE No. 4 and No. 1 MK III Rifles, Caliber
.303 British.
   *Purpose.*—For sale to dealers and gunsmiths and for conversion to sporting
rifles and subsequent sale to dealers.
   4. *Origin.*—Interarmco Industries, S.A., Geneva, Switzerland, and Panama,
R. P.
*Consignee.*—International Armament Corp., Alexandria, Va.
   License #8185 for:

| | |
|---|---:|
| American rifles, M1903, cal. 7.62mm (.30) | 4,918 |
| American rifles, M1917, cal. 7.62mm (.30) | 5,036 |

*Purpose.*—For resale within the US.
   5. *Origin.*—J. P. Sauer & Sohn Gegrundet 1751 In Suml, Koln-Niehi, Nessel-
rodestrabe 20, Western Germany.
*Consignee.*—Saint Hubert Company, Waseca, Minnesota.
   License #8361 for:

| | |
|---|---:|
| .357 cal. revolvers | 1,700 |
| .401 cal. revolvers | 1,600 |
| .44 cal revolvers | 1,700 |

*Purpose.* – For resale to sporting goods stores and dealers.

FEDERAL FIREARMS ACT 89

Subject: Major individual arms importations, 1965 licenses.

1. *Origin.*—Spanish Army, Madrid, Spain.
*Consignee.*—International Armament Corporation, Alexandria, Va.
License #9231 for:

| | |
|---|---|
| Long & Short Rifles w/bayonets, cal. 7.92mm | 150,000 |
| Long & Short Rifles w/bayonets, cal. 7mm | 175,000 |
| Pistols | 45,331 |
| Long & Short Rifles & Carbines, cal. 6.5mm | 100,418 |
| Bayonets | 35,000 |
| Steel Helmets | 98,030 |
| Sabres | 12,694 |
| Cartridges, cal. 7mm | 23,391,000 |
| Cartridges, cal. 6.5mm | 1,750,000 |
| Cartridges, cal. 9mm | 40,000,000 |

*Purpose.*—Wholesale and retail distribution on the American Civilian commercial market.

2. *Origin.*—Fabrique Nationale d'Armes de Guerre, Herstal-lex-Liege, Belgium.
*Consignee.*—Browning Industries, Inc., St. Louis, Missouri.
License #00708 for:

| | |
|---|---|
| .25 cal. Automatic Pistol (6.35mm) | 15,000 |
| .380 cal. Automate Pistol (9mm short) | 5,000 |
| 9mm cal. Automatic Pistol (9mm Parabellum) | 5,000 |
| .243 cal. Bolt Action Mauser | 50 |
| .308 cal. Bolt Action Mauser | 20 |
| .308 Norma cal. Bolt Action Mauser | 100 |

*Purpose.*—For resale to sporting goods dealers.

3. *Origin.*—Interarmco Industries, S.A. Panama City, Republic of Panama.
*Consignee.*—Interntaional Armament Corporation, Alexandria, Virginia.
License #01865 for:

| | |
|---|---|
| Mauser type rifles, cal. 7.92mm | 50,000 |
| Rifles/carbines, cal. 6.5mm & 7.35mm | 10,000 |
| Mannlicher type rifles/carbines, cal. 8mm | 10,000 |
| Pistols of various types & calibers | 200 |
| Rounds of small arms ammunition, various calibers | 5,000,000 |

*Purpose.*—For sale on the American commercial market.

4. *Origin.*—Pietro Beretta, Gardone, Val Trompia, Italy.
Consignee.—Berben Corporation, New York, New York.
License #01722 for:

| | |
|---|---|
| 25 cal. Jetfire automatic pistols | 2,000 |
| 22 cal. Minx M2 automatic pistols | 1,000 |
| 22 cal. Minx M4 automatic pistols | 400 |
| 22 LR cal. Jaguar 3½'' automatic pistols | 300 |
| 22 LR cal. Jaguar 6'' automatic pistols | 200 |
| 32 Cal. Puma automatic pistols | 600 |
| 380 cal. Cougar automatic pistols | 1,000 |
| 9MM cal. Brigadier automatic pistols | 50 |

*Purpose.*—Distribution to sporting goods dealers.

5. *Origin.*—Roehm Gmbh, Sontheim/Brenz, Germany.
*Consignee.*—Eig Cutlery, Inc., Miami, Florida.
License # 01655 for:

| | *Pieces* |
|---|---|
| RG 10 Revolver Frame, Cal. .22 Short | 25,000 |
| RG 10 Cylinders, Cal. .22 Short | 25,000 |
| RG 10 Hammer | 25,000 |
| RG 10 Hammer Screw | 25,000 |

*Purpose.*—Resale to Federal Licensed Dealers.

90                          FEDERAL FIREARMS ACT

Subject: Major individual arms importations, 1966 licenses.
1. *Origin:* Fabrique Nationale d'Armes de Guerre, Herstal-lex-Liege, Belgium.
*Consignee:* Browning Arms Company, St. Louis, Missouri.
License #05360 for:

| | |
|---|---:|
| .243 cal. Mausers | 100 |
| .308 cal. Mausers | 150 |
| .22 cal. rifles | 53,000 |
| .25 cal. automatic pistols | 30,000 |
| .380 cal. automatic pistols | 6,000 |
| 9mm cal. automatic pistols | 9,000 |
| .32 cal. automatic pistols | 300 |
| .22 cal. automatic pistols | 15,000 |

*Purpose.*—For sale through Browning Arms Company to retail sporting goods dealers located throughout the U.S.
2. *Origin.*—Ministerio de la Defensa, Caracas, Venezuela.
*Consignee.*—Century Arms Company, St. Albans, Vermont.
License #03275 for:

| | |
|---|---:|
| 7mm cal. rifles, semiautomatic | 7,074 |
| 7mm cal. rifles | 30,614 |
| 7mm cal. carbine | 12,455 |
| 11.05mm cal. Mausers | 2,070 |
| 6 million plus rounds of ammunition—7, 9 & 11.05mm. | |

*Purpose.*—For hunting and sporting purposes.
3. *Origin.*—Star, Sonifacio Echeverria, Eibar, Spain.
*Consignee.*—Firearms International Corp., Washington, D.C.
License #03416 for:

| | |
|---|---:|
| .22 cal. pistols | 10,000 |
| .32 cal. pistols | 1,000 |
| .380 cal. pistols | 1,000 |
| 9mm cal. pistols | 500 |
| .45 cal. pistols | 700 |
| .380 cal. pistols (Starfire) | 2,000 |
| .25 cal. pistols | 1,000 |
| .22 cal. pistols (Lancer) | 1,000 |

*Purpose.*—For resale to sporting goods dealers.
4. *Origin.*—Luthy, Neuchatel, Switzerland.
*Consignee.*—International Armament Corp., Alexandria, Va.
License #05146 for:

| | |
|---|---:|
| 7.5mm Swiss Army rifles | 35,000 |
| 7.5mm Swiss Army carbines | 80,000 |
| Bayonets | 35,000 |

*Purpose.*—Sporting and collecting resale within the U.S.
5. *Origin.*—Gabilondo Y Cia., Vitoria, Spain.
*Consignee.*—Stoeger Arms Corp., South Hackensack, New Jersey.
License #05169 for:

| | |
|---|---:|
| .38 cal. revolvers | 60 |
| .22 cal. automatic pistols | 4,500 |
| .380 cal. automatic pistols | 1,000 |
| .32 cal. revolvers | 125 |
| .380 cal. pistols C III A | 345 |
| .380 cal. pistols CE III A | 175 |

*Purpose.*—For resale in the U.S.

Senator HRUSKA. Would the Senator yield on the point which he is now concerned with?
Senator KENNEDY. Yes.
Senator HRUSKA. You indicated, Mr. Cohen, that the destination or the actual use of these imports is unknown, and you have no way of tracking them?

Mr. COHEN. No, I didn't mean to imply that sir. I said that once they entered the United States, they are treated as if they were domestic manufacture, and the same kinds of records would be kept for these weapons as would be kept for domestically manufactured weapons.

Senator HRUSKA. Of course, we can get the guns of larger caliber out of the way right away, can't we?

Mr. COHEN. Yes.

Senator HRUSKA. No license for destructive devices has been granted for at least 2 years and maybe more they are not imported and that was accomplished under the authority of the Mutual Security Act. Doesn't the President have the power, if he feels that these or other guns should not be imported, to say they shall not be imported, period; isn't that true?

Mr. COHEN. I am not an expert on that act, but I have been informed——

Senator HRUSKA. Well, I understand that.

Mr. COHEN. I have been informed by the Attorney General that he feels there is not sufficient authority under that act to forbid all that should be forbidden.

Senator KENNEDY. Could I just on that point—would you support such a recommendation yourself?

Mr. COHEN. The restriction?

Senator KENNEDY. Yes, on these kinds of weapons that could not be clearly used for sporting weapons.

Mr. COHEN. Oh, we feel——

Chairman DODD. Bazookas.

Mr. COHEN. I personally feel very strongly when once we get beyond bazookas we get to the surplus military weapon, really, that is a travesty. People are trying to pass off junk on American citizens that is dangerous to user and potential victim, and it is just unconscionable.

Chairman DODD. Let me make an observation.

Mr. COHEN. I am talking about pistols now, not the long guns, some of which are adaptable to proper use.

Chairman DODD. We do have a witness from the Office of Munitions Control of the State Department who will probably be more helpful than we would expect you to be on this particular subject.

Senator HRUSKA. On the matter of being able to trace them and determine what is being done with them, there is no difference in that regard between pistols, revolvers, rifles and shotguns of domestic manufacture.

Mr. COHEN. No, I didn't indicate——

Senator HRUSKA. So the attribute of being an imported article in and of itself is another factor?

Mr. COHEN. Except for the quality.

Senator HRUSKA. Except for the quality?

Mr. COHEN. That is right.

Senator HRUSKA. Of course, some of these starter pistols are bad, but suppose a starter pistol was made in this country and was bad, would you go after them?

Mr. COHEN. I would hope that we would have some kind of authority. We have not had, to date we have not had that kind of experience.

Senator HRUSKA. A strange thing you know, on June 1, the *Shotgun News*, published in my native State, at Columbus, Nebr., we find advertisements for starter revolvers. Here is one that sells for $21.93, and here is another one which sells for $12.95 in blue, and if you want chrome it is $13.95. The second one which is cheaper is described as "Not an import. Built in Texas." Now I imagine that if we are going to get so awfully angry at imports because the are bad, we ought to get mad at domestic manufacturers because they are bad.

Mr. COHEN. Well, not all of the starter pistols, in fact most of the pistols and these go to fairly inexpensive ones manufactured in the United States are of sufficient expense, that they are usually of reasonably decent quality. I won't say they are first-rate quality always, but they are usually much better than these $2.94 or $3.95 things that are being imported, or $4.95.

Senator HRUSKA. Here is an import selling for $21.95 and this domestic job $12.95. Now, which is junk?

Mr. COHEN. I am not saying every one is of equal character. I am not an excellent judge of weapons. I turn you over to Mr. Barr who is my expert.

Chairman DODD. Have you finished on the question of imports?

Senator KENNEDY. Yes.

Chairman DODD. It has just been called to my attention that in 1965 I received a memorandum from the Department of Justice concerning the import provisions of what was then S. 1592. The memorandum says "The authority and responsibility to control the importation of implements of war under the Mutual Security Act which the President has delegated to the Secretary of State is dependent upon the furtherance of world peace and the security and foreign policies of the United States." It does not extend to the broad protection of the general welfare. However, the import provisions in S. 1592 are the same as in S. 1, Amendment 90, and do extend this broad protection. Thus they are necessary and do not represent a duplication of authority or responsibility as conferred by the Mutual Security Act.

I think that is important.

Mr. COHEN. That answers the Senator's question. Thank you very much, sir.

Chairman DODD. The President couldn't stop these imports as has been suggested under the Mutual Security Act, and unless we get this language into the new legislation, he still won't be able to do so; am I right about that?

Mr. COHEN. That is right, sir. That is my recollection.

Senator HRUSKA. Mr. Cohen, in your statement you have said among other things that "since the persons being federally licensed in the firearms business are engaging in interstate and foreign commerce, their firearms business activities may be federally registered."

I don't think too many people would quarrel with that. Now, what about the intrastate sales by these Federal licensees. Are they contemplated for coverage under Amendment 90, the administration bill?

Mr. Cohen. The licensee is bound by the Federal requirements. I believe there is a memorandum on file with the House committee from the General Counsel which indicates that once the Congress has determined that the control of interstate commerce in weapons is essential to the welfare of the citizens of the United States, then it follows that the Congress has the right to—it was filed also with this committee——

Senator Hruska. I am not talking about the right of Congress but whether this bill is intended to, and does provide for the controlling, and regulation of intrastate sales. For instance, a sale by Sears, Roebuck in Chicago, going to Alton, Ill. Is that controlled? Is that within the purview of that act?

Mr. Cohen. Yes, sir. There are differences. However, for example, Sears Roebuck, in Chicago, Ill., can receive an order from a resident of Springfield, Ill., for a weapon and can mail it to him. That is intrastate. There is no problem in mailing that weapon, or a resident of your State can write to a large commercial establishment in Omaha and receive the weapon by mail. It cannot cross State lines but it can within the jurisdiction.

Senator Hruska. Have you any difference or opinion with that, Mr. Barr?

Mr. Cohen. No, sir, Senator.

Senator Hruska. It is a pretty big loophole, isn't it?

Mr. Barr. No, sir.

Mr. Cohen. No, sir.

Mr. Barr. If you stop to consider the objective that we have here, and I keep getting back to it, we are not trying to clean up this whole area, sir, because as I have said, I think this is the third time, our objective is quite simple. It is to enable the States to perform the responsibility which has been given to them by the Constitution to protect their citizens. I don't think that is a loophole, sir. The States can take care of that themselves.

Senator Hruska. I see. Why can't they take care of these other aspects themselves?

Mr. Barr. Because the other aspects, sir, that we are addressing ourselves to are the interstate operations, where they cannot control them.

Senator Hruska. Precisely, precisely.

Mr. Barr. Yes.

Senator Hruska. Under S. 1853 we have a presale notification procedure, this is sent to the dealer in advance, and he must send a copy to the chief of police. You have praised that concept highly in the matter of the National Firearms Act and said it might be burdensome, "but this is where the responsibility clearly lies." I am reading from page 550 of your testimony in the House.

It is not a Federal responsibility but a local responsibility. It is rightly or wrongly we in this country have determined that police powers and the protection of the citizen in the main reside with state and local officers. That is the clear thrust of this bill. It might be burdensome on the local officer, but if a determination is to be made, it should be made on the local level.

Now, what I cannot get into my head is why is this good as a concept and philosophy in the case of the National Firearms Act, but no good for the purpose of controlling interstate sales by mail of handguns?

Mr. BARR. Senator, this administration would not object, and I think Mr. Cohen has made this clear, to the philosophy and the concept that you have expressed in the case of handguns. We believe that our concept is preferable, but Mr. Cohen has said, and I echo the statement, that your concept is a vast step forward and the administration would not object if the Congress saw fit to adopt it.

Senator HRUSKA. Well, getting back again to "reasonable cause," it is unlawful for a person who is under indictment or who has been convicted in any court of a felony, to buy a gun?

Mr. BARR. Yes, sir.

Senator HRUSKA. Now, how in the world can a purchaser satisfy the seller, over the counter, that he is free and clear from any felony conviction simply by showing his driver's license?

Mr. BARR. In that respect your proposal, in its limited area of applicability, may have some advantages over the administration's proposal. There is no question about it.

Senator HRUSKA. Would the seller under those circumstances have no reasonable cause, just the display of a driver's license, would he have then no reasonable cause to believe that the applicant was not a felon?

Mr. BARR. No, sir.

Senator HRUSKA. If that is all he did, and he later turned out to be a felon, could the dealer be prosecuted under S. 1, Amendment 90 if enacted into law?

Mr. BARR. Are you speaking now, sir, of the seller, the licensee?

Senator HRUSKA. Yes.

Mr. COHEN. If he took reasonable steps.

Mr. BARR. If he took reasonable steps.

Senator HRUSKA. Then it would be a reasonable and satisfactory step for a seller, in order to determine whether or not the applicant, the prospective buyer, is a felon or not, to ask to see his driver's license and that is all?

Mr. COHEN. He should take reasonable measures to keep informed.

Senator HRUSKA. All right. Now, what else can a dealer do?

Chairman DODD. Will the Senator yield?

Senator HRUSKA. Let me pursue this just a minute because they stop now with a driver's license. Do you want to add something more?

Mr. COHEN. No. I think that anyone in this business is in a position to keep informed on the local crime situation within his jurisdiction, and if he has, he will be aware of some of the people in this area.

Senator HRUSKA. Oh, Mr. Cohen, California is a thousand miles up and down. Redwood or Shasta is about a thousand miles from San Diego. How is he going to keep abreast of the crime situation under those circumstances? What else should he do?

Mr. COHEN. The local police likewise have access in their jurisdiction to the statement that he has made, and they can look at it and they can check out these people the same as they would if they had the affidavit.

Senator HRUSKA. Then you are adding something, aren't you, information from the police station?

Mr. COHEN. Well, the police, that is right. No, I didn't say he had to do that. I said that this is the job of the local police.

FEDERAL FIREARMS ACT                    95

Senator HRUSKA. How would the local police in Shasta, Calif., a thousand miles from San Diego, handle this? Here we have a man in San Diego trying to buy a gun. He says, "I am a resident of Redlands. Here is my driver's license." Previously you said that is all the seller would be required to prove good faith and establish reasonable cause to believe he is qualified.

Mr. COHEN. That is what I said.

Senator HRUSKA. Now, what else?

Mr. COHEN. That is all. The rest is up to the local officials to coordinate the information which local police will get from observing the records of these——

Senator HRUSKA. How would the local officials know about him?

Mr. COHEN. If your purchase is being made in Redlands, the local police officers or the State police in Redlands have easy access to the records of Mr. Brown, the local gunsmith, and they can look at them and report to the other places in the State.

Senator HRUSKA. I know, they do, but here is a man buying a gun. Now, how does the local police learn about him? Is there an obligation by the storekeeper, in order to show that there is no reasonable cause for him to believe that the man is a felon. Is there a duty on the part of the storekeeper to call up the local police and say, "Will you get a hold of the chief of police in San Diego and tell me whether Joe Doakes is really living here and that he is really not a felon and that he is not a fugitive from justice," and so on? Does that duty rest upon him?

Mr. COHEN. Only if the potential purchaser was acting in such a way that it could cause a reasonable man to make that inquiry.

Senator HRUSKA. You mean with a furtive look in his eye maybe? How would he judge? One storekeeper might have great suspicion of me. Another might have great suspicion of you just because Mother Nature probably wasn't very kind at least to me in physiognomy, but how would he know. The furtive look in his eye, by his shiftiness, and then the guy who was the best actor, he would escape free?

Mr. COHEN. Senator, you are not going to get me to quarrel with you. I like your provision as far as it goes. I would like it better if it were applicable also to long guns, not just handguns?

Senator HRUSKA. You are advocating the administration bill and I want to know what it means. What does it take for a storekeeper to get away from the stigma, the burden of having reasonable cause in his determination that the purchaser is not a felon so that he can discharge the attaching responsibility? This is something you are advocating. Tell me how does it work?

Mr. BARR. Senator, may I ask a question at this juncture, sir?

Senator HRUSKA. Surely.

Mr. BARR. As I understand it, your bill does not go to sales within a State; is that correct, sir?

Senator HRUSKA. That is true.

Mr. BARR. That is true?

Senator HRUSKA. That is true.

Mr. BARR. Your bill goes only to interstate sales?

Senator HRUSKA. That is right.

Mr. BARR. So the issue between us here is which is the preferable method of approaching the problem of interstate sales. It is not the

96                    FEDERAL FIREARMS ACT

issue—I have been a bit confused in this colloquy here—as to a sale in Redlands, Calif., to a resident of San Diego, Calif. That is not the issue; is it? Am I correct, sir?

Senator HRUSKA. I use that example. We could say Las Vegas to Redlands, Calif. Then it is in focus, isn't it?

Mr. BARR. Then it is in focus. I was confused by the intra and interstate.

Chairman DODD. That was the point I wished to make.

Senator KENNEDY. Of course, it is of interest in California you don't do it anyway because there is a 72-hour waiting period.

Mr. BARR. Right. Right. I was not aware of that.

Senator HRUSKA. Well, that is fine. And what do they do during that waiting period, just sit around and stare at the application or what do they do?

Mr. COHEN. I am not familiar with California law, sir. I happen to be a District of Columbia lawyer.

Senator HRUSKA. That would be up to the proponents of this bill to tell us what a seller must do under these circumstances.

Mr. COHEN. In most States where there is a waiting period there is a State requirement, either a daily requirement for inspection or a daily requirement for reports.

Senator HRUSKA. Texas has no waiting period?

Mr. COHEN. That is right, sir.

Senator HRUSKA. Most States do not have waiting periods.

Senator KENNEDY. Can I ask just on this point here?

Senator HRUSKA. I haven't quite finished but go ahead. The Senator always sheds a lot of light by his questions and I know he will do it now.

Senator KENNEDY. As I understand it both from what you have mentioned here and what Mr. Barr has said, this area has been left particularly open so that you invite the States to establish what regulations they want to establish, and what procedures will be followed by the local personnel. Isn't that one of the reasons? And rather than to set firm procedures or standards by Federal legislation, it is my understanding that you are encouraging the States to make the kinds of requirements they want whether there be a time period to wait or procedures that will be met on the particular licensees?

Mr. COHEN. That is correct.

Senator KENNEDY. You are inviting them to work in partnership with this Federal legislation here, and you would expect under the provisions mentioned here that they would pursue a reasonable standard and a reasonable course of conduct, and as I am constantly reminded, reasonableness appears, I think, 1,032 times in Federal statutes and has been readily interpreted in the various courts?

Senator HRUSKA. Let me remind my good colleague that in criminal statutes a reasonable criteria and standard is not enough. A citizen is entitled to know what specific things he can do. What specific things he is barred from doing. And it is in this that the efficiency of any criminal law, in fact the constitutional requirements lie. That is the essence of it. If you are going to say well, under certain circumstances you have no reasonable cause to believe that this shifty character here a felon since he showed you this driver's license. He might have been a dope addict. He might have just been paroled from some prison. I am

surprised at the laxness with which S. 1—Amendment 90 this bill, Administration bill, is drawn in this connection. No effort to look up what Mr. Barr has referred to as being the real public policy in this country; namely, that the local authorities should be the one to enforce their laws. Under this procedure in the Administration bill, they get no chance at it. They have no notice that a gun is being sold to the prospective buyer. None. None, isn't that true?

Mr. COHEN. They have, as Mr. Barr pointed out—and I think Senator Kennedy ably pointed out—they have whatever requirements they wish to impose on their own residents. Likewise the Federal statute is primarily concerned with the transaction which crosses a State line.

Now, in the situation that you gave before, we can have that today with no possibility of convicting anyone today under the statute at least. We would have a clear violation of S. 1 or Amendment No. 90 by the purchaser in misrepresenting to the——

Senator HRUSKA. Yes; but in the meantime the gun is sold and the crime rate goes up again. According to the record almost every buyer that we talk about here seems to be one who goes out and shoots somebody. I hope that is not the idea in most people's minds because that is not true. But we still have this question. What does it take for a seller to escape the criminal penalty of $5,000 and a year or more in jail by selling a shotgun to a guy who comes to his shop. He must put himself in a position where he has no reasonable cause to believe that that man is a felon; and that he has reasonable cause to believe that he is a resident; that he is over 21, and all the other qualifications that that act requires of a gun buyer and they are tough ones.

Mr. COHEN. I think this is a standard that they are probably all living by, by their local requirements right now, sir.

Senator KENNEDY. Would it be possible to establish regulations under this legislation that would outline so that the license——

Mr. COHEN. I think we would have to outline these steps we would expect everyone to take.

Senator KENNEDY. You could actually do this, outline in regulations the course of conduct that would be expected.

Mr. COHEN. That is right. These dealers, do not deal in an isolated area. They deal every day with the police and they keep informed of local crime situations.

Senator KENNEDY. And we would expect you to do so; is that correct?

Senator HRUSKA. Is it being suggested that we would have Federal regulations with criminal sanctions for their violation? One of the greatest parts that Congress plays, any legislature, the legislature describes what a crime is and does not delegate that part to an executive or administrative agency. Almost anybody, any lawyer has access to a set of statutes. Not every lawyer has the current regulations of the numerous public bodies that range over the width and breadth of this land.

Mr. COHEN. You introduced yourself earlier in the day, sir, the copies of the regulations presently enforced.

Senator HRUSKA. Yes.

Mr. COHEN. Under the National and Federal acts.

Senator HRUSKA. Yes.

Mr. COHEN. There would be similar regulations which would spell out and define all of the terms in accordance with the intent of the Congress as expressed in either reports and legislative history. If the Congress chooses to define their terms very carefully, so much the better, and the administrator has that many fewer terms to worry about defining. But this is done every day in every kind of legislation imaginable.

Senator HRUSKA. It might be, but if I were a storekeeper and were selling guns, I would clamp down severely on sales. If I do, and if that is done by tens of thousands of dealers, all over America, and particularly in the sparsely settled places, people won't be able to buy shotguns and rifles the way they should be able to buy them. This goes beyond the realm of inconvenience or hardship. It would totally disqualify them and make it impossible for them to deal with that facility that the present conditions in America call for regarding the ownership and use of guns.

Mr. BARR. Senator, here again aren't we going to the interstate operations of business?

Senator HRUSKA. Interstate operations, yes.

Mr. BARR. That is correct. It would not affect the local hardware dealer who was selling to the farmer down the road.

Mr. COHEN. He knows the farmer down the road anyway, knows him very well.

Mr. BARR. That is correct, so as I say, I want to make it very clear that the difference between us here is which is the more efficacious. We are not going to debate that your proposal does not have merit, because it certainly does. The point I am making here is that we are dealing on an interstate issue, and I do not think we should exaggerate the importance of this issue in the local sale of shotguns and rifles.

Senator HRUSKA. Very well.

Mr. BARR. If I may be a bit personal, sir, I have hunted in your State, the State of the Senator from South Carolina, the State of the gentleman from Michigan who has just left. I have never bought a gun mail order in my life. I usually like to go down and look at them and pick them up and feel them. I hope to hunt and——

Senator HRUSKA. May I say that that comment simply says Mr. Barr is denying a great big undeniable American fact of life that has existed for 100 years. The mail order business extends all the way from mattresses to shingles and back again and goes into the millions of dollars worth of business. Now Mr. Barr has his own inclinations and preferences, but at the same time the mail order business is a big business, and firearms are legitimate articles of use.

Mr. BARR. We agree it is legitimate business.

Senator HRUSKA. One's personal preference doesn't apply here. Besides you do not live in Sundance, Wyo., or in Nebraska. There is some difference.

Mr. BARR. I have herded cattle in Newcastle, Wyo., sir, where the nearest store was 70 miles and I can remember riding in and buying a gun.

Senator HRUSKA. On horseback, perhaps?

Mr. BARR. No, sir, a pickup truck.

Chairman Dodd. With respect to those who have been convicted of certain crimes this is nothing new. I believe this has been in the law since 1938.

Mr. Barr. That is right, sir.

Mr. Cohen. The nature of the crime was changed in 1961.

Senator Hruska. We want to improve on the law. The witness previously stated the law is indefinite and vague and hard to enforce. We want to improve on it. Amendment 90 has one way to improve on it it is said and I don't think it has any.

Chairman Dodd. You have made a good point. Let me ask the witnesses what has been the experience with this provision since 1938? Do you know of any injustices that have been worked? Have there been any complaints?

Mr. Cohen. We have had no real problems that way, sir. The good gun dealer knows his customers. He knows the kind of people he is dealing with.

Senator Hruska. Mr. Cohen, you just got through telling us of the thousands of guns that are sold to nonresidents, and it makes all kinds of troubles for Massachusetts and Missouri and New Jersey and so on. Let me refer you to your statement. You just got through saying it is a big problem. Do you want to change that part of your statement?

Mr. Cohen. No, sir. Under present law such sales are not proscribed. I am talking about if we had the restrictions on the out-of-State purchase this should not be any problem of consequence.

Senator Hruska. The chairman asked whether you have had any trouble under present law?

Mr. Cohen. I said the good gun dealers, sir. We have some good and some bad in this country today.

Senator Hruska. Didn't you just get through testifying as to the thousands of guns just from Illinois alone?

Mr. Cohen. Yes, sir; and I also testified that there were no licensing standards under which we could control who the gun dealers were, whether they were people of ethical standards or not.

Senator Hruska. What did you do with those 479 instances mentioned on page 10 of your statement? You gave many other examples.

Mr. Cohen. There were no findings that the gun dealer had violated anything that he was required under the present statute to do, sir, in most of those cases. There were a few there that were.

Senator Hruska. In that regard is there any difference between present law and Amendment 90, the administration bill?

Mr. Cohen. In what regard, sir?

Senator Hruska. In the regard of determining whether the dealer has exercised good faith in trying to find out if a guy had a felony record?

Mr. Cohen. There is an additional requirement of his recordkeeping. He must be more complete in his recordkeeping, which was not the case under the old law, sir, which would give us a better indication of whether he was in good faith or not.

Senator Hruska. You had no trouble identifying 18,670 such instances.

Mr. COHEN. There were many of those, thousands of those that were discarded because it was obvious that we could not follow them up, from our own knowledge.

Chairman DODD. Does the Senator from Nebraska have other questions?

Senator HRUSKA. I have many more.

Chairman DODD. We have a witness from out of State.

Senator THURMOND. Mr. Chairman, could I have just about 2 minutes?

Chairman DODD. Yes; of course.

Senator THURMOND. Mr. Chairman, I ask unanimous consent to put in the record a newsletter written by me on June 19, 1967, entitled "The Right To Bear Arms."

Chairman DODD. Yes; without objection that will be included.

(The document referred to was marked "Exhibit No. 13" and is as follows:)

<div align="center">

EXHIBIT No. 13

[Vol. XIII, No. 23, June 19, 1967]

STROM THURMOND, U.S. SENATOR FROM SOUTH CAROLINA REPORTS TO THE PEOPLE ON THE RIGHT TO BEAR ARMS

</div>

The tempo of the demands for some type of gun legislation has been increasing this year. Rising crime rates have led to more heated argument about the need for gun control by the authorities, State or Federal. The debate today is whether the Federal Government should provide assistance for State laws on the subject, or set up substantive legislation of its own.

I believe, as I have indicated many times in the past, that Congress has no authority to prevent people from buying and owning firearms. The Second Amendment to the Constitution provides that "the right of the people to keep and bear Arms, shall not be infringed." These prohibitions are directed against the National Government, but not against the States. The people of each State, therefore, can regulate the sale of firearms without running afoul of the Constitution.

Most of the States have laws designed to prevent firearms from being sold to juveniles, insane persons and people with criminal records. The State laws vary in strictness and enforcement, according to the needs of each State. The New York law, for instance, requires that a person apply for and be granted a permit from the State as a prerequisite to purchasing or possessing a hand gun. In most States, however, control over gun sales is exercised by licensing the merchants who sell firearms, and by requiring the sellers to adhere to the law in order to keep their licenses.

In recent years, State laws governing the sale of firearms have been increasingly circumvented by mail order sales of weapons. Dealers in weapons located outside State boundaries often do not comply with State laws restricting sales. Guns have been sold through the mail to children, persons of unsound mind, and people with long criminal records. Some irresponsible mail order merchants sell with impunity to anyone who has the price, since they do not have to obtain a license in the State where the purchaser lives, and are beyond the reach of criminal laws of the State to which the gun is shipped.

The problem is easily solved without overstepping the safeguards of the Second Amendment. Congress has the power to regulate interstate commerce. Therefore, Congress can make it unlawful to ship firearms in interstate commerce unless the sale is consistent with the law of the State to which the weapon is shipped.

Congress should require the gun seller to obtain from the would-be purchaser a sworn statement that the buyer is not prevented by the law of his home State from purchasing the weapon. This should be coupled with a requirement that the seller, prior to shipping the weapon, send a copy of the sworn statement by registered mail to the chief law enforcement officer of the area in which the would-be purchaser lives. Failure to comply would be a Federal criminal offense.

Legislation of this type would protect the rights of the States and the rights of the people, without working an undue hardship on seller or buyer. In most States, the people feel strongly that law-abiding, sane adults should be permitted to own firearms. If the National Government prohibited the sale of firearms, law-abiding citizens would not obtain firearms, but lawbreakers would, Criminals do not hesitate to obtain firearms illegally. Moreover, they would know that a gun would provide them with a bigger advantage over a citizenry disarmed by law.

Congress should enact legislation to support the laws which the people of each State have passed according to their varying requirements. It is just as important, however, for Congress to obey the Constitutional mandate that protects the right of the people to keep and bear arms.

Sincerely,

STROM THURMOND.

Senator THURMOND. There are just two or three statements from this that I would like to emphasize at this time. The first is that Congress has no authority to prevent people from buying and owning firearms.

Next, that the people of each State can regulate the sale of firearms without running afoul of the Constitution.

The next is that the Congress has he power to regulate interstate commerce. Therefore Congress can make it unlawful to ship firearms in interstate comerce unless the sale is consistent with the law of the State in which the weapon is shipped. Therefore I suggest that Congress would require the gun seller to obtain from the would-be purchased the sworn statement that the buyer is not prevented by the law of his home State from purchasing the weapon.

This would be coupled with a requirement that the seller prior to shipping the weapon send a copy of the sworn statement by registered mail to the chief law enforcement officer of the area in which the would-be purchaser lives. Failure to comply would be a Federal criminal offense.

Now, legislation of this type would protect the rights of the states and the rights of the people, without working an undue hardship on the seller or the buyer. I am convinced that if the National Government prohibited the sale of firearms, the law-abiding citizens would not obtain firearms but the lawbreakers would. Criminals do not hesitate to obtain firearms illegally.

Moreover, they would know that a gun would provide them with a big advantage over a citizenry disarmed by law. It is my opinion that Congress should enact legislation to support the laws which the people of each State have passed according to their varying requirements, and I think it is important, just as important, for Congress to obey the constitutional mandate that protects the right of the people to keep and bear arms.

I just wanted to make those statements for the record to set out my position. I wish to thank you gentlemen for your statements here, and I feel that we could enact some legislation along the line indicated, that it would be helpful, but I feel that what has been advocated by the administration goes beyond the jurisdiction of the National Government, if we are going to observe the Constitution.

Thank you, Mr. Chairman.

Chairman DODD. Would it be acceptable to you, Mr. Commissioner and Mr. Secretary, if we interrupted your testimony? We have an official from out of State to whom I made a commitment that we

would get him away today. We may not be able to do that. By the way, as I understand it, the Judiciary Committee meeting for tomorrow morning has been canceled.

Senator HRUSKA. I am so told, because we have a meeting of the full committee.

Chairman DODD. Can we possibly meet here tomorrow morning?

Senator HRUSKA. Sure, as far as I am concerned.

Chairman DODD. Senator Thurmond, is it acceptable to you that we meet tomorrow morning?

Senator THURMOND. Yes.

Chairman DODD. Would that be acceptable to you?

Mr. BARR. Yes, sir.

Chairman DODD. Very well. Without objection then we will excuse you now and ask you to return tomorrow morning. We will now call Mr. Ludwig.

I thank you very much.

Mr. COHEN. Thank you, Senator.

Mr. BARR. Thank you.

Chairman DODD. Mr. Frederick J. Ludwig is the chief assistant district attorney of Queens County, N.Y. He is a lawyer, a graduate from the City College of New York Law School and Columbia University School of Law. He was a professor of law for several years. He was formerly a member of the New York Police Force. He is now retired from the New York City Police Force. As I said, he is the chief assistant district attorney for Queens County.

We are very interested and pleased that you were able to come, Mr. Ludwig.

## STATEMENT OF FREDERICK J. LUDWIG, CHIEF ASSISTANT DISTRICT ATTORNEY, QUEENS, LONG ISLAND, N.Y.

Mr. LUDWIG. Thank you, Mr. Chairman. I appear here on behalf of the Queens district attorney, Thomas J. Mackell, who is now in Europe with the New York State Attorneys Association, so I am now the acting district attorney of Queens and I am anxious to get back.

Chairman DODD. I know that.

Mr. LUDWIG. Because Queens has maybe twice as many people as some of the States that are represented at the table. May I begin, Mr. Chairman?

Chairman DODD. Oh, yes, go right ahead.

Mr. LUDWIG. Very briefly, I have submitted, as the committee rules require, an advance statement which I will cover.

Senator KENNEDY. Can I ask, will you talk about the Jamaica Rifle Club?

Mr. LUDWIG. I will talk about it as far as *Shepherd* v. *Maxwell*, the decision of the Supreme Court a year ago will permit me to. I am not allowed to discuss evidence, but within the ranges of the constitutional strictures of that decision I certainly will, Senator. Thank you.

One of the things the Federal Government could do is to refrain from aiding and abetting and supplying with arms persons who are engaged in criminal conspiracy. On two occasions out of three major investigations during the few months we have been in office since the first of the year, we have found that the Office of Civilian Marks-

# EXHIBIT 24



# Gun Crime in the Age Group 18-20

A Report by:

## The Department of the Treasury and The Department of Justice

June 1999



*Department of Justice*                                          *Department of the Treasury*

# Gun Crime in the Age Group 18 to 20

In 1996, 34,040 people in the United States were killed with guns.  Of those deaths, 18,166 were suicides, 14,037 were homicides, 1,134 were unintentional shootings, and 413 deaths were of unknown intent. (National Center for Health Statistics, Centers for Disease Control, U.S. Department of Health and Human Services.)  This report focuses primarily on firearms homicides and other gun crime in the age group 18 to 20.

## Current Law on Firearms Possession by Young People

Current federal minimum age regulations relating to firearms vary by type of gun and means of access.  The Gun Control Act of 1968 made it unlawful for federal firearms dealers to sell handguns to persons under 21.  The Youth Handgun Safety Act of 1994 generally prohibited transfers of handguns to and possession of handguns by anyone under 18.  Exceptions include official military use, and the following activities with the written consent of the parent or guardian: employment, ranching, farming, target practice, hunting and handgun safety instruction.  Persons between the ages of 18 and 21 may still acquire handguns from non-licensed sellers.

There is no federal age restriction on possession of long guns (including rifles and shotguns).  While licensed dealers may only sell rifles and shotguns to persons aged 18 and older, there is no age restriction on the transfer of shotguns and rifles by non-licensed sellers.

The Violent Crime Control and Law Enforcement Act of 1994 banned the possession of semiautomatic assault weapons manufactured after passage of the law.  Under the law, assault weapons are defined either by specific make and model or by specific features.  Assault weapons can be pistols, rifles, or shotguns.  A person of any age may acquire an assault rifle or assault shotgun manufactured before 1994 from a non-licensed seller, and as of age 18, a person may buy assault rifles and assault shotguns manufactured before 1994 from licensed dealers.  Pistols classified as semiautomatic assault weapons that are grandfathered are subject to the same restrictions as other handguns.  There are no age restrictions on transfer or possession of large capacity ammunition feeding devices (more than 10 rounds); thus a person of any age may purchase such devices manufactured before 1994.

## Age Restrictions in The Youth Gun Crime Enforcement Act of 1999

The Youth Gun Crime Enforcement Act of 1999 would raise the minimum age for possession of a handgun from 18 to 21 and bar all handgun transfers to anyone in that age group, with exceptions for employment, hunting, farming, target practice, and for safety instruction.  The legislation would also raise the minimum age to possess an assault rifle from 18 to 21, and bar assault rifle transfers by anyone to anyone in that age group, without exception.  The same is true for large capacity magazine feeding devices.

## Murder and  Violent Crime Arrests in the 18 to 20 Age Range

In 1997, the most frequent age for arrest for murder was 18, accounting for 8 percent of all arrests for murder.  The second most frequent age for murder was 19, accounting for 8 percent of those arrests, and the third most frequent age for arrest for murder was 20, accounting for 7 percent.  Eighteen to 20 year olds comprised 22 percent of all those arrested for murder.  Similarly, the most frequent age for arrest for violent crime was 18, accounting for 5 percent of all violent crime

arrests.  Eighteen to 20 year olds comprised 14 percent, or one in seven, of all of those arrested for violent crime.  (FBI Uniform Crime Reports, Table 38, 1997).

## Criminal Use of Firearms in the 18 to 20 Age Range

In 1997, 18, 19 and 20 year olds ranked first, second, and third in the number of gun homicides committed.   Of all gun homicides where an offender was identified, 24 percent were committed by 18 to 20 year olds.  (Figure 1).  This is consistent with the historical pattern of gun homicides over the past 10 years.

Among murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and over. More specifically, in 1997, 74 percent of the homicides committed by 18 to 20 year old offenders involved firearms.  In contrast, only 61 percent of homicides committed by offenders 21 or over involved firearms. (Table 1).  The under-21 offender age groups showed a significant shift toward the use of firearms in committing homicides by the mid-1980's.  By the 1990's, these offender groups were using firearms to commit homicides more than 70 percent of the time.  Although the proportion of 18 to 20 year olds who use firearms to commit homicides has declined since the 1994 peak, it remains higher than levels recorded before 1990.  (Figure 2).  Similarly, in non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old offenders were more likely to use guns than both younger and older offender age groups.  For non-lethal crimes of violence from 1992 to 1997, in cases where the weapon and age of offender were identified, 15 percent of 18 to 20 year old offenders used a firearm, in contrast to 10 percent of adult offenders, and 5 percent of offenders 17 and under.  (Table 2).

## Youth Gun Acquisition Through the Illegal Market

Young offenders can and do obtain firearms illegally.  The complexity of the firearms market poses a challenge for law enforcement officials seeking to develop strategies to attack the illegal market that supplies criminals and juveniles.  The firearms market includes federal firearms licensees (FFLs); unregulated sellers and private transferors in what is known as the secondary market; and the illegal market.  The illegal market involves transfers both from FFLs and from unregulated transferors.  Gun violence is also facilitated when firearms are inadequately secured by FFLs, common carriers, and gun owners, especially parents with children at home.

### *Recent Law Enforcement Information on the Illegal Market in Firearms*

During the past six years, the Bureau of Alcohol, Tobacco and Firearms (ATF), working with law enforcement agencies around the country, academic researchers, and the Department of Justice, has significantly increased efforts to determine how felons and other prohibited persons, including juveniles and youth offenders, obtain firearms.  Better information enables ATF and State and local law enforcement officials to deploy regulatory and criminal investigative resources more effectively against illegal traffickers.

ATF has encouraged all law enforcement agencies to submit crime guns for tracing by the National Tracing Center (NTC).  An NTC trace can identify the FFL that sold the crime gun as a new gun, and the purchaser of the crime gun. This information can assist law enforcement officials in identifying illegal traffickers.  ATF has worked with law enforcement officials in an increasing number of jurisdictions to trace *all* recovered crime guns as part of an effort to obtain better investigative and strategic information about how the illegal market in firearms operates locally.

When crime guns are traced comprehensively, and this information is analyzed, patterns in the illegal supply can be discerned and illegal sources of supply can be better targeted by law enforcement officials.  Crime gun traces by federal, state and local officials grew from about 55,000 traces in 1993, to over 197,000 traces in 1998, a 258 percent increase.  Efforts to trace crime guns comprehensively by jurisdiction and analyze the results to support investigations and arrests of illegal traffickers in firearms are now underway in 37 cities through the Youth Crime Gun Interdiction Initiative (YCGII).  The Youth Gun Crime Enforcement Act of 1999 increases this program to 75 cities over the next four years.

### The Structure of the Illegal Market in Firearms

Information derived from analyses of crime gun traces and investigative information confirms what survey evidence also shows: while some juveniles and criminals steal guns for their own use, many underage gun users obtain firearms through illegal diversion from retail sources, and from purveyors of stolen guns.[1]  While it used to be assumed that there were two primary sources of illegally supplied firearms — older guns that were stolen, primarily by criminals and juveniles stealing the guns for their own use, and new guns that were trafficked, primarily across state lines in bulk — it has become clear that there are many more.  These include interstate and intrastate trafficking in *new* firearms, *used* firearms, and in new and used *stolen* firearms.

Trafficking in *new and used firearms* involves licensed firearms dealers, including pawnbrokers; large scale straw purchasers and straw purchasing rings; small scale straw purchasers, e.g. buying one or a few guns; private sellers, including unlicensed sellers at gun shows and flea markets, or those who sell through want ads, gun magazines, the Internet, and personal associations; and bartering and trading within criminal networks.  Trafficking in *stolen firearms*, both new and used, involves theft from licensed gun dealers, including pawnbrokers; organized fencing of stolen guns; theft from common carriers; theft from households and automobiles; bartering and trading within criminal networks; and theft from manufacturers.  Law enforcement must address all of these channels in order to prevent juveniles and other prohibited persons from obtaining firearms.

### Crime Gun Trace Information Involving 18 to 20 Year Olds in Selected Cities

Crime gun trace data show that reducing illegal trafficking is essential for reducing firearms violence in the 18 to 20 age group.  For the 27 cities where law enforcement officials submitted all recovered crime guns for tracing through the Youth Crime Gun Interdiction Initiative from August 1997 through July 1998, the most frequent age of crime gun possession was 19, and the second most frequent was 18.  Approximately 15 percent of crime guns were recovered from 18 to 20 year olds.  (Figure 3).

Handguns comprised 85 percent of the crime guns known to be recovered from 18 to 20 year olds in the 27 cities.  Semiautomatic pistols accounted for 59 percent of all the crime guns known to be recovered from this age group.  (Table 3).  Eighteen to 20 year old crime gun possessors were

---

[1] *See e.g.* "Gun Acquisition and Possession in Selected Juvenile Samples," Sheley, Joseph F. and Wright, James D., Department of Justice, Office of Justice Programs, p. 6, December 1993,  (12 percent of surveyed juvenile inmates and 2 percent of surveyed high school students reported stealing their most recent handgun).

involved in crimes of violence, drug crimes, and in possessing these guns illegally.  Crimes of violence--including homicide, rape, assault, and robbery--and narcotics crimes accounted for 28 percent of the crime gun traces for this age group in the 27 cities. (Table 4).

On average, of the crime guns that were recovered and traced from the 27 cities, an estimated 43 percent moved from the shelf of an FFL to recovery by law enforcement within three years, a time period ATF considers an indicator of potential illegal trafficking.  This estimate includes only potential trafficking in new guns, not potential trafficking in used and stolen firearms.[2]  (Table 5).  Analysis of ATF's recent illegal trafficking investigations involving juveniles and youth shows that over half of them involved used guns, and 35 percent involved trafficking in stolen firearms.  (Table 7).  Finally, crime guns recovered from 18 to 20 year olds are often concentrated among a relatively few kinds of firearms, and nine of the top ten most frequently traced crime guns in the 27 cities were handguns.  (Table 6).


### The Youth Gun Crime Enforcement Act of 1999:  Provisions to Reduce Youth Gun Violence

The significant role that 18 to 20 year olds have in gun crime and violence in our Nation demands that we make changes in the legal regulation of their access to guns.  A further benefit to restrict-ing possession of firearms by 18 to 20 year olds will be to decrease the likelihood that younger family members, friends, and classmates will be able to obtain guns illegally.

Raising the age at which young people can legally obtain unauthorized access to guns is not by itself enough to reduce the level of gun violence among 18 to 20 year olds.  There must be a vigor-ous attack on the illegal supply of guns to youth,  as well as deterrence of illegal youth acquisition of guns:  appropriate punishment of  those who transfer guns illegally, and of young persons who violate laws prohibiting firearms possession or who commit crimes with guns.  Different methods of regulatory and criminal enforcement are needed to reduce the various illegal channels of supply to 18 to 20 year olds, and punishments must be appropriate for both underage criminal firearms users and adult felons.  The Youth Crime Gun Enforcement Act of 1999 contains a number of provisions that will address these issues.  It will:

- Raise the age for possession of handguns from 18 to 21;

- Prohibit possession of semiautomatic assault weapons and large capacity magazines by persons under the age of 21;

- Require background checks and crime gun tracing records for all firearms sales at gun shows;

- Increase penalties for those who engage in the business of dealing in firearms without a license;

- Increase the punishment for serious recordkeeping violations by FFLs;

- Provide new administrative remedies, including license suspension and civil monetary penal-ties, for FFLs who violate federal firearms laws;

- Increase penalties for transactions involving firearms with obliterated serial numbers;

---

[2] For a full discussion of the methodologies used to arrive at the estimate of the percentage of crime guns moving from FFL shelf to recovery by law enforcement officials within a three year time period, see C*rime Gun Trace Analy-sis Reports:  The Illegal Youth Firearms Markets in 27 Communities*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, p. 9 and Technical Notes A1-A3, February 1999.

*Department of Justice*                                                    *Department of the Treasury*

- Limit individuals to one handgun purchase a month, with certain exceptions;

- Criminalize the transfer of a firearm by one who knows or has reasonable cause to believe that the firearm will be used to commit a crime of violence or a drug trafficking crime;

- Enable used guns to be traced by requiring FFLs to report information about firearms that are acquired from nonlicensees for resale (without including names or identifying information about firearms purchasers);

- Require FFLs to securely store their firearms inventories;

- Impose responsibility upon common carriers to report the theft or loss of a firearm;

- Prohibit possession of firearms by persons adjudicated delinquent as juveniles for serious drug offenses or violent felonies;

- Increase the penalty for possession of firearms by persons under 21;

- Include serious juvenile drug trafficking offenses as Armed Career Criminal Act predicates;

- Add a number of gang-related firearms offenses to the RICO statute;

- Increase the number of cities participating in comprehensive crime gun tracing and firearms law enforcement through the Youth Crime Gun Interdiction Initiative.

Adoption of these measures will greatly assist in curbing gun violence by the Nation's young people.

*Department of the Treasury*                                                      *Department of Justice*

# Gun Homicide Offenders by Age Group

### Figure 1



Source: Federal Bureau of Investigation (FBI), Uniform Crime Reports, Supplemental Homicide Reports, 1997, special tabulation prepared by Northeastern University, Boston, Massachusetts.

In 1997, 18, 19, and 20 year olds ranked first, second, and third in the number of gun homicides committed.  For each of these ages, the number of homicides exceeded the number for any ages older or younger than 18 to 20.  Of all gun homicides where an offender was identified, 24 percent were committed by 18 to 20 years olds.  This is consistent with the historical pattern of gun homicides over the past 10 years.

*Department of Justice*                                              *Department of the Treasury*

# Homicide Offenders by Type of Weapon and Age Group

## Table 1

| Type of Weapon | Age of Offender | | | |
| --- | --- | --- | --- | --- |
| | Percent 17 and Under | Percent 18-20 | Percent 21 and Over | Percent Total |
| Gun | 74.6 | 74.0 | 61.0 | 65.5 |
| Other Weapon | 23.3 | 23.8 | 35.1 | 31.2 |
| Unknown Weapon | 2.1 | 2.2 | 3.9 | 3.3 |
| **Total Percent** | **100.0** | **100.0** | **100.0** | **100.0** |
| **Total # of Homicide Offenders** | **1,487** | **2,420** | **7,723** | **11,630** |

Source: FBI Uniform Crime Reports, Supplemental Homicide Reports, 1997, special tabulation prepared by Northeastern University, Boston, Massachusetts.

Among murderers, 18 to 20 year olds, as well as those 17 and under, were more likely to use a firearm than adults.   More specifically, in 1997, about three quarters of the homicides committed by 18 to 20 year old offenders, and by offenders 17 and under, involved firearms.  In contrast, only about three fifths of homicides committed by offenders 21 or over during 1997 involved firearms.

# Percentage of Homicide Offenders Using a Firearm by Age Group for the Years 1976-1997

## Figure 2



Source: FBI Uniform Crime Reports, Supplemental Homicide Reports, 1976-1997, special tabulation prepared by Bureau of Justice Statistics.

The under-21 offender age groups showed a significant shift toward the greater use of firearms in committing homicides by the mid-1980's.  By the 1990's, these offender groups were using fire-arms to commit homicides more than 70 percent of the time.  Although the proportion of 18 to 20 year olds who use firearms to commit homicides has declined since the 1994 peak, it remains higher than levels recorded before 1990.

*Department of Justice*                                                          *Department of the Treasury*

# Non-Lethal Crimes of Violence by Type of Weapon and Offender Age Group

## Table 2

| Type of weapon | Age of Offender | | |
|---|---|---|---|
| | **Percent 17 and Under** | **Percent 18-20** | **Percent 21 and Over** |
| Firearm | 5.0 | 14.8 | 10.0 |
| Knife | 6.9 | 9.4 | 7.2 |
| Other Weapon | 8.0 | 10.3 | 8.8 |
| No Weapon | 80.1 | 65.5 | 74.4 |
| **Total Percent** | **100.0** | **100.0** | **100.0** |
| **Total # of Victimizations** | **12,449,485** | **5,505,453** | **30,971,671** |

Source: Bureau of Justice Statistics, National Crime Victimization Survey, 1992-1997, special tabulation.

In non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old offenders were more likely to use guns than both younger and older age groups. From 1992 to 1997, in cases where the weapon and age of offender were identified, 15 percent of 18 to 20 year old offenders used a firearm, in contrast to 10 percent of adult offenders, and 5 percent of offenders 17 and under.

*Department of the Treasury*                                                      *Department of Justice*

# Crime Gun Possession by Age in Selected Cities

## Figure 3

Based on trace requests submitted August 1, 1997 to July 31, 1998 from 27 cities participating in the Youth Crime Gun Interdiction Initiative*



Source: Bureau of Alcohol, Tobacco and Firearms (ATF), National Tracing Center, *Youth Crime Gun Interdiction Initiative 27 Communities Report*, 1999.  For a discussion of trace analysis methodology, see pp. 7-9 and Technical Notes.

For 27 cities where law enforcement officials submitted all recovered crime guns for tracing, the most frequent age of crime gun possession was 19 (5 percent) and the second most frequent was 18 (5 percent).  Approximately 15 percent of crime guns were recovered from 18 to 20 year olds.

*The Youth Crime Gun Interdiction Initiative is a firearms law enforcement program of the Bureau of Alcohol, Tobacco and Firearms (ATF).  Law enforcement agencies in cities participating with ATF in the program trace all recovered crime guns with ATF's National Tracing Center to determine the last known seller and purchaser of the firearm.  This information is used by federal, state, and local law enforcement officials to determine patterns of crime gun supply, and to investigate illegal sources of firearms and arrest firearms offenders.  The most recent available data is from 27 cities that submitted traces during the period August 1, 1997 to July 31, 1998.  The participating cities were: Atlanta, Georgia; Baltimore, Maryland; Birmingham, Alabama; Boston, Massachusetts; Bridgeport, Connecticut; Chicago, Illinois; Cincinnati, Ohio; Cleveland, Ohio; Detroit, Michigan; Gary, Indiana; Houston, Texas; Inglewood, California; Jersey City, New Jersey; Los Angeles, California; Memphis, Tennessee; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; New York City, New York; Philadelphia, Pennsylvania; Richmond,Virginia; Salinas, California; San Antonio, Texas; Seattle, Washington; St. Louis, Missouri; Tucson, Arizona; Washington, D.C.

*Department of Justice*                                                      *Department of the Treasury*

# Type of Crime Guns Recovered From the 18 to 20 Age Group in Selected Cities

### Table 3

Based on trace requests submitted August 1, 1997 to July 31, 1998 from 27 cities participating in the Youth Crime Gun Interdiction Initiative*

| Type of Weapon | Memphis<br>Percent | San Antonio<br>Percent | St. Louis<br>Percent | Philadelphia<br>Percent | Tucson<br>Percent | 27 Cities<br>Percent |
|---|---|---|---|---|---|---|
| Semiautomatic Pistol | 54.5 | 51.1 | 33.5 | 62.0 | 66.7 | 58.9 |
| Revolver and other Handgun | 28.8 | 19.5 | 35.5 | 26.8 | 14.4 | 26.1 |
| Long Gun | 16.5 | 29.5 | 30.2 | 11.2 | 19.0 | 14.9 |
| Other | .3 | 0.0 | .8 | 0.0 | 0.0 | .1 |
| **Total Percent** | **100.0** | **100.0** | **100.0** | **100.0** | **100.0** | **100.0** |
| **Total # of Cases** | **400** | **190** | **245** | **508** | **201** | **4,888** |

Source: Bureau of Alcohol, Tobacco and Firearms (ATF), National Tracing Center, Youth Crime Gun Interdiction Initiative, 1999, special tabulation prepared by Northeastern University, Boston, Massachusetts.  For a discussion of trace analysis methodology, see *Youth Crime Gun Interdiction Initiative 27 Communities Report*, 1999, pp. 7-9  and Technical Notes.

Handguns (including semiautomatic pistols) comprised 85 percent of the crime guns known to be recovered from 18 to 20 year olds in 27 cities where law enforcement officials submitted all recovered crime guns for tracing.  Semiautomatic pistols clearly predominate, accounting for 59 percent of all the firearms known to be recovered from 18 to 20 year olds in these cities.  Information for five geographically diverse cities among the 27 cities are provided to show local variations.

*The Youth Crime Gun Interdiction Initiative is a firearms law enforcement program of the Bureau of Alcohol, Tobacco and Firearms (ATF).  Law enforcement agencies in cities participating with ATF in the program trace all recovered crime guns with ATF's National Tracing Center to determine the last known seller and purchaser of the firearm.  This information is used by federal, state, and local law enforcement officials to determine patterns of crime gun supply, and to investigate illegal sources of firearms and arrest firearms offenders.  The most recent available data is from 27 cities that submitted traces during the period August 1, 1997 to July 31, 1998.  The participating cities were: Atlanta, Georgia; Baltimore, Maryland; Birmingham, Alabama; Boston, Massachusetts; Bridgeport, Connecticut; Chicago, Illinois; Cincinnati, Ohio; Cleveland, Ohio; Detroit, Michigan; Gary, Indiana; Houston, Texas; Inglewood, California; Jersey City, New Jersey; Los Angeles, California; Memphis, Tennessee; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; New York City, New York; Philadelphia, Pennsylvania; Richmond,Virginia; Salinas, California; San Antonio, Texas; Seattle, Washington; St. Louis, Missouri; Tucson, Arizona; Washington, D.C.

Department of the Treasury                                          Department of Justice

# Type of Crime Associated with Crime Guns Recovered From the 18 to 20 Age Group in Selected Cities

### Table 4

Based on trace requests submitted August 1, 1997 to July 31, 1998 from 27 cities participating in the Youth Crime Gun Interdiction Initiative*

| Type of Crime | Memphis Percent | San Antonio Percent | St. Louis Percent | Philadelphia Percent | Tucson Percent | 27 Cities Percent |
|---|---|---|---|---|---|---|
| Crimes of Violence | 9.7 | 13.1 | 12.6 | 24.4 | 24.3 | 15.3 |
| Firearms Offense | 84.0 | 43.7 | 53.9 | 52.3 | 45.8 | 66.1 |
| Narcotics | 2.3 | 25.8 | 29.8 | 19.9 | 18.9 | 12.7 |
| Property/Fraud | 3.0 | 10.5 | 3.3 | 3.0 | 6.5 | 3.4 |
| Other | 1.0 | 6.9 | .4 | .4 | 4.5 | 2.5 |
| **Total Percent** | **100.0** | **100.0** | **100.0** | **100.0** | **100.0** | **100.0** |
| **Total # of Cases** | **400** | **190** | **245** | **508** | **201** | **4,888** |

Source: Bureau of Alcohol, Tobacco and Firearms (ATF), National Tracing Center, Youth Crime Gun Interdiction Initiative, 1999, special tabulation prepared by Northeastern University, Boston, Massachusetts.  For a discussion of trace analysis methodology, see *Youth Crime Gun Interdiction Initiative 27 Communities Report*, 1999, pp. 7-9 and Technical Notes.

Eighteen to 20 year old crime gun possessors were involved in crimes of violence, drug crimes, and in carrying these guns illegally.  Crimes of violence, including homicide, rape, assault, and robbery, and narcotics crimes accounted for 28 percent of the crime gun traces for this age group in 27 cities where law enforcement officials submitted all recovered crime guns for tracing.  Information from five geographically diverse cities is provided to show local variations.

*The Youth Crime Gun Interdiction Initiative is a firearms law enforcement program of the Bureau of Alcohol, Tobacco and Firearms (ATF).  Law enforcement agencies in cities participating with ATF in the program trace all recovered crime guns with ATF's National Tracing Center to determine the last known seller and purchaser of the firearm.  This information is used by federal, state, and local law enforcement officials to determine patterns of crime gun supply, and to investigate illegal sources of firearms and arrest firearms offenders.  The most recent available data is from 27 cities that submitted traces during the period August 1, 1997 to July 31, 1998.  The participating cities were: Atlanta, Georgia; Baltimore, Maryland; Birmingham, Alabama; Boston, Massachusetts; Bridgeport, Connecticut; Chicago, Illinois; Cincinnati, Ohio; Cleveland, Ohio; Detroit, Michigan; Gary, Indiana; Houston, Texas; Inglewood, California; Jersey City, New Jersey; Los Angeles, California; Memphis, Tennessee; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; New York City, New York; Philadelphia, Pennsylvania; Richmond,Virginia; Salinas, California; San Antonio, Texas; Seattle, Washington; St. Louis, Missouri; Tucson, Arizona; Washington, D.C.

*Department of Justice*                                                    *Department of the Treasury*

# Time-to-Crime for Crime Guns Recovered From the 18 to 20 Age Group in Selected Cities

## Table 5

Based on trace requests submitted August 1, 1997 to July 31, 1998 from 27 cities participating in the Youth Crime Gun Interdiction Initiative*

|  | Memphis<br>Percent | San Antonio<br>Percent | St. Louis<br>Percent | Philadelphia<br>Percent | Tucson<br>Percent | 27 Cities<br>Percent |
|---|---|---|---|---|---|---|
| 3 years or under | 43.8 | 38.0 | 32.3 | 44.3 | 68.3 | 43.3 |
| Over 3 years | 56.2 | 62.0 | 67.7 | 55.7 | 31.7 | 56.7 |
| **Total Percent** | **100.0** | **100.0** | **100.0** | **100.0** | **100.0** | **100.0** |
| **Total # of Cases** | **162** | **100** | **62** | **183** | **126** | **2,036** |

Source: Bureau of Alcohol, Tobacco and Firearms (ATF), National Tracing Center, Youth Crime Gun Interdiction Initiative, 1999, special tabulation prepared by Northeastern University, Boston, Massachusetts.  For a discussion of the methodologies used to analyze time-to-crime, see *Youth Crime Gun Interdiction Initiative 27 Communities Report*, 1999, pp. 7-9  and Technical Notes A1-A3.

Time-to-crime is the time it takes for a gun to move from the shelf of a federally licensed firearms dealer to recovery by a law enforcement official in connection with a crime.  ATF considers a time-to-crime of three years or less an indicator of potential illegal firearms trafficking that can be investigated by law enforcement to identify an illegal source of supply.  On average, of the traced crime guns recovered from 18 to 20 year olds in 27 cities, 43 percent were fast time-to-crime guns.

*The Youth Crime Gun Interdiction Initiative is a firearms law enforcement program of the Bureau of Alcohol, Tobacco and Firearms (ATF).  Law enforcement agencies in cities participating with ATF in the program trace all recovered crime guns with ATF's National Tracing Center to determine the last known seller and purchaser of the firearm.  This information is used by federal, state, and local law enforcement officials to determine patterns of crime gun supply, and to investigate illegal sources of firearms and arrest firearms offenders.  The most recent available data is from 27 cities that submitted traces during the period August 1, 1997 to July 31, 1998.  The participating cities were: Atlanta, Georgia; Baltimore, Maryland; Birmingham, Alabama; Boston, Massachusetts; Bridgeport, Connecticut; Chicago, Illinois; Cincinnati, Ohio; Cleveland, Ohio; Detroit, Michigan; Gary, Indiana; Houston, Texas; Inglewood, California; Jersey City, New Jersey; Los Angeles, California; Memphis, Tennessee; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; New York City, New York; Philadelphia, Pennsylvania; Richmond,Virginia; Salinas, California; San Antonio, Texas; Seattle, Washington; St. Louis, Missouri; Tucson, Arizona; Washington, D.C.

*Department of the Treasury*                                                    *Department of Justice*

# Most Frequent Crime Gun Trace Requests by Type, Manufacturer, and Caliber of Firearm for the 18 to 20 Age Group in Selected Cities

This table depicts the most frequently recovered and traced crime guns by firearm type, manufacturer, and caliber recovered from 18 to 20 year olds in 27 cities, and in five geographically diverse cities from among those 27 cities. This report does not distinguish among models of firearms of the same type, manufacturer and caliber. For instance, all .38 caliber revolvers manufactured by Smith and Wesson are considered as a group. Recovered crime guns are often concentrated among relatively few kinds of firearms. This information facilitates strategic enforcement against illegal traffickers of particular kinds of firearms. To the extent that youth acquisition is being fueled by illegal trafficking, preventing such trafficking would inhibit youth acquisition of the handguns, rifles, and shotguns identified below.

## Table 6

Based on trace requests submitted August 1, 1997 to July 31, 1998 from 27 cities participating in the Youth Crime Gun Interdiction Initiative*

### 27 Cities

| Type of Crime Gun | Manufacturer | Caliber | Number of Kinds of Crime Guns | Number of Crime Guns | Percent of Crime Guns |
|---|---|---|---|---|---|
| Semiautomatic Pistol | Lorcin | .380 | | 214 | 4.4 |
| Revolver | Smith & Wesson | .38 | | 189 | 3.9 |
| Semiautomatic Pistol | Raven | .25 | | 164 | 3.4 |
| Semiautomatic Pistol | Davis | .380 | | 141 | 2.9 |
| Semiautomatic Pistol | Ruger | 9mm | | 135 | 2.8 |
| Semiautomatic Pistol | Bryco | .380 | | 103 | 2.1 |
| Semiautomatic Pistol | Bryco | 9mm | | 91 | 1.9 |
| Revolver | Smith & Wesson | .357 | | 87 | 1.8 |
| Semiautomatic Pistol | Smith & Wesson | 9mm | | 83 | 1.7 |
| Shotgun | Mossberg | 12GA | | 82 | 1.7 |
| Summary for top weapons: | | | 10 | 1,289 | 26.4 |
| All other weapons: | | | 538 | 3,599 | 73.6 |

### Memphis, Tennessee

| Type of Crime Gun | Manufacturer | Caliber | Number of Kinds of Crime Guns | Number of Crime Guns | Percent of Crime Guns |
|---|---|---|---|---|---|
| Semiautomatic Pistol | Lorcin | .380 | | 23 | 5.8 |
| Revolver | Smith & Wesson | .357 | | 14 | 3.5 |
| Semiautomatic Pistol | Davis | .380 | | 13 | 3.3 |
| Revolver | Smith & Wesson | .38 | | 13 | 3.3 |
| Semiautomatic Pistol | Bryco | .380 | | 12 | 3.0 |
| Revolver | Rossi | .38 | | 11 | 2.8 |
| Revolver | RG Industries | .22 | | 10 | 2.5 |
| Semiautomatic Pistol | Ruger | 9mm | | 10 | 2.5 |
| Semiautomatic Pistol | Raven | .25 | | 10 | 2.5 |
| Semiautomatic Pistol | Smith & Wesson | .38 | | 9 | 2.3 |
| Summary for top weapons: | | | 10 | 125 | 31.3 |
| All other weapons: | | | 143 | 275 | 68.8 |

*Department of Justice*                                   *Department of the Treasury*

## San Antonio, Texas

| Type of Crime Gun | Manufacturer | Caliber | Number of Kinds of Crime Guns | Number of Crime Guns | Percent of Crime Guns |
|---|---|---|---|---|---|
| Rifle | Norinco | 7.62mm | | 9 | 4.7 |
| Semiautomatic Pistol | Lorcin | .380 | | 9 | 4.7 |
| Semiautomatic Pistol | Raven | .25 | | 9 | 4.7 |
| Semiautomatic Pistol | Bryco | .9mm | | 8 | 4.2 |
| Shotgun | Mossberg | 12GA | | 7 | 3.7 |
| Semiautomatic Pistol | Ruger | 9mm | | 7 | 3.7 |
| Revolver | Smith & Wesson | .38 | | 5 | 2.6 |
| Rifle | Marlin | .22 | | 4 | 2.1 |
| Semiautomatic Pistol | Glock | 9mm | | 4 | 2.1 |
| Revolver | Colt | .357 | | 4 | 2.1 |
| Summary for top weapons: | | | 10 | 66 | 34.7 |
| All other weapons: | | | 93 | 124 | 65.3 |

## St. Louis, Missouri

| Type of Crime Gun | Manufacturer | Caliber | Number of Kinds of Crime Guns | Number of Crime Guns | Percent of Crime Guns |
|---|---|---|---|---|---|
| Revolver | Smith & Wesson | .38 | | 20 | 8.2 |
| Rifle | Norinco | 7.62 | | 7 | 2.9 |
| Shotgun | Mossberg | 12GA | | 7 | 2.9 |
| Semiautomatic Pistol | Davis | .380 | | 6 | 2.4 |
| Rifle | Winchester | .22 | | 6 | 2.4 |
| Rifle | Marlin | .22 | | 6 | 2.4 |
| Semiautomatic Pistol | Lorcin | .380 | | 6 | 2.4 |
| Semiautomatic Pistol | Ravin | .25 | | 6 | 2.4 |
| Revolver | Rohm | .22 | | 4 | 1.6 |
| Revolver | Rossi | .38 | | 4 | 1.6 |
| Summary for top weapons: | | | 10 | 72 | 29.4 |
| All other weapons: | | | 116 | 173 | 70.6 |

## Philadelphia, Pennsylvania

| Type of Crime Gun | Manufacturer | Caliber | Number of Kinds of Crime Guns | Number of Crime Guns | Percent of Crime Guns |
|---|---|---|---|---|---|
| Semiautomatic Pistol | Bryco | 9mm | | 21 | 4.1 |
| Revolver | Smith & Wesson | .38 | | 20 | 3.9 |
| Semiautomatic Pistol | Ruger | 9mm | | 18 | 3.5 |
| Semiautomatic Pistol | Lorcin | .380 | | 18 | 3.5 |
| Semiautomatic Pistol | Bryco | .380 | | 13 | 2.6 |
| Semiautomatic Pistol | Raven | .25 | | 13 | 2.6 |
| Semiautomatic Pistol | Glock | 9mm | | 11 | 2.2 |
| Semiautomatic Pistol | Smith & Wesson | .40 | | 10 | 2.0 |
| Semiautomatic Pistol | Davis | .380 | | 9 | 1.8 |
| Revolver | Harrington & Richardson | .32 | | 9 | 1.8 |
| Summary for top weapons: | | | 10 | 142 | 28.0 |
| All other weapons: | | | 170 | 366 | 72.0 |

*Department of the Treasury*                                                    *Department of Justice*

## Tucson, Arizona

| Type of Crime Gun | Manufacturer | Caliber | Number of Kinds of Crime Guns | Number of Crime Guns | Percent of Crime Guns |
|---|---|---|---|---|---|
| Semiautomatic Piston | Ruger | 9mm | | 10 | 5.0 |
| Semiautomatic Piston | Lorcin | .380 | | 8 | 4.0 |
| Shotgun | Mossberg | 12GA | | 8 | 4.0 |
| Semiautomatic Piston | Norino | 9mm | | 7 | 3.5 |
| Semiautomatic Piston | Bryco | 9mm | | 7 | 3.5 |
| Semiautomatic Piston | Smith & Wesson | 9mm | | 7 | 3.5 |
| Rifle | Norinco | 7.62 | | 6 | 3.0 |
| Semiautomatic Piston | Glock | 9mm | | 6 | 3.0 |
| Semiautomatic Piston | Hi-Point | 9mm | | 6 | 3.0 |
| Semiautomatic Piston | Lorcin | .25 | | 5 | 2.5 |
| Summary for top weapons: | | | 10 | 70 | 34.8 |
| All other weapons: | | | 80 | 131 | 65.2 |

Source: Bureau of Alcohol, Tobacco and Firearms (ATF), National Tracing Center, Youth Crime Gun Interdiction Initiative, special tabulation prepared by Northeastern University, Boston, Massachusetts. For a discussion of trace analysis methodology, see *Youth Crime Gun Interdiction Initiative 27 Communities Report*, 1999, pp. 7-9 and Technical Notes.

*The Youth Crime Gun Interdiction Initiative is a firearms law enforcement program of the Bureau of Alcohol, Tobacco and Firearms (ATF). Law enforcement agencies in cities participating with ATF in the program trace all recovered crime guns with ATF's National Tracing Center to determine the last known seller and purchaser of the firearm. This information is used by federal, state, and local law enforcement officials to determine patterns of crime gun supply, and to investigate illegal sources of firearms and arrest firearms offenders. The most recent available data is from 27 cities that submitted traces during the period August 1, 1997 to July 31, 1998. The participating cities were: Atlanta, Georgia; Baltimore, Maryland; Birmingham, Alabama; Boston, Massachusetts; Bridgeport, Connecticut; Chicago, Illinois; Cincinnati, Ohio; Cleveland, Ohio; Detroit, Michigan; Gary, Indiana; Houston, Texas; Inglewood, California; Jersey City, New Jersey; Los Angeles, California; Memphis, Tennessee; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; New York City, New York; Philadelphia, Pennsylvania; Richmond, Virginia; Salinas, California; San Antonio, Texas; Seattle, Washington; St. Louis, Missouri; Tucson, Arizona; Washington, D.C.

*Department of Justice*                                              *Department of the Treasury*

# Involvement of Used Guns in ATF Illegal Trafficking Investigations Involving Juveniles and Youth

### Table 7

Based on an analysis of 648 ATF illegal trafficking investigations involving youth (ages 18-24) and/or juveniles (ages 17 and under) conducted by all 23 ATF field divisions after the Youth Crime Gun Interdiction Initiative* commenced in July 1996.

Note: Since more than one type of firearm can be recovered in an investigation, an investigation can be included in more than one category.

| Type of firearm | Number of Investigations | Percent of Investigations |
|---|---|---|
| New guns | 507 | 78.2% |
| Used guns | 357 | 55.1% |
| Stolen guns | 227 | 35.0% |
| Unknown | 8 | 1.2% |
| **Stolen firearms:** | | |
| New guns | 136 | 61.2% |
| Used guns | 182 | 80.2% |
| **Mutually exclusive categories for new and used firearms:** | | |
| New guns only | 283 | 43.6% |
| New and used guns | 224 | 34.5% |
| Used guns only | 133 | 20.5% |
| Unknown | 8 | 1.2% |

Source: Bureau of Alcohol, Tobacco and Firearms (ATF), National Tracing Center, Youth Crime Gun Interdiction Initiative, *Performance Report* for the Senate and House Committees on Appropriations, Table 7, p. 16, February 1999. For a discussion of methodology, see p. 22.

*The Youth Crime Gun Interdiction Initiative is a firearms law enforcement program of the Bureau of Alcohol, Tobacco and Firearms (ATF).  Law enforcement agencies in cities participating with ATF in the program trace all recovered crime guns with ATF's National Tracing Center to determine the last known seller and purchaser of the firearm.  This information is used by federal, state, and local law enforcement officials to determine patterns of crime gun supply, and to investigate illegal sources of firearms and arrest firearms offenders.  The most recent available data is from 27 cities that submitted traces during the period August 1, 1997 to July 31, 1998.  The participating cities were: Atlanta, Georgia; Baltimore, Maryland; Birmingham, Alabama; Boston, Massachusetts; Bridgeport, Connecticut; Chicago, Illinois; Cincinnati, Ohio; Cleveland, Ohio; Detroit, Michigan; Gary, Indiana; Houston, Texas; Inglewood, California; Jersey City, New Jersey; Los Angeles, California; Memphis, Tennessee; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; New York City, New York; Philadelphia, Pennsylvania; Richmond, Virginia; Salinas, California; San Antonio, Texas; Seattle, Washington; St. Louis, Missouri; Tucson, Arizona; Washington, D.C.

# EXHIBIT 25

*Sourcebook of criminal justice statistics Online*
http://www.albany.edu/sourcebook/pdf/t31252005.pdf

Table 3.125.2005

**Rate (per 100,000 persons in each group) of murder and nonnegligent manslaughter victimization**

By age, sex, and race of victim, United States, 1976-2005

| | Total | 13 years and younger | 14 to 17 years | 18 to 24 years | 25 to 34 years | 35 to 49 years | 50 years and older | Male | Female | White | Black | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Age | | | | | | Sex | | Race | | |
| 1976 | 8.8 | 1.8 | 4.5 | 13.8 | 15.4 | 12.6 | 6.8 | 13.6 | 4.2 | 5.1 | 37.1 | 4.9 |
| 1977 | 8.8 | 1.9 | 4.9 | 14.3 | 15.5 | 12.3 | 6.6 | 13.7 | 4.2 | 5.4 | 36.2 | 4.7 |
| 1978 | 9.0 | 1.9 | 5.1 | 14.6 | 16.1 | 12.2 | 6.3 | 14.0 | 4.1 | 5.6 | 35.1 | 4.0 |
| 1979 | 9.7 | 1.8 | 5.2 | 16.5 | 17.5 | 12.8 | 6.7 | 15.4 | 4.4 | 6.1 | 37.5 | 4.1 |
| 1980 | 10.2 | 1.8 | 5.9 | 17.5 | 18.5 | 13.2 | 6.8 | 16.2 | 4.5 | 6.3 | 37.7 | 5.7 |
| 1981 | 9.8 | 1.9 | 5.0 | 16.0 | 17.5 | 13.0 | 6.7 | 15.6 | 4.3 | 6.2 | 36.4 | 6.1 |
| 1982 | 9.1 | 2.0 | 4.8 | 15.0 | 15.7 | 11.8 | 6.2 | 14.1 | 4.3 | 5.9 | 32.3 | 6.5 |
| 1983 | 8.3 | 1.8 | 4.5 | 13.8 | 14.6 | 10.5 | 5.5 | 12.8 | 3.9 | 5.3 | 29.4 | 6.4 |
| 1984 | 7.9 | 1.7 | 4.2 | 13.2 | 13.8 | 10.0 | 5.1 | 12.1 | 3.9 | 5.2 | 27.2 | 5.5 |
| 1985 | 7.9 | 1.8 | 4.9 | 13.2 | 13.9 | 9.9 | 5.0 | 12.2 | 4.0 | 5.2 | 27.6 | 5.5 |
| 1986 | 8.6 | 2.0 | 5.2 | 15.3 | 15.2 | 10.1 | 5.0 | 13.2 | 4.1 | 5.4 | 31.5 | 6.2 |
| 1987 | 8.3 | 1.8 | 5.8 | 15.5 | 14.7 | 9.4 | 4.9 | 12.6 | 4.2 | 5.1 | 30.7 | 5.2 |
| 1988 | 8.4 | 2.0 | 6.5 | 16.4 | 15.3 | 9.2 | 4.7 | 12.9 | 4.2 | 4.9 | 33.5 | 4.0 |
| 1989 | 8.7 | 2.1 | 7.9 | 18.2 | 15.6 | 9.2 | 4.6 | 13.6 | 4.0 | 5.0 | 35.1 | 4.3 |
| 1990 | 9.4 | 2.0 | 9.7 | 21.1 | 16.7 | 9.9 | 4.4 | 15.0 | 4.0 | 5.4 | 37.6 | 4.2 |
| 1991 | 9.8 | 2.1 | 11.1 | 23.9 | 16.7 | 10.0 | 4.5 | 15.7 | 4.2 | 5.5 | 39.3 | 6.0 |
| 1992 | 9.3 | 2.0 | 11.3 | 23.4 | 16.1 | 9.4 | 4.2 | 14.9 | 4.0 | 5.3 | 37.2 | 5.4 |
| 1993 | 9.5 | 2.2 | 12.1 | 24.4 | 16.1 | 9.5 | 4.2 | 15.0 | 4.2 | 5.3 | 38.7 | 5.5 |
| 1994 | 9.0 | 2.0 | 11.2 | 23.6 | 15.4 | 8.9 | 3.8 | 14.4 | 3.8 | 5.0 | 36.4 | 4.6 |
| 1995 | 8.2 | 1.9 | 11.0 | 21.5 | 13.8 | 8.2 | 3.8 | 12.9 | 3.7 | 4.8 | 31.6 | 4.9 |
| 1996 | 7.4 | 1.9 | 9.1 | 19.5 | 12.4 | 7.7 | 3.4 | 11.7 | 3.3 | 4.3 | 28.3 | 4.1 |
| 1997 | 6.8 | 1.7 | 7.3 | 19.1 | 11.4 | 6.8 | 3.2 | 10.7 | 3.0 | 3.9 | 26.0 | 4.1 |
| 1998 | 6.3 | 1.7 | 6.2 | 17.5 | 10.7 | 6.5 | 2.8 | 9.7 | 3.0 | 3.8 | 23.0 | 2.9 |
| 1999 | 5.7 | 1.6 | 5.9 | 15.4 | 9.9 | 5.9 | 2.6 | 8.8 | 2.7 | 3.5 | 20.5 | 3.3 |
| 2000 | 5.5 | 1.4 | 4.8 | 15.0 | 10.3 | 5.7 | 2.5 | 8.6 | 2.6 | 3.3 | 20.5 | 2.7 |
| 2001 | 5.6 | 1.5 | 4.6 | 15.4 | 10.7 | 5.6 | 2.6 | 8.8 | 2.6 | 3.4 | 20.4 | 2.8 |
| 2002 | 5.6 | 1.5 | 4.5 | 15.3 | 11.0 | 5.7 | 2.5 | 8.8 | 2.6 | 3.3 | 20.8 | 2.7 |
| 2003 | 5.7 | 1.4 | 4.3 | 15.7 | 11.3 | 5.7 | 2.6 | 9.0 | 2.5 | 3.4 | 20.9 | 2.8 |
| 2004 | 5.5 | 1.4 | 4.6 | 14.3 | 11.1 | 5.6 | 2.6 | 8.7 | 2.4 | 3.3 | 19.7 | 2.4 |
| 2005 | 5.6 | 1.4 | 4.8 | 14.9 | 11.7 | 5.7 | 2.6 | 9.0 | 2.3 | 3.3 | 20.6 | 2.5 |

Note: These data are from the Federal Bureau of Investigation's (FBI) Supplementary Homicide Reports (SHR), a component of the Uniform Crime Reporting Program. SHRs are incident-based reports, which include more detail about the offense, offender, and victim, than the other part I UCR offenses. Not all agencies that report aggregate offense data to the FBI also submit supplemental homicide data. On average, about 91% of homicides reported to the FBI are included in the SHR database. To account for homicides for which SHR data were not available, the victim-based analyses include SHR data that have been weighted to match national and State estimates prepared by the FBI. Rates are calculated from U.S. Census Bureau, Current Populations Reports. Deaths resulting from the events of Sept. 11, 2001 are not included in any of the analyses that generated these tables. Some data have been revised by the Source and may differ from previous editions of SOURCEBOOK.

Source: U.S. Department of Justice, Bureau of Justice Statistics, "Homicide Trends in the United States" [Online]. Available: http://www.ojp.usdoj.gov/bjs/homicide/homtrnd.htm [July 23, 2007]. Table adapted by SOURCEBOOK staff.

# EXHIBIT 26

**Expanded Homicide Data Table 8**

**Murder Victims**

by Weapon, 2014–2018

| Weapons | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Total** | **12,278** | **13,780** | **15,318** | **15,195** | **14,123** |
| Total firearms: | 7,803 | 9,103 | 10,372 | 11,006 | 10,265 |
|    Handguns | 5,342 | 6,176 | 6,762 | 7,051 | 6,603 |
|    Rifles | 235 | 215 | 300 | 390 | 297 |
|    Shotguns | 238 | 247 | 247 | 264 | 235 |
|    Other guns | 88 | 151 | 172 | 180 | 167 |
|    Firearms, type not stated | 1,900 | 2,314 | 2,891 | 3,121 | 2,963 |
| Knives or cutting instruments | 1,545 | 1,525 | 1,558 | 1,609 | 1,515 |
| Blunt objects (clubs, hammers, etc.) | 431 | 436 | 464 | 472 | 443 |
| Personal weapons (hands, fists, feet, etc.)[1] | 668 | 647 | 664 | 710 | 672 |
| Poison | 9 | 8 | 12 | 15 | 5 |
| Explosives | 6 | 1 | 1 | 0 | 4 |
| Fire | 55 | 63 | 78 | 96 | 72 |
| Narcotics | 70 | 69 | 118 | 110 | 78 |
| Drowning | 12 | 12 | 9 | 8 | 9 |
| Strangulation | 84 | 96 | 97 | 89 | 70 |
| Asphyxiation | 93 | 105 | 92 | 111 | 90 |
| Other weapons or weapons not stated | 1,502 | 1,715 | 1,853 | 969 | 900 |

[1] Pushed is included in personal weapons.

NOTE: The Uniform Crime Reporting Technical Refresh enables updating of prior years' crime data; therefore, data presented in this table may not match previously published data.

# EXHIBIT 27



SIGN UP

DONATE

   

SEARCH        GUN LAWS        FACTS        RESOURCES        MEDIA        ABOUT

TAKE ACTION

# Minimum Age to Purchase & Possess

Purchasing and possessing a lethal weapon is a serious responsibility and one that should not be taken lightly. Our country sets minimum ages for driving, voting, and drinking alcohol to encourage responsible behavior. Because young adults are at elevated risk of attempting suicide and engaging in violent behaviors, strengthening minimum age laws for purchasing and possessing guns will help protect young people and the public at large.

FEDERAL LAW        STATE LAW        KEY ELEMENTS

## BACKGROUND

Laws imposing minimum age requirements for the possession and purchase of firearms are intended to decrease access to firearms by young people and, correspondingly, to decrease the number of suicides, homicides, and unintentional shootings among that population. Given that young people are at elevated risk of engaging in violent behaviors

against themselves or others, these laws have the potential to protect a particularly vulnerable group.

**A robust body of academic literature shows that the human brain continues to develop well past the age of 21**, particularly in areas that may alter a person's likelihood of involvement in violence against themselves or others.

- The parts of the brain responsible for impulse control, judgement, and long-range planning are among the last areas of the brain to fully mature, and in fact, may continue to develop until at least age 26.[1]

- The developing brains of adolescents and young adults may put them at higher risk of making risky decisions. Hormonal changes can have significant effects on self-control, decision making, emotions, risk-taking behaviors, and aggressive impulses.[2]

**The biological processes that take place during late adolescence and young adulthood can predispose individuals to riskier and more aggressive behaviors.**

- A study of offenders incarcerated for crimes committed with firearms found that 17% of offenders would have been prohibited from buying a gun if their state had a law that raised the minimum age to possess a handgun to 21 years.[3]

- Young people commit gun offenses in high numbers. In 2017, 36,024 young people between the ages of 10 and 21 were arrested for weapons offenses, such as illegally carrying or possessing a firearm.[4] This group made up 28% of all arrests for weapons offenses that year.[5]

- Data also suggests that young people disproportionately commit gun homicides. For example, 18-20-year olds comprise just 4% of the US population, but account for 17% of known homicide offenders.[6]

Because impulse regulation and emotional control continues to develop into the mid-20s, **young people, including adolescents and people under age 21, are at elevated risk of attempting suicide.**

- Suicide risk is often much higher in the early stages of the onset of major psychiatric conditions, and these symptoms usually first develop in adolescence or early adulthood.[7]

- Suicide attempts that result in death or hospital treatment peak at age 16, but are at the highest rates from age 14 through age 21.[8]

- Gun access can significantly increase these risks. The association between firearm availability and suicide is strongest among adolescents and young adults.[9]

**Laws that prohibit unsupervised possession or purchase of firearms by children and young people can reduce harm among people under age 21.**

- One study found that state laws raising the minimum legal age to purchase firearms to 21 years were associated with a nine percent decline in rates of firearm suicides among 18-to-20-year-olds.[10]

- Controlling for other factors, unintentional firearm deaths and firearm suicides among youth (ages 0-19) also fell after the federal minimum age law was enacted.[11]

As described below, federal law and the laws in most states continue to allow unsupervised access to firearms by individuals under age 21. Additional information about laws preventing child access to firearms is included in our summary on **Child Access Prevention**.

# SUMMARY OF FEDERAL LAW

Federal law in this area distinguishes between long guns (rifles and shotguns) and handguns, and between gun possession and gun sales. Federal law also provides stronger age restrictions for sales by licensed gun sellers.

## MINIMUM AGE FOR GUN SALES AND TRANSFERS

| *Under federal law –* | **Handguns** | **Long Guns (Rifles and Shotguns)** |
|---|---|---|
| **Licensed firearms dealers** | Dealers may not sell or deliver a handgun or ammunition for a handgun to any person the dealer has reasonable cause to believe is under age **21**.[12] | Dealers may not sell or deliver a long gun, or ammunition for a long gun, to any person the dealer knows or has reasonable cause to believe is under age **18**.[13] |
| **Unlicensed persons** | Unlicensed persons may not sell, deliver or otherwise | Unlicensed persons may sell, deliver, or otherwise transfer a |

transfer a handgun or handgun ammunition to any person the transferor knows or has reasonable cause to believe is under age **18**, with certain exceptions\*.[14]

long gun or long gun ammunition to **a person of any age**.

**Minimum Age for Gun Possession:** Subject to limited exceptions\*, federal law prohibits the possession of a handgun or handgun ammunition by any person under the age of 18.[15] Federal law provides no minimum age for the possession of long guns or long gun ammunition.

\***Exceptions:** Federal law provides exceptions for the temporary transfer and possession of handguns and handgun ammunition for specified activities, including employment, ranching, farming, target practice and hunting.[16]

# SUMMARY OF STATE LAW

Several states and the District of Columbia impose minimum age requirements that extend beyond those contained in federal law. Those laws generally fall into four categories:

- Laws imposing a stricter minimum age for handgun or firearm purchases than federal law;

- Laws imposing a minimum age for all long gun purchases, from licensed or unlicensed sellers;

- Laws imposing age requirements for possession of handguns that are stricter than federal law; and

- Laws imposing a minimum age for possession of long guns.

Additional information about laws preventing child access to firearms is included in our summary on **Child Access Prevention**.

# STATE MINIMUM AGE LAWS THAT EXTEND BEYOND FEDERAL LAW

| State | Purchase of a Handgun | Purchase of a Long Gun[17] | Possession of a Handgun | Possession of a Long Gun |
|---|---|---|---|---|
| Alabama | 18[18] | | 18[19] | |
| Alaska | | 18[20] | | 16 (without parental consent)[21] |
| Arizona | | 18 (without parental consent)[22] | | 18[23] |
| Arkansas | | 18 (without parental consent)[24] | | |
| California | 21[25] | 21[26] | | |
| Colorado | | | | |
| Connecticut | 21[27] | 18[28] | 21[29] | |
| Delaware | 21[30] | 18 (without parental consent)[31] | | |
| D.C. | 21[32] | 18[33] | 21[34] | 21 or 18 with parental consent[35] |
| Florida | 21[36] | 21[37] | | 18[38] |
| Georgia | | | | |
| Hawaii | 21[39] | 21[40] | 21[41] | 21[42] |
| Idaho | | 18 (without parental consent)[43] | | 18 (without parental consent or hunting license, or while hunting)[44] |
| Illinois | 21[45] | 21[46] | 21[47] | 21[48] |

| State | | | | |
|---|---|---|---|---|
| Indiana | | | | 18[49] |
| Iowa | 21[50] | 18 (without parental consent)[51] | 21[52] | 18[53] |
| Kansas | | | | |
| Kentucky | | | | |
| Louisiana | | 18[54] | | |
| Maine | | 16 for transfers, 18 for sales[55] | | |
| Maryland | 21[56] | 18[57] | 21[58] | |
| Massachusetts | 21[59] | 18[60] | 21[61] | 15 (with parental consent) or 18[62] |
| Michigan | | 18[63] | | 18[64] |
| Minnesota | | 18 in cities (without parental consent) or 14 outside cities (without parental consent)[65] | | 14 (with firearms safety certificate), otherwise 16[66] |
| Mississippi | | | | |
| Missouri | | 18 (without parental consent)[67] | | |
| Montana | | | | |
| Nebraska | 21[68] | 18[69] | | |
| Nevada[70] | | | | 18[71] |

| State | | | | |
|---|---|---|---|---|
| New Hampshire | | | | |
| New Jersey | 21[72] | 18[73] | 21[74] | 18[75] |
| New Mexico | | | 19[76] | |
| New York | 21[77] | | 21[78] | 16[79] |
| North Carolina | | | | |
| North Dakota | "a minor"[80] | | 18[81] | |
| Ohio | 21[82] | 18[83] | | |
| Oklahoma | | 18[84] | | 18[85] |
| Oregon | | 18[86] | | 18 (without parental consent)[87] |
| Pennsylvania | | 18[88] | | 18[89] |
| Rhode Island | 21[90] | 18[91] | | 18[92] |
| South Carolina | 18[93] | | 18[94] | |
| South Dakota | | | | |
| Tennessee | | | | |
| Texas | | 18 (without parental consent)[95] | | |
| Utah | | 18 (without parental consent)[96] | | 18 (without parental consent)[97] |
| Vermont | 21 (without a hunting safety certificate)[98] | 21 (without a hunting safety certificate)[99] | 16 (without parental consent)[100] | |
| Virginia | 18[101] | | | 18 (subject to certain exceptions)[102] |
| Washington | 21[103] | 21 (for semiautomatic | 21 (for possession | 18[106] |

| | | rifles)[104] | outside private property)[105] | 21 (for possession of semiautomatic rifles outside private property)[107] |
|---|---|---|---|---|
| West Virginia | | | | 18 (except in hunting)[108] |
| Wisconsin | | 18[109] | | 18[110] |
| Wyoming | 21[111] | 18[112] | | |

# STATE LAWS GOVERNING MINIMUM AGE TO PURCHASE AND POSSESS FIREARMS

*For citations to these laws, please see the chart above.*

## States Imposing Minimum Age Requirements for All Firearm Purchases

Although federal law prohibits licensed dealers from selling long guns to persons under 18, there is no federal regulation of the sale of long guns by unlicensed dealers to minors. Similarly, while federal law prohibits handgun sales by licensed dealers to persons under 21, unlicensed dealers are prohibited only from selling handguns to persons under 18. As listed above, many states have imposed a minimum age for the purchase of all firearms, including both handguns and long guns, regardless of whether they are purchased from a licensed firearms dealer.

## States with Stricter Minimum Age Requirements for Possession of Handguns than Federal Law

Connecticut, Hawaii, Illinois, Iowa, Maryland, Massachusetts, New Jersey, New Mexico, New York, Washington, and the District of Columbia impose minimum age requirements for the possession of handguns which are stricter than the federal minimum of 18.[113]

## States Imposing Minimum Age Requirements for Possession of Long Guns

While federal law prohibits federally licensed firearms dealers from selling a long gun to anyone under 18, there is no federal minimum age for possession of a long gun. Twenty-

three states have enacted laws to at least partially close this gap, and impose a minimum age at which persons can possess long guns. Many of these laws contain exceptions which allow younger children to possess long guns where the minor's parent or guardian is present, or when the minor is engaged in hunting or target shooting.

## SELECTED LOCAL LAW

### New York City

In New York City, however, no person under age 21 may be granted a permit or license to purchase, possess or carry any firearm, with certain exceptions. It is also unlawful to transfer a firearm to any person under age 21 unless he or she is exempted. A person under 21 may carry, fire or use a rifle or shotgun without being subject to the permit requirement if he or she is in the presence of, or under the direct supervision of, a permit holder, or engaged in a military drill, competition, or target practice at a firing range.[114]

# KEY LEGISLATIVE ELEMENTS

The features listed below are intended to provide a framework from which policy options may be considered. A jurisdiction considering new legislation should consult with counsel.

- Minimum age of 21 is imposed for all handgun sales, from licensed or unlicensed sellers (*California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maryland, Massachusetts, New Jersey, New York, Ohio, Rhode Island, Vermont, and District of Columbia*).

- Minimum age of 18 is imposed for all long gun sales, from licensed or unlicensed sellers (*23 states and the District of Columbia*).

- Minimum age of 21 is imposed for possession of handguns (*Connecticut, Hawaii, Illinois, Iowa, Maryland, Massachusetts, New Jersey, New York and the District of Columbia*).

- Minimum age of 18 is imposed for possession of long guns (*16 states and the District of Columbia*).

- Younger teens are allowed to possess long guns only under direct adult supervision.

**NOTES** >

SIGN UP FOR UPDATES

First Name

Last Name

Email

Zip                                                          SIGN UP

POLICY AREAS

STATES

TAKE ACTION

ABOUT

Copyright 2018 Giffords Law Center to Prevent Gun Violence. All Rights Reserved. Legal Disclaimer.

# EXHIBIT 28



**U.S. Department of Justice**
Office of Justice Programs
*Office of Juvenile Justice and Delinquency Prevention*



OJJDP

Working for Youth Justice and Safety

# JUVENILE JUSTICE
## B U L L E T I N

March 2015                                    *Robert L. Listenbee, Administrator*

**Pathways to Desistance**

How and why do many serious adolescent offenders stop offending while others continue to commit crimes? This series of bulletins presents findings from the Pathways to Desistance study, a multidisciplinary investigation that attempts to answer this question.

Investigators interviewed 1,354 young offenders from Philadelphia and Phoenix for 7 years after their convictions to learn what factors (e.g., individual maturation, life changes, and involvement with the criminal justice system) lead youth who have committed serious offenses to persist in or desist from offending.

As a result of these interviews and a review of official records, researchers have collected the most comprehensive dataset available about serious adolescent offenders and their lives in late adolescence and early adulthood.

These data provide an unprecedented look at how young people mature out of offending and what the justice system can do to promote positive changes in the lives of these youth.

# Psychosocial Maturity and Desistance From Crime in a Sample of Serious Juvenile Offenders

Laurence Steinberg, Elizabeth Cauffman, and Kathryn C. Monahan

## Highlights

The Pathways to Desistance study followed more than 1,300 serious juvenile offenders for 7 years after their conviction. In this bulletin, the authors present key findings on the link between psychosocial maturity and desistance from crime in the males in the Pathways sample as they transition from midadolescence to early adulthood (ages 14–25):

- Recent research indicates that youth experience protracted maturation, into their midtwenties, of brain systems responsible for self-regulation. This has stimulated interest in measuring young offenders' psychosocial maturity into early adulthood.

- Youth whose antisocial behavior persisted into early adulthood were found to have lower levels of psychosocial maturity in adolescence and deficits in their development of maturity (i.e., arrested development) compared with other antisocial youth.

- The vast majority of juvenile offenders, even those who commit serious crimes, grow out of antisocial activity as they transition to adulthood. Most juvenile offending is, in fact, limited to adolescence.

- This study suggests that the process of maturing out of crime is linked to the process of maturing more generally, including the development of impulse control and future orientation.



*Office of Juvenile Justice and Delinquency Prevention*          **ojjdp.gov**

JUVENILE JUSTICE
B U L L E T I N

MARCH 2015

# Psychosocial Maturity and Desistance From Crime in a Sample of Serious Juvenile Offenders

Laurence Steinberg, Elizabeth Cauffman, and Kathryn C. Monahan

Involvement in delinquent and criminal behavior increases through adolescence, peaking at about age 16 (in cases of property crime) or age 17 (in cases of violent crime) and declining thereafter (Farrington, 1986; Piquero, 2007; Piquero et al., 2001). Although a small number of youth persist in antisocial behavior across this developmental period, the vast majority of antisocial adolescents desist from criminal behavior as they enter adulthood (Laub and Sampson, 2001; Piquero, 2007; Sampson and Laub, 2003). Understanding why most juvenile offenders desist from antisocial activity as a part of the normative transition into adulthood may provide important insights into the design of interventions aimed at encouraging desistance. This bulletin describes findings from the Pathways to Desistance study, a multisite, longitudinal sample of adolescent (primarily felony) offenders (see "About the Pathways to Desistance Study").[1] This study explores the processes through which juvenile offenders desist from crime and delinquency.

## Theories of the Psychosocial Maturation Process

Both sociological and psychological theories suggest that one reason most adolescents desist from crime is that they mature out of antisocial behavior, but sociologists and psychologists have different ideas about the nature of this maturation. A traditional sociological view is grounded in the notion that the activities individuals typically enter into during early adulthood—such as full-time employment, marriage, and parenthood—are largely incompatible with criminal activity (Sampson and Laub, 2003). Thus, according to this view, individuals desist from antisocial behavior as a consequence of taking on more mature social roles, either because the time and energy demands of these activities make it difficult to maintain a criminal lifestyle or because embracing the socially approved roles

of adulthood leads individuals to adopt more conventional values and attitudes.

The conventional psychological view describes a different scenario. According to this view, desistance from antisocial behavior is the product of psychosocial maturation (Cauffman and Steinberg, 2000; Steinberg and Cauffman, 1996; Monahan et al., 2009), which includes the ability to:

- Control one's impulses.
- Consider the implications of one's actions on others.
- Delay gratification in the service of longer term goals.
- Resist the influences of peers.

Thus, psychologists see that much juvenile offending reflects psychological immaturity and, accordingly, they view desistance from antisocial behavior as a natural consequence of growing up—emotionally, socially, and intellectually. As individuals become better able to regulate their behavior, they become less likely to engage in impulsive, ill-considered acts.

Although the sociological and psychological explanations of desistance from antisocial behavior during the transition to adulthood are not incompatible, there has been much more research in the sociological tradition, largely because psychological maturation during young adulthood has received relatively little attention from psychologists. Indeed, most research on psychological development during adolescence has focused on the first half of the adolescent decade rather than on the transition from adolescence to adulthood (Institute of Medicine, 2013), perhaps because social scientists widely assumed that there was little systematic development after midadolescence (Steinberg, 2014). However, recent research indicating protracted maturation (into the midtwenties) of brain

systems responsible for self-regulation has stimulated interest in charting the course of psychosocial maturity beyond adolescence (Steinberg, 2010). Because juvenile offending is likely to wane during late adolescence and young adulthood (age 16 through age 25), it is important to ask whether desistance from crime and delinquency is linked to normative processes of psychological maturation.

Psychologist Terrie Moffitt (1993, 2003) has advanced the most widely cited theory regarding psychological contributors to desistance from antisocial behavior during the transition to adulthood. She distinguished between the vast majority of individuals (90 percent or more, depending on the study) whose antisocial behavior stopped in adolescence (adolescence-limited offenders) and the small proportion of individuals whose antisocial behavior persisted into adulthood (life-course persistent offenders). Moffitt suggested that different etiological factors explained these groups' involvement in antisocial behavior. Moffitt hypothesizes that adolescence-limited offenders' involvement in antisocial behavior is a normative consequence of their desire to feel more mature, and their antisocial activity is often the result of peer pressure or the emulation of higher status agemates, especially during midadolescence, when opposition to adult authority may confer special prestige with peers. In contrast, she thinks that antisocial behavior that persists into adulthood is rooted in early neurological and cognitive deficits that, combined with environmental risk, lead to early conduct problems and lifelong antisocial behavior. Although the identification of variations in these broad patterns of antisocial behavior has led Moffitt to refine her framework (Moffitt, 2006; Moffitt et al., 2002), the scientific consensus is that the distinction between adolescence-limited and life-course persistent offenders is a useful one.

Although Moffitt never explicitly outlined the role of normative psychosocial maturation in her framework, it follows from this perspective that growth in psychosocial maturity underlies adolescence-limited offenders' desistance from antisocial behavior. That is, if adolescence-limited offenders engage in antisocial behavior to appear and feel more mature, the genuine process of maturation should lessen their need to engage in antisocial behavior to achieve this end, thereby contributing to desistance from crime and delinquency. Moreover, juvenile offenders who are relatively more mature for their age, or who mature faster than their peers, should "age out" of offending sooner than others. Indeed, there is some evidence to suggest that this is the case. In a previous analysis of earlier waves of data from the Pathways study, the researchers found that youth whose antisocial behavior persisted into their early twenties were significantly less psychosocially mature than youth who desisted from antisocial behavior (Monahan et al., 2009). In this bulletin, the researchers

explore whether this pattern characterizes trajectories of antisocial behavior through age 25.

## Models of Psychosocial Maturity

Many psychologists have proposed theoretical models of psychosocial maturity (e.g., Greenberger et al., 1974). The researchers' approach to measuring psychosocial maturity is based on a model advanced in the 1990s (Steinberg and Cauffman, 1996), which suggested that during adolescence and early adulthood, three aspects of psychosocial maturity develop:

- **Temperance.** The ability to control impulses, including aggressive impulses.

- **Perspective.** The ability to consider other points of view, including those that take into account longer term consequences or that take the vantage point of others.

- **Responsibility.** The ability to take personal responsibility for one's behavior and resist the coercive influences of others.

Previous studies have demonstrated that youth with lower temperance, perspective, and responsibility report greater antisocial behavior (Cauffman and Steinberg, 2000) and that, over time, deficiencies in developing these aspects of psychosocial maturity are associated with more chronic patterns of antisocial behavior (Monahan et al., 2009).

The researchers' model of psychosocial maturation maps nicely onto one of the most widely cited criminological theories of antisocial behavior: Gottfredson and Hirschi's (1990) General Theory of Crime, which posits that deficits in self-control are the cause of criminal behavior. Gottfredson and Hirschi's definition of self-control, like the definition of maturity, includes components such as orientation toward the future (rather than immediate gratification), planning ahead (rather than impulsive decisionmaking), physical restraint (rather than the use of aggression when frustrated), and concern for others (rather than self-centered or indifferent behavior) (Gottfredson and Hirschi, 1990). Although the General Theory of Crime is useful in explaining which adolescents are more likely to engage in antisocial behavior (i.e., the ones with poor self-control), it does not explain why most antisocial adolescents desist as they mature into adulthood. From a developmental perspective, it may be variability in both individuals' level of maturity during adolescence and their degree of change in maturity over time that distinguishes between those whose antisocial behavior wanes and those whose antisocial behavior persists during the transition to adulthood. The General Theory of Crime predicts that, at any point in time, individuals who are less mature than their peers would be more likely to engage

## ABOUT THE PATHWAYS TO DESISTANCE STUDY

The Pathways to Desistance study is a multidisciplinary, multisite longitudinal investigation of how serious juvenile offenders make the transition from adolescence to adulthood. It follows 1,354 young offenders from Philadelphia County, PA, and Maricopa County, AZ (metropolitan Phoenix), for 7 years after their court involvement. This study has collected the most comprehensive dataset currently available about serious adolescent offenders and their lives in late adolescence and early adulthood. It looks at the factors that lead youth who have committed serious offenses to persist in or desist from offending. Among the aims of the study are to:

• Identify initial patterns of how serious adolescent offenders stop antisocial activity.

• Describe the role of social context and developmental changes in promoting these positive changes.

• Compare the effects of sanctions and interventions in promoting these changes.

### Characteristics of Study Participants

Enrollment took place between November 2000 and March 2003, and the research team concluded data collection in 2010. In general, participating youth were at least 14 years old and younger than 18 years old at the time of their study index petition; 8 youth were 13 years old, and 16 youth were older than age 18 but younger than age 19 at the time of their index petition. The youth in the sample were adjudicated delinquent or found guilty of a serious (overwhelmingly felony-level) violent crime, property offense, or drug offense at their current court appearance. Although felony drug offenses are among the eligible charges, the study limited the proportion of male drug offenders to no more than 15 percent; this limit ensures a heterogeneous sample of serious offenders. Because investigators wanted to include a large enough sample of female offenders—a group neglected in previous research—this limit did not apply to female drug offenders. In addition, youth whose cases were considered for trial in the adult criminal justice system were enrolled regardless of the offense committed.

At the time of enrollment, participants were an average of 16.2 years old. The sample is 84 percent male and 80 percent minority (41 percent black, 34 percent Hispanic, and 5 percent American Indian/other). For approximately one-quarter (25.5 percent) of study participants, the study index petition was their first petition to court. Of the remaining participants (those with a petition before the study index petition), 69 percent had 2 or more prior petitions; the average was 3 in Maricopa County and 2.8 in Philadelphia County (exclusive of the study index offense). At both sites, more than 40 percent of the adolescents enrolled were adjudicated of felony crimes against persons (i.e., murder, robbery, aggravated assault, sex offenses, and kidnapping). At the time of the baseline

interview for the study, 50 percent of these adolescents were in an institutional setting (usually a residential treatment center); during the 7 years after study enrollment, 87 percent of the sample spent some time in an institutional setting.

### Interview Methodology

Immediately after enrollment, researchers conducted a structured 4-hour baseline interview (in two sessions) with each adolescent. This interview included a thorough assessment of the adolescent's self-reported social background, developmental history, psychological functioning, psychosocial maturity, attitudes about illegal behavior, intelligence, school achievement and engagement, work experience, mental health, current and previous substance use and abuse, family and peer relationships, use of social services, and antisocial behavior.

After the baseline interview, researchers interviewed study participants every 6 months for the first 3 years and annually thereafter. At each followup interview, researchers gathered information on the adolescent's self-reported behavior and experiences during the previous 6-month or 1-year reporting period, including any illegal activity, drug or alcohol use, and involvement with treatment or other services. Youth's self-reports about illegal activities included information about the range, the number, and other circumstances of those activities (e.g., whether or not others took part). In addition, the followup interviews collected a wide range of information about changes in life situations (e.g., living arrangements, employment), developmental factors (e.g., likelihood of thinking about and planning for the future, relationships with parents), and functional capacities (e.g., mental health symptoms).

Researchers also asked participants to report monthly about certain variables (e.g., school attendance, work performance, and involvement in interventions and sanctions) to maximize the amount of information obtained and to detect activity cycles shorter than the reporting period.

In addition to the interviews of study participants, for the first 3 years of the study, researchers annually interviewed a family member or friend about the study participant to validate the participants' responses. Each year, researchers also reviewed official records (local juvenile and adult court records and FBI nationwide arrest records) for each adolescent.

Investigators have now completed the last (84-month) set of followup interviews, and the research team is analyzing interview data. The study maintained the adolescents' participation throughout the project: At each followup interview point, researchers found and interviewed approximately 90 percent of the enrolled sample. Researchers have completed more than 21,000 interviews in all.

in antisocial behavior. In this bulletin, the researchers examine this proposition but also ask whether individuals who mature more quickly over time compared to their peers are more likely to desist from crime as they get older.

To investigate whether and to what extent changes in psychosocial maturity across adolescence and young adulthood account for desistance from antisocial behavior, it is necessary to study a sample of individuals who are known to be involved in antisocial behavior. The Pathways study affords an ideal opportunity to do this because it is the first longitudinal study that examined psychosocial development among serious adolescent offenders during their transition to adulthood. As a result, the researchers examined whether the majority of juvenile offenders demonstrate significant growth in psychosocial maturity over time, as the psychological theories of desistance predict, and whether individual variability in the development of psychosocial maturity accounts for variability in patterns of desistance. They also examined whether differential development of psychosocial maturity over time is linked to differential timing in desistance; presumably, those who mature faster should desist earlier. Because individuals generally cease criminal activity by their midtwenties (Piquero, 2007), this extension of a previous analysis through age 25 allows greater confidence in any conclusions drawn about the connection between psychosocial maturation and desistance from antisocial behavior.

# Measuring Psychosocial Maturity

As noted earlier, in the researchers' theoretical model, psychosocial maturity consists of three separate components: temperance, perspective, and responsibility (Steinberg and Cauffman, 1996). Each of these components is indexed by two different measures. For more detail on the psychometric properties of the measures, see Monahan and colleagues (2009).

## Temperance

The measures were self-reported impulse control (e.g., "I say the first thing that comes into my mind without thinking enough about it") and suppression of aggression (e.g., "People who get me angry better watch out"), both of which are subscales of the Weinberger Adjustment Inventory (Weinberger and Schwartz, 1990).

## Perspective

The measures were self-reported consideration of others (e.g., "Doing things to help other people is more important to me than almost anything else," also from the Weinberger Adjustment Inventory; Weinberger and Schwartz, 1990) and future orientation (e.g., "I will keep

working at difficult, boring tasks if I know they will help me get ahead later") (Cauffman and Woolard, 1999).

## Responsibility

The measures were self-reported personal responsibility (e.g., "If something more interesting comes along, I will usually stop any work I'm doing," reverse scored) from the Psychosocial Maturity Inventory (Greenberger et al., 1974), and resistance to peer influence (e.g., "Some people go along with their friends just to keep their friends happy, but other people refuse to go along with what their friends want to do, even though they know it will make their friends unhappy") (Steinberg and Monahan, 2007).

In addition to examining each indicator of psychosocial maturity independently, the researchers also standardized each measure across the age distribution and then calculated the average to create a global measure of psychosocial maturity.

# Measuring Antisocial Behavior

Involvement in antisocial behavior was assessed using the Self-Report of Offending, a widely used instrument in delinquency research (Huizinga, Esbensen, and Weihar, 1991). Participants reported if they had been involved in any of 22 aggressive or income-generating antisocial acts (e.g., taking something from another person by force, using a weapon, carrying a weapon, stealing a car or motorcycle to keep or sell, or using checks or credit cards illegally). At the baseline interview and the 48- through 84-month annual interviews, these questions were asked with the qualifying phrase, "In the past 12 months have you … ?" At the 6- through 36-month biannual interviews, these questions were asked with the qualifying phrase, "In the past 6 months, have you … ?" The researchers counted the number of different types of antisocial acts that an individual reported having committed since the previous interview to derive the measure of antisocial activity. So-called "variety scores"[2] are widely used in criminological research because they are highly correlated with measures of seriousness of antisocial behavior yet are less prone to recall errors than self-reported frequency scores, especially when the antisocial act is committed frequently (such as selling drugs). In the Pathways sample, self-reported variety scores also were significantly correlated with official arrest records (Brame et al., 2004).

# Identifying Trajectories of Antisocial Behavior

The first task was to see whether individuals followed different patterns of antisocial behavior over time. The



research team used a type of analysis called group-based trajectory modeling (Nagin, 2005; Nagin and Land, 1993) to determine whether they could reliably divide the participants into distinct subgroups, each composed of individuals who demonstrated a common pattern of antisocial behavior. This analysis indicated that there were five different patterns, which are shown in figure 1.

The first group (low, 37.2 percent of the sample) consisted of individuals who reported low levels of offending at every time point. The second group (moderate, 13.5 percent) showed consistently moderate levels of antisocial behavior. The third group (early desisters, 31.3 percent) engaged in high levels of antisocial behavior in early adolescence, but their antisocial behavior declined steadily and rapidly thereafter. The fourth group (late desisters, 10.5 percent) engaged in high levels of antisocial behavior through midadolescence, which peaked at about age 15 and then declined during the transition to adulthood. The fifth group (persistent offenders, 7.5 percent) reported high levels of antisocial behavior consistently from ages 14 to 25.

Several points about these patterns are noteworthy:

- As expected—and consistent with other studies—the vast majority of serious juvenile offenders desisted from antisocial activity by the time they were in their early twenties. Less than 10 percent of the sample could be characterized as chronic offenders. This statistic is similar to that reported in other studies.

- More than one-third of the sample were infrequent offenders for the entire 7-year study period. Although all of these individuals were arrested for a very serious crime during midadolescence, their antisocial behavior did not continue.

- Even among the subgroup of juveniles who were high-frequency offenders at the beginning of the study (about 40 percent of the sample), the majority stopped offending by the time they reached young adulthood. Indeed, at age 25, most of the individuals who had been high-frequency offenders when they were in midadolescence were no longer committing crimes. This, too, is consistent with previous research showing that very few individuals—even those with a history of involvement in serious crime—were engaging in criminal activity after their midtwenties.

Figure 1. Five Trajectories of Antisocial Behavior



## Patterns of Change in Psychosocial Maturity Over Time

The researchers next examined patterns of change in psychosocial maturity. Was adolescence a time of psychosocial maturation for these juveniles? Was it a period of continued growth in temperance, perspective, and responsibility? To answer these questions, they used an approach called growth curve modeling. This statistical technique examines whether, on average, individuals matured over the course of the study and whether there was significant variability within the sample

*"As expected—and consistent with other studies—the vast majority of serious juvenile offenders desisted from antisocial activity by the time they were in their early twenties."*

in the level, degree, and rate of change in psychosocial maturation.

Across each of the six individual indicators of psychosocial maturity—impulse control, suppression of aggression, consideration of others, future orientation, personal responsibility, and resistance to peer influence—and the global index of psychosocial maturity, the pattern of results was identical. Individuals showed increases in all aspects of psychosocial maturity over time, but the rate of increase slowed in early adulthood.

Figure 2 illustrates this pattern; it shows the growth curve for the composite psychosocial maturity variable and steady psychosocial maturation from age 14 to about age 22, and then maturation begins to slow down. The researchers investigated whether psychosocial maturation actually stopped by the end of adolescence and found that it did not. Rather, they found that, across each of the six indicators of psychosocial maturity and the global measure of psychosocial maturity, individuals in the Pathways sample were still maturing psychosocially at age 25. At this age, individuals in the sample continued to increase in impulse control, suppression of aggression, consideration of others, future orientation, personal responsibility, and resistance to peer influence—indicating that psychosocial

development continues beyond adolescence. This finding is consistent with new research on brain development, which shows that there is continued maturation of brain systems that support self-regulation—well into the midtwenties. It is important to note that this pattern of growth was seen in a sample of serious juvenile offenders, a population that is often portrayed as "deviant."

Although these analyses indicate that, on average, adolescence and (to a lesser extent) early adulthood are times of psychosocial maturation, the analyses also indicated—not surprisingly—that individuals differ in their level of psychosocial maturity (i.e., some are more mature than others of the same chronological age) and in the way they develop psychosocial maturity during adolescence and early adulthood (i.e., some mature to a greater degree or faster than others) (see Monahan et al., 2009, for a fuller discussion). These results confirm that the population of juvenile offenders—even serious offenders—is quite heterogeneous, at least with respect to their psychosocial maturation. This variability also leads to the question of whether differences in patterns of offending are linked to differences in patterns of psychosocial development.

## Psychosocial Maturation and Patterns of Offending

If it is true that desistance from crime during the transition to adulthood is due, at least in part, to normative psychosocial maturation, then there should be a connection between patterns of offending and patterns of psychosocial growth. Juvenile offenders vary in their patterns of offending and their patterns of psychosocial development. Are the two connected? More specifically, is psychosocial maturation linked to desistance from antisocial behavior? To explore this question, the researchers compared patterns of development in psychosocial maturity within each of the

**Figure 2. Rates of Psychosocial Maturity Across Adolescence and Early Adulthood**



antisocial trajectory groups (figure 3). They selected age 16, the average age of participants when first enrolled in the study, to compare analyses that examined absolute levels of maturity with those that examined changes in maturity over time across the entire age range (ages 14–25).

As hypothesized, individuals in different antisocial trajectory groups differed in their absolute levels of psychosocial maturity and the extent to which their psychosocial maturity increased with age. The pattern of group differences was similar for the different psychosocial maturity subscales and for the composite psychosocial maturity index. At age 16, persistent offenders were significantly less mature than individuals in the low, moderate, and early desister groups and were not significantly different from those in the late desister group. Moreover, at age 16, late desisters, who did not start desisting from crime until about age 17, were significantly less mature than early desisters, whose desistance from crime was evident before they turned 16. The findings regarding changes in maturity over time were consistent with the concept that desistance from antisocial activity is linked to the process of psychosocial maturation. As expected, offenders who desisted from antisocial activity during adolescence showed significantly greater growth in psychosocial maturity than those who persisted into adulthood.

These findings are important for several reasons:

- Even in a population of serious juvenile offenders, there were significant gains in psychosocial maturity during adolescence and early adulthood. Between ages 14 and 25, youth continue to develop an increasing ability to control impulses, suppress aggression, consider the impact of their behavior on others, consider the future consequences of their behavior, take personal responsibility for their actions, and resist the influence of peers. Psychosocial development is far from over at age 18.

- Although the rate of maturation slows as individuals reach early adulthood (about age 22), it does not come to a standstill. Individuals are still maturing socially and emotionally when they are in their midtwenties; much of this maturation is probably linked to the maturation of brain systems that support self-control.

- There is significant variability in psychosocial maturity within the offender population with respect to both how mature individuals are in midadolescence and to what extent they continue to mature as they transition to adulthood.

- This variability in psychosocial maturity is linked to patterns of antisocial activity. Less mature individuals are more likely to be persistent offenders, and high-frequency offenders who desist from antisocial activity are likely to become more mature psychosocially than those who continue to commit crimes as adults. The association between immature impulse control and continued offending is consistent with Gottfredson and Hirschi's General Theory of Crime, which posits that poor self-control is the root cause of antisocial behavior

Figure 3. Trajectories of Antisocial Behavior and Global Psychosocial Maturity



*"New research on brain development … shows that there is continued maturation of brain systems that support self-regulation—well into the midtwenties."*

(Gottfredson and Hirschi, 1990), and with Moffitt's theory of "adolescence-limited offending," which suggests that most antisocial behavior in adolescence is the product of transient immaturity (Moffitt, 1993, 2003, 2006; Moffitt et al., 2002).

## Summary

Far more is known about the factors that cause young people to commit crimes than about the factors that cause them to stop committing crimes. The Pathways to Desistance study provides evidence that, just as immaturity is an important contributor to the emergence of much adolescent misbehavior, maturity is an important contributor to its cessation. This observation provides an important complement to models of desistance from crime that emphasize individuals' entrance into adult roles and the fact that the demands of these roles are incompatible with a criminal lifestyle (Laub and Sampson, 2001; Sampson and Laub, 2003).

The results of the analyses suggest that the transition to adulthood involves the acquisition of more adultlike psychosocial capabilities and more adult responsibilities; however, not all adolescents mature to the same degree. Youth whose antisocial behavior persists into early adulthood exhibit lower levels of psychosocial maturity in adolescence and also demonstrate deficits in the development of psychosocial maturity compared with other antisocial youth. In a sense, these chronic offenders show a lack of psychosocial maturation that might be characterized as arrested development. Although it is reasonable to assume that this factor contributed to persistent involvement in criminal activity, researchers do not know the extent to which continued involvement in crime impeded the development of these individuals. To the extent that chronic offending leads to placement in institutional settings that do not facilitate positive development, the latter is certainly a strong possibility. In all likelihood, the connection between psychosocial immaturity and offending is bidirectional; that is, each factor affects the other factor. One important implication for practitioners is that interventions for juvenile offenders should be aimed explicitly at facilitating the development of psychosocial maturity and that special care should be taken to avoid exposing young offenders to environments that might inadvertently derail this developmental process. More research is needed that examines outcomes of interventions for antisocial youth that go beyond standard measures of recidivism.

Perhaps the most important lesson learned from these analyses is that the vast majority of juvenile offenders grow out of antisocial activity as they make the transition to adulthood; most juvenile offending is, in fact, limited to adolescence (i.e., these offenders do not persist into adulthood). Although this is well documented, the researchers believe that the Pathways study is the first investigation to show that the process of maturing out of crime is linked to the process of maturing more generally. It is therefore important to ask whether the types of sanctions and interventions that serious offenders are exposed to are likely to facilitate this process or are likely to impede it (Steinberg, Chung, and Little, 2004). When the former is the case, the result may well be desistance from crime. However, if responses to juvenile offenders slow the process of psychosocial maturation, in the long run these responses may do more harm than good.

## Endnotes

1. OJJDP is sponsoring the Pathways to Desistance study (project number 2007–MU–FX–0002) in partnership with the National Institute of Justice (project number 2008–IJ–CX–0023), the John D. and Catherine T. MacArthur Foundation, the William T. Grant Foundation, the Robert Wood Johnson Foundation, the William Penn Foundation, the National Institute on Drug Abuse (grant number





R01DA019697), the Centers for Disease Control and Prevention, the Pennsylvania Commission on Crime and Delinquency, and the Arizona State Governor's Justice Commission. Investigators for this study are Edward P. Mulvey, Ph.D. (University of Pittsburgh), Robert Brame, Ph.D. (University of North Carolina–Charlotte), Elizabeth Cauffman, Ph.D. (University of California–Irvine), Laurie Chassin, Ph.D. (Arizona State University), Sonia Cota-Robles, Ph.D. (Temple University), Jeffrey Fagan, Ph.D. (Columbia University), George Knight, Ph.D. (Arizona State University), Sandra Losoya, Ph.D. (Arizona State University), Alex Piquero, Ph.D. (University of Texas–Dallas), Carol A. Schubert, M.P.H. (University of Pittsburgh), and Laurence Steinberg, Ph.D. (Temple University). More details about the study can be found in a previous OJJDP fact sheet (Mulvey, 2011) and at the study website (www.pathwaysstudy.pitt.edu), which includes a list of publications from the study.

2. The variety score is calculated as the number of different types of antisocial acts that the participant reported during the period that the interview covered, divided by the number of different antisocial acts the participant was asked about.

## References

Brame, R., Fagan, J., Piquero, A., Schubert, C., and Steinberg, L. 2004. Criminal careers of serious delinquents in two cities. *Youth Violence and Juvenile Justice* 2:256–272.

Cauffman, E., and Steinberg, L. 2000. (Im)maturity of judgment in adolescence: Why adolescents may be less culpable than adults. *Behavioral Sciences and the Law* 18:741–760.

Cauffman, E., and Woolard, J. 1999. The Future Outlook Inventory. Measure developed for the MacArthur Network on Adolescent Development and Juvenile Justice. Unpublished manuscript.

Farrington, D.P. 1986. Age and crime. *Crime and Justice: A Review of Research* 7:189–250.

Gottfredson, M., and Hirschi, T. 1990. *A General Theory of Crime.* Stanford, CA: Stanford University Press.

Greenberger, E., Josselson, R., Knerr, C., and Knerr, B. 1974. The measurement and structure of psychosocial maturity. *Journal of Youth and Adolescence* 4:127–143.

Huizinga, D., Esbensen, F., and Weihar, A. 1991. Are there multiple paths to delinquency? *Journal of Criminal Law and Criminology* 82:83–118.

Institute of Medicine. 2013. *Improving the Health, Safety, and Well-Being of Young Adults.* Washington, DC: National Academies Press.

Laub, J.H., and Sampson, R.J. 2001. Understanding desistance from crime. *Crime and Justice: A Review of Research* 28:1–69.

Moffitt, T.E. 1993. Adolescence-limited and life-course-persistent antisocial behavior: A developmental taxonomy. *Psychological Review* 100(4):674–701.

Moffitt, T.E. 2003. Life-course-persistent and adolescence-limited antisocial behaviour: A 10-year research review and a research agenda. In *The Causes of Conduct Disorder and Serious Juvenile Delinquency,* edited by B. Lahey, T.E. Moffitt, and A. Caspi. New York, NY: Guilford Press, pp. 49–75.

Moffitt, T.E. 2006. Life-course-persistent versus adolescence-limited antisocial behavior. In *Developmental Psychopathology,* vol. 3: *Risk, Disorder, and Adaptation,* 2d ed., edited by D. Cicchetti and D.J. Cohen. Hoboken, NJ: John Wiley & Sons, pp. 570–598.

Moffitt, T.E., Caspi, A., Harrington, H., and Milne, B.J. 2002. Males on the life-course-persistent and adolescence-limited antisocial pathways: Follow-up at age 26 years. *Development and Psychopathology* 14:179–207.

Monahan, K.C., Steinberg, L., Cauffman, E., and Mulvey, E. 2009. Trajectories of antisocial behavior and psychosocial maturity from adolescence to young adulthood. *Developmental Psychology* 45(6):1654–1668.

Mulvey, E.P. 2011. *Highlights From Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders.* Washington, DC: U.S. Department of Justice,

Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Nagin, D.S. 2005. *Group-Based Modeling of Development.* Cambridge, MA: Harvard University Press.

Nagin, D.S., and Land, K.C. 1993. Age, criminal careers, and population heterogeneity: Specification and estimation of a nonparametric, mixed Poisson model. *Criminology* 31:327–362.

Piquero, A.R. 2007. Taking stock of developmental trajectories of criminal activity over the life course. In *The Long View of Crime: A Synthesis of Longitudinal Research,* edited by A.M. Liberman. New York, NY: Springer, pp. 23–78.

Piquero, A.R., Blumstein, A., Brame, R., Haapanen, R., Mulvey, E.P., and Nagin, D.S. 2001. Assessing the impact of exposure time and incapacitation on longitudinal trajectories of criminal offending. *Journal of Adolescent Research* 16:54–74.

Sampson, R.J., and Laub, J.H. 2003. Life-course desisters? Trajectories of crime among delinquent boys followed to age 70. *Criminology* 41:555–592.

Steinberg, L. 2010. A behavioral scientist looks at the science of adolescent brain development. *Brain and Cognition* 72:160–164.

Steinberg, L. 2014. *Age of Opportunity: Lessons From the New Science of Adolescence.* New York, NY: Houghton Mifflin Harcourt.

Steinberg, L., and Cauffman, E. 1996. Maturity of judgment in adolescence: Psychosocial factors in adolescent decision making. *Law and Human Behavior* 20:249–272.

Steinberg, L., Chung, H., and Little, M. 2004. Reentry of young offenders from the justice system: A developmental perspective. *Youth Violence and Juvenile Justice* 1:21–38.

Steinberg, L., and Monahan, K.C. 2007. Age differences in resistance to peer influence. *Developmental Psychology* 43:1531–1543.

Weinberger, D.A., and Schwartz, G.E. 1990. Distress and restraint as superordinate dimensions of self-reported adjustment: A typological perspective. *Journal of Personality* 58:381–417.



U.S. Department of Justice

Office of Justice Programs

Office of Juvenile Justice and Delinquency Prevention

8660 Cherry Lane

Laurel, MD 20707-4651

Official Business
Penalty for Private Use $300

PRESORTED STANDARD
POSTAGE & FEES PAID
DOJ/OJJDP/GPO
PERMIT NO. G – 26

## Acknowledgments

Laurence Steinberg, Distinguished University Professor and Laura H. Carnell Professor of Psychology at Temple University, is one of the principal investigators on the Pathways to Desistance study. His research focuses on brain and behavioral development in adolescence.

Elizabeth Cauffman, Professor and Chancellor's Fellow in the Department of Psychology and Social Behavior at the University of California, Irvine, is one of the principal investigators on the Pathways to Desistance study. Dr. Cauffman is interested in applying research on normative and atypical adolescent development to issues with legal and social policy implications.

Kathryn C. Monahan is Assistant Professor of Psychology at the University of Pittsburgh. Dr. Monahan's research focuses on risk and resilience during adolescence in typically developing and high-risk populations.

This bulletin was prepared under grant number 2007–MU–FX–0002 from the Office of Juvenile Justice and Delinquency Prevention (OJJDP), U.S. Department of Justice.

Points of view or opinions expressed in this document are those of the authors and do not necessarily represent the official position or policies of OJJDP or the U.S. Department of Justice.

The Office of Juvenile Justice and Delinquency Prevention is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance; the Bureau of Justice Statistics; the National Institute of Justice; the Office for Victims of Crime; and the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking.

**NCJ 248391**

# EXHIBIT 29



ELSEVIER

Journal of Adolescent Health 45 (2009) 216–221

JOURNAL OF
ADOLESCENT
HEALTH

Review article

# Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy

Sara B. Johnson, Ph.D., M.P.H.[a],*, Robert W. Blum, M.D., Ph.D.[b], and Jay N. Giedd, M.D.[c]

[a]Johns Hopkins School of Medicine, Department of Pediatrics Johns Hopkins Bloomberg School of Public Health, Department of Population, Family & Reproductive Health, Baltimore, Maryland
[b]Johns Hopkins Bloomberg School of Public Health, Department of Population, Family & Reproductive Health, Baltimore, Maryland
[c]National Institute of Mental Health, Child Psychiatry Branch, Unit on Brain Imaging, Bethesda, Maryland

Manuscript received March 11, 2009; manuscript accepted June 4, 2009

**Abstract**

Longitudinal neuroimaging studies demonstrate that the adolescent brain continues to mature well into the 20s. This has prompted intense interest in linking neuromaturation to maturity of judgment. Public policy is struggling to keep up with burgeoning interest in cognitive neuroscience and neuroimaging. However, empirical evidence linking neurodevelopmental processes and adolescent real-world behavior remains sparse. Nonetheless, adolescent brain development research is already shaping public policy debates about when individuals should be considered mature for policy purposes. With this in mind, in this article we summarize what is known about adolescent brain development and what remains unknown, as well as what neuroscience can and cannot tell us about the adolescent brain and behavior. We suggest that a conceptual framework that situates brain science in the broader context of adolescent developmental research would help to facilitate research-to-policy translation. Furthermore, although contemporary discussions of adolescent maturity and the brain often use a deficit-based approach, there is enormous opportunity for brain science to illuminate the great strengths and potentialities of the adolescent brain. So, too, can this information inform policies that promote adolescent health and well-being. © 2009 Society for Adolescent Medicine. All rights reserved.

*Keywords:* Adolescent; Health policy; Neuroscience; Neuroimaging; Judgment

In the last decade, a growing body of longitudinal neuro-imaging research has demonstrated that adolescence is a period of continued brain growth and change, challenging longstanding assumptions that the brain was largely finished maturing by puberty [1–3]. The frontal lobes, home to key components of the neural circuitry underlying "executive functions" such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life [2]. This finding has prompted interest in linking stage of neuromaturation to maturity of judgment. Indeed, the promise of a biological explanation for often puzzling adolescent health risk behavior has captured the

attention of the media, parents, policymakers, and clinicians alike. Although such research is currently underway, many neuroscientists argue that empirical support for a causal relationship between neuromaturational processes and real-world behavior is currently lacking [4].

Despite the lack of empirical evidence, there has been increasing pressure to bring adolescent brain research to bear on adolescent health-and-welfare policy. For example, in the policy process, adolescent brain immaturity has been used to make the case that teens should be considered less culpable for crimes they commit; however, parallel logic has been used to argue that teens are insufficiently mature to make autonomous choices about their reproductive health [5]. This apparently conflicting use of neuroscience research evidence highlights the need for brain scientists, neurocognitive psychologists, and adolescent health professionals to work together to ensure appropriate translation of science for policy. Failing to proactively define or engage in

*Address correspondence to: Sara Johnson, Ph.D., M.P.H., Johns Hopkins Division of General Pediatrics and Adolescent Medicine, 200 N. Wolfe Street, Room 2017, Baltimore, MD 21287.
E-mail address: sjohnson@jhsph.edu

1054-139X/09/$ – see front matter © 2009 Society for Adolescent Medicine. All rights reserved.
doi:10.1016/j.jadohealth.2009.05.016

*S.B. Johnson et al. / Journal of Adolescent Health 45 (2009) 216–221*                                                                217

a discussion about the role of neuroimaging research in policy may catalyze a course of action many adolescent health professionals would not endorse.

In this review, we begin by outlining historical attempts to use developmental benchmarks as measures of adolescent maturity. (When we refer to ''maturity'' we do not intend to suggest the end of development, but rather use this as shorthand for the achievement of adult-like capacities and privileges.) We then briefly summarize what is known about adolescent brain development, and what is unknown. (For in-depth reviews of adolescent brain development, and more nuanced discussions of research findings, which are beyond the scope of this review, see [6] and [7].) We provide an overview of what neuroimaging research can and cannot tell us about the adolescent brain and behavior. We then highlight the current use of the brain sciences in adolescent health policy debates. Finally, we outline a strategy for increasing the utility of brain science in public policy to promote adolescents' well-being.

## A Historical Perspective on Development and Maturity

Throughout history there have been biological benchmarks of maturity. For example, puberty has often been used as the transition point into adulthood. As societal needs have changed, so too have definitions of maturity. For example, in 13th century England, when feudal concerns were paramount, the age of majority was raised from 15 to 21 years, citing the strength needed to bear the weight of protective armor and the greater skill required for fighting on horseback [8]. More recently, in the United States the legal drinking age has been raised to 21, whereas the voting age has been reduced to 18 years so as to create parity with conscription [9]. Similarly, the minimum age to be elected varies by office in the U.S.: 25 years for the House of Representatives, 30 years for the Senate, and 35 years for President. However, individuals as young as 16 can be elected Mayor in some municipalities. The variation evident in age-based definitions of maturity illustrates that most are developmentally arbitrary [9]. Nonetheless, having achieved the legal age to participate in a given activity (e.g., driving, voting, marrying) often comes to be taken as synonymous with the developmental maturity required for it.

Age-based policies are not exceptional; policies are frequently enacted in the face of contradictory or nonexistent empirical support [10]. Although neuroscience has been called upon to determine adulthood, there is little empirical evidence to support age 18, the current legal age of majority, as an accurate marker of adult capacities. Less clear is whether neuroimaging, at present, helps to inform age-based determinations of maturity. If so, can generic guidelines be established, or is individual variation so great as to preclude establishing a biological benchmark for adult-like maturity of judgment?

## Brain Development in Adolescence

Current studies demonstrate that brain structures and processes change throughout adolescence and, indeed, across the life course [11]. These findings have been facilitated by imaging technologies such as structural and functional magnetic resonance imaging (sMRI and fMRI, respectively). Much of the popular discussion about adolescent brain development has focused on the comparatively late maturation of the frontal lobes [12], although recent work has broadened to the increasing ''connectivity'' of the brain.

Throughout childhood and into adolescence, the cortical areas of the brain continue to thicken as neural connections proliferate. In the frontal cortex, gray matter volumes peak at approximately 11 years of age in girls and 12 years of age in boys, reflecting dendritic overproduction [7]. Subsequently, rarely used connections are selectively pruned [6] making the brain more efficient by allowing it to change structurally in response to the demands of the environment [13]. Pruning also results in increased specialization of brain regions [14]; however, the loss of gray matter that accompanies pruning may not be apparent in some parts of the brain until young adulthood [2,15,16]. In general, loss of gray matter progresses from the back to the front of the brain with the frontal lobes among the last to show these structural changes [3,6].

Neural connections that survive the pruning process become more adept at transmitting information through myelination. Myelin, a sheath of fatty cell material wrapped around neuronal axons, acts as ''insulation'' for neural connections. This allows nerve impulses to travel throughout the brain more quickly and efficiently and facilitates increased integration of brain activity [17]. Although myelin cannot be measured directly, it is inferred from volumes of cerebral white matter [18]. Evidence suggests that, in the prefrontal cortex, this does not occur until the early 20s or later [15,16].

The prefrontal cortex coordinates higher-order cognitive processes and executive functioning. Executive functions are a set of supervisory cognitive skills needed for goal-directed behavior, including planning, response inhibition, working memory, and attention [19]. These skills allow an individual to pause long enough to take stock of a situation, assess his or her options, plan a course of action, and execute it. Poor executive functioning leads to difficulty with planning, attention, using feedback, and mental inflexibility [19], all of which could undermine judgment and decision making.

Synaptic overproduction, pruning and myelination—the basic steps of neuromaturation—improve the brain's ability to transfer information between different regions efficiently. This information integration undergirds the development of skills such as impulse control [20]. Although young children can demonstrate impulse control skills, with age and neuro-maturation (e.g., pruning and myelination), comes the ability to *consistently* use these skills [21].

Evidence from animal studies suggests that the neural connections between the amygdala (a limbic structure involved in emotional processing, especially of fear and vigilance) and the cortices that comprise the frontal lobes become

*S.B. Johnson et al. / Journal of Adolescent Health 45 (2009) 216–221*

denser during adolescence [22]. These connections integrate emotional and cognitive processes and result in what is often considered to be ''emotional maturity'' (e.g., the ability to regulate and to interpret emotions). The evidence suggests that this integration process continues to develop well into adulthood [23]. Steinberg, Dahl, and others have hypothesized that a temporal gap between the development of the socioemotional system of the brain (which experiences an early developmental surge around puberty) and the cognitive control system of the brain (which extends through late adolescence) underlies some aspects of risk-taking behavior [24,25]. This temporal gap has been compared with starting the engine of a car without the benefit of a skilled driver [25].

## Adolescent Neuropsychology: Linking Brain and Behavior

As detailed above, across cultures and millennia, the teen years have been observed to be a time of dramatic changes in body and behavior. During adolescence, most people successfully navigate the transition from dependence upon caregivers to self-sufficient adult members of society. Where specifically, along the maturational path of cognitive and emotional development, individuals should be given certain societal rights and responsibilities continues to be a topic of intense interest. Increasingly, neuroscience has been called on to inform this question.

### Impulse control, response inhibition, and sensation seeking

Among the many behavior changes that have been noted for teens, the three that are most robustly seen across cultures are: (1) increased novelty seeking; (2) increased risk taking; and (3) a social affiliation shift toward peer-based interactions [13]. This triad of behavior changes is seen not only in human beings but in nearly all social mammals [13]. Although the behaviors may lead to danger, they confer an evolutionary advantage by encouraging separation from the comfort and safety of the natal family, which decreases the chances of inbreeding. The behavior changes also foster the development and acquisition of independent survival skills [13].

Studying the link between behavioral changes and brain changes has been greatly facilitated by recent advances in neuroimaging technology and behavioral assessments. One challenge has been to identify the fundamental units of emotion and cognition and how they combine to determine more complicated ''real-world'' behaviors. For instance, younger adolescents are less likely than older adolescents to wait a given period of time to receive a larger reward [26]. This tendency can be studied using experiments in which the subject is asked questions such as whether they would rather receive $800 now or $1,000 in 12 months. By varying the amount of monetary difference and/or time between the transactions, an ''indifference point'' can be calculated to quantify an individual's tendency to prefer the ''here and now'' to some future reward. There is an extensive literature characterizing effects of age, gender, intelligence quotient (IQ), and other variables on this phenomenon, which is termed ''delay discounting'' [26,27]. However, more recent work has demonstrated that delay discounting is determined in part by the more fundamental traits of impulse control and future orientation, each with their own neural representations and developmental trajectories [28]. Furthermore, future orientation itself is a multidimensional construct involving cognitive, affective, and motivational systems.

Studies using fMRI are beginning to contribute to this parsing of behavior into more fundamental units by characterizing different neural representations and maturational courses for separate but related concepts such as impulse control and sensation seeking. Whereas sensation seeking changes seem to reflect striatal dopamine changes related to the onset of puberty, impulse control, as discussed previously, is more protracted and related to maturational changes in the frontal lobe [21].

### ''Hot'' and ''cold'' cognition

Perhaps because of the relative ease of quantifying hormonal levels in animal models, it is tempting to attribute all adolescent behavioral changes to ''raging hormones.'' More nuanced investigations of adolescent behavior seek to understand the specific mechanisms by which hormones affect neural circuitry and to discern these processes from nonhormonal developmental changes. An important aspect of this work is the distinction between ''hot'' and ''cold'' cognition. Hot cognition refers to conditions of high emotional arousal or conflict; this is often the case for the riskiest of adolescent behaviors [29]. Most research to date has captured information in conditions of ''cold cognition'' (e.g., low arousal, no peers, and hypothetical situations). Like impulse control and sensation seeking, hot and cold cognition are subserved by different neuronal circuits and have different developmental courses [30]. Thus, adolescent maturity of judgment and its putative biological determinants are difficult to disentangle from socioemotional context.

## What We Do Not Know About Brain Development in Adolescence

In many respects, neuroimaging research is in its infancy; there is much to be learned about how changes in brain structure and function relate to adolescent behavior. As of yet, however, neuroimaging studies do not allow a chronologic cut-point for behavioral or cognitive maturity at either the individual or population level. The ability to designate an adolescent as ''mature'' or ''immature'' neurologically is complicated by the fact that neuroscientific data are continuous and highly variable from person to person; the bounds of ''normal'' development have not been well delineated [5].

Neuroimaging has captured the public interest, arguably because the resulting images are popularly seen as ''hard'' evidence whereas behavioral science data are seen as

S.B. Johnson et al. / Journal of Adolescent Health 45 (2009) 216–221

subjective. For example, in one study, subjects were asked to evaluate the credibility of a manufactured news story describing neuroimaging research findings. One version of the story included the text, another included an fMRI image, and a third summarized the fMRI results in a chart accompanying the text. Subjects who saw the brain image rated the story as more compelling than did subjects in other conditions [31]. More strikingly, simply referring verbally to neuroimaging data, even if logically irrelevant, increases an explanation's persuasiveness [32].

Despite being popularly viewed as revealing the "objective truth," neuroimaging techniques involve an element of subjectivity. Investigators make choices about thickness of brain slices, level of clarity and detail, techniques for filtering signal from noise, and choice of the individuals to be sampled [5]. Furthermore, the cognitive or behavioral implications of a given brain image or pattern of activation are not necessarily straightforward. Researchers generally take pains to highlight the correlative nature of the relationship; however, such statements are often misinterpreted as causal [5]. Establishing a causal relationship is more complicated than it might, at first, seem. For example, there is rarely a one-to-one correspondence between a particular brain region and its discrete function; a given brain region can be involved in many cognitive processes, and many types of cognitive processes may be subserved by a particular brain structure [33].

Some neuroscientists lament that the technology has been used too liberally to draw conclusions where there is little empirical basis for interpreting the results. For example, a 2007 New York Times Op-Ed piece reported the results of a study in which fMRI was used to view the brains of 20 undecided voters while they watched videos of presidential candidates; they had previously rated the candidates on a scale of 1 to 10 from "very unfavorable" to "very favorable" [34]. The results of the brain scans were interpreted as reflecting the inner thoughts of the participants. For instance, "[w]hen viewing images of [Senator Clinton], these voters exhibited significant activity in the anterior cingulate cortex, an emotional center of the brain that is aroused when a person feels compelled to act in two different ways but must choose one. It looked as if they were battling unacknowledged impulses to like [Senator] Clinton" [34]. The editorial drew a swift response from several neuroscientists who believed that, in addition to subverting the standard peer review process before presenting data to the public, the investigators did not address the issue of reverse inference [35]. In neuroimaging terms, reverse inference is using neuroimaging data to infer specific mental states, motivations, or cognitive processes. Because a given brain region may be activated by many different processes, careful study design and analysis are imperative to making valid inferences [36,37]. In symbolic logic terminology, reverse inference errors are related to the "fallacy of affirming the consequent" (e.g., "All dogs are mammals. Fred is a mammal. Therefore, Fred is a dog.").

In sum, neuroimaging modalities involve an element of subjectivity, just as behavioral science modalities do. A concern is that high-profile media exposures may leave the mistaken impression that fMRI, in particular, is an infallible mind-reading technique that can be used to establish guilt or innocence, infer "true intentions," detect lies, or establish competency to drive, vote, or consent to marriage.

*The adolescent brain in context*

Neuroimaging technologies have made more information available about the structure and function of the human brain than ever before. Nonetheless, there is still a dearth of empirical evidence that allows us to anticipate behavior in the real world based on performance *in the scanner* [5]. Linking brain scans to real-world functioning is hampered by the complex integration of brain networks involved in behavior and cognition. Further hindering extrapolation from the laboratory to the real world is the fact that it is virtually impossible to parse the role of the brain from other biological systems and contexts that shape human behavior [6]. Behavior in adolescence, and across the lifespan, is a function of multiple interactive influences including experience, parenting, socioeconomic status, individual agency and self-efficacy, nutrition, culture, psychological well-being, the physical and built environments, and social relationships and interactions [38–42]. When it comes to behavior, the relationships among these variables are complex, and they change over time and with development [43]. This causal complexity overwhelms many of our "one factor at a time" explanatory and analytic models and highlights the need to continually situate research from brain science in the broader context of interdisciplinary developmental science to advance our understandings of behavior across the lifespan [44].

## Adolescent Maturity and Policy in the Real World: Scientific Complexity Meets Policy Reality

The most prominent use of neuroscience research in adolescent social policy was the 2005 U.S. Supreme Court Case, *Roper vs. Simmons,* which has been described as the *"Brown v. Board of Education* of 'neurolaw,'" recalling the case that ended racial segregation in American schools [45]. In that case, 17-year-old Christopher Simmons was convicted of murdering a woman during a robbery. Ultimately, he was sentenced to death for his crime. Simmons' defense team argued that he did not have a specific, diagnosable brain condition, but rather that his still-developing adolescent brain made him less culpable for his crime and therefore not subject to the death penalty. *Amicus* briefs were filed by, among others, by the American Psychological Association (APA) and the American Medical Association (AMA) summarizing the existing neuroscience evidence and suggesting that adolescents' still-developing brains made them fundamentally different from adults in terms of culpability.

The AMA brief argued that: "[a]dolescents' behavioral immaturity mirrors the anatomical immaturity of their brains. To a degree never before understood, scientists can now

*S.B. Johnson et al. / Journal of Adolescent Health 45 (2009) 216–221*

demonstrate that adolescents are immature not only to the observer's naked eye, but in the very fibers of their brains'" [46]. (Notably, the brief submitted by the AMA et al., implied a causal link among brain structure, function, and behavior in adolescence [5]). The neuroscientific evidence is thought to have carried significant weight in the Court's decision to overturn the death penalty for juveniles [47].

In a dissenting opinion in that case, Justice Antonin Scalia reflected on a 1990 brief filed by the APA in support of adolescents' right to seek an abortion without parental consent *(Hodgson v. Minnesota)*. In this case, the APA argued that adolescent decision making was virtually indistinguishable from adult decision making by the age of 14 or 15. Scalia pointed out this seeming inconsistency: "[The APA] claims in this case that scientific evidence shows persons under 18 lack the ability to take moral responsibility for their decisions, [the APA] has previously taken precisely the opposite position before this very Court…Given the nuances of scientific methodology and conflicting views, courts—which can only consider the limited evidence on the record before them, are ill equipped to determine which view of science is the right one" [48]. Although one can make the case that the "cold cognitive" context in which abortion-related decisions are made encourages more mature judgment than the "hot cognitive" context of a murder, Scalia's comments highlight the peril of leaving nonscientists to arbitrate and translate neuroscience for policy.

The Supreme Court used neuroimaging research to protect juveniles from the death penalty based on reduced capacity and consequently reduced culpability. A year after *Roper vs. Simmons* was decided, the same logic was extended to limit adolescent sexual behavior. In 2006, the State of Kansas used its interpretation of adolescent neuroscience research to expand the state's child abuse statute to include any consensual touching between minors under the age of 16 years. Although scientists may be reticent to apply their research to policy, in some cases, policy makers are doing it for them.

Some argue that one must only look to the use of early-life brain science to anticipate what happens when brain science is overgeneralized [49]. In the early 1990s, there were several high-profile studies that suggested that there was rapid growth brain growth and plasticity in the first 3 years of life and, therefore, that "enriched" environments could hasten the achievement of some developmental milestones [50]. This research was used to perpetuate the idea that videos, classical music, and tailored preschool educational activities could give a child a cognitive advantage before the door of neural plasticity swung shut forever [49]. One could imagine that such a perspective would discourage the allocation of resources for school-aged children and adolescents because, if this were true, after early childhood it would simply be "too late." The use of neuroscientific research to support "enriched" environments demonstrates that if neuroscientists do not direct the interpretation and application of their findings (or the lack of applicability), others will do it for them, perhaps without the benefit of their nuanced

understanding. A proactive approach to research and research-to-policy translation that includes neuroscientists, adolescent health professionals, and policy makers is an important next step.

## Toward a Policy-Relevant Neuroscientific Research Agenda

Public policy is struggling to keep up with burgeoning interest in cognitive neuroscience and neuroimaging [51]. In a rush to assign biological explanations for behavior, adolescents may be caught in the middle. Policy scholar Robert Blank comments, "We have not kept up in terms of policy mechanisms that anticipate the implications beyond the technologies. We have little evidence that there is any anticipatory policy. Most policies tend to be reactive" [51]. There is a need to situate research from the brain sciences in the broader context of adolescent developmental science, and to find ways to communicate the complex relationships among biology, behavior, and context in ways that resonate with policymakers and research consumers.

Furthermore, the time is right to advance collaborative, multidisciplinary research agendas that are explicit in the desire to link brain structure to function as well as adolescent behavior and implications for policy [52].

Ultimately, the goal is to be able to articulate the conditions under which adolescents' competence, or demonstrated maturity, is most vulnerable *and* most resilient. Resilience, it seems, is often overlooked in contemporary discussions of adolescent maturity and brain development. Indeed, the focus on pathologic conditions, deficits, reduced capacity, and age-based risks overshadows the enormous opportunity for brain science to illuminate the unique strengths and potentialities of the adolescent brain. So, too, can this information inform policies that help to reinforce and perpetuate opportunities for adolescents to thrive in this stage of development, not just survive.

## References

[1] Giedd J, Blumenthal J, Jeffries NO, et al. Brain development during childhood and adolescence: A longitudinal MRI study. Nature Neurosci 1999;2:861–3.

[2] Sowell ER, Thompson PM, Holmes CJ, et al. In vivo evidence for postadolescent brain maturation in frontal and striatal regions. Nature Neurosci 1999;2:859–61.

[3] Sowell ER, Thompson PM, Tessner KD, et al. Mapping continued brain growth and gray matter density reduction in dorsal frontal cortex: Inverse relationships during postadolescent brain maturation. J Neurosci 2001;21:8819–29.

[4] Schaffer A. Head case: Roper v. Simmons asks how adolescent and adult brains differ. Slate October 15, 2004.

[5] Aronson J. Brain imaging, culpability and the juvenile death penalty. Psychol Public Pol Law 2007;13:115–42.

[6] Giedd JN. The teen brain: Insights from neuroimaging. J Adolesc Health 2008;42:335–43.

[7] Lenroot RK, Giedd JN. Brain development in children and adolescents: Insights from anatomical magnetic resonance imaging. Neurosci Biobehav Rev 2006;30:718–29.

[8] James T. The age of majority. Am J Legal Hist 1960;4:22–33.

[9] Scott E. The legal construction of childhood. In: Rosenheim M, Dohrn B, Tanenhaus D, eds. A century of juvenile justice. Chicago, IL: University of Chicago Press, 2002.

[10] Gardner W, Scherer D, Tester M. Asserting scientific authority: Cognitive development and legal rights. Am Psychol 1989;44:895–902.

[11] Sowell ER, Thompson PM, Holmes CJ, et al. Localizing age-related changes in brain structure between childhood and adolescence using statistical parametric mapping. NeuroImage 1999;9:587–97.

[12] Park A, Wallis C, Dell K. What makes teens tick. Time Magazine 2008. May 10, 2004.

[13] Spear LP. The adolescent brain and age-related behavioral manifestations. Neurosci Biobehav Rev 2000;24:417–63.

[14] Casey BJ, Trainor RJ, Orendi JL, et al. A developmental functional MRI study of prefrontal activation during performance of a Go–No-Go task. J Cogn Neurosci 1997;9:835–47.

[15] Rubia K, Overmeyer S, Taylor E, et al. Functional frontalisation with age: Mapping neurodevelopmental trajectories with fMRI. Neurosci Biobehav Rev 2000;12:13–9.

[16] Sowell ER, Petersen BS, Thompson PM, et al. Mapping cortical change across the human life span. Nature Neurosci 2003;6:309–15.

[17] Anderson P. Assessment and development of executive function (EF) during childhood. Neuropsychol Dev Cogn Sect C Child Neuropsychol 2002;8:71–82.

[18] Paus T, Collins DL, Evans AC, et al. Maturation of white matter in the human brain: A review of magnetic resonance studies. Brain Res Bull 2001;54:255–66.

[19] Anderson VA, Anderson P, Northam E, et al. Development of executive functions through late childhood and adolescence in an Australian sample. Dev Neuropsychol 2001;20:385–406.

[20] Luna B, Thulborn KR, Munoz DP, et al. Maturation of widely distributed brain function subserves cognitive development. NeuroImage 2001;13:786–93.

[21] Luna B, Sweeney JA. The emergence of collaborative brain function: FMRI studies of the development of response inhibition. Ann N Y Acad Sci 2004;1021:296–309.

[22] Cunningham MG, Bhattacharyya S, Benes FM. Amygdalo-cortical sprouting continues into early adulthood: Implications for the development of normal and abnormal function during adolescence. J Compar Neurol 2002;453:116–30.

[23] Benes FM. Brain development, VII: Human brain growth spans decades. Am J Psychiatry 1998;155:1489.

[24] Steinberg L. Risk-taking in adolescence: New perspectives from brain and behavioral science. Curr Direct Psychol Sci 2007;16:55–9.

[25] Dahl RE. Affect regulation, brain development, and behavioral/emotional health in adolescence. CNS Spectr 2001;6:60–72.

[26] Steinberg L, Graham S, O'Brien L, et al. Age differences in future orientation and delay discounting. Child Dev 2009;80:28–44.

[27] Furby L, Beyth-Marom R. Risk-taking in adolescence—a decision-making perspective. Dev Rev 1992;12:1–44.

[28] Steinberg L, Albert D, Cauffman E, et al. Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: Evidence for a dual systems model. Dev Psychol 2008; 44:1764–78.

[29] MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice. Issue Brief 3: Less guilty by reason of adolescence September 21, 2006.

[30] Steinberg L. Cognitive and affective development in adolescence. Trends Cogn Sci 2005;9:69–74.

[31] McCabe DP, Castel AD. Seeing is believing: The effect of brain images on judgments of scientific reasoning. Cognition 2008;107:343–52.

[32] Weisberg DS, Keil FC, Goodstein J, et al. The seductive allure of neuroscience explanations. J Cogn Neurosci 2008;20:470–7.

[33] Snead OC. Neuroimaging and capital punishment. The New Atlantis: A Journal of Technology and Society 2008;19 (Winter):35–63.

[34] Iacoboni M, Freedman J, Kaplan J, et al. This is your brain on politics. New York Times November 11, 2007.

[35] Aron A, Badre D, Brett M, et al. Letter: Politics and the brain. New York Times November 14, 2007.

[36] Poldrack R. Can cognitive processes be inferred from neuroimaging data? Trends in Cognitive Sciences 2006;10:59–63.

[37] Poldrack RA. The role of fMRI in cognitive neuroscience: Where do we stand? Curr Opin Neurobiol 2008;18:223–7.

[38] Arnett JJ. Reckless behavior in adolescence: A developmental perspective. Dev Rev 1992;12:339–73.

[39] Irwin CE Jr, Millstein SG, Susman EJ, et al. Risk-taking behaviors and biopsychosocial development during adolescence. Emotion, cognition, health, and development in children and adolescents. Hillsdale, NJ: Lawrence Erlbaum, 1992. 75–102.

[40] Jessor R, Turbin MS, Costa FM. Protective factors in adolescent health behavior. J Pers Soc Psychol 1998;75:788–800.

[41] Moffitt TE, McCord J. Neuropsychology, antisocial behavior, and neighborhood context. Violence and childhood in the inner city. Cambridge: Cambridge University Press, 1997. 116–170.

[42] Susman EJ, Ponirakis A. Hormones—context interaction and antisocial behavior in youth. NATO ASI Series Life Sci 1997;292:251–69.

[43] Bronfenbrenner U. The ecology of human development: Experiments by nature and design. Cambridge, MA: Harvard University Press, 1979.

[44] Wang C. Invited commentary: Beyond frequencies and coefficients—toward meaningful descriptions for life course epidemiology. Am J Epidemiol 2006;164:122–5.

[45] Rosen J. The brain on the stand. New York Times Magazine March 11, 2007.

[46] American Medical Association APA, American Academy of Psychiatry and the Law, American Society for Adolescent Psychiatry, American Academy of Child & Adolescent Psychiatry, National Association of Social Workers, Missouri Chapter of the National Association of Social Workers, and National Mental Health Association. Brief of amicus curiae supporting respondent, Roper v. Simmons, 543 U.S. 551 (No. 03-633). 2005.

[47] Haider A. Roper v. Simmons: The role of the science brief. Ohio State J Crimin Law 2006;375:369–77.

[48] Scalia A. Dissenting Opinion, Roper vs. Simmons. In: Supreme Court of the United States, No. 03–633, 2005.

[49] Bruer JT. A new understanding of early brain development and lifelong learning, The Myth of the First Three Years. New York: Free Press, 1999.

[50] Bruer JT. Avoiding the pediatrician's error: How neuroscientists can help educators (and themselves). Nature Neurosci 2002;5(Suppl):1031–3.

[51] Blank R. Policy implications of advances in cognitive neuroscience. In: Teich A, Nelson S, Lita S, eds. AAAS Science and Technology Yearbook 2003. AAAS, 2003.

[52] Steinberg L. Adolescent development and juvenile justice. Annu Rev Clin Psychol 2009;5:459.

# EXHIBIT 30

 

American Psychological Association

American Psychology-Law Society

Law and Human Behavior

© 2019 American Psychological Association
0147-7307/19/$12.00

2019, Vol. 43, No. 1, 69–85
http://dx.doi.org/10.1037/lhb0000315

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

# Adolescents' Cognitive Capacity Reaches Adult Levels Prior to Their Psychosocial Maturity: Evidence for a "Maturity Gap" in a Multinational, Cross-Sectional Sample

Grace Icenogle, Laurence Steinberg, Natasha Duell, and Jason Chein
Temple University

Lei Chang
University of Macau

Nandita Chaudhary
University of Delhi

Laura Di Giunta
Università di Roma "La Sapienza"

Kenneth A. Dodge
Duke University

Kostas A. Fanti
University of Cyprus

Jennifer E. Lansford
Duke University

Paul Oburu
Maseno University

Concetta Pastorelli
Università di Roma "La Sapienza"

Ann T. Skinner
Duke University

Emma Sorbring
University West

Sombat Tapanya
Chiang Mai University

Liliana M. Uribe Tirado
Universidad de San Buenaventura

Liane P. Alampay
Ateneo de Manila University

Suha M. Al-Hassan
Hashemite University and Emirates College for Advanced Education

Hanan M. S. Takash
Hashemite University

Dario Bacchini
University of Naples "Federico II"

All countries distinguish between minors and adults for various legal purposes. Recent U.S. Supreme Court cases concerning the legal status of juveniles have consulted psychological science to decide where to draw these boundaries. However, little is known about the robustness of the relevant research, because it has been conducted largely in the U.S. and other Western countries. To the extent that lawmakers look to research to guide their decisions, it is important to know how generalizable the scientific conclusions are. The present study examines 2 psychological phenomena relevant to legal questions about adolescent maturity: cognitive capacity, which undergirds logical thinking, and psychosocial maturity, which comprises individuals' ability to restrain themselves in the face of emotional, exciting, or risky stimuli. Age patterns of these constructs were assessed in 5,227 individuals (50.7% female), ages 10–30 ($M = 17.05$, $SD = 5.91$) from 11 countries. Importantly, whereas cognitive capacity reached adult levels around age 16, psychosocial maturity reached adult levels beyond age 18, creating a "maturity gap" between cognitive and psychosocial development. Juveniles may be capable of deliberative decision

Grace Icenogle, Laurence Steinberg, Natasha Duell, and Jason Chein, Department of Psychology, Temple University; Lei Chang, Department of Psychology, University of Macau; Nandita Chaudhary, Department of Human Development and Childhood Studies, Lady Irwin College, Univer-

sity of Delhi; Laura Di Giunta, Department of Psychology, Università di Roma "La Sapienza"; Kenneth A. Dodge, Center for Child and Family Policy, Duke University; Kostas A. Fanti, Department of Psychology, University of Cyprus; Jennifer E. Lansford, Center for Child and Family

continued

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

making by age 16, but even young adults may demonstrate "immature" decision making in arousing situations. We argue it is therefore reasonable to have different age boundaries for different legal purposes: 1 for matters in which cognitive capacity predominates, and a later 1 for matters in which psychosocial maturity plays a substantial role.

---

**Public Significance Statement**

Cognitive capacity—the basic cognitive functions that serve as the foundation for higher-level, complex thinking processes—reaches adult levels during adolescence (around 16). In contrast, psychosocial maturity—one's ability to exercise self-restraint in emotional situations—reaches adult levels during the 20s. Importantly, in a study of over 5,200 participants, these distinct age patterns emerge across 11 diverse countries around the world. Thus, having two legal age boundaries that distinguish adolescence and adulthood—one for decisions typically made with deliberation and another for decisions typically made in emotionally charged situations—may be more sensible than having just one.

---

*Keywords:* adolescence, maturity, law, age of majority, cross-national

*Supplemental materials:* http://dx.doi.org/10.1037/lhb0000315.supp

All developed societies draw chronological age boundaries between minors and adults for legal purposes, among them, determining who is permitted to vote, drive, purchase alcohol, and make autonomous medical decisions and, if arrested, who is tried as an adult. In many countries, age 18 is used for most purposes with some exceptions (e.g., consent to research or medical treatment; World Health Organization, 2014). In others, such as the United States, different ages are used for different matters. For example, although the presumptive age of majority in the U.S. is 18, eligibility for driver's licensing is generally granted at a younger age, whereas the minimum legal purchase age for alcohol is 21.

The idea that young people lack certain capacities or abilities necessary to assume the responsibilities or enjoy the privileges of adulthood is undoubtedly part of the logic behind differentiating between adults and minors in the law (Woolard & Scott, 2009). For example, the infancy doctrine, which allows minors who enter into contracts to void them at their discretion, was fashioned to protect minors from their immature judgment as well as adults who might capitalize on youths' lack of understanding of the consequences of the contract (Preston & Crowther, 2012). In the early 20th century, legislators established a separate justice system in the U.S. for juveniles (Scott & Steinberg, 2008) based on similar logic, namely, that children differ from adults in ways that require special

protection in criminal matters: Children suffer from deficient decision-making abilities, which makes them less responsible for their bad acts; children are more amenable to rehabilitation, so they should be reformed, not punished (Davis, Scott, Wadlington, & Whitebread, 2009; Woolard & Scott, 2009).

The delineation of a specific age-boundary that separates children from adults has often resulted from practical considerations, without reference to relevant empirical and theoretical foundations (Scott, 2000). For example, initially there were no age restrictions for driving. As traffic safety became a concern, states began setting a minimum driving age, typically 18 (Mayhew, Fields, & Simpson, 2000). In the 1920s and 1930s, many states lowered the driving age from 18 to 16 to allow minors to work in occupations requiring a vehicle. As teen driving fatalities increased, many states adopted "graduated driver-licensing" in the 1990s, which lets 16-year-olds drive, but only under certain circumstances (e.g., no other teen passengers in the car; Williams, 1999).

In other instances, political considerations led legislators to draw or change legal boundaries. At the height of the Vietnam War, when the military draft age was 18, the voting age was 21. Many politicians argued that it was unfair to send 18-year-olds into battle but prohibit them from voting, and Congress amended the Constitution in 1971 to lower the voting age to 18. In response,

---

Policy, Duke University; Paul Oburu, Department of Educational Psychology, Maseno University; Concetta Pastorelli, Department of Psychology, Università di Roma "La Sapienza"; Ann T. Skinner, Center for Child and Family Policy, Duke University; Emma Sorbring, Centre for Child and Youth Studies, University West; Sombat Tapanya, Department of Psychiatry, Chiang Mai University; Liliana M. Uribe Tirado, Consultorio Psicológico Popular, Universidad San Buenaventura; Liane P. Alampay, Department of Psychology, Ateneo de Manila University; Suha M. Al-Hassan, Queen Rania Faculty for Childhood, Hashemite University, and Emirates College for Advanced Education; Hanan M. S. Takash, Queen Rania Faculty for Childhood, Hashemite University; Dario Bacchini, Department of Humanistic Studies, University of Naples "Federico II".

Natasha Duell is now at the Center for Developmental Science and Department of Psychology and Neuroscience, University of North Carolina, Chapel Hill.

The data reported here are drawn from a larger study of decision making in everyday life and an ongoing longitudinal study of parenting across cultures (funded by the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development, grant RO1-HD054805). Previous publications and parallel conference presentations have drawn on portions of the data described in the present study (e.g., Duell et al., 2017; Icenogle et al., 2016; Steinberg et al., 2017). This research was supported by a grant to Laurence Steinberg from the Klaus J. Jacobs Foundation.

Correspondence concerning this article should be addressed to Grace Icenogle, who is now at Department of Psychological Science, University of California, Irvine, 4201 Social and Behavioral Sciences Gateway, Irvine, CA 92697. E-mail: gicenogl@uci.edu

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

some states lowered their legal drinking age from 21 to 18 or 19 (Cook & Tauchen, 1984). Because not all states did this, young people living in places with higher drinking ages would drive across state lines to purchase and consume alcoholic beverages—and then drive back home intoxicated. In 1984, under pressure from the federal government, all states raised the minimum legal drinking age back to 21.

Until recently, developmental psychology has not been an explicit force in determining specific legal age boundaries—when legislators lowered the driving age or raised the drinking age, no one asked whether research on psychological development supported either change. However, developmental science has gradually become more influential (Steinberg, 2017). In both legal and nonlegal venues, experts have weighed in on whether, and at what age, the law should distinguish between adolescents and adults. But considerable controversy has arisen because scientists have answered this question in different ways, depending on the legal issue involved.

In 2005, when the American Psychological Association (APA) submitted an amicus brief in *Roper v. Simmons* (2005) the U.S. Supreme Court case that abolished the juvenile death penalty for 16- and 17-year-olds, the APA argued that people younger than 18 lacked the psychological maturity necessary to be held fully responsible for their crimes and, therefore, that they should not be eligible for capital punishment (American Psychological Association [APA], 2004). Justice Antonin Scalia, in his dissenting opinion, criticized the APA, because in an earlier case its experts had opined that teenagers should have the right to make decisions about abortion without involving their parents, on the grounds that their decision-making abilities were just as mature as adults' (APA, 1989).

A group of psychologists argued that this apparent logical inconsistency was actually in keeping with developmental science (Steinberg, Cauffman, Woolard, Graham, & Banich, 2009a). They contended that because different abilities mature along different timetables, adolescents of a given age could be adult-like in some respects but not others. Based on analyses of data from over 900 individuals between the ages of 10 and 30, they noted that cognitive capacity—the basic cognitive processes supporting the ability to reason logically—matures by 16, whereas psychosocial maturity—the capacity to exercise self-restraint, especially in emotionally arousing contexts—does not fully mature until several years later. Steinberg, Cauffman, Woolard, Graham, and Banich (2009a) argued that these patterns justify having a lower age boundary for legal decisions that allow deliberation and a higher age boundary for matters pertaining to acts typically made under emotionally arousing circumstances (Scott & Steinberg, 2008).

One way to think about the difference between these capacities and abilities is to distinguish between "cold" cognition and "hot" cognition. Cold cognition refers to mental processes (such as working memory or response inhibition) employed in situations calling for deliberation in the absence of high levels of emotion (e.g., Figner, Mackinlay, Wilkening, & Weber, 2009). Hot cognition involves mental processes in affectively charged situations where deliberation is unlikely or difficult. Recent research has borne out this distinction, showing that on response inhibition tasks, young adults (aged 18–21) perform comparably with somewhat older individuals when tested under emotionally neutral conditions but more poorly—and similarly with younger teenagers—when tested under arousing ones (Cohen et al., 2016).

Legal issues pertaining to cold cognition include voting, granting consent for research participation, and making autonomous medical decisions, where the presence of adult consultants and the absence of time pressure impose sufficient external control to minimize the dangers of impulsive decision making (Grisso et al., 2003; Hein et al., 2015). Issues related to hot cognition include driving, consuming alcohol, and criminal behavior; it is easy to make impulsive choices when emotions are aroused, such as when behind the wheel, intoxicated, or committing a crime, behaviors that often occur in the presence of peers during adolescence (Albert & Steinberg, 2011).

Importantly, the developmental trajectories of cold and hot cognition differ. In studies using cold cognitive tasks, performance increases dramatically from childhood to early- or midadolescence and then plateaus. This pattern is demonstrated on tasks of response inhibition (e.g., Huizinga, Dolan, & van der Molen, 2006; Luna, Garver, Urban, Lazar, & Sweeney, 2004), cognitive flexibility (e.g., Crone, Ridderinkhof, Worm, Somsen, & van der Molen, 2004), and working memory (e.g., Huizinga et al., 2006; Luna et al., 2004; Prencipe et al., 2011). A similar developmental pattern appears in the psycholegal literature as well. For example, younger juveniles (11–15 years) are impaired at significantly higher rates than older adolescents (16–17 years) on measures of understanding and appreciation of Miranda rights and on other measures of adjudicative competence (Viljoen, Zapf, & Roesch, 2007). But by the time they are 16- to 17-years-old, adolescents and adults score comparably on abilities relevant to competence to stand trial, (Grisso et al., 2003; Redlich & Shteynberg, 2016).

In contrast, facets of hot cognition, including sensation seeking (or lack thereof), impulse control, future orientation, and resistance to peer influence, follow a protracted development into adulthood. Sensation seeking, which peaks during adolescence (Steinberg et al., 2008), decreases into the early- to mid-20s (Harden & Tucker-Drob, 2011; Shulman, Harden, Chein, & Steinberg, 2014). On the other hand, impulse control, future orientation, and resistance to peer influence improve into adulthood in studies employing either self-report assessments (e.g., Harden & Tucker-Drob, 2011; Romer, Duckworth, Sznitman, & Park, 2010; Steinberg et al., 2009c; Steinberg & Monahan, 2007) or behavioral tasks (e.g., Chein, Albert, O'Brien, Uckert, & Steinberg, 2011; Cohen et al., 2016; Steinberg et al., 2009c). Similarly, relative to adults, adolescents demonstrate impaired decision making in emotionally arousing contexts, such as when being interrogated by police (e.g., Malloy, Shulman, & Cauffman, 2014). To the extent that these legal contexts become emotionally arousing as a consequence of external pressures—by friends, family, police, or the adolescent's own lawyer—adolescents' decision making lags behind adults'. Thus, if our laws were more closely aligned with developmental science, age boundaries for matters involving cold cognition might be lower than those involving hot cognition, because effective hot cognition requires both cognitive capacity and psychosocial maturity (e.g., self-restraint).

There is no universally agreed-upon way to measure cognitive capacities or psychosocial maturity. Steinberg et al. (2009a) measured cognitive capacity using tests of short-term memory (STM), working memory, and verbal fluency. These measures of executive functioning undergird goal-directed behavior and higher-order log-

Case 3:19-cv-01226-L-AHG   Document 34-7   Filed 01/03/20   PageID.7267   Page 510 of 620

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

ical reasoning (Diamond, 2013). Their measure of psychosocial maturity was based on self-reports of traits such as impulse control, sensation seeking, future orientation, and resistance to peer influence. These measures tap individuals' ability to restrain themselves in the face of temptations to pursue rewarding, immediately gratifying, socially encouraged, or risky activities. These measures capture some, but not *all*, important aspects of cognitive and psychosocial functioning that are relevant to decision making (e.g., neither measure included an index of morality or perspective taking; see Fischer, Stein, & Heikkinen, 2009 and Steinberg, Cauffman, Woolard, Graham, & Banich, 2009b for a response). It is notable that Steinberg et al. (2009a) measure of cognitive capacity comprised all behavioral tasks, whereas their measure of psychosocial maturity comprised all self-report measures. These limitations notwithstanding, both constructs include measures that are essential to decision making competence in legal contexts— executive functions facilitate flexible, optimized decision making (Diamond, 2013) whereas elements of psychosocial maturity are strongly tied to what some writers have referred to as "judgment" (e.g., Scott, Reppucci, & Woolard, 1995; Steinberg & Cauffman, 1996).

## Overview and Rationale of Present Study

The present study replicates Steinberg et al. (2009a) in a large international sample. Such a replication is warranted for several reasons. First, because most of the relevant research has been conducted in Western countries, it is not known to what degree conclusions drawn from these countries extend to non-Western societies. Further, of the few cross-national studies of cognitive capacity or psychosocial development that do exist, most suffer at least one major limitation. Studies typically examine only a single developmental period (e.g., middle adolescence, excluding the transition to adulthood). Furthermore, these studies often examine mean differences between cultures and not age trends (e.g., Thorell, Veleiro, Siu, & Mohammadi, 2013). In addition, apart from a few studies (e.g., Matsumoto et al., 2008; Vazsonyi & Ksinan, 2017), most cross-cultural work examines only a few countries or cultures at a time. Although some studies have collected data from a large number of participants from many countries (e.g., Rossier et al., 2007), such studies are limited to adult samples and rely on self-report measures, which typically do not assess executive functions. To our knowledge, no cross-cultural study has measured multiple elements of both cognitive and psychosocial development within a single, multiage sample. To the extent that lawmakers look to science to guide their decisions, it is important to know how robust the scientific conclusions are. This is especially important with respect to laws within the U.S., with its ever-growing population of immigrants (Migration Policy Institute, 2018).

Despite the limitations of most of the published cross-cultural research, some studies have examined age patterns of legally relevant psychological phenomenon. For example, cognitive capacity improves with age across childhood and into adolescence in Kenya (Alcock, Holding, Mung'ala-Odera, & Newton, 2008), Japan (Imada, Carlson, & Itakura, 2013), and Hong Kong (Wang, Devine, Wong, & Hughes, 2016). Using self-report indices of facets of psychosocial maturity, Rossier et al. (2007) found that sensation seeking decreased with age during young adulthood

(from age 18 to 25) in China, Germany, Italy, Spain, and Switzerland, though impulsivity did not.

The paucity of cross-cultural work in this area is regrettable because there is reason to expect cultural variation in development, particularly with respect to psychosocial maturity. Cross-cultural studies of self-regulation focus on the socialization of appropriate behaviors (i.e., emotional displays), especially in social interactions. That is, to the extent that emotions motivate or precipitate behavior (e.g., feeling anger may lead to an act of aggression), emotion regulation is necessary to comply with the behavioral norms of a culture (LeCuyer & Zhang, 2015; Matsumoto et al., 2008). In this view, parents and peers shape self-regulation by encouraging culturally appropriate behaviors and discouraging inappropriate behaviors (Chen & French, 2008). Cultures valuing individuality (typically Western cultures) encourage autonomy and self-assertion, whereas more collectivistic cultures stress the importance of suppressing one's desires to benefit the group (Chen & French, 2008).

Cultural variations in self-regulation also extend to the management of positive emotions. Americans, for example, are less likely to dampen positive emotions than are people from East Asian countries (Ma, Tamir, & Miyamoto, 2018; Miyamoto & Ma, 2011). This cultural difference has particular implications for sensation seeking, which often involves a lack of regulation of positive affect (e.g., the thrill or excitement of doing something fun, but dangerous, with friends). Indeed, according to Hofstede (2011), cultures vary considerably along a dimension of "indulgence-restraint," the degree to which societal norms encourage hedonic satisfaction rather than the strict regulation of impulses. In summary, in East Asian and collectivistic cultures, children must learn to suppress (regulate) undesirable behaviors (LeCuyer & Zhang, 2015). Thus, self-regulation may develop earlier in these contexts than in Western/individualistic societies for both positive and negative affect (Lamm et al., 2017). Comparative cross-cultural research on the development of self-regulation is limited and equivocal. Some studies indicate similar developmental patterns cross-culturally, but other research examining the socialization of self-regulation suggests divergent developmental trajectories.

A second reason for the present replication concerns the measurement of psychosocial maturity. Steinberg et al. (2009a) employed behavioral tasks to assess cognitive capacity and self-report measures to assess psychosocial maturity. One outstanding question is whether previously documented differences in age patterns of cognitive capacity and psychosocial maturity are an artifact of differences in methodology. For example, whereas self-report measures tap the individual's subjective assessment of their behavior, behavioral tasks provide a brief snapshot of behavior while controlling for context, an important consideration in cross-national studies. In the present study, we employ a measure of psychosocial maturity that is based mainly on behavioral assessments, which allows us to more directly compare its growth with a measure of cognitive capacity that is also based on behavioral assessments.

Finally, since its 2005 decision on the juvenile death penalty, the Supreme Court has heard several other cases in which developmental science was applied. During the past decade, the Court has decided cases on the constitutionality of sentencing juveniles to life without the possibility of parole (Graham v. Florida, 2010; Miller v. Alabama, 2012) and on the admissibility of the results of

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

interrogations of adolescents in situations in which they may be inadvertently encouraged to confess to crimes (*JDB v. North Carolina,* 2011). And, in light of new evidence that brain maturation continues into adulthood (Casey, 2015), a number of experts have asked whether these findings support raising the age of majority under criminal law and processing young adult offenders in the juvenile justice system (Schiraldi, Western, & Bradner, 2015). Importantly, the relevant research on psychological development in young adulthood—especially comparing young adults with people in their mid- and late 20s—is very limited (Scott, Bonnie, & Steinberg, 2016).

In the present study, we compare two facets of development relevant to the treatment of young people under the law—cognitive capacity (the predominant influence on cold cognition) and psychosocial maturity (the predominant influence on hot cognition)—using some of the same tasks as Steinberg et al. (2009a), but in an 11-country sample of more than 5,200 individuals between the ages of 10 and 30. Countries vary in how they socialize youth (Chen & French, 2008; Matsumoto et al., 2008), but the question of where to draw a boundary between adolescence and adulthood is one that all societies face. Accordingly, we examine the second two decades of life to determine whether and in what ways age differences in cognitive capacity and psychosocial maturity are evinced in a diverse group of countries. The countries in this sample—China, Colombia, Cyprus, Jordan, Kenya, India, Italy, the Philippines, Sweden, Thailand, and the U.S.—are diverse geographically, economically, and culturally, including on dimensions of individualism/collectivism and indulgence/restraint (Hofstede, 2011). For example, Columbia and China rank as some of the world's most collectivistic cultures, whereas Italy and the U.S. are some of the most individualistic. Likewise, China and India greatly value restraint, whereas Sweden and Columbia are highly indulgent (see Table 1 for details on country-level attributes and the online supplemental materials for details on legal age boundaries by country).

Consistent with Steinberg et al. (2009a), we examine age differences using composite measures of psychosocial maturity and cognitive capacity. These composite variables allow us to capture multiple facets of an overarching construct (executive functions in the case of cognitive capacity and self-restraint in the case of psychosocial maturity). However, unlike Steinberg et al. (2009a),

we rely largely on behavioral measures of psychosocial maturity. Like the original measure of psychosocial maturity, these behavioral tasks tap various manifestations of self-restraint. Here, we include behavioral measures of sensation seeking (using the "stoplight game"), future orientation (using a delay discounting task), and impulse control (using the Tower of London task). We also measure cost sensitivity, or one's ability to learn from negative outcomes, using a modified version of the Iowa gambling task (IGT). This measure has not been used before as an indicator of psychosocial maturity, but it can be used to assess self-restraint. Specifically, successful performance on the IGT requires that one learn to resist potential rewards that also carry high costs. Lastly, because a behavioral measure was unavailable, we rely on a self-report measure of resistance to peer influence. In its opinion in *Roper v. Simmons* (2005), the Supreme Court explicitly cited teens' greater susceptibility to others as a mitigating factor for their bad behavior. Thus, given its important place in questions of maturity, self-reported resistance to peer influence was retained in the current study.

### Hypotheses

We hypothesized that cognitive capacity would reach adult levels *prior* to age 18 and plateau in midadolescence, but that psychosocial maturity would not reach adult levels until after 18, into the 20s. These hypotheses are consistent with the idea that deliberative, "cold" decision making matures prior to "hot" decision making. Given the substantial cultural variation in expectations for self-regulation (which likely influences each component of self-restraint within the psychosocial maturity composite), we anticipated that patterns of age differences in psychosocial maturity would vary notably across countries (Chen & French, 2008; Matsumoto et al., 2008). In contrast, we expected the pattern of age differences in cognitive capacity to generally be more consistent across countries.

### Method

#### Participants

We recruited nine of the 11 countries of the present sample from an ongoing longitudinal study of parenting across cultures (PAC;

Table 1
*Country-Level Attributes*

| Country | Individualism/Collectivism | Indulgence/Restraint | GDP per capita (PPP) 2014 (USD) |
|---------|---------------------------|----------------------|--------------------------------|
| China | 20 | 24 | 13,200 |
| Columbia | 13 | 83 | 13,500 |
| Cyprus | — | 70 | 30,900 |
| India | 48 | 26 | 5,800 |
| Italy | 76 | 30 | 35,100 |
| Jordan | 30 | 43 | 12,000 |
| Kenya | 25 | — | 3,100 |
| Philippines | 32 | 42 | 7,000 |
| Sweden | 71 | 78 | 46,200 |
| Thailand | 20 | 45 | 15,600 |
| U.S. | 91 | 68 | 54,400 |

*Note.* The Individualism/Collectivism Scale and the Indulgence/Restraint Scale range from 0–100 (Hofstede, 2011). GDP per capita is given in U.S. dollars (Central Intelligence Agency, 2018) .

Case 3:19-cv-01226-L-AHG   Document 34-7   Filed 01/03/20   PageID.7269   Page 512 of 620

Lansford & Bornstein, 2011), which has been described elsewhere (Steinberg et al., 2017). The PAC study originally selected these nine countries because they differ in how children are parented and disciplined, which is the focus of that study. In particular, these nine countries differ on several levels: (a) individualism versus collectivism; (b) religious affiliation; and (c) laws governing parenting behaviors (e.g., the one-child policy in China that was in effect at the time of data collection; Lansford & Bornstein, 2011). The current study has a different focus, but collaborating with the PAC group allowed us to build on their cross-national infrastructure. In addition to the PAC countries, the current study included Cyprus and India. Cyprus participated in the current study, but not the PAC project, because PAC data collection had already begun prior to Cyprus' involvement. India was unable to join the PAC group because the Indian Council of Medical Research did not approve the PAC study given that the sample was not nationally representative of India. Because the National Institutes of Health, which funds the PAC study, required this approval to fund data collection, India could not participate in the PAC study. However, because the Jacobs Foundation funded the current study, such approval was not required, thus allowing India to participate.

The sample ($N = 5,404$) comprises individuals between 10 and 30 years of age in 11 countries: China ($n = 493$), Colombia ($n = 513$), Cyprus ($n = 407$), India ($n = 425$), Italy ($n = 561$), Jordan ($n = 506$), Kenya ($n = 488$), the Philippines ($n = 512$), Sweden ($n = 425$), Thailand ($n = 504$), and the U.S. ($n = 570$; see Table S2 for a breakdown of participants by age in each country). We balanced the proportion of males and females in the full sample (50.8% female, $n = 2,746$, within each country (ranging between 48.9%–53.8% female) and across age group (ranging between 48.7%–52.0% female). Each site recruited participants from urban centers in each participating country using flyers posted in neighborhoods, advertisements in newspapers, and word of mouth. All sites attempted to recruit a minimum of 60 participants (50% female) for each of seven age groups: 10–11 years, 12–13 years, 14–15 years, 16–17 years, 18–21 years, 22–25 years, and 26–30 years. (Because the 10- to 11-year-old group comprised PAC participants, within PAC countries, the number of participants in this group generally exceeded those in other age groups.) Participants came from households with similar levels of parental education (average = "some college") and reflected the majority ethnicity of the country (except in the U.S., where we tried to recruit equal numbers of Black, Latino, and White participants, and in Kenya, where participants were of the Luo ethnic group).

## Procedure

At each data collection site, research staff received identical training for administering the test battery. Measures were administered in the predominant language at each site, following forward- and back-translation and a process of cultural adaptation (Erkut, 2010). Translators were fluent in both English and the target language, and identified any items that translated poorly, were culturally insensitive or inappropriate, or may have multiple meanings. Site coordinators and translators then modified items as appropriate. During data collection, investigators from each site attended an annual in-person meeting to resolve any questions, concerns, or obstacles, and to review study procedures. In addition, sites regularly used e-mail and Skype calls to resolve ongoing questions or issues. A central coordinating center received and checked all incoming data each week.

Participants completed a session that lasted 2 hr. Staff members tested participants individually in their homes, schools, or other locations designated by the participants. Parental consent and adolescent assent were obtained at all sites for all youth under 18 except Sweden, where parental consent is not required for participants over 15. Participants completed computerized versions of all measures including self-report measures, behavioral tasks, an intelligence assessment, and a demographic questionnaire.

In order to maintain participants' interest and motivation, they were told they would receive a base payment ($30 in the U.S.) for participating in the study, but that they could earn a bonus (equal to 50% of the base payment) based on their performance on the computer tasks. In actuality, all participants received this bonus. Research staff debriefed participants regarding this deception in countries where local Institutional Review Boards (IRBs) deemed such disclosure necessary. Local investigators set base payments so as not to be coercive; the participating university in Sweden prohibits paying research participants, so these participants received a base payment of two movie tickets and a bonus of one additional ticket. Local IRBs approved all procedures.

## Measures

Analyses focused on a demographic questionnaire, a measure of intellectual ability, three measures of cognitive capacity, and five measures of psychosocial maturity.

**Demographics.**   Participants reported their age, sex, and the level of education of each of their parents, as a proxy for socioeconomic status. Due to small but significant differences among age groups, we added average parental education as a covariate in all analyses.

**Intellectual ability.**   We used the Matrix Reasoning subtest of the *Wechsler Abbreviated Scale of Intelligence* (WASI; Psychological Corporation, 1999), administered on a laptop, to estimate *nonverbal intellectual ability*. (Verbal subscales of the WASI were excluded due to the variability in language across sites in the sample.) The WASI has been normed for individuals between the ages of 6 and 89 years; an age-normed score (i.e., *t*-score) was computed for each participant (see Icenogle et al., 2016 for more details about this measure). We included intellectual ability, which may influence task performance, as a covariate in all analyses to control for small but significant age differences in intellectual functioning in some of the countries.

**Cognitive capacity.**   We computed a measure of cognitive capacity by averaging within-country standardized scores from digit span, working memory, and verbal fluency tasks.

**Digit span.**   Participants recalled strings of digits beginning with two digits and increasing to eight. The outcome of interest is the highest number of digits recalled in reverse order (DSB). DSB taps working memory because it requires individuals to hold and manipulate information held in memory (Diamond, 2013).

**Working memory.**   Participants saw four probe letters on the screen, followed by a target letter (Thompson-Schill et al., 2002). Participants indicated whether the target letter was among the four probes. On difficult trials, two of the four probes had appeared on the previous trial; on easy trials, none of the four probes had appeared in the two previous trials. Participants completed two

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Case 3:19-cv-01226-L-AHG   Document 34-7   Filed 01/03/20   PageID.7270   Page 513 of 620

blocks of 32 trials. The outcome of interest is average accuracy across all trials.

**Verbal fluency.** Participants generated as many words as possible belonging to a given category in 1 min. Three categories were used: fruits, vegetables, and animals. The number of valid words (i.e., those that were not proper nouns, repeats, or different forms of the same word) generated within each category were averaged to create an overall fluency score. Kenyan participants scored notably lower than any other country (e.g., two thirds of the sample did not produce one example of a fruit). A discussion with the principal investigator in Kenya revealed that these low scores may be the result of low exposure to a variety of fruits, vegetables, and animals, or to performance-related anxiety. Further, Kenyans who have attended school are often multilingual, and a language mix-up could have contributed to poor performance. Accordingly, the cognitive capacity variable for Kenyan participants excluded verbal fluency.

**Psychosocial maturity.** We computed a composite measure of psychosocial maturity by averaging within-country standardized scores from five measures: self-reported resistance to peer influence, the stoplight task, delay discounting, the modified Iowa gambling task, and the Tower of London task. Although Steinberg et al. (2009a) also included a measure of risk perception, this measure was excluded from the current analyses (although it was administered). Unlike the other psychosocial measures, the risk perception questionnaire asks about specific risky behaviors (e.g., riding in a car with a drunk driver), perceptions of which may differ across countries simply because the behavior is more or less normative or common (e.g., sanctions against alcohol use in Jordan give intoxicated driving a different meaning than in the United States).

These specific measures were chosen both because they tap aspects of development frequently cited in legal debates, and because they are behavioral, not self-report, assessments. By using behavioral measures of both psychosocial maturity and cognitive capacity, we are able to determine whether previously reported divergent age patterns of the two are merely a reflection of measurement. Although our measures, like those used by Steinberg et al. (2009a), reflect multiple domains of psychosocial functioning, we create an aggregate for two main reasons. Conceptually, these measures are related; each is undergirded by self-restraint (which manifests in different ways). Second, it is important to produce scientific research that meaningfully guides the legal field. Practically speaking, the courts and policymakers require simple explanations to complicated questions (Steinberg, Cauffman, Woolard, Graham, & Banich, 2009b). Thus, we consolidate across measures to make our study more directly applicable to legal settings.

**Resistance to peer influence.** We used the Resistance to Peer Influence Scale (RPI; Steinberg & Monahan, 2007), a 10-item questionnaire that uses a two-stage response format (see online supplemental materials for an example and full scale). Participants first indicated which of two opposing statements best described them (e.g., "For some people, it's pretty easy for their friends to get them to change their mind BUT for other people, it's pretty hard for their friends to get them to change their mind"). Then, participants rated whether this statement is "really true" or "sort of true," yielding a 4-point scale. Because, in our sample, confirmatory factor analyses (CFAs) indicated poor model fit using the

4-point scale in all countries, we used dichotomized responses (i.e., which of the two statements was selected)—which yield better model fit indices—to compute scales scores. Further, psychometric properties of the RPI (based on fit indices from CFA) were improved when using only seven of the original 10 items. Thus, we used only dichotomized responses from these seven items. (See the online supplemental materials for details of this procedure.) Reliabilities ranged from $\alpha = .43$ (Philippines) to .79 (India; see supplemental materials for reliabilities in each country and the full 10-item scale).

**The stoplight task.** To obtain a behavioral index of sensation seeking, participants completed a computerized driving task called the "stoplight task" (Steinberg et al., 2008). In this task, participants approached a series of 20 intersections at which they decided whether to run a stoplight as it turned yellow, or to stop safely. If the participant chose to stop, he or she must wait 3 s before restarting. If the participant ran the light, he or she either passed through successfully (resulting in no loss of time) or crashed into another car (resulting in a loss of 6 s). Performance on this task is associated with self-reported sensation seeking (Chein et al., 2011; Steinberg et al., 2008). We defined sensation seeking as the proportion of lights run (regardless of whether the participant passed safely through the intersection). Z-scores for this measure were reversed so that higher values indicate greater restraint (i.e., less sensation seeking).

**Delay discounting.** We employed a computerized delay discounting task to assess individuals' future orientation (see Steinberg et al., 2009a for details). In this task, participants made hypothetical decisions between an immediate but smaller reward and a delayed but larger reward. The value of the delayed reward was held constant at 1,000 units of local currency. The starting value of the immediate reward was randomly determined for each participant to be 200, 500, or 800 units of currency. Our version of the task uses six delay periods: 1 day, 1 week, 1 month, 3 months, 6 months, and 1 year (e.g., "Would you rather have 200 euros today or 1,000 euros in 6 months?"). The size of the immediate reward was adjusted after each offer to converge at a value reflecting the subjective value of the delayed reward if it were offered immediately, referred to as the "indifference point" (Ohmura, Takahashi, Kitamura, & Wehr, 2006). As the delay period lengthens, one must have a stronger sense of future orientation to forgo the immediate reward. That is, when waiting only 1 day or 1 week to receive a reward, it is relatively easy to forgo the immediate option. Longer delays, then, may better inform our understanding of future orientation because they require projection into the extended future. Accordingly, indifference points for the three longest delay intervals (3 months, 6 months, and 1 year) were averaged and used as a measure of future orientation. A higher value indicates a stronger willingness to forgo an immediate smaller reward for a more valuable reward in the future (i.e., greater future orientation).

Many researchers report that on delay discounting measures, there often are a small number of participants who fail to vary their responses across delay periods (i.e., they always choose the immediate reward regardless of the delay, or they always choose the delayed reward regardless of the delay). Because these responses show an absence of discounting behavior (indicating that participants either do not take the task seriously, or do not understand the task), we recoded them as missing for these participants.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

**Modified Iowa gambling task.** We measured cost sensitivity with a modified IGT (Cauffman et al., 2010). Participants played from four decks of cards to earn money. Two of the decks resulted in a monetary gain over repeated play (advantageous decks), whereas the other two resulted in a net loss over repeated play (disadvantageous decks). In this modified version of the IGT, one deck was highlighted with an arrow, and participants were given four seconds to decide to play or pass on that card (see Cauffman et al., 2010 for details). This "play or pass" modification allowed us to independently track avoidance of disadvantageous decks (Peters & Slovic, 2000). The task was administered in six blocks of 20 trials. A running total of each participant's earnings remained on the screen throughout the task. Cost sensitivity was operationalized as the change in proportion of cards played on disadvantageous decks from the first block to the last block. The more individuals resist the disadvantageous decks over the course of the task, the better they are at learning to avoid harmful decks despite their potential for reward. So that higher values indicated greater cost sensitivity and restraint, scores were z-scored and reversed.

**Tower of London task.** We measured impulse control using a computerized version of the Tower of London task (Shallice, 1982; Steinberg et al., 2008). Participants saw pictures of two sets of three colored balls distributed across three rods, one of which can hold three balls, one can hold two balls, and the last, only one ball. The first picture showed the starting positioning of the three balls and the second picture depicted the goal position. The purpose of the task is for participants to match the goal arrangement in as few moves as possible by moving the balls from peg to peg. Participants saw 20 trials, beginning with trials that can be solved in three moves and progressing to those that require a minimum of seven moves.

One capacity assessed by this task is whether one can inhibit acting before a plan is fully formed (i.e., impulse control). Impulse control was measured by the latency to the first move (in milliseconds) on difficult problems (those requiring six or seven moves to complete). To prevent extreme outliers form influencing the results, we recoded as missing responses from any participants with latencies greater than 60 s ($n = 18$). As is often the case with response time data, latencies were markedly skewed. A log transformation was applied to these data, which improved the distribution.

## Data Analyses

We excluded a relatively small number of participants (172; 3.18%) based on interviewer feedback (e.g., the participant did not appear to understand tasks or did not evince adequate effort during the assessment). We also excluded three participants who failed to report their age or whose age exceeded the specified age range for the study. Of the remaining 5,227 participants, 78 (1.50%) did not provide information on parental education, 83 (1.59%) lacked Tower of London data, and 165 (3.16%) lacked data from the stoplight task (mostly due to technical difficulties with the program). Forty-one participants were missing delay discounting, and an additional 171 failed to vary their responses (either always choosing the immediate option or always choosing the delay option) and were recoded as missing. In total, 212 (4.06%) of participants lacked delay discounting data. Less than 1% of the sample were missing data on any other covariate or measure. Analyses were completed with Mplus statistical software (Version 7.31; Muthén & Muthén, 1998–2010) using full-information maximum likelihood to handle missing data.

We tested for linear, quadratic, and cubic age patterns of the cognitive capacity and psychosocial maturity composites in the sample as a whole and separately within each country. All analyses controlled for parental education and intellectual ability. To produce meaningful decimals and avoid rounding errors, we multiplied composite values by 100. Age was centered at 10 years, and both parental education and intellectual functioning were centered at their respective means.

## Results

Zero-order correlations among all variables and descriptive statistics for each measure by age group are reported in Table 2 and Table 3, respectively. For all regression analyses, we report only coefficients from the model with the highest-order significant age trend. Lower-order age trends are reported in the online supplemental materials. Results of age patterns of individual components can be found in the online supplemental materials.

Table 2
*Zero-Order Correlations Among Variables*

| Variable | Par. Ed. | WASI | RPI | Stoplight | DD | IGT | ToL | WM | VF | DSB |
|---|---|---|---|---|---|---|---|---|---|---|
| Age | −.07*** | .15*** | .15*** | −.03* | .06*** | −.16*** | .18*** | .29*** | .26*** | .20*** |
| Par. Ed. | — | .20*** | .05** | .004 | .09*** | −.08*** | .04** | .10*** | −.03* | .09*** |
| WASI | | — | .10*** | .06*** | .13*** | −.15*** | .21*** | .36*** | .30*** | .36*** |
| RPI | | | — | −.05*** | .07*** | −.07*** | .06*** | .15*** | .04* | .06*** |
| Stoplight | | | | — | −.03 | .04** | .02 | .09*** | .09*** | .07*** |
| DD | | | | | — | −.12*** | .09*** | −.01 | .09*** | .05** |
| IGT | | | | | | — | −.14*** | −.13*** | −.10*** | −.10*** |
| ToL | | | | | | | — | .16*** | .08*** | .23*** |
| WM | | | | | | | | — | .26*** | .37*** |
| VF | | | | | | | | | — | .27*** |
| DSB | | | | | | | | | | |

*Note.* Par. Ed. = Parental education; WASI = WASI *t*-score; RPI = Resistance to peer influence; DD = delay discounting, average indifference point for longest delays; IGT = Iowa gambling task, corresponding to the proportion decrease in plays on disadvantageous decks; ToL = Tower of London, latency to first move; WM = working memory; VF = verbal fluency; DSB = digit span backward.
* $p < .05$.   ** $p < .01$.   *** $p < .001$.

Case 3:19-cv-01226-L-AHG   Document 34-7   Filed 01/03/20   PageID.7272   Page 515 of 620

Table 3
*Descriptive Statistics by Age Group: Mean (SD)*

| Variable | 10–11 | 12–13 | 14–15 | 16–17 | 18–21 | 22–25 | 26–30 |
|---|---|---|---|---|---|---|---|
| Par. Ed. | 11.83 (3.00) | 12.07 (2.91) | 12.12 (2.78) | 11.86 (2.88) | 12.01 (2.79) | 11.78 (3.03) | 11.24 (3.24) |
| WASI | 48.33 (11.00) | 46.01 (11.07) | 46.18 (10.87) | 46.97 (10.54) | 49.81 (10.41) | 51.36 (10.19) | 51.42 (11.62) |
| RPI | .57 (.25) | .60 (.25) | .60 (.25) | .62 (.25) | .62 (.24) | .67 (.23) | .67 (.25) |
| Stoplight | .42 (.22) | .42 (.21) | .44 (.23) | .42 (.21) | .43 (.23) | .42 (.23) | .39 (.23) |
| DD | 400.85 (301.17) | 375.29 (303.76) | 384.49 (269.58) | 400.23 (295.09) | 415.20 (291.62) | 443.08 (303.11) | 437.20 (311.98) |
| IGT | −.02 (.24) | −.03 (.24) | −.06 (.25) | −.07 (.27) | −.10 (.28) | −.12 (.29) | −.13 (.32) |
| ToL | 4475.99 (3382.75) | 4467.41 (3661.45) | 5363.33 (5660.86) | 5848.01 (6092.83) | 6481.17 (5978.23) | 6926.48 (6618.99) | 7055.67 (6932.37) |
| WM | 6.11 (1.37) | 6.58 (1.26) | 6.97 (1.08) | 7.15 (1.00) | 7.26 (.95) | 7.21 (1.08) | 7.17 (1.11) |
| VF | 10.5 (4.44) | 11.03 (5.15) | 12.72 (5.71) | 13.65 (6.52) | 13.94 (5.84) | 14.46 (6.49) | 14.90 (6.48) |
| DSB | 4.02 (1.19) | 4.26 (1.20) | 4.52 (1.47) | 4.61 (1.43) | 4.82 (1.49) | 4.81 (1.52) | 4.79 (1.39) |
| N | 1191 | 702 | 667 | 623 | 715 | 670 | 659 |
| % Female | 51.8 | 48.4 | 50.7 | 50.9 | 49.9 | 51.3 | 51.4 |

*Note.* Par. Ed. = Parental education. WASI = WASI *t*-score; DD = delay discounting, average indifference point for longest delays; RPI = Resistance to peer influence (on a 0–1 scale); IGT = Iowa gambling task, corresponding to the proportion decrease in plays on disadvantageous decks; ToL = Tower of London, latency to first move (in ms); WM = working memory, average accuracy (out of 8); VF = verbal fluency, number of words produced in 1 min; DSB = digit span backward, longest string of digits correctly recalled in reverse order (with a maximum value of 8).

## Measurement Invariance

To ensure that self-reported resistance to peer influence was suitable for use in our sample, we examined measurement invariance in all 11 countries. We fit CFAs for this measure within each country to test for unidimensionality and identify problematic items. We used the alignment technique to explore measurement invariance (Muthén & Asparouhov, 2014), which also provided information about the noninvariance of each item in each country.

CFAs indicated that the RPI evinced acceptable model fit when three problematic items (based on visual inspection and alignment analyses) were dropped. Muthén and Asparouhov (2014) suggest that approximate measurement invariance is attained if less than 20%–25% of parameters register as noninvariant. Tests of measurement invariance indicated very few noninvariant items (less than 7%) for the RPI. More details of this process and results can be found in the online supplemental materials.

## Full Sample Age Trends

Cognitive capacity followed a significant cubic age trend in the full sample ($b_{Age}$ = 22.82, $SE$ = 1.07, 95% CI [20.68, 24.90], $p <$ .001; $b_{Age}^2$ = −1.95, $SE$ = 0.14, 95% CI [−2.22, −1.66], $p <$ .001; $b_{Age}^3$ = 0.05, $SE$ = 0.01, 95% CI [0.04, 0.06], $p <$ .001; $R^2$ = .92, $p <$ .001). Improvements in cognitive capacity were most striking from childhood into adolescence, with little change after age 16. Psychosocial maturity, in contrast, followed a significant linear trend ($b_{Age}$ = 1.86, $SE$ = 0.12, 95% CIs [1.62, 2.07], $p <$ .001; $R^2$ = .09, $p <$ .001). Figure 1 displays age patterns of both composites.

## Age Trends in Cognitive Capacity by Country

Cognitive capacity followed a significant age pattern in all 11 countries (see Table 4 for regression results). Nine of these countries evinced a cubic pattern, and two (Sweden and Cyprus) followed a curvilinear pattern. Figure 2 depicts the estimated regression lines for all countries. Except in Jordan, cognitive capacity increased steeply from age 10 to around age 16, when it plateaued. In a subset of countries with cubic age patterns (China, Colombia,

India, and Thailand), cognitive capacity increased during childhood and again, albeit modestly, at the end of the age range. Jordan followed a cubic trend, but the pattern departed notably from other countries and from theory-based predictions.

## Age Trends in Psychosocial Maturity by Country

Psychosocial maturity evinced a significant age pattern in all countries except Jordan and Kenya (see Table 5). Notably, there was far more diversity in patterns of psychosocial maturity than in patterns of cognitive capacity (see Figure 3). Significant linear age patterns for psychosocial maturity were found in China, Cyprus, India, Italy, the Philippines, Sweden, and Thailand. The U.S. evinced a curvilinear age pattern, increasing through the teen years before leveling-off in the 20s. Lastly, Colombia followed a cubic pattern where psychosocial maturity improved until the mid-20s, after which it declined.

In the current study, the self-report measure of resistance to peer influence, which was the only nonbehavioral measure used in the present analyses, evinced low reliability in some countries. To ensure that including this variable did not fundamentally change the observed age patterns, we computed the psychosocial maturity composite without the RPI scale, and reran all analyses. By and large, the results of these analyses mirrored the original findings. One exception was in Thailand, where the age pattern of psychosocial maturity without the RPI scale followed a cubic trend rather than the linear trend seen in the original analysis. However, visual inspection of the estimated marginal means of both versions of the psychosocial maturity composite indicates very similar age patterns; in both cases, psychosocial maturity increases with age, but also peaks around 16–17 years. Nevertheless, caution is needed when interpreting age patterns of psychosocial maturity in Thailand.

Post hoc analyses of unusual age patterns. In most of the countries, interpretation of the age patterns was straightforward. In Colombia and the U.S, however, both cognitive capacity and psychosocial maturity follow nonlinear age patterns, making it more challenging to test the hypothesis that the former reaches adult levels earlier than the latter. Visual inspection of age patterns

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

78                                      ICENOGLE ET AL.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.





*Figure 1.*   Age patterns in cognitive capacity (top) and psychosocial maturity (bottom) in the aggregated sample. Values of these composites were multiplied by 100. Gray lines denote estimated marginal means for each age group (error bars indicate 95% confidence intervals). Black lines denote estimated regression value.

in these two countries suggests that cognitive capacity reaches adult levels prior to psychosocial maturity. To statistically determine which construct reaches a plateau first, we examined the instantaneous rate of change in each variable, which is equal to the slope of a tangent line drawn at a given point along the curve of a line. With this technique, we are able to determine the magnitude and significance of a tangent line drawn at each discrete age. Accordingly, the age at which this tangent slope is no longer

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 4
*Regression Results for Cognitive Capacity*

| Country | | $b$ (SE) | 95% Confidence Interval | | $p$-value | $R^2$ Adjusted | $p$-value |
|---|---|---|---|---|---|---|---|
| | | | LB | UB | | | |
| China | Age | 22.02 (3.48) | 15.20 | 28.84 | <.001 | .88 | <.001 |
| $n$ = 489 | Age$^2$ | −1.70 (.45) | −2.59 | −.81 | <.001 | | |
| | Age$^3$ | .05 (.02) | .02 | .08 | .003 | | |
| Colombia | Age | 37.00 (2.76) | 31.59 | 42.41 | <.001 | .97 | <.001 |
| $n$ = 498 | Age$^2$ | −3.58 (.40) | −4.36 | −2.81 | <.001 | | |
| | Age$^3$ | .11 (.02) | .08 | .13 | <.001 | | |
| Cyprus | Age | 15.11 (1.97) | 11.25 | 18.98 | <.001 | .80 | <.001 |
| $n$ = 364 | Age$^2$ | −.56 (.10) | −.76 | −.36 | <.001 | | |
| | Age$^3$ | — | — | — | — | | |
| India | Age | 19.19 (4.18) | 11.00 | 27.39 | <.001 | .86 | <.001 |
| $n$ = 417 | Age$^2$ | −1.54 (.52) | −2.57 | −.53 | .003 | | |
| | Age$^3$ | .04 (.02) | .01 | .08 | .02 | | |
| Italy | Age | 28.76 (3.08) | 22.73 | 34.80 | <.001 | .95 | <.001 |
| $n$ = 547 | Age$^2$ | −2.27 (.42) | −3.10 | −1.44 | <.001 | | |
| | Age$^3$ | .06 (.02) | .03 | .09 | <.001 | | |
| Jordan | Age | 14.90 (3.65) | 7.74 | 22.06 | <.001 | .84 | <.001 |
| $n$ = 450 | Age$^2$ | −1.82 (.47) | −2.75 | −.91 | <.001 | | |
| | Age$^3$ | .06 (.02) | .03 | .09 | <.001 | | |
| Kenya | Age | 27.13 (3.62) | 20.03 | 34.23 | <.001 | .94 | <.001 |
| $n$ = 483 | Age$^2$ | −2.48 (.46) | −3.40 | −1.57 | <.001 | | |
| | Age$^3$ | .07 (.02) | .04 | .10 | <.001 | | |
| Philippines | Age | 27.80 (2.89) | 22.15 | 33.45 | <.001 | .95 | <.001 |
| $n$ = 505 | Age$^2$ | −2.01 (.39) | −2.77 | −1.25 | <.001 | | |
| | Age$^3$ | .04 (.01) | .02 | .07 | .002 | | |
| Sweden | Age | 13.61 (1.72) | 10.25 | 16.99 | <.001 | .75 | <.001 |
| $n$ = 416 | Age$^2$ | −.42 (.09) | −.61 | −.25 | <.001 | | |
| | Age$^3$ | — | — | — | — | | |
| Thailand | Age | 28.29 (3.72) | 21.00 | 35.58 | <.001 | .93 | <.001 |
| $n$ = 502 | Age$^2$ | −2.46 (.51) | −3.45 | −1.47 | <.001 | | |
| | Age$^3$ | .07 (.02) | .03 | .11 | <.001 | | |
| U.S. | Age | 30.94 (3.18) | 24.70 | 37.17 | <.001 | .95 | <.001 |
| $n$ = 556 | Age$^2$ | −2.47 (.42) | −3.29 | −1.64 | <.001 | | |
| | Age$^3$ | .06 (.01) | .03 | .09 | <.001 | | |

*Note.* Composite values were multiplied by 100. Analyses control for parental education and intellectual functioning (each centered at their mean). Age was centered at 10. Reported coefficients were derived from a single model with the highest-order significant age term.

significantly different from zero indicates the beginning of a plateau in the estimated regression line. Consistent with visual inspection, cognitive capacity reaches a plateau prior to psychosocial maturity in both Colombia (where cognitive capacity peaks at 18 and psychosocial maturity at 24) and the U.S. (where cognitive capacity peaks at 19 and psychosocial maturity at 22).

In China and Colombia, cognitive capacity appears to increase near the end of the age range. To determine whether these increases are significant, we identified the age at which cognitive capacity reaches a peak according to the instantaneous rate of change in all 11 countries, and reassessed age patterns from this peak through age 30. According to these analyses, there is no growth in cognitive capacity after the beginning of the plateau in any country except China, where cognitive capacity increases linearly from age 20 to age 30 ($b$ = 5.16, $SE$ = 1.37, $p$ < .001), and in the Philippines, cognitive capacity increases during early and middle adolescence, but decreases between 19 and 30 ($b$ = −3.19, $SE$ = 1.04, $p$ = .002). Results for all analyses of the instantaneous rate of change are listed in Table S12.

Lastly, it is important to caution the reader that the instantaneous rate of change approach, while useful to compare the *relative* age patterns between psychosocial maturity and cognitive capacity,

does not tell us absolute age at which these constructs reaches adult levels because this test is highly sensitive to very small changes in slopes. Thus, we caution the reader not to overinterpret the implications of these analyses.

## Discussion

The age of majority, when citizens become legal adults, is set at 18 in most countries, but this boundary is an imperfect divider separating mature from immature individuals. Rather, research suggests that some aspects of psychological development reaches adult levels prior to 18, whereas others reach adult levels later. Findings from the present study are consistent with previous reports that cognitive capacity (cold cognition), the ability of an individual to reason and consider alternative courses of action—undergirded by executive functions—reaches adult levels during the midteen years, whereas other elements of maturity, specifically those indexing aspects of psychosocial functioning (hot cognition), such as self-restraint, tend to reach adult levels into adulthood. That these constructs reach adult levels on different timetables suggests a "maturity gap" between these elements of psychological development. To our knowledge, this is the first study to measure

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.



*Figure 2.* Age patterns in cognitive capacity for each country. Values of the composite were multiplied by 100. Coefficients indicate the highest-order significant age term.

both cognitive capacity and psychosocial maturity within a single sample with a sufficiently wide age range (10–30) across so many diverse countries.

The age patterns of cognitive capacity and psychosocial maturity evinced in the international sample in the aggregate strongly resemble those reported by Steinberg et al. (2009a) in their exclusively U.S. study. Specifically, post hoc analyses indicate that in nine of 11 countries, cognitive capacity does not change during adulthood. This age pattern is also consistent with previous studies of working memory, inhibition, and verbal fluency, where adult-like performance is generally reached around age 15 or 16 (e.g., Huizinga et al., 2006; Linares, Bajo, & Pelegrina, 2016). Further, consistent with Steinberg et al. (2009a), who reported that adults in their late 20s evince higher psychosocial maturity than young adults (ages 18–21), we note the same pattern in eight of the 11 countries studied (the exceptions are Colombia, Jordan, and Kenya). It is notable that the age pattern of psychosocial maturity using primarily behavioral assessments replicates the age pattern reported by Steinberg et al. (2009a) using self-report measures. Our results are also consistent with Rossier et al. (2007), who reported that sensation seeking (an aspect of immaturity) decreased between 18 and 25 years in a sample drawn from China, Germany, Italy, Spain, Switzerland, and the U.S. However, these investigators found that impulsivity did not change during this same age period (Rossier et al., 2007). The age pattern of psychosocial maturity found in the current study is also consistent with studies (largely conducted in Western countries) documenting

improvements during adulthood with respect to declines in sensation seeking (Quinn & Harden, 2013) and increases in impulse control (Shulman et al., 2014), future orientation (Steinberg et al., 2009c), and resistance to peer influence (Chein et al., 2011). Our results also align with neuroscientific evidence indicating that the brain continues to develop during the early 20s, especially with regard to connectivity among brain regions in ways that improve self-regulation (Casey, 2015). The relative immaturity in functional connectivity in late adolescence, compared to the mid-20s, is reflected in part in the findings on psychosocial maturity, of which self-restraint is a part.

Although many of our findings are consistent with our hypotheses—specifically, that cognitive capacity would reach adult levels prior to age 18, but psychosocial maturity not until the 20s—there were several unanticipated results. First, a few countries exhibited either no age differences in psychosocial maturity or a pattern inconsistent with developmental theories. Neither Jordan nor Kenya evinced significant age patterns. There is no obvious factor distinguishing countries that did and did not show the expected increase in psychosocial functioning into the adult years. The countries in which psychosocial maturity evinced age differences into adulthood are diverse (e.g., a mix of Western and Asian, and individualistic and collectivistic countries), as is the group in which this pattern was not seen. Thus, although cultural norms likely influence the development and expression of self-regulation (Chen & French, 2008; Matsumoto et al., 2008), in our sample they did not do so in an easily interpretable way. Furthermore,

Case 3:19-cv-01226-L-AHG   Document 34-7   Filed 01/03/20   PageID.7276   Page 519 of 620

Table 5
*Regression Results for Psychosocial Maturity*

| Country | | b (SE) | 95% Confidence Interval | | p-value | $R^2$ Adjusted | p-value |
|---|---|---|---|---|---|---|---|
| | | | LB | UB | | | |
| China | Age | 2.1 (.40) | 1.34 | 2.89 | <.001 | .09 | <.001 |
| n = 489 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| Colombia | Age | −.17 (2.23) | −4.56 | 4.22 | .94 | .17 | .26 |
| n = 498 | Age² | .64 (.32) | .02 | 1.28 | .04 | | |
| | Age³ | −.03 (.01) | −.05 | −.01 | .01 | | |
| Cyprus | Age | 1.64 (.46) | .74 | 2.54 | <.001 | .11 | <.001 |
| n = 364 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| India | Age | 1.29 (.42) | .47 | 2.11 | .002 | .02 | .06 |
| n = 417 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| Italy | Age | 2.92 (.36) | 2.21 | 3.63 | <.001 | .15 | <.001 |
| n = 547 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| Jordan | Age | .03 (.44) | −.82 | .89 | .94 | .01 | .13 |
| n = 450 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| Kenya | Age | .27 (.36) | −.44 | .97 | .46 | .004 | .24 |
| n = 483 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| Philippines | Age | 2.17 (.38) | 1.44 | 2.91 | <.001 | .12 | <.001 |
| n = 505 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| Sweden | Age | 3.18 (.41) | 2.38 | 3.99 | <.001 | .22 | <.001 |
| n = 416 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| Thailand | Age | .93 (.37) | .21 | 1.66 | .01 | .02 | .05 |
| n = 502 | Age² | — | — | — | — | | |
| | Age³ | — | — | — | — | | |
| U.S. | Age | 4.43 (1.21) | 2.06 | 6.80 | <.001 | .38 | .001 |
| n = 556 | Age² | −.13 (.07) | −.26 | −.003 | .04 | | |
| | Age³ | — | — | — | — | | |

*Note.* Composite values were multiplied by 100. Analyses control for parental education and intellectual functioning (each centered at their mean). Age was centered at 10. Reported coefficients were derived from a single model with the highest-order significant age term.

given the relative absence of prior studies using these measures in many non-Western countries, we do not know whether cross-cultural differences in participants' responses to elements of the test battery account for differences in their performance on various tasks.

Second, although we anticipated few changes in cognitive capacity during the adult years, we found continued improvement during the late 20s in China and a modest decline during the late 20s in the Philippines. Nevertheless, even in these countries the majority of growth in cognitive capacity occurred prior to adulthood, consistent with past research (Huizinga et al., 2006; Linares et al., 2016), followed by modest changes thereafter. There is no obvious reason why cognitive capacity increases in adulthood only in China and decreases in adulthood only in the Philippines. Further cross-cultural research on age differences in executive function would be useful in determining whether these patterns are robust or idiosyncratic to the present study. In the absence of more research, we caution against generating post hoc explanations for these patterns.

Third, contrary to our hypothesis, we did not find more consistency in age patterns of cognitive capacity compared with psychosocial maturity across countries. Eight countries followed qualita-

tively similar patterns of cognitive capacity (i.e., increasing from childhood to adolescence, then plateauing), while seven countries followed qualitatively similar patterns of psychosocial maturity (i.e., increasing linearly with age). Thus, it does not appear that age patterns are more similar in one domain than the other, at least with respect to the measures employed in this study.

The current study has a few limitations, some of which limit its utility as a guide for the law. First, our measures do not assess real-world behaviors or explicitly test decision-making capacities (e.g., by using decision-making vignettes), and therefore do not assess actual decision-making competence. However, Steinberg et al. (2009a) found that cognitive capacity (as assessed in this study) and performance on a standardized assessment of competence to stand trial develop nearly in lockstep with age in these societies. Thus, our assessment of cognitive capacity may speak to decision-making competency, albeit indirectly. Second, not all countries evinced the expected age pattern of psychosocial maturity, and other relevant aspects of psychosocial maturity not captured by our measure likely do develop with age in these societies. Second, the reliability of self-reported resistance to peer influence was low in some countries. Although sensitivity analyses indicate the results with respect to age patterns in psychosocial maturity are largely unchanged when

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

ICENOGLE ET AL.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.



*Figure 3.*   Age patterns in psychosocial maturity for each country. Values of the composite were multiplied by 100. Coefficients indicate the highest-order significant age term. Only significant age patterns are shown.

this measure is excluded, caution is needed when interpreting our analyses, especially in Thailand. More generally, the reliability and validity of some of our measures in non-Western societies are not known. For example, although some of our measures have been used cross-culturally (e.g., executive functioning measures in Kenya; Alcock et al., 2008), others have not (e.g., the stoplight task). Lastly, despite our wide age range, this study relies on cross-sectional data, which limits our ability to draw conclusions about developmental changes. That is, we are able to study age differences, but cannot directly study development and maturity.

With these caveats in mind, we can draw several conclusions from our findings. In agreement with Steinberg et al. (2009a), the clear answer to the question, "When do individuals become mature?" is that it depends on the component of maturity in question. Our findings provide evidence that basic cognitive processes undergirding higher-order, goal-directed behavior (cold cognition) reach adult levels relatively early—around age 16. To the extent that a situation lends itself to deliberation, 16 might be a reasonable age of majority. Voting (Steinberg, 2014), making decisions in medical contexts (Weithorn & Campbell, 1982), consenting to participate in research (Hein et al., 2015), and participating in legal proceedings (Grisso et al., 2003) constitute situations in which adolescents may be competent. Although all 16-year-olds would not necessarily make "good" decisions in the voting booth or doctor's office, their decisions in these contexts, on average, would be as logical as adults' decisions.

Decision making in these contexts is not purely cognitive, of course. Being a defendant in a legal proceeding or deciding

whether to undergo a medical procedure may instill concern or fear. However, given that knowledgeable adults (e.g., doctors and lawyers) typically surround adolescents in these situations, there is opportunity to diminish the emotional intensity of the decision in favor of reflection. For example, pressure to decide quickly intensifies the affective arousal of a situation (Hein et al., 2015), so one easy point of intervention is to ask clinicians and legal professionals to mitigate arousal and facilitate reflection by giving their patients and clients time to consider their options (and be available to discuss them). Such efforts may be especially important during plea negotiations. Ideally, individuals considering a plea bargain have time to contemplate their choices, consult with their attorney about the offer, and deliberate on what is in their best interest. In reality, the context may be considerably less favorable. For instance, the plea bargain may be a one-time offer, and a decision whether to accept may need to be immediate (or nearly so; Malloy et al., 2014; Zottoli, Daftary-Kapur, Winters, & Hogan, 2016). Furthermore, a minor may experience external pressure from his own attorney, parents, or friends to take the deal (Daftary-Kapur & Zottoli, 2014). Thus, depending on the unique situation of the adolescent, the plea bargain context straddles the line between a hot and cold context, which complicates discussions around appropriate age boundaries.

That the age at which psychosocial reaches adult levels is beyond age 18 (and to a striking degree in some countries) suggests that adolescents *and* young adults are still developing in ways that should influence their culpability in criminal proceedings and, perhaps, some of the privileges we extend to them.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Young adults—like adolescents—are more likely than somewhat older adults to be impulsive, sensation seeking, and sensitive to peer influence in ways that influence their criminal conduct (Scott et al., 2016). This does not mean that no one under 18 is mature enough to think responsibly or premeditate a serious crime; nor is it to say that all adults are capable of mature self-restraint. It is to posit that *on average*, teens—and young adults—are relatively less likely to have the self-restraint necessary to deserve the privileges and penalties we reserve for people we judge to be fully responsible for their behavior.

The idea that young adults may be worthy of special consideration in criminal cases has circulated for years (e.g., Council of Europe, 2003; Woolard & Scott, 2009), but there is a dearth of research exploring differences between young adults and older adults (e.g., studies often combine all adults 18 and older into a single group). However, recent commentaries have sparked discussions about the differential treatment of young adults in the legal system in the U.S. (Schiraldi et al., 2015). Other countries have implemented policies that extend to young adults some aspects of leniency and protection given to minors (e.g., the Netherlands, Germany, and Sweden), informed partly by evidence of continued brain maturation beyond 18, and because the acquisition of adult roles has been increasingly delayed in many parts of the world (Dünkel, 2014; Scott et al., 2016) leading to a developmental period some writers call "emerging adulthood" (Arnett, 2000).

## Conclusions

The present study reaffirms the complexity of defining "maturity" or "adulthood" based on psychological grounds alone. Developmental science ought to inform, but not dictate, where the law sets age boundaries. Having different ages of majority, depending on the legal issue in question, is truer to the science than having a single age for all legal matters. Therefore, we advocate two different boundaries: one that applies to situations in which time pressure, emotional arousal, and coercive influence are not likely to inhibit decision-making capacities—which might be designated at age 16—and a second that applies to situations in which psychosocial immaturity may compromise judgment—which might be designated at 18 or older.

## References

Albert, D., & Steinberg, L. (2011). Peer influences on adolescent risk behavior. In M. Bardo, D. Fishbein, & R. Milich (Eds.), *Inhibitory control and drug abuse prevention: From research to translation* (pp. 211–226). New York, NY: Springer. http://dx.doi.org/10.1007/978-1-4419-1268-8_11

Alcock, K. J., Holding, P., Mung'ala-Odera, V., & Newton, C. R. J. C. (2008). Constructing tests of cognitive abilities for schooled and unschooled children. *Journal of Cross-Cultural Psychology, 39,* 529–551. http://dx.doi.org/10.1177/0022022108321176

American Psychological Association (APA). (1989). *Amicus curiae brief filed in U.S. Supreme Court in Ohio v. Akron Center for Reproductive Health, Inc., 497 U.S. 502 (1990). and Hodgson v. Minnesota, 497 U.S. 417 (1990).* Retrieved from http://www.apa.org/about/offices/ogc/amicus/ohio.pdf

American Psychological Association (APA). (2004). *Amicus curiae brief filed in U.S. Supreme Court in Roper v. Simmons, 543 U.S. 551 (2005).* Retrieved from http://www.apa.org/about/offices/ogc/amicus/roper.pdf

Arnett, J. J. (2000). Emerging adulthood. A theory of development from the late teens through the twenties. *American Psychologist, 55,* 469–480. http://dx.doi.org/10.1037/0003-066X.55.5.469

Casey, B. J. (2015). Beyond simple models of self-control to circuit-based accounts of adolescent behavior. *Annual Review of Psychology, 66,* 295–319. http://dx.doi.org/10.1146/annurev-psych-010814-015156

Cauffman, E., Shulman, E. P., Steinberg, L., Claus, E., Banich, M. T., Graham, S., & Woolard, J. (2010). Age differences in affective decision making as indexed by performance on the Iowa gambling task. *Developmental Psychology, 46,* 193–207. http://dx.doi.org/10.1037/a0016128

Central Intelligence Agency. (2018). *The world factbook 2018.* Washington, DC: Author. Retrieved from https://www.cia.gov/library/publications/the-world-factbook/index.html

Chein, J., Albert, D., O'Brien, L., Uckert, K., & Steinberg, L. (2011). Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry. *Developmental Science, 14,* F1–F10. http://dx.doi.org/10.1111/j.1467-7687.2010.01035.x

Chen, X., & French, D. C. (2008). Children's social competence in cultural context. *Annual Review of Psychology, 59,* 591–616. http://dx.doi.org/10.1146/annurev.psych.59.103006.093606

Cohen, A. O., Breiner, K., Steinberg, L., Bonnie, R. J., Scott, E. S., Taylor-Thompson, K. A., . . . Casey, B. J. (2016). When is an adolescent an adult? Assessing cognitive control in emotional and non-emotional contexts. *Psychological Science, 27,* 549–562. http://dx.doi.org/10.1177/0956797615627625

Cook, P. J., & Tauchen, G. (1984). The effect of minimum drinking age legislation on youthful auto fatalities, 1970–1977. *The Journal of Legal Studies, 13,* 169–190. http://dx.doi.org/10.1086/467738

Council of Europe. (2003). *Recommendation of the Committee of Ministers to member states concerning new ways of dealing with juvenile delinquency and the role of juvenile justice.* Retrieved from http://www.coe.int/

Crone, E. A., Ridderinkhof, K. R., Worm, M., Somsen, R. J. M., & van der Molen, M. W. (2004). Switching between spatial stimulus-response mappings: A developmental study of cognitive flexibility. *Developmental Science, 7,* 443–455. http://dx.doi.org/10.1111/j.1467-7687.2004.00365.x

Daftary-Kapur, T., & Zottoli, T. M. (2014). A first look at the plea deal experiences of juveniles tried in adult court. *International Journal of Forensic Mental Health, 12,* 323–336. http://dx.doi.org/10.1080/14999013.2014.960983

Davis, S. M., Scott, E. S., Wadlington, W., & Whitebread, C. H. (2009). *Children in the legal system: Cases and materials* (4th ed.). New York, NY: Foundation Press.

Diamond, A. (2013). Executive functions. *Annual Review of Psychology, 64,* 135–168. http://dx.doi.org/10.1146/annurev-psych-113011-143750

Duell, N., Steinberg, L., Icenogle, G., Chein, J., Chaudhary, N., Di Giunta, L., . . . Bacchini, D. (2017). Age patterns in risk taking across the world. *Journal of Youth and Adolescence, 5,* 1052–1072. http://dx.doi.org/10.1007/s10964-017-0752-y

Dünkel, F. (2014). Juvenile justice systems in Europe: Reform developments between justice, welfare and "new punitiveness." *Criminological Studies, 1,* 31–76.

Erkut, S. (2010). Developing multiple language versions of instruments for intercultural research. *Child Development Perspectives, 4,* 19–24. http://dx.doi.org/10.1111/j.1750-8606.2009.00111.x

Figner, B., Mackinlay, R. J., Wilkening, F., & Weber, E. U. (2009). Affective and deliberative processes in risky choice: Age differences in risk taking in the Columbia Card Task. *Journal of Experimental Psychology, 35,* 709–730. http://dx.doi.org/10.1037/a0014983

Fischer, K. W., Stein, Z., & Heikkinen, K. (2009). Narrow assessments misrepresent development and misguide policy: Comment on Steinberg, Cauffman, Woolard, Graham, and Banich (2009). *American Psychologist, 64,* 595–600. http://dx.doi.org/10.1037/a0017105

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

*Graham v. Florida, 130 S. Ct. (2010).*

Grisso, T., Steinberg, L., Woolard, J., Cauffman, E., Scott, E., Graham, S., . . . Schwartz, R. (2003). Juveniles' competence to stand trial: A comparison of adolescents' and adults' capacities as trial defendants. *Law and Human Behavior, 27,* 333–363. http://dx.doi.org/10.1023/A:1024065015717

Harden, K. P., & Tucker-Drob, E. M. (2011). Individual differences in the development of sensation seeking and impulsivity during adolescence: Further evidence for a dual systems model. *Developmental Psychology, 47,* 739–746. http://dx.doi.org/10.1037/a0023279

Hein, I. M., De Vries, M. C., Troost, P. W., Meynen, G., Van Goudoever, J. B., & Lindauer, R. J. L. (2015). Informed consent instead of assent is appropriate in children from the age of twelve: Policy implications of new findings on children's competence to consent to clinical research. *BMC Medical Ethics.* Advance online publication. http://dx.doi.org/10.1186/s12910-015-0067-z

Hofstede, G. (2011). Dimensionalizing cultures: The Hofstede model in context. *Online Readings in Psychology and Culture, 2, 2.* http://dx.doi.org/10.9707/2307-0919.1014

Huizinga, M., Dolan, C. V., & van der Molen, M. W. (2006). Age-related change in executive function: Developmental trends and a latent variable analysis. *Neuropsychologia, 44,* 2017–2036. http://dx.doi.org/10.1016/j.neuropsychologia.2006.01.010

Icenogle, G., Steinberg, L., Olino, T. M., Shulman, E. P., Chein, J., Alampay, L. P., . . . Uribe Tirado, L. M. (2016). Puberty predicts approach but not avoidance on the Iowa gambling task in a multinational sample. *Child Development, 88,* 1598–1614. http://dx.doi.org/10.1111/cdev.12655

Imada, T., Carlson, S. M., & Itakura, S. (2013). East–West cultural differences in context-sensitivity are evident in early childhood. *Developmental Science, 16,* 198–208. http://dx.doi.org/10.1111/desc.12016

*J. D. B v. North Carolina, 564 U.S. 261 (2011).*

Lamm, B., Keller, H., Teiser, J., Gudi, H., Yovsi, R. D., Freitag, C., . . . Lohause, A. (2017). Waiting for the second treat: Developing culture-specific modes of self-regulation. *Child Development, 89,* e261–e277. http://dx.doi.org/10.1111/cdev.12847

Lansford, J. E., & Bornstein, M. H. (2011). Parenting attributions and attitudes in diverse cultural contexts: Introduction to the special issue. *Parenting, 11,* 87–101. http://dx.doi.org/10.1080/15295192.2011.585552

LeCuyer, E. A., & Zhang, Y. (2015). An integrative review of ethnic and cultural variation in socialization and children's self-regulation. *Journal of Advanced Nursing, 71,* 735–750. http://dx.doi.org/10.1111/jan.12526

Linares, R., Bajo, M. T., & Pelegrina, S. (2016). Age-related differences in working memory updating components. *Journal of Experimental Child Psychology, 147,* 39–52. http://dx.doi.org/10.1016/j.jecp.2016.02.009

Luna, B., Garver, K. E., Urban, T. A., Lazar, N. A., & Sweeney, J. A. (2004). Maturation of cognitive processes from late childhood to adulthood. *Child Development, 75,* 1357–1372. http://dx.doi.org/10.1111/j.1467-8624.2004.00745.x

Ma, X., Tamir, M., & Miyamoto, Y. (2018). A socio-cultural instrumental approach to emotion regulation: Culture and the regulation of positive emotions. *Emotion, 18,* 138–152. http://dx.doi.org/10.1037/emo0000315

Malloy, L. C., Shulman, E. P., & Cauffman, E. (2014). Interrogations, confessions, and guilty pleas among serious adolescent offenders. *Law and Human Behavior, 38,* 181–193. http://dx.doi.org/10.1037/lhb0000065

Matsumoto, D., Yoo, S. H., Fontaine, J., Anguas-Wong, A. M., Arriola, M., Ataca, B., . . . Grossi, E. (2008). Mapping expressive differences around the world: The relationship between emotional display rules and individualism versus collectivism. *Journal of Cross-Cultural Psychology, 39,* 55–74. http://dx.doi.org/10.1177/0022022107311854

Mayhew, D. R., Fields, M., & Simpson, H. M. (2000). *Why 16?* Retrieved from http://www.iihs.org/frontend/iihs/documents/masterfiledocs.ashx?id=1261

Migration Policy Institute. (2018). *Frequently requested statistics on immigrants and immigration in the United States.* Retrieved from https://www.migrationpolicy.org/

*Miller v. Alabama, 132 S. Ct. 2455 (2012).*

Miyamoto, Y., & Ma, X. (2011). Dampening or savoring positive emotions: A dialectical cultural script guides emotion regulation. *Emotion, 11,* 1346–1357.

Muthén, B., & Asparouhov, T. (2014). IRT studies of many groups: The alignment method. *Frontiers in Psychology, 5,* 978.

Muthén, L. K., & Muthén, B. O. (1998–2010). *Mplus user's guide. Sixth edition.* Los Angeles, CA: Author.

Ohmura, Y., Takahashi, T., Kitamura, N., & Wehr, P. (2006). Three-month stability of delay and probability discounting measures. *Experimental and Clinical Psychopharmacology, 14,* 318–328. http://dx.doi.org/10.1037/1064-1297.14.3.318

Peters, E., & Slovic, P. (2000). The springs of action: Affective and analytical information processing in choice. *Personality and Social Psychology Bulletin, 26,* 1465–1475. http://dx.doi.org/10.1177/01461672002612002

Prencipe, A., Kesek, A., Cohen, J., Lamm, C., Lewis, M. D., & Zelazo, P. D. (2011). Development of hot and cool executive function during the transition to adolescence. *Journal of Experimental Child Psychology, 108,* 621–637. http://dx.doi.org/10.1016/j.jecp.2010.09.008

Preston, C. B., & Crowther, B. T. (2012). Infancy doctrine inquiries. *Santa Clara Law Review, 52,* 47–80.

Psychological Corporation. (1999). *Wechsler Abbreviated Scale of Intelligence.* San Antonio, TX: Psychological Corporation.

Quinn, P. D., & Harden, K. P. (2013). Differential changes in impulsivity and sensation seeking and the escalation of substance use from adolescence to early adulthood. *Development and Psychopathology, 25,* 223–239. http://dx.doi.org/10.1017/S0954579412000284

Redlich, A. D., & Shteynberg, R. V. (2016). To plead or not to plead: A comparison of juvenile and adult true and false plea decisions. *Law and Human Behavior, 40,* 611–625. http://dx.doi.org/10.1037/lhb0000205

Romer, D., Duckworth, A. L., Sznitman, S., & Park, S. (2010). Can adolescents learn self-control? Delay of gratification in the development of control over risk taking. *Prevention Science, 11,* 319–330. http://dx.doi.org/10.1007/s11121-010-0171-8

*Roper v. Simmons, 543 U.S. 551 (2005).*

Rossier, J., Aluja, A., García, L. F., Angleitner, A., De Pascalis, V., Wang, W., . . . Zuckerman, M. (2007). The cross-cultural generalizability of Zuckerman's alternative five-factor model of personality. *Journal of Personality Assessment, 89,* 188–196. http://dx.doi.org/10.1080/00223890701468618

Schiraldi, V., Western, B., & Bradner, K. (2015). Community-based responses to justice-involved young adults. *New Thinking in Community Corrections Bulletin.* Washington: U.S. Department of Justice, National Institute of Justice.

Scott, E. S. (2000). The legal construction of adolescence. *Hofstra Law Review, 29,* 547–598.

Scott, E. S., Bonnie, R. J., & Steinberg, L. (2016). Young adulthood as a transitional legal category: Science, social change, and justice policy. *Fordham Law Review, 85,* 101–127.

Scott, E. S., Reppucci, N. D., & Woolard, J. L. (1995). Evaluating adolescence decision making in legal contexts. *Law and Human Behavior, 19,* 221–244. http://dx.doi.org/10.1007/BF01501658

Scott, E. S., & Steinberg, L. (2008). *Rethinking juvenile justice.* Cambridge, MA: Harvard University Press.

Shallice, T. (1982). Specific impairments of planning. *Philosophical Transactions of the Royal Society of London.* Series B, Biological Sciences, *298,* 199–209. http://dx.doi.org/10.1098/rstb.1982.0082

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Shulman, E. P., Harden, K. P., Chein, J. M., & Steinberg, L. (2014). The development of impulse control and sensation-seeking in adolescence: Independent or interdependent processes? *Journal of Research on Adolescence, 26,* 37–44. http://dx.doi.org/10.1111/jora.12181

Steinberg, L. (2014). *Age of opportunity: Lessons from the new science of adolescence.* New York, NY: Houghton Mifflin Harcourt Publishing Company.

Steinberg, L. (2017). Adolescent brain science and juvenile justice policymaking. *Psychology, Public Policy, and Law, 23,* 410–420. http://dx.doi.org/10.1037/law0000128

Steinberg, L., Albert, D., Cauffman, E., Banich, M., Graham, S., & Woolard, J. (2008). Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: Evidence for a dual systems model. *Developmental Psychology, 44,* 1764–1778. http://dx.doi.org/10.1037/a0012955

Steinberg, L., & Cauffman, E. (1996). Maturity of judgment in adolescence: Psychosocial factors in adolescents decision making. *Law and Human Behavior, 20,* 249–272. http://dx.doi.org/10.1007/BF01499023

Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (2009a). Are adolescents less mature than adults?: Minors' access to abortion, the juvenile death penalty, and the alleged APA "flip-flop." *American Psychologist, 64,* 583–594. http://dx.doi.org/10.1037/a0014763

Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (2009b). Reconciling the complexity of human development with the reality of legal policy: Reply to Fischer, Stein, and Heikkinen (2009b). *American Psychologist, 64,* 601–604. http://dx.doi.org/10.1037/a0017246

Steinberg, L., Graham, S., O'Brien, L., Woolard, J., Cauffman, E., & Banich, M. (2009c). Age differences in future orientation and delay discounting. *Child Development, 80,* 28–44. http://dx.doi.org/10.1111/j.1467-8624.2008.01244.x

Steinberg, L., & Monahan, K. C. (2007). Age differences in resistance to peer influence. *Developmental Psychology, 43,* 1531–1543. http://dx.doi.org/10.1037/0012-1649.43.6.1531

Steinberg, L., Icenogle, G., Shulman, E. P., Breiner, K., Chein, J., Bacchini, D., . . . Takash, H. M. S. (2017). Around the world, adolescence is a time of heightened sensation seeking and immature self-regulation. *Developmental Science, 21,* e12532. http://dx.doi.org/10.1111/desc.12532

Thompson-Schill, S. L., Jonides, J., Marshuetz, C., Smith, E. E., D'Esposito, M., Kan, I. P., . . . Swick, D. (2002). Effects of frontal lobe damage on interference effects in working memory. *Cognitive, Affective & Behavioral Neuroscience, 2,* 109–120. http://dx.doi.org/10.3758/CABN.2.2.109

Thorell, L. B., Veleiro, A., Siu, A. F. Y., & Mohammadi, H. (2013). Examining the relation between ratings of executive functioning and academic achievement: Findings from a cross-cultural study. *Child Neuropsychology, 19,* 630–638. http://dx.doi.org/10.1080/09297049.2012.727792

Vazsonyi, A. T., & Ksinan, A. J. (2017). Understanding deviance through the dual systems model: Converging evidence for criminology and developmental sciences. *Personality and Individual Differences, 111,* 58–64. http://dx.doi.org/10.1016/j.paid.2017.01.030

Viljoen, J. L., Zapf, P. A., & Roesch, R. (2007). Adjudicative competence and comprehension of Miranda rights in adolescent defendants: A comparison of legal standards. *Behavioral Sciences & The Law, 25,* 1–19. http://dx.doi.org/10.1002/bsl.714

Wang, Z., Devine, R. T., Wong, K. K., & Hughes, C. (2016). Theory of mind and executive function during middle childhood across cultures. *Journal of Experimental Child Psychology, 149,* 6–22. http://dx.doi.org/10.1016/j.jecp.2015.09.028

Weithorn, L. A., & Campbell, S. B. (1982). The competency of children and adolescents to make informed treatment decisions. *Child Development, 53,* 1589–1598. http://dx.doi.org/10.2307/1130087

Williams, A. F. (1999). Graduated licensing comes to the United States. *Injury Prevention, 5,* 133–135. http://dx.doi.org/10.1136/ip.5.2.133

Woolard, J., & Scott, E. (2009). The legal regulation of adolescence. In R. Lerner & L. Steinberg (Eds.), *Handbook of adolescent psychology* (3rd ed., Vol. 2, pp. 345–371). New York, NY: Wiley.

World Health Organization. (2014). *Considerations regarding consent in vaccinating children and adolescents between 6 and 17 years old.* Retrieved from http://www.int/immunization/programmes_systems/policies_strategies/consent_note

Zottoli, T. M., Daftary-Kapur, T., Winters, G. M., & Hogan, C. (2016). Plea discounts, time pressures, and false-guilty pleas in youth and adults who pleaded guilty to felonies in New York City. *Psychology, Public Policy, and Law, 22,* 250–259. http://dx.doi.org/10.1037/law0000095

Received February 25, 2018
Revision received November 2, 2018
Accepted November 2, 2018 ■

# EXHIBIT 31

# Juvenile Justice Center

**American Bar Association**

740 15th Street, NW  Washington, DC 20005  •  202.662.1506  •  juvjus@abanet.org  •  www.abanet.org/crimjust/juvjus

January 2004



### Cruel and Unusual Punishment: The Juvenile Death Penalty

# Adolescence, Brain Development and Legal Culpability

*"[They] frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others…. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability."*

Atkins v. Virginia, *536 U.S. 304, 318, 122 S.Ct. 2242, 2250 (2002)*

In 2002, the U.S. Supreme Court banned the execution of mentally retarded persons. This decision, *Atkins v. Virginia*, cited the underdeveloped mental capacities of those with mental retardation as a major factor behind the Justices' decision.

Adolescence is a transitional period during which a child is becoming, but is not yet, an adult. An adolescent is at a crossroads of changes where emotions, hormones, judgment, identity and the physical body are so in flux that parents and even experts struggle to fully understand.

As a society, we recognize the limitations of adolescents and, therefore, restrict their privileges to vote, serve on a jury, consume alcohol, marry, enter into contracts, and even watch movies with mature content. Each year, the United States spends billions of dollars to promote drug use prevention and sex education to protect youth at this vulnerable stage of life. When it comes to the death penalty, however, we treat them as fully functioning adults.

## The Basics of the Human Brain

The human brain has been called the most complex three-pound mass in the known universe. This is a well deserved reputation, for this organ contains billions of connections among its parts and governs countless actions, involuntary and voluntary, physical, mental and emotional.

The largest part of the brain is the *frontal lobe*. A small area of the frontal lobe located behind the forehead, called the *prefrontal cortex*, controls the brain's most advanced functions. This part, often referred to as the "CEO" of the body, provides humans with advanced cognition. It allows us to prioritize thoughts, imagine, think in the abstract, anticipate consequences, plan, and control impulses.

Along with everything else in the body, the brain changes significantly during adolescence. In the last five years, scientists, using new technologies, have discovered that adolescent brains are far less developed than previously believed.

## New Technology, New Discoveries

Scientists are now utilizing advances in magnetic resonance imaging (MRI) to create and study three-dimensional images of the brain without the use of radiation (as in an x-ray). This breakthrough allows scientists to safely scan children over many years, tracking the development of their brains.[1]

Researchers at Harvard Medical School, the National Institute of Mental Health, UCLA, and others, are collaborating to "map" the development of the brain from childhood to adulthood and examine its implications.



A three dimensional "map" showing portions of gray matter "pruned" from the brain between adolescence and adulthood. The dark portions in the two boxes indicate sections that will be discarded from the **frontal lobe**. The box on the far right indicates the **prefrontal cortex**, a subsection of the frontal lobe that controls judgment.

Image adapted from *Nature Neuroscience.*

Lobes of the Brain:

©2002 Hybrid Medical Animation

The scientists, to their surprise, discovered that the teenage brain undergoes an intense overproduction of *gray matter* (the brain tissue that does the "thinking"). Then a period of "pruning" takes over, during which the brain discards gray matter at a rapid rate.[2] This process is similar to pruning a tree: cutting back branches stimulates health and growth.

In the brain, pruning is accompanied by *myelination*, a process in which *white matter* develops. White matter is fatty tissue that serves as insulation for the brain's circuitry, making the brain's operation more precise and efficient.[3]

Researchers have carefully scrutinized the pace and severity of these changes and have learned that they continue into a person's early 20s. Dr. Elizabeth Sowell, a member of the UCLA brain research team, has led studies of brain development from adolescence to adulthood. She and her colleagues found that the frontal lobe undergoes far more change during adolescence than at any other stage of life.[4] It is also the last part of the brain to develop, which means that even as they become fully capable in other areas, adolescents cannot reason as well as adults: "[m]aturation, particularly in the frontal lobes, has been shown to correlate with measures of cognitive functioning."[5]

### Biology and Behavior

Jay Giedd, a researcher at the National Institute of Mental Health, explains that during adolescence the "part of the brain that is helping organization, planning and strategizing is not done being built yet…. It's sort of unfair to expect [adolescents] to have adult levels of organizational skills or decision making before their brain is finished being built."[6]

Dr. Deborah Yurgelun-Todd of Harvard Medical School has studied the relation between these new findings and teen behavior and concluded that adolescents often rely on emotional parts of the brain, rather than the frontal lobe. She explains, "one of the things that teenagers seem to do is to respond more strongly with gut response than they do with evaluating the consequences of what they're doing."[7]

Also, appearances may be deceiving: "Just because they're physically mature, they may not appreciate the consequences or weigh information the same way as adults do. So we may be mistaken if we think that [although] somebody looks physically mature, their brain may in fact not be mature."[8]

This discovery gives us a new understanding into juvenile delinquency. The frontal lobe is "involved in behavioral facets germane to many aspects of criminal culpability,"[9] explains Dr. Ruben C. Gur, neuropsychologist and Director of the Brain Behavior Laboratory at the University of Pennsylvania. "Perhaps most relevant is the involvement of these brain regions in the control of aggression and other impulses…. If the neural substrates of these behaviors have not reached maturity before adulthood, it is unreasonable to expect the behaviors themselves to reflect mature thought processes.

"The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable…. Indeed, age 21 or 22 would be closer to the 'biological' age of maturity."[10]

### Other Changes in the Body

In addition to the profound physical changes of the brain, adolescents also undergo dramatic hormonal and emotional changes. One of the hormones which has the most dramatic effect on the body is testosterone. Testosterone, which is closely associated with aggression, increases tenfold in adolescent boys.[11]

> "Just because they're physically mature, they may not appreciate the consequences or weigh information the same way as adults do. So, [although] somebody looks physically mature, their brain may in fact not be mature."
>
> Deborah Yurgelun-Todd, PhD
> Brain Imaging Laboratory,
> McClean Hospital
> Harvard University Medical School

Emotionally, an adolescent "is really both part child and part adult,"[12] explains Melvin Lewis, an expert in child psychiatry and pediatrics at Yale University School of Medicine. Normal development at this time includes self-searching, during which the adolescent tries to grow out of his or her childlike self. This change is complicated by the conflict between an adolescent's new sense of adult identity and remaining juvenile insecurities.

The behaviors associated with this process include self-absorption, a need for privacy, mood swings, unique dress, and escapism, such as video games, music, and talking on the phone, as well as riskier behaviors, such as drug use or sexual activity.[13]

## Childhood Abuse and Violence

In addition to this context of change and volatility, research shows that abusive childhood experiences can trigger violent behavior. The American Academy of Pediatrics has identified several risk factors that can spark violence in adolescents, including being witness to domestic violence or substance abuse within the family, being poorly or inappropriately supervised, and being the victim of physical or sexual assault.[14]

Researcher Phyllis L. Crocker of Cleveland-Marshall College of Law has written that "the nexus between poverty, childhood abuse and neglect, social and emotional dysfunction, alcohol and drug abuse and crime is so tight in the lives of many capital defendants as to form a kind of social historical profile."[15]

> "The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable...."
>
> Ruben Gur, MD, PhD
> Director, University of
> Pennsylvania Medical Center

Dr. Chris Mallett, Public Policy Director at Bellefaire Jewish Children's Bureau in Ohio, recently completed the most comprehensive study of traumatic experiences in the lives of death row juvenile offenders to date.[16] He found that:

- 74% experienced family dysfunction[17]
- 60% were victims of abuse and/or neglect[18]
- 43% had a diagnosed psychiatric disorder[19]
- 38% suffered from substance addictions[20]
- 38% lived in poverty[21]

More than 30% of death row juvenile offenders had experienced six or more distinct areas of childhood trauma with an overall average of four such experiences per offender. Most children and adolescents do not face even one of these defined areas of difficulty.[22] Mallett also found that such mitigating evidence was presented to juries in fewer than half of the offenders' trials.[23]

Mallett's research confirmed findings in previous studies. In 1992, researchers found that two-thirds of all juveniles sentenced to death had backgrounds of abuse, psychological disorders, low IQ, indigence, and/or substance abuse.[24]



Dr. Jay Giedd of the National Institute of Mental Health. Image courtesy of PBS Frontline report *Inside the Teenage Brain*.

In 1987, an investigation into 14 juveniles on death row[25] (40% of the total at the time) revealed that nine had major neuropsychological disorders[26] and seven had psychotic disorders since early childhood.[27] All but two had IQ scores under 90.[28] Only three had average reading abilities, and another three had learned to read only after arriving on death row.[29] Twelve reported having been physically or sexually abused, including five who were sodomized by relatives.[30]

## Delinquency Link

The turmoil often associated with adolescence can result in poor decisions and desperate behaviors. For example, studies have found that 20 to 30% of high school students consider suicide. Suicide is the third-leading cause of death among teenagers, occurring once every two hours, or over 4,000 times a year, according to the U.S. Surgeon General.[31] Approximately 30% of youths reported using an illicit drug at least once during their lifetime, and 22.2% reported using an illicit drug within the past year.[32]

## Conclusion

New discoveries provide scientific confirmation that the teen years are a time of significant transition. They shed light on the mysteries of adolescence and demonstrate that adolescents have significant neurological deficiencies that result in stark limitations of judgment. Research suggests that when compounded with risk factors (neglect, abuse, poverty, etc.), these limitations can set the psychological stage for violence.

These discoveries support the assertion that adolescents are less morally culpable for their actions than competent adults and are more capable of change and rehabilitation. The ultimate punishment for minors is contrary to the idea of fairness in our justice system, which accords the greatest punishments to the most blameworthy.

This fresh understanding of adolescence does not excuse juvenile offenders from punishment for violent crime, but it clearly lessens their culpability. This concept is not new; it is why we refer to those under 18 as "minors" and "juveniles"—because, in so many respects, they are *less than adult*.

# American Bar Association Juvenile Justice Center

## Notes

1 For an excellent overview, see Elkhonon Goldberg, *The Executive Brain: Frontal Lobes and the Civilized Mind,* Oxford University Press (2001).

2 Sowell, Elizabeth R, Paul M. Thompson, Colin J. Holems, Terry L. Jernigan and Arthur W. Toga. *In vivo evidence for post-adolescent brain maturation in frontal and striatal regions.* 2 Nature Neuroscience 10 (1999), also Paus, Tomas, Jay Giedd, et. al. *Structural maturation of neural pathways in children and adolescents: in vivo study.* Science, 283 (1999).

3 Id.

4 Id.

5 Sowell, Elizabeth R, Paul M. Thompson, Kevin D. Tessner and Arthur W. Toga. *Mapping continued brain growth and gray matter density reduction in dorsal frontal cortex: inverse relationships during postadolescent brain maturation,* 21 Journal of Neuroscience 22 (2001), at 8819, also Reiss, A.L., et. al., *Brain development, gender and IQ in children, a volumetric imaging study.* Brain, 119 (1996).

6 PBS Frontline, *Inside the Teen Brain.* See Interview with Jay Giedd, online at www.pbs.org/wgbh/pages/frontline/shows/teenbrain/.

7 Id, at *Interview with Deborah Yurgelun-Todd.*

8 Id.

9 Gur, Ruben C. Declaration of Ruben C. Gur., PhD, *Patterson v. Texas.* Petition for Writ of Certiorari to US Supreme Court, J. Gary Hart, Counsel. (Online at: www.abanet.org/crimjust/juvjus/patterson.html)

10 Id.

11 See Adams, Gerald R., Raymond Montemayor, and Thomas P. Gullota, eds. *Psychosocial Development during Adolescence.* Thousand Oaks, CA, Sage Publications (1996).

12 Lewis, Melvin. *Child and Adolescent Psychiatry: A comprehensive textbook,* Lippincott Williams and Wilkins (2002).

13 See id, and Cobb, Nancy J. *Adolescence: Continuity, Change and Diversity.* Mayfield Publishing, CA (1998).

14 American Society of Pediatrics, *Policy Statement,* 1 Pediatrics, 103 (1999).

15 Phyllis L. Crocker. *Childhood Abuse and Adult Murder: Implications for the Death Penalty,* 77 NC L. Rev. 1143 (1999).

16 Mallet, Chris. *Socio-Historical Analysis of Juvenile Offenders on Death Row,* 3 Juv. Corr. Mental Health Report 65 (2003).

17 Id., at 77.

18 Id., at 78.

19 Id., at 77.

20 Id., at 78.

21 Id.

22 Id.

23 Id.

24 Robinson, DA and Stephens, OH; *Patterns of mitigating factors in juvenile death penalty cases,* 3 Criminal Law Bulletin 28 (1992).

25 Lewis, DO, Pincus, Bard, Richardson, Prichep, Feldman, Yeager. *Neuropsychiatric, psychoeducational, and family characteristics of 14 juveniles condemned to death in the United States,* 5 Am. J. of Psychiatry 145 (1988).

26 Id.

27 Id.

28 Id.

29 Id.

30 Id.

31 Office of the U.S. Surgeon General, *At a Glance, Suicide Among the Young:* Online at www.surgeongeneral.gov/library/calltoaction/fact3.htm

32 White House Office of National Drug Control Policy, Juveniles and Drugs, at www.whitehousedrugpolicy.gov/drugfact/juveniles/index.html

*This publication was supported in part by a grant from the Soros Justice Fellowship of the Open Society Institute. By Adam Ortiz.*



**Defending Liberty
Pursuing Justice**

# EXHIBIT 32



**Firearms on College Campuses:  Research Evidence and Policy Implications**

**Prepared by**

**Daniel W. Webster, ScD, MPH**

**John J. Donohue III, PhD, JD**

**Louis Klarevas, PhD**

**Cassandra K. Crifasi, PhD, MPH**

**Jon S. Vernick, JD, MPH**

**David Jernigan, PhD**

**Holly C. Wilcox, PhD**

**Sara B. Johnson, PhD, MPH**

**Sheldon Greenberg, PhD**

**Emma E. McGinty, PhD, MS**

**October 15, 2016**

Corresponding Author:

Daniel W. Webster, ScD, MPH

Johns Hopkins Center for Gun Policy and Research

Johns Hopkins Bloomberg School of Public Health

624 N. Broadway, Rm. 593

Baltimore, MD 21205

410-955-0440

dwebster@jhu.edu

**Executive Summary**

Restrictions on legal gun owners carrying firearms in public places have been removed or greatly weakened in most states over the past three decades. Colleges and universities, however, have been locations that have commonly been allowed to prohibit otherwise legal gun carriers from bringing guns onto campuses. This exception, however, has recently begun to change. Eight states now have laws that, generally, allow individuals who can legally carry guns elsewhere to bring guns onto college campuses. In 24 states, colleges and universities have the authority to allow or forbid civilians from having firearms on their campuses.  A number of additional states considered new laws relevant to carrying firearms on college campuses during their 2015-2016 legislative sessions.

This report reviews the evidence surrounding the relationship between civilian gun carrying and violent crime and mass shootings and factors that are unique to public safety on college campuses. Policies removing restrictions on civilian gun carrying are based on claims or assumptions about civilian gun use, the impact of state Right-to-Carry (RTC) laws, and the nature of mass shootings that are not supported by or are contrary to the best available research.  The incidence of civilian self-defensive gun use (SDGU) is difficult to discern as available data are based on self-report, and distinguishing aggressor from victim in interpersonal altercations can be highly subjective.  Nonetheless, data from the National Crime Victimization Survey indicate that SDGU is relatively rare (about 102,000 self-reported incidents per year affecting 0.9% of all violent crime victimizations) and is no more effective in reducing victims' risk of injury than other victim responses to attempted violent crimes. Research led by John Lott, author of *More Guns, Less Crime*, suggesting that RTC laws prevent violent crime has important flaws that biased his findings.  The most recent and rigorous research on RTC laws that corrects for these flaws consistently finds that RTC laws are associated with *more* violent crime.  These findings may seem counterintuitive because concealed-carry permit holders have, as a group, low rates of criminal offending and must pass a background check to ensure that they do not have any condition, such as a felony conviction, that prohibits firearm ownership.  But, in states with low standards for legal gun ownership, legal gun owners account for the majority of persons incarcerated for committing violent crimes with firearms.

As mass shootings and casualties from those shootings have risen sharply over the past decade, one rationale for allowing more civilians to carry firearms, both on and off college campuses, is to avert rampage shootings or stop rampage shooters before additional victims are shot.  Central to these arguments are the notions that "gun-free" zones attract individuals set on mass murder and that armed civilians frequently thwart or interrupt such shootings.  New research on mass shootings involving six or more victims murdered that occurred in the United States from 1966 to through June 2016 contradicts these claims.  Only 12% of these shootings took place, in whole or in part, in a truly gun-free zone (no armed security or police or armed civilians) and 5% in a gun-restricting zone (civilian gun possession prohibited).  A separate study of mass shootings involving four or more fatalities, that included domestic incidents during 2009-2015, found that only 13% occurred in a gun-free or gun-restricting zone. Successful civilian uses of guns to stop a mass shooting were incredibly rare and about as common as armed civilians being shot while attempting to respond to mass shooting incidents. Furthermore, the data show no evidence that RTC laws – which, it is argued, lead to more armed citizens ready to defend against a mass shooting – reduce mass shootings or the number of people shot in those incidents.

2

This report also reviews research relevant to the unique context of college campuses, especially student demographics and characteristics, and the implications for increased access to firearms among college students. Late adolescence and early adulthood is marked by increases in a variety of risky behaviors including violence, binge drinking, and drug abuse. Binge drinking, a common behavior among college students, especially elevates risks for involvement in violent altercations. Risky decision-making in adolescence and early adulthood is due, in part, to on-going brain development during that stage of life that can compromise emotional and behavioral regulation, impulse control, and judgment – all of which are essential for avoiding the circumstances in which firearm access leads to tragedy. Age-specific homicide offending peaks around the age when youth reach the minimum legal age for purchasing, possessing, and carrying handguns (19-21 years).

Suicidal behavior that leads to death or hospital treatment peaks at age 16, but remains high through age 25, covering the age span of most college students. Mental illnesses, such as depression, that commonly emerge during adolescence and young adulthood, coupled with restricted impulse control and the stressors that many college students experience, increases the risk of suicidal behavior among college students. Research demonstrates that access to firearms substantially increases suicide risks, especially among adolescents and young adults, as firearms are the most common method of lethal self-harm.

Proposals to allow guns on college campuses must consider the fact that serious assaults and suicide attempts – which are more likely to be lethal when firearms are present – are far more common than are the rampage shooting incidents that the policies are purported to prevent. Inserting more firearms into those assaults and suicide attempts by allowing more people to have firearms on campuses is likely to lead to more deaths and serious injuries. A recent study identified 85 incidents of shootings or undesirable discharges of firearms on college campuses in the U.S. from January 2013 through June 2016. Only two of these 85 incidents (2.4%) involved a shooter on a rampage. The most common incidents were interpersonal disputes that escalated into gun violence (45%), premeditated acts of violence against an individual (12%), suicides or murder/suicides (12%), and unintentional shootings or discharges (9%). Campus police much more commonly respond to a variety of violent and non-violent incidents than to rampage shootings. If those campus officers must assume that any given student is armed, this may compromise their ability to effectively respond to, and de-escalate, these incidents.

In summary, available data indicate that policies that allow individuals to bring firearms onto college campuses are unlikely to lead to fewer mass shootings or fewer casualties from those shootings. Mass shootings are a growing concern, but are still very rare events. Increasing gun availability in campus environments could make far more common acts of aggression, recklessness, or self-harm more deadly and, thus, have a deleterious impact on the safety of students, faculty, and staff.

## Aims of this Report

The purpose of this report is to review relevant research and implications associated with policies that allow the carrying of firearms on college and university campuses.  During the past 30 years, a growing number of states have passed laws that make it easier for civilians to legally carry loaded firearms in public places. However, even as more states adopted so-called right-to-carry (RTC) laws, these laws generally set aside certain places such as bars, courthouses, schools, and college campuses where gun carrying is prohibited or that allowed businesses or institutions to declare that civilians are not allowed to bring firearms onto their premises.  Deregulation of civilian gun carrying has accelerated in recent years in many states including new laws that allow or require state colleges and universities to allow those who can legally carry firearms in public to bring guns onto college campuses.

Policies that allow civilians who are not explicitly prohibited from carrying firearms in public to carry concealed loaded firearms onto college campuses are based, in part, on beliefs that such policies with enhance campus safety including reducing risks of mass shootings. Because there have been no formal evaluations of policies to allow guns on college campuses – many of these policies are relatively new – we sought to summarize research relevant to civilian use of guns, the impact of RTC laws on violent crime and mass shootings, and common patterns in public mass shootings to determine how well available research aligns with the assumptions underlying policies to allow civilians to bring guns onto college and university campuses.  We also sought to summarize research that is relevant to the potential increased firearm access among college students and the college campus environment.

## Relevant Law Governing Guns on College Campuses

In the United States, laws regulating the purchase, possession, and carrying of firearms -- including on college or university campuses -- may originate at the federal, state, or local levels.  Federal law is primarily codified as part of the Gun Control Act of 1968 and its amendments.[1] The Gun Control Act specifically includes language stating that Congress does not intend the Act to preclude state gun laws unless there is a "direct and positive conflict" between federal and state law. As a result, federal law acts as a "floor" -- imposing minimum standards applicable everywhere -- rather than as a ceiling for U.S. gun laws.[2]

One federal law, the Gun Free School Zones Act, forbids the carrying of firearms in school zones -- subject to certain exceptions.[3] A "school," however, is defined as one "which provides elementary or secondary education, as determined under state law."[4] As a result, colleges and universities are not covered by this federal law.

Most U.S. law regulating the carrying of firearms originates at the state level.  Every U.S. state permits the carrying of weapons, either concealed or open, under some circumstances.  These laws establish the terms under which a lawful gun owner may obtain a carry permit as well as the places and circumstances in which the gun may be carried.  For example, these laws may allow or forbid carrying of firearms in places that serve alcohol, churches, or college and university campuses.  (See the section of this report devoted to concealed carrying permit research for more information about these laws).

Localities within a state may sometimes also enact their own gun laws.  However, since the late 1980s, many states have enacted firearm preemption laws forbidding localities from enacting some or all types of gun laws. Today, more than 40 states forbid localities from enacting most types of gun laws.

4

In fact, just five states generally allow local regulation of guns: Connecticut, Hawaii, Massachusetts, Illinois, and New York.[5] Even in these states which lack express preemption of local firearm laws, some local laws may nevertheless be deemed subject to implied preemption if a court determines that existing state law evidences an intent by the legislature to occupy the field of regulation or if the local law would otherwise conflict with state law. Therefore, local law plays little role in regulating carrying of firearms on college or university campuses.

According to the National Conference of State Legislatures, eighteen states currently ban carrying a concealed weapon on campus.  In twenty-four states, individual institutions have the power to allow or forbid firearm carrying on campus.  In the remaining eight states, firearms must generally be allowed on campus. In addition, during the 2015-2016 state legislative sessions, similar laws were considered in other states. None have yet been enacted. [6]

College and university firearm restrictions have been the subject of several recent lawsuits brought by individuals or groups seeking the ability to carry guns on campus.  The results of the lawsuits have been mixed, often based on the specific language of state law.  In Regents of the University of Colorado v. Students for Concealed Carry on Campus, a student group brought a complaint in 2008 alleging that a University of Colorado policy forbidding the possession of firearms on campus violated a Colorado state law, the Concealed Carry Act (CCA) enacted in 2003.[7] The CCA preempts localities from enacting their own laws regarding concealed carrying of handguns and allows concealed permit holders to carry their handgun anywhere not specifically excluded by the law.  Public elementary, middle, and high schools are excluded but universities are not.  In Regents, the Colorado Supreme Court concluded that the 2003 state law "divested the Board of Regents of its authority to regulate concealed handgun possession on campus."[8]

Similarly, in 2011 in Oregon Firearms Educational Foundation v. Board of Education and Oregon University System, the Oregon Court of Appeals concluded that an administrative rule promulgated by the State Board of Higher Education forbidding the possession of firearms on campus was preempted by a prior Oregon state law.[9] The Oregon preemption law states, in part, that "the authority to regulate in any manner whatsoever the sale, acquisition, transfer, ownership, possession, storage, or use of firearms ... is vested solely in the Legislative Assembly."  Because the carrying rule promulgated by the Board of Education had the force of administrative law, it was preempted by this language.

In 2006, the Supreme Court of Utah also struck down a University of Utah policy prohibiting students, faculty, and staff from carrying guns on campus.  In University of Utah v. Shurtleff, the Court held that Utah's firearm preemption statute -- which specifically applied to "state institutions of higher education" -- was constitutional within the meaning of the Utah state constitution and prevented the University from enforcing its policy.[10]

By contrast, in at least two cases, courts have upheld a college or university's ability to ban the carrying or possession of firearms on campus.  In Florida Carry, Inc. v. University of Florida, the plaintiffs argued that a Florida law permitting the possession of firearms in a person's home or business should supersede a different Florida law prohibiting firearms on school property (including colleges and universities).  The plaintiffs argued that university dormitories were essentially the students' homes. The Court concluded that the law forbidding guns on university property should prevail despite a state preemption law.[11] In a related Florida case, however, a court concluded that a state university could not forbid the possession of a firearm in a vehicle parked on school property, as long as the gun was securely encased in the vehicle.[12] Finally, in Digiacinto v. The Rector and Visitors of George Mason University, a non-student but frequent visitor to the George Mason University campus challenged a

University rule forbidding firearms in campus buildings or at campus events.  The Virginia Supreme Court concluded that the University policy violated neither state law nor the federal constitution.[13]

As these cases demonstrate, the outcomes are very fact and state law dependent.  In addition, the case law may or may not address whether the campus or university policies violate the Second Amendment to the U.S. Constitution.  In 2008, the U.S. Supreme Court, in District of Columbia v. Heller,[14] concluded that a Washington, D.C. law essentially banning the possession of handguns by civilians in their homes violated the Second Amendment.[15] However, the Supreme Court has yet to determine whether this right extends to carrying firearms in public.[16]

**Table 1: Status of State Campus Carry Laws as of May 2016**

| STATE | BANS CONCEALED CARRY ON CAMPUS | ALLOWS CONCEALED CARRY ON CAMPUS | DECISION LEFT TO INSTITUTION |
|---|---|---|---|
| Alabama | | | √ |
| Alaska | | | √ |
| Arizona | | | √ |
| Arkansas | | | √* |
| California | √ | | |
| Colorado | | √ | |
| Connecticut | | | √ |
| Delaware | | | √ |
| Florida | √ | | |
| Georgia | √ | | |
| Hawaii | | | √ |
| Idaho | | √ | |
| Illinois | √ | | |
| Indiana | | | √ |
| Iowa | | | √ |
| Kansas | | √**** | |
| Kentucky | | | √ |
| Louisiana | √ | | |
| Maine | | | √ |
| Maryland | | | √ |
| Massachusetts | √ | | |
| Michigan | √ | | |
| Minnesota | | | √ |
| Mississippi | | √ | |
| Missouri | √ | | |
| Montana | | | √ |
| Nebraska | √ | | |
| Nevada | √ | | |
| New Hampshire | | | √ |
| New Jersey | √ | | |
| New Mexico | √ | | |

| STATE | BANS CONCEALED CARRY ON CAMPUS | ALLOWS CONCEALED CARRY ON CAMPUS | DECISION LEFT TO INSTITUTION |
|---|---|---|---|
| New York | √ | | |
| North Carolina | √ | | |
| North Dakota | | | √ |
| Ohio | √ | | |
| Oklahoma | | | √ |
| Oregon | | √ | |
| Pennsylvania | | | √ |
| Rhode Island | | | √ |
| South Carolina | √ | | |
| South Dakota | | | √ |
| Tennessee | √* | | |
| Texas | | √** | |
| Utah | | √ | |
| Vermont | | | √ |
| Virginia | | | √ |
| Washington | | | √ |
| West Virginia | | | √ |
| Wisconsin | | √*** | |
| Wyoming | √ | | |

Adapted from information provided by National Conference of State Legislatures, Guns on Campus: Overview.  Available at: http://www.ncsl.org/research/education/guns-on-campus-overview.aspx.
* Certain faculty members may carry weapons on campus but not students or the public.
** Effective August 2016.  Private institutions may still choose to ban concealed carry.
*** May prohibit weapons in specific buildings if appropriate signs are posted at every entrance.
****Law takes effect in July 2017. Institutions may prohibit carrying in a campus building if all entrances have adequate security measures

### Legal Context and the Potential for Armed Citizens to Reduce Casualties from Mass Shootings

John Lott, author of the book *More Guns, Less Crime*, popularized the notion that "gun free zones" invite mass shootings and contribute to the number of casualties from those events because there are no armed defenders to interrupt rampage shootings.  Specifically, Lott purports that perpetrators of mass shootings intentionally seek out places where people are barred from carrying firearms in order to maximize casualties and minimize their risk of being shot. He claims that allowing civilians to legally carry loaded guns in public places increases the odds that an attempted rampage shooting will be interrupted and the number of casualties reduced; however, Lott's claims are inconsistent with available evidence.[17]

The most prominent justification in support of campus-carry policies relates to the potential for armed civilians to intervene to reduce the carnage of active shootings. According to the advocates of allowing civilians to carry firearms on college campuses, some individuals considering perpetrating a mass shooting will be deterred from attacking places where they stand a likelihood of being confronted by private citizens carrying firearms. In instances when deterrence fails and attacks are initiated, campus-carry advocates claim that armed students and staff will be able to intervene and halt gun rampages and thereby minimize the number of victims killed or wounded in the attack.[18]

Below, we assess the evidence of the three underlying arguments for the campus-carry movement relevant to mass shootings. First, the occurrence and lethality of mass shootings is drastically reduced in so-called Right-to-Carry (RTC) jurisdictions.[i] Second, mass shootings occur almost exclusively in "gun-free zones," where civilians are prohibited from carrying loaded firearms on their person. Third, when shooting rampages do occur, the active shooters are often stopped by armed civilians who confront the perpetrators.

As campus-carry is a relatively new phenomenon, there is little evidence that confirms or refutes the thesis specifically in the context of college campuses. However, there are several studies that assess the three underlying propositions that form the foundation of the campus-carry thesis. Examining each tenet individually offers valuable insights.

### *Right-to-Carry Firearm Laws Do Not Reduce Mass Shootings or Casualties from Such Shootings*

Advocates for allowing civilians to bring guns onto college campuses and to deregulate carrying of guns in public places in general commonly cite research and statements by John Lott, an economist widely known for his claims that deregulating gun possession reaps significant reductions in violent crime.[17,19] Lott supports his claims with data and analytic methods that others have consistently found to have important flaws. In the 2nd edition of *More Guns, Less Crime*, Lott reported to have assembled a dataset of all mass shootings in the United States from 1977 to 1997. He found that the adoption of RTC laws was associated with a 67% reduction in mass shootings, completely eliminating mass shootings within five years of enactment. He also claimed RTC laws led to a 75% reduction in deaths from such shootings and an 81% reduction in persons injured in these shootings. However, an independent team of researchers tried to reproduce Lott's findings on RTC laws and mass shootings, and found no association between such laws and such shootings.[20]

Lott's claims pertaining to mass shootings and RTC laws are also inconsistent with evidence about mass shootings assembled in Louis Klarevas's forthcoming book on the topic.[21] Klarevas collected data on 111 high-fatality mass shootings (6 or more people murdered with a gun) from 1966 through 2015. He found that in the 41 states that currently have RTC laws or no regulation of concealed carrying of firearms for legal gun owners, the average death toll in high-fatality mass shootings *increased* following the implementation of a RTC law from a mean of 7.5 before to 8.4 after the law. Moreover, this pattern of over eight fatalities per incident, on average, held well after five years, contradicting Lott's assertion that mass shootings stop occurring within five years of the enactment of RTC laws. When Klarevas expanded his data set to include all 50 states and the District of Columbia, the average death toll in gun massacres was slightly higher in states and years where RTC laws were in place (8.4) than in states and years where there were no RTC laws in place (8.0).

---

[i] Right-to-Carry (RTC) laws are those that remove discretion from law enforcement in issuing licenses to carry concealed firearms, provided that applicants are legally permitted to possess guns in their homes and meet any additional conditions, such as safety training. Laws of this type are also referred to as "Shall Issue" laws because law enforcement discretion is removed from the decision to issue the permits.

### *There is No Evidence that "Gun-Free Zones" Facilitate Mass Shootings*

When John Lott's book was reissued in its 3rd edition in 2010, he introduced a new concept that characterized places "where private citizens are not allowed to carry guns": gun-free zones. He maintained that in locations where someone is bound to be armed, rampage gunmen will be thwarted. Further, he claimed that mass shooters—knowing they will face far less resistance in places where their potential victims are unarmed—consciously target gun-free zones. Unfortunately, the concept of a gun-free zone has never been properly defined. Initially, Lott described gun-free zones as locales "where private citizens are not allowed to carry guns." Subsequently, Lott began embracing a looser conceptualization that deemed entire cities and counties to be gun-free zones, if they were extremely restrictive in issuing concealed-carry permits.[22]

Another problem with the term "gun-free zone" relates to how proponents of unrestricted gun carrying define areas as gun free when there are law enforcement officers and armed security guards on the premises, though civilians are prohibited from carrying their personal firearms on site. Lott characterized military installations like Fort Hood and the Washington Navy Yard, which have been attacked by rampage gunmen, as gun free despite the presence of significant armed security personnel. The implication of this notion of "gun free" is that rampage shooters are only deterred by armed civilians, not by armed guards and law enforcement. But a bullet fired from a police officer's firearm has similar stopping power to a bullet from a civilian's firearm, and it is probably more likely to hit its intended target since security and law enforcement personnel are likely to be better trained and prepared to respond to a rampage shooting than is the average civilian gun carrier.

Sharpening definitions can alleviate the ambiguities and inconsistencies surrounding gun-free zones and their relationship to mass shootings. In Klarevas's study of rampage shootings, he argues that it makes more sense to distinguish between truly gun-free zones – places where there are never armed personnel stationed on the property *and* private citizens are prohibited from being armed with personal firearms by law or appropriate notice – and "gun-restricting zones" – places where private citizens are barred from carrying personal firearms by law or appropriate notice, yet armed security is routinely present. Most military bases and college campuses are gun restricting, as they typically have armed guards and/or armed police on regular patrol, but prohibit civilians from bearing arms. To round out the possibilities, Klarevas identified "gun-allowing zones" as places where private civilians are not legally prohibited from carrying personal firearms.[21]

A review conducted by Klarevas of the 111 high-fatality mass shootings (six or more victims murdered) that occurred in the U.S. since 1966 found that only eighteen have taken place, in whole or in part, in a gun-free zone or gun-restricting zone. (Three of these eighteen incidents occurred, in part, in gun-allowing zones.) Of these eighteen high-fatality mass shootings in gun-free or gun-restricting zones, thirteen took place in bona fide gun-free zones. The remaining five incidents occurred in gun-restricting zones. Contrary to what Lott argues, 84% of all gun massacres occurred in whole or in part where there is no evidence that civilian guns were prohibited, and nearly 90% occurred in whole or in part in locations where civilian guns were allowed or there was armed security or law enforcement. These 111 incidents did not include the mass shooting of police officers in Dallas on July 7 that obviously occurred in a gun-allowing zone where there were numerous Dallas police officers, campus police, and civilians

9

openly carrying firearms. Among the wounded were two El Centro College police officers. These data do not suggest that gun-allowing zones deter gun massacres.[ii]

**There is also little evidence that perpetrators of mass shootings intentionally seek out their targets based on whether or not civilians are prohibited from having guns.** Most targets of mass shootings are directed at a specific person, group, or institution with whom the perpetrator has a grievance.[21] Everytown for Gun Safety analyzed data on mass shootings using a slightly less conservative definition than that employed by Klarevas – four persons killed with a firearm, not including the shooter – for the period 2009-2015 and found that the majority (57%) of the incidents involved a shooter's current or former intimate partner or family member. Seventy-one percent of the incidents occurred in a private dwelling and only 13% occurred in a public location that could qualify as a gun free or gun restricting zone.[23]

*Effective Neutralization of Active Shooters Requires Skills and Experience that Most Civilians Lack*

There is an unsupported assumption of campus carry advocates that armed students or staff on campus will shoot accurately enough to stop the shooter in an active shooting incident without wounding or killing innocent victims. Shooting accurately and making appropriate judgments about when and how to shoot in chaotic, high-stress situations requires a high level of familiarity with tactics and the ability to manage stress under intense pressure. Shooting accuracy in such situations is influenced by distance, the opponent shooter's actions, lighting, use of cover, type of gun, and more.[24] Ability to shoot accurately are also affected by heart rate, breathing, fatigue, and mental stress.[25]

Effective and responsible use of a firearm under the conditions of an active shooting requires significant training. Yet most RTC laws require only that carry permit holders have weapon familiarity, perform basic range shooting and, in some cases, minimal crisis-shooting training to qualify to legally carry a gun. Of course, there are no training or performance requirements in states that do not require civilians to obtain a permit to carry concealed firearms. There is well-documented research citing the inaccuracy of police officers who use firearms in crisis encounters, although they receive extensive training and readiness preparation. [26] There is no reason to believe that college students, faculty and civilian staff will shoot accurately in active shooter situations when they have only passed minimal training requirements for a permit to carry. Generally, college and university students function at a high rate of mental and emotional stress, with over 50% reporting that they feel so depressed that it is difficult for them to function.[27]

---

[ii] In addition to the July 7, 2016, mass shooting in Dallas, since January 1, 2015, there have been at least four mass public shootings (as defined by Lott) that occurred in gun-allowing zones: Christopher Harper-Mercer's shooting spree that claimed nine lives at Umpqua Community College in Roseburg, Oregon; William Hudson's rampage that claimed six lives at the Tennessee Colony campsite near Palestine, Texas; Syed Rizwan Farook and Tashfeen Malik's attack that claimed fourteen lives at a holiday party being held at the Inland Regional Center in San Bernardino, California; and Jason Dalton's murder spree that left six dead in Kalamazoo, Michigan. At two of the four locations (Umpqua and Inland)—and possibly at the other two locations—there were armed civilians present at the time of the shootings.

*Legally Armed Citizens Very Rarely Successfully Intervene to Prevent or Interrupt Mass Shootings*

One rationale for allowing guns on campus is that by increasing the number of armed civilians, you increase the ability of someone to effectively intervene with a gun to stop someone engaging in or attempting a mass shooting.  Opponents of gun-free zones do not just argue that civilians carrying firearms can prevent mass shootings from occurring in the first place. They also maintain that, should deterrence fail, armed people will help reduce the bloodshed by neutralizing perpetrators before they can complete their rampages. In theory, this too sounds logical. Again, Lott is the source of this thesis. In particular, his central contribution to this debate is his effort to assemble an anecdotal compilation of thirty-one shootings since 1990 that involved armed civilians intervening and halting rampage gunmen from completing their objective of killing as many people as possible. Others have seized on his initiative, and the list of incidents now numbers 39.[19]

But there is one substantial problem with this list. When Klarevas scrutinized the specific instances where armed civilians purportedly intervened to end a mass shooting in progress, he found that, in reality, rarely did private citizens with personal guns stop rampages. Of the 39 incidents, the majority—22 incidents—did not involve mass-shooting scenarios. Instead, they were knife attacks, gun-brandishing episodes where the weapon was never fired, armed robberies where the criminals never tried to execute the customers present, and shootings that did not involve enough targeted victims to constitute a mass shooting. Seventeen of the 39 were actual mass-shooting situations. Out of this subset, the armed intervenor in six of these incidents was a law enforcement officer or armed security guard (not a private citizen). In two cases, armed civilians drew their weapons and helped detain the perpetrators, but only after the shootings had concluded. (Neither defender in these two incidents actually used his weapon to end the rampage.) In five shootings, the attempted defensive gun uses failed to stop the attacks, with the armed intervenors shot in three of these instances.[28, 18, 29] Over a 26-year period, only four incidents that were actual rampage shootings in progress were terminated by the actions of an armed civilian.

An FBI study that examined 160 active shootings in the United States during 2000-2013 also provides reason to be suspect of claims that civilian defensive gun uses figure prominently in terminating ongoing gun rampages. FBI researchers found only one incident that involved an armed civilian intervening to end an attack in progress. The civilian in that incident (which is also one of the interventions cited by Klarevas) involved a U.S. Marine with a concealed-firearms license shooting a man attacking patrons in a Nevada bar. In another four incidents, the attacks were brought to an end when armed security guards shot the perpetrators. By contrast, the FBI found that 21 of the 160 active shooting incidents were interrupted when unarmed civilians confronted and restrained the gunmen. The FBI's data suggest that unarmed civilians are more than twenty times likely to successfully end an active shooting than are armed civilians.[30]

Of course, some incidents could potentially have led to mass shootings had an armed civilian not intervened quickly to prevent more casualties.  Klarevas's review of civilian-interrupted mass shootings would miss some instances of this sort.  However, allowing more civilians to carry firearms into more public places could also facilitate more mass shootings.  The Violence Policy Center has tracked incidents in which a concealed carry weapon (CCW) permit holder was alleged to have committed various crimes of violence and unintentional shootings. They identified 29 CCW holders who perpetrated non-defensive shootings that involved three or more deaths not including the shooter during the period 2007-2015.[31]

### Defensive and Hostile Gun Use by Civilians

Debates surrounding policies about guns on college campuses hinge on differing views about civilian use of firearms including the likelihood that a person can successfully use a firearm to ward off a criminal assailant in comparison to the likelihood that a person carrying a gun might be prompted to use his or her gun in hostile or even criminal ways.  Unfortunately, there are no surveillance systems designed to identify and verify acts of self-defense with guns.  The best available data on the phenomena come from the National Crime Victimization Survey (NCVS) which interviews a nationally representative sample (after weighting) of approximately 90,000 households and over 158,000 individuals age 12 years and older.  Households remain in the NCVS sample for three years and eligible individuals are interviewed every six months about their experiences in which they were a victim of crime, any actions that they took in response to the attempted or actual crime, and outcomes such as whether or not they were injured in the crime.  Response rates for households and individuals within those households are typically around 85%, an exceptional rate for survey research.

David Hemenway and Sara Solnick recently published a study based on data from the NCVS for the five-year period 2007-2011 to examine the use of guns by crime victims and estimate the effects of victims using a gun in response to a crime versus others actions commonly taken by crime victims.[32] During the study period, there were 62 cases in which a NCVS respondent reported being a victim of a violent crime[iii] and used a gun in self-defense and an additional 65 who used a gun in property crimes or situations involving only verbal threat to the victim.  These 62 incidents represented 0.9% of all violent crimes reported (6,663) and accounted for 8.1 incidents per 100,000 population per year or a total of 102,478 self-defense gun uses (SDGUs) against violent crimes annually.  In less than one fifth of the incidents of reported SDGU, the offender was also armed with a gun. Seventy-three percent of SDGUs reported by men and 48% of SDGUs reported by women occurred away from their homes.  None of the SDGUs over the five-year period involved sexual assaults.

### *Victim Gun Use in Response to Criminal Acts Do Not Affect Victims' Risk of Injury*

In this study, Hemenway and Solnick also examined victims' risk of being injured after taking any of thirteen specific actions volunteered by NCVS respondents when asked what they did or tried to do about the incident while it was going on.  Four percent of those who reported a SDGU reported being injured after attempting to protect themselves with a gun; a virtually identical odds of injury among all victims who took *any* act of self-protection.  **After controlling for a host of contextual factors, self-defensive gun use did not significantly affect victims' risk of being injured in the criminal act.**  Most victims who are injured in crimes are injured before they can take any protective action.  Prior studies suggesting SDGU reduces victims' injury risk used NCVS data that did not distinguish victim injuries that occurred before versus after protective actions such as SDGU took place and, thus, could not ascertain causal connections between SDGU and injury risks.[33,34]

The NCVS does not ask respondents whether they used a gun in a hostile or unlawful manner. Drawing upon NCVS victimization data for the five years studied by Hemenway and Solnick (2007-2011)

---

[iii] Violent crimes examined include physical assaults, both sexual and non-sexual, and robberies.

and including firearm homicides for those years, there were 3.6 victimizations involving firearms for every self-reported SDGU in response to a violent crime.[iv]  It is unknown what percentage of the criminal uses of guns nationally were committed by individuals who owned guns legally.  **However, data from a nationally representative survey of state prison inmates and determined that of those who were incarcerated for committing a violent crime with a firearm in the thirteen states with the lowest legal standards, 60 percent legally possessed the firearms when they committed the crime.[35]**

The true incidence of SDGU may be significantly lower than indicated by the NCVS because the data are based on self-reports and determining who is the aggressor and who is the victim in interpersonal altercations can be highly subjective. Hemenway and colleagues fielded two surveys of a nationally representative sample of gun owners to ascertain gun owners' reports of both defensive uses of guns and hostile uses of guns against respondents. Respondents were asked to describe these incidents in some detail and five criminal court judges were asked to review the narratives and assess the probably legality of self-reported use of guns.[36] **In the majority of the self-reported SDGUs, most criminal court judges considered the actions taken by the respondent with their guns to be "probably illegal" due to inadequate justification for using deadly force.** The judges' were told to assume that the respondent had a valid permit to own and carry the gun, and that the respondent had described the event honestly.

An alternative source of data on SDGU to the NCVS is a national phone survey of 4,977 gun owners directed by criminologist Gary Kleck in the early 1990s. In this survey, 56 (1.1%) respondents reported having used defensively used a gun within the past 12 months in situations in which they report being the would-be victim of a crime.  Kleck used these data to make a projection that 2.5 million times per year a U.S. citizen used a firearm defensively in situations when someone was committing or attempting to commit a crime – about 22 times higher than the estimate from the NCVS.[37] The projections from Kleck's survey are discordant with data from other sources relevant to crime and violence, calling into question the validity of the data. For example, Kleck's survey data extrapolate to over 200,000 assailants shot by civilians defending themselves against crime each year. During the early 1990s when the survey was conducted there were approximately 300 deaths per year that were recorded as justifiable homicides committed by civilians using firearms.[38] There is no direct measure of criminals suffering nonfatal wounds as a result of being shot by civilians defending themselves, but the CDC's surveillance systems for tracking all deaths and a nationally representative sample of nonfatal injuries treated in hospitals indicates that there are roughly four to five persons suffering nonfatal gunshot wounds in assaults or incidents of undetermined intent for every fatal gunshot wound with the same external cause. That would suggest that about no more than 1,800 persons shot by civilians defending themselves against criminal attacks for the period that Kleck's survey projects 200,000 – a wounding rate more than 100 times higher than indicated in hospital surveillance systems.

### The Impact of Laws Expanding Civilians Ability to Carry Firearms in Public Places

In 2005 the National Research Council reviewed the then-current information with data through 2000 concerning the impact of state laws allowing citizens to carry concealed weapons.[39] Noting that the estimated effects of so-called right to carry (RTC) laws were highly sensitive to the particular choice of

---

[iv] The NCVS reported a total of 1,784,547 incidents in which respondents reported crime victimization by assailants wielding firearms and the CDC's vital records indicate a total of 58,450 homicides with firearms for an average of 368,599 victimizations per year over the five-year period.

explanatory variables, the report concluded that the evidence was too uncertain to determine the impact of RTC laws on crime.

A major obstacle to generating a valid estimate of this impact was that most of the studies looking at this question included data for the period from 1985 through the early 1990s when violent crime rose sharply in certain areas, such as California, New York, and the District of Columbia, owing principally to the introduction of crack cocaine. Since all three of those jurisdictions and a number of other states with the worst crack problems (e.g., Maryland, New Jersey) also did not adopt RTC laws, any panel data analysis that did not control for the criminogenic influence of crack would necessarily generate a biased estimate of the impact of RTC laws that would make them appear to be either less harmful or more beneficial than they actually were in influencing crime. This was a major problem for the original study of RTC laws by John Lott and David Mustard and subsequent analyses by Lott.[17,19,40] But this problem plagues every panel data analysis of RTC laws, except for those that started *after* the impact of crack had been full dissipated in the very late 1990s or early 2000s.[v]

A quick but admittedly crude way to address this problem is to present a difference-in-differences comparison between the 36 states that adopted RTC laws over the period 1977-2012 and the ten states that did not adopt these laws. By comparing the change in crime from a period before crack emerged to a year well after its impact had dissipated, one can eliminate the impact of crack on crime (although of course this simple comparison does not control for other influences on crime that differed over this period for the two sets of states). Figure 1 shows that the ten non-RTC states enjoyed a 38.1% drop in their violent crime rate from 1977 to 2012, while the 36 adopting states had almost no change in violent crime over this period (a decline of 2% over a 35-year period).

This simple evidence is suggestive that RTC laws tend to exacerbate violent crime (controlling for the influence of crack but not for other explanatory variables). Obviously, this chart would overstate the harm of RTC laws if, say, the non-adopting states had increased their per capita rates of incarceration or police personnel more than the adopting states, thereby suppressing violent crime through those mechanisms (which could then potentially explain the relatively better experience with violent crime over the 1977-2012 period in the non-adopting states). In fact, the opposite is true. The adopting states had considerably larger percentage increases relative to the non-adopting states over this time period in their rates of incarceration (262% vs. 221%) and police staffing (61% vs. 26%). The relatively better crime performance of non-RTC-adopting states in the raw comparison of in the figure below could be even greater if one were to control for the influence on violent crime of police and incarceration.

Of course, many factors in addition to police, incarceration, and crack influence crime and the challenge for researchers who seek to find the impact of a single factor such as RTC laws is to account for those factors that may also be correlated with RTC adoption in an appropriately specified statistical model. A number of panel data analyses conducted since the publication of the NRC report have tried to control for a host of explanatory variables. These models, however, have not adequately controlled for the criminogenic influence of crack (thereby making RTC laws look better) as well as other factors that are likely to bias the estimated effects of RTC laws.

---

[v] See the discussion of Zimmerman (2015) below.



*The Most Recent Rigorous Research Studies Find RTC Laws Linked to Increased Violence*

Donohue, Aneja, and Webber attempted to address these deficiencies with state panel data analyses that extended the NRC data by twelve years, during which time eleven additional states adopted RTC laws, to 1979-2012.  Two models were used to explore the relationship between RTC laws and crime. Model 1 estimated shifts in the level of crime after RTC adoption and model 2 estimated RTC laws' association with changes in crime trends or slopes. Both models indicated that violent and property crime both increased in response to the adoption of RTC laws.  Specifically, violent crime was 12.3% higher after adoption of RTC laws and violent crime increases about 1.1% more for each year RTC laws are in effect.

New and sophisticated techniques are being employed to assist researchers in finding the best set of control states that have violent crime patterns most similar to the states adopting new laws. Research by Durlauf, Navarro, and Rivers attempts to sort out the different specification choices between Aneja, Donohue, and Zhang, and Lott and Mustard, using a Bayesian model averaging approach.[41] Applying this technique to analyze the impact of RTC laws using county data from 1979-2000, the authors find that in their preferred spline (trend) model, RTC laws *elevate* violent crime rates by 6.5% in the three years after RTC adoption, with the effects growing over time. A recent report from the Brennan Center based on state-level data for 1979-2012 indicates that violent crime increased, on average, 10% following RTC law adoption. [42]  Zimmerman (2015) examined the impact of various crime prevention measures on crime using a state panel data set from 1999-2010.  The findings from this study revealed statistically significant increases in murder, robbery and assault associated with RTC law adoption. Estimating so-called synthetic controls for states that adopt new policies is a relatively new technique to evaluate the impact of state policy changes on violent crime and other outcomes. This

approach addresses some of the challenges posed by regression analyses with panel data from 50 very disparate states.  Webber, Donohue, and Aneja used this approach and found evidence that RTC laws increase violent crime by 12% to 18% over the ten years after adoption. These results are broadly consistent with the bulk of the panel data estimates cited above and are inconsistent with the outlier results generated using the Lott's model specifications.  One difference between the two analytic approaches is that the panel data estimates typically found that RTC laws were associated with increases in both violent and property crime, while the synthetic controls estimates only found evidence that RTC laws increase violent crime.

Some final comments should be made about the likely mechanisms between adoption of RTC laws and increased crime, which the statistical studies do not directly address.  First, the supporters of RTC laws frequently cite evidence that permit holders, as a group, are arrested for violent crimes at relatively low rates. [43] But the important policy question is whether having a CCW (and carrying a gun on one's person or in one's vehicle) affects CCW holders' risk of committing acts of violence and whether having more people carrying firearms will increase or decrease the incidents of violent crime and the lethality of those incidents. Ready access to a loaded firearm is likely to have a greater impact on risk of committing serious acts of violence among individuals with a history of violence, recklessness, substance abuse, or those prone to impulsivity or angry outbursts. Passing a background check when the principal criteria for denial are a convictions for either a felony crime or misdemeanor domestic battery, having a current domestic violence restraining order, or having been adjudicated mentally incompetent or a serious threat to self or others due to mental illness is no guarantee that a person is not prone to violence and can be trusted to carry a loaded concealed firearm in public places.[44,35] CCW holders do commit serious crimes with guns including murder and mass shootings.[31]

Second, RTC laws can increase crime in many ways even if the permit holders are not committing it.  The ability to carry a gun may embolden some permit holders to incite criminal responses to their provocative behavior, as some have alleged in the George Zimmerman case leading to the death of Trayvon Martin.  Criminals may also be more likely to carry weapons in response to RTC adoption and more likely to be aggressive towards their victims if they fear armed opposition.  Guns carried outside the home because of RTC laws are potentially more likely to be lost or stolen, especially when left in motor vehicles, which can expand criminals' access to guns.  Finally, the presence of more guns can complicate the job of police and simply take up more police time as they process applications and check for permit validity when they confront armed citizens.  The recent July 2016 shooting by police of concealed carry permit holder Philando Castile in Minnesota underscores how the introduction of a gun by a law-abiding citizen can end in tragedy.

### Why the College Campus Environment is Ill-Suited for the Civilian Gun Possession

The broader research literature on civilian gun use and policies that allow civilians to carry concealed firearms has not examined the experience or implications of policies that allow students, staff, faculty, or visitors to carry firearms onto college campuses.  Relevant to this discussion is the frequency and nature of events where civilians might use firearms at their disposal, the capacity and proclivities of adolescents and young adults of typical college age to make prudent decisions about when or how to use firearms, the onset of severe mental illness during young adulthood, the frequency of binge drinking of alcoholic beverages among college students and the violence that stems from that drinking. In addition, suicidal ideation and behavior is common during late adolescence and early adulthood and increasing access to firearms through policies that allow guns onto college campuses

could increase risk of suicide among college students.  Due to a variety of developmental, psychological, and sociological reasons, age-specific homicide offending rates increase dramatically during adolescence, peaking at age nineteen, and are highest during the age span of most college students (18-24 years).  Suicide attempts that lead to hospital treatment or death also rise dramatically and peak during the years that most youth enter college.

A recent study identified 85 incidents of shootings or undesirable discharges of firearms on college campuses in the U.S. from January 2013 through June 2016.  Only two of these 85 incidents (2.4%) involved a shooter on a rampage.  The most common incidents were interpersonal disputes that escalated into gun violence (45%), premeditated acts of violence against an individual (12%), suicides or murder/suicides (12%), and unintentional shootings or discharges (9%).[45]



Rate of homicide offending by age of suspect, 2014.

Homicide data obtained from the FBI's, Uniform Crime Reporting Program, Supplemental Homicide Reports, 2014. Data on age-specific population estimates were obtained from the Centers for Disease Control and Prevention and generated by US Census Bureau. https://www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm



Data obtained from the Centers for Disease Control and Prevention's Web-based Injury Statistics Query and Reporting System (WISQARS), Fatal and Nonfatal Injury Reports, 2014. https://www.cdc.gov/injury/wisqars/

**Brain and Cognitive Development in Adolescence and Emerging Adulthood**

Adolescence and emerging adulthood is a time of tremendous change in the biological systems that support decision-making, emotional and behavioral regulation, and motivation. As has been widely documented in the lay press and in the scientific literature, the brain's higher association areas (e.g., prefrontal cortex or PFC), among other areas, continue to change well into the third decade of life. [46-48] Areas of the PFC are part of the circuitry that supports self-control, including impulse control and inhibition, judgment, and long-range planning. [47,49]  These skills are essential for safe firearm storage and use, and for appreciating and avoiding the circumstances in which firearm use is likely to lead to tragedy.

Risky decision-making in adolescence/early adulthood is due, in part, to changes in both frontal/limbic balance in the developing brain and changes in the connections between the PFC and limbic subcortical structures that support emotional and behavioral regulation.[49] While the PFC and other higher order association areas mature relatively late, limbic areas are dense with hormone receptors that are awakened during puberty. [50] Limbic areas play a key role in the circuitry that supports emotions, reward systems, and drives. When limbic influences predominate, drives toward sex aggression are heightened, and social relationships become particularly important. [51] Similarly, dopamine receptors proliferate in the striatum--part of the brain's motivational circuitry--before they proliferate in the PFC, which may also help explain why adolescent behavior is biased toward motivation rather than inhibition. [49]

Compared with adults and younger children, adolescent decision-makers are particularly sensitive to social and emotional cues in the environment, and are more sensitive to stress, both psychologically and biophysiologically. [52-55] A number of studies demonstrate that adolescents' self-control is vulnerable in the face of potential rewards (e.g., peer approval and acceptance). [56,57]  Similarly, in laboratory studies, adolescents have been shown to demonstrate poorer emotional regulation in the context of threat than other age groups. For example, in a self-control task, Dreyfuss et al. found that compared to their older and younger peers, adolescents, particularly males, were more likely to react

impulsively to threat cues (compared to neutral cues); a finding that was mediated by differences in limbic activation in brain areas that support emotion regulation. [58]

**In summary, typical developmental processes in adolescence are associated with more risk-taking, and poorer self-control in the transition to adulthood. Guns may be called on in the very situations in which adolescents are most developmentally vulnerable: in the context of high emotional arousal, situations that require rapid, complex social information processing, those that involve reinforcing or establishing peer relationships (i.e., showing off), or in conditions of perceived threat.**

**Onset of Mental Illness, Youth Suicide and Access to Firearms**

College students are vulnerable to a range of mental health issues.  The stress associated with the life transitions inherent in college attendance – leaving home, exploring new social identities, developing new peer groups, managing challenging coursework and extracurricular activities – place students at risk of conditions like depression and anxiety.[59] The majority of mental disorders have their onset by age 24.[60] Studies have demonstrated high prevalence of clinical depression and anxiety among college students: one study found that 14% of undergraduate students and 11% of graduate students at a large public University with a demographic profile similar to the overall U.S. student population screened positive for depression, and 4% of undergraduates and 5% of graduates met criteria for anxiety.[61,62] Despite the high burden of mental illness among college students, many go untreated. While mental illness treatment rates vary across campuses, one study of students on 26 campuses across the U.S. found that on average, only 36% of students who screened positive for mental illness had received treatment in the past year.[63]

Of particular concern in the context of proposals to allow students to carry firearms on campus is the risk of suicide associated with mental illnesses, especially depression, among this group.  In a national survey of undergraduates conducted in 2015 about events within the past 12 months, 8.9% reported "seriously considering attempting suicide" and 1.4% had attempted suicide.[64] A study of students from 645 U.S. college campuses found increased rates of suicide among college students in 2008-2009 compared to 2004-2005: the suicide rate increased from 6.5 to 7.7 per 100,000 students.[65] **Importantly, a firearm was the leading method for suicide among males, accounting for nearly a third (31%) of all suicides among male college students.**[65]  For females, firearms were the third leading cause of suicide (10% of all suicides in this group), behind hanging (29%) and poison (16%).[65]  This gender differential in firearm suicide on college campuses mirrors the differential in the overall U.S. population.[66] **A large body of literature clearly shows that firearm access is associated with increased rates of suicide, suggesting that increased access to firearms on college campuses could significantly increase suicide in this vulnerable group.**[67,68]

The combination of challenges with impulse control, emotional regulation, and onset of mental illness contribute to high rates of suicide and suicide attempts among adolescents and young adults. In 2014, suicide was the second leading cause of death in the U.S. among college age youth 17-24 years old.[69]  Between 1999 and 2014, the suicide rate in this age group increased 12% from 11.3 to 12.7 per 100,000.[69] Firearms represent an extremely lethal means of intentional self-harm; approximately 90% of suicide attempts with a firearm resulted in a fatality compared to 3% for poisoning attempts.[70] In 2014 among males age 17-24 who died by suicide, 49% used a firearm.[69]

19

Some suicide risk factors differ among those under age 25 compared to older populations. Emotional control, impulsivity, and decision making continue to develop into the mid-20s, which can put youth at higher risk for suicide.[71] In addition to being more impulsive, young individuals tend to be more vulnerable to a contagion effect after exposure to suicide within their community.[72] Suicide risk is often highest in the early stages of the onset of major psychiatric conditions and these symptoms often first develop in childhood or early adolescence.[60,73] The risk of suicide among youth also increases with age; 2.6 per 100,000 among boys age 10-14 compared to 22.9 per 100,000 among young men age 20-24.[69]

Suicide attempts (whether fatal or nonfatal) may occur in the context of an underlying mental health condition such as depression and/or alcohol or drug misuse.[74,75] Many suicides also have an impulsive quality and are often precipitated by an acute stressor (e.g. loss of a relationship, trouble with the law or school, humiliation, job loss).[67] The majority of those who survive an attempt do not go on to die by suicide; a suicide prevented is a life saved.

The lethality of a given means or method of suicide attempt accounts for a substantial portion of the variation observed in suicide mortality and points to the unrealized potential for means restrictions strategies to reduce suicide. The method used for a suicide attempt depends on availability; there is a strong association between the availability of firearms in households and death by suicide. Having ready access to firearms is linked with suicide not only for the gun owner but for all members of the household, especially for children and adolescents.[76-78]

Studies of the relationship between the presence of guns in the home and risk for suicide among younger populations have found that the risk of suicide is two- to five-fold higher for all household members in homes with firearms.[76,77,79,80] These studies have reported limited evidence of substitution of methods; restricting access to firearms did not lead to increased use of other methods of suicide attempt. An analysis of changes to Connecticut and Missouri's permit to purchase handgun purchaser licensing laws also indicate that these laws – which both screen out some individuals at high risk of suicide and reduce guns purchased in response to a suicidal impulse – play a role in reducing firearm suicide risk.[81] Reducing the availability of highly lethal and commonly used suicide methods has been associated with declines in suicide rates of as much as 30%–50% in other countries and can be especially influential in younger populations.[82]

Safe gun storage practices (e.g., using a gun safe or storing ammunition separate from an unloaded gun), which can be required by state law, are associated with a decreased risk for adolescent suicide.[78 83] This association is especially strong in the 15-19 year old age group, which implies that restricting access to a firearm is likely to have the biggest impact during the age characterized by higher impulsivity.[84] The potential for unsafe storage of firearms, if firearms were permitted in college dorms, is a concern and could elevate suicide risks to anyone who has access to a firearm owner's room.

**Alcohol Abuse and Violence on College Campuses**

A large international literature has established a close association between alcohol use and violence.[85] Culture can structure and determine the strength of this relationship through such variables as frequency of drinking to intoxication or consumption of high-alcohol beverages, and expectations about drinking behavior or the situational appropriateness of aggression.[86] College drinking cultures possess all of these attributes. U.S. college students drink frequently and at high levels: nearly 60% of 18-22 year-old college students reported drinking the past month; 37.9% reported binge drinking (defined as five or more drinks within two hours).[87] Among young men in particular, research has found

that expectations about the acceptability of violent action while intoxicated may precede actual acts of violence while drinking.[88] Among college students, there appears to be a normative belief that abusive behavior is more common and less abusive when alcohol is involved for psychological and moderately severe physically abusive behaviors.[89]

The interaction between college drinking cultures and violent behavior helps to explain the high prevalence of alcohol-related violence in college populations. In the general population, CDC estimates that every year, there are 7,756 homicides attributable to alcohol use; 1,269 of these happen to persons younger than 21.[90] Hingson et al. have estimated that 600,000 college students annually are assaulted by another student who has been drinking.[91] The Bureau of Justice Statistics reported that alcohol was involved in 41% of on-campus violence and 37% of off-campus violence for students who lived on campus, and 18% of on-campus violence and 31% of off-campus violence for students living off campus.[92]

Sexual violence is another significant risk when alcohol is in the mix. On college campuses, 88%of male college rapists who used force to commit the rape also used alcohol or drugs, and college males who rape incapacitated women are more likely to drink right before the rape.[93] Alcohol use also increases the likelihood of assault occurring for women. A meta-analysis and systematic review have concluded there is a clear positive association between alcohol consumption and physical and sexual violence for women.  Longitudinal data suggests this relationship is bidirectional, meaning that women who are victims of interpersonal violence tend to drink more and women who drink more are more likely to be victims of interpersonal violence.[94]

One factor that can moderate the relationship between alcohol use and violence on campus is the density of alcohol outlets around a college campus. According to one study of 32 colleges, on- and off-premise outlet densities were associated with campus rape-offense rates. Student drinking level was associated with both campus rape and assault rates, and mediated the effects of on- and off-campus alcohol outlet density. Campuses with greater densities of alcohol outlets had higher drinking levels, which in turn explained higher rates of violence on those campuses.[95]

Thus both culturally and ecologically, college campuses can present a "lit fire" in which interpersonal violence is prevalent (according to the Bureau of Justice Statistics, one in 10 college students has experienced a violent crime[92]), and worsened by the addition of alcohol use. To this potentially incendiary situation should be added data on the relationship between gun ownership on college campuses and alcohol use. Two studies from the 1990s looked at this relationship. **One found that students with guns were more likely to be binge drinkers and to need to start the day with alcohol;[96] the other revealed that those who self-reported binge drinking or engaging in risky or aggressive behavior after drinking were not only more likely to have guns at college but also more likely to be threatened by a gun while at college.[97]**

**Implications of Guns on Campus for Campus Security and Law Enforcement**

For a police officer, the decision to apply deadly force is taken seriously and discussed in training throughout his or her career.[98]  The decision in a crisis, such as an active shooter event, occurs in an atmosphere of chaos and panic, and is often over in a matter of minutes, if not seconds.[99]  Like police officers, students or faculty attempting to use a gun to end an active shooter situation would be expected to assess the situation, ensure a clear line of fire, shoot well, minimize loss, and bring the

situation to closure. While an entire active shooter situation may last longer, the actual shooting and opportunity to stop the suspect may be momentary.[24]

Police officers routinely experience high anxiety/high threat situations – including home invasions, intrusion alarms, armed robberies, suspicious circumstances, traffic stops, and prowlers – and are prepared to take whatever action is necessary to safely end these incidents.  Despite their training and frequent exposure to high-risk and life-threatening events, evidence shows that police officers do not shoot accurately in a crisis encounter; though officers who participate in simulation or other high-stress training tend to shoot somewhat more accurately in a crisis than those who do not.[24,100-103] The idea that students or faculty could shoot as well as trained police officers in an active shooter situation is highly questionable given what we know about police performance in high stress situations. Additionally, consideration must be given to the possibility of police officers not being able to differentiate a student or faculty member with a gun from the perpetrator during the response to an active shooter situation. There are numerous examples of this happening, creating confusion and, in some instances, resulting in civilians being unintentionally shot by law enforcement.

Much of the discussion and debate about allowing the carrying of guns on campus revolves around this concern over active shooters; however, the issue is more extensive.[104] While active shooter situations are rare, colleges and universities have responded well to this threat by establishing policies and plans, conducting training and drills, implementing threat assessment teams, and embracing the national Incident Command System.[105-107] There are other situations that occur far more frequently on college campuses, such as disorderly conduct, abuse of alcohol and dangerous substances, intimate partner violence, suicide threat, faculty-student disputes, fights, and trespass. These types of incidents deserve more attention because response to these incidents will change based on the potential increase in the presence of guns due to laws allowing the right to carry on campus.

While there is no evidence to aid in predicting how many students will carry guns on campus if bans are lifted, campus police and security officers must assume that weapons may be present in many situations, especially those involving groups and crowds.[108]  Most campus officers routinely respond to situations in which information is sparse.  They respond to calls such as "suspicious person," "suspicious circumstance," "911- hang up," and "alarm sounding" often with no additional information.  If the presence of guns must be assumed, the level of seriousness, tactics used, and necessary precautions taken in response to such calls are elevated.  Tactical changes may include greater reliance on back up officers, assessing and questioning individuals about the presence of weapons, scanning the environment for protective cover, and moving quickly to resolve aggression and threat without limiting the time spent to de-escalate.  Local and state police who are called to assist in campus situations will implement similar precautions and changes in approach. The perception of increased likelihood of situations in which there may be a gun present could simultaneously increase the risk of shooting, intentional or otherwise, by police or campus security while responding to calls.

**Conclusion**

The best available research contradicts many claims and assumptions that underlie policies to allow civilians to bring firearms onto college campuses.  Gun ownership and gun carrying in many states is common, but successful and warranted civilian defensive gun use is relatively rare.  Concealed carry permit holders have passed criminal background checks and, as a group, commit crimes at a relatively low rate.  But, in states with the most lax standards for legal gun ownership, 60%of individuals incarcerated for committing crimes with guns were legal gun owners when they committed their crimes.

Some who are legally allowed to own and carry firearms in public places have histories of violence and recklessness. Many states relaxed restrictions on concealed and open carrying of firearms based on claims that such policies reduced violent crime. But the best available evaluations of these policies indicate that these right-to-carry laws increase violence.

Some have blamed rampage shootings, including those on college campuses, on "gun free zones," and they have claimed that the best deterrent to such shootings is to remove virtually all restrictions on civilian gun carrying. Indeed, much of the impetus for policies to allow guns on college campuses has been to reduce mass shootings or the number of casualties from those shootings by enabling armed civilians to intervene.  Yet the number of people shot in mass shootings in the U.S. has increased dramatically during the past decade – a period that coincides with the removal of restrictions on public gun carrying and a push to make gun carrying in public more normative.  New research on fatal mass shootings demonstrates that:  1) right-to-carry laws do not decrease mass shootings or the average number of people shot in those incidents; 2) the overwhelming majority of fatal mass shootings occur in places where guns are allowed; and 3) when rampage shootings do occur, very rarely are they stopped by gun-wielding civilians.

While the net effect of right-to-carry gun policies have negatively impacted public safety broadly, their effects are likely to be far more deleterious when extended to college campuses. Risks for violence, suicide attempts, alcohol abuse, and risky behavior are greatly elevated among college-age youth and in the campus environment.  The presence of firearms greatly increases the risk of lethal and near-lethal outcomes from these behaviors and in this context. Even if allowing more guns on college campuses did have some protective effect against rare mass shootings on campuses – and available evidence suggests that this is not the case – the net effect on the safety of college students, faculty, and staff is likely to be more deaths, more nonfatal gunshot wounds, and more threats with a firearm that are traumatizing to victims.

**Author Bios**

**Daniel W. Webster, ScD, MPH**

Daniel W. Webster, ScD, MPH, is a Professor of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health, where he serves as Director of the Center for Gun Policy and Research and Deputy Director of Research for the Center for the Prevention of Youth Violence. He is one of the nation's leading researchers studying gun policy and has published numerous articles on the prevention of gun violence, firearm policy, youth gun acquisition and carrying, intimate partner violence, and the prevention of youth violence. He is co-editor and contributor to *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* (Johns Hopkins University Press, 2013)*.* Dr. Webster helps lead the Johns Hopkins-Baltimore Collaborative for Violence Reduction and conducting studies evaluating the effects of various efforts to reduce violence, including state gun policies, policing strategies focused on deterring gun violence, drug law enforcement practices on gun violence, and a community gun violence prevention initiative. He is also leading a study of Baltimore's underground gun market. Dr. Webster teaches courses in violence prevention at Johns Hopkins Bloomberg School of Public Health.  He has advised the White House, Congressional leaders, state and local officials on policies to reduce gun violence. In 2015, Dr. Webster received the American Public Health Association's David Rall Award for Science-Based Advocacy.

**John J. Donohue, III, PhD, JD**

John J. Donohue III is the C. Wendell and Edith M. Carlsmith professor of law at Stanford University. He is well known for using empirical analysis to determine the impact of law and public policy in a wide range of areas, including examinations of the impact on crime of the death penalty, incarceration, guns, and the legalization of abortion. Other work by Donohue has explored the benefits from stronger efforts to fight racial discrimination in employment and in school funding, and examined the issues involved in the regulation of illegal substances. Before rejoining the Stanford Law School faculty in 2010, Professor Donohue was the Leighton Homer Surbeck professor of law at Yale Law School. Earlier in his career, he was a law professor at Northwestern University as well as a research fellow with the American Bar Association. Additionally, he clerked with Chief Justice T. Emmet Clarie, of the U.S. District Court of Hartford, Connecticut. He is a member of the American Academy of Arts and Sciences, the former empirical editor of the American Law and Economics Review, and the former president of the American Law and Economics Association. He received his B.A. from Hamilton College, his J.D. from Harvard University, and his Ph.D. in economics from Yale University.

**Louis Klarevas, PhD**

Dr. Louis Klarevas is Associate Lecturer in the Department of Global Affairs at the University of Massachusetts – Boston. He is the author of *Rampage Nation: Securing America from Mass Shootings* (Prometheus Books, forthcoming in 2016). A former Senior Fulbright Scholar in Security Studies, he has also taught at American University, George Washington University, the City University of New York, and New York University. During the early phases of the Iraq War, he served as the Defense Analysis Research Fellow at the London School of Economics. Before joining the ranks of academia, he served as a research associate at the United States Institute of Peace. His articles and commentaries have appeared in a variety of prominent news outlets, including The Atlantic, Forbes, The New Republic, The

Huffington Post, The New York Daily News, New York Newsday, The Washington Post, The Washington Times, and Vice. He has also appeared as an expert on numerous news networks, including ABC, BBC, CBS, CNN, and NPR. Dr. Klarevas holds a B.A. from the University of Pennsylvania and a Ph.D. in International Relations from the School of International Service at American University.

**Cassandra K. Crifasi, PhD, MPH**

Dr. Crifasi is an Assistant Professor in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health and a core faculty member in the Center for Gun Policy and Research and the Center for Injury Research and Policy. Her research focuses on injury epidemiology and prevention, firearm policy, and the development, implementation and evaluation of policies, practices, and procedures on public safety and first responders. She teaches courses in research and evaluation methods for health policy and currently serves as the Deputy Director of the Johns Hopkins-Baltimore Collaborative for Violence reduction. Dr. Crifasi's recent research examined the affect changing state policies have on the assault and homicide of law enforcement officers in the United States. She received her PhD in Health Policy and Management in 2014 from the Johns Hopkins Bloomberg School of Public Health and an MPH in Environmental and Occupational Health from the Drexel University School of Public Health in 2010.

**Jon S. Vernick, JD, MPH**

Jon S. Vernick, JD, MPH, is an Associate Professor of Health Policy and Management at The Johns Hopkins Bloomberg School of Public Health and Co-Director of the Johns Hopkins Center for Gun Policy and Research. Jon Vernick is the primary instructor for courses on Issues in Injury and Violence Prevention, and Public Health and the Law. He is also Co-Director of the MPH/JD Program at Johns Hopkins. Jon Vernick's research has concentrated on ways in which the law and legal interventions can improve the public's health. He is particularly interested in epidemiologic, policy, legal, and ethical issues associated with the prevention of firearm and other injuries. He has also studied legal aspects of motor vehicle safety, tobacco control, public health preparedness, and obesity prevention, having published more than 75 scholarly articles and reports on these and other topics. Prof. Vernick is committed to translating research findings into policy change, regularly working with legislators, media, courts, and advocates to provide information about effective policies. Jon Vernick earned his BA from the Johns Hopkins University, a JD with honors from the George Washington University, and an MPH from the Johns Hopkins Bloomberg School of Public Health.

**David Jernigan, PhD**

David Jernigan, PhD, directs the Center on Alcohol Marketing and Youth (CAMY) and is an Associate Professor in the Department of Health, Behavior and Society at the Johns Hopkins Bloomberg School of Public Health, where he teaches courses on media advocacy, alcohol policy, and campaigning and organizing for public health. He is also co-director of the Maryland Collaborative to Reduce College Drinking and Related Problems, a statewide effort involving 14 institutions of higher education committed to reducing alcohol-related problems on campus and in the surrounding communities. Dr. Jernigan serves on the boards of Behavioral Health System Baltimore and the Global Alcohol Policy

Alliance, and on advisory boards for Cancer Research UK and the UK Center for Tobacco and Alcohol Studies. He has written more than 90 peer-reviewed journal articles, co-authored three books and monographs, and contributed chapters to six books on alcohol issues. He has served as an advisor to the World Bank and the World Health Organization (WHO) and was the principal author of WHO's first Global Status Report on Alcohol and Global Status Report on Alcohol and Youth, and co-author of Alcohol in the Developing World: A Public Health Perspective and Media Advocacy and Public Health: Power for Prevention. He has also trained thousands of students and public health advocates in media advocacy, the strategic use of the mass media to influence public health policy.

**Holly C. Wilcox, PhD**

Holly C. Wilcox, Ph.D is an Associate Professor in the Johns Hopkins School of Medicine Department of Psychiatry and the Bloomberg School of Public Health Department of Mental Health. Dr. Wilcox has spent the past 25 years actively engaged in suicide prevention in schools, universities, emergency departments, and with the United States Marine Corps. Dr. Wilcox's most significant contributions have been in three areas: 1) large population-based, prospective cohort studies of youth suicidal behaviors; 2) the evaluation of impact of community-based universal prevention programs targeting youth suicidal behaviors; 3) the identification of biomarkers to inform suicide prevention. Dr. Wilcox led a national project to identify research needs for data linkage and analyses of linked data to serve as the foundation for a National Institutes of Health Pathway to Prevention workshop on suicide prevention. She is the co-chair of the Suicide Prevention Task Group of the National Network of Depression Centers, a non-profit 501(c)(3) network of 23 leading academic medical centers. She has offered since 2005 a course at Johns Hopkins entitled *Suicide as a Public Health Problem*.

**Sara B. Johnson, PhD, MPH**

Sara Johnson is Associate Professor of Pediatrics at the Johns Hopkins School of Medicine, with a joint appointment in the Johns Hopkins Bloomberg School of Public Health's Department of Population, Family, and Reproductive Health. She also serves the Director of the Rales Center for the Integration of Health and Education, which is focused on reducing health and educational disparities in children and adolescents using school-based health care and wellness programs. Her research is broadly focused on two areas: 1) how early adversity such as poverty and trauma impacts brain, cognitive, and neuroendocrine system development from the prenatal period to adolescence; and 2) translating developmental science to inform evidence-based health and social policies.

**Sheldon Greenberg, PhD**

Sheldon Greenberg, Ph.D., is Professor of Management in School of Education, Division of Public Safety Leadership. He served as Associate Dean for more than a decade, during which time he led the Police Executive Leadership Program and established University partnerships with the U.S. Secret Service and U.S. Immigration and Customs Enforcement (ICE). His primary research interests are police patrol, the relationship between police and public health, police organizational structure, highway safety, campus and school safety, the role of the police in community development, and community organizing. Prior to

joining Johns Hopkins, Dr. Greenberg served as Associate Director of the Police Executive Research Forum, the nation's largest law enforcement think tank and center for research.  He began his career with the Howard County, MD, Police Department, where he served as a patrol officer, supervisor, and director of the police academy, director of research and planning, and commander of the administrative services bureau.  He worked with the U.S. Marshals Service, U.S. Border Patrol, Department of Justice, and Department of State, as well as with police agencies in Cyprus, Jordan, Kenya, Panama, Hungary, Pakistan, and the Czech Republic.  Dr. Greenberg served on national commissions and task forces on violence in schools, race-based profiling, and police response to people who have mental illness, police recruiting, highway safety, military deployment, and homeland defense.  He serves as a member of the Federal Law Enforcement Training Accreditation Board.


**Emma E. McGinty, PhD**

Dr. McGinty is an Assistant Professor in the Department of Health Policy and Management at JHSPH, and a core faculty member of both the Center for Gun Policy and Research and the Center for Mental Health and Addiction Policy Research. Her research focuses on how public policies affect mental health, substance use, and gun violence. Dr. McGinty's recent research examined the effects of news media coverage of mass shootings by persons with mental illness on Americans' support for gun policies and attitudes toward individuals with serious mental illnesses. At the Center for Gun Policy and Research, Dr. McGinty uses public opinion surveys and message framing experiments to assess public support for gun violence prevention policies and collaborates on studies of the effects of youth-focused firearm restrictions and policies designed to prevent the diversion of guns to criminals.  She received her PhD in Health Policy and Management in 2013 from the JHSPH where she was a Sommer Scholar and received an MS in Health and Behavior Studies from Columbia University in 2006.

### References

1. 18 U.S.C. § 921 et seq.
2. 18 U.S.C. § 927.
3. 18 U.S.C. § 922 (q).
4. 18 U.S.C. § 921 (a) (26).
5. Law Center to Prevent Gun Violence. Local Authority to Regulate Firearms: Policy Summary. 2016; http://smartgunlaws.org/local-authority-to-regulate-firearms-policy-summary/. Accessed June 28, 2016.
6. National Conference of State Legislatures. Guns on Campus Overview. 2016; http://www.ncsl.org/research/education/guns-on-campus-overview.aspx. Accessed June 28, 2016.
7. Max W, Rice DP, Finkelstein E, Bardwell RA, Leadbetter S. The economic toll of intimate partner violence against women in the United States. *Violence Vict.* 2004;19(3):259-272.
8. Regents of the University of Colorado v. Students for Concealed Carry on Campus, 271 P.2d 496 at 502 (Colorado 2012).
9. Oregon Firearms Educational Foundation v. Board or Higher Education and Oregon University System, 245 Or. App. 713 (Court of Appeals of Oregon 2011).
10. University of Utah v. Shurtleff, 144 P.3d 1109 (Utah 2006).
11. Florida Carry, Inc. v. University of Florida 190 So. 3d (District Court of Appeal of Florida 2015).
12. Florida Carry, Inc. v. University of North Florida 133 So.3d 966 (District Court of Appeal of Florida 2013).
13. DiGiacinto v. The Rector and Visitors of the George Mason University 704 S.E. 2d 365 (Virginia 2011).
14. District of Columbia v. Heller 554 U.S. 570 (2008).
15. Vernick JS, Rutkow L, Webster DW, Teret SP. Changing the constitutional landscape for firearms: the US Supreme Court's recent Second Amendment decisions. *American journal of public health.* 2011;101(11):2021-2026.
16. Vernick JS. Carrying guns in public: legal and public health implications. *The Journal of Law, Medicine & Ethics.* 2013;41(s1):84-87.
17. Lott Jr JR. More guns, less crime. *University of Chicago Press Economics Books.* 2010.
18. Roosevelt H. 12 Times Mass Shootings Were Stopped by Good Guys with Guns 2015; http://controversialtimes.com/issues/constitutional-rights/12-times-mass-shootings-were-stopped-by-good-guys-with-guns.
19. Lott J. More Guns, Less Crime. Vol 340: Mass Medical Soc; 1999:1599-1600.
20. Duwe G, Kovandzic T, Moody CE. The impact of right-to-carry concealed firearm laws on mass public shootings. *Homicide Studies.* 2002;6(4):271-296.
21. Klarevas L. *RAMPAGE NATION Securing America from Mass Shootings.* Prometheus Books; 2016.
22. Reason Aw. 2016; http://www.armedwithreason.com/. Accessed June 28, 2016.
23. Everytown for Gun Safety. *Analysis of Mass Shootings.* New York, NY, 2015.
24. White MD. Hitting the target (or not): Comparing characteristics of fatal, injurious, and noninjurious police shootings. *Police quarterly.* 2006;9(3):303-330.
25. Thompson A, Price JH, Mrdjenovich AJ, Khubchandani J. Reducing firearm-related violence on college campuses—Police chiefs' perceptions and practices. *Journal of American College Health.* 2009;58(3):247-254.
26. Morrison GB. Police department and instructor perspectives on pre-service firearm and deadly force training. *Policing: An International Journal of Police Strategies & Management.* 2006;29(2):226-245.

27.    Kadison R, DiGeronimo TF. *College of the overwhelmed: The campus mental health crisis and what to do about it.* Jossey-Bass; 2004.

28.    Compiling Cases Where Concealed Handgun Permit Holders Have Stopped Mass Public Shootings. 2016; http://crimeresearch.org/2015/04/uber-driver-in-chicago-stops-mass-public-shooting/. Accessed July 12, 2016.

29.    Volokh E. Do Citizens (Not Police Officers) with Guns Ever Stop Mass Shootings? *Washington Post,* 2015.

30.    Blair JP, Schweit K. A study of active shooter incidents, 2000-2013. Texas State University and Federal Bureau of Investigation, US Department of Justice. *Washington DC: US Department of Justice.* 2014.

31.    Violence Policy Center. *Mass Shootings Involving Concealed Carry Killers.* Washington, DC2016.

32.    Hemenway D, Solnick SJ. The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007–2011. *Preventive medicine.* 2015;79:22-27.

33.    Kleck G, DeLone MA. Victim resistance and offender weapon effects in robbery. *Journal of Quantitative Criminology.* 1993;9(1):55-81.

34.    Schnebly SM. An examination of the impact of victim, offender, and situational attributes on the deterrent effect of defensive gun use: A research note. *Justice Quarterly.* 2002;19(2):377-398.

35.    Vittes KA, Vernick JS, Webster DW. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership. *Injury Prevention.* 2013;19(1):26-31.

36.    Hemenway D, Azrael D, Miller M. Gun use in the United States: results from two national surveys. *Injury Prevention.* 2000;6(4):263-267.

37.    Kleck G, Gertz M. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J Crim L & Criminology.* 1995;86:150.

38.    Crime in the United States, 1995. In: Justice UDo, ed. Washington, DC1996.

39.    Wellford CF, Pepper JV, Petrie CV. Firearms and violence: A critical review. Committee to Improve Research Information and Data on Firearms. Washington, DC: The National Academies Press; 2005.

40.    Lott J, John R, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. *The Journal of Legal Studies.* 1997;26(1):1-68.

41.    Durlauf SN, Navarro S, Rivers DA. *Model Uncertainty and the Effect of Shall-issue Right-to-carry Laws on Crime.* National Bureau of Economic Research;2015.

42.    Roeder OK, Eisen L-B, Bowling J, Stiglitz JE, Chettiar IM. What caused the crime decline? *Columbia Business School Research Paper.* 2015(15-28).

43.    Phillips CD, Nwaiwu O, McMaughan Moudouni DK, Edwards R, Lin S-h. When Concealed Handgun Licensees Break Bad: Criminal Convictions of Concealed Handgun Licensees in Texas, 2001–2009. *American journal of public health.* 2013;103(1):86-91.

44.    Swanson JW, Sampson NA, Petukhova MV, et al. Guns, Impulsive Angry Behavior, and Mental Disorders: Results from the National Comorbidity Survey Replication (NCS-R). *Behavioral sciences & the law.* 2015;33(2-3):199-212.

45.    Everytown for Gun Safety. *Analysis of School Shootings - Appendix: School Shootings in America 2013-2015.* 2016.

46.    Giedd J, Blumenthal J, Jeffries N, et al. Brain development during childhood and adolescence: a longitudinal MRI study. *Nat Neurosci.* 1999;2(10):861-863.

47.    Giedd JN. The teen brain: insights from neuroimaging. *The Journal of adolescent health : official publication of the Society for Adolescent Medicine.* 2008;42(4):335-343.

48.    Johnson SB, Blum RW, Giedd JN. Adolescent maturity and the brain: the promise and pitfalls of neuroscience research in adolescent health policy. *J Adolesc Health.* 2009;45(3):216-221.

49.     Casey BJ. Beyond simple models of self-control to circuit-based accounts of adolescent behavior. *Annual review of psychology.* 2015;66:295-319.

50.     Johnson S, Giedd J. Normal brain development and child/adolescent policy. In: N. Levy JC, M Farah (Eds). ed. *Springer Handbook of Neuroethics.* New York: Springer; 2015.

51.     Sisk CL, Zehr JL. Pubertal hormones organize the adolescent brain and behavior. *Frontiers in Neuroendocrinology.* 2005;26(3–4):163-174.

52.     Casey BJ, Getz S, Galvan A. The adolescent brain. *Dev Rev.* 2008;28(1):62-77.

53.     Somerville L, Jones R, Casey B. A time of change: Behavioral and neural correlates of adolescent sensitivity to appetitive and aversive environmental cues. *Brain Cogn.* 2010;72(1):124-133.

54.     Lupien S, McEwen B, Gunnar M, Heim C. Effects of stress throughout the lifespan on the brain, behaviour and cognition. *Nat Rev Neurosci.* 2009;10(6):434-445.

55.     Dreyfuss M, Caudle K, Drysdale AT, et al. Teens Impulsively React rather than Retreat from Threat. *Developmental Neuroscience.* 2014;36(3-4):220-227.

56.     Chein J, Albert D, O'Brien L, Uckert K, Steinberg L. Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry. *Developmental science.* 2011;14(2):F1-10.

57.     Sebastian C, Viding E, Williams KD, Blakemore S-J. Social brain development and the affective consequences of ostracism in adolescence. *Brain and Cognition.* 2010;72(1):134-145.

58.     Dreyfuss M, Caudle K, Drysdale AT, et al. Teens Impulsively React rather than Retreat from Threat. *Developmental Neuroscience.* 2014;36(3-4):220-227.

59.     Hunt J, Eisenberg D. Mental health problems and help-seeking behavior among college students. *Journal of Adolescent Health.* 2010;46(1):3-10.

60.     Kessler RC, Berglund P, Demler O, Jin R, Merikangas KR, Walters EE. Lifetime prevalence and age-of-onset distributions of DSM-IV disorders in the National Comorbidity Survey Replication. *Archives of general psychiatry.* 2005;62(6):593-602.

61.     Kawa I, Carter JD, Joyce PR, et al. Gender differences in bipolar disorder: age of onset, course, comorbidity, and symptom presentation. *Bipolar disorders.* 2005;7(2):119-125.

62.     Eisenberg D, Gollust SE, Golberstein E, Hefner JL. Prevalence and correlates of depression, anxiety, and suicidality among university students. *American Journal of Orthopsychiatry.* 2007;77(4):534-542.

63.     Eisenberg D, Hunt J, Speer N, Zivin K. Mental health service utilization among college students in the United States. *The Journal of nervous and mental disease.* 2011;199(5):301-308.

64.     American College Health Association. *National College Health Assessment: Spring 2015 Reference Group Executive Summary.* American College Health Association;2015.

65.     Schwartz AJ. Rate, Relative Risk, and Method of Suicide by Students at 4-Year Colleges and Universities in the United States, 2004–2005 through 2008–2009. *Suicide and life-threatening behavior.* 2011;41(4):353-371.

66.     Romero MP, Wintemute GJ. The epidemiology of firearm suicide in the United States. *Journal of Urban Health.* 2002;79(1):39-48.

67.     Miller M, Azrael D, Barber C. Suicide mortality in the United States: the importance of attending to method in understanding population-level disparities in the burden of suicide. *Annual review of public health.* 2012;33:393-408.

68.     Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. *Journal of Trauma and Acute Care Surgery.* 2002;52(2):267-275.

69.     Center for Disease Control and Prevention. WISQARS - Fatal Injury Reports, 2014. 2016; http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html. Accessed June 3, 2016.

70.     Spicer RS, Miller TR. Suicide acts in 8 states: incidence and case fatality rates by demographics and method. *American Journal of Public Health.* 2000;90(12):1885.

71.    Gogtay N, Giedd JN, Lusk L, et al. Dynamic mapping of human cortical development during childhood through early adulthood. *Proceedings of the National academy of Sciences of the United States of America.* 2004;101(21):8174-8179.

72.    Insel BJ, Gould MS. Impact of modeling on adolescent suicidal behavior. *Psychiatric Clinics of North America.* 2008;31(2):293-316.

73.    Hawton K. Assessment of suicide risk. *The British Journal of Psychiatry.* 1987.

74.    Mann JJ, Waternaux C, Haas GL, Malone KM. Toward a clinical model of suicidal behavior in psychiatric patients. *American Journal of Psychiatry.* 1999;156(2):181-189.

75.    Shaffer D, Craft L. Methods of adolescent suicide prevention. *Journal of Clinical Psychiatry.* 1999.

76.    Brent DA. Firearms and suicide. *Annals of the New York Academy of Sciences.* 2001;932(1):225-240.

77.    Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. *New England Journal of Medicine.* 1992;327(7):467-472.

78.    Grossman DC, Mueller BA, Riedy C, et al. Gun storage practices and risk of youth suicide and unintentional firearm injuries. *Jama.* 2005;293(6):707-714.

79.    Arias E, Anderson RN, Kung H-C, Murphy SL, Kochanek KD. Deaths: final data for 2001. *National vital statistics reports.* 2003;52(3):1-116.

80.    Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. *jama.* 1991;266(21):2989-2995.

81.    Crifasi CK, Meyers JS, Vernick JS, Webster DW. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. *Preventive medicine.* 2015;79:43-49.

82.    Barber CW, Miller MJ. Reducing a suicidal person's access to lethal means of suicide: a research agenda. *American journal of preventive medicine.* 2014;47(3):S264-S272.

83.    Webster DW VJ, Zeoli AM, Manganello JA. Effects of youth-focused firearm laws on youth suicides. *JAMA.* 2004;292:594-601.

84.    Miller M, Lippmann SJ, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. *Journal of Trauma and Acute Care Surgery.* 2007;62(4):1029-1035.

85.    Pernanen K. *Alcohol in human violence.* New York: The Guilford Press; 1991.

86.    Pernanan K. Prevention of alcohol-related violence. *Contemporary Drug Problems.* 1998;25(3):477-509.

87.    Substance Abuse and Mental Health Services Administration (SAMHSA). Results from the 2014 National Survey on Drug Use and Health: Detailed Tables. 2015; http://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs2014/NSDUH-DetTabs2014.htm#tab6-89b. Accessed June 3, 2016.

88.    Zhang L, Welte JW, Wieczorek WW. The role of aggression-related alcohol expectancies in explaining the link between alcohol and violent behavior. *Subst Use Misuse.* 2002;37(4):457-471.

89.    Witte TH, Kopkin MR, Hollis SD. Is it dating violence or just "drunken behavior"? Judgments of intimate partner violence when the perpetrator is under the influence of alcohol. *Subst Use Misuse.* 2015;50(11):1421-1426.

90.    Centers for Disease Control and Prevention. Alcohol-Related Disease Impact Software. 2015; http://apps.nccd.cdc.gov/DACH_ARDI/Default/Default.aspx. Accessed December 16, 2015.

91.    Hingson R, Heeren T, Winter M, Wechsler H. Magnitude of alcohol-related mortality and morbidity among U.S. college students ages 18-24: Changes from 1998 to 2001. *Annual Review of Public Health.* 2005;26:259-279.

92.    Greenfeld LA. Alcohol and Crime: An Analysis of National Data on the Prevalence of Alcohol Involvement in Crime. 1998; http://www.bjs.gov/content/pub/pdf/ac.pdf. Accessed June 3, 2016.

93.    Zinzow HM, Thompson M. Factors associated with the use of verbally coercive, incapacitated, and forcible sexual assault tactics in a longitudinal study of college men. *Aggressive Behavior.* 2015;41:34-43.

94.    Devries KM, Child JC, Bacchus LJ, et al. Intimate partner violence victimization and alcohol consumption in women: A systematic review and meta-analysis. *Addiction.* 2013;109(3):379-391.

95.    Scribner RA, Mason KE, Simonsen NR, et al. An ecological analysis of alcohol-outlet density and campus-reported violence at 32 U.S. colleges. *Journal of Studies on Alcohol and Drugs.* 2010;71(2):184-191.

96.    Miller M, Hemenway D, Wechsler H. Guns at college. *Journal of American College Health.* 1999;48(1):7-13.

97.    Miller M, Hemenway D, Wechsler H. Guns and gun threats at college. *Journal of American College Health.* 2002;51(2):57-65.

98.    Lester D, Geller W, Toch H. Officer attitudes toward police use of force. *Police violence: Understanding and controlling police abuse of force.* 1996:180-190.

99.    Engel RS, Smith MR. Perceptual distortion and reasonableness during police shootings: Law, legitimacy, and future research. *Criminology & Public Policy.* 2009;8(1):141-151.

100.   Nieuwenhuys A, Oudejans RàuR. Effects of anxiety on handgun shooting behavior of police officers: A pilot study. *Anxiety, Stress, & Coping.* 2010;23(2):225-233.

101.   Doerner WG, Ho T. SHOOT--DON'T SHOOT: POLICE USE OF DEADLY FORCE UNDER SIMULATED FIELD CONDITIONS. *Journal of Crime and Justice.* 1994;17(2):49-68.

102.   Vila BJ, Morrison GB. Biological limits to police combat handgun shooting accuracy. *Am J Police.* 1994;13:1.

103.   Oudejans R. Reality-based practice under pressure improves handgun shooting performance of police officers. *Ergonomics.* 2008;51(3):261-273.

104.   Greenberg SF. State of security at US colleges and universities: A national stakeholder assessment and recommendations. *Disaster medicine and public health preparedness.* 2007;1(S1):S47-S50.

105.   Deisinger G, Randazzo M, O'Neill Dàl, Savage J. *The handbook for campus threat assessment & management teams.* Applied Risk Management Stoneham, MA; 2008.

106.   Thompson A, Price JH, Mrdjenovich AJ, Khubchandani J. Reducing firearm-related violence on college campuses--Police chiefs' perceptions and practices. *Journal of American College Health.* 2009;58(3):247-254.

107.   Griffin OR. Constructing a legal and managerial paradigm applicable to the modern-day safety and security challenge at colleges and universities. *Louis ULJ.* 2009;54:241.

108.   Bouffard JA, Nobles MR, Wells W, Cavanaugh MR. How many more guns? Estimating the effect of allowing licensed concealed handguns on a college campus. *Journal of interpersonal violence.* 2012;27(2):316-343.

# EXHIBIT 33

# ARRESTED DEVELOPMENT: RETHINKING THE CONTRACT AGE OF MAJORITY FOR THE TWENTY-FIRST CENTURY ADOLESCENT

WAYNE R. BARNES[*]

ABSTRACT

*The contract age of majority is currently age eighteen. Contracts entered into by minors under this age are generally voidable at the minor's option. This contract doctrine of capacity is based on the policy of protecting minors from their own poor financial decisions and lack of adultlike judgment. Conversely, the age of eighteen is currently set as the arbitrary age at which one will be bound to her contract, since this is the current benchmark for becoming an "adult." However, this Article questions the accuracy of age eighteen for this benchmark. Until comparatively recently, the age of contract majority had been twenty-one for centuries. The age was reduced to eighteen in the aftermath of protest over the military draft of eighteen-year-olds during the Vietnam War during the 1960s and 1970s, and the enactment of the Twenty-Sixth Amendment which lowered the voting age from twenty-one to eighteen. However, the appropriate age for the military draft bears little to no relation to the appropriate age for voting, or contracting. Moreover, other evidence points in the direction of age twenty-one as a more appropriate age of majority. First, scientific evidence of brain development has advanced to the point that we now know the brain does not stop developing until well into the twenties, which means the powers of cognition and decision-making are not fully developed until then. Second, sociological evidence suggests that most people do not perceive the full attributes of adulthood as having been reached until at least twenty-one, if not older. Third, other areas of the law have experiences in coming back to age twenty-one as an appropriate marker of adulthood—these include the age for purchasing alcohol, the age for obtaining a credit card, and soon (it appears) the age for purchasing cigarettes. This confluence of evidence suggests that the contract age of majority was always appropriately set at age twenty-one, and a return to that*

© 2017 Wayne R. Barnes.

    [*] Professor, Texas A&M University School of Law. I would like to thank Texas A&M University School of Law for its generous research assistance provided for this Article. I would also like to thanks Cheryl Preston for valuable comments on an earlier draft.

405

MARYLAND LAW REVIEW                    [VOL. 76:405

> *age of capacity for contracts will correct a historical misstep in the*
> *law.*

TABLE OF CONTENTS

INTRODUCTION .................................................................................... 406
I.   MINORS AND CAPACITY TO CONTRACT ............................................ 408
II.  THE HISTORY OF THE AGE OF MAJORITY: FROM TWENTY-ONE TO
        EIGHTEEN ................................................................................. 413
III. EMERGING EVIDENCE OF POST-EIGHTEEN ADOLESCENCE ............ 418
        A. Emerging Scientific Evidence of Adolescent Brain
            Development ...................................................................... 419
        B. Sociological Evidence of Delayed or "Emerging" Adulthood 423
        C. Existing and Developing Recognition of Post-Eighteen
            Adolescence in the Legal Context ...................................... 430
            1. Legal Drinking Age ..................................................... 430
            2. The Federal CARD Act ............................................... 433
            3. Legal Smoking Age ..................................................... 435
IV.  A RETURN TO A MAJORITY AGE OF TWENTY-ONE AND SOME
        OBJECTIONS ............................................................................ 437
        A. Return to a Majority Age of Twenty-One ........................... 437
        B. Possible Objections .......................................................... 443
V.   CONCLUSION ............................................................................... 446

INTRODUCTION

In the United States, an individual generally is considered to be an adult
for contract purposes when he or she is eighteen years old.[1]  Most contracts
entered into by a person that is underage (referred to as "minors" or "infants")
are voidable at the minor's option.  On the other hand, contracts entered into
by adults are not voidable for reason of capacity because of age.[2]  Making the
age of contract "adulthood" age eighteen is a comparatively recent develop-
ment; the age of majority had, for centuries, been twenty-one.[3]  However,
during a brief but tumultuous time of political and social upheaval in America
in the 1960s and 1970s, largely as a result of the Vietnam War and the invol-
untary military draft that ensued for those eighteen and up, passage of the

---

1.  JOSEPH M. PERILLO, CONTRACTS § 8.1 (7th ed. 2014); *see also* Cheryl B. Preston & Bran-
don T. Crowther, *Infancy Doctrine Inquiries*, 52 SANTA CLARA L. REV. 47, 50 n.8 (2012) ("Under
the common law, this line was set as the day before the minor's twenty-first birthday.  Currently,
the line is more often set as the minor's eighteenth birthday rather than the preceding day." (citing
RESTATEMENT (SECOND) OF CONTRACTS § 14 cmt. a (AM. LAW INST. 1981))).

2.  Preston & Crowther, *supra* note 1, at 50.

3.  5 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 9:3 (7th ed. 2009).

Twenty-Sixth Amendment to the United States Constitution resulted in a decrease of the voting age from twenty-one to eighteen.[4]  Once this happened, most states lowered the age of adulthood for most legal categories from twenty-one to eighteen, including the contract age of majority.[5]  It does not appear that a great deal of independent analysis and thought went into lowering the age for each of the various legal categories at this time, but rather something on the order of "an adult for one purpose, an adult for all purposes."[6]  In other words, if the age of adulthood was eighteen for purposes of serving in the military and voting, then eighteen-year-olds must be sufficiently "adultlike" for all legal purposes, including for purposes of capacity to contract.[7]

Forty years have elapsed since this arbitrary and sudden change, and this article raises the question: with the benefit of hindsight, and upon observing the maturity level of the typical eighteen- to twenty-year-old in the United States today, is the contract majority age of eighteen still warranted?  That is, as a normative matter, based on the facts on the ground—rather than arbitrarily marrying the issue to other benchmarks, such as voting age—does it still make sense to say that most eighteen-year-olds possess adultlike judgment with respect to contractual and commercial matters such that the currently prevailing age of majority remains justified and defensible?  Several considerations indicate that it may no longer make sense, if it ever did.  For one, recent advancements in the knowledge of brain and cognitive development shed more light than has been previously known about the age at which persons become fully mature in a cognitive sense.  For another, sociologists are beginning to observe the phenomenon of the increasingly extended nature of the twenty-first century American adolescence.  The idea that young people are not fully adults at age eighteen has also been recognized in other comparatively recent developments in the law.  Based on these developments, there is some reason to question the continuing validity of setting the contract age of majority at eighteen.  This Article poses that question and proposes a solution.

Part I of the Article will discuss the rule of capacity in contract law, and the right of minors to disaffirm their contracts.  Part II will discuss the history of the age of majority—originally set at age twenty-one and then lowered to age eighteen—and the historical reasons and context for that change.  Part III will collect and discuss several observations with respect to the maturity and

4. *See* Jennifer Lai, *Old Enough to Vote, Old Enough to Smoke?*, SLATE (Apr. 23, 2013), http://www.slate.com/articles/news_and_politics/explainer/2013/04/new_york_minimum_smoking_age_why_are_young_people_considered_adults_at_18.html ("There's no clear reason why 18 was chosen for the minimum voting age.").

5. *Id.*; *see* WILLISTON, *supra* note 3, § 9:3 (discussing age of majority for contract).

6. Lai, *supra* note 4.

7. *Id.*

cognitive abilities of adolescents and young adults, with the benefit of recent developments in science, sociology, and the law. Part IV will consider whether a return to age twenty-one for the age of majority is warranted and possible objections to such a proposal. Part V will present a conclusion.

## I. Minors and Capacity to Contract

In order to be able to enter into fully valid contracts, each party must possess, as a threshold matter, a sufficient capacity to contract.[8] If a person lacks capacity, contract law seeks to give a remedy in order to protect that person against both his own unwise judgment as well as the exploitation of his incapacity by others.[9] The two main categories of incapacity in contract law are: (1) minors,[10] and (2) mental incapacity.[11] The contract doctrine of capacity is, as Farnsworth describes it, a choice between "competing policies—on the one side favoring protection of the party that lacks capacity, and on the other favoring protection of the other party's expectation, reliance, and restitution interests."[12] Thus, the contract rule of minors is generally seen as a reconciliation of these policy concerns: protecting the disadvantaged minor on the one hand, but vindicating, to some degree, the expectations of the adult contracting party on the other hand.

At least one additional reason for the minor-capacity rule may exist, which is not as frequently cited. According to Robert Edge in an influential article on the rights of minors:

> A father was due the earnings of an unemancipated minor until the latter reached his majority. One way to make certain that the father would not be deprived of this was by allowing disaffirmation of the child's contract when he spent his earnings on something considered foolish by his father, such as a pair of boots. Also, if a minor sold his father's cow and took the money to buy something for himself, the father could regain his cow if the minor could disaffirm the contract.[13]

---

8.  1 E. Allan Farnsworth, Farnsworth on Contracts § 4.2 (3d ed. 2004).

9.  *Id.*

10.  Perillo, *supra* note 1, § 8.1, at 260.

11.  Farnsworth, *supra* note 8, § 4.2, at 442. Because this Article is only concerned with the rule of minors and strict "age" capacity, I will henceforth limit my focus to that rule. Other types of incapacity have existed in contract law. For instance, at one point, "the common law regarded a woman's marriage as depriving her for the life of her husband of separate legal identity, including the capacity to contract, but this disability was largely removed by statutes enacted in the nineteenth century, long before women were given the right to vote." *Id.* at 442–43.

12.  *Id.* at 443.

13.  Robert G. Edge, *Voidability of Minors' Contracts: A Feudal Doctrine in a Modern Economy*, 1 Ga. L. Rev. 205, 221–22 (1967) (footnotes omitted) (citing James L. Sivils, Jr., Comment, *Contracts—Capacity of the Older Minor*, U. Kan. City L. Rev. 230 (1962); and then citing 2 Williston, Contracts § 245 (3d. ed. 1959)).

In fact, the general rule remains today that a minor's wages belong to the parents; the rule is seen as reciprocal in nature to the corresponding duty of the parents to give support to the child.[14]  Seen in this light, the capacity rule is thus also a rule of protection for the parents, as well as the minor.

In any event, the law has always been clear that the rule for age capacity is a bright-line, arbitrary, age-based one.  Once a person attains a particular age, she is presumptively an adult and can legally enter into valid contracts.[15]  The bright-line rule, however, does not take into account the fact that different people obviously have different levels of maturity at different ages.[16]  Moreover, in most jurisdictions it makes no difference if the minor is married or emancipated from her parents—she will be protected by the rule until reaching the age of majority, regardless.[17]  As mentioned above, for centuries the age of majority for contract purposes was twenty-one.[18]  However, in the 1970s, most states reduced the age of majority to age eighteen in the aftermath of the reduction of the voting age to eighteen by constitutional amendment.[19]  The history of the original age of twenty-one as the majority age, as well as the historical reasons and context for lowering it to age eighteen, is of course part and parcel to the thesis of this Article, and will be discussed in much more detail in the next Part and beyond.  For now, the point is that the applicability of the rule of age-based capacity in contracts is a very simple one: once one attains the specified age, she attains capacity to contract and is deemed by the law to have sufficient age, maturity, and judgment to safely enter into contracts which are binding and non-voidable.[20]

The legal effect of a minor entering into a contract is that the contract is voidable at the minor's option.[21]  The reason is that the "law recognizes that [minors] . . . are not fully accountable for their actions because they lack the

---

14.  *See* 59 AM. JUR. 2D, *Parent and Child* § 39 (2012); *see also* WILLISTON, *supra* note 3, § 9:4.

15.  FARNSWORTH, *supra* note 8, § 4.3, at 443.

16.  *Id.*

17.  *Id.* at 444 (citing Kiefer v. Fred Howe Motors, 158 N.W.2d 288 (Wis. 1968)).  *But see* ALASKA STAT. § 25.20.020 (providing that when a person marries, he or she "arrives at the age of majority"); Mitchell v. Mitchell, 963 S.W.2d 222, 223 (Ky. App. 1998) (providing that marriage of a minor "emancipates the minor [but] does not . . . make the minor *sui juris*" and may "be indicative of a lack of wisdom and maturity").

18.  WILLISTON, *supra* note 3, § 9:3, at 8 (citing Jones v. Jones, 72 F.2d 829 (D.C. Cir. 1934)); *see also* FARNSWORTH, *supra* note 8, § 4.3, at 443.

19.  FARNSWORTH, *supra* note 8, § 4.3, at 445.

20.  Of course, reaching the age of majority does not prevent a person from arguing that other problems with the contract exist, such as mistake.  RESTATEMENT (SECOND) OF CONTRACTS §§ 153–154 (AM. LAW. INST. 1981).  *See also id.* §§ 163–64 (misrepresentations); *id.* §§ 174–75 (duress); *id.* § 177 (undue influence); *id.* § 178 (public policy grounds); *id.* § 208 (unconscionability).

21.  FARNSWORTH, *supra* note 8, § 4.4, at 446 (citing 8 W. HOLDSWORTH, HISTORY OF ENGLISH LAW 51 (1926)).

capacity to exercise mature judgment."[22]  Farnsworth explains the operation
of the rule: "there is a contract if no further action is taken at the minor's
instance, but . . . the effects of the contract can be avoided if appropriate steps
are taken on the minor's behalf."[23]  The "steps" to avoid the contract are
known in contract law as *disaffirmance*, and must be undertaken by either the
minor or the minor's legal representatives.[24]  There is no particular formula
or method by which the minor must disaffirm.  All that is generally required
is some form of communication of an intent to disaffirm, or conduct evidenc-
ing such intent, or pleading the defense in a lawsuit regarding the contract.[25]

 The minor is not, of course, required to disaffirm the contract entered
into during minority.  She may, instead, upon reaching the age of majority,
choose to retain its benefits and thereby give up the ability to disaffirm.  This
is known as *ratification*.[26]  The steps involved in ratification are similarly
straightforward as the steps for disaffirmance: "Any manifestation of an un-
dertaking to be bound by the original transaction will suffice as a ratifica-
tion."[27]  A person may effect ratification verbally, in writing or orally, "or by
other conduct such as performance or acceptance of the other party's perfor-
mance under the contract."[28]  It is worth emphasizing that the power to ratify
is limited to those who have reached the age of majority—a minor has no
more capacity to irrevocably bind herself to a ratification than she has the
ability to irrevocably bind herself to the underlying contract in the first
place.[29]  Most courts state that the person is required to exercise the option of
disaffirmance within a reasonable time after reaching the age of majority, or
she will lose such option (as a court would deem her to have ratified the con-
tract by her silence).[30]  However, the ultimate effect of the rule on minority
is to give the minor flexibility—she may choose to avoid the contract by dis-
affirming it, or she may instead choose to keep the contract by ratifying it.  It
is thus a misnomer to say that the minor's incapacity removes the ability to

---

 22.  Davis *ex rel.* LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 672 (1999) (Ken-
nedy, J., dissenting) (citing FARNSWORTH, *supra* note 8, at § 4.4).

 23.  FARNSWORTH, *supra* note 8, § 4.4, at 446.

 24.  *Id.* at 447.

 25.  *Id.*

 26.  *Id.* at 447

 27.  *Id.* 447–48.

 29.  *Id.* at 447 (stating that "[a]n effective ratification cannot be made by one who is not yet of
age" (citing Oubre v. Entergy Operations, 622 U.S. 422 (1998) (Scalia, J., dissenting))).

 29.  *Id.* at 447 (stating that "[a]n effective ratification cannot be made by one who is not yet of
age" (citing Oubre v. Entergy Operations, 622 U.S. 422 (1998) (Scalia, J., dissenting))).

 30.  *Id.* at 448–49 (discussing Walker v. Stokes Bros., 262 S.W. 158, 160 (Tex. Civ. App.
1924).  Farnsworth observes: "Although it is often said that the minor must act within a reasonable
time after coming of age, the minor is rarely precluded from avoidance by delay, as long as there
has been no demonstrable reliance on the transaction by the other party." *Id.* at 449 (citing Cassella
v. Tiberio, 80 N.E.2d 426 (Ohio 1948)).

contract.[31]  Rather, the minor may contract if she chooses, but the law gives a safety net to the minor who makes an improvident or foolish choice by allowing the minor to choose to disaffirm upon reaching majority.[32]

If a minor chooses to disaffirm a contract, she must generally return any goods or items still in her possession.  Otherwise, however, the majority rule is that the minor need not pay anything to the other party for use of the items, the value of services received (which cannot be returned), or for damage or depreciation of the item while in her possession and use.[33]  The traditional rationale for this position is that, "[e]ven if a minor has squandered or destroyed what has been received, the loss is regarded as 'the result of the very improvidence and indiscretion of infancy which the law has always in mind.'"[34]  A tiny minority of jurisdictions has refused to follow the general rule, going so far as to require the minor to make full restitution for all benefits received upon disaffirmance, a quasi-contract recovery.[35]  Notably, the recently enacted Third Restatement of Restitution and Remedies adopted the minority approach.[36]  However, most jurisdictions do not follow this rule;

---

31.  Although the rule seemingly gives minors complete flexibility, it must be conceded that the capacity rule may discourage some from entering into contracts with minors.  *See id.* § 4.3, at 444 ("[M]iserable must the condition of minors be, excluded from the society and commerce of the world." (quoting Zouch v. Parsons, 97 Eng. Rep. 1103, 1106–07 (K.B. 1765))).  *But see id.* at 445 ("[S]ubstantial areas of commercial activity have developed that could scarcely survive without the patronage of those who are known to be minors." (citing Edge, *supra* note 13, at 227–32)).  The policy issue of the willingness (or lack thereof) of others to contract with minors will be discussed more in Part IV, *infra*.

32.  PERILLO, *supra* note 1, at 261.  Perillo points out:

Because of the one-sided power of avoidance held by the infant it might seem anomalous to speak in terms of the limited capacity of infants.  To some observers it has seemed that the infant has capacity to contract coupled with an additional power of disaffirmance.  It has been said that "the law confers a privilege rather than a disability."

*Id.* (quoting LAURENCE P. SIMPSON, CONTRACTS 216 (2d ed. 1965)).

33.  FARNSWORTH, *supra* note 8, § 4.5, at 450.

34.  *Id.* (quoting Utterstrom v. Myron D. Kidder, Inc., 124 A. 725, 726 (Me. 1924)).  Farnsworth criticizes the rule, stating: "The law in this area would surely be simpler and arguably fairer if the minor were accountable in full for the benefit received."  *Id.*  To bolster his argument, Farnsworth quoted the New York Court of Appeals as stating:

That young men, nearly twenty-one years of age, actively engaged in business, can at will revoke any or all of their business transactions and obligations, thereby causing loss to innocent parties dealing with them, upon the assumption or even the assurance that they were of age, has not appealed to some courts, and has been adopted without much enthusiasm by others.

*Id.* at 450–51 (quoting Sternlieb v. Normandie Nat'l Sec. Corp., 188 N.E. 726, 726 (N.Y. 1934)).

35.  *Id.* at 451; *see also, e.g.*, Valencia v. White, 654 P.2d 287 (Ariz. 1982); Kelly v. Furlong, 261 N.W. 460 (Minn. 1935); Porter v. Wilson, 209 A.2d 730 (N.H. 1965); Bartlett v. Bailey, 59 N.H. 408 (1879); Hall v. Butterfield, 59 N.H. 354 (1879).

36.  RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 33 (AM. LAW. INST. 2011); *see also* Joseph M. Perillo, *Restitution in a Contractual Context and the Restatement*

rather, they only require the minor to make restitution for the value of benefits received upon disaffirmance when an exception applies, such as the necessaries doctrine or misrepresentation of age.[37]  Such exceptions will be discussed next.

The most-adopted exception is the well-known *necessaries* doctrine, in which the minor will be responsible for paying the reasonable value of any items necessary for her survival.[38]  The policy behind the necessaries rule is "that unless an infant can get credit for necessaries he may starve."[39]  What items are necessaries is generally considered a question of law, and the determination depends on a number of factors including socioeconomic status, as well as the extent to which the minor's parents or guardians have failed to obtain the items in question.[40]  Items which have typically been upheld as constituting necessaries include food, clothing, shelter, medical care, and legal services.[41]

Another exception adopted by a "substantial" number of jurisdictions is the *minor-as-plaintiff* rule, whereby "the minor, as plaintiff, seeks recovery of money paid."[42]  This is to be distinguished from the situation where the minor merely raises her incapacity as a defense to suit brought by the other party to the transaction.[43]  The jurisdictions that adopt this exception do so based on the admonition that "the privilege of infancy is to be used as a shield and not as a sword."[44]  As Farnsworth explains the minor-as-plaintiff position:

> The result is that one who furnishes goods or services to a minor for cash is entitled to restitution in full in the event of avoidance, while one who furnishes them on credit is not. . . .  From the minor's point of view, to the extent that one pays cash, one is fully accountable for the benefit received, while to the extent that one has used credit, one is not.  One is, in short, protected against improvident *commitment* but not the improvident *outlay of cash*.[45]

The third exception that will be mentioned here, adopted by some jurisdictions, is the minor's *misrepresentation of age*—in other words, the minor

---

*(Third) of Restitution & Unjust Enrichment*, 68 WASH. & LEE L. REV. 1007, 1016–17 (2011) (criticizing the Restatement's broadening of the circumstances under which a minor may be required to pay restitution).

37.  FARNSWORTH, *supra* note 8, § 4.5, at 451.

38.  *Id.*

39.  *Id.* (quoting Turner v. Gaither, 83 N.C. 357, 361 (1879)).

40.  *Id.* at 451–52 (citing Int'l Text-Book Co. v. Connelly, 99 N.E. 722, 725 (N.Y. 1912)).

41.  *Id.* at 452.

42.  *Id.* at 453.

43.  *Id.* at 453–54.

44.  *Id.* at 454 (quoting 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 240 (3d ed. 1836)).

45.  *Id.* (emphasis added).

lies and says that she is an adult.[46]  Not all jurisdictions allow this exception. The ones that do reason that "a minor is liable for torts and a fraudulent misrepresentation of age is actionable as a tort if it induced reliance by the other party."[47]  However, the jurisdictions that allow the misrepresentation exception generally require an affirmative misrepresentation by the minor—mere recitals in standard form contracts about age of majority have been held insufficient.[48]  Many jurisdictions do not apply this exception, however, reasoning that to do so "would involve indirect enforcement of the contract."[49] In any event, the misrepresentation rule appears to only be a minority rule; the prevailing view is that a "minor's representation of his age does not bar him from disaffirming his contract."[50]

The rule allowing minors the option of disaffirming their contracts is for their protection.  It serves to protect them from unscrupulous adults, as well as their own lack of judgment and poor decisionmaking.[51]  As Cheryl Preston and Brandon Crowther have explained, "[t]he doctrine is based on the presumption that minors are generally less easily exploitable and less capable of understanding the nature of legal obligations that come with a contract."[52]  This doctrine is well settled and is designed to "look after the interest of [minors]," who have long been considered worthy of the law's protection, especially in the area of contracts.[53]

## II.  THE HISTORY OF THE AGE OF MAJORITY: FROM TWENTY-ONE TO EIGHTEEN

The age-based capacity rule for contracts is, as discussed above, a bright-line, arbitrary test—a person is presumed to lack capacity to contract

---

46.  *Id.*  Examples of this occurring in pop culture are legion, but for some reason the one that sticks with me is the character in the movie *Superbad* that has a fake ID made in order to purchase alcohol—the ID contains the single name "McLovin."  *See* SUPERBAD (Sony Pictures 2007).

47.  FARNSWORTH, *supra* note 8, § 4.5, at 454 (citing Byers v. Lemay Bank & Trust Co., 282 S.W.2d 512 (Mo. 1955); Wisconsin Loan & Fin. Corp. v. Goodnough, 228 N.W. 484 (Wis. 1930); Gillis v. Whitley's Discount Auto Sales, 319 S.E.2d 661 (N.C. App. 1984)).

48.  *Id.* (citing Kiefer v. Fred Howe Motors, 158 N.W.2d 288 (Wis. 1968); Rutherford v. Hughes, 228 S.W.2d 909 (Tex. Civ. App. 1950)).

49.  *Id.* at 455 (citing Sternlieb v. Normandie Nat'l Sec. Corp., 188 N.E. 726, 726 (N.Y. 1934); Creer v. Active Auto. Exch., 121 A. 888 (Conn. 1923); Slayton v. Barry, 56 N.E. 574 (Mass. 1900)).

50.  Gillis v. Whitley's Discount Auto Sales, 319 S.E.2d 661, 666 (N.C. App. 1984) (citing Greensboro Morris Plan Co. v. Palmer, 185 N.C. 109 (1923); Carolina Interstate Bldg. & Loan Ass'n v. Black, 119 N.C. 323 (1896)); *see also* Preston & Crowther, *supra* note 1, at 59–62 (2012) (discussing the misrepresentation exception and its possibly inconsistent application).

51.  Preston & Crowther, *supra* note 1, at 50.

52.  *Id.* (citing City of New York v. Stringfellow's of N.Y., Ltd., 684 N.Y.S.2d 544, 550–51 (N.Y. App. Div. 1999); Loveless v. State, 896 N.E.2d 918, 920–21 (Ind. Ct. App. 2008)).

53.  *Stringfellow's of N.Y.*, 684 N.Y.S.2d at 551 ("It is the policy of the law to look after the interests of infants, who are considered incapable of looking after their own affairs, to protect them from their own folly and improvidence, and to prevent adults from taking advantage of them.").

(thereby giving her the power of disaffirmance) up until the moment she reaches the age of majority. Therefore, this area of the law has always operated by selecting a specific age as the benchmark, even though such arbitrary line drawing is imperfect because the actual maturity, wisdom, and judgment of people at various ages differs considerably.[54] Although the law could instead opt for a more flexible, case-by-case approach to determine the wisdom and maturity of each minor in a dispute, "[t]he costs and uncertainties of distinguishing the capacities of minors . . . preclude any rule except an arbitrary one."[55]

Williston notes that "[f]or centuries, the age of 21 was fixed by the law as that age at which either a man or a woman was regarded by the law as acquiring full capacity."[56] There is nothing magical about the way that the age of twenty-one was historically selected.[57] Various cultures and civilizations have adopted different ages at different times, sometimes (but not always) coinciding with the age for military service.[58] One court described some significant historical ages of majority thusly:

> The male child of an Athenian citizen reached majority at 18 and was qualified for membership in the assembly at age 20; however, age 30 was a requirement for service on a jury. In ancient Sparta, males did not reach majority until 31. In Rome, increased emphasis on education led to a correlation of understanding of the law to the age of majority, which was eventually set at 14. This prevailed in northern parts of Europe and in England during the ninth, tenth and eleventh centuries. The expanding role of the mounted knight after the Norman Conquest led to heavier mail shirts and coifs, as well as shields and armor. With the advent of knighthood, the age of majority rose to 21; for at that time, young men were first capable of meeting its physical and mental demands. . . .

---

54. FARNSWORTH, *supra* note 8, § 4.3, at 443.

55. JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS § 24, at 46 (4th ed. 2001).

56. WILLISTON, *supra* note 3, § 9:3, at 8.

57. N.J. State Policemen's Benevolent Ass'n of N.J., Inc. v. Town of Morristown, 320 A.2d 465, 470 (N.J. 1974) ("There is no magic to the age of 21."). *See also* NAT'L ASS'N OF SECONDARY SCH. PRINCIPALS, THE CHANGING AGE OF MAJORITY 2 (1974), http://files.eric.ed.gov/fulltext/ED099996.pdf. The report stated:

> Actually, there was nothing either sacred or inherently logical in establishing 21 as the appropriate age at which the law should recognize a person as being an adult. There was a recognized need to establish some point at which the full rights and responsibilities were extended, and the age of 21 was tacitly agreed upon. This apparently grew out of the Act of Parliament of the Province of Massachusetts Bay, which established 21 as the age for performing certain civic duties back in 1751. But the age of 21 for establishing majority goes back even further in Anglo-American legal history—at least to 1620 when the age for serving in the English Army had reached this level. This age had been rising for several centuries because of the increasing weight of armor.

*Id.*

58. *N.J. State Policemen's Benevolent Ass'n of N.J., Inc.*, 320 A.2d at 470.

From this point on, the age of 21 seem [sic] gradually to be accepted, even though the specific reasons for its appearance had long since passed.[59]

Thus, the majority age of twenty-one was settled in England around the fifteenth century.[60]  The point, at present, is that once it was so established, it was accepted and endured as the unquestioned legal age of majority for a period approaching half a millennium.  As Andrew Schwartz has noted, "[t]his rule remained remarkably stable from the Middle Ages until well into the twentieth century."[61]

The universal move to lower the age of majority to eighteen arose out of public debate in the 1960s and early 1970s, primarily with respect to the voting age at a time when eighteen-year-olds were being drafted into service in the Vietnam War.[62]  Like the contract age of majority, prior to this time the voting age had always been twenty-one in the United States, as it had been in England before colonization.[63]  But something changed in the first half of the twentieth century: federal law authorized eighteen-year-old males to be involuntarily called into military service during both World War I and World War II.[64]  The need to draft eighteen-year-olds into military service was obviously related to the exigent national emergency needs of the time.[65]  When the age for eligibility for military service dropped, however, states began discussing lowering the voting age as well.  Two states—Georgia and Kentucky—lowered the voting age to eighteen in the 1940s and 1950s, respectively,[66] and President Eisenhower even expressed support for the change as a matter of federal law.[67]

However, the overall sentiment during and after World War II remained that twenty-one was the appropriate age of majority for voting and other purposes besides the draft.  For example, in a 1939 poll, a mere seventeen percent of the American populace was in favor of reducing the voting age.[68]  As

---

59.  *Id.*; *see also* Note, *Infants' Contractual Disabilities: Do Modern Sociological and Economic Trends Demand a Change in the Law?*, 41 IND. L.J. 140, 143 (1965).

60.  Note, *supra* note 59, at 140.

61.  Andrew A. Schwartz, *Old Enough to Fight, Old Enough to Swipe: A Critique of the Infancy Rule in the Federal Credit CARD Act*, 2011 UTAH L. REV. 407, 410.

62.  *Id.* at 410–15.

63.  *Id.* at 410, 411; *see also* WENDELL W. CULTICE, YOUTH'S BATTLE FOR THE BALLOT: A HISTORY OF VOTING AGE IN AMERICA 2–3 (1992).

64.  *Id.* at 411 (citing CULTICE, *supra* note 63, at 16, 20).

65.  Franklin D. Roosevelt, Statement on Signing the Bill Reducing the Draft Age (Nov. 13, 1942), http://www.presidency.ucsb.edu/ws/?pid=16198 ("The time has now come when the successful prosecution of the war requires that we call to the colors the men of eighteen and nineteen.  Many have already volunteered.  Others have been eagerly awaiting the call.  All are ready and anxious to serve.").

66.  CULTICE, *supra* note 63, at 206.

67.  *Id.* at 51, 56.

68.  Schwartz, *supra* note 61, at 411 (citing CULTICE, *supra* note 63, at 53).

Schwartz notes, "[t]he prevailing view of lawmakers and their constituents in the immediate post-war years remained what it had been for centuries, namely that the voting age should be twenty-one."[69]  Numerous attempts to lower the voting age, both state and federal, in the 1950s and 1960s ended in failure.[70]  The popular opinion seemed to remain that the age to fight had little to nothing to do with the age to vote.[71]  Therefore, as of 1970, the voting age remained twenty-one under federal law and in all but four of the states.[72]

The era of the Vietnam War appears to be what finally turned the tide.[73]  Eighteen-year-olds were subject to the draft again; "[t]his time, however, the movement to lower the voting age to eighteen was carried along as part of the massive civil rights, antiwar, counterculture, and other social movements of the late 1960s and early 1970s."[74]  Many youth organizations forcefully advocated for the reduction in voting age, but they were not alone—other groups joined their cause, including the NAACP, the National Education Association, the American Jewish Committee, and the United Auto Workers union.[75]  The oft-used slogan for the cause was "[o]ld enough to fight, old enough to vote."[76]  The principle argument, in the face of soldiers dying daily in Vietnam, was that it was "surely unjust . . . to command men to sacrifice their lives for a decision which they had no part in making."[77]

In the face of these youthful protests, and the dynamics at work in sending eighteen-year-olds to war under a political regime they had had no say in selecting, public opinion shifted.  Eighteen-year-olds were increasingly seen as adults with greater maturity.[78]  President Nixon at the time argued in favor of lowering the voting age: "The younger generation today is better educated, it knows more about politics, more about the world than many of the older people.  That is why I want them to vote, not because they are old enough to

---

69.  *Id.* at 411–12 (citing CULTICE, *supra* note 63, at 44–49).

70.  *Id.* at 412; CULTICE, *supra* note 63, at 141–59, 206.

71.  *See* ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 226 (rev. ed. 2009) (noting New York Congressman Emanuel Celler's point that "[t]he thing called for in a soldier is uncritical obedience, and that is not what you want in a voter").

72.  *See* CULTICE, *supra* note 63, at 206 (listing Georgia, Kentucky, Alaska and Hawaii as the four states that successfully lowered the voting age to eighteen prior to 1970).

73.  Schwartz, *supra* note 61, at 412.

74.  *Id.* (citing KEYSSAR, *supra* note 71, at 279; Jolicoeur v. Mihaly, 488 P.2d 1, 7 (Cal. 1971)).

75.  *Id.*; CULTICE, *supra* note 63, at 99.

76.  Schwartz, *supra* note 61, at 412 (citing CULTICE, *supra* note 63, at 234).

77.  *Id.* (citing *Lowering the Voting Age to 18: Hearings Before the Subcomm. on Constitutional Amendments of the S. Comm. on the Judiciary*, 90th Cong. 20–21 (1968) (statement of R. Spencer Oliver, President, Young Democratic Clubs of America); Oregon v. Mitchell, 400 U.S. 112, 141–42 (1970) (Douglas, J., dissenting)).

78.  *Id.* at 413 (citing CULTICE, *supra* note 63, at 98).

Case 3:19-cv-01226-L-AHG   Document 34-7   Filed 01/03/20   PageID.7332   Page 575 of 620

fight but because they are smart enough to vote."[79] A court opinion from this same era reflected this view: "[T]oday's youth is better informed and more mature than any other generation in the nation's history."[80] Even anthropologist Dr. Margaret Mead testified that the eighteen- to twenty-one-year-olds at that time "are not only the best educated generation that we have ever had, and the segment of the population that is better educated than any other group, but also they are more mature than young people in the past."[81] Therefore, as Andrew Schwartz notes, "[a]ll of this was a sea change from the view of eighteen-year-olds as infants that prevailed from the Middle Ages through the 1950s."[82]

And thus, in the onslaught of protest, the dynamics of the Vietnam War, and politicians joining the chorus, public opinion shifted by the end of the 1960s to substantial approval of reducing the voting age to eighteen.[83] From there, the political machinations sprang into action. In 1970, with bipartisan support, Congress added an amendment to the Voting Rights Act to lower the voting age to eighteen for all elections at both the state and federal level.[84] Soon after, the Supreme Court subsequently held in *Oregon v. Mitchell*[85] that the statutory attempt to set the required state voting age was unconstitutional.[86] But the political and public desire for a conclusive resolution of the matter was such that mere unconstitutionality was no serious obstacle. In the swiftest amendment process in the history of the United States (about 100 days from congressional approval to requisite state approvals), the Twenty-Sixth Amendment was passed, constitutionally extending the right to vote to all citizens eighteen years of age or older.[87] In the aftermath of the enactment of the Twenty-Sixth Amendment, all states modified their laws to lower the voting age to eighteen.[88] The public discussion and changes to the voting

---

79. Lewis J. Paper, Note, *Legislative History of Title III of the Voting Rights Act of 1970*, 8 HARV. J. ON LEGIS. 123, 136 (1970) (quoting *Hearings on S.J. Res. 147 and Others Before the Subcomm. on Constitutional Amendments of the Senate Comm. on the Judiciary*, 91st Cong. 129, 130 (1970) (unpublished transcripts of hearings)).

80. Jolicoeur v. Mihaly, 488 P.2d 1, 5 (Cal. 1971).

81. S. REP. NO. 92-26, at 4 (1971).

82. Schwartz, *supra* note 61, at 413–14.

83. *Id.* at 414; THOMAS H. NEALE, CONG. RESEARCH SERV., REPORT NO. 83-103 GOV, THE EIGHTEEN YEAR OLD VOTE: THE TWENTY-SIXTH AMENDMENT AND SUBSEQUENT VOTING RATES OF NEWLY ENFRANCHISED AGE GROUPS 7 (1983), https://digital.library.unt.edu /ark:/67531/meta-crs8805/m1/1/high_res_d/83-103GOV_1983May20.pdf (noting a sixty-four percent approval rate among Americans for lowering the voting age to eighteen, according to a 1967 Gallup poll).

84. CULTICE, *supra* note 63, at 125, 137.

85. 400 U.S. 112 (1970).

86. *Id.* at 117–18.

87. U.S. CONST. amend XXVI; Schwartz, *supra* note 61, at 414 (citing CULTICE, *supra* note 63, at 214).

88. *See* Roper v. Simmons, 543 U.S. 551, 581–83 (2005) (listing in Appendix B state statutes establishing minimum voting ages).

age, however, had further reverberations.  The age of required juror service and the age at which the death penalty could be assessed were also subsequently lowered in most states to eighteen.[89]

This wave of age-reductions in the law also reached the law of contracts.  Indeed, during the ongoing national discussion on lowering the voting age in the 1960s and 1970s, reference was also frequently made to the additional benefit of giving American youth "a piece of the action"—in other words, the ability to make contracts and engage in business, commerce, and entrepreneurship.[90]  The longstanding rule of twenty-one as the contract age of majority was seen as a serious impediment to this ideal.  Therefore, in a wave of state statutory changes that mirrored the debate and processes of reducing the voting age, the vast majority of states lowered the age of majority for contract purposes from twenty-one to eighteen.[91]  At least some commentators expressed confusion: "[p]erhaps less clearly understood than the reason for establishing the age of majority at 21 are the reasons many states began reducing it suddenly after so many years."[92]  The nationwide change was so complete that when the *Restatement (Second) of Contracts* was promulgated in 1979, it provided that the contract age of majority was eighteen.[93]  Thus, when the dust of the turbulent 1960s and 1970s had settled, the contract age of majority, along with the military draft age and voting age, came to be fixed at the age of eighteen.

## III.  EMERGING EVIDENCE OF POST-EIGHTEEN ADOLESCENCE

Since the voting age was lowered to eighteen in the early 1970s, eighteen has also remained as the age of majority for contracting.  However, in the decades that have gone by, research and developments in the law have emerged that arguably establish that age eighteen is not the most appropriate legal demarcation between adolescence and adulthood for contract (and perhaps other) purposes.  This Part will gather and discuss some of this evidence, which has been developed in the scientific, sociological and legal fields.

---

89.  Schwartz, *supra* note 61, at 415, 416.

90.  *Id.* at 417 (quoting CULTICE, *supra* note 63, at 98, 103).

91.  *See* FARNSWORTH, *supra* note 8, § 4.3, at 445; MURRAY, *supra* note 55, § 24, at 45 n.208 ("The twenty-sixth amendment to the U.S. Constitution lowered the voting age to 18.  This prompted almost all of the states to enact statutes reducing the age of majority for contracting to 18." (citing 23 PA. CONS. STAT. § 5101 (2000))); PERILLO, *supra* note 1, § 8.1, at 260 (citing U.S. DEP'T OF HEALTH & HUMAN SERVS., THE LEGAL STATUS OF ADOLESCENTS 1980 (1981)); WILLISTON, *supra* note 3, at § 9:3, at 14–15 (citing state statutes enacting majority age of eighteen).

92.  NAT'L ASS'N OF SECONDARY SCH. PRINCIPALS, *supra* note 57, at 2.

93.  RESTATEMENT (SECOND) OF CONTRACTS § 14 (AM. LAW INST. 1981) ("Unless a statute provides otherwise, a natural person has the capacity to incur only voidable contractual duties until the beginning of the day before the person's eighteenth birthday.").

### A. Emerging Scientific Evidence of Adolescent Brain Development

Scientific research over the past several decades has confirmed what we have known for centuries: that adolescents lack the sophistication, reasoning ability, and judgment of mature adults. One basis that has led researchers to conclude that adolescents are less mature is their behavior.[94] Behavior manifests lack of maturity in at least three ways. First, adolescents are bigger risk-takers than adults, because they are more highly driven by the desire for immediate gratification than adults.[95] Second, minors have less impulse control, and thus are "less able than adults to consistently reflect before they act."[96] Gaining the ability to control impulses is critical for effective problem solving, logical thinking, and reliably dependable discernment.[97] Third, adolescents have a poorer ability to regulate their emotions: "stress can affect adolescents' 'ability to effectively regulate behavior as well as . . . to weigh costs and benefits and override impulses with rational thought.'"[98]

While the developmental patterns of adolescent behavioral immaturity have long been known and identified, the increasing role of neuroscience in this area of study has provided new explanations for such behavior.[99] Specifically, the development of MRI scans in the 1990s yielded revealing new information about the young brain.[100] By using MRI images, researchers are able to observe the level and extent of the growth of total brain mass, as well as subsequent pruning of the mass and eventual myelination of the brain matter—all of which scientists have found is necessary and part of the maturation of the brain.[101] Notably, researchers have recently discovered that the prefrontal cortex—associated with impulse control, assessment of risk, determination of advantages and disadvantages, and general decisionmaking—is underdeveloped throughout adolescence as a result of unfinished pruning and incomplete myelination.[102] These two processes—pruning and myelination—operate to simultaneously reduce brain matter, and thicken what

---

94. Cheryl B. Preston & Brandon T. Crowther, *Legal Osmosis: The Role of Brain Science in Protecting Adolescents*, 43 HOFSTRA L. REV. 447, 454 (2014).

95. *Id.* at 455 (citing Brief for the Am. Med. Ass'n and the Am. Acad. Of Child and Adolescent Psychiatry as Amici Curiae in Support of Neither Party at 7, Graham v. Florida, 560 U.S. 48 (2010) (Nos. 08-7412, 08-7621) [hereinafter Graham AMA Brief]).

96. *Id.* at 456 (quoting Graham AMA Brief, *supra* note 95, at 9).

97. AMA Brief, *supra* note 95, at 8–9.

98. Preston & Crowther, *supra* note 95, at 457 (quoting Graham AMA Brief, *supra* note 95, at 11); *see also* Linda Patia Spear, *The Adolescent Brain and Age-Related Behavioral Manifestations*, 24 NEUROSCIENCE & BIOBEHAVIORAL REVS. 417, 422–23 (2000)).

99. Preston & Crowther, *supra* note 94, at 458.

100. Graham AMA Brief, *supra* note 95, at 13; MICHAEL S. GAZZANIGA ET AL., COGNITIVE NEUROSCIENCE: THE BIOLOGY OF THE MIND 20–21, 138 (2d ed. 2002); Preston & Crowther, *supra* note 94, at 458.

101. Preston & Crowther, *supra* note 94, at 458–59.

102. *Id.*; Graham AMA Brief, *supra* note 95, at 16–24.

remains at the same time, in a process which brings the brain to its ultimate maturity. The processes are described more technically as follows:

> Pruning involves the "programmed elimination of unused and cumbersome neuronal connections believed to support the ability for the brain to adapt to its environment," which "enhance[s] the ability to process complex information quickly allowing the brain to make executive plans supporting voluntary control of behavior." Myelination consists of "the process by which the brain's axonal connections become progressively insulated with a fatty white matter called myelin," which "makes communication between different parts of the brain faster and more reliable."[103]

The rate of this brain developmental process—which generally corresponds to the rate of increasing behavioral maturity—may vary from individual to individual.[104] However, certain patterns have emerged in the recent research. Research conducted at the National Institute of Mental Health, along with several related studies, led to the conclusion that "a number of structural changes occur in the brain *much later in adolescence than anyone had supposed.*"[105] In additional research involving mapping of the development of the brain, scientists at Harvard and UCLA came to similar conclusions and more specifically observed that "*the brain undergoes massive changes between the ages of twelve and twenty-one.*"[106]

In another recent study by a team of researchers from the National Institute of Mental Health, the neurodevelopmental trajectories of the human cerebral cortex were analyzed from hundreds of MRI scans from 375 youths and adults.[107] The researchers undertook to study the ages of development of this important part of the brain,[108] which comprises the outer surface of the gray matter of the brain.[109] Various parts of the cortex regulate functions such as sensation and movement, but also higher cognitive functions."[110] The researchers identified different cortical portions of the brain.[111] The ages at

---

103.   *Id.* at 459 (footnotes omitted) (quoting Brief for the Am. Med. Ass'n and the Am. Acad. of Child and Adolescent Psychiatry as Amici Curiae in Support of Neither Party at 21–24, Miller v. Alabama, 132 S. Ct. 2455 (2012) (Nos. 10-9646, 10-9647) [hereinafter Miller AMA Brief]).

104.   Ann MacLean Massie, *Suicide on Campus: The Appropriate Legal Responsibility of College Personnel*, 91 MARQ. L. REV. 625, 660 (2008).

105.   *Id.* at 660 (emphasis added).

106.   Richard F. Walsh, *Raising the Age for Juvenile Jurisdiction in Illinois: Medical Science, Adolescent Competency, and Cost*, 39 LOY. U. CHI. L.J. 767, 774 (2008) (emphasis added) (citing Adam Caine Ortiz, *Juvenile Death Penalty: Is it "Cruel and Unusual" in Light of Competency Standards?*, CRIM. JUST., Winter 2003, at 23).

107.   Philip Shaw et al., *Neurodevelopmental Trajectories of the Human Cerebral Cortex*, 28 J. NEUROSCIENCE 3586, 3586–94 (2008).

108.   *Id.*

109.   *Cerebral Cortex*, AM. HERITAGE DICTIONARY (New College ed. Rev. 1985).

110.   *Id.*

111.   Shaw, *supra* note 107, at 3586.

which the MRI scans were taken ranged from age three-and-a-half to thirty-three.[112]  Measured in several different ways, the results indicated that the peak accumulation of cortical thickness (brain tissue) occurred around ages nine to eleven, but that the crucial cortical thinning (pruning, as described above) critical for brain development continued *through age twenty-five*.[113] The researchers reiterated the implications of cortical thinning: "the age at which the phase of cortical thinning stops . . . is better conceptualized as the points of transition into the essentially stable cortical dimensions of adulthood."[114]

That brain development continues much longer than originally believed has come to be a fairly well-recognized conclusion in the literature—another academic article in the field states that:

> Total cortical gray matter volume peaks at about age 11 years in girls and age 13 years in boys. . . . Areas such as the prefrontal cortex—a key component of neural circuitry involved in judgment, impulse control, and long-range planning—are particularly late to reach adult morphometry, *continuing to undergo dynamic changes well into the 20s*.[115]

These studies have made their way into lay knowledge as well.  For instance, a June 2015 article in *Scientific American* described the emerging research on brain development, and noted: "we now know that the pre-frontal cortex continues to change prominently until well into a person's 20s."[116] The article observes the clear implication that adolescence may last beyond the teenage years.[117]  Another article in *National Geographic* offered the view that teenagers "act that way because their brains aren't done!  You can see it right there in the [MRI] scans!"[118]

One notable dissemination to the general public on the emerging research on adolescent brain development occurred in a relatively recent PBS program on *Frontline*, entitled "Inside the Teenage Brain," which highlighted the research of Dr. Jay Giedd at the National Institute of Mental Health, along with other researchers at McGill University.[119]  Dr. Giedd and his colleagues studied the brains of 145 children and performed MRI scans on them at two-

---

112.  *Id.* at 3587.

113.  *Id.* at 3588–90, 3593.

114.  *Id.* at 3589.

115.  Jay N. Giedd, *The Digital Revolution and Adolescent Brain Evolution*, 51 J. ADOLESCENT HEALTH 101, 102 (2012) (emphasis added).

116.  Jay N. Giedd, *The Amazing Teen Brain*, SCI. AM., June 2015, at 33, 34.

117.  *Id.* at 36.

118.  David Dobbs, *Beautiful Brains*, NAT'L GEOGRAPHIC (Oct. 2011), http://ngm.nationalgeographic.com/print/2011/10/teenage-brains/dobbs-text (last visited Dec. 20, 2016).

119.  Sarah Spinks, *Adolescent Brains Are Works in Process: Here's Why*, FRONTLINE, http://www.pbs.org/wgbh/pages/frontline/shows/teenbrain/work/adolescent.html (last visited Dec. 20, 2016).

year intervals.[120]  Dr. Giedd reported findings, similar to those discussed herein, that the prefrontal cortex is still developing later in adolescence than previously thought.  He observed:

> [in the teen years, this] part of the brain that is helping organization, planning and strategizing is not done being built yet. . . .  It's sort of unfair to expect them to have adult levels of organizational skills or decision making before their brain is finished being built.[121]

Dr. Giedd and his colleagues also reported that the cerebellum—a part of the brain which has a number of functions, but assists with high-level thinking, including making decisions—has been found to be changing well into adolescence.[122]  Many factors influence the development of the cerebellum.  Dr. Giedd noted:

> Traditionally it was thought that physical activity would most influence the cerebellum, and that's still one of the leading thoughts.  It actually raises thoughts about, as a society, we're less active than we ever have been in the history of humanity.  We're good with our thumbs and video games and such.  But . . . children [today] are doing less and less [physical activity], and we wonder, long term, whether that may have an effect on the development of the cerebellum.[123]

Giedd also said this about the cerebellum: "interestingly, *it's a part of the brain that changes most during the teen years.  This part of the brain has not finished growing well into the early 20s, even*."[124]  As Dr. Giedd later quipped: "In retrospect I wouldn't call it shocking, but it was at the time . . . .  The only people who got this right were the car-rental companies."[125]

The scientific evidence that has emerged over the last decade is fairly clear.  The human brain is complex, and it develops in ways we did not understand—and could not measure—prior to the twenty-first century.  Moreover, the human brain continues to develop well past age eighteen and in most cases into the early twenties and perhaps beyond.

---

120.  *Id.*

121.  *Interview: Jay Giedd*, FRONTLINE, http://www.pbs.org/wgbh/pages/frontline/shows/teen brain/interviews/giedd.html) (last visited Dec. 20, 2016) (emphasis added).

122.  Spinks, *supra* note 119.

123.  *Interview: Jay Giedd*, *supra* note 121.

124.  *Id.* (emphasis added).

125.  Robin Marantz Henig, *What Is It About 20-Somethings?*, N.Y. TIMES (Aug. 18, 2010), http://www.nytimes.com/2010/08/22/magazine/22Adulthood-t.html?pagewanted=all&_r=0. Giedd was referring to car rental companies who sometimes do not rent cars to people under twenty-five, or charge an extra fee for doing so.

## B. Sociological Evidence of Delayed or "Emerging" Adulthood

University of Maryland Professor Jeffrey Jensen Arnett has developed and presented a sociological theory of development that lends a large degree of support to the scientific evidence on brain development discussed above. Recently, Arnett coined the term "emerging adulthood" for the age range from eighteen to twenty-five.[126]  Arnett was initially struck by a sense that the behaviors of his college students were different than previous generations, which was corroborated by some observed demographic shifts between 1970 and the late 1990s—including increases in the American ages for marriage and childbirth, as well as a substantial rise in the percentage of the population attending college.[127]  Based on these demographic trends, Arnett observed that traditional adult roles were not being assumed as early as had been typical before this time.[128]

Therefore, Arnett proposed a novel theory of development for ages eighteen to twenty-five, which he has labeled "emerging adulthood."  He noted that this new, culturally constructed, life phase theory was "neither adolescence nor young adulthood but is theoretically and empirically distinct from them both."[129]

In order to support his theory of emerging adulthood, Arnett looked at several key areas in which people ages eighteen to twenty-five were conceptually distinct demographically, subjectively, and in other ways.  With respect to demographic distinctions, Arnett again noted the degree to which demographic indicators changed from the early 1970s to the present.[130]  The fact that people undertake marital and parental roles later in life, Arnett claimed, has "made a period of emerging adulthood typical for young people in industrialized societies."[131]  Interestingly, however, in surveys conducted by Arnett, he discovered that the people in this age range did not necessarily view attaining those and other demographic statuses—setting up a permanent residence, finishing college, beginning a stable career, and marrying—as critical to achieving adulthood.  Upon realizing this, Arnett took surveys based on their subjective opinions of adulthood attainment and what was critical to becoming an adult.[132]

---

126.  Jeffrey Jensen Arnett, *Emerging Adulthood: A Theory of Development from the Late Teens Though the Twenties*, 55 AM. PSYCHOLOGIST 469, 469 (2000).

127.  *Id.* at 469 (citing Jeffrey Jensen Arnett & Susan Taber, *Adolescence Terminable and Interminable: When Does Adolescence End?*, 23 J. YOUTH & ADOLESCENCE 517 (1994); Suzanne M. Bianchi & Daphne Spain, *Women, Work, and Family in America*, POPULATION BULL., Dec. 1996, at 1).

128.  *Id.*

129.  *Id.* at 469–70.

130.  *Id.* at 470.

131.  *Id.*

132.  *Id.* at 471–73.

The subjective qualities that the respondents viewed as the most relevant to whether adulthood had been attained were comprised of three individual characteristics: (1) "accepting responsibility for one's self"; (2) "making independent decisions"; and (3) "becoming financially independent."[133]   In keeping attainment of these characteristics in mind, Arnett surveyed over 500 people from ages twelve though fifty-five, and asked the question: "Do you feel that you have reached adulthood?"[134]   Respondents were allowed three choices: "yes," "no," or "yes and no."   For the age group eighteen to twenty-five, nearly sixty percent responded "yes and no" (about forty percent said "yes").[135]   Only after the three individual characteristics listed above "reached fruition" did the respondents feel that they had fully reached adulthood.[136]   Importantly, Arnett noted that "[f]or most young people in American society, *this occurs some time during the twenties and is usually accomplished by the late twenties.*[137]

Arnett noted other considerations that supported his theory of emerging adulthood.  First, he pointed to the well-researched literature on adolescent risk-taking and compulsive behavior, such as, for example, "unprotected sex, most types of substance use, and risky driving behaviors such as driving at high speeds or while intoxicated."[138]   As an example, Arnett includes data from a known study on the rates at which various age groups engaged in

---

133.  *Id.* at 473 (citing Jeffrey Jensen Arnett, *Learning to Stand Alone: The Contemporary American Transition to Adulthood in Cultural and Historical Context,* 41 HUM. DEV. 295 (1998) [hereinafter Arnett, *Learning to Stand Alone*]; Jeffrey Jensen Arnett, *Young People's Conceptions of the Transition to Adulthood,* 29 YOUTH & SOC'Y 1 (1997) [hereinafter Arnett, *Young People's Conceptions*]; A. L. Greene et al., *Stages on Life's Way: Adolescents' Implicit Theories of the Life Course,* 7 J. ADOLESCENT RES. 364 (1992); Scott D. Scheer et al., Adolescents Becoming Adults: Attributes for Adulthood, Poster presented at the biennial meeting of the Society for Research on Adolescence, San Diego, CA (Feb. 1994)).  Arnett noted that "[p]arenthood ranks low in young people's views of the essential criteria for adulthood for people in general, but those who have had a child tend to view becoming a parent as the most important marker of the transition to adulthood for themselves." *Id.*

134.  *Id.* at 472 fig.2.

135.  *Id.*   The other responses were as follows (percentages approximate): (1) 12–17: 18% yes, 38% no, 45% yes and no; (2) 26–35: 65% yes, 2% no, 33% yes and no; (3) 36–55: 90% yes, 2% no, 6% yes and no.  *Id.*   The "yes and no" category was described as ambiguous: "*in some respects yes, in some respects no.*"  *Id.*   As Arnett described it:

> This reflects a subjective sense on the part of most emerging adults that they have left adolescence but have not yet completely entered young adulthood.  They have no name for the period they are in—because the society they live in has no name for it—so they regard themselves as being neither adolescents nor adults, in between the two but not really one or the other.

*Id.* at 471 (citing Arnett, *Learning to Stand Alone, supra* note 133; Arnett, *Young People's Conceptions, supra* note 133; Jeffrey Jensen Arnett, *Are College Students Adults? Their Conceptions of the Transition to Adulthood,* 1 J. ADULT DEV. 213 (1994)).

136.  *Id.* at 473.
DEVELOPMENTAL REV139. *Id.* at 475 fig.3 (citing Jerald G. Bachman et al., *supra* note 138, at 118).
DEVELOPMENTAL REV139. *Id.* at 475 fig.3 (citing Jerald G. Bachman et al., *supra* note 138, at 118).

binge drinking, which showed that the percentage of respondents that had engaged in binge drinking steadily increased until the peak ages of twenty-one to twenty-two (where it hit approximately forty percent), and then steadily decreased with age throughout the twenties.[139]  Similar results have been established for substance use, which "rises to a peak in the early twenties during the role hiatus of emerging adulthood, declines steeply and sharply following marriage, and declines further following the entry to parenthood."[140]  According to Arnett, these findings illustrate two factors emerging adults experience, which allow them to more freely pursue their own experiences.  First, they are no longer considered adolescents and thus can act without meaningful parental supervision and, second, they are not yet tied down by marital or parental responsibilities.[141]  In short, they enjoy many of the benefits of traditional adulthood, with few of the responsibilities.

Arnett addresses an interesting historical shift in attitudes and perceptions towards adolescence that occurred over the course of the twentieth century.  He cites G. Stanley Hall as the pioneer of the study of adolescence as a scientific endeavor, with the publication of Hall's two-volume treatise on the subject in 1904, and states that Hall's role in this regard is "widely known."[142]  Arnett points out, however, that a less known aspect of Hall's scholarship is that he contended that adolescence endured through age twenty-four (as opposed to the then more traditionally viewed endpoint of age of eighteen or nineteen).[143]  Arnett posits two possible explanations for the change in perception of the end of adolescence to the lower age of eighteen.  One explanation is the reduction of the age of the onset of puberty—a century ago, the median age of menarche was around fifteen; it declined steadily through the twentieth century and is now closer to twelve-and-a-half.[144]  This potentially explains a different perceived beginning point for adolescence.  Additionally, Arnett believes that what may explain a different perceived ending point for adolescence is high school: "[i]n 1900, only 10% of persons ages 14–17 were enrolled in high school.  However, this proportion rose steeply and steadily over the course of the 20th century to reach 95% by 1985."[145]  He speculates that it would not have made any sense for Hall to choose age eighteen as the

---

139.  *Id.* at 475 fig.3 (citing Jerald G. Bachman et al., *supra* note 138, at 118).

140.  *Id.* at 475.

141.  *Id.*

142.  *Id.* at 476 (citing G. STANLEY HALL, 1 ADOLESCENCE: ITS PSYCHOLOGY AND ITS RELATION TO PHYSIOLOGY, ANTHROPOLOGY, SOCIOLOGY, SEX, CRIME, RELIGION, AND EDUCATION (1904)).

143.  *Id.*

144.  *Id.* (citing Jeanne Brooks-Gunn & Roberta Paikoff, *Sexuality and Developmental Transitions During Adolescence*, *in* HEALTH RISKS AND DEVELOPMENTAL TRANSITIONS DURING ADOLESCENCE 190 (John Schulenberg et al., eds., 1997); PHYLLIS EVELETH & J. TANNER, WORLDWIDE VARIATION IN HUMAN GROWTH (1976)).

145.  *Id.* (citing Arnett & Taber, *supra* note 127, at 517–37).

end point of adolescence in 1900, because no particularly important transitions occurred then: "Education ended earlier, work began earlier, and leaving home took place later.  Marriage and parenthood did not take place for most people until their early twenties or midtwenties, which may have been why Hall designated age 24 as the end of adolescence."[146]  On the other hand, of course, turning eighteen now signals a significant transition and cessation of the typical presence of several factors—living with parents, experiencing puberty, and attending high school.[147]

Finally, Arnett makes the case that emerging adulthood should henceforth be perceived as a separate, conceptually distinct life stage—subsequent to adolescence, but prior to adulthood.[148]  He cites several reasons for this conclusion.  First, he reiterates the data: "*most* young people in this age period [18-25] would disagree that they have reached adulthood.  They see themselves [instead] as gradually making their way into adulthood . . . ."[149]  Arnett also reasons that it makes no sense to lump ages eighteen through thirty into one age group, "young adulthood," because the eighteen to twenty-five period is quite distinct from the thirties and beyond.  The majority of people ages eighteen to twenty-five are single, childless, and still getting education and training for an eventual career.  In contrast, most people in their thirties have settled into a defined career path, married and have at least one child.[150]  Although exceptions to these patterns surely exist, Arnett believes that "[e]merging adulthood and young adulthood should be distinguished as separate developmental periods."[151]

Other scholars, in addition to Arnett, have identified similar trends.  Tom Smith wrote on the gathering and study of age norms for a variety of transitions to adulthood, conducted by the Network on the Transitions to Adulthood of the MacArthur Foundation.[152]  The study inquired as to the importance of seven different indicators to becoming an adult (either extremely important, quite important, somewhat important, not too important, or not at

---

146.  *Id.* at 476 (citing Arnett & Taber, *supra* note 127).

147.  *Id.*

148.  *Id.* at 477.  Arnett actually refers here to the distinction between "emerging adulthood" and "*young* adulthood," but what he means by young adulthood here is the attainment of most of the attributes of full adulthood and responsibility.  *Id.*  Therefore, for all intents and purposes, he means transcending the "emerging adulthood" label and becoming, simply, an adult.

149.  *Id.* (emphasis added).

150.  *Id.*

151.  *Id.*  Arnett also notes that the concept of emerging adulthood can vary considerably by culture or country.  *Id.* at 477–78.  For instance, he notes that the median age of marriage in women is generally higher (twenty-five to almost twenty-seven) in the Western and industrialized countries, then it is in the developing countries (eighteen to twenty-two).  *Id.* at 478.

152.  Tom W. Smith, *Coming of Age in Twenty-First Century America: Public Attitudes Towards the Importance and Timing of Transitions to Adulthood*, 29 AGEING INT'L 136, 137–38 (2004).

all important), and by what age the transition should occur.  The seven indi-
cators were:

> a.  Financially independent from their parents/guardians
> b. No longer living in their parents' household
> c. Completed their formal schooling
> d. To be employed full-time
> e. Be capable of supporting a family financially
> f. Have a child
> g. Get married[153]

The results of Smith's study were as follows[154]:

|  | Mean Age Indicator Should Occur | Extr. Imp. | Quite Imp. | Somewhat Imp. | Not too Imp. | Not at all Imp. |
|---|---|---|---|---|---|---|
| *Complete Education* | 22.3 | 72.3 | 17.9 | 7.0 | 2.1 | 0.8 |
| *Employed Full-time* | 21.2 | 61.0 | 22.8 | 11.7 | 3.8 | 0.7 |
| *Supporting a Family* | 24.5 | 60.3 | 22.0 | 11.2 | 4.6 | 1.8 |
| *Financially Independent* | 20.9 | 47.4 | 33.5 | 16.0 | 2.1 | 1.0 |

---

153.  *Id.* at 138.
154.  *Id.* at 139 tbl.1.

| | | | | | | |
|---|---|---|---|---|---|---|
| *Not Living w/ Parents* | 21.1 | 29.3 | 27.9 | 25.0 | 13.3 | 4.4 |
| *Married* | 25.7 | 19.1 | 14.1 | 21.6 | 24.0 | 21.1 |
| *Have a Child* | 26.2 | 15.8 | 13.2 | 23.3 | 25.3 | 22.4 |

The results are listed in the order of what percentage believed the factor was "extremely important." As can be seen, completing an education was the factor most commonly viewed as extremely important, followed by full-time employment, being capable of supporting a family, being financially independent, and not living with parents.[155] All of these factors were seen as either extremely important or quite important (combined) by a substantial majority of the respondents.[156] Moreover, although the mean ages at which the respondents thought each of these transition indicators should occur varied, none of the mean ages were appreciably younger than twenty-one.[157]

The survey results discussed by Arnett and Smith above are fully corroborated by actual demographic data. For instance, the Census Bureau has collected data on the median age of first marriages from 1890 to the present. This data shows that the median age of marriage in men was twenty-six years old in 1890 (twenty-two for women), which fell steadily until it reached a low in the 1950s and early 1960s (a little over twenty-two in men and around twenty in women).[158] It rose again throughout the 1970s and beyond, reaching an all-time high in 2010 (28 in men and 26 in women).[159] Similarly, according to data collected by the national birth registration system, the mean age of mothers giving birth to their first child rose from 21.4 in 1970 to 24.9 in 2000—a 3.5-year increase.[160] The percentage of eighteen- to twenty-four-year-olds living with their parents (excluding college dorm inhabitants) is shown to have risen from around 24% in 2000 to over 32% in 2012.[161] An inverse relationship has also been noted between the percentage of eighteen- to nineteen-year-olds in the workplace versus those enrolled in school: the

---

155.   *Id.*

156.   *Id.*

157.   *Id.*

158.   U.S. CENSUS BUREAU, FIG. MS-2, MEDIAN AGE AT FIRST MARRIAGE: 1890 TO PRESENT, https://www.census.gov/hhes/families/files/graphics/MS-2.pdf (last visited Dec. 21, 2016).

159.   *Id.*

160.   T.J. Matthews & Brady E. Hamilton, *Mean Age of Mother, 1970–2000*, 51 NAT'L VITAL STAT. REP. 1, 2 (2011), http://www.cdc.gov/nchs/data/nvsr/nvsr51/nvsr51_01.pdf.

161.   David Dayen, *Yes, Millenials Actually Are Living in Their Parents' Basements*, NEW REPUBLIC (July 9, 2014), https://newrepublic.com/article/118619/millennials-living-parents-numbers-behind-trend.

percentage enrolled in school rose from around 48% in 1970 to over 70% in 2012, whereas the percentage in the workplace fell from 60% in 1970 to around 48% in 2012.[162]

These demographic trends have helped demonstrate that the age for achieving adulthood has dramatically changed in the United States and most of the developed world.[163]  Because of a variety of factors, today's young adults are often still fully dependent on their parents while in college and in search of permanent employment; as a result, age eighteen or twenty-one is no longer a clear indication of adulthood.[164]  Dr. Giedd concurs, noting that all of this evidence shows that adolescence appears to now extend beyond the teenage years, since traditional adult roles such as marriage, parenthood and home ownership are happening at least five years later than what was normative in the 1970s.[165]

These trends have not gone unnoticed by the mass media.[166]  The *New York Times* observed that some of the traditional markers of adulthood—finishing education, moving out, becoming economically self-reliant, getting married and becoming a parent—were being realized by substantially fewer thirty-year-olds in 2000 than in 1960, thus observing that "[t]he traditional cycle seems to have gone off course."[167]  This, the article concluded, seems to indicate that people are reaching adulthood later in life than ever in history.[168]  Another *New York Times* article, more tongue-in-cheek, bemoans the state of parents who have to deal with a son or daughter who has reached "The Terrible 32s" stage of life:

> The Terrible 32s are a perfectly normal stage in your youngish adult's development, characterized by cranky self-pity over the discrepancy between the life she has and the one she feels entitled to based on popular-culture narratives and her peers' achievements, such as those of Laura, who recently landed a big promotion, and maybe it's worth calling her to see if there's an opening at her company?[169]

---

162. *Id.*

163. Gordon Berlin et al., *Introducing the Issue*, 20 TRANSITION TO ADULTHOOD 3, 3 (2010), https://www.princeton.edu/futureofchildren/publications/docs/20_01_FullJournal.pdf.

164. *Id.* at 4.

165. Giedd, *supra* note 116, at 36.

166. Berlin et al., *supra* note 163, at 3.

167. Henig, *supra* note 125.

168. *Id.*

169. Kate Greathead & Teddy Wayne, *The Terrible 32s*, N.Y. TIMES (Nov. 1, 2014), http://www.nytimes.com/2014/11/02/opinion/sunday/the-terrible-32s.html.  Other media articles on the subject abound.  *See, e.g.*, Richard Fry, *A Rising Share of Young Adults Live in Their Parents' Home*, PEW RES. CENT. (Aug. 1, 2013), http://www.pewsocialtrends.org/2013/08/01/a-rising-share-of-young-adults-live-in-their-parents-home/; Mickey Goodman, *Are We Raising a Generation of Helpless Kids?*, HUFF. POST (Feb. 23, 2012, 6:31 PM), http://www.huffingtonpost.com/Mickey-goodman/are-we-raising-a-generati_b_1249706.html; *Is Today's Generation Less Mature Than the*

Accordingly, the trends described herein are not only well established in the academic literature and demographic data, but are present in the larger media and known by the lay audience, as well. There is broad recognition that young people are maturing into adulthood later than had been previously perceived, certainly later than age eighteen.

### C. Existing and Developing Recognition of Post-Eighteen Adolescence in the Legal Context

In order to establish that there is recognition that a person does not automatically reach adulthood upon turning eighteen, the final area to be addressed is legal recognition. A few key areas in the law either recognize a higher age requirement to engage in certain behavior or, when determining liability for potentially unlawful conduct, take maturity into account. In doing so, these areas of legal regulation seemingly recognize and corroborate the realities of brain development and maturity discussed in Part II.A. Although not necessarily exhaustive, the following areas of legal regulation will be discussed for present purposes: the legal drinking age, the federal Credit Card Accountability Responsibility and Disclosure Act, the legal smoking age, and the military service age. Each of these areas helps establish, in different ways, that true adulthood lies beyond one's eighteenth birthday.

#### 1. Legal Drinking Age

The national legal drinking age is twenty-one, not eighteen.[170] This is so, on its face, because policymakers have made qualitative judgments about the requisite maturity level for responsible consumption of alcoholic beverages. A brief review of the history of the drinking age limit, however, is quite illuminating for the subject at hand.

Unlike the contract age of majority, there apparently were no significant age-based restrictions on the purchase or consumption of alcohol until the 1880s.[171] These restrictions occurred at a time when governmental paternalism toward adolescents was ascending in general, resulting also in mandatory

---

*Previous?*, YAHOO! ANSWERS, https://answers.yahoo.com/question/index?qid=20121205180301AAzPZ5Y (last visited Dec. 21, 2016). The issue has even reached the entertainment world—a 2006 movie starring Matthew McConaughey, *Failure to Launch*, is described with the plot summary: "A thirtysomething slacker suspects his parents of setting him up with his dream girl so he'll finally vacate their home." *Failure to Launch*, IMDB, http://www.imdb.com/title/tt0427229/ (last visited Dec. 21, 2016).

170. *21 Is The Legal Drinking Age*, FED. TRADE COMM'N (Sept. 2013), https://www.consumer.ftc.gov/articles/0386-21-legal-drinking-age.

171. Michael P. Rosenthal, *The Minimum Drinking Age for Young People: An Observation*, 92 DICK. L. REV. 649, 649–52 (1988).

schooling, juvenile justice, and regulations on child labor.[172]  By the late nine-teenth to the early twentieth century, many states had implemented legal bans on selling alcohol to minors, with age limits ranging among the states from sixteen to twenty.[173]  The country's experiment with Prohibition, of course, legally banned the sale of alcohol for all ages between 1920 and 1933.[174]  In 1933, after the repeal of Prohibition, states reacquired legislative authority over alcohol, and most set twenty-one as the minimum drinking age, which was in line with the then-general age of majority in contract and other adult markers.[175]  The minimum drinking age of twenty-one remained unques-tioned throughout the next four decades or so.[176]

However, during the virulent Vietnam War-era protests,[177] many argued that the drinking age should be lowered to eighteen.[178]  The argument was a perceived inconsistency between eighteen-year-olds being subject to the mil-itary draft and in peril of death by combat, but not being allowed to vote, drink, or exercise other privileges of adulthood.[179]  As a result of the force of these protests, and the perceived unfairness of the scenario in which eighteen-year-old soldiers were placed, twenty-nine states lowered their minimum drinking age to eighteen.[180]

But in the immediate aftermath of lowering the drinking age to eighteen, the number of fatal accidents involving drunk driving steadily increased.[181]  In reaction to this development, some states raised the age back to twenty-one and continued collecting data.[182]  A study by the General Accounting Office reviewed several national and state studies on the correlation between driving fatalities and minimum drinking age and concluded that increasing

---

175.  *Id.* at 307–08.

175.  *Id.* at 307–08.

175.  *Id.* at 307–08.

175.  *Id.* at 307–08.

176.  Rosenthal, *supra* note 171, at 652.

177.  *See supra* Part II.

178.  Rosenthal, *supra* note 171, at 652–53.

179.  *Id.* at 653 (citing R.L. Douglass, *The Legal Drinking Age and Traffic Casualties: A Special Case of Changing Alcohol Availability in a Public Health Context, in* HENRY WECHSLER, MINIMUM DRINKING AGE LAWS 93 (1980)).

180.  *See id.* at 653–54.  This followed suit after the passage of the Twenty-Sixth Amendment granting suffrage to eighteen-year-olds, lowering the contract age of majority, and other similar changes to the law on "adulthood."  *Id.*

181.  *Id.* at 653–54.

182.  *Id.* at 654 (citing William Du Mouchel et al., *Raising the Alcohol Purchase Age: Its Effects on Fatal Motor Vehicle Crashes in Twenty-Six States,* 16 J. LEGAL STUD. 249, 249–50 (1987); Allan F. Williams et al., *The Effect of Raising the Legal Minimum Drinking Age on Involvement in Fatal Crashes,* 12 J. LEGAL STUD. 169 (1983)).

the drinking age would result in statistically significant decreases in fatalities on American roadways.[183]

In light of the increasingly clear data on fatalities caused by underage drinking and lobbying by organizations like Mothers Against Drunk Driving,[184] President Reagan created the Presidential Commission on Drunken Driving, which ultimately concluded that all states should increase the legal drinking age to twenty-one.[185] When this recommendation alone did not result in uniform compliance, Congress enacted the National Minimum Drinking Age Act, which conditioned the states' receipt of full federal highway funding on increasing the legal drinking age to twenty-one.[186] Most states followed suit,[187] so that the national minimum drinking age is, effectively, twenty-one.[188]

The minimum legal drinking age, therefore, is an interesting national experiment with potential implications for the debate about adulthood and the age of contract majority generally. The minimum drinking age was set at twenty-one in the 1930s based on a legislative assessment of the sufficient degree of maturity required to allow the consumption of alcohol. In the early 1970s, during the wave of Vietnam War-era protest, the age was lowered to age eighteen without much thought or analysis beyond the belief that lowering the legal drinking age was "fair," considering the exigencies of that era.[189] It was, in effect, an experiment, the results of which were quickly revealed: eighteen-year-olds *were not sufficiently mature to handle the responsibilities of drinking*. The statistics bore out the irresponsibility of the policymakers of that time. Even now, the statistics are compelling: "The National Highway Traffic Safety Administration estimates that 21-year-old minimum drinking age laws have reduced alcohol traffic fatalities by 13 percent and have saved an estimated 28,765 lives since 1975."[190] This reflects the idea that drinkers under the age of twenty-one have poor judgment and decisionmaking, and

---

183.  *Id.* at 654–55 (citing *National Minimum Drinking Age Law, Hearing Before the Subcomm. on Investigations and Oversight of the Comm. on Public Works and Transportation*, 99th Cong. 27 (1986) (statement of Eleanor Chelimsky, Director, Program Evaluation and Methodology Division, U.S. General Accounting Office)).

184.  *See* Treuthart, *supra* note 172, at 308–09.

185.  Rosenthal, *supra* note 171, at 655; *see also* Presidential Commission on Drunk Driving, Exec. Order 12358, 47 Fed. Reg. 16,311 (Apr. 14, 1982); FINAL REPORT, PRESIDENTIAL COMMISSION ON DRUNK DRIVING 10 (1983).

186.  Act to Amend the Surface Transportation Assistance Act of 1982, Pub. L. No. 98-363, § 6(a), 98 Stat. 435, 437 (1984) (codified as amended at 23 U.S.C. § 158 (2012)).

187.  South Dakota initially resisted, and challenged the constitutionality of the Act; however, it was upheld by the United States Supreme Court. South Dakota v. Dole, 483 U.S. 203 (1987).

188.  *See* FED. TRADE COMM'N, *supra* note 170.

189.  Rosenthal, *supra* note 171, at 653.

190.  *Dangers of Teen Drinking*, FED. TRADE COMM'N, (Sept. 2013), http://www.consumer.ftc.gov/articles/0387-dangers-teen-drinking.

are bad at assessing risk.  Therefore, it would seem that with respect to drinking, the answer is clear—we have decided that a person is not an adult until age twenty-one.[191]

### 2. *The Federal CARD Act*

In 2009, Congress passed the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("CARD Act").[192]  The law was designed to provide several types of consumer protections to existing and prospective credit card holders, including banning retroactive rate increases, clear specification and availability of contract terms, limitations and restrictions on the types and amounts of fees that may be charged, and plain language/disclosure requirements.[193]  The provision that attracted the most media attention, however, was the provision aiming to reform credit card companies' efforts at marketing to students on college and university campuses.[194]

The CARD Act accomplished this legislative goal by placing restrictions on the ability to obtain a credit card for people under the age of twenty-one.[195]  The original draft of the CARD Act, introduced in the House, did not contain the provision relating to age twenty-one, but instead referred to age eighteen—the same as the current contract age of majority.[196]  However, in the Senate version amended in May 2009, the age limit was raised to twenty-one, and this is the version that was approved by both houses the next day and enacted into law.[197]  The CARD Act does not actually prevent people under twenty-one from obtaining a credit card in all scenarios; there are two exceptions.  The first exception provides that the underage person may obtain a credit card if a cosigner over the age of twenty-one agrees to accept joint liability for debt incurred.[198]  The second exception provides that the underage person may be issued a credit card if she "indicat[es] an independent

---

191.  *See* William DeJong, *POV: Legal Drinking Age of 21 Works. Deal with It.*, BU TODAY (Apr. 8, 2014), http://www.bu.edu/today/2014/pov-legal-drinking-age-of-21-works-deal-with-it/.

192.  Credit Card Accountability Responsibility and Disclosure Act of 2009, Pub. L. No. 111-24, 123 Stat. 1734 (2009) (codified as amended in scattered sections of Titles 5, 11, 15, 20 & 31 U.S.C.) [hereinafter CARD Act of 2009].

193.  *Fact Sheet: Reforms to Protect American Credit Card Holders*, OFFICE OF THE PRESS SECRETARY, THE WHITE HOUSE (May 22, 2009), https://www.whitehouse.gov/the-press-office/fact-sheet-reforms-protect-american-credit-card-holders.

194.  *See id.*; *see also* Jennifer Liberto, *Under 21? Getting a Credit Card Just Got Tougher*, CNN MONEY (Feb. 22, 2010, 11:48 AM), http://money.cnn.com/2010/02/19/news/economy /student_credit_cards/.

195.  CARD Act of 2009 § 301, 123 Stat. at 1748 (stating "[n]o credit card may be issued to, or open end consumer credit plan established by or on behalf of, a consumer who has not attained the age of 21").

196.  H.R. 627, 111th Cong. § 7 (as introduced in House, Jan. 22, 2009).

197.  *Id.* § 301 (as amended in Senate, May 19, 2009); H.R. 627, 111th Cong. § 301 (2009) (enacted).

198.  CARD Act of 2009 § 301, 123 Stat. at 1748.

means of repaying any obligation arising from the proposed extension of credit."[199]

The CARD Act provisions have been criticized by some, especially for their contradiction of the present contract age of majority of eighteen. Andrew Schwartz has remarked: "In short, eighteen- to twenty-year-olds are now classified by the law as adults with full capacity to enter into any contract—except a credit card agreement."[200] He rues the passage of the CARD Act because it "reinstates—for credit card contracts—the ancient common-law rule that those under twenty-one are infants lacking capacity to contract."[201] However, Congress apparently felt otherwise, and for good reason. Indeed, consumer advocates had long been concerned with what was seen as credit card companies aggressively taking advantage of college-aged consumers' inexperience and lack of awareness of consumer finance.[202] It was well known that credit card companies frequently utilized on-campus recruiting and lures of free food, t-shirts, or other gimmicks to persuade students into signing credit card applications.[203] The legislative history of the CARD Act does not provide additional insight, but the rationale was apparently obvious: to protect young and naïve eighteen-, nineteen-, and twenty-year-olds from aggressive marketing practices of credit card companies.[204] It seems that Congress decided that—much like with drinking alcohol—age twenty-one was the more appropriate age at which a sufficient level of adult-like maturity could reliably be employed with respect to credit card accounts. What is notable about the CARD Act provisions is that they relate to the very same issues—financial maturity and sound commercial decision making— that animate the general doctrine on the contract age of majority.

---

199. *Id.* Under the accompanying federal regulations, this requires that the minor must be able, on her own, "to make the required minimum periodic payments" on the credit card account. 12 C.F.R. §§ 226.51(a)(1)(i), (b)(1)(i) (2016).

200. Schwartz, *supra* note 61, at 424.

201. *Id.* at 423.

202. Eboni S. Nelson, *From the Schoolhouse to the Poorhouse: The Credit Card Act's Failure to Adequately Protect Young Consumers*, 56 Vill. L. Rev. 1, 13 (2011).

203. *See* Campus Credit Card Trap: A Survey of College Students and Credit Card Marketing, U.S. Pub. Int. Res. Group Educ. Fund (2008), http://www.studentpirgs.org/reports/sp/campus-credit-card-trap.

204. *See* S. Rep. No. 111-16, at 8 (2009) (discussing "[a]ggressive marketing to students" as rationale for the Act's provisions regarding age 21). Note also that the heading of the relevant provisions of the Act is entitled "Protection of Young Consumers." *Id.* at 12.

### 3. Legal Smoking Age

The legal minimum age for smoking is currently eighteen in the vast majority of states.[205]  The legal regulation of smoking has traveled a circuitous route through history.  Prior to colonization, there was a fairly large anti-tobacco sentiment.  King James I, for example, wrote a treatise in 1604 entitled *Counterblast to Tobacco* and declared an English ban on tobacco.[206]  Cigarettes nevertheless made their debut in Europe and the United States in the later part of the nineteenth century.[207]  Beginning in the 1890s and continuing throughout the early part of the twentieth century, a temperance movement swept the United States and several states enacted outright bans on cigarettes.  Moreover, by 1940, a majority of states banned the sale of cigarettes to minors (at the time, still defined as those under the age of twenty-one).[208]  Although the outright bans on cigarette smoking were dropped, the ban on the sale to minors mostly remained, albeit with various state-specific variations.[209]

The "glamour days" of smoking commenced with the end of World War I and continued throughout World War II and the 1950s and 1960s.[210]  Soon thereafter, the Surgeon General's "clarion call" in 1964 for action against the dangers of cigarettes initiated the national campaign against smoking.[211]  Over the next three decades, multiple state and federal efforts were made to address the health effects of smoking.[212]  Efforts intensified in the 1990s; in 1992, Congress passed the Synar Amendment to the Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act.[213]  The Synar Amendment conditioned states' receipt of federal substance abuse grant money on the states' implementation and effective enforcement of laws banning the sale of tobacco to those under the age of eighteen.[214]  After the Synar

205.  RICHARD J. BONNIE ET AL., INST. OF MED. OF THE NAT'L ACADS., PUBLIC HEALTH IMPLICATION OF RAISING THE MINIMUM AGE OF LEGAL ACCESS TO TOBACCO PRODUCTS 3 (2015), http://iom.nationalacademies.org/Reports/2015/TobaccoMinimumAgeReport.aspx.

206.  Lee J. Alston, et al., *Social Reformers and Regulation: The Prohibition of Cigarettes in the United States and Canada*, 39 EXPLORATIONS IN ECON. HIS. 425, 428 (2002), http://www.colorado.edu/ibs/es/alston/econ8534/SectionIX/Alston,_Dupre_and_Nonnenmacher,_Social_Reformers_and_Regulation.pdf.  The treatise described tobacco as "[a] custom loathsome to the eye, hateful to the nose, harmful to the brain, dangerous to the lungs and in the black stinking fume thereof, resembling the horrible Stygian smoke of the pit that is bottomless." *Id.*

207.  *Id.*

208.  *Id.* at 431–32.

209.  *Id.* at 432.

210.  Tad Vezner, *Smokers Have Faced Tougher Bans: Debate Smolders Through Ages*, THE BLADE, Oct. 24, 2004, at B2.

211.  *See* BONNIE ET AL., *supra* note 205, at ix.

212.  *Id.*

213.  ADAMHA Reorganization Act, Pub. L. No. 102-321, § 1926, 106 Stat. 323, 394 (1992).

214.  *See* BONNIE ET AL., *supra* note 205, at 17–18.

Amendment, forty-six states set the minimum tobacco age at eighteen, and four states put a nineteen-year-old age limit into place.[215]

Today, there is a movement afoot seeking to raise the smoking age to twenty-one. Several cities have recently already done so on a municipal level.[216] As part of this continuing movement, Congress directed the Food and Drug Administration to commission a report on the potential health effects of increasing the minimum smoking age.[217] The resulting report, *Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products*, was issued in March 2015 by a committee of the independent Institute of Medicine.[218] The report "supports increasing the tobacco purchase age to 21 from 18, saying it would decrease early deaths, cut low birth weights and 'substantially' reduce the number of 15- to 17-year-olds who begin smoking."[219] Over 70% of the American public—including 58% of current smokers—support the proposal to increase the minimum legal smoking age to twenty-one, and most respondents believe it is important to prevent teenagers' use or experimentation with tobacco products.[220]

Notably, the Institute of Medicine cited some of the same emerging evidence of brain and social development, as were referred to in Parts III.A and III.B. Specifically, the report notes that "[t]he development of adult decision-making skills and abilities is a continuous process that begins in early adolescence and continues into and through young adulthood."[221] The study also references the distinct period, from ages eighteen to approximately twenty-six, which is increasingly seen as a distinct developmental phase.[222] The emphasis on this age range, the report contended is due to two categories of factors—one is the current trend of delayed achievement of traditional markers of adulthood (education, marriage, and parenthood), and the other is the newfound scientific discovery that brain development continues well into the twenties.[223] The report then tied these factors to decisionmaking regarding smoking: "[t]he unique psychosocial maturation of the adolescent and young adult developmental period, coupled with various environmental and social influences, results in a milieu that increases the desire for engaging in health-risk behaviors, including tobacco use."[224] In short, the findings demonstrated

---

215. *Id.* at 3.

216. Tripp Mickle, *Study Supports Raising Tobacco-Purchase Age to 21*, WALL ST. J. (Mar. 12, 2015, 7:41 PM), http://www.wsj.com/articles/study-supports-raising-tobacco-purchase-age-to-21-1426172582.

217. BONNIE ET AL., *supra* note 205, at x.

218. *Id.*; *see also* Mickle, *supra* note 216.

219. Mickle, *supra* note 216.

220. *Id.*

221. BONNIE ET AL., *supra* note 205, at 63.

222. *Id.*

223. *Id.*

224. *Id.* at 64.

that age eighteen has come to be seen as insufficiently mature, as a generalized matter, to risk granting the power to choose to engage in use of cigarettes or other smoking products.  The report considers age twenty-one as a more appropriate milestone to mark the transition to adulthood for this purpose.

Accordingly, in three different legal areas, lawmakers have considered and modified the age of adulthood to age twenty-one.  The minimum drinking age was once age eighteen, but for policy reasons it was increased to age twenty-one.  Similarly, the age for obtaining a credit card has been set for many purposes to age twenty-one rather than age eighteen.  And, at the municipal, state, and federal level, governments have raised or are considering raising the minimum smoking age to twenty-one.  What all of these developments have in common is they rely on a comparatively recent recognition that age twenty-one is a more appropriate legal marker for adulthood than age eighteen.

## IV. A RETURN TO A MAJORITY AGE OF TWENTY-ONE AND SOME OBJECTIONS

The contract doctrine of incapacity is a well-established tradition of the common law.[225]  It serves to protect minors from their own foolish, improvident decisions, and from exploitation by commercial entities and adult contracting partners.[226]  There is every reason to continue protecting minors into the twenty-first century because business are targeting minors for profit more than ever before.[227]  Section A presents the argument for raising the contract age of majority to twenty-one.  Section B outlines possible objections.

### A.  Return to a Majority Age of Twenty-One

For more than half a millennium, the majority age for contract was twenty-one.[228]  While it may be true that this age was set as a result of the weight of medieval English armor[229]—a fact seemingly irrelevant to the cognitive capacities of young persons to make contractual decisions—the reality is that the age was set as a matter of contract, and was unquestioned throughout a period exceeding five centuries.  There was never any documented objection to the age nor was anyone pointing out the obvious absurdity of the reason for setting an age in the first place; rather, it was accepted for centuries as a sound basis for the arbitrary legal transition to adulthood.  There may have been some rough accuracy in correlating the physical development of a

---

225.  *See supra* Part I; *see also* Victoria Slade, Note, *The Infancy Defense in the Modern Contract Age: A Useful Vestige*, 34 SEATTLE UNIV. L. REV. 613, 616 (2011).

226.  *See supra* notes 8–12 and accompanying text.

227.  *See* Slade, *supra* note 225, at 632–34.

228.  *See supra* notes 56–61 and accompanying text.

229.  *See supra* notes 56–61 and accompanying text.

boy being able to bear the weight of armor, which physical development surely mirrored the cognitive and neurological development occurring at the same time. The medieval English may not have had MRIs and neuroscience, but they surely had a good degree of learned common sense. The only reason that the age was ever lowered from twenty-one to eighteen was the convulsive, unique period of political turmoil that accompanied the Vietnam War and the protest that accompanied the military draft of those eighteen years of age and older.[230]  In essence, it was the idea that a person that was "[o]ld enough to fight," was "old enough to vote."[231]

Here's the thing—we were wrong.[232]  The factors that go into drafting able-bodied soldiers in an exigent time of war have little to nothing to do with the cognitive capacities necessary to vote or to contract, and they were illogically conflated during the debate in the aftermath of the Vietnam War and the draft. As Congressman Emmanuel Celler stated during the 1960s:

> To say that he who is old enough to fight is old enough to vote is to draw an utterly fallacious parallel. No such parallel exists. The ability to choose, to separate promise from performance, to evaluate on the basis of fact, are the prerequisites to good voting. Eighteen to twenty-one are mainly formative years where the youth is racing forward to maturity. His attitudes shift from place to place. These are the years of the greatest uncertainties, a fertile ground for the demagogues. Youth attaches itself to promises, rather than to performance. These are rightfully the years of rebellion rather than reflection. We will be doing a grave injustice to democracy if we grant the vote to those under twenty-one.[233]

Fighting and voting are, as Congressman Celler said at the time, "as different as chalk is from cheese."[234]  Soldiers (certainly at the typical initial enlistment age of eighteen to twenty) are supposed to be "uncritically obedient," whereas the nature of voting is to question, analyze, weigh choices, and "to evaluate on the basis of fact."[235]  Of course, many of the same cognitive functions Congressman Celler discussed with respect to voting apply equally or to a greater extent in contracting.

Congressman Celler's rationale was lost in a universal, frenzied chorus of political support at the time for lowering the age of voting (and eventually, contract), in light of the perceived fairness of letting eighteen-year-olds have

---

230. *See supra* notes 62–93 and accompanying text.

231. Schwartz, *supra* note 61, at 412 (citing CULTICE, *supra* note 63, at 234).

232. Or, as Gob Bluth might have said on the TV sitcom *Arrested Development*, "I've made a huge mistake." *Arrested Development* (Fox television broadcast, 2003).

233. KEYSSAR, *supra* note 71, at 226.

234. DONALD GRIER STEPHENSON, JR., THE RIGHT TO VOTE: RIGHTS AND LIBERTIES UNDER THE LAW 249 (2004).

235. *Id.*

a say in selecting the political leaders who may subsequently decide to send them to war. But, these things are conceptually distinct, and the connections between the two were not particularly well thought out at the time. As Michael Rosenthal put the point:

> To the extent the Vietnam War was responsible for lowering the age of majority in general and the minimum drinking age in particular in a large number of states, *it should be realized that the changes were for reasons somewhat different than the reasons an age of majority is usually lowered or raised.* Normally, a change is based on society's view of the age that should be considered the age of responsible decision-making or competency. When states lowered the age of majority and the minimum drinking age because boys were serving and dying in the War, however, they did so because society felt it was *unfair* to have them serve and die and yet not have the rights and privileges of adults. *The states did not inquire whether the boys were mature enough to vote or to handle liquor; they just deemed the treatment to be unfair.*[236]

Now, with the benefit of forty-plus years of hindsight, Congressman Celler seems prophetic. Rosenthal's point that the age of majority was hastily lowered without sound rationalization is well taken. Their views on the capacity needed to make sound, adult-like voting decisions cohere very well with today's knowledge about brain development. We now know, due to advancements in modern science, that the human brain is still developing well into a person's twenties—past twenty-one, usually, and certainly well past age eighteen.[237] Therefore, we have reason to believe that age eighteen does not generally indicate full, neurological adulthood. This has recently been corroborated by sociologists and others through observance of the typical age of traditional adult achievements, such as completing education, becoming residentially independent, getting married, and becoming a parent.[238] As discussed above, Jeffrey Jensen Arnett has deemed the age range of eighteen to twenty-five as a distinct new life phase called "emerging adulthood"— a period distinct from actual, full adulthood.[239] Surveys indicate that most people expect that the usual markers of adulthood, including attainment of financial independence, should occur between the ages of twenty-one and twenty-six or so.[240]

---

236. Rosenthal, *supra* note 171, at 653 (emphasis added).
237. *See supra* Part III.A.
238. *See supra* Part III.B.
239. *See supra* Part III.B.
240. *See supra* notes 152–157 and accompanying text.

We also have evidence from other legal areas that experimentation with age eighteen as the age of majority has been determined to be a policy failure.[241]  The legal age of drinking alcohol was reduced from age twenty-one to age eighteen during the same Vietnam War-era "old enough to fight" protests; however, we quickly changed our minds when the statistics ominously brought to light the poorer impulse and risk control exhibited by eighteen- and nineteen-year-olds in the form of marked increases in fatal highway accidents, and the age was raised back to twenty-one.[242]  The same transformation is now beginning with respect to legal regulation of smoking, as recent studies show that the overwhelming majority of smokers begin smoking when they are teenagers and lack maturity and risk-assessment ability.  As a result of these findings, an increase of the legal minimum smoking age to twenty-one is being contemplated on a national level.[243]  And recently, the federal CARD Act imposed significant limits on the ability to obtain a credit card before age twenty-one, because of the perception that college-age students under twenty-one were being targeted by the credit card companies precisely for their unequal bargaining power and their poor maturity in making credit and financial decisions.[244]  These are, of course, the very same areas of decision and cognitive activity that are employed when a person makes contract decisions, and yet the contract age of majority remains eighteen at present.

Age eighteen, as it turns out, is not old enough as an adult marker for all of these legal areas.  Frankly, it may not be a good age at which to let citizens vote, as Congressman Celler argued and others have more recently observed.[245]  Of course, that is a political and, now, a constitution decision,[246] and the likelihood of changing the voting age is relatively low at this point.  Additionally, some have even questioned whether the military draft age of eighteen—the starting point for this entire chronology of "proof" that age eighteen equals adulthood—should be retained, as opposed to raising the minimum age back to twenty-one.[247]  Interestingly, it should be noted that

---

241.  *See supra* Part III.C.

242.  *See supra* Part III.C.1.

243.  *See supra* Part III.C.3.

244.  *See supra* Part III.C.2.

245.  *See, e.g.*, Glenn Harlan Reynolds, Opinion, *Glenn Reynolds: After Yale, Mizzou, Raise the Voting Age—to 25*, USA TODAY (Nov. 16, 2015, 10:18 AM), http://www.usatoday.com/story/opinion/2015/11/11/raise-voting-age-25-yale-missouri-protests-political-debate-column/75577468/; Ann Coulter, *Repeal the 26th Amendment!*, ANNCOULTER.COM (Nov. 10, 2010), http://www.anncoulter.com/columns/2010-11-10.html.

246.  U.S. CONST. amend. XXVI.

247.  *See, e.g.*, *These Boiled Brains of Nineteen*, ECONOMIST (Sept. 28, 2010, 5:36 PM), http://www.economist.com/blogs/democracyinamerica/2010/09/future_contrition_0; Michael Tierney, *The Draft Age Should be 21, Not 18*, PHILA. INQUIRER (June 4, 1988), http://articles.philly.com/1988-06-04/news/26267232_1_draft-registration-military-service-enlistments.

even the military seems to recognize the concept of emerging adulthood to some degree.  For one, the current version of the "draft" system—the Selective Service registration system—requires all males from ages eighteen to twenty-six to register with the system.[248]  This happens to cohere with Arnett's phase of "emerging adulthood" (coincidentally or not).  Moreover, the military has a sequence of mobilization in the event an involuntary draft was ever commenced in the future due to a national emergency.[249]  According to the Selective Service System website, men aged twenty will be drafted first, followed by ages twenty-one through twenty-five.  Notably, the Selective Service maintains that eighteen- and nineteen-year-olds will "probably not be drafted."[250]  Although the reasons are not given, it would be reasonable to infer that the Selective Service plans to avoid drafting eighteen- and nineteen-year-olds because they are still immature and not truly adults.

Be that as it may, the fact remains that the happenstance of soldiers being drafted into war at age eighteen in a time of national emergency is not probative that they are sufficiently adult-like for purposes of decisionmaking and contracting.  The two should never have been conflated, and little reason exists for them to have been treated as related other than the explosive time of political and emotional Vietnam War-era protest.  As Michael Rosenthal has stated, little thought went into lowering the age of majority, other than exigent-wartime emotional pleas for fairness.[251]  And, as Kathleen Horan has observed, the early 1970s may have been precisely the *wrong* point at which to lower the age, because it was just at this point that college education became more normative, which in turn led to a delay in the assumption of self-sufficiency and other markers of adulthood.[252]  A law review article from 1965—several years before the reduction to age eighteen occurred—made a similar point:

> [T]he modern minor spends more time in attaining a formal education than did his counterpart of even three decades ago.  He is thus isolated from the commercial world to a greater degree than if he were earning a living, and is likely to be less sophisticated in the ways of contract and business.  *Therefore, from the standpoint of*

---

248.  50 U.S.C. app. § 453 (2012).

250.  *Id.*; Suzanne Gamboa, *What Many Young Men Need to Know About the Draft*, NBC NEWS (Oct. 14, 2014, 7:39 AM), http://www.nbcnews.com/news/latino/what-many-young-men-need-know-about-draft-n224746.

250.  *Id.*; Suzanne Gamboa, *What Many Young Men Need to Know About the Draft*, NBC NEWS (Oct. 14, 2014, 7:39 AM), http://www.nbcnews.com/news/latino/what-many-young-men-need-know-about-draft-n224746.

251.  *See* Rosenthal, *supra* note 171, at 653.

252.  Kathleen Conrey Horan, *Postminority Support for College Education—A Legally Enforceable Obligation in Divorce Proceedings?*, 20 FAM. L.Q. 589, 604 (1987) (citing Washburn, *Post-Majority Support: Oh Dad, Poor Dad*, 44 TEMP. L.Q. 319, 328–29 (1971)).

> *the maturity of today's youth, the age of twenty-one might be too low an age to grant contractual capacity.*[253]

More recently, Cheryl Preston and Brandon Crowther have observed that "[t]rends of the past few decades suggest that if legislatures were to move the line, the cutoff age would likely *increase, not decrease*."[254] Furthermore, the point on delayed financial independence overlaps with another reason that age twenty-one is more appropriate: part of the reality of the infancy doctrine is to allow immature minors to avoid poorly-made contract decisions, so that their *parents* will not ultimately have to foot the bill.[255] If the contract age of majority is left at eighteen, then eighteen- and nineteen-year-old "adults" will be bound to their obligations, even though the reality is that this "adult" is still looking to her parents to bail her out (the technicality that the parents are not legally obligated to support their daughter at that age being outweighed by the relational reality that they often will).[256] Shifting the age back to twenty-one would more closely align with the realities of most family support situations.[257]

Accordingly, the contract age of majority should never have been lowered and thus should be returned to age twenty-one. Simply put, if the goal of the contract law minority doctrine is to soundly and sensibly set the age at which we best estimate that sufficient maturation and development has occurred so that contract decisions, risk assessments, and understanding can be appropriately undertaken, then the evidence is clear: age twenty-one is a better benchmark than eighteen, and should likely never have been abandoned. Age twenty-one served contract law and other areas quite well, and was a venerable rule of long-lasting effectiveness for over 500 years. Although it is true that rules of law should not be blindly followed simply because of their longevity,[258] in this case the following would not be blind. It is instead supported now by the weight of scientific knowledge, sociological research, and

---

253. *See* Note, *supra* note 59, at 144–45 (emphasis added) (footnotes omitted) (citing U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES: 1964, at 107 (1964); 1 U.S. BUREAU OF THE CENSUS, CENSUS OF THE POPULATION: 1960 tbl.127 (1963); U.S. BUREAU OF THE CENSUS, HISTORICAL STATISTICS OF THE UNITED STATES: COLONIAL TIMES TO 1957, at 211 ser. H-322 (1960)).

254. Cheryl B. Preston & Brandon T. Crowther, *Minor Restrictions: Adolescence Across Legal Disciplines, the Infancy Doctrine, and the Restatement (Third) of Restitution and Unjust Enrichment*, 61 U. KAN. L. REV. 343, 375 (2012) (emphasis added) (first citing Coulter, *supra* note 245; and then citing Rodney Skager, *Extending Childhood into the Teen Years: "Infantilization" and its Consequences*, 18 RECLAIMING CHILDREN & YOUTH 18 (2009)).

255. *See supra* notes 13–15 and accompanying text.

256. *See supra* notes 13–15 and accompanying text.

257. *See supra* notes 152–157 and accompanying text.

258. Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 HARV. L. REV. 457, 469 (1897) ("It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.").

legal experimentation.[259]  The age of majority is not a vested right, but rather is set by the will of the legislature.[260]  The contract age of majority could and should be changed by legislation across the states, in light of the compelling evidence of its sensibility as the more appropriate and accurate age of majority.

### B.  Possible Objections

Before concluding, I anticipate at least a few possible objections to the proposal to return the contract age of majority to twenty-one.  The first objection is simply a form of the one that was raised in the 1960s and 1970s at the time the voting age was changed: "old enough to fight, old enough to vote."  This seems to be, at least in part, an argument that being an adult for one purpose means one is an adult for all purposes.  But this has never been the case.  And there are different ages for different purposes in all manner of contexts:

> People can vote at 18, but in some states they don't age out of foster care until 21.  They can join the military at 18, but they can't drink until 21.  They can drive at 16, but they can't rent a car until 25 without some hefty surcharges.  If they are full-time students, the Internal Revenue Service considers them dependents until 24; those without health insurance will soon be able to stay on their parents' plans even if they're not in school until age 26, or up to 30 in some states.  Parents have no access to their child's college records if the child is over 18, but parents' income is taken into account when the child applies for financial aid up to age 24.[261]

It is simply not necessary that the same majority age be applied in all legal contexts.[262]  Rather, the legislature is empowered to set a particular age for a particular circumstance in the manner most appropriate.[263]

For the particular context at issue here—contracting—it is worth making some observations with respect to the different considerations in place.  Military matters—where the minimum age is eighteen—are obviously based on potential national emergencies that create a need for many able-bodied fighting men and women.  Concepts of full maturity and adulthood are not as important as the need for a mass of soldiers who are capable of withstanding the rigors of training and combat, understanding the need for following orders, being away from home, handling weapons safely, and performing basic, militaristic tasks.[264]  Voting is, yet again, different.  Voting involves allowing

---

259.  *See supra* Part III.

260.  *See, e.g.*, Davenport v. Davenport, 356 So.2d 205, 208 (Ala. Civ. App. 1978).

261.  Henig, *supra* note 125.

262.  43 C.J.S. *Infants* § 2 (2004) (citing Allam v. State, 830 P.2d 435 (Alaska Ct. App. 1992)).

263.  *Id.*

264.  *See supra* notes 232–234 and accompanying text.

the person to take part in a collective, democratic expression of majoritarian will. The vote does not directly affect the person's individual affairs, except insofar as the affairs of the community (or state or nation) are collectively affected. However, unlike voting, contracting (like drinking) affects the individual person's affairs directly and uniquely. A poor decision to contract affects that person and that person alone—there is no other "vote" to offset the person's poor financial decision. Therefore, because of the direct impact of contracting on the person's individual affairs, it is more important that one be sufficiently adult-like and mature before being allowed to contract, as opposed to being allowed to vote.

A second foreseeable objection concerns the possible effect of an increase in the age of majority on eighteen-year-olds' access to the marketplace, since, the theory goes, companies will refuse to contract with them on the basis of the risk of subsequent disaffirmance.[265] In the first place, it should be noted that minors are not prohibited from contracting; they merely gain the power of disaffirming any contracts they choose to enter.[266] But, in observing that others may be dissuaded from contracting with minors, Farnsworth quotes Lord Mansfield, who once stated: "miserable must the condition of minors be, excluded from the society and commerce of the world."[267] Schwartz puts it more plainly: "the practical result of a judicial refusal to hold infants to their promises was that no one was willing to contract with them. The common law's paternalism toward infants excluded them from the commercial world."[268] Schwartz cites Bill Gates, Michael Dell, and Mark Zuckerberg as several examples of minor entrepreneurs who could not have succeeded if the age of majority had been twenty-one.[269] But, there are also anecdotes of minors who have succeeded in entrepreneurship in spite of their minority status: Ashley Qualls founded WhateverLife.com at age fourteen; Juliath Brindak developed a social media platform at age sixteen; and Nick D'Aloisio designed an app worth $30 million at age seventeen.[270]

But the more important point is that minor status does not seem to hinder companies from engaging in commercial activity with minors. A 1965 law review article noted, "recent surveys show that today's minors spend annu-

---

265. *See* FARNSWORTH, *supra* note 8, §4.3, at 444.

266. *See supra* Part I.

267. FARNSWORTH, *supra* note 8, § 4.3, at 444 (quoting Zouch v. Parsons, 97 Eng. Rep. 1103, 1106–07 (K.B. 1765)).

268. Schwartz, *supra* note 61, at 418 (footnotes omitted) (first citing FARNSWORTH, *supra* note 8, § 4.5; then citing Arthur Allen Leff, *Unconscionability and the Code—The Emperor's New Clause*, 115 U. PA. L. REV. 485, 556–57 (1967); and then citing *Zouch*, 97 Eng. Rep. at 1107–08).

269. *Id.* at 421–22.

270. *See* John Boitnott, *40 Young People Who Became Millionaires Before They Were 20*, INC. (Sept. 22, 2014), http://www.inc.com/john-boitnott/40-young-people-who-became-millionaires-before-they-were-20.html.

ally more than twelve billion dollars . . . .  The business community obviously feels that the risk of disaffirmance is more than offset by the advantages to it and to the economy in allowing these sales."[271]  Fast forward to the present, and the willingness to engage the minor is even more prevalent:

> Today's children are subjected to a constant stream of advertisements. . . .  Because of the increase in their disposable income, children and teen consumers have been recognized as a huge market, and accordingly, advertisers have ruthlessly targeted them. What has emerged is the most brand-loyal, consumerist generation this nation has ever seen. . . .  A contract that formerly took weeks of negotiation and hours of reading fine print may now be sealed merely through a click.  Obligations can even arise when a user simply browses a website, without clicking anything.[272]

Facebook and YouTube explicitly allow a child to create an account at age thirteen.[273]  Although other online merchants usually state they will contract only with purchasers who are eighteen, the age requirement is rarely enforced other than in simply asking the purchaser to enter her age without otherwise verifying it.[274]  These companies are regularly engaging in commercial transactions with minors, regardless of the legal age of contract.  The same is surely true of traditional, brick-and-mortar stores as well.  In fact, there are research companies that specialize in educating businesses in how to "tap the youth market through advertising campaigns and outreach specifically designed to appeal to minors."[275]  These companies are surely well-advised on legal matters, fully cognizant of existing contract doctrine on minors, and prepared to tap into the lucrative minor market, taking any risks of

---

271.  Note, *supra* note 59, at 146–47 (footnotes omitted) (citing TIME MAG., Jan. 29, 1965, at 56, 57a).

272.  *See* Slade, *supra* note 225, at 613–14 (footnotes omitted) (first citing JULIET B. SCHOR, BORN TO BUY: THE COMMERCIALIZED CHILD AND THE NEW CONSUMER CULTURE 9 (2004); then citing Allen Chappell, *What a Teen Consumer Wants*, IMEDIA (Oct. 21, 2004), http://www.imediaconnection.com/articles/ported-articles/red-dot-articles/2004/oct/what-a-teen-consumer-wants/; then citing TRU-TEENS, TWEENS, AND TWENTY-SOMETHINGS RESEARCH, http://www.tru-insight.com; and then citing ONLINE CONTRACT FORMATION 328 (N. Stephen Kinsella & Andrew F. Simpson eds., 2004)).

273.  *See Age Requirements on Google Accounts*, GOOGLE, https://support.google.com/accounts/answer/1350409?hl=en (last visited Dec. 21, 2016); *How Do I Report a Child Under the Age of 13?*, FACEBOOK, https://www.facebook.com/help/157793540954833 (last visited Dec. 21, 2016).

274.  *See, e.g.*, Tom Rawstorne, *What's YOUR Child Buying Online?*, DAILY MAIL, http://www.dailymail.co.uk/femail/article-1033878/Whats-YOUR-child-buying-online.html  (last updated July 9, 2008, 4:59 PM).

275.  Slade, *supra* note 225, at 632; *see also How Marketers Target Kids*, MEDIA SMARTS, http://mediasmarts.ca/digital-media-literacy/media-issues/marketing-consumerism/how-marketers-target-kids (last visited Jan. 12, 2017).  Major retail corporations use such services in a clear attempt to market directly to minors.  Slade, *supra* note 225, at 632 n.99 (listing major retailers).

disaffirmance into account in their business models.[276]  The idea that changing the age of majority to twenty-one will suddenly keep all those under twenty-one from the marketplace does not seem to constitute a major cause for concern.

One last objection of note is that some disagree that the rule providing minors' ability to disaffirm their contracts should continue at all.[277]  Suffice it to say that I believe there continue to be good reasons for the disaffirmation doctrine.  Teenagers and even young adults in their early twenties lack the maturity, judgment, and decisionmaking ability of adults.  This has always been the underlying premise of the rule allowing minors to void their contracts.  And now, we actually have direct scientific proof of this, whereas the rule has always previously been based, presumably, on observation, supposition, and experience.  But, as Cheryl Preston and Brandon Crowther have recently observed in defending the continued existence of the doctrine, "[f]ew people dispute that protecting minors from more-experienced adults is a worthy goal."[278]  Although some believe that other doctrines—such as duress and unconscionability—are sufficient to protect minors, Preston and Crowther argue otherwise.  They contend that two factors militate against this argument.  First, contract law's general weakening of the requirement of assent: the advent of standard form contracts, especially in the online "click" context, makes surprise over contract terms an ever-increasing likelihood.[279]  Second, these methods are being used to impose ever more onerous terms, such as arbitration clauses.[280]  These factors in the emerging contract jurisprudence have "diluted the chance that vulnerable minors could find relief outside of the infancy doctrine."[281]  Therefore, sound reasons exist for keeping the venerable rules of infancy in place for the protection of minors.

## V. CONCLUSION

The age of majority should be returned to age twenty-one.  The rule that minors' contracts are voidable has existed for centuries.[282]  It is a sound doctrine, which serves to protect minors from their own impulsive and foolish

---

276.  *See* Larry A. DiMatteo, ss*Deconstructing the Myth of the "Infancy Law Doctrine": From Incapacity to Accountability*, 21 OHIO N.U. L. REV. 481, 502 (1994) ("The 'fact' is that the ever-growing size of the infant consumer market is an indication that the infancy law doctrine has done little to discourage adults from selling or contracting with minors.").

277.  *See, e.g.*, *id.* at 501–02.

278.  Preston & Crowther, *supra* note 1, at 71.

279.  *See id.* at 71–74.

280.  *See id.* at 74–76.

281.  *Id.* at 77.

282.  *See* WILLISTON, *supra* note 3, § 9:3.

financial decisions and to protect them from the actions of potentially exploitative adults and commercial entities.[283]  Until very recently, the centuries-old doctrine was accompanied by an age of majority set at twenty-one.[284]  The age was only reduced to eighteen due to a series of explosive protests in the face of heated and emotional opposition to the Vietnam War, and the draft of eighteen-year-olds into military service—eighteen-year-olds who had not been afforded the opportunity to vote for the politicians who then sent them to war.[285]  The resultant lowering of the voting age to eighteen by enactment of the Twenty-Sixth Amendment caused a ripple effect, and many other legislative ages of majority were changed as well, including the contract age of majority.[286]  Whatever the wisdom of lowering the voting age, little thought was given to the wisdom of lowering the contract age of majority beyond the fairness perceived in the military draft situation.[287]

However, with the benefit of modern developments in neurological science, we now know that human brains do not fully mature until the early to mid-twenties and beyond.  The full powers of cognition, decisionmaking, risk-assessment, and impulse control are not fully developed until at least age twenty-one or later.[288]  Sociologists have also begun to observe that the ages eighteen to twenty-five are, in reality, a distinct life phase now referred to as "emerging adulthood," in which the full adult attributes are gradually attained.[289]  Census and demographic data tend to corroborate these findings, and survey results indicate that most people do not perceive adulthood (including financial independence) as having been reached until the age of twenty-one or later.[290]  Finally, legal experimentation in the areas of alcohol, smoking, and credit card ownership have resulted in (or are in the process of trending towards) an increase in the responsible age from eighteen back to twenty-one.[291]

With the benefit of forty years of hindsight, reflection, and the scientific, sociological, demographic, and legal data now available, it seems clear that the contract age of majority was always sensibly placed at age twenty-one.  Now, the decision to lower the age in the early 1970s in a wave of emotional and frenzied protest seems to have been ill-advised.  Young people at ages eighteen, nineteen, and twenty are still in the formative years of attaining

---

283.  *See* FARNSWORTH, *supra* note 8, § 4.2, at 442.

284.  WILLISTON, *supra* note 3, § 9:3.

285.  *See supra* notes 62–93 and accompanying text.

286.  *See supra* notes 60–91 and accompanying text.

287.  Rosenthal, *supra* note 171, at 653.

288.  *See supra* Part III.A.

289.  *See supra* Part III.B.

290.  *See supra* notes 152–169 and accompanying text.

291.  *See supra* Part III.C.

maturity, and the reasons for minors' need for protection in the area of contract are fully applicable to those of this age.  Accordingly, legislatures should follow the lead provided by alcohol regulation and the federal CARD Act and revert the contract age of majority to twenty-one.  Only then will an historical misstep in contract law be remedied.

# EXHIBIT 34

Case 3:19-cv-01226-L-AHG   Document 94-7   Filed 01/03/20   PageID.7365   Page 608 of 620

the frontal cortex[15]. Striatal structures are involved in cognitive functions such as learning, which is linked to frontal system function[15] and improves throughout adolescence[8]. This suggests temporal and functional relationships between simultaneous postadolescent reductions in gray-matter density in frontal and striatal regions.

Thus, we describe *in-vivo* documentation for a temporal and spatial progression of postadolescent maturation into the frontal lobes, highlighting the potential importance of frontal/striatal maturation to adult cognition.

### Acknowledgements

We thank the McConnell Brain Imaging Center at the Montreal Neurological Institute and the SPM software developers at the Wellcome Department of Cognitive Neurology. Finally, we thank David Kornsand for assistance in anatomical analyses and John Bacheller for artwork. This study was supported by grants P50 NS22343, and R01 HD 23854, and NIMH MRSA grant 5T32 MH16381, NSF DBI 9601356, the NCRR (P41 RR13642), NINDS (NS38753) and the pediatric supplement of the Human Brain Project, funded jointly by NIMH and NIDA (P20 MH/DA52176).

RECEIVED 17 MAY; ACCEPTED 12 AUGUST 1999

1. Yakovlev, P. I. & Lecours, A. R. in *Regional Development of the Brain in Early Life* (ed. Minkowski, A.) 3–70 (Blackwell Scientific, Oxford, 1967)
2. Benes, F. M., Turtle, M., Khan, Y. & Farol, P. *Arch. Gen. Psychiatry* 51, 477–484 (1994).
3. Sowell, E. R. *et al. Neuroimage* 9, 587–597 (1999).
4. Jernigan, T. L., Trauner, D. A., Hesselink, J. R. & Tallal, P. A. *Brain* 114, 2037–2049 (1991).
5. Paus, T. *et al. Science* 283, 1908–1911 (1999).
6. Hudspeth, W. J. & Pribram, K. H. *Int. J. Psychophysiol.* 21, 19–29 (1990).
7. Chugani, H. T., Phelps, M. E. & Mazziotta, J. C. *Ann. Neurol.* 22, 487–497 (1987).
8. Levin, H. S. *et al. Dev. Neuropsychol.* 7, 377–395 (1991).
9. Woods, R. P., Grafton, S. T., Holmes, C. J., Cherry, S. R. & Mazziotta, J. C. *J. Comput. Assist. Tomogr.* 22, 139–152 (1998).
10. Friston, K. J. *et al. Hum. Brain Mapp.* 2, 189–210 (1995).
11. Worsley, K. J. *et al. Hum. Brain Mapp.* 8 (in press).
12. Fuster, J. M. *The Prefrontal Cortex: Anatomy, Physiology, and Neuropsychology of the Frontal Lobe,* 2nd edn (Raven, New York, 1989).
13. Cohen, M. J., Branch, W. B., Willis, W. G., Yeyandt, L. L. & Hynd, G. W. in *Handbook of Neuropsychological Assessment: A Biopsychosocial Perspective* (eds. Puente, A. E. & McCaffrey, R. J.) 49–79 (Plenum, New York, 1992).
14. Connor, J. R. & Menzies, S. L. *Glia* 17, 83–93 (1996).
15. Rolls, E. T. *Rev. Neurol. (Paris)* 150, 648–660 (1994).

# Brain development during childhood and adolescence: a longitudinal MRI study

Jay N. Giedd[1], Jonathan Blumenthal[1], Neal O. Jeffries[2], F. X. Castellanos[1], Hong Liu[1], Alex Zijdenbos[3], Tomáš Paus[3], Alan C. Evans[3] and Judith L. Rapoport[1]

[1] Child Psychiatry Branch, National Institute of Mental Health, Building 10, Room 4C110, 10 Center Drive, MSC 1367, Bethesda, Maryland 20892, USA

[2] Biometry Branch, National Institute of Neurological Disease and Stroke, Federal Building, Room 7C06, 7550 Wisconsin Avenue, Bethesda, Maryland, 20892, USA

[3] Montreal Neurological Institute, McGill University, 3801 University Street, Montreal, Quebec H3A 2B4, Canada

Correspondence should be addressed to J.N.G. (jgiedd@helix.nih.gov)

Pediatric neuroimaging studies[1–5], up to now exclusively cross sectional, identify linear decreases in cortical gray matter and increases in white matter across ages 4 to 20. In this large-scale longitudinal pediatric neuroimaging study, we confirmed linear increases in white matter, but demonstrated nonlinear changes in cortical gray matter, with a preadolescent increase followed by a postadolescent decrease. These changes in cortical gray matter were regionally specific, with developmental curves for the frontal and parietal lobes peaking at about age 12 and for the temporal lobe at about age 16, whereas cortical gray matter continued to increase in the occipital lobe through age 20.

The subjects for this study were healthy boys and girls participating in an ongoing longitudinal pediatric brain-MRI project at the Child Psychiatry Branch at the National Institute of Mental Health. Subjects were recruited from the community as previously described, using phone screening, questionnaires mailed to parents and teachers and face-to-face physical and psychological testing; approximately one in six volunteers were accepted[5]. At least 1 scan was obtained from each of 145 healthy subjects (89 male). Of

these, 65 had at least 2 scans, 30 had at least 3 scans, 2 had at least 4 scans and 1 had 5 scans, acquired at approximately two-year intervals. The age range was from 4.2 to 21.6 years. There were no significant sex differences for age, Tanner stage, ethnicity, socioeconomic status, height, weight or handedness.

All subjects were scanned on the same GE 1.5 Tesla Signa scanner using the same three-dimensional, spoiled-gradient, recalled echo in the steady state (3D SPGR) imaging protocol, with an axial-slice thickness of 1.5 mm, a time-to-echo of 5 ms, a repetition time of 24 ms, flip angle of 45°, a 192 ( 256 acquisition matrix, 1 excitation and a field of view of 24 cm. A clinical neuroradiologist evaluated all scans; no gross abnormalities were reported.

Volumes of white and cortical gray matter were quantitatively analyzed by combining a technique using an artificial neural network to classify tissues based on voxel intensity with non-linear registration to a template brain for which these tissue regions had been manually defined[7]. This technique supplemented MRI signal-intensity information with predetermined brain anatomy and provides lobar (frontal, parietal, temporal and occipital) parcellation of cortical gray- and white-matter volumes.

We used previously described statistical analysis techniques that combine cross-sectional and longitudinal data[8]. These longitudinal methods are more sensitive to detecting individual growth patterns, even in the presence of large interindividual variation[9]. We assessed if there was significant change with age, if developmental curves differed by sex and/or region and whether the developmental curves were linear or quadratic.

The volume of white matter increased linearly with age (Fig. 1; Table 1), increasing less in females than in males. The net increase across ages 4 to 22 was 12.4%. Curves for white-matter development did not significantly differ among various lobes. In contrast, changes in volume of cortical gray matter were nonlinear and regionally specific. Gray matter in the frontal lobe increased during pre-adolescence with a maximum size occurring at 12.1 years for males and 11.0 years for females, followed by a decline during post-adolescence that resulted in a net decrease in volume across this age span. Parietal-lobe gray matter followed a similar pattern, increasing during pre-adolescence to a maximum size at age 11.8 years for males and 10.2 years for females, followed by decline during postadolescence and a net decrease

© 1999 Nature America Inc. • http://neurosci.nature.com

Case 3:19-cv-01226-L-AHG   Document 94-7   Filed 07/08/20   PageID.7366   Page 609 of 620

*scientific correspondence*

**Table 1. Developmental curves for different regions.**

| Structure | Male intercept | Female intercept | Age coefficient $\beta_1$ | Age$^2$ coefficient $\beta_2$ | $p$ value for no change ($\beta_1 = 0$, $\beta_2 = 0$) | $p$ value for only linear change ($\beta_2 = 0$) | $p$ value for curves having same shape |
|---|---|---|---|---|---|---|---|
| Total cerebrum | 1382 (12.3) | 1260 (19.3) | 5.6 (10.0) | −0.72 (0.15) | $p < 0.0001$ | $p < 0.0001$ | $p = 0.83$ |
| Total gray | 758 (7.3) | 686 (11.3) | −0.50 (0.80) | −0.39 (0.12) | $p = 0.001$ | $p = 0.001$ | $p = 0.47$ |
| Frontal gray | 235 (2.3) | 214 (3.8) | −0.38 (0.28) | −0.18 (0.04) | $p < 0.0001$ | $p < 0.0001$ | $p = 0.84$ |
| Temporal gray | 191 (1.7) | 175 (2.6) | 0.81 (0.22) | −0.10 (0.03) | $p < 0.0001$ | $p = 0.002$ | $p = 0.99$ |
| Parietal gray | 126 (1.3) | 116 (20.0) | −0.31 (0.15) | −0.10 (0.02) | $p < 0.0001$ | $p < 0.0001$ | $p = 0.51$ |
| Occipital gray | 70.1 (1.2) | 61.5 (1.7) | 0.41 (0.22) | 0.009 (0.02) | $p = 0.007$ | $p = 0.69$ | $p = 0.07$ |

The developmental curves are modeled by the equation: size = intercept + $\beta_1$ (age − mean age) + $\beta_2$ (age − mean age)$^2$ + $\varepsilon$ where the intercept term is a random effect that varies by individual and intra-individual correlation of $\varepsilon$ is taken into account. A Wald statistic assesses whether the curve changes with age (that is, whether $\beta_1$ and $\beta_2$ are both 0). A z statistic of $\beta_2$ assesses whether the curve is best fit by a linear ($\beta_2 = 0$) or quadratic curve ($\beta_2 \neq 0$). The curves were found to have similar shapes by sex (no significant differences for any structure), but because the height of the curves did vary, separate terms were used for boys and girls. Multivariate analysis showed that shapes for the four regions of gray matter significantly differed from one another ($p < 0.0001$), with parietal and frontal regions most similar and temporal the most distinct.

© 1999 Nature America Inc. • http://neurosci.nature.com

in volume; however, pre- and post-adolescent slopes were steeper for parietal than for frontal lobes. Temporal-lobe gray matter also followed a nonlinear developmental course, but maximum size was not reached until 16.5 years for males and 16.7 years for females, with a slight decline thereafter. Occipital-lobe gray matter increased linearly over the age range, without evidence of significant decline or leveling. Developmental curves for the different cortical regions significantly differed from each other; those for frontal and parietal lobes were the most similar. The absolute size of the cortical gray matter was approximately 10% larger in boys, and peaked slightly earlier in girls, but the shapes of the curves were not significantly different between boys and girls.

The regional specificity of findings in cortical gray matter sheds light on the debate regarding synchronous versus heterochronous development of the cerebral cortex. Nonhuman primate studies generally reveal synchronous cortical development (that is, with similar timing in diverse cortical regions)[10]. However, in humans there are limited but compelling histological data to suggest that synapse elimination is heterochronous, with changes in primary visual and auditory cortex occurring before those in frontal cortex[11]. The present data support heterochronic development in human cerebral cortex. The pre-adolescent increase and post-adolescent decrease in cortical gray matter parallel developmental PET studies of cerebral glucose metabolism[12] and EEG studies of slow-wave sleep amplitude[13].

This MRI study demonstrates a pre-adolescent increase in cortical gray matter; this phenomenon was previously obscured, probably by the lack of longitudinal data, as even in an analysis of the 145 cross-sectional data points in our sample, the largest to date, we could not detect nonlinearity in these developmental curves. Whether this gray-matter increase is related to changes in neuropil, neuronal size or dendritic or axonal arborization will be best addressed by methods other



**Fig. 1.** Predicted size with 95% confidence intervals for cortical gray matter in frontal, parietal, temporal and occipital lobes for 243 scans from 89 males and 56 females, ages 4 to 22 years. The arrows indicate peaks of the curves.

Case 3:19-cv-01226-L-AHG   Document 94-7   Filed 07/08/20   PageID.7367   Page 610 of 620

© 1999 Nature America Inc. • http://neurosci.nature.com

than MRI. If the increase is related to a second wave of overproduction of synapses, it may herald a critical stage of development when the environment or activities of the teenager may guide selective synapse elimination during adolescence. The relative prominence of the role of the environment in shaping late synaptogenesis is supported by rat studies[14,15]. That the frontal and parietal gray matter peaks approximately one year earlier in females, corresponding with the earlier age of onset of puberty, suggests a possible influence of gonadal hormones. Studies of healthy monozygotic and dizygotic twins, chromosomal aneuploidies (XXY, XXYY, XYY), congenital adrenal hyperplasia (producing high levels of testosterone *in utero*) and psychiatric illnesses are underway to address the effects of genes, hormones and environment on this process.

RECEIVED 21 MAY; ACCEPTED 9 AUGUST 1999

1. Jernigan, T. L., Trauner, D. A., Hesselink, J. R. & Tallal, P. A. *Brain* 114, 2037–2049 (1991).
2. Pfefferbaum, A. *et al. Arch. Neurol.* 51, 874–887 (1994).
3. Caviness, V. S. Jr., Kennedy, D. N., Richelme, C., Rademacher, J. & Filipek, P. A. *Cereb. Cortex.* 6, 726–736 (1996).
4. Reiss, A. L., Abrams, M. T., Singer, H. S., Ross, J. L. & Denckla, M. B. *Brain* 119, 1763–1774 (1996).
5. Giedd, J. N. *et al. Cereb. Cortex.* 6, 551–560 (1996).
6. Lange, N., Giedd, J. N., Castellanos, F. X., Vaituzis, A. C. & Rapoport, J. L. *Psychiatry Res.* (in press).
7. Zijdenbos, A. P., Dawant, B. M. & Margolin, R. A. *Comput. Med. Imaging Graph.* 18, 11–23 (1994).
8. Giedd, J. N. *et al. Prog. Neurosychopharmacol. Biol. Psychiatry* 23, 571–588 (1999).
9. Hand, D. J. & Crowder, M. J. *Practical Longitudinal Data Analysis* (Chapman and Hall, London, 1996).
10. Rakic, P., Bourgeois, J. P., Eckenhoff, M. F., Zecevic, N. & Goldman-Rakic, P. S. *Science* 232, 232–235 (1986).
11. Huttenlocher, P. R. & Dabholkar, A. S. *J. Comp. Neurol.* 387, 167–178 (1997).
12. Chugani, H. T., Phelps, M. E. & Mazziotta, J. C. *Ann. Neurol.* 22, 487–497 (1987).
13. Feinberg, I. *J. Psychiatr. Res.* 10, 283–386 (1974).
14. Kleim, J. A., Lussnig, E., Schwarz, E. R., Comery, T. A. & Greenough, W. T. *J. Neurosci.* 16, 4529–4535 (1996).
15. Bourgeois, J. P., Jastreboff, P. J. & Rakic, P. *Proc. Natl. Acad. Sci. USA* 86, 4297–4301 (1989).

# A contingent aftereffect in the auditory system

C.-J. Dong, N. V. Swindale and M. S. Cynader

*Department of Ophthalmology, University of British Columbia, 2550 Willow Street, Vancouver, British Columbia V5Z 3N9, Canada*

*Correspondence should be addressed to C.-J.D. (cdong@interchg.ubc.ca)*

Pairs of stimulus attributes, such as color and orientation, that are normally uncorrelated in the real world are generally perceived independently; that is, the perception of color is usually uninfluenced by orientation and *vice versa*. Yet this independence can be altered by relatively brief exposure to artificially correlated stimuli, as has been shown for vision[1]. Here we report an analogous contingent aftereffect in the auditory system that can persist for four hours after the initial adaptation.

After a few minutes of alternately viewing an orange-black vertical grating and a blue-black horizontal grating, the white stripes in a vertical black-and-white grating appear blue-green, whereas the white stripes in a horizontal grating appear orange[1].

There are numerous demonstrations of other types of visual contingent aftereffect, such as color-contingent orientation[2] and motion[3,4] aftereffects and spatial frequency[5]- and motion[6,7]-contingent color aftereffects. These visual contingent aftereffects can be extremely persistent. For example, the motion-contingent color aftereffect and the color-contingent motion aftereffect can persist for at least 24 hours[3,6]. The motion-contingent color aftereffect can last as long as six weeks in some cases[7].

In contrast to the rich variety of reported visual contingent aftereffects, there are no reports of contingent aftereffects for





**Fig. 1.** Stimulus protocols. (**a**) Time sequence of stimuli. Each run began with 10 minutes of adaptation, followed by a series of brief test sounds (1 s), with either a rising (0.7 octaves per s) or a falling (–0.7 octaves per s) pitch presented by a loudspeaker moving at one of six different velocities (2°, 6° or 10° per s, either to the left or the right). For each test presentation, the subject was asked to press one of two buttons to indicate the direction (leftward or rightward) of spatial movement. (**b**) Detailed time sequence of adapting stimuli. While the central frequency of an adapting sound (1-octave band-pass noise) was moving upward (0.7 octave per s), the loudspeaker moved to the left (30° per s) for 1 second (from –15° to 15° in azimuth). Following a silent interval of 1.4 seconds, the loudspeaker moved to the right (–30° per s) for 1 second, while the central frequency of the sound moved downward (–0.7 octave per s). During adaptation, this sequence was repeated continuously. In the control condition, the loudspeaker moved over the same trajectory with the same time course, but the center frequency of the adapting sound was kept constant at 1.5 kHz. Note that the vertical axis in the top panel is a logarithmic scale.

# EXHIBIT 37

# Dynamic mapping of human cortical development during childhood through early adulthood

Nitin Gogtay*†, Jay N. Giedd*, Leslie Lusk*, Kiralee M. Hayashi‡, Deanna Greenstein*, A. Catherine Vaituzis*, Tom F. Nugent III*, David H. Herman*, Liv S. Clasen*, Arthur W. Toga‡, Judith L. Rapoport*, and Paul M. Thompson‡

*Child Psychiatry Branch, National Institutes of Mental Health, National Institutes of Health, Bethesda, MD 20892; and ‡Laboratory of Neuro Imaging, Department of Neurology, University of California School of Medicine, Los Angeles, CA 90095-1769

Communicated by Leslie G. Ungerleider, National Institutes of Health, Bethesda, MD, April 15, 2004 (received for review January 7, 2004)

We report the dynamic anatomical sequence of human cortical gray matter development between the age of 4–21 years using quantitative four-dimensional maps and time-lapse sequences. Thirteen healthy children for whom anatomic brain MRI scans were obtained every 2 years, for 8–10 years, were studied. By using models of the cortical surface and sulcal landmarks and a statistical model for gray matter density, human cortical development could be visualized across the age range in a spatiotemporally detailed time-lapse sequence. The resulting time-lapse "movies" reveal that (i) higher-order association cortices mature only after lower-order somatosensory and visual cortices, the functions of which they integrate, are developed, and (ii) phylogenetically older brain areas mature earlier than newer ones. Direct comparison with normal cortical development may help understanding of some neurodevelopmental disorders such as childhood-onset schizophrenia or autism.

**H**uman brain development is structurally and functionally a nonlinear process (1–3), and understanding normal brain maturation is essential for modeling neurodevelopmental disorders (4, 5). The heteromodal nature of cognitive brain development is evident from studies of neurocognitive performance (6, 7), functional imaging (functional MRI or positron-emission tomography) (8–10), and electroencephalogram coherence studies (1, 2, 10). Prior imaging studies show regional nonlinear changes in gray matter (GM) density during childhood and adolescence with prepubertal increase followed by postpubertal loss (11–14). The GM density on MRI is an indirect measure of a complex architecture of glia, vasculature, and neurons with dendritic and synaptic processes. Studies of GM maturation show a loss in cortical GM density over time (15, 16), which temporally correlates with postmortem findings of increased synaptic pruning during adolescence and early adulthood (17–19). Here we present a study of cortical GM development in children and adolescents by using a brain-mapping technique and a prospectively studied sample of 13 healthy children (4–21 years old), who were scanned with MRI every 2 years for 8–10 years. Because the scans were obtained repeatedly on the same subjects over time, statistical extrapolation of points in between scans enabled construction of an animated time-lapse sequence ("movie") of pediatric brain development. We hypothesized that GM development in childhood through early adulthood would be nonlinear as described before and would progress in a localized, region-specific manner coinciding with the functional maturation. We also predicted that the regions associated with more primary functions (e.g., primary motor cortex) would develop earlier compared with the regions that are involved with more complex and integrative tasks (e.g., temporal lobe).

The result is a dynamic map of GM maturation in the pre- and postpubertal period. Our results, while highlighting the remarkable heterogeneity, show that the cortical GM development appears to follow the functional maturation sequence, with the primary sensorimotor cortices along with frontal and occipital poles maturing first, and the remainder of the cortex developing in a parietal-to-frontal (back-to-front) direction. The superior temporal cortex, which contains association areas that integrate information from several sensory modalities, matured last. Furthermore, the maturation of the cortex also appeared to follow the evolutionary sequence in which these regions were created.

## Methods

**Subjects.** Sample demographics are shown in Table 1. All subjects were recruited from the community for an ongoing National Institute of Mental Health study of human brain development (20). Briefly, each subject was given a structured diagnostic interview to rule out any psychiatric diagnoses at each visit. Subjects returned every 2 years for a follow-up MRI scan together with psychiatric and neurocognitive reassessment. A subset of all children who had three or more usable MRI scans and were between the ages of 4 and 21 years was chosen to be included in this study. The study was approved by the National Institute of Mental Health institutional review board, and an informed consent was obtained from subjects >18 years old or from parents of minor subjects, and an additional written assent was obtained from each minor subject.

**Image Processing and Analysis.** MRI images were acquired at the National Institute of Mental Health on the same 1.5-T General Electric scanner. The MRI sequence was consistent throughout the study. T1-weighted images with contiguous 1.5-mm slices in the axial plane and 2.0-mm slices in the coronal plane were obtained by using 3D spoiled-gradient recalled echo in the steady state. Imaging parameters were: echo time, 5 ms; repetition time, 24 ms; flip angle, 45°; acquisition matrix, $256 \times 192$; number of excitations, 1; and field of view, 24 cm. With each major software/hardware upgrade, the reliability of the data before and after the upgrade was tested by scanning a set of subjects before and after the upgrade (20). Briefly, for each scan, a radio-frequency bias field-correction algorithm was applied. Baseline images were normalized, transforming them to a standard 3D stereotaxic space (21). Follow-up scans were then aligned to the baseline scan from the same subject, and mutually registered scans for each subject were linearly mapped into the International Consortium for Brain Mapping (ICBM) space (22). An extensively validated tissue classifier generated detailed maps of GM, white matter, and cerebrospinal fluid by using a Gaussian mixture distribution to generate a maximum *a posteriori* segmentation of the data (23, 24), and a surface model of the cortex was then automatically extracted for each subject and time point as described (25).

An image-analysis technique known as cortical pattern matching (25–27) was used to better localize cortical differences over time and increase the power to detect systematic changes (25). This approach matches gyral features of cortical

---

Abbreviations: GM, gray matter; STG, superior temporal gyrus.

†To whom correspondence should be addressed at: Child Psychiatry Branch, National Institute of Mental Health, Building 10, Room 3N 202, Bethesda, MD 20892. E-mail: nitin@codon.nih.gov.

© 2004 by The National Academy of Sciences of the USA

Downloaded from guest on December 27, 2019

**Table 1. Demographics of the study sample**

| | |
|---|---|
| No. of subjects | 13 |
| Gender (no. of male:female) | 6:7 |
| Total no. of scans | 52 |
| Average age (±SD) at | |
|    Scan 1 | 9.8 ± 3.8 years |
|    Scan 2 | 11.7 ± 4.1 years |
|    Scan 3 | 13.8 ± 4.4 years |
|    Scan 4 | 16.7 ± 4.3 years |
| Average age for all scans | 13.0 ± 4.8 years |
| Average IQ (±SD) | 125.8 ± 12.7 |
| Handedness (no. of right:left) | 12:1 |

surface anatomy as far as possible across subjects before making cross-subject comparisons, group averages, and statistical maps. Because this technique eliminates some confounding anatomical variance, there is increased statistical power for detecting statistical effects on cortical measures as well as increased ability to localize these effects relative to major sulcal and gyral landmarks. In the cortical matching step, secondary deformations are computed that match gyral patterns across all the time points and all subjects, which allows data to be averaged and compared across corresponding cortical regions. A set of 34 sulcal landmarks per brain constrains the mapping of one cortex onto the other by using corresponding cortical regions across subjects. An image analyst blind to subject identity, gender, and age traced each of 17 sulci in each lateral hemisphere on the surface rendering of each brain. These sulci included the Sylvian fissure, central, precentral, and postcentral sulci, superior temporal sulcus (STS) main body, STS ascending branch, STS posterior branch, primary and secondary intermediate sulci, and inferior temporal, superior, and inferior frontal, intraparietal, transverse occipital, olfactory, occipitotemporal, and collateral sulci. In addition to contouring the major sulci, a set of six midline landmark curves bordering the longitudinal fissure was outlined in each hemisphere to establish hemispheric gyral limits. Landmarks were defined according to a detailed anatomical protocol. This protocol is available on the Internet (www.loni.ucla.edu/~khayashi/Public/medial_surface) and has known inter- and intrarater reliability as reported (25).

A time-dependent average 3D cortical model for the group was created by flattening all sulcal/gyral landmarks into a 2D plane along with the cortical model assigning a color code to retain 3D shape information. Once data were in this flat space, sulcal features were aligned across subjects to an average set of sulcal curves. The warped cortical maps were mathematically reinflated to 3D, producing a crisp average cortical model with gyral features in their mean anatomic locations (28).

To quantify local GM, we used a measure termed "GM density," used in many prior studies, which measures the proportion of GM in a small region of fixed radius (15 mm) around each cortical point (15, 25, 26, 28). The GM-density measure averages information on GM volumes over a small neighborhood (the 15-mm kernel used in this report), providing an increased signal-to-noise ratio, and it averages away some of the noise inherent in resolving the cortical GM boundaries in MRI. However, if GM density is used, some localization power is lost, and the approach can average data from opposing sulcal banks. The measure also can index GM changes stemming from differences in cortical surface curvature, in which increased curvature may cause less GM to be sampled within the kernel of a fixed radius. Our work, however, shows that GM density and thickness are very highly correlated (K. Narr, R. M. Bilder, A. W. Toga, R. P. Woods, D. E. Rex, P. Szeszko, D. Robinson, Y. Wang, H. DeLuca, D. Asuncion, and P. M. Thompson, unpub-

lished data) and therefore likely index similar maturational processes.

To determine whether there was enough power to achieve statistical significance at each surface point on the cortex, we fitted the model of GM change and estimated the multiple regression coefficient ($R^2$) at each point, which varies in the range of 0 to 1. From the null distribution of $R^2$, adjusted for the number of degrees of freedom in the statistical model, it is possible to determine whether there is sufficient power to reject the null hypothesis ($R^2 = 0$) at each cortical point. The significance of the model fit, $p(R^2)$, then was plotted at each cortical point (data not shown). The resulting map indicated that $R^2$ is not zero at almost every cortical point, suggesting that the changes seen were very highly significant.

Statistical plots were generated by using a mixed-model regression analysis (11, 30) for the GM volumes at each of 65,536 points on the entire cortical surface as well as individual lobar volumes and also at several specific points of interest over the surface. Because a nonlinear mixed model was used, intersubject differences in GM density were modeled separately from the intraindividual rates of cortical change, giving additional power to resolve longitudinal changes at each cortical point. Hypothesis tests for model building were based on F statistics with α = 0.05. Specifically, F tests were used to determine whether the order of a developmental growth model was cubic, quadratic, or linear. If a cubic model was not significant, a quadratic model was tested; if a quadratic model was not significant, a linear model was tested. Thus a growth model was polynomial/nonlinear if either the cubic or quadratic term significantly contributed to the regression equation. Given that each hypothesis was tested only once, correction of the statistics for multiple comparisons was not necessary.

The following regions were selected for analyses in each hemisphere: precentral gyrus, primary motor cortex (Fig. 1A), superior frontal gyrus, posterior limit near the central sulcus (Fig. 1B), inferior frontal gyrus, posterior limit (Fig. 1C), inferior frontal sulcus, anterior limit (Fig. 1D), inferior frontal sulcus in the dorsolateral prefrontal cortex (Fig. 1E), anterior end of superior frontal sulcus (Fig. 1F), frontal pole (Fig. 1G), primary sensory cortex in postcentral gyrus (Fig. 1H), supramarginal gyrus (area 40) (Fig. 1I), angular gyrus (area 39) (Fig. 1J), occipital pole (Fig. 1K), anterior, middle, and posterior portions of superior frontal gyrus (STG) (Fig. 1 L–N), inferior temporal gyrus midpoint, as well the anterior and posterior limits (Fig. 1 O–Q), and on the inferior surface, anterior and posterior ends of olfactory sulcus (Fig. 2 R and S) and the anterior and posterior ends of collateral sulcus (Fig. 2 T and U). Corresponding points were chosen on both hemispheres by using the same sulcal landmarks.

## Results

Overall, the total GM volume was found to increase at earlier ages, followed by sustained loss starting around puberty. However, as seen in the time-lapse sequence (Figs. 2 and 3), the process of GM loss (maturation) begins first in dorsal parietal cortices, particularly the primary sensorimotor areas near the interhemispheric margin, and then spreads rostrally over the frontal cortex and caudally and laterally over the parietal, occipital, and finally the temporal cortex. (This sequence is available in Movies 1–4, which are published as supporting information on the PNAS web site.) Frontal and occipital poles lose GM early, and in the frontal lobe, the GM maturation ultimately involves the dorsolateral prefrontal cortex, which loses GM only at the end of adolescence.

To examine further the maturation patterns within individual cortical subregions, we used mixed-model regression analyses to construct plots of linear as well as nonlinear (quadratic or cubic) age effects on GM volumes at points of interest along the cortical

NEUROSCIENCE

Downloaded from by guest on December 27, 2019



**Fig. 1.** Mixed-model regression plots at regions of interest over the cortical surface. The following regions were selected for analyses in each hemisphere: A, precentral gyrus and primary motor cortex; B, superior frontal gyrus, posterior end near central sulcus; C, inferior frontal gyrus, posterior end; D, inferior frontal sulcus, anterior end in the ventrolateral prefrontal cortex; E, inferior frontal sulcus in the dorsolateral prefrontal cortex; F, anterior limit of superior frontal sulcus; G, frontal pole; H, primary sensory cortex in postcentral gyrus; I, supramarginal gyrus (area 40); J, angular gyrus (area 39); K, occipital pole; L–N, anterior, middle, and posterior portions of STG; O–Q, anterior, middle, and posterior points along the inferior temporal gyrus anterior end. All quadratic, cubic, or linear terms were significant with $P < 0.05$. Age of peak GM is shown for B–D, I, and J. x-axis values are ages in years, and y-axis values show GM volumes.

surface by using major sulcal landmarks to ensure that corresponding anatomy was correlated correctly across time and subjects. When we compared the mean lobar volumes in this sample with our larger cross-sectional sample ($n = 149$), the trends for total and lobar GM volumes were in agreement in both groups (data not shown) (11). However, at individual subregions across the cortex, GM maturation shows a variable maturation pattern.

Within the frontal cortex, the precentral gyrus (Figs. 1A and 3) matures early. GM loss progresses linearly at an early age, whereas more rostral regions of the frontal lobe (along the superior and inferior frontal gyri; Figs. 1 and 3, B–G) mature successively in an anterior progression, as also indicated by the progressively later peaks of nonlinear GM loss (Fig. 1 B–D), with the prefrontal cortex maturing last (Figs. 1, D and E, and 3). In the parietal lobe, the GM loss begins in the postcentral gyrus (Figs. 1H and 3; with a nonlinear early peak), progressing laterally into the angular gyrus (area 40; Figs. 1I and 3), and supramarginal gyrus (area 39; Figs. 1J and 3). The frontal and occipital poles, similar to the pre- and postcentral gyri, mature early (Figs. 1 G and K and 3).

**Later Maturation.** Parts of the temporal lobe, on the other hand, show a characteristic late maturation pattern. The temporal lobe matures last except for the temporal pole, which shows GM loss around the same time as the frontal and occipital poles (Figs. 1O and 3). By contrast, the superior and inferior

temporal gyri (STG and inferior temporal gyrus) do not show the same degree of GM loss throughout this age range. This is also shown by the flat graphs for age effects (Figs. 1 L and M and 3). Within the STG, the posterior part shows a distinct linear trajectory (Fig. 1N).

On the inferior brain surface, the medial aspects of the inferior temporal lobe (presumptive entorhinal cortex, medial to the rhinal sulcus, between the anterior end of the collateral sulcus and the posterior end of the olfactory sulcus) mature early and do not change much thereafter, as seen by the flat graphs for the age effects (Fig. 2T). A similar maturational pattern occurs in the caudal and medial parts of the inferior frontal lobe (Fig. 2S, presumptive piriform cortex). Other parts of the ventral temporal lobe show a lateral-to-medial pattern of maturation, whereas the orbitofrontal regions continued to mature until the oldest age that we studied (Fig. 2).

## Discussion

Here we show a visualization of dynamic progression of human cortical brain development in a prospective, longitudinal study of healthy children and adolescents. Earlier reports have either been cross-sectional (i.e., an MRI scan is acquired only once per subject) or used methods that provide mean global volumes instead of point-by-point comparison that is possible with the mapping methods (11, 15). Cross-sectional designs are influenced by interindividual variance and cohort effects, whereas methods that provide mean global volumes provide no spatio-

Downloaded by guest on December 27, 2019



**Fig. 2.** Bottom view of the brain showing early and late time-lapse images. Points correspond to anterior and posterior ends of the olfactory sulcus (R and S) and collateral sulcus (T and U), and mixed-model graphs corresponding to the regions of interest on the right hemisphere are shown in the middle. x-axis values show ages in years, and y-axis values show GM volumes.

temporal detail. We have overcome these limitations by studying a longitudinally acquired pre- and postpubertal sample, in which the same children were rescanned prospectively over a 10-year period. Our results, while highlighting heterochronicity of human cortical development, suggest that individual subregions follow temporally distinct maturational trajectories in which higher-order association areas mature only after the lower-order sensorimotor regions, the functions of which they integrate, have matured. Additionally, it appears that phylogenetically older cortical areas mature earlier than the newer cortical regions.

Frontal-lobe maturation progressed in a back-to-front direction, beginning in the primary motor cortex (the precentral gyrus) and spreading anteriorly over the superior and inferior frontal gyri, with the prefrontal cortex developing last. Conversely, the frontal pole matured at approximately the same age as the primary motor cortex. In the posterior half of the brain, the maturation began in the primary sensory area, spreading laterally over the rest of the parietal lobe. Similar to the frontal pole, the occipital pole matured early. Lateral temporal lobes were the last to mature.

Thus, the sequence in which the cortex matured agrees with regionally relevant milestones in cognitive and functional development. Parts of the brain associated with more basic functions matured early: motor and sensory brain areas matured first, followed by areas involved in spatial orientation, speech and language development, and attention (upper and lower parietal lobes). Later to mature were areas involved in executive function, attention, and motor coordination (frontal lobes). The frontal pole, involved in taste and smell processing, and the occipital pole, containing the primary visual cortex, also matured early, as expected. This maturational sequence was also reflected in the peak ages for maximum GM values, which increase as development progresses anteriorly (Fig. 1 A–D and

H–J). Visually, the prefrontal cortex and the inferior parietal cortex on the left side matured earlier than the corresponding regions on the right side, which may be because of the fact that the majority of children in this sample are right-handed, with a left-dominant hemisphere that matures early.

The temporal lobe followed a distinct maturation pattern. Temporal poles matured early. Most of the remaining temporal lobe matured during the age range of this sample except for a small area in the posterior part of the STG, which appeared to mature last. In humans, temporal cortex, in particular the posterior aspect of superior temporal sulcus, superior temporal gyrus, and middle temporal gyrus, is thought to be a heteromodal association site (along with prefrontal and inferior parietal cortices) and is involved with integration of memory, audiovisual association, and object-recognition functions (31–34). Thus, the temporal cortex continues to mature after other association areas, the functions of which it integrates, are relatively developed.

Phylogenetically, some of the oldest cortical regions lie on the inferior brain surface in the medial aspect of the temporal lobe (the posterior part of the piriform cortex and the entorhinal cortex, for example) or on the inferior and medial aspect of the frontal lobe near the caudal end of the olfactory sulcus (anterior piriform cortex and the orbital periallocortex) (35–37). The maturation process in the vicinity of these areas appeared to have started early (ontogenetically) already by the age of 4 years, as seen by the linear or flat plots (Fig. 2 S and T). From these areas, maturation slowly progresses laterally. In the inferior frontal cortex, the medial and posterior aspects of the olfactory cortices matured early, whereas orbitofrontal cortices matured later. In the remainder of the inferior temporal lobe, the maturation appeared later and in a somewhat lateral-to-medial direction. In mammals, the inferior temporal cortex, along with

NEUROSCIENCE

Downloaded from by guest on December 27, 2019



**Fig. 3.** Right lateral and top views of the dynamic sequence of GM maturation over the cortical surface. The side bar shows a color representation in units of GM volume. The initial frames depict regions of interest in the cortex as described for Fig. 1. This sequence is available in Movies 1–4 in the supporting information.

parts of the STG, posterior parietal cortex, and prefrontal cortex, are high-order association areas, which are also most recent evolutionarily (38, 39). Our observation of these areas appearing to mature later may suggest that the cortical development follows the evolutionary sequence to some degree.

The exact process underlying the GM loss is unknown. Cerebral white matter increases in the first four decades because of axonal myelination (40) and may partially explain the observed GM loss (41, 42). Although changes in sulcal and gyral folding patterns or other nonatrophic processes such as dehydration could influence the GM density, the primary cause for loss of GM density is unknown. We speculate that it may be driven at least partially by the process of synaptic pruning (43) together with trophic glial and vascular changes and/or cell shrinkage (44). Thus, region-specific differences in GM maturation may result from the underlying heterochronous synaptic pruning in the cortex, as has been shown in the primate and human cerebral cortical development (18, 45–48). Interestingly, in the frontal cortex, the dorsolateral prefrontal cortex matures last, coinciding with its later myelination, demonstrating that pruning myelination may often occur in parallel.

These findings may have clinical implications. For example, autism, with onset before the age of 3 years, shows global cerebral GM hyperplasia in the first 2 years of life (49) and larger frontal and temporal GM volumes by 4 years, followed by a slower rate of growth in these regions by 7 years (50, 51). Childhood-onset schizophrenia, with a mean age of onset around the age of 10 years, is associated with a striking parietal GM loss, which progresses anteriorly during adolescence in a back-to-front fashion (52), whereas adult-onset schizophrenia (the more typical form) is more strongly associated with deficits in later-maturing temporal and frontal regions (53–55) and is associated with selective abnormalities of the heteromodal regions (29). Thus, alterations either in degree or timing of basic maturational pattern may at least partially be underlying these neurodevelopmental disorders.

The magnitude of the changes in some cortical regions is highly significant and consistent with the growth and loss rates observed in our prior longitudinal studies. In an earlier report (28), we developed an approach using tensor mapping to measure the local growth rates and tissue-loss rates at a local level in the anatomy of the caudate and corpus callosum. In very small regions of these structures, local growth rates exceeded 40% per year, and local tissue-loss rates reached 40% per year in small regions of the basal ganglia. Because of the increased spatial resolution, peak local rates of change obtained from anatomical mapping approaches are often greater than those obtained in volumetric studies of anatomically parcellated brain structures. Assessment of lobar volumes, for example, can average growth or tissue-loss rates over a large structure, and the peak rates of volumetric change are reduced correspondingly. The cellular substrate for these cortical changes may be a combination of myelination, dendritic pruning, and changes in the neuronal, glial, vascular, and neurite packing density in different cortical laminae. There also may be changes in the relaxometric properties of the MRI signal, which is based on underlying water content. The myelination component can result in very large net percent changes in cortical volumes over periods of several years, especially when the volumes assessed are relatively small.

Downloaded from by guest on December 27, 2019

Downloaded by guest on December 27, 2019

There are several limitations to this study. These analyses are based on 52 scans, in which 1,976 anatomical models were created, giving sufficient power to track change, but are from only 13 children. In addition, this is a nonrepresentative population with an average IQ of 125, reflecting a referral bias of the National Institute of Mental Health study. We were not able to capture prepubertal gain in the time-lapse movie sequence, although it was readily visualized in the mixed-model graphs. Similarly, gender differences in brain maturation could not be explored, because there are only six males and seven females in the sample. However, our findings uncover key information on the maturational sequence of early brain development and its relation to functional and evolutionary milestones.

We thank Drs. Steven Wise (National Institutes of Health) and Alex Martin (National Institutes of Health) for valuable input and comments. This work was supported by National Institute of Mental Health Intramural funding; research grants from the National Institute for Biomedical Imaging and Bioengineering (EB 001561) and National Center for Research Resources (P41 RR13642 and R21 RR19771); and a Human Brain Project grant to the International Consortium for Brain Mapping, funded jointly by the National Institute of Mental Health and National Institute on Drug Abuse (P20 MH/DA52176).

1. Thatcher, R. W. (1992) *Brain Cognit.* **20**, 24–50.
2. Thatcher, R. W., Walker, R. A. & Giudice, S. (1987) *Science* **236**, 1110–1113.
3. Johnson, M. H. (2001) *Nat. Rev. Neurosci.* **2**, 475–483.
4. Stiles, J. (2000) *Dev. Neuropsychol.* **18**, 237–272.
5. Schlaggar, B. L., Brown, T. T., Lugar, H. M., Visscher, K. M., Miezin, F. M. & Petersen, S. E. (2002) *Science* **296**, 1476–1479.
6. Cepeda, N. J., Kramer, A. F. & Gonzalez de Sather, J. C. (2001) *Dev. Psychol.* **37**, 715–730.
7. Tamm, L., Menon, V. & Reiss, A. L. (2002) *J. Am. Acad. Child. Adolesc. Psychiatry* **41**, 1231–1238.
8. Luna, B., Thulborn, K. R., Munoz, D. P., Merriam, E. P., Garver, K. E., Minshew, N. J., Keshavan, M. S., Genovese, C. R., Eddy, W. F. & Sweeney, J. A. (2001) *Neuroimage* **13**, 786–793.
9. Chugani, H. T., Phelps, M. E. & Mazziotta, J. C. (1987) *Ann. Neurol.* **22**, 487–497.
10. Meyer-Lindenberg, A. (1996) *Electroencephalogr. Clin. Neurophysiol.* **99**, 405–411.
11. Giedd, J. N., Blumenthal, J., Jeffries, N. O., Castellanos, F. X., Liu, H., Zijdenbos, A., Paus, T., Evans, A. C. & Rapoport, J. L. (1999) *Nat. Neurosci.* **2**, 861–863.
12. Sowell, E. R., Thompson, P. M., Tessner, K. D. & Toga, A. W. (2001) *J. Neurosci.* **21**, 8819–8829.
13. Jernigan, T. L., Trauner, D. A., Hesselink, J. R. & Tallal, P. A. (1991) *Brain* **114**, 2037–2049.
14. Jernigan, T. L. & Tallal, P. (1990) *Dev. Med. Child Neurol.* **32**, 379–385.
15. Sowell, E. R., Peterson, B. S., Thompson, P. M., Welcome, S. E., Henkenius, A. L. & Toga, A. W. (2003) *Nat. Neurosci.* **6**, 309–315.
16. Sowell, E. R., Thompson, P. M., Holmes, C. J., Jernigan, T. L. & Toga, A. W. (1999) *Nat. Neurosci.* **2**, 859–861.
17. Huttenlocher, P. R. (1994) in *Human Behavior and the Developing Brain*, eds. Dawson, G. & Fischer, K. (Guilford, New York), pp. 137–152.
18. Bourgeois, J. P., Goldman-Rakic, P. S. & Rakic, P. (1994) *Cereb. Cortex* **4**, 78–96.
19. Rakic, P. (1996) in *Child and Adolescent Psychiatry*, ed. Lewis, M. (Williams and Wilkins, Baltimore), pp. 9–30.
20. Giedd, J. N., Snell, J. W., Lange, N., Rajapakse, J. C., Casey, B. J., Kozuch, P. L., Vaituzis, A. C., Vauss, Y. C., Hamburger, S. D., Kaysen, D., *et al.* (1996) *Cereb. Cortex* **6**, 551–560.
21. Sled, J. G., Zijdenbos, A. P. & Evans, A. C. (1998) *IEEE Trans. Med. Imaging* **17**, 87–97.
22. Collins, D. L., Neelin, P., Peters, T. M. & Evans, A. C. (1994) *J. Comput. Assist. Tomogr.* **18**, 192–205.
23. Shattuck, D. W. & Leahy, R. M. (2001) *IEEE Trans. Med. Imaging* **20**, 1167–1177.
24. Zijdenbos, A. P. & Dawant, B. M. (1994) *Crit. Rev. Biomed. Eng.* **22**, 401–465.
25. Thompson, P. M., Hayashi, K. M., de Zubicaray, G., Janke, A. L., Rose, S. E., Semple, J., Herman, D., Hong, M. S., Dittmer, S. S., Doddrell, D. M., *et al.* (2003) *J. Neurosci.* **23**, 994–1005.
26. Thompson, P. M., Mega, M. S., Vidal, C., Rapoport, J. L. & Toga, A. (2001) *Detecting Disease-Specific Patterns of Brain Structure Using Cortical Pattern Matching and a Population-Based Probabilistic Brain Atlas, IEEE Conference on Information Processing in Medical Imaging (IPMI), UC Davis 2001* (Springer, Berlin).
27. Ashburner, J., Csernansky, J. G., Davatzikos, C., Fox, N. C., Frisoni, G. B. & Thompson, P. M. (2003) *Lancet Neurol.* **2**, 79–88.
28. Thompson, P. M., Giedd, J. N., Woods, R. P., MacDonald, D., Evans, A. C. & Toga, A. W. (2000) *Nature* **404**, 190–193.
29. Buchanan, R. W., Francis, A., Arango, C., Miller, K., Lefkowitz, D. M., McMahon, R. P., Barta, P. E. & Pearlson, G. D. (2004) *Am. J. Psychiatry* **161**, 322–331.
30. Giedd, J. N., Jeffries, N. O., Blumenthal, J., Castellanos, F. X., Vaituzis, A. C., Fernandez, T., Hamburger, S. D., Liu, H., Nelson, J., Bedwell, J., *et al.* (1999) *Biol. Psychiatry* **46**, 892–898.
31. Mesulam, M. M. (1998) *Brain* **121**, 1013–1052.
32. Calvert, G. A. (2001) *Cereb. Cortex* **11**, 1110–1123.
33. Martin, A. & Chao, L. L. (2001) *Curr. Opin. Neurobiol.* **11**, 194–201.
34. Mesulam, M. (2000) *Principles of Behavioral and Cognitive Neurology* (Oxford Univ. Press, New York).
35. Puelles, L. (2001) *Philos. Trans. R. Soc. London B* **356**, 1583–1598.
36. Puelles, L. & Rubenstein, J. L. (2003) *Trends Neurosci.* **26**, 469–476.
37. Rubenstein, J. L., Martinez, S., Shimamura, K. & Puelles, L. (1994) *Science* **266**, 578–580.
38. Allman, J., Hakeem, A. & Watson, K. (2002) *Neuroscientist* **8**, 335–346.
39. Fuster, J. M. (2002) *J. Neurocytol.* **31**, 373–385.
40. Bartzokis, G., Beckson, M., Lu, P. H., Nuechterlein, K. H., Edwards, N. & Mintz, J. (2001) *Arch. Gen. Psychiatry* **58**, 461–465.
41. Benes, F. M. (1989) *Schizophr. Bull.* **15**, 585–593.
42. Benes, F. M., Turtle, M., Khan, Y. & Farol, P. (1994) *Arch. Gen. Psychiatry* **51**, 477–484.
43. Huttenlocher, P. R. (1979) *Brain Res.* **163**, 195–205.
44. Morrison, J. H. & Hof, P. R. (1997) *Science* **278**, 412–419.
45. Rakic, P., Bourgeois, J. P. & Goldman-Rakic, P. S. (1994) *Prog. Brain Res.* **102**, 227–243.
46. Bourgeois, J. P. (1997) *Acta. Paediatr. Suppl.* **422**, 27–33.
47. Zecevic, N., Bourgeois, J. P. & Rakic, P. (1989) *Brain Res. Dev. Brain Res.* **50**, 11–32.
48. Huttenlocher, P. R. & Dabholkar, A. S. (1997) *J. Comp. Neurol.* **387**, 167–178.
49. Courchesne, E., Carper, R. & Akshoomoff, N. (2003) *J. Am. Med. Assoc.* **290**, 337–344.
50. Saitoh, O. & Courchesne, E. (1998) *Psychiatry Clin. Neurosci.* **52** Suppl, S219–S222.
51. Carper, R. A., Moses, P., Tigue, Z. D. & Courchesne, E. (2002) *Neuroimage* **16**, 1038–1051.
52. Thompson, P. M., Vidal, C., Giedd, J. N., Gochman, P., Blumenthal, J., Nicolson, R., Toga, A. W. & Rapoport, J. L. (2001) *Proc. Natl. Acad. Sci. USA* **98**, 11650–11655.
53. Shenton, M. E., Dickey, C. C., Frumin, M. & McCarley, R. W. (2001) *Schizophr. Res.* **49**, 1–52.
54. Gur, R. E., Cowell, P., Turetsky, B. I., Gallacher, F., Cannon, T., Bilker, W. & Gur, R. C. (1998) *Arch. Gen. Psychiatry* **55**, 145–152.
55. DeLisi, L. E., Stritzke, P., Riordan, H., Holan, V., Boccio, A., Kushner, M., McClelland, J., Van Eyl, O. & Anand, A. (1992) *Biol. Psychiatry* **31**, 241–254.

NEUROSCIENCE

# EXHIBIT 38

Case 3:19-cv-01226-L-AHG    Document 34-7   Filed 01/03/20   PageID.7976

PUBLIC RELEASE: 17-MAY-2004

# Imaging study shows brain maturing

NIH/NATIONAL INSTITUTE OF MENTAL HEALTH

The brain's center of reasoning and problem solving is among the last to mature, a new study graphically reveals. The decade-long magnetic resonance imaging (MRI) study of normal brain development, from ages 4 to 21, by researchers at NIH's National Institute of Mental Health (NIMH) and University of California Los Angeles (UCLA) shows that such "higher-order" brain centers, such as the prefrontal cortex, don't fully develop until young adulthood.

A time-lapse 3-D movie that compresses 15 years of human brain maturation, ages 5 to 20, into seconds shows gray matter - the working tissue of the brain's cortex - diminishing in a back-to-front wave, likely reflecting the pruning of unused neuronal connections during the teen years. Cortex areas can be seen maturing at ages in which relevant cognitive and functional developmental milestones occur. The sequence of maturation also roughly parallels the evolution of the mammalian brain, suggest Drs. Nitin Gogtay, Judith Rapoport, NIMH, and Paul Thompson, Arthur Toga, UCLA, and colleagues, whose study is published online during the week of May 17, 2004 in The Proceedings of the National Academy of Sciences.

"To interpret brain changes we were seeing in neurodevelopmental disorders like schizophrenia, we needed a better picture of how the brain normally develops," explained Rapoport.

The researchers scanned the same 13 healthy children and teens every two years as they grew up, for 10 years. After co-registering the scans with each other, using an intricate set brain anatomical landmarks, they visualized the ebb and flow of gray matter - neurons and their branch-like extensions - in maps that, together, form the movie showing brain maturation from ages 5 to 20.

It was long believed that a spurt of overproduction of gray matter during the first 18 months of life was followed by a steady decline as unused circuitry is discarded. Then, in the late l990s, NIMH's Dr. Jay Giedd, a co-author of the current study, and colleagues, discovered a second wave of overproduction of gray matter just prior to puberty, followed by a second bout of "use-it-or-lose-it" pruning during the teen years.



Time-Lapse Imaging Tracks Brain Maturation from ages 5 to 20

Constructed from MRI scans of healthy children and teens, the time-lapse "movie" (http://www. nimh.nih.gov/press/ prbrainmaturing.mpeg), from which the above images were extracted, compresses 15 years of brain development (ages 5 - 20) into just a few seconds. Red indicates more gray matter, blue less gray matter. Gray matter wanes in a back-to-front wave as the brain matures and neural connections are pruned. Areas performing more basic functions mature earlier; areas for higher order functions mature later. The prefrontal cortex, which handles reasoning and other "executive" functions, emerged late in evolution and is among the last to mature. Studies in twins are showing that development of such

12/27/2019                    Imaging study shows brain maturing - EurekAlert! Science News                    Page 620 of 620

Case 3:19-cv-01226-L-AHG    Document 34-7   Filed 01/03/20   PageID.7977    Page 620 of 620

The new study found that the first areas to mature (e.g., extreme front and back of the brain) are those with the most basic functions, such as processing the senses and movement. Areas involved in spatial orientation and language (parietal lobes) follow. Areas with more advanced functions -- integrating information from the senses, reasoning and other "executive" functions (prefrontal cortex) - mature last.

late-maturing areas is less influenced by heredity than areas that mature earlier.

Source: Paul Thompson, Ph.D. UCLA Laboratory of Neuroimaging

In a related study published a few years ago, Rapoport and colleagues discovered an exaggerated wave of gray matter loss in teens with early onset schizophrenia. These teens, who became psychotic prior to puberty, lost four times the normal amount of gray matter in their frontal lobes, suggesting that childhood onset schizophrenia "may be an exaggeration of a normal maturation process, perhaps related to excessive synaptic pruning," note the researchers. By contrast, children with autism show an abnormal back-to-front wave of gray matter increases, rather than decreases, suggesting "a specific faulty step in early development."

Also participating in the new study were: Leslie Lusk, Cathy Vaituzis, Tom Nugent, David Herman, Drs. Deanna Greenstein, Liv Clasen, NIMH; Kiralee Hayashi, UCLA.

###

NIMH is part of the National Institutes of Health (NIH), the Federal Government's primary agency for biomedical and behavioral research. NIH is a component of the U.S. Department of Health and Human Services.

**Disclaimer:** AAAS and EurekAlert! are not responsible for the accuracy of news releases posted to EurekAlert! by contributing institutions or for the use of any information through the EurekAlert system.

**Media Contact**

Jules Asher
NIMHpress@nih.gov
301-443-4536

🐦 @nimhgov

http://www.nimh.nih.gov ➦