# EXHIBIT 37

DEATH PENALTY INFORMATION CENTER

f  SHARE      🐦 TWEET      ✉ EMAIL

PUBLICATIONS AND TESTIMONY

# What Makes Teens Tick

*Posted on May 10, 2004*

ARTICLES      JUVENILES

*Time Magazine*
*May 10, 2004*
*What Makes Teens Tick; A flood of hormones, sure. But also a host of structural changes in the brain. Can those explain the behaviors that make adolescence so exciting—and so exasperating?*

By Claudia Wallis; Kristina Dell, with reporting by Alice Park/New York

Five young men in sneakers and jeans troop into a waiting room at the National Institutes of Health Clinical Center in Bethesda, Md., and drape themselves all over the chairs in classic collapsed-teenager mode, trailing backpacks, a CD player and a laptop loaded with computer games. It's midafternoon, and they are, of course, tired, but even so their presence adds a jangly, hormonal buzz to the bland, institutional setting. Fair-haired twins Corey and Skyler Mann, 16, and their burlier big brothers Anthony and Brandon, 18, who are also twins, plus eldest brother Christopher, 22, are here to have their heads examined. Literally. The five brothers from Orem, Utah, are the latest recruits to a giant study that's been going on in this building since 1991. Its goal: to determine how the brain develops from childhood into adolescence and on into early adulthood.

It is the project of Dr. Jay Giedd (pronounced Geed), chief of brain imaging in the child psychiatry branch at the National Institute of Mental Health. Giedd, 43, has devoted the past 13 years to peering inside the heads of 1,800 kids and teenagers using high-powered magnetic resonance imaging (MRI). For each volunteer, he creates a unique photo album, taking MRI snapshots every two years and building a record as the brain morphs and grows. Giedd started out investigating the developmental origins of attention-deficit/hyperactivity disorder (ADHD) and autism ("I was going alphabetically," he jokes) but soon discovered that so little was known about how the brain is supposed to develop that it was impossible to figure out where things might be going wrong. In a way, the vast project that has become his life's work is nothing more than an attempt to establish a gigantic control group. "It turned out that normal brains were so interesting in themselves," he marvels. "And the adolescent studies have been the most surprising of all."

Before the imaging studies by Giedd and his collaborators at UCLA, Harvard, the Montreal Neurological

Institute and a dozen other institutions, most scientists believed the brain was largely a finished product by the time a child reached the age of 12. Not only is it full-grown in size, Giedd explains, but "in a lot of psychological literature, traced back to [Swiss psychologist Jean] Piaget, the highest rung in the ladder of cognitive development was about age 12—formal operations." In the past, children entered initiation rites and started learning trades at about the onset of puberty. Some theorists concluded from this that the idea of adolescence was an artificial construct, a phenomenon invented in the post—Industrial Revolution years. Giedd's scanning studies proved what every parent of a teenager knows: not only is the brain of the

adolescent far from mature, but both gray and white matter undergo extensive structural changes well past puberty. "When we started," says Giedd, "we thought we'd follow kids until about 18 or 20. If we had to pick a number now, we'd probably go to age 25."

Now that MRI studies have cracked open a window on the developing brain, researchers are looking at how the newly detected physiological changes might account for the adolescent behaviors so familiar to parents: emotional outbursts, reckless risk taking and rule breaking, and the impassioned pursuit of sex, drugs and rock 'n' roll. Some experts believe the structural changes seen at adolescence may explain the timing of such major mental illnesses as schizophrenia and bipolar disorder. These diseases typically begin in adolescence and contribute to the high rate of teen suicide. Increasingly, the wild conduct once blamed on "raging hormones" is being seen as the by-product of two factors: a surfeit of hormones, yes, but also a paucity of the cognitive controls needed for mature behavior.

In recent years, Giedd has shifted his focus to twins, which is why the Manns are such exciting recruits. Although most brain development seems to follow a set plan, with changes following cues that are preprogrammed into genes, other, subtler changes in gray matter reflect experience and environment. By following twins, who start out with identical—or, in fraternal twins, similar—programming but then diverge as life takes them on different paths, he hopes to tease apart the influences of nature and nurture. Ultimately, he hopes to find, for instance, that Anthony Mann's plan to become a pilot and Brandon's to study law will lead to brain differences that are detectable on future MRIs. The brain, more than any other organ, is where experience becomes flesh.

Throughout the afternoon, the Mann brothers take turns completing tests of intelligence and cognitive function. Between sessions they occasionally needle one another in the waiting room. "If the other person is in a bad mood, you've got to provoke it," Anthony asserts slyly. Their mother Nancy Mann, a sunny paragon of patience who has three daughters in addition to the five boys, smiles and rolls her eyes.

Shortly before 5 p.m., the Manns head downstairs to the imaging floor to meet the magnet. Giedd, a trim, energetic man with a reddish beard, twinkly blue eyes and an impish sense of humor, greets Anthony and tells him what to expect. He asks Anthony to remove his watch, his necklace and a high school ring, labeled KEEPER. Does Anthony have any metal in his body? Any piercings? Not this clean-cut, soccer-playing Mormon. Giedd tapes a vitamin E capsule onto Anthony's left cheek and one in each ear. He explains that the oil-filled capsules are opaque to the scanner and will define a plane on the images, as well as help researchers tell left from right. The scanning will take about 15 minutes, during which Anthony must lie completely still. Dressed in a red sweat shirt, jeans and white K-Swiss sneakers, he stretches out on the

completely still. Dressed in a red sweat shirt, jeans and white K-Swiss sneakers, he stretches out on the examining table and slides his head into the machine's giant magnetic ring.

MRI, Giedd points out, "made studying healthy kids possible" because there's no radiation involved. (Before MRI, brain development was studied mostly by using cadavers.) Each of the Mann boys will be scanned three times. The first scan is a quick survey that lasts one minute. The second lasts two minutes and looks for any damage or abnormality. The third is 10 minutes long and taken at maximum resolution. It's the money shot. Giedd watches as Anthony's brain appears in cross section on a computer screen. The machine

scans 124 slices, each as thin as a dime. It will take 20 hours of computer time to process the images, but the analysis is done by humans, says Giedd. "The human brain is still the best at pattern recognition," he marvels.

Some people get nervous as the MRI machine clangs noisily. Claustrophobes panic. Anthony, lying still in the soul of the machine, simply falls asleep.

## CONSTRUCTION AHEAD

One reason scientists have been surprised by the ferment in the teenage brain is that the brain grows very little over the course of childhood. By the time a child is 6, it is 90% to 95% of its adult size. As a matter of fact, we are born equipped with most of the neurons our brain will ever have—and that's fewer than we have in utero. Humans achieve their maximum brain-cell density between the third and sixth month of gestation—the culmination of an explosive period of prenatal neural growth. During the final months before birth, our brains undergo a dramatic pruning in which unnecessary brain cells are eliminated. Many neuroscientists now believe that autism is the result of insufficient or abnormal prenatal pruning.

What Giedd's long-term studies have documented is that there is a second wave of proliferation and pruning that occurs later in childhood and that the final, critical part of this second wave, affecting some of our highest mental functions, occurs in the late teens. Unlike the prenatal changes, this neural waxing and waning alters not the number of nerve cells but the number of connections, or synapses, between them. When a child is between the ages of 6 and 12, the neurons grow bushier, each making dozens of connections to other neurons and creating new pathways for nerve signals. The thickening of all this gray matter—the neurons and their branchlike dendrites—peaks when girls are about 11 and boys 12 1/2, at which point a serious round of pruning is under way. Gray matter is thinned out at a rate of about 0.7% a year, tapering off in the early 20s. At the same time, the brain's white matter thickens. The white matter is composed of fatty myelin sheaths that encase axons and, like insulation on a wire, make nerve-signal transmissions faster and more efficient. With each passing year (maybe even up to age 40) myelin sheaths thicken, much like tree rings. During adolescence, says Giedd, summing up the process, "you get fewer but faster connections in the brain." The brain becomes a more efficient machine, but there is a trade-off: it is probably losing some of its raw potential for learning and its ability to recover from trauma.

Most scientists believe that the pruning is guided both by genetics and by a use-it-or-lose-it principle. Nobel prizewinning neuroscientist Gerald Edelman has described that process as "neural Darwinism"— survival of the fittest (or most used) synapses. How you spend your time may be critical. Research shows,

Studies of London cab drivers, who must memorize all the city's streets, show that they have an unusually large hippocampus, a structure involved in memory. Giedd's research suggests that the cerebellum, an area that coordinates both physical and mental activities, is particularly responsive to experience, but he warns that it's too soon to know just what drives the buildup and pruning phases. He's hoping his studies of twins will help answer such questions: "We're looking at what they eat, how they spend their time—is it video games or sports? Now the fun begins," he says.

No matter how a particular brain turns out, its development proceeds in stages, generally from back to front. Some of the brain regions that reach maturity earliest—through proliferation and pruning—are those in the back of the brain that mediate direct contact with the environment by controlling such sensory functions as vision, hearing, touch and spatial processing. Next are areas that coordinate those functions: the part of the brain that helps you know where the light switch is in your bathroom even if you can't see it in the middle of the night. The very last part of the brain to be pruned and shaped to its adult dimensions is the prefrontal cortex, home of the so-called executive functions—planning, setting priorities, organizing thoughts, suppressing impulses, weighing the consequences of one's actions. In other words, the final part of the brain to grow up is the part capable of deciding, I'll finish my homework and take out the garbage, and then I'll IM my friends about seeing a movie.

"Scientists and the general public had attributed the bad decisions teens make to hormonal changes," says Elizabeth Sowell, a UCLA neuroscientist who has done seminal MRI work on the developing brain. "But once we started mapping where and when the brain changes were happening, we could say, Aha, the part of the brain that makes teenagers more responsible is not finished maturing yet."

## RAGING HORMONES

Hormones, however, remain an important part of the teen-brain story. Right about the time the brain switches from proliferating to pruning, the body comes under the hormonal assault of puberty. (Research suggests that the two events are not closely linked because brain development proceeds on schedule even when a child experiences early or late puberty.) For years, psychologists attributed the intense, combustible emotions and unpredictable behavior of teens to this biochemical onslaught. And new research adds fresh support. At puberty, the ovaries and testes begin to pour estrogen and testosterone into the bloodstream, spurring the development of the reproductive system, causing hair to sprout in the armpits and groin, wreaking havoc with the skin, and shaping the body to its adult contours. At the same time, testosterone-like hormones released by the adrenal glands, located near the kidneys, begin to circulate. Recent discoveries show that these adrenal sex hormones are extremely active in the brain, attaching to receptors everywhere and exerting a direct influence on serotonin and other neurochemicals that regulate mood and excitability.

The sex hormones are especially active in the brain's emotional center—the limbic system. This creates a "tinderbox of emotions," says Dr. Ronald Dahl, a psychiatrist at the University of Pittsburgh. Not only do feelings reach a flash point more easily, but adolescents tend to seek out situations where they can allow their emotions and passions to run wild. "Adolescents are actively looking for experiences to create intense

Cases 3.14 - 10.2.2016 Approval Document at the Files on 02/27 Page 06 of 83 Page 6 of 192

feelings," says Dahl. "It's a very important hint that there is some particular hormone-brain relationship contributing to the appetite for thrills, strong sensations and excitement." This thrill seeking may have evolved to promote exploration, an eagerness to leave the nest and seek one's own path and partner. But in a world where fast cars, illicit drugs, gangs and dangerous liaisons beckon, it also puts the teenager at risk.

That is especially so because the brain regions that put the brakes on risky, impulsive behavior are still under construction. "The parts of the brain responsible for things like sensation seeking are getting turned on in big ways around the time of puberty," says Temple University psychologist Laurence Steinberg. "But the parts for exercising judgment are still maturing throughout the course of adolescence. So you've got this time gap between when things impel kids toward taking risks early in adolescence, and when things that allow people to think before they act come online. It's like turning on the engine of a car without a skilled driver at the wheel."

## DUMB DECISIONS

Increasingly, psychologists like Steinberg are trying to connect the familiar patterns of adolescents' wacky behavior to the new findings about their evolving brain structure. It's not always easy to do. "In all likelihood, the behavior is changing because the brain is changing," he says. "But that is still a bit of a leap." A critical tool in making that leap is functional magnetic resonance imaging (fMRI). While ordinary MRI reveals brain structure, fMRI actually shows brain activity while subjects are doing assigned tasks.

At McLean Hospital in Belmont, Mass., Harvard neuropsychologist Deborah Yurgelun-Todd did an elegant series of FMRI experiments in which both kids and adults were asked to identity the emotions displayed in photographs of faces. "In doing these tasks," she says, "kids and young adolescents rely heavily on the amygdala, a structure in the temporal lobes associated with emotional and gut reactions. Adults rely less on the amygdala and more on the frontal lobe, a region associated with planning and judgment." While adults make few errors in assessing the photos, kids under 14 tend to make mistakes. In particular, they identify fearful expressions as angry, confused or sad. By following the same kids year after year, Yurgelun-Todd has been able to watch their brain-activity pattern—and their judgment—mature. Fledgling physiology, she believes, may explain why adolescents so frequently misread emotional signals, seeing anger and hostility where none exists. Teenage ranting ("That teacher hates me!") can be better understood in this light.

At Temple University, Steinberg has been studying another kind of judgment: risk assessment. In an experiment using a driving-simulation game, he studies teens and adults as they decide whether to run a yellow light. Both sets of subjects, he found, make safe choices when playing alone. But in group play, teenagers start to take more risks in the presence of their friends, while those over age 20 don't show much change in their behavior. "With this manipulation," says Steinberg, "we've shown that age differences in decision making and judgment may appear under conditions that are emotionally arousing or have high social impact." Most teen crimes, he says, are committed by kids in packs.

Other researchers are exploring how the adolescent propensity for uninhibited risk taking propels teens to experiment with drugs and alcohol. Traditionally, psychologists have attributed this experimentation to

peer pressure, teenagers, attraction to novelty and their roaring interest in loosening sexual inhibitions.

Case 3:19-cv-81226-L-AHG   Document 34-8   Filed 01/03/20   PageID.7384   Page 7 of 192

But researchers have raised the possibility that rapid changes in dopamine-rich areas of the brain may be an additional factor in making teens vulnerable to the stimulating and addictive effects of drugs and alcohol. Dopamine, the brain chemical involved in motivation and in reinforcing behavior, is particularly abundant and active in the teen years.

Why is it so hard to get a teenager off the couch and working on that all important college essay? You might blame it on their immature nucleus accumbens, a region in the frontal cortex that directs motivation to seek rewards. James Bjork at the National Institute on Alcohol Abuse and Alcoholism has been using fMRI to study motivation in a challenging gambling game. He found that teenagers have less activity in this region than adults do. "If adolescents have a motivational deficit, it may mean that they are prone to engaging in behaviors that have either a really high excitement factor or a really low effort factor, or a combination of both." Sound familiar? Bjork believes his work may hold valuable lessons for parents and society. "When presenting suggestions, anything parents can do to emphasize more immediate payoffs will be more effective," he says. To persuade a teen to quit drinking, for example, he suggests stressing something immediate and tangible—the danger of getting kicked off the football team, say—rather than a future on skid row.

Persuading a teenager to go to bed and get up on a reasonable schedule is another matter entirely. This kind of decision making has less to do with the frontal lobe than with the pineal gland at the base of the brain. As nighttime approaches and daylight recedes, the pineal gland produces melatonin, a chemical that signals the body to begin shutting down for sleep. Studies by Mary Carskadon at Brown University have shown that it takes longer for melatonin levels to rise in teenagers than in younger kids or in adults, regardless of exposure to light or stimulating activities. "The brain's program for starting nighttime is later," she explains.

## PRUNING PROBLEMS

The new discoveries about teenage brain development have prompted all sorts of questions and theories about the timing of childhood mental illness and cognitive disorders. Some scientists now believe that ADHD and Tourette's syndrome, which typically appear by the time a child reaches age 7, may be related to the brain proliferation period. Though both disorders have genetic roots, the rapid growth of brain tissue in early childhood, especially in regions rich in dopamine, "may set the stage for the increase in motor activities and tics," says Dr. Martin Teicher, director of developmental biopsychiatry research at McLean Hospital. "When it starts to prune in adolescence, you often see symptoms recede."

Schizophrenia, on the other hand, makes its appearance at about the time the prefrontal cortex is getting pruned. "Many people have speculated that schizophrenia may be due to an abnormality in the pruning process," says Teicher. "Another hypothesis is that schizophrenia has a much earlier, prenatal origin, but as the brain prunes, it gets unmasked." MRI studies have shown that while the average teenager loses about 15% of his cortical gray matter, those who develop schizophrenia lose as much as 25%.

## WHAT'S A PARENT TO DO?

Brain scientists tend to be reluctant to make the leap from the laboratory to real-life, hard-core teenagers.

Some other marketing schemes that misapplied their science. It is clear, however, that there are implications in the new research for parents, educators and lawmakers.

In light of what has been learned, it seems almost arbitrary that our society has decided that a young American is ready to drive a car at 16, to vote and serve in the Army at 18 and to drink alcohol at 21. Giedd says the best estimate for when the brain is truly mature is 25, the age at which you can rent a car. "Avis must have some pretty sophisticated neuroscientists," he jokes. Now that we have scientific evidence that

the adolescent brain is not quite up to scratch, some legal scholars and child advocates argue that minors should never be tried as adults and should be spared the death penalty. Last year, in an official statement that summarized current research on the adolescent brain, the American Bar Association urged all state legislatures to ban the death penalty for juveniles. "For social and biological reasons," it read, "teens have increased difficulty making mature decisions and understanding the consequences of their actions."

Most parents, of course, know this instinctively. Still, it's useful to learn that teenage behavior is not just a matter of willful pigheadedness or determination to drive you crazy—though these, too, can be factors. "There's a debate over how much conscious control kids have," says Giedd, who has four "teenagers in training" of his own. "You can tell them to shape up or ship out, but making mistakes is part of how the brain optimally grows." It might be more useful to help them make up for what their brain still lacks by providing structure, organizing their time, guiding them through tough decisions (even when they resist) and applying those time-tested parental virtues: patience and love.

—With reporting by Alice Park/New York

## INSIDE THE ADOLESCENT BRAIN

The brain undergoes two major developmental spurts, one in the womb and the second from childhood through the teen years, when the organ matures by fits and starts in a sequence that moves from the back of the brain to the front

| BRAIN AREA | | |
| --- | --- | --- |
| **CORPUS CALLOSUM** | | |
| | **DESCRIPTION / DUTIES** | Thought to be involved in problem solving and creativity, this bundle of nerve fibers connects the left and right hemispheres of the brain. During adolescence, the nerve fibers thicken and process information more and more efficiently |
| **PREFRONTAL CORTEX** | | |
| | **DESCRIPTION / DUTIES** | The CEO of the brain, also called the area of sober second thought, is the last part of the brain to mature—which may be why teens get into so much trouble. Located just behind the forehead, the prefrontal cortex grows during the preteen years and then shrinks as neural connections are pruned during |

## BASAL GANGLIA

| | DESCRIPTION / DUTIES | Larger in females than in males, this part of the brain acts like a secretary to the prefrontal cortex by helping it prioritize information. The basal ganglia and prefrontal cortex are tightly connected: at nearly the same time, they grow neuron connections and then prune them. This area of the brain is also active in small and large motor movements, so it may be important to expose preteens to music and sports while it is growing |
|---|---|---|

## AMYGDALA

| | DESCRIPTION / DUTIES | This is the emotional center of the brain, home to such primal feelings as fear and rage. In processing emotional information, teens tend to rely more heavily on the amygdala. Adults depend more on the rational prefrontal cortex, a part of the brain that is underdeveloped in teens. That may explain why adolescents often react more impulsively than adults |
|---|---|---|

## CEREBELLUM

| | DESCRIPTION / DUTIES | Long thought to play a role in physical coordination, this area may also regulate certain thought processes. More sensitive to environment than to heredity, the cerebellum supports activities of higher learning like mathematics, music and advanced social skills. New research shows that it changes dramatically during adolescence, increasing the number of neurons and the complexity of their connections. The cerebellum is the only part of the brain that continues growing well into the early 20s |
|---|---|---|

## NERVE PROLIFERATION...

| | DESCRIPTION / DUTIES | By age 11 for girls and 12 1/2 for boys, the neurons in the front of the brain have formed thousands of new connections. Over the next few years, most of these links will be pruned |
|---|---|---|

## ... AND PRUNING

| | DESCRIPTION / DUTIES | Those that are used and reinforced-the pathways involved in language, for example-will be strengthened, while the ones that aren't used will die out |
|---|---|---|

**Sources:** Dr. Jay Giedd, chief of brain imaging, child psychiatry branch, NIMH; Paul Thompson, Andrew Lee, Kiralee Hayashi and Arthur Toga, UCLA Lab of Neuro Imaging; Nitin Gogtay and Judy Rapoport, child

Text by Kristina Dell

## VIEW BY CATEGORY

All Publications And Testimony

Books

Testimony and Statements

Articles

Law Reviews

Studies

---

# Join our mailing list

*Enter your email address*

SUBSCRIBE



  

## POLICY ISSUES

## FACTS & RESEARCH

## EXECUTIONS

## DEATH ROW

## STATE & FEDERAL INFO

## ABOUT

## FOR THE MEDIA

## RESESOURCES ⌄

## FOR EDUCATORS

## FACT SHEET

## DONATE

Death Penalty Information Center

1701 K Street NW Suite 205

Washington, DC 20006

Phone: 202-289-2275

Email: dpic@deathpenaltyinfo.org

Privacy Policy | ©2019 Death Penalty Information Center

# EXHIBIT 38



| Search Encyclopedia | Search |
|---|---|

# Understanding the Teen Brain

It doesn't matter how smart teens are or how well they scored on the SAT or ACT. Good judgment isn't something they can excel in, at least not yet.

The rational part of a teen's brain isn't fully developed and won't be until age 25 or so.

In fact, recent research has found that adult and teen brains work differently. Adults think with the prefrontal cortex, the brain's rational part. This is the part of the brain that responds to situations with good judgment and an awareness of long-term consequences. Teens process information with the amygdala. This is the emotional part.

In teen's brains, the connections between the emotional part of the brain and the decision-making center are still developing—and not always at the same rate. That's why when teens have overwhelming emotional input, they can't explain later what they were thinking. They weren't thinking as much as they were feeling.

## What's a parent to do?

You're the most important role model your kids have. Sure, their friends are important to them, but the way you behave and fulfill your responsibilities will have a profound and long-lasting effect on your children.

- Discussing the consequences of their actions can help teens link impulsive thinking with facts. This helps the brain make these connections and wires the brain to make this link more often.

- Remind your teens that they're resilient and competent. Because they're so focused in the moment, adolescents have trouble seeing they can play a part in changing bad situations. It can help to remind them of times in the past they thought would be devastating, but turned out for the best.

- Become familiar with things that are important to your teens. It doesn't mean you have to like hip-hop music, but showing an interest in the things they're involved in shows them they're important to you.

- Ask teens if they want you to respond when they come to you with problems, or if they just want you to listen.

Parents tend to jump in with advice to try to fix their children's problems or place blame. But this can make teens less likely to be open with their parents in the future. You want to make it emotionally safe and easy for them to come to you, so you can be part of their lives.

# Signs of trouble

It's normal for teens to be down or out of sorts for a couple of days. But if you see a significant mood or behavioral change that lasts more than 2 weeks, it could mean something else is going on, such as depression.

If you think your teen could be depressed, promptly seek professional treatment for your child. Depression is serious and, if left untreated, can be life-threatening.

Your teen needs your guidance, even though they may think they don't. Understanding their development can help you support them in becoming independent, responsible adults.

**Medical Reviewers:**

- Anne Fetterman RN BSN

- Joseph Campellone MD

- Raymond Kent Turley BSN MSN RN

---

Ask a Medical Librarian

---

Make an Appointment

# EXHIBIT 39

3586 • The Journal of Neuroscience, April 2, 2008 • 28(14):3586 –3594

Development/Plasticity/Repair

# Neurodevelopmental Trajectories of the Human Cerebral Cortex

**Philip Shaw,**[1] **Noor J. Kabani,**[3] **Jason P. Lerch,**[4] **Kristen Eckstrand,**[1] **Rhoshel Lenroot,**[1] **Nitin Gogtay,**[1]
**Deanna Greenstein,**[1] **Liv Clasen,**[1] **Alan Evans,**[4] **Judith L. Rapoport,**[1] **Jay N. Giedd,**[1] and **Steve P. Wise**[2]
[1]Child Psychiatry Branch and [2]Laboratory of Systems Neuroscience, National Institute of Mental Health, Bethesda, Maryland 20892, [3]Sunnybrook Health Sciences Centre, Toronto, Ontario, Canada M4N 3N1, and [4]Montreal Neurological Institute, McGill University, Montreal, Quebec, Canada H3A 2B4

Understanding the organization of the cerebral cortex remains a central focus of neuroscience. Cortical maps have relied almost exclusively on the examination of postmortem tissue to construct structural, architectonic maps. These maps have invariably distinguished between areas with fewer discernable layers, which have a less complex overall pattern of lamination and lack an internal granular layer, and those with more complex laminar architecture. The former includes several agranular limbic areas, and the latter includes the homotypical and granular areas of association and sensory cortex. Here, we relate these traditional maps to developmental data from noninvasive neuroimaging. Changes in cortical thickness were determined *in vivo* from 764 neuroanatomic magnetic resonance images acquired longitudinally from 375 typically developing children and young adults. We find differing levels of complexity of cortical growth across the cerebrum, which align closely with established architectonic maps. Cortical regions with simple laminar architecture, including most limbic areas, predominantly show simpler growth trajectories. These areas have clearly identified homologues in all mammalian brains and thus likely evolved in early mammals. In contrast, polysensory and high-order association areas of cortex, the most complex areas in terms of their laminar architecture, also have the most complex developmental trajectories. Some of these areas are unique to, or dramatically expanded in primates, lending an evolutionary significance to the findings. Furthermore, by mapping a key characteristic of these development trajectories (the age of attaining peak cortical thickness) we document the dynamic, heterochronous maturation of the cerebral cortex through time lapse sequences ("movies").

*Key words:* brain development; cytoarchitecture; cognition; cerebral cortex; prefrontal cortex; primate

## Introduction

Most maps of human cerebral cortex have partitioned it according to histological features, such as the distribution of cell bodies or myelin, and, more recently, molecular markers (von Economo and Koskinas, 1925; Ongur et al., 2003; Zilles et al., 2004). Comparisons of similar classifications among several species provide an evolutionary perspective, and such analyses have identified two broad cortical types. One type, allocortex, has a primitive three-layered form that strongly resembles its homologues in reptiles. Another type, isocortex, lacks such homologues and has a more derived structure characterized by more than three layers (typically six) and a more complex pattern of afferent and efferent projections (Kaas, 1987; Puelles, 2001; Allman et al., 2002; Striedter, 2005). Between allocortex and isocortex, areas sometimes called "transition cortex" have intermediate properties. Using structural neuroimaging of the *in vivo* developing brain, we explored the possibility that these different kinds of cortex show differing levels of complexity in the trajectories of their growth in childhood and adolescence.

Using computational neuroanatomy, we defined cortical thickness at over 40,000 points throughout the cerebrum in a cohort of 375 healthy children and adolescents. Cortical thickness was chosen as a metric which both captures the columnar architecture of the cortex and is sensitive to developmental change in typically developing and clinical populations (Lerch et al., 2005; O'Donnell et al., 2005; Makris et al., 2006; Shaw et al., 2006a,b; Lu et al., 2007; Sowell et al., 2007).

Most of the children in our cohort had repeated neuroanatomic imaging, and such longitudinal data can be combined with cross-sectional data to model developmental change, with the longitudinal data being particularly informative. For cortical thickness, the simplest trajectory that can be fitted to describe its change over time is a straight line. More complex growth models include distinct phases of increase and decrease in cortical thickness: a quadratic model has two such phases (typically an initial increase which reaches a peak before declining) and a cubic model has three. The complexity of growth may vary across the cerebral cortex, and we sought to explore whether this variation aligned with cytoarchitectural properties.

Derived properties of developmental curves, such as the age of reaching various points of inflection, are frequently used as developmental indices (Tanner et al., 1976; Jolicoeur et al., 1988).

Received Nov. 30, 2007; revised Feb. 7, 2008; accepted Feb. 26, 2008.

This work was supported by the Intramural Research Program of the National Institutes of Health. We thank all the participants in this study and their families.

The authors declare no competing financial interests.

Correspondence should be addressed to Philip Shaw, Child Psychiatry Branch, Room 3N202, Building 10, Center Drive, National Institute of Mental Health, Bethesda, MD 20892. E-mail: shawp@mail.nih.gov.

DOI:10.1523/JNEUROSCI.5309-07.2008

Copyright © 2008 Society for Neuroscience   0270-6474/08/283586-09$15.00/0

Shaw et al. • Mapping Cortical Development

J. Neurosci., April 2, 2008 • 28(14):3586–3594 • **3587**



**Figure 1.** The age distribution of the data. The age at each scan is indicated by a blue diamond. For each subject, the first scan is always the leftmost; subjects with repeated scans have a horizontal line drawn connecting the age at first scan with the age at later scans.

For cortical thickness, the age at which peak cortical thickness is reached (the point where increase gives way to decrease in cortical thickness) can be determined for cortical points with either a cubic or quadratic (but not linear) trajectory and, thus, emerges as a potentially useful index of cortical development. We therefore additionally examined the pattern of attaining peak cortical thickness across the cerebrum, to confirm and expand previous observations of a heterochronous sequence, with primary sensory areas attaining peak cortical thickness before polymodal, high-order association areas (Gogtay et al., 2004).

## Materials and Methods

*Participants.* Three hundred and seventy-five children and adolescents, healthy children with no personal or family history of psychiatric or neurological disorders, had a total of 764 magnetic resonance images. Each subject completed the Childhood Behavior Checklist as a screening tool and then underwent a structured diagnostic interview by a child psychiatrist to rule out any psychiatric or neurological diagnoses (Giedd et al., 1996). Handedness was determined using the PANESS (Physical and Neurological Examination for Soft Signs), and 336 (90%) were predominately right-handed, 20 (5%) predominately left-handed, and 19 (5%) ambidextrous. The mean intelligence quotient (IQ) was 115 (SD, 13) as determined from age appropriate versions of the Wechsler Intelligence Scales (Shaw et al., 2006b). Socioeconomic status (SES) was determined from the Hollingshead Scales and the mean score was 40 (SD, 19) (Hollingshead, 1975). The age range spanned from 3.5 to 33 years, and the age distribution of scans is illustrated in Figure 1. The subjects came from 292 different families; 196 (52%) were male. The age range spanned from 3.5 to 33 years. All subjects had at least one scan (mean age at initial scan, 12.3 years; SD, 5.3); 203 (54.1%) had at least two scans (mean age, 13.8; SD, 4.6); 106 (28.3%) had at least three scans (mean, 15.3; SD, 4.2); and 57 (15.2%) had four or more scans (mean 18, SD 4.5).

*Neuroimaging.* T1-weighted images with contiguous 1.5 mm axial slices and 2.0 mm coronal slices were obtained using three-dimensional spoiled gradient recalled echo in the steady state on a 1.5-T General Electric (Milwaukee, WI) Signa scanner. Imaging parameters were as follows: echo time, 5 ms; repetition time, 24 ms; flip angle, 45°; acquisition matrix, 256 × 192; number of excitations, 1; and field of view, 24 cm. Head placement was standardized as described previously (Giedd et al., 1999). The same scanner was used throughout the study. The native MRI scans were registered into standardized stereotaxic space using a linear transformation and corrected for nonuniformity artifacts (Sled et al., 1998). The registered and corrected volumes were segmented into white matter, gray matter, CSF, and background using an advanced neural net classifier (Zijdenbos et al., 2002). A surface deformation algorithm was applied which first fits the white matter surface, then expands outward to find the gray matter-CSF intersection defining a known relationship between each vertex of the white matter surface and its gray matter surface counterpart; cortical thickness is defined as the distance between these linked vertices (and measured at 40,962 such vertices) (MacDonald et al., 2000). A 30-mm-bandwidth blurring kernel was applied; this size was chosen on the basis of population simulations which that this bandwidth maximized statistical power while minimizing false positives (Lerch and Evans, 2005). This kernel allows anatomical localization, as 30 mm blurring along the surface using a diffusion smoothing operator preserves cortical topologic features and represents considerably less cortex than the equivalent volumetric Gaussian blurring kernel.

The validity of this automated measure against expert manual neuroanatomical estimation of cortical thickness has been demonstrated previously for selected cortical regions in an adult population (Kabani et al., 2001) We repeated this validation study in our pediatric population in the cortical regions included in the original study (the pre and post central gyri, the superior frontal gyrus, the superior temporal gyrus, the cuneus, the superior parietal lobule and supramarginal gyrus) (Kabani et al., 2001). We also examined regions of particular interest for this study. These were the insula, the orbitofrontal cortex (measured bilaterally in its anterior, posterior, medial, and lateral divisions), and medial cortical regions (the anterior and posterior cingulate, the medial dorsal prefrontal cortex, and the parahippocampal gyrus). Twenty scans were chosen at random from the cohort (from ages 6 through 15). For each brain region the neuroanatomist (N.K.) used image analyses software (MacDonald, 1996) to mark one point or tag on the CSF and gray matter border which represents the outer surface of the cortex, and another point of the gray and white matter border which represents the inner surface of the cortex. The distance between the two tags was calculated, mimicking the algorithm used by the automated tool. For a given tag placed by the neuroanatomist on the outer cortical surface, the closest vertex on the automatically extracted cortical surface was identified and its associated cortical thickness was noted. The output of the manual and automatic methods were compared using a repeated measures ANOVA followed by paired $t$ tests to identify regional differences. There was a significant difference for type of measurement with the automated estimates being larger (mean, 4.62; SE, 0.06) than the manual (mean, 4.41; SE, 0.04; $F_{(1,684)} = 8.8$, $p = 0.02$). There was a significant interaction of the type of measurement and region ($F_{(35,684)} = 2.59$, $p < 0.001$) which was further explored. Overall there was no significant difference between the manual and automated measures in 30 of the 36 regions, with poorer performance noted bilaterally in the precentral gyrus, and in the left postcentral gyrus, and in the middle frontal gyrus, gyrus rectus and the cuneus in the left hemisphere. Notably, only one of these regions lay in an area of particular interest for this study (the left gyrus rectus). There was no correlation between age and the difference between the automated and manual estimates ($r = 0.02$, $p = 0.53$). Thus, there was no evidence that the differences between the two metrics had any significant age related bias.

To determine developmental trajectories at each cortical point, mixed model regression analysis was chosen as it permits the inclusion of multiple measurements per person, missing data, and irregular intervals between measurements, thereby increasing statistical power (Pinheiro and Bates, 2000). Our classification of developmental trajectories was based on a step-down model selection procedure: at each cortical point we modeled cortical thickness using a mixed-effects polynomial regression model, testing for cubic, quadratic and linear age effects. If the cubic age effect was not significant at $p < 0.05$, it was removed and we stepped

**3588** • J. Neurosci., April 2, 2008 • 28(14):3586–3594                                                                     Shaw et al. • Mapping Cortical Development

down to the quadratic model and so on. In this way, we were able to classify the development of each cortical point as being best explained by a cubic, quadratic, or linear function of age. We consider cubic models to be more complex than quadratic, which in turn are held to be more complex than linear models. A random effect for each individual was nested within a random effect for each family, thus accounting for both within-person and within-family dependence. Thus, for cortical points with a cubic model, the $k$th cortical thickness of the $i$th individual in the $j$th family was modeled as thickness$_{ijk}$ = intercept + $d_{ij}$ + $\beta_1$(age) + $\beta2^*$(age)$^{**}2$ + $\beta3^*$(age)$^{**}3$ + $e_{ijk}$, where $d_{ij}$ are nested random effects modeling within-person and within-family dependence, the intercept and $\beta$ terms are fixed effects, and $e_{ijk}$ represents the residual error. Quadratic models lacked the cubic age term, and linear models the cubic and quadratic age terms. The analyses were repeated entering SES and IQ as covariates.

The age at which peak cortical thickness was attained was calculated for cubic and quadratic models from the first order derivatives of the fitted curves.

## Results

Throughout most of the lateral frontal, lateral temporal, parietal and occipital isocortex, developmental trajectories are cubic, with a period of initial childhood increase, followed by adolescent decline and then stabilization of cortical thickness in adulthood (Fig. 2). Growth characterized by increase and decrease, but lacking the phase of stabilization within the first three decades of life (a quadratic model) is present in much of the insula and anterior cingulate cortex. A linear trajectory is seen in the posterior orbitofrontal and frontal operculum, portions of the piriform cortex, the medial temporal cortex, subgenual cingulate areas, and medial occipitotemporal cortex. Graphs illustrating individual data points from representative regions with a cubic, quadratic or linear trajectory are shown in Figure 3.

We examined the complexity of developmental trajectories with respect to cortical regions of differing cytoarchitecturonic types, using histological atlases to assign cytoarchitectonic fields (Ongur et al., 2003). This analysis revealed a clear parallel between basic types of cortex and the pattern of cortical development. The orbitofrontal cortex exemplifies the correspondence between cortical types and developmental trajectories (Fig. 4). In the most anterior part of this region, a cubic trajectory characterizes the homotypical (six-layered) isocortex of the frontal pole and lateral orbitofrontal regions. In contrast, most of the cortex on the posterior orbital surface follows relatively simple quadratic and linear growth trajectories. This region has a lamination pattern typical of transitional cortex: compared with homotypical isocortex it has fewer, less well developed layers and lacks the clear concentration of nonpyramidal cells of layer 4, the internal granular layer (Brockhaus, 1940; Mesulam and Mufson, 1982; Ongur et al., 2003). In the most posterior part of this region,



**Figure 2.** Complexity of developmental trajectories throughout the cerebral cortex. The brain maps show the vertices having a cubic (red), quadratic (green) or linear (blue) developmental trajectory. The graphs show the growth pattern for each of these divisions. In order there are dorsal, right lateral, left medial, left lateral, and right medial views. The corpus callosum is blacked out.

linear and quadratic growth characterizes the piriform cortex, a primitive allocortical area that subserves olfaction.

Although Figure 4 focuses on the orbitofrontal cortex, the same principles are observed generally, where a transition from isocortex to simpler forms occurs. The results for the medial frontal cortex are similar to those in the orbitofrontal cortex, with cubic growth anteriorly, especially in the homotypical cortex of the medial frontal pole- and linear or quadratic trajectories more posteriorly in regions of dysgranular or agranular architecture (Fig. 5, top). For the insula (Fig. 5, bottom), the pattern is much the same. The anterior insula, with its agranular and poorly laminated cortex, has a linear developmental trajectory. Moving posteriorly to the dysgranular and homotypical insula, there is at first a more complex quadratic fit; still more posteriorly, as the cortex becomes increasingly homotypical, the trajectory becomes cubic. Likewise in the temporal lobe, an allocortical component such as the piriform cortex shows a predominately a linear trajectory. In contrast, the lateral temporal isocortex has a cubic trajectory and transition areas such as the entorhinal and perirhinal regions have quadratic and linear trajectories (Fig. 2). These results are

J. Neurosci., April 2, 2008 • 28(14):3586–3594 • 3589



**(a) Superior frontal gyri (cubic)**

**(b) Insula (quadratic)**

**(c) Orbitofrontal gyri (linear)**

**Figure 3.** Graphs showing raw cortical thickness data in blue, with the fitted trajectory superimposed in pink. **a–c**, The first three images show in order the mean cortical thickness and trajectory for representative regions: the superior frontal gyri, which have a cubic trajectory (**a**); the portion of the insula which has a quadratic trajectory, seen in green in Figure 5 (**b**); the portion of the orbitofrontal cortex which has a linear trajectory, seen in blue in Figure 4 (**c**).

by the occipital poles, containing much of the striate primary visual area (~7 years on the left, and ~8 years on the right) and then the remaining parieto-occipital cortex, with polymodal regions (such as the posterior parietal cortex) reaching peak thickness later (~9–10 years). In the frontal cortex, the primary motor cortex attains peak cortical thickness relatively early (~9 years), followed by the supplementary motor areas (~10 years) and most of the frontal pole (~10 years). High-order cortical areas, such as the dorsolateral prefrontal cortex and cingulate cortex, reach peak thickness last (~10.5 years). In the medial views, the occipital and frontal poles attain peak thickness early, and then a centripetal wave sweeps from these areas, with the medial prefrontal and cingulate cortex attaining peak thickness last. There is also a marked dorsal to ventral progression of development. Detailed results for each brain region are given in Table 2.

## Discussion
### Alignment of cortical types with developmental trajectories
This study demonstrates a tight alignment between developmental trajectories and the cortical types depicted in traditional cytoarchitectonic maps, affording these classic maps a developmental significance. The study both supports and extends previous work (Gogtay et al., 2004; Sowell et al., 2004; O'Donnell et al., 2005) through the inclusion of a much larger sample size which allowed the detection of higher order effects of age.

Other longitudinal studies of typical development support some of the present findings. For example, the simple linear growth we report in one part of allocortex, the piriform area, has also been found previously for the hippocampus (Gogtay et al., 2006). We were unable to measure the hippocampus directly in the present study, but Gogtay and colleagues found that the trajectory of volume change of the allocortical hippocampus was linear. The prominence of isocortical thinning in adolescence is confirmed in studies using other cortical morphometric measures such as gray matter density, demonstrating the complementary nature of these different measures of cortical characteristics (Gogtay et al., 2004; Sowell et al., 2004).

The model used here applies only to the age range covered and cannot be extrapolated. For example, if the cubic trajectory were extended beyond the age range, it would imply there is an increase in cortical thickness in adulthood (starting around the age of ~25), which is neither biologically plausible nor supported by existing data in this age range (Sowell et al., 2007). Rather, the age at which the phase of cortical thinning stops (the second point of inflection in a cubic curve) is better conceptualized as the points of transition into the essentially stable cortical dimensions of adulthood. Areas with cubic trajectories reach this inflection point faster than those with quadratic curves, and in this sense could be conceptualized as having faster growth.

summarized in Table 1. There are some cortical regions where this link between cortical types and developmental trajectories does not hold, most notably in the medial occipitotemporal and the anterior superior temporal areas, both of which are isocortical regions that nonetheless have a linear and quadratic trajectory, respectively. The pattern of results held when SES and IQ were entered as covariates, either separately or together.

We next determined the age at which peak cortical thickness was attained for all points with either a cubic or quadratic trajectory, using the first order derivative of the fitted curve for each point. A peak age cannot be determined for the points with a linear trajectory. The results are presented as a time-lapse dynamic sequence (supplemental Movies 1, 2, available at www.jneurosci.org as supplemental material), "stills" taken from the movies (Fig. 6), and the estimated age of peak cortical thickness for 56 brain regions (as defined by the ANIMAL segmentation tool).

To summarize the results, within isocortex, the primary sensory and motor areas generally attain their peak cortical thickness before adjacent secondary areas, and also before other polymodal association areas. In the posterior brain, the first area to reach its peak thickness is the somatic sensory cortex (~7 years), followed

Shaw et al. • Mapping Cortical Development

## Methodological issues

It is important to consider the possibility of methodological artifact contributing to the results. This could arise, for example, as the cortical surface reconstruction, which is the basis of the automated technique, may be particularly difficult in regions of the allocortex and transitional cortex, and the resulting increase in measurement error might obscure complex (cubic) growth patterns. Several factors make this unlikely. The validity of the cortical thickness measure judged against manual estimates did not vary systematically with type of cortex. The automated cortical thickness estimates in allocortical regions of the orbitofrontal and medial cortex were as valid as the measurements of isocortical regions. Additionally, the algorithm we used and its derivatives can also accurately extract the cortical surfaces of a "phantom" brain, detect simulated thinning of the cortex and capture the neuropathologically established patterns of disease progression (MacDonald et al., 2000; Lerch and Evans, 2005; Lerch et al., 2005; Lee et al., 2006). Finally, our study benefits from its large sample size and high proportion of prospective data, factors which afforded the detection of linear and curvilinear effects of age on cortical growth which were both statistically and, we argue biologically, significant.

## Environmental and genetic effects on growth trajectories

The nature of the cellular events underpinning cortical change in humans has not been established. Some of the earliest aspects of cortical development, such as the emergence and resolution of the subplate as neuroblasts migrate from the neuroepithelium to their mature laminar locations (Kostovic and Rakic, 1990; Kostovic et al., 2002) determine cerebral lamination *in utero* and perinatally, but fall outside the age window we studied. Studies in nonhuman animal suggest that cortical dimensions during critical periods for the development of cognitive functions may reflect experience-dependent molding of the architecture of cortical columns along with dendritic spine and axonal remodeling (Chklovskii et al., 2004; Mataga et al., 2004; Hensch, 2005; Sur and Rubenstein, 2005). Such morphological events may contribute to the childhood phase of increase in cortical thickness, which occurs in regions with either a cubic or quadratic trajectory. The



**Figure 4.** *A*, Complexity of developmental trajectories throughout the orbitofrontal cortex, projected onto a standard brain template. The anterior and lateral orbitofrontal cortex has a cubic fit (red); medial and posterior orbitofrontal cortex has simpler quadratic (green) and linear (blue) trajectories. *B*, The trajectories are superimposed on a cytoarchitectonic map of the region by Öngür et al. (2003) to illustrate the overlap between the cytoarchitectonic fields and regional differences in trajectories. *C*, The trajectory of each of the divisions.



**Figure 5.** Top, Detailed views of trajectories in the right medial prefrontal cortex, where isocortical regions have a cubic trajectory, and transitional areas have either a quadratic trajectory (e.g., the agranular and poorly laminated cortex of area 24a in the cingulate gyrus) or a linear decline in thickness (e.g., the thin and largely agranular cortex of the gyrus rectus). Bottom, The right insula shows progressively more complex trajectories moving: the posterior portion has a cubic trajectory (red), the body of the insula has a quadratic fit (green) and the anterior insula has a linear fit (blue). A similar pattern holds for the left insula.

phase of cortical thinning which dominates adolescence might reflect the use-dependent selective elimination of synapses (Huttenlocher and Dabholkar, 1997) that could refine neural circuits, including those supporting cognitive abilities (Hensch, 2004; Knudsen, 2004). Events occurring at the interface between white and gray matter, such as the proliferation of myelin into the peripheral cortical neuropil in childhood and adolescence, may also influence cortical thickness (Yakovlev and Lecours, 1967; Sowell et al., 2004).

This account of possible cellular events emphasizes the role of

J. Neurosci., April 2, 2008 • 28(14):3586–3594 • **3591**

**Table 1. The different orders of trajectories are given with the corresponding cortical regions and the underlying cortical type**

| Trajectory | Region | Cortical type |
|---|---|---|
| Linear | Piriform | Allocortex |
| | L entorhinal/perirhinal | Transition cortex |
| | Subgenual cingulate | Transition cortex |
| | Posterior orbitofrontal | Transition cortex |
| | Frontal operculum | Transition cortex |
| | Anterior insula | Transition cortex |
| | Medial occipitotemporal | Homotypical isocortex |
| Quadratic | Anterior cingulate (ventral supracallosal part) | Transition cortex |
| | Posterior orbitofrontal | Transition cortex |
| | R entorhinal/perirhinal | Transition cortex |
| | R parahippocampal | Homotypical isocortex |
| | R anterior superior temporal | Homotypical isocortex |
| | L temporal polar | Homotypical isocortex |
| | Body of insula | Homotypical and dysgranular isocortex |
| Cubic | Lateral orbitofrontal | Homotypical isocortex |
| | Medial and lateral frontal pole | Homotypical isocortex |
| | Lateral prefrontal (superior, middle, and inferior gyri) | Homotypical isocortex |
| | Anterior cingulate (dorsal supracallosal part) | Agranular isocortex |
| | Precentral motor | Agranular isocortex |
| | Somatosensory | Granular isocortex |
| | Posterior parietal | Homotypical isocortex |
| | Posterior insular | Homotypical isocortex |
| | Auditory | Granular isocortex |
| | Lateral temporal cortex | Homotypical isocortex |
| | Polar occipital | Granular isocortex |
| | Lateral occipital (superior, middle, and inferior gyri) | Homotypical isocortex |

Homotypical isocortex corresponds to the six layer prototype described by Brodmann; the granular cortex is similar to the homotypical isocortex, but has a thick and sometimes complex internal granular layer (layer 4); the agranular isocortex develops in the six-layer pattern of homotypical isocortex, but the cells composing layer 4 disperse during development; dysgranular isocortex has a thin, but discernable layer 4 and in that sense is intermediate between agranular isocortex and homotypical isocortex (but it is not, however, intermediate between isocortex and allocortex); allocortex, the three-layer cortex typified in mammalian brains by the hippocampus and piriform area; transition cortex, cortical areas, typically limbic, with a laminar organization intermediate between allocortex and isocortex. L, Left; R, right.

experience as one determinant of cortical architecture. Our assessment of the environmental factors was limited to a child's socioeconomic status and entering this measure as a covariate did not change the pattern of results. It would however be interesting to examine the impact of other key factors, particularly family and school environments on cortical development. Individual differences in intelligence influence cortical thickness and its development (Narr et al., 2006; Shaw et al., 2006b). However, our principal findings held when IQ was entered as a covariate, implying that although intelligence may influence some properties of cortical growth trajectories, such as velocity and the age of attaining peak cortical thickness, it does not impact on the basic link between complexity of cytoarchitecture and complexity of developmental trajectory.

Genetic factors are also important in determining cortical architecture (Thompson et al., 2001; Lenroot et al., 2007). Common polymorphisms such as the *catechol-O-methyltransferase Val158Met* polymorphism, a single nucleotide polymorphism in the regulator of G-protein signaling 4 gene, and a promoter region polymorphism of the serotonin transporter gene (*5-HTTLPR*) have all been found to have some influence on cortical volume, thickness or complexity (Brown and Hariri, 2006; Meyer-Lindenberg et al., 2006; Zinkstok et al., 2006; Buckholtz et al., 2007; Taylor et al., 2007). Of particular interest are genes that both contribute to both cortical growth and complexity and appear to be under positive selection in primate evolution, particularly in lineages leading to modern humans (Gilbert et al., 2005). These include the *ASPM* (abnormal spindle-like, microcephaly associated) and *MCPH1* (microcephaly, primary autosomal recessive) genes (Evans et al., 2004a,b). It would be interesting to determine whether variation in the regional cortical expression of such genes aligns with both cortical types and developmental trajectory maps.

**Functional considerations**

Detailed consideration of these developmental patterns and their possible relationship to cognitive development remains for future work, but a few points can be made. For example, the posterior medial orbitofrontal areas have been linked with the limbic system and control of the autonomic nervous system, and they show a linear trajectory. These areas are thought to monitor the outcomes associated with behavior, particularly punishment or reward (Rolls, 2004; Kennerley et al., 2006), cognitive functions so fundamental that they are unlikely to undergo prolonged development. In contrast, isocortical regions often support more complex psychological functions, which show clear developmental gradients, characterized by rapid development during critical periods. We can only speculate about a possible relationship between critical periods for human skill development and the developmental trajectories described here. The delineation of critical periods for human skill development is complex, but late childhood is a period of particularly rapid development of executive skills of plan-

ning, working memory and cognitive flexibility, an age period which coincides with an increase in cortical thickness in the lateral prefrontal cortex (Chelune and Baer, 1986; Diamond, 2002; Huizinga et al., 2006; Jacobs et al., 2007). In contrast, the critical period for certain visual functions (such as letter acuity and global motion detection) has been estimated as ending in middle childhood (~age 6 or 7) (Lewis and Maurer, 2005) and, likewise, the period of increase in cortical thickness in the visual cortex also ends around this time (approximately ages 7–8). This correlation between the duration of some critical periods with the phase of increase in cortical thickness is certainly not universal. It is necessarily limited by the existence of systems (supported by similar cortical regions) with multiple critical periods, each having a different temporal window, as occurs in certain sensory systems. (Harrison et al., 2005; Levi, 2005; Lewis and Maurer, 2005). This discussion focuses on critical periods and should not be taken as dismissing the important of continued refinement of many cognitive skills during the adolescent phase of cortical thinning (Luna et al., 2004; Luciana et al., 2005).

**Conclusion**

The findings reported here support the idea that the organization of the cerebral cortex can be understood in terms of a series of concentric rings, with the isocortex (having a cubic trajectory) at its core, the allocortex (showing predominately linear growth) at the periphery, and the transitional areas (having a mix of quadratic and linear trajectories) in between. The isocortex in this model not only lies at the core of the cerebral cortex in this sense, but also arises later in evolution than the piriform area (lateral allocortex) and hippocampus (medial allocortex), and additional

**3592** · J. Neurosci., April 2, 2008 · 28(14):3586–3594    Shaw et al. • Mapping Cortical Development





**Figure 6.** Age of attaining peak cortical thickness across the cerebral cortex. Peak thickness can only be estimated for regions with a cubic or quadratic trajectory and not for regions with linear change (which are indicated with a darker red shade). The changes are illustrated dynamically in supplemental Movies 1 and 2, available at www.jneurosci.org as supplemental material.

small allocortical areas. Thus, through *in vivo* neuroanatomic imaging we demonstrate that cortical development mirrors both the cytoarchitecture and history of the cerebral cortex.

## References

Allman J, Hakeem A, Watson K (2002) Two phylogenetic specializations in the human brain. Neuroscientist 8:335–346.

Brockhaus H (1940) Die cyto- und myleoarchitcktonik des crotex clastralis und des clastrum beim menschen. J Psychol Neurol 49:249–348.

Brown SM, Hariri AR (2006) Neuroimaging studies of serotonin gene polymorphisms: exploring the interplay of genes, brain, and behavior. Cogn Affect Behav Neurosci 6:44–52.

Buckholtz JW, Meyer-Lindenberg A, Honea RA, Straub RE, Pezawas L, Egan MF, Vakkalanka R, Kolachana B, Verchinski BA, Sust S, Mattay VS, Weinberger DR, Callicott JH (2007) Allelic variation in RGS4 impacts functional and structural connectivity in the human brain. J Neurosci 27:1584–1593.

Chelune GJ, Baer RA (1986) Developmental norms for the Wisconsin Card Sorting test. J Clin Exp Neuropsychol 8:219–228.

Chklovskii DB, Mel BW, Svoboda K (2004) Cortical rewiring and information storage. Nature 431:782–788.

Diamond A (2002) Normal development of prefrontal cortex from birth to young adulthood: cognitive functions, anatomy and biochemistry. In: Principles of frontal lobe function (Stuss DT, Knight RT, eds), pp 466–503. New York: Oxford UP.

Evans PD, Anderson JR, Vallender EJ, Choi SS, Lahn BT (2004a) Reconstructing the evolutionary history of microcephalin, a gene controlling human brain size. Hum Mol Genet 13:1139–1145.

Evans PD, Anderson JR, Vallender EJ, Gilbert SL, Malcom CM, Dorus S, Lahn BT (2004b) Adaptive evolution of ASPM, a major determinant of cerebral cortical size in humans. Hum Mol Genet 13:489–494.

Giedd JN, Snell JW, Lange N, Rajapakse JC, Casey BJ, Kozuch PL, Vaituzis AC, Vauss YC, Hamburger SD, Kaysen D, Rapoport JL (1996) Quantitative magnetic resonance imaging of human brain development: ages 4–18. Cereb Cortex 6:551–560.

Giedd JN, Blumenthal J, Jeffries NO, Castellanos FX, Liu H, Zijdenbos A, Paus T, Evans AC, Rapoport JL (1999) Brain development during childhood and adolescence: a longitudinal MRI study. Nat Neurosci 2:861–863.

Gilbert SL, Dobyns WB, Lahn BT (2005) Genetic links between brain development and brain evolution. Nat Rev Genet 6:581–590.

Gogtay N, Giedd JN, Lusk L, Hayashi KM, Greenstein D, Vaituzis AC, Nugent III TF, Herman DH, Clasen LS, Toga AW, Rapoport JL, Thompson PM (2004) Dynamic mapping of human cortical development during childhood through early adulthood. Proc Natl Acad Sci USA 101:8174–8179.

Gogtay N, Nugent III TF, Herman DH, Ordonez A, Greenstein D, Hayashi KM, Clasen L, Toga AW, Giedd JN, Rapoport JL, Thompson PM (2006) Dynamic mapping of normal human hippocampal development. Hippocampus 16:664–672.

Harrison RV, Gordon KA, Mount RJ (2005) Is there a critical period for cochlear implantation in congenitally deaf children? Analyses of hearing and speech perception performance after implantation. Dev Psychobiol 46:252–261.

Hensch TK (2004) Critical period regulation. Annu Rev Neurosci 27:549–579.

Hensch TK (2005) Critical period plasticity in local cortical circuits. Nat Rev Neurosci 6:877–888.

Hollingshead AB (1975) Four-factor index for social status. New Haven, CT: Yale UP.

Huizinga M, Dolan CV, van der Molen MW (2006) Age-related change in executive function: developmental trends and a latent variable analysis. Neuropsychologia 44:2017–2036.

Huttenlocher PR, Dabholkar AS (1997) Regional differences in synaptogenesis in human cerebral cortex. J Comp Neurol 387:167–178.

Jacobs R, Harvey AS, Anderson V (2007) Executive function following focal frontal lobe lesions: impact of timing of lesion on outcome. Cortex 43:792–805.

Jolicoeur P, Pontier J, Pernin MO, Sempe M (1988) A lifetime asymptotic growth curve for human height. Biometrics 44:995–1003.

Kaas JH (1987) The organization of neocortex in mammals: implications for theories of brain function. Annu Rev Psychol 38:129–151.

Kabani N, Le Goualher G, MacDonald D, Evans AC (2001) Measurement of cortical thickness using an automated 3-D algorithm: a validation study. NeuroImage 13:375–380.

Kennerley SW, Walton ME, Behrens TE, Buckley MJ, Rushworth MF (2006) Optimal decision making and the anterior cingulate cortex. Nat Neurosci 9:940–947.

Knudsen EI (2004) Sensitive periods in the development of the brain and behavior. J Cogn Neurosci 16:1412–1425.

Kostovic I, Rakic P (1990) Developmental history of the transient subplate zone in the visual and somatosensory cortex of the macaque monkey and human brain. J Comp Neurol 297:441–470.

Kostovic I, Judas M, Rados M, Hrabac P (2002) Laminar organization of the human fetal cerebrum revealed by histochemical markers and magnetic resonance imaging. Cereb Cortex 12:536–544.

Shaw et al. • Mapping Cortical Development

J. Neurosci., April 2, 2008 • 28(14):3586 –3594 • **3593**

**Table 2. The estimated age of peak cortical thickness is given for 56 brain regions**

| | Hemisphere | Trajectory | Age of peak cortical thickness (years) |
|---|---|---|---|
| **Frontal** | | | |
| Superior | R | Cubic | 10.2 |
| | L | Cubic | 10.1 |
| Middle | R | Cubic | 10.4 |
| | L | Cubic | 10.3 |
| Inferior | R | Cubic | 9.7 |
| | L | Cubic | 9.7 |
| Medial | R | Cubic | 10.6 |
| | L | Cubic | 10.0 |
| Precentral | R | Cubic | 9.6 |
| | L | Cubic | 10.5 |
| Cingulate | R | Cubic | 13.8 |
| | L | Cubic | 11.2 |
| Medial orbitofrontal | R | Linear | |
| | L | Cubic | 8.6 |
| Lateral orbitofrontal | R | Cubic | 9.4 |
| | L | Cubic | 9.4 |
| **Temporal** | | | |
| Superior | R | Cubic | 14.9 |
| | L | Cubic | 14.9 |
| Middle | R | Cubic | 11.7 |
| | L | Cubic | 11.6 |
| Inferior | R | Cubic | 11.2 |
| | L | Cubic | 11.1 |
| Insula | R | Quadratic | 18.1 |
| | L | Quadratic | 18.0 |
| Periamygdaloid | R | Linear | |
| | L | Linear | |
| Parahippocampal | R | Linear | |
| | L | Linear | |
| Uncal | R | Linear | |
| | L | Linear | |
| **Parietal** | | | |
| Postcentral gyrus | R | Cubic | 8.4 |
| | L | Cubic | 8.5 |
| Superior lobule | R | Cubic | 8.3 |
| | L | Cubic | 9.0 |
| Supramarginal gryus | R | Cubic | 9.2 |
| | L | Cubic | 9.2 |
| Angular gryus | R | Cubic | 8.5 |
| | L | Cubic | 9.0 |
| Precuneus | R | Cubic | 9.8 |
| | L | Cubic | 10.1 |
| Lateral occipitotemporal | R | Cubic | 11.2 |
| | L | Cubic | 11.1 |
| Medial occipitotemporal | R | Linear | |
| | L | Linear | |
| **Occipital** | | | |
| Pole | R | Cubic | 7.9 |
| | L | Cubic | 6.8 |
| Superior | R | Cubic | 8.3 |
| | L | Cubic | 8.3 |
| Middle | R | Cubic | 9.5 |
| | L | Cubic | 9.2 |
| Inferior | R | Cubic | 7.3 |
| | L | Cubic | 7.9 |
| Lingual | R | Cubic | 8.6 |
| | L | Cubic | 9.2 |
| Cuneus | R | Cubic | 9.2 |
| | L | Cubic | 8.8 |

This can be estimated only for regions with either a cubic of quadratic trajectory (thus, regions with a linear trajectory are marked with a dash). For regions with a mix of trajectories (e.g., the insula), the dominant trajectory, which applies to the majority of points within the region, is given. L, Left; R, right.

Lee JK, Lee JM, Kim JS, Kim IY, Evans AC, Kim SI (2006) A novel quantitative cross-validation of different cortical surface reconstruction algorithms using MRI phantom. NeuroImage 31:572–584.

Lenroot RK, Schmitt JE, Ordaz SJ, Wallace GL, Neale MC, Lerch JP, Kendler KS, Evans AC, Giedd JN (2007) Differences in genetic and environmental influences on the human cerebral cortex associated with development during childhood and adolescence. Hum Brain Mapp, in press.

Lerch JP, Evans AC (2005) Cortical thickness analysis examined through power analysis and a population simulation. NeuroImage 24:163–173.

Lerch JP, Pruessner JC, Zijdenbos A, Hampel H, Teipel SJ, Evans AC (2005) Focal decline of cortical thickness in Alzheimer's disease identified by computational neuroanatomy. Cereb Cortex 15:995–1001.

Levi DM (2005) Perceptual learning in adults with amblyopia: a reevaluation of critical periods in human vision. Dev Psychobiol 46:222–232.

Lewis TL, Maurer D (2005) Multiple sensitive periods in human visual development: evidence from visually deprived children. Dev Psychobiol 46:163–183.

Lu LH, Leonard CM, Thompson PM, Kan E, Jolley J, Welcome SE, Toga AW, Sowell ER (2007) Normal developmental changes in inferior frontal gray matter are associated with improvement in phonological processing: a longitudinal MRI analysis. Cereb Cortex 17:1092–1099.

Luciana M, Conklin HM, Hooper CJ, Yarger RS (2005) The development of nonverbal working memory and executive control processes in adolescents. Child Dev 76:697–712.

Luna B, Garver KE, Urban TA, Lazar NA, Sweeney JA (2004) Maturation of cognitive processes from late childhood to adulthood. Child Development 75:1357–1372.

MacDonald D (1996) MNI-display. Montreal: McConnell Brain Imaging Center, Montreal Neurological Institute.

MacDonald D, Kabani N, Avis D, Evans AC (2000) Automated 3-D extraction of inner and outer surfaces of cerebral cortex from MRI. NeuroImage 12:340–356.

Makris N, Biederman J, Valera EM, Bush G, Kaiser J, Kennedy DN, Caviness VS, Faraone SV, Seidman LJ (2006) Cortical thinning of the attention and executive function networks in adults with attention-deficit/hyperactivity disorder. Cereb Cortex 17:1364–1375.

Mataga N, Mizuguchi Y, Hensch TK (2004) Experience-dependent pruning of dendritic spines in visual cortex by tissue plasminogen activator. Neuron 44:1031–1041.

Mesulam MM, Mufson EJ (1982) Insula of the old world monkey. I. Architectonics in the insulo-orbito-temporal component of the paralimbic brain. J Comp Neurol 212:1–22.

Meyer-Lindenberg A, Nichols T, Callicott JH, Ding J, Kolachana B, Buckholtz J, Mattay VS, Egan M, Weinberger DR (2006) Impact of complex genetic variation in COMT on human brain function. Mol Psychiatry 11:867–877.

Narr KL, Woods RP, Thompson PM, Szeszko P, Robinson D, Dimtcheva T, Gurbani M, Toga AW, Bilder RM (2006) Relationships between IQ and regional cortical gray matter thickness in healthy adults. Cereb Cortex 17:2163–2171.

O'Donnell S, Noseworthy MD, Levine B, Dennis M (2005) Cortical thickness of the frontopolar region in typically developing children and adolescents. NeuroImage 24:948–954.

Ongur D, Ferry AT, Price JL (2003) Architectonic subdivision of the human orbital and medial prefrontal cortex. J Comp Neurol 460:425–449.

Pinheiro JC, Bates DM (2000) Mixed-effects models in S and S-PLUS. New York: Springer.

Puelles L (2001) Thoughts on the development, structure and evolution of the mammalian and avian telencephalic pallium. Philos Trans R Soc Lond B Biol Sci 356:1583–1598.

Rolls ET (2004) The functions of the orbitofrontal cortex. Brain Cogn 55:11–29.

Shaw P, Lerch J, Greenstein D, Sharp W, Clasen L, Evans A, Giedd J, Castellanos FX, Rapoport J (2006a) Longitudinal mapping of cortical thickness and clinical outcome in children and adolescents with attention-deficit/hyperactivity disorder. Arch Gen Psychiatry 63:540–549.

Shaw P, Greenstein D, Lerch J, Clasen L, Lenroot R, Gogtay N, Evans A, Rapoport J, Giedd J (2006b) Intellectual ability and cortical development in children and adolescents. Nature 440:676–679.

Sled JG, Zijdenbos AP, Evans AC (1998) A nonparametric method for automatic correction of intensity nonuniformity in MRI data. IEEE Trans Med Imaging 17:87–97.

**3594** • J. Neurosci., April 2, 2008 • 28(14):3586–3594

Sowell ER, Thompson PM, Leonard CM, Welcome SE, Kan E, Toga AW (2004) Longitudinal mapping of cortical thickness and brain growth in normal children. J Neurosci 24:8223–8231.

Sowell ER, Peterson BS, Kan E, Woods RP, Yoshii J, Bansal R, Xu D, Zhu H, Thompson PM, Toga AW (2007) Sex differences in cortical thickness mapped in 176 healthy individuals between 7 and 87 years of age. Cereb Cortex 17:1550–1560.

Striedter GF (2005) Principles of brain evolution. Sunderland, MA: Sinauer.

Sur M, Rubenstein JL (2005) Patterning and plasticity of the cerebral cortex. Science 310:805–810.

Tanner JM, Whitehouse RH, Marubini E, Resele LF (1976) The adolescent growth spurt of boys and girls of the Harpenden growth study. Ann Hum Biol 3:109–126.

Taylor WD, Zuchner S, Payne ME, Messer DF, Doty TJ, MacFall JR, Beyer JL, Krishnan KRR (2007) The COMT Val158Met polymorphism and temporal lobe morphometry in healthy adults. Psychiatry Res 155:173–177.

Thompson PM, Cannon TD, Narr KL, van Erp T, Poutanen VP, Huttunen M, Lonnqvist J, Standertskjold-Nordenstam CG, Kaprio J, Khaledy M, Dail R, Zoumalan CI, Toga AW (2001) Genetic influences on brain structure. Nature Neuroscience 4:1253–1258.

von Economo C, Koskinas GN (1925) Die dytoarchitektonik der hirnrinde des erwachsenen menschen. Berlin: Springer.

Yakovlev PI, Lecours AR (1967) The myelinogenetic cycles of regional maturation of the brain. In: Regional development of the brain in early life (Minokowski A, ed). Oxford: Blackwell Scientific.

Zijdenbos AP, Forghani R, Evans AC (2002) Automatic "pipeline" analysis of 3-D MRI data for clinical trials: application to multiple sclerosis. IEEE Trans Med Imaging 21:1280–1291.

Zilles K, Palomero-Gallagher N, Schleicher A (2004) Transmitter receptors and functional anatomy of the cerebral cortex. J Anat 205:417–432.

Zinkstok J, Schmitz N, van Amelsvoort T, de Win M, van den Brink W, Baas F, Linszen D (2006) The COMT val158met polymorphism and brain morphometry in healthy young adults. Neurosci Lett 405:34–39.

# EXHIBIT 40

Available online at www.sciencedirect.com

**ScienceDirect**

Current Opinion in
Behavioral
Sciences

# The neuroscience of adolescent decision-making

Catherine A Hartley[1] and Leah H Somerville[2]



Adolescence is a phase of the lifespan associated with greater independence, and thus greater demands to make self-guided decisions in the face of risks, uncertainty, and varying proximal and distal outcomes. A new wave of developmental research takes a neuroeconomic approach to specify what decision processes are changing during adolescence, along what trajectory they are changing, and what neurodevelopmental processes support these changes. Evidence is mounting to suggest that multiple decision processes are tuned differently in adolescents and adults including reward reactivity, uncertainty-tolerance, delay discounting, and experiential assessments of value and risk. Unique interactions between prefrontal cortical, striatal, and salience processing systems during adolescence both constrain and amplify various component processes of mature decision-making.

**Addresses**
[1] Sackler Institute for Developmental Psychobiology, Weill Cornell Medical College, 1300 York Avenue, Box 140, New York, NY 10065, USA
[2] Department of Psychology and Center for Brain Science, Harvard University, 52 Oxford Street, Room 290, Cambridge, MA 02138, USA

Corresponding authors: Hartley, Catherine A
(cah2031@med.cornell.edu) and Somerville, Leah H
(somerville@fas.harvard.edu)

Current Opinion in Behavioral Sciences 2015, 5:108–115

This review comes from a themed issue on Neuroeconomics

Edited by John P O'Doherty and Colin C Camerer

For a complete overview see the Issue and the Editorial

Available online 3rd October 2015

http://dx.doi.org/10.1016/j.cobeha.2015.09.004

2352-1546/© 2015 Elsevier Ltd. All rights reserved.

## Current opinion in behavioral sciences

The phase of the lifespan known as adolescence begins around the time of physical puberty and ends with the assumption of adult-like levels of autonomy. Relative to childhood, adolescents are faced with more frequent and complex demands on independent decision-making. Though adolescence is typically a phase of robust physical health, adolescents in many western societies face prominent health risks that stem, at least in part, from their own choices. Adolescents spend more time unmonitored by guardians and have growing access to risky and ambiguous situations that involve potential negative outcomes such as access to illegal substances, opportunities to take physical and sexual risks, and complex peer-related decisions that could impact their social status. Understanding what is unique about adolescent decision-making has come under the spotlight of applied research aimed at promoting adolescent health.

Adolescent decision-making is also coming under the spotlight from another direction: neuroscience. Here, we evaluate the complex ways in which trajectories of brain development shape adolescent decision processes. A recent wave of developmental research has drawn on neuroeconomic experimental approaches that allow complex decisions to be decomposed into component processes.

Neuroeconomic approaches employ formal mathematical models to estimate parameters that modulate individual choice behavior and make quantitative predictions about the neural signals underlying idiosyncratic decision computations. Thus, neuroeconomic approaches permit precise characterization of the underlying aspects of complex decisions that are (or are not) changing with age. This review highlights recent work that links understanding of (a) what decision processes are changing during adolescence and along what trajectory they are changing, and (b) neurodevelopmental features of well-characterized neural circuits that have been implicated in different facets of adult decision-making.

To isolate developmental shifts in decision processes, empirical studies typically compare adolescent-aged participants with a reference group or groups of older and/or younger participants. However, the field lacks consensus on which age ranges should be compared and the boundaries between age groups (see Box 1 for further discussion on this point). Thus, by necessity this review reflects diverse operationalizations of 'developmental change'.

Further, development is often assumed to represent progressive, linear patterns of change over time. However, many features of adolescent development are nonlinear, and this review demonstrates that some decision processes are 'tuned' uniquely during adolescence when compared to both earlier and later stages of development. Whereas studies with narrow age ranges lack the age span to target nonlinear changes, studies that incorporate both pre-adolescent and post-adolescent comparison groups allow for detection of both linear and complex patterns of change.

## Trajectories of adolescent neurodevelopment of neurocircuitry important for decision computations

Although the overall size and gross organization of the brain is similar in adolescents and adults, dynamic

**Box 1 Where to go from here? Conceptual challenges in the study of adolescent decision-making.**

Applying quantitative, neuroeconomics-based analyses has proven to be highly useful in delineating precise mechanisms underlying developmental shifts in complex choice behavior. Here we specify challenges and future directions in hopes of stimulating progress in these domains:

- *Who is an adolescent?* There is presently wide variability across studies with regard to operationalizing 'adolescence'. As adolescence is a culturally defined concept without straightforwardly observable starting and ending points, it is perhaps not surprising that consensus is lacking. Even pubertal onset, a relatively agreed upon trigger for the onset of adolescence, varies widely across sexes and across individuals, and begins centrally well before secondary sex characteristics are observed. However, such variability frequently muddies clear-cut comparison of research findings across studies. *We encourage researchers to incorporate as wide of an age range as is feasible to capture linear and nonlinear changes, to allow for continuous analyses of age that circumvent issues related to arbitrary delineations between age 'groups', and with consideration of the samples in existing studies to which one wishes to compare their findings.*

- *Applying 'adult' quantitative models of decision-making to developmental populations.* Formal models of decision-making rely on mathematical assumptions that define the latent structure of decision processes. It is important to acknowledge that these latent models have largely been developed with an adult decision-maker in mind. Applying such models to the study of developmental populations enables discovery of quantitative changes in decision processes, but this approach is relatively insensitive to qualitative differences in decision-making that might be best described by alternative models. *As 'adult' models are utilized, careful examination of unexplained variance in decision-making could open doors to characterization of qualitative shifts in decision making that occur across development.*

- Ecological validity of assessments of adolescent decision-making. Many tasks employed in neuroeconomic studies fail to capture key qualitative features of naturalistic choice contexts, which may diminish their validity for understanding real-world decision-making. While preserving the precision of neuroeconomics-based tasks, new tasks should be developed that also evoke the anticipatory and feedback-driven affective responses that typically accompany motivated decision-making. In addition, adolescent decision-making typically occurs within rich environments that often involve complex motivations. Prominent motivations at this age, which can compete and conflict with one another, include maintaining status with peers, achieving goals in academic, athletic, or other arenas, finding independence, and maintaining harmony within the family. Future work should attempt to strike balance between experimental precision and ecological validity. *Studies employing techniques that index choices in the real world and their specific motivational contexts (e.g., ecological momentary assessment) may offer unique insights into adolescents' naturalistic decision-making.*

changes in brain structure, function, and features of neuromodulatory systems are occurring throughout adolescence. Structural magnetic resonance imaging (MRI) studies have revealed developmentally normative reductions in the volume of gray matter across adolescence [1,2] that are thought to reflect experience-dependent pruning processes. Lagged structural development of the prefrontal cortex, particularly dorsolateral regions, has been linked to a number of functional outcomes during adolescence, including continued improvement in impulse control [3], working memory [4], and complex reasoning [5]. As such, late development of the prefrontal cortex could constrain components of decision-making that rely heavily on deliberation or integrating complex sources of information.

By contrast, certain properties of dopaminergic signaling exhibit adolescent-specific peaks. Structurally, there is a proliferation of D1 and D2 receptors in various targets within the mesolimbic dopamine system, which prune 50% or more from the transition of adolescence to adulthood [6] paired with a peaking tissue concentration of dopamine [7]. Corresponding studies in humans using functional MRI have demonstrated an adolescent-specific exaggeration of response to various forms of reward [8,9••] and stronger parametric tracking of expected value [10] in the ventral striatum, a key target of dopaminergic signaling.

The observed developmental asymmetries in prefrontal and striatal signaling and connectivity have informed theoretical frameworks describing adolescent behavior as reflecting staggered trajectories of neurodevelopment [11–13]. Whereas the adolescent striatum exhibits exaggerated response properties in many studies, the function of prefrontal systems, which can modulate dopaminergic signals [14], is thought to be developmentally constrained. Additional findings suggest that neural signals that reflect attributions of salience or elicited arousal similarly exhibit adolescent-specific shifts in activity. Such a developmentally normative functional neurocircuitry could manifest behaviorally in robust incentive motivation [15•], reward reactivity [16], and sensation seeking [17] paired with still-developing executive control. In the remaining sections, we highlight themes emerging from our nascent understanding of how these staggered neurodevelopmental trajectories influence multiple component processes of decision-making.

## Value-based learning

By taking actions in the world and observing their positive and negative consequences, one can learn through experience how to make beneficial choices. Dopaminergic reward prediction errors, which reflect the discrepancy between an expected outcome and what actually occurs, carry crucial information that enables this learning process. Prediction error signals typically correlate with activity of the ventral striatum in adults [18]. Such signals have also been observed in children and adolescents [19•,20,21], consistent with evidence of successful feedback-based learning across development [19•,22,23]. Increased magnitude of both positive [24•] and negative [25] prediction error signals has been observed during adolescence, consistent with reports of heightened adolescent responses to both reward [8,26] and punishment

[27]. However, such age differences in prediction error signals have not been consistently observed [19•,20,21].

The extent to which a reward prediction error alters subsequent expected values depends on one's learning rate. High learning rates give a heavy weighting to a recent outcome, whereas lower learning rates integrate over a longer feedback history, with recent outcomes yielding only a small value adjustment. Several studies have observed valence-dependent developmental differences in the integration of feedback [19•,25,28,29]. These studies suggest that children weigh recent negative feedback heavily in their updated values, and that this tendency decreases with age, a change that is associated with increased connectivity between the ventromedial prefrontal cortex (vmPFC) and the ventral striatum [19•]. A developmental decline in the influence of negative outcomes might foster adaptive responding in decision contexts in which reward is probabilistic, and one should persist with a response despite occasional negative feedback.

By contrast, the weighting of recent rewarding outcomes has been found to increase from childhood into adulthood [19•,28]. Adolescents, lying at the intersection of these opposing linear trajectories, exhibit variable weighting of positive and negative prediction errors across different tasks [19•,25,28,29]. This sensitivity to task demands is to be expected, as distinct asymmetric weightings of positive and negative feedback can optimize performance given different reinforcement structures. However, as higher learning rates for positive versus negative outcomes, independent of performance demands, can promote risk-seeking behavior [30], future studies might examine whether such a reward bias in value-based learning might contribute to adolescent risk-taking. Learning elicited through reward and punishment is mediated by D1 and D2 receptor activity, respectively [31]. The marked changes in the expression and pruning of striatal D1:D2 receptors during the transition into and out of adolescence are likely to play an important mediating role in these valence-dependent alterations in value-based learning [6].

Studies in adults have highlighted a distinction between two forms of value-based learning [32]. A 'model-free' process, relying upon the striatal error-driven updating mechanism described above, evaluates an action based solely upon previous experienced feedback. By contrast, 'model-based' evaluations, recruiting additional contributions from prefrontal and hippocampal regions, also take into account the structure of the decision environment and specific potential outcomes. Burgeoning evidence suggests that whereas model-free learning is employed from childhood onwards, reliance on model-based learning only emerges during adolescence, and continues to increase into adulthood [33]. This finding suggests that the normal developmental changes occurring in the brain across adolescence confer an expansion in the repertoire of evaluative processes that are available to inform one's decisions.

## Risk

In economics, a 'risky' choice is typically defined as a decision with multiple potential outcomes, which have probabilities that are known or can be estimated. Early accounts asserted that adolescents make risky choices because they either did not understand the potential negative consequences associated with particular actions, or perceived themselves as invulnerable to those consequences. However, several studies have refuted these assertions by demonstrating that adolescents know the potential negative consequences of risks, overestimate the probability of rare negative outcomes, as adults do, and perceive themselves as *more* vulnerable to those outcomes [34]. Consequently, Reyna and Farley [35•] have argued that adolescents have achieved a cognitive threshold for comprehending probabilistic outcomes [36] and for reasoning about complex decisions.

Studies have therefore turned to identifying biases in risk computations and information processing that might account for developmental differences in risky decision-making. Adolescents have been reported to exhibit similar, if not more, risk aversion relative to adults when risk attitudes are assessed via choices between statistically described gambles [37,38•]. However, a recent meta-analysis by Defoe and colleagues [39•] compiled dozens of studies using a variety of experimental tasks including the Iowa Gambling Task [40], the Balloon Analog Risk Task [41], and the Columbia Card Task (CCT; [42]) and observed reliably heightened rates of risky choices in adolescents compared to adults, with a medium effect size. Analyses of moderating effects showed that tasks in which risk is assessed experientially through immediate gain and loss feedback show the greatest uptick in risky choice in adolescents compared to adults [9••,29,42,43]. Additional work has demonstrated that adolescents exhibit increased risk-taking (relative to adults) in situations where risk must be learned through trial and error [29] and in dynamic choice contexts that involve incremental risk-taking (relative to both children and adults) [9••,42]. This difference in adolescent risk attitudes across decision contexts echoes the noted discrepancy in adulthood between risky choices made on the basis of personal experience versus formal description [43].

Direct comparison of children and adolescents revealed equivalent overall levels of risky choice. However, whether adolescents or children exhibited greater risk-taking varied substantially across tasks, and the distinctions between tasks underlying such differences were not readily apparent. As these preliminary findings are based on the small number of studies that included children

within their sample, a more precise characterization of differences in risk-taking in children and adolescents awaits converging findings from additional studies.

In adults, evaluation of risk in decisions has been associated with activity of the lateral prefrontal cortex [44] and insular cortex [45,46]. Few developmental studies to date have decoupled risk from other decision parameters such as subjective value. Van Duijvenvoode and colleagues [47•] conducted an fMRI study using the CCT, a card-based choice task optimized for isolating the influence of trial-by-trial varying risk (i.e., outcome variability) and return (i.e., expected value) on decisions. Both aversion to risk and sensitivity to return increased from childhood to adulthood. Activation in the insular cortex and prefrontal cortex tracking trial-by-trial variation in risk was exaggerated in adolescents relative to children and adults, with adolescents who exhibited greater activation in these regions showing more avoidance of risk. Further work isolating risk from other decision components is needed to clarify how neurodevelopmental shifts in risk tracking relate to adolescents' orientation toward risk, as well as how the manner in which risk is evaluated alters choice.

## Uncertainty
A related decision-making construct is uncertainty, or a dearth of information regarding potential outcomes or their probabilities when making decisions. Decisions in daily life are fraught with uncertainty, and the level of uncertainty for complex decisions might be particularly high for adolescents, whose information stems from a more impoverished repertoire of past experiences than adults. A study by Tymula and colleagues [38•] contrasted decision-making under risk and under ambiguity (i.e., uncertainty regarding outcome probabilities) by parametrically obscuring a proportion of the information depicting odds of winning in a monetary choice task. They found that adolescents showed a greater tolerance for these ambiguous decisions than adults, whereas risk tolerance for gambles with explicit probabilities did not differ. Many real-world decisions (as well as experimental choice tasks) that are characterized as 'risky' do not involve known outcome probabilities. Thus, the use of experimental approaches that deconfound ambiguity from related decision parameters holds promise in uncovering the role ambiguity tolerance plays in unique adolescent decisions. Convergent work has extended the concept of adolescent uncertainty tolerance to the temporal domain. Using a simple task probing the degree to which simple behavioral responses are slowed by temporally unpredictable stimulus presentations, recent work has demonstrated that adolescents are less slowed by uncertainty than both children and adults [48].

Both human adolescents and other mammalian models of adolescence demonstrate a precipitous rise in novelty seeking and exploratory behavior [49••,50]. A willingness to explore novel environments inherently requires tolerance of uncertain outcomes. Prominent theoretical views have considered adolescent exploratory tendencies to be highly adaptive [15•,51], given that a primary challenge of adolescence is to seek resources, mates, information about the world, and self-directed learning opportunities. This adaptive function of exploration is consistent with a recent proposal that developmental shifts from high to low exploration (akin to changes in search 'temperature' in computational 'simulated annealing' algorithms) may reflect a developmentally optimized search process that promotes broad investigation of potential behaviors before focusing more narrowly on those that have proven most beneficial [52]. Tolerance for ambiguity might represent a mechanism facilitating adolescent-specific exploratory tendencies.

## Time
Many of the everyday choices adolescents face carry consequences that unfold over time. While going to a party on Friday night might be fun, studying for Monday's exam may bring more valuable long-term benefits. Economic models propose that when making choices between proximal rewards and more substantial but deferred reinforcement, one decreases or 'discounts' the subjective value of a delayed outcome as a function of the amount of time one must wait to receive it. Intertemporal choice in the lab has been found to have striking ecological validity, predicting an array of real world decisions that reflect prioritization of future rewards [53]. Convergent findings across numerous developmental studies of intertemporal choice suggest that discount rates decline throughout adolescence and asymptote in early adulthood [54–58]. Collectively, these studies suggest that throughout adolescent maturation, delayed rewards become more highly valued.

This developmental increase in preference for delayed rewards has been associated with both structural and functional changes in the brain [55,57–59]. Consistent with abundant evidence for the roles of both the vmPFC and the ventral striatum in the computation of subjective value [60], functional connectivity between these regions during intertemporal choice has been shown to increase linearly from childhood into adulthood, predicting a corresponding decrease in discount rates [57]. Both structural and functional connectivity between the ventral striatum and more lateral prefrontal regions has also been associated with age-related increases in patient intertemporal choice [58]. Gradual maturation of corticostriatal connectivity throughout adolescence has been proposed to underlie the development of self-regulatory ability [61] and reductions in impulsivity [62], cognitive processes that are commonly associated with decreases in discounting. This interpretation is supported by evidence in developmental samples that steeper discount rates predict

alternative forms of impulsivity, such as poor response inhibition [59,63] but see [58].

Greater recruitment of prospective future-oriented cognition might also contribute to decreases in discount rates with age. Burgeoning evidence suggests that the episodic simulation of the future during intertemporal choice promotes more patient choices [53,64]. While the capacity for episodic mental simulation is evident from childhood [65], the recruitment of future-oriented cognitive processes such planning, or anticipating the consequences of actions continues to increase throughout adolescence [56]. In adults, the influence of mental simulation on intertemporal choice has been shown to depend upon functional connectivity between the PFC and the hippocampus [53]. Although few studies neuroimaging studies have examined the development of PFC-hippocampal connectivity, the white matter tracts connecting these regions undergo continued myelination during adolescence [66], suggesting protracted maturation of related cognitive processes. Age-related increases in foresight during choice might be facilitated by the accumulation of experience with decisions that have temporally extended consequences.

## Context dependency of adolescent decisions

People who interact with adolescents often are frustrated by the mercurial qualities of their decisions. Having the flexibility to make different decisions in different contexts has been described as an adaptive consequence of continuing neurodevelopment [51,67]. Research has begun to explore the context-dependency of adolescent decisions in two domains in which adolescents might display particularly robust sensitivity: contexts of heightened arousal or excitement, and contexts involving peers.

Inspired by dual process theories, the modulation of adolescent decision-making in arousing or 'hot', compared to deliberative or 'cold' situations has been examined using the CCT [42]. In the CCT, participants select a number of cards from a deck of mixed gain and loss cards on each trial, which terminates when a loss is encountered. In the 'cold' condition, participants are encouraged to use deliberation and to weigh the available odds information to determine how many cards to select. In this condition, adolescents and adults selected an equivalent number of cards. However, despite explicit knowledge of risk information, adolescents drew more cards than adults in a 'hot' condition where each choice to draw a card was made one at a time, inducing physiological arousal and encouraging the feeling of a 'hot hand' via incremental win feedback. This contextual increase in adolescents' risk-taking reflects a diminished influence of information about odds and outcomes in the 'hot' condition. This work suggests that in arousing or exciting situations where outcomes are directly experienced, adolescents are less influenced by their explicit knowledge of the probabilities of potential negative outcomes, and are more willing to take risks to obtain potential rewards.

The presence of peers is another uniquely powerful context that shapes adolescents' decisions [68]. Inspired by statistics showing that peer-aged passengers predict a precipitous rise in traffic fatalities among adolescent drivers [69], controlled laboratory studies using driving simulation games have found that adolescents choose to speed through a yellow light, rather than stop, more often when a peer observes their driving, whereas adults are unaffected by peer monitoring [70,71]. Similarly, adolescents show exaggerated delay discounting in the presence of peers [72], and peripubertal but not adult rodents demonstrate an age-unique increase in time spent consuming alcohol in the presence of peer-aged conspecifics [73], suggesting that peers may influence impulsive or risky decision-making across multiple domains.

Social modulation of risky behavior is perhaps unsurprising given the intensive social reorientation that characterizes adolescence [51,74]. Dramatic changes in peer relationships yield a greater importance assigned to peers, which could manifest as a greater reliance on peers' attitudes as a factor in decision value computations (e.g., [75]). Indeed, reward-related signals in the ventral striatum are intensified when adolescents choose to run a yellow light while a friend is monitoring risky decisions, compared to those of adults as well as to when they are alone [70]. However, adolescent attunement to the social environment is perhaps even more subtle than originally thought — merely being looked at by a peer is sufficient to induce uniquely high levels of physiological arousal in adolescents and modulation of corticostriatal valuation systems [76,77]. While peers are clearly influential during adolescence behavior, peers do not uniformly influence adolescents' reward valuation processes [78]. As the majority of tasks in which peer modulation of risky decision-making has been observed do not permit identification of the underlying decision computations that are affected, further research is warranted to clarify precisely how adolescent decision-making is shaped by social context.

## Conclusions

Independent decision-making is a burgeoning challenge for adolescents, who are often stereotyped as making poor choices in everyday life. Scientific evidence is emerging to suggest that adolescents' decision-making is indeed unique, and that their patterns of uniqueness can be partially attributed to normative maturational changes in brain function.

Although adolescents appear to have full access to many of the cognitive foundations of decision-making, several aspects of decision-making such as intertemporal choice, prospective evaluation, and integration of positive and negative feedback are not yet tuned to typical adult

levels. Still other processes that inform decision-making are uniquely amplified during adolescence: learning from direct experience, reward reactivity, tolerance of ambiguity, and context-dependent orientation toward risk in exciting or peer-laden situations.

Greater insight into adolescent decision processes can be gained by considering the putative neurodevelopmental changes that contribute to biased decision computations. On the basis of the adult literature, the amplified components of decisions are largely signaled by neural systems that assign reward or salience value to information in the environment such as the striatum. This observation is broadly consistent with the nonlinear functional developmental trajectories for these regions. Conversely, those aspects of decisions that require reliance on abstract goals, distal outcomes, and complex cost–benefit calculation are thought to be mediated by interactions between subcortical and cortical systems, including a prominent role for the lateral prefrontal cortex. Therefore, the late development of the prefrontal cortex, and continued development of corticostriatal connectivity, could constrain the utilization of such strategic aspects of decision-making in adolescence.

Although adolescents' decision-making is not adult-like, it is developmentally normative. Thus, adolescents' unique decision computations may be optimized for the fulfillment of the specific goals of this developmental phase. Adolescents are tasked with attaining independence despite limited amounts of direct experience. Therefore, it might be advantageous for the adolescent brain to be attuned to more proximal outcomes, to be tolerant of uncertainty, and to benefit from robust learning signals that can entrain a richer experience base to scaffold the transition to independence.

## Conflict of interest statement
Nothing declared.

## Acknowledgements

This work was supported by the National Institute of Mental Health (R00MH087813; LHS), the National Science Foundation (CAREER 1452530; LHS), the National Institute on Drug Abuse (R03DA038701; CAH) and a generous gift from the Mortimer D. Sackler MD family (CAH). We thank Catherine Insel for helpful comments on a draft of this manuscript.

## References and recommended reading
Papers of particular interest, published within the period of review, have been highlighted as:

- • of special interest
- •• of outstanding interest

1. Giedd JN, Vaituzis AC, Hamburger SD, Lange N, Rajapakse JC, Kaysen D, Vauss YC, Rapoport JL: **Quantitative MRI of the temporal lobe, amygdala, and hippocampus in normal human development: ages 4–18 years**. *J Comp Neurol* 1996, **366**: 223-230.

2. Giedd JN, Blumenthal J, Jeffries NO, Castellanos FX, Liu H, Zijdenbos A, Paus T, Evans AL, Rapoport J: **Brain development during childhood and adolescence: a longitudinal MRI study**. *Nat Neurosci* 1999, **2**:861-863.

3. Casey BJ, Giedd JN, Thomas KM: **Structural and functional brain development and its relation to cognitive development**. *Biol Psychol* 2000, **54**:241-247.

4. Østby Y, Tamnes CK, Fjell AM, Walhovd KB: **Morphometry and connectivity of the fronto-parietal verbal working memory network in development**. *Neuropsychologia* 2011, **49**:3854-3862.

5. Tamnes CK, Østby Y, Walhovd KB, Westlye LT, Due-Tønnessen P, Fjell AM: **Neuroanatomical correlates of executive functions in children and adolescents: a magnetic resonance imaging (MRI) study of cortical thickness**. *Neuropsychologia* 2010, **48**:2496-2508.

6. Andersen SL, Thompson AT, Rutstein M, Hostetter JC, Teicher MH: **Dopamine receptor pruning in prefrontal cortex during the periadolescent period in rats**. *Synapse* 2000, **37**:167-169.

7. Andersen SL, Dumont NL, Teicher MH: **Developmental differences in dopamine synthesis inhibition by (±)-7-OH-DPAT**. *Naunyn Schmiedebergs Arch Pharmacol* 1997, **356**:173-181.

8. Galvan A, Hare TA, Parra CE, Penn J, Voss H, Glover G, Casey BJ: **Earlier development of the accumbens relative to orbitofrontal cortex might underlie risk-taking behavior in adolescents**. *J Neurosci* 2006, **26**:6885-6892.

9. Braams BR, van Duijvenvoorde AC, Peper JS, Crone EA:
•• **Longitudinal changes in adolescent risk-taking: a comprehensive study of neural responses to rewards, pubertal development, and risk-taking behavior**. *J Neurosci* 2015, **35**:7226-7238.
A large, definitive, longitudinal assessment of the reliability of hyperresponsive ventral striatal responses to rewards and relationships with puberty and real life risky behavior.

10. Barkley-Levenson EE, Galvan A: **Neural representation of expected value in the adolescent brain**. *Proc Natl Acad Sci U S A* 2014, **111**:1646-1651.

11. Ernst M, Pine DS, Hardin M: **Triadic model of the neurobiology of motivated behavior in adolescence**. *Psychol Med* 2006, **36**:299-312.

12. Somerville LH, Casey BJ: **Developmental neurobiology of cognitive control and motivational systems**. *Curr Opin Neurobiol* 2010, **20**:236-241.

13. Steinberg L: **A dual systems model of adolescent risk-taking**. *Dev Psychobiol* 2010, **52**:216-224.

14. Haber SN, Kim K-S, Mailly P, Calzavara R: **Reward-related cortical inputs define a large striatal region in primates that interface with associative cortical connections, providing a substrate for incentive-based learning**. *J Neurosci* 2006, **26**:8368-8376.

15. Luciana M, Collins PF: **Incentive motivation, cognitive control,
• and the adolescent brain: is it time for a paradigm shift?** *Child Dev Perspect* 2012, **6**:392-399.
This provocative review emphasizes unique linkages between incentive motivation, dopamine, and learning during adolescence.

16. Galvan A: **Adolescent development of the reward system**. *Front Hum Neurosci* 2010, **4**:6.

17. Harden KP, Tucker-Drob EM: **Individual differences in the development of sensation seeking and impulsivity during adolescence: further evidence for a dual systems model**. *Dev Psychol* 2011, **47**:739.

18. Daw ND, Doya K: **The computational neurobiology of learning and reward**. *Curr Opin Neurobiol* 2006, **16**:199-204.

19. van den Bos W, Cohen MX, Kahnt T, Crone EA: **Striatum-medial prefrontal cortex connectivity predicts developmental changes in reinforcement learning**. *Cereb Cortex* 2012, **22**:1247-1255.
This study characterized changes in neural connectivity underlying age-related variation in the integration of positive and negative feedback across development.

20. Javadi AH, Schmidt DH, Smolka MN: **Differential representation of feedback and decision in adolescents and adults**. *Neuropsychologia* 2014, **56**:280-288.

21. Jones RM, Somerville LH, Li J, Ruberry EJ, Powers A, Mehta N, Dyke JP, Casey BJ: **Adolescent-specific patterns of behavior and neural activity during social reinforcement learning**. *Cogn Affect Behav Neurosci* 2014, **14**:683-697.

22. van Duijvenvoorde AC, Zanolie K, Rombouts SA, Raijmakers ME, Crone EA: **Evaluating the negative or valuing the positive? Neural mechanisms supporting feedback-based learning across development**. *J Neurosci* 2008, **28**:9495-9503.

23. Decker JH, Lourenco FS, Doll BB, Hartley CA: **Experiential reward learning outweighs instruction prior to adulthood**. *Cogn Affect Behav Neurosci* 2015:1-11.

24. Cohen JR, Asarnow RF, Sabb FW, Bilder RM, Bookheimer SY,
  •  Knowlton BJ, Poldrack RA: **A unique adolescent response to reward prediction errors**. *Nat Neurosci* 2010, **13**:669-671.
This study observed that neural prediction errors in the striatum exhibited peak magnitude during adolescence.

25. Hauser TU, Iannaccone R, Walitza S, Brandeis D, Brem S: **Cognitive flexibility in adolescence: neural and behavioral mechanisms of reward prediction error processing in adaptive decision making during development**. *Neuroimage* 2015, **104**:347-354.

26. Ernst M, Nelson EE, Jazbec S, McClure EB, Monk CS, Leibenluft E, Blair J, Pine DS: **Amygdala and nucleus accumbens in responses to receipt and omission of gains in adults and adolescents**. *Neuroimage* 2005, **25**:1279-1291.

27. Galvan A, McGlennen KM: **Enhanced striatal sensitivity to aversive reinforcement in adolescents versus adults**. *J Cogn Neurosci* 2013, **25**:284-296.

28. van der Schaaf ME, Warmerdam E, Crone EA, Cools R: **Distinct linear and non-linear trajectories of reward and punishment reversal learning during development: relevance for dopamine's role in adolescent decision making**. *Dev Cogn Neurosci* 2011, **1**:578-590.

29. Christakou A, Gershman SJ, Niv Y, Simmons A, Brammer M, Rubia K: **Neural and psychological maturation of decision-making in adolescence and young adulthood**. *J Cogn Neurosci* 2013, **25**:1807-1823.

30. Niv Y, Edlund JA, Dayan P, O'Doherty JP: **Neural prediction errors reveal a risk-sensitive reinforcement-learning process in the human brain**. *J Neurosci* 2012, **32**:551-562.

31. Frank MJ, Fossella JA: **Neurogenetics and pharmacology of
  •  learning, motivation, and cognition**. *Neuropsychopharmacology* 2011, **36**:133-152.

32. Dolan RJ, Dayan P: **Goals and habits in the brain**. *Neuron* 2013, **80**:312-325.

33. Decker JH, Otto AR, Daw ND, Casey BJ, Hartley CA: **The developmental emergence of model-based learning**. *Society for Neuroscience*; *Washington, DC: 2014.*

34. Millstein SG, Halpern–Felsher BL: **Judgments about risk and perceived invulnerability in adolescents and young adults**. *J Res Adolesc* 2002, **12**:399-422.

35. Reyna VF, Farley F: **Risk and rationality in adolescent decisioin
  •  making: implications for theory, practice, and public policy**. *Psychol Sci Public Interest* 2006, **7**:1-44.
This comprehensive review emphasizes the highly rational features of adolescent risk estimation and decision making.

36. Schlottmann A, Wilkening F: **Judgment and decision making in young children**. In  *Judgment and Decision Making as a Skill.* Edited by Dhami M, Schlottmann A, Waldmann M. Cambridge University Press; 2011:55-83.

37. Barkley-Levenson EE, Van Leijenhorst L, Galván A: **Behavioral and neural correlates of loss aversion and risk avoidance in adolescents and adults**. *Dev Cogn Neurosci* 2013, **3**:72-83.

38. Tymula A, Belmaker LAR, Roy AK, Ruderman L, Manson K,
  •  Glimcher PW, Levy I: **Adolescents' risk-taking behavior is driven by tolerance to ambiguity**. *Proc Natl Acad Sci U S A* 2012, **109**:17135-17140.
This study dissociating attitudes towards risk and ambiguity in adolescents and adults observed greater tolerance of ambiguity, but not risk, in adolescents.

39. Defoe IN, Dubas JS, Figner B, van Aken MA: **A meta-analysis on
  •  age differences in risky decision making: adolescents versus children and adults**. *Psychol Bull* 2015, **1**:48-84.
This meta-analysis of risky decision-making across development observed greater risk taking in adolescents versus adults.

40. Bechara A, Damasio H, Tranel D, Damasio AR: **Deciding advantageously before knowing the advantageous strategy**. *Science* 1997, **275**:1293-1295.

41. Lejuez CW, Read JP, Kahler CW, Richards JB, Ramsey SE, Stuart GL, Strong DR, Brown RA: **Evaluation of a behavioral measure of risk taking: the Balloon Analogue Risk Task (BART)**. *J Exp Psychol Appl* 2002, **8**:75.

42. Figner B, Mackinlay RJ, Wilkening F, Weber EU: **Affective and deliberative processes in risky choice: age differences in risk taking in the Columbia Card Task**. *J Exp Psychol Learn Mem Cogn* 2009, **35**:709-730.

43. Hertwig R, Erev I: **The description–experience gap in risky choice**. *Trends Cogn Sci* 2009, **13**:517-523.

44. Tobler PN, Christopoulos GI, O'Doherty JP, Dolan RJ, Schultz W: **Risk-dependent reward value signal in human prefrontal cortex**. *Proc Natl Acad Sci U S A* 2009, **106**:7185-7190.

45. Mohr PN, Biele G, Heekeren HR: **Neural processing of risk**. *J Neurosci* 2010, **30**:6613-6619.

46. Preuschoff K, Quartz SR, Bossaerts P: **Human insula activation reflects risk prediction errors as well as risk**. *J Neurosci* 2008, **28**:2745-2752.

47. van Duijvenvoorde AC, Huizenga HM, Somerville LH, Delgado MR,
  •  Powers A, Weeda WD, Casey B, Weber EU, Figner B: **Neural correlates of expected risks and returns in risky choice across development**. *J Neurosci* 2015, **35**:1549-1560.
This study characterized the neural substrates of trial-by-trial variation in risk and return measures in a risky choice task across development.

48. Rodman AM, Insel C, Skwara AC, Kastman EK, Sasse SF, Somerville LH: **Reduced cognitive interference by temporal uncertainty in adolescence**. *Association for Psychological Science*; *New York, NY: 2015.*

49. Spear LP: **The adolescent brain and age-related behavioral
  •• manifestations**. *Neurosci Biobehav Rev* 2000, **24**:417-463.
This seminal article identifies strking parallels in non-human and human developmental literatures.

50. Adriani W, Chiarotti F, Laviola G: **Elevated novelty seeking and peculiar D-amphetamine sensitization in periadolescent mice compared with adult mice**. *Behav Neurosci* 1998, **112**:1152-1166.

51. Crone EA, Dahl RE: **Understanding adolescence as a period of social-affective engagement and goal flexibility**. *Nat Rev Neurosci* 2012, **13**:636-650.

52. Gopnik A, Griffiths TL, Lucas CG: **When younger learners can be better (or at least more open-minded) than older ones**. *Curr Dir Psychol Sci* 2015, **24**:87-92.

53. Peters J, Büchel C: **The neural mechanisms of inter-temporal decision-making: understanding variability**. *Trends Cogn Sci* 2011, **15**:227-239.

54. Scheres A, Dijkstra M, Ainslie E, Balkan J, Reynolds B, Sonuga-Barke E, Castellanos FX: **Temporal and probabilistic discounting of rewards in children and adolescents: effects of age and ADHD symptoms**. *Neuropsychologia* 2006, **44**:2092-2103.

55. Olson EA, Collins PF, Hooper CJ, Muetzel R, Lim KO, Luciana M: **White matter integrity predicts delay discounting behavior in 9- to 23-year-olds: a diffusion tensor imaging study**. *J Cogn Neurosci* 2009, **21**:1406-1421.

56. Steinberg L, Graham SJ, O'Brien L, Woolard J, Cauffman E, Banich M: **Age differences in future orientation and delay discounting**. *Child Dev* 2009, **80**:28-44.

57. Christakou A, Brammer M, Rubia K: **Maturation of limbic corticostriatal activation and connectivity associated with developmental changes in temporal discounting**. *Neuroimage* 2011, **54**:1344-1354.

58. van den Bos W, Rodriguez CA, Schweitzer JB, McClure SM: **Adolescent impatience decreases with increased frontostriatal connectivity**. *Proc Natl Acad Sci U S A* 2015, **112**:E3765-E3774.

59. Steinbeis N, Haushofer J, Fehr E, Singer T: **Development of behavioral control and associated vmPFC–DLPFC connectivity explains children's increased resistance to temptation in intertemporal choice**. *Cereb Cortex* 2014.

60. Bartra O, McGuire JT, Kable JW: **The valuation system: a coordinate-based meta-analysis of BOLD fMRI experiments examining neural correlates of subjective value**. *Neuroimage* 2013, **76**:412-427.

61. Casey B: **Beyond simple models of self-control to circuit-based accounts of adolescent behavior**. *Annu Rev Psychol* 2015, **66**:295-319.

62. Vink M, Zandbelt BB, Gladwin T, Hillegers M, Hoogendam JM, van den Wildenberg WPM, Du Plessis S, Kahn RS: **Frontostriatal activity and connectivity increase during proactive inhibition across adolescence and early adulthood**. *Hum Brain Mapp* 2014, **35**:4415-4427.

63. Olson EA, Hooper CJ, Collins P, Luciana M: **Adolescents' performance on delay and probability discounting tasks: contributions of age, intelligence, executive functioning, and self-reported externalizing behavior**. *Pers Individ Dif* 2007, **43**:1886-1897.

64. Benoit RG, Gilbert SJ, Burgess PW: **A neural mechanism mediating the impact of episodic prospection on farsighted decisions**. *J Neurosci* 2011, **31**:6771-6779.

65. Østby Y, Walhovd KB, Tamnes CK, Grydeland H, Westlye LT, Fjell AM: **Mental time travel and default-mode network functional connectivity in the developing brain**. *Proc Natl Acad Sci U S A* 2012, **109**:16800-16804.

66. Benes FM: **Myelination of cortical-hippocampal relays during late adolescence**. *Schizophr Bull* 1989, **15**:585.

67. Christakou A: **Present simple and continuous: emergence of self-regulation and contextual sophistication in adolescent decision-making**. *Neuropsychologia* 2014, **65**:302-312.

68. Albert D, Chein J, Steinberg L: **The teenage brain peer influences on adolescent decision making**. *Curr Dir Psychol Sci* 2013, **22**:114-120.

69. Chen L-H, Baker SP, Braver ER, Li G: **Carrying passengers as a risk factor for crashes fatal to 16- and 17-year-old drivers**. *JAMA* 2000, **283**:1578-1582.

70. Chein J, Albert D, O'Brien L, Uckert K, Steinberg L: **Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry**. *Dev Sci* 2011, **14**:F1-F10.

71. Gardner M, Steinberg L: **Peer influence on risk taking, risk preference, and risky decision making in adolescence and adulthood: an experimental study**. *Dev Psychol* 2005, **41**:625-635.

72. Weigard A, Chein J, Albert D, Smith A, Steinberg L: **Effects of anonymous peer observation on adolescents' preference for immediate rewards**. *Dev Sci* 2014, **17**:71-78.

73. Logue S, Chein J, Gould T, Holliday E, Steinberg L: **Adolescent mice, unlike adults, consume more alcohol in the presence of peers than alone**. *Dev Sci* 2014, **17**:79-85.

74. Nelson EE, Leibenluft E, McClure EB, Pine DS: **The social re-orientation of adolescence: a neuroscience perspective on the process and its relation to psychopathology**. *Psychol Med* 2005, **35**:163-174.

75. Knoll LJ, Magis-Weinberg L, Speekenbrink M, Blakemore S-J: **Social influence on risk perception during adolescence**. *Psychol Sci* 2015.

76. Somerville LH: **The teenage brain: sensitivity to social evaluation**. *Curr Dir Psychol Sci* 2013, **22**:129-135.

77. Somerville LH, Jones RM, Ruberry EJ, Dyke JP, Glover G, Casey B: **The medial prefrontal cortex and the emergence of self-conscious emotion in adolescence**. *Psychol Sci* 2013, **24**:1554-1562.

78. Lourenco FS, Decker JH, Pedersen GA, Dellarco DV, Casey B, Hartley CA: **Consider the source: adolescents and adults similarly follow older adult advice more than peer advice**. *PLoS One* 2015, **10**:e0128047.

# EXHIBIT 41

# Are Adolescents Less Mature Than Adults?

## Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged

## APA "Flip-Flop"

Laurence Steinberg    *Temple University*
Elizabeth Cauffman    *University of California, Irvine*
Jennifer Woolard    *Georgetown University*
Sandra Graham    *University of California, Los Angeles*
Marie Banich    *University of Colorado*

*The American Psychological Association's (APA's) stance on the psychological maturity of adolescents has been criticized as inconsistent. In its Supreme Court amicus brief in Roper v. Simmons (2005), which abolished the juvenile death penalty, APA described adolescents as developmentally immature. In its amicus brief in Hodgson v. Minnesota (1990), however, which upheld adolescents' right to seek an abortion without parental involvement, APA argued that adolescents are as mature as adults. The authors present evidence that adolescents demonstrate adult levels of cognitive capability earlier than they evince emotional and social maturity. On the basis of this research, the authors argue that it is entirely reasonable to assert that adolescents possess the necessary skills to make an informed choice about terminating a pregnancy but nevertheless less mature than adults in ways that mitigate criminal responsibility. The notion that a single line can be drawn between adolescence and adulthood for different purposes under the law is at odds with developmental science. Drawing age boundaries on the basis of developmental research cannot be done sensibly without a careful and nuanced consideration of the particular demands placed on the individual for "adult-like" maturity in different domains of functioning.*

*Keywords:* adolescents, abortion, juvenile death penalty, Supreme Court, APA

**I**n its landmark 2005 decision abolishing the juvenile death penalty (*Roper v. Simmons*, 2005), the U.S. Supreme Court held that the inherent immaturity of adolescents relative to adults mitigated teenagers' criminal responsibility to the extent that it barred the imposition of capital punishment for crimes committed under the age of 18, regardless of their heinousness. Prior to this decision, in the United States, individuals could be executed for capital crimes committed at the age of 16 or older. By a 5-to-4 vote, the Court ruled that this age boundary should be set at 18, rather than 16.

Developmental science was front and center in the Court's ruling, which drew extensively on an amicus curiae brief submitted by the American Psychological Association (APA, 2004) and was informed by a recent summary of relevant research on psychological development during adolescence that was published in this journal (Steinberg & Scott, 2003). Writing for the majority, Justice Anthony Kennedy drew attention to three specific aspects of adolescents' immaturity that diminished their criminal culpability: their underdeveloped sense of responsibility (and difficulty controlling their impulses), their heightened vulnerability to peer pressure, and the unformed nature of their characters. As Justice Kennedy wrote,

First, as any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." . . . The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. . . . The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. . . . These differences render suspect any conclusion that a juvenile falls among the worst offenders. (*Roper v. Simmons*, 2005, pp. 15–16)

The position taken by APA in its brief—that adolescents are inherently less blameworthy than adults as a consequence of their developmental immaturity—was noteworthy not only because it proved so influential to the Court's decision but because it appeared, on its face, to contradict a stance taken by APA in a previous U.S. Su-

*Editor's note.*   June P. Tangney served as the action editor for this article.

*Author's note.*   Laurence Steinberg, Department of Psychology, Temple University; Elizabeth Cauffman, Department of Psychology and Social Behavior, University of California, Irvine; Jennifer Woolard, Department of Psychology, Georgetown University; Sandra Graham, Psychological Studies in Education, University of California, Los Angeles; Marie Banich, Departments of Psychology and Psychiatry, University of Colorado.

Correspondence concerning this article should be addressed to Laurence Steinberg, Department of Psychology, Temple University, Philadelphia, PA 19122. E-mail: lds@temple.edu

© 2009 American Psychological Association 0003-066X/09/$12.00
Vol. 64, No. 7, 583–594     DOI: 10.1037/a0014763



**Laurence Steinberg**

preme Court case, *Hodgson v. Minnesota* (1990). In that case, which concerned a minor's right to obtain an abortion without parental notification, APA had argued that because adolescents had decision-making skills comparable to those of adults, there was no reason to require teenagers to notify their parents before terminating a pregnancy (APA, 1987, 1989). Thus, in *Roper*, APA argued that science showed that adolescents were not as mature as adults, whereas in *Hodgson,* it argued that the science showed that they were.

The apparent contradiction in these views did not go unnoticed. Justice Kennedy explicitly asked at oral argument in *Roper* if the APA had "flip-flopped" between 1989 (when its final amicus brief was filed in the abortion case) and 2004 (when its brief was filed in the juvenile death penalty case). The flip-flop issue also was raised by those who disagreed with the Court's decision to abolish the juvenile death penalty. Indeed, in his dissenting opinion in *Roper v. Simmons* (2005), Justice Antonin Scalia drew unambiguous attention to this issue:

[T]he American Psychological Association (APA), which claims in this case that scientific evidence shows persons under 18 lack the ability to take moral responsibility for their decisions, has previously taken precisely the opposite position before this very Court. In its brief in *Hodgson v. Minnesota,* 497 U. S. 417 (1990), the APA found a "rich body of research" showing that juveniles are mature enough to decide whether to obtain an abortion without parental involvement. . . . The APA brief, citing psychology treatises and studies too numerous to list here, asserted: "[B]y middle adolescence (age 14–15) young people develop abilities similar to adults in reasoning about moral dilemmas, understanding social rules and laws, [and] reasoning about interpersonal relationships and interpersonal problems." (Justice Scalia, dissenting, pp. 11–12)

The petitioner in *Roper*, the State of Missouri, made a similar point in its brief:

Ultimately, Simmons wants the Court to declare that [drawing the age boundary for purposes of death penalty eligibility at 16] is now "without penological justification" not based on research that uniformly reaches that conclusion, but based on inconsistent research, viewed through the lense [sic] of a stereotype that the American Psychological Association decried in *Hodgson*: "[T]he assumption that adolescents as a group are less able than adults to understand, reason and make decisions about intellectual and social dilemmas is not supported by contemporary psychological theory and research." (Roper, 2004, p. 11)

Concerns about reconciling the scientific arguments offered in the two cases were also raised by abortion rights advocates, but in a different context. Indeed, after Laurence Steinberg met with the Executive Committee of the Society for Research on Adolescence, asking for the organization's endorsement of the APA stance in *Roper*, the committee decided not to sign on to the APA brief, fearing that the argument that adolescents were not as mature as adults (and thus ineligible for capital punishment) would come back to haunt those who had worked so hard to secure the abortion rights of young women. As it turns out, these worries were not unfounded. Within two years of the *Roper* decision, the U.S. Supreme Court heard *Ayotte v. Planned Parenthood of Northern New England* (2006), which, like *Hodgson*, concerned minors' access to abortion without parental involvement. Opponents of adolescents' autonomous abortion rights had taken the Court's characterization of adolescent immaturity in the juvenile death penalty case and used it to argue in favor of parental involvement requirements. Citing the *Roper* decision, they argued,

Parental involvement is critical to ensure not only that the adolescent's choice is informed, but that it is freely made and not the result of coercion or duress. . . . These concerns are heightened for adolescents who, as this Court has recently observed, are more susceptible than adults to "outside pressure" and other "negative influences," and more likely than adults to make decisions that are "impetuous and ill-considered." *Roper v. Simmons*, 125 S.Ct. 1183, 1195 (2005). (*Ayotte v. Planned Parenthood of Northern New England,* 2006, p. 15)

It is easy to see why many criticized the APA for its apparently contradictory positions. On the face of it, the APA position in the juvenile death penalty case was in direct opposition to the stance it took in *Hodgson*. In its amicus brief arguing for adolescents' abortion rights, for example, APA stated,

[B]y age 14 most adolescents have developed adult-like intellectual and social capacities [italics added] including specific abilities outlined in the law as necessary for understanding treatment alternatives, considering risks and benefits, and giving legally competent consent. (APA, 1989, p. 20)

However, in its amicus brief arguing against the juvenile death penalty, APA stated,

*Given that 16- and 17-year-olds as a group are less mature developmentally than adults* [italics added], imposing capital punishment on such adolescents does not serve the judicially recognized purposes of the sanction. (APA, 2004, p. 13)

APA responded to accusations that developmental psychologists were trying to have their scientific cake and



**Elizabeth Cauffman**

The juvenile death penalty case was an 8th Amendment case involving the amendment's cruel and unusual punishments clause. A central issue in *Roper* was whether adolescents were mature enough to be held to adult levels of criminal blameworthiness and, in particular, to a level of blameworthiness that potentially warranted capital punishment; if they were not, the juvenile death penalty was excessively cruel. Under a bedrock principle of American criminal law known as "penal proportionality," the punishment a guilty party receives should be in proportion to his or her culpability for the criminal act, and certain factors are accepted as mitigating the actor's culpability. These mitigating factors include diminished decision-making capability (e.g., decision making that is impulsive or short-sighted), exposure to coercion, and evidence of the offender's otherwise good character (Steinberg & Scott, 2003). As noted earlier, the Court ruled that the inherent immaturity of adolescents, with respect to the impetuousness of their decision making, their susceptibility to coercion, and their unformed characters, made them categorically less blameworthy than the average criminal and therefore not eligible for a punishment that was reserved for only the most culpable offenders.

Whether APA in fact "flip-flopped" or, worse yet, tried to have it both ways, as its critics have contended, is an exceedingly important question, both with respect to the decisions about where to draw legal boundaries between adolescents and adults for various purposes and with respect to APA's scientific credibility more generally. As some of us have written elsewhere, "scientists' authority to enter the policy arena rests largely on the credibility of their research findings" (Grisso & Steinberg, 2005, p. 620). If APA's statements about the state of scientific knowledge are seen as advocacy masquerading as research, the integrity of the Association's scientific mission is threatened. After all, in both *Hodgson* and *Roper*, APA took a position that could be fairly characterized as, at the very least, friendly to youth advocates. It is crucial, therefore, to examine the issue empirically. That is the focus of the present article.

For the past several years, as members of the MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice, we have been studying age differences in many of the cognitive and psychosocial capacities that have been at issue in the Supreme Court cases discussed above. We have been studying basic intellectual abilities, such as working memory and verbal fluency, but also aspects of psychosocial development, including impulse control (Steinberg et al., 2008), future orientation (Steinberg et al., 2009), reward sensitivity (Cauffman et al., in press), sensation seeking (Steinberg et al., 2008), and susceptibility to peer influence (Steinberg & Monahan, 2007). To our knowledge, ours is the first study to include both cognitive and psychosocial measures administered to the same sample, to include an ethnically and socioeconomically diverse group of individuals, and to span the period from preadolescence through young adulthood.

eat it too—spinning the science for the sake of youth advocacy—by pointing out that the type of decision under consideration in *Roper* was not the same as that at issue in *Hodgson*:

We [APA] took note of the Hodgson brief in the approval process for APA's brief in [Roper] but concluded that the two cases were distinguishable in several respects. [Roper] and Hodgson, while both dealing with adolescent decision-making, involved very different legal issues and different types of decisions. Therefore the research, which was different in each of the two cases, addressed distinct aspects of adolescent behavior and attributes. (Gilfoyle, 2005, p. 1)

There is no question that the legal issues in *Hodgson* and *Roper* differed. The abortion rights case was a 14th Amendment case involving the amendment's due process clause. The central question considered in *Hodgson* was whether the state had a compelling interest in mandating that an adolescent seeking an abortion be required to first notify both her parents. Several legal issues were relevant, including whether the notification requirement placed an undue burden on adolescents (especially those whose parents were divorced or estranged) and whether providing for a judicial hearing as an alternative to parental notification (known as a "judicial bypass") was acceptable, but the most relevant for the present discussion concerned the competence of adolescents to make informed and sound health care decisions on their own. If it could be concluded that adolescents were sufficiently competent to make an informed decision about whether to terminate a pregnancy, the state's interest in requiring parental notification would be rendered less compelling. Ultimately, the Court ruled that requiring parental notification *was* constitutional so long as a bypass provision was part of the law.



**Jennifer Woolard**

On the basis of this work, some of which we summarize in the pages that follow, we believe that APA's seemingly contradictory positions in *Hodgson* and *Roper* are in fact quite compatible with research on age differences in cognitive and psychosocial capacities. More specifically, our findings, as well as those of other researchers, suggest that whereas adolescents and adults perform comparably on cognitive tests measuring the sorts of cognitive abilities that were referred to in the *Hodgson* brief—abilities that permit logical reasoning about moral, social, and interpersonal matters—adolescents and adults are not of equal maturity with respect to the psychosocial capacities listed by Justice Kennedy in the majority opinion in *Roper*—capacities such as impulse control and resistance to peer influence. Not only were the legal issues different in the two cases, but so are the circumstances surrounding abortion decisions and criminal behavior, and therefore, the relevant dimensions along which adolescents and adults should be compared differ as well. Unlike adolescents' decisions to commit crimes, which are usually rash and made in the presence of peers, adolescents' decisions about terminating a pregnancy can be made in an unhurried fashion and in consultation with adults.

We recognize that not all abortion decisions are deliberative, rational, and autonomous and that not all criminal decisions are impulsive, emotional, and influenced by others. After all, any decision about whether to abort a pregnancy or carry it to term has an emotional component, involves both immediate and long-term consequences, and may be influenced by the opinions of family and friends. By the same token, adolescents' crimes are occasionally strategic, planned in advance, and executed alone. In general, though, when contemplating an abortion, an adolescent has time to deliberate before making a final choice and

has an opportunity to consult with an adult expert, whereas the circumstances leading up to the typical adolescent criminal offense—robbing a convenience store, for instance—are characterized by heightened emotional arousal, time pressure, and peer influence.

For example, studies indicate that about half of all pregnant adolescents contemplating an abortion whose parents are unaware of the situation consult with a nonparental adult other than medical staff (e.g., a teacher, school counselor, clergyperson, older relative, or adult friend of the family); this figure is the same among younger (under age 16) and older adolescents (Henshaw & Kost, 1992). Moreover, 35 states require all women seeking an abortion to receive some type of counseling from the abortion provider before the procedure is performed, usually including information about the specific procedure as well as the health risks of abortion and pregnancy (Guttmacher Institute, 2009). Twenty-four states mandate a waiting period of at least 24 hours between the counseling and the medical procedure (Guttmacher Institute, 2009). Thus, it does not appear as if a high proportion of pregnant teenagers decide to terminate a pregnancy under circumstances that are rushed or in the absence of adult advice. In contrast, studies indicate that adolescents' crimes are more often than not impulsive and unplanned (Farrington, 2003) and typically committed with peers (Reiss & Farrington, 1991). Thus, while some of the capabilities relevant to both decision-making contexts no doubt overlap, the circumstances that define "mature" behavior in each are clearly different. Resisting peer influence, thinking before making a decision, and considering the future consequences of one's actions are clearly more important in criminal decision making than abortion decision making, in part because society structures the latter context to promote consultation with adults and avoid hasty decision making.

The importance of maintaining a distinction between cognitive and psychosocial maturity in discussions of the legal status of adolescents is supported by other research that has examined age differences in each of these domains. Studies that have examined logical reasoning abilities in structured situations and basic information-processing skills, for instance, have found no appreciable differences between adolescents age 16 and older and adults; any gains that take place in these domains during adolescence occur very early in the adolescent decade, and improvements after this age are very small (Hale, 1990; Kail, 1997; Keating, 2004; Overton, 1990). The results of the MacArthur Foundation Research Network's earlier study of age differences in competence to stand trial, which depends on individuals' ability to understand facts about a court proceeding and to reason with those facts in a rational fashion, also were consistent with these findings. We found significant differences between the competence-related abilities of adults and those of adolescents who were 15 and younger, but no differences between the abilities of adults and those of adolescents who were 16 and older (Grisso et al., 2003). This general pattern, indicating that adolescents attain adult levels of competence to stand trial somewhere around age 15, has been reported in similar studies of



**Sandra Graham**

decision making across a wide variety of domains (e.g., Grisso, 1980; Jacobs-Quadrel, Fischhoff, & Davis, 1993) and in many studies of age differences in individuals' competence to provide informed consent (Belter & Grisso, 1984; Grisso & Vierling, 1978; Gustafson & McNamara, 1987; Weithorn & Campbell, 1982).

In contrast, the literature on age differences in psychosocial characteristics such as impulsivity, sensation seeking, future orientation, and susceptibility to peer pressure shows continued development well beyond middle adolescence and even into young adulthood (Scott, Reppucci, & Woolard, 1995; Steinberg & Cauffman, 1996), although few studies have gone much beyond adolescence (but see Cauffman & Steinberg, 2000, for an exception). Consistent with this literature, and in contrast to the pattern of age differences seen in the information-processing, logical reasoning, and informed consent literatures, studies of age differences in the sorts of risky behavior likely to be influenced by the psychosocial factors listed above—such as reckless driving, binge drinking, crime, and spontaneous unprotected sex—indicate that risky behavior is significantly more common during late adolescence and early adulthood than after (Steinberg, 2007). In other words, although adolescents may demonstrate adult-like levels of maturity in some respects by the time they reach 15 or 16, in other respects they show continued immaturity well beyond this point in development.

# The MacArthur Juvenile Capacity Study

## Participants

The MacArthur Juvenile Capacity Study was designed to examine age differences in a variety of cognitive and psychosocial capacities that are relevant to debates about the relative maturity of adolescents and adults, especially as they affect judgments of criminal blameworthiness. There were five data collection sites in the study: Los Angeles; Irvine, CA; Denver; Philadelphia; and Washington, DC. Data for the present study come from 935 individuals ranging in age from 10 to 30 years ($M = 17.84$ years). Participants were recruited via newspaper advertisements and flyers posted at community organizations, Boys & Girls Clubs, churches, community colleges, and local places of business in neighborhoods targeted to have an average household education level of "some college" according to 2000 U.S. Census data. Because we were interested in characterizing the capacities of "average" adolescents and adults, we did not target individuals on the basis of their involvement with the legal system but sought instead to survey an ethnically and socioeconomically diverse sample of individuals in the age range of interest.

Individuals who were interested in the study were asked to call the research office listed on the flyer. Members of the research team described the nature of the study to prospective participants over the telephone and invited those interested to participate. Given this recruitment strategy, it is not possible to know how many potential participants saw the advertisements, what proportion responded, and whether those who responded were different from those who did not, although the education level of the sample is comparable to that of the people in the neighborhoods from which it was drawn.

Data collection took place either at one of the participating university's offices or at a convenient location in the community. Before beginning, participants were provided verbal and written explanations of the study, their confidentiality was assured, and their written consent or assent was obtained. For participants who were under the age of 18, informed consent was obtained from either a parent or a guardian.

## Procedure

Prior to data collection, all site project directors and research assistants met at one location for several days of training. The project coordinators and research assistants conducted on-site practice protocol administrations prior to enrolling participants. Participants took part in a two- to two-and-half-hour interview that included three sets of measures: (a) a series of computerized tasks designed to assess a range of executive functions (not discussed in this report); (b) a series of questionnaires designed to measure a variety of psychosocial capacities relevant to discussions of how adolescents should be treated by the legal system; and (c) tests of basic intellectual functioning. The tasks and questionnaires were administered on a laptop computer in individual interviews. Research assistants were present to monitor the participant's progress, reading aloud the instructions as each new task was presented and providing assistance as needed. To keep participants engaged in the computer tasks, we told the participants that they would receive $35 for participating in the study and that they could obtain up to a total of $50 (or, for participants who



**Marie Banich**

were under 14, an additional prize) depending on their performance. In actuality, we paid all participants ages 14–30 the full $50, and all participants ages 10–13 received $35 plus a prize (approximately $15 in value). This strategy was used to increase the motivation to perform well on the tasks but also to ensure that no participants were penalized for their performance. All procedures were approved by the institutional review board of the university associated with the data collection site.

## Measures

Of interest in the present report are the demographic measures and IQ (which were used to ensure that the various age groups had comparable social and intellectual backgrounds), the measures of psychosocial capacities, and the tests of basic intellectual functioning.

**Demographic variables.** Participants provided information about their age, gender, ethnicity, and highest level of education within their household. For youths 17 years of age and younger, household education was based on parents' level of education, as research has indicated that parental education may be the most stable component of a family's social class (Steinberg, Mounts, Lamborn, & Dornbusch, 1991). For participants 18 years of age and older, their own educational attainment was used to index this construct. In order to have cells with sufficiently large and comparably sized subsamples for purposes of data analysis, we created age groups as follows: 10–11, 12–13, 14–15, 16–17, 18–21, 22–25, and 26–30 years. The age groups did not differ with respect to gender or ethnicity but did differ, albeit modestly, with respect to household education. Accordingly, all subsequent analyses controlled for this variable. Demographic characteristics of the sample are presented in Table 1.

**IQ.** The Wechsler Abbreviated Scale of Intelligence (WASI) Full-Scale IQ Two-Subtest (FSIQ-2) (Psychological Corporation, 1999) was used to produce an estimate of general intellectual ability based on two (Vocabulary and Matrix Reasoning) of the four subtests. The WASI can be administered in approximately 15 minutes and is correlated with the Wechsler Intelligence Scale for Children ($r = .81$) and the Wechsler Adult Intelligence Scale ($r = .87$). It has been normed for individuals between the ages of 6 to 89 years. Because there were small but significant differences between the age groups in mean IQ, this variable was controlled for in all subsequent analyses.

**Psychosocial maturity.** The battery of instruments contained self-report measures of five capacities frequently mentioned in discussions about age differences in maturity and their relevance to legal policy. Table 2 lists these measures and provides sample items from each.

Three widely used and well-validated Likert-scale-type instruments were used to assess *risk perception* (the extent to which one perceives a potentially dangerous or harmful activity as risky), *sensation seeking* (the extent to which one actively seeks experiences that provide thrills), and *impulsivity* (the extent to which one acts without thinking or has difficulty controlling impulses). Risk perception was assessed using a modified version of a widely used measure developed by Benthin, Slovic, and Severson (1993). The respondent is presented with eight potentially dangerous activities (e.g., riding in a car with a drunk driver, having unprotected sex) and asked to indicate how risky the activity is ($\alpha = .82$).[1] Sensation seeking was assessed using a subset of six items ($\alpha = .70$) from the Sensation Seeking Scale (Zuckerman, Eysenck, & Eysenck, 1978).[2] Impulsivity was assessed using all 18 items ($\alpha = .73$) from three six-item subscales of the Barratt Impulsiveness Scale (Patton, Stanford, & Barratt, 1995): Motor Impulsivity, Inability to Delay Gratification, and Lack of Perseverance. All three self-report measures have been shown to be significantly correlated with behavioral indices of their associated constructs. In our sample, scores on the impulsivity self-report measure were significantly negatively related to the amount of time participants waited before making their first move on a Tower of London task, and scores on the sensation-seeking questionnaire were significantly correlated with sensation-seeking behavior in a video driving game (Steinberg et al., 2008). In addition, individuals who were less likely to perceive potentially risky behaviors as risky were more likely to report engaging in high-risk behavior.

---

[1] The original Benthin et al. (1993) measure also contains an item concerning alcohol use. Our analyses indicated that including this item in the scale's construction adversely differentiated the reliability of the scale among the younger and older participants, most likely because the use of alcohol is risky for minors but not necessarily for adults. As a consequence, we dropped that item from our scale computation.

[2] Many of the items on the full Zuckerman et al. (1978) scale appear to measure impulsivity, not sensation seeking (e.g., "I often do things on impulse.") Because we have a separate measure of impulsivity in our battery, we used only the Zuckerman et al. items that clearly indexed thrill or novelty seeking (see Table 2).

**Table 1**
*Demographic Characteristics of the Sample (N = 935)*

| Characteristic | Percentage |
|---|---|
| Age (in years) | |
| 10–11 | 12.5 |
| 12–13 | 14.7 |
| 14–15 | 13.8 |
| 16–17 | 15.2 |
| 18–21 | 15.9 |
| 22–25 | 14.6 |
| 26–30 | 13.2 |
| Gender | |
| Male | 49.2 |
| Female | 50.8 |
| Ethnicity | |
| African American | 29.2 |
| Asian American | 15.1 |
| Hispanic | 21.2 |
| White | 24.0 |
| Other/biracial | 9.9 |
| Household education | |
| High school | 11.9 |
| High school graduate | 22.8 |
| Some college | 34.1 |
| College graduate | 21.4 |
| Postcollege | 9.7 |

Two additional psychosocial capacities, *resistance to peer influence* and *future orientation,* were assessed using new self-report measures developed for this program of work. Each used a response format introduced by Harter (1982) in which respondents are presented with two opposing statements that are both phrased in a socially acceptable fashion, asked to indicate which best describes them, and then asked whether the descriptor is "very true" or "sort of true." (This format is presumed to reduce social desirability bias.) Resistance to peer influence (Steinberg & Monahan, 2007) was assessed using a 10-item scale ($\alpha = .76$) designed to measure the extent to which individuals change their behavior or opinions in order to follow the crowd. We have no data on the validity of this measure in the current sample, but we do in analyses of data from a large study of serious juvenile offenders. There we found that the presence of antisocial peers in an individual's network is more highly correlated with the individual's own criminal behavior among those who report a low ability to resist peer influence on this measure than among those who have equally antisocial peers but score high in self-reported resistance to peer influence (Monahan, Steinberg, & Cauffman, 2007). Studies of the neural underpinnings of resistance to peer influence using this measure have found neurobiological differences between same-age individuals who vary in their resistance to peer influence in ways consistent with the notion that higher scores on this instrument reflect better coordination of affect and thinking (Grosbras et al., 2007; Paus et al., 2008), a key component of psychosocial maturity in our conceptualization of the construct. Future orientation was assessed using a 15-item scale ($\alpha = .80$) that measures the anticipation of future consequences, planning ahead, and thinking about the future. The validity of this measure is supported by our finding that individuals who score high on this scale are more likely to choose a larger delayed reward over an immediate smaller one in a delay discounting task (Steinberg et al., 2009).

A composite measure of *psychosocial maturity* was formed by reverse-scoring the measures of impulsivity and

**Table 2**
*Indices of Psychosocial Maturity*

| Construct | Measure | Sample item |
|---|---|---|
| Risk perception | Benthin et al., 1993 | "If you did this activity (e.g., had unprotected sex), how much are you at risk for something bad happening?" |
| Sensation seeking | Zuckerman et al., 1978 | "I sometimes like to do things that are a little frightening." |
| Impulsivity | Patton et al., 1995 | "I do things without thinking." |
| Resistance to peer influence | Steinberg & Monahan, 2007 | "Some people think it's better to be an individual even if people will be angry at you for going against the crowd.<br>BUT<br>Other people think it's better to go along with the crowd than to make people angry at you." |
| Future orientation | Steinberg et al., 2009 | "Some people take life one day at a time without worrying about the future.<br>BUT<br>Other people are always thinking about what tomorrow will bring." |

sensation seeking so that higher scores indicated greater maturity (i.e., more impulse control and less thrill seeking), standardizing all five measures, and averaging the standardized scores. Thus, individuals who score relatively lower on the composite characterize themselves as less likely to perceive dangerous situations as risky, more impulsive, more thrill seeking, more oriented to the immediate, and more susceptible to peer influence. This is very similar to the portrait of adolescents described by Justice Kennedy in his majority opinion in the juvenile death penalty case. A confirmatory factor analysis indicated that the composite model fit the data well (comparative fit index = .95, root mean square error of approximation = .075). The five indicators are modestly, but significantly, intercorrelated ($r$s range from .14 to .38; average $r$ = .26).

**Cognitive capacity.** The test battery included several widely used tests of basic cognitive skills, including a test of resistance to interference in working memory (Thompson-Schill et al., 2002), a digit-span memory test, and a test of verbal fluency. The resistance to interference in working memory test was one in which participants saw four probe letters on the screen and then a target. They were then asked whether the target was among the four probes. On test trials, two of the four letters presented had appeared in the previous trial, providing interference with recall on the present trial. An overall accuracy score was computed by averaging the number of correct responses across all test trials. The digit-span memory test was similar to that in the Wechsler scales. Participants heard a series of 13 sequences of digits (beginning with two digits and increasing to eight) that they were asked to recall forwards and 13 sequences that they were asked to recall backwards. A memory score was computed by averaging the total number of forward trials and backward trials recalled correctly. Finally, the measure of verbal fluency asked participants to generate, in one minute, as many words as possible that either began with a specific letter (three trials) or were members of a category (e.g., fruits; three trials). A verbal fluency score was computed by averaging the number of words generated for each of the six lists.

Because the composite consisted of only three items, it was not possible to derive a reliable estimate of internal consistency. However, after examining the intercorrelations among the tests, we found them to be significant (fluency and working memory, $r$ = .29; working memory and digit span, $r$ = .39; digit span and verbal fluency, $r$ = .40). Accordingly, scores on each of the measures were standardized, and the standard scores were averaged to create an index of *general cognitive capacity*. Not surprisingly, our composite measure of general cognitive capacity is significantly correlated with IQ ($r$ = .46, $p$ < .001). Unlike IQ scores, however, which are adjusted for chronological age, the measure of cognitive capacity is not. More important, because we controlled for IQ in all analyses, any observed age differences in general cognitive capacity are not due to age differences in intelligence.

In its original amicus brief in *Hodgson*, the APA (1987) made reference to the "cognitive capacity" (p. 6) of

adolescents and cited sources that referred to both information-processing abilities (Keating, 1980) and logical reasoning (Inhelder & Piaget, 1958) in support of its argument that adolescents are as cognitively competent as adults. We acknowledge that our index, which tilts heavily toward measuring how many pieces of information an individual can process or produce, does not measure logical or moral reasoning and as such is an incomplete measure of cognitive capacity as conceptualized in the APA *Hodgson* brief. Our measure assesses cognitive ability in a highly structured manner and as such does not tap aspects of executive function that may be important in novel situations. It is also important to note that our measure of general cognitive capacity does not include tests of higher order executive functioning, such as comparing short- versus long-term consequences, coordinating affect and cognition, or balancing risk and reward. Many such executive functions have both cognitive and psychosocial aspects to them, however, and given that our interest was in maintaining a distinction between general cognitive and psychosocial capacities so as to better examine their distinct developmental timetables, it was important not to conflate the two. The measures of psychosocial maturity and cognitive capacity are very modestly correlated once age is controlled, $r(922)$ = .15, $p$ < .001. Although our operationalization of general cognitive capacity is not identical to that used by APA in its argument, it is very clear that the authors of the *Hodgson* brief (APA, 1987) were referring to cognitive abilities and not psychosocial maturity and that the authors of the *Roper* brief (APA, 2004) were referring to psychosocial maturity and not cognitive capacity.

## Results

Two analyses of covariance were conducted in order to examine age patterns in psychosocial maturity and general cognitive capacity; as noted earlier, both analyses controlled for IQ and household education.

The results of the two analyses are shown in Figures 1 and 2. Each figure presents the age group means for the standardized composites, with a value of 1.0 added to each

**Figure 1**
*Psychosocial Maturity (Standardized Composite Scores) as a Function of Age (in Years)*



**Figure 2**
*General Cognitive Capacity (Standardized Composite Scores) as a Function of Age (in Years)*



**Figure 3**
*Proportion of Individuals in Each Age Group Scoring at or Above the Mean for 26- to 30-Year-Olds on Indices of Cognitive Capacity and Psychosocial Maturity*



group's mean for ease of presentation (i.e., to make all values positive numbers). The analysis of age differences in psychosocial maturity indicates a significant age effect, $F(6, 900) = 12.577$, $p < .001$. As Figure 1 indicates, age differences in psychosocial maturity, as assessed in this study, did not emerge until mid-adolescence but were present throughout late adolescence and early adulthood. Indeed, pairwise comparisons, using a Bonferroni correction, revealed no significant differences in psychosocial maturity among the first four age groups (10–11, 12–13, 14–15, and 16–17 years) but significant differences between the 16–17-year-olds and those 22 and older, and between the 18–21-year-olds and those 26 and older. In neither case was there a significant interaction between age and gender, indicating that the patterns were the same among males and females.

The analysis of age differences in cognitive capacity shows a very different pattern. As with psychosocial maturity, there is a highly significant age effect, $F(6, 901) = 58.246$, $p < .001$. However, as Figure 2 indicates, age differences in cognitive capacity were evident during the first part of adolescence but not after age 16—just the opposite from the pattern seen with respect to psychosocial maturity. Pairwise comparisons using a Bonferroni correction indicated significant differences in general cognitive capacity between each of the first four age groups but no age differences after 16.

Figure 3 presents these data in a somewhat different way. Here we show the proportion of individuals in each age group who scored at or above the mean level of the 26- to 30-year-olds in our sample on the psychosocial and cognitive composites, graphed in the same figure. As the figure indicates, general cognitive capacity reaches adult levels long before the process of psychosocial maturation is complete.

Although our measure of cognitive capacity included several of the information-processing skills noted in the APA (1987) *Hodgson* brief but did not include indices of the sort of reasoning to which APA referred, it is important to ask whether the pattern of age differences we found on this measure resembles that observed using measures of more sophisticated cognitive abilities of the sort believed to

influence abortion decision making. As we noted earlier, in addition to the present study, the MacArthur Network also conducted a study of age differences in capacities related to competence to stand trial (Grisso et al., 2003). The main instrument used to assess these capacities was the MacArthur Competence Assessment Tool—Criminal Adjudication (MacCAT–CA), a standardized interview that measures respondents' understanding of and reasoning about their legal situation (Poythress et al., 1999). Although the abilities necessary for competence to stand trial are not identical to those necessary for competent decision making about abortion, they are conceptually similar in that both involve being able to understand and reason with facts and appreciate the nature of one's situation.

Figure 4 presents data from the present study alongside data from the Grisso et al. (2003) study in a way

**Figure 4**
*Proportion of Individuals in Each Age Group Scoring at or Above the Mean for 22- to 24-Year-Olds on Index of Cognitive Capacity and on a Measure of Abilities Relevant to Competence to Stand Trial*



*Note.* MacCAT–CA = MacArthur Competence Assessment Tool—Criminal Adjudication, Understanding and Reasoning subscales. MacCAT–CA data are from Grisso et al (2003).

comparable to that used in Figure 3, that is, in terms of the proportion of individuals of different ages who performed at or above the mean level of the adults in the sample. The Grisso et al. study included participants ages 11 to 24, drawn equally from the community and the justice system. In order to make the appropriate comparison of these data to those of the present study, we excluded the justice system subsample from the analyses (the average IQ of that subsample was 85, substantially lower than that of the present study), categorized individuals into chronological age groups that paralleled those used in the present study (11, 12–13, 14–15, 16–17, 18–21, and 22–24 years), and used the oldest group as the adult reference category. Similarly, we reanalyzed the cognitive capacity data from the present study after dropping the 10-year-olds, excluding individuals who were older than 24, and using 22- to 24-year-olds as the adult reference category.

As Figure 4 illustrates, the pattern of age differences in abilities relevant to competence to stand trial is virtually identical to the pattern seen with respect to general cognitive capacity as assessed in the present study. On both indices, scores increased between ages 11 and 16 and then leveled off, with no improvement after this age. This gives us greater confidence that the absence of age differences in cognitive capacity after age 16 observed in our study is not merely a function of the fact that our index included only measures of basic information-processing abilities. Rather, our reanalysis of the Grisso et al. (2003) data supports the argument that adolescents reach adult levels of cognitive maturity several years before they reach adult levels of psychosocial maturity.

## Discussion

Developmental psychologists with expertise in adolescence are frequently called on to provide guidance about the appropriate treatment of young people under the law and about the proper placement of legal age boundaries between those who should be treated as adults and those who should not. The results of the present study suggest that it is not prudent to make sweeping statements about the relative maturity of adolescents and adults, because the answer to the question of whether adolescents are as mature as adults depends on the aspects of maturity under consideration. By age 16, adolescents' general cognitive abilities are essentially indistinguishable from those of adults, but adolescents' psychosocial functioning, even at the age of 18, is significantly less mature than that of individuals in their mid-20s. In this regard, it is neither inconsistent nor disingenuous for scientists to argue that studies of psychological development indicate that the boundary between adolescence and adulthood should be drawn at a particular chronological age for one policy purpose and at a different one for another.

Whether and how these findings should inform decisions about adolescents' treatment under the law depends on the specific legal issue under consideration. To varying degrees, such decisions rely on value judgments (e.g., about what aspects of maturity are relevant to a particular decision or about what is mature "enough" to warrant

autonomy and/or culpability), which science alone cannot dictate. Nevertheless, the legal treatment of adolescents should at the very least be informed by the most accurate and timely scientific evidence on the nature and course of psychological development. On the basis of the present study, as well as previous research, it seems reasonable to distinguish between two very different decision-making contexts in this regard: those that allow for unhurried, logical reflection and those that do not. This distinction is also in keeping with our emerging understanding of adolescent brain maturation, which suggests that brain systems responsible for logical reasoning and basic information processing mature earlier than those that undergird more advanced executive functions and the coordination of affect and cognition necessary for psychosocial maturity (Steinberg, 2008).

When it comes to decisions that permit more deliberative, reasoned decision making, where emotional and social influences on judgment are minimized or can be mitigated, and where there are consultants who can provide objective information about the costs and benefits of alternative courses of action, adolescents are likely to be just as capable of mature decision making as adults, at least by the time they are 16. Three domains of decision making that would seem to fit into this category are medical decision making (where health care practitioners can provide information and encourage adolescents to think through their decisions before acting), legal decision making (where legal practitioners, such as defense attorneys, can play a comparable role), and decisions about participating in research studies (where research investigators, guided by institutional review boards, can function similarly). Although adults in these positions cannot and should not make the decision for the adolescent, they surely can take steps to create a context in which adolescents' decision-making competence will be maximized. The position taken by APA in *Hodgson v. Minnesota* (1990), in favor of granting adolescents' access to abortion without the necessity of parental involvement, therefore seems to us to be consistent with the available scientific evidence, so long as youngsters under the age of 16 have the opportunity to consult with other, informed adults (e.g., health care practitioners, counselors).

In contrast, in situations that elicit impulsivity, that are typically characterized by high levels of emotional arousal or social coercion, or that do not encourage or permit consultation with an expert who is more knowledgeable or experienced, adolescents' decision making, at least until they have turned 18, is likely to be less mature than adults'. This set of circumstances likely characterizes the commission of most crimes perpetrated by adolescents (which are usually committed in groups and are seldom premeditated; Farrington, 2003; Zimring, 1998) and may also be typical of other situations where adolescents are emotionally aroused, in groups, absent adult supervision, and facing choices with apparent immediate rewards and few obvious or immediate costs—the very conditions that are likely to undermine adolescents' decision-making competence (Steinberg, 2007). These conditions often prevail in situa-

tions involving the purchase of alcohol and tobacco, driving, and other potentially health-compromising behaviors, such as having unprotected sex. In these cases, adolescents' relative immaturity should be acknowledged either by imposing greater restraints on their behavior than are imposed on adults (e.g., prohibiting the purchase of alcohol, restricting driving to certain hours of the day or certain conditions) or by providing added protections (e.g., prohibiting capital punishment, making condoms easily accessible). Thus, APA's argument that adolescents should not be subject to capital punishment owing to their impulsivity and susceptibility to peer pressure is consistent with the results of our own research and with other scientific studies of psychosocial development that show continued maturation of these capacities well into young adulthood (Steinberg & Scott, 2003).

In our view, then, the seemingly conflicting positions taken by APA in *Roper v. Simmons* (2005) and *Hodgson v. Minnesota* (1990) are not contradictory. Rather, they simply emphasize different aspects of maturity, in accordance with the differing nature of the decision-making scenarios involved in each case. The skills and abilities necessary to make an informed decision about a medical procedure are likely in place several years before the capacities necessary to regulate one's behavior under conditions of emotional arousal or coercive pressure from peers.

Science alone cannot dictate public policy, although it can, and should, inform it. Our data can neither "prove" nor "disprove" the appropriateness of requiring parental involvement before a teenager can obtain an abortion, but they do inform the debate. Nor do our data "prove" or "disprove" whether it is appropriate to apply the death penalty to individuals who are inherently more impulsive than adults and whose characters are not yet fully formed—although, again, they are informative. But our findings do demonstrate how the positions taken by APA in *Hodgson v. Minnesota* (1990) and in *Roper v. Simmons* (2005) are compatible with each other and consistent with the rapidly growing body of scientific evidence indicating that intellectual maturity is reached several years before psychosocial maturity.

Developmental science can and should contribute to debates about the drawing of legal age boundaries, but research evidence cannot be applied to this sort of policy analysis without a careful and nuanced consideration of the particular demands placed on the individual for "adult-like" maturity in different domains of functioning. Jurists, politicians, advocates, and journalists seeking a uniform answer to questions about where we should draw the line between adolescence and adulthood for different purposes under the law need to consider the asynchronous nature of psychological maturation, especially during periods of dramatic and rapid change across multiple domains of functioning.

## REFERENCES

American Psychological Association. (1987, March 16). [Amicus curiae brief filed in the U.S. Court of Appeals for the Eighth Circuit in Hodgson v. Minnesota, 497 U.S. 417 (1990)]. Retrieved February 11, 2009, from http://www.apa.org/psyclaw/hodgson.pdf

American Psychological Association. (1989, September 1). [Amicus curiae brief filed in U.S. Supreme Court in Ohio v. Akron Center for Reproductive Health, Inc., 497 U.S. 502 (1990) and Hodgson v. Minnesota, 497 U.S. 417 (1990)]. Retrieved February 11, 2009, from http://www.apa.org/psyclaw/reproductivehealth.pdf

American Psychological Association. (2004, July 19). [Amicus curiae brief filed in U.S. Supreme Court in Roper v. Simmons, 543 U.S. 551 (2005)]. Retrieved February 11, 2009, from http://www.apa.org/psyclaw/roper-v-simmons.pdf

Ayotte v. Planned Parenthood of Northern New England, 546 U.S. 320 (2006).

Belter, R., & Grisso, T. (1984). Children's recognition of rights violations in counseling. *Professional Psychology: Research and Practice, 15,* 899–910.

Benthin, A., Slovic, P., & Severson, H. (1993). A psychometric study of adolescent risk perception. *Journal of Adolescence, 16,* 153–168.

Cauffman, E., Shulman, E., Steinberg, L., Claus, E., Banich, M., Graham, S., & Woolard, J. (in press). Age differences in affective decision making as indexed by performance on the Iowa Gambling Task. *Developmental Psychology.*

Cauffman, E., & Steinberg, L. (2000). (Im)maturity of judgment in adolescence: Why adolescents may be less culpable than adults. *Behavioral Sciences and the Law, 18,* 741–760.

Farrington, D. (2003). Developmental and life-course criminology: Key theoretical and empirical issues. *Criminology, 41,* 221–225.

Gilfoyle, N. (2005). Understanding APA's amicus curiae brief in *Roper v. Simmons.* Retrieved February 11, 2009, from http://www.apa.org/releases/ropervsimmons.html

Grisso, T. (1980). Juveniles' capacities to waive *Miranda* rights: An empirical analysis. *California Law Review, 68,* 1134–1166.

Grisso, T., & Steinberg, L. (2005). Between a rock and a soft place: Developmental research and the child advocacy process. *Journal of Clinical Child and Adolescent Psychology, 34,* 619–627.

Grisso, T., Steinberg, L., Woolard, J., Cauffman, E., Scott, E., Graham, S., et al. (2003). Juveniles' competence to stand trial: A comparison of adolescents' and adults' capacities as trial defendants. *Law and Human Behavior, 27,* 333–363.

Grisso, T., & Vierling, L. (1978). Minors' consent to treatment: A developmental perspective. *Professional Psychology, 9,* 412–426.

Grosbras, M., Jansen, M., Leonard, G., McIntosh, A., Osswald, K., Poulsen, C., et al. (2007). Neural mechanisms of resistance to peer influence in early adolescence. *Journal of Neuroscience, 27,* 8040–8045.

Gustafson, K., & McNamara, J. (1987). Confidentiality with minor clients: Issues and guidelines for therapists. *Professional Psychology: Research and Practice, 18,* 503–508.

Guttmacher Institute. (2009, February). Counseling and waiting periods for abortion. In *State policies in brief.* Retrieved February 11, 2009, from http://www.guttmacher.org/statecenter/spibs/spib_MWPA.pdf

Hale, S. (1990). A global developmental trend in cognitive processing speed. *Child Development, 61,* 653–663.

Harter, S. (1982). The Perceived Competence Scale for Children. *Child Development, 53,* 87–97.

Henshaw, S., & Kost, K. (1992). Parental involvement in minors' abortion decisions. *Family Planning Perspectives, 24,* 196–207, 213.

Hodgson v. Minnesota, 497 U.S. 417 (1990).

Inhelder, B., & Piaget, J. (1958). *The growth of logical thinking from childhood to adolescence.* New York: Basic Books.

Jacobs-Quadrel, M., Fischhoff, B., & Davis, W. (1993). Adolescent (in)vulnerability. *American Psychologist, 48,* 102–116.

Kail, R. (1997). Processing time, imagery, and spatial memory. *Journal of Experimental Child Psychology, 64,* 67–78.

Keating, D. (1980). Thinking processes in adolescence. In J. Adelson (Ed.), *Handbook of adolescent psychology* (pp. 211–246). New York: Wiley.

Keating, D. (2004). Cognitive and brain development. In R. Lerner & L. Steinberg (Eds.), *Handbook of adolescent psychology* (2nd ed.). New York: Wiley.

Monahan, K., Steinberg, L., & Cauffman, E. (2007). *Affiliation with antisocial peers, susceptibility to peer influence, and desistance from*

*antisocial behavior during the transition to adulthood.* Manuscript submitted for publication.

Overton, W. (1990). Competence and procedures: Constraints on the development of logical reasoning. In W. Overton (Ed.), *Reasoning, necessity, and logic: Developmental perspectives* (pp. 1–32). Hillsdale, NJ: Erlbaum.

Patton, J., Stanford, M., & Barratt, E. (1995). Factor structure of the Barratt Impulsiveness Scale. *Journal of Clinical Psychology, 51,* 768–774.

Paus, T., Toro, R., Leonard, G., Lerner, J., Lerner, R., Perron, M., et al. (2008). Morphological properties of the action-observation cortical network in adolescents with low and high resistance to peer influence. *Social Neuroscience, 3,* 303–316.

Poythress, N., Nicholson, R., Otto, R., Edens, J., Bonnie, R., Monahan, J., & Hoge, S. (1999). *The MacArthur Competence Assessment Tool—Criminal Adjudication: Professional manual.* Odessa, FL: Psychological Assessment Resources.

Psychological Corporation. (1999). *Wechsler Abbreviated Scale of Intelligence.* San Antonio, TX: Author.

Reiss, A., & Farrington, D. (1991). Advancing knowledge about co-offending: Results from a prospective longitudinal survey of London males. *Journal of Criminal Law and Criminology, 82,* 360–395.

Roper, D. (2004). [Brief of petitioner Donald P. Roper in Roper v. Simmons, 543 U.S. 551 (2005)]. Retrieved February 11, 2009, from http://supreme.lp.findlaw.com/supreme_court/briefs/03–633/03–633.mer.pet.rep.pdf

Roper v. Simmons, 543 U.S. 551 (2005).

Scott, E., Reppucci, N., & Woolard, J. (1995). Evaluating adolescent decision making in legal contexts. *Law and Human Behavior, 19,* 221–244.

Steinberg, L. (2007). Risk taking in adolescence: New perspectives from brain and behavioral science. *Current Directions in Psychological Science, 16,* 55–59.

Steinberg, L. (2008). A social neuroscience perspective on adolescent risk taking. *Developmental Review, 28,* 78–106.

Steinberg, L., Albert, D., Cauffman, E., Banich, M., Graham, S., & Woolard, J. (2008). Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: Evidence for a dual systems model. *Developmental Psychology, 44,* 1764–1778.

Steinberg, L., & Cauffman, E. (1996). Maturity of judgment in adolescence: Psychosocial factors in adolescent decision-making. *Law and Human Behavior, 20,* 249–272.

Steinberg, L., Graham, S., O'Brien, L., Woolard, J., Cauffman, E., & Banich, M. (2009). Age differences in future orientation and delay discounting. *Child Development, 80,* 28–44.

Steinberg, L., & Monahan, K. (2007). Age differences in resistance to peer influence. *Developmental Psychology, 43,* 1531–1543.

Steinberg, L., Mounts, N., Lamborn, S., & Dornbusch, S. (1991). Authoritative parenting and adolescent adjustment across various ecological niches. *Journal of Research on Adolescence, 1,* 19–36.

Steinberg, L., & Scott, E. (2003). Less guilty by reason of adolescence: Developmental immaturity, diminished responsibility, and the juvenile death penalty. *American Psychologist, 58,* 1009–1018.

Thompson-Schill, S. L., Jonides, J., Marshuetz, C., Smith, E. E., D'Esposito, M., Kan, I. P., et al. (2002). Effects of frontal lobe damage on interference effects in working memory. *Cognitve, Affective, and Behavioral Neuroscience, 2,* 109–120.

Weithorn, L., & Campbell, S. (1982). The competency of children and adolescents to make informed treatment decisions. *Child Development, 53,* 1589–1598.

Zimring, F. (1998). *American youth violence.* New York: Oxford University Press.

Zuckerman, M., Eysenck, S., & Eysenck, H. J. (1978). Sensation seeking in England and America: Cross-cultural, age, and sex comparisons. *Journal of Consulting and Clinical Psychology, 46,* 139–149.

# EXHIBIT 42



*Research Article*

# When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts

Psychological Science
2016, Vol. 27(4) 549–562
© The Author(s) 2016
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0956797615627625
pss.sagepub.com



Alexandra O. Cohen[1], Kaitlyn Breiner[2], Laurence Steinberg[3], Richard J. Bonnie[4], Elizabeth S. Scott[5], Kim A. Taylor-Thompson[6], Marc D. Rudolph[7], Jason Chein[3], Jennifer A. Richeson[8,9], Aaron S. Heller[10], Melanie R. Silverman[1], Danielle V. Dellarco[1], Damien A. Fair[7], Adriana Galván[2], and B. J. Casey[1]

[1]Department of Psychiatry, Sackler Institute for Developmental Psychobiology, Weill Cornell Medical College; [2]Department of Psychology, University of California, Los Angeles; [3]Department of Psychology, Temple University; [4]University of Virginia School of Law, University of Virginia; [5]Columbia Law School, Columbia University; [6]New York University School of Law, New York University; [7]Department of Behavioral Neuroscience and Psychiatry, Oregon Health & Science University; [8]Department of Psychology, Northwestern University; [9]Institute for Policy Research, Northwestern University; and [10]Department of Psychology, University of Miami

### Abstract

An individual is typically considered an adult at age 18, although the age of adulthood varies for different legal and social policies. A key question is how cognitive capacities relevant to these policies change with development. The current study used an emotional go/no-go paradigm and functional neuroimaging to assess cognitive control under sustained states of negative and positive arousal in a community sample of one hundred ten 13- to 25-year-olds from New York City and Los Angeles. The results showed diminished cognitive performance under brief and prolonged negative emotional arousal in 18- to 21-year-olds relative to adults over 21. This reduction in performance was paralleled by decreased activity in fronto-parietal circuitry, implicated in cognitive control, and increased sustained activity in the ventromedial prefrontal cortex, involved in emotional processes. The findings suggest a developmental shift in cognitive capacity in emotional situations that coincides with dynamic changes in prefrontal circuitry. These findings may inform age-related social policies.

### Keywords

adolescence, cognitive control, development, emotion, fMRI, legal policy, young adult

Received 8/6/15; Revision accepted 12/28/15

Definitions of adulthood in the United States differ according to state law and policy. Although most states set the age of majority at 18, the legal age for purchasing alcohol is 21 (Institute of Medicine & National Research Council, 2014), and the minimum age for criminal prosecution is 14 or younger in most states (Taylor-Thompson, 2014). In scientific studies, 18 is often used as the cutoff for adulthood even though government research policies, until recently, considered individuals under 21 to be minors. Thus, the legal definition of adulthood is fluid and imprecise. One consideration in defining adulthood is when behavior, and the underlying neural circuitry, can be said

to have reached maturity. Extant studies suggest that this may vary depending on the context in which adolescents are assessed. In the current study, we compared the development of cognitive control in neutral and emotionally arousing situations because the latter seem highly relevant to many policies relating to definitions of adulthood.

**Corresponding Author:**
B. J. Casey, Weill Cornell Medical College, Sackler Institute for Developmental Psychobiology, 1300 York Ave., Box 140, New York, NY 10065
E-mail: bjc2002@med.cornell.edu

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

Although a large developmental literature shows that adolescents' speed and accuracy on simple cognitive tasks can resemble adults' (Luna, Marek, Larsen, Tervo-Clemmens, & Chahal, 2015), mounting evidence suggests that contextual factors influence performance differentially as a function of age. Studies show that adolescence, typically defined as ages 13 through 17, is a time of heightened sensitivity to motivational, social, and emotional information (Casey, 2015; Steinberg, 2010). Specifically, during adolescence, cognitive-control capacities and decision making appear to be especially influenced by incentives (Galvan et al., 2006; Geier, Terwilliger, Teslovich, Velanova, & Luna, 2010; Somerville, Hare, & Casey, 2011; Van Leijenhorst et al., 2010), threats (Cohen-Gilbert & Thomas, 2013; Dreyfuss et al., 2014; Grose-Fifer, Rodrigues, Hoover, & Zottoli, 2013; Hare et al., 2008), and peers (Chein, Albert, O'Brien, Uckert, & Steinberg, 2011; Gardner & Steinberg, 2005). Behavioral regulation in response to these inputs has been shown to rely on prefrontal circuitry (Dreyfuss et al., 2014; Hare et al., 2008; Somerville et al., 2011), which shows marked change into the early 20s (Gogtay et al., 2004; Sowell et al., 2004).

Prominent neurobiological theories of adolescence suggest that dynamic and asymmetric trajectories in structural and functional development of limbic and prefrontal circuitry are implicated in motivated behavior and its control, respectively, and may lead to a propensity toward risky and impulsive actions (Casey, 2015; Casey, Getz, & Galvan, 2008; Ernst, Pine, & Hardin, 2006; Mills, Goddings, Clasen, Giedd, & Blakemore, 2014; Steinberg, 2010). Phylogenetically older brain regions, such as subcortical limbic regions, show nonlinear developmental changes and appear to be functionally sensitized during adolescence (Galvan et al., 2006; Hare et al., 2008; Raznahan et al., 2014), whereas development of prefrontal cortex (PFC) exhibits a roughly linear trajectory (Galvan et al., 2006; Gogtay et al., 2004; Sowell et al., 2004). Resting-state functional-connectivity data show prolonged development of long-range cortical connectivity that does not stabilize until the 20s (Dosenbach et al., 2011; Fair et al., 2009). Together, these results suggest continued refinement of brain circuitry, particularly prefrontal cortical circuitry, into young adulthood, but the behavioral implications of this protracted brain development remain unclear.

The current study compared the development of cognitive control under brief and prolonged states of emotional arousal and nonemotional states. We focused on the 18-to-21 age range given the protracted development of prefrontal circuitry and the particular legal and social relevance of this age group. Our key premise was that responses in emotional situations would provide insight on cognitive capacities relevant to social and legal policy, such as those related to criminal responsibility and accountability. Prior research examining motivational and social influences on cognitive capacities in young adults has used varying age ranges and experimental manipulations that have produced mixed results (Chein et al., 2011; Cohen-Gilbert et al., 2014; Silva, Shulman, Chein, & Steinberg, 2015; Steinberg et al., 2009). We attempted to control for several of these variables by testing the impact of both brief and sustained positive and negative emotional states on cognitive control, using predefined age groups as well as age as a continuous variable. We hypothesized that there would be a developmental shift in cognitive control in emotional situations that would correspond to dynamic changes in prefrontal circuitry. Specifically, we predicted that young adults 18 to 21 years old would differ from adults over age 21 in cognitive control in emotionally arousing conditions (as teens do) but not in neutral conditions.

## Method

### Participants

Participants were 110 individuals from a larger sample of 147 healthy, right-handed 13- to 25-year-olds who underwent functional MRI (fMRI) while performing an adapted emotional go/no-go task (Hare et al., 2008) under sustained emotional states of threat and excitement and under nonemotional states (Cohen et al., 2016). Data from 5 participants were excluded because of their poor overall performance (> 2 *SD* below the group's average performance as measured by $d'$). Data from 14 participants were excluded because of excessive head motion (more than 10% of time points within a run censored because of translational motion > 1.56 mm, or half a voxel, or rotational motion > 1°), and data from 18 participants were excluded because of technical problems that led to errors in coding and recording of behavioral data in the scanner. A total of 110 usable scans were included in the final analyses reported here (41 teens—23 females and 18 males, ages 13–17 years, *M* = 16.19, *SD* = 1.20; 35 young adults—17 females and 18 males, ages 18–21 years, *M* = 19.88, *SD* = 1.09; 34 adults—17 females and 17 males, ages 22–25 years, *M* = 24.08, *SD* = 1.04). Portions of the data from 38 adults in this sample are included in a separate report (Cohen et al., 2016) focusing on different experimental questions.

Participants were a diverse community sample recruited from New York City and Los Angeles as part of an ongoing multisite project. They self-identified as Caucasian (32.7%), African American (27.3%), Hispanic (24.6%), Asian (12.7%) and "other" (2.7%). The recruitment target for this portion of the study was 125 participants, in anticipation of 20% attrition due to excessive

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

head motion, poor performance, or technical issues. Because of exclusions due to poor task performance and technical issues in the scanner environment, 22 additional participants were run. Participants reported no use of psychotropic medications or past diagnoses of or treatment for psychiatric or neurological disorders. Adults and parents provided informed written consent, and minors provided assent. The institutional review board at each site approved the study.

### Experimental task

Participants completed a modified emotional go/no-go paradigm (Hare et al., 2008) called the Cognitive Control Under Emotion (CCUE) task (Cohen et al., 2016). In this task, happy, fearful, and calm emotional expressions (Fig. 1a) are presented as targets, which participants are instructed to respond to (go trials), and nontargets, which participants are instructed not to respond to (no-go trials). The task is performed in blocks of sustained anticipation of a negative event (aversive sound), a positive event (winning up to $100), and no event; each type of block is denoted with a different background color on the screen (Fig. 1b). (Further descriptions of this task and task-related neural activations are available in other

reports: Cohen et al., 2016; Dreyfuss et al., 2014; Hare et al., 2008; Somerville et al., 2011). Participants practiced the task prior to entering the scanner, so that they understood the instructions and conditions.

We included both blocks with a sustained state of threat and blocks with a sustained state of excitement in order to dissociate effects of arousal and effects of valence. Threat was induced by telling participants that they might experience an unpredictable aversive auditory stimulus. Excitement was induced by telling participants that they had a chance of winning up to $100. Participants were instructed that the probability of an event occurring, the volume of the noise, and the amount of money won would not be tied to their performance, but rather would be determined by the computer. They were also told that events of a given type would occur randomly, only when the background screen was a particular color (blue for one event and purple for the other). In reality, each participant heard the noise once and won $20 once over the course of the task, and these events occurred in a pseudorandomized order. Each event always occurred near the end of an experimental run, so that these time points could be eliminated from the analyses. During blocks of a sustained neutral state (depicted with a yellow background), participants were told there



**Fig. 1.** The Cognitive Control Under Emotion (CCUE) paradigm (from Cohen et al., 2016): (a) examples of the fearful, happy, and calm faces used as cues and (b) schematic of one run of the task. In a given run, participants were instructed to respond to one type of cue (go trials) and not to respond to another (no-go trials). These cues were presented within blocks of sustained negative emotion (anticipation of an unpredictable aversive noise), positive emotion (anticipation of an unpredictable monetary reward), and neutral emotion (no event anticipated); the block type was indicated by the background color of the screen (yellow, blue, or purple).

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

was no chance of either event occurring as they performed the task. Each state (75-s duration) was induced twice during each run.

Data were acquired in six 8-min 2-s runs (total of 48 min 12 s). Each run consisted of a unique combination of the emotional expressions that served as go and no-go cues (calm–go/fearful–no go, calm–go/happy–no go, happy–go/fearful–no go, happy–go/calm–no go, fearful–go/calm–no go, fearful–go/happy–no go), in a mixed-block event-related design. Run orders were pseudocounterbalanced, and pairing of the background color and emotional state was counterbalanced. Before each run, participants were told which type of emotional expression was the target and reminded of the meaning of each colored background. We then asked participants a series of four questions to be sure they were aware of each of these contingencies. On each trial, a face appeared for 500 ms; the intertrial interval was jittered (2–7 s). A total of 114 trials were presented in each run, in a pseudorandomized order (84 go trials and 30 no-go trials). For each emotional state, we acquired data on a total of 168 go trials and 60 no-go trials.

### Behavioral and psychophysiological data acquisition

Participants completed a final screening for MRI safety before being positioned in the scanner, with a five-button (New York) or four-button (Los Angeles) MR-compatible button box. The experimental task was presented using E-Prime 1.0 (New York) or 2.0 (Los Angeles; Psychology Software Tools, Inc., http://www.pstnet.com) and was projected onto a flat screen mounted in the scanner bore. Participants viewed the screen via a mirror mounted on a 12-channel head coil. Skin conductance response (SCR) was acquired using disposable, isotonic gel electrodes, which were attached to the first and second fingers of the left hand between the first and second phalanges. The electrode cables were grounded through a radio-frequency filter panel. During fMRI scanning, the skin conductance signal was recorded (200-Hz sampling) and amplified using a Biopac recording system and AcqKnowledge 4.0 software. E-Prime software was used to indicate the onset and offset of the emotional states during the task. SCR data were acquired from all the participants.

After exiting the scanner, participants were asked debriefing questions about the believability of task conditions. Specifically, they were asked how much they expected to win money or hear the noise during the blocks in which the background color signaled the possibility of those events (e.g., "Did you expect to win money more during the purple blocks than the blue or yellow blocks?"). Each question was answered using a 7-point Likert scale (1 = *not at all*, 7 = *very much*).

Collection of debriefing data from 2 of the 110 subjects was accidently omitted.

### fMRI data acquisition

Whole-brain fMRI data were acquired using Siemens Magnetom Trio 3.0-T scanners located at the Citigroup Biomedical Imaging Center at Weill Cornell College or at the Staglin Center for Cognitive Neuroscience at the University of California, Los Angeles. Scanning parameters were identical at the two data-collection sites. A high-resolution, T1-weighted magnetization-prepared rapid-acquisition gradient-echo (MPRAGE) sequence scan was acquired using Biomedical Informatics Research Network (Jovicich et al., 2006) optimized sequences with the following parameters: repetition time (TR) = 2,170 ms, echo time (TE) = 4.33 ms, 256-mm field of view (FOV), 160 sagittal slices with a thickness of 1.2 mm. Functional images were acquired using T2*-sensitive echo planar pulse sequences covering the full brain. Thirty-eight 4-mm-thick axial slices were acquired per 2,500-ms TR (TE = 30 ms, FOV = 200 mm, flip angle = 90°, 3.1- × 3.1- × 4.0-mm voxels).

### Behavioral data analysis

Behavioral data were analyzed for accuracy using the sensitivity index $d'$, which incorporates the rates of both hits and false alarms (Macmillan & Creelman, 2004). We calculated $d'$ by subtracting the normalized false alarm rate from normalized accuracy on go trials. Behavioral data, stimulus timing, and emotional-state timing were extracted and calculated using MATLAB and Statistics Toolbox Release 2013b (The MathWorks, Natick, MA). All statistical analyses of the behavioral data were conducted using R (Release 3.1.0; R Core Team, 2014). We tested for age-related differences in performance ($d'$) using analysis of variance (ANOVA) models that included sex and scanning site as between-subjects variables. To investigate performance responding to the emotional cues, without effects of emotional state, we tested for main effects of age group on performance with each cue type in the neutral state. To investigate performance during the emotional states, controlling for effects of the emotional cues, we tested for main effects of age group on performance responding to the calm face cues in each emotional state. A Bonferroni-adjusted alpha of less than .01 was used to correct for multiple comparisons in determining the statistical significance of these ANOVA results. Bonferroni-corrected post hoc $t$ tests were used to determine the statistical significance of differences between age groups. Linear and quadratic models were also fitted to each dependent variable, with age modeled continuously. As in the age-group analyses, we used a Bonferroni-adjusted

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

alpha of less than .01 to determine statistical significance. All analyses were performed on the data from the 110 subjects with usable imaging and behavioral data.

We examined responses to the debriefing questions and the SCR data to assess the efficacy of our emotional-state manipulation. A 1-Hz filter was applied to the raw SCR data. Data were smoothed for each subject. Six subjects had no SCR data because of technical difficulties in the collection of these data, and 29 of the remaining 104 participants had no discernible variation in SCR across the experiment or individual runs and so were removed from the SCR analyses. SCR slope was extracted for each emotional-state block within each run and was z-scored within subjects to account for individual differences in SCR. Each individual's average slope was calculated for each emotional state (excitement, threat, and neutral). Change in skin conductance was computed as the difference between average SCR slope in an aroused state (excitement or threat) and average SCR slope in the neutral state. Given the directionality of our hypotheses with respect to these validation measures, we performed one-tailed one-sample Student's $t$ tests to test whether responses to debriefing questions were significantly different from 1 (the lowest value on the 7-point scale) and whether SCR differences were significantly different from zero.

### fMRI data analysis

**Image processing.** Functional imaging data were preprocessed and analyzed using Analysis of Functional NeuroImages (AFNI) software (Cox, 1996). Preprocessing of functional scans included correction for slice-time acquisition using sinc interpolation, volume registration using a 6-parameter rigid-body transformation to account for head motion, and normalization to the Montreal Neurological Institute (MNI) 152 1-mm T1 template using a 12-parameter affine transformation and nonlinear transformations (AFNI *3dQWarp* function). Data were resampled to 3-mm isotropic voxels and were smoothed using a full-width/half-maximum Gaussian kernel of 6 mm. Signal intensity of each voxel time series was normalized to percentage signal change.

**Image analysis.** A general linear model (GLM) was created for each participant to estimate activation in response to the emotional cues and sustained-emotional-state blocks. To disentangle the neural responses to the cues and to the sustained states, which were presented simultaneously, we included 16 regressors in each participant's GLM: 6 task regressors for correct responses to the emotional cues (fearful, happy, or calm faces on go trials and fearful, happy, or calm faces on no-go trials), 3 task regressors modeling the longer (30-TR) sustained

emotional states (i.e., the threat, excitement, and neutral sustained states), an additional regressor corresponding to trials with incorrect responses (both go and no-go trials), and 6 motion estimation parameters. Baseline trends were estimated to capture shifts in signal change. Activation in response to the face cues was modeled with a three-parameter gamma hemodynamic-response function (HRF); activation during the sustained states was modeled using a single-parameter block HRF. Time points with motion greater than half a voxel (1.56 mm) were censored, along with the preceding and following time points.

Individual-level regression coefficients for the 110 participants were submitted to group linear mixed-effects (LME) analyses using the AFNI *3dLME* function (Chen, Saad, Britton, Pine, & Cox, 2013), which is robust to small amounts of missing data. All group-level analyses included a random intercept for each participant and included sex and scanning site as between-subjects variables. Separate models were used to assess effects of transient cues (modeled as brief events) and sustained states (modeled as prolonged blocks) on brain activity. The first group-level LME model assessed effects of the transient cues (fearful, happy, and calm faces) on go and no-go trials. The second group-level LME model assessed effects of the sustained states (threat, excitement, and neutral). Age-group contrasts (general linear tests) were specified within each model to directly probe the neural correlates of behavioral findings. Two additional models assessed effects of the emotional cues and emotional states as a function of exact age as a continuous variable (i.e., interactions of emotional cues or states with exact age).

In group whole-brain analyses, individual voxels were thresholded at a $p$ value of .005; the cluster-size threshold was a $p$ value of .05 after correction for multiple comparisons (performed using Monte Carlo simulation via the *3dClustSim* program in AFNI). For the threat condition, given our a priori hypotheses regarding differences in prefrontal activation, we used an anatomical region of interest (ROI) for the PFC (obtained from the Harvard-Oxford probabilistic atlas in FSL; http://fsl.fmrib.ox.ac.uk/fsl/fslwiki/; Smith et al., 2004). Similar to the PFC ROI in previous studies (e.g., Foerde, Steinglass, Shohamy, & Walsh, 2015), this ROI combined the frontal pole, superior frontal gyrus, middle frontal gyrus, inferior frontal gyrus (triangularis and opercularis), frontal medial cortex, subcallosal cortex, paracingulate gyrus, cingulate gyrus anterior division, and frontal orbital cortex bilaterally; a threshold of 50% probability was used for all subregions within the PFC. A $p$ value of .005 was used as the threshold for individual voxels ($p < .05$ after PFC volume correction for multiple comparisons was performed using Monte Carlo simulation via the *3dClustSim* program in AFNI). Regression coefficients for individual participants

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

were extracted from regions with significant effects and were tested for brain-behavior correlations in R (Release 3.1.0; R Core Team, 2014).

***Psychophysiological interaction analysis.*** Generalized psychophysiological interaction (gPPI) analyses (McLaren, Ries, Xu, & Johnson, 2012) were conducted in AFNI to examine task-dependent connectivity across the whole brain. Seed regions were the two PFC regions identified as having age-group effects. The gPPI analyses were carried out by removing sources of noise and artifact, deconvolving the neural signal, extracting the functional time course within the seed regions (5-mm spheres around peak activation), and convolving the time-course data with task timings and the canonical HRF (McLaren et al., 2012). The 16-regressor GLM used for the individual-level image analyses was implemented, but for the gPPI analyses, these models also included regressors for the seed time course and each Time Course × Task Condition interaction, for a total of 27 regressors. The group-level LME model (controlling for sex and scanning site) was used to test the specific age-group contrasts. Specifically, group-level LME models tested the effects of transient cues (fearful, happy, and calm faces) and sustained states (threat, excitement, and neutral) separately. Age-group contrasts (general linear tests) were specified within each model. The models used a $p$ threshold of .05, corrected for multiple comparisons at the whole-brain level using *3dClustSim*, as described previously.

## Results

### Behavioral results

***Validation of the paradigm.*** Responses to the debriefing questions and SCR slope differences were tested independently, so we used a Bonferroni-adjusted alpha of less than .025 in our validation tests. These validation measures were collapsed across age. Participants expected both the money, $t(107) = 24.49$, $p < .001$, $d = 3.35$, and loud noise, $t(107) = 31.87$, $p < .001$, $d = 4.36$, to occur during the blocks in which they were led to anticipate these possibilities (Fig. 2a).

Participants' mean SCR difference scores (arousal state minus neutral state) were positive for both the excitement condition, $t(74) = 1.92$, $p = .029$, $d = 0.32$, and the threat condition, $t(74) = 1.65$, $p = .051$, $d = 0.27$ (Fig. 2b). SCR difference scores for the excitement and threat conditions were not significantly different from each other, $t(74) = 0.26$, $p > .250$, $d = 0.04$. These validation results replicate previous results for adults performing this same task (Cohen et al., 2016).

***Main effects of age for each type of emotional cue.*** In the neutral-state blocks, there were significant main effects of age group on performance in response to fearful cues, $F(2, 98) = 11.11$, $p < .001$, $\eta_p^2 = .16$; happy cues, $F(2, 98) = 10.90$, $p < .001$, $\eta_p^2 = .15$; and calm cues, $F(2, 98) = 7.81$, $p < .001$, $\eta_p^2 = .10$ (see Fig. 3a and Behavioral Results and Figs. S1a and S2a in the Supplemental



**Fig. 2.** Validation of the Cognitive Control Under Emotion (CCUE) paradigm: (a) participants' mean ratings of how likely they thought they were to win money and hear a loud sound in the excitement and threat blocks, respectively, and (b) participants' mean skin conductance response (SCR) during those blocks relative to the neutral blocks. Error bars represent ±1 *SE*.

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

Material available online). Post hoc $t$ tests revealed that teens and young adults showed diminished performance relative to adults in response to fearful cues—teens versus adults: $t(62.39) = 4.08$, $p < .001$, $d = 0.95$; young adults versus adults: $t(64.82) = 3.33$, $p = .0019$, $d = 0.80$; teens versus young adults: $t(70.09) = 0.61$, $p > .250$, $d = 0.14$. However, young adults and adults showed enhanced performance relative to teens in response to happy cues—teens versus adults: $t(71.15) = 4.14$, $p < .001$, $d = 0.96$; young adults versus adults: $t(65.77) = 1.79$, $p > .250$, $d = 0.43$; teens versus young adults: $t(73.96) = 2.55$, $p = .042$, $d = 0.59$—and only teens and adults differed significantly in their performance with calm cues—teens versus adults: $t(64.05) = 3.54$, $p = .001$, $d = 0.82$; young adults versus adults: $t(64.60) = 1.56$, $p > .250$, $d = 0.38$; teens versus young adults: $t(71.54) = 2.14$, $p = .140$, $d = 0.49$.

We also examined effects of age as a continuous variable, fitting both linear and quadratic functions to performance with each cue type in the neutral-state blocks. Linear and quadratic functions significantly fit the data for all three cue types—fearful cues, linear: adjusted $R^2 = .12$, $p < .001$, $F(1, 108) = 15.68$; fearful cues, quadratic: adjusted $R^2 = .13$, $p < .001$, $F(2, 107) = 9.23$; happy cues, linear: adjusted $R^2 = .14$, $p < .001$, $F(1, 108) = 18.33$; happy cues, quadratic: adjusted $R^2 = .13$, $p < .001$, $F(2, 107) = 9.25$; calm cues, linear: adjusted $R^2 = .10$, $p < .001$, $F(1, 108) = 13.6$; calm cues, quadratic: adjusted $R^2 = .095$, $p = .002$, $F(2, 107) = 6.75$. However, the fit of the quadratic function completely overlapped with the fit of the linear function for the calm cues (see Fig. 4 for performance in response to calm cues in all three sustained emotional states and in response to fearful and happy cues in the neutral-state blocks).

***Main effects of age for each emotional state.*** There were significant main effects of age group on performance in response to calm cues when participants were in emotionally arousing states of threat, $F(2, 98) = 17.57$, $p < .001$, $\eta_p^2 = .24$ (Fig. 5a), and of excitement, $F(2, 98) = 8.65$, $p < .001$, $\eta_p^2 = .13$ (Fig. S1b). Post hoc $t$ tests revealed that, although young adults performed better than teens, teens and young adults both showed diminished performance relative to adults under the state of threat—teens versus adults: $t(60.47) = 5.40$, $p < .001$, $d = 1.24$; young adults versus adults: $t(59.51) = 2.75$, $p = .014$, $d = 0.66$; teens versus young adults: $t(73.25) = 3.25$, $p = .014$, $d = 0.64$. In contrast, only teens and adults' performance differed significantly under the state of excitement—teens versus adults: $t(58.52) = 4.28$, $p < .001$, $d = 0.98$; young adults versus adults: $t(66.95) = 2.03$, $p = .087$, $d = 0.49$; teens versus young adults: $t(61.39) = 1.83$, $p = .213$, $d = 0.42$.

We also examined effects of age as a continuous variable, fitting both linear and quadratic functions to performance in response to the calm cues in each emotional-state condition. We found that both linear and quadratic functions significantly fit the data in both the threat condition—linear function: adjusted $R^2 = .23$, $p < .001$, $F(1, 108) = 34.08$; quadratic function: adjusted $R^2 = .24$, $p < .001$, $F(2, 107) = 17.78$—and the excitement condition—linear function: adjusted $R^2 = .13$, $p < .001$, $F(1, 108) = 17.09$; quadratic function: adjusted $R^2 = .13$, $p < .001$, $F(2, 107) = 9.21$ (see Fig. 4).

## Imaging results

To probe the neural correlates of the observed behavioral effects, we examined blood-oxygen-level-dependent (BOLD) activity in the age-group contrasts specified in the group LME models for each emotional cue and state. Specifically, general linear tests comparing brain activity (relative to implicit baseline, i.e., overall baseline brain activity) of teens and young adults with that of adults were specified for the relevant conditions. We also examined BOLD activity using group LME models in which age was modeled continuously. For these models, in the absence of any specific general linear tests, we examined activation maps showing the interactions of age with type of emotional cue and emotional-state condition.

***Effects of emotional cues as a function of age.*** Two clusters survived whole-brain correction in the age-group analyses of response to fearful cues, showing less activity in teens and young adults than in adults: right dlPFC ($x = -41.5$, $y = -9.5$, $z = 36.5$, 47 voxels; $Z = -4.66$, $p < .02$, corrected; Figs. 3b and 3c) and right thalamus ($x = -20.5$, $y = 23.5$, $z = 6.5$, 57 voxels; $Z = -3.88$, $p < .02$, corrected). MR signal change in dlPFC was positively correlated with behavioral performance (in the neutral condition) responding to fearful cues across age, $r(108) = .203$, $p = .033$ (Fig. 3d), but this correlation did not remain significant when we controlled for age, $r(107) = .087$, $p = .365$. A general linear test corresponding to the behavioral result was performed for happy cues in the group-level emotional-cue model to compare brain activity (relative to implicit baseline) of teens with that of adults and young adults in response to happy cues. A single cluster in the right inferior frontal gyrus ($x = -32.5$, $y = -24.5$, $z = -11.5$, 30 voxels; $Z = -4.18$, $p < .02$, corrected) survived whole-brain correction, showing more activity in teens than in both young adults and adults (see Imaging Results and Figs. S2b and S2c in the Supplemental Material). No clusters survived whole-brain correction in the analyses of activation in response to calm cues, and no interactions of emotional cue with age group were observed.

Four clusters in the dorsal anterior cingulate cortex (dACC), parietal cortex, and right and left cerebellum survived whole-brain correction when we examined the

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

556



**Fig. 3.** Results for the fearful cues. The graph in (a) shows mean performance in response to the brief fearful cues in the neutral-state condition, as indexed by $d'$, for each of the age groups. The brain image in (b) shows the location of the region in the dorsolateral prefrontal cortex (dlPFC) for which signal-change results are presented. The graphs in (c) and (d) show mean signal change in the dlPFC in response to the fearful cues for each age group and as a function of $d'$ in the neutral-state condition (separately for each age group), respectively. The brain image in (f) shows the location of the regions in the dorsal anterior cingulate cortex (dACC) and parietal cortex for which mean signal change in response to the fearful cues is graphed as a function of $d'$ in the neutral-state condition, separately for each age group, in (e) and (g). Error bars represent ±1 *SE*. Asterisks indicate significant differences (\*\**p* < .01, \*\*\**p* < .001).

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016



**Fig. 4.** Scatterplots showing male and female participants' performance, as indexed by *d′*, as a function of age, along with linear and quadratic functions fitted to the data. Results are shown for each kind of emotional cue in the neutral-state condition, as well as for calm cues in the threat and excitement conditions.

interaction of age as a continuous variable with type of emotional cue (see Table S1 in the Supplemental Material). In the two largest regions, the dACC and the parietal cortex (Fig. 3f), activity in response to fearful cues was positively correlated with age, *r*(108) = .196, *p* = .040, and *r*(108) = .32, *p* < .001, respectively. MR signal change in response to happy cues was negatively correlated with age in the dACC, *r*(108) = −.189, *p* = .048, but not in the parietal cortex, *r*(108) = −.164, *p* = .087. Activity in response to calm cues was not significantly correlated with age in either of these regions, *r*(108) = −.088, *p* = .363, and *r*(108) = −.079, *p* = .412, respectively.

We examined whether changes in dACC and parietal activity in response to fearful cues were correlated with behavioral performance. In both of these regions, MR signal change in response to fearful cues was positively correlated with *d′* in the neutral-state condition, *r*(108) = .222, *p* = .020, and *r*(108) = .359, *p* < .001, respectively (Figs. 3e and 3g). Similar patterns were observed even when we controlled for age, *r*(107) = .166, *p* = .081, and *r*(107) = .277, *p* = .002. These results suggest that these

regions are important for behavioral performance of the task.

***Effects of emotional states as a function of age.***
Although no activations survived whole-brain correction for the contrast of age groups in emotional states, a single cluster in the ventromedial PFC (vmPFC; *x* = 3.5, *y* = −33.5, *z* = −17.5, 13 voxels; *Z* = 3.58, *p* < .05, PFC corrected; Fig. 5b) survived PFC volume correction for responses in the state of threat. Teens' and young adults' BOLD activity in the vmPFC during the threat condition showed a sustained increase relative to adults' (Fig. 5c). MR signal change in this region in the threat condition was negatively correlated with behavioral performance (in response to the calm cues) in the threat condition, *r*(108) = −.308, *p* = .001 (Fig. 5d), and this correlation remained significant even when we controlled for age, *r*(107) = −.215, *p* = .023, and when we removed the one extreme outlier, *r*(107) = −.253, *p* = .008. No interactions of emotional state with age group were observed. In analyses for the excitement

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016



**Fig. 5.** Results for the sustained-threat condition. The graph in (a) shows mean performance on calm-cue trials, as indexed by $d'$, for each of the age groups under the sustained state of threat. The brain image in (b) shows the location of the region in ventromedial prefrontal cortex (vmPFC) for which signal-change results are presented. The graphs in (c) and (d) show mean signal change in the vmPFC in the threat condition for each age group and as a function of $d'$ on calm-cue trials (separately for each age group), respectively. The brain images in (f) show the location of the regions in the dorsal anterior cingulate cortex (dACC) and posterior parietal cortex (PPC) for which functional coupling with the vmPFC is graphed for the three age groups in (e) and (g), respectively. Error bars represent ±1 *SE*. The asterisk indicates a significant difference (*p < .05, ***p < .001).

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

and neutral-state conditions, no clusters survived whole-brain or PFC volume correction.

A single cluster in the parietal cortex ($x = -2.5$, $y = 68.5$, $z = 54.5$, 29 voxels; $F = 11.90$, $p < .05$, corrected) survived whole-brain correction when we examined the interaction of emotional state and age as a continuous variable (see Fig. S3 in the Supplemental Material). MR signal change in this region showed similar positive associations with age in the threat and excitement conditions, $r(108) = .181$, $p = .058$, and $r(108) = .305$, $p = .001$, respectively, but not in the neutral-state condition, $r(108) = .151$, $p = .116$. Because BOLD activity in the threat and excitement conditions showed positive correlations with age, we collapsed the MR signal across these conditions and tested for associations between activation in this region and behavioral performance (in response to the calm cues) in these conditions. MR signal change was positively correlated with behavioral performance, $r(108) = .209$, $p = .028$ (see Fig. S3), but this correlation did not hold when we controlled for age, $r(107) = .11$, $p = .251$.

**Seed-based functional connectivity with prefrontal regions in the three age groups.** Whole-brain gPPI analyses were performed using the dlPFC and vmPFC regions as seeds. Nine clusters of voxels showing significantly less functional coupling with the vmPFC in teens and young adults than in adults across the threat condition were observed (see Table S2 in the Supplemental Material). Areas showing this pattern included the dACC (Figs. 5e and 5f) and posterior parietal cortex (Figs. 5f and 5g). No significant clusters were observed in the age-group contrast for fearful cues using the dlPFC seed.

## Discussion

Our findings suggest a developmental shift in cognitive control in negative emotional situations during young adulthood that is paralleled by dynamic developmental changes in prefrontal circuitry. Specifically, young adults showed diminished cognitive control under both brief and prolonged negative emotional arousal relative to slightly older adults, a pattern not observed in neutral or positive situations. This behavioral pattern was paralleled by altered recruitment of lateral and medial prefrontal circuitry in young adults and adolescents, a finding consistent with structural imaging studies showing protracted development of prefrontal circuitry (Gogtay et al., 2004; Sowell et al., 2004).

Teens' and young adults' diminished cognitive control in response to negative cues was paralleled by their decreased activity in cognitive-control circuitry. When presented with fearful cues, teens and young adults showed less activity than older adults in dlPFC, a region implicated in affective and cognitive regulation (Silvers

et al., 2015; Vincent et al., 2008), and in the dACC and parietal cortex. The dlPFC and parietal cortex have reciprocal projections with the dACC, and all three regions have been implicated in cognitive control and are coactivated during cognitive-control tasks (Botvinick, Nystrom, Fissell, Carter, & Cohen, 1999; Platt & Glimcher, 1999; Roy, Shohamy, & Wager, 2012). Further, activity in these regions not only was consistently lower in younger participants, but also was positively correlated with task performance. Together, these findings are consistent with the hypothesis that lower levels of activity within this circuitry in younger individuals reflects diminished cognitive control in the face of negative emotional cues that signal potential threat in the environment.

Although under sustained states of negative emotional arousal (threat), young adults performed better than teens, they performed worse than adults. Teens' and young adults' diminished performance relative to adults in the threat condition was paralleled by increased activity in the vmPFC. This region has been implicated in various processes, including self-referential thought and integration of affective information, and is a proposed hub for affective computations and regulation (Roy et al., 2012). Increased sustained recruitment of the vmPFC under threat in teens and young adults may suggest heightened sensitivity to potential threat, leading to emotional interference and diminished cognitive control. This interpretation is supported in part by our finding of decreased functional coupling of the vmPFC with cognitive-control circuitry of the dACC and posterior parietal cortex in the threat condition among teens and young adults relative to adults. The negative functional connectivity between cognitive and emotional brain regions during this emotional state may underlie the poorer performance of the younger age groups.

Taken together, these findings suggest that young adulthood is a time when cognitive control is still vulnerable to negative emotional influences, in part as a result of continued development of lateral and medial prefrontal circuitry. This temporal developmental shift in cognitive-control capacity in negatively arousing situations relative to neutral (or positive) situations is consistent with the classic notion of developmental cascades in brain and behavior (Casey, Galván, & Somerville, 2015; Masten & Cicchetti, 2010). Accordingly, dynamic brain changes during late adolescence may enhance receptivity to or processing of emotional inputs in order to facilitate meeting changing socioemotional pressures that accompany adulthood (Casey et al., 2015).

Our findings have potential implications for informing age-related legal and social policies. Developmental findings based largely on teens have been referenced in several U.S. Supreme Court decisions regarding treatment of juvenile offenders over the past decade, with the Court

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

acknowledging immature cognitive functioning in juveniles as a mitigating factor in judgments of criminal culpability (Cohen & Casey, 2014; Scott, 2013; Steinberg, 2013). Scientific research has demonstrated that adolescents show heightened sensitivity to motivational and socioemotional information, which potentially renders them more vulnerable to poor decision making in these situations, compared with younger and older individuals (Chein et al., 2011; Cohen-Gilbert & Thomas, 2013; Dreyfuss et al., 2014; Galvan et al., 2006; Grose-Fifer et al., 2013; Hare et al., 2008; Somerville et al., 2011; Steinberg et al., 2009). The extension of this work to young adults, who show diminished cognitive control relative to slightly older adults in negative emotional situations, may have implications for legal policy. This is not to suggest that teens and young adults should not be held accountable for their actions, but rather, the boundaries of juvenile-court jurisdiction, criminal-court sentencing, and punishment may be informed by developmental considerations (Bonnie & Scott, 2013).

The implications of our findings must be considered within the limitations of the study. First, behaviors were measured within a controlled research setting. Although the emotionally arousing conditions may be relevant to emotional arousal in the real world, they were limited to experimentally manipulated emotional conditions that did not capture the complex real-world situations in which individuals typically make decisions. Second, the sample, although community based and representative of the racial and ethnic distribution in Los Angeles and New York City, was relatively small, with 110 participants 13 to 25 years of age; replication of these findings is warranted.

Prior research examining motivational and social influences on cognitive capacities in young adults as a unique age group has produced mixed results (Chein et al., 2011; Cohen-Gilbert et al., 2014; Silva et al., 2015; Steinberg et al., 2009). The present and previous findings suggest that teens' and young adults' cognitive capacities may be affected differently by various situations. For instance, although negative emotional arousal may diminish cognitive control in both teens and young adults, positive emotional arousal and the presence of peers may not influence young adults as strongly as teens (Chein et al., 2011). Identifying specific situations in which the behavior of young adults may differ from that of slightly older adults will be important in informing potential changes to existing policies and laws. Moreover, further examination of changes in brain structure, activity, and connectivity during this developmental period may provide clearer insights into why and when researchers may or may not observe group-level behavioral changes in young adults.

We examined the influence of emotional arousal on cognitive control from early adolescence through the mid 20s and found that negative emotional arousal, brief or prolonged, affects this capacity in individuals ages 18 to 21 more than in older individuals. Few studies have examined cognitive capacities under emotional influences, and fewer still have taken this approach to study developmental differences in capacities of potential relevance to legal and social policies. Our findings provide support for consideration of contextual influences on behavior and brain function, such as the influence of emotional arousal, when evaluating appropriate age cutoffs for such policies. Although the data in this study do not speak directly to these policy issues, they may inform dialogues about the age of adulthood in a variety of social and policy contexts.

### Author Contributions

B. J. Casey, A. Galván, and L. Steinberg developed the study concept. A. O. Cohen, K. Breiner, A. S. Heller, M. R. Silverman, and D. V. Dellarco collected the data and performed data analysis under the supervision of B. J. Casey and A. Galván. All authors contributed to interpretation of the data. A. O. Cohen and B. J. Casey drafted the manuscript, and all authors provided critical revisions and approved the final version of the manuscript for submission.

### Acknowledgments

We gratefully acknowledge the assistance of Doug Ballon, Kristine Caudle, Jonathan Dyke, Hillary Raab, Ahrareh Rahdar, and the Citigroup Biomedical Imaging Center at Weill Cornell Medical College. We thank the anonymous reviewers for their constructive feedback.

### Declaration of Conflicting Interests

B. J. Casey and L. Steinberg serve as paid consultants to the John D. and Catherine T. MacArthur Foundation. The authors declared that they have no other conflicts of interest with respect to their authorship or the publication of this article.

### Funding

This work was supported by a National Science Foundation Graduate Research Fellowship (to A. O. Cohen). Preparation of this article was supported by a grant from the John D. and Catherine T. MacArthur Foundation to Vanderbilt University. Its contents reflect the views of the authors, and do not necessarily represent the official views of either the John D. and Catherine T. MacArthur Foundation or the MacArthur Foundation Research Network on Law and Neuroscience (www.lawneuro.org).

### Supplemental Material

Additional supporting information can be found at http://pss.sagepub.com/content/by/supplemental-data

### Open Practices

The data reported here are part of an ongoing multisite project. An optimized version of the Cognitive Control Under Emotion

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

(CCUE) task (both behavioral and jittered for use in the scanner) will soon be made available at https://www.sacklerinstitute.org/cornell/assays_and_tools/. The complete Open Practices Disclosure for this article can be found at http://pss.sagepub.com/content/by/supplemental-data.

## References

Bonnie, R. J., & Scott, E. S. (2013). The teenage brain: Adolescent brain research and the law. *Current Directions in Psychological Science, 22*, 158–161.

Botvinick, M., Nystrom, L. E., Fissell, K., Carter, C. S., & Cohen, J. D. (1999). Conflict monitoring versus selection-for-action in anterior cingulate cortex. *Nature, 402*, 179–181.

Casey, B. J. (2015). Beyond simple models of self-control to circuit-based accounts of adolescent behavior. *Annual Review of Psychology, 66*, 295–319.

Casey, B J, Galván, A., & Somerville, L. (2015). Beyond simple models of adolescence to an integrated circuit-based account: A commentary. *Developmental Cognitive Neuroscience.* Advance online publication. doi:10.1016/j.dcn.2015.12.006

Casey, B. J., Getz, S., & Galvan, A. (2008). The adolescent brain. *Developmental Review, 28*, 62–77.

Chein, J., Albert, D., O'Brien, L., Uckert, K., & Steinberg, L. (2011). Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry. *Developmental Science, 14*, F1–F10.

Chen, G., Saad, Z. S., Britton, J. C., Pine, D. S., & Cox, R. W. (2013). Linear mixed-effects modeling approach to FMRI group analysis. *NeuroImage, 73*, 176–190.

Cohen, A. O., & Casey, B. J. (2014). Rewiring juvenile justice: The intersection of developmental neuroscience and legal policy. *Trends in Cognitive Sciences, 18*, 63–65.

Cohen, A. O., Dellarco, D. V., Breiner, K., Helion, C., Rahdar, A., Pedersen, G., . . . Casey, B. J. (2016). The impact of emotional states on cognitive control circuitry and function. *Journal of Cognitive Neuroscience 28*, 446–459.

Cohen-Gilbert, J. E., Killgore, W. D. S., White, C. N., Schwab, Z. J., Crowley, D. J., Covell, M. J., . . . Silveri, M. M. (2014). Differential influence of safe versus threatening facial expressions on decision-making during an inhibitory control task in adolescence and adulthood. *Developmental Science, 17*, 212–223.

Cohen-Gilbert, J. E., & Thomas, K. M. (2013). Inhibitory control during emotional distraction across adolescence and early adulthood. *Child Development, 84*, 1954–1966.

Cox, R. W. (1996). AFNI: Software for analysis and visualization of functional magnetic resonance neuroimages. *Computers and Biomedical Research, 29*, 162–173.

Dosenbach, N. U. F., Nardos, B., Cohen, A. L., Fair, D. A., Power, D., Church, J. A., . . . Schlaggar, B. L. (2011). Prediction of individual brain maturity using fMRI. *Science, 329*, 1358–1361.

Dreyfuss, M., Caudle, K., Drysdale, A. T., Johnston, N. E., Cohen, A. O., Somerville, L. H., . . . Casey, B. J. (2014). Teens impulsively react rather than retreat from threat. *Developmental Neuroscience, 36*, 220–227.

Ernst, M., Pine, D. S., & Hardin, M. (2006). Triadic model of the neurobiology of motivated behavior in adolescence. *Psychological Medicine, 36*, 299–312.

Fair, D. A., Cohen, A. L., Power, J. D., Dosenbach, N. U., Church, J. A., Miezin, F. M., . . . Petersen, S. E. (2009). Functional brain networks develop from a "local to distributed" organization. *PLoS Computational Biology, 5*(5), Article 381. doi:10.1371/journal.pcbi.1000381

Foerde, K., Steinglass, J. E., Shohamy, D., & Walsh, B. T. (2015). Neural mechanisms supporting maladaptive food choices in anorexia nervosa. *Nature Neuroscience, 18*, 1571–1573. doi:10.1038/nn.4136

Galvan, A., Hare, T. A., Parra, C. E., Penn, J., Voss, H., Glover, G., & Casey, B. J. (2006). Earlier development of the accumbens relative to orbitofrontal cortex might underlie risk-taking behavior in adolescents. *The Journal of Neuroscience, 26*, 6885–6892. doi:10.1523/JNEUROSCI.1062-06.2006

Gardner, M., & Steinberg, L. (2005). Peer influence on risk taking, risk preference, and risky decision making in adolescence and adulthood: An experimental study. *Developmental Psychology, 41*, 625–635.

Geier, C. F., Terwilliger, R., Teslovich, T., Velanova, K., & Luna, B. (2010). Immaturities in reward processing and its influence on inhibitory control in adolescence. *Cerebral Cortex, 20*, 1613–1629.

Gogtay, N., Giedd, J. N., Lusk, L., Hayashi, K. M., Greenstein, D., Vaituzis, A. C., . . . Thompson, P. M. (2004). Dynamic mapping of human cortical development during childhood through early adulthood. *Proceedings of the National Academy of Sciences, USA, 101*, 8174–8179.

Grose-Fifer, J., Rodrigues, A., Hoover, S., & Zottoli, T. (2013). Attentional capture by emotional faces in adolescence. *Advances in Cognitive Psychology, 9*, 81–91.

Hare, T. A., Tottenham, N., Galvan, A., Voss, H. U., Glover, G. H., & Casey, B. J. (2008). Biological substrates of emotional reactivity and regulation in adolescence during an emotional go-nogo task. *Biological Psychiatry, 63*, 927–934.

Institute of Medicine & National Research Council. (2014). *Investing in the health and well-being of young adults* (R. J. Bonnie, C. Stroud, & H. Breiner, Eds.). Washington, DC: The National Academies Press.

Jovicich, J., Czanner, S., Greve, D., Haley, E., van der Kouwe, A., Gollub, R., . . . Dale, A. (2006). Reliability in multisite structural MRI studies: Effects of gradient non-linearity correction on phantom and human data. *NeuroImage, 30*, 436–443.

Luna, B., Marek, S., Larsen, B., Tervo-Clemmens, B., & Chahal, R. (2015). An integrative model of the maturation of cognitive control. *Annual Review of Neuroscience, 38*, 151–170.

Macmillan, N. A., & Creelman, C. D. (2004). *Detection theory: A user's guide* (2nd ed.). Mahwah, NJ: Erlbaum.

Masten, A. S., & Cicchetti, D. (2010). Developmental cascades. *Development and Psychopathology, 22*, 491–495.

McLaren, D. G., Ries, M. L., Xu, G., & Johnson, S. C. (2012). A generalized form of context-dependent psychophysiological interactions (gPPI): A comparison to standard approaches. *NeuroImage, 61*, 1277–1286.

Mills, K. L., Goddings, A.-L., Clasen, L. S., Giedd, J. N., & Blakemore, S.-J. (2014). The developmental mismatch in structural brain maturation during adolescence. *Developmental Neuroscience, 36*, 147–160.

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

*Cohen et al.*

Platt, M. L., & Glimcher, P. W. (1999). Neural correlates of decision variables in parietal cortex. *Nature, 400*, 233–238.

R Core Team. (2014). *R: A language and environment for statistical computing.* Retrieved from https://cran.r-project.org/doc/manuals/r-release/fullrefman.pdf

Raznahan, A., Shaw, P. W., Lerch, J. P., Clasen, L. S., Greenstein, D., Berman, R., . . . Giedd, J. N. (2014). Longitudinal four-dimensional mapping of subcortical anatomy in human development. *Proceedings of the National Academy of Sciences, USA, 111*, 1592–1597.

Roy, M., Shohamy, D., & Wager, T. D. (2012). Ventromedial prefrontal-subcortical systems and the generation of affective meaning. *Trends in Cognitive Sciences, 16*, 147–156.

Scott, E. S. (2013). "Children are different": Constitutional values and justice policy. *Ohio State Journal of Criminal Law, 11*, 71–105.

Silva, K., Shulman, E. P., Chein, J., & Steinberg, L. (2015). Peers increase late adolescents' exploratory behavior and sensitivity to positive and negative feedback. *Journal of Research on Adolescence.* Advance online publication. doi:10.1111/jora.12219

Silvers, J. A., Weber, J., Wager, T. D., & Ochsner, K. N. (2015). Bad and worse: Neural systems underlying reappraisal of high- and low-intensity negative emotions. *Social Cognitive and Affective Neuroscience, 10*, 172–179.

Smith, S. M., Jenkinson, M., Woolrich, M. W., Beckmann, C. F., Behrens, T. E. J., Johansen-Berg, H., . . . Matthews, P. M. (2004). Advances in functional and structural MR image analysis and implementation as FSL. *NeuroImage, 23*, 208–219.

Somerville, L. H., Hare, T., & Casey, B. J. (2011). Frontostriatal maturation predicts cognitive control failure to appetitive cues in adolescents. *Journal of Cognitive Neuroscience, 23*, 2123–2134.

Sowell, E. R., Thompson, P. M., Leonard, C. M., Welcome, S. E., Kan, E., & Toga, A. W. (2004). Longitudinal mapping of cortical thickness and brain growth in normal children. *The Journal of Neuroscience, 24*, 8223–8231.

Steinberg, L. (2010). A dual systems model of adolescent risk-taking. *Developmental Psychobiology, 52*, 216–224.

Steinberg, L. (2013). The influence of neuroscience on U.S. Supreme Court decisions involving adolescents' criminal culpability. *Nature Reviews Neuroscience, 14*, 513–518.

Steinberg, L., Graham, S. J., O'Brien, L., Woolard, J., Cauffman, E., & Banich, M. (2009). Age differences in future orientation and delay discounting. *Child Development, 80*, 28–44.

Taylor-Thompson, K. (2014). Minority rule: Redefining the age of criminality. *N.Y.U. Review of Law & Social Change, 38*, 143–200.

Van Leijenhorst, L., Zanolie, K., Van Meel, C. S., Westenberg, P. M., Rombouts, S. A. R. B., & Crone, E. A. (2010). What motivates the adolescent? Brain regions mediating reward sensitivity across adolescence. *Cerebral Cortex, 20*, 61–69.

Vincent, J. L., Kahn, I., Snyder, A. Z., Raichle, M. E., Buckner, R. L., Philippi, C. L., . . . Raichle, M. E. (2008). Evidence for a frontoparietal control system revealed by intrinsic functional connectivity. *Journal of Neurophysiology, 100*, 3328–3342.

Downloaded from pss.sagepub.com at UNIV OF MIAMI on June 21, 2016

# EXHIBIT 43

# OLD ENOUGH TO FIGHT, OLD ENOUGH TO SWIPE: A CRITIQUE OF THE INFANCY RULE IN THE FEDERAL CREDIT CARD ACT

Andrew A. Schwartz[*]

## I. INTRODUCTION

In the 1960s and 1970s, American society came to the considered conclusion that if eighteen-year-olds can be drafted to fight and possibly die for their country, they should be treated as adults under the law. Thus, in 1971, the Twenty-Sixth Amendment to the United States Constitution, which lowered the voting age from twenty-one to eighteen, was proposed and ratified in just three months, making it the fastest amendment to be ratified in American history. The minimum age for federal and state jury service was also lowered from twenty-one to eighteen. And, with regard to contract law, every state passed legislation reducing the age of contractual capacity to eighteen. These changes overrode the centuries-old common law rule that one becomes an adult, in the eyes of the law, at age twenty-one—this being premised on the then-relevant custom that Englishmen became eligible for knighthood at that age. Despite the fact that all of these reforms remain in place, the federal Credit CARD Act of 2009 (CARD Act) established twenty-one as the minimum age to contract for a credit card.[1]

[*] © 2011 Andrew A. Schwartz, Associate Professor of Law, University of Colorado Law School. I thank Allison Schwartz and Harry Surden for helpful comments on prior drafts, and Carolyn Black and Jane Thompson for research assistance. I also thank the moderator and my codiscussants at the AALS Section on Commercial and Related Consumer Law roundtable discussion on the Credit CARD Act of 2009 for an engaging and enlightening conversation. This Article is dedicated to a true infant, my one-year-old son, Morris Jacob Schwartz.

[1] Credit Card Accountability Responsibility and Disclosure (CARD) Act of 2009, Pub. L. No. 111-24, § 1, 123 Stat. 1734, 1734. The full text of the relevant section is as follows:

> Section 127(c) of the Truth in Lending Act (15 U.S.C. 1637(c)) is amended by adding at the end the following:
> (8) APPLICATIONS FROM UNDERAGE CONSUMERS.—
> (A) PROHIBITION ON ISSUANCE.—No credit card may be issued to, or open end consumer credit plan established by or on behalf of, a consumer who has not attained the age of 21, unless the consumer has submitted a written application to the card issuer that meets the requirements of subparagraph (B).
> (B) APPLICATION REQUIREMENTS.—An application to open a credit card account by a consumer who has not attained the age of 21 as of the date of submission of the application shall require—
> (i) the signature of a cosigner, including the parent, legal guardian, spouse, or any other individual who has attained the age of 21 having a means to repay debts incurred by the consumer in connection with the account, indicating joint

This Article criticizes the "infancy rule" of the CARD Act, found in section 301, for two reasons. First, in the late twentieth century, we decided that eighteen-year-olds are adults that deserve to be treated with dignity by the law, and this view has not changed. This basic principle was the driving force behind the Twenty-Sixth Amendment to the United States Constitution, which in 1971 lowered the minimum voting age to eighteen, as well as state and federal statutes that lowered the age for jury service to eighteen, not to mention the state statutes lowering the age of contractual capacity to eighteen. In declaring all those under twenty-one to be infants, section 301 runs badly afoul of this broad societal consensus, rolls back the clock to medieval times, and undermines the dignity of eighteen-year-olds.

Second, separate and apart from the harm section 301 directly inflicts on young people, the CARD Act's infancy rule hurts society at large. This is because the state statutory reforms of the 1970s that endowed eighteen-year-olds with the capacity to enter into binding contracts ushered in the new and hugely beneficial phenomenon of youthful entrepreneurship. Young people, aged eighteen to twenty, were now able to obtain credit and found start-up companies. Such youthful entrepreneurs included Bill Gates, who founded Microsoft at age nineteen, and Mark Zuckerberg, who founded Facebook at the same age. These and other youthful start-ups employ hundreds of thousands of people, and their products and services improve our lives. Under section 301 of the CARD Act, however, they likely never would have been launched. In short, by hampering youthful entrepreneurship, section 301 harms not only the youths themselves, but society as a whole.

This Article proceeds as follows. Part II recounts the history of legal adulthood, showing that it was originally set at twenty-one years in the Middle Ages, but was subsequently lowered in the late twentieth century. This Part focuses on four areas—voting, jury service, death eligibility and contracting—and elaborates on how extending the right to contract to eighteen-year-olds created a new class of youthful entrepreneurs. Part III describes section 301 of the CARD Act and criticizes it for contradicting our modern view of adulthood and for undermining socially beneficial youthful entrepreneurship. Part IV concludes with a call to repeal section 301.[2]

---

liability for debts incurred by the consumer in connection with the account before the consumer has attained the age of 21; or

(ii) submission by the consumer of financial information, including through an application, indicating an independent means of repaying any obligation arising from the proposed extension of credit in connection with the account.

(C) SAFE HARBOR.—The Board shall promulgate regulations providing standards that, if met, would satisfy the requirements of subparagraph (B)(ii).

CARD Act § 301.

[2] An alternative course would be for Congress to replace section 301 with a provision establishing a maximum credit line of, say, $10,000 for those under twenty-one. Simple

## II. EVOLVING STANDARDS OF INFANCY[3]

From as far back as precedents stretch, our law has always imposed a minimum age for engaging in weighty aspects of public and private life, such as serving as a juror, voting, and making contracts.[4] This is known as the "infancy" doctrine. The underlying policy of the rule is, of course, that children lack the necessary maturity and experience to be trusted to make sensible choices on important subjects, such as whether to impose the death penalty on a fellow citizen.

But where should the line between infancy and adulthood be drawn? A four-year-old is clearly an infant, and a forty-year-old is clearly an adult. But what about close cases, like that of a precocious seventeen-year-old who lives with her parents but has already graduated from college? Courts can resolve close cases such as this, generally speaking, in one of two ways. One alternative is to draw a bright-line rule at a certain age and take no account of individual characteristics. The other is to decide on a case-by-case basis whether the specific person is mature enough to be treated by the law as an adult. Each approach has its merits and demerits.[5] A bright-line rule is likely to be both over- and underinclusive, but also predictable and inexpensive.[6] A flexible standard may be more fair and accurate, but also more costly to administer and difficult to predict.[7]

Beginning in the thirteenth century,[8] the common-law courts universally embraced a bright-line rule setting legal adulthood at twenty-one years. In the eyes

---

repeal of section 301 would be preferable for the reasons discussed in this Article, but a provision establishing a maximum credit line would respond to the animating concern of section 301 (i.e., that those under twenty-one are too immature to handle credit) while ameliorating some of the problems of the present prohibition.

[3] *Cf.* Trop v. Dulles, 356 U.S. 86, 101 (1958) (holding that the Eighth Amendment to the United States Constitution, which bans "cruel and unusual" punishment, "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society").

[4] WENDELL W. CULTICE, YOUTH'S BATTLE FOR THE BALLOT: A HISTORY OF VOTING AGE IN AMERICA 2 (1992) ("England had adopted the legal age of 21 as the minimum voting age, and the colonies adopted the same standard."); *see* 5 RICHARD A. LORD, WILLISTON ON CONTRACTS § 9:2 (4th ed. 2010) [hereinafter WILLISTON] (citing cases from as early as 1292).

[5] *See, e.g.*, Pierre Schlag, *Rules and Standards*, 33 UCLA L. REV. 379, 383–90 (1985) (recounting and critiquing the "patterned sets of 'canned' pro and con arguments about the value of adopting either rules or standards in particular contexts").

[6] 5 WILLISTON, *supra* note 4, § 9:3.

[7] *See, e.g.*, Roper v. Simmons, 543 U.S. 551, 601 (2005) (O'Connor, J., dissenting) ("Chronological age is not an unfailing measure of psychological development, and common experience suggests that many 17-year-olds are more mature than the average young 'adult.'"); 5 WILLISTON, *supra* note 4, § 9:3 (explaining how age rather than intelligence has been used in varying degrees to signal the attainment of majority).

[8] 5 WILLISTON, *supra* note 4, § 9:2 (citing an English case from 1292).

of the law, everyone under that age was an infant and everyone over that age an adult.[9] The courts paid no attention to the actual level of maturity of the person at issue. Twenty-one was initially selected because, at the time (the medieval era), Englishmen were eligible for knighthood only upon achieving twenty-one years of age.[10] Apparently, the suits of armor worn by English knights were so heavy that only at age twenty-one could most young men be expected to bear it.[11] Thus under the common law, a person becomes an adult, with full legal capacity, when he turns twenty-one.[12]

This rule remained remarkably stable from the Middle Ages until well into the twentieth century. But in the late 1960s and early 1970s, the idea that all persons under twenty-one were infants was widely examined and discussed—and rejected. After several years of public debate and deliberation, American society came to the collective conclusion that the legal age of majority should be reduced to eighteen. In light of this new consensus, the people amended the United States Constitution, as well as the statutory law of every state, to declare that infancy ends at eighteen. Those amendments, and the consensus behind them, remain firmly in place today.

The reduction in the age of adulthood to eighteen played out in numerous arenas, including voting, jury service, death eligibility and, most importantly for present purposes, contracting. Each will be examined in turn.

### A. Suffrage

Prior to the 1970s, the right to vote in the Anglo-Saxon world was always reserved to those twenty-one and older.[13] This was but a particular application of the common law's general bright-line rule that all persons are classified as infants by the law until they attain their majority at age twenty-one.[14] The rule was so well settled that the United States Constitution did not bother to mention a minimum

---

[9] *Id.* § 9:3 ("No distinction has generally been drawn so far as concerns contractual capacity between a minor of tender years and one who, having nearly attained his majority, has ample intelligence in fact.").

[10] CULTICE, *supra* note 4, at 2; *see also* Jolicoeur v. Mihaly, 488 P.2d 1, 5 (Cal. 1971); HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 8.1, at 309 (2d ed. 1988); Adam Liptak, *1971: 18-Year-Olds Get the Vote*, N.Y. TIMES UPFRONT, Sept. 4, 2006, at 24.

[11] *Jolicoeur*, 488 P.2d at 5; S. REP. No. 92-26 (1971) (report on "Lowering the Voting Age to 18"). Once translated into the common law, however, the rule was applied equally to both genders. *See* CULTICE, *supra* note 4, at 2.

[12] Jones v. Jones, 72 F.2d 829, 830 (D.C. Cir. 1934) ("[U]nder the common law infants . . . attained their majority at the age of 21 years."); Gastonia Pers. Corp. v. Rogers, 172 S.E.2d 19, 20 (N.C. 1970) ("Under the common law, persons . . . are classified and referred to as *infants* until they attain the age of twenty-one years."). To be completely accurate, one achieved majority under the common law the day before one's twenty-first birthday. United States v. Wright, 197 F. 297, 298 (8th Cir. 1912). This is because the common law ignores fractions of days. *Id.*

[13] CULTICE, *supra* note 4, at 2.

[14] *See* sources cited *supra* note 12.

Case 3:19-cv-01226-L-AHG   Document 34-8   Filed 01/03/20   PageID.7445   Page 68 of 192

voting age until the post–Civil War amendments.[15] In short, from the founding of this nation until quite recently, a minimum voting age of twenty-one was imposed in all state and federal elections.[16]

Limiting the franchise to those over twenty-one may have made sense in medieval England or pre-industrial America. But in the twentieth century, the United States Congress decreed for the first time that males aged eighteen and older were eligible to be drafted into the military.[17] This created an incongruity in the law: an eighteen-year-old could be called to fight—and possibly die—for a government that he was powerless to change.[18] Taxation without representation looked pretty good by comparison.

So, when many Americans (or their loved ones) enlisted or were drafted to fight in World War II and the Korean War in the 1940s and 1950s, support began to build for the idea that "if a man is old enough to fight he is old enough to vote."[19] Prior to World War II and Korea, only 17% of the public favored reducing the voting age, according to a 1939 poll.[20] Following those two wars, in which eighteen-year-olds were drafted and served, 58% of American adults supported lowering the voting age to eighteen.[21] In 1942, during World War II, Georgia became the first state to lower the voting age to eighteen.[22] In 1955, shortly after the Korean War, Kentucky reduced its voting age to eighteen.[23] On the federal level, President Eisenhower—who had previously served as a five-star General in the United States Army—advocated for the same outcome on the federal level, mentioning it in two State of the Union addresses.[24]

Georgia, Kentucky, and President Eisenhower were ahead of their time, however. The prevailing view of lawmakers and their constituents in the

---

[15] Section Two of the Fourteenth Amendment only pertained to those newly freed slaves "being twenty one years of age." U.S. CONST. amend. XIV, § 2.

[16] CULTICE, *supra* note 4, at 2–3, 6 ("England had adopted the legal age of 21 as the minimum voting age, and the colonies adopted the same standard."); ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 277 (2000) ("Since the nation's founding, a voting age of twenty-one—a carryover from colonial and English precedents—had been a remarkable constant in state laws governing the franchise."). *See generally* CULTICE, *supra* note 4, at 2 ("It is believed that all countries, colonies, and territories within the British Commonwealth in which suffrage was extended subscribed to the legal voting age of 21 years.").

[17] CULTICE, *supra* note 4, at 16 (World War I draft); *id.* at 20 (World War II draft).

[18] *Id.* at 20–21 ("Mr. President, if young men are to be drafted at eighteen years of age to fight for their Government, they ought to be entitled to vote at eighteen years of age for the kind of government for which they are best satisfied to fight." (quoting Sen. Vanderberg on the floor of the U.S. Senate, Oct. 19, 1942)).

[19] *Id.* at 33 (quoting then-presidential nominee Dwight D. Eisenhower in 1952).

[20] *Id.* at 53.

[21] *Id.* ("This trend of public opinion represented one of the greatest shifts ever recorded by the Gallup poll.").

[22] *Id.* at 206, 234.

[23] *Id.* at 206.

[24] *Id.* at 51 (1954 State of the Union); *id.* at 56 (1956 State of the Union).

immediate post-war years remained what it had been for centuries, namely that the voting age should be twenty-one.[25] Throughout the 1950s and 1960s, federal and state legislators repeatedly introduced bills to lower the voting age to eighteen—but such proposals were defeated, again and again.[26] As late as 1970, every state except four continued to restrict suffrage to those age twenty-one and older, as did federal law.[27]

But then came the Vietnam War, which changed everything.[28] Once again, a military engagement called attention to the injustice of subjecting eighteen-year-olds to the draft but denying them the ballot. This time, however, the movement to lower the voting age to eighteen was carried along as part of the massive civil rights, antiwar, counterculture, and other social movements of the late 1960s and early 1970s.[29] "Let Us Vote" (LUV) and other youth organizations were founded on college campuses to campaign in favor of extending the franchise to eighteen-year-olds, but they were not alone.[30] Other influential groups, including the NAACP, the American Jewish Committee, and the United Auto Workers union, also endorsed lowering the voting age to eighteen.[31]

They took up the slogan, "Old enough to fight, old enough to vote"[32] and argued that it was "surely unjust . . . to command men to sacrifice their lives for a decision which they had no part in making."[33] This seemed particularly poignant with regard to the Vietnam War, not only because it was broadly unpopular,[34] but

---

[25] CULTICE, *supra* note 4, at 44–49; *see, e.g., id.* at 46 ("Eighteen to twenty-one are mainly formative years where the youth is racing forward to maturity. . . . These are rightfully the years of rebellion rather than reflection. We will be doing a grave injustice to democracy if we grant the vote to those under 21." (quoting Rep. Emanuel Celler)).

[26] *Id.* at 141–59, 206; *id.* at 159 ("[T]he fifteen-state referenda held during the interim of 1943–69 resulted in only two states—Georgia and Kentucky—lowering their voting ages to 18.").

[27] *See id.* at 94–95, 206.

[28] KEYSSAR, *supra* note 16, at 279.

[29] *Id.*; *see* Jolicoeur v. Mihaly, 488 P.2d 1, 7 (Cal. 1971) ("America's youth entreated, pleaded for, demanded a voice in the governance of this nation. On campuses by the hundreds, at Lincoln's Monument by the hundreds of thousands, they voiced their frustration at their electoral impotence and their love of a country which they believed to be abandoning its ideals.").

[30] CULTICE, *supra* note 4, at 98–99.

[31] *Id.* at 99–109.

[32] *Id.* at 234.

[33] *Lowering the Voting Age to 18: Hearings Before the Subcomm. on Constitutional Amendments of the Comm. on the Judiciary*, 90th Cong. 20–21 (1968) (statement of Rep. Spencer Oliver); *accord* Oregon v. Mitchell, 400 U.S. 112, 141–42 (1970) (Douglas, J., dissenting).

[34] THOMAS H. NEALE, CONG. RESEARCH SERV., REPORT NO. 83–103, THE EIGHTEEN YEAR OLD VOTE: THE TWENTY-SIXTH AMENDMENT AND SUBSEQUENT VOTING RATES OF NEWLY ENFRANCHISED AGE GROUPS 8 (1983) ("[T]he claim of young Americans that they deserved the right to vote seemed more compelling in light of growing questions about

also because approximately half the casualties—about 25,000 deaths—were of servicemen aged eighteen to twenty.[35] Under these circumstances, it seemed absurd to many Americans that "the right to vote of Americans in the 20th century" was still governed by "the weight of armor in the 11th century."[36]

Furthermore, the American view of eighteen-year-olds had evolved by the late 1960s; they were no longer viewed as children, but as young adults capable of handling adult responsibilities.[37] The unrest on college campuses called attention to the fact that eighteen-year-olds desperately wanted, and deserved, a voice in the political process.[38] There was hope that young people could be "turned from a revolutionary path by their ability to vote."[39]

Scientific authorities, such as anthropologist Margaret Mead, opined that modern eighteen-year-olds were sufficiently mature to be entrusted with the vote.[40] Even President Nixon agreed: "The younger generation today is better educated, it knows more about politics, more about the world than many of the older people. That is why I want them to vote, not because they are old enough to fight but because they are smart enough to vote."[41] All of this was a sea change from the

---

United States military involvement in Indochina."); KEYSSAR, *supra* note 16, at 279 (describing the "unpopularity" and "absence of democratic support for the war").

[35] Theodore J. Hull, *Statistical Information about Casualties of the Vietnam War*, NAT'L ARCHIVES, http://www.archives.gov/research/military/vietnam-war/casualty-stat istics.html#age (last updated Feb. 2007); *see* Jolicoeur v. Mihaly, 488 P.2d 1, 5 (Cal. 1971) (observing that congressional action to lower the voting age "was influenced by the fact that over half the deaths in Vietnam have been of men in the 18–20 age group"); JACK N. RAKOVE, THE ANNOTATED U.S. CONSTITUTION AND DECLARATION OF INDEPENDENCE 304 (2009) (opining that the Twenty-Sixth Amendment "was badly needed" to honor the "sacrifices and burdens borne by the younger generation, who did so much of the fighting").

[36] *Lowering the Voting Age to 18: Hearings Before the Subcomm. on Constitutional Amendments of the Comm. on the Judiciary*, 91st Cong. 157 (1970) [hereinafter *Lowering the Voting Age to 18 (91st Cong.)*] (statement of Sen. Edward M. Kennedy). Even if the weight of armor were relevant, contemporary males apparently mature more quickly than their medieval counterparts and would be able to wear a knights' armor at age eighteen, according to noted anthropologist Margaret Mead. S. REP. NO. 92–26, at 5 (1971).

[37] *See* CULTICE, *supra* note 4, at 98; BOB DYLAN, *The Times They Are A-Changin', on* THE TIMES THEY ARE A-CHANGIN' (Columbia Records 1964) ("Come mothers and fathers / Throughout the land / And don't criticize / What you can't understand / Your sons and your daughters / Are beyond your command.").

[38] *See* RICK PERLSTEIN, NIXONLAND: THE RISE OF THE PRESIDENT AND THE FRACTURING OF AMERICA 508 (2008).

[39] *Id.* at 582.

[40] *See* S. REP. NO. 92–26, at 4.

[41] Lewis J. Paper, Note, *Legislative History of Title III of the Voting Rights Act of 1970*, 8 HARV. J. ON LEGIS. 123, 136 (1970); *see also* Jolicoeur v. Mihaly, 488 P.2d 1, 5 (Cal. 1971) ("[T]oday's youth is better informed and more mature than any other generation in the nation's history." (citing, inter alia, President Nixon's testimony)); PERLSTEIN, *supra* note 38, at 508–09 (recounting that President Nixon "favored the eighteen-year-old vote").

view of eighteen-year-olds as infants that prevailed from the Middle Ages through the 1950s.

By the late 1960s, the public overwhelmingly favored lowering the voting age to eighteen.[42] And their elected officials acted accordingly. Prominent voices from across the political spectrum—from Senator Kennedy to Senator Goldwater—supported reducing the voting age to eighteen.[43] By 1969, a significant majority of federal legislators agreed.[44] Hence, in 1970, a bipartisan Congress amended the Voting Rights Act to make eighteen the minimum voting age for all state and federal elections.[45] Later that year, however, the Supreme Court held that Congress lacked the power to lower the minimum age to vote in state, as opposed to federal, elections.[46] A constitutional amendment would be required.

The United States Constitution is difficult to amend, as a proposed amendment must be approved by two-thirds of both houses of Congress and then ratified by three-quarters of the states.[47] The process is time consuming and rarely successful.[48] But the Twenty-Sixth Amendment to the Constitution, which extended suffrage to all citizens "eighteen years of age or older," was so tremendously popular that its enactment was very quick and easy.[49] In early 1971, a near-unanimous Congress voted to propose the amendment to the states.[50] Then, within just one hundred days, it was ratified by the requisite number of states.[51] This was the fastest ratification in the history of the Constitution, and remains so to this day.[52] The people had spoken, loudly and clearly: eighteen-year-olds are

---

[42] NEALE, *supra* note 34, at 7 (citing a 1967 Gallup poll showing 64% in favor of reducing the voting age to eighteen and 28% opposed).

[43] *See Lowering the Voting Age to 18 (91st Cong.)*, *supra* note 36, at 156–58 (statement of Sen. Kennedy); *id.* at 132–33 (statement of Sen. Goldwater); S. REP. NO. 92–26, at 4 (statement of President Nixon) (asserting that modern eighteen-year-olds demonstrate "the highest qualities of mature citizenship").

[44] CULTICE, *supra* note 4, at 108.

[45] *Id.* at 125, 137 (reporting a 64–17 vote in the Senate and a 272–132 vote in the House).

[46] Oregon v. Mitchell, 400 U.S. 112, 117–18 (1970); *see* CULTICE, *supra* note 4, at 172.

[47] U.S. CONST. art. V.

[48] CULTICE, *supra* note 4, at 214 (noting that prior to the Twenty-Sixth Amendment, the fastest ratification of a Constitutional amendment—the Twelfth—had been six months and six days); Rosalind Dixon, *Updating Constitutional Rules*, 2009 SUP. CT. REV. 319, 342 (reporting that, of eleven thousand attempts to amend the Constitution, only twenty-seven have succeeded).

[49] *See* CULTICE, *supra* note 4, at 214.

[50] NEALE, *supra* note 34, at 13 (noting the vote was 94–0 in the Senate and 400–19 in the House).

[51] *Id.* at 14 ("The degree of acceptance of the proposed amendment was evidenced by the unprecedented speed with which the States approved it . . . .").

[52] KEYSSAR, *supra* note 16, at 281 ("The ratification process was by far the most rapid in the history of the republic.").

adults, not infants, and therefore must be guaranteed the right to vote. And so they are, under the law of every state.[53]

### B. Jury Service

Jury service followed a parallel trajectory to suffrage, and indeed was part and parcel of the same legal reform. As with voting, the minimum age for federal and state jury service traditionally was twenty-one years, based on the general common-law rule that a person becomes an adult at that age.[54] But when the modern view of infancy emerged in the 1960s and 1970s, which classified eighteen-year-olds as adults, not infants, it logically followed that the minimum age to serve on a jury should be lowered to eighteen. And so it was, in nearly every state and under federal law.[55]

On the federal level, the federal Jury Selection and Service Act was amended in 1972 to reduce the minimum age for federal jury service from twenty-one to eighteen.[56] The legislative history of the federal amendment indicates that support for this change—which had already been made in twenty states by then—was unanimous:[57]

> For reasons substantially similar to those which prompted the Congress to . . . propose a constitutional amendment reducing the age to vote, and which have resulted in such a ready response among the States in the ratification process, it is now clear as a matter of policy that the 18- to 21-year-olds should no longer be barred from Federal jury service. If they are mature enough to vote . . . , they are mature enough to participate as jurors . . . .[58]

As for state law, nearly every state has by now passed legislation reducing the minimum age for jury service to eighteen,[59] and even these last holdouts may soon join the majority.[60] This is all in line with our modern consensus that eighteen-

---

[53] *See* Roper v. Simmons, 543 U.S. 551, 581–82 (2005) (listing in Appendix B state statutes establishing minimum voting ages).

[54] *See, e.g.*, 28 U.S.C. § 1865(b)(1) (1970) (stating that one must be at least twenty-one years old to serve on a federal grand or petit jury).

[55] *See infra* note 59.

[56] Act of Apr. 6, 1972, Pub. L. No. 92-269, 86 Stat. 117.

[57] *See* H.R. REP. NO. 92-869, at 3 (1972) ("Without exception, all of the testimony and statements supported the reduction of Federal jury eligibility to age 18.").

[58] *Id.* at 4 (letter from Deputy Att'y Gen. Kleindienst).

[59] *See* Roper v. Simmons, 543 U.S. 551, 583–84 (2005) (listing in Appendix C state statutes establishing minimum ages for jury service). Missouri and Mississippi retain twenty-one as the minimum age for jury service; Alabama and Nebraska have reduced the minimum age to nineteen; the rest of the states have reduced it to eighteen. *Id.*

[60] *See, e.g.*, Ria Jackson, *Pros and Cons of Lowering the Age for Jurors*, ST. LOUIS DAILY REC. & ST. LOUIS COUNTIAN, Aug. 10, 2002, at 2 ("A Missouri Senate bill

year-olds, as a class, are adults, not infants. They can be trusted to make reasonable decisions in high-stakes civil and criminal trials. As a result, this new group of eighteen- to twenty-year-old jurors has played a hand in deciding cases worth hundreds of millions of dollars[61] and even deciding whether to impose (or withhold) the death penalty.[62]

### C. Death Eligibility

Being treated as an adult does not always redound to the benefit of eighteen-year-olds. Nowhere is this clearer than in the case of the ultimate criminal sanction, the death penalty. In the landmark case of *Roper v. Simmons*,[63] the United States Supreme Court held that the Eighth Amendment prohibits the imposition of the death penalty on a seventeen-year-old child—but permits the execution of eighteen-year-olds.[64] The Court's rationale should be familiar by now: The "age of 18 is the point where society draws the line for many purposes between childhood and adulthood," including "voting [and] serving on juries."[65] By the same token, eighteen-year-olds, as a class, are sufficiently mature and sophisticated to be held fully responsible for their crimes, held the Court.[66]

The *Roper* decision was handed down in 2005, more than thirty years after our society rejected the old common-law view that adulthood begins at twenty-one and adopted the modern view that it begins at eighteen. Our collective decision in the 1970s to treat eighteen-year-olds as adults in the eyes of the law has become firmly embedded as a matter of law, culture, and custom.

### D. Capacity to Contract

Voting and jury service are important civic rights and duties, but the protesting youth of the 1960s and 1970s wanted more than just the right to

---

introduced this past session sought to lower the age of jury duty to 18 instead of 21."); Timothy J. Wilson, *Antiquated Bias Keeps Missouri's Youngest Voters from Serving on Juries*, ST. LOUIS POST-DISPATCH, Nov. 19, 2002, at B7 (arguing in favor of reducing the minimum age for jury service to eighteen).

[61] *See, e.g.*, Bruce Japsen, *Jury: Vioxx to Blame*, CHI. TRIB., Aug. 20, 2005, at 1 (quoting a twenty-year-old juror whose vote was necessary to impose a \$253 million judgment).

[62] *See, e.g.*, Jon Burstein, *Waffle House Robber Acquitted of Murder*, SUN SENTINEL, Feb. 14, 2004, at B1 (discussing the significant role played by an eighteen-year-old high school student juror in a capital case); Michelle Roberts, *Murderer of Gay Couple Gets Death Sentence*, OREGONIAN, July 29, 2000, at D1 (quoting an eighteen-year-old juror who was part of a jury that imposed the death penalty); *see also* Janan Hanna & Lisa Black, *Woman Gets Death Penalty for Brutal Addison Slayings*, CHI. TRIB., Mar. 28, 1998, at 1 (quoting a nineteen-year-old juror who was part of a jury that imposed the death penalty).

[63] 543 U.S. 551.

[64] *Id.* at 568.

[65] *Id.* at 570, 574.

[66] *Id.* at 569–70.

participate in their government. They also wanted "a piece of the action"—that is, an opportunity to make investments or to start a business of their own.[67] But contract law has always held that infants lack the requisite mental "capacity" to bind themselves by contract[68] and, under the traditional common-law rule, everyone under twenty-one was an infant.[69] The result of this confluence of rules was a legal prohibition on eighteen-, nineteen-, and twenty-year-olds grabbing "a piece of the action" for themselves.

That infants lack capacity to contract follows from first principles of contract law. The nature of a contractual duty is that it is assumed freely and voluntarily.[70] Therefore both parties to a contract must have the mental "capacity" to bind themselves for their agreement to be legally enforceable.[71] If one of them lacked capacity at the time—she was sleepwalking or delirious, say—the contract will not be enforceable against her.[72] Beyond these sorts of temporary incapacities that might befall anyone, certain classes of people are held as a matter of law to always lack capacity to contract,[73] including the mentally ill and, most notably for present purposes, infants.[74] The underlying idea is not hard to understand. Infants are, by definition, "immature in both mind and experience" and therefore need to be protected from their own poor decisions, "as well as from adults who would take advantage" of them.[75]

---

[67] CULTICE, *supra* note 4, at 103 ("During the 1968 campaign, Nixon promised the nation's youth 'a piece of the action.'"); *id.* at 98 ("American youth should be given a 'piece of the action.'" (quoting the founder of LUV, Dennis Warren)). For judicial uses of the phrase, see, for example, Ambrosino v. Rodman & Renshaw, Inc., 972 F.2d 776, 787 (7th Cir. 1992) (observing that it is "common practice for a promoter or other interested party to own a piece of the action in oil prospects, generally in the form of a leasehold, working, or overriding royalty interest").

[68] 5 WILLISTON, *supra* note 4, § 9:1.

[69] *See supra* Part II.

[70] Johnson v. Scandia Assocs., Inc., 717 N.E.2d 24, 29 (Ind. 1999) (stating that contractual liability is "voluntary"; also stating that tort liability, by contrast, is "involuntary"); E. ALLAN FARNSWORTH, CONTRACTS § 3.1 (4th ed. 2004); Andrew A. Schwartz, *Consumer Contract Exchanges and the Problem of Adhesion*, 28 YALE J. ON REG. 313, 347 (2011) ("A key normative premise of the enforcement of contracts is that the legal obligation being enforced was accepted knowingly and voluntarily. . . .").

[71] RESTATEMENT (SECOND) OF CONTRACTS § 12(1) (1981). The concept of capacity is limited to natural persons. *Id.* cmt. e.

[72] *Id.* § 12(1).

[73] *Id.* § 12(2)(a)–(d). Married women were formerly included in this group. *See id.* cmt. d.

[74] *Id.* § 12(2)(b); *accord, e.g.*, Panza v. Panza, 112 N.Y.S.2d 262, 265 (N.Y. Fam. Ct. 1952) ("Under the law, a contract made by a child, one who is under the age of 21, cannot be enforced against that child, for in law a child is incapable of entering into a valid contract.").

[75] Kiefer v. Fred Howe Motors, Inc., 158 N.W.2d 288, 290 (Wis. 1968); *see also* Baker v. Lovett, 6 Mass. (6 Tyng) 78, 80 (1809) ("Infants are supposed to be destitute of sufficient understanding to contract. The law, therefore, protects their weakness and

This is not to say that the common law prohibits infants from contracting or that a contract with an infant is void or "illegal" in some sense. Rather, the common-law infancy rule—designed as it is for the protection of the infant—holds that an infant's contract is voidable at her election.[76] So, if a contract turns out to be good for the infant, she can enforce it against the counterparty; but if it turns out bad for the infant, the counterparty cannot enforce it against her.[77]

At first blush, this seems purely beneficial to the infant. But the practical result of a judicial refusal to hold infants to their promises was that no one was willing to contract with them.[78] The common law's paternalism toward infants excluded them from the commercial world.[79] Without the capacity to contract, one cannot purchase inventory or engage employees, let alone borrow money or enter into a stockholder agreement; entrepreneurship is out of the question.

This state of affairs persisted for centuries until the late 1960s, when eighteen- to twenty-year-olds demanded to be treated, by the law, as adults with full capacity to contract.[80] Mirroring the changing view of eighteen-year-olds as adults with respect to suffrage and jury service, Americans in the Vietnam era overwhelmingly agreed that, just as eighteen-year-olds were entitled as adults to vote and serve as jurors, they should likewise have the right to enter into contracts of their own choosing.[81]

---

imbecility, so far as to allow them to avoid all their contracts by which they may be injured.").

[76] Aetna Cas. & Sur. Co. v. Duncan, 972 F.2d 523, 526 (3d Cir. 1992); 5 WILLISTON, *supra* note 4, § 9:5; *see generally id.* § 9:9 ("[I]t is now well-settled in the United States that a minor's contract is voidable, rather than void.").

[77] *E.g.*, Smoot v. Ryan, 65 So. 828, 830 (Ala. 1914). An exception exists for so-called "necessaries." Rodriguez v. Reading Hous. Auth., 8 F.3d 961, 964 (3d Cir. 1993) ("[T]he predominant rule is that a minor's contracts are generally voidable but that contracts for what are known as 'necessaries' are enforceable."). The ground for this exception is that, without it, no one would contract with infants, and they could be deprived of food or shelter. *See* 1 FARNSWORTH, *supra* note 70, § 4.5.

[78] 1 FARNSWORTH, *supra* note 70, § 4.5; *cf.* Arthur Allen Leff, *Unconscionability and the Code—The Emperor's New Clause*, 115 U. PA. L. REV. 485, 556–57 (1967) (suggesting that, at a time when English courts of equity freely released English seamen from their contracts, "one cannot help wondering how many sailors managed to get credit at any reasonable price").

[79] *See, e.g.*, Zouch v. Parsons, (1765) 97 Eng. Rep. 1103 (K.B.) 1107–08, ("[M]iserable must the condition of minors be; excluded from the society and commerce of the world.").

[80] Legal Memorandum from the Nat'l Ass'n of Secondary Sch. Principals 2 (Jan. 1974) [hereinafter Memorandum], *available at* http://www.eric.ed.gov/PDFS/ED099996.pdf (noting "youths' demands").

[81] *See, e.g.*, Robert G. Edge, *Voidability of Minors' Contracts: A Feudal Doctrine in a Modern Economy*, 1 GA. L. REV. 205, 230 (1967) (arguing in favor of the enforcement of minors' contracts); Robert S. Stubbs II, *When Is a Child a "Child"?*, 6 GA. ST. B.J. 189, 195 (1969) (criticizing the "unduly paternalistic" notion that "an eighteen-year-old who can vote and go to war must be protected from his own bad deals"); Memorandum, *supra* note 80, at 2; *see also* Irving M. Mehler, *Infant Contractual Responsibility: A Time for*

With the nation unified on the point, the old common-law rule was quickly "swept away by state legislation."[82] From 1970–73, thirty-nine states enacted statutes that lowered the age at which one gains capacity to contract to eighteen,[83] and by now all fifty states have done the same.[84] New York's statute is typical: "A contract made on or after September first, nineteen hundred seventy-four by a person after he has attained the age of eighteen years may not be disaffirmed by him on the ground of infancy."[85] By the late 1970s, this lowered age of contractual capacity had become so universally accepted that the 1979 Second Restatement of Contracts added a new section, not present in the 1932 original, stating as black-letter law that eighteen-year-olds possess capacity to contract.[86]

---

*Reappraisal and Realistic Adjustment?*, 11 U. KAN. L. REV. 361, 361 (1963) (arguing in favor of holding an infant "legally responsible for his contractual obligations as if he were an adult"); *cf.* RESTATEMENT (SECOND) OF CONTRACTS § 14 reporter's note (1981) ("The impetus for the lowering of the age of majority probably came from the widespread draft of those under twenty-one and from the lowering of the voting age to eighteen."). Georgia-based legal journals seem to have been at the vanguard of the movement. *See, e.g.,* Edge, *supra*; Stubbs, *supra*. This makes sense because Georgia became the first state to lower the voting age to eighteen during World War II. CULTICE, *supra* note 4, at 206, 234.

[82] Memorandum, *supra* note 80, at 2.

[83] *Id.*

[84] 5 WILLISTON, *supra* note 4, § 9:3 nn.5–7 (cataloging statutes); *see, e.g.,* W. VA. CODE § 2-3-1 (2007) ("On and after June nine, [1972], no person who is eighteen years of age or older shall lack legal capacity, by reason of his age, to enter into contracts . . . ."). To be completely accurate, Alabama lowered its age of contractual capacity to nineteen, not eighteen. *See* ALA. CODE § 26-1-1 (2006). On the other hand, even Mississippi and Missouri, the only states that still require jurors to be twenty-one or older, *see supra* note 59, hold that eighteen-year-olds have capacity to contract. *See* MISS. CODE. ANN. §§ 1-3-41, 93-19-13 (2006); MO. REV. STAT. §§ 431.055, 507.115 (2003).

[85] N.Y. GEN. OBLIG. LAW § 3-101 (Consol. 2011).

[86] RESTATEMENT (SECOND) OF CONTRACTS § 14 ("Unless a statute provides otherwise, a natural person has the capacity to incur only voidable contractual duties until the beginning of the day before the person's eighteenth birthday."); *id.* reporter's note ("This section is new."). The only apparent statutory exceptions to this modern rule involve alcohol and firearms, the former of which is restricted in every state to those over twenty-one, and the latter of which is commonly restricted to those over twenty-one. But these exceptions are irrelevant to the right to contract, because the purchase of alcohol or a firearm is not actually a contract, but rather a present sale. *See generally* FARNSWORTH, *supra* note 70, § 1.1 (explaining that a present sale is an exchange of goods for cash and no promises give, so there is no contract, such as the purchase of "apples for money"). Furthermore, these are special classes of goods that can, if abused, put third parties in immediate mortal danger, thereby making appropriate a different legal regime than ordinary contracts. And even this exception to the modern rule that adulthood begins at eighteen is under attack by a group of university presidents and others that have called for a public debate on the wisdom of the twenty-one-year-old drinking age. *See Statement,* AMETHYST INITIATIVE, http://www.amethystinitiative.org/statement (last visited Mar. 30, 2011) (signed by 136 university presidents, including those of Ohio State, the University of Massachusetts and Virginia Tech); *see also* Glenn Harlan Reynolds, *Old Enough to Fight,*

This change in the law of contracts confirms our modern view that adulthood begins at eighteen.[87] And perhaps even more than suffrage[88] or jury service, the change in contract law has had a profound impact on our society: it created a new class of youthful entrepreneurs.

### 1. The New Class of Youthful Entrepreneurs

For centuries, the law was clear that a person could not enter into binding contracts until reaching twenty-one years of age.[89] This had the practical effect of denying those younger than twenty-one the ability to start their own business. Even the greatest entrepreneurs in American history had to wait until reaching twenty-one (or partner with their parents) to found their ventures.

In 1810, for example, when Cornelius Vanderbilt sought to start a ferry business at the tender age of sixteen, he was not able to do so on his own, but rather was forced to partner with his father: "Per the laws of the day, young Cornelius was not free to embark upon his own enterprises until he was twenty-one. In the absence of that majority, he was little more than his father's property . . . ."[90] And in 1858, when John D. Rockefeller was nineteen, his father partnered with him to found a commission merchant business.[91] It was only a few years later, when he was twenty-three, that he finally went into the oil refining business on his own, and he did not found Standard Oil until he was thirty.[92] Other stories could be told: Andrew Carnegie began making investments on his own

---

*Old Enough to Drink*, WALL ST. J., Apr. 13, 2011, at A17 (advocating repeal of the 1984 Federal Uniform Drinking Age Act); Megan McArdle, *America's Drinking Problem*, ATLANTIC (Jan. 21, 2009, 9:27 AM ET), http://www.theatlantic.com/business/archive/2009/01/america-apos-s-drinking-problem/4593 ("If you are old enough to enlist, and old enough to vote, you are old enough to [drink].").

[87] *Citizenship for Eighteen Year Olds—Age of Majority in Washington—Ch. 292, Washington Laws of 1971*, 47 WASH. L. REV. 367, 367 (1972) (observing that Washington's statutory reduction in the age of capacity "manifests a confidence in the maturity of persons between eighteen and twenty-one years of age and recognizes their readiness to accept the responsibilities of citizenship").

[88] In their first presidential election in 1972, only 48.3% of eighteen- to twenty-year-olds cast a ballot, compared to 63.0% of the total voting-age population. CULTICE, *supra* note 4, at 220. This proved to be the high point of their participation as voters. *See id.* at 222–23.

[89] *See supra* Part II.D.

[90] EDWARD J. RENEHAN, JR., COMMODORE: THE LIFE OF CORNELIUS VANDERBILT 25–26 (2007); *see also* T.J. STILES, THE FIRST TYCOON: THE EPIC LIFE OF CORNELIUS VANDERBILT 23–24 (2009).

[91] PETER COLLIER & DAVID HOROWITZ, THE ROCKEFELLERS: AN AMERICAN DYNASTY 12–13 (1976).

[92] *Id.* at 16–22.

Case 3:19-cv-01226-L-AHG   Document 34-8   Filed 01/03/20   PageID.7455   Page 78 of 192

when he was in his twenties;[93] Levi Strauss opened his San Francisco dry goods store when he was twenty-four.[94]

But when the age of capacity to contract was reduced to eighteen in the early 1970s, it gave rise to a new social phenomenon—that of the youthful entrepreneur. Once eighteen- to twenty-year-olds were empowered with the capacity to enter into legally binding contracts, some of them decided to launch business ventures of their own, something they never before in history had the chance to do. Many of these youths surely failed. But some youthful start-up companies have succeeded in a spectacular fashion, employing tens of thousands and creating products and services that have changed the world.

One of the first, and still among the most famous, youthful entrepreneurs is Bill Gates, the founder of Microsoft. In 1975, Gates left Harvard after his freshman year and moved to New Mexico to launch the company that would become Microsoft.[95] It all began with a licensing agreement between Gates, Paul Allen, and a company called MITS, signed on July 22, 1975—when Gates was only nineteen years old.[96] This agreement would not have been enforceable (and therefore would never have been made) under the common-law rule that the nineteen-year-old Gates was an infant.[97] But New Mexico had enacted a statute in 1971—just four years previous—that overruled the common law and empowered Gates to found one of the most successful companies of all time.[98] Microsoft, whose software noticeably increased the productivity of the American worker, is presently worth over $200 billion[99] and employs approximately 90,000 people.[100]

Similarly, in 1983, Michael Dell went into the computer hardware business when he was a freshman at the University of Texas.[101] A 1973 Texas statute had endowed all persons with the legal capacity to contract at age eighteen,[102] and Dell took full advantage of the opportunity denied to countless youths before him. At just eighteen years of age, Dell bid for, and won, government contracts to supply computers to the State of Texas—something that surely would have been unthinkable just a generation before.[103] Shortly thereafter, he dropped out of

---

[93] PETER KRASS, CARNEGIE 52, 65–66 (2002).

[94] TIFFANY PETERSON, LEVI STRAUSS 6, 14 (2003).

[95] STEPHEN MANES & PAUL ANDREWS, GATES 82–83 (1993).

[96] See id. at 11, 82.

[97] See supra Part II.D.

[98] N.M. STAT. ANN. § 28-6-1(A) (1978); see Mason v. Mason, 507 P.2d 781, 783 (N.M. 1973) (observing that the legislature lowered the age of capacity to eighteen in 1971).

[99] As of April 12, 2011, Microsoft had a market capitalization of $215.44 billion. *Microsoft Corporation*, GOOGLE FIN., http://www.google.com/finance?q=NASDAQ%3 AMSFT (last visited Apr. 12, 2011).

[100] *Facts About Microsoft*, MICROSOFT NEWS CENTER, http://www.microsoft.com/ presspass/inside_ms.mspx (last visited Mar. 30, 2011).

[101] MICHAEL DELL, DIRECT FROM DELL 9–11 (1999).

[102] S.B. 123, 63d Leg., Reg. Sess. (Tex. 1973) (this statute was repealed in 1985).

[103] See DELL, *supra* note 101, at 10.

college and founded Dell Computer Corp., a company that is now worth over $25 billion[104] and employs nearly one hundred thousand people.[105]

Finally, the latest, greatest story of youthful entrepreneurship is that of Facebook, founded in 2004 by Mark Zuckerberg, then a nineteen-year-old Harvard sophomore, and his classmate.[106] The online social network created by Facebook, which consists of five hundred million users and is growing, has changed the way in which people interact.[107] The recent uprisings in Egypt, which were largely planned and organized on Facebook, illustrated the revolutionary power of the site.[108] In economic terms, the company was recently valued at $50 billion,[109] and while it only employs a few thousand people at present, its actual employment impact is far greater than that.[110]

All of this is to say that the 1970s statutory revolution that lowered the age of contractual capacity to eighteen has had a tremendously beneficial effect both for the newly empowered youths and for society as a whole. Unleashing the energy and creativity of eighteen- to twenty-year-olds into the commercial realm has led to whole new categories of products and services that never would have occurred to older entrepreneurs, and the start-up companies founded by these youthful

---

[104] As of April 12, 2011, Dell had a market capitalization of $28.03 billion. *Dell Inc.*, GOOGLE FIN., http://www.google.com/finance?q=NASDAQ%3ADELL (last visited Apr. 12, 2011).

[105] *Our Story: Facts about Dell*, DELL.COM, http://content.dell.com/us/en/corp/d/corp-comm/our-story-facts-about-dell.aspx (last visited Apr. 12, 2011).

[106] *See* BEN MEZRICH, THE ACCIDENTAL BILLIONAIRES: THE FOUNDING OF FACEBOOK, A TALE OF SEX, MONEY, GENIUS, AND BETRAYAL 79–83 (2009).

[107] Peter Lattman, *Share Rules Could Push an Offering by Facebook*, N.Y. TIMES, Dec. 29, 2010, at B1 (reporting that Facebook "has more than 500 million users"); *see also* Alvan Balent, Note, *An Energy-Efficient Internet: The Next Revolution*, 37 FLA. ST. U. L. REV. 981, 981 (2010) (observing that Facebook is "changing basic modes of social interactions"); THE SOCIAL NETWORK (Columbia Pictures 2010) (film based on the meteoric rise of Facebook).

[108] Mansoura Ez-Eldin, *Date With a Revolution*, N.Y. TIMES, Jan. 31, 2011, at A19 (reporting that "the call arose on Facebook for an Egyptian revolution, to begin on Jan. 25"); Matt Bradley, *Rioters Jolt Egyptian Regime*, WALL ST. J., Jan. 26, 2011, at A1 (reporting on a rally in Egypt that was "planned and organized . . . on Facebook" and which attracted "[t]ens of thousands of protesters" who "clashed with police"). Similar stories could be told about Tunisia, and even Sudan. *See* Roger Cohen, *Facebook and Arab Dignity*, INT'L HERALD TRIB., Jan. 25, 2011, at 6 ("Tunisia was a Facebook revolution."); Jeffrey Gettleman, *Discontent is Growing in Sudan*, N.Y. TIMES, Feb. 3, 2011, at A13 ("[I]n an unusual show of boldness, thousands of young Sudanese, many responding to the Facebook call, have braved beatings and arrests to protest against their government.").

[109] Geoffrey A. Fowler & Liz Rappaport, *Corporate News: Facebook Deal Raises $1 Billion*, WALL ST. J., Jan. 22, 2011, at B4.

[110] *See, e.g.*, John Letzing, *Facebook Data Center Is Boon for Oregon Town – Internet Giant Brings More Than Jobs to Prineville as It Mulls Expansion; Free High School Uniforms and Dental Care*, WALL ST. J., Jan. 21, 2011, at B7 (describing employment and other economic benefits for the town where Facebook's data center is located).

Case 3:19-cv-01226-L-AHG   Document 34-8   Filed 01/03/20   PageID.7457   Page 80 of 192

entrepreneurs grow the economy and create jobs. Thus, while suffrage may have gotten all the attention, the biggest impact of our revised notion of infancy may be in the economic sphere rather than in the political arena.

### III. INFANCY UNDER SECTION 301 OF THE CARD ACT

For centuries, the legal age at which one left infancy and entered adulthood had been twenty-one. In the 1960s and 1970s, American society came to a consensus that the age of legal majority should be lowered to eighteen, as evidenced by the Twenty-Sixth Amendment to the Constitution and statutory enactments overruling the common law in every state. This consensus remains firmly in place, as evidenced by the fact that not a single state has tinkered with the new statutory age for voting, jury service, or contracting.

In 2009, however, Congress overruled every one of these statutes by enacting section 301 of the federal Credit CARD Act of 2009.[111] That section reinstates—for credit card contracts—the ancient common-law rule that those under twenty-one are infants lacking capacity to contract.[112] Indeed, the Act's prohibition is even harsher than the common-law rule. Under the common law, a contract with an infant is merely voidable by the infant,[113] but the CARD Act renders a credit card contract with an infant void, even if she would have preferred to abide by it.[114]

And this change in status for eighteen- to twenty-year-olds was accomplished without any significant public deliberation, let alone the type of massive social movement observed in the 1970s. The original draft of what became the CARD Act was introduced in January 2009 in the House of Representatives with more than forty cosponsors.[115] Section 301 in that original draft read almost exactly the same as the final version, except that it called for a minimum age of eighteen—not twenty-one—to obtain a credit card.[116] This was, of course, consistent with the modern understanding of adulthood.[117] The first appearance of the twenty-one year old age limit came in May 2009, after the bill was amended by the Senate,[118] and the very next day it was approved by the House and became law.[119] This limited

---

[111] See Credit Card Accountability Responsibility and Disclosure (CARD) Act of 2009, Pub. L. No. 111-24, § 301, 123 Stat. 1734, 1748.

[112] Id. ("PROHIBITION ON ISSUANCE.—No credit card may be issued to, or open end consumer credit plan established by or on behalf of, a consumer who has not attained the age of 21 . . . .").

[113] See supra Part II.D.

[114] See CARD Act § 301.

[115] H.R. 627, 111th Cong. (as introduced by the House, Jan. 22, 2009).

[116] Id. § 7.

[117] See supra Part II.

[118] See H.R. 627, 111th Cong. (as passed by the Senate, May 19, 2009).

[119] See H.R. 627, 111th Cong. (enacted). For a complete timeline relating to the passage of H.R. 627, see H.R. 627: To Amend the Truth in Lending Act to Establish Fair and Transparent Practices Relating to the Extension of Credit under an Open End Consumer Credit Plan, and for Other Purposes, N.Y. TIMES, http://politics.nytimes.com/

excursion into legislative history is merely meant to show that there was no social movement to replace the modern understanding of adulthood (i.e., eighteen) with its medieval counterpart (i.e., twenty-one), simply because there was no time for one.

There are two important exceptions to the CARD Act's ban on credit cards for infants. First, an infant under twenty-one years old may contract for a credit card if someone else, twenty-one years or older, cosigns and accepts joint liability for the infant's credit card debts.[120] Second, an infant may obtain a credit card if she demonstrates "independent means of repaying" her debt.[121] The upshot is that independently wealthy eighteen-year-olds, or those whose parents are willing and able to accept joint liability, will still be able to obtain a credit card. But poor and middle-income applicants may not.[122] In short, eighteen- to twenty-year-olds are now classified by the law as adults with full capacity to enter into any contract—except a credit card agreement.

Section 301 is a mistake for at least two reasons: First, section 301 is badly out of step with the modern consensus on adulthood and harms eighteen- to twenty-year-olds by treating them as infants. Second, section 301 will suppress socially beneficial youthful entrepreneurship, particularly by those of modest backgrounds, and is therefore contrary to the public interest.[123]

### A. Section 301 Contradicts Our Modern View of Adulthood

Section 301 conflicts directly with the statutory law of every state and the national consensus that eighteen-year-olds are adults with the capacity to make legally binding contracts.[124] As discussed in Part II, *supra*, our society wrestled in

---

congress/bills/111/hr627 (last visited Apr. 12, 2011).

[120] H.R. 627, 111th Cong. (enacted).

[121] *See id.* Federal Reserve regulations clarify that this means that the infant must be able, based on her own income, assets and current obligations, "to make the required minimum periodic payments" on the account. 12 C.F.R. §§ 226.51(b)(1)(i), (a)(1)(i) (2010).

[122] David Migoya, *Earning Credit in College: More Students Are Signing for Younger Peers to Skirt New Credit-Card Requirements*, DENVER POST, Sept. 7, 2010, at A15 ("'I don't have bad credit, but I can't get a card because my parents have the bad credit,' said Estevan Torres, a 20-year-old graphic arts student at Metropolitan State College of Denver.").

[123] A potential third problem with section 301 is that, by imposing a national infancy rule for credit card agreements, it is inconsistent with the basic federalist notion that the states should be "laboratories of democracy." *See* New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). However, the clearly interstate commercial nature of the credit card industry significantly undermines that concern.

[124] *See supra* Part II.D.

the 1960s and 1970s with the issue of when a person crosses the legal line from infancy to adulthood—and decided on a flat rule of eighteen years.[125]

Thanks to section 301, under current law an eighteen-year-old may legally bind herself to a $10,000 loan, a $100,000 home mortgage, or a $1 million stock purchase agreement—but not a credit card with a $100 limit. This is absurd. If eighteen-year-olds are sufficiently mature to make binding contracts of all other types (not to mention elect our leaders, serve as our jurors, and receive the death penalty for crimes)—and our societal consensus is that they are[126]—they are surely mature enough to hold a credit card.

Supporters of section 301 argue that eighteen-year-olds lack the necessary maturity and sophistication to enter into a credit card agreement.[127] But this is nothing more than the same old paternalistic argument that has been statutorily rejected in every state. And, as is often the case, this paternalistic policy has the perverse effect of harming the very people it is intended to help. Credit cards are ubiquitous in our society:[128] More than three-quarters of all Americans have one[129] and the total amount currently borrowed is close to $1 trillion.[130] This is because credit cards are extremely useful.[131] They are ideal for the financing of consumer

---

[125] Indeed, this consensus has more recently become a part of international law. The United Nations Convention on the Rights of the Child, adopted in 1989, and ratified by nearly every nation in the world, defines "child" in Article 1 as someone "below the age of eighteen years." Convention on the Rights of the Child, G.A. Res 44/25, U.N. DOC. A/44/736, at art. 1 (Nov. 20, 1989); *see also* David M. Rosen, *Who Is a Child? The Legal Conundrum of Child Soldiers*, 25 CONN. J. INT'L L. 81, 96 (2009) ("[H]umanitarian and human rights organizations have adopted the so-called 'Straight 18' position, which sets forth a universal definition of childhood as beginning at birth and ending at age eighteen.").

[126] *See supra* Part II.

[127] *See* Eboni S. Nelson, *Young Consumer Protection in the "Millennial" Age*, 2011 UTAH L. REV. 369, 377 (suggesting that "young consumers generally lack financial experience and knowledge"); *id.* at 378 (claiming that "young consumers' lack of financial knowledge impedes their ability to fully understand and consider the costs and consequences associated with credit card usage"); *id.* at 381 (asserting that "low self-control [i]s a factor contributing to young consumers' credit card indebtedness"); Dan Serra, *Know What to Expect from New Credit Card Regulations*, MCCLATCHY-TRIBUNE NEWS SERVICE, Feb. 22, 2010, at 1 (describing section 301 as "an effort to protect young adults from falling into credit holes").

[128] Katherine Porter, *The Debt Dilemma*, 106 MICH. L. REV. 1167, 1167 (2008).

[129] *Id.* at 1171.

[130] Mary Pilon, *Student-Loan Debt Surpasses Credit Cards*, WALL ST. J. (Aug. 9, 2010, 1:13 PM ET), http://blogs.wsj.com/economics/2010/08/09/student-loan-debt-surpasses-credit-cards/ ("Americans owe some $826.5 billion in revolving credit.").

[131] RONALD J. MANN, CHARGING AHEAD: THE GROWTH AND REGULATION OF PAYMENT CARD MARKETS 37–43 (2006); ROBERT D. MANNING, CREDIT CARD NATION 2 (2000) (suggesting that credit cards have "greatly enhanced our quality of life" by "offering convenient methods of payment" and "easy credit during periods of economic distress and uncertainty").

goods and services that one wants, but cannot immediately afford.[132] Alternatives such as "layaway"[133] or individual store credit[134] are clearly inferior to a single plastic card accepted essentially everywhere. Credit cards are also helpful for paying for things that one can afford, as they greatly reduce transaction costs compared to drafting a check or withdrawing cash from an ATM.[135] Section 301 takes away all of these benefits from eighteen- to twenty-year-olds.

Further, credit cards are often the first step on the road toward larger and more sophisticated debt, such as a home mortgage or a car loan, as the interest rate for such debt depends on one's "credit history." But by denying eighteen- to twenty-year-olds credit cards, section 301 deprives them of the ability to establish a credit history over those years. Again, children of wealthy parents need not worry, as their parents can cosign for them to ensure they start their credit history as early as possible.[136] But the children of modest backgrounds will emerge as twenty-one-year-olds without a credit history, forcing them to pay higher interest rates[137] and adversely affecting their chances of landing a job.[138] This is unfair and wrong.

Today's youth have registered their objections to section 301.[139] Shortly after the CARD Act was passed, the University of Michigan's student newspaper complained that it "doesn't respect the autonomy of college-aged individuals as legal adults and hurts their financial independence" and suggested that the "federal government should reevaluate the need to treat young adults like children."[140]

---

[132] MANN, *supra* note 131, at 42–43.

[133] *See, e.g.,* Ex Parte Alabama, No. 1090007, 2010 WL 5185393, at *1 (Ala. Dec. 22, 2010) (describing a typical layaway plan whereby a customer makes installment payments to a store toward an item and, once the customer has paid the total purchase price, the store tenders the item).

[134] *See, e.g.,* Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 447 (D.C. Cir. 1965) (describing a notorious installment credit agreement proffered by a furniture store).

[135] MANNING, *supra* note 131, at 2; Porter, *supra* note 128, at 1170 ("[T]he transaction costs savings of card-based transactions are quite significant."); *see also id.* ("[T]he current cost of processing paper checks in the United States equals about one-half of one percent of the gross domestic product." (citation omitted)). Much of these transaction cost savings of credit cards are paralleled by debit cards. *Id.* at 1170 n.16.

[136] Karen Gross, *New Credit-Card Rules May Hurt Financially Insecure Students,* CHRON. HIGHER EDUC. (July 13, 2009), http://chronicle.com/article/New-Credit-Card-Rules-May-Hurt/47039 ("[T]he requirement of a co-signature[] ensures that many middle- and upper-class students will continue to have access to credit because their parents have the means and willingness to repay any debts incurred.").

[137] Claudia Buck, *Steps You Can Take to Build Good Credit—Get a Card,* BUFFALO NEWS, Feb. 2, 2010, at C3; Gross, *supra* note 136.

[138] Gross, *supra* note 136 ("Increasingly, credit scores are checked by employers and insurance companies as well.").

[139] *See id.* ("For students using their cards appropriately, the new legislation can have the feel, as one financial blogger put it, of 'credit-card paternalism.'").

[140] *From the Daily: Adult Supervision Required,* MICH. DAILY (June 7, 2009), http://www.michigandaily.com/content/daily-adult-supervision-required. This article was later reprinted as: Ashley Goetz, *Credit Card Act Treats Adults as Children,* MINN. DAILY

Similarly, in an editorial titled "Credit Card Act Unfair to Responsible Young Adults," an eighteen-year-old high-school senior wryly complained: "I can vote, enlist in the army, get married and do just about everything else that a legal adult can do, all without asking my parents' permission. But now, I can only get a credit card if I ask Mommy and Daddy if they would please co-sign?"[141]

Some eighteen- to twenty-year-old college students have gone further than complaining—they figured out a way around the ban.[142] Rather than applying for a card on their own, or even asking their parents to cosign, they simply "ask classmates or fraternity brothers to co-sign" their credit card application, "sometimes for a small fee."[143] Indeed, thanks to section 301, some commentators believe a whole new industry could develop whereby enterprising college students "sell or rent out their good credit to younger students who are having trouble establishing credit for the first time."[144] And while such a practice is clearly contrary to the intent of the CARD Act, its very ingenuity is evidence of the sophistication that modern eighteen- to twenty-year-olds possess.[145]

The age of capacity was settled in the 1970s and, absent a massive social movement calling for reinstatement of the ancient common-law rule, Congress should have left it alone. Unfortunately, by treating eighteen- to twenty-year-olds as infants, section 301 harms this cohort by denying them the legal ability to obtain a credit card as the adults they are.

---

(June 9, 2009), http://www.mndaily.com/2009/06/09/credit-card-act-treats-adults-children ("Instead of allowing young adults the freedom they need to gain financial stability, the federal government seems committed to mollycoddling them. At some point, the federal government needs to realize that college students aren't kids anymore and that they need to learn to take care of themselves."). *See also* Paula Ebben, *Creatively Signing-Up For Credit Cards Can Put Students at Risk*, CBS BOSTON (Jan. 20, 2011, 6:08 PM), http://boston.cbslocal.com/2011/01/20/creatively-signing-up-for-credit-cards-can-put-students-at-risk/ ("Molly Heilny is frustrated. [Thanks to section 301, the] 20 year old college sophomore can't get a credit card. 'I don't really have anyone that could co-sign, so I could apply for a million credit cards and they're never going to give me one,' Heilny said."); Timothy Rabb, *Too Much Credit Card Control*, MICH. DAILY (Jan. 12, 2011), http://www.michigandaily.com/content/viewpoint-credit-card-control ("It's not fair to deprive responsible young adults from their right to a credit card . . . .").

[141] Katie Greenberg, *Credit Card Act Unfair to Responsible Young Adults*, BUCKS COUNTY COURIER TIMES, June 11, 2009, *available at* 2009 WLNR 12465939.

[142] Ebben, *supra* note 140 ("[E]xperts say some college students are finding loopholes and creative ways to get around the law.").

[143] Migoya, *supra* note 122; *accord* Susan Tompor, *Credit Card Offers Still Contain Trouble Spots for Consumers*, DETROIT FREE PRESS, Sept. 30, 2010, at B4 ("[S]ome college students who are 18 or 19 are asking friends 21 or older to co-sign their credit card applications,"); Ebben, *supra* note 140.

[144] Ebben, *supra* note 140 (quoting Gerri Detweiler, author of THE ULTIMATE CREDIT HANDBOOK).

[145] *Id.* ("[I]t's actually quite clever . . . ." (quoting John Ulzheimer of Credit.com)).

*B. Section 301 Contradicts Public Policy Favoring Entrepreneurship*

The youths directly affected by section 301 of the CARD Act are not the only ones harmed by it—we all are. Entrepreneurship is in the public interest, as it drives economic growth and job creation, and modern-day entrepreneurs depend critically on credit cards to finance their start-up companies. But section 301 withholds this crucial tool from potential youthful entrepreneurs, thus making it much more difficult for them to start their own businesses. This is clearly contrary to the strong public policy favoring entrepreneurship.

*1. Entrepreneurship Is in the Public Interest*

All agree that entrepreneurship is vital for economic growth and job creation in modern-day America and is therefore strongly in the public interest.[146] As President Obama recently explained, "[E]ntrepreneurialism is the key to our continued global leadership and the success of our people."[147] With respect to job creation—seen by many as our most pressing need right now[148]—recent scholarship reveals that start-up firms in their first year have been responsible for all net job creation in the United States since at least the 1970s, having added about three million jobs per year, even during recessions.[149] Start-ups are similarly key to general economic growth.[150] True, many of these start-ups eventually fold.[151] But those that survive are often the type of companies that create satisfying

---

[146] Barack Obama, *Toward a 21st-Century Regulatory System*, WALL ST. J., Jan. 18, 2011, at A17 ("America's free market has . . . been the greatest force for prosperity the world has ever known.").

[147] *Id.*

[148] *See, e.g.*, President Barack Obama, State of the Union Address (Jan. 27, 2010), *as reprinted in* 156 CONG. REC. H416–20 (daily ed. Jan. 27, 2010) (stating that because "jobs must be our number one focus in 2010 . . . [w]e should start where most new jobs do—in small businesses, companies that begin when an entrepreneur takes a chance on a dream, or a worker decides it's time she became her own boss").

[149] TIM KANE, KAUFFMAN FOUND., THE IMPORTANCE OF STARTUPS IN JOB CREATION AND JOB DESTRUCTION 5 (2010) (noting that all "net job growth in the United States comes from firms less than one year old, formally defined as startups"); *id.* at 2 ("[W]ithout startups, there would be no net job growth in the U.S. economy."); John C. Haltiwanger et al., *Who Creates Jobs? Small vs. Large vs. Young* 2 (Nat'l Bureau of Econ. Research, Working Paper No. 16300, 2010) ("Business startups contribute substantially to both gross and net job creation.").

[150] *See, e.g.*, 15 U.S.C. § 631a(a) (2006) ("For the purpose of preserving and promoting a competitive free enterprise economic system, Congress hereby declares that it is the continuing policy and responsibility of the Federal Government to . . . provide an opportunity for entrepreneurship, inventiveness, and the creation and growth of small businesses.").

[151] Steve Lohr, *To Create Jobs, Nurture Start-Ups*, N.Y. TIMES, Sept. 12, 2010, at BU3 ("Within five years, half of [start-up] businesses have folded.").

Case 3:19-cv-01226-L-AHG   Document 34-8   Filed 01/03/20   PageID.7463   Page 86 of 192

employment opportunities and whose products or services improve our quality of life.[152]

Our leaders and policy makers have long understood the importance of entrepreneurship to a thriving economy and society.[153] Congress has twice declared that "it is the continuing policy and responsibility of the Federal Government to . . . provide an opportunity for entrepreneurship . . . and the creation and growth of small businesses."[154] To that end, a portion of all federal contract dollars are statutorily required to go to small businesses, and the Small Business Administration guarantees loans for small businesses and provides free counseling and training to entrepreneurs.[155] Similarly, state and local governments endeavor to attract entrepreneurs to their communities.[156]

In short, entrepreneurship is in the public interest and start-up companies are actively encouraged as a matter of public policy. All of this is doubly true for youthful entrepreneurs, for in addition to all the ordinary benefits of entrepreneurship just discussed, youthful entrepreneurs add something unique: The creativity and energy of youth. Experience shows that eighteen- to twenty-year-olds are eager to challenge orthodox thinking and may be able to offer fresh, new solutions to vexing problems. Perhaps an older person could have founded Microsoft or Facebook, but their founders demonstrated a heedlessness for convention that is more commonly found in the young. And the result is that these companies have changed our world for the better.

---

[152] *Id.* ("[T]he survivors are prime candidates to join the young, dynamic companies that make an outsize contribution to innovation, productivity gains and job growth.").

[153] *See* Obama, *supra* note 146.

[154] 15 U.S.C. § 631a(a); *accord id.* § 631(a) ("The essence of the American economic system of private enterprise is free competition. . . . The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. . . . It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns . . . .").

[155] *See* ERIC TYSON & JIM SCHELL, SMALL BUSINESS FOR DUMMIES 89 (2d ed. 2003); *What We Do*, SBA.GOV, http://www.sba.gov/about-sba-services/what-we-do (last visited Mar. 30, 2011).

[156] *See, e.g.*, Patrick McGeehan, *Hoping to Lure Tech Jobs, City Seeks a Partner to Open Graduate School of Engineering*, N.Y. TIMES, Dec. 17, 2010, at A34 ("Worried that New York City is not spawning enough technology-based start-up companies with the potential to become big employers like Google, city officials are inviting universities around the world to create an engineering campus on city-owned land."). The phenomenon is not limited to the United States. *See, e.g.*, Clyde H. Farnsworth, *Russians Are Coming, but for Money*, N.Y. TIMES, Oct. 2, 1993, at A4 (reporting on "Canada's strong desire to attract entrepreneurs").

2. *Entrepreneurs Need Credit Card Financing*

Entrepreneurship is socially useful, but it is also notoriously risky, with as many as half of all start-up companies shutting their doors within a few years.[157] Thus, although start-ups "depend critically on access to credit,"[158] most banks and other traditional business lenders refuse to extend credit to them.[159] The risk/reward ratio is simply too high for banks to lend to start-up companies at any reasonable interest rate.[160] Once a company has established some sort of track record, a bank (or venture capitalist or angel investor) may be willing to lend[161]— but the company can obviously never reach that point unless it can launch in the first place and survive its earliest days.

The result is that entrepreneurs are often left to seek financing from their own savings and their friends and family.[162] But many potential entrepreneurs have neither significant personal savings nor a "rich Uncle Joe."[163] With the bank's doors (understandably) closed, where can such a person go for a relatively small amount of cash to start a new company?

---

[157] Hannah Seligson, *No Jobs? Young Graduates Make Their Own*, N.Y. TIMES, Dec. 12, 2010, at BU1 ("Roughly half of all new businesses fail within the first five years, according to federal data.").

[158] Shayndi Raice, *For Small Business, Slow Gains in Credit*, WALL ST. J., July 13, 2010, at A5 ("The formation and growth of small businesses depend critically on access to credit." (quoting Federal Reserve Chairman Ben Bernanke)); *see generally* ALICIA M. ROBB & DAVID T. ROBINSON, THE KAUFMAN FIRM SURVEY: THE CAPITAL STRUCTURE DECISIONS OF NEW FIRMS 11 (2008) ("[D]ebt plays a paramount role in funding nascent firms.").

[159] RHONDA ABRAMS, THE OWNER'S MANUAL FOR SMALL BUSINESS 215 (2005) ("[B]anks generally aren't an appropriate place for start-up capital . . . ."); PERI PAKROO, THE WOMEN'S SMALL BUSINESS START-UP KIT 98–99 (2010) ("[B]anks are notoriously reluctant to lend start-up funds to first-time entrepreneurs . . . ."); TYSON & SCHELL, *supra* note 155, at 87; David S. Joachim, *Betting Your Retirement on Your Start-Up*, N.Y. TIMES, Sept. 30, 2008, at SPG4 (reporting that "small-business loans" for start-up companies are "scarce these days"); Kristina Shevory, *With Squeeze on Credit, Microlending Blossoms*, N.Y. TIMES, July 28, 2010, at B7 ("Most banks, large or small, do not bother granting business loans of less than $50,000 because there's not enough profit to balance the risk."). The federal government does offer some funding through the Small Business Administration, but "SBA loans have a reputation for being cumbersome and subject to enormous red tape." TYSON & SCHELL, *supra* note 155, at 89.

[160] ABRAMS, *supra* note 159, at 215–16.

[161] *Id.* at 216 ("[B]anks prefer to lend money to companies that have been in business for at least one or two years.").

[162] PAKROO, *supra* note 159, at 104 ("Since start-ups are so commonly turned down by banks and other traditional funders, entrepreneurs often turn to friends and family for an injection of cash."); TYSON & SCHELL, *supra* note 155, at 84–86.

[163] *But cf.* TYSON & SCHELL, *supra* note 155, at 84 (noting that the financing discussion "assumes" the reader's "parents and family are financially able to help").

A credit card, of course, which provides an immediate line of credit, with little to no questions asked: "[U]nlike bank loan officers, private angel investors, or SBA bureaucrats, credit cards do not require extensive documentation or entail second guessing of business decisions."[164] Thus most entrepreneurs rely on credit cards to finance their start-up companies, particularly in their earliest days.[165] Even the most speculative ventures can be financed on plastic—simply because the lender places no limit on the purpose for which the credit can be used. This has greatly leveled the playing field for aspiring entrepreneurs, allowing those who hail from modest backgrounds to compete with those whose parents can provide start-up funds.[166]

And some of these start-up acorns grow into mighty oaks. Even one of the harshest critics of credit cards acknowledges that recent American history is "replete with examples of billion-dollar companies whose entrepreneurial seeds were nurtured with . . . credit cards during their formative start-up years."[167] Well-known examples include Cisco Systems,[168] CA Technologies,[169] and Spike Lee's film production studio, 40 Acres and a Mule.[170] This is all to the good.

---

[164] MANNING, *supra* note 131, at 229–30; *see also* TYSON & SCHELL, *supra* note 155, at 85 ("No personal guarantees here, no bankers looking over your shoulder; just sign your name and get on with the business at hand.").

[165] ABRAMS, *supra* note 159, at 217 ("According to the U.S. Small Business Administration (SBA), credit cards are the primary way entrepreneurs finance their businesses."); *id.* at 214 ("[M]ost entrepreneurs use credit cards for many start-up expenses."); CAITLIN FRIEDMAN & KIMBERLY YORIO, THE GIRL'S GUIDE TO STARTING YOUR OWN BUSINESS 64–65 (2003) ("Entrepreneurs often put start-up costs on their personal credit cards."); MANNING, *supra* note 131, at 228 ("[C]redit cards have become the number one source of financing for small businesses—supplanting bank loans in the late 1990s."); *id.* at 229 ("[M]ost business start-ups owe their early survival to plastic money."); *id.* at 241 ("For most aspiring entrepreneurs, . . . credit cards [are] their most reliable source of start-up capital."); ROBERT H. SCOTT III, THE KAUFMAN FIRM SURVEY: THE USE OF CREDIT CARD DEBT BY NEW FIRMS 1 (2009); *see also* BD. OF GOVERNORS OF THE FED. RESERVE SYS., REPORT TO THE CONGRESS ON THE USE OF CREDIT CARDS BY SMALL BUSINESSES AND THE CREDIT CARD MARKET FOR SMALL BUSINESSES 28 (2010) ("In 2009, 83 percent of small firms used credit cards . . . ."); RICHARD STIM & LISA GUERIN, RUNNING A SIDE BUSINESS: HOW TO CREATE SECOND INCOME 69 (2009) ("Mini-entrepreneurs depend on plastic.").

[166] MANNING, *supra* note 131, at 231; *see id.* at 238–56 (collecting stories of start-up companies financed with credit cards).

[167] *Id.* at 228.

[168] DAVID BUNNELL, MAKING THE CISCO CONNECTION: THE STORY BEHIND THE REAL INTERNET SUPERPOWER 24 (2000).

[169] MANNING, *supra* note 131, at 228.

[170] *Id.* at 227; *see also id.* at 227–28 (discussing THE BLAIR WITCH PROJECT (Haxan Films 1999)); SCOTT, *supra* note 165, at 2 ("*The Blair Witch Project*, a film that grossed more than \$250 million, was funded almost exclusively with credit card debt . . . ."); Miguel Helft, *For Start-Ups, Web Success on the Cheap*, N.Y. TIMES, Nov. 9, 2006, at C1 (reporting that Meebo, a successful web-based start-up company, was initially financed with the founders' credit cards).

### 3. Section 301 Inhibits Youthful Entrepreneurship

By categorically withholding credit cards from eighteen- to twenty-year-olds, section 301 seriously impedes their ability to start up a business. This is clearly contrary to the strong and bipartisan public policy favoring youthful entrepreneurship.[171] And, given the fact that credit cards are the most important method of financing early stage start-ups,[172] the effect is sure to be noticeable. Even worse, the group of youthful entrepreneurs who are most in need of credit card financing—those from modest backgrounds and whose family and friends are not wealthy—will be the ones least able to find a cosigner.[173]

Today's youth are excited about entrepreneurship. A recent survey found that 38% of eighteen- to twenty-one-year olds want to start a business of their own.[174] Despite the risks, many youths these days see entrepreneurship as "a viable career path, not a renegade choice."[175] Unfortunately, section 301 is likely to defer, if not deny, their business dreams, because a credit card is a practical necessity of a start-up in most cases. Had section 301 been in effect when Microsoft or Facebook were founded, they might never have gotten off the ground.[176] It is impossible to predict what companies will not be founded thanks to section 301, but surely some will not, and we will all be the worse off for it.

### IV. CONCLUSION

Section 301 of the Credit CARD Act, which denies credit cards to those aged eighteen to twenty-years-old, should be repealed. After much discussion in the 1960s and 1970s, our society rejected the ancient common-law rule that one is an infant until age twenty-one, and coalesced around the view that legal adulthood begins at eighteen. That consensus has not changed. Hence, by raising the age of contractual capacity to twenty-one, section 301 contradicts the well-established preferences of the public as well as the strong public policy favoring entrepreneurship. Just as eighteen-year-olds are deemed by the law to be sufficiently mature to enter into any other contract—and mature enough to be drafted, vote, serve as a juror, and be sentenced to death—then, *a fortiori*, they are mature enough to hold a credit card: Old enough to fight, old enough to swipe. Section 301 should be repealed.

---

[171] *See supra* Part III.B.1.

[172] *See supra* Part III.B.2.

[173] *See* Migoya, *supra* note 122.

[174] KAUFFMAN FOUND., YOUTHPULSE[SM] 2010, at 15 (2010).

[175] Seligson, *supra* note 157, at BU1.

[176] One response might be that both Gates and Zuckerberg came from relatively wealthy families and could have had a parent cosign for a credit card, even under section 301. True enough, but do we really want to limit entrepreneurship to the sons and daughters of the wealthy?

# EXHIBIT 44

# Emerging Adulthood

## *A Theory of Development From the Late Teens Through the Twenties*

Jeffrey Jensen Arnett
*University of Maryland College Park*

*Emerging adulthood is proposed as a new conception of development for the period from the late teens through the twenties, with a focus on ages 18–25. A theoretical background is presented. Then evidence is provided to support the idea that emerging adulthood is a distinct period demographically, subjectively, and in terms of identity explorations. How emerging adulthood differs from adolescence and young adulthood is explained. Finally, a cultural context for the idea of emerging adulthood is outlined, and it is specified that emerging adulthood exists only in cultures that allow young people a prolonged period of independent role exploration during the late teens and twenties.*

When our mothers were our age, they were engaged. . . . They at least had some idea what they were going to do with their lives. . . . I, on the other hand, will have a dual degree in majors that are ambiguous at best and impractical at worst (English and political science), no ring on my finger and no idea who I am, much less what I want to do. . . . Under duress, I will admit that this is a pretty exciting time. Sometimes, when I look out across the wide expanse that is my future, I can see beyond the void. I realize that having nothing ahead to count on means I now have to count on myself; that having no direction means forging one of my own. (Kristen, age 22; Page, 1999, pp. 18, 20)

For most young people in industrialized countries, the years from the late teens through the twenties are years of profound change and importance. During this time, many young people obtain the level of education and training that will provide the foundation for their incomes and occupational achievements for the remainder of their adult work lives (Chisholm & Hurrelmann, 1995; William T. Grant Foundation Commission on Work, Family, and Citizenship, 1988). It is for many people a time of frequent change as various possibilities in love, work, and worldviews are explored (Erikson, 1968; Rindfuss, 1991). By the end of this period, the late twenties, most people have made life choices that have enduring ramifications. When adults later consider the most important events in their lives, they most often name events that took place during this period (Martin & Smyer, 1990).

Sweeping demographic shifts have taken place over the past half century that have made the late teens and early twenties not simply a brief period of transition into adult roles but a distinct period of the life course, characterized by change and exploration of possible life directions. As recently as 1970, the median age of marriage in the United States was about 21 for women and 23 for men; by 1996,

it had risen to 25 for women and 27 for men (U.S. Bureau of the Census, 1997). Age of first childbirth followed a similar pattern. Also, since midcentury the proportion of young Americans obtaining higher education after high school has risen steeply from 14% in 1940 to over 60% by the mid-1990s (Arnett & Taber, 1994; Bianchi & Spain, 1996). Similar changes have taken place in other industrialized countries (Chisholm & Hurrelmann, 1995; Noble, Cover, & Yanagishita, 1996).

These changes over the past half century have altered the nature of development in the late teens and early twenties for young people in industrialized societies. Because marriage and parenthood are delayed until the mid-twenties or late twenties for most people, it is no longer normative for the late teens and early twenties to be a time of entering and settling into long-term adult roles. On the contrary, these years are more typically a period of frequent change and exploration (Arnett, 1998; Rindfuss, 1991).

In this article, I propose a new theory of development from the late teens through the twenties, with a focus on ages 18–25. I argue that this period, *emerging adulthood*, is neither adolescence nor young adulthood but is theoretically and empirically distinct from them both. Emerging adulthood is distinguished by relative independence from social roles and from normative expectations. Having left the dependency of childhood and adolescence, and having not yet entered the enduring responsibilities that are normative in adulthood, emerging adults often explore a variety of possible life directions in love, work, and worldviews. Emerging adulthood is a time of life when many different directions remain possible, when little about the future has been decided for certain, when the scope of independent exploration of life's possibilities is greater for most people than it will be at any other period of the life course.

For most people, the late teens through the midtwenties are the most *volitional* years of life. However, cultural influences structure and sometimes limit the extent to

I thank the following colleagues for their comments on drafts of this article: Jack Brunner, James Coté, Shirley Feldman, Nancy Galambos, Lene Arnett Jensen, John Modell, John Schulenberg, David Skeel, Dorothy Youniss, and James Youniss.

Correspondence concerning this article should be addressed to Jeffrey Jensen Arnett, Department of Human Development, University of Maryland. 3304 Benjamin Hall, College Park, MD 20742. Electronic mail may be sent to arnett@wam.umd.edu.

Copyright 2000 by the American Psychological Association, Inc. 0003-066X/00/$5.00
Vol. 55, No. 5, 469–480   DOI: 10.1037//0003-066X.55.5.469



**Jeffrey
Jensen Arnett**

which emerging adults are able to use their late teens and twenties in this way, and not all young people in this age period are able to use these years for independent exploration. Like adolescence, emerging adulthood is a period of the life course that is culturally constructed, not universal and immutable.

I lay out the theoretical background first and then present evidence to illustrate how emerging adulthood is a distinct period demographically, subjectively, and in terms of identity explorations. Next, I explain how emerging adulthood can be distinguished from adolescence and young adulthood. Finally, I discuss the economic and cultural conditions under which emerging adulthood is most likely to exist as a distinct period of the life course.

## The Theoretical Background

There have been a number of important theoretical contributions to the understanding of development from the late teens through the twenties. One early contribution was made by Erik Erikson (1950, 1968). Erikson rarely discussed specific ages in his writings, and in his theory of human development across the life course he did not include a separate stage that could be considered analogous to emerging adulthood as proposed here. Rather, he wrote of development in adolescence and of development in young adulthood. However, he also commented on the *prolonged adolescence* typical of industrialized societies and on the *psychosocial moratorium* granted to young people in such societies "during which the young adult through free role experimentation may find a niche in some section of his society" (Erikson, 1968, p. 156). Thus, Erikson seems to have distinguished—without naming—a period that is in some ways adolescence and in some ways young adulthood yet not strictly either one, a period in

which adult commitments and responsibilities are delayed while the role experimentation that began in adolescence continues and in fact intensifies.

Another theoretical contribution can be found in the work of Daniel Levinson (1978). Levinson interviewed men at midlife, but he had them describe their earlier years as well, and on the basis of their accounts he developed a theory that included development in the late teens and the twenties. He called ages 17–33 the *novice phase* of development and argued that the overriding task of this phase is to move into the adult world and build a stable life structure. During this process, according to Levinson, the young person experiences a considerable amount of change and instability while sorting through various possibilities in love and work in the course of establishing a life structure. Levinson acknowledged that his conception of the novice phase was similar to Erikson's ideas about the role experimentation that takes place during the psychosocial moratorium (Levinson, 1978, pp. 322–323).

Perhaps the best-known theory of development in the late teens and the twenties is Kenneth Keniston's theory of youth. Like Erikson and Levinson, Keniston (1971) conceptualized youth as a period of continued role experimentation between adolescence and young adulthood. However, Keniston wrote at a time when American society and some Western European societies were convulsed with highly visible youth movements protesting the involvement of the United States in the Vietnam War (among other things). His description of youth as a time of "tension between self and society" (Keniston, 1971, p. 8) and "refusal of socialization" (p. 9) reflects that historical moment rather than any enduring characteristics of the period.

More importantly, Keniston's (1971) application of the term *youth* to this period is problematic. *Youth* has a long history in the English language as a term for childhood generally and for what later became called adolescence (e.g., Ben-Amos, 1994), and it continues to be used popularly and by many social scientists for these purposes (as reflected in terms such as *youth organizations*). Keniston's choice of the ambiguous and confusing term *youth* may explain in part why the idea of the late teens and twenties as a separate period of life never became widely accepted by developmental scientists after his articulation of it. However, as I argue in the following sections, there is good empirical support for conceiving this period—proposed here as emerging adulthood—as a distinct period of life.

## Emerging Adulthood Is Distinct Demographically

Although Erikson (1968), Levinson (1978), and Keniston (1971) all contributed to the theoretical groundwork for emerging adulthood, the nature of the period has changed considerably since the time of their writings more than 20 years ago. As noted at the outset of this article, demographic changes in the timing of marriage and parenthood in recent decades have made a period of emerging adulthood typical for young people in industrialized societies. Postponing these transitions until at least the late twenties

leaves the late teens and early twenties available for exploring various possible life directions.

An important demographic characteristic of emerging adulthood is that there is a great deal of demographic variability, reflecting the wide scope of individual volition during these years. Emerging adulthood is the only period of life in which nothing is normative demographically (Rindfuss, 1991; Wallace, 1995). During adolescence, up to age 18, a variety of key demographic areas show little variation. Over 95% of American adolescents aged 12–17 live at home with one or more parents, over 98% are unmarried, fewer than 10% have had a child, and over 95% are enrolled in school (U.S. Bureau of the Census, 1997). By age 30, new demographic norms have been established: About 75% of 30-year-olds have married, about 75% have become parents, and fewer than 10% are enrolled in school (U.S. Bureau of the Census, 1997).

In between these two periods, however, and especially from ages 18 to 25, a person's demographic status in these areas is very difficult to predict on the basis of age alone. The demographic diversity and unpredictability of emerging adulthood is a reflection of the experimental and exploratory quality of the period. Talcott Parsons (1942) called adolescence the *roleless role*, but this term applies much better to emerging adulthood. Emerging adults tend to have a wider scope of possible activities than persons in other age periods because they are less likely to be constrained by role requirements, and this makes their demographic status unpredictable.

One demographic area that especially reflects the exploratory quality of emerging adulthood is residential status. Most young Americans leave home by age 18 or 19 (Goldscheider & Goldscheider, 1994). In the years that follow, emerging adults' living situations are diverse. About one third of emerging adults go off to college after high school and spend the next several years in some combination of independent living and continued reliance on adults, for example, in a college dormitory or a fraternity or sorority house (Goldscheider & Goldscheider, 1994). For them, this is a period of semiautonomy (Goldscheider & Davanzo, 1986) as they take on some of the responsibilities of independent living but leave others to their parents, college authorities, or other adults. About 40% move out of their parental home not for college but for independent living and full-time work (Goldscheider & Goldscheider, 1994). About two thirds experience a period of cohabitation with a romantic partner (Michael, Gagnon, Laumann, & Kolata, 1995). Some remain at home while attending college or working or some combination of the two. Only about 10% of men and 30% of women remain at home until marriage (Goldscheider & Goldscheider, 1994).

Amidst this diversity, perhaps the unifying feature of the residential status of emerging adults is the instability of it. Emerging adults have the highest rates of residential change of any age group. Using data from several cohorts of the National Longitudinal Study, Rindfuss (1991) described how rates of residential mobility peak in the mid-twenties (see Figure 1). For about 40% of the current generation of emerging adults, residential changes include

moving back into their parents' home and then out again at least once in the course of their late teens and twenties (Goldscheider & Goldscheider, 1994). Frequent residential changes during emerging adulthood reflect its exploratory quality, because these changes often take place at the end of one period of exploration or the beginning of another (e.g., the end of a period of cohabitation, entering or leaving college, or the beginning of a new job in a new place).

School attendance is another area in which there is substantial change and diversity among emerging adults. The proportion of American emerging adults who enter higher education in the year following high school is at its highest level ever, over 60% (Bianchi & Spain, 1996). However, this figure masks the expanding diversity in the years that follow. Only 32% of young people ages 25–29 have completed four years or more of college (U.S. Bureau of the Census, 1997). For emerging adults, college education is often pursued in a nonlinear way, frequently combined with work, and punctuated by periods of nonattendance. For those who do eventually graduate with a four-year degree, college is increasingly likely to be followed by graduate school. About one third of those who graduate with a bachelor's degree are enrolled in postgraduate education the following year (Mogelonsky, 1996). In European countries too, the length of education has become extended in recent decades (Chisholm & Hurrelmann, 1995).

Overall, then, the years of emerging adulthood are characterized by a high degree of demographic diversity and instability, reflecting the emphasis on change and exploration. It is only in the transition from emerging adulthood to young adulthood in the late twenties that the diversity narrows and the instability eases, as young people make more enduring choices in love and work. Rindfuss (1991) called the period from ages 18 to 30 "demographically dense" (p. 496) because of the many demographic transitions that take place during that time, especially in the late twenties.

## Emerging Adulthood Is Distinct Subjectively

Emerging adults do not see themselves as adolescents, but many of them also do not see themselves entirely as adults. Figure 2 shows that when they are asked whether they feel they have reached adulthood, the majority of Americans in their late teens and early twenties answer neither *no* nor *yes* but the ambiguous *in some respects yes, in some respects no* (Arnett, in press). This reflects a subjective sense on the part of most emerging adults that they have left adolescence but have not yet completely entered young adulthood (Arnett, 1994a, 1997, 1998). They have no name for the period they are in—because the society they live in has no name for it—so they regard themselves as being neither adolescents nor adults, in between the two but not really one or the other. As Figure 2 shows, only in their late twenties and early thirties do a clear majority of people indicate that they feel they have reached adulthood. However, age is only the roughest marker of the subjective transition from emerging adulthood to young adulthood. As

**Figure 1**
*Residential Change by Age, 1998*



*Note.* Data are from "Geographic Mobility: March 1997 to March 1998," by the U.S. Bureau of the Census, 2000, *Current Population Reports* (Series P-20, No. 520), Washington, DC: U.S. Government Printing Office.

**Figure 2**
*Subjective Conceptions of Adult Status in Response to the Question, Do You Feel That You Have Reached Adulthood?*



*Note.* N = 519. Data are from Arnett (in press).

illustrated in Figure 2, even in their late twenties and early thirties, nearly one third did not feel their transition to adulthood was complete.

One might expect emerging adults' subjective sense of ambiguity in attaining full adulthood to arise from the demographic diversity and instability described above. Perhaps it is difficult for young people to feel they have reached adulthood before they have established a stable residence, finished school, settled into a career, and married (or at least committed themselves to a long-term love relationship). However, perhaps surprisingly, the research evidence indicates strongly that these demographic transitions have little to do with emerging adults' conceptions of what it means to reach adulthood. Consistently, in a variety of studies with young people in their teens and twenties, demographic transitions such as finishing education, settling into a career, marriage, and parenthood rank at the *bottom* in importance among possible criteria considered necessary for the attainment of adulthood (Arnett, 1997, 1998, in press; Greene, Wheatley, & Aldava, 1992; Scheer, Unger, & Brown, 1994).

The characteristics that matter most to emerging adults in their subjective sense of attaining adulthood are not demographic transitions but individualistic *qualities of*

*character* (Arnett, 1998). Specifically, the two top criteria for the transition to adulthood in a variety of studies have been *accepting responsibility for one's self* and *making independent decisions* (Arnett, 1997, 1998; Greene et al., 1992; Scheer et al., 1994). A third criterion, also individualistic but more tangible, *becoming financially independent*, also ranks consistently near the top.

The prominence of these criteria for the transition to adulthood reflects an emphasis in emerging adulthood on becoming a self-sufficient person (Arnett, 1998). During these years, the character qualities most important to becoming successfully self-sufficient—accepting responsibility for one's self and making independent decisions—are being developed. Financial independence is also crucial to self-sufficiency, so it is also important in emerging adults' conceptions of what is necessary to become an adult. Only after these character qualities have reached fruition and financial independence has been attained do emerging adults experience a subjective change in their developmental status, as they move out of emerging adulthood and into young adulthood. For most young people in American society, this occurs some time during the twenties and is usually accomplished by the late twenties (Arnett, in press).

Although emerging adults do not view demographic transitions as necessary for attaining adulthood, it should be noted that parenthood in particular is often sufficient for marking a subjective sense of adult status. Parenthood ranks low in young people's views of the essential criteria for adulthood for people in general, but those who have had a child tend to view becoming a parent as the most important marker of the transition to adulthood for themselves (Arnett, 1998). The explorations that occur in emerging adulthood become sharply restricted with parenthood, because it requires taking on the responsibilities of protecting and providing for a young child. With parenthood, the focus of concern shifts inexorably from responsibility for one's self to responsibility for others.

## Emerging Adulthood Is Distinct for Identity Explorations

A key feature of emerging adulthood is that it is the period of life that offers the most opportunity for identity explorations in the areas of love, work, and worldviews. Of course, it is adolescence rather than emerging adulthood that has typically been associated with identity formation. Erikson (1950) designated identity versus role confusion as the central crisis of the adolescent stage of life, and in the decades since he articulated this idea the focus of research on identity has been on adolescence (Adams, 1999). However, as noted, Erikson (1950, 1968) clearly believed that industrialized societies allow a prolonged adolescence for extended identity explorations. If adolescence is the period from ages 10 to 18 and emerging adulthood is the period from (roughly) ages 18 to 25, most identity exploration takes place in emerging adulthood rather than adolescence. Although research on identity formation has focused mainly on adolescence, this research has shown that identity achievement has rarely been reached by the end of high

school (Montemayor, Brown, & Adams, 1985; Waterman, 1982) and that identity development continues through the late teens and the twenties (Valde, 1996; Whitbourne & Tesch, 1985).

The focus on identity issues in emerging adulthood can be seen in the three main areas of identity exploration: love, work, and worldviews. Identity formation involves trying out various life possibilities and gradually moving toward making enduring decisions. In all three of these areas, this process begins in adolescence but takes place mainly in emerging adulthood. With regard to love, American adolescents typically begin dating around ages 12 to 14 (Padgham & Blyth, 1991). However, because any serious consideration of marriage is a decade or more away for most 12- to 14-year-olds, young people view the early years of dating as primarily recreational (Roscoe, Dian, & Brooks, 1987). For adolescents, dating provides companionship, the first experiences of romantic love, and sexual experimentation; however, their dating relationships typically last only a few weeks or months (Feiring, 1996), and few adolescents expect to remain with their "high school sweetheart" much beyond high school.

In emerging adulthood, explorations in love become more intimate and serious. Dating in adolescence often takes place in groups, as adolescents pursue shared recreation such as parties, dances, and hanging out (Padgham & Blyth, 1991). By emerging adulthood, dating is more likely to take place in couples, and the focus is less on recreation and more on exploring the potential for emotional and physical intimacy. Romantic relationships in emerging adulthood last longer than in adolescence, are more likely to include sexual intercourse, and may include cohabitation (Michael et al., 1995). Thus, in adolescence, explorations in love tend to be tentative and transient; the implicit question is, Who would I enjoy being with, here and now? In contrast, explorations in love in emerging adulthood tend to involve a deeper level of intimacy, and the implicit question is more identity focused: Given the kind of person I am, what kind of person do I wish to have as a partner through life?

With regard to work, a similar contrast exists between the transient and tentative explorations of adolescence and the more serious and focused explorations of emerging adulthood. In the United States, the majority of high school students are employed part-time (Barling & Kelloway, 1999). Although adolescents often report that their work experiences enhance their abilities in areas such as managing their time and money (Mortimer, Harley, & Aronson, 1999), for the most part their jobs do not provide them with knowledge or experience that will be related to their future occupations (Greenberger & Steinberg, 1986; Steinberg & Cauffman, 1995). Most adolescents are employed in service jobs—at restaurants, retail stores, and so forth—in which the cognitive challenges are minimal and the skills learned are few. Adolescents tend to view their jobs not as occupational preparation but as a way to obtain the money that will support an active leisure life—paying for compact discs, concerts, restaurant meals, clothes, cars, travel, and

so forth (Bachman & Schulenberg, 1993; Shanahan, Elder, Burchinal, & Conger, 1996; Steinberg & Cauffman, 1995).

In emerging adulthood, work experiences become more focused on preparation for adult work roles. Emerging adults begin to consider how their work experiences will lay the groundwork for the jobs they may have through adulthood. In exploring various work possibilities, they explore identity issues as well: What kind of work am I good at? What kind of work would I find satisfying for the long term? What are my chances of getting a job in the field that seems to suit me best?

Emerging adults' educational choices and experiences explore similar questions. In their educational paths, they try out various possibilities that would prepare them for different kinds of future work. College students often change majors more than once, especially in their first two years, as they try on possible occupational futures, discard them, and pursue others. With graduate school becoming an increasingly common choice after an undergraduate degree is obtained, emerging adults' educational explorations often continue through their early twenties and mid-twenties. Graduate school allows emerging adults to switch directions again from the path of occupational preparation they had chosen as undergraduates.

For both love and work, the goals of identity explorations in emerging adulthood are not limited to direct preparation for adult roles. On the contrary, the explorations of emerging adulthood are in part explorations for their own sake, part of obtaining a broad range of life experiences before taking on enduring—and limiting—adult responsibilities. The absence of enduring role commitments in emerging adulthood makes possible a degree of experimentation and exploration that is not likely to be possible during the thirties and beyond. For people who wish to have a variety of romantic and sexual experiences, emerging adulthood is the time for it, because parental surveillance has diminished and there is as yet little normative pressure to enter marriage. Similarly, emerging adulthood is the time for trying out unusual work and educational possibilities. For this reason, short-term volunteer jobs in programs such as Americorps and the Peace Corps are more popular with emerging adults than with persons in any other age period. Emerging adults may also travel to a different part of the country or the world on their own for a limited period, often in the context of a limited-term work or educational experience. This too can be part of their identity explorations, part of expanding their range of personal experiences prior to making the more enduring choices of adulthood.

With regard to worldviews, the work of William Perry (1970/1999) has shown that changes in worldviews are often a central part of cognitive development during emerging adulthood. According to Perry, emerging adults often enter college with a worldview they have learned in the course of childhood and adolescence. However, a college education leads to exposure to a variety of different worldviews, and in the course of this exposure college students often find themselves questioning the worldviews they brought in. Over the course of their college years, emerging adults examine and consider a variety of possible worldviews. By the end of their college years they have often committed themselves to a worldview different from the one they brought in, while remaining open to further modifications of it.

Most of the research on changes in worldviews during emerging adulthood has involved college students and graduate students, and there is evidence that higher education promotes explorations and reconsiderations of worldviews (Pascarella & Terenzini, 1991). However, it is notable that emerging adults who do not attend college are as likely as college students to indicate that deciding on their own beliefs and values is an essential criterion for attaining adult status (Arnett, 1997). Also, research on emerging adults' religious beliefs suggests that regardless of educational background, they consider it important during emerging adulthood to reexamine the beliefs they have learned in their families and to form a set of beliefs that is the product of their own independent reflections (Arnett & Jensen, 1999; Hoge, Johnson, & Luidens, 1993).

Although the identity explorations of emerging adulthood make it an especially full and intense time of life for many people, these explorations are not always experienced as enjoyable. Explorations in love sometimes result in disappointment, disillusionment, or rejection. Explorations in work sometimes result in a failure to achieve the occupation most desired or in an inability to find work that is satisfying and fulfilling. Explorations in worldviews sometimes lead to rejection of childhood beliefs without the construction of anything more compelling in their place (Arnett & Jensen, 1999). Also, to a large extent, emerging adults pursue their identity explorations on their own, without the daily companionship of either their family of origin or their family to be (Jonsson, 1994; Morch, 1995). Young Americans ages 19–29 spend more of their leisure time alone than any persons except the elderly and spend more of their time in productive activities (school and work) alone than any other age group under 40 (Larson, 1990). Many of them see the condition of the world as grim and are pessimistic about the future of their society (Arnett, 2000b). Nevertheless, for themselves personally, emerging adults are highly optimistic about ultimately achieving their goals. In one national poll of 18- to 24-year-olds in the United States (Hornblower, 1997), nearly all—96%—agreed with the statement, "I am very sure that someday I will get to where I want to be in life."

## Other Notable Findings on Emerging Adulthood

The three areas outlined above—demographics, subjective perceptions, and identity explorations—provide the most abundant information on the distinctiveness of emerging adulthood. However, evidence is available from other areas that suggests possible lines of inquiry for future research on emerging adulthood. One of these areas is risk behavior. Although there is a voluminous literature on adolescent risk behavior and relatively little research on risk behavior in emerging adulthood (Jessor, Donovan, & Costa, 1991), the prevalence of several types of risk behavior peaks not

during adolescence but during emerging adulthood (ages 18–25). These risk behaviors include unprotected sex, most types of substance use, and risky driving behaviors such as driving at high speeds or while intoxicated (Arnett, 1992; Bachman, Johnston, O'Malley, & Schulenberg, 1996). Figure 3 shows an example for binge drinking.

What is it about emerging adulthood that lends itself to such high rates of risk behavior? To some degree, emerging adults' risk behaviors can be understood as part of their identity explorations, that is, as one reflection of the desire to obtain a wide range of experiences before settling down into the roles and responsibilities of adult life. One of the motivations consistently found to be related to participation in a variety of types of risk behavior is sensation seeking, which is the desire for novel and intense experiences (Arnett, 1994b). Emerging adults can pursue novel and intense experiences more freely than adolescents because they are less likely to be monitored by parents and can pursue them more freely than adults because they are less constrained by roles. After marriage, adults are constrained from taking part in risk behavior by the responsibilities of the marriage role, and once they have a child, they are constrained by the responsibilities of the parenting role. In one example of this, Bachman et al. (1996) used longitudinal data to show how substance use rises to a peak in the early twenties during the role hiatus of emerging adulthood, declines steeply and sharply following marriage, and declines further following the entry to parenthood. The responsibilities of these roles lead to lower rates of risk behavior as emerging adulthood is succeeded by young adulthood.

Research on family relationships among emerging adults has also been conducted. For American emerging adults in their early twenties, physical proximity to parents has been found to be *inversely* related to the quality of relationships with them. Emerging adults with the most frequent contact with parents, especially emerging adults still living at home, tend to be the least close to their parents and to have the poorest psychological adjustment (Dubas & Petersen, 1996; O'Connor, Allen, Bell, & Hauser, 1996). In European studies, emerging adults who remain at home tend to be happier with their living situations than those who have left home; they continue to rely on their parents as a source of support and comfort, but they also tend to have a great deal of autonomy within their parents' households (Chisholm & Hurrelmann, 1995). Thus, for emerging adults in both the United States and Europe, *autonomy* and *relatedness* are complementary rather than opposing dimensions of their relationships with their parents (O'Connor et al., 1996).

**Figure 3**
*Rates of Binge Drinking (Five or More Alcoholic Drinks in a Row) in the Past Two Weeks at Various Ages*



*Note.* Data are from "Transitions in Drug Use During Late Adolescence and Young Adulthood," by J. G. Bachman, L. D. Johnston, P. O'Malley, and J. Schulenberg, in *Transitions Through Adolescence: Interpersonal Domains and Context* (p. 118), by J. A. Graber, J. Brooks-Gunn, and A. C. Petersen (Eds.), 1996, Mahwah, NJ: Erlbaum. Copyright 1996 by Erlbaum. Used with permission. Data also available at http://www.monitoringthefuture.org/data/99data/pr99t1c.pdf.

These findings provide a foundation for research into development during emerging adulthood. Of course, much more work remains to be done on virtually every aspect of development during this period. To what extent do emerging adults rely on friends for support and companionship, given that this is a period when most young people have left their families of origin but have not yet entered marriage? To what extent are the explorations of emerging adulthood different for men and women? Do emerging adults have especially high rates of media use, given that they spend so much time alone? These and many other questions about the period await investigation. Establishing emerging adulthood as a distinct developmental period may help to promote this research.

## Why Emerging Adulthood Is Not Adolescence

It is widely known that the scientific study of adolescence began with the publication of G. Stanley Hall's two-volume magnum opus nearly a century ago (Hall, 1904). What is less widely known, however, is that in Hall's view adolescence extended from age 14 to age 24 (Hall, 1904, p. xix). In contrast, contemporary scholars generally consider adolescence to begin at age 10 or 11 and to end by age 18 or 19. The cover of every issue of the *Journal of Research on Adolescence,* the flagship journal of the Society for Research on Adolescence, proclaims that adolescence is defined as "the second decade of life." What happened between Hall's time and our own to move scholars' conceptions of adolescence earlier in the life course?

Two changes stand out as possible explanations. One is the decline that has taken place during the 20th century in the typical age of the initiation of puberty. At the beginning of the 20th century, the median age of menarche in Western countries was about 15 (Eveleth & Tanner, 1976). Because menarche takes place relatively late in the typical sequence of pubertal changes, this means that the initial changes of puberty would have begun at about ages 13–15 for most people, which is just where Hall designated the beginning of adolescence. However, the median age of menarche (and by implication other pubertal changes) declined steadily between 1900 and 1970 before leveling out, so that now the typical age of menarche in the United States is 12.5 (Brooks-Gunn & Paikoff, 1997). The initial changes of puberty usually begin about 2 years earlier, thus the designation of adolescence as beginning with the entry into the second decade of life.

As for the age when adolescence ends, the change in this age may have been inspired not by a biological change but by a social change: the growth of high school attendance that made high school a normative experience for adolescents in the United States. In 1900, only 10% of persons ages 14–17 were enrolled in high school. However, this proportion rose steeply and steadily over the course of the 20th century to reach 95% by 1985 (Arnett & Taber, 1994). This makes it easy to understand why Hall would not have chosen age 18 as the end of adolescence, because for most adolescents of his time no significant transition took place at that age. Education ended earlier, work began earlier, and leaving home took place later. Marriage and parenthood did not take place for most people until their early twenties or midtwenties (Arnett & Taber, 1994), which may have been why Hall designated age 24 as the end of adolescence. (Hall himself did not explain why he chose this age.)

In our time, it makes sense to define adolescence as ages 10–18. Young people in this age group have in common that they live with their parents, are experiencing the physical changes of puberty, are attending secondary school, and are part of a school-based peer culture. None of this remains normative after age 18, which is why it is not adequate simply to call the late teens and early twenties *late adolescence.* Age 18 also marks a variety of legal transitions, such as being allowed to vote and sign legal documents.

Although some scholars have suggested that the late teens and early twenties should be considered late adolescence (e.g., Elliott & Feldman, 1990), for the most part scholars on adolescence focus on ages 10–18 as the years of adolescent development. Studies published in the major journals on adolescence rarely include samples with ages higher than 18. For example, in 1997, 90% of the studies published in the *Journal of Research on Adolescence* and the *Journal of Youth & Adolescence* were on samples of high school age or younger. College students have been the focus of many research studies, but most often as "adults" in social psychology studies. Sociologists have studied the late teens and the twenties for patterns of demographic events viewed as part of the transition to adulthood (e.g., Hogan & Astone, 1986; Rindfuss, 1991). However, few studies have recognized the late teens through the twenties as a distinct developmental period.

## Why the Forgotten Half Remains Forgotten

In 1987, a distinguished panel of scholars and public policy officials was assembled by the William T. Grant Foundation and asked to address the life situations of young people who do not attend college after high school, especially with respect to their economic prospects. They produced an influential and widely read report entitled *The Forgotten Half: Non-College-Bound Youth in America* (William T. Grant Foundation Commission on Work, Family, and Citizenship, 1988), which contained an analysis of the circumstances of the "forgotten half" and a set of policy suggestions for promoting a successful transition from high school to work.

Over a decade later, the forgotten half remains forgotten by scholars, in the sense that studies of young people who do not attend college in the years following high school remain rare. Why did the Grant commission's widely acclaimed report not inspire more enduring scholarly attention to young people not attending college in this age period? One reason is practical. Studies of college students are ubiquitous because college students are so easy to find—most scholars who teach at colleges or universities

have ready access to them. Studying young people who are not in college is more difficult because they are not readily accessible in any institutional setting. Other ways of obtaining research participants in this age period must be used, such as contacting community organizations or taking out newspaper ads, and these samples often have the liability of being nonrepresentative. The same conditions apply to research on college students after they leave college. Few studies exist of young people in their midtwenties to late twenties, in part because they are not available in any institutional setting. Notable exceptions to this rule include some excellent longitudinal studies (the National Longitudinal Studies, e.g., Rindfuss, 1991; the Monitoring the Future studies, e.g., Bachman et al., 1996; O'Connor et al., 1996; Offer & Offer, 1975).

However, the dearth of studies on young people in their late teens and twenties is not due only to the difficulty of finding samples in this age group. It also arises from the lack of a clear developmental conception of this age group. Scholars have no clearly articulated way of thinking about development from the late teens through the twenties, no paradigm for this age period, so they may not think about young people at these ages as a focus for developmental research. Emerging adulthood is offered as a new paradigm, a new way of thinking about development from the late teens through the twenties, especially ages 18–25, partly in the hope that a definite conception of this period will lead to an increase in scholarly attention to it.

## Why Emerging Adulthood Is Not Young Adulthood

But (some might object) is there not already a paradigm for the years of the late teens and the twenties? Is that not what young adulthood is? The answer is *no*. There are a number of reasons why *young adulthood* is unsatisfactory as a designation for this developmental period.

One reason is that the use of *young adulthood* implies that adulthood has been reached at this point. As we have seen, most young people in this age period would disagree that they have reached adulthood. They see themselves as gradually making their way into adulthood, so *emerging adulthood* seems a better term for their subjective experience. More generally, the term *emerging* captures the dynamic, changeable, fluid quality of the period.

Also, if ages 18–25 are young adulthood, what would that make the thirties? Young adulthood is a term better applied to the thirties, which are still young but are definitely adult in a way that the years 18–25 are not. It makes little sense to lump the late teens, twenties, and thirties together and call the entire period *young adulthood*. The period from ages 18 to 25 could hardly be more distinct from the thirties. The majority of young people ages 18–25 do not believe they have reached full adulthood, whereas the majority of people in their thirties believe that they have (Arnett, in press). The majority of people ages 18–25 are still in the process of obtaining education and training for a long-term adult occupation, whereas the majority of people in their thirties have settled into a more stable

occupational path. The majority of people ages 18–25 are unmarried, whereas the majority of people in their thirties are married. The majority of people ages 18–25 are childless, whereas the majority of people in their thirties have had at least one child. The list could go on. The point should be clear. Emerging adulthood and young adulthood should be distinguished as separate developmental periods.

It should be emphasized, however, that age is only a rough indicator of the transition from emerging adulthood to young adulthood. Eighteen is a good age marker for the end of adolescence and the beginning of emerging adulthood, because it is the age at which most young people finish secondary school, leave their parents' home, and reach the legal age of adult status in a variety of respects. However, the transition from emerging adulthood to young adulthood is much less definite with respect to age. There are 19-year-olds who have reached adulthood—demographically, subjectively, and in terms of identity formation—and 29-year-olds who have not. Nevertheless, for most people, the transition from emerging adulthood to young adulthood intensifies in the late twenties and is reached by age 30 in all of these respects.

Emerging adulthood differs both from adolescence and from young adulthood in that it is, to some extent, defined by its heterogeneity. As noted, in emerging adulthood, there is little that is normative. Emerging adulthood is very much a transitional period leading to adulthood, and different emerging adults reach adulthood at different points. Also, the possibility of devoting the late teens and early twenties to explorations of various kinds is not equally available to all young people, and in any case, people vary in the degree of exploration they choose to pursue.

The heterogeneity of emerging adulthood represents both a warning and an opportunity for those who wish to study this age period. The warning is to be cautious in making sweeping statements about emerging adults. Almost always, such statements need to be qualified by mentioning the heterogeneity of emerging adulthood. The opportunity is that this heterogeneity makes emerging adulthood an especially rich, complex, dynamic period of life to study.

## Emerging Adulthood Across Cultures

Thus far, the focus of this article has been on emerging adulthood among young people in the West, especially in the United States. Is emerging adulthood a period of life that is restricted to certain cultures and certain times? The answer to this question appears to be *yes*. For example, Schlegel and Barry (1991), in their comprehensive integration of information on adolescence in 186 traditional non-Western cultures, concluded that adolescence as a life stage is virtually universal, but that a further period between adolescence and adulthood (*youth*, in the terminology they used) existed in only 20% of the cultures they studied. In the cultures in their sample, adulthood was typically signified by entry into marriage, and marriage usually took place at about ages 16 to 18 for girls and at about ages 18 to 20

for boys. This early timing of marriage allowed for a period of adolescence but not for a period of emerging adulthood.

Emerging adulthood, then, is not a universal period but a period that exists only in cultures that postpone the entry into adult roles and responsibilities until well past the late teens. Thus, emerging adulthood would be most likely to be found in countries that are highly industrialized or postindustrial. Such countries require a high level of education and training for entry into the information-based professions that are the most prestigious and lucrative, so many of their young people remain in school into their early twenties and midtwenties. Marriage and parenthood are typically postponed until well after schooling has ended, which allows for a period of exploration of various relationships before marriage and for exploration of various jobs before taking on the responsibility of supporting a child financially. Table 1 shows the median ages of marriage in a range of highly industrialized countries, contrasted with the median ages of marriage in selected developing countries.

Although median marriage ages are typically calculated on a countrywide basis, it should be noted that emerging adulthood is best understood as a characteristic of cultures rather than countries. Within some highly industrialized countries, members of minority cultures may have cultural practices that lead to a shortened period of emerging adulthood or no emerging adulthood at all. For example, in the United States, members of the Mormon church tend to have a shortened and highly structured emerging adulthood. Because of cultural beliefs prohibiting premarital sex and emphasizing the desirability of large families, considerable social pressure is placed on young Mormons to marry early and begin having children. Consequently, the median ages of marriage and first childbirth are much lower among Mormons than in the American population as a whole (Heaton, 1992), and young Mormons are likely to have a much briefer period of exploration before taking on adult roles.

Limitations in educational and occupational opportunities also influence the extent to which young people can experience their late teens and twenties as a volitional period. The young woman who has a child outside of marriage at age 16 and spends her late teens and early twenties alternating between welfare and low-paying jobs has little chance for exploration of possible life directions, nor does the young man who drops out of school and spends most of his late teens and early twenties unemployed and looking unsuccessfully for a job (Cote & Allahar, 1996). Because opportunities tend to be less widely available in minority cultures than in the majority culture in most industrialized countries, members of minority groups may be less likely to experience ages 18–25 as a period of independent exploration of possible life directions (Morch, 1995). However, social class may be more important than ethnicity, with young people in the middle class or above having more opportunities for the explorations of emerging adulthood than young people who are working class or below. Alternatively, it may be that explorations are not fewer in the working class but different, with more emphasis on work explorations and less emphasis on education. These are possibilities to be investigated.

In economically developing countries, there tends to be a distinct cultural split between urban and rural areas. Young people in urban areas of countries such as China and India are more likely to experience emerging adulthood, because they marry later, have children later, obtain more education, and have a greater range of occupational and recreational opportunities than young people in rural areas. In contrast, young people in rural areas of developing countries often receive minimal schooling, marry early, and have little choice of occupations except agricultural work. Thus in developing countries emerging adulthood is often experienced in urban areas but rarely in rural areas.

However, it should also be noted that emerging adulthood is likely to become more pervasive worldwide in the decades to come, with the increasing globalization of the world economy. Between 1980 and 1995, the proportion of young people in developing countries who attended secondary school rose sharply, and the median ages of marriage and first childbirth rose in these countries as well (Noble et al., 1996). As developing countries are becoming more integrated into a global economy, there is an increasing number of higher-paying jobs in these countries, jobs that require young people to obtain higher education. At the same time, as technology becomes increasingly available in these countries, particularly in agriculture, the labor of young people is becoming less and less necessary for family survival, making it possible for many of them to attend school instead.

These changes open up the possibility for the spread of emerging adulthood in developing countries. Economic development makes possible a period of the independent role exploration that is at the heart of emerging adulthood. As societies become more affluent, they are more likely to grant young people the opportunity for the extended moratorium of emerging adulthood, because they have no urgent need for young people's labor. Similarly, economic development is usually accompanied by increased life expectancy, and devoting years to the explorations of emerg-

**Table 1**
*Median Marriage Age of Women in Selected Countries*

| Industrialized countries | Age | Developing countries | Age |
|---|---|---|---|
| United States | 25.2 | Egypt | 21.9 |
| Canada | 26.0 | Morocco | 22.3 |
| Germany | 26.2 | Ghana | 21.1 |
| France | 26.1 | Nigeria | 18.7 |
| Italy | 25.8 | India | 20.0 |
| Japan | 26.9 | Indonesia | 21.1 |
| Australia | 26.0 | Brazil | 22.6 |

*Note.* Data are from *The World's Youth*, by J. Noble, J. Cover, and M. Yanagishita, 1996, Washington, DC: Population Reference Bureau. Copyright 1996 by the Population Reference Bureau. Reprinted with permission.

ing adulthood becomes more feasible and attractive when people can expect to live to be at least 70 or 80 rather than 40 or 50. Thus it seems possible that by the end of the 21st century emerging adulthood will be a normative period for young people worldwide, although it is likely to vary in length and content both within and between countries (Arnett, 2000a). The growth and variability of emerging adulthood in countries and cultures around the world would make an important and fascinating topic for a nascent scholarly field of emerging adulthood.

## Conclusion

Emerging adulthood has become a distinct period of the life course for young people in industrialized societies. It is a period characterized by change and exploration for most people, as they examine the life possibilities open to them and gradually arrive at more enduring choices in love, work, and worldviews. Not all young people experience their late teens and twenties as years of change and exploration, even in industrialized societies. Some lack the opportunities to use those years as a volitional period; others may be inclined by personality or circumstances to limit their explorations or to seek a relatively early resolution to them. Nevertheless, as scholars we can characterize emerging adulthood as a period when change and exploration are common, even as we recognize the heterogeneity of the period and investigate this heterogeneity as one of emerging adulthood's distinguishing characteristics.

Emerging adulthood merits scholarly attention as a distinct period of the life course in industrialized societies. It is in many respects the age of possibilities, a period in which many different potential futures remain possible and personal freedom and exploration are higher for most people than at any other time. It is also a period of life that is likely to grow in importance in the coming century, as countries around the world reach a point in their economic development where they may allow the prolonged period of exploration and freedom from roles that constitutes emerging adulthood.

### REFERENCES

Adams, G. R. (1999). *The objective measure of ego identity status: A manual on theory and test construction.* Guelph, Ontario, Canada: Author.

Arnett, J. (1992). Reckless behavior in adolescence: A developmental perspective. *Developmental Review, 12,* 339–373.

Arnett, J. J. (1994a). Are college students adults? Their conceptions of the transition to adulthood. *Journal of Adult Development, 1,* 154–168.

Arnett, J. (1994b). Sensation seeking: A new conceptualization and a new scale. *Personality and Individual Differences, 16,* 289–296.

Arnett, J. J. (1997). Young people's conceptions of the transition to adulthood. *Youth & Society, 29,* 1–23.

Arnett, J. J. (1998). Learning to stand alone: The contemporary American transition to adulthood in cultural and historical context. *Human Development, 41,* 295–315.

Arnett, J. J. (2000a). *Emerging adulthood: Prospects for the 21st century.* Manuscript submitted for publication.

Arnett, J. J. (2000b). High hopes in a grim world: Emerging adults' views of their futures and of "Generation X." *Youth & Society, 31,* 267–286.

Arnett, J. J. (in press). Conceptions of the transition to adulthood from adolescence through midlife. *Journal of Adult Development.*

Arnett, J. J., & Jensen, L. A. (1999, November). *A congregation of one:*
*The individualization of religious beliefs among people in their twenties.* Paper presented at the annual meeting of the Society for the Scientific Study of Religion, Boston, MA.

Arnett, J., & Taber, S. (1994). Adolescence terminable and interminable: When does adolescence end? *Journal of Youth & Adolescence, 23,* 517–537.

Bachman, J. G., Johnston, L. D., O'Malley, P., & Schulenberg, J. (1996). Transitions in drug use during late adolescence and young adulthood. In J. A. Graber, J. Brooks-Gunn, & A. C. Petersen (Eds.), *Transitions through adolescence: Interpersonal domains and context* (pp. 111–140). Mahwah, NJ: Erlbaum.

Bachman, J. G., & Schulenberg, J. (1993). How part-time work intensity relates to drug use, problem behavior, time use, and satisfaction among high school seniors: Are these consequences or just correlates? *Developmental Psychology, 29,* 220–235.

Barling, J., & Kelloway, E. K. (1999). *Young workers: Varieties of experience.* Washington, DC: American Psychological Association.

Ben-Amos, I. K. (1994). *Adolescence and youth in early modern England.* New Haven, CT: Yale University Press.

Bianchi, S. M., & Spain, D. (1996). Women, work, and family in America. *Population Bulletin, 51*(3), 1–48.

Brooks-Gunn, J., & Paikoff, R. (1997). Sexuality and developmental transitions during adolescence. In J. Schulenberg, J. L. Maggs, & K. Hurrelmann (Eds.), *Health risks and developmental transitions during adolescence* (pp. 190–219). New York: Cambridge University Press.

Chisholm, L., & Hurrelmann, K. (1995). Adolescence in modern Europe: Pluralized transition patterns and their implications for personal and social risks. *Journal of Adolescence, 18,* 129–158.

Cote, J. E., & Allahar, A. L. (1996). *Generation on hold: Coming of age in the late twentieth century.* New York: New York University Press.

Dubas, J. S., & Petersen, A. C. (1996). Geographical distance from parents and adjustment during adolescence and young adulthood. *New Directions for Child Development, 71,* 3–19.

Elliott, G. R., & Feldman, S. S. (1990). Capturing the adolescent experience. In S. S. Feldman & G. R. Elliott (Eds.), *At the threshold: The developing adolescent* (pp. 1–14). Cambridge, MA: Harvard University Press.

Erikson, E. H. (1950). *Childhood and society.* New York: Norton.

Erikson, E. H. (1968). *Identity: Youth and crisis.* New York: Norton.

Eveleth, P., & Tanner, J. (1976). *Worldwide variation in human growth.* New York: Cambridge University Press.

Feiring, C. (1996). Concepts of romance in 15-year-olds. *Journal of Research on Adolescence, 6,* 181–200.

Goldscheider, F., & Davanzo, J. (1986). Semiautonomy and leaving home during early adulthood. *Social Forces, 65,* 187–201.

Goldscheider, F., & Goldscheider, C. (1994). Leaving and returning home in 20th century America. *Population Bulletin, 48*(4), 1–35.

Greenberger, E., & Steinberg, L. (1986). *When teenagers work: The psychological and social costs of adolescent employment.* New York: Basic Books.

Greene, A. L., Wheatley, S. M., & Aldava, J. F., IV. (1992). Stages on life's way: Adolescents' implicit theories of the life course. *Journal of Adolescent Research, 7,* 364–381.

Hall, G. S. (1904). *Adolescence: Its psychology and its relation to physiology, anthropology, sociology, sex, crime, religion, and education* (Vol. 1). Englewood Cliffs, NJ: Prentice-Hall.

Heaton, T. B. (1992). Demographics of the contemporary Mormon family. *Dialogue, 25,* 19–34.

Hogan, D. P., & Astone, N. M. (1986). The transition to adulthood. *Annual Review of Sociology, 12,* 109–130.

Hoge, D. R., Johnson, B., & Luidens, D. A. (1993). Determinants of church involvement of young adults who grew up in Presbyterian churches. *Journal of the Scientific Study of Religion, 32,* 242–255.

Hornblower, M. (1997, June 9). Great Xpectations. *Time, 149,* 58–68.

Jessor, R., Donovan, J. E., & Costa, F. M. (1991). *Beyond adolescence: Problem behavior and young adult development.* New York: Cambridge University Press.

Jonsson, B. (1994, March). *Youth life projects and modernization in Sweden: A cross-sectional study.* Paper presented at the biennial meeting of the Society for Research on Adolescence, San Diego, CA.

Keniston, K. (1971). *Youth and dissent: The rise of a new opposition.* New York: Harcourt Brace Jovanovich.

Larson, R. W. (1990). The solitary side of life: An examination of the time people spend alone from childhood to old age. *Developmental Review, 10,* 155–183.

Levinson, D. J. (1978). *The seasons of a man's life.* New York: Ballantine.

Martin, P., & Smyer, M. A. (1990). The experience of micro- and macroevents: A life span analysis. *Research on Aging, 12,* 294–310.

Michael, R. T., Gagnon, J. H., Laumann, E. O., & Kolata, G. (1995). *Sex in America: A definitive survey.* New York: Warner Books.

Mogelonsky, M. (1996, May). The rocky road to adulthood. *American Demographics, 18,* 26–36, 56.

Montemayor, R., Brown, B., & Adams, G. (1985). *Changes in identity status and psychological adjustment after leaving home and entering college.* Paper presented at the biennial meeting of the Society for Research on Child Development, Toronto, Ontario, Canada.

Morch, S. (1995). Culture and the challenge of adaptation: Foreign youth in Denmark. *International Journal of Comparative Race and Ethnic Studies, 2,* 102–115.

Mortimer, J. T., Harley, C., & Aronson, P. J. (1999). How do prior experiences in the workplace set the stage for transitions to adulthood? In A. Booth, A. C. Crouter, & M. J. Shanahan (Eds.), *Transitions to adulthood in a changing economy: No work, no family, no future?* (pp. 131–159). Westport, CT: Praeger.

Noble, J., Cover, J., & Yanagishita, M. (1996). *The world's youth.* Washington, DC: Population Reference Bureau.

O'Connor, T. G., Allen, J. P., Bell, K. L., & Hauser, S. T. (1996). Adolescent–parent relationships and leaving home in young adulthood. *New Directions in Child Development, 71,* 39–52.

Offer, D., & Offer, J. B. (1975). *From teenage to young manhood.* New York: Basic Books.

Padgham, J. J., & Blyth, D. A. (1991). Dating during adolescence. In R. M. Lerner, A. C. Petersen, & J. Brooks-Gunn (Eds.), *Encyclopedia of adolescence* (pp. 196–198). New York: Garland.

Page, K. (1999, May 16). The graduate. *Washington Post Magazine, 152,* 18, 20.

Parsons, T. (1942). Age and sex in the social structure of the United States. *American Sociological Review, 7,* 604–616.

Pascarella, E., & Terenzini, P. (1991). *How college affects students: Findings and insights from twenty years of research.* San Francisco: Jossey-Bass.

Perry, W. G. (1999). *Forms of ethical and intellectual development in the college years: A scheme.* San Francisco: Jossey-Bass. (Original work published 1970)

Rindfuss, R. R. (1991). The young adult years: Diversity, structural change, and fertility. *Demography, 28,* 493–512.

Roscoe, B., Dian, M. S., & Brooks, R. H. (1987). Early, middle, and late adolescents' views on dating and the factors influencing partner selection. *Adolescence, 22,* 59–68.

Scheer, S. D., Unger, D. G., & Brown, M. (1994, February). *Adolescents becoming adults: Attributes for adulthood.* Poster presented at the biennial meeting of the Society for Research on Adolescence, San Diego, CA.

Schlegel, A., & Barry, H., III. (1991). *Adolescence: An anthropological inquiry.* New York: Free Press.

Shanahan, M., Elder, G. H., Jr., Burchinal, M., & Conger, R. D. (1996). Adolescent earnings and relationships with parents: The work–family nexus in urban and rural ecologies. In J. T. Mortimer & M. D. Finch (Eds.), *Adolescents, work, and family: An intergenerational developmental analysis* (pp. 97–128). Thousand Oaks, CA: Sage.

Steinberg, L., & Cauffman, E. (1995). The impact of employment on adolescent development. In R. Vasta (Ed.), *Annals of child development* (Vol. 11, pp. 131–166). London: Kingsley.

U.S. Bureau of the Census. (1997). *Statistical abstracts of the United States: 1997.* Washington, DC: Author.

U.S. Bureau of the Census. (2000). *Geographic mobility: March 1997 to March 1998* (Current Population Reports, Series P-20, No. 520). Washington, DC: U.S. Government Printing Office.

Valde, G. A. (1996). Identity closure: A fifth identity status. *Journal of Genetic Psychology, 157,* 245–254.

Wallace, C. (1995, April). *How old is young and young is old? The restructuring of age and the life course in Europe.* Paper presented at Youth 2000: An International Conference, Middlesborough, UK.

Waterman, A. L. (1982). Identity development from adolescence to adulthood: An extension of theory and a review of research. *Developmental Psychology, 18,* 341–358.

Whitbourne, S. K., & Tesch, S. A. (1985). A comparison of identity and intimacy statuses in college students and alumni. *Developmental Psychology. 21,* 1039–1044.

William T. Grant Foundation Commission on Work, Family, and Citizenship. (1988). *The forgotten half: Non-college-bound youth in America.* Washington, DC: William T. Grant Foundation.

# EXHIBIT 45

DEVELOPMENTAL REVIEW 12, 339–373 (1992)

# REVIEW
# Reckless Behavior in Adolescence: A Developmental Perspective

## JEFFREY ARNETT

### University of Missouri-Columbia

A developmental theory of reckless behavior among adolescents is presented, in which sensation seeking and adolescent egocentrism are especially prominent factors. Findings from studies of automobile driving, sex without contraception, illegal drug use, and minor criminal activity are presented in evidence of this. The influence of peers is then discussed and reinterpreted in the light of sensation seeking and adolescent egocentrism. Socialization influences are considered in interaction with sensation seeking and adolescent egocentrism, and the terms narrow and broad socialization are introduced. Factors that may be responsible for the decline of reckless behavior with age are discussed.   © 1992 Academic Press, Inc.

> I would that there were no age between ten and three-and-twenty, or that youth would sleep out the rest; for there is nothing in between but getting wenches with child, wronging the ancientry, stealing, fighting . . .
>
> William Shakespeare, "The Winter's Tale," Act III, Scene 3

Adolescence bears a heightened potential for recklessness compared to other developmental periods in every culture and in every time. The forms that this proclivity takes, and even whether it is allowed expression at all, depend on the characteristics of the particular culture and the particular time. "Wronging the ancientry" may not be a social problem in the late 20th century, but new forms of recklessness have arisen in our time—driving a car while under the influence of alcohol, for example. Other forms of recklessness appear and reappear across time: the delinquency and sexual recklessness alluded to centuries ago in the above quote are characteristic of adolescence in our age as well. Contemporary theory and research on adolescence have emphasized that the storm and stress popularly thought to be characteristic of adolescence have been exaggerated and that adolescence is not necessarily a tumultuous period of development, but it remains true that adolescents are overrepresented statistically in virtually every category of reckless behavior.

Correspondence and reprint requests should be addressed to Jeffrey Arnett, Ph.D., Department of Human Development and Family Studies, 31 Stanley Hall, University of Missouri-Columbia, Columbia, MO 65211.

0273-2297/92 $5.00
Copyright © 1992 by Academic Press, Inc.
All rights of reproduction in any form reserved.

Various forms of reckless behavior have been studied, but thus far there have been few attempts to identify the factors that might underlie all varieties of recklessness or to explain why reckless behavior is especially prevalent in adolescence. In what follows, threads from various areas that bear directly or indirectly on reckless behavior in adolescence will be drawn together in an effort to establish a developmental understanding of it.

Studies in this area have used a number of terms to describe behavior similar to what is discussed here as reckless behavior. For example, Jessor and Jessor (1977; Jessor, 1987a,b, 1990) have discussed what they term ''problem behavior.'' This includes behavior of interest here, such as drug use and minor criminal activity, as well as sexual activity (with or without contraceptives) and alcohol consumption (at any level). The term reckless behavior is preferred here because it carries stronger connotations of the potential for negative consequences—serious personal injury or death, an unwanted pregnancy, or arrest and conviction by the legal system. Thus, while sexual activity among adolescents may be ''problem behavior,'' in the sense that many adults do not approve of it, it is not considered reckless behavior here unless they engage in sex without the use of contraception. Similarly, alcohol consumption is defined as problem behavior in that it is discouraged for adolescents in the U.S. below the age of 21, but it would not be considered reckless behavior here unless it were combined with automobile driving or some other activity that raised the stakes of the potential consequences.

Other forms of reckless behavior have been referred to using the term ''risk taking.'' However, ''risk'' is a term that has been used to refer not only to acts with serious potential consequences, but also to economic calculations and gambling judgments, where the focus is on monetary gain or loss, and to behavior such as truancy and willingness to volunteer for psychological experiments, where even the worst outcome is not profound. ''Recklessness'' is also preferred to ''thrill seeking,'' since many activities (e.g., parachute jumping, rafting, rock climbing) may be thrilling but also socially acceptable, and the potential for serious consequences resulting from them is slight. Danger is recognized but deliberately minimized; with reckless behavior, on the contrary, precautions that could easily be taken are not. Still, the terms overlap considerably, and the ideas presented here are intended to apply to most forms of problem behavior and risk taking.

Adolescence will be discussed here as extending from puberty to the early 20's. This is a wider range than typically defined, but if adolescence is the time from the beginning of puberty until adult responsibilities are taken on, it is an appropriate range for our culture. Adolescence is a bridge between childhood and adulthood, during which the individual is

gaining further education and training that will enable him/her to fulfill a useful role in adult society. The demarcation of the end of adolescence must always be somewhat arbitrary, since in most societies there is likely to be variance among individuals in the completion of that period of preparation. But certainly a young person who is in college at someone else's expense has not yet completed adolescence, nor has a young person who has chosen not to attend college but is working a variety of short-term jobs while trying to decide upon a future direction and living with his/her parents during this period. In our culture, establishing an independent household is delayed until the early 20's for most people—today only 24.3% of 18- to 24-year-olds run their own households (U.S. Department of Education, 1988)—and in general adolescence cannot be said to have been completed until this responsibility is assumed.

The goal of this paper is fivefold: (1) to argue that a variety of forms of reckless behavior have common underlying factors that are especially characteristic of adolescence as a developmental stage; (2) to present evidence indicating that sensation seeking and adolescent egocentrism are two of the most influential of these factors; (3) to reinterpret the influence of peers in the light of sensation seeking and adolescent egocentrism; (4) to consider the interactions between sensation seeking/egocentrism and socialization; and (5) to suggest directions for research on the course of reckless behavior from adolescence to young adulthood.

## FORMS OF RECKLESS BEHAVIOR

In what ways does reckless behavior in adolescence manifest itself in our time? Some of the most prevalent forms are driving at high speeds and while under the influence of alcohol, engaging in sex without using contraception, using illegal and potentially dangerous drugs, and engaging in minor criminal activity. Each of them, of course, has unique features and a complex network of causes—inexperience may play a role in driving fatalities, etc. The model presented here is intended to delineate the developmental foundation of causes that these different forms of reckless behavior have in common, in addition to their unique characteristics. All of them are more common among adolescents than among any other age group. Furthermore, the theory is intended to apply to other, less common forms of reckless behavior, in addition to the four categories used here for illustration.

### Driving at High Speeds and While Drunk

Reckless driving behavior is among the most pervasive and damaging social problems of American society, and it is a problem that is especially

Case 3:19-cv-01226-L-AHG  Document 34-8  Filed 01/03/20  PageID.7484  Page 107 of 192

characteristic of adolescents. Adolescents are not only more likely than those in other age groups to drive after drinking (Jonah & Wilson, 1984), but they also drive faster, drive closer to vehicles in front of them, and use seat belts less frequently (Jonah, 1986). This is a lethal combination. In 1986, adolescents (aged 16–24) comprised 18.7% of the licensed drivers, but 38.7% of the drunk drivers involved in fatal accidents (U.S. Bureau of the Census, 1987). Drivers aged 16–19 have the highest rate of involvement in accidents resulting in injuries (Jonah, 1984) and fatalities (Williams, 1985) of any age group, and over half of the fatally injured drivers aged 16–25 have been found to have blood alcohol levels above the legal limit (Beirness, Haas, Walsh, & Donelson, 1985). Automobile accidents are the leading cause of death among people aged 16 to 24 (U.S. Department of Education, 1988).

## Sex without Contraception

In recent years in the U.S. over a million unmarried girls aged 15 to 19 have become pregnant each year, the highest number and the highest rate of premarital pregnancies of any age group. These statistics are predictable in light of the finding that over two-thirds of unmarried girls have had sex by age 19, and only one-third of sexually active girls aged 15–19 use contraceptives consistently (Zelnik & Kantner, 1980). Young women aged 15–24 have both the highest abortion rate (Tietze, 1983) and the highest out-of-wedlock birth rate (U.S. Department of Education, 1988) of any age group.

## Illegal Drug Use

The use of illegal drugs can be considered reckless in a number of different ways. The more powerful drugs, such as heroine and cocaine, carry the risk of a fatal overdose. Another risk is contained in the fact that most illegal drugs are potentially addictive. And even the more benign illegal drugs, such as marijuana, carry by definition the risk that the user will be arrested and prosecuted for using them.

Adolescents have the highest rate of use of virtually every kind of illegal drug. Persons 12–25 years old are five times more likely than persons over 26 to be current users of marijuana; five times more likely to be current users of hallucinogens; and six times more likely to be users of stimulants (U.S. Bureau of the Census, 1987). Heroin use is also highest among 18- to 25-year-olds (Fishburne, Abelson, & Cisin, 1980). Furthermore, drug use among adolescents is not restricted to a phase in early adolescence; use of alcohol, marijuana, and cocaine increases throughout early to mid adolescence and declines sharply only after the early 20's (Gans, Blyth, Elster, & Gaveras, 1990).

### Delinquency and Crime

Studies of the prevalence of delinquency and criminal activity such as minor theft and vandalism have found the proportion of adolescents who have recently engaged in such activity in some form to range from about one-quarter (Levine & Kozak, 1979) to over three-quarters (Farrington, 1989) depending on factors such as the time interval in question and urban or nonurban location. The prevalence rates in this area are especially high in early adolescence (Farrington, 1989; Levine & Kozak, 1979; Murphy, 1986). Statistics of arrests underestimate the prevalence of minor criminal activity among adolescents, as offenders in this age group are more likely than older offenders to be cautioned rather than prosecuted (Murphy, 1986). Nevertheless, arrests for offenses such as vandalism and larceny theft are also far more common for adolescents than for adults (Wilson & Herrnstein, 1985, p. 130). What is true for minor criminal activity is also true for crime generally, with regard to age differences, although most other crime is less normative and more characteristic of a highly reckless subgroup of adolescents. Even when factors such as education, occupation, family size, and quality of home life are taken into account, the association of age with criminal behavior is preeminent (Rowe & Tittle, 1977).

## MULTIPLE RECKLESS BEHAVIOR

Among adolescents, a propensity for recklessness tends to be reflected not just in one type of behavior, but in a variety of forms. Elster, Lamb, and Tavare (1987) found that among a national sample of adolescent males, those who had fathered a child by age 19 were also more likely to report marijuana use, police involvement, shoplifting, and antisocial aggression. Similar findings were reported for a national sample of adolescent females: self-reported behaviors at age 15–17 such as fighting and use of marijuana and other drugs were predictive of bearing a child by age 21 (Elster, Ketterlinus, & Lamb, 1989). Other studies have noted correlations between delinquency and drug use (Levine & Singer, 1988); premarital pregnancy and drug use (Yamaguchi & Kandel, 1987); sexual behavior, delinquency, drug use, and school misbehavior (Hundleby, 1987); and problem drinking, marijuana use, delinquency, and early sexual intercourse (Donovan, Jessor, & Costa, 1988). An understanding of any of these problems might be fostered by identifying factors that underlie all of them.

The focus in this paper is on reckless behavior from a developmental perspective. Reckless behavior is analyzed as a common feature of the adolescent age period, not as aberrant or deviant behavior and not as an indication of psychopathology. These kinds of behavior certainly are ab-

errant and deviant when set against the adult standard of acceptable be-
havior, but with half or more adolescents reporting that they have expe-
rienced drunk driving (Arnett, 1990a), sex without contraception (Zelnik
& Kantner, 1980), illegal drug use (U.S. Department of Education, 1988),
and some form of minor criminal activity (Farrington, 1989), reckless
behavior becomes virtually a normative characteristic of adolescent de-
velopment. It is true that reckless behavior may be in some cases a
reflection of psychopathology (Brill & Cristie, 1974) or of pathogenic
family conditions (Dembo, Dertke, laVoie, & Bonders, 1987), or at least
partly a response to parental neglect, hostility, or absence (Davis &
Cross, 1973; Hansson, O'Conner, Jones, & Blocker, 1981; Johnson,
Shontz, & Locke, 1984; Stern, Northmn, & Van Slyck, 1984). But the
very prevalence of reckless behavior calls into question the common
assumption that it necessarily arises from pathological personal charac-
teristics or from pathogenic socialization practices or that reckless be-
havior is always deviant behavior for adolescents. Because reckless be-
havior is so pervasive among adolescents, other explanations are called
for that explain it in terms of factors that are features of adolescence as a
developmental stage. On the other hand, it is not being suggested here
that all adolescents are reckless, only that adolescents as a group engage
in a disproportionate amount of reckless behavior.

## FACTORS PROMOTING RECKLESS BEHAVIOR

### Sensation Seeking

In part, reckless behavior in adolescence can be viewed as a manifes-
tation of what Zuckerman (1979a) terms ''sensation seeking.'' Sensation
seeking is a dimension of personality that is characterized by ''the need
for varied, novel, and complex sensations and experiences and the will-
ingness to take physical and social risks for the sake of such experiences''
(Zuckerman, 1979a, p. 10). The implication of this is that people who are
high in sensation seeking are willing, even eager, to engage in reckless
behavior in order to produce intense and/or novel sensation. And adoles-
cents, as a group, are especially high in sensation seeking. Scores on the
Sensation Seeking Scale (Zuckerman, Eysenck, & Eysenck, 1978) are
highest at age 16 (the lowest age included in the development of the scale),
and there is a steady decline with age.

In the Sensation Seeking Scale (SSS), there are four subscales. The
Thrill and Adventure Seeking (TAS) subscale concerns the individual's
inclination to engage in novel and intense recreation such as water skiing
or mountain climbing. The Disinhibition (Dis) subscale concerns social
drinking, enjoyment of loud and lively parties, and sexual attitudes. Items
on the Boredom Susceptibility (BS) subscale tap the degree of the indi-

vidual's aversion to repetition, routine, and unexciting people. The Experience Seeking (ES) subscale focuses on desire for travel, pursuit of a nonconforming way of life, and generally the seeking of unusual experiences through the mind and senses. Age differences are strongest for the TAS and Dis subscales; for females, there is a steady decline with age on all subscales, but for males only scores on the TAS and Dis subscales decline significantly with age (Zuckerman et al., 1978).

Sensation seeking has been found to be directly and indirectly related to reckless behavior in a variety of studies. One study has confirmed its relation to drunk driving among adolescents (Arnett, 1990a), and it has also been shown in separate studies to be related to alcohol use (Schwartz, Burkhart, & Green, 1978; Zuckerman, Bone, Neary, Mangelsdorff, & Brustman, 1972) and to dangerous driving practices (Zuckerman and Neeb, 1980). An early study (Goldstein & Mosel, 1958) found positive attitudes toward speed and risk taking while driving to be predictive of the number of traffic violations and accidents in which the individual had been involved. Sensation seeking has also been found to be related to sex without contraception among adolescents (Arnett, 1990b) and to a variety of sexual experiences (Zuckerman et al., 1972; Zuckerman, Tushup, & Fenner, 1976). In the area of drug use, Satinder and Black (1984) found sensation seeking to be related to the use of marijuana and LSD on all four subscales of the SSS and on the total score. Also, SSS scores have been found to be related to the number of different drugs used by drug abusers (Spotts & Shontz, 1984; Sutker, Archer, & Allain, 1978). Indirectly, adolescents report sensation seeking motives—"out of curiosity;" "to see what it was like"—overwhelmingly as their strongest motive for trying illegal drugs (Levine & Kozak, 1979). With regard to crime and delinquency, Perez and Torrubia (1985) reported a significant relation between sensation seeking and antisocial behavior for a sample of Spanish medical students for the total SSS score and all four subscales. Also, use of an early form of the SSS indicated that prisoners who were high in sensation seeking were guilty of more criminal behavior, for both males (Farley, 1973) and females (Farley & Farley, 1972). Indirectly, Wilson and Herrnstein (1985), noting the small potential gains involved in property crimes committed by juveniles, suggest that these adolescents are motivated partly by "sheer adventurousness" (p. 133), which may be taken to indicate a high level of sensation seeking.

The biological basis of sensation seeking, which has received considerable research attention (see Zuckerman, 1984), provides further insight into the prevalence of reckless behavior during adolescence. Table 1 summarizes the evidence connecting biological factors to sensation seeking and reckless behavior. Scores on the SSS have been found to be related to Average Evoked Potential (AEP) augmenting–reducing, which is a

TABLE 1
BIOLOGICAL FACTORS IN SENSATION SEEKING AND RECKLESS BEHAVIOR

| Biological factor | Age differences | Relation to sensation seeking | Relation to reckless behavior |
|---|---|---|---|
| AEP augmenting–reducing | Younger augment; older reduce | SS positively related to augmenting | Augmenting related to alcohol and depressant drug use, delinquency, criminality |
| MAO levels | Increase with age or no difference | SS negatively related to MAO levels | Low MAO related to drug and alcohol use, criminality |
| Sex hormone levels | Testosterone declines with age | Dis subscale positively related to testosterone and estrogen levels | Testosterone levels related to violent crime, sexual attitudes and experience |

measure of the brain's tendency to respond to a strong visual or auditory stimulus by augmenting the stimulus (increasing its intensity) or reducing it (responding less to a highly intense stimulus than to a slightly less intense stimulus). Augmenting is considered to indicate a ''strong'' nervous system, while reducing represents a ''weak'' one (Zuckerman, 1984). A number of studies (Buchsbaum, 1971; Coursey, Buchsbaum, & Frankel, 1975; Lukas & Siegel, 1981) have shown SSS scores to be positively related to augmenting, especially the Disinhibition subscale, and it has also been shown that younger subjects tend to be augmenters, while older subjects tend to be reducers (Buchsbaum, 1974). Also, augmenting has been found to be related to delinquency (Silverman, Buchsbaum, & Stierlin, 1973) and criminality (Blackburn, 1978; Emmons & Webb, 1974), which indicates a common biological basis for sensation seeking and these manifestations of reckless behavior. More directly, both augmenting and high scores on the Disinhibition subscale have been found in sociopaths, delinquents, and drug users (Zuckerman, 1984).

Monoamine oxidase (MAO) is an enzyme that is related to the synaptic sensitivity of neurons; the higher the MAO level, the less sensitive the neurons. Platelet MAO levels have been found to be negatively correlated with SSS scores (Murphy, Belmaker, Buchsbaum, Wyatt, Martin, & Ciaranello, 1977; Schooler, Zahn, Murphy, & Buchsbaum, 1978); high sensation seekers tend to have low MAO levels and low sensation seekers tend to have high MAO levels. In relation to reckless behavior, a study of 18-year-old Swedish draftees found that low-MAO males were higher in

SSS scores than high-MAO males, and the low-MAO males were also more likely to report reckless behavior such as drug use and criminality (von Knorring, Oreland, & Winbald, 1983). Low MAO levels are also characteristic of alcoholics (Major & Murphy, 1978) and chronic marijuana users (Stillman et al., 1978). Since MAO is negatively correlated with sensation seeking and sensation seeking is negatively correlated with age, one might reasonably expect to find that MAO levels increase with age; one study (Robinson, Davis, Nies, Ravaris, & Sylvester, 1971) bears this out, although another (Murphy, Wright, Buchsbaum, Nichols, Costa, & Wyatt, 1976) reports no age differences in MAO levels.

Sensation seeking has also been demonstrated to be related to levels of sex hormones. Daitzman, Zuckerman, Sammelwitz, and Ganjam (1978) found levels of androgen and estrogen to be positively related to scores on the Dis subscale, even when age, height, weight, and recency of orgasm were controlled. Testosterone levels, like sensation seeking, decline steadily with age from the 20's onward (Harman, 1978). Testosterone levels have also been found to be related directly and indirectly to reckless behavior. Directly: although there is not a clear correlation between aggressiveness and testosterone in the normal range, male prisoners who have committed especially violent crimes tend to have higher testosterone levels than other prisoners (Rose, 1978). Indirectly: Daizman and Zuckerman (1980) report that testosterone level is positively correlated with variety of sexual experiences and with permissiveness in sexual attitudes.

It is worth noting in this context that there are clear sex differences in sensation seeking, the reckless behavior associated with it, and the biological factors that underlie it. Scores on the SSS are higher among males than among females at all ages (Zuckerman et al., 1978). Males are higher on most types of reckless behavior (including drunk driving (Clark & Midanik, 1980), drug use (U.S. Bureau of the Census, 1987, p. 112), and property crimes such as vandalism (Wilson & Herrnstein, 1985)). Males are also different than females on some biological markers in ways that point to a higher level of sensation seeking. They have higher testosterone levels (Daitzman & Zuckerman, 1980) and lower levels of platelet MAO (Murphy et al., 1976; Robinson et al., 1971), although the findings concerning the relation between augmenting–reducing and gender are mixed (see Zuckerman, 1983).

It should be added that there are certain psychometric limitations of the Sensation Seeking Scale, in its construction and in how it has been used. The phrasing of some items is awkward and lends itself to misreading, and certain words in it are anachronistic (e.g., ''hippies,'' ''jet set'') and reflective of the late 1960s–early 1970s period when the scale was developed. Also, some of the studies that have purported to demonstrate the relationship between sensation seeking and behavior have failed to ac-

knowledge the potential for item overlap between the SSS and the be-
havior it is said to predict. For example, numerous studies (Satinder &
Black, 1984; Spotts & Shontz, 1984; Sutker et al., 1978) have reported a
significant relation between drug use and scores on the SSS, while failing
to note that 3 of the 40 items on the SSS directly concern drug use and
apparently neglecting to delete those items. Nevertheless, the SSS has
proven useful in establishing the personality trait of sensation seeking and
its relation to a wide range of behaviors. Sensation seeking is rich as a
theoretical construct and holds the potential for further operationalizing
in relation to reckless behavior. (See Arnett (1992) for an alternative
scale.)

In summary, sensation seeking may form a large part of the foundation
of reckless behavior among adolescents. Scores on the Sensation Seeking
Scale are highest in adolescence, and research evidence suggests that
sensation seeking is related to various forms of reckless behavior. The
biological factors related to sensation seeking—Average Evoked Poten-
tial, MAO levels, and gonadal hormones—help to explain the particular
intensity of sensation seeking (and, in turn, of reckless behavior) during
adolescence.

## Cognitive Factors

In some respects, cognitive development is considered to be complete
by the time the individual reaches mid adolescence. In Piaget's formula-
tion, the stage of formal operations begins at age 12–13 and is consoli-
dated, if not complete, by the age of 15–16. Research has accumulated,
however, to show that the attainment of formal operations is not nearly as
universal as was once thought (Flavell, 1985) and that even adults who
possess it may use it only in special circumstances (Keating, 1980; Mosh-
man, 1979). Adults are for the most part not entirely rational thinkers, and
the deficiencies of reasoning that afflict adults are even more acute among
adolescents (Kuhn, Phelps, & Walters, 1985).

Chief among these deficiencies, for an understanding of reckless be-
havior in adolescence, may be Elkind's (1967, 1968, 1985) conception of
adolescent egocentrism. Egocentrism among younger children is charac-
terized, in Piagetian theory, by a failure to differentiate between subject
and object, a failure to understand clearly where the self ends and the
other begins. In Elkind's view, this is a cognitive deficiency that has not
been entirely overcome by adolescence.

In adolescence, the advent of formal operations confers the ability to
consider thoughts as objects, both one's own thoughts and the thoughts of
others. But egocentrism persists: adolescents are likely to confuse the
two, so that they are prone to attribute to others many of the thoughts that

are in fact their own. In particular, they may believe that others are as preoccupied with their behavior and appearance as they are; they construct an imaginary audience, in Elkind's terminology, that is constantly monitoring and evaluating their behavior.

How is this related to reckless behavior? The existence of the imaginary audience leads adolescents to conclude that there is something unique and unparalleled about their lives; it must be so, since so many others are preoccupied with their behavior. This, in turn, leads to a conviction that—by virtue of the fact that their lives are so exceptional—they are invulnerable to the consequences of reckless behavior. As Elkind puts it, ''Perhaps because he believes he is of importance to so many people, the imaginary audience, he comes to regard himself . . . as something special and unique. Only he can suffer with such agonized intensity, or experience such exquisite rapture . . . This belief in personal uniqueness becomes a conviction that he will not die, that death will not happen to him'' (1967, p. 1031). This is the personal fable, ''a story which he tells himself and which is not true'' (p. 1031).

The concept of the personal fable has important applications to reckless behavior in adolescence. But Elkind puts more emphasis on the imaginary audience than on the personal fable in his theory of adolescent egocentrism, so the personal fable bears some expansion and elaboration here. First, it is necessary to describe how the attainment of formal operations fosters the development of the personal fable. One of the hallmarks of formal operations is that there is a new conception of the real vs the ideal. Adolescents are capable of thinking in terms of hypothetical situations to a degree that younger children are not. This fosters the idealism that is highly characteristic of adolescents; they are capable of imagining an ideal world, a world free from the multiple ills that afflict the present one. As Piaget notes, the egocentrism of the adolescent makes it difficult for him/her to recognize the inevitable real-world impediments to idealistic visions of how things ought to be: ''Adolescent egocentricity is manifested by a belief in the omnipotence of reflection, as though the world should submit itself to idealistic schemes rather than to systems of reality. It is the metaphysical age *par excellance:* the self is strong enough to reconstruct the universe and big enough to incorporate it'' (Piaget, 1967, p. 64).

Applied to adolescents on a personal level, it might be argued that this expanded imaginative capacity inspires an ideal vision of their own lives. In the same way they can imagine a just and contented world, they may imagine the course of their lives as smooth and sure, an untrammeled path to success and happiness. Clearly, that ideal does not include being afflicted with disasters. And in the same way that the adolescent's conception of an ideal society overlooks the potential flaws in it, and does not follow competely the complex implications and consequences of it, so the

adolescent's conception of the course of his own life is unsullied by the possibility that some calamity will befall him as a consequence of behaving recklessly. Adolescents are not fully aware that the world inherently holds the potential for irremediable tragedy as well as for ultimate triumph. The personal fable is precisely the adolescent's conviction that he/she is exempt from the disastrous consequences that sometimes result—for others—from reckless behavior.

Another, related way that cognitive factors can be understood to play a role in reckless behavior is in the adolescent's capacity for probability reasoning. It is possible to think of reckless behavior as resulting partly from a failure of probability reasoning. The personal fable may underlie this failure. One could say that the personal fable leads adolescents to distort the perceived risk of a given behavior in their favor: one set of probabilities applies to others, and another, unique set applies to themselves. So, for example, in considering the risks of driving while under the influence of alcohol, an adolescent may consider the possibility of getting a ticket or getting into an accident to be relatively high for others, relatively low or nonexistent for him/herself. As Piaget and Inhelder (1975) point out, in every judgement of probability there is a reference, implicit or explicit, to a system of distributions or frequencies. Adolescents' perceptions of these systems are skewed by their desire for sensation and by the personal fable that convinces them of their immunity from disaster.

Understanding probability and chance is one of the most sophisticated and difficult mental challenges there is, even for the person who has reached formal operations. In contrast to deductive determinations, for which a certain answer is obtainable, the outcomes of events involving probability are, by their very nature, uncertain (Piaget & Inhelder, 1975). Even if one knows that an event has a 90% chance of occurring under a given set of conditions, on a particular occasion it is impossible to say with absolute certainty that the event will occur. It is this elusive quality of probability reasoning that makes it especially vulnerable to the distortions of egocentrism. If Piaget and Inhelder (1975) are correct, the adolescent contemplating some form of reckless behavior has in mind a system of distributions or frequencies that describe the likelihood that the contemplated act will result in a disastrous outcome. The probability judgement of adolescents is poor (Ross & DeGrot, 1982; Wavering, 1984); but, even if an adolescent were exceptionally proficient at estimating probabilities, on a given occasion the likelihood of disaster resulting from drunk driving, or sex without contraception, or illegal drug use, or delinquency/crime is, in fact, statistically small—even when applied to others. Applied to the self, and seen through the dual lens of sensation seeking and egocentrism, the perceived probability fades even further.

Tversky and Kahneman (1973; Kahneman & Tversky, 1972) describe

Case 3:19-cv-01226-L-AHG   Document 34-8   Filed 01/03/20   PageID.7493   Page 116 of 192

two common heuristics for judging probability, both of which have applications in this context. Probability reasoning is inherently difficult, they note, and so when faced with a task that requires it, people employ heuristics to assess them. One of these heuristics they term *representativeness*. This refers to the tendency to judge an event as probable "to the extent that it represents the essential features of the parent population . . . When judging the probability of an event by representativeness, one compares the essential features of the event to those of the structure from which it originates" (Tversky & Kahneman, 1973, pp. 207–208). For our present purposes, then, when adolescents consider the probability that disaster will result from reckless behavior, they (implicitly) imagine a probability distribution. But when applied to themselves, the "essential feature" that is different is that it is "me" that is being considered, not some anonymous other. So even in situations where adolescents have an accurate understanding of the statistical probability of negative consequences resulting from reckless behavior, they may regard that distribution as being only very weakly representative of their own probability of suffering those consequences.

This kind of thinking is demonstrated most clearly in the research concerning sex without contraception. A perplexing finding in that area is that there is apparently little relationship between what adolescent girls know about fertility, conception, and contraception and whether or not they use contraception. Some studies do find a relationship between knowledge and use of contraception (Furstenberg, 1976; Oskamp & Mindick, 1981), but to the puzzlement and dismay of those who would advocate early and comprehensive sex education for children, there simply is not a strong relationship between knowledge of contraception and the use of contraception; studies just as numerous find no relationship between them (Cvetkovich, Grote, Bjorseth, & Sarkissian, 1975; Cvetkovich & Grote, 1981; Gerrard, McCann, & Fortini, 1983; Kane & Lachenbruch, 1973). Representativeness makes sense of this paradox. Even when adolescents learn about the general probability of becoming pregnant, they may not consider their own fate to be strongly represented by that distribution.

The other heuristic described by Tversky and Kahneman is *availability*. Probability judgements are influenced by the ease with which relevant instances come to mind: "Classes whose instances are easy to construct or imagine will be perceived as more frequent than classes of the same size whose instances are less available" (Tversky & Kahneman, 1973, p. 211). Tversky and Kahneman present a number of experiments supporting this idea. For example, subjects are asked to suppose that a word is selected at random. Is K more likely to be the first letter or the third letter of that word? Since words in which K is the first letter come to mind more

352                                    JEFFREY ARNETT

easily than words in which K is the third letter, words with K as the first
letter should be judged as more frequent, and indeed they are. With
regard to reckless behavior, we might say that when an adolescent con-
siders the likelihood that negative consequences will result from a reck-
less act, at that tender age occasions where negative consequences have
indeed occurred are unlikely to be readily available. Simply knowing
someone else who suffered negative consequences is unlikely to have
much affect, because of adolescent egocentrism (although it may depend
on the proximity of the relation). As with representativeness, the influ-
ence of a memory of a similar situation depends on the perceived simi-
larity between the past situation and the current one. If the two are seen
to be similar, then one might expect that what happened in the past will
recur—but if the past situation involved someone else, it is unlikely that
adolescents will perceive it as being sufficiently similar to a current situ-
ation involving ''me.''

In fact, for most adolescents the available precedents may even act to
strengthen their conviction of exemption from disaster. The adolescent
him/herself may in fact have driven a car while intoxicated, had sex
without contraception, taken illegal drugs, or committed acts of delin-
quency many times without suffering for it. ''Getting away with it'' very
likely bolsters and inflates whatever cognitive distortion existed to begin
with. Winston Churchill observed that ''nothing in life is so exhilarating
as to be shot at without result.'' Most adolescents would, in their own
way, heartily agree.

Studies supporting this model of the influence of cognitive factors on
reckless behavior can be found in the areas of driving behavior, sex
without contraception, and criminal behavior. In the area of automobile
driving, it has been reported in several studies that adolescents take
greater risks when driving and estimate their likelihood of getting into an
accident, drunk or sober, as lower than their peers. Arnett (1990a) re-
ported that high school-age males who have driven while drunk estimate
the likelihood of an accident resulting from drunk driving as lower than do
their peers who have not driven while drunk. Finn and Bragg (1986) found
that younger drivers (18–24 years old) estimated their likelihood of getting
into an accident as lower than that of their peers and lower than that of
older drivers (38–50), in general and for a variety of specific driving sit-
uations, including driving after consuming six beers within 1 h. Older
drivers were less likely to show this tendency to rate themselves as su-
perior to their peers. In a study by Matthews and Moran (1986), adoles-
cent/young adult (18–25) and older adult (35–50) subjects were asked to
make ratings of accident likelihood on a questionnaire of driving situa-
tions and after observing a variety of videotaped driving sequences. On
both the questionnaire and the videotape ratings, the younger subjects

consistently rated themselves as less likely to be involved in an accident in those situations than their peers, and also rated their ability to handle the situations in a manner similar to that of the older drivers. Again, older drivers did not exhibit as strongly biased a judgment of themselves in relation to their peers.

Concerning sex without contraception, a number of studies have provided evidence of the role of egocentrism and probability misjudgement. Kalmuss (1986) found that the perceived probability of becoming pregnant (from engaging in sexual activity without using birth control) is the strongest predictor of birth control use. Similarly, Gerrard et al. (1983) found that ''ineffective'' contraceptive users (those sexually active adolescent females who use unreliable contraception or none at all) are more likely than effective users to view their probability of becoming pregnant as low. Also, among the sexually active female adolescents studied by Oskamp and Mindick (1981), those who used contraception were less likely to believe that they could not get pregnant easily than those who did not use contraception. It should be noted, however, that in most research on sex without contraception, methodological problems call the results into question. Subjects typically have been drawn from girls who come to birth control clinics. Nevertheless, a study of a normal cross-section of high school-age females found this same pattern, with girls who had had sex without contraception estimating the likelihood of pregnancy resulting from that activity as lower than girls who had not (Arnett, 1990b).

Several studies of probability judgments in relation to crime also have implications in this area. A number of studies find that criminal behavior is inversely related to the perceived risk of formal sanctions (Erikson, Gibbs, & Jensen, 1977; Grasmick & Milligan, 1976; Jensen, Gibbs, & Erikson, 1978), and it has also been found that the perceived probability that negative consequences will result from crime increases with age (Piliavin, Thornton, Gartner, & Matsueda, 1986).

In summary, both theory and research suggest that cognitive factors play a role in reckless behavior among adolescents. Theoretically, the notion of adolescent egocentrism, and in particular the personal fable, provides a potential framework for understanding and describing the role of cognitive factors in reckless behavior. Also, the probability constructs of representativeness and availability presented by Tversky and Kahneman (1973) have strong implications for an understanding of reckless behavior. Research supports the assertion that cognitive factors are influential in reckless behavior. Furthermore, two studies on probability judgments related to driving and one on crime indicate that the gap between the probabilities one perceives for others for negative consequences from reckless behavior and the probabilities one perceives for oneself diminishes once the adolescent reaches adulthood.

Case 3:19-cv-01226-L-AHG   Document 34-8   Filed 01/03/20   PageID.7496   Page 119 of 192

One study (Zuckerman, 1979b) has examined the interaction of sensation seeking and cognitive factors in risk taking, which might be considered to be a close cousin of reckless behavior. Sensation seeking had been found to be positively related to risk taking behavior such as participation in unusual psychological experiments and travel to unusual places, but it remained to be tested whether sensation seekers are more likely to take risks because they appraise risk differently or because the quality of the arousal produced by risk is experienced as pleasureable. The results of the study indicate that both factors are involved.

Zuckerman (1979b) notes that risk taking is influenced by the interaction of sensation seeking and anxiety. Confronted with a potentially risky situation, whether or not the person takes the risk depends on which is higher, the level of sensation seeking or the level of anxiety. Zuckerman found that people who are high in sensation seeking report less anxiety when faced with risks, both for risks involving participation in psychological experiments (taking an "unknown" drug) and for hypothetical travel-related risks. One reason for this, it was found, is that high sensation seekers tend to appraise novel situations as less risky than low sensation seekers do across a wide variety of risks. The operation of the personal fable is evident here in that the conviction that a negative outcome from taking a given risk "wouldn't happen to me" would lead naturally to a lower perception of risk, and a low perception of risk would in turn lead to a low level of anxiety. But even for situations where the high and low sensation seekers judged the level of risk equally, the high sensation seekers were less likely to respond with anxiety at the thought of entering the situation and more likely to anticipate that it would be enjoyable. High sensation seekers, then, not only appraise risk differently (i.e., lower), but they also anticipate risky situations with pleasure even (perhaps especially) when they acknowledge the risk involved.

## Peer Influences, Reinterpreted

It has long been recognized that adolescence is the time of greatest susceptibility to peer influences (Berndt, 1979; Clasen & Brown, 1985; Steinberg & Silverberg, 1986). This seems to be especially true for transgressive (and sometimes reckless) behavior. Peer influences have been cited as a factor in the use of illegal drugs (Galambos & Silbereisen, 1987; Halebsky, 1987; Meier, Burkett, & Hickman, 1984), alcohol use (Dishion & Loeber, 1985; McLaughlin, Baer, Burnside, & Porkorny, 1985), sexual behavior (Collins & Harper, 1985), cigarette smoking (Chasin, 1985; Hirschman, Leventhal, & Glynn, 1984), and delinquency (Gomme, 1985). Some short-term longitudinal studies indicate that involvement with deviant peers precedes and leads to deviant behavior (Brook, Whitman, Gordon, & Nomura, 1986; Hirschman et al., 1984), while others indicate that deviant adolescents seek each other out as friends because of the

proclivity for deviant behavior they have in common (Galambos & Silbereisen, 1987; Meier et al., 1984). Kandel (1985) reports on the basis of her longitudinal studies that adolescent friends tend to share characteristics such as drug use or nonuse before they become friends, but also that the likelihood of sharing this characteristic increases with the duration of the friendship.

In the context of sensation seeking and adolescent egocentrism, peer influences on reckless behavior might be interpreted in the following way. It can be expected that adolescents who share a high level of sensation seeking would be attracted to each other as friends on the basis of this similarity. In such a group of friends, the adolescent who is highest in sensation seeking might be likely to emerge as the leader of the group, especially with regard to reckless behavior. (Ozeran (1973) found that in groups, high sensation seekers tend to speak more and tend to be selected as group leaders.) Because high sensation is an inherent part of reckless behavior, the highest sensation seeker in the group would be most attracted to the prospect of engaging in reckless behavior. The rest of the group may go along with the highest sensation seeker on a reckless adventure, partly out of conformity and partly on behalf of their own sensation seeking propensities. For the followers, their sensation seeking propensities might not be high enough for them to initiate reckless behavior in most circumstances, but high enough for them to go along once a leader initiates it.

Peer influences may also contribute to reckless behavior by mediating adolescent egocentrism in that the personal fable is likely to be strengthened when it is shared by a group of adolescents. Imagine, for example, a group of adolescents out drinking alcohol together. The evening comes to an end, and it is time to drive home. The driver for the group, however, realizes that he has had too much to drink and doubts his ability to drive them all home safely. His own personal fable comes to the rescue: ''Oh, it'll be OK; nothing bad will happen.'' But it is also reinforced and inflated by his observations of his friends: clearly, they are not worried; none of them is mentioning any concern over the potential danger of driving in this condition. Perhaps each of them is thinking this on some level: ''None of them seem to be worried; of course nothing bad will happen.'' The personal fable of each thus strengthened by their assumptions about the personal fables of their peers, or, one could say, by their participation in their collective fable, they proceed to drive home—and perhaps dodge the bullet, perhaps not.

## SENSATION SEEKING AND EGOCENTRISM IN THE CONTEXT OF A COMPREHENSIVE MODEL

In the theory presented here, sensation seeking and adolescent egocentrism have been argued to be two influential factors promoting reckless

behavior in adolescence. Both of these influences have been argued to arise developmentally in the sense that a predisposition toward a heightened level of both sensation seeking and egocentrism exists as a normal part of adolescent development.

However, sensation seeking and egocentrism are by no means the only factors involved in reckless behavior. Rather, they should be understood in the context of a comprehensive model which includes socialization influences. The socialization environment is crucial for how (and even whether) the developmental predispositions for sensation seeking and egocentrism are expressed, and socialization also directly influences participation in reckless behavior. If the socialization to which an adolescent is exposed is characterized by insistence on allegiance to the family and/or community and adherence to group traditions, by clear expectations and responsibilities, and by a clearly and unambiguously communicated standard of conduct, with swift, certain, and forceful sanctions (verbal or physical) for any deviation from that standard—characterized, that is, by what will here be termed *narrow socialization*—then there is less allowance or tolerance for either predisposition to be expressed in its fullest form. If, in contrast, the socialization of the cultural environment promotes and encourages independence and autonomy, allows adolescents to determine right and wrong for themselves to a large extent, does not have a clearly articulated standard of conduct, and is inconsistent and lenient in enforcing such standard as there is—here termed *broad socialization*—then sensation seeking and egocentrism for those adolescents will be expressed more fully and will on average be higher. Adolescents' participation in reckless behavior will vary accordingly.

Narrow and broad socialization differ from terms that have been applied to socialization such as permissive/authoritarian/authoritative, laissez-faire/democratic/autocratic, in that they apply not just to parenting but to the entire ecological context of socialization (Bronfenbrenner, 1977), including neighborhood and community, institutions such as school and the legal system, the media (where existing), and ethnic, tribal, or national traditions: the whole culture. This conceptualization is perhaps especially appropriate for discussing socialization with regard to adolescents because by adolescence direct familial influences in socialization typically have diminished, while extrafamilial influences have risen in prominence (Emmerich, 1978; Floyd & South, 1972; Sebald & White, 1980).

In addition to affecting adolescent participation in reckless behavior through moderating sensation seeking and egocentrism, the narrowness or breadth of an adolescent's socialization affects the likelihood of reckless behavior in a number of direct ways within the ecological context. The family environment affects reckless behavior through family policies

which impede or allow reckless behavior (Arnett, 1989), such as a nightly curfew, restrictions on automobile use, or requirements for performing family-related responsibilities. Communities affect reckless behavior through their sheer size (Mott & Haupin, 1987); in a smaller community there may be more of a fear of social censure for reckless transgressions than in a larger community and perhaps more of a sense of responsibility to one's neighbors, since one knows many of them personally. The society as a whole also influences reckless behavior, through the media (including television, movies, popular music, and advertising), which provide models of indulgence or restraint (Bandura, 1973; Bandura & Walters, 1963), and through laws and the legal system, which may (or may not) threaten and carry out punishment for reckless behavior.

The terms *narrow* and *broad* should be taken not as evaluative terms, in a positive or negative sense, but as terms indicating the amount of variance likely to exist among the adolescents in a given culture. For adolescents in a culture or family where socialization is narrow, a clear set of beliefs concerning good and bad, right and wrong, praiseworthy and unacceptable behavior is taught. There are clear expectations and responsibilities, and any deviation from the prescribed standard of conduct is strongly condemned and swiftly punished (physically or with disapproval and criticism). As a result, there is less deviance from this standard and less variance within the group. The range of individual predispositions for sensation seeking and egocentrism is pressed toward the low end of the distribution by this form of socialization, resulting in a narrower range and an overall lower level of these characteristics and of reckless behavior. (This is true *within* the community or culture; sensation seeking, egocentrism, and reckless behavior may still be allowed expression outward, toward enemies.) For adolescents in a culture or family where socialization is broad, it is left more to the individual to form principles of good and bad, right and wrong. There are fewer expectations and responsibilities, and there are fewer sanctions against deviating from such expectations and responsibilities as there are. Under this type of socialization, the variance among adolescents in their sensation seeking and egocentrism is likely to be great, as the entire range of individual predispositions is allowed to be expressed. The result is an overall higher level of reckless behavior. This has implications in three respects: between cultures, for a single culture over time, and within any given culture.

Between cultures, it can be expected that cultures with relatively narrow socialization will have adolescents who are less egocentric because they have been socialized strongly to contribute to and rely upon the family and/or the community. Also, they will have their propensities for sensation seeking directed outward (toward their enemies) or toward so-

cially constructive ends, or even suppressed. In addition, adolescents in these cultures will have their behavior restricted directly by family, community, and society, through methods ranging from family rules to community censure to the legal system. As a consequence, the adolescents will engage in a lower rate of reckless behavior within the community. In contrast, adolescents in cultures with relatively broad socialization will be more egocentric on average because a primary concern with the self has not been discouraged or has even been encouraged, and their propensities for sensation seeking will be less socialized. There will also be fewer direct family, community, or societal restrictions on their behavior. As a consequence, they will engage in a higher rate of reckless behavior, i.e., behavior that holds the possibility of long-term adverse consequences to themselves and possibly to others within their community.

Narrow socialization is more likely to be characteristic of unindustrialized cultures, where communities are small and tightly integrated. One example of this can be found in the work of Herdt (1987) with the Sambia of New Guinea. Herdt describes a process of narrow socialization for male children beginning at age 7, when they are taken away from their mothers and initiated into the male group, where they are prohibited from interaction with females until marriage. This initiation is the first of six stages of initiation, extending into young adulthood when the young man's first child is born. The initiations, especially in the early stages, involve thrashings, nose bleedings, and other painful and unpleasant surprises and humiliations. They also involve exhortations from the elders, concerning the necessity of maintaining the ritual practices, the prohibition against adultery, and the ideals of manhood for which they should strive. Children may resist but cannot avoid the initiations, at any stage. They are encouraged, coerced, and if necessary dragged into compliance.

As a consequence, there is very little reckless behavior among male Sambian adolescents, in the sense of behavior which is viewed as antisocial and disruptive by adults. The Sambia have no jails; none are needed. There is, however, one important avenue through which recklessness may be expressed: toward neighboring tribes. Significantly, it is part of the tradition at the close of the third stage of initiation for those who have just completed this initiation—the adolescents, 14 and 15 years old—to celebrate their new status by going together on a warring expedition. An adolescent who successfully kills an enemy during this expedition is lauded and viewed as having great promise. In later battles, adolescents may distinguish themselves by their recklessness, by displaying enjoyment of aggressive confrontations with other groups and a willingness to stand in the front lines of battle. Sensation seeking and egocentrism are evident here, but they have been socialized in such a way

Case 3:19-cv-01226-L-AHG Document 34-8 Filed 01/03/20 PageID.7501 Page 124 of 192

that they are not harmful to the group and may even be beneficial in defending it.

In another study, Whiting and Whiting (1975) compared children in six cultures which varied in cultural complexity (indicated by features such as occupational specialization, a cash economy, and a centralized political and legal system) from simple to highly complex. They did not study adolescents, but what they found has implications for adolescence. They observed distinct differences in the kind of socialization that was characteristic of the different cultures. In particular, parents in what they termed simpler cultures were, in general, more strict with their children, requiring them to be responsible for important duties from an early age (such as child care of younger siblings, food preparation, and tending of livestock and fowl), and punishing disobedience swiftly and severely. As a consequence, their children were relatively dependable, responsible, and obedient compared to children in more complex cultures. Parents in what they termed complex cultures, in contrast, were generally more lenient with their children, more tolerant of disobedience, and required less work from them (because in a more complex society much of the simple and menial work around the home is done by automation). As a consequence, children in these cultures were observed to be relatively competitive and self-oriented, and less responsible and nurturant toward others.

It is plain how the idea of narrow and broad socialization applies to these findings. The narrow socialization of simpler societies results in less variance in the behavior of their children; because disobedience is closely monitored and swiftly and severely punished, and work on behalf of the group is required from an early age, there is less disobedience, less concern with the self, and more concern for others. In studying adolescence across cultures, it could be expected that a similar pattern would apply: narrow socialization, in simpler societies, results in lower levels of egocentrism and, consequently, less reckless behavior.

This is not meant to imply that narrow socialization is somehow superior or preferable to broad socialization. There may be trade-offs with both narrow and broad socialization. In the simpler societies described by the Whitings, characterized by narrow socialization, one reason children in these societies are able to contribute so much help to the family is that they do not attend school. In complex societies, the cost of providing universal education and encouraging competitiveness is a lesser concern for others and, it might be argued, greater egocentrism. Competition may prepare a child well for participation in a highly complex economy, but as the Whitings note, ''competition for good grades is training for egoism and does not encourage a child to consider the needs of others'' (Whiting & Whiting, 1975, p. 107).

It is possible that narrow socialization exacts a cost not only in lower education, but also in less creative and independent thinking; perhaps in cultures with narrow socialization, not only reckless behavior but also new ideas are inhibited and constrained because new ideas may challenge the tradition, the established order. This kind of analysis on a cultural level has yet to be performed, but within American culture adolescents in families which are strongly constraining and suppressive have been found to be inhibited, conventional, and less imaginative (Block, 1971; Schedler & Block, 1990). Broad socialization, in highly technological societies, may result in a higher rate of reckless behavior but also in the kind of independent and creative thinking that leads to social and technological innovation. As Irwin (1990) and Zuckerman (1983) note, the willingness to take risks that is so strong among adolescents has great potential benefits as well as potential dangers. There is a cost to allowing this tendency too free a rein, in damage to the lives of adolescents and those around them, but there may also be a certain cost to constraining it tightly.

In addition to predicting differences in sensation seeking, egocentrism, and reckless behavior among adolescents of different cultures according to their narrow or broad socialization of adolescents, the theory presented here would also predict changes in these characteristics among adolescents in a single culture over time, as the narrowness or breadth of that culture's socialization changes. Recent trends in American society arguably provide one illustration. The past three decades have witnessed a dramatic and disquieting rise in the rate of reckless behavior among American adolescents. The rate of arrests for drunk driving among people aged 18–24 increased by almost 800% between 1965 and 1985 (U.S. Department of Education, 1988). Drug-related arrests for this age group increased by an appalling 1000% during this same period. The rates of single motherhood and abortion have also increased steeply and steadily. From 1950 to 1981, the proportion of first-born children conceived out of wedlock among girls 15–19 rose from 18 to 60% (O'Connell & Rogers, 1984), and from 1972 to 1983 the abortion rate for this group more than doubled (U.S. Department of Education, 1988). Crime and delinquency among adolescents have also risen markedly during this period. In 1950, the arrest rate for persons aged 14–24 was under 10 per 1000 persons; by 1985, it had risen to over 100 per 1000 persons (U.S. Department of Education, 1988). Simultaneously with the rise of these rates of reckless behavior, many observers have argued that this period has been marked by a growth in permissiveness among American parents and in American society generally (see Ehrenreich, 1989), including education, the media, and the legal system. This increasingly broad socialization may be one of the factors responsible for the rise in reckless behavior among adolescents. It should be noted, however, that these observations of increased

permissiveness are largely unempirical; a more systematic sociocultural analysis awaits.

In any case, more telling than a post-hoc test of the theory would be to observe a culture currently in the process of changing its socialization of adolescents. Eastern Europe provides several such examples. The political changes taking place in those countries may result in socialization changes as well, most likely in the direction of broader socialization, with corresponding changes in sensation seeking, egocentrism, and reckless behavior among adolescents.

Although it may be useful to describe societies according to broad or narrow socialization, it is of course acknowledged that variance exists in every society, according to the practices of particular families. (Still, it might be noted that societies with narrow socialization are likely to be characterized by less variance among families because deviance from the norm by families will be censured as surely as deviance from the norm by adolescents. It should also be emphasized that, by adolescence, the family is only one influence among many in the milieu of socialization.) In families as in cultures, the model presented here would predict that adolescents who are subjected to narrow socialization will engage in relatively less reckless behavior, while adolescents whose families are characterized by broad socialization will engage in relatively more. To be specific, adolescents' sensation seeking, egocentrism, and reckless behavior will be in part predicted by the extent to which parents (1) share a certain clear set of beliefs about right and wrong and communicate these beliefs to their children, (2) expect their children to perform certain clearly specified duties for the family, duties which the parents communicate as important to the functioning of the family, and (3) enforce the rules and expectations based on these beliefs and duties consistently and forcefully.

Support for this prediction exists in research on the relationship between reckless behavior and parental beliefs, parental practices, and divorce. In a study of Jessor and Jessor (1977), parental beliefs were directly related to adolescents' reckless behavior in important ways. The authors defined a variable termed maternal ideology, which referred to mothers' beliefs about the social order, religion, and morality and was considered to reflect her socialization of her child. It was found that traditionalism/conventionality in maternal ideology, i.e., mothers' beliefs in the absoluteness of right and wrong, the importance of obeying the law, and the wrongness of socially disapproved behavior such as stealing, lying, drug use, and extramarital sex, was inversely related to her adolescent's participation in problem behavior. Conversely, lack of parental disapproval of problem behavior was associated with relatively greater participation in it. From the perspective of the present theory, it is argued

that this demonstrates the influence of narrow and broad socialization on adolescents' reckless behavior.

Other research on parenting also supports the model, indicating that a lack of involvement and monitoring by parents is related to recklessness among adolescents. Block (1971; Schedler & Block, 1990), in a longitudinal study following individuals from early adolescence to their 30's, reported that adolescents whose parents were characterized as uninvolved and neglecting were significantly more undercontrolled and impulsive than other adolescents. Although attitudes and personality characteristics, not behavior, were the focus of this study, it might reasonably be argued that the characteristics of being undercontrolled and impulsive would lead to reckless behavior. A longitudinal study in Finland (Pulkinnen, 1982) produced comparable results: low parental involvement in childhood was predictive of deviant behavior in early adolescence, in particular truancy, alcohol consumption, and smoking. Also Patterson (1982), from extensive work with delinquent adolescents, connects a lack of parental monitoring of children to adolescent delinquent behavior such as stealing and social aggressiveness. This pattern of association between parental fecklessness or neglect and adolescent delinquency/reckless behavior has been found consistently over several decades (Glueck & Glueck, 1950; Hirschi, 1969; Levine & Kozak, 1979; McCord & McCord, 1959). The present theory would predict that sensation seeking and egocentism would be found to be two of the mediating variables between uninvolved parenting and reckless behavior. Parenting that is uninvolved and that fails to provide limits, sanctions, and a moral structure does not socialize the developmental propensities for sensation seeking and egocentrism, which may be expressed as reckless behavior.

One might expect broader socialization in divorced families than in nondivorced families because the multiple burdens—financial, occupational, emotional—which fall upon the custodial parent would make it more difficult to summon the time and energy necessary for narrow socialization. This expectation is supported in research on reckless behavior, where parents' divorce has been found to be related to drug use (Johnson et al., 1984), sexual behavior (Eberhardt & Schill, 1984), and delinquency (Stumphauser, 1976). It might be argued that reckless behavior in the aftermath of divorce could be an externalization of adolescents' unhappiness and confusion surrounding divorce, except that for adolescents in divorced families it is probable that the divorce took place many years ago in most cases (although age of child at divorce is a variable rarely considered in research on adolescence). Still, it should be noted that there is likely to be a great deal of variance in divorced families. In some divorced families, the duties and expectations for the children may increase, and also the closeness of the children to their custodial parent

(Weiss, 1979), resulting in effect in narrower socialization and less reckless behavior. These variations, and whether sensation seeking and egocentrism mediate their connections to reckless behavior, remain to be studied.

## COMPARISON TO JESSOR AND JESSOR'S PROBLEM BEHAVIOR THEORY

Jessor and Jessor (1977; Jessor, 1987a,b; Jessor, 1990) have presented the most fully articulated theory of reckless behavior (or, as they term it, problem behavior) in adolescence. Many factors are included in their model (see Jessor, 1987a), but the developmental basis of the theory is that adolescents engage in problem behavior more than other age groups primarily because it serves as a mark of adult status (Jessor, 1987a, p. 339). Certain behavior in our society, such as alcohol consumption and sexual activity, is socially approved for adults but not adolescents, according to the legal and/or moral standards of society. Adolescents violate the prohibitions and engage in the prohibited behavior because it signifies the adult status they wish to attain. Problem behavior diminishes after adolescence because it is no longer necessary as a declaration of adulthood.

They tested this theory in a large scale longitudinal study of high school and college students, examining a wide variety of personality and social environment variables in relation to five types of problem behavior: sexual activity, drinking, problem drinking (which concerned not behavior per se but the experience of negative *consequences* as a result of excessive drinking), marijuana use, and general deviance (including lying, stealing, and vandalism). The study was among the first to consider a number of these kinds of behavior together, as a syndrome, rather than in isolation and remains an important empirical contribution to the area. The model presented in the theory contains elements such as parental control and parental ideology which are important to recognize and which have been applied to the present theory as part of the ideas of broad and narrow socialization.

However, both the design and the results refute the developmental theory that underlies the study. They argue that the desire to achieve a more adult status is "the developmental role played by the initiation of problem behavior during adolescence" (Jessor, 1987a, p. 339). A case could perhaps be made that adolescents wish to engage in sexual activity and alcohol consumption partly because these are activities that are approved for adults and proscribed for adolescents, and adolescents desire to signify their attainment of adulthood. Lying, stealing, and vandalism, however, which are also part of the syndrome of problem behavior they have identified, are no more socially acceptable for adults than for ado-

lescents; marijuana use is arguably even *less* socially acceptable behavior for adults than for adolescents. Including marijuana use and general deviance in the design along with sexual activity and alcohol use is an implicit recognition that developmental factors other than the pursuit of adult status are involved.

The results of the study also contradict the theoretical model. If problem behavior theory were accurate, it might have been expected that behavior prohibited for adolescents but approved for adults (sexual activity and moderate drinking) would have been found to be unrelated to behavior prohibited at any age (marijuana use, general deviance). In fact, however, the various kinds of problem behavior were found to be highly correlated. This is more consistent with the model presented here, in which it is argued that a wide variety of forms of reckless behavior sprout from the common developmental soil of sensation seeking and egocentrism.

It should be added that, although the Jessors' theory proposes the desire to achieve adult status as the developmental basis for the prevalence of problem behavior in adolescence, neither their original study nor subsequent studies have included measurements or evaluations of the presence of this characteristic.

The theories also differ in what they would predict concerning the prevalence among adolescents of problem/reckless behavior in areas where adolescents are allowed access to activities that signify adulthood but which are also potentially reckless. It might be predicted from Jessor and Jessor's theory that the prevalence of problem behavior would be low for adult-like behavior in which adolescents are allowed to participate. The present theory, in contrast, would predict that adolescents will be most reckless in the areas where they are given the most unsocialized and unmonitored opportunity to be reckless—in the areas which are *least,* rather than most, restricted to them.

Perhaps the best test of this contrast in predictions is in the area of automobile driving. Driving is age-graded in the U.S., but the age of entry into socially approved driving is earlier (16 in most states) than that for other kinds of age-graded behavior (for example, the legal drinking age is 21 in most states). It might be expected on the basis of problem behavior theory, then, that the rate of problem behavior associated with driving would be low. In fact, however, just the opposite is true. Driving-related reckless behavior is a pervasive form of reckless behavior among adolescents (U.S. Department of Education, 1988). This is true long past the age of 16, when adolescents are first allowed to drive; adolescents 20–24 also have significantly higher rates of accidents and fatalities than older age groups (U.S. Bureau of the Census, 1987). Even adolescents who do not

behave recklessly in other ways tend to drive at high speeds (Arnett, 1990c). This is consistent with what would be predicted by the present theory.

## THE DECLINE OF RECKLESS BEHAVIOR

How and why does reckless behavior finally diminish? Thus far, few studies have examined the decline of reckless behavior as adolescents enter adulthood. However, there are a number of theoretical and empirical suggestions that point the way for future research.

Elkind (1967) suggests that the personal fable is overcome by the entrance into Erikson's (1963) intimacy stage: in the course of establishing a long-term intimate relationship (typically, marriage) with another person, we discover that others have similar feelings and describe similar agonies and raptures. This discovery punctures the belief that our own experiences are unique and unparalleled. It might also be added that marriage diminishes the likelihood of reckless behavior in a number of specific ways. For example, sex without contraception no longer has connotations of recklessness once the person is married, and most people are married by their late 20's. Also, marriage, with its attendant responsibilities and restrictions, probably contributes to a decline in reckless driving, crime, and drug use as well. Statistically, it is true that young married adults have a lower rate of driving offenses and crime than young unmarried adults (U.S. Bureau of the Census, 1987).

Another reason reckless behavior declines with age may be that the biological "engine" that drives it slows downs. Biological measures associated with sensation seeking (AEP, sex hormone levels) show a pattern in relation to age that reflects a decline in energy and intensity; the decline in relation to sensation seeking may also underlie a decline in relation to reckless behavior. Zuckerman et al. (1978) observe: "What is the basis of the increasing cautiousness and conservatism of age? It might simply reflect the mellowing effect of accumulated experience. But many biological changes also occur with age, including a slowing of cortical activity and a diminution of gonadal output . . . It can be hypothesized that the same biological factors that are prominent in aging effect the sensation seeking tendency" (p. 148). This, however, remains to be tested directly.

Piaget cites the importance of work experience for attenuating adolescent egocentrism. Work requires the individual to bend his/her ideal vision of things to fit the real: "In other words, the job leads thinking away from the dangers of formalism back to reality" (Inhelder & Piaget, 1958, p. 346). Steinberg, Greenberger, Jacobi, and Garduque (1981) also suggest that work experience leads to the decline of adolescent egocentrism and

support that contention with interviews with high school students who have part-time jobs. However, several studies (Bachman, Johnston, & O'Malley, 1982; Ruggiero, Greenberger, & Steinberg, 1982; Shannon, 1982) have found that working may actually promote reckless behavior by providing adolescents with the money to engage in it, by creating stress that adolescents may ameliorate through substance use, and by providing an additional venue for stealing money and property. If work does attenuate reckless behavior, it may be only in a job that is viewed as a potential step to a career, so that the adolescent is highly motivated to avoid reckless behavior that might jeopardize it.

Tversky and Kahneman's (1973) notion of availability also applies to the decline of reckless behavior. As adolescents grow older, into the late 20's and early 30's, the cumulative likelihood of suffering the consequences of reckless behavior rises. Somewhere in the course of years of reckless behavior, adolescents may get a ticket for driving wildly or under the influence of alcohol or may have a serious automobile accident; they may be involved in an unintentional pregnancy; they may have a bad experience with drugs; they may have an embarassing or career-threatening experience with the law. It is probably not necessary to suffer disaster in order to develop out of adolescent egocentrism, but in many cases it may be sufficient. Thus far, no studies have examined the influence of negative experiences on reckless behavior through adolescence to young adulthood.

Finally, reckless behavior may decrease with age among populations partly because some of the most reckless members of any cohort will die young. Extreme recklessness is not a good prescription for survival. By midlife, a fatal automobile accident, a violent death related to crime, or an accidental death resulting from some other variant of reckless behavior has claimed a substantial number of those who exhibited an especially high level of reckless behavior in adolescence. Current data charting the decline of reckless behavior with age are mostly cross-sectional; more longitudinal studies are needed.

## CONCLUSION

Reckless behavior in adolescence is manifested in our time in driving at high speeds and while drunk, sex without contraception, illegal drug use, delinquency and crime, and countless other less common varieties. Sensation seeking and adolescent egocentrism are normative developmental features of adolescence that are implicated in the high level of reckless behavior during that age period. Considerable research evidence supports the relation between these factors and the various prominent forms of reckless behavior in adolescence. The narrowness or breadth of an adolescent's socialization environment is also an important factor in reckless

behavior, directly and in interaction with the developmental factors of sensation seeking and egocentrism. One of the clearest findings in the area is that reckless behavior does decline after adolescence. Why this is true remains to be established, although it is probable that the biologically based decline in sensation seeking, increasing cognitive maturity, and the assumption of greater personal and occupational responsibilities are involved.

## REFERENCES

Arnett, J. (1989, April). *Understanding reckless behavior in adolescence*. Paper presented at the biennial meeting of the Society of Research in Child Development, Kansas City.

Arnett, J. (1990a). Drunk driving sensation seeking, and egocentrism among adolescents. *Personality and Individual Differences*, 11, 541–546.

Arnett, J. (1990b). Contraceptive use, sensation seeking and adolescent egocentrism. *Journal of Youth of Adolescence*, 19, 171–180.

Arnett, J. (1990c). *The development of reckless behavior in adolescence, ages 15–18*. Unpublished data.

Arnett, J. (1992, April). Sensation seeking and adolescent reckless behavior: A new conceptualization and a new scale. Poster presented at the biennial meeting of the Society for Research on Adolescence, Washington, D.C.

Bachman, J., Johnston, L., & O'Malley, P. (1982). Smoking, drinking and drug use among American high school students. *American Journal of Public Health*, 71, 59–69.

Bandura, A. (1973). *Aggression: A social learning analysis*. Englewood Cliffs, NJ: Prentice–Hall.

Bandura, A., & Walters, R. H. (1963). *Social learning and personality development*. New York: Holt, Rinehart & Winston.

Beirness, D. J., Haas, G. C., Walsh, P. J., & Donelson, A. C. (1985). *Alcohol and fatal road accidents in Canada: A statistical look at its magnitude and persistence*. Ottawa, Ontario, Canada: Department of Justice.

Berndt, T. J. (1979). Developmental changes in conformity to peers. *Developmental Psychology*, 15, 608–616.

Blackburn, R. (1978). Psychopathy, arousal, and the need for stimulation. In R. D. Hare and D. Schalling (Eds.), *Psychopathic behavior*. New York: Wiley.

Block, J. (1971). *Lives through time*. Berkeley, CA: Bancroft.

Brill, H. Q., & Christie, R. L. (1974). Marijuana use and psychosocial adaptation: Follow-up study of a collegiate population. *Archives of General Psychiatry*, 31, 713–719.

Bronfenbrenner, U. (1977). Ecological factors in human development in retrospect and prospect. In H. McGurk (Ed.), *Ecological factors in human development*. Amsterdam: North-Holland.

Brook, J., Whiteman, M., Gordon, A., & Nomura, C. (1986). Onset of adolescent drinking: A longitudinal study of intrapersonal and interpersonal antecedents. *Advances in Alcohol and Substance Abuse*, 5, 91–110.

Buchsbaum, M. S. (1971). Neural events and the psychophysical law. *Science*, 172, 502.

Buchsbaum, M. S. (1974). Average evoked response and stimulus intensity in identical and fraternal twins. *Physiological Psychology*, 2, 365–370.

Chassin, L. (1985). Changes in peer and parent influence during adolescence: Longitudinal versus cross-sectional perspectives on smoking initiation. *Developmental Psychology*, 22, 327–334.

Clark, W. B., & Midanik, L. (1980). *Alcohol use and alcohol problems among U.S. adults:*

*Results of the 1979 National Survey* (Working Paper F122). Berkeley, CA: Alcohol Research Group.

Clasen, D., & Brown, B. (1985). The multidimensionality of peer pressure in adolescence. *Journal of Youth and Adolescence,* 14, 451–468.

Collins, J. K., & Harper, J. F. (1985). Sexual behavior and peer pressure in adolescent girls. *Australian Journal of Sex, Marriage, and Family,* 6, 137–142.

Coursey, R. D., Buchsbaum, M., & Frankel, B. L. (1975). Personality measures and evoked responses from chronic insomnias. *Journal of Abnormal Psychology,* 84, 239–249.

Cvetkovich, G., & Grote, B. (1981). Adolescent development and teenage fertility. In D. Byrne & W. A. Fisher (Eds.), *Adolescents, sex, and contraception* (109–123). New York: McGraw-Hill.

Cvetkovich, G., Grote, B., Bjorseth, A., & Sarkissian, J. (1975). On the psychology of adolescents' use of contraceptives. *Journal of Sex Research,* 11, 256–270.

Daitzman, R. J., & Zuckerman, M. (1980). Disinhibitory sensation seeking personality, and gonadal hormones. *Personality and Individual Differences,* 1, 103–110.

Daitzman, R. J., Zuckerman, M., Sammelwitz, P. H., & Ganjam, V. (1978). Sensation seeking and gonadal hormones. *Journal of Bioscience,* 10, 401–408.

Davis, G. L., & Cross, H. J. (1973). College student drug users' memories of their parents. *Adolescence,* 7, 475–480.

Dembo, R. L., Dertke, M., laVoie, L., & Bonders, S. (1987). Physical abuse, sexual victimization, and illicit drug use: A structural analysis among high risk adolescents. *Journal of Adolescence,* 10, 13–34.

Dishion, T. J., & Loeber, R. (1985). Adolescent marijuana and alcohol use: The role of parents and peers revisited. *American Journal of Drug and Alcohol Abuse,* 11, 11–25.

Donovan, J. E., Jessor, R., & Costa, F. M. (1988). Syndrome of problem behavior in adolescence: A replication. *Journal of Consulting and Clinical Psychology,* 56, 762–765.

Eberhardt, C. A., & Schill, T. (1984). Differences in sexual attitudes and likelihood of sexual behaviors of black lower socioeconomic father-present vs. father-absent female adolescents. *Adolescence,* 19, 99–105.

Ehrenreich, B. (1989). *Fear of falling: The inner life of the middle class.* New York: Pantheon.

Elkind, D. (1967). Egocentrism in adolescence. *Child Development,* 38, 1025–1034.

Elkind, D. (1968). Cognitive structure and adolescent experience. *Adolescence,* 2, 427–434.

Elkind, D. (1985). Egocentrism redux. *Developmental Review,* 5, 218–226.

Elster, A. B., Lamb, M. E., & Tavare, J. (1987). Association between behavioral and school problems and fatherhood in a national sample of adolescent youths. *Journal of Pediatrics,* 111, 932–936.

Elster, A. B., Ketterlinus, R., & Lamb, M. E. (1989). *The association between parental status and problem behavior among female adolescents.* Paper presented at the biennial meeting of the Society for Research in Child Development, Kansas City, April.

Emmerich, H. J. (1978). The influences of parents and peers on choices made by adolescents. *Journal of Youth and Adolescence,* 7, 175–180.

Emmons, T. D., & Webb, W. W. (1974). Subjective correlates of emotional responsivity and stimulation seeking in psychopaths, normals, and acting-out neurotics. *Journal of Consulting and Clinical Psychology,* 42, 620–625.

Erikson, E. (1963). *Childhood and society.* New York: Norton.

Erikson, M., Gibbs, J. P., & Jensen, G. F. (1977). The deterence doctrine and the perceived certainty of legal punishments. *American Sociological Review,* 42, 305–317.

Farley, F. H. (1973). *A theory of delinquency.* Paper presented at the annual meeting of the American Psychological Association, Montreal, Quebec.

Farley, F. H., & Farley, S. V. (1972). Stimulus-seeking motivation and delinquent behavior among institutionalized delinquent girls. *Journal of Consulting and Clinical Psychology, 39*, 94–97.

Farrington, D. P. (1989). Self-reported and official offending from adolescence to adulthood. In M. W. Klein (Ed.), *Cross-national research in self-reported crime and delinquency*. Boston: Kluwer.

Finn, P., & Bragg, B. W. (1986). Perception of risk of an accident by young and older drivers. *Accident Analysis and Prevention, 18*, 289–298.

Fishburne, P. M., Abelson, H. I., & Cisin, I. (1980). *National survey on drug abuse: main finding: 1979*. Rockville, MD: National Institute of Drug Abuse.

Flavell, J. (1985). *Cognitive development*. Englewood Cliffs, NJ: Prentice–Hall.

Floyd, H. H., Jr., & South, D. R. (1972). Dilemma of youth: The choice of parents or peers as a frame of reference for behavior. *Journal of Marriage and the Family, 34*, 627–634.

Furstenburg, F. (1976). *Unplanned parenthood*. New York: Free Press.

Galambos, N. L., & Silbereisen, R. K. (1987). Substance use in West German youth: A longitudinal study of adolescents' use of alcohol and tobacco. *Journal of Adolescent Research, 2*, 161–174.

Gans, J., Blyth, D., Elster, A., & Gaveras, L. L. (1990). *America's adolescents: How healthy are they?* (Vol. 1). Chicago: American Medical Association.

Gerrard, M., McCann, L., & Fortini, M. (1983). Prevention of unwanted pregnancy. *American Journal of Community Psychology, 11*, 153–167.

Glueck, S., & Glueck, E. (1950). *Unravelling juvenile delinquency*. New York: Commonwealth Fund.

Goldsmith, S., Gabrielson, M. O., Gabrielson, I., Mathews, V., & Potts, L. (1972). Teenagers, sex, and contraception. *Family Planning Perspectives, 4*, 32–38.

Goldstein, L. G., & Mosel, J. N. (1958). A factor study of drivers' attitudes with further study on driver aggression. *Highway Research Board Bulletin, 172*, 9–29.

Gomme, I. M. (1985). Predictors of status and criminal offenses among male and female adolescents in an Ontario community. *Canadian Journal of Criminology, 27*, 147–159.

Grasmick, H. G., & Milligan, H. M., Jr. (1976). Deterrence theory approach to socioeconomic/demographic correlates of crime. *Social Science Quarterly, 57*, 608–617.

Halebsky, M. (1987). Adolescent alcohol and substance abuse: Parent and peer effects. *Adolescence, 22*, 961–967.

Hansson, R. O., O'Connor, M. E., Jones, W. H., & Blocker, T. J. (1981). Maternal employment and adolescent sexual behavior. *Journal of Youth and Adolescence, 101*, 55–60.

Harman, S. M. (1978). Clinical aspects of aging of the male reproductive system. In E. L. Schneider (Ed.), *The aging reproductive system* (Aging, Vol. 4). New York: Raven Press.

Herdt, G. (1987). *The Sambia: Ritual and gender in New Guinea*. New York: Holt, Rinehart & Winston.

Hirschi, T. (1969). *Causes of delinquency*. Berkeley: Univ. of California Press.

Hirschman, R. S., Leventhal, H., & Glynn, K. (1984). The development of smoking behavior: Conceptualization and supportive cross-sectional survey data. *Journal of Applied Social Psychology, 14*, 184–206.

Hundleby, J. D. (1987). Adolescent drug use in a behavioral matrix: A confirmation and comparison of the sexes. *Addictive Behaviors, 12*, 103–112.

Inhelder, B., & Piaget, J. (1958). *The growth of logical thinking from childhood to adolescence*. New York: Basic Books.

Irwin, C. E. (1990). The theoretical concept of at-risk adolescents. *Adolescent Medicine, 1*, 1–14.

370                                          JEFFREY ARNETT

Jensen, G. F., Gibbs, J. P., & Erikson, M. (1978). Perceived risk of punishment and self-reported delinquency. *Social Forces, 57,* 57–78.

Jessor, R. (1987a). Problem behavior theory, psychosocial development, and adolescent problem drinking. *British Journal of Addiction, 82,* 331–342.

Jessor, R. (1987b). Risky driving and adolescent problem behavior: An extension of problem behavior theory. *Alcohol, Drugs, and Driving, 3,* 1–11.

Jessor, R. (1990). Road safety and health behavior: Some lessons for research and intervention. *Health Education Research, 5,* 1–3.

Jessor, R., & Jessor, S. L. (1977). *Problem behavior and psychosocial development: A longitudinal study of youth.* New York: Academic Press.

Jonah, B. A. (1984). *Accident risk and risk-taking among young drivers.* Paper presented at the Conference on Risk-Taking in Adolescent Drivers, University of British Columbia, Vancouver.

Jonah, B. A. (1986). Accident risk and risk-taking behaviour among young drivers. *Accident Analysis and Prevention, 18,* 255–271.

Jonah, B. A., & Wilson, R. J. (1984). *Drinking and driving among youth.* Paper presented at the Workshop on Epidemiological and Social Psychological Studies in Alcohol and Drug Use Among Youth, Toronto.

Johnson, G. M., Shontz, F. C., & Locke, T. P. (1984). Relationships between adolescent drug use and parental drug behavior. *Adolescence, 19,* 295–299.

Kahneman, D., & Tversky, A. (1972). Subjective probability: A judgement of representativeness. *Cognitive Psychology, 3,* 430–454.

Kalmuss, D. (1986). Contraceptive use: A comparison of ever- and never-pregnant adolescents. *Journal of Adolescent Health Care, 7,* 332–337.

Kandel, D. (1985). On processes of peer influences in adolescent drug use: A developmental perspective. *Advances in Alcohol and Substance Abuse,* 139–163.

Kane, F. J., Jr., & Lachenbruch, P. (1973). Adolescent pregnancy: A study of aborters and non-aborters. *American Journal of Orthopsychiatry, 43,* 796–803.

Keating, D. (1980). Thinking processes in adolescence. In J. Adelson (Ed.), *Handbook of adolescent psychology.* New York: Wiley.

von Knorring, L., Oreland, L., & Winblad, B. (1983). Personality traits related to mono-amine oxidase (MAO) activity in platelets. Submitted for publication.

Kuhn, D., Phelps, E., & Walter, J. (1985). Correlational reasoning in an everyday context. *Journal of Applied Developmental Psychology, 6,* 85–97.

Levine, E. M., & Kozak, C. (1979). Drug and alcohol use, delinquency, and vandalism among upper middle class pre- and post-adolescents. *Journal of Youth and Adolescence, 8,* 91–101.

Levine, M., & Singer, S. (1988). Delinquency, substance abuse, and risk-taking in middle-class adolescents. *Behavioral Sciences and the Law, 6,* 385–400.

Lukas, J. H., & Siegel, J. (1981). *Human augmenting-reducing and sensation-seeking.* Paper presented at meeting of the Society for Psychophysiological Research. Washington, DC, October.

Major, L. F., & Murphy, D. L. (1978). Platelet and plasma amine oxidase activity in alcoholic individuals. *British Journal of Psychiatry, 132,* 548–554.

Matthews, M., & Moran, A. (1986). Age differences in male drivers' perception of accident risk: The role of perceived driving ability. *Accident Analysis and Prevention, 18,* 299–313.

McCord, W., & McCord, J. (1959). *Origins of crime.* New York: Columbia Univ. Press.

McLaughlin, R. J., Baer, P. E., Burnside, M. A., & Pokorny, A. D. (1985). Psychosocial correlates of alcohol use at two age levels during adolescence. *Journal of Studies on Alcohol, 46,* 212–210.

Meier, R. F., Burkett, S. R., & Hickman, C. A. (1984). Sanctions, peers, and deviance: Preliminary models of a social control process. *Sociological Quarterly*, 25, 67–82.

Moshman, D. (1979). Development of formal hypothesis-testing ability. *Developmental Psychology*, 15, 104–112.

Mott, F. L., & Haurin, R. J. (1987). *The interrelateness of age at first intercourse, early pregnancy, alcohol, and drug use among American adolescents: Preliminary results from the National Longitudinal Survey of Youth Labor Market Experience*. Columbus, OH: Center for Human Resource Research, Ohio State University.

Murphy, D. J. (1986). *Customers and theives: An ethnography of shoplifting*. Dorset, England: Gower.

Murphy, D. L., Belmaker, R. H., Buchsbaum, M., Wyatt, R. J., Martin, N. F., & Ciaranello, R. (1977). Biogenic amine-related enzymes and personality variations in normals. *Psychological Medicine*, 7, 149–157.

Murphy, D. L., Wright, C., Buchsbaum, M. S., Nichols, A., Costa, J. L., & Wyatt, R. J. (1976). Platelet and plasma amine oxidase activity in 680 normals: Sex and age differences and stability over time. *Biochemical Medicine*, 16, 254–265.

O'Connell, M., & Rogers, C. C. (1984). Out-of-wedlock births, premarital pregnancies, and their effect on family formation and dissolution. *Family Planning Perspectives*, 16, 157–162.

Oskamp, S., & Mindick, B. (1981). Personality and attitudinal barriers to contraception. In D. Byrne & W. A. Fisher (Eds.), *Adolescents, sex, and contraception* (pp. 65–107). New York: McGraw-Hill.

Ozeran, B. J. (1973). *Sensation seeking as a predictor of leadership in leaderless, task-oriented groups*. Master's thesis, University of Hawaii.

Patterson, G. (1982). *Coercive family process*. Eugene, OR: Castalia.

Perez, J., & Torrubia, R. (1985). Sensation seeking and antisocial behavior in a student sample. *Personality and Individual Differences*, 6, 401–403.

Piaget, J. (1967). *Six psychological studies*. New York: Random House.

Piaget, J., & Inhelder, B. (1975). *The origin of the idea of chance in children*. New York: Norton.

Piliavin, I., Thornton, C., Gartner, R., & Matsueda, R. L. (1986). Crime, deterrence, and rational choice. *American Sociological Review*, 51, 101–119.

Pulkinnen, L. (1982). Self-control and continuity from childhood to adolescence. In P. B. Baltes & O. G. Brim (Eds.), *Lifespan development and behavior* (Vol. 4). New York: Academic Press.

Robinson, D. S., Davis, J. M., Nies, A., Ravaris, C. L., & Sylvester, D. (1971). Relation of sex and aging to monoamine oxidase activity of human brain, plasma, and platelets. *Archives of General Psychiatry*, 24, 536–539.

Rose, R. M. (1978). Neuroendocrine correlates of sexual and aggressive behavior in humans. In M. A. Lipton, A. Dimascio, & K. F. Killam (Eds.), *Psychopharmacology: A generation of progress*. New York: Raven Press.

Ross, B. M., & DeGroot, J. F. (1982). How adolescents combine probabilities. *Journal of Psychology*, 110, 75–90.

Rowe, A. R., & Tittle, C. R. (1977). Life cycle changes and criminal propensity. *Sociological Quarterly*, 18, 223–236.

Ruggiero, M., Greenberger, E., & Steinberg, L. (1982). Occupational deviance among first-time workers. *Youth and Society*, 13, 423–48.

Satinder, K. P., & Black, A. (1984). Cannibis use and sensation seeking orientation. *Journal of Psychology*, 116, 101–105.

Schwarz, R. M., Burkhart, B. R., & Green, B. (1978). Turning on or turning off: Sensation

seeking or tension reduction as motivational determinants of alcohol use. *Journal of Consulting and Clinical Psychology, 46,* 1144–1145.

Schooler, C., Zahn, T. P., Murphy, D. L., & Buchsbaum, M. (1978). Psychological correlates of monoamine oxidase activity in normals. *Journal of Nervous and Mental Diseases, 166,* 177–186.

Sebald, H., & White, B. (1980). Teenagers' divided reference groups: Uneven alignment with parents and peers. *Adolescence, 15,* 979–984.

Shannon, L. W. (1982). *Assessing the relationship of adult criminal activity to juvenile careers.* Washington, DC: U.S. Department of Justice. [Microfiche No. NCJ 77744, available from the National Juvenile Justice Clearinghouse of the National Criminal Justice Reference Service, Washington, DC]

Shedler, J., & Block, J. (1990). Adolescent drug use and psychological health: A longitudinal inquiry. *American Psychologist, 45,* 612–630.

Silverman, J., Buchsbaum, M. S., & Stierlin, H. (1973). Sex differences in perceptual differentiation and stimulus intensity control. *Journal of Personality and Social Psychology, 25,* 309–318.

Spotts, J. V., & Shontz, F. C. (1984). Correlates of sensation seeking by heavy, chronic drug users. *Perceptual and Motor Skills, 58,* 427–435.

Steinberg, L. D., Greenberger, E., Jacobi, M., & Garduque, L. (1981). Early work experience: A partial antidote for adolescent egocentrism. *Journal of Youth and Adolescence, 10,* 141–157.

Steinberg, L., & Silverberg, S. B. (1986). The vicissitudes of autonomy in early adolescence. *Child Development, 57,* 841–851.

Stern, M., Northmn, J. E., & Van Slyck, M. R. (1984). Father absence and adolescent 'problem behaviors': Alcohol consumption, drug use, and sexual activity. *Adolescence, 19,* 301–312.

Stillman, R. C., Wyatt, R. J., Murphy, D. L., & Rauscher, F. D. (1978). Low platelet monoamine oxidase activity and chronic marijuana use. *Life Sciences, 23,* 1577–1582.

Stumphauser, J. S. (1976). Modifying delinquent behavior: Beginnings and current practices. *Adolescence, 11,* 13–28.

Sutker, P. B., Archer, R. P., & Allain, A. N. (1978). Drug abuse patterns, personality characteristics, and relationships with sex, race, and sensation seeking. *Journal of Consulting and Clinical Psychology, 46,* 1374–1378.

Tietze, C. (1983). *Induced abortion: A world review.* New York: The Population Council, Inc.

Tversky, A., & Kahneman, D. (1973). Availability: A heuristic for judging frequency and probability. *Cognitive Psychology, 5,* 207–232.

U.S. Bureau of the Census (1987). *Statistical abstracts of the United States* (108th ed.). Washington, DC.

U.S. Department of Education (1988). *Youth indicators 1988: Trends in the well-being of American youth* (DE Publication No. 065-000-00347-3). Washington, DC: U.S. Government Printing Office.

Wavering, M. (1984). Interrelationships among Piaget's formal operational schemata: Proportions, probability, and correlation. *Journal of Psychology, 118,* 57–64.

Weiss, R. S. (1979). Growing up a little faster: The experience of growing up in a single-parent household. *Journal of Social Issues, 35,* 97–111.

Whiting, B. B., & Whiting, J. W. M. (1975). *Children of six cultures: A psychocultural analysis.* Cambridge, MA: Harvard Univ. Press.

Williams, A. F. (1985). Night-time driving and fatal crash involvement of teenagers. *Accident Analysis and Prevention, 17,* 1–5.

Wilson, J. Q., & Herrnstein, R. J. (1985). *Crime and human nature.* New York: Simon & Schuster.

Yamaguchi, K., & Kandel, D. (1987). Drug use and other determinants of premarital pregnancy and its outcome: A dynamic analysis of competing life events. *Journal of Marriage and Family,* **49,** 257–270.

Zelnik, M., & Kantner, J. P. (1980). Sexual activity, contraceptive use, and pregnancy among metropolitan-area teenagers, 1971–1979. *Family Planning Perspectives,* **12,** 230.

Zuckerman, M. (1979a). *Sensation seeking: Beyond the optimal level of arousal.* Hillsdale, NJ: Erlbaum.

Zuckerman, M. (1979b). Sensation seeking and risk taking. In C. E. Izard (Ed.), *Emotions in personality and psychopathology.* New York: Plenum.

Zuckerman, M. (1983). A biological theory of sensation seeking. In M. Zuckerman (Ed.), *Biological bases of sensation seeking, impulsivity, and anxiety.* Hillsdale, NJ: Erlbaum.

Zuckerman, M. (1984). Sensation seeking: A comparative approach to a human trait. *Behavioral and Brain Sciences,* **7,** 413–471.

Zuckerman, M., Bone, R. N., Neary, R., Mangelsdorff, D., & Brustman, B. (1972). What is the sensation seeker? Personality trait and experience correlates of the Sensation Seeking Scales. *Journal of Consulting and Clinical Psychology,* **39,** 308–321.

Zuckerman, M., Eysenck, S. B. G., & Eysenck, H. J. (1978). Sensation seeking in England and America: Cross-cultural, age, and sex comparisons. *Journal of Consulting and Clinical Psychology,* **46,** 139–149.

Zuckerman, M., & Neeb, M. (1980). Demographic influences in sensation seeking and expressions of sensation in religion, smoking, and driving habits. *Personality and Individual Differences,* **1,** 197–206.

Zuckerman, M.., Tushup, R., & Finner, S. (1976). Sexual attitudes and experience: Attitude and personality correlates and changes produced by a course in sexuality. *Journal of Consulting and Clinical Psychology,* **44,** 7–19.

RECEIVED October 26, 1989; REVISED October 16, 1990.

# EXHIBIT 46

# COMING OF AGE IN TWENTY-FIRST CENTURY AMERICA: PUBLIC ATTITUDES TOWARDS THE IMPORTANCE AND TIMING OF TRANSITIONS TO ADULTHOOD

### Tom W. Smith

This paper examines age norms on seven important transitions to adulthood. Americans rank finishing school as the most important hallmark of becoming an adult. This is followed closely by obtaining full-time employment, being able to support a family, and being financially independent. Among these seven standards of achieving adulthood the average transition age runs over a 5.3 year span, from being financially independent, living independently, and being employed full-time by the traditional age of majority (21) to being a parent by age 26.

A large degree of consensus prevails across social groups on the importance of these transitions. The only notable pattern of differences is that on supporting a family, having a child, and getting married older adults and the widowed and married rate these as more important than younger adults and the never married do.

Considerably more variation exists across social groups on the age or timing of these transitions. First, the young and never married favor earlier transitions on financial independence, living away from parents, and working full-time, and later transitions on supporting a family, getting married, and having children. Second, the better educated and those with higher incomes favor later transitions on all domains. Third, cultural differences related to race and religion appear. For example, blacks tend to favor the early transition model more than whites do.

### Introduction

The transition to adulthood is universal in that it takes place in all human societies, but particularistic in that each society evolves its own system. The transition to adulthood is timeless in that it occurs thorough the history of human society and time-specific in that its nature and pace shifts and changes. The contemporary

*Ageing International,* Spring 2004, Vol. 29, No. 2, pp. 136-148.

American system of transition to adulthood is distinct not only from that in other countries, even other advanced industrial societies, but quite different from the American system only a generation ago (Breen & Buchmann, 2002; Cook & Furstenberg, 2002; Mercer, 2003; Settersten & Mayer, 1997).

Cross-nationally, the United States differs from other developed countries in numerous ways including having an earlier shift from secondary to college education and a higher proportion in college (Lippman, 2002), earlier ages of leaving home and living with a partner (Iacovou, 2002), and a greater spread in the age and timing of transitions (Cook & Furstenberg, 2002). Of course on other dimensions transitions in the United States are similar to those in other countries such as regarding employment and being self-supporting (Smeeding & Phillips, 2002).

Domestically, there have been major legal and demographic changes in how adulthood is defined and experienced. For example, legally the age of majority was decreased from 21 to 18 and the age at which people can be tried as adults was lowered in most states. Demographically, changes include the rise in median age at first marriage for women from 20 in 1960 to 25 in 2000, the large increase in post-secondary education, and huge increases in pre-marital childbearing (Baker & Stevenson, 1994; Smith, 1999, 2003).

While the legal and demographic shifts in the transition to adulthood are well-documented and frequently studied, the values and social preferences about the transition to adulthood are less well known. Research does show that prescriptive and proscriptive age norms do exist about what transitions should occur, at what age, and in what order (Neugarten et al., 1965; Settersten & Mayer, 1997). For example, Settersten's work in Chicago (Settersten, 1997, 1998; Settersten & Haegestad, 1996) showed that a majority considered age as relevant for the following youth-to-adulthood transitions—marrying, full-time employment, becoming a parent, leaving home, and finishing school. But because the age-norming, transition-to-adulthood research is based on studies that are variable in methods, local in coverage, and typically have small samples, what is known about national norms, sub-group differences, and changes over time is limited (Settersten & Mayer, 1997).

No truly comparative study of age norms has been carried out, but research indicates that prescriptive and proscriptive standards exist across cultures and that the specific norms vary across societies and generations. In Europe home leaving occurs at earlier ages in the north than in the south and this relates to differences in religion and cultural norms (Holdsworth, 2000; Holdsworth & Elliott, 2001; Iacovou, 2002). Based on a student sample, Peterson (1996) found that Australian age norms "differed in every case" from levels in the United States. Generational differences were found in homeleaving age differences in Canada (Veevers, Gee, & Wister, 1996) and in Japan younger people generally favored earlier transitions than older people did (Hori, 1994).

To better understand where the American public currently stands on the importance of and age norms for various transitions to adulthood the Network on the Transitions to Adulthood of the MacArthur Foundation designed a module to measure this. This is part of wide ranging research by the MacArthur Network examin-

ing current patterns of transitions to adulthood, how these transitions are changing, what factors aid and hinder successful attainment of adulthood, the social norms that guide this process, how the transitions and norms differ across sub-groups, and what public policies would best assist in people transitioning to adulthood. Understanding the social norms that govern the transition to adulthood will allow a better understanding of this crucial process and assist in the formulation of both personal decisions and public policies that will facilitate the transition to adulthood.

## Data

The data on transitions to adulthood were collected on the 2002 General Social Survey (GSS). The GSS is an in-person, full-probability sample of adults living in households in the United States (Davis, Smith, & Marsden, 2003). The transition to adulthood items were administered to a half sample with 1398 cases.

The key questions to measure the transitions are as follows:

1. People differ in their ideas about what it takes for a young person to become an adult these days. How important is it for them to be....

    a. Financially independent from their parents/guardians
    b. No longer living in their parents' household
    c. Completed their formal schooling
    d. To be employed full-time
    e. Be capable of supporting a family financially
    f. Have a child
    g. Get married

    Extremely Important/Quite Important/Somewhat Important/Not too Important/Not at All Important

2. If Extremely/Quite/Somewhat Important, ask:
    By what age should this normally occur?

## Analysis

### Importance of Transitions

As Table 1A shows, Americans are most likely to mention finishing schooling as a transition that a young person needs to complete to become an adult. Seventy-two percent consider this extremely important and 97% consider it at least somewhat important (the criteria for then being asked by what age the transition should "normally occur"). This is followed by obtaining full-time employment which is mentioned as extremely important by 61% and at least somewhat important by 95.5%. Next comes being able to support a family financially which 60% consider

**Table 1**
**Importance and Timing of Transitions to Adulthood**

A. Importance

| | Ex. Imp. | Quite Imp. | Some-what Imp. | Not too Imp. | Not at all Imp. |
|---|---|---|---|---|---|
| Complete Education | 72.3 | 17.9 | 7.0 | 2.1 | 0.8 |
| Employed Full-time | 61.0 | 22.8 | 11.7 | 3.8 | 0.7 |
| Supporting a Family | 60.3 | 22.0 | 11.2 | 4.6 | 1.8 |
| Financially Independent | 47.4 | 33.5 | 16.0 | 2.1 | 1.0 |
| Not Living with Parents | 29.3 | 27.9 | 25.0 | 13.3 | 4.4 |
| Married | 19.1 | 14.1 | 21.6 | 24.0 | 21.1 |
| Have a Child | 15.8 | 13.2 | 23.3 | 25.3 | 22.4 |

N=1353–1379

Wording: People differ in their ideas about what it takes for a young person to become an adult these days. How important is it for them to be…

a. Financially independent from their parents/guardians
b. No longer living in their parents' household
c. Completed their formal schooling
d. To be employed full-time
e. Be capable of supporting a family financially
f. Have a child
g. Get married

Extremely Important/Quite Important/Somewhat Important/Not too Important/Not at All Important

B. Timing

| | Mean Age | % 25 or Older |
|---|---|---|
| Financially Independent | 20.9 | 13.9 (1317) |
| Not Living with Parents | 21.1 | 15.2 (1114) |
| Employed Full-time | 21.2 | 16.3 (1297) |
| Complete Education | 22.3 | 22.3 (1306) |
| Supporting a Family | 24.5 | 57.6 (1220) |
| Married | 25.7 | 68.2 ( 714) |
| Have a Child | 26.2 | 77.7 ( 675) |

Wording: If Extremely/Quite/Somewhat Important, ask:
By what age should this normally occur?

extremely important and 94% as at least somewhat important. Last among the top choices is being financially independent of parents which is considered extremely important by 47% and at least somewhat important by 97%. Other transitions are mentioned less frequently. Not living with parents is extremely important to 29% and at least somewhat important to 82%. It is followed by being married which is extremely important to 19% and at least somewhat important to 55%. The event least often mentioned as needed to become an adult is having a child which is considered as extremely important by 16% and at least somewhat important by 52%.

Of these seven roles, 37.9% considered all to be important markers of a youth becoming an adult (i.e. somewhat, quite, or extremely important), 19.9% named six of these changes, 28.4% five of them, 8.7% four, and only 5.1% considered three or fewer as important (mean mentions = 5.8).

*Age Norms of Transitions*

On average people believe that becoming self-supporting is the first transition that a young person should make (mean age = 20.9)(Table 1B). This is followed by no longer living with parents (21.1), having a full-time job (21.2), completing schooling (22.3), being able to support a family financially (24.5), getting married (25.7), and having a child (26.2). Thus, the average age at which people feel these various transitions to adulthood should occur ranges over a period of 5.3 years. This difference in the timing of transitions is further demonstrated by looking at how many people think the transitions should happen at age 25 or older. As Table 1B indicates, only 14–16% think that financial independence, living independently, and having a full-time job should wait until a person is 25 or older. Twenty-two percent think that finishing your education should be delayed until at least 25. A majority favor an age of 25 and over for being able to support a family (58%), getting married (68%), and having a child (78%).[1]

*Sub-Group Differences on Importance of Transitions*

Overall, there is a good deal of consensus across social groups on the importance of these seven transitions. Examining the differences on the seven transitions by the nine demographics shows statistically significant variations in only 14 of 63 comparisons (Table 2). Looking at these by transitions there are no statistically significant differences in the importance of completing schooling and only one, small demographic difference over the importance of financial independence and full-time employment. Two notable differences occur on the importance of living independently and being able to support a family. College graduates are more likely to think that living independently is important (extremely + quite)(67%) than those with a high school degree or less education (54–55%). It is also seen as more important by Jews (71%) and those with no religion (62%) than by Protestants

**Table 2**
**Importance Ratings of Transition by Socio-Demographics**

(Probability levels)

| Demographics | Finan. Indep. | Living on Own | Finish Sch. | Work Full | Support family | Have Child | Married |
|---|---|---|---|---|---|---|---|
| Gender | **.022** | .461 | .136 | .058 | .408 | .555 | .884 |
| Age | .610 | .839 | .530 | .158 | **.000** | **.007** | **.000** |
| Degree | .286 | **.001** | .318 | **.027** | .125 | .491 | .529 |
| Race | .948 | .296 | .684 | .892 | .130 | .753 | .318 |
| Hispanic | .686 | .088 | .157 | .620 | .360 | .464 | **.020** |
| Marital Status | .937 | .431 | .567 | .061 | **.006** | **.000** | **.000** |
| Income | .595 | .649 | .238 | .343 | .795 | .061 | **.003** |
| Religion | .809 | **.006** | .934 | .482 | .106 | **.000** | **.001** |

(59%) or Catholics (53%). Being able to support a family is seen as more important by older adults (90% 65+, 86% 50–64, 82% 39–49, 74% under 30) and by the married (85%) and widowed (87%) than by the never married (76%). There is least agreement on the importance having a child and getting married. Older adults are more likely than younger adults to see both these activities as important for becoming an adult. Twenty-nine percent of those under 30 rated marriage as important, but 50% of those 65 and over did so. Similarly, the widowed and married see childbearing and marriage as more important than those who have never married. On childbearing Jews and Catholics are the most likely to consider it important (respectively 45% and 34%) while only 26–27% of Protestants and those with no religion think it is important. On marriage Catholics and Protestants rate it as most important (respectively 36% and 35%), compared to only 25% of Jews and those with no religion. Marriage is also considered more important by Hispanics (44%) than non-Hispanics (32%). Those with low incomes tend to be bimodal either saying that getting married is extremely important or not at all important, while those with high incomes are in the middle categories, not to important to quite important.

Age and the life-cycle related variable of marital status show the only well-established pattern of differences with older adults and the married and widowed holding more to the traditional point of view that being able to support a family, getting married, and having children are important hallmarks of becoming an adult. This probably largely reflects a change in values across cohorts, but with only a single point of observation the effects of aging, life cycle, and cohort cannot be readily separated.

**Ageing International/Spring 2004**

**Table 3**
**Mean Age of Transitions by Socio-Demographics**

| Demographics | Finan. Indep. | Living on Own | Finish Sch. | Work Full | Support family | Have Child | Mar- ried |
|---|---|---|---|---|---|---|---|
| Gender |  |  |  |  |  |  |  |
| Men | 20.9 | 21.0 | 22.4 | 21.2 | 24.3 | 26.1 | 25.8 |
| Women | 20.9 | 21.2 | 22.2 | 21.3 | 24.8 | 26.3 | 25.6 |
| Prob. | .695 | .109 | .436 | .486 | .024 | .559 | .734 |
| Model | — | — | — | — | L | — | — |
| Age |  |  |  |  |  |  |  |
| 18–29 | 20.0 | 20.3 | 22.3 | 20.6 | 24.7 | 25.8 | 26.3 |
| 30–49 | 21.0 | 21.2 | 22.1 | 21.2 | 24.6 | 26.6 | 25.9 |
| 50–64 | 21.5 | 21.6 | 22.7 | 21.8 | 24.7 | 26.4 | 25.7 |
| 65+ | 20.9 | 21.4 | 22.0 | 21.5 | 24.0 | 25.6 | 24.3 |
| Prob. | .000 | .000 | .398 | .000 | .119 | .037 | .001 |
| Model | SLC | SLC | — | SLC | — | NCNL | L |
| Degree |  |  |  |  |  |  |  |
| LTHS | 19.9 | 20.5 | 20.9 | 20.1 | 23.2 | 25.3 | 24.4 |
| HS | 20.7 | 20.9 | 21.9 | 20.9 | 24.3 | 25.7 | 25.0 |
| Jr. Col. | 21.0 | 21.4 | 23.4 | 22.0 | 25.3 | 26.9 | 26.0 |
| Bachelor | 21.9 | 21.8 | 23.3 | 22.3 | 25.6 | 27.5 | 26.6 |
| Graduate | 22.2 | 22.0 | 23.9 | 22.9 | 26.1 | 28.8 | 27.7 |
| Prob. | .000 | .000 | .000 | .000 | .000 | .000 | .000 |
| Model | L | L | L | L | L | L | L |
| Race |  |  |  |  |  |  |  |
| White | 21.1 | 21.2 | 22.5 | 21.4 | 24.7 | 26.5 | 25.7 |
| Black | 20.3 | 20.9 | 21.3 | 20.5 | 23.9 | 24.8 | 25.5 |
| Other | 20.2 | 20.9 | 21.7 | 21.2 | 24.3 | 26.3 | 25.8 |
| Prob. | .001 | .207 | .003 | .003 | .029 | .000 | .891 |
| Model | NC | — | NC | NC | NC | NC | — |
| Hispanic |  |  |  |  |  |  |  |
| Not | 20.9 | 21.1 | 22.3 | 21.3 | 24.5 | 26.2 | 25.6 |
| Hispanic | 20.3 | 21.0 | 22.1 | 21.0 | 24.7 | 26.0 | 26.5 |
| Prob. | .031 | .806 | .603 | .309 | .729 | .649 | .081 |
| Model | L | — | — | — | — | — | — |
| Marital Status |  |  |  |  |  |  |  |
| Married | 21.2 | 21.4 | 22.5 | 21.6 | 24.7 | 26.4 | 25.6 |
| Widowed | 20.0 | 20.6 | 21.9 | 21.0 | 23.8 | 24.9 | 23.8 |
| Divorced | 21.0 | 21.0 | 22.4 | 21.0 | 24.3 | 26.5 | 26.0 |

*continued*

Table 3 (*continued*)

| Demographics | Finan. Indep. | Living on Own | Finish Sch. | Work Full | Support family | Have Child | Mar- ried |
|---|---|---|---|---|---|---|---|
| Separated | 19.7 | 20.2 | 21.7 | 20.0 | 23.3 | 25.0 | 24.0 |
| Never Married | 20.3 | 20.7 | 21.9 | 20.8 | 24.7 | 26.1 | 26.6 |
| Prob. | .000 | .001 | .504 | .000 | .060 | .102 | .002 |
| Model | NC | NC | — | NC | — | — | NC |
| Income | | | | | | | |
| Lt 10K | 19.9 | 20.2 | 21.3 | 20.9 | 24.0 | 24.4 | 25.2 |
| 10–15K | 20.1 | 20.2 | 22.1 | 20.6 | 23.9 | 24.5 | 25.7 |
| 15–20K | 20.1 | 20.3 | 22.8 | 20.4 | 23.6 | 25.2 | 23.9 |
| 20–25K | 20.6 | 20.6 | 22.1 | 20.5 | 23.8 | 25.7 | 24.6 |
| 25–30K | 19.6 | 20.4 | 21.9 | 20.4 | 23.8 | 25.5 | 25.9 |
| 30–35K | 20.3 | 20.9 | 21.7 | 20.8 | 23.9 | 24.8 | 24.8 |
| 35–40K | 20.9 | 21.2 | 21.7 | 20.9 | 24.1 | 25.9 | 25.8 |
| 40–50K | 20.9 | 21.0 | 21.9 | 21.0 | 24.4 | 26.4 | 26.0 |
| 50–60K | 21.1 | 21.4 | 23.0 | 21.0 | 24.7 | 26.9 | 25.6 |
| 60–75K | 21.0 | 21.1 | 23.0 | 21.7 | 24.9 | 26.9 | 25.7 |
| 75–90K | 21.1 | 21.6 | 22.6 | 21.8 | 25.4 | 27.5 | 26.7 |
| 90–110K | 21.7 | 21.7 | 22.6 | 21.6 | 25.1 | 27.5 | 26.9 |
| 110K+ | 22.4 | 22.1 | 22.8 | 22.5 | 26.1 | 27.9 | 27.2 |
| Refused | 21.5 | 21.8 | 22.3 | 22.0 | 25.0 | 26.1 | 25.5 |
| Prob. | .000 | .000 | .287 | .000 | .000 | .000 | .029 |
| Model | L | L | — | L | L | L | L |
| Religion | | | | | | | |
| Prot. | 20.8 | 21.1 | 22.2 | 21.1 | 24.1 | 25.8 | 25.2 |
| Cath. | 20.8 | 21.3 | 22.5 | 21.5 | 25.0 | 26.7 | 25.8 |
| Jew. | 21.9 | 22.1 | 22.7 | 24.1 | 26.6 | 29.4 | 27.5 |
| None | 21.1 | 20.7 | 22.1 | 20.7 | 24.8 | 26.1 | 27.5 |
| Other | 21.4 | 21.4 | 22.1 | 21.7 | 25.8 | 27.3 | 26.7 |
| Prob. | .257 | .042 | .908 | .000 | .000 | .001 | .000 |
| Model | — | NC | — | NC | NC | NC | NC |

Models:

NC=not constant (nominal variable)
L=linear
SLC=significant linear component, best linear fit is statistically significant, but also statistically significant variation around this linear model
NCNL=not constant, not linear, best linear fit is not statistically significant, but significantly different from constant model

*Sub-Group Differences in Age Norms*

There are considerably more differences across sub-groups about the timing of these seven transitions. Statistically significant differences appear for over half of the breakdowns (34 of 63).

Only one difference occurs for gender and Hispanic ethnicity and neither is notable.

On marital status the currently married favor the highest ages for all dimensions except getting married, for which the never married thinks one should wait the longest. There is also an interesting reversal on the general preference for a younger age of marrying than having children. The married, widowed, separated, and divorced all put the average age of marrying above the age of having a child (by 0.5–1.1 years), but the never married put having a child 0.5 years before getting married.

Age shows two distinct patterns. On gaining financial independence, living independently, and working full-time, young adults favor an earlier transition and older adults a delay. Those 50–64 favor a higher age than adults over 65. For the family-oriented variables of supporting a family, getting married, and having a child, the pattern reverses. Younger adults are for a later transition and older adults and especially those over 65 are for a younger age.

On race Blacks consistently favor earlier transitions than Whites and (with one exception) Others.[2] Blacks also differ from Whites and Others in favoring an earlier age for having a child than for getting married.

Jews favor later transitions than the other religious groups do. They are generally followed by Catholics with Protestants or those with no religion backing the youngest transitions. Those with no religion differ from the others in putting the transition to parenthood before matrimony.

On income the wealthiest are for the highest transition age for all changes. The earlier ages of change occur among those with low to moderate incomes, but only for four events is the lowest age among those with the least income.

Education shows the most consistent differences of all. For all transitions those with graduate degrees favor the latest transition and those without a high school degree the earliest. The transition gaps are 1.5 years for living independently, 2.3 for financial independence, 2.8 for working full-time, 2.9 for supporting a family, 3.0 for finishing school, 3.3 for getting married, and 3.5 years for having a child. This means that different educational groups have large and consistent differences about the timing of transition to adulthood. For example, 46% of those without a high school degree believe that one should finish schooling before age 20. This early end to education is backed by 32% of those with a high school degree, 19% with an associate degree, 11% of those with four-year degrees, and 7% of those with graduate degrees.[3]

Thus, on the timing of transitions there are several major patterns. First, there are differences by cohort/life cycle and marital status in which the young and never married favor younger transitions on financial independence, living away from

parents, and working full-time, and older transitions on supporting a family, getting married, and having children. (There are no differences on finishing school for either age or marital status.) Second, SES differences occur on education and income. Substantially later transitions are consistently endorsed by the better educated and those with higher incomes. Third, there are some race and religious differences that do not seem entirely due to SES. Blacks, for example, endorse earlier ages for finishing school than Whites do controlling for level of education.[4]

### Summary and Conclusion

Americans rank finishing school as the most important hallmark of becoming an adult. This is followed closely by obtaining full-time employment, being able to support a family, and being financially independent. Of lesser importance are not living with parents, getting married, and having a child. The transition that people believe should come first is being financially independent (by age 20.9 on average), followed by not living with one parents (21.2), being employed full-time (21.2), finishing schooling (22.3), being able to support a family (24.5), getting married (25.7), and having a child (26.2). Thus, among these seven key standards of achieving adulthood the average transition period runs over a 5.3-year span, from being financially independent, living independently, and being employed full-time by the traditional age of majority (21) to being a parent by age 26.

There is a large degree of consensus across social groups on the relative importance of the seven transitions. The only notable pattern of differences is that on supporting a family, having a child, and getting married older adults and the widowed and married rate these as more important than younger adults and the never married do. This probably reflects in large part a shift in values across generations away from traditional family values, but may also represent life-cycle effects.

There is considerably more variations across social groups on the age or timing of the seven transitions. First, the young and never married favor earlier transitions on financial independence, living away from parents, and working full-time, and later transitions on supporting a family, getting married, and having children. (There are no differences on finishing school for either age or marital status.) This probably reflects a combination of inter-generational shifts in values and differences related to life cycle. Second, the better educated and those with higher incomes favor later transitions on all domains. It appears that the college-educated middle and upper classes and the not college-educated working and lower classes have notably different models on how people in general (and presumably their own children in particular) should transition to adulthood. The college-educated class favors finishing education at 23–24, getting married at about 27 and having children at 28–29.[5] Those without any college education think these transitions should occur 3–3.5 years earlier. To the extent that extended education and delayed family formation leads to greater achievement and more material and psychological well-being, these difference in models of transition to adulthood could have notable impacts on social inequality and the perpetuation of same across generations. Third,

apparently independent of the SES effects there are also cultural differences related to race and religion. Blacks, for example, tend to back the early transition model more than Whites do net of SES. As with the case of the SES differences themselves, this would tend to lead to racial differences being continued into succeeding generations.

While the American people have norms about the sequence and timing of these seven transitions to adulthood, these norms are not rigid. There is a fair bit on inter-subject variation, a few notable sub-group variations (e.g. across cohorts and racial groups), and the norms have been flexible enough to change over time with alterations in family structure and demography.

Understanding the patterns and age norms is also relevant to the formulation of public policies and the programs of advocacy groups. First, it is important to realize that while the legal age of majority fell over the last 40 years (from 21 to 18), the social age of majority rose in terms of both behaviors and values. Public officials need to keep this disconnect in mind when setting educational, labor, and tax policies. Second, as noted above, Blacks and Whites differ notably on some age norms. Since age norms on such things as when education should end and when family formation should begin will notably affect people's life opportunities, public policies to reduce racial inequality and the efforts of civil-rights organization to overcome minority disadvantages need to take these differences into account. Third, norms in one area affect both norms and behaviors in other areas. The rising level of college education has led to a higher expected age for finishing education. This in turn has led to both later age of first marriage and a greater acceptance that marriage should be delayed (i.e. a rise in the age norm for marriage). Public officials and social advocates need to realize that norms and behaviors interact in complex ways and that norms in one area can profoundly influence norms and behaviors in other areas.

To what extent adult transition norms and patterns are particularistic to the United States or common among developed countries in general is unknown. Given the important role that culture and religion plays in establishing many transitional age norms (Cook & Furstenberg, 2002; Holdsworth, 2000; Holdsworth & Elliott, 2001; Iacovou, 2002) and the influence that institutions and public policies have on shaping transitional behaviors (Lippman, 2002; Smeeding & Phillips, 2002), it is probable that the norms in other countries vary systematically with their cultures and structures and due to this differ from what prevails in the contemporary United States. Only a rigorous cross-national study can establish what situation actually prevails.

## Biographical Notes

Corresponding author: Tom W. Smith, Ph.D., National Opinion Research Center, 1155 E. 60th Street, Chicago, IL 60637-2799. E-Mail: Smith-tom@norc.net
**Tom W. Smith, Ph.D.** is director of the General Social Survey at the National Opinion Research Center, the University of Chicago. He specializes in the survey methodology and the study of social change.

## Acknowledgements

The research reported here was supported by the National Opinion Research Center, University of Chicago (GSS Topical Report No. 35).

## Notes

1. The age of transitions and their ordering are similar to those found in Settersten and Haegestad, 1996.
2. See similar results in Settersten and Haegestad, 1996.
3. See Settersten and Haegestad, 1996 for a similar pattern.
4. The cultural differences related to religion, ethnicity, and race need to be examined more closely, but sample size limits what can be established as their net effects.
5. Creating what is sometimes called a period of extended adolescence (Baker, 1994; Byers, 1993).

## References

Baker, D.P. & Stevenson, D.L. (1994). Transition to higher education in the United States: Institutional boundaries and pathways to adulthood. *Sociological Studies of Children, 6*, 141–157.

Breen, R. & Buchmann, M. (2002). Institutional variation and the position of young people: A comparative perspective. *The Annals, AAPSS, 580*, 288–305.

Byers, K.F. (1993). *Rights of transition: A study of extended adolescence, the role of traditional masculine growth rituals, and the initiation of manhood in the contemporary masculine life*. Unpublished Ph.d. dissertation, Union Institute.

Cook, T.D. & Furstenberg, F., Jr. (2002). Explaining aspects of the transition to adulthood in Italy, Sweden, Germany, and the United States: A cross-disciplinary, case synthesis approach. *The Annals, AAPSS, 580*, 257–287.

Holdsworth, C. (2000). Leaving home in Britain and Spain. *European Sociological Review, 16*, 201–222.

Holdsworth, C. & Elliott, J. (2001). The timing of family formation in Britain and Spain. *Sociological Research Online, 6* at www.socresonline.org.uk.

Hori, S. (1994). Begging of old-age in Japan and age norms in adulthood. *Educational Gerontology, 20*, 439–451.

Iacovou, M. (2002). Regional differences in the transition to adulthood. *The Annals, AAPSS, 580*, 40–69.

Lippman, L. (2002). Cross-national variation in educational preparation for adulthood: From early Adolescence to young adulthood. *The Annals, AAPSS, 580*, 70–102.

Mercer, C.H. (2003). *The age difference between spouses: Cross-national and within country variations*. Unpublished Ph.D. dissertation, University of Southampton.

Neugarten, B.L., Moore, J.W., & Lowe, J.C. (1965). Age norms, age constraints, and adult socialization, *American Journal of Sociology, 70*, 710–717.

Peterson, C.C. (1996). The ticking of the social clock: Adults' belief about the timing of transitional events. *International Journal of Aging and Human Development, 42*, 189–203.

Settersten, R.A., Jr. (1997). The salience of age in the life course. *Human Development, 49*, 257–281.

Settersten, R.A., Jr. (1998). A time to leave home and a time never to return? Age constraints on the living arrangements of young adults. *Social Forces, 76,* 1373–1400.

Settersten, R.A., Jr. & Haegestad, G.O. (1996). What's the latest? Cultural age deadlines for family transitions. *Gerontologist, 36,* 178–188.

Settersten, R.A., Jr. & Mayer, K.U. (1997). The measurement of age, age structure, and the life course. *Annual Review of Sociology, 23,* 233–261.

Smeeding, T.M. & Phillips, K. R. (2002). Cross-national differences in employment and economic sufficiency. *The Annals, AAPSS, 580,* 103–133

Smith, T.W. (2003). American sexual behavior: Trends, socio-demographic differences, and risk behavior. GSS Topical Report No. 25. Chicago: NORC, revised edition.

Smith, T.W. (1999). The Emerging 21st Century American Family. GSS Social Change Report No. 62. Chicago: NORC.

Veevers, J.E.; Gee, E.M.; and Wister, A.V. (1996). Homeleaving age norms: Conflict or consensus? *International Journal of Aging and Human Development, 43,* 277–295.

Revised manuscript accepted for publication in March, 2004. Action editor: P.S. Fry

# EXHIBIT 47

# Introducing the Issue

*Gordon Berlin, Frank F. Furstenberg Jr., and Mary C. Waters*

That the schedule for coming of age has been rather sharply revised both in the United States and more broadly throughout the industrialized world is by now widely recognized. Over the past decade, especially, the mass media have trumpeted the findings of a growing body of research showing that young people are taking longer to leave home, attain economic independence, and form families of their own than did their peers half a century ago. The forces behind this new timetable have been evident for several decades, but social science researchers, much less policy makers, were slow to recognize just how profound the change has been. A trickle of studies during the 1980s about the prolongation of young adulthood grew to a steady stream during the 1990s and then to a torrent during the first decade of the new millennium.[1] Now that researchers have shown how and why the timetable for becoming an adult has altered, policy makers must rethink whether the social institutions that once successfully educated, trained, and supported young adults are up to the task today.

Changes in the coming-of-age schedule are, in fact, nothing new. A century or more ago, the transition to adulthood was also a protracted affair. In an agriculture-based economy, it took many young adults some time to gain the wherewithal to leave home and form a family. Formal education was typically brief because most jobs were still related to farming, the trades, or the growing manufacturing sector. By their teens, most youth were gainfully employed, but they frequently remained at home for a time, contributing income to their families and building resources to enter marriage and form a family.

By contrast, after World War II, with opportunities for good jobs abundant, young Americans transitioned to adult roles quickly. In 1950, fewer than half of all Americans completed high school, much less attended college. Well-paying, often unionized jobs with benefits were widely available to males. The marriage rush and baby boom era at mid-century was stimulated not only by a longing to settle down after the war years but also by generous new government programs to help integrate veterans back into society.

Today young adults take far longer to reach economic and social maturity than their contemporaries did five or six decades ago. In large part, this shift is attributable to the expansion of higher education beginning in the late 1960s. Employers have become

Gordon Berlin is president of MDRC. Frank F. Furstenberg Jr. is the Zellerbach Family Professor of Sociology at the University of Pennsylvania. Mary C. Waters is the M. E. Zukerman Professor of Sociology at Harvard University.

*Gordon Berlin, Frank F. Furstenberg Jr., and Mary C. Waters*

increasingly reluctant to hire young people without educational credentials. Failing to complete high school all but relegates individuals to a life of permanent penury; even completing high school is hardly enough to ensure reasonable prospects. Like it or not, at least some postsecondary education is increasingly necessary. In short, education has become an ever more potent source of social stratification, dividing the haves and the have-nots, a theme in this volume to which we will return.

---

*Many observers, especially in the mass media, worry that this new timetable for adulthood has created a growing sense of entitlement and a lingering pattern of dependency.*

---

The boom in higher education is not the only reason why young adults are taking more time to gain independence from their families and establish themselves in adult roles. The schedule for growing up, no doubt, has been affected by the lengthening of the life span over the past century. Most young adults today can expect to live into their late seventies, a decade longer than their counterparts even fifty years ago. It makes sense to continue investing into the third and even fourth decades of life when one can expect to live another fifty years or more.

Cultural changes, such as the post-1960s shift in sexual attitudes and practices, have also slowed what was once a rush into adult roles. Fifty years ago, premarital sex was still highly

stigmatized. Although the stigma did not deter many young couples from breaching the norms, marriage served as a safety net in the event of a premarital pregnancy. Today, most young people expect to have sex before marriage and have the means to prevent unwanted childbearing. Their contraceptive efforts are still imperfect, but the point is that they need not marry to have sex, and they will not necessarily become pregnant when they do.

The past several decades, then, have witnessed a big change in how and when youth take on adult roles—to put it another way, another notable shift in the "normal" pattern of moving from adolescence to adulthood. Although today's delayed schedule is reminiscent of the pattern a century ago, however, the two are fundamentally different. Today, young people (unless they are the children of recent immigrants) rarely contribute earnings to the household; by and large, they are either fully or partially beholden to their parents for support while they complete their schooling and find a foothold in the labor force. Typically, they defer marriage in favor of cohabitation even when they do leave the natal household.

Although today's young adults and their parents value independence highly, both tolerate and even endorse a slower schedule for attaining economic and social maturity. In effect, what is becoming normal, if not normative, is that the age of eighteen, or even twenty-one, has lost its significance as a marker of adult status. The transition to adulthood is drawn out over a span of nearly a decade and consists of a series of smaller steps rather than a single swift and coordinated one. Moreover, the social construction of adulthood seems to rely much less on the traditional demographic markers—home

leaving, full-time work, and family forma-
tion—and more on personal psychological
self-assessments of "maturity." At any rate,
the traditional markers do not any longer
stand for attaining adulthood.

Many observers, especially in the mass media,
worry that this new timetable for adulthood
has created a growing sense of entitlement
and a lingering pattern of dependency. Much
of the evidence, however, points to a dif-
ferent conclusion: attaining adult roles (as
measured by independence from the natal
family, union formation, and parenthood) is
simply more difficult than it was, especially
three or four decades ago. In fact, the vast
majority of young adults in their late teens
and early twenties are not at leisure—they are
working, going to school, or doing both at the
same time. Many unemployed and undereducated
young people are desperate to work but
cannot secure stable employment or make
enough money to live on their own. Although
they probably do receive support from their
families during this period of semi-autonomy,
most do not exhibit the signs of entitlement
that are frequently ascribed to them.

The nation's young adults are highly unlikely
to return any time soon to the schedule for
growing up that was normative among their
parents and grandparents. The conditions
driving the shift in the schedule are likely to
be long-lasting. Policy makers must therefore
begin to rethink and renovate the social insti-
tutions that were suited to the past, a time
when the age of eighteen or twenty-one signi-
fied something different than it does today.

## Understanding the New Schedule
Concern about the mismatch between the
new realities of coming of age and the social
institutions that once successfully supported
young people moving toward adulthood gave

rise, in 1999, to the MacArthur Network on
Adult Transitions and Public Policy. The
Network, a team of twelve researchers from
diverse social science disciplines, began its
work by assessing the demographic, economic,
sociological, and psychological evidence on
adult transitions to learn what had changed
and why. In a series of recent publications, the
Network has documented that the changes in
the timing, sequencing, and even attainment
of adult roles have indeed been substantial and
that they are affecting young adults in varying
socioeconomic circumstances quite different-
ly.[2] Drawing on both quantitative and qualita-
tive data in the initial phase of its work, the
Network reported that young adults between
the ages of eighteen and thirty-four are
employing some familiar and some different
strategies than those that their parents and
grandparents used to make a successful
transition to adult work and family roles. In
particular, young adults and their families are
much more skeptical about the wisdom of
early transitions to work and marriage, even
taking into account geographical, religious,
and socioeconomic differences. The Network
also discovered that gender differences in the
timing of adult transitions had virtually
disappeared.[3] By contrast, differences by
social class have, if anything, become more
pronounced.

These changes coincided with and were
reinforced by a wave of immigration during
the 1980s that attracted many young adult
immigrants as well as immigrant families to
the United States. These immigrants have
imported traditional family practices while
simultaneously demonstrating a high level of
adaptation to American ways. First-generation
immigrants often arrive as young adults—the
peak age period for immigration. Social-
ized in their sending society, they enter the
United States seeking work and are often cut

*Gordon Berlin, Frank F. Furstenberg Jr., and Mary C. Waters*

off from their parents and extended family. They achieve independence very young and are more likely to be in the labor force than native-born Americans of the same age and educational background. Second-generation immigrants—native-born children of immigrants—are more likely to live at home as young adults than are comparable natives, and they achieve higher levels of education than natives of similar socioeconomic backgrounds. As a result they have more extended transitions to adulthood than both their parents and comparable native-born Americans.

Network researchers then turned to the challenging task of examining some of the institutions that house and serve young adults—the family, higher education, the workplace, the community, and, for a group of especially vulnerable youth, the juvenile justice, foster care, and related systems. The aim of the second phase of the research program was to assess the ability of each of these institutions to support young adults in their quest for economic independence, intimacy, and civic responsibility—goals widely shared among both young adults and their parents. This volume of *The Future of Children* provides a summary of research findings to date and suggests policy steps that could make these institutions more effective.

## How Well Do Traditional Supports Work?

One important if not unexpected finding of the Network was that existing institutions work much better for affluent young adults than they do for most others. Family resources and the opportunities they afford have become more central to educational attainment. And, with educational attainment an increasingly potent predictor of economic success and stable family life, growing levels of inequality have created an ever larger

chasm between the affluent third (roughly corresponding to college graduates) and the rest of the population. The economic burden on families, particularly those in the bottom two-thirds of the income distribution, has been growing far more rapidly than their capacity to undertake a longer and more expensive period of investment in their children's futures. Increasingly, parents are being asked to take on the costs of education, health care, and, often, support of children in their early twenties (and often later).

Although parents of all social strata seem to understand and accept the new schedule for growing up, middle- and lower-income parents are ill-equipped to handle the costs entailed, and the result is a sharply tilted playing field for young adult development. The new demands of supporting young adults for longer periods create impossible burdens for lower-income households and pose serious problems for all parents who must balance the need to make increased financial (and emotional) investments in their adult children against the need to ensure their own retirements. This privatized approach to investment in the nation's young is quite different from the accepted public approach to education for children below the age of eighteen.

Health care represents a glaring example of how the nation's public arrangements simply do not work for young adults who follow the new schedule for coming of age. Today's health care system more or less protects low-income children up to age eighteen, or in some instances twenty-one, but it does nothing for older youth who lack work-based or school-based health insurance. All but the most affluent parents are frustrated in their efforts to fill the health insurance gap. The pending health care bill, if passed by

Congress and signed by the president, will go a long way toward correcting the problem.

The new public-private approach to supporting higher education is equally problematic. Parents of modest means are hard-pressed to help their children obtain a college education. Although, as described in several articles in this volume, the nation makes both grants and loans available to low-income students, the process for applying for that money—and for finding out how large the grant or loan would be—is complex, intimidating, and cumbersome. As a result, many low-income students simply do not apply. Others end up borrowing and eventually owe considerable amounts of money or try to put themselves through school by working. These two options may not represent a problem for low- and moderate-income families whose children are well-prepared for college. But many youth from these families grow up in areas with poorly functioning school systems and are ill-prepared to make the transition to college. Without adequate economic and social support, they may flounder in the transition to college, creating a nightmare scenario where they fail to get a degree that enables them to repay their educational debts. Although the educational burdens on upper-income families are considerable, these parents are better equipped to help meet the costs of higher education, and their children are better prepared to succeed in college. Here too recent efforts to amend the student financial aid system and to increase Pell Grants and other sources of support could help to address these challenges for low- and moderate-income families.

Once students arrive at college, they tend to receive strikingly different levels of support depending on their economic background. Most four-year residential institutions, which are largely populated by relatively affluent youth, are extremely well-suited to assist young adults in transition. They provide orientations for incoming students and their families, an array of services and counseling should students encounter problems, mentoring delivered by older students, recreational and extracurricular programs, health and mental health services, and, of course, residences. Students who get off track receive academic and emotional guidance. Many of these colleges and universities even offer career counseling and job placement for graduates. Furthermore, these institutions are conveniently linked to postgraduate education programs that are, generally speaking, similarly well-designed for youth in their mid- and late-twenties.

By contrast, the two-year community colleges that less affluent students are likely to attend are typically bare-bones institutions stretched thin by a myriad of demands and insufficient resources. Although potentially useful portals of entry for students hoping to move on to a four-year college, a skilled job, or a semi-profession that requires an associate's degree or a licensing exam, many two-year colleges lack the most basic amenities offered by a four-year residential college or even a four-year commuter school. Campus life is frequently limited, and the services afforded are meager or nonexistent. Students, often unprepared and overcommitted by outside obligations, pose serious challenges to the sometimes underpaid, overburdened faculty and administrators. Rather than serving as beacons of opportunity, too many of these two-year colleges are revolving doors through which students wander aimlessly in search of future direction. Indeed, research supported by the U.S. Department of Education shows that close to half of students who enter a community college do not earn a degree and

*Gordon Berlin, Frank F. Furstenberg Jr., and Mary C. Waters*

are not enrolled in any other postsecondary institution six years later.

In collaboration with MDRC, Network researchers undertook an assessment of how community colleges could realize their mission of providing academic training to allow students to get a degree or secure a job that might be otherwise unattainable without special training. Analysts examined several programs aimed at improving student outcomes, including changes in instructional practices, enhancements to student services, and increases in financial support. Although not all the programs were successful, some led to significant improvements in students' academic performance and persistence. The findings, as presented in the article in this volume by Thomas Brock, suggest that policy makers and educators need not accept high dropout rates as a given. Rather, by making changes in institutional practices— including new forms of flexible financial aid that incentivize and reward students who get good grades and complete courses, as well as innovative "learning community" programs that integrate courses and create study peer groups—they can boost the odds that more young people will earn college degrees and succeed in the labor market.

During the middle decades of the twentieth century and extending through the Vietnam War, military service represented an attractive possibility for youth who were not college bound. It provided, as Ryan Kelty, Meredith Kleykamp, and David R. Segal report in their article in this volume, an effective bridge from high school to work for a large number of young men who lacked vocational direction. Although the military continues today to provide a supportive environment for men and women who want to serve their country, leave home, and get training, it is increasingly

meant to provide a military career rather than a transition to the civilian labor market. Smaller and more select than the draft-era military, today's military is disinclined to afford training to youth who may exhibit educational deficits. Other youth-oriented institutions could learn much from the way the military trains and supports young adults, but the military itself is no longer a significant remedial institution for poorly functioning young adults.

---

*Countless studies have assessed and evaluated the effect of service corps of various types. One rigorous study concluded that they can and often do play a useful role.*

---

From the Depression-era's Civilian Conservation Corps, to the Great Society's Peace Corps and VISTA, to the 1980s state and urban conservation corps, and to the 1990s Corporation for National and Community Service and its dramatic expansion in the Edward M. Kennedy Serve America Act of 2009, policy makers have experimented episodically with institutions that serve the community while providing training and experience for young people who are unemployable or who simply want to gain skills, serve the community, or move on to independent living. Countless studies have assessed and evaluated the effect of service corps of various types. One rigorous study concluded that they can and often do play a useful role in providing time and space for young people to gain experience, acquire useful work skills and direction, and build a sense

of commitment to the larger community. If such results can be extended and built on by the Serve America Act, community service programs could begin to reach the scale needed to provide a new "institution" to help meet the needs of youth making the extended transition to adulthood.

Often coming as a year-long experience between high school and college or work, or as a year off during or after college, youth service programs could be a valuable bridging program with double social utility. Through these programs, young people do important work in their local communities—in hospitals, schools, and other public and nonprofit settings—and gain many experiences needed to make a successful transition to adulthood. In the long-standing debate about the pros and cons of mandatory national service for all, the passage of the Serve America Act may signal a commitment to build a voluntary, as opposed to a mandatory, system of opportunities for a diverse group of young people. This signal notwithstanding, unless concrete steps are taken to build the capacity of service models that work, to collect evidence of their ongoing effectiveness, and to build a record of their accomplishments—much as the WPA's accomplishments were documented and remain for all to see in the nation's parks and other structures—history suggests that expansion could be followed by contraction. After all, it was only a few short years ago that the Corporation for National and Community Service survived a near-death experience in Congress. But this time, getting it right may matter more than it has in the past, given the dearth of institutions to help meet the demands of a lengthened transition to adulthood.

Some proportion of young adults—those exiting foster care; youth in special education or with physical, emotional, or cognitive limitations; the homeless; and the many exiting jail or prison—are at much higher risk in the transition to adulthood. Because these populations often overlap, however, it is hard to estimate their number precisely. Most experts believe that the share of youth who are at risk of encountering serious problems is significant. The vast majority come from poor and near-poor families that are disproportionately African American and Latino.

Much of the Network's attention has been focused on the very expensive systems that serve these vulnerable populations as children—foster care, juvenile justice, special education, and social security disability. No easy or cost-free solutions are available to help these youth improve their prospects as young adults. Early detection of youths with problems, better schooling, and better alternatives to foster care and incarceration could reduce the share that enters early adulthood without the requisite skills to take advantage of educational opportunities and eventually find good jobs. But even with the best schooling and most effective preventive and ameliorative services, another challenge would be how to integrate the diverse systems that serve vulnerable youth. In addition, these youth often lack the family supports that other young people have as they age into young adulthood. The failure of existing institutions to adapt to current realities and the dearth of new institutions to serve young people without family supports are huge problems, as many of these young adults at risk will face lifelong problems that must be paid for one way or another.

## The Changing Nature of Young Adulthood

The premise of this issue of *The Future of Children* is that the nation's public policy and its social institutions fail to reflect the realities

*Gordon Berlin, Frank F. Furstenberg Jr., and Mary C. Waters*

of the new transition to adulthood—and thus do not adequately serve the needs of young adults. Although each article in the volume opens with a full summary, in this section we briefly highlight some of the findings we think are the most important.

## Overview

Richard Settersten of Oregon State University and Barbara Ray of Hired Pen, inc., open the issue by surveying the changes that have taken place over the past few decades in the timing and sequencing of young adulthood. They describe the later age at marriage, the rise in the number of young people living at home with their parents into their twenties, and the longer period of time young people are staying in school. They stress that these changes create strains not only on the families of young adults but also on the institutions—colleges and universities, the military, youth service organizations, and the work setting—that have traditionally supported them. Noting that these institutions are not designed for this new pattern of life choices, Settersten and Ray raise the question of whether the risks and costs newly associated with the early adult years should be borne privately by families or publicly by government. They also point out that despite the problems it creates, the lengthening transition to adulthood creates opportunities for some young people, especially those from more affluent backgrounds, to explore careers and lifestyles before settling into traditional adult roles.

## Immigration

One of the most notable changes in American young adulthood is a demographic one. Young adults today are remarkably ethnically and racially diverse, owing in no small part to the enormous volume of immigration during the past four decades that has swelled the ranks of first- and second-generation immigrants and children of immigrants. Rubén Rumbaut and Golnaz Komaie of the University of California–Irvine document these demographic changes and explore the ways in which generation and national origin shape the experience of young adulthood. The first generation of immigrants, having arrived in this country as young adults themselves, are the least likely of all young adults in the United States aged eighteen to thirty-four to live in their parents' households. They are also the least likely to be attending school, but the most likely to be working full time, to be married, and to have children. By contrast, the second generation is the most likely to live in the natal household and to be attending school between eighteen and thirty-four; they are by far the least likely to be married and to have children. In addition to these vast differences between the generations, immigrant groups also experience gaps in social, economic, and legal status that are even greater than the gaps between native whites and blacks. Sizable segments of immigrant youth, especially the undocumented and the less-educated poor, face structural barriers in their transitions to adulthood, and the authors discuss possible policy options to deal with those barriers.

## Family Changes

Frank Furstenberg of the University of Pennsylvania surveys the important family changes that characterize the transition to adulthood. He notes that both patterns of family formation and the shape of the family have changed often in American history and that the period often used as a benchmark for measuring family change—that immediately after World War II—was in reality an anomaly in the long sweep of family history, notable for its very early pattern of attaining such markers of adulthood as employment, marriage, and

childbearing. It should therefore come as no surprise that U.S. family formation patterns today differ dramatically from those of fifty years ago. Young adults are on average marrying later, and a substantial fraction, not at all. Cohabitation has become increasingly acceptable as an alternative to marriage, and the average age of childbearing has risen. Furstenberg documents two major trends in these family formation patterns. First, gender equality has increased, with men and women growing more alike in the age at which they leave home, marry, and have children. And, second, class inequality has grown substantially, with lower-income young people less likely to follow an orderly and predictable sequence of education, full-time employment, home-leaving, marriage, and parenthood. Higher-income young adults are more likely to follow the traditional sequence, but they take longer to complete it and often must go through an extended period of financial dependence on parents while they complete their education. The share of young adults residing with parents has risen since the 1960s, when adult transitions started at an earlier age. Furstenberg argues that the popular media often portray these changes as objectionable for parents and young adult children, but the few studies to examine this question find that parents and young adults accommodate well to the new schedule.

As a result of delays in establishing themselves financially, young people tend to depend longer on their families of origin. Although all industrialized countries have experienced this same pattern, the U.S. welfare state is relatively undeveloped, meaning that the burden of supporting young adults falls more heavily on American families. Furstenberg calls for further research on how families are managing these new demands and warns that the need for active parenting

extending into their children's twenties and even thirties may discourage people from becoming parents in the first place, leading to a trend toward lower fertility, especially among more affluent families.

## Second Chances for High School Dropouts

The American labor market has little to offer workers who do not complete high school, and at least some college is increasingly required to attain a well-paying job. Yet somewhere between 9 and 16 percent of young people aged sixteen to twenty-four have not completed high school. Over the past several decades a variety of "second-chance" programs have been developed to help dropouts finish high school or obtain a General Educational Development (GED) credential and get a foothold in the labor market. Dan Bloom of MDRC reviews the types of programs available, as well as their efficacy, and then considers their implications for the transition to adulthood. Although he notes that it is difficult to prove that the collapse of the job market for high school dropouts over the past several decades caused the steep decline in the share of dropouts who marry—from 68 percent of men aged twenty-two to thirty-two in 1970 to only 26 percent in 2007—the two trends certainly reflect each other. Bloom surveys eleven major programs intended for young dropouts, dividing them into three categories—work programs, training and education programs, and mandatory, welfare-based programs for teen mothers. All have been evaluated using rigorous random-assignment techniques. Though the evaluation findings are mixed, they show at least short-term modest effects for many of the programs. Bloom also cites descriptive studies showing that young people who obtain a GED tend to do relatively poorly in the labor market, in part because they are much less

*Gordon Berlin, Frank F. Furstenberg Jr., and Mary C. Waters*

likely to pursue postsecondary education than those who get a high school degree. Based on these findings, Bloom proposes three focuses for future research and policy: strengthening programs for youth who voluntarily seek to continue their education or find jobs, including building tighter links between GED preparation programs and postsecondary occupational certificate programs; identifying strategies to engage disconnected youth who are unlikely to volunteer for programs such as the Job Corps; and analyzing local systems to support disconnected youth.

**Improving Higher Education Outcomes**
Even though the value of a college education has increased markedly over the past forty years, with college graduates earning 1.8 times as much as high school graduates, college graduation rates have not improved in decades, largely because students' rates of persistence to a degree have not improved. The five-year college graduation rate is 60 percent at four-year colleges, but only 32 percent at community colleges. The low community college graduation rate is a growing concern, because more than a third of all college students attend two-year colleges. Meanwhile, access to college has improved substantially, with the share of women on campus catching up to and surpassing that of men and the share of nonwhite college students doubling in the past two decades.

Thomas Brock of MDRC outlines these trends in college attendance and persistence and reviews the research on interventions aimed at improving college outcomes for young adults. The changing nature of young adulthood, with more youth combining work, school, and parenthood, results in a diverse college student population—one that is older, more part time, and more likely to attend episodically than has been conventional until

recently. Indeed, Brock reports that only 27 percent of current undergraduates are "traditional students" who attend full time immediately following high school and who rely on parents for financial support. Of all undergraduates in 1999–2000, 28 percent were highly nontraditional—in their twenties or older, combining work with school, and raising children. And nontraditional students are much less likely than traditional students to persist to a degree. Brock surveys a number of interventions that have been evaluated by rigorous random-assignment design. Among the more promising interventions are remedial education courses that foster more student engagement and belonging on campus, enhanced student services such as counseling and support, and performance-based scholarships that tie financial incentives to successful course completion. Brock concludes that many of the interventions show modest positive effects and that performance-based scholarships show pronounced positive effects. Although many people believe that making federal financial aid more effective will also increase persistence, surprisingly little systematic research has addressed that question. One clear finding is that simplifying the application form for federal financial aid (FAFSA) has a substantial payoff in increasing college enrollment.

**The Labor Market**
One of the key markers of the transition to adulthood, and arguably one necessary for success, is finding stable and well-paying employment. Dramatic changes in the labor market in recent decades, however, have complicated young people's prospects of finding such employment. In their survey of the labor market and the transition to adulthood, Sheldon Danziger and David Ratner of the University of Michigan contend that young people now must struggle to attain

financial independence—a development with implications in other areas. Although it cannot be proved, for example, that the delay in achieving financial independence has caused delays in leaving home and in marrying, these trends are correlated.

---

*Even though the value of a college education has increased markedly over the past forty years, college graduation rates have not improved in decades, largely because students' rates of persistence to a degree have not improved.*

---

Danziger and Ratner stress that gender plays an important part in the story of the labor market. The prospects of young men, especially less-educated young men, have declined precipitously, while more young women are working and their earnings have increased relative both to inflation and to the earnings of young men. The median annual earnings (in constant 2007 dollars) of men between the ages of twenty-five and thirty-four who worked at some time during the year fell 21 percent between 1973 and 2007, whereas the median earnings of women rose 62 percent. Job turnover— what economists call "churning"—has also increased dramatically. The fraction of individuals in jobs lasting less than one year has risen faster for younger than for older workers. The share of workers in longer-term jobs declined precipitously for men, while

holding steady for women. Employment for men with the least education also fell during the past few decades, with the sharpest declines for African American men with less than a high school education. Because of the increasing labor market returns to education and the importance of postsecondary education for employment, Danziger and Ratner recommend programs that increase educational attainment, including early childhood education and second-chance programs such as those described by Dan Bloom. They also support raising the minimum wage and expanding the earned income tax credit (EITC), both of which could raise the incomes of workers at the lower end of the distribution.

## Civic Participation

In their article on civic participation, Constance Flanagan of Penn State University and Peter Levine of Tufts University reinforce a theme running throughout the volume— the ways in which class, race, and immigrant status shape very different patterns in young adulthood. They find that more affluent young people are more likely to be civically engaged than the less affluent, both in terms of political activity such as voting and in terms of volunteering. This civic divide is a consequence both of cumulative disadvantage in the pre-adult years and of a dearth of institutional opportunities for young adults who are not in college. The authors argue that young adulthood is a critical period for forming political beliefs and behaviors, and they trace the ways in which an elongated transition to adulthood might provide opportunities for increased civic engagement among young people. They also trace generational differences in political attitudes and behaviors and suggest that young people in more recent cohorts may be shifting to more active engagement.

*Gordon Berlin, Frank F. Furstenberg Jr., and Mary C. Waters*

## The Military

Although only a small fraction of U.S. young adults serve in the nation's all-volunteer military, young adults are very much the focus of the military, because the majority of military personnel fall into this age group. In their article on young adulthood and the military, Ryan Kelty of Washington College, Meredith Kleykamp of the University of Kansas, and David R. Segal of the University of Maryland explain that in periods of mass conscription, such as during World War II, the military is for most people a hiatus between adolescence and adulthood. By contrast, today's all-volunteer military is more likely to be a period of active transition into young adulthood and, often, into a career in the military.

The military's new, more career-oriented system has led it to implement a number of policies to cope with the family needs of young adults. Indeed Kelty, Kleykamp, and Segal document the ample material support the military provides to young adults—reasonable wages, generous in-kind transfers, free medical care, housing, educational benefits, and training designed to promote responsible membership in intimate relationships and the wider community. As a result, the pattern of family formation in the military is earlier and more stable than it is among civilians of the same age. The majority of enlisted personnel are parents, and the racial differences in family formation that exist among civilians do not characterize the military. No black-white gap in marriage exists among military personnel. The transition to adulthood, including economic independence from parents, is thus much more stable and orderly for military personnel.

Kelty, Kleykamp, and Segal note that much about what the military does cannot easily be replicated in the wider society. As an institution, the military has unique control over young adult behavior through its code of conduct. It also restricts who can enlist, barring openly homosexual personnel, restricting the occupations available to women within the military, drawing recruits who have high school diplomas, and refusing to enlist high school dropouts or people with criminal records. The authors also note that the military in a time of war holds dangers for young adults, most especially in the long-run effects of injuries, both psychological and physical, from the war and the long-run effects of the physical and symbolic violence women experience in a male-dominated institution.

## Justice System and Social Services

All the articles in this volume stress the varying needs of young adults and the ways in which young people with fewer financial resources, less education, and less support from their families of origin have a harder time than their more affluent peers in making a successful transition to independent adulthood. The point holds particularly true in the case of vulnerable youth—defined by D. Wayne Osgood and E. Michael Foster of Penn State University and Mark E. Courtney of the University of Washington as those involved in the social service, health, and justice systems in childhood and adolescence. The authors survey the special challenges faced by youth involved in the mental health system, the foster care system, the juvenile justice system, the criminal justice system, special education, and the health care system, as well as runaway and homeless youth. Although noting that these populations overlap and that many young people need services from multiple systems, Osgood, Foster, and Courtney show that the categorical ways in which state and federal funding for these systems are designed often keep

these issues compartmentalized and prevent service providers from seeing or helping the whole person. The authors explain that at age eighteen or twenty-one, young people age out of more supportive and inclusive systems designed for children to either no services or services with less support designed for adults. Many of these systems still function as if youth become independent adults overnight, and they are at odds with the longer period of semi-autonomy that characterizes young adulthood today. The authors point to the poor outcomes among these vulnerable youth and stress the need to redesign targeted services for them. They also argue that universal programs for all young adults would greatly benefit vulnerable populations. Finally, they highlight recent promising policy developments such as the 2008 Fostering Connections Act, which extends government responsibility for youth in foster care from age eighteen to age twenty-one, and the Shared Youth Vision Initiative, designed to improve and coordinate systems that serve vulnerable youth as they transition to adulthood.

## Key Policy Issues

The Network's research has revealed three urgent policy issues. The first is the twin problem of access and persistence in higher education, especially at the nation's community colleges. In response to findings from research, some of it supported by this Network, federal policy makers are moving rapidly and forcefully to strengthen these critical institutions that bridge the gap between a generation ill-prepared for college-level work and a labor market that is demanding ever more complex skills.

The second pressing need is to design and implement effective new programs to identify and prepare at-risk youth for the transition.

Such programs, for example, would help young people to complete their secondary education so that they are better prepared to take the next step, whether directly into the labor force, into military service or alternative forms of service, or into higher education. Although the Network's focus was on the period of adult transitions (age eighteen to thirty-four), one signal research effort was an evaluation of ChalleNGe, a unique program developed by the National Guard to provide an alternative for high school dropouts between the ages of sixteen and eighteen. The program intervenes early to help these young people complete high school or obtain a GED during a five-month military-academy style residential program that emphasizes schooling, service, leadership, and healthy living among other skills needed in adulthood. After youth complete the residential portion of the program, trained mentors work with them in their own communities over the next twelve months to effectuate a successful transition to postsecondary education, work, or military service. As the articles in this volume by Dan Bloom and by Sheldon Danziger and David Ratner demonstrate, the consequences of school dropout are devastating to the long-term transition to adulthood. Early evaluation results from a randomized controlled trial of the ChalleNGe program present encouraging evidence that the program could offer valuable lessons for tackling this difficult set of problems.

The third policy priority is diagnosing and attending to the problems of especially vulnerable youth and the systems that serve them, like foster care and juvenile justice, and rethinking how the nation might build a better integrated system of care. The list of systemic issues is long. One key problem is the failure to coordinate among systems that often define their jurisdiction narrowly,

especially when young people are known to more than one system and when needs overlap. Another is conflicting missions and funding sources. Yet another is the age at which services end—a crucial issue at a time of lengthening transitions to adulthood. Although families with means are extending help to their children well into their twenties and beyond, the special education, foster care, juvenile justice after-care, and related systems end service eligibility abruptly, often at age eighteen and only rarely much past age twenty-one. Promising strategies would reward collaboration and coordination, extend the reach of these systems well into adulthood, strengthen existing services and develop new ones to meet the special developmental needs of vulnerable youth at this stage of life, and better integrate services with those from more mainstream systems. Examples include building links to programs like ChalleNGe for foster care youth who drop out of school or facilitating access to community colleges and four-year colleges when skills permit. Here too, policy makers are beginning to recognize the need for change—witness the passage in 2008 of federal legislation extending services in the foster care system from age eighteen to twenty-one. Other efforts to coordinate these systems at the federal level are also under way. But more remains to be done. One way to stimulate change would be to free a few willing states from federally imposed categorical restrictions and ask them to experiment with integrated systems of care geared to making mainstream links and providing supports that extend into adulthood.

In sum, when the Research Network on Transitions to Adulthood and Public Policy began its work more than a decade ago, the lengthening of the transition and the concept of early adulthood as a distinct stage in human development were only dimly perceived. As a result, the real and tangled implications of young people taking a decade or more after leaving high school to attain the markers commonly associated with adulthood—full-time work, an independent household, a stable relationship with a significant other in marriage or cohabitation, child-rearing, civic engagement, and, increasingly in the twenty-first century, at least some postsecondary education or training—were only poorly understood.

Research uncovered several important consequences of the extended transition. The first was the growing burden placed on the middle- and lower-income families who were providing their children with schooling, housing, health insurance, and income well beyond the age range of eighteen to twenty-one, the traditional age of majority. Instead of saving for retirement, or meeting their own needs, parents found themselves continuing to invest in their children's future. The second consequence was the unexpected strain being imposed on key social institutions. Many young adults found themselves without health insurance and with few viable options to obtain it. Colleges often labeled students who came back to school later in life as "nontraditional," when in fact taking time off to work, see the world, or volunteer was increasingly the norm and not the exception for young adults. And the academic, financial, social, and emotional needs of this new breed of students differed from those of fresh-out-of-high-school students. Third, few new institutional options were available to promote development at this stage of life. Youth corps and other volunteer programs existed, but the total number of slots available was generally small. Possibly most consequential of all, children in the care of the state—foster care, special education, the juvenile justice

system—had been particularly hard hit by the new transition. These social systems continued to end their support abruptly at age eighteen, even while low- and middle-income families were increasingly stepping in to help their more advantaged young adult children weather a longer transition. In effect, the most disadvantaged—those least able to adapt and most in need of transitional help well into adulthood—had been left "on their own without a net."

A decade later, as the articles in this volume testify, recognition and change are in the air. While families still bear the brunt of the burden and institutions have not completely made the transition, policy and practice are now both astir. Out of necessity, to attract and hold a volunteer army, the military has made a number of changes to encourage and support the transition to adulthood—paying for higher education, offering more attractive pay, and providing better housing, supports, and work hours for married couples. For vulnerable youth, the Fostering Connections to Success and Increasing Adoptions Act of 2008 extends the definition of a "child" up to age twenty-one and offers federal matching funds to states that opt to allow young people to remain in foster care past age eighteen. It also encourages states to provide that support in more constructive ways that facilitate mastery of the skills needed to become productive adults and lead independent lives. Similarly, the Edward M. Kennedy Serve America Act of 2009, as noted, expands and extends the work of the Corporation for National and Community Service. It more than triples (from 75,000 today to 250,000 by 2017) the number of positions available each year for young people to engage in service learning opportunities in education, health, clean energy, economic opportunity, and other national priorities, thus providing a new rite of passage to adulthood in the way that military service did during the draft era. In the health care area, sweeping new legislation would offer health insurance options for all Americans, including young adults who have not yet connected with employer-based health insurance and who are not covered by college-based plans. Change is stirring in higher education as well. The Obama administration has proposed a bold, potentially transformative set of reforms and expansions in student grant and loan programs including significant increases in Pell Grant amounts, a $12 billion investment in community college facilities, accountability measures, instructional innovation, and programs—investments that would help these strategically placed institutions meet the needs of a twenty-first century student body.

Taken as a whole, these developments signal an unusually bold set of initiatives and, most important, resources that would significantly help to relieve parental burden and drive key institutions to adapt to the changing needs of young adults in transition. But as is the case for all policy changes, the devil will be in the details of on-the-ground practice. The articles in this volume provide a blueprint for harnessing resources to need and policy to practice that could help to put derailed young people back on the pathway to adulthood in the twenty-first century.

*Gordon Berlin, Frank F. Furstenberg Jr., and Mary C. Waters*

## Endnotes

1. William S. Aquilino, "Two Views of One Relationship: Comparing Parents' and Young Adult Children's Reports of the Quality of Intergenerational Relations," *Journal of Marriage and the Family* 61 (1999): 858–70; Frances K. Goldscheider and Calvin Goldscheider, "The Effects of Childhood Family Structure on Leaving and Returning Home," *Journal of Marriage and the Family* 60 (1998):745–56; Frances K. Goldscheider and Linda J. Waite, *New Families? No Families? The Transformation of the American Home* (University of California Press, 1991); Michael J. Rosenfeld, *The Age of Independence: Interracial Unions, Same-Sex Unions, and the Changing American Family* (Harvard University Press, 2007); Michael Shanahan, "Pathways to Adulthood in Changing Societies: Variability and Mechanisms in Life Course Perspective," *Annual Review of Sociology* 26 (2000): 667–92.

2. MacArthur Foundation Research Network on Transitions to Adulthood, www.transad.pop.upenn.edu.

3. Richard A. Settersten, Frank F. Furstenberg Jr., and Rubén G. Rumbaut, eds., *On the Frontier of Adulthood: Theory, Research, and Public Policy* (University of Chicago Press, 2005).

# EXHIBIT 48

| Home | News | Sport | Reel | Worklife | Travel | Future | M |
| --- | --- | --- | --- | --- | --- | --- | --- |

## Magazine

# Is 25 the new cut-off point for adulthood?

By Lucy Wallis
BBC News

23 September 2013                                                        



**New guidance for psychologists will acknowledge that adolescence now effectively runs up until the age of 25 for the purposes of treating young people. So is this the new cut-off point for adulthood?**

"The idea that suddenly at 18 you're an adult just doesn't quite ring true," says child psychologist Laverne Antrobus, who works at London's Tavistock Clinic.

"My experience of young people is that they still need quite a considerable amount of support and help beyond that age."

Child psychologists are being given a new directive which is that the age range they work with is increasing from 0-18 to 0-25.

"We are becoming much more aware and appreciating development beyond [the age of 18] and I think it's a really good initiative," says Antrobus, who believes we often rush through

childhood, wanting our youngsters to achieve key milestones very quickly.

The new guidance is to help ensure that when young people reach the age of 18 they do not fall through the gaps in the health and education system. The change follows developments in our understanding of emotional maturity, hormonal development and particularly brain activity.

"Neuroscience has made these massive advances where we now don't think that things just stop at a certain age, that actually there's evidence of brain development well into early twenties and that actually the time at which things stop is much later than we first thought," says Antrobus.

There are three stages of adolescence - early adolescence from 12-14 years, middle adolescence from 15-17 years and late adolescence from 18 years and over.

Neuroscience has shown that a young person's cognitive development continues into this later stage and that their emotional maturity, self-image and judgement will be affected until the prefrontal cortex of the brain has fully developed.

Alongside brain development, hormonal activity is also continuing well into the early twenties says Antrobus.

"A number of children and young people I encounter between the age of 16 and 18, the flurry of hormonal activity in them is so great that to imagine that's going to settle down by the time they get to 18 really is a misconception," says Antrobus.

She says that some adolescents may want to stay longer with their families because they need more support during these formative years and that it is important for parents to realise that all young people do not develop at the same pace.

But is there any danger we could be breeding a nation of young people reluctant to leave adolescence behind?

TV sitcoms are littered with such comic stereotypes of juvenile adults, such as Smithy from Gavin and Stacey or Private Pike in Dad's Army.

Then there are those characters who want to break away from their overbearing or protective parents or guardians and reach adulthood, but struggle to cut the family ties.

Frank Furedi, professor of sociology at the University of Kent, says we have infantilised young people and this has led to a growing number of young men and women in their late 20s still living at home.

"Often it's claimed it's for economic reasons, but actually it's not really for that," says Furedi. "There is a loss of the aspiration for independence and striking out on your own. When I went to university it would have been a social death to have been seen with your parents, whereas now it's the norm.



"So you have this kind of cultural shift which basically means that adolescence extends into your late twenties and that can hamper you in all kinds of ways, and I think what psychology does is it inadvertently reinforces that kind of passivity and powerlessness and immaturity and normalises that."

Furedi says that this infantilised culture has intensified a sense of "passive dependence" which can lead to difficulties in conducting mature adult relationships. There's evidence of this

culture even in our viewing preferences.

"There's an increasing number of adults who are watching children's movies in the cinema," says Furedi. "If you look at children's TV channels in America, 25% of the viewers are adults rather than children."

He does not agree that the modern world is far more difficult for young people to navigate.

"I think that what it is, is not that the world has become crueller, it's just that we hold our children back from a very early age. When they're 11, 12, 13 we don't let them out on their own. When they're 14, 15, we hover all over them and insulate them from real-life experience. We treat university students the way we used to treat school pupils, so I think it's that type of cumulative effect of infantilisation which is responsible for this."

But should parents really be encouraging adolescents to make their own way in the world more? The TV series Girls - with central character Hannah Horvath struggling with adulthood - has captured the zeitgeist. Hannah's parents have cut her off financially and she has to live away and navigate her 20s making her own mistakes.



One of the traditional rites of passage for adulthood was always leaving home, but TV property expert Sarah Beeny says that adolescents do not have to move out of the parental house in order to learn how to be independent and there are huge advantages to multi-generational living.

"The solution to not having useless 25 [and] 30-year-olds living at home is not sending them out of the home, it's making them do their own washing, pay their own way, pay towards the rent, pay towards the bills, to take responsibility for cleaning up their bedroom and not waiting on them hand and foot," says Beeny.

She says that parents should play a part in teaching adolescents key skills and that young people in return can keep their parents current.

Case 3:19-cv-01226-L-AHG   Document 34-8   Filed 01/03/20   PageID.7552   Page 175 of 192

"I know it sounds like a utopian dream but it's probably where we should be aiming. To me that's the holy grail… not everybody living in their own individual pods by themselves thinking, brilliant I'm paying a mortgage."

The idea of parental responsibility to adolescents should also extend to another external symbol of maturity says motoring expert Quentin Willson - the car. He says it has become a "talisman" for young people to feel more mature.

Willson says statistics show that at the age of 18 the vast majority of accidents caused by young drivers are down to bad judgement and decision making, and that behind the wheel "adult maturity isn't fully formed until you get past 25 for most cases of people".

But rather than raise the minimum age for driving, Willson believes parents and teachers should impart safe driving skills before the effects of adolescence really kick in.

"If you teach these children when their mindsets are pure and before they've been corrupted by things like Grand Theft Auto 5 and Top Gear and all these corrosive social pressures, then you get the road safety message in much earlier," says Willson.

"The government should look at this very carefully and put driving on the GCSE syllabus. So you teach kids to drive in terms of theory at school and all the right messages at 13, 14, 15, because when you get to 17 the testosterone is raging, all those corrosive influences are embedded."

With such racing hormonal activity and adolescence taking much longer than we previously thought, how will we know when we actually do reach adulthood?

For Antrobus it is when independence "feels like something that you both want and can acquire".

But for the eternal adolescents among us, perhaps Beeny's definition is apt.

"For me adulthood is realising that there are no grown-ups and everyone else is winging it," says Beeny.

**What was the moment when you realised you had become an adult? How old were you? Comment on Facebook or Twitter with the hashtag #adulthood.**

# Share this story About sharing

# In today's Magazine

## Two close friends who have every reason to hate each other
24 December 2019

# EXHIBIT 4;

# Figure MS-2
## Median age at first marriage: 1890 to present




U.S. Department of Commerce
Economics and Statistics Administration
U.S. CENSUS BUREAU
census.gov

*Source:* U.S. Census Bureau, Decennial Censuses, 1890 to 1940, and Current Population Survey, Annual Social and Economic Supplements, 1947 to 2019.
Note: Starting in 2019, estimates for marriages now include same-sex married couples.

# EXHIBIT 50

# National Vital Statistics Reports





**Volume 51, Number 1**

**December 11, 2002**

# Mean Age of Mother, 1970–2000

by T. J. Mathews, M.S., and Brady E. Hamilton, Ph.D.,
Division of Vital Statistics

## Abstract

*Objectives*—This report presents trends in the mean age of mothers giving birth for the United States for the last three decades. Data are presented by live-birth order, race, Hispanic origin, and State of residence of the mother.

*Methods*—Descriptive tabulations and graphs of the trends in the mean age of mother are discussed.

*Results*—The mean age of mother has increased steadily in the United States over the last three decades. Mothers having their first and second live births had the largest increase in mean age. Among racial and Hispanic origin subgroups, Japanese women had the highest mean age in 2000. Puerto Rican women had the lowest mean age. Massachusetts had the highest mean age in 2000 and Mississippi had the lowest.

**Keywords**: mean age • birth order • race and Hispanic origin • State-specific mean age

## Introduction

Data on the age of mothers have been collected and published from the birth registration system of the United States for many decades. One measure that generates considerable interest among researchers and particularly the public is the typical age at which women have children. Often the interest is specifically in the "average" age of women having their first child.

The mean age figures, published here in detail for the first time, are shown for the years 1970–2000. Data by State are shown for 1970, 1980, 1990, and 2000. Data by detailed race and Hispanic origin begin with 1989, when the Hispanic reporting area was nearly complete, and go through 2000. Mean age of mother for selected countries are shown for 1970 and 2000. Information about change in the mean age of mother over these various time periods is displayed as absolute change in years.

The mean age of mother is the arithmetic average of the mother's age at time of the birth. For this report the mean age is computed directly from the frequency of births by age of mother in the United States (approximately 4 million annually). Consequently, the measure



**Figure 1. Percent of all live births by age of mother, 1970–2000**

**Acknowledgments**

This report was prepared under the general direction of Stephanie J. Ventura, Chief of the Reproductive Statistics Branch (RSB). William D. Mosher of RSB provided peer review. This report was edited by Thelma W. Sanders, typeset by Jacqueline M. Davis, and graphics were produced by Jarmila G. Ogburn of the Publications Branch, Division of Data Services.



is affected by age patterns in childbearing and by the age distribution of the population of women within the childbearing years. The age distribution of women giving birth has changed from 1970 to 2000 with relatively fewer mothers under 20 years of age and more mothers 35 years and over (figure 1).

Median age of mother is a related measure to the mean and is published elsewhere (1). The median age of the mother is the middle point if mothers ages were arranged from the lowest to highest. Published medians are computed using the birth rates of women in 5-year age groups, from 10–14 years to 45–49 years of age (1,2). The median is the more useful measure when it is appropriate to minimize the influence of outliers, i.e., births to the youngest and oldest women. Another measure, age-specific birth rates, can also be used to describe the age pattern of childbearing of women over time. However, mean age at birth is more easily compared over time and across population groups than age-specific birth rates. It is also easier to interpret than either age-specific birth rates or median age at birth. For a more detailed explanation of the difference between the mean and median age of mother and the calculation of these measures see the Technical Notes.

## Results and Discussion

### Mean age of mother, 1970–2000

The mean age of mother in the United States was 24.6 in 1970 and rose to 27.2 in 2000, an increase of 2.6 years. The mean age at first birth was 21.4 in 1970 and rose to 24.9 in 2000, an increase of 3.5 years.

In contrast, the median age of mother was 25.4 in 1970 and 27.1 in 2000. The median age at first birth was 22.1 in 1970 and 24.6 in 2000. In 1990 the mean was higher than the median, remained higher through 1998, but was only slightly higher in 1999 and 2000 (table 1, figure 2, and table I in the Technical Notes).

Figure 2 shows that in most years, the mean and median ages were not identical. In the 1970s the mean age was lower than the median, while in the 1990s the mean was slightly higher (see the Technical Notes for a more detailed explanation of these differences).

### Mothers are older

The mean age of mothers increased 2.6 years in the past three decades. This increase occurred despite the fact that over one-half of all births still occur to women in their twenties. The lowest mean age was for the years 1973 and 1974 (24.4 years of age).

The increase in the mean age for women having their first live birth from 1970 to 2000 was 3.5 years. The largest increase in mean age was for women having their second live birth (3.6 years). Mean age at third, fourth, and fifth higher order increased 2.6, 1.6, and 0.4 years, respectively (table 1).

### Mean age by race and Hispanic origin

Table 2 shows the mean age of mother by race and Hispanic origin by live birth order for the years 1989–2000. The mean age for all groups for all live birth orders increased during this time period (figure 3). In 1989 Chinese women had the highest mean age of 30.4 years, but in 2000 Japanese women had the highest mean age at 31.8 years. Puerto Rican women had the lowest mean age in 1989



**Figure 2. Mean and median age of mother by live birth order, 1970–2000**



**Figure 3. Mean age of mother by live birth order, 1970–2000**

and 2000 (24.3 and 25.0 years, respectively). American Indian women had the lowest mean age at first live birth in both 1989 and 2000 (21.3 and 21.6 years, respectively). Japanese and Chinese women had the highest mean ages in all live birth orders from 1989 to 2000 (data for 2000 in figure 4).

### Mean age at first live birth by State

Mean age of mother at first live birth varies considerably by State (table 3 and figure 5). In 1970 the lowest mean age was for Arkansas at 20.2 years. The mean ages for Connecticut, Massachusetts, and New York was 22.5 in 1970, 2.3 years higher than Arkansas. In 2000 Mississippi had the lowest mean age, 22.5 years, while Massachusetts had the highest at 27.8, a difference of 5.3 years.

Several factors affect variations in mean age by State. States with higher proportions of births to younger women have a lower mean age. Teenage women are the most likely to be having first births and thus State teenage birth rates play a role in variations in the mean age at first live birth by State. Compositional factors can also affect variations in means by State. In general, black, Hispanic, and American Indian women have lower mean ages than non-Hispanic white and Asian or Pacific Islander women (table 2). States with higher proportions of black, Hispanic, and American Indian women can be expected to have lower mean ages.

All States and the District of Columbia had significant increases in the mean age at first birth from 1970 to 2000 (figure 5). Eight States and the District of Columbia reported an increase of more than 4 years. Massachusetts reported the greatest increase in mean age at first birth, 5.3 years, from 22.5 to 27.8, while Utah reported the smallest increase, 1.9 years.

In the more recent period, from 1990 to 2000, only Alaska declined significantly in mean age at first birth, declining less than 1 year from 24.4 years to 24.1. Forty-five States and the District of Columbia had significant increases in mean age in this decade. Six States, Massachusetts, Michigan, Virginia, North Carolina, New Jersey, and New Hampshire and the District of Columbia had absolute increases of 1 year or more of age.

### Mean age at first birth for developed countries

The mean age at first birth varies considerably across developed nations (table 4). According to the latest available data for selected countries, the mean age in 2000 ranged from 24 in the Slovak Republic to 29 in Switzerland (3–5). Increases in mean age at first birth from 1970 to 2000 for the selected countries shown here range from 2 to 4 years. The United States ranks in the top one-half of this distribution, with an increase of 3.5 years. A recent report showed that most developed countries have experienced an increase in the mean age at first birth over the last 30 years (6).



[1]Persons of Hispanic origin may be of any race.
[2]Includes Aleuts and Eskimos.

**Figure 4. Mean age of mother by race and Hispanic origin of mother, 2000**



**Figure 5. Absolute change in mean age of mother at first live birth, 1970–2000**

### Factors affecting mean age at birth

Since 1970 the data in this report show that the mean age of mother for all births and the mean age at first birth increased 2.6 and 3.5 years, respectively. The fact that the rise has been widespread, occurring for each birth order, race and Hispanic origin group, and all States, supports the idea that there has been a real change in the reproductive behavior of women in the United States.

Several factors may account for the upward trend in mean age at birth apart from an upward shift in the age structure of the population of women. Education and career have been reported as important factors in women's decisions to delay marriage and motherhood (7). From 1970 to 2000, the percent of women having completed 4 or more years of college nearly tripled while the female labor force participation rate increased 39 percent (8). Contraceptive use at first intercourse, particularly condom use, rose dramatically between the 1970s and 1990s (9). These concurrent trends can contribute to the delay of a first birth and subsequently to older ages at second and higher order births. The effect of economic cycle, social support, marriage squeeze, and marital disruption, are additional factors to be considered in understanding the postponement of childbearing.

## References

1. National Center for Health Statistics. Vital statistics of the United States, 1999, vol 1 natality. Hyattsville, Maryland. 2002. Available at: http://www.cdc.gov/nchs/datawh/unpubd/natality/natab99.htm.

2. Martin JA, Hamilton BE, Ventura SJ, Menacker F, Park MM. Births: Final data for 2000. National vital statistics reports; vol 50 no. 5. Hyattsville, Maryland: National Center for Health Statistics. 2002.

3. Council of Europe. Recent Demographic Developments in Europe 2001. Strasbourg: Council of Europe Publishing. 2001.

4. Statistics Bureau. Statistical handbook of Japan 2001. Ministry of Public Management, Home Affairs, Ports, and Telecommunications. 2001.

5. Japan Information Network. Women's Life Cycle (1983–2000). Released August 29, 2001. Available at: http://www.jinjapan.org/stat/stats/18WME11.html.

6. UNICEF. 'A league table of teenage births in rich nations,' *Innocenti Report Card* No. 3, July 2001. UNICEF Innocenti Research Centre, Florence.

7. Goldin C. Career and family: College women look to the past. Working Paper No. 5188. Cambridge, Massachusetts: National Bureau of Economic Research. 1995.

8. U.S. Census Bureau. Statistical abstract of the United States: 2001. 121st ed. Washington DC: U.S. Census Bureau. 2001.

9. Abma J, Chandra A, Mosher W, Peterson L, Piccinino L. Fertility, family planning, and women's health: New data from the 1995 National Survey of Family Growth. National Center for Health Statistics. Vital Health Stat 23(19). 1997.

## List of Detailed Tables

1. Mean age of mother and absolute change by live birth order: United States, 1970–2000 . . . . . . . . . . . . . . . . . . . . . . . . .    6

2. Mean age of mother and absolute change by race and Hispanic origin of mother and live birth order: United States, 1989–2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

3. Mean age of mother at first live birth by State, 1970, 1980, 1990, and 2000, and absolute change, 1970–2000: United States, each State, and territory . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

4. Mean age of mother at first live birth and absolute change for selected countries, 1970 and 2000 . . . . . . . . . . . . . . . . . .   11

## Table 1. Mean age of mother and absolute change by live birth order: United States, 1970–2000

| Year | Total[1] | 1st | 2d | 3d | 4th | 5th and higher order |
|------|------|------|------|------|------|------|
| 2000 . . . . . . . . . . . . . . . . . . . . . | 27.2 | 24.9 | 27.7 | 29.2 | 30.3 | 32.4 |
| 1999 . . . . . . . . . . . . . . . . . . . . . | 27.1 | 24.8 | 27.7 | 29.1 | 30.3 | 32.3 |
| 1998 . . . . . . . . . . . . . . . . . . . . . | 27.1 | 24.7 | 27.6 | 29.1 | 30.3 | 32.3 |
| 1997 . . . . . . . . . . . . . . . . . . . . . | 27.0 | 24.7 | 27.6 | 29.1 | 30.2 | 32.2 |
| 1996 . . . . . . . . . . . . . . . . . . . . . | 27.0 | 24.6 | 27.6 | 29.1 | 30.2 | 32.2 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 26.9 | 24.5 | 27.5 | 29.1 | 30.1 | 32.1 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 26.8 | 24.4 | 27.4 | 28.9 | 30.0 | 31.9 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 26.7 | 24.4 | 27.2 | 28.7 | 29.7 | 31.7 |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 26.6 | 24.4 | 27.1 | 28.5 | 29.5 | 31.6 |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 26.4 | 24.2 | 27.0 | 28.4 | 29.5 | 31.5 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 26.4 | 24.2 | 26.9 | 28.3 | 29.4 | 31.5 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 26.3 | 24.2 | 26.8 | 28.3 | 29.4 | 31.6 |
| 1988 . . . . . . . . . . . . . . . . . . . . . | 26.3 | 24.1 | 26.7 | 28.2 | 29.4 | 31.7 |
| 1987 . . . . . . . . . . . . . . . . . . . . . | 26.1 | 24.0 | 26.6 | 28.1 | 29.4 | 31.7 |
| 1986 . . . . . . . . . . . . . . . . . . . . . | 26.0 | 23.8 | 26.4 | 28.0 | 29.3 | 31.8 |
| 1985 . . . . . . . . . . . . . . . . . . . . . | 25.8 | 23.7 | 26.3 | 27.9 | 29.3 | 31.8 |
| 1984 . . . . . . . . . . . . . . . . . . . . . | 25.7 | 23.5 | 26.1 | 27.8 | 29.2 | 31.8 |
| 1983 . . . . . . . . . . . . . . . . . . . . . | 25.5 | 23.3 | 25.9 | 27.6 | 29.1 | 31.9 |
| 1982 . . . . . . . . . . . . . . . . . . . . . | 25.3 | 23.1 | 25.7 | 27.5 | 29.1 | 31.9 |
| 1981 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 22.9 | 25.5 | 27.4 | 29.0 | 32.0 |
| 1980 . . . . . . . . . . . . . . . . . . . . . | 25.0 | 22.7 | 25.4 | 27.3 | 29.0 | 32.0 |
| 1979 . . . . . . . . . . . . . . . . . . . . . | 24.9 | 22.6 | 25.3 | 27.2 | 29.0 | 32.2 |
| 1978 . . . . . . . . . . . . . . . . . . . . . | 24.8 | 22.4 | 25.1 | 27.2 | 28.9 | 32.2 |
| 1977 . . . . . . . . . . . . . . . . . . . . . | 24.7 | 22.2 | 25.0 | 27.1 | 29.0 | 32.3 |
| 1976 . . . . . . . . . . . . . . . . . . . . . | 24.6 | 22.0 | 24.9 | 27.0 | 28.9 | 32.4 |
| 1975 . . . . . . . . . . . . . . . . . . . . . | 24.5 | 21.8 | 24.7 | 26.9 | 28.9 | 32.4 |
| 1974 . . . . . . . . . . . . . . . . . . . . . | 24.4 | 21.7 | 24.6 | 26.8 | 28.9 | 32.4 |
| 1973 . . . . . . . . . . . . . . . . . . . . . | 24.4 | 21.5 | 24.5 | 26.8 | 28.9 | 32.4 |
| 1972 . . . . . . . . . . . . . . . . . . . . . | 24.5 | 21.4 | 24.4 | 26.7 | 28.8 | 32.3 |
| 1971 . . . . . . . . . . . . . . . . . . . . . | 24.6 | 21.4 | 24.2 | 26.6 | 28.7 | 32.1 |
| 1970 . . . . . . . . . . . . . . . . . . . . . | 24.6 | 21.4 | 24.1 | 26.6 | 28.7 | 32.0 |
| Absolute change 1970–2000 . . . . . . . | 2.6 | 3.5 | 3.6 | 2.6 | 1.6 | 0.4 |

[1]Includes birth order not stated.

**Table 2. Mean age of mother and absolute change by race and Hispanic origin of mother and live birth order: United States, 1989–2000**

| Years and origin/race of mother | Total[1] | 1st | 2d | 3d | 4th | 5th and higher order |
|---|---|---|---|---|---|---|
| **Non-Hispanic white** | | | | | | |
| 2000 | 28.0 | 25.9 | 28.6 | 30.0 | 31.3 | 33.4 |
| 1999 | 27.9 | 25.8 | 28.5 | 30.0 | 31.2 | 33.4 |
| 1998 | 27.9 | 25.7 | 28.5 | 30.0 | 31.2 | 33.4 |
| 1997 | 27.8 | 25.6 | 28.4 | 30.0 | 31.2 | 33.3 |
| 1996 | 27.7 | 25.5 | 28.4 | 30.0 | 31.2 | 33.3 |
| 1995 | 27.6 | 25.4 | 28.3 | 29.9 | 31.1 | 33.2 |
| 1994 | 27.5 | 25.4 | 28.2 | 29.8 | 31.0 | 33.0 |
| 1993 | 27.4 | 25.3 | 28.0 | 29.6 | 30.8 | 32.8 |
| 1992 | 27.3 | 25.2 | 27.9 | 29.3 | 30.5 | 32.7 |
| 1991 | 27.1 | 25.1 | 27.7 | 29.2 | 30.5 | 32.5 |
| 1990 | 27.1 | 25.0 | 27.6 | 29.1 | 30.3 | 32.5 |
| 1989 | 27.0 | 25.0 | 27.5 | 29.0 | 30.3 | 32.5 |
| Absolute change 1989–2000 | 1.0 | 0.9 | 1.1 | 1.0 | 1.0 | 0.9 |
| **Non-Hispanic black** | | | | | | |
| 2000 | 25.2 | 22.3 | 25.5 | 27.2 | 28.2 | 30.5 |
| 1999 | 25.1 | 22.2 | 25.5 | 27.1 | 28.2 | 30.5 |
| 1998 | 25.0 | 22.2 | 25.4 | 27.0 | 28.2 | 30.4 |
| 1997 | 25.0 | 22.1 | 25.4 | 27.0 | 28.2 | 30.4 |
| 1996 | 24.9 | 22.0 | 25.3 | 27.0 | 28.1 | 30.3 |
| 1995 | 24.8 | 21.9 | 25.3 | 27.0 | 28.0 | 30.2 |
| 1994 | 24.7 | 21.8 | 25.1 | 26.7 | 27.8 | 30.0 |
| 1993 | 24.6 | 21.8 | 24.9 | 26.5 | 27.6 | 29.7 |
| 1992 | 24.5 | 21.8 | 24.7 | 26.2 | 27.4 | 29.6 |
| 1991 | 24.4 | 21.7 | 24.6 | 26.2 | 27.4 | 29.6 |
| 1990 | 24.4 | 21.7 | 24.6 | 26.3 | 27.4 | 29.7 |
| 1989 | 24.3 | 21.6 | 24.6 | 26.3 | 27.5 | 29.8 |
| Absolute change 1989–2000 | 0.9 | 0.7 | 0.9 | 0.9 | 0.7 | 0.7 |
| **American Indian** | | | | | | |
| 2000 | 25.1 | 21.6 | 24.7 | 27.0 | 29.0 | 31.7 |
| 1999 | 25.0 | 21.5 | 24.7 | 26.9 | 28.7 | 31.6 |
| 1998 | 24.9 | 21.4 | 24.6 | 26.9 | 28.9 | 31.4 |
| 1997 | 25.0 | 21.4 | 24.6 | 27.0 | 28.9 | 31.5 |
| 1996 | 25.0 | 21.4 | 24.7 | 27.0 | 28.8 | 31.2 |
| 1995 | 24.9 | 21.3 | 24.7 | 27.0 | 28.7 | 31.3 |
| 1994 | 24.9 | 21.3 | 24.6 | 26.8 | 28.4 | 31.1 |
| 1993 | 24.9 | 21.4 | 24.4 | 26.6 | 28.4 | 30.9 |
| 1992 | 24.9 | 21.3 | 24.3 | 26.4 | 28.1 | 30.8 |
| 1991 | 24.8 | 21.2 | 24.2 | 26.4 | 28.0 | 30.8 |
| 1990 | 24.9 | 21.3 | 24.2 | 26.3 | 28.0 | 30.9 |
| 1989 | 24.8 | 21.3 | 24.1 | 26.2 | 28.0 | 30.9 |
| Absolute change 1989–2000 | 0.3 | 0.3 | 0.6 | 0.8 | 1.0 | 0.8 |
| **Chinese** | | | | | | |
| 2000 | 31.6 | 30.1 | 32.7 | 34.0 | 34.2 | 35.3 |
| 1999 | 31.6 | 30.2 | 32.7 | 34.0 | 34.1 | 35.5 |
| 1998 | 31.6 | 30.2 | 32.6 | 33.9 | 34.7 | 35.2 |
| 1997 | 31.3 | 29.9 | 32.4 | 33.8 | 34.6 | 35.9 |
| 1996 | 31.2 | 29.8 | 32.3 | 33.5 | 34.4 | 35.8 |
| 1995 | 31.1 | 29.8 | 32.1 | 33.5 | 34.2 | 35.3 |
| 1994 | 31.0 | 29.6 | 32.0 | 33.3 | 34.3 | 36.2 |
| 1993 | 30.8 | 29.5 | 31.8 | 33.1 | 33.8 | 35.6 |
| 1992 | 30.7 | 29.4 | 31.7 | 33.0 | 34.0 | 35.2 |
| 1991 | 30.5 | 29.2 | 31.4 | 33.0 | 33.4 | 35.4 |
| 1990 | 30.5 | 29.1 | 31.2 | 32.3 | 33.2 | 34.8 |
| 1989 | 30.4 | 29.1 | 31.3 | 32.8 | 33.7 | 34.7 |
| Absolute change 1989–2000 | 1.2 | 1.0 | 1.4 | 1.2 | 0.5 | 0.6 |

See footnote at end of table.

**Table 2. Mean age of mother and absolute change by race and Hispanic origin of mother and live birth order: United States, 1989–2000—Con.**

| Year and origin/race of mother | Total[1] | 1st | 2d | 3d | 4th | 5th and higher order |
|---|---|---|---|---|---|---|
| **Japanese** | | | | | | |
| 2000 . . . . . . . . . . . . . . . . . . . . . | 31.8 | 30.6 | 32.7 | 33.7 | 34.6 | 35.6 |
| 1999 . . . . . . . . . . . . . . . . . . . . . | 31.6 | 30.3 | 32.5 | 33.9 | 34.6 | 36.0 |
| 1998 . . . . . . . . . . . . . . . . . . . . . | 31.6 | 30.3 | 32.4 | 33.5 | 34.5 | 35.0 |
| 1997 . . . . . . . . . . . . . . . . . . . . . | 31.5 | 30.2 | 32.3 | 33.5 | 34.1 | 35.8 |
| 1996 . . . . . . . . . . . . . . . . . . . . . | 31.2 | 29.8 | 32.1 | 33.5 | 34.2 | 35.5 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 31.1 | 29.6 | 32.1 | 33.4 | 33.6 | 35.1 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 31.0 | 29.6 | 31.9 | 32.9 | 33.9 | 34.4 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 30.9 | 29.5 | 31.7 | 33.1 | 33.7 | 34.9 |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 30.9 | 29.6 | 31.7 | 32.9 | 33.6 | 34.9 |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 30.6 | 29.1 | 31.4 | 32.8 | 33.1 | 35.2 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 30.4 | 29.1 | 31.2 | 32.3 | 33.2 | 34.0 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 30.3 | 28.9 | 31.3 | 32.2 | 32.3 | 34.5 |
| Absolute change 1989–2000 . . . . . . | 1.5 | 1.7 | 1.4 | 1.5 | 2.3 | 1.1 |
| **Hawaiian** | | | | | | |
| 2000 . . . . . . . . . . . . . . . . . . . . . | 25.7 | 22.6 | 25.8 | 28.2 | 29.4 | 31.6 |
| 1999 . . . . . . . . . . . . . . . . . . . . . | 25.6 | 22.7 | 25.6 | 28.1 | 29.3 | 31.6 |
| 1998 . . . . . . . . . . . . . . . . . . . . . | 25.6 | 22.6 | 25.9 | 28.0 | 29.4 | 31.6 |
| 1997 . . . . . . . . . . . . . . . . . . . . . | 25.5 | 22.6 | 25.8 | 27.8 | 29.1 | 31.2 |
| 1996 . . . . . . . . . . . . . . . . . . . . . | 25.5 | 22.5 | 25.9 | 27.8 | 29.2 | 30.7 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 25.5 | 22.4 | 25.9 | 27.8 | 29.1 | 31.2 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 25.2 | 22.1 | 25.6 | 27.7 | 28.6 | 30.7 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 25.3 | 22.3 | 25.5 | 27.1 | 28.7 | 30.9 |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 22.3 | 24.9 | 27.0 | 28.7 | 30.6 |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 22.1 | 25.0 | 27.3 | 28.7 | 30.9 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 25.0 | 22.2 | 25.1 | 27.0 | 28.4 | 30.7 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 25.0 | 22.2 | 25.1 | 26.9 | 28.3 | 30.6 |
| Absolute change 1989–2000 . . . . . . | 0.7 | 0.4 | 0.7 | 1.3 | 1.1 | 1.0 |
| **Filipino** | | | | | | |
| 2000 . . . . . . . . . . . . . . . . . . . . . | 29.5 | 27.3 | 30.3 | 32.1 | 33.3 | 34.9 |
| 1999 . . . . . . . . . . . . . . . . . . . . . | 29.4 | 27.1 | 30.2 | 32.0 | 33.1 | 35.1 |
| 1998 . . . . . . . . . . . . . . . . . . . . . | 29.4 | 27.2 | 30.2 | 31.9 | 33.1 | 34.2 |
| 1997 . . . . . . . . . . . . . . . . . . . . . | 29.3 | 27.1 | 30.1 | 31.9 | 33.1 | 34.3 |
| 1996 . . . . . . . . . . . . . . . . . . . . . | 29.2 | 26.9 | 30.1 | 32.0 | 32.9 | 34.5 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 29.2 | 26.9 | 30.1 | 31.9 | 33.0 | 34.5 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 29.1 | 27.0 | 29.9 | 31.7 | 32.8 | 34.5 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 29.0 | 26.9 | 29.7 | 31.6 | 32.9 | 34.0 |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 29.0 | 26.9 | 29.6 | 31.6 | 32.8 | 34.5 |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 28.9 | 26.7 | 29.6 | 31.4 | 32.6 | 34.6 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 28.8 | 26.8 | 29.4 | 31.2 | 32.1 | 34.3 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 28.8 | 26.8 | 29.4 | 31.2 | 32.6 | 34.2 |
| Absolute change 1989–2000 . . . . . . | 0.7 | 0.5 | 0.9 | 0.9 | 0.7 | 0.7 |
| **Mexican** | | | | | | |
| 2000 . . . . . . . . . . . . . . . . . . . . . | 25.4 | 22.2 | 25.3 | 27.8 | 29.7 | 32.2 |
| 1999 . . . . . . . . . . . . . . . . . . . . . | 25.4 | 22.1 | 25.2 | 27.7 | 29.6 | 32.2 |
| 1998 . . . . . . . . . . . . . . . . . . . . . | 25.3 | 22.1 | 25.1 | 27.6 | 29.5 | 32.2 |
| 1997 . . . . . . . . . . . . . . . . . . . . . | 25.2 | 22.0 | 25.1 | 27.6 | 29.6 | 32.1 |
| 1996 . . . . . . . . . . . . . . . . . . . . . | 25.2 | 22.0 | 25.0 | 27.5 | 29.5 | 32.2 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 21.9 | 24.9 | 27.5 | 29.5 | 32.1 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 21.9 | 24.9 | 27.4 | 29.4 | 32.0 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 21.9 | 24.8 | 27.3 | 29.2 | 31.9 |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 21.9 | 24.7 | 27.2 | 29.1 | 31.9 |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 25.0 | 21.8 | 24.7 | 27.2 | 29.0 | 31.8 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 21.9 | 24.7 | 27.1 | 29.0 | 31.8 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 25.1 | 21.9 | 24.6 | 27.1 | 29.0 | 31.8 |
| Absolute change 1989–2000 . . . . . . | 0.3 | 0.3 | 0.7 | 0.7 | 0.7 | 0.4 |

See footnote at end of table.

**Table 2. Mean age of mother and absolute change by race and Hispanic origin of mother and live birth order: United States, 1989–2000—Con.**

| Year and origin/race of mother | Total[1] | 1st | 2d | 3d | 4th | 5th and higher order |
|---|---|---|---|---|---|---|
| *Puerto Rican* | | | | | | |
| 2000 . . . . . . . . . . . . . . . . . . . . . | 25.0 | 22.4 | 25.5 | 27.2 | 28.4 | 30.5 |
| 1999 . . . . . . . . . . . . . . . . . . . . . | 24.9 | 22.2 | 25.4 | 27.2 | 28.2 | 30.5 |
| 1998 . . . . . . . . . . . . . . . . . . . . . | 24.8 | 22.1 | 25.4 | 27.1 | 28.3 | 30.4 |
| 1997 . . . . . . . . . . . . . . . . . . . . . | 24.8 | 22.1 | 25.3 | 27.1 | 28.3 | 30.3 |
| 1996 . . . . . . . . . . . . . . . . . . . . . | 24.7 | 22.0 | 25.3 | 27.1 | 28.1 | 30.1 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 24.6 | 21.9 | 25.2 | 26.9 | 28.1 | 30.0 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 24.6 | 21.9 | 25.1 | 26.9 | 28.0 | 29.7 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 24.6 | 22.0 | 25.0 | 26.6 | 27.8 | 29.9 |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 24.5 | 22.0 | 24.8 | 26.5 | 27.7 | 29.7 |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 24.4 | 22.0 | 24.6 | 26.4 | 27.8 | 29.7 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 24.4 | 21.9 | 24.6 | 26.5 | 27.7 | 29.9 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 24.3 | 21.8 | 24.5 | 26.4 | 27.8 | 30.0 |
| Absolute change 1989–2000 . . . . . . | 0.7 | 0.6 | 1.0 | 0.8 | 0.6 | 0.5 |
| *Cuban* | | | | | | |
| 2000 . . . . . . . . . . . . . . . . . . . . . | 28.8 | 26.5 | 29.8 | 31.6 | 32.7 | 33.8 |
| 1999 . . . . . . . . . . . . . . . . . . . . . | 28.7 | 26.4 | 29.7 | 31.3 | 32.7 | 33.8 |
| 1998 . . . . . . . . . . . . . . . . . . . . . | 28.6 | 26.3 | 29.5 | 31.4 | 32.7 | 33.5 |
| 1997 . . . . . . . . . . . . . . . . . . . . . | 28.4 | 26.1 | 29.4 | 31.2 | 32.0 | 33.4 |
| 1996 . . . . . . . . . . . . . . . . . . . . . | 28.3 | 26.2 | 29.2 | 31.0 | 32.3 | 33.2 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 28.2 | 25.9 | 29.2 | 31.1 | 31.7 | 33.4 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 28.1 | 25.9 | 29.0 | 30.8 | 31.7 | 32.3 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 28.1 | 26.1 | 28.9 | 30.5 | 31.5 | 32.5 |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 27.9 | 25.9 | 28.8 | 30.3 | 31.0 | 32.3 |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 27.8 | 25.7 | 28.4 | 30.1 | 31.0 | 32.3 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 27.6 | 25.6 | 28.3 | 30.0 | 31.1 | 31.3 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 27.3 | 25.3 | 28.1 | 29.8 | 30.6 | 31.4 |
| Absolute change 1989–2000 . . . . . . | 1.5 | 1.2 | 1.7 | 1.8 | 2.1 | 2.4 |
| *Central and South American* | | | | | | |
| 2000 . . . . . . . . . . . . . . . . . . . . . | 27.5 | 24.8 | 28.0 | 30.0 | 31.3 | 33.3 |
| 1999 . . . . . . . . . . . . . . . . . . . . . | 27.5 | 24.6 | 27.9 | 29.9 | 31.3 | 33.4 |
| 1998 . . . . . . . . . . . . . . . . . . . . . | 27.4 | 24.6 | 27.8 | 29.9 | 31.2 | 33.4 |
| 1997 . . . . . . . . . . . . . . . . . . . . . | 27.4 | 24.6 | 27.8 | 29.9 | 31.2 | 33.2 |
| 1996 . . . . . . . . . . . . . . . . . . . . . | 27.3 | 24.6 | 27.7 | 29.7 | 31.3 | 33.1 |
| 1995 . . . . . . . . . . . . . . . . . . . . . | 27.2 | 24.5 | 27.6 | 29.6 | 31.1 | 33.1 |
| 1994 . . . . . . . . . . . . . . . . . . . . . | 27.2 | 24.6 | 27.5 | 29.5 | 30.8 | 32.8 |
| 1993 . . . . . . . . . . . . . . . . . . . . . | 27.1 | 24.6 | 27.3 | 29.3 | 30.6 | 32.9 |
| 1992 . . . . . . . . . . . . . . . . . . . . . | 27.1 | 24.6 | 27.2 | 29.2 | 30.6 | 32.6 |
| 1991 . . . . . . . . . . . . . . . . . . . . . | 27.0 | 24.5 | 27.1 | 29.2 | 30.4 | 32.6 |
| 1990 . . . . . . . . . . . . . . . . . . . . . | 27.0 | 24.5 | 27.1 | 29.1 | 30.5 | 32.6 |
| 1989 . . . . . . . . . . . . . . . . . . . . . | 27.0 | 24.5 | 27.1 | 29.1 | 30.6 | 32.5 |
| Absolute change 1989–2000 . . . . . . | 0.5 | 0.3 | 0.9 | 0.9 | 0.7 | 0.8 |

[1]Includes live birth order not stated.

**Table 3. Mean age of mother at first live birth by State, 1970, 1980, 1990, and 2000, and absolute change, 1970–2000: United States, each State, and territory**

| State | 1970 | 1980 | 1990 | 2000 | Absolute change, 1970–2000 |
|---|---|---|---|---|---|
| United States . . . . . . . . . . . . . . . . | 21.4 | 22.7 | 24.2 | 24.9 | 3.5 |
| Alabama . . . . . . . . . . . . . . . . . . . | 20.5 | 21.6 | 22.8 | 23.3 | 2.8 |
| Alaska . . . . . . . . . . . . . . . . . . . . | 21.6 | 23.2 | 24.4 | 24.1 | 2.5 |
| Arizona . . . . . . . . . . . . . . . . . . . | 21.2 | 22.3 | 23.5 | 23.8 | 2.6 |
| Arkansas . . . . . . . . . . . . . . . . . . | 20.2 | 21.3 | 22.2 | 22.7 | 2.5 |
| California . . . . . . . . . . . . . . . . . . | 21.8 | 23.2 | 24.5 | 25.3 | 3.5 |
| Colorado . . . . . . . . . . . . . . . . . . | 21.6 | 23.3 | 24.9 | 25.3 | 3.7 |
| Connecticut . . . . . . . . . . . . . . . . . | 22.5 | 24.1 | 26.3 | 27.2 | 4.7 |
| Delaware . . . . . . . . . . . . . . . . . . | 21.4 | 22.7 | 24.5 | 25.0 | 3.6 |
| District of Columbia . . . . . . . . . . . . | 21.0 | 22.9 | 24.0 | 25.7 | 4.7 |
| Florida . . . . . . . . . . . . . . . . . . . . | 21.0 | 22.5 | 24.2 | 24.9 | 3.9 |
| Georgia . . . . . . . . . . . . . . . . . . . | 20.7 | 22.2 | 23.5 | 24.4 | 3.7 |
| Hawaii . . . . . . . . . . . . . . . . . . . . | 22.4 | 23.8 | 25.0 | 25.5 | 3.1 |
| Idaho . . . . . . . . . . . . . . . . . . . . . | 20.8 | 22.1 | 23.2 | 23.5 | 2.7 |
| Illinois . . . . . . . . . . . . . . . . . . . . | 21.5 | 22.7 | 24.3 | 25.1 | 3.6 |
| Indiana . . . . . . . . . . . . . . . . . . . . | 20.9 | 22.1 | 23.3 | 23.9 | 3.0 |
| Iowa . . . . . . . . . . . . . . . . . . . . . . | 21.3 | 22.6 | 24.0 | 24.4 | 3.1 |
| Kansas . . . . . . . . . . . . . . . . . . . . | 21.1 | 22.4 | 23.8 | 24.0 | 2.9 |
| Kentucky . . . . . . . . . . . . . . . . . . . | 20.7 | 21.5 | 22.9 | 23.6 | 2.9 |
| Louisiana . . . . . . . . . . . . . . . . . . . | 20.5 | 21.5 | 22.6 | 23.0 | 2.5 |
| Maine . . . . . . . . . . . . . . . . . . . . . | 21.2 | 22.6 | 24.4 | 25.3 | 4.1 |
| Maryland . . . . . . . . . . . . . . . . . . . | 21.6 | 23.1 | 25.3 | 26.1 | 4.5 |
| Massachusetts . . . . . . . . . . . . . . . | 22.5 | 24.1 | 26.2 | 27.8 | 5.3 |
| Michigan . . . . . . . . . . . . . . . . . . . | 21.2 | 22.7 | 23.9 | 25.0 | 3.8 |
| Minnesota . . . . . . . . . . . . . . . . . . | 22.0 | 23.4 | 25.2 | 25.9 | 3.9 |
| Mississippi . . . . . . . . . . . . . . . . . . | 20.3 | 21.0 | 21.9 | 22.5 | 2.2 |
| Missouri . . . . . . . . . . . . . . . . . . . | 21.1 | 22.3 | 23.6 | 24.0 | 2.9 |
| Montana . . . . . . . . . . . . . . . . . . . | 21.2 | 22.7 | 23.8 | 24.2 | 3.0 |
| Nebraska . . . . . . . . . . . . . . . . . . . | 21.4 | 22.7 | 24.1 | 24.5 | 3.1 |
| Nevada . . . . . . . . . . . . . . . . . . . . | 21.3 | 22.6 | 23.8 | 24.2 | 2.9 |
| New Hampshire . . . . . . . . . . . . . . . | 21.6 | 23.6 | 25.7 | 26.7 | 5.1 |
| New Jersey . . . . . . . . . . . . . . . . . | 22.4 | 23.9 | 26.1 | 27.1 | 4.7 |
| New Mexico . . . . . . . . . . . . . . . . . | 21.0 | 22.0 | 23.0 | 23.0 | 2.0 |
| New York . . . . . . . . . . . . . . . . . . | 22.5 | 23.8 | 25.6 | 26.4 | 3.9 |
| North Carolina . . . . . . . . . . . . . . . | 20.8 | 22.1 | 23.5 | 24.5 | 3.7 |
| North Dakota . . . . . . . . . . . . . . . . | 21.5 | 22.6 | 24.2 | 24.3 | 2.8 |
| Ohio . . . . . . . . . . . . . . . . . . . . . . | 21.3 | 22.5 | 23.8 | 24.5 | 3.2 |
| Oklahoma . . . . . . . . . . . . . . . . . . | 20.7 | 21.7 | 22.8 | 23.1 | 2.4 |
| Oregon . . . . . . . . . . . . . . . . . . . . | 21.4 | 23.0 | 24.2 | 24.7 | 3.3 |
| Pennsylvania . . . . . . . . . . . . . . . . | 21.7 | 23.1 | 24.8 | 25.6 | 3.9 |
| Rhode Island . . . . . . . . . . . . . . . . | 22.1 | 23.4 | 25.1 | 25.9 | 3.8 |
| South Carolina . . . . . . . . . . . . . . . | 20.6 | 21.8 | 23.1 | 23.7 | 3.1 |
| South Dakota . . . . . . . . . . . . . . . . | 21.1 | 22.3 | 23.6 | 23.7 | 2.6 |
| Tennessee . . . . . . . . . . . . . . . . . . | 20.7 | 22.1 | 23.1 | 23.8 | 3.1 |
| Texas . . . . . . . . . . . . . . . . . . . . . | 20.9 | 22.1 | 23.3 | 23.7 | 2.8 |
| Utah . . . . . . . . . . . . . . . . . . . . . . | 21.4 | 21.9 | 22.9 | 23.3 | 1.9 |
| Vermont . . . . . . . . . . . . . . . . . . . | 21.7 | 23.4 | 25.4 | 26.3 | 4.6 |
| Virginia . . . . . . . . . . . . . . . . . . . . | 21.4 | 23.0 | 24.7 | 25.7 | 4.3 |
| Washington . . . . . . . . . . . . . . . . . | 21.5 | 23.2 | 24.7 | 25.3 | 3.8 |
| West Virginia . . . . . . . . . . . . . . . . | 20.8 | 21.7 | 22.8 | 23.5 | 2.7 |
| Wisconsin . . . . . . . . . . . . . . . . . . | 21.8 | 22.9 | 24.6 | 25.1 | 3.3 |
| Wyoming . . . . . . . . . . . . . . . . . . . | 21.0 | 22.1 | 23.3 | 23.2 | 2.2 |
| Puerto Rico . . . . . . . . . . . . . . . . . | 25.3 | 24.9 | 24.9 | 25.0 | –0.3 |
| Virgin Islands . . . . . . . . . . . . . . . . | 25.3 | 25.6 | 25.9 | 26.3 | 1.0 |
| Guam[1,2] . . . . . . . . . . . . . . . . . . . | - - - | 25.7 | 25.8 | 26.4 | 0.7 |
| American Samoa[3] . . . . . . . . . . . . . | - - - | - - - | - - - | 27.6 | NA |
| Northern Marianas[4] . . . . . . . . . . . . | - - - | - - - | - - - | 27.9 | NA |

- - - Data not available.

NA Not applicable.

[1]Data are not available for Guam, 1970.

[2]Absolute change for Guam, 1980–2000.

[3]Data are not available for American Samoa, 1970, 1980, and 1990.

[4]Data are not available for Northern Marianas, 1970, 1980, and 1990.

NOTE: Difference of means was significant at $p < 0.05$ for United States, each State, and territory, 1970–2000.

National Vital Statistics Reports, Vol. 51, No. 1, December 11, 2002   **11**

**Table 4. Mean age of mother at first live birth and absolute change for selected countries, 1970 and 2000**

| Countries | 1970 | 2000 | Absolute change, 1970–2000 |
|---|---|---|---|
| Czech Republic. . . . . . . . . . . . . . . | 22.5 | 24.9 | 2.4 |
| Finland . . . . . . . . . . . . . . . . . . . | 24.4 | 27.4 | 3.0 |
| Hungary . . . . . . . . . . . . . . . . . . | 22.8 | 25.1 | 2.3 |
| Iceland . . . . . . . . . . . . . . . . . . . | 21.3 | 25.5 | 4.2 |
| Japan. . . . . . . . . . . . . . . . . . . . | 25.6 | 28.0 | 2.4 |
| Netherlands . . . . . . . . . . . . . . . . | 24.8 | 28.6 | 3.8 |
| Slovak Republic. . . . . . . . . . . . . . | 22.6 | 24.2 | 1.6 |
| Sweden . . . . . . . . . . . . . . . . . . | 25.9 | 27.9 | 2.0 |
| Switzerland . . . . . . . . . . . . . . . . | 25.3 | 28.7 | 3.4 |
| United States . . . . . . . . . . . . . . . | 21.4 | 24.9 | 3.5 |

SOURCES: Council of Europe. Recent Demographic Developments in Europe 2001. Council of Europe Publishing, Strasbourg, 2001. Statistics Bureau. Statistical Handbook of Japan 2001. Ministry of Public Management, Home Affairs, Ports, and Telecommunications, 2001. Japan Information Network. Women's Life Cycle (1983–2000). Released August 29, 2001. Available at: http://www.jinjapan.org/sta/stats/18WME11.html.

# Technical Notes

## Differences between mean and median age of mother

As mentioned in the introduction, the mean age of mother is the arithmetic average of mother's age at birth. The median age of the mother, on the other hand, is the middle point of the distribution of age at birth. Ranked in order of age of mother, 50 percent of the births would occur above and below the median age.

For this report, the mean is computed directly from the sum of all mother's ages divided by the number of mothers. Unlike the median age, which is a function of the rank order of the ages, the mean is affected by the numeric values of the ages. As a result, the mean is more sensitive to the distribution of births by age of mother than the median. For example, compare the age of mother at childbirth for the following distributions:

Distribution A—18, 19, 22, 23, 25, 26, and 28 years (mean = 23, median = 23).
Distribution B—15, 17, 20, 23, 25, 26, and 28 years (mean = 22, median = 23).

The median and mean age is the same in distribution A, but differ in distribution B. In both distributions, the median, the middle frequency in the distribution, is 23 years. However, the mean age in distribution A is 23 years while the mean in distribution B is 22 years. This occurs because age at childbirth in distribution B is more dispersed for those mothers below the median age (15–23 years) than above it (23–28 years). In distribution A, age at childbirth is equally dispersed about the median age (18–23 years and 23–28 years). Distribution B is therefore skewed towards births to younger women with the result that the mean age is less than the median age.

Figure 2 shows that the mean age of mother was less than the median age from 1970 to 1987. This indicates more frequent births to younger women than to older women. In 1990 the mean was higher than the median, remained through 1998, but was only slightly different in 1999 and 2000. The trends for mean and median age at first live birth are similar to those for all births. However, the transition happened several years earlier and the mean remained higher in 1999 and 2000. These trends in combination indicate more frequent births to older than younger women now compared with the mid-1980s and earlier years.

## Significance testing

The number of births, while essentially a complete count and not subject to sampling error, may be affected by nonsampling errors in the registration process. The number of events that occurred can be thought of as one in a series of possible outcomes. When considered in this way, the number of births for analytical purposes is subject to random variation.

The difference between the two means, irrespective of sign (+/–), is defined as statistically significant (when $N$ is relatively large) if the value exceeds the test statistic in the derived formula for $Z$ below. This statistic equals 1.96 times the standard error of the difference between means.

**Table I. Median age of mother and absolute change for total births and first live birth: United States, 1970–2000**

| Year | Total[1] | 1st |
|---|---|---|
| 2000 . . . . . . . . . . . . . . . . . . . . . . . | 27.1 | 24.6 |
| 1999 . . . . . . . . . . . . . . . . . . . . . . . | 27.0 | 24.5 |
| 1998 . . . . . . . . . . . . . . . . . . . . . . . | 26.9 | 24.3 |
| 1997 . . . . . . . . . . . . . . . . . . . . . . . | 26.7 | 24.2 |
| 1996 . . . . . . . . . . . . . . . . . . . . . . . | 26.6 | 24.1 |
| 1995 . . . . . . . . . . . . . . . . . . . . . . . | 26.5 | 23.9 |
| 1994 . . . . . . . . . . . . . . . . . . . . . . . | 26.4 | 23.8 |
| 1993 . . . . . . . . . . . . . . . . . . . . . . . | 26.4 | 23.8 |
| 1992 . . . . . . . . . . . . . . . . . . . . . . . | 26.3 | 23.8 |
| 1991 . . . . . . . . . . . . . . . . . . . . . . . | 26.2 | 23.7 |
| 1990 . . . . . . . . . . . . . . . . . . . . . . . | 26.3 | 23.8 |
| 1989 . . . . . . . . . . . . . . . . . . . . . . . | 26.3 | 23.7 |
| 1988 . . . . . . . . . . . . . . . . . . . . . . . | 26.3 | 23.8 |
| 1987 . . . . . . . . . . . . . . . . . . . . . . . | 26.3 | 23.7 |
| 1986 . . . . . . . . . . . . . . . . . . . . . . . | 26.2 | 23.6 |
| 1985 . . . . . . . . . . . . . . . . . . . . . . . | 26.1 | 23.5 |
| 1984 . . . . . . . . . . . . . . . . . . . . . . . | 26.0 | 23.5 |
| 1983 . . . . . . . . . . . . . . . . . . . . . . . | 25.9 | 23.3 |
| 1982 . . . . . . . . . . . . . . . . . . . . . . . | 25.8 | 23.2 |
| 1981 . . . . . . . . . . . . . . . . . . . . . . . | 25.7 | 23.1 |
| 1980 . . . . . . . . . . . . . . . . . . . . . . . | 25.7 | 23.0 |
| 1979 . . . . . . . . . . . . . . . . . . . . . . . | 25.6 | 22.9 |
| 1978 . . . . . . . . . . . . . . . . . . . . . . . | 25.6 | 22.8 |
| 1977 . . . . . . . . . . . . . . . . . . . . . . . | 25.5 | 22.7 |
| 1976 . . . . . . . . . . . . . . . . . . . . . . . | 25.4 | 22.5 |
| 1975 . . . . . . . . . . . . . . . . . . . . . . . | 25.3 | 22.3 |
| 1974 . . . . . . . . . . . . . . . . . . . . . . . | 25.3 | 22.3 |
| 1973 . . . . . . . . . . . . . . . . . . . . . . . | 25.3 | 22.1 |
| 1972 . . . . . . . . . . . . . . . . . . . . . . . | 25.3 | 22.0 |
| 1971 . . . . . . . . . . . . . . . . . . . . . . . | 25.4 | 22.1 |
| 1970 . . . . . . . . . . . . . . . . . . . . . . . | 25.4 | 22.1 |
| Absolute change 1970–2000 . . . . . . | 1.7 | 2.5 |

[1]Includes birth order not stated.

$$1.96 \sqrt{\left(\frac{s_1^2}{N_1}\right) + \left(\frac{s_2^2}{N_2}\right)}$$

where:

$s_1$ = first standard deviation
$s_2$ = second standard deviation
$N_1$ = first number of births
$N_2$ = second number of births

If the difference is less than or equal to this test statistic, then the difference would occur by chance 5 times out of 100 or more. Accordingly, we would conclude that the difference is not statistically significant at the 95-percent confidence level. If the difference is greater than this statistic, then the difference would occur by chance less than 5 times out of 100. The difference, we would therefore conclude, is statistically significant at the 95-percent confidence level.

Example:

Is the 2000 mean age at first birth of women in Ohio (24.5 years) significantly higher than the comparable 1990 statistic (23.8 years)?

The difference between the rates is $24.5 - 23.8 = 0.7$. The statistic is then calculated as follows:

$$1.96 \sqrt{\left(\frac{(5.38)^2}{67,621}\right) + \left(\frac{(5.83)^2}{60,643}\right)}$$

$$1.96 \sqrt{\left(\frac{(28.94)}{67,621}\right) + \left(\frac{(33.99)}{60,643}\right)}$$

$$1.96 \sqrt{(0.000428039) + (0.000560475)}$$

$$1.96 \sqrt{0.000988514}$$

$$0.06$$

The difference between the two means (0.7) is greater than this statistic (0.06). Therefore, the difference is statistically significant at the 95-percent confidence level.

## Contents

Abstract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Results and Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  2
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
List of detailed tables . . . . . . . . . . . . . . . . . . . . . . . . . .  5
Technical Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Suggested citation**

Mathews TJ, Hamilton BE. Mean age of mother, 1970–2000. National vital statistics reports; vol 51 no 1. Hyattsville, Maryland: National Center for Health Statistics. 2002.

**National Center for Health Statistics**

Director, Edward J. Sondik, Ph.D.
Deputy Director, Jack R. Anderson

**Division of Vital Statistics**

Director, Mary Anne Freedman

To receive this publication regularly, contact the National Center for Health Statistics by calling 301-458-4636. E-mail: nchsquery@cdc.gov
Internet: www.cdc.gov/nchs

**Copyright information**

All material appearing in this report is in the public domain and may be reproduced or copied without permission; citation as to source, however, is appreciated.

DEPARTMENT OF
HEALTH & HUMAN SERVICES

Centers for Disease Control and Prevention
National Center for Health Statistics
6525 Belcrest Road
Hyattsville, Maryland 20782-2003

DHHS Publication No. (PHS) 2003–1120
03-0046 (12/02)

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

MEDIA MAIL
POSTAGE & FEES PAID
CDC/NCHS
PERMIT NO. G-284