# EXHIBIT 55

**Expanded Homicide Data Table 8**

**Murder Victims**

by Weapon, 2014–2018

| Weapons | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Total** | **12,278** | **13,780** | **15,318** | **15,195** | **14,123** |
| Total firearms: | 7,803 | 9,103 | 10,372 | 11,006 | 10,265 |
|   Handguns | 5,342 | 6,176 | 6,762 | 7,051 | 6,603 |
|   Rifles | 235 | 215 | 300 | 390 | 297 |
|   Shotguns | 238 | 247 | 247 | 264 | 235 |
|   Other guns | 88 | 151 | 172 | 180 | 167 |
|   Firearms, type not stated | 1,900 | 2,314 | 2,891 | 3,121 | 2,963 |
| Knives or cutting instruments | 1,545 | 1,525 | 1,558 | 1,609 | 1,515 |
| Blunt objects (clubs, hammers, etc.) | 431 | 436 | 464 | 472 | 443 |
| Personal weapons (hands, fists, feet, etc.)[1] | 668 | 647 | 664 | 710 | 672 |
| Poison | 9 | 8 | 12 | 15 | 5 |
| Explosives | 6 | 1 | 1 | 0 | 4 |
| Fire | 55 | 63 | 78 | 96 | 72 |
| Narcotics | 70 | 69 | 118 | 110 | 78 |
| Drowning | 12 | 12 | 9 | 8 | 9 |
| Strangulation | 84 | 96 | 97 | 89 | 70 |
| Asphyxiation | 93 | 105 | 92 | 111 | 90 |
| Other weapons or weapons not stated | 1,502 | 1,715 | 1,853 | 969 | 900 |

[1] Pushed is included in personal weapons.

NOTE: The Uniform Crime Reporting Technical Refresh enables updating of prior years' crime data; therefore, data presented in this table may not match previously published data.

# EXHIBIT 56



   

SIGN UP

DONATE

SEARCH    GUN LAWS    FACTS    RESOURCES    MEDIA    ABOUT

TAKE ACTION

# Concealed Carry

The carrying of concealed, loaded guns in public places can quickly escalate everyday conflicts into deadly altercations, causing tragic, irreversible damage to innocent lives. These dangers are amplified when the permitting standards for concealed carry are weakened. Despite this public safety risk, the gun lobby continues to push dangerous proposals that would weaken or eliminate the permitting requirements for carrying concealed firearms in public.

FEDERAL LAW    STATE LAW    KEY ELEMENTS

## BACKGROUND

Historically, almost every state prohibited or strictly limited the carrying of concealed, loaded weapons (also known as CCW) in public places. These restrictions were among the earliest gun laws adopted in the United States. In the late 20th century, some states began to grant law enforcement discretion to issue concealed carry permits to individuals who passed a background check and received firearm safety training and/or demonstrated a particular need to carry hidden, loaded guns in public. At the behest of

the gun lobby, however, many states have weakened those permit requirements in recent years—and 15 states have eliminated the permit requirement entirely.

These changes have expanded the number of people who have permits to carry hidden, loaded handguns and the number of public locations in which they may be carried.

- Estimates suggest that 9 million US adults carry loaded handguns monthly.[1] 3 million of these gun owners carry loaded handguns every day.[2]

- Proportionally fewer people carry concealed loaded handguns in states that have strong concealed carry permitting standards.[3]

Guns carried in public pose a substantial threat to public safety. A robust body of academic literature shows that **when more people carry guns in public, violent crime increases.**

- The most comprehensive and rigorous study of concealed carry laws found that in states with weak permitting laws, violent crime rates were 13% to 15% higher than predicted had such laws not been in place.[4]

- Weak concealed-carry permitting laws are also associated with 11% higher rates of homicide committed with handguns compared with states with stronger permitting systems.[5]

**There is also some evidence that lax concealed carry laws increase other undesirable outcomes, including gun thefts and unintentional gun injuries.**

- People who carried firearms at least once in the past month were three times more likely to have had a firearm stolen than other gun owners.[6]

- Similarly, one analysis suggests that unintentional firearm injuries may occur more frequently after states weaken permitting standards.[7]

In addition to the robust evidence showing the dangers of permissive public carry laws, **there is no research that suggests expanding public carry has any public safety benefits.**

- Firearms are rarely used successfully in self-defense. In fact, individuals successfully defend themselves with a gun in less than one percent of crimes.[8]

- In the rare instances in which firearms are used in self defense, research shows that using a firearm did not reduce a person's chance of being injured during criminal victimization more than other various forms of protection did.[9]

- Carrying a firearm may actually increase a victim's risk of firearm injury during the commission of a crime.[10]

# SUMMARY OF FEDERAL LAW

## FEDERALLY MANDATED CCW

In recent years, the gun lobby has been pushing federal legislation that would mandate that each state recognize concealed carry permits from every other state. **So far, such efforts have been unsuccessful.** Many states have extremely lax permitting laws; ten states do not even require a permit to carry concealed. Forcing states with strong CCW laws like California and New York to comply with weak laws from states like Florida and Louisiana will endanger public safety and make it significantly harder for police to enforce gun laws proven to save lives.

## LAW ENFORCEMENT CCW

Federal law provides that certain law enforcement officers may carry concealed firearms. Any "qualified law enforcement officer" with proper agency-issued identification may carry a concealed firearm.[11] "Qualified retired law enforcement officer" with proper identification may also carry a concealed firearm.[12]

Both statutes supersede state and local laws regarding concealed carry by law enforcement except in certain circumstances. States are not precluded from allowing private persons or entities to prohibit or restrict the possession of concealed firearms on their property by current or retired law enforcement. States also are not precluded from prohibiting or restricting the possession of firearms by current or retired law enforcement on any state or local government property, installations, buildings, bases, or parks.

## BACKGROUND CHECK EXCEPTION

Significantly, a person holding a state-issued permit allowing the person to acquire or possess firearms (e.g., a concealed weapons permit) is not required to undergo a background check if the permit was issued: (1) within the previous five years in the state in which the transfer is to take place; and (2) after an authorized government official has conducted a background investigation to verify that possession of a firearm would not be unlawful.[13] Permits issued after November 30, 1998 qualify as exempt only if the approval process included a NICS check.[14]

This exemption threatens public safety because it allows a prohibited person to acquire a firearm when the person falls into a prohibited category after issuance of the state permit and the state has not immediately revoked the permit. Under the federal exemption, no background check is required and the seller would have no way to learn that the prospective purchaser is prohibited from possessing firearms. For more information about this exemption, see our summary on **Background Check Procedures**.

# SUMMARY OF STATE LAW

Every state—as well as the District of Columbia—allows the carrying of concealed weapons in some form. **Thirty-five states generally require a state-issued permit in order to carry concealed weapons in public** (CCW permit). The remaining 15 (Alaska, Arizona, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, New Hampshire, North Dakota, Oklahoma, South Dakota, Vermont, West Virginia, and Wyoming) generally allow individuals to carry concealed weapons in public without a permit. (However, 14 of these 15 states still issue CCW permits; individuals may desire them to qualify for an exemption from federal law's background check requirements when purchasing a firearm, or so that they may carry concealed weapons in other states).

Of the 35 states that generally require a CCW permit in order to carry concealed weapons in public, eight states and the District of Columbia have "may issue" laws, which grant the issuing authority wide discretion to deny a CCW permit to an applicant if, for example, the authority believes the applicant lacks good character or lacks a good reason for carrying a weapon in public. 14 "shall issue" states provide the issuing authority a limited amount of discretion, and 13 "shall issue" states provide no discretion to the issuing authority.

Nearly every state places some restrictions on where concealed firearms may be carried, such as restrictions on carrying in bars, schools, and hospitals, and at public sporting events.

### "May Issue" States

California[15]
Connecticut[16]
Delaware[17]
District of Columbia[18]
Hawaii[19]
Maryland[20]
Massachusetts[21]

New Jersey[22]

New York[23]

## Limited Discretion "Shall Issue" States

Alabama[24]

Arkansas[25]

Colorado[26]

Georgia[27]

Illinois[28]

Indiana[29]

Iowa[30]

Minnesota[31]

Montana[32]

Oregon[33]

Pennsylvania[34]

Rhode Island[35]

Utah[36]

Virginia[37]

## No Discretion "Shall Issue" States

Florida[38]

Louisiana[39]

Michigan[40]

Nebraska[41]

Nevada[42]

New Mexico[43]

North Carolina[44]

Ohio[45]

South Carolina[46]

Tennessee[47]

Texas[48]

Washington[49]

Wisconsin[50]

## No CCW Permit Is Required

Alaska[51]

Arizona[52]

Idaho[53]

Kansas[54]

Kentucky[55]

Maine[56]

Mississippi[57]

Missouri[58]

New Hampshire[59]

North Dakota[60]

Oklahoma[61]

South Dakota[62]

Vermont[63]

West Virginia[64]

Wyoming[65]


## "MAY" VERSUS "SHALL" ISSUE LAWS

**"May issue" laws** give significant discretion to the issuing official to grant or deny the permit, based on the guidance of various statutory factors. **Even if the general requirements are met, the official is not required to issue the permit.** This kind of law allows permitting authorities to consider factors that may not have been included in the language of a state's CCW permitting statutes. Nine states have laws that can truly be categorized as "may issue."

**In "shall issue" states, law enforcement officials are generally required to issue a permit to anyone who meets certain minimal statutory requirements** (e.g., that the person is not a convicted felon or mentally incompetent). Among states with shall issue laws, some states provide the issuing authority no discretion to deny a permit if the person meets these requirements. In contrast, other states have "shall issue" statutes that still give issuing authorities some degree of discretion to deny a permit if, for example, there is reasonable suspicion to believe that the applicant is a danger to self or others. These "limited discretion" states fall into a separate category that lies between pure "shall issue" and true "may issue" states.

As noted above, fifteen states (Alaska, Arizona, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, New Hampshire, North Dakota, Oklahoma, South Dakota, Vermont, West Virginia, and Wyoming) now allow the carrying of concealed weapons without a permit, although all but Vermont issue CCW permits.


## QUALIFICATIONS FOR CONCEALED WEAPONS PERMITS

The strongest seven concealed carry permitting systems require CCW applicants to demonstrate good cause as to why the applicant needs a permit. In addition, ten states also require the applicant to be of good character before a permit is issued. In roughly half

the states, CCW applicants are also required to demonstrate some level of knowledge of firearm use and/or firearm safety.

## States Requiring a Showing of Good Cause

Seven states require CCW permit applicants to demonstrate good cause or a justifiable need to carry a concealed weapon. In California, for example, good cause exists to issue a CCW permit when there is a clear and present danger to the applicant or the applicant's spouse, family, or employees. **Generally, a credible threat to the applicant's safety that cannot be alleviated through other legal channels constitutes good cause when applying for a CCW permit.** Maryland requires an applicant to demonstrate "a good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." New York requires an applicant to demonstrate "proper cause," and New Jersey allows a court to issue a permit only if it is satisfied that the applicant "has a justifiable need to carry a handgun."

Other states further delineate the circumstances that constitute good cause or justifiable need: Massachusetts requires the applicant to show a "good reason" to fear injury to his or her person or property, or any other proper reason for carrying a concealed firearm. Delaware issues concealed weapons licenses only "for personal protection or the protection of the person's property." Hawaii grants licenses to carry concealed weapons "[i]n an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property." Connecticut and Washington DC are the only "may issue" states that do not require the applicant to demonstrate a reason for a permit.

States that Require a Showing of Good Cause for Issuance of a Concealed Weapons Permit:[66]

California
Delaware
Hawaii
Maryland
Massachusetts
New Jersey
New York

## States Requiring Applicants to be of Good Character or a Suitable Person, or Allowing for Denial When There is Reason to Believe a Person is Dangerous

Eight "may issue" and two limited-discretion "shall issue" states (Georgia and Indiana), as well as the District of Columbia, require the licensing authority to consider the

character of the applicant. Connecticut, Hawaii, Massachusetts, and the District of Columbia allow permits to be issued only to "suitable persons." California, Delaware, Georgia, and New York require the licensing authority to find that the applicant is of "good moral character." New Jersey requires that three "reputable persons" who have known the applicant for at least three years certify that the applicant is of "good moral character and behavior." Delaware also requires that the applicant include with his or her application a certificate signed by five "respectable citizens" of the county in which the applicant resides stating that the applicant is of good moral character, has a reputation for peace and good order, and that possession of a concealed deadly weapon by the applicant is necessary for the protection of the applicant or the applicant's property. Indiana requires that the applicant be of good character and reputation. Rhode Island requires a person to either have a suitable character or make a "proper showing of need."

The remaining limited discretion "shall issue" states do not technically have a "good character" requirement, but allow a CCW application to be denied to a person who is not categorically ineligible if law enforcement can show a documented reason to believe the person is dangerous.

<u>States that Require Applicants to be of Good Character or a Suitable Person:</u>[67]

California
Connecticut
Delaware
District of Columbia
Georgia
Hawaii
Indiana
Maine (permit not required for CCW)
Massachusetts
New Jersey
New York
Rhode Island (as an alternative to a proper showing of need)

<u>States Without a "Character" Requirement that Allow Denials When There is Reason to Believe the Person is Dangerous:</u>[68]

Alabama
Arkansas
Colorado
Illinois
Iowa
Minnesota

Missouri (permit not required for CCW)

Montana

North Dakota (permit not required for CCW)

Oregon

Pennsylvania

South Dakota (permit not required for CCW)

Utah

Virginia

Wyoming (permit not required for CCW)

## States Requiring Applicants to Demonstrate Knowledge of Firearm Use and/or Safety

**More than half of the states and the District of Columbia require a CCW permit applicant to demonstrate that they have received training in firearm use and/or safety.** Among "may issue" states, California, Connecticut, Delaware, Hawaii, Massachusetts, New Jersey, Rhode Island, and the District of Columbia, require applicants to complete a firearm safety course, or otherwise demonstrate their qualification to use a firearm safely.

**Delaware's** firearm safety training requirement, which applies to the applicant's initial CCW license only, is particularly strong, and specifies that the training course must include instruction regarding:

- Knowledge and safe handling of firearms and ammunition;

- Safe storage of firearms and ammunition and child safety;

- Safe firearms shooting fundamentals;

- Federal and state laws pertaining to the lawful purchase, ownership, transportation, use, and possession of firearms;

- State laws pertaining to the use of deadly force for self-defense; and

- Techniques for avoiding a criminal attack and how to manage a violent confrontation, including conflict resolution.

Delaware also requires that the training include live fire-shooting exercises on a range, including the expenditure of a minimum of 100 rounds of ammunition, and identification of ways to develop and maintain firearm-shooting skills. Finally, Rhode Island requires applicants to obtain a certification that they are qualified to use a handgun of a caliber equal to or larger than the one they seek to carry. The certification can be obtained by

passing a firing test conducted by a range officer or pistol instructor. **Such thorough training requirements help ensure that only highly trained individuals are allowed to carry concealed firearms in public areas.**

Among "shall issue" states, Illinois, Michigan, North Carolina, South Carolina and Texas require live firing as part of the firearm training component of the law.

<u>States Requiring CCW Applicants to Demonstrate Knowledge of Firearm Use and/or Safety:</u>[69]

Alaska (permit not required for CCW)
Arizona (permit not required for CCW)
Arkansas
California
Connecticut
Colorado
Delaware
Hawaii
Idaho (permit not required for CCW)
Illinois
Iowa
Florida
Kansas (permit not required for CCW)
Kentucky (permit not required for CCW)
Maine (permit not required for CCW)
Massachusetts
Michigan
Minnesota
Missouri (permit not required for CCW)
Montana
Nebraska
Nevada
New Jersey
New Mexico
North Carolina
North Dakota (permit not required for CCW)
Ohio
Oklahoma
Oregon
Rhode Island
South Carolina

Tennessee

Texas

Utah

West Virginia (permit not required for CCW)

Wyoming (permit not required for CCW)

## STATES LIMITING THE LOCATIONS WHERE CONCEALED WEAPONS MAY BE CARRIED

Almost every state imposes at least some restrictions on the locations in which concealed weapons may be carried. For more information, see our page on **Location Restrictions**.

## OTHER RESTRICTIONS ON PERMITS

State concealed weapons permits vary in duration and renewal processes. The strongest laws limit the duration of permits and require applicants for renewal of a permit to undergo a complete background check and complete safety training and testing. Strong state laws also require the immediate revocation of a permit if the permit-holder becomes ineligible for the permit or violates a law regarding firearms.

State laws also vary regarding the carrying of concealed weapons by individuals who have obtained a permit from a different state. The strongest state laws limit the carrying of concealed weapons to individuals who have obtained a permit from that state. Other states limit carrying to individuals with permits from states that have similar requirements for their permits. The states with the weakest laws allow carrying by individuals with permits from any state that recognizes that state's permit, or by individuals with permits from any state.

# KEY LEGISLATIVE ELEMENTS

The features listed below are intended to provide a framework from which policy options may be considered. A jurisdiction considering new legislation should consult with counsel.

- A license or permit to carry is required.

- Law enforcement has full discretion to issue permits (*nine states are pure "may issue" states*) based on strict guidelines, including, but not limited to, a showing of both:

- Good moral character, and

- Good cause for requesting a CCW permit.

- In addition to background checks, applicants are required to have safety training and to pass written and hands-on tests demonstrating knowledge of firearm laws and safety *(27 states require some form of firearm training/knowledge)*.

- Applicants must be 21 years of age or over.

- Restrictions are placed on the locations where carrying concealed weapons is allowed, prohibiting the carrying of concealed weapons in sensitive areas such as schools, courthouses, hospitals, mental health institutions, and public sporting events.

- Permits are of limited duration and may be renewed only upon satisfaction of all conditions and testing, including background checks.

- Permits are subject to revocation in cases where holder becomes a prohibited purchaser or fails to comply with applicable federal, state, and local firearms laws.

## NOTES >

### SIGN UP FOR UPDATES

First Name

Last Name

Email

Zip                                                      SIGN UP

### POLICY AREAS

STATES

TAKE ACTION

ABOUT

Copyright 2018 Giffords Law Center to Prevent Gun Violence. All Rights Reserved. Legal Disclaimer.

# EXHIBIT 57

NBER WORKING PAPER SERIES

THE IMPACT OF RIGHT TO CARRY LAWS AND THE NRC REPORT:
THE LATEST LESSONS FOR THE EMPIRICAL EVALUATION OF LAW AND POLICY

Abhay Aneja
John J. Donohue III
Alexandria Zhang

Working Paper 18294
http://www.nber.org/papers/w18294

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
August 2012

The authors wish to thank David Autor, Alan Auerbach, Phil Cook, Peter Siegelman, Hugh LaFollette, and an anonymous referee for helpful comments, Todd Elder for assistance in understanding the technique of testing for omitted variable bias, Akshay Rao, Vikram Rao, Andrew Baker, and Kyle Weber for outstanding research assistance, and Stanford Law School and Yale Law School for financial support. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2012 by Abhay Aneja, John J. Donohue III, and Alexandria Zhang. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy
Abhay Aneja, John J. Donohue III, and Alexandria Zhang
NBER Working Paper No. 18294
August 2012, Revised November 2014
JEL No. K0

## ABSTRACT

For over a decade, there has been a spirited academic debate over the impact on crime of laws that grant citizens the presumptive right to carry concealed handguns in public – so-called right-to-carry (RTC) laws.  In 2004, the National Research Council (NRC) offered a critical evaluation of the "More Guns, Less Crime" hypothesis using county-level crime data for the period 1977-2000.  15 of the 16 academic members of the NRC panel essentially concluded that the existing research was inadequate to conclude that RTC laws increased or decreased crime.  One member of the panel thought the NRC's panel data regressions showed that RTC laws decreased murder, but the other 15 responded by saying that "the scientific evidence does not support" that position.

We evaluate the NRC evidence, and improve and expand on the report's county data analysis by analyzing an additional six years of county data as well as state panel data for the period 1979-2010.  We also present evidence using both a more plausible version of the Lott and Mustard specification, as well as our own preferred specification (which, unlike the Lott and Mustard model presented in the NRC report, does control for rates of incarceration and police).  While we have considerable sympathy with the NRC's majority view about the difficulty of drawing conclusions from simple panel data models and re-affirm its finding that the conclusion of the dissenting panel member that RTC laws reduce murder has no statistical support, we disagree with the NRC report's judgment on one methodological point: the NRC report states that cluster adjustments to correct for serial correlation are not needed in these panel data regressions, but our randomization tests show that without such adjustments the Type 1 error soars to 22 - 73 percent.

Our paper highlights some important questions to consider when using panel data methods to resolve questions of law and policy effectiveness.  We buttress the NRC's cautious conclusion regarding the effects of RTC laws by showing how sensitive the estimated impact of RTC laws is to different data periods, the use of state versus county data, particular specifications (especially the Lott-Mustard inclusion of 36 highly collinear demographic variables), and the decision to control for state trends.

Across the basic seven Index I crime categories, the strongest evidence of a statistically significant effect would be for aggravated assault, with 11 of 28 estimates suggesting that RTC laws increase this crime at the .10 confidence level. An omitted variable bias test on our preferred Table 8a results suggests that our estimated 8 percent increase in aggravated assaults from RTC laws may understate the true harmful impact of RTC laws on aggravated assault, which may explain why this finding is only significant at the .10 level in many of our models.  Our analysis of the year-by-year impact of RTC laws also suggests that RTC laws increase aggravated assaults.  Our analysis of admittedly imperfect gun aggravated assaults provides suggestive evidence that RTC laws may be associated with large increases in this crime, perhaps increasing such gun assaults by almost 33 percent.

In addition to aggravated assault, the most plausible state models conducted over the entire 1979-2010 period provide evidence that RTC laws increase rape and robbery (but usually only at the .10 level).  In contrast, for the period from 1999-2010 (which seeks to remove the confounding influence of the crack cocaine epidemic), the preferred state model (for those who accept the Wolfers proposition that one should not control for state trends) yields statistically significant evidence for only one crime -- suggesting that RTC laws increase the rate of murder at the .05 significance level.  It will be worth exploring whether other methodological approaches and/or additional years of data will confirm the results of this panel-data analysis and clarify some of the highly sensitive results and anomalies (such as the occasional estimates that RTC laws lead to higher rates of property crime) that have plagued this inquiry for over a decade.

Abhay Aneja
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
aaneja@stanford.edu

Alexandria Zhang
Johns Hopkins University
Baltimore, Maryland
azhang4@jhu.edu

John J. Donohue III
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305
and NBER
donohue@law.stanford.edu

## I. Introduction

The debate on the impact of "shall-issue" or "right-to-carry" (RTC) concealed handgun laws on crime—which has now raged on for over a decade—is a prime example of the many difficulties and pitfalls that await those who try to use observational data to estimate the effects of changes in law or policy.[2]  John Lott and David Mustard initiated the "More Guns, Less Crime" discussion with their widely cited 1997 paper arguing that the adoption of RTC laws has played a major role in reducing violent crime.  However, as Ayres and Donohue (2003a) note, Lott and Mustard's period of analysis ended just before the extraordinary crime drop of the 1990s.  They concluded that extending Lott and Mustard's dataset beyond 1992 undermined the "More Guns, Less Crime" (MGLC) hypothesis.  Other studies have raised further doubts about the claimed benefits of RTC laws (for example, see Black and Nagin, 1997 and Ludwig, 1998).

But even as the empirical support for the Lott and Mustard thesis was weakening, its political impact was growing.  Legislators continued to cite this work in support of their votes on behalf of RTC laws, and the "More Guns, Less Crime" claim has been invoked often in support of ensuring a personal right to have handguns under the Second Amendment.  In the face of this scholarly and political ferment, in 2003, the National Research Council (NRC) convened a committee of top experts in criminology, statistics, and economics to evaluate the existing data in hopes of reconciling the various methodologies and findings concerning the relationship between firearms and violence, of which the impact of RTC laws was a single, but important, issue.  With so much talent on board, it seemed reasonable to expect that the committee would reach a decisive conclusion on this topic and put the debate to rest.

The bulk of the NRC report on firearms, which was finally issued in 2004, was uncontroversial.  The chapter on RTC laws was anything but.  Citing the extreme sensitivity of

---

[2] The term "RTC laws" is used interchangeably with "shall-issue laws" in the guns and crime literature.

point estimates to various panel data model specifications, the NRC report failed to narrow the domain of uncertainty about the effects of RTC laws.  Indeed, it may have increased it.  However, while the NRC report concluded there was no reliable statistical support for the "More Guns, Less Crime" hypothesis, the vote was not unanimous.  One dissenting committee member argued that the committee's own estimates revealed that RTC laws did in fact reduce the rate of murder.  Conversely, a different member went even further than the majority's opinion by doubting that *any* econometric evaluation could illuminate the impact of RTC laws owing to model specification and endogeneity issues.

Given the prestige of the committee and the conflicting assessments of both the substantive issue of RTC laws' impact and the suitability of empirical methods for evaluating such laws, a reassessment of the NRC's report would be useful for researchers seeking to estimate the impact of other legal and policy interventions.  Our systematic review of the NRC's evidence—its approach and findings—also provides important lessons on the perils of using traditional observational methods to elucidate the impact of legislation.  To be clear, our intent is not to provide what the NRC panel could not—that is, the final word on how RTC laws impact crime.  Rather, we show how fragile panel data evidence can be, and how a number of issues must be carefully considered when relying on these methods to study politically and socially explosive topics with direct policy implications.

The outline of this paper is as follows. Section II offers background on the debate over RTC laws, and Section III describes relevant aspects of the NRC report in depth.  Section IV discusses how the NRC majority presented some panel data models based on the Lott and Mustard specification in support of the conclusion that one could not reach a definitive conclusion about the impact of RTC laws.  While this conclusion was correct, the models

contained an array of errors that opened the door for the Wilson dissent to argue that RTC laws reduce murder.  We discuss these errors in depth and show that Wilson would have been unable to make his dissent if the errors in the presented models (and standard error calculations) had been corrected.

Sections V and VI explore two key econometric issues in evaluating RTC laws—whether to control for state-specific trends (which the NRC panel did not address) and whether to adjust standard errors to account for serial or within-group correlation (we show that the NRC report was in error when it concluded such adjustment was not needed).  Section VII extends the analysis through 2006, and Section VIII offers improvements to the NRC model by revising the regression specification in accordance with past research on crime.  Section IX discusses the issue of whether the impact of RTC laws can be better estimated using county- or state-level data.  Section X delves further into the issue of omitted variable bias in assessing the impact of RTC laws, and in particular, how the difficult-to-measure effect of the crack epidemic may influence our estimates.  Section XI offers concluding comments on the current state of the research on RTC laws, the difficulties in ascertaining the causal effects of legal interventions, and the dangers that exist when policy-makers can simply pick their preferred study from among a wide array of conflicting estimates.

## II. Background on the Debate

In a widely-discussed 1997 paper, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," John Lott and David Mustard (1997) argued, based on a panel-data analysis, that right-to-carry laws were a primary driving force behind falling rates of violent crime.  Lott and Mustard used county-level crime data (including county and year fixed effects, as well as a set of

control variables) to estimate the impact of RTC laws on crime rates over the time period 1977-1992. In essence, Lott and Mustard's empirical approach was designed to identify the effect of RTC laws on crime in the ten states that adopted them during this time period. Using a standard difference-in-difference model, the change in crime in RTC regions is compared with the change in crime in non-RTC regions. The implicit assumption is that the controls included in the regression will explain other movements in crime across states, and the remaining differences in crime levels can be attributed to the presence or absence of the RTC laws.

Lott and Mustard estimated two distinct difference-in-difference-type models to test the impact of RTC laws: a dummy variable model and a trend, or "spline," model.[3] The "dummy model" tests whether the average crime level in the pre-passage period is statistically different from the post-passage crime level (after controlling for other factors). The "spline model" measures whether crime *trends* are altered by the adoption of RTC laws. Lott and Mustard noted that the spline approach would be superior if the intervention caused a reversal in a rising crime rate. Such a reversal could be obscured in a dummy variable model that only estimates the average change in crime between the pre- and post-passage periods. An effective RTC law might show no effect in the dummy model if the rise in the pre-passage crime rate and the fall in the post-passage rate were to leave the average "before" and "after" crime levels the same.

---

[3] In Lott's "dummy model" specification, RTC laws are modeled as a dummy variable which takes on a value of one in the first full year after passage and retains that value thereafter (since no state has repealed its RTC law once adopted). In Lott's "trend model," RTC laws are modeled as a spline variable indicating the number of years post-passage. In prior work, including previous drafts of this article, we had followed this specification choice. But this approach adds noise to this key RTC variable because of heterogeneity across states in the effective dates of RTC laws. Accordingly, we decided to modify our approach to these laws in the most recent version of this paper to more precisely model the impact of the RTC laws based on the actual effective dates of these statutes. Using the text of relevant statutes and information on the court cases that challenged them, we determined the exact date when each state's RTC law took effect. (A more precise description of what was involved in this process can be found in Footnote 17.) Our "dummy model" specification uses a variable that takes a value of one for every full year after each law takes effect and is equal to the fraction of the year that the law is in effect the first year it is implemented. Similarly, our "trend model" specification uses a spline variable indicating the number of years post-passage which takes into account the portion of the year the law was initially implemented.

6

In both regression models, Lott and Mustard included only a single other criminal justice explanatory variable -- county-level arrest rates -- plus controls for county population, population density, income, and thirty-six(!) categories of demographic composition.  As we will discuss shortly, we believe that many criminological researchers would be concerned about the absence of important explanatory factors such as the incarceration rate and the level of police force.

Lott and Mustard's results seemed to support the contention that laws allowing the carry of concealed handguns lead to less crime.  Their estimates suggested that murder, rape, aggravated assault, and overall violent crime fell by 4 to 7 percent following the passage of RTC laws.  In contrast, property crime rates (auto theft, burglary, and larceny) were estimated to have increased by 2 to 9 percent.  Lott and Mustard thus concluded that criminals respond to RTC laws by substituting violent crime with property crime to reduce the risk that they would be shot (since, according to them, victims are more often absent during the commission of a property crime).  They also found that the MGLC contention was strengthened by the trend analysis, which ostensibly suggested significant *decreases* in murder, rape, and robbery (but no significant increases in property crime).

From this evidence, Lott and Mustard (1997) concluded that permissive gun-carrying laws deter violent crimes more effectively than any other crime reduction policy: "concealed handguns are the most cost-effective method of reducing crime thus far analyzed by economists, providing a higher return than increased law enforcement or incarceration, other private security devices, or social programs like early education."  They went even further by claiming that had remaining non-RTC states enacted such legislation, over 1,400 murders and 4,100 rapes would have been avoided nationwide, and that each new handgun permit would reduce victim losses by up to $5,000.

### A. The Far-Reaching Impact of "More Guns, Less Crime"

The first "More Guns, Less Crime" paper and Lott's subsequent research (and pro-gun advocacy) have had a major impact in the policy realm. Over the past decade, politicians as well as interest groups such as the National Rifle Association have continually trumpeted the results of this empirical study to oppose gun control efforts and promote less restrictive gun-carrying laws. Lott has repeatedly invoked his own research to advocate for the passage of state-level concealed-carry gun laws, testifying on the purported safety benefits of RTC laws in front of several state legislatures, including Nebraska, Michigan, Minnesota, Ohio, and Wisconsin (Ayres and Donohue 2003a).

The impact of the Lott-Mustard paper can also be seen at the federal level. In 1997, ex-Senator Larry Craig (R-Idaho) introduced the Personal Safety and Community Protection Act with Lott's research as supporting evidence. This bill was designed to allow state nonresidents with valid handgun permits in their home state to possess concealed firearms (former football athlete Plaxico Burress sought to invoke this defense when he accidentally shot himself in a Manhattan nightclub with a gun for which he had obtained a Florida permit). According to Craig, Lott's work confirmed that positive externalities of gun-carrying would result in two ways: by affording protection for law-abiding citizens during criminal acts, and by deterring potential criminals from ever committing offenses for fear of encountering an armed response.[4] Clearly, Lott's work has provided academic cover for policymakers and advocates seeking to justify the view—on public safety grounds—that the 2nd Amendment conferred a private right to possess handguns.

---

[4] 143 CONG. REC. S5109 (daily ed. May 23, 1997) (statement of Sen. Craig). The bill was again introduced in 2000 by Congressman Cliff Stearns (R-Florida), who also cited Lott's work. 146 CONG. REC. H2658 (daily ed. May 9) 2000) (statement of Rep. Stearns).
Indeed, this proposed legislation, now derisively referred to as "Plaxico's Law," is a perennial favorite of the NRA and frequently introduced by supportive members of Congress (Collins 2009).

### B. Questioning "More Guns, Less Crime"

Immediately after the publication of the Lott-Mustard paper, scholars started raising serious questions about the theoretical and empirical validity of the "More Guns, Less Crime" hypothesis. For example, Zimring and Hawkins (1997) claimed that the comparison of crime between RTC and non-RTC states is inherently misleading because of factors such as deprivation, drugs, and gang activity, which vary significantly across gun-friendly and non-gun-friendly states (and are often difficult to quantify). To the extent that the relatively better crime performance seen in shall-issue states during the late 1980s and early 1990s was the product of these other factors, researchers may be obtaining biased impact estimates. Underscoring this point, Ayres and Donohue (2003a) pointed out that crime rose across the board from 1985 to 1992, and most dramatically in non-RTC states. Since the data set used in Lott and Mustard (1997) ended in 1992, it could not capture the most dramatic reversal in crime in American history.

Figures 1-7 depict the trends of violent and property crimes over the period 1970-2010. For each of the seven crimes, we calculate average annual crime rates for four groupings of states: non-RTC states (those states that had not passed RTC laws by 2006), states that adopted RTC laws over the period 1985-1988 ("early adopters"), those that adopted RTC laws over the period 1989-1991 ("mid-adopters"), and those that adopted RTC laws over the period 1994-1996 ("late adopters"). The crime rate shown for each group is a within-group average, weighted by population. The figures corroborate Ayres and Donohue's point: crime rates declined sharply across the board beginning in 1992. In fact, there was a steady *upward* trend in crime rates in the years leading up to 1992, most distinctly for rape and aggravated assault. Moreover, the average crime rates in non-RTC states seemed to have dropped even more drastically than those in RTC

states, which suggests that crime-reducing factors other than RTC laws were at work.

**Figure 1:**



**Figure 2:**



**Figure 3:**



**Figure 4:**



**Figure 5:**



**Figure 6:**



**Figure 7:**



Ayres and Donohue (2003a) also recommended the use of a more general model, referred to as the "hybrid model," which essentially combined the dummy variable and spline models, to measure the immediate *and* long-run impact of RTC laws on crime. Since the hybrid model nests both the dummy and spline models, one can estimate the hybrid and generate either of the other models as a special case (depending on what the data show). This exercise seemed to weaken the MGLC claim. Their analysis of the county data set from 1977-1997 using the Lott-Mustard specification (revised to measure state-specific effects) indicated that RTC laws across all states *raised* total crime costs by as much as $524 million.

Just as Lott had identified a potential problem with the dummy model (it might understate a true effect if crime followed either a V-shaped or inverted V-shaped pattern), there is a potential problem with models (such as the spline and the hybrid models) that estimate a post-passage linear trend. Early adopters of RTC laws have a far more pronounced impact on the

trend estimates of RTC laws than later adopters, since there may only be a few years of post-passage data available for a state that adopts RTC laws close to the end of the data period.  If those early adopters were unrepresentative of low crime states, then the final years of the spline estimate would suggest a dramatic drop in crime, not because crime had in fact fallen in adopting states, but because the more representative states had dropped out of the estimate (since there would be no post-passage data after, say, three years for a state that had adopted the RTC law only three years earlier, but there would be such data for Maine and Indiana, which were the earliest RTC adopters).  We recognize that each model has limitations, and present the results of all three in our tables below.[5]

## III. Findings of the National Research Council

The sharply conflicting academic assessments of RTC laws specifically and the impact of firearms more generally, not to mention the heightened political salience of gun issues, prompted the National Research Council to impanel a committee of experts to critically review the entire range of research on the relationships between guns and violence.  The blue-chip committee, which included prominent scholars such as sociologist Charles Wellford (the committee chair), political scientist James Q. Wilson, and economists Joel Horowitz, Joel Waldfogel, and Steven Levitt, issued its wide ranging report in 2004.

While the members of the panel agreed on the major issues discussed in eight of the nine chapters of the NRC report, the single chapter devoted to exploring the causal effects of RTC laws on crime proved to be quite contentious. After reviewing the existing (and conflicting)

---

[5] We note that in the latest version of his book, Lott (2010) criticizes the hybrid model, but he fails to appreciate that the problem with the hybrid model –and with the spline model he prefers—is that they both yield estimates that are inappropriately tilted down as the more representative states drop out of the later years, which drive the post-passage trend estimates.  An apples to apples comparison that included the identical states to estimate the post-passage trend would not suggest a negative slope.  This is clear in Figure 1 and Table 1 of Ayres and Donohue (2003a).

literature and undertaking their own evaluation of Lott's county-level crime data, 15 of the 16 academic members of the committee concluded that the data provided no reliable and robust support for the Lott-Mustard contention.  In fact, they believed the data could not support any policy-relevant conclusion.  In addition, they claimed they could not estimate the true impact of these laws on crime because: (1) the empirical results were imprecise and highly sensitive to changes in model specification, and (2) the estimates were not robust when the data period was extended eight years beyond the original analysis (through 2000), a period during which a large number of states adopted the law.

### A. The NRC Presents Two Sets of Estimates of the Impact of RTC Laws

One can get an inkling of the NRC majority's concern about model sensitivity by examining Table 1 below, which reports estimates from the NRC report on the impact of RTC laws on seven crimes.  The Table 1b estimates are based on the Lott and Mustard (1997) dummy and spline models using county data for the period 1977-2000 with the full set of Lott and Mustard controls.  The Table 1a estimates use the same data but provide a more sparse specification that drops the Lott and Mustard controls and provides estimates with no covariates other than year and county fixed effects.  The vastly different results produced by these different models gave the majority considerable pause. For example, if one believed the dummy model in Table 1b, then RTC laws considerably *increased* aggravated assault and robbery, while the spline model in Table 1b suggested RTC laws *decreased* the rate of both of these crimes.  Noting that the RTC impact estimates disagreed across their two models (dummy and spline) for six of the seven crime categories, the NRC report concluded that there was no reliable scientific support for the more guns, less crime thesis.

16

## Table 1

### Table 1a[6]

Estimated Impact of RTC Laws – Published NRC Estimates – No Controls, All Crimes, County Data, 1977-2000

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.95 | 17.91*** | 12.34*** | 19.99*** | 23.33*** | 19.06*** | 22.58*** |
| | (1.48) | (1.39) | (0.90) | (1.21) | (0.85) | (0.61) | (0.59) |
| Spline Model: | 0.12 | -2.17*** | -0.65*** | -0.88*** | 0.57*** | -1.99*** | -0.71*** |
| | (0.32) | (0.30) | (0.20) | (0.26) | (0.19) | (0.13) | (0.13) |

### Table 1b[7]

Estimated Impact of RTC Laws – Published NRC Estimates – Lott-Mustard Controls, All Crimes, County Data 1977-2000

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -8.33*** | -0.16 | 3.05*** | 3.59*** | 12.74*** | 6.19*** | 12.40*** |
| | (1.05) | (0.83) | (0.80) | (0.90) | (0.78) | (0.57) | (0.55) |
| Spline Model: | -2.03*** | -2.81*** | -1.92*** | -2.58*** | -0.49** | -2.13*** | -0.73*** |
| | (0.26) | (0.20) | (0.20) | (0.22) | (0.19) | (0.14) | (0.13) |

Interestingly, the conflicting estimates of Table 1 also led to substantial intra-panel dissention, with two members of the Committee writing separately from the NRC's majority evaluation of RTC laws. One sought to refute the majority's skepticism, and one sought to reinforce it. Noted political scientist James Q. Wilson offered the lone dissent to the Committee's report, claiming that Lott and Mustard's "More Guns, Less Crime" finding actually held up under the panel's reanalysis. Specifically, Wilson rejected the majority's interpretation of the

---

[6]Estimations include year and county fixed effects, and are weighted by county population. Standard errors are in parentheses below estimations. Robust standard errors are not used in the published NRC estimates. * Significant at 10%; ** Significant at 5%; *** Significant at 1%. Throughout this paper, the standard errors appear just below the corresponding parameter estimate.

[7] Estimations include year and county fixed effects, and are weighted by county population. Standard errors are provided beneath point estimates in parentheses. Robust standard errors are not used in the published NRC estimates. The control variables (adopted from the Lott-Mustard model) include: arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

regression estimates seen in Table 1.  Although the majority saw sharp conflicts in the Table 1b
results between the dummy and spline models, Wilson was impressed that for one of the seven
crimes -- murder --  the dummy and spline models of Table 1b generated estimates that
seemingly suggested there were statistically significant drops in crime associated with RTC laws.
This agreement in the Table 1b murder estimates led him to heartily endorse the "More Guns,
Less Crime" view.  Indeed, after dismissing papers that had cast doubt on the MGLC hypothesis
(such as Black and Nagin, 1998) on the grounds that they were "controversial," Wilson
concluded: "I find the evidence presented by Lott and his supporters suggests that RTC laws do
in fact help drive down the murder rate, though their effect on other crimes is ambiguous" (NRC
Report, p. 271.).

 The Committee penned a response to Wilson's dissent (separate from its overall
evaluation of RTC legislation), which stressed that the only disagreement between the majority
and Wilson (throughout the entire volume on gun issues) concerned the impact of RTC laws on
murder.  They noted that, while there were a number of negative estimates for murder using the
Lott-Mustard approach, there were also several positive estimates that could not be overlooked.
In addition, as the NRC panel noted, even the results for murder failed to support the MGLC
contention when restricting the period of analysis to five years or less after law adoption.[8]  The
important task was to try to reconcile these contradictions—and the panel majority believed that
was not possible using the existing data.

 Committee member (and noted econometrician) Joel Horowitz was the ardent skeptic,
and not without merit.   Horowitz joined the refutation of Wilson but also authored his own
appendix discussing at length the difficulties of measuring the impact of RTC laws on crime

---

[8] The importance of this restriction on the post-passage data was mentioned earlier: as states dropped out of the
post-passage data, the estimated impact of RTC laws became badly biased (since one was no longer deriving the
estimated effect from a uniform set of states).

18

using observational rather than experimental data.[9]  He began by addressing a number of flaws in the panel-data approach.  First, if factors other than the adoption of the RTC law change but are not controlled for in the model, then the resulting estimates would not effectively isolate the impact of the law (we demonstrate the likelihood of this possibility in Section X below). Second, if crime increases before the adoption of the law at the same rate it decreases after adoption, then a measured zero-difference would be misleading.  The same problem arises for multiyear averages.  Third, the adoption of RTC laws may be a *response* to crime waves.  If such an endogeneity issue exists, the difference in crime rates may merely reflect these crime waves rather than the effect of the laws.  Lastly, as even Lott (2000) found in his data, RTC states differ noticeably from non-RTC states (e.g., RTC states are mainly Republican and had low but rising rates of crime).  It would not be surprising if these distinctive attributes influence the measured effect of RTC laws. In this event, looking at the impact of RTC laws in current RTC states may not be useful for predicting the likely result if these laws were adopted in very different states.

Ideally, states would be randomly selected to adopt RTC laws, thereby eliminating the systematic differences between RTC states and non-RTC states.  In the absence of such randomization, researchers introduce controls to try to account for these differences, which generates debate over which set of controls is appropriate.  Lott (2000) defended his model by claiming that it included "the most comprehensive set of control variables yet used in a study of crime" (p. 153).  But Horowitz was unimpressed by Lott's claim, noting that it is possible to control for too many variables – or too few.  He pointed out that Donohue (2003) found a significant relationship between crime and *future* adoption of RTC legislation, suggesting the likelihood of omitted variable bias and/or the endogenous adoption of the laws. Horowitz

---

[9] While his chapter is directed at the analysis of RTC laws, Horowitz's comments applied to an array of empirical studies of policy that were discussed throughout the entire NRC volume.

19

concluded by noting that there is no test that can determine the right set of controls: "it is not possible to carry out an empirical test of whether a proposed set of $X$ variables is the correct one…it is largely a matter of opinion which set [of controls] to use" (NRC Report, p. 307). Noting the likelihood of misspecification in the evaluation of RTC laws, and that estimates obtained from a misspecified model can be highly misleading, he concluded that there was little hope of reaching a scientifically supported conclusion based on the Lott-Mustard/NRC model (or any other).[10]

### B. The Serious Need for Reassessment

The story thus far has been discouraging for those hoping for illumination of the impact of legislation through econometric analysis. If the NRC majority is right, then years of observational work by numerous researchers, topped off with a multi-year assessment of the data by a panel of top scholars, were not enough to pin down the actual impact of RTC laws. If Horowitz is right, then the entire effort to estimate the impact of state right-to-carry policies from observational data is doomed. Indeed, there may be simply too much that researchers do not know about the proper structure of econometric models of crime. Notably, however, the majority did not join Horowitz in the broad condemnation of all observational microeconometrics for the study of this topic. Perhaps a model that better accounts for all relevant, exogenous, crime-influencing factors and secular crime trends could properly discern the effects of RTC laws – whether supporting or refuting the Wilson conclusion that RTC laws reduce murder. On the other hand, an examination of additional models might only serve to strengthen the NRC majority conclusion that the models generated estimates that were too

---

[10] Note that this nihilistic conclusion was very close to that found by a more recent NRC report investigating the deterrent effect of the death penalty. Daniel S. Nagin and John V. Pepper, editors, Deterrence and the Death Penalty (2012). This recent NRC report reviewed 30 years of studies on this deterrence question and found the entire literature to be "uninformative."

variable to provide clear insight into the effect of RTC laws on crime.

## IV. Panel Data Estimates in the NRC Report

Previous research on guns and crime has shown how data and methodological flaws can produce inaccurate conclusions. In a follow-up to their initial 2003 *Stanford Law Review* paper, Ayres and Donohue (2003b) demonstrated how coding errors can yield inaccurate and misleading estimates of the effect of RTC laws on crime. Commenting on a study in support of the MGLC premise by Florenz Plassman and John Whitley (2003), Ayres and Donohue (2003b) described numerous coding flaws. After correcting these errors, the existing evidence supporting the "More Guns, Less Crime" hypothesis evaporated.

### A. The NRC's Panel-Data Models

Since the NRC panel based their reported estimates on data provided by John Lott, we thought it prudent to carefully examine the NRC committee's own estimates. With the help of the NRC committee members who provided the NRC 1977-2000 county data set, we were ultimately able to generate the NRC panel data estimates.[11] Once we fully understood the way in which these NRC estimates were generated (shown in Table 1 above), it became clear that the NRC report presented estimates that essentially had three flaws: 1) the specification (used by Lott and Mustard) was problematic in a number of dimensions; 2) the standard errors were incorrect in two ways, both of which made the results appear more significant than they were; and 3) there were some errors in the data, which had been supplied by Lott.

Given the NRC majority conclusion that the Lott and Mustard thesis was not supported by the data, it was a reasonable choice to simply take the Lott and Mustard data and

---

[11] The initial published version of this article -- Aneja, Donohue, and Zhang (2011) -- noted that we had originally failed to replicate the NRC results, with our efforts complicated because the Committee had misplaced the do files that generated the NRC estimates. After publication, we were informed of the precise specification the NRC had employed, which did generate the published NRC estimates (although these estimates are flawed in the manner described in the text).

specifications and adhere to their method of computing standard errors. In essence, the NRC majority was shrewdly saying, "Even if we fully accept everything that Lott and Mustard have argued for, we still find no support for their conclusion." The only problem with the NRC majority approach, though, was that presenting the estimates in Table 1b above opened the door for James Q. Wilson to argue that some support for RTC laws could be gleaned from the ostensibly conflicting evidence.

Wilson's claim, once again, was that Table 1b spoke with clarity, albeit on only one point. He conceded that the Lott and Mustard dummy and spline estimates conflicted for six of the seven crime categories, but since they both showed statistically significant reductions in murder, Wilson claimed that the murder finding was robust and he concluded that RTC laws save lives. The NRC majority responded that Table 1a did not similarly suggest that RTC laws reduced murder but Wilson swatted that response aside by saying that a model with no covariates would not be as persuasive as the Table 1b models with covariates. The NRC majority could have countered Wilson's claim far more effectively if they had simply shown that the Lott and Mustard model was highly assailable and greatly underestimated its standard errors. Indeed, nothing would have been left standing for Wilson to construct a positive story of RTC laws if the NRC majority had simply calculated the correct standard errors for the Table 1b models, since doing so would have eliminated any claim that the RTC laws generated a statistically significant reduction in murder or any other crime.

### B. Problems with the Lott and Mustard Models and Data Published in the NRC Report

Our goal in this section is to improve on the estimates presented in the NRC report (Table 1 above) by correcting what we consider to be clear errors in the Lott and Mustard specification, data, and standard errors. Thus, we began by constructing our own county-level data set, which

we will refer to as the "Updated 2013 Data Set."  We create the same variables found in Lott's data—crime rates, demographic composition, arrest rates, income, population, and population density—and extend our new set to 2006 (the NRC data ended in 2000).[12]  This data extension will also provide us an opportunity to explore how the NRC's results are affected when using more current data.  As we will see in Section VII, the additional years of data will also enable us to estimate the effect of six additional state adoptions of RTC laws not present in the NRC analysis: Michigan (2001), Colorado (2003), Minnesota (2003), Missouri (2004), New Mexico (2004), and Ohio (2004).[13]

We obtained our county crime data from the University of Michigan's Interuniversity Consortium for Political and Social Research, which maintains the most comprehensive collection of UCR data.  Unfortunately, county-level crime data for 1993 is currently unavailable.  The National Archive of Criminal Justice Data recently discovered an error in the crime data imputation procedure for 1993 and for this reason, has made 1993 data inaccessible until the error has been corrected.  Thus, for all of the following tables with estimates using our updated county data, we are missing values for 1993.

In Table 2, we will replicate and extend the Table 1 NRC estimates correcting for three errors:  1) some data errors that were transmitted to the NRC when they used the Lott county data set; 2) a clear specification error in the arrest rate controls; and 3) the failure to use both robust and clustered standard errors.  We also modify the RTC variables used in this analysis to take into account additional information that we have gathered on the effective dates of these laws.

---

[12] We also add 0.1 to *all zero* crime values before taking the natural log in our county-level data set, as the NRC did.

[13] Kansas and Nebraska adopted RTC laws which took effect in 2007, which is too late to be captured in our analysis.  A more complete explanation of how these years were determined can be found in Footnote 17 and Appendix G.

### 1.  The Lott Data Errors Used in the NRC Estimates

In our original efforts at trying to replicate the NRC estimates derived from their Lott data set, we discovered a number of small errors in that data set.[14]  First, Philadelphia's year of adoption is coded incorrectly—as 1989 instead of 1995.  Second, Idaho's year of adoption is coded incorrectly—as 1991 instead of 1990.  Third, the area variable, which is used to compute county density, has missing data for years 1999 and 2000.  Fourth, we determined that the NRC data set was missing all county identifiers for 1999 and 2000, which meant that that both these years were dropped for the NRC estimates depicted in Table 1.   Our analysis corrects all these errors.

### 2.  Lott and Mustard's Erroneous Arrest Rate Variables

Since the NRC report followed the Lott-Mustard specification, the regressions it presented (which we reproduce in Table 1) used arrest rates as the sole criminal justice control variable in estimating the effect of RTC laws.  Although we have already noted Lott's claim that his is "the most comprehensive set of control variables yet used in a study of crime," in fact, the Lott and Mustard model omits controls for police and incarceration, which many studies -- e.g., Kovandzic, Vieraitis, and Boots, (2009) -- have found to be key influences on crime (we will re-introduce those variables in Section VIII).

Lott and Mustard's use of the arrest rate variables is not a good modeling choice in general, and the particular approach that Lott and Mustard employed is especially problematic.[15]

---

[14] We know all too well how easy it is to make these small but annoying errors in creating these data sets, since regrettably we had a few similar errors in our own data set in the Aneja, Donohue, Zhang (2011) published version, which are all corrected here. None of the main conclusions of the published paper were altered by those errors, some of which are set forth in footnote 18.

[15] Even apart from the considerable data problems with the county arrest rates, the measure is also not well defined. Ideally, one might like a measure showing the likelihood that one who commits a certain crime will be arrested.  The Lott and Mustard arrest rates instead are a ratio of arrests to crimes, which means that when one person kills many, for example, the arrest rate falls, but when many people kill one person, the arrest rate rises since only one can be arrested in the first instance and many can in the second.  The bottom line is that this "arrest rate" is not a probability

To see the concern, note that the NRC's model (Table 1b in this paper) is trying to explain the level of seven individual Index I crime categories while using a control that is computed as a crime-specific arrest rate, which is the number of arrests for a given crime divided by the contemporaneous number of crimes. Thus, murder in 1990 is "explained" by the ratio of arrest to murders in 1990. Econometrically, it is inappropriate to use this contemporaneous measure since it leaves the dependent variable on both sides of the regression equation (at a minimum, a better approach would lag this variable one year, as discussed in Ayres and Donohue (2009)). Better still, one could alternatively use the broad categories of violent and property crimes to compute arrest rates, as have many recent papers (such as, Moody and Marvell, 2008). We adopt this latter approach for all of our regressions in this paper and also lag the arrest rate one year to reduce the endogeneity problem.

### 3. The Erroneous Standard Errors in the NRC Estimates

Surprisingly, when the NRC presented its estimates (which we reproduce in Table 1), the NRC report did not make the very basic adjustment to their standard errors to correct for heteroskedacticity. Since Hal White's paper discussing this correction has been the single most cited paper in all of economics since 1970,[16] the failure to make this standard adjustment was unexpected. Accordingly, in all of our own estimates, we use robust standard errors.

Even more significant in terms of the results, though, is the issue of whether one must cluster the standard errors. The statistical consequence of the NRC committee's failure to use robust and clustered standard errors is to massively understate the reported standard errors (and consequently to overstate the level of significance). Unlike the issue of robust standard errors,

---

and is frequently greater than one because of the multiple arrests per crime. For an extended discussion on the abundant problems with this pseudo arrest rate, see Donohue and Wolfers (2009).

[16] Kim, E.H.; Morse, A.; Zingales, L. (2006). "What Has Mattered to Economics since 1970?". *Journal of Economic Perspectives* 20 (4): 189–202.

the Committee report actually addressed the issue of clustering, concluding that this adjustment

was not necessary.  In Section V, we will show that this was an error.  Therefore, we will from

this time forward only present results based on the clustering adjustment to our standard errors.

### C. Improving on the Table 1 Estimates by Using Better Data and Slightly Improved Lott and Mustard Models

Having just identified three problems with the estimates presented by the NRC, we now

seek to fix them.  To be clear about our approach, we use annual county-level crime data for the

United States from 1977 through either 2000 (to conform to the NRC report) or 2006.  We

explore the impact of RTC laws on seven Index I crime categories by estimating the reduced-

form regression:

$$Y_{it} = \eta RTC_{jt} + \alpha_i + \theta_t + \beta_{jt} + \gamma X_{ijt} + \varepsilon_{it} \tag{1}$$

where the dependent variable $Y_{it}$ denotes the natural log of the individual violent and property

crime rates for county $i$ and year $t$.  Our explanatory variable of interest—the presence of an RTC

law within state $j$ in year $t$—is represented by $RTC_{jt}$.  The exact form of this variable shifts

according to the three variations of the model we employ (these include our modified version of

the Lott and Mustard dummy and spline models, as well as the Ayres and Donohue hybrid

model.)  Owing to new information that we have gathered about the RTC laws of various states,

we use our own modified dummy and spline variables that take into account the exact date when

these laws were implemented.[17]

---

[17] As noted in Footnote 3, in the dummy variable approach, the RTC variable is a dichotomous indicator that equals the fraction of the year that the law is in effect the first year the law is implemented and equals one each full year thereafter.  In the spline model, the RTC variable indicates the number of post-passage years (adjusted by the fraction of the year the law is first in effect).  The hybrid specification contains both dummy and trend variables. Using the effective date when laws were implemented rather than simply assuming that laws take effect one year after passage changes the initial year of a number of RTC laws. In addition, some states (e.g., Texas) passed RTC laws that technically "took effect" on one date but which specified another date when permits could begin to be issued.  We treat these states as if their laws took effect on the second date.  We also took court-mandated delays in

26

The variable $\alpha_i$ indicates county-level fixed effects (unobserved county traits) and $\theta_t$ indicates year effects.  As we will discuss below, there is no consensus on the use of state-specific time trends in this analysis, and the NRC report did not address this issue.  Nevertheless, we will explore this possibility, with $\beta_{jt}$ indicating state-specific trends, which are introduced in selected models.  Since neither Lott and Mustard (1997) nor the NRC (2004) focus on state trends, this term is dropped when we estimate their models.  The term $X_{ijt}$ represents a matrix of observable county and state characteristics thought by researchers to influence criminal behavior. The components of this term, however, vary substantially across the literature. For example, while Lott uses only "arrest rates" as a measure of criminal deterrence, we discuss the potential need for other measures of deterrence, such as incarceration levels or police presence, which are measured at the state level.

Table 2 reproduces the regressions depicted in Table 1, while correcting for the three problems mentioned above (the inaccurate Lott data, the poorly constructed Lott arrest ratios, and the incorrect standard errors), changing the manner in which RTC dates were determined, and using our reconstruction of the county dataset from 1977 through 2000 (which omits the flawed 1993 county data).  Tables 2a and 2b represent our improved estimates of what the NRC reported and we depict in Tables 1a and 1b.  Table 2b appends our hybrid model, which estimates the effect of RTC laws with both a dummy and a spline component (thus nesting the individual dummy and spline models).

The bottom line is that the superior Table 2 estimates look nothing like the Table 1 estimates presented in the NRC report.  Table 1 shows estimated effects that are almost

---

implementing RTC laws into account when determining when permits would actually first be issued (and the corresponding value of the RTC dummy).  In short, the process of reviewing the effective dates of different RTC laws led us to change the effective year of a number of these laws, changes which are described in greater detail in Appendix G.

uniformly statistically significant -- at times suggesting crime increases and at times suggesting crime decreases. Table 2 shows far fewer statistically significant effects, but every one of which suggests RTC laws *increase* crime -- for rape, aggravated assault, robbery, auto theft, burglary, and larceny. There is not even a hint of any crime declines.

Recall that James Q. Wilson thought that the most important regressions to look at were those presented in Table 1b, because they provided the full set of controls from the Lott and Mustard specification. While for six of the seven crime categories the story that emerged from Table 1b varied sharply on whether one looked at the dummy or the spline model, Wilson was content to find a beneficial RTC effect on murder because the Table 1 estimates for murder both appeared to be negative and significant.

When we switch to Table 2b, however, we see that there is nothing resembling a statistically significant impact of RTC laws on murder. In fact, we see that assault, auto theft, and larceny now have estimates that are simultaneously statistically significant and positive for both the dummy and spline model. Thus, the results that Professor Wilson found to be consistent evidence of RTC laws reducing murder (see Table 1b) disappear with better data and a superior specification.[18]

---

[18] In the process of reviewing our previous published models and data from ADZ (2011), we discovered some errors in the two data sets that we had constructed (the so-called updated 2009 county data and updated 2009 state data), which are corrected in this paper. For the county data set, we miscoded the state trend variable for Arkansas. Second, Kansas counties had been incorrectly coded as belonging to Kentucky for years 1997-2006. Third, our spline and hybrid models had included a counter variable to capture the effect of a post-passage trend, but they inadvertently omitted the overall trend variable off of which this post-passage trend was to be estimated. Fourth, Vermont was coded as a "may issue" state instead of a "shall issue" state, although this did not affect our results owing to the inclusion of state fixed effects in our regressions. Fifth, the real per capita income measures from our previous datasets had been calculated incorrectly, and these changes have been made for real per capita income and income maintenance, unemployment insurance, and retirement payments. (This last change was also made to the state data set.)

In addition to these errors that we discovered, Moody, Lott, Marvell, and Zimmerman (2012) identified three other errors: duplicative observations for Alaska county 2060 were improperly included for 1996, Kansas' year of adoption was coded incorrectly as 1996 instead of 2006, and South Dakota's year of adoption was coded incorrectly as 1986 instead of 1985. All of these errors have been corrected in the tables prepared for this paper.

In fact, this was essentially the message of the NRC report.  Small changes made the estimates bounce around so much that it was difficult to reach any conclusion about the true causal impact of RTC laws.  Perhaps it might have been helpful to Wilson if the majority had gone one step further and presented something like the alternative results from Table 2.  As we will see in the ensuing sections, there are many additional avenues that could have been explored to probe the robustness of the Table 1b findings that Wilson had accepted so unquestioningly.

We will explore these factors in subsequent sections:  Section VI will explore whether one should control for individual state trends in crime, section VII will look at additional years of data (adding data beyond 2000 to 2006), section VIII will alter the Lott and Mustard specification (beyond the already mentioned correction for the contemporaneous, crime-specific arrest rates and changing the method used to construct the two RTC variables), section IX will go beyond the county data to look at state data, and Section X will consider the additional problem of potential omitted variable bias.  But a key aspect of the Table 2 results is that the standard errors were adjusted using the cluster command, and this is one area where the NRC majority stumbled in concluding that this adjustment was not needed. Section V will now address the clustering question.

---

Moody, Lott et al also claimed that Florida's year of adoption was coded incorrectly as 1989 instead of 1987 but this simply reflects their misreading of our coding. Our county data does not have crime information for Florida counties in the year 1988 (this is evident in the NRC data set as well), so observations for Florida's counties in this year are dropped. Thus, while it may seem that our first year of adoption is erroneously coded as 1989, this simply reflects the fact that we have not included observations for 1988. Note that we maintained consistency with our other trend variables by beginning the post-passage variable counter with a value of "2" in year 1989 to demonstrate 2 years since the passage of RTC legislation.

For the state data set in ADZ (2011), we note the following corrections: both North and South Dakota should show RTC adoption in year 1985. Similarly, Oregon's date of adoption for its RTC law should have been 1989 instead of 1990 in the state data set.

Additional changes made to the RTC indicator variables used in this paper are described in footnotes 3 and 17, as well as Appendix G. The state dataset has also been re-constructed with the most recently available data, the sources of which are provided with this paper at http://works.bepress.com/john_donohue/.

## **Table 2**

### Table 2a[19]

Estimated Impact of RTC Laws – with ADZ Changes – No Controls, All Crimes, 1977-2000
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Changes: Updated Dataset, Robust and Clustered Standard Errors, Alternative RTC Dates

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.07 | 34.43 | 22.85 | 26.21* | 32.76 | 32.24 | 38.42 |
|  | (8.48) | (24.72) | (19.88) | (15.02) | (21.20) | (22.51) | (26.15) |
| Spline Model: | 0.65 | 4.41* | 3.83* | 2.96 | 4.41* | 4.65* | 5.59* |
|  | (0.88) | (2.61) | (2.07) | (1.86) | (2.44) | (2.42) | (2.93) |

### Table 2b

Estimated Impact of RTC Laws – with ADZ Changes – Lott-Mustard Controls, All Crimes, 1977-2000
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Changes: Updated Dataset, Lagged Violent/Property Arrest Rates, Robust and Clustered Standard Errors, Alternative RTC Dates

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.13 | 17.60 | 17.01*** | 11.69* | 19.54*** | 10.70** | 20.89*** |
|  | (7.15) | (11.88) | (6.16) | (6.11) | (7.15) | (5.07) | (5.75) |
| Spline Model: | -0.08 | 1.35 | 1.76* | 0.70 | 1.99** | 0.86 | 1.97* |
|  | (0.82) | (1.42) | (0.92) | (0.84) | (0.77) | (0.71) | (1.01) |
| Hybrid Post-Passage Dummy: | -1.11 | 16.41 | 13.14** | 12.04* | 15.28* | 9.73* | 17.28*** |
|  | (7.96) | (10.34) | (6.04) | (6.93) | (7.74) | (5.63) | (4.71) |
| Trend Effect: | -0.00 | 0.28 | 0.91 | -0.08 | 1.00 | 0.23 | 0.85 |
|  | (0.90) | (1.26) | (0.99) | (0.83) | (0.71) | (0.78) | (0.92) |

---

[19] All table estimations include year and county fixed effects, and are weighted by county population. Standard errors are robust and clustered at the state level.  * Significant at 10%; ** Significant at 5%; *** Significant at 1%. In Table 2b, the control variables (adopted from the Lott-Mustard model) include: lagged arrest rates, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.

## V. Debate over the Clustering of Standard Errors

### A. Is Clustering Necessary?

Aside from neglecting to use heteroskedastic-robust standard errors, the NRC committee also did not use a cluster adjustment.  Research has found that the issue of whether to "cluster" the standard errors has a profound impact on assessments of statistical significance.  This issue gained prominence beginning primarily with a 1990 paper by Brent Moulton.  Moulton (1990) pointed to the possible need for the clustering of observations when treatments are assigned at a group-level.  In such cases, there is an additive source of variation that is the same for all observations in the group, and ignoring this unique variation leads to standard errors that are underestimated.  Lott, however, suggests that clustered standard errors are not needed (Lott 2004), claiming that county-level fixed effects implicitly control for state-level effects, and therefore, clustering the standard errors by state is unnecessary.

The NRC committee (2004) sided with Lott on this point, stating that "there is no need for adjustments for state-level clustering." (p. 138).  However, we *strongly* believe the committee was mistaken in this decision.  One must account for the possibility that county-level disturbances may be correlated within a state during a particular year by clustering the standard errors by state.  There is also a second reason for clustering that the NRC report did not address.  Specifically, serial correlation in panel data can lead to major underestimation of standard errors.  Indeed, Bertrand, Duflo, and Mullainathan (2004) point out that even the Moulton correction alone may be insufficient for panel-data estimators that utilize more than two periods of data due to autocorrelation in both the intervention variable and the outcome variable of interest.  Wooldridge (2003, 2006), as well as Angrist and Pischke (2009), suggest that clustering the standard errors by state (along with using heteroskedasiticity-robust standard errors) will help

31

address this problem, and at least provide a lower bound on the standard errors.

### B. Using Placebo Laws to Test the Impact of Clustering

Our Table 2 estimates (which include clustering) reveal that this adjustment makes a major difference in the results generated by the Lott and Mustard models that the NRC report adopted in its analysis -- completely wiping out any sign of statistically significant crime reductions attributable to RTC laws.  But who is correct on the clustering issue—Lott, Mustard, and the NRC panel on the one hand, or Angrist, Pischke, and several other high-end applied econometricians on the other?  To address this important question we run a series of placebo tests.  In essence, we randomly assign RTC laws to states, and re-estimate our model iteratively (1000 times), recording the number of times that the variable(s) of interest are "statistically significant" at the 5% level.  For this experiment, we use our most flexible model: the hybrid model (that incorporates both a dummy and a trend variable) with the controls employed by the NRC.

We run five versions of this test.  In our first test, we generate a placebo law in a random year for all 50 states and the District of Columbia.  Once the law is applied, it persists for the rest of our data period (beginning the year after the law's randomly generated effective date), which is how laws were coded in our original analysis.  We run 1000 trials (where each trial consists of a randomly generated set of RTC passage years) and then proceed to take a simple average of the percentage of significant dummy variable and spline variable estimates. In our second test, we apply a placebo law in a random year to the 32 states that had actually implemented right-to-carry laws between 1979 and 2006.  The remaining 19 states are assumed to either have no RTC law or to have had one during the entire analysis period.[20]  Here again we run 1000 trials in

---

[20] For the purposes of this analysis we do not consider Nebraska or Kansas to have passed an RTC law during this period. These states passed RTC laws in 2006; however, their laws did not take effect until 2007.

which each iteration consists of randomly generated RTC passage years and proceed to take a simple average of the percentage of significant estimates. Third, we randomly select 32 states to receive a placebo law in a random year (to ensure that any random sample of 32 states does not have the potential to inaccurately bias results, we repeat this entire procedure 5 times – that is, we take 5 samples of 32 random states and for each sample, run the aforementioned process of assigning a random year of RTC adoption 1000 times). Then, we take a simple average of the number of statistically significant dummy variable and spline estimates. Thus, we are, in effect, counting the number of significant dummy and trend estimates generated from 5000 hybrid regressions.  Fourth, we apply a placebo law in a random year to the 19 states which did not pass RTC laws within the period, dropping the other 32 states from our dataset, and take the simple average of the statistically significant dummy variable and spline estimates.  Finally, we randomly select 12 of the 19 states (to correspond to the previous randomly generated 32 states) to receive an RTC in a randomized year of adoption and iterate this process 1,000 times over five separate samples. The results of these five tests are presented in Table 3.

Given the random assignment, one would expect to reject the null hypothesis of no effect of these randomized "laws" roughly 5 percent of the time if the standard errors in our regressions are estimated correctly. Instead, the table reveals that the null hypothesis is rejected 21-69 percent of the time for murder and robbery with the dummy variable and even more frequently with the trend variable (35-73 percent). Clearly, this exercise suggests that the standard errors used in the NRC report are far too small.

Table 3b replicates the exercise of Table 3a, but now uses the cluster correction for standard errors (by state).  Table 3b suggests that clustering standard errors does not excessively reduce significance, as the NRC panel feared.  In fact, the percentages of "significant" estimates

produced in all three versions of the test still lie well beyond the 5% threshold.  Similar results are found when we replicate Tables 3a and 3b using a random selection of either 32 or 12 states while employing the dummy model instead of the hybrid model (we do not show those results here).  All of these tests show that if we do *not* cluster the standard errors, the likelihood of obtaining significant estimates is astonishingly (and unreasonably) high.  The conclusion we draw from this exercise is that clustering is clearly needed to adjust the standard errors in these panel-data regressions.  Accordingly, we use this clustering adjustment for all remaining regressions in this paper.

34

# Table 3[21]

## Table 3a

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1977-2006 – **No Clustered Standard Errors**
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Hybrid Model

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 45.8 | 67.5 |
| | Robbery | 53.8 | 63.9 |
| 2. Exact 32 States: | Murder | 64.6 | 72.0 |
| | Robbery | 68.9 | 73.0 |
| 3. Random 32 States: | Murder | 56.1 | 68.3 |
| | Robbery | 56.6 | 62.7 |
| 4. All 19 States: | Murder | 21.7 | 34.9 |
| | Robbery | 36.3 | 45.4 |
| 5. Random 12 States: | Murder | 23.6 | 42.1 |
| | Robbery | 39.0 | 46.6 |

## Table 3b

Percentage of Significant Estimates (at the 5% Level) – Lott-Mustard Controls, 1977-2006 – **With Clustered Standard Errors**
Dataset: ADZ Updated 2013 County Data (without 1993 data)
Hybrid Model

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 8.8 | 13.2 |
| | Robbery | 7.8 | 8.5 |
| 2. Exact 32 States: | Murder | 10.9 | 11.4 |
| | Robbery | 8.1 | 9.8 |
| 3. Random 32 States: | Murder | 11.0 | 13.3 |
| | Robbery | 8.5 | 7.6 |
| 4. All 19 States | Murder | 13.9 | 12.9 |
| | Robbery | 12.7 | 13.8 |
| 5. Random 12 States: | Murder | 15.9 | 18.7 |
| | Robbery | 14.1 | 14.4 |

---

[21] Simulation based on NRC with-controls model, which, similar to above estimations, includes year fixed effects, county fixed effects, and weighting by county population. The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group. All ten tests use robust standard errors.

## VI. Debate over the Inclusion of Linear Trends

An important issue that the NRC did not address was whether there was any need to control for state-specific linear trends. Inclusion of state trends could be important if, for example, a clear pattern in crime rates existed before a state adopted an RTC law that continued into the post-passage period. On the other hand, there is also a potential danger in using state-specific trends if their inclusion inappropriately extrapolates a temporary swing in crime long into the future or otherwise mars the estimate of the dynamic effect of the policy shock (Wolfers 2006). Lott and Mustard (1997) never controlled for state-specific trends in analyzing handgun laws in their main analysis (only adding these trends for one robustness check mentioned in a footnote), while Moody and Marvel (2008) always controlled for these trends. Ayres and Donohue (2003a) presented evidence with and without such trends.

Table 4 replicates the NRC's full model (with the appropriate clustering adjustment) from Table 2b with one change: here we add a linear state trend to this county-data model. Strikingly, Table 4 suggests that RTC laws increase aggravated assault by roughly 3-4 percent each year, but no other statistically significant effect is observed. Thus, the addition of state trends eliminates the potentially problematic result of RTC laws increasing property crimes, which actually increases our confidence in these results. Certainly an increase in gun carrying and prevalence induced by a RTC law could well be thought to spur more aggravated assaults. Nonetheless, one must at least consider whether the solitary finding of statistical significance is merely the product of running seven different models, is a spurious effect flowing from a bad model, or reflects some other anomaly (such as changes in the police treatment of domestic violence cases, which could confound the aggravated assault results).[22]

---

[22] We tested this theory by creating a new right-hand side dummy variable that identified if a state passed legislation requiring law enforcement officials to submit official reports of all investigated domestic violence cases. Eight

### Table 4[23]

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2000 – Clustered Errors and State Trends
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.82 | -5.23 | 9.90 | 1.41 | 5.73 | -1.29 | 3.61 |
| | (6.44) | (11.23) | (6.20) | (7.52) | (8.22) | (5.98) | (5.56) |
| Spline Model: | -0.30 | -3.77 | 4.11** | 1.00 | 1.56 | 0.13 | 1.34 |
| | (1.54) | (4.79) | (1.79) | (2.50) | (1.97) | (1.96) | (2.05) |
| Hybrid Post-Passage Dummy: | -0.53 | -1.34 | 5.91 | 0.38 | 4.34 | -1.51 | 2.33 |
| | (6.06) | (7.60) | (6.07) | (7.49) | (7.88) | (5.94) | (5.41) |
| Trend Effect: | -0.27 | -3.70 | 3.79** | 0.98 | 1.32 | 0.21 | 1.22 |
| | (1.46) | (4.54) | (1.79) | (2.54) | (1.90) | (1.98) | (2.07) |

## VII. Extending the Data Through 2006

Thus far we have presented panel-data regression results for the period 1977-2000.  Since more data are now available, we can further test the strength of the MGLC premise over time by estimating the NRC Lott and Mustard covariates specification on data extended through 2006. Table 5a presents our estimates (with clustering), which can be compared with Table 2b (which also clusters the standard errors in the main NRC model, but is estimated on the shorter time period).  This comparison reveals that the additional six years of data do not substantially change the picture that emerged in Table 2b showing that  RTC laws *increase* aggravated assault, auto theft, burglary, and larceny (although the results showing an increase in aggravated assault are

---

states have passed this legislation of which we are aware: Florida (1984), Illinois (1986), Louisiana (1985), New Jersey (1991), North Dakota (1989), Oklahoma (1986), Tennessee (1995), and Washington (1979).  We included this dummy variable when running both the NRC specification (through 2000) and our preferred specification (through 2006) without state-specific trends, and found that this dummy indicator of domestic violence reporting statutes did not undermine our general finding that RTC laws *increase* aggravated assaults.

[23] Estimations include year and county fixed effects and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

stronger with the additional years of data for the dummy model).

Table 5b simply adds state trends to the Table 5a model, which can then be compared to Table 4 (clustering, state trends, and 1977-2000 county data).  Collectively, these results suggest that the added six years of data do not appreciably change the results from the shorter period. The inclusion of state trends on the longer data set suggests that RTC laws *increase* aggravated assault by roughly 8-9 percent.

# Table 5[24]

## Table 5a

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2006 – Clustered Standard Errors
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -3.03 | 15.45 | 15.30*** | 7.55 | 17.72** | 11.20** | 16.40*** |
| | (6.46) | (14.68) | (5.12) | (5.23) | (7.59) | (4.67) | (5.15) |
| Spline Model: | -0.20 | 0.98 | 1.05 | 0.43 | 1.01 | 0.36 | 1.05* |
| | (0.59) | (1.25) | (0.71) | (0.53) | (0.63) | (0.46) | (0.53) |
| Hybrid Post-Passage Dummy: | -2.61 | 13.65 | 13.06*** | 6.97 | 16.30** | 11.90** | 14.45*** |
| | (6.72) | (12.51) | (4.58) | (6.15) | (7.08) | (5.41) | (5.29) |
| Trend Effect: | -0.09 | 0.39 | 0.49 | 0.13 | 0.31 | -0.15 | 0.42 |
| | (0.60) | (0.96) | (0.71) | (0.61) | (0.51) | (0.52) | (0.55) |

## Table 5b

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2006 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.03 | -8.30 | 9.45** | 6.79 | 9.20 | 3.71 | 6.03 |
| | (5.61) | (10.75) | (4.33) | (6.19) | (6.16) | (4.93) | (5.14) |
| Spline Model: | -0.44 | -5.57 | 1.65 | -0.54 | -0.84 | -1.37 | -1.54 |
| | (0.99) | (4.49) | (1.48) | (1.83) | (1.81) | (1.54) | (1.66) |
| Hybrid Post-Passage Dummy: | 0.23 | -5.85 | 8.79** | 7.09 | 9.66* | 4.37 | 6.78 |
| | (5.68) | (9.28) | (4.18) | (6.11) | (5.76) | (4.71) | (4.78) |
| Trend Effect: | -0.45 | -5.46 | 1.48 | -0.68 | -1.03 | -1.45 | -1.67 |
| | (1.01) | (4.40) | (1.47) | (1.83) | (1.76) | (1.53) | (1.65) |

---

[24] Estimations include year and county fixed effects, and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, county population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

## VIII. Revising the Lott-Mustard Specification

We have already suggested that the Lott and Mustard specification that the NRC employed is not particularly appealing along a number of dimensions. The most obvious problem – omitted variable bias has already been alluded to: the Lott and Mustard (1997) model had no control for incarceration, which Wilson considered to be one of the most important influences on crime in the last 20 years. In addition to a number of important omitted variables, the Lott-Mustard model adopted by the NRC includes a number of questionable variables, such as the dubious ratio of arrests to murders, and the 36 (highly collinear) demographic controls.

To explore whether these specification problems are influencing the regression estimates, we revise the NRC models in a number of ways. First, we completely drop Lott and Mustard's flawed contemporaneous arrest rate variable and add in two preferable measures of state law enforcement/deterrence: the incarceration rate and the rate of police.[25] Second, we add two additional controls to capture economic conditions: the unemployment rate and the poverty rate, which are also state-level variables. Finally, mindful of Horowitz's admonition that the Lott-Mustard model might have *too many* variables (including demographic controls that are arguably irrelevant to the relationship between the guns and crime, and may have a spurious, misleading effect), we decided not to follow the NRC in using the 36 demographic controls employed by Lott-Mustard. Instead, we adhered to the more customary practice in the econometrics of crime and controlled only for the demographic groups considered to be most involved with criminality (as offenders and victims), namely the percentage of black and white males between ages 10 and

---

[25] We also estimated the model with the arrest rate (lagged by one year to avoid endogeneity concerns), and the results were qualitatively similar to Table 6a except that dummy variable estimates for Rape (10%), Assault (1%), Robbery (5%), Auto (5%), Burglary (1%), and Larceny (1%) are now all significant. For Table 6b, the dummy variable estimates for murder, burglary, and larceny shift from negative to positive (but still remain insignificant) and assault and auto theft become positive and significant at the 10% level.

40 in each county.[26]

The results with this new specification are presented in Tables 6a-6b (which correspond to Tables 5a-5b estimated using the Lott and Mustard specification).  Note that had the NRC panel used our preferred specification while maintaining its view that neither clustering nor controls for state trends are needed, we would have overwhelming evidence that RTC laws *increase* crime.[27]  We don't show these regression results since we are convinced that clustering is needed, although of course when we cluster in Table 6a, the point estimates remain the same (while significance is drastically reduced).  Table 6b shows that this model is sensitive to whether we control for state trends, since adding these trends reverses the sign of most of our estimates (while making all of them statistically insignificant).  Essentially, our preferred specification shows almost no statistically significant crime effects (with the large standard errors reflecting a considerable degree of uncertainty).

---

[26] To test the robustness of this specification to changes in the demographic controls, we also estimated the following variants from our 6 demographic controls: only black males between ages 10 and 40 (three variables); only black males between ages 10 and 30 (two variables); and black and white males between ages 10 and 30 (four variables).  The results were again qualitatively similar across our tests.

[27] Re-estimating Table 6a without clustering (no state trends) shows all dummy variable point estimates (except murder) positive and significant at the 1% level.  The murder dummy variable is positive, but not significant. For the spline model, all spline estimates (except murder) are positive and significant at the 1% level, whereas murder is positive and significant at the 5% level.

41

## Table 6[28]

### Table 6a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1977-2006 – Clustered Standard Errors
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 1.59 | 25.33 | 22.65 | 22.27 | 27.46 | 30.08 | 31.33 |
| | (7.63) | (18.81) | (19.54) | (14.82) | (21.81) | (23.09) | (26.54) |
| Spline Model: | 0.38 | 2.81 | 3.19 | 2.58* | 3.07 | 3.64 | 4.19 |
| | (0.82) | (1.76) | (1.95) | (1.53) | (2.25) | (2.38) | (2.72) |
| Hybrid Post-Passage Dummy: | -0.43 | 14.75 | 8.74 | 12.20 | 15.81 | 15.49 | 13.56 |
| | (7.75) | (15.38) | (17.15) | (12.83) | (17.82) | (19.46) | (21.54) |
| Trend Effect: | 0.40 | 2.11 | 2.77 | 2.01 | 2.32 | 2.91 | 3.55 |
| | (0.86) | (1.45) | (1.81) | (1.42) | (1.97) | (2.17) | (2.41) |

### Table 6b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1977-2006 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -2.66 | -15.99 | -2.36 | 2.73 | 1.26 | -6.39 | -7.06 |
| | (6.34) | (13.35) | (11.59) | (8.58) | (11.70) | (13.18) | (14.71) |
| Spline Model: | -0.43 | -7.93 | 0.58 | -0.60 | -0.71 | -2.23 | -2.68 |
| | (1.26) | (5.54) | (2.66) | (2.41) | (2.98) | (3.05) | (3.42) |
| Hybrid Post-Passage Dummy: | -2.50 | -12.80 | -2.62 | 3.00 | 1.56 | -5.50 | -6.00 |
| | (6.56) | (12.20) | (12.09) | (8.95) | (12.14) | (13.73) | (15.24) |
| Trend Effect: | -0.38 | -7.69 | 0.63 | -0.66 | -0.74 | -2.13 | -2.57 |
| | (1.31) | (5.50) | (2.75) | (2.48) | (3.08) | (3.17) | (3.55) |

---

[28] Estimations include year and county fixed effects and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

### IX. State versus County Crime Data

In their initial study, Lott and Mustard (1997) tested the "More Guns, Less Crime" hypothesis by relying primarily on county-level data from the FBI's *Uniform Crime Reports* (UCR).[29]  These FBI reports present yearly estimates of crime based on monthly crime data from local and state law enforcement agencies across the country.  The NRC report followed Lott and Mustard in this choice and presented regression estimates using only county data.  Unfortunately, according to criminal justice researcher Michael Maltz, the FBI's county-level data is highly problematic.

The major problem with county data stems from the fact that law enforcement agencies voluntarily submit crime data to the FBI.  As a result, the FBI has little control over the accuracy, consistency, timeliness, and completeness of the data it uses to compile the UCR reports.  In a study published in the *Journal of Quantitative Criminology,* Maltz and Targonski (2002) carefully analyzed the shortcomings in the UCR data set and concluded that UCR county-level data is unacceptable for evaluating the impact of RTC laws.   For example, in Connecticut, Indiana, and Mississippi, over 50% of the county-level data points are missing crime data for more than 30% of their populations (Maltz and Targonski 2002).  In another thirteen states, more than 20% of the data points have gaps of similar magnitude.  Based on their analysis, Maltz and Targonski (2002) concluded that:

> "County-level crime data cannot be used with any degree of confidence…The crime rates of a great many counties have been underestimated, due to the exclusion of large fractions of their populations from contributing to the crime counts. Moreover, counties in those states with the most coverage gaps have laws permitting the carrying of concealed weapons. How these shortcomings can be compensated for is still an open question…it is clear, however, that in their current condition, county-level UCR crime statistics cannot be used for evaluating the effects of changes in policy" (pp. 316-317).

---

[29] Lott and Mustard present results based on state-level data, but they strongly endorse their county-level over their state-level analysis: "the very different results between state- and county-level data should make us very cautious in aggregating crime data and would imply that the data should remain as disaggregated as possible" (Lott and Mustard, 1997, p. 39).

Because of the concerns raised about county-level crime data, it is prudent to test our models on state-level data. According to Maltz and Targonski (2003), state-level crime data are less problematic than county-level data because the FBI's state-level crime files take into account missing data by imputing all missing agency data. County-level files provided by NACJD, however, impute missing data only if an agency provides at least six months of data; otherwise, the agency is dropped completely (Maltz 2006). As with our estimations using county-level data, we compiled our state-level data from scratch, and will refer to it as "Updated 2013 State-level Data."[30]

### A. State Data Results Using the Lott-Mustard Specification

Unsurprisingly, the regression results reproduced using state-level data are again different from the NRC committee's estimates using county-level data. This is shown in Table 7a, which presents the results from the NRC's specification (the Lott-Mustard model) on state data through 2010, with the cluster adjustment.[31] Table 7b simply adds state trends. When we compare these state-level estimates to the county-level estimates (using the Updated 2013 County-Level Data Set), we see that there are marked differences. Considering the preceding discussion on the reliability—or lack thereof—of county data, this result may be unsurprising.[32] Looking across

---

[30] State poverty data for years 1977 and 1978 are unavailable from the census. Thus all regressions run on our state dataset are effectively using data from 1979 onwards. State poverty figures from 1980 onwards come from the Census Bureau's Historical Poverty Table 21 found at (http://www.census.gov/hhes/www/poverty/data/historical/people.html). The data for 1979 comes from the Census Statistical Abstract for 1982.

[31] Our placebo test on county data showed that standard errors needed to be adjusted by clustering. In Appendix A, we again find that clustering is needed for state data. Thus, all our state-level estimates include clustering.

[32] We also estimated the model on data through 2000 (the last year in the NRC report). Though those results are not shown here, our point estimates for this model are qualitatively similar to those shown in Tables 7a. Interestingly, the patterns of statistical significance are extremely different. For example, when Table 7a is estimated through the year 2000, there is a statistically significant decline in aggravated assault in the hybrid model with no other impact on violent crime. When estimated to the year 2010, Table 7a shows no statistically significant decline in aggravated assault and evidence of declines in rape and robbery. Moreover, while Table 7b shows some hints of crime declines for rape and aggravated assault when estimated through 2000, when the data is extended for another

the models with and without state linear trends, there is evidence of increases in aggravated assault and murder and decreases in robbery, burglary, auto theft, and rape after the passage of RTC laws.

As Ayres and Donohue (2003; 1231) noted, the most important driver of the ostensible decline in crime from RTC laws comes from the Lott and Mustard use of 36 highly collinear demographic variables. The Ayres and Donohue finding that "The results are incredibly sensitive to the inclusion of various seemingly unimportant demographic controls" still applies even after augmenting the data set with 10 more years of data. To demonstrate the strong influence of these variables, we rerun the regression shown in Table 7a after substituting a more defensible set of 6 controls for black and white men in the higher crime ages (the ADZ demographic variables) for the full set of 36 controls used in the Lott-Mustard specification. Examining the results of this process (shown in Table 7c) reveals that 27 out of the 28 resulting estimates of the effect of RTC laws on crime are positive, with at least some evidence of statistical significant crime increases for 5 of the 7 crime categories. The story is somewhat muddier when state trends are added (Table 7d), but the strongest effect in this modified version of the Lott and Mustard specification on more complete data suggests substantial and statistically significant increases in aggravated assaults.

---

decade, the table shows only statistically significant evidence of *increases* in aggravated assault. We also estimate the NRC's no-controls model through 2010 on the state-level data. See Appendix B for these results.

## Table 7[33]

### Table 7a

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -2.96 | -5.07** | -0.69 | -7.53** | 1.78 | -3.35* | 2.24 |
| | (3.60) | (2.23) | (4.56) | (2.92) | (4.03) | (1.92) | (1.76) |
| Spline Model: | 0.49 | -0.23 | 0.64 | 0.03 | -0.54 | -0.26 | 0.39 |
| | (0.36) | (0.38) | (0.62) | (0.45) | (0.32) | (0.35) | (0.25) |
| Hybrid Post-Passage Dummy: | -4.91 | -4.70* | -2.94 | -8.28*** | 3.75 | -2.75 | 1.10 |
| | (3.59) | (2.68) | (3.76) | (3.01) | (4.48) | (1.90) | (1.59) |
| Trend Effect: | 0.62* | -0.12 | 0.71 | 0.24 | -0.63* | -0.19 | 0.37 |
| | (0.34) | (0.42) | (0.60) | (0.43) | (0.35) | (0.35) | (0.25) |

### Table 7b

Estimated Impact of RTC Laws – Lott-Mustard Controls, 1977-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.87 | -3.54 | -2.93 | -3.91 | 2.20 | -2.28 | 0.45 |
| | (3.48) | (2.43) | (3.07) | (2.76) | (3.10) | (1.51) | (1.36) |
| Spline Model: | 0.70 | 0.03 | 1.70*** | 0.23 | -1.62** | 0.20 | 0.18 |
| | (0.75) | (0.60) | (0.56) | (0.86) | (0.74) | (0.55) | (0.44) |
| Hybrid Post-Passage Dummy: | -1.50 | -3.68 | -4.49 | -4.23 | 3.68 | -2.53 | 0.31 |
| | (3.39) | (2.59) | (3.02) | (2.74) | (3.20) | (1.68) | (1.46) |
| Trend Effect: | 0.76 | 0.17 | 1.87*** | 0.39 | -1.75** | 0.29 | 0.16 |
| | (0.73) | (0.63) | (0.56) | (0.85) | (0.79) | (0.57) | (0.45) |

---

[33] Estimations include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

# Table 7 (Continued)[34]

## Table 7c

Estimated Impact of RTC Laws – Lott-Mustard Controls (with ADZ Demographic Variables), 1977-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 2.20 | 9.67* | 7.86 | 12.04 | 17.15 | 11.21* | 10.40** |
| | (6.84) | (5.37) | (5.42) | (8.97) | (10.70) | (6.22) | (4.55) |
| Spline Model: | 0.62 | 0.86 | 1.18* | 1.59* | 1.39 | 0.95 | 1.05** |
| | (0.64) | (0.59) | (0.67) | (0.80) | (0.93) | (0.61) | (0.43) |
| Hybrid Post-Passage Dummy: | -1.21 | 6.54 | 2.22 | 4.82 | 12.55 | 7.96 | 6.31* |
| | (5.78) | (4.76) | (4.62) | (6.86) | (8.30) | (4.81) | (3.75) |
| Trend Effect: | 0.66 | 0.61 | 1.09 | 1.40** | 0.90 | 0.64 | 0.80** |
| | (0.59) | (0.56) | (0.68) | (0.69) | (0.70) | (0.51) | (0.39) |

## Table 7d

Estimated Impact of RTC Laws – Lott-Mustard Controls (with ADZ Demographic Variables), 1977-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.77 | -4.65* | -3.33 | -2.01 | 3.10 | -0.63 | 0.24 |
| | (3.91) | (2.41) | (3.55) | (3.16) | (4.72) | (1.90) | (1.87) |
| Spline Model: | 0.46 | 0.15 | 1.82** | -0.26 | -1.49* | 0.02 | -0.39 |
| | (0.72) | (0.59) | (0.68) | (0.95) | (0.78) | (0.59) | (0.55) |
| Hybrid Post-Passage Dummy: | 0.43 | -4.88* | -4.83 | -1.86 | 4.31 | -0.66 | 0.54 |
| | (3.95) | (2.50) | (3.38) | (3.29) | (4.63) | (2.15) | (2.05) |
| Trend Effect: | 0.45 | 0.31 | 1.97*** | -0.20 | -1.63** | 0.04 | -0.41 |
| | (0.72) | (0.60) | (0.67) | (0.98) | (0.79) | (0.63) | (0.58) |

---

[34] Estimations include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and the six demographic composition measures used in the ADZ model. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

47

### B. State Data Results Using the ADZ Preferred Specification

Table 8 mimics Table 7 in that we again employ state data through 2010 but now we use our preferred set of controls.  Here the ostensible evidence that RTC laws increase crime is very strong:  all three models in Table 8a have positive coefficients for every crime category, and 12 of the 28 coefficients are statistically significant.  Table 8b once again shows highly significant evidence (in the spline model and in the trend effect of the hybrid model) that RTC laws increase aggravated assault.  Some significant but conflicting predictions for auto theft emerge with both dummy effects positive and significant, while both trend effects are negative and significant. None of the remaining coefficients are statistically significant.[35]

While there are a number of differences in the modified Lott-Mustard specification versus the ADZ specification, the most important difference in generating the different estimates of the impact of RTC laws is the Lott-Mustard use of 36 demographic variables.  We illustrate this in Table 8c, by substituting Lott's chosen thirty-six demographic variables in place of our own.  Under this specification, RTC laws are no longer associated with any statistically significant increases in crime and rape, robbery, and auto theft appear to decline.  Adding state trends in Table 8d brings back a result similar to that in Table 7d:  aggravated assault rises sharply and auto theft seems to fall with the adoption of RTC laws.

---

[35] As a robustness check for the Tables 8a and 8b results, we explored the effect of dropping the states with the highest residual variances from the aggravated assault regressions in these two tables.  Appendix C shows the results of this exercise.  Essentially, the basic patterns of Tables 8a and 8b persist, but evidence of RTC laws increasing aggravated assault is strengthened when the high variance states are dropped from Table 8a and somewhat weakened when dropped from Table 8b.

## Table 8[36]

### Table 8a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.31 | 11.53** | 8.03* | 13.85* | 17.83* | 12.54* | 10.80** |
| | (6.51) | (5.73) | (4.46) | (8.03) | (8.95) | (6.28) | (4.70) |
| Spline Model: | 0.58 | 0.82 | 1.05* | 1.27 | 1.20 | 0.81 | 0.85* |
| | (0.64) | (0.63) | (0.60) | (0.82) | (0.80) | (0.63) | (0.49) |
| Hybrid Post-Passage Dummy: | 0.82 | 9.23* | 3.91 | 9.58 | 14.59* | 10.46* | 8.18** |
| | (5.35) | (4.79) | (4.01) | (6.86) | (7.47) | (5.21) | (4.00) |
| Trend Effect: | 0.56 | 0.51 | 0.92 | 0.95 | 0.72 | 0.46 | 0.58 |
| | (0.58) | (0.58) | (0.62) | (0.77) | (0.66) | (0.55) | (0.46) |

### Table 8b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.74 | -3.16 | -1.80 | 1.66 | 8.72* | 0.87 | 1.03 |
| | (3.94) | (2.30) | (3.61) | (3.16) | (4.50) | (2.19) | (1.83) |
| Spline Model: | 0.77 | -0.25 | 1.88** | -0.23 | -1.32* | -0.08 | -0.59 |
| | (0.74) | (0.65) | (0.80) | (0.79) | (0.76) | (0.64) | (0.52) |
| Hybrid Post-Passage Dummy: | -1.33 | -3.05 | -3.23 | 1.87 | 9.90** | 0.95 | 1.49 |
| | (3.86) | (2.34) | (3.51) | (3.33) | (4.42) | (2.31) | (1.98) |
| Trend Effect: | 0.81 | -0.16 | 1.99** | -0.29 | -1.64** | -0.11 | -0.64 |
| | (0.72) | (0.65) | (0.79) | (0.83) | (0.73) | (0.66) | (0.55) |

---

[36] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

49

# Table 8 (Continued)

## Table 8c[37]

Estimated Impact of RTC Laws – ADZ Preferred Controls (with Lott-Mustard demographic variables), 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| _All figures reported in %_ | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.55 | -5.46** | 0.48 | -6.62** | 3.87 | -3.29 | 0.98 |
| | (3.46) | (2.50) | (4.23) | (3.23) | (3.14) | (2.16) | (1.95) |
| Spline Model: | 0.21 | -0.30 | 0.64 | -0.26 | -0.75* | -0.38 | 0.13 |
| | (0.35) | (0.35) | (0.58) | (0.46) | (0.38) | (0.33) | (0.27) |
| Hybrid Post-Passage Dummy: | -5.51 | -4.91* | -1.47 | -6.27** | 6.43* | -2.34 | 0.66 |
| | (3.46) | (2.73) | (3.59) | (3.49) | (3.45) | (2.22) | (2.01) |
| Trend Effect: | 0.33 | -0.19 | 0.68 | -0.12 | -0.89** | -0.33 | 0.11 |
| | (0.35) | (0.37) | (0.56) | (0.46) | (0.37) | (0.33) | (0.28) |

## Table 8d

Estimated Impact of RTC Laws – ADZ Preferred Controls (with Lott-Mustard demographic variables), 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| _All figures reported in %_ | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.32 | -2.36 | -2.50 | -0.21 | 5.29** | -0.74 | 1.12 |
| | (3.27) | (2.54) | (3.08) | (2.60) | (2.30) | (1.61) | (1.19) |
| Spline Model: | 0.96 | 0.05 | 1.92*** | 0.49 | -1.36* | 0.38 | 0.09 |
| | (0.73) | (0.60) | (0.69) | (0.88) | (0.75) | (0.56) | (0.46) |
| Hybrid Post-Passage Dummy: | -1.17 | -2.49 | -4.26 | -0.64 | 6.65*** | -1.10 | 1.08 |
| | (3.10) | (2.65) | (3.00) | (2.59) | (2.32) | (1.68) | (1.30) |
| Trend Effect: | 1.01 | 0.14 | 2.09*** | 0.51 | -1.62** | 0.43 | 0.05 |
| | (0.69) | (0.62) | (0.69) | (0.89) | (0.76) | (0.58) | (0.48) |

---

[37] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and thirty-six demographic composition measures.
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

Given the strong influence that demographic variables have on the estimated effect of RTC laws on crime, it is important to reflect on why we prefer our demographic variables to the specification used in the Lott-Mustard model. The first thing to note about the Lott-Mustard specification is that it is entirely idiosyncratic: no other major study in the entire empirical literature on crime has used the sheer number of demographic controls found in the Lott-Mustard model. In fact, many published papers use fewer demographic controls than the six that we include in our own preferred model. Table 9 modifies our specification by reducing our six demographic controls to only three that represent the size of the younger black male population (in the three age groups of 10-19, 20-29 and 30-39). The effect of this change can be seen by comparing Table 9a to 8a (no state trends) and Table 9b to 8b (with state trends). Beginning with the first comparison, we see that using even fewer demographic controls only strengthens our finding that RTC laws are generally associated with higher, not lower, crime rates. Table 9a suggests that RTC laws caused every crime category apart from murder to rise by 9.5 percent or more. The comparison of Tables 9b and 8b (with state trends) shows that changing the demographic variables has a small influence on the results when controls are included for state trends. Nevertheless, reducing the number of demographic variables in Table 9b does not change our finding that there is no evidence that RTC laws decrease violent crime.[38]

---

[38] A fairly standard set of demographics that can be seen in the crime literature includes controls for a few age categories across all races combined with a single identifier of the percentage of blacks in the state. Table D1 and D2 in Appendix D provide this tweak to the ADZ model by putting in four such demographic variables – the percent of the population falling into the three age categories of 10-19, 20-29, and 30-39 plus the percent black -- in place of the ADZ six demographic variables. The results for violent crime are not dramatically different from the main ADZ models of Tables 8a and 8b. Table D1's and Table 8a's estimated violent crime increases for rape, aggravated assault, and robbery are substantial in both sets of dummy variable estimates and significant at the .10 level or better, but only Table 8a has one of these estimates rise to the level of significance at the .05 level (for rape).

# Table 9[39]

## Table 9a

Estimated Impact of RTC Laws – ADZ Preferred Controls (with 3 demographic variables), 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| All figures reported in % | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.01 | 10.77** | 9.69** | 14.66** | 19.65** | 13.26** | 11.24** |
|  | (5.71) | (5.36) | (3.84) | (7.29) | (7.76) | (5.51) | (4.25) |
| Spline Model: | 0.50 | 0.87 | 1.04* | 1.26 | 1.08 | 0.89 | 0.88* |
|  | (0.60) | (0.59) | (0.54) | (0.75) | (0.72) | (0.56) | (0.45) |
| Hybrid Post-Passage Dummy: | 0.84 | 8.00* | 5.79 | 10.49 | 17.37** | 10.87** | 8.51** |
|  | (4.71) | (4.43) | (3.78) | (6.71) | (6.82) | (4.85) | (3.82) |
| Trend Effect: | 0.47 | 0.60 | 0.84 | 0.90 | 0.49 | 0.52 | 0.59 |
|  | (0.56) | (0.55) | (0.57) | (0.74) | (0.65) | (0.52) | (0.44) |

## Table 9b

Estimated Impact of RTC Laws – ADZ Preferred Controls (with 3 demographic variables), 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| All figures reported in % | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.23 | -3.46 | 1.01 | 4.24 | 11.14** | 1.93 | 1.67 |
|  | (3.81) | (2.76) | (3.33) | (3.19) | (4.41) | (2.21) | (1.79) |
| Spline Model: | 0.48 | -0.16 | 1.52* | -0.31 | -0.77 | -0.20 | -0.95* |
|  | (0.67) | (0.58) | (0.79) | (0.74) | (0.74) | (0.64) | (0.48) |
| Hybrid Post-Passage Dummy: | -0.06 | -3.41 | 0.08 | 4.50 | 11.78** | 2.08 | 2.28 |
|  | (3.74) | (2.80) | (3.18) | (3.34) | (4.44) | (2.30) | (1.97) |
| Trend Effect: | 0.48 | -0.08 | 1.52* | -0.41 | -1.04 | -0.25 | -1.00* |
|  | (0.65) | (0.59) | (0.79) | (0.76) | (0.73) | (0.65) | (0.50) |

---

[39] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and three demographic composition measures.
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

### C. *The 36 Demographic Controls Should Not be Used in Crime Regressions*

In his book *More Guns, Less Crime*, Lott concedes that he "overcontrolled" for demographic composition out of an abundance of caution, in order to avoid potentially problematic omitted variable bias.  However, it is well known that introducing a large number of highly collinear variables into a regression model can lead to highly unstable results.[40]  To test for the degree of collinearity among the independent variables when the Lott-Mustard demographic variables are used in Table 8c, we run auxiliary regressions of one independent variable on the remaining explanatory variables and analyze the resulting variance inflation factor (VIF).[41]  Table 10 shows that the RTC variable has an uncomfortably high VIF greater than 5 in both the dummy and spline models when the 36 demographic controls are used.  Using the 6 ADZ variables (or the more limited set of 3 demographics) reduces the multicollinearity for the RTC dummy to a tolerable level (with VIFs always below 5).  Nonetheless, the degree of multicollinearity for the individual demographics (showing three different black-male categories) can be seen to be astonishingly high with 36 demographic controls and still high with even more limited demographic controls.  This analysis makes us highly skeptical of any estimates of the impact of RTC laws that employ the Lott-Mustard set of 36 demographic controls.

---

[40] For a longer discussion of the consequences that multicollinearity can have on a regression model, see Studenmund (1997).

[41] The VIF is an estimate of the extent to which multicollinearity has increased the variance of the estimated coefficient. A VIF of five or more, calculated as the inverse of the difference between 1 and the coefficient of determination ($R^2$) from the auxiliary regression, is evidence of severe multicollinearity.

53

| Table 10[42] | | RTC | Black Male: 10-19 | Black Male: 20-20 | Black Male: 30-39 |
|---|---|---|---|---|---|
| *VIF Calculations* | | | | | |
| 36 Demographic Controls: | Dummy Variable Model: | 5.9 | 13888.9 | 1733.1 | 1788.9 |
| | Spline Mode: | 7.0 | 13888.9 | 1733.1 | 1785.7 |
| 6 Demographic Controls: | Dummy Variable Model: | 4.1 | 158.8 | 91.4 | 74.1 |
| | Spline Model: | 4.8 | 158.4 | 90.8 | 75.6 |
| 3 Demographic Controls: | Dummy Variable Model: | 3.8 | 136.5 | 82.1 | 67.7 |
| | Spline Model: | 4.4 | 136.8 | 82.6 | 68.8 |

### D. Addressing the Problem of Endogenous Adoption of RTC Laws

The problem of endogenous adoption of RTC laws during a period of rising crime that is unique to a state is obviously a concern, since this would likely bias the estimated effect of the law in a way that would make the law appear more favorable in reducing crime (as crime ultimately returned to prior mean levels). One way to address this concern is to restrict the analysis to a period such as 1999-2010, which is a far more stable period of crime in the US. The 1999-2010 period does not include the immense increases and then declines associated with the rise and fall of the crack epidemic, which threatened a key assumption of the panel data model of crime (since these dramatic crime shifts were not uniform across states and thus could not be expected to be adequately captured by year fixed effects). Table 11a restricts the analysis of the basic ADZ model to this date range, with the hope that this estimation on a more limited sample involving only 8 states that adopted RTC laws during that time frame will eliminate enough endogeneity bias to offset the cost of having a smaller sample size. This approach generates evidence that RTC laws increased the rate of murder but had no other statistically

---

[42] These regressions include year and state fixed effects, and are weighted by state population. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, and per capita income measures. The number of demographic variables (excluding the explanatory variable for which the VIF is calculated) varies by row in the table. The VIF is calculated as $1/(1-R^2)$.

54

significant impact on crime for the 8 changing states.  Table 11b shows that if state trends need to be controlled for, the results become more varied, with some crime declines (in rape and larceny and possibly auto theft) and a possible crime increase in aggravated assault.

---

## Table 11[43]

### Table 11a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1999-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 7.40 | 3.00 | 4.76 | -3.55 | -0.21 | 1.79 | -3.18 |
| | (5.84) | (3.50) | (3.73) | (5.23) | (4.07) | (3.40) | (2.64) |
| Spline Model: | 1.47** | 0.34 | 1.10 | 0.12 | -0.61 | 0.59 | 0.15 |
| | (0.55) | (0.42) | (0.67) | (0.43) | (0.73) | (0.38) | (0.33) |
| Hybrid Post-Passage Dummy: | 6.73 | 2.85 | 4.26 | -3.62 | 0.08 | 1.52 | -3.27 |
| | (6.06) | (3.51) | (3.82) | (5.31) | (4.05) | (3.52) | (2.66) |
| Trend Effect: | 1.42*** | 0.32 | 1.07 | 0.14 | -0.61 | 0.58 | 0.18 |
| | (0.53) | (0.42) | (0.67) | (0.44) | (0.73) | (0.39) | (0.33) |

### Table 11b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1999-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 5.70 | 4.66 | 6.00* | 1.04 | 1.66 | 1.91 | -0.38 |
| | (5.30) | (3.57) | (3.24) | (6.66) | (5.48) | (4.11) | (2.43) |
| Spline Model: | 1.03 | -2.94** | -1.70 | -1.41 | -5.36* | -0.92 | -1.72** |
| | (3.24) | (1.22) | (1.40) | (1.93) | (2.79) | (1.41) | (0.85) |
| Hybrid Post-Passage Dummy: | 5.79 | 4.44 | 5.87* | 0.93 | 1.24 | 1.84 | -0.52 |
| | (5.32) | (3.53) | (3.21) | (6.75) | (5.26) | (4.07) | (2.34) |
| Trend Effect: | 1.10 | -2.89** | -1.64 | -1.40 | -5.35* | -0.90 | -1.72** |
| | (3.23) | (1.22) | (1.35) | (1.91) | (2.76) | (1.37) | (0.85) |

55

## X. Additional Concerns in the Evaluation of Legislation Using Observational Data

We now turn to three critical issues that must be considered when using panel data to evaluate the impact of legislation and public policy (and gun laws in particular). First, we discuss the possibility of difficult-to-measure omitted variables and how such variables can shape estimates of policy impact. We are particularly concerned with how the crack epidemic of the 1980s and 1990s may bias results in the direction of finding a beneficial effect. Second, we explore pre-adoption crime trends in an attempt to examine the potentially endogenous adoption of right-to-carry legislation. Finally, given that the intent of right-to-carry legislation is to increase gun-carrying in law-adopting states, we explore whether these laws may have had a particular effect on gun-related assaults (which is the one crime category that has generated somewhat consistent results thus far).

### A. Further Thoughts on Omitted Variable Bias

As discussed above, we believe it is likely that the NRC's estimates of the effects of RTC legislation are marred by omitted variable bias. In our attempt to improve (at least to a degree) on the original Lott-Mustard model, we included additional explanatory factors, such as the incarceration and police rates, and removed extraneous variables (such as unnecessary and collinear demographic measures). We recognize, however, that there are additional criminogenic influences for which we cannot fully control. In particular, we suspect that a major shortcoming of all of the models presented is the inability to account for the possible influence of the crack-

---

[43] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures. The states that adopted shall issue laws during the time period are Colorado (2003), Kansas (2007), Michigan (2001), Minnesota (2003), Missouri (2004), Nebraska (2007), New Mexico (2004), and Ohio (2004).
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

cocaine epidemic on crime.[44]

Many scholars now suggest that rapid growth in the market for crack cocaine in the late 1980s and the early 1990s was likely one of the major influences on increasing crime rates (and violent crimes in particular) during this period (Levitt 2004). Moreover, the harmful criminogenic effect of crack was likely more acute in urban areas of states slow to adopt RTC laws. Meanwhile, many rural states adopted such laws during this era. If this was indeed the case, this divergence between states could account for much of the purported "crime-reducing" effects attributed by Lott and Mustard to gun laws (which were then supported by scholars such as James Q. Wilson). The regression analysis would then identify a relationship between rising crime and the failure to adopt RTC legislation, when the actual reason for this trend was the influence of crack (rather than the passage of the RTC law).

We now explore how results from our main models vary when we restrict the analysis to the time periods before and after the peak of the American crack epidemic. According to Fryer et al. (2005), the crack problem throughout most of the country peaked at some point in the early 1990s. Coincidentally, the original Lott-Mustard period of analysis (1977-1992) contains years that likely represent the height of crack-induced crime problem. With this in mind, we run our main regressions after breaking up our dataset into two periods: the original Lott-Mustard period

---

[44] Although Lott and Mustard (1997) do attempt to control for the potential influence of crack cocaine through the use of cocaine price data based on the U.S. Drug Enforcement Agency's STRIDE program, we find their approach wanting for both theoretical and empirical reasons. First, a control for crack should capture the criminogenic influence of the crack trade on crime. We know that prior to 1985, there was no such influence in any state and that after some point in the early to mid-1990s this criminogenic influence declined strongly. Since there is little reason to believe that cocaine prices would be informative on the criminogenic influence of crack in particular geographic areas, it is hard to see how the cocaine price data could be a useful control. Second, the data that Lott and Mustard use is itself questionable. Horowitz (2001) argues forcefully that STRIDE data is not a reliable source of data for policy analyses of cocaine. The data are mainly records of acquisitions made to support criminal investigations in particular cities, and are not a random sample of an identifiable population. Moreover, since the STRIDE data is at the city-level, we are not sure how this would be used in a county-level analysis. The data was collected for 21 cities, while there are over 3,000 counties in the U.S. In addition, the data is missing for 1988 and 1989, which are crucial years in the rise of the crack epidemic in poor urban areas. Lott and Mustard drop those years of analysis when including cocaine prices as a control.

of analysis (1979-1992) as well as the post-Lott-Mustard period (1993-2010).  We first present the results for the era that includes the crack epidemic (1979-1992) [45] on our preferred model. We run these regressions (with clustered standard errors) on state-level data, with and without state trends.  These results are presented in Tables 12a and 12b.  We then estimate the same models on the post-crack period (see Tables 13a and 13b).

Note that, with a simple naive reading, the regression results in Table 12 from the initial 14-year time period (1979-1992) do suggest that violent crime rates are dampened by RTC laws if state trends are not needed and that murder, rape, and robbery may have declined if state trends are needed.  If we look at the following 18 year period from 1993 – 2010 in Table 13, however, there is no longer any evidence of a statistically significant decline in violent crimes.  Instead, RTC laws are associated with higher rates of murder, aggravated assault, robbery, and burglary. This evidence supports the theory that the initial Lott and Mustard finding was likely the result of the crime-raising impact of crack in non-RTC states.

---

[45] As mentioned in footnote 29, poverty data is not available before 1979. Thus, although the Lott-Mustard period originally was 1977-1992, for our preferred specification the analysis covers 1979-1992.

# Table 12[46]

## Table 12a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-1992 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.88 | -7.28** | -9.71** | -5.46 | 7.95* | -3.12 | -0.20 |
| | (4.28) | (3.40) | (4.48) | (4.02) | (4.38) | (2.70) | (1.51) |
| Spline Model: | -1.48 | -0.93 | -0.30 | -2.49*** | 0.27 | -0.42 | 0.04 |
| | (1.18) | (0.63) | (1.53) | (0.60) | (0.83) | (0.75) | (0.30) |
| Hybrid Post-Passage Dummy: | -1.02 | -7.20* | -13.75** | 2.58 | 11.14** | -2.97 | -0.49 |
| | (5.02) | (3.67) | (5.64) | (5.06) | (5.13) | (3.56) | (1.69) |
| Trend Effect: | -1.35 | -0.03 | 1.42 | -2.81*** | -1.12 | -0.05 | 0.10 |
| | (1.40) | (0.77) | (1.19) | (0.86) | (0.81) | (0.84) | (0.31) |

## Table 12b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-1992 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -4.83 | -6.19** | -2.93 | -2.80 | 1.37 | -1.86 | 2.75 |
| | (4.27) | (2.81) | (2.75) | (5.25) | (4.54) | (3.07) | (2.32) |
| Spline Model: | -5.56** | -0.39 | -0.72 | -4.03* | -1.17 | -1.96 | 0.86 |
| | (2.34) | (1.22) | (1.07) | (2.21) | (1.79) | (1.19) | (1.07) |
| Hybrid Post-Passage Dummy: | 5.65 | -7.95*** | -2.56 | 5.11 | 4.58 | 1.76 | 1.98 |
| | (6.22) | (2.83) | (3.61) | (6.88) | (4.20) | (3.99) | (2.54) |
| Trend Effect: | -6.62** | 1.11 | -0.23 | -5.00* | -2.03 | -2.29 | 0.49 |
| | (2.95) | (1.15) | (1.34) | (2.76) | (1.87) | (1.44) | (1.23) |

---

[46] Estimations include year and state fixed effects and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.  * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

# Table 13[47]

## Table 13a

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1993-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 4.77 | -1.53 | 2.03 | 2.91 | 5.18 | 6.29** | 2.26 |
| | (4.68) | (3.45) | (4.49) | (4.57) | (4.32) | (3.09) | (2.77) |
| Spline Model: | 1.25** | 0.28 | 1.37** | 1.28** | 0.61 | 0.68 | 0.16 |
| | (0.51) | (0.55) | (0.60) | (0.62) | (0.87) | (0.57) | (0.43) |
| Hybrid Post-Passage Dummy: | 4.15 | -1.68 | 1.34 | 2.27 | 4.89 | 5.96* | 2.19 |
| | (4.94) | (3.55) | (4.58) | (4.74) | (4.11) | (3.23) | (2.77) |
| Trend Effect: | 1.22** | 0.29 | 1.36** | 1.26** | 0.58 | 0.65 | 0.15 |
| | (0.52) | (0.54) | (0.61) | (0.63) | (0.86) | (0.57) | (0.43) |

## Table 13b

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1993-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 6.30* | 0.94 | 1.85 | 4.38 | 4.22 | 1.12 | -0.94 |
| | (3.38) | (3.29) | (3.27) | (3.26) | (4.25) | (2.54) | (2.30) |
| Spline Model: | -0.26 | 0.43 | 1.66 | -0.21 | -3.87** | -1.14 | -1.61** |
| | (1.40) | (0.87) | (1.24) | (0.93) | (1.50) | (0.73) | (0.65) |
| Hybrid Post-Passage Dummy: | 6.62* | 0.74 | 1.03 | 4.61 | 6.38 | 1.76 | -0.12 |
| | (3.46) | (3.23) | (3.01) | (3.54) | (4.07) | (2.47) | (2.13) |
| Trend Effect: | -0.62 | 0.39 | 1.61 | -0.46 | -4.22** | -1.23 | -1.60** |
| | (1.32) | (0.86) | (1.24) | (1.03) | (1.61) | (0.77) | (0.70) |

---

[47] Estimations include year and state fixed effects and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

Figure 8 depicts a measure of crack prevalence for the period 1980-2000 in the five states with the greatest crack problem, as well as the five states with the least crack, according to Fryer et al. (2005). Figure 9 shows the murder rates over time for these two sets of states. We see that crime rose in the high crack states when the crack index rises in the mid-to-late 1980s, but that the crack index does not turn down in those states at the time crime started to fall. Apparently, the rise of the crack market triggered a great deal of violence, but once the market stabilized, the same level of crack consumption could be maintained while the violence ebbed.

Of course, omitting an appropriate control for the criminogenic influence of crack is problematic if the high-crack states tend not to adopt RTC laws and the low-crack states tend to adopt. This is in fact the case: all of the five "high-crack" states are non-RTC states during the time period of Figure 9, whereas four of the five "low-crack" states are RTC states (all four adopted an RTC law by 1994).[48] The only exception is Nebraska, a state that did not adopt an RTC law until 2007.[49]

---

[48] New Mexico, one of the five highest crack states, became an RTC state in 2004. Wyoming and Montana adopted RTC laws in 1994 and 1991, respectively. North Dakota and South Dakota both adopted their laws by 1985.
[49] Out of the ten states with the lowest crack cocaine index, seven adopted an RTC law by 1994. The exceptions are Nebraska (2007), Minnesota (2003), and Iowa (2011).

**Figure 8: Prevalence of Crack in the 5 Most and 5 Least Crack-affected States**



Source:  Authors' calculations based on the crack index of Fryer et al (2005).

**Figure 9: Murder Rates in the 5 Most and 5 Least Crack-affected States**

Source:  FBI UCR Data.

Moreover, as Table 14 reveals, the 13 states that adopted RTC laws during the initial

Lott-Mustard period (1977-1992) had crack levels substantially below the level of the five high-crack states shown in Figures 8 and 9.  Of the RTC adopters shown in Table 14, the largest has an average crack index of 1.46 (Georgia), while the high-crack states had an average population weighted crack level of 1.76.

### Table 14: Population-weighted Statistics of RTC-Adopting States between 1977 and 1992[50]

| State | Year of RTC Law Adoption | Murder Rate | Crack Index |
|---|---|---|---|
| Indiana | 1980 | 6.56 | 0.30 |
| Maine | 1985 | 2.34 | 0.09 |
| North Dakota | 1985 | 1.32 | 0.04 |
| South Dakota | 1985 | 1.96 | -0.04 |
| Virginia | 1986 | 7.97 | 1.13 |
| Florida | 1987 | 11.53 | 1.24 |
| Georgia | 1989 | 12.89 | 1.46 |
| Pennsylvania | 1989 | 5.75 | 1.13 |
| West Virginia | 1989 | 5.53 | 0.42 |
| Idaho | 1990 | 3.04 | 0.34 |
| Mississippi | 1990 | 11.50 | 0.44 |
| Oregon | 1990 | 4.85 | 1.14 |
| Montana | 1991 | 3.69 | 0.07 |
| *Top Five Crack States[51]* | | 10.64 | 1.76 |
| RTC Adopters | | 8.04 | 0.96 |

In other words, over the initial Lott-Mustard period of analysis (ending in 1992), the criminogenic influence of crack made RTC laws look beneficial since crack was raising crime in non-RTC states.  In the later period, crime fell sharply in the high-crack states, making RTC states look bad in comparison.  Therefore, the effects estimated over this entire period will necessarily water down the initial Lott-Mustard results.  The hope is that estimating the effect

---

[50] The crack index data comes from Fryer et al (2005), which constructs the index (beginning in 1980) based on several indirect proxies for crack use, including cocaine arrests, cocaine-related emergency room visits, cocaine-induced drug deaths, crack mentions in newspapers, and DEA drug busts.  The paper does suggest that these values can be negative. The state with the lowest mean value of the crack index over the data period from 1980 to 1990 is South Dakota (-0.03), and the state with the highest mean value is New York (1.58).

[51] The top five states with the highest population weighted average crack index in the period 1980-1992 were California, Maryland, Massachusetts, New York, and Rhode Island. None of these states adopted RTC laws during this period.

over the entire period will wash out the impact of the omitted variable bias generated by the lack of an adequate control for the effect of crack.

As an additional test for potential omitted variable bias in both the NRC and our own preferred model specification, we perform an analysis inspired by Altonji et al. (2005). In their influential paper, the authors provide a practical method to test the extent to which potential omitted variable bias drives the results of a multivariate analysis. This test assumes that the selected, observable variables are chosen from a broader set of possible controls, and then explores how strong selection on unobserved variables would have to be relative to selection on observed variables to produce an OLS estimate if the true effect (in our case the effect of RTC laws on crime trends) were zero. We provide further details on this test procedure in Appendix F.

Using the Altonji et al (2005) test procedure, we analyzed the relative strength of the Table 1b estimate from the NRC Report that RTC laws were associated with an 8.33% reduction in murder rates (using the Lott-Mustard county data estimate for 1977-2000). The Altonji test procedure suggests that this Lott-Mustard estimate has a potential bias of -1.03, which implies that the ostensible finding of a crime-reducing estimate would be entirely driven by selection bias if selection on unobservables were only 8 percent as strong as selection on observables. This is strong evidence that the NRC/Lott model suffers fatally from omitted variable bias. In comparison, an analogous test of our preferred specification using state data from 1979 to 2010 (Table 8a) – which showed an estimated *increase* in murder of 3.31% (albeit not statistically significant) – shows that the potential bias in the murder effect was -0.35. In other words, in our case, the implied bias is negative, which means that the positive and statistically insignificant effect of RTC laws on murder that we found is a likely a *lower* bound for the true effect.

## B. Endogeneity and Misspecification Concerns

To this point, our analysis has remained within the estimation framework common to the NRC/Lott-Mustard analyses, which implicitly assumes that passage of right-to-carry legislation in a given state is an exogenous factor influencing crime levels. Under this assumption, one can interpret the estimated coefficient as an unbiased measure of RTC laws' collective impact.

We probe the validity of this strong claim by estimating a more flexible year-by-year specification, adding pre- and post-passage dummy variables to the analysis.[52] Pre-passage dummies can allow us to assess whether crime trends shift in unexpected ways prior to the passage of a state's RTC law. Figures 10 through 13 present the results from this exercise in graphical form. Using our preferred model as the base specification, we introduce dummies for the eight years preceding and the first eight years following adoption. We first estimate this regression for each violent crime category over the full sample of 50 states plus the District of Columbia. However, because of the presence of five states that adopted their RTC law within eight years of 1979, and seven states that adopted laws within the eight years before our dataset ends, we have twelve states that cannot enter into the full set of pre- and post-adoption dummy variables.[53] Because Ayres and Donohue (2003) showed that the year-by-year estimates can jump wildly when states drop in or out of the individual year estimates, we also estimate the year-by-year model after dropping out the earliest (pre-1987) and latest (post-2002) law-adopting states. In this separate series of regressions, our estimates of the full set of lead and lag variables for the 22 states that adopted RTC laws between 1987 and 2002 are based on a trimmed data set

---

[52] In Appendix C, we further analyze the issue of misspecification and model fit by analyzing residuals from the regression analysis.

[53] We also include a control for more than 8 years before the passage of RTC laws, although these are not shown in the following charts.

that omits the 12 early and late adopters.[54]

Autor, Donohue, and Schwab (2006) point out that when analyzing the impact of state-level policies using panel data, one would ideally see lead dummies that are near zero. For the crime of aggravated assault (Figure 12), this desirable pattern is roughly approximated. Therefore, we would expect these estimates to perhaps be the most reliable among the four violent crime categories. The graphs for murder, rape, and robbery, though, suggest the possible presence of systematic differences between RTC law adopters that can complicate or thwart the endeavor of obtaining clean estimates of the impact of right-to-carry laws. Rather than being close to zero in the pre-passage period, the levels of murder, rape, and robbery seemed to be lower in the pre-passage period and rising rapidly. Such a pattern raises concerns about the presence of endogenous adoption that complicate our thinking about the influence of right-to-carry laws on violent crime.

---

[54] The states that drop out (with dates of RTC law passage in parentheses) include: Indiana (1980), Maine (1985), North Dakota (1985), South Dakota (1985), Virginia (1986), Colorado (2003), Minnesota (2003), Missouri (2004), New Mexico (2004), Ohio (2004), Kansas (2007), and Nebraska (2007).

Figure 10[55]



If one looks at the four lines in Figure 10, one sees four different sets of year-by-year

estimates of the impact of RTC laws on murder.  The lines have been normalized to show a zero

value in the year of adoption of a RTC law.  Let's begin with the bottom line (looking at the right

hand side of the figure) and the line just above it.  The lower line represents the naive year-by-

year estimates from the preferred model estimated on the 1979-2010 period, while the line just

above it drops out the early and late adopters, so that the estimated year-by-year estimates are

based on the "clean" sample of all non-adopting states (over the sample period) plus the 22 RTC

adopters for which complete data is available from 8 years prior to adoption through 8 years after

---

[55] Estimations include year and state fixed effects and are weighted by county population.  The control variables
include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate,
poverty rate, population density, per capita income measures, and six demographic composition measures.

adoption.  One sees that the trimmed estimates are different and less favorable to the "More

Guns, Less Crime" hypothesis, as evidenced by the higher values in the post-passage period.

How should we interpret these trimmed sample estimates?  One possibility is to conclude

that on average the pre-passage estimates are reasonably close to zero and then take the post-

passage figures as reasonable estimates of the true effect.  If we do this, none of the estimates

would be statistically significant, so one could not reject the null hypothesis of no effect.

Perhaps, though, what is most important is the trend just prior to passage.  This might

suggest that rising crime in fact increases the likelihood that a state would adopt a RTC law.  In

particular, since murder is typically the crime most salient in the media, we suspect it has the

greatest effect on the implementation of purported crime control measures such as RTC

legislation.  Of course, this would suggest an endogeneity problem that would also likely lead to

a bias in favor of finding a deterrent effect.  The mechanism driving this bias would presumably

be that rising crime strengthens the NRA push for the law, and the mean reversion in crime

would then falsely be attributed to the law by the naive panel data analysis (incorrectly premised

on exogenous RTC law adoption).   But in the trimmed model, there is no sign of mean

reversion.  Murder rates keep increasing after RTC adoption.  There is certainly no evidence of a

beneficial impact from RTC laws, but conclusions about causation are difficult given the strong

pre-passage crime trends.

Another striking feature we note is the strong influence of Florida and Georgia on our

estimates of the impact of RTC laws on murder (Figure 10).  When we remove these two states,

the post-adoption trend lines for murder clearly shift upwards.  Moreover, when dropping them

from the set of RTC states that already excludes the early and late adopters—still leaving us with

20 RTC states to analyze—we see that murder increases in each post-adoption year.  As previous

papers have noted, Florida experienced enormous drops in murder during the 1990s that may have been completely unrelated to the passage of its right-to-carry policy. Donohue (2003) points out that the 1980 Mariel boat lift temporarily added many individuals prone to committing crimes to Florida's population, causing a massive increase in crime in Florida during the 1980s. Thus, it is plausible that the massive 1990s crime reductions in Florida were not driven by the adoption of the state's RTC law but rather a return to traditional population dynamics that were less prone to violent crime (again, a reversion to the mean). This is important to consider given the strong downward pull of Florida on aggregate murder rates.

The line based on dropping Florida and Georgia from the trimmed sample would suggest that for the 20 other states, the impact of RTC laws on murder was highly pernicious. Again a number of interpretations are possible: 1) Florida and Georgia are unusual and the best estimate of the impact of RTC laws comes from the trimmed sample that excludes them (and the early and late adopters); 2) there is heterogeneity in the impact of RTC laws, so we should conclude that the laws help in Florida and Georgia, and tend to be harmful in the other 21 states; and 3) omitted variables mar the state-by-state estimates but the aggregate estimates that include Florida and Georgia may be reasonable if the state-by-state biases on average cancel out.

Note that Figure 11, which presents the comparable year-by-year estimates of the impact of RTC laws on rape, shows a similar yet even more extreme pattern of apparent spikes in crime leading to the adoption of RTC laws. The rape estimates are less sensitive than the murder estimates to the dropping of the early and late adopters (or Georgia and Florida). Clearly, the rate of rape is higher in the post-passage period but Figure 11 shows why the controls for state trends can be influential for this crime. If one believes that the pre-passage trend of increasing rapes would have continued without the adoption of RTC laws then you might conclude that the

69

RTC laws moderated that upward trend. Alternatively, a dummy variable model that just compared pre- and post-passage would show greater evidence of RTC laws increasing the rate of rape.

**Figure 11**[56]



Figure 11: Normalized Year-by-Year Estimates of the Impact of RTC Laws on Rape (State Data, 1979-2010)

---

[56] Estimations include year and state fixed effects, state trends, and are weighted by state population. The control variables include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

**Figure 12[57]**



**Figure 12: Normalized Year-by-Year Estimates of the Impact of RTC Laws on Assault (State Data, 1979-2010)**

---

[57] Estimations include year and state fixed effects, state trends, and are weighted by state population.  The control variables include: incarceration and police rates, unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

Figure 13[58]



As noted, the pattern of near-zero pre-passage estimates for the crime of assaults gives us greater confidence that we are able to estimate the impact of RTC laws on this crime.  The general story here seems to be that assault increases markedly over the time period after law passage, which squares with our results discussed in previous sections.  One observes positive coefficient changes that are initially modest, but that increase dramatically and uniformly over the second half of the post-passage period.  Moreover, in contrast to the year-by-year murder estimate, assault trends are not demonstrably different when we alter the sample to exclude early

---

[58] Estimations include year and state fixed effects, state trends, and are weighted by state population.  The control variables include: incarceration and police rates, unemployment rate, poverty rate, state population, population density, per capita income, and six demographic composition measures.

and late adopters, as well as Florida and Georgia. The pattern is generally unaffected by sample, giving us some confidence that RTC laws may be having an adverse impact on the rate of assault. Robbery rates similarly increase over time after the passage of RTC laws.

If the near uniform increases in assault coefficients means that aggravated assault did actually increase over time with the passage of right-to-carry legislation, this would strongly undercut the "More Guns, Less Crime" thesis. Interestingly, the robbery data (Figure 13) either suggests a pernicious effect similar to that on aggravated assault (particularly for the trimmed estimates dropping only early and late adopters) or a strong upward trend in crime, starting well before passage, that might be taken as a sign of the absence of any impact of RTC laws on robbery.

### C. Effects of RTC Laws on Gun-related Assaults

A general concern in evaluating the impact of generic law X is that there is not some other law or policy Y that is generating the observed effect. In this case, the apparent finding that RTC laws increase aggravated assaults raises the question of whether changes in reporting or documenting aggravated assaults might be a possible confounding factor. Specifically, over the last two decades a number of states and municipalities have launched programs designed to combat domestic violence by increasing the arrests of likely perpetrators. These programs could influence the count of aggravated assaults appearing in the FBI crime data we employ. If such programs are more likely to be adopted in either RTC or non-RTC states than the potential for bias must be considered.

One way to address this problem would be to collect data on the various state or municipal initiatives that lead to higher rates of arrest of those committing acts of domestic violence. However, collecting uniform panel data along these lines that also fully captures the

73

nature and intensity of the police initiatives is extremely difficult.  An alternative approach is to look at assaults that we think are less likely to be influenced by these domestic violence initiatives (or by other shifts in the likelihood of arrest for potentially assaultive conduct), but which are most likely to be influenced by RTC laws (if there is in fact such an influence). Counts of gun assaults would seem to meet these two criteria, because assaults with a gun tend to be serious enough that the level of discretion as to whether to arrest is reduced, and because gun assaults are precisely the types of crimes that we might expect would be influenced if more guns are on the street because of the passage of RTC laws.  For this reason, we may get more reliable estimates of the impact of RTC laws by looking at gun-related aggravated assaults than at overall aggravated assaults.

To test this possibility, we estimate our preferred regression using gun-related aggravated assaults as the dependent variable (both with and without state-specific trends) in Table 15 below.  Unfortunately, our confidence in these results is undermined by data quality issues similar to those described in section IX.  Since agencies report gun assault data to the FBI on a voluntary basis, there are significant gaps in which areas are reporting their gun assault totals in a given year.  In addition, if reporting bias were correlated with either the gun assault rate or a state's adoption of an RTC statute, our coefficient estimates of the effect of RTC laws on the gun assault rate would be biased (although the direction of this bias would depend on the nature of this correlation).  Nevertheless, we report our results for these regressions to examine whether they are consistent with our other evidence that right-to-carry laws increase aggravated assault rates.

Comparing these new results with the assault estimates in Tables 8a and 8b and Figure 12 above, our bottom-line story of how RTC laws increase rates of aggravated assault is further

strengthened when limiting our analysis to assaults involving a gun.  Without state trends, we uniformly see very large, positive estimates, some of which are significant at the 5% and 10% level.  With state trends, we again see some evidence that gun-related aggravated assault rates are increased by RTC legislation, although none of the resulting coefficients are statistically significant.  These results again suggest that RTC laws may be generating higher levels of assaultive conduct, although more refined tools (or cleaner data) will be needed before confident predictions can be made.

| **Table 15**[59] | | |
|---|---|---|
| Estimated Impact of RTC Laws on Gun-Related Aggravated Assaults – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors<br>Dataset: ADZ Updated 2013 State Data | | |
| *All figures reported in %* | Gun-Related Aggravated Assault (No State Trends) | Gun-Related Aggravated Assault (With State Trends) |
| Dummy Variable Model: | 32.96** | 4.36 |
| | (13.24) | (8.19) |
| Spline Model: | 2.86* | 3.07 |
| | (1.47) | (2.13) |
| Hybrid Post-Passage Dummy: | 23.49** | 2.08 |
| | (9.77) | (8.01) |
| Trend Effect: | 2.08 | 3.00 |
| | (1.30) | (2.11) |

[59] Estimations include year and state fixed effects, and are weighted by state population.  Robust standard errors are provided beneath point estimates in parentheses.   The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures.   * Significant at 10%; ** Significant at 5%; *** Significant at 1%. The gun assault data comes from the FBI master file, available upon request from the agency. The data is provided at the local level; thus for state values we sum the reported gun assaults over all of the reporting agencies by year. However, not all agencies report their estimates during each reporting period, leaving our gun assault figures likely to be undervalued.

## XI. Conclusion

In this paper, we have explored the question of the impact of RTC laws on crime and the NRC panel's 2004 report concluding that the then-current literature was too fractured to reach a conclusion on what that impact is. We agree with the conclusion that the NRC panel reached at that time, as well as with the pointed rebuke the panel gave to James Q. Wilson who argued -- without scientific merit according to the NRC majority -- that RTC laws reduce murder. We do take issue, though, with the NRC majority report in a few respects.

First, as we show in this paper, there is a clear need to employ the cluster correction to the standard errors when estimating panel data models of crime, and the NRC majority erred when it concluded otherwise. As our placebo tests show, the standard errors that the NRC presented in their panel data models were far too low and greatly exaggerated the statistical significance of their results. Indeed, the clustering gaffe was on top of the NRC failure to use the robust correction for heteroskedascticity, which created additional downward bias in the standard errors (although less dramatically than the failure to cluster). Both corrections are needed, and this error alone set the stage for Wilson's dissent. With correct standard errors, none of the estimates that Wilson thought established a benign effect of RTC laws on murder would have been statistically significant. Thus, getting the standard errors right might have kept Wilson from writing his misguided dissent -- to the benefit of Wilson, the NRC majority, and the public.

Second, beyond getting the standard errors correct and therefore undermining the ostensible statistical significance of their presented murder regression, the NRC majority could have said much more than they did to refute Wilson's reliance on extremely limited statistical evidence to endorse the view that RTC laws reduce murder. Wilson's conclusion essentially rested on the NRC report's presentation of two Lott and Mustard models (the dummy and the

spline) based on county data from 1977-2000.   The NRC majority did point out that the estimates for six out of 7 crimes were contradictory (some suggesting crime increases and some suggesting crime decreases), so the fact that  for the seventh crime -- murder -- both models suggested RTC laws reduced crime might well be a spurious result.  But the NRC majority could have given many more reasons to be cautious about relying on the two Lott and Mustard regressions.

Specifically, the NRC response to Wilson could easily have noted that Wilson had previously written that incarceration was perhaps the most important factor explaining the drop in crime in the United States in the 1990s, and he had also written on the importance of police (Wilson, 2008).  Yet the Lott and Mustard model that the NRC presented (and that Wilson relied on) did not control for either of these factors.[60]  Thus, on these grounds alone, one would have thought Wilson would have been particularly wary not to rely on a regression which was potentially subject to a charge of omitted variable bias. Neither the NRC majority nor Wilson ever noted this omission.

Moreover, we note in this paper some of the data problems with the Lott data set that the NRC panel used and then address an array of issues about data and model specification that Wilson ideally should have explored before he uncritically accepted the ostensible finding of a RTC impact on murder.  These issues included the danger of omitted variable bias concerning the crack epidemic, the choice of county over state-level data, the inclusion of state-specific linear trends, and the over-use of highly collinear demographic variables, all of which have enough impact on the panel data estimates to influence one's perception of the "More Guns, Less Crime" theory and thus warrant closer examination than they received from Wilson.

---

[60] The Lott and Mustard model omitted a control for the incarceration and police rates (which is indicated implicitly —though not explicitly highlighted — in the notes to each table of the NRC report, which listed the controls included in each specification).

Perhaps Wilson was so wedded to his position that nothing could have persuaded him not to write his ill-conceived dissent, but the NRC majority could have done more to buttress their entirely correct assessment that "the scientific evidence does not support [Wilson's] position" (pg. 275). As a result, Lott now claims that Wilson, one of the most eminent criminologists of our time, supports his position (Lott, 2008).  If one of the goals of the NRC report was to shield the public and policymakers from claims based on inadequate empirical evidence, the Wilson dissent represents a considerable failure.

A number of important lessons emerge from this story for both producers and consumers of econometric evaluations of law and policy.  The first and most obvious is that a single statistical study cannot resolve an important question.  Instead, one must wait until a literature has developed.  But even then, the conclusion that emerges may be one of uncertainty as the NRC report showed.

 A second lesson is how easy it is for mistakes to creep into these empirical studies.  The pure data errors that entered into the NRC data set when Lott transmitted an imperfect data set or the error in the 1993 Uniform Crime Reports data (or the errors that entered into our own work in Aneja et al (2011), which are described in greater detail in Footnote 18) were not major enough to have an impact, but at times the errors will be decisive (and the process of peer review is not well-equipped to detect such errors).  This episode underscores the value of making publicly available data and replication files that can reproduce published econometric results.  This exercise can both help to uncover errors prior to publication and then assist researchers in the process of replication, thereby aiding the process of ensuring accurate econometric estimates that later inform policy debates.

A third lesson is that the "best practices" in econometrics are evolving. Researchers and

policymakers should keep an open mind about controversial policy topics in light of new and

better empirical evidence or methodologies.  Prior to the important work of Bertrand, Duflo, and

Mullainathan (2004) on difference-in-differences estimation, few researchers understood that

clustering standard errors on the state-level in order to account for serial correlation in panel data

was necessary.  The results in many pre-2004 published papers would be wiped out with this

single adjustment.  Despite its impressive array of talent, the NRC report in 2004 got this

important issue wrong, even though most applied econometricians today would make this cluster

adjustment to avoid greatly increasing the level of Type I error.

While the NRC majority decision of uncertainty was clearly influenced by the sensitivity

of the estimates to various modeling choices, the separate statement by Horowitz was even more

categorical in its nihilism, essentially rejecting all applied econometric work on RTC legislation,

as indicated by his independent statement in an appendix to the NRC's (2004) report:

> "It is unlikely that there can be an empirically based resolution of the question of whether
> Lott has reached the correct conclusions about the effects of right-to-carry laws on
> crime."  (p. 304, NRC Report.)

Of course, if there can be no empirically based resolution of this question, it means that short of

doing an experiment in which laws are randomly assigned to states, there will be no way to

assess the impact of these laws.  But there is nothing particularly special about the RTC issue, as

the recent National Research Council report on the deterrence of the death penalty shows

(essentially adopting the Horowitz position on the question of whether the death penalty deters

murders). The econometrics community needs to think deeply about what these NRC reports and

the Horowitz appendix imply more broadly for the study of legislation using panel data

econometrics and observational data.

Finally, despite our belief that the NRC's analysis was imperfect in certain ways, we

agree with the committee's cautious final judgment on the effects of RTC laws: "with the current

evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates."  Our results here further underscore the sensitivity of guns-crime estimates to modeling decisions.[61]  But not being able to "determine" with the level of certainty one strives for in academic work does not mean that one cannot offer conclusions at some lower level of certainty such as "more probable than not."  Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained.

Clearly, we now have more believable panel data models of the type used in the NRC report estimated on more complete state and county data, coupled with the additional evidence presented in this article examining gun assaults (Table 15) and estimating year by year effects on crime (Figures 10-13).  Can a consistent story be distilled from this evidence?

We would consider our preferred regression models run on either the most complete data (state data from 1979-2010) or the data likely to be free of the confounding effect of the crack cocaine epidemic (state data from 1999-2010) as likely to yield more reliable estimates of the effect of RTC laws on crime than the Lott-Mustard specification.  If we estimate both the dummy and spline models using our preferred specification without state trends for each of these two time periods (overall or after 1999), then we have 4 estimates of the impact of RTC laws for each of seven crime categories (Tables 8a and 11a).  In each of the seven crime categories, at least one of these four estimates suggests that RTC laws increase crime at the .10 level of significance, with murder, rape, and larceny estimates reaching significance at the .05 level.  These crime increases are substantial, with the dummy variable model for the complete period (Table 8a) suggesting that RTC laws increased every crime category by at least 8 percent, except

---

[61] For a quick and clear sense of how sensitive estimates of the impact of right-to-carry laws are, see Appendix E, where we visually demonstrate the range of point estimates we obtain throughout our analysis.

murder (in that model, murder rose 3 percent but it is not statistically significant).   For the post-1999 regressions, spline estimate (Table 11a) suggests that RTC laws increased the rate of murder by 1.5 percentage points each year (significant at the .05 level).  In none of those 28 regressions was there any statistically significant estimate suggesting that RTC laws decreased crime.

Thus, the evidence that RTC laws increase crime is strongest if one accepts the dummy variable model with our preferred specification on state data (the Table 8a and 11a results) and accepts the Wolfers (2006) critique that one should avoid controlling for state trends.[62]  But even here questions remain.  First, one might argue that the fact that estimates suggest that RTC laws increase property crime is an indication that these models are not giving credible causal estimates since this link is not based on a strong theoretical foundation.[63]  Second, for all but aggravated assault, the state year by year estimates of Figures 10-13 raise endogeneity concerns that may undermine the state panel data results.

But the fact that Figure 12 shows a more ideal pattern of no pre-RTC adoption effects followed by sharp rises in aggravated assault and that the data on gun aggravated assaults also

---

[62] If one were to reject the Wolfers proposition and conclude that one *must* control for state trends in estimating the impact of RTC laws, the story becomes even more complicated.  Exhibit E shows (using the .10 level or better for significance) that there are two estimates with state trends suggestive of crime *decreases* in rape, six suggestive of crime *increases* in aggravated assault and one suggesting a decrease in this crime, four suggestive of *decreases* in auto theft and one suggesting an increase in this crime, and one suggestive of *decreases* in larceny.

[63] It is not clear why the property crimes of burglary, auto theft, and larceny would rise as a result of RTC passage.  Three possible explanations for this finding come to mind.  First, the results are correctly capturing the impact of RTC laws and perhaps the indirect effect of increasing the weapons available to criminals (through loss or theft) facilitates all criminal activity (perhaps by emboldening newly armed criminals) or the increase in violent crime diverts police resources so that property crime is stimulated.  Second, it is possible that states adopting RTC laws were less successful in fighting crime than non-adopting states, so the RTC law was not itself increasing crime but was simply a proxy for states that on the whole adopted less successful crime-fighting strategies over the last quarter century.  Third, it is possible that states chose to adopt RTC laws at a time when crime was on the rise, so their post-passage crime experience reflects an adverse crime shock that is incorrectly causally attributed to RTC laws.  If this endogenous timing argument is correct, then it might suggest that post-1999 estimates of Table 11a are preferable, since that has been a period of greater crime stability (as opposed to the dramatic crime swings of the late 1980s and 1990s).  The Table 11a estimates show that RTC laws only affected one crime category – with the laws causing a substantial *increase* in murder.

provides evidence that RTC laws increase these crimes may provide the strongest conclusion of a causal impact of RTC laws on crime.  The evidence that RTC laws increase aggravated assault is not overwhelming but it does find support in different models and different time periods using both state and county data sets in different panel data regressions both for all assaults and gun assaults (Table 15), and in models estimating year-by-year effects.  As Tables E5 and E6 reveal, eleven of the 28 estimates of the impact of RTC laws on aggravated assault meet at least the minimal standard of significance at the .10 level and show evidence of crime increases (against only one model showing a significant decline – the Lott/Mustard county data model with year fixed effects).  Moreover, the omitted variable bias test suggests that if anything our 8 percent estimate of the increase in aggravated assault from RTC laws (at the .10 level, see Table 8a) is likely to understate the true increases in aggravated assault caused by RTC law.[64]

Further research will hopefully further refine our conclusions as more data and better methodologies are employed to estimate the impact of RTC laws on crime.

---

[64] Note that the assaults can be committed either by RTC permit holders or those who have acquired their guns -- either via theft or appropriation of lost guns.

# References

Altonji, Joseph G., Todd E. Elder, and Christopher R. Taber.  2005. "Selection on Observed and Unobserved Variables: Assessing the Effectiveness of Catholic Schools." *Journal of Political Economy* 113(1): 151-184.

Angrist, Joshua and Jorn-Steffen Pischke. 2009. *Mostly Harmless Econometrics*. Princeton: Princeton University Press.

Autor, David, John J. Donohue, and Stewart Schwab.  2006.  "The Costs of Wrongful-Discharge Laws."  *Review of Economics and Statistics* 88(2): 211-231.

Ayres, Ian and John J. Donohue. 2003a. "Shooting Down the More Guns, Less Crime Hypothesis." *Stanford Law Review*, 55(4): 1193-1312.

Ayres, Ian and John J. Donohue. 2003b. "The Latest Misfires in Support of the More Guns, Less Crime Hypothesis." *Stanford Law Review*, 55(4): 1371-1398.

Ayres, Ian and John J. Donohue. 2009. "More Guns Less Crime Fails Again: The Latest Evidence from 1977-2006." *Econ Journal Watch*, 6(2): 218-238. http://www.aier.org/aier/publications/ejw_com_may09_ayresdonohue.pdf

Bertrand, Marianne, Esther Duflo, and Sendhil Mullainathan. 2004. "How Much Should We Trust Differences-in-Differences Estimates?" *Quarterly Journal of Economics*, 119(1): 249-275.

Black, Dan A., and Daniel S. Nagin. 1998. ''Do Right-to-Carry Laws Deter Violent Crime?'' *Journal of Legal Studies*, 27: 209-219.

Cramer, Clayton E., and David B. Kopel. 1995. "'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review*, 62 (3): 679-757.

Collins, Gail. 2009. "Have Gun, Will Travel." *The New York Times*. 31 July 2009.

83

**Donohue, John J.** 2003. "The Impact of Concealed-carry Laws." *Evaluating Gun Policy*. J. Ludwig & P. J. Cook (Eds.). Washington, DC: Brookings Institution Press. 287–324.

**Donohue, John J**. 2004. "Guns, Crime, and the Impact of State Right-to-Carry Laws." *Fordham Law Review*, 73: 623-652.

**Donohue, John J. and Justin Wolfers**. 2009. "Estimating the Impact of the Death Penalty on Murder." *American Law and Economics Review, 11 (2): 249-309*

**Elder, Todd and Christopher Jepsen**. 2013. "Are Catholic Primary Schools More Effective Than Public Primary Schools?" *Journal of Urban Economics*, forthcoming.

**Fryer, Roland, Paul Heaton, Steven Levitt, and Kevin Murphy.** 2005. "Measuring the Impact of Crack Cocaine." NBER Working Paper Series No. W11318. National Bureau of Economic Research, Cambridge, MA.

**Horowitz, Joel L.** "Should the DEA's STRIDE Data Be Used for Economic Analyses of Markets for Illegal Drugs?" *Journal of the American Statistical Association*, 96(465): 1254-1271.

**Kovandzic, T. V., Vieraitis, L. M. and Boots, D. P.** (2009), Does the death penalty save lives? *Criminology & Public Policy*, 8: 803–843.

**Levitt, Steven D.** 2004. "Understanding Why Crime Fell in the 1990's: Four Factors that Explain the Decline and Six that Do Not," *Journal of Economic Perspectives*, 17: 163-190.

**Lott, John R.** 2000. *More Guns, Less Crime*. Chicago: University of Chicago Press.

**Lott, John R**. 2004. "Right-to-Carry Laws and Violent Crime Revisited: Clustering, Measurement Error, and State-by-State Breakdowns." http://ssrn.com/abstract=523002 or doi:10.2139/ssrn.523002.

**Lott, John R.**  2008.  "Do Guns Reduce Crime?" *Intelligence Squared Debate Series*.

   http://intelligencesquaredus.org/wp-content/uploads/Guns-Reduce-Crime-102808.pdf

**Lott, John R. and David Mustard**. 1997. "Crime, Deterrence and Right-to-Carry Concealed

   Handguns." *Journal of Legal Studies*, 26(1): 1-68.

**Ludwig, J.** 1998. "Concealed Gun-carrying Laws and Violent Crime: Evidence from State Panel

   Data." *International Review of Law and Economics*, 18: 239-254.

**Maltz, Michael D**. 2006. *Analysis of Missingness in UCR Crime Data*. NCJ 215343

   Washington: U.S. Department of Justice.

**Maltz, Michael D., and J. Targonski**. 2002. "A note on the use of county-level crime data."

   *Journal of Quantitative Criminology*, 18(3): 297-318.

**Maltz, Michael D., & J. Targonski**. 2003. "Measurement and other errors in county-level UCR

   data: A reply to Lott and Whitley." *Journal of Quantitative Criminology*, 19: 199-206.

**Moody, Carlisle E. and Thomas B. Marvell.** 2008. "The Debate on Shall-Issue Laws." *Econ

   Journal Watch*, 5(3): 269-293. http://www.aier.org/ejw/archive/doc_view/3610-ejw-

   200809?tmpl=component&format=raw.

**Moody, Carlisle E. John R Lott, Jr., Thomas B. Marvell, and Paul R. Zimmerman.** 2012.

   "Trust but Verify: Lessons for the Empirical Evaluation of Law and Policy."

**Moulton, Brent.** 1990. "An Illustration of a Pitfall in Estimating the Effects of Aggregate

   Variables on Micro Units." *Review of Economics and Statistics*, 72: 334-338.

**Nagin, Daniel S. and John V. Pepper**, editors, 2012. *Deterrence and the Death Penalty*.

   Washington: The National Academies Press.

**National Research Council**. 2004. *Firearms and Violence: A Critical Review*. Washington: The

   National Academies Press.

Plassman, Florenz and John Whitley.  2003. "Confirming More Guns, Less Crime." *Stanford Law Review*, 2003: 1313-1369.

Studenmund, AH. 1997.  *Using Econometrics: A Practical Guide.* Reading, MA: Addison-Wesley.

Wilson, James Q. 2000.  "Guns and Bush."  *Slate Politics.*  http://slate.msn.com/?id=91132. (accessed on November 29 2009).

Wilson, James Q. 2008. "What Do We Get From Prison?" *The Volokh Conspiracy.* http://volokh.com/posts/chain_1213046814.shtml. (accessed on 20 November 2009).

Wooldridge, Jeffrey M. 2003. "Cluster-sample Methods in Applied Econometrics" *American Economic Review*, 93: 133-138.

Wooldridge, Jeffrey M. 2006. "Cluster-Sample Methods in Applied Econometrics: An Extended Analysis." Unpublished manuscript. Michigan State University.

Wolfers, Justin. 2006. "Did Unilateral Divorce Laws Raise Divorce Rates? A Reconciliation and New Results." American Economic Review, 96(5): 1802-1820.

Zimring, Franklin and Gordon Hawkins. 1997. "Concealed handguns: The counterfeit deterrent." *The Responsive Community*, 7:46-60.

**Appendix A:  Using Placebo Laws to Test the Impact of Clustering in the State Data**

Table 3 reports the results of our placebo tests using county data.  In this appendix, we use state-level data to again conduct our experiment with placebo laws to examine the effects of clustering the standard errors.  As seen in Tables 1-4 of Appendix A, we find results similar to those generated with our county data:  without clustering, the Type 1 error rates are often an order of magnitude too high or worse for our murder and robbery regressions (see Tables A1 and A3).  In fact, even *with* clustered standard errors (Tables A2 and A4), the rejection of the null hypothesis (that RTC laws have no significant impact on crime) occurs at a relatively high rate.  This finding suggests that, at the very least, we should include clustered standard errors to avoid unreasonably high numbers of significant estimates.

# Appendix A[65]

## Table A1

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Hybrid Model
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 47.6 | 63.9 |
| | Robbery | 46.5 | 63.7 |
| 2. Exact 34 States: | Murder | 46.9 | 61.6 |
| | Robbery | 51.5 | 64.4 |
| 3. Random 34 States: | Murder | 52.4 | 68.0 |
| | Robbery | 53.0 | 67.1 |
| 4. All 17 States: | Murder | 36.4 | 58.5 |
| | Robbery | 45.4 | 72.5 |
| 5. Random 11 States: | Murder | 35.4 | 64.4 |
| | Robbery | 43.4 | 73.0 |

## Table A2

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Hybrid Model and **Clustered Standard Errors**
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable | Trend Variable |
|---|---|---|---|
| 1. All 50 States + DC: | Murder | 16.1 | 28.5 |
| | Robbery | 13.4 | 18.3 |
| 2. Exact 34 States: | Murder | 15.8 | 23.0 |
| | Robbery | 14.6 | 15.3 |
| 3. Random 34 States | Murder | 21.5 | 35.1 |
| | Robbery | 17.1 | 25.8 |
| 4. All 17 States | Murder | 23.9 | 45.5 |
| | Robbery | 24.2 | 53.0 |
| 5. Random 11 States: | Murder | 23.7 | 48.7 |
| | Robbery | 23.0 | 53.7 |

---

[65] Simulation based on NRC with-controls model, includes year fixed effects, state fixed effects, and weighting by state population.  The control variables (adopted from the Lott-Mustard model) include: lagged arrest rate, state population, population density, per capita income measures, and 36 demographic composition measures indicating the percentage of the population belonging to a race-age-gender group.

# Appendix A (Cont.)

## Table A3

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Dummy Model
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable |
|---|---|---|
| 1. All 50 States + DC: | Murder | 47.1 |
| | Robbery | 46.9 |
| 2. Exact 34 States: | Murder | 46.3 |
| | Robbery | 50.6 |
| 3. Random 34 States: | Murder | 61.6 |
| | Robbery | 56.8 |
| 4. All 17 States: | Murder | 35.9 |
| | Robbery | 45.4 |
| 5. Random 11 States: | Murder | 37.5 |
| | Robbery | 49.8 |

## Table A4

Percentage of Significant Estimates (5% Level) – Lott-Mustard Controls, 1979-2010 – Dummy Model and **Clustered Standard Errors**
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | | Dummy Variable |
|---|---|---|
| 1. All 50 States + DC: | Murder | 16.3 |
| | Robbery | 13.2 |
| 2. Exact 34 States: | Murder | 13.7 |
| | Robbery | 13.1 |
| 3. Random 34 States | Murder | 29.6 |
| | Robbery | 21.4 |
| 4. All 17 States | Murder | 22.2 |
| | Robbery | 24.4 |
| 5. Random 11 States: | Murder | 25.2 |
| | Robbery | 28.0 |

89

### Appendix B – Panel Data Models over the Full Period with No Covariates

The NRC panel sought to underscore the importance of finding the correct set of covariates by presenting county panel data estimates (on data through 2000) of the impact of RTC without covariates but including county and year fixed effects.  For completeness, this Appendix presents these same no controls estimates for models (with and without state trends) estimated on both county and state data for the periods from 1977-2006 and 1977-2010 (respectively).

If one compares the results from these four tables with no controls with the analogous tables using the preferred model for the same time period, one sees some interesting patterns.  For example, if we compare the county results without state trends from both our preferred specification (Table 6a) and the no-controls specification (Table B1), we see that both sets of results are always positive (suggesting crime increases) but rarely statistically significant when covariates are added (although quite frequently for the no-controls model).  The basic story in these two different county data regressions seems to be that there is no evidence of an effect of RTC laws on murder, while if there is *any* RTC effect on other crimes generally, it is a crime-*increasing* effect.  When we compare those from the county models that include state trends (Tables 6b and B2), some negative point estimates emerge, although there is no sign of any statistically significant results at even the .10 level in either Table.

When we shift to a comparison of the state-level results, we again see similarities between the preferred and no-controls specifications.  When looking at the results without state trends (Tables 8a and B3), we see that the estimates are fairly similar in terms of direction, although the no-controls estimates are often larger in magnitude and more statistically significant (with Table B3 showing statistically significant increases at the .05 level in all crime categories other than murder and rape).  When doing a similar comparison of the specifications that now

90

add in state trends (Tables 8b and B4), we also see similar results.  In both tables, the only statistically significant effect on violent crime at the .05 level is that RTC laws increase aggravated assaults.

# Appendix B[66]

## Table B1

Estimated Impact of RTC Laws – No Controls, 1977-2006 – Clustered Standard Errors

Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.53 | 35.43 | 28.59 | 28.64* | 36.66 | 39.79* | 41.22 |
| | (8.91) | (23.88) | (19.84) | (15.18) | (22.40) | (22.93) | (26.50) |
| Spline Model: | 0.35 | 3.25* | 2.96* | 2.75** | 3.30* | 3.68* | 4.08* |
| | (0.73) | (1.92) | (1.61) | (1.32) | (1.96) | (1.95) | (2.23) |
| Hybrid Post-Passage Dummy: | -2.02 | 24.26 | 16.86 | 18.64 | 25.58 | 27.02 | 25.84 |
| | (9.13) | (20.04) | (18.53) | (13.86) | (19.05) | (20.58) | (23.32) |
| Trend Effect: | 0.45 | 1.99 | 2.08 | 1.78 | 1.97 | 2.27 | 2.73 |
| | (0.71) | (1.24) | (1.29) | (1.07) | (1.47) | (1.54) | (1.70) |

## Table B2

Estimated Impact of RTC Laws – No Controls, 1977-2006 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 County Data (without 1993 data)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -1.93 | -13.42 | 3.00 | 4.37 | 5.28 | -0.25 | -0.04 |
| | (6.33) | (12.08) | (11.00) | (8.89) | (10.58) | (12.16) | (13.23) |
| Spline Model: | 0.04 | -5.77 | 2.50 | 0.29 | 0.51 | -0.43 | -0.39 |
| | (1.26) | (4.40) | (2.36) | (2.41) | (2.59) | (2.44) | (2.59) |
| Hybrid Post-Passage Dummy: | -1.98 | -9.90 | 1.43 | 4.24 | 5.03 | 0.03 | 0.21 |
| | (6.45) | (11.32) | (11.62) | (9.40) | (11.19) | (12.99) | (14.14) |
| Trend Effect: | 0.09 | -5.55 | 2.47 | 0.19 | 0.40 | -0.43 | -0.40 |
| | (1.28) | (4.40) | (2.46) | (2.49) | (2.69) | (2.59) | (2.76) |

---

[66] Estimations include year and county fixed effects, and are weighted by county population.  Robust standard errors are provided beneath point estimates in parentheses. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

# Appendix B (Cont.)

## Table B3

Estimated Impact of RTC Laws – No Controls, 1977-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 1.07 | 13.83 | 13.38** | 21.63** | 26.88** | 23.32*** | 17.63*** |
| | (8.23) | (8.98) | (5.51) | (8.99) | (12.81) | (8.00) | (5.73) |
| Spline Model: | 0.37 | 1.10 | 1.33** | 1.86** | 1.79 | 1.70** | 1.32** |
| | (0.72) | (0.84) | (0.61) | (0.85) | (1.16) | (0.73) | (0.52) |
| Hybrid Post-Passage Dummy: | -1.62 | 9.48 | 6.96 | 13.62* | 21.32** | 17.27** | 12.75** |
| | (6.86) | (6.26) | (4.36) | (7.59) | (9.10) | (6.52) | (4.98) |
| Trend Effect: | 0.44 | 0.70 | 1.04* | 1.29 | 0.90 | 0.98 | 0.79 |
| | (0.66) | (0.70) | (0.61) | (0.80) | (0.93) | (0.63) | (0.47) |

## Table B4

Estimated Impact of RTC Laws – No Controls, 1977-2010 – Clustered Standard Errors and State Trends
Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.83 | -4.56* | 0.57 | 4.45 | 9.59 | 3.10 | 1.98 |
| | (4.57) | (2.67) | (3.64) | (4.59) | (5.92) | (3.60) | (2.50) |
| Spline Model: | 1.09 | -0.53 | 2.03** | 0.13 | -0.27 | -0.41 | -1.03** |
| | (0.73) | (0.88) | (0.86) | (1.03) | (1.12) | (0.62) | (0.48) |
| Hybrid Post-Passage Dummy: | -1.36 | -4.34 | -0.40 | 4.42 | 9.78 | 3.32 | 2.48 |
| | (4.43) | (2.70) | (3.39) | (4.76) | (5.94) | (3.76) | (2.54) |
| Trend Effect: | 1.10 | -0.47 | 2.04** | 0.07 | -0.41 | -0.46 | -1.07** |
| | (0.73) | (0.88) | (0.86) | (1.05) | (1.13) | (0.65) | (0.51) |

Note:  In earlier tables, our data period begins in 1979 for models that include the poverty rate as a control since that is when that information becomes available.

## Appendix C – Trimming the Sample to Address Questions of Model Fit

Given our concerns about how well the guns-crime econometric models fit all 50 US states (plus D.C.), we decided to examine the residuals from various regressions models. For example, one potentially important issue is whether one should include linear state trends in our models. To further explore this issue, we examined the variance of the residuals for the aggravated assault regression estimates using our preferred models on state data for the period through 2010—both with and without state trends.[67] In particular, we found that the residual variance was high for smaller states, even when we do not weight our regressions by population.[68]

We explored how these "high residual-variance" states (defined from the aggravated assault regressions on our preferred model through 2010) might be influencing the results. We estimated our preferred model (both with and without state trends) after removing the 10 percent of states with the highest residual variance. This step is also repeated after removing the highest 20 percent of states in terms of residual variance. Our results for our preferred specification (which includes clustered standard errors and is run over the 1979-2010 time period) are shown in Table 8a and 8b (without and with state trends, respectively). The results from our two trimmed set of states are presented below. Tables C1 and C2 should be compared to Table 8a (no state trends), and Tables C3 and C4 should be compared to Table 8b (adding in state trends).

Removing high residual-variance states (based on the aggravated assault regressions)

---

[67] Since evidence that RTC laws increased aggravated assault appeared in a number of different models and with different data sets, we focused specifically on the residuals obtained using assault rate as the dependent variable.

[68] We removed the population weight for this exercise because it is likely that when regressions are weighted by population, the regression model will naturally make high-population states fit the data better. As a result, we expect that residuals for smaller states will be higher. We find, however, that the results are qualitatively similar even when we obtain the residuals from regressions that include the population-weighting scheme (although the patterns of statistical significance sometimes change significantly when dropping the highest variance 20% of states from the sample).

does not alter the story told in Table 8a (no state trends) that there is no hint that RTC laws reduce crime and this message comes through again in Tables C1 and C2. Indeed, removing the high variance states has increased the statistical significance of the finding that RTC laws *increase* aggravated assault from the .10 level in Table 8a to the .05 level in both Tables C1 and C2. Removing the high residual-variance states from the models with state trends again reveals the same Table 8b estimates of a statistically significant increase in aggravated assault at the .05 level (Table C3), but reduces this level of significance to the .10 level in Table C4.

Of the states dropped from Tables C1 because of their high residual variance, all adopted RTC laws during the 1977-2010 period (with date of adoption in parentheses): Montana (1991), Maine (1985), West Virginia (1989), North Dakota (1985), and Tennessee (1996). Of the *additional* states dropped from Table C2, the following two states adopted RTC laws during the 1977-2010 period (with date of adoption in parentheses): Nebraska (2007) and Oregon (1990). Results from Table C3 come from dropping Montana, North Dakota, New Hampshire, Nebraska, and Vermont.[69] Finally, in addition to the five RTC states that were dropped in Table C3, Table C4 dropped the following five RTC states: West Virginia (1989), Nevada (1995), Kentucky (1996), Indiana (1980), and South Dakota (1985).

---

[69]The dropped states are slightly different between Tables C1 and C3, as well as between Tables C2 and C4, because the state ranks based on residual variances differed when the models were run with and without state trends.

# Appendix C[70]

## Table C1

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data
Dropping States with Highest Residual Variance (Top 10%: ND, MT, WV, TN, ME)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.54 | 11.70** | 8.48** | 14.12* | 19.32** | 12.40* | 10.43** |
| | (6.66) | (5.74) | (3.93) | (8.13) | (9.15) | (6.26) | (4.76) |
| Spline Model: | 0.61 | 0.65 | 1.03* | 1.21 | 1.31 | 0.79 | 0.87* |
| | (0.65) | (0.64) | (0.59) | (0.84) | (0.80) | (0.61) | (0.50) |
| Hybrid Post-Passage Dummy: | 0.95 | 10.35** | 4.51 | 10.22 | 15.82** | 10.44* | 7.66* |
| | (5.60) | (4.96) | (3.39) | (7.13) | (7.83) | (5.40) | (4.06) |
| Trend Effect: | 0.57 | 0.30 | 0.88 | 0.87 | 0.78 | 0.44 | 0.61 |
| | (0.60) | (0.60) | (0.60) | (0.80) | (0.67) | (0.55) | (0.48) |

## Table C2

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors
Dataset: ADZ Updated 2013 State Data
Dropping States with Highest Residual Variance (Top 20%: ND, MT, WV, TN, ME, NE, NH, HI, OR, VT)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 3.93 | 12.52** | 10.21** | 15.19* | 20.26** | 13.11* | 10.85** |
| | (7.01) | (5.91) | (3.92) | (8.48) | (9.54) | (6.56) | (4.97) |
| Spline Model: | 0.80 | 0.78 | 1.30** | 1.49* | 1.43* | 0.91 | 0.91* |
| | (0.65) | (0.65) | (0.58) | (0.83) | (0.83) | (0.62) | (0.53) |
| Hybrid Post-Passage Dummy: | 0.47 | 10.62** | 5.23 | 10.06 | 16.33* | 10.64* | 8.01* |
| | (5.83) | (5.20) | (3.58) | (7.35) | (8.17) | (5.64) | (4.26) |
| Trend Effect: | 0.78 | 0.43 | 1.13* | 1.16 | 0.89 | 0.56 | 0.64 |
| | (0.59) | (0.60) | (0.59) | (0.78) | (0.70) | (0.55) | (0.50) |

---

[70] Estimations include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and six demographic composition measures. * Significant at 10%; ** Significant at 5%; *** Significant at 1%.

## **Appendix C (Cont.)**

## Table C3

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 10%: MT, ND, NH, NE, VT)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.13 | -3.20 | -0.33 | 1.86 | 9.64** | 1.12 | 1.11 |
| | (4.02) | (2.34) | (3.62) | (3.21) | (4.52) | (2.24) | (1.88) |
| Spline Model: | 0.86 | -0.23 | 1.71** | -0.26 | -1.41* | -0.10 | -0.57 |
| | (0.76) | (0.65) | (0.79) | (0.83) | (0.76) | (0.65) | (0.53) |
| Hybrid Post-Passage Dummy: | -0.78 | -3.10 | -1.63 | 2.10 | 10.95** | 1.23 | 1.57 |
| | (3.93) | (2.38) | (3.51) | (3.40) | (4.43) | (2.37) | (2.06) |
| Trend Effect: | 0.89 | -0.13 | 1.76** | -0.33 | -1.76** | -0.14 | -0.62 |
| | (0.74) | (0.65) | (0.79) | (0.86) | (0.73) | (0.67) | (0.56) |

## Table C4

Estimated Impact of RTC Laws – ADZ Preferred Controls, 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

Dropping States with Highest Residual Variance (Top 20%:  MT, ND, NH, NE, VT, WV, NV, KY, IN, SD)

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | -0.30 | -3.11 | 1.36 | 2.56 | 10.91** | 0.89 | 1.24 |
| | (4.26) | (2.47) | (3.44) | (3.25) | (4.38) | (2.36) | (1.97) |
| Spline Model: | 0.94 | -0.15 | 1.38* | -0.11 | -1.39 | -0.13 | -0.55 |
| | (0.83) | (0.71) | (0.78) | (0.89) | (0.84) | (0.73) | (0.57) |
| Hybrid Post-Passage Dummy: | -0.98 | -3.07 | 0.40 | 2.70 | 12.16*** | 1.01 | 1.67 |
| | (4.16) | (2.51) | (3.38) | (3.49) | (4.30) | (2.50) | (2.18) |
| Trend Effect: | 0.97 | -0.06 | 1.37* | -0.20 | -1.78** | -0.17 | -0.60 |
| | (0.81) | (0.71) | (0.79) | (0.94) | (0.80) | (0.76) | (0.61) |

**Appendix D – Alternative Demographic Variable Specification**

A fairly standard set of demographics that can be seen in the crime literature includes controls for a few age categories across all races combined with a single identifier of the percentage of blacks in the state.  Table D1 and D2 in Appendix D provide yet another robustness check to the ADZ model by putting in four such demographic variables – the percent of the population falling into the three age categories of 10-19, 20-29, and 30-39 plus the percent black -- in place of the ADZ six demographic variables.  The results are not dramatically different from the main ADZ models of Tables 8a and 8b, and they essentially show only evidence of RTC laws increasing crime.  Table D1's and Table 8a's estimated violent crime increases for rape, aggravated assault, and robbery are substantial in both sets of dummy variable estimates and significant at the .10 level or better, only Table 8a has one of these estimates rise to the level of significance at the .05 level (for rape).

# **Appendix D**

## Table D1[71]

Estimated Impact of RTC Laws – ADZ Preferred Controls (with four demographic variables), 1979-2010 – Clustered Standard Errors

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 2.25 | 9.45* | 8.15* | 12.06* | 15.06* | 11.33** | 11.06** |
| | (5.75) | (5.43) | (4.27) | (6.51) | (8.15) | (4.88) | (4.29) |
| Spline Model: | 0.47 | 0.97 | 1.07 | 1.27 | 1.12 | 0.83 | 0.93* |
| | (0.63) | (0.64) | (0.64) | (0.76) | (0.76) | (0.58) | (0.49) |
| Hybrid Post-Passage Dummy: | 0.08 | 5.90 | 3.81 | 7.31 | 11.73 | 8.90** | 8.02** |
| | (4.69) | (4.21) | (3.77) | (5.52) | (7.12) | (4.00) | (3.49) |
| Trend Effect: | 0.47 | 0.77 | 0.94 | 1.03 | 0.72 | 0.52 | 0.66 |
| | (0.60) | (0.60) | (0.66) | (0.75) | (0.70) | (0.55) | (0.47) |

## Table D2

Estimated Impact of RTC Laws – ADZ Preferred Controls (with four demographic variables), 1979-2010 – Clustered Standard Errors and State Trends

Dataset: ADZ Updated 2013 State Data

| *All figures reported in %* | Murder | Rape | Aggravated Assault | Robbery | Auto Theft | Burglary | Larceny |
|---|---|---|---|---|---|---|---|
| Dummy Variable Model: | 0.60 | -2.86 | -0.73 | 3.25 | 9.47** | 1.74 | 1.52 |
| | (3.99) | (2.57) | (3.97) | (3.17) | (4.34) | (2.13) | (1.72) |
| Spline Model: | 0.59 | -0.28 | 1.53* | -0.70 | -1.06 | -0.42 | -0.71 |
| | (0.70) | (0.63) | (0.78) | (0.94) | (0.79) | (0.61) | (0.48) |
| Hybrid Post-Passage Dummy: | 0.15 | -2.71 | -1.95 | 3.88 | 10.54** | 2.11 | 2.12 |
| | (3.89) | (2.63) | (3.90) | (3.41) | (4.23) | (2.29) | (1.86) |
| Trend Effect: | 0.59 | -0.19 | 1.59** | -0.82 | -1.39* | -0.49 | -0.78 |
| | (0.68) | (0.64) | (0.78) | (0.97) | (0.75) | (0.63) | (0.52) |

---

[71] These regressions include year and state fixed effects, and are weighted by state population. Robust standard errors are provided beneath point estimates in parentheses. The control variables for this "preferred" specification include: incarceration and police rates (lagged one year to avoid potential endogeneity issues), unemployment rate, poverty rate, population density, per capita income measures, and four demographic variables (percent of the population that is between 10 and 19, 20 and 29, and 30 and 39 as well as percent black in the state).
* Significant at 10%; ** Significant at 5%; *** Significant at 1%.

**Appendix E – Summarizing Estimated Effects of RTC Laws Using Different Models, State v. County Data, and Different Time Periods**

This appendix provides graphical depictions of 14 different estimates of the impact of RTC laws for both the dummy and spline models for specific crimes using different data sets (state and county), time periods (through 2000, 2006, or 2010), and models (Lott and Mustard versus our preferred model and with and without state trends). For example, Figure E1 shows estimates of the impact on murder using the dummy model, designed to capture the average effect of RTC laws during the post-passage period. The first bar in each of the first six groupings corresponds to county-level estimates; the second bar corresponds to state-level estimates, for a total of 14 estimates per figure. Since our county model estimates are generally run through 2006 and our state model estimates are run through 2010, we generally paired state and county model results that were otherwise identical and which were run through 2010 and 2006 (respectively). Additionally, the last two estimates only contain one bar corresponding to state models run between 1999 and 2010. The value of the figures is that they permit quick visual observation of the size and statistical significance of an array of estimates. Note, for example, that only one of the estimates of RTC laws on murder in either Figure E1 or Figure E2 is significant at even the .10 threshold. This is the estimate for the 1999-2010 period on state data, which shows a statistically significant *increase* in murder (at the .05 level) in the spline model. This sharp contrast to the conclusion drawn by James Q. Wilson on the NRC panel is in part driven by the fact that all of the estimates in this appendix come from regressions in which we adjusted the standard errors by clustering.

In contrast to the solitary statistically significant estimate for murder (suggesting an increase), the estimates of the impact of RTC laws on aggravated assault in Figures E5 and E6

are significant at at least the .10 level suggesting crime increases in 11 of the 28 estimates depicted, as indicated by the shading of the columns.[72]  Note that the overall impression from Figure E6 is suggestive that RTC laws *increase* aggravated assault, although the evidence is not uniformly strong in the more preferred models.  No other crime category has as strong evidence of an impact of RTC laws as the findings on aggravated assault.

Figure E1. Various Murder Estimates (Dummy Model)



Figure E2. Various Murder Estimates (Spline Model)



---

[72] No shading indicates insignificance, and the shading darkens as significance increases (from a light grey indicating significance at the .10 level, slightly darker indicating significance at the .05 level, and black indicating significance at the .01 level).

Figure E3. Various Rape Estimates (Dummy Model)



Figure E4. Various Rape Estimates (Spline Model)



Figure E5. Various Aggravated Assault Estimates (Dummy Model)



Figure E6. Various Aggravated Assault Estimates (Spline Model)



Figure E7. Various Robbery Estimates (Dummy Model)



Figure E8. Various Robbery Estimates (Spline Model)



Figure E9. Various Auto Theft Estimates (Dummy Model)



Figure E10. Various Auto Theft Estimates (Spline Model)



103

Figure E11. Various Burglary Estimates (Dummy Model)



Figure E12. Various Burglary Estimates (Spline Model)



Figure E13. Various Larceny Estimates (Dummy Model)



Figure E14. Various Larceny Estimates (Spline Model)



104

**Appendix F – Methodological Description of Using Selection on the Observables to Assess Selection Bias**

Altonji et al. (2005) provides a test for whether there is omitted variable bias in a regression that attempts to quantify whether selection bias drives the OLS estimate. An underlying assumption of this approach is that the observable controls are selected independently from the larger set of possible controls. Elder and Jepsen (2013) provides a useful description of the methodological features of the test, and footnote 6 of that paper states that potential bias can be calculated with the given equation $\frac{cov(CS, \varepsilon_i)}{var(\widetilde{CS}_i)} = \frac{cov(\widetilde{CS}_i, \varepsilon_i)}{var(\widetilde{CS}_i)}$, where CS corresponds to our right-to-carry dummy variable.[73]

Drawing on this equation and equation (3) of the Elder and Jepsen paper, one can generate an expression for the potential bias: $\frac{cov(CS_i, X_i\gamma) \cdot var(\varepsilon_i)}{var(\widetilde{CS}_i) \cdot var(X_i\gamma)}$. Here $\widetilde{CS}_i$ is given by the formula $CS_i = X_i\beta + \widetilde{CS}_i$ (that is, $\widetilde{CS}_i$ is simply the residual from the regression of $CS_i$ on $X_i\beta$). Putting this formula in terms of our RTC dummy variable gives the expression $\frac{cov(Shall_i, X_i\gamma) \cdot var(\varepsilon_i)}{var(\widetilde{Shall}_i) \cdot var(X_i\gamma)}$. Because the beta coefficient of the bivariate regression of the RTC dummy on the fitted values of the regression of $Y_i$ (murder rate) on our full set of controls (less the RTC dummy variable) amounts to $\frac{cov(Shall_i, X_i\gamma)}{var(X_i\gamma)}$, the only remaining variables needed are $var(\varepsilon_i)$ and $var(\widetilde{Shall}_i)$. With this information one can calculate the "potential bias," which then can be compared to the beta coefficients we estimate in this paper.

The ratio of this implied bias to the estimate of the beta coefficient represents how strong selection on unobserved variables would have to be relative to selection on observed variables to

---

[73] In Elder and Jepsen's (2013) paper, CS refers to the effect of Catholic schools on educational achievement.

attribute the entire estimated effect to selection bias.  For the ADZ preferred specification (Table 8a), we find a beta coefficient of 0.0331, with a potential bias of -0.3549.  This implied ratio is negative, implying that selection on observables and unobservables would have to be of <u>opposite signs</u> to be consistent with a true effect of zero.  This finding implies that our slightly positive coefficient is a lower bound of the true effect of RTC laws on murder.

In contrast, the Altonji test applied to the NRC regression (Table 1b) finding of a statistically significant beta coefficient on murder of -0.0833 indicates strong evidence of omitted variable bias.  The test reveals an estimate of potential bias of -1.0304, which implies that the -0.0833 OLS estimate would be solely driven by selection bias if selection on unobservables were <u>only 8 percent</u> as strong as selection on observables.

Finally, owing to the frequency with which RTC laws are associated with statistically significant increases in aggravated assault rates, we analyze the results of the Altonji test when using the ADZ preferred specification (Table 8a) and aggravated assaults as the relevant dependent variables.   The coefficient associated with this model is .080334, with a potential bias of -.07211.  Thus, our results again suggest that selection on observables and unobservables would have to be biased in opposite directions to eliminate our estimated effect of RTC laws on aggravated assault.  This strongly suggests that our finding that RTC laws increase aggravated assaults is, if anything, biased toward zero.

## Appendix G – Summarizing Changes to Our RTC Dates

In this appendix, we detail all of the changes that we have made to the years when RTC laws took effect.  As noted in Footnote 3 and Footnote 17, the most recent version of our analysis includes a change in how the RTC dummy was defined.  Whereas in earlier work, we modeled RTC laws on the assumption that their impact would take effect only during the first full year after they were passed, we now assume that they take effect immediately after they are actually implemented.

**Missouri:**  While the state's right-to-carry law was originally intended to take effect in 2003 (the date that we used in earlier versions of this paper), a legal challenge based on the state's constitution prevented the law from taking effect until February 26, 2004.  For this reason, we use the date that the law's legal challenges were dismissed rather than the statutory date that the law was originally intended to take effect as its effective date.

**New Mexico & Oklahoma:**  This law passed in 2003 but took effect January 1st, 2004.  For this reason, while the initial year of the law switches from 2003 to 2004 in our most recent version of the paper, New Mexico's RTC dummy does not change after this revision.  Similarly, Oklahoma's RTC law passed in 1995 (our passage year) but took effect January 1st, 1996 (our new effective date).

**South Dakota:** Earlier versions of this paper inaccurately identified the state's 1986 legislation modifying its concealed carry laws as making the state "shall issue," but a careful re-examination of the details of this statute reveals that the state's 1985 legislation is a more appropriate candidate.

**Tennessee:**  While we earlier identified the state's 1994 law as making the state's concealed carry permitting system "shall issue," this law continued to allow sheriffs to deny permits "for good cause and in the exercise of reasonable discretion" without precisely defining what "good cause" entails.  For this reason, we now use the state's 1996 law (which took effect the same year) as the basis for determining the effective date of the state's RTC status.

**Texas:**  Texas's RTC law passed in 1995 and took effect that same year, but the state's statute specifies that permits (even those issued in 1995) are not supposed to have legal backing before January 1st, 1996.  For this reason, while our original passage year for RTC legislation was 1995, our new effective date for this legislation is actually in 1996.

**Virginia:**  Virginia's RTC law has undergone so many changes that it is difficult to say which one eliminated discretion in the issuance of permits.  While our earlier analysis used the state's 1988 revisions as the proper year for this transition, our decision to use this date was based on the date used in Lott (2000), which was based on research by Cramer and Kopel (1995). Surprisingly, the language that he identified as coming from the state's 1988 law was actually introduced in earlier legislation passed in 1986, so we accordingly changed our chosen effective date from 1988 to the effective date of this 1986 law.

# EXHIBIT 58

**1**

# Firearms and Violent Death in the United States

## Matthew Miller, Deborah Azrael, and David Hemenway

### Firearm-Related Deaths in the United States

In 2010, there were more than 31,000 firearm deaths in the United States: 62% were suicides, 36% were homicides, and 2% were unintentional (2%) (CDC 2012a). Almost as many Americans die from gunfire as die from motor vehicle crashes (almost 34,000 in 2010). Americans under age 40 are more likely to die from gunfire than from any specific disease (CDC 2012a).

#### *Homicide*

The United States is not a more violent country than other high-income nations. Our rates of car theft, burglary, robbery, sexual assault, and aggravated assault are similar to those of other high-income countries (van Kesteren, Mayhew, and Nieuwbeerta 2001); our adolescent fighting rates are also similar (Pickett

Matthew Miller, MD, ScD, MPH, is deputy director of the Harvard Injury Control Research Center and associate professor of Injury Prevention and Health Policy at the Harvard School of Public Health. Deborah Azrael, PhD, has been a member of the firearms research group at the Harvard School of Public Health for more than 20 years. David Hemenway, PhD, is an economist and professor at the Harvard School of Public Health and director of the Harvard Injury Control Research Center.

4   *Matthew Miller, Deborah Azrael, and David Hemenway*

*Table 1.1*   Homicide, suicide, and unintentional gun deaths among 5–14 year olds: The United States versus 25 other high-income populous countries (early 2003)

|  | Mortality rate ratio |
|---|---|
| Homicides | |
| Gun homicides | 13.2 |
| Non-gun homicides | 1.7 |
| Total | 3.4 |
| | |
| Suicides | |
| Gun suicides | 7.8 |
| Non-gun suicides | 1.3 |
| Total | 1.7 |
| Unintentional firearm deaths | 10.3 |

*Source:* Richardson and Hemenway 2011

et al. 2013). However, when Americans are violent, the injuries that result are more likely to prove fatal. For example, the U.S. rate of firearm homicide for children 5 to 14 years of age is thirteen times higher than the firearms homicide rate of other developed nations, and the rate of homicide overall is more than three times higher (Table 1.1).

U.S. homicide rates vary cyclically over time. Current rates are at a 30-year low, but as recently as 1991 rates were nearly twice as high (CDC 2012a). Changes in homicide rates over the past several decades are largely attributable to changes in firearm homicide rates, mostly driven by changes in firearm homicide rates among adolescent and young men in large cities (Hepburn and Hemenway 2004, Blumstein and Wallman 2000, Cork 1999, Cook and John 2002).[1]

The U.S. homicide rate is much higher in urban than in rural areas, as are rates of all violent crime. Nine out of ten homicide offenders are male, and 75% of victims are male. African Americans are disproportionately represented among both perpetrators and victims.[2]

### Suicide

Compared with other high-income countries, the U.S. adult suicide rate falls roughly in the middle. Among younger persons, however, our suicide mortality is relatively high: for children under 15 years of age, the overall suicide

**1**

# Firearms and Violent Death in the United States

## Matthew Miller, Deborah Azrael, and David Hemenway

### Firearm-Related Deaths in the United States

In 2010, there were more than 31,000 firearm deaths in the United States: 62% were suicides, 36% were homicides, and 2% were unintentional (2%) (CDC 2012a). Almost as many Americans die from gunfire as die from motor vehicle crashes (almost 34,000 in 2010). Americans under age 40 are more likely to die from gunfire than from any specific disease (CDC 2012a).

#### Homicide

The United States is not a more violent country than other high-income nations. Our rates of car theft, burglary, robbery, sexual assault, and aggravated assault are similar to those of other high-income countries (van Kesteren, Mayhew, and Nieuwbeerta 2001); our adolescent fighting rates are also similar (Pickett

Matthew Miller, MD, ScD, MPH, is deputy director of the Harvard Injury Control Research Center and associate professor of Injury Prevention and Health Policy at the Harvard School of Public Health. Deborah Azrael, PhD, has been a member of the firearms research group at the Harvard School of Public Health for more than 20 years. David Hemenway, PhD, is an economist and professor at the Harvard School of Public Health and director of the Harvard Injury Control Research Center.

4    *Matthew Miller, Deborah Azrael, and David Hemenway*

*Table 1.1*   Homicide, suicide, and unintentional gun deaths among 5–14 year olds: The United States versus 25 other high-income populous countries (early 2003)

|  | Mortality rate ratio |
|---|---|
| Homicides | |
|   Gun homicides | 13.2 |
|   Non-gun homicides | 1.7 |
|     Total | 3.4 |
| Suicides | |
|   Gun suicides | 7.8 |
|   Non-gun suicides | 1.3 |
|     Total | 1.7 |
| Unintentional firearm deaths | 10.3 |

*Source:* Richardson and Hemenway 2011

et al. 2013). However, when Americans are violent, the injuries that result are more likely to prove fatal. For example, the U.S. rate of firearm homicide for children 5 to 14 years of age is thirteen times higher than the firearms homicide rate of other developed nations, and the rate of homicide overall is more than three times higher (Table 1.1).

U.S. homicide rates vary cyclically over time. Current rates are at a 30-year low, but as recently as 1991 rates were nearly twice as high (CDC 2012a). Changes in homicide rates over the past several decades are largely attributable to changes in firearm homicide rates, mostly driven by changes in firearm homicide rates among adolescent and young men in large cities (Hepburn and Hemenway 2004, Blumstein and Wallman 2000, Cork 1999, Cook and John 2002).[1]

The U.S. homicide rate is much higher in urban than in rural areas, as are rates of all violent crime. Nine out of ten homicide offenders are male, and 75% of victims are male. African Americans are disproportionately represented among both perpetrators and victims.[2]

### Suicide

Compared with other high-income countries, the U.S. adult suicide rate falls roughly in the middle. Among younger persons, however, our suicide mortality is relatively high: for children under 15 years of age, the overall suicide

rate in the United States is 1.6 times that of the average of other high-income countries, largely accounted for by a firearm suicide rate eight times that of the average of these countries (Richardson and Hemenway 2011).

Over the past several decades, suicide rates have been more stable than have rates of homicide (Miller, Azrael, and Barber 2012). Nevertheless, after declining from a peak of 12.9/100,000 in 1986 to 10.4 in 2000, driven largely by a decline in the rate of firearm suicide, the suicide rate has increased over the past decade to 12.4/100,000 in 2010, mostly due to an increase in suicide by hanging (Miller, Azrael, and Barber 2012, CDC 2012a).

Age, sex, race, and other demographic characteristics—including marital status, income, educational attainment, and employment status—all influence suicide mortality (Nock et al. 2008). Suicide rates are higher, for example, for white and Native Americans than for black, Hispanic, and Asian Americans (CDC 2007). A consistent finding across numerous studies is that the strongest individual-level risk factor for a fatal suicidal act is having previously attempted suicide; other strong risk factors include psychiatric and substance abuse disorders (Shaffer et al. 1996).

In contrast to homicide rates, suicide rates are higher in rural than in urban areas almost entirely due to higher rates of firearm suicide in rural areas.

### Unintentional Firearm Deaths

Approximately 675 Americans per year were killed unintentionally with firearms between 2001 and 2010 (CDC 2007). Data from the National Violent Death Reporting System show that two-thirds of the accidental shooting deaths occurred in someone's home, about half of the victims were younger than 25 years, and half of all deaths were other-inflicted. In other-inflicted shootings, the victim was typically shot accidentally by a friend or family member—often an older brother (Hemenway, Barber, and Miller 2010).

## Firearm Ownership in the United States

The United States has more private guns per capita (particularly more handguns) and higher levels of household gun ownership than other developed countries (Killias 1993, SAS 2007).

Most of what we know about gun ownership levels in the United States over the past several decades comes from the General Social Survey (GSS 2010),

a relatively small biannual survey of U.S. adults. Data from the GSS show that the percentage of households with firearms has fallen from approximately 50% in the late 1970s to 33% today. Changing household demographics are believed to explain the decline in the household ownership of guns chiefly due to a fall in the number of households with an adult male (Smith 2000). Notably, however, the percentage of individuals owning firearms has remained relatively constant over the past several decades (GSS 2010).

The GSS does not speak to the number of guns in civilian hands or the distribution of guns within households. For this information, researchers have turned to data from two medium-sized national surveys conducted a decade apart. These surveys suggest that the number of guns in civilian hands grew from approximately 200 million in 1994 to 300 million in 2004—and that the average gun owner now owns more guns than previously (Hepburn et al. 2007, Cook and Ludwig 1997).

Compared with other Americans, gun owners are disproportionately male, married, older than 40, and more likely to live in nonurban areas. Their long guns (rifles, shotguns) are owned mainly for sport (hunting and target shooting). People who own only handguns typically own the guns for protection against crime (Hepburn et al. 2007, Cook 1979).

In 2001, 2002, and 2004, but not before or since, information on household gun ownership from the General Social Survey was supplemented by information from the National Behavioral Risk Factor Surveillance System (CDC 1997). The BRFSS is of sufficient size (more than 200,000 respondents annually) that household gun ownership could, for the first time, be determined at the state level for all 50 states and for some Metropolitan Statistical Areas.

Prior to these three iterations of the BRFSS, researchers generally used proxies to measure firearm ownership rates at the state and sub-state level. A validation study by Azrael, Philip, and Miller (2004) found that from among all proxies, the fraction of suicides that are committed with firearms (FS/S) correlates most strongly and consistently with cross-sectional survey-based measures of household firearm ownership at the county, state, and regional levels.

Household firearm ownership is probably a good measure of the accessibility of guns used in suicides, since most suicides involving firearms occur in the home (Kellermann et al. 1992, CDC 2012b) and involve a firearm owned by a member of the household (Kellermann et al. 1992). Household gun owner-

ship levels seem also to be the key exposure variable for firearm homicides that take place in the home, where women, children and older adults are particularly likely to be killed. The most common perpetrator in such instances is a family member (CDC 2012b). By contrast, older adolescent and young adult males are more often killed outside the home by guns owned by a non-family member.[3]

In this essay, we focus on studies that assess the relationship between gun prevalence and violent death. As such, the essay does not examine studies of gun carrying nor any literature on illegal gun markets. It also does not address research that investigates the relationship between firearm regulations and violent death. Note, however, that firearm prevalence and firearm regulation are highly collinear. Strong regulations may limit firearm ownership, and low levels of firearm ownership make it easier to pass stronger regulations.

This essay is also not an exhaustive review of the literature examining the association of firearm availability and violent death. (For more comprehensive reviews, see Hepburn and Hemenway 2004, Miller and Hemenway 1999, and Brent 2001.) Rather, it briefly summarizes (a) international ecologic studies comparing the United States to other countries, (b) ecologic studies of U.S. regions, states, and metropolitan areas, and (c) individual case-control and cohort studies.

Studies included in this brief review met a minimal threshold of attempting to control for important confounders: studies had to compare likes to likes. For case-control studies of homicide, that means—at a minimum—controlling for age, gender, and neighborhood; in suicide studies, for age, sex, and psychiatric risk factors for suicidal behavior. For international studies of homicide, it means comparing high-income countries to high-income countries. International comparisons of adult suicide rates are confounded by large differences in religion, culture and recording practices (i.e., the social meaning and cultural acceptance of adult suicide), as evidenced by tenfold differences in suicide rates across high-income nations. Thus, the only international studies of suicide included focus on the suicides of children—which all countries hold to be tragedies. For ecologic studies in the United States, making "like to like" comparisons means comparing states to states with similar levels of urbanization (or, for homicide, similar crime rates), cities to cities, and rural areas to rural areas.[4]

## Firearms and Homicide
### Ecologic Studies

Killias (1993) evaluated rates of violence in 14 developed countries: 11 in Europe, along with the United States, Canada, and Australia. He used data from the 1989 International Crime Survey, a telephone survey of 14 countries and 28,000 respondents, to measure firearm prevalence. Respondents were asked whether there were any firearms in their household and, if so, whether any were a handgun or a long gun. Military firearms were excluded. In this study, which did not include control variables, rates of firearm ownership and homicide were positively correlated, while rates of firearm ownership and non-firearm homicide were not.

A study by Hemenway and Miller (2000) included 26 high-income nations with populations greater than one million. To measure gun availability, the authors used two proxies, including FS/S. No control variables were included in the analysis. Firearm availability was strongly and significantly associated with homicide across the 26 countries.

A follow-up study (Hemenway, Shinoda-Tagawa, and Miller 2002) examined homicide rates among women across high-income countries. The validated proxy (FS/S, or the percentage of suicides committed with a firearm) was used to estimate firearm ownership in each country. Urbanization and income inequality were included as control variables. The United States accounted for 70% of all female homicide victims in the study and had the highest firearm ownership rates. The U.S. homicide rate for women was five times higher than that of all of the other countries combined; its female firearm homicide rate was eleven times higher.

### U.S. Studies

Cook (1979) conducted a cross-sectional analysis of 50 large cities in the United States to explore the relationship between gun availability and robbery, including robbery-murder. Using data on the number of robberies in 1975, Cook examined how firearm availability (as proxied by Cook's index) was related to robbery and robbery-murder rates, controlling for measures of the effectiveness of the criminal justice system, population density, and other regional and state differences. Increased gun availability was not associated with overall robbery rates, but it was positively associated with the proportion of robber-

ies that involved a gun—and with the per capita robbery-murder rate, through an increased rate of gun robbery.

Miller et al. (2002) evaluated the relationship between levels of firearm ownership at the state and regional level and the incidence of homicide from 1988 to 1997 for 50 states and 9 regions. At the state level, they used the percentage of suicides with a firearm as a proxy for ownership and they measured gun availability at the regional level with data from the GSS. Five potential confounders were included: poverty, urbanization, unemployment, alcohol consumption, and (non-homicide) violent crime rates. In the multivariate analyses, a positive and significant association between gun ownership and homicide rates was found for the entire population and for every age group (except ages 0–4), primarily due to higher firearm homicide rates.

A similar study (Miller et al. 2007) used survey estimates of household gun ownership for each state from the Behavioral Risk Factor Surveillance System. It examined data from 2001 to 2003 and controlled for state-level rates of aggravated assault, robbery, unemployment, urbanization, alcohol consumption, poverty, income inequality, the percentage of the population that was black, and the percentage of families headed by a single female parent. Again, states with higher rates of household firearm ownership had significantly higher homicide victimization rates for men, for women, and for children. The association was driven by gun-related homicide victimization rates; non-gun-related victimization rates were not significantly associated with rates of firearm ownership.

### Individual Level Studies

Ecologic studies provide evidence about whether more guns in the community are associated with more homicides in the community. Case-control and cohort studies provide data more germane to the question of whether a gun in the home increases or reduces the risk of homicide victimization for members of the household.

Kellermann et al. examined approximately 400 homicide victims from three metropolitan areas who were killed in their homes (Kellermann et al. 1993). All died from gunshot wounds. In 83% of the homicides, the perpetrator was identified; among these cases, 95% of the time, the perpetrator was not a stranger. In only 14% of all the cases was there evidence of forced entry. After controlling for illicit drug use, fights, arrests, living alone, and whether the home was rented,

10    *Matthew Miller, Deborah Azrael, and David Hemenway*

*Table 12*   NVDRS 2005–2010

| | Firearm | | | Non-firearm | | |
|---|---|---|---|---|---|---|
| | *N* | Occurred in a house/apt | Occurred at victim's residence | *N* | Occurred in a house/apt | Occurred at victim's residence |
| **Homicides by age group** | | | | | | |
| 0–4 yrs | 81 | 75% | 67% | 1,025 | 90% | 77% |
| 5–14 yrs | 257 | 72% | 51% | 205 | 78% | 67% |
| 15–24 yrs | 5,679 | 37% | 16% | 1,385 | 47% | 27% |
| 25–34 yrs | 4,906 | 44% | 24% | 1,479 | 56% | 39% |
| 35–64 yrs | 5,003 | 56% | 41% | 3,716 | 62% | 50% |
| 65+ yrs | 470 | 74% | 69% | 719 | 79% | 76% |
| **Suicides by age group** | | | | | | |
| 0–4 yrs | — | | | — | | |
| 5–14 yrs | 105 | 97% | 88% | 301 | 91% | 88% |
| 15–24 yrs | 3,332 | 75% | 64% | 3,769 | 69% | 65% |
| 25–34 yrs | 4,034 | 76% | 67% | 4,743 | 70% | 65% |
| 35–64 yrs | 15,634 | 78% | 74% | 16,568 | 72% | 70% |
| 65+ yrs | 6,019 | 89% | 88% | 2,168 | 80% | 83% |

*Note:* Unknowns for age (0.7%), house/apt (1.4%), home (3.6%) were set aside.

the presence of a gun in the home remained strongly associated with an increased risk for homicide in the home. Gun ownership was most strongly associated with an increased risk of homicide by a family member or intimate acquaintance.[5]

Whereas most men are murdered away from home, most children, older adults, and women are murdered at home (Table 1.2). A gun in the home is a particularly strong risk factor for female homicide victimization—with the greatest danger for women coming from their intimate partners.

The heightened risk of femicide is illustrated in a subgroup analysis of female homicide victimization from Kellermann's 1993 case-control study of homicide in the home. A spouse, a lover, or a close relative murdered most of the women decedents, and the increased risk for homicide from having a gun in the home was attributable to these homicides (Bailey, Flewelling, and Rosenbaum 1997). A case-control study by Wiebe et al. (2003) also found that the risk of homicide associated with living in a home with guns was particularly high for women (who were almost three times more likely to become homicide victims compared with women living in homes without guns). Here too, a gun in the home was a risk factor for homicide by firearm but not for homicide by other means.

Other case-control studies have also found that a gun in the home is a risk for homicide in the home, with especially heightened risk for women (Cummings et al. 1997, Dahlberg, Ikeda, and Kresnow 2004). Results from perpetrator-based case-control homicide studies also find that gun ownership is a risk for homicide perpetration. For example, a study of women murdered by intimate partners found that compared with a control group of living battered women, a gun in the house was present for 65% of perpetrators of murder versus 24% of perpetrators of nonfatal abuse. Access to a firearm by the battered woman had no protective effect (Campbell et al. 2003).

### Cohort Studies

There are no studies that follow a large cohort of individuals with known characteristics, comparing homicide victimization rates of those with a gun in the home and those without.

## Firearm Prevalence and Suicide

Firearm suicide rates and overall suicide rates in the United States are higher where guns are more prevalent (Miller, Hemenway, and Azrael 2007, Kubrin and Wadsworth 2009). By contrast, rates of suicide by methods other than firearms are not significantly correlated with rates of household firearm ownership (Miller, Hemenway, and Azrael 2007). This pattern has been reported in ecologic studies that have adjusted for several potential confounders, including measures of psychological distress, alcohol and illicit drug use and abuse, poverty, education, and unemployment (Miller, Azrael, and Barber 2012, Miller, Hemenway, and Azrael 2007).

Household firearm ownership has also been consistently found to be a strong predictor of suicide risk in studies that examined individual-level data. U.S. case-control studies find that the presence of a gun in the home or purchase from a licensed dealer is a risk factor for suicide (Bailey et al. 1997, Brent et al. 1993, Brent et al. 1994, Brent et al. 1991, Brent et al. 1988, Conwell et al. 2002, Cummings et al. 1997, Kellermann et al. 1992, Grassel et al. 2003, Kung, Pearson, and Lui 2003, Wiebe 2003). The relative risk is large (two- to tenfold), depending on the age group and, for younger persons, how firearms in the home are stored (Miller and Hemenway 1999, Brent et al. 1991, Kellermann et al. 1992).

The only large U.S. cohort study to examine the firearm–suicide connection found that suicide rates among California residents who purchased handguns

from licensed dealers were more than twice as likely to die by suicide as were age/sex matched members of the general population, not only immediately after the purchase but throughout the six-year study period (Wintemute et al. 1999). Here, too, the increase in suicide risk was attributable entirely to an excess risk of suicide with a firearm (Wintemute et al. 1999).

Drawing causal inferences about the relation between firearm availability and the risk of suicide from existing case-control and ecologic studies has been questioned on the grounds that these studies may not adequately control for the possibility that members of households with firearms are inherently more suicidal than members of households without firearms (NRC 2005). Additional cited limitations include the possibility of differential recall (by cases compared with controls) of firearm ownership and comorbid conditions, and reverse causation (whereby suicidal persons purchase firearms with the idea of committing suicide).

It is very unlikely, however, that the strong association between firearms and suicide reported consistently in U.S. studies is either spurious or substantially overstated. First, individual-level studies have often controlled for measures of psychopathology (Bailey et al. 1997, Brent et al. 1994, Brent et al. 1993, Brent et al. 1988, Conwell et al. 2002, Cummings et al. 1997, Kellermann et al. 1992, Wiebe 2003).

Second, directly answering the reverse causation critique, the risk of suicide associated with a household firearm pertains not only to gun owners but to *all* household members (Cummings et al. 1997, Kellermann et al. 1992, Wintemute et al. 1999); the relative risk is larger for adolescents than for the gun owner; and for the gun owner the risk persists for years after firearms are purchased (Cummings et al. 1997, Kellermann et al. 1992, Wintemute et al. 1999).

Third, studies that have examined whether people who live in homes with guns have higher rates of psychiatric illness, substance abuse, or other known suicide risk factors generally fail to find any indication of heightened risk (Oslin et al. 2004, Kolla, O'Connor, and Lineberry 2011). For example, four case-control studies found comparable rates of psychiatric illness and psychosocial distress among households with versus without firearms (Kellermann et al. 1992, Ilgen et al. 2008, Miller et al. 2009, Sorenson and Vittes 2008, Betz, Barber, and Miller 2011).

Fourth, there appears to be a hierarchy of suicide risk among children and young adults, depending on how securely household firearms are stored, suggesting a dose-response relationship (Grossman et al. 2005).

Finally, the consistency in magnitude, direction, and specificity of method-related risk observed in both the many individual-level and ecologic studies (the latter not being subject to recall bias or the reverse causation criticism) leads to only one conclusion: a gun in the home increases the likelihood that a family member will die from suicide.

## Unintentional Firearm Deaths

Not surprisingly, ecologic and case-control studies find that where there are more guns and more guns poorly stored, there are more unintentional firearm deaths (Miller, Azrael, and Hemenway 2001, Wiebe 2003, Grossman et al. 2005). U.S. children aged 5 to 14 have eleven times the likelihood of being killed accidentally with a gun compared with similarly aged children in other developed countries (Table 1.2) (Richardson and Hemenway 2011).

## Conclusion

The United States, with its many guns and highly permissive gun laws, faces a far more serious problem of lethal firearms violence than other high-income nations. The relative magnitude of our problem is illustrated in Table 1.1. This table, which compares U.S. children aged 5–14 with children of other developed countries, illustrates the stark fact that U.S. children are *thirteen* times more likely to die from a firearm homicide and *eight* times more likely to a die of a firearm suicide than children in comparable developed nations. There is no evidence that U.S. children are more careless, suicidal. or violent than children in other high-income nations. Rather, what distinguishes children in the United States from children in the rest of the developed world is the simple, devastating fact that they die—mostly by firearms—at far higher rates.

Within the United States itself, the evidence is similarly compelling: where there are more guns, there are more violent deaths—indeed, many more. The magnitude of this relationship is illustrated in Table 1.3, which compares the number of lives lost between 2001 and 2007 to homicide, suicide, and unintentional firearm accidents by sex and age groups in states with the highest compared with the lowest gun ownership rates. The consistency of findings across different populations, using different study designs, and by different researchers is striking. No credible evidence suggests otherwise.

*Table 13*   Violent deaths in states with the highest versus lowest gun ownership levels (BRFSS 2004); Mortality Data WISQARS 1999–2007

|  | High-gun states[a] | Low-gun states[b] | Ratio |
|---|---|---|---|
| Aggregate population of adults, 2001–2007 | 356 million | 358 million | 1.0 |
| Proportion of households with firearms | 50% | 15% | 3.3 |
| Percentage of adult population reporting depression, past 12 months (NSDUH 2008–2009) | 3.7% | 3.7% | 1.0 |
| Percentage of adult population reporting suicidal ideation, past 12 months (NSDUH 2008–2009) | 6.6% | 6.5% | 1.0 |
| Number of nonlethal violent crimes in 2010 (UCR 2010) | 165,739 | 148,287 | 1.1 |
| **Suicide** | | | |
|   Women | | | |
|     Firearm suicide | 4,148 | 563 | 7.4 |
|     Non-firearm suicide | 4,633 | 4,575 | 1.0 |
|       Total suicide | 8,781 | 5,138 | 1.7 |
|   Men | | | |
|     Firearm suicide | 26,314 | 7,163 | 3.7 |
|     Non-firearm suicide | 11,592 | 12,377 | 0.9 |
|       Total suicide | 37,906 | 19,540 | 1.9 |
|   Men ages 15–29 | | | |
|     Firearm suicide | 5,803 | 1,308 | 4.4 |
|     Non-firearm suicide | 3,192 | 2,671 | 1.2 |
|       Total suicide | 8,995 | 3,979 | 2.2 |
|   5–14 year olds | | | |
|     Firearm suicide | 166 | 15 | 11.1 |
|     Non-firearm suicide | 225 | 154 | 1.5 |
|       Total suicide | 391 | 169 | 2.3 |
|   Adults 65+ years old | | | |
|     Firearm suicide | 6,374 | 1,714 | 3.7 |
|     Non-firearm suicide | 1,182 | 2,270 | 0.5 |
|       Total suicide | 7,556 | 3,984 | 1.9 |
| **Homicide** | | | |
|   Men | | | |
|     Firearm homicide | 13,755 | 7,799 | 1.8 |
|     Non-firearm homicide | 5,031 | 3,963 | 1.3 |
|       Total homicide | 18,786 | 11,762 | 1.6 |
|   Women | | | |
|     Firearm homicide | 3,165 | 998 | 3.2 |
|     Non-firearm homicide | 2,855 | 2,132 | 1.3 |
|       Total homicide | 6,020 | 3,130 | 1.9 |

Case 3:19-cv-01226-L-AHG   Document 34-11   Filed 01/03/20   PageID.7775   Page 142 of 305

*Table 13*   (Continued)

| | High-gun states[a] | Low-gun states[b] | Ratio |
|---|---|---|---|
| 5–14 year olds | | | |
|   Firearm homicide | 259 | 100 | 2.6 |
|   Non-firearm homicide | 212 | 169 | 1.3 |
|     Total homicide | 471 | 269 | 1.8 |
| Men 15–29 | | | |
|   Firearm homicide | 6,971 | 4,900 | 1.4 |
|   Non-firearm homicide | 1,187 | 1,334 | 0.9 |
|     Total homicide | 8,158 | 6,234 | 1.3 |
| Adults 65+ years old | | | |
|   Firearm homicide | 620 | 139 | 4.5 |
|   Non-firearm homicide | 794 | 534 | 1.5 |
|     Total homicide | 1,414 | 673 | 2.1 |
| Unintentional firearm deaths | 109 | 677 | 6.2 |

*Note:* All data are from 1999–2007 because cell counts were suppressed beginning in 2008; terrorism-related homicides are not counted.

[a]Louisiana, Utah, Oklahoma, Iowa, Tennessee, Kentucky, Alabama, Mississippi, Idaho, North Dakota, West Virginia, Arkansas, Alaska, South Dakota, Montana, Wyoming

[b]Hawaii, New Jersey, Massachusetts, Rhode Island, Connecticut, New York

Firearm policy is often focused on guns used in crime. What is notable about the studies reviewed here, however, is the consistency of the story they tell about *all* firearms—not just those used in crime. In the United States, there are more firearm suicides than firearm homicides, and women, children, and older adults are more likely to die by gunfire from a household gun (typically, legally acquired and possessed) than from illegal guns.

The first step in ameliorating a public health problem is to identify what the problem is. For the purposes of this essay, the problem is that, year after year, many more Americans are dying by gunfire than people in any other high-income nation. Good firearm policy has the potential to reduce the toll of lethal firearm violence in the United States. Efforts to reduce this uniquely American problem will, however, be less effective than they could be if good policy is not accompanied by a shift in the kind of discussions politicians, academicians, and citizens engage in about firearms. Science can provide the content—and better science based on better data, better content. The best chance for durable and large-scale reductions in lethal violence in the United States is for all of us to commit to keeping the conversation about the costs and benefits of guns in American society civil, ongoing, and factually grounded.

16    *Matthew Miller, Deborah Azrael, and David Hemenway*

## Acknowledgments

The text, but not the figures reported, in this essay draw in part on prior reviews written previously by the authors, often supported by the Joyce Foundation.

## Notes

1.  Researchers attribute the decline in the 1990s to different causes, including reduced unemployment, increased policing, and a decline in and stabilization of illegal drug markets (Wintemute 2000). Declines in the last decade have not yet been well explained.

2.  Homicide rates have been consistently higher in the southern and western regions of the United States. This is especially true for firearm homicides (CDC 2012a).

3.  Measuring the availability of guns in the context of these homicides is more problematic, not least because researchers (Webster, Vernick, and Hepburn 2001, MAIG 2008) have shown that guns involved in these deaths often move across state lines from states with permissive gun laws to states with fewer guns and stronger laws.

4.  Studies included in this review were those previously included in review articles by two of the authors, updated to include new articles meeting the criteria specified in these reviews which have appeared in the research literature since the time those review papers were published.

5.  The study did not provide evidence about whether a gun from the home was used in any of the homicides. However, the idea that a gun in the home increased the risk of death was supported by several observations. First, the link between gun ownership and homicide was due entirely to a strong association between gun ownership and homicide by firearm; homicide by other means was not significantly linked to having a gun in the home. Second, gun ownership was most strongly associated with homicide at the hands of a family member or intimate acquaintance (i.e., guns were not significantly linked to an increased risk of homicide by non-intimate friends, unidentified persons, or strangers). Third, there was no evidence of a protective effect of keeping a gun in the home—even in the small subgroup of cases that involved forced entry.

## References

Azrael, D., J. C. Philip, and M. Miller. 2004. "State and local prevalence of firearms ownership measurement, structure, and trends." *Journal of Quantitative Criminology* 20 (1):43–62.

Bailey, S., R. Flewelling, and D. Rosenbaum. 1997. "Characteristics of students who bring weapons to school." *Journal of Adolescent Health* 20 (4):261–270.

Bailey, J. E., A. L. Kellerman, G. Somes, J. G. Banton, F. Rivara, and N. B. Rushforth. 1997. "Risk factors for violent death of women in the home." *Archives of Internal Medicine* 157 (7):777–782.

Betz, M. E., C. Barber, and M. Miller. 2011. "Suicidal behavior and firearm access: Results from the second injury control and risk survey." *Suicide and Life Threatening Behavior* 41 (4):384–391.

Blumstein, A., and J. Wallman. 2000. *The crime drop in America.* New York: Cambridge University Press.

Brent D. A. 2001. "Firearms and suicide." *Ann. N. Y. Acad. Sci.* 932:225–39.

Brent, D. A., et al. 1988. "Risk factors for adolescent suicide: A comparison of adolescent suicide victims with suicidal inpatients." *Archives of General Psychiatry* 45 (6):581–588.

Brent, D. A., J. A. Perper, C. J. Allman, G. Moritz, M. E. Wartella, and J. P. Zelenak. 1991. "The presence and accessibility of firearms in the homes of adolescent suicides: A case-control study." *JAMA* 266 (21):2989–2995.

Brent, D. A., J. A. Perper, G. Moritz, M. Baugher, J. Schweers, and C. Roth. 1994. "Suicide in affectively ill adolescents: A case-control study." *Journal of Effective Disorders* 31 (3):193–202.

Brent, D. A., J. A. Perper, G. Moritz, M. Baugher, J. Schweers, and C. Roth. 1993. "Firearms and adolescent suicide: A community case-control study." *American Journal of Diseases of Children* 147 (10):1066–1071.

Campbell, J. C., D. Webster, J. Koziol-McLain, C. Block, D. Campbell, et al. 2003. "Risk factors for femicide in abusive relationships: Results from a multisite case control study." *American Journal of Public Health* 93 (7):1089–1097.

CDC. 1997. Rates of homicide, suicide, and firearm-related death among children—26 industrialized countries. In *Morbidity and Mortality Weekly Report.* Centers for Disease Control and Prevention.

CDC. 2007. Centers for Disease Control WISQARS injury mortality report. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

CDC. 2012a. Centers for Disease Control and Prevention, National Center for Health Statistics: Compressed Mortality File 1999–2009. Edited by CDC. CDC WONDER Online Database, compiled from Compressed Mortality File 1999–2009.

CDC. 2012b. Surveillance for violent deaths—National Violent Death Reporting System, 18 states, 2012. Centers for Disease Control and Prevention.

Conwell, Y., P. R. Duberstein, K. Connor, S. Eberly, C. Cox, and E. D. Caine. 2002. "Access to firearms and risk for suicide in middle-aged and older adults." *American Journal of Geriatric Psychiatry* 10 (4):407–416.

Cook, P. J. 1979. "The effect of gun availability on robbery and robbery murder." In *Policy studies review annual*, edited by R. H. Haveman and B. B. Zellner, 743–781. Beverly Hills, CA: Sage.

Cook, P. J., and H. L. John. 2002. "After the epidemic: Recent trends in youth violence in the United States" In *Crime and justice: A review of research*, ed. Michael Tonry, 117–153. Chicago: University of Chicago Press.

Cook, P. J., and J. Ludwig. 1997. Guns in America: National survey on private ownership and use of firearms (NCJ 1654476). Washington, DC: U.S. Department of Justice.

Cork, D. 1999. "Examining time-space interaction in city-level homicide data: Crack markets and the diffusion of guns among youth." *Journal of Quantitative Criminology* 15 (4):379–406.

Cummings, P., T. D. Koepsell, D. C. Grossman, J. Savarino, and R. S. Thompson. 1997. "The association between the purchase of a handgun and homicide or suicide." *American Journal of Public Health* 87 (6):974–978.

Dahlberg, L. L., R. M. Ikeda, and M. J. Kresnow. 2004. "Guns in the home and risk of a violent death in the home: Findings from a national study." *American Journal of Epidemiology* 160 (10):974–978.

Grassel, K. M., G. J. Wintemute, M. A. Wright, and M. P. Romero. 2003. "Association between handgun purchase and mortality from firearm injury." *Injury Prevention* 9:48–52.

Grossman, D. C., B. A. Mueller, C. Riedy, M. D. Dowd, A. Villaveces, J. Prodzinski, J. Nakagawara, J. Howard, N. Thiersch, and R. Harruff. 2005. "Gun storage practices and rise of youth suicide and unintentional firearm Injuries." *JAMA* 293 (6):707–714.

GSS. 2010. "General Social Survey."

Hemenway, D., C. Barber, and M. Miller. 2010. "Unintentional firearm deaths: A comparison of other-inflicted and self-inflicted shootings." *Accident Analysis and Prevention* 42 (2):1184–1188.

Hemenway, D., & Miller, M. (2000). "Firearm availability and homicide rates across 26 high-income countries." *Journal of Trauma, Injury, Infection, and Critical Care,* 49(6), 985–988.

Hemenway, D., T. Shinoda-Tagawa, and M. Miller. 2002. "Firearm availability and female homicide victimization rates among 25 populous high-income countries." *Journal of the American Medical Women's Association* 57:1–5.

Hepburn, M., M. Miller, D. Azrael, and D. Hemenway. 2007. "The US gun stock: results from the 2004 national firearms survey." *Injury Prevention* 13:15–19.

Hepburn, L. M., and D. Hemenway. 2004. "Firearm availability and homicide: A review of the literature." *Aggression and Violent Behavior* 9:417–440.

Ilgen, M. A., K. Zivin, R. J. McCammon, and M. Valenstein. 2008. "Mental illness, previous suicidality, and access to guns in the United States." *Psychiatric Services* no. 59 (2):198–200.

Kellermann, A. L., and F. P. Rivara. 2012. "Silencing the Science on Gun Research." *JAMA* ():1–2. doi: 10.1001/jama.2012.208207.

Kellermann, A. L., F. Rivara, N. B. Rushforth, J. Banton, D. T. Reav, J. Francisco, A. B. Locci, J. Prodzinski, B. B. Hackman, and G. Somes. 1993. "Gun ownership as a risk factor for homicide in the home." *New England Journal of Medicine* 329 (15):1084–1091.

Kellermann, A. L., F. P. Rivara, G. Somes, D. T. Reay, J. Francisco, J. Banton, J. Prodzinski, C. Fligner, and B. B. Hackman. 1992. "Suicide in the home in relation to gun ownership." *New England Journal of Medicine* 327 (7):467–472.

Killias, M. 1993. "International correlations between gun ownership and rates of homicide and suicide." *Canadian Medical Association Journal* 148 (10):1721–1725.

Kolla, B. P., S. S. O'Connor, and T.W. Lineberry. 2011. "The base rates and factors associated with reported access to firearms in psychiatric inpatients." *General Hospital Psychiatry* 33 (2):191–196.

Kubrin, C. E., and T. Wadsworth. 2009. "Explaining suicide among blacks and whites: How socio-economic factors and gun availability affect race-specific suicide rates." *Social Science Quarterly* (90):1203–1227.

Kung, H. C., J. L. Pearson, and X. Lui. 2003. "Risk factors for male and female suicide decedents ages 15–64 in the United States: Results from the 1993 National Mortality Followback Survey." *Social Psychiatry and Psychiatric Epidemiology* 39 (8):419–426.

MAIG (Mayors Against Illegal Guns). 2008. The movement against illegal guns in America.

Miller, M., D. Azrael, and C. Barber. 2012. "Suicide mortality in the United States: the importance of attending to method in understanding population-level disparities in the burden of suicide." *Annual Review of Public Health* 33:393–408.

Miller, M., D. Azrael, and D. Hemenway. 2001. "Firearm availability and unintentional firearm deaths." *Accident Analysis and Prevention* 33 (4):447–484.

Miller, M., C. Barber, D. Azrael, D. Hememway, and B. E. Molnar. 2009. "Recent psychopathology, suicidal thoughts and suicide attempts in households with and without firearms: Findings from the National Comorbidity Study Replication." *Injury Prevention* 15 (3):183–187.

Miller, M., and D. Hemenway. 1999. "The relationship between firearms and suicide: A review of the literature." *Aggression and Violent Behavior* 4 (1):59–75.

Miller, M., D. Hemenway, and D. Azrael. 2007. "State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001–2003." *Social Science & Medicine* 64 (3):656–664.

Miller, M., S. J. Lippmann, D. Azrael, and D. Hemenway. 2007. "Household firearm ownership and rates of suicide across the 50 states." *Journal of Trauma Injury, Infection and Critical Care* 62 (4):1029–1035.

Nock, M. K., G. Borges, E. J. Bromet, C. B. Cha, R. C. Kessler, and S. Lee. 2008. "Suicide and suicidal behavior." *Epidemiology Reviews* 30 (1):133–154.

NRC. 2005. National Research Council: Firearms and violence: A critical review. Washington, DC: National Academies Press.

Oslin, D.W., C. Zubritsky, G. Brown, M. Mullahy, and A. Puliafico. 2004. "Managing suicide in late life: Access to firearms as a public health risk." *American Journal of Geriatric Psychiatry* 12 (1):30–36.

Pickett, W., F, J. Elgar, F. Brooks, M. de Looze, and K. Rathman. 2013. "Trends and socioeconomic correlates of adolescent physical fighting in 30 Countries." *Pediatrics* 131 (1):18–26.

Richardson, E. G., and D. Hemenway. 2011. "Homicide, suicide, and unintentional firearm fatality: Comparing the United States with other high-income countries, 2003." *Journal of Trauma Injury, Infection and Critical Care* 70 (1):238–243.

SAS. 2007. "Completing the count: Civilian firearms: Annexe 1: Seventy-nine countries with comprehensive civilian ownership data." In *The small arms survey: Guns in the city*, ed. Small Arms Survey Geneva. Cambridge, UK: Cambridge University Press.

Shaffer, D., M. S. Gould, P. Fisher, P. Trautman, and D. Moreau. 1996. "Psychiatric diagnosis in child and adolescent suicide." *Archives of General Psychiatry* 53(4):339–348.

Smith, T. W. 2000. 1999 National gun policy survey of the National Opinion Research Center: Research findings. Chicago, IL: National Opinion Research Center, University of Chicago.

Sorenson, S. B., and K. A. Vittes. 2008. "Mental health and firearms in community-based surveys: Implications for suicide prevention." *Evaluation Review* 32 (3):239–256.

van Kesteren, J., P. Mayhew, and P. Nieuwbeerta. 2001. Criminal victimization in seventeen industrialized countries: Key findings from the 2000 international crime victims survey. In *Netherlands Ministry of Justice: Research and Documentation Centre Netherlands.*

Webster, D., J. Vernick, and L. Hepburn. 2001. "Relationship between licensing, registration, and other gun sales laws and the source state of crime guns." *Injury Prevention* 7 (3): 184–189. doi: 10.1136/ip.7.3.184.

Wiebe, D. J. 2003. "Homicide and suicide risks associated with firearms in the home: A national case-control study." *Annals of Emergency Medicine* 41 (6): 771–782.

Wintemute, G. J. 2000. "Guns and gun violence." In *The crime drop in America*, ed. A. Blumstein and J. Wallman. Cambridge: Cambridge University Press.

Wintemute, G. J., C. A. Parham, J. J. Beaumont, M. Wright, and C. Drake. 1999. "Mortality among recent purchasers of handguns." *New England Journal of Medicine* 341 (21): 1583–1589.

# EXHIBIT 59

*Journal of Empirical Legal Studies*
Volume 16, Issue 2, 198–247, April 2019

# Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis

*John J. Donohue, Abhay Aneja, and Kyle D. Weber**

This article uses more complete state panel data (through 2014) and new statistical techniques to estimate the impact on violent crime when states adopt right-to-carry (RTC) concealed handgun laws. Our preferred panel data regression specification, unlike the statistical model of Lott and Mustard that had previously been offered as evidence of crime-reducing RTC laws, both satisfies the parallel trends assumption and generates statistically significant estimates showing RTC laws *increase* overall violent crime. Our synthetic control approach also finds that RTC laws are associated with 13–15 percent *higher* aggregate violent crime rates 10 years after adoption. Using a consensus estimate of the elasticity of crime with respect to incarceration of 0.15, the average RTC state would need to roughly double its prison population to offset the increase in violent crime caused by RTC adoption.

## I. Introduction

For two decades, there has been a spirited academic debate over whether "shall-issue" concealed carry laws (also known as right-to-carry or RTC laws) have an important impact on crime. The "More Guns, Less Crime" hypothesis originally articulated by John Lott and David Mustard (1997) claimed that RTC laws decreased violent

*Address correspondence to John J. Donohue, Stanford Law School, 559 Nathan Abbott Way, Stanford, CA 94305; email: donohue@law.stanford.edu. Abhay Aneja, Haas School of Business, 2220 Piedmont Avenue, Berkeley, CA 94720; email: aaneja@law.stanford.edu; Kyle D. Weber, Columbia University, 420 W. 118th Street, New York, NY 10027; email: kdw2126@columbia.edu.

We thank Phil Cook, Dan Ho, Stefano DellaVigna, Rob Tibshirani, Trevor Hastie, Stefan Wager, Jeff Strnad, and participants at the 2011 Conference of Empirical Legal Studies (CELS), 2012 American Law and Economics Association (ALEA) Annual Meeting, 2013 Canadian Law and Economics Association (CLEA) Annual Meeting, 2015 NBER Summer Institute (Crime), and the Stanford Law School faculty workshop for their comments and helpful suggestions. Financial support was provided by Stanford Law School. We are indebted to Alberto Abadie, Alexis Diamond, and Jens Hainmueller for their work developing the synthetic control algorithm and programming the Stata module used in this paper and for their helpful comments. The authors would also like to thank Alex Albright, Andrew Baker, Jacob Dorn, Bhargav Gopal, Crystal Huang, Mira Korb, Haksoo Lee, Isaac Rabbani, Akshay Rao, Vikram Rao, Henrik Sachs and Sidharth Sah who provided excellent research assistance, as well as Addis O'Connor and Alex Chekholko at the Research Computing division of Stanford's Information Technology Services for their technical support.

crime (possibly shifting criminals in the direction of committing more property crime to avoid armed citizens). This research may well have encouraged state legislatures to adopt RTC laws, arguably making the pair's 1997 paper in the *Journal of Legal Studies* one of the most consequential criminological articles published in the last 25 years.

The original Lott and Mustard paper as well as subsequent work by John Lott in his 1998 book *More Guns, Less Crime* used a panel data analysis to support the theory that RTC laws reduce violent crime. A large number of papers examined the Lott thesis, with decidedly mixed results. An array of studies, primarily those using the limited data initially employed by Lott and Mustard for the period 1977–1992 and those failing to adjust their standard errors by clustering, supported the Lott and Mustard thesis, while a host of other papers were skeptical of the Lott findings.[1]

It was hoped that the 2005 National Research Council report *Firearms and Violence: A Critical Review* (hereafter the NRC Report) would resolve the controversy over the impact of RTC laws, but this was not to be. While one member of the committee—James Q. Wilson—did partially endorse the Lott thesis by saying there was evidence that murders fell when RTC laws were adopted, the other 15 members of the panel pointedly criticized Wilson's claim, saying that "the scientific evidence does not support his position." The majority emphasized that the estimated effects of RTC laws were highly sensitive to the particular choice of explanatory variables and thus concluded that the panel data evidence through 2000 was too fragile to support any conclusion about the true effects of these laws.

This article answers the call of the NRC Report for more and better data and new statistical techniques to be brought to bear on the issue of the impact of RTC laws on crime. First, we revisit the state panel data evidence to see if extending the data for an additional 14 years, thereby providing additional crime data for prior RTC states as well as on 11 newly adopting RTC states, offers any clearer picture of the causal impact of allowing citizens to carry concealed weapons. We distill from an array of different panel data regressions for various crime categories for two time periods using two major sets of explanatory variables—including our preferred specification (DAW) and that of Lott and Mustard (LM)—a subset of regressions that satisfy the critical parallel trends assumption. All the statistically significant results from these regressions show RTC laws are associated with *higher* rates of overall violent crime, property crime, or murder.

Second, to address some of the weaknesses of panel data models, we undertake an extensive synthetic control analysis in order to present the most complete and robust

---

[1]In support of Lott and Mustard (1997), see Lott's 1998 book *More Guns, Less Crime* (and the 2000 and 2010 editions). Ayres and Donohue (2003) and the 2005 National Research Council report *Firearms and Violence: A Critical Review* dismissed the Lott/Mustard hypothesis as lacking credible statistical support, as did Aneja et al. (2011) (and Aneja et al. (2014) further expanding the latter). Moody and Marvell (2008) and Moody et al. (2014) continued to argue in favor of a crime-reducing effect of RTC laws, although Zimmerman (2014) and McElroy and Wang (2017) find that RTC laws *increase* violent crime and Siegel et al. (2017) find RTC laws increase murders, as discussed in Section III.B.

results to guide policy in this area.[2] This synthetic control methodology—first introduced in Abadie and Gardeazabal (2003) and expanded in Abadie et al. (2010, 2014)—uses a matching methodology to create a credible "synthetic control" based on a weighted average of other states that best matches the prepassage pattern of crime for each "treated" state, which can then be used to estimate the likely path of crime if RTC-adopting states had not adopted an RTC law. By comparing the actual crime pattern for RTC-adopting states with the estimated synthetic controls in the postpassage period, we derive year-by-year estimates for the impact of RTC laws in the 10 years following adoption.[3]

To preview our major findings, the synthetic control estimate of the average impact of RTC laws across the 33 states that adopt between 1981 and 2007[4] indicates that violent crime is substantially higher after 10 years than would have been the case had the RTC law not been adopted. Essentially, for violent crime, the synthetic control approach provides a similar portrayal of RTC laws as that provided by the DAW panel data model and undermines the results of the LM panel data model. According to the aggregate synthetic control models—regardless of whether one uses the DAW or LM covariates—RTC laws led to increases in violent crime of 13–15 percent after 10 years, with positive but not statistically significant effects on property crime and murder. The median effect of RTC adoption after 10 years is 12.3 percent if one considers all 31 states with 10 years worth of data and 11.1 percent if one limits the analysis to the 26 states with the most compelling prepassage fit between the adopting states and their synthetic controls. Comparing our DAW specification findings with the results generated using placebo treatments, we are able to reject the null hypothesis that RTC laws have no impact on aggregate violent crime.

The structure of the article proceeds as follows. Section II begins with a discussion of the ways in which increased carrying of guns could either dampen crime (by thwarting or deterring criminals) or increase crime by directly facilitating violence or aggression by permit holders (or others), greatly expanding the loss and theft of guns, and burdening the functioning of the police in ways that diminish their effectiveness in controlling crime. We then show that a simple comparison of the drop in violent crime from

---

[2]Abadie et al. (2014) identify a number of possible problems with panel regression techniques, including the danger of extrapolation when the observable characteristics of the treated area are outside the range of the corresponding characteristics for the other observations in the sample.

[3]The accuracy of this matching can be qualitatively assessed by examining the root mean square prediction error (RMSPE) of the synthetic control in the pretreatment period (or a variation on this RMSPE implemented in this article), and the statistical significance of the estimated treatment effect can be approximated by running a series of placebo estimates and examining the size of the estimated treatment effect in comparison to the distribution of placebo treatment effects.

[4]Note that we do not supply a synthetic control estimate for Indiana, even though it passed its RTC law in 1980, owing to the fact that we do not have enough pretreatment years to accurately match the state with an appropriate synthetic control. Including Indiana as a treatment state, though, would not meaningfully change our results. Similarly, we do not generate synthetic control estimates for Iowa and Wisconsin (whose RTC laws went into effect in 2011) or for Illinois (2014 RTC law), because of the limited postpassage data.

1977–2014 in the states that have resisted the adoption of RTC laws is almost an order of magnitude greater than in RTC-adopting states (a 42.3 percent drop vs. a 4.3 percent drop), although a spartan panel data model with only state and year effects reduces the differential to 20.2 percent. Section III discusses the panel data results, showing that the DAW model indicates that RTC laws have increased violent and property crime, with weaker evidence that RTC laws increased homicide (but not non-gun homicide) over our entire data period, while both the DAW and the LM model provide statistically significant evidence that RTC laws have increased murder in the postcrack period.

The remainder of the article shows that, using either the DAW or LM explanatory variables, the synthetic control approach uniformly supports the conclusion that RTC laws lead to substantial increases in violent crime. Section IV describes the details of our implementation of the synthetic control approach and shows that the mean and median estimates of the impact of RTC laws show greater than double-digit increases by the 10th year after adoption. Section V provides aggregate synthetic control estimates of the impact of RTC laws, and Section VI concludes.

## II. The Impact of RTC Laws: Theoretical Considerations and Simple Comparisons

*A. Gun Carrying and Crime*

### 1. Mechanisms of Crime Reduction

Allowing citizens to carry concealed handguns can influence violent crime in a number of ways, some benign and some invidious. Violent crime can fall if criminals are deterred by the prospect of meeting armed resistance, and potential victims or armed bystanders may thwart or terminate attacks by either brandishing weapons or actually firing on the potential assailants. For example, in 2012, a Pennsylvania concealed carry permit holder became angry when he was asked to leave a bar because he was carrying a weapon and, in the ensuing argument, he shot two men, killing one, before another permit holder shot him (Kalinowski 2012). Two years later, a psychiatric patient in Pennsylvania killed his caseworker, and grazed his psychiatrist before the doctor shot back with his own gun, ending the assault by wounding the assailant (Associated Press 2014).

The impact of the Pennsylvania RTC law is somewhat ambiguous in both these cases. In the bar shooting, it was a permit holder who started the killing and another who ended it, so the RTC law may actually have increased crime. The case of the doctor's use of force is more clearly benign, although the RTC law may have made no difference: a doctor who routinely deals with violent and deranged patients would typically be able to secure a permit to carry a gun even under a may-issue regime. Only a statistical analysis can reveal whether in aggregate extending gun carrying beyond those with a demonstrated need and good character, as shall-issue laws do, imposes or reduces overall costs.

Some defensive gun uses can be socially costly and contentious even if they do avoid a robbery or an assault. For example, in 1984, when four teens accosted Bernie Goetz on a New York City subway, he prevented an anticipated robbery by shooting all four,

permanently paralyzing one.[5] In 2010, a Pennsylvania concealed carry holder argued that he used a gun to thwart a beating. After a night out drinking, Gerald Ung, a 28-year-old Temple University law student, shot a 23-year-old former star lacrosse player from Villanova, Eddie DiDonato, when DiDonato rushed Ung angrily and aggressively after an altercation that began when DiDonato was bumped while doing chin ups on scaffolding on the street in Philadelphia. When prosecuted, Ung testified that he always carried his loaded gun when he went out drinking. A video of the incident shows that Ung was belligerent and had to be restrained by his friends before the dispute became more physical, which raises the question of whether his gun carrying contributed to his belligerence, and hence was a factor that precipitated the confrontation. Ung, who shot DiDonato six times, leaving DiDonato partially paralyzed with a bullet lodged in his spine, was acquitted of attempted murder, aggravated assault, and possessing an instrument of crime (Slobodzian 2011). While Ung avoided criminal liability and a possible beating, he was still prosecuted and then hit with a major civil action, and the incident did impose significant social costs, as shootings frequently do.[6]

In any event, the use of a gun by a concealed carry permit holder to thwart a crime is a statistically rare phenomenon. Even with the enormous stock of guns in the United States, the vast majority of the time that someone is threatened with violent crime no gun will be wielded defensively. A five-year study of such violent victimizations in the United States found that victims reported failing to defend or to threaten the criminal with a gun 99.2 percent of the time—this in a country with 300 million guns in civilian hands (Planty & Truman 2013). Adding 16 million permit holders who often dwell in low-crime areas may not yield many opportunities for effective defensive use for the roughly 1 percent of Americans who experience a violent crime in a given year, especially since criminals can attack in ways that preempt defensive measures.[7]

## 2. Mechanisms of Increasing Crime

Since the statistical evidence presented in this article suggests that the benign effects of RTC laws are outweighed by the harmful effects, we consider five ways in which RTC laws could increase crime: (a) elevated crime by RTC permit holders or by others, which can be induced by the greater belligerence of permit holders that can attend gun carrying or even through counterproductive attempts by permit holders to intervene protectively; (b) increased crime by those who acquire the guns of permit holders via loss or theft; (c) a change in culture induced by the hyper-vigilance about one's rights and the need

_____

[5]The injury to Darrell Cabey was so damaging that he remains confined to a wheelchair and functions with the intellect of an eight-year-old, for which he received a judgment of $43 million against Goetz, albeit without satisfaction (Biography.com 2016).

[6]According to the civil lawsuit brought by DiDonato, his injuries included "severe neurological impairment, inability to control his bowels, depression and severe neurologic injuries" (Lat 2012).

[7]Even big city police officers rarely need to fire a weapon despite their far greater exposure to criminals. According to a 2016 Pew Research Center survey of 7,917 sworn officers working in departments with 100 or more officers, "only about a quarter (27%) of all officers say they have ever fired their service weapon while on the job" (Morin & Mercer 2017).

to avenge wrongs that the gun culture can nurture; (d) elevated harm as criminals respond to the possibility of armed resistance by increasing their gun carrying and escalating their level of violence; and (e) all of the above factors will either take up police time or increase the risks the police face, thereby impairing the crime-fighting ability of police in ways that can increase crime.

*a. Crime committed or induced by permit holders:* RTC laws can lead to an increase in violent crime by increasing the likelihood a generally law-abiding citizen will commit a crime or increasing the criminal behavior of others. Moreover, RTC laws may facilitate the criminal conduct of those who generally have a criminal intent. We consider these two avenues below.

### i. The pathway from the law-abiding citizen

Evidence from a nationally representative sample of 4,947 individuals indicates that Americans tend to overestimate their gun-related abilities. For example, 82.6 percent believed they were less likely than the average person to use a gun in anger. When asked about their "ability to responsibly own a handgun," 50 percent of the respondents deemed themselves to be in the top 10 percent and 23 percent placed their ability within the top 1 percent of the U.S. population. Such overconfidence has been found to increase risk taking and could well lead to an array of socially harmful consequences ranging from criminal misconduct and gun accidents to lost or stolen guns (Stark & Sachau 2016).

In a number of well-publicized cases, concealed carry permit holders have increased the homicide toll by killing someone with whom they became angry over an insignificant issue, ranging from merging on a highway and talking on a phone in a theater to playing loud music at a gas station (Lozano 2017; Levenson 2017; Scherer 2016). In one particularly tragic example in January 2019 at a bar in State College, Pennsylvania, a lawful permit holder, Jordan Witmer, got into a fight with his girlfriend. When a father and son sitting at the bar tried to intervene, Witmer killed both of them, shot his girlfriend in the chest, and fled. When his car crashed, Witmer broke into a nearby house, killed the 82-year-old homeowner, who was with his wife on their 60th wedding anniversary, and then killed himself (Sauro 2019). Another such example occurred in July 2018 when Michael Drejka started to hassle a woman sitting in a car in a disabled parking spot while her husband and five-year-old son ran into a store. When the husband emerged, he pushed Drejka to the ground, who then killed him with a shot to the chest. The killing is caught on video and Drejka is being prosecuted for manslaughter in Clearwater, Florida (Simon 2018).

When Philadelphia permit holder Louis Mockewich shot and killed a popular youth football coach (another permit holder carrying his gun) over a dispute concerning snow shoveling in January 2000, Mockewich's car had an NRA bumper sticker reading "Armed with Pride" (Gibbons & Moran 2000). An angry young man, with somewhat of a paranoid streak, who has not yet been convicted of a crime or adjudicated as a "mental defective," may be encouraged to carry a gun if he resides in an RTC state.[8] That such

---

[8]The Gun Control Act of 1968 prohibits gun possession by felons and adjudicated "mental defectives" (18 U.S.C. 922(d)(4), 2016).

individuals will be more likely to be aggressive once armed and hence more likely to stimulate violence by others should not be surprising.

Recent evidence suggests that as gun carrying is increasing with the proliferation of RTC laws, road rage incidents involving guns are rising (Biette-Timmons 2017; Plumlee 2012). Incidents in which "someone in a car brandished a gun in a threatening manner or fired a gun at another driver or passenger have more than doubled in the last three years, from 247 in 2014 to 620 in 2016 .... The highest-profile recent road rage incidents involved two NFL players, Joe McKnight and Will Smith, killed … in separate road rage shootings in New Orleans" (Shen 2017).[9] In the nightmare case for RTC, two Michigan permit-holding drivers pulled over to battle over a tailgating dispute in September 2013 and each shot and killed the other (Stuart 2013). Without Michigan's RTC law, this would likely have not been a double homicide. Indeed, two studies—one for Arizona and one for the nation as a whole—found that "the evidence indicates that those with guns in the vehicle are more likely to engage in 'road rage'" (Hemenway et al. 2006; Miller et al. 2002).[10] These studies may suggest either that gun carrying emboldens more aggressive behavior or reflects a selection effect for more aggressive individuals.[11] If this is correct, then it may not be a coincidence that there are so many cases in which a concealed carry holder acts belligerently and is shot by another permit holder.[12]

---

[9]Joe McNight and Ronald Gasser were arguing through their open car windows as they drove for miles. When they were both stopped at a red light, McNight walked over to Gasser's car, and the "two argued through the passenger-side window until Gasser pulled a gun from between his seat and the center console and shot McKnight three times." Gasser was convicted of manslaughter and sentenced to a prison term of 30 years (Calder 2018).

[10]A perfect illustration was provided by 25-year-old Minnesota concealed carry permit holder Alexander Weiss, who got into an argument after a fender bender caused by a 17-year-old driver. Since the police had been called, it is hard to imagine that this event could end tragically—unless someone had a gun. Unfortunately, Weiss, who had a bumper sticker on his car saying "Gun Control Means Hitting Your Target," killed the 17-year-old with one shot to the chest and has been charged with second-degree murder (KIMT 2018).

[11]While concealed carry permit holders should be free of any felony conviction, and thus show a lower overall rate of violence than a group that contains felons, a study in Texas found that when permit holders do commit a crime, it tends to be a severe one: "the concentration of convictions for weapons offenses, threatening someone with a firearm, and intentionally killing a person stem from the ready availability of a handgun for CHL holders" (Phillips et al. 2013). See, for example, a Texas permit holder who told police he shot a man in the head at an IHOP restaurant in Galveston because "he was annoyed by the noise the victim and others were making just a table away" (ABC News 2018).

[12]We have just cited three of them: the 2012 Pennsylvania bar shooting, the 2000 Philadelphia snow-shoveling dispute, and the 2013 Michigan road-rage incident. Here are two more. Former NFL player Will Smith, a concealed carry permit holder with a loaded gun in his car, was engaged in a road rage incident with another permit holder, who killed him with seven shots in the back and one into his side and shot his wife, hitting both knees. The shooter was convicted of manslaughter and sentenced to 25 years in prison (Lane 2018). In yet another recent case, two permit holders glowered at each other in a Chicago gas station, and when one drew his weapon, the second man pulled out his own gun and killed the 43-year-old instigator, who died in front of his son, daughter, and pregnant daughter-in-law (Hernandez 2017). A video of the encounter can be found at https://www.youtube.com/watch?v=I2j9vvDHlBU. According to the police report obtained by the *Chicago Tribune*, a bullet from the gun exchange broke the picture window of a nearby garden apartment and another shattered the window of a car with four occupants that was driving past the gas station. No charges were brought against the surviving permit holder, who shot first but in response to the threat initiated by the other permit holder.

In general, the critique that the relatively low number of permit revocations proves that permit holders do not commit enough crime to substantially elevate violent criminality is misguided for a variety of reasons. First, only a small fraction of 1 percent of Americans commits a gun crime each year, so we do not expect even a random group of Americans to commit much crime, let alone a group purged of convicted felons. Nonetheless, permit revocations clearly understate the criminal misconduct of permit holders, since not all violent criminals are caught and we have just seen five cases where six permit holders were killed, so no permit revocation or criminal prosecution would have occurred regardless of any criminality by the deceased.[13] Second, and perhaps more importantly, RTC laws increase crime by individuals other than permit holders in a variety of ways. The messages of the gun culture, perhaps reinforced by the adoption of RTC laws, can promote fear and anger, which are emotions that can invite more hostile confrontations leading to violence. For example, if permit holder George Zimmerman hassled Trayvon Martin only because Zimmerman was armed, then the presence of Zimmerman's gun could be deemed to have encouraged a hostile confrontation, regardless of who ultimately becomes violent.[14]

Even well-intentioned interventions by permit holders intending to stop a crime have elevated the crime count when they ended with the permit holder either being killed by the criminal[15] or shooting an innocent party by

———

[13] In addition, NRA-advocated state laws that ban the release of information about whether those arrested for even the most atrocious crimes are RTC permit holders make it extremely difficult to monitor their criminal conduct.

[14] Psychologists have found that the very act of carrying a gun tends to distort perceptions of reality in a way that exaggerates perceived threats. "We have shown here that … the act of wielding a firearm raises the likelihood that nonthreatening objects will be perceived as threats. This bias can clearly be horrific for victims of accidental shootings" (Witt & Brockmole 2012). As one permit holder explained: "a gun causes its bearer to see the world differently. A well-lit city sidewalk full of innocent pedestrians becomes a scene—a human grouping one of whose constituents you might need to shoot. Something good in yourself is, by this means, sacrificed. And more. In a sudden, unwieldy hauling-out of your piece, or just by having your piece in your pocket, you can fumble around and shoot yourself, as often happens and isn't at all funny. Or you might shoot some little girl on a porch across the street or two streets away, or five streets away. Lots and lots of untoward things can happen when you're legally carrying a concealed firearm. One or two of them might turn out to be beneficial—to you. But a majority are beneficial to neither man nor beast. Boats are said, by less nautical types, always to be seeking a place to sink. Guns—no matter who has them—are always seeking an opportunity to go off. Anybody who says different is a fool or a liar or both" (Ford 2016).

[15] In 2016 in Arlington, Texas, a man in a domestic dispute shot at a woman and then tried to drive off (under Texas law it was lawful for him to be carrying his gun in his car, even though he did not have a concealed carry permit.) When he was confronted by a permit holder, the shooter slapped the permit holder's gun out of his hand and then killed him with a shot to the head. Shortly thereafter, the shooter turned himself into the police (Mettler 2016). Similarly, when armed criminals entered a Las Vegas Walmart in 2014 and told everyone to get out because "[t]his is a revolution," one permit holder told his friend he would stay to confront the threat. He was gunned down shortly before the police arrived, adding to the death toll rather than reducing it (NBC News 2014). Finally, in January 2010, Stephen Sharp arrived at work at a St. Louis power plant just as co-worker Timothy Hendron began firing at fellow workers with an AK-47. Retrieving a pistol from his truck, Sharp opened fire at Hendron, and fecklessly discharged all six rounds from across the parking lot. Unharmed, Hendron returned fire, grievously wounding Sharp and continuing his rampage unabated. When the police arrived, there was "no clear distinction between attacker and victims." In the end, Hendron killed three and wounded five before killing himself (Byers 2010).

mistake.[16] Indeed, an FBI study of 160 active shooter incidents found that in almost half (21 of 45) the situations in which police engaged the shooter to end the threat, law enforcement suffered casualties, totaling nine killed and 28 wounded (Blair & Schweit 2014). One would assume the danger to an untrained permit holder trying to confront an active shooter would be greater than that of a trained professional, which may in part explain why effective intervention in such cases by permit holders to thwart crime is so rare. Although the same FBI report found that in 21 of a total of 160 active shooter incidents between 2000 and 2013, "the situation ended after unarmed citizens safely and successfully restrained the shooter," there was only one case—in a bar in Winnemucca, Nevada in 2008—in which a private armed citizen other than an armed security guard stopped a shooter, and that individual was an active-duty Marine (Holzel 2008).

## ii. The pathway from those harboring criminal intent

Over the 10-year period from May 2007 through January 2017, the Violence Policy Center (2017) lists 31 instances in which concealed carry permit holders killed three or more individuals in a single incident. Many of these episodes are disturbingly similar in that there was substantial evidence of violent tendencies and/or serious mental illness, but no effort was made to even revoke the carry permit, let alone take effective action to prevent access to guns. For example, on January 6, 2017, concealed handgun permit holder Esteban Santiago, 26, killed five and wounded six others at the Fort Lauderdale-Hollywood Airport, before sitting on the floor and waiting to be arrested as soon as he ran out of ammunition. In the year prior to the shooting, police in Anchorage, Alaska, charged Santiago with domestic violence, and visited the home five times for various other complaints (KTUU 2017). In November 2016, Santiago entered the Anchorage FBI office and spoke of "mind control" by the CIA and having "terroristic thoughts" (Hopkins 2017). Although the police took his handgun at the time, it was returned to him on December 7, 2016 after Santiago spent four days in a mental health facility because, according to federal officials, "there was no mechanism in federal law for officers to permanently seize the weapon"[17] (Boots 2017). Less than a month later, Santiago flew with his gun to Florida and opened fire in the baggage claim area.[18]

In January 2018, the FBI charged Taylor Wilson, a 26-year-old Missouri concealed carry permit holder, with terrorism on an Amtrak train when, while carrying a loaded

---

[16]In 2012, "a customer with a concealed handgun license … accidentally shot and killed a store clerk" during an attempted robbery in Houston (MacDonald 2012). Similarly, in 2015, also in Houston, a bystander who drew his weapon upon seeing a carjacking incident ended up shooting the victim in the head by accident (KHOU 2015). An episode in June 2017 underscored that interventions even by well-trained individuals can complicate and exacerbate unfolding crime situations. An off-duty Saint Louis police officer with 11 years of service was inside his home when he heard the police exchanging gunfire with some car thieves. Taking his police-issued weapon, he went outside to help, but as he approached he was told by two officers to get on the ground and then shot in the arm by a third officer who "feared for his safety" (Hauser 2017).

[17]Moreover, in 2012, Puerto Rican police confiscated Santiago's handguns and held them for two years before returning them to him in May 2014, after which he moved to Alaska (Clary et al. 2017).

[18]For a similar story of repeated gun violence and signs of mental illness by a concealed carry permit holder, see the case of Aaron Alexis, who murdered 12 at the Washington Navy Yard in September 2013 (Carter et al. 2013).

weapon, he tried to interfere with the brakes and controls of the moving train. According to the FBI, Wilson had (1) previously joined an "alt-right" neo-Nazi group and traveled to the Unite the Right rally in Charlottesville, Virginia in August 2017; (2) indicated his interest in "killing black people" and was the perpetrator of a road-rage incident in which he pointed a gun at a black woman for no apparent reason while driving on an interstate highway in April 2016; and (3) possessed devices and weapons "to engage in criminal offenses against the United States." Research is needed to analyze whether having a permit to legally carry weapons facilitates such criminal designs (Pilger 2018).

In June 2017, Milwaukee Police Chief Ed Flynn pointed out that criminal gangs have taken advantage of RTC laws by having gang members with clean criminal records obtain concealed carry permits and then hold the guns after they are used by the active criminals (Officer.com 2017). Flynn was referring to so-called human holsters who have RTC permits and hold guns for those barred from possession. For example, Wisconsin permit holder Darrail Smith was stopped three times while carrying guns away from crime scenes before police finally charged him with criminal conspiracy. In the second of these, Smith was "carrying three loaded guns, including one that had been reported stolen," but that was an insufficient basis to charge him with a crime or revoke his RTC permit (DePrang 2015). Having a "designated permit holder" along to take possession of the guns when confronted by police may be an attractive benefit for criminal elements acting in concert (Fernandez et al. 2015; Luthern 2015).

*b. Increased gun thefts:* The most frequent occurrence each year involving crime and a good guy with a gun is not self-defense but rather the theft of the good guy's gun, which occurs hundreds of thousands of times each year.[19] Data from a nationally representative web-based survey conducted in April 2015 of 3,949 subjects revealed that those who carried guns outside the home had their guns stolen at a rate over 1 percent per year (Hemenway et al. 2017). Given the current level of roughly 16 million permit holders, a plausible estimate is that RTC laws result in permit holders furnishing more than 100,000 guns per year to criminals.[20] As Phil Cook has noted, the relationship between gun theft and crime is a complicated one for which few definitive data are currently available (Cook

---

[19]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers): "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts (Freskos 2017b). According to National Crime Information Center data, the number of guns reported stolen nationally jumped 60 percent between 2007 and 2016 (Freskos 2018a).

[20]While the Hemenway et al. study is not large enough and detailed enough to provide precise estimates, it establishes that those who have carried guns in the last month are more likely to have them stolen. A recent Pew Research Survey found that 26 percent of American gun owners say they carry a gun outside of their home "all or most of the time" (Igielnik & Brown 2017, surveying 3,930 U.S. adults, including 1,269 gun owners). If 1 percent of 16 million permit holders have guns stolen each year, that would suggest 160,000 guns were stolen. Only guns stolen outside the home would be attributable to RTC laws, so a plausible estimate of guns stolen per year owing to gun carrying outside the home might be 100,000.

*208   Donohue et al.*

2018). But if there was any merit to the outrage over the loss of about 1,400 guns during the Fast and Furious program that began in 2009 and the contribution that these guns made to crime (primarily in Mexico), it highlights the severity of the vastly greater burdens of guns lost by and stolen from U.S. gun carriers.[21] A 2013 report from the Bureau of Alcohol, Tobacco, Firearms, and Explosives concluded that "lost and stolen guns pose a substantial threat to public safety and to law enforcement. Those that steal firearms commit violent crimes with stolen guns, transfer stolen firearms to others who commit crimes, and create an unregulated secondary market for firearms, including a market for those who are prohibited by law from possessing a gun" (Office of the Director—Strategic Management 2013; Parsons & Vargas 2017).

For example, after Sean Penn obtained a permit to carry a gun, his car was stolen with two guns in the trunk. The car was soon recovered, but the guns were gone (Donohue 2003). In July 2015 in San Francisco, the theft of a gun from a car in San Francisco led to a killing of a tourist on a city pier that almost certainly would not have occurred if the lawful gun owner had not left it in the car (Ho 2015). Just a few months later, a gun stolen from an unlocked car was used in two separate killings in San Francisco and Marin in October 2015 (Ho & Williams 2015). According to the National Crime Victimization Survey, in 2013 there were over 660,000 auto thefts from households. More guns being carried in vehicles by permit holders means more criminals will be walking around with the guns stolen from permit holders.[22]

As Michael Rallings, the top law enforcement official in Memphis, Tennessee, noted in commenting on the problem of guns being stolen from cars: "Laws have unintended consequences. We cannot ignore that as a legislature passes laws that make guns more accessible to criminals, that has a direct effect on our violent crime rate" (Freskos 2017a). An Atlanta police sergeant elaborated on this phenomenon: "Most of our criminals, they go out each and every night hunting for guns, and the easiest way to get them is out of people's cars. We're finding that a majority of stolen guns that are getting in the hands of criminals and being used to commit crimes were stolen out of vehicles" (Freskos 2017c). In 2015, 70 percent of guns reported stolen in Atlanta came from cars and trucks (Freskos 2016). Another Atlanta police officer stated that weapons stolen from cars "are used in crimes to shoot people, to rob people" because criminals find these guns to be easy to steal and hard to trace. "For them, it doesn't cost them anything to break into a car and steal a gun" (Freskos 2016).[23]

---

[21]"Of the 2,020 guns involved in the Bureau of Alcohol, Tobacco, Firearms, and Explosives probe dubbed 'Operation Fast and Furious,' 363 have been recovered in the United States and 227 have been recovered in Mexico. That leaves 1,430 guns unaccounted for" (Schwarzschild & Griffin 2011). Wayne LaPierre of the NRA was quoted as saying: "These guns are now, as a result of what [ATF] did, in the hands of evil people, and evil people are committing murders and crimes with these guns against innocent citizens" (Horwitz 2011).

[22]In early December 2017, the sheriff in Jacksonville, Florida announced that his office knew of 521 guns that had been stolen so far in 2017—from unlocked cars alone! (Campbell 2017).

[23]Examples abound: Tario Graham was shot and killed during a domestic dispute in February 2012 with a revolver stolen weeks earlier out of pickup truck six miles away in East Memphis (Perrusquia 2017). In Florida, a handgun stolen from an unlocked Honda Accord in mid-2014 helped kill a police officer a few days before Christmas that year (Sampson 2014). A gun stolen from a parked car during a Mardi Gras parade in 2017 was used a few days later to kill 15-year-old Nia Savage in Mobile, Alabama, on Valentine's Day (Freskos 2017a).

Of course, the permit holders whose guns are stolen are not the killers, but they can be the but-for cause of the killings. Lost, forgotten, and misplaced guns are another dangerous byproduct of RTC laws.[24]

*c. Enhancing a culture of violence:* The South has long had a higher rate of violent crime than the rest of the country. For example, in 2012, while the South had about one-quarter of the U.S. population, it had almost 41 percent of the violent crime reported to police (Fuchs 2013). Social psychologists have argued that part of the reason the South has a higher violent crime rate is that it has perpetuated a "subculture of violence" predicated on an aggrandized sense of one's rights and honor that responds negatively to perceived insults. A famous experiment published in the *Journal of Personality and Social Psychology* found that southern males were more likely than northern males to respond aggressively to being bumped and insulted. This was confirmed by measurement of their stress hormones and their frequency of engaging in aggressive or dominant behavior after being insulted (Cohen et al. 1996). To the extent that RTC laws reflect and encourage this cultural response, they can promote violent crime not only by permit holders, but by all those with or without guns who are influenced by this crime-inducing worldview.

Even upstanding citizens, such as Donald Brown, a 56-year-old retired Hartford firefighter with a distinguished record of service, can fall prey to the notion that resort to a lawful concealed weapon is a good response to a heated argument. Brown was sentenced to seven years in prison in January 2018 by a Connecticut judge who cited his "poor judgment on April 24, 2015, when he drew his licensed 9mm handgun and fired a round into the abdomen of Lascelles Reid, 33." The shooting was prompted by a dispute "over renovations Reid was performing at a house Brown owns" (Owens 2018). Once again, we see that the RTC permit was the pathway to serious violent crime by a previously law-abiding citizen.

*d. Increasing violence by criminals:* The argument for RTC laws is often predicated on the supposition that they will encourage good guys to have guns, leading only to benign effects on the behavior of bad guys. This is highly unlikely to be true.[25] Indeed, the

---

[24]The growing TSA seizures in carry-on luggage are explained by the increase in the number of gun carriers who simply forget they have a gun in their luggage or briefcase (Williams & Waltrip 2004). A chemistry teacher at Marjory Stoneman Douglas High School in Parkland, Florida, who had said he would be willing to carry a weapon to protect students at the school, was criminally charged for leaving a loaded pistol in a public restroom. The teacher's 9mm Glock was discharged by an intoxicated homeless man who found it in the restroom (Stanglin 2018).

[25]Consider in this regard, David Friedman's theoretical analysis of how right-to-carry laws will reduce violent crime: "Suppose one little old lady in ten carries a gun. Suppose that one in ten of those, if attacked by a mugger, will succeed in killing the mugger instead of being killed by him—or shooting herself in the foot. On average, the mugger is much more likely to win the encounter than the little old lady. But—also on average—every hundred muggings produce one dead mugger. At those odds, mugging is a very unattractive profession—not many little old ladies carry enough money in their purses to justify one chance in a hundred of being killed getting it. The number of muggers—and muggings—declines drastically, not because all of the muggers have been killed but because they have, rationally, sought safer professions" (Friedman 1990). There is certainly no empirical support for the conjecture that muggings will "decline drastically" in the wake of RTC adoption. What Friedman's analysis overlooks is that muggers can decide not to mug (which is what Friedman posits) or they can decide to initiate their muggings by cracking the old ladies over the head or by being

evidence that gun prevalence in a state is associated with higher rates of lethal force by police (even controlling for homicide rates) suggests that police may be more fearful and shoot quicker when they are more likely to interact with an armed individual (Nagin forthcoming).[26] Presumably, criminals would respond in a similar fashion, leading them to arm themselves more frequently, attack more harshly, and shoot more quickly when citizens are more likely to be armed. In one study, two-thirds of prisoners incarcerated for gun offenses "reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun" (Cook et al. 2009). Such responses by criminals will elevate the toll of the crimes that do occur.

Indeed, a panel data estimate over the years 1980 to 2016 reveals that the percentage of robberies committed with a firearm rises by 18 percent in the wake of RTC adoption ($t =$ 2.60).[27] Our synthetic controls assessment similarly shows that the percentage of robberies committed with a firearm increases by 35 percent over 10 years ($t = 4.48$).[28] Moreover, there is no evidence that RTC laws are reducing the overall level of robberies: the panel data analysis associates RTC laws with a 9 percent higher level of overall robberies ($t = 1.85$) and the synthetic controls analysis suggests a 7 percent growth over 10 years ($t = 1.19$).

*e. Impairing police effectiveness:* According to an April 2016 report of the Council of Economic Advisers: "Expanding resources for police has consistently been shown to reduce crime; estimates from economic research suggests that a 10% increase in police size decreases crime by 3 to 10%" (CEA 2016:4). In summarizing the evidence on fighting crime in the *Journal of Economic Literature*, Aaron Chalfin and Justin McCrary note that adding police manpower is almost twice as effective in reducing violent crime as it is in reducing property crime (Chalfin & McCrary 2017). Therefore, anything that RTC laws do to occupy police time, from processing permit applications to checking for permit validity to dealing with gunshot victims, inadvertent gun discharges, and the staggering number of stolen guns is likely to have an opportunity cost expressed in higher violent crime.

The presence of more guns on the street can complicate the job of police as they confront (or shy away from) armed citizens. Daniel Nagin finds a pronounced positive association between statewide prevalence of gun ownership and police use of lethal force (Nagin forthcoming). A Minnesota police officer who stopped Philando Castile for a broken taillight shot him seven times only seconds after Castile indicated he had a permit to carry a weapon because the officer feared the permit holder might be reaching for the

---

prepared to shoot them if they start reaching for a gun (or even wear body armor). Depending on the response of the criminals to increased gun carrying by potential victims, the increased risk to the criminals may be small compared to the increased risk to the victims. Only an empirical evaluation can answer this question.

[26]See footnotes 29–31 and accompanying text for examples of this pattern of police use of lethal force.

[27]The panel data model uses the DAW explanatory variables set forth in Table 2.

[28]The weighted average proportion of robberies committed by firearm in the year prior to RTC adoption (for states that adopted RTC between 1981 and 2014) is 36 percent while the similar proportion in 2014 for the same RTC states is 43 percent (and for non-RTC states is 29 percent).

gun. Another RTC permit holder, stranded in his disabled car early one morning on a Florida highway exit ramp, grabbed the gun he had legally purchased three days earlier when a police officer in plainclothes pulled up in a van with tinted windows and no lights. "It was not immediately clear what happened after [the officer] got out of his van, but the permit holder at some point started running … and [the officer] fired six times," killing the permit holder, whose body fell "about 80 to 100 feet from his vehicle," with his undischarged handgun on the ground somewhere in between (Robles & Hauser 2015). After a similar encounter between an officer and a permit holder, the officer asked the gun owner: "Do you realize you almost died tonight?" (Kaste 2019).[29]

A policemen trying to give a traffic ticket has more to fear if the driver is armed. When a gun is found in a car in such a situation, a greater amount of time is needed to ascertain the driver's status as a permit holder. A lawful permit holder who happens to have forgotten his permit may end up taking up more police time through arrest and/or other processing.

Moreover, police may be less enthusiastic about investigating certain suspicious activities or engaging in effective crime-fighting actions given the greater risks that widespread gun carrying poses to them, whether from permit holders or the criminals who steal their guns.[30] In a speech at the University of Chicago Law School in October 2015, then-FBI Director James Comey argued that criticism of overly aggressive policing led officers to back away from more involved policing, causing violent crime to rise (Donohue 2017a). If the more serious concern of being shot by an angry gun toter impairs effective policing, the prospect of increased crime following RTC adoption could be far more substantial than the issue that Comey highlighted.[31]

———

[29]A permit to carry instructor has posted a YouTube video about "How to inform an officer you are carrying a handgun and live" that is designed to "keep yourself from getting shot unintentionally" by the police. The video, which has over 4.2 million views, has generated comments from non-Americans that it "makes the US look like a war zone" and leads to such unnatural and time-consuming behavior that "an English officer … would look at you like a complete freak" (Soderling 2016).

[30]"Every law enforcement officer working today knows that any routine traffic stop, delivery of a warrant or court order, or response to a domestic disturbance anywhere in the country involving people of any race or age can put them face to face with a weapon. Guns are everywhere, not just in the inner city" (Wilson 2016). In offering an explanation for why the United States massively leads the developed world in police shootings, criminologist David Kennedy stated: "Police officers in the United States in reality need to be conscious of and are trained to be conscious of the fact that literally every single person they come in contact with may be carrying a concealed firearm." For example, police in England and Wales shot and killed 55 people over the 25-year period from 1990–2014, while in just the first 24 days of 2015, the United States (with six times the population) had a higher number of fatal shootings by police (Lopez 2018).

[31]A vivid illustration of how even the erroneous perception that someone accosted by the police is armed can lead to deadly consequences is revealed in the chilling video of five Arizona police officers confronting an unarmed man they incorrectly believed had a gun. During the prolonged encounter, the officers shouted commands at an intoxicated 26-year-old father of two, who begged with his hands in the air not to be shot. The man was killed by five bullets when, following orders to crawl on the floor toward police, he paused to pull up his slipping pants. A warning against the open carry of guns issued by the San Mateo County, California, Sheriff's Office makes the general point that law enforcement officers become hyper-vigilant when encountering an armed individual: "Should the gun carrying person fail to comply with a law enforcement instruction or move in a way that could be construed as threatening, the police are forced to respond in kind for their own protection. It's well and good in hindsight to say the gun carrier was simply 'exercising their rights' but the result could be deadly" (Lunny 2010).

The presence of multiple gun carriers can also complicate police responses to mass shootings and other crimes. When police arrived at an Alabama mall in November 2018, they saw a 21-year-old concealed carry permit holder with gun drawn, and mistakenly killed him, thinking he was the shooter. In fact, the dead man had been assisting and protecting shoppers, and the real shooter escaped (McLaughlin & Holcombe 2018). Another benign intervention that ended in tragedy for the good guy with a gun occurred in July 2018 when police officers arrived as a "good Samaritan" with a concealed carry permit was trying to break up a fight in Portland, Oregon. The police saw the gun held by the permit holder—a Navy veteran, postal worker, and father of three—and in the confusion shot and killed him (Gueverra 2018).

Good guys with guns also can interfere with police anti-crime efforts. For example, police reported that when a number of Walmart customers (fecklessly) pulled out their weapons during a shooting on November 1, 2017, their "presence 'absolutely' slowed the process of determining who, and how many, suspects were involved in the shootings, said Thornton [Colorado] police spokesman Victor Avila" (Simpson 2017).

Similarly, in 2014, a concealed carry permit holder in Illinois fired two shots at a fleeing armed robber at a phone store, thereby interfering with a pursuing police officer. According to the police: "Since the officer did not know where the shots were fired from, he was forced to terminate his foot pursuit and take cover for his own safety" (Glanton & Sadovi 2014).

Indeed, preventive efforts to get guns off the street in high-crime neighborhoods are less feasible when carrying guns is presumptively legal. The passage of RTC laws normalizes the practice of carrying guns in a way that may enable criminals to carry guns more readily without prompting a challenge, while making it harder for the police to know who is and who is not allowed to possess guns in public.

Furthermore, negligent discharges of guns, although common, rarely lead to charges of violent crime but they can take up valuable police time for investigation and in determining whether criminal prosecution or permit withdrawal is warranted. For example, on November 16, 2017, Tennessee churchgoers were reflecting on the recent Texas church massacre in Sutherland Springs when a permit holder mentioned he always carries his gun, bragging that he would be ready to stop any mass shooter. While proudly showing his Ruger handgun, the permit holder inadvertently shot himself in the palm, causing panic in the church as the bullet "ripped through [his wife's] lower left abdomen, out the right side of her abdomen, into her right forearm and out the backside of her forearm. The bullet then struck the wall and ricocheted, landing under the wife's wheelchair." The gun discharge prompted a 911 call, which in the confusion made the police think an active shooting incident was underway. The result was that the local hospital and a number of schools were placed on lockdown for 45 minutes until the police finally ascertained that the shooting was accidental (Eltagouri 2017).[32]

_____

[32]Negligent discharges by permit holders have occurred in public and private settings from parks, stadiums, movie theaters, restaurants, and government buildings to private households (WFTV 2015; Heath 2015). Thirty-nine-year-old Mike Lee Dickey, who was babysitting an eight-year-old boy, was in the bathroom removing his handgun from his waistband when it discharged. The bullet passed through two doors, before striking the child in his arm while he slept in a nearby bedroom (Associated Press 2015). In April 2018, a 21-year-old pregnant mother of two in

Everything that takes up added police time or complicates the job of law enforcement will serve as a tax on police, rendering them less effective on the margin, and thereby contributing to crime. Indeed, this may in part explain why RTC states tend to increase the size of their police forces (relative to nonadopting states) after RTC laws are passed, as shown in Table 1.[33]

### B. A Simple Difference-in-Differences Analysis

We begin by showing how violent crime evolved over our 1977–2014 data period for RTC and non-RTC states.[34] Figure 1 depicts percentage changes in the violent crime rate over our entire data period for three groups of states: those that never adopted RTC laws, those that adopted RTC laws sometime between 1977 and before 2014, and those that adopted RTC laws prior to 1977. It is noteworthy that the 42.3 percent drop in violent crime in the nine states that never adopted RTC laws is almost an order of magnitude greater than the 4.3 percent reduction experienced by states that adopted RTC laws during our period of analysis.[35]

The NRC Report presented a "no-controls" estimate, which is just the coefficient estimate on the variable indicating the date of adoption of a RTC law in a crime rate panel data model with state and year fixed effects. According to the NRC Report: "Estimating the model using data to 2000 shows that states adopting right-to-carry laws saw 12.9 percent increases in violent crime—and 21.2 percent increases in property crime—relative to national crime patterns." Estimating this same model using 14 additional years of data (through 2014) and 11 additional adopting states (listed at the bottom of Appendix Table C1) reveals that the average postpassage increase in violent crime was

_____

Indiana was shot by her three-year-old daughter when the toddler's father left the legal but loaded 9mm handgun between the console and the front passenger seat after he exited the vehicle to go inside a store. The child climbed over from the backseat and accidentally fired the gun, hitting her mother though the upper right part of her torso. (Palmer 2018) See also Savitsky (2019) (country western singer Justin Carter dies when the gun in his pocket discharges and hits him in the face); Schwarz (2014) (Idaho professor shoots himself in foot during class two months after state legalizes guns on campuses); Murdock (2018) (man shoots himself in the groin with gun in his waistband in the meat section of Walmart in Buckeye, Arizona); Barbash (2018) (California teacher demonstrating gun safety accidentally discharges weapon in a high school classroom in March 2018, injuring one student); Fortin (2018) (in February 2018, a Georgia teacher fired his gun while barricaded in his classroom); US News (2018) (in April 2018, an Ohio woman with a valid concealed carry permit accidentally killed her two-year-old daughter at an Ohio hotel while trying to turn on the gun's safety); and Fox News (2016) ("the owner of an Ohio gun shop was shot and killed when a student in a concealed carry permit class accidentally discharged a weapon," striking the owner in the neck in a different room after the bullet passed through a wall).

[33]See Adda et al. (2014), describing how local depenalization of cannabis enabled the police to reallocate resources, thereby reducing violent crime.

[34]The FBI violent crime category includes murder, rape, robbery, and aggravated assault.

[35]Over the same 1977–2014 period, the states that avoided adopting RTC laws had substantially smaller increases in their rates of incarceration and police employment. The nine never-adopting states increased their incarceration rate by 205 percent, while the incarceration rates in the adopting states rose by 262 and 259 percent, for those adopting RTC laws before and after 1977, respectively. Similarly, the rate of police employment rose by 16 percent in the never-adopting states and by 38 and 55 percent for those adopting before and after 1977, respectively.

*Figure 1:* The decline in violent crime rates has been far greater in states with no RTC laws, 1977−2014.



DATA SOURCES: UCR for crime rates; Census for state populations.
NOTE: Illinois excluded since its concealed carry law did not go into effect until 2014. From 1977–2013, the violent crime rate in Illinois fell by 36 percent, from 631 to 403 crimes per 100,000 people.

20.2 percent, while the comparable increase in property crime was 19.2 percent (both having $p$ values less than 5 percent).[36]

Of course, it does not prove that RTC laws increase crime simply because RTC states experience a worse postpassage crime pattern. For example, it might be the case that some states decided to fight crime by allowing citizens to carry concealed handguns while others decided to hire more police and incarcerate a greater number of convicted criminals. If police and prisons were more effective in stopping crime, the "no-controls" model might show that the crime experience in RTC states was worse than in other states even if this were not a true causal result of the adoption of RTC laws. As it turns out, though, RTC states not only experienced higher rates of violent crime but they also had larger increases in incarceration and police than other states. Table 1 provides panel data evidence on how incarceration and two measures of police employment changed after RTC adoption (relative to nonadopting states). All three measures rose in RTC states, and the 7–8 percent greater increases in police in RTC states are statistically significant. In other words, Table 1 confirms that RTC states did *not* have relatively declining rates of

---

[36]The dummy variable model reports the coefficient associated with a RTC variable that is given a value of 0 when a RTC law is not in effect in that year, a value of 1 when a RTC law is in effect that entire year, and a value equal to the portion of the year a RTC law is in effect otherwise. The date of adoption for each RTC state is shown in Appendix Table A1. Note the fact that violent crime was noticeably higher in 1977 in the nine states that did not adopt RTC laws indicates that it will be particularly important that the parallel trends requirement of a valid panel data analysis is established, which is an issue to which we carefully attend in Section III.A.3. All our appendices are posted online at https://works.bepress.com/john_donohue/.

Table 1:   Panel Data Estimates Showing Greater Increases in Incarceration and Police Following RTC Adoption: State- and Year-Fixed Effects, and No Other Regressors, 1977–2014

|  | *Incarceration* | *Police Employment per 100k* | *Police Officers per 100k* |
| --- | --- | --- | --- |
|  | *(1)* | *(2)* | *(3)* |
| Dummy variable model | 6.78 (6.22) | 8.39*** (3.15) | 7.08** (2.76) |

NOTE: OLS estimations include state- and year-fixed effects and are weighted by population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. The police employment and sworn police officer data are from the Uniform Crime Reports (UCR). The source of the incarceration rate is the Bureau of Justice Statistics (2014). *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

incarceration or total police employees after adopting their RTC laws that might explain their comparatively poor postpassage crime performance.

## III.  A Panel Data Analysis of RTC Laws

### A.  *Estimating Two Models on the Full Data Period 1977–2014*

We have just seen that RTC law adoption is followed by *higher* rates of violent and property crime (relative to national trends) and that the elevated crime levels after RTC law adoption occur despite the fact that RTC states actually invested relatively more heavily in prisons and police than non-RTC states. While the theoretical predictions about the effect of RTC laws on crime are indeterminate, these two empirical facts based on the actual patterns of crime and crime-fighting measures in RTC and non-RTC states suggest that the most plausible working hypothesis is that RTC laws *increase* crime. The next step in a panel data analysis of RTC laws would be to test this hypothesis by introducing an appropriate set of explanatory variables that plausibly influence crime.

The choice of these variables is important because any variable that both influences crime and is simultaneously correlated with RTC laws must be included if we are to generate unbiased estimates of the impact of RTC laws. At the same time, including irrelevant and/or highly collinear variables can also undermine efforts at valid estimation of the impact of RTC laws. At the very least, it seems advisable to control for the levels of police and incarceration because these have been the two most important criminal justice policy instruments in the battle against crime.

### 1.  The DAW Panel Data Model

In addition to the state and year fixed effects of the no-controls model and the identifier for the presence of an RTC law, our preferred "DAW model" includes an array of other factors that might be expected to influence crime, such as the levels of police and incarceration, various income, poverty, and unemployment measures, and six demographic controls designed to capture the presence of males in three racial categories (black, white, other) in two high-crime age groupings (15–19 and 20–39). Table 2 lists the full

Table 2:   Table of Explanatory Variables for Four Panel Data Studies

| *Explanatory Variables* | *DAW* | *LM* |
|---|---|---|
| Right-to-carry law | x | x |
| Lagged per capita incarceration rate | x | |
| Lagged police staffing per 100,000 residents | x | |
| Poverty rate | x | |
| Unemployment rate | x | |
| Per capita ethanol consumption from beer | x | |
| Percentage of state population living in metropolitan statistical areas (MSA) | x | |
| Real per capita personal income | x | x |
| Real per capita income maintenance | | x |
| Real per capita retirement payments | | x |
| Real per capita unemployment insurance payments | | x |
| Population density | | x |
| Lagged violent or property arrest rate | | x |
| State population | | x |
| 6 Age-sex-race demographic variables —all 6 combinations of black, white, and other males in 2 age groups (15–19, 20–39) indicating the percentage of the population in each group | x | |
| 36 Age-sex-race demographic variables —all possible combinations of black, white, and other males in 6 age groups (10–19, 20–29, 30–39, 40–49, 50–64, and over 65) and repeating this all for females, indicating the percentage of the population in each group | | x |

NOTE: The DAW model is advanced in this article and the LM model was previously published by Lott and Mustard.

set of explanatory variables for both the DAW model and the comparable panel data model used by Lott and Mustard (LM).[37]

Mathematically, the simple dummy model takes the following form:

$$\ln\left(crime\ rate_{it}\right) = \beta X_{it} + \gamma RTC_{it} + \alpha_t + \delta_i + \varepsilon_{it} \qquad (1)$$

where $\gamma$ is the coefficient on the RTC dummy, reflecting the average estimated impact of adopting a RTC law on crime. The matrix $X_{it}$ contains either the DAW or LM covariates

---

[37]While we attempt to include as many state-year observations in these regressions as possible, District of Columbia incarceration data are missing after the year 2001. In addition, a handful of observations are also dropped from the LM regressions owing to states that did not report any usable arrest data in various years. Our regressions are performed with Huber-White robust standard errors that are clustered at the state level, and we lag the arrest rates used in the LM regression models. The rationales underlying both choices are described in more detail in Aneja et al. (2014). All the regressions presented in this article are weighted by state population.

Table 3:   Panel Data Estimates Suggesting that RTC Laws Increase Violent and Property Crime: State- and Year-Fixed Effects, DAW Regressors, 1979–2014

|  | *Murder Rate* | *Firearm Murder Rate* | *Nonfirearm Murder Rate* | *Violent Crime Rate* | *Property Crime Rate* |
|---|---|---|---|---|---|
|  | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | 2.27 (5.05) | 2.90 (6.74) | 1.53 (3.32) | 9.02*** (2.90) | 6.49** (2.74) |

NOTE: All models include year- and state-fixed effects, and OLS estimates are weighted by state population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. The violent and property crime data are from the Uniform Crime Reports (UCR) while the murder data are from the National Vital Statistics System (NVSS). Six demographic variables (based on different age-sex-race categories) are included as controls in the regression above. Other controls include the lagged incarceration rate, the lagged police employee rate, real per capita personal income, the unemployment rate, poverty rate, beer, and percentage of the population living in MSAs. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

and demographic controls for state $i$ in year $t$. The vectors $\alpha$ and $\delta$ are year and state fixed effects, respectively, while $\varepsilon_{it}$ is the error term.

The DAW panel data estimates of the impact of RTC laws on crime are shown in Table 3.[38] The results are consistent with, although smaller in magnitude than, those observed in the no-controls model: RTC laws on average increased violent crime by 9.0 percent and property crime by 6.5 percent in the years following adoption.[39] The effect of RTC laws on murder is seen in Table 3 to be very imprecisely estimated and not statistically significant.[40]

We should also note one caveat to our results. Panel data analysis assumes that the treatment in any one state does not influence crime in nontreatment states. However, as we noted above,[41] RTC laws tend to lead to substantial increases in gun thefts and those guns tend to migrate to states with more restrictive gun laws, where they elevate violent crime. This flow of guns from RTC to non-RTC states has been documented by gun trace data (Knight 2013), and Olson et al. (2019) find that "firearm trafficking from states with less restrictive firearm legislation to neighboring states with more restrictive firearm legislation

[38]The complete set of estimates for all explanatory variables (except the demographic variables) for the DAW and LM dummy models are shown in Appendix Table B1.

[39]Defensive uses of guns are more likely for violent crimes because the victim will clearly be present. For property crimes, the victim is typically absent, thus providing less opportunity to defend with a gun. It is unclear whether the many ways in which RTC laws could lead to more crime, which we discuss in Section II.A.2, would be more likely to facilitate violent or property crime, but our intuition is that violent crime would be more strongly influenced, which is in fact what Table 3 suggests.

[40]We thank Phil Cook for informing us that UCR murder data are both less complete and less discerning than murder data collected by the National Vital Statistics. Note that we subtract all cases of justifiable homicides from the murder counts in our own Vital Statistics data.

[41]See text at footnotes 20–22.

increases firearm homicide rates in those restrictive states."[42] As a result, our panel data estimates of the impact of RTC laws are downward biased by the amount that RTC laws induce crime spillovers into non-RTC states.[43] One police investigation revealed that of the 224 guns a single gun trafficker in the DC area was known to have sold in just five months of 2015, 94 were later found at crime scenes from Virginia to New York (Hermann & Weiner 2019).

## 2.  The LM Panel Data Model

Table 2's recitation of the explanatory variables contained in the Lott and Mustard (LM) panel data model reveals there are no controls for the levels of police and incarceration in each state, even though a substantial literature has found that these factors have a large impact on crime. Indeed, as we saw in Table 1, both factors grew substantially and statistically significantly after RTC law adoption. A Bayesian analysis of the impact of RTC laws found that "the incarceration rate is a powerful predictor of future crime rates," and specifically faulted this omission from the Lott and Mustard model (Strnad 2007:201, n.8). We have discussed an array of infirmities with the LM model in Aneja et al. (2014), including their reliance on flawed pseudo-arrest rates, and highly collinear demographic variables.

As noted in Aneja et al. (2014):

> The Lott and Mustard arrest rates … are a ratio of arrests to crimes, which means that when one person kills many, for example, the arrest rate falls, but when many people kill one person, the arrest rate rises, since only one can be arrested in the first instance and many can in the second. The bottom line is that this "arrest rate" is not a probability and is frequently greater than one because of the multiple arrests per crime. For an extended discussion on the abundant problems with this pseudo arrest rate, see Donohue and Wolfers (2009).

The LM arrest rates are also econometrically problematic since the denominator of the arrest rate is the numerator of the dependent variable crime rate, improperly leaving the dependent variable on both sides of the regression equation. We lag the arrest rates by one year to reduce this problem of ratio bias.

Lott and Mustard's use of 36 demographic variables is also a potential concern. With so many enormously collinear variables, the high likelihood of introducing noise into the estimation process is revealed by the wild fluctuations in the coefficient estimates on these variables. For example, consider the LM explanatory variables "neither black nor white male aged 30–39" and the identical corresponding female category. The LM dummy variable model for violent crime suggests that the male group will significantly

---

[42]"Seventy-five percent of traceable guns recovered by authorities in New Jersey [a non-RTC state] are purchased in states with weaker gun laws, according to … firearms trace data … compiled by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives … between 2012 and 2016" (Pugliese 2018). See also Freskos (2018b).

[43]Some of the guns stolen from RTC permit holders may also end up in foreign countries, which will stimulate crime there but not bias our panel data estimates. For example, a recent analysis of guns seized by Brazilian police found that 15 percent came from the United States. Since many of these were assault rifles, they were probably not guns carried by American RTC permit holders (Paraguassu & Brito 2018).

Table 4:  Panel Data Estimates of the Impact of RTC Laws: State-and Year-Fixed Effects, Using Actual and Modified LM Regressors, 1977–2014

| | *Panel A: LM Regressors Including 36 Demographic Variables* | | | | |
|---|---|---|---|---|---|
| | *Murder Rate* | *Firearm Murder Rate* | *Nonfirearm Murder Rate* | *Violent Crime Rate* | *Property Crime Rate* |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | –5.17 (3.33) | –3.91 (4.82) | –5.70** (2.45) | –1.38 (3.16) | –0.34 (1.71) |

| | *Panel B: LM Regressors with 6 DAW Demographic Variables* | | | | |
|---|---|---|---|---|---|
| | *Murder Rate* | *Firearm Murder Rate* | *Nonfirearm Murder Rate* | *Violent Crime Rate* | *Property Crime Rate* |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | 3.75 (5.92) | 4.34 (7.85) | 2.64 (4.02) | 10.03** (4.81) | 7.59** (3.72) |

| | *Panel C: LM Regressors with 6 DAW Demographic Variables and Adding Controls for Incarceration and Police* | | | | |
|---|---|---|---|---|---|
| | *Murder Rate* | *Firearm Murder Rate* | *Nonfirearm Murder Rate* | *Violent Crime Rate* | *Property Crime Rate* |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | 4.99 (5.50) | 5.96 (7.20) | 3.76 (4.29) | 10.05** (4.54) | 8.10** (3.63) |

NOTE: All models include year- and state-fixed effects, and OLS estimates are weighted by state population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. In Panel A, 36 demographic variables (based on different age-sex-race categories) are included as controls in the regressions above. In Panel B, only six demographic variables are included. In Panel C, only six demographic variables are included and controls are added for incarceration and police. For all three panels, other controls include the previous year's violent or property crime arrest rate (depending on the crime category of the dependent variable), state population, population density, real per capita income, real per capita unemployment insurance payments, real per capita income maintenance payments, and real retirement payments per person over 65. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

*increase* crime (the coefficient is 219), but their female counterparts have an even greater dampening effect on crime (with a coefficient of –258). Both conflicting estimates (not shown in Appendix Table B1) are statistically significant at the 0.01 level, and they are almost certainly picking up noise rather than revealing true relationships. Bizarre results are common in the LM estimates among these 36 demographic variables.[44]

———

[44]Aneja et al. (2014) test for the severity of the multicollinearity problem using the 36 LM demographic variables, and the problem is indeed serious. The variance inflation factor (VIF) is shown to be in the range of 6 to 7 for the RTC variable in the LM dummy model when the 36 demographic controls are used. Using the six DAW variables reduces the multicollinearity for the RTC dummy to a tolerable level (with VIFs always below the desirable threshold of 5).

Table 4, Panel A shows the results of the LM panel data model estimated over the period 1977–2014. As seen above, the DAW model generated estimates that RTC laws raised violent and property crime (in the dummy model of Table 3), while the estimated impact on murders was too imprecise to be informative. The LM model generates no statistically significant estimates, except for an apparent decline in non-firearm-related murders. We can almost perfectly restore the DAW Table 3 findings, however, by simply limiting the inclusion of 36 highly collinear demographic variables to the more typical array used in the DAW regressions, as seen in Panel B of Table 4. This modified LM dummy variable model suggests that RTC laws increase violent and property crime, mimicking the DAW dummy variable model estimates, and this same finding persists if we add in controls for police and incarceration, as seen in Panel C of Table 4.

### 3.  Testing the DAW and LM Models for the Parallel Trends Assumption

Many researchers are content to present panel data results such as those shown in Tables 3 and 4 without establishing their econometric validity. This can be a serious mistake. We have already registered concerns about the choice of controls included in the LM model, but, as we will see, the LM model regressions in Panel A of Table 4—including the spurious finding that RTC laws reduce non-firearm homicides—uniformly violate the critical assumption of parallel trends. In sharp contrast, the DAW model illustrates nearly perfect parallel trends in the decade prior to RTC adoption for violent crime and sufficiently satisfies this assumption in three of the other four regressions in Table 3 (murder, non-firearm murder, and property crime).

To implement this test and to provide more nuanced estimates of the impact of RTC laws on crime than in the simple dummy models of Tables 3 and 4, we ran regressions showing the values on yearly dummy variables for 10 years prior to RTC adoption to 10 years after RTC adoption. If the key parallel trends assumption of panel data analysis is valid, we should see values of the pre-adoption dummies that show no trend and are close to zero. Figure 2 shows that the DAW violent crime model performs extremely well: the pre-adoption dummies are virtually all zero (and hence totally flat) for the eight years prior to adoption, and violent crime starts rising in the year of adoption, showing statistically significant increases after the law has been in effect for at least a full year. The upward trend in violent crime continues for the entire decade after adoption. Figure 2 also highlights that the single dummy models of Tables 3 and 4 (which implicitly assume an immediate and constant post-adoption impact on crime) are mis-specified. Importantly, we can now see the exact timing and pattern of the estimated impact on crime, which can, and in this case does, provide further support for a causal interpretation of the estimated increase in violent crime.

In contrast to the ideal performance of the DAW violent crime model, all of the Table 4 regressions using the LM model perform extremely poorly. For example, consider the LM model for firearm murder depicted in Figure 3, which shows that there is

*Figure 2:*   The impact of RTC laws on violent crime, DAW model, 1979—2014.



NOTE: We regress crime on dummies for pre— and post—passage years and DAW covariates. Reference year is year before adoption and adoption year is first year with RTC in place at any time, meaning that in states that adopt after January 1, this will capture only a partial effect of RTC laws. We display the 95 percent confidence interval for each estimate using cluster-robust standard errors and show the number of states that contribute to each estimate.

an enormously steep downward trend in the values of the pre-adoption dummies. Indeed, we see that the downward trend reverses just at the time of adoption of the RTC law and after six years we observe statistically significant increases in firearm

*Figure 3:*   The impact of RTC laws on firearm murder, LM model, 1977–2014



murder above the prior trend. Thus, while Table 4 ostensibly showed a statistically insignificant 3.9 percent drop in violent crime, the more discerning analysis of Figure 3 shows that that estimate is econometrically invalid, given such an influential violation of the parallel trends requirement. In fact, the LM model estimated for Figure 3 provides evidence that the adoption of RTC laws reversed a previous benign trend starting exactly at the time of RTC adoption and led to higher levels of firearm homicide.

Appendix D depicts the same year-by-year estimates for the other crimes using both the DAW and LM models. It is worth noting that, for our entire data period, the four DAW and LM murder and firearm murder figures show an apparent malign break in trend at the time of RTC adoption, while the trend for non-firearm murder remains unchanged in the DAW and LM models. The unchanged downward trend in the LM non-firearm model illustrates the violation of the parallel trends assumption, invalidating the anomalous finding for that crime in Panel A of Table 4.[45]

For the DAW and LM property crime panel data estimates, we see almost the same pattern. While the pre-adoption performance of the DAW property crime model (see Appendix Figure D2) is not quite as perfect as it was for violent crime, it still shows a roughly flat pattern for the eight years prior to adoption, followed by a persistent pattern of increasing property crime in the 10 years after RTC adoption. The increase in property crime turns statistically significant at the time of adoption. In Appendix Figure D3, however, we again see the same deficient pattern observed for the LM model in Appendix Figure D1: property crime falls in the 10 years prior to adoption, and the pattern reverses itself, leading to increasing property crime in the decade following RTC adoption.

We also conducted a panel data assessment looking at the 11 states that adopted RTC laws in the period from 2000–2014 when the confounding effect of the crack epidemic had subsided. The results provide further support that RTC laws increase crime, including estimates that overall murder and firearm murder rise substantially with RTC adoption. See further discussion and relevant figures and estimates in Appendix C. Figure 4 shows the year-by-year estimated effect of RTC laws on overall murder for the DAW model for this postcrack time period. The figure shows a flat pretrend (albeit with some variance around it) and then a sizeable jump in murder starting just at the year of RTC adoption. The LM model shows substantially the same statistically significant increase in murder.

--------

[45]Appendix Figure D1 also illustrates why the LM dummy model estimate on violent crime in Panel A of Table 4 was not positive and statistically significant (as it was for the DAW model in Table 3 and the modified LM models in Panels B and C of Table 4): Appendix Figure D1 reveals that, for the LM model, violent crime was trending down throughout the pre-adoption period, dropping from 5 percentage points to zero over that decade, at which point it reverses and violent crime increases to roughly a 6 percent increase by 10 years after RTC adoption. The v-shape pattern over that two-decade period leads the LM dummy model to obscure the increase in violent crime that is clearly seen in Appendix Figure D1.

*Figure 4:*   The impact of RTC laws on murder, DAW model, 2000–2014



### B. *Summary of Panel Data Analysis*

The uncertainty about the impact of RTC laws on crime expressed in the NRC Report was based on an analysis of data only through 2000. The preceding evaluation of an array of different specifications over the full data period from the late 1970s through 2014 as well as in the postcrack period has given consistent evidence that something bad happened to murder and violent and property crime right at the time of RTC adoption. The most statistically significant crime increases for the full period were seen for DAW violent and property crime. For the postcrack period, the largest and most highly statistically significant increases were seen for murder and firearm murder.

Other work has also provided evidence that RTC laws increase murder and/or overall violent crime—see Zimmerman (2014), examining postcrack-era data and the recent work by Donohue (2017b) and Siegel et al. (2017) concluding that RTC laws increase firearm and handgun homicide. Work by McElroy and Wang (2017) reinforces this conclusion, with results from a dynamic model that accounts for forward-looking behavior finding that violent crime would be one-third lower if RTC laws had not been passed. We discuss other recent published studies finding that RTC laws increase violent crime in Appendix C.

Despite the substantial panel data evidence in the post-NRC literature that supports the finding of the pernicious influence of RTC laws on crime, the NRC suggestion that

new techniques should be employed to estimate the impact of these laws is fitting. The important paper by Strnad (2007) used a Bayesian approach to argue that none of the published models used in the RTC evaluation literature rated highly in his model selection protocol when applied to data from 1977–1999.

Durlauf et al. attempt to sort out the different specification choices in evaluating RTC laws by using their own Bayesian model averaging approach using county data from 1979–2000. Applying this technique, the authors find that in their preferred spline (trend) model, RTC laws elevate violent crime in the three years after RTC adoption: "As a result of the law being introduced, violent crime increases in the first year and continues to increase afterwards" (2016:50). By the third year, their preferred model suggests a 6.5 percent increase in violent crime. Since their paper only provides estimates for three postpassage years, we cannot draw conclusions beyond this but note that their finding that violent crime increases by over 2 percent per year owing to RTC laws is a substantial crime increase. Moreover, the authors note: "For our estimates, the effect on crime of introducing guns continues to grow over time" (2016:50).[46]

Owing to the substantial challenges of estimating effects from observational data, it will be useful to see if yet another statistical approach that has different attributes from the panel data methodology can enhance our understanding of the impact of RTC laws. The rest of this article will use this synthetic control approach, which has been deemed "arguably the most important innovation in the policy evaluation literature in the last 15 years" (Athey & Imbens 2017).

## IV. Estimating the Impact of RTC Laws Using Synthetic Controls

The synthetic control methodology, which is becoming increasingly prominent in economics and other social sciences, is a promising new statistical approach for addressing the impact of RTC laws.[47] While most synthetic control papers focus on a single

---

[46]While our analysis focused on crime at the state level, there is obviously heterogeneity in crime rates within states, which is amalgamated into our population-weighted state average figures. A paper by Kovandzic et al. (KMV) buttresses the view that our state-focused estimates are not giving a misleading impression of the impact of RTC laws on violent crime. KMV limited their analysis to urban areas within each state, estimating the impact of RTC laws on crime using a panel data analysis from 1980–2000 on 189 cities with a population of 100,000 or more (Kovandzic et al. 2005). Although they did not estimate an overall violent crime effect, they did report that RTC laws were associated with a highly statistically significant increase in the rate of aggravated assault, the largest single component of violent crime. Their figures suggest that RTC laws led to a 20.1 percent increase in aggravated assault in the 10 years following adoption.

[47]The synthetic control methodology has been deployed in a wide variety of fields, including health economics (Nonnemaker et al. 2011), immigration economics (Bohn et al. 2014), political economy (Keele 2009), urban economics (Ando 2015), the economics of natural resources (Mideksa 2013), and the dynamics of economic growth (Cavallo et al. 2013).

treatment in a single geographic region, we look at 33 RTC adoptions occurring over three decades throughout the country. For each adopting ("treated") state we will find a weighted average of other states ("a synthetic control") designed to serve as a good counterfactual for the impact of RTC laws because it had a pattern of crime similar to that of the adopting state prior to RTC adoption. By comparing what actually happened to crime after RTC adoption to the crime performance of the synthetic control over the same period, we generate estimates of the causal impact of RTC laws on crime.[48]

### A.  *The Basics of the Synthetic Control Methodology*

The synthetic control method attempts to generate representative counterfactual units by comparing a treatment unit (i.e., a state adopting an RTC law) to a set of control units across a set of explanatory variables over a preintervention period. The algorithm searches for similarities between the treatment state of interest and the control states during this period and then generates a synthetic counterfactual unit for the treatment state that is a weighted combination of the component control states.[49] Two conditions are placed on these weights: they must be nonnegative and they must sum to 1. In general, the matching process underlying the synthetic control technique uses pretreatment values of both the outcome variable of interest (in our case, some measure of crime) and other predictors believed to influence this outcome variable.[50] For the reasons set forth in Appendix K, we use every lag of the dependent variable as predictors in the DAW and LM specifications. Once the synthetic counterfactual is generated and the weights associated with each control unit are assigned, the *synth* program then calculates values for the outcome variable associated with this counterfactual and the root mean squared prediction error (RMSPE) based on differences between the treatment and synthetic control units in the pretreatment period. The effect of the treatment can then be estimated by comparing the actual values of the dependent variable for the treatment unit to the corresponding values of the synthetic control.

### B.  *Generating Synthetic Controls for 33 States Adopting RTC Laws During Our Data Period*

To illustrate the procedure outlined above, consider the case of Texas, whose RTC law went into effect on January 1, 1996. The potential control group for each treatment state

---

[48]For a more detailed technical description of this method, we direct the reader to Abadie and Gardeazabal (2003) and Abadie et al. (2010, 2014).

[49]Our analysis is done in Stata using the *synth* software package developed by Alberto Abadie, Alexis Diamond, and Jens Hainmueller.

[50]Roughly speaking, the algorithm that we use finds **W** (the weights of the components of the synthetic control) that minimizes $\sqrt{(\mathbf{X_1} - \mathbf{X_0W})'\mathbf{V}(\mathbf{X_1} - \mathbf{X_0W})}$, where **V** is a diagonal matrix incorporating information about the relative weights placed on different predictors, **W** is a vector of nonnegative weights that sum to 1, $\mathbf{X_1}$ is a vector containing pretreatment information about the predictors associated with the treatment unit, and $\mathbf{X_0}$ is a matrix containing pretreatment information about the predictors for all the control units.

consists of all nine states with no RTC legislation as of the year 2014, as well as states that pass RTC laws at least 10 years after the passage of the treatment state (e.g., in this case, the five states passing RTC laws after 2006, such as Nebraska and Kansas, whose RTC laws went into effect at the beginning of 2007). Since we estimate results for up to 10 years postpassage,[51] this restriction helps us avoid including states with their own permissive concealed carry laws in the synthetically constructed unit (which would mar the control comparison).

After entering the necessary specification information into the *synth* program (e.g., treatment unit, list of control states, explanatory variables, etc.), the algorithm proceeds to construct the synthetic unit from the list of control states specific to Texas and generates values of the dependent variable for the counterfactual for both the pretreatment and posttreatment periods. The rationale behind this methodology is that a close fit in the prepassage time series of crime between the treatment state and the synthetic control generates greater confidence in the accuracy of the constructed counterfactual. Computing the posttreatment difference between the dependent variables of the treatment state and the synthetic control unit provides the synthetic control estimate of the treatment effect attributable to RTC adoption in that state.

### 1. Synthetic Control Estimates of Violent Crime in Two States

Figure 5 shows the synthetic control graph for violent crime in Texas over the period from 1977 through 2006 (10 years after the adoption of Texas's RTC law). The solid black line shows the actual pattern of violent crime for Texas, and the vertical line indicates when the RTC law went into effect. Implementing the synthetic control protocol identifies three states that generate a good fit for the pattern of crime experienced by Texas in the pre-1996 period. These states are California, which gets a weight of 57.7 percent owing to its similar attributes compared to Texas, Nebraska with a weight of 9.7 percent, and Wisconsin with a weight of 32.6 percent.

One of the advantages of the synthetic control methodology is that one can assess how well the synthetic control (call it "synthetic Texas," which is identified in Figure 5 by the dashed line) matches the pre-RTC-passage pattern of violent crime to see whether the methodology is likely to generate a good fit in the 10 years of postpassage data. Here the fit looks rather good in mimicking the rises and falls in Texas violent crime from 1977–1995. This pattern increases our confidence that synthetic Texas will provide a good prediction of what would have happened in Texas had it not adopted an RTC law.

Looking at Figure 5, we see that while both Texas and synthetic Texas (the weighted average violent crime performance of the three mentioned states) show declining crime rates in the postpassage decade after 1996, the crime drop is

---

[51]Our choice of 10 years is informed by the tradeoffs associated with using a different timeframe. Tables 5 and 6 indicate that the increase in violent crime due to RTC laws is statistically significant at the .01 level for all years after seven years post-adoption.

*Figure 5:*   Texas: Violent crime rate.



Effect of 1996 RTC Law 10 Years After Adoption: 16.9%

Note: Passage Year Difference From SC: 3.6% Composition of SC: CA (0.577); NE (0.097); WI (0.326) CVRMSPE: 0.06 (8 of 33 states, where 1 denotes the state with the best pre-passage fit.).

States Never Passing RTC Laws Included in Synthetic Control: CA;

RTC Adopting States Included in Synthetic Control: NE (2007); WI (2012).

substantially greater in synthetic Texas, which had no RTC law over that period, than in actual Texas, which did. As Figure 5 notes, 10 years after adopting its RTC law, violent crime in Texas was 16.9 percent *higher* than we would have expected had it not adopted an RTC law.[52]

Figure 5 also illustrates perhaps the most important lesson of causal inference: one cannot simply look before and after an event to determine the consequence of the event. Rather, one needs to estimate the difference between what did unfold and the counterfactual of what would have unfolded without the event. The value of the synthetic control methodology is that it provides a highly transparent estimate of that counterfactual, using a tool designed to ensure the validity of the parallel trends assumption that we have already seen is so critical to achieving meaningful causal estimates. Thus, when Lott

---

[52]Texas's violent crime rate 10 years post-adoption exceeds that of "synthetic Texas" by 20.41 percent $= \frac{517.3 - 429.6}{429.6} \times 100\%$. While some researchers would take that value as the estimated effect of RTC, we chose to subtract off the discrepancy in 1996 between the actual violent crime rate and the synthetic control value in that year. This discrepancy is 3.55 percent $= \frac{644.4 - 622.3}{622.3} \times 100\%$ (shown in the line just below the graph of Figure 5). See footnote 58 for further discussion of this calculation. Figure 5 shows a (rounded) estimated violent crime increase in Texas of 16.9 percent. We arrive at this estimate by subtracting the 1996 discrepancy of 3.55 percent from the 20.41 percent 10th-year discrepancy, which generates a TEP of 16.86 percent.

(2010) quotes a Texas District Attorney suggesting that he had reversed his earlier opposition to the state's RTC law in light of the perceived favorable experience with the law, we see why it can be quite easy to draw the inaccurate causal inference that Texas's crime decline was facilitated by its RTC law. The public may perceive the falling crime rate post-1996 (the solid black line), but our analysis suggests that Texas would have experienced a more sizable violent crime decline if it had not passed an RTC law (the dotted line). More specifically, Texas experienced a 19.7 percent decrease in its aggregate violent crime rate in the 10 years following its RTC law (between 1996 and 2006), while the state's synthetic control experienced a larger 31.0 percent decline. This counterfactual would not be apparent to residents of the state or to law enforcement officials, but our results suggest that Texas's RTC law imposed a large social cost on the state.

The greater transparency of the synthetic control approach is one advantage of this methodology over the panel data models that we considered above. Figure 5 makes clear what Texas is being compared to, and we can reflect on whether this match is plausible and whether anything other than RTC laws changed in these three states during the post-passage decade that might compromise the validity of the synthetic control estimate of the impact of RTC laws.

Figure 6 shows our synthetic control estimate for Pennsylvania, which adopted an RTC law in 1989 that did not extend to Philadelphia until a subsequent law went into

*Figure 6:*   Pennsylvania: Violent crime rate.



Effect of 1989 RTC Law 10 Years After Adoption: 24.4%

NOTE: Passage Year Difference From SC: -1.1%. Composition of SC: DE (0.078); HI (0.073); MD (0.038); NE (0.016); NJ (0.103); OH (0.27); WI (0.424) CVRMSPE: 0.017 (1 of 33 states, where 1 denotes the state with the best pre-passage fit.).

States Never Passing RTC Laws Included in Synthetic Control: DE; HI; MD; NJ;

RTC Adopting States Included in Synthetic Control: NE (2007); OH (2004); WI (2012).

*Figure 7:* The effect of RTC laws on violent crime after 10 years, synthetic control estimates for 31 states (1977–2014).



effect on October 11, 1995. In this case, synthetic Pennsylvania is comprised of eight states and the prepassage fit is nearly perfect. Following adoption of the RTC laws, synthetic Pennsylvania shows substantially better crime performance than actual Pennsylvania after the RTC law is extended to Philadelphia in late 1995, as illustrated by the second vertical line at 1996. The synthetic control method estimates that RTC laws in Pennsylvania increased its violent crime rate by 24.4 percent after 10 years.[53]

## 2. State-Specific Estimates Across All RTC States

Because we are projecting the violent crime experience of the synthetic control over a 10-year period, there will undoubtedly be a deviation from the "true" counterfactual and our estimated counterfactual. If we were only estimating the impact of a legal change for a single state, we would have an estimate marred by this purely stochastic aspect of changing crime. Since we are estimating an average effect across a large number of states, the

---

[53]In Appendix I, we include all 33 graphs showing the path of violent crime for the treatment states and the synthetic controls, along with information about the composition of these synthetic controls, the dates of RTC adoption (if any) for states included in these synthetic controls, and the estimated treatment effect (expressed in terms of the percent change in a particular crime rate) 10 years after adoption (or seven years after adoption for two states that adopted RTC laws in 2007, since our data end in 2014). The figures also document the discrepancy in violent crime in the year of adoption between the actual and synthetic control values.

stochastic variation will be diminished as the overestimates and underestimates will tend to wash out in our mean treatment estimates. Figure 7 shows the synthetic control estimates on violent crime for all 31 states for which we have 10 years of postpassage data. For 23 of the 31 states adopting RTC laws, the increase in violent crime is noteworthy.[54] Although three states were estimated to have crime reductions greater than the −1.6 percent estimate of South Dakota, if one averages across all 31 states, the (population-weighted) mean treatment effect after 10 years is a 14.3 percent *increase* in violent crime. If one instead uses an (unweighted) median measure of central tendency, RTC laws are seen to *increase* crime by 12.3 percent.


### 3. Less Effective Prepassage Matches

Section IV.B.1 provided two examples of synthetic controls that matched the crime of the treatment states well in the prepassage period, but this does not always happen. For example, we would have considerably less confidence in the quality of the synthetic control estimates for Maine, whose poor estimate is depicted in Appendix Figure I11. Maine also happens to be the state showing the greatest reduction in violent crime following RTC adoption, as indicated in Figure 7.

For Maine, one sees that the synthetic control and the state violent crime performance diverged long before RTC adoption in 1986, and that, by the date of adoption, Maine's violent crime rate was already 37.9 percent below the synthetic control estimate. The violent crime rate of actual Maine was trending down, while the synthetic control estimate had been much higher and trending up in the immediate pre-adoption period. The difficulty in generating good prepassage matches for states like Maine stems from their unusually low violent crime in the prepassage period.

Appendix Figure D11 reproduces Figure 7 while leaving out the five states for which the quality of prepassage fit is clearly lower than in the remaining 26 states.[55] This knocks out North Dakota, South Dakota, Maine, Montana, and West Virginia, thereby eliminating three of the five outlier estimates at both ends of the scale, and leaving the mean and median effects of RTC laws relatively unchanged from Figure 7. As Appendix Figure D11 shows, the (weighted) mean increase in crime across the listed 26 RTC-adopting states is 13.7 percent while the (unweighted) median increase is now 11.1 percent. Increases in violent crime of this magnitude are troubling. Consensus estimates of the elasticity of crime with respect to incarceration hover around 0.15 today, which suggests that to offset the increase in crime caused by RTC adoption, the average RTC state would need to approximately double its prison population.

---

[54]The smallest of these, Kentucky, had an increase of 4.6 percent.

[55]In particular, for these five states, the prepassage CVRMSPE—that is, the RMSPE transformed into a coefficient of variation by dividing by the average prepassage crime rate—was 19 percent or greater. See note 61 for further discussion of this statistic.

# V.  Aggregation Analysis Using Synthetic Controls

A small but growing literature applies synthetic control techniques to the analysis of multiple treatments.[56] We estimate the percentage difference in violent crime between each treatment (RTC-adopting) state and the corresponding synthetic control in both the year of the treatment and in the 10 years following it. This estimate of the treatment effect percentage (TEP) obviously uses data from fewer posttreatment years for the two treatment states[57] in which RTC laws took effect less than 10 years before the end of our sample.

We could use each of these 10 percentage differences as our estimated effects of RTC laws on violent crime for the 10 postpassage years, but, as noted above, we make one adjustment to these figures by subtracting from each the percentage difference in violent crime in the adoption year between the treatment and synthetic control states. In other words, if 10 years after adopting an RTC law, the violent crime rate for the state was 440 and the violent crime rate for the synthetic control was 400, one estimate of the effect of the RTC law could be 10 percent $\left(= \frac{440 - 400}{400}\right)$. Rather than use this estimate, however, we have subtracted from this figure the percentage difference between the synthetic and treatment states in the year of RTC adoption. If, say, the violent crime rate in the treatment state that year was 2 percent higher than the synthetic control value, we would subtract 2 from 10 to obtain an estimated 10th-year effect of RTC laws of 8 percent.[58] We

---

[56]The closest paper to the present study is Arindrajit Dube and Ben Zipperer (2013), who introduce their own methodology for aggregating multiple events into a single estimated treatment effect and calculating its significance. Their study centers on the effect of increases in the minimum wage on employment outcomes, and, as we do, the authors estimate the percentage difference between the treatment and the synthetic control in the posttreatment period. While some papers analyze multiple treatments by aggregating the areas affected by these treatments into a single unit, this approach is not well-equipped to deal with a case such as RTC law adoption where treatments affect the majority of panel units and more than two decades separate the dates of the first and last treatment under consideration, as highlighted in Figure 7.

[57]These two states are Kansas and Nebraska, which adopted RTC laws in 2007. See note 4 discussing the states for which we cannot estimate the impact of RTC laws using synthetic controls.

[58]It is unclear ex ante whether one should implement this subtraction. The intuitive rationale for our choice of outcome variable was that pretreatment differences between the treatment state and its synthetic control at the time of RTC adoption likely reflected imperfections in the process of generating a synthetic control and should not contribute to our estimated treatment effect if possible. In other words, if the treatment state had a crime rate that was 5 percent greater than that of the synthetic control in both the pretreatment and posttreatment period, it would arguably be misleading to ignore the pretreatment difference and declare that the treatment increased crime rates by 5 percent. On the other hand, subtracting off the initial discrepancy might be adding noise to the subsequent estimates.

We resolve this issue with the following test of our synthetic control protocol: we pretend that each RTC-adopting state actually adopted its RTC law five years before it did. We then generate synthetic control estimates of this phantom law over the next five years of actual pretreatment data. If our synthetic control approach is working perfectly, it should simply replicate the violent crime pattern for the five pretreatment years. Consequently, the estimated "effect" of the phantom law should be close to zero. Indeed, when we follow our subtraction protocol, the synthetic controls match the pretreatment years more closely than when we do not provide this normalization. Specifically, with subtraction the estimated "effect" in the final pretreatment year is a wholly insignificant 3.2 percent; without subtraction, it jumps to a statistically significant 5.3 percent. Consequently,

then look across all the state-specific estimates of the impact of RTC laws on violent crime for each of the 10 individual postpassage years and test whether they are significantly different from zero.[59]


### A.  RTC Laws Increase Violent Crime

We begin our analysis of the aggregated synthetic control results using predictors derived from the DAW specification. Table 5 shows our results on the full sample examining violent crime.[60] Our estimates of the normalized average treatment effect percentage (TEP) suggest that states that passed RTC laws experienced more deleterious changes in violent criminal activity than their synthetic controls in the 10 years after adoption. On average, treatment states had aggregate violent crime rates that were almost 7 percent higher than their synthetic controls five years after passage and around 14 percent higher 10 years after passage. Table 5 suggests that the longer the RTC law is in effect (up to the 10th year that we analyze), the greater the cost in terms of increased violent crime.

As we saw in Figures 6 (Pennsylvania) and I11(Maine), the validity of using the posttreatment difference between crime rates in the treatment state (the particular state adopting an RTC law that we are analyzing) and its corresponding synthetic control as a measure of the effect of the RTC law depends on the strength of the match between these two time series in the pretreatment period. To generate an estimate of pretreatment fit that takes into account differences in pretreatment crime levels, we estimate the coefficient of variation for the root mean squared prediction error (RMSPE), which

normalization is the preferred approach for violent crime. It should also be noted that our actual synthetic control estimates will be expected to perform better than this phantom RTC estimate since we will be able to derive our synthetic controls from five additional years of data, thereby improving our pretreatment fit.

As it turns out, the choice we made to subtract off the initial-year crime discrepancy is a conservative one, in that the estimated crime increases from RTC laws would be *greater* without subtraction. We provide synthetic control estimates for the DAW model without subtraction of the adoption-year percentage difference for violent crime, murder, and property crime in Appendix F. Comparison of these Appendix F estimates with those in the text (Table 5) reveals that our preferred method of subtracting yields more conservative results (i.e., a smaller increase in violent crime due to RTC). In Table 5, we estimate the 10th-year TEP for violent crime as roughly 13.5 to 14.3 percent, while the comparable estimates without subtraction are roughly 17–18 percent, as seen in Appendix Tables F1, F2, and F3. Indeed, without subtraction, every estimated impact would show RTC laws lead to a statistically significant increase in every crime category we consider except non-firearm homicide, as seen in Appendix F.

[59]This test is performed by regressing these differences in a model using only a constant term and examining whether that constant is statistically significant. These regressions are weighted by the population of the treatment state in the posttreatment year under consideration. Robust standard errors corrected for heteroskedasticity are used in this analysis.

[60]We discuss the synthetic control estimates for murder and property crime in Section V.F.

Table 5:   The Impact of RTC Laws on the Violent Crime Rate, DAW Covariates, Full Sample, 1977–2014

|  | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| Average normalized treatment effect percentage (TEP) | −0.117 | 2.629* | 3.631* | 4.682** | 6.876*** | 7.358** | 10.068*** | 12.474*** | 14.021*** | 14.344*** |
|  | (1.076) | (1.310) | (1.848) | (2.068) | (2.499) | (3.135) | (2.823) | (3.831) | (3.605) | (2.921) |
| $N$ | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 31 | 31 | 31 |
| Pseudo $p$ value | 0.936 | 0.274 | 0.220 | 0.192 | 0.094 | 0.106 | 0.060 | 0.038 | 0.032 | 0.032 |

NOTE: Standard errors in parentheses. Column numbers indicate postpassage year under consideration; $N$ = number of states in sample. The synthetic controls method is run using the nested option, and each year's estimate and statistical significance is computed as explained in note 59. *$p < 0.10$; **$p < 0.05$; ***$p < 0.01$.

is the ratio of the synthetic control's pretreatment RMSPE to the pretreatment average level of the outcome variable for the treatment state.[61]

To evaluate the sensitivity of the aggregate synthetic control estimate of the crime impact of RTC laws in Table 5, we consider two subsamples of treatment states: states whose coefficients of variation are less than two times the average coefficient of variation for all 33 treatments and states whose coefficients of variation are less than this average. We then rerun our synthetic control protocol using each of these two subsamples to examine whether restricting our estimation of the average treatment effect to states for which a relatively "better" synthetic control could be identified would meaningfully change our findings.

All three samples yield roughly identical conclusions: RTC laws are consistently shown to increase violent crime, with the 10th-year increase ranging from a low of 13.5 (when we remove the six states with above-average values of the CV RMSPE) to a high of 14.3 percent (Table 5).

### B. The Placebo Analysis

Our ability to make valid inferences from our synthetic control estimates depends on the accuracy of our standard error estimation. To test the robustness of the standard errors that we present under the first row of Table 5, we incorporate an analysis using placebo treatment effects similar to Ando (2015).[62] For this analysis, we generate 500 sets of randomly generated RTC dates that are designed to resemble the distribution of actual RTC

---

[61]While the RMSPE is often used to assess this fit, we believe that the use of this measure is not ideal for comparing fit across states, owing to the wide variation that exists in the average pretreatment crime rates among the 33 treatment states that we consider. For example, the pretreatment RMPSE associated with our synthetic control analysis using the DAW predictor variables and aggregate violent crime as the outcome variable is nearly identical for Texas (37.1) and Maine (36.4), but the pretreatment levels of Texas's aggregate violent crime rate are far greater than Maine's. To be more specific, Texas's average violent crime rate prior to the implementation of its RTC law (from 1977 through 1995) was 617 violent crimes per 100,000 residents, while the corresponding figure for Maine was 186 violent crimes per 100,000 residents, less than one-third of Texas's rate. The more discerning CV of the RMSPE is 0.06 for Texas (with a year of adoption discrepancy of only 3.6 percent), while for Maine, the CV is a dramatically higher at 0.196 (with an initial year discrepancy of –37.9 percent). Accordingly, since the percentage imprecision in our synthetic pretreatment match for Maine is so much greater than for Texas, we have greater confidence in our estimates that in the 10th year, Texas's RTC law had increased violent crime by 16.9 percent than we do in an estimate that Maine's law had decreased violent crime by 16.5 percent.

[62]Ando (2015) examines the impact of constructing nuclear plants on local real per capita taxable income in Japan by generating a synthetic control for every coastal municipality that installed a nuclear plant. Although the average treatment effect measured in our article differs from the one used by Ando, we follow Ando in repeatedly estimating average placebo effects by randomly selecting different areas to serve as placebo treatments. (The sheer number of treatments that we are considering in this analysis prevents us from limiting our placebo treatment analysis to states that never adopt RTC laws, but this simply means that our placebo estimates will likely be biased *against* finding a qualitatively significant effect of RTC laws on crime, since some of our placebo treatments will be capturing the effect of the passage of RTC laws on crime rates.) Our estimated average treatment effect can then be compared to the distribution of average placebo treatment effects. Heersink and Peterson (2016) and Cavallo et al. (2013) also perform a similar randomization procedure to estimate the significance of their estimated average treatment effects, although the randomization procedure in the latter paper differs from ours by restricting the timing of placebo treatments to the exact dates when actual treatments took place.

passage dates that we use in our analysis.[63] For each of the 500 sets of randomly generated RTC dates, we then use the synthetic control methodology and the DAW predictors to estimate synthetic controls for each of the 33 states whose randomly generated adoption year is between 1981 and 2010. We use these data to estimate the percentage difference between each placebo treatment and its corresponding synthetic control during both the year of the treatment and each of the 10 posttreatment years (for which we have data) that follow it. Using the methodology described in notes 52 and 58, we then test whether the estimated treatment effect for each of the 10 posttreatment years is statistically significant.

To further assess the statistical significance of our results, we compare each of the 10 coefficient estimates in Table 5 with the distribution of the 500 average placebo treatment effects that use the same crime rate, posttreatment year, and sample as the given estimate. To assist in this comparison process, we report a pseudo $p$ value that is equal to the proportion of our placebo treatment effects whose absolute value is greater than the absolute value of the given estimated treatment effect. This pseudo $p$ value provides another intuitive measure of whether our estimated average treatment effects are qualitatively large compared to the distribution of placebo effects. Our confidence that the treatment effect that we are measuring for RTC laws is real increases if our estimated treatment effect is greater than the vast majority of our estimated average placebo treatment effects. Examining our pseudo $p$ values in Table 5, we see that our violent crime results are always statistically significant in comparison to the distribution of placebo coefficients at the 0.05 level eight years or more past RTC adoption.

### C. Synthetic Control Estimates Using LM's Explanatory Variables

In our Section III panel data analysis, we saw that RTC laws were associated with significantly higher rates of violent crime in the DAW model (Table 3), but not in the LM model (Table 4, Panel A). Under the synthetic controls approach, however, we find that the results are the same whether one uses the DAW or LM explanatory variables. This is necessarily true when one uses yearly lags in implementing the synthetic controls – see Kaul et al. (2016) – but it is also true when we use three lags of the dependent variable in our synthetic control protocol, as shown in Table 6. The detrimental effects of RTC laws on violent crime rates are statistically significant at the 0.05 level starting three years after the passage of an RTC law, and appear to increase over time. The treatment effects associated with violent crime in Table 6 range from 9.6 percent in the seventh posttreatment year to 12.8 percent in the 10th posttreatment year. Remarkably, the DAW and LM synthetic control estimates of the impact of RTC laws on violent crime are nearly identical

[63]More specifically, we randomly choose eight states to never pass RTC laws, six states to pass RTC laws before 1981, 33 states to pass RTC laws between 1981 and 2010, and three states to pass their RTC laws between 2011 and 2014. (Washington, DC is not included in the placebo analysis since it is excluded from our main analysis.) These figures were chosen to mirror the number of states in each of these categories in our actual data set.

*236   Donohue et al.*

Table 6:   The Impact of RTC Laws on the Violent Crime Rate, LM covariates, Full Sample, 1977–2014

| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* | *(6)* | *(7)* | *(8)* | *(9)* | *(10)* |
|---|---|---|---|---|---|---|---|---|---|---|
| Average Normalized TEP | 0.309 | 1.981 | 4.063* | 5.211* | 7.159** | 6.981** | 9.644*** | 11.160*** | 12.115*** | 12.794*** |
| | (1.318) | (1.646) | (2.192) | (2.572) | (2.887) | (3.319) | (3.016) | (3.680) | (3.857) | (3.200) |
| *N* | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 31 | 31 | 31 |

NOTE: Standard errors in parentheses. Column numbers indicate post-passage year under consideration; $N$ = number of states in sample. The synthetic controls method is run using the non-nested option, and each year's estimate and statistical significance is computed as explained in footnote 59. *$p < 0.10$; **$p < 0.05$; ***$p < 0.01$.

(compare Tables 6 and Appendix Table K1), and this is true even when we limit the sample of states in the manner described above.[64]

### D. The Contributions of Donor States to the Synthetic Control Estimates: Evaluating Robustness

One of the key elements of the synthetic control approach is its selection among plausible control states. For each state adopting an RTC law in year X, the approach selects among states that do not have RTC laws through at least ten years after X, including never-adopting states. Appendix Figure D10 lists all the states that are eligible under this criterion to serve as synthetic controls for one or more of the 33 adopting states, and shows how often they are selected. The horizontal length of each bar tells us how much that state contributes to our synthetic control violent crime estimates.[65] As the figure indicates, Hawaii appears most frequently—contributing to a synthetic control 18 of the 33 times it is eligible and averaging a 15.2 percent contribution—but California, a substantial contributor to multiple large states, edges it out for the largest average contribution (18.1 percent).

Hawaii's relatively large contribution as a donor state in the synthetic control estimates has some advantages but also raises concern that this small state might be unrepresentative of the states for which it is used as a control. For example, note that the largest share of Virginia's synthetic control comes from Hawaii (27.9 percent), with Rhode Island, Kansas, and Nebraska making up the lion's share of the remaining synthetic control. We had already mentioned one problem with the panel data analysis caused by the tendency of lax gun control states to serve as a source for guns that contribute to crime in the non-RTC states, and Virginia has always been a major source of that interstate flow. Since Virginia's guns are not likely to end up in Hawaii, the bias that the treatment infects the control is reduced for that particular match. Nonetheless, one may be concerned that Hawaii might be unduly skewing the estimates of the impact of RTC laws on violent crime.

To address this, as well as the analogous concern for other potentially idiosyncratic control states, we generated 18 additional TEP estimates, with each one generated by dropping a single one of the 18 states that appears as an element of our synthetic control analysis (as identified in Appendix Figure D10). The results of this exercise are presented in Appendix Figure D12, which shows that our estimated increase in violent crime resulting from the adoption of an RTC law is extremely robust: All 18 estimates remain statistically significant at the 0.01 percent level, and

---

[64]The 10th-year effect in the synthetic control analysis using the LM variables is 12.4 percent when we eliminate the three states with more than twice the average CV of the RMSPE. Knocking out the seven states with above-average values of this CV generates a similar 12.5 percent effect.

[65]In particular, it reflects the portion of each synthetic state it becomes part of, weighted by the treated state's population. For example, Texas's population is 13.6 percent of the total treated states' population. As a result, a state that made up 50 percent of synthetic Texas (but is not a donor for any other treatment state) would have a bar of size 6.8 percent.

the smallest TEP, which comes from dropping Illinois as a control state, is 12.0 percent. Note in particular that dropping Hawaii from the list of potential donor states slightly *increases* the estimate of the increase in violent crime caused by RTC laws. In fact, when we dropped Hawaii completely as a potential control and repeated the previous protocol of dropping one state at a time, the estimated increase in violent crime from RTC never fell below 12 percent (which was the value when New York was dropped as well as Hawaii). Indeed, the synthetic control finding that RTC laws increase violent crime is so robust that even if we drop California, New York, and Hawaii from the pool of potential donor states, RTC laws still increase violent crime by 8.9 percent after 10 years ($p = 0.018$).

### E. Does Gun Prevalence Influence the Impact of RTC Laws?

The wide variation in the state-specific synthetic control estimates that was seen in Figures 7 and D11 suggests that there is considerable noise in some of the outlier estimates of a few individual states. For example, it is highly improbable that RTC laws led to a 16.5 percent decrease in violent crime in Maine and an 80.2 percent increase in violent crime in Montana, the two most extreme estimates seen in Figure 7. Since averaging across a substantial number of states will tend to eliminate the noise in the estimates, one should repose much greater confidence in the aggregated estimates than in any individual state estimate. Indeed, the fact that we can average across 33 separate RTC-adopting states is what generates such convincing and robust estimates of the impact of RTC laws on violent crime.

Another way to distill the signal from the noise in the state-specific estimates is to consider whether there is a plausible factor that could explain underlying differences in how RTC adoption influences violent crime. For example, RTC laws might influence crime differently depending on the level of gun prevalence in the state.

Figure 8 shows the scatter diagram for 33 RTC-adopting states, and relates the estimated impact on violent crime to a measure of gun prevalence in each RTC-adopting state. The last line of the note below the figure provides the regression equation, which shows that gun prevalence is positively related to the estimated increase in crime ($t = 2.39$).[66]

### F. The Murder and Property Crime Assessments with Synthetic Controls

The synthetic control estimates of the impact of RTC laws on violent crime uniformly generate statistically significant estimates, and our phantom RTC law synthetic control estimates for the five pretreatment years (described in note 58) give us confidence that the synthetic control approach is working well for our violent crime estimates, as illustrated in Appendix Table L1. Since the estimated increases in violent crime are

---

[66]The gun prevalence data were collected by the data analytics firm YouGov in a 2013 online survey (Kalesan et al. 2016); 4,486 people were initially surveyed, although only 4,000 results are used in the final data set. YouGov used a proximity matching method to select the survey results for inclusion, matching respondents by race, age, gender, and education to the demographic breakdown of the 2010 American Community Survey.

*Figure 8:*   The impact of gun ownership on the increase in violent crime due to RTC laws (synthetic control estimates, 1977−2014).



NOTE: Treatment effect displayed is for the 10th year after RTC adoption (but 7th post−passage year for Kansas and Nebraska). Treatment Effect = −9.15 + 0.69 * Gun Prevalence. t = 2.39; R^2 = 0.16. Regression weighted by population in the final TEP year.

statistically significant and consistently observed in both our panel data and synthetic control analyses, these represent our most robust finding.

Just as we saw in the panel data analysis, the synthetic controls provide evidence of increases in the murder and firearm murder categories, but it is weaker and less precise than our violent crime estimates. For example, both Appendix Tables E1 and E2 show estimated crime increases of 8.7 percent (murder) and 15.3 percent (firearm murder), but only the 8.7 figure is statistically significant at the 0.10 level. Interestingly, our phantom law test works well for murder and even suggests statistically significant increases in that crime beginning right at the time of RTC adoption (Appendix Table L3). The firearm murder estimates perform less well in this test, generating an estimated fall in crime of 6.8 percent in the year prior to RTC adoption (Appendix Table L5).

The results from implementing this phantom law approach for property crime are perhaps our less encouraging estimates. While our estimated "effect" in the year prior to adoption would ideally be close to zero in this test, for property crime it is 6.9 percent, with the latter significant at the 0.10 level. (The full results of this test for all the crime categories are shown in Appendix L.) If we accept our normalized estimate for the impact of RTC laws on property crime it would give little reason to reject a null hypothesis of no effect (Appendix Table E8). Because our synthetic control estimates for violent crime are validated by our phantom adoption test and generate uniform and highly

robust results whether dropping selected donor states or states with poor fit, or using either the DAW or LM models, we have greater confidence in and therefore highlight our violent crime estimates. Accordingly, we consign our further discussion of the synthetic control estimates of murder and property crime to Appendix E.

## VI. Conclusion

The extensive array of panel data and synthetic control estimates of the impact of RTC laws that we present uniformly undermine the "More Guns, Less Crime" hypothesis. There is not even the slightest hint in the data from any econometrically sound regression that RTC laws reduce violent crime. Indeed, the weight of the evidence from the panel data estimates as well as the synthetic control analysis best supports the view that the adoption of RTC laws substantially raises overall violent crime in the 10 years after adoption.

In our initial panel data analysis, our preferred DAW specification predicted that RTC laws have led to statistically significant and substantial increases in violent crime. We also presented both panel data and synthetic control estimates that RTC laws substantially increase the percentage of robberies committed with a firearm, while having no restraining effect on the overall number of robberies. Moreover, to the extent the massive theft of guns from carrying guns outside the home generates crime spillovers to non-RTC states, our estimated increases in violent crime are downward biased.

We then supplemented our panel data results using our synthetic control methodology, and the finding from our panel data analysis was strongly buttressed. Whether we used the DAW or LM specifications, states that passed RTC laws experienced 13–15 percent *higher* aggregate violent crime rates than their synthetic controls after 10 years (results that were significant at either the 0.05 or 0.01 level after five years).

The synthetic control effects that we measure represent meaningful increases in violent crime rates following the adoption of RTC laws, and this conclusion remained unchanged after restricting the set of states considered based on model fit and after considering a large number of robustness checks. The consistency across different specifications and methodologies of the finding that RTC elevates violent crime enables far stronger conclusions than were possible over a decade ago when the NRC Report was limited to analyzing data only through 2000 with the single tool of panel data evaluation.

The best available evidence using different statistical approaches—panel data regression and synthetic control—with varying strengths and shortcomings and with different model specifications all suggest that the net effect of state adoption of RTC laws is a substantial increase in violent crime.

## References

Abadie, Alberto, Alexis Diamond, & Jens Hainmueller (2010) "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program," 105 (490) *J. of the American Statistical Association* 493.

————— (2014) Comparative Politics and the Synthetic Control Method," 59(2) *American J. of Political Science* 495.

Abadie, Alberto, & Javier Gardeazabal (2003) "The Economic Costs of Conflict: A Case Study of the Basque Country," 93(1) *American Economic Rev.* 113.

ABC News (2018) "Man Annoyed by IHOP Customer Before Allegedly Shooting Him in Head," *ABC News.* https://abc13.com/man-annoyed-by-ihop-customer-before-allegedly-shooting-him/3160627/

Adda, Jérôme, Brendon McConnell, & Imran Rasul (2014) "Crime and the Depenalization of Cannabis Possession: Evidence from a Policing Experiment," 122(5) *J. of Political Economy* 1130.

Ando, Michihito (2015) "Dreams of Urbanization: Quantitative Case Studies on the Local Impacts of Nuclear Power Facilities Using the Synthetic Control Method," 85 *J. of Urban Economics* 68.

Aneja, Abhay, John J. Donohue, & Alexandria Zhang (2011) "The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy," 13(2) *American Law & Economics Rev.* 565.

————— (2014) "The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy," *National Bureau of Economic Research Working Paper* 18294.

Associated Press (2014) "Official: Suspect in Deadly Hospital Shooting Had Lengthy History of Gun Arrests, Violence," July 26 *Fox News.* http://www.foxnews.com/us/2014/07/26/official-suspect-in-deadly-hospital-shooting-had-lengthy-history-gun-arrests.html

————— (2015) "8-Year-Old Arizona Boy Accidentally Shot by Baby Sitter," September 8 *Daily Record.* http://www.canoncitydailyrecord.com/ci_28778997/8-year-old-arizona-boy-accidentally-shot-by

Athey, Susan, & Guido W. Imbens (2017) "The State of Applied Econometrics: Causality and Policy Evaluation," 31(2) *J. of Economic Perspectives* 3.

Ayres, Ian, & John J. Donohue (2003) "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 *Stanford Law Rev.* 1371.

Barbash, Fred (2018) "Calif. Teacher Resigns After Unintentionally Firing Weapon in Gun Safety Class," April 12 *Washington Post.* https://www.washingtonpost.com/news/morning-mix/wp/2018/04/12/calif-teacher-resigns-after-unintentionally-firing-weapon-in-gun-safety-class/?noredirect=on&utm_term=.68faa7eb0133

Biette-Timmons, Nora (2017) "More People Are Pulling Guns During Road-Rage Incidents," August 10 *Trace.* https://www.thetrace.org/2017/08/guns-road-rage-cleveland-2017

Biography.com (2016) "Bernhard Goetz," November 15 *Online.* https://www.biography.com/people/bernhard-goetz-578520

Blair, J. Pete, & Katherine W. Schweit (2014) *A Study of Active Shooter Incidents in the United States Between 2000 and 2013.* Washington, DC: Texas State Univ. & Federal Bureau of Investigation, U.S. Department of Justice.

Bohn, Sarah, Magnus Lofstrom, & Steven Raphael (2014) "Did the 2007 Legal Arizona Workers Act Reduce the State's Unauthorized Immigrant Population?" 96(2) *Rev. of Economics & Statistics* 258.

Boots, Michelle Theriault (2017) "In Alaska, a High Bar for Taking Guns from the Mentally Ill," January 9 *Anchorage Daily News.* https://www.adn.com/alaska-news/2017/01/09/in-alaska-a-high-bar-for-the-mentally-ill-to-part-with-their-guns/

Bureau of Alcohol, Tobacco, Firearms, & Explosives (2012) *2012 Summary: Firearms Reported Lost and Stolen.* https://www.atf.gov/resource-center/docs/2012-firearms-reported-lost-and-stolenpdf-1/download

Bureau of Justice Statistics (2014) *The Nation's Two Measures of Homicide.* https://www.bjs.gov/content/pub/pdf/ntmh.pdf

Byers, Christine (2010) "Police Report Details AAB Shooting Chaos," November 18 *St. Louis Post-Dispatch.* https://www.stltoday.com/news/local/crime-and-courts/police-report-details-abb-shooting-chaos/article_bb52f36b-3757-5c95-a775-384c52dfd887.html

Calder, Chad (2018) "Legal Analysts Weigh in on Ronald Gasser's Defense in Joe McKnight Killing as Trial Set to Begin," January 15 *New Orleans Advocate*. https://www.theadvocate.com/new_orleans/news/courts/article_f51f97ca-fa45-11e7-a3eb-2fa820d7858f.html

Campbell, Elizabeth (2017) "521 Guns Stolen in 2017 from Unlocked Cars, Jacksonville Police Say," December 11 *News 4 Jax*. https://www.news4jax.com/news/local/jacksonville/521-guns-stolen-in-2017-from-unlocked-cars-jacksonville-police-say

Carter, Chelsea J., Ed Lavandera, & Evan Perez (2013) "Who Is Navy Yard Gunman Aaron Alexis?" *CNN*. http://www.cnn.com/2013/09/16/us/navy-yard-suspects/index.html

Cavallo, Eduardo, Sebastian Galiani, Ilan Noy, & Juan Pantano (2013) "Catastrophic Natural Disasters and Economic Growth," 95(5) *Rev. of Economics & Statistics* 1549.

CEA (2016) *Economic Perspectives on Incarceration and the Criminal Justice System*. Washington, DC: Council of Economic Advisors, Executive Office of the President of the United States.

Chalfin, Aaron, & Justin McCrary (2017) "Criminal Deterrence: A Review of the Literature," 55(1) *J. of Economic Literature* 5.

Clary, Mike, Megan O'Matz, & Lisa Arthur (2017) "Puerto Rico Police Seized Guns from Airport Shooter Esteban Santiago," January 13 *Sun Sentinel*. http://www.sun-sentinel.com/news/fort-lauderdale-hollywood-airport-shooting/fl-santiago-guns-puerto-rico-20170113-story.html

Cohen, Dov, Richard E. Nisbett, Brian F. Bowdle, & Norbert Schwarz (1996) "Insult, Aggression, and the Southern *Culture of Honor*: An 'Experimental Ethnography'," 70(5) *J. of Personality & Social Psychology* 945.

Cook, Philip J. (2018) "Gun Theft and Crime," 95(1) *J. of Urban Health* 305.

Cook, Philip J., Jens Ludwig, & Adam M. Samaha (2009) "Gun Control After *Heller*: Threats and Sideshows from a Social Welfare Perspective," 56(5) *UCLA Law Rev.* 1041.

DePrang, Emily (2015) "The Mystery of Milwaukee's 'Human Holster'," July 16 *Trace*. https://www.thetrace.org/2015/07/concealed-carry-wisconsin-human-holster/

Donohue, John J. (2003) "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," 2(3) *Criminology & Public Policy* 397.

——— (2017a) "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117(5) *Columbia Law Rev.* 1297.

——— (2017b) "Laws Facilitating Gun Carrying and Homicide," 107(12) *American J. of Public Health* 1864.

Donohue, John J., & Justin Wolfers (2009) "Estimating the Impact of the Death Penalty on Murder," 11(2) *American Law & Economics Rev.* 249.

Dube, Arindrajit, & Ben Zipperer (2013) "Pooling Multiple Case Studies Using Synthetic Controls: An Application to Minimum Wage Policies," *IZA Discussion Paper* 8944. https://ssrn.com/abstract=2589786

Durlauf, Steven N., Salvado Navarro, & David A. Rivers (2016) "Model Uncertainty and the Effect of Shall-Issue Right-to-Carry Laws on Crime," 81 *European Economic Rev.* 32.

Eltagouri, Marwa (2017) "Man Accidentally Shoots Himself and His Wife at a Church, Shortly After a Discussion on Shootings," November 17 *Washington Post*. https://www.washingtonpost.com/news/acts-of-faith/wp/2017/11/17/a-man-accidentally-shot-himself

Fernandez, Manny, Liam Stack, & Alan Blinder (2015) "9 Are Killed in Biker Gang Shootout in Waco," May 17 *New York Times*. http://www.nytimes.com/2015/05/18/us/motorcycle-gang-shootout-in-waco-texas.html

Ford, Richard (2016) "Richard Ford on America's Gun Problem," March 18 *Financial Times*. https://www.ft.com/content/d0cea3d0-eaab-11e5-bb79-2303682345c8

Fortin, Jacey (2018) "Georgia Teacher Fired Gun While Barricaded in Classroom, Police Say," February 28 *New York Times*. https://www.nytimes.com/2018/02/28/us/georgia-teacher-gun-shooting.html

Fox News (2016) "Ohio Gun Shop Owner Killed During Concealed Carry Class," June 19 *Fox News*. https://www.foxnews.com/us/ohio-gun-shop-owner-killed-during-concealed-carry-class

Freskos, Brian (2016) "Guns Are Stolen in America Up to Once Every Minute. Owners Who Leave Their Weapons in Cars Make it Easy for Thieves," September 21 *Trace*. https://www.thetrace.org/2016/09/stolen-guns-cars-trucks-us-atlanta/

———— (2017a) "As Thefts of Guns from Cars Surge, Police Urge Residents to Leave Their Weapons at Home," March 6 *Trace*. https://www.thetrace.org/2017/03/as-thefts-of-guns-from-cars-surge-police-urge-residents-to-leave-their-weapons-at-home/

———— (2017b) "Missing Pieces," November 20 *Trace*. https://www.thetrace.org/features/stolen-guns-violent-crime-america/

———— (2017c) "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen," April 11 *Trace*. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/

———— (2018a) "Citing *The Trace*'s Reporting, Top Gun Violence Scholar Calls for More Research on Threat of Stolen Firearms," April 26 *Trace*. https://www.thetrace.org/rounds/stolen-guns-research-agenda-phil-cook/

———— (2018b) "Maryland Will Invest in Gun Trafficking Crackdown," April 30 *Trace*. https://www.thetrace.org/2018/04/maryland-gun-trafficking-task-force-wiretapping-baltimore/

Friedman, David D. (1990) *Price Theory: An Intermediate Text*. South-Western Publishing Co. http://www.daviddfriedman.com/Academic/Price_Theory/PThy_Chapter_20/PThy_Chapter_20.html

Fuchs, Erin (2013) "Why the South Is More Violent Than the Rest of America," September 18 *Business Insider*. http://www.businessinsider.com/south-has-more-violent-crime-fbi-statistics-show-2013-9

Gibbons, Thomas, & Robert Moran (2000) "Man Shot, Killed in Snow Dispute," January 27 *Philadelphia Inquirer*. http://articles.philly.com/2000-01-27/news/25598207_1_snow-dispute-man-shot-christian-values

Glanton, Dahleen, & Carlos Sadovi (2014) "Concealed Carry Shooting Reignites Debate," July 31 *Chicago Tribune*. http://www.chicagotribune.com/news/ct-crestwood-concealed-carry-0730-20140730-story.html

Gueverra, Ericka Cruz (2018) "Man Killed by Armed PSU Officers Had Valid Concealed Carry Permit," June 30 *OPB*. https://www.opb.org/news/article/portland-state-shooting-victim-jason-erik-washington/

Hauser, Christine (2017) "White Police Officer in St. Louis Shoots Off-Duty Black Colleague," June 26 *New York Times*. https://www.nytimes.com/2017/06/26/us/saint-louis-black-officer.html?_r=0

Heath, Michelle (2015) "Gun Goes Off Inside Christus Facility, Injures Woman," October 19 *Beaumont Enterprise*. http://www.beaumontenterprise.com/news/article/Gun-goes-off-inside-Christus-facility-injures-6578001.php

Heersink, Boris, & Brenton Peterson (2016) "Measuring the Vice-Presidential Home State Advantage with Synthetic Controls," 44(4) *American Politics Research* 734.

Hemenway, David, Deborah Azrael, & Matthew Miller (2017) "Whose Guns Are Stolen? The Epidemiology of Gun Theft Victims," 4(1) *Injury Epidemiology* 11.

Hemenway, David, Mary Vriniotis, & Matthew Miller (2006) "Is an Armed Society a Polite Society? Guns and Road Rage," 38(4) *Accident Analysis and Prevention* 687.

Hermann, Peter, & Rachel Weiner (2019) "He Put 224 Guns on the Streets. His Family Would Pay a Price," January 24 *Washington Post*. https://www.washingtonpost.com/local/public-safety/he-put-224-guns-on-the-streets-his-family-would-pay-a-price/2019/01/23/68cd2520-1a57-11e9-8813-cb9dec761e73_story.html?utm_term=.8bfebbb0072e

Hernandez, Alex V. (2017) "Police: No Charges in Fatal Shootout at Elmwood Park Gas Station," April 10 *Chicago Tribune*. http://www.chicagotribune.com/suburbs/elmwood-park/news/ct-elm-elmwood-park-shooting-tl-0413-20170409-story.html

Ho, Vivian (2015) "Gun Linked to Pier Killing Stolen from Federal Ranger," July 8 *San Francisco Chronicle*. http://www.sfchronicle.com/crime/article/Gun-linked-to-S-F-pier-killing-was-BLM-6373265.php

Ho, Vivian, & Kale Williams (2015) "Gun in 2 Killings Stolen from Unlocked Car in Fisherman's Wharf, Cops Say," October 9 *San Francisco Chronicle*. http://www.sfgate.com/crime/article/Gun-in-2-killings-stolen-from-unlocked-car-in-6562039.php

Holzel, Dee (2008) "Shootout in Winnemucca: Three Dead, Two Injured in Early-Morning Gunfight," May 24 *Elko Daily Free Press*. https://elkodaily.com/news/local/shootout-in-winnemucca-three-dead-two-injured-in-early-morning/article_83fe3832-cc3b-528b-88bd-a85ce65f5967.html

Hopkins, Kyle (2017) "Accused Florida Airport Shooter to Appear in Alaska Case by Phone," March 28 *2 KTUU Anchorage*. http://www.ktuu.com/content/news/Diagnosed-with-serious-mental-illness-accused-airport-shooter-to-appear-in-Alaska-case-by-phone-417394013.html

Horwitz, Josh (2011) "Speaking of 'Fast and Furious': NRA Leaders Well-Versed in Fomenting Foreign Conflicts," September 13 *Huffington Post*. https://www.huffingtonpost.com/josh-horwitz/speaking-of-fast-and-furi_b_959633.html

Igielnik, Ruth, & Anna Brown (2017) *Key Takeaways on Americans' Views of Guns and Gun Ownership*. Pew Research Center. http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership

Kalesan, Bindu, Marcos D. Villarreal, Katherine M. Keyes, & Sandro Galea (2016) "Gun Ownership and Social Gun Culture," 22(3) *Injury Prevention* 216.

Kalinowski, Bob (2012) "Police: Plymouth Homicide Suspect Shot by Patron," September 10 *Citizens' Voice*. http://citizensvoice.com/news/police-plymouth-homicide-suspect-shot-by-patron-1.1370815

Kaste, Martin (2019) "Gun Carry Laws Can Complicate Police Interactions," July 19 *NPR*. https://www.npr.org/2016/07/19/486453816/open-carry-concealed-carry-gun-permits-add-to-police-nervousness

Kaul, Ashok, Stefan Klobner, Gregor Pfeifer & Manuel Schieler (2016) "Synthetic Control Methods: Never Use All Pre-Intervention Outcomes as Economic Predictors."

Keele, Luke (2009) "An Observational Study of Ballot Initiatives and State Outcomes," *Working Paper*. https://www.researchgate.net/publication/228715196_An_observational_study_of_ballot_initiatives_and_state_outcomes

KHOU (2015) "One Man Injured After Carjacking, Shooting at Gas Station," September 27 *KHOU 11*. http://www.khou.com/news/one-man-injured-after-carjacking-shooting-at-gas-station/142447940

KIMT (2018) "Update: Court Documents Chronicle Tense Moments Prior to Rochester Shooting" January 17 *KIMT 3 News*. http://www.kimt.com/content/news/Rochester-shooting-Weiss-charged-with-2nd-degree-murder-469747873.html

Knight, Brian (2013) "State Gun Policy and Cross-State Externalities: Evidence from Crime Gun Tracing," 5(4) *American Economic J.: Economic Policy* 200.

Kovandzic, Tomislav, Thomas Marvell, & Lynne Vieraitis (2005) "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates: Evidence from Panel Data for Large Urban Cities," 9 *Homicide Studies* 292.

KTUU (2017) "Esteban Santiago, Accused Fort Lauderdale Shooter, Agreed to Anger Management Courses in Alaska," January 9 *2 KTUU Anchorage*. http://www.ktuu.com/content/news/Esteban-Santiago-accused-Fort-Lauderdale-shooter-had-agreed-to-under-anger-management-in-Alaska-410177225.html

Lane, Emily (2018) "Cardell Hayes Again Claims Self-Defense in Will Smith Shooting Death: Appeal," February 15 *NOLA.com*. https://www.nola.com/crime/2018/02/cardell_hayes_self_defense_wil.html

Lat, David (2012) "*DiDonato v. Ung*: The Temple Law Shooter Gets Hit—With a Civil Suit," January 12 *Above the Law*. https://abovethelaw.com/2012/01/didonato-v-ung-the-sequelor-the-temple-law-shooter-gets-hit-with-a-lawsuit

Levenson, Eric (2017) "Judge Denies 'Stand Your Ground' Defense in Movie Theater Shooting," March 11 *CNN*. http://www.cnn.com/2017/03/10/us/stand-your-ground-movie-trial/index.html

Lopez, German (2018) "Police Shootings Are Also Part of America's Gun Problem," April 9 *Vox*. https://www.vox.com/2018/4/9/17205256/gun-violence-us-police-shootings

Lott, John R. (2010) *More Guns, Less Crime: Understanding Crime and Gun Control Laws.* Chicago, IL: Univ. of Chicago Press.

Lott, John R., & David B. Mustard (1997) "Crime, Deterrence, and Right-to-Carry Concealed Handguns," 26(1) *J. of Legal Studies* 1.

Lozano, Alicia Victoria (2017) "28-Year-Old David Desper Charged in Road Rage Killing of 18-Year-Old Bianca Roberson," July 2 *NBC Philadelphia*. https://www.nbcphiladelphia.com/news/local/Police-Update-on-Road-Rage-Killing-of-18-Yr-Old-432100983.html

Lunny, SanRay (2010) *Unloaded Open Carry.* San Mateo County Sheriff's Office. http://www.calgunlaws.com/wp-content/uploads/2012/09/San-Mateo-County-Sheriffs-Office_Unloaded-Open-Carry.pdf

Luthern, Ashley (2015) "Concealed Carry Draws Opposite Views—And a Murky Middle," June 11 *Milwaukee Wisconsin J. Sentinel*. http://www.jsonline.com/news/crime/concealed-carry-draws-opposite-views--and-a-murky-middle-b99510854z1-307079321.html

MacDonald, Sally (2012) "CHL Holder Fired Shot that Killed Store Clerk," May 31 *Free Republic*. http://www.freerepublic.com/focus/f-news/2889792/posts

McElroy, Majorie B., & Will Peichun Wang (2017) "Seemingly Inextricable Dynamic Differences: The Case of Concealed Gun Permit, Violent Crime and State Panel Data." https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2992058

McLaughlin, Eliott, & Madeline Holcombe (2018) "Mother of Man Killed by Police at Alabama Mall Ponders Open Casket as Family Seeks Justice," November 26 *CNN*. https://www.cnn.com/2018/11/25/us/alabama-shooting-family-seeks-answers/index.html

Mettler, Katie (2016) "'He Thought He Could Help': Concealed Carry Gun-Wielder Intervenes in Domestic Dispute and Is Shot Dead," May 3 *Washington Post*. https://www.washingtonpost.com/news/morning-mix/wp/2016/05/03/he-thought-he-could-help

Mideksa, Torben K. (2013) "The Economic Impact of Natural Resources," 65(2) *J. of Environmental Economics & Management* 277.

Miller, Matthew, Deborah Azrael, David Hemenway, & Frederic I. Solop (2002) "'Road Rage' in Arizona: Armed and Dangerous," 34(6) *Accident Analysis & Prevention* 807.

Moody, Carlisle E., & Thomas B. Marvell (2008) "The Debate on Shall-Issue Laws," 5(3) *Econ J. Watch* 269.

Moody, Carlisle E., Thomas B. Marvell, Paul R. Zimmerman, & Fasil Alemante (2014) "The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," 4 *Rev. of Economics & Finance* 33.

Morin, Rich, & Andrew Mercer (2017) *A Closer Look at Police Officers Who Have Fired Their Weapon on Duty.* Pew Research Center. https://www.pewresearch.org/fact-tank/2017/02/08/a-closer-look-at-police-officers-who-have-fired-their-weapon-on-duty/

Murdock, Jason (2018) "Arizona Man Accidentally Shoots Himself in Groin in Walmart," November 29 *Newsweek*. https://www.newsweek.com/arizona-man-accidentally-shoots-himself-groin-walmart-1236287

Nagin, Daniel S. (Forthcoming) "Firearm Availability and Police Use of Force," *Annals of American Academy of Political & Social Science.*

National Research Council (2005) *Firearms and Violence: A Critical Review.* Washington, DC: National Academies Press.

NBC News (2014) "Cost of Bravery: Vegas Bystander Died Trying to Stop Rampage," June 10 *NBC News*. https://www.nbcnews.com/storyline/vegas-cop-killers/cost-bravery-vegas-bystander-died-trying-stop-rampage-n127361

Nonnemaker, James, Mark Engelen, & Daniel Shive (2011) "Are Methamphetamine Precursor Control Laws Effective Tools to Fight the Methamphetamine Epidemic?" 20(5) *Health Economics* 519.

Office of the Director—Strategic Management (2013) *2012 Summary: Firearms Reported Lost and Stolen.* U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives. https://www.atf.gov/resource-center/docs/2012-firearms-reported-lost-and-stolenpdf-1/download

Officer.com (2017) "Chief: Concealed-Carry Law Is 'Irresponsible'," June 29 *Officer.com.* https://www.officer.com/command-hq/news/12348064/milwaukee-police-chief-calls-concealedcarry-law-irresponsible

Olson, Erik J., Mark Hoofnagle, Elinore J. Kaufman, William C. Schwab, Patrick Reilly, & Mark J. Seamon (2019) "American Firearm Homicides: The Impact of Your Neighbors," February 7 *J. of Trauma & Acute Care Surgery.* https://journals.lww.com/jtrauma/Abstract/publishahead/American_Firearm_Homicides__The_Impact_of_Your.98406.aspx#pdf-link

Owens, David (2018) "Retired Hartford Firefighter Donald Brown Sentenced to 7 Years in Shooting," January 9 *Hartford Courant.* http://www.courant.com/news/connecticut/hc-hartford-donald-brown-sentenced-0110-story.html

Palmer, Ewan (2018) "Pregnant Woman Shot by Daughter, 3, After Finding Gun in Car," April 18 *Newsweek.* http://www.newsweek.com/pregnant-woman-shot-daughter-3-after-finding-gun-car-outisde-platos-closet-891073

Paraguassu, Lisandra, & Ricardo Brito (2018) "U.S. Biggest Source of Illegal Foreign Guns in Brazil: Report," January 10 *Reuters.* https://www.reuters.com/article/us-usa-brazil-arms/u-s-biggest-source-of-illegal-foreign-guns-in-brazil-report-idUSKBN1EZ2M5

Parsons, Chelsea, & Eugenio Weigend Vargas (2017) *Stolen Guns in America: A State-by-State Analysis.* Center for American Progress. https://cdn.americanprogress.org/content/uploads/2017/07/25052308/StolenGuns-report.pdf

Perrusquia, Marc (2017) "Stolen Guns: 'Getting Them Is the Easy Part'," *Commercial Appeal.* http://projects.commercialappeal.com/woundedcity/stolen-guns-this-fence-makes-a-bad-neighbor.php

Phillips, Charles D., Obioma Nwaiwu, Darcy K. McMaughan Moudouni, Rachel Edwards, & Szu hsuan Lin (2013) "When Concealed Handgun Licensees Break Bad: Criminal Convictions of Concealed Handgun Licensees in Texas, 2001–2009," 103(1) *American J. of Public Health* 86.

Pilger, Lori (2018) "FBI Accuses White Supremacist of Terror Attack on Amtrak Train in Rural Nebraska," January 4 *Lincoln J. Star.* http://journalstar.com/news/state-and-regional/nebraska/fbi-accuses-white-supremacist-of-terror-attack-on-amtrak-train/article_82f0860e-3c75-5a66-ab0c-a2e3a3c16aab.html

Planty, Michael, & Jennifer Truman (2013) "Firearm Violence, 1993–2011." *U.S. Department of Justice Bureau of Justice Statistics BJS Special Report* 241730.

Plumlee, Rick (2012) "Eight with Concealed-Carry Permits Charged with Felonies in Sedgwick County," November 17 *Wichita Eagle.* http://www.kansas.com/latest-news/article1103131.html

Pugliese, Nicholas (2018) "It's Tough to Buy a Gun in New Jersey. So Where Do All the Guns Used in Crimes Come From?" April 16 *NorthJersey.com.* https://www.northjersey.com/story/news/new-jersey/2018/04/16/nj-new-jersey-where-do-guns-used-crimes-come/503115002/

Robles, Frank, & Christine Hauser (2015) "Lawyers Provide Details in Police Shooting of Corey Jones in Florida," October 22 *New York Times.* https://www.nytimes.com/2015/10/23/us/florida-corey-jones-police-shooting.html

Sampson, Zachary T. (2014) "Stolen Guns, Like One Used to Kill Tarpon Springs Officer, Routine at Crime Scenes," December 24 *Tampa Bay Times.* http://www.tampabay.com/news/publicsafety/crime/gun-police-say-was-used-to-kill-tarpon-springs-officer-stolen-from/2211436

Sauro, Sean (2019) "Plans Made to Honor Men Killed in State College Shooting Spree," January 26 *Penn Live.* https://www.pennlive.com/news/2019/01/plans-made-to-honor-men-killed-in-state-college-shooting-spree.html

Savitsky, Sasha (2019) "Country Singer Justin Carter Dead at 35 After Accidental Shooting," March 22 *Fox News.* https://www.foxnews.com/entertainment/country-singer-justin-carter-dead-at-35-after-accidental-shooting

Scherer, Jasper (2016) "Fla. 'Loud Music' Murder: Firing into Car Full of Teens Playing Rap Music Not 'Self-Defense,' Court Rules," November 18 *Washington Post.* https://www.washingtonpost.com/news/morning-mix/wp/2016/11/18/fla-loud-music-murder-firing

Schwarz, Hunter (2014) "Idaho Professor Shoots Himself in Foot Two Months After State Legalizes Guns on Campuses," September 5 *Washington Post*. https://wapo.st/1nAtjTj?tid=ss_mail&utm_ term=.a706e9990995

Schwarzschild, Todd, & Drew Griffin (2011) "ATF Loses Track of 1,400 Guns in Criticized Probe," July 12 *CNN*. http://www.cnn.com/2011/POLITICS/07/12/atf.guns/index.html

Shen, Aviva (2017) "When the Driver Who Just Cut You Off Also Has a Gun," April 10 *Trace*. https://www.thetrace.org/2017/04/road-rage-shootings-guns/

Siegel, Michael, Molly Pahn, Ziming Xuan, Craig S. Ross, Sandro Galea, Bindu Kalesan, Eric Fleegler, & Kristin A. Goss (2017) "Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States," 107(12) *American J. of Public Health* 1923.

Simon, Darran (2018) "Manslaughter Defendant in 'Stand Your Ground' Case Said He Felt Scared in Altercation," September 3 *CNN*. https://www.cnn.com/2018/09/03/us/michael-drejka-stand-your-ground-jailhouse-interview/index.html

Simpson, Kevin (2017) "Shoppers Pulled Guns in Response to Thornton Walmart Shooting, But Police Say that Slowed Investigation," November 2 *Denver Post*. http://www.denverpost.com/2017/11/02/shoppers-pulled-weapons-walmart-shooting/

Slobodzian, Joseph A. (2011) "Ung Acquitted in Wounding of DiDonato in Old City," February 16 *Inquirer*. http://www.philly.com/philly/news/local/20110216_Ung_acquitted_in_wounding_of_DiDonato_in_Old_City.html

Soderling, Luke (2016) *How to Inform an Officer You Are Carrying a Handgun and Live* [video file]. https://www.youtube.com/watch?v=fOO99qcASEM

Stanglin, Doug (2018) "Parkland Teacher Charged with Leaving Loaded Gun in Public Restroom," April 13 *USA Today*. https://www.usatoday.com/story/news/2018/04/13/parkland-teacher-charged-leaving-loaded-gun-public-restroom/514855002/

Stark, Emily, & Daniel Sachau (2016) "Lake Wobegon's Guns: Overestimating Our Gun-Related Competences," 4(1) *J. of Social & Political Psychology* 8.

Strnad, Jeff (2007) "Should Legal Empiricists Go Bayesian?" 9(1) *American Law & Economics Rev.* 195.

Stuart, Hunter (2013) "2 Concealed Carry Holders Kill Each Other In Road Rage Incident," September 19 *Huffington Post*. http://www.huffingtonpost.com/2013/09/19/michigan-concealed-carry-road-rage-two-dead_n_3956491.html

US News (2018) "Cops: Mom Was Turning on Safety When Gun Fired, Killing Girl," April 23 *US News*. https://www.usnews.com/news/best-states/ohio/articles/2018-04-23/cops-mom-was-turning-on-safety-when-gun-fired-killing-girl

Violence Policy Center (2017) *Mass Shootings Committed by Concealed Carry Killers: May 2007 to the Present*. http://concealedcarrykillers.org/wp-content/uploads/2017/06/ccwmassshootings.pdf

WFTV (2015) "3 Injured When Man's Gun Goes Off in Sanford Cracker Barrel," November 2 *WFTV 9*. http://www.wftv.com/news/local/man-not-charged-after-gun-goes-sanford-cracker-bar/26880670

Williams, Clois, & Steven Waltrip (2004) *Aircrew Security: A Practical Guide*. New York, NY: Ashgate Publishing.

Wilson, Robert (2016) "Common Sense," February 29 *American Scholar*. https://theamericanscholar.org/common-sense/#

Witt, Jessica K., & James R. Brockmole (2012) "Action Alters Object Identification: Wielding a Gun Increases the Bias to See Guns," 38(5) *J. of Experimental Psychology: Human Perception & Performance* 1159.

Zimmerman, Paul R. (2014) "The Deterrence of Crime Through Private Security Efforts: Theory and Evidence," 37 *International Rev. of Law & Economics* 66.

# EXHIBIT 60

Center for American Progress



# America Under Fire

An Analysis of Gun Violence in the United States
and the Link to Weak Gun Laws

By Chelsea Parsons and Eugenio Weigend     October 2016



# America Under Fire

An Analysis of Gun Violence in the United States and the Link to Weak Gun Laws

By Chelsea Parsons and Eugenio Weigend       October 2016

# Contents

1   **Introduction and summary**

4   **10 indicators of gun violence and the Gun Violence Index**

27  **The link between high levels of gun violence and weak state gun laws**

32  **Conclusion**

34  **Methodology**

39  **About the authors**

40  **Endnotes**

# Introduction and summary

One of the key questions in the gun debate is whether strong gun laws—such as requiring background checks for all gun sales; limiting who may carry guns and where they may carry them; and providing increased oversight of the gun industry—are effective at reducing gun violence. This is not an easy question to answer, as there are myriad factors that may contribute to the rate of gun violence in any community. In addition to easy access to guns facilitated and enabled by weak gun laws, there are an interconnected web of social and economic issues that can have an impact on rates of violence in a community, such as persistent poverty, lack of employment and educational opportunities, and a breakdown in the police-community relationship that imperils community safety. Much of the burden of day-to-day gun violence in this country falls disproportionately on communities of color, which are often at the epicenter of these related challenges. Another factor that may affect rates of gun deaths in a state is the level of gun ownership in that state, which is difficult to assess because of the lack of any comprehensive accounting of private gun ownership in this country.[1] And roughly two-thirds of gun deaths in the United States are the result of suicide, which raises another set of questions regarding the role of access to guns in contributing to high rates of suicide.

Despite the many factors that may contribute to rates of gun violence in a particular community, there is a robust and growing body of research that demonstrates an undeniable correlation between certain strong gun laws and lower rates of gun violence. A 2013 study by a group of public health researchers examined the relationship between the overall strength of a state's gun laws and rates of gun deaths in the state and found that states with stronger gun laws had lower rates of gun deaths than states with weaker gun laws.[2] A 2011 study that analyzed state-level data drew similar conclusions: Firearm-related deaths were significantly lower in states that had enacted laws to ban assault weapons, require trigger locks, and mandate safe storage of guns.[3] Two studies led by Daniel Webster at the Johns

Hopkins Bloomberg School of Public Health demonstrated the impact of state laws requiring a permit—and background check—before an individual can purchase a handgun. When Connecticut implemented this requirement, gun-related homicides in the state fell 40 percent; when Missouri eliminated this requirement, gun homicides increased 26 percent.[4] And research conducted by Everytown for Gun Safety, a nonprofit gun violence prevention advocacy group, found that states that require universal background checks for all handgun sales have significantly lower rates of intimate partner gun homicides of women, law enforcement officers killed by handguns, and gun-related suicides.[5]

In 2013, the Center for American Progress conducted a study to assess the correlation between the relative strength or weakness of a state's gun laws, as measured by the Law Center to Prevent Gun Violence, and rates of gun violence in the state across 10 categories of gun violence or gun-related crimes. Consistent with the research cited above, the CAP study found a strong correlation between strong gun laws and lower rates of gun violence.[6]

In the 3.5 years since that study, a number of things have changed that warrant revisiting that research. Many states have acted to strengthen their gun laws: Since the mass shooting at Sandy Hook Elementary School, eight states have enacted laws to require universal background checks—bringing the total number of states that have enacted such laws to 18—and 20 states have strengthened their laws to help keep guns out of the hands of domestic abusers.[7] Unfortunately, other states have taken the opposite approach, loosening laws regarding where guns may be carried and weakening or eliminating concealed carry permit requirements.[8] In addition, improvements made in the collection of data relating to gun violence now allow more precise tracking of events such as mass shootings and fatal shootings by law enforcement officers.

In this report, the authors revisit CAP's 2013 analysis with a revised methodology, some new categories of gun violence, and updated state grades from the Law Center to Prevent Gun Violence. The report provides a state ranking across 10 key indicators of gun violence, then uses these rankings to calculate an overall Gun Violence Index score for each state. Using this score, the authors assessed the correlation between the rate of overall gun violence in the state and the relative strength or weakness of each state's gun laws.

Once again, CAP finds a strong and significant link between weak gun laws and high rates of gun violence. The 10 states with the weakest gun laws collectively have an aggregate level of gun violence that is 3.2 times higher than the 10 states with the strongest gun laws. And while this correlation does not prove a causal relationship between stronger gun laws and fewer gun deaths, the link between stronger gun laws and lower rates of gun violence cannot be ignored. As the gun debate continues to churn, policymakers at all levels of government must take action to close dangerous loopholes and enact strong gun laws to protect all of the nation's communities from this national disgrace.

# 10 indicators of gun violence and the Gun Violence Index

In order to measure levels of gun violence for each state, CAP analyzed data relating to 10 different types of gun violence:

• Rate of overall gun deaths per every 100,000 people, 2005-2014

• Rate of gun suicides per every 100,000 people, 2005-2014

• Rate of gun homicides per every 100,000 people, 2005-2014

• Rate of fatal gun accidents per every 1 million people, 2005-2014

• Rate of mass shootings per every 1 million people, 2006-2015

• Rate of intimate partner gun homicides of women per every 1 million women, 2005-2014

• Rate of gun deaths among people younger than age 21 per every 100,000 people younger than age 21, 2005-2014

• Rate of law enforcement officers feloniously killed with a firearm per every 1 million people, 2005-2014

• Rate of fatal shootings by police per every 1 million people, 2015-2016

• Crime gun export rates per every 100,000 people, 2010-2015

For each of these indicators, the authors ranked the states from zero, defined as the state with the lowest level of gun violence, to 100, defined as the state with the highest level of gun violence. The remaining states were given values in between depending on their place in the range. The authors then averaged the scores of the 10 indicators to calculate a final overall Gun Violence Index score for each state.

TABLE 1

## Gun Violence Index ranking

| Ranking | State | Gun Violence Index | | Ranking | State | Gun Violence Index |
|---|---|---|---|---|---|---|
| 1 | Louisiana | 75 | | 26 | Colorado | 33 |
| 2 | Alaska | 66 | | 27 | Florida | 33 |
| 3 | Mississippi | 61 | | 28 | Pennsylvania | 32 |
| 4 | West Virginia | 60 | | 29 | Delaware | 30 |
| 5 | Alabama | 59 | | 30 | Oregon | 29 |
| 6 | South Carolina | 57 | | 31 | Vermont | 29 |
| 7 | Wyoming | 56 | | 32 | Utah | 29 |
| 8 | Arizona | 53 | | 33 | Michigan | 28 |
| 9 | Montana | 51 | | 34 | Maryland | 28 |
| 10 | Oklahoma | 51 | | 35 | Ohio | 28 |
| 11 | Nevada | 50 | | 36 | Maine | 27 |
| 12 | New Mexico | 50 | | 37 | Washington | 26 |
| 13 | Tennessee | 49 | | 38 | California | 26 |
| 14 | Arkansas | 47 | | 39 | Nebraska | 26 |
| 15 | Missouri | 47 | | 40 | Illinois | 23 |
| 16 | Kentucky | 46 | | 41 | Wisconsin | 23 |
| 17 | Georgia | 44 | | 42 | New Hampshire | 21 |
| 18 | Kansas | 40 | | 43 | Minnesota | 17 |
| 19 | South Dakota | 39 | | 44 | Iowa | 16 |
| 20 | Indiana | 38 | | 45 | Connecticut | 12 |
| 21 | North Carolina | 38 | | 46 | New Jersey | 12 |
| 22 | Idaho | 36 | | 47 | New York | 11 |
| 23 | Virginia | 36 | | 48 | Rhode Island | 9 |
| 24 | North Dakota | 35 | | 49 | Hawaii | 6 |
| 25 | Texas | 34 | | 50 | Massachusetts | 6 |

States in **red** indicate the 10 states with the highest levels of gun violence. States in **green** indicate the 10 states with the lowest levels of gun violence.

Source: For full source information, please see the Methodology section of Chelsea Parsons and Eugenio Weigend, "America Under Fire: An Analysis of Gun Violence in the United States and the Link to Weak Gun Laws" (Washington: Center for American Progress, 2016).

Table 1 presents the results of the Gun Violence Index for each state according to their placement in the national ranking. States with a higher score, closer to 100, have higher overall rates of gun violence than states with a lower score, closer to zero. The 10 states with the highest level of gun violence are Louisiana, Alaska, Mississippi, West Virginia, Alabama, South Carolina, Wyoming, Arizona, Montana, and Oklahoma. The 10 states with the lowest levels of gun violence are Massachusetts, Hawaii, Rhode Island, New York, New Jersey, Connecticut, Iowa, Minnesota, New Hampshire, and Wisconsin.



**FIGURE 1**
**Gun violence outcomes and ranking by state**

Level of gun violence

- 1–10 (highest)
- 11–20
- 21–30
- 31–40
- 41–50 (lowest)

Source: For full source information, please see the Methodology section of Chelsea Parsons and Eugenio Weigend, "America Under Fire: An Analysis of Gun Violence in the United States and the Link to Weak Gun Laws" (Washington: Center for American Progress, 2016).

## Overall gun deaths

The overall scope of gun violence in America is truly staggering. In 2014, more than 33,000 people were killed with guns in the United States, amounting to 92 people killed with guns every day.[9] The Centers for Disease Control and Prevention, or CDC, separates gun-related deaths into three broad categories based on the intent of the shooter: intentional violence-related, accidental, and suicide. There is also a small category for gun deaths for which the intent of the shooter cannot be determined. Aggregating these categories gives a total picture of overall gun deaths in the state. As illustrated in table 2, the rate of overall gun deaths from 2005 to 2014 vary widely across the states and were particularly high in Louisiana, Alaska, Mississippi, Alabama, and Wyoming. These states presented rates higher than 16 gun deaths per every 100,000 residents. In contrast, Hawaii, Massachusetts, Rhode Island, New York, Connecticut, and New Jersey presented rates lower than six gun deaths per every 100,000 residents.

**TABLE 2**
## Rate of overall gun deaths, 2005–2014

National average rate: 10.24 per every 100,000 people

| Ranking | State | Rate per every 100,000 people | Score | Ranking | State | Rate per every 100,000 people | Score |
|---|---|---|---|---|---|---|---|
| 1 | Louisiana | 18.78 | 100 | 26 | Texas | 10.73 | 49 |
| 2 | Alaska | 18.20 | 96 | 27 | Pennsylvania | 10.69 | 49 |
| 3 | Mississippi | 17.49 | 92 | 28 | Oregon | 10.62 | 49 |
| 4 | Alabama | 16.79 | 87 | 29 | Maryland | 10.45 | 48 |
| 5 | Wyoming | 16.27 | 84 | 30 | Virginia | 10.42 | 47 |
| 6 | Arkansas | 15.78 | 81 | 31 | Ohio | 9.96 | 45 |
| 7 | Montana | 15.58 | 80 | 32 | Delaware | 9.62 | 42 |
| 8 | Tennessee | 15.08 | 77 | 33 | North Dakota | 9.40 | 41 |
| 9 | New Mexico | 14.91 | 76 | 34 | South Dakota | 9.32 | 41 |
| 10 | Nevada | 14.74 | 75 | 35 | Vermont | 9.04 | 39 |
| 11 | Oklahoma | 14.71 | 74 | 36 | Washington | 8.90 | 38 |
| 12 | Arizona | 14.60 | 74 | 37 | Maine | 8.59 | 36 |
| 13 | South Carolina | 14.22 | 71 | 38 | Illinois | 8.41 | 35 |
| 14 | West Virginia | 13.94 | 70 | 39 | Nebraska | 8.35 | 34 |
| 15 | Missouri | 13.84 | 69 | 40 | Wisconsin | 8.28 | 34 |
| 16 | Kentucky | 13.44 | 66 | 41 | California | 8.25 | 34 |
| 17 | Idaho | 12.91 | 63 | 42 | New Hampshire | 6.94 | 26 |
| 18 | Georgia | 12.76 | 62 | 43 | Minnesota | 6.82 | 25 |
| 19 | North Carolina | 12.02 | 57 | 44 | Iowa | 6.78 | 25 |
| 20 | Florida | 11.60 | 55 | 45 | New Jersey | 5.26 | 15 |
| 21 | Indiana | 11.39 | 54 | 46 | Connecticut | 5.25 | 15 |
| 22 | Michigan | 11.33 | 53 | 47 | New York | 4.82 | 12 |
| 23 | Utah | 11.28 | 53 | 48 | Rhode Island | 4.00 | 7 |
| 24 | Colorado | 11.22 | 52 | 49 | Massachusetts | 3.39 | 3 |
| 25 | Kansas | 10.82 | 50 | 50 | Hawaii | 2.88 | 0 |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html (last accessed June 2016).

## Gun suicides

The largest category of gun deaths in the United States are gun-related suicides: Roughly two-thirds of all gun deaths in this country are suicides. Access to firearms significantly increases the risk that a suicide attempt will be fatal. While suicide attempts involving methods other than guns have a 5 percent fatality rate, 85 percent of suicide attempts with a firearm are fatal.[10] People complete suicide more often with a gun than with any other method: Of the more than 375,000 people who died by suicide in the U.S. from 2005 to 2014, roughly half used a gun.[11] A person dies by gun-related suicide in the United States approximately every 30 minutes.[12]

Table 3 ranks the states based on the rate of gun suicides from 2005 to 2014, which vary widely from state to state. While Alaska, Wyoming, Montana, Idaho, and Nevada presented rates higher than 10 gun suicides per every 100,000 people from 2005 to 2014, 10 states presented rates lower than five gun suicides per every 100,000 people.

TABLE 3

## Rate of gun suicides, 2005–2014

National average rate: 5.99 per every 100,000 people

| Ranking | State | Rate per every 100,000 people | Score | Ranking | State | Rate per every 100,000 people | Score |
|---|---|---|---|---|---|---|---|
| 1 | Alaska | 14.21 | 100 | 26 | Maine | 7.25 | 44 |
| 2 | Wyoming | 14.11 | 99 | 27 | North Carolina | 7.11 | 43 |
| 3 | Montana | 13.26 | 92 | 28 | Indiana | 6.97 | 42 |
| 4 | Idaho | 11.02 | 75 | 29 | Florida | 6.74 | 40 |
| 5 | Nevada | 10.33 | 69 | 30 | Virginia | 6.72 | 40 |
| 6 | New Mexico | 9.99 | 66 | 31 | Washington | 6.68 | 40 |
| 7 | West Virginia | 9.98 | 66 | 32 | Texas | 6.57 | 39 |
| 8 | Oklahoma | 9.87 | 65 | 33 | New Hampshire | 6.01 | 35 |
| 9 | Utah | 9.62 | 63 | 34 | Pennsylvania | 5.97 | 34 |
| 10 | Arkansas | 9.57 | 63 | 35 | Wisconsin | 5.96 | 34 |
| 11 | Kentucky | 9.47 | 62 | 36 | Michigan | 5.86 | 33 |
| 12 | Arizona | 9.36 | 61 | 37 | Ohio | 5.82 | 33 |
| 13 | Alabama | 9.03 | 59 | 38 | Nebraska | 5.74 | 32 |
| 14 | Tennessee | 9.01 | 58 | 39 | Iowa | 5.52 | 31 |
| 15 | Mississippi | 8.95 | 58 | 40 | Minnesota | 5.31 | 29 |
| 16 | Colorado | 8.70 | 56 | 41 | Delaware | 4.95 | 26 |
| 17 | Oregon | 8.68 | 56 | 42 | Maryland | 4.14 | 20 |
| 18 | North Dakota | 8.21 | 52 | 43 | California | 3.96 | 18 |
| 19 | Louisiana | 8.06 | 51 | 44 | Illinois | 3.40 | 14 |
| 19 | South Carolina | 8.06 | 51 | 45 | Connecticut | 2.68 | 8 |
| 21 | South Dakota | 8.03 | 51 | 46 | Rhode Island | 2.37 | 5 |
| 22 | Missouri | 7.95 | 50 | 47 | New York | 2.23 | 4 |
| 23 | Vermont | 7.82 | 49 | 48 | Hawaii | 2.20 | 4 |
| 24 | Kansas | 7.67 | 48 | 49 | New Jersey | 1.86 | 1 |
| 25 | Georgia | 7.32 | 45 | 50 | Massachusetts | 1.69 | 0 |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html (last accessed June 2016).

## Gun homicides

More than 30 people are murdered with a gun every day in the United States, which amounts to a person being murdered with a gun every 48 minutes.[13] Moreover, according to information from the CDC, close to 69 percent of all homicides from 2005 to 2014 were committed with a gun, placing firearms as the number one tool for homicides.[14] The United States is an outlier among peer nations when it comes to gun murders: The U.S. gun murder rate is 25 times higher than the average rate of other high-income countries.[15]

Gun homicides have a disproportionate impact on communities of color in the United States.[16] While African Americans make up 14 percent of the national population, they account for 56 percent of gun homicides.[17] This discrepancy is even more acute in a number of states. For example, while African Americans make up 15 percent of the population in Michigan and New Jersey, they represent 80 percent and 75 percent of gun homicide victims in those states, respectively. The Hispanic population in some states also experiences disproportionate rates of gun violence. For example while Hispanics represent 29 percent and 12 percent of the state population in Arizona and Rhode Island, they account for 49 percent and 39 percent of gun homicide victims in those states, respectively.[18]

Among states, the disparity in terms of rates of gun homicides is significant. The average of the five states with the highest rates—7.14 per every 100,000 population—is 10 times higher than the average of the five states with the lowest rates, 0.72 per every 100,000 population. Louisiana's gun homicide rate alone is more than two times higher than the national average rate and 29 percent higher than Mississippi's rate, the state that ranks second. In contrast, five states presented rates lower than one gun homicide per every 100,000 people.

TABLE 4

## Rate of gun homicides, 2005–2014

National average rate: 3.85 per every 100,000 people

| Ranking | State | Rate per every 100,000 people | Score | Ranking | State | Rate per every 100,000 people | Score |
|---|---|---|---|---|---|---|---|
| 1 | Louisiana | 9.75 | 100 | 26 | New Jersey | 3.29 | 30 |
| 2 | Mississippi | 7.53 | 76 | 27 | West Virginia | 3.04 | 27 |
| 3 | Alabama | 6.90 | 69 | 28 | Alaska | 2.95 | 26 |
| 4 | Maryland | 5.96 | 59 | 29 | Kansas | 2.67 | 23 |
| 5 | South Carolina | 5.56 | 55 | 30 | Connecticut | 2.46 | 21 |
| 6 | Arkansas | 5.44 | 53 | 30 | New York | 2.46 | 21 |
| 7 | Missouri | 5.36 | 52 | 32 | Nebraska | 2.25 | 19 |
| 8 | Michigan | 5.22 | 51 | 33 | Wisconsin | 2.07 | 17 |
| 8 | Tennessee | 5.22 | 51 | 34 | Colorado | 2.06 | 17 |
| 10 | Georgia | 4.94 | 48 | 35 | Washington | 1.79 | 14 |
| 11 | Illinois | 4.72 | 45 | 36 | Massachusetts | 1.55 | 11 |
| 12 | Arizona | 4.69 | 45 | 36 | Montana | 1.55 | 11 |
| 13 | Florida | 4.57 | 44 | 38 | Rhode Island | 1.49 | 10 |
| 14 | North Carolina | 4.50 | 43 | 39 | Wyoming | 1.48 | 10 |
| 15 | Delaware | 4.44 | 42 | 40 | Oregon | 1.43 | 10 |
| 16 | Pennsylvania | 4.33 | 41 | 41 | Minnesota | 1.28 | 8 |
| 17 | Oklahoma | 4.25 | 40 | 42 | Idaho | 1.23 | 7 |
| 18 | New Mexico | 4.04 | 38 | 43 | Utah | 1.16 | 7 |
| 19 | Indiana | 3.92 | 37 | 44 | Maine | 1.01 | 5 |
| 20 | California | 3.91 | 37 | 45 | Iowa | 1.00 | 5 |
| 21 | Nevada | 3.87 | 36 | 46 | Vermont | 0.95 | 4 |
| 22 | Ohio | 3.81 | 36 | 47 | South Dakota | 0.75 | 2 |
| 23 | Texas | 3.78 | 35 | 48 | North Dakota | 0.74 | 2 |
| 24 | Kentucky | 3.31 | 30 | 49 | New Hampshire | 0.63 | 1 |
| 24 | Virginia | 3.31 | 30 | 50 | Hawaii | 0.54 | 0 |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html (last accessed June 2016).

## Fatal gun accidents

A person is accidentally killed with a gun every 15 hours in the United States.[19] While accidental gun deaths account for the smallest portion of overall gun deaths, making up around 2 percent of annual gun deaths in the United States, they often occur in the most tragic of circumstances and involve young children who gain access to loaded guns that were improperly stored.[20] And although these numbers are small when compared to gun homicides or suicides, they are significant when placed in other contexts. For example, in 2015, more people were fatally shot in the United States by toddlers with guns than by terrorists.[21]

Assessing the full scope of accidental gun deaths across states is a challenge, as there are inconsistencies in how the states code and report these deaths.[22] However, the best available data come from the CDC; these data demonstrate that Louisiana, Mississippi, Alabama, West Virginia, and Tennessee had the highest rates of accidental gun deaths from 2005 to 2014, with rates above five per every 1 million people, while seven states had rates lower than one fatal gun accident per every 1 million people.[23]

TABLE 5

## Rate of fatal gun accidents, 2005–2014

National average rate: 1.9 per every 1 million people

| Ranking | State | Rate per every one million people | Score | Ranking | State | Rate per every one million people | Score |
|---|---|---|---|---|---|---|---|
| 1 | Louisiana | 7.6 | 100 | 25 | Nevada | 1.5 | 14 |
| 2 | Mississippi | 6.3 | 82 | 27 | Colorado | 1.4 | 13 |
| 3 | Alabama | 6.1 | 79 | 27 | Illinois | 1.4 | 13 |
| 4 | West Virginia | 5.7 | 73 | 27 | Ohio | 1.4 | 13 |
| 5 | Tennessee | 5.3 | 68 | 27 | Virginia | 1.4 | 13 |
| 6 | Wyoming | 4.7 | 59 | 31 | Oregon | 1.3 | 11 |
| 7 | Arkansas | 4.6 | 58 | 32 | California | 1.2 | 10 |
| 8 | Kentucky | 4.2 | 52 | 32 | Florida | 1.2 | 10 |
| 8 | Montana | 4.2 | 52 | 32 | Iowa | 1.2 | 10 |
| 10 | South Carolina | 4.1 | 51 | 32 | New Hampshire | 1.2 | 10 |
| 11 | Oklahoma | 3.9 | 48 | 36 | Michigan | 1.1 | 8 |
| 12 | Alaska | 3.7 | 45 | 36 | Utah | 1.1 | 8 |
| 13 | Idaho | 3.4 | 41 | 36 | Washington | 1.1 | 8 |
| 14 | Missouri | 3.3 | 39 | 39 | Wisconsin | 0.9 | 6 |
| 15 | South Dakota | 3.2 | 38 | 40 | Minnesota | 0.8 | 4 |
| 16 | Georgia | 2.9 | 34 | 41 | Connecticut | 0.7 | 3 |
| 17 | North Carolina | 2.8 | 32 | 41 | Massachusetts | 0.7 | 3 |
| 18 | Indiana | 2.5 | 28 | 43 | New Jersey | 0.6 | 1 |
| 18 | North Dakota | 2.5 | 28 | 43 | New York | 0.6 | 1 |
| 20 | Nebraska | 2.3 | 25 | 45 | Maryland | 0.5 | 0 |
| 20 | Pennsylvania | 2.3 | 25 | - | Delaware | - | - |
| 22 | Kansas | 2.2 | 24 | - | Hawaii | - | - |
| 23 | Texas | 2.1 | 23 | - | Maine | - | - |
| 24 | New Mexico | 1.8 | 18 | - | Rhode Island | - | - |
| 25 | Arizona | 1.5 | 14 | - | Vermont | - | - |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html (last accessed June 2016). The CDC does not provide data for states that reported fewer than 10 deaths during this period.

## Mass shootings

While mass shootings constitute a very small part of gun violence in the United States, they often receive the most attention from the media and policymakers and tend to grip the nation. These incidents are generally not representative of the daily toll of gun violence experienced in many communities, yet they have a substantial impact on the gun debate. Recent research also suggests that, while infrequent, mass shootings have increased in the United States: One study found that public mass shootings that resulted in four or more fatalities have tripled since 2011.[24]

In recent years, increased efforts have been made to track mass shootings in real time—not only the episodes of random, public shootings, but also incidents in which multiple people are shot in the context of domestic violence or other interpersonal disputes. There are a few different ways to measure mass shootings in the United States. Some sources count all incidents where four or more people are shot, regardless of the number of fatalities, while other sources—including the Federal Bureau of Investigation, or FBI—include only those incidents in which four or more people are killed.

This report uses the data collected by *USA Today*, which tracks all mass shootings that result in the death of four or more people. According to these data, six states did not have any mass shooting incidents in which four or more people were killed from 2006 to 2015. The remaining states presented at least one such mass shooting during this period.[25] North Dakota, West Virginia, Kansas, Wyoming, Louisiana, and South Carolina presented rates that were more than two times higher than the national average. Meanwhile, Massachusetts, New Jersey, and Pennsylvania had rates lower than 0.025 mass shootings per every million people.

**TABLE 6**

## Rate of mass shootings, 2006–2015

National average rate: 0.083 per every one million people

| Ranking | State | Rate per every one million people | Score | Ranking | State | Rate per every one million people | Score |
|---|---|---|---|---|---|---|---|
| 1 | North Dakota | 0.294 | 100 | 25 | Utah | 0.073 | 25 |
| 2 | West Virginia | 0.217 | 74 | 27 | Texas | 0.072 | 25 |
| 3 | Kansas | 0.212 | 72 | 28 | California | 0.070 | 24 |
| 4 | Wyoming | 0.180 | 61 | 29 | Maryland | 0.069 | 24 |
| 5 | Louisiana | 0.177 | 60 | 30 | Georgia | 0.062 | 21 |
| 6 | South Carolina | 0.175 | 59 | 31 | Michigan | 0.060 | 21 |
| 7 | Vermont | 0.160 | 54 | 32 | Connecticut | 0.056 | 19 |
| 8 | Arizona | 0.158 | 54 | 33 | North Carolina | 0.053 | 18 |
| 9 | Maine | 0.151 | 51 | 34 | Oregon | 0.053 | 18 |
| 10 | Missouri | 0.134 | 46 | 35 | New Mexico | 0.049 | 17 |
| 11 | South Dakota | 0.123 | 42 | 36 | Colorado | 0.040 | 14 |
| 12 | Washington | 0.120 | 41 | 37 | Minnesota | 0.038 | 13 |
| 13 | Nebraska | 0.110 | 37 | 38 | Arkansas | 0.035 | 12 |
| 14 | Oklahoma | 0.107 | 36 | 39 | Iowa | 0.033 | 11 |
| 15 | Wisconsin | 0.106 | 36 | 40 | New York | 0.031 | 11 |
| 16 | Alabama | 0.105 | 36 | 41 | Pennsylvania | 0.024 | 8 |
| 17 | Montana | 0.102 | 34 | 42 | New Jersey | 0.023 | 8 |
| 18 | Indiana | 0.093 | 32 | 43 | Massachusetts | 0.015 | 5 |
| 19 | Kentucky | 0.093 | 31 | 50 | Alaska | 0.000 | 0 |
| 20 | Illinois | 0.086 | 29 | 50 | Delaware | 0.000 | 0 |
| 21 | Tennessee | 0.079 | 27 | 50 | Hawaii | 0.000 | 0 |
| 22 | Ohio | 0.078 | 27 | 50 | Idaho | 0.000 | 0 |
| 23 | Virginia | 0.075 | 26 | 50 | Mississippi | 0.000 | 0 |
| 24 | Nevada | 0.075 | 25 | 50 | New Hampshire | 0.000 | 0 |
| 25 | Florida | 0.074 | 25 | 50 | Rhode Island | 0.000 | 0 |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center of American Progress analysis of USA Today, "Behind the Bloodshed," available at http://www.gannett-cdn.com/GDContent/mass-killings/index.html#title (last accessed June 2016). According to this source, seven states did not report any mass shootings during the 2006–2015 period.

## Intimate partner gun homicides of women

The deadly intersection between domestic violence and gun violence has been well established. When domestic abusers have easy access to guns, the risk that a woman will be murdered increases exponentially: When a gun is present in the home, the risk of lethal violence against women by a relative or an intimate partner is eight times higher than in homes without a gun and is 20 times greater when there is a previous history of domestic violence.[26] A previous CAP analysis found that, from 2005 to 2014, roughly one-third of murders of American women were committed by an intimate partner and half of those homicides were committed with a gun.[27]

Review of the FBI *Supplemental Homicide Data* reveals that South Carolina, Louisiana, Nevada, Tennessee, and Oklahoma have the highest rates of intimate partner gun homicides against women from 2005 to 2014. In contrast, Illinois and Massachusetts present rates lower than one case per every 1 million women.

TABLE 7
## Rate of intimate partner gun homicides of women, 2005–2014

National average rate: 3.71 per every one million women

| Ranking | State | Rate per every one million women | Score | Ranking | State | Rate per every one million women | Score |
|---|---|---|---|---|---|---|---|
| 1 | South Carolina | 7.69 | 100 | 26 | Indiana | 3.57 | 43 |
| 2 | Louisiana | 6.93 | 89 | 27 | Kansas | 3.50 | 42 |
| 3 | Nevada | 6.43 | 83 | 28 | Vermont | 3.47 | 41 |
| 4 | Tennessee | 6.07 | 77 | 29 | South Dakota | 3.45 | 41 |
| 5 | Oklahoma | 6.00 | 77 | 30 | Delaware | 3.26 | 39 |
| 6 | Georgia | 5.70 | 72 | 31 | California | 3.05 | 36 |
| 7 | Arizona | 5.64 | 72 | 32 | Maryland | 2.89 | 33 |
| 8 | Kentucky | 5.42 | 69 | 33 | Washington | 2.72 | 31 |
| 9 | Alaska | 5.33 | 67 | 34 | Michigan | 2.67 | 30 |
| 10 | Texas | 5.32 | 67 | 35 | Ohio | 2.61 | 30 |
| 11 | West Virginia | 5.24 | 66 | 36 | Utah | 2.51 | 28 |
| 12 | Missouri | 5.00 | 63 | 37 | Nebraska | 2.40 | 27 |
| 13 | Alabama | 4.67 | 58 | 38 | Minnesota | 2.25 | 25 |
| 14 | Virginia | 4.64 | 58 | 39 | Connecticut | 2.13 | 23 |
| 15 | North Carolina | 4.49 | 56 | 40 | Wisconsin | 2.10 | 23 |
| 16 | Montana | 4.48 | 56 | 41 | New Hampshire | 1.95 | 20 |
| 17 | Mississippi | 4.41 | 54 | 42 | New York | 1.83 | 19 |
| 18 | New Mexico | 4.38 | 54 | 43 | North Dakota | 1.79 | 18 |
| 19 | Oregon | 4.16 | 51 | 44 | New Jersey | 1.73 | 17 |
| 20 | Arkansas | 4.14 | 51 | 45 | Hawaii | 1.63 | 16 |
| 21 | Wyoming | 4.04 | 49 | 46 | Iowa | 1.56 | 15 |
| 22 | Pennsylvania | 4.02 | 49 | 47 | Rhode Island | 1.47 | 14 |
| 23 | Idaho | 4.01 | 49 | 48 | Massachusetts | 0.80 | 4 |
| 24 | Colorado | 3.93 | 48 | 49 | Illinois | 0.48 | 0 |
| 25 | Maine | 3.84 | 47 | - | Florida | - | - |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center of American Progress analysis of Federal Bureau of Investigation, Supplemental Homicide Data (U.S. Department of Justice, 2005–2014). "Intimate partner" includes boyfriends, girlfriends, husbands, wives, ex-wives, ex-husbands, common-law wives, and common law husbands. The state of Florida does not report information to the FBI and therefore is not included in this ranking.

## Gun deaths among people younger than age 21

The impact of gun violence falls disproportionately on young people in the United States. In 2015, gun violence surpassed car accidents as the leading cause of death of Millennials in this country.[28] Once again, America is an outlier when it comes to gun violence: The rate of gun-related homicides among young people in the United States is 49 times higher than peer nations.[29]

Louisiana tops the states for having the highest rate of gun deaths of people younger than age 21 with a rate that is more than twice as high as the national average. Hawaii presents less than one gun death per every 100,000 people younger than age 21.

TABLE 8

## Rate of gun deaths among people younger than age 21, 2005–2014

National average rate: 4.13 per every 100,000 people under 21

| Ranking | State | Rate per every 100,000 people younger than age 21 | Score | Ranking | State | Rate per every 100,000 people younger than age 21 | Score |
|---|---|---|---|---|---|---|---|
| 1 | **Louisiana** | 9.24 | **100** | 26 | Idaho | 4.08 | **41** |
| 2 | **Alaska** | 8.06 | **86** | 27 | Ohio | 4.00 | **40** |
| 3 | **Mississippi** | 6.17 | **65** | 28 | Kansas | 3.88 | **39** |
| 4 | **Missouri** | 6.08 | **64** | 29 | Virginia | 3.84 | **38** |
| 5 | **Alabama** | 6.07 | **64** | 30 | West Virginia | 3.80 | **38** |
| 6 | **New Mexico** | 5.56 | **58** | 31 | Kentucky | 3.68 | **36** |
| 7 | **Montana** | 5.55 | **58** | 32 | Texas | 3.65 | **36** |
| 7 | **Wyoming** | 5.55 | **58** | 33 | South Dakota | 3.64 | **36** |
| 9 | **Illinois** | 5.30 | **55** | 34 | Nebraska | 3.43 | **33** |
| 10 | **Oklahoma** | 5.22 | **54** | 35 | Colorado | 3.38 | **33** |
| 11 | South Carolina | 5.17 | **53** | 36 | Wisconsin | 3.22 | **31** |
| 12 | Tennessee | 5.15 | **53** | 37 | Washington | 2.80 | **26** |
| 13 | Arkansas | 5.14 | **53** | 38 | Oregon | 2.73 | **25** |
| 14 | Maryland | 5.12 | **53** | 39 | New Jersey | 2.66 | **25** |
| 15 | Arizona | 5.00 | **51** | 40 | Vermont | 2.65 | **25** |
| 15 | Michigan | 5.00 | **51** | 41 | **Utah** | 2.60 | **24** |
| 17 | Pennsylvania | 4.77 | **49** | 42 | **Minnesota** | 2.47 | **22** |
| 18 | Nevada | 4.67 | **48** | 43 | **Iowa** | 2.41 | **22** |
| 19 | North Dakota | 4.56 | **46** | 44 | **New York** | 2.31 | **21** |
| 20 | Delaware | 4.50 | **46** | 45 | **Connecticut** | 2.22 | **20** |
| 21 | Florida | 4.40 | **45** | 46 | **Maine** | 2.10 | **18** |
| 22 | California | 4.31 | **44** | 46 | **Rhode Island** | 2.10 | **18** |
| 23 | Georgia | 4.28 | **43** | 48 | **Massachusetts** | 1.77 | **14** |
| 24 | Indiana | 4.25 | **43** | 49 | **New Hampshire** | 1.70 | **14** |
| 25 | North Carolina | 4.20 | **42** | 50 | **Hawaii** | 0.51 | **0** |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html (last accessed June 2016).

## Law enforcement officers feloniously killed with a firearm

There are approximately 900,000 sworn law-enforcement officers in the United States who often face substantial risks in the performance of their duties to protect community safety.[30] According to the National Law Enforcement Officers Memorial Fund, from 2006 to 2015, 1,439 officers were killed in the line of duty, both as a result of attacks on officers and accidents.[31] According to the FBI, more than 90 percent of officers who were fatally assaulted in the line of duty from 2005 to 2014 were killed with guns.[32] The risks faced by officers were tragically highlighted in a number of recent incidents, including and the murder of a police officer on her first day of work in Virginia in February 2016 while she and fellow officers were responding to a domestic violence call, and the ambush attacks of police officers in Dallas and Baton Rouge in July 2016.[33]

Alaska, Louisiana, Mississippi, South Dakota, New Hampshire, Kansas, and West Virginia presented the highest rates of law enforcement officers being killed with a gun while Wyoming, Vermont, Nebraska, Maine, and Connecticut did not have any such incidents during this time period.

TABLE 9

# Rate of law enforcement officers feloniously killed with a firearm, 2005–2014

National average rate: 0.16 officers per every one million people

| Ranking | State | Rate per every one million people | Score | Ranking | State | Rate per every one million people | Score |
|---|---|---|---|---|---|---|---|
| 1 | Alaska | 0.568 | 100 | 26 | North Dakota | 0.147 | 26 |
| 2 | Louisiana | 0.376 | 66 | 27 | Minnesota | 0.132 | 23 |
| 3 | Mississippi | 0.372 | 66 | 28 | Tennessee | 0.127 | 22 |
| 4 | South Dakota | 0.369 | 65 | 29 | Kentucky | 0.116 | 20 |
| 5 | New Hampshire | 0.304 | 54 | 30 | Ohio | 0.113 | 20 |
| 6 | Kansas | 0.282 | 50 | 31 | Delaware | 0.112 | 20 |
| 7 | West Virginia | 0.271 | 48 | 32 | Michigan | 0.111 | 19 |
| 8 | Arizona | 0.268 | 47 | 33 | California | 0.110 | 19 |
| 9 | Alabama | 0.211 | 37 | 34 | Illinois | 0.110 | 19 |
| 10 | Georgia | 0.208 | 37 | 35 | Rhode Island | 0.095 | 17 |
| 11 | Arkansas | 0.207 | 37 | 36 | New York | 0.088 | 15 |
| 12 | Montana | 0.203 | 36 | 37 | Maryland | 0.087 | 15 |
| 13 | New Mexico | 0.197 | 35 | 38 | Oklahoma | 0.081 | 14 |
| 14 | South Carolina | 0.196 | 35 | 39 | Hawaii | 0.074 | 13 |
| 15 | Nevada | 0.187 | 33 | 40 | New Jersey | 0.068 | 12 |
| 16 | Missouri | 0.185 | 33 | 41 | Iowa | 0.066 | 12 |
| 17 | Utah | 0.184 | 32 | 42 | Idaho | 0.065 | 11 |
| 18 | Pennsylvania | 0.182 | 32 | 43 | Massachusetts | 0.061 | 11 |
| 19 | Virginia | 0.176 | 31 | 44 | Wisconsin | 0.053 | 9 |
| 20 | Florida | 0.175 | 31 | 45 | Oregon | 0.053 | 9 |
| 21 | North Carolina | 0.170 | 30 | 50 | Connecticut | 0.000 | 0 |
| 22 | Washington | 0.165 | 29 | 50 | Maine | 0.000 | 0 |
| 23 | Texas | 0.160 | 28 | 50 | Nebraska | 0.000 | 0 |
| 24 | Colorado | 0.160 | 28 | 50 | Vermont | 0.000 | 0 |
| 25 | Indiana | 0.155 | 27 | 50 | Wyoming | 0.000 | 0 |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center for American Progress analysis of Federal Bureau of Investigation, "Uniform Crime Reports: Law Enforcement Officers Killed & Assaulted," available at https://www.fbi.gov/about-us/cjis/ucr/leoka (last accessed June 2016). Connecticut, Maine, Nebraska, Vermont, and Wyoming did not present any cases from 2005 to 2014.

## Fatal shootings by police

The use of lethal force by police officers has been a top concern in many communities for decades—particularly communities of color that have a deep and complicated history with police—and has been part of a larger conversation about police-community relations in cities across the country.[34] This issue gained new national attention after the shooting death of Michael Brown by police in Ferguson, Missouri, in August 2014 and a number of other unarmed black men in the two years since. One of the most troubling revelations in the wake of Brown's death was the lack of reliable, complete, and timely data on how frequently police officers use lethal force in the course of their duties. While the FBI has purported to collect this information as part of the Uniform Crime Reporting program, those data have been notoriously incomplete.[35] In 2015, two news organizations, *The Guardian* and *The Washington Post* attempted to fill this gap by launching real-time data collection projects that track incidents involving use of lethal force by police officers.[36] These efforts have created a much more robust source of data to measure the frequency with which officers use deadly force and the circumstances of those incidents. This has allowed numerous journalists and researchers to study these incidents and has resulted in a new body of research about use of lethal force by police.[37]

These new data on shootings by police allowed the authors of this report to assess both sides of fatal encounters between police and the community—not just the rates at which officers are shot and killed, which was one of the indicators considered in the 2013 report—but also the frequency of fatal shootings by police. Many of these fatal shootings by police will be deemed justified by the criminal justice system as a lawful use of force; however, they still represent part of the full picture of what gun violence looks like in many communities.

Using data from *The Guardian,* the authors were able to measure fatal shootings by police in every state from January 2015 through July 2016. The table below shows that New Mexico is by far the state with the highest rate of police officers fatally shooting individuals, which is more than three times higher than the national average. On the other hand, Rhode Island, New York, and Connecticut have rates lower than one per every 1 million people.

TABLE 10

# Rate of fatal shootings by police, 2015–2016

National average rate: 2.79 per every one million people

| Ranking | State | Rate per every one million people | Score | Ranking | State | Rate per every one million people | Score |
|---|---|---|---|---|---|---|---|
| 1 | New Mexico | 8.87 | 100 | 26 | Georgia | 2.34 | 20 |
| 2 | Wyoming | 6.85 | 75 | 27 | Wisconsin | 2.26 | 19 |
| 3 | Alaska | 6.11 | 66 | 28 | Kansas | 2.24 | 19 |
| 4 | Oklahoma | 6.08 | 66 | 29 | Arkansas | 2.19 | 18 |
| 5 | Arizona | 5.09 | 54 | 30 | Delaware | 2.15 | 18 |
| 6 | Nevada | 4.80 | 50 | 31 | North Carolina | 2.07 | 17 |
| 7 | Colorado | 4.42 | 46 | 32 | Indiana | 2.05 | 17 |
| 8 | Louisiana | 4.20 | 43 | 33 | Maryland | 2.01 | 16 |
| 9 | South Dakota | 4.12 | 42 | 34 | Washington | 1.99 | 16 |
| 10 | Montana | 3.92 | 40 | 35 | Ohio | 1.90 | 15 |
| 11 | West Virginia | 3.78 | 38 | 36 | Virginia | 1.87 | 14 |
| 12 | Alabama | 3.61 | 36 | 37 | Minnesota | 1.75 | 13 |
| 13 | California | 3.56 | 35 | 38 | Vermont | 1.60 | 11 |
| 14 | Oregon | 3.29 | 32 | 39 | Illinois | 1.55 | 10 |
| 15 | Nebraska | 3.20 | 31 | 40 | New Hampshire | 1.51 | 10 |
| 16 | Missouri | 2.97 | 28 | 41 | North Dakota | 1.37 | 8 |
| 17 | South Carolina | 2.92 | 27 | 42 | Iowa | 1.29 | 7 |
| 18 | Kentucky | 2.84 | 26 | 43 | New Jersey | 1.29 | 7 |
| 19 | Texas | 2.81 | 26 | 44 | Massachusetts | 1.26 | 7 |
| 20 | Idaho | 2.77 | 25 | 45 | Pennsylvania | 1.21 | 6 |
| 21 | Mississippi | 2.67 | 24 | 46 | Michigan | 1.21 | 6 |
| 22 | Tennessee | 2.61 | 23 | 47 | Maine | 1.13 | 5 |
| 23 | Florida | 2.56 | 23 | 48 | Rhode Island | 0.95 | 3 |
| 24 | Hawaii | 2.47 | 22 | 49 | New York | 0.91 | 3 |
| 25 | Utah | 2.39 | 21 | 50 | Connecticut | 0.69 | 0 |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center for American Progress analysis of *The Guardian*, "The Counted: People killed by police in the US," available at http://www.theguardian.com/us-news/ng-interactive/2015/jun/01/the-counted-police-killings-us-database (last accessed August 2016). For 2016, this report only considers those cases between January and July.

## Crime gun export rates

Guns do not respect state boundaries; the patchwork of inconsistent gun laws from state to state has contributed to a dynamic in which crime guns often move from states with weak gun laws to states with stronger gun laws. State and local law enforcement can submit all guns recovered in connection with crime to the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives, or ATF, to determine the first point of sale and the first legal purchaser of that gun. ATF then aggregates information about crime guns recovered in each state in annual trace data reports, which allows for an analysis of the movement of crime guns from state to state.

From 2010 to 2015 nearly 30 percent of all crime guns submitted for tracing crossed state lines before being used in connection with a crime.[38] Previous research has demonstrated that states are not equal opportunity exports of crime guns: A 2010 study by Mayors Against Illegal Guns found that just 10 states were responsible for selling nearly half of the crime guns that had crossed state lines.[39]

According to ATF data, from 2010 to 2015, West Virginia and Mississippi had rates of crime guns exported to other states that were more than twice the national average. New York, Hawaii, and New Jersey had the lowest rate of crime gun exports with rates lower than three crime guns per every 100,000 people.

TABLE 11

## Crime gun export rates, 2010–2015

National average rate: 19.8 per every 100,000 people

| Ranking | State | Rate per every 100,000 people | Score | Ranking | State | Rate per every 100,000 people | Score |
|---|---|---|---|---|---|---|---|
| 1 | West Virginia | 52.1 | 100 | 26 | Oregon | 18.6 | 32 |
| 2 | Mississippi | 49.6 | 95 | 27 | South Dakota | 16.7 | 29 |
| 3 | Alaska | 39.0 | 74 | 28 | North Dakota | 16.6 | 28 |
| 4 | Nevada | 37.0 | 69 | 29 | Ohio | 15.7 | 27 |
| 5 | South Carolina | 36.1 | 68 | 30 | Utah | 15.3 | 26 |
| 6 | Wyoming | 34.2 | 64 | 31 | Pennsylvania | 14.9 | 25 |
| 7 | Alabama | 33.3 | 62 | 32 | Colorado | 14.1 | 23 |
| 8 | Kentucky | 33.1 | 62 | 33 | Missouri | 14.0 | 23 |
| 9 | Virginia | 31.6 | 59 | 34 | Washington | 13.2 | 21 |
| 10 | Indiana | 31.5 | 58 | 35 | Florida | 13.1 | 21 |
| 11 | Arizona | 30.3 | 56 | 36 | Nebraska | 11.8 | 19 |
| 12 | Georgia | 30.1 | 56 | 37 | Iowa | 11.7 | 19 |
| 13 | Montana | 29.7 | 55 | 38 | Wisconsin | 11.0 | 17 |
| 14 | Arkansas | 26.6 | 49 | 39 | Maryland | 10.9 | 17 |
| 15 | Idaho | 25.0 | 45 | 40 | Texas | 10.2 | 15 |
| 16 | New Hampshire | 23.7 | 43 | 41 | Michigan | 7.6 | 10 |
| 17 | Louisiana | 23.5 | 42 | 42 | Illinois | 6.8 | 9 |
| 18 | Delaware | 23.1 | 41 | 43 | Connecticut | 6.8 | 9 |
| 19 | New Mexico | 22.4 | 40 | 44 | Minnesota | 6.4 | 8 |
| 20 | Vermont | 21.6 | 39 | 45 | Rhode Island | 4.9 | 5 |
| 21 | Oklahoma | 20.9 | 37 | 46 | California | 4.5 | 4 |
| 22 | North Carolina | 20.7 | 37 | 47 | Massachusetts | 3.6 | 2 |
| 23 | Kansas | 20.3 | 36 | 48 | New York | 2.9 | 1 |
| 24 | Tennessee | 19.7 | 35 | 49 | Hawaii | 2.8 | 1 |
| 25 | Maine | 19.1 | 33 | 50 | New Jersey | 2.5 | 0 |

States in **red** indicate the 10 states with the highest rates. States in **green** indicate the 10 states with the lowest rates.

Source: Center for American Progress analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Trace Data (2010–2015), available at https://www.atf.gov/resource-center/data-statistics.

# The link between high levels of gun violence and weak state gun laws

As discussed above, there are numerous factors that influence rates of gun violence in any community and that could account for variations in the frequency of different types of gun deaths from state to state. In this report, CAP seeks to zero-in on one such factor and assess whether there is a relationship between the strength of a state's gun laws and the levels of gun violence in the state. In doing so, this report does not discount the importance of those other factors, but rather seeks to address one of the key questions in the national gun debate: whether gun laws have an impact on reducing gun violence. In addition, the level of gun violence may vary widely within a state and increased rates in some cities may drive up the statewide rates. In this report, the authors only consider statewide rates of gun violence and the relationship to statewide gun laws.

To conduct this analysis, the authors used the "2015 Gun Law State Scorecard" prepared by the Law Center to Prevent Gun Violence, or Law Center, which ranks each state according to its gun laws and assigns each state a corresponding grade. In the "Scorecard," states received points for having enacted strong gun laws designed to help keep communities safe by keeping guns out of the wrong hands, such as laws requiring universal background checks; prohibiting domestic abusers from possessing guns; limiting bulk gun purchases; and banning assault weapons and high-capacity magazines. States lost points for having enacted laws that jeopardize public safety, such as eliminating the permit requirement for carrying concealed guns; expansive self-defense laws; and allowing guns in sensitive locations, such as schools and bars.[40]

The 10 states rated as having the weakest gun laws in 2015 are as follows:

- Kansas
- Mississippi
- Wyoming
- Arizona
- Alaska
- Idaho
- Louisiana
- Kentucky
- Vermont
- Missouri

The 10 states rated as having the strongest gun laws in 2015 are as follows:

- California
- Connecticut
- New Jersey
- Maryland
- Massachusetts
- New York
- Hawaii
- Illinois
- Rhode Island
- Delaware

## Weak gun laws, bad results

Comparing the Gun Violence Index score for each state with the Law Center's scorecard, the authors found that there is a significant correlation between the strength of a state's gun laws and the levels of gun violence in the state: The 10 states with the weakest gun laws collectively have an aggregate level of gun violence that is 3.2 times higher than the average of the 10 states with the strongest gun laws.[41]



**FIGURE 2**

**Average Gun Violence Index results**

16 — Ten states with the strongest gun laws

51 — Ten states with the weakest gun laws

Source: For full source information, please see the Methodology section of Chelsea Parsons and Eugenio Weigend, "America Under Fire: An Analysis of Gun Violence in the United States and the Link to Weak Gun Laws" (Washington: Center for American Progress, 2016); Center for American Progress analysis of information from Law Center to Prevent Gun Violence, "2015 Gun Law State Scorecard" (2015), available at http://gunlawscorecard.org/.

Additionally, in each individual category of gun violence analyzed, the 10 states with the weakest gun laws have collectively higher levels of gun violence than the 10 states with the strongest gun laws and collectively present higher rates in comparison to national average rates. These disparities are particularly clear on fatal gun-related accidents, gun suicides, rates of crime guns exported to other states, rates of law enforcement officers feloniously killed with a gun and overall gun deaths. On the other hand, the 10 states with the strongest gun laws present average rates that are lower than the national average rates across all 10 indicators.



**FIGURE 3**
**Comparison of average rates of gun violence to the national average**

■ Ten states with the weakest gun laws   ■ Ten states with the strongest gun laws

Source: Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at http://webappa.cdc.gov/sasweb/ncipc/dataRestriction_inj.html (last accessed June 2016); *USA Today*, "Behind the Bloodshed," available at http://www.gannett-cdn.com/GDContent/mass-killings/index.html#title (last accessed June 2016); Federal Bureau of Investigation, *Supplemental Homicide Data* (U.S. Department of Justice, 2005–2014); Federal Bureau of Investigation, "Uniform Crime Reports: Law Enforcement Officers Killed & Assaulted," available at https://www.fbi.gov/about-us/cjis/ucr/leoka (last accessed June 2016); *The Guardian*, "The Counted: People killed by police in the US," available at http://www.theguardian.com/us-news/ng-interactive/2015/jun/01/the-counted-police-killings-us-database (last accessed June 2016); Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Trace Data (2010–2015), available at https://www.atf.gov/resource-center/data-statistics (last accessed July 2016); Law Center to Prevent Gun Violence, "2015 Gun Law State Scorecard" (2015), available at http://gunlawscorecard.org/.

Of the 10 states with the weakest gun laws, nine are among the top-25 states with the highest levels of gun violence in the country. In contrast, of the 10 states with the strongest gun laws, all are among the 25 states with the lowest levels of gun violence in the country, including the six states with the overall lowest levels of gun violence in our index.

TABLE 12

## Gun Violence Index ranking

States with the weakest and strongest gun laws

| Ranking | State | Gun Violence Index | Ranking | State | Gun Violence Index |
|---|---|---|---|---|---|
| 1 | Louisiana | 75 | 26 | Colorado | 33 |
| 2 | Alaska | 66 | 27 | Florida | 33 |
| 3 | Mississippi | 61 | 28 | Pennsylvania | 32 |
| 4 | West Virginia | 60 | 29 | Delaware | 30 |
| 5 | Alabama | 59 | 30 | Oregon | 29 |
| 6 | South Carolina | 57 | 31 | Vermont | 29 |
| 7 | Wyoming | 56 | 32 | Utah | 29 |
| 8 | Arizona | 53 | 33 | Michigan | 28 |
| 9 | Montana | 51 | 34 | Maryland | 28 |
| 10 | Oklahoma | 51 | 35 | Ohio | 28 |
| 11 | Nevada | 50 | 36 | Maine | 27 |
| 12 | New Mexico | 50 | 37 | Washington | 26 |
| 13 | Tennessee | 49 | 38 | California | 26 |
| 14 | Arkansas | 47 | 39 | Nebraska | 26 |
| 15 | Missouri | 47 | 40 | Illinois | 23 |
| 16 | Kentucky | 46 | 41 | Wisconsin | 23 |
| 17 | Georgia | 44 | 42 | New Hampshire | 21 |
| 18 | Kansas | 40 | 43 | Minnesota | 17 |
| 19 | South Dakota | 39 | 44 | Iowa | 16 |
| 20 | Indiana | 38 | 45 | Connecticut | 12 |
| 21 | North Carolina | 38 | 46 | New Jersey | 12 |
| 22 | Idaho | 36 | 47 | New York | 11 |
| 23 | Virginia | 36 | 48 | Rhode Island | 9 |
| 24 | North Dakota | 35 | 49 | Hawaii | 6 |
| 25 | Texas | 34 | 50 | Massachusetts | 6 |

States in **red** indicate the 10 states with the weakest gun laws. States in **green** indicate the 10 states with the strongest gun laws.

Source: For full source information, please see the Methodology section of Chelsea Parsons and Eugenio Weigend, "America Under Fire: An Analysis of Gun Violence in the United States and the Link to Weak Gun Laws" (Washington: Center for American Progress, 2016).

Finally, by plotting the Gun Violence Index score for each state and the strength each state's gun laws, the authors find a clear correlation between these two variables. With a correlation coefficient of 0.71, this link is statistically significant and visually apparent as shown on Figure 2. This means that states with stronger gun laws tend to have lower levels of gun violence and, vice versa, states with weaker gun laws tend to have higher levels of gun violence.[42]



FIGURE 4
**Correlation between state gun laws and gun violence outcomes**

Source: For full source information, please see the Methodology section of Chelsea Parsons and Eugenio Weigend, America Under Fire: An Analysis of Gun Violence in the United States and the Link to Weak Gun Laws" (Washington: Center for American Progress, 2016); Center for American Progress analysis of information from Law Center to Prevent Gun Violence, "2015 Gun Law State Scorecard" (2015), available at http://gunlawscorecard.org/; Personal communication from Garrett McDonough, communications director, Law Center to Prevent Gun Violence, December 21, 2015.

# Conclusion

*The United States of America is not the only country on Earth with violent or dangerous people. We are not inherently more prone to violence. But we are the only advanced country on Earth that sees this kind of mass violence erupt with this kind of frequency. It doesn't happen in other advanced countries. It's not even close. And as I've said before, somehow we've become numb to it and we start thinking that this is normal.*

*—President Barack Obama, January 5, 2016*[43]

Gun violence is a uniquely American problem, and the intensely polarized politics surrounding it can make it seem like an intractable one. But looking across the vastly different experiences of the states reveals that high rates of gun deaths are not inevitable and that there are policy options available to begin to stem the tide of gun violence in many communities. While there are many factors that contribute to high rates of gun deaths and gun laws alone are not a panacea, CAP's research in this report and the finding of a strong correlation between strong gun laws and fewer gun deaths in the states sends a powerful message to lawmakers to take a serious look at a number of smart laws that can have an impact on reducing gun violence. Some of those policies include:

- Closing the private-sale loophole and requiring background checks for all gun sales

- Banning or more strictly regulating the sale and possession of assault weapons and high-capacity magazines

- Prohibiting domestic abusers and stalkers from gun possession

- Investing in community-based programs designed to address underlying root causes of violence in impacted communities

- Strengthening the federal law to penalize gun traffickers who flood vulnerable communities with illegal guns

- Increasing oversight of the gun industry

- Requiring a permit to carry concealed, loaded guns in the community

- Banning gun possession at certain sensitive locations, such as bars, houses of worship, and schools

# Methodology

## Selecting the 10 measures

There are many different ways to measure gun violence and gun crime on the state level. For this report the authors looked at 22 total possible indicators and ultimately chose 10. One of the reasons these measures were selected was the fact that these indicators came from reliable sources such as the National Center for Injury Prevention at the Centers for Disease Control and Prevention, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and several news outlets. The authors also selected these indicators because data were available in each category for at least 45 states, allowing the authors to access data for at least 90 percent of the states in each category. There were also some types of gun violence that the authors were unable to measure in a sufficient number of states and therefore chose not to include. In addition, the authors could not include nonfatal gun injuries because the CDC does not provide this information broken down by state.

The authors selected five indicators of gun violence that affect the overall population: overall gun deaths, gun suicides, gun homicides, accidental gun deaths and mass shootings, defined as incidents in which four or more people were killed in a single incident. They chose four categories of gun violence because of their particular impact on vulnerable groups: rates of intimate partner gun homicides against women, rates of gun deaths for people younger than age 21, rates of police officers feloniously killed with a gun and rates of fatal shootings by police officers. Finally, the authors include a measurement of illegal movement of guns across states: the rate of crime guns exported to other states from 2010-2015.

## Calculating the Gun Violence Index

Rates of overall gun deaths, gun suicides, gun homicides, fatal gun accidents and gun deaths for people younger than age 21 were obtained directly from the CDC. While age-adjusted rates do not apply for the latter indicator, the authors used age-adjusted rates for the first four indicators to allow for a fairer comparison between states with different age distributions.

Information regarding intimate partner gun homicides of women was obtained from the FBI *Supplementary Homicide Report,* using cases with one victim and one aggressor. Information on mass shootings was obtained from *USA TODAY,* which maintains a real-time database of these incidents beginning in 2006 that has been used by other researchers.[44] Data on police feloniously killed with a firearm were obtained from the FBI *Law Enforcement Officers Killed and Assaulted* reports. Finally, data on fatal shootings by police were obtained from *The Guardian,* which since 2015 has maintained a real-time database of these incidents. While *The Washington Post* also monitors and collects real time information regarding these incidents, the authors relied on *The Guardian's* project because it presented broader information.[45] Data on crime-gun exports was drawn from the ATF annual trace data reports.

With respect to calculating rates, the authors obtained the rate directly from the CDC for the following categories: overall gun deaths, gun suicides, gun homicides, fatal gun accidents, and gun deaths among people younger than age 21. For the remaining categories, the authors calculated the rates using population data available from the CDC through 2014, which is consistent with population data available from the U.S. Census Bureau. Because the CDC does not provide population data for 2015 or 2016, for those categories that include data from those years, the authors used the population data available from previous years. In order to obtain the rate of mass shootings from 2006 to 2015, the authors used the population from 2005 to 2014. Similarly, to obtain the rate of fatal shootings by police from 2015 to 2016, the authors used the 2013 and 2014 population. Finally, for the rate of crime guns from 2010 to 2015, the authors used the 2014 population from the CDC as an approximation of the 2015 population. The authors are confident that year-to-year variations in population do not significantly change rates based on constant raw numbers.

The authors recognized that the rates of police officers feloniously killed with a firearm and mass shootings are based on a small number of cases. However, given the impact that these forms of gun violence have on the community, the authors decided to include them as key indicators of gun violence.

To create the Gun Violence Index, the authors ranked each state according to their rate of each indicator of gun violence. The state with the lowest level of gun violence per indicator was given a zero and the state with the highest level was given a 100. All remaining states that fall in between were given numbers between 0 and 100 in proportion to their placement within the range. The result for each state in each category was then averaged to obtain one aggregate Gun Violence Index number for each state.

For those states that did not present data for a particular indicator, the authors calculated the overall Gun Violence Index score by averaging the other nine indicators without considering that particular category. For example, data were not available on the rate of intimate partner gun homicides of women in Florida or for the rate of accidental gun deaths in Delaware, Hawaii, Maine, Rhode Island, and Vermont. Therefore, the authors did not consider these particular indicators when calculating the final Gun Violence Index number for these states. Moreover, if a source indicated that a state presented zero cases on a particular indicator, the state was scored with a zero, indicating the lowest level of gun violence. For example, according to the FBI data, there were no reported cases of police officers feloniously killed with a gun in Wyoming, Vermont, Nebraska, Maine, and Connecticut. Therefore, these states were scored with a zero.

This ranking presents a relative comparison among states. This report does not suggest that states with lower scores on the Gun Violence Index cannot improve their gun violence outcomes.

The majority of the indicators in this report are presented per every 100,000 people. However, indicators such as mass shootings, police officers feloniously killed with a gun, fatal shootings by police, and accidental gun deaths involved relatively low raw numbers and were instead presented per every 1 million people. The rate of intimate partner gun homicides against women was presented per every 1 million women. Additionally, the rate of gun deaths for people younger than age 21 was estimated per every 100,000 people younger than age 21.

National rates or averages were obtained directly from the CDC for gun deaths, gun suicides, gun homicides, fatal gun accidents, and gun deaths for people younger than age 21. However, as other sources did not provide national rates for the remaining categories, these were obtained by averaging the rates of the 50 states.

If states presented the same rate in a particular indicator, they were ranked equally. This is why some states present the same ranking number. Some differences in rates may not be illustrated due to decimal rounding.

Finally, it is important to note that some of the indicators may be underreported. For example, crime gun trace data obtained from the ATF does not account for all crime guns. This is because not all crime guns are recovered and not all those that are recovered are later traced. Information on intimate partner gun homicides against women is obtained from the FBI *Supplementary Homicide Report*, however, many states report partial information into this dataset. Despite this limitation, this indicator is the best source for intimate partner gun homicides against women for a state-level analysis. Data on fatal gun accidents, categorized by the CDC as "unintentional" gun deaths, suffer from inconsistent coding across states, making it difficult to compare states on this measure.

## Measuring the strength of state gun laws

To assess the strength of each state's laws, this report relies on the 2015 annual "Gun Law State Scorecard" prepared by the Law Center to Prevent Gun Violence.[46] This organization considers 34 different categories of state laws and awards points to states for enacting strong policies, such as requiring background checks for all gun sales, prohibiting individuals who pose an increased risk to public safety from buying or possessing guns, and regulating gun dealers. It also deducts points for laws that weaken public safety, such as allowing concealed carry of guns without a permit, expansive self-defense laws that eliminate any duty to retreat, and allowing guns to be carried in sensitive locations, including schools, bars, and houses of worship.[47] The scores range from zero being the weakest gun laws to 100 being the strongest gun laws.[48] However, for the purpose of presenting a positive association, this report will use the inverse of these scores.[49] Consequently, gun law scores used in this report will range from zero, indicating the strongest gun laws to 100, indicating the weakest gun laws.

The Law Center to Prevent Gun Violence also provides a state ranking, as well as an alphabetical grading system ranging from F to A+ that can be transformed into a grade point average, or GPA. For this analysis, the authors chose to rely on the inverse of the number of points awarded to a state, rather than the grade, because doing so yields a more precise measure of the strength of a state's gun laws and allows one to observe variations in a state's score that are not apparent from its letter grade. For example, 26 states were awarded an F, yet the points awarded to these states ranged from 2 to 17.[50]

In conducting the analysis in this report, the authors did not include the District of Columbia, primarily because the Law Center to Prevent Gun Violence does not provide a score for the strength of gun laws in the District of Columbia. Additionally many state-level reports exclude the District of Columbia because it is more comparable to metropolitan areas or cities than to states.[51]

## Correlation analysis

A correlation coefficient presents a measurement of the strength of the linear relationship between two variables. It also measures the direction of this relation. If it is a positive association, both variables would tend to decrease or increase at the same time. However, a negative association means that while one variable increases, the other variable tends to decrease, or that while one variable decreases, the other tends to increase. Correlation coefficients are always presented with values between -1 and 1. In this regard, correlation does not prove causation and this report does not conclude that gun violence is solely explained by weak gun laws. Nonetheless, a strong association, measured by the correlation coefficient, does suggest a potential causal relationship.

## About the authors

**Chelsea Parsons** is the Vice President of Guns and Crime Policy at the Center for American Progress. Her work focuses on advocating for progressive laws and policies relating to gun violence prevention and the criminal justice system at the federal, state, and local levels. In this role, she has helped develop measures to strengthen gun laws and reduce gun violence that have been included in federal and state legislation and as part of President Barack Obama's January 2016 executive action announcement on gun violence prevention. Prior to joining the Center, Parsons was general counsel to the New York City criminal justice coordinator, a role in which she helped develop and implement criminal justice initiatives and legislation in areas including human trafficking, sexual assault, family violence, firearms, identity theft, indigent defense, and justice system improvements. She previously served as an assistant New York state attorney general and a staff attorney law clerk for the 2nd U.S. Circuit Court of Appeals.

**Eugenio Weigend** is the Senior Policy Analyst for the Guns and Crime Policy team at the Center for American Progress. His work has focused on public security. He has conducted research on arms trafficking, organized crime and violence, firearm regulations in the United States, and the illegal flow of weapons into Mexico. He has a Ph.D from Tecnologico de Monterrey and a master's degree in public affairs from Brown University.

## Acknowledgements

The authors would like to thank Arkadi Gerney for his contributions to this report.

# Endnotes

1  Estimates of gun ownership in the United States are based on survey data. See for example Bindu Kalesan and others, "Gun Ownership and social gun culture," *Injury Prevention* (2015): 1-5, available at http://injuryprevention.bmj.com/content/early/2015/06/09/injuryprev-2015-041586.full.pdf?keytype=ref&ijkey=doj6vx0laFZMsQ2; Kate Masters, "Why a New Survey From Harvard and Northeastern Is the Most Authoritative Assessment of American Gun Ownership in 20 Years," The Trace, September 19, 2016, available at https://www.thetrace.org/2016/09/harvard-northeastern-gun-ownership-survey-research/.

2  Eric W. Fleegler and others, "Firearm Legislation and Firearm-Related Fatalities in the United States," *JAMA Internal Medicine* 173 (9) (2013): 732–740.

3  Richard Florida, "The Geography of Gun Deaths," *The Atlantic*, January 13, 2011, available at http://www.theatlantic.com/national/archive/2011/01/the-geography-of-gun-deaths/69354/.

4  Daniel Webster, Cassandra Kercher Crifasi, and Jon S. Vernick, "Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides," *Journal of Urban Health: Bulletin of the New York Academy of Medicine* 91 (3) (2014): 293–302; Daniel Webster, Cassandra Kercher Crifasi, and Jon S. Vernick, "Erratum to: Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides," *Journal of Urban Health: Bulletin of the New York Academy of Medicine* 91 (3) (2014): 598–601.

5  Everytown for Gun Safety, "Gun Background Checks Reduce Crime and Saves Lives" (2015), available at https://everytown.org/documents/2014/10/background-checks-reduce-crimes-and-save-lives.pdf.

6  Arkadi Gerney, Chelsea Parsons, and Charles Posner, "America Under the Gun: A 50-State Analysis of Gun Violence and Its Link to Weak State Gun Laws" (Washington: Center for American Progress, 2013), available at https://www.americanprogress.org/wp-content/uploads/2013/04/AmericaUnderTheGun-3.pdf.

7  Law Center to Prevent Gun Violence, "Summary of Enacted Laws since Newtown," available at http://smartgunlaws.org/summary-of-enacted-laws-since-newtown/ (last accessed October 2016).

8  Law Center to Prevent Gun Violence, "Concealed Weapons Permitting," available at http://smartgunlaws.org/gun-laws/policy-areas/firearms-in-public-places/concealed-weapons-permitting/ (last accessed October 2016).

9  Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data," available at http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html (last accessed September 2016); Estimations are based on 2014 gun death figures.

10  Rebecca S. Spicer, and Ted R. Miller, "Suicide Acts in 8 States: Incidence and Case Fatality Rates by Demographies and Method," *American Journal of Public Health* 90 (12) (2000): 1885-1891, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1446422/pdf/11111261.pdf; Harvard T.H. Chan School of Public Health, "Lethality of Suicide Method," available at https://www.hsph.harvard.edu/means-matter/means-matter/case-fatality/ (last accessed October 2016).

11  Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data."

12  Ibid.

13  Ibid.

14  Ibid.

15  Erin Grinshteyn and David Hemenway, "Violent Death Rates: The US Compared with Other High-Income OECD Countries, 2010," *The American Journal of Medicine* 219 (3) (2016): 266-273, available at http://www.ncbi.nlm.nih.gov/pubmed/26551975.

16  Morriah Kaplan and Sophia Kerby, "Top 10 Reasons Why Communities of Color Should Care About Stricter Gun-Violence Prevention Laws," Center for American Progress, January 17, 2013, available at https://www.americanprogress.org/issues/race/news/2013/01/17/49885/top-10-reasons-why-communities-of-color-should-care-about-stricter-gun-violence-prevention-laws/.

17  Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data."

18  Ibid.

19  Ibid.

20  Ibid.; Jennifer Mascia, "It's Easy for Most American Kids to Get a Gun — Even If Their Parents Believe Otherwise," The Trace, February 18, 2016, available at https://www.thetrace.org/2016/02/child-gun-access-arizona-shooting/; Michael Luo and Mike McIntire, "Children and Guns: The Hidden Toll," *The New York Times*, September 28, 2013, available at http://www.nytimes.com/2013/09/29/us/children-and-guns-the-hidden-toll.html?pagewanted=all.

21  Benjamin Powers, "Toddlers Involved in More Shootings than Terrorists in 2015," The Huffington Post, November 29, 2015, available at http://www.huffingtonpost.com/benjamin-powers/toddlers-involved-in-in-more_b_8650536.html.

22  See, e.g., Everytown for Gun Safety, "Innocents Lost" (2014), available at https://everytownresearch.org/reports/innocents_lost/; Maggie Koerth-Baker, "What Counts As An Accident?" FiveThirtyEight, available at http://fivethirtyeight.com/features/gun-accidents/ (last accessed October 2016).

23  Center for American Progress analysis of Centers for Disease Control and Prevention, "Injury Prevention & Control: Data & Statistics (WISQARS): Fatal Injury Data."

24  Amy P. Cohen, Deborah Azrael, and Matthew Miller, "Rate of Mass Shootings Has Tripled Since 2011, Harvard Research Shows," *Mother Jones*, October 15, 2014, available at http://www.motherjones.com/politics/2014/10/mass-shootings-increasing-harvard-research.

25  *USA Today*, "Behind the Bloodshed," available at http://www.gannett-cdn.com/GDContent/mass-killings/index.html#explore (last accessed October 2016).

26  Arthur L. Kellermann and others, "Gun ownership as a risk factor for homicide in the home," *New England Journal of Medicine* 329(15) (1993): 1084-1091.

27  Arkadi Gerney and Chelsea Parsons, "Women Under the Gun: How Gun Violence Affects Women and 4 Policy Solutions to Better Protect Them" (Washington: Center for American Progress, 2014), available at https://www.americanprogress.org/issues/guns-crime/report/2014/06/18/91998/women-under-the-gun/.

28  Chris Christoff and Ilan Kolet, "American Gun Deaths to Exceed Traffic Fatalities by 2015," Bloomberg Business, December 19, 2012, available at http://www.bloomberg.com/news/articles/2012-12-19/american-gun-deaths-toexceed-traffic-fatalities-by-2015; Chelsea Parsons and Anne Johnson, "Young Guns: How Gun Violence is Devastating the Millennial Generation" (Washington: Center for American Progress and Generation Progress, 2014), available at https://www.americanprogress.org/issues/guns-crime/report/2014/02/21/84491/youngguns-how-gun-violence-isdevastating-the-millennialgeneration.

29  Mark Berman, "Americans are much, much more likely to be killed by guns than people in other countries," The Washington Post, February 3, 2016, available at https://www.washingtonpost.com/news/post-nation/wp/2016/02/03/americans-are-much-much-more-likely-to-be-killed-by-guns-than-people-in-other-countries/?utm_term=.ebc7a7db0c91. Young people in this study are defined by those between 15 and 24 years of age.

30  National Law Enforcement Officers Memorial Fund, "Law Enforcement Facts," available at http://www.nleomf.org/facts/enforcement/ (last accessed October 2016).

31  Ibid.

32  Ibid.; Center for American Progress analysis of Federal Bureau of Investigation, "Uniform Crime Reports: Law Enforcement Officers Killed & Assaulted," available at https://www.fbi.gov/about-us/cjis/ucr/leoka (last accessed June 2016).

33  The Associated Press, "New Virginia Officers Killed on Domestic Violence Call," The New York Times, February 28, 2016, available at http://www.nytimes.com/2016/02/29/us/new-virginia-officer-killed-on-domestic-violence-call.html?_r=0; Andy Sullivan, "Obama tells police after killings: 'We have your backs,'" Reuters, July 20, 2016, available at http://www.reuters.com/article/us-usa-police-idUSKCN0ZX0MX.

34  For a discussion of the history of the intersection of policing and race, see Danyelle Solomon, "The Intersection of Policing and Race" (Washington: Center for American Progress, 2016), available at https://www.americanprogress.org/issues/race/report/2016/09/01/143357/the-intersection-of-policing-and-race/.

35  Michele Jawando and Chelsea Parsons, "4 Ideas That Could Begin to Reform the Criminal Justice System and Improve Police-Community Relations" (Washington: Center for American Progress, 2014), available at https://www.americanprogress.org/issues/civil-liberties/report/2014/12/18/103578/4-ideas-that-could-begin-to-reform-the-criminal-justice-system-and-improve-police-community-relations/.

36  The Guardian, "The Counted: People killed by police in the US," available at http://www.theguardian.com/us-news/ng-interactive/2015/jun/01/the-counted-police-killings-us-database# (last accessed August 2016); The Washington Post, "People shot dead by police this year," available at https://www.washingtonpost.com/graphics/national/police-shootings/ (last accessed August 2016).

37  For example, The Washington Post review of its 2015 data revealed that, of the 965 people fatally shot by police in 2015, 564 were armed with a gun and 281 were armed with another weapon; black men accounted for 40 percent of unarmed men fatally shot by police in 2015. Kimberly Kindy and others, "A Year of Reckoning: Police Fatally Shot Nearly 1,000," The Washington Post, December 26, 2015, available at http://www.washingtonpost.com/sf/investigative/wp/2015/12/26/2015/12/26/a-year-of-reckoning-police-fatally-shoot-nearly-1000/. An analysis by The Guardian of their 2015 data on all killings by police officers—not just shootings—found that young black men were nine times more likely to be killed by police officers than any other group. Jon Swaine and others, "Young black men killed by US police at higher rate in year of 1,134 deaths," The Guardian, December 31, 2015, available at https://www.theguardian.com/us-news/2015/dec/31/the-counted-police-killings-2015-young-black-men.

38  Center for American Progress' analysis of Bureau of Alcohol, Tobacco, Firearms and Explosives, "Firearms Trace Data" (2010-2015), available at https://www.atf.gov/resource-center/data-statistics (last accessed July 2016).

39  Mayors Against Illegal Guns, "Trace the Guns" (2010), available at http://tracetheguns.org/report.pdf.

40  Law Center to Prevent Gun Violence, "2015 Gun Law State Scorecard" (2015), available at http://gun-lawscorecard.org/; Personal communication from Garrett McDonough , communications director, Law Center to Prevent Gun Violence, December 21, 2015.

41  This difference was statistically significant at a 95 percent confidence level.

42  Positive correlations between weak gun laws and each of the 10 indicators of gun violence further support this finding. The correlation between weak gun laws and the ten indicators are as following: overall rate of gun deaths (0.72); rate of gun suicides (0.80); rate of gun homicides (0.13); rate of fatal gun-related accidents (0.57); rate of mass shootings (0.40); rate of intimate partner gun homicides of women (0.61); rate of gun deaths among people younger than age 21 (0.44); rate of law enforcement officers feloniously killed with a firearm (0.43); rate of fatal shootings by police (0.41); crime gun export rate (0.66).

43  The White House, "Remarks by the President on Common-Sense Gun Safety Reform," Press release, January 5, 2016, available at https://www.whitehouse.gov/the-press-office/2016/01/05/remarks-president-common-sense-gun-safety-reform.

44  For example, Matt Rocheleau, "How many mass shootings so far in 2016?," The Boston Globe, April 22, 2016, available at https://www.bostonglobe.com/metro/2016/04/22/how-many-mass-shootings-have-there-been-far/Njdb2kV2BRa6dYjh3li9GJ/story.html.

45  The authors did a separate analysis using information from The Washington Post. The results are consistent and do not change significantly.

46  Law Center to Prevent Gun Violence, "2015 Gun Law State Scorecard."

47  Ibid.; Personal communication from Garrett McDonough, communications director, Law Center to Prevent Gun Violence, December 21, 2015.

48  Ibid.

49  In this report, the authors used the inverse of scores provided by the Law Center to Prevent Gun Violence in order to measure gun laws. Consequently, the authors' scores will range from zero, indicating the strongest gun laws, to 100, indicating the weakest gun laws. For example, the Law Center reports that California has a score of 93.5; however, for the purposes of this report, the authors will use its inverse of 6.5—100 minus 93.5.

50  Law Center to Prevent Gun Violence, "2015 Gun Law State Scorecard."

51  See for example, Albert Hermalin and Lisa Neidert, "Lifetime Migration in the United States as of 2006-2010: Measures, Patterns, and Application" (Ann Arbor, MI: Population Studies Center, 2014), available at http://www.psc.isr.umich.edu/pubs/pdf/rr14-832.pdf.

## Our Mission

The Center for American Progress is an independent, nonpartisan policy institute that is dedicated to improving the lives of all Americans, through bold, progressive ideas, as well as strong leadership and concerted action. Our aim is not just to change the conversation, but to change the country.

## Our Values

As progressives, we believe America should be a land of boundless opportunity, where people can climb the ladder of economic mobility. We believe we owe it to future generations to protect the planet and promote peace and shared global prosperity.

And we believe an effective government can earn the trust of the American people, champion the common good over narrow self-interest, and harness the strength of our diversity.

## Our Approach

We develop new policy ideas, challenge the media to cover the issues that truly matter, and shape the national debate. With policy teams in major issue areas, American Progress can think creatively at the cross-section of traditional boundaries to develop ideas for policymakers that lead to real change. By employing an extensive communications and outreach effort that we adapt to a rapidly changing media landscape, we move our ideas aggressively in the national policy debate.

Center for American Progress

# EXHIBIT 61

Research

**JAMA Internal Medicine** | Original Investigation

# State Firearm Laws and Interstate Firearm Deaths From Homicide and Suicide in the United States
## A Cross-sectional Analysis of Data by County

Elinore J. Kaufman, MD, MSHP; Christopher N. Morrison, PhD, MPH; Charles C. Branas, PhD; Douglas J. Wiebe, PhD

**IMPORTANCE** Firearm laws in one state may be associated with increased firearm death rates from homicide and suicide in neighboring states.

**OBJECTIVE** To determine whether counties located closer to states with lenient firearm policies have higher firearm death rates.

**DESIGN, SETTING, AND PARTICIPANTS** This cross-sectional study of firearm death rates by county for January 2010 to December 2014 examined data from the US Centers for Disease Control and Prevention for firearm suicide and homicide decedents for 3108 counties in the 48 contiguous states of the United States.

**EXPOSURES** Each county was assigned 2 scores, a state policy score (range, 0-12) based on the strength of its state firearm laws, and an interstate policy score (range, −1.33 to 8.31) based on the sum of population-weighted and distance-decayed policy scores for all other states. Counties were divided into those with low, medium, and high home state and interstate policy scores.

**MAIN OUTCOMES AND MEASURES** County-level rates of firearm, nonfirearm, and total homicide and suicide. With multilevel Bayesian spatial Poisson models, we generated incidence rate ratios (IRR) comparing incidence rates between each group of counties and the reference group, counties with high home state and high interstate policy scores.

**RESULTS** Stronger firearm laws in a state were associated with lower firearm suicide rates and lower overall suicide rates regardless of the strength of the other states' laws. Counties with low state scores had the highest rates of firearm suicide. Rates were similar across levels of interstate policy score (low: IRR, 1.34; 95% credible interval [CI], 1.11-1.65; medium: IRR, 1.36, (95% CI, 1.15-1.65; and high: IRR, 1.43; 95% CI, 1.20-1.73). Counties with low state and low or medium interstate policy scores had the highest rates of firearm homicide. Counties with low home state and interstate scores had higher firearm homicide rates (IRR, 1.38; 95% CI, 1.02-1.88) and overall homicide rates (IRR, 1.32; 95% CI, 1.03-1.67). Counties in states with low firearm policy scores had lower rates of firearm homicide only if the interstate firearm policy score was high.

**CONCLUSIONS AND RELEVANCE** Strong state firearm policies were associated with lower suicide rates regardless of other states' laws. Strong policies were associated with lower homicide rates, and strong interstate policies were also associated with lower homicide rates, where home state policies were permissive. Strengthening state firearm policies may prevent firearm suicide and homicide, with benefits that may extend beyond state lines.

← **Editor's Note** page 701

⊞ **Supplemental content**

⊞ **CME Quiz** at
jamanetwork.com/learning
and CME Questions page 736

**Author Affiliations:** Department of Surgery, New York-Presbyterian Weill Cornell Medicine, New York (Kaufman); Penn Injury Science Center, Department of Biostatistics, Epidemiology and Informatics, University of Pennsylvania, Philadelphia (Morrison); Department of Epidemiology, Columbia University, New York, New York (Branas); Penn Injury Science Center, Department of Biostatistics, Epidemiology and Informatics, University of Pennsylvania, Philadelphia (Wiebe).

**Corresponding Author:** Elinore J. Kaufman, MD, MSHP, Department of Surgery, New York-Presbyterian Weill Cornell Medical Center, 525 E 68th St, New York, NY 10065 (ejk9003@nyp.org).

*JAMA Intern Med.* 2018;178(5):692-700. doi:10.1001/jamainternmed.2018.0190
Published online March 5, 2018. Corrected on March 12, 2018.

**692**

© 2018 American Medical Association. All rights reserved.

jamainternalmedicine.com

Downloaded From: https://jamanetwork.com/ on 12/30/2019

Firearm injuries caused 36 252 deaths in the United States in 2015, including 22 018 (60.7%) from suicides and 12 979 (35.8%) from homicides. Despite decreases in violent deaths in the 1990s, the rate of deaths from firearm injuries remained steady from 1999 through 2015, with an increase in the firearm suicide rate from 5.96 to 6.48 per 100 000 population in the same period.[1,2] Firearms account for over 50% of suicides and two-thirds of homicides,[3] and firearm injuries and deaths are an important public health issue.[4-10]

States regulate how firearms are bought, sold, and tracked, as well as who may purchase them.[11,12] Stronger firearm policy environments have been associated with lower rates of firearm deaths,[12-14] as have specific laws, such as licensing and inspection of firearm dealers,[15,16] licensing and background checks for handgun sales,[16-23] including private sales[24,25] and laws regulating the availability of inexpensive handguns.[18] Laws, however, vary widely among states, and evidence of their impact is limited.[7,26,27]

Firearms may move across state lines, presenting a challenge to effective state policies. Evidence from Federal Bureau of Investigation firearm traces indicates that in states with strict firearm laws, many crimes are committed using firearms that originated out-of-state.[28,29] To investigate the effect of home state and out-of-state firearm laws on firearm death rates, we conducted a cross-sectional study of firearm deaths in United States counties from January 2010 to December 2014. We hypothesized that counties located in states with more restrictive firearm laws would have lower rates of firearm suicide and homicide, and that firearm death rates would be higher in counties near adjoining states with more lenient laws.

## Methods

### Study Sample

The units of analysis for this study were United States counties. We excluded counties in Alaska and Hawaii because our measure of interstate policy impact assumed that the effect of distance was uniform among localities, and travel from these noncontiguous states differs. We excluded Washington, DC, because there are no applicable state laws. Our final sample was 3108 counties in 48 states. This study received a waiver of review from the Weill Cornell Medicine institutional review board.

### Dependent Measures

The dependent measures were counts of deaths for the years from January 2010 to December 2014, according to *International Statistical Classification of Diseases and Related Health Problems, Tenth Revision* (ICD-10) classification. Using Compressed Mortality Data records from the Centers for Disease Control,[30] we calculated counts of firearm homicide (ICD-10 codes U014, X93-X95), nonfirearm homicide (ICD-10 codes U011, U012, X85-X92, X96-X99, Y00-Y05, Y060-Y062, Y068-Y073, Y078, Y079, Y08, Y09, Y871), firearm suicide (ICD-10 codes X72-X74), and nonfirearm suicide (ICD-10 codes U030, X60-X71, X75-84, Y870). We calculated total homicides and suicides by summing firearm and nonfirearm deaths.

### Key Points

**Question** Are state firearm laws associated with increases in interstate firearm deaths from homicide and suicide?

**Findings** In this cross-sectional study, strong firearm laws in a state were associated with lower firearm suicide rates and lower overall suicide rates in the state regardless of the strength of the laws in other states. Strong firearm laws in a state were associated with lower rates of firearm homicide. Counties in states with weak laws had lower rates of firearm homicide only when surrounding states had strong laws.

**Meaning** Strengthening firearm policies at the state level could help to reduce the incidence of both firearm suicide and homicide, with benefits that extend across state lines.

### Policy Metric

The Law Center to Prevent Gun Violence (LCPGV) provided detailed data describing firearm laws for every state for 2010.[11] We reviewed the literature and identified 6 categories of laws for which evidence best supports an association with firearm death or interstate movement of firearms (Table 1). Dealer practices and standards may vary between and within states, and laws mandating strict licensing requirements or increased law enforcement oversight of dealers have been associated with up to 50% lower rates of firearm homicide.[15,16] We included laws requiring background checks for private sales of firearms (including gun show sales), because states with these laws have been shown to have lower rates of firearm death.[12,24,25] Laws that require individuals to obtain licenses to purchase or own firearms have been associated with lower rates of death.[17,22] Regulations setting minimum design standards for firearms limit the availability of inexpensive handguns ("Saturday night specials") and have been associated with 6.8% to 11.5% fewer firearm homicides.[18] Two types of laws focus on preventing diversion of legally purchased firearms to homicide and other crimes. Laws restricting multiple purchases of guns are designed to prevent "straw purchasers" from buying excess firearms on behalf of those who could not legally purchase a firearm. Twenty percent of firearms used in crime originate in multiple purchases, and these laws have been shown to reduce diversion of firearms by up to two-thirds.[31-33] Firearms used in crime may be legally purchased but then lost or stolen. Laws requiring owners to report loss and theft have been associated with a 30% decrease in firearms diversion.[24] Increased rates of firearm ownership have been associated with higher firearm suicide rates at the state level,[34] and presence of firearms in the home is associated with firearm suicide risk at the individual level,[35] but few studies have examined the association of firearm policies and firearm suicide. Licensing laws, however, have been associated with a 15% to 23% decrease in firearm suicide.[23,36] Studies have yet to establish the efficacy of other legal strategies for preventing suicide, such as gun restraining orders.[36] Based on the LCPGV methodology, we rated each state 0 to 2 in each of 6 areas, with stronger policies receiving 2 points and more lenient regulations receiving 1 point (Table 1). We summed these scores to a cumulative measure, with possible values of 0 to 12.

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 12/30/2019

State Firearm Laws and Interstate Firearm Deaths

Table 1. Firearm Control Laws Included in the State Firearm Policy Scale

| Law | Description[a] | Scoring |
|---|---|---|
| Dealer regulation[15,16] | Laws regulating record keeping, security practices, and licensing for firearms dealers | 1 point: Ban residential dealers, require security measures, or require reporting of sales, losses and thefts to law enforcement<br>2 points: Require dealer license |
| Background checks for private sales[24,25] | Laws requiring background checks for firearms sales made by individuals who are not federally licensed dealers | 1 point: select firearms or only required at gun shows<br>2 points: required for all private sales |
| License to purchase or own[17,22] | Laws that require an individual to obtain a license prior to purchasing or owning a firearm | 1 point: Require license for select firearms only, require safety training or testing, limit duration of license to ≤1 y<br>2 points: Require license for purchase or possession of all firearms |
| Junk gun regulation[18] | Laws that require firearms to meet design and manufacturing standards | 1 point: Allow sale of only a list of approved guns<br>2 points: Require specific design and safety standards |
| Reporting requirement for lost or stolen guns[24] | Laws that require individuals to report the loss or theft of their firearms within a specified period of time | 2 points: Require reporting of lost or stolen firearms |
| Multiple purchases[31] | Laws that restrict the number of firearms an individual can purchase within a given timeframe | 2 points: restrict multiple purchases or sales |

[a] The Law Center to Prevent Gun Violence (LCPGV) provided detailed data describing firearm laws for every state for 2010. Based on the LCPGV methodology, we rated each state 0 to 2 in each of 6 areas, with stronger policies receiving 2 points and more lenient regulations receiving 1 point. These scores were summed to a cumulative measure, with possible values of 0 to 12.

For each county, we calculated an interstate policy score. Borrowing concepts from transport geography,[37] we assumed that the strength of an interstate policy association would be greatest between places located close to one another.[38,39] For example, a county located in New York state adjacent to the border of Pennsylvania would be more likely to be affected by Pennsylvania laws than Vermont laws. Therefore, the interstate policy score includes an inverse-distance decay term. We assumed a state with a larger population would have greater potential to serve as a source of firearms, and so weighted the interstate policy score by population, consistent with established methods.[37] We standardized the score with a mean of 0 and standard deviation of 1, resulting in a range of scores from −1.33 to 8.31, with higher scores indicating stricter laws in nearby states. Further details about the interstate policy score are available eMethods in the Supplement.

To understand the combined influence of home state and interstate policy scores, we divided counties into 3 groups by home state policy score, with counties in the low group having 0 included state policies (22 states); those in the medium group having 1 to 2 (15 states); and those in the high group having 3 to 10 (11 states). No state had a score of more than 10 included state policies. These cutoffs were chosen to create 3 groups close to equal size. However, as more than one-third of counties had a home state policy score of 0, the groups are uneven in size. We also divided the interstate policy score for

counties into tertiles of 1036 counties each. Interstate policy scores in the low tertile ranged from −1.33 to −0.46. Interstate policy scores in the medium tertile ranged from −0.46 to −0.01. Interstate policy scores in the high tertile ranged from −0.01 to 8.31. Considered together, these variables yielded a primary exposure variable with 9 categories encompassing both exposures (Figure).

## Covariates

We used 5-year estimates from the American Community Survey for January 2010 to December 2014 to describe county demographic characteristics,[40] including population size, median age, median household income, sex, and race/ethnicity. We included 4 measures of neighborhood disadvantage related to violence: the unemployment rate, the proportion age 25 years or older without a high school diploma, households receiving public assistance, and female-headed households.[41] We controlled for rates of crimes against persons and against property using data from the Federal Bureau of Investigation Uniform Crime Reporting System.[42]

## Statistical Analysis

Using established techniques in epidemiology, we constructed multilevel spatial Poisson models.[43-45] A first group of models assessed relationships for homicides, and a second group of models assessed relationships for suicides. For both homicides and suicides, we conducted separate analyses for firearm deaths, nonfirearm deaths, and all deaths.

We fitted the Poisson models using a Bayesian procedure in WinBUGS v14 (University of Cambridge).[46] To account for spatial autocorrelation (the concept that places closer to one another are likely more similar than those that are far apart), all models included a conditional autoregressive random effect that smoothed the effect of outliers and controlled for overdispersion of the count data. In addition, this modeling strategy accounted for unmeasured, spatially structured, regional characteristics that may cause counties in the same region to have similar policies and similar mortality rates, without requiring us to include a categorical variable to control for region explicitly (southeast vs southwest, etc) (eMethods in the Supplement).[43,47] Because counties in the same state may be more similar to each other than counties in different states, models included a state-level random effect. This approach yields an incidence rate ratio (IRR), which provides an estimate of how observed death rates in each group differ from a specified reference group, for the firearm policy variable, or for a 1-unit difference in the exposure variable, such as for the demographic variables. The IRR is situated within a 95% credible interval (CI), which is analogous to a 95% confidence interval in conventional regression analyses. We performed geoprocessing using ArcGIS 10.3 (Esri Inc), and nonspatial data management using Stata v14 (StataCorp).

## Sensitivity Analyses

We conducted multiple tests to minimize the likelihood that our results were artifacts of model or variable specification (eTable 1 in the Supplement). We conducted a sensitivity analysis using inverse distance squared to allow geographic rela-

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 12/30/2019

State Firearm Laws and Interstate Firearm Deaths

**Figure. Geographic Distributions of Combined Home State and Interstate Policy Scores**



A US counties

Home State-Interstate (Counties):
- Low-Low (598)
- Low-Medium (711)
- Low-High (204)
- Medium-Low (278)
- Medium-Medium (305)
- Medium-High (434)
- High-Low (160)
- High-Medium (20)
- High-High (398)

B Distribution of policy scores

| Interstate Policy Score | Home State Policy Score | | |
| --- | --- | --- | --- |
| | Low (22 States; 1513 Counties) | Medium (15 States; 1017 Counties) | High (11 States; 578 Counties) |
| Low (1036 counties) | 598 Counties | 278 Counties | 160 Counties |
| Medium (1036 counties) | 711 Counties | 305 Counties | 20 Counties |
| High (1036 counties) | 204 Counties | 434 Counties | 398 Counties |

A, Map of US counties showing home state and interstate policy scores. B, Distribution of US counties into low, medium, and high home state and interstate policy scores.

tionships to fall off more quickly. We reconstructed all 6 Poisson models, replacing the dependent variables with deaths from 2010 only, to account for possible variation in trends over time between counties. We also replaced the 2010 home state and interstate policy scores with similar scores calculated using: (1) 2012 policies; (2) complete scores proposed by the LCPGV, including 35 firearm laws, rather than the 6 areas selected for our primary analysis[11]; and (3) scores developed using iterative principal components analyses. The principle components analysis aimed to identify correlations among all 35 laws for which the LCPGV collected data. We calculated Eigenvectors for these laws, removing laws with Eigenvectors less than 0.3 (highly correlated with other laws), and then taking a count of laws in a final analysis in which all laws had Eigenvectors greater than 0.3.[48] We evaluated the home state and interstate policy variables separately, and tested an interaction between the home state and interstate policy scores as continuous variables.

## Results

**Table 2** shows descriptive statistics for the 3108 counties. The mean (SD) county firearm suicide rate was 10.04 (6.10) per 100 000 population per year, and the mean (SD) county firearm homicide rate was 2.56 (3.21). Geographic distributions of firearm homicide and suicide rates are presented in the eFigure in the Supplement. The Figure shows geographic distributions of combined home state policy scores and interstate policy scores. California had the strongest firearm control laws

(10 out of 12). However, because California is adjacent to states with low policy scores, many California counties had low interstate policy scores.

**Table 3** shows results of the Bayesian, conditional, autoregressive, Poisson models for suicide deaths. **Table 4** shows comparable results for homicide deaths. Both Table 3 and Table 4 also show analyses of suicide and homicide deaths, respectively, for various demographic characteristics of the counties. The reference group for the IRR was counties with high home state and high interstate policy scores.

As shown in Table 3, model 1A, counties with low-strength home state policy laws had the highest rates of firearm suicide. Rates were similar across levels of interstate policy score (low: IRR, 1.35; 95% CI, 1.11-1.65; medium: IRR, 1.36; 95% CI, 1.15-1.65; and high: IRR, 1.43; 95% CI 1.20-1.73). Counties with medium-strength home state policy scores had slightly lower rates of firearm suicide; counties with high-strength home state policy scores had the lowest rates. Firearm suicide rates for counties with medium-strength policy scores were also similar across levels of interstate policy score. Counties with high home state policy scores had equivalent rates of firearm suicide, regardless of interstate policy score level. These relationships carried over, though attenuated, to the total suicide rate, as shown in model 1C. There was no association between either state or interstate policy scores and nonfirearm suicide, as shown in model 1B. Factors associated with higher suicide rates in counties, firearm and otherwise, included a higher median age of residents and a higher proportion of male residents. Factors associated with lower suicide rates included higher percentages of black or Hispanic resi-

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 12/30/2019

**Table 2. Characteristics of US Counties (N = 3108) Included in the Study**

| Characteristic | Mean (SD) [Range] |
| --- | --- |
| Deaths, average annual rate per 100 000 population[a] | |
| Firearm suicides | 10.04 (6.10) [0.00 to 72.90] |
| Nonfirearm suicides | 6.05 (4.14) [0.00 to 63.08] |
| All suicides | 16.09 (7.59) [0.00 to 97.21] |
| Firearm homicides | 2.56 (3.21) [0.00 to 38.10] |
| Nonfirearm homicides | 1.50 (1.82) [0.00 to 30.63] |
| All homicides | 4.06 (4.12) [0.00 to 42.17] |
| Firearm Policy Scales, 2010 data | |
| Home state policy scale | 1.53 (2.30) [0.00 to 10.00] |
| Interstate policy scale, standardized | 0.00 (1.00) [−1.33 to 8.31] |
| Census Characteristics, 2010-2014 mean | |
| Population | 100 179.70 (321 005.30) [89.00 to 9 974 203.00] |
| Area, square miles | 990.85 (1323.11) [2.00 to 20 105.40] |
| Male, % | 50.01 (2.35) [37.36 to 71.66] |
| Median age, y | 40.75 (5.20) [21.60 to 64.50] |
| Black, % | 8.94 (14.46) [0.00 to 85.91] |
| Hispanic, % | 8.69 (13.47) [0.00 to 95.68] |
| Annual median household income, $ | 46 347.14 (11 938.71) [19 146.00 to 123 966.00] |
| Households receiving public assistance, % | 2.54 (1.63) [0.00 to 24.83] |
| Population aged ≥16 who are unemployed, % | 4.65 (3.09) [0.00 to 100.00] |
| Households with female heads of house, % | 16.93 (6.52) [0.00 to 52.09] |
| Population aged ≥25 y without high school diploma, % | 15.06 (6.76) [1.27 to 53.28] |
| Crime per 100 population, 2010 data | |
| Property crimes | 2.24 (4.84) [0.00 to 109.04] |
| Violent crimes | 0.26 (0.76) [0.00 to 24.11] |

[a] Calculated from total count of deaths from January 2010 to December 2014.

dents. Counties with higher percentages of households headed by women had lower firearm suicide rates but higher rates of nonfirearm suicide rates and overall suicide.

For homicides, as shown in Table 4, model 2A, counties with low home state and low or medium interstate policy scores had the highest rates of firearm homicide. Findings for nonhomicide and overall homicide rates are shown in model 2B and model 2C, respectively. Compared with counties with high home state and interstate policy scores, counties with low home state and interstate scores had higher firearm homicide rates (IRR, 1.38; 95% CI, 1.02-1.88) and overall homicide rates (IRR, 1.32; 95% CI, 1.03-1.67) but not nonfirearm homicides (IRR, 1.24; 95% CI, 0.99-1.57). Counties with low home state scores and medium interstate policy scores had higher rates of firearm homicide (IRR, 1.33; 95% CI, 1.02-1.75), nonfirearm homicide (IRR, 1.29; 95% CI, 1.04-1.60), and overall homicide (IRR, 1.28; 95% CI, 1.03-1.59). In contrast, counties with low state policy scores and high interstate policy scores did not have higher firearm homicide rates (IRR, 1.18; 95% CI, 0.89-1.54), nonfirearm homicide rates (IRR, 0.97; 95% CI, 0.78-1.20), or overall homicide (IRR, 1.07; 95% CI, 0.86-1.32). For counties with medium or high home state scores, homicide rates (firearm, nonfirearm, and overall) were not associated with the interstate policy score, regardless of whether it was low, medium, or high.

Factors associated with higher firearm homicide rates in counties included higher percentages of black or Hispanic residents, more households receiving public assistance, more

households headed by women, and higher percentages of residents without a high school diploma. Higher rates of firearm homicides were associated with higher rates of property crimes and violent crimes and were inversely associated with higher median household income.

Results of the sensitivity analyses for suicide or homicide are available in eTable 2 and eTable 3 in the Supplement, respectively. Results for suicide were not substantively different from those in the main analyses. For homicide, only the main analyses demonstrated an association between either home state or interstate firearm policies and homicides.

## Discussion

In a national, cross-sectional analysis of state firearm policies, we found that counties in states with high firearm policy scores had the lowest rates of firearm suicide and overall suicide, regardless of the strength of the firearm policies of other states. We also found that counties in states with high firearm policy scores had lower rates of firearm homicide. Counties in states with low firearm policy scores had lower rates of firearm homicide only if the interstate firearm policy score was high.

Prior studies have provided indirect evidence for interstate spillover effects of state firearm laws and firearm death rates. In 2006, Webster et al[49] found that the proportion of out-of-state firearms recovered in crimes in US cities was associ-

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 12/30/2019

State Firearm Laws and Interstate Firearm Deaths

Original Investigation **Research**

**Table 3. Multilevel Bayesian Conditional Autoregressive Poisson Models for Counts of Suicide by Firearms (January 2010-December 2014) for Counties (N = 3108) Nested Within Contiguous US States (N = 48)**

| Description | IRR (95% CI) | | |
| --- | --- | --- | --- |
| | Model 1A: Firearm Suicide | Model 1B: Nonfirearm Suicide | Model 1C: All Suicide |
| **Firearm Policies** | | | |
| Low home state, low interstate | 1.35 (1.11-1.65)[a] | 1.02 (0.89-1.18) | 1.19 (1.05-1.35)[a] |
| Low home state, medium interstate | 1.36 (1.15-1.65)[a] | 1.04 (0.92-1.18) | 1.23 (1.10-1.39)[a] |
| Low home state, high interstate | 1.43 (1.20-1.73)[a] | 1.06 (0.95-1.20) | 1.23 (1.10-1.34)[a] |
| Medium home state, low interstate | 1.35 (1.07-1.71)[a] | 0.96 (0.82-1.13) | 1.16 (1.00-1.35)[a] |
| Medium home state, medium interstate | 1.24 (1.06-1.49)[a] | 1.05 (0.94-1.18) | 1.17 (1.01-1.27)[a] |
| Medium home state, high interstate | 1.22 (1.06-1.45)[a] | 1.06 (0.96-1.169) | 1.11 (1.01-1.23)[a] |
| High home state, low interstate | 0.91 (0.71-1.16) | 1.00 (0.87-1.16) | 0.93 (0.79-1.10) |
| High home state, medium interstate | 1.19 (0.98-1.45) | 0.99 (0.79-1.25) | 1.11 (0.95-1.29) |
| High home state, high interstate | 1 [Reference] | 1 [Reference] | 1 [Reference] |
| **Census Characteristics** | | | |
| Population (model offset) | | | |
| Area (1000 sq miles) | 1.02 (1.01-1.03)[a] | 1.01 (1.00-1.02) | 1.01 (1.01-1.02)[a] |
| Male[b] | 1.01 (1.01-1.02)[a] | 1.02 (1.01-1.03)[a] | 1.02 (1.01-1.02)[a] |
| Median age (for each 10 y increase) | 1.31 (1.27-1.35)[a] | 1.16 (1.12-1.20)[a] | 1.24 (1.21-1.28)[a] |
| Black[b] | 0.92 (0.90-0.94)[a] | 0.82 (0.80-0.83)[a] | 0.88 (0.86-0.89)[a] |
| Hispanic[b] | 0.89 (0.88-0.91)[a] | 0.94 (0.92-0.96)[a] | 0.91 (0.90-0.92)[a] |
| Median household income (for each additional $10 000) | 0.92 (0.90-0.93)[a] | 1.01 (1.00-1.03) | 0.96 (0.95-0.97)[a] |
| Households receiving public assistance[b] | 0.99 (0.89-1.10) | 1.26 (1.13-1.40)[a] | 1.12 (1.04-1.21)[a] |
| Population aged ≥16 y who are unemployed[b] | 1.17 (1.08-1.26)[a] | 1.04 (0.94-1.14) | 1.11 (1.04-1.17)[a] |
| Households with female heads of house[b] | 0.92 (0.88-0.96)[a] | 1.40 (1.33-1.47)[a] | 1.11 (1.07-1.15)[a] |
| Population aged ≥25 y without high school diploma[b] | 1.01 (0.98-1.05) | 0.81 (0.84-0.91)[a] | 0.97 (0.94-1.00)[a] |
| **Crime** | | | |
| Property crimes (1 per 100 population) | 1.01 (1.00-1.01)[a] | 1.02 (1.01-1.03)[a] | 1.01 (1.01-1.02)[a] |
| Violent crimes (1 per 100 population) | 1.03 (0.98-1.07) | 1.00 (0.96-1.05) | 1.02 (0.98-1.05) |

Abbreviations: CI, credible interval; IRR, incidence rate ratio.

[a] Estimates have credible intervals that do not include an IRR of 1.0. Parameter estimates for county population constrained to an IRR of 1.0.

[b] For each 10% of population.

ated with proximity to states with permissive firearm policies. Law enforcement firearm trace data has consistently shown that states with stronger firearm control policies are the source of proportionately fewer firearms used in crimes.[29] Likewise, a Virginia law limiting handgun purchases to 1 per month was associated with a decreased proportion of Virginia firearms recovered in crime nationwide.[31] The Federal Assault Weapons Ban was passed in 1994, prohibiting the manufacture, possession and sale of certain military-style, semiautomatic firearms and large-capacity ammunition magazines in the United States. This ban expired automatically in 2004. Dube et al[50] evaluated the effect of this expiration on firearm violence in Mexican towns, finding an increase in firearm-related homicides near the Texas, Arizona, and New Mexico border. California had a 1989 state assault weapons ban in place, so there was no effective policy change in California in 2004, and Dube et al[50] found no increase in homicides near the California border.

Suicides account for two-thirds of all firearm-related deaths in the United States.[3,51] We found that stronger home-state firearm policies were associated with lower firearm suicide rates, independent of the strength of the firearm policies of other states. We identified a partial substitution effect, as nonfirearm suicide rates were higher in counties with higher interstate policy scores, but overall suicide rates remained lower,

consistent with prior studies.[17,23,52-58] Because suicidal ideation is often transient, and because firearms are a highly lethal method of suicide, access to firearms is an important risk factor for completed suicide attempts.[35,53] Considered in the context of prior studies, our findings provide evidence that stronger state firearm laws could help to prevent firearm suicides, without an equivalent increase in suicide by other methods.[17,54,55]

We found no relationship between firearm suicide rates in counties and the strength of the firearm laws of nearby states. This finding is consistent with prior studies showing that most firearm suicides are committed by firearm owners or their family members, and likely involve legally purchased firearms obtained for other purposes.[35,53,54,59]

We found the highest rates of firearm homicide and overall homicide in counties with low state and interstate policy scores. Counties with low state policy scores had lower firearm homicide rates when the interstate policy scores were high. In contrast, counties in states with high policy scores had lower rates of firearm homicide even when the interstate policy score was low. Prior studies have had mixed results with regard to the relationship between state firearm laws and firearm homicides.[7,13,58,60-63] We did not identify a difference in homicide rates between counties in states with medium and high firearm policy scores. Fleegler et al,[13] however, found an as-

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 12/30/2019

**Table 4. Multilevel Bayesian Conditional Autoregressive Poisson Models for Counts of Homicide by Firearms (January 2010-December 2014) for Counties (N = 3108) Nested Within Contiguous US States (N = 48)**

| | IRR (95% CI) | | |
| --- | --- | --- | --- |
| Description | Model 2A: Firearm Homicide | Model 2B: Nonfirearm Homicide | Model 2C: All Homicide |
| **Firearm Policies** | | | |
| Low home state, low interstate | 1.38 (1.02-1.88)[a] | 1.24 (0.99-1.57) | 1.32 (1.03-1.67)[a] |
| Low home state, medium interstate | 1.33 (1.02-1.75)[a] | 1.29 (1.04-1.60)[a] | 1.28 (1.03-1.59)[a] |
| Low home state, high interstate | 1.18 (0.89-1.54) | 0.97 (0.78-1.20) | 1.07 (0.86-1.32) |
| Medium home state, low interstate | 1.22 (0.88-1.70) | 1.17 (0.90-1.53) | 1.22 (1.00-1.49) |
| Medium home state, medium interstate | 1.22 (0.95-1.56) | 1.16 (0.95-1.41) | 1.13 (1.01-1.27) |
| Medium home state, high interstate | 1.15 (0.94-1.39) | 1.09 (0.91-1.29) | 1.13 (0.96-1.32) |
| High home state, low interstate | 1.13 (0.84-1.53) | 1.11 (0.84-1.45) | 1.11 (0.95-1.29) |
| High home state, medium interstate | 1.11 (0.74-1.65) | 0.95 (0.64-1.39) | 1.07 (0.78-1.48) |
| High home state, high interstate | 1 [Reference] | 1 [Reference] | 1 [Reference] |
| **Census Characteristics** | | | |
| Population (model offset) | | | |
| Area (1000 sq miles) | 1.03 (1.01-1.06)[a] | 1.35 (1.11-1.65)[a] | 1.04 (1.02-1.06)[a] |
| Male[b] | 0.98 (0.96-1.00)[a] | 1.04 (1.02-1.05)[a] | 1.00 (0.99-1.01) |
| Median age (for each 10 y increase) | 1.13 (1.04-1.24)[a] | 1.07 (1.01-1.13)[a] | 1.09 (1.03-1.16)[a] |
| Black[b] | 1.20 (1.15-1.25)[a] | 0.98 (0.95-1.02) | 1.12 (1.08-1.15)[a] |
| Hispanic (for each 10% of population) | 1.06 (1.01-1.11)[a] | 0.94 (0.91-0.97)[a] | 1.01 (0.98-1.04) |
| Median household income (for each additional $10 000) | 0.94 (0.90-0.98)[a] | 0.97 (0.94-1.00)[a] | 0.95 (0.92-0.98)[a] |
| Households receiving public assistance[b] | 1.75 (1.42-2.14)[a] | 1.34 (1.15-1.66)[a] | 1.66 (1.42-1.95)[a] |
| Population aged ≥16 y who are unemployed[b] | 0.88 (0.72-1.08) | 0.952 (0.787-1.141)(0.90 (0.77-1.06) |  |
| Households with female heads of house[b] | 1.29 (1.16-1.41)[a] | 1.57 (1.44-1.71)[a] | 1.41 (1.29-1.52)[a] |
| Population aged ≥25 y without high school diploma[b] | 1.08 (1.00-1.18)[a] | 1.11 (1.04-1.19)[a] | 1.08 (1.02-1.15)[a] |
| **Crime** | | | |
| Property crimes (1 per 100 population) | 1.04 (1.03-1.06)[a] | 1.03 (1.02-1.04)[a] | 1.04 (1.02-1.05)[a] |
| Violent crimes (1 per 100 population) | 1.15 (1.06-1.26)[a] | 1.14 (1.06-1.3)[a] | 1.15 (1.07-1.22)[a] |

Abbreviations: CI, credible interval; IRR, incidence rate ratio

[a] Estimates have credible intervals that do not include an IRR of 1.0. Parameter estimates for county population constrained to an IRR of 1.0.

[b] For each 10% of population.

sociation between strong state firearm laws and lower rates of firearm-related fatalities. Firearm laws in the United States are generally lenient. Thus, in our geographic analysis there may have been insufficient variation between states to discern such an effect. Adjustment for county demographics may also have obscured a state-level association, as found in other studies. We did find higher rates of nonfirearm homicide in counties with low state policy scores and medium interstate policy scores, although not in those with low or high interstate policy scores. Possible explanations include an increase in general violent activity associated with increases in firearm homicide, or an unrecognized confounder that we were unable to identify. Our sensitivity analyses did not identify an association between firearm policies and firearm homicide rates. Analyses were consistent for suicide, likely because there is a continuous effect between home state policy strength and firearm suicide, with no effect from interstate policy strength. For homicide, we identified a nonlinear interaction between the home state and interstate policy scores. No other model that we tested allowed for either a nonlinear effect or a nonlinear interaction, which may explain why we did not detect a relationship between home or interstate policy score and homicide in these other models.

## Limitations

Our analysis has limitations. First, because US state firearm laws are generally more lenient than in the other countries, and with only a few states with strict laws, our ability to detect an effect of the strictest laws may have been limited.[10,26,55,64,65] Second, we used distance as a proxy for the ability of firearms to travel from one location to another. However, Federal Bureau of Investigation trace data indicated that firearms discovered in crime often originate in distant states, not adjoining states, an observation that held low weight in our analysis (based on inverse distance).[29] Mail and internet commerce may mitigate the barrier of distance, as may cultural affinities between locations. Firearms may travel across state borders in specific ways, such as on interstate highways.[29,66] Further research should consider such dynamics. Third, our cumulative policy score might mask the effect of a particular law, as seen in prior studies.[12,15,28,62] The laws we analyzed cannot completely eliminate gun theft or illegal, deceptive purchases, and we could not account for differences in law enforcement between counties or states. Fourth, in a cross-sectional analysis, we were unable to test for a causal relationship between state policies and firearm deaths. Fifth, certain municipalities have stronger firearm restrictions than

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 12/30/2019

their states, and our analysis does not account for this. Sixth, confounding factors may vary between homicide and suicide, but we included broadly relevant variables, such as age and sex, to avoid overadjustment.[67] Seventh, an unmeasured variable may contribute to both the adoption of state firearm laws and death rates. Finally, limitations to available data required us to use counties as spatial units of analysis. County boundaries are nonrandom, arbitrary, and include populations of up to 10 million. We used land area and population to calculate population density, but it is possible that certain counties have low population density but are very close to high-density centers and thus have distinctive properties. Future research on the impact of firearm policies should continue to assess both local and distant effects.

## Conclusions

In this study of the geographic dynamics of firearm policy, stronger home state policies were associated with lower rates of firearm suicide and overall suicide regardless of the strength of other states' laws. Stronger home state laws were associated with lower rates of firearm homicide, while counties in states with weaker laws had lower rates of firearm homicide only when surrounding states had stronger laws. Our findings support strengthening state firearm policies to reduce the incidence of both firearm suicide and homicide, with benefits that may extend across state lines.

### ARTICLE INFORMATION

**Accepted for Publication:** January 9, 2018.

**Correction:** This article was corrected on March 12, 2018, for a typographical error in the Importance paragraph in the abstract.

**Published Online:** March 5, 2018.
doi:10.1001/jamainternmed.2018.0190

**Author Contributions:** Dr Kaufman had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* All authors.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* Kaufman.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Kaufman, Morrison.
*Obtained funding:* Branas.
*Administrative, technical, or material support:* Morrison, Branas, Wiebe.
*Study supervision:* Branas, Wiebe.

**Conflict of Interest Disclosures:** None reported.

**Funding/Support:** Dr Morrison was supported by a grant from the National Center for Injury Control and Prevention, Centers for Disease Control and Prevention (grant No. R49CEOO2474).

**Role of the Funder/Sponsor:** The funder/sponsor had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**Additional Contributions:** The authors thank Jon Vernick, JD, of Johns Hopkins Bloomberg School of Public Health for his input on the components of the policy score; Dr Vernick was not compensated.

### REFERENCES

**1.** Wintemute GJ. The epidemiology of firearm violence in the twenty-first century United States. *Annu Rev Public Health.* 2015;36(1):5-19. doi:10.1146/annurev-publhealth-031914-122535

**2.** Steinbrook R, Stern RJ, Redberg RF. Firearm injuries and gun violence: call for papers. *JAMA Intern Med.* 2016;176(5):596-597. doi:10.1001/jamainternmed.2016.0937

**3.** U. S. Centers for Disease Control and Prevention. National Vital Statisitcs Reports, Volume 65,

Number 4.; 2016. http://www.cdc.gov/nchs/data/nvsr/nvsr65/nvsr65_04.pdf. Accessed November 21, 2016.

**4.** Wahowiak L. Public health taking stronger approach to gun violence: APHA, Brady team up on prevention. http://thenationshealth.aphapublications.org/content/45/10/1.3.full. Accessed November 21, 2016.

**5.** Obama B. Whitehouse.gov. Remarks by the president on common-sense gun safety reform. https://www.whitehouse.gov/the-press-office/2016/01/05/remarks-president-common-sense-gun-safety-reform. Published January 5, 2016. Accessed May 15, 2016.

**6.** Stewart RM, Kuhls DA. Firearm injury prevention: a consensus approach to reducing preventable deaths. *J Trauma Acute Care Surg.* 2016;80(6):850-852. doi:10.1097/TA.0000000000001036

**7.** Lee LK, Fleegler EW, Farrell C, et al. Firearm laws and firearm homicides: a systematic review. *JAMA Intern Med.* 2017;177(1):106-119. doi:10.1001/jamainternmed.2016.7051

**8.** Steinbrook R, Stern RJ, Redberg RF. Firearm violence: a JAMA Internal Medicine series. *JAMA Intern Med.* 2017;177(1):19-20. doi:10.1001/jamainternmed.2016.7180

**9.** Alcorn T. Trends in research publications about gun violence in the United States, 1960 to 2014. *JAMA Intern Med.* 2017;177(1):124-126. doi:10.1001/jamainternmed.2016.7076

**10.** Hemenway D, Miller M. Public health approach to the prevention of gun violence. *N Engl J Med.* 2013;368(21):2033-2035. doi:10.1056/NEJMsb1302631

**11.** Law Center to Prevent Gun Violence - Annual Gun Law State Scorecard. 2015. http://gunlawscorecard.org/. Accessed May 15, 2016.

**12.** Kalesan B, Mobily ME, Keiser O, Fagan JA, Galea S. Firearm legislation and firearm mortality in the USA: a cross-sectional, state-level study. *Lancet.* 2016;387(10030):1847-1855. doi:10.1016/S0140-6736(15)01026-0

**13.** Fleegler EW, Lee LK, Monuteaux MC, Hemenway D, Mannix R. Firearm legislation and firearm-related fatalities in the United States. *JAMA Intern Med.* 2013;173(9):732-740. doi:10.1001/jamainternmed.2013.1286

**14.** Sumner SA, Layde PM, Guse CE. Firearm death rates and association with level of firearm purchase

background check. *Am J Prev Med.* 2008;35(1):1-6. doi:10.1016/j.amepre.2008.03.023

**15.** Irvin N, Rhodes K, Cheney R, Wiebe D. Evaluating the effect of state regulation of federally licensed firearm dealers on firearm homicide. *Am J Public Health.* 2014;104(8):1384-1386.

**16.** Vernick JS, Webster DW, Bulzacchelli MT, Mair JS. Regulation of firearm dealers in the United States: an analysis of state law and opportunities for improvement. *J Law Med Ethics.* 2006;34(4):765-775. doi:10.1111/j.1748-720X.2006.00097.x

**17.** Crifasi CK, Meyers JS, Vernick JS, Webster DW. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. *Prev Med.* 2015;79:43-49. doi:10.1016/j.ypmed.2015.07.013

**18.** Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning "Saturday night special" handguns on homicides. *Am J Epidemiol.* 2002;155(5):406-412.

**19.** Webster D, Crifasi CK, Vernick JS. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. *J Urban Health.* 2014;91(2):293-302. doi:10.1007/s11524-014-9865-8

**20.** Sen B, Panjamapirom A. State background checks for gun purchase and firearm deaths: an exploratory study. *Prev Med.* 2012;55(4):346-350. doi:10.1016/j.ypmed.2012.07.019

**21.** Ruddell R, Mays GL. State background checks and firearms homicides. *J Crim Justice.* 2005;33(2):127-136. doi:10.1016/j.jcrimjus.2004.12.004

**22.** Rudolph KE, Stuart EA, Vernick JS, Webster DW. Association between Connecticut's permit-to-purchase handgun law and homicides. *Am J Public Health.* 2015;105(8):e49-e54. doi:10.2105/AJPH.2015.302703

**23.** Loftin C, McDowall D, Wiersema B, Cottey TJ. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N Engl J Med.* 1991;325(23):1615-1620. doi:10.1056/NEJM199112053252305

**24.** Webster DW, Vernick JS, eds. *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.* Baltimore, Maryland: Johns Hopkins University Press; 2013.

**25.** Wintemute GJ, Braga AA, Kennedy DM. Private-party gun sales, regulation, and public safety. *N Engl J Med.* 2010;363(6):508-511. doi:10.1056/NEJMp1006326

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 12/30/2019

**26.** Hahn RA, Bilukha O, Crosby A, et al; Task Force on Community Preventive Services. Firearms laws and the reduction of violence: a systematic review. *Am J Prev Med*. 2005;28(2)(suppl 1):40-71. doi:10 .1016/j.amepre.2004.10.005

**27.** Santaella-Tenorio J, Cerdá M, Villaveces A, Galea S. What do we know about the association between firearm legislation and firearm-related injuries? *Epidemiol Rev*. 2016;38(1):140-157. doi:10 .1093/epirev/mxv012

**28.** Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun sales laws and the source state of crime guns. *Inj Prev*. 2001;7(3):184-189.

**29.** Mayors AIG. Trace the Guns. https: //tracetheguns.org/report.pdf. Published September 2010. Accessed January 17, 2018.

**30.** Centers for Disease Control and Prevention. DC WONDER. https://wonder.cdc.gov/. Accessed May 12, 2016.

**31.** Weil DS, Knox RC. Effects of limiting handgun purchases on interstate transfer of firearms. *JAMA*. 1996;275(22):1759-1761.

**32.** Bureau of Alcohol Tobacco and Firearms. *Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (2000)*. Washington, DC; U.S. Department of the Treasury; 2002.

**33.** Wright MA, Wintemute GJ, Webster DW. Factors affecting a recently purchased handgun's risk for use in crime under circumstances that suggest gun trafficking. *J Urban Health*. 2010;87(3): 352-364. doi:10.1007/s11524-010-9437-5

**34.** Siegel M, Rothman EF. Firearm ownership and suicide rates among US men and women, 1981-2013. *Am J Public Health*. 2016;106(7):1316-1322. doi:10.2105/AJPH.2016.303182

**35.** Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case-control study. *Ann Emerg Med*. 2003;41(6): 771-782. doi:10.1067/mem.2003.187

**36.** Vernick JS, Alcorn T, Horwitz J. Background checks for all gun buyers and gun violence restraining orders: state efforts to keep guns from high-risk persons. *J Law Med Ethics*. 2017;45 (1_suppl):98-102. doi:10.1177/1073110517703344

**37.** Rodrigue J-P, Comtois C, Slack B. *The Geography of Transport Systems*. 2nd ed. London, New York: Routledge; 2009.

**38.** Fotheringham AS. Spatial structure and distance-decay parameters. *Ann Assoc Am Geogr*. 1981;71(3):425-436.

**39.** Fotheringham AS. A new set of spatial-interaction models: the theory of competing destinations. *Environ Plann A*. 1983;15(1):15-36. doi: 10.1068/a150015

**40.** United States Census Bureau. Census.gov. https://www.census.gov/. Accessed May 15, 2016.

**41.** Sampson RJ, Raudenbush SW, Earls F. Neighborhoods and violent crime: a multilevel study of collective efficacy. *Science*. 1997;277 (5328):918-924. doi:10.1126/science.277.5328.918

**42.** United States Department of Justice. Federal Bureau of Investigation. Uniform Crime Reporting Program Data: County-Level Detailed Arrest and Offense Data, 2012 (ICPSR 35019). 2014. http://www.icpsr.umich.edu/icpsrweb/NACJD /studies/35019. Accessed November 29, 2016. 10.3886/ICPSR35019.v1.

**43.** Waller LA, Gotway CA. *Applied Spatial Statistics for Public Health Data*. Hoboken, NJ: John Wiley & Sons; 2004.

**44.** Best N, Richardson S, Thomson A. A comparison of Bayesian spatial models for disease mapping. *Stat Methods Med Res*. 2005;14 (1):35-59. doi:10.1191/0962280205sm388oa

**45.** Imprialou M-IM, Quddus M, Pitfield DE, Lord D. Re-visiting crash-speed relationships: a new perspective in crash modelling. *Accid Anal Prev*. 2016;86:173-185. doi:10.1016/j.aap.2015.10.001

**46.** Lunn DJ, Thomas A, Best N, Spiegelhalter D. WinBUGS—a Bayesian modelling framework: concepts, structure, and extensibility. *Stat Comput*. 2000;10(4):325-337.

**47.** Lord D, Washington SP, Ivan JN. Poisson, Poisson-gamma and zero-inflated regression models of motor vehicle crashes: balancing statistical fit and theory. *Accid Anal Prev*. 2005;37 (1):35-46. doi:10.1016/j.aap.2004.02.004

**48.** Dunteman GH. *Principal Components Analysis. Nachdr*. Newbury Park, CA: Sage Publishing; 2006.

**49.** Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *J Urban Health*. 2006;83(5):778-787. doi:10.1007/s11524-006 -9073-2

**50.** Dube A, Dube O, García-Ponce O. Cross-border spillover: U.S. gun laws and violence in Mexico. *Am Polit Sci Rev*. 2013;107(03):397-417. doi:10.1017 /S0003055413000178

**51.** Fowler KA, Dahlberg LL, Haileyesus T, Annest JL. Firearm injuries in the United States. *Prev Med*. 2015;79:5-14. doi:10.1016/j.ypmed.2015.06.002

**52.** Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA*. 2000; 284(5):585-591.

**53.** Swanson JW, Bonnie RJ, Appelbaum PS. Getting serious about reducing suicide: more "how" and less "why." *JAMA*. 2015;314(21):2229-2230. doi:10.1001/jama.2015.15566

**54.** Anestis MD, Khazem LR, Law KC, et al. The association between state laws regulating handgun ownership and statewide suicide rates. *Am J Public Health*. 2015;105(10):2059-2067.

**55.** Chapman S, Alpers P, Agho K, Jones M. Australia's 1996 gun law reforms: faster falls in firearm deaths, firearm suicides, and a decade without mass shootings. *Inj Prev*. 2015;21(5):355-362. doi:10.1136/ip.2006.013714rep

**56.** Miller M, Azrael D, Hepburn L, Hemenway D, Lippmann SJ. The association between changes in household firearm ownership and rates of suicide in the United States, 1981-2002. *Inj Prev*. 2006;12(3): 178-182. doi:10.1136/ip.2005.010850

**57.** McCourt AD, Vernick JS, Betz ME, Brandspigel S, Runyan CW. Temporary transfer of firearms from the home to prevent suicide: legal obstacles and recommendations. *JAMA Intern Med*. 2017;177(1): 96-101. doi:10.1001/jamainternmed.2016.5704

**58.** Rosengart M, Cummings P, Nathens A, Heagerty P, Maier R, Rivara F. An evaluation of state firearm regulations and homicide and suicide death rates. *Inj Prev*. 2005;11(2):77-83. doi:10.1136/ip .2004.007062

**59.** Barber C, Frank E, Demicco R. Reducing Suicides through partnerships between health professionals and gun owner groups—beyond Docs vs Glocks. *JAMA Intern Med*. 2017;177(1):5-6. doi:10 .1001/jamainternmed.2016.6712

**60.** Beaver BL, Woo S, Voigt RW, et al. Does handgun legislation change firearm fatalities? *J Pediatr Surg*. 1993;28(3):306-308. doi:10.1016 /0022-3468(93)90222-7

**61.** Hepburn L, Miller M, Azrael D, Hemenway D. The effect of nondiscretionary concealed weapon carrying laws on homicide. *J Trauma*. 2004;56(3): 676-681. doi:10.1097/01.TA.0000068996.01096 .39

**62.** Crandall M, Eastman A, Violano P, et al. Prevention of firearm-related injuries with restrictive licensing and concealed carry laws: an Eastern Association for the Surgery of Trauma systematic review. *J Trauma Acute Care Surg*. 2016; 81(5):952-960. doi:10.1097/TA .0000000000001251

**63.** Kalesan B, Vasan S, Mobily ME, et al. State-specific, racial and ethnic heterogeneity in trends of firearm-related fatality rates in the USA from 2000 to 2010. *BMJ Open*. 2014;4(9): e005628-e005628. doi:10.1136/bmjopen-2014 -005628

**64.** Grinshteyn E, Hemenway D. Violent death rates: the US Compared with other high-income OECD countries, 2010. *Am J Med*. 2016;129(3): 266-273. doi:10.1016/j.amjmed.2015.10.025

**65.** Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. *N Engl J Med*. 1988; 319(19):1256-1262. doi:10.1056 /NEJM198811103191905

**66.** Aisch G, Keller J. How Gun Traffickers Get Around State Gun Laws. *New York Times*. https://www.nytimes.com/interactive/2015/11/12 /us/gun-traffickers-smuggling-state-gun-laws.html. Published November 13, 2015. Accessed August 5, 2017.

**67.** Schisterman EF, Cole SR, Platt RW. Overadjustment bias and unnecessary adjustment in epidemiologic studies. *Epidemiology*. 2009;20 (4):488-495. doi:10.1097/EDE.0b013e3181a819a1

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ on 12/30/2019

# EXHIBIT 62

# The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: a Panel Study


Check for updates

*Michael Siegel[1], Molly Pahn[1], Ziming Xuan[1], Eric Fleegler[2], and David Hemenway[3]*

[1]Department of Community Health Sciences, Boston University School of Public Health, Boston, MA, USA; [2]Division of Emergency Medicine, Boston Children's Hospital, Boston, MA, USA; [3]Harvard T.H. Chan School of Public Health, Boston, MA, USA.

**BACKGROUND:** Firearm injuries are a major cause of mortality in the USA. Few recent studies have simultaneously examined the impact of multiple state gun laws to determine their independent association with homicide and suicide rates.

**OBJECTIVE:** To examine the relationship between state firearm laws and overall homicide and suicide rates at the state level across all 50 states over a 26-year period.

**DESIGN:** Using a panel design, we analyzed the relationship between 10 state firearm laws and total, age-adjusted homicide and suicide rates from 1991 to 2016 in a difference-in-differences, fixed effects, multivariable regression model. There were 1222 observations for homicide analyses and 1300 observations for suicide analyses.

**PARTICIPANTS:** Populations of all US states.

**MAIN MEASURES:** The outcome measures were the annual age-adjusted rates of homicide and suicide in each state during the period 1991–2016. We controlled for a wide range of state-level factors.

**KEY RESULTS:** Universal background checks were associated with a 14.9% (95% CI, 5.2–23.6%) reduction in overall homicide rates, violent misdemeanor laws were associated with a 18.1% (95% CI, 8.1–27.1%) reduction in homicide, and "shall issue" laws were associated with a 9.0% (95% CI, 1.1–17.4%) increase in homicide. These laws were significantly associated only with firearm-related homicide rates, not non-firearm-related homicide rates. None of the other laws examined were consistently related to overall homicide or suicide rates.

**CONCLUSIONS:** We found a relationship between the enactment of two types of state firearm laws and reductions in homicide over time. However, further research is necessary to determine whether these associations are causal ones.

*KEY WORDS:* community health; firearms; health policy; injury; prevention; public health.

J Gen Intern Med 34(10):2021–8
DOI: 10.1007/s11606-019-04922-x
© Society of General Internal Medicine 2019

*Electronic supplementary material* The online version of this article (https://doi.org/10.1007/s11606-019-04922-x) contains supplementary material, which is available to authorized users.

*Received January 30, 2018*
*Revised August 21, 2018*
*Accepted January 10, 2019*
*Published online March 28, 2019*

## INTRODUCTION

From 1991 to 2016, the average annual firearm death rate in the USA was 11.4 per 100,000 individuals.[1] This amounts to 859,871 lives lost due to a single cause of preventable death over a 26-year period.[1] Although numerous studies have evaluated the impact of state firearm laws on homicide or suicide rates (Online Supplemental Tables S1, S2), a major limitation is that most examined the impact of only one type of policy. Because states that enact one type of law are also more likely to enact others,[2] it is difficult to isolate the effect of one law without considering the simultaneous impact of other policies.

To improve our ability to draw causal inferences, a stronger study design would examine the relationship between the enactment of *multiple* types of state firearm laws over time and differences in fatality rates between states. However, we are aware of only one multi-year panel study of homicide rates that examined multiple laws and included data from the past decade; this study was conducted at the level of urban counties, and only 34 states were included.[3] We are not aware of any panel study at the state level that used data within the past decade to assess simultaneously the effect of multiple state firearm laws on homicide or suicide death rates.

One reason why many previous studies have focused on a single type of law is the absence of a comprehensive national database of state firearm laws. For most previous studies, researchers had to track down the status of state firearm laws by conducting their own legal research, a painstaking process that precluded a single study of a large range of gun-related policies. We recently created a novel database in which we recorded, quantified, and classified the largest-to-date compilation of firearm provisions by state over a 26-year period.[2] In this study, we examine the simultaneous impact of 10 different types of state firearm laws on overall homicide and suicide rates over a 26-year period using the same model specification.

## METHODS

### Data Sources

We ascertained the annual presence or absence of 10 state firearm laws in all 50 states from 1991 to 2016 using the State Firearm Law Database, which provides a panel of firearm-related laws in each state, for each year.[2] The database was

compiled using the Thompson Reuters Westlaw database of state statutes and session laws and a database assembled by Everytown for Gun Safety.[4]

We obtained homicide and suicide mortality data from the Centers for Disease Control and Prevention Web-Based Injury Statistics Query and Reporting System (WISQARS), which are derived from the vital statistics death registry of the National Center for Health Statistics.[1] WISQARS reports annual state-specific, age-adjusted fatality rates for homicide and suicide.

## Study Population

We assembled annual, state-specific age-adjusted total homicide and suicide rates in each state from 1991 to 2016. We excluded homicides due to legal intervention (1% of firearm deaths), unintentional firearm fatalities (2.5% of firearm deaths), and fatalities of undetermined intent (1% of firearm deaths) from our analysis.

## Outcome Measures

The main outcome measures were the annual, age-adjusted homicide rate and age-adjusted suicide rate in each state over the study period. Because there were 50 states and 26 years, the total number of possible observations was 1300. However, the CDC does not report death rates when the absolute number of deaths in a state during a given year is less than 10. For this reason, we did not have a complete panel of homicide data for three states: North Dakota, Vermont, and Wyoming. We therefore excluded these states from the homicide analyses, yielding a total of 1222 observations. There were no missing data for suicide death rates, so there were 1300 observations for analyses involving this outcome.

## Main Predictor Variables

From the state law database, we selected 10 laws to analyze based on several considerations: (1) laws that are currently being considered by state legislatures; (2) laws that have been examined in prior research; and (3) laws that were enacted by at least two states during the study period. We analyzed the following 10 laws (defined in detail in Table 1): (1) universal background checks, either through point-of-purchase checks or a permit to purchase requirement; (2) ban on handgun possession for people convicted of a violent misdemeanor; (3) age 21 limit for handgun possession; (4) "shall issue" laws; (5) permitless carry laws; (6) prohibition against gun trafficking; (7) ban on "junk guns"; (8) "stand your ground" laws; (9) assault weapons ban; and (10) ban on large-capacity ammunition magazines. Laws were lagged by 1 year in the analysis; that is, we considered the potential effect of a law only in the full first year after its enactment.

## Data Analysis

Unlike many earlier analyses in the public health literature, we employed a difference-in-differences approach to the analysis of policy outcomes,[5, 6] an approach that is widely used in the econometric and criminology literature on the effect of state firearm laws and was first introduced by Lott and Mustard in their classic 1997 paper.[7] Using multivariable linear regression, we evaluated the association between the firearm law provisions in each state (which were time-varying) and the homicide and suicide rates over the study period, while controlling for several other time-varying state-level factors. We included year and state fixed effects and estimated cluster-robust standard errors, which account for the clustering of observations, serial autocorrelation, and heteroskedasticity.[8] By including state fixed effects, our analysis focuses on the time series of observations within each state, comparing changes in homicide or suicide rates within a state from before to after the implementation of a particular firearm law, using states without that law as controls. Because the outcome variables are not normally distributed but skewed, we log-transformed the homicide and suicide rates.

Our final model was as follows:

$$ln\,(\mu_{st}) = \alpha + (B_*LAW_{st}) + (C_*CONTROL_{st}) + S + T + e,$$

where $\mu_{st}$ is the homicide or suicide rate in state $s$ in year $t$, $LAW_{st}$ is a dummy variable for the presence or absence of a particular state firearm law in state $s$ in year $t$, $CONTROL_{st}$ is a vector of control variables, $S$ represents state fixed effects, and $T$ represents year fixed effects.

We controlled for the following time-varying state-level factors, chosen because of their association with homicide or suicide rates in the published literature and their association with both death rates and the adoption of firearm laws in our data set: (1) the percent of the population that is black; (2) the percent of population ages 15–29 that is male; (3) per capita law enforcement officers; (4) the violent crime rate (excluding homicide); (5) the divorce rate; (6) the unemployment rate; (7) the poverty rate; (8) per capita alcohol consumption; (9) the incarceration rate; (10) population density; (11) log of population; and (12) household gun ownership percentage.

Because annual survey data of household gun ownership at the state level are not available, most previous studies have used the ratio of firearm suicides to all suicides (FS/S) as a proxy for household firearm ownership.[9] This proxy is highly correlated ($r = 0.80$) with state-specific measures of firearm ownership on a cross-sectional basis.[10] Recently, we developed a new proxy measure that improves the correlation with survey-measured gun ownership from 0.80 to 0.95.[10] This new proxy measure incorporates a state's hunting license rate in addition to FS/S.[10] In this study, we used this new proxy.

Per capita law enforcement officers and violent crime rates were obtained from the FBI Uniform Crime Reports;[11] incarceration rates were obtained from the Bureau of Justice Statistics;[12] and per capita alcohol consumption was obtained from the National Institute on Alcohol Abuse and Alcoholism (NIAAA) for 1991–2015[13] and from Statistica[14] for 2016. Hunting licensing data were obtained from the U.S. Fish and Wildlife Service.[15] The remaining variables were obtained

**Table 1** Description of State Firearm Laws Examined

| Law | Brief description | Detailed description | States with law in 1991 | Additional states with law in 2016 | Law changes from 1991 to 2016 |
|---|---|---|---|---|---|
| Universal background checks | Background checks conducted through permit requirement for all firearm sales or through required background checks for all sales) | Individuals must undergo a background check to purchase any type of firearm, either at the point of purchase or through a license/permit application. This may or may not include exemptions for buyers who have already undergone a background check for a concealed carry permit or other licensing requirements. | CA, IL, MA, NJ, RI | CO, CT, DE, HI, NY, OR, WA | 7 |
| Violent misdemeanor is prohibiting for handgun possession | Handgun possession is prohibited for people who have committed a violent misdemeanor punishable by less than 1 year of imprisonment | Must cover possession of handguns, not just purchase. Must cover assault, not just aggravated assault. Must extend beyond domestic violence-related misdemeanors, restraining orders, and stalking. Must not require that misdemeanor be punishable by imprisonment of more than 1 year. Must not require that misdemeanor involve use of a firearm or result in injury. | CA, HI, NY | CT, MD | 2 |
| Age 21 limit for handgun possession | No possession of handguns until age 21 | You must be 21 to possess a handgun. No exemption for parental consent. Exclusions for adult-supervised hunting, sporting, or training activities are OK. Exception for possession on private premises NOT OK unless minor required to be under adult supervision. | IA, RI, SC | CT, HI, MD, MA, NJ, NY (SC repealed) | 7 |
| Shall issue law | Law provides no discretion to law enforcement authorities in deciding whether to grant a concealed carry permit. | A permit must be issued unless the applicant meets pre-established disqualifying criteria. | FL, GA, ID, IN, IA, ME, MS, MT, NH, ND, OR, PA, SD, WA, WV | AL, AR, CO, IL, KY, LA, MI, MN, MO, NE, NV, NM, NC, OH, OK, SC, TN, TX, UT, VA, WA, WI (WV moved to permitless carry) | 23 |
| Permitless carry | No permit is required to carry a concealed handgun. | Age restrictions may apply, and a voluntary permitting system may still be in place. | VT | AK, AZ, ID, KS, ME, MS, WV, WY | 8 |
| Trafficking prohibited | No person may purchase a firearm with the intent to re-sell to a person who is prohibited from buying or possessing a firearm | The law prohibits the purchase of a firearm with the intent to re-sell to a prohibited person. We make no distinction between whether the trafficker (original purchaser) must actually know or have reason to believe that the buyer is prohibited. An exemption for sale to relatives is acceptable. | FL, MA, ND, OH, VA | CA, CO, CT, DE, IL, MN, NY, UT, VA | 9 |
| Junk gun ban | Ban on junk guns (sometimes called "Saturday night specials") | The law prohibits the sale of handguns that fail to meet one or more of the following requirements: (1) Passes drop testing and firing testing; (2) Passes a melting point test; (3) Possesses specific handgun safety features; (4) Appears on a list of approved handguns. This may or may not apply to private sellers. | HI, IL, MD, MN, SC | CA, MA (SC repealed) | 3 |
| Stand your ground law | A "stand your ground" law is in place | Use of deadly force is allowed to be a first resort if you are threatened in a public place in which you have the right to be present. There is no duty to retreat. Does not count as stand your ground law if it only | None | AL, AK, AZ, FL, GA, IN, KS, KY, LA, MI, MS, MO, MT, NV, NH, NC, OK, PA, SC, SD, TN, TX, UT, WV | 24 |

*(continued on next page)*

**Table 1. (continued)**

| Law | Brief description | Detailed description | States with law in 1991 | Additional states with law in 2016 | Law changes from 1991 to 2016 |
|---|---|---|---|---|---|
| Assault weapons ban | Ban on sale of assault weapons beyond just assault pistols | applies when person is in a vehicle. Law bans the sale of both assault pistols and other assault weapons. | CA, NJ | CT, MD, MA, NY | 4 |
| Large capacity ammunition magazine ban | Ban on sale large capacity magazines beyond just ammunition for pistols | Law bans the sale of both assault pistol ammunition and other large-capacity magazines. | NJ | CA, CO, CT, MD, MA, NY | 6 |

from the U.S. Census. We conducted the analysis using Stata version 15 (StataCorp LP, College Station, TX).

Because the outcome variables are log-transformed, the regression coefficients can be interpreted as the percentage change in the firearm homicide or suicide rate associated with the presence of a particular law by exponentiating the coefficient, subtracting 1, and then multiplying by 100 (i.e., a coefficient of 0.10 for a given law would indicate a 10.5% increase in the mortality rate associated with that law).

To test the plausibility of any observed associations between firearm laws and overall homicide or suicide rates, we conducted a falsification test: we analyzed the relationship between these laws and firearm compared to non-firearm mortality rates. These laws would be expected to primarily affect only the firearm-related rates.

In a final sensitivity analysis, we modeled the secular time trend in firearm homicide or suicide rates by including year as a continuous variable in the model rather than as a fixed effect.

## RESULTS

Over the 26-year study period, there was a substantial variation in the violent death rates across states. In 2016, overall homicide rates ranged from a low of 1.3 per 100,000 in Maine and New Hampshire to a high of 14.2 per 100,000 in Louisiana (Table 2). In 2016, overall suicide rates ranged from a low of 7.2 per 100,000 in New Jersey to a high of 26.0 per 100,000 in Montana. Across the study period, there were a total of 93 law changes among the 10 laws studied (Table 1).

When examined individually, universal background checks and violent misdemeanor laws were significantly associated with lower overall homicide rates and "shall issue" laws were significantly associated with higher homicide rates (Table 3). After simultaneously controlling for all 10 firearm laws, universal background checks were associated with 14.9% lower overall homicide rates (95% confidence interval [CI], 5.2%–23.6%); violent misdemeanor laws were associated with 18.1% lower homicide rates (95% CI, 8.1–27.1%); and "shall issue" laws were associated with 9.0% higher homicide rates (95% CI, 1.1%–17.4%). None of the other seven laws were significantly associated with overall homicide rates. In a

falsification test, each of these three laws was found to be significantly associated only with the firearm-related homicide rate, not the non-firearm-related homicide rate (Online Supplemental Table S3).

In the fully adjusted model, household gun ownership was not associated with overall rates of homicide (Table 3). Factors that were significant positive predictors of overall homicide rates were the percentage of males, the violent crime rate, and population density. Overall population was negatively associated with homicide rates.

When examined individually, four of the 10 firearm laws were significantly associated with overall suicide rates (Table 4). However, after simultaneously controlling for all 10 firearm laws, only two laws were significantly related to suicide rates: bans on junk guns were associated with 6.4% lower suicide rates (95% CI, 3.5–9.2%) and permitless carry laws were associated with 5.1% higher suicide rates (95% CI, 0.2–10.4%). Both laws failed the falsification test, as both were significantly related to non-firearm as well as firearm homicide rates (Online Supplemental Table S4). None of the other laws were significantly associated with overall suicide rates.

In the fully adjusted model, household gun ownership was not associated with overall rates of suicide (Table 4). Factors that were significant positive predictors of suicide rates were the violent crime rate, unemployment rate, poverty rate, and per capita alcohol consumption. Overall population was negatively related to suicide rates.

Entering year as a continuous variable instead of as a fixed effect had no appreciable impact on the results (Online Supplemental Table S5).

## DISCUSSION

To the best of our knowledge, this is the first study using data from within the past decade to simultaneously model the effect of multiple state firearm laws on homicide and suicide rates at the state level using a multi-year panel design. Using a difference-in-differences analysis, we found that laws requiring universal background checks and those prohibiting firearm possession by people with a conviction for a violent

Case 3:19-cv-01226-L-AHG   Document 34-11   Filed 01/03/20   PageID.7894   Page 261 of 305

JGIM    Siegel et al.: The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: a Panel Study    2025

**Table 2  Status of State Firearm Laws and Violent Death Rates, 2016**

| State | UBC | VM | 21 | SI | PC | TP | JG | SYG | AW | LCM | Age-adjusted overall homicide rate (per 100,000) | Age-adjusted overall suicide rate (per 100,000) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Louisiana | | | | √ | | | | √ | | | 14.2 | 14.1 |
| Mississippi | | | | | √ | | | √ | | | 12.0 | 12.7 |
| Alabama | | | | √ | | | | √ | | | 11.8 | 15.6 |
| Maryland | | √ | √ | | | | √ | | √ | √ | 10.0 | 9.3 |
| Missouri | | | | √ | | | | | | | 9.9 | 18.3 |
| New Mexico | | | | √ | | | | | | | 9.5 | 22.5 |
| Illinois | √ | | | √ | | √ | √ | | | | 9.2 | 10.7 |
| South Carolina | | | | √ | | | | √ | | | 9.0 | 15.7 |
| Tennessee | | | | √ | | | | √ | | | 8.7 | 16.3 |
| Arkansas | | | | √ | | | | | | | 8.7 | 18.2 |
| Oklahoma | | | | √ | | | | √ | | | 8.6 | 20.9 |
| Georgia | | | | √ | | | | √ | | | 7.9 | 13.3 |
| Alaska | | | | | √ | | | √ | | | 7.5 | 25.4 |
| Indiana | | | | √ | | | | √ | | | 7.5 | 15.4 |
| North Carolina | | | | √ | | | | √ | | | 7.4 | 13.0 |
| Nevada | | | | √ | | | | √ | | | 7.4 | 21.4 |
| Kentucky | | | | √ | | | | √ | | | 7.1 | 16.8 |
| Delaware | √ | | | | | √ | | | | | 7.0 | 11.5 |
| Florida | | | | √ | | √ | | √ | | | 6.8 | 13.9 |
| Michigan | | | | √ | | √ | | √ | | | 6.6 | 13.3 |
| Ohio | | | | √ | | | | | | | 6.5 | 14.1 |
| West Virginia | | | | | √ | | | √ | | | 6.3 | 19.5 |
| Arizona | | | | | √ | | | √ | | | 6.3 | 17.6 |
| Pennsylvania | | | | √ | | | | √ | | | 6.0 | 14.7 |
| Texas | | | | √ | | | | √ | | | 6.0 | 12.6 |
| Virginia | | | | √ | | √ | | √ | | | 5.5 | 13.2 |
| Kansas | | | | | √ | | | √ | | | 5.3 | 17.9 |
| California | √ | √ | | | | √ | √ | | √ | √ | 5.2 | 10.5 |
| Wisconsin | | | | √ | | | | | | | 4.8 | 14.6 |
| South Dakota | | | | | | | | √ | | | 4.7 | 20.5 |
| New Jersey | | | √ | | | | | | √ | √ | 4.6 | 7.2 |
| Montana | | | | √ | | | | √ | | | 4.3 | 26.0 |
| Colorado | √ | | | | | √ | | | | √ | 4.2 | 20.5 |
| New York | √ | √ | √ | | | √ | | | √ | √ | 3.5 | 8.1 |
| Nebraska | | | | √ | | | | | | | 3.3 | 13.0 |
| Oregon | √ | | | √ | | | | | | | 3.2 | 17.8 |
| Wyoming | | | | | √ | | | | | | 3.0 | 25.2 |
| Washington | | | | √ | | | | | | | 2.9 | 14.8 |
| Iowa | | | √ | √ | | | √ | | | | 2.8 | 14.5 |
| Hawaii | √ | √ | √ | | | | | | | | 2.8 | 12.0 |
| Connecticut | √ | √ | | | | √ | | √ | √ | √ | 2.6 | 10.0 |
| Utah | | | | √ | | √ | | √ | | | 2.5 | 21.8 |
| Minnesota | | | | √ | | | √ | | | | 2.4 | 13.2 |
| Rhode Island | √ | | √ | | | | | | | | 2.3 | 11.1 |
| North Dakota | | | | √ | | | | | | | 2.2 | 19.0 |
| Massachusetts | √ | | √ | | | √ | | √ | √ | √ | 2.0 | 8.7 |
| Idaho | | | | | √ | | | | | | 2.0 | 21.3 |
| Vermont | | | | | √ | | | | | | 1.9 | 17.3 |
| New Hampshire | | | | √ | | | | √ | | | 1.3 | 17.3 |
| Maine | | | | | √ | | | | | | 1.3 | 15.7 |

*Includes the following 10 laws: UBC, universal background checks; VM, violent misdemeanor prohibitor; 21, age 21 limit for handgun purchase; SI, shall issue; PC, permitless carry; TP, trafficking prohibited; JG, junk gun ban; SYG, stand your ground law; AW, assault weapons ban; LCM, large capacity magazine ban*

misdemeanor were associated with significant reductions in the overall homicide rate, while "shall issue" laws were associated with a significant increase in the homicide rate. There was no significant association between homicide and the other laws studied, and we did not find consistent relationships between any of the laws and overall suicide rates.

This study has several strengths. First, it is one of the first studies to clearly define each law with attention to the detailed provisions of the law, including its scope, exceptions, and exemptions. One reason for some of the conflicting results of previous studies (Online Supplemental Tables S1, S2) may be the inconsistent definition of state statutes.

Second, using a difference-in-differences approach helps to address the major threat to validity in this type of research: states with lower homicide rates to begin with may be more likely to enact stronger gun laws. By including state and year fixed effects, we are using a "within-estimator" that assesses differences within states over time.[5, 6] Studies that do not include state fixed effects are also assessing differences across states at a given time ("between effects"), which may reflect different propensities of states with lower or higher homicide rates to enact laws, rather than law effects. Thus, the difference-in-differences approach is less subject to the possibility of "reverse causation" (i.e., it is the level of the homicide

**Table 3  Linear Regression Model Results: Factors Affecting Homicide Rates, 1991–2016**

| | Regression coefficient for state firearm laws entered one at a time (95% CI) | Regression coefficient, fully adjusted model [all laws entered together] (95% CI) |
|---|---|---|
| Percent black | | 0.043 (−0.004, 0.089) |
| Percent male among population ages 15–29 | | *0.100\* (0.021, 0.179)* |
| Per capita law enforcement officers | | −0.023 (−0.079, 0.033) |
| Violent crime rate | | *0.054\* (0.026, 0.081)* |
| Divorce rate | | −0.030 (−0.066, 0.005) |
| Unemployment rate | | 0.002 (−0.015, 0.019) |
| Poverty rate | | 0.002 (−0.005, 0.010) |
| Per capita alcohol consumption | | 0.138 (−0.021, 0.298) |
| Incarceration rate (per 1000 population) | | −0.025 (−0.058, 0.008) |
| Population density (per 0.1 mile²) | | *0.032\* (0.010, 0.054)* |
| Log of population | | *−0.629\* (−1.081, −0.177)* |
| Proxy for household gun ownership percentage | | 0.001 (−0.004, 0.007) |
| **Firearm laws** | | |
| Universal background checks | −0.173\* (−0.299, −0.048) | −0.161\* (−0.269, −0.053) |
| Violent misdemeanor is prohibiting for handgun possession | −0.155\* (−0.276, −0.033) | −0.200\* (−0.316, −0.084) |
| Age 21 limit for handgun possession | −0.117 (−0.245, 0.010) | −0.068 (−0.200, 0.064) |
| Shall issue law | *0.082\* (0.018, 0.146)* | *0.086\* (0.011, 0.160)* |
| Permitless carry law | −0.063 (−0.152, 0.027) | 0.015 (−0.101, 0.131) |
| Trafficking prohibited | −0.045 (−0.133, 0.044) | 0.005 (−0.050, 0.061) |
| Junk gun ban | −0.028 (−0.177, 0.121) | −0.010 (−0.136, 0.116) |
| Stand Your Ground law | 0.020 (−0.042, 0.083) | 0.009 (−0.050, 0.067) |
| Ban on assault weapons | −0.143 (−0.300, 0.013) | −0.092 (−0.222, 0.039) |
| Ban on large capacity ammunition magazines | −0.089 (−0.205, 0.027) | 0.038 (−0.036, 0.112) |
| $R^2$ | | 0.94 |

Outcome variable is the log of the age-adjusted total homicide rate. All models include year and state fixed effects. Standard errors are robust and adjusted for state-level clustering
*CI, confidence interval*
*\*Coefficient is statistically significant from zero ($p < 0.05$). Also shown in italic*

rates that are affecting the law enactment, not the other way around). The inclusion of state fixed effects has the added advantage of controlling for any differences between states in time-invariant factors.

Third, including a large panel of time-varying state factors as independent variables helps address the problem of omitted variable bias. Nevertheless, it is still possible that states which were experiencing large declines in homicide were more likely to enact a particular law; even the within-estimator may not be sufficient to rule out the possibility of reverse causation.

Our finding of a negative association between universal background checks (including permit requirements) and homicide rates is consistent with several other studies.[3, 16–20] Our finding of a negative association between violent misdemeanor laws and homicide rates is consistent with one other recent study, which reported a 24% reduction in intimate partner homicide in states with these laws.[21] However, caution should be exercised when interpreting this finding because only two states implemented violent misdemeanor laws during the study period. While historically the literature on the impact of concealed carry–permitting laws has been inconsistent and several studies have found an association between "shall issue" laws and reduced murder rates,[7, 22–29] the three most recent studies to examine these laws found a positive association with homicide rates.[3, 30, 31]

Our finding that there was no association between stand your ground laws and homicide rates conflicts with the findings of two previous studies on these laws.[32, 33] However, both of these studies examined only the decade of 2000–2010.

When we restrict our analysis to that decade, we obtain similar results.

A second important finding of this study is that changes in household gun ownership were not found to be significantly associated with homicide or suicide rates, a result that differs from several previous studies.[34, 35] The discrepancy in these results could possibly be due to our inclusion of state fixed effects. It is possible that although there is a strong cross-sectional relationship between the prevalence of firearm ownership and homicide and suicide rates, small changes in firearm ownership that are observed over time are not sufficient enough to result in measurable differences in overall population homicide or suicide rates. Even if we had survey-based measures of household gun ownership, the margin of error is probably greater than the actual change in gun ownership levels from year to year. There is too much noise in our measure of gun ownership and too little variability in true levels of household gun ownership to determine if changes in gun ownership are related to differences in homicide or suicide rates. Few of the previous studies included state fixed effects. Because of the conflict with the existing literature, further study is required before any definitive conclusion is drawn.

It is important to note that the absence of an observed association of a law and overall homicide or suicide rates does not necessarily mean that these laws are ineffective. It may also be that the laws are not broad enough to affect overall population death rates or that the laws are not being adequately enforced.

JGIM    *Siegel et al.: The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: a Panel Study*    **2027**

**Table 4  Linear Regression Model Results: Factors Affecting Suicide Rates, 1991–2016**

| | Regression Coefficient for State Firearm Laws Entered One at a Time (95% CI) | Regression Coefficient, Fully Adjusted Model [All Laws Entered Together] (95% CI) |
|---|---|---|
| Percent black | | −0.015 (−0.033, 0.003) |
| Percent male among population ages 15–29 | | 0.018 (−0.014, 0.049) |
| Per capita law enforcement officers | | 0.006 (−0.015, 0.027) |
| Violent crime rate | | *0.018* (0.007, 0.029) |
| Divorce rate | | −0.008 (−0.028, 0.012) |
| Unemployment rate | | *0.008* (0.001, 0.016) |
| Poverty rate | | *0.004* (0.000, 0.007) |
| Per capita alcohol consumption | | *0.075* (0.012, 0.138) |
| Incarceration rate (per 1000 population) | | 0.007 (−0.011, 0.025) |
| Population density (per 0.1 mile$^2$) | | −0.001 (−0.010, 0.007) |
| Log of population | | *−0.349* (−0.601, −0.097) |
| Proxy for household gun ownership percentage | | 0.001 (−0.001, 0.003) |
| Firearm laws | | |
| Universal background checks | 0.008 (−0.034, 0.050) | −0.010 (−0.033, 0.053) |
| Violent misdemeanor is prohibiting for handgun possession | −0.024 (−0.064, 0.016) | −0.043 (−0.090, 0.004) |
| Age 21 limit for handgun possession | *−0.040* (−0.078, −0.001) | −0.030 (−0.070, 0.010) |
| Shall issue law | 0.000 (−0.025, 0.024) | 0.004 (−0.022, 0.029) |
| Permitless carry law | *0.063* (0.006, 0.120) | *0.050* (0.002, 0.099) |
| Trafficking prohibited | −0.013 (−0.047, 0.021) | −0.002 (−0.043, 0.038) |
| Junk gun ban | *−0.074* (−0.101, −0.047) | *−0.066* (−0.097, −0.036) |
| Stand Your Ground law | −0.014 (−0.033, 0.006) | −0.018 (−0.037, 0.001) |
| Ban on assault weapons | −0.037 (−0.081, 0.006) | 0.001 (−0.063, 0.066) |
| Ban on large-capacity ammunition magazines | *−0.052* (−0.099, −0.005) | −0.004 (−0.053, 0.046) |
| $R^2$ | | 0.94 |

Outcome variable is the log of the age-adjusted total suicide rate. All models include year and state fixed effects. Standard errors are robust and adjusted for state-level clustering
CI confidence interval
*Coefficient is statistically significant from zero (p < 0.05). Also shown in italic

Several other limitations deserve mention. First, the firearm ownership proxy has been validated with cross-sectional data, but not with longitudinal data.[36] It is not clear whether this proxy is able to accurately measure changes in household gun ownership over time.

Second, while we controlled for a range of state-level factors associated with homicide death rates, there may be unidentified omitted variables. For example, in the early 1990s, firearm homicide rates were very high in many cities, seemingly related to the crack cocaine epidemic.[37, 38] Nevertheless, when we restrict the analysis to the period 2000–2016, our results remain essentially unchanged, although the precision of the estimates decreases.

Third, we accounted only for the presence or absence of firearm law provisions, not for the implementation and enforcement of these laws. Fourth, trying to incorporate the most important explanatory variables in a large regression almost invariably leads to some multicollinearity. For example, when we use all the other independent variables to explain variations in the gun ownership proxy, the adjusted $R^2$ is 0.69.

Finally, we do not disaggregate homicide rates by the age or other characteristics of either the offender or victim, which could mask the effect of laws intended to affect a particular subpopulation. For example, age restrictions on gun possession would only be expected to affect youth suicide rates, not adult rates.

In conclusion, this study provides evidence that universal background checks and laws prohibiting gun ownership by people with a history of a violent misdemeanor are associated with lower overall homicide rates, while laws that provide no

discretion to law enforcement officials in approving concealed carry permits are associated with higher homicide rates. Further research on the impact of state firearm laws is necessary to assess causality and should rely upon detailed definitions of each law.

**Corresponding Author:** *Michael Siegel, Department of Community Health Sciences, Boston University School of Public Health, 801 Massachusetts Avenue, 4th Floor, Boston, MA 02118, USA (e-mail: mbsiegel@bu.edu).*

**Funding Information** Support for this research was provided by the Robert Wood Johnson Foundation, Evidence for Action Program (grant 73337).

**Compliance with Ethical Standards:**

**Conflict of Interest:** The authors declare that they do not have a conflict of interest.

**Disclaimer:** The views expressed here do not necessarily reflect the views of the Robert Wood Johnson Foundation.

## REFERENCES

1. Centers for Disease Control and Prevention. Web-based Inquiry Statistics Query and Reporting System (WISQARS). Atlanta, GA: National Center for Injury Prevention and Control; 2018. https://webappa.cdc.gov/sasweb/ncipc/mortrate.html. Accessed 14 Dec 2018.
2. **Siegel M, Pahn M, Xuan Z**, et al. Firearm-related laws in all 50 US states, 1991–2016. Am J Public Health. 2017;107(7):1122–9.

3. **Crifasi CK**, **Merrill-Francis M**, **McCourt A**, et al. Association between firearm laws and homicide in urban counties. J Urban Health. 2018;95(3):383–90.

4. Everytown for Gun Safety. Gun law navigator. New York: Everytown for Gun Safety; 2018. https://everytownresearch.org/navigator/index.html. Accessed 14 Dec 2018.

5. **Wooldridge JM**. Introductory Econometrics: a Modern Approach (5th edition). Mason, OH: South-Western Cengage Learning; 2013.

6. **Wooldridge JM**. Econometric analysis of cross section and panel data (2nd edition). Cambridge, MA: MIT Press; 2010.

7. **Lott JR**, **Mustard DB**. Crime, deterrence, and right-to-carry concealed handguns. J Legal Stud. 1997;26:1–67.

8. **White H**. A heteroskedasticity-consistent covariance matrix estimator and a direct test for heteroskedasticity. Econometrica. 1980;48(4):817–38.

9. **Azrael D**, **Cook PJ**, **Miller M**. State and local prevalence of firearm ownership: measurement, structure, and trends. J Quant Criminol. 2004;20(1):43–62.

10. **Siegel M**, **Ross CS**, **King C**. A new proxy measure for state-level gun ownership in studies of firearm injury prevention. Inj Prev. 2014;20:204–7.

11. Federal Bureau of Investigation. Uniform crime reporting statistics. Washington, DC: U.S. Department of Justice; 2016. http://www.ucrdatatool.gov. Accessed 14 Dec 2018.

12. U.S. Bureau of Justice Statistics. Prison Population Counts. Washington, DC: U.S. Department of Justice; 2018. http://www.bjs.gov/index.cfm?ty=tp&tid=131. Accessed 14 Dec 2018.

13. **LaVallee, RA**, **Yi H**. Apparent per capita alcohol consumption: national, state, and regional trends, 1977–2010. Arlington, VA: CSR, Incorporated and National Institute on Alcohol Abuse and Alcoholism; 2012.

14. Statista. Alcohol consumption per capita from all beverages in the U.S. in 2016, by state. New York: Statistica; 2018. https://www.statista.com/statistics/442848/per-capita-alcohol-consumption-of-all-beverages-in-the-us-by-state/. Accessed 14 Dec 2018.

15. U.S. Fish & Wildlife Service. Historical hunting license data. http://wsfrprograms.fws.gov/Subpages/LicenseInfo/Hunting.htm. Accessed 14 Dec 2018.

16. **Fleegler EW**, **Lee LK**, **Monuteaux MC**, **Hemenway D**, **Mannix R**. Firearm legislation and firearm-related fatalities in the United States. JAMA Intern Med. 2013;173(9):732–40.

17. **Rudolph KE**, **Stuart EA**, **Vernick JS**, **Webster DW**. Association between Connecticut's permit-to-purchase handgun law and homicides. Am J Public Health. 2015;105(8):e49–54.

18. **Webster D**, **Crifasi CK**, **Vernick JS**. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. J Urban Health. 2014;91(2):293–302.

19. **Sumner SA**, **Layde PM**, **Guse CE**. Firearm death rates and association with level of firearm purchase background check. Am J Prev Med. 2008;35(1):1–6.

20. **Ruddell R**, **Mays GL**. State background checks and firearms homicides. J Crim Justice. 2005;33:127–36.

21. **Zeoli AM**, **McCourt A**, **Buggs S**, **Frattaroli S**, **Lilley D**, **Webster DW**. Analysis of the strength of legal firearm restrictions for perpetrators of domestic violence and their association with intimate partner homicide. Am J Epidemiol. 2018;187(7): 1449–55.

22. **Gius M**. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. Appl Econ Lett. 2014;21(4):265–7.

23. **Moody CE**, **Marvell TB**, **Zimmerman PR**, **Alemante F**. The impact of right-to-carry laws on crime: an exercise in replication. Review of Economics & Finance. 2014;4(1):33–43.

24. **Lott JR**. More guns, less crime: understanding crime and gun-control laws. Chicago, IL: The University of Chicago Press; 2010.

25. **Olson DE**, **Maltz MD**. Right-to-carry concealed weapon laws and homicide in large U.S. counties: the effect on weapon types, victim characteristics, and victim-offender relationships. J Law Econ. 2001;44:747–70.

26. **Lott JR, Jr.**, **Whitley JE**. Safe-storage gun laws: accidental deaths, suicides, and crime. J Law Econ. 2001;44:659–89.

27. **Dezhbakhah H**, **Rubin PH**. Lives saved or lives lost? The effects of concealed-handgun laws on crime. AEA Papers and Proceedings. 1998;88(2):468–74.

28. **Bronars SG**, **Lott JR**, Jr. Criminal deterrence, geographic spillovers, and the right to carry concealed handguns. AEA Papers and Proceedings. 1998;88(2):475–9.

29. **Lott JR, Whitley JE**. Abortion and crime: unwanted children and out-of-wedlock births. Econ Inquiry. 2006;45:304–24.

30. **Donohue JJ**, **Aneja A**, **Weber KD**. Right-to-carry laws and violent crime: a comprehensive assessment using panel data, the LASSO, and a state-level synthetic controls analysis. NBER working paper no. 23510. Cambridge, MA: National Bureau of Economic Research; 2017. http://www.nber.org/papers/w23510. Accessed 14 Dec 2018.

31. **Siegel M**, **Xuan Z**, **Ross CS**, et al. Easiness of legal access to concealed firearm permits and homicide rates in the United States. Am J Public Health. 2017;107(12):1923–9.

32. **McClellan CB**, **Tekin E**. Stand your ground laws, homicides, and injuries. NBER working paper no. 18187. Cambridge, MA: National Bureau of Economic Research; 2012. http://www.nber.org/papers/w18187. Accessed 14 Dec 2018.

33. **Cheng C**, **Hoekstra M**. Does strengthening self-defense law deter crime or escalate violence? Evidence from expansions to Castle Doctrine. J Hum Resour. 2013;48(3):821–54.

34. **Hepburn LM**, **Hemenway D**. Firearm availability and homicide: a review of the literature. Aggress Violent Behav. 2004;9(4):417–40.

35. **Miller M**, **Hemenway D**. The relationship between firearms and suicide: a review of the literature. Aggress Violent Behav. 1999;4(1):59–75.

36. **Kleck G**. Measures of gun ownership levels for macro-level crime and violence research. J Res Crime Delinq. 2004;41(1):3–36.

37. **Blumstein A**. **Rosenfeld R**. Explaining recent trends in US homicide rates. J Crim Law Criminol. 1998;88(4):1175–1216.

38. **Cook P**, **Laub J**. The unprecedented epidemic in youth violence. In Tonry M, ed. Crime and justice: an annual review of research. Chicago: University of Chicago Press; 1998:26–64.

**Publisher's Note** *Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.*

# EXHIBIT 63

Epidemiologic Reviews
© The Author 2016. Published by Oxford University Press on behalf of the Johns Hopkins Bloomberg School of Public Health.
All rights reserved. For permissions, please e-mail: journals.permissions@oup.com.

Vol. 38, 2016
DOI: 10.1093/epirev/mxv012
Advance Access publication:
February 10, 2016

# What Do We Know About the Association Between Firearm Legislation and Firearm-Related Injuries?

Julian Santaella-Tenorio*, Magdalena Cerdá, Andrés Villaveces, and Sandro Galea

* Correspondence to Dr. Julian Santaella-Tenorio, Department of Epidemiology, Mailman School of Public Health, Columbia University, 722 West 168th Street, Room 515, New York, NY 10032 (e-mail: js4222@cumc.columbia.edu).

Accepted for publication September 4, 2015.

Firearms account for a substantial proportion of external causes of death, injury, and disability across the world. Legislation to regulate firearms has often been passed with the intent of reducing problems related to their use. However, lack of clarity around which interventions are effective remains a major challenge for policy development. Aiming to meet this challenge, we systematically reviewed studies exploring the associations between firearm-related laws and firearm homicides, suicides, and unintentional injuries/deaths. We restricted our search to studies published from 1950 to 2014. Evidence from 130 studies in 10 countries suggests that in certain nations the simultaneous implementation of laws targeting multiple firearms restrictions is associated with reductions in firearm deaths. Laws restricting the purchase of (e.g., background checks) and access to (e.g., safer storage) firearms are also associated with lower rates of intimate partner homicides and firearm unintentional deaths in children, respectively. Limitations of studies include challenges inherent to their ecological design, their execution, and the lack of robustness of findings to model specifications. High quality research on the association between the implementation or repeal of firearm legislation (rather than the evaluation of existing laws) and firearm injuries would lead to a better understanding of what interventions are likely to work given local contexts. This information is key to move this field forward and for the development of effective policies that may counteract the burden that firearm injuries pose on populations.

death; firearms; homicide; legislation; suicide; weapons; wounds and injuries

Abbreviations: NCHS, National Center for Health Statistics; NFA, National Firearms Agreement; UCR, Uniform Crime Reports.

## INTRODUCTION

Firearms account for a substantial number of external causes of death across the world. In 2000, for example, it has been estimated that globally between 196,000 and 229,000 persons died from nonconflict firearm-related injuries (1). Global estimates from 2010 indicate that the rates of firearm homicides and unintentional firearm injuries for this year were 2.5 and 0.7 per 100,000, respectively (2). Although less clear estimates for global firearm suicide rates are available, among high-income countries, the United States has one of the highest rates (5.8 per 100,000) (3). In the United States, 31,672 persons died from firearm injuries in 2010, at an age-adjusted rate of 10.1 per 100,000, and this has remained relatively unchanged since 2000 (4, 5).

Governments around the world have adopted a range of approaches to regulate the access and use of firearms in the general population, aiming to reduce firearm-related crime and mortality rates (Table 1). The variety of laws is matched by the diversity of ways in which laws are implemented, the heterogeneity in law enforcement efforts, and the severity of penalties associated with legal violations.

This heterogeneity in approaches and implementation methods makes it critical to identify approaches that are less likely to be effective and to identify which strategies, looking forward, may be more likely to work (5–8). In addition, examining the associations between specific policies and firearm-related deaths across countries can improve our understanding about which types of laws are more likely to be successful in reducing firearm mortality rates in similar contexts or within diverse legal frameworks. This review aimed to examine the association between firearm-related laws and the rate of firearm-related suicides, homicides, and unintentional injuries and deaths worldwide. Previous literature reviews assessing this issue (6–11) have focused mainly on US studies.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

**Table 1.** Categorization of Firearm-Related Laws[a]

| Categories | Types of Laws |
|---|---|
| Use | Right to carry or shall issue laws |
| | Hunting laws |
| | Stand your ground and castle doctrine laws |
| | Ordinances against publicly firing a gun |
| Sales | Licensing and inspections of dealers |
| | Record-keeping requirements |
| | Background checks |
| | Waiting periods |
| | Requirement to report multiple sales |
| | One-handgun per month laws |
| | Zoning ordinances barring gun shows on public property |
| Ownership | Bans on purchases or possession by felons, youths, other presumably high-risk groups, and those with mental conditions |
| | Licensing for owners and permits for firearms |
| | Required training on safe firearm use |
| | Requirement to notify police of stolen firearms |
| Safer storage | Child access prevention laws |
| | Other safe storage requirements |
| Firearms and ammunition | Bans on automatic and semiautomatic firearms; high-capacity ammunition magazines; and inexpensive, poor-quality firearms (e.g., Saturday night specials) |
| Punishment for firearm offenders | Penalties and sentences for firearm misuse |
| Voluntary rendition of firearms | Firearm buyback programs |

[a] Adapted from Cook and Goss (146).

We conducted a systematic literature review of empirical studies directly assessing the association between firearm-related laws at the local, regional, and national levels and the rate of firearm-related homicides, suicides, and unintentional injuries/deaths. We defined firearm-related laws as any law on regulations or restrictions on the use, sale, ownership, storage of firearms, those banning specific types of firearms or ammunition, those modifying the penalties and sentences for firearm misuse, and those promoting voluntary rendition of firearms through buyback programs.

## METHODS

We reviewed peer-reviewed and non-peer-reviewed published studies between 1950 and 2014. Given the fact that laws are enacted and implemented in social contexts and are not controlled by researchers as in an experimental study, evidence of the consequences of these laws is likely to be generated from observational ecological cross-sectional or longitudinal studies. Although these studies have limitations related to confounding, the uncertainty of a temporal sequence, and

variation in the laws and enforcement across units of observation, they provide an alternative when it is not feasible to conduct randomized controlled trials for policy interventions. Therefore, our inclusion criteria included observational ecological studies examining the association between firearm-related laws and firearm-related suicides, homicides, and unintentional injuries/deaths at the national or local level. No randomized trials were available on this topic.

We searched the PubMed, Scopus, and Web of Knowledge databases to capture evidence from cross-sectional and longitudinal studies in diverse fields including the social, medical, political, and criminology sciences. We also searched for studies cited in previous literature reviews and books on this topic, as well as studies cited in the reference lists of the original articles identified through our search.

The search was conducted in the English language but covered studies in other languages (e.g., French, Spanish, or Portuguese) if abstracts were available in English so they could be detected in our search or if studies were cited in reviewed studies. We used keywords/Medical Subject Headings terms for the searches that included a combination of the following: 1) firearm terms (firearms, weapons, gun, handgun); 2) gun-control law terms (law enforcement, storage, trafficking, safety, carry, permit, ban, legislation, regulation, control, formal, background check, child safety locks, childproof handguns); and 3) health outcome terms (impact, assessment, trends, mortality, wounds, injuries, suicide, homicide). We also searched citations in primary studies and literature reviews on the topic.

We excluded studies that did not assess the association between firearm-related laws and homicides, suicides, or unintentional injuries/deaths; studies in which firearm deaths were reported as part of a combined outcome but specific results for firearm death rates were not reported; longitudinal studies reporting only average rate comparisons in pre/post law periods; or those reporting descriptive changes in rates but not using any statistical method to compare rates.

A total of 5,039 studies were retrieved by using the Medical Subject Headings/keywords terms in selected search engines: PubMed (n = 1,120), Scopus (n = 2,197), and Web of Science (n = 1,722). After exclusion of duplicates and those not meeting the inclusion or exclusion criteria after title screening (n = 2,861) and after reading the abstract or text (n = 852), a total of 90 primary studies were identified. In addition, we identified 40 articles cited in selected studies or in reviews that met our inclusion or exclusion criteria for a total of 130 primary studies. A description of the number of studies that were included or excluded in our study is presented in Figure 1.

Design suitability and quality of execution of studies were assessed following criteria from the *Guide to Community Preventive Services* (12, 13). Although there are other instruments, such as the environmental health perspectives tool or the Cochrane risk of bias assessment tool, we used the criteria from this *Guide* given its applicability to the evaluation of ecological studies and because it has been used to examine studies on the effectiveness of firearm laws (9). In this review, assessments of studies were conducted by one of the coauthors. Longitudinal prospective or retrospective cohort studies with a concurrent comparison group and multiple pre/post intervention measurements were classified as having "greatest" design

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019



**Figure 1.** Process of selecting studies examining the effects of firearm-related laws with firearm homicides, suicides, and unintentional deaths.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

suitability; longitudinal studies without a concurrent comparison group but with multiple pre/post intervention measurements were classified as "moderate"; and cross-sectional studies or longitudinal studies without a concurrent comparison group and with only single pre/post intervention measurements or with only postintervention measurements were classified as "least" design suitability (Web Table 1 available at http://aje. oxfordjournals.org/). Potential limitations that could threaten the internal validity of studies are also presented in Web Table 1 (a description of limitations is provided in Table 2).

The reporting and description of findings from included studies adhere to the Preferred Reporting Items for Systematic Reviews and Meta-Analyses (PRISMA) statement guidelines (14).

## FINDINGS

Results are presented and described according to categories of firearm laws (Table 1) and then according to specific types of laws within these categories. A summary of different laws evaluated by studies in this review is provided in Table 3. A description of studies reviewed here, including data, study design ratings, results, and potential limitations, is summarized in the Web Table 1. Most studies used a cross-sectional time-series design to compare rates and rate trends between pre/post-law periods. The majority of studies conducted in the United States compared states with and without laws over time while controlling for potential confounders. In addition, US cross-sectional studies frequently used an index of strictness of firearm laws to examine the association between laws and firearm deaths (Web Table 1). Most international studies assessed the association between combinations of laws being simultaneously implemented and different outcomes using pre/post-law period comparisons at the national level without a control group. Of all studies, 47.69% fit the "greatest," 20% fit the "moderate," and 32.31% fit the "least" design criteria.

We also provide a summary of results from some studies in Figures 2–4. Results are grouped according to the laws being examined across studies and the different outcomes. A summary of results for the association between laws restricting firearm use and homicides is shown in Figure 2. The results for the association between all other laws and homicides and suicides/unintentional deaths are shown in Figures 3 and 4, respectively.

### Laws targeting firearms use

*Licenses to carry concealed firearms or "shall issue" laws.* These laws allow qualified individuals to carry concealed firearms (Table 3). In the United States, Lott and Mustard (15) using a times-series design approach and data from the Federal Bureau of Investigation's Uniform Crime Reports (UCR) (1977–1992) identified that shall issue laws were associated with lower rates of homicides at the county and state levels. Bronars and Lott (16) also noted evidence that shall issue laws were associated with an apparent increase in the rate of homicides in adjacent counties without shall issue laws (16). Seven other studies (17–23) supported Lott and Mustard's findings. However, others found inconsistent results when using different modeling strategies (24–31) and suggested the presence of errors in the data used in this study (32). Ayres and Donohue (33–35) used Lott and Mustard's data and found, after recoding the data and varying model specifications, that shall issue laws were not associated with reductions in homicide rates. Particularly, they demonstrated that using county data introduced severe bias and that results were not robust to model specifications (such as including more year data or weighting strategies). Wellford et al. (36) from the National Research Council reached similar conclusions. In addition, Grambsch (37) found that controlling for regression to the mean diluted the association between shall issue laws and homicides. Using additional data from the National Center for Health Statistics (NCHS), Rosengart et al. (38) and Hepburn et al. (39) showed no association between these laws and overall and firearm homicides. Studies comparing cities with a population of 100,000 or more (40) and others using samples of large cities in the United States (41, 42) found similar findings. Another study (43) looking at injury data from southern Arizona found higher

**Table 2.**   Potential Limitations in the Execution of Studies That Could Threaten Their Internal Validity

| Category | Specific Items |
|---|---|
| Descriptions | The study population not well described |
| Sampling | Limited year data (period studied) to identify the effects of the intervention |
| | County level covariates with missing data excluding counties from analysis |
| | No clear description of the units (e.g., states) included in analyses |
| | Convenience sample |
| | No clear description of the criteria used for inclusion of units (e.g., states) in the study |
| Exposure measurement | No clear details on source of the exposure variable |
| | No validated scale for exposure classification |
| | Exposure variable with some percentage of missing data |
| | Coding errors in exposure variable |
| | No clear description of the laws that were being examined |
| Outcome measurement | No clear details on source of the outcome variable |
| | Outcome variable with some percentage of missing data |
| | No reliable county data |
| | Other relevant outcomes not examined |
| Data analysis | No use of alternative analytical strategies to account for dynamic trends of time-series data[a] |
| | Inappropriate or unclear operationalization of variables |
| | No information on statistical strategies used in analyses |
| | Statistical testing model not appropriate to answer question |
| | No alternative strategies to test for robustness of findings given other model specifications[b] |
| | Covariates with large percentage of missing data |
| Confounders[c] | No adjustment for other potential confounders |
| | No information on covariates used in analyses |
| | Risk of collinearity because of adjustment for a vast number of confounders |
| | No clear details on source of the covariates |
| Follow-up period | Not applicable for studies included in this review |
| Other | Results from statistical tests not presented |
| | Disaggregated results for single units not provided |
| | Results of some analyses described in methods not provided in the text |
| | Subpopulation being studied not a target of the laws |

[a] Alternative analytical strategies to account for dynamic trends of time-series data: strategies to examine whether trends are abrupt, delayed, gradual, or constant, with comparison of slopes in pre- and postlaw periods, as well as hybrid models (both dummy and spline/trends specifications).

[b] Alternative strategies to test for robustness of findings given other model specifications: inclusion/exclusion of years of data, different sets of covariates, fixed year effects, fixed state effects, state-specific trend effects, lag of intervention or covariates, years of available pre- and postlaw data across states or cities, exclusion of states/cities with unusually high rates of the outcome, weights for population size, clustering of errors at the state level, and log transformations of covariates.

[c] Potential confounders of the laws-homicides association: baseline state-level firearm prevalence; percent of population that is white, black, or Hispanic; percent of males aged 10–24 or 15–24 years; state average median family income; percentage of the population residing in a metropolitan area; unemployment rate; alcohol consumption rates; percentage living under poverty threshold; incarceration rates; law enforcement officers per capita; and other laws and concurrent events influencing the use and availability of firearms during the period of observation. Potential confounders of the laws-suicides association: baseline state-level firearm prevalence, marriage rates and divorce rates, unemployment rates, state average median family income, and the percentage of males aged 15–24 years, and other laws and concurrent events influencing the use and availability of firearms during the period of observation.

proportions of firearm injuries/deaths associated with shall issue laws.

In recent years, studies by Strnad (44) using a Bayesian approach and by Moody and Marvell (45, 46), Lott (47), and

Gius (48) showed that shall issue laws were associated with reductions in homicide rates (extending data to 2000). Ayres and Donohue (49, 50) responded to the studies by Moody and Marvell (45, 46) showing the inconsistency of results when

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

**144**  Santaella-Tenorio et al.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

**Table 3.**  Laws Examined in Primary Studies

| Firearm Law | Date of Enactment | Description |
|---|---|---|
| "Shall issue" or "right to carry" laws (United States) | Different enactment dates for each state | These laws allow qualified individuals to carry concealed firearms. Qualified individual criteria require that eligible individuals have no felony convictions, no pending domestic violence orders, no drug or alcohol disorders or charges, and no hospitalizations in a mental institution. Individuals usually must also have American citizenship, state citizenship, and county residency; have met the minimum age requirement; and have a certificate of completion of a firearm safety course. In addition, some states have may-issue laws, which are laws containing language suggesting that a qualified individual could be denied the permit to carry concealed firearms (36). |
| Gun Control Act of 1968 (United States) | October 22, 1968 | This law banned the sale of Saturday night specials (handguns), blocked the importation of firearms that did not meet criteria for being classified for sporting or scientific purposes, prohibited dealers from shipping firearms to other states and prohibited the sale of firearms to buyers without state identification, implemented license requirements for firearm sellers and owners, and banned possession and purchasing of firearms by minors (under 18 years for rifles and 21 years for handguns) and high-risk-group individuals (persons convicted of a felony, mental health problems, or illegal drug users) (147). |
| Florida felony firearm law (United States) | October 1, 1975 | This law mandated a 3-year sentence for possessing a firearm or destructive device while committing or attempting to commit any of the specified felonies in the law (including murder, sexual battery, robbery, burglary, and aggravated assault). Sentences could not be suspended, deferred, or withheld, and the defendant could not be eligible for parole until the minimum 3 years had been served (85). |
| Massachusetts gun control law (United States) | April 1, 1975 | This law mandated a 1-year minimum prison term for the unlicensed carrying of firearms. In addition, the law required a Firearms Owner Identification card to own or possess either firearms or ammunition. Sentences could not be suspended, and the defendant could not be eligible for parole until at least 1 year had been served (79). |
| District of Columbia 1976 law (United States) | July 23, 1976 | This law required that every person who owned and had firearms should register them under the provision of the 1968 law and should reregister them with the Metropolitan Police Department 60 days after the effective date of the Act. New rifles and shotguns could be registered if purchased from a licensed dealer and after passing a background check for criminal records and history of substance use or mental health problems. The law also strengthened safe storage requirements, including keeping firearms unloaded or bound by a trigger-locking device (97, 148). |
| Michigan Felony Firearm Law (United States) | February 11, 1976 (effective date: January 1, 1977) | This law mandated a 2-year sentence for possessing a firearm for felonies committed with or in possession of firearms. Sentences could not be suspended, deferred, or withheld, and the defendant could not be eligible for parole until the minimum 2 years had been served (84). |
| New Jersey "Graves Amendment" (United States) | February 12, 1981 | This law mandated a minimum sentence of imprisonment for any person involved in a crime who was in possession of a firearm. The minimum sentence also applied to those convicted of possession of a firearm with intention to use against another person. Sentences could not be suspended, and the defendant could not be eligible for parole until the mandatory sentence had been served. The minimum sentence was one third to one half of the total sentence imposed or 3 years, whichever was greater, for first, second, and third degree crimes and 18 months for fourth degree crimes (87). |
| 1986 Detroit law (United States) | November 26, 1986 | This law imposed mandatory jail sentences of 30–90 days and a fine of $100–$500, depending on whether or not it was a first conviction under the ordinance, on anyone convicted of unlawfully concealing a pistol or carrying a firearm (88). |
| 1994 Brady Handgun Violence Prevention Act (United States) | November 30, 1993 | The Brady Act instituted federal background checks on firearm purchasers from a federally licensed dealer, manufacturer, or importer. Prohibitions applied to an individual convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year, fugitives from justice, unlawful user of or addicted to any controlled substance, persons with mental conditions or committed to a mental institution, a person being unlawfully in the United States, a person with a court restraining order for domestic violence, or convicted in any court of a misdemeanor crime of domestic violence (149). |
| 1994 Federal assault weapons ban (The Public Safety and Recreational Firearms Use Protection Act) (United States) | September 13, 1994 | This law banned the manufacture, transfer, sale, and possession of certain semiautomatic weapons and large-capacity ammunition magazines. Semiautomatic weapons fire a bullet each time the trigger is squeezed, loading the next bullet after each shot. Weapons already in possession at the time of the law's enactment were grandfathered. The law was enacted in 1994 and expired in 2004. None of the attempts to renew it has prospered (76). |
| Maryland Gun Violence Act (United States) | Effective date: October 1, 1996 | This law set stronger restrictions to prevent firearm purchases including background checks and registration of handguns sold by private gun owners, 1 handgun purchase per month, and greater authority given to police and judges to confiscate firearms from domestic violence offenders (77). |

<em>Table continues</em>

**Table 3.** Continued

| Firearm Law | Date of Enactment | Description |
|---|---|---|
| Castle doctrine laws and stand your ground laws (United States) | Different enactment dates for each state | These laws include those eliminating the duty to retreat before using lethal force against an assailant in one's own home and a list of other places and those removing any civil liability for those acting under that law and under the principle of self-defense (53, 54). |
| Bill C-51 (Canada) | August 5, 1977 | This law increased sentences (1–14 year consecutive sentence for the actual use of a firearm to commit an indictable offense; stricter penalties for firearm homicides) and required permits for firearm sellers and certificates for buyers; the law also included provisions dealing with new offenses, search and seizure powers, and prohibitions to sell fully automatic weapons unless registered as restricted weapons before January 1, 1978. In addition, the law included specific procedures to store firearms and the elimination of permits to carry guns to defend property (150). |
| Bill C-17 (Canada) | December 5, 1991 | This law implemented stricter storage requirements and stricter restrictions to purchase firearms including photographs and personal references. A 28-day waiting period and mandatory courses for safe handling and storage for new gun owners were also required. The law also included new restrictions for prohibited weapons, including automatic, semiautomatic, and military firearms and those with large-capacity cartridge magazines. In addition, the law also increased penalties for crimes committed with firearms (150). |
| Bill C-68 (Canada) | December 5, 1995 | This law included minimum sentences for individuals committing crimes while carrying firearms, a more organized regulatory process for licensing and registration of firearms, a license to purchase firearms and ammunition, a requirement for spousal notification, and registration of all firearms including rifles and shotguns (150). |
| The 1996 National Firearms Agreement (Australia) | Government's agreement date: May 10, 1996 | The National Firearms Agreement included banning the importation, ownership, sale, transfer, possession, manufacture, or use of all self-loading center rifles, all self-loading and pump action shotguns, and all self-loading rim fire rifles. The law included the following: implementation of a buyback program for prohibited firearms; mandatory registration of all firearms; licensing requirements proving genuine reason for owning a firearm; being at least 18 years of age to buy guns; a 28-day waiting period to purchase a firearm; requirement of a separate permit for each firearm purchased; certification of being mentally and physically fit to own, possess, and use a firearm; required background checks for gun sales; for recreational and hunting purposes, required membership of an authorized shooting club or permission from a hunting land owner; strict firearm storage requirements; licenses for firearm dealers and all records of sales to be provided to the police; restrictions to purchase ammunition (quantities within a time period) and only for the licensed firearms owned by the buyer; and an accredited training course certificate in firearm safety for new applicants (151, 152). |
| National "Army XXI" reform (Switzerland) | January 1, 2004 | The national reform that reduced by half the number of active soldiers, increased the fee to purchase a military gun, and implemented license requirements for gun owners (68). |
| 1977 South Australia Firearms Act (Australia) | May 12, 1977 | This regulation required a license for firearm purchases; new owners were required to pass an examination on the handling and safety of weapons. The law also included increments in the severity of penalties for firearm offenders and registration of all firearms (153). |
| Estatuto do Desarmamento (Brazil) | December 22, 2003 | This law tightened restrictions on the possession and commercialization of firearms and ammunition, banned the carrying of firearms, implemented requirements for the registration of firearms, increased firearm costs, and established stronger penalties for illegal trafficking of firearms. In addition, background checks were implemented for firearm sales that included checking for criminal and mental health records. The minimum age to purchase was increased to 25 years (154). |
| The 1997 firearm law (Austria) | July 1997 | This law included background checks for category B weapons (handguns, semiautomatic firearms, repeating firearms, or single shot firearms with center fire percussion) in addition to psychological testing; also, the law required a 3-day "cooling-off" waiting period for category C and D weapons including long firearms with a smooth bore and rifled barrels and other semiautomatic long firearms. The law increased the minimum age to purchase to 21 years and also included safer firearm storage regulations (123). |
| Amendment to the Arms Act (New Zealand) | October 27, 1992 | The law required licensing for dealers and licensing for firearm owners that included the following: passing a test on knowledge of the Firearms Code and rules of firearm safety; police assessments of the applicant and the applicant's home that include checks for firearm storage, security, and social arrangements; and interviews with 2 referees of whom one was a partner or parent in a process that could take 8–12 weeks. The law also included stricter safe storage requirements with ammunition being kept separately from firearms (125). |
| Firearms Control Act (South Africa) | October 2000 | This law required firearm licenses for firearm purchases; the licensing process required background checks (criminal and mental health records) of applicants to be submitted to the registrar, completion of training, and passing a test on the efficient and safe handling of firearms. The law also required an additional license per each gun owned. Fully automatic guns were banned, and the minimum age to purchase and carry firearms was increased to 21 years (155, 156). |

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

**146** Santaella-Tenorio et al.



First Author, Year (Reference No.)

% Change in Homicides (95% CI)

| | |
|---|---|
| Castle doctrine laws | |
| McClellan, 2012 (54) | 15.00 (3.83, 26.17) |
| Cheng, 2013 (53) | 10.00 (2.40, 17.60) |
| Lott, 2010 (47) | −9.00 (not provided) |
| Ban on carrying firearms | |
| Villaveces, 2000 (52) | −13.00 (−24.00, −1.00) |
| Shall issue laws | |
| Ayres, 2003 (34) | 7.10 (1.02, 13.18) |
| Rosengart, 2005 (38) | 7.00 (−2.00, 17.00) |
| Grambsch, 2008 (37) | 6.00 (3.06, 8.94) |
| McDowall, 1995 (30) | 4.52 (1.09, 7.95) |
| Black,1998 (28) | 3.80 (−8.61, 16.21) |
| Ayres, 2003 (33) | 3.50 (−1.20, 8.20) |
| Ayres, 2009 (50) | 1.70 (−5.94, 9.34) |
| Hepburn, 2004 (39) | 1.00 (−6.00, 10.00) |
| Moody, 2008 (46) | 0.60 (−0.12, 1.08) |
| Ayres, 2009 (49) | 0.40 (−2.99, 3.79) |
| Aneja, 2014 (51) | 0.23 (−7.24, 7.70) |
| Kovandzic, 2005 (40) | −0.10 (−6.63, 6.43) |
| Moody, 2001 (27) | −0.10 (−0.37, 0.17) |
| Moody, 2009 (45) | −0.90 (−6.48, 4.68) |
| Donohue, 2004 (35) | −1.90 (−7.78, 3.98) |
| Wellford, 2005 (36) | −1.95 (−4.85, 0.95) |
| Martin, 2005 (32) | −5.54 (−11.23, 0.15) |
| Plassmann, 2003 (21) | −6.20 (−12.28, −0.12) |
| Duggan, 2001 (24) | −6.39 (−13.37, −0.59) |
| Olson, 2001 (19) | −6.52 (−13.62, 0.58) |
| Bronars, 1998 (16) | −6.57 (−3.23, −9.91) |
| Lott, 2000 (23) | −7.70 (−11.62, −3.78) |
| Helland, 2004 (22) | −7.80 (−18.38, 2.78) |
| Lott, 1997 (15) | −8.62 (−1.26, −15.98) |
| Plassmann, 2001 (20) | −10.55 (−12.73, −8.37) |

% Change in Homicides and Firearm Homicides

**Figure 2.** Summary of results from studies examining the effects of laws targeting firearms use (shall issue or right to carry laws, bans on carrying laws, and castle doctrine and stand your ground laws) on homicides and firearm homicides. We present only a single estimate from each study because of space limitations. We selected the estimates from models that, to our consideration, included the most important model specifications. We present the results from studies with comparable results in terms of percent change in firearm deaths (when not provided, we calculated the percent change if there was available information for calculations). Stand your ground laws are presented with castle doctrine laws. The estimate in Grambsch (37) represents the percent annual change in the rate of homicides in the postlaw period compared with the prelaw period. CI, confidence interval.

using alternative model specifications and suggesting that county data should not be used. The study by Aneja et al. (51) that included different model specifications also suggested that shall issue laws were not associated with reduction of homicides. A summary of study results for the association between shall issue laws and homicides is shown in Figure 2.

In Colombia, Villaveces et al. (52) examined the association between laws banning the carrying of firearms during weekends after paydays, holidays, and election days in Cali and Bogota and the rate of homicides. In an interrupted time series with multiple replications comparing the rates of homicides on days with and without the restriction, these authors identified a 14% reduction in all homicide rates in Cali during intervention days compared with days without it. The intervention was associated with a 13% reduction in firearm homicides in Bogota.

*"Castle doctrine" laws and "stand your ground" laws.* These laws eliminate the duty to retreat before using lethal force against an assailant in one's own home and remove

civil liability for those acting under the principle of self-defense (Table 3). Lott (47), using time-series models and data over the 1977–2005 period, observed that castle doctrine laws were associated with a 9% reduction in homicide rates. In contrast, Cheng and Hoekstra (53) compared states during the 2000–2010 period using a differences-in-difference approach (UCR data) and found that these laws were associated with a 6%–11% increase in homicide rates. With a similar approach to that of Cheng and Hoekstra (53) but using NCHS monthly data (2000–2010), McClellan and Tekin (54) found that stand your ground laws were associated with a 6.8% increase in homicide rates, mainly driven by increments (14.7%) in homicide rates among white males; other self-defense provisions were not consistently associated with homicides.

**Laws targeting firearms sales**

Cross-sectional studies assessing the association between background checks/waiting periods and firearm deaths provide

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019



**Figure 3.** Summary of results from studies examining the effects of firearm laws (firearms sales, firearms ownership, firearms storage regulations, laws targeting specific firearms and ammunition, sentences and punishment for gun offenders, and combinations of laws being simultaneously implemented) on homicides and firearm homicides. We present only a single estimate from each study because of space limitations. We selected the estimates from models that, to our consideration, included the most important model specifications. We present the results from studies with comparable results in terms of percent change in firearm deaths (when not provided, we calculated the percent change if there was available information for calculations). The estimate in Chapman (115) represents the ratio between pre- and postlaw trends; the estimate in Kapusta (123) represents the difference between pre- and postlaw trends; the estimate in Ozanne-Smith (78) represents the percent change in the rate of firearm deaths; and the estimate in Matzopoulos (126) represents the percent annual change in the rate of firearm homicides in the postlaw period. CAP, child access prevention; CI, confidence interval.

mixed results. Kleck and Patterson (7) used data from 170 US cities (1979–1981) and found no association between waiting periods and homicides or suicides; however, firearm purchase bans for those with mental health conditions were associated with fewer homicides. Ruddell and Mays (55) using a scale to rate the state's ability to screen individuals found that more stringent background checks were associated with reductions in firearm homicides. Sumner et al. (56) wrote that local checks (as opposed to federal) for local mental health and court restraining records were associated with lower suicide rates, but not with homicide rates, among adults aged 21 years or older.

Longitudinal studies have also examined these laws. Lott and Mustard (15) using time-series analyses and UCR data from counties and states in the United States found no associations between waiting periods and homicide rates at the state level (inconsistent results at the county level). Similar

findings were previously reported by McDowall et al. (30) using data from 5 cities. Ludwig and Cook (57) comparing 32 "treatment" states directly affected by the Brady Act against 18 "control" states that already had similar restrictions (NCHS data, 1985–1997). No associations between the Brady Act and firearm homicides among adults (aged 21 years or older and 55 years or older) were observed. However, in states that included changes in waiting periods, the law was associated with fewer firearm suicides only among those aged 55 years or older. More recently, Lott (47) using state-level data found no significant associations between the Brady Act and homicide rates. In contrast, La Valle (41) comparing 20 large cities in the United States by using UCR data (1990–2000), found that the Brady Act was associated with reductions in all and firearm homicide rates.

Other studies examined specific aspects of these laws. Vigdor and Mercy (58, 59), using UCR data (1982–1998),

**148** Santaella-Tenorio et al.



**Figure 4.** Summary of results from studies examining the effects of firearm laws (firearms sales, firearms ownership, firearms storage regulations, laws targeting specific firearms and ammunition, and combinations of laws being simultaneously implemented) on suicides and firearm suicides and unintentional deaths. We present only a single estimate from each study because of space limitations. We selected the estimates from models that, to our consideration, included the most important model specifications. We present the results from studies with comparable results in terms of percent change in firearm deaths (when not provided, we calculated the percent change if there was available information for calculations). The estimates from Klieve (120) and Chapman (115) represent the ratio between pre-and postlaw trends; the estimate from Kapusta (127) represents the difference between pre- and postlaw trends; and the estimate from Gagne (112) represents the percent annual change in the rate of firearms in the postlaw period. CAP, child access prevention; CI, confidence interval; UD, unintentional death.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

found that states with laws preventing subjects with domestic violence restraining orders from owning/purchasing firearms had a 9% reduction in the rates of intimate partner, female intimate partner, and female intimate partner firearm homicides; however, there was no association between these outcomes and restrictions for those convicted of domestic violence misdemeanors. Zeoli and Webster (60) also described similar findings using data from 46 of the largest cities in the United States (1979–2003). In addition, Rodríguez Andrés and Hempstead (61), using NCHS data from 1995 to 2004, found that purchasing restrictions for mental health issues and domestic violence convictions were associated with lower rates of male suicides in some age groups. Sen and Panjamapirom (62), using NCHS data from 1996 to 2005, found that, compared with states checking for criminal backgrounds only, there were lower homicide rates in states additionally checking for restraining orders and lower suicide rates in states also checking for mental conditions, fugitive status, and misdemeanors.

Particularly on laws regarding licensing of dealers, Kleck and Patterson (7) in a cross-sectional study found an association between these laws and reductions in homicide rates but not in suicide rates. Moreover, Irvin et al. (63), using NCHS data

(1995–2010) in adjusted models, found that licensing requirements for dealers were associated with firearm homicide reductions.

**Laws targeting firearms ownership**

Two cross-sectional studies (7, 64) found that permits and licenses to purchase firearms were associated with lower rates of firearm suicides. In a longitudinal study using NCHS data (1970–1998), Marvell (65) found that laws restricting juvenile access to firearms were not associated with all or firearm homicide or suicide rates among youth. Studies using times-series analyses from Webster et al. (66) and Rosengart et al. (38) did not find evidence of reductions in firearm deaths associated with state and federal laws raising the legal age to 18 or 21 years for handgun purchases/possession. Rodríguez Andrés and Hempstead (61) in unadjusted models found that minimum age requirements were associated with fewer suicides among males.

Interestingly, Webster et al. (67) examined the association between Missouri's 2007 repeal of the permit-to-purchase handgun law, which required all handgun purchasers to have a valid license to purchase handguns, and homicide rates.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

Using NCHS (1999–2010) and UCR (1999–2012) data, these authors found that repeal of the law was associated with a 25% increase in firearm homicide rates in Missouri.

In Switzerland, Reisch et al. (68) examined the association between the national army XXI reform and suicide rates; this reform reduced by half the number of active soldiers, increased the fee to purchase a military gun, and implemented license requirements for gun owners (Table 3). The overall suicide and firearm suicide rates were lower than predicted among males aged 18–43 years (targeted population), without changes among control groups (women aged 18–44 years and males aged 44–53 years). In Norway, Gjertsen et al. (69) examined different firearm laws using piecewise regression models (1969–2009 data). Their findings suggested that the 1990 restrictions requiring permits for firearm purchases were the only firearm ownership laws likely contributing to reductions in suicides rates.

### Laws targeting firearms storage regulations

Cummings et al. (70) examined the association between child access prevention laws and firearm deaths using an ecological time-series design and NCHS data (1979–1994). These authors found that child access prevention laws were associated with fewer unintentional firearm deaths among children under the age of 15 years, but not among older ones. Results were pronounced in 3 states that allowed felony prosecution of law offenders, especially Florida and California. Similar results were found by Webster and Starnes (71) using NCHS data (1979–1997) and Hepburn et al. (72) using NCHS data (1979–2000) in more complex models, with Florida driving most of the association (the authors suggest that the low number of unintentional deaths in some states may have resulted in limited power to identify significant associations (72)). Only Lott and Whitley's (73) study using UCR data (1977–1996) in time-series weighted tobits analyses found that child access prevention laws were not associated with unintentional firearm deaths.

Regarding suicides and homicides, no clear association between child access prevention laws on these outcomes was observed by Lott and Whitley (73), who indicated that Poisson models suggested a decline in firearm suicides and an increment in homicides, or by Lott (47) (with homicides). In contrast, Webster et al. (66) found that child access prevention laws were associated with a reduction in all suicide and firearm suicide rates among individuals aged 14–17 years (8.3% and 10.8% reduction, respectively) and those aged 18–20 years (11% and 13%, respectively). Cummings et al. (70) observed a reduction of 19% in firearm suicides and 11% in firearm homicides among children aged 15 years or younger, almost reaching significance (95% confidence intervals: 0.66, 1.01 and 0.76, 1.05, respectively).

Other studies focused on hospital discharge data. A cross-sectional study by Lee et al. (74) found that child access prevention laws were associated with increments in firearm injuries. A longitudinal study by DeSimone et al. (75) using information from 11 states, of which 7 passed child access prevention laws between 1988 and 2003, found that child access prevention laws were associated with lower nonfatal firearm injuries among individuals under the age of 18 years.

In Norway, Gjertsen et al. (69) found that the 2003 home guard firearm law implementing safer storage requirements was likely contributing to reductions in homicide rates among males.

### Laws targeting specific firearms and ammunition

*1994 Federal assault weapons ban, United States.* This law banned the sales and ownership of semiautomatic firearms and large-capacity ammunition magazines. Koper and Roth (76) using UCR data (1980–1995) found no association between the law and homicide rates in 15 states after adjusting for the presence of other firearm laws and crime laws in New York and California. A recent study by Gius (48) showed that the federal assault weapons ban was associated with higher rates of firearm homicides.

*Saturday night specials, United States.* Saturday night specials are inexpensive poor-quality guns commonly used in crime activity. In a cross-sectional study, Kleck and Patterson (7) found no associations between these laws and homicide rates. Webster et al. (77) studied the 1988 Maryland law banning these firearms in time-series analyses using 2 neighboring states as controls and NCHS data (1975–1998). These authors found the law was associated with a 6.8%–11.5% reduction in homicide rates when assuming a delayed effect model but not an immediate and constant model. Rosengart et al. (38) found no association of the law with reductions in firearm or all homicides rates when assuming an immediate and constant model. A reduction in suicide rates, but not in firearm suicide rates, was associated with the law.

*The 1988 Victoria state law, Australia.* Ozanne-Smith et al. (78) examined the Victoria law that tightened restrictions on semiautomatic long-arms and pump action guns, by comparing pre- versus posttrends of annual death rates in Victoria compared with other states in Australia. The law was associated with a 17.3% decrease in the rate of firearm deaths and lower rates of firearm suicides, but not with firearm homicides (78).

### Laws targeting sentences and punishment for gun offenders

Deutsch and Alt (79) examined the 1975 Bartley-Fox amendment to Massachusetts' gun control law that mandated a 1-year minimum prison term for carrying firearms without a license and a 2-year sentence for crimes committed while in possession of a firearm. Examining the following 6 months postimplementation, these authors found no association between the law and homicide rates. Similar results were observed by Berk et al. (80) and by Hay and McCleary (81) using UCR data up to 1976. Pierce and Bowers (82) using other cities as controls and data up to 1976 found a reduction of 55.7% in the rate of homicides, a reduction not observed in other control cities. In a posterior study, Deutsch (83) found the law to be associated with fewer homicides after adding more years of data.

Loftin and McDowall (84) examined the 1977 Michigan Felony Firearm Law, with 2-year mandatory sentences for felonies committed with or in possession of firearms. They found, in unadjusted autoregressive integrated moving average

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

models, that the law was associated with a 10.86% reduction in the number of firearm homicides in Detroit. These authors also observed similar results in 1 of 3 cities in Florida in regard to the state felony firearm law (3-year sentence for possessing a firearm while committing or attempting to commit a felony) (85) and also reductions in Pittsburgh and Philadelphia associated with legislation in Pennsylvania (5-year minimum sentence for violent crimes committed with firearms) (86). Fife and Abrams (87) also found similar results while examining the 1981 New Jersey "Graves Amendment" requiring minimum sentences of imprisonment without parole for possessing a firearm while committing a crime. O'Carroll et al. (88) found that the 1986 Detroit law (mandatory jail sentence for unlawfully carrying a firearm in public) was associated with higher rates of firearm indoor and nonfirearm homicides but not with firearm homicides or those committed outside.

Marvell and Moody (89) criticized previous studies for not adjusting models for confounders; in time-series analyses adjusting for state and year effects and state-level covariates, they found that laws requiring minimum sentences or additions to sentences for crimes committed with guns (1970–1993 data) were not associated with state-level homicide or firearm homicide rates; they confirmed only Deutsch's findings for the Massachusetts law (83). La Valle (90), using data from 20 major cities (1970–2005 data), found that additional jail time was associated with reductions in firearm homicide rates, and minimum sentencing enhancements were associated with higher firearm homicide rates.

With regard to Project Exile from Richmond, Virginia (considered a sentence enhancement program as felons arrested for gun possession were brought to federal courts where sentences were more severe), Raphael and Ludwig (91) using UCR data (1994–1999) did not find strong evidence suggesting that the program was associated with reductions in firearm homicide rates once 1997 (a year with unusual high rates) was excluded. Rosenfeld et al. (92) added more years (1992–2001) and used adjusted multilevel models, and they observed a 22% yearly reduction in firearm homicides; however, this reduction was only marginal ($P < 0.10$) when 1997 was excluded and replaced by the average of 1996 and 1998 values.

### Laws promoting voluntary rendition of firearms

Rosenfeld (93) found no association between firearm buyback programs implemented in St. Louis, Missouri (1991 and 1994) and firearm homicides. More recently, Phillips et al. (94) found that yearly firearm buyback programs implemented in Buffalo, New York, from 2007 to 2012 were not associated with reductions in firearm homicides. Leigh and Neill (95) evaluated the 1997 Australian gun buyback program and found no association between the program and firearm homicides but a reduction in suicide rates associated with the number of firearms that were bought back.

### Simultaneous implementation of laws targeting multiple elements of regulations

*US Gun Control Act of 1968.* This law restricted the sale of some handguns, blocked the importation of firearms not

meeting specific criteria, prohibited the sale of firearms to buyers without state identification, implemented licenses for firearm sellers and for owners, and banned the possession/purchasing of firearms by high-risk-group individuals (Table 3). Magaddino and Medoff (96), using data for the period 1947–1977 in structural models adjusted by state characteristics, found that the law was not associated with changes in homicide rates.

*District of Columbia 1976 law.* This law banned residents from owning automatic and semiautomatic firearms and handguns, placed stronger requirements for home firearm storage, and required registration of all firearms. Loftin et al. (97), using NCHS data (1968–1987) from the District of Columbia and adjacent metropolitan areas of Maryland and Virginia, found an abrupt reduction in homicide and suicide rates with no similar changes in control areas. Similar results for suicides were found by McDowall et al. (98) comparing the District of Columbia with Boston, Massachusetts, Memphis, Tennessee, and Baltimore, Maryland. Britt et al. (99, 100) questioned the selection of controls in the study by Loftin et al. (97), given the differences in homicide rates in the prelaw period; using Baltimore as the control area, Britt et al. found that the law was not associated with abrupt or gradual changes in homicide rates (no estimates for the law-suicide rates association were reported).

*1996 Maryland Gun Violence Act.* This law set stronger regulations including background checks and registration of handguns sold by private gun owners, 1 handgun purchase per month, and greater authority given to police and judges to confiscate firearms from domestic violence offenders. Webster et al. (77) examined the law in models adjusted for sociodemographics and trends in neighboring states (1975–1998 NCHS data) and found that the law was associated with reductions (from 10.3% to 11.4%) in firearm homicide rates in Maryland, assuming an immediate or delayed start, and constant/gradual effects.

*Canadian firearm-related bills.* Table 3 contains a summary of the 3 Canadian firearm bills. Regarding the variability in homicides rates, Leenaars and Lester (101) found that the 1977 bill C-51 was no longer associated with reductions in firearm homicide rates, as previously suggested (102, 103), after controlling for other socioeconomic indicators (101); however, reductions in homicide rates remained associated with the bill (101). Mauser and Holmes (104) found no associations between bill C-51 and all homicides in dummy models adjusted for covariates and time trends. Blais et al. (105) in models adjusted for potential confounders (1974–2004 data) found that bill C-51 was associated with reductions in firearm homicide rates. In this study, bill C-17 from 1991 was not associated with all or firearm homicides, but bill C-68 from 1995 was associated with lower firearm homicide rates.

More recently, Langmann (106) analyzed data from 1974 to 2008 using different modeling strategies and found no association of any of the 3 bills with firearm homicide rates and also no association between bills C-17 and C-68 and spousal firearm homicide rates (results for bill C-51 on this outcome were not provided). Using a similar approach, McPhedran and Mauser (107) found no associations between bill C-68 and firearm female homicides, but bill C-51 was associated with reductions in firearm female domestic homicides.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

Studies on the association between the Canadian bills and suicide rates are also described. Unadjusted studies comparing pre- versus postlaw trend slopes showed that lower suicide (108) and firearm suicide (103, 109) rates were associated with bill C-51. Although the association with firearm suicides was diluted after adjusting for divorce and unemployment rates (102), additional analyses assessing trends in pre/post intervention periods and models adjusting for additional factors showed that bill C-51 reversed a prior steep increase in firearm suicides; further, although the bill was associated with lower firearm suicide rates in the population and among males and females (110), there was evidence of males switching to other methods.

Caron et al. (111), using Quebec, Canada, data (1987–2001), found that bill C-17 was not associated with changes in firearm suicide rates; an increment in the rates of suicides by hanging was observed among females. Gagné et al. (112) using Quebec data (1981–2006) in Joinpoint regressions found a breakpoint in 1996 indicating reductions in firearm suicides among males and individuals aged 15–34 years. Results from Poisson regressions showed reductions in suicide rates when the anticipated effect of bill C-17 was moved to 1995 (112). Similar results were identified by Cheung and Dewa (113) for firearm suicides after 1994. These 3 studies found that suicides due to hanging increased and that the rate of overall suicides did not change over time, which is suggestive of individuals switching to substitution methods.

Regarding unintentional firearm deaths, Leenaars and Lester (114) using national data (1969–1985) in models adjusted by unemployment and divorce rates, initially found bill C-51 was only marginally associated with lower death rates among males; later the authors found the bill was also associated with lower death rates in the entire population (102).

*The 1996 National Firearms Agreement (NFA) and the South Australia Firearms Act.* A summary of these laws is provided in Table 3. In regards to homicide rates, Ozanne-Smith et al. (78) examined the NFA using Victoria as a control group, given that this state had previously enacted firearm restrictions in 1988. The authors found a reduction (14%) in overall firearm death rates in states implementing NFA restrictions relative to Victoria (78). Another study by Chapman et al. (115), analyzed data from 1979 to 2003 and found evidence of an acceleration in the reduction in firearm deaths and all homicides after the passing of the law; although there was also a steeper reduction in firearm homicides, the trend ratio was not significant. In addition, no firearm mass shootings occurred in Australia after the NFA compared with 13 in the prelaw period (115). In contrast, Baker and McPhedran (116) compared observed versus predicted homicide rates after the NFA (1979–2004 data) in autoregressive integrated moving average models and found no association between the law and homicide rates, although the downward trend was observed to continue in the years after the law. Neill and Leigh (117) criticized Baker and McPhedran (116) for not using the log of death rates (which made expected rates become negative). Adjusting for new model specifications, they found a reduction in the firearm homicide rates associated with the NFA (117).

Lee and Suardi (118), using data from 1915 to 2004 and tests of unknown structural breaks, found no evidence suggesting

that the NFA was associated with reduction in homicides or suicide rates. In contrast, Chapman et al. (115) showed reductions in the rate of firearm and total suicide rates after the implementation of the NFA. Similar results were observed by Neill and Leigh (117) and by Baker and McPhedran (116) for firearm suicides. McPhedran and Baker (119), using an approach similar to that of Lee and Suardi (118), also identified a breakpoint in 1997 for firearm suicide rates but only for individuals aged 35–44 years (although no association was found in other models). Klieve et al. (120), examining data from the Queensland suicide register (1990–2004) and national data (1968–2004), found that the NFA was associated with negative trends in firearm suicide rates at the national level, but not with suicides among males in Queensland.

In regard to the 1977 South Australia Firearms Act, Snowdon and Harris (121) using data from Australian states (1968–1989) observed that the law was associated with lower rates of firearm suicides.

Finally, in regard to unintentional firearm death rates, Baker and McPhedran (116) and Chapman et al. (115) showed an increment in the rate of unintentional firearm deaths associated with the NFA (115), although they conclude that rates can be greatly affected by small changes in the number of annual cases given that unintentional firearm deaths are rare events.

*The Estatuto do Desarmamento in Brazil.* This law tightened restrictions on the possession of firearms and ammunition, implemented requirements for the registration of owned firearms, increased firearm costs, and established stronger penalties for illegal trafficking of firearms (Table 3). Marinho de Souza et al. (122), using time-series models (1996–2004 data) found that observed deaths were lower than predicted ones in the next 6 postlaw months.

*The 1997 Austrian firearm law.* This law placed restrictions for some firearms (including handguns and semiautomatics) and mandated background checks, minimum age requirements for purchases, safer firearm storage regulations, and waiting periods (Table 3). Kapusta et al. (123), using data from 1985 to 2005, found that the law was associated with reductions in firearm homicide (percent change in trends in pre/postlaw periods = −4.8) and firearm suicide (percent change = −9.9) rates in models adjusted for unemployment and alcohol consumption. Moreover, Niederkrotenthaler et al. (124) found that the law was associated with a long-term reduction in the rate of firearm suicides and the proportion of firearm suicides among adolescents (aged 10–19 years).

*The New Zealand Amendment to the Arms Act.* The law included bans on certain firearms, licensing for dealers and firearm owners that required passing training tests, police assessments of applicant and applicant's home, and interviews with family members. Beautrais et al. (125), using Poisson models and interrupted time-series analyses (1985–2002 data), found that the amendment was associated with reductions in the rate of firearm suicides among those aged 15–24 and 25 years or older, but not with reductions in all suicides.

*South Africa's Firearms Control Act.* This law banned certain firearms (including automatic guns), required an additional license per each gun owned and passing training tests to obtain licenses, increased age requirements for possession/ purchase of firearms, and mandated background checks

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

(Table 3). Matzopoulos et al. (126) evaluated the association between the Act and changes in homicide rates in 5 major cities (2001–2005 data). Results showed a decreasing trend (13.6% per year) for firearm homicides through the implementation of the program and until 1 year after the law was fully implemented. Reductions in nonfirearm homicides were also observed, although not as pronounced as the ones observed for firearm homicides.

## Additional studies comparing states/cities with a classification based on degrees of firearm law strictness

In regard to homicide rates, studies from the 1960s found little evidence of laws affecting homicide rates. Geisel et al. (127) compared states and major cities (1960–1965 data) and found that stricter laws were not associated with homicide rates. Magaddino and Medoff (96) and others (128–130) examined state and federal laws (requirements for sales and purchases) using data from 1960 and 1970, and they observed that associations between laws and homicide rates vanished after controlling for sociodemographic factors. A study by Seitz (131) (1967 data) showed that states with carrying and purchasing prohibitions had lower homicide rates among whites. Recent studies found that states/cities with stricter laws had lower rates of homicides (132), firearm deaths (133–135), and firearm injuries (136). Fleegler et al. (137), using a legislative strength score, found that states with scores in the highest quartile (more restrictive) compared with those in the lowest quartile had lower rates of firearm homicides.

In regard to variations in suicide rates, Geisel et al. (127) and other authors (129, 138–141) reported that stricter laws were associated with lower rates of suicides and unintentional death rates; however, other authors described that these associations vanished when models were adjusted for confounders (128, 130). Boor and Bair (142) (1985 data) found that stricter firearm laws were associated with reductions in suicide rates. Sloan et al. (143) while comparing 2 cities also found similar results for firearm suicides. In addition, Conner and Zhong (144) classified states according to strictness (1999–2000 data) and found lower suicide rates among males and females in states with stricter laws. Fleegler et al. (137) also identified lower firearm suicides in states in the highest quartile (most strict).

## CONCLUSIONS

In a comprehensive review of firearm-control legislation worldwide, we identified a range of studies examining the association between firearm-related laws and firearm deaths. Three general observations emerge from this analysis: 1) The simultaneous implementation of laws targeting multiple elements of firearms regulations reduced firearm-related deaths in certain countries; 2) some specific restrictions on purchase, access, and use of firearms are associated with reductions in firearm deaths; 3) challenges in ecological design and the execution of studies limit the confidence in study findings and the conclusions that can be derived from them.

A variety of longitudinal studies describe the association between the simultaneous implementation of laws targeting multiple elements of regulations and firearm deaths. Despite their limitations, specifically on the identification of which laws are more likely to be effective, these studies inform on the potential synergistic effects, or the aggregated individual effects of multiple laws, when they are simultaneously implemented within a narrow time window. The Australian NFA provides a good illustration of this. Following the implementation of the NFA, a decline in firearm deaths and firearm suicides, as well as an absence of mass shootings (78, 115, 117, 120), occurred. We found similar findings in other studies examining legislation targeting multiple elements of regulations in other countries (122–126), although, except in the case of Austria, findings have not been replicated. In Canada, although there has been a continuous downward trend in firearm death rates over time and legislation including background checks has been associated with fewer female firearm homicides, evidence of the association between these laws and overall homicides is mixed. Moreover, studies from Canada, New Zealand, and Australia (at least for the first post-NFA years) show that observed reductions in firearm suicides, after the implementation of these laws, were compensated by substitution methods that resulted in no significant changes in overall suicide rates.

There is also compelling evidence of specific laws being associated with reductions in the rate of firearm deaths. Studies on background checks suggest that the quality of systems used to review applicants, in terms of the access to local and federal information on mental health conditions and criminal and domestic violence history, is a critical component of these laws. However, in some longitudinal studies, little attention is given to whether states conducted local checks and how results would vary after adjusting models for this. US studies examining more detailed aspects of background check laws describe how requiring checks on restraining orders is associated with reductions in intimate partner female firearm homicides, and how checking local mental health facility records is linked to fewer firearm suicides. Regarding child access prevention laws, most studies in the United States show that additional laws allowing for felony prosecution of offenders are associated with greater reductions in unintentional deaths among children. In addition, most studies show that relaxing firearm restrictions, as in the case of "stand your ground" laws or the repealing of existing permit laws, may increase the rate of firearm homicides. We also found international evidence suggesting that, in a particular setting with high rates of homicides, banning the carrying of firearms on sensitive days along with police enforcement can be an effective strategy to reduce homicide rates.

In contrast, evidence suggests that laws restricting the sales of certain firearms are not associated with variations in all or firearm homicides. For instance, it is possible that because of the fact that studies examine short periods after the laws are implemented, studies may not be able to identify a significant association, as the effects of these laws are more likely to be gradual and delayed given the already high rate of firearms ownership and the availability of firearms in secondary markets. A similar situation may occur for studies with short postlaw periods examining laws targeting sentences for gun offenders, as described for studies on the 1975 Massachusetts' law. In addition, for laws targeting sentences, variations in the restrictions and the types of sentence in states, and also

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

the interactions with other factors, such as law enforcement and limitations in jail space, may explain the different results across regions and studies.

One potential problem of studies on firearms laws is the way in which the author's affiliations and personal interests bias study results and influence what is to be published. This can be particularly problematic when researchers are funded by for-or-against firearms groups and when these organizations have control of what material is publishable and what is not, and also when researchers purposely select to present only the results that match their interests. In this review, we have avoided making statements on sources of funding or on affiliations of authors, although we acknowledge that this is an important problem that may distort the general information that could be obtained from this review, and that may contribute to publication bias.

In addition, the studies reviewed here may suffer from validity problems that are common in observational ecological studies. In this regard, cross-sectional studies are of least design suitability (145), and although useful for hypothesis generation, they offer little information on which laws are more likely to work in certain settings. Alternatively, longitudinal studies, especially those examining changes in outcomes before and after the legislation and those including control groups, offer stronger evidence. Longitudinal studies looking at local policy changes, although less generalizable, may provide more precise information on factors necessary for interventions to work compared with those using national aggregated data. However, we observe that incomplete or missing data or problems in quality of the data challenge the evaluation of laws at local levels. Additional concerns of validity, even in longitudinal designs, include the lack of robustness of findings to modeling specifications, such as regarding the use of more years of data or moving the expected point of the intervention effect. Also, particular challenges in study execution include specifications that control for potential confounders that can also be mediators (e.g., firearm ownership). Researchers adjusting for these variables without acknowledging the presence of mediating effects can wrongly conclude that these laws are not associated with the outcomes.

While identifying the limitations of designs and the execution of studies reviewed here, we also identified opportunities for future research. First, studies focusing on the association between the relaxation of firearms laws, such as Missouri's repeal of permits law and the "stand your ground" law, and firearm-related deaths provide an alternative angle to evaluate firearm legislation. Research in this direction may be able to identify more abrupt changes in firearm mortality compared with research on the implementation of new laws, which in theory would have more gradual and delayed effects (67). Second, limited availability and quality of injury data have driven most research to focus on firearm deaths, the most extreme outcome. Better data to assess changes in firearm injuries at both the national and state levels could improve our knowledge on the consequences of firearm laws with a broader scope. Third, we found that few studies have examined how these laws are associated with outcomes among particular ethnic/racial or lower socioeconomic groups; focusing on subgroup outcomes would help to identify which laws may be most beneficial to those at greater risk. Fourth, research is needed to understand how the enactment or repeal of firearms laws is associated with changes in social attitudes, norms, and behaviors and how this in turn is associated with firearms deaths. Fifth, there is little research using complex systems approaches to identify or predict variations in firearm deaths when single or multiple laws are implemented and how the magnitude of associations would vary in the presence of other factors (e.g., enforcement). As these methods evolve, they may become an avenue to explore the benefits and disadvantages associated with firearms laws and other alternatives in different population contexts. There are also unanswered questions on whether new alternatives, not directly targeting firearm rights, such as increments in firearm taxation, safer manufacturing of firearms, or background checks for all private sales, can be effective in reducing firearm-related death rates.

To conclude, we have provided an overview of national and international studies on the association between firearm-related laws and firearm injuries/deaths. High-quality research overcoming limitations of existing studies in this field would lead to a better understanding of what interventions are more likely to work given local contexts. This information is key for policy development aiming at reducing the burden posed to populations worldwide by violent and unintentional firearm injuries.

## ACKNOWLEDGMENTS

Author affiliations: Epidemiology Department, Mailman School of Public Health, Columbia University, New York, New York (Julian Santaella-Tenorio); Department of Emergency Medicine, University of California at Davis, Sacramento, California (Magdalena Cerdá); Department of Epidemiology, University of North Carolina at Chapel Hill, Chapel Hill, North Carolina (Andrés Villaveces); and School of Public Health, Boston University, Boston, Massachusetts (Sandro Galea).

J.S.T. was supported by the J. William Fulbright and the Colciencias doctoral scholarships.

We thank Konstantina Matsoukas and Maria C. Salcedo for their help and comments on the literature search process. We also thank Robert Hahn for helpful comments on the classification of study limitations.

Conflict of interest: none declared.

## REFERENCES

1. Richmond TS, Cheney R, Schwab CW. The global burden of non-conflict related firearm mortality. *Inj Prev.* 2005;11(6): 348–352.
2. GBD 2013 Mortality and Causes of Death Collaborators. Global, regional, and national age-sex specific all-cause and cause-specific mortality for 240 causes of death, 1990–2013: a systematic analysis for the Global Burden of Disease Study 2013. *Lancet.* 2015;385(9963):117–171.
3. Richardson EG, Hemenway D. Homicide, suicide, and unintentional firearm fatality: comparing the United States with other high-income countries, 2003. *J Trauma.* 2011; 70(1):238–243.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

4. Murphy S, Xu J, Kochanek K. Deaths: final data for 2010. Supplemental tables. http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_04.pdf. Published May 8, 2013. Accessed June 12, 2014.

5. Miniño A, Arias E, Kochanek K, et al. Deaths: final data for 2000. *Natl Vital Stat Rep*. 2002;50(15):1–120.

6. Ohsfeldt RL, Morrisey MA. Firearms, firearms injury, and gun control: a critical survey of the literature. *Adv Health Econ Health Serv Res*. 1992;13:65–82.

7. Kleck G, Patterson EB. The impact of gun control and gun ownership levels on violence rates. *J Quant Criminol*. 1993; 9(3):249–287.

7. Teret SP, Wintemute GJ. Policies to prevent firearm injuries. *Health Aff (Millwood)*. 1993;12(4):96–108.

8. Hahn RA, Bilukha O, Crosby A, et al. Firearms laws and the reduction of violence: a systematic review. *Am J Prev Med*. 2005;28(2 suppl 1):40–71.

9. Wellford CF, Pepper JV, Petrie CV, eds. *Firearms and Violence: A Critical Review*. Washington, DC: The National Academies Press; 2005.

11. Makarios MD, Pratt TC. The effectiveness of policies and programs that attempt to reduce firearm violence: a meta-analysis. *Crime Delinq*. 2012;58(2):222–244.

12. Zaza S, Wright-De Agüero LK, Briss PA, et al. Data collection instrument and procedure for systematic reviews in the *Guide to Community Preventive Services*. Task Force on Community Preventive Services. *Am J Prev Med*. 2000;18(1 suppl):44–74.

13. Briss PA, Zaza S, Pappaioanou M, et al. Developing an evidence-based *Guide to Community Preventive Services*—methods. The Task Force on Community Preventive Services. *Am J Prev Med*. 2000;18(1 suppl):35–43.

14. Moher D, Liberati A, Tetzlaff J, et al. Preferred reporting items for systematic reviews and meta-analyses: the PRISMA statement. *Ann Intern Med*. 2009;151(4):264–269.

15. Lott JR, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud*. 1997;26(1):1–68.

16. Bronars SG, Lott JR Jr. Criminal deterrence, geographic spillovers, and the right to carry concealed handguns. *Am Econ Rev*. 1998;88(2):475–479.

17. Bartley WA, Cohen MA. The effect of concealed weapons laws: an extreme bound analysis. *Econ Inq*. 1998;36(2):258–265.

18. Mustard DB. The impact of gun laws on police deaths. *J Law Econ*. 2001;44(2):635–657.

19. Olson D, Maltz M. Right-to-carry concealed weapons laws and homicide in large U.S. counties: the effect on weapons types, victim characteristics, and victim-offender relationships. *J Law Econ*. 2001;44:747–770.

20. Plassmann F, Tideman TN. Does the right to carry concealed handguns deter countable crimes? Only a count analysis can say. *J Law Econ*. 2001;44(2):771–798.

21. Plassmann F, Whitley J. Confirming "more guns, less crime." *Stanford Law Rev*. 2003;55(4):1313–1369.

22. Helland E, Tabarrok A. Using placebo laws to test "more guns, less crime." *Adv Econ Anal Policy*. 2004;4(1):1–11.

23. Lott J. *More Guns, Less Crime: Understanding Crime and Gun Control Laws*. 2nd ed. Chicago, IL: University of Chicago Press; 2000.

24. Duggan M. More guns, more crime. *J Polit Econ*. 2001; 109(5):1086–1114.

25. Duwe G, Kovandzic T, Moody CE. The impact of right-to-carry concealed firearm laws on mass public shootings. *Homicide Stud*. 2002;6(4):271–296.

26. Ludwig J. Concealed-gun-carrying laws and violent crime: evidence from state panel data. *Int Rev Law Econ*. 1998;18(3): 239–254.

27. Moody CE. Testing for the effects of concealed weapons laws: specification errors and robustness. *J Law Econ*. 2001;44(2): 799–813.

28. Black DA, Nagin DS. Do right-to-carry laws deter violent crime? *J Legal Stud*. 1998;27(1):209–219.

29. Kovandzic T, Marvell TB. Right-to-carry concealed handguns and violent crime: crime control through gun decontrol? *Criminol Public Policy*. 2003;2(3):363–396.

30. McDowall D, Loftin C, Wiersema B. Easing concealed firearms laws: effects on homicide in three states. *J Crim Law Criminol*. 1995;86(1):193–206.

31. Rubin PH, Dezhbakhsh H. The effect of concealed handgun laws on crime: beyond the dummy variables. *Int Rev Law Econ*. 2003;23(2):199–216.

32. Martin RA Jr, Legault RL. Systematic measurement error with state-level crime data: evidence from the "more guns, less crime" debate. *J Res Crime Delinq*. 2005;42(2):187–210.

33. Ayres I, Donohue JJ. Shooting down the "more guns, less crime" hypothesis. *Stanford Law Rev*. 2003;55(4): 1193–1312.

34. Ayres I, Donohue JJ. The latest misfires in support of the "more guns, less crime" hypothesis. *Stanford Law Rev*. 2003; 55(4):1371–1398.

35. Donohue J. Guns, crime, and the impact of state right-to-carry laws. *Fordham Law Rev*. 2004;73(2):623–652.

36. Wellford CF, Pepper JV, Petrie CV, eds. Right to carry laws. In: *Firearms and Violence: A Critical Review*. Washington, DC: The National Academies Press; 2005:120–151.

37. Grambsch P. Regression to the mean, murder rates, and shall-issue laws. *Am Stat*. 2008;62(4):289–295.

38. Rosengart M, Cummings P, Nathens A, et al. An evaluation of state firearm regulations and homicide and suicide death rates. *Inj Prev*. 2005;11(2):77–83.

39. Hepburn L, Miller M, Azrael D, et al. The effect of nondiscretionary concealed weapon carrying laws on homicide. *J Trauma*. 2004;56(3):676–681.

40. Kovandzic TV, Marvell TB, Vieraitis LM. The impact of "shall-issue" concealed handgun laws on violent crime rates—evidence from panel data for large urban cities. *Homicide Stud*. 2005;9(4):292–323.

41. La Valle JM. Rebuilding at gunpoint: a city-level re-estimation of the Brady law and RTC laws in the wake of hurricane Katrina. *Crim Justice Policy Rev*. 2007;18(4):451–465.

42. La Valle J, Glover TC. Revisiting licensed handgun carrying: personal protection or interpersonal liability? *Am J Crim Just*. 2012;37(4):580–601.

43. Ginwalla R, Rhee P, Friese R, et al. Repeal of the concealed weapons law and its impact on gun-related injuries and deaths. *J Trauma Acute Care Surg*. 2014;76(3):569–574; discussion 574–575.

44. Strnad J. Should legal empiricists go Bayesian? *Am Law Econ Rev*. 2007;9(1):195–303.

45. Moody CE, Marvell TB. The debate on shall issue laws, continued. *Econ J Watch*. 2009;6(2):203–217.

46. Moody CE, Marvell TB. The debate on shall-issue laws. *Econ J Watch*. 2008;5(3):269–293.

47. Lott J. *More Guns, Less Crime: Understanding Crime and Gun Control Laws*. 3rd ed. Chicago, IL: University of Chicago Press; 2010.

48. Gius M. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. *Appl Econ Lett*. 2014;21(4):265–267.

49. Ayres I, Donohue JJ. More guns, less crime fails again: the latest evidence from 1977–2006. *Econ J Watch*. 2009;6(2): 218–238.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

50. Ayres I, Donohue JJ. Yet another refutation of the more guns, less crime hypothesis—with some help from Moody and Marvell. *Econ J Watch*. 2009;6(1):35–59.

51. Aneja A, Donohue J 3rd, Zhang J. The impact of right to carry laws and the NRC report: the latest lessons for the empirical evaluation of law and policy. Cambridge, MA: National Bureau of Economic Research; 2012. (NBER working paper no. 18294). http://www.nber.org/papers/w18294. Published August 2012. Updated November 7, 2014. Accessed December 12, 2014.

52. Villaveces A, Cummings P, Espitia VE, et al. Effect of a ban on carrying firearms on homicide rates in 2 Colombian cities. *JAMA*. 2000;283(9):1205–1209.

53. Cheng C, Hoekstra M. Does strengthening self-defense law deter crime or escalate violence? Evidence from expansions to castle doctrine. *J Hum Resour*. 2013;48(3):821–854.

54. McClellan C, Tekin E. Stand your ground laws and homicides. Cambridge, MA: National Bureau of Economic Research; 2012:1–55. (NBER working paper no. 18187). http://nber.org/papers/w18187. Accessed December 13, 2014.

55. Ruddell R, Mays GL. State background checks and firearms homicides. *J Crim Just*. 2005;33(2):127–136.

56. Sumner SA, Layde PM, Guse CE. Firearm death rates and association with level of firearm purchase background check. *Am J Prev Med*. 2008;35(1):1–6.

57. Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA*. 2000;284(5):585–591.

58. Vigdor E, Mercy J. Disarming batterers: the impact of laws restricting access to firearms by domestic violence offenders. In: Ludwig J, Cook P, eds. *Evaluating Gun Policy: Effects on Crime and Violence*. Washington, DC: Brookings Institution; 2003:157–215.

59. Vigdor ER, Mercy JA. Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide? *Eval Rev*. 2006;30(3):313–346.

60. Zeoli AM, Webster DW. Effects of domestic violence policies, alcohol taxes and police staffing levels on intimate partner homicide in large US cities. *Inj Prev*. 2010;16(2):90–95.

61. Rodríguez Andres A, Hempstead K. Gun control and suicide: the impact of state firearm regulations in the United States, 1995–2004. *Health Policy*. 2011;101(1):95–103.

62. Sen B, Panjamapirom A. State background checks for gun purchase and firearm deaths: an exploratory study. *Prev Med*. 2012;55(4):346–350.

63. Irvin N, Rhodes K, Cheney R, et al. Evaluating the effect of state regulation of federally licensed firearm dealers on firearm homicide. *Am J Public Health*. 2014;104(8):1384–1386.

64. Medoff MH, Magaddino JP. Suicides and firearm control laws. *Eval Rev*. 1983;7(3):357–372.

65. Marvell TB. The impact of banning juvenile gun possession. *J Law Econ*. 2001;44(2):691–713.

66. Webster DW, Vernick JS, Zeoli AM, et al. Association between youth-focused firearm laws and youth suicides. *JAMA*. 2004;292(5):594–601.

67. Webster D, Crifasi CK, Vernick JS. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides [erratum in *J Urban Health*. 2014;91(3):598–601]. *J Urban Health*. 2014;91(2):293–302.

68. Reisch T, Steffen T, Habenstein A, et al. Change in suicide rates in Switzerland before and after firearm restriction resulting from the 2003 "Army XXI" reform. *Am J Psychiatry*. 2013;170(9):977–984.

69. Gjertsen F, Leenaars A, Vollrath ME. Mixed impact of firearms restrictions on fatal firearm injuries in males: a

national observational study. *Int J Environ Res Public Health*. 2014;11(1):487–506.

70. Cummings P, Grossman DC, Rivara FP, et al. State gun safe storage laws and child mortality due to firearms. *JAMA*. 1997;278(13):1084–1086.

71. Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional shooting deaths of children. *Pediatrics*. 2000;106(6):1466–1469.

72. Hepburn L, Azrael D, Miller M, et al. The effect of child access prevention laws on unintentional child firearm fatalities, 1979–2000. *J Trauma*. 2006;61(2):423–428.

73. Lott JR, Whitley JE. Safe storage gun laws: accidental deaths, suicides, and crime. *J Law Econ*. 2001;44(2):659–689.

74. Lee J, Moriarty KP, Tashjian DB, et al. Guns and states: pediatric firearm injury. *J Trauma Acute Care Surg*. 2013;75(1):50–53.

75. DeSimone J, Markowitz S, Xu J. Child access prevention laws and nonfatal gun injuries. *South Econ J*. 2013;80(1):5–25.

76. Koper CS, Roth JA. The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001;17(1):33–74.

77. Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning "Saturday night special" handguns on homicides. *Am J Epidemiol*. 2002;155(5):406–412.

78. Ozanne-Smith J, Ashby K, Newstead S, et al. Firearm related deaths: the impact of regulatory reform. *Inj Prev*. 2004;10(5):280–286.

79. Deutsch SJ, Alt FB. The effect of Massachusetts gun-control law on gun-related crimes in city of Boston. *Eval Q*. 1977;1(4):543–568.

80. Berk RA, Hoffman DM, Maki JE, et al. Estimation procedures for pooled cross-sectional and time series data. *Eval Q*. 1979;3(2):385–411.

81. Hay RA, McCleary R. Box-tiao time series models for impact assessment: a comment on the recent work of Deutsch and Alt. *Eval Q*. 1979;3(2):277–314.

82. Pierce GL, Bowers WJ. The Bartley-Fox gun law's short-term impact on crime in Boston. *Ann Am Acad Pol Soc Sci*. 1981;455(May):120–137.

83. Deutsch S. Intervention modeling: analysis of changes in crime rates. In: Fox J, ed. *Methods in Quantitative Criminology*. New York, NY: Academic Press; 1981:171–193.

84. Loftin C, McDowall D. "One with a gun gets you two": mandatory sentencing and firearms violence in Detroit. *Ann Am Acad Pol Soc Sci*. 1981;455(May):150–167.

85. Loftin C, McDowall D. The deterrent effects of the Florida felony firearm law. *J Crim Law Crim*. 1984;75(1):250–259.

86. McDowall D, Loftin C, Wiersema B. A comparative study of the preventive effects of mandatory sentencing laws for gun crimes. *J Crim Law Crim*. 1992;83(2):378–394.

87. Fife D, Abrams WR. Firearms' decreased role in New Jersey homicides after a mandatory sentencing law. *J Trauma*. 1989;29(11):1548–1551.

88. O'Carroll PW, Loftin C, Waller JB Jr, et al. Preventing homicide: an evaluation of the efficacy of a Detroit gun ordinance. *Am J Public Health*. 1991;81(5):576–581.

89. Marvell TB, Moody CE. The impact of enhanced prison terms for felonies committed with guns. *Criminology*. 1995;33(2):247–281.

90. La Valle JM. Guns and homicide: Is the instrument-focused approach to deterrence efficacious? *Justice Policy J*. 2008;5(2):1–30.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

91. Raphael S, Ludwig J. Prison sentence enhancements: the case of Project Exile. In: Cook P, Ludwig J, eds. *Evaluating Gun Policy: Effects on Crime and Violence.* Washington, DC: Brookings Institution; 2003:251–286.

92. Rosenfeld R, Fornango R, Baumer E. Did Ceasefire, Compstat, and Exile reduce homicide? *Criminol Public Policy.* 2005;4(3):419–449.

93. Rosenfeld R. Gun buybacks: crime control or community mobilization. In: Plotkin M, ed. *Under Fire: Gun Buybacks, Exchanges and Amnesty Programs.* Washington, DC: Police Executive Research Forum; 1995:1–28.

94. Phillips SW, Kim DY, Sobol JJ. An evaluation of a multiyear gun buy-back programme: re-examining the impact on violent crimes. *Int J Police Sci Manage.* 2013;15(3):246–261.

95. Leigh A, Neill C. Do gun buybacks save lives? Evidence from panel data. *Am Law Econ Rev.* 2010;12(2):509–557.

96. Magaddino J, Medoff M. State firearm control laws and violent crimes—an empirical analysis of federal and state firearm control laws. In: Kates D, ed. *Firearms and Violence.* Cambridge, MA: Ballinger; 1984:229–241.

97. Loftin C, McDowall D, Wiersema B, et al. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. *N Engl J Med.* 1991;325(23):1615–1620.

98. McDowall D, Loftin C, Wiersema B. Using quasi-experiments to evaluate firearm laws: comment on Britt et al.'s reassessment of the D.C. Gun Law. *Law Soc Rev.* 1996;30(2):381–391.

99. Britt CL, Kleck G, Bordua DJ. A reassessment of the D.C. Gun Law: some cautionary notes on the use of interrupted time series designs for policy impact assessment. *Law Soc Rev.* 1996;30(2):361–380.

100. Britt CL, Kleck G, Bordua DJ. Avoidance and misunderstanding: a rejoinder to McDowall et al. *Law Soc Rev.* 1996;30(2):393–398.

101. Leenaars AA, Lester D. The impact of gun control (Bill C-51) on homicide in Canada. *J Crim Just.* 2001;29(4):287–294.

102. Leenaars AA, Lester D. Gender, gun control, suicide and homicide: a reply. *Arch Suicide Res.* 1999;5(1):77–79.

103. Carrington PJ. Gender, gun control, suicide and homicide in Canada. *Arch Suicide Res.* 1999;5(1):71–75.

104. Mauser GA, Holmes RA. An evaluation of the 1977 Canadian firearms legislation. *Eval Rev.* 1992;16(6):603–617.

105. Blais E, Gagne MP, Linteau I. The effect of laws in relation to firearm control on homicides in Canada, 1974–2004. *Can J Criminol Crim.* 2011;53(1):27–61.

106. Langmann C. Canadian firearms legislation and effects on homicide 1974 to 2008. *J Interpers Violence.* 2012;27(12):2303–2321.

107. McPhedran S, Mauser G. Lethal firearm-related violence against Canadian women: Did tightening gun laws have an impact on women's health and safety? *Violence Vict.* 2013;28(5):875–883.

108. Rich CL, Young JG, Fowler RC, et al. Guns and suicide: possible effects of some specific legislation. *Am J Psychiatry.* 1990;147(3):342–346.

109. Carrington PJ, Moyer S. Gun control and suicide in Ontario. *Am J Psychiatry.* 1994;151(4):606–608.

110. Leenaars AA, Moksony F, Lester D, et al. The impact of gun control (Bill C-51) on suicide in Canada. *Death Stud.* 2003;27(2):103–124.

111. Caron J, Julien M, Huang JH. Changes in suicide methods in Quebec between 1987 and 2000: the possible impact of bill C-17 requiring safe storage of firearms. *Suicide Life Threat Behav.* 2008;38(2):195–208.

112. Gagné M, Robitaille Y, Hamel D, et al. Firearms regulation and declining rates of male suicide in Quebec. *Inj Prev.* 2010;16(4):247–253.

113. Cheung AH, Dewa CS. Current trends in youth suicide and firearms regulations. *Can J Public Health.* 2005;96(2):131–135.

114. Leenaars AA, Lester D. Effects of gun control on the accidental death rate from firearms in Canada. *J Safety Res.* 1997;28(3):119–122.

115. Chapman S, Alpers P, Agho K, et al. Australia's 1996 gun law reforms: faster falls in firearm deaths, firearm suicides, and a decade without mass shootings. *Inj Prev.* 2006;12(6):365–372.

116. Baker J, McPhedran S. Gun laws and sudden death: Did the Australian firearms legislation of 1996 make a difference? *Br J Criminol.* 2007;47(3):455–469.

117. Neill C, Leigh A. Weak tests and strong conclusions: a re-analysis of gun deaths and the Australian firearms buyback. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1011519. Published September 5, 2007. Accessed December 12, 2014.

118. Lee WS, Suardi S. The Australian firearms buyback and its effect on gun deaths. *Contemp Econ Policy.* 2010;28(1):65–79.

119. McPhedran S, Baker J. Suicide prevention and method restriction: evaluating the impact of limiting access to lethal means among young Australians. *Arch Suicide Res.* 2012;16(2):135–146.

120. Klieve H, Barnes M, De Leo D. Controlling firearms use in Australia: Has the 1996 gun law reform produced the decrease in rates of suicide with this method? *Soc Psychiatry Psychiatr Epidemiol.* 2009;44(4):285–292.

121. Snowdon J, Harris L. Firearms suicides in Australia. *Med J Aust.* 1992;156(2):79–83.

122. Marinho de Souza Mde F, Macinko J, Alencar AP, et al. Reductions in firearm-related mortality and hospitalizations in Brazil after gun control. *Health Aff (Millwood).* 2007;26(2):575–584.

123. Kapusta ND, Etzersdorfer E, Krall C, et al. Firearm legislation reform in the European Union: impact on firearm availability, firearm suicide and homicide rates in Austria. *Br J Psychiatry.* 2007;191:253–257.

124. Niederkrotenthaler T, Till B, Herberth A, et al. Can media effects counteract legislation reforms? The case of adolescent firearm suicides in the wake of the Austrian firearm legislation. *J Adolesc Health.* 2009;44(1):90–93.

125. Beautrais AL, Fergusson DM, Horwood LJ. Firearms legislation and reductions in firearm-related suicide deaths in New Zealand. *Aust N Z J Psychiatry.* 2006;40(3):253–259.

126. Matzopoulos RG, Thompson ML, Myers JE. Firearm and nonfirearm homicide in 5 South African cities: a retrospective population-based study. *Am J Public Health.* 2014;104(3):455–460.

127. Geisel MS, Roll R, Wettick RS Jr. The effectiveness of state and local regulation of handguns: a statistical analysis. *Duke Law J.* 1969;18(4):647–676.

128. Murray DR. Handguns, gun control laws and firearm violence. *Soc Probl.* 1975;23(1):81–93.

129. Lester D, Murrell ME. The influence of gun control laws on personal violence. *J Community Psychol.* 1986;14(3):315–318.

130. Lester D. Gun control, gun ownership, and suicide prevention. *Suicide Life Threat Behav.* 1988;18(2):176–180.

131. Seitz S. Firearms, homicides, and gun control effectiveness. *Law Soc Rev.* 1972;6(4):595–614.

Downloaded from https://academic.oup.com/epirev/article-abstract/38/1/140/2754868 by White & Case LLP user on 30 December 2019

132. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide. A tale of two cities. *N Engl J Med*. 1988;319(19):1256–1262.

133. Kwon IWG, Scott B, Safranski SR, et al. The effectiveness of gun control laws: multivariate statistical analysis. *Am J Econ Sociol*. 1997;56(1):41–50.

134. Kwon IWG, Baack DW. The effectiveness of legislation controlling gun usage: a holistic measure of gun control legislation. *Am J Econ Sociol*. 2005;64(2):533–547.

135. Lanza SP. The effect of firearm restrictions on gun-related homicides across US states. *Appl Econ Lett*. 2014;21(13):902–905.

136. Safavi A, Rhee P, Pandit V, et al. Children are safer in states with strict firearm laws: a National Inpatient Sample study. *J Trauma Acute Care Surg*. 2014;76(1):146–150.

137. Fleegler EW, Lee LK, Monuteaux MC, et al. Firearm legislation and firearm-related fatalities in the United States. *JAMA Intern Med*. 2013;173(9):732–740.

138. Lester C, Murrell ME. The influence of gun control laws on suicidal behavior. *Am J Psychiatry*. 1980;137(1):121–122.

139. Lester D, Murrell ME. The preventive effect of strict gun control laws on suicide and homicide. *Suicide Life Threat Behav*. 1982;12(3):131–140.

140. Lester D. Capital punishment, gun control, and personal violence (suicide and homicide). *Psychol Rep*. 1990;66(1):122.

141. Sommers PM. The effect of gun control laws on suicide rates. *Atl Econ J*. 1984;12(1):67–69.

142. Boor M, Bair JH. Suicide rates, handgun control laws, and sociodemographic variables. *Psychol Rep*. 1990;66(3 pt 1):923–930.

143. Sloan JH, Rivara FP, Reay DT, et al. Firearm regulations and rates of suicide. a comparison of two metropolitan areas. *N Engl J Med*. 1990;322(6):369–373.

144. Conner KR, Zhong Y. State firearm laws and rates of suicide in men and women. *Am J Prev Med*. 2003;25(4):320–324.

145. Cartwright N, Hardie J. *Evidence-Based Policy: A Practical Guide to Doing It Better*. New York, NY: Oxford University Press; 2012.

146. Cook P, Goss K. *The Gun Debate, What Everyone Needs to Know*. New York, NY: Oxford University Press; 2014.

147. Gun Control Act of 1968, 101, Pub. L. No. 90-618, 82 Stat. 1213-1236. http://www.gpo.gov/fdsys/pkg/STATUTE-82/pdf/STATUTE-82-Pg1213-2.pdf. Accessed August 12, 2015.

148. Jones E 3rd. The District of Columbia's 'Firearms Control Regulations Act of 1975': the toughest handgun control law in the United States—or is it? *Ann Am Acad Pol Soc Sci*. 1981;455:138–149.

149. Brady Handgun Violence Prevention Act. Pub. L. No. 103-159, 107 Stat. 1536-1546. http://www.gpo.gov/fdsys/pkg/STATUTE-107/pdf/STATUTE-107-Pg1536.pdf. Accessed August 11, 2015.

150. Royal Canadian Mounted Police. History of firearms control in Canada: up to and including the Firearms Act. http://www.rcmp-grc.gc.ca/cfp-pcaf/pol-leg/hist/con-eng.htm. Updated June 19, 2012. Accessed August 12, 2015.

151. Australian Government, Australian Institute of Criminology. Legislative reforms. http://www.aic.gov.au/publications/current series/rpp/100-120/rpp116/06_reforms.html. Updated June 29, 2012. Accessed August 12, 2015.

152. Library of Congress. Firearms-control legislation and policy: Australia. http://www.loc.gov/law/help/firearms-control/australia.php. Updated July 30, 2015. Accessed August 12, 2015.

153. Attorney-General's Department, Government of South Australia. South Australia Firearms Act 1977. http://www.legislation.sa.gov.au/LZ/C/A/FIREARMS ACT 1977.aspx. Accessed August 12, 2015.

154. Câmara dos Deputados. Estatuto do Desarmamento. http://www2.camara.leg.br/busca/?o=recent&v=noticias&colecao=AGENCIA_CAMARA&assunto=estatuto+do+desarmamento. Accessed January 26, 2016.

155. Kirsten A. Simpler, better, faster—review of the 2005 firearms amnesty. Institute for Security Studies. http://www.issafrica.org/uploads/Paper134.pdf. Published April 2007. Accessed August 12, 2015.U.

156. The Law Library of Congress. Firearms-control legislation and policy. https://www.loc.gov/law/help/firearms-control/firearms-control.pdf. Published February 2013. Accessed January 26, 2016.

# EXHIBIT 64



IOHN LOCKE

# TWO TREATISES OF GOVERNMENT
## BY IOHN LOCKE

### SALUS POPULI SUPREMA LEX ESTO

LONDON PRINTED MDCLXXXVIIII
REPRINTED, THE SIXTH TIME, BY A. MILLAR, M.
WOODFALL, I. WHISTON AND B. WHITE, I. RI-
VINGTON, L. DAVIS AND C. REYMERS, R. BALD-
WIN, HAWES CLARKE AND COLLINS; W. IOHN-
STON, W. OWEN, I. RICHARDSON, S. CROWDER,
T. LONGMAN, B. LAW, C. RIVINGTON, E.
DILLY, R. WITHY, C. AND R. WARE, S. BAKER,
T. PAYNE, A. SHUCKBURGH, L. HINXMAN
MDCCLXIIII

The prefent Edition of this Book has not only been collated with the firft three Editions, which were publifhed during the Author's Life, but alfo has the Advantage of his laft Corrections and Improvements, from a Copy delivered by him to Mr. Peter Cofte, communicated to the Editor, and now lodged in Chrift College, Cambridge.

TWO TREATISES OF GOVERNMENT.
IN THE FORMER THE FALSE PRIN-
CIPLES AND FOUNDATION OF SIR
ROBERT FILMER AND HIS FOL-
LOWERS ARE DETECTED AND
OVERTHROWN.
THE LATTER IS AN ESSAY CON-
CERNING THE TRUE ORIGINAL
EXTENT AND END OF CIVIL
GOVERNMENT.



# OF CIVIL-GOVERNMENT

## BOOK II

Chap. I. §. 1. It having been ſhewn in the foregoing diſcourſe,

1. That *Adam* had not, either by natural right of fatherhood, or by poſitive donation from God, any ſuch authority over his children, or dominion over the world, as is pretended :

2. That if he had, his heirs, yet, had no right to it :

3. That if his heirs had, there being no law of nature nor poſitive law of God that determines which is the right heir in all caſes that may ariſe, the right of ſucceſſion, and conſequently of bearing rule, could not have been certainly determined :

4. That if even that had been determined, yet the knowledge of which is the eldeſt line

O                              of

194   OF CIVIL-GOVERNMENT.

of *Adam*'s posterity, being so long since utterly lost, that in the races of mankind and families of the world, there remains not to one above another, the least pretence to be the eldest house, and to have the right of inheritance:

All these premises having, as I think, been clearly made out, it is impossible that the rulers now on earth should make any benefit, or derive any the least shadow of authority from that, which is held to be the fountain of all power, *Adam's private dominion and paternal jurisdiction*; so that he that will not give just occasion to think that all government in the world is the product only of force and violence, and that men live together by no other rules but that of beasts, where the strongest carries it, and so lay a foundation for perpetual disorder and mischief, tumult, sedition and rebellion, (things that the followers of that hypothesis so loudly cry out against) must of necessity find out another rise of government, another original of political power, and another way of designing and knowing the persons that have it, than what Sir *Robert Filmer* hath taught us.

§. 2. To this purpose, I think it may not be amiss, to set down what I take to be political power; that the power of a *magistrate* over a subject may be distinguished from that of a *father* over his children, a *master* over his servant, a *husband* over his wife, and

a

a *lord* over his flave. All which diftinct powers happening fometimes together in the fame man, if he be confidered under thefe different relations, it may help us to diftinguifh thefe powers one from another, and fhew the difference betwixt a ruler of a common-wealth, a father of a family, and a captain of a galley.

§. 3. *Political power*, then, I take to be a *right* of making laws with penalties of death, and confequently all lefs penalties, for the regulating and preferving of property, and of employing the force of the community, in the execution of fuch laws, and in the defence of the common-wealth from foreign injury; and all this only for the public good.

## CHAP. II.

### *Of the State of Nature.*

§. 4. TO underftand political power right, and derive it from its original, we muft confider, what ftate all men are naturally in, and that is, a *ftate of perfect freedom* to order their actions, and difpofe of their poffeffions and perfons, as they think fit, within the bounds of the law of nature, without afking leave, or depending upon the will of any other man.

A *ftate* alfo *of equality*, wherein all the power and jurifdiction is reciprocal, no one

having

196   OF CIVIL-GOVERNMENT.

having more than another; there being no-
thing more evident, than that creatures of
the same species and rank, promiscuously born
to all the same advantages of nature, and
the use of the same faculties, should also be
equal one amongst another without subor-
dination or subjection, unless the lord and
master of them all should, by any manifest
declaration of his will, set one above another,
and confer on him, by an evident and clear
appointment, an undoubted right to dominion
and sovereignty.

§. 5. This *equality* of men by nature, the
judicious *Hooker* looks upon as so evident in
itself, and beyond all question, that he makes
it the foundation of that obligation to mu-
tual love amongst men, on which he builds
the duties they owe one another, and from
whence he derives the great maxims *of justice*
and *charity*.   His words are,

*The like natural inducement hath brought
men to know that it is no less their duty, to
love others than themselves; for seeing those
things which are equal, must needs all have one
measure; if I cannot but wish to receive good,
even as much at every man's hands, as any man
can wish unto his own soul, how should I look
to have any part of my desire herein satisfied,
unless myself be careful to satisfy the like desire,
which is undoubtedly in other men, being of one
and the same nature? To have any thing offered
them repugnant to this desire, must needs in all
respects*

*respects grieve them as much as me; so that if I do harm, I must look to suffer, there being no reason that others should shew greater measure of love to me, than they have by me shewed unto them: my desire therefore to be loved of my equals in nature, as much as possible may be, imposeth upon me a natural duty of bearing to them-ward fully the like affection; from which relation of equality between ourselves and them that are as ourselves, what several rules and canons natural reason hath drawn, for direction of life, no man is ignorant.* Eccl. Pol. Lib. 1.

§. 6. But though this be *a state of liberty,* yet *it is not a state of licence:* though man in that state have an uncontroulable liberty to dispose of his person or possessions, yet he has not liberty to destroy himself, or so much as any creature in his possession, but where some nobler use than its bare preservation calls for it. The *state of nature* has a law of nature to govern it, which obliges every one: and reason, which is that law, teaches all mankind, who will but consult it, that being all *equal and independent,* no one ought to harm another in his life, health, liberty, or possessions: for men being all the workmanship of one omnipotent, and infinitely wise maker; all the servants of one sovereign master, sent into the world by his order, and about his business; they are his property, whose workmanship they are, made to last

O 3 during

198   OF CIVIL-GOVERNMENT.

during his, not one another's pleasure: and being furnished with like faculties, sharing all in one community of nature, there cannot be supposed any such *subordination* among us, that may authorize us to destroy one another, as if we were made for one another's uses, as the inferior ranks of creatures are for our's. Every one, as he is *bound to preserve himself*, and not to quit his station wilfully, so by the like reason, when his own preservation comes not in competition, ought he, as much as he can, *to preserve the rest of mankind*, and may not, unless it be to do justice on an offender, take away, or impair the life, or what tends to the preservation of the life, the liberty, health, limb, or goods of another.

§. 7. And that all men may be restrained from invading others rights, and from doing hurt to one another, and the law of nature be observed, which willeth the peace and *preservation of all mankind*, the *execution* of the law of nature is, in that state, put into every man's hands, whereby every one has a right to punish the transgressors of that law to such a degree, as may hinder its violation: for the *law of nature* would, as all other laws that concern men in this world, be in vain, if there were no body that in the state of nature had a *power to execute* that law, and thereby preserve the innocent and restrain offenders. And if any one in the state of nature may punish another for any evil he has done,

4

done, every one may do ſo : for in that *ſtate of perfect equality*, where naturally there is no ſuperiority or juriſdiction of one over another, what any may do in proſecution of that law, every one muſt needs have a right to do.

§. 8. And thus, in the ſtate of nature, *one man comes by a power over another* ; but yet no abſolute or arbitrary power, to uſe a criminal, when he has got him in his hands, according to the paſſionate heats, or boundleſs extravagancy of his own will ; but only to retribute to him, ſo far as calm reaſon and conſcience dictate, what is proportionate to his tranſgreſſion, which is ſo much as may ſerve for *reparation* and *reſtraint :* for theſe two are the only reaſons, why one man may lawfully do harm to another, which is that we call *puniſhment*. In tranſgreſſing the law of nature, the offender declares himſelf to live by another rule than that of reaſon and common equity, which is that meaſure God has ſet to the actions of men, for their mutual ſecurity ; and ſo he becomes dangerous to mankind, the tye, which is to ſecure them from injury and violence, being ſlighted and broken by him. Which being a treſpaſs againſt the whole ſpecies, and the peace and ſafety of it, provided for by the law of nature, every man upon this ſcore, by the right he hath to preſerve mankind in general, may reſtrain, or where it is neceſ-

O 4                             ſary,

fary, deſtroy things noxious to them, and ſo
may bring ſuch evil on any one, who hath
tranſgreſſed that law, as may make him re-
pent the doing of it, and thereby deter him,
and by his example others, from doing the
like miſchief. And in this caſe, and upon
this ground, *every man hath a right to puniſh
the offender, and be executioner of the law of
nature.*

§. 9. I doubt not but this will ſeem a very
ſtrange doctrine to ſome men : but before
they condemn it, I deſire them to reſolve
me, by what right any prince or ſtate can
put to death, or *puniſh an alien*, for any crime
he commits in their country. It is certain
their laws, by virtue of any ſanction they
receive from the promulgated will of the
legiſlative, reach not a ſtranger : they ſpeak
not to him, nor, if they did, is he bound to
hearken to them. The legiſlative authority,
by which they are in force over the ſubjects
of that common-wealth, hath no power over
him. Thoſe who have the ſupreme power
of making laws in *England, France* or *Holland,*
are to an *Indian,* but like the reſt of the
world, men without authority : and there-
fore, if by the law of nature every man
hath not a power to puniſh offences againſt
it, as he ſoberly judges the caſe to require,
I ſee not how the magiſtrates of any com-
munity can *puniſh an alien* of another coun-
try ; ſince, in reference to him, they can have

no

no more power than what every man naturally may have over another.

§. 10. Befides the crime which confifts in violating the law, and varying from the right rule of reafon, whereby a man fo far becomes degenerate, and declares himfelf to quit the principles of human nature, and to be a noxious creature, there is commonly *injury* done to fome perfon or other, and fome other man receives damage by his tranfgreffion : in which cafe he who hath received any damage, has, befides the right of punifhment common to him with other men, a particular right to feek *reparation* from him that has done it : and any other perfon, who finds it juft, may alfo join with him that is injured, and affift him in recovering from the offender fo much as may make fatisfaction for the harm he has fuffered.

§. 11. From thefe *two diftinct rights,* the one of *punifhing* the crime *for reftraint,* and preventing the like offence, which right of punifhing is in every body ; the other of taking *reparation,* which belongs only to the injured party, comes it to pafs that the magiftrate, who by being magiftrate hath the common right of punifhing put into his hands, can often, where the public good demands not the execution of the law, *remit* the punifhment of criminal offences by his own authority, but yet cannot *remit* the fatisfaction due to any private man for the damage

202   OF CIVIL-GOVERNMENT.

damage he has received.   That, he who has
suffered the damage has a right to demand
in his own name, and he alone can remit :
the damnified person has this power of ap-
propriating to himself the goods or service
of the offender, *by right of self-preservation*,
as every man has a power to punish the
crime, to prevent its being committed again,
*by the right he has of preserving all mankind,* and
doing all reasonable things he can in order
to that end : and thus it is, that every man,
in the state of nature, has a power to kill a
murderer, both *to deter* others from doing
the like injury, which no reparation can
compensate, by the example of the punish-
ment that attends it from every body, and
also to secure men from the attempts of a
criminal, who having renounced reason, the
common rule and measure God hath given
to mankind, hath, by the unjust violence and
slaughter he hath committed upon one, de-
clared war against all mankind, and there-
fore may be destroyed as a *lion* or a *tyger*,
one of those wild savage beasts, with whom
men can have no society nor security : and
upon this is grounded that great law of na-
ture, *Whoso sheddeth man's blood, by man shall
his blood be shed.*   And *Cain* was so fully con-
vinced, that every one had a right to destroy
such a criminal, that after the murder of
his brother, he cries out, *Every one that findeth
me,*

*me, shall slay me*; so plain was it writ in the hearts of all mankind.

§. 12. By the same reason may a man in the state of nature *punish the lesser breaches* of that law. It will perhaps be demanded, with death? I answer, each transgression may be *punished* to that *degree*, and with so much *severity*, as will suffice to make it an ill bargain to the offender, give him cause to repent, and terrify others from doing the like. Every offence, that can be committed in the state of nature, may in the state of nature be also punished equally, and as far forth as it may, in a common-wealth : for though it would be besides my present purpose, to enter here into the particulars of the law of nature, or its *measures of punishment*; yet, it is certain there is such a law, and that too, as intelligible and plain to a rational creature, and a studier of that law, as the positive laws of common-wealths ; nay, possibly plainer ; as much as reason is easier to be understood, than the fancies and intricate contrivances of men, following contrary and hidden interests put into words; for so truly are a great part of the *municipal laws* of countries, which are only so far right, as they are founded on the law of nature, by which they are to be regulated and interpreted.

§. 13. To this strange doctrine, *viz.* That *in the state of nature every one has the executive power* of the law of nature, I doubt not but it
will

204   OF CIVIL-GOVERNMENT.

will be objected, that it is unreasonable for men to be judges in their own cases, that self-love will make men partial to themselves and their friends: and on the other side, that ill nature, passion and revenge will carry them too far in punishing others; and hence nothing but confusion and disorder will follow, and that therefore God hath certainly appointed government to restrain the partiality and violence of men. I easily grant, that *civil government* is the proper remedy for the inconveniencies of the state of nature, which must certainly be great, where men may be judges in their own case, since it is easy to be imagined, that he who was so unjust as to do his brother an injury, will scarce be so just as to condemn himself for it: but I shall desire those who make this objection, to remember, that *absolute monarchs* are but men; and if government is to be the remedy of those evils, which necessarily follow from men's being judges in their own cases, and the state of nature is therefore not to be endured, I desire to know what kind of government that is, and how much better it is than the state of nature, where one man, commanding a multitude, has the liberty to be judge in his own case, and may do to all his subjects whatever he pleases, without the least liberty to any one to question or controul those who execute his pleasure? and in whatsoever he doth, whether led by reason, mistake or passion, must be submitted to? much better

it

Case 3:19-cv-01226-L-AHG   Document 34-11   Filed 01/03/20   PageID.7937   Page 304 of 305

it is in the state of nature, wherein men are not bound to submit to the unjust will of another : and if he that judges, judges amiss in his own, or any other case, he is answerable for it to the rest of mankind.

§. 14. It is often asked as a mighty objection, *where are*, or ever were there any *men in such a state of nature?* To which it may suffice as an answer at present, that since all princes and rulers of *independent* governments all through the world, are in a state of nature, it is plain the world never was, nor ever will be, without numbers of men in that state. I have named all governors of *independent communities*, whether they are, or are not, in league with others : for it is not every compact that puts an end to the state of nature between men, but only this one of agreeing together mutually to enter into one community, and make one body politic ; other promises, and compacts, men may make one with another, and yet still be in the state of nature. The promises and bargains for truck, &c. between the two men in the desert island, mentioned by *Garcilasso de la Vega*, in his history of *Peru* ; or between a *Swiss* and an *Indian*, in the woods of *America*, are binding to them, though they are perfectly in a state of nature, in reference to one another : for truth and keeping of faith belongs to men, as men, and not as members of society.

§. 15.

206   OF CIVIL-GOVERNMENT.

§. 15. To those that say, there were never any men in the state of nature, I will not only oppose the authority of the judicious *Hooker, Eccl. Pol. lib.* i. *sect.* 10. where he says, *The laws which have been hitherto mentioned,* i. e. the laws of nature, *do bind men absolutely, even as they are men, although they have never any settled fellowship, never any solemn agreement amongst themselves what to do, or not to do: but forasmuch as we are not by ourselves sufficient to furnish ourselves with competent store of things, needful for such a life as our nature doth desire, a life fit for the dignity of man; therefore to supply those defects and imperfections which are in us, as living single and solely by ourselves, we are naturally induced to seek communion and fellowship with others: this was the cause of men's uniting themselves at first in politic societies.* But I moreover affirm, that all men are naturally in that state, and remain so, till by their own consents they make themselves members of some politic society; and I doubt not in the sequel of this discourse, to make it very clear.

---

## C H A P.  III.
### *Of the State of War.*

§. 16. THE *state of war* is a state of *enmity* and *destruction:* and therefore declaring by word or action, not

a