# EXHIBIT 66

# The Right Not to Be Shot: Public Safety, Private Guns, and the Constellation of Constitutional Liberties

Jonathan Lowy* and Kelly Sampson**

## Table of Contents

Introduction: Dueling Visions of America's First Freedom . . . . . . .   188

I.   The Right for Which "There is No Remedy of
     Resurrection" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   191

II.  Protecting Lives: The First Legitimate Object of Good
     Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   196

     A.   America's First Freedom . . . . . . . . . . . . . . . . . . . . . . . . .   196

     B.   Constitutional Recognition of the Right to Live . . . . . . . . . . .   198

     C.   Public Safety is Paramount . . . . . . . . . . . . . . . . . . . . . . . . .   198

          i.    Public Safety Limits Fifth Amendment Rights . . . . . . . .   198

          ii.   Public Safety Limits First Amendment Rights . . . . . . . .   199

          iii.  Public Safety Limits Property Rights . . . . . . . . . . . . . .   200

          iv.   Public Safety Limits Habeas Corpus Rights . . . . . . . . . .   200

     D.   Back to the Future: Protecting Life and Public Safety in
          Pre-Heller America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   201

III. Protecting America's First Freedom in the Post-Heller
     World . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   204

Conclusion: Reclaiming America's First Freedom . . . . . . . . . . . . .   205

*   Director, Legal Action Project, Brady Center to Prevent Gun Violence.
**  Staff Attorney, Legal Action Project, Brady Center to Prevent Gun Violence.
    Thanks to Elizabeth Holtzman, who years ago responded to the *Heller* decision by asking: "What about the right to life?" Thanks also to Sara Murphy, Brad Paraszczak, and Matthew Merlo for extraordinary research; Joseph Blocher, Dennis Henigan, Paul Wolfson, Alla Lefkowitz, and Rob Wilcox for advice; and Kelsey Rogers and Saurav Sarkar for invaluable all-around assistance. © 2016, Jonathan Lowy and Kelly Sampson.

INTRODUCTION: DUELING VISIONS OF AMERICA'S FIRST FREEDOM

*"They talk about gun rights. What about Chris's right to live?"*[1]
—Richard Martinez, after his son Chris was killed in the
2014 Santa Barbara spree shootings

*"[Y]our dead kids don't trump my Constitutional rights."*[2]
—Joe "the Plumber" Wurzelbacher, responding to Richard Martinez

On the evening of February 26, 2012, a seventeen-year old boy bought a soft drink and candy at a convenience store in Sanford, Florida, and began walking back to the house where he was staying with his father.[3] He was spotted by a twenty-eight-year old man, who was sitting in a truck. The man called the police, telling them he was suspicious of the teen. The police told him someone was on the way. Though the police discouraged the man from pursuing the boy, the man left his vehicle and followed him into the rainy night. The man was carrying a loaded semi-automatic pistol, for which the State of Florida had issued him a permit to carry. The man claimed to be carrying the gun to protect his community as a Neighborhood Watch volunteer. What happened next is disputed, but what is certain is that the man shot and killed the teen. A jury later found that the man, George Zimmerman, had committed no crime in shooting and killing the teen, Trayvon Martin. Zimmerman retained his Florida gun permit, entitling him to carry a loaded gun on streets, in parks—virtually anywhere.[4]

Many gun rights proponents assert that it was not just Florida law that allowed Zimmerman to carry and fire his gun, but the United States Constitution—specifically the Second Amendment's right to keep and bear arms (the "RKBA," for short).[5] The Second Amendment, they claim, entitles anyone who can legally possess a gun to carry and use it in "confrontation," in the home or in

---

1. Todd Leopold, *Father of Rampage Victim: 'When will this insanity stop?'* CNN (May 27, 2014, 8:01 PM), http://www.cnn.com/2014/05/24/us/santa-barbara-shooting-victims/.

2. Joe Wurzelbacher, *An Open Letter: To the Parents of the Victims Murdered by Elliot Rodger*, BARBWIRE (May 27, 2014, 6:05 AM), http://barbwire.com/2014/05/27/open-letter-parents-victims-murdered-elliot-rodger/; *see also* Alan Rappeport, *Ben Carson on Oregon: "I Would Not Just Stand There And Let Them Shoot Me,"* N.Y. TIMES: FIRST DRAFT (Oct. 6, 2015, 1:34 PM), http://www.nytimes.com/politics/first-draft/2015/10/06/ben-carson-says-he-would-have-been-more-aggressive-against-oregon-gunman/ (quoting Republican presidential candidate Ben Carson saying that "I never saw a body with bullet holes that was more devastating than taking the right to arm ourselves away").

3. For details on the shooting of Trayvon Martin, *see* Adam Weinstein et al., *The Trayvon Martin Killing, Explained*, MOTHER JONES (Mar. 18, 2012, 12:42 PM), http://www.motherjones.com/politics/2012/03/what-happened-trayvon-martin-explained.

4. *See* Katie McDonough, *George Zimmerman Arrested for Domestic Violence Again—Will He Finally Lose His Guns?*, SALON (Jan. 12, 2015, 4:39 PM), http://www.salon.com/2015/01/12/george_zimmerman_arrested_for_domestic_violence_again/ ("[B]ecause [Zimmerman] was ultimately acquitted in the fatal shooting of Martin, . . . he's free to own and carry as many guns as he'd like.").

5. U.S. CONST. amend. II.

public spaces.[6] Gun rights lawsuits seek to strike down laws that deny gun carry permits to people who do not have good cause or a particular need to carry guns in public; such restrictions, advocates say, are as unconstitutional as laws prohibiting "almost all persons from speaking out loud in public."[7] Other constitutional challenges seek to invalidate laws that require gun owners to have firearms training; mandate safety standards for guns; bar sales of military-style weapons to civilians; or prohibit domestic abusers from possessing guns.[8] The right to keep and bear arms is not only broad, the NRA says; it is "America's First Freedom."[9]

This expansive conception of the Second Amendment is not supported by Supreme Court precedent. *District of Columbia v. Heller*[10] and *McDonald v. City of Chicago*[11] recognized only "the right of law-abiding, responsible citizens to use arms in defense of hearth and home,"[12] and emphasized that while total handgun bans are "off the table,"[13] most and perhaps all other gun laws remain constitutional—including bans on carrying concealed weapons in public.[14] This article contends that a sweeping right to guns also is at odds with our most fundamental rights.

"America's First Freedom" is *not* the right to firearms; it is the freedom that the Founders, in fact, announced first: the right to life, liberty, and the pursuit of

---

6. *See, e.g.,* Woollard v. Gallagher, 712 F.3d 865, 872 (4th Cir. 2013) (reversing district court decision recognizing "the right of individuals to possess and carry firearms in case of confrontation . . . is a right that extends beyond the home."). Five states have enacted "Constitutional Carry" laws that allow public carrying without a permit. Vermont has never required permits. *See* Law Center to Prevent Gun Violence, *Concealed Weapons Permitting Policy Summary* (Sept. 10, 2015), http:// smartgunlaws.org/concealed-weapons-permitting-policy-summary/.

7. Brief of Amicus Curiae Center for Constitutional Jurisprudence at 12, McKay v. Hutchens, No. 12-57049 (9th Cir. Dec. 6, 2012), 2012 WL 6538347.

