John W. Dillon (Bar No. 296788)
Gatzke Dillon & Ballance LLP
2762 Gateway Road
Carlsbad, California 92009
Telephone: (760) 431-9501
Facsimile: (760) 431-9512
E-mail:  jdillon@gdandb.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW JONES; THOMAS FURRH; KYLE YAMAMOTO; PWGG, L.P. (d.b.a. POWAY WEAPONS AND GEAR and PWG RANGE); NORTH COUNTY SHOOTING CENTER, INC.; BEEBE FAMILY ARMS AND MUNITIONS LLC (d.b.a. BFAM and BEEBE FAMILY ARMS AND MUNITIONS); FIREARMS POLICY COALITION, INC.; FIREARMS POLICY FOUNDATION; CALIFORNIA GUN RIGHTS FOUNDATION; and SECOND AMENDMENT FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,<br><br>Defendants | Case No.: 3:19-cv-01226-L-AHG<br><br>Hon. M. James Lorenz and Magistrate Judge Allison H. Goddard<br><br>**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' EVIDENCE IN SUPPORT OF OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Complaint Filed: July 1, 2019<br>Second Amended Complaint Filed: November 8, 2019<br><br>No oral argument should be heard unless ordered by the Court |

Plaintiffs Matthew Jones et al., object to the following evidence presented in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction. Dkt. No. 25.

1. *Declaration of Maricela Leyva Chavez* ¶¶9-11. Fed. R. Evid. 403 allows this Court to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusion, or misleading the trier of fact.

The evidence parses out the relevant information to hide its effects. For example, according to the Chavez data, from 2014-2019, there were at least 76,270 sales or transactions of long guns by Young Adults (not counting combination transactions and "many other types of long guns" transactions. Chavez Dec. ¶10. On average, that is 15,254 Young Adult transactions per year. "From January 1, 2019 through December 24, 2019, Young Adults ages 18 to 20 purchased or otherwise received transfer of 3,789 long guns." Chavez Dec. ¶11. That is 11,465 fewer than the yearly average or *a 75% decline in transactions*. By breaking up the data and not providing relevant totals and percentages, the Chavez declaration is unduly prejudicial, confusing, and misleading as to the effect of Section 27510 on Young Adults.

2. *Declaration of Jennifer Rosenberg,* ¶3, **Ex. 1** (U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2017, at **Table 38**), [cited in support of the State's claim that "Young Adults 18-20 continued to commit a disproportionately large number of violent crimes… Opp. p. 15]. The State's reference to **Table 38** is cut-off, incomplete, and misleading. Fed. R. Evid. 402, 403. The data shows that adults 18-20 years old consist of 15% of "murder and nonnegligent manslaughter." However, the *complete* **Table 38** shows that adults 21-23 consist of 14% of "murder and nonnegligent manslaughter." *See* https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/topic-pages/tables/table-38. Further, the total percentage distribution of adults 18-20 years old and adults 21 to 23 years old is *nearly identical*. Lastly, this data is unduly prejudicial as it identifies *arrest data*, not conviction data — whether a

subsequent conviction occurred is unknown and cannot be determined on this evidence.

3. *Rosenberg Dec*. ¶4, **Ex. 2** (CRIMINAL JUSTICE STATISTICS CENTER, CAL. DEP'T OF JUSTICE, *Crime in California*, at 39 (Table 32) (2018) [cited in support of State's claim that "arrests in California specifically show that Young Adults commit a disproportionately large portion of the homicides" in California].) Fed. R. Evid. 402, 403. The data in question is prejudicial, confusing, and misleading. The data does not address the specific age group of 18 to 20. There is also no similarly narrow age group range to compare the data on arrests for 18-19-year-old adults. Nevertheless, the data provided on the age group 20-29 years old shows that this group accounts for 41% of homicide arrests, significantly higher than the 18-19-year-old group. Thus, it cannot be determined whether the arrest percentages drastically differ from the 15-17-year-old age group or the 21-24-year-old age group. Further, arrest data is irrelevant as these are not convictions. *See* Rosenberg Dec. **Ex. 2**, p. 53 (**Table 37** — Dispositions of Adult Felony Arrests, 1982-2018 [only 65.7 percent of the felony arrests in 2018 resulted in convictions].)

