John W. Dillon (SBN 296788)
**Dillon Law Group APC**
2647 Gateway Road, Suite 105 No. 255
Carlsbad, California 92009
Phone: 760-642-7150
Fax: 760-642-7151
JDillon@Dillonlawgp.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW JONES; THOMAS FURRH; KYLE YAMAMOTO; PWGG, L.P. (d.b.a. POWAY WEAPONS AND GEAR and PWG RANGE); NORTH COUNTY SHOOTING CENTER, INC.; BEEBE FAMILY ARMS AND MUNITIONS LLC (d.b.a. BFAM and BEEBE FAMILY ARMS AND MUNITIONS); FIREARMS POLICY COALITION, INC.; FIREARMS POLICY FOUNDATION; CALIFORNIA GUN RIGHTS FOUNDATION; and SECOND AMENDMENT FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California et al.,<br><br>Defendants. | Case No.: 3:19-cv-01226-L-AHG<br><br>Hon. M. James Lorenz and Magistrate Judge Allison H. Goddard<br><br>**NOTICE OF NEW CASE AUTHORITY IN SUPPORT OF PLAINITFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Complaint Filed: July 1, 2019<br>Second Amended Complaint Filed: November 8, 2019 |

TO THE COURT AND ALL PARTIES:

PLEASE TAKE NOTICE the following relevant new persuasive authority; which was decided on July 14, 2020 (well after briefing was completed):

*Peter Elhert, et al. v. Colonel Gary T Settle*, CL20000582, Circuit for the City of Lynchburg

We rely on only the portions of the case beginning in section (A)(3) on pages 7 through 9; and also section (B) on page 11. These portions support arguments raised in Plaintiffs' opening legal memorandum in support of their preliminary injunction at pages 11-17 and the reply memorandum at pages 4-6.

Further, we acknowledge that the new authority is a state court decision issued by the Twenty-Fourth Judicial District of Virginia; however, in reaching its decision, the court cited to and relied on various Second Amendment case authorities from the United States Supreme Court and other Federal courts. We also have attached a true and correct copy of the Virginia Court decision as **Attachment A** for this Court's consideration.

July 17, 2020                                Respectfully submitted,

                                            Dillon Law Group APC

                                            By:

                                            John Dillon

1

*NOTICE OF NEW CASE AUTHORITY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION*
(CASE NO. 3:19-CV-01226-L-AHG)

# ATTACHMENT "A"

# TWENTY-FOURTH JUDICIAL CIRCUIT OF VIRGINIA



J. FREDERICK WATSON, JUDGE
900 COURT STREET
P.O. BOX 4
LYNCHBURG, VA 24505
(434) 455-2600
(434) 847-1350 (FAX)

F. PATRICK YEATTS, JUDGE
900 COURT STREET
P.O. BOX 4
LYNCHBURG, VA 24505
(434) 455-2600
(434) 847-1350 (FAX)

COMMONWEALTH OF VIRGINIA
CITIES OF LYNCHBURG AND BEDFORD
COUNTIES OF AMHERST, BEDFORD, CAMPBELL AND NELSON

July 14, 2020

David G. Brown, Esq.
Spiro & Browne, PLC
6802 Paragon Place, Suite 410
Richmond, VA 23230

Martine E. Cicconi, Esq.
Deputy Solicitor General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

**RE:** <u>Peter Elhert, et al. v. Colonel Gary T. Settle</u>, **CL20000582, Circuit for the City of Lynchburg**

Dear Mr. Brown and Ms. Cicconi:

I am writing to furnish you with the decision of the Court in the above case. This constitutional challenge to Virginia Code § 18.2-308.2:5 ("the Act"), which requires background checks for private firearm sales, came before the Court on an application for a declaratory judgment, temporary injunction, and writ of mandamus. The Court has reviewed the pleadings and considered the arguments made at the hearing on July 2, 2020.

