UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW JONES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of California, et al., <br><br> Defendants. | Case No.: 19-cv-1226-L-AHG <br><br> **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiffs in this Second Amendment rights case have filed a motion for declaratory and injunctive relief. Defendants filed an Opposition and Plaintiffs filed a Reply. Both parties have filed additional recent authority which they claim supports their respective positions.

I. BACKGROUND

Plaintiffs argues that California Penal Code § 27510(a), as amended by Senate Bill ("SB") 1100 and SB61, violates the Second Amendment rights of 18-20 year-old persons ("Young Adults") because it bans them from purchasing, using, transferring, possessing, or controlling any firearm. (Motion at 1). In Plaintiffs view, the ban directly contradicts

the holdings in *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), which collectively held that the Second Amendment's "text, structure and history" confirm an individual's fundamental right to keep and bear arms, and that this right applies with full force to the states. (*Id*.) Plaintiffs contend that California's age-based gun ban cannot stand under the textual and historical analysis of *Heller* because it abridges Young Adults' Second Amendment right to keep and bear arms in self-defense and for other lawful purposes. (*Id*. at 11-15). Even if the Court finds that the ban does not abridge a core right of the Second Amendment, the gun ban cannot pass strict or immediate scrutiny. (*Id*. at 17). In addition, Plaintiffs contend that the gun ban's exemptions are illusory and inapplicable because very few, if any, Young Adults qualify for those exemptions. (*Id*. at 27).

Defendants counter that the Court should deny Plaintiffs request to enjoin enforcement of § 27510 because Plaintiffs cannot show they are likely to succeed on the merits of their claims. (Oppo. at 1). Defendants argue that §27510, as amended by SB 1100 and SB 61, is not an outright ban, but instead imposes limited restrictions with exceptions carved out for individuals with firearm training. (*Id*.) The restrictions allow Young Adults to obtain long guns under certain circumstances, and ensure that "only those Young Adults with adequate training are able to purchase from federally licensed firearm dealers ("FFL") semi-automatic centerfire rifles capable of inflicting serious injury."[1] (*Id*.) Defendants argue that Plaintiffs cannot meet their burden to establish the other preliminary injunction factors. Specifically, Defendants suggest that the balance of equities and public interest weigh against enjoining enforcement of a law that promotes

---

[1] Semi-automatic centerfire rifles are "able to fire repeatedly through an automatic reloading process but requiring release and another pressure of the trigger for each successive shot" using "centerfire" ammunition in which a primer is located in the center of the cartridge case head, rather than in the rim. See https://www.merriam-webster.com/dictionary/semiautomatics; https://en.wikipedia.org/wiki/Centerfire_ammunition.

firearm safety education and limits access to dangerous semi-automatic weapons to individuals in an age group prone to impulsive or reckless behavior. (*Id*. 1-2).

California Penal Code § 27510 prohibits FFL's from selling a firearm to a person under 21 years of age: "A person licensed under Sections 26700 to 26915, inclusive, shall not sell, supply, deliver, or give possession or control of a firearm to any person who is under 21 years of age." Cal. Penal Code §27510(a).

Section 27510 was amended by Senate Bill 1100 (SB 1100) and Senate Bill 61 (SB 61) which imposed age-based restrictions on the sale, supply, delivery, possession, or control of a firearm. *See Id.*; 2017 California Senate Bill No. 1100; 2019 California Senate Bill No. 61. Notably, SB 1100 restricts the sale, rental, delivery, or transfer of long guns[2] to any person under the age of 21 unless the individual has a valid, unexpired hunting license issued by the Department of Fish and Wildlife, is an active duty member of the Armed Forces, is an active duty peace officer, or honorably discharged member of the Armed Forces. *See* Cal. Penal Code §27510 (b)(1)-(2). In 2019, the Legislature passed SB 61 which limited the sale to individuals under age 21 of semi-automatic centerfire rifles by FFL's to active duty or reserve law enforcement officers who are authorized to carry a firearm in the course of their employment, or active duty members of the Armed Forces. Cal. Penal Code. §27510(3).

