ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
JENNIFER E. ROSENBERG
Deputy Attorney General
State Bar No. 275496
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6617
 Fax:  (916) 731-2124
 E-mail:  Jennifer.Rosenberg@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in
his official capacity as Attorney General of
the State of California, and Allison Mendoza,
in her official capacity as Acting Director of
the Department of Justice Bureau of
Firearms[1]*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Matthew Jones; *et al.*,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**Rob Bonta, in his official capacity as Attorney General of the State of California; *et al.*,**<br><br>Defendants. | 3:19-cv-01226-L-AHG<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF SEPTEMBER 14, 2022**<br><br>Dept:     5B<br>Judge:    The Honorable  M. James Lorenz<br>Action Filed:    July 1, 2019<br><br>First Amended Complaint Filed:    July 30, 2019<br><br>Second Amended Complaint Filed:    November 8, 2019 |

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Attorney General Rob Bonta is automatically substituted as a defendant in place of his predecessor, former Attorney General Xavier Becerra, and Acting Director Allison Mendoza is automatically substituted as a defendant in place of her predecessors, former Directors Luis Lopez and Martin Horan, and former Acting Directors Brent E. Orick and Blake Graham.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

RELEVANT BACKGROUND AND PROCEDURAL HISTORY ........................3

    I.    Petition for Rehearing in the Interlocutory Appeal, Remand, and This Court's Supplemental Briefing Order...........................................3

    II.    Current Case Status..............................................................................4

ARGUMENT.......................................................................................................5

    I.    *Bruen* Altered the Legal Standard for Analyzing Second Amendment Claims Previously Applied in This Case.........................5

    II.    This Court Should Permit the Parties to Compile a Comprehensive Record and Substantive Briefing Addressing *Bruen*'s Text-and-History Standard, Both on the Merits and to Address the Preliminary Injunction Motion ...................................11

        A.    Further Proceedings Are Necessary As a Procedural Matter ................................................................................12

        B.    Significant Analogical Questions Remain for the Court to Consider in the First Instance...................................15

        C.    "Categorical" Invalidation is Inappropriate, As *Bruen* Requires Historical Analysis and Consideration of Historical Analogues...............................................17

        D.    The Court Must Also Assess the "Threshold" Textual Issues With the Benefit of Further Briefing and Analysis .......20

        E.    The Historical Analysis *Bruen* Requires Must Be Presented with an Adequate Record and Substantive Legal Analysis ........................................................24

    III.    The Court Should Enter a Scheduling Order Allowing Sufficient Time to Conduct Further Expert Discovery and Develop a Record Responsive to *Bruen* Before Considering Any Dispositive Motions, and Set a Reasonable Schedule for Preliminary Injunction Briefing ................................................28

    IV.    Plaintiffs Can Identify No Reason Why the Court Should Not Entertain Additional Briefing on Plaintiffs' Request for a Preliminary Injunction .....................................................34

CONCLUSION .................................................................................................39

ii

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Alliance for Wild Rockies v. Cottrell*
5      632 F.3d 1127 (9th Cir. 2011) ......................................................... 15
6

*Buckingham v. United States*
7      998 F.2d 735 (9th Cir. 1993) ........................................................... 13
8

*Caetano v. Massachusetts*
9      577 U.S. 411 (2016) ........................................................................... 7
10

*Cool Fuel, Inc. v. Connett*
11      685 F.2d 309 (9th Cir. 1982) ........................................................... 13
12

*Defense Distributed v. Bonta*
13      No. CV 22-6200-GW-AGRX, 2022 WL 15524977 (C.D. Cal. Oct.
         21, 2022) .................................................................................. 10, 32
14

*District of Columbia v. Heller*
15      554 U.S. 570 (2008) ................................................................. *passim*
16

*Durning v. Citibank, N.A.*
17      950 F.2d 1419 (9th Cir. 1991) ......................................................... 23
18

*Fouts v. Bonta*
19      561 F. Supp. 3d 941 (S.D. Cal. 2021) ............................................. 31
20

*Fouts v. Bonta*
21      No. 21-56039, 2022 WL 4477732 (9th Cir. Sept. 22, 2022) ............ 31
22

*Fyock v. Sunnyvale*
23      779 F.3d 991 (9th Cir. 2015) ........................................................... 35
24

*Goldie's Bookstore v. Superior Ct.*
25      739 F.2d 466 (9th Cir. 1984) ........................................................... 38
26

*Heller v. District of Columbia*
27      670 F.3d 1244 (D.C. Cir. 2011) ........................................ 8, 9, 18, 26

28

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Hohe v. Casey*
    868 F.2d 69 (3d Cir. 1989)..................................................................36

*Jackson v. City & Cnty. of San Francisco*
    746 F.3d 953 (9th Cir. 2014)................................................................6

*Jones v. Becerra*
    498 F. Supp. 3d 1317 (S.D. Cal. 2020) ......................................*passim*

*Jones v. Bonta*
    34 F.4th 704 (9th Cir. 2022)..........................................3, 15, 23, 36

*Jones v. Bonta*
    47 F.4th 1124 (9th Cir. 2022)...........................................................18

*Lydo Enters. v. Las Vegas*
    745 F.2d 1211 (9th Cir. 1984)...........................................................35

*McDonald v. City of Chicago*
    561 U.S. 742 (2010).....................................................6, 9, 11, 16

*Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*
    991 F.2d 536 (9th Cir. 1993)............................................................35

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*
    142 S. Ct. 2111 (2022)..............................................................*passim*

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
    No. 22-cv-00501-BLF, --- F. Supp. 3d ---, 2022 WL 3083715 (N.D.
    Cal. Aug. 3, 2022)..........................................................................10

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,
    & Explosives*
    700 F.3d 185 (5th Cir. 2012)............................................................26

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*
    719 F.3d 338 (5th Cir. 2013).............................................................37

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*
    662 F.2d 641 (9th Cir. 1981)............................................................13

iv

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4

*San Diego Cty. Gun Rights Comm'n v. Reno*
   98 F.3d 1121 (9th Cir. 1996)..............................................................38

5
6

*Staples v. United States*
   511 U.S. 600 (1994).......................................................................23

7
8

*Teixeira v. Cnty. of Alameda*
   873 F.3d 670 (9th Cir. 2017) (en banc) ...........................................37

9

*Tracy Rifle & Pistol LLC v. Harris*
   118 F.Supp. 3d 1182 (E.D. Cal. 2015) ...........................................38

10
11

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008)......................................................................*passim*

12
13

**STATUTES**

California Penal Code § 27510 ...............................................................1

14
15

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. II................................................................9, 21, 26

16
17

**OTHER AUTHORITIES**

18
19

C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev, 741, 773
   (1993) ........................................................................................11

20
21
22

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second
   Amendment: Making Sense of the Historical Record*, 39 Yale L. &
   Pol'y Rev. Inter Alia 1 (2021).........................................................27

23

Suzanne Goldsmith, *Perspective: Ohio State's Murder Professor*,
   Columbus Monthly, Apr. 16, 2018 .................................................16

24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

The Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), fundamentally altered the legal standard for evaluating Second Amendment challenges to firearms regulations.  Instead of the two-step framework that the Ninth Circuit and most other federal courts of appeals had adopted for resolving those claims, *Bruen* rejected the application of means-end scrutiny and set forth a new standard for analyzing Second Amendment claims that is "centered on constitutional text and history."  *Id.* at 2126, 2128–29.  Under this new "text-and-history" standard, courts must determine whether "the Second Amendment's plain text" protects the conduct in which the plaintiff wishes to engage, and if it does, then decide whether the regulation "is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.

This case is on remand from the Ninth Circuit, which considered Plaintiffs' interlocutory appeal of this Court's November 2020 order denying their motion for preliminary injunctive relief enjoining provisions of California Penal Code section 27510 that place limitations on the sale or transfer of certain firearms to people aged 18-20.  The Ninth Circuit originally affirmed that order in part and reversed in part, but prior to the mandate's issuance, the Ninth Circuit panel vacated its opinion and this Court's order, and remanded for this Court to conduct further proceedings consistent with *Bruen*.  After remand, this Court's September 14, 2022 supplemental briefing order directed the parties to submit briefs addressing *Bruen* and then await further direction of the Court.  Dkt. 92.

Prior to the interlocutory appeal, the parties litigated this case—and this Court analyzed Plaintiffs' motion—under the now-defunct two-step approach.  The parties tailored the fact and expert discovery conducted thus far—including expert report subject matters, legal and expert analysis, and choice of experts—to that framework.  Although much of that material remains relevant under the new

1

standard, neither the parties nor the Court specifically addressed—either in briefing Plaintiffs' preliminary injunction motion or in developing the evidentiary record that will be used on the merits in this action—whether Section 27510's age limitation provisions impose "comparable burden[s] on the right of armed-self-defense" as "relevantly similar" historical analogues, or whether the modern and historical regulations are "comparably justified," as *Bruen* now requires. *Bruen*, 142 S. Ct. at 2133.

Discovery has not yet closed in this matter and the Ninth Circuit's order remanding the case to this Court provides the Court and the parties the opportunity to examine additional evidence and conduct further legal analysis, informed by *Bruen*'s newly articulated text-and-history standard. Accordingly, Defendants request that the Court enter a new scheduling order permitting the parties to conduct focused expert discovery to supplement the existing evidentiary record in order to address the new text-and-history standard, and setting a reasonable schedule for the parties to submit dispositive motions after fact and expert discovery conclude. This approach would serve the interests of the parties, allowing them a full and fair opportunity to address the new emphasis on historical analogues and to prepare a record responsive to the new standard. It would also allow this Court to address important questions about how *Bruen* applies in the first instance.

