1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   JOHN D. ECHEVERRIA
    Deputy Attorney General
4   JENNIFER E. ROSENBERG
    Deputy Attorney General
5   State Bar No. 275496
      300 South Spring Street, Suite 1702
6     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6617
7     Fax:  (916) 731-2124
      E-mail:  Jennifer.Rosenberg@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta, in*
    *his official capacity as Attorney General of*
9   *the State of California, and Allison Mendoza,*
    *in her official capacity as Acting Director of*
10  *the Department of Justice Bureau of*
    *Firearms[1]*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| 15 **Matthew Jones; *et al.*,** | 3:19-cv-01226-L-AHG |
| 16                                 Plaintiffs, | |
| 17            **v.** | **DECLARATION OF PROFESSOR SAUL CORNELL** |
| 18 **Rob Bonta, in his official capacity as** | Dept:        5B |
| 19 **Attorney General of the State of** | Judge:       The Honorable  M. James |
| **California; *et al.*,** | Lorenz |
| 20                             Defendants. | Action Filed:        July 1, 2019 |
| 21 | |
| 22 | First Amended Complaint Filed:        July 30, 2019 |
| 23 | Second Amended Complaint Filed:        November 8, 2019 |
| 24 | |

25

26

27   _____

      [1] Acting Director of the Bureau of Firearms Allison Mendoza has succeeded
     former Acting Director Blake Graham. Pursuant to Federal Rule of Civil Procedure
     25(d), Acting Director Mendoza, in her official capacity, is substituted as a
28   defendant in this action.

---

## DECLARATION OF PROFESSOR SAUL CORNELL

I, Saul Cornell, Ph.D., declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.    I have been retained by the California Department of Justice to render expert opinions in this case. I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to keep and bear arms, as well as the understanding of the right to keep and bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. I have also been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history and the broader historical context regarding the rights and duties of minors aged 18-20 during the relevant timeframes. I provided initial and rebuttal expert reports in this matter in June and July 2021. I have not yet been deposed in this matter.

2.    In June 2022, nearly a year after I provided my initial and rebuttal expert reports in this matter and while this matter remained pending in the U.S. Court of Appeals for the Ninth Circuit, the Supreme Court issued its decision in *N.Y. State Rifle & Pistol Ass'n Inc. v. Bruen*.

3.    In *Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. This declaration discusses the modality of historical analysis relevant to the issues presented in this case.

4.    This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to

the truth of the matters discussed in this declaration

5.     I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[2]

6.     My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *NYSRPA v. Bruen*.[3] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[4] Thus, my expertise not only includes the

---

[2] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit A.

[3] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). For a full list of court citations, *see* Exhibit B.

[4] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the*

(continued…)

history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.

7.    I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.); *Miller v. Smith*, No. 2018 cv 3085 (C.D. Ill.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); and *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wa.).

8.    I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports or declarations; $750 per hour for depositions and court appearances; and an additional $100 per hour for travel time. My compensation is not contingent on the results of my analysis or the substance of any testimony.

9.    It is impossible to understand the status of minors in American law without analyzing the complex processes by which English common law was absorbed and modified in early America. Persons aged 18–20 were considered "infants" or "minors" under the law in the Founding era.[5] This legal fact did not change until the latter half of the twentieth century.[6] Across this broad swath of American legal history, infants' or minors' legal status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision. Therefore, treating

---

*Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

[5] Zephaniah Swift, 1 *A System of the Laws of the State of Connecticut* 213 (1795).

[6] Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 57-58 (2016).

infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms is profoundly anachronistic and ignores the common law context in which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries. Indeed, under English common law and in the early days of the Republic, individuals under the legal age of majority, twenty-one, were entirely subsumed under the authority of their parents (usually their fathers) or guardian. The patriarchal authority enjoyed by fathers or guardians was slightly modified in the legal reforms following the American Revolution; the main change did not confer additional autonomy on minors, but transferred some of the power enjoyed by parents or guardians to the legislature and courts who were given greater power to intervene to promote the welfare of those under the age of 21. These changes did not alter the basic fact that minors still did not enjoy the full rights of those considered legal adults.

