John W. Dillon (Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Telephone: (760) 642-7150
Facsimile: (760) 642-7151
E-mail: jdillon@dillonlawgp.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW JONES; et al.,<br><br>                                 Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as<br>Attorney General of the<br>State of California, et al.,<br><br>                                 Defendants | Case No.: 19-cv-01226-L-AHG<br><br>Hon. Judge M. James Lorenz and<br>Magistrate Judge Barbara Lynn Major<br><br>**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF SEPTEMBER 14, 2022**<br><br><br>Complaint Filed: July 1, 2019<br>Amended Complaint Filed: July 30, 2019 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TOPICAL INDEX

Pages

I.    INTRODUCTION ............................................................................. 1

II.   RELEVANT PROCEDURAL HISTORY .......................................... 2

III.  *BRUEN* REAFFIRMED THAT SECOND AMENDMENT
      CLAIMS MUST BE JUDGED IN LIGHT OF THE TEXT
      AND HISTORY OF THE AMENDMENT ......................................... 6

IV.   THE COMPREHENSIVE RECORD ALREADY HAS BEEN
      COMPILED; AND IS MORE THAN SUFFICIENT FOR THIS
      COURT TO ISSUE A DECISION ON PLAINTIFFS'
      PRELIMINARY INJUNCTION MOTION ...................................... 11

V.    THE STATE'S CONTENTIONS REGARDING THE
      "THRESHOLD TEXTUAL ISSUES" ARE WRONG .................................. 15

VI.   THE OTHER PRELIMINARY INJUNCTION FACTORS
      WARRANT RELIEF ...................................................................... 18

VII.  CONCLUSION ............................................................................... 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*All. for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011)..........................................................................18

*Andrews v. State*
    50 Tenn. 165 (1871)..........................................................................................15

*BOKF, NA v. Estes*
    923 F.3d 558 (9th Cir. 2019)............................................................................18

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ............................................................................... *Passim*

*Doe v. Kelly*
    878 F.3d 710 (9th Cir. 2017)......................................................................18, 19

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014)..........................................................................18

*Elrod v. Burns*
    427 U.S. 347 (1976)..........................................................................................19

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011)............................................................................15

*Gamble v. United States*
    587 U.S. ___, 139 S.Ct. 1960 (2019) .............................................................8, 9

*Heller v. District of Columbia* (*Heller II*)
    670 F.3d 1244 (D.C. Cir. 2011) .........................................................................9

*Illinois Ass'n of Firearms Retailers v. City of Chicago*
    961 F.Supp.2d 928 (N.D. Ill. 2014) ................................................................15

*Jones v. Becerra*
    498 F. Supp. 3d 1317 (S.D. Cal. 2020)......................................................11, 16

*Jones v. Bonta*
    34 F.4th 704 (9th Cir. 2022)...................................................................5, 12, 22

*Klein v. City of San Clemente*
    584 F.3d 1196 (9th Cir. 2009).........................................................................21

*Luis v. United States,* 578 U.S. 5, 26-27 .................................................................15

*McDonald v. City of Chicago*
    561 U.S. 742 (2010)............................................................................................9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012)..................................................................19, 20

*Miller v. Bonta*, Case No. 3:19-cv-01537-BEN-JLB ..................................5

*New York State Rifle & Pistol Association Inc. v. Bruen*
    142 S. Ct. 2111 (2022) ........................................................... *Passim*

*Nken v. Holder*
    556 U.S. 418 (2009) ...................................................................20

*Pom Wonderful LLC v. Purely Juice, Inc.*
    277 Fed. App'x 744 (9th Cir. 2008)..........................................13

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013)..............................20

*Roman Cath. Diocese of Brooklyn v. Cuomo*
    *141 S. Ct. 63 (2020)* ...............................................................19

*State Oil Co. v. Khan*
    522 U.S. 3 (1997)........................................................................9

*Teixeira v. Cnty. Of Alameda*
    873 F.3d 670 (9th Cir. 2017)....................................................15

*United States v. Sineneng-Smith*
    590 U.S. __, __ (2020) ............................................................14

*Univ. of Texas v. Camenisch*
    451 U.S. 390 (1981) .................................................................13

*Valle del Sol Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013)..................................................20

*Virginia v. Moore*
    553 U.S. 164 (2008)....................................................................8

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008).....................................................................18

**Penal Code**

Section 27510 ............................................................................. *Passim*

**Federal Practice & Procedure**

Section 2948.1 (3d ed. 2013)..........................................................20

**U.S. Constitution**

Second Amendment...................................................................... *Passim*

Fourteenth Amendment .............................................................3, 8, 9, 10, 12

**Other Authorities**

David Kopel & Joseph Greenlee, *The Second Amendment
    Rights of Young People*, 53 S. Ill. L. J. 495 (2019) ...........................................2

The Dick Act of 1903, 32 Stat. 775 .................................................................2

The Milia Act of 1792, 1 Stat. 271 .................................................................2

The Militia Act of 1862, 12 Stat. 597 .............................................................2

Prof. Cornell: Robert J. Spitzer, Gun Law History in the United States
    and Second Amendment Rights, 80 Law and Contemporary
    Problems 55 (2017) ...............................................................................3

Mark Frassetto, Firearm and Weapons Legislation Up to the Early
    20th Century (2013) ...............................................................................3

Mark W. Smith, "Not all History is Created Equal": In the post-Bruen World, the
Critical Period for Historical Analogues is When the Second Amendment Was
Ratified in 1791, and Not 1868, SSRN (Oct. 1, 2022) .............................................12

## I.   INTRODUCTION

Instead of substantively responding to Plaintiffs' supplemental brief (ECF 95), the State (ECF 96) fundamentally misconstrues the clear standards set forth in *New York State Rifle & Pistol Association Inc. v. Bruen,* 142 S. Ct. 2111 (2022), fails to apply the *Bruen* framework, as ordered by this Court (ECF 92), and does not provide any relevant founding era historical analogues justifying the State's age-based firearms ban.

