1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   S. CLINTON WOODS
    Deputy Attorney General
4   STEPHANIE ALBRECHT
    Deputy Attorney General
5   JENNIFER E. ROSENBERG
    Deputy Attorney General
6   State Bar No. 275496
      300 South Spring Street, Suite 1702
7     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6617
8     Fax:  (916) 731-2124
      E-mail:  Jennifer.Rosenberg@doj.ca.gov
9   *Attorneys for Defendants Rob Bonta, in his*
    *official capacity as Attorney General of the*
10  *State of California, and Allison Mendoza, in*
    *her official capacity as Acting Director of the*
11  *Department of Justice Bureau of Firearms*

12                IN THE UNITED STATES DISTRICT COURT

13              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

16  | **MATTHEW JONES, *et al.*,** | 3:19-cv-01226-L-AHG |

17                              Plaintiffs,

18       v.                                    **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT; DEFENDANTS' APPLICATION PURSUANT TO FED. R. CIV. P. 56(D)**

19  **ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.*,**

20

21                              Defendants.

22                                            Dept:        5B
                                             Judge:       The Honorable M. James
23                                                        Lorenz and Magistrate
                                                         Judge Alison H. Goddard
24
                                             Action
25                                           Filed:       July 1, 2019

26

27

28

1

2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

    I.    Statutory Background ................................................................2

            A.    SB 1100 and SB 61 Restrict FFL Sales and Transfers of Semiautomatic Centerfire Rifles and Other Long Guns to Certain 18-20-Year-Olds.............................................................2

            B.    18-20-Year-Olds May Possess, Use, and Acquire Arms, Including Semiautomatic Centerfire Rifles and Other Long Guns, Under California Law ............................................4

    II.    Relevant Procedural History ....................................................5

LEGAL STANDARDS .........................................................................................6

ARGUMENT.........................................................................................................6

    I.    Plaintiffs are Unlikely to Succeed on the Merits of Their Second Amendment Claim...................................................................6

            A.    Plaintiffs are unlikely to prevail in challenging Section 27510's provision concerning long guns available with a hunting license ...................................................................8

            B.    Plaintiffs are unlikely to prevail in challenging Section 27510's provisions concerning semiautomatic centerfire rifles and other long guns ..............................................14

    II.    Plaintiffs Fail to Establish That They Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief ...............................22

    III.    The Other Equitable Considerations Weigh Heavily Against Preliminary Injunctive Relief ..............................................23

CONCLUSION ...................................................................................................25

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011)...................................................................6

*Baird v. Bonta*
    2022 WL 17542432 (E.D. Cal. Dec. 8, 2022) ....................................6

*Constructors Ass'n of W. Penna. v. Kreps*
    573 F.2d 811 (3d Cir. 1978)...................................................................22

*Defense Distributed v. Bonta*
    2022 WL 15524977 (C.D. Cal. Oct. 21, 2022)....................................7

*District of Columbia v. Heller*
    554 U.S. 570 (2008)...............................................................*passim*

*F.T.C. v. Affordable Media*
    179 F.3d 1228 (9th Cir. 1999)..............................................................24

*Firearms Policy Coal., Inc. v. McCraw*
    2022 WL 3656996 (N.D. Tex. Aug. 25, 2022)...............................14

*Hohe v. Casey*
    868 F.2d 69 (3d Cir. 1989)...................................................................22

*Horsley v. Trame*
    808 F.3d 1126 (7th Cir. 2015)..............................................................15

*Jones v. Becerra*
    498 F. Supp. 3d 1317 (S.D. Cal. 2020) ....................................22, 24

*Jones v. Bonta*
    34 F.4th 704 (9th Cir. 2022)........................................................5, 6, 23

*McDonald v. City of Chicago*
    561 U.S. 742 (2010)..................................................................................8

*Nat'l Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms*
    *& Explosives*
    700 F.3d 185 (5th Cir. 2012)........................................................15, 18

ii

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

1
2

# TABLE OF AUTHORITIES
### (continued)

<u>Page</u>

3
4

*Nat'l Rifle Assn. v. Bondi*
___ F.4th___, 2023 WL 2484818 (11th Cir. March 9, 2023) ...................*passim*

5
6

*New York State Pistol & Rifle Ass'n v. Bruen*
142 S. Ct. 2111 (2002) (*Bruen*)......................................................*passim*

7
8

*Nken v. Holder*
556 U.S. 418 (2009)...................................................................24

9
10

*Powell v. Tompkins*
926 F. Supp. 2d 367 (D. Mass. 2013)...............................................18

11

*Preminger v. Principi*
422 F.3d 815 (9th Cir. 2005)........................................................22

12
13
14

*Reese v. Bureau of Tobacco Alcohol Firearms & Explosives*
___ F. Supp. 3d ___, 2022 WL 17859138 (E.D. La. December 21,
2022) .........................................................................1, 15, 21

15
16

*Rupp v. Becerra*
2018 WL 2138452 (C.D. Cal. May 9, 2018) ......................................24

17
18

*State v. Callicutt*
69 Tenn. 714 (1878)...................................................................20

19

*U.S. v. Rene E.*
583 F.3d 8 (1st Cir. 2009) ............................................................18

20
21

*United States v. Holton*
2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)....................................14

22
23

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008)...................................................................6, 24

24

STATUTES

25

Cal. Penal Code § 16720.................................................................4

26

Cal. Penal Code § 16960(g) & (h)......................................................4

27
28

Cal. Penal Code § 26545.................................................................5

1
2

# <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3

Cal. Penal Code § 27505.................................................................................4

4

Cal. Penal Code § 27510.................................................................................2

5
6

Cal. Penal Code § 27510.................................................................................4

7

Cal. Penal Code § 27510(a)............................................................................4

8

Cal. Penal Code § 27510(b)(1)................................................................3, 22

9

Cal. Penal Code § 27510(b)(2)........................................................................4

10

Cal. Penal Code § 27510(b)(3)(A)..................................................................3

11

Cal. Penal Code § 27510(b)(3)(B)..................................................................3

12
13

Cal. Penal Code § 27510(b)(3)(C)..................................................................3

14

Cal. Penal Code § 27510(b)(3)(D)..................................................................4

15

Cal. Penal Code § 27545............................................................................2, 4

16

Cal. Penal Code § 27590(b)............................................................................4

17

Cal. Penal Code § 27875.................................................................................4

18

Cal. Penal Code § 27880.................................................................................4

19
20

Cal. Penal Code § 27885.................................................................................5

21

Cal. Penal Code § 27910.................................................................................5

22

Cal. Penal Code § 27920.................................................................................4

23

Cal. Penal Code § 27950.................................................................................5

24

Cal. Penal Code § 28050.................................................................................2

25
26

Cal. Penal Code § 29610.................................................................................4

27

Cal. Penal Code § 29615.................................................................................4

28

1
2

# TABLE OF AUTHORITIES
**(continued)**

**Page**

3

**CONSTITUTIONAL PROVISIONS**

4

U.S. Const. amend. II ............................................................................7, 9

5

**COURT RULES**

6
7

Fed. R. Civ. P. 56(d) ................................................................................2

8

**OTHER AUTHORITIES**

9

Patrick J. Charles, *Armed in America: A History of Gun Rights from*
   *Colonial Militias to Concealed Carry* 156 (2019) .............................20

10

William J. Novak, *The People's Welfare, Law and Regulation in*
   *Nineteenth Century America* 87 (University of North Carolina Press
   1996) ..................................................................................................10

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

**INTRODUCTION**

Plaintiffs seek a preliminary injunction halting enforcement of restrictions imposed on licensed firearms dealers ("FFLs"), prohibiting them from selling or transferring semiautomatic centerfire rifles and other types of long guns to certain young people aged 18-20.  The challenged law operates in a different manner depending on the nature of the firearm:  With respect to any long guns other than semiautomatic centerfire rifles, FFLs may sell or transfer to 18-20-year-olds, so long as the 18-20-year-olds secure a valid, unexpired hunting license or are part of law enforcement or military (active or reserve).  With respect to semiautomatic centerfire rifles, FFLs may not sell or transfer to 18-20-year-olds unless they are active members of law enforcement or military.  The challenged laws do not ban the possession of arms by 18-20-year-olds.  If 18-20-year-olds lawfully secure firearms through gifts or inheritance from family members, by loan, or by one of the enumerated exemptions, they may possess firearms under state law.