8. *See, e.g.,* Heller v. District of Columbia, 801 F.3d 264 (D.C. Cir. 2015) (striking down parts of District of Columbia gun law requiring re-registration of firearms, passage of a test of knowledge about local gun laws, and one-pistol-per-month registration limitations); Friedman v. City of Highland Park, 784 F.3d 406 (7th Cir.), *cert. denied,* 136 S. Ct. 447 (2015) (rejecting challenge to city ordinance generally prohibiting the possession, sale, or manufacture of semi-automatic weapons and large capacity magazines); United States v. Skoien, 614 F.3d 638 (7th Cir. 2010) (upholding statute prohibiting domestic-violence misdemeanants from possessing a firearm); Draper v. Healey, 98 F. Supp. 3d 77 (D. Mass. 2015), *aff'd,* 2016 U.S. App. LEXIS 11003 (1st Cir. June 17, 2016) (dismissing action challenging the constitutionality of regulation requiring certain safety features to be on handguns sold by dealers).

9. The National Rifle Association, for example, published a magazine entitled *America's 1st Freedom. See* NAT'L RIFLE ASS'N OF AM., AMERICA'S 1ST FREEDOM, http://www.americas1stfreedom.org/.

10. 554 U.S. 570 (2008).

11. 561 U.S. 742 (2010).

12. *Heller,* 554 U.S. at 635.

13. *Id.* at 636.

14. *See id.* at 626–27 & n.26; *McDonald,* 561 U.S. at 785 (plurality opinion) ("[S]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment.") (quoting Brief of the States of Texas et al. as Amici Curiae in Support of Petitioners at 23, McDonald v. City of Chicago, 561 U.S. 742 (No. 08-1521), 2009 WL 4378909).

happiness.[15] The right to life—or to live[16]—is protected by the Constitution and is the bedrock principle on which our government and civil society are founded. While courts have not labeled safety interests as deriving from a "right to live,"[17] courts have recognized that public safety (which derives from, and is intended to protect, that right) is paramount, and no rights may expose people to the risk of imminent harm. Whatever gun rights George Zimmerman had that night in Florida, Trayvon Martin had a countervailing right to live—a right not to be shot.

The right to live is of particular importance in today's post-*Heller* world, as the Supreme Court has recognized a right (albeit limited) to lethal firearms. Legal challenges seeking to broadly expand that right force courts to grapple with a heretofore largely novel question: Does the Constitution require the public to be exposed to a risk of lethal violence? This article begins to answer that question.

This article argues that the right to live, as enunciated in America's founding documents, subsumes a right not to be shot,[18] and it serves as a constitutional counterweight that limits Second Amendment rights. We first describe the imminent, lethal risks created by firearms possession and use. We then explore how the Declaration of Independence and Constitution recognize a right to live. We next demonstrate that courts limit the scope of all constitutional rights to prevent people from being exposed to the risk of imminent harm—and that, historically, the RKBA was not allowed to infringe on public safety and order. Finally, we explain that because guns create a risk of imminent harm, the RKBA is necessarily constrained by the Constitution in order to protect public safety. To paraphrase Justice Jackson, the Constitution is not a homicide pact.[19]

In sum, there is constitutional relevance to the question posed by Richard Martinez, and by the ever-growing list of gun violence victims. Americans do enjoy a right to enjoy a club in Orlando, Florida; to watch a movie in Aurora, Colorado; to go to church in Charleston, South Carolina, or temple in Oak Creek, Wisconsin; to meet one's elected representative at a strip mall in Tucson,

---

15. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

16. This article uses "right to live," as it is a more accurate descriptor and avoids confusion with the abortion issue.

17. *Cf.* Bond v. United States, 134 S. Ct. 2077, 2088 (2014) ("The notion that some things 'go without saying' applies to legislation just as it does to everyday life.").

18. In addition to Elizabeth Holtzman and Richard Martinez, others have referred to a right not to be shot. *See* Paul Kurtz, *Mayor Nutter Joins Coalition of Anti-Gun Groups*, CBS PHILLY (Apr. 16, 2014, 5:10 PM) http://philadelphia.cbslocal.com/2014/04/16/mayor-nutter-joins-coalition-of-anti-gun-groups/ (quoting Philadelphia Mayor Michael Nutter saying "I respect the second amendment, but I believe I have a first amendment right not to be shot."); Andy Borowitz, *Right Not to Get Shot Faces Uphill Fight in Senate*, NEW YORKER (Apr. 9, 2013), www.newyorker.com/humor/borowitz-report/right-not-to-get-shot-faces-uphill-fight-in-senate (lampooning Senate Republicans for opposing a hypothetical "controversial bill supporting the right not to get shot").

19. *See* Terminiello v. City of Chicago, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting) ("There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.").

Arizona; to go to work in Washington, D.C., Minneapolis, Minnesota, or Kennesaw, Georgia; to ride a bus in Chicago; to teach or attend a college in Roseburg, Oregon, or Blacksburg, Virginia, or a high school in Littleton, Colorado, or an elementary school in Newtown, Connecticut—without getting shot and killed.[20] When considering the breadth of the RKBA, courts must minimize infringement on individuals' right to live and to public safety.

## I. THE RIGHT FOR WHICH "THERE IS NO REMEDY OF RESURRECTION"

Second Amendment analysis must begin with the recognition that the risks created by firearms are unique among constitutional rights inasmuch as firearms pose a risk of imminent lethality. There is some risk that speech may incite violence, or that a released suspect may commit a crime; but firearms can be used to kill people in seconds,[21] and they often are.

In considering the risks created by the RKBA, it must be acknowledged that a right to firearms implicitly embraces, if not a right to shoot, at least an increased risk that others will be shot. Guns are generally possessed in order to shoot them when the owner deems it necessary to do so. And a gun that is legally (or constitutionally) possessed one second can become a cause of needless death or injury the next. Guns possessed in the home for self-defense can lead to the shooting of visitors or family members mistaken for burglars[22]; unintentional

---

20. *See* Larry Buchanan et al., *How They Got Their Guns*, N.Y. TIMES (June 12, 2016), http://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-guns.html (describing via interactive graphic how perpetrators of mass shootings acquired their firearms); Mark Follman et al., *A Guide to Mass Shootings in America*, MOTHER JONES (July 7, 2016, 10:00 PM), http://www.motherjones.com/politics/2012/07/mass-shootings-map (discussing recent past shootings); Mandi Milligan, *FedEx Gunman Joked He Would Shoot Up Workplace*, CBS46 (Apr. 29, 2014, 6:13 AM), http://www.cbs46.com/story/25375072/shooting-reported-at-fedex-warehouse (discussing workplace shooting at FedEx in Kennesaw, Georgia); Joseph Lindberg, *Minneapolis Workplace Shooting: Gunman Was Fired, Then The Rampage Began*, PIONEER PRESS (St. Paul, Minn.) (Sept. 30, 2012, 11:01 PM), http://www.twincities.com/ci_21673312/minneapolis-police-office-shooter-who-killed-five-was (discussing 2012 workplace shooting at Minneapolis sign company); Kristen Schorsch, *Blair Holt Case: Killer of Student Blair Holt Gets 100 Years in Prison*, CHI. TRIB. (July 21, 2009), http://articles.chicagotribune.com/2009-07-21/news/0907200506_1_prison-killer-bus (discussing incident where a teen was killed by gunman on bus while attempting to shield his friend from gunfire).

21. A semiautomatic handgun can shoot twenty rounds in 3.3 seconds. *See* Brian Palmer, *How Many Times Can You Shoot a Handgun in Seven Minutes?*, SLATE (Nov. 9, 2009, 6:25 PM), www.slate.com/articles/news_and_politics/explainer/2009/11/how_many_times_can_you_shoot_a_handgun_in_seven_minutes.html. An assault rifle, with a high-capacity ammunition magazine, can be shot up to sixty-five times per minute, depending on the shooter's skill and experience. *See* INST. FOR RES. ON SMALL ARMS IN INT'L SEC., *Assault Rifle Fact Sheet #1*, www.guncite.com/assausup.txt.