4. *Rosenberg Dec*. ¶5, **Ex. 3** (Mariam Arian et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449 (2013) [cited in support of the State's claim that "Young Adults under the age of 21 are less likely to have developed the maturity necessary to make responsible decisions than older counterparts, that they are more reactive and take more risks"].) The subject study is irrelevant and misleading as it consists of generalizations regarding brain development of adolescents, which consists of individuals *10 to 25 years old*. Fed. R. Evid. 402, 403.The study makes no distinction of the various levels of maturity, brain development, and impulse control reached at different ages of adolescence (*e.g.*, the study makes no distinction between the impulse control, potential reckless behavior, maturity, or emotional reactions of a 12-year-old verses a 20-year-old). The study is

2

Plaintiffs' Objections to Defendants' Evidence In Support of Opposition To Motion For Preliminary Injunction
(Case No.: 3:19-cv-01226-L-AHG)

prejudicial and misleading as it makes generalizations regarding brain development well before the age of 18 (10 years old) and well beyond the age of 20 (25 years old). "The term 'adolescence' is generally used to describe a transition stage between childhood and adulthood. 'Adolescence' also denotes both teenage years and puberty, as these terms are not mutually exclusive." Rosenberg Dec. **Ex. 3**, p. 94. Moreover, the subject study is on brain maturation during adolescence *and the influence that various factors such as social influences, substance abuse, cannabis, nicotine, alcohol, sex differences, chemotherapy, and nutrition have on brain development during adolescence*. It is not a study on the various levels of brain development of adults ages 18 to 20, nor a study analyzing the differences of brain development between individuals under and over 21.

5. *Rosenberg Dec.* ¶6, **Ex. 4** (Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 Brain & Cognition 124 (2010) [cited in support of the State's claim that "minors are uniquely prone to 'negative emotional states'"].) The study is irrelevant, unduly prejudicial, confusing, overly broad, and misleading as it consists of generalizations regarding brain development of adolescents, which consists of individuals 10 to 25 years old. Fed. R. Evid. 402, 403. As stated in the objections above, no distinction is made in the study of the various levels of maturity, brain development, and impulse control reached at certain ages of adolescence. These generalizations are made clear within the study: "it is important to note that most adolescents are actually not miserable, and negotiate this potentially difficult period with relative ease and without lasting problems (Steinberg, 2008). We believe that a bias in available data may contribute to this discrepancy — while many studies ask adolescents to report on their negative emotions, very few ask about positive emotions which may also be elevated during this time." Rosenberg Dec. **Ex. 4**, p. 107. "It is easy to forget that many adolescents make rational decisions, and have no problem regulating their emotions. Rosenberg Dec. **Ex. 4**, p. 108. The study itself

3

Plaintiffs' Objections to Defendants' Evidence In Support of Opposition To Motion For Preliminary Injunction
(Case No.: 3:19-cv-01226-L-AHG)

cautions against making unequivocal conclusions — "it should be pointed out that the number of experiments on this topic is still relatively few and caution should be taken in drawing unequivocal conclusions from them. More studies with larger samples sizes are called for to fully elucidate the nature of amygdala-striatal-prefrontal interactions and their relation to adolescent behavior." Rosenberg Dec. **Ex. 4**, p. 113. "A host of individual difference also appear to be critical for predicting heightened risk for this behavior profile, which are just beginning to be explored empirically." *Id.*

6.  *Rosenberg Dec.* ¶7, **Ex. 5** (Daniel E. Webster et al., John Hopkins Ctr. For Gun Policy and Research, *Firearms on College Campuses: Research Evidence and Policy Implications* (Oct. 2016) [cited in support of the State's claim that "science shows that young adults have weaker impulse control and 'demonstrate poorer emotional regulation in the context of threat than other age groups,' which makes them uniquely disposed to use firearms 'in the very situations in which adolescents are most developmentally vulnerable: in the context of high emotional arousal, situations that require rapid, complex social information processing, those that involve reinforcing or establishing peer relationships (i.e., showing off), or in conditions of perceived threat.'"].) The cited article is irrelevant as it is a report on the "relationship between civilian gun carrying and violent crime and mass shootings and factors that are unique to public safety on college campuses." Rosenberg Dec. **Ex. 5**, p. 118. It is also prejudicial, confusing, and misleading, as it summarizes other research discussing "teens" and adolescents ages 10-25. Fed. R. Evid. 402, 403. There is no information provided that addresses "risky decision-making" and "on-going brain development" of Young Adults ages 18-20. No distinction is made between the brain development of Young Adults and adolescents of other ages. Finally, the data provided regarding suicide also wrongly includes broader age groups than what is before this Court (noting that "suicide was the second leading cause of death in the U.S. among college age youth 17-24 years in 2014, that 49 percent of