For the reasons stated below, the Court holds that the Act is facially valid, but it is unconstitutional as currently applied to adults under 21 years of age seeking to purchase handguns.

## Facts

From his personal collection, Raul Wilson plans to sell various firearms to Peter Elhert and Wyatt Lowman. Before selling a firearm for value, the Act requires the following: (1) "verification from a licensed dealer in firearms that information on the prospective purchaser has been submitted for a criminal history record information check," and (2) "that a determination has been received from the Department of State Police that the prospective purchaser is not prohibited under state or federal law from possessing a firearm or such sale is specifically exempted by state or federal law."

1

The dealer collects the fees prescribed in § 18.2-308.2:2 ($2 for an in-state resident and $5 for an out-of-state resident) as well as an optional "additional fee not to exceed $15 for obtaining a criminal history record information check." A Class 1 misdemeanor is the punishment for buyers and sellers who violate the Act.

Elhert, Wilson, and Lowman contend that the Act, which they call "government preclearance" and "unconstitutional government interference," violates the Virginia Constitution. At 18 years of age, Lowman cannot purchase the desired handgun because the current background check system automatically rejects such a purchase by those under 21 years of age. Due to these alleged infringements on their constitutional rights, Elhert, Wilson, Lowman, Virginia Citizens Defense League ("VCDL"), Gun Owners of America, Inc. ("GOA"), and the Gun Owners Foundation ("GOF") sued Superintendent of Virginia State Police Gary T. Settle. The plaintiffs claim the Act violates Article I, § 13 (Right to Keep and Bear Arms) and Article IV, § 12 (Form of Laws) of the Virginia Constitution as well as other concerns. In response, the Commonwealth denies that the Act violates either constitutional provision and that Lowman has no constitutional right to buy a handgun.

### Background

The right of the people to keep and bear arms has been embedded in Virginia constitutional law since the Virginia Declaration of Rights in 1776. In the debate over ratifying the United States Constitution, some argued that the federal government might accumulate too much military power that would lead to tyranny. James Madison, an architect of the United States Constitution and later fourth president of the United States, pointed to two defenses from this scenario. First, he noted that state and local governments would check federal power; second, he pointed to the "advantage of being armed, which the Americans possess over the people of almost every other nation" such as certain nations in Europe where "the governments are afraid to trust the people with arms." *The Federalist* No. 46, at 295-96 (James Madison) (Clinton Rossiter ed., 1961).

Even with these protections, many in the founding generation pushed for a federal bill of rights. In Virginia's ratification debate, significant Virginians like George Mason (author of Virginia's Declaration of Rights) and Patrick Henry considered the lack of a federal bill of rights so dangerous as to warrant Virginia rejecting the United States Constitution. Virginia narrowly ratified the Constitution and proposed amendments for a bill of rights.

At first Madison did not see the danger in the absence of a federal bill of rights, but his friend Thomas Jefferson advocated for it, telling Madison that a bill of rights would place a beneficial "legal check . . . into the hands of the judiciary." Letter from Thomas Jefferson to James Madison (Mar. 15, 1789) reprinted in *Thomas Jefferson: Writings* 943 (Merrill D. Peterson ed., 1984). As a member of the First Congress, Madison proposed what became the Bill of Rights that included the right to keep and bear arms.

To this day, both the constitutions of Virginia and the United States protect the right to keep and bear arms, which the famed English jurist William Blackstone considered necessary to the "natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression"; it protects "the three great and primary rights, of personal security, personal liberty, and private property." 1 William Blackstone,

*Commentaries* \*136, \*139. In his Americanized version of Blackstone's *Commentaries on the Laws of England*, St. George Tucker called the right to keep and bear arms the "true palladium of liberty," and he called the right of self-defense "the first law of nature." 1 *Blackstone's Commentaries, With Notes of Reference to the Constitution and Laws of the General Government of the United States and of the Commonwealth of Virginia* App. 300 (1803).