II. PRELIMINARY INJUNCTION STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking such relief under Federal Rule of Civil Procedure 65 must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking*

---

[2] A long-gun is "a handheld firearm with a long barrel, as a rifle, designed to be fired when braced against the shoulder." https://www.dictionary.com/browse/long-gun

*Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir.2009)(quoting *Winter*, 555 U.S. at 20). The Ninth Circuit applies a sliding scale approach to the showing of likelihood of success on the merits. *See Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, the elements of the preliminary injunction test are balanced and, where a plaintiff can make a stronger showing of one element, it may offset a weaker showing of another. *Id*. at 1131, 1134-35. "Therefore, 'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1134-35.

### III.   SECOND AMENDMENT

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II. An individual's right to possess a handgun in the home for self-defense is protected by the Second Amendment.  *Heller*, 554 U.S. 595. In *Heller*, the Supreme Court struck down a series of laws in the District of Columbia which banned handgun possession within the home along with requirements that all firearms within the home be "unloaded and disassembled or bound by a trigger lock or similar device," *Id*. at 575.  The Court found that the core of the Second Amendment right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635. However, the Court noted that this right is "not unlimited" and that individuals may not "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626.   Importantly, the Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626-27.

In 2010, the Supreme Court incorporated the Second Amendment to the states via the Fourteenth Amendment's Due Process Clause. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). The *McDonald* Court found that the right of law-abiding citizens to keep and bear arms for self-defense is "deeply rooted in this Nation's history and tradition." *Id*. at 768 (internal quotation marks omitted). In sum, the Court held that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." *Id*. at 767.

The Ninth Circuit has adopted a two-part test when considering the constitutionality of a firearm regulation which: "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013). When determining whether a regulation creates a burden on protected Second Amendment conduct, the Ninth Circuit recently announced that it appears to ask four questions:

> First, as a threshold matter, we determine whether the law regulates 'arms' for purposes of the Second Amendment. Second, we ask whether the law regulates an arm that is both dangerous and unusual. If the regulated arm is both dangerous and unusual, then the regulation does not burden protected conduct and the inquiry ends. Third, we assess whether the regulation is longstanding and thus presumptively lawful. And fourth, we inquire whether there is any persuasive historical evidence in the record showing that the regulation affects rights that fall outside the scope of the Second Amendment.

*Duncan v. Becerra*, 970 F.3d 1133, 1145 (9th Cir. 2020)(internal citations omitted).

IV.   ANALYSIS

    A. *Likelihood of Success on the Merits*

Plaintiffs must show that they are likely to succeed on the merits of the claim that § 27510 is unconstitutional. In accordance with the *Chovan* two-part test, the Court first asks whether the challenged law burdens conduct protected by the Second Amendment. *See* 735 F.3d at 1138. To answer this question, the Court applies the Ninth Circuit's four prong inquiry, beginning with whether Section 27510 regulates "arms." *Jackson v. City*

*of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)("The Second Amendment protects 'arms,' 'weapons,' and 'firearms.'") At issue here are regulations limiting who may obtain or use "semi-automatic centerfire rifles" and "long-guns." These firearms constitute "arms" under the National Firearms Act (Act), 26 U.S.C. §§ 5801–5872, satisfying the first prong.

Next, the Court considers whether long-guns and semi-automatic centerfire rifles are considered "dangerous and unusual" to determine whether they fall outside the protections of the Second Amendment. *Duncan*, 970 F.3d at 1146. A firearm is not unusual if it is "typically possessed by law-abiding citizens for lawful purposes." *Heller,* 554 U.S. at 627. Whether a firearm is "common" is generally a question of statistics. *Duncan,* 970 F.3d at 1147. Hand grenades, sawed-off shotguns and fully automatic "M–16 rifles and the like," are not in common use or typically possessed by the citizenry, making them unusual weapons that fall outside of the Second Amendment. *Heller,* 554 U.S. at 627; *U.S.* v. *Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."). Both long-guns and semi-automatic centerfire rifles are commonly used by law abiding citizens for lawful purposes such as hunting, target practice, and self-defense. Because these weapons are not considered "unusual," the Court does not need to determine whether they are also "dangerous." *Duncan*, 970 F.3d n.8 at 1149.

The final inquiry requires that the Court assess whether the regulation is longstanding and thus presumptively lawful. In addition, if text, history, and tradition, demonstrate that the challenged law does not impose a burden on conduct falling within the protections of the Second Amendment, the law "passes constitutional muster" and the Court's inquiry "is complete." See *Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (internal quotations omitted). If, however, the challenged law burdens the Second Amendment, the court must next determine whether to apply intermediate or strict scrutiny. *Chovan*, 735 F.3d at 1138.