Further, the Court should reject Plaintiffs' invitations to enter judgment or grant their request for a preliminary injunction without receiving further evidence or entertaining full briefing addressing *Bruen*'s new standard. Plaintiffs' Supplemental Brief ("Pls.' Br."), Dkt. 95, at 6, 17–18. Defendants' petition for rehearing sought vacatur of the panel opinion and remand to this Court for development of a full record and consideration of *Bruen*'s new standard on the basis that *Bruen* materially changed the Second Amendment inquiry—and the Ninth Circuit granted Defendants' request. In addition, the Court must consider all

of the preliminary injunction factors set forth in *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) together—including the irreparable harm, public interest, and balance of the equities factors that the Ninth Circuit's now-vacated panel opinion left open for this Court to consider in the first instance. Thus, to the extent the Court is inclined to consider granting preliminary injunctive relief, the Court should set a reasonable schedule for the parties to submit substantive briefing and additional evidentiary support addressing Plaintiffs' motion for preliminary injunction in this new legal landscape.

## RELEVANT BACKGROUND AND PROCEDURAL HISTORY

**I.    PETITION FOR REHEARING IN THE INTERLOCUTORY APPEAL, REMAND, AND THIS COURT'S SUPPLEMENTAL BRIEFING ORDER**

In May 2022, prior to the Supreme Court's decision in *Bruen*, a divided Ninth Circuit panel affirmed in part and reversed in part this Court's order denying Plaintiffs' motion for preliminary injunction, and remanded for this Court to further consider all three equitable *Winter* factors in reassessing the propriety of denying preliminary injunctive relief. *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022), *vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022). The parties jointly moved for an extension of time of 61 days to seek rehearing in the Ninth Circuit on the grounds that the impending decision in *Bruen* likely would "affect the legal framework under which this case will ultimately be decided." *Jones v. Bonta*, No. 20-56174 (9th Cir. May 16, 2022), 9th Cir. Dkt. 89-1.

After the *Bruen* decision articulated the new legal standard for evaluating Second Amendment claims, Defendants filed a petition for panel rehearing or rehearing en banc, requesting that the Ninth Circuit vacate the panel opinion and this Court's order denying Plaintiffs' motion for preliminary injunction. *Jones v. Bonta*, No. 20-56174 (9th Cir. July 25, 2022), 9th Cir. Dkt. 93. Defendants argued that vacatur and remand to this Court were appropriate to "allow the parties to compile the kind of historical record that *Bruen* now requires" and to afford this

3

Court the opportunity "to answer a number of important issues raised by *Bruen* in the first instance." *Id.* at 1–2. In particular, Defendants argued that vacatur and remand were "especially appropriate given the interlocutory posture" of the appeal, which meant that the Ninth Circuit "did not have the full historical record before it when it resolved th[e] appeal." *Id.* at 13. Defendants further argued that "[r]emand will allow the parties to present a full historical record under the standard announced in *Bruen*." *Id.*

On September 7, 2022, the Ninth Circuit granted Defendants' petition for panel rehearing, vacated both the Ninth Circuit panel decision and this Court's November 2020 decision denying Plaintiffs' motion for a preliminary injunction, and remanded this case for further proceedings consistent with *Bruen*. *Jones v. Bonta*, No. 20-56174 (9th Cir. September 7, 2022), 9th Cir. Dkt. 99.[2] Thereafter, on September 14, 2022, this Court ordered the parties to "submit supplemental briefing addressing the Supreme Court's decision in [*Bruen*]," and "await further direction of the Court" upon completion of such briefing. Dkt. 92.

## II.   CURRENT CASE STATUS

***There is no operative scheduling order.*** In August 2021, this Court granted a joint motion of the parties for entry of a limited stay of all trial court proceedings in this action pending issuance of the mandate in the then-pending Ninth Circuit interlocutory appeal of Plaintiffs' motion for preliminary injunction. Dkt. 83 & 85. All dates in the previously-operative scheduling orders were suspended pursuant to the limited stay, and the Court's order stated that the Court would schedule a status conference "to discuss the status of the case, any potential narrowing of issues,

---

[2] The Ninth Circuit has disposed of several other pending Second Amendment cases in this manner. *See, e.g.*, *Rupp v. Bonta*, No. 19-56004 (9th Cir. June 28, 2022), Dkt. 71; *McDougall v. Cty. of Ventura*, No. 20-56220 (9th Cir. June 29, 2022) (en banc), Dkt. 55; *Martinez v. Villanueva*, No. 20-56233 (9th Cir. July 6, 2022), Dkt. 45.

resetting and revising dates in the scheduling order for this case, and any other issues" following remand.  *Id.*  No post-*Bruen* status conference has been held yet. Thus, there are no current discovery, dispositive motion, or other deadlines set in this action, and there is no assigned trial date.  No party has filed a motion for summary judgment or any other dispositive motion in this case yet.  And no briefing schedule has been set to address Plaintiffs' motion for preliminary injunction now that the matter has been remanded after interlocutory appeal with instructions to address *Bruen*'s new framework.

**Both fact and expert discovery remain open.**  Prior to entry of the stay, the parties partially completed fact and expert discovery.  *See* Dkt. 83.  They exchanged written fact discovery in 2020 and 2021, as well as initial expert reports and rebuttal and supplemental expert reports in June and July 2021.  *Id.*  The parties' expert reports were developed under the framework of the then-governing, pre-*Bruen*, two-step legal standard for evaluating Second Amendment claims.  No fact or expert witnesses have been deposed in this action yet.  *Id.*

## ARGUMENT

### I. *BRUEN* ALTERED THE LEGAL STANDARD FOR ANALYZING SECOND AMENDMENT CLAIMS PREVIOUSLY APPLIED IN THIS CASE

In *Bruen*, the Supreme Court addressed the constitutionality of New York's requirement that individuals show "proper cause" as a condition of securing a license to carry a firearm in public.  142 S. Ct. at 2123.  Before turning to the merits, the Court announced a new methodology for analyzing Second Amendment claims.  It recognized that lower courts had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."  *Id.* at 2125.  At the first step of that approach, the government could "justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the [Second Amendment] right as originally understood.'"  *Id.* at 2126 (citation omitted).  If that inquiry showed that

5

the regulation did not burden conduct protected by the Second Amendment, lower courts would uphold the regulation without further analysis. *Id.* Otherwise, courts would proceed to the second step, asking "how close[ly] the law c[ame] to the core of the Second Amendment right and the severity of the law's burden on that right," and applying intermediate scrutiny unless the law severely burdened the "'core' Second Amendment right" of self-defense in the home, in which case strict scrutiny applied. *Id.*; *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (same).

The Supreme Court in *Bruen* declined to adopt the two-step approach. *See* 142 S. Ct. at 2126. The Court explained that its earlier decisions in *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), "do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126–27. It then announced a new standard for analyzing Second Amendment claims that is "centered on constitutional text and history." *Id.* at 2128–29. Under this text-and-history approach,

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* at 2129–30.

Applying that test to the case before it, the Court held that New York's "proper cause" requirement was inconsistent with the Second Amendment's text and history, and therefore unconstitutional. *Id.* at 2134–56. New York defined "proper cause" as a showing of "special need for self-protection distinguishable from that of the general community." *Id.* at 2123. This was a "demanding" standard, *id.*, and made it "virtually impossible for most New Yorkers" "to carry a gun outside the home for self-defense," *id.* at 2156 (Alito, J., concurring). The

6

Supreme Court had "little difficulty" concluding that the "plain text" of the Second Amendment protected the course of conduct that the *Bruen* plaintiffs wished to engaged in—"carry[ing] handguns publicly for self-defense"—reasoning that the term "'bear' naturally encompasses public carry." *Id.* at 2134.[3] The Court explained that because "self-defense is 'the *central component*' of the [Second Amendment] right itself," and because "[m]any Americans hazard greater danger outside the home than in it," it would make "little sense" to confine that right to the home. *Id.* at 2135.

Because the plain text of the Second Amendment covered the *Bruen* plaintiffs' proposed course of conduct, the burden then shifted to the government to show that the prohibition was consistent with an accepted tradition of firearm regulation. 142 S. Ct. at 2135. The Court categorized the government's historical evidence into different historical periods: (1) medieval to early modern England, (2) the American colonies and the early Republic, (3) antebellum America, (4) postbellum America and Reconstruction, and (5) the late 19th and early 20th centuries. *Id.* at 2135–36. Given that the historical evidence is used to determine the scope of the Second Amendment as it existed at the time of ratification—and remains to this day—"not all history is equal," and the Court focused on the historical evidence from the period surrounding the ratification of the Second and Fourteenth Amendments. *Id.* at 2136.[4]

---

[3] No party in *Bruen* disputed that the "ordinary, law-abiding, adult citizens" who were plaintiffs in the case were "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. And no party disputed that the handguns that the plaintiffs sought to carry in public were in "common use" for self-defense and thus qualified as protected "Arms." *Id.* (citing *Heller*, 554 U.S. at 627, and *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016)).

[4] The Court suggested that historical evidence long predating ratification may be relevant, however, if it "survived to become our Founders' law" and is consistent with the traditions during the relevant historical period. *Bruen*, 142 S. Ct. at 2136.