10.    Finally, it is important to distinguish between the scope of liberty enjoyed by minors today,  which is a  consequence of a series of landmark decisions during the Warren Court era (1953-1969) that gave those under the legal age of majority legal standing to assert broad First Amendment-type freedoms, and the narrow scope of First Amendment liberties that minors enjoyed at the time of the Second Amendment.[7] Under both federal and state law, in the Founding era minors would not have been able to assert similar legal claims. First Amendment rights, and analogous rights under state constitutional provisions, were also mediated by male head of households during this period. Locating and presenting the relevant sources to explicate this important context for understanding the limited nature of Second Amendment rights for minors is also critical. Collecting these sources is time consuming because the major "test cases" of this legal principle were not adjudicated by courts, but by special acts of the legislature. The best evidence for

---

[7] *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).

the meaning of religious freedom in this context may be found in controversies involving  the fate of children who were taken into Shaker communities. The various petitions, pamphlets, and legislative proceedings discussing the fate of these children and the meaning of constitutional safeguards for religious liberty are not among the sources included in the standard legal databases familiar to lawyers and judges, but which are among the sources legal historians consult in the ordinary course of their research. These sources make clear that male head of households had nearly unlimited authority over the religious life of minors under their care.

11.    From its outset, the plain meaning of the text of the Second Amendment recognized both the right to keep and bear arms and the right of the people to regulate arms to ensure public safety and order. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complementary. Without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues, which contemplated that private arms ownership would both further the goals of creating a well regulated militia and promote the security of a free state.[8] The original text of the Second Amendment thus both affirms the right of the people to keep and bear arms and the equally important right of the people to regulate those arms to secure a free state.

12.    The lengthy militia statutes enacted by the individual states and the First Congress, among the longest and most detailed laws enacted in early America, testify to the centrality of this linkage between rights and regulation.[9] These laws defined who was part of the militia, who was excused from duty, and what

---

[8] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[9] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) (Discussing the requirements regarding inspection and mustering imposed on members of the militia.).

1   weaponry the citizens were required to procure to meet this obligation.[10] In

2   addition, the militia laws described the process for court martial and the penalties

3   for militia members for various infractions, including failing to appear at muster

4   with an appropriate weapon in good working order, traveling to muster with a

5   loaded weapon, or discharging a weapon on a muster day.[11] All of these regulations

6   served the equally vital goals of ensuring that the militia was well regulated and the

7   presence of firearms would not undermine public safety, but promote it.

8        13.   It is impossible to make sense of the numerous laws enacted by the

9   Founding generation and later generations to preserve the peace without

10   recognizing that the right to keep and bear arms was understood to further the goals

11   of ordered liberty, not undermine them. The Founding generation did not oppose

12   government regulation and would have been astonished by the view that regulation

13   was antithetical to liberty. Early American firearms regulation carried forward a

14   tradition inherited from English common law in which the right of self-defense was

15   regulated to preserve the peace and promote public safety. The individual states

16   enacted a variety of laws to further this ancient legal principle: disarming dangerous

17   persons, regulating public carry, imposing safe storage requirements.[12]

18        14.   Modern-style arms control measures targeting weapons used more

19

20        [10]   There were exceptions to this general practice. Certain groups were
21   exempted from militia service. In the case of minors, the obligation to purchase
      weapons typically fell on parents or guardians, not those below the age of legal
22   majority, see Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second
      Amendment: Making Sense of the Historical Record*, 39 YALE L. & POL'Y REV.
23   INTER ALIA 1 (2021).
24        [11] E.g., Act of May 8, 1792, 1792 Conn. Pub. Acts 440 (forming the state
25   militia); Act of July 19, 1776, ch. I, 1775-1776 Mass. Acts 15 (regulating the
      militia of Massachusetts); Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 62
26   (regulating the militia of New York State); Act of Mar. 20, 1780, ch. CLXVII, 1780
27   Pa. Laws 347 (regulating the militia of Pennsylvania); Act of Mar. 26, 1784, 1784
      S.C. Acts 68 (regulating militia). For additional discussion, see note 7.
28        [12] *Supra* note 9.