This dearth of evidence is not surprising, as *no* age-based firearm acquisition or possession restrictions existed during the precolonial and founding-era.  Similarly, there were no age-based arms restrictions in the early republic or during the Jacksonian period.

The brunt of the State's brief identifies the alleged "unanswered questions" left by the Supreme Court's decision in *Bruen* without offering answers; focuses on why the State has not provided any evidence supporting its age-based firearms ban under the *Bruen* framework; and requests more time to conduct additional discovery to develop a "comprehensive [historical] record."  The State's assertions are dubious, and at best, an unnecessary delay tactic resulting in a waste of the parties' and this Court's time and resources.

In contrast, Plaintiffs submitted an extensive historical record as a part of their preliminary injunction motion — an evidentiary record that provides detailed relevant historical evidence from the founding era demonstrating that age-based firearms prohibitions and restrictions on law abiding young adults have no historical pedigree.  Plaintiffs' application of the *Bruen* framework to the historical record before this Court is not contradicted by the State (ECF 96).  Further, this case is certainly not new.  A thorough record was developed as part of Plaintiffs' motion for preliminary injunction.

## II.    RELEVANT PROCEDURAL HISTORY

In lieu of providing the evidentiary support required under *Bruen*, the State asserts it is impossible to compile a "complete record" without an additional 6-7 months of expert research.  Not so.

It is not possible to justify an argument that proper preparation of the historical record will require six additional months of searching for relevant statutes. Pre-1868 statutes regulating possession of long arms by those aged 18-20 were exceedingly rare. The Militia Act of 1792, 1 Stat. 271, amended by the Militia Act of 1862, 12 Stat. 597, *required* persons aged 18-45 to own a rifle or musket.  It remained on the books until it was repealed by the Dick Act of 1903, 32 Stat. 775. Thus, any state ban on possession of long arms by 18-to-20-year-olds would likely have been barred by the Supremacy Clause. This is not to say that a legislature could not pass a law, but it does suggest such bans would have been rare.

Further, such additional time for research is entirely superfluous—a matter of delaying six months to re-invent the wheel.  Scholars have already explored, in exhaustive detail, this historical question. *See* David Kopel & Joseph Greenlee, *The Second Amendment Rights of Young People*, 53 S. Ill. L. J. 495 (2019), online at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3205664.  This exploration of the question spans 118 pages, supported by an impressive 1,021 footnotes.  The problem for the State is not that the issue posed here is unexplored, but that the exploration leads to an undesired result for the State.

As in the colonial period and the Founding Era, there were no age-based arms restrictions in the early republic or the Jacksonian period. The first age restrictions appear in the South shortly before the Civil War.  In 1856 Alabama prohibited giving handguns to male minors.  In 1860 Kentucky outlawed providing handguns to minors, free blacks, or slaves.  Other than these two laws, age-based restrictions did not appear until the last quarter of the nineteenth century. *Id.* at 596.

2

Additionally, there is the authority cited by Prof. Cornell: Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 *Law and Contemporary Problems* 55 (2017). This reference states that "Numerous laws restricting gun access by minors — minimum ownership ages ranged from twelve to twenty-one — or others deemed irresponsible arose in the late 1800s, becoming more common in the early 1900s." *Id.* at 76. However, the cited support for this claim cites only a 1907 territorial law from Arizona, an 1881 Florida law, and a 1911 county ordinance. None of these would be relevant to an examination of the Second and Fourteenth Amendments.

There is a third body of research, directed to arms restrictions in general, and cataloging restrictions based on age. *See* Mark Frassetto, *Firearm and Weapons Legislation Up to the Early 20ᵗʰ Century* (2013), online at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991. Frassetto describes his methodology:

> This document was created by first performing a literature review of secondary sources including law review articles, cases, and legal briefs addressing the Second Amendment. Statutes discussed within these sources were included in this document. After the literature review, primary sources were searched. The bulk of the research was done in the Hein Online Session Laws Library. Yale Law School's Avalon Project was an important source, especially for the extremely old English statutes. State archives that have digitized their session laws were searched. Some session laws have also been digitized by Google Books; these were searched as well." *Id.* at 2.

Frassetto catalogs age restrictions at pages 75-78. Pre-14th Amendment, he found but two: (1) an 1856 Alabama law forbidding giving a pistol to any male minor, and (2) an 1859 Kentucky law making it illegal for anyone other than a parent or guardian to give a minor a pistol or other arm. Neither forbids possession of a long arm by an 18-20-year-old—and these two laws could hardly be considered a well-established historical analogue.

Finally, another historical source cataloging relevant age-based restrictions is the online resource created by Duke University (and relied on by the State's expert), the Duke Center for Firearms Law, online at https://firearmslaw.duke.edu/repository/search-the-repository/. This offers a searchable database and also organizes laws by subject, including age restrictions. How many laws are in the database is not stated, but search under age restrictions turned up 92 hits. Almost all of those are post-14th Amendment, limited to pistols, and using 18 rather than 21 as the cut-off. In short, the issue has been thoroughly explored in two encyclopedic articles, one more limited article, and by an academic database. No additional time is required.