Plaintiffs have failed to establish that an interim injunction is warranted while the Court considers the merits of their Second Amendment claims.  On the merits, Plaintiffs have not established that they are likely to succeed.  Indeed, a federal court of appeals—assuming that a similar state law restricting sales of firearms to 18-20-year-olds implicates the text of the Second Amendment—recently concluded after a close examination of history that the challenged "firearms regulation is part of the historical tradition" of restricting 18-20-year-olds' access to arms.  *Nat'l Rifle Assn. v. Bondi*, ___ F.4th___, 2023 WL 2484818 (11th Cir. March 9, 2023) (*Bondi*) (upholding Florida limitation on firearms sales to persons under 21); *see also Reese v. Bureau of Tobacco Alcohol Firearms & Explosives*, ___ F. Supp. 3d ___, 2022 WL 17859138 (E.D. La. December 21, 2022) (upholding federal prohibition on sales of handguns and handgun ammunition to persons under 21), *appeal docketed*, No. 23-30033 (5th Cir. Jan. 13, 2023).  The *Bondi* court observed that those historical laws were designed "to address the public-safety crisis some 18-to-20-

1

year-olds with firearms represent." 2023 WL 2484818, at *13. And it observed that the same considerations support modern-day analogues, with the only difference being "the amount of carnage a single person can inflict in a short period because of the advances made in firearm technology over the last 150, or so, years." *Id.* That equitable consideration, and others described below, weigh heavily against preliminary injunctive relief. Plaintiffs' motion should be denied.[1]

## BACKGROUND

### I. STATUTORY BACKGROUND

#### A. SB 1100 and SB 61 Restrict FFL Sales and Transfers of Semiautomatic Centerfire Rifles and Other Long Guns to Certain 18-20-Year-Olds

Under California law, all commercial sales of firearms must occur through a federally licensed firearms dealer. Cal. Penal Code §§ 27545, 28050. In 2018, in the wake of the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, the California Legislature enacted Senate Bill 1100 to raise the minimum age for sale or transfer of long guns through FFLs from 18 to 21. *See* Woods Decl., Exs. 13-14. The relevant provisions of SB 1100 amended California Penal Code Section 27510 to prohibit licensed firearms dealers from selling or otherwise transferring any firearm to any person under the age of 21, with several important exemptions: 18-20-year-olds could obtain any kind of long guns from FFLs after securing a hunting license, or if they were part of law enforcement or the military or had been honorably discharged from the military. *Id.*, Ex. 13, p. 345.

To obtain a hunting license, applicants must complete an official hunter education course. They may opt to take a traditional course (ten hours of in-

---

[1] Plaintiffs' alternative requests for summary judgment or to consolidate trial on the merits with a hearing for a preliminary injunction should be denied. The Court has already entered a scheduling order providing time for discovery in support of summary judgment motions. To the extent the Court is inclined to consider Plaintiffs' request, Defendants apply for sufficient time to complete discovery as contemplated under the existing scheduling order (ECF 105). *See* Fed. R. Civ. P. 56(d); Decl. of Jennifer Rosenberg in Support of Defendants' Application Pursuant to Fed. R. Civ. P. 56(d) filed concurrently herewith.

2

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

classroom instruction) or a four-hour online course and a four-hour, in-person follow-up course.  (*See* ECF 21-18, Bogan Decl. ¶¶ 11-12.)  After taking the course, applicants must pass a 100-question test covering firearms and safe gun handling and other hunting and safety topics, and complete a safe gun handling demonstration.  *Id.* ¶¶ 12, 18.  Hunter education courses are subject to a modest fee (less than $30) (ECF 21-8, Combs Decl., Ex. 6, p. 0193), and applicants who successfully complete the course may purchase a hunting license for $54, Woods Decl., Ex. 9, p. 320 (Cal. Dept. Fish & Wildlife, Hunting Licenses and Tags).

In 2019, following a deadly shooting in which a 19-year-old opened fire in a synagogue in a suburb of San Diego, California, with a semiautomatic centerfire rifle he had purchased using Section 27510's hunting license exemption, the California Legislature passed Senate Bill 61 to prohibit 18-20-year-olds from purchasing semiautomatic centerfire rifles under the hunting license exemption. Woods Decl., Exs. 15-16.  Under SB 61, a FFL may not sell or transfer semiautomatic centerfire rifles to any person under the age of 21.  While exemptions are available for law enforcement officers, as well as active and reserve members of the Armed Forces, neither the hunting license exemption nor the exemption for honorably discharged members of the Armed Forces extends to sales or transfers of semiautomatic centerfire rifles.

Following SB 61, with respect to long guns that are not semiautomatic centerfire rifles, including other types of rifles and shotguns, Section 27510's restriction on sales or transfers from FFLs to 18-20-year-olds does not apply to a person aged 18-20 who "possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife" (Cal. Penal Code § 27510(b)(1)); an active peace officer authorized to carry a firearm (*id.* § 27510(b)(3)(A)); "[a]n active federal officer or law enforcement agent" (*id.* § 27510(b)(3)(B)); "[a] reserve peace officer" (*id.* § 27510(b)(3)(C)); an active member of "the United States Armed Forces, the National Guard, the Air National Guard, or active reserve components

3

of the United States" (*id.* § 27510(b)(3)(D)); or "an honorably discharged member of the United States Armed Forces, the National Guard, the Air National Guard, or the active reserve components of the United States" (*id.* § 27510(b)(2)).

Section 27510, as amended, regulates only sales and transfers of certain arms by FFLs.  *See* Cal. Penal Code §§ 27510(a), 27590(b).  Section 27510 imposes no penalties on purchasers or transferees aged 18-20.  And, importantly, no provision of California law limits an 18-20-year-old's possession or use of any type of otherwise-legal firearm.  *See* Cal. Penal Code §§ 27505, 27510, 29610, 29615.

**B.  18-20-Year-Olds May Possess, Use, and Acquire Arms, Including Semiautomatic Centerfire Rifles and Other Long Guns, Under California Law**

California law preserves several ways that 18-20-year-olds may own, purchase, inherit, borrow, possess, use, and receive gifts of firearms, including handguns, semiautomatic centerfire rifles, and other long guns.  Although most sales and transfers of firearms in California must be through a FFL (*see* Cal. Penal Code § 27545), there are several provisions authorizing 18-20-year-olds to receive firearms without having to go through a FFL.  Because these transfers may occur without the FFL as intermediary, the limitations of Section 27510 do not apply:

- Intrafamilial transfers of handguns and long guns (including semiautomatic centerfire rifles) from a parent or grandparent "by gift, bequest, intestate succession, or other means from one individual to another[.]" Cal. Penal Code § 27875; Cal. Penal Code § 16720; Cal. Penal Code § 27505 (prohibiting *sale* of handguns to those under 21 by private parties, but not other types of transfers).