22. *See, e.g.*, Anoushah Rasta, *HCSO: Husband Accidentally Shoots Wife After Believing Intruder Was Inside Home*, CLICK2HOUSTON.COM (Apr. 24, 2015, 7:43 PM), http://www.click2houston.com/news/hcso-husband-accidentally-shoots-wife-after-thinking-intruder-was-inside-home/32545450; Dan Sullivan, *Woman Shoots 7-Year-Old Grandson She Mistook For an Intruder*, TAMPA BAY TIMES (Aug. 19, 2014, 6:59 AM), http://www.tampabay.com/news/publicsafety/accidents/tampa-grandmother-mistakes-grandson-7-for-intruder-shoots-him-deputies-say/2193576; *Retired Chicago Cop Fatally Shoots Son After Mistaking Him For Burglar*, CBS NEWS (Oct. 10, 2012, 3:26 PM), http://www.cbsnews.com/news/retired-chicago-cop-fatally-shoots-son-after-mistaking-him-for-burglar/; *Cops: Woman Kills Husband,*

shootings, often of children;[23] and suicides.[24] Guns are dropped,[25] stolen,[26] and misfired.[27] Guns turn quotidian skirmishes and feuds deadly.[28] A gun in the home is twenty-two times more likely to be used in a domestic homicide, suicide, or accidental shooting than in self-defense.[29] The risks to women, especially abused women, are even more dire.[30] Even trained officers miss their

---

*Mistaking Him For Intruder*, NBC NEWS (Sept. 11, 2012, 4:06 AM), http://usnews.nbcnews.com/_news/2012/09/11/13800398-cops-woman-kills-husband-mistaking-him-for-intruder.

23. *See* U.S. GOV'T ACCT. OFF., ACCIDENTAL SHOOTINGS: MANY INJURIES AND DEATHS CAUSED BY FIREARMS COULD BE PREVENTED (1991); Matthew Miller et al., *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477, 477 (2001) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths."). There are hundreds of documented child shootings per year, and many incidents are uncounted. *See* Gina Damron & Ann Zaniewski, *4-Year-Old Shot, Killed By 4-Year-Old Cousin in Detroit*, DETROIT FREE PRESS (Jan. 17, 2014, 1:25 PM), http://www.usatoday.com/story/news/nation/2014/01/17/boy-fatally-shot-by-girl-cousin/4566727/; Mark Follman, *At Least 194 Children Have Been Shot To Death Since Newtown*, MOTHER JONES (Dec. 10, 2013, 7:00 AM), http://www.motherjones.com/politics/2013/12/children-killed-guns-newtown-anniversary; Michael Luo & Mike McIntire, *Children and Guns: The Hidden Toll*, N.Y. TIMES (Sept. 28, 2013), http://www.nytimes.com/2013/09/29/us/children-and-guns-the-hidden-toll.html.

24. *See* Matthew Miller et al., *Household Firearm Ownership and Rates of Suicide Across the 50 United States*, 62 J. TRAUMA 1029, 1029–35 (2007) (noting that states with higher gun ownership are associated with higher suicide and gun suicide); BRADY CTR. TO PREVENT GUN VIOLENCE, THE TRUTH ABOUT SUICIDE & GUNS 3–5 (2015), http://www.bradycampaign.org/sites/default/files/Truth-About-Suicide-Guns.pdf.

25. *See* Claudette Riley, *Police: Student Was Passing Gun That Dropped, Fired*, SPRINGFIELD NEWS-LEDGER (Sept. 6, 2014, 6:45 AM), http://www.news-leader.com/story/news/local/ozarks/2014/09/05/central-high-firearm-discharged-backpack/15132835/; *Wife Drops Gun at McDonald's, Shoots Husband*, ASSOCIATED PRESS (Feb. 8, 2013, 3:31 PM), http://archive.azcentral.com/news/free/20130208oregon-wife-drops-gun-mcdonalds-shoots-husband.html.

26. *See* Kelly Matter, *Resident Charged After Killing Home Invasion Suspect with Stolen Gun, Officials Say*, WMBF NEWS (Aug 25, 2015, 7:05 PM), http://www.wmbfnews.com/story/29872377/resident-charged-after-killing-home-invasion-suspect-with-stolen-gun-officials-say; *Jacksonville, Florida: Man Faces Charges After Fatally Shooting Girlfriend with Stolen Gun, Police Say*, MISSOPEN (Oct. 7, 2015), http://www.missopen.com/news/jacksonville-florida-man-faces-charges-after-fatally-shooting-girlfriend-with-stolen-gun-police-say/.

27. *See* Laura Zuckerman, *Idaho Professor Accidentally Shoots Himself in the Foot in Chemistry Class*, REUTERS (Sept. 3, 2014, 3:48 PM) http://www.reuters.com/article/2014/09/03/us-usa-guncontrol-idaho-idUSKBN0GY2E620140903.

28. Ryan Parker et al., *Bell Gardens Mayor Daniel Crespo Fatally Shot at Home; Wife Released*, L.A. TIMES (Sept. 30, 2014, 10:55 PM), http://www.latimes.com/local/lanow/la-me-ln-bell-gardens-mayor-shot-20140930-story.html; Lisa Roose-Church, *'Stand Your Ground' Defense Raised in Road Rage Case*, DETROIT FREE PRESS, (Oct. 7, 2014, 6:06 PM), http://www.freep.com/story/news/local/michigan/2014/10/07/road-rage-shooting/16844745/; Lisa Buie, *Curtis Reeves, Suspect in Movie Theater Shooting, Released on Bail*, TAMPA BAY TIMES (July 11, 2014, 3:16 PM), http://www.tampabay.com/news/courts/criminal/appeals-court-sends-bail-issue-for-accused-movie-theater-shooter-back-to/2188116.

29. *See* Arthur Kellermann et al., *Injuries and Deaths Due to Firearms in the Home*, 45 J. TRAUMA: INJ., INFECTION, & CRITICAL CARE 263, 263 (1998).

30. The presence of a gun in the home of an abused woman makes it six times more likely that she will be killed. *See* Jacquelyn C. Campbell et al., *Assessing Risk Factors for Intimate Partner Homicide*, 250 NAT'L INST. JUST. J. 14, 16 (2003). In 2011, 61% of the women killed with a gun by someone they knew were murdered by a husband or intimate acquaintance. *See* VIOLENCE POL'Y CTR., WHEN MEN MURDER WOMEN: AN ANALYSIS OF 2011 HOMICIDE DATA—FEMALES MURDERED BY MALES IN SINGLE VICTIM/SINGLE OFFENDER INCIDENTS 3 (Sept. 2013), *available at* http://www.vpc.org/studies/wmmw2013.pdf.

target far more than they hit it, and misjudgments are compounded in confrontations.[31] Civilians with less training create greater risks.[32] Guns are often possessed and carried by people who may have anger management problems, struggle with impulse control, or abuse alcohol, among other issues that lead to shootings.[33] People with concealed carry licenses have killed hundreds,[34] and at least some of those deaths would not have happened if a gun were not present.[35] People are shot and killed in the course of everyday life in virtually every place and activity imaginable—in schools, workplaces, shopping centers, theaters, places of worship[36]; while being strolled in a baby carriage, or riding in a car[37]—often at the hands of legal gun owners.[38] Every year in America about 100,000 people are shot, about 30,000 of them fatally, including homicides, suicides, and unintentional shootings.[39]

---

31. A study found that police hit their target 18% of the time in gunfights, 30% when no return of fire. *See* BERNARD D. ROSTKER ET AL., RAND CENTER ON QUALITY POLICING, EVALUATION OF THE NEW YORK CITY POLICE DEPARTMENT FIREARM TRAINING AND FIREARM-DISCHARGE REVIEW PROCESS 14 (2008), *available at* http://www.nyc.gov/html/nypd/downloads/pdf/public_information/RAND_Firearm Evaluation.pdf.