4

males aged 17-24 who committed suicide used firearms, and that suicide attempts by firearm result in death 90 percent of the time." Rosenberg Dec. **Ex. 5**, p. 135. The evidence provides *no* distinction between those 18-20 and those old or younger.

7.   *Rosenberg Dec*. ¶12, **Ex. 10** (Cal. Dept. Fish & Wildlife, Hunting License: Number Issued (2010s) [cited in support of State's claim that at the end of 2019 the amount of hunting licenses issued were "numbers consistent with the reported full-year numbers are for each of the prior nine years."].) First, the hunting license numbers are irrelevant as they are not separated by age. Thus, there is no data to determine whether hunting licenses in this age group were affected. Second, there were 35,549 fewer resident hunting licenses issued in 2019 than the *lowest recorded date* in the last ten years (a 15% decline from the lowest recorded year in the previous 10 years (2018)). *Id*., **Ex. 10**, p. 181; Fed. R. Evid. 402, 403.

8.   *Rosenberg Dec*. ¶¶13-17, **Exs. 11, 12, 13, 14, 15**. (All cited generally to support the State's claim that Section 27510 serves the "interest of limiting gun violence effected through mass shootings…..") The articles are irrelevant or otherwise unduly prejudicial, confusing, and misleading. Fed. R. Evid. 402, 403. First, **Exs. 11** through **15** all discuss mass shootings in general. There is no discussion of mass shootings committed by Young Adults — the relevant issue in this case. **Exhibit 11** lists various mass shootings in California, but there is no discussion or distinction of which of mass shootings listed were committed by Young Adults. **Exhibit 12** lists 7 California mass shootings — none of which were committed by Young Adults. *See also* Rosenberg Dec., **Exs. 12-15.**

Further, the evidence cited in **Exs. 11-15** is contradictory. **Exhibit 11** states there have been 32 mass shootings in California in 2019 (250 in the U.S. in 2019). **Exhibit 12** states there has been 67 mass shootings in California in the last 20 years. **Exhibit 13** discusses 69 mass shootings from 1982 to 2011 in the United States; and **Exhibit 14** states there have been 114 mass shootings in the U.S. since 1982. **Exhibit 15** discusses the "19 most recent mass shootings" since 2009 (*e.g.*, 19 in 10

5

years.) Further, **Ex. 12** states that "over the past decade, mass public shootings haven't become particularly more prevalent…," but **Ex. 13** states that they have.

**Exhibit 14** relies on inaccurate and misleading data. First, the article is irrelevant as there is no discussion on how *Young Adult mass shooters* obtained their firearms. Second, the article derives its data from Mark Follman, Gavin Arosen, and Deanna Pan, *US Mass Shootings, 1982-2019: Data From Mother Jones' Investigation*, Mother Jones (updated Dec. 11, 2019, 9:15 AM), *Open Source database. See* https://www.motherjones.com/politics/2012/12/massshootings-mother-jones-full -data/. Using this data, of the 114 mass shootings listed from 1982 to 2019 in the United States, *only 10 in 37 years were committed by Young Adults and only 2 were in California*. Of those ten, the Mother Jones data states that in 4 of them, the guns were acquired legally; in two the guns were acquired illegally; and in 4 it was unclear. However, in only 2 incidents the shooter obtained their gun legally. The Gilroy shooting involved a firearm purchased out-of-state and illegally imported and possessed in California. *See* https://www.latimes.com/california/story/2019-07-29/gilroy-garlic-festival-shooting-weapon-gun. In the Westroads Mall Shooting in Omaha, Nebraska, the shooter illegally stole the firearm. https://www.reuters.com/article/us-shooting-nebraska/mall-shooter-hid-assault-rifle-in-sweatshirt-idUSN0564256720071206.