### Interpretative Principles

Contending the plaintiffs must overcome a strong presumption that the acts of the legislature are constitutional, the Commonwealth provides quotations from *Whitlock v. Hawkins*, 105 Va. 242 (1906), and *Howell v. McAuliffe*, 292 Va. 320 (2016). Defs.' Br. 1, 7. The cases reiterate the esteemed Chief Justice John Marshall's view that laws passed by the legislature should not be ruled unconstitutional unless a "judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher v. Peck*, 10 U.S. 87, 128 (1810). The conviction must come from a contradiction between the Constitution and the challenged statute.

In Federalist 78, Alexander Hamilton discussed the judiciary's role in deciding constitutional provisions such as the Constitution's prohibition of bills of attainder and *ex post facto* laws: "Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." *The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). He emphasized that "[n]o legislative act . . . contrary to the Constitution, can be valid. To deny this would be to affirm . . . that the representatives of the people are superior to the people themselves; that men acting by virtue of powers may do not only what their powers do not authorize, but what they forbid." *Id.* at 466.

In the present case, the Court is assigned with ascertaining the meaning of the right to keep and bear arms and whether a law requiring background checks on private sales unconstitutionally conflicts with that right.

### Discussion

At this stage, the plaintiffs seek a temporary injunction. To obtain a temporary injunction, the plaintiffs must show the following: (1) likelihood of success on the merits, (2) they will suffer irreparable harm absent injunctive relief, (3) the harm to plaintiffs outweighs the harm to the defendants from an injunction, and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

#### A. Likelihood of Success on the Merits

##### 1. Article I, § 13 should be interpreted with a history-and-tradition framework, not a sliding scale.

Article I, § 13 of the Virginia Constitution provides that "a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state, therefore, the right of the people to keep and bear arms shall not be infringed . . . ." The text requires a two-step analysis: (1) whether the Act falls within the scope of the right to keep and

bear arms, and (2) whether the Act infringes on the right. For the first step, the Commonwealth does not dispute that the Act falls within the scope of the right. The operative clause, which provides the right to keep and bear arms, implies the corresponding right to buy and sell arms. The lack of a right to buy and sell arms would negate the right to keep arms as well as defeat the purpose of the right stated in the prefatory clause, so the Court finds that the Act falls within the scope of the right to keep and bear arms.

The question before the Court is whether the Act requiring mandatory background checks on private sales unconstitutionally infringes on the right to buy and sell arms. In *DiGiacinto v. Rector & Visitors of George Mason University*, the Supreme Court of Virginia noted the similarities between Article I, § 13 of the Virginia Constitution and the Second Amendment of the United States Constitution. 281 Va. 127, 133-34 (2011). For the factual situation of a university prohibiting guns in certain campus buildings, the Court reasoned that the Virginia and federal constitutional rights were co-extensive. *Id.* at 134. The rest of the opinion followed the framework set up by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

No party disputes that *Heller* and *McDonald* should provide the framework for analyzing the present case. Based on the quality of analysis in both cases and the absence of disagreement from the parties, the Court finds *Heller* and *McDonald* to be highly persuasive in evaluating Virginia's constitutional right to keep and bear arms.

In *Heller*, the United States Supreme Court ruled that the right to keep and bear arms is a pre-existing right codified in the United States Constitution. 554 U.S. at 592. The Court reasoned that the "inherent right of self-defense has been central to the Second Amendment right," and held unconstitutional a law prohibiting handguns. *Id.* at 628, 636. Incorporating this holding against the states, the Court added that the right is "fundamental to *our* scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *McDonald*, 561 U.S. at 767 (emphasis in original).