*1. Longstanding Regulation, History and Tradition*

The inquiry as to whether a regulation is longstanding necessarily requires the Court to examine the history of the law. When analyzed through the lens of history and tradition, it is apparent that a number of gun regulations have co-existed with the Second Amendment right. *Heller v. District of Columbia ("Heller II"),* 670 F.3d 1244, 1274 (U.S.App. D.C. 2011). The exceptions to the Second Amendment include "laws imposing conditions and qualifications on the *commercial* sale of arms" and some "longstanding prohibitions on the possession of firearms." *Heller*, 554 U.S. at 626-27 & n. 26. Although the term "longstanding" is somewhat ambiguous, "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *National Rifle Ass'n of America, Inc., v. Bureau of Alcohol and Tobacco, Firearms, and Explosives,* 700 F.3d 185, 196 (5th Cir. 2012*)("NRA"); see also United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791.") As an example, the Court drew an analogy between long recognized rights such as freedom of speech and libel afforded by the First Amendment, and the regulation of firearms under the Second Amendment, noting that simply because those First Amendment rights were not established by the Court for almost 150 to 200 years from the ratification of the Amendment they nonetheless are considered longstanding rights. See *Heller*, 554 U.S. at 625 (citing *Near v. Minnesota ex.rel. Olson*, 283 U.S. 697 (1931); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).)

The Ninth Circuit has yet to weigh in on the constitutionality of age-based restrictions on the possession and use of specific firearms, but the Fifth Circuit determined that a federal prohibition against the sale of handguns to those under age 21 by FFL's passed constitutional muster because it was "consistent with a longstanding historical tradition" and therefore the regulation did not burden the Second Amendment's protections. *NRA,* 700 F.3d at 203. In so finding, the Fifth Circuit looked as far back as the Founding Era when concluding that various gun safety regulations, including laws

that restricted the ability of persons under 21 to purchase or use particular firearms, were longstanding and served public safety purposes. *Id*. 700 F.3d 200-203.

Other courts have agreed that prohibitions on the acquisition and possession of certain firearms by those under the age of 21 are longstanding and fall outside the ambit of Second Amendment protections. See *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms and Explosives,* 417 F.Supp.3d 747, 755 (W.D. Virginia 2019)(federal criminal statutes prohibiting FFL's from selling handguns to those under 21 reflect "'longstanding' prohibitions on the use or possession of handguns by those of a given age"). Though not binding on this Court, the reasoning of *Mitchell v. Atkins*, from the Western District of Washington, another district court within the Ninth Circuit, is instructive. *Mitchell v. Atkins*, --F.Supp.3d --, 2020 WL 5106723 (W.D. Wash. Aug. 2020). The Plaintiffs there challenged the constitutionality of I-1639, a Washington initiative that prohibits individuals under the age of 21 from purchasing semiautomatic assault rifles ("SARs"). *Id*. at 1. The district court noted that "at common law and at the time of the adoption of the Constitution, the age of majority was 21 years," and that "by 1923, over half the states then in the union had set 21 as the minimum age for purchase or use of a particular firearm." *Id*. at 4. Age-based restrictions for firearm possession and use continue into the modern age, with federal law prohibiting FFL's from selling handguns to persons under 21 starting in 1968 under 18 U.S.C. § 922(b)(1), and five states prohibit the sale of all long-guns to persons under age 21. *Id*. In conclusion, the court held that the "authorities demonstrate that reasonable age restrictions on the sale, possession, or use of firearms have an established history in this country," therefore the Washington initiative did not burden Second Amendment rights, and the plaintiffs challenge failed at the first step of the inquiry. *Id*. at 5.

The Ninth Circuit has noted that, even "early twentieth century regulations might . . . demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015); *see also Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016). Courts may

look to a "variety of legal and other sources" when attempting to determine whether a regulation burdens Second Amendment protections or is a longstanding exclusion. *Heller*, 554 U.S. at 605.

Plaintiffs argue that extensive historical analysis demonstrates there were no age-based restrictions on the acquisition, purchase, or possession of firearms during the Colonial and Founding Era, and that in fact all male citizens over the age of 18 were required to use their own arms "to help enforce the law" by participating in the militia. (Reply at 4-5). Defendants counter that Section 27510's age-based restrictions on FFL sales and transfers are consistent with historical prohibitions and are presumptively lawful regulations that do not implicate the Second Amendment. (Oppo. at 7).