7

After conducting a lengthy survey of "the Anglo-American history of public carry," the Court held that New York had failed to justify its proper-cause requirement. *Id.* at 2156. The Court concluded that this history showed that the Second Amendment guaranteed a right to bear "commonly used arms" in public, "subject to certain reasonable, well-defined restrictions," which had not historically included a requirement that "law-abiding, responsible citizens . . . 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public.'" *Id.* (citation omitted).

While *Bruen* announced a new standard for analyzing Second Amendment claims, it also made clear that governments may continue to adopt reasonable gun safety regulations. The Court recognized that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. Nor does it protect a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). Indeed, as Justice Alito explained, *Bruen*'s majority opinion "decide[d] nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.* at 2157 (Alito, J., concurring).

Moreover, Justice Kavanaugh—joined by Chief Justice Roberts—wrote separately to underscore the "limits of the Court's decision." *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring). Justice Kavanaugh reiterated the majority's view that the Second Amendment is not a "regulatory straightjacket," *id.* (quoting

---

Similarly, evidence from long after ratification of the Fourteenth Amendment, though less probative of the original understanding of the scope of the right, may still confirm the scope of that right if consistent with the text of the Second Amendment and the regulatory traditions at the time of ratification. *Id.* at 2137 ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (*Heller II*) (Kavanaugh, J., dissenting))).

*Bruen*, 142 S. Ct. at 2133), and *Heller*'s observation that "the Second Amendment allows a 'variety' of gun regulations," *id.* at 2162 (quoting *Heller*, 554 U.S. at 636).[5]  In particular, Justice Kavanaugh emphasized that that the "presumptively lawful measures" that *Heller* identified—including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," laws "forbidding the carrying of firearms in sensitive places," laws "imposing conditions and qualifications on the commercial sale of arms," and laws prohibiting the keeping and carrying of "dangerous and unusual weapons"—remained constitutional, and that this was not an "exhaustive" list.  *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626–27, 627 n.26).[6]

Beyond these general observations, *Bruen* also provided more specific guidance about how lower courts should scrutinize Second Amendment claims under its new approach.  As a threshold issue, *Bruen* directs courts to assess whether the "Second Amendment's plain text covers an individual's conduct," *Bruen*, 142 S. Ct. at 2126—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, U.S. Const. amend. II.  The Constitution "presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2126; *see also id.* at 2129–30 ("When the Second Amendment's plain text

---

[5] These observations are consistent with the Court's assurances that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment."  *McDonald*, 561 U.S. at 785 (plurality opinion) (quotation marks and citation omitted).

[6] *See also Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *accord McDonald*, 561 U.S. at 785 (plurality opinion) (the Second Amendment "by no means eliminates" state and local governments' "ability to devise solutions to social problems that suit local needs and values").

9

covers an individual's conduct, the Constitution presumptively protects that conduct."); *id.* at 2134 (examining whether the "plain text of the Second Amendment" protected the *Bruen* plaintiffs' desired course of conduct); *id.* at 2135 (similar).  Plaintiffs bear the burden of establishing that their claim satisfies this "plain text" threshold inquiry.  *See Defense Distributed v. Bonta*, No. CV 22-6200-GW-AGRX, 2022 WL 15524977, at *5 (C.D. Cal. Oct. 21, 2022), *adopted*, No. CV 22-6200-GW-AGRX, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).  If they do not, the Court's analysis is at an end.  *Id.* at *3–5 & n.5.

If—and *only* if—a challenged restriction regulates conduct protected by the "plain text" of the Second Amendment, *Bruen* then directs the government to justify its regulation by showing that the law is "consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126; *id.* at 2129–30, 2134–35, 2140 n.11; *accord, e.g.*, *Defense Distributed*, 2022 WL 15524977, at *5 ("under *Bruen*, the burden does not shift to the government to support the regulations with a historical analysis" where the claim "fails at the threshold stage of the inquiry"); *id.* at *3 (collecting cases); *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-00501-BLF, --- F. Supp. 3d ---, 2022 WL 3083715, *8 (N.D. Cal. Aug. 3, 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then shifts to the government to show why the regulation is consistent with the Nation's historical traditional of firearm regulation . . . .").

While the Court recognized that the historical analysis conducted at the first step of the two-step approach that lower courts had adopted for analyzing Second Amendment claims was "broadly consistent with *Heller*," *Bruen*, 142 S. Ct. at 2127, it clarified how that analysis should proceed in important respects.  In some cases, the Court explained, this historical inquiry will be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has

persisted since the 18th century." *Id.* at 2131.  But in others—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—the Court recognized that this historical analysis requires a "more nuanced approach." *Id.* at 2132.

To justify regulations of that sort, *Bruen* held that governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*." 142 S. Ct. at 2133 (emphasis in original). Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster. *Id.*  Instead, in evaluating whether a "historical regulation is a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are "'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev, 741, 773 (1993)).  The Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.  The Court explained that those dimensions are especially important because "'individual self-defense is "the *central component*" of the Second Amendment right.'" *Id.* (quoting *McDonald*, 561 U.S. at 767, *and Heller*, 554 U.S. at 599).[7]  After *Bruen*, a modern regulation that restricts conduct protected by the plain text of the Second Amendment is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors that is "comparably justified." *Id.*

## II.  THIS COURT SHOULD PERMIT THE PARTIES TO COMPILE A COMPREHENSIVE RECORD AND SUBSTANTIVE BRIEFING ADDRESSING *BRUEN*'S TEXT-AND-HISTORY STANDARD, BOTH ON THE MERITS AND TO ADDRESS THE PRELIMINARY INJUNCTION MOTION

Now that the case has been remanded for further proceedings consistent with *Bruen*, the Court should conduct further proceedings that will allow for additional

_____

[7] *See also Heller*, 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right.").

expert discovery directed at *Bruen*'s text-and-history standard, and full briefing on dispositive motions applying this new standard.  The parties litigated this case—and this Court analyzed Plaintiffs' motion for preliminary injunction—under the now-defunct two-step approach, focusing much of the attention on whether Section 27510's age-based limitations on sales and transfers satisfied the appropriate level of means-end scrutiny.  Plaintiffs' claim must now be evaluated under the test articulated in *Bruen*, with a complete evidentiary record compiled with *Bruen*'s command in mind.  This would serve the interests of the parties, allowing them a full and fair opportunity to address the new emphasis on historical analogues and the analogical methodology prescribed in *Bruen*.  It would also allow this Court in the first instance to address several important questions left open by *Bruen*.[8]

Analyzing the specific application of *Bruen* to all of the issues presented by Plaintiffs' challenge to Section 27510 is beyond the scope of this brief, but Defendants nonetheless outline below several examples from the broader universe of issues requiring further evidentiary development and substantive briefing.

**A.   Further Proceedings Are Necessary As a Procedural Matter**

Much of Plaintiffs' supplemental brief paraphrases or otherwise presents the Ninth Circuit's now-vacated panel decision in this matter as encompassing the governing law, factual conclusions, and legal analysis that this Court should follow here.  Pls.' Br. at 8–9 (asking this Court to "reaffirm the Panel's findings" and

---

[8] As the Third Circuit recently observed in remanding a challenge to New Jersey's restrictions on large-capacity magazines, *Bruen* "provided lower courts with new and significant guidance on the scope of the Second Amendment and the particular historical inquiry that courts must undertake when deciding Second Amendment claims."  Order at 1 n.1, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, No. 19-3142 (3d Cir. Aug. 25, 2022) (Dkt. 147-1).  Despite a dissenting judge's view that the case could be resolved on the existing record, the court granted the government's request to engage in "further record development, targeted at the legal and historical analysis required under *Bruen*."  *Id.*

Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022
(3:19-cv-01226-L-AHG)

"apply the same standard" the panel decision applied).  In doing so, Plaintiffs appear to contend that further expert evidence and substantive briefing—and perhaps even *any* further proceedings at all—are unnecessary in light of the limited record provided to this Court in connection with their preliminary injunction motion and considered by the Ninth Circuit in the vacated panel opinion.  Pls.' Br. at 2, 7–17; *id.* at 6 (arguing that the "Court should enter judgment in favor of Plaintiffs"); *id.* at 17 (stating that the "Court should rule in favor of Plaintiffs and find that California's ban on 18- to-20-year-old adults from purchasing firearms is unconstitutional" in light of the preliminary injunction evidence they submitted).  Such a contention at this early stage of the case is specious.

  ***First***, to the extent that Plaintiffs intended their statements to request entry of a *permanent* injunction and final disposition of this case, that request is plainly premature.  Discovery has not yet concluded and there are no pending motions for summary judgment.  "Before summary judgment may be entered against a party, that party must be afforded both notice that the motion is pending and an adequate opportunity to respond."  *See Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981).  "Implicit in the 'opportunity to respond' is the requirement that sufficient time be afforded for discovery necessary to develop 'facts essential to justify [a party's] opposition' to the motion."  *Id.* (citations omitted); *accord, e.g.*, *Buckingham v. United States*, 998 F.2d 735, 742 (9th Cir. 1993).  Defendants would be extremely prejudiced by a decision disposing of this entire action without a "full and fair opportunity to ventilate the issues involved" with both a full evidentiary record *and* reasoned substantive briefing addressed to such a motion, on a noticed motion briefing schedule—*especially* given *Bruen*'s imposition of a new legal standard governing the claim at issue.  *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982).