frequently for crime and inter-personal violence, and not especially useful for militia service, did not emerge in American law until technological changes and economic efficiencies made more accurate and more easily concealable weapons widely available in the nineteenth century. The market revolution of the Jacksonian period (1828-1854) transformed American life, making a host of consumer goods—from wooden clocks to firearms—widely available for the first time. The impact of this inter-connected set of changes in production, consumption, and technology transformed gun culture by making a variety of weapons, including pistols, more common and more reliable.[13] At the time of the Second Amendment's adoption, 90% of the guns owned by Americans were long guns.[14] These weapons were most useful for hunting, ridding fields of pests, and in the case of military quality muskets, collective defense of community and nation. Muzzle loading black powder weapons were ill suited for inter-personal violence or crime because they took too long to load and could not be kept loaded for long periods of time.[15]

15.    Cheap handguns become widely available for the first time in American history in the early decades of the nineteenth century. Thus, in response to the perception that these guns posed a particular danger, states began passing laws to deal with increasing crime rates and other the negative consequences of these weapons, including new limits on public carry.[16] Accordingly, the decades before

---

[13] Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History*, in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 113, 117 (Jennifer Tucker et al. eds., 2019).

[14] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (Jennifer Tucker et al. eds., 2019).

[15] *Supra* note 9.

[16] Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 Law & Contemp. Probs. 73 (2020). For a good example, *see* Of

(continued…)

the Civil War witnessed an expansion of regulation in response to these new and

unprecedented problems created by the proliferation of firearms, mostly handguns,

that were less useful for the militia and more deadly in a civilian context.

16.    This era was also a formative period of American law, the era of the

Marshall Court. Among the most important legal developments of this age was the

emergence of a distinctive body of police-power jurisprudence by state and federal

courts. Eighteenth century constitutions affirmed the right of the people to regulate

by legislating to promote public health and safety through the concept of "internal

police."  This term of art refers to a concept identical to modern jurisprudence's

understanding of individual states' police power; the Founding era's idea of the

broad scope of legislative authority was developed by early American jurists, most

notably John Marshall, and recast as the foundation for the modern doctrine of state

police power. The Founding generation's conception of ordered liberty rested on

this robust view of the police power and is key to understanding the original

meaning of the right to keep and bear arms.

17.    The power to regulate firearms and gunpowder has always been central

to the police power and historically was shared by states, local municipalities, and

to some extent the federal government (when administering federal land and

buildings).[17] The adoption of the Constitution and the Bill of Rights did not deprive

states of their longstanding police powers. Indeed, ratification was only possible

because Federalists offered Anti-Federalists firm assurances that the new

government would not, and could not, threaten the individual states' police-power

authority. Federalists and Anti-Federalists disagreed over many legal issues, but

one point on which there was broad agreement was that the federal Constitution did

not trench on the traditional police powers of the individual states. "Brutus," a

---

Miscellaneous Offences, ch. 7, § 4, 1841 Ala. Acts 148, 148–49.

[17] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE
AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

pseudonymous author, and a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic] of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power, "such as unlicensed public houses, nuisances, and many other things of the like nature."[18] The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his discussion of laws regulating gunpowder in *Brown v. Maryland*, where he stated that "[t]he power to direct the removal of gun powder is a branch of the police power."[19]

18.    Although there is a growing body of scholarship in the field of legal and constitutional history and the history of firearms regulations, Second Amendment scholarship is a relatively young field compared to other well studied sub-fields of constitutional and legal history.

19.    One important difference between research on the history of firearms regulation, in contrast to other subfields of law, is that there is no Westlaw-like searchable database for this topic. The most important collection of sources in a digital and searchable format, the Duke Firearms Research Center Repository of Historical Gun Laws, is a useful starting point for research in this area, but the collection has serious gaps and has not been substantially updated since its

---

[18] Brutus, ESSAYS OF BRUTUS VII, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981); Tench Coxe, A Freeman, PA. GAZETTE, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[19] 25 U.S. (12 Wheat.) 419, 442-43 (1827).

inception in 2019. There are a number of conspicuous deficiencies in the content of the data base. The Duke collection contains only a smattering of the many local ordinances that proliferated during the era of the Fourteenth Amendment's ratification and are a key part of the historical inquiry required by *Bruen*. Although some of these missing materials are available from other online sources, in many other cases one must travel to physical historical archives, rare book libraries, and other repositories of primary sources to locate the relevant materials.