Further, after remand from the Ninth Circuit, this Court ordered the parties to submit supplemental briefs addressing the Supreme Court's decision in *Bruen* on September 14, 2022 (ECF 92). The State's response was originally due on October 17, 2022. The State had 33 days in which to complete a supplemental brief addressing the relevant historical record justifying the State's ban. However, due to the State's counsel scheduling conflicts, the State requested an extension to submit the briefing, and the Court granted it to November 7, 2022 (ECF 94). Thus, State was granted 54 days to compile the historical record and apply the *Bruen* framework but elected not to do so.1

In fact, the State has been able to provide courts with historical records under similar timeframes. For example, in *Miller v. Bonta*, Case No. 3:19-cv-01537-BEN-JLB (Hon. Roger Benitez, presiding), the Court requested the parties to submit supplemental briefing to address the decision in *Bruen* within 45 days of its order (ECF 131). In that time frame, the State submitted a 77-page brief, with 9 expert declarations

---

1 Moreover, the *Bruen* decision was published on June 23, 2022 — nearly five months ago. This case was stayed until the decision is *Bruen*, so the State cannot now reasonably assert insufficient time to both address *Bruen* and develop the necessary record. The State knew what was required and chose to do nothing.

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022

1    (including the State's retained expert in this case, Saul Cornell), cross-referencing
2    thousands of pages of primary and secondary sources in an attempt to provide a
3    historical justification for the State's assault weapons ban under the *Bruen* framework.
4    Here, however, the State asserts that meeting such a request is impossible without an
5    additional 6 or more months.  To make matters worse, the State has made no substantive
6    effort to meet its deadlines in this case.  This Court should not award the State's idleness
7    with additional time — especially considering the record already before this Court, and
8    the insights provided by the Ninth Circuit in *Jones v. Bonta*, 34 F.4th 704 (9th Cir.
9    2022), *vacated* on *reh'g and remanded in light of* Bruen, 47 F.4th 1124 (9th Cir. 2022).

10        In addition to not meeting its burden under the *Bruen* framework, the State
11   misinterprets the Supreme Court's decision in *Bruen*, and its experts attempt to
12   undermine controlling Supreme Court authority.2  In summary: (i) *Bruen* reaffirmed
13   that Second Amendment claims must be judged in light of the text of the Amendment
14   and the history of firearms regulation in this country; (ii) there are no threshold textual
15   issues that need to be determined as both the conduct in question and the arms prohibited
16   are clearly protected under the plain text of the Second Amendment; (iii) additional
17   discovery is not necessary for this Court to rule on Plaintiffs' preliminary injunction;
18   and (iv) all remaining preliminary injunction factors favor Plaintiffs.

19        Accordingly, Plaintiffs request that this Court grant Plaintiffs' request for
20   preliminary injunction consistent with the Supreme Court's decision in *Bruen*.

---

2  The State's retained experts, Professors Saul Cornell and Zachary Schrag, lament
about the difficulty in conducting the historical analysis required since the Supreme
Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and reaffirmed
in *Bruen* (2022).  As shown below, the Supreme Court in *Bruen* was unpersuaded.
*Bruen*, 142 S. Ct. at 2118.

### III. *BRUEN* REAFFIRMED THAT SECOND AMENDMENT CLAIMS MUST BE JUDGED IN LIGHT OF THE TEXT AND HISTORY OF THE AMENDMENT

From the outset, the State misconstrues *Bruen* and disregards the clear, articulated constitutional standard for considering Second Amendment challenges established in *Heller* and *affirmed* in *Bruen*. Worse still, the State advances entirely new standards, in defiance of controlling Supreme Court precedent. The State's efforts fail in many respects.

First, the State starts with the incorrect premise that *Bruen* "fundamentally altered the legal standard for evaluating Second Amendment challenges to firearms regulations." ECF 96, at 1, 24 ("*Bruen*'s new requirement"), 32 ("*Bruen*'s new standard"), 34 ("*Bruen*'s new legal standard"). The premise is wrong. The Supreme Court in *Bruen* referenced the "test that the Court set forth in *Heller* and applies today...;" and simply "made the constitutional standard endorsed in *Heller* more explicit[]." *Bruen*, 142 S. Ct. at 2118-2119. What the Court did in *Bruen* was abolish the two-step test that nearly every circuit court, including the Ninth Circuit, had applied in the wake of *Heller*. *Id.* at 2127. What was left was a requirement that, where "the Second Amendment's plain text covers an individuals conduct . . . [t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Second, the State wrongly claims (i) the conduct in question (18-to-20-year-olds acquiring commonly owned bearable arms) is not encompassed by the plain text of the Second Amendment; and (ii) that semiautomatic centerfire rifles are not "arms" encompassed by the plain text of the Second Amendment. See ECF 96 at 20-24.

Third, the State attempts to reintroduce an interest-balancing test in the aftermath of *Bruen*, suggesting that the State's age-based firearms ban addresses "unprecedented

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022

1   societal concerns" or "dramatic technological changes" to justify a "more nuanced
2   approach" to the historical analysis required under *Bruen*. *Id*. at 11.