- Transfers of a handgun or long gun (including semiautomatic centerfire rifles) from a spouse.  Cal. Penal Code § 27920 (transfer need not be through licensed dealer where recipient "takes title or possession of a firearm by operation of law"); Cal. Penal Code §16960(g) & (h) ("operation of law" includes transfer by "transmutation of property between spouses" or as a surviving spouse).

- Loans by parents, siblings, grandparents, spouses, registered domestic partners, and others for up to 30 days, Cal. Penal Code § 27880, loans by

4

other people for up to three days at a time if the 18-20-year-old uses the firearm in the presence of the person loaning it, Cal. Penal Code § 27885, and for licensed hunters, loans of firearms, other than a handgun, for the entirety of a hunting season, Cal. Penal Code § 27950.

- Loans for the purposes of target shooting if the loan occurs on the premises of a qualified target facility.  Cal. Penal Code §§ 27910, 26545.

## II.   RELEVANT PROCEDURAL HISTORY

Plaintiffs filed their initial complaint challenging SB 1100's amendments to Section 27510 on July 1, 2019.  (ECF 1.)  Following enactment of SB 61, they filed a Second Amended Complaint in November 2019, adding allegations challenging the amendments added by that statute.[2]  (ECF 20.)  They then filed a motion for preliminary injunction to enjoin enforcement of SB 1100 and SB 61.  (ECF 21.)  This Court denied the preliminary injunction motion in November 2020, concluding that Plaintiffs were not likely to succeed on the merits; that they could not establish irreparable harm because of their delay in seeking injunctive relief and because they maintained access to firearms through other means; and that other equitable considerations weighed against injunctive relief.  (ECF 66.)

The Ninth Circuit affirmed in part and reversed in part.  *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022), *vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022). Applying the now-vacated two-step approach to analyzing Second Amendment claims, the Court held that the Plaintiffs were not likely to succeed in challenging the hunting license requirement for sales and transfers of long guns.  But the Court held that Plaintiffs were likely to succeed with respect to their challenge to restrictions on sales and transfers of semiautomatic centerfire rifles, and remanded for this Court to consider the equitable preliminary injunction factors.  (*Id.*)

The parties agreed to stay litigation pending the Supreme Court's disposition of *New York State Pistol & Rifle Ass'n v. Bruen*, 142 S. Ct. 2111 (2002) (*Bruen*).

---

[2] Plaintiffs challenge only Section 27510's restrictions on sales and transfers of long guns, including semiautomatic centerfire rifles, not any restrictions on sales and transfers of handguns.

Following *Bruen*, the Ninth Circuit vacated its opinion and remanded for further proceedings consistent with *Bruen*.  *Jones*, 47 F.4th 1124.  On remand, this Court concluded "that *Bruen* represents a change in the legal framework this Court applied when deciding Plaintiffs' preliminary injunction motion," denied Plaintiffs' 2019 motion for a preliminary injunction as moot, and allowed Plaintiffs to file a renewed preliminary injunction motion.  (ECF 100.)[3]

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs seeking an injunction bear the burden of establishing that:  (1) their claims are likely to succeed on the merits; (2) they will likely suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; *and* (4) an injunction is in the public interest.  *Id.* at 20.  Alternatively, "[a] preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted).  Plaintiffs must make a showing of all four *Winter* factors even under the alternative sliding scale test.  *See Baird v. Bonta*, 2022 WL 17542432, at *4 (E.D. Cal. Dec. 8, 2022).

## ARGUMENT

### I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND AMENDMENT CLAIM

Under a proper application of *Bruen*'s standards, Plaintiffs are unlikely to

---

[3] Magistrate Judge Goddard issued a scheduling order resetting all substantive dates in this case.  (ECF 105.)  The scheduling order contemplates exchange of initial and rebuttal disclosures of experts by September 15 and October 16, 2023, respectively, and close of expert discovery on November 17, 2023.  *Id.*  The deadline for filing pretrial motions is January 12, 2024.  *Id.*

On February 16, 2023, Plaintiffs filed a motion to amend their complaint to add two new individual plaintiffs and voluntarily dismiss Plaintiffs Jones, Furrh, Yamamoto, and Beebe Family Arms and Munitions.  (ECF 108, 109, 109-2.)  Those requests have not yet been addressed by this Court, so the Second Amended Complaint remains the operative pleading.

6

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

1    succeed in their challenge to Section 27510 concerning the acquisition of

2    semiautomatic centerfire rifles and other long guns.

3         In *Bruen*, the Supreme Court announced a new methodology for analyzing

4    Second Amendment claims, "centered on constitutional text and history."  142 S.

5    Ct. at 2128–29.  Under this text-and-history approach, "[w]hen the Second

6    Amendment's plain text covers an individual's conduct, the Constitution

7    presumptively protects that conduct.  The government must then justify its

8    regulation by demonstrating that it is consistent with the Nation's historical

9    tradition of firearm regulation."  *Id.* at 2129–30.  Under that framework, *Bruen*

10   directs courts to first assess whether the Second Amendment's "plain text" covers

11   an individual's proposed course of conduct,  *id.* at 2126, 2134—*i.e.*, whether the

12   regulation prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for

13   lawful purposes, U.S. Const. amend. II.  If so, the Constitution "presumptively

14   protects that conduct."  *Bruen*, 142 S. Ct. at 2126.  *Bruen* makes clear that a party

15   challenging a law under the Second Amendment bears this threshold, textual

16   burden.  *See Bruen*, 142 S. Ct. at 2134-35; *see also Defense Distributed v. Bonta*,

17   2022 WL 15524977, at \*5 (C.D. Cal. Oct. 21, 2022) ("Much as [plaintiff] would

18   like to move history and tradition forward in the course of relevant analysis under

19   *Bruen*, its attempt does not survive a careful, and intellectually-honest, reading of

20   that decision.").

21        If a challenged restriction regulates conduct protected by the "plain text" of

22   the Second Amendment, *Bruen* then directs the government to justify its regulation

23   by showing that the law is "consistent with this Nation's historical tradition of

24   firearm regulation."  142 S. Ct. at 2126.  And while the Supreme Court recognized

25   that the historical analysis conducted at the first step of the two-step approach that

26   lower courts had adopted for analyzing Second Amendment claims was "broadly

27   consistent with *Heller*," *id.* at 2127, it clarified how that analysis should proceed in

28   important respects.  In some cases, the Court explained, this historical inquiry will

7

be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century." *Id.* at 2131.  But in others—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—the Court recognized that this historical analysis requires a "more nuanced approach." *Id.* at 2132.