32. *See, e.g., Deadly Hunting Accident Reported in Delaware County, Oklahoma State Bureau of Investigation Reports,* NEWSOK (Sept. 28, 2015), http://newsok.com/deadly-hunting-accident-reported-in-delaware-county-oklahoma-state-bureau-of-investigation-reports/article/5449878; Cassandra Taloma, *Target Shooting Ricochet Blamed For Man's Death in Tule Springs,* LAS VEGAS REV.-J. (Mar. 9, 2015, 5:08 PM), http://www.reviewjournal.com/news/las-vegas/target-shooting-ricochet-blamed-man-s-death-tule-springs; Elizabeth Daley, *Pennsylvania Baby Shot in Head in Apparent Hunting Accident,* REUTERS (Sept. 29, 2014), http://www.reuters.com/article/2014/09/29/us-usa-pennsylvania-infant-idUSKCN0HO 21Z20140929.

33. *See, e.g.,* Shamar Walters, *Pregnant Teen Critically Hurt by Road-Rage Shooting in Reedley, California,* NBC NEWS (Aug. 4, 2015, 9:31 AM), http://www.nbcnews.com/news/us-news/pregnant-teen-critically-hurt-road-rage-shooting-reedley-california-n403651; *Road Rage Leads To Shooting, Suicide,* ABC NEWS (June 19, 2001), http://abcnews.go.com/US/story?id=93070; *see also* Jeffrey W. Swanson et al., *Guns, Impulsive Angry Behavior, and Mental Disorders: Results from the National Comorbidity Survey Replication,* 33 BEHAV. SCI. & L. 199 (2015) (finding that 8.9% of Americans who have a history of angry, impulsive behavior also have access to guns); Garen J. Wintemute, *Alcohol Misuse, Firearm Violence Perpetration, and Public Policy in the United States,* PREVENTIVE MED. (2015), http://www.calwellness.org/assets/docs/news/wintemute_alcohol_misuse.pdf (observing that alcohol misuse coupled with firearms ownership or access is associated with various firearms risks).

34. Between May 2007 and September 27, 2015, 750 people were killed by concealed carry license holders, excluding self-defense incidents. *See* VIOLENCE POL'Y CTR., *Total People Killed By Concealed Carry Killers,* http://www.concealedcarrykillers.org/total-people-killed-by-concealed-carry-killers/.

35. For example, it is questionable whether George Zimmerman would have left his car, against the advice of police, to follow someone he viewed as a threat, if he did not have a gun—in which case he would not have interacted with Trayvon Martin.

36. *See supra* note 20.

37. *See* Iris Carreras, *Antonio Santiago Murder Update: De'Marquise Elkins, Ga. Teen Convicted of Killing Baby in Stroller, Sentenced to Life in Prison,* CBS NEWS (Sept. 13, 2013, 10:54 AM), http://www.cbsnews.com/news/antonio-santiago-murder-update-demarquise-elkins-ga-teen-convicted-of-killing-baby-in-stroller-sentenced-to-life-in-prison/; *Police: 9 Year Old Shot in Car,* LEX18.COM (Mar. 8, 2015, 8:04 PM) http://www.lex18.com/story/28289485/police-9-year-old-child-shot-in-car.

38. *See supra* note 20 (discussing mass shootings, some by legal gun owners, including at an Aurora, Colorado movie theater; Lafayette, Louisiana movie theater; Virginia television station; Sandy Hook elementary school; Wisconsin Sikh temple; and constituent meeting outside a supermarket in Tucson).

39. *See* BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, KEY GUN VIOLENCE STATISTICS, http://www. bradycampaign.org/key-gun-violence-statistics.

No other right exposes the public to such grave risks of lethal, imminent harm. While some claim that laws allowing more gun carrying reduce crime,[40] that assertion has been debunked.[41] Research suggests that tighter gun regulations are associated with reduced firearm death rates and criminal access to guns,[42] while more gun ownership and availability is associated with more homicides, suicides, unintentional shootings, and harm to society.[43] Regardless

---

40. *See, e.g.*, JOHN R. LOTT, JR., MORE GUNS LESS CRIME 160 (1998).

41. John J. Donohue, *The Impact of Concealed-Carry Laws*, *in* EVALUATING GUN POLICY: EFFECTS ON CRIME AND VIOLENCE 287, 324 (Jens Ludwig & Philip J. Cook eds., 2003) (stating that evidence "should put to rest any notion that shall-issue laws can be expected to lower crime . . . most states experienced *increases* in crime from the passage of shall-issue laws"); Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 STAN. L. REV. 1193, 1296 (2003) ("No longer can any plausible case be made on statistical grounds that shall-issue laws are likely to reduce crime for all or even most states."); Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239, 239 (1998) (noting that laws broadly allowing concealed carrying of weapons "have resulted, if anything, in an *increase* in adult homicide rates.") (emphasis in original). *See generally* Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001).

42. *See* UPDATED EVIDENCE AND POLICY DEVELOPMENTS ON REDUCING GUN VIOLENCE IN AMERICA (Daniel Webster, & Jon Vernick, eds., 2014), *available at* http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/resources/digtal_update_Webster_Vernick.pdf (noting that repeal of Missouri permit-to-purchase law was associated with an increase in gun homicides, which was not seen in neighboring state); REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 111–19 (Daniel Webster, & Jon Vernick, eds., 2013) (finding that more restrictive gun laws are associated with fewer guns diverted to criminals); Daniel Webster et al., *Effects of Missouri's Repeal of Its Handgun Purchaser Licensing Law on Homicides*, 91 J. URBAN HEALTH 293 (2014) (finding that repeal of handgun licensing law was associated with increased homicide rate); Eric W. Fleegler et al., *Firearm Legislation and Firearm-Related Fatalities in the United States*, 173 JAMA INTERNAL MED. 732 (2013) (observing that the higher number of firearm laws in a given state is associated with a lower rate of firearm fatalities); Kenneth R. Conner & Yueying Zhong, *State Firearm Laws and Rates of Suicide in Men and Women*, 25 AM. J. PREVENTIVE MED. 320, 322–23 (2003) (finding that more restrictive firearms laws are associated with lower rates of suicide); John J. Donohue III et al., *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy*, Nat'l Bureau of Econ. Res., Working Paper 18294, 2012), *available at* http://media.law.stanford.edu/publications/archive/pdf/ssrn-id1632599.pdf (noting that evidence suggests that right to carry laws are associated with statistically significant increases in murder, rape, aggravated assault, robbery, auto theft, burglary, and larceny, with no statistically significant estimate of decreased crime); *Permit to Purchase Licensing For Handguns Fact Sheet*, JOHNS HOPKINS BLOOMBERG SCH. OF PUB. HEALTH (Mar. 2015), http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/FactSheet_PermittoPurchaseLicensing.pdf.