**Exhibit 13**, is irrelevant, unduly prejudicial, confusing, and misleading as it is an article that references "Harvard Findings" and an "FBI report." However, the declarant does not properly identify the data upon which he bases the conclusions in the article; and these sources are *not* provided. **Exhibit 13** also states that the "FBI report" "notes explicitly that it is not a study of mass shootings."

**Exhibit 15** is irrelevant, unduly prejudicial, confusing, and misleading as it relies on inaccurate data. **Exhibit 15** lists 19 "recent mass shootings" that have occurred across the United States. First, no explanation is provided as to why the analysis is limited to the 19 "most recent" shootings. Second, of the 19 listed, only

6

two were committed by Young Adults (Sandy Hook and Parkland Florida shooting). Third, no mass shootings committed by Young Adults in California are listed. Fourth, the article's claim that "a vast majority of guns used in 19 recent mass shootings were bought legally" is incorrect. At least 5 of the mass shootings listed, in which the article claims the guns were acquired legally, the purchaser acquired their guns illegally because they were a prohibited person, they conducted a straw purchase, or they stole the firearm. *See* Rosenberg Dec., **Ex. 15**, pp. 210, 215, 219, 222.

9.  *Rosenberg Dec*. ¶¶18-19, **Exs. 16** and **17** (cited in support of the State's claim that "the social science and medical community commentary overwhelmingly shows that the damage caused by the higher caliber, higher speed bullets used in 'modern sporting rifles' akin to the AR-15 and other semi-automatic centerfire rifles cause more traumatic injuries and result in a significantly higher incidence of persons wounded or killed…." And "If a 9mm bullet strikes someone in the liver . . . that person might suffer a wound perhaps an inch wide, . . . [b]ut if you're struck in the liver with an AR-15, it would be like dropping a watermelon onto the cement. It just is disintegrated.")

First, the articles are irrelevant, unduly prejudicial, confusing, and misleading as they discuss what the State has defined as "assault weapons," not all other common semiautomatic centerfire rifles in general. Fed. R. Evid. 402, 403. *See* **Exhibit 16** ("With Paddock perched on the 32nd floor of the Mandalay Bay Resort and Casino and firing military-style rifles onto the crowd…") **Exhibit 17** [("The weapons were banned in 1994 under the federal assault weapons ban")[1] Evidence regarding attacks outside of California, using firearms already prohibited in California, and firearms not subject to Section 27510 is irrelevant.

---

[1] Although the Federal Assault Weapons Ban expired, California still enforces a more restrictive assault weapons ban under the California Assault Weapons Ban.

7

Plaintiffs' Objections to Defendants' Evidence In Support of Opposition To Motion For Preliminary Injunction
(Case No.: 3:19-cv-01226-L-AHG)

Second, **Exhibit 16** and **Exhibit 17** are irrelevant, unduly prejudicial, confusing, and misleading because neither discuss mass shootings committed by Young Adults, or the weapons used in those shootings.

Third, **Exhibit 16** is likewise objectionable because it draws expert conclusions on ballistics and firearm mechanics and operations through its description of a single anecdotal case (the Las Vegas shooting). Again, this anecdotal evidence is irrelevant because the shooting involved a shooter *older than 21* and firearms defined as "assault weapons" (already prohibited under California law). Further, neither the article's author nor the hearsay testimony quoted within the article are qualified to make such conclusions on firearm ballistics, firearms mechanics, or any difference between semiautomatic rifles and "assault weapons." The Court may exclude testimony if there is too great a gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997); Fed. R. Evid. 702-703.

Plaintiffs respectfully request that this Court sustain the above objections and strike the referenced evidence. To the extent that this Court determines any of the disputed evidence is admissible, Plaintiffs ask that, based on the discussion above, each disputed evidentiary item be given no weight in the Court's determination on the pending motion. *See Dr. Suess Enters., L.P. v. Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1562 (S.D. Cal. 1996), *aff'd*, 109 F.3d 1394 (9th Cir. 1997) (holding that a court resolving a preliminary injunction motion has discretion to weigh evidence that may not meet the standards of admissibility at trial).

January 24, 2020                                    Respectfully submitted,

                                                            Gatzke, Dillon & Ballance LLP

                                                            By:  */s/ John W. Dillon*
                                                                 John Dillon

8

Plaintiffs' Objections to Defendants' Evidence In Support of Opposition To Motion For Preliminary Injunction
(Case No.: 3:19-cv-01226-L-AHG)