Having already established that the Act falls within the scope of the right to keep and bear arms, the next question is what framework should be used to evaluate whether the Act is an unconstitutional infringement. In *Prekker v. Commonwealth*, the Virginia Court of Appeals noted that *Heller* rejects rational basis and interest-balancing inquiries in reviewing Second Amendment cases. 66 Va. App. 103, 112-13 (2016) (citing *Heller*, 554 U.S. at 634-35). The court listed various levels of scrutiny used by federal appellate courts: (1) strict scrutiny, (2) intermediate scrutiny, and (3) a sliding scale from strict scrutiny to intermediate scrutiny depending on how much the right is burdened. *Id.* at 113-15. Although no Virginia court has expressly ruled out using levels of scrutiny in gun cases, neither of the holdings in *Prekker* and *DiGiacinto* went beyond the *Heller/McDonald* framework by choosing a level of scrutiny.

The two frameworks proposed by the parties are the following: (1) a history-and-tradition framework from *Heller* and *McDonald*, and (2) a sliding scale of heightened scrutiny as applied by the United States Fourth Circuit Court of Appeals. The Court rejects the sliding-scale framework because it is inconsistent with the text of the right to keep and bear arms and inconsistent with the guidance in *Heller* and *McDonald*. Three discrepancies have led the Court to this conclusion.

First, a sliding scale is the type of interest balancing rejected by the United States Supreme Court. *See Heller*, 554 U.S. at 634 ("The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.") (emphasis in original). Not adopting a level of scrutiny in Second Amendment cases, the Court reasoned that the limitations of the right are determined by historical justifications. *Heller*, 554 U.S. at 635. The Court has rejected judicial assessment of difficult empirical judgments dealing with the costs and benefits of firearms restrictions. *McDonald*, 561 U.S. at 790-91 (controlling opinion of Alito, J.).

Diverting from these instructions, the proposed framework is a sliding scale in which a "severe burden" on the "core" of the right requires a "strong justification" and "less severe" burdens "may be more easily justified." Defs.' Br. 15-16 (citing *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010). Intermediate scrutiny applies when a court "believe[s] his claim is not within the core right." *Chester*, 628 F.3d at 682-83.

The sliding-scale framework replaces the analysis of historical justifications with conjecture about a laws burden, guesswork on where the burden places the law on the scale, and empirical judgments about what justifications are heavy enough to balance the scale. It is difficult to imagine a test sounding more like interest balancing than a sliding scale of burdens and justifications. Unlike the historically focused method in *Heller*, the sliding-scale framework is an example of "vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *McDonald*, 561 U.S. at 803-04 (Scalia, J., concurring); *see also Rogers v. Grewal*, — S. Ct. — (2020) (Thomas, J., dissenting from the denial of certiorari) ("Instead of following the guidance provided in *Heller*, these courts minimized that decision's framework. . . . They then 'filled' the self-created 'analytical vacuum' with a 'two-step inquiry' that incorporates tiers of scrutiny on a sliding scale.").

Within the sliding scale, the strict and intermediate scrutiny balancing tests are "necessarily encompassed by *Heller's* more general rejection of balancing." *Heller v. District of Columbia*, 670 F.3d 1244, 1280 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). The majority in *Heller* rejected Justice Breyer's proposal that relied on *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), "which had applied a form of intermediate scrutiny." *Id.* at 1277 n.8. Because the people of Virginia completed the necessary interest balancing by placing in the Virginia Constitution the right to keep and bear arms, the Court should not override the people's decision by engaging in the whirl of rebalancing. *See Heller*, 554 U.S. at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."); *Mance v. Sessions*, 896 F.3d 390, 394 (2018) (Elrod, J., dissenting from denial of rehearing en banc, joined by Jones, J.; Smith, J.; Willett, J.; Ho, J.; Duncan, J.; & Engelhardt, J.) ("[W]e should apply a test rooted in the Second Amendment's text and history—as required under *Heller* and *McDonald*—rather than a balancing test like strict and intermediate scrutiny.").

Constitutional rights can be severely undercut when judges juggle empirical data and justifications because they do "not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." Defs.' Br. 32 (citation omitted). Perhaps due to a fear of being minutely

responsible, some courts have decided to calculate only the historical scope, not the historically justified limitations; replacing an inquiry into historical justifications, these courts use a sliding-scale inquiry to dance around the constitutional right whenever they desire. Such an inquiry is not faithful to the preexisting right to keep and bear arms.