Though the Fifth Circuit's reasoning in *NRA* is not controlling, it sheds light on the extensive historical background of firearm regulations, the reasoning behind such regulations, and militia requirements to ensure members complied with accountability rules. Although the regulations in question in *NRA* and §27510 involve the prohibition of different weapons, the historical backdrop of age-based restrictions is the same. They support the conclusion that age-based restrictions like the one in section 27510 are longstanding, and presumptively Constitutional.

Plaintiffs take issue with comparisons between Young Adults and "dubious laws disarming and prohibiting sales of arms to certain groups" of individuals such as felons, the mentally unstable, Loyalists, and slaves, as the Court in *NRA* did. (Mot. at 16-17.) This decision does not rest on such comparisons. Individuals under the age of 21 were considered minors or "infants" for most of our country's history without the rights afforded adults. It is therefore, not surprising that Young Adults were included along with others believed unfit of responsible firearm possession and use. *See* e.g. 1 *Commentaries on the Laws of England* 55 (1769) William Blackstone, ("So that full age in male or female, is twenty-one years …, who till that time is an infant, and so styled in law.") Indeed, Black's Law Dictionary defines an "infant" under the law as "a person under the age of twenty-one years, and at that period . . . he or she is said to attain

majority." Black's Law Dictionary (11th ed. 2019). The reasoning behind those prohibitions was that these groups were considered incapable of the trust required to ensure proper and safe use of firearms. *See generally Powell*, 926 F.Supp.2d at 387. Even today, laws prohibit individuals under 21 from renting a car or purchasing alcohol, indicating that age-based restrictions facilitate important public safety goals. *See Mitchell*, 2020 5106723 at *5-6; Declaration of Combs, Ex 2 at 0012 [ECF No. 21-8.])

Plaintiffs argument that in the Founding Era, Young Adults age 18 and up were expected to participate in the militia and were required to have their own firearm is not at odds with the regulation of Young Adults' firearm possession. Militias were well regulated by each state in the Founding Era: members of the militia were required to meet regularly for weapons inspection and registration, and members who did not show up with the required equipment could be fined. Saul Cornell, Nathan DeDino, *A Well Regulated Right: The Early America Origins of Gun Control*, 73 Fordham L. Rev. 487, 509-511. Militia members were required to possess their own firearms if they complied with accountability and maintenance regulations. The strict rules surrounding militia duty demonstrate that as far back as the Founding Era, firearm regulations were considered necessary and an individual's right to firearm possession came with obligations to ensure public safety. The regulations applied to militia members support the *Heller* court's finding that an individual may not "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" he or she chooses. *Heller*, 554 U.S. at 626.

As indicated above, Plaintiffs cannot show a likelihood of success on the merits when other courts, including those within the Ninth Circuit, have found that age-based firearm restrictions such as California Penal code 27510 are longstanding, do not burden the Second Amendment, and are therefore presumptively Constitutional.

//
//
//

### *2. Intermediate or Strict Scrutiny*

Although the Court concludes that Plaintiffs cannot demonstrate a likelihood of success on the merits because the challenged regulation does not burden the Second Amendment, most courts, in an abundance of caution, also consider whether the regulation in question survives strict or intermediate scrutiny. *See NRA.*, 700 F.3d at 204-205; *Mitchell*, 2020 WL 5106723 at *5. The level of scrutiny depends on "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1138 (internal quotation marks omitted). For strict scrutiny to apply, the law must (1) implicate the core Second Amendment right of defense of home and hearth, and (2) severely burden that right. *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018).   If the law "does not implicate the core Second Amendment right *or* does not place a substantial burden on that right," the court applies intermediate scrutiny. *See Fyock*, 779 F.3d 998-99.  There has been "near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Silvester*, 843 F.3d at 823.

Plaintiffs argue that strict scrutiny is the proper test, citing the recent Ninth Circuit decision in *Duncan v. Becerra*.  There, the appellate court addressed a California law banning possession of large capacity magazines (LCM) that carried more than ten rounds of ammunition, finding that "any law that comes close to categorically banning the possession of arms that are commonly used for self-defense imposes a substantial burden on the Second Amendment" requiring strict scrutiny. *Duncan*, 970 F.3d at 1152. Defendants counter that intermediate scrutiny is the proper test because § 27510 is limited in scope to the category of individuals affected, allows alternative channels for self-defense, and proscribes only commercial conduct outside the home.  (Oppo. at 10.)