  Moreover, in opposing Defendants' petition for panel rehearing or rehearing

en banc in the Ninth Circuit, Plaintiffs expressly acknowledged that Defendants should have an opportunity to compile a complete historical record for the Court's consideration of the merits:  Plaintiffs argued that rehearing and vacatur of the panel's opinion were unnecessary because the panel's decision on the preliminary injunction did not constitute a ruling on the merits, "[p]reliminary injunctions are often decided on an incomplete record," and "the government will have the opportunity to compile a complete historical record in the district court" on remand. *See Jones v. Bonta*, No. 20-56174 (9th Cir. Aug. 23, 2022), 9th Cir. Dkt. 97 (Pls.' Opposition to Petition for Rehearing), at 2.  The Court should reject any invitation Plaintiffs pose to circumvent an ordered procedure for consideration of an adequate evidentiary record and fully developed briefing on these important issues.

*Second*, to the extent that Plaintiffs are arguing that the Court need not consider any additional evidence or analysis for purposes of resolving the preliminary injunction motion, Plaintiffs made these same arguments in opposing Defendants' petition for rehearing in the Ninth Circuit, and the Ninth Circuit nonetheless vacated the panel opinion and remanded the matter for further proceedings consistent with *Bruen*.  *See Jones v. Bonta*, No. 20-56174 (9th Cir. Sept. 7, 2022), 9th Cir. Dkt. 99 (Order Granting Rehearing, Vacatur, and Remand).[9] Indeed, Defendants' petition sought vacatur and remand precisely to "allow the parties to compile the kind of historical record that *Bruen* now requires."  *Jones v.*

---

[9] *See also*, *e.g.*, *Jones v. Bonta*, No. 20-56174 (9th Cir. Aug. 23, 2022), 9th Cir. Dkt. 97 (Pls.' Opposition to Petition for Rehearing), at 9 (arguing that vacatur of the panel opinion was unnecessary because "[w]hatever the minor differences might be between the *Bruen* analysis and the analysis the Court undertook at step one, the conclusions at step one of the panel opinion are still accurate forecasts of the likely result in this case."); *id.* at 10 (arguing that vacatur of the panel decision to compile a more complete record and conduct further analysis was unnecessary because "the historical analysis required by *Bruen* was the historical analysis that the panel conducted," and "there is no need to have a complete historical record" for purposes of considering the propriety of preliminary injunctive relief).

14

*Bonta*, No. 20-56174 (9th Cir. July 25, 2022), 9th Cir. Dkt. 93, at 1–2.

In addition, neither the Ninth Circuit nor this Court has yet considered the equitable *Winter* factors—including irreparable harm, the public's interest, and the balance of the equities—since *Bruen* issued. The Ninth Circuit's now-vacated panel opinion would have remanded for this Court to consider these factors in the first instance. *Jones*, 34 F.4th at 732–33. All of the *Winter* factors—likelihood of success on the merits under the new *Bruen* standard, irreparable harm to Plaintiffs, the public's interest, and the balance of the equities—must be weighed and considered *together* in determining the propriety of granting or denying interim relief. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). These factors thus must be fully briefed by the parties and considered by the Court before interim relief can be granted. *See infra*, § IV.

**B.   Significant Analogical Questions Remain for the Court to Consider in the First Instance**

*Bruen* left open several questions that are best resolved by this Court, if necessary, after further substantive briefing and argument. The Court did not decide "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" or look to the "public understanding of the right to keep and bear arms" when the Second Amendment was ratified in 1791. *Bruen*, 142 S. Ct. at 2138. More broadly, the Court "d[id] not resolve" the "manner and circumstances in which postratification practice may bear on the original meaning of the Constitution." *Id.* at 2162-2163 (Barrett, J., concurring).

In resolving these and other historical questions, *Bruen* directs district courts (and then, later, courts of appeals) to follow "various evidentiary principles and default rules," including "the principle of party presentation." *Id.* at 2130 n.6 (majority opinion). And as *Bruen* recognizes, this historical analysis "can be difficult," and sometimes requires judges to "resolv[e] threshold questions" and

"mak[e] nuanced judgments about which evidence to consult and how to interpret it." *Id.* at 2130 (quoting *McDonald*, 561 U.S. at 803–04 (Scalia, J., concurring)).[10] That is especially true in cases like this one, which implicates "unprecedented societal concerns [and] dramatic technological changes." *Id.* at 2132; *see also id.* (recognizing that these cases "require a more nuanced approach"). The problem of gun violence in the under-21 age group, the development of sophisticated and high-powered firearm technology that is presented by semiautomatic centerfire rifles, the easy access to firearms by those under the age of 21, and the problem of mass shootings that formed one of the bases for Section 27510's age-based limitations on sales and transfers of firearms through FFLs are undoubtedly modern advances and pose modern problems.[11] A "more nuanced" analogical approach is thus required in this case. *Id.* at 2130.

Expert analysis considering "[s]ocial history, cultural history, economic history, and military history" in addition to constitutional and statutory history can help guide the Court in answering these unresolved questions about, for example, the most relevant timeframe for assessing historical analogues and which historical regulations should be considered relevantly similar. *See* Declaration of Professor Saul Cornell, ¶ 22. [12] A proper assessment of whether Section 27510 is consistent

---

[10] *See also Bruen*, 142 S. Ct. at 2134 ("[W]e acknowledge that 'applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins.'" (quoting *Heller II*, 670 F.3d at 1275 (Kavanaugh, J., dissenting))).

[11] *See*, *e.g.*, Suzanne Goldsmith, *Perspective: Ohio State's Murder Professor*, Columbus Monthly, Apr. 16, 2018 (history professor Randolph Roth explained that, historically, mass violence was a "group activity," but "[r]apid-fire guns and high-capacity ammunition changed the equation" and gave rise to "the current scourge of mass shootings"), *available at* https://bit.ly/3dPON4K.

[12] Defendants submit the accompanying declaration of Professor Saul Cornell to further explain the complexities involved in the historical research into age-based limitations and the relevant historical context that *Bruen* now requires, and to

Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022
(3:19-cv-01226-L-AHG)

1   with historical practice would not be possible without analyzing, among other

2   things, the historical context surrounding both the understanding of legal capacity

3   of those under 21 at the time of the Founding, and the rise of modern firearms

4   regulation—including the market revolution of the Jacksonian period, during which

5   an "inter-connected set of changes in production, consumption, and technology

6   transformed gun culture by making a variety of weapons . . . more common and

7   more reliable," and prompted "increasing crime rates" and other "unprecedented

8   problems created by the proliferation of firearms . . . ."  Cornell Decl., ¶¶ 14–15,

9   24; *see also id.* ¶ 25 (contextualizing the rise of age-specific limits during

10  Reconstruction by reference to the "proliferation of weapons among unsupervised

11  minors" under the age of 21 during that period).

12       The Court has not yet had the benefit of this kind of contextualization that

13  *Bruen*'s analysis requires to help with answering the analogical questions that

14  *Bruen* left open.  The parties must have the opportunity to further develop the

15  evidentiary record and arguments consistent with *Bruen*'s commands, and this

16  Court should have the opportunity to consider substantive briefing from the parties

17  regarding the analysis *Bruen* requires.

18       **C.  "Categorical" Invalidation is Inappropriate, As *Bruen* Requires**
         **Historical Analysis and Consideration of Historical Analogues**

19

20       Although not entirely clear, Plaintiffs appear to argue that if the Court

21  determines under its textual analysis that the provisions of Section 27510 implicate

22  _____

     provide the Court with an estimate of the timeframe that just one of several

23   potential experts Defendants may offer would require to conduct adequate research.
     Professor Cornell is a historian, the Paul and Diane Guenther Chair in American

24   History at Fordham University, author of the chapter on the right to bear arms in

25   *The Oxford Handbook of the U.S. Constitution*, and one of the world's preeminent
     scholars of American legal and constitutional history, including the history of the

26   Second Amendment and the right to keep and bear arms.  His writings on the
     Second Amendment and gun regulation have been widely cited by state and federal

27   courts, including the majority and dissenting opinions in *Bruen*.

28

1    the Second Amendment *at all* (by concluding that 18-20-year-olds are part of "the

2    people" to whom the Second Amendment refers, that the firearms that are the

3    subject of Section 27510's limitations are in common use for self-defense, and that

4    Plaintiffs' proposed course of conduct is covered by the text of the amendment), the

5    Court may find that the regulation is "categorical[ly] *per se* invalid[]" and strike

6    down Section 27510 without conducting the historical analogue analysis *Bruen*

7    requires.  *See* Pls.' Br. at 9–10 (citing *Heller II*, 670 F.3d at 1290–91 (Kavanaugh,

8    J., dissenting); *accord id.* at 17 (Arguing that "as the long gun prohibition is a ban

9    on bearable arms in common use, it is categorically unconstitutional under *Heller*

10   and *Bruen*.").

11        This argument finds no root in the law or in the plain facts of this case.  First,

12   Section 27510's *de minimis* requirement that 18-20-year-olds take a hunter

13   education course and obtain a hunting license, or qualify for another exemption,

14   before purchasing or receiving transfer of a long gun is in no way a flat "ban on

15   bearable arms in common use," as Plaintiffs contend.  *See, e.g.*, Pls.' Br. at 17.

16   Defendants have explained at length, and this Court rightly concluded in its order

17   denying Plaintiffs' motion for preliminary injunction, that "the California law in

18   question is not a complete ban on the sale, transfer or supply by a federally licensed

19   firearms dealer of all firearms for persons 18 to 20 years old."  *Jones v. Becerra*,

20   498 F. Supp. 3d 1317, 1328 (S.D. Cal. 2020), *vacated*, *Jones v. Bonta*, 47 F.4th

21   1124 (9th Cir. 2022); *see also id.* at 1329 ("Section 27510 does not categorically

22   ban the possession of arms used for self-defense.").  The Court's conclusion in its

23   preliminary injunction order is premised on the same limited regulation, and subject

24   to the same exemptions:

25        Young Adults are not banned from acquiring all firearms, but may
26        qualify under an exception, or may receive transfers from parents,
         grandparents, and spouses. They may also use firearms at shooting
27        ranges under certain circumstances.  Although the Court recognizes

28

that Plaintiffs might prefer to protect themselves with any firearm of their choice, this is still possible if they comply with exemption qualifications.