20.    In short, research on historical gun regulation is time-consuming, far more so than many other areas of legal history where many "one-stop shop" digital collections, most notably Westlaw and Hein-Online, have made some of the traditionally arduous tasks of legal research and writing less cumbersome and labor intensive. Given that one must combine research in the existing digital sources with more traditional and time-consuming primary source research in archives and rare book collections, the inquiry required by *Bruen* is both more labor-intensive and time-consuming than other forms of legal research typically associated with constitutional litigation.

21.    In the years since *Heller* was decided, a burgeoning body of scholarship has started to partially remedy these deficiencies, but new source materials and scholarship continue to emerge, and must be incorporated into our slowly expanding  understanding of the scope of arms regulation in the Anglo-American legal tradition. In short, much work needs to be done to fill out this emerging picture.

22.    The methods of legal historical research require a deep immersion in the primary source materials, conscious attention to the limits and strengths of various types of legal sources, and a broad knowledge of related historical subfields, both within and outside of Anglo-American legal history.[20] To avoid approaching history,

---

[20] For a discussion of the minimum standard for undergraduate history

(continued…)

text, and tradition with the type of "ahistorical literalism" that Justice Thomas has warned against, it is vital to survey historical scholarship across a broad range of subfields.[21] Social history, cultural history, economic history, and military history all shed important light on the original meaning of the Second Amendment. One must avoid the common tendency, closely associated with the discredited genre of "law office history," to treat sources in isolation, decontextualized, floating freely, detached from the web of historical meaning that originally made them comprehensible to Americans in 1791, and ignoring the way specific pieces of evidence fit together to form a coherent whole.[22]

23.    Finally, much of the writing on the topic of the Second Amendment and gun regulation is highly partisan and has been produced by activists with close ties to political advocacy groups. Moreover, in contrast to other thriving fields of legal history, such as the history of federalism or the First Amendment, the number of professional legal historians working on the history of gun regulation remains small. One consequence of this fact is that any claim or citation made in the existing law review literature must be subjected to exhaustive scrutiny for its historical accuracy and potential ideological bias. Typically, in less contentious and

_____

majors, *see* Mary Lynn Rampolla, A POCKET GUIDE TO WRITING IN HISTORY 18 (8th ed., 2015). For a primer written for graduate students, *see* Martha Howell & Walter Prevenier, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 128 (2001). On the methods of professional legal history, *see generally* THE OXFORD HANDBOOK OF LEGAL HISTORY (Markus Dirk Dubber and Christopher L. Tomlins, eds., 2018). On the methods of originalism, *see* Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013). On the proper role of history in constitutional law, *see generally* Richard H. Fallon Jr., *The Many and Varied Roles of History in Constitutional Adjudication*, 90 NOTRE DAME L. REV. 1753 (2015). The best illustration of the breadth of approaches adopted by modern legal historians of the United States is the three volume *Cambridge History of Law in America*. *See generally* THE CAMBRIDGE HISTORY OF LAW IN AMERICA (Michael Grossberg & Christopher L. Tomlins eds., 2008).

[21] *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485 (2019) at 1498.
[22] J.H. Hexter, REAPPRAISALS IN HISTORY 194–45 (1961).

ideologically charged sub-fields of the law, one can spot-check citations in the "scholarly" literature and largely trust that historical claims are generally accurate, but this is not true in the field of Second Amendment "scholarship." Thus, one must not simply cite check, but one must verify the accuracy of every source quoted by going back to the original source. Vetting every claim and checking every source in this body of partisan "scholarship" is therefore essential and further increases the amount of time needed to conduct reliable historical research.