3          In *Bruen*, the Court reasserted principles it already applied in *Heller*.  There
4   should be no dispute over the proper approach to evaluating Second Amendment claims.
5   The Court must first determine whether "the Second Amendment's plain text covers an
6   individual's conduct" that is being restricted by a challenged law or policy.  *Bruen*, 142
7   S. Ct. at 2129–30.  If the answer is yes, that conduct is presumptively protected, and the
8   burden then falls on the State to justify the challenged restriction by "demonstrating that
9   it is consistent with the Nation's historical tradition of firearm regulation." *Id*., at 2130.
10  If the State cannot meet its burden, the restriction is unconstitutional — full stop.  No
11  interest-balancing or scrutiny analysis can or should be conducted. *Id.* at 2127.

12         The decision in *Bruen* made it abundantly clear, to prevail under an historical
13  tradition analysis, the State bears the burden of justifying its regulation by offering
14  appropriate well-established historical analogues from the founding era.  "Much like we
15  use history to determine which modern 'arms' are protected by the Second Amendment,
16  so too does history guide our consideration of modern regulations that were
17  unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132.

18         In *Bruen*, the Supreme Court found that respondents had offered historical
19  evidence in their attempt to justify their prohibitions on the carrying of firearms in
20  public. Specifically, respondents had offered sources from five  historical periods: "(1)
21  medieval to early modern England; (2) the American Colonies and the early Republic;
22  (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th
23  centuries." 142 S. Ct at 2135-36.  However, the Court explained that "not all history is
24  created equal. 'Constitutional rights are enshrined with the scope they were understood
25  to have when the people adopted them.' […] The Second Amendment was adopted in
26  1791; the Fourteenth in 1868." *Id*., at 2136 (citing *Heller*, 554 U.S. at 634- 35 (emphasis

28

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order
of September 14, 2022

original).  Thus, the Court cautioned against "giving postenactment history more weight than it can rightly bear."  *Id*., 142 S. Ct. at 2136.  And "to the extent later history contradicts what the text says, the text controls."  Bruen, 142 S.Ct. at 2137 (citing *Gamble v. United States*, 587 U.S. ___, 139 S.Ct. 1960, 1987 (2019) (Thomas, J., concurring)).  Further, in examining the relevant history offered, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614).

The decision in *Bruen* did make note of an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."  *Bruen*, 142 S. Ct. at 2138. At the same time, the Court found it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."  *Id*., at 2137 (citations omitted).

The Supreme Court in *Bruen* was not overruling cases in which it had, dispositively, "look[ed] to the statutes and common law of the founding era to determine the norms that the [Bill of Rights] was meant to preserve."  See, *e.g., Virginia v. Moore*, 553 U.S. 164, 168 (2008) (Fourth Amendment).  And while the Court in *Heller* itself had reviewed materials published after adoption of the Fourteenth Amendment, it did so to shed light on the public understanding in 1791 of the rights codified by the Second Amendment, and only after surveying what it regarded as a wealth of authority for its reading — including the text of the Second Amendment and state constitutions.  "The 19th-century treatises were treated as mere confirmation of what the Court had already been established." *Bruen*, 142 S. Ct. at 2137 (citing *Gamble*, 139 S. Ct. at 1976).

1    Therefore, based on binding Supreme Court precedent, 1791 is the controlling

2    time for the constitutional meaning of Bill of Rights provisions incorporated against the

3    States by the Fourteenth Amendment because, as in *Heller*, the Court looked to 1791

4    when construing the Bill of Rights and, in *McDonald*, the Court established that

5    incorporated Bill of Rights provisions mean the same thing when applied to the States

6    as when applied to the federal government. *McDonald v. City of Chicago*, 561 U.S. 742,

7    765 (2010).   *Bruen* did not disturb these precedents, and they are binding on lower

8    courts.  *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

9    This dispute aside, *Bruen* made clear that 20th-century historical evidence was

10    not even considered.  *Id*., at 2154, n.28 ("We will not address any of the 20th century

11    historical evidence brought to bear by respondents or their amici.  As with their late-

12    19th-century evidence, the 20th-century evidence presented by respondents and their

13    amici does not provide insight into the meaning of the Second Amendment when it

14    contradicts earlier evidence."). Therefore, under *Bruen* some historic references cannot

15    be appropriate historical analogues: 20th-century restrictions, laws that have been

16    subsequently overturned (such as total handgun bans), and as noted, laws clearly

17    inconsistent with the original meaning of the constitutional text.  *Bruen*, 142 S. Ct at

18    2137 ("post-ratification adoption or acceptance of laws that are inconsistent with the

19    original meaning of the constitutional text obviously cannot overcome or alter that

20    text.") (citing *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1274 n.6 (D.C.

21    Cir. 2011) (Kavanaugh, J., dissenting)).

22    In examining historical analogues from the relevant period, the Supreme Court

23    in *Bruen* explained that such historical analogues identified by the State must be

24    "relevantly similar" to the restriction before a court today. *Id*., at 2132.  Meaning

25    regulations must be similar in "how and why the regulations burden a law-abiding

26    citizen's right to armed self-defense."  *Id*., at 2133.

27

28

Here, the State fails to offer any evidence of age-based firearms restrictions from the pre-colonial era through the Jacksonian period. The only age-based restrictions cited by the State to support the ban come from the late 19th and early 20th centuries —and the vast majority of these restrictions said nothing about long guns but were focused on the sale of concealable pistols.  Simply, the State has no relevant, well-established historical analogue for its law—  even in the period following ratification of the Fourteenth Amendment.