Under this "more nuanced approach," governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*." *Bruen*, 142 S. Ct. at 2133 (emphasis in original).  Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster.  *Id.*  Instead, in evaluating whether a "historical regulation is a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are "'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein*, On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).  The Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133.  The Court explained that those dimensions are especially important because "'individual self-defense is "the *central component*" of the Second Amendment right.'" *Id.* (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), and *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)).  After *Bruen*, a modern regulation that restricts conduct protected by the plain text of the Second Amendment is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors that is "comparably justified." *Id.*

### A.   Plaintiffs are unlikely to prevail in challenging Section 27510's provision concerning long guns available with a hunting license

Assuming only for the purpose of this motion that 18-20-year-olds are part of the "people" protected by the Second Amendment and that the acquisition restrictions imposed through FFLs implicate the right to "keep and bear Arms,"

8

Section 27510's restrictions concerning long guns available for purchase with a hunting license are constitutional under *Bruen*.[4]  Plaintiffs concede that they bear the burden to show that the Second Amendment protects their proposed course of conduct at the textual stage of the analysis.  ECF 103-1, Pls.' Mem. Of Points and Authorities ISO Prelim. Inj. Mot. ("MPA") at 9; *accord Bruen*, 142 S. Ct. at 2134. They fail to carry that burden with respect to Section 27510's imposition of a licensing requirement before 18-20-year-olds may acquire long guns from FFLs.

Section 27510 does not prohibit *any person* from "keep[ing]" or "bear[ing]" any "Arms," U.S. Const. amend. II, whether inside the home or in public.  Under Section 27510, 18-20-year-olds may keep, bear, and possess any lawful firearm of their choosing—including handguns, semiautomatic centerfire rifles, and any other long guns—and to use that firearm for *any* otherwise lawful purpose.  For those 18-20-year-olds who are unable to receive firearms through intrafamilial transfers, Section 27510 simply requires they procure a hunting license and associated firearm training before purchasing a long gun from a FFL.

Licensing regimes based on objective and definite criterion remain valid under *Bruen*.  Both the majority opinion and Justice Kavanaugh's concurring opinion approved of States continuing to require that a public-carry license applicant first pass a background check and pass a firearms safety course.  *Bruen*, 142 S. Ct. at 2123-24 (citing approvingly the licensing schemes of 43 States); *id.* at 2138 n. 9 ("nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" or other licensing requirements that

---

[4] As the Eleventh Circuit observed, "it's not clear whether 18-to-20-year olds 'are part of "the people" whom the Second Amendment protect.'"  *Bondi*, 2023 WL 2484818, at *6; *but see* Cornell Decl., ¶¶ 20, 23, 45-53, 82, 152-154 (opining that the Second Amendment did not recognize a right of infants under 21 to keep and bear arms).  Those substantial questions may be better resolved in the summary judgment posture and this Court may assume for the purpose of this analysis that 18-20-year-olds are covered by the Second Amendment's text.  And as the court of appeals did in *Bondi*, this Court may also assume without deciding that the "right to keep and bear arms includes the right to acquire them."  2023 WL 2484818, at *6. Defendants reserve the right to make such arguments in merits briefing.

9

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

1   are "'narrow, objective, and definite'"); *see also id.* at 2161 (Kavanaugh, J.,

2   concurring).  The hunting license requirements, *see supra*, are no different.

3       Even if a licensing scheme could implicate the plain text of the Second

4   Amendment, a regulation like Section 27510 imposing commercial conditions on

5   the acquisition of long guns is part of a historical tradition of regulation.  The

6   government has long preserved the peace and welfare of the community by

7   exercising its sovereign power to regulate the commercial sale of products,

8   including firearms and ammunition.  "[D]espite historical depictions of free trade,

9   'laggard' regulation, and the opening of American society, the early nineteenth

10  century was home to a deluge of formal economic regulations and vigorous

11  defenses of the power of the state over trade and commerce."  William J. Novak,

12  *The People's Welfare, Law and Regulation in Nineteenth Century America* 87

13  (University of North Carolina Press 1996); *see also id.* at 85 (contrasting the "'myth

14  of laissez-faire'" with "the myriad ways that law and active state governments

15  furnished the necessary conditions for early American economic development").

16  Thus, "early Americans understood the economy as simply another part of their

17  well-regulated society, intertwined with public safety, morals, health, and welfare

18  and subject to the same kinds of legal controls."  *Id.* at 84.

19      Consistent with these principles, "[n]early all state legislatures in the early

20  nineteenth century passed laws directing 'trades to be conducted, and wares and

21  goods to be fabricated, and put up for market in a certain manner.'"  *Id.* at 88 (citing

22  Dane, *A General Abridgment and Digest of American Law* (1823)).  Between 1780

23  and 1835, the Massachusetts legislature passed regulations that closely specified

24  and controlled the way numerous products were manufactured and sold, including

25  gunpowder and firearms.  *Id.* (citing Stearns and Metcalf, *The General Laws of*

26  *Massachusetts, 1780-1835* (1823-36), and listing a total of 49 regulated products,

27  from boards and shingles to beef and pork).  Maryland, South Carolina, Michigan,

28  and Ohio enacted similar legal schemes.  *Id.*  Aside from product and inspection

10

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

laws, nineteenth-century legislators also used licensing "to regulate and control a host of economic activities, trades, callings, and professions . . . for the public good and the people's welfare." *Id.* at 90. In 1827, Maryland enacted a series of statutes requiring a "license to trade," and Tennessee, Missouri, Pennsylvania, and California passed similar statutes in the midcentury "requiring the licensing of merchants, retailers, and wholesalers." *Id.* at 90-91. In 1868, Alabama required licenses for over thirty occupations and businesses, including for "dealers in firearms." *Id.* at 91 (citing *Alabama Acts of the General Assembly* 329-35 (1868)).

Regulation of commerce was strict on government property, as well. In local public marketplaces where foods were sold, such as Philadelphia's High Street Market and Boston's Faneuil Hall, "states and municipalities used their police powers to . . . protect their populations from high prices, unhealthy goods, unsanitary conditions, fraud and cheating, and the adverse effects of simple profiteering by hucksters, forestallers, middlemen, and other second hand sellers." *Id.* at 96. Lawmakers recognized that leaving such products unregulated would be "an abdication of public responsibility," *id.*, and "a chorus of judicial opinion support[ed] urban market regulations," *id.* at 101.

Firearms and ammunition were no exception; they have been regulated "from the dawn of American history." Woods Decl., Ex. 6 (Feb. 2023 Decl. of Saul Cornell filed in *B&L Prods., Inc. v. Newsom*, Case No. 8:22-cv-01518 JWH (JDEx) (C.D. Cal.), ECF No. 31-2), ¶ 21. Of course, "the Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America." *Id.* ¶ 28.[5] Indeed, "[t]he pressing problem Americans faced at the time of the Second Amendment" was "reluctance to purchase the type of weapons needed to effectively arm their militias." Woods Decl., Ex. 6 (Feb. 2023

---

[5] For a detailed discussion of the relative lack of firearms crime—and thus relative lack of firearm regulation—during the colonial period and early national period, and the rise in firearms violence and concomitant rise in regulation from the Nineteenth Century onward, *see generally* Roth Decl.; Spitzer Decl.; Rivas Decl.

Decl. of Saul Cornell) ¶¶ 25, 29.  Because local gunsmiths had close ties to the community, as they were both responsible for selling firearms and keeping these dangerous products in good working order, "much of the supervision of this market was achieved through [] informal means."  *Id.* ¶ 31.

Nonetheless, it was well understood that state and local governments possessed the inherent police power to regulate firearms commerce to address both "longstanding issues and novel problems created by firearms in American society."  *Id.* ¶ 11.  Indeed, no less than seventeen state constitutions adopted during the Reconstruction era employed "expansive language" providing that the right to keep and bear arms was subject to state regulation.  *Id.* ¶ 41 (citing, e.g., Tex. Const. of 1868, art. I, § 13, which stated, "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, *under such regulations as the Legislature may prescribe*" (emphasis added)); *see also* Cornell Decl. filed herewith, ¶ 109 & Ex. C (collecting constitutional provisions).