43. *See, e.g.*, Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379, 387 (2006) (noting that increase in gun prevalence may cause greater lethality and harm to the community); Matthew Miller et al., *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001–2003*, SOC. SCI. & MED. (2006) (finding that states with higher rates of firearm ownership had significantly higher homicide victimization rates"); Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004) (finding that households with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership); Matthew Miller et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 AM J. PUB. HEALTH 1988 (2002) (finding that in areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide); David Hemenway et al., *Gun Use in the United States: Results of National Survey*, 6 INJ. PREVENTION 263 (2000) (finding that most

of the benefits of gun possession, guns indisputably create risks, causing people to be killed and injured who would not have been if a gun was not present.[44]

Some courts have recognized the uniquely lethal consequences of the RKBA. Judge William H. Walls upheld New Jersey's law restricting the public carrying of firearms, noting:

> [T]his Court shall be careful—most careful—to ascertain the reach of the Second Amendment right that the plaintiffs advance. That privilege is unique among all other constitutional rights to the individual because it permits the user of a firearm to cause serious personal injury—including the ultimate injury, death—to other individuals, rightly or wrongly. In the protection of oneself and one's family in the home, it is a right use. In the deliberate or inadvertent use under other circumstances, it may well be a wrong use. A person wrongly killed cannot be compensated by resurrection.[45]

Judge J. Harvie Wilkinson III similarly noted the potentially lethal consequences of extending the Second Amendment right to a broad right to carry guns in public, stating:

> To the degree that we push the right beyond what the Supreme Court in *Heller* declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee. This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.[46]

Judge David Ebel, writing for the Tenth Circuit, similarly wrote:

> The right to carry weapons in public for self-defense poses inherent risks to others. Firearms may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate. The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the

---

self-reported self-defense gun uses likely illegal); David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000) (finding that firearms are used more to intimidate than for self-defense).

44. The claim that the right not to be shot is protected by more guns also ignores the fact that the person being shot has, probably, a right to shoot back, at a person who also has a right not to be shot.

45. Piszczatoski v. Filko, 840 F. Supp. 2d 813, 816 (D.N.J. 2012), *aff'd sub nom.* Drake v. Filko, 724 F.3d 426 (3d Cir. 2013), *cert. denied sub nom.* Drake v. Jerejian, 134 S. Ct. 2134 (2014).

46. United States v. Masciandaro, 638 F.3d 458, 475–76 (4th Cir. 2011).

right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others.[47]

These thoughtful jurists are properly cautious about extending the relatively narrow right recognized in *Heller*, not only because of the public safety risks created by expanding the Court's holding, but because the *Heller* opinion counsels restraint. Indeed, the *Heller* majority referred to 19th-century cases which rejected expansive gun rights as antithetical to a civil society, in noting that "commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."[48]

Nonetheless, in this early era in the post-*Heller* world some courts are struggling to grasp for principles that properly account for the right's unique dangers. Some courts have applied precedent developed for far less risk-creating rights, like the right to free speech.[49] Doing so fails to account for the inherent risks posed by guns. For example, content-based restrictions on speech are far more troubling than the risks of unfettered discourse, but the lethal risks posed by firearms make preventative, prophylactic measures essential to protect public safety. Since "[a] person wrongly killed cannot be compensated by resurrection,"[50] Second Amendment cases demand consideration of the bedrock right to live, and of individuals' personal safety. This is not a novel concept. It is a return to first principles.

## II. PROTECTING LIVES: THE FIRST LEGITIMATE OBJECT OF GOOD GOVERNMENT

### A. *America's First Freedom*

The right to live is America's first right, and it predates the nation's founding. John Locke listed the right to life as the foremost natural right.[51] William Blackstone explained that life "cannot legally be disposed of or destroyed by any individual . . . ."[52] The Founding Fathers incorporated these natural law concepts into the Declaration of Independence. Chiefly drafted by Thomas Jefferson, the Declaration was the United States' first official act. It established the nation, and defined the purpose of government—to protect man's inalienable rights:

---

47. Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1126 (10th Cir. 2015).
48. District of Columbia v. Heller, 554 U.S. 570, 626 (2008).
49. *E.g.*, Tyler v. Hillsdale Cnty. Sheriff's Dep't, 775 F.3d 308, 327 (6th Cir. 2014) (holding that strict scrutiny should apply in Second Amendment challenge to federal statute prohibiting the possession of firearms by persons committed to a mental institution), *reh'g en banc granted, opinion vacated*, 2015 U.S. App. LEXIS 6638 (6th Cir. Apr. 21, 2015).
50. *Piszczatoski*, 840 F. Supp. 2d at 816.
51. JOHN LOCKE, THE SECOND TREATISE ON CIVIL GOVERNMENT 9–10 (1986) (1690).
52. WILLIAM BLACKSTONE, 1 COMMENTARIES *129.

> We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men . . . .[53]

There it is—America's first freedom. America was founded with the declaration that the core purpose of government is to protect life, liberty and, as the Declaration goes on to say, "Safety and Happiness."[54] Jefferson later reiterated, "the care of human life & happiness, & not their destruction, is the first and only legitimate object of good government."[55]

While the Declaration does not have the force of law, as "Father of the Constitution" James Madison put it, the purpose of the Constitutional Convention was to establish a government that would "provide for the safety, liberty and happiness of the Community."[56] And the Supreme Court has recognized:

> It is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence. No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government.[57]

The right to live is accepted internationally as well,[58] and international authorities have explicitly noted that stronger regulation of firearms is needed for the United States to "fulfil its obligation to protect the right to life and to reduce gun violence . . . ."[59]

---

53. THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

54. *Id.*

55. THOMAS JEFFERSON, TO THE REPUBLICANS OF WASHINGTON COUNTY, MARYLAND (1809), *available at* http://founders.archives.gov/documents/Jefferson/03-01-02-0088.

56. 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 53 (M. Farrand ed., 1911). In a letter to Jefferson, Madison wrote that the Declaration was one of the "best guides" to the "distinctive principles" of the U.S. government. *See* FOUNDERS EARLY ACCESS, *James Madison to Thomas Jefferson 8 Feb. 1825*, *available at* http://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-02-02-02-0384.

57. Gulf, Colo. & Santa Fe Ry. Co. v. Ellis, 165 U.S. 150, 160 (1897).

58. *See, e.g.*, G.A. Res. 217 (III) A, Universal Declaration of Human Rights, art. III (Dec. 10, 1948); Geneva Convention Relative to the Treatment of Prisoners of War, art. 3(1)(a), Aug. 12, 1949, 6 U.S.T. 3316; International Covenant on Civil and Political Rights, art. 6, Dec. 16, 1966, 999 U.N.T.S. 171.

59. U.N. Committee on the Elimination of Racial Discrimination, *Concluding Observations on the Combined Seventh to Ninth Periodic Reports of the United States of America*, at 7 (Aug. 29, 2014) [hereinafter CERD Report]; *see id.* 7–8 ("The Committee urges the State party to take effective legislative and policy measures to fulfill its obligation to protect the right to life and to reduce gun violence, including by adopting legislation expanding background checks for all private firearm transfers and prohibiting the practice of carrying concealed handguns in public venues; increasing transparency concerning gun use in crime and illegal gun sales, including by repealing the Tiahrt Amendments; and reviewing the Stand Your Ground Laws to remove far-reaching immunity and ensure strict adherence to the principles of necessity and proportionality when deadly force is used for self-defence").