Second, the sliding-scale framework too easily resorts to intermediate scrutiny, which is not compatible with fundamental rights. The United States Supreme Court has mentioned that a law banning handguns would fail any of the standards of scrutiny that are applied to enumerated constitutional rights. *Heller*, 554 U.S. at 628-29. The Court did not foresee that lower courts would apply intermediate scrutiny, which requires only a reasonable fit between the challenged law and a substantial government objective. Because public safety is a substantial (even compelling) government objective, almost any law on guns, which are inherently dangerous, would pass such a scrutiny, making the process look more like rational basis than the scrutiny surrounding a fundamental right. Intermediate scrutiny has resulted in opinions void of historical justifications. *See Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) (upholding a law requiring an applicant to demonstrate a "good and substantial reason" for the issuance of a permit to have a handgun in public); *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) (upholding a conviction for possessing a handgun in a vehicle within a national park). Unless a law infringes on the right to have a handgun in the home, the sliding scale uses intermediate scrutiny to slip the rest of the preexisting right under the rug without analyzing any historical justifications.

Third, the sliding scale has eliminated crucial words in the text such as the word *bear* in the phrase *keep and bear arms*. The United States Supreme Court interprets the Second Amendment as codifying a pre-existing "individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. Even with the right to bear arms being in the text and the statement from *Heller*, it has been postulated that strict scrutiny applies to only "the core right of the self-defense of a law-abiding citizen in his home" whereas a "lessor showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home." *Masciandaro*, 638 F.3d at 471. The *Masciandaro* Court applied intermediate scrutiny and found a law prohibiting guns in national parks "reasonably adapted" to the substantial governmental interest in safety. *Id.* at 473. The scrutiny analysis allowed the court to waltz around the right to bear arms when the historical justification for restricting the carrying of firearms in sensitive places (such as schools and government buildings) could not be stretched to cover parks. In contrast, the Supreme Court of Virginia, in ruling that the buildings on university campuses qualified as sensitive places, reasoned that campus buildings were "[u]nlike a public street or park." *DiGiacinto*, 281 Va. at 136.

Accordingly, the Court rejects the proposed sliding scale or any other contrivance that circumvents the history-and-tradition framework in *Heller/McDonald*.

### 2. The Act is valid based on historical justifications.

Turning to the history-and-tradition framework regarding what constitutes an infringement, the United States Supreme Court stated that whether gun regulations are permissible depends on their historical justifications. *Heller*, 554 U.S. at 635. Examples of presumptively lawful regulatory measures include the longstanding prohibitions on "the possession of firearms by felons and the

mentally ill, . . . or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27; *see also McDonald*, 561 U.S. at 786.

The plaintiffs assert that background checks infringe on the right to keep and bear arms by presuming that "*any and every* person who wishes to obtain a firearm could be a prohibited person" and that the background check, fee, and any delay constitutes a prior restraint on the right to keep and bear arms. Pls.' Br. 18-20 (emphasis in original). Although the vast majority of background checks last a few minutes, some can last up to three days after which dealers with federal firearms licenses ("FFLs") may transfer the firearm. *See* 18 U.S.C. § 922(t)(B)(ii).

Although this argument would apply to all background checks, the plaintiffs do not expressly challenge the laws regulating FFLs, nor do the plaintiffs question Virginia's law requiring state-level background checks for purchases from licensed dealers, which has been in force since 1989. This is likely because *Heller* mentions that the conditions and qualifications on the commercial sale of arms are presumptively constitutional.

To get around the presumption, the plaintiffs contend that the Act does "not impose a 'condition' or 'qualification' on the '*commercial* sale of arms,' but rather regulates heretofore entirely *private* conduct." Pls.' Reply Br. 4 (emphasis in original). The Court agrees that a commercial sale is not the same as a private sale. Although the word *sale* by itself covers both commercial and private sales, the distinction between commercial and private sales has long been understood in the context of firearm regulations. Thus, because the word *commercial* modifies *sales*, the meaning no longer includes private sales.