Contrary to Plaintiffs' assertions, the California law in question is not a complete ban on the sale, transfer or supply by a federally licensed firearms dealer of all firearms for persons 18 to 20 years old. Instead, a careful reading of the provision shows that FFL's may sell, deliver, transfer any firearm that is not a handgun or semiautomatic

11

centerfire rifle to Young Adults who have a valid, unexpired hunting license, or who have been honorably discharged from the armed forces, or National Guard.[3] Cal. Pen. Code § 27510(b)(1)-(2). The only complete ban is for any FFA to sell, deliver, or supply a handgun to a Young Adult. Under the SB61 amendments, individuals between the ages of 18 and 20 may possess semi-automatic centerfire rifles if they are members of law enforcement, active duty members of the Armed Forces, National Guard, Air National Guard, or active reserve components of the United States. Cal. Pen. Code 27510 (b)(3)(A)-(D). Section 27510 also allows Young Adults to purchase long guns for self-defense from FFL's or receive otherwise prohibited firearms via transfer from immediate family.  The exemptions in §27510 arguably ensure that access to these weapons is restricted to mature individuals who have successfully completed safety training, furthering the public safety objectives and ensuring that the Founding Era balancing of Second Amendment rights with safety concerns continues today. *Chovin*, 735 F.3d at 1138 (If a law creates exceptions to the regulation of a core Second Amendment right, the impact of the burden on that right may be alleviated.)

      Plaintiffs further argue that the exemptions for individuals with hunting licenses, military, or law enforcement training are illusory because requiring Young Adults to enlist in the military or police force, or "feign interest" in hunting just to purchase the weapons of their choice makes the exemptions prohibitive. (Reply at 2).  They claim that the hunting exemption is "useless and inapplicable to ordinary, law-abiding Young Adults" who want to buy certain firearms for self-defense.  (*Id*.) In addition, Plaintiffs point to the fact that many police forces will not allow a candidate to apply until he or she

---

[3] Plaintiffs claim that prior to SB 61's passage, honorably discharged Young Adults were able to purchase firearms, but now the exemption is "gutted" because they can no longer access semiautomatic centerfire rifles. (Reply at 2). The exemption is not "gutted" because  SB 61's amendment only prohibits them from a specific kind of firearm, specifically semi-automatic centerfire rifles. Honorably discharged Young Adults may still purchase long-guns.

is 20 years old, and some do not allow anyone to serve as a law enforcement officer until he or she is 21, which means that the exemption does not assist Young Adults as it appears. (Mot at 26.)

Contrary to Plaintiffs assertions, the hunting license course is not a severe burden to Young Adults who wish to possess long-guns. The standard fee for online hunting courses is $28.95, which is about the same as the $25 firearm safety certificate required absent section 27510's amendments. *See* Combs Decl, Ex. 6 at 0156 [ECF No. 21-8]; Rosenberg Decl. Ex. 7, Cal. Dept. of Justice, Firearm Safety Certificate Program FAQs, http://oag.ca.gov/fiearms/fscpfaqs). The courses are widely available and combine written testing with a firearm safety demonstration follow-up class, effectuating the stated intent of the legislature to allow Young Adults with proper safety training the right to own long-guns. The law enforcement exemption is more limited, as it is true that some agencies require individuals to be 20 years old to apply, and individuals may not join the force until they are 21. It is notable that many law enforcement agencies do not allow individuals under the age of 21 to become officers, and even then require extensive physical, academic, and firearms training, supporting the argument that individuals under the age of 21 are not ready for the responsibilities attendant with the gravity of the position.

While the Ninth Circuit found strict scrutiny appropriate in *Duncan,* the reasoning is distinguishable because the large capacity magazines ("LCM") at issue there were banned completely. This led the court to find that this complete prohibition struck the very heart of Second Amendment protections. *Duncan*, 970 F.3d at 1152. Section 27510 does not categorically ban the possession of arms used for self-defense. It therefore, does not impose a substantial burden on the Second Amendment, and allows for intermediate rather than strict scrutiny.

Under intermediate scrutiny, "all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a

reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139.