*Id.* at 1331.

Moreover, nothing in either *Bruen*'s recitation and application of the new text-and-history standard, or in then-Judge Kavanaugh's dissent in *Heller II*, sanctions a conclusion that the Court need not proceed to consider historical analogues. Indeed, *Bruen* expressly requires an examination of relevant history when the plain text of the Second Amendment covers a particular arm or a plaintiff's proposed course of conduct. *Bruen*, 142 S. Ct. at 2134. If the plain text of the Second Amendment covers the arms, people, and proposed course of conduct, the conduct is only "*presumptively*" protected. *Id.* at 2126, 2134 (emphasis added). Such presumptively constitutional arms, rightsholders, and courses of conduct are not beyond the reach of government regulation. *See*, *e.g.*, *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun.") Rather, the analysis proceeds next to an examination of the historical context and a comparison of the challenged law to historical analogues—an inquiry focused on accepted limitations on the scope of the right to keep and bear arms as that right was understood in the past. In distilling *Heller*'s reasoning into the new text-and-history standard, and discussing the extreme outlier of "a flat ban on the possession of handguns in the home" that the *Heller* court considered, *Bruen* noted that the *Heller* court conducted historical analysis by considering whether relevant historical analogues existed, *even after* it concluded the challenged regulation touched on conduct falling within the Second Amendment's ambit. *See id.* at 2131. And, of course, *Bruen* explored potential historical analogues and the broader historical context at length after concluding at the textual stage that New York's public-carry law burdened conduct related to "Arms" in "common use" for self-

19

1  defense today (handguns). *See id.* at 2134–56.

2      There is thus no merit to Plaintiffs' conclusion that the Court can find Section

3  27510's hunting license exemption to be a categorically unconstitutional regulation;

4  it must consider the historical context of similar regulations, and determine, based

5  on expert and other evidence the parties may present, whether the requirement that

6  18-20-year-olds receive training and procure a license prior to purchasing or

7  receiving transfer of firearms through FFLs, or qualify for another exemption, is

8  "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142

9  S. Ct. at 2130.

10      **D.    The Court Must Also Assess the "Threshold" Textual Issues
            With the Benefit of Further Briefing and Analysis**

11

12      As an initial matter, Plaintiffs must identify at the threshold textual stage the

13  course of conduct in which they wish to engage, and explain how and whether that

14  course of conduct is covered by the plain text of the Second Amendment. *See*

15  *Bruen*, 142 S. Ct. at 2134.  The level of generality that should apply to frame the

16  course of conduct likely will be in dispute here.  Although Plaintiffs have not

17  clearly identified, as they must, the relevant course or courses of conduct, they are

18  likely to argue that they are the keeping or bearing of arms and the concomitant

19  right to purchase or acquire arms. *See* Pls.' Br. at 5–6; Second Amended

20  Complaint ("SAC") ¶¶ 4–6 (alleging that but for Section 27510's restrictions, each

21  individual plaintiff "would immediately purchase, acquire, and/or possess a firearm

22  within California for self-defense and other lawful purposes").[13]  Defendants

23  dispute that such a high level of generalization in articulating the proposed course

24  of conduct is appropriate when assessing this threshold issue.[14]  Rather, in

25      [13] In declarations supporting their preliminary injunction motion, each

26  individual Plaintiff declared he "would like to purchase a firearm for self-defense
    and other lawful purposes." *See* Dkt. 21-2, ¶ 4; Dkt. 21-3, ¶ 5; Dkt. 21-4, ¶ 5.

27      [14] Otherwise, every challenge could be cast as one in which a plaintiff seeks

28

challenging the restrictions on sales and transfers of semiautomatic centerfire rifles, what Plaintiffs appear to seek is the specific right to acquire a semiautomatic centerfire rifle, or the right to procure the specific firearm of their choosing.  And in challenging the requirement that they procure training and a hunting license prior to purchasing a long gun of their choosing, the course of conduct in which Plaintiffs seek to engage appears to be the acquisition of firearms without training, fees, or licensure requirements.  *See*, *e.g.*, Dkt. 21-2, ¶ 8 (declaration of individual Plaintiff M. Jones stating, "I have no interest in purchasing a firearm in order to hunt . . . and have no need for or interest in attending a hunter's safety course or paying unnecessary and burdensome fees associated with these classes and licenses").

Yet *Bruen* reaffirmed that the Second Amendment does not "protect a right to 'keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose,'" *id.* at 2128 (quoting *Heller*, 554 U.S. at 626), and it did not "decide anything about the kinds of weapons that people may possess."  142 S. Ct. at 2157 (Alito, J., concurring).  Thus, with respect to the limitation on sales and transfers of semiautomatic centerfire rifles, Plaintiffs must show that the right to acquire semiautomatic centerfire rifles falls within the plain text of the amendment.

Moreover, the hunting license exemption in Section 27510 clearly falls outside the protection of the Second Amendment's plain text, and is therefore constitutional.  Among other things, the requirement to obtain a license does not regulate conduct covered by the "plain text" of the Second Amendment, *id.* at 2126, because it does not prohibit any person from "keep[ing]" or "bear[ing]" any "Arms," U.S. Const. amend. II.  Instead, it merely imposes a condition that purchasers who do not qualify for other exemptions must satisfy before they may acquire firearms from federally licensed firearms dealers ("FFLs").  Finding the

---

to keep and bear arms, and the threshold textual analysis would be superfluous in many cases.

Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022
(3:19-cv-01226-L-AHG)

hunting license exemption constitutional at this textual stage accords with *Bruen*'s new standard; as Justice Kavanaugh explained, under *Bruen*, licensing regimes may permissibly "require a license applicant to undergo fingerprinting, a background check, a mental health records check, and *training in firearms handling and in laws regarding the use of force, among other possible requirements*" without offending the Second Amendment. *Id.* at 2162 (Kavanaugh, J., concurring) (noting that states could continue operating such licensing regimes, subject to as-applied challenges) (emphasis added). And if the Court determines that the hunting license exemption is not implicated by the plain text of the Second Amendment, the analysis is over with respect to that portion of the statute. Plaintiffs must establish that the conduct in which they wish to engage falls within the plain text of the Second Amendment, and *only* if they do so can the burden be shifted to Defendants to show that Section 27510's provisions are consistent with historical tradition.

In addition, the parties and the Court should address the threshold question of whether a semiautomatic centerfire rifle qualifies as a protected "Arm" under the Second Amendment, notwithstanding the Court's previous conclusion on this point. *Bruen* confirmed that to qualify as a protected "Arm," a weapon must, like handguns, be commonly *used* for lawful self-defense—not simply manufactured, produced, sold, or owned. *See Bruen*, 142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense" (emphasis added)); *id.* at 2142 n.12 (finding that pocket pistols were "commonly *used* at least by the founding" (emphasis added)); *id.* at 2143 (noting that certain belt and hip pistols "were commonly *used* for lawful purposes in the 1600s" (emphasis added)); *id.* at 2156 (describing the "right to bear commonly *used* arms in public subject" (emphasis added)); *id.* (noting that American governments would not have broadly prohibited the "public carry of commonly *used* firearms for personal defense" (emphasis added); *accord Heller*, 554 U.S. at 636 (holding that the government could not impose an "absolute

22

1    prohibition of handguns held *and used* for self-defense" (emphasis added)).

2        Plaintiffs, who bear the burden on the threshold textual inquiry, did not submit

3    any studies or evidence demonstrating how frequently semiautomatic centerfire

4    rifles are used in self-defense in their preliminary injunction briefing.  Instead,

5    Plaintiffs proffered only a handful of articles and advertisements discussing the

6    popularity of certain types of rifles for hunting and other purposes.  *See* Dkt. 21-8,

7    (Combs Declaration), ¶ 38; *id.* Dkt. 21-9, Ex. 18 (Combs Declaration), at p. 0499–

8    0554.  Plaintiffs' supplemental brief contends that "semiautomatic rifles and long

9    guns are commonly owned, bearable arms, fully protected under the Second

10   Amendment," and they cite the vacated Ninth Circuit panel opinion in support of

11   the conclusion that semiautomatic centerfire rifles are "[u]nquestionably" among

12   the arms protected by the plain text of the Second Amendment.  Pls.' Br. at 10.  Of

13   course, the vacated panel decision "has no precedential authority whatsoever."

14   *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 (9th Cir. 1991).  In addition, the

15   panel opinion's conclusion relied on *Staples v. United States*, 511 U.S. 600

16   (1994)—a case not addressing the Second Amendment, but mens rea standards—in

17   concluding that semiautomatic centerfire rifles are "not dangerous and unusual

18   weapons."  *Jones v. Bonta*, 34 F.3d at 716.  *Staples* did not hold that all

19   semiautomatic weapons are in "common use" in the sense contemplated by the

20   Second Amendment; it merely stated that semiautomatic weapons have been

21   "widely accepted as lawful possessions."  511 U.S. at 612.  Following *Bruen*, it

22   remains unclear what satisfies Plaintiffs' burden to show that regulated firearms

23   like semiautomatic centerfire rifles are "commonly used" for self-defense;

24   statistical evidence and expert testimony may be necessary to carry that burden, and

25   should inform the Court's analysis.