24.    The specific issues before the court in *Jones*, the history of regulations of those under the age of 21, is one area that requires additional research. There are several under-developed issues that are crucial to understanding the relevant contexts of this history. In particular, the history of firearms regulation of those under the age of 21 in the era of the Fourteenth Amendment has not received much attention.[23]  To implement Bruen's framework such an inquiry would necessarily include a close examination of the legal status, rights, and capacities of those under the age of legal majority at this moment in American history. Additionally, *Bruen* noted that it was essential to understand how changing technologies and the societal problems they generated prompted novel solutions and new modes of firearms regulation. The case of regulating guns and minors in the post-Civil War era is one such area. It offers a classic example of the necessity of additional scholarly research which is essential to properly flesh out how this ancient tradition of regulation was adapted to the new demands of a rapidly urbanizing and industrializing nation.

25.    The general expansion of firearms regulation during Reconstruction

---

[23] On the growing perception of the threat guns posed to minors in the post-Civil War era, see Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Accidental Shootings involving Children*, 98 SOCIAL SCIENCE QUARTERLY 397 (2017).

included a spate of new laws governing minors and guns.[24] Individual states and localities responded to the proliferation of weapons among unsupervised minors by adopting a range of age-specific limits on the purchase and use of firearms by those under the age of legal majority.[25] A few illustrative examples give some sense of the range of regulations adopted by government during the era of the Fourteenth Amendment to deal with the novel problems guns posed to minors in a rapidly industrializing and increasing urban society.

26.    The provision adopted by the city of Fresno, California just before the turn of the century is illustrative of these types of laws: "No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of eighteen years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon."[26] Nor was this law unique. States and municipalities across the nation passed similar laws.[27] Some of these laws targeted children younger than sixteen, but others singled out anyone below the age of twenty-one. For example, Indiana's state law cast a broad net, prohibiting "The Sale, Gift or Bartering of Deadly Weapons or Ammunition to Minors."[28] These are but a few of many examples of laws regulating sale and transfer of firearms to minors under the age of 21; this declaration is not meant to canvass the fully applicable historical record, but merely offers a few examples to show how important this research is to implementing *Bruen*'s framework.

27.    Further research and analysis is necessary to examine the broader framework of regulations of minors under the age of 21 that will inform the

---

[24] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

[25] *Id.*

[26] Misdemeanors. Section 53., *in* L. W. MOULTRIE, CHARTER AND ORDINANCES OF THE CITY OF FRESNO 37 (1896).

[27] *Supra* note 24.

[28] Act of Feb. 27, 1875, ch. 40, 1975 Ind. Acts 59.

questions presented in this case under *Bruen*'s new historical analytical framework. In particular, additional research is necessary so that an analysis of the analogues to modern gun laws are properly contextualized. This may include further examination of the roles, duties, and responsibilities of minors and their parents in relation to militia service, as well as further examination of other aspects of the historical context in which minors under the age of 21 were placed at the Founding and following the adoption of the Fourteenth Amendment.

28.   Although I could and likely will spend years more on further research in this area, I recognize that litigation is not scholarship and cannot await the development of the most complete and accurate answers possible. I anticipate it will take me approximately 6 months to delve deeply enough into the areas outlined above to formulate a supplemental expert report that meets the demanding historical standards required by *Bruen*.


Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, 2022, at Redding, CT.



*Saul Cornell*
_____
Saul Cornell, Ph.D.

# EXHIBIT A

# Saul Cornell

Paul and Diane Guenther Chair in American History

Department of History

Fordham University

441 East Fordham Road ✽ Bronx, NY 10458 ✽ 203 826-6608 (c) ✽ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| **Publications, Presentations and Media Appearances** |
|---|

### Books:

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Interviews, Editorials, Essays, Podcasts:

 "Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*,"* SCOTUSblog (Jun. 27, 2022, 5:05 PM), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/

"Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
SLATE June 24, 2022

"The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022

"The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022

"Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022

"The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021

"'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021

"Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021

"Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021

"Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021

"Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate

"What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021

"Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019

"Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019

"The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019

"The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.

"Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018

"Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017

"The State of the Second Amendment," National Constitution Center, Podcast October, 2017

"Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017

"Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017

"Half Cocked," *Book Forum* April 2016

"Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016

"Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015

"The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]

PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013

"All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

"What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010

"Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)

"What's Happening to Gun Control,"    To the Point, NPR. March 11, 2010

"Getting History Right," *National Law Journal*, March 1, 2010

"History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008

"The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008

"Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007

"A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV  ( 2006)

"Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005

"Gun Control," Odyssey, Chicago NPR September 8, 2004

"Loaded Questions," *Washington Post Book World* February 2, 2003

"The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002

"Real and Imagined," *New York Times*, June 24, 1999

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and *C*ontemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the Future of Second Amendment Jurisprudence after *Heller*," in <u>Firearms and Freedom: The Second Amendment in the Twenty-First Century</u> Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace," 80 <u>Law and Contemporary Problems</u> (2017): 11-54

"Half Cocked': The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment," 107 <u>Northwestern Journal of Criminal Law</u> 107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," <u>Wisconsin Law Review Forward</u> 92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History," <u>American</u> <u>Journal of Legal History</u> 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," <u>Yale Law Journal Forum</u> 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" <u>Fordham Law Review *Res Gestae*</u> 84 (2015): 1-10

"The Right to Bear Arms," <u>The Oxford Handbook of the US Constitution</u>, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" <u>Constitutional Commentary</u> 29 (2014): 383-409

"Meaning and Understanding in the History of Constitutional Ideas: the Intellectual History Alternative to Originalism" <u>Fordham Law Review</u> 82 (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" <u>Fordham Urban Law Journal</u> 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" <u>William & Mary Quarterly</u> 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" <u>William & Mary Quarterly</u> 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," <u>Yale Journal of Law and the Humanities</u> 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," <u>Northwestern University Law Review</u> 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u> 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u> 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> <u>History of American Law</u> (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique,"  Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and  Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:  The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in <u>New York in the Age of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130


### Invited Lectures:

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment,"
Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in Early American History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up: The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You: Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History? Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders," NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification," paper presented at "Possible Pasts: Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism," Columbia Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?" Indiana University School of Law, Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers? Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights: a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years," Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke: Brothers in Liberty?" Liberty Fund Conference, Houston, TX (1991)

"Mere Parchment Barriers? Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA (1989)

## Other Professional Activities

Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)

Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008

Editorial Board, American Quarterly (2004-2007)

Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007

Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001-2004

Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003

Project Gutenberg Prize Committee, American Historical Association, 2004,  2002

Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001

Co-Founder Ohio Early American Studies Seminar

NEH Fellowship Evaluator, New Media Projects, Television Projects

Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)


## Book Reviews:

Journal of American History
William and Mary Quarterly
American Studies Journal of the Early Republic
Pennsylvania Magazine of History and Biography
American Quarterly
American Journal of Legal History
Law and History Review

## Journal and Book Referee:

Journal of American History
William and Mary Quarterly
Diplomatic History
Pennsylvania Magazine of History and Biography
Law and History Review
Harvard Law Review
Stanford Law Review
Yale Law Journal
University Press of Virginia
University of North Carolina Press
Stanford University Press
University of Massachusetts Press
Oxford University Press
Cambridge University Press
University of Michigan Press
Harvard University Press

# EXHIBIT B

**Saul Cornell**
**Court Citations**

## Supreme Court

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## Federal Courts

UNITED STATES OF AMERICA, Plaintiff, v. JESSIE BULLOCK A/K/A BOOMAN BULLOCK, Defendant., No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022)

United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022)

United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022)

Jones v. Bonta, 34 F.4th 704 (9th Cir. 2022)

Duncan v. Bonta, 19 F.4th  (2021).

Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407 (4th Cir.), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021), cert. denied sub nom. Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 142 S. Ct. 1447 (2022).

Nat'l Rifle Ass'n of Am., Inc. v. Swearingen, 545 F. Supp. 3d 1247 (N.D. Fla. 2021).

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom. United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom. United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts**

State v. Christen, 2021 WI 39, 396 Wis. 2d 705, 958 N.W.2d 746, cert. denied, 142 S. Ct. 1131, 212 L. Ed. 2d 20 (2022).

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746