*Bruen* demands the presentation of actual historical analogues. Lacking any, the State turns to obscure explanations about the lack thereof (*see, e.g.*, Cornell Decl. and Schrag Decl.).  The State thus fails to do what *Bruen* requires, namely, to point to relevant founding-era laws and regulations that might support an historical analogue. "Like all analogical reasoning, determining whether an historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"  142 S. Ct. at 2132 (emphasis added).

*Bruen* further clarified what *Heller* established regarding how the proper Second Amendment legal standard applies specifically to firearms prohibitions, such as California's ban on 18-to-20-year-old adults from purchasing long guns and semiautomatic centerfire rifles.  Considering the Second Amendment's text, the Supreme Court affirmed "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (emphasis added).  Applying the proper historical inquiry, the Court determined that this prima facie protection can be overcome only by a showing that any banned arms are both "dangerous and unusual" weapons at the time the analysis is being conducted.  *Id.*, at 2128.  As stated in Plaintiffs' prior briefing, this is the *only* relevant test — and this Court already found that the firearms the State bans (long guns and semiautomatic centerfire rifles) are *not* both dangerous

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022

and unusual as they are in common use for lawful purposes. *See Jones v. Becerra*, 498 F. Supp. 3d 1317, 1325 (S.D. Cal. 2020).

Unquestionably, the firearms the State attempts to ban are bearable "arms" under the plain text of the Second Amendment.  As such, they are protected unless the State can justify the ban.  With respect to history, the Supreme Court found that the historical record demonstrates that this prima facie protection can be overcome only by a showing that any banned arms are "dangerous and unusual weapons" at the time the analysis is being conducted; it follows that arms that are "in common use today" are constitutionally protected and cannot be banned.  *Bruen*, 142 S. Ct. at 2143.

## IV.   THE COMPREHENSIVE RECORD ALREADY HAS BEEN COMPILED; AND IS MORE THAN SUFFICIENT FOR THIS COURT TO ISSUE A DECISION ON PLAINTIFFS' PRELIMINARY INJUNCTION MOTION

The State wrongly asserts that a complete historical record must be compiled before this Court can issue a decision on Plaintiffs' preliminary injunction motion. However, notwithstanding that Plaintiffs' already have submitted an extensive historical record — one that the Ninth Circuit had no issue analyzing in detail in the Panel opinion — a "complete" historical record is not necessary in this stage of the case as preliminary injunctions are often issued on incomplete records (much less extensive than the one already before this Court).

Indeed, the historical record already before this Court was good enough for these purposes for the Ninth Circuit.  The first step of the now abrogated test used by most courts of appeal, including the Ninth Circuit, was "broadly consistent with *Heller*."  *Id*. A comparison of the Panel's opinion here and the Supreme Court's decision in *Bruen* demonstrates how true this is.  In its opinion, the Panel explained the old first step this way: "First, we ask whether the challenged law burdens conduct protected by the Second Amendment.  In this step, we explore the amendment's reach based on a

historical understanding of the scope of the Second Amendment right." *Jones v. Bonta*, 34 F.4th at 752 (internal citations omitted). This analysis closely matches *Bruen's* prescription for the State to justify a restriction on conduct falling within the text of the Second Amendment "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" 142 S. Ct. at 2130.

In addition to the similarity in how it described the test, the Panel opinion applied the analysis and reasoning that the Supreme Court in *Bruen* has held is dispositive in Second Amendment cases. *Jones*, 34 F.4th at 715-723. As *Bruen* would later command, the Panel opinion discussed the historical scope of the right to bear arms at the founding and when the Fourteenth Amendment was ratified and conducted a detailed analysis of historical analogues for California's challenged laws, identifying 28 state laws regulating access to firearms by minors passed between 1856 and 1897. *Jones*, 34 F.4th at 719; see also *Bruen*, 142 S. Ct. at 2132 ("[H]istory guide[s] our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy— a commonplace task for any lawyer or judge.").

In rejecting the Reconstruction-era laws (which again, are not relevant where the Founding era history has already answered the question at issue, *see Mark W. Smith, "Not all History is Created Equal": In the post-*Bruen *World, the Critical Period for Historical Analogues is When the Second Amendment was Ratified in 1791, and Not 1868,* SSRN (Oct. 1, 2022), available at https://bit.ly/3Dm2HEI)  the State had identified as providing support for the challenged regulations, the Panel concluded the "laws themselves are not convincing" because they are not similar enough to California's present-day restrictions — again, exactly the sort of analogical conclusion the Supreme Court in *Bruen* has said these cases require. *Jones*, 34 F.4th at 722.  Noting

1   that the majority of the laws were focused on handguns, not long guns, the Panel opinion

2   also concluded that the laws actually "show that long guns were far less regulated than

3   handguns" and emphasized that just five states had outright bans on sales of firearms to

4   minors that swept as broadly as California's. *Id*.  In other words, the analogical review

5   that *Bruen* prescribed by testing whether prior restrictions "impose[d] a comparable

6   burden on the right of armed self-defense" to the modern regulations at issue "and

7   whether that burden [was] comparably justified" already has been completed. See

8   *Bruen*, 142 S. Ct. at 2133.

9       In short, this Court need only apply the same analysis as presented in the Panel

10  opinion and in *Bruen*. Whatever minor analytic differences might exist between the two

11  decisions, both undertook an historical analysis, and historical conclusions the Panel

12  opinion reached remain applicable and accurately forecasted the holding in *Bruen*.