In accordance with technological and social norms and the needs of the day, gunpowder—which was inherently dangerous (especially in urban areas with wooden infrastructure) and was manufactured by a rapidly growing industry—was highly regulated in early America.  *See generally* Novak, *supra*, at 60-67.  States regularly enacted laws regulating gunpowder, including prohibitions of where one may sell gunpowder.  *See*, *e.g.*, An Act To Regulate The Keeping And Selling, And Transporting Of Gunpowder, 1825 N.H. Laws 74, chap. 61, § 5 (penalizing the selling or offer for sale of gunpowder in any highway, street, lane, alley, wharf, parade, or common); An Act in Addition to an Act, entitled "An Act to Provide for the Proof of Fire Arms, Manufactured within this Commonwealth" 1814 Mass. Acts 464, ch. 192, § 2 (requiring inspection of musket barrels and pistol barrels); An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, 1821 Me. Laws 98, chap. 25, § 5 (power to inspect storage of gunpowder); An Act to Regulate Gun Powder Manufactories and Magazines within this State,

12

1811 N.J. Laws 300, § 1 (limitations on gunpowder factory locations); An Act to
Provide for the Appointment of Inspectors and Regulating the Manufacture of
Gunpowder, 1820 N.H. Laws 274, chap XXV, §§ 1-9 (duty of inspectors, quality
control, storage specifications); An Act to Amend an Act Entitled "An Act to
Incorporate the Village of Rutland" 1865 Vt. Acts & Resolves 213 § 10 (Approved
November 15, 1847) (fire wardens' authority to inspect manufacturing and storage).
In the mid-nineteenth century, as firearms became more common, state and local
governments began to regulate shooting galleries, again to protect the public from
danger.  Woods Decl., Ex. 6 (Feb. 2023 Saul Cornell Decl.), ¶ 37.  Such regulations
required licensure to open a shooting gallery, and oftentimes set limitations on the
location of galleries.[6]  And, relevant here, ordinances from the latter half of the
Eighteenth Century imposed age-based restrictions prohibiting shooting gallery
owners, licensees, or employees from allowing minors to play on the galleries.  *See*,
*e.g.*, *Ordinances of the City of New York. Firing of Fire-Arms, Cannons and
Fireworks, § 6*, in D. T. Valentine, Ordinances of the Mayor, Aldermen and
Commonalty of the City of New York: Revised A. D. 1859, Adopted by the
Common Council 235, Image 243 (1859), available at The Making of Modern Law:
Primary Sources. 1859; WM. H. Bridges, Argus Book and Job Office, Digest of the

---

[6] *See Digest of the Laws and Ordinances of the Parish of East Feliciana,
Adopted by the Police Jury of the Parish*, sec. 1. (September session, 1847), at 80
(John C. White, Whig Office, September 1, 1848); 1851 R.I. Pub. Laws 9, An Act
in Amendment of an Act Entitled an Act Relating to Theatrical Exhibitions and
Places of Amusement, §§ 1-2, in *The Revised Statutes of the State of Rhode Island
and Providence Plantations: To Which are Prefixed, The Constitutions of the
United States and of the State*, chp. 80, section 2 (January Session 1857), at 204-
205 (Samuel Ames, Chairman, Sayles, Miller and Simons 1857) (same);
*Ordinances and Joint Resolutions of the City of San Francisco: Together with a
List of the Officers of the City and County, and Rules and Orders of the Common
Council 220,* Ordinance No. 498, section 13 (December 29, 1853), at 220 (Monson
& Valentine 1854)); *Ordinances of the City of Burlington, with Head Notes and an
Analytic Index*, § 1 (1841), at 149-150 (Chas. Ben. Darwin, Thompson & Co.
Printers, 1856) (listing other conditions); *The Laws and General Ordinances of the
City of New Orleans: Together with the Acts of the Legislature, Decisions of the
Supreme Court, and Constitutional Provisions Relating to the City Government:
Revised and Digested, Pursuant to an Order of the Common Council*, Section 1, art.
636 (5), at 257 (Henry Jefferson Leovy, Simmons & Co. New Ed. 1870).

13

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page, Chp. 5, Art. VI., at 147-149 (1863); *Ordinances, City of Council Bluffs, Shooting Gallery*, § 5, in Geoffrey Andrew Holmes Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa 168-169, Image 171-172 (1887), available at The Making of Modern Law: Primary Sources. 1887.

Thus, from the Founding era through the Nineteenth Century, state and local governments fully exercised their police powers to enact commercial firearms regulations based on the needs at the time.  Woods Decl., Ex. 6 (Feb. 2023 Cornell Decl.), ¶ 11; *see, e.g.*, *United States v. Holton*, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022) (relying in part on "commercial firearms regulations" dating back to colonial times to reject Second Amendment challenge).  Those laws fit into a broader tradition of regulating commercial sales of a host of products more generally.  The challenged laws here fit well within this historical tradition.  Section 27510's licensing requirements, like early American laws imposing commercial regulations relating to firearms, regulate firearms-related commercial activity to promote public safety; they are thus no more burdensome than their predecessors.[7]

Independent of its validity as a licensing regime involving acquisition of long guns, Section 27510 is also consistent—as demonstrated below—with the nation's historical tradition of regulating 18-20-year-olds' acquisition and use of firearms.

**B.  Plaintiffs are unlikely to prevail in challenging Section 27510's provisions concerning semiautomatic centerfire rifles and other long guns**

Similarly, a historical analysis establishes that Section 27510's regulation of

---

[7] Indeed, even the single district court decision to invalidate an age-based restriction post-*Bruen*—a ban on public carry for virtually all individuals under 21 outside law enforcement and the Armed Forces—noted that "[t]hough Texas cannot impose a 'substantial burden on public carry' for 18-to-20-year-olds, Texas could, under *Bruen*, require 18-to-20-year-olds to satisfy additional objective criteria when compared to those above the age of 21."  *Firearms Policy Coal., Inc. v. McCraw*, 2022 WL 3656996, at *11 n.9 (N.D. Tex. Aug. 25, 2022).

14

FFL commercial transactions with 18-20-year-olds—including the general limitation on sales and transfers of long guns to those without proper training, and the more specific restrictions on sales and transfers of semiautomatic centerfire rifles—is part of a long-established tradition of States regulating the possession and use of firearms by individuals aged 18 to 20.  The declarations of historians Saul Cornell, Randolph Roth, Robert Spitzer, and Brennan Rivas filed herewith establish that historical tradition.  *See, e.g.*, Cornell Decl. ¶¶ 42-88, 101-155, and Exs. B & C; Roth Decl. ¶¶ 34-36, 61-68; Spitzer Decl. ¶¶ 11-18, 56-60, and Exs. I-K; Rivas Decl. ¶¶ 44-50.  And the Eleventh Circuit, looking to a similar historical record, rejected a Second Amendment challenge to a Florida law barring the sale of firearms to 18-20-year-olds, concluding that States have long held the "power to regulate 18-to-20-year-olds' access to firearms."  *Bondi*, 2023 WL 2484818, at *13; *see also Reese*, 2022 WL 17859138 (rejecting Second Amendment challenge to similar restriction on 18-to-20-year-olds).