### B.  Constitutional Recognition of the Right to Live

Beyond the Declaration of Independence, the right to live is recognized in the Due Process Clauses of the Constitution's Fifth and Fourteenth Amendments, which prohibit the government from depriving "any person of life, liberty, or property without due process of law."[60] In fact, courts have recognized that police shooting of suspects may infringe on their "right not to be shot."[61] The constitutional liberty interest also arguably protects the freedom to live without the risk of gunfire in streets, parks, places of worship and other venues frequented in ordinary life. And while some argue the Due Process Clause is expressly a "negative" right that restricts government action,[62] as Dean Erwin Chemerinsky has stated, "the argument that the Constitution provides only negative liberties is based on a questionable distinction between government action and government inaction."[63] Regardless of the extent to which the right is "positive," the Due Process Clauses embrace a constitutional right to live.

### C.  Public Safety is Paramount

Courts consistently recognize that every right is constrained by the bedrock interest in public safety. Although these cases do not expressly rely on the right to live, these public safety interests necessarily derive from the right to live and, hence, the need to protect lives.

#### i.  Public Safety Limits Fifth Amendment Rights

The Supreme Court has recognized that the public safety risks posed by even a single unsecured gun can outweigh Fifth Amendment rights. In *New York v. Quarles*,[64] a woman claimed she was raped by an armed man, who then fled into a store.[65] When the suspect was apprehended, the officer asked him about

---

60. U.S. CONST. amend. V; U.S. CONST. amend. XIV.

61. *See, e.g.*, Weinmann v. McClone, 787 F.3d 444, 448 (7th Cir. 2015) (stating that a person "has a constitutional right not to be shot on sight if he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime"); Yates v. Cleveland, 941 F.2d 444, 447 (6th Cir. 1991) ("Yates 'had a right not to be shot unless he was perceived to pose a threat to the pursuing officers or to others[.]'") (alterations in original) (quoting Robinson v. Bibb, 840 F.2d 349, 351 (6th Cir. 1988)); *see also* Tennessee v. Garner, 471 U.S. 1, 9 (1984) ("The suspect's fundamental interest in his own life need not be elaborated upon.").

62. *See, e.g.*, DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989).

63. Erwin Chemerinsky, *Making the Case for a Constitutional Right to Minimum Entitlements*, 44 MERCER L. REV. 525, 535 (1993); *see also* Cass R. Sunstein, *Social and Economic Rights? Lessons from South Africa* 2 (Pub. Law and Legal Theory, Working Paper No. 12, 2001) (explaining that government action is needed to create conditions to enjoy rights); Eugene Volokh, *Positive Rights, the Constitution, and Conservatives and Moderate Libertarians*, VOLOKH CONSPIRACY (May 7, 2013, 4:21 PM), http://volokh.com/2013/05/07/positive-rights-the-constitution-and-conservatives-and-moderate-libertarians/ ("While it's true that the U.S. Constitution lacks some of the 'positive rights' that people sometimes discuss under that label . . . it does secure other positive rights; and indeed, some positive rights are a longstanding feature of American legal traditions.").

64. 467 U.S. 649 (1984).

65. *Id.* at 651–53.

the gun's whereabouts without giving *Miranda* warnings.[66] Despite the constitutional violation, the Supreme Court refused to exclude the suspect's response—"the gun is over there"—because the danger created by the gun "presents a situation where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*."[67] Even though "there was nothing to suggest that any of the officers were any longer concerned for their own physical safety,"[68] the firearm, which the suspect had concealed in a supermarket, "obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it."[69] The Court held that the police's need to find and secure the gun "in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."[70] The public safety concerns raised by a gun outweighed the Fifth Amendment right of suspects.

### ii. Public Safety Limits First Amendment Rights

The Supreme Court has long recognized that public safety concerns limit the scope of First Amendment rights. The First Amendment does not allow one to falsely yell "fire!" in a crowded theater, because the public has a greater right not to be exposed to the risk of being trampled by a mob heading for the exits.[71] Under the Fighting Words Doctrine, words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace" are not within the scope of speech protected by the Constitution.[72] Hence, the Supreme Court held that an individual had no right to call his city marshal a "damned racketeer" and "Fascist."[73] The Constitution does not protect speech or press likely to "incit[e] or produc[e] imminent lawless action,"[74] because of the risks to public safety. The Assembly right is qualified by the word "peaceably," underlining the predominance of public safety.[75] Expressive conduct with the intent to intimidate also is not protected.[76]

The free exercise of religion is constrained when life or safety is at risk. The Supreme Court has stated that "it was never intended or supposed that the [First] amendment could be invoked as a protection against legislation for the punish-

---

66. *Id.* at 652.
67. *Id.* at 653.
68. *Id.* at 655.
69. *Id.* at 657.
70. *Id.*
71. *See* Schenck v. United States, 249 U.S. 47, 52 (1919).
72. Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942); *see id.* (Fighting words "are of such slight social value . . . that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.").
73. *Id.*
74. Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (per curiam).
75. *See* Cox v. Louisiana, 379 U.S. 536, 558 (1965).
76. *See* Virginia v. Black, 538 U.S. 343 (2003).

ment of acts inimical to the peace, good order and morals of society."[77] Courts have upheld bans on religious acts involving snake handling, recognizing that the Constitution does not preclude "a law prohibiting the practice of a religious rite which endangers the lives, health or safety of the participants, or other persons."[78] As the Supreme Court of North Carolina noted, "Which is superior, the public safety or the defendants' religious practice? The authorities are at one in holding that the safety of the public comes first."[79]

### iii.  Public Safety Limits Property Rights

The "sacred" constitutional right to private property[80] is constrained to protect public safety. The rule of necessity allows entry onto the land of another if "it is or reasonably appears to be necessary to prevent serious harm."[81] The overriding principle is *salus populi suprema lex*—"the safety of the people is the supreme law."[82] When human life is concerned, "the law requires the highest degree of care . . . . In all cases of doubt the safest course should be pursued remembering that it is infinitely better to do too much than run the risk of doing too little."[83] The nuisance doctrine also constrains property rights when public safety may be harmed.[84]

### iv.  Public Safety Limits Habeas Corpus Rights

The Constitution's Habeas Corpus provision is expressly limited by public safety concerns, allowing for the great Writ to be suspended "when in Cases of Rebellion or Invasion the public Safety may require it."[85] For example, when the Ku Klux Klan was terrorizing blacks in the South,[86] President Grant called on Congress for legislation to suspend the Writ.[87] While there is certainly no

---

77. Davis v. Beason, 133 U.S. 333, 342 (1890).

78. Lawson v. Commonwealth, 164 S.W.2d 972, 974 (Ky. 1942); *see also* State *ex rel.* Swann v. Pack, 527 S.W.2d 99, 112 (Tenn. 1975) (holding that, under the Free Exercises Clauses of the United States and Tennessee Constitutions, "a religious practice may be limited, curtailed or restrained to the point of outright prohibition, where it involves a clear and present danger to the interests of society").

79. State v. Massey, 51 S.E.2d 179, 180 (N.C. 1949).

80. *See* U.S. CONST. amend. V; Wilkinson v. Leland, 27 U.S. (2 Pet.) 627, 657 (1829).

81. RESTATEMENT (SECOND) OF TORTS § 197 (1965); *see also, e.g.*, Vincent v. Lake Erie Transp. Co., 124 N.W. 456 (Minn. 1910); Ploof v. Putnam, 71 A. 188 (Vt. 1908); Seavey v. Preble, 64 Me. 120 (1874).

82. *Seavey*, 64 Me. at 121.

83. *Id.* at 121–22.

84. *See* Camfield v. United States, 167 U.S. 518, 522–23 (1897).

85. U.S. CONST. art. I, § 9.

86. *Jim Crow and the Ku Klux Klan*, LIB. OF VA., http://www.lva.virginia.gov/exhibits/mitchell/jimcro.htm.