Even though private sales and commercial sales are different, the Court is at a loss as to how the historical justifications of preventing felons and the mentally disabled from possessing firearms would allow conditions on commercial sales and not also justify conditions on private sales. So long as the background check is limited to preventing a longstanding prohibition on a historically justified category, it does not violate the right to keep and bear arms. At this time, therefore, the Court holds that the Act does not violate Article I, § 13 of the Virginia Constitution.

### 3. The Act is unconstitutional as currently applied to adults under 21 years of age.

Unlike the condition of a background check, the Act currently prohibits Lowman from purchasing a handgun. Prior to the Act, those between the ages of 18 and 21 could purchase a handgun through only a private sale, not from a licensed dealer. *See* 18 U.S.C. § 922(b)(1) ("It shall be unlawful . . . to sell or deliver any firearm or ammunition to any individual . . . who the licensee knows or has reasonable cause to believe is less than twenty-one years of age . . . ."). At this time, federal regulations and procedures mandate dealers who facilitate private transactions to first take the firearm into inventory and record it as an acquisition before transferring it to the buyer. *See* Michael S. Matthews Aff. 2. In order to obtain a background check from the FBI's National Instant Criminal Background Check System ("NICS system"), both the buyer's age and type of firearm are required; the NICS system automatically rejects a handgun transfer to someone under 21 years of age.

Agreeing that adults under 21 years of age can no longer purchase handguns under the present setup, the Commonwealth deflects by saying the problem lies with federal law, not the

7

*Hirschfeld*, 417 F. Supp. 3d at 752 (emphasis added); *see also National Rifle Ass'n*, 700 F.3d at 202-03.

The existence of an age-based prohibition includes a scope to the limitation: the longstanding prohibition on (1) firearms in sensitive places (like schools and government buildings) implies that other areas are not sensitive places, (2) conditions and qualifications on the commercial sale of arms implies no prohibitions on those sales, and (3) no possession of firearms by felons and the mentally ill implies a right to possession for everyone else not in those categories. Following this principle, the Court rules that the alleged longstanding age-based prohibition applies only to the sale of firearms to minors, not adults. The Virginia Code defines an *adult* as a person 18 years of age or more. Va. Code Ann. § 1-203. This definition is used for interpreting "all laws of the Commonwealth including common law, case law, and the acts of the General Assembly . . . unless an exception is specifically provided in this Code." Va. Code Ann. § 1-204.

Because no exception to Lowman's situation is specifically provided in the Code, the Court finds that Lowman is not a minor and thus is not covered by the age-based prohibition. Banning types of firearms is a prohibition, not a mere condition, infringing on the right to keep and bear arms and greatly reducing Lowman's means of self-defense. *Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed."); *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of certiorari) ("[T]he Second Amendment confers rights upon individual citizens—not state governments," so courts err when they "delegate to States and localities the power to decide which firearms people may possess.").

Although the Act is facially constitutional, the Commonwealth is currently unprepared to administer it in a way that does not infringe on the right of adults under 21 to purchase a handgun, the "quintessential self-defense weapon." *See Heller*, 554 U.S. at 629. The Commonwealth cannot create and justify a constitutional violation by transferring the infringement to federal law or federal systems. Lowman, therefore, is likely to succeed on the merits.

### 4. The Act does not violate Article IV, § 12 of the Virginia Constitution.

Article IV, § 12 of the Virginia Constitution provides the following: "No law shall embrace more than one object, which shall be expressed in its title. Nor shall any law be revived or amended with reference to its title, but the act revived or the section amended shall be reenacted and published at length." The plaintiffs contend that the "*de facto* raising the age to obtain a handgun" should have been expressed in the title. Pls.' Br. 24.