Plaintiffs contend that §27510 fails intermediate scrutiny because it is not substantially related to the State's interests in reducing school shootings and gun violence. (Mot. at 18-21.) In addition, Plaintiffs claim that the restriction is not a reasonable fit to facilitate those interests because there is no reliable data confirming that Young Adults commit more violent crimes, and therefore, restricting FFL's from selling certain weapons to Young Adults will not reduce gun related crime. (*Id*.)

Defendants counter that California has a substantial interest in increasing public safety and preventing gun violence, and that section 27510 furthers those interests by ensuring that Young Adults with access to certain firearms have additional safety training. (Oppo. at 12). Defendants further argue that the limitations on semi-automatic centerfire rifles is also a reasonable fit with the stated public safety interest in ensuring that "weapons capable of quickly inflicting violence on large numbers of people remain in the hands of those with proper training." (*Id*.) Age-based regulations on specific commercial firearm sales are also supported by scientific data that shows Young Adults are disproportionately disposed to harm themselves or others in part due to the general rate of cognitive development in individuals in this age group. (*Id*. at 14). The exemptions allowed for those with firearm safety training in the military, law enforcement, or through hunting licenses, are a "modest requirement." Finally, despite the restrictions imposed by §27510, sales of the allowed firearms have continued. (*Id*. at 21).

The stated objectives of SB 1100 and SB 61 are to increase public safety through sensible firearm control and limit access to certain firearms for some Young Adults with proper safety training. (Combs Decl., Ex. 2 0010-0011, Ex. 6. [ECF No. 21-8.]) The Ninth Circuit has stated that "public safety is advanced by keeping guns out of the hands of people who are most likely to misuse them[.]" *Bauer v. Becerra*, 858 F.3d 1216, 1223 (9th Cir. 2017). When Congress passed the Omnibus Crime Control and Safe Streets Act

of 1968, one of the aims was to reduce crime by keeping "firearms out of the hands of those not legally entitled to possess them" including those under a certain age. *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (quoting S.Rep No. 90-1501, at 22).  In passing the Act, the legislature heard testimony from law enforcement officials, including one who stated "[t]he greatest growth of crime today is in the area of young people, juveniles, and young adults. The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly." *Federal Firearms Act: Hearings Before the Subcomm., to Investigate Juvenile Delinquency of the Sen.Comm. on the Judiciary*, 90th Cong. 57 (1967)(testimony of Sheldon S. Cohen).  Similarly, courts that have considered Second Amendment challenges to age-based firearm restrictions or prohibitions have noted that this group "tend[s] to be relatively immature and that denying them easy access to [certain firearms] would deter violent crime."  *NRA*, 700 F.3d at 203. The stated public safety concerns and objectives of section 27510 to promote public safety through age-based long-gun and semiautomatic centerfire rifle regulations is significant.

Plaintiffs argue that Defendants' evidence suggesting Young Adults are more prone to violence and poor judgment misrepresents or misconstrues the statistical evidence, and that there is no foundation to that claim. (Plaintiffs' Objections to Defendants Evidence at 1-4.) The Court recognizes that the specific age to which the Congressional delegates were referring is unclear, and that many 18-20 year olds navigate those years without criminal records or engaging in reckless behavior. However, it remains commonly understood that Young Adults may require additional safeguards to ensure proper training and maintenance of firearms, and that § 27510 provides a reasonable fit to the stated public safety aims with its enumerated exceptions.

As noted above, the majority of courts have applied intermediate scrutiny to similar challenges to age-based firearm restrictions, finding them to pass Constitutional muster. Plaintiffs, therefore, are not likely to succeed on the merits of the claim.
//

B. *Irreparable Harm*

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Even if Plaintiffs can show a likelihood of success on the merits, they have not demonstrated irreparable harm requiring enjoining section 27510.

Plaintiffs argue they have been deprived of their Second Amendment rights, which is sufficient in itself to show irreparable harm. (Mem. P. & A. at 28). Moreover, Plaintiffs argue that Defendants have no plausible argument that enjoining enforcement of 27510 will endanger public safety or lead to an increase in mass school shootings. (*Id.*) Instead, Plaintiffs contend that safeguards remain in place for all firearm sales including federal and state background checks, a valid firearm safety certificate, proofs of age and residency, a ten-day waiting period, a safe handling demonstration of the firearm being purchased, a gun safe affidavit or a firearm cable lock, and a background check to purchase ammunition. (*Id.* at 29). Finally, Plaintiffs argue that any suggestion that the prohibitions result in temporary inconvenience is "absurd" because the prohibitions on Young Adults "could be deadly to them and/or their families." (Reply at 9-10).