26       The parties should have the opportunity to brief the threshold textual

27   questions, and then to develop and present expert evidence setting forth the relevant

28

23

historical context and addressing the question of whether sufficient relevant historical analogues imposing comparable burdens, supported by comparable justifications, exist.

### E.   The Historical Analysis *Bruen* Requires Must Be Presented with an Adequate Record and Substantive Legal Analysis

*Bruen* has now clarified how the historical inquiry must proceed, and the analysis it requires differs from analysis of "longstanding" laws employed by courts before *Bruen*—including this Court and every other court considering similar age-based limitations on sales, transfers, or other access to firearms for those under the age of 21—in important respects.  Among other things, the parties, this Court, and the Ninth Circuit panel did not employ *Bruen*'s reasoning-by-analogy method—with its emphasis on comparable burdens and comparable justifications—that *Bruen* requires when considering Plaintiffs' motion for preliminary injunction.  *See* 142 S. Ct. at 2133 (noting that these questions "are *central* considerations when engaging in an analogical inquiry" (quotation marks omitted)).  Nor did the expert reports that the parties exchanged in 2021, as the concept of comparable burdens and comparable justifications had not been crystallized in the governing legal framework.  Thus, both the extant evidentiary record and the evidence presented in connection with Plaintiffs' preliminary injunction motion must be supplemented with the kind of analysis that *Bruen* requires for consideration of Plaintiffs' claim.

*Bruen*'s new requirement of considering historical analogues imposing comparable burdens and involving comparable justifications raises several issues with which the parties must grapple, and for which the development of additional expert and historical evidence is necessary.  For example, *Bruen* advised that "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"  142 S. Ct. at 2133.  However, although *Bruen* identified comparable burdens and comparable justifications as two

24

metrics by which courts may assess whether two regulations are relevantly similar, this Court is left to determine at what level of granularity a modern regulation must resemble a historical regulation. *Id.*

For example, Plaintiffs assert that Section 27510's hunting license exemption, which permits a person between the ages of 18 and 20 to purchase or receive transfer of any firearm that is not a handgun or a semiautomatic centerfire rifle so long as that person procures a hunting license after receiving firearms training in a hunter education course, "has no historical pedigree" and therefore cannot pass constitutional muster as a condition or qualification on the sale of firearms. *See, e.g.*, Pls.' Br. at 15. Plaintiffs contend that in order for the hunting license exemption to qualify as a permissible "training requirement," Defendants must identify "historical regulations that impose analogous training requirements *as a prerequisite*" to purchase of a firearm. *Id.* (emphasis in original). And they claim that "[t]he government cannot point to a single founding era regulation that required an individual *of any age* to obtain training *before* they were permitted to purchase a firearm and exercise their right to keep and bear arms." *Id.* (emphasis in original). However, *Bruen* makes clear that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*", 142 S. Ct. at 2133, and Plaintiffs' characterization of the required analogue is exceedingly narrow. This Court must determine what renders a historical analogue "representative" and "relevantly similar." This will require briefing and additional evidence.

Similarly, Plaintiffs argue that "the vast majority" of 19th and 20th century regulations did not prohibit or restrict sales or transfers of long guns to people between the ages of 18 and 20. Pls.' Br. at 11–12. But nothing under *Bruen*'s reasoning-by-analogy requirement directs that a historical analogue must regulate the same type of firearm; a "historical twin" is not required, and comparable burden

and comparable justification are key in assessing relevant similarity.  Again, the parties should be permitted to develop additional historical evidence and present additional substantive briefing to assist the Court with conducting the necessary historical analysis.

In addition, a large portion of Plaintiffs' supplemental brief is directed to a continued reliance on militia service as the *source* of a Second Amendment right for 18-20-year-olds to personally keep and bear arms, and the basis for their conclusion that 18-20-year-olds *must* have been part of "the people" whose rights were codified in the Second Amendment.  *See, e.g.*, Pls.' Br. at 6–8 (reasoning that the reference to the militia in the prefatory clause "demonstrates that 18-year-olds *must* be part of 'the people'" that the Second Amendment protects).  But sourcing the *personal right* from *militia service* is directly contrary to *Heller*, which "decoupl[ed]" militia service from the individual right to keep and bear arms.  *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco*, *Firearms, & Explosives*, 700 F.3d 185, 204 n.17 (5th Cir. 2012).[15]  In premising the right almost entirely on a history of militia service, Plaintiffs' supplemental brief does not directly address the broader context of the relative lack of legal rights of minors under the age of 21—the historical age of majority—from the Founding through the latter half of the Twentieth Century.  As Professor Cornell notes,

---

[15] *Heller* emphasized that the prefatory clause of the Second Amendment "does not limit *or expand* the scope of the operative clause," *Heller*, 554 U.S. at 578 (emphasis added)—*i.e.*, the "right of the people to keep and bear arms, shall not be infringed," U.S. Const. amend. II.  *Heller* further noted that in 1825, William Rawle's "influential treatise" differentiated between the people's right to bear arms and their service in the militia," 554 U.S. at 607, and explained that the English right that was the predecessor to the Second Amendment "had nothing to do with militia service," *id.* at 608.  Plaintiffs' arguments in this regard conflate the *obligations and duties* imposed upon 18-20-year-olds who were required to serve in state militias with *full personal rights* to keep and bear arms.  Pls.' Br. at 8 (Arguing that "even before 1791, the history of 18-to-20-year-olds keeping and bearing arms uniformly shows that they have full Second Amendment rights.").

1
2
3
4
5
6
7

> Across this broad swath of American legal history, infants' or minors' legal status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision.  Therefore, treating infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms is profoundly anachronistic and ignores the common law context in which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries.

8   Cornell Decl., ¶ 9.  By giving short shrift to that crucial context, among others—

9   including the reality of minors' conscription in the militia and the fact that their

10  parents often were legally obligated to supply their arms for them, *see*, *e.g.*, *id.*, ¶ 12

11  n.10 (citing Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second*

12  *Amendment: Making Sense of the Historical Record*, 39 Yale L. & Pol'y Rev. Inter

13  Alia 1 (2021))—Plaintiffs fail to heed *Bruen*'s command to examine the legal *and*

14  nonlegal sources showing longstanding government practice.  *Cf. Bruen*, 142 S. Ct.

15  at 2136–37 ("[W]e recognize that 'where a governmental practice has been open,

16  widespread, and unchallenged since the early days of the Republic, the practice

17  should guide our interpretation of an ambiguous constitutional provision.'").  The

18  Court's assessment of the right Plaintiffs assert here must be guided by additional

19  expert evidence providing the necessary historical, social, economic, and military

20  context, *see* Cornell Decl., ¶ 22, and the parties should be provided the opportunity

21  to further examine the scope of the Second Amendment by canvassing the

22  applicable historical context and potentially relevant analogues.

23        These and many other legal questions require careful analysis in substantive

24  briefing under *Bruen*'s new standard, as well as supplementation of the existing

25  record with additional fact and expert evidence.  Accordingly, the Court should

26  assess, through briefing on dispositive motions informed by further expert

27  discovery, the effects of *Bruen* on its prior application of *Heller* and the now-

28

defunct two-step framework.  And the Court should provide a reasonable opportunity for the parties to develop evidence and submit briefing addressing Plaintiffs' motion for preliminary injunction under *Bruen*'s new standard.

### III. THE COURT SHOULD ENTER A SCHEDULING ORDER ALLOWING SUFFICIENT TIME TO CONDUCT FURTHER EXPERT DISCOVERY AND DEVELOP A RECORD RESPONSIVE TO *BRUEN* BEFORE CONSIDERING ANY DISPOSITIVE MOTIONS, AND SET A REASONABLE SCHEDULE FOR PRELIMINARY INJUNCTION BRIEFING

As explained above, *Bruen* calls for a new and searching textual and historical analysis regarding—at the least—whether the conduct in which Plaintiffs wish to engage, and the arms they seek to acquire, are covered by the plain text of the Second Amendment, and whether Section 27510's age limitations are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  A scheduling order providing sufficient time to develop an adequate factual and expert evidentiary record is critical for this post-remand phase of the case.

The type of historical analysis called for by the second prong in *Bruen's* new legal standard is "difficult," requiring resolution of "threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *See id.* at 2130 (citation omitted)).  It also requires time, resources, and expertise.  The weighty Second Amendment issues raised by Plaintiffs should be resolved based on a "historical record compiled by the parties," *id.* at 2130, n.6, which will require expert discovery (for the underlying merits case) and expert evidence (for considering the preliminary injunction motion) to prepare.  Plaintiffs' claims are thus ill-suited for resolution (whether on a preliminary or ultimate basis) based solely on the existing, still-incomplete record developed thus far in this case, the existing preliminary injunction evidentiary submissions, or on these briefs responding to the Court's September 14, 2022 supplemental briefing order.

This case stands apart from other matters in which *Bruen* plainly controls.  For example, the plaintiffs in *Flanagan v. Bonta*, 9th Cir. Case No. 18-55717,

1  challenged California's requirement that to secure a permit to carry firearms in

2  most public places, applicants must show that they have "good cause." *See*

3  *Flanagan*, Appellants' Opening Br. (9th Cir. Oct. 2, 2018), 9th Cir. Dkt. 16. *Bruen*

4  involved a challenge to New York's similar "proper cause" requirement that could

5  be resolved by way of a "straightforward" inquiry. 141 S. Ct. at 2122, 2131.