13      In any case, there is no need to have a complete historical record at this stage

14  because a court's a decision on a preliminary injunction "is not necessarily the court's

15  final word on the merits."  *Pom Wonderful LLC v. Purely Juice, Inc.*, 277 Fed. App'x

16  744, 746 (9th Cir. 2008).  "Given [its] limited purpose, and given the haste that is often

17  necessary . . . a preliminary injunction is customarily granted on the basis of procedures

18  that are less formal and evidence that is less complete than in a trial on the merits."

19  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  While the State may compile

20  a historical record to justify the ban in response to a motion for summary judgment or

21  a trial on the merits, it is entirely appropriate for this Court to issue a decision on

22  Plaintiffs' preliminary injunction motion, using the current historical record. That is the

23  nature of a preliminary injunction.

24

25      The State's experts provide nothing that would satisfy *Bruen* or take the

26  challenged laws outside the scope of the Second Amendment.  Professor Zachary

27  Schrag's declaration is devoid of any substantive historical evidence supporting the

28

State's ban, or even an implication that the current historical record before this Court is somehow insufficient based on his expert review.  Further, Professor Schrag wrongly questions Supreme Court precedent in *Bruen*, saying it is "difficult" to address the holding in *Bruen* that in order to justify a firearms regulation, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearms regulation." Schrag Dec. ¶ 6. He prefers Justice Breyer's dissent in *Bruen*, suggesting that the *Heller/Bruen* text-history test will be difficult to apply because courts are not equipped or staffed to resolve difficult historical questions.  *Id.*, ¶¶ 6-7. However, the Supreme Court majority in *Bruen* was "unpersuaded." 142 S. Ct. at 2130, n. 6.  "The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies.... For example, '[i]n our adversarial system of adjudication, we follow the principle of party presentation'" (citing *United States v. Sineneng-Smith*, 590 U.S. __, __ (2020) (slip op., at 3)) and concluding that courts "are thus entitled to decide a case based on the historical record *compiled by the parties*." *Id.* (original emphasis and emphasis added). Here, the State's experts elected not to compile and present the historical record required by *Bruen*.[3]

In contrast, Plaintiffs provided this Court with a comprehensive historical record, including expert analysis derived from primary and secondary sources, personal accounts, and case law.  This evidence is unopposed by the State and its experts Professors Schrag or Cornell.  Simply, the State's assertions are baseless and amount to a needless delay tactic.  All while Penal Code section 27510 continues to infringe on the constitutional rights of 18-to-20-year-old adults in California.

---

3  And Professor Cornell is a known, outspoken critic of *Bruen*, calling the majority opinion "one of the most intellectually dishonest and poorly argued decisions in American judicial history" https://historynewsnetwork.org/article/183423 — hardly an objective expert at the ready to assist in evaluating and applying the *Heller/Bruen* "text-and-history test." 142 S. Ct. at 2130, n. 6.

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022

1    By refusing to provide any kind of historical evidence under the *Bruen*

2    framework that would contradict or invalidate any of Plaintiffs' historical evidence, the

3    State, at the very least, has waived any opposition to Plaintiff's historical evidence in

4    support of Plaintiffs' motion for preliminary injunction.

## V.    THE STATE'S CONTENTIONS REGARDING THE "THRESHOLD TEXTUAL ISSUES" ARE WRONG

The State dubiously twists the clear legal framework in *Bruen* in a frivolous attempt to strip the Second Amendment of all meaning, asserting there is a legitimate question regarding the "threshold textual issues" and whether the firearms prohibited under Penal Code section 27510 in fact are "arms" under the plain meaning of the text of the Second Amendment. The State's contentions border on the absurd.

Under the *Bruen* framework, the first step is to determine whether the conduct that Plaintiffs wish to vindicate is protected by the Second Amendment's plain text. The answer to this first inquiry is "yes." The Second Amendment protects the right to "keep and bear arms" and the right to acquire arms is necessarily encompassed by the Second Amendment's plain text. Under the common sense and plain meaning of the Second Amendment's text, it would be impossible to keep or bear arms if the Amendment's protection did not first necessarily extend to necessary incidents such as the *acquisition* of firearms. *See Luis v. United States*, 578 U.S. 5, 26–27 (Thomas, J., concurring); *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp.2d 928, 938 (N.D. Ill. 2014); *Andrews v. State*, 50 Tenn. 165, 178 (1871). A holding that the Second Amendment right does not extend to its necessary incidents would improperly treat the Second Amendment as a second-class right and empty it of practical meaning.

As to whether the types of arms regulated by the State are protected, *Heller* established, and *Bruen* reinforced: "'the Second Amendment extends, *prima facie*, to

1   all instruments that constitute bearable arms, even those that were not in existence at
2   the time of the founding.'" *Bruen*, 142 S.Ct. at 2132 (citing *Heller*, 554 U.S. at 582).
3   And as for whether 18-to-20-year-olds rights are protected, *Heller* said "the Second
4   Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at
5   581 (emphasis added). Plaintiffs contend that Penal Code section 27510 prevents
6   Plaintiffs and those similarly situated 18-to-20-year-old adults in California from
7   purchasing *any firearm* based solely on their age.  See Declaration of Kyle Yamamoto,
8   Thomas Furrh, Matthew Jones. Penal Code section 27510 also prohibits the federal
9   firearms licensee Plaintiffs from selling any firearm to young adults based solely on
10  their age.  See Decl. of Anthony Williams, Darin Price, and John Phillips. That brings
11  their claims within the Second Amendment's protective scope.