To begin, for most of U.S. history, including when the Second and Fourteenth Amendments were ratified, persons younger than 21 were considered minors or "infants."  *E.g.*, Cornell Decl. ¶¶ 9, 20, 151-152.  At the time of the founding, the age of majority was 21, and the term "minor" applied to persons under 21.  *See Nat'l Rifle Assn. of Am., Inc. v. BATFE*, 700 F.3d 185, 201 (5th Cir. 2012) (*BATFE*); *Horsley v. Trame*, 808 F.3d 1126, 1130 (7th Cir. 2015) ("During the founding era, persons under 21 were considered minors or 'infants.'"); 1 Blackstone, Commentaries On the Laws of England 451 (1st ed. 1765) ("So that full age in male or female, is twenty one years, ... who till that time is an infant, and so styled in law.").  Indeed, until 1969—more than a century after the Fourteenth Amendment's ratification—the age of majority for unmarried men was 21 in every state.  *See* Larry D. Barnett, The Roots of Law, 15 Am. U. J. Gender, Soc. Pol'y & L. 613, 681-86 (2007); *BATFE*, 700 F.3d at 201 ("[I]t was not until the 1970s that States enacted legislation to lower the age of majority to 18.").  Thus, historically,

15

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

laws restricting minors' rights applied to persons under the age of 21; and, since the Founding, their "legal status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision." Cornell Decl. ¶ 42; *see also id.* ¶¶ 9, 20, 23, 43-53, 82, 152-154. Infants under the age of 21 were considered "legally 'disabled'" under the law,—unable to vote, exercise religious liberty, or assert other rights we would consider fundamental; "Founding Era law analogized minors to married women under coverture, madmen, and 'idiots.'" *Id.* at ¶¶ 44, 66-68.

Moreover, the historical record shows that regulations from the Reconstruction Era burdened 18-20-year-olds' rights to armed self-defense to an even greater extent and for the same reason as Section 27510 does.[8] Twelve years before the Fourteenth Amendment's ratification, Alabama prohibited selling, giving, or lending, "to any male minor, a bowie knife, or knife, or instrument of the like kind or description, by whatever named called, or air gun, or pistol." 1855 Ala. Laws 17; Cornell Decl. ¶ 105. At that time, the age of majority in Alabama was twenty-one. So, in 1856, Alabama law prohibited the sale (and even the giving or lending) of handguns and other handheld, smaller arms to 18-to-20-year-olds. *Id.*; *see also Bondi*, 2023 WL 2484818, at *6. Tennessee followed suit with a law prohibiting the selling, loaning, giving, or delivering "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in traveling," Tenn. Code § 4864 (1858), reprinted in 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858); Cornell Decl. ¶ 106. At that

---

[8] The Eleventh Circuit persuasively explains why Reconstruction era laws are probative of the meaning of Second Amendment at the time of ratification. "In short, because the Fourteenth Amendment is what caused the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters." *Bondi*, 2023 WL 2484818, at *4.

16

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

time, the age of majority in Tennessee was twenty-one years.  Kentucky also passed a law that prohibited selling, giving, or loaning "any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon ... to any minor," 1859 Ky. Acts 245, § 23.  The law contained an exception allowing parents or guardians to give, lend, or sell deadly weapons to their minor children. Cornell Decl. ¶¶ 106-107.  At that time, the age of majority in Kentucky was twenty-one.

As the court in *Bondi* explained, "Alabama and Tennessee generally prohibited selling, loaning, or even giving handguns and other handheld arms to 18-to-20-year-olds in the years leading up to the Fourteenth Amendment's ratification." *Bondi*, 2023 WL 2484818, at *7.  "Because those laws made it unlawful not only to sell those types of arms to 18-to-20-year-olds, but also to lend those arms to that age group, those laws imposed a greater burden on the right to keep and bear arms than does [Section 27510, which] leaves 18-to-20-year-olds free to obtain firearms through legal means other than purchasing." *Id.*

Those laws are consistent with Founding and Reconstruction era laws prohibiting students from possessing firearms on university campuses. *See* Cornell Decl. ¶¶ 59-64.  The University of Georgia, for example, prohibited students from keeping "any gun, pistol," or "other offensive weapon in College or elsewhere," meaning that students could not possess such weapons even while they were away from college.  Cornell Decl. ¶ 62.  The University of Virginia passed a resolution— with supporting votes from Thomas Jefferson and James Madison—that prohibited students from keeping or using "weapons or arms of any kind, or gunpowder," on school grounds.  The University of North Carolina similarly prohibited students from keeping "firearms, or gunpowder" by the mid-nineteenth century.  Those rules and regulations "further support the conclusion that for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms.  Rather, access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over

17

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

them: fathers, guardians, constables, justices of the peace, or militia officers."
Cornell Decl. ¶ 64; *accord* Spitzer Decl. ¶¶ 19-20 & Ex. K.

"[B]y the end of the 19th century, nineteen States and the District of Columbia
had enacted laws expressly restricting the ability of persons under 21 to purchase or
use particular firearms, or restricting the ability of 'minors' to purchase or use
particular firearms while the state age of majority was set at age 21." *BATFE*, 700
F.3d at 202 & n.14; *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387 (D. Mass. 2013)
("Case law from jurisdictions across the country confirms that during the late
nineteenth and early twentieth centuries, minors' capacity to purchase and own
firearms was significantly curtailed.").  Indeed, "restrictions on minors [in the
Nineteenth Century] were more common than limits on felons."  Cornell Decl. ¶¶
121-122 (also noting that the state regulatory authority was "at its zenith when
regulating arms and minors").  Often, these prohibitions expressly targeted
handguns—which *Heller* characterized as "the quintessential self-defense weapon,"
554 U.S. at 629—and some criminalized their "mere possession," *U.S. v. Rene E.*,
583 F.3d 8, 14 (1st Cir. 2009).[9]  Many of those post-ratification regulations were
similar to the laws passed in Alabama, Tennessee, and Kentucky.  Maryland, for
example, made it "unlawful" for anyone "to sell, barter, or give away any firearm
whatsoever or other deadly weapon, except for shot guns, fowling pieces and rifles
to any person who is a minor under the age of twenty-one years." 1882 Md. Laws
656; *see also, e.g.*, 1875 Ind. Acts 59 (making it "unlawful for any person to sell,

---

[9] *See* No. 26, § 1, 1856 Ala. Acts 17; Ch. 548, § 1, 16 Del. Laws 716 (1881);
Ch. 159, § 5, 27 Stat. 116-17 (1892); No. CXXVIIII (O. No. 63.), § 1, 1876 Ga.
Acts And Resolutions 112; § 2, 1881 Ill. Laws 73; Ch. XL, § 1, 1875 Ind. Laws 59;
Ch. 78, § 1, 1884 Iowa Acts And Resolutions 86; Ch. CV, §§ 1-2, 1883 Kan. Sess.
Laws 159; Ky. Gen. Stat. ch. 29, art. 29, § 1, at 359 (1873); No. 46, § 1, 1890 La.
Acts 39, 39; Ch. 424, § 2, 1882 Md. Laws 656; Ch. 66, §§ 1-2, 1878 Miss. Laws
175; Mo. Rev. Stat. § 1274 (1879); Ch. 51, § 1, 1885 Nev. Stat. 51; Ch. 514, § 1,
1893 N.C. Pub. L. & Res. 468; § 2, 1856 Tenn. Acts 92; Ch. 155, § 1, 1897 Tex.
Gen. Laws 221-22; Ch. 135, § 1, 1882 W. Va. Acts 421-22; Ch. 329, §§ 1-2, 1883
Wis. Laws 290; Wyo. Rev. Stat. § 5052 (1899); *see also* Cornell Decl. ¶ 128 & Ex.
B; Woods Decl., Ex. 1 (Survey of Relevant Age Restrictions, Founding Era-1930s);
Spitzer Decl. ¶ 12 & Exs. I & J (identifying 44 local ordinances and state statutes
imposing age limits on possession, use, sale, or transfer from 1700s-early 1900s).

barter, or give to any other person, under the age of twenty-one-years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon").