87. Ulysses S. Grant, President of the United States, Proclamation 204—Suspending the Writ of Habeas Corpus in the County of Union, South Carolina (Nov. 10, 1871); *The Enforcement Acts (1870–71)*, THE RISE AND FALL OF JIM CROW, http://www.pbs.org/wnet/jimcrow/stories_events_enforce. html ("Many states were afraid to take strong action against the Klan either because the political leaders sympathized with the Klan, were members, or because they were too weak to act."); *American*

suggestion that the Writ should be suspended today, the key point is that the threat of violence by private actors can have significant constitutional relevance.

### D. Back to the Future: Protecting Life and Public Safety in pre-Heller America

The notion that the public's right to live and to safety cannot be overridden by the RKBA is longstanding—as is the recognition that overly broad gun rights are inconsistent with the Framers' vision of a civil society.

Gun-toting tall tales aside, constraining the RKBA to protect the public is as American as bald eagles. "[C]olonial and early state governments routinely exercised their police powers to restrict the time, place, and manner in which Americans used their guns."[88] In the years after the founding, for example, states began to pass laws prohibiting concealed carrying of weapons.[89] After the Civil War, many states wrote new constitutions,[90] several of which granted citizens some right to bear arms and the majority of which explicitly empowered the state legislature to regulate the RKBA.[91] Even state legislatures that did not have explicit authority to regulate firearms had implicit authority to do so.[92] In sharp contrast to claims by today's gun lobby that citizens are entitled to possess military-style assault weaponry,[93] several states outlawed the private carrying of military grade weapons during the Reconstruction era.[94]

---

*President: A Reference Resource*, MILLER CTR. OF PUB. AFFS., http://millercenter.org/president/events/04_20.

88. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 162 (2007).

89. *See* An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases (La. 1813), *reprinted in* CLAYTON E. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC 143–44 (1999); Saul Cornell, *The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History*, 17 STAN. L. & POL'Y REV. 571, 591 (2006); *see also, e.g.*, Ark. Act of Apr. 1, 1881; 1881 Colo. Rev. Stat. p. 229 § 149; Fla. Act of Feb. 12, 1885, ch. 3620, § 1; Ill. Act of Apr. 16, 1881; 1880 Ky. Gen. Stat. ch. 29, § 1; 1893 Neb. Cons. Stat. § 5604; 1879 N.C. Sess. Laws ch. 127; N.D. Pen. Code § 457 (1895); Act of Mar. 18, 1859, Ohio Laws 56; Laws of Oregon 1885, An Act to Prevent Persons from Carrying Concealed Weapons, §§ 1–4, p. 33; 1880 S.C. Acts 448, § 1; S.D. Terr. Pen. Code § 457 (1877); Tex. Act of Apr. 12, 1871; 1869–1870 Va. Acts 510; Wash. Code § 929 (1881); W. Va. Code ch. 148, § 7 (1870).

90. *See* SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 160–64 (2006).

91. For example, Texas's 1876 Constitution gave the legislature, "power, by law, to regulate the wearing of arms, with a view to prevent crime." TEX. CONST. of 1876, art. I, § 26. Idaho's Constitution noted that "the Legislature shall regulate the exercise of this right by law." IDAHO CONST. of 1889, art. I, § 11. Utah's Constitution noted that "nothing herein shall prevent the legislature from defining the lawful use of arms." UTAH CONST. of 1896, art. I, § 6.

92. *See, e.g.*, Ark. Act of Apr. 1, 1881.

93. *See, e.g.*, Friedman v. City of Highland Park, 784 F.3d 406 (7th Cir.), *cert. denied*, 136 S. Ct. 447 (2015).

94. Tennessee law forbade carrying, "publically or privately, any . . . belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand." 1879 Tenn. Pub. Acts. ch. 186. Wyoming, Arkansas and Texas enacted similar bans. 1876 Wyo. Comp. Laws ch. 52, § 1; Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871.

One striking example of how the balance has shifted from safety rights to gun rights comes from Georgia. In an 1874 case, *Hill v. State*,[95] the Supreme Court of Georgia upheld the constitutionality of a Georgia law that forbade people from carrying pistols and certain other weapons into courts, places of worship, or election grounds.[96] The court recognized that

> The constitution is to be construed as a whole. One part of it is not to be understood in such a sense as will militate against another. It is as well the duty of the general assembly to pass laws for the protection of the person and property of the citizen as it is to abstain from any infringement of the right to bear arms. The preservation of the public peace, and the protection of the people against violence, are constitutional duties of the legislature, and the guarantee of the right to keep and bear arms is to be understood and construed in connection and in harmony with these constitutional duties.
>      . . . One guarantee is not to swallow up all others, but each is to be construed reasonably in reference to its plain intent, and in reference to other duties cast upon the legislature, and other rights guaranteed to the people.[97]

Recognizing that the right to free exercise of religion could be infringed if guns were brought to church, the court noted that other rights are "*just as solemnly guaranteed, and just as necessary for the existence of a free state as the right to bear arms*, and either of them is seriously interfered with if it is the right and the custom of 'people' to attend such meetings armed as though for battle."[98] Relying on the state Constitution's RKBA, the court concluded that "the right to keep and bear arms is not infringed if the exercise of it be by law prohibited at places and times when a proper respect for the majesty of the law, a sense of decency and propriety, or the danger of a breach of the peace, forbid it."[99] The *Hill* court explained that expansive gun rights are wholly inconsistent with the Framers' vision of a civilized society:

> To suppose that the framers of the constitution ever dreamed, that in their anxiety to secure to the state a well regulated militia, they were sacrificing the dignity of their courts of justice, the sanctity of their houses of worship, and the peacefulness and good order of their other necessary public assemblies, is absurd. To do so, is to assume that they took it for granted that their whole scheme of law and order, and government and protection, would be a failure, and that the people, instead depending upon the laws and the public authorities for protection, were each man to take care of himself, and to be always ready to resist to the death, then and there, all opposers . . . . On the contrary, we take it for granted that they meant what they have said, and that in

---

95. 53 Ga. 472 (1874).
96. *Id.* at 473.
97. *Id.* at 476–77.
98. *Id.* at 478 (emphasis added).
99. *Id.* at 479. The court held that the Second Amendment was not incorporated.

> guaranteeing the right to keep and bear arms, they never dreamed they were authorizing practices, common enough, it is true, among savages, and not unusual even in the olden time, when every man was at war with his neighbor, but utterly useless and disgraceful in a well ordered and civilized community.[100]

The *Hill* court's reasoning provides a direct contrast to recent Georgia legislation that allows for widespread public carrying of guns, including in city halls and airports.[101]

A similar decision by the Texas Supreme Court in 1872, *English v. State*,[102] was relied on by the *Heller* majority for the proposition that the RKBA has limitations, including "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"[103] The Texas court upheld a statute regulating and in some cases prohibiting the carrying of deadly weapons, finding it "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[104] Like *Hill*, the court found that civilized society should be resistant to practices that encourage individuals to take the law into their own hands:

> It will doubtless work a great improvement in the moral and social condition of men, when every man shall come fully to understand that, in the great social compact under and by which States and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the State for redress. We must not go back to that state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive.[105]

Emphasizing the State's responsibility to prevent crime, here by restricting gun carrying, the court quoted John Stuart Mill:

> It is one of the undisputed functions of government, to take precautions against crime before it has been committed, as well as to detect and punish it afterwards. The right inherent in society, to ward off crimes against itself by antecedent precautions, suggests the obvious limitations to the maxim, "that