The fact that the plaintiffs had to refer to a *de facto* age requirement lethally undercuts their argument. Nothing in the text of the Act expressly prohibits 18-20-year-olds from purchasing handguns subject to a background check. Based on what the Court has read and heard, the prohibition exists due to a problem with federal statutes and the setup of the NICS system. At most the Court would have to infer that the Legislature intended to create the prohibition, a prohibition that would cease to exist if either federal law changes or the NICS system adapts to facilitate the background checks without automatically denying adults under 21 years of age.

9

The Act need not state in its title every consequence that could result from interplay with other statutes. Accordingly, the Court finds this argument to be without merit.

### 5. The Act does not violate the non-delegation doctrine.

The plaintiffs argue that the Act unconstitutionally vests legislative power in FFLs, which they compare to the example of an unconstitutional delegation of veto power over zoning laws once given to private landowners. Pls.' Reply Br. 27-28 (citing *County of Fairfax v. Fleet Indus. Park Ltd. Partnership*, 242 Va. 426 (1991). The plaintiffs are concerned that FFLs might choose not to provide the background check service because FFLs are not required to facilitate private sales and the $15 charge limit is below market price. Pls.' Br. 26-28.

Unlike the veto power in *County of Fairfax*, the Act vests no legislative power in FFLs. FFLs are required to follow the laws passed by both state and federal governments, and the Act does not grant FFLs power to alter the laws.

Regarding the concern that FFLs might not facilitate private sales, the Court finds that such a concern is premature. In Colorado's version of the Act, the permissible fee for a background check was $10, and the Court has no evidence that the condition of a background check resulted in a prohibition on private sales. *See Rocky Mountain Gun Owners v. Hickenlooper*, 371 P.3d 768, 777 (Colo. App. 2016).

### 6. The rest of the plaintiffs' concerns do not presently justify review.

The Act has an exception that allows a buyer at a gun show to be checked by the Virginia State Police. Although the plaintiffs do not challenge the statute referenced in the Act that sets up the system for voluntary background checks at gun shows, they argue that the referenced statute behind this exception was the product of "fraudulent dealings by the Commonwealth." Pls.' Br. 30. The Court will not delve into the nuances of the unchallenged statute because the answer has no bearing on the result of the present case. By itself, the voluntary-background-check exception would not save the Act. An infringement on the right to keep and bear arms would not be overlooked based on the lifting of the infringement on approved dates and at certain locations.

The plaintiffs are also concerned about the lack of alternatives to the Act in case of events like a virus-based pandemic or an overwhelming of the NICS system. Pls.' Br. 35. The plaintiffs reason that "there is a risk that, at some point in the future, it will be impossible to transfer any firearms through NICS checks." *Id.* at 36. The plaintiffs caution that if "that occurs, then the challenged Act will not just have mandated universal background checks, but it will also have eliminated the ability of Virginians lawfully to obtain firearms for self-defense and other lawful purposes from any source." *Id.*

These scenarios would concern the Court, but the Court has scarcely any evidence that the hypothetical situations are currently burdening the right to keep and bear arms. The future risks can be litigated when they are no longer hypothetical.

For the reasons stated above, the Court finds that only Lowman is likely to succeed on the merits regarding the private sale of handguns to adults under 21 years of age.

**B. Irreparable Harm, Balance of Equities, Public Interest**

Lowman has demonstrated irreparable harm because the temporary violation of a constitutional right is enough. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Court finds that the violation easily tips the balance of equities in Lowman's favor. Finally, the Court finds that the public interest favors enjoining a constitutional violation, not allowing the unconstitutional application of a statute to perpetuate. *See Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

**Conclusion**

The Court holds that the Act does not facially violate Article I, § 13 of the Virginia Constitution. However, because the application of the Act currently creates a prohibition on Lowman's right to purchase a handgun, the Court enjoins the defendant from enforcing the Act on adults under the age of 21. The Court denies the plaintiffs' request for a writ of mandamus.

Sincerely yours,

F. Patrick Yeatts, Judge