In response, Defendants argue that Plaintiffs cannot establish they will suffer any irreparable harm in the absence of a preliminary injunction because they have not shown that they are likely to succeed on their Second Amendment claim. (Oppo. at 26.) Moreover, the purpose of a preliminary injunction is to provide speedy action to protect a plaintiff's rights, but Plaintiffs waited three months after filing their initial complaint before filing the request for a preliminary injunction belying their contention that they were suffering from grave and irreparable harm. (*Id*. at 28). Defendants note that none of the named Plaintiffs alleged in the SAC stated that they wanted to acquire a semi-automatic centerfire rifle or that he could not acquire the firearm he desired through a parent, grandparent, or spouse. (Oppo at 27).

Plaintiffs claim that a deprivation of their rights for any amount of time is sufficient to demonstrate irreparable harm is contradicted by the fact that they did not immediately request a preliminary injunction to stop the alleged deprivation. Instead, Plaintiffs, waited two months after filing the SAC to seek this relief and did not allege they were unable to acquire semi-automatic centerfire rifles. The delay is a factor in this Court's consideration of the matter. *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)("[L]ong delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"); *but see Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014)("delay is but a single factor to consider in evaluating irreparable injury.")

More importantly, Young Adults are not banned from acquiring all firearms, but may qualify under an exception, or may receive transfers from parents, grandparents, and spouses. They may also use firearms at shooting ranges under certain circumstances. Although the Court recognizes that Plaintiffs might prefer to protect themselves with any firearm of their choice, this is still possible if they comply with exemption qualifications. The restrictions placed on acquisition of long-guns and semi-automatic centerfire rifles from FFL's includes exceptions allowing qualified individuals access to certain firearms for self-defense and other legal purposes. The conditions placed on commercial transactions from FFL's imposes a condition or qualification on commercial transactions to ensure public safety, as Plaintiffs may still access firearms if they meet the exemptions, through family transfers and when they turn 21. *See Hirschfeld*, 417 F.Supp 3d at 757.

For the reasons above, Plaintiffs have not shown a likelihood of success on the merits of their claim that § 27510 violates Young Adults Second Amendment rights, and have not shown they will suffer irreparable harm in the absence of a preliminary injunction.

//
//
//

C. *Balancing Interests*

Plaintiffs contends that the balance of harms sharply tips in their favor because they seek to maintain the status quo while they litigate the merits of their action, and prohibiting lawful sales, transfers, acquisitions, use, handling, and rentals of "any firearm does not increase public safety, especially where, as here, all such purchases must comply with a vast array of regulations." (Mot. at 30.)

Defendants counter that the "modest inconveniences any individual Young Adult may experience in procuring a hunting license in order to purchase a long-gun, or lawfully securing a firearm through a non-FFL transfer, do not outweigh the public safety concerns" outlined in their opposition. (Oppo. at 29-30.)

This Court must balance the burden that some Young Adults will experience because they are deprived of their choice to purchase or use certain firearms, against the enjoinment of a law designed to increase public safety. When undertaking this weighing "of the public interest against a private interest, the public interest should receive greater weight." *F.T.C. v. Affordable Media,* 179 F.3d 1228, 1236 (9th Cir. 1999) (internal quotation marks omitted).

As noted above, the aim of § 27510 was to advance public safety by limiting the possession and use of deadly weapons to mature individuals who have demonstrated discipline through proper training to ensure public safety while honoring the Second Amendment rights of these individuals. *See generally NRA*, 700 F.3d at 203; *Mitchell*, 2020 WL5106723 *4-5. The potential harm of enjoining a duly-enacted law designed to protect public safety outweighs Young Adults' inability to secure the firearm of their choice without proper training. *See, Tracy Rifle & Pistol LLC v. Harris*, 118 F.Supp. 3d 1182, 1193 (E.D. Cal. 2015), aff'd, 637 Fed.Appx. 401 (9th Cir. 2016) (holding that "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave.") Here, the public interests outweigh the potential for private harm.

//

V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs motion for preliminary injunctive relief.

**IT IS SO ORDERED**

Dated: November 3, 2020

Hon. M. James Lorenz
United States District Judge