6  California quickly recognized that its similar "good cause" requirement was

7  unconstitutional in light of *Bruen* and therefore controlled the outcome in

8  *Flanagan*. *See Flanagan*, 9th Cir. Dkt. 64.

9      Plaintiffs' challenge to Section 27510's restrictions, by contrast, will require a

10  "more nuanced" analysis of historical traditions and historical analogues than

11  *Bruen*'s "proper cause" requirement. *Bruen*, 141 S. Ct. at 2132. Among other

12  reasons, the urbanization of American society and concomitant rise in violence

13  among those under the age of 21, mass production of firearms, advancements in

14  firearms technology generally, growing sophistication of features and firing

15  capabilities of semiautomatic centerfire rifles, ease of access to firearms for those

16  under the age of 21, and the scourge of mass shootings that (in part) prompted

17  amendments to Section 27510, "implicat[e] unprecedented societal concerns" and

18  "dramatic technological change" relative to the time periods in which the Second

19  and Fourteenth Amendments were ratified. *Bruen*, 141 S. Ct. at 2132. [16]

20      Preparing a record that will discern the relevant historical traditions will

21  involve original historical research—an "unpredictable, labor-intensive, and time-

22  consuming" process, albeit a necessary one. Declaration of Zachary Schrag

23  ("Schrag Decl."), ¶ 7.[17] To identify possible historical analogues to challenged

24

25      [16] *See supra* n.11.

26      [17] Defendants submit the accompanying declaration of Professor Zachary
    Schrag, a historian, history professor at George Mason University, and author of
27  *The Princeton Guide to Historical Research* (Princeton University Press, 2021), to
    explain the complexities of sound historical research.

28

29

regulations, one must first devise the scope of the research project, clarifying what specific questions the research is intended to answer, and what time periods, geographic areas, and subject matters it will encompass. *Id.*, ¶¶ 9–11. A researcher must also identify appropriate primary and secondary source materials to consult. *Id.*, ¶¶ 13–17. As *Bruen* recognizes, the types of source material that will elucidate whether a historical statute imposes a comparable burden on Second Amendment rights or has a comparable justification might not be limited to the plain text of historical statutes. They may also include legal and non-legal source materials establishing the existence of a societal problem involving arms, whether that problem has historically been addressed by non-legal means, or whether there have been disputes over the lawfulness of a regulation. *See Bruen*, 141 S. Ct. at 2131, 2133. Such sources might include court records, newspaper articles, books, and manuscripts, in addition to statutory and legislative materials. Schrag Decl., ¶ 15.

The accessibility of these sources can vary greatly, especially for archival materials dating back to the 18th and 19th centuries. *Id.*, ¶ 20–22. Professor Cornell notes that "[o]ne important difference between research on the history of firearms regulation, in contrast to other subfields of law, is that there is no Westlaw-like searchable database for this topic," and the databases that exist have "serious gaps" and are often outdated. Cornell Decl. ¶ 19. Even if the source materials from these time periods have been digitized, a thorough search spanning all U.S. jurisdictions would still require parallel searches across numerous databases and archives. Schrag Decl., ¶ 20. "Given that one must combine research in the existing digital sources with more traditional and time-consuming primary source research in archives and rare book collections, the inquiry required by *Bruen* is both more labor-intensive and time-consuming than other forms of legal research typically associated with constitutional litigation." Cornell Decl., ¶ 20. And although "new source materials and scholarship continue to emerge

slowly" that "must be incorporated into our slowly expanding understanding of the scope of arms regulation in the Anglo-American legal tradition," Professor Cornell reports that "much work needs to be done to fill out this emerging picture" in order to properly provide the kind of historical analysis that *Bruen* requires.  *Id.*, ¶ 21.

Further, developing effective search criteria requires special expertise to account for linguistic developments since the 18th and 19th centuries; using modern language "can yield profoundly misleading results."  Schrag Decl., ¶¶ 18–21.  For this reason, experts in traditional historical research and other related fields—including, potentially, the emerging field of corpus linguistics—may be required to inform the complex analysis *Bruen* requires.

Importantly, review and interpretation of source materials also requires historical expertise, if such work is to be done correctly.  Although attorneys and judges are accustomed to performing textual analysis of laws, historical scholars are better situated to interpret 18th- and 19th-century statutes within their broader historical context, referencing what events or circumstances contributed to a law's enactment or the law's enforcement history.  *See id.*, ¶ 29; *see also*, *e.g.*, *Fouts v. Bonta*, 561 F. Supp. 3d 941, 950 (S.D. Cal. 2021) ("[H]istory is the work of historians rather than judges."), *vacated*, *Fouts v. Bonta*, No. 21-56039, 2022 WL 4477732 (9th Cir. Sept. 22, 2022).  Importantly, to avoid engaging in an "ahistorical literalis[t]" analysis, "it is vital to survey historical scholarship across a broad range of subfields" to consider the historical context, "including "[s]ocial history, cultural history, economic history, and military history," which "all shed important light on the original meaning of the Second Amendment."  Cornell Decl., ¶ 22.  Historians, rather than lawyers and judges, are best equipped to conduct this kind of analysis in the first instance.

These concerns underscore why a complete and accurate record for assessing the ultimate merits of this case, as well as assessing the propriety of preliminary

injunctive relief, must include expert analysis.  The requisite historical analysis cannot, as Plaintiffs have suggested, be limited to the text of statutes or a limited universe of law review articles, much less to the record produced for purposes of Plaintiffs' preliminary injunction nearly three years ago and addressed to the now-defunct two-step legal standard that focused means-end scrutiny.  *See* Pls.' Br. at 2.

Lastly, *Bruen*'s textual and historical analysis should not be rushed.  Courts have expressed particular doubt about parties' ability to produce an adequate record in expedited timeframes, such as those associated with short-turnaround preliminary injunction briefing.  *See Defense Distributed*, 2022 WL 15524977, at *5 n.9 (Rejecting preliminary injunction motion and stating that "[t]here is no possibility this Court would expect [the California Attorney General] to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice).").  Although Defendants cannot provide a precise estimate of how much time would be needed to conduct a thorough identification and review of source materials, at a general level, a historian conducting original research on primary-source materials would fairly expect to conduct many hours of work to yield several sentences of written historical analysis.  Schrag Decl., ¶ 35.  As a practical matter, most qualified historians would be unable to devote themselves to this endeavor full-time on account of other research, teaching, and professional obligations.  *Id.*, ¶ 36.  This is especially so given that there is a limited universe of historians and other experts who specialize in, and devote their scholarship to, language of the Constitution and the history of the Second Amendment—and such historians are simultaneously providing expert reports, testimony, and consultation in many lawsuits addressing distinct firearms regulations in California and across the country that require additional research to address *Bruen*'s new standard.[18]

---

[18] Although any given historian's research on different cases or issues might overlap to a certain degree, the nuances of each challenged law may still require

Professor Cornell, who submitted initial and rebuttal expert reports in this action in 2021 under the pre-*Bruen* standard, notes that *Bruen*'s new legal standard will require additional legal research, both because the history of firearms regulations of those under the age of 21 has not received much attention, and because *Bruen* itself has directed that the historical analysis address how changing technologies and new social problems influenced regulation.  Cornell Decl., ¶ 24 (noting that the intensified regulation of guns and minors in the post-Civil War era is "a classic example of the necessity of additional scholarly research . . . to properly flesh out how this ancient tradition of regulation was adapted to the new demands of a rapidly urbanizing and industrializing nation."); *see also id.*, ¶ 27 ("In particular, additional research is necessary so that an analysis of the analogues to modern gun laws are properly contextualized.").  Professor Cornell estimates that it will take him "approximately 6 months to delve deeply enough into the [relevant historical research] to formulate a supplemental expert report that meets the demanding historical standards required by *Bruen*."  *Id.*, ¶ 28.

To be clear, Defendants do not seek to re-start this case from scratch or inject needless delay.  Substantial material adduced in the fact and expert discovery already exchanged, and submitted in connection with the parties' preliminary injunction briefing, remains relevant under the new *Bruen* standard.  But further expert discovery would directly address the textual and historical questions raised by *Bruen*'s new legal framework.  The parties would be free to rely on the existing evidentiary record to support their claims and defenses, to the extent that evidence remains relevant.  In this way, the matter can be resolved on the merits expeditiously after a reasonable period of focused expert discovery, followed by cross-motions for summary judgment or other dispositive motions.

_____

significantly different research to identify relevant analogues.  Analogues are not likely to be precisely the same when evaluating restrictions on ghost guns as they are when evaluating open carry licensing regimes, for example.

33

*Merits Briefing.*  In order to provide sufficient time to develop the supplemental textual and historical record and conduct further expert discovery relevant to *Bruen*'s new legal standard before further proceedings on the merits, Defendants respectfully request that the Court issue a scheduling order that would provide the parties with approximately six to seven months to develop supplemental expert witness opening and rebuttal reports, complete fact and expert discovery (including completion of depositions that were stayed while the interlocutory appeal was pending), and submit cross-motions for summary judgment.  This proposed timeframe is reasonable in light of the current posture of this case—where both expert and fact discovery remain open and no dispositive motions have yet been filed—and the challenges posed by the kind of textual and historical analysis that *Bruen* now requires the parties and this Court to undertake.