12      The State's asserts "the Court should address the threshold question of whether a
13  semiautomatic centerfire rifle qualifies as a protected "Arm" under the Second
14  Amendment, *notwithstanding the Court's previous conclusion on this point*." (Defs.
15  Brf., p. 22) (emphasis added); see also *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1325
16  (S.D. Cal. 2020).  As the State admits, this question already has been answered by this
17  Court and the Supreme Court in *Bruen*. The firearms prohibited by the State's ban, in
18  fact, are "arms" under the plain text of the Second Amendment.

19      In support of the State's contention — which already has been answered — the
20  State shockingly claims that *Bruen* "confirmed that to qualify as a protected "Arm," a
21  weapon must, like handguns, be commonly *used* for lawful self-defense — not simply
22  manufactured, produced, sold, or owned." *Id*.   Neither *Heller* nor *Bruen* make such a
23  claim.  Under the State's reasoning, countless firearms, such as a bolt action hunting
24  rifle, would not qualify as "arms" under the Second Amendment because they are not
25  commonly "used" for lawful self-defense. The State's assertions are baseless.

26
27
28

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order
of September 14, 2022

In fact, *Heller* already has established the relevant contours of this tradition: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are *both* dangerous *and* unusual. *Bruen*, 142 S.Ct. at 2128. And *Bruen* spelled out that this was an historical matter. *See id.* ("[W]e found it fairly supported by the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time") (emphasis added, internal quotation marks omitted). Under the *Heller* analysis, history is used to establish the scope of the right. But here, the decision in *Heller* already has completed the historical analysis, and has determined the scope of the right when it comes to protected arms — those which include arms in common use, for lawful purposes such as self-defense — because the only bearable arms that are not protected are those that are both dangerous *and* unusual at the time the analysis is being done.4 The State's contentions have no legal support. And since both the conduct and the arms in question are covered by the Second Amendment's plain text, the burden shifts to the State to justify its ban as consistent with the Nation's tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2126.

## VI. THE OTHER PRELIMINARY INJUNCTION FACTORS WARRANT RELIEF

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party, the balance of equities factor and the public interest

---

4  The State misconstrues Plaintiffs' contention and asserts that Plaintiffs argue that no historical analysis is required under *Bruen*. This is false. A historical analysis regarding the government's ability to ban commonly owned bearable arms is, in fact, required by the decisions in *Heller* and *Bruen*. However, as Plaintiffs have argued, this historical analysis was already completed in *Heller*. As such, this Court need only to apply this same historical analysis to the facts of this case.

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022

factor merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Under the Ninth Circuit's "'sliding scale' approach, a stronger showing of one element may offset a weaker showing of another, as long as plaintiffs 'establish that irreparable harm is likely.'" *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

As shown above, Plaintiffs have shown an overwhelming likelihood of success on the merits. This is especially true under the framework established in *Heller* and affirmed by *Bruen.* Under the Second Amendment's plain text, both the conduct and the arms in question are protected. As such, the State bears the burden of justifying its prohibition with a showing of relevant historical analogues from the founding era. The State has not provided, and frankly, cannot provide, any well-established historical analogous regulations during the founding era that could justify prohibiting the Second Amendment rights of 18-to-20-year-olds based solely on their age. Therefore, the State's ban is unconstitutional and Plaintiffs are likely to succeed on the merits.

Because the proper application of the *Bruen* framework overwhelmingly supports Plaintiff's likelihood of success on the merits, this Court must now apply that legal framework and reassess the remaining *Winter* factors consistent with the *Bruen* decision — a task made simpler under the guidance provided in *Jones*, 34 F.4th at 732-733 (citing *BOKF, NA v. Estes*, 923 F.3d 558, 565 (9th Cir. 2019)).

First, the prior Panel opinion found error in in evaluating the irreparable harm factor under the now abrogated two-step test. However, the evaluation has been solidified under the *Bruen* framework as to both the long gun prohibition and semiautomatic centerfire rifle prohibition under Penal Code section 27510. As Plaintiffs have previously contended, "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (internal quotation marks omitted).

1   Unquestionably, the State's age-based prohibitions infringe on both protected conduct
2   (18-to-20-year-olds acquiring firearms for all lawful purposes) and protected arms (long
3   guns and semiautomatic centerfire rifles).     This is abundantly clear based on the plain
4   text of the Second Amendment. With the burden shifted, the State fails to meet its
5   burden under *Bruen* to justify its ban by offering appropriate well-established historical
6   analogues from the relevant time period, *i.e.*, the founding era. Thus, Plaintiffs have
7   properly shown irreparable harm due to the State's age-based ban infringing on
8   Plaintiffs' constitutional right to keep and bear arms. Further, the State sustains no
9   "harm" because, as point out in *Jones*, 34 F.4th at 733, "the government suffers no harm
10  from an injunction that merely ends unconstitutional practices," citing *Doe v. Kelly*, 878
11  F.3d 710, 718 (9th Cir. 2017).