The Reconstruction Era statutes are "relevantly similar" and often more burdensome to 18-to-20-year-olds' Second Amendment rights than Section 27510. The Reconstruction Era laws applied to handguns and other non-firearm types of concealable, deadly weapons like dirks and bowie knifes. *See, e.g.*, 1883 Wis. Sess. Laws 290 (covering only "pistol[s]" and "revolver[s]"); 1884 Iowa Acts 86 (covering only "pistol[s], revolver[s] or toy pistol[s]"); 1881 Ill. Laws 73 (covering only "pistol[s], revolver[s], derringer[s], bowie knife[s], dirk[s] or other deadly weapon[s] of like character").[10]  The Reconstruction Era statutes also often prohibited selling, giving, or loaning handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 630—to 18-to-20-year-olds.  Unlike many of these Reconstruction Era predecessors, Section 27510 leaves open avenues for 18-to-20-year-olds to acquire that "quintessential self-defense weapon." *Id.*[11]

As the Eleventh Circuit explained, the conclusion that restrictions on 18-20-year-olds "firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127, "finds further support from Reconstruction Era newspapers." *Bondi*, 2023 WL 2484818, at *10.  "Based on newspapers from the Reconstruction Era, historians have confirmed that the public did not understand the right to keep and bear arms to protect the rights of 18-to-20-year-olds to purchase such weapons. In fact, much of

---

[10] Notably, these Reconstruction Era age-limits statutes mirrored analogues in statutes from the early 1800s and Antebellum period prohibiting adults from carrying these same types of concealable weapons, which were considered to pose the most risk to the public at that time. *See* Rivas Decl. ¶¶ 35-41; Roth Decl. ¶¶ 34-38.  The earliest age limits laws appeared in city and town ordinances, with the earliest known, a New York City ordinance enacted in 1763, penalizing minors who discharged weapons in public places.  Spitzer Decl. ¶¶ 12.  Numerous city ordinances followed in the early 1800s through the Antebellum period, including some of the first age-based sales or transfer restrictions; these "early laws applying to cities and towns both reflected and presaged the effort to keep dangerous weapons out of the hands of minors in populated areas." *Id.* ¶ 13 & Exs. C, E-J.

[11] For further discussion of similarities between exemptions included in Reconstruction Era laws and Section 27510, *see* Rivas Decl. ¶¶ 10, 46-47.____

19

the public at the time supported restrictions." *Id.* (citing Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 (2019)). "It would be odd indeed if the people who adopted the Fourteenth Amendment did so with the understanding that it would invalidate widely adopted and widely approved-of gun regulations at the time." *Bondi*, 2023 WL 2484818, at *11.

State courts also "generally shared the public's approval of laws that prohibited providing handguns and other dangerous weapons to minors." *Id.* at *11. The Supreme Court of Tennessee, for example, "held [in 1871] that a statute that forbade openly carrying a pistol . . . violated the state constitutional provision (which the court equated with the Second Amendment)." *Heller*, 554 U.S. at 629 (citing *Andrews v. State*, 50 Tenn. 165, 187 (1871)). Just seven years later, the same court described Section 4864 of Tennessee's Code, which prohibited "the sale, gift, or loan of a pistol or other like dangerous weapon to a minor," as "not only constitutional . . . but wise and salutary in all its provisions." *State v. Callicutt*, 69 Tenn. 714, 716–17 (1878).

Based on its review of the historical record, the court in *Bondi* "distill[ed] two key points. First, several states burdened 18-to-20-year-olds' rights to keep and bear arms—both before and after the Fourteenth Amendment's ratification—by making it unlawful even to give or lend handguns and other deadly weapons to minors." 2023 WL 2484818, at *12. Indeed, "at least nineteen states and the District of Columbia banned the sale and even the giving or loaning of handguns and other deadly weapons to 18-to-20-year-olds by the close of the nineteenth century." *Id.* "Second, those states did so to enhance public safety." *Id.*

In light of these two points, Section 27510's restrictions on FFLs are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Section 27510 is no more restrictive than its historical predecessors: assuming the Second Amendment is implicated at all, *see supra* §

20

I(A), Section 27510 limits only the circumstances under which 18-to-20-year-olds may be sold or receive transfer of a firearm through a FFL, and it still leaves 18-to-20-year-olds free to acquire any type of firearm in legal ways.  And Section 27510, like historical laws, was designed to improve public safety and reduce gun violence, including by imposing increased regulations on particular weapons that pose significant risk to the public in the hands of people of this age group as new technologies emerge and drive rates of gun violence up.  *See, e.g.*, Woods Decl., Exs. 13-15, pp. 347-358; *see also* Spitzer Decl. ¶¶ 11, 18; *cf.* Klarevas Decl. ¶ 19 (noting that modern "18-20-year-old mass public shooters display a preference for long guns, particularly semiautomatic, centerfire rifles").

As in *Bondi*, Plaintiffs here point to Founding Era laws that required 18-to-20-year-olds to join the militia.  Like the Ninth Circuit panel and the plaintiffs in *Bondi* and *Reese*, Plaintiffs and their historian declarant, David Hardy, appear to view that obligation as evidence "that 18-to-20-year-olds had the right to an unimpeded ability to purchase firearms."  *Bondi*, 2023 WL 2484818, at *12; *accord* MPA at 12; ECF 21-11, Hardy Decl.  As in *Bondi*, this inference is mistaken.  "The fact that federal law obliged 18-to-20-year-olds to join the militia does not mean that 18-to-20-year-olds had an absolute right to buy arms."  *Bondi*, 2023 WL 2484818, at *12. "To the contrary, the historical record shows that merely being part of the militia did not entitle 18-to-20-year-olds to enjoy the same political and civil rights as adults."  *Id.* As Saul Cornell explains, "the claim that militia laws offer strong proof of the existence of a right possessed by minors to keep and bear arms . . . rests almost entirely on an ahistorical and anachronistic misreading of the original meaning of early militia statutes and a failure to acknowledge the common law status of minors as dependent, not independent legal actors."  Cornell Decl. ¶ 85; *accord id.* ¶¶ 23-24, 51-94, 153-154 (militia duty did not confer rights on those under 21; Plaintiffs' argument "confuses rights with obligations" and "conflates specific public policy choices" with "fixed constitutional principles").

## II. PLAINTIFFS FAIL TO ESTABLISH THAT THEY WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF

Plaintiffs have not established that they will suffer any irreparable harm in the absence of preliminary injunctive relief, because they have not shown that they are likely to succeed on their Second Amendment claim. *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Moreover, even if they could establish a likelihood of success on the merits, Plaintiffs still cannot show irreparable harm or that the balance of harms tips in their favor.