---

100. *Id.* at 478–79.
101. *See* Safe Carry Protection Act, 2014 Ga. Laws. 599 (codified in scattered titles of GA. CODE ANN.) (authorizing Georgians with carry permits to bring their guns into (with exceptions) bars, schools, unsecured government buildings, churches, and areas of airport terminals outside the screening zone).
102. 35 Tex. 473 (1872).
103. District of Columbia v. Heller, 554 U.S. 570, 627 (2008).
104. *English*, 35 Tex. at 478–79.
105. *Id.* at 477.

purely self-regarding misconduct cannot properly be meddled with in the way of prevention or punishment."[106]

Other antebellum laws likewise allowed broad regulation of firearms to protect public safety.[107] And courts construing the scope of the RKBA in state constitutions almost universally recognized the government's broad authority to protect public safety, applying, as Adam Winkler has explained, a doctrinal framework that allowed for "reasonable regulation."[108]

### III. PROTECTING AMERICA'S FIRST FREEDOM IN THE POST-*HELLER* WORLD

The recognition of a right to live raises numerous issues beyond the scope of this article, including whether the right can form the basis to strike down laws that unreasonably expose the public to heightened risks of lethal violence.[109] The premise of this article is more limited; we argue that the right to live—the right not to be shot—necessarily constrains the scope of the Second Amendment.

Given the Supreme Court's recognition that the "paramount" public safety concern created by a single firearm outweighed a suspect's Fifth Amendment rights against self-incrimination, consider the risks created with expansive gun rights. In addition to the previously-discussed risks posed by gun possession,[110] guns are mislaid and misused, by even the most trained professionals,[111] including in stores,[112] just as in *Quarles*. Such risks are significant Constitutional counterweights to expansive RKBA arguments.

The public safety limitations on the First Amendment also have important implications in the post-*Heller* world. How can the same man who is not entitled to express "fighting words"—because of the risk that they would instigate a (probably non-lethal) fight—be entitled to approach his nemesis,

---

106. *Id.* at 478 (quoting JOHN STUART MILL, ON LIBERTY (1859)).

107. *See* Brief of Thirty-Four Professional Historians and Legal Historians as Amici Curiae at App., McDonald v. Chicago, 561 U.S. 742 (2010) (No. 08-1521), 2010 WL 59025, at *1A.

108. *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007); Adam Winkler, *The Reasonable Right to Bear Arms*, 17 STAN. L. & POL'Y REV. 593, 597–603 (2006).

109. Although not addressed in this article, another issue for future discussion is the implications of possible discriminatory impact on the right to live. *See* Complaint, Coal. for Safe Chi. Cmtys. v. Vill. of Riverdale (Ill. Cir. Ct. Cook Cnty. July 7, 2015) (No. 2015-CH-10390), http://www.scribd.com/doc/270818355/Coalition-for-Safe-Chicago-Communities-Complaint (alleging that cities' failure to regulate gun dealers violates Illinois' civil rights law due to discriminatory impact); CERD Report, *supra* note 59, at 11 (calling on U.S. to take action to reduce racial discrimination, including by reducing gun violence and eliminating Stand Your Ground laws, since they disproportionately impact minorities).

110. *See supra* notes 21–44 and accompanying text.

111. *See Armed School Security Guard Clark Arnold Leaves Gun Unattended in Student Bathroom*, HUFFINGTON POST (Jan. 18, 2013, 2:21 PM), http://www.huffingtonpost.com/2013/01/18/armed-school-security-gua_n_2505747.html; Ryan J. Reilly, *DEA Agent Who Shot Self Presses Forward In Suit Against Gov't (Video)*, TALKINGPOINTSMEMO (Feb. 2, 2011, 3:10 PM), http://talkingpointsmemo.com/muckraker/dea-agent-who-shot-self-presses-forward-in-suit-against-gov-t-video.

112. In South Carolina a loaded gun was left in the toy aisle of a department store. *See* Lisa Gresci, *Police Identify Man Wanted for Leaving Loaded Gun in Target Toy Aisle*, WMBF NEWS (June 5, 2014), http://www.wmbfnews.com/story/25698439/real-gun-found-in-toy-aisle.

with the same (albeit silent) hostility, armed with a loaded gun? Even if he is not constitutionally-entitled to shoot his foe, as a practical matter it makes little difference if he is entitled to carry his gun when he approaches; the risk presented is far more imminent and lethal than the fight that might have been provoked by Mr. Chaplinsky's name-calling. Consider that it took the man who shot Rep. Gabby Giffords and others thirty seconds to fire thirty-three lethal rounds, killing six and wounding thirteen.[113]

Similarly, how can a minister, who has no right to wield a poisonous snake, be entitled to pack a loaded handgun in church,[114] exposing his parishioners to a far more dangerous risk that, unlike the snake, has no religious import?[115] The more imminent, lethal risks created by firearms yield a constrained reading of the Second Amendment.

Other current laws also flip the proper constitutional balance, prioritizing gun rights over public safety and the right to live. For example, laws that entitle people to carry guns on private property deprive property owners of their right to exclude guns,[116] and they ignore "the supreme law" that prioritizes public safety. Courts should look to correct these constitutional imbalances.[117]

## CONCLUSION: RECLAIMING AMERICA'S FIRST FREEDOM

The fundamental right to live necessarily constrains the right to keep and bear arms. When considering arguments to expand Second Amendment rights, courts should consider the overriding constitutional interest in protecting lives and public safety, and should ensure that any expansion of the RKBA does not expose the public to an increased risk of being shot. This approach is entirely consistent with *Heller* and *McDonald*, which explicitly allow for virtually all serious gun policy solutions, other than total handgun bans.[118] The *Heller* Court's reliance on self-defense justifications itself implicitly assumes a right to live. After all, the right recognized in *Heller* did not spring from any freestanding right to engage in "confrontation"; people are entitled to use arms "in defense of hearth and home" in order to protect life (and perhaps property).[119]

---

113. Mark Follman & Gavin Aronsen, *"A Killing Machine": Half of All Mass Shooters Used High-Capacity Magazines*, MOTHER JONES (Jan. 30, 2013, 7:01 AM), http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings.

114. For example, Kentucky bars the use of reptiles in religious services or gatherings but allows concealed weapons in places of worship. *Compare* KY. REV. STAT. ANN. § 437.060, *with* KY. REV. STAT. ANN. § 237.110.

115. The Georgia law raises other Constitutional issues; by allowing guns in city councils, some people are likely to be chilled from exercising First Amendment rights—in a forum where political speech should be freest.

116. *See, e.g.*, Ramsey Winch, Inc. v. Henry, 555 F.3d 1199 (10th Cir. 2009).

117. While not a focus of this article, courts also should be sensitive to the potential of broad firearms rights to chill or infringe upon other liberty interests, such as speech and free exercise of religion.

118. *See* McDonald v. City of Chicago, 561 U.S. 742, 785 (2010) (plurality opinion); District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

119. *Heller*, 554 U.S. at 593–94 (discussing Blackstone).

Even as *Heller* found a limited right of people to defend themselves with guns, the Court did not disturb the broad authority to protect public safety from the risks posed by firearms. *Heller* and *McDonald* are fully supportive of a constitutional right to live.

Additional constitutional scholarship is needed to develop a legal framework that fully addresses the Second Amendment's lethal consequences, and to flesh out the implications of a right to live. This article intends to offer a start, a few insights, and a plea to keep the public's safety interests paramount. Rights are, in essence, stars in a constitutional firmament, constrained by counterweights that form the basis of our civil society, most importantly the right to live. As courts chart maps to navigate through the post-*Heller* world, they should be guided, foremost in their thoughts, by America's true First Freedom.