*Preliminary Injunction Briefing.*  Although preliminary injunctions are often decided on incomplete records and much of the existing material developed prior to *Bruen* is still relevant, the development of some additional evidence—including the development of additional expert declarations directed to the new textual and historical analysis demanded by *Bruen*—is necessary for the Court to properly consider whether preliminary injunctive relief is required here, for all the reasons discussed above.  Defendants thus respectfully request that the Court set a reasonable schedule for the parties to provide new evidence and briefing on the propriety of Plaintiffs' request for a preliminary injunction.

## IV.  PLAINTIFFS CAN IDENTIFY NO REASON WHY THE COURT SHOULD NOT ENTERTAIN ADDITIONAL BRIEFING ON PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION

Plaintiffs cannot and do not proffer any reason why the Court should bypass the important step of considering Plaintiffs' motion for preliminary injunction under *Bruen*'s newly articulated text-and-history standard with the benefit of additional evidence and full substantive briefing—addressing the likelihood of

success under the new standard, *together* with an assessment of the three equitable *Winter* factors.  Indeed, Plaintiffs do not address the *Winter* factors in their supplemental brief at all.  There is every reason for the Court to consider fulsome briefing on a reasonable schedule—especially in light of the fact that Plaintiffs still fail to show that the equitable *Winter* factors would tip sharply in their favor.

The Court's reasoning as to irreparable harm and the balance of the equities in its order denying Plaintiffs' motion for preliminary injunction remains sound under the governing precedent, and supports further substantive briefing on Plaintiffs' motion for preliminary injunction here.  *See Jones v. Becerra*, 498 F.Supp.3d at 1330–32.  As the Court previously ruled, "Plaintiffs['] claim that a deprivation of their rights for any amount of time is sufficient to demonstrate irreparable harm is contradicted by the fact that they did not immediately request a preliminary injunction to stop the alleged deprivation," but instead delayed two months after filing their SAC, four months after instituting this action, and 10 months after the hunting license exemption took effect to ask for the urgent remedy of preliminary injunctive relief.  *Id.* at 1331.[19]  Plaintiffs' voluntary joinder of the parties' joint motion for a limited stay of all proceedings in this Court pending the Ninth Circuit's resolution of their interlocutory appeal—in which Plaintiffs agreed that a limited stay was appropriate, would promote judicial efficiency, and otherwise benefit all parties, Dkt. 83—further underscores why they cannot establish entitlement to a preliminary injunction.  *Fyock v. Sunnyvale*, 779 F.3d 991, 996 n.2 (9th Cir. 2015) (Joinder in a voluntary stay made it "unlikely [Plaintiffs] could make the requisite showing of irreparable harm to support the issuance of a

---

[19] "By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action," even in cases alleging deprivation of fundamental rights.  *Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984); *accord Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993).

35

preliminary injunction" in a Second Amendment challenge.)[20]

Further, Plaintiffs' mere assertion of constitutional injury is still not dispositive on this factor. *See Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction[.]"). As this Court recognized, 18-20-year-olds still may purchase or receive transfer of any firearm other than a handgun or semiautomatic centerfire rifle by procuring a hunting license. *Jones v. Becerra*, 498 F.Supp.3d at 1331. Even the Ninth Circuit panel found no error in the Court's conclusion that there was no irreparable harm as to the hunting license requirement, and affirmed the Court's denial of preliminary injunction as to that requirement. *Jones*, 34 F.4th at 732–33.

Moreover, Plaintiffs still have provided *no* declaration or allegation—in the SAC or in their preliminary injunction papers—that any of the individual Plaintiffs or unnamed members of the public potentially represented by the institutional or firearms dealer and shooting range plaintiffs actually wished to purchase a semiautomatic centerfire rifle or even any particular firearm; that any plaintiff or represented member of the public could not acquire a firearm of their choosing through a parent, grandparent, or spouse (or that they had tried do so); that any plaintiff or represented member of the public even attempted to *seek out* firearms training or target practice opportunities at a shooting range or gun club, where they could be loaned a firearm for purposes of target and safe handling practice; or that any plaintiff or represented member of the public attempted to, but could not, enroll in a hunter education course or procure a hunting license. *See* Defs.' Opp. to

---

[20] Notably, the vacated Ninth Circuit panel decision, which would have remanded the matter for this Court to reconsider the three equitable *Winter* factors, did not find any error in this Court's consideration of Plaintiffs' delay in assessing irreparable harm, and would have left it for this Court to consider *all three* equitable *Winter* factors—irreparable harm, the public interest, and the balance of the equities—on remand. *Jones*, 34 F.4th at 732–33.

Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022
(3:19-cv-01226-L-AHG)

1  Prelim. Inj., Dkt. 25, at 27; *see generally* SAC.

2       Plaintiffs' inability to show irreparable harm or that the balance of equities tips

3  in their favor is made particularly evident by the fact that during the pendency of

4  the Ninth Circuit appeal, all three individual Plaintiffs in this action aged out of

5  Section 27510's provisions.  All individual Plaintiffs are now over the age of 21,

6  *see* SAC ¶¶ 4–6, and thus are free to purchase or receive transfer of any otherwise

7  legal firearm, including semiautomatic centerfire rifles and handguns, through FFLs

8  or any other legal means.  In short, the sole claim alleged in this action is moot as to

9  the individual Plaintiffs, and they therefore can suffer *no* harm.  *Cf. Nat'l Rifle*

10  *Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 (5th Cir. 2013) (dismissing as

11  moot claims of plaintiffs challenging a law prohibiting 18-20-year-olds from

12  obtaining concealed carry licenses because plaintiffs had turned 21 during

13  pendency of action).  Thus, even assuming that the individual Plaintiffs could have

14  shown some small measure of irreparable harm from their inability to purchase or

15  receive transfer of a semiautomatic centerfire rifle through a FFL or their inability

16  to obtain a firearm without procuring a hunting license, they can no longer do so.

17       Moreover, Plaintiffs have repeatedly affirmed that they do not bring this action

18  as a class action.  *See* Oct. 1, 2019 Joint Case Management Statement, Dkt. 11, at

19  24.  And the dealer and range plaintiffs alleged that they bring this action solely on

20  behalf of *themselves* and "as a representative of similar [licensed dealer] entities,"

21  not any potential customers, SAC ¶¶ 17–19; they therefore do not invoke derivative

22  standing because they do not purport to represent the subsidiary rights of their

23  potential customers.  *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 678 (9th Cir.

24  2017) (en banc).  *Even* if the dealer and range plaintiffs are construed to represent

25  such interests, they have identified no "'honest-to-God [customer]" who wanted to

26  purchase or receive transfer of a firearm but has been unable to do so under any

27  available exemption, rendering their standing allegations insufficient.  *Id.* at 680–81

28

37

(citation omitted).  The institutional plaintiffs fail to identify *any* particular member at all, much less a particular member with identified harms that could satisfy the requirement that a plaintiff seeking to assert associational standing must have a member who "would otherwise have standing to sue in their own right."  *San Diego Cty. Gun Rights Comm'n v. Reno*, 98 F.3d 1121, 1130–31 (9th Cir. 1996).  While such pleading deficiencies might or might not be remedied later in the case, at this stage, Plaintiffs' vague, conclusory allegations of harm to unidentified customers or members fail to identify any irreparable harm—from either the hunting license requirement or the limitation on semiautomatic centerfire rifles—that could support issuing the "extraordinary remedy" of a preliminary injunction.  *Winter*, 555 U.S. at 24; *accord Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984) (Noting that this kind of "[s]peculative injury does not constitute irreparable injury" warranting injunctive relief.).

Lastly, Plaintiffs have provided no basis for concluding that the balance of the equities, including the public interest, tips in their favor any more now than it did in 2020.  The Court's conclusion that the equities tip against issuing a preliminary injunction remains appropriate:  "The potential harm of enjoining a duly-enacted law designed to protect public safety outweighs Young Adults' inability to secure the firearm of their choice without proper training.  *See Tracy Rifle & Pistol LLC v. Harris*, 118 F.Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 Fed.Appx. 401 (9th Cir. 2016) (holding that '[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave.')."  *Jones v. Becerra*, 498 F.Supp.3d at 1332.

In light of the fact that Plaintiffs likely will not be able to satisfy their burden as to any of the three equitable *Winter* factors, this Court should not rush to a decision on Plaintiffs' motion for preliminary injunction without considering further substantive briefing and evidence addressing *Bruen*'s new standard.

38

1

**CONCLUSION**

2     *Bruen* changed the legal framework applicable to the Second Amendment

3 challenge presented in this case.  Defendants respectfully request that the Court set

4 a reasonable schedule for the parties to conduct additional expert discovery and

5 submit dispositive motions in this case.  In addition, Defendants request that the

6 Court set a reasonable schedule for the parties to submit additional evidence and

7 substantive briefing addressing Plaintiffs' request for preliminary injunctive relief.

8

9 Dated:  November 7, 2022               Respectfully submitted,

10                                    ROB BONTA
                                   Attorney General of California

11                                    MARK R. BECKINGTON
                                   Supervising Deputy Attorney General

12                                    JOHN D. ECHEVERRIA
                                   Deputy Attorney General

13

14                                    */s/ Jennifer E. Rosenberg*
                                   JENNIFER E. ROSENBERG

15                                    Deputy Attorney General
                                   *Attorneys for Defendants Rob Bonta,*

16                                    *in his official capacity as Attorney*
                                   *General of the State of California,*

17                                    *and Allison Mendoza, in her official*
                                   *capacity as Acting Director of the*

18                                    *Department of Justice Bureau of*
                                   *Firearms*

19

20

21

22

23

24

25

26

27

28

Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022
(3:19-cv-01226-L-AHG)