12      The State's wrongly claims irreparable harm has not been shown because the
13  individual Plaintiffs have aged out of the prohibition and, therefore, can now purchase
14  firearms.  As the Panel opinion made clear, "a constitutional violation is not reparable
15  just because it is definite in duration: a harm need not last indefinitely to be irreparable.
16  In other words, we would not tell a plaintiff suing over voting right restrictions on young
17  adults that her harm was not irreparable because she could still vote when she turned
18  21." *Jones*, 34 F.4th at 733.  For preliminary relief, the "loss of [constitutional]
19  freedoms, for even minimal periods of time, unquestionably constitutes irreparable
20  injury." *Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 67 (2020) (per
21  curiam); see also 11A* Charles Alan Wright, et al., Federal Practice & Procedure §
22  2948.1 (3d ed. 2013) ("When an alleged deprivation of a constitutional right is involved,
23  . . . most courts hold that no further showing of irreparable injury is necessary."). Nor
24  do the extremely limited and illusory exceptions alleviate the irreparable harm caused
25  by Penal Code section 27510.  See *Jones* 34 F.4th at 732 (finding that the "three
26  rationales for why Plaintiffs would not be irreparably injured" were all error). Again,
27  the Panel's conclusions under the prior two-step test are only bolstered when the *Bruen*
28

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022

framework is applied.  Plaintiffs have established irreparable injury. Nevertheless, the organizational Plaintiffs in this case have properly established representative standing on behalf of their members. See Declaration of Jose Chavez; Declaration of Jason Wieringa filed concurrently herewith.

Moreover, both the balance of the equities and the public interest — which merge here, *Nken v. Holder*, 556 U.S. 418, 435 (2009) — strongly support relief.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).   Those factors tip overwhelmingly in Plaintiffs' favor because California has no legitimate interest in enforcing laws like Penal Code section 27510 that strips a broad group of its citizens of their constitutional rights due to the criminal acts of a minute portion of that group. The preliminary injunction, therefore, will protect Californians, ages 18 to 20 years old, from harm.

In contrast, the State "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); see also *Valle del Sol Inc. v. Whiting,* 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable ... to allow the state ... to violate the requirements of federal law.") (citations omitted). The State's attempt to tip the balance of equities and public interest in its favor by alleging the "potential harm of enjoining a duly-enacted law designed to protect public safety outweighs [18-to-20-year-olds'] inability to secure the firearm of their choice without proper training" also fails under any reasonable review of the undisputed facts regarding crime committed by this age group. For example, the State justifies its law by citing statistics showing that 18-20-year-olds constitute less than 5% of the population but represent more than 15% of homicide and manslaughter arrests. The State asserts that Section 27510 enforcement is necessary for its public safety goal.  But as the Panel's concurring opinion stated, this is a "malleable and meaningless limit on

Plaintiffs' Brief in Opposition to Defendants' Supplemental Brief in Response to the Court's Order of September 14, 2022

the government's power to restrict constitutional rights. As the majority opinion capably pointed out, only 0.25% of young adults commit violent crimes. So California limits the rights of 99.75% of young adults based on the bad acts of an incredibly small sliver of the young adult population." *Id*.  Simply, the State cannot legitimately claim that the balance of interest tips sharply in its favor when it strips the rights of the vast majority of a group of law-abiding adults to address such a minute fraction of offenders.

Moreover, when challenging government action that affects the exercise of constitutional rights, "[t]he public interest … tip[s] sharply in favor of enjoining the" law.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  Plaintiffs seek to restore their Second Amendment rights and continue to be able to acquire firearms for self-defense and all other lawful purposes.  Thus, not only are Plaintiffs' rights at stake, but so are the rights of all young adults in California — as well as those who will become young adults in the future.  Thus, the public interest tips sharply in Plaintiffs' favor. *Id*., at 1208.

The State has no plausible argument that enjoining enforcement of California's age-based gun ban will endanger public safety or lead to an increase in mass school shootings.  Marvell Dec. ¶¶ 1-19, Exs. 1-10; Lott Dec. ¶¶ 1-19, Exs. 1- 8.  Further, if properly enjoined, all firearm purchases must still go through federal and state background checks. Prohibiting lawful sales, transfers, acquisitions, use, handling, and rentals of any firearm does not increase public safety, especially where, as here, all such purchases must comply with a vast array of regulations, identified as "the most stringent gun laws in the country." Combs Dec., ¶ 12, Ex. 2, at 8.  Moreover, the State cites no evidence that young adults who pass and complete the above conditions are more prone to commit an act of violence with that firearm than any other lawful adult. Again, all evidence suggests that age-based firearm restrictions have no effect on homicides, suicides, and mass shootings. See Marvell Dec. ¶¶ 5-19, Exs. 2-11. On the other hand, continuing to allow young adults to purchase firearms serves the public interest as it

21

allows this class — one that is most likely to fall victim to violent crime — to protect themselves. Lott Dec. ¶ 21.9.

## VII.   CONCLUSION

In the words of the Ninth Circuit in *Jones v. Bonta*, 34 F.4th at 710:

"America would not exist without the heroism of the young adults who fought and died in our revolutionary army. Today we reaffirm that our Constitution still protects the right that enabled their sacrifice: the right of young adults to keep and bear arms."

Here, the State cannot offer any relevant historical evidence to contradict this conclusion because there is none.  This Court has all the evidence it requires to decide this case.  Indeed, no amount of analogizing can save the State from the ultimate conclusion under *Bruen framework* in this case — Penal Code section 27510 is unconstitutional. This Court is asked to issue an order on Plaintiffs' motion for preliminary injunction without delay.

November 21, 2022                     Respectfully submitted,

                                      DILLON LAW GROUP APC

                                      Attorney for Plaintiffs

                                      By:   ___*/s/ John W. Dillon*___
                                            John W. Dillon