The Court's reasoning as to irreparable harm and the balance of the equities in its order denying Plaintiffs' motion for preliminary injunction remains sound under the governing precedent. *See Jones v. Becerra*, 498 F. Supp. 3d 1317, 1330–32 (S.D. Cal. 2020). Plaintiffs' mere assertion of constitutional injury is not adequate. *See Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction," even in the First Amendment context (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 112-13 (1983)); *Constructors Ass'n of W. Penna. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978) ("[U]nlike First Amendment rights whose deprivation even for minimal periods of time constitutes irreparable injury," denial of other rights "may be more or less serious depending on the other injuries which accompany such deprivation."). 18-20-year-olds still may purchase or receive transfer of any firearm other than a handgun, semiautomatic centerfire rifle, frame or receiver, or firearm precursor part by procuring a hunting license. *Jones*, 498 F. Supp. 3d at 1331; Cal. Penal Code § 27510(b)(1). And evidence shows that 18-20-year-olds *do* make ample use of the available exemptions, purchasing thousands of firearms (including semiautomatic centerfire rifles) each year: between January 1, 2020, and March 3, 2023, the Department of Justice approved 16,101 long gun sales or transfer transactions for 18-20-year-olds through FFLs. *See* Leyva-Chavez Decl. ¶¶ 8-9. Even the Ninth Circuit panel found no error in the

22

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

Court's previous conclusion that there was no irreparable harm as to the hunting license requirement, and affirmed the Court's denial of preliminary injunction as to that requirement.  *Jones*, 34 F.4th at 732–33.

Moreover, Plaintiffs still have provided *no* declaration or allegation—in the SAC or in their preliminary injunction papers—that any of the named individual Plaintiffs or unnamed members of the public potentially represented by the institutional or firearms dealer and shooting range plaintiffs actually wished to purchase any particular firearm; that any Plaintiff or represented member of the public could not acquire a firearm of their choosing through a parent, grandparent, or spouse (or that they had tried do so); that any Plaintiff or represented member of the public even attempted to *seek out* firearms training or target practice opportunities at a shooting range or gun club, where they could be loaned a firearm for purposes of target and safe handling practice; or that any Plaintiff or represented member of the public attempted to, but could not, enroll in a hunter education course or procure a hunting license.  *See* ECF 25, at 27; *see generally* SAC; ECF Nos. 21-2, 21-3, & 21-4.[12]  And Plaintiffs cannot show any hardship in finding or signing up for a hunter education course; in February and March 2023, hundreds of seats were available in such classes throughout Southern California—including courses offered by Plaintiffs' declarant, David Bogan.  Woods Decl., Exs. 7 & 8.

### III. THE OTHER EQUITABLE CONSIDERATIONS WEIGH HEAVILY AGAINST PRELIMINARY INJUNCTIVE RELIEF

The other equitable considerations tip sharply against relief.  A district court "must balance the competing claims of injury and consider the effect of granting or withholding the requested relief," paying "particular regard for the public

---

[12] Plaintiffs submit declarations from two new prospective plaintiffs, Jose Chavez and Andrew Morris.  (ECF 103-2, 103-3.)  Both state that they "do not currently own any firearms but wish to purchase at least one, such as a shotgun or rifle (including a centerfire semiautomatic rifle) for self-defense and other lawful purposes."  (ECF 103-2 ¶ 5, 103-3 ¶ 5.)  Neither alleges that he cannot procure a firearm of his choosing through an intrafamilial transfer, nor that he attempted to but could not take a hunter education course or procure a hunting license.

23

Defs.' Opp. to Pls.' Mot. for Prelim. Injunction or Summary Judgment (3:19-cv-01226-L-AHG)

consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).  Importantly, the balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Indeed, "[t]he Ninth Circuit instructs that when balancing the hardships 'of the public interest against a private interest, the public interest should receive greater weight.'" *Rupp v. Becerra*, 2018 WL 2138452, at *13 (C.D. Cal. May 9, 2018) (denying preliminary injunction regarding provisions of California's Assault Weapons Control Act and citing to *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999)).

Plaintiffs have provided no basis for concluding that the balance of the equities, including the public interest, tips in their favor any more now than it did in 2020.  The Court's prior conclusion remains apt:  "The potential harm of enjoining a duly-enacted law designed to protect public safety outweighs Young Adults' inability to secure the firearm of their choice without proper training." *Jones*, 498 F.Supp.3d at 1332 (citing *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*, 637 Fed.Appx. 401 (9th Cir. 2016) (holding that "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave.").

The safety risk to the public is real.  Since 2020, when this Court last considered this challenge, 18-20-year-olds have been involved in several additional mass shootings involving semiautomatic centerfire rifles.  Those shootings have led to the deaths of dozens of children and adults, including the May 2022 shootings at Robb Elementary School in Uvalde, Texas (21 killed) and a supermarket in Buffalo, New York (10 killed), and the April 2021 shooting at a FedEx facility in Indianapolis, Indiana (8 killed).  Donohue Decl. ¶¶ 32-33.  Indeed, although 18-to-20-year-olds make up less than 4% of the population, they make up more than 15% of homicide and manslaughter arrests, and have perpetrated 20% of all of the mass shootings leaving double-digit fatalities in recorded U.S. history, Klarevas Decl. ¶

16 & n.9.  Following the massacre in Uvalde, data show that 40% of all mass public shootings at K-12 schools involved 18-20-year-old shooters.  *Id.* ¶ 33.[13] The challenged laws directly address these serious public safety risks, because they help to ensure that individuals who are between 18 and 20, who may still lawfully possess, use, and in some cases acquire semiautomatic centerfire rifles and other long guns, do so safely after adequate training, under the supervision of a more senior family member, or in the context of law enforcement or military training. Due to their relative neurobiological immaturity in late adolescence, many 18-20-year-olds "demonstrate difficulties in exercising self-restraint, controlling impulses, considering future consequences, making decisions independently from their peers, and resisting the coercive influence of others" and they are "especially at risk for violence, suicide, nonsuicidal self-injury, and excessive drinking."  Woods Decl., Ex. 5 (Expert Report of L. Steinberg), ¶¶ 26, 36, 38.  Thus, restrictions on their ability to purchase semiautomatic centerfire rifles and other long guns "are likely to reduce various forms of firearms violence, including suicide, non-fatal self-injury, homicide, non-fatal firearms violence, and other gun-related crimes."  *Id.* ¶ 26.[14]

Any modest inconvenience 18-20-year-olds may experience in procuring a hunting license in order to purchase a long gun, or lawfully securing a firearm through a non-FFL transfer while this Court considers the merits of Plaintiffs' claims, do not outweigh the public safety interests Section 27510's restrictions promote.  The law, balance of harms, and public interest all weigh decisively against entry of a preliminary injunction here.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

---

[13] In fact, the latest national FBI data shows that in 2019, "the single most homicidal age group in the nation was age 19," followed by ages 18 and 20. Donohue Decl. ¶ 19 & Ex. B, p. 32.

[14] *See also* Donohue Decl. ¶¶ 55-81; *cf.* Allen Decl. ¶¶ 25, 28-29.

1   Dated:  March 16, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
S. CLINTON WOODS
Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General

/s/ *Jennifer E. Rosenberg*
JENNIFER E. ROSENBERG
Deputy Attorney General
*Attorneys for Defendants Rob Bonta,
in his official capacity as Attorney
General of the State of California,
and Allison Mendoza, in her official
capacity as Acting Director of the
Department of Justice Bureau of
